**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | | |
|---|---|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. | **19-34054-SGJ11** | |
| **Charitable DAF Fund, L.P et al** | | | | |
| Appellant | § | | | |
| vs. | § | 21-03067 | | |
| **Highland Capital Management, L.P** | § | | | |
| | § | | | |
| Appellee | § | **3:23-CV-01503-B** | | |

   **[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.**

# Volume 4

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.    STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.    DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.    Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2.    The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.    Docket Sheet kept by the Bankruptcy Clerk.

4.    Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|-----|-----------|-----------|---------------------------|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-B from U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7* *001203* *Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001905 thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17 003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| Vol. 18 00363 7 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
|---|---|---|---|---|
| 00 3666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| 0038 43 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 00 3844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 00385 1 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| Vol. 19 003882 Thru Vol 20 | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| Vol. 21 004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 *Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6_Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

| | | | | |
|---|---|---|---|---|
| *Vol. 28 006130* | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
| *006133 Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32 006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| | | | | |
|---|---|---|---|---|
| *006961* | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| **Vol. 33** | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

**Counsel for Appellants**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

---

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01802-B   Document 23-4 Filed 09/11/2374 Page 14 of 213   PageID 564

6

1          THE COURT:  Yes?

2          MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

3     Weisgerber from Debevoise on behalf of HarbourVest.

4          THE COURT:  Okay.

5          MS. WEISGERBER:  And I'm joined by Natasha Labovitz

6     and Dan Stroik --

7          THE COURT:  Okay.

8          MS. WEISGERBER:  -- from Debevoise as well.

9          THE COURT:  Thank you.  I was neglectful in not

10    getting your appearance, because, of course, you're at the

11    front and center of this motion to compromise, and I did see

12    that you filed a reply brief yesterday afternoon.  Okay.

13    Thank you.

14       All right.  Do we have -- do we have Mr. Dondero on the

15    line?  I'm going to check again.

16       (No response.)

17          THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18    so please unmute your device.

19          MR. WILSON:  Your Honor, it appears to me that Mr.

20    Dondero's device was unmuted as soon as you asked if he was

21    available.  I sent him a communication a second ago asking if

22    he's having technical difficulties.  I have not received a

23    response, so I --

24          MR. DONDERO:  Hello.  Can anybody hear me?

25          THE COURT:  Oh.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-00803-B   Document 28-14   Filed 09/18/24   Page 18 of 213   PageID 565

7

1        MR. WILSON:  Okay.  I hear him.

2        THE COURT:  Mr. Dondero?

3        MR. DONDERO:  Hello?

4        THE COURT:  Is that you?

5        MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6   everything since the beginning.  It's just we've had technical

7   difficulties.  I couldn't use the Highland offices.  We've

8   been trying to set up something else.

9        THE COURT:  All right.

10       MR. DONDERO:  But I'm on now, if -- yes.

11       THE COURT:  All right.  Very good.  Well, I'm glad

12  we've got you.

13     All right.  Well, Mr. Pomerantz, how did you want to

14  proceed this morning?

15       MR. POMERANTZ:  Your Honor, we could take up the

16  HarbourVest motion first, and I will turn it over to John

17  Morris.  He and Greg Demo will be handling that.  And then

18  after that we can handle the other motion, which is unopposed.

19       THE COURT:  All right.  Mr. Morris?

20       MR. KANE:  Your Honor, this is -- sorry.  This is

21  John Kane for CLO Holdco.  Just very briefly, if I may.  And

22  this will affect, I think, the Debtor's case in chief, so I'll

23  expedite things a little bit, I believe.

24     CLO Holdco has had an opportunity to review the reply

25  briefing, and after doing so has gone back and scrubbed the

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01803-B    Document 28-14    Filed 09/19/24    Page 16 of 213    PageID 566

8

1    HCLOF corporate documents.  Based on our analysis of Guernsey

2    law and some of the arguments of counsel in those pleadings

3    and our review of the appropriate documents, I obtained

4    authority from my client, Grant Scott, as Trustee for CLO

5    Holdco, to withdraw the CLO Holdco objection based on the

6    interpretation of the member agreement.

7               THE COURT:  All right.  Well, thank you for that, Mr.

8    Kane.  I think that -- that eliminates one of the major

9    arguments that we had anticipated this morning.  So, thank you

10   for that.

11       Any other housekeeping matters that maybe someone had that

12   I didn't ask about?

13               MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca

14   Matsumura from King & Spalding representing Highland CLO

15   Funding, Ltd.  I just wanted to put on the record, we -- our

16   client had requested that some of its organizational documents

17   be filed under seal.  But we have given permission for the

18   parties to present the relevant excerpts, to the extent it's

19   still relevant after Mr. Kane's announcement, in court.  And

20   we'd just ask that the underlying documents remain sealed, but

21   we're not going to object if they show them on a PowerPoint or

22   anything like that.

23       So, to the extent that you had that on your radar, I just

24   wanted to clear that up for the proceedings.

25               THE COURT:  All right.  Well, I did sign an order

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 09/03/24   Page 17 of 213   PageID 7675

9

```
1    late last night.  I don't know if it's popped up on the
2    docket.
3              MS. MATSUMURA:  Yes, Your Honor.  That's what this
4    referred to.  That was what -- these are the documents that
5    were being sealed.  And so I just wanted to note, if you --
6    you know, if the Debtor puts up an excerpt of those documents
7    and you're like, wait a minute, didn't I seal those, that we
8    were the party that requested them be under seal and we're
9    fine with them being shown in court, as long as the underlying
10   documents aren't publicly accessible.
11             THE COURT:  Okay.  Got you.  Thank you.
12        All right.  Any other housekeeping matters?
13             MR. MORRIS:  Yes, Your Honor.  This is John Morris
14   from Pachulski Stang for the Debtor.  Good morning.
15             THE COURT:  Good morning.
16             MR. MORRIS:  The only other matter that I wanted to
17   raise, and I can do it now or I can do it later, or Your Honor
18   may tell me that it's not appropriate to do at this time, is
19   to schedule the Debtor's motion to hold Mr. Dondero in
20   contempt for violation of the TRO.
21             THE COURT:  All right.  Well, let's do that at the
22   conclusion today.  And please make sure I do it.  I think I
23   was going to address this last Friday, and we went very late
24   and it slipped off my radar screen.  But I did see from my
25   courtroom deputy that you all were reaching out to her
```

000573

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 22-44    Filed 09/11/23    Page 18 of 213    PageID 7686

10

1   yesterday to get this set, and then Mr. Dondero's counsel

2   reached out to her and said, We're going to file an objection

3   to a setting next Wednesday, or I think you had asked for a

4   setting next Tuesday or Wednesday.

5          MR. MORRIS:  I did.

6          THE COURT:  And I don't -- I don't know if that

7   response/objection was ever filed last night.  I haven't seen

8   it if it was.  So, we'll -- please, make sure I don't forget.

9   We'll take that up at the end of today's matters.  All right.

10  Well, --

11         MR. MORRIS:  All right.  So, --

12         MS. WEISGERBER:  Your Honor, one last housekeeping

13  item from -- I'm joined this morning by Michael Pugatch of

14  HarbourVest, who will present some testimony this morning.  I

15  just want to confirm he's on the line and confirm no

16  objections to him sitting in for the rest of the hearing.

17         THE COURT:  All right.  Mr. Pugatch, this is Judge

18  Jernigan.  Could you respond?  Are you there with us?

19         MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20  Pugatch from HarbourVest here.

21         THE COURT:  All right.  Very good.  I think we had

22  you testify once before in the Acis matter, if I'm not

23  mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24  I can't remember.

25       All right.  So, we're going to let Mr. Pugatch sit in on

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/10/23 174    Page 19 of 213    Page ID 7697

11

1    this.  Anyone want to say anything about that?  I consider him

2    a party representative, so I don't -- I don't think anyone

3    could invoke the Rule.

4        All right.  Very good.  Well, let's go forward if there

5    are no more housekeeping matters.

6            MR. MORRIS:  Okay.

7            THE COURT:  Mr. Morris?

8            MR. MORRIS:  Thank you.  Thank you very much, Your

9    Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10   Debtor.

11       It's a rather straightforward motion today.  It's a motion

12   under Rule 9019, pursuant to which the Debtor requests the

13   Court's authority and approval to enter into a settlement

14   agreement with HarbourVest that will resolve a number of

15   claims that HarbourVest has filed against the Debtor.

16       What I -- the way I propose to proceed this morning, Your

17   Honor, is to give what I hope is an informative but relatively

18   brief opening statement.  I'll defer to HarbourVest and its

19   counsel as to whether they want to make a presentation in

20   advance of the offer of evidence.  Any objecting party, I

21   suppose, should then be given the opportunity to present their

22   case to the Court.  Then the Debtor will call Jim Seery, the

23   Debtor's CEO and CRO.  We will offer documents into evidence.

24   I would propose then that the objecting parties take the

25   opportunity to ask Mr. Seery any questions they'd like on the

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-44    Filed 09/30/23    Page 20 of 213    PageID 5703

12

1 matter.

2      After the Debtor rests, I think HarbourVest would like to

3 put Mr. Pugatch on the stand to offer some testimony on their

4 behalf.  And I think that that will conclude the case.  We can

5 finish up with some closing arguments as to what we believe

6 the evidence showed, but that's the way that I'd like to

7 proceed, if that's okay with the Court.

8           THE COURT:  All right.  That sounds fine.

9           OPENING STATEMENT ON BEHALF OF THE DEBTOR

10           MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11 is a -- this should be a very straightforward motion under

12 Rule 9019.  The standard is well-known to the Court.  There

13 are four elements to a 9019 motion.  The Debtor clearly has

14 the burden of proof on each one.  And we easily meet that

15 burden, Your Honor.

16      The standard, just to be clear, the first part is that we

17 have to establish a probability of success, with due

18 consideration for uncertainty of law and fact.  The second one

19 is the complexity, likely duration, expense and inconvenience

20 of the litigation.  The third part of the test is the

21 paramount interest of creditors.  And the fourth part of the

22 test is whether or not the proposed settlement was reached

23 after arm's-length negotiations.

24      The Debtor believes that it easily meets this standard,

25 and frankly, is a little bit frustrated that it's being forced

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/14/23   Page 21 of 213   PageID 5719

13

1    to incur the expense by Mr. Dondero in going through this

2    process.

3        A plain reading, a fair reading of the economics here

4    relative to the claim shows that this is a very reasonable

5    settlement.  I don't need to go beyond that, Your Honor.  I

6    don't even need to use the word reasonable.  It surely meets

7    the lowest standard.

8        We've prepared a couple of demonstrative exhibits, Your

9    Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10   just put one up on the screen now, if I may.

11       Ms. Canty, can you please put up Demonstrative Exhibit #3?

12       Demonstrative Exhibit #3 is an outline of the economics of

13   the settlement.  It includes the various pieces, the

14   components that the parties have agreed to.  And it shows, at

15   least from the Debtor's perspective, just what HarbourVest is

16   being given here.

17       Up on the screen is a demonstrative exhibit.  It has

18   citations to the evidence that will be admitted by the Court.

19   The first line shows that HarbourVest will receive a $45

20   million allowed general unsecured nonpriority claim.  And that

21   -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22   Page 2.

23       That claim is discounted by the expected recovery that

24   general unsecured creditors are supposed to get.  As of

25   November, in the liquidation analysis that was part of the

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/16/23174   Page 22 of 213   PageID 572

14

1  disclosure statement -- that's the citation in the footnote --

2  the Debtor believed that unsecured creditors were estimated to

3  recover approximately eighty-seven and a half cents on the

4  dollar.  And so we just did the arithmetic there to get to the

5  net economic value of the proposed general unsecured claim.

6      And from that, we reduced $22-1/2 million because that is

7  the net asset value of HarbourVest's interest in HCLOF, which,

8  pursuant to the settlement agreement, it will transfer back to

9  the Debtor, so that the net economic value is approximately

10  $16.8 million.

11     You will hear testimony from Mr. Seery that this number

12  is, in fact, overstated, and it's overstated because, since

13  the time the disclosure statement was filed in November, a

14  number of events have occurred that will -- that have caused

15  the estimated recovery percentage to be reduced from

16  approximately 87-1/2 percent to something lower than that.  We

17  don't have the exact number, Your Honor, but Mr. Seery will --

18  and the evidence will show that there's been more expenses,

19  that there's been some resolution of certain claims.  There's

20  been some positive issues, too.  But that number is probably

21  in the 70s somewhere.

22     And in any event, I think the point here is, Your Honor,

23  HarbourVest invested $80 million in HCLOF, which was going to

24  participate in the investment in CLOs.  They filed a claim for

25  $300 million, through treble damages and other claims.  But

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-4   Filed 09/16/23   Page 23 of 213   PageID 5731

15

1   the net economic impact of this is going to be somewhere

2   probably in between $12 and $14 million.  I'll let Mr. Seery

3   give more precision to that.  And it represents less than -- a

4   less than five percent recovery on the total claim.

5        And we think it's important for the Court to keep that in

6   mind.  What are the economics here?  Are we overpaying?  Is

7   this an unreasonable settlement?  And I think the evidence

8   will show that the Debtor is not, but that this settlement

9   that you see before you was the product of arm's length, and

10  I'm going to go in reverse order of the four-part test under

11  9019.

12       So, the last part is whether or not the settlement, the

13  proposed settlement was the product of arm's-length

14  negotiation.  You'll hear lots of evidence that this

15  settlement that's up on the screen right now very much was the

16  product of arm's-length negotiation.

17       The third part of the test, Your Honor, is whether it

18  meets the paramount interest of creditors.  You know,

19  regrettably, Mr. Dondero is the only purported creditor who is

20  objecting here.  He may have done so through different

21  vehicles, but every objecting party here is a debtor [sic]

22  owned and controlled by Mr. Dondero.  No other creditor -- not

23  the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24  -- nobody is objecting to this settlement except for Mr.

25  Dondero.  And we believe that that highlights the Debtor's

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B   Document 48-14   Filed 09/16/23   Page 24 of 213   PageID 7542

16

1    ability to meet the third prong of the test, and that is these

2    are -- this settlement is in the paramount interest of

3    creditors.

4         Again, going in reverse, the second part of the test is

5    the complexity, duration, and expense of litigation.  There

6    will be no disputed evidence that we meet -- the Debtor easily

7    meets this prong of the test.  The evidence is going to show

8    that HarbourVest's claim is based on fraud, fraud in the

9    inducement, fraudulent statements and omissions, the kind of

10   case, Your Honor, that I'm sure you're familiar with that is

11   incredibly fact-intensive, that will be incredibly difficult

12   to navigate through.  It will be prolonged, it will be

13   expensive, because you're necessarily relying on he said/she

14   said, basically.  And so we're going to have to get testimony

15   from every person that spoke in connection with the events

16   leading up to the transaction.  So we think the second prong

17   will be easily met, Your Honor.

18        And then the last prong -- the first prong, if you will --

19   is the likelihood of success on the merits.  We think that the

20   settlement, the economic recovery that's up on the screen

21   here, which ultimately will be less than five percent of the

22   claimed amount, in and of itself shows that the settlement is

23   consistent with the Debtor's perception of its likely success

24   on the merits.  I'm certain that HarbourVest disagrees, but

25   that's okay, we're here today and that's the Debtor's view,

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/30/23   Page 25 of 213   PageID 7573

17

1    and the Court is here to assess the Debtor's business judgment

2    and whether the Debtor has properly analyzed the issues and

3    gone through the process.  And the evidence will show

4    conclusively that it will.  That it has.

5        Mr. Seery will testify at some length as to the risks that

6    he saw.  I think that you'll hear counsel for Mr. Dondero ask

7    both Mr. Seery and Mr. Pugatch a number of questions designed

8    to elicit testimony about this defense or that defense.  And

9    it's a little -- it's a little ironic, Your Honor, because,

10   really, every defense that they're going to try to suggest to

11   the Court was a valid defense is a defense that the Debtor

12   considered.  In fact, it's, you know, it's a little spooky,

13   how they've -- how they've been able to identify kind of the

14   arguments that the Debtor had already considered in the

15   prosecution of their objections here.

16       But be that as it may, the evidence will conclusively show

17   that the Debtor acted consistent with its fiduciary duties,

18   acted in the best interests of the Debtor's estate, acted

19   completely appropriately here in getting yet another very

20   solid achievement for the Debtor, leaving very few claims that

21   are disputed at this point, all but one of which I believe are

22   in the hands of Mr. Dondero.

23       So, that's what we think that the evidence will show.

24       I do want to express my appreciation to Mr. Kane for

25   reflecting on the arguments that we made with respect to the

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 01/16/24   Page 26 of 213   PageID 7524

18

1    ability of the Debtor to engage in the transfer or the

2    acquisition of the asset from HarbourVest.  I would -- I would

3    respectfully request that we just enter into a short

4    stipulation on the record reflecting that the Debtor's

5    acquisition of HarbourVest's interests in HCLOF is compliant

6    with all of the applicable agreements between the parties.

7         And with that, Your Honor, I look forward to putting Mr.

8    Seery on the stand and presenting the Debtor's case.

9              THE COURT:  All right.  Other opening statements?

10              OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11              MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12    behalf of CLO Holdco.

13         In response to Mr. Morris, I'm not going to enter into a

14    stipulation on behalf of my client, but the Debtor is

15    compliant with all aspects of the contract.  We withdrew our

16    objection, and we believe that's sufficient.

17              THE COURT:  All right.  Well, I'm content with that.

18         Other opening statements?

19               OPENING STATEMENT ON BEHALF OF HARBOURVEST

20              MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21    behalf of HarbourVest.

22         HarbourVest joins in Mr. Morris's comments in support of

23    the settlement, and we believe that the question of whether

24    the settlement between HarbourVest and the Debtor satisfies

25    the Rule 9019 standard is not even a close one.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/29/23   Page 27 of 213   PageID 7525

19

1        Some Objectors have made arguments about the merits of

2   HarbourVest's claims, which is why we're here.  As Your Honor

3   will hear this morning, HarbourVest has meaningful and

4   meritorious claims against Highland, but made the business

5   decision to avoid the time, expense, and inherent risk of

6   litigation in the interest of preserving value, both for

7   itself and for the estate.

8        Today, Michael Pugatch, a managing director of

9   HarbourVest, will testify before the Court.  He'll explain

10  that HarbourVest claims against Highland arise out of certain

11  misrepresentations and omissions by Highland to HarbourVest in

12  connection with HarbourVest's purchase of an interest in

13  HCLOF, one of Highland's managed funds.  Those

14  misrepresentations and omissions, as Your Honor will hear,

15  relate to Highland's litigation with its former employee,

16  Joshua Terry, and transfers that were conducted in 2017 to

17  strip Acis of value and prevent Mr. Terry from collecting on

18  an $8 million judgment.

19       Mr. Pugatch will further explain that HarbourVest would

20  not have invested in HCLOF had it known the underlying facts

21  about those Acis transfers.

22       Mr. Pugatch will also testify that not only did

23  HarbourVest not know about those transfers, it learned about

24  those transfers when it was accused of orchestrating the

25  transfers itself in the Acis bankruptcy.  Your Honor will hear

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 09/11/23   Page 28 of 213   PageID 5726

20

1 │ that the Acis trustee sought extensive discovery from

2 │ HarbourVest after numerous accusations that HarbourVest was

3 │ behind the transfers.

4 │     Mr. Pugatch will also testify that Highland charged legal

5 │ fees for itself and its affiliates to HCLOF, essentially

6 │ forcing HCLOF to fund the litigation involving the Acis

7 │ bankruptcy and Mr. Terry.

8 │     In total, HarbourVest's claims for damages are over a

9 │ hundred million dollars in investment-related losses, lost

10 │ profits, legal fees inappropriately charged to HCLOF, its own

11 │ legal fees.  And that's before interest or trebling damages.

12 │     But HarbourVest stands ready to litigate its claims, but

13 │ following hard-fought and extensive negotiations with the

14 │ Debtors, the parties reached the settlement that's now before

15 │ the Court.  Mr. Pugatch's testimony regarding the strong

16 │ factual bases for HarbourVest's claims against Highland and

17 │ its recoverable damages will further underscore the risks that

18 │ the Debtors faced if they chose to litigate these claims, and

19 │ why this settlement is fair, equitable, and in the best

20 │ interest of the estate.

21 │         THE COURT:  All right.  Thank you, Counsel.

22 │     Other opening statements?

23 │   OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24 │         MR. DRAPER:  Your Honor, this is Douglas Draper on

25 │ behalf of one of the Objectors.  I'd like to just make a few

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 09/22/23   Page 29 of 213   PageID 5797

21

1   comments with respect to what I've heard and what the Court is

2   going to hear.

3       The first issue I'd like to address is the comment by

4   counsel for the Debtor that no other party has objected.  The

5   9019 motion is one of the issues that this Court has to rule

6   on, whether or not there was an objection or not.  So the fact

7   that this may be -- bankruptcy is not a popularity contest and

8   not an issue of who votes for what and doesn't vote.  This,

9   along with the 1129(a) tests, are clearly within your

10  province, and you need to listen carefully because you'll have

11  to make your own independent analysis whether my objection is

12  correct or incorrect.

13      Two other points I'd like to make that I think are very

14  salient.  Number one is, if you look at the Debtor's

15  disclosure statement, it basically took the position that the

16  HarbourVest claim is of little or no value.  And lo and

17  behold, thirty days later, there's a settlement that brings

18  about a significant recovery to HarbourVest.  The timing is

19  interesting, and I think the Court needs to pay careful

20  attention to what transpired between the two dates.

21      And then the last point I'd like to make is, as you listen

22  to the evidence, and what I learned abundantly clear from

23  hearing the depositions, is that the claim of HarbourVest, if

24  there is a claim at all, is probably one hundred percent --

25  should be subordinated in that it appears to arise out of the

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-14    Filed 09/30/23    Page 30 of 213    PageID 7808

22

1   purchase or sale of a security.  And, again, I would ask the

2   Court to listen carefully to this because that's what it

3   appears to be and that's what the evidence is going to show to

4   the Court.

5           THE COURT:  All right.  Mr. Draper, let me clarify

6   something I'm not sure if I heard you say or not.  Were you

7   saying that the Court still needs to drill down on the issue

8   of whether the Debtor can acquire HarbourVest's interest in

9   HCLOF?

10          MR. DRAPER:  No.

11          THE COURT:  Okay.  I was confused whether you were

12  saying I needed to take an independent look at that, now that

13  the objection has been withdrawn of Holdco.  You are not

14  pressing that issue?

15          MR. DRAPER:  No, I am not.  Basically, I think it's

16  the fairness of the settlement.  I think the transferability

17  of the interest is separate and apart from the fairness of the

18  settlement itself.  I think the fairness -- the

19  transferability was a contractual issue between two parties

20  that the Court does not have to drill down on.

21          THE COURT:  All right.  I have another question for

22  you.  I want to clarify your client's standing.  Tell me --

23  I'm looking through a chart I printed out a while back.  I

24  guess Dugaboy Investment Trust filed a couple of proofs of

25  claim; is that right?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 23-14   Filed 09/21/23   Page 31 of 213   PageID 7829

23

1            MR. DRAPER:  Yes.

2            THE COURT:  Okay.  What --

3            MR. DRAPER:  And objections are pending.

4            THE COURT:  Pardon?

5            MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7            THE COURT:  Okay.

8            MR. DRAPER:  -- and have not been litigated.

9            THE COURT:  And what about Get Good Trust?

10           MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12           THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16           MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22        And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25        The second part to the Dugaboy ownership is we own an

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 18-14   Filed 09/25/23   Page 32 of 213   PageID 7832

24

 1   interest in the Debtor.  And so we are, in fact, a party in

 2   interest.

 3            THE COURT:  Okay.

 4            MR. DRAPER:  It may be a small interest, but it is an

 5   interest.

 6            THE COURT:  It has a limited partnership interest in

 7   the Debtor?

 8            MR. DRAPER:  Yes.

 9            THE COURT:  Is that correct?

10            MR. DRAPER:  Yes.

11            THE COURT:  Okay.  Well, I'll move forward.  Thank

12   you.

13       Does that cover -- any other opening statements?  I think

14   that covered everyone who was -- who filed some sort of

15   pleading today.  No.

16            MR. WILSON:  Your Honor, John Wilson on behalf of --

17            THE COURT:  I'm sorry.  I'm sorry.

18            MR. WILSON:  -- Mr. Dondero.

19            THE COURT:  I missed Mr. Dondero's counsel.  I knew

20   we had visited at some point this morning.  I just got

21   confused there.  Go ahead, Mr. Wilson.

22            MR. WILSON:  No problem, Your Honor.  I was just

23   going to say that we will reserve our comments until after the

24   conclusion of the testimony.

25            THE COURT:  All right.  Very well.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/26/23   Page 33 of 213   PageID 7831

25

1    Mr. Morris, you may call your first witness.

2            MR. MORRIS:  Thank you, Your Honor.  Before I do,

3    just two very, very quick points.

4            THE COURT:  Okay.

5            MR. MORRIS:  To be clear, Dugaboy's interest in the

6    Debtor is 0.1866 percent.  Less than two-tenths of one

7    percent.

8        Secondly, the argument that Mr. Draper just made with

9    respect to subordination is one that appears in nobody's

10   papers.  And, in fact, not only doesn't it appear in anybody's

11   papers, but Mr. Dondero, I believe, specifically took issue

12   with the fact that a portion of the consideration that

13   HarbourVest would receive would be on a subordinated basis,

14   and he would -- and I think he took the position there is no

15   basis to give them a subordinated claim.

16       So, I just wanted to point those items out to the Court,

17   not that I think either one makes a large difference today,

18   but I do want to deal with the facts.

19           THE COURT:  Thank you.

20           MR. MORRIS:  The Debtor would call -- you're welcome,

21   Your Honor.  The Debtor calls Mr. James Seery.

22           THE COURT:  All right.  Mr. Seery, welcome back to

23   virtual court.  If you could say, "Testing, one, two" so I can

24   see you and swear you in.

25           MR. SEERY:  Testing, one, two.

1          THE COURT:  All right.  I heard you but I'm not yet

2    seeing your video.  Is your video turned on?

3          MR. SEERY:  Video is on.  Yes, Your Honor.

4          THE COURT:  Okay.  I see you now.  Please raise your

5    right hand.

6          JAMES SEERY, DEBTOR'S WITNESS, SWORN

7          THE COURT:  Thank you.  Mr. Morris?

8          MR. MORRIS:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. MORRIS:

11   Q    Good morning, Mr. Seery.  Can you hear me?

12   A    I can.  Thank you, Mr. Morris.

13   Q    Okay.  Let's just cut to the chase here.  Are you familiar

14   with HarbourVest's claims filed against the Debtor?

15   A    I am, yes.

16   Q    And did you personally review them?

17   A    I did, yes.

18   Q    Do you recall that over the summer the Debtor objected to

19   HarbourVest's claim?

20   A    Yes, we did.

21   Q    Why -- can you explain to the judge why Harbour -- why the

22   Debtor objected to HarbourVest's claim last summer?

23   A    Sure.  The HarbourVest claims, I believe there are about

24   six of them, initially were filed, and they were -- they were

25   relatively vague in terms of what the specifics of the claims

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-14    Filed 09/28/23    Page 35 of 213    PageID 7835

                                    Seery - Direct                           27

 1   were.

 2        So, we saw the claims but didn't, frankly, pay a lot of

 3   attention to the underlying transaction that was referred to

 4   in the proofs of claim and the losses that HarbourVest had

 5   claimed to suffer -- to suffer with respect to their purchase

 6   of securities related to HCLOF and the damages caused by the

 7   Acis case.  So we filed a pretty pro forma objection.  I

 8   believe it was a simply stated objection that we didn't have

 9   any record that there was anything in the Debtor's books and

10   records that they had a valid claim for any amount against the

11   Debtor.

12   Q    Are you aware that HarbourVest subsequently filed a

13   response to the Debtor's objection to their claims?

14   A    Yes.  Yes, I am aware.

15   Q    And did you familiarize yourself with that particular

16   response?

17   A    I did indeed.  It was a pretty extensive response, really

18   developing the full panoply of their claims, which included

19   claims for expenses relating to the Acis case, which

20   HarbourVest viewed as being improperly charged to HCLOF by its

21   manager, which is effectively Highland.  Those expenses,

22   HarbourVest took the view, were excessive, had nothing to do

23   with the investment, and were simply a pursuit of a personal

24   vendetta against Mr. Terry and his interests by Mr. Dondero,

25   and using HCLOF's money to actually pursue those interests.

1     In addition, and this was the first time we saw that,

2  HarbourVest brought forth its claims that it was entitled to

3  effectively rescind the transaction.  And I say rescind the

4  transaction:  In security parlance, they claim that they were

5  induced by fraud, I think as most are -- to enter into the

6  transaction.

7     As most are aware, the liability limitations in the OMs

8  and the exculpation in the documents are pretty broad, and

9  HarbourVest's position was that they weren't going to be

10 subject to those limitations because the actual transaction

11 that they entered into was a fraud on them, designed by Mr.

12 Dondero, Mr. Ellington, and the Highland team.

13 Q   All right.  Let's talk about your understanding, the

14 Debtor's understanding of the factual background to

15 HarbourVest's claim.  What is your understanding of the

16 investment that HarbourVest made?

17 A   Well, HarbourVest made an investment in the Highland CLO

18 business.  The Highland CLO business was -- was Acis.  And

19 effectively, the business had been separated, but in name

20 only.  Acis was just a shell, with a few partners --

21 obviously, Mr. Terry as well -- but it was all Highland

22 personnel doing all the work.

23     And what they were trying to do with Acis was, in essence,

24 resuscitate a business that had been in a bit of a decline

25 from its pre-crisis heyday.

1       They were looking to take additional outside capital.

2   They would -- they would pay down or take money out of the

3   transaction, Highland would, or ultimately Mr. Dondero, and

4   they would -- they would seek to invest in Acis CLOs,

5   Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6   and potentially new CLOs, but with the Acis CLOs, they'd seek

7   to reset those and capture what they thought would be an

8   opportunity in the market to -- to really use the assets that

9   were there, not have to gather assets in the warehouse but be

10  able to use those assets to reset them to market prices for

11  the liabilities and then make money on the equity.

12  Q    Do you have an understanding --

13  A    Then --

14  Q    I'm sorry.  Go ahead.

15  A    Why don't I continue?  So, the transaction, they found

16  HarbourVest as a potential investor, and the basis of the

17  transaction was that they would make an investment into Acis.

18       Shortly before the transaction, and while they were doing

19  diligence, Mr. Terry received his arbitration award.  I

20  believe that was in October of 2017.  The transaction with

21  HarbourVest closed in mid- to late November of 2017.  But Mr.

22  Terry was not an integral part.  Indeed, he wasn't going to be

23  a key man.  He had been long gone from Highland by that time.

24       What the -- I think you asked me originally what the basis

25  of their claim was.  The transaction went forward, and the

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/30/23   Page 38 of 213   PageID 7386

Seery - Direct                          30

1  basis of their claim is that they really were never -- nothing

2  was disclosed to them about the nature of the dispute with Mr.

3  Terry other than in the highest-level terms; the animosity

4  with respect to which that dispute was held by Highland and

5  potentially Mr. Terry; and really, how those costs would be

6  borne and risks be borne by the investment that they were

7  making.

8       That was, in essence, the transaction and the high-level

9  view of their claim.

10  Q   Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A   Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q   And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A   They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/20/23   Page 39 of 213   PageID 7897

Seery - Direct                              31

 1  U.S. investors unless they qualify, and these are sold under

 2  Reg S to -- to investors that otherwise qualify.  And

 3  HarbourVest was investing in that transaction through the

 4  Guernsey structure.

 5  Q    And do you have an understanding as to who owned the 50-

 6  plus percent of HCLOF that HarbourVest was not going to

 7  acquire?

 8  A    Yeah.  There's -- you can tell by the name.  HCLOF is

 9  Highland CLO Funding.  This is a Highland vehicle.  So

10  Highland owned and controlled the vehicle.  The DAF, which is

11  -- which is Dondero-controlled trusts, have the -- 49 percent.

12  Highland has, I believe, around .63-65 percent directly.  And

13  then Highland employees at the time who were involved in the

14  business owned another small percentage.

15       So the majority was going to be controlled by Highland

16  through its control of DAF and its control of the employees

17  that worked for it.  HarbourVest would be a minority investor.

18  Q    Okay.  And I believe you testified that the investment was

19  made in mid-November; is that right?

20  A    That's correct.  I think it was the 15th, may have been

21  the 17th of November.

22  Q    And do you recall when in October the Terry arbitration

23  award was rendered?

24  A    It was about a month before.  I think it was right around

25  the 20th, the 17th to the 20th.  I may be slightly wrong on

000595

Seery - Direct                                    32

1   each of those dates.

2   Q    Okay.  What is your understanding as to what happened

3   after the issuance of the award that is the basis or at least

4   one of the bases for HarbourVest's claim?

5   A    I don't think there's -- I don't think there's any

6   dispute.  And there certainly are judicial findings.  Dondero

7   and Highland went about stripping Acis of all of its assets.

8   So, remember that Acis is not a separate standalone company,

9   in any event.  It's controlled and dominated completely by

10  Highland at the time.  But it did have contracts.  And those

11  contracts had value.

12       So the first idea was to strip out the management contract

13  and put it into a separate vehicle, which we called HCF

14  Advisor, which Highland still owns.  The second piece was to

15  strip out some valuable assets, the risk retention piece,

16  which was a loan that in essence was equity that Highland had

17  put into Acis but structured as a loan, as many of the

18  transactions we'll see down the road are, in order to deal

19  with some -- avoid taxes in any way possible.  And that

20  structure, that value moved value out of Acis for the express

21  purpose of trying to run, in essence, the Highland business

22  back in Highland.

23       Remember, as I said, Acis is just a Highland business

24  moved to a separate shell.  When Mr. Terry got his arbitration

25  award against Acis and was seeking to enforce it, it was

Seery - Direct                              33

1   pretty straightforward, let's take all the assets -- Dondero

2   scheme -- let's take all the assets and move them back into

3   Highland so Terry can't get anything.

4   Q   And how does that scheme relate to the HarbourVest claim,

5   to the best of your knowledge?

6   A   Well, HarbourVest -- HarbourVest's position is that they

7   invested in Acis and -- and whether Acis was called Acis or

8   called Highland, it doesn't really matter; there were valuable

9   assets in the -- in the entity that they were going to be

10  investing in through the equity in these CLOs and some of the

11  debt securities in those CLOs.

12      And then the stripping out and the fraudulent conveyances

13  out of Acis caused them damages because that's what left the

14  damage to Mr. Terry.

15      The quick math on Acis, by the way, is Acis has probably

16  lost, total damages, 175 million bucks.  And that's pretty

17  easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18  fees charged to HCLOF.  Another five million of fees, at

19  least, incurred by Mr. Terry.  Ten million that went to Mr.

20  Terry, 15 to Highland fees, another five, plus Mr. Terry's

21  settlement in this case, over eight million bucks.

22      So HarbourVest's position, which, on a factual basis, you

23  know, is problematic for the estate, is, wait a second, we

24  invested in this vehicle with Highland.  That was supposed to

25  invest in Highland CLOs.  They were called Acis, but they were

1  Highland CLOs.  And then you went about causing tremendous

2  damage to that vehicle that we ultimately were investing in,

3  and then charge us for the pleasure.

4  Q    You used the phrase earlier "OM," I believe.

5  A    Offering memorandum.

6  Q    Offering memorandum?  Can you just explain to the Court

7  your understanding of what an offering memorandum is?

8  A    Typically, under U.S. law, and foreign jurisdictions have

9  similar laws, you have to have a document that explains the

10 securities that you're selling.  And it goes into extreme

11 detail about the securities and the risks related to those

12 securities.

13     And the idea is not to have a document that tells you

14 whether it's a good investment or a bad investment, but it's a

15 document that discloses to the potential investor all of the

16 risks with respect to that security or related to the

17 investment over the duration of the security.  It doesn't

18 predict the future, but it's supposed to make sure that it

19 gives you a very clean view of the past and a very clean view

20 of what the facts from the past are and how they would

21 implicate the future of the investment.

22 Q    And in the course of its diligence, did the Debtor have an

23 opportunity to review the offering memorandum in the context

24 of the claims that were being asserted by HarbourVest?

25 A    Oh, absolutely.  It was originally effectively -- it's an

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/26/23   Page 43 of 213   PageID 793

Seery - Direct                      35

1  HCLOF offering memorandum.  But as I said, HCLOF was managed

2  and controlled by Highland, and Highland originally prepared

3  it.  And then, of course, in connection with -- with this

4  dispute and these claims, we reviewed it, both myself and my

5  legal team.

6  Q    All right.

7           MR. MORRIS:  Your Honor, the offering memorandum is

8  on the Debtor's exhibit list, and I think this is an

9  appropriate time to move into evidence Debtor's Exhibits A

10  through EE, all of which appear at Docket No. 1732.

11          THE COURT:  1732?

12          MR. MORRIS:  It's the Debtor's Second Amended Witness

13  and Exhibit List.

14          THE COURT:  All right.  Any objection to admission of

15  A through EE?

16          MR. DRAPER:  Douglas Draper.  No objection, Your

17  Honor.

18          THE COURT:  All right.  Mr. --

19          MR. MORRIS:  May I proceed?

20          THE COURT:  Yeah.  Mr. Wilson, did you want to

21  confirm no objection?

22      (Echoing.)

23          THE COURT:  All right.  Hearing no objection,

24  Debtor's A through EE are admitted.

25      (Debtor's Exhibits A through EE are received into

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-14    Filed 09/30/23    Page 44 of 213    PageID 5942

Seery - Direct                          36

 1 | evidence.)

 2 |          THE COURT:  Go ahead, Mr. Morris.

 3 |          MR. MORRIS:  Thank you, Your Honor.  The offering

 4 | memorandum itself is one of the documents that we filed under

 5 | seal, and we did so at the request of counsel to HCLOF.  But

 6 | HCLOF has consented to our sharing up on the screen certain

 7 | very limited provisions of the document, without waiving the

 8 | request that the agreement otherwise be maintained under seal.

 9 |          THE COURT:  All right.

10 |          MR. MORRIS:  So may I proceed on that basis, Your

11 | Honor?

12 |          THE COURT:  You may.  Uh-huh.

13 |          MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14 | on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15 | is there a way to just expand that just a bit, Ms. Canty?

16 | Thank you very much.  And if we could just scroll it up?

17 | Thank you very much.  Perfect.

18 |     Okay.  So, Your Honor, this, as the footnote says, is an

19 | excerpt from the offering memorandum that can be found at

20 | Debtor's Exhibit AA.  Double A.  And this particular portion

21 | of the offering memorandum is at Page 35.

22 |          THE COURT:  Okay.

23 | BY MR. MORRIS:

24 | Q   Mr. Seery, have you seen this portion of the offering

25 | memorandum before?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 09/30/23   Page 45 of 213   PageID 5953

Seery - Direct                        37

1  A   Yes, I have.  But before I continue, I just -- I should

2  have checked.  Are you able to hear me clearly?  Am I speaking

3  too quickly or am I cutting out?  I just want to make sure.

4  I'm using a different set of audio today.

5           THE COURT:  All right.

6           MR. MORRIS:  That's fine.

7           THE COURT:  I hear you very well.

8           MR. MORRIS:  Yeah.

9           THE COURT:  So I think we're good right now.  Thank

10 you.

11           THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12 just checking.

13           THE COURT:  Okay.

14           THE WITNESS:  In response to your question, Mr.

15 Morris, yes, I have seen this before.

16 BY MR. MORRIS:

17 Q   Okay.  And can you -- did you form a view in doing the due

18 diligence as to the adequacy of this disclosure?

19 A   Yes, I did.

20 Q   Can you share your -- or share with Judge Jernigan the

21 Debtor's view as to the adequacy of this disclosure concerning

22 the litigation between Highland and Acis?

23 A   With respect to the litigation between Highland and Acis,

24 or, really, between Acis, Highland, and Highland's principals

25 and Acis's principal, totally inadequate.  The disclosure here

000601

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 09/30/23   Page 46 of 213   PageID 7964

Seery - Direct                          38

1  is very high-level.  And if there were no other litigation

2  going on, it might serve to suffice.  It basically says, In

3  our business, because we invest in distressed loans, there's a

4  lot of litigation around distressed investments, and that's

5  what we have.  And then it says, We've talked with the

6  investor about other things and we're -- we think that's

7  enough.

8  Q    Is there anything in this portion or anywhere in the

9  offering memorandum that you're aware of that disclosed to

10 HarbourVest that in the weeks leading up to the investment

11 Highland was engaged in the fraudulent transfer of assets away

12 from Acis?

13 A    No.  And I apologize, because I think it's -- I've

14 conflated two provisions.  This one only deals with the very

15 high-level nature of the business.  It doesn't give any

16 indication that there's any material litigation going on

17 elsewhere with respect to Acis.

18      I believe there's another provision that says, We -- we

19 have talked to -- oh, here -- I'm sorry.  It is here.

20 Shareholders have had an opportunity to discuss with Highland

21 to their satisfaction all litigation matters against Highland

22 and its affiliates unrelated to its distressed business.

23      That, in my opinion, is wholly inadequate.

24 Q    Okay.

25          MR. MORRIS:  And let's put up -- actually, let's just

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/03/24    Page 47 of 213    PageID 595

Seery - Direct                              39

1    move on.

2    BY MR. MORRIS:

3    Q    Let's go to the settlement itself.

4          MR. MORRIS:  Can we put back up Demonstrative Exhibit

5    #3?

6    BY MR. MORRIS:

7    Q    Mr. Seery, can you see that?

8    A    Yes, I can.

9    Q    Does this generally describe the net economic recovery of

10   the HarbourVest settlement based on estimated recoveries for

11   general unsecured creditors as of November 2020?

12   A    As of November 2020, it does.  And you alluded to this in

13   your opening, but to be clear, the numbers have shifted.

14   Costs have increased.  The -- so the -- effectively, the

15   numerator, in terms of distributable value that we estimate,

16   is lower.  And settlements, the denominator, have also

17   increased.  So the claims against the estate that have been

18   recognized have increased.  And that, that probably takes it

19   down closer, in our view, to about seventy cents distribution,

20   a number closer to nine to ten million, maybe a little bit

21   less.

22          However, there's also some additional value that we -- we

23   believe we will recover directly.  There are north of $150

24   million of intercompany notes owed by Dondero entities to

25   Highland.  A number of those notes are demand notes, and we've

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/10/23   Page 48 of 213   PageID 7956

Seery - Direct                                    40

1   already made demand.  We'll be initiating actions next week.

2   So those are -- those value, we believe, we'll recover

3   directly from Mr. Dondero and from related entities.

4       To the extent those related entities don't have value, we

5   feel very strongly about our ability to pierce the veil and

6   reach in to Mr. Dondero.  And then his assets, either his

7   personal assets or the assets that he claims are in trusts.

8       In addition, there are a significant amount of notes that

9   were extended in two -- I believe around 2017, for no

10  consideration.  Those notes were demand notes, I believe, and

11  then extended it 30 years.  So they have 2047 maturities.

12  Those were probably going to have to be subject to fraudulent

13  conveyance type actions or -- or some sort of sale at a very

14  discounted value because third parties wouldn't want long-

15  dated notes with Mr. Dondero as the counterparty for very much

16  money.

17      Those -- they defaulted on some of those parties, so we

18  effectively turned them into demand notes.  We've accelerated,

19  and we'll be bringing actions against those entities next week

20  as well.

21      So I think (garbled) have come up, so I apologize.  One

22  way of saying I think the sixteen and a half is a bit high

23  right now, based upon what we know, but the value is going to

24  be higher than our estimate a couple of weeks ago because we

25  do believe we'll be able to recover on the notes.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/29/21   Page 49 of 213   PageID 5997

Seery - Direct                                41

1       One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6       In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q   And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A   That's correct, yes.

16  Q   Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A   Yes.

19  Q   And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A   Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

1    complexity to it to satisfy some of HarbourVest's concerns

2    that they be able to effectively rescind the transaction, at

3    least from an optical perspective.  Value was important, but

4    optics were as well.  The twenty-two and a half is the current

5    -- actually, the November value of HCL -- the HarbourVest

6    interests in HCLOF.  And that's based upon Highland's

7    evaluation of those interests.

8        So we do believe that that is a fair value as of that

9    date.  It has not gone done.  It hasn't gone up explosively,

10   either, but it hasn't gone down.  We think that's good, real

11   value.  That value is in the Acis CLOs, the equity in those

12   CLOs, which is 2 through 6, that we -- we will be working with

13   the HCLOF folks to get Mr. Terry to monetize those assets and

14   those longer-dated CLOs.

15       In addition, I think it's 85 percent of the equity in Acis

16   7 -- Acis 7 is managed by Highland -- that is also beyond its

17   reinvestment period.  And in talking to the directors -- and

18   they're new directors, and I'll get to that in a minute, for

19   HCLOF -- they'll seek to push Highland, which is the

20   reorganized Highland, to monetize that asset, with due regard

21   to fair value.

22       In addition, Harbour -- HCLOF owned a significant amount

23   of the preferred or equity pieces, if you will, in the

24   Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25   really CLOs.  Those are effectively closed-end funds with

1    illiquid assets, primarily illiquid assets in them.  We've had

2    some dispute in front of the Court about selling the liquid

3    assets in them, which we can go into it another time.  Those

4    are being liquidated in the market at fair value.

5        But HCLOF also is a significant holder of those preferred

6    shares, and those directors would -- have indicated to me that

7    they would like to see those interests also monetized.

8    Q    All right.  Let's shift gears for a moment to talk about

9    the diligence that the Debtor did before entering into this

10   agreement.  Can you just describe for the Court generally the

11   diligence that was undertaken at your direction?

12   A    Well, when we first received the reply to our objection,

13   we dug into that reply and the specifics in it very

14   aggressively.  So we reviewed all of the underlying documents

15   related to the original transaction.  We discussed with

16   counsel the legal basis for the HarbourVest claims.  We

17   interviewed our own HCMLP employees who were involved in the

18   transaction and tested their recollection, specifically around

19   who dealt with HarbourVest, who had the discussions with

20   HarbourVest, what was disclosed to HarbourVest with respect to

21   the Terry dispute and the Acis litigation.

22       We also had done, as I think the Court is well aware from

23   prior 9019 testimony, extensive work around the transfers and

24   the issues related to Acis.  So we were familiar with their

25   impact on HCLOF.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/16/23   Page 52 of 213   PageID 3052

Seery - Direct                        44

 1        We also did extensive work valuing the remaining HCLOF

 2   interests to get a good feel of not only how much HarbourVest

 3   originally invested, but how much they actually lost in this

 4   transaction.  And as I said, their original investment was

 5   around, in total, in two tranches, about $80 million, of which

 6   they got about $5 million back, and they've lost $22 million.

 7   So it -- I mean, remaining with $22 million.  So they've lost,

 8   you know, in excess of $50 million.

 9   Q    Do you recall whether the Debtor reviewed and analyzed all

10   of the documents that were cited in HarbourVest's response to

11   the Debtor's objection to the HarbourVest proofs of claim?

12   A    Yeah.  I think -- I forget, to be honest, which -- exactly

13   what documents were in there.  But we went through their

14   objection with a fine-toothed comb, not only with respect to

15   the issues related to the Acis case, but also their references

16   to Guernsey law, other U.S. law, any of the documents between

17   the parties.  And obviously, as I mentioned before, the

18   offering memorandum.

19        MR. MORRIS:  Your Honor, I would just note for the

20   record that Debtor's Exhibits I through X are all of the

21   documents that are cited in HarbourVest's response to the

22   Debtor's objection to the HarbourVest proofs of claim, and

23   those are the documents that Mr. Seery just referred to.

24        THE COURT:  All right.

25        MR. MORRIS:  Just, they're in evidence now, and I

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/16/23   Page 53 of 213   PageID 3031

Seery - Direct                          45

1    just wanted the Court to understand why they're in evidence.

2              THE COURT:  Okay.  Thank you.

3              MR. MORRIS:  You're welcome.

4    BY MR. MORRIS:

5    Q    Let's talk about the Debtor and whether or not it had or

6    has any viable defenses.  Did the Debtor form any views as to

7    whether or not it had any defenses to the HarbourVest claims?

8    A    Yes, we did.

9    Q    Can you describe for the Court the defenses that were

10   reviewed and analyzed by the Debtor?

11   A    Yeah.  I think we -- we had very significant defenses.

12   So, first and foremost, with respect to the original proof of

13   claim, as I mentioned earlier, it alluded to the expenses and

14   the overcharge.  And I think with respect to the 15 million of

15   fees that were charged to HCLOF by Highland, we didn't have a

16   lot of defenses to that claim.

17        It's pretty clear, by any fair view of the Acis case, that

18   HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19   had no real responsibility for fighting with Acis and Josh

20   Terry and shouldn't have been charged those fees.  I don't --

21   I don't think there's a legitimate investor that would

22   actually think that that was an appropriate amount to be

23   charged to a fund.

24        However, the claim was not as broad -- the proof of claim

25   was not as fulsome in terms of discussing and only vaguely

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/08/23   Page 54 of 213   PageID 8052

Seery - Direct                                    46

1    referred to other damages.  So we did -- we did, as a

2    threshold matter, think about whether we could argue that it

3    was time-barred because they had not met their obligations to

4    fully disclose under the proof of claim.

5         Secondly, we considered the defenses to the overall claim

6    of fraudulent inducement.  Our perspective was that if we

7    could stop the claim of fraudulent inducement, the damages

8    would likely be limited to the 15 and maybe some -- some other

9    damages.  With respect to the 15, again, the problem that we

10   had when we got past -- past motions for summary judgment is

11   the factual predicate for our defense was going to be that we

12   divulged these things to HarbourVest and that they did not

13   reasonably -- it was -- reasonably rely on some failure to

14   divulge because they're a sophisticated investor.

15        The problem with that defense is that our witnesses, which

16   really would have primarily been Mr. Dondero and Mr.

17   Ellington, and one other employee who runs the CLO business,

18   Mr. Covitz, would not be pretty good.  They've been -- two of

19   them have been in front of this Court and they're not viewed

20   favorably and their testimony would be challenged and

21   potentially suspect.

22        So that gave us a real focus on trying to make sure that

23   we could, if we had to litigate, that we would litigate around

24   the fraudulent inducement.

25        As I said, reasonable reliance, what was disclosed, lack

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-4   Filed 09/30/23   Page 55 of 213   PageID 3055

Seery - Direct                              47

1   of digging into the public record, because you don't have to

2   go far on Google to find "fraud" within two words of

3   "Highland," and the tremendous, you know, litigious nature of

4   Highland.  You know, even at that point, when this investment

5   was made, aside from Mr. Terry's arbitration, which by that

6   point, at least by the time (inaudible) was public, there was,

7   you know, significant public disclosure around the Credit

8   Strat and the litigation, the Crusader litigation, the UBS

9   litigation, the, gosh knows, the Daugherty litigation.

10      So our defense was going to be that you should have

11   figured this out, you're a sophisticated investor, and you

12   should have been able to figure out that there was significant

13   risk that, with respect to Mr. Terry, that Mr. Dondero would

14   not stop litigating and that those costs would put significant

15   risk on the investment.

16      The problem with that, as I mentioned earlier, is that the

17   OM is wholly deficient.  If you have a typical risk factor in

18   the offering memorandum, you would have disclosed that there

19   was a litigation with Mr. Terry, a former partner in the

20   business, and that the Debtor had no intention of settling it.

21   There was no intention of settling.  That litigation would go

22   on.  It could go on for years and it could result in

23   bankruptcy or attachments and other risks to the business, and

24   that the investor should be fully aware that the Offeror does

25   not intend to be involved in any -- or the manager, in any

1   settlement with Mr. Terry, and the fact it undermined the

2   investment.  That wasn't there.

3       But that was our preliminary focus, to try to stop fraud

4   in the inducement.  And then we -- we had specific facts

5   related to that.  You know, once they knew about the

6   bankruptcy in HarbourVest of -- I'm sorry, of Acis,

7   HarbourVest made a second funding, which was there was a -- it

8   was an initial $75 million draw, and then a second, I believe,

9   about a $5 million draw, which was in -- I believe in

10  February.  And they made it without -- without objection, and

11  that was after the commencement of the bankruptcy.

12      In addition, they were -- they were active in the

13  bankruptcy, so the -- some of the things that happened in the

14  bankruptcy, there were many opportunities to settle that case,

15  from our examination, all of which were turned down to -- by

16  Mr. Dondero.  But you don't see HarbourVest pounding the table

17  to settle, either, either with respect to the Oaktree

18  transaction or any other transaction.

19      Now, HarbourVest's defense to that is, well, we were

20  taking advice and all of our information from Highland, and we

21  were getting that information directly from senior folks at

22  Highland why -- what the value was and why we shouldn't do

23  those things.  We thought that that would mitigate some of the

24  arguments that -- some of the damages that we might have, I'm

25  sorry, if we -- if we lost.

1      But the focus at that point, you know, our legal strategy,

2   was can we stop HarbourVest at the very forefront to say,

3   You've got to come into the factual realm and get out of the

4   fraud in the inducement realm.  And then the defenses and the

5   exculpations and the liability limitations in the documents

6   would also come into play.

7      So that -- those are some of the defenses that we focused

8   on and our analytical thinking around them.

9   Q   So, if the Debtor had viable defenses, why is it settling?

10  A   Well, this is a significant claim.  And we -- we looked at

11  it with respect to both the impact on the case, but, really,

12  the merits of the claim.

13     As I said, there's really little dispute that the legal

14  fees should not have been charged to HarbourVest.  We think

15  based upon the testimony in Acis, the suspect credibility of

16  those who would have been our witnesses, and the experience in

17  Acis that the Court has had in terms of the completely hell-

18  bent on litigation, it would be hard for anyone to justifiably

19  defend those fees being charged.  So, as an initial matter, we

20  had exposure there.

21     In addition, if HarbourVest got by our defense of -- was

22  able, for example, to claim fraud in the inducement, then we

23  were open to significant damages.

24     We really didn't put much value, frankly, on the RICO part

25  of it.  We think that that's waved around often to show treble

1   damages.  Although in this case certainly somebody could lay

2   out the predicate acts and put forth a RICO-type argument, we

3   just didn't think that that had real merit in this commercial

4   dispute, even with a fraud claim.

5       But even without the trebling of the damages, there's no

6   dispute that HarbourVest lost more than $50 million in this

7   investment.  You know, we -- we thought about that risk as

8   well.

9       In addition, because the case would really be fact-based,

10  even if we had a high degree of confidence based upon our

11  discussions with our employees and the factual testimony, it

12  was going to be expensive to litigate this case, and time-

13  consuming.

14      And so we looked at the economic value, the potential

15  risks, and the actual value that we were giving up, and found

16  this to be an extremely, extremely reasonable settlement.

17      Importantly, and I think what drove it, you -- one of --

18  one of the things that drove it is another one of our defenses

19  on why, notwithstanding their -- what they held out as

20  meritorious claims, I don't think HarbourVest really wanted to

21  publicly litigate this claim.  And we were aggressive in our

22  discussions with HarbourVest of how we would litigate it,

23  which would be quite publicly.

24      Now, that may or may not be fair, but that does put risk

25  on the counterparty.  And so I think that helped drive the

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/20/23   Page 59 of 213   PageID 8097

Seery - Direct                              51

1    settlement.

2         In addition, the structure of the settlement we think is

3    extremely favorable to the Debtor and to the estate because,

4    rather than taking the full claim and putting it into a senior

5    unsecured position, we have bifurcated it.  We did think about

6    whether this was a claim that could be subordinated under 510.

7    There won't be any arguments, I would be surprised if there's

8    arguments today that we didn't actually give to the Highland

9    employees who have given them to Mr. Dondero's respective

10   counsel.

11        We did structure it in a way that we thought gave

12   HarbourVest the opportunity to effectively claim a rescission,

13   even though that's not really what it is, and then be able to

14   claim that their recovery is based on the bankruptcy, which it

15   is, but not really dilute all the other stakeholders in the

16   case.

17        (Pause.)

18             THE COURT:  Mr. Morris?  Anything else?

19             MR. MORRIS:  I can hear you, Your Honor.

20             THE COURT:  Okay.

21             MR. MORRIS:  I can hear you.

22             THE COURT:  Okay.  Now can you --

23             MR. MORRIS:  I got cut off from Mr. Seery for a

24   moment.

25             THE COURT:  Okay.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-44   Filed 09/30/23   Page 60 of 213   PageID 8568

Seery - Direct                                    52

1  BY MR. MORRIS:

2  Q    Okay.  I appreciate that.  Are you done giving the

3  Debtor's basis for entering into this settlement, Mr. Seery,

4  if you can hear me?

5  A    I think so, but I think as the Court has probably seen, I

6  can go on.

7  Q    Yes.

8  A    So I will try to be -- I'll try to be more concise.  But

9  this was a -- this was a difficult settlement.  We felt good

10  about our defenses.  Felt that we could -- we could try them.

11  But it would be extremely expensive, time-consuming, and there

12  would be a lot of risk.  And settling at a level which we

13  believe is actually below the damages that were clearly caused

14  only by the fees was a -- was a -- is a -- is a very

15  reasonable settlement.

16  Q    Okay.  Let's just talk about the process by which we got

17  to the settlement.  Do you recall generally when the

18  settlement negotiations have -- were commenced?

19  A    I believe it was -- was late summer, early -- early fall.

20  Q    Okay.  Before I move on, I just want to go back to the

21  Acis matter that you were talking about, one last issue.  Do

22  you know how, if at all, the injunction that was entered in

23  the Acis bankruptcy impacted or related to the HarbourVest

24  claims?

25  A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

1   think there's an argument, and we analyzed it thoroughly, that

2   the injunction effectively caused a lot of the damages.

3   Because if you look at the values of the equity that

4   HarbourVest had, the -- and HCLOF had in the CLOs, it went

5   down dramatically after the Trustee in the Acis case took over

6   and then subsequently, when the case was reorganized and Mr.

7   Terry took over, you know, with Brigade as the sub-advisor.

8        Now, that would -- you know, we would -- we could

9   certainly attempt to throw, in our defense, the causation at

10  Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11  retort is that none of this would have occurred but for the

12  burn-it-down litigation that Mr. Dondero engaged in with

13  Highland.

14       In addition, in Mr. Terry's defense, you know, he did try

15  multiple times with HCLOF, tried to petition, if you will, the

16  HCLOF entity to -- and directors, former directors, to reset

17  the CLOs to make them more economically viable, based upon the

18  current level of asset returns versus the debt costs in the

19  CLOs.  And that was rejected by the HCLOF and the Debtor as

20  the controlling party of HCLOF.  So, we thought about those

21  risks.

22       You know, similarly, the economic values in Acis 7 went

23  down pretty significantly from that date as well.  So I think

24  there's -- there are some defenses, but that's really Mr.

25  Terry's issue, not our issue.  So we thought about those

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/30/23   Page 62 of 213   PageID 8162

Seery - Direct                          54

1   issues, we analyzed them, and we certainly did all the work

2   around month-to-month reductions in NAVs and how different

3   events in the Acis case might have -- might have caused those

4   and was that some sort of break from the original

5   transgression that HarbourVest claims, which was the

6   fraudulent inducement.

7   Q    Do you recall that in November HarbourVest's motion under

8   3018 was scheduled to be heard?

9   A    Yes.

10  Q    And can you just tell the Court your understanding of what

11  the 3018 motion was about?

12  A    Well, the 3018 motion was going to be on voting.  And we

13  took the view that it really was not -- it shouldn't have been

14  that big an issue and HarbourVest should have been content

15  with just taking their actual losses of roughly a $50-$60

16  million claim for voting purposes and then we would move on.

17       HarbourVest was very insistent that they have a $300

18  million claim, because they took the position -- and with

19  extensive documentation; not only the pleadings they filed,

20  but also detailed decks that were prepared by their counsel,

21  which they had presented to us on the merits of their claim --

22  that they were going to litigate for -- the 3018 and for the

23  full $300 million value.

24       And that became the genesis, if you will, of the

25  negotiations to settle.

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-44    Filed 05/16/23    Page 63 of 213    PageID 5161

Seery - Direct                                55

1         So, we started talking about the 3018.  It was very

2    contentious.  My apologies to Ms. Weisgerber and her counsel,

3    her partners, because it was a significant and contentious

4    negotiating call.  But the reasons for that I think were that

5    -- their insistence on litigating the 3018 and our view that

6    this was just, you know, another -- another of a series of

7    delays and costs in this case that we really were hoping to

8    avoid.

9         That led to Mr. Pugatch and I stepping away from counsel,

10   no offense to counsel, you know, ours and his, to begin

11   negotiations around the potential for a settlement.  First, it

12   started with a 3018, and then, you know, argued that we would,

13   if we got past the 3018, we were going to litigate this,

14   because we effectively had -- thought we could get everyone

15   else done at -- in and around that time.  And I think we were

16   also probably a little bit optimistic about UBS at that time

17   and the mediation, which subsequently we have settled.  But

18   that was the genesis of those settlements.

19   Q    And how did the structure, how did the Debtor and

20   HarbourVest derive at the structure whereby there is a general

21   unsecured claim, there is a subordinated piece, and there's

22   the takeback of the HCLOF interest?

23   A    Well, as I outlined, we -- we aggressively set forth our

24   various defenses.  Their position was that they -- they should

25   never have been in this transaction before.  And they --

000619

 1   HarbourVest is, in essence, a fund of funds, and they have

 2   investors, and it certainly wouldn't be their, I'm sure, the

 3   best-performing asset in their portfolio, to have made this

 4   investment and lost $50 million over this period of time.  So

 5   they felt strongly that they should never have been in this

 6   investment, and but for the failure to disclose and the

 7   improper disclosures, they would not have been in this

 8   investment.

 9        So, optically, getting out of it was important to them,

10   and that led to our idea and construction of a subordinated

11   claim and the transfer of the HCLOF interests to the estate.

12        Importantly, the HCLOF interests, as I mentioned, are --

13   the investments are in the Acis CLOs controlled by Acis and

14   Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15   the Acis 7.

16        So we were keenly focused on, if we were going to get that

17   interest, would we then have the majority control in HCLOF,

18   which we will, and would we be able to drive the recoveries,

19   as opposed to what Highland typically does in these

20   investments is use other people's money, drive down the value,

21   and then try to buy back the interest on the cheap.

22   Q    Just in terms of timing, because I think there was a

23   suggestion in one of the openings that there was something

24   untoward about the timing here:  At the time the liquidation

25   analysis was prepared on November 24th, had the Debtor reached

 1   any agreement in principle with HarbourVest?

 2   A    If we had, it would have been reflected, so I don't -- I

 3   don't think we were agreed by then.  I don't recall the

 4   specific dates, but if we had, it would have -- it would have

 5   been reflected.

 6   Q    If I can refresh your recollection that the motion was

 7   filed on December 24th, does that help form your understanding

 8   or refresh your recollection that there was no agreement in

 9   principle on November 24th?

10   A    Yeah.  Well, I'm quite sure there was no agreement in

11   principle or we would have reflected it minimally by a

12   footnote.  There's -- there's no chance.  It's a material

13   reduction in the claims pool that we were previously telling

14   people that, at least for purposes of distribution, like UBS

15   and a couple others we said we thought we would get to zero

16   on.  So we didn't calculate in that amount.  So I'm quite sure

17   we didn't have a deal when we filed the disclosure statement.

18        In terms of the timing, anyone who's done this business

19   for any degree of time knows that the crucible of bankruptcy

20   brings people to the settlement when they see something

21   happening in the case, and not before.  I think HarbourVest

22   looked at our -- this is my supposition -- HarbourVest looked

23   at our plan, our ability to get this done, our settlement with

24   Redeemer, our settlement with Mr. Terry and Acis, and saw that

25   this plan was coming together, and if they didn't think about

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-14    Filed 09/13/24    Page 66 of 213    PageID 8164

Seery - Direct                                    58

1   the settlement, they were going to think about not only the

2   risks that we laid forth for them with respect our defenses,

3   but also the opportunity to litigate with the Claimant Trustee

4   over a long period of time, which couldn't have been

5   particularly appetizing.

6   Q    Can you describe for the Court the role played by the

7   independent board of Strand, the general partner of the

8   Debtor, in analyzing and participating in the approval

9   process?

10  A    Yes.  I think, as the Court is aware and I've testified

11  before, Mr. Russell Nelms and Mr. John Dubel are fellow

12  independent directors with me, appointed pursuant to the Court

13  order.  They are kept abreast of every detail, and -- along

14  the way, not just in a summary form at the end.  We have

15  reviewed and analyzed collectively each of the issues.  Mr.

16  Dubel has extensive experience in these types of litigation

17  matters.  Obviously, Mr. Nelms, from his -- both his practice

18  and his time on the bench, has a keen insight into how to

19  resolve and what the risks and benefits are from settling

20  litigation.  So I consult them every step of the way.

21  Q    And as part of this process, did the Debtor reach out to

22  the directors of HCLOF?

23  A    Yes, we did.  So, we reached out and we've had several

24  conversations on video chats with the directors.  The

25  directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/09/23   Page 67 of 213   PageID 3165

Seery - Direct                              59

1   and Mr. Dicky Burwood.  They are extremely professional.  They

2   are exceptionally well-informed.  They are truly careful, and

3   I would say very experienced professional not only directors,

4   but experienced in -- in these matters, both in respect of

5   structured finance as well as these types of vehicles and

6   litigation.

7        They were appointed by the old directors, Scott and

8   Bestwick, and they have been in control.  They have outside

9   counsel, which is King & Spalding in the U.S.  They have

10  Guernsey counsel.  They have accountants and professional

11  advisors, and are being, in my opinion, exceptionally careful.

12  I've got -- very quickly developed a lot of respect for them,

13  and we consulted with them on this settlement and how it would

14  work.

15       They've been very clear that they represent HCLOF and they

16  work for the benefit of the equity, whomever owns it, and

17  taking a view that they would like to see these assets

18  monetized swiftly, with due regard to value, for the benefit

19  of the equity.

20  Q    And is it your understanding that the directors of HCLOF

21  approved of this transaction?

22  A    They -- I don't know that their approval was required.

23  It's really -- there are a number of hoops to jump through

24  under the documentation, including opinion of outside counsel

25  that we received from WilmerHale in terms of the effectiveness

000623

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/11/23   Page 68 of 213   PageID 8166

Seery - Direct                              60

1   of the transfer under the documents.  We had a negotiation

2   with -- with those directors, and making sure that we did

3   everything correct -- correctly, excuse me -- with respect to

4   the requirements for the transfer under the documents.  And

5   they've indicated their support and acknowledgement that we're

6   doing it correctly.

7       I don't know if it's fair to say they approved it.  I'd

8   just have to go check the documents.  But they certainly

9   support it.  And I think they generally support our position

10  with respect to how to move forward with the assets.

11  Q   I appreciate that.  I guess I meant approval with a small

12  a and not a capital A.

13      You mentioned WilmerHale.  Who do they represent in all of

14  this?

15  A   WilmerHale is the Debtor's outside corporate counsel, in

16  particular with respect to the fund issues that we don't

17  handle in-house.  We have significant support for fund issues

18  from the expertise of Mr. Surgent, who's been the CCO, and he

19  is also a lawyer, with respect to, you know, some of the

20  difficult fund issues that Highland has.  But when we use

21  outside counsel, we use WilmerHale for that, and they've been

22  -- they've been exceptional.

23  Q   Okay.  Just the last two points that were made in Mr.

24  Dondero's objection, I believe.  Did the Debtor overpay in

25  this settlement in order to gain the support of HarbourVest in

1   connection with its -- with the Debtor's attempt to get its

2   plan confirmed?

3   A    Not in any way.  My -- I believe the settlement is

4   extremely reasonable.  As I testified, it's -- it's less than

5   the -- the actual value going out, depending on unless there's

6   successful litigation, and there well could be, is less than

7   on a pro forma basis the fees that were taken and charged to

8   HCLOF.  We didn't do this for votes.  We will have Class 2,

9   Class 7, Class 8, and Class 9.  So I don't think that's a --

10  there's no vote purchasing, I think you called it.  No, not at

11  all.

12  Q    Yeah.  Well, on that topic, I think the phrase that was

13  used was gerrymandering.  Are you aware of the argument that's

14  been made that the subordinated claim was dropped in there in

15  order to gerrymander a positive vote for the impaired class of

16  Class 9, I believe?

17  A    In a word, I would say that's preposterous.  The -- as I

18  said, we have a number of classes that will vote for the plan.

19  The plan is -- the plan is a monetization plan.  And if -- if

20  the creditors determine that they don't want to pursue this

21  plan, we'll go forward with another -- we'll try to get

22  another plan.  We tried to have a grand bargain plan.  We

23  tried to have a pot plan, as I've testified previously.  I'm

24  quite certain that I've done more work on that than anyone

25  else, including Mr. Dondero and anybody who works for him.

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-14    Filed 09/30/23    Page 70 of 213    PageID 8203

Seery - Direct                                62

1   And he hasn't been willing to do that.

2       This is a -- this is a plan that's come together.  We

3   think it's going to be in the best interests of the estate.

4   That'll be confirmation next week.  Or two weeks, I guess.

5   But I don't see how this is any way related -- this settlement

6   is not any way related to the voting on that -- on that -- on

7   that plan.

8   Q   Just to put the finest point on it, is the Debtor relying

9   on Class 9 to be the impaired consenting class?

10  A   No.  I think -- I think what I've -- as I said, I believe

11  we already have the votes in Class -- I think it's 2 or 3, 7,

12  8, and -- and 9 will vote in favor as well.  So that won't be

13  an issue.

14          MR. MORRIS:  Your Honor, I have no further questions

15  of Mr. Seery.

16          THE COURT:  All right.  Pass the witness.  I'll ask

17  HarbourVest counsel first:  Do you have any questions of Mr.

18  Seery?

19          MS. WEISGERBER:  No, Your Honor.

20          THE COURT:  All right.  Thank you.

21      What about cross-examination?  Mr. Dondero's counsel?

22                      CROSS-EXAMINATION

23  BY MR. WILSON:

24  Q   Mr. Seery, how are you doing today?

25  A   I'm well, thank you.

Seery - Cross                                63

1    Q    I'm John Wilson, and I represent Jim Dondero.  I have a

2    few questions for you today.

3         Now, the HarbourVest proof of claims were filed on April

4    8th, 2020; is that your recollection?

5    A    I believe that's correct.  I don't recall the specific

6    date.

7    Q    Okay.  And do you know when you first became aware of the

8    HarbourVest claims?

9    A    I believe it was early in the summer when we filed the

10   omnibus objection.  It may have been in late spring, shortly

11   after that.  I don't recall the specific date of the filing.

12   Q    And before the time of the filing of the omnibus

13   objection, did Highland educate itself regarding the

14   HarbourVest proof of claims?

15   A    I'm sorry, could you say that again?  I didn't quite

16   understand it.

17   Q    Before the omnibus objection was filed, did HarbourVest --

18   I'm sorry, did Highland educate itself on the HarbourVest

19   proof of claims?

20   A    Not especially, no.

21   Q    Okay.  And -- but at some point, Highland did investigate

22   those proofs of claim, correct?

23   A    That's correct.

24   Q    And when would you -- when do you recall that that

25   investigation began?

Seery - Cross                                    64

1   A    I don't recall the date, but the triggering event was

2   HarbourVest's response to our omnibus objection.

3   Q    Okay.  And that would have been filed September 11th of

4   2020?

5   A    I'll take your representation.  I don't -- I don't recall

6   the specific date.

7   Q    Okay.  And so when you began to investigate the

8   HarbourVest claims, what was your initial reaction?

9   A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16      But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 06/06/23   Page 73 of 213   PageID 8231

Seery - Cross                           65

1   Q    And did you ever represent to any party that the

2   HarbourVest claim was worth, at most, $5 million?

3   A    I think I represented often, including to HarbourVest,

4   that it was worth nothing.  I don't recall if I specifically

5   said $5 million.  $5 million would have been a nominal amount

6   to -- which is litigation costs.  So it may -- it may have

7   been in my models that I put in that as a settlement amount,

8   but I -- I thought that there were valid and good defenses to

9   those larger claims.

10  Q    And you recognize that HarbourVest was a large,

11  sophisticated investor, correct?

12  A    Yes.  I think they manage north of -- right around a

13  hundred billion dollars.

14  Q    And you recognize that HarbourVest routinely structured

15  complex customized investments, correct?

16  A    I believe that -- I don't know the intricate part of their

17  businesses, but as a fund of funds who does creative

18  investments, I think that they do do quite a bit of that.

19  This, I believe, was their first investment in the CLO space.

20  Q    And it was not -- or I should say, you did not believe

21  that HarbourVest was simply a passive investor in HCLOF,

22  correct?

23  A    I don't think that that's true, no.

24  Q    You don't -- you don't believe that you denied their claim

25  to be a passive investor?

Seery - Cross                                    66

1    A    Oh, I think -- I'm sure that in defense of their claims I

2    would argue that they were -- they were more than a passive

3    investor.  But it was pretty clear when you look at the

4    structure of what they invested that there was an intent that

5    they be passive on their part.  They didn't take a majority

6    interest.

7         In fact, Highland made it clear in the structure of the

8    deal that they couldn't -- it would be hard for them to get a

9    majority interest because Highland entities would control that

10   and Dondero-controlled entities or individuals would control

11   the majority.

12        I think that they -- they had hoped to be a passive

13   investor.

14   Q    But was it not your position that HarbourVest was actually

15   an active, involved investor?

16   A    I think our defense was going to be that they knew exactly

17   what was going on, that they participated, that they were

18   active, and that, indeed, that they were in and around some of

19   the subsequent issues in the Acis case.

20   Q    And you understood that HarbourVest played a material role

21   in the various outcomes in the Acis bankruptcy case, correct?

22   A    I don't believe that to be correct, no.

23   Q    Have you ever made that representation to anyone before?

24   A    Not -- not that I recall.

25   Q    Well, do you recall giving statements to a reporter named

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 08/30/23   Page 75 of 213   PageID 3253

Seery - Cross                                67

 1  Syed Khaderi?

 2  A    I've never spoken to a reporter named Syed Khaderi in my

 3  life.

 4  Q    Well, did you participate in the preparation of statements

 5  to be given to Syed Khaderi?

 6  A    I've never heard of Syed Khaderi, nor have I participated

 7  in any preparation of statements.  I don't know who that is.

 8          MR. WILSON:  All right.  I'm going to have Bryan

 9  Assink put on the screen a document.

10      And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q    Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A    Yes.

16  Q    And who is Lucy Bannon?

17  A    She is the Highland public relations person.

18          MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q    Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A    Yes.

24  Q    Have you seen this email before?

25  A    Not that I recall, no.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 06/10/23   Page 76 of 213   PageID 3264

Seery - Cross                                68

1    Q    All right.  It continues on that, I saw the filing on

2    Friday about HarbourVest claims against Highland for a CLO

3    investment, and I'm looking to put out a report tomorrow

4    morning London time.  Ahead of that, I wanted to check if

5    Highland would like to comment on the matter.

6            MR. MORRIS:  Your Honor, this is -- the Debtor

7    respectfully objects.  A, this document is not in evidence.

8    B, it's rank hearsay.

9            THE COURT:  Response, Mr. Wilson?

10           MR. WILSON:  Your Honor, I am attempting to

11   authenticate this document, but I'm using it in rebuttal to

12   the testimony that Mr. Seery just offered.

13           THE COURT:  All right.  I'll allow it.  Overrule the

14   objection.

15           MR. WILSON:  All right.  Thank you, Your Honor.

16   BY MR. WILSON:

17   Q    All right.  Now, if we -- and oh, that September 14th

18   date, that was three days after the September 11th date that

19   we discussed was the date that HarbourVest filed its response

20   to the omnibus objection, correct?

21   A    Yes.  If that's the date that they filed it, then I -- if

22   you're representing that, I concede that the 14th is three

23   days after the 11th.

24   Q    All right.  And if you go back to the first page of this,

25   it looks like, on the following day, Lucy Bannon sends an

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 28-14    Filed 07/06/23    Page 77 of 213    PageID 8275

Seery - Cross                                69

1  email to you, and is that your email address,

2  jpseeryjr@gmail.com?

3  A    That's correct, yes.

4  Q    And do you recall receiving this email from Lucy Bannon?

5          MR. MORRIS:  Your Honor, I renew my objection that

6  this is hearsay.  He's not rebutting anything that Mr. Seery

7  testified to.  He testified that he'd never heard of the

8  gentleman at the bottom of the document.  There's nothing in

9  this document that rebuts Mr. Seery's testimony at all.

10         THE COURT:  Response, Mr. Wilson?

11         MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12  his statement that he hadn't -- that he hadn't heard of Syed

13  Khaderi.  My rebuttal is attempted to -- attempting to show

14  that he has made various statements that he denied.

15         THE COURT:  I'll overrule the objection.

16  BY MR. WILSON:

17  Q    All right.  So, back to this exhibit, Mr. Seery.  You

18  recall receiving this email from Lucy Bannon on Tuesday,

19  September 15, 2020?

20  A    Not specifically.  But to be clear, I recall talking to

21  Lucy Bannon about the HCMLP dispute with HarbourVest.

22  Q    Okay.  And --

23         MR. WILSON:  Bryan, can you go down to the next page?

24  Scroll down to where -- the James Seery email.

25  BY MR. WILSON:

Seery - Cross                              70

1    Q    Do you see this email on your screen that's dated

2    September 15, 2020 at 10:33 p.m.?

3    A    Yes, I do.

4    Q    And do you recall sending this email to Lucy?

5    A    Not specifically, no.

6    Q    Well, do you deny that you sent this email to Lucy?

7    A    It appears to be my email.

8             MR. WILSON:  Your Honor, we would move to admit this

9    document into evidence as Dondero Exhibit Letter N.

10            THE COURT:  Any objections?

11            MR. MORRIS:  I would consent to the admission of Mr.

12   Seery's email, but the balance of it ought to be excluded as

13   hearsay.

14            THE COURT:  What about that?

15            MR. WILSON:  Well, Your Honor, I think that this

16   document -- and I'll get into this in a little more detail in

17   a second -- but I think this document is a combination of the

18   work product of Lucy Bannon and Mr. Seery in preparing a

19   response for the reporter who requested comment from Highland.

20            THE COURT:  Okay.  I --

21            MR. MORRIS:  Your Honor, um, --

22            THE COURT:  Go ahead.

23            MR. MORRIS:  I just -- I do question how they got

24   this document, but that's for another day.  That's number one.

25   Number two, in addition to the hearsay argument, I just --

000634

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 07/20/23   Page 79 of 213   PageID 8297

Seery - Cross                               71

 1   relevance grounds.

 2          THE COURT:  Okay.  I'll allow the portion that is the

 3   communication of Seery, that portion of Exhibit N.  All right?

 4          MR. WILSON:  Okay.  With due -- thank you, Your

 5   Honor.  With due respect, I -- to use that portion, I need to

 6   refer to the portion below it, because he says, Good to submit

 7   with your final edit/revisions.  And so we need to know what

 8   those final edit/revisions are, which are contained in the

 9   email directly below that on the document that was four

10   minutes earlier in time.

11          THE COURT:  All right.  Fair enough.  That'll be

12   allowed.

13          MR. WILSON:  All right.  Thank you, Your Honor.

14      (James Dondero's Exhibit N is received into evidence as

15   specified.)

16          MR. WILSON:  So, Bryan, now can you scroll to the

17   next page?  Oh, actually, let's just -- let's just stop at the

18   top -- at the bottom of the page.  What's this statement?

19   BY MR. WILSON:

20   Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21   Khaderi's request for information and comment, you prepared

22   actually two responses, and one of those was a statement on

23   the record attributed to a spokesperson for HCMLP or something

24   along those lines.  And then --

25          MR. WILSON:  Can you scroll down to that next page?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/30/23   Page 80 of 213   PageID 6308

Seery - Cross                                72

1   BY MR. WILSON:

2   Q    And this says -- I think part of this got cut off for some

3   reason, but it looks like the official statement is in

4   quotation marks.  It says, "We dispute the allegations made in

5   the filing and believe the underlying claims are invalid and

6   will be found to be without merit.  Our focus continues to be

7   treating all valid claims in a transparent, orderly, and

8   equitable manner, and vigorously disputing meritless in the

9   court.  That focus will assure that HCMLP's reorganization

10  process -- progress is towards an efficient and equitable

11  resolution."

12       And then below that there's another section of this email

13  that says, Background/Clarification, Not for Attribution.  And

14  do you know the purpose of this second section of the

15  response?

16  A    Do I know the purpose of that?  Yes.

17  Q    And what would that purpose be?

18  A    Ms. Bannon was speaking on background to reporters.  As I

19  said earlier, I've -- I never heard of the gentleman from

20  London.  If he's at the bottom of the email, I didn't pay any

21  mind, never heard of him.  Nor have I heard it since.  Ms.

22  Bannon didn't ever reference the specific person.

23       But she is the public relations person.  So, as I

24  testified earlier, she does communicate with the press.  And

25  as I previously testified when Mr. Morris questioned me, one

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 07/10/23174 Page 874 of 2131   Page ID 8379

Seery - Cross                          73

1    of our tactics and our defenses for HarbourVest was going to

2    be that we were going to be very public and aggressive about

3    the investment and it would have a negative impact or negative

4    perspective for viewers, in our opinion, about HarbourVest's

5    investment.

6    Q    All right.  Well, look with me in the middle of that

7    paragraph right after the closed parenthetical, where it says,

8    "But it's important to note the background of HarbourVest's

9    active and deep involvement in the investment of which it now

10   complains."

11       And so it was your position that HarbourVest had an active

12   and deep involvement in the investment, correct?

13   A    No.  I don't think that's correct.  Ms. Bannon prepared

14   the statement, it was a litigation defense on background, and

15   that's our -- that was our position for this purpose.  It was

16   not my view that they were active and deeply involved.  They

17   were certainly involved.  There's no doubt about it.  But they

18   got all their information, in our estimation and our research,

19   from Highland.

20   Q    But in any event, you would agree with me that four

21   minutes after receiving this email, you approved this

22   statement to go out to the reporter, correct?

23   A    No, that's not correct.  That's -- this portion is on

24   background.  That statement doesn't go out.  The previous

25   statement was the official statement.  This is the background

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/16/23   Page 82 of 213   PageID 5332

Seery - Cross                                    74

1   discussion that she would have.  So, no, she was not

2   authorized in any way whatsoever to send that out.  She was

3   authorized to have conversations with those general facts.

4          MR. WILSON:  Okay.  Bryan, go to the top, or the

5   bottom of the page immediately preceding that.  That's it.

6   Yes, that's it right there.

7   BY MR. WILSON:

8   Q    Now, you'll see that this email from Lucy Bannon on

9   September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10  what you think of the below.  And, again, the first would be

11  on the record and the second will be sent for information

12  purposes to ensure accuracy, not for attribution."

13         So the intent was that this -- that this entire statement

14  be sent to the reporter, correct?

15  A    I don't believe that's correct.  I think when she goes on

16  background she doesn't send them a written doc.  It's got to

17  be clear to the reporter, at least my understanding is that

18  what on background means -- I've been involved with this

19  before -- is that typically that's done orally.  I don't know

20  if she's done it in a written statement before.  I have never

21  seen that done in a written statement before.  You give the

22  official statement and then you walk the reporter through your

23  other views on background.  And you're not quoted.  And it's

24  usually attributed to a source with knowledge.

25  Q    Okay.  We'll come back to that in a minute.  The next

1  sentence after the one I just read to you --

2          MR. WILSON:  Go back to where we were on the

3  background.

4  BY MR. WILSON:

5  Q   Now, we just read you the sentence that starts with, "Then

6  it's important."  The following sentence says, "HarbourVest

7  was not simply invested in HCLOF as an ignorant,

8  unsophisticated, passive investor, but was an active and

9  informed participant in the inception of its investment

10  through all of the Acis bankruptcy proceedings, and

11  HarbourVest played a material role in various outcomes related

12  to that case and its impact on HCLOF."

13      And is it -- did you not just tell me before we

14  investigated this document that HarbourVest did not play a

15  material role in the various outcomes of the Acis bankruptcy?

16  A   I don't know exactly what I said, but I think that's

17  correct, after we'd done the research on it, yeah.

18  Q   But you took the position in this email that you approved

19  to go out to a reporter that says that -- that HarbourVest was

20  an active and informed participant in the inception of -- of

21  its investment through all of the Acis bankruptcy proceedings

22  and played a material role in various outcomes related to that

23  case and its impact on HCLOF.  Can we agree with that?

24  A   Yes.

25  Q   And then the final sentence of this paragraph says that,

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 23-44   Filed 09/20/23   Page 84 of 213   PageID 5342

Seery - Cross                                                76

1   We believe that neither the facts nor the law support

2   HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3       Whose words were those, "We-were-too-lazy-to-know

4   allegations"?

5   A   I don't recall.  They may be mine.  It's aggressive the

6   way I am, so that -- that may well be the case.

7           MR. WILSON:  All right.  Go -- go down to the next

8   page.

9   BY MR. WILSON:

10  Q   And with respect your comment that that second paragraph

11  would not have gone to the reporter, look at this email in the

12  middle of the page from Lucy Bannon to Syed Khaderi, September

13  16, 2020, at 1:51 a.m.  And --

14          MR. MORRIS:  Your Honor, this I will object to as

15  hearsay.  There is no witness here to testify to anything on

16  this document.

17          THE COURT:  All right.  How about that?

18          MR. WILSON:  Well, it's -- well, scroll up just a

19  little bit.  This email at the top of the page is three

20  minutes after the one in the middle of the page, where Lucy

21  Bannon is forwarding this to James Seery, saying, See below

22  for responses sent to *Creditflux*.  Will follow up with the

23  story when it runs or with any other updates.

24          MR. MORRIS:  Your Honor, these --

25          MR. WILSON:  So I think this --

1          MR. MORRIS:  These documents don't appear on the

2    witness list.  They're not being offered to impeach anything.

3    They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5    trying to rebut the statements that Mr. Seery made.  In fact,

6    he told me just a minute ago that that second paragraph would

7    not have gone out to the reporter.  However, this email from

8    Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10   questioning, with an undisclosed document, is to rebut the

11   earlier testimony he gave before you even put this exhibit in

12   front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14   that Mr. Seery has made today, and I think it -- you know, if

15   he's going to testify that this information did not go out to

16   a reporter, I think I'm allowed to rebut that to demonstrate

17   that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19   in advance?  It's feeling less and less like an impeachment

20   document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22   actually have this document at the time we filed our witness

23   and exhibit list, but I would also say that I didn't have any

24   purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 07/10/23   Page 86 of 213   PageID 8364

Seery - Cross                                   78

1    disclose all exhibits you anticipate using except those for

2    purposes of impeachment.  Okay?  Not rebuttal, to be

3    technical.

4        So, if you didn't disclose this exhibit, the only way you

5    can use it, subject to other possible objections, is if you're

6    impeaching a statement.  And I'm just saying I think we're

7    going beyond trying to impeach the original statement and now

8    we're trying to impeach statements he's made after seeing

9    portions of the document.

10       What did you mean, you didn't have this document in time

11   to disclose it?

12           MR. WILSON:  Well, I actually just received this

13   document this morning, Your Honor.

14           THE COURT:  Where did you receive it from?

15           MR. MORRIS:  From who?

16           MR. WILSON:  I -- I honestly do not know the source

17   of this document, although it was provided to me by my client.

18           MR. MORRIS:  Your client being Mr. Dondero?

19           THE COURT:  Could you answer that, Mr. Wilson?

20           MR. WILSON:  Yes, that's -- yes, that's correct.

21           THE COURT:  All right.  I will -- that's --

22           MR. MORRIS:  Your Honor, I'd like to --

23           THE COURT:  That's a different can of worms.  But for

24   now, I sustain the objection.  You're done questioning on this

25   document.

000642

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 48-14   Filed 09/06/23   Page 87 of 213   PageID 8375

Seery - Cross                          79

1          MR. WILSON:  That's fine, Your Honor.  I can move on.

2     BY MR. WILSON:

3     Q    Now, Mr. Seery, you would agree with me that whether or

4     not HarbourVest played an active role in the Acis bankruptcy,

5     it was kept apprised of the -- of the ongoings in the

6     bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

7     A    Yes.  My understanding is that -- that they were.

8     Q    And in fact, did Highland have weekly conference calls

9     with HarbourVest during the Acis bankruptcy to discuss what

10    was going on in the bankruptcy?

11    A    I don't know if they were weekly.  I've been told that

12    they had regular calls updating HarbourVest, yes.

13    Q    Okay.  And did Highland produce over 40,000 pages of

14    documents to HarbourVest related to the Acis bankruptcy?

15    A    I'm not aware of that, no.

16    Q    Have those documents been provided to you?

17    A    I hope not.

18    Q    So, in your role --

19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20    from anybody.

21    Q    Well, did you receive any number of documents that were

22    provided by Highland to HarbourVest during the Acis

23    bankruptcy?

24    A    I wasn't involved in this during the Acis bankruptcy.  I'm

25    sorry.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/11/23   Page 88 of 213   PageID 8386

Seery - Cross                                    80

1   Q    Well, I'm referring to, after you became involved in this
2   Highland bankruptcy, whether you were provided with these
3   documents that were sent from Highland to HarbourVest.
4   A    I don't -- I don't know what the documents are.  I've
5   reviewed tons of documents with respect to the HarbourVest
6   claims, but I don't know of the documents to which you're
7   referring.
8   Q    Okay.  And after you performed your investigation into the
9   HarbourVest claim, what was your opinion as to the cause in
10  the reduction in value of HarbourVest's investment in HCLOF?
11  A    I think the main cause of the reduction in the investment
12  was the imposition of the Trustee and the failure of Highland
13  HCLOF and then subsequently with the injunction to reset the
14  CLOs.
15      You know, these are -- these are some of the worst-
16  performing CLOs in the market because they weren't reset.  And
17  when the liabilities of the CLOs are set at a level to match
18  assets, and then liability -- the assets run off, and the
19  asset financings or the new deals come in at much lower
20  levels, and the obligations of the CLO are not reset, the
21  arbitrage that is the CLO shrinks.  And that's what happened
22  to these CLOs.
23  Q    And during the course of the Acis bankruptcy, Acis and
24  Brigade were given management responsibilities over the CLOs
25  and HCLOF, correct?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/29/21   Page 89 of 213   PageID 8397

Seery - Cross                               81

1  A    I believe that the Trustee had the overall, and then

2  subsequently, with the confirmation of the plan, they took it

3  over.  So I think that ultimately Mr. Terry had the management

4  authority, full management authority, and some advice through

5  Brigade.  But I think technically it wasn't actually during

6  the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7  Phelan had the actual authority.

8      (Echoing.)

9  Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10  the actual authority but he delegated that authority to Josh

11  Terry and Brigade?

12  A    I think that's fair, yes.

13  Q    And do you know when that occurred?

14  A    I believe that the control of the CLOs was in July of

15  2018, and then the ultimate confirmation of the case was at

16  the very beginning of '19.

17  Q    So, after being instituted as portfolio manager, and

18  during the time when Acis and Brigade were working under the

19  direction of the Trustee, who would have receive the fees for

20  managing those portfolios?

21  A    I believe -- I don't know.  I believe the -- that the Acis

22  estate would have received those fees.

23  Q    And who -- and so is that your testimony, that prior to

24  confirmation the Acis estate would have received the

25  management fees?

1  A   I believe that -- I believe they would have if they were

2  the manager, yeah.

3  Q   Okay.  And who would have received the fees after

4  confirmation?

5  A   Acis.

6  Q   Okay.  And who would have had the discretion to set the

7  amount of those management fees?

8  A   They would be agreed to in the -- in the investment

9  management agreement.

10  Q   They would be agreed to?

11  A   Yes.  As far as I've seen, I've -- I haven't seen

12  unilateral ability of a manager to set fees at its -- at its

13  whim.

14  Q   So is it your understanding that Acis and Brigade ended up

15  charging substantially more fees than Highland had charged

16  when it was under Highland's management?

17  A   I think the fees were -- the fees were -- the fees were

18  set by the agreement.

19        MR. MORRIS:  Your Honor, I just object to the line of

20  questioning on relevance grounds.  This is a 9019 hearing,

21  Your Honor.  How -- I just don't think this has any relevance

22  at all.

23        THE COURT:  All right.  Mr. Wilson, what is the

24  relevance?

25        MR. WILSON:  The relevance is that Mr. Seery has

Seery - Cross                              83

1   testified that these Acis CLOs were among the worst-performing

2   in the market, and frankly, we would agree with that, and I'm

3   trying to get his understanding as to why, because I think

4   there's direct relevance in the reason that the value of the

5   HarbourVest investment diminished.

6         MR. MORRIS:  I don't think that was his testimony,

7   Your Honor.  But at the end of the day, Your Honor has heard

8   the litany of reasons why the Debtor is entering into this

9   agreement.  I just, I just think it's irrelevant, Your Honor.

10        THE COURT:  All right.  Mr. Wilson, I barely think

11  this is relevant.  I mean, I'm going to give you some benefit

12  of the doubt on that because of, you know, the testimony that

13  HarbourVest lost $50 million of value and --

14     (Echoing.)

15        THE COURT:  -- maybe that shouldn't, you know, lie at

16  the feet of Highland.  I think the compromise reflects that

17  they don't -- it doesn't lie entirely at the feet of Highland.

18  But, you know, maybe two or three more questions.

19        MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20  didn't have very much more on this point.  But to be a hundred

21  percent honest, I can't remember my question right before the

22  objection.

23        THE WITNESS:  I think you were asking me about the

24  fees and somehow alluding or implying that the manager could

25  unilaterally set fees.

1      The fees are set in the investment management contract.

2    The manager doesn't get to wake up on Wednesday and say, you

3    know, I'd like another half a basis point.  It doesn't work

4    that way.

5    BY MR. WILSON:

6    Q    But you would agree with me that the fees and expenses

7    charged to an investment would impact the performance of that

8    investment in the market?

9    A    Absolutely.

10   Q    Would you also agree with me that there was one CLO -- and

11   I think you referred to it in your direct testimony -- but CLO

12   7, which continued to be managed by Highland?

13   A    That's correct.

14   Q    And is it fair to say that CLO 7 exceeded the performance

15   of the CLOs that were managed by Acis and Brigade?

16   A    I think that's fair.  I don't -- I don't recall the

17   magnitude, but I think it's outperformed those -- those CLOs,

18   yes.

19   Q    All right.  Well, thank you.  I want to turn your

20   attention to the portion of the settlement agreement that

21   deals with voting of the HarbourVest claim.  How did

22   HarbourVest's commitment to vote for the plan become a part of

23   the settlement?

24   A    Pretty straightforward negotiation.  We -- in negotiating

25   the settlement, one of the key factors was the cost and

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-44   Filed 09/06/23   Page 93 of 213   PageID 8431

Seery - Cross                              85

1   expense of the litigation, in addition to the risk on the --

2   on the fees, and whether we could wrap this up in a global

3   settlement now.  So in my experience, it's fairly typical, we

4   would try to do this in every settlement, have the settling

5   party, be that the claimant, agree to support the case and the

6   plan.

7        You know, we did not do that with the Committee members,

8   although we wanted to.  (Echoing) I frankly still wish I had.

9   Those little -- little bits that have been difficult

10  (echoing).  The Committee members have a different interest in

11  (echoing) than their more global interest for creditors at

12  large, which is more difficult than traditionally in

13  bankruptcy cases, less likely to have a Committee member, a

14  sitting Committee member, actually support the (echoing) of

15  the plan.

16          THE COURT:  Mr. Wilson, could you be careful to put

17  your device on mute every time you're not talking?  Because

18  we're getting some feedback loop from you when Mr. Seery

19  answers your questions.  Okay?

20      (Echoing continues.)

21          THE COURT:  Like right now.  I'm hearing feedback of

22  my own voice through your speakers.

23      Right, Mike?  Isn't that what --

24          A VOICE:  I am, too.

25          THE COURT:  Yes.  Okay.  So please be sure you put

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-14   Filed 09/29/21   Page 94 of 213   PageID 3592

Seery - Cross                        86

1   your device on mute whenever you are not speaking.  All right.

2   Go ahead.

3   BY MR. WILSON:

4   Q   I mean, I think you just answered this question, but there

5   was -- there was no similar voting provision in the Acis or

6   the Redeemer settlements, correct?

7   A   There is not, no.  And just as a -- by way of explanation,

8   if it's okay, the reason was my counsel advised against it.  I

9   did ask for it.

10  Q   Your counsel advised against putting that voting

11  requirement in the Acis and Redeemer settlements?

12  A   For the reasons I stated.  And in my experience, that's

13  consistent, where sitting members of Committees don't

14  generally sign up to resolve their own claims and support the

15  plan because of their larger fiduciary duties to the creditor

16  body as a whole.

17  Q   And during the settlement negotiations of the HarbourVest

18  claim, was this commitment to vote a topic of discussion?

19  A   Not -- not particularly, no.  It was pretty clear that

20  HarbourVest, if they were going to agree to the settlement and

21  the numbers, could see structure.  Obviously, it wanted to

22  understand what the potential distributions would be under the

23  plan, but this was not a hotly-negotiated point.

24  Q   And would you consider HarbourVest's commitment to vote

25  for the plan an important part of the settlement?

Seery - Cross                                87

1  A    I think it's an important part of the settlement, that the

2  part of the settlement is the subordinated claim.  We could

3  put that into presumably any plan.  But our plan does -- does

4  have a Class 9 for that.  So I think it's a -- it's a part of

5  the settlement that is important or we wouldn't have included

6  it.  It clearly wraps everything up and moves us towards

7  confirmation.

8  Q    And would you have made the deal with HarbourVest if they

9  had pushed back on the commitment to vote for the plan?

10 A    Yeah, I would have.

11 Q    All right.  Thank you.

12         MR. WILSON:  No further questions.

13         THE COURT:  All right.  Mr. Draper, anything from

14 you?

15         MR. DRAPER:  Yes, Your Honor.

16                   CROSS-EXAMINATION

17 BY MR. DRAPER:

18 Q    Mr. Seery, I may not understand the settlement, and I

19 apologize, but the way I think the settlement reads, the

20 interest that you're acquiring, you have the right to place in

21 any entity.  Is that my -- is that correct?

22 A    I don't recall the -- the specifics, but just from a

23 structural standpoint, we wanted to be able to put it into a

24 subsidiary as opposed to putting it directly in HCMLP.  If we

25 couldn't do that, we would -- we would put it into HCMLP.  So

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/30/23    Page 96 of 213    PageID 3464

Seery - Cross                           88

1   there wasn't a -- I don't recall the actual specifics, but we

2   certainly thought about holding that interest in a -- in a

3   subsidiary, just to have a cleaner hold.

4   Q   Why aren't you putting it into the Debtor so the Court and

5   the estate have jurisdiction over that?

6   A   I think the Court certainly has jurisdiction over an

7   entity that the estate owns a hundred percent of.  I don't

8   think that's -- that's even a close call.  So the important --

9   Q   Now, --

10  A   Can I finish?

11  Q   Sure.

12  A   You asked me why.  To the extent that somebody thinks that

13  problematic, I will consent to the Court having complete

14  jurisdiction over it, since I control it a hundred percent.

15  Q   No.  The real reason is, if I remember correctly, Mr.

16  Dondero and Judge Lynn filed a motion to have some say or some

17  information as to sales by subsidiaries, and I think you took

18  the position that they weren't entitled to it.  And so my

19  concern was that putting this in a subsidiary in a sense gave

20  you unfettered control without any review of the item.

21  A    I don't -- I don't think that's the case where we --

22  there's a directly-held subsidiary where we own a hundred

23  percent of it.  I don't think that that's the case.

24  Q   Okay.  But you're willing to (a) put this into the Debtor,

25  number one; and number two, have the estate and have the Court

1  have complete control over the disposition of it and its

2  actions, correct?

3  A    That's not correct, no.

4  Q    What -- what is incorrect about my statement?

5  A    The debtor-in-possession has control of its assets.  The

6  Court doesn't have complete control over its assets.  There's

7  --

8  Q    Well, --

9  A    -- issues -- hold on a second.  This is not -- this is not

10  a game and a trap.  We put it in a subsidiary for specific

11  reasons.  You asked why.  I'm giving you the why.  It's not to

12  hide it from anybody.  We're not going to sell the asset

13  unless somebody comes up with a great price for it.  We're

14  going to monetize the assets.  We're going to control HCLOF by

15  a majority.

16  Q    But, again, the issue is, if it's in the estate, the Court

17  has supervision over it.  If it's not in the estate, the Court

18  has no supervision of it.

19  A    I don't think that's correct, because the Court has

20  supervision over the estate, which owns a hundred percent of

21  the special-purpose entity that will own the shares.

22  Q    Okay.  All right.  Now, let's talk about the $15 million

23  that you discussed and the legal fees that were incurred.  Is

24  that the total amount that was spent, or is -- or is that --

25  was the total amount $30 million and HarbourVest was only

1    responsible for one half of it or functionally took the brunt

2    of one half of it?

3    A    I think the total amount is between $15 and $20 million.

4    I don't have the exact numbers.

5    Q    So, in fact, the HarbourVest loss due to its ownership

6    would have been one half of that, not $15 million?

7    A    Well, the vehicle lost the money.  HarbourVest owned 49.98

8    percent of it, and Highland controlled the rest.  So if you

9    allocate it that way, I suppose that would be a -- that's how

10   you would divide it, in -- roughly in half, yes.

11   Q    And so HarbourVest's actual dollar loss due to the legal

12   fees is really the 49-point-whatever percent of $15 million,

13   not $15 million?

14   A    I don't know if -- I certainly would argue that.  I don't

15   think that HarbourVest has that position.

16   Q    Okay.  Now, in connection -- you were asked a question

17   about the documentation that was provided by Highland to

18   HarbourVest both during the bankruptcy of Acis and before.

19   You have control over the Harbour -- over the Highland server,

20   correct?

21   A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22   Draper, I can't see you, so it would be better if I could see

23   you during the questioning.

24   Q    Okay.

25   A    And could you repeat the question?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14   Filed 09/26/23   Page 99 of 213   PageID 8497

Seery - Cross                                    91

1    Q    All right.  I'll be happy to.  You were asked a question

2    about the documentation that was provided by Highland to

3    HarbourVest during the Acis bankruptcy and meetings that took

4    place between the parties.  Correct?

5    A    Yes.

6    Q    And you stated you were unaware of the material that was

7    sent over?

8    A    I think I testified that I didn't receive the 40,000

9    documents that were mentioned.

10   Q    Did you do any search or order a search of the Highland

11   server to see what material was sent over by any party to

12   HarbourVest to analyze what -- what information they had

13   available to them and what was provided to them?

14   A    Yes, we did a search.

15   Q    And did you review the documentation that was sent over?

16   A    The -- the documentation that we looked at was very

17   specific to the investment and to the OM.  So we didn't look

18   for the -- the supposed 40,000 documents, no.

19   Q    Did you look for the material that was provided to them

20   during the Acis bankruptcy and the periodic meetings that you

21   discussed?  Or that you testified to earlier?

22   A    The answer is no.

23   Q    One last question.  I think, and just so I understand your

24   testimony, you've broken out the HarbourVest claim into two

25   pieces.  One is the legal fee amount that we've just

1  discussed, and I gather the other piece of that is the fraud

2  in the inducement to enter into the CLO purchase?

3  A    It's -- it's more -- it's much more than that.

4  Q    Okay.  Well, let me say it in a different way.  The other

5  part of it is the losses as a result of the fraud in the

6  inducement to purchase the interest?

7  A    I don't think that's -- that's fair.  If I could explain?

8  Q    Sure.

9  A    Yeah.  The legal fee piece is pretty clear.  The other

10 piece starts with fraud in the inducement, but it's extensive

11 fraud claims.  Fraud in the inducement, as I testified

12 earlier, would get them around the exculpation and liability

13 limitations in the OM.  You don't get around all of those with

14 just the fraud.  And so that's -- that's the split of that

15 claim.  So the fraud in the inducement contains fraud

16 allegations.  Even if you didn't have inducement, you'd have

17 other potential fraud claims.

18 Q    But let me state it in a different fashion.  But for the

19 investment, the fraud that you allege wouldn't have occurred?

20 A    I -- HarbourVest alleges it.

21 Q    No, I'm just -- in your analysis of the claim, but for the

22 inducement, the rest of the damages wouldn't have flowed?

23 A    That's HarbourVest's position, yes.  But for the fraud,

24 they wouldn't have made the investment.

25 Q    All right.

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4    Just a very few questions.

5                    REDIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Seery,  you were asked about that document that Lucy

8    prepared.  Do you remember that?

9    A    Yes, I do.

10   Q    In your experience, don't defendants often deny liability

11   before entering into settlements, or even worse, getting

12   adverse judgments entered against them?

13   A    Of course.  Yes.

14   Q    Okay.  And in response to Mr. Draper's questions, isn't

15   the Guernsey claim another claim that the Debtor took into

16   account in assessing the potential risks of this settlement?

17   A    There's a number of claims contained in it.  As I

18   mentioned earlier, I mentioned the RICO claim.  But there is a

19   Guernsey shadow director claim, which is not dissimilar to

20   U.S. claims that somebody effectively controls an enterprise,

21   notwithstanding them not having the official role.

22   Q    Okay.

23         MR. MORRIS:  I have nothing further, Your Honor.

24         THE COURT:  All right.  Any recross on that redirect?

25   All right.

000657

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01803-B   Document 28-44 Filed 09/15/23 17 Page 102 of 213   PageID 662

Seery - Redirect                        94

1            MR. WILSON:  No, Your Honor.

2            MR. DRAPER:  No, Your Honor.

3            THE COURT:  Thank you.  Mr. Seery, that concludes

4    your testimony.  Thank you.

5            THE WITNESS:  Thank you, Your Honor.

6            THE COURT:  We need to take a bathroom break.  Before

7    we do, I just want to be clear with what we have left.  As I

8    understood it, we were having Mr. Pugatch from HarbourVest.

9    Mr. Morris, will that conclude the Debtor's evidence?

10   (Pause.)  Okay.  You were on mute, but I think you were saying

11   yes.

12           MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13   going to be putting their witness on the stand.

14           THE COURT:  Okay.

15           MR. MORRIS:  But it's part of the evidence in support

16   of the motion.

17           THE COURT:  All right.  Do the Objectors have any

18   witnesses today?

19           MR. WILSON:  Your Honor, Mr. Dondero intends to

20   examine Mr. Pugatch, but if he's going to be called by his

21   counsel, then we will do that as a cross-examination.

22           THE COURT:  All right.

23           MR. DRAPER:  This is Douglas Draper.  I have no

24   witnesses.

25           THE COURT:  Okay.  All right.  Well, I'm asking --

1    well, I do want to ask:  Can we get a time estimate

2    potentially for Mr. Pugatch?

3            MS. WEISGERBER:  For my examination, Your Honor,

4    twenty minutes, perhaps.

5            THE COURT:  Okay.

6            MS. WEISGERBER:  Or less.

7            THE COURT:  All right.  Well, let me tell you what

8    we're going to do.  We're going to take a ten-minute bathroom

9    break.  But I have a 1:30 hearing and I have a 2:00 o'clock.

10   Well, I have a 1:30 docket, multiple matters, and a 2:00

11   o'clock docket.  So, you know, I'm really intending that we

12   get finished in time to give me and my staff a little bit of a

13   lunch break before launching into the 1:30 docket, so I'm

14   hopeful we can get done around 1:00-ish.  If we can't, then

15   we're going to have to reconvene, I'm going to say probably

16   3:00-ish Central time.  So let's hope we can get through

17   everything.  All right?  Ten-minute break.

18           THE CLERK:  All rise.

19       (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20           THE CLERK:  All rise.

21           THE COURT:  All right.  Please be seated.  We're

22   going back on the record in the Highland matters.  Do we have

23   everyone?  It looks like we do.  Ms. Weisgerber is going to

24   call the next witness; is that correct?

25           MS. WEISGERBER:  Yes, Your Honor.  We call Michael

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-00803-B   Document 28-14   Filed 09/27/23   Page 104 of 213   PageID 664

Pugatch - Direct                              96

 1  Pugatch of HarbourVest to the stand.

 2          THE COURT:  All right.  Mr. Pugatch, if you could

 3  turn on your video and say, "Testing one, two."

 4          MR. PUGATCH:  Two.

 5          THE COURT:  All right.  There you are.  Please raise

 6  your right hand.

 7          MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

 8          THE COURT:  Thank you.  You may proceed.

 9          MS. WEISGERBER:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q    Good morning.  Can you please state your name for the

13  record?

14  A    Sure.  It's Michael Pugatch.

15  Q    And where do you work, Mr. Pugatch?

16  A    HarbourVest Partners.

17  Q    And what is your title?

18  A    I'm a managing director in our secondary investment

19  group.

20  Q    Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A    We did, yes.  Several claims, in fact.

23  Q    What was the basis for those claims?

24  A    Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-4   Filed 09/23/23   Page 105 of 213   PageID 665

Pugatch - Direct                                    97

1   connection with our original investment, mismanagement at the

2   HCLOF level, including inappropriate fees that were charged

3   to investors, among a number of other items as well.

4   Q   Can you explain what you mean by misrepresentations made

5   to HarbourVest by Highland?

6   A    Yeah, sure.  So, you know, based on a number of

7   statements that were made to us around the litigation

8   involving Mr. Terry, some of the intentions found, the

9   structural changes that came to light with respect to HCLOF

10  and our investment, as well as the fact that the arbitration

11  award specifically against Mr. Terry would have no impact or

12  implication on Highland's sale or business.

13  Q   And can you explain what you mean by omissions made by

14  Highland to HarbourVest?

15  A    Sure.  So I would say, really, the implications behind

16  the structural changes that were made at the time of our

17  investment into HCLOF.  Also, the intention, clear intentions

18  that Highland had to never, in fact, pay the arbitration

19  award that came to light during our due diligence period to

20  Mr. -- to Mr. Terry as part of the investment.  And

21  ultimately the -- what Highland went about doing in terms of

22  stripping assets of Acis that led to the material value

23  declines and destruction of value that we've experienced

24  since our investment.

25  Q   You mentioned a diligence period.  Did HarbourVest

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 28-14 Filed 09/29/21 17:31 Page 106 of 213   PageID 866

Pugatch - Direct                                98

1  conduct diligence on the investment?

2  A    We did.  We conducted very detailed due diligence, as we

3  do for all of our investments.  That diligence period lasted

4  several months ahead of our investment decision.

5  Q    And did HarbourVest conduct that diligence by itself?

6  A    No.  So, in addition to internal investment professionals

7  at HarbourVest, we engage with outside advisors, both

8  consultants as well as legal advisors, in connection with

9  that due diligence.

10 Q    And did Highland answer all of HarbourVest's questions

11 during that diligence period?

12 A    They did.  And they were numerous.  But yes, they

13 answered all the questions that we had for them.

14 Q    Was the Terry dispute part of HarbourVest's diligence?

15 A    It was.  That came up as one of the outstanding items of

16 litigation as part of our due diligence.

17 Q    I'm going to ask my colleague to pull up on the screen an

18 exhibit that was on our exhibit list as Items -- Exhibits 34

19 and 35.  It's an August 15, 2017 email from Brad Eden to

20 Dustin Willard.  Mr. Pugatch, do you recognize this document?

21 A    I do, yes.

22 Q    And what is it?

23 A    This was an email sent to us during our due diligence

24 period in response to a request for more information on the

25 outstanding litigation that Highland was involved with.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 16-4   Filed 09/19/23   Page 107 of 213   PageID 8575

Pugatch - Direct                     99

1          MS. WEISGERBER:  And if my colleague can just scroll

2     to the attachment to that email.

3     BY MS. WEISGERBER:

4     Q   And do you recall the attachment as well, Mr. Pugatch?

5     A   Yes, I do.

6          MS. WEISGERBER:  And if you can scroll back up to the

7     first email.

8     BY MS. WEISGERBER:

9     Q   Who is Dustin Willard?

10    A   Yes.  Dustin is a colleague of mine at HarbourVest who

11    worked closely with me on this investment.

12    Q   And you said that this document was shared with

13    HarbourVest during the diligence period before the HCLOF

14    investment?

15    A   It was, correct.

16    Q   Is it typical during diligence to receive a description

17    of litigation such as this?

18    A   It is.  It's a question that we always ask.  Certainly a

19    component of our diligence to understand any outstanding

20    litigation on the part of our counterparty or manager that

21    we're investing in.

22         MS. WEISGERBER:  Your Honor, I'd move to offer this

23    exhibit into evidence.

24         THE COURT:  Any objection?

25         MR. DRAPER:  No objection, Your Honor.

1          MR. MORRIS:  No objection from the Debtor, Your

2     Honor.

3          THE COURT:  All right.  What is the letter or number

4     for this exhibit?

5          MS. WEISGERBER:  It's HarbourVest Exhibit 34.

6          THE COURT:  All right.  So HarbourVest Exhibit 34 is

7     admitted.

8        (HarbourVest's Exhibit 34 is received into evidence.)

9          THE COURT:  And I need to be clear where it appears

10     on the docket.  Can someone tell me?

11          MS. WEISGERBER:  So, it's identified on our exhibit

12     list, not -- it's not attached to the exhibits.  It is on the

13     docket.  We were -- when we initially filed the exhibit list,

14     we were working out confidentiality issues.  But it was

15     subsequently filed with our reply last night.  It's at Docket

16     No. 1735 --

17          THE COURT:  All right.

18          MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19          THE COURT:  All right.  Very well.  Thank you.

20     BY MS. WEISGERBER:

21     Q   Mr. Pugatch, we'll just scroll down to the second page of

22     the attachment.  Can you describe generally what the

23     litigation says regarding the Terry dispute?

24     A   Yes.  Generally speaking, this dispute was described as

25     an employee dispute, employment agreement dispute, with Mr.

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 01/09/23    Page 109 of 213    PageID 8597

Pugatch - Direct                                          101

1    Terry, who was a former employee of Highland involved in

2    their CLO business, and is described by Highland to us really

3    having to do with a series of false claims, in their opinion,

4    but having to do with a disgruntled former employee.

5    Q    And did it strike you as an unusual or significant

6    dispute?

7    A    No.  I would say we often -- we'll see, you know, former

8    employees with, you know, claims against a former employer in

9    connection with wrongful termination.  I wouldn't say it's

10   extremely common, but certainly not entirely out of the

11   ordinary.  And based on the explanations that we'd received

12   from Highland, seemed to be more of an ordinary-course type

13   former employee litigation suit.

14   Q    Based on what you now know about the Terry dispute, do

15   you believe that this was an adequate disclosure regarding

16   the dispute?

17   A    I would say very clearly not, you know, based on the

18   facts that came to light subsequently, the various rulings in

19   connection with the Acis bankruptcy case.  What was very

20   clearly not stated are the actual facts and implications of

21   the ongoing litigation with Mr. Terry.

22        MS. WEISGERBER:  I'd ask my colleague to put up the

23   next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24   list, which is Document No. 1723.  It's Exhibit 36 on that.

25   Same issue with respect to initially not filed, but it is on

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/29/21    Page 110 of 213    PageID 8608

Pugatch - Direct                                    102

1    the docket at our response last evening at ECF No. 1735 at

2    Page A351.

3              THE COURT:  Page what?

4              MS. WEISGERBER:  A351.

5              THE COURT:  A351.  Thank you.

6              MS. WEISGERBER:  You're welcome.

7    BY MS. WEISGERBER:

8    Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9    Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10   Bellisario.  Do you recall this document?

11   A    I do, yes.

12   Q    And what is this document?

13   A    This was an email sent to us by Highland a couple weeks

14   after we closed on our investment on the (inaudible) in

15   response to a *Wall Street Journal* article that had come out

16   regarding Highland, a number of actions that they had taken,

17   and what Highland was articulating to us, a number of false

18   claims that had been made about Highland's prior actions, and

19   specifically trying to explain some of that and also share

20   with HarbourVest a letter that was being sent to the editor

21   of the *Wall Street Journal* highlighting, in their view, some

22   of the inaccuracies around the reporting.

23   Q    And did you receive this document?

24   A    We did, yes.

25              MS. WEISGERBER:  I'd move to offer this, so

Pugatch - Direct                                    103

1   HarbourVest Exhibit 36, into evidence.

2            THE COURT:  Any objections?

3            MR. WILSON:  Your Honor, John Wilson.  I would object

4   as to the relevance of this document.

5            THE COURT:  All right.  What's your response?

6            MS. WEISGERBER:  Your Honor, it shows

7   misrepresentations that the witness will testify how it

8   relates back to prior representations prior to HarbourVest's

9   investment, as well as misrepresentations at that time.

10           THE COURT:  Okay.  I overrule the objection.  I'm

11  going to admit it.

12       (HarbourVest's Exhibit 36 is received into evidence.)

13  BY MS. WEISGERBER:

14  Q   Mr. Pugatch, can you describe generally -- we spoke about

15  this a little bit -- just what this communication from

16  Highland was conveying to HarbourVest at the time?

17  A   Yes.  Specifically, again, responding to this *Wall Street*

18  *Journal* article that had been published, trying to defend,

19  again, Highland's own views why there were inaccuracies in

20  the reporting.  But importantly, from our perspective, trying

21  to reassure us as to the fact that, you know, these

22  accusations would have no bearing and any results from it

23  would have no bearing on their ongoing business or

24  partnership or the investment that we had made in HCLOF.

25           MS. WEISGERBER:  And if you can scroll to the second

000667

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/05/23   Page 112 of 213   PageID 862

Pugatch - Direct                                           104

1   page.

2   BY MS. WEISGERBER:

3   Q   We'll just look at the last paragraph of another email

4   from Mr. Covitz.  Can you just read that first sentence of

5   the last paragraph?

6   A   Sure.  (reading)  While the dispute has no impact on our

7   investment activities, as always, we welcome any questions

8   you may have.

9   Q   Mr. Pugatch, was this email and the discussion regarding

10  the Terry dispute consistent with the representations made to

11  you prior to HarbourVest's investment into HCLOF?

12  A   It was, yes.  Both the message, the lack of any impact

13  that ultimately the dispute with Mr. Terry, the arbitration

14  award would have around Highland's ongoing CLO business, or

15  HCLOF specifically, was all, you know, very clear in this

16  document, but all consistent with the representations that

17  had been made to us leading up to our investment in the

18  middle of November 2017 as well.

19  Q   Thank you.

20       MS. WEISGERBER:  And you can take down the exhibit,

21  Emily.  Thank you.

22  BY MS. WEISGERBER:

23  Q   You mentioned, Mr. Pugatch, an arbitration award to Mr.

24  Terry.  How did you learn about that arbitration award?

25  A   That was initially disclosed to us by Highland as we were

Pugatch - Direct                                         105

1  in the late stages of our diligence and closing process on

2  the investment into HCLOF.

3  Q    And generally, what did Highland tell you about the

4  arbitration award?

5  A    We were aware of its existence.  We were aware of the

6  quantum of the award, I think it was around an $8 million

7  arbitration award in the favor of Mr. Terry, and that was

8  following the litigation around the wrongful termination and

9  employee dispute that Highland had described to us

10  previously.

11  Q    Did you ask to see a copy of the arbitration award?

12  A    No, we did not.

13  Q    Why not?

14  A    Ultimately, we -- you know, the explanations that

15  Highland had provided to us all seemed very reasonable.  We

16  relied on their representations that this was, again, nothing

17  more than a dispute with a former disgruntled employee, in

18  their words, that had no bearing or, you know, would not have

19  any bearing on our investment in HCLOF or their ongoing CLO

20  business, which all very clearly was not the case, as

21  we've -- as we've learned over the last several years.

22  Q    Following learning about the arbitration award, did

23  HarbourVest do other diligence?

24  A    We did.  So, in addition to asking questions related to

25  the arbitration award and any impact that it would have, we

1  also spent some time diligencing a couple of structural

2  changes that were proposed by Highland, and, in fact, ended

3  up delaying the closing of our investment by about two weeks

4  as we vetted some of those structural changes that Highland

5  had proposed.  Vetted those both, you know, internally with

6  Highland directly and with external counsel in order to make

7  sure that those structural changes were in fact legally sound

8  in ultimately making our investment.

9  Q    And were those changes proposed following the arbitration

10 award?

11 A    They were, yes.

12 Q    Did Highland tell you the reason for the structural

13 changes?

14 A    Yeah.  So, so some of this -- and specifically, this

15 involved a change of the portfolio manager at the HCLOF level

16 that was really in connection with a rebranding as Highland

17 was going through a rebuild of its CLO business and wanting

18 to align, from a brand perspective, their business on an

19 ongoing basis with the Highland brand as opposed to the Acis

20 brand.  But more specifically, in the case of a late change

21 from a structured standpoint, the -- part of the intention

22 and the investment thesis of HCLOF was to pursue a reset, a

23 refinancing of all the underlying CLOs as they approached the

24 end of their investment period or came out of their

25 investment period.

000670

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/05/23   Page 115 of 213   PageID 8653

Pugatch - Direct                                    107

1      And in connection with that, in light of the arbitration

2   award, Highland's view was that there may be difficulties in

3   the market in resetting certain of those Acis CLOs with the

4   Acis brand associated with them, given, again, the existence

5   of the arbitration award and concerns in the market around

6   the Acis brand reputation.

7   Q    And what did they tell you was the market view of Acis,

8   or the Acis brand?

9   A    Yeah.  Their view or their concern was that the, you

10  know, because of the existence of that arbitration award, the

11  brand would be viewed as toxic.

12  Q    Didn't this put you on notice that perhaps there was

13  something wrong with the structural changes?

14  A    I mean, we -- I mean, short answer, no.  We ultimately

15  asked questions, we diligenced the legal structure, but

16  relied on the representations that were made to us by

17  Highland around the rationale for the structural changes,

18  that these are all changes that were within a Highland-

19  managed vehicle or sat below the vehicle that we were

20  investing in, and so ultimately were in Highland's purview,

21  was the representations that we relied on.

22  Q    And did HarbourVest alone do that diligence of the

23  structural changes?

24  A    So, no.  I mean, in connection with the diligence that we

25  did internally and with Highland directly, we engaged with

000671

 1  outside counsel who was working with us at the time to vet

 2  those structural changes as well.

 3  Q    Did HarbourVest rely on Highland's representations

 4  regarding the arbitration award and the structural changes in

 5  making its investment in HCLOF?

 6  A    We did, absolutely.

 7  Q    If Highland had disclosed the nature of the structural

 8  changes, of removing Acis as the portfolio manager and

 9  related transfers, would HarbourVest have proceeded with its

10  investment?

11  A    Definitively, no, we would not have.

12  Q    Why not?

13  A    I think the reality is if we had understood the intent,

14  you know, that Highland was ultimately undertaking here, we

15  would not have wanted to be any part of this, and certainly

16  getting dragged into all of this, the hassle, the value

17  destruction that we've seen on behalf of the investors and

18  the funds that we manage.  And I would say, lastly, we just

19  full stop would not have done business with a firm who

20  engages with this type of behavior, had we actually known the

21  truth.

22  Q    Mr. Pugatch, are you familiar with the bankruptcy that

23  followed of Acis?

24  A    Yes.

25  Q    And what was your -- or, did HarbourVest participate in

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/19/23   Page 117 of 213   PageID 8675

Pugatch - Direct                    109

1  that bankruptcy?

2  A    So, initially, no.  Subsequently, we ended up getting

3  dragged into that on account of a number of misstatements by

4  Highland about the role that HarbourVest had played as part

5  of our investment into HCLOF and some of that structure and

6  the structural changes that I alluded to.

7  Q    How did HarbourVest learn about those misstatements in

8  the bankruptcy about HarbourVest's role?

9  A    So, ultimately, those came to light on -- you know, on

10  account of the ongoing proceedings within the Acis bankruptcy

11  process, and specifically brought to light to us by the Acis

12  trustee at the time, who decided to pursue, you know, further

13  diligence or discovery around the claims that Highland had

14  made around HarbourVest's involvement in those changes.

15  Q    And what is your understanding of what the allegations

16  were that caused the Acis trustee to investigate HarbourVest?

17  A    Sure.  So, you know, our understanding was that Highland

18  had made statements, again, false statements that HarbourVest

19  had actually instructed some of those structural changes,

20  that we were the ones that had said that we would not do

21  business with Acis and had ordered some of the underlying

22  transfer of assets or, again, structural changes, that, you

23  know, very clearly I would say were not the case.  Also, that

24  HarbourVest was -- was calling the shots as it relates to any

25  of the ongoing management or future resets of the CLOs.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-4   Filed 01/10/23   Page 118 of 213   PageID 8666

Pugatch - Direct                               110

1  Q    Did HarbourVest instruct any of those structural changes

2  or transfers to occur?

3  A    We did not.  Absolutely not.

4  Q    Why didn't HarbourVest itself appear in the Acis

5  bankruptcy and file a claim?

6  A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7  passive investor in a Highland-managed company.  We had no

8  direct interaction with or relationship with Acis.  There was

9  really no reason for us to be directly involved until we were

10  subsequently dragged into involvement on account of those

11  misstatements.  And then at that point our focus really

12  pivoted to, you know, whether we needed to defend ourselves

13  against those accusations that had been made by Highland and

14  after a request for further information in discovery by the

15  Acis trustee.

16  Q    Did HCLOF participate in the Acis bankruptcy?

17  A    They did, yes.

18  Q    Did HCLOF incur fees for participating in the Acis

19  bankruptcy?

20  A    Yes.  In fact, very meaningful fees, to the tune of well

21  in excess of $15 million of legal fees, as we understand it,

22  that have been incurred, largely in connection with the

23  ongoing Acis bankruptcy and Highland's continued pursuit of

24  and in connection with the litigation with Mr. Terry, which

25  we firmly believe was entirely inappropriate that HCLOF and

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 16-14   Filed 01/12/21   Page 119 of 213   PageID 8697

Pugatch - Direct                              111

1  ultimately investors in HCLOF bear those expenses, which were

2  not just expenses of HCLOF but of Highland and a number of

3  other Highland affiliates.

4  Q   Do those expenses form a basis of separate claims filed

5  by HarbourVest against Highland?

6  A   They do, yes.  One of the multiple claims that we had

7  filed against Highland.

8  Q   And a few more questions, just for the record, Mr.

9  Pugatch.  How much did HarbourVest initially invest in HCLOF?

10  A   Sure.  So, our initial investment in November of 2017 was

11  right about $73-1/2 million, I believe.

12  Q   Did HarbourVest invest any additional money in HCLOF?

13  A   We did.  There was a subsequent capital call investment

14  of about $5 million, bringing our total investment to just

15  under $80 million in aggregate.

16  Q   When HarbourVest initially made the investment, did it

17  anticipate making a profit on it?

18  A   We did, yes.

19  Q   How much did HarbourVest anticipate earning from the

20  investment?

21  A   Yeah.  So, our -- based on the original $73-1/2 million

22  investment, we had expected a total return of about $137

23  million on that -- on that investment.

24  Q   What was that projection based on?

25  A   So, that projection was based on materials that we had

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/19/23   Page 120 of 213   PageID 8703

Pugatch - Direct                                    112

1    received from Highland, their internal projection models on

2    the future performance of the underlying CLOs that we were

3    acquiring exposure to through our investment in HCLOF, and

4    was one of the inputs or formed the basis in connection with

5    our diligence that we ultimately ran different sensitivities

6    -- projections around and helped employ -- helped inform our

7    investment thesis.

8    Q    Do you know the current value of HarbourVest's investment

9    in HCLOF?

10   A    Yes.  The current value is right around $22-1/2 million.

11   Q    So roughly how much has the investment itself decreased

12   from HarbourVest's initial investment?

13   A    So, net of what was about $4-1/2 million of distributions

14   that we received early on in the investment, we've lost, to

15   date, in excess of $50 million on our original investment.

16   Q    And just for -- to close out, Mr. Pugatch, knowing all

17   that you know, if HarbourVest had known that -- about the

18   nature of the transfers by Acis or Highland's intent with

19   respect to the arbitration award, would HarbourVest have made

20   this investment?

21   A    No.  The reality is, had we known the truth, or even had

22   a sense of the truth, the true intentions behind some of

23   those transfers and ultimately what would have happened, we

24   never would have made this investment, full stop.

25   Q    Thank you, Mr. Pugatch.

000676

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-14   Filed 09/19/23   Page 121 of 213   PageID 8719

Pugatch - Cross                                    113

1        THE COURT:  All right.  I didn't hear you, Ms.

2   Weisgerber.  Do you pass the witness?

3        MS. WEISGERBER:  Yes, I pass the witness.

4        THE COURT:  All right.  Thank you.

5     Mr. Morris, any examination from you?

6        MR. MORRIS:  No, thank you, Your Honor.

7        THE COURT:  All right.

8     (Interruption.)

9        THE COURT:  All right.  I'm not sure whose voice that

10  was, but please, again, mute your devices when you're not

11  talking.

12     Any cross-examination of Mr. Pugatch?  I'll start with

13  you, Mr. Wilson.

14        MR. WILSON:  Yes, Your Honor.

15        THE COURT:  Okay.

16                    CROSS-EXAMINATION

17  BY MR. WILSON:

18  Q    How are you -- I guess we're afternoon now.  How are you

19  this afternoon, Mr. Pugatch?

20  A    I'm doing well.  Yourself?

21  Q    I'm doing well as well.  Do you recall that on Monday of

22  this week I took your deposition?

23  A    Yes, I do.

24  Q    And so you understand that my name is John Wilson and I

25  represent Jim Dondero, who has filed an objection to the 9019

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-14   Filed 09/15/23   Page 122 of 213   PageID 8720

Pugatch - Cross                                    114

1    motion filed by the Debtor?

2         I've got a few questions for you today.  Has HarbourVest

3    been around for over 35 years?

4    A    We have, yes.

5    Q    And does HarbourVest have ten offices around the world?

6    A    Correct, yes.

7    Q    And does HarbourVest employ over 150 investment

8    professionals?

9    A    Yes.

10   Q    Does HarbourVest have over $74 billion in assets under

11   management?

12   A    Correct, yes.

13   Q    And is HarbourVest's client base largely comprised of

14   institutional investors?

15   A    Also correct.

16   Q    And you would agree with me that HarbourVest is a

17   sophisticated investor, right?

18   A    I would, yes.

19   Q    How long have you worked for HarbourVest?

20   A    I've been employed by HarbourVest for 17 years now.

21   Q    And how long have you been a managing director?

22   A    I've been a managing director for approximately six

23   years.

24   Q    And you were, in fact, the managing director for the

25   investment that HarbourVest made in Highland CLO Funding,

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/16/21    Page 123 of 213    PageID 8731

Pugatch - Cross                    115

 1  Ltd., which has been referred to today as HCLOF, correct?

 2  A    I was, correct.

 3  Q    And HarbourVest, I think you just testified, invested

 4  approximately $73 million as its initial investment in HCLOF?

 5  A    Yes, correct.

 6  Q    And before HarbourVest made that investment, it had made

 7  many investments of this type, correct?

 8  A    Yeah.  We've made hundreds of investments into

 9  partnerships over our history, correct.

10  Q    So HarbourVest was well-experienced in evaluating and

11  deciding whether to invest in large investments, correct?

12  A    It was, yes.

13  Q    Now, in your -- and by your, I mean HarbourVest -- in the

14  response to the Debtor's omnibus objection, it says that by

15  summer 2017 HarbourVest was engaged in preliminary

16  discussions with Highland regarding the investment.  Is that

17  a correct statement?

18  A    Correct, yes.

19  Q    And, in fact, those talks began in the second quarter of

20  2017, correct?

21  A    Yes.

22  Q    And so the investment closed ultimately on November 15th,

23  2017?

24  A    Yes, that's correct.

25  Q    So it's fair to say that HarbourVest considered and

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-14   Filed 09/17/23   Page 124 of 213   PageID 8722

Pugatch - Cross                          116

1   evaluated this transaction for over six months before

2   investing its $73 million, right?

3   A    From the time of the initial conversations that we had

4   with Highland, yes.

5   Q    And one of the reasons that it took over six months to

6   complete the investment is that HarbourVest performs due

7   diligence before it makes an investment, correct?

8   A    Correct.

9   Q    And when you're performing due diligence -- well, first

10  off, you would agree with me that that's a common practice

11  amongst sophisticated investors such as HarbourVest, correct?

12  A    To perform due diligence?

13  Q    Yes.

14  A    Yes.

15  Q    And describe -- describe what HarbourVest does in a

16  general sense when it performs its due diligence.

17  A    Sure.  So, we spend time with the manager -- in this

18  case, Highland -- certainly around the investment thesis, the

19  opportunity, receive materials around the underlying assets.

20  We take that and perform our own independent due diligence

21  around the value of those assets, perform due diligence on

22  the manager itself, the go-forward opportunity.  In many

23  cases, and certainly in this case, engage with outside

24  advisors to assist with that due diligence.  It's a very

25  robust and thorough process.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 48-44   Filed 09/13/23   Page 125 of 213   PageID 8753

Pugatch - Cross                                    117

1  Q   And by outside advisors, are you referring to the outside

2  counsel that you testified about earlier?

3  A   Yes.  Both outside counsel and outside consultants.

4  Q   Okay.  And so did you say that it's typical to engage

5  outside counsel when performing due diligence?

6  A   Yes.

7  Q   And which outside counsel did you retain with respect to

8  this due diligence?

9  A   Debevoise and Plimpton as well as Milbank.

10 Q   And during the course of HarbourVest's due diligence, did

11 it identify some items of concern?

12 A   As with any investment, there are always items that are

13 identified that require further diligence, risks that are

14 identified that we look to mitigate through our due

15 diligence, et cetera.

16 Q   And if Harbour -- I'm sorry, did you say something else?

17 A   No.

18 Q   You were finished?  Okay.  Now, if HarbourVest identifies

19 an item of concern, is it typical to request additional

20 information regarding those items of concern?

21 A   It is, yes.

22 Q   And so that actually happened with respect to the HCLOF

23 investment, correct?

24 A   In certain cases, yes.

25 Q   HarbourVest identified several litigation matters that it

 1  had questions about, correct?

 2  A    Correct.  As we would with any investment.

 3  Q    And it went back to Highland and asked them to explain

 4  their position on those litigation matters?

 5  A    Correct.

 6  Q    And one of those litigation matters was the Joshua Terry

 7  litigation, correct?

 8  A    Yes.

 9  Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-4   Filed 01/20/23   Page 127 of 213   PageID 8725

Pugatch - Cross                                    119

1   litigation, was issued months before the arbitration award to

2   Josh Terry, correct?

3   A    I don't remember the exact timing, but it was certainly

4   during our due diligence period and prior to the arbitration

5   award, yes.

6   Q    Well, it seems to me that that email that you -- your

7   counsel admitted as an exhibit was issued in August of 2017.

8   Does that sound right to you?

9   A    If that's what the email said, yes.

10  Q    And if the Terry arbitration award came out in October,

11  then you would agree with me that that is several months

12  prior to the -- or at least two months prior to the

13  arbitration award?

14  A    Yes.

15  Q    And so when HarbourVest made requests of Highland to

16  provide information regarding its items of concern, Highland

17  complied with those requests, correct?

18  A    It did, correct.

19  Q    And was there ever a time when HarbourVest requested

20  Highland to provide information and that information was not

21  provided?

22  A    Our requests for information, or at least, you know,

23  responses or color to a question, were always met either

24  with, you know, written or verbal communication back to us,

25  yeah.

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-14    Filed 09/20/21    Page 128 of 213    PageID 8726

Pugatch - Cross                                          120

1  Q   And you would agree with me that, in fact, HarbourVest

2  delayed the closing of the investment by two weeks to

3  continue its due diligence, correct?

4  A   Correct, related to the structural changes that were made

5  close to closing.  That's right.

6  Q   And after conducting that due diligence, HarbourVest

7  satisfied itself that the investment was sound?

8  A   That the legal structure that had been put in place in

9  connection with those proposed changes by Highland was -- was

10  legally sound, yes, and on the back of, again, statements and

11  misrepresentations on the part of Highland around the nature

12  and potential impact to their ongoing CLO business and HCLOF.

13         MR. WILSON:  Well, I'm going to object to the latter

14  part of your response as nonresponsive.

15         THE COURT:  Sustained.

16  BY MR. WILSON:

17  Q   Now, after you conducted the due diligence, HarbourVest

18  made the investment of $73 million on November 15th, 2017,

19  correct?

20  A   Correct.

21  Q   And so I think you testified earlier that prior to that

22  investment HarbourVest had become aware that that Josh Terry

23  litigation had resulted in an arbitration award, correct?

24  A   Yes.

25  Q   But I think you've also testified that HarbourVest did

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/29/21   Page 129 of 213   PageID 8597

Pugatch - Cross                                    121

1  not request that Highland provide a copy of the arbitration

2  award, correct?

3  A    That's correct.

4  Q    And you further testified that you were represented by

5  outside counsel at the time, correct?

6  A    Correct.

7  Q    And as of Monday of this week, you had not reviewed that

8  arbitration award; is that correct?

9  A    That's correct.

10 Q    Have you reviewed that arbitration award since Monday of

11 this week?

12 A    I have not.

13 Q    But in any event, you testified that Highland told you

14 about the award?

15 A    Yes.

16 Q    And they told you the amount of the award?

17 A    Yes.

18 Q    And then they told you that the award had been converted

19 to a judgment?

20 A    When you say the award had been converted to a judgment,

21 can you be more specific?

22 Q    Well, I don't know how familiar you are with the

23 litigation process, but in this instance, that award was

24 taken to a court and the court entered a judgment on the

25 arbitration award.  Did you -- were you aware of that?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/29/21 17   Page 130 of 213   PageID 8808

Pugatch - Cross                    122

 1   A   I don't recall the specific legal terms of judgment

 2   against it.  I was award of the existence of the arbitration

 3   award and the -- and the obligation for Highland to comply

 4   with that arbitration award.

 5   Q   And HarbourVest did not make an appearance in the Acis

 6   bankruptcy, right?

 7   A   We did not.

 8   Q   But you were aware of the Acis bankruptcy, correct?

 9   A   Yes.

10   Q   And you were kept apprised of the Acis bankruptcy by

11   Highland individuals, correct?

12   A   We had conversations with a couple of Highland

13   individuals throughout the Acis bankruptcy process, yes.

14   Q   Right.  And in fact, you testified that you participated

15   in regular conference calls with Highland regarding that

16   bankruptcy?

17   A   That's correct, yes.

18   Q   And do you recall having been provided with over 40,000

19   documents by Highland related to the Acis bankruptcy?

20   A   I do not recall that, no.

21   Q   Would those documents have been provided to your outside

22   counsel, had you received them?

23   A   I don't know the answer to that.

24   Q   Did the outside counsel that represented you in the due

25   diligence continue to represent you throughout the Acis

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-14    Filed 09/29/21    Page 131 of 213    PageID 8829

Pugatch - Cross                                    123

1  bankruptcy?

2  A    They did.  One of the counsels did, correct.

3  Q    And which counsel was that?

4  A    Debevoise.

5  Q    So was your counsel actively involved with monitoring the

6  Acis bankruptcy?

7  A    They were, yes, particularly after we were ultimately

8  accused of having something to do with the original structure

9  and -- as a result of misstatements by Highland.

10 Q    Did your counsel attend hearings in the Acis bankruptcy?

11 A    I don't recall.

12 Q    Are you familiar with the PACER system?

13 A    I am not.

14 Q    Now, I think that HarbourVest has been described as a

15 passive investor.  You recall that description of HarbourVest

16 in this instance?

17 A    Yes.

18 Q    But, in fact, HarbourVest invested substantial assets

19 such that it owned a 49.98 percent share of HCLOF.  Would you

20 agree with that?

21 A    That's correct.

22 Q    And in fact, the next largest investor was CLO Holdco,

23 which owned 49.02 percent of the shares, correct?

24 A    That sounds right.

25 Q    And there was an advisory board that was created pursuant

000687

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 44-4   Filed 09/25/21   Page 132 of 213   Page ID 882

Pugatch - Cross                              124

 1   to the formation documents of this investment, correct?

 2   A    That's correct.

 3   Q    And in fact, that advisory board only had two members,

 4   and one was a representative of HarbourVest and one was a

 5   representative of CLO Holdco, correct?

 6   A    Correct.

 7   Q    And the advisor -- I'm sorry, the portfolio manager was

 8   not allowed to disregard the recommendations of the advisory

 9   board, correct?

10   A    With respect to the limited set of items that the

11   advisory board could opine on, that is correct.

12   Q    All right.  I want to go over a couple of the

13   misrepresentations that HarbourVest has identified in its

14   filings related to its claim.  The first one is -- and just

15   for the record, I'm reading from Docket No. 1057 filed on

16   September 11, 2020, HarbourVest Response to Debtor's First

17   Omnibus Objection.

18        But the first misrepresentation identified in that

19   document says that Highland never informed HarbourVest that

20   Highland had no intention of paying the arbitration award.

21   And was -- was Highland obligated to pay the Josh Terry

22   arbitration award against Acis?

23            MR. MORRIS:  Objection to the question to the extent

24   it calls for a legal conclusion.

25            THE COURT:  Sustained.

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-44    Filed 01/26/17    Page 133 of 213    PageID 8831

Pugatch - Cross                               125

1         MS. WEISGERBER:  Join in that objection.

2         THE COURT:  Sustained.  I think --

3   BY MR. WILSON:

4   Q   Your understanding was --

5         MR. WILSON:  I'm sorry, Judge?

6         THE COURT:  I sustained the objection as calling for

7   a legal conclusion.  So, next question.

8         MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

9   Honor.

10  BY MR. WILSON:

11  Q   In your understanding, was Highland responsible for

12  paying the arbitration award to Josh Terry?

13  A   My understanding is on the account of the fact that Acis

14  --

15        MS. WEISGERBER:  Objection, Your Honor.  Objection,

16  Your Honor, same basis.

17        THE COURT:  Sustained.  It was essentially the same

18  question.

19        MR. WILSON:  Well, Your Honor, I didn't ask --

20        THE COURT:  It was essentially the same question, Mr.

21  Wilson.  Move on.

22        MR. WILSON:  Okay.

23  BY MR. WILSON:

24  Q   The next misrepresentation identified by HarbourVest said

25  that Highland did not inform HarbourVest that it undertook

Pugatch - Cross                    126

 1    the transfers to siphon assets away from Acis, LP and that
 2    such transfers would prevent Mr. Terry from collecting on the
 3    arbitration award.  So the basis for that allegation would be
 4    that Highland was siphoning assets from Acis to avoid having
 5    Acis pay the arbitration award, correct?
 6    A    That -- that would be the implication, yes.
 7    Q    Okay.  And then that misrepresentation continues on and
 8    says that Highland represented to HarbourVest that it was
 9    changing the portfolio manager because Acis was toxic.  And
10    do you recall that representation being made to you?
11    A    Yes, I do.
12    Q    And would you agree with me that whether or not Acis is
13    toxic in the industry would be an opinion?
14    A    I suppose it would be an opinion, but by the manager of
15    the vehicle responsible for managing the HCLOF investment and
16    the underlying CLOs.  Yeah, we viewed the Acis name and the
17    Highland name as synonymous, if you will.  I mean, Acis was a
18    subsidiary of Highland.  For all intents and purposes, it was
19    the same from our perspective as we made the investment into
20    HCLOF.
21    Q    So did HarbourVest have an independent understanding of
22    whether or not the Acis name was toxic in the industry?
23    A    We did not, no.  We relied on Highland's views of that as
24    manager of HCLOF.
25          MR. WILSON:  Your Honor, just a brief housekeeping

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/29/21   Page 135 of 213   PageID 8855

Pugatch - Cross                          127

1  item.  Did you say that we need to be done at 1:00 o'clock?

2          THE COURT:  Well, I said I really wanted you to be

3  done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4  o'clock docket and I'd rather not have to hang up 70-

5  something people and reconnect them again at 3:00 o'clock.

6  How close are you to being finished?

7          MR. WILSON:  Well, --

8          THE COURT:  This is going at a very slow pace.

9          MR. WILSON:  Well, I apologize for that, Your Honor.

10  I think I've got at least ten more minutes, but -- but I know

11  we also have closing remarks.  And I was just going to ask if

12  Your Honor had a preference of --

13          THE COURT:  Keep going.

14          MR. WILSON:  -- of breaking now --

15          THE COURT:  Keep -- let's --

16          MR. WILSON:  -- or keep going?  Okay.

17          THE COURT:  Let's talk fast and try to get through.

18  You know, even if I'm sacrificing lunch today, I don't want

19  to inconvenience 75 people this way.  So we'll just probably

20  start our 1:30 hearing a little late and inconvenience those

21  people.

22      All right.  Go ahead.

23          MR. WILSON:  All right.  Thank you, Your Honor.

24  BY MR. WILSON:

25  Q   Did Acis form its -- I can't recall if you answered this

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-4   Filed 01/29/23   Page 136 of 213   PageID 8364

Pugatch - Cross                         128

1   question, but did Acis form its own opinion on whether or not

2   -- I'm sorry, strike that.  Did HarbourVest form its own

3   opinion on whether or not the Acis name was toxic in the

4   industry?

5          MS. WEISGERBER:  Objection, --

6          THE WITNESS:  We did not.  We didn't have a basis.

7          THE COURT:  I'm sorry, did I have an objection?

8   BY MR. WILSON:

9   Q   You did not --

10         THE COURT:  Did I have an objection?

11         MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12  asked and answered, Your Honor.

13         THE COURT:  Overruled.  He can answer.

14  BY MR. WILSON:

15  Q   Okay.  But --

16  A   We did not.

17  Q   Did Highland have the ability to investigate the Acis

18  name and make its own determination of whether that name was

19  toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20  A   HarbourVest had the ability to do that, yes.

21  Q   I apologize I misspoke.  I meant HarbourVest.  Did

22  HarbourVest have the ability to investigate that name and

23  determine if it was toxic?

24  A   It was irrelevant to our investment thesis.  And as I

25  said before, Acis was a subsidiary of Highland.  We viewed

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-4   Filed 09/30/23   Page 137 of 213   PageID 8875

Pugatch - Cross                              129

1   them as interchangeable in the context of our investment.

2   Q   Okay.  The next misrepresentation that you refer to says

3   that Highland indicated to HarbourVest that the dispute with

4   Mr. Terry would have no impact on its investment activities.

5   Would you agree with me that that is also an opinion?

6   A   It was a statement that --

7        MS. WEISGERBER:  Your Honor, I'm going to object to

8   the extent these questions are seeking a legal conclusion

9   regarding, you know, if something's an opinion or not.

10       THE COURT:  Okay.  Overruled.  He can answer.

11       THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q   And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A   On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 16-4   Filed 09/30/23   Page 138 of 213   PageID 8886

Pugatch - Cross                     130

1   Q    And you just testified that you thought that Acis and

2   Highland were interchangeable from the perspective of the

3   investment opportunity, correct?

4   A    Correct.

5   Q    But you also accepted Highland's recommendation because

6   HarbourVest agreed that the change in the -- to a Highland

7   manager made commercial sense, correct?

8   A    We took at face value what Highland recommended because

9   this all had to do with the structuring of an entity that

10  they fully managed with respect to multiple underlying

11  subsidiaries that weren't managed by Highland.

12  Q    But would you agree that, at the time, you -- HarbourVest

13  thought that made commercial sense?

14  A    It did not seem unreasonable to us based on the

15  explanation we were given.

16  Q    Okay.

17       MR. WILSON:  I want to refer to HarbourVest Exhibit

18  39.

19       (Pause.)

20       THE COURT:  What are we waiting on?  What are we

21  waiting on?

22       MR. WILSON:  I'm trying to get the document on the

23  screen, Your Honor.

24       (Pause.)

25       THE COURT:  We can't hear you.  We can't hear you.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/29/21   Page 139 of 213   PageID 8897

Pugatch - Cross                    131

1          MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2     speaking with my --

3          THE COURT:  Okay.

4          MR. WILSON:  -- co-counsel here.

5          THE COURT:  All right.

6       (Pause.)

7          MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8     you're referring to?

9          MR. WILSON:  39.  HarbourVest 9019 motion on the

10    main -- on the Dondero file.  And then there's the -- it's --

11    it's John  -- and then there's the HarbourVest, and then the

12    exhibits are all in one file.

13         MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14    was subject to confidentiality based on HCLOF's request.

15    HCLOF's counsel is present.  I think they know it's an

16    excerpt.  But I'd just -- that for HCLOF's counsel.

17         MR. WILSON:  Well, is there an objection to showing

18    this document on the screen? Yes.  All right.  We're not

19    going to put Document 39 on the screen.

20         A VOICE:  Yes.

21         MR. WILSON:  All right.  Scroll down to the next

22    page.

23    BY MR. WILSON:

24    Q    This is a -- this is a document that was produced to us

25    this week, the Highland production.  It appears to be a

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/13/17    Page 140 of 213    PageID 8908

Pugatch - Cross                          132

 1  Highland CLO Funding, Ltd. Statement of Operations for the

 2  Year Ended 31 December 2017.  Do you see at the top of that --

 3  at the top of that document where it says total investment

 4  income of $26 million?

 5  A    I do, yes.

 6  Q    And total expenses were roughly $1.8 million?

 7  A    Yes.

 8  Q    And then net change and unrealized depreciation on

 9  investments and net realized loss on investments was $4.26

10  million cumulative, resulting in a net increase in net assets

11  resulting from operations of $20.224 million.  Do you agree

12  with that?

13  A    Yes.

14  Q    Okay.

15       MR. WILSON:  Go to the next one.

16  BY MR. WILSON:

17  Q    And you understand that, in the course of the Acis

18  bankruptcy, the portfolio managers for certain of the CLOs

19  were changed by the Trustee, correct?

20  A    Yes, around the underlying CLOs.  That's -- that's my

21  understanding, yes.

22  Q    And, in fact, Mr. Seery testified earlier today that that

23  occurred in the summer of 2018, correct?

24       MR. WILSON:  Scroll.

25       THE WITNESS:  I don't recall the timing, but that's

Pugatch - Cross                                    133

1   what he testified to.

2   BY MR. WILSON:

3   Q   Well, this document is HarbourVest Exhibit 40, and this is

4   the statement of operations for the financial year ended 31

5   December 2018.  Here, the total investment income is only

6   $11.1 million.  Do you see that?

7   A   I do.

8   Q   And do you see where the expenses have increased to $13.6

9   million?

10  A   I do, yes.

11         MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q   And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A   Yes.

16  Q   And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19         MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21         THE COURT:  Overruled.  He --

22         MR. WILSON:  Your Honor, --

23         THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25         MR. WILSON:  Thank you, Your Honor.  Thank you, Your

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 48-14   Filed 03/15/24   Page 142 of 213   PageID 8942

Pugatch - Cross                                    134

1   Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2   right.  I'll --

3   BY MR. WILSON:

4   Q    Did you answer the question, Mr. Pugatch?

5   A    No, I -- I would agree with the second part of your

6   statement that for the year 2018 the -- the loss was $52

7   million.  I don't -- I don't believe that jives with the first

8   part of your statement that that was after Acis and Brigade

9   took over.  As I understand, that was in the middle of the

10  year.

11  Q    But in any event, Acis and Brigade had been managing this

12  for at least six months of 2018 when that loss occurred,

13  correct?

14  A    They had been managing a portion of the underlying CLO

15  portfolio held by Highland CLO Funding.

16  Q    All right.  We're now looking at Exhibit #41, which is the

17  Draft Unaudited Statement of Comprehensive Income, 31 December

18  2019.  Total income has now dropped to $4.664 million.

19          MR. WILSON:  And scroll down.

20  BY MR. WILSON:

21  Q    Expenditures are at $3.645 million.  And then it says

22  investment gains and losses net out to $11.493 million, a

23  negative $11.493 million.  And --

24          MR. WILSON:  Scroll down to the --

25  BY MR. WILSON:

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-14    Filed 09/13/23    Page 143 of 213    Page ID 8931

Pugatch - Cross                                135

1  Q   And so would you agree with me that in the year 2019,

2  HCLOF showed a net loss of $10.476 million?

3  A   Yes, that's what the financial statements say.

4  Q   And in this year, the Acis CLOs were solely managed by

5  Acis and Brigade, correct?

6  A   The Acis CLOs were.  Yes, correct.

7  Q   All right.

8        MR. WILSON:  Now, go to 42.

9  BY MR. WILSON:

10 Q   Now, this is HarbourVest #42.

11       MR. WILSON:  Go down to the next page.

12 BY MR. WILSON:

13 Q   And this is the Highland CLO Funding, Ltd. Unaudited

14 Condensed Statement of Operations for the Financial Period

15 Ended 30 June 2020.  And so this is just half a year of

16 operations.  And would you -- and this actually has a

17 comparison between 2019 and 2020.  But do you see where it

18 says investment income has dropped from a million dollars in

19 the first half of 2019 to $381,000 in the first half of 2020?

20 A   Yes.

21       MR. WILSON:  Okay.  Scroll down.

22 BY MR. WILSON:

23 Q   And do you see where, in the first half of 2019, total

24 expenses were $1.85 million, and then in the first half of

25 2020 total expenses were $2.16 million?  Do you see that?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 48-44   Filed 09/13/21   Page 144 of 213   Page ID 8942

Pugatch - Cross                                        136

1    A    I do.

2    Q    And if you go down below that, where it says Net Realized

3    and Unrealized Gain/Loss on Investments, the first half of

4    2019 HCLOF lost $12 million, and in the first half of 2020 it

5    lost $39.472 million?

6          MR. MORRIS:  Your Honor, I'm going to object.  It's

7    John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8    he can offer this document into evidence.  There's no

9    foundation that Mr. Pugatch has any particularized knowledge

10   about any of the numbers behind this.  All he's asking him to

11   do is to confirm what the document says.  It says what it

12   says.  But this -- I'll object on that basis, Your Honor.

13         THE COURT:  All right.  Mr. Wilson, what about it?

14   You're just getting him to read numbers off of these exhibits.

15         MR. WILSON:  Well, --

16         THE COURT:  Shall we just --

17         MR. WILSON:  -- I understood --

18         THE COURT:  -- by stipulation get them into evidence?

19         MR. WILSON:  Well, --

20         MR. MORRIS:  No objection, Your Honor.

21         MS. WEISGERBER:  No objection.

22         THE COURT:  All right.  So these are exhibits what?

23   We've gone through 39, 41, and I don't know what else.  40,

24   maybe?

25         MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

1    were on the HarbourVest exhibit list.

2            THE COURT:  All right.  Those will be admitted, and

3    we've already discussed what docket entry number they appear

4    at.

5        (HarbourVest's Exhibits 39 through 42 are received into

6    evidence.)

7            THE COURT:  All right.  Anything else?  You told me

8    you had 10 more minutes about 15 minutes ago.

9            MR. WILSON:  Well, I'm sorry if I -- I think I had

10   said I had at least ten more minutes, and I was looking at the

11   -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12   have longer than that.  I'm sorry, Your Honor.

13           THE COURT:  Well, --

14           MR. WILSON:  But --

15           THE COURT:  -- I feel like I'm being --

16           MR. WILSON:  -- I'll try to proffer --

17           THE COURT:  Okay, Mr. Wilson, let me just tell you

18   something.  I feel like I'm being disrespected now, and the

19   parties are.  We really need to pick up the pace.  I've told

20   you I've got a 1:30 docket -- with four or five matters on it,

21   by the way.  I've got a 2:00 o'clock docket.  I'm starting

22   them late.  No one advised my courtroom deputy that we were

23   going to need all day today for this, okay?  So you've got

24   five more minutes to wrap it up, and then, of course, I have

25   to go to Mr. Draper and see if he has cross.  All right?  So

 1  please don't test my patience any more.  Five minutes to

 2  finish.

 3           MR. DRAPER:  Judge, I have no questions.

 4           THE COURT:  I didn't hear you, Mr. Draper.  What did

 5  you say?

 6           MR. DRAPER:  I have no questions.

 7           THE COURT:  All right.  Very good.

 8           MR. WILSON:  I apologize, Your Honor.  I was actually

 9  trying to be respectful of your time when I informed you that

10  I had at least ten more minutes left at 12:50, but I will try

11  to be as expedient as I can as I finish up.

12  BY MR. WILSON:

13  Q   And I don't see you on my screen.

14           MR. WILSON:  You can take that document down.

15           THE WITNESS:  Here.

16  BY MR. WILSON:

17  Q   Mr. Pugatch, do you have an opinion as to what caused

18  these incredible losses of value at HCLOF?

19           MS. WEISGERBER:  Objection to the extent it calls for

20  a legal conclusion.

21           THE COURT:  Overruled.  He can answer.

22           THE WITNESS:  I would say that there's no one cause

23  for the decline in value.  I can point to a number of

24  different things, including the exorbitant fees that were

25  charged to HCLOF, including the inability to be able to re --

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 24-14    Filed 09/19/23    Page 147 of 213    PageID 8975

Pugatch - Cross                                    139

1    refinance the CLOs on the part of HCLOF, all of which stems

2    from the actions that Highland took prior to our investment in

3    HCLOF.

4    BY MR. WILSON:

5    Q    And you've -- I think it's been referenced several times

6    in HarbourVest's arguments that -- that the reset was a

7    fundamental -- the inability to get a reset was a fundamental

8    cause of the loss in value.  Is that -- is that HarbourVest's

9    position?

10   A    That -- that is a part of the -- the cause in the

11   declining value of the CLOs, yes.

12   Q    And you would agree with me that a reset is fundamentally

13   a reset of interest rates, correct?

14   A    Of the interest rates of the liabilities of the -- the

15   timing for repayment of those liabilities, yes.

16   Q    Now, just say with -- for the sake of a hypothetical

17   example.  If you had a home that was valued at $5 million, or

18   let's just say $500,000, let's make it more realistic.  If you

19   had a $500,000 home and you had a mortgage on that home at

20   five percent interest, your inability to refinance that home

21   at a lower interest rate would not affect the underlying value

22   of that home, correct?

23        MS. WEISGERBER:  Objection, Your Honor. Hypothetical.

24   And objection to relevance as well.

25        THE COURT:  Sustained.

1    MS. WEISGERBER:  Calls for speculation.

2            THE COURT:  Sustained.

3  BY MR. WILSON:

4  Q    Is there any reason to believe that the change in the

5  interest rate would have prevented the massive losses of

6  investment value that occurred in HCLOF?

7            MS. WEISGERBER:  Object on the same grounds.

8            THE COURT:  Sustained.

9            THE WITNESS:  The short -- the short answer is yes,

10  with a -- with the amount of leverage --

11            MS. WEISGERBER:  I --

12            THE WITNESS:  -- that exists.  Oh, sorry.

13            MS. WEISGERBER:  The objection was sustained.

14            THE COURT:  Yeah, I sustained the objection.  That

15  means you don't answer.

16            THE WITNESS:  I'm sorry, Your Honor.

17  BY MR. WILSON:

18  Q    So, would you agree with me that if the expenses and the

19  fees charged by the portfolio manager increased dramatically,

20  that would -- that would impact the value of the investment,

21  correct?

22            MS. WEISGERBER:  Objection on the same grounds, and

23  relevance.  This is a 9019 hearing, Your Honor.  We are not

24  here to try every minutia.  And in fact, we're trying to avoid

25  a trial on the merits.  And it feels like we're getting a bit

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-4   Filed 09/19/21   Page 149 of 213   PageID 8997

Pugatch - Cross                                                        141

| 1 | far afield now. |
|---|---|

2          THE COURT:  I sustain.

3          MR. WILSON:  All right.  I'll pass the witness.

4          THE COURT:  All right.  Mr. Draper said he had no

5   cross.  So, any redirect, Ms. Weisgerber?

6          MS. WEISGERBER:  No, Your Honor.

7          THE COURT:  All right.  Mr. Morris, did you have any

8   redirect?

9          MR. MORRIS:  I do not, Your Honor.  I have a very

10  brief closing and then some additional remarks if -- if we

11  finish.

12         THE COURT:  All right.  So, Mr. Pugatch, that

13  concludes your testimony.  Thank you.  You're excused if you

14  want to be.

15     All right.  So, as I understood it, there would be no more

16  evidence after this.

17         MR. WILSON:  Well, Your Honor, along those lines, as

18  a housekeeping measure, I think everything on my exhibit list

19  is included on someone else's exhibit list, but just for belt

20  and suspenders I would move to admit all of the exhibits on

21  the -- on Mr. Dondero's exhibit list.

22         THE COURT:  Well, is that agreed or not?  Because we

23  didn't have a witness to get them in.

24         MR. MORRIS:  No objection, Your Honor.

25         THE COURT:  Any objection?  All right.  If there's no

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 16-14   Filed 09/19/23   Page 150 of 213   PageID 9103

142

1    objection, I'll --

2              MR. MORRIS:  Your Honor, --

3              THE COURT:  I'm sorry.  Was there an objection?  I

4    will admit Dondero Exhibits A through M, and those appear at

5    Docket Entry 1721, correct, Mr. Wilson?

6              MR. WILSON:  That is correct, Your Honor.

7              THE COURT:  All right.

8              MR. WILSON:  That is correct, Your Honor.

9        (James Dondero's Exhibits A through M are received into

10   evidence.)

11             MR. WILSON:  And one final matter is, during the

12   examination of Mr. Seery, you at least partially admitted

13   Dondero's Exhibit N, and I was wondering if we need to -- how

14   we'd need to submit that for the record.

15             THE COURT:  Okay.  First, I'm confused.  I think you

16   said Mr. Terry's testimony.  You --

17             MR. WILSON:  I said Seery.  I'm sorry.

18             THE COURT:  Oh, Seery?

19             MR. WILSON:  Or I may have said Terry, but I meant to

20   say Seery.

21             THE COURT:  Okay.  Maybe you said it.  Okay.  During

22   Mr. Seery's testimony -- oh, the email that I admitted a

23   portion of?

24             MR. WILSON:  That is -- that's correct, Your Honor.

25             THE COURT:  What -- what are you asking?  It's not in

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 01/19/24   Page 154 of 213   PageID 9049

143

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3              MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6              THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9              MR. WILSON:  Okay.  Thank you, Your Honor.

10             THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12                 CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13             MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-4   Filed 09/15/23   Page 152 of 213   PageID 9632

144

1   about.  They just don't.  The fraudulent transfers led to the

2   bankruptcy, led to the appointment of a trustee, led to --

3   right?  So, so it's -- that's why -- but they're getting

4   something for their claim.

5       It was a hard negotiation, Your Honor.  There is no

6   dispute that if we litigated this it would be complex.  It

7   would fact-intensive.  The Debtor would be forced to rely upon

8   witnesses who are no longer employed by it.  That it would be

9   expensive, for sure.  There's no dispute about any of that.

10  There's no dispute that the creditor body has spoken loudly

11  here by unanimously refraining from objecting except for Mr.

12  Dondero and the entities controlled by him.

13      And you heard Mr. Seery's testimony.  I think he

14  exhaustively informed the Court as to the process by which the

15  transaction was analyzed and negotiated, and there's no

16  evidence to the contrary that this was an arm's-length

17  negotiation.

18      Unless Your Honor has any questions, we would request that

19  the motion be granted.

20          THE COURT:  Thank you.  Ms. Weisgerber, your closing

21  argument?

22              CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23          MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24  also be brief.  We again join in Mr. Morris's arguments and

25  comments.

000708

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 01/16/24   Page 153 of 213   PageID 9631

145

1    The Court has now heard testimony from Mr. Pugatch

2    regarding the factual detail underlying HarbourVest's claims.

3    The Court has also heard about the significant damages that

4    HarbourVest stands to recover for those claims.  And

5    HarbourVest came to this Court ready to litigate.  It would --

6    it's ready to do so if needed.  It believes it would prevail

7    on its claims if it had to do so.

8    But the Court also heard from Mr. Seery about his

9    understanding of HarbourVest's claims, his calculus, and his

10   decision to settle them.  And we submit that nothing further

11   is needed by this Court in order to approve the settlement.

12   This is a question of the Debtor's business judgment.  We're

13   not here to have a trial on the merits of HarbourVest's

14   claims.  The Objectors have made various arguments, including

15   about the cause of HarbourVest's damages.  But even the nature

16   of the legal claims that HarbourVest is asserting, some do not

17   require a loss causation.  So we submit that's not even

18   relevant to the merits of the claims.

19   The settlement is clearly in the best interest of the

20   estate, and we respectfully request that the Court approve it.

21        THE COURT:  Thank you.  All right.  Mr. Wilson, your

22   closing argument?

23        MR. LYNN:  Michael Lynn.  I will give the closing

24   argument, if that's satisfactory to the Court.

25        THE COURT:  All right.  Go ahead.

1              CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

2              MR. LYNN:  Good afternoon, Your Honor.  I just want

3     to make a few points, and I'll try to do it as quickly as

4     possible.

5         First, I feel compelled to address the argument of the

6     Debtor that Mr. Dondero is repeating his litigious behavior

7     from the Acis case.  I don't know about the Acis case.  I

8     wasn't involved except very, very peripherally.  But with

9     respect to this case, we have only taken positions in court

10    that we believed -- that is, his lawyers -- believed were

11    warranted by law, facts as we knew them, and that are

12    consistent with professionalism.  I'd be glad to explain any

13    position we took.

14        Often, through the Debtor's very persuasive powers, we

15    never had the chance to explain our position previously to the

16    Court.  In fact, for the most part, as today, we have been

17    reactive rather than commencing proceedings.  In fact, during

18    the first seven months of this case, we only appeared in court

19    a few times, when we felt we had to -- for example, when

20    discovery was being sought by the Creditors' Committee that we

21    feared might invade privilege.  Then, much to the Debtor's

22    fury, we opposed the Acis 9019.  We did so because we thought

23    it was too much.

24        Since, as the Court can see, the principal instigators of

25    litigation have been the Debtor, and to a lesser extent, the

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-14   Filed 09/19/23   Page 156 of 214   PageID 9055

147

1 | Committee.

2 |     Indeed, in an apparent effort to drown Mr. Dondero and his

3 | counsel in litigation, the Debtor has repeatedly sought court

4 | action on a very short fuse, claiming need for expedited

5 | hearing.

6 |     Perhaps the most startling example of this is the recent

7 | contempt motion, for which there is no good reason for a quick

8 | hearing.  Resolution of that motion is not necessary to reach

9 | the confirmation hearing.  The motion could be heard after the

10 | confirmation hearing.  There is no need to put Mr. Dondero and

11 | his professionals in a position where they have to respond in

12 | a couple of days, two business days, and then will have two

13 | days to prepare for trial.

14 |     Second, Your Honor, Mr. Seery has repeatedly asserted,

15 | contrary to today's motion, that the HarbourVest claim was of

16 | no merit.  That is why, when he came in to settle for tens of

17 | millions of dollars, we opposed this motion.  It appears that

18 | the motion is occurring without any cross-party discovery.

19 | There is no consideration, apparently, of trying dispositive

20 | -- dispositive motions first.  There is no consideration for

21 | junior classes of equity, which Mr. Seery has previously

22 | opined were in the money.  This, even though there's no reason

23 | that this settlement is necessary pre-confirmation, unless Mr.

24 | Seery wants HarbourVest's vote.

25 |     Third, for whatever reason, that seems to be the driving

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/19/23   Page 156 of 213   PageID 9064

148

1  factor for settling.  On its face, the vote seems to be a key

2  factor of the settlement.  About the longest provision of the

3  settlement agreement relates to voting.  The motion itself --

4  in the motion itself, five of seven bullet points cited by the

5  Debtor for approval of the settlement deal with and emphasize

6  support of the plan or the vote that is to be cast for the

7  plan.

8      If the settlement is a good deal, it didn't need to have

9  as one of its parts the requirement that HarbourVest vote for

10  the plan.

11      Your Honor, I'll stop there.  I know Your Honor would like

12  to get just a few minutes before your 1:30 docket.  I've been

13  there and I understand that, and I do apologize for taking the

14  time we have, but I think that responsibility is shared with

15  the Debtor and HarbourVest.

16      Thank you, Your Honor.

17          THE COURT:  All right.  Thank you for that.

18      Mr. Draper, any closing argument from you?

19    CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20          MR. DRAPER:  Yes, I have three comments.  The first

21  is the claim -- the loss claim, absent the fraud claim, is, at

22  best, $7 million.  I think Mr. Seery's argument that a hundred

23  -- one hundred percent is attributable to there is just wrong.

24  If he and I both invested in a company 50-50 and it goes

25  broke, we only lost 50 cents each.

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-14    Filed 09/19/23    Page 157 of 213    PageID 9075

149

1    Number two, I think the Court heard the evidence.  I think

2    this is, at best, a subordinated claim under 5 -- under the

3    Bankruptcy Code.  It's really a "But for the

4    misrepresentations, we wouldn't have invested."

5    And the last one is the -- Judge Lynn represented the

6    voting, so I won't deal with that.  But the one that troubles

7    me the most is the fact that this asset that is ultimately

8    being paid for in claim dollars that's being transferred over

9    to the Debtor and being put it outside the estate, outside the

10   purview of this Court, and placed in some subsidiary, this --

11   this transaction, if it is approved, must -- should contain a

12   provision that the asset that's being acquired come into the

13   Debtor and be owned by the Debtor.

14        THE COURT:  All right.

15        MR. DRAPER:  I have nothing further, Your Honor.

16        THE COURT:  Thank you, Mr. Draper.

17   Mr. Morris, you get the last word since it's your motion.

18        MR. MORRIS:  Very quickly, Your Honor.  The

19   subordination argument doesn't hold water.  This is not a

20   claim against the Debtor for the security; it's a claim for

21   fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,

22   that might make sense, but this is a claim against the Debtor.

23   And it's a Debtor -- it's a claim for fraud.  That's number

24   one.

25        Number two, we need to keep this exactly as it's been

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/10/24   Page 158 of 213   PageID 9086

150

1   structured in order to avoid litigation.  Mr. Seery told the

2   Court.  I'm sure the Court can make its own assessment as to

3   Mr. Seery's credibility as to whether or not the Debtor is

4   intending to somehow get this asset beyond the Court.

5       But there are reasons why we've done this, Your Honor.

6   They could have made an objection on that basis.  In fact, if

7   they did, it would be overruled, because there's no -- there's

8   no basis for this Court to find that somehow the Debtor and

9   Mr. Seery are doing something untoward to get assets away from

10  this Court's jurisdiction.

11      You know, I don't know what to say about Mr. Lynn's

12  commentary.  Much of it had nothing to do with any evidence in

13  the record.

14      The fact remains, Your Honor, that this settlement is

15  fair.  It's reasonable.  It's in the best interest of the

16  estate.  And we would respectfully request that the Court

17  grant the motion.

18          THE COURT:  All right.  Thank you.  Well, I

19  appreciate all the arguments and evidence I have heard today.

20  I'm going to be brief in my ruling here, but I reserve the

21  right to supplement in a more fulsome written order, which I'm

22  going to instruct Mr. Morris to submit.  I am approving the

23  motion to compromise the HarbourVest claim today, and I guess

24  subsumed in that is granting the motion to allow their claim

25  for 3018 voting purposes.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-14   Filed 09/29/21   Page 159 of 213   PageID 9097

151

1      I in all ways find this compromise to meet the required

2   legal standard set forth in such cases as *TMT Trailer Ferry*,

3   *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4   cases.

5      First, I'm going to specifically say for the record that I

6   found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7   very credible.  Very credible testimony and meaningful

8   testimony was provided to the Court today.  And based on that

9   testimony, I find, first, that this compromise was the product

10  of arm's-length negotiations.  It was a hard-fought

11  negotiation, as far as I'm concerned.  The Debtor objected to

12  these numerous HarbourVest proofs of claim.  The Debtor did

13  not want to allow HarbourVest a significant claim for voting

14  purposes.  I duly note the statements made in the disclosure

15  statement before this compromise was reached suggesting, you

16  know, the Debtor didn't think HarbourVest should have a large

17  claim.

18     That is consistent with everything I typically see in a

19  bankruptcy case when there's a claim objection.  The objector

20  vehemently denies the claimant should have a proof of claim,

21  and then people sit down and think about the risks and rewards

22  of litigating things.  And I believe very fervently that's

23  what happened here.  There were good-faith, arm's-length

24  negotiations that resulted in this proposed compromise.

25     I find the compromise -- and I'll add to that point, on

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/13/21   Page 160 of 213   PageID 9553

152

1   the good-faith point, I find nothing sinister or improper

2   about the fact that the compromise includes a commitment of

3   HarbourVest to vote in favor of the plan.  Again, we see this

4   a lot.  You know, there's even a buzz word that doesn't even

5   exist in the Bankruptcy Code:  "plan support agreement."  You

6   know, we see those a lot -- you know, oftentimes negotiated

7   before the case, but sometimes after.  You know, it may be

8   improper in certain situations, but there was nothing here

9   that troubles me about that component of the compromise.

10       I find the compromise to meet the paramount interest of

11   creditors here.  Notably, we have very large creditors in this

12   case who have not objected.  The *Foster Mortgage* case from the

13   Fifth Circuit tells me I am supposed to consider support or

14   opposition of creditors.  No opposition of UBS.  No opposition

15   of the Redeemer Committee Crusader Fund.  No opposition from

16   Josh Terry or Acis.  No opposition from Daugherty.

17       But moreover, when considering the paramount interest of

18   creditors, I find this compromise to be in all ways fair and

19   equitable and in the best interest of the estate, and

20   certainly within the range of reasonableness.  The evidence

21   showed that HarbourVest asserted over $300 million.  Over $300

22   million.  Granted, that was based on all kinds of legal

23   theories that would be contested and expensive to litigate,

24   but the evidence also showed that they invested over $70

25   million.  You know, close to $75 million.  I forget the exact

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 48-4   Filed 09/19/23   Page 161 of 213   PageID 9559

153

1  number.  $75 or $80 million, somewhere in that range.  And now

2  the credible evidence is that investment is worth about $22

3  million.

4      So, certainly, while the claim may not have, at the

5  ultimate end of the day in litigation, resulted in a $300

6  million proof of claim, certainly, certainly there were strong

7  arguments for a very sizeable claim, more than this compromise

8  amount.  So it's certainly fair and equitable and reasonable

9  when considering the complexity and duration of further

10 litigation, the risks and rewards, the expense, delay, and

11 likely success.

12     A couple of last things I'm going to say are these.  I

13 understand, you know, there is vehement disagreement on the

14 part of our Objectors to the notion that Highland might have

15 caused a $50 million loss to HarbourVest.  But I will tell

16 you, for what it's worth -- I want the record clear that this

17 is part of my evaluation of the reasonableness of the

18 settlement -- my reaction is that, indeed, Highland's

19 litigation strategy in the Acis case caused HCLOF to lose a

20 huge portion of its value, to the detriment of HarbourVest.

21 You know, whether all evidence at the end of the day would

22 convince me of that, I don't know, but that's -- that is

23 definitely this judge's impression.

24     I'm very sympathetic to HarbourVest.  It appears in all

25 ways from the record, not just the record before me today, but

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-14    Filed 09/15/23    Page 162 of 213    PageID 9162

154

1  the record in the Acis case that I presided over, that

2  Highland back then would have rather spent HarbourVest's

3  investment for HCLOF legal fees than let Josh Terry get paid

4  on his judgment.  They were perfectly happy to direct the

5  spending of other people's money, is what the record suggested

6  to me.

7      And then, you know, I have alluded to this very recently,

8  as recently as last Friday:  I can still remember Mr.

9  Ellington sitting on the witness stand over here to my left

10  and telling the Court, telling the parties under oath, that

11  HarbourVest -- he didn't use its name back then, okay?  For

12  the first phase of the Acis case, or most of the Acis case, we

13  were told it was an investor from Boston.  And at some point

14  someone even said their name begins with H.  I mean, it seemed

15  almost humorous.  But Mr. Ellington said it was they,

16  HarbourVest, the undisclosed investor, who was insistent that

17  the Acis name was toxic, and so that's what all of this had

18  been about:  the rebranding, the wanting to extract or move

19  things away from Acis.

20      So, you know, I have heard for the -- well, at least the

21  second time today, from Mr. Pugatch, what I perceive to be

22  very credible testimony that that's just not the way it

23  happened.

24      And I guess the last thing I want to say here today, and

25  you know, I guess I have multiple reasons for saying this, not

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 246-14   Filed 09/15/23   Page 163 of 213   PageID 9163

155

1    just in connection with approving the settlement, you know,

2    I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

3    you know, a crazy amount of value, that they underperform in

4    the market, that, you know, during the Acis/Brigade tenure

5    and, you know, they should have been reset.  You know, I hope

6    those who have not been around as long as some of us in this

7    whole saga know that the -- Mr. Terry, Mr. Phelan, I think

8    Brigade, they all desperately wanted to reset these things,

9    but it was HCLOF, I believe directed by Highland, that wanted

10   to redeem, wanted to liquidate, take the pot of money,

11   warehouse it, and then do their own thing.

12       And there was, I think, from my vantage point, a

13   monumental effort to try to get everyone to the table to do

14   reasonable resets that would be good for the stakeholders at

15   HCLOF and be good for the creditors of Acis, including Josh

16   Terry.  That was always the balancing act that most of us were

17   focused on during the Acis bankruptcy.  But Highland, I

18   believe, directing HCLOF's strategy, just did not want the

19   resets to happen.

20       So, again, part of me, I suppose, just wants to make the

21   record clear on something that I fear not everyone is clear

22   about.  And I say that because the comment was made that the

23   injunctions, the preliminary injunctions sought by the Acis

24   trustee caused the plummet in value, and I think that's just

25   not an accurate statement.  I think litigation strategies are

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/15/23   Page 164 of 213   PageID 9542

156

1   what caused the plummet in value, and that's why I think

2   ultimately HarbourVest would potentially have a meritorious

3   claim here in a significant amount if this litigation were to

4   go forward.

5       So, I approve this under 9019.  And again, Mr. Morris,

6   you'll upload an order.

7       It is now 1:41, so let's as quickly as possible hear the

8   other motion that I don't think had any objections.  Mr.

9   Morris?

10          MR. MORRIS:  Your Honor, just -- yes, just very

11   quickly, just four things.

12      With respect to the order, I just want to make it clear

13   that we are going to include a provision that specifically

14   authorizes the Debtor to engage in -- to receive from

15   HarbourVest the asset, you know, the HCLOF interest, and that

16   that's consistent with its obligations under the agreement.

17      The objection has been withdrawn, I think the evidence is

18   what it is, and we want to make sure that nobody thinks that

19   they're going to go to a different court somehow to challenge

20   the transfer.  So I just want to put the Court on notice and

21   everybody on notice that we are going to put in a specific

22   finding as to that.

23          THE COURT:  All right.  Fair --

24          MR. MORRIS:  Number two is --

25          THE COURT:  Fair enough.  I do specifically approve

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/15/23   Page 165 of 213   PageID 9153

157

1   that mechanism and find it is appropriate and supported by the

2   underlying agreements.

3       And just so you know, I spent some time noodling this

4   yesterday before I knew it was going to be settled, so I'm not

5   just casually doing that.  I think it's fine.

6       Okay.  Next?

7           MR. MORRIS:  Thank you very much, Your Honor.  Number

8   two, with respect to the motion to pay, there is no objection.

9   If we can just submit an order.  Or if Your Honor has other

10  guidance for us, we're happy to take it.

11          THE COURT:  Okay.  Does anyone have anything they

12  want to say about that motion?

13      Again, I looked at it.  I didn't see any objections.  I

14  didn't see any problem with it.  It's -- you know, you're

15  going through this exercise because of the earlier protocol

16  order.

17          MR. MORRIS:  Correct.

18          THE COURT:  All right.  Well, if there's nothing,

19  then, I will approve that, finding there is good cause to

20  grant that motion.

21          MR. MORRIS:  Okay.

22          THE COURT:  All right.  Is the only other

23  housekeeping matter --

24          MR. MORRIS:  I --

25          THE COURT:  -- we have the contempt motion?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 24-44   Filed 09/19/23   Page 166 of 213   PageID 9164

158

1        MR. MORRIS:  It is, and I do -- I do have to point

2  out how troubled the Debtor is to learn that Mr. Dondero was

3  still receiving documents from Highland as late as this

4  morning.  It's got to be a violation of both the TRO -- I

5  guess it's now the preliminary injunction.

6    I would respectfully request -- I know that time is what

7  it is -- but maybe Mr. Dondero can answer now where he got the

8  document, who he got the document from, what other documents

9  he's gotten from the Debtor since Your Honor ordered him not

10  to communicate with the Debtor's employees.

11    This is not saying hello in the hallway.  I mean, this is

12  just -- it is really troubling, Your Honor, and it's why we

13  need the contempt motion heard as soon as possible.

14        THE COURT:  Well, Mr. Wilson, do you want to address

15  that?  I think the words I heard were that you just got the

16  document this morning, and you got it from Mr. Dondero, but we

17  don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18  you there?

19        MR. LYNN:  I'm afraid I'm back, Your Honor.

20        THE COURT:  Okay.

21        MR. LYNN:  I am not sure whether Mr. Dondero had it

22  in his files from some -- from back before he was asked not to

23  communicate with members or with employees of the Debtor.  I

24  believe -- I believe he's with us, though I don't think he's

25  available by video.

000722

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 49-44   Filed 09/30/23   Page 160 of 213   PageID 9165

159

```
1         Are you there, Mr. Dondero?
2              THE COURT:  We can't hear you, Mr. Dondero.
3              MR. DONDERO:  Judge?
4              THE COURT:  Oh, go ahead.
5              MR. DONDERO:  Can you hear me now?
6              THE COURT:  Yes.
7              MR. DONDERO:  Yes, I -- I -- when I moved offices, I
8    found it in a stack of paper, and --
9              MR. LYNN:  I understand it shows that his microphone
10   is working.
11             THE COURT:  Okay.  Go ahead.
12             MR. DONDERO:  Can you hear me?
13             THE COURT:  Yes, go ahead.
14             MR. DONDERO:  Yeah, I -- I'm sitting in new offices.
15   I've got everything in boxes.  I was going through everything
16   yesterday, and I found those emails in a stack of papers and I
17   sent them over because I thought they would be relevant
18   relative to Seery's initial impression.
19             THE COURT:  Okay.  Well, let's talk about the timing
20   of this hearing.  Mr. Morris, I'm going to -- I'm going to ask
21   you why --
22             MR. LYNN:  Michael Lynn, Your Honor.  I don't want to
23   waste the Court's time.  We have not made available anything
24   to the Court objecting to the expedited hearing on the
25   contempt motion.  We've been here.
```

Case 21-03067-sgj    Doc 24-14    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:23-cv-01503-B    Document 46-14    Filed 09/30/23    Page 168 of 213    PageID 9166

160

1    I would say to Your Honor that if Mr. Dondero is indeed in

2    contempt, or was in contempt toward the motion, which has

3    nothing to do with the document that was presented as Dondero

4    Exhibit N, there is no need to hear this on an expedited

5    basis.

6    Every time we turn around, Your Honor, the Debtor is

7    asking that something be heard on an expedited basis.  And we

8    have not opposed that.  We have not fought that, to speak of,

9    to date.  But this is getting a little ridiculous.  We're

10    within days of confirmation of the Debtor's plan, and it is

11    simply a means of causing pain and suffering to Mr. Dondero

12    and those who are working with him and for him.  And he does

13    have employees at NexPoint who are assisting him.

14    So we most strongly object to being put on a schedule

15    where we are expected to get a response to the contempt motion

16    on file by Monday, today being Thursday, and a weekend

17    intervening.  And we strongly object to any setting of this

18    contempt motion on Tuesday or Wednesday.  It is absurd, and it

19    is done solely, solely, Your Honor, to cause pain.

20            THE COURT:  All right.

21            MR. MORRIS:  Your Honor, if I may?

22            THE COURT:  Please.

23            MR. MORRIS:  Just very briefly, we had a hearing the

24    other day.  The evidence is the exact same.  The evidence is

25    crystal clear that the violations are meaningful, they're

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-4   Filed 01/19/21 17   Page 169 of 213   PageID 9537

161

1   substantial, and they are repeated.

2       After the TRO was entered into, Mr. Dondero and only Mr.

3   Dondero chose to interfere with the Debtor's business.  Mr.

4   Dondero and only Mr. Dondero chose to communicate with the

5   Debtor's employees, not about saying hello in the hallway but

6   about coordinating a legal defense strategy against the

7   Debtor.

8       The need is immediate, Your Honor, and I would

9   respectfully request that the hearing be set for Tuesday or

10  Wednesday.  They've had this motion now since the 7th of

11  January.  They had a full evidentiary hearing, so they know

12  most of the evidence that's going to be presented.  They have

13  a whole team of -- they have an army of lawyers, Your Honor,

14  and half a dozen firms working on behalf of Mr. Dondero and

15  his interests.  For him to cry here, for him to cry that this

16  is too much is really -- it's obscene.  It just is.

17          THE COURT:  All right.  I'm going to say a couple --

18          MR. LYNN:  That is absurd.

19          THE COURT:  I'm going to say a couple of things.  One

20  is that I -- well, the one time I remember getting reversed

21  for holding someone in contempt of court, the District Court

22  felt like I had not given enough notice of that.  The District

23  Courts, what they think is reasonable notice, is sometimes

24  very different from what the bankruptcy judges think.  We're

25  used to going very lickety-split fast in the bankruptcy

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/15/23   Page 170 of 213   PageID 9508

162

1   courts.  And the Courts of Appeals, District Court, Courts of

2   Appeals obviously, for good reason, are very concerned about

3   due process in this kind of context.  So I'm sensitive to

4   that.

5       I'm also sensitive to the fact that it is monetary damages

6   that are being sought here to purge the contempt.  Okay?  The

7   shifting of attorneys' fees is basically what I understand is

8   being sought at this point.  You know, we have a preliminary

9   injunction halting behavior at this point, and so I think

10  that's another reason I'm hesitant to give an emergency

11  hearing.  I feel like monetary damages can wait and we can

12  give 21-plus days' notice of the hearing.

13      But I'm going to throw this out there as well.  If I do

14  feel like there is a showing of contempt, if I do feel like

15  the phone -- as I told you the other day, I'm very, very

16  fixated on the phone that may have been destroyed or thrown

17  away, maybe at Mr. Dondero's suggestion.  I mean, the

18  potential monetary sanction here may be very, very large if

19  the evidence plays out in the way I fear it might play out.

20  So I need to make sure everybody has adequate time to prepare

21  for that hearing and make sure I get all the evidence I need

22  to see.  All right?  Contempt of court is very, very, very,

23  very serious, and I don't think anyone would deny that.

24      So, with that, it was filed what day?  January 4th?  Is

25  that what I heard?  Or --

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 48-44   Filed 09/19/23   Page 174 of 213   PageID 9559

163

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3   are you there?  Hopefully, you're not in a hunger coma at this

4   point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7   go to that first week of February, right?  Because we've got

8   the confirmation hearing that, you know, late in January, and

9   then --

10         THE CLERK:  Yes.  Uh-huh.

11         THE COURT:  Okay.  Do you have an available date to

12  give right now?

13         THE CLERK:  How about -- if you're willing to hear

14  them on Friday, February 5th.

15         THE COURT:  Okay.  I can do that.  February 5th at

16  9:30.  Any -- anybody want to argue about that?

17         MR. MORRIS:  Thank you, Your Honor.  That's

18  acceptable to the Debtor.

19         THE COURT:  Okay.  Mr. Lynn, is that good with you?

20         MR. LYNN:  We'll do that, Your Honor.  I would say,

21  by the way, that I'll be happy to buy Mr. Seery, out of my own

22  pocket, five cell phones, which ought to make up for the one

23  that was lost, though I recognize that those cell phones will

24  not have on them the privileged information, the conversations

25  between his lawyers and Mr. Dondero that I imagine he was

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/15/23   Page 172 of 213   PageID 9572

164

1 | looking forward to seeing.

2 |      THE COURT:  Well, I wouldn't want him to see that

3 | information, but I do think he's entitled to any nonprivileged

4 | information, texting, or calls that are on that phone.  So,

5 | again, I'm either going to hear good explanations for that or

6 | not, but it's something very concerning to me.

7 |    All right.  So we have a game plan.

8 |    I'm going to ask, Did we have good-faith negotiations

9 | between Dondero and the Committee and anything positive to

10 | report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11 |      MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12 | Honor.  Mr. Lynn and I have exchanged several emails over the

13 | weekend, and the message that I sent to Mr. Lynn was very

14 | clear.  There had been a term sheet that Mr. Seery had sent

15 | back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16 | out and be very specific as to what it was Mr. Dondero was

17 | prepared to do in connection with the pot plan.  I instructed

18 | him that some of the issues that the Committee still has is

19 | obviously the overall value, along with the concept that's

20 | signing up to a promise from Mr. Dondero to comply with

21 | (indiscernible) as part of that value.  As Your Honor may

22 | understand, the Committee is obviously very skeptical of Mr.

23 | Dondero's future performance under an agreement that he enters

24 | into.

25 |    Those are but a couple of issues, Your Honor, that I

000728

1    advised Mr. Lynn were very concerning to the Committee.  And I

2    suggested to him that if he wanted to move things forward, the

3    best way to do it would be to come to us with a fulsome term

4    sheet that explained exactly what it was in clear and precise

5    detail that Mr. Dondero was proposing, and that would be the

6    best way to move the process forward, Your Honor.

7              THE COURT:  All right.  Mr. Lynn, anything to add to

8    that?

9              MR. LYNN:  Well, Your Honor, my experience in

10   negotiations is that it is useful to agree on substantive

11   terms, or at least be in the ballpark, before term sheets are

12   exchanged.  Long ago, a term sheet was prepared and presented

13   to the Committee.  Ultimately, I think it was rejected, though

14   I don't know if we ever received a formal rejection.

15      I explained in my emails, which I'm happy to share with

16   the Court if Your Honor wants to see them, why I was reluctant

17   to try to put into a term sheet form the proposal that I

18   suggested to Mr. Clemente.  As I said, I'm more than happy to

19   provide you with that email chain and let you form your own

20   judgment, Your Honor, as to whether we're proceeding in good

21   faith.

22             THE COURT:  All right.  Well I'm not going to ask --

23             MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24   Pomerantz.

25             THE COURT:  -- to see any of that.  Mr. Pomerantz?

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 16-44   Filed 01/17/23   Page 174 of 213   PageID 9742

166

1          MR. POMERANTZ:  May I just be heard real quickly?

2          THE COURT:  Sure.

3          MR. POMERANTZ:  Your Honor, we also took Your Honor's

4     comments to heart.  We, Mr. Seery and I, had an over-an-hour

5     conversation with Mr. Lynn and with Mr. Bonds.  We provided

6     them with our thoughts as to what they needed to do in order

7     to move forward.  Of course, it's not really the Debtor to

8     agree.  It's the creditors to agree.  But as Mr. Seery has

9     testified many times before and as I have told the Court, we

10    would support a plan that the Committee and Mr. Dondero could

11    get behind.

12       So we again -- I'm not going to divulge the nature of

13    those communications, but we suggested several things that Mr.

14    Dondero could do in order to move the ball forward, and

15    unfortunately, we have not seen any of those things done thus

16    far.  So we are, at this point, not optimistic that there will

17    be a grand bargain plan.

18          THE COURT:  All right.

19          MR. DONDERO:  Your Honor, could I comment for a

20    second?  This is Mr. Dondero.

21          THE COURT:  If you and your counsel want you to

22    comment, you can comment.

23          MR. DONDERO:  I'd love to do a pot plan.  I would

24    love to reach some kind of settlement and everybody move on

25    with their lives.  The estate started with $360 million of

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/18/23   Page 175 of 213   PageID 9253

167

1    third-party assets and $90 million of notes.  The $360 million

2    of third-party assets are down to $130 million.

3          MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4    I did this at the last hearing, and it's not my practice to

5    interrupt, but issues regarding what the value is or not, it's

6    going to require a response, and that's not really before Your

7    Honor.  I think before Your Honor is --

8          MR. DONDERO:  Okay.

9          MR. POMERANTZ:  -- have there been negotiations?

10   Have they been in good faith?  If Mr. Dondero wanted to

11   address that, that's fine, but I object to having any

12   discussion at this point, especially with Mr. Dondero not even

13   under oath, on what the nature of the value of the assets and

14   why they have changed and what not.

15         THE COURT:  Well, --

16         MR. POMERANTZ:  It's just not appropriate.

17         THE COURT:  I understand --

18         MR. DONDERO:  Okay.  Can I --

19         THE COURT:  Stop.

20         MR. DONDERO:  Can I -- can I finish?

21         THE COURT:  Let me please respond to that.  I

22   understand your concern, but I've heard from Mr. Seery

23   testimony many months ago about the value plummeting during

24   the case.  And I asked why, and I got some explanations.  This

25   is not evidence.  This is just, you know, this is not going to

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/13/21   Page 176 of 213   PageID 9264

168

1   be binding in any way.  Mr. Dondero can speak as to what he

2   thinks, you know, the situation is.

3       Go ahead, Mr. Dondero.

4       MR. DONDERO:  Okay.  I'm not trying to fixate on the

5   numbers.  And as far as the third-party assets are, we would

6   be willing to pay -- I would be willing to pay for those.  I'd

7   be willing to pay more, and even some value for the affiliate

8   notes that were really part of compensation agreements

9   throughout the history of Highland and avoid the POC

10  arguments.  I'd be willing to pay for the assets and I'd be

11  willing to pay even more than that.

12      I have no transparency in terms of what the assets are,

13  and there's no fulsome discussion in terms of, well, here are

14  the assets, here are the notes, here's what we think the

15  values are, can you get to this number?  It's just a -- you --

16  the -- it -- I don't view there is good-faith negotiations

17  going on because it's always just a:  You need to put a big

18  number on a piece of paper; otherwise, you're going to get run

19  over.

20      And there's no back and forth going on, but it's not due

21  to a lack of willingness on my part.  And maybe there needs to

22  be a committee set up.  Maybe there needs to be, I don't know,

23  a mediator or an examiner or somebody to try and push through

24  the pot plan, but there's nothing happening.  People are not

25  returning the judge's calls, I mean, Mr. Lynn's calls, or my

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-44   Filed 09/29/21   Page 177 of 213   PageID 9275

169

1    calls.  They're -- there's -- despite efforts of our -- of my

2    own and a willingness of my own, there's no negotiations of

3    any sort going on at the moment.

4              THE COURT:  All right.  I don't want anyone to

5    respond to that.  I know people have different views of what's

6    going on.  But let me just say a couple of things, and then

7    we're done.

8         We do have a Committee in this case.  We have a Committee

9    with very sophisticated members and very sophisticated

10   professionals.  Okay?  That's who I wanted you to be talking

11   to before the end of the day Tuesday.

12        We have had co-mediators in this case.  Okay?  And, you

13   know, I identified very sophisticated human beings for that

14   role.  Okay?  And in fact, there ended up being settlements

15   that flowed out of the co-mediator process.

16        We're now 15 months into the case.  There are major,

17   significant compromises now:  HarbourVest, UBS, Acis, Terry,

18   and Redeemer Committee.  I hate to use a worn-out metaphor,

19   but the train is leaving the station.  We've got confirmation.

20   I've pushed out two weeks.  I mean, you all are either going

21   to get there in the next few days or we're just going to go

22   forward with I think what everyone, you know, would rather be

23   a pot plan, but if we can't get there, we're just going to

24   have to consider the plan that's on the table now.  Okay?

25        You know, the Committee, again, they're sophisticated.

1    They can compare apples to oranges and decide whether the plan

2    on the table, with its risks of future litigation and

3    recoveries, whether it's better or worse than whatever

4    consideration you're offering, Mr. Dondero.

5        And you know, as we all know, there is distrust here,

6    there, and everywhere among these parties.  So I can totally

7    understand them, you know, taking a hard line:  We either get

8    all cash or we're just not going to mess with it.  We don't

9    want to risk broken promises.  We'd rather just do litigation.

10        So, anyway, that's as much as I'm going to say except I am

11    going to further direct good-faith negotiations.  It sounds

12    like to me a written term sheet might be the appropriate next

13    step, given where I've heard things are at the moment.  But,

14    you know, I guess we don't have any hearings between now and

15    the 26th, right?  No Highland hearings that I can think of

16    between now and the 26th.

17            MR. POMERANTZ:  I don't think so.

18            MR. MORRIS:  I think that's correct, Your Honor.

19            THE COURT:  So you have all this time --

20            MR. MORRIS:  At the moment.

21            THE COURT:  You have all this time to negotiate and

22    simultaneously get ready for the confirmation hearing without

23    any other battles.  So I know you will use the time well.

24        All right.  We're adjourned.

25            THE CLERK:  All rise.

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 46-14   Filed 09/29/21   Page 179 of 213   PageID 9297

171

1        MR. BONDS:  Thank you, Your Honor.

2        (Proceedings concluded at 2:04 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21    I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                           **01/16/2021**

24   _____        _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

000735

172

INDEX

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Morris                                                   12
- By Mr. Kane                                                    18
- By Ms. Weisgerber                                             18
- By Mr. Draper                                                  20

WITNESSES

Debtor's Witnesses

James Seery
- Direct Examination by Mr. Morris                              26
- Cross-Examination by Mr. Wilson                               62
- Cross-Examination by Mr. Draper                               87
- Redirect Examination by Mr. Morris                            93

HarbourVest's Witnesses

Michael Pugatch
- Direct Examination by Ms. Weisgerber                          96
- Cross-Examination by Mr. Wilson                              113

EXHIBITS

Debtor's Exhibits A through EE                     Received  35

James Dondero's Exhibits A through M               Received 142
James Dondero's Exhibit N (as specified)           Received  71

HarbourVest's Exhibit 34                           Received 100
HarbourVest's Exhibit 36                           Received 103
HarbourVest's Exhibits 39 through 42               Received 137

CLOSING ARGUMENTS

- By Mr. Morris                                                 143
- By Ms. Weisgerber                                            144
- By Mr. Lynn                                                  146
- By Mr. Draper                                                148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 21-03067-sgj   Doc 24-14   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:23-cv-01503-B   Document 26-14   Filed 09/29/21   Page 181 of 213   PageID 9379

173

1                              INDEX
                              Page 2
2

3    RULINGS

4    Motion to Compromise Controversy with HarbourVest 2017     150
     Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
5    HarbourVest Dover Street IX Investment L.P., HV
     International VIII Secondary L.P., HarbourVest Skew Base
6    AIF L.P., and HarbourVest Partners L.P. filed by Debtor
     Highland Capital Management, L.P. (1625)

7    Motion to Allow Claims of HarbourVest Pursuant to Rule     150
8    3018(a) of the Federal Rules of Bankruptcy Procedure for
     Temporary Allowance of Claims for Purposes of Voting to
9    Accept or Reject the Plan filed by Creditor HarbourVest
     et al. (1207)

10   Debtor's Motion Pursuant to the Protocols for Authority    157
11   for Highland Multi-Strategy Credit Fund, L.P. to Prepay
     Loan (1590)

12   END OF PROCEEDINGS                                          171

13   INDEX                                                   172-173

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX 15

Docket #1388 Date Filed: 01/21/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



¨1¤}+Q5!5 &!}«
1934054210121000000000001

000739

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "<u>Morris Declaration</u>"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "<u>Settlement Agreement</u>"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "<u>Dondero Objection</u>"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "<u>Trusts' Objection</u>"), filed by the Dugaboy Investment Trust ("<u>Dugaboy</u>") and Get Good Trust ("<u>Get Good</u>," and together with Dugaboy, the "<u>Trusts</u>"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "<u>CLOH Objection</u>" and collectively, with the Dondero Objection and the Trusts' Objection, the "<u>Objections</u>"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "<u>Debtor's Reply</u>"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "<u>HarbourVest Reply</u>"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "<u>Hearing</u>"), including assessing the credibility of the witnesses; and (j) the

2

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** as set forth herein.

2. All objections to the Motion are overruled.

3. The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3

4. All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5. The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6. Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7. The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

4

# EXHIBIT 1

000743

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

    (a)     In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)     an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)     an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)     On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

    (a)     Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

000745

Case 19-34054-sgj11 Doc 1784-15 Filed 01/29/21 Entered 01/29/21 15:31:37 Page 3 of 23
Case 3:21-cv-01502-B Document 44-15 Filed 09/22/24 Page 190 of 213 PageID 6940
EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

000746

**EXECUTION VERSION**

4.    **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.    **Plan Support.**

(a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

000747

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.      **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.      **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.      **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

000749

**EXECUTION VERSION**

    14.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

000750

EXECUTION VERSION

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:     /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:     CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

000751

Case 3-24-03467-jtg Doc 1073 Filed 11/21/29 Entered 11/21/29 15:31:37 Desc of 23
Case 3:23-cv-01503-B Document 104-15 Filed 05/15/24 Page 196 of 213 PageID 9946
EXECUTION VERSION

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch

Name: Michael Pugatch

Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch

Name: Michael Pugatch

Its: Managing Director

Case 3:21-cv-01300-RBM-JLB Document 104-15 Filed 06/30/24 PageID.9457 Page 197 of 213

# Exhibit A

# TRANSFER AGREEMENT
# FOR ORDINARY SHARES OF
# HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Transfer of Shares and Advisory Board</u>

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

2

000755

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

   a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

   b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

   c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

   a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

   b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

   Prior to the Effective Date the Transferee shall procure that:

   c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

   a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 184668980v.2

000756

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

000757

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

*[Additional Signatures on Following Page]*

5

000758

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:   HIPEP VIII Associates L.P.
       Its General Partner

By:   HarbourVest GP LLC
       Its General Partner

By:   HarbourVest Partners, LLC
       Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:   HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:   HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:   HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:   HarbourVest Partners (Ireland) Limited
       Its Alternative Investment Fund Manager

By:   HarbourVest Partners L.P.
       Its Duly Appointed Investment Manager

By:   HarbourVest Partners, LLC
       Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

000759

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

Case 3:21-cv-01503-B Document 184-15 Filed 06/24/24 Page 205 of 213 PageID 9155

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

000761

# APPENDIX 16

Case 19-34054-sgj11 Doc 1870 Filed 02/01/21 Entered 02/01/21 15:07:21 Page 1 of 4
Case 3:21-cv-01008-B Document 24 Filed 09/11/23 Page 207 of 213 PageID 357
Docket #1870 Date Filed: 02/01/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

### UNITED STATES BANKRUPTCY COURT FOR THE
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s): ___

*The Dugaboy Investment Trust and Get Good Trust*

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
  Plaintiff
  Defendant
  Other (describe)
_____

For appeals in a bankruptcy case and not in an adversary proceeding.
  Debtor
**X** Creditor
  Trustee
  Other (describe)
_____

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from: *Order Approving Debtor's Settlement with Harbourvest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Dkt. # 1788]*

{00374995-1}



1934054210201000000000000003

2. State the date on which the judgment, order, or decree was entered: <u>January 21, 2021</u>

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: <u>Debtor: Highland Capital Management, L.P.</u>

Attorney:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone:  (212) 561-7700
Fax:  (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
Telephone:  (972) 755-7100
Fax:  (972) 755-7110


2. Party:  <u>Creditor:  James Dondero</u>

Attorney:

BONDS ELLIS EPPICH SCHAFER JONES, LLP
D. Michael Lynn
John Y. Bonds
John T. Wilson
Bryan C. Assink
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
Telephone:  (817) 405-6900
Fax:  (817) 405-6902

{00374995-1}

000764

3. Party: <u>Creditor:  CLO Holdco, Ltd.</u>

Attorney:

KANE RUSSELL COLEMAN LOGAN PC
Joseph M. Coleman
John J Kane
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone:  (214) 777-4200
Fax:  (214) 777-4299

4. Party:  <u>Creditors:  HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P.,
HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.</u>

Attorney:

CROWE & DUNLEVY, P.C.
Vickie Driver
2525 McKinnon Street, Suite 425
Telephone:  (214) 420-2142

And

DEBEVOISE & PLIMPTON, LLP
M. Natash Labovitz
Erica S. Weisgerber
Daniel E. Stroik
919 Third Avenue
New York, NY 10022
Telephone:  (212) 909-6000

5.  Party:  <u>The Dugaboy Investment Trust and Get Good Trust</u>

Attorney:

HELLER, DRAPER & HORN, L.L.C.
Douglas S. Draper
Leslie A. Collins
Greta M. Brouphy
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

{00374995-1}

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

**Not applicable.**

February 1, 2021                                        Respectfully submitted,


                                                        */s/Douglas S. Draper.*
                                                        Douglas S. Draper, La. Bar No. 5073
                                                        ddraper@hellerdraper.com
                                                        Leslie A. Collins, La. Bar No. 14891
                                                        lcollins@hellerdraper.com
                                                        Greta M. Brouphy, La. Bar No. 26216
                                                        gbrouphy@hellerdraper.com
                                                        Heller, Draper & Horn, L.L.C.
                                                        650 Poydras Street, Suite 2500
                                                        New Orleans, LA  70130
                                                        Telephone: (504) 299-3300
                                                        Fax: (504) 299-3399
                                                        *Attorneys for The Dugaboy Investment Trust*
                                                        *and Get Good Trust*

Case 23-03067-sgj Doc 1-2 Filed 12/04/23 Entered 12/04/23 15:15:31 Page 4 of 4
Case 3:21-cv-01534-B Document 24 Exhibit Filed 09/11/23 Page 15 of 113 PageID 961
Docket #1889 Date Filed: 02/03/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**AMENDED NOTICE OF APPEAL AND STATEMENT OF ELECTION**

**Part 1: Identify the appellant(s)**
1. Name(s) of appellant(s): ____

*The Dugaboy Investment Trust and Get Good Trust*　　　　　　　　　　　　　　　　

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

| For appeals in an adversary proceeding. | For appeals in a bankruptcy case and not in an adversary proceeding. |
|---|---|
| ☐ Plaintiff | |
| ☐ Defendant | ☐ Debtor |
| ☐ Other (describe) | **X** Creditor |
| _____ | ☐ Trustee |
| | ☐ Other (describe) |
| | _____ |

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from: *Order Approving Debtor's Settlement with HarbourVest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Dkt. # 1788]*

{00375065-1}


1934054210203000000000000003

2. State the date on which the judgment, order, or decree was entered: <u>January 21, 2021</u>

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. *Party/Appellee*: <u>Debtor: Highland Capital Management, L.P.</u>

Attorney:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Fax: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Fax: (972) 755-7110

2. *Interested Party*: <u>Creditor: James Dondero</u>

Attorney:

BONDS ELLIS EPPICH SCHAFER JONES, LLP
D. Michael Lynn
John Y. Bonds
John T. Wilson
Bryan C. Assink
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
Telephone: (817) 405-6900
Fax: (817) 405-6902

{00375065-1}

3. *Interested Party*: <u>Creditor: CLO Holdco, Ltd.</u>

Attorney:

KANE RUSSELL COLEMAN LOGAN PC
Joseph M. Coleman
John J Kane
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Fax: (214) 777-4299

4. *Interested Party*: <u>Creditors: HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.</u>

Attorney:

CROWE & DUNLEVY, P.C.
Vickie Driver
2525 McKinnon Street, Suite 425
Telephone: (214) 420-2142

And

DEBEVOISE & PLIMPTON, LLP
M. Natash Labovitz
Erica S. Weisgerber
Daniel E. Stroik
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000

5. *Party/Appellants*: <u>The Dugaboy Investment Trust and Get Good Trust</u>

Attorney:

HELLER, DRAPER & HORN, L.L.C.
Douglas S. Draper
Leslie A. Collins
Greta M. Brouphy
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

{00375065-1}

000769