**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P Charitable DAF Fund, L.P et al** | § | Case No. **19-34054-SGJ11** |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

**Volume 6**

**APPELLANT RECORD**

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.   Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2.   The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.   Docket Sheet kept by the Bankruptcy Clerk.

4.   Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|-----|-----------|-----------|---------------------------|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-B from U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br>*Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *vol. 9* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001905 thru vol. 13* | | | | |
| *vol. 14.* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002757* | | | | |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* 002878 | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* 003392 | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| 003394 | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| 003583 | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| 003585 | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| 003611 | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*<br>*003637* | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| *003666* | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| *003843* | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| *003844* | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| *003851* | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*<br>*003882*<br>*Thru Vol. 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*<br>*004395* | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21* *004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442* *Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22* *004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*004745* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*004770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|

*006133*

*Thru Vol. 31*

| | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
|---|---|---|---|---|

*Vol. 32*
*006925*

| | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
|---|---|---|---|---|

*006942*

| | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
|---|---|---|---|---|

*006960*

| | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |
|---|---|---|---|---|

TRANSCRIPTS

*006961*

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED  IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

---

Dated:  July 14, 2023                           Respectfully submitted,

                                                **SBAITI & COMPANY PLLC**

                                                */s/ Mazin A. Sbaiti*
                                                **Mazin A. Sbaiti**
                                                Texas Bar No. 24058096
                                                **Jonathan Bridges**
                                                Texas Bar No. 24028835
                                                2200 Ross Avenue – Suite 4900W
                                                Dallas, TX  75201
                                                T:  (214) 432-2899
                                                F:  (214) 853-4367
                                                E:  mas@sbaitilaw.com
                                                     jeb@sbaitilaw.com

                                                **Counsel for Appellants**


                        **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.


                                                */s/ Mazin A. Sbaiti*
                                                Mazin A. Sbaiti

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## <u>PARTIES</u>

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("<u>DAF</u>") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("<u>RIA</u>") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "<u>Adviser's Act</u>"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("<u>Seery</u>") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

000970

## III.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

8.      Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### HCLOF IS FORMED

10.      Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

11.      Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25. Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26. While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27. In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28. HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29. On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30. HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31. On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

000975

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40. Typically, the value of the securities reflected by a market price quote.

41. However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42. There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43. Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44. Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45. It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46. For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

000976

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

000977

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

**V.**

**<u>CAUSES OF ACTION</u>**

**FIRST CAUSE OF ACTION**
*Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

000979

65. This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66. The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* ==17 C.F.R. § 275.206(4)-7==. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67. The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68. HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69. This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70. It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

000982

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

000983

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

## SECOND CAUSE OF ACTION
### Breach of HCLOF Company Agreement
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

**100.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.** Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### *Negligence*
### (By the DAF and CLO Holdco against HCM and HCFA)

**103.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

---

000986

108.     It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

109.     It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

110.     Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

111.     Defendants' negligence foreseeably and directly caused Plaintiff harm.

112.     Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

113.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

114.     Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

115.     HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

---

Original Complaint

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

---

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.    Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

FIFTH CAUSE OF ACTION
*Tortious Interference*
(CLO Holdco against HCM)

134.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## **JURY DEMAND**

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## **PRAYER FOR RELIEF**

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.   Actual damages;

    b.   Disgorgement;

    c.   Treble damages;

    d.   Exemplary and punitive damages;

    e.   Attorneys' fees and costs as allowed by common law, statute or contract;

    f.   A constructive trust to avoid dissipation of assets;

    g.   All such other relief to which Plaintiff is justly entitled.

000992

Dated:  April 12, 2021                 Respectfully submitted,

                                       **SBAITI & COMPANY PLLC**

                                       */s/  Mazin A. Sbaiti*
                                       **Mazin A. Sbaiti**
                                       Texas Bar No. 24058096
                                       **Jonathan Bridges**
                                       Texas Bar No. 24028835
                                       JPMorgan Chase Tower
                                       2200 Ross Avenue – Suite 4900W
                                       Dallas, TX  75201
                                       T:  (214) 432-2899
                                       F:  (214) 853-4367
                                       E:  mas@sbaitilaw.com
                                            jeb@sbaitilaw.com

                                       **Counsel for Plaintiffs**

---

000993

# EXHIBIT 2

000994

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

### I.

### NECESSITY OF MOTION

Plaintiffs submit this Motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of Defendant Highland Capital Management, L.P. ("HCM"), and the chief perpetrator of the wrongdoing that forms the basis of Plaintiffs' causes of action.

Seery is not named in the Original Complaint. But this is only out of an abundance of caution due to the bankruptcy court, in HCM's pending Chapter 11 proceeding, having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the bankruptcy court also asserts "sole jurisdiction" over all such causes of action.

Plaintiffs respectfully submit that, to the extent the bankruptcy court order prohibits the filing of an action in *this Court*, whose jurisdiction the bankruptcy court's jurisdiction is wholly

---

derivative of, that order exceeds the bankruptcy court's powers and is unenforceable. Alternatively, Plaintiffs submit that filing ***this Motion*** satisfies the prerequisites provided in the bankruptcy court's order. Either of these reasons provides sufficient grounds to grant this Motion.

The proposed First Amended Complaint is attached as Exhibit 1.

## II.

## BACKGROUND

On June 23, 2020, counsel for HCM filed a motion in HC's bankruptcy proceedings asking the bankruptcy court to defer to the "business judgment" of the board's compensation committee and approve the terms of its appointment of Seery as chief executive officer and chief restructuring officer at HCM, retroactive to March.[1] Counsel also asked the bankruptcy court to declare that it had exclusive jurisdiction over any claims asserted against Seery in this role.

On July 16, 2020, the bankruptcy court granted that motion and stated as follows:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. ***The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted***.[2]

---

[1] Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Doc. 774]. This motion is attached as Exhibit 2.

[2] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Doc 854]. A related order dated January 9, 2020, contains a similar provision with regard to Seery's role as an "Independent Director." Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Doc 339]. These orders are attached, respectively, as Exhibits 3 and 4.

---

On March 22, 2021, the bankruptcy court entered an order confirming HCM's reorganization plan.[3] That order purports to extend the prohibitions on suits against Seery, and it also prohibits certain actions against HCM and its affiliates. By its own terms, however, that order is not effective due to a pending appeal.

On April 12, 2021, Plaintiffs filed their Original Complaint in this action, alleging that HCM and related entities are liable as a result of insider trading and other violations of the antifraud provisions of the Investment Company Act of 1940, among other causes of action. The Original Complaint does not name Seery as a defendant. But the action is based on Seery's misrepresentations, omissions, and other breaches of duty committed in his role as HCM's CEO, which are sufficient to demonstrate his willful misconduct or gross negligence, though Plaintiffs submit that mere negligence and breach of fiduciary duty also form sufficient bases for his personal liability.

## III.

## ARGUMENT

This Court should grant leave to amend because the liberal policies behind Rule 15 require it and because leave is not prohibited by the bankruptcy court's order.

### A. Rule 15(a) Allows Plaintiffs' Amendment As a Matter of Course

Rule 15(a) instructs the Court to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a). The Fifth Circuit, in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.,* 195 F.3d 765 (5th Cir. 1999), interpreted the rule as "evinc[ing] a bias in favor of granting leave to amend." *Id.* at 770. Thus the Court must possess a "substantial reason"

---

[3] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) And (II) Granting Related Relief [Doc. 1943].

---

to deny a request for leave to amend. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002); *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that leave should be granted "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

Moreover, one amendment, filed within 21 days of service of the pleading it seeks to amend or before a responsive pleading is filed, is allowed "as a matter of course." Fed. R. Civ. P. 15(a)(1); *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984) ("When, as in this case, a plaintiff who has a right to amend nevertheless petitions the court for leave to amend, the court should grant the petition."); *Galustian v. Peter*, 591 F.3d 724, 729-30 (4th Cir. 2010) (holding that district court abused its discretion in denying timely motion to amend adding defendant because "[t]he plaintiff's right to amend once is absolute"); *Rogers v. Girard Tr. Co.*, 159 F.2d 239, 241 (6th Cir. 1947) (holding that complaint may be amended as matter of course where defendant has filed no responsive pleading, and leave of district court is not necessary, but it is error to deny leave when asked); *Bancoult v. McNamara*, 214 F.R.D. 5, 7-8 (D.D.C. 2003) (holding that plaintiff's filing of a motion for leave to amend does not nullify plaintiff's absolute right to amend once before responsive pleadings, even if the amendment would be futile).

Here, Plaintiffs did not name Seery as a defendant in the Original Complaint out of an abundance of caution in light of the bankruptcy court's order of July 16, 2020 [Doc. 854]. Instead, Plaintiffs are seeking leave in this Motion to do so. Because the proposed amendment is their first, and because it comes within 21 days of service of the Original Complaint, as well as before any

responsive pleadings, Plaintiffs respectfully submit that they are entitled to leave and their proposed First Amended Complaint should be allowed.

## B. The Bankruptcy Court's Order Should Not Prohibit Plaintiffs' Amendment

Plaintiffs submit that the bankruptcy court order of July 16, 2020, does not prohibit the proposed amendment for two independent reasons.

### 1. The Bankruptcy Court's Order Exceeds Its Jurisdiction

#### a. The Bankruptcy Court Cannot Strip This Court of Jurisdiction

Because the bankruptcy court's jurisdiction derives from and is dependent upon the jurisdiction of this Court, its order declaring that it has "sole jurisdiction" is overreaching.

Congress provided for and limited the jurisdiction of bankruptcy courts in 28 U.S.C. § 1334 and 28 U.S.C. § 157. As a result, bankruptcy court jurisdiction derives from and is limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) ("The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."); *Williams v. SeaBreeze Fin., LLC (In re 7303 Holdings, Inc.)*, Nos. 08-36698, 10-03079, 2010 Bankr. LEXIS 2938 at *7 (Bankr. S.D. Tex. Aug. 26, 2010) ("A bankruptcy court's jurisdiction is derivative of the district court's jurisdiction. The bankruptcy court does not have jurisdiction unless the district court could exercise authority over the matter . . . ."). The plain provisions of § 1334 grant **to the district courts** "original jurisdiction" over all bankruptcy cases and related civil proceedings. 28 U.S.C. § 1334(a)-(b). What Congress giveth, the bankruptcy courts cannot taketh away.

#### b. The *Barton* Doctrine Does Not Apply

The bankruptcy court's overreach seems to stem from a misapplication of the *Barton* doctrine. That doctrine protects receivers and trustees who are appointed by the bankruptcy court. *Randazzo v. Babin*, No. 15-4943, 2016 U.S. Dist. LEXIS 110465, at *3 (E.D. La. Aug. 18, 2016)

---

("While the *Barton* case involved a receiver in state court, the United States Court of Appeals for the Fifth Circuit has extended this principle, now known as the *Barton* doctrine, to lawsuits against bankruptcy trustees for acts committed in their official capacities."). The doctrine does not apply to executives of a debtor, like Seery, who are not receivers or trustees, and who are stretching the truth to claim that they were "appointed" by the bankruptcy court after asking it merely to approve their appointment in deference to their discretion under the business judgment rule.[4]

### c. The Order Exceeds the Constitutional Limits of the Bankruptcy Court's Jurisdiction

Plainly the bankruptcy court does not have "***sole jurisdiction***" over all causes of action that might be brought against Seery related to his role as HCM's CEO. But more to the point, the bankruptcy court does not even have ***concurrent jurisdiction*** over *all* such claims. The separation of powers doctrine does not allow that. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that Congress cannot bypass Article III and create jurisdiction in bankruptcy courts "simply because a proceeding may have some bearing on a bankruptcy case"); *id.* at 488 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), for the proposition that "Congress cannot 'withdraw from judicial [read Article III] cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty'" with the limited exception of matters involving certain public rights); *id.* at 494 (quoting the dissent's quote of *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985), for the proposition that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law," and

---

[4] Exhibit 2 at 14-15 (arguing that the bankruptcy court should not "interfere" with their "corporate decisions . . . as long as they are attributable to any rational business purpose") (internal quotes omitted); *id.* at 5-7 (detailing the compensation committee's "appointment" of Seery as CEO as well as chief restructuring officer).

then adding "tort" to the rule for purposes of the matter before it); *cf. In re Prescription Home Health Care,* 316 F.3d 542, 548 (5th Cir. 2002) (holding that trustee's tax liability was not within the bankruptcy court's related-to jurisdiction and rejecting "the theory that a bankruptcy court has jurisdiction to enjoin any activity that threatens the debtor's reorganization prospects [because that] would permit the bankruptcy court to intervene in a wide variety of third-party disputes [such as] any action (however personal) against key corporate employees, if they were willing to state that their morale, concentration, or personal credit would be adversely affected by that action"). The bankruptcy court's order asserting "sole jurisdiction" here is hardly even relevant since that court lacks the power to expand its jurisdiction or manufacture jurisdiction where none exists.

The proposed First Amended Complaint asserts common law and equitable contract and tort claims. For the reasons explained by the Supreme Court in *Stern,* such claims should not be deemed within the bankruptcy court's jurisdiction.

### d. The Order Exceeds the Bankruptcy Court's Statutory Authorization

Not only are there constitutional issues with the scope of the bankruptcy court's order, there is also the limitation of 28 U.S.C. § 157(d). *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),* 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157). In § 157(d), Congress prohibited the bankruptcy court, absent the parties' consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulating organizations or activities affecting interstate commerce.

The First Amended Complaint's allegations against Seery—accusing him of insider trading, violations of the RICO statute (18 U.S.C. § 1961 et seq.), and violations of the antifraud provisions of the Investment Advisers Act of 1940—require precisely that. Even determining the

"colorability" of such claims will require a close examination of both the proceedings that took place in the bankruptcy court under Title 11 and the Investment Advisers Act as well as the RICO statute. The bankruptcy court lacks the authority to make such determinations. This Court has that power.

Thus, at least as it applies to the proposed First Amended Complaint, the bankruptcy court's order exceeds its authority under 28 U.S.C. § 157(d), and any determination of "colorability" should take place in this Court, which Rule 12(b)(6) of the Federal Rules of Civil Procedure already provides for. To hold otherwise would create unnecessary tension with the congressional aims of 28 U.S.C. § 959 ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.").

### 2. The Prerequisites in the Bankruptcy Court's Order Are Satisfied by This Motion and the Detailed Allegations in the Proposed First Amended Complaint

Alternatively, or in addition, should this Court read the bankruptcy court's order as prohibiting the filing of actions against Seery even in *this* Court, Plaintiffs submit that this Motion seeking leave provides the mechanisms required by that order and therefore satisfies it.

The bankruptcy court's order requires only that any contemplated action must first be submitted to that court for a preliminary determination of colorability. Because that court only has derivative jurisdiction as a result of this Court's jurisdiction—and only over matters referred to it by this Court—Plaintiffs submit that filing a motion for leave here is the correct procedure for complying with that order. This Court may refer this Motion to the bankruptcy court under Miscellaneous Order No. 33, as authorized by § 104 of the Bankruptcy Amendments and Federal Judgeship Act of 1984, codified at 28 U.S.C. § 157(a). Or it may instead decline to refer the Motion or withdraw the reference under 28 U.S.C. § 157(d), as Plaintiffs submit is appropriate for the

---

reasons addressed above. Regardless, this Motion presents the issue in a manner that allows the bankruptcy court to address it, should this Court decide that the bankruptcy court is authorized to do so. *Cf.* Confirmation Order [Doc. 1943] at 77, ¶ AA ("The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, ***only to the extent legally permissible*** and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.") (emphasis added).

Plaintiffs therefore submit that, by filing this Motion in this Court, they have complied with the bankruptcy court's order.

## IV.

## <u>CONCLUSION</u>

Plaintiffs are entitled to amend as a matter of course. The bankruptcy court lacks jurisdiction to prohibit the proposed amendment. In these circumstances, Plaintiffs respectfully submit that the interests of justice support the granting of leave to amend, and Rule 15(a) requires that this Motion be granted.

Dated: April 19, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Jonathan Bridges*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

## CERTIFICATE OF CONFERENCE

I hereby certify that, on April 19, 2021, I conferred with Defendant HCM's counsel in the HCM bankruptcy proceedings regarding this Motion. I have not conferred with counsel for the other Defendants because they have not been served and I do not know who will represent them. HCM's counsel indicated that they are opposed to the relief sought in this Motion.


*/s/ Jonathan Bridges*
Jonathan Bridges

001004

# APPENDIX 26

Case 19-34054-sgj11 Doc 2352 Filed 04/29/21 Entered 04/29/21 13:37:51 Page 1 of 3
Case 3:21-cv-01508-B Document 26 Filed 09/11/23 Page 50 of 239 PageID 1226

Docket #2255 Date Filed: 04/29/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 28, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |

### ORDER REQUIRING THE VIOLATORS TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR VIOLATING TWO COURT ORDERS

Having considered (a) the *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247] (the "Motion"), (b) the *Debtor's Memorandum of Law in Support of Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court* [Docket No. 2236] (the "Memorandum of Law"),[2] (c) the exhibits

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.



annexed to the *Declaration of John A. Morris in Support of Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2237] (the "Morris Declaration"), and (d) all prior proceedings relating to this matter, including the proceedings that led to the entry of each of the Orders and the Approval Order; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      On **Tuesday, June 8, 2021 at 9:30 a.m. (Central Time)** (i) The Charitable DAF Fund, L.P. ("The DAF"); (ii) CLO Holdco, Ltd. ("CLO Holdco"); (iii) Sbaiti & Company PLLC ("Sbaiti & Co."); (iv) those persons who authorized The DAF and CLO Holdco, respectively, to file *Plaintiff's Motion for Leave to File First Amended Complaint in the District Court* in that certain civil action styled *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al.*, case no. 21-cv-00842, pending in the United States District Court for the Northern District of Texas; and (v) James Dondero shall appear **in-person** before this Court and show cause why an order should not be granted: (a) finding and holding each of the Violators in contempt of court; (b) directing the Violators, jointly and severally, to pay the Debtor's estate an amount of money equal to two (2) times the Debtor's actual expenses incurred in bringing this Motion, payable within three (3) calendar days of presentment of an itemized list of expenses; (c) imposing a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of

DOCS_NY:43022.1 36027/002

any order of this Court (including filing any motion in the District Court to name Mr. Seery as a defendant without seeking and obtaining this Court's prior approval, as required under the Orders), and (d) granting the Debtor such other and further relief as the Court deems just and proper under the circumstances.

2.      Any response (each, a "Response") to the relief requested in the Motion shall be filed with the Clerk of the Court on or before **Friday, May 14, 2021 at 5:00 p.m. (Central Time)** (the "Response Deadline").

3.      The Debtor may file a reply (each, a "Reply") to any Response.  Any Reply shall be filed with the Clerk of the Court on or before **Friday, May 21, 2021 at 5:00 p.m. (Central Time)** (the "Reply Deadline").

4.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

DOCS_NY:43022.1 36027/002

001008

# APPENDIX 27

1              GRANT SCOTT - 1/21/2021

2         IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION

4    IN RE:                         )
                                    )      Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT,   )
     L.P.                           )       Case No.
6                                   )  19-34054-sgj11
                    Debtor.         )
7    ---------------------------    )
     HIGHLAND CAPITAL MANAGEMENT,   )
8    L.P.,                          )
                    Plaintiff,      )
9                                   )      Adversary
          vs.                       )  Proceeding No.
10                                  )   21-03000-sgj
     HIGHLAND CAPITAL MANAGEMENT    )
11   FUND ADVISORS, L.P.; NEXPOINT  )
     ADVISORS, L.P.; HIGHLAND       )
12   INCOME FUND; NEXPOINT          )
     STRATEGIC OPPORTUNITIES FUND;  )
13   NEXPOINT CAPITAL, INC.; and    )
     CLO HoldCo, LTD.,              )
14                                  )
                    Defendants.     )
15   ------------------------------

16

17   VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18        Thursday, 21st of January, 2021

19

20

21

22

23   Reported by: Lisa A. Wheeler, RPR, CRR

24   Job No: 188910

25

Page 2

```
 1              GRANT SCOTT - 1/21/2021
 2              January 21, 2021
 3              2:02 p.m.
 4
 5
 6        Videoconference deposition of Grant
 7   SCOTT, pursuant to the Federal Rules of
 8   Civil Procedure before Lisa A. Wheeler,
 9   RPR, CRR, a Notary Public of the State of
10   North Carolina.  The court reporter
11   reported the proceeding remotely and the
12   witness was present via videoconference.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              GRANT SCOTT - 1/21/2021
 2   REMOTE APPEARANCES:
 3        PACHULSKI STANG ZIEHL & JONES
 4        Attorneys for Debtor
 5            780 Third Avenue
 6            New York, NY 10017
 7        BY:   JOHN MORRIS, ESQ.
 8
 9        LATHAM & WATKINS
10        Attorneys for UBS
11            885 Third Avenue
12            New York, NY 10022
13        BY:   SHANNON McLAUGHLIN, ESQ.
14
15        SIDLEY AUSTIN
16        Attorneys for the Creditors Committee
17            2021 McKinney Avenue
18            Dallas, TX 75201
19        BY:   PENNY REID, ESQ.
20            ALYSSA RUSSELL, ESQ.
21            PAIGE MONTGOMERY, ESQ.
22
23
24
25
```

Page 4

```
 1              GRANT SCOTT - 1/21/2021
 2   REMOTE APPEARANCES:  (Continued)
 3        KING & SPALDING
 4        Attorneys for Highland CLO Funding, Ltd.
 5            500 West 2nd Street
 6            Austin, TX 78701
 7        BY:   REBECCA MATSUMURA, ESQ.
 8
 9        K&L GATES
10        Attorneys for Highland Capital Management
11        Fund Advisors, L.P., et al.
12            4350 Lassiter at North Hills Avenue
13            Raleigh, NC 27609
14        BY:   A. LEE HOGEWOOD, III, ESQ.
15            EMILY MATHER, ESQ.
16
17        HELLER DRAPER & HORN
18        Attorneys for The Dugaboy Investment Trust
19        and The Get Good Trust
20            650 Poydras Street
21            New Orleans, LA 70130
22        BY:  MICHAEL LANDIS, ESQ.
23
24
25
```

Page 5

```
 1              GRANT SCOTT - 1/21/2021
 2   REMOTE APPEARANCES:  (Continued)
 3        KANE RUSSELL COLEMAN & LOGAN
 4        Attorneys for Defendant CLO HoldCo Limited
 5            Bank of America Plaza
 6            901 Main Street
 7            Dallas, TX 75202
 8        BY:   BRIAN CLARK, ESQ.
 9            JOHN KANE, ESQ.
10
11   ALSO PRESENT:  La Asia Canty
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| Page 6 | Page 7 |
|---|---|
| GRANT SCOTT - 1/21/2021 | GRANT SCOTT - 1/21/2021 |

Page 6

1     GRANT SCOTT - 1/21/2021
2   G R A N T   S C O T T,
3         called as a witness, having been duly sworn
4   by a Notary Public, was examined and
5   testified as follows:
6         MR. MORRIS:  Good afternoon.  My
7   name is John Morris.  I'm an attorney with
8   Pachulski Stang Ziehl & Jones, a law firm
9   who represents the debtor in the bankruptcy
10  known as In Re: Highland Capital
11  Management, L.P., and we're here today for
12  the deposition of Grant Scott.
13         Before I begin, I would just like to
14  have confirmation on the record that
15  everybody here who's representing their
16  respective parties agrees that this
17  deposition can be used in evidence in any
18  subsequent hearing, notwithstanding the
19  fact that it's being conducted remotely,
20  and that the witness is not in the same
21  room as the court reporter.
22         Does anybody have an objection to
23  the admissibility of the transcript subject
24  to any reservation of -- of actual
25  objections on the record to using this

Page 7

1     GRANT SCOTT - 1/21/2021
2   transcript going forward?
3         Okay.  Nobody's spoken up, so I --
4   I'd like to begin.
5              EXAMINATION
6   BY MR. MORRIS:
7     Q.    Good afternoon, Mr. Scott.  As I
8   mentioned, my name is John Morris, and we're
9   here for your deposition today.  Have you ever
10  been deposed before?
11    A.    On two occasions.
12    Q.    And -- and when did the -- when did
13  those depositions take place?
14    A.    This past October and maybe six to
15  eight years ago.
16    Q.    Okay.  Can you just tell me
17  generally what the subject matter was of the
18  deposition this past October.
19    A.    It was relating to Jim Dondero's --
20  it was a family law issue in -- in -- with
21  respect to Jim Dondero.
22    Q.    Okay.  And did you testify in a
23  courtroom, or was it a deposition like this?
24    A.    I -- right here, actually.
25    Q.    Okay.  Super.  And -- and what about

Page 8

1     GRANT SCOTT - 1/21/2021
2   the -- the deposition six to eight years ago,
3   do you have a recollection as to what that was
4   about?
5     A.    Yeah.  It was a -- it was a patent I
6   wrote for Samsung Electronics.
7     Q.    Okay.
8     A.    And as being the person that I --
9   that wrote it and the patent was in litigation,
10  not -- not being handled by me, but by virtue
11  of having written the patent, I was -- I was
12  deposed --
13    Q.    Okay.  So you --
14    A.    -- on the -- on the patent.
15    Q.    Okay.  So you've had a little bit of
16  experience with depositions.  But just
17  generally speaking, I'm going to ask you a
18  series of questions.  It's very important that
19  you allow me to finish my question before you
20  begin your answer.
21         Is that fair?
22    A.    Absolutely.
23    Q.    And I will certainly try to extend
24  the same courtesy to you, but if I -- if I step
25  on your words, will you let me know that?

Page 9

1     GRANT SCOTT - 1/21/2021
2     A.    Okay.
3     Q.    And if there's anything that I ask
4   that you don't understand, will you let me know
5   that as well?
6     A.    Yes.  I'll try -- I'll do my best.
7     Q.    Okay.  So this is a virtual
8   deposition.  We're not in the same room.  I am
9   going to be showing you documents today.  The
10  documents will be put up on the screen.  This
11  isn't a -- a trick of any kind.  If at any time
12  you see a document up on the screen and either
13  you believe or you have any reason to want to
14  read other portions of the document, will you
15  let me know that?
16    A.    Yes, I -- yes, I will.  Uh-huh.
17    Q.    With respect to the Dondero family
18  matter, I really don't want to go into the
19  substance of that, but I do want to know
20  whether you testified voluntarily in that
21  matter or whether you -- whether you testified
22  pursuant to subpoena.
23    A.    I would have done that, but the
24  first time I found out about it was a -- was a
25  subpoena that I received.  I wasn't given the

Page 10

GRANT SCOTT - 1/21/2021

2  choice.

3      Q.    Okay.  And do you recall who served
4  the subpoena on you?  Actually, let me ask a
5  different question because I'm really not
6  interested in the -- in the details.

7          Did Mr. Dondero serve that subpoena
8  on you or did somebody else?

9      A.    His counsel for his ex-wife.

10     Q.    Mr. -- so -- so the lawyer acting on
11  behalf of Mr. Dondero's ex-wife served you with
12  the subpoena?

13     A.    Correct.

14     Q.    Okay.  You're familiar with an
15  entity called CLO HoldCo Limited; is that
16  right?

17     A.    Yes.

18     Q.    Do you know what that entity is?

19     A.    Yes.

20     Q.    What -- what -- can you describe for
21  me what CLO HoldCo Limited is.

22     A.    It's a holding company of assets
23  including collateralized loan obligation-type
24  assets.  That's a portion of the overall
25  portfolio.  It's an organization that is

Page 11

GRANT SCOTT - 1/21/2021

1  integrated with other entities as part of a
2  charitable -- loosely what we -- what we refer
3  to as a charitable foundation equivalent.
4  Yeah.

5      Q.    All right.  We'll -- we'll get into
6  some detail about the corporate structure in a
7  moment.  Do you personally play any role at CLO
8  HoldCo Limited?

9      A.    Yes.  My technical title is
10  director, but I -- I don't necessarily know
11  specifically what that title means other than I
12  act, as I understand it, as -- as a trustee for
13  those -- for those assets.

14     Q.    And where did you get that
15  understanding?

16     A.    Approximately ten years ago from the
17  group that -- that set up the hierarchy.

18     Q.    And which group set up the
19  hierarchy?

20     A.    Employees at Jim Don- -- as I
21  understand it, employees of Highland along with
22  outside counsel, as I understand it, and also,
23  I guess, input from -- from Jim Dondero.

24     Q.    At the time that you assumed the

Page 12

GRANT SCOTT - 1/21/2021

1  role of director of CLO HoldCo Limited, was
2  that entity already in existence?

3      A.    I believe so.  I'm not certain.  I'm
4  not certain.

5      Q.    What are your duties and
6  responsibilities as a director of CLO HoldCo
7  Limited?

8      A.    Well, my day-to-day responsibilities
9  are to interface with -- with the manager of
10  the -- of the assets of CLO.  I do have some
11  role in -- with respect to some of the entities
12  that are -- I -- I have a limited role with
13  respect to a subset of the charitable
14  foundations that receive money from the CLO
15  HoldCo structure, which is commonly referred to
16  as the DAF.  There's -- sometimes those are
17  used interchangeably.

18     Q.    What terms are used interchangeably?

19     A.    Well, the DAF and CLO HoldCo are
20  frequently -- by -- by other people they're --
21  it's the short -- it's the -- I guess it's
22  easier to use the acronym DAF than CLO HoldCo
23  Limited, so I'm frequently having to -- there
24  is a DAF entity so -- that's above -- above CLO

Page 13

GRANT SCOTT - 1/21/2021

1  in terms of the management, and so it's
2  frequently confusing and I'm having to clarify
3  at times which entity we're talking about,
4  but -- but other parties frequently use those
5  terms interchangeably.

6      Q.    Okay.

7          MR. MORRIS:  Lisa, when we use the
8      phrase DAF, because you'll hear that a lot,
9      it's all caps, D-A-F.

10  BY MR. MORRIS:

11     Q.    You mentioned that you interface
12  with the manager of assets of CLOs.  Do I have
13  that right?

14     A.    Well, of all the assets.

15     Q.    Okay.  Who is the manager of the
16  assets that you're referring to?

17     A.    Highland Capital Management.

18     Q.    Highland Capital Management manages
19  all of the assets -- withdrawn.

20          Is it your understanding that
21  Highland Capital Management manages all the
22  assets that are owned by CLO HoldCo Limited?

23     A.    Yes.

24     Q.    Who makes the investment decisions

GRANT SCOTT - 1/21/2021

1  on behalf of CLO HoldCo Limited?
2      A.   Highland -- those managers that you
3  mentioned.
4      Q.   Okay.  I didn't mention anybody in
5  particular.
6      A.   Oh, I'm sorry.  The -- the -- the
7  money manager -- could you repeat that
8  question?  I'm sorry.  I'm so sorry.
9      Q.   Can you just -- can you just
10 identify for me the person who makes investment
11 decisions on behalf of CLO HoldCo Limited.
12     A.   It's -- well, it's -- it's persons
13 as I understand it.  I inter- -- interface with
14 a -- with a group, but it's -- it's Highland
15 Capital employee -- Highland Capital Management
16 employees.
17     Q.   Okay.  Can you just name any of
18 them, please.
19     A.   Hunter Covitz, Jim Dondero.  Mark
20 Okada's no longer there, but I believe he was
21 involved, and there are others that I interface
22 with.
23     Q.   Can you -- can you recall the name
24 of anybody other than Mr. Okada and Mr. Dondero

GRANT SCOTT - 1/21/2021

1  and Mr. Covitz?
2      A.   Yeah.  Over the years I've worked
3  with Tim Cournoyer, Thomas Surgent, but I
4  think -- I think that's the core -- the core
5  group.
6      Q.   All right.  And is there anybody
7  within that core group who has the final
8  decision-making authority concerning the
9  investments in CLO HoldCo Limited?
10     A.   I don't -- I don't know.  I'm sorry.
11 Say that again.  I just want to -- I'm sorry.
12 I'm trying to be -- I'm not trying to -- I'm
13 trying to be --
14     Q.   I understand.  And --
15     A.   Sorry.  If you could just repeat it.
16     Q.   Sure.  Is there any particular
17 person who has the final decision-making
18 authority for investments that are being made
19 on behalf of CLO HoldCo Limited?
20     A.   Amongst that group I am -- I am not
21 sure.
22     Q.   Okay.  So are there any other
23 directors of CLO HoldCo besides yourself?
24     A.   No.

GRANT SCOTT - 1/21/2021

1      Q.   Is it fair to say that you do not
2  make decisions, investment decisions, on behalf
3  of CLO HoldCo Limited?
4      A.   Yes.
5      Q.   Does CLO HoldCo Limited have any
6  employees that you know of?
7      A.   No.
8      Q.   Does CLO HoldCo have any --
9  withdrawn.
10     Does CLO HoldCo Limited have any
11 officers that you know of?
12     A.   No.
13     Q.   So am I correct that you're the only
14 representative in the world of CLO HoldCo in
15 terms of being a director, officer, or
16 employee?
17     A.   Yes.
18     Q.   Do you receive any compensation from
19 CLO HoldCo for your services as the director?
20     A.   I do now.
21     Q.   When did that begin?
22     A.   I believe in the middle of 2012.
23     Q.   Okay.  And had you served as a
24 director prior to that time without

GRANT SCOTT - 1/21/2021

1  compensation?
2      A.   Yes.
3      Q.   And have you been the sole director
4  of CLO HoldCo Limited since the time of your
5  appointment approximately ten years ago?
6      A.   Yes.
7      Q.   Nobody else has served in that
8  capacity; is that right?
9      A.   That is correct.
10     Q.   There have been no employees or
11 officers of that entity during the time that
12 you've served as director, correct?
13     A.   Yes.
14     Q.   Do you know who formed CLO HoldCo
15 Limited?
16     A.   I do not.
17     Q.   Do you know why CLO HoldCo Limited
18 was formed?
19     A.   I believe so.
20     Q.   Can you explain to me why -- your
21 understanding as to why CLO HoldCo was formed.
22     A.   So as I understand things, Jim
23 Dondero wanted to create a charitable
24 foundation-like entity or entities, and tax

GRANT SCOTT - 1/21/2021

1  people particularly, I guess, finance people,
2  lawyers, they created this network of entities
3  to carry out that charitable goal.  At one
4  point, I thought it was a novel type of
5  institution, if you want to call it, or a
6  novel -- novel type of group of entities, but
7  over time, I came to understand that although
8  not cookie cutter, it -- it follows a general
9  arrangement of entities for legal and tax
10 purposes, compliance purposes, IRS purposes,
11 various insulating purposes to maintain -- or
12 to meet the necessary requisites to carry out
13 that charitable function.
14     Q.    When did you come to that
15 understanding?
16     A.    Over the last couple of years.  I
17 periodically have to refresh my recollection.
18 It's -- it's fairly complex.
19     Q.    Okay.  In your capacity as the sole
20 director of CLO HoldCo Limited, do you report
21 to anybody?
22     A.    No.
23     Q.    Other than interfacing with the
24 manager of the assets of the CLO, do you have

GRANT SCOTT - 1/21/2021

1  any other duties and responsibilities as a
2  director of CLO HoldCo Limited?
3      A.    Yes.  Sorry.  My mouth is a little
4  dry.
5      Q.    By the way, if you ever need to take
6  a break, just let me know.
7      A.    Okay.  Thank you.  Now I forgot your
8  question.  The -- the -- the --
9      Q.    I understand.
10     A.    The answer -- the -- the answer is
11 yes.  I -- why don't you ask -- ask your
12 question again.  I'm sorry.
13     Q.    Sure.  Other than interfacing with
14 the manager of the assets of the CLO, do you
15 have any other duties and responsibilities as
16 the sole director of CLO HoldCo Limited?
17     A.    Yes.  So Highland Capital because of
18 its -- the way it's set up to manage or service
19 CLO HoldCo and the DAF, it has a relatively
20 large group of people that I have to interface
21 with to do everything from -- everything from
22 soup to nuts.  Finances and the money
23 management is one aspect, but most of my
24 time -- on a day-to-day or week-to-week basis,

GRANT SCOTT - 1/21/2021

1  most of my time is spent working with the
2  various compliance and other people for
3  addressing issues of get- -- you know, getting
4  taxes filed.  It runs -- it runs the gamut of
5  every aspect of the organization being -- being
6  handled by Highland.
7      Q.    Okay.
8      A.    You know, unlike -- unlike my
9  financial -- unlike a financial planner that
10 might, you know, manage assets, they -- they do
11 it all, and I interface with them regularly to
12 maintain -- mostly to deal with compliance
13 issues.
14     Q.    Who's the com- -- is there a person
15 who's in charge of compliance?
16     A.    I believe Thomas Surgent.  I
17 mentioned him.  I believe he also has that
18 role, but it's -- you know, they do have
19 turnover, I guess, in that.  It's -- I guess
20 they refer to it as the back office.  I've
21 heard that term be used, but -- basically, it's
22 a large number of people that have changed over
23 time, but it's -- it's more -- I believe it's
24 more than one collectively.

GRANT SCOTT - 1/21/2021

1      Q.    How much time do you devote -- you
2  know, can you estimate either on a weekly or a
3  monthly basis how many -- how much time do you
4  devote to serving as the director of CLO HoldCo
5  Limited?
6      A.    I thought about that.  Well, let --
7  let's put it this way:  There was the
8  prebankruptcy time I spent per day, and then
9  there was the postbankruptcy time I've spent
10 per -- per -- or per week -- excuse me, or
11 per -- I've estimated it as probably a day --
12 it's so intermittent it's -- it's hard, okay?
13 It's -- I don't dedicate my Mondays to only
14 doing that and then Tuesday through Friday I
15 don't, right?  I -- it's -- I have to piece
16 together everything that occurs during the
17 week.  There might be some weeks where I don't
18 have any contact.  There might be every day of
19 the week I have multiple contact.  There may be
20 days where from morning to night there is so
21 much contact, it precludes me from doing
22 anything else meaningfully.  So -- but I would
23 estimate it's probably three or four -- maybe
24 three days, four days a month when things are

Page 22

1   GRANT SCOTT - 1/21/2021
2   going well.
3       Q.    And -- and I think you -- you
4   testified just now that there was kind of a
5   difference between prebankruptcy and
6   postbankruptcy.  Do I have that right?
7       A.    Yes.
8       Q.    And can you tell me -- is it fair to
9   say that before the bankruptcy, you didn't
10  devote much time to CLO HoldCo, or do I have
11  that wrong?
12      A.    Well, I -- just the time that --
13  that I mentioned just -- I'm sorry.  The -- the
14  time I just mentioned now when you asked me,
15  that was the pre period.  Excuse me.  I haven't
16  talked about the postbankruptcy period.
17      Q.    So are you -- are you -- are you
18  devoting more time or less time since the
19  bankruptcy?
20      A.    Much more.
21      Q.    Much more since the bankruptcy
22  filing?
23      A.    Yes.
24      Q.    And so why did the bankruptcy filing
25  cause you to spend more time as a director of

Page 23

1   GRANT SCOTT - 1/21/2021
2   CLO HoldCo Limited?
3       A.    Well, initially, and this would
4   be -- this would be late 2019, it was --
5   aft- -- after the bankruptcy was -- was filed
6   and I obtained counsel, who are on the phone
7   now -- or in this deposition now, excuse me,
8   that was -- that transition occurred because
9   CLO was a debtor -- excuse me, a creditor to --
10  to the debtor and had to take steps to
11  establish its -- its claim.  So if I understand
12  the -- things correctly, the -- the debtor
13  identified as part of the filing -- I don't
14  know how bankruptcy works, but if I under- --
15  if my recollection is correct, there's a
16  hierarchy from biggest to smallest, and we were
17  relatively high up.  And when I say we or I,
18  I -- I just mean CLO was relatively high up.
19  And so initially, for the first period of so
20  many months, the -- the exclusive focus was on
21  our position as a creditor -- a creditor having
22  a certain claim against a debtor.
23      Q.    Can you describe for me your
24  understanding of the nature of the claim
25  against the debtor.

Page 24

1   GRANT SCOTT - 1/21/2021
2       A.    It was various obligations that were
3   owed to -- to CLO, things that had been
4   previously donated or -- or agreements that had
5   been set up that transferred certain assets,
6   and it was basically the -- the -- the amounts
7   were derived from those sorts of transactions.
8       Q.    Okay.  You're a patent lawyer; is
9   that right?
10      A.    I -- I'm exclusively a patent
11  attorney, yes.
12      Q.    Have you been a patent lawyer on an
13  exclusive basis since the time you graduated
14  from law school?
15      A.    From law school, yes.
16      Q.    Can you just describe for me
17  generally your educational background.
18      A.    So I'm an electrical engineer by
19  training.  I graduated from the University of
20  Virginia in 1984.  I then went to graduate
21  school at the University of Illinois.  I
22  received my master's degree in 1986, and then I
23  immediately joined IBM Research at the Thomas
24  Watson Institute in New York where I was a --
25  my title was research scientist, but I was -- I

Page 25

1   GRANT SCOTT - 1/21/2021
2   guess I was more of a research engineer, if
3   that matters.  And I did that until I
4   transitioned -- or I began law school in the
5   fall of 1988, and then I graduated law school
6   in May of 1991.
7       Q.    And where did you go to law school?
8       A.    University of North Carolina.
9       Q.    Do you have any formal training in
10  investing or finance?
11      A.    I do not.
12      Q.    Do you hold yourself out as an
13  expert in any field of investment?
14      A.    None -- none at all.
15      Q.    Have you had any formal training
16  with respect to compliance issues?  You
17  mentioned compliance issues earlier.
18      A.    No.
19      Q.    Now, do you have any knowledge about
20  compliance rules or regulations?
21      A.    Minimal that I've -- that have
22  occurred organically but -- but generally, no.
23      Q.    You don't hold yourself out as an
24  expert in com- -- in the area of compliance,
25  correct?

---

Page 26

GRANT SCOTT - 1/21/2021

1
2      A.    No.  No.  I'm -- no.
3      Q.    Do you have any particular
4  investment philosophy or strategy?
5          MR. CLARK:  I'm going to object to
6  the form of the question.  And, John,
7  can -- can we get an agreement that -- I
8  know you were objecting just simply on the
9  form basis yesterday -- that objection to
10 form is sufficient today?
11         MR. MORRIS:  Sure.
12         MR. CLARK:  Okay.  And I object to
13 form.  Grant, you can answer to the extent
14 you can.
15         THE WITNESS:  I forget the question
16 now that you interrupted.  I'm sorry.
17 BY MR. MORRIS:
18     Q.    So -- so -- and I'm going to ask a
19 different question because in hindsight, that's
20 a good objection.
21         In your capacity as the director
22 of -- withdrawn.
23         Do the employees of Highland that
24 you identified earlier, do they make investment
25 decisions on behalf of CLO HoldCo Limited

---

Page 27

GRANT SCOTT - 1/21/2021

1
2  without your prior knowledge on occasion?
3      A.    On occasion, they do.
4      Q.    So there's no rule that your prior
5  approval is needed before investments are made,
6  right?
7      A.    I don't know whether they have an
8  internal guideline as to the amount that
9  triggers when they get in touch with me or
10 whether it's a new -- a change, something new,
11 or -- versus recurring.  So I don't -- I don't
12 know what they use internally for the metr**ic.**
13     Q.    Okay.  Are you aware of any
14 guideline that was ever used by the Highland
15 employees whereby they were required to obtain
16 your consent prior to effectuating transactions
17 on behalf of CLO HoldCo Limited?
18     A.    I understand there was one or more,
19 but I do not know that.
20     Q.    Okay.  Did you ever see such a
21 policy or list of rules that would require your
22 prior consent before the Highland employees
23 effectuated transactions on behalf of CLO
24 HoldCo Limited?
25     A.    Possibly some time ago, but I -- I

---

Page 28

GRANT SCOTT - 1/21/2021

1
2  don't recall.
3      Q.    Okay.  So -- withdrawn.  I'll --
4  I'll go on.
5          How did you come to be the director
6  of CLO HoldCo?
7      A.    I was asked either by Jim Dondero
8  or -- directly or indirectly by -- by Jim
9  Dondero.
10     Q.    And who is Jim Dondero?
11     A.    Well, at the time, he was the head
12 or one of the heads of Highland Capital
13 Management, a friend of mine.
14     Q.    How long have you known Mr. Dondero?
15     A.    Since high school so that -- 1976.
16     Q.    Where did you and Mr. Dondero grow
17 up?
18     A.    In northern New Jersey.
19     Q.    Do you consider him among the
20 closest friends you have?
21     A.    I think he is my closest friend.
22     Q.    Did you two go to college together?
23     A.    We actually -- for the last -- last
24 two years I was at UVA, University of Virginia,
25 excuse me, he and I were -- were at UVA.  So we

---

Page 29

GRANT SCOTT - 1/21/2021

1
2  did not start out at UVA initially, but -- but
3  we both transferred -- I transferred my
4  sophomore year.  I was actually a chemical
5  engineer at the University of Delaware when I
6  transferred in, and then he transferred in his
7  junior year.  So we were there at college for
8  two years.
9      Q.    And -- and based on your
10 relationship with him, is it your understanding
11 that one of the reasons he chose to transfer to
12 UVA is -- is to -- because you were there?
13     A.    Oh, no.  He transferred -- he --
14 he -- he transferred there because of the -- so
15 he went to the University of -- he -- he went
16 to Virginia Tech University, which is more
17 known as being an engineering school, which I
18 might have wanted to go to, and less a finance
19 business school.  And if I understand things
20 correctly, and I believe I do, he transferred
21 to UVA because of the well-known
22 business/finance program, accounting program.
23     Q.    And did you -- did you and
24 Mr. Dondero become roommates at UVA?
25     A.    We weren't roommates, but we lived

Page 30

GRANT SCOTT - 1/21/2021

1  in the -- we were housemates. I'm sorry. We
2  were housemates.
3
4      Q.   So you shared a house together. How
5  would you describe your relationship with
6  Mr. Dondero today?
7      A.   It's -- it's been strained a while,
8  for some time, but -- but generally, very good.
9  Good to very good.
10     Q.   Without -- without getting personal
11 here, can you just generally identify the
12 source of the strain that you described.
13     A.   This -- I think it would be fair to
14 say that this bankruptcy, particularly events
15 in 2020 so some months after the bankruptcy was
16 declared, things have become -- we -- we still
17 have a close friendship, but -- but things
18 are -- are a bit -- are a bit more difficult.
19     Q.   Were you ever married?
20     A.   I've never been married.
21     Q.   Did you serve as Mr. Dondero's best
22 man at his wedding?
23     A.   I did.
24     Q.   Is it fair to say that -- that
25 Mr. Dondero trusts you?

Page 31

GRANT SCOTT - 1/21/2021

1
2      MR. CLARK:  Objection, form.
3  BY MR. MORRIS:
4      Q.   Withdrawn.
5      Do you believe that Mr. Dondero
6  trusts you?
7      A.   I do.
8      Q.   Over the years, is it fair to say
9  that Mr. Dondero has confided in you?
10     MR. CLARK:  Objection, form.
11 BY MR. MORRIS:
12     Q.   You can answer if you understand it.
13     A.   I think so.
14     Q.   I -- I -- what's your answer?  You
15 think so?
16     A.   Maybe you can de- -- I think of
17 confide as -- could you define confide, please.
18     Q.   Sure. Is it -- is it fair to say
19 that over the -- let me -- you've known
20 Mr. Dondero for almost 45 years, right?
21     A.   Yes.
22     Q.   And you consider him to be your
23 closest friend in the world, right?
24     A.   Yes.
25     Q.   And is it fair to say over the

Page 32

GRANT SCOTT - 1/21/2021

1  course of those 45 years, Mr. Dondero has
2  shared confidential information with you that
3  he didn't want you to reveal publicly to other
4  people?
5      A.   Yes.
6      Q.   And is it your understanding that
7  because of the nature of your relationship with
8  him, he asked you to serve as the director of
9  CLO HoldCo Limited?
10     A.   Yes. I believe it's because he --
11 he trusted -- trusted me with -- with assets
12 relating to his charitable vision. I -- I --
13 yeah. Yes.
14     Q.   And is it your understanding that he
15 thought you would help him execute his
16 charitable vision?
17     A.   That was the point of attraction
18 initially. It wasn't for money. I wasn't
19 being paid. That was -- the charitable mission
20 was the attraction.
21     Q.   Does Mr. Dondero play any role in
22 the management of the CLO HoldCo Limited asset
23 pool?
24     MR. CLARK:  Objection, form.
25

Page 33

GRANT SCOTT - 1/21/2021

1
2      A.   I'm sorry. Could you repeat that?
3  My -- my screen went small and then big again.
4  I was distracted.
5      Q.   What role does Mr. Dondero play with
6  respect to the management of the CLO HoldCo
7  Limited asset pool?
8      MR. CLARK:  Objection, form.
9      A.   He is with the company that manages
10 that asset pool. He's one of the people I
11 named previously as managing those assets.
12     Q.   He is -- he -- he is the -- do you
13 understand that he has the final
14 decision-making power with respect to the
15 management of the assets that are held by CLO
16 HoldCo Limited?
17     MR. CLARK:  Objection, form.
18     A.   I believe I ansel -- answered that
19 previously. I -- I don't know who has -- for
20 certainty I do not know who has that within
21 that company. I don't. If -- if -- I -- I
22 don't know, consistent with my prior answer.
23     Q.   Did you ever ask anybody who had the
24 final decision-making authority for investments
25 on behalf of CLO HoldCo Limited?

Page 34

GRANT SCOTT - 1/21/2021

1  A.   I -- I did not.
2  Q.   Did you ever make a decision on
3  behalf of -- withdrawn.
4       In your capacity as a director --
5  withdrawn.
6       In your capacity as the sole
7  director of CLO HoldCo Limited, can you think
8  of any decision that you've ever made that
9  Mr. Dondero disagreed with?
10  A.   Since -- prior to the bankruptcy,
11  no, not that I'm aware of.
12  Q.   And since the bankruptcy?
13  A.   There are decisions that I've made
14  that he's disagreed with.
15  Q.   Can you identify them?
16  A.   Yes.
17  Q.   Please do so.
18  A.   Okay.  So the reason I'm pausing is
19  I'm trying to put these in chronological order
20  and, at the same time, identify maybe some of
21  the more important ones versus the lesser
22  important ones.  One of the decisions I made
23  related to a request that I received from the
24  independent board of Highland.  I don't know

Page 35

GRANT SCOTT - 1/21/2021

1  how the request was transmitted to me, but I
2  believe the way it played out is as follows:  I
3  believe I was asked to call Jim Seery, and the
4  other -- and Russell Nelms, and the third
5  independent director, I believe his name is
6  John.  I -- I forget right now what his last
7  name is.  They were in New York, said they were
8  in a conference room.  I called in.  They were
9  very pleasant.  They identified who they were,
10  and they had a request, and the request was
11  that I agree to a transfer -- or that I -- that
12  I agree to allow certain assets that were not
13  Highland's assets but they were CLO's as- --
14  assets -- apparently, there was no dispute
15  about that at any point in time, but that I
16  agree to allow certain assets that were due CLO
17  to be transferred to the registry of the
18  bankruptcy court.  And either on that call I
19  immediately agreed or ended the call, called my
20  attorney, and then immediately agreed.  It was
21  a very -- I accommodated the request quickly.
22  Q.   Okay.  And can you just tell me at
23  what point in time you spoke with Mr. Dondero,
24  and what did he say that you recall?

Page 36

GRANT SCOTT - 1/21/2021

1  A.   I don't know when he became aware of
2  that decision.  I'm not sure I ever volunteered
3  that the decision was even made, but at some
4  point, it became an issue because he found out
5  through -- if I understand the sequence of
6  events correctly, he found out possibly through
7  his counsel because there was ultimately
8  litigation about that issue.  It became known
9  to everyone at some point what I had done, I --
10  I think.  And subsequent to that, it became an
11  issue because of CLO HoldCo having fairly
12  significant cash flow issues with respect to
13  its expenses and obligations, including payment
14  of management fees as well as some of the
15  scheduled charitable giving that was -- that
16  was by contract already predefined.  My
17  decision to tuck that money -- or to agree
18  to -- my agreement to let that money be tucked
19  away created some -- created some -- created
20  some problems --
21  Q.   And -- and --
22  A.   -- for CLO HoldCo.
23  Q.   Okay.  And I just want you to focus
24  specifically on my question, and that is, what

Page 37

GRANT SCOTT - 1/21/2021

1  did Mr. Dondero say to you that -- that causes
2  you to testify as you did, that this is one
3  issue that he didn't agree with?
4  A.   I believe his concern was that
5  because it was money that was undisputably to
6  flow to CLO HoldCo that -- which had many, many
7  other nonliquid assets -- this was a form of a
8  liquid asset.  It was cash in effect, proceeds.
9  -- that the money should have been allowed to
10  flow to be available for obligations.  He
11  didn't under- -- I -- I -- I don't know what he
12  was thinking, but the -- the issue was that the
13  decision to put it into escrow was -- was --
14  was in- -- incorrect, that there was no basis
15  for it.
16  Q.   That -- that's an issue where after
17  learning of your decision, he didn't agree with
18  it; is that fair?
19  A.   That's right.
20  Q.   Okay.  Can you think of any decision
21  that you've ever made on behalf of CLO HoldCo
22  Limited where Mr. Dondero had advance knowledge
23  of what you were going to do and he objected to
24  it, but you nevertheless overruled his

Page 38

GRANT SCOTT - 1/21/2021

1  objection and went ahead and did what -- did
2  what you thought was right?
3      A.    Okay.  Let me -- let me -- I have --
4  I'm sorry.
5      Q.    We're here.
6      A.    Oh, I'm sorry.  I'm having some
7  issues with my screen.  So that may have
8  occurred with respect to the original proof of
9  claim.  Then there was a subsequent amendment
10  to the proof of claim, and I -- I believe it --
11  I believe that he might have been aware of both
12  of those and was in disagreement with -- with
13  those.  But after working with my attorney, I
14  just -- you know, we did what we thought was
15  right, and I still think what we did was right.
16  There was an issue with respect to Har- --
17  HarbourVest that occurred relatively recently
18  where he objected to a decision that I had
19  made.  As I understand it, I could have
20  contacted my attorney and changed the decision,
21  but I didn't, and I still think that was the
22  right decision.
23          We have filed plan objections.  I
24  can't say if he has any -- in that regard, I --

Page 39

GRANT SCOTT - 1/21/2021

1  I -- I don't know what his thoughts are on
2  objections.  They would not have been
3  communicated with -- by me to him, but my
4  attorney might have consulted with his
5  attorney, and there -- they may know what that
6  difference is, but I -- that was just another
7  big decision.  I -- I -- maybe that --
8      Q.    All right.  Let me see if I can --
9  let me see if I can summarize this.  So two
10  proofs of claim.  Is it fair to say that
11  Mr. Dondero saw those proofs of claim before
12  they were filed?
13          MR. CLARK:  Objection, form.
14  BY MR. MORRIS:
15      Q.    Withdrawn.
16      A.    It --
17      Q.    Do -- do you know whether
18  Mr. Dondero saw the proofs of claim before they
19  were filed?
20      A.    I don't believe he did.
21      Q.    What -- what steps in filing the
22  proofs of claim did he object to that you
23  overruled?  Did he think there was -- something
24  should be different about them?

Page 40

GRANT SCOTT - 1/21/2021

1      A.    So we had to interface with Highland
2  employees at some point to get information to
3  support our proof of claim, and my guess, and
4  it's just a guess, is that he was aware of
5  those inquiries.  I -- I'm sorry.  I shouldn't
6  speculate.  I don't know.  But he -- with
7  respect to the original proof of claim, I'm --
8  I'm not aware of what specifically he was
9  objecting to or was -- thought should have been
10  different, but the -- with respect to the
11  amended proof of claim, which reduced the
12  original proof of claim to zero, I think that's
13  where he had a -- an issue.
14      Q.    And did you speak with him about
15  that topic prior to the time the amended claim
16  was filed, or did you only speak with him after
17  it was filed?
18      A.    I'm not sure the timing of that.
19      Q.    And with respect to HarbourVest, did
20  he ask you to object to the settlement on
21  behalf of CLO HoldCo Limited, and is that
22  something that you declined to do?
23          MR. CLARK:  Objection, form.
24      A.    I'm -- I'm sorry.  I was confused

Page 41

GRANT SCOTT - 1/21/2021

1  with the word.  Could you please repeat that?
2      Q.    Yes.  You mentioned HarbourVest
3  before, right?
4      A.    Yes.
5      Q.    And you mentioned that there was an
6  issue with Mr. Dondero and you concerning
7  HarbourVest; is that right?
8      A.    Yes.
9      Q.    And did that have to do with whether
10  or not CLO HoldCo Limited would -- would object
11  to the debtor's motion to get the HarbourVest
12  settlement approved?
13      A.    Would -- would get the
14  HarbourVest --
15      Q.    Settlement approved by the court.
16      A.    I'm not trying to be difficult.
17  I'm -- I'm -- could you just repeat that one
18  more time?  I'm --
19      Q.    What was -- what was --
20      A.    There was --
21      Q.    Let me try again.
22      A.    Okay.
23      Q.    What was the issue with respect to
24  HarbourVest that he objected to and -- and you

Page 42

GRANT SCOTT - 1/21/2021

1  overrode his objection and did what you thought
2  was right anyway?
3      A.    Okay.  Okay.  That's -- that's
4  easier for me to understand.  I'm sorry.  So I
5  had worked with my attorney or he did the work
6  and consulted with -- we consulted, but we had
7  filed an objection, motion objecting to the
8  settlement, if I understand the terminology and
9  nomenclature correctly.  Okay.  He had -- we
10  had come to an agreement that we had a very
11  valid argument.  That argument was evidenced
12  by, I guess it was, our motion that was
13  submitted to the court.  On the day of the
14  hearing to resolve this issue, we pulled our
15  request, and that was because I believed it did
16  not have a good-faith basis in law to move
17  forward on.
18      Q.    And did you discuss that issue with
19  Mr. Dondero before informing the court that CLO
20  HoldCo Limited was withdrawing its objection,
21  or did he learn about that for the first time
22  during the hearing --
23          MR. CLARK:  Objection, form.
24  BY MR. MORRIS:

Page 43

GRANT SCOTT - 1/21/2021

1      Q.    -- if you know?
2      A.    I -- I understand that he learned it
3  during the hearing.  I don't know the -- I -- I
4  don't know the -- whether there was any -- I --
5  I don't know for certain on the second half of
6  your question.
7      Q.    Let me -- let me try it -- let me
8  try it this way:  Did you speak with
9  Mr. Dondero about your decision to withdraw the
10  objection to the HarbourVest settlement prior
11  to the time your counsel made the announcement
12  in court?
13      A.    I don't -- I don't believe so.  No.
14  No.  No.  I'm sorry.  No.
15      Q.    And did --
16      A.    Okay.  No.  Here -- here's where
17  I'm -- I can clarify, okay?  I'm sorry.  I can
18  clarify.
19      Q.    That's all right.
20      A.    I gave the decision to my
21  attorney -- I -- I agreed with the
22  recommendation of my attorney, okay?  It wasn't
23  my --
24      Q.    Did you have a good --

Page 44

GRANT SCOTT - 1/21/2021

1      A.    -- thought, okay?
2          THE REPORTER:  I didn't --
3      A.    Okay.  So he --
4      Q.    It was a recommendation.
5      A.    Yeah.  So he -- he called me with a
6  recommendation.  It was highly urgent.  You
7  know, I was coming out of the men's room, had
8  my phone with me.  I got the call.
9          MR. CLARK:  Hey, Grant, I -- Grant,
10      I just want to caution you not to -- to --
11      and I don't think counsel is looking for
12      this but not to disclose the -- the
13      substance of any of your communications
14      with counsel, okay?
15          THE WITNESS:  Thank you.
16      A.    So --
17          THE WITNESS:  Thank you.  I'm -- I'm
18      sorry.
19  BY MR. MORRIS:
20      Q.    It's -- it's really a very simple
21  question.  Do you recall --
22      A.    He made a recommendation.  I -- I --
23  I think I can answer your question without
24  going off tangent.  I'm sorry.  So he -- my

Page 45

GRANT SCOTT - 1/21/2021

1  attorney made a recommendation.  I agreed with
2  it.  We with -- I -- I told him to withdraw --
3  or I authorized him to withdraw.
4      Q.    Okay.
5      A.    Then I received a communication, and
6  I -- I guess the most likely scenario is the
7  motion had been withdrawn by the time Jim
8  Dondero found out.
9      Q.    And -- and did he write to you, or
10  did he call you?  Did he send you a text?
11      A.    He called me.
12      Q.    What did he say?
13      A.    He was asking why, and I explained,
14  and I said I agreed with the decision and I was
15  sticking with the decision.
16      Q.    Let's just -- let's just move on to
17  a new topic, and let's talk about the structure
18  of -- of CLO HoldCo.  Are you generally
19  familiar with the ownership structure of CLO
20  HoldCo?
21      A.    Yeah.  I mean, in terms --
22      Q.    Are -- are you -- are you generally
23  familiar with it?  It's not a test.  I'm just
24  asking do you have a general familiarity --

Page 46

GRANT SCOTT - 1/21/2021

2    A.    With CLO HoldCo or the entities
3  associated with CLO HoldCo?
4    Q.    The latter.
5    A.    Yes, I believe so.
6    Q.    All right.  I've prepared what's
7  called a demonstrative exhibit.  It's just --
8    A.    Yes.
9    Q.    -- just -- it's a document that, I
10  think, reflects facts, but I want to ask you
11  about it.
12    MR. MORRIS:  La Asia, can we please
13    put up Exhibit 1.
14    (SCOTT EXHIBIT 1, Organizational
15    Structure: CLO HoldCo, Ltd., was marked
16    for identification.)
17  BY MR. MORRIS:
18    Q.    Okay.  Can you see that, Mr. Scott?
19    A.    Yes, I can.
20    Q.    Okay.  So I think I took the
21  information from resolutions that were attached
22  to the CLO HoldCo proof of claim, and that's
23  why you got that little footnote there at the
24  bottom of the page.  But let's start in the
25  lower right-hand corner and see if this chart

Page 47

GRANT SCOTT - 1/21/2021

2  comports with your understanding of the facts.
3    Do you know that CLO HoldCo Limited
4  was formed in the Cayman Islands?
5    A.    Yes.
6    Q.    And to the best of your knowledge,
7  is CLO HoldCo Limited 100 percent owned by the
8  Charitable DAF Fund, L.P.?  If you're not sure,
9  just say you're not sure if you don't know.
10  It's not a test.
11    A.    So the -- the -- the familiarity
12  I -- I'm -- I'm familiar with the different --
13  I'm confused with the arrangement of the boxes
14  and the ownership interest versus managerial
15  interest.  I believe that's -- that's right.
16    Q.    Okay.  And -- and you're the sole
17  director of CLO HoldCo Limited, right?
18    A.    Yes.
19    Q.    And this whole structure was -- the
20  idea for this structure, to the best of your
21  knowledge, was to implement Mr. Dondero's plan
22  for charitable giving; is that fair?
23    A.    Yes.  Ultimately, yes.
24    Q.    And is it fair to say then that
25  he -- he made the decision to establish this

Page 48

GRANT SCOTT - 1/21/2021

2  particular structure, to the best of your
3  knowledge?
4    A.    I -- I didn't -- I'm sorry.  I
5  didn't hear you very well.
6    Q.    To the best of your knowledge, did
7  Mr. Dondero make the decisions to establish the
8  structure that's reflected on this page?
9    A.    Oh, I don't know if he made the
10  decision to establish this structure, although
11  it's -- it's -- I'm sorry.  Strike that.  I --
12  if -- if what you're saying is did he approve
13  of this structure, to my knowledge, yes.
14    Q.    Okay.  Do you hold any position with
15  respect to Charitable DAF Fund, L.P.?
16    A.    I -- I -- your chart says no.  I --
17  I -- I thought I had a role there, too.
18    Q.    I don't know.  I don't have
19  information on that.  That's why I'm asking the
20  question.
21    A.    I -- I -- I believe -- yes, I
22  believe I have the same role as I do in -- in
23  CLO HoldCo.
24    Q.    And that would be director?
25    A.    Yes.

Page 49

GRANT SCOTT - 1/21/2021

2    Q.    And to the best of your knowledge,
3  is the Charitable DAF GP, LLC, the general
4  partner of Charitable DAF Fund, L.P.?
5    A.    Yes.
6    Q.    And is it your understanding that
7  you are the managing member of Charitable DAF
8  GP, LLC?
9    A.    Yes.
10    Q.    Does Charitable DAF GP, LLC, have
11  any employees?
12    A.    No.
13    Q.    Does Charitable DAF GP, LLC, have
14  any officers or directors?
15    A.    No.
16    Q.    Are you the only person affiliated
17  with Charitable DAF GP, LLC, to the best of
18  your --
19    A.    I believe so.
20    Q.    Do you receive any compensation for
21  serving as the managing member of Charitable
22  DAF GP, LLC?
23    A.    No.  The -- I don't interact with it
24  very often.  It's -- no, I don't receive any
25  compensation.

Page 50

GRANT SCOTT - 1/21/2021

1    Q.   Can you tell me in your capacity as
2  the managing member of Charitable DAF GP, LLC,
3  what's the nature of that entity's business?
4    A.   It -- it doesn't perform any
5  day-to-day operations.  My understanding is --
6  is that it's -- it's there for purposes of
7  compliance.  I can't recall the last time I had
8  any activity with respect to that.
9    Q.   How about the Charitable DAF Fund,
10 L.P.?  I apologize if I've asked you these
11 questions.
12   A.   It -- it's the same.  I -- I -- my
13 activity is almost exclusively CLO HoldCo.
14   Q.   All right.  Let me just ask the
15 questions nevertheless.  Does Charitable DAF
16 Fund, L.P., have any employees?
17   A.   Employees?  No.
18   Q.   Does it have any officers and
19 directors?
20   A.   No.
21   Q.   Are you the sole director of
22 Charitable DAF Fund, L.P.?
23   A.   Yes, I believe so.
24   Q.   So if we -- if we put under

Page 51

GRANT SCOTT - 1/21/2021

1  Charitable DAF Fund, L.P., Grant Scott,
2  director, and we put under CLO HoldCo Limited
3  Grant Scott, director, would everything on the
4  right side of that page be accurate, to the
5  best of your --
6    A.   I believe so.
7    Q.   Well, let's move to the left side of
8  the page.  Have you heard of the entity
9  Charitable DAF HoldCo Limited?
10   A.   Yes.
11   Q.   Are you the sole director of
12 Charitable DAF HoldCo Limited?
13   A.   Yes.
14   Q.   How did you become -- how did you
15 come to be the char-- -- the sole director of
16 Charitable DAF HoldCo Limited?
17   A.   That was when it was established.
18   Q.   And did Mr. Dondero ask you to serve
19 in that capacity?
20   A.   Yes.
21   Q.   And did Mr. Dondero ask you to serve
22 as the managing member of Charitable DA- -- DAF
23 GP, LLC?
24   A.   Yes.

Page 52

GRANT SCOTT - 1/21/2021

1    Q.   And did Mr. Dondero ask you to serve
2  as the director of Charitable DAF, L.P. --
3  withdrawn.
4        Did Mr. Dondero ask you to serve as
5  director of Charitable DAF Fund, L.P.?
6    A.   Yes.
7    Q.   To the best of your knowledge, does
8  Charitable DAF HoldCo Limited own 99 percent of
9  the limited partnership interests in Charitable
10 DAF Fund, L.P.?
11   A.   Yes.  The -- the feed -- the -- the
12 feeds -- the -- the three horizontal blocks
13 there that identify Highland Dallas Foundation,
14 Kansas City, Santa Barbara -- there's a fourth
15 of -- relatively de minimus in terms of
16 participation.  There's a fourth entity that's
17 missing.  It's Dallas -- I forget the name.
18 That -- that -- that structure is -- is a bit
19 dated --
20   Q.   Okay.
21   A.   -- as it -- as is shown.
22   Q.   Okay.  So I will tell you and we can
23 look the documents if you want, but attached to
24 CLO HoldCo Limited's claim are a number of

Page 53

GRANT SCOTT - 1/21/2021

1  resolutions, and there's one that I have in
2  mind that shows Charitable DAF HoldCo Limited
3  holding 99 percent of the limited partnership
4  interests of Charitable DAF Fund, L.P., and
5  there's another that shows it being a hundred
6  percent.  Do you -- do you know which is
7  accurate at least at this time?
8    A.   There's a 1 percent/99 percent
9  division, and I am -- I believe it's the 99
10 percent, but I'm -- I'm getting confused by
11 the -- by the arrangement.  I'm so used to
12 another arrangement.  I -- I believe the 99
13 percent is correct.
14   Q.   Okay.  Do you have any understanding
15 as to who owns the other 1 percent of the
16 limited partnership interests of Charitable DAF
17 Fund, L.P.?
18   A.   No.  This -- this is confusing to
19 me.  No.
20   Q.   Okay.  There are, at least on this
21 page, three foundations that I think you've
22 identified.  Are those three foundations
23 together with the fourth that you mentioned the
24 owners of the Charitable DAF HoldCo Limited?

```
1                    GRANT SCOTT - 1/21/2021
2         A.    Owners?
3         Q.    Yes.
4              MR. CLARK:  Objection, form.
5         A.    They -- they only participate in the
6    money that flows up to them.
7         Q.    And what does that mean exactly?
8         A.    What's that?
9         Q.    What does that -- what do you mean
10   by that?  Do the foundations fund Charitable
11   DAF Fund HoldCo Limited?
12        A.    Initially.  Initially, as I
13   understand it, the money flows downward into
14   the Charitable DAF HoldCo Limited before it
15   ultimately makes its way to CLO HoldCo, and
16   then each of those three entities, the various
17   foundations, obtain participation interest in
18   the money that flows back to them.
19        Q.    And -- and is that par- -- are those
20   participation interests in Charitable -- you
21   know what, let -- let me just pull up one
22   document and see if that helps.
23              MR. MORRIS:  Can we put up -- I
24        think it's Exhibit Number 5.
25              (SCOTT EXHIBIT 2, Unanimous Written
```

```
1                    GRANT SCOTT - 1/21/2021
2         Consent of Directors In Lieu of Meeting,
3         was marked for identification.)
4              MR. MORRIS:  I apologize.  Let's go
5         to --
6              MS. CANTY:  I'm sorry, John.  I
7         can't hear you.  Was that not the exhibit?
8              MR. MORRIS:  4.
9              MS. CANTY:  Okay.
10             THE REPORTER:  And Mr. Morris, you
11        are -- Mr. Morris, you are breaking up just
12        a little bit at the end of your questions.
13   BY MR. MORRIS:
14        Q.    Okay.  Do you see the document on
15   the screen, sir?
16        A.    Yes, I do.
17        Q.    Okay.  And so this is a unanimous
18   written consent of the directors of the
19   Highland Dallas Foundation.  That's one of the
20   entities that was on the chart.
21             MR. MORRIS:  Can we scroll down to
22        the -- bottom of the document where the
23        signature lines are.  Right there.
24   BY MR. MORRIS:
25        Q.    Are you a director of the Highland
```

```
1                    GRANT SCOTT - 1/21/2021
2    Dallas Foundation?
3         A.    Yes, selected by them.
4         Q.    Selected by whom?
5         A.    By that foundation.
6         Q.    Are you -- are you a director of all
7    of the four foundations that feed into the
8    Charitable DAF HoldCo Limited entities that --
9         A.    No.
10        Q.    Which of the four foundations are
11   you a director of?
12        A.    This and the Santa Barbara -- I'm
13   sorry, Santa Barbara and Kansas City.
14        Q.    So is -- there's one that you're not
15   a director of; is that right?
16        A.    Yes.
17        Q.    And which one is that?
18        A.    The -- could you go back to the --
19        Q.    Yeah.
20             MR. MORRIS:  Go back to the
21        demonstrative.
22        A.    It's the Highland Dallas Foundation
23   and Santa Barbara Foundation.
24        Q.    Those are the two that you're a
25   director of?
```

```
1                    GRANT SCOTT - 1/21/2021
2         A.    Yes.
3         Q.    To the best of your knowledge, does
4    Mr. Dondero serve as the president for each of
5    the foundations that we're talking about?
6         A.    Yes.
7         Q.    To the best of your knowledge, is
8    Mr. Dondero a director of each of the
9    foundations that we're talking about?
10        A.    Say that again.  I'm sorry.
11        Q.    Is he also a director of each of the
12   foundations?
13        A.    Yes.
14        Q.    Do you know whether any of the
15   foundations has any employees?
16        A.    I believe they do, but I -- I -- I
17   can't say for certain.
18        Q.    Does -- withdrawn.
19             Do you know if there are any
20   officers of any of the four foundations other
21   than Mr. Dondero's service as president?
22        A.    I'm sorry.  Say that one more time,
23   please.
24        Q.    Yes.  Do you know whether any of the
25   four foundations has any officers other than
```

Page 58

GRANT SCOTT - 1/21/2021

1  Mr. Dondero's service as president?
2      A.   No.
3      Q.   You don't know, or they do not?
4      A.   I -- I don't believe anyone else
5  has.  I -- actually, I should say I don't -- I
6  don't recall.  I -- I don't know.  I don't -- I
7  don't know.
8      Q.   As a director of the Dallas and
9  Santa Barbara foundations, are you aware of any
10 officers serving for either of those
11 foundations other than Mr. Dondero?
12     A.   No.
13     Q.   Do you know who the beneficial owner
14 of the Charitable DAF HoldCo Limited entity is?
15     A.   The beneficial owner?
16     Q.   Correct.
17     A.   The various -- various trusts that
18 were used to -- that were the vehicles by which
19 the money originally was established within --
20 within -- within CLO HoldCo.
21     Q.   Would that be -- would one of them
22 be the Get Good Nonexempt Trust?
23     A.   Yes.
24     Q.   And you're a trustee of the Get Good

Page 59

GRANT SCOTT - 1/21/2021

1  Nonexempt Trust, right?
2      A.   Yes.
3      Q.   When did you become a trustee of the
4  Get Good Nonexempt Trust?
5      A.   Many years ago.  I -- I don't
6  remember.
7      Q.   Are there any other trustees of the
8  Get Good Nonexempt Trust?
9      A.   No.
10     Q.   Does the Get Good Nonexempt Trust
11 have any officers, directors, or employees?
12     A.   No.
13         MR. CLARK:  Objection, form.  Sorry.
14 BY MR. MORRIS:
15     Q.   Withdrawn.
16         Do you know whether the Get Good
17 Nonexempt Trust has any officers, directors, or
18 employees?
19     A.   It does not.
20     Q.   And I apologize if I asked this, but
21 are you the only trustee of the Get Good
22 Nonexempt Trust?
23     A.   Yes.
24     Q.   Is the Dugaboy Investment Trust also

Page 60

GRANT SCOTT - 1/21/2021

1  one of the trusts that has an interest in
2  Charitable DAF HoldCo Limited?
3      A.   Yes.
4      Q.   Are you a trustee of the Dugaboy
5  Investment Trust?
6      A.   I am not.
7      Q.   Do you know who is?
8      A.   I believe it's his sister.
9      Q.   And is that -- you're referring to
10 Mr. Dondero's sister?
11     A.   I'm sorry.  Yes.
12     Q.   And what's the basis for your
13 understanding that Mr. Dondero's siv- -- sister
14 serves as the trustee of the Dugaboy Investment
15 Trust?
16     A.   Many years ago there was a -- there
17 was a clerical error that identified me as the
18 trustee of the Dugaboy.  That error was present
19 for approximately two weeks or a week and a
20 half before it was detected and corrected, and
21 so I know from that correction that it's Nancy
22 Dondero.
23     Q.   Are there any other trusts that have
24 an interest in Charitable DAF HoldCo Limited

Page 61

GRANT SCOTT - 1/21/2021

1  besides those trusts, to the best of your
2  knowledge?
3      A.   No.
4      Q.   Is it your understanding based on
5  what we've just talked about that the Get Good
6  Nonexempt Trust and the Dugaboy Investment
7  Trust are the indirect beneficiaries of CLO
8  HoldCo Limited?
9      A.   Yes.
10     Q.   Can you tell me who the
11 beneficiaries are of the Get Good trust?
12     A.   I mean, Jim Dondero.
13     Q.   And -- and what is that -- is that
14 based on the trust agreement -- your knowledge
15 of the trust agreement?
16     A.   Yes.
17     Q.   Do you have an understanding of who
18 the beneficiary is of the Dugaboy Investment
19 Trust?
20     A.   I don't know anything about that
21 trust.
22         MR. MORRIS:  Okay.  All right.
23 Let's take a short break and reconvene at
24 3:30 Eastern Time.  We've been going for a

| Page 62 | Page 63 |
|---|---|
| GRANT SCOTT - 1/21/2021 | GRANT SCOTT - 1/21/2021 |

Page 62

```
 1              GRANT SCOTT - 1/21/2021
 2      while.
 3              MR. CLARK:  Thank you.
 4              MR. MORRIS:  Okay.  Thank you.
 5              (Whereupon, there was a recess in
 6      the proceedings from 3:20 p.m. to
 7      3:31 p.m.)
 8  BY MR. MORRIS:
 9      Q.    Mr. Scott, earlier I think you
10  testified that you interfaced with the folks at
11  Highland in connection with your duties as the
12  director of CLO HoldCo Limited, right?
13      A.    Yes.
14      Q.    Are you aware of any written
15  agreement between Highland Capital Management
16  and CLO HoldCo Limited?
17      A.    Yes, the various servicer
18  agreements.
19      Q.    Okay.  Are you aware that
20  Mr. Dondero resigned from his position at
21  Highland Capital Management sometime in
22  October?
23      A.    No.
24      Q.    Have you communicated with anybody
25  at Highland Capital Management about the
```

Page 63

```
 1  affairs of CLO HoldCo Limited at any time since
 2  October?
 3      A.    Yes.
 4      Q.    Anybody other than Jim Seery?
 5      A.    Yes.
 6      Q.    Okay.  Let's start with Mr. Seery.
 7  You've spoken with him before, right?
 8      A.    Yes.
 9      Q.    Do you have his phone number?
10      A.    Yes.
11      Q.    How many times have you spoken with
12  Mr. Seery, to the best of your recollection,
13  just generally?  It's not a test.
14      A.    Three, maybe four times.
15      Q.    Okay.  Can you identify by name
16  anybody else at Highland that you've spoken
17  with since -- in the last two or three months?
18      A.    I spoke to Jim Dondero.  I've spoken
19  with Mike Throckmorton.  The usual suspects, so
20  to speak.  Mark Patrick, Mel- -- Melissa
21  Schroth.
22      Q.    Can you recall anybody else?
23      A.    No.  No.  Sorry.
24      Q.    Did you -- did you -- withdrawn.
```

Page 64

```
 1              GRANT SCOTT - 1/21/2021
 2              Do you recall the subject matter of
 3  your discussions with Mr. Throckmorton?
 4              MR. CLARK:  Objection, form.
 5  BY MR. MORRIS:
 6      Q.    Withdrawn.
 7              Do you recall your -- the subject
 8  matter of your communications with
 9  Mr. Throckmorton?
10              MR. CLARK:  Objection, form.
11  BY MR. MORRIS:
12      Q.    You can answer.
13      A.    I -- I regularly interface with
14  Mr. Throckmorton regarding approvals of
15  expenses, and he's my sort of -- he's my point
16  person for approving wire transfers and things
17  of that nature.
18      Q.    How about Mr. Patrick, what -- what
19  area of responsibility does he have with
20  respect to CLO HoldCo Limited?
21      A.    He -- he doesn't, to my knowledge.
22      Q.    Do you recall the nature of the
23  substance of any communications that you've had
24  with Mr. Patrick since -- you know, the last
25  two or three months?
```

Page 65

```
 1              GRANT SCOTT - 1/21/2021
 2      A.    Yes.  Or -- yes.
 3      Q.    And what -- what are the nature of
 4  those conversations or the substance?
 5      A.    He was -- he was one of the
 6  individuals that helped to establish the
 7  hierarchy for the -- what I keep referring to
 8  as the charitable foundation.
 9      Q.    And -- and do you recall why you
10  spoke to him in the last -- or -- withdrawn.
11              Do you recall the nature of your
12  communications in the last two or three months
13  with Mr. Patrick?
14      A.    I --
15              MR. CLARK:  And hold on, Grant.  I'm
16  going to caution -- my understanding -- I
17  believe Mr. Patrick's an attorney, and so
18  I'm going to caution you that you shouldn't
19  disclose the substance of -- of those
20  communications based on the attorney-client
21  privilege.
22              MR. MORRIS:  Well, I'm -- I -- I am
23  the lawyer for the company so -- I guess
24  there are other people on the phone and I
25  appreciate that, but let's see if we can --
```

Page 66

GRANT SCOTT - 1/21/2021

1  I don't mean to be contentious here, so it
2  wouldn't -- I -- I'd be part of the
3  privilege anyway.
4
5  BY MR. MORRIS:
6      Q.  But in any event, can you tell me
7  generally -- I'm just looking for general
8  subject matter of your conversations with
9  Mr. Patrick.
10     A.  I asked him how I would go about
11 re- -- resigning my position.
12     Q.  And when did that conversation take
13 place?
14     A.  Within the last two weeks.
15     Q.  Have you made a decision to resign?
16     A.  No.
17     Q.  I think you mentioned Melissa
18 Schroth.  Do I have that right?
19     A.  Yes.
20     Q.  Can you describe generally the
21 communications you had with Ms. Schroth in the
22 last few months.
23     A.  They -- she has e-mailed me certain
24 documents that I needed to sign.  I had a
25 conversation with her about -- about some

Page 67

GRANT SCOTT - 1/21/2021

1  home -- home improvements, home construction
2  with respect to Jim Dondero's home in Colorado,
3  and that's -- I -- I think that's -- that's it.
4
5      Q.  Okay.  Do you recall communicating
6  with anybody at Highland in the last three
7  months other than Mr. Dondero,
8  Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?
9      A.  I -- I spoke with Jim Seery this
10 week.
11     Q.  Anybody else?
12     A.  I don't -- I don't know.
13     Q.  Okay.
14     A.  I don't think so.
15     Q.  In your communications with
16 Mr. Seery, did you two ever discuss his reasons
17 for making any trade on behalf of any CLO?
18     A.  No.
19     Q.  In your discussions with Mr. Seery,
20 did you ever tell him that you believed that
21 Highland Capital Management had breached any
22 agreement in relation to any CLO?
23     A.  Have I had that discussion with Jim
24 Seery?
25     Q.  Yes.

Page 68

GRANT SCOTT - 1/21/2021

1
2      A.  No.
3      Q.  In your discussions with Mr. Seery,
4  did you ever tell him that you thought Highland
5  Capital Management was in default under any
6  agreement in relation to the CLOs?
7      A.  No.
8      Q.  I want to focus in particular on the
9  shared services agreement.  In -- in your
10 discussions with Mr. Seery, did you ever tell
11 him that you believed that Highland Capital
12 Management was in default or in breach of its
13 shared services agreement with CLO HoldCo
14 Limited?
15     A.  No.
16     Q.  In your communications with
17 Mr. Seery, did you ever indicate any concern on
18 the part of CLO HoldCo Limited with respect to
19 Highland Capital's Man- -- Highland Capital
20 Management's performance under the shared
21 services agreement?
22     A.  No.
23     Q.  As you sit here today, do you have
24 any reason to believe that Highland Capital
25 Management has done anything wrong in

Page 69

GRANT SCOTT - 1/21/2021

1  connection with its performance as the
2  portfolio manager of the CLOs in which CLO
3  HoldCo Limited has invested?
4
5          MR. CLARK:  Object to form.
6      A.  In terms of the -- are you saying --
7  please say that again.  I'm sorry.
8      Q.  That's okay.  I ask long questions
9  sometimes so forgive me, but I'm trying to
10 get -- I'm trying to be precise so that's why
11 it's difficult sometimes.  But let me try
12 again.
13          Does CLO HoldCo Limited contend that
14 Highland Capital Management has done anything
15 wrong in the performance of its duties as
16 portfolio manager of the CLOs in which CLO
17 HoldCo has invested?
18          MR. CLARK:  Objection, form.
19     A.  Yes.  It's -- it's outlined in our
20 objections to -- to the plan.
21     Q.  Okay.  Any -- are you aware of
22 anything that's not contained within CLO Holdco
23 Limited's objection to the plan?
24          MR. CLARK:  Objection, form.
25     A.  I don't know if this is responsive

---

Page 70

GRANT SCOTT - 1/21/2021

1  to your quest -- request, but two -- two
2  issues, I believe, also pose an in- -- a
3  problem for CLO HoldCo.  One is we are paying
4  for services.  I think I referred to the
5  services as being soup to nuts, but we are not
6  getting the full services.  We haven't been for
7  some time.  So we're likely overpaying.  There
8  was a Highland Select Equity issue, 11-month
9  payment that was delayed which I was unaware of
10 was due.  Normally, I would have interfaced
11 with someone at Highland about that, but my
12 attorney -- but my -- my attorney had to make a
13 request for payment, and that payment was
14 ultimately made.  I -- other than that, I -- I
15 don't -- I don't know.  I don't believe so.
16 
17     Q.    I want to distinguish between the
18 shared services agreement between Highland
19 Capital Management and CLO HoldCo Limited on
20 the one hand and on the other hand the
21 management agreements pursuant to which
22 Highland Capital Management manages certain
23 CLOs that CLO HoldCo invests in.
24          You understand the distinction that
25 I'm making?

---

Page 71

GRANT SCOTT - 1/21/2021

1     A.    Now I do.  I'm sorry.  I didn't
2  appreciate that.
3     Q.    Okay.  So let's just take each of
4  those pieces one at a time.  You mentioned your
5  concern about services.  That's a concern that
6  arises under the shared services agreement,
7  right?
8     A.    Yes.
9     Q.    And you mentioned something about a
10 delayed payment having to do with Highland
11 Select.  Do I have that generally right?
12    A.    Correct.
13    Q.    And is that a concern that you have
14 that arises under the shared services
15 agreement?
16    A.    It's not the agreement with respect
17 to the CLOs as I understand it.
18    Q.    Okay.  So then let's turn to that
19 second bucket.  You were aware -- you are
20 aware, are you not, that Highland Capital
21 Management has certain agreements with CLOs
22 pursuant to which it manages the assets that
23 are owned by the CLOs?
24    A.    I'm so sorry.  Could you please --

---

Page 72

GRANT SCOTT - 1/21/2021

1     Q.    I'll try again.
2     A.    I'm just -- I'm sorry.  I was
3  distracted and -- and I -- I'm sorry for asking
4  you to repeat it again.  Please --
5     Q.    Okay.
6     A.    Please re- --
7     Q.    Are you aware that CLO HoldCo
8  Limited has made investments in certain CLOs?
9     A.    Oh, yes, certainly.
10    Q.    And are you aware that those CLOs
11 are managed by Highland Capital Management?
12    A.    Yes.  As the -- as the servicer,
13 yes.
14    Q.    Okay.  Have you ever seen any of the
15 agreements pursuant to which Highland Capital
16 Management acts as a servicer?
17    A.    I've seen a few, yes.
18    Q.    Does CLO HoldCo Limited contend that
19 it is a party to any agreement between Highland
20 Capital Management and the CLOs?
21          MR. CLARK:  Object to form.  And I
22       just want to note for the record that
23       Mr. Scott is here testifying in his
24       individual capacity, I believe, not as a

---

Page 73

GRANT SCOTT - 1/21/2021

1  corporate representative.
2          MR. MORRIS:  Fair enough.  But he is
3       the only representative so...
4          MR. CLARK:  Fair enough.  I just
5       want that made -- stated for the record,
6       but I also object as to form.
7          MR. MORRIS:  Got it.
8     A.    It's a third-party beneficiary under
9  the agreements.
10    Q.    And is that because of something you
11 read in the document, or is that just your
12 belief and understanding?
13    A.    My belief and understanding.
14    Q.    And is that belief and understanding
15 based on anything other than conversations with
16 counsel?
17    A.    In -- in -- recently it has, but I
18 don't recall from previous interactions over
19 the years how we discussed that or how I came
20 to -- to understand that.
21    Q.    Does HCLO [sic] HoldCo -- did -- in
22 your capacity as the sole director of HCLO
23 HoldCo Limited, are you aware of anything that
24 Highland Capital Management has done wrong in

---

GRANT SCOTT - 1/21/2021

1  connection with the services provided under the
2  CLO management agreements?
3          MR. CLARK:  Objection, form.
4      A.    I -- I don't -- I don't -- I
5  don't -- your answer's no.
6      Q.    In your capacity as the director of
7  CLO HoldCo Limited, are you aware of any
8  default or breach under the CLO management
9  agreements that -- that Highland Capital
10  Management has caused?
11         MR. CLARK:  Objection, form.
12     A.    We have raised the issue about
13  ongoing sales in various -- I'm not sure
14  whether they represent a technical breach,
15  though.
16     Q.    Okay.  Are you aware of any
17  technical breach?
18         MR. CLARK:  Objection, form.
19     A.    No.
20     Q.    I'm sorry.  You said, no, sir?
21     A.    My answer's no.
22     Q.    Thank you.  Do you know who made the
23  decision to cause the CLO HoldCo Limited entity
24  to invest in the CLOs that are managed by

GRANT SCOTT - 1/21/2021

1  Highland Capital?
2      A.    The select -- ultimately, I had to.
3      Q.    I thought you testified earlier that
4  you didn't make decisions as to investment.  Do
5  I have that wrong?
6      A.    The selection.
7      Q.    Okay.
8      A.    I -- I'm --
9      Q.    So -- so explain to me --
10     A.    I have to approve -- I have to
11  approve the selection.  I'm sorry.  But the
12  people making -- I was putting that in the camp
13  of the people that make the selection.
14     Q.    Okay.  Do you know if -- do you know
15  if there are CLOs in the world that exist that
16  aren't managed by Highland Capital Management?
17         MR. CLARK:  Objection, form.
18     A.    Are there CLOs in the -- in the
19  world that are not --
20     Q.    Yes.
21     A.    Yes.  It's -- it's a well-known --
22  it's a well-known --
23     Q.    In your capacity as the director of
24  CLO HoldCo Limited, did you ever consider

GRANT SCOTT - 1/21/2021

1  making an investment in a CLO that wasn't
2  managed by Highland?
3      A.    No.
4      Q.    Is there any particular reason why
5  you haven't given that any consideration?
6      A.    That hasn't been my role.  That's
7  not my expertise.  That's been something
8  Highland has done and, quite frankly, over the
9  years brilliantly so, no.
10     Q.    You're aware that HCM, L.P., has
11  filed for bankruptcy, right?
12     A.    Yes.
13     Q.    When did you learn that Highland had
14  filed for bankruptcy?
15     A.    After the fact sometime in late --
16  late 2019.
17     Q.    Since the bankruptcy filing, have
18  you made any attempt to sell CLO HoldCo
19  Limited's position in any of the CLOs that are
20  managed by Highland?
21     A.    No.
22     Q.    So notwithstanding the bankruptcy
23  filing, you as the director haven't made any
24  attempt to transfer out of the CLOs that are

GRANT SCOTT - 1/21/2021

1  managed by Highland, correct?
2      A.    Correct.
3      Q.    Did you ever give any thought to
4  exiting the CLO vehicles that were managed by
5  Highland in light of its bankruptcy filing?
6      A.    No.
7      Q.    Have you ever discussed with
8  Mr. Seery anything having to do with the
9  management -- withdrawn.
10         Have you ever discussed with
11  Mr. Seery any aspect of the debtor's management
12  of the CLOs in which CLO HoldCo Limited is
13  invested?
14     A.    No.
15     Q.    You mentioned earlier a request to
16  stop trading.  Do I have that right?
17     A.    Yes.
18     Q.    Okay.  And are you aware that a
19  letter was written purportedly on behalf of CLO
20  HoldCo Limited in which a request to stop
21  trading was made?
22     A.    As a cos- -- yeah.  Yes.
23     Q.    Okay.  Have you ever seen that
24  letter before?

Page 78

```
1                GRANT SCOTT - 1/21/2021
2        A.    Yes.
3              MR. MORRIS:  Can we put up on the
4        screen -- I think it's now Exhibit 6.  It's
5        Exhibit DDDD.
6              (SCOTT EXHIBIT 3, Letter to James A.
7        Wright, III, et al., from Gregory Demo,
8        December 24, 2020, with Exhibit A
9        Attachment, was marked for identification.)
10             MR. MORRIS:  Can we scroll down to,
11       I guess, what's Exhibit A.  Ri- -- right
12       there.
13  BY MR. MORRIS:
14       Q.    You see this is a letter Dece- --
15  dated December 22nd?
16       A.    Yes.
17       Q.    In the first paragraph there there's
18  a reference to the entities on whose behalf
19  this letter is being sent.
20             Do you see that?
21       A.    Yes.
22       Q.    Okay.  So this letter was sent on
23  December 22nd.  Did you see a copy of it before
24  it was sent?
25       A.    A -- a draft -- an earlier draft of
```

Page 79

```
1                GRANT SCOTT - 1/21/2021
2   this I did.
3        Q.    Okay.  Did you provide any comments
4   to it?
5        A.    I did.
6              MR. CLARK:  Well, hold on.  Grant,
7        let me caution you.  To the extent you
8        provided comments to counsel, we're going
9        to assert the attorney-client privilege on
10       those comments.
11             MR. MORRIS:  It's just a yes-or-no
12       question.  I'm not looking for the
13       specifics.
14             MR. CLARK:  Thank you.
15       A.    Yes.
16       Q.    Are you aware that earlier letters
17  were -- withdrawn.
18             Are you aware that prior to December
19  22nd, the entities other than CLO HoldCo
20  Limited that are listed in this pers- -- first
21  paragraph had sent a letter making the same
22  request?
23       A.    With respect to a letter, no.  No,
24  I -- I did not.
25       Q.    Are you aware as you sit here now
```

Page 80

```
1                GRANT SCOTT - 1/21/2021
2   that the entities other than CLO HoldCo Limited
3   that are listed in the first paragraph made a
4   motion in the court asking the court for an
5   order that would have prevented Highland from
6   making any transactions for a limited period of
7   time?
8        A.    Yes.
9        Q.    Did you know that motion was being
10  made prior to the time that it was made?
11       A.    I'm not sure.
12       Q.    Did you ever think about whether CLO
13  HoldCo Limited should join that particular
14  motion?
15       A.    I believe we were -- my attorney was
16  aware of it.  I don't recall our discussion
17  about it.  We were aware -- when I say we, I
18  mean collectively -- and did not join it.
19       Q.    Okay.  Can you tell me why you did
20  not join it.
21             MR. CLARK:  And, again, Grant, to --
22       to the extent it's based on communications
23       with counsel, you're free to say that
24       but -- but not to disclose any substance of
25       communications with counsel.
```

Page 81

```
1                GRANT SCOTT - 1/21/2021
2        A.    The subject of this letter on the
3   22nd which yielded the original letter you
4   briefly showed me on the 24th as well as an
5   additional letter on the 28th identified two
6   points as I understand it.  The first point is
7   what I believe is the somewhat innocuous
8   request to halt sales, not a demand in any way.
9   And the second more substantive issue has to do
10  with steps to remove Highland or a subsequent
11  derived entity from Highland from the various
12  services agreements that you had previously --
13  we had previously discussed.  Neither of those
14  issues met the require- -- neither of those
15  issues led us to believe that a motion such as
16  what you've just mentioned was -- was right --
17       Q.    Okay.
18       A.    -- because no -- no decision has
19  been made on that.
20       Q.    Okay.
21             MR. MORRIS:  So I want to go back to
22       my question and move to strike as
23       nonresponsive, and I'll just ask my
24       question again.
25  BY MR. MORRIS:
```

GRANT SCOTT - 1/21/2021

1   Q.   Why did CLO HoldCo Limited decide
2   not to participate in the earlier motion that
3   was brought by the other entities that are
4   identified in Paragraph 1 that asked the court
5   to stop Highland from engaging in trades?
6
7   A.   John, I'm so sorry.  There was a
8   feedback loop that came up when you started to
9   re- -- re- -- recite -- restate your question.
10  I'm sorry.
11  Q.   That's okay.  Why did CLO HoldCo
12  Limited decide not to join in the earlier
13  motion where the entities listed in Paragraph 1
14  asked the court to order Highland not to make
15  any further trades?  Why did they not join that
16  motion?
17  A.   The -- the issue didn't rise to
18  the -- I don't believe we had formulated a
19  legal basis sufficient to justify such steps.
20  We hadn't laid the foundation necessary to --
21  to do that.
22  Q.   Are you aware of what the court
23  decided?
24  A.   By virtue of the original letter you
25  sent me dated the -- or show -- showed

GRANT SCOTT - 1/21/2021

1   initially dated the 24th, I have a general
2   understanding of what they decided.
3
4   Q.   Did you -- did you ever review the
5   transcript of the hearing where the other
6   parties asked the court to stop Highland from
7   engaging in any further trades on the CLOs?
8   A.   I did not.
9   Q.   Is there anything different about
10  the request in this letter, to the best of your
11  knowledge, from the request that was made of
12  the court just six days earlier?
13  MR. CLARK:  Objection, form.
14  A.   Yes.  There's a -- in -- in my -- my
15  view there's a substantial difference between
16  filing an action converting a request into
17  essentially a demand versus a gentle request
18  with multiple caveats, that that request is not
19  a demand.
20  Q.   Okay.  Let me ask you this:  Are you
21  aware -- what -- when did you first learn that
22  Highland was making trades in its capacity as
23  the servicer of the CLOs?  When -- when did you
24  first learn that Highland was doing that?  Ten
25  years ago, right?  I mean --

GRANT SCOTT - 1/21/2021

1
2   A.   Oh.  Oh.  Oh, I'm -- yeah.  Yeah.
3   Oh, yes.  I'm sorry.  Of course.
4   Q.   Right?  I mean, Highland has been
5   making trades on behalf of CLOs for years,
6   right?
7   A.   Yes.
8   Q.   And Highland was making trades on
9   behalf of CLOs throughout 2020, to the best of
10  your knowledge, right?
11  A.   Yes.
12  Q.   And you know when Jim Dondero was
13  still with Highland, he was making trades on
14  behalf of CLO -- on behalf of the CLOs, right?
15  A.   Yes.
16  Q.   And you never objected when Jim
17  Dondero was doing it; is that right?
18  A.   That is correct.
19  Q.   Okay.  So what changed that caused
20  you in your capacity as the director of CLO
21  HoldCo to request a full stoppage of trading?
22  A.   It was my understanding that because
23  of the bankruptcy and the removal of Jim
24  Dondero that the replacement decision-makers
25  did not have the expertise where I felt

GRANT SCOTT - 1/21/2021

1   comfortable with them making those decisions,
2   but...
3
4   Q.   I thought you testified earlier that
5   you weren't aware that Mr. Dondero left
6   Highland.  Am I mistaken in my recollection?
7   A.   I think you said in October, and
8   I -- as I -- there's some con- -- I have
9   confusion about when he left versus when he was
10  still there but other -- but he was not making
11  those trades.
12  Q.   Okay.  Fair enough.  The bankruptcy
13  has nothing to do with your desire to stop
14  trading, right, because Highland traded for a
15  year after the bankruptcy and never took any
16  action to try to stop Highland from trading on
17  behalf of the CLOs, fair?
18  A.   The -- Highland as of right now
19  isn't the same entity it was -- well, the
20  decision-making team -- the -- the financial
21  decision-making team for CLO Holdco's is no
22  longer the team I have worked with, and upon
23  discussion with counsel, we agreed -- I agreed
24  to this letter, which I did, to just maintain
25  the status quo.

Page 86

GRANT SCOTT - 1/21/2021

2    Q.    How did you form your opinion that
3  the debtor doesn't have the expertise to
4  execute trades on behalf of the CLOs today?
5  What's the basis for that belief?
6    A.    I -- as I understood it, the -- the
7  people historically making that decision were
8  no longer making that decision.
9    Q.    Who besides Mr. Dondero --
10  withdrawn.
11        Who are you referring to?
12    A.    Well, Mr. Dondero is one.  I don't
13  know the names, but I -- I understood it to
14  mean that the group previously responsible, for
15  exam- -- for example, Hunter Covitz, including
16  Hun- -- him, were no longer involved in the
17  decision-making process, but...
18    Q.    How did you -- how -- how -- who
19  gave you the information that led you to
20  conclude that Hunter Covitz was no longer
21  involved in the decision-making process?
22    A.    Specifically him and that name being
23  mentioned, I -- I -- I wasn't informed of his
24  speci- -- him -- him being removed.  I was
25  under the impression that the team that had

Page 87

GRANT SCOTT - 1/21/2021

1  previously been doing that was no longer doing
2  it.
3
4    Q.    And what gave you that impression?
5    A.    Was communications I had with my
6  attorney.
7    Q.    Okay.  Is there any source for your
8  information that led you to conclude that the
9  team was no longer there that was able to
10  engage in the trades on behalf of the CLOs
11  other than your attorneys?
12    A.    Well, this -- this letter -- I -- I
13  think the answer is no.
14    Q.    Thank you.  Do you know if Jim -- do
15  you have an opinion or a view as to whether Jim
16  Seery is qualified to make trades?
17    A.    This --
18        MR. CLARK:  Objection, form.
19    A.    I don't know -- I spoke to Jim Seery
20  earlier this week.  You -- you asked me whether
21  I had his number.  I said I did.  That's only
22  because he called me.  My phone rang with his
23  number.  It was a number I did not recognize,
24  it was not in my contacts, but he left me a
25  voice mail so I called him back.  Then I

Page 88

GRANT SCOTT - 1/21/2021

1  updated my contacts to -- to add his name so
2  now I have his name.  And during that
3  conversation he informed me that he did have
4  that expertise --
5    Q.    And --
6    A.    -- without me making any inquiry.
7  He volunteered that.
8    Q.    But you hadn't made any inquiry
9  prior to the time that you authorized the
10  sending of this letter; is that fair?
11    A.    That's correct.
12    Q.    Do you know whether Mr. Seery, in
13  fact, engaged in transactions on behalf of the
14  debtor since he was appointed back in January?
15    A.    I do not.
16    Q.    Did you ask that question prior to
17  the time you authorized the sending of this
18  letter?
19    A.    I did not.
20    Q.    Can you identify a single
21  transaction that Jim Seery has ever made that
22  you disagree with?
23    A.    No.
24    Q.    Can you identify any transaction

Page 89

GRANT SCOTT - 1/21/2021

1  that the debtor made on behalf of any of the
2  CLOs since the time that you understand
3  Mr. Dondero left Highland that you disagree
4  with?
5    A.    No.
6    Q.    Did you have any discussion with any
7  representative of any of the entities listed on
8  this document where they told you they believe
9  Jim Seery didn't have the expertise to engage
10  in transactions on behalf of the whole -- of
11  the CLOs?
12    A.    You -- your question -- I'm -- I'm
13  sorry.  I'm trying to be -- I'm trying to be a
14  hundred perc- -- I'm trying to be accurate
15  here.
16    Q.    Let me interrupt you and just say,
17  I'm very grateful for your testimony.  I know
18  this is not easy, and I do believe that you're
19  earnestly and honestly trying to answer the
20  questions the best you can.  So no apologies
21  necessary anymore.  If you need me to repeat
22  the question or rephrase it, just say that,
23  okay?
24    A.    Please -- yes.

GRANT SCOTT - 1/21/2021

1

2    Q.    Okay.

3    A.    Please -- please repeat that.

4    Q.    Did you ever communicate with any

5  employee, officer, director, representative of

6  any of the entities that are on this page

7  concerning the debtor's ability to service the

8  CLOs?

9    A.    I believe so.

10    Q.    And can you identify the person or

11  persons?

12    A.    I think it's Jim Dondero.

13    Q.    Anybody else other than Mr. Dondero?

14    A.    No.

15    Q.    When did you have that conversation

16  or those conversations with Mr. Dondero?

17    A.    This letter is dated the 22nd --

18    Q.    Correct.

19    A.    -- right?

20    Q.    Yes.

21    A.    I believe that's the Tuesday before

22  Christmas, and this would have been on the

23  21st, the Monday.

24    Q.    What do you recall about your

25  conversation on the 21st regarding the

GRANT SCOTT - 1/21/2021

1

2  substance of this particular letter?

3    A.    Jim Dondero described why he

4  believed sales being made on an ongoing basis

5  after a request was made to stop was im- --

6  improper.

7    Q.    Do you -- do you rely on what

8  Mr. Dondero said to you during that phone call

9  on December 21st in -- in deciding to join in

10  this particular letter?

11    A.    No.

12    Q.    Did you only then rely on the

13  information you obtained from counsel?

14    A.    Yes.  I -- I -- I -- I considered

15  this letter to be nearly the most gentle

16  request imaginable amongst lawyers to maintain

17  the status quo.

18    Q.    And the request that's made in this

19  letter is perfectly consistent with what

20  Mr. Dondero told you on the 21st of December,

21  correct?

22    A.    I don't -- no.

23    Q.    How --

24    MR. MORRIS:  Can we go to the end of

25  this letter, please.  All right.  Right

GRANT SCOTT - 1/21/2021

1

2  there.

3  BY MR. MORRIS:

4    Q.    Do you see the request that's in the

5  last sentence?

6    A.    Yes.

7    Q.    Is that the same thing that

8  Mr. Dondero told you should happen, that --

9  that there should be no further CLO

10  transactions at least until the issues raised

11  and addressed by the debtor's plan were

12  resolved substantively?

13    A.    Yes.

14    Q.    Is there anything that he said

15  that's inconsistent with the request that's

16  made here?

17    MR. CLARK:  Objection, form.

18    A.    This -- and can you -- can you show

19  me earlier parts?

20    Q.    Of course.  You know what, I'll

21  withdraw the question.

22    And let me see if I can do it this

23  way:  In your discussion with Mr. Dondero, did

24  he indicate that he had seen a draft of this

25  letter?

GRANT SCOTT - 1/21/2021

1

2    A.    No.  And I didn't -- I didn't have a

3  discussion with him.  I -- I merely listened to

4  him.  There was no -- I -- I had no input to

5  the conversation.

6    Q.    Okay.  I -- I did -- I didn't --

7  I -- I appreciate that.  So he called you; is

8  that right?

9    A.    We -- we called in.

10    Q.    Oh, was it --

11    A.    I --

12    Q.    Was it --

13    A.    I don't know --

14    Q.    Was it --

15    A.    I don't know the sequence of the

16  calls.  I'm sorry.

17    Q.    Was there anybody on the call other

18  than you and Mr. Dondero, the call that you're

19  describing on December 21st?

20    A.    Yes, my attorney and an attorney --

21  I believe the attorney that signed this letter.

22    Q.    Okay.  And I just want to focus on

23  what Mr. Dondero said.  Did he -- did he say

24  during the call that Highland should not be

25  engaging in any further CLO transactions?

Page 94

```
 1              GRANT SCOTT - 1/21/2021
 2       A.   He took a more -- if I can
 3  characterize his mental -- I looked at the
 4  issue of maintaining the status quo since there
 5  was somebody that was complaining about it,
 6  that that -- because it -- it isn't assets of
 7  Highland, it doesn't adversely affect Highland.
 8  If -- if stopping the sales -- you know, my --
 9  my thought was -- is if stopping the sales
10  reduces the likelihood of litigation
11  disputes -- you already saw that there was the
12  one from middle of December.  I -- I thought
13  that would be the more appropriate way to go.
14  I didn't think there'd be any harm.
15       Q.   And was that your --
16       A.   I think -- I think Jim Dondero had a
17  more legalistic view of its impro- -- im- --
18  improper nature.
19       Q.   And did he share that view with you?
20       A.   On Monday, yes.
21       Q.   Can you describe for me your
22  recollection of what he said about the
23  legalistic view?
24       A.   Just the mention of -- all I recall
25  is in terms of -- the law associated with it
```

Page 95

```
 1  was -- the Advisers Act was mentioned --
 2       Q.   Did you have --
 3       A.   -- but I don't -- I don't know what
 4  that is.  You know, I don't know what that is.
 5       Q.   And you -- and -- and you never --
 6  it never occurred to you to pick up the phone
 7  and -- and to speak with Mr. Seery to see why
 8  it was he thought he should be engaging in
 9  transactions?
10       A.   No.  And -- but I -- my lack of
11  volunteering a phone call to Jim Seery isn't --
12  it's -- it's because of -- I -- I thought any
13  phone call by me to Jim Seery would be
14  inappropriate because he's represented by
15  counsel.  I mean, we were working on claims
16  against him --
17       Q.   Okay.
18       A.   -- right, so...
19       Q.   Did you -- did you -- did you think
20  to instruct your lawyers to reach out to
21  Mr. Seery to actually speak to him instead of
22  just sending a letter like this and to -- and
23  to ask -- and to maybe inquire as to why he
24  thought it was appropriate to engage in
```

Page 96

```
 1              GRANT SCOTT - 1/21/2021
 2  transactions before they made a request six
 3  days after the court threw out their suit as
 4  frivolous?  I'll withdraw that.  That's too
 5  much.
 6            A few days later did you authorize
 7  the sending of another letter to the debtor in
 8  which you suggested that the -- the entities on
 9  behoove -- on -- on whose behalf the letter was
10  sent might take steps to terminate the CLO
11  management agreements?
12       A.   I did not see -- so there is a --
13  there is a December 28th letter.
14            MR. MORRIS:  Let's just go to the
15       next letter, and -- and let's just call
16       that up.
17  BY MR. MORRIS:
18       Q.   I think it's -- I think it's
19  actually dated December 23rd.  It was the next
20  day.
21       A.   Yes.
22            (SCOTT EXHIBIT 4, Letter to James A.
23       Wright, III, et al., from Gregory Demo,
24       December 24, 2020, with Exhibit A
25       Attachment, was marked for identification.)
```

Page 97

```
 1              GRANT SCOTT - 1/21/2021
 2  BY MR. MORRIS:
 3       Q.   And do you recall that the next day
 4  CLO HoldCo Limited joined in another letter to
 5  the debtors?  Do you have that recollection?
 6       A.   Yes.  Not -- not be- -- yes, I do,
 7  but -- yes, I do.
 8       Q.   Did you see this letter before it
 9  was sent?
10       A.   I don't believe so.
11       Q.   Did you authorize the sending of
12  this letter?
13       A.   I gave -- I relied on my attorney to
14  guide me through this process.
15       Q.   I appreciate that.
16       A.   I let him make that call on this
17  letter, which is -- copies most of the prior
18  letter and then adds another issue.
19       Q.   Okay.  Do you have an understanding
20  of what that issue is?
21       A.   Yes.
22       Q.   And what is your understanding of
23  what that additional issue is?
24       A.   Somewhere in this letter of the 23rd
25  there's an -- there's an -- an inclusion of
```

Page 98

GRANT SCOTT - 1/21/2021

1  a -- a statement of an -- a future intent.
2      Q.    A future intent to do what?
3      A.    To remove Highland as the servicer
4  of the agreements you talked to me about
5  previously.
6      Q.    Can you tell me whether there's a
7  factual basis on which CLO HoldCo Limited
8  believes that the debtor should be removed as
9  the servicer of the portfolio manager of the
10  CLOs?
11      A.    Yes.  There are -- there are
12  multiple bases to consider subject to all the
13  other conditional language in the request of
14  these letters to consider that going forward
15  but no decision.  That intent is an intent to
16  evaluate, not an intent to take any action.  I
17  haven't authorized any action.  I don't feel
18  comfortable with my knowledge base at this
19  time, but it's something being explored.
20      Q.    So knowing everything that you know
21  as of today, you have not yet formed a decision
22  as to whether CLO HoldCo Limited will take any
23  steps to terminate Highland's portfolio
24  management agreements, correct?
25

Page 99

GRANT SCOTT - 1/21/2021

1      A.    I don't -- I don't want to be
2  difficult, but I'm -- I'm confused yet again
3  with your question.  But I have not -- there --
4  there are a number of cr- -- a number of issues
5  that with my nonfinance background would
6  suggest to me that they -- they may be bases
7  for -- for cause, to -- to assert a cause.  And
8  I've been conferring with my attorney about
9  that, but it's very preliminary and no -- no
10  decision has been made.  I -- no decision is
11  being made.
12      Q.    So what -- what are the factors that
13  are causing you to consider possibly seeking to
14  begin the process of terminating the CLO
15  management agreements?
16      A.    Well, I guess I would break them
17  down into maybe two categories, maybe more.
18  The one that resonates most with me -- I don't
19  know -- maybe because even though I'm a patent
20  attorney, I guess at one point I was an
21  attorney.  But the thing that resonates most
22  with me --
23      Q.    You are an attorney.
24      A.    -- at the moment -- well, now you
25

Page 100

GRANT SCOTT - 1/21/2021

1  know why I'm a patent attorney and not one of
2  you guys.  But the thing that resonates with me
3  the most from a legal substantive, black letter
4  law sort of issue is the plan for
5  reorganization, which we've objected to.  I've
6  re- -- I've reviewed the objection, and that
7  sets forth our -- that sets forth my position,
8  and I consider that to be quite material.  The
9  others are issues of practical effects of
10  what's happened thus far with the bankruptcy,
11  the termination of the experts with a long
12  track record of success, the soon-to-be
13  termination of all employees, the cancellation
14  of various representation agreements, things of
15  that nature looked at from an additive sort of
16  perspective.
17      Q.    You know that -- can we refer to the
18  counterparties under the CLO management
19  agreements as the issuers?  Are you familiar
20  with that term?
21      A.    I -- I am familiar with the term
22  issuers, yes.
23      Q.    Okay.  And do you understand --
24      A.    There's an agreement between the --
25

Page 101

GRANT SCOTT - 1/21/2021

1  I'm sorry.
2      Q.    There's an agreement between the
3  issuers and Highland pursuant to which Highland
4  manages the CLO assets, right?
5      A.    With res- -- yes.
6      Q.    Okay.  And do you understand what's
7  going to happen to those management contracts
8  in connection with the plan of reorganization?
9      A.    Partially.
10      Q.    What's your partial understanding?
11      A.    Well, I -- I wouldn't want to
12  characterize it as a partial understanding.  I
13  mean, with respect to part of the agreement.
14      Q.    Okay.
15      A.    Okay.  Our plan objection lays out
16  our basis for objecting to steps that Highland
17  is actively taking to preclude us from the full
18  rights that we have as third-party
19  beneficiaries under that agreement, and they're
20  not de minimus.  They're quite material.  They
21  relate to cause issues and no-cause issues, for
22  example, as out- -- as outlined in our --
23  our -- our objections.
24      Q.    Okay.  Did you ever make any attempt
25

Page 102

GRANT SCOTT - 1/21/2021

1  to speak with any issuer concerning Highland's
2  performance under the CLO management
3  agreements?
4      A.   No.
5      Q.   Why not?
6      A.   I -- I don't have any facts --
7  understand I -- I get all of the reports
8  periodically from Highland -- from Highland.
9  I -- I don't have a basis that I'm aware of to
10 complain about performance issues.  This is a
11 legal issue that I'm talking about.
12     Q.   So you have no basis to suggest that
13 Highland hasn't performed under the CLO
14 management agreements, correct?
15     A.   Well, Highland as of right now,
16 the -- the issue really is as -- as to what's
17 next, not -- not -- I -- I don't -- I don't
18 believe I have facts that support a com- --
19 a -- an issue right now.  It's -- it's --
20 it's -- it's going forward that is the problem.
21     Q.   I --
22     A.   That's -- you know, that's --
23     Q.   Have you given any thought to
24 speaking with the issuers to try to get their

Page 103

GRANT SCOTT - 1/21/2021

1  views as to what they think is going to happen
2  in the future?
3      A.   No.
4      Q.   They're the -- they're the actual
5  direct beneficiaries under the CLO management
6  agreements, to the best of your understanding,
7  right?
8      A.   Yes.  Their rights may not be
9  impacted; it's CLO Holdco's rights that are
10 going to be adversely impacted.  So it's -- I
11 don't know that our view is in alignment with
12 their view.  But to answer your question, no,
13 we did not contact them.
14     Q.   Do you have any knowledge or
15 information as to any assertion by the issuers
16 that Highland is in breach of any of the CLO
17 management agreements?
18     A.   No.
19     Q.   Do you have any knowledge or
20 information as to whether or not any of the
21 issuers believe that Highland is in default
22 under the CLO management agreements?
23     A.   No, I don't have any of those facts.
24     Q.   Are you aware that the issuers are

Page 104

GRANT SCOTT - 1/21/2021

1  negotiating with Highland to permit Highland to
2  assume the CLO management agreements and to
3  continue operating under them?
4      A.   I believe so --
5      Q.   Is that --
6      A.   -- but they're --
7      Q.   Go ahead.  I'm sorry.
8      A.   As I understand it, Highland
9  wants -- Highland or its subsidiary -- or
10 its -- its -- its postbankruptcy relative --
11 post- -- excuse me, that Highland
12 postbankruptcy -- or postplan confirmation
13 wants to move forward, substitute itself for
14 the prior issuer -- no, sorry, substitute
15 itself for the prior servicer under those
16 agreements to assume those agreements but in
17 the process of assuming those agreements,
18 carving out a bunch of provisions that from a
19 legal standpoint and a potentially future
20 practical and monetary standpoint are quite
21 substantial, and that has to relate to the
22 removal rights based on cause and without
23 cause.  As I understand it, that's all set
24 forth in our plan objection.

Page 105

GRANT SCOTT - 1/21/2021

1      Q.   Okay.  Are you aware of a third
2  letter that was sent to Highland on behalf of
3  CLO HoldCo and the other entities that are
4  listed in this document?
5      A.   The December 28th letter, is that
6  what you mean?
7      Q.   It's actually December 31st, if I
8  can refresh your recollection.
9           MR. MORRIS:  Can we put up Exhibit
10 F?
11          (SCOTT EXHIBIT 5, Letter to Jeffrey
12          N. Pomerantz from R. Charles Miller,
13          December 31, 2020, was marked for
14          identification.)
15 BY MR. MORRIS:
16     Q.   You remember that there was a letter
17 dated on or about December 31st that was
18 sent -- oh, actually, you know, I apologize.
19 If we scroll down to the -- to the next -- to
20 the first box, there actually is no mention of
21 CLO HoldCo.
22          Are you aware that Mr. Dondero was
23 evicted from Highland's offices as of the end
24 of the year?

**Page 106**

GRANT SCOTT - 1/21/2021

1    A.  I -- I didn't know the time, but I
2  understand he's no longer there.
3    Q.  Does CLO HoldCo Limited contend that
4  it was damaged in any way by Mr. Dondero's
5  eviction from the Highland suite of offices?
6    MR. CLARK:  Objection, form.
7    A.  I -- I don't have any information to
8  support that as of this time.
9    Q.  It's not -- it's not a belief that
10  you hold today?
11    A.  I don't have a belief of that, yes.
12    MR. MORRIS:  All right.  Let's take
13  a short break.  I may be done.  I -- I'm
14  grateful, Mr. Scott, and don't want to
15  abuse your time.  Give me -- let -- just
16  let -- let's come back at 4:50, just eight
17  minutes, and if I have anything further, it
18  will be brief.
19    (Whereupon, there was a recess in
20  the proceedings from 4:42 p.m. to
21  4:49 p.m.)
22    MR. MORRIS:  Okay.  Mr. Scott, thank
23  you very much for your time.  I have no
24  further questions.

**Page 107**

GRANT SCOTT - 1/21/2021

1    THE WITNESS:  Thank you.
2    MR. CLARK:  We will reserve our
3  questions.
4    THE WITNESS:  I appreciate it, John.
5    MR. MORRIS:  Take care.  Thanks for
6  your time and your -- and your diligence.
7  I do appreciate it.  Take care, guys.
8    THE REPORTER:  Okay.
9    MR. CLARK:  Thank you.
10    MR. HOGEWOOD:  No questions from us.
11    (Time Noted:  4:50 p.m.)

16         GRANT SCOTT
17  Subscribed and sworn to before me
18  this    day of         2021.

**Page 108**

GRANT SCOTT - 1/21/2021

1      C E R T I F I C A T E
2  STATE OF NORTH CAROLINA  )
3          ) ss.:
4  COUNTY OF WAKE     )
5
6    I, LISA A. WHEELER, RPR, CRR, a
7  Notary Public within and for the State of New
8  York, do hereby certify:
9    That GRANT SCOTT, the witness whose
10  deposition is hereinbefore set forth, having
11  produced satisfactory evidence of
12  identification and having been first duly sworn
13  by me, according to the emergency video
14  notarization requirements contained in G.S.
15  10B-25, and that such deposition is a true
16  record of the testimony given by such witness.
17    I further certify that I am not
18  related to any of the parties to this action by
19  blood or marriage; and that I am in no way
20  interested in the outcome of this matter.
21    IN WITNESS WHEREOF, I have hereunto
22  set my hand this 21st day of January, 2021.
23         ----*Lisa Wheeler*----
24         LISA A. WHEELER, RPR, CRR

**Page 109**

GRANT SCOTT - 1/21/2021

1  ------------------I N D E X------------------
2                  PAGE
3  EXAMINATION BY MR. MORRIS     7
4
5  -----------------EXHIBITS------------------
6                  PAGE
7  EXHIBIT 1  Organizational Structure:  46
8         CLO HoldCo, Ltd.
9  EXHIBIT 2  Unanimous Written Consent of  54
10         Directors In Lieu of Meeting
11  EXHIBIT 3  Letter to James A. Wright,  78
12         III, et al., from Gregory
13         Demo, December 24, 2020, with
14         Exhibit A Attachment
15  EXHIBIT 4  Letter to James A. Wright,  96
16         III, et al. From Gregory
17         Demo, December 24, 2020, with
18         Exhibit A Attachment
19  EXHIBIT 5  Letter to Jeffrey N.  105
20         Pomerantz from R. Charles
21         Miller, December 31, 2020

Case 21-03067-sgj    Doc 24-27    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:21-cv-01503-B    Document 16-27    Filed 06/30/24    Page 82 of 239    PageID 1258

Index: 1..aware

**1**

**1** 46:13,14 53:9,16
82:5,13

**1/21/2021** 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1

**100** 47:7

**11-month** 70:9

**1976** 28:15

**1984** 24:20

**1986** 24:22

**1988** 25:5

**1991** 25:6

**2**

**2** 54:25

**2012** 16:23

**2019** 23:4 76:17

**2020** 30:15 78:8 84:9
96:24 105:14

**2021** 107:19

**21st** 90:23,25 91:9,20
93:19

**22nd** 78:15,23 79:19
81:3 90:17

**23rd** 96:19 97:24

**24** 78:8 96:24

**24th** 81:4 83:2

**28th** 81:5 96:13 105:6

**3**

**3** 78:6

**31** 105:14

**31st** 105:8,18

**3:20** 62:6

**3:30** 61:25

**3:31** 62:7

**4**

**4** 55:8 96:22

**45** 31:20 32:2

**4:42** 106:21

**4:49** 106:22

**4:50** 106:17 107:12

**5**

**5** 54:24 105:12

**6**

**6** 78:4

**9**

**99** 52:9 53:4,10,13

**A**

**ability** 90:7

**Absolutely** 8:22

**abuse** 106:16

**accommodated**
35:22

**accounting** 29:22

**accurate** 51:5 53:8
89:15

**acronym** 12:23

**act** 11:13 95:2

**acting** 10:10

**action** 83:16 85:16
98:17,18

**actively** 101:18

**activity** 50:9,14

**acts** 72:17

**actual** 6:24 103:5

**add** 88:2

**additional** 81:5
97:23

**additive** 100:16

**addressed** 92:11

**addressing** 20:4

**adds** 97:18

**admissibility** 6:23

**advance** 37:23

**adversely** 94:7
103:11

**Advisers** 95:2

**affairs** 63:2

**affect** 94:7

**affiliated** 49:16

**aft-** 23:5

**afternoon** 6:6 7:7

**agree** 35:12,13,17
36:18 37:4,18

**agreed** 35:20,21
43:22 45:2,15 85:23

**agreement** 26:7
36:19 42:11 61:15,16
62:15 67:22 68:6,9,
13,21 70:18 71:7,16,
17 72:20 100:25
101:3,14,20

**agreements** 24:4
62:18 70:21 71:22
72:16 73:10 74:3,10
81:12 96:11 98:5,25
99:16 100:15,20
102:4,15 103:7,18,23
104:3,17,18

**agrees** 6:16

**ahead** 38:2 104:8

**alignment** 103:12

**allowed** 37:10

**amended** 40:12,16

**amendment** 38:10

**amount** 27:8

**amounts** 24:6

**announcement**
43:12

**ansel** 33:18

**answer's** 74:6,22

**anymore** 89:22

**apologies** 89:21

**apologize** 50:11
55:4 59:21 105:19

**apparently** 35:15

**appointed** 88:15

**appointment** 17:6

**approval** 27:5

**approvals** 64:14

**approve** 48:12
75:11,12

**approved** 41:13,16

**approving** 64:16

**approximately**
11:17 17:6 60:20

**area** 25:24 64:19

**argument** 42:12

**arises** 71:7,15

**arrangement** 18:10
47:13 53:12,13

**as-** 35:14

**Asia** 46:12

**aspect** 19:24 20:6
77:12

**assert** 79:9 99:8

**assertion** 103:16

**asset** 32:23 33:7,10
37:9

**assets** 10:22,24
11:14 12:11 13:13,
15,17,20,23 18:25
19:15 20:11 24:5
32:12 33:11,15
35:13,14,15,17 37:8
71:23 94:6 101:5

**assume** 104:3,17

**assumed** 11:25

**assuming** 104:18

**attached** 46:21
52:24

**Attachment** 78:9
96:25

**attempt** 76:19,25
101:25

**attorney** 6:7 24:11
35:21 38:14,21 39:5,
6 42:6 43:22,23 45:2
65:17 70:13 80:15
87:6 93:20,21 97:13
99:9,21,22,24 100:2

**attorney-client**
65:20 79:9

**attorneys** 87:11

**attraction** 32:18,21

**authority** 15:9,19
33:24

**authorize** 96:6 97:11

**authorized** 45:4
88:10,18 98:18

**aware** 27:13 34:12
36:2 38:12 40:5,9
58:10 62:14,19 69:21
71:20,21 72:8,11
73:24 74:8,17 76:11
77:19 79:16,18,25
80:16,17 82:22 83:21
85:5 102:10 103:25

Case 21-03067-sgj   Doc 24-27   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:21-cv-01503-B   Document 6-27   Filed 05/31/24   Page 83 of 239   PageID 1259

Index: back..compensation

105:2,23

**B**

**back** 20:21 54:18 56:18,20 81:21 87:25 88:15 106:17

**background** 24:17 99:6

**bankruptcy** 6:9 22:9,19,21,24 23:5, 14 30:14,15 34:11,13 35:19 76:12,15,18,23 77:6 84:23 85:12,15 100:11

**Barbara** 52:15 56:12, 13,23 58:10

**base** 98:19

**based** 29:9 61:5,15 65:20 73:16 80:22 104:23

**bases** 98:13 99:7

**basically** 20:22 24:6

**basis** 19:25 21:4 24:13 26:9 37:15 42:17 60:13 82:19 86:5 91:4 98:8 101:17 102:10,13

**be-** 97:6

**began** 25:4

**begin** 6:13 7:4 8:20 16:22 99:15

**behalf** 10:11 14:2,12 15:20 16:3 26:25 27:17,23 33:25 34:4 37:22 40:22 67:17 77:20 78:18 84:5,9, 14 85:17 86:4 87:10 88:14 89:2,11 96:9 105:3

**behoove** 96:9

**belief** 73:13,14,15 86:5 106:10,12

**believed** 42:16 67:20 68:11 91:4

**believes** 98:9

**beneficial** 58:14,16

**beneficiaries** 61:8, 12 101:20 103:6

**beneficiary** 61:19 73:9

**big** 33:3 39:8

**biggest** 23:16

**bit** 8:15 30:18 52:19 55:12

**black** 100:4

**blocks** 52:13

**board** 34:25

**bottom** 46:24 55:22

**box** 105:21

**boxes** 47:13

**breach** 68:12 74:9, 15,18 103:17

**breached** 67:21

**break** 19:7 61:24 99:17 106:14

**breaking** 55:11

**briefly** 81:4

**brilliantly** 76:10

**brought** 82:4

**bucket** 71:20

**bunch** 104:19

**business** 29:19 50:4

**business/finance** 29:22

**C**

**call** 18:6 35:4,19,20 44:9 45:11 91:8 93:17,18,24 95:12,14 96:15 97:16

**called** 6:3 10:15 35:9,20 44:6 45:12 46:7 87:22,25 93:7,9

**calls** 93:16

**camp** 75:13

**cancellation** 100:14

**CANTY** 55:6,9

**capacity** 17:9 18:20 26:21 34:5,7 50:2 51:20 72:25 73:23 74:7 75:24 83:22 84:20

**Capital** 6:10 13:18, 19,22 14:16 19:18 28:12 62:15,21,25 67:21 68:5,11,19,24 69:14 70:19,22 71:21 72:12,16,21 73:25 74:10 75:2,17

**Capital's** 68:19

**caps** 13:10

**care** 107:6,8

**Carolina** 25:8

**carry** 18:4,13

**carving** 104:19

**cash** 36:13 37:9

**categories** 99:18

**caused** 74:11 84:19

**causing** 99:14

**caution** 44:11 65:16, 18 79:7

**caveats** 83:18

**Cayman** 47:4

**certainty** 33:20

**change** 27:10

**changed** 20:23 38:21 84:19

**char-** 51:16

**characterize** 94:3 101:13

**charge** 20:16

**charitable** 11:3,4 12:14 17:24 18:4,14 32:13,17,20 36:16 47:8,22 48:15 49:3,4, 7,10,13,17,21 50:3, 10,16,23 51:2,10,13, 17,23 52:3,6,9,10 53:3,5,17,25 54:10,

14,20 56:8 58:15 60:3,25 65:8

**Charles** 105:13

**chart** 46:25 48:16 55:20

**chemical** 29:4

**choice** 10:2

**chose** 29:11

**Christmas** 90:22

**chronological** 34:20

**City** 52:15 56:13

**claim** 23:11,22,24 38:10,11 39:11,12, 19,23 40:4,8,12,13, 16 46:22 52:25

**claims** 95:16

**clarify** 13:3 43:18,19

**CLARK** 26:5,12 31:2, 10 32:25 33:8,17 39:14 40:24 42:24 44:10 54:4 59:14 62:3 64:4,10 65:15 69:5,18,24 72:22 73:5 74:4,12,19 75:18 79:6,14 80:21 83:13 87:18 92:17 106:7 107:3,10

**clerical** 60:18

**CLO** 10:15,21 11:8 12:2,7,11,15,20,23, 25 13:23 14:2,12 15:10,20,24 16:4,6,9, 11,15,20 17:5,15,18, 22 18:21,25 19:3,15, 17,20 21:5 22:10 23:2,9,18 24:3 26:25 27:17,23 28:6 32:10, 23 33:6,15,25 34:8 35:17 36:12,23 37:7, 22 40:22 41:11 42:20 45:19,20 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3 52:25 54:15 58:21 61:8 62:12,16 63:2 64:20 67:17,22 68:13,18 69:3,13,16,22 70:4, 19,23 72:8,19 74:3,8, 9,24 75:25 76:2,19

14,20 56:8 58:15 60:3,25 65:8

**CLO's** 35:14

**CLOS** 13:13 68:6 69:3,16 70:23 71:18, 22,24 72:9,11,21 74:25 75:16,19 76:20,25 77:13 83:7, 23 84:5,9,14 85:17 86:4 87:10 89:3,12 90:8 98:11

**close** 30:17

**closest** 28:20,21 31:23

**collateralized** 10:23

**collectively** 20:25 80:18

**college** 28:22 29:7

**Colorado** 67:3

**com-** 20:15 25:24 102:19

**comfortable** 85:2 98:19

**comments** 79:3,8,10

**commonly** 12:16

**communicate** 90:4

**communicated** 39:4 62:24

**communicating** 67:5

**communication** 45:6

**communications** 44:14 64:8,23 65:12, 20 66:21 67:15 68:16 80:22,25 87:5

**company** 10:22 33:9,21 65:23

**compensation** 16:19 17:2 49:20,25

**complain** 102:11

**complaining** 94:5

**complex** 18:19

**compliance** 18:11 20:3,13,16 25:16,17, 20,24 50:8

**comports** 47:2

**con-** 85:8

**concern** 37:5 68:17 71:6,14

**conclude** 86:20 87:8

**conditional** 98:14

**conducted** 6:19

**conference** 35:9

**conferring** 99:9

**confide** 31:17

**confided** 31:9

**confidential** 32:3

**confirmation** 6:14 104:13

**confused** 40:25 47:13 53:11 99:3

**confusing** 13:3 53:19

**confusion** 85:9

**connection** 62:11 69:2 74:2 101:9

**consent** 27:16,22 55:2,18

**consideration** 76:6

**considered** 91:14

**consistent** 33:22 91:19

**construction** 67:2

**consulted** 39:5 42:7

**contact** 21:19,20,22 103:14

**contacted** 38:21

**contacts** 87:24 88:2

**contained** 69:22

**contend** 69:13 72:19 106:4

**contentious** 66:2

**continue** 104:4

**contract** 36:17

**contracts** 101:8

**conversation** 66:12, 25 88:4 90:15,25 93:5

**conversations** 65:4 66:8 73:16 90:16

**converting** 83:16

**cookie** 18:9

**copies** 97:17

**copy** 78:23

**core** 15:5,8

**corner** 46:25

**corporate** 11:7 73:2

**correct** 10:13 16:14 17:10,13 23:15 25:25 53:14 58:17 71:13 77:2,3 84:18 88:12 90:18 91:21 98:25 102:15

**corrected** 60:21

**correction** 60:22

**correctly** 23:12 29:20 36:7 42:10

**cos-** 77:23

**counsel** 10:9 11:23 23:6 36:8 43:12 44:12,15 73:17 79:8 80:23,25 85:23 91:13 95:16

**counterparties** 100:19

**couple** 18:17

**Cournoyer** 15:4

**court** 6:21 35:19 41:16 42:14,20 43:13 80:4 82:5,14,22 83:6, 12 96:3

**courtesy** 8:24

**courtroom** 7:23

**Covitz** 14:20 15:2 86:15,20

**cr-** 99:5

**create** 17:24

**created** 18:3 36:20

**creditor** 23:9,21

**cutter** 18:9

---

**D**

**D-A-F** 13:10

**DA-** 51:23

**DAF** 12:17,20,23,25 13:9 19:20 47:8 48:15 49:3,4,7,10,13, 17,22 50:3,10,16,23 51:2,10,13,17,23 52:3,6,9,11 53:3,5, 17,25 54:11,14 56:8 58:15 60:3,25

**Dallas** 52:14,18 55:19 56:2,22 58:9

**damaged** 106:5

**dated** 52:20 78:15 82:25 83:2 90:17 96:19 105:18

**day** 21:9,12,19 42:14 96:20 97:3 107:19

**day-to-day** 12:9 19:25 50:6

**days** 21:21,25 83:12 96:3,6

**DDDD** 78:5

**de** 52:16 101:21

**de-** 31:16

**deal** 20:13

**debtor** 6:9 23:9,10, 12,22,25 86:3 88:15 89:2 96:7 98:9

**debtor's** 41:12 77:12 90:7 92:11

**debtors** 97:5

**Dece-** 78:14

**December** 78:8,15, 23 79:18 91:9,20 93:19 94:12 96:13, 19,24 105:6,8,14,18

**decide** 82:2,12

**decided** 82:23 83:3

**deciding** 91:9

**decision** 34:3,9 36:3, 4,18 37:14,18,21 38:19,21,23 39:8 43:10,21 45:15,16 47:25 48:10 66:15 74:24 81:18 86:7,8 98:16,22 99:11

**decision-makers** 84:24

**decision-making** 15:9,18 33:14,24 85:20,21 86:17,21

**decisions** 13:25 14:12 16:3 26:25 34:14,23 48:7 75:5 85:2

**declared** 30:16

**declined** 40:23

**dedicate** 21:14

**default** 68:5,12 74:9 103:22

**define** 31:17

**degree** 24:22

**Delaware** 29:5

**delayed** 70:10 71:11

**demand** 81:8 83:17, 19

**Demo** 78:7 96:23

**demonstrative** 46:7 56:21

**deposed** 7:10 8:12

**deposition** 6:12,17 7:9,18,23 8:2 9:8 23:7

**depositions** 7:13 8:16

**derived** 24:7 81:11

**describe** 10:20 23:23 24:16 30:5 66:20 94:21

**describing** 93:19

**desire** 85:13

**detail** 11:7

**details** 10:6

**detected** 60:21

**devote** 21:2,5 22:10

**devoting** 22:18

**difference** 22:5 39:7 83:15

**difficult** 30:18 41:17 69:11 99:3

**diligence** 107:7

**direct** 103:6

**directly** 28:8

**director** 11:11 12:2,7 16:16,20,25 17:4,13 18:21 19:3,17 21:5 22:25 26:21 28:5 32:9 34:5,8 35:6 47:17 48:24 50:22 51:3,4,12,16 52:3,6 55:25 56:6,11,15,25 57:8,11 58:9 62:12 73:23 74:7 75:24 76:24 84:20 90:5

**directors** 15:24 49:14 50:20 55:2,18 59:12,18

**disagree** 88:23 89:4

**disagreed** 34:10,15

**disagreement** 38:13

**disclose** 44:13 65:19 80:24

**discuss** 42:19 67:16

**discussed** 73:20 77:8,11 81:13

**discussion** 67:23 80:16 85:23 89:7 92:23 93:3

Case 21-03067-sgj    Doc 24-27    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:21-cv-01503-B    Document 16-27 Filed 09/23/24   Page 86 of 239    PageID 1261

Index: discussions..foundation

**discussions** 64:3
67:19 68:3,10

**dispute** 35:15

**disputes** 94:11

**distinction** 70:24

**distinguish** 70:17

**distracted** 33:4 72:4

**division** 53:10

**document** 9:12,14
46:9 54:22 55:14,22
73:12 89:9 105:5

**documents** 9:9,10
52:24 66:24

**Don-** 11:21

**donated** 24:4

**Dondero** 7:21 9:17
10:7 11:24 14:20,25
17:24 28:7,9,10,14,
16 29:24 30:6,25
31:5,9,20 32:2,22
33:5 34:10 35:24
37:2,23 39:12,19
41:7 42:20 43:10
45:9 48:7 51:19,22
52:2,5 57:4,8 58:12
60:23 61:13 62:20
63:19 67:7 84:12,17,
24 85:5 86:9,12 89:4
90:12,13,16 91:3,8,
20 92:8,23 93:18,23
94:16 105:23

**Dondero's** 7:19
10:11 30:21 47:21
57:21 58:2 60:11,14
67:3 106:5

**downward** 54:13

**draft** 78:25 92:24

**dry** 19:5

**due** 35:17 70:11

**Dugaboy** 59:25 60:5,
15,19 61:7,19

**duly** 6:3

**duties** 12:6 19:2,16
62:11 69:15

### E

**e-mailed** 66:23

**earlier** 25:17 26:24
62:9 75:4 77:16
78:25 79:16 82:3,12
83:12 85:4 87:20
92:19

**earnestly** 89:20

**easier** 12:23 42:5

**Eastern** 61:25

**easy** 89:19

**educational** 24:17

**effect** 37:9

**effects** 100:10

**effectuated** 27:23

**effectuating** 27:16

**electrical** 24:18

**Electronics** 8:6

**employee** 14:16
16:17 90:5

**employees** 11:21,22
14:17 16:7 17:11
26:23 27:15,22 40:3
49:11 50:17,18 57:15
59:12,19 100:14

**end** 55:12 91:24
105:24

**ended** 35:20

**engage** 87:10 89:10
95:25

**engaged** 88:14

**engaging** 82:6 83:7
93:25 95:9

**engineer** 24:18 25:2
29:5

**engineering** 29:17

**entities** 11:2 12:12
17:25 18:3,7,10 46:2
54:16 55:20 56:8
78:18 79:19 80:2
82:4,13 89:8 90:6
96:8 105:4

**entity** 10:15,18 12:3,
25 13:4 17:12,25
51:9 52:17 58:15
74:24 81:11 85:19

**entity's** 50:4

**Equity** 70:9

**equivalent** 11:4

**error** 60:18,19

**escrow** 37:14

**essentially** 83:17

**establish** 23:11
47:25 48:7,10 65:6

**established** 51:18
58:20

**estimate** 21:3,24

**estimated** 21:12

**et al** 78:7 96:23

**evaluate** 98:17

**event** 66:6

**events** 30:14 36:7

**evicted** 105:24

**eviction** 106:6

**evidence** 6:17

**evidenced** 42:12

**ex-wife** 10:9,11

**exam-** 86:15

**EXAMINATION** 7:5

**examined** 6:4

**exclusive** 23:20
24:13

**exclusively** 24:10
50:14

**excuse** 21:11 22:15
23:7,9 28:25 104:12

**execute** 32:16 86:4

**exhibit** 46:7,13,14
54:24,25 55:7 78:4,5,
6,8,11 96:22,24
105:10,12

**exist** 75:16

**existence** 12:3

**exiting** 77:5

**expenses** 36:14
64:15

**experience** 8:16

**expert** 25:13,24

**expertise** 76:8 84:25
86:3 88:5 89:10

**experts** 100:12

**explain** 17:21 75:10

**explained** 45:14

**explored** 98:20

**extend** 8:23

**extent** 26:13 79:7
80:22

### F

**fact** 6:19 76:16 88:14

**factors** 99:13

**facts** 46:10 47:2
102:7,19 103:24

**factual** 98:8

**fair** 8:21 16:2 22:8
30:13,24 31:8,18,25
37:19 39:11 47:22,24
73:3,5 85:12,17
88:11

**fairly** 18:19 36:12

**fall** 25:5

**familiar** 10:14 45:20,
24 47:12 100:20,22

**familiarity** 45:25
47:11

**family** 7:20 9:17

**feed** 52:12 56:7

**feedback** 82:8

**feeds** 52:13

**feel** 98:18

**fees** 36:15

**felt** 84:25

**field** 25:13

**filed** 20:5 23:5 38:24
39:13,20 40:17,18
42:8 76:12,15

**filing** 22:22,24 23:13
39:22 76:18,24 77:6
83:16

**final** 15:8,18 33:13,24

**finance** 18:2 25:10
29:18

**Finances** 19:23

**financial** 20:10 85:20

**finish** 8:19

**firm** 6:8

**flow** 36:13 37:7,11

**flows** 54:6,13,18

**focus** 23:20 36:24
68:8 93:22

**folks** 62:10

**footnote** 46:23

**forget** 26:15 35:7
52:18

**forgive** 69:9

**forgot** 19:8

**form** 26:6,9,10,13
31:2,10 32:25 33:8,
17 37:8 39:14 40:24
42:24 54:4 59:14
64:4,10 69:5,18,24
72:22 73:7 74:4,12,
19 75:18 83:13 86:2
87:18 92:17 106:7

**formal** 25:9,15

**formed** 17:15,19,22
47:4 98:22

**formulated** 82:18

**forward** 7:2 42:18
98:15 102:21 104:14

**found** 9:24 36:5,7
45:9

**foundation** 11:4
52:14 55:19 56:2,5,
22,23 65:8 82:20

Case 21-03067-sgj    Doc 24-27    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:21-cv-01502-B    Document 16-27    Filed 08/31/22    Page 86 of 239    PageID 1262
Appendix 0627    Page 534 of 239    Page ID 1362

Index: foundation-like..inclusion

**foundation-like** 17:25

**foundations** 12:15 53:22,23 54:10,17 56:7,10 57:5,9,12,15, 20,25 58:10,12

**fourth** 52:15,17 53:24

**frankly** 76:9

**free** 80:23

**frequently** 12:21,24 13:3,5

**Friday** 21:15

**friend** 28:13,21 31:23

**friends** 28:20

**friendship** 30:17

**frivolous** 96:4

**full** 70:7 84:21 101:18

**function** 18:14

**fund** 47:8 48:15 49:4 50:10,17,23 51:2 52:6,11 53:5,18 54:10,11

**future** 98:2,3 103:3 104:20

**G**

**gamut** 20:5

**gave** 43:21 86:19 87:4 97:13

**general** 18:9 45:25 49:3 66:7 83:2

**generally** 7:17 8:17 24:17 25:22 30:8,11 45:19,23 63:14 66:7, 20 71:12

**gentle** 83:17 91:15

**get all** 102:8

**get-** 20:4

**give** 77:4 106:16

**giving** 36:16 47:22

**goal** 18:4

**good** 6:6 7:7 26:20 30:8,9 43:25 58:23, 25 59:5,9,11,17,22 61:6,12

**good-faith** 42:17

**GP** 49:3,8,10,13,17, 22 50:3 51:24

**graduate** 24:20

**graduated** 24:13,19 25:5

**Grant** 6:1,12 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1,13 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,10 45:1 46:1 47:1 48:1 49:1 50:1 51:1,2,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1, 15 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1,21 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,16

**grateful** 89:18 106:15

**Gregory** 78:7 96:23

**group** 11:18,19 14:15 15:6,8,21 18:7 19:21 86:14

**grow** 28:16

**guess** 11:24 12:22 18:2 20:20 25:2 40:4, 5 42:13 45:7 65:23 78:11 99:17,21

**guide** 97:14

**guideline** 27:8,14

**guys** 100:3 107:8

**H**

**half** 43:6 60:21

**halt** 81:8

**hand** 70:20

**handled** 8:10 20:7

**happen** 92:8 101:8 103:2

**happened** 100:11

**Har-** 38:17

**Harbourvest** 38:18 40:20 41:3,8,12,15, 25 43:11

**hard** 21:13

**harm** 94:14

**HCLO** 73:22,23

**HCM** 76:11

**head** 28:11

**heads** 28:12

**hear** 13:9 48:5 55:7

**heard** 20:22 51:9

**hearing** 6:18 42:15, 23 43:4 83:5

**held** 33:15

**helped** 65:6

**helps** 54:22

**Hey** 44:10

**hierarchy** 11:18,20 23:16 65:7

**high** 23:17,18 28:15

**Highland** 6:10 11:22 13:18,19,22 14:3,15, 16 19:18 20:7 26:23 27:14,22 28:12 34:25 40:2 52:14 55:19,25 56:22 62:11,15,21,25 63:17 67:6,21 68:4, 11,19,24 69:14 70:9, 12,18,22 71:11,21 72:12,16,20 73:25

74:10 75:2,17 76:3,9, 14,21 77:2,6 80:5 81:10,11 82:6,14 83:6,22,24 84:4,8,13 85:6,14,16,18 89:4 93:24 94:7 98:4 101:4,17 102:9,14,16 103:17,22 104:2,9, 10,12 105:3 106:6

**Highland's** 35:14 98:24 102:2 105:24

**highly** 44:7

**hindsight** 26:19

**historically** 86:7

**HOGEWOOD** 107:11

**hold** 25:12,23 48:14 65:15 79:6 106:11

**Holdco** 10:15,21 11:9 12:2,7,16,20,23 13:23 14:2,12 15:10, 20,24 16:4,6,9,11,15, 20 17:5,15,18,22 18:21 19:3,17,20 21:5 22:10 23:2 26:25 27:17,24 28:6 32:10,23 33:6,16,25 34:8 36:12,23 37:7, 22 40:22 41:11 42:21 45:19,21 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3,10,13,17 52:9,25 53:3,25 54:11,14,15 56:8 58:15,21 60:3,25 61:9 62:12,16 63:2 64:20 68:13,18 69:4, 13,17,22 70:4,19,23 72:8,19 73:22,24 74:8,24 75:25 76:19 77:13,21 79:19 80:2, 13 82:2,11 84:21 97:4 98:8,23 105:4, 22 106:4

**Holdco's** 85:21 103:10

**holding** 10:22 53:4

**home** 67:2,3

**honestly** 89:20

**horizontal** 52:13

**house** 30:4

**housemates** 30:2,3

**Hun-** 86:16

**hundred** 53:6 89:15

**Hunter** 14:20 86:15, 20

**I**

**IBM** 24:23

**idea** 47:20

**identification** 46:16 55:3 78:9 96:25 105:15

**identified** 23:13 26:24 35:10 53:23 60:18 81:5 82:5

**identify** 14:11 30:11 34:16,21 52:14 63:16 88:21,25 90:10

**Ill** 78:7 96:23

**Illinois** 24:21

**im-** 91:5 94:17

**imaginable** 91:16

**immediately** 24:23 35:20,21

**impacted** 103:10,11

**implement** 47:21

**important** 8:18 34:22,23

**impression** 86:25 87:4

**impro-** 94:17

**improper** 91:6 94:18

**improvements** 67:2

**in-** 37:15 70:3

**inappropriate** 95:15

**including** 10:23 36:14 86:15

**inclusion** 97:25

Case 21-03067-sgj    Doc 24-27    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:21-cv-01503-B    Document 10-27    Filed 06/25/24    Page 87 of 239    PageID 1263

Index: inconsistent..mail

**inconsistent** 92:15

**incorrect** 37:15

**independent** 34:25 35:6

**indirect** 61:8

**indirectly** 28:8

**individual** 72:25

**individuals** 65:6

**information** 32:3 40:3 46:21 48:19 86:19 87:8 91:13 103:16,21 106:8

**informed** 86:23 88:4

**informing** 42:20

**initially** 23:3,19 29:2 32:19 54:12 83:2

**innocuous** 81:7

**input** 11:24 93:4

**inquire** 95:24

**inquiries** 40:6

**inquiry** 88:7,9

**Institute** 24:24

**institution** 18:6

**instruct** 95:21

**insulating** 18:12

**integrated** 11:2

**intent** 98:2,3,16,17

**inter-** 14:14

**interact** 49:23

**interactions** 73:19

**interchangeably** 12:18,19 13:6

**interest** 47:14,15 54:17 60:2,25

**interested** 10:6

**interests** 52:10 53:5, 17 54:20

**interface** 12:10 13:12 14:14,22 19:21 20:12 40:2 64:13

**interfaced** 62:10 70:11

**interfacing** 18:24 19:14

**intermittent** 21:13

**internal** 27:8

**internally** 27:12

**interrupt** 89:17

**interrupted** 26:16

**invest** 74:25

**invested** 69:4,17 77:14

**investing** 25:10

**investment** 13:25 14:11 16:3 25:13 26:4,24 59:25 60:6, 15 61:7,19 75:5 76:2

**investments** 15:10, 19 27:5 33:24 72:9

**invests** 70:23

**involved** 14:22 86:16,21

**IRS** 18:11

**Islands** 47:4

**issue** 7:20 36:5,9,12 37:4,13,17 38:17 40:14 41:7,24 42:15, 19 70:9 74:13 81:9 82:17 94:4 97:18,20, 23 100:5 102:12,17, 20

**issuer** 102:2 104:15

**issuers** 100:20,23 101:4 102:25 103:16, 22,25

**issues** 20:4,14 25:16,17 36:13 38:8 70:3 81:14,15 92:10 99:5 100:10 101:22 102:11

### J

**James** 78:6 96:22

**January** 88:15

**Jeffrey** 105:12

**Jersey** 28:18

**Jim** 7:19,21 11:21,24 14:20 17:23 28:7,8, 10 35:4 45:8 61:13 63:5,19 67:3,9,23 84:12,16,23 87:14, 15,19 88:22 89:10 90:12 91:3 94:16 95:12,14

**John** 6:7 7:8 26:6 35:7 55:6 82:7 107:5

**join** 80:13,18,20 82:12,15 91:9

**joined** 24:23 97:4

**Jones** 6:8

**junior** 29:7

**justify** 82:19

### K

**Kansas** 52:15 56:13

**kind** 9:11 22:4

**knowing** 98:21

**knowledge** 25:19 27:2 37:23 47:6,21 48:3,6,13 49:2 52:8 57:3,7 61:3,15 64:21 83:11 84:10 98:19 103:15,20

### L

**L.P.** 6:11 47:8 48:15 49:4 50:11,17,23 51:2 52:3,6,11 53:5, 18 76:11

**La** 46:12

**lack** 95:11

**laid** 82:20

**language** 98:14

**large** 19:21 20:23

**late** 23:4 76:16,17

**law** 6:8 7:20 24:14,15 25:4,5,7 42:17 94:25 100:5

**lawyer** 10:10 24:8,12 65:23

**lawyers** 18:3 91:16 95:21

**lays** 101:16

**learn** 42:22 76:14 83:21,24

**learned** 43:3

**learning** 37:18

**led** 81:15 86:19 87:8

**left** 51:8 85:5,9 87:24 89:4

**legal** 18:10 82:19 100:4 102:12 104:20

**legalistic** 94:17,23

**lesser** 34:22

**letter** 77:20,25 78:6, 14,19,22 79:21,23 81:2,3,5 82:24 83:10 85:24 87:12 88:11,19 90:17 91:2,10,15,19, 25 92:25 93:21 95:23 96:7,9,13,15,22 97:4, 8,12,17,18,24 100:4 105:3,6,12,17

**letters** 79:16 98:15

**Lieu** 55:2

**light** 77:6

**likelihood** 94:10

**limited** 10:15,21 11:9 12:2,8,13,24 13:23 14:2,12 15:10,20 16:4,6,11 17:5,16,18 18:21 19:3,17 21:6 23:2 26:25 27:17,24 32:10,23 33:7,16,25 34:8 37:23 40:22 41:11 42:21 47:3,7, 17 51:3,10,13,17 52:9,10 53:3,4,17,25 54:11,14 56:8 58:15 60:3,25 61:9 62:12, 16 63:2 64:20 68:14, 18 69:4,13 70:19

**72**:9,19 73:24 74:8, 24 75:25 77:13,21 79:20 80:2,6,13 82:2, 12 97:4 98:8,23 106:4

**Limited's** 52:25 69:23 76:20

**lines** 55:23

**liquid** 37:9

**Lisa** 13:8

**list** 27:21

**listed** 79:20 80:3 82:13 89:8 105:5

**listened** 93:3

**litigation** 8:9 36:9 94:10

**lived** 29:25

**LLC** 49:3,8,10,13,17, 22 50:3 51:24

**loan** 10:23

**long** 28:14 69:8 100:12

**longer** 14:21 85:22 86:8,16,20 87:2,9 106:3

**looked** 94:3 100:16

**loop** 82:8

**loosely** 11:3

**lot** 13:9

**lower** 46:25

### M

**made** 15:19 27:5 34:9,14,23 36:4 37:22 38:20 43:12 44:23 45:2 47:25 48:9 66:15 70:15 72:9 73:6 74:23 76:19,24 77:22 80:3, 10 81:19 83:11 88:9, 22 89:2 91:4,5,18 92:16 96:2 99:11,12

**mail** 87:25

Case 21-03067-sgj   Doc 24-27   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:21-cv-01509-B   Document 16-27   Filed 06/26/24   Page 88 of 239   PageID 12664
Appendix 0627   Page 535/22

Index: maintain..outlined

**maintain** 18:12
20:13 85:24 91:16

**maintaining** 94:4

**make** 16:3 26:24 34:3
48:7 70:13 75:5,14
82:14 87:16 97:16
101:25

**makes** 13:25 14:11
54:15

**making** 67:17 70:25
75:13 76:2 79:21
80:6 83:22 84:5,8,13
85:2,10 86:7,8 88:7

**man** 30:22

**Man-** 68:19

**manage** 19:19 20:11

**managed** 72:12
74:25 75:17 76:3,21
77:2,5

**management** 6:11
13:2,18,19,22 14:16
19:24 28:13 32:23
33:6,15 36:15 62:15,
21,25 67:21 68:5,12,
25 69:14 70:19,21,22
71:22 72:12,17,21
73:25 74:3,9,11
75:17 77:10,12 96:11
98:25 99:16 100:19
101:8 102:3,15
103:6,18,23 104:3

**Management's**
68:20

**manager** 12:10
13:13,16 14:8 18:25
19:15 69:3,16 98:10

**managerial** 47:14

**managers** 14:3

**manages** 13:19,22
33:9 70:22 71:23
101:5

**managing** 33:11
49:7,21 50:3 51:23

**Mark** 14:20 63:21

**marked** 46:15 55:3
78:9 96:25 105:14

**married** 30:19,20

**master's** 24:22

**material** 100:9
101:21

**matter** 7:17 9:18,21
64:2,8 66:8

**matters** 25:3

**meaningfully** 21:23

**means** 11:12

**meet** 18:13

**Meeting** 55:2

**Mel-** 63:21

**Melissa** 63:21 66:17

**member** 49:7,21
50:3 51:23

**men's** 44:8

**mental** 94:3

**mention** 14:5 94:24
105:21

**mentioned** 7:8 13:12
14:4 20:18 22:13,14
25:17 41:3,6 53:24
66:17 71:5,10 77:16
81:16 86:23 95:2

**met** 81:14

**metric** 27:12

**middle** 16:23 94:12

**Mike** 63:20

**Miller** 105:13

**mind** 53:3

**mine** 28:13

**Minimal** 25:21

**minimus** 52:16
101:21

**minutes** 106:18

**missing** 52:18

**mission** 32:20

**mistaken** 85:6

**moment** 11:8 99:25

**Monday** 90:23 94:20

**Mondays** 21:14

**monetary** 104:21

**money** 12:15 14:8
19:23 32:19 36:18,19
37:6,10 54:6,13,18
58:20

**month** 21:25

**monthly** 21:4

**months** 23:20 30:15
63:18 64:25 65:12
66:22 67:7

**morning** 21:21

**Morris** 6:6,7 7:6,8
13:8,11 26:11,17
31:3,11 39:15 42:25
44:20 46:12,17 54:23
55:4,8,10,11,13,21,
24 56:20 59:15 61:23
62:4,8 64:5,11 65:22
66:5 73:3,8 78:3,10,
13 79:11 81:21,25
91:24 92:3 96:14,17
97:2 105:10,16
106:13,23 107:6

**motion** 41:12 42:8,
13 45:8 80:4,9,14
81:15 82:3,13,16

**mouth** 19:4

**move** 42:17 45:17
51:8 81:22 104:14

**multiple** 21:20 83:18
98:13

**N**

**named** 33:11

**names** 86:13

**Nancy** 60:22

**nature** 23:24 32:8
50:4 64:17,22 65:3,
11 94:18 100:16

**necessarily** 11:11

**needed** 27:5 66:24

**negotiating** 104:2

**Nelms** 35:5

**network** 18:3

**night** 21:21

**no-cause** 101:22

**Nobody's** 7:3

**nomenclature** 42:10

**Nonexempt** 58:23
59:2,5,9,11,18,23
61:7

**nonfinance** 99:6

**nonliquid** 37:8

**nonresponsive**
81:23

**North** 25:8

**northern** 28:18

**Notary** 6:4

**note** 72:23

**Noted** 107:12

**notwithstanding**
6:18 76:23

**number** 20:23 52:25
54:24 63:10 87:21,23
99:5

**nuts** 19:23 70:6

**O**

**object** 26:5,12 39:23
40:21 41:11 69:5
72:22 73:7

**objected** 37:24
38:19 41:25 84:16
100:6

**objecting** 26:8 40:10
42:8 101:17

**objection** 6:22 26:9,
20 31:2,10 32:25
33:8,17 38:2 39:14
40:24 42:2,8,21,24
43:11 54:4 59:14
64:4,10 69:18,23,24
74:4,12,19 75:18
83:13 87:18 92:17
100:7 101:16 104:25
106:7

**objections** 6:25
38:24 39:3 69:20
101:24

**obligation-type**
10:23

**obligations** 24:2
36:14 37:11

**obtain** 27:15 54:17

**obtained** 23:6 91:13

**occasion** 27:2,3

**occasions** 7:11

**occurred** 23:8 25:22
38:9,18 95:7

**occurs** 21:17

**October** 7:14,18
62:22 63:3 85:7

**office** 20:21

**officer** 16:16 90:5

**officers** 16:12 17:12
49:14 50:19 57:20,25
58:11 59:12,18

**offices** 105:24 106:6

**Okada** 14:25

**Okada's** 14:21

**ongoing** 74:14 91:4

**operating** 104:4

**operations** 50:6

**opinion** 86:2 87:15

**order** 34:20 80:5
82:14

**organically** 25:22

**organization** 10:25
20:6

**Organizational**
46:14

**original** 38:9 40:8,13
81:3 82:24

**originally** 58:20

**out-** 101:23

**outlined** 69:19
101:23

Case 21-03067-sgj   Doc 24-27   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:21-cv-01503-B   Document 16-27   Filed 05/17/24   Page 89 of 239   PageID 1265
Appendix 627 Page 817 of 240 Page 89 of 239 PageID 1265

**overpaying** 70:8

**overrode** 42:2

**overruled** 37:25
39:24

**owed** 24:3

**owned** 13:23 47:7
71:24

**owner** 58:14,16

**owners** 53:25 54:2

**ownership** 45:20
47:14

**owns** 53:16

---

**P**

**p.m.** 62:6,7 106:21,22
107:12

**Pachulski** 6:8

**paid** 32:20

**par-** 54:19

**paragraph** 78:17
79:21 80:3 82:5,13

**part** 11:2 23:13 66:3
68:18 101:14

**partial** 101:11,13

**Partially** 101:10

**participate** 54:5 82:3

**participation** 52:17
54:17,20

**parties** 6:16 13:5
83:6

**partner** 49:4

**partnership** 52:10
53:4,17

**parts** 92:19

**party** 72:20

**past** 7:14,18

**patent** 8:5,9,11,14
24:8,10,12 99:20
100:2

**Patrick** 63:21 64:18,
24 65:13 66:9 67:8

**Patrick's** 65:17

**pausing** 34:19

**paying** 70:4

**payment** 36:14
70:10,14 71:11

**people** 12:21 18:2
19:21 20:3,23 32:5
33:10 65:24 75:13,14
86:7

**perc-** 89:15

**percent** 47:7 52:9
53:4,7,9,11,14,16

**percent/99** 53:9

**perfectly** 91:19

**perform** 50:5

**performance** 68:20
69:2,15 102:3,11

**performed** 102:14

**period** 22:15,16
23:19 80:6

**periodically** 18:18
102:9

**permit** 104:2

**pers-** 79:20

**person** 8:8 14:11
15:18 20:15 49:16
64:16 90:10

**personal** 30:10

**personally** 11:8

**persons** 14:13 90:11

**perspective** 100:17

**philosophy** 26:4

**phone** 23:6 44:9
63:10 65:24 87:22
91:8 95:7,12,14

**phrase** 13:9

**pick** 95:7

**piece** 21:16

**pieces** 71:5

**place** 7:13 66:13

**plan** 38:24 47:21

69:20,23 92:11 100:5
101:9,16 104:25

**planner** 20:10

**play** 11:8 32:22 33:5

**played** 35:3

**pleasant** 35:10

**point** 18:5 32:18
35:16,24 36:5,10
40:3 64:15 81:6
99:21

**points** 81:6

**policy** 27:21

**Pomerantz** 105:13

**pool** 32:24 33:7,10

**portfolio** 10:25 69:3,
16 98:10,24

**portion** 10:24

**portions** 9:14

**pose** 70:3

**position** 23:21 48:14
62:20 66:11 76:20
100:8

**possibly** 27:25 36:7
99:14

**post-** 104:12

**postbankruptcy**
21:10 22:6,16
104:11,13

**postplan** 104:13

**potentially** 104:20

**power** 33:14

**practical** 100:10
104:21

**pre** 22:15

**prebankruptcy** 21:9
22:5

**precise** 69:10

**preclude** 101:18

**precludes** 21:22

**predefined** 36:17

**preliminary** 99:10

**prepared** 46:6

**present** 60:19

**president** 57:4,21
58:2

**prevented** 80:5

**previous** 73:19

**previously** 24:4
33:11,19 81:12,13
86:14 87:2 98:6

**prior** 16:25 27:2,4,16,
22 33:22 34:11 40:16
43:11 79:18 80:10
88:10,17 97:17
104:15,16

**privilege** 65:21 66:4
79:9

**problem** 70:4 102:21

**problems** 36:21

**proceedings** 62:6
106:21

**proceeds** 37:9

**process** 86:17,21
97:14 99:15 104:18

**program** 29:22

**proof** 38:9,11 40:4,8,
12,13 46:22

**proofs** 39:11,12,19,
23

**provide** 79:3

**provided** 74:2 79:8

**provisions** 104:19

**Public** 6:4

**publicly** 32:4

**pull** 54:21

**pulled** 42:15

**purportedly** 77:20

**purposes** 18:11,12
50:7

**pursuant** 9:22 70:21
71:23 72:16 101:4

**put** 9:10 21:8 34:20
37:14 46:13 50:25

51:3 54:23 78:3
105:10

**putting** 75:13

---

**Q**

**qualified** 87:16

**quest** 70:2

**question** 8:19 10:5
14:9 19:9,13 26:6,15,
19 36:25 43:7 44:22,
24 48:20 79:12
81:22,24 82:9 88:17
89:13,23 92:21 99:4
103:13

**questions** 8:18
50:12,16 55:12 69:8
89:21 106:25 107:4,
11

**quickly** 35:22

**quo** 85:25 91:17 94:4

---

**R**

**raised** 74:13 92:10

**rang** 87:22

**re-** 66:11 72:7 82:9
100:7

**reach** 95:21

**read** 9:14 73:12

**reason** 9:13 34:19
68:24 76:5

**reasons** 29:11 67:16

**recall** 10:3 14:24
28:2 35:25 44:22
50:8 58:7 63:23 64:2,
7,22 65:9,11 67:5
73:19 80:16 90:24
94:24 97:3

**receive** 12:15 16:19
49:20,24

**received** 9:25 24:22
34:24 45:6

**recently** 38:18 73:18

**recess** 62:5 106:20

Case 21-03067-sgj    Doc 24-27    Filed 09/29/21    Entered 09/29/21 17:31:37    Desc
Case 3:21-cv-01605-B    Document 16-27 Filed 06/03/24    Page 90 of 239    PageID 1266

Index: recite..short

**recite** 82:9

**recognize** 87:23

**recollection** 8:3 18:18 23:15 63:13 85:6 94:22 97:5 105:9

**recommendation** 43:23 44:5,7,23 45:2

**reconvene** 61:24

**record** 6:14,25 72:23 73:6 100:13

**recurring** 27:11

**reduced** 40:12

**reduces** 94:10

**refer** 11:3 20:21 100:18

**reference** 78:18

**referred** 12:16 70:5

**referring** 13:17 60:10 65:7 86:11

**reflected** 48:8

**reflects** 46:10

**refresh** 18:18 105:9

**regard** 38:25

**registry** 35:18

**regularly** 20:12 64:13

**regulations** 25:20

**relate** 101:22 104:22

**related** 34:24

**relating** 7:19 32:13

**relation** 67:22 68:6

**relationship** 29:10 30:5 32:8

**relative** 104:11

**relied** 97:13

**rely** 91:7,12

**remember** 59:7 105:17

**remotely** 6:19

**removal** 84:23 104:23

**remove** 81:10 98:4

**removed** 86:24 98:9

**reorganization** 100:6 101:9

**repeat** 14:8 15:16 33:2 41:2,18 72:5 89:22 90:3

**rephrase** 89:23

**replacement** 84:24

**report** 18:21

**reporter** 6:21 44:3 55:10 107:9

**reports** 102:8

**represent** 74:15

**representation** 100:15

**representative** 16:15 73:2,4 89:8 90:5

**represented** 95:15

**representing** 6:15

**represents** 6:9

**request** 34:24 35:2, 11,22 42:16 70:2,14 77:16,21 79:22 81:8 83:10,11,16,17,18 84:21 91:5,16,18 92:4,15 96:2 98:14

**require** 27:21

**require-** 81:14

**required** 27:15

**requisites** 18:13

**res-** 101:6

**research** 24:23,25 25:2

**reservation** 6:24

**reserve** 107:3

**resign** 66:15

**resigned** 62:20

**resigning** 66:11

**resolutions** 46:21 53:2

**resolve** 42:15

**resolved** 92:12

**resonates** 99:19,22 100:3

**respect** 7:21 9:17 12:12,14 25:16 33:6, 14 36:13 38:9,17 40:8,11,20 41:24 48:15 50:9 64:20 67:3 68:18 71:17 79:23 101:14

**respective** 6:16

**responsibilities** 12:7,9 19:2,16

**responsibility** 64:19

**responsible** 86:14

**responsive** 69:25

**restate** 82:9

**reveal** 32:4

**review** 83:4

**reviewed** 100:7

**Ri-** 78:11

**right-hand** 46:25

**rights** 101:19 103:9, 10 104:23

**rise** 82:17

**role** 11:8 12:2,12,13 20:19 32:22 33:5 48:17,22 76:7

**room** 6:21 9:8 35:9 44:8

**roommates** 29:24, 25

**rule** 27:4

**rules** 25:20 27:21

**runs** 20:5

**Russell** 35:5

## S

**sales** 74:14 81:8 91:4 94:8,9

**Samsung** 8:6

**Santa** 52:15 56:12, 13,23 58:10

**scenario** 45:7

**scheduled** 36:16

**school** 24:14,15,21 25:4,5,7 28:15 29:17, 19

**Schroth** 63:22 66:18, 21 67:8

**scientist** 24:25

**scott** 6:1,12 7:1,7 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,14,18 47:1 48:1 49:1 50:1 51:1, 2,4 52:1 53:1 54:1,25 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,9 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,24 73:1 74:1 75:1 76:1 77:1 78:1,6 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,22 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1,12 106:1,15,23 107:1,16

**screen** 9:10,12 33:3 38:8 55:15 78:4

**scroll** 55:21 78:10 105:20

**seeking** 99:14

**Seery** 35:4 63:5,7,13 67:9,16,19,24 68:3, 10,17 77:9,12 87:16, 19 88:13,22 89:10 95:8,12,14,22

**select** 70:9 71:12 75:3

**selected** 56:3,4

**selection** 75:7,12,14

**sell** 76:19

**send** 45:11

**sending** 88:11,18 95:23 96:7 97:11

**sentence** 92:5

**sequence** 36:6 93:15

**series** 8:18

**serve** 10:7 30:21 32:9 51:19,22 52:2,5 57:4

**served** 10:3,11 16:24 17:8,13

**serves** 60:15

**service** 19:19 57:21 58:2 90:7

**servicer** 62:17 72:13,17 83:23 98:4, 10 104:16

**services** 16:20 68:9, 13,21 70:5,6,7,18 71:6,7,15 74:2 81:12

**serving** 21:5 49:21 58:11

**set** 11:18,19 19:19 24:5 104:24

**sets** 100:8

**settlement** 40:21 41:13,16 42:9 43:11

**share** 94:19

**shared** 30:4 32:3 68:9,13,20 70:18 71:7,15

**short** 12:22 61:24 106:14

Case 21-03067-sgj   Doc 24-27   Filed 09/29/21   Entered 09/29/21 17:31:37   Desc
Case 3:21-cv-01603-B   Document 16-27   Filed 06/29/24   Page 91 of 239   PageID 1967

Index: show..transferred

**show** 82:25 92:18

**showed** 81:4 82:25

**showing** 9:9

**shown** 52:22

**shows** 53:3,6

**sic** 73:22

**side** 51:5,8

**sign** 66:24

**signature** 55:23

**signed** 93:21

**significant** 36:13

**simple** 44:21

**simply** 26:8

**single** 88:21

**sir** 55:15 74:21

**sister** 60:9,11,14

**sit** 68:23 79:25

**siv-** 60:14

**small** 33:3

**smallest** 23:16

**sole** 17:4 18:20 19:17 34:7 47:16 50:22 51:12,16 73:23

**soon-to-be** 100:13

**sophomore** 29:4

**sort** 64:15 100:5,16

**sorts** 24:7

**soup** 19:23 70:6

**source** 30:12 87:7

**speak** 40:15,17 43:9 63:21 95:8,22 102:2

**speaking** 8:17 102:25

**speci-** 86:24

**specifically** 11:12 36:25 40:9 86:22

**specifics** 79:13

**speculate** 40:7

**spend** 22:25

**spent** 20:2 21:9,10

**spoke** 35:24 63:19 65:10 67:9 87:19

**spoken** 7:3 63:8,12, 17,19

**standpoint** 104:20, 21

**Stang** 6:8

**start** 29:2 46:24 63:7

**started** 82:8

**stated** 73:6

**statement** 98:2

**status** 85:25 91:17 94:4

**step** 8:24

**steps** 23:10 39:22 81:10 82:19 96:10 98:24 101:17

**sticking** 45:16

**stop** 77:17,21 82:6 83:6 85:13,16 91:5

**stoppage** 84:21

**stopping** 94:8,9

**strain** 30:12

**strained** 30:7

**strategy** 26:4

**strike** 48:11 81:22

**structure** 11:7 12:16 45:18,20 46:15 47:19,20 48:2,8,10, 13 52:19

**subject** 6:23 7:17 64:2,7 66:8 81:2 98:13

**submitted** 42:14

**subpoena** 9:22,25 10:4,7,12

**Subscribed** 107:18

**subsequent** 6:18 36:11 38:10 81:10

**subset** 12:14

**subsidiary** 104:10

**substance** 9:19 44:14 64:23 65:4,19 80:24 91:2

**substantial** 83:15 104:22

**substantive** 81:9 100:4

**substantively** 92:12

**substitute** 104:14,15

**success** 100:13

**sufficient** 26:10 82:19

**suggest** 99:7 102:13

**suggested** 96:8

**suit** 96:3

**suite** 106:6

**summarize** 39:10

**Super** 7:25

**support** 40:4 102:19 106:9

**Surgent** 15:4 20:17

**suspects** 63:20

**sworn** 6:3 107:18

---

**T**

**taking** 101:18

**talk** 45:18

**talked** 22:16 61:6 98:5

**talking** 13:4 57:5,9 102:12

**tangent** 44:25

**tax** 17:25 18:10

**taxes** 20:5

**team** 85:20,21,22 86:25 87:9

**Tech** 29:16

**technical** 11:10

74:15,18

**ten** 11:17 17:6 83:24

**term** 20:22 100:21,22

**terminate** 96:10 98:24

**terminating** 99:15

**termination** 100:12, 14

**terminology** 42:9

**terms** 12:19 13:2,6 16:16 45:22 52:16 69:6 94:25

**test** 45:24 47:10 63:14

**testified** 6:5 9:20,21 22:4 62:10 75:4 85:4

**testify** 7:22 37:3

**testifying** 72:24

**testimony** 89:18

**text** 45:11

**there'd** 94:14

**thing** 92:7 99:22 100:3

**things** 17:23 21:25 23:12 24:3 29:19 30:16,17 64:16 100:15

**thinking** 37:13

**third-party** 73:9 101:19

**Thomas** 15:4 20:17 24:23

**thought** 18:5 21:7 32:16 38:3,15 40:10 42:2 44:2 48:17 68:4 75:4 77:4 85:4 94:9, 12 95:9,13,25 102:24

**thoughts** 39:2

**threw** 96:3

**Throckmorton** 63:20 64:3,9,14 67:8

**Tim** 15:4

**time** 9:11,24 11:25 16:25 17:5,12 18:8 19:25 20:2,24 21:2,4, 9,10 22:10,12,14,18, 25 24:13 27:25 28:11 30:8 34:21 35:16,24 40:16 41:19 42:22 43:12 45:8 50:8 53:8 57:22 61:25 63:2 70:8 71:5 80:7,10 88:10,18 89:3 98:20 106:2,9,16,24 107:7, 12

**times** 13:4 63:12,15

**timing** 40:19

**title** 11:10,12 24:25

**today** 6:11 7:9 9:9 26:10 30:6 68:23 86:4 98:22 106:11

**told** 45:3 89:9 91:20 92:8

**topic** 40:16 45:18

**touch** 27:9

**track** 100:13

**trade** 67:17

**traded** 85:14

**trades** 82:6,15 83:7, 22 84:5,8,13 85:11 86:4 87:10,16

**trading** 77:17,22 84:21 85:14,16

**training** 24:19 25:9, 15

**transaction** 88:22, 25

**transactions** 24:7 27:16,23 80:6 88:14 89:11 92:10 93:25 95:10 96:2

**transcript** 6:23 7:2 83:5

**transfer** 29:11 35:12 76:25

**transferred** 24:5 29:3,6,13,14,20 35:18

**transfers** 64:16

**transition** 23:8

**transitioned** 25:4

**transmitted** 35:2

**trick** 9:11

**triggers** 27:9

**trust** 58:23 59:2,5,9, 11,18,23,25 60:6,16 61:7,8,12,15,16,20, 22

**trusted** 32:12

**trustee** 11:13 58:25 59:4,22 60:5,15,19

**trustees** 59:8

**trusts** 30:25 31:6 58:18 60:2,24 61:2

**tuck** 36:18

**tucked** 36:19

**Tuesday** 21:15 90:21

**turn** 71:19

**turnover** 20:20

**type** 18:5,7

**U**

**Uh-huh** 9:16

**ultimately** 36:8 47:23 54:15 70:15 75:3

**unanimous** 54:25 55:17

**unaware** 70:10

**under-** 23:14 37:12

**understand** 9:4 11:13,22,23 14:14 15:15 17:23 18:8 19:10 23:11 27:18 29:19 31:12 33:13 36:6 38:20 42:5,9 43:3 54:13 70:24 71:18 73:21 81:6 89:3 100:24 101:7 102:8 104:9,24 106:3

**understanding** 11:16 13:21 17:22 18:16 23:24 29:10 32:7,15 47:2 49:6 50:6 53:15 60:14 61:5,18 65:16 73:13, 14,15 83:3 84:22 97:19,22 101:11,13 103:7

**understood** 86:6,13

**undisputably** 37:6

**University** 24:19,21 25:8 28:24 29:5,15, 16

**unlike** 20:9,10

**updated** 88:2

**urgent** 44:7

**usual** 63:20

**UVA** 28:24,25 29:2, 12,21,24

**V**

**valid** 42:12

**vehicles** 58:19 77:5

**versus** 27:11 34:22 47:14 83:17 85:9

**view** 83:15 87:15 94:17,19,23 103:12, 13

**views** 103:2

**Virginia** 24:20 28:24 29:16

**virtual** 9:7

**virtue** 8:10 82:24

**vision** 32:13,17

**voice** 87:25

**voluntarily** 9:20

**volunteered** 36:3 88:8

**volunteering** 95:12

**W**

**wanted** 17:24 29:18

**Watson** 24:24

**wedding** 30:22

**week** 21:11,18,20 60:20 67:10 87:20

**week-to-week** 19:25

**weekly** 21:3

**weeks** 21:18 60:20 66:14

**well-known** 29:21 75:22,23

**wire** 64:16

**with-** 45:3

**withdraw** 43:10 45:3,4 92:21 96:4

**withdrawing** 42:21

**withdrawn** 13:20 16:10 26:22 28:3 31:4 34:4,6 39:16 45:8 52:4 57:18 59:16 63:25 64:6 65:10 77:10 79:17 86:10

**word** 41:2

**words** 8:25

**work** 42:6

**worked** 15:3 42:6 85:22

**working** 20:2 38:14 95:16

**works** 23:14

**world** 16:15 31:23 75:16,20

**Wright** 78:7 96:23

**write** 45:10

**written** 8:11 54:25 55:18 62:14 77:20

**wrong** 22:11 68:25 69:15 73:25 75:6

**wrote** 8:6,9

**Y**

**year** 29:4,7 85:15 105:25

**years** 7:15 8:2 11:17 15:3 17:6 18:17 28:24 29:8 31:8,20 32:2 59:6 60:17 73:20 76:10 83:25 84:5

**yes-or-no** 79:11

**yesterday** 26:9

**yielded** 81:3

**York** 24:24 35:8

**Z**

**Ziehl** 6:8

# APPENDIX 28

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |

**RESPONSE OF THE CHARITABLE DAF FUND, L.P., CLO HOLDCO, LTD., AND
SBAITI & COMPANY PLLC TO SHOW CAUSE ORDER**

1

## I. INTRODUCTION

We write in response on behalf of the Charitable DAF Fund, L.P. (the "DAF"), CLO Holdco, Ltd. ("CLO Holdco"), and Sbaiti & Company PLLC (altogether, the "Respondents").[1]

We are deeply concerned by this Court's adoption of the name-calling initiated by Movants. Identifying Respondents as the "Violators" in the order to show cause suggests that this Court has prejudged the issues before it and creates the appearance of impropriety. We are equally concerned that the show-cause order was communicated to us by Debtor's counsel, verbatim, ***three days before*** this Court actually issued that order, as if Debtor's counsel speaks for the Court and has special, advance access to its pronouncements. This also creates the appearance of impropriety.

We are especially concerned that any prejudgment this Court may have made is based solely on the deliberately misleading statements in Movants' brief. Respondents respectfully submit that the issue before the Court here is not whether Mr. Seery has been sued in violation of an order of this Court, as Movants want this Court to believe. Seery has not been sued at all.

The issue here is whether Respondents should be held in contempt for ***asking permission from the district court***, which has original jurisdiction over the action, to sue Seery. Movants claim this Court has stripped the district court of jurisdiction—construing this Court's reference to "sole jurisdiction" as excluding the district court from which this Court derives its jurisdiction. Not only did we not violate this Court's orders by filing a motion for leave in the district court, we complied with them. And even were it otherwise, no case cited in the Motion, and no case we could find, has issued sanctions as a result of a party asking a court for leave to do something, even if it was the wrong court.

---

[1] The undersigned do not represent the other persons required by this Court's order to appear in person on June 8, 2021, and therefore, this Response is on behalf of the named respondents.

001051

Thus, we respectfully submit:

- that we have not violated any order of this Court,

- that we have carefully studied and complied with those orders,

- that we have not been sneaky or deceptive, and

- that we fully disclosed to the district court, to opposing counsel, and to this Court both what we were seeking to do and why doing so would not violate this Court's orders.

In addition to misrepresenting the law, Movants have misrepresented the facts. They have loaded their motion with histrionics, character smears, and half-truths aimed at distracting this Court from the actual record. We respectfully ask this Court to carefully consider Movants' representations and compare them to the record, as we have attempted to do below. We submit that the record shows that Respondents have not violated any order because we did not sue Seery (the only prohibited act we have been accused of).

We respectfully ask this Court to carefully consider the reach of its own powers—most importantly its power to strip the district court of congressionally granted original jurisdiction—which we respectfully contend this Court did not and cannot do.

We respectfully ask this Court to carefully consider the relief requested by Movants, who claim to have incurred not one red cent in costs or fees defending Respondents' motion for leave, the motion that forms the sole basis for their contempt motion. Because the relief requested is punitive rather than compensatory, we respectfully submit that it is beyond this Court's powers to award non-compensatory damages. And because Respondents have asked this Court for relief from the orders that Movants claim were violated, the present Motion is wholly unnecessary.

Finally, we respectfully ask this Court to expunge from its docket any order prejudging Respondents, or anyone for that matter, by referring to us as the "Violators." Justice requires no less.

## II. PROCEEDINGS IN THE DISTRICT COURT

The DAF is a charitable organization that invests some of its funds as part of its long-term mission to provide financial assistance, primarily in the Dallas/Ft. Worth area to such notable causes as:

- Committing several millions of dollars to support a facility that helps the victims of domestic violence in North Texas—the new facility has, since 2016, supported over 2000 victims each year;

- Supporting children's advocacy centers, as well as education initiatives for underserved children, in addition to education programs to help in things like job training and adult education in underserved populations;

- Supporting organizations that care for homeless military veterans and other institutions that help retrain and support veterans' reintegration, into;

- Supporting the arts in DFW such as proving funding the Perot Museum and the Dallas Zoo; and

- Funding medical research, among other things.

All in, the DAF has helped fund over $32 million in in grants and committed millions more in prospective funding. To meet these commitments, the DAF has an obligation to generate the funds through its investing activities. Doing so marries the charitable mission with the benefits of our market economy.

For that reason as well, the DAF dutifully safeguards its investments and protects its rights when it has been damaged. Hence the underlying lawsuit in the district court. Without the ability to safeguard its investments, the DAF's ability to fund public causes would be severely hampered, costing the people of Dallas/Ft. Worth millions in benefits given to area families and children in need.

001053

A. **Respondents' Complaint in District Court Raises Significant, Recently Discovered Issues**

    The basis of the DAF's action pending in the district court—the action in which Respondents filed their *Motion for Leave to Amend to Add James Seery*[2]—can be summed up in three simple bullets:

- The defendants, including Debtor, had duties under the Investment Advisers Act of 1940 ("Advisers Act") to the DAF and its subsidiary, CLO Holdco. Those duties arise by operation of law as a result of the defendants' role as a registered investment adviser to the plaintiffs. And those duties are unwaivable.

- The Harbourvest settlement was predicated on a valuation of the HCLOF assets at $22.5 million, which Seery testified was the value of those interests. That statement was not true—but it was relied upon by the plaintiffs at the time—there would be no justification for spending $22.5 million in cash to get $22.5 million in contingent assets. It was only in March 2021, two months after Seery's testimony, that another HCLOF investor brought to light the fact that the interests were worth almost double the amount testified to, and that Seery knew or should have known about that differential, in his role as a registered investment advisor.[3]

- Seery's duty under the Adviser's Act required him to disclose that differential to the DAF and disclose the opportunity to the DAF to purchase the interests. By not doing so, the defendants violated those unwaivable federal duties in connection with the Harbourvest settlement that this Court approved earlier this year.

    The DAF and CLO Holdco to file their Original Complaint in the district court to protect their investment. That Complaint, however, purposefully did *not* name Seery as a defendant. And the Complaint does *not* ask to void, undo, or reverse, the Harbouvest Settlement. Nor is reversing the releases or the "allowed claims" as consideration between Harbourvest and the debtor a necessary predicate to relief in the Complaint. For example, one avenue would be for the defendants to simply sell the Harbourvest interests to the DAF for $22.5 million—which should

---

[2] APP_0027-0036.

[3] APP_0015.

be net-neutral to the debtor, and would actually give the debtor $22.5 million more in cash ***now***

than what it received under the Harbourvest settlement.[4]

Because of the Orders limiting suits against Seery, Respondents did not name him, but

instead filed their *Motion for Leave to Amend to Add James Seery* on April 19, 2021 (the "<u>Motion</u>

<u>for Leave</u>"), informing the district court (1) that this Court had entered orders limiting suits against

Seery, (2) attaching the orders to the motion, and (3) briefing several good-faith, statutorily-based

reasons why those orders should not prohibit what we were asking the district court to allow. This

Motion for Leave is what Movants contend merits holding us in contempt.

Respondents submit that a fair recitation of the Motion for Leave cannot support a

contempt finding.

## B. <u>Movants Make Deliberately Misleading Statements About Us</u>

Movants' brief makes no argument that Respondents' suit in the district court violates any

order. Their argument focuses solely on the Motion for Leave, which the district court denied

without prejudice on the basis that it was premature.[5] To support their argument, Movants' brief

misstates the record in several ways, the highlights of which we identify here:

### 1. Movants Misrepresent Respondents' Prior Knowledge of the Key Facts Underlying the Harbourvest Settlement

The Movants have misrepresented that "CLO Holdco knew of all aspects of the

[Harbourvest settlement, which is the transaction at issue in Respondents' action in the district

court] before [this] Court granted the Debtor's Settlement Motion."[6]

---

[4] The proposed $22.5 million would add liquidity to the estate and obviate the need for a questionable exit loan.

[5] APP_0120.

[6] APP_0001-0026.

001055

This representation is false in a significant and material way. As noted above, the Harbourvest settlement was predicated on, among other things, the debtor purchasing Harbourvest's interests in Highland CLO Funding, Ltd. for $22,500,000 in consideration.

As alleged in the Original Complaint, the value of Harbourvest's interest was equal to, roughly, 49.98% of the net asset value of the assets of Highland CLO Funding, Ltd. ("HCLOF"). The net asset values were calculated internally at Highland Capital Management, LP (HCMLP or the debtor)—the registered investment advisor for both Highland CLO Funding, Ltd. and for the DAF/CLO Holdco. In the quarter ending December 31, 2020, the net asset value of HCLOF was *almost double* what Seery represented it to be. But those internal values were never communicated prior to the hearing. Seery's self-serving denials are of no moment because he was a registered investment advisor to the DAF; thus, he *should have* calculated those values properly and represented them to the DAF, the failure to do either of which is equally a breach of duties imposed by federal law. It was only in March 2021 that another HCLOF investor brought to light the fact that the interests were worth *their true value*.  As a registered investment advisor to the DAF, Seery knew or should have known otherwise and should have disclosed it.[7]

Thus, the DAF has alleged that Seery, as the person in the middle of these transactions, and one who is cloaked with heightened federally-imposed fiduciary duties under the Advisers Act, concealed material information from the very advisee he owed fiduciary duties to, and consummated a self-dealing transaction at the expense of an advisee to benefit himself, to benefit the debtor, and to benefit its creditors. This Court's orders do not immunize him from the consequences of these acts and omissions.

---

[7] APP_0015.

001056

Unsurprisingly, no case has held that someone in the position of Seery, as a registered investment advisor subject to the federal Advisers Act's rules and regulations, can shirk federally-imposed fiduciary duties to its advisees for the mere expediency of enriching its wealthy creditors—whether in bankruptcy or not. No case has held that being insolvent is an exception to the Advisers Act either.

### 2. Movants Misrepresent Respondents' Communications About This Court's Orders

Movants represent in their brief that Respondents "simply ignored," "intentionally flout[ed]," and "willfully disregard[ed]" this Court's orders,[8] when they know full well that was not the case. The record is clear on this fact.

Before Respondents filed the motion for leave that provides the basis of Movants' motion here, Respondents reached out to Debtor's counsel to confer regarding that motion:

> Mr. Pomerantz,
>
> Mazin [Sbaiti] and I intend to move for leave today in the district court seeking permission to amend our complaint to add claims against Mr. Seery. They are the same causes of action. We believe we are entitled to amend as a matter of course. ***But we will also raise and brief the bankruptcy court s orders re the same.***
>
> Can we put your client down as unopposed?
>
> We appreciate your prompt reply.[9]

Plainly this communication does not support Movant's representation that we ignored or disregarded this Court's orders. Their brief selectively quotes only the third paragraph of this email—"Can we put your client down as unopposed?"—while omitting the context. Apparently only the one line fit the narrative that Movants wished to present to this Court.

---

[8] Memorandum ¶¶ 1, 3 & n.3, 51, 53.

[9] APP_0123.

001057

Counsel responded by informing us that this Court's gatekeeper orders[10] prohibited us from filing our motion. We responded as follows:

> Mr. Pomerantz,
>
> Thank you for sending the orders and for keeping in mind that we're new to a matter that, in the bankruptcy court, has over 2,000 filings. We may well have missed something. But we have seen and carefully studied the orders that you sent. And we do not believe they prohibit the motion we are filing, which briefs them and explains why we don't believe they prohibit our motion.
>
> We also don't think the district court will both decide that we're wrong about this and nonetheless grant our motion. As I read the orders, that's the only theoretical way that a motion for leave could violate them.
>
> And if the district court does grant our motion for the reasons we ask— because it finds that the bankruptcy court exceeded its jurisdiction or because it finds that our motion for leave (which can be referred) complies with the bankruptcy court orders—then we don't think the bankruptcy court can or will overrule the district court.
>
> So please know that we are not willfully violating those orders, as your email suggests. Quite the contrary, we are giving them careful attention. Which is why we are seeking leave rather than amending as of right.[11]

Separately, counsel also explained:

> Jeff,
>
> Our meet and confer is for our motion for leave to amend to add [James Seery]. I believe, per those orders' language, we are following the court's instruction.
>
> We are not unilaterally adding him.
>
> I take it you want us to put you down as " opposed" on the certificate of conference?[12]

---

[10] APP_0101-0118.

[11] APP_0121..

[12] APP_0122.

It is fair for Movants' counsel to disagree with us as to what this Court has and has not prohibited in the gatekeeper orders. It is not fair to represent that we chose to simply disregard those orders, or that we did so in bad faith. The record contradicts that. And Respondents' Motion for Leave specifically articulates good-faith reasons why this Court's orders do not prohibit bringing suit against Seery for his post-petition conduct in violation of the Advisers Act, the SEC's regulations under that statute, and other federal and state laws.

### 3. Movants Misrepresent Respondents Motion As Effectively Ex Parte

Movants attempt to gloss over their own apparent *ex parte* communications by gaslighting the Court and Respondents with a preemptive accusation. Movants misrepresented in their brief that Respondents attempted to get a ruling on the Motion for Leave "effectively on an *ex parte* basis."[13] This is deceitful. Movants obviously knew that we had conferred with them in advance before filing our motion. And they knew we had filed it as an "opposed" motion, guaranteeing that it would not be granted without an opportunity for them to submit a brief. Indeed, the district court denied the motion specifically because not all defendants had yet been served. The minute order states that the denial is without prejudice to refiling once all defendants have been served.[14]

Most importantly, the notion that we attempted to go behind their back or to sneak something past the district court vitiating this Court's Orders is wholly refuted by the Motion for Leave itself, which quotes from and attaches the very orders of this Court that Movants accuse us of completely disregarding.[15]

### 4. Movants Misrepresent Respondents' District Court Action

---

[13] Memorandum ¶ 4; *see also id*. ¶ 53 (implying sneaky, ex parte conduct by stating, "they simply ignored the Orders and sought permission from the District Court—before any of the defendants had appeared in the action").

[14] APP_0120.

[15] APP_0100-0118.

001059

Movants claim that Respondents' lawsuit in the district court action is an attempt to reverse or undo the Harbourvest settlement that this Court previously approved. This is wrong. And it is refuted by the lawsuit itself, which requests no such relief but instead seeks damages. Respecting the finality of the Harbourvest settlement need not require exoneration of those who breached their duties, including Seery, by keeping critical information from CLO Holdco or its parent, the DAF, whom Seery was a registered investment advisor for at the time of the transaction.

### III. ARGUMENT

#### A. <u>This Court's Orders Do Not Immunize Seery from All Actions</u>

We do not doubt that Movants intended for this Court to bar, practically speaking, all lawsuits that might implicate Seery in any way. Certainly insulating him from any litigation whatsoever has been a matter of considerable attention in the now protracted proceedings before this Court. But this Court's orders do not go that far. Nor could they, without trampling federal notions of limited jurisdiction, constitutional concerns regarding comity, due process, and takings, and the relationship between the Article I bankruptcy court system and its referring courts.

Thus, it is not surprising that Movants make no argument here that the Original Complaint Respondents filed in the district court action violates any order of this Court. Although that Complaint mentions Seery and his acts and omissions, in detail, it does **not** name him as a defendant and therefore is **not** the commencement or pursuit of "a claim or cause of against" him, which is all that the orders say is prohibited.

The sole act that Movants do argue is a violation—an argument to which they devote a mere two pages of their 22-page memorandum—is Respondents' motion for leave to amend. As we have made clear, the issue before this Court is not whether Respondents violated any order by **suing** Seery. He has not been sued. The issue is whether Respondents should be held in contempt

11

for ***asking for permission to sue*** Seery. And for doing so in the district court, which Movants say this Court has stripped of its statutorily granted original jurisdiction.

This is a remarkable request. Our research uncovered no precedent of any kind for a finding of contempt as a result of a motion for leave or any other kind of request for permission. Neither have we found any cases holding a party or its counsel in contempt for making a request in the wrong court. Perhaps this is why Movants' argument is so short and devoid of authority.

Moreover, Movants seem to have assumed that the Motion for Leave would be granted, and that the proposed amended complaint naming Seery would therefore be automatically filed. That is not what was intended, and is not what happened,. To the contrary, Respondents expected that the motion for leave would likely be referred to this Court for a report and recommendation. And Respondents planned, if necessary, to move to withdraw the reference under 28 U.SC. § 157(d). In addition, Respondents carefully avoided asking to have our proposed amended complaint "deemed filed," going so far as to submit an amended proposed order when we realized that we had inadvertently used such terminology in our initial proposed order.[16]

All of these acts are legal and have a sound basis in the statutes and in the case law. None of them can be said to be in "bad faith."

**B. Respondents' Action in District Court Is Not Prohibited by This Court's Orders**

Movants fail to identify the provision in this Court's gatekeeper orders that they claim Respondents have violated. Instead, they summarily declare the orders "definite and specific," and assert that Respondents violated them "by filing the Seery Motion."[17] Of course, the "Seery Motion" is merely Respondents' Motion for Leave. So Respondents are left to decipher precisely

---

[16] APP_0125.

[17] Memorandum ¶ 59.

12

001061

how Movants think that asking for permission to sue Seery constitutes a violation of any provision of the gatekeeper orders, which provide, in relevant part,

> No entity may **commence or pursue** a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have **sole jurisdiction** to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.[18]

_**First**_, Respondents submit that asking for permission to do a thing does not equate to doing a thing. School children asking for permission to go to the restroom are not, obviously, going to the restroom by the mere act of asking. In the same way, our motion for leave to commence an action against Seery cannot, as a matter of law, constitute commencing an action. An alternative interpretation would render the order void for vagueness.

_**Second**_, Respondents submit that pursuing a claim or cause of action can only follow—not precede—commencing such action. That commencement must happen first is inherent in the term "commence." Therefore, as a matter of law, our motion for leave cannot amount to pursuing an action.

_**Third**_, Respondents submit that the terms of the order saying that "this Court shall have sole jurisdiction" necessarily means the Northern District of Texas, to which this Court is an adjunct. Because that is so, filing the motion for leave in the Northern District of Texas cannot violate the order because it necessarily complies with it. The alternative interpretation requires this

---

[18] Cite July order. This Court's January Order includes similar language except that it applies only to matters related to Seery's conduct as a director of Strand. Respondents do not believe their cause of action is related to Seery's director role, but that point seems immaterial here because the two orders are so similarly worded.

001062

Court to have meant to strip the district courts of the Northern District of Texas of original jurisdiction. And Respondents do not believe this Court intended to do any such thing.

The reasoning behind this conclusion is not complex. This Court well knows the jurisdictional framework in which it operates, resulting from the Supreme Court's opinion in *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.* opinion.[19] That framework is established by 28 U.S.C. § 151: "In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district."[20]

The Second Circuit, in *United States v. Guariglia*, made precisely this point, holding that an order of the bankruptcy court constitutes an order of the district court it is a unit of:

> In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Under this provision, much of the autonomy has been stripped from the bankruptcy courts, now labeled 'units' of the district courts. By definition, under the statutory scheme, the bankruptcy court Order restraining Guariglia from gambling was issued by a 'unit' of the district court. As an Order originating from a unit of the district court, ***it necessarily follows that the Order constitutes an Order of both the bankruptcy court and the district court for the district encompassing the bankruptcy court from which the Order emanated***.[21]

---

[19] 458 U.S. 50 (1982).

[20] "[B]ankruptcy courts are a unit of the district court in each judicial district under 28 U.S.C. § 151 and exercise the power of the district court in bankruptcy cases." *In re D&B Countryside LLC*, 217 B.R. 72, 75 n.5 (Bankr. E.D. Va. 1998).

[21] 962 F.2d 160, 162-63 (2d Cir. 1992); *accord In re Coastal Plains Inc.*, 338 B.R. 703 (Bankr. N.D. Tex. 2006) ("When Congress reconstructed the jurisdiction of the bankruptcy courts with the 1984 Act, it made those courts 'a unit of the district courts' and classified bankruptcy judges as 'judicial officers of the district court.' Both of these statutes reinforce the current placement of the bankruptcy courts in the federal judicial scheme as a subset of federal district courts that derive their jurisdiction from the primary branch of the district court. . . . [T]he bankruptcy court as such no longer exists as a distinct jurisdictional entity, but is subsumed within the district court apparatus. Hence, removing a case to a bankruptcy court is the functional equivalent of removing it to the federal district court."); *Thomas v. U.S. Bank*, 2010 Bankr. LEXIS 986 at *8-9 (Bankr. D. Or. 2010) ("[B]ecause this court is part of the District Court, both tribunals should be considered the same court and debtors should have asked the District Court to decide the contempt issue at the same time as their other claims."). In sum, "the Bankruptcy Court is the District Court." *In re North Am. Funding Corp.*, 64 B.R. 795, 796 (Bankr. S.D. Tex. 1986) (emphasis added); *accord*

The law is therefore clear that this Court's orders are orders of the district court, that this Court is the district court,[22] and that this Court did not and could not exclude the district court when it ordered that it had "sole jurisdiction" over actions brought against Seery. Therefore, as a matter of law, Respondents could not have violated this Court's orders by seeking leave to sue Seery from the district court.

## C. **Stripping the District Court of Jurisdiction Is Beyond This Court's Powers**

Respondents filed a Motion for Relief from this Court's gatekeeper orders contemporaneously with Movant's show-cause motion. There, we briefed the proper scope of this Court's jurisdiction with regard to the gatekeeper orders and Movants' position that those orders have stripped the district court of jurisdiction. Respondents incorporate that briefing here by reference. But the gist of the argument bears repeating.

This Court's jurisdiction is derivative of the district court's because, as explained above, this Court **is** the district court. This Court therefore lacks the authority to remove a matter from that court's purview. Movants' contrary contention necessarily requires adoption of the view that this Court's authority trumps that of both the district court and Congress, a very troubling position

---

*Onewoo Corp. v. Hampshire Brands Inc.*, 566 B.R. 136, 144-45 (Bankr. S.D.N.Y. 2017) (holding that party may not remove case from district court to its bankruptcy court because "[a] court cannot remove a case to itself . . . the bankruptcy court is the district court"); *In re Mitchell*, 206 B.R. 204, 211 (Bankr. C.D. Cal. 1997) (labeling argument that a case can be removed from the district court to its bankruptcy court as "logically idiotic" since it would be a removal "from the district court where it is already pending to that very same court").

[22] The Respondents do not concede that this Court had the jurisdiction or authority to enter its order the subject of these proceedings, as discussed below. They present this argument assuming, but not conceding, that the entry of such order was proper.

001064

in light of the separation of powers doctrine and the Supreme Court's recent decision in *Stern v. Marshall*.[23]

The only conceivable ground for contending, as Movants do, that this Court's jurisdiction could be somehow "exclusive"—a term of art ***not*** used in the gatekeeper orders—is the *Barton* doctrine. Respondents respectfully submit that applying the *Barton* doctrine to Seery here—after this Court granted Movants' motion asking the Court to defer to their business judgment in approving Seery's appointment[24]—would be both unprecedented and nonsensical.

Moreover, Respondents' action in the district court—whether or not Seery is ultimately joined by amendment—is beyond the reach of bankruptcy-court jurisdiction.

To begin with, 28 U.S.C. § 157(b) states that "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[25] This principle is stated even more directly in 28 U.S.C. § 1409(a), which provides that an action that is "related to a case under title 11 may be commenced in the district court." Plainly Respondents' action in the district court is related to Debtor's bankruptcy case here. That action therefore "may be commenced in the district court" under § 1409(a).

---

[23] 564 U.S. 462, 499 (2011) (holding that "Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case.").

[24] APP_0079-0082.

[25] *Compare* 28 U.S.C. § 1409(a) (stating that cases that are "related to a case under title 11 may be commenced in the district court"). This Court previously recognized this principal in *In re AHN Homecare, LLC*, 222 B.R. 804, 809 (Bankr. N.D. Tex. 1998) (quoting 1 L. King, Collier on Bankruptcy, ¶ 3.01[1][c][ii], at 3–22 (15th ed.1991), for the following proposition: "The language of section 1334(b) grants jurisdiction to the district courts, and therefore to the bankruptcy court, over civil proceedings related to bankruptcy and accords with 'the intent of Congress to bring all bankruptcy related litigation within the umbrella of the district court, at least as an initial matter, irrespective of congressional statements to the contrary in the context of other specialized litigation.'").

Bankruptcy courts are not Article III courts. They are created under Congress's Article I authority, and they do not have original jurisdiction over non-bankruptcy matters.[26] The only reason bankruptcy courts can ever hear such matters is because of the ability of the district courts to refer them under 28 U.S.C. § 157(a). Because of this framework, it necessarily follows that the district court here never gave up jurisdiction over cases related to the Debtor's bankruptcy case.

Respondents' action in the district court is such a case. But more to the point, that action falls outside of the reach of this Court's jurisdiction because, in 28 U.S.C. § 157(d), Congress requires district courts to withdraw the reference to bankruptcy courts in a particular proceeding "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Plainly Respondents' district court action involves such considerations, since the Advisers Act was passed under Congress' power to regulate interstate commerce and regulates the investment markets of the United States. Withdrawal of the reference is mandatory in such circumstances.[27]

As a result, this Court lacks jurisdiction to preside over Respondents' district court action and the district court is the appropriate place to bring it. And Movants' attempt to describe this Court's jurisdiction as "exclusive" is both misguided and unsupportable.

**D. <u>The Punitive Relief Requested by Movants Exceeds This Court's Powers</u>**

Movants also overreach with the relief they request. There is no statutory basis for that relief. And although their motion states that they are seeking civil sanctions, that is pretext. The

---

[26] *See generally Stern v. Marshall*, 564 U.S. 462 (2011).

[27] *In re Am. Freight Sys., Inc.*, 150 B.R. 790, 793 (D. Kan. 1993) ("Withdrawal is required if the bankruptcy court would be called upon to make a significant interpretation of a non-Code federal statute.").

17

relief they seek would be highly punitive in effect, and thus it is in excess of this Court's subject matter jurisdiction.

Bankruptcy court jurisdiction is expressly limited to "civil proceedings" by 28 U.S.C. § 1334(b). The Fifth Circuit, in fact, expressly held in *In re Hipp, Inc.* "that bankruptcy courts do not have inherent criminal contempt powers, at least with respect to the criminal contempt not committed in (or near) their presence."[28] Even as to civil sanctions, the standard for imposing them is a high one.[29] The Fifth Circuit holds that a court's inherent power to sanction "must be exercised with restraint and discretion,"[30] must be accompanied by "a specific finding that the [sanctioned party] acted in 'bad faith,'"[31] *id.* at 236, and "must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees."[32]

Here, this Court's order requiring Respondents to show cause already names them "violators," suggesting that they have been prejudged before they even had a chance to be heard. Notice from opposing counsel accurately informed Respondents that this Court had deemed them "violators" and ordered them to appear in person and show cause three days before the order actually issued, suggesting that *ex parte* communications may have taken place in violation of Rule 9003(a). These circumstances raise serious due process concerns.

---

[28] 895 F.2d 1503, 1510-11 (5th Cir. 1990).

[29] *Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998) ("The threshold for the use of inherent power sanctions is high.").

[30] *Id.*

[31] *Id.* at 236.

[32] *Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894, 898 (5th Cir. 1997) (quoting *Chambers v. NASCO, Inc.*, 111 S. Ct. at 2136).

18

Stated differently, how can counsel in this matter reassure our clients that they will get a fair shake, before an impartial court, when they have already been deemed "violators," and when opposing counsel knew what that court was going to order days before we did?

Adding to the problem here is that this Court's show-cause order reverses the burden of proof. It is no longer Movants' motion that we must respond to. It is an order of this Court—one that has already deemed us "Violators." Under Fifth Circuit law, this is error. A movant seeking sanctions must bear the burden to show, by clear and convincing evidence, that a violation of this Court's orders has occurred.[33]

As one bankruptcy court explained:

> In effect, such a litigant seeks the Court's endorsement of relief against another private party, on an ex parte basis, before the merits of that relief have been subjected to due process. Such orders create an appearance of impropriety. They create the appearance that the Court has evaluated allegations made by the applicant—without an opportunity for input from the other party—and adopts the applicant's position that a basis exists to require the target of the order to appear and explain himself to the Court.[34]

The same is true here.

Respondents also submit it is telling that the relief sought here includes not a penny for the costs to defend against the allegedly sanctionable acts in the district court. This is, of course, because there are no such costs. The district court's prompt denial of the motion for leave prevented that. Because there is no harm—indeed, there is no attempt by Movants to show

---

[33] See *Louisiana Ed. Ass'n v. Richland Parish School Bd.*, 421 F. Supp. 973, aff'd, 585 F.2d 518 (5th Cir. 1978); *see also In re Cannon*, No. BR 17-11549-JGR, 2017 WL 10774809, at *1 (Bankr. D. Colo. June 13, 2017) (declining "to issue orders that would create such an impression or shift the burden in this manner").

[34] *In re Symka*, 518 B.R. 888, 888-89 (Bankr. D. Colo. 2014); *see also id.* at 889 (noting that, where such a motion relates to a dispute between private litigants, "a court's entry of an order to show cause has the effect of shifting the burden of going forward from the applicant to the target of the show cause order").

19

prejudice in any form—it is difficult to understand how the sanctions they seek could be anything but punitive in nature.

Every single dollar of "costs" Movants ask this Court to award was incurred in bringing *this* motion—a motion that was unnecessary, because the motion for leave before the district court was no longer pending and because Respondents' motion asking this Court to revise its orders, on jurisdictional grounds, was already in the works. Awarding multipliers on top of the costs for Movants' unnecessary motion would be punitive.[35]

Most importantly, because the allegedly offending conduct consists solely of asking for leave from the district court, it is difficult to understand how this Court could possibly find that Respondents have acted in bad faith. Asking permission from the district court—who very well could have referred Respondents' motion to this Court—does not evidence bad faith. Doing so in a motion that discloses this Court's gatekeeper orders, Respondents submit, is pretty compelling evidence of the opposite.

## VI. CONCLUSION

Respondents respectfully submit that we have not violated any order of this Court, that any order deeming us to be "Violators" is unjust and should be expunged, and that this Court does not have the power to strip the district court of jurisdiction. Respondents also submit that Movants have failed to demonstrate that the prerequisites for an award of sanctions have been met. For these reasons, Respondents urge this Court to deny Movants' motion.

---

[35] *Compare Petroleos Mexicanos v. Crawford Enterprises*, 826 F.2d at 399 (citing *United States v. Rizzo*, 539 F.2d 458, 462-63 (5th Cir. 1976) (for the proposition that sentences for criminal contempt are punitive in their nature and are imposed primarily for the purpose of vindicating the authority of the court), *with id.* (citing *Southern Railway Co. v. Lanham*, 403 F.2d 119, 124 (5th Cir. 1968), for the proposition that sanctions for civil contempt are meant to be "wholly remedial" and serve to benefit the party who has suffered injury or loss at the hands of the contemnor).

001069

Dated:  May 14, 2021                     Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         */s/  Mazin A. Sbaiti*
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         JPMorgan Chase Tower
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                              jeb@sbaitilaw.com

                                         **Counsel for Plaintiffs**

001070

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

### I.

### INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## <u>PARTIES</u>

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("<u>DAF</u>") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("<u>RIA</u>") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "<u>Adviser's Act</u>"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

Case 19-34054-sgj11 Doc 3432 Filed 05/04/21 Entered 05/04/21 17:53:07 Desc

# III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

# IV.

## RELEVANT BACKGROUND

### HCLOF IS FORMED

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.    The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.    Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.    Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.    Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.    In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.    The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.    Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.    HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

---

Original Complaint                                                                     Page 7

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.　　Typically, the value of the securities reflected by a market price quote.

41.　　However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.　　There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.　　Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.　　Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.　　It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.　　For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

---

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value
of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair
market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest
confirmation, implicitly suggested that a proper current valuation had been performed.

76.      Defendant's principal, Seery, testified in January 2021 that the then-current fair
market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But
by then, it was worth almost double that amount and has continued to appreciate. Seery knew or
should have known that fact because the value of some of the HCLOF assets had increased, and
he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly
fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper
diligence and information that was plainly available.

77.      Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via
various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors
meeting in December 2020 that Highland would have to restrict its trading in MGM because of its
insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.      Furthermore, Seery controlled the Board of CCS Medical. And in or around
October 2020, Seery was advocating an equatization that would have increased the value of the
CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's
holdings.

79.      Seery's knowledge is imputed to HCM.

80.      Moreover, it is a breach of fiduciary duty to commit corporate waste, which is
effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**SECOND CAUSE OF ACTION**
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

92.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.    On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.    The Company Agreement governs the rights and duties of the members of HCLOF.

95.    Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.    Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.    The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.    Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.    Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

**100.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.** Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

---

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

001092

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.     Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.     Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

134.     Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.     At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.     At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.     Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.     HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.   Actual damages;

    b.   Disgorgement;

    c.   Treble damages;

    d.   Exemplary and punitive damages;

    e.   Attorneys' fees and costs as allowed by common law, statute or contract;

    f.   A constructive trust to avoid dissipation of assets;

    g.   All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021                    Respectfully submitted,

                                          **SBAITI & COMPANY PLLC**

                                          */s/ Mazin A. Sbaiti*
                                          **Mazin A. Sbaiti**
                                          Texas Bar No. 24058096
                                          **Jonathan Bridges**
                                          Texas Bar No. 24028835
                                          JPMorgan Chase Tower
                                          2200 Ross Avenue – Suite 4900W
                                          Dallas, TX  75201
                                          T:  (214) 432-2899
                                          F:  (214) 853-4367
                                          E:  mas@sbaitilaw.com
                                               jeb@sbaitilaw.com


                                          **Counsel for Plaintiffs**

001096

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

### I.

### NECESSITY OF MOTION

Plaintiffs submit this Motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of Defendant Highland Capital Management, L.P. ("HCM"), and the chief perpetrator of the wrongdoing that forms the basis of Plaintiffs' causes of action.

Seery is not named in the Original Complaint. But this is only out of an abundance of caution due to the bankruptcy court, in HCM's pending Chapter 11 proceeding, having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the bankruptcy court also asserts "sole jurisdiction" over all such causes of action.

Plaintiffs respectfully submit that, to the extent the bankruptcy court order prohibits the filing of an action in ***this Court***, whose jurisdiction the bankruptcy court's jurisdiction is wholly

---

Plaintiffs' Motion for Leave to File First Amended Complaint                    Page 1

derivative of, that order exceeds the bankruptcy court's powers and is unenforceable. Alternatively, Plaintiffs submit that filing ***this Motion*** satisfies the prerequisites provided in the bankruptcy court's order. Either of these reasons provides sufficient grounds to grant this Motion.

The proposed First Amended Complaint is attached as Exhibit 1.

## II.

## <u>BACKGROUND</u>

On June 23, 2020, counsel for HCM filed a motion in HC's bankruptcy proceedings asking the bankruptcy court to defer to the "business judgment" of the board's compensation committee and approve the terms of its appointment of Seery as chief executive officer and chief restructuring officer at HCM, retroactive to March.[1] Counsel also asked the bankruptcy court to declare that it had exclusive jurisdiction over any claims asserted against Seery in this role.

On July 16, 2020, the bankruptcy court granted that motion and stated as follows:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. ***The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted***.[2]

---

[1] Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Doc. 774]. This motion is attached as Exhibit 2.

[2] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Doc 854]. A related order dated January 9, 2020, contains a similar provision with regard to Seery's role as an "Independent Director." Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Doc 339]. These orders are attached, respectively, as Exhibits 3 and 4.

---

On March 22, 2021, the bankruptcy court entered an order confirming HCM's
reorganization plan.[3] That order purports to extend the prohibitions on suits against Seery, and it
also prohibits certain actions against HCM and its affiliates. By its own terms, however, that order
is not effective due to a pending appeal.

On April 12, 2021, Plaintiffs filed their Original Complaint in this action, alleging that
HCM and related entities are liable as a result of insider trading and other violations of the antifraud
provisions of the Investment Company Act of 1940, among other causes of action. The Original
Complaint does not name Seery as a defendant. But the action is based on Seery's
misrepresentations, omissions, and other breaches of duty committed in his role as HCM's CEO,
which are sufficient to demonstrate his willful misconduct or gross negligence, though Plaintiffs
submit that mere negligence and breach of fiduciary duty also form sufficient bases for his personal
liability.

### III.

### ARGUMENT

This Court should grant leave to amend because the liberal policies behind Rule 15 require
it and because leave is not prohibited by the bankruptcy court's order.

**A. Rule 15(a) Allows Plaintiffs' Amendment As a Matter of Course**

Rule 15(a) instructs the Court to "freely give leave [to amend] when justice so requires."
FED. R. CIV. P. 15(a). The Fifth Circuit, in *Martin's Herend Imports, Inc. v. Diamond & Gem
Trading United States Co.,* 195 F.3d 765 (5th Cir. 1999), interpreted the rule as "evinc[ing] a bias
in favor of granting leave to amend." *Id.* at 770. Thus the Court must possess a "substantial reason"

---

[3] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.
(As Modified) And (II) Granting Related Relief [Doc. 1943].

---

to deny a request for leave to amend. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002); *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that leave should be granted "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

Moreover, one amendment, filed within 21 days of service of the pleading it seeks to amend or before a responsive pleading is filed, is allowed "as a matter of course." Fed. R. Civ. P. 15(a)(1); *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984) ("When, as in this case, a plaintiff who has a right to amend nevertheless petitions the court for leave to amend, the court should grant the petition."); *Galustian v. Peter*, 591 F.3d 724, 729-30 (4th Cir. 2010) (holding that district court abused its discretion in denying timely motion to amend adding defendant because "[t]he plaintiff's right to amend once is absolute"); *Rogers v. Girard Tr. Co.*, 159 F.2d 239, 241 (6th Cir. 1947) (holding that complaint may be amended as matter of course where defendant has filed no responsive pleading, and leave of district court is not necessary, but it is error to deny leave when asked); *Bancoult v. McNamara*, 214 F.R.D. 5, 7-8 (D.D.C. 2003) (holding that plaintiff's filing of a motion for leave to amend does not nullify plaintiff's absolute right to amend once before responsive pleadings, even if the amendment would be futile).

Here, Plaintiffs did not name Seery as a defendant in the Original Complaint out of an abundance of caution in light of the bankruptcy court's order of July 16, 2020 [Doc. 854]. Instead, Plaintiffs are seeking leave in this Motion to do so. Because the proposed amendment is their first, and because it comes within 21 days of service of the Original Complaint, as well as before any

responsive pleadings, Plaintiffs respectfully submit that they are entitled to leave and their proposed First Amended Complaint should be allowed.

**B. The Bankruptcy Court's Order Should Not Prohibit Plaintiffs' Amendment**

Plaintiffs submit that the bankruptcy court order of July 16, 2020, does not prohibit the proposed amendment for two independent reasons.

**1. The Bankruptcy Court's Order Exceeds Its Jurisdiction**

**a. The Bankruptcy Court Cannot Strip This Court of Jurisdiction**

Because the bankruptcy court's jurisdiction derives from and is dependent upon the jurisdiction of this Court, its order declaring that it has "sole jurisdiction" is overreaching.

Congress provided for and limited the jurisdiction of bankruptcy courts in 28 U.S.C. § 1334 and 28 U.S.C. § 157. As a result, bankruptcy court jurisdiction derives from and is limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) ("The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."); *Williams v. SeaBreeze Fin., LLC (In re 7303 Holdings, Inc.)*, Nos. 08-36698, 10-03079, 2010 Bankr. LEXIS 2938 at *7 (Bankr. S.D. Tex. Aug. 26, 2010) ("A bankruptcy court's jurisdiction is derivative of the district court's jurisdiction. The bankruptcy court does not have jurisdiction unless the district court could exercise authority over the matter . . . ."). The plain provisions of § 1334 grant ***to the district courts*** "original jurisdiction" over all bankruptcy cases and related civil proceedings. 28 U.S.C. § 1334(a)-(b). What Congress giveth, the bankruptcy courts cannot taketh away.

**b. The *Barton* Doctrine Does Not Apply**

The bankruptcy court's overreach seems to stem from a misapplication of the *Barton* doctrine. That doctrine protects receivers and trustees who are appointed by the bankruptcy court. *Randazzo v. Babin*, No. 15-4943, 2016 U.S. Dist. LEXIS 110465, at *3 (E.D. La. Aug. 18, 2016)

---

("While the *Barton* case involved a receiver in state court, the United States Court of Appeals for the Fifth Circuit has extended this principle, now known as the *Barton* doctrine, to lawsuits against bankruptcy trustees for acts committed in their official capacities."). The doctrine does not apply to executives of a debtor, like Seery, who are not receivers or trustees, and who are stretching the truth to claim that they were "appointed" by the bankruptcy court after asking it merely to approve their appointment in deference to their discretion under the business judgment rule.[4]

### c. The Order Exceeds the Constitutional Limits of the Bankruptcy Court's Jurisdiction

Plainly the bankruptcy court does not have "***sole jurisdiction***" over all causes of action that might be brought against Seery related to his role as HCM's CEO. But more to the point, the bankruptcy court does not even have ***concurrent jurisdiction*** over *all* such claims. The separation of powers doctrine does not allow that. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that Congress cannot bypass Article III and create jurisdiction in bankruptcy courts "simply because a proceeding may have some bearing on a bankruptcy case"); *id.* at 488 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), for the proposition that "Congress cannot 'withdraw from judicial [read Article III] cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty'" with the limited exception of matters involving certain public rights); *id.* at 494 (quoting the dissent's quote of *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985), for the proposition that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law," and

---

[4] Exhibit 2 at 14-15 (arguing that the bankruptcy court should not "interfere" with their "corporate decisions . . . as long as they are attributable to any rational business purpose") (internal quotes omitted); *id.* at 5-7 (detailing the compensation committee's "appointment" of Seery as CEO as well as chief restructuring officer).

---

Plaintiffs' Motion for Leave to File First Amended Complaint                    Page 6

then adding "tort" to the rule for purposes of the matter before it); *cf. In re Prescription Home Health Care,* 316 F.3d 542, 548 (5th Cir. 2002) (holding that trustee's tax liability was not within the bankruptcy court's related-to jurisdiction and rejecting "the theory that a bankruptcy court has jurisdiction to enjoin any activity that threatens the debtor's reorganization prospects [because that] would permit the bankruptcy court to intervene in a wide variety of third-party disputes [such as] any action (however personal) against key corporate employees, if they were willing to state that their morale, concentration, or personal credit would be adversely affected by that action"). The bankruptcy court's order asserting "sole jurisdiction" here is hardly even relevant since that court lacks the power to expand its jurisdiction or manufacture jurisdiction where none exists.

The proposed First Amended Complaint asserts common law and equitable contract and tort claims. For the reasons explained by the Supreme Court in *Stern*, such claims should not be deemed within the bankruptcy court's jurisdiction.

### d.  The Order Exceeds the Bankruptcy Court's Statutory Authorization

Not only are there constitutional issues with the scope of the bankruptcy court's order, there is also the limitation of 28 U.S.C. § 157(d). *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),* 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157). In § 157(d), Congress prohibited the bankruptcy court, absent the parties' consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulating organizations or activities affecting interstate commerce.

The First Amended Complaint's allegations against Seery—accusing him of insider trading, violations of the RICO statute (18 U.S.C. § 1961 et seq.), and violations of the antifraud provisions of the Investment Advisers Act of 1940—require precisely that. Even determining the

---

"colorability" of such claims will require a close examination of both the proceedings that took place in the bankruptcy court under Title 11 and the Investment Advisers Act as well as the RICO statute. The bankruptcy court lacks the authority to make such determinations. This Court has that power.

Thus, at least as it applies to the proposed First Amended Complaint, the bankruptcy court's order exceeds its authority under 28 U.S.C. § 157(d), and any determination of "colorability" should take place in this Court, which Rule 12(b)(6) of the Federal Rules of Civil Procedure already provides for. To hold otherwise would create unnecessary tension with the congressional aims of 28 U.S.C. § 959 ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.").

### 2. The Prerequisites in the Bankruptcy Court's Order Are Satisfied by This Motion and the Detailed Allegations in the Proposed First Amended Complaint

Alternatively, or in addition, should this Court read the bankruptcy court's order as prohibiting the filing of actions against Seery even in *this* Court, Plaintiffs submit that this Motion seeking leave provides the mechanisms required by that order and therefore satisfies it.

The bankruptcy court's order requires only that any contemplated action must first be submitted to that court for a preliminary determination of colorability. Because that court only has derivative jurisdiction as a result of this Court's jurisdiction—and only over matters referred to it by this Court—Plaintiffs submit that filing a motion for leave here is the correct procedure for complying with that order. This Court may refer this Motion to the bankruptcy court under Miscellaneous Order No. 33, as authorized by § 104 of the Bankruptcy Amendments and Federal Judgeship Act of 1984, codified at 28 U.S.C. § 157(a). Or it may instead decline to refer the Motion or withdraw the reference under 28 U.S.C. § 157(d), as Plaintiffs submit is appropriate for the

reasons addressed above. Regardless, this Motion presents the issue in a manner that allows the bankruptcy court to address it, should this Court decide that the bankruptcy court is authorized to do so. *Cf.* Confirmation Order [Doc. 1943] at 77, ¶ AA ("The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, ***only to the extent legally permissible*** and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.") (emphasis added).

Plaintiffs therefore submit that, by filing this Motion in this Court, they have complied with the bankruptcy court's order.

## IV.

## CONCLUSION

Plaintiffs are entitled to amend as a matter of course. The bankruptcy court lacks jurisdiction to prohibit the proposed amendment. In these circumstances, Plaintiffs respectfully submit that the interests of justice support the granting of leave to amend, and Rule 15(a) requires that this Motion be granted.

Dated: April 19, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

/s/ Jonathan Bridges
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   jeb@sbaitilaw.com

**Counsel for Plaintiffs**

### CERTIFICATE OF CONFERENCE

I hereby certify that, on April 19, 2021, I conferred with Defendant HCM's counsel in the HCM bankruptcy proceedings regarding this Motion. I have not conferred with counsel for the other Defendants because they have not been served and I do not know who will represent them. HCM's counsel indicated that they are opposed to the relief sought in this Motion.

_/s/ Jonathan Bridges_
Jonathan Bridges

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No.  3:21-CV-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **JAMES P. SEERY,** *individually*, **and** | § | |
| **HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## FIRST AMENDED COMPLAINT

### I.

### INTRODUCTION

This action arises out of the acts and omissions of Defendant James P. Seery ("Seery") in

his conduct as chief executive officer and chief restructuring officer of Defendant Highland Capital

Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd.

("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of

1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF")

(Seery, HCM, and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions

which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the

Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement,

among others, which have caused and/or likely will cause Plaintiffs damages, and which arise out

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

of or are related to acts or omissions that constitute bad faith, fraud, gross negligence, or willful misconduct.

Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, Seery, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

---

First Amended Complaint

Page 2

interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

### PARTIES

1. Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2. Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3. Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4. Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5. Defendant James Seery is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Adviser, Ltd., and is a citizen of and domiciled in Floral Park, New York. He can be served personally at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

6. Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey

Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**III.**

**JURISDICTION AND VENUE**

**7.**     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.**     Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.**     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

**IV.**

**RELEVANT BACKGROUND**

*HCLOF IS FORMED*

**10.**     Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**     Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

16.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM. Seery is the CEO of HCM which, upon information and belief, is the parent of HCFA.

17.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

**The Harbourvest Settlement with**
**Highland Capital Management in Bankruptcy**

**18.**     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

**19.**     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

**20.**     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

**21.**     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

**22.**     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

**23.**     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054,  Doc. 1057.

**24.**     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

**25.**     Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

---

First Amended Complaint                                                                                    Page 6

26.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

27.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).

28.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

29.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

30.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

31.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

33.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

34.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM.

35.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, and $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million. Still $1.5 million over the reasonable damages amount that Harbourvest suffered.

36.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

37.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

38.     It has recently come to light that the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

39.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

---

First Amended Complaint                                                                 Page 8

40. The change was due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

41. Typically, the value of the securities are reflected by a market price quote.

42. However, the underlying securities in HCLOF are not liquid and had not been traded in a long while. Therefore, any market quotes were stale.

43. There not having been any contemporaneous market quotations that could be used in good faith to set the marks,[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

44. Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off by a mile.

45. Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value at $22.5 million was false because the NAV was so much higher.

46. But it does not appear that they disclosed that fact to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff. One would expect HCM to disclose that its trade with Harbourvest—or someone in Harbourvest's position—was sanitized by complete disclosure of the NAV of the interests, and noting Harbourvest's acceptance of the trade notwithstanding that disclosure. The abject silence of the information's disclosure—both in the Settlement Agreement and in the papers seeking to

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

approval of the settlement and the testimony proffered in its support—strongly suggests its absence from the negotiations.

47. What it appears is that Seery used an old valuation, itself a reckless if not intentional misrepresentation of value. Thus, it is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

48. For years HCM had internal procedures and compliance protocols to govern this not infrequent occurrence. Prior to Seery taking over as CEO, HCM's internal compliance policies, enforced by its compliance officers, prohibiting HCM from trading with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

49. Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

50. Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

51.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

52.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

53.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

54.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

55.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

56.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

**V.**

**CAUSES OF ACTION**

---

First Amended Complaint                                            Page 11

## FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

57.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

58.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs because HCM had a direct advisor agreement with the DAF at all relevant times, and HCM, through HCFA, advised CLO Holdco in the HCLOF venture.

59.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers,[5] and its chief compliance officers.[6]

60.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

61.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

[6] Advisers Act Rule 206(4)-7 ("An adviser's chief compliance officer should be competent and knowledgeable regarding the Advisers Act and should be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the firm.").

---

62.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

63.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

64.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

65.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

66.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

67.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

68.     Seery in controlling HCM, HCFA, and by extension, HCLOF, directly owed a fiduciary duty to Plaintiffs by virtue of his position, or is liable for aiding and abetting HCM's and HCFA's breaches of fiduciary duty by controlling them and either recklessly or intentionally causing them to breach their duties.

69.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and
confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-
registered or not) to establish, maintain, and enforce written policies and procedures reasonably
designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. §
275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not
have to second guess or dig behind representations made by them.

70.     The simple thesis of this claim is that Defendants Seery, HCFA and HCM breached
their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the
underlying assets—i.e., trading with Harbourvest on superior, non-public information that was
neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest
Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its
designee) without offering it to or making it available to Plaintiff or the DAF.

71.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly
recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on
its investment was an additional breach of fiduciary duty.

72.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to
Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while
possessing non-public information is liable for insider trading, and they do not necessarily have to
have *used* the specific inside information.

73.     It also violated HCM's own internal policies and procedures.

74.     Also, the regulations impose obligations on Defendants to calculate a *current*
valuation when communicating with an investor, such as what may or may not be taken into

account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

75. HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

76. HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

77. In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[7]

78. At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair

---

[7] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest
confirmation, implicitly suggested that a proper current valuation had been performed.

79.     Seery testified in January 2021 that the then-current fair market value of
Habourvests's 49.98% interest in HCLOF was worth around $22.5 million.

80.     But by then, it was worth almost double that amount and has continued to
appreciate. Seery knew or should have known that fact because the value of some of the HCLOF
assets had increased, and he had a duty to know the current value. His lack of actual knowledge,
while potentially not overtly fraudulent, would nonetheless amount to a reckless breach of
fiduciary duty for acting without proper diligence and information that was plainly available.

81.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via
various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors
meeting in December 2020 that Highland would have to restrict its trading in MGM because of its
insider status due to activities that were likely to apply upward pressure on MGM's share price.

82.     Furthermore, Seery controlled the Board of CCS Medical. And in or around
October 2020, Seery was advocating an equatization that would have increased the value of the
CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's
holdings.

83.     Seery's knowledge is and should be imputed to HCM and HCFA.

84.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is
effectively what disposing of the HCLOF assets would constitute in a rising market, where there
is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could
easily be sold to the DAF at fair value).

85.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

86.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

87.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

88.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

89.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021. Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered

Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO
management contracts and allowing investors to replace Highland as manager.

     **90.**    Seery's compensation agreement with the UCC incentivizes him to expedite
recoveries and to prevent transparency regarding the Harbourvest settlement.

     **91.**    What is more, Seery had previously testified that the management contracts for the
funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later
rejected offers to purchase those management contracts for fair value and instead decided to
continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement,
among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million,
stating that they were worth much more than that.

     **92.**    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in
damages—a number that continues to rise—and the Defendants should not be able to obtain a
windfall.

     **93.**    For the same reason, Defendants' malfeasance has also exposed HCLOF to a
massive liability from Harbourvest since the assignment of those interests is now one that is likely
unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

     **94.**    Seery is liable as a principal and as an officer and control person under the
regulations promulgated pursuant to Dodd-Frank and other laws.

     **95.**    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the
principals and compliance staff of each entity.

     **96.**    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and
costs. To the extent the Court determines that this claim had to have been brought derivatively on

behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

SECOND CAUSE OF ACTION
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

97.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

98.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

99.     The Company Agreement governs the rights and duties of the members of HCLOF.

100.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

101.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

102.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

103.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

---

104.    Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

105.    Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

106.    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

107.    Plaintiff is entitled to specific performance or, declaratory relief, and/or disgorgement, constructive trust, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
#### *Negligence*
**(By the DAF and CLO Holdco against Seery, HCM, and HCFA)**

108.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

109.    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

110.    Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

111.    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**112.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**113.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**114.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**115.** Relying on stale valuations without updating them was reckless due to Seery's and HCM's knowledge that the values of the interests were not static and likely would have changed over time, such that old information had a high degree of probability of being inaccurate.

**116.** Seery's and HCM's failure to inform the DAF and Holdco of the updated valuations, and/or to misstate the value in January 2021 in support of the Harbourvest settlement was likewise reckless in the face of the known risk that Plaintiffs would be relying on those representations, as would Harbourvest and the Court.

**117.** Seery's and HCM's failure to offer the DAF and Holdco the right to purchase the Harboruvest Interests was likewise reckless in light of the obvious risk.

**118.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

119. Defendants' negligence or gross negligence foreseeably and directly caused Plaintiff harm.

120. Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM and Seery)**

121. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

122. Defendants HCM and Seery are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

123. HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

124. The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM and Seery joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

125. HCM and Seery injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. Seery's actions (performed on behalf of

---

First Amended Complaint

Page 22

HCM and the association-in-fact enterprise) constitute violations of the federal wire fraud, mail
fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to <mark>18
U.S.C. § 1961(1)(B)</mark> and <mark>(D)</mark>.

126.     Seery operated HCM in such a way as to violate insider trading rules and
regulations when it traded with Harbourvest while it had material, non-public information that it
had not supplied to Harbourvest or to Plaintiffs.

127.     In or about November 2020, HCM and Harbourvest entered into discussions about
settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through
the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests
in HCLOF.

128.     On or about each of September 30, 2020, through December 31, 2020, Seery,
through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive
at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease
sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into
believing that Seery had properly valued the interests.

129.     On or about September 30, 2020, Seery transmitted or caused to be transmitted
though the interstate wires information to HCLOF investors from HCM (via HCFA), including
Harbourvest, regarding the value of HCLOF interests and underlying assets.

130.     Additionally, Seery operated HCM in such a way that he concealed the true value
of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to
the court in the form of written representations on or about December 23, 2020, and then further
transmitted verbal representations of the current market value (the vastly understated one) on
January 14, 2021, during live testimony.

131.     However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

132.     The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, that the fair market value of the Harbourvest Assets was $22.5 million, it was actually closer to $43,202,724.

133.     Seery, speaking on behalf of HCM, knew of the distinction in value and made the representations either knowingly or with reckless disregard for the truth.

134.     On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was at that time ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

135.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the federal Adviser's Act.

136.     Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue

First Amended Complaint

001131

the HCLOF investment in MGM. Seery's failure to disclose this information which would have
been germane to the valuation of the Harbourvest Interests was another incidence of wrongful
omission in violation of the Advisers Act's antifraud provision and RICO.

137.    In or around October 2020, Seery (who controls the Board of CSS Medical) was
pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain
securities by 25%. In several communications through the U.S. interstate wires and/or mails, and
with Plaintiffs, and the several communications with Harbourvest during the negotiations of the
settlement, Seery failed to disclose these changes which were responsible in part for the ever-
growing value of the HCLOF CLO portfolio. Seery's failure to disclose this information which
would have been germane to the valuation of the Harbourvest Interests was another incidence of
wrongful omission in violation of the Advisers Act's antifraud provision and RICO.

138.    Seery's failure to disclose the information about the current valuation, which would
have been material to the value of the Harbourvest Interest—and by extension, to Plaintiff's rights
with respect to those as part of the Harbourvest Settlement was another incidence of wrongful
omission in violation of the Advisers Act's antifraud provision and RICO.

139.    The Harbourvest Settlement is not final and unwinding it could prove difficult—
which Seery had to be counting on.

140.    Seery was at all relevant times operating as an agent of HCM and its control person
as CEO.

141.    This series of related violations of the wire fraud, mail fraud, and securities fraud
laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of
racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000
payday under the confirmation agreement.

142.    The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when, as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

143.    Accordingly, because Seery and HCM's conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

144.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

### FIFTH CAUSE OF ACTION
### *Tortious Interference*
### (CLO Holdco against HCM and Seery)

145.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

146.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

147.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

148.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

149.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

150.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

151.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

152.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## <u>JURY DEMAND</u>

153.    Plaintiffs demand trial by jury on all claims so triable.

## VII.

## <u>PRAYER FOR RELIEF</u>

154.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in their favor and against Defendants, jointly and severally, for:

    a.  Actual damages;

    b.  Disgorgement;

    c.  Treble damages;

    d.  Exemplary and punitive damages;

001134

e.   Attorneys' fees and costs as allowed by common law, statute or contract;

f.   A constructive trust to avoid dissipation of assets;

g.   All such other relief to which Plaintiff is justly entitled.


Dated:  April 19, 2021                          Respectfully submitted,

                                                **SBAITI & COMPANY PLLC**

                                                */s/  Jonathan Bridges*
                                                **Mazin A. Sbaiti**
                                                Texas Bar No. 24058096
                                                **Jonathan Bridges**
                                                Texas Bar No. 24028835
                                                JPMorgan Chase Tower
                                                2200 Ross Avenue – Suite 4900W
                                                Dallas, TX  75201
                                                T:  (214) 432-2899
                                                F:  (214) 853-4367
                                                E:  mas@sbaitilaw.com
                                                     jeb@sbaitilaw.com


                                                **Counsel for Plaintiffs**

001135

# EXHIBIT 2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT

### NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |

Response Deadline: July 10, 2020 at 5:00 p.m.
Hearing Date: July 14, 2020 at 1:30 p.m.

## DEBTOR'S MOTION UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) FOR AUTHORIZATION TO RETAIN JAMES P. SEERY, JR., AS CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER AND FOREIGN REPRESENTATIVE *NUNC PRO TUNC* TO MARCH 15, 2020

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves (the "Motion") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") for the entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), authorizing the Debtor (a) (i) to retain James P. Seery, Jr. as the chief executive officer and chief restructuring officer of the Debtor, pursuant to the terms of the letter attached as Exhibit 1 to the Proposed Order (the "Agreement") *nunc pro tunc* to March 15, 2020, and (ii) for Mr. Seery to replace the Debtor's current chief restructuring officer as the Debtor's foreign representative pursuant to 11 U.S.C. § 1505, and (b) granting related relief. In support of the Motion, the Debtor respectfully represents as follows:

Jurisdiction

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The bases for the relief requested herein are sections 105 and 363 of the Bankruptcy Code.

Background

3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court").

4.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court. On December 4, 2019,

the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's chapter 11
case to this Court [Docket No. 186].[1]

> 5.     The Debtor has continued in the possession of its property and has
> continued to operate and manage its business as a debtor-in-possession pursuant to sections
> 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this
> chapter 11 case.

> 6.     On December 4, 2019, the Debtor filed in the Delaware Bankruptcy Court
> its *Motion of the Debtor Pursuant to* ==11 U.S.C. §§ 105(a)== *and* ==363(b)== *To Retain Development
> Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial
> Advisory and Restructuring-Related Services, Nunc Pro Tunc, as of the Petition Date* [Docket
> No. 74] (the "CRO Motion").  The CRO Motion sought, among other things, to appoint Bradley
> Sharp as the Debtor's chief restructuring officer and for DSI to provide financial advisory
> services to the Debtor in support of Mr. Sharp.

> 7.     On December 27, 2019, the Debtor filed the *Motion of the Debtor for
> Approval of Settlement with the Official Committee of Unsecured Creditors Regarding
> Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No.
> 281] (the "Settlement Motion").  The Settlement Motion sought approval of the settlement
> between the Debtor and the Committee and provided for, among other things, the creation of a
> new independent board of directors of Strand Advisors, Inc.[2] (the "New Board") consisting of

---

[1]  All docket numbers refer to the docket maintained by this Court.
[2]  Strand Advisors, Inc. ("Strand") is the general partner of the Debtor.

James P. Seery, Jr., John S. Dubel, and Russell Nelms (collectively, the "<u>Independent Directors</u>").

8.    The order granting the Settlement Motion authorized the Debtor to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of any indemnification agreements entered into by Strand with each of the Independent Directors (the "<u>Indemnification Agreements</u>").

9.    The Court entered orders approving the Settlement Motion on January 9, 2020[3] and the DSI Approval Order on January 10, 2020.

10.    The Settlement Order approved, among other things, a term sheet setting forth the agreement between the Debtor and the Committee.  The final term sheet was attached to the *Notice of Final Term Sheet* filed in the Court on January 14, 2020 [Docket No. 354] (the "<u>Final Term Sheet</u>").  The Settlement Order also provided that no entity could commence or pursue a claim or cause of action against any Independent Director and/or his respective advisors and agents relating in any way to his role as an independent director of Strand unless authorized by this Court pursuant to the criteria set forth in the Settlement Order.[4]

11.    The Settlement Motion and Final Term each provided that "[a]s soon as practicable after their appointments, the Independent Directors shall, in consultation with the

---

[3] *See Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and the Procedures for Operations in the Ordinary Course* [Docket No. 339] (the "<u>Settlement Order</u>").

[4] Specifically, paragraph 10 of the Settlement Order provides:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Committee, determine whether a CEO should be appointed for the Debtor. If the Independent

Directors determine that appointment of a CEO is appropriate, the Independent Directors shall

appoint a CEO acceptable to the Committee as soon as possible, which may be one of the

Independent Directors." Final Term Sheet, page 3; Settlement Motion, ¶ 13.

12. On February 18, 2020, the Court entered its *Order (I) Authorizing Bradley

D. Sharp to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 and (II) Granting

Related Relief* [Docket No. 461] (the "Foreign Representative Order"). The Foreign

Representative Order authorized Mr. Sharp, as chief restructuring officer, to act as the Debtor's

foreign representative pursuant to section 1515 of the Bankruptcy Code (the "Foreign

Representative"). The Foreign Representative specifically appointed Mr. Sharp to act as the

Debtor's foreign insolvency officeholder to seek appropriate relief in Bermuda pursuant to

Bermudian common law (the "Bermuda Foreign Representative") and the Cayman Islands

pursuant to Section 241(1) of the Companies Law (2019 Revision) with respect to that British

overseas territory (the "Cayman Foreign Representative").

13. Since the appointment of the Independent Directors, it was apparent that it

would be more efficient to have a traditional corporate management structure oversee the Debtor

– i.e., a fully engaged chief executive officer supervised by the New Board – as contemplated by

the Final Term Sheet. This need was driven by the complexity of the Debtor's organization and

business operations and the need for daily management and oversight of the Debtor's personnel.

The search for a chief executive officer, however, was delayed while the Independent Directors

made initial efforts to learn the Debtor's business and its day-to-day operations. It was further

delayed with the onset of the COVID-19 global pandemic, which both had a serious impact on

the Debtor's operations and assets and limited the Independent Directors' ability to search for an appropriate chief executive officer.

14.     During this time, however, Mr. Seery integrated himself into the daily operations of the Debtor and became essential in stabilizing the Debtor's assets and trading accounts during the economic distress caused by COVID-19.  While Mr. Dubel and Mr. Nelms were each spending on average approximately 140 hours a month addressing the operational issues facing the Debtor and certain of its fund entities, Mr. Seery's workload was at least 180 hours a month.

15.     As such, it was readily apparent to the Independent Directors who would be the best fit for the role:  Mr. Seery.  Mr. Seery had the appropriate skill set, extensive relevant background, and was already carrying the responsibility of the role.  Mr. Seery had been functionally operating as the Debtor's de facto chief executive officer since at least early March and was already overseeing the Debtor's ordinary course operations, including managing the Debtor's personnel and the daily interactions with the Debtor's bankruptcy professionals

16.     The Independent Directors subsequently appointed a compensation committee consisting of Messrs. Dubel and Nelms (the "Compensation Committee") to negotiate the terms and conditions of the Agreement on behalf of the Debtor.  And, on June 23, 2020, the Compensation Committee approved the appointment of Mr. Seery to serve as both the Debtor's chief executive officer and chief restructuring officer concurrently with his role as one of the Independent Directors pursuant to the terms of the Agreement.  Because Mr. Seery has been fulfilling the role since March 2020, the Compensation Committee determined that it was appropriate to make Mr. Seery's appointment as the Debtor's chief executive officer and chief

restructuring officer effective as of March 15, 2020.[5]  The Independent Directors also authorized the Debtor to file this Motion.

**A.**     The Chief Executive Officer and Chief Restructuring Officer Positions

17.     Mr. Seery has agreed to, among other things, provide daily leadership and direction to the Debtor's employees on business and restructuring matters relating to the Debtor's chapter 11 case.  In that capacity, he will direct the Debtor's day-to-day ordinary course operations, oversee the Debtor's personnel, make management decisions with respect to the Debtor's trading operations, direct the Debtor's reorganization efforts, monetize the Debtor's assets, oversee the claims objection and resolution process, and lead the process toward the hopeful consensual confirmation of a plan in this chapter 11 case in the capacities as chief executive officer and chief restructuring officer positions.  Mr. Seery would report directly to the New Board and would continue to serve as an Independent Director, as provided under the Settlement Order.

18.     Mr. Seery has extensive management and restructuring experience.  Mr. Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he was responsible for helping direct the development of a credit business.   Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, where he was responsible for originating, executing, and managing stressed and distressed credit investments.  Mr. Seery is also a long-time attorney licensed to practice in New York who

---

[5] The Committee has also agreed to Mr. Seery's appointment as chief executive officer and chief restructuring officer and to the amount of Mr. Seery's Base Compensation (as defined below).  The Committee has not agreed, however, as to the amount and timing of the payment of the Restructuring Fee (defined below) and are continuing to discuss payment of the Restructuring Fee with the Compensation Committee.

has run corporate reorganization groups and numerous restructuring matters.  He also served as a
Commissioner of the American Bankruptcy Institute's Commission to Study the Reform of
Chapter 11.  Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers'
Fixed Income Loan business where he was responsible for managing the firm's investment grade
and high yield loans business, including underwriting commitments, distribution, hedging,
trading and sales (including CLO manager relationships), portfolio management and
restructuring.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout
businesses with responsibility for the management of distressed corporate debt investments and
was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

The Agreement

19.     The Compensation Committee negotiated the Agreement with Mr. Seery
at arm's length.  The additional material economic terms of the Agreement are as follows:[6]

(a) Term: Commencing retroactively to March 15, 2020.

(b) Roles:  Mr. Seery shall serve as the chief executive officer and
chief restructuring officer of the Debtor and shall be responsible
for the overall management of the business of the Debtor during its
chapter 11 case, including: directing the Debtor's day-to-day
ordinary course operations, overseeing the Debtor's personnel,
making management decisions with respect to the Debtor's trading
operations, directing the reorganization and restructuring of the
Debtor, the monetization of the Debtor's assets, resolution of
claims, the development and negotiation of a plan of
reorganization or liquidation, and the implementation of such plan.
Mr. Seery shall remain a full member of the New Board and shall
be entitled to vote on matters other than on those in which he is
conflicted.  Mr. Seery shall devote as much time to the engagement
as he determines is required to execute his responsibilities as chief
executive officer and chief restructuring officer.  Mr. Seery will
have no specific on-site requirements in Dallas, Texas, but shall be

[6] What follows is by way of summary only and is qualified in its entirety by reference to the Agreement, which
controls. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Agreement.

on site as much as he determines is necessary to execute his responsibilities as chief executive officer and chief restructuring officer, consistent with applicable COVID-19 orders, protocols and advice.

(c) <u>Compensation for Services</u>:  Mr. Seery's compensation under the Agreement shall consist of the following:

> (1) <u>Base Compensation</u>: $150,000 per month, which shall be due and payable at the start of each calendar month; plus

> (2) <u>Bonus Compensation; Restructuring Fee</u>:

> Subject to separate Bankruptcy Court approval, the Compensation Committee and Mr. Seery have reached agreement on the payment of a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "<u>Restructuring Fee</u>").[7]  The Committee has not yet agreed to the amount, composition, and timing of the Restructuring Fee.  The Compensation Committee and Mr. Seery have agreed to defer Court consideration of the Restructuring Fee until further development in the Case. The Restructuring Fee agreed to by Mr. Seery and the Compensation Committee is as follows:

> <u>Case Resolution Restructuring Plan</u>

> On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "<u>Case Resolution Plan</u>"):

> > $1,000,000 on confirmation of the Case Resolution Plan;

> > $500,000 on the effective date of the Case Resolution Plan; and

---

[7] Although the Compensation Committee and Mr. Seery have agreed on the amount and timing of the Restructuring Fee, both the Compensation Committee and Mr. Seery understand that the Restructuring Fee is payable only upon order of this Court.  The Compensation Committee is reserving the right to seek approval of the Restructuring Fee from this Court in connection with the confirmation hearing on a plan or as otherwise appropriate.

$750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

Debtor/Creditor Monetization Vehicle Restructuring Fee:

On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

$500,000 on confirmation of the Monetization Vehicle Plan;

$250,000 on the effective date of the Monetization Vehicle Plan; and

A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

(e) Participation in Employee Benefit Plans: Mr. Seery shall act as an independent professional contractor and shall not be an employee of the Debtor. Mr. Seery will pay for his own benefits and will not participate under the Debtor's existing employee benefit plans.

(f) Expenses: Reimbursement of actual and reasonable out-of-pocket expenses in connection with the services provided under the Agreement. Expenses will be generally consistent with expenses incurred to date as a member of the New Board.

(g) Conflicts and Other Engagements. Mr. Seery is not aware of any potential conflicts of interest based on his understanding of the various parties involved in the Debtor's chapter 11 case to date. Mr. Seery shall not be precluded from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Debtor under the Agreement. Mr. Seery shall not undertake any engagements directly adverse to the Debtor during the term of his engagement.

(h) <u>Termination</u>.  The Agreement may be terminated at any time by either the Debtor or by Mr. Seery upon two weeks advance written notice given to the other party.  The termination of the Agreement shall not affect Mr. Seery's right to receive, and the Debtor's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of any termination notice; *provided however*, that (1) if the Agreement is terminated by Mr. Seery, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and Mr. Seery will return any Base Compensation received in excess of such amount, and (2) if the Agreement is terminated by the Debtor, Base Compensation shall be deemed fully earned as of the first day of any month.  Bonus Compensation shall be earned by Mr. Seery immediately upon his termination by the Debtor; *provided  however*, Mr. Seery shall not be entitled to Bonus Compensation if:  (A) the Debtor's chapter 11 case is converted to chapter 7 or dismissed; (B) a chapter 11 trustee is appointed in the Debtor's chapter 11 case; (C) Mr. Seery is terminated by the Debtor for Cause;[8] or (D) Mr. Seery resigns prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section of the Agreement.

(j) <u>Conditional Requirement to Seek Further Court Approval of Agreement</u>.   The Committee may, upon two weeks advance written notice to the Debtor, require the Debtor to file a motion with the Bankruptcy Court on normal notice seeking a continuation of the Agreement and if such motion is not filed, the Agreement will terminate at the expiration of such two week period.  If the Debtor files such motion, Mr. Seery will be entitled to the Base Compensation through and including the date on which a final order is entered on such motion by this Court.  Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Debtor until a date which is more than ninety days following the date this Court enters an order approving the Agreement.

(j) <u>Indemnification</u>.   the Debtor agrees (i) to indemnify and hold harmless Mr. Seery and any of his affiliates (the "<u>Indemnified Party</u>"), to the fullest extent lawful, from and against any and all

---

[8] For purposes of the Agreement, "Cause" means any of the following grounds for termination of Mr. Seery's engagement, in each case as reasonably determined by the New Board within 60 days of the New Board becoming aware of the existence of the event or circumstance:  (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on the part of Mr. Seery; (B) conviction of or the entry of a plea of *nolo contendere* by Mr. Seery for any felony; (C) the willful breach by Mr. Seery of any material term of the Agreement; or (D) the willful failure or refusal by Mr. Seery to perform his duties to the Debtor, which, if capable of being cured, is not cured on or before fifteen (15) days after Mr. Seery's receipt of written notice from the Debtor.

losses, claims, costs, damages or liabilities (or actions in respect
thereof), joint or several, arising out of or related to the Agreement,
Mr. Seery's engagement under the Agreement, or any actions
taken or omitted to be taken by Mr. Seery or the Debtor in
connection with the Agreement and (ii) to reimburse the
Indemnified Party for all expenses (including, without limitation,
the reasonable fees and expenses of counsel) as they are incurred
in connection with investigating, preparing, pursuing, defending,
settling or compromising any action, suit, dispute, inquiry,
investigation or proceeding, pending or threatened, brought by or
against any person (including, without limitation, any shareholder
or derivative action, or any fee dispute), arising out of or relating to
the Agreement, or such engagement, or actions.  However, the
Debtor shall not be liable under the foregoing indemnity and
reimbursement agreement for any loss, claim, damage or liability
which is finally judicially determined by a court of competent
jurisdiction to have resulted primarily from the willful misconduct
or gross negligence of the Indemnified Party.

The Debtor has agreed to extend the indemnification and insurance
currently covering Mr. Seery's role as a director to fully cover Mr.
Seery in his roles as chief executive officer and chief restructuring
officer.  The Debtor is currently working to extend such coverage.

Mr. Seery is also entitled to any indemnification or other similar
provisions under the Debtor's existing or future insurance policies,
including any policy tails obtained (or which may be obtained in
the future), by the Debtor.

<u>Relief Requested</u>

20.    By this Motion, the Debtor seeks the entry of the Proposed Order

authorizing the Debtor to retain Mr. Seery pursuant to the terms of the Agreement, *nunc pro tunc*

to March 15, 2020.  The Motion also seeks to amend the Foreign Representative Order to appoint

Mr. Seery as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman

Foreign Representative in the stead of Mr. Sharp.

21.    The Debtor believes that the Debtor's retention of a chief executive officer

and chief restructuring officer constitutes an act in the ordinary course of business, and

consequently, is permissible under Bankruptcy Code section 363(c) without Court approval. However, out of an abundance of caution, the Debtor seeks this Court's approval of the Agreement under Bankruptcy Code section 363(b).

Basis For Relief

**B.** The Debtor's Entry Into the Agreement is a Valid Exercise of the Debtor's Business Judgment and the Proposed Compensation is Appropriate Under the Circumstances and Within the Range of Similar Market Transactions

22.     The Compensation Committee's decision for the Debtor to retain Mr. Seery pursuant to the terms of the Agreement should be approved pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

23.     The proposed use, sale, or lease of property of the estate may be approved under Bankruptcy Code section 363(b) if it is supported by sound business justification. *See In re Montgomery Ward*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"). Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations. *See, e.g., Inst. Creditors of Cont'l Air Lines v. Cont'l Air Lines (In re Cont'l Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (applying the "business judgment" standard in context of proposed

"use" of estate property).  Moreover, pursuant to section 105, this Court has expansive equitable

powers to fashion any order or decree which is in the interest of preserving or protecting the

value of a debtor's assets.  <mark>11 U.S.C. § 105(a)</mark>.

       24.    It is well established that courts are unwilling to interfere with corporate

decisions absent a showing of bad faith, self-interest, or gross negligence, and will uphold a

board's decisions as long as they are attributable to "any rational business purpose." *Unocal*

*Corp. v. Mesa Petroleum Co.*, <mark>493 A.2d 946, 954</mark> (Del. 1985) (citing *Sinclair Oil Corp. v.*

*Levien*, <mark>280 A.2d 717, 720</mark> (Del. 1971)).  Whether or not there are sufficient business reasons to

justify the use of assets of the estate depends upon the facts and circumstances of each case.  *See*

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, <mark>722 F.2d 1063, 1071</mark> (2d Cir.

1983).  In this case, the Debtor has ample justification to retain Mr. Seery as the Debtor's chief

executive officer and chief restructuring officer pursuant to the Agreement.  The Final Term

Sheet expressly contemplated that the New Board could appoint a chief executive officer and

that the chief executive officer could also be one of the Independent Directors.  Because Mr.

Seery will also be serving as chief restructuring officer, it is not necessary to have two separate

ranking chief restructuring officers, especially considering that Mr. Sharp (the current chief

restructuring officer) and his firm has agreed to continue to provide financial advisory services

on behalf of the Debtor.[9]  Mr. Seery is well- qualified to serve as the Debtor's chief executive

officer and chief restructuring officer.

---

[9] *See Amended Motion of the Debtor Pursuant to* <mark>*11 U.S.C. §§ 105(a)*</mark> *and* <mark>*363(b)*</mark> *to Employ and Retain
Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc, to
March 15, 2020* filed concurrently herewith

25.     The Compensation Committee negotiated the Agreement in good faith and at arm's length.  The Compensation Committee also worked with the Debtor's compensation consultant, Mercer (US) Inc., to determine the appropriate compensation for Mr. Seery as chief executive officer and chief restructuring officer.  The Compensation Committee, therefore, believes that the terms of the Agreement are reasonable, are consistent with the market within the Debtor's industry, and are entirely appropriate given the scope of Mr. Seery's duties.  Accordingly, entry into the Agreement is a sound exercise of the Debtor's business judgment.

26.     Finally, the Debtor requests that the Court apply the same criteria by which parties in interest must first petition the Court prior to asserting claims against the Independent Director approved in the Settlement Order be extended to Mr. Seery in his capacity as chief executive officer and chief restructuring officer contemplated by this Motion.  *See* Settlement Order, ¶ 10.  The rationale for the Court to first determine whether or not a colorable claim or cause of action can be maintained against the Mr. Seery, as one of the Independent Directors, is equally applicable to Mr. Seery in his capacity as chief executive officer and chief restructuring officer, will further aid in the implementation of the Settlement Order, and discourage frivolous litigation.  As was true in the Settlement Order with respect to the Independent Directors, no parties will be prejudiced by having to first apply to this Court to determine the propriety of any hypothetical claim that may be asserted against Mr. Seery in his officer capacities of the Debtor.

**C.**     The Debtor Has Satisfied Bankruptcy Code Section 503(c)(3)

27.     Bankruptcy Code section 503(c)(3) provides that "transfers or obligations that are outside the ordinary course of business . . . including transfers made to . . . consultants

hired after the date of the filing of the petition" are not allowed if they are "not justified by the

facts and circumstances of the case." 11 U.S.C. § 503(c)(3).  Courts generally use a form of the

"business judgment" and the "facts and circumstances" standard.  *See In re Pilgrim's Pride*

*Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (citing *In re Dura Auto Sys., Inc.*, Case

No. 06-11202 (Bankr. D. Del. June 29, 2007) and *In re Supplements LT, Inc.,* Case No. 08-10446

(KJC) (Bankr. D. Del. Apr. 14, 2008)).  Specifically, the court examines first, whether the

transaction meets the Debtor's business judgment standard, and second, whether the facts and

circumstances justify the transaction.  *See In re Pilgrim's Pride Corp.*, 401 B.R. at 237 (Bankr.

N.D. Tex. 2009).

        28.    The Debtor submits that the proposed transaction is within the ordinary

course of its business and thus that Bankruptcy Code section 503(c)(3) does not apply to the

Agreement.   Nevertheless, for the reasons stated above — the benefits from Mr. Seery's

leadership skills and industry experience — even if this were outside the ordinary course of

business, entry into the Agreement is well within the Debtor's business judgment as applied to

the facts and circumstances of the Debtor.  Further, the facts and circumstances of this case

support entry into the relationship under the Agreement where the Debtor will benefit from the

ability to retain Mr. Seery at a critical juncture to ongoing restructuring efforts.

        29.    For the reasons set forth above, the Debtor submits that the relief

requested herein is in the best interest of the Debtor, its estate, creditors, stakeholders, and other

parties in interest, and therefore, should be granted.

**D.    The Proposed Chief Executive Officer and Chief Restructuring Officer Should Also Serve as the Debtor's Foreign Representative**

30.    Bankruptcy Code section 1505 provides that:

A trustee or another entity (including an examiner) may be authorized by the court to act in a foreign country on behalf of an estate created under section 541. An entity authorized to act under this section may act in any way permitted by the applicable foreign law.

<mark>11 U.S.C. § 1505</mark>.

31.    The Debtor respectfully submits that Mr. Seery is qualified and capable of representing the Debtor's estate as the Foreign Representative. The Debtor believes it is appropriate for Mr. Seery, as an officer of the Debtor, to replace Mr. Sharp as Foreign Representative inasmuch as Mr. Sharp will no longer be an officer of the Debtor if the Motion is granted. In order to avoid any possible confusion or doubt regarding this authority and to comply with the requirements of Part XVII of the Cayman Law, the Debtor seeks entry of an order, pursuant to section 1505 of the Bankruptcy Code, explicitly substituting Mr. Seery in the place of Mr. Sharp as the Debtor's Foreign Representative, including specifically to serve as the Bermuda Foreign Representative and Cayman Foreign Representative.

32.    For the reasons set forth in the Foreign Representative Motion, authorizing Mr. Seery to act as the Foreign Representative on behalf of the Debtor's estate in Bermuda, the Cayman Islands or any other foreign proceeding will allow coordination of this chapter 11 case and each of the foreign proceedings and provide an effective mechanism to protect and maximize the value of the Debtor's assets and estate. Courts have routinely granted relief similar to that requested herein in other large chapter 11 cases where a debtor has foreign assets or operations requiring a recognition proceeding. *See, e.g., In re CJ Holding Co.,* No. 16-33590 (Bankr. S.D.

Tex. July 21, 2016); ECF No. 59*; In re CHC Group Ltd.,* No. 16-31854 (Bankr. N.D. Tex. Sept.

20, 2016), ECF No. 884; *In re Ultra Petroleum Corp.,* No. 16-32202 (Bankr. S.D. Tex. May 3,

2016); *In re Digital Domain Media Grp., Inc.*, No. 12-12568 (BLS) (Bankr. D. Del. Sept. 12,

2012); ECF No. 82*; In re Probe Resources US Ltd., No*. 10-40395 (Bankr. S.D. Tex. Mar. 21,

2011); ECF N. 320*; In re Bigler LP,* No. 09-38188 (Bankr. S.D. Tex. Jan. 12, 2010), ECF No.

159; In *re Horsehead Holdings Corp.,* No. 16-10287 (CSS) (Bankr. D. Del. Feb. 4, 2016); *In re*

*Colt Holding Co. LLC*, No. 15-11296 (LSS) (Bankr. D. Del. June 16, 2015).   The Debtor

believes it is appropriate for one of its officers to serve as the Foreign Representative.  In several

jurisdictions, an officer or someone acting in a similar capacity is a prerequisite to serve as a

Foreign Representative.[10]  As more fully explained in the Foreign Representative Motion, the

Debtor has assets in jurisdictions other than the United States, including in Bermuda and the

Cayman Islands.  To the extent any disputes with respect to such assets arise, it is critical that the

Foreign Representative be permitted to appear on behalf of the Debtor and it estate in any court

in which a foreign proceeding may be pending.

Notice

33.    Notice of this Motion shall be given to the following parties or, in lieu

thereof, to their counsel, if known: (a)the Office of the United States Trustee; (b)the Office of the

United States Attorney for the Northern District of Texas; (c)the Debtor's principal secured

---

[10] *See e.g.* Part XVII, Section 240o f the Companies Law (2018 Revision) of the Cayman Islands requiring that the
foreign representative be "a trustee, liquidator or other official in respect of a debtor for the purposes of a foreign
bankruptcy proceeding."  In addition, and as more fully explained in the Foreign Representative Motion, Bermuda
common law and conflict of laws principles will recognize the authority of a foreign insolvency officeholder
appointed in proceedings in the jurisdiction of incorporation of a company (or, in the instant case, the jurisdiction of
the establishment of a limited partnership) to act on behalf of and in the name of the company (or partnership) in
Bermuda.

parties; (d)counsel to the Committee; and (e)parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

<u>Conclusion</u>

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto as **Exhibit A**, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: June 23, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pcszjlaw.com
           gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**EXHIBIT A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054 |
| L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | Re: Docket No. _____ |
| | § | |

ORDER APPROVING DEBTOR'S MOTION UNDER
BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)
AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS
CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND
FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020

Upon the *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b)*

*for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring*

*Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

and 1334; (ii) venue is proper pursuant to <mark>28 U.S.C. §§ 1408</mark> and <mark>1409</mark>; <mark>(iii)</mark> this is a core proceeding pursuant to <mark>28 U.S.C. § 157(b)(2)</mark>; <mark>(iv)</mark> due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED that:

1.     The Motion is granted.

2.     Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as <u>Exhibit 1</u> and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.     The Debtor is hereby authorized to enter into and perform under the Agreement.

4.     The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph.  For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

DOCS_SF:103156.17 36027/002

5.      No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

8.      The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative.  All other provisions of the Foreign Representative Order shall remain in full force and effect.

### # # # END OF ORDER # # #

DOCS_SF:103156.17 36027/002

001160

# EXHIBIT A-1

## Engagement Agreement

DOCS_SF:103156.17 36027/002

001161

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049
jpseeryjr@gmail.com

June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Re:     Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in Chapter 11 including, directing the reorganization and restructuring of the Company, monetization of assets, resolution of claims, development and negotiation of a plan of reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the Company as I determine should report to directly to me.  In the event that the Board determines to restructure the reporting lines or functions of the Company, my direct reports will be amended in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than those on which I am conflicted.

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO. I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services. For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees. The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company. I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
    a. Base Compensation:  As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation").  Base Compensation shall be due and payable at the start of each calendar month.  Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
    b. Bonus Compensation/Restructuring Fee:
        i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
        ii. Case Resolution Restructuring Plan
            1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
                a. $1,000,000 on confirmation of the Case Resolution Plan;
                b. $500,000 on the effective date of the Case Resolution Plan; and
                c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

        iii.   Debtor/Creditor Monetization Vehicle Restructuring Fee:
                1.   On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

                      a.   $500,000 on confirmation of the Monetization Vehicle Plan;
                      b.   $250,000 on the effective date of the Monetization Vehicle Plan; and
                      c.   A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2.   Out-of-Pocket Expenses:  In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder.  Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time. Expenses will be generally consistent with expenses incurred to date as a member of the Board.

Bankruptcy Court Approval

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court.  I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

Conflicts and Other Engagements

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company.  Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement.  However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

Privilege

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential. I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

<u>Termination of Engagement</u>

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party. The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month. Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof. For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance: (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

<u>Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement</u>

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

001165

Indemnification

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions. However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

Miscellaneous

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court. As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York. The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner

_____        _____
John Dubel                              Russell Nelms
Director                                Director
Strand Advisors, Inc.                   Strand Advisors, Inc.

001167

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____           _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

001168

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                                    Russell Nelms
Director                                                          Director
Strand Advisors, Inc.                                    Strand Advisors, Inc.

001169

EXHIBIT 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed July 16, 2020

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 19-34054 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Re: Docket No. 774 |
| Debtor. | § | |

**ORDER APPROVING DEBTOR'S MOTION UNDER
BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)
AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS
CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND
FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020**

Upon the *Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

DOCS_SF:103156.19 36027/002



001171

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

      **ORDERED, ADJUDGED, and DECREED** that:

1.      The Motion is **GRANTED**.

2.      Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as **Exhibit 1** and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.      The Debtor is hereby authorized to enter into and perform under the Agreement.

4.      The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph.  For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

5.     No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.     Notwithstanding anything in the Motion, the Agreement or the Order to the contrary, the Agreement shall be deemed terminated upon the effective date of a confirmed plan of reorganization unless such plan provides otherwise.

7.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.     This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

9.     The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative.  All other provisions of the Foreign Representative Order shall remain in full force and effect.

### ###END OF ORDER###

DOCS_SF:103156.19 36027/002

001173

**EXHIBIT 1**

**Engagement Agreement**

June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Re:     Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in Chapter 11 including, directing the reorganization and restructuring of the Company, monetization of assets, resolution of claims, development and negotiation of a plan of reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the Company as I determine should report to directly to me. In the event that the Board determines to restructure the reporting lines or functions of the Company, my direct reports will be amended in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than those on which I am conflicted.

001175

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO. I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services. For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees. The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company. I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
   a. Base Compensation: As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation"). Base Compensation shall be due and payable at the start of each calendar month. Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
   b. Bonus Compensation/Restructuring Fee:
      i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
      ii. Case Resolution Restructuring Plan
         1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
            a. $1,000,000 on confirmation of the Case Resolution Plan;
            b. $500,000 on the effective date of the Case Resolution Plan; and
            c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

          iii.   Debtor/Creditor Monetization Vehicle Restructuring Fee:
                   1.   On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

               a.   $500,000 on confirmation of the Monetization Vehicle Plan;
               b.   $250,000 on the effective date of the Monetization Vehicle Plan; and
               c.   A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2.   Out-of-Pocket Expenses:  In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder.  Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time.  Expenses will be generally consistent with expenses incurred to date as a member of the Board.

Bankruptcy Court Approval

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court.  I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

Conflicts and Other Engagements

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company.  Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement.  However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

Privilege

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential. I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

<u>Termination of Engagement</u>

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party. The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month. Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof. For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance: (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

<u>Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement</u>

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

<u>Indemnification</u>

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "<u>Indemnified Party</u>"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions. However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

<u>Miscellaneous</u>

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court. As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York. The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner

_____     _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

001180

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

001182

# EXHIBIT 4



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed January 9, 2020

_____
United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
### UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
### AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to <mark>28 U.S.C. §§157</mark> and <mark>1334,</mark> <mark>(b)</mark> this is a core proceeding pursuant to <mark>28 U.S.C. §157(b)(2)(A),</mark> and <mark>(c)</mark> notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.      The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

DOCS_NY:39973.13 36027/002

001185

4.      The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.      The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.      All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.      Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.      Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.      Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

DOCS_NY:39973.13 36027/002

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

       11.    Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

       12.    Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

DOCS_NY:39973.13 36027/002

001187

13.    The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order, including matters related to the Committee's

approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No. 3:21-CV-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **JAMES P. SEERY,** *individually,* **and** | § | |
| **HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## <u>ORDER</u>

The Court,  having considered Plaintiffs' Motion for Leave to File First Amended

Complaint, finds that the Motion should be GRANTED.

IT IS THEREFORE ORDERED that Plaintiff's First Amended Complaint is hereby

deemed filed.

SO ORDERED.

Dated this _____ day of _____, 2021.


_____
UNITED STATES DISTRICT JUDGE

## Kim James

| | |
|---|---|
| **From:** | ecf_txnd@txnd.uscourts.gov |
| **Sent:** | Tuesday, April 20, 2021 1:19 PM |
| **To:** | Courtmail@txnd.uscourts.gov |
| **Subject:** | Activity in Case 3:21-cv-00842-B Charitable DAF Fund et al v. Highland Capital Management LP et al Order on Motion for Leave to File |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

If you need to know whether you must send the presiding judge a paper copy of a document that you have docketed in this case, click here: Judges' Copy Requirements. Click here to see Judge Specific Requirements. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge.

### U.S. District Court

### Northern District of Texas

## Notice of Electronic Filing

The following transaction was entered on 4/20/2021 at 1:18 PM CDT and filed on 4/20/2021

| | |
|---|---|
| **Case Name:** | Charitable DAF Fund et al v. Highland Capital Management LP et al |
| **Case Number:** | 3:21-cv-00842-B |
| **Filer:** | |
| **Document Number:** | 8(No document attached) |

**Docket Text:**
**ELECTRONIC ORDER denying [6] Motion for Leave to File without prejudice. To the extent a motion for leave to file an amended complaint is required under Rule 15, Plaintiffs may renew their motion after Defendants are served and have appeared. (Ordered by Judge Jane J. Boyle on 4/20/2021) (chmb)**

**3:21-cv-00842-B Notice has been electronically mailed to:**

Jonathan Bridges     jeb@sbaitilaw.com, jbridges99@ymail.com

Mazin A Sbaiti     MAS@SbaitiLaw.com, kls@sbaitilaw.com, knc@sbaitilaw.com, krj@sbaitilaw.com, mgp@sbaitilaw.com

**3:21-cv-00842-B The CM/ECF system has NOT delivered notice electronically to the names listed below. The clerk's office will only serve notice of court Orders and Judgments by mail as required by the federal rules.**

1

**From:** Jonathan E. Bridges
**Sent:** Monday, April 19, 2021 7:25 PM
**To:** Jeff Pomerantz
**Cc:** Mazin Sbaiti; Kim James; John A. Morris
**Subject:** Re: CLO Holdco v. Highland

Mr. Pomerantz,

Thank you for sending the orders and for keeping in mind that we're new to a matter that, in the bankruptcy court, has over 2,000 filings. We may well have missed something. But we have seen and carefully studied the orders that you sent. And we do not believe they prohibit the motion we are filing, which briefs them and explains why we don't believe they prohibit our motion.

We also don't think the district court will both decide that we're wrong about this and nonetheless grant our motion. As I read the orders, that's the only theoretical way that a motion for leave could violate them.

And if the district court does grant our motion for the reasons we ask—because it finds that the bankruptcy court exceeded its jurisdiction or because it finds that our motion for leave (which can be referred) complies with the bankruptcy court orders—then we don't think the bankruptcy court can or will overrule the district court.

So please know that we are not willfully violating those orders, as your email suggests. Quite the contrary, we are giving them careful attention. Which is why we are seeking leave rather than amending as of right.

Jonathan Bridges

**Sbaiti & Company PLLC**
CHASE TOWER
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
O: (214) 432-2899
C: (214) 663-3036
F: (214) 853-4367
E: JEB@SbaitiLaw.com
W: https://www.SbaitiLaw.com

On Apr 19, 2021, at 6:20 PM, Jeff Pomerantz <jpomerantz@pszjlaw.com> wrote:

> These Orders require you to seek such authority from the Bankruptcy Court which has exclusive jurisdiction to make the determination as to whether an action against Mr. Seery may be brought.
>
> If you violate such Orders by filing your motion in the District Court we will seek

appropriate relief from the Bankruptcy Court including sanctions against you and your
client for a willful violation of the Bankruptcy Court's orders.

Jeff

On 4/19/21, 4:11 PM, "Mazin Sbaiti" <MAS@sbaitilaw.com> wrote:

  District Court where we filed the case, where we suspect it will be referred to the bk
court.
  M


  From Mazin A. Sbaiti, Esq.


  -----Original Message-----
  From: Jeff Pomerantz <jpomerantz@pszjlaw.com>
  Sent: Monday, April 19, 2021 6:10 PM
  To: Mazin Sbaiti <MAS@sbaitilaw.com>; Jonathan E. Bridges <JEB@sbaitilaw.com>
  Cc: Kim James <KRJ@sbaitilaw.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff
Pomerantz <jpomerantz@pszjlaw.com>
  Subject: Re: CLO Holdco v. Highland

  Yes. Put us down as opposed. And you will be filing that motion in the bankruptcy
court correct?

  Jeff

  On 4/19/21, 4:09 PM, "Mazin Sbaiti" <MAS@sbaitilaw.com> wrote:

    Jeff,

    Our meet and confer is for our motion for leave to amend to add him. I believe, per
those orders' language, we are following the court's instruction.
    We are not unilaterally adding him.

    I take it you want us to put you down as "opposed" on the certificate of conference?

    Mazin



    From Mazin A. Sbaiti, Esq.


    -----Original Message-----
    From: Jeff Pomerantz <jpomerantz@pszjlaw.com>

001192

Sent: Monday, April 19, 2021 6:05 PM
To: Jonathan E. Bridges <JEB@sbaitilaw.com>
Cc: Mazin Sbaiti <MAS@sbaitilaw.com>; Kim James <KRJ@sbaitilaw.com>; Jeff
Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>
Subject: Re: CLO Holdco v. Highland

I appreciate that you are new to the case but you need to be aware of the attached
July 9, 2020 and July 16, 2020 Bankruptcy Court orders that prohibit Mr. Seery (among
others) from being sued without first obtaining authority from the Bankruptcy Court. If
you proceed to amend the complaint as you suggest below without first obtaining
Bankruptcy Court approval we reserve all rights to take appropriate action and seek
appropriate relief from the Bankruptcy Court.

Also please keep my partner John Morris copied on emails.

Jeff Pomerantz


From: "Jonathan E. Bridges" <JEB@sbaitilaw.com>
Date: Monday, April 19, 2021 at 12:49 PM
To: Jeffrey Pomerantz <jpomerantz@pszjlaw.com>
Cc: Mazin Sbaiti <MAS@sbaitilaw.com>, Kim James <KRJ@sbaitilaw.com>
Subject: CLO Holdco v. Highland

Mr. Pomerantz,

Mazin and I intend to move for leave today in the district court seeking permission
to amend our complaint to add claims against Mr. Seery. They are the same causes of
action. We believe we are entitled to amend as a matter of course. But we will also raise
and brief the bankruptcy court's orders re the same.

Can we put your client down as unopposed?

We appreciate your prompt reply.

Jonathan Bridges
[cid:image001.png@01D67A35.9FEE2C90] Sbaiti & Company PLLC CHASE TOWER
2200 Ross Avenue, Suite 4900W<x-apple-data-detectors://1/0>
Dallas, Texas 75201<x-apple-data-detectors://1/0>
O: (214) 432-2899<tel:(214)%20432-2899>
C: (214) 663-3036<tel:(214)%20663-3036>
F: (214) 853-4367<tel:(214)%20853-4367>
E: JEB@SbaitiLaw.com<mailto:JEB@SbaitiLaw.com>
W: https://www.SbaitiLaw.com<https://www.sbaitilaw.com>

_____

CONFIDENTIALITY

This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **CHARITABLE DAF FUND, L.P.** §<br>**and CLO HOLDCO, LTD.,** §<br>*directly and derivatively,* §<br> §<br>*Plaintiffs,* §<br> §<br>v. §<br> §<br>**HIGHLAND CAPITAL MANAGEMENT,** §<br>**L.P. , HIGHLAND HCF ADVISOR, LTD.,** §<br>**JAMES P. SEERY,** *individually,* **and** §<br>**HIGHLAND CLO FUNDING, LTD.,** §<br>*nominally,* §<br> §<br>*Defendants.* § | **Cause No.  3:21-CV-00842-B** |

## <u>ORDER</u>

The Court, having considered Plaintiffs' Motion for Leave to File First Amended
Complaint, finds that the Motion should be GRANTED.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Leave to File First Amended
Complaint is GRANTED.

SO ORDERED.

Dated this _____ day of _____, 2021.


_____
UNITED STATES DISTRICT JUDGE