**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| In Re: **Highland Capital Management, L.P** **Charitable DAF Fund, L.P et al** | § | Case No. **19-34054-SGJ11** |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

## Volume 7

## APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

---

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.   Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2.   The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.   Docket Sheet kept by the Bankruptcy Clerk.

4.   Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| Vol. 2 000139 | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 000232 | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 000239 | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 000270 Thru Vol. 6 | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| Vol. 7 001196 | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7* *001203* *Thru Vol. 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9*<br>*001905*<br>*Thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14*<br>*002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| Vol. 14 | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| 002878 | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| 002883 Thru Vol. 16 | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| Vol. 17 003392 | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| 003394 | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| 003583 | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| 003585 | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| 003611 | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18* 003637 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| 003666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| 003843 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 003844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 003851 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19* 003882 *Thru Vol. 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21* 004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* *004745* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* *004770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* *005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056* *Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* *005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* *005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* *006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|
| *006133*  *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32*  *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| *006961* | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| Vol. 33 | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

007065

Dated:  July 14, 2023                      Respectfully submitted,

                                           **SBAITI & COMPANY PLLC**

                                           */s/  Mazin A. Sbaiti*
                                           **Mazin A. Sbaiti**
                                           Texas Bar No. 24058096
                                           **Jonathan Bridges**
                                           Texas Bar No. 24028835
                                           2200 Ross Avenue – Suite 4900W
                                           Dallas, TX  75201
                                           T:  (214) 432-2899
                                           F:  (214) 853-4367
                                           E:  mas@sbaitilaw.com
                                               jeb@sbaitilaw.com

                                           **Counsel for Appellants**


                        **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                           */s/ Mazin A. Sbaiti*
                                           Mazin A. Sbaiti

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., <br><br> Plaintiffs, <br><br> vs. <br><br> HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD., <br><br> Defendants. | § <br> § <br> § <br> § <br> § Case No. 3:21-cv-00842-B <br> § <br> § <br> § <br> § <br> § <br> § |

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## <u>MOTION TO DISMISS COMPLAINT</u>

Highland Capital Management, L.P., the plaintiff in the above-captioned case (the

"<u>Debtor</u>" or "<u>Highland</u>"), by and through its undersigned counsel, files this motion (the "<u>Motion</u>")

001196

seeking entry of an order dismissing the *Original Complaint* [Docket No. 1] (the "Complaint")
filed by Plaintiffs Charitable DAF Fund, L.P. (the "DAF") and CLO Holdco, Ltd. ("CLOH")
(together, "Plaintiffs"). In support of its Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over the Motion pursuant to section 1331 and 1367 of
title 11 of the United States Code (the "Bankruptcy Code").

2.       Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.       The predicates for the relief requested in the Motion are 28 U.S.C. § 1391.

## RELIEF REQUESTED

4.       The Debtor requests that this Court issue the proposed form of order attached as
**Exhibit A** (the "Proposed Order") pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

5.       For the reasons set forth more fully in Defendant Highland Capital Management,
L.P.'s *Memorandum of Law in Support of Motion to Dismiss Complaint* (the "Memorandum of
Law"), filed contemporaneously with this Motion, the Debtor requests that the Court: (a) dismiss
the Complaint in its entirety and (b) grant the Debtor such other and further relief as the Court
deems just and proper under the circumstances.

6.       In accordance with Rule 7.1 of the *Local Civil Rules of the United States District
Court for the Northern District of Texas* (the "Local Rules"), contemporaneously herewith and in
support of this Motion, the Debtor is filing: (a) its Memorandum of Law, and (b) the *Appendix in
Support of Defendant Highland Capital Management L.P.'s Motion to Dismiss the Complaint* (the
"Appendix") together with the exhibits annexed thereto.

001197

7.      Based on the exhibits annexed to the Appendix, and the arguments contained in the Memorandum of Law, the Debtor is entitled to the relief requested herein as set forth in the Proposed Order.

8.      Notice of this Motion has been provided to all parties.  The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant the Debtor such other and further relief as the Court may deem proper.

001198

Dated:  May 27, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

001199

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---------------------------------------------------------------

CHARITABLE DAF FUND, L.P., AND CLO
HOLDCO LTD.,

                Plaintiffs,

vs.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
HIGHLAND HCF ADVISOR, LTD., AND
HIGHLAND CLO FUNDING, LTD.,

                Defendants.

§
§
§
§
§
§
§
§
§
§
§
§

Case No. 3:21-cv-00842-B

---------------------------------------------------------------

## ORDER GRANTING MOTION TO DISMISS COMPLAINT

Before the Court is *Defendant Highland Capital Management L.P.'s Motion to Dismiss the Complaint* [Docket No. __] (the "Motion").[1]  Having considered: (a) the Motion; (b) Defendant Highland Capital Management, L.P.'s *Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference* [Docket No. __] (the "Memorandum of Law"); and (c) the *Appendix in Support of Highland Capital Management's Motion to Dismiss the Complaint* [Docket No. __] (the "Appendix") and the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1331; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1391; and this Court having found that the Complaint should be dismissed in its entirety because: (a) the Claims asserted therein are barred by the doctrine of *res judicata*; (b) the Claims are barred by the doctrine of judicial estoppel; and (c) the Complaint fails to allege any Claim for relief that is plausible for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure; and this Court having found that the Debtor's

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Memorandum of Law.

1

notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and that no other notice need be provided; and this Court having determined that

the legal and factual bases set forth in the Motion establish good cause for the relief granted herein;

and upon all of the proceedings had before this Court; and after due deliberation and sufficient

cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY**

**ORDERED THAT**:

1.       The Motion is **GRANTED** as set forth herein.

2.       This Complaint is dismissed in its entirety.

   **It is so ordered** this _____ day of _____, 2021.

                                        _____
                                        The Honorable Jane J. Boyle
                                        United States District Judge

001202

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § | |
| | § | |
| | § | Case No. 3:21-cv-00842-B |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING, LTD., | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
MOTION TO DISMISS THE COMPLAINT**

001203

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>"

or "<u>Highland</u>"), hereby files this appendix in support of *Highland Capital Management, L.P.'s*

*Motion to Dismiss the Complaint* (the "<u>Motion</u>").[1]

## **TABLE OF CONTENTS**

| Appx. | Description |
|---|---|
|  |  |
| 1 | HarbourVest 2017 Global Fund L.P. Proof of Claim No. 143, HarbourVest 2017 Global AIF L.P., Proof of Claim No. 147, HarbourVest Dover Street IX Investment L.P., Proof of Claim No. 150, HV International VIII Secondary L.P., Proof of Claim No. 153, HarbourVest Skew Base AIF L.P., Proof of Claim No. 154, and HarbourVest Partners L.P., Proof of Claim No, 149. |
| 2 | *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] |
| 3 | *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* [Docket No. 1631-1] |
| 4 | *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest*, [Docket No. 1697] |
| 5 | *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] |
| 6 | *Objection to HarbourVest Settlement* [Docket No. 1707] |
| 7 | Deposition Transcript of Michael Pugatch, January 21, 2021 |
| 8 | *Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1731] |
| 9 | Hearing Transcript, January 14, 2021 |
| 10 | *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1788] |
| 11 | *Original Complaint*, Case No. 21-00842-B, Docket No. 1 (N.D. Tex. Apr. 12, 2001) |
| 12 | Deposition Transcript of Grant Scott, January 21, 2021 |
| 13 | Members Agreement, November 15, 2017 |

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

Dated: May 27, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
　　　rfeinstein@pszjlaw.com
　　　jmorris@pszjlaw.com
　　　gdemo@pszjlaw.com
　　　jelkin@pszjlaw.com
　　　hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

001205

# APPENDIX 1

# CLAIM 143

**Fill in this information to identify the case:**

Debtor     Highland Capital Management, L.P.

United States Bankruptcy Court for the:   Northern    District of   Texas
                                                    (State)

Case number   19-34054

## Official Form 410
# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest 2017 Global Fund L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HarbourVest 2017 Global Fund L.P. <br> Attn: Erica Weisgerber <br> Debevoise and Plimpton LLP <br> 919 Third Avenue <br> New York, NY 10022, U.S.A. | See summary page |
| Contact phone   2129096000 | Contact phone   6173483773 |
| Contact email   eweisgerber@debevoise.com | Contact email   agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                    MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

001208

19340542004080000000000055

**Part 2:**   Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $ _See Annex_____ .   **Does this amount include interest or other charges?**<br><br>☐ No<br><br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other<br>charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>_See Annex_____ |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☑ No<br><br>☐ Yes.  The claim is secured by a lien on property.<br><br>**Nature or property:**<br><br>☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br><br>☐ Motor vehicle<br><br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br>**Amount of the claim that is secured:** $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes**.** Identify the property: _____ |

001209
1934054200040800000000000055

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |
|---|---|

---

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. **FRBP 9011(b).**<br><br>If you file this claim electronically, **FRBP 5005(a)(2)** authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☑ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   <u>04/08/2020</u><br>               MM / DD / YYYY<br><br><br><u>/s/Michael Pugatch</u><br>  Signature<br><br>Print the name of the person who is completing and signing this claim:<br><br>Name    <u>Michael Pugatch</u><br>           First name               Middle name           Last name<br><br>Title      <u>Managing Director - Company: HarbourVest 2017 Global Fund L.P., by Harbo</u><br><br>Company   <u>by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL</u><br>           Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address<br><br><br><br>Contact phone   _____        Email   _____ |

1934054200040800000000000055

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| **Debtor:** | |
|---|---|
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global Fund L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global Fund L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | |
| No | **Amount Unsecured:** |
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:40:16 p.m. Eastern Time | |
| **Title:** | |
| Managing Director - Company: HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its Gen Partner | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

VN: 0DB62642624B41D1B004FEABCD97B964

001211

001212

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global Fund L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.   *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

001213

documents.    However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.    This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.    Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

001214

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.   Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.   This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.   This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.   The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

001215

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

001216

# CLAIM 147

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: ___Northern___ District of __Texas__
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HarbourVest 2017 Global AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

HarbourVest 2017 Global AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____  Filed on ___/___/___
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

00128

1934054200040800000000000059

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

00129

1934054200040800000000000059

| 12. | **Is all or part of the claim entitled to priority under** <mark>11 U.S.C. § 507(a)</mark>? | | |
|---|---|---|---|

☑ No

☐ Yes. *Check all that apply:*

| | | **Amount entitled to priority** |
|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under <mark>11 U.S.C. § 507(a)(1)(A)</mark> or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. <mark>11 U.S.C. § 507(a)(7).</mark>

$_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. <mark>11 U.S.C. § 507(a)(4).</mark>

☐ Taxes or penalties owed to governmental units. <mark>11 U.S.C. § 507(a)(8).</mark>

$_____

☐ Contributions to an employee benefit plan. <mark>11 U.S.C. § 507(a)(5).</mark>

$_____

☐ Other. Specify subsection of <mark>11 U.S.C. § 507(a)(___)</mark> that applies.

$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. | **Is all or part of the claim pursuant to** <mark>11 U.S.C. § 503(b)(9)</mark>? | |
|---|---|---|

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it.** <mark>FRBP 9011(b).</mark>

If you file this claim electronically, <mark>FRBP 5005(a)(2)</mark> authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** <mark>18 U.S.C. §§ 152, 157, and 3571.</mark>

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___04/08/2020___
                   MM  /  DD  /  YYYY

_/s/Michael Pugatch_
Signature

Print the name of the person who is completing and signing this claim:

| Name | _Michael Pugatch_ |
|---|---|
| | First name        Middle name        Last name |

| Title | _Managing Director-Company: HarbourVest 2017 Global AIF L.P., by Harbour\ |
|---|---|

| Company | _Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme_ |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | |
|---|---|

| Contact phone | _____ | Email | _____ |
|---|---|---|---|

1934054200040800000000000059

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:49:59 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative |
| **Company:** |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

### ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

001223

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.     Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

001224

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.     Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.     This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

001225

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*\*\*

001226

# CLAIM 150

---

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern    District of Texas<br>(State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest Dover Street IX Investment L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

**Federal Rule of Bankruptcy Procedure** (FRBP) 2002(g)

Where should notices to the creditor be sent?

See summary page

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone   2129096000
Contact email   eweisgerber@debevoise.com

Contact phone   6173483773
Contact email   agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

001228

1934054200040800000000000060

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ _See  Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See  Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410     **Proof of Claim**

1934054200408000000000060

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
| | | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | | $_____ |

| **Part 3:** | **Sign Below** |

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | *Check the appropriate box:* |
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |
| | Executed on date  04/08/2020 |
| | MM / DD / YYYY |
| | /s/Michael Pugatch |
| | Signature |

Print the name of the person who is completing and signing this claim:

| Name | Michael Pugatch | | |
| | First name | Middle name | Last name |
| Title | Managing Director-Company: HarbourVest Dover Street IX Investment L.P., |
| Company | Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____ | Email | _____ |

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Dover Street IX Investment L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Dover Street IX Investment L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | **Arrearage Amount:** | |
| **Based on Lease:** | | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:59:00 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners Ireland Limited, its Alter | |
| **Company:** | |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | |

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. |  |

## <u>ANNEX TO PROOF OF CLAIM</u>

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest Dover Street IX Investment L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

2

documents.  However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

001234

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.    Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.    This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

001235

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*** 

001236

# CLAIM 153

001237

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: ___Northern___ District of __Texas__
(State)

Case number ___19-34054_____

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | HV International VIII Secondary L.P.<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HV International VIII Secondary L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A.<br><br>Contact phone  2129096000<br>Contact email  eweisgerber@debevoise.com | See summary page<br><br><br><br><br>Contact phone  6173483773<br>Contact email  agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ Filed on ____/____/_____<br>MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

00128

1934054200040800000000000065

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

Name        Michael Pugatch
            First name        Middle name        Last name

Title       Managing Director-Company: HV International VIII Secondary L.P.,  by HI

Company     by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____        Email    _____

---

0012401
1934054200040800000000000065

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HV International VIII Secondary L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HV International VIII Secondary L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
|---|---|---|
| See Annex | No | |

| | |
|---|---|
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:16:54 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HV International VIII Secondary L.P.,  by HIPEP VIII Associates L.P., its General Partner, | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

VN: 671DA480298CC9959BF07710FFD6AEBF

001241

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## <u>ANNEX TO PROOF OF CLAIM</u>

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HV International VIII Secondary L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.    Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.    Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.    The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

001243

documents.    However, any requested relevant documents will be provided to the Official

Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the

event of a dispute regarding this Proof of Claim and will be made available for review by other

parties in interest as appropriate upon reasonable request and after consultation with the Debtor

and execution of appropriate confidentiality agreements.

6.    This Proof of Claim is filed with a full reservation of rights, including the right to

amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any

time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or

release of any of the Claimant's rights against any person, entity or property accruing to it

against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C.

§ 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the

Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of

any of the claims described herein, or any objection or other proceeding commenced with respect

to any of the claims described herein, or any other proceeding commenced in the Debtor's

chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right

of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or

proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have

orders entered only after *de novo* review by a United States District Judge; (f) an election of

remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request

withdrawal of the reference with respect to any matter, including, without limitation, any matter

relating to this Proof of Claim.

7.    Claimant's express reservation of all rights and causes of action, includes, without

limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

001244

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.     Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.     This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

001245

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

001246

# CLAIM 154

Fill in this information to identify the case:

Debtor ____Highland Capital Management, L.P.____

United States Bankruptcy Court for the: ____Northern____  District of __Texas__
(State)

Case number ____19-34054____

## Official Form 410
# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:   Identify the Claim

**1. Who is the current creditor?**
HarbourVest Skew Base AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ____

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes.  From whom? ____

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?
HarbourVest Skew Base AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

Where should payments to the creditor be sent? (if different)
See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):
____

**4. Does this claim amend one already filed?**
☑ No
☐ Yes.  Claim number on court claims registry (if known) ____  Filed on ____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing? ____

001248
1934054200040800000000000064

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ _See Annex_____ . Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                    $_____

**Amount of the claim that is secured:**        $_____

**Amount of the claim that is unsecured:**     $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under** <mark>11 U.S.C. § 507(a)</mark>**?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under <mark>11 U.S.C. § 507(a)(1)(A)</mark> or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. <mark>11 U.S.C. § 507(a)(7).</mark> | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. <mark>11 U.S.C. § 507(a)(4).</mark> | $_____ |
| ☐ Taxes or penalties owed to governmental units. <mark>11 U.S.C. § 507(a)(8).</mark> | $_____ |
| ☐ Contributions to an employee benefit plan. <mark>11 U.S.C. § 507(a)(5).</mark> | $_____ |
| ☐ Other. Specify subsection of <mark>11 U.S.C. § 507(a)(___)</mark> that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to** <mark>11 U.S.C. § 503(b)(9)</mark>**?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

**Part 3:    Sign Below**

**The person completing this proof of claim must sign and date it.** <mark>FRBP 9011(b).</mark>

If you file this claim electronically, <mark>FRBP 5005(a)(2)</mark> authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** <mark>18 U.S.C. §§ 152, 157, and 3571.</mark>

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

_/s/Michael Pugatch_
Signature

Print the name of the person who is completing and signing this claim:

Name        Michael Pugatch
            First name        Middle name        Last name

Title       Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVes

Company     Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investme
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____        Email    _____

---

1934054200040800000000000064

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HarbourVest Skew Base AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| **Disbursement/Notice Parties:** | |
|---|---|
| HarbourVest Skew Base AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| **Other Names Used with Debtor:** | **Amends Claim:** |
|---|---|
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:11:50 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative Inv | |
| **Company:** | |
| Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | |

VN: 37ADBC619BCE5E389F8F25C4DAB7545F

**001251**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. |  |

### ANNEX TO PROOF OF CLAIM

1.     This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Skew Base AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.     The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings

001252

in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.   *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

001253

documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

001254

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.     Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.     This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

001255

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*** 

001256

# CLAIM 149

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___   District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | Who is the current creditor? | HarbourVest Partners L.P. on behalf of funds and accounts under management |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.   From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- | --- | --- |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | See summary page | See summary page |
| | | Contact phone 2129096000 | Contact phone 6173483773 |
| | | Contact email eweisgerber@debevoise.com | Contact email agoren@harbourvest.com |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | | ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | |

| 4. | Does this claim amend one already filed? | ☑ No | |
| --- | --- | --- | --- |
| | | ☐ Yes.   Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes. Who made the earlier filing? _____ |

| **Part 2:** | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?**    $ __See Annex_____ . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

__See Annex_____

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                          $_____

**Amount of the claim that is secured:**        $_____

**Amount of the claim that is unsecured:**      $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

001259

1934054200040800000000000061

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. **FRBP 9011(b).**

If you file this claim electronically, **FRBP 5005(a)(2)** authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM  /  DD  /  YYYY

_/s/Michael Pugatch_
Signature

Print the name of the person who is completing and signing this claim:

Name        Michael Pugatch
            First name            Middle name            Last name

Title       Managing Director

Company     HarbourVest Partners L.P., on behalf of funds and accounts under manage
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____            Email    _____

---

001260

1934054200408000000000061

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

**Debtor:**
  19-34054 - Highland Capital Management, L.P.

**District:**
  Northern District of Texas, Dallas Division

| | |
|---|---|
| **Creditor:**<br>HarbourVest Partners L.P. on behalf of funds and accounts under management<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br><br>New York, NY, 10022<br>U.S.A.<br>**Phone:**<br>2129096000<br>**Phone 2:**<br><br>**Fax:**<br><br>**Email:**<br>eweisgerber@debevoise.com | **Has Supporting Documentation:**<br>  Yes, supporting documentation successfully uploaded<br>**Related Document Statement:** |
| | **Has Related Claim:**<br>  No<br>**Related Claim Filed By:** |
| | **Filing Party:**<br>  Authorized agent |

**Disbursement/Notice Parties:**
  HarbourVest Partners L.P. c/o HarbourVest Partners, LLC

  One Financial Center

  Boston, MA, 02111
  U.S.A.
  **Phone:**
  6173483773
  **Phone 2:**

  **Fax:**

  **E-mail:**
  agoren@harbourvest.com
  **DISBURSEMENT ADDRESS**

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:**<br>  No<br>**Acquired Claim:**<br>  No |
| **Basis of Claim:**<br>  See Annex | **Last 4 Digits:**<br>  No | **Uniform Claim Identifier:** |
| **Total Amount of Claim:**<br>  See Annex | **Includes Interest or Charges:**<br>  None | |
| **Has Priority Claim:**<br>  No | **Priority Under:** | |
| **Has Secured Claim:**<br>  No | **Nature of Secured Amount:**<br>**Value of Property:** | |
| **Amount of 503(b)(9):**<br>  No | **Annual Interest Rate:** | |
| **Based on Lease:**<br>  No | **Arrearage Amount:** | |
| **Subject to Right of Setoff:**<br>  No | **Basis for Perfection:**<br>**Amount Unsecured:** | |

**Submitted By:**
  Michael Pugatch on 08-Apr-2020 5:06:59 p.m. Eastern Time
**Title:**
  Managing Director
**Company:**
  HarbourVest Partners L.P., on behalf of funds and accounts under management,  by HarbourVest Partners, LLC, its Gen Partner

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

### ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Partners L.P. on behalf of funds and accounts under management (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant manages investment funds that are limited partners in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third*

*Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.    The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such documents.    However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.    This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.    The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

001264

7.    Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor, as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.    Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.    This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

001265

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.


***

001266

# APPENDIX 2

Case 19-34054-sgj11 Doc 1625 Filed 12/29/21 Entered 12/29/21 15:20:19 Page 1 of 13
Case 3:21-cv-01603-B Document 7-21 Filed 05/07/14 Page 86 of 263 PageID 1501
Docket #1625 Date Filed 12/23/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the <mark>Federal Rules of Bankruptcy Procedure (the</mark> "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

DOCS_NY:41802.6 36027/002

001269

## RELEVANT BACKGROUND

**A.**    **Procedural Background**

        3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

        4.      On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

        5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

        6.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

        7.      In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

        8.      On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

        9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

### B.    Overview of HarbourVest's Claims

      10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

      11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

      12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

      13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

## C.   Summary of HarbourVest's Factual Allegations

14.   At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.   The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.   HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.   For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.   In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

DOCS_NY:41802.6 36027/002

001272

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof.  The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC.  *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case").  The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee").  A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim"). Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

001274

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "<u>Claim Objection</u>").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "<u>Fraud Claims</u>"), U.S. State and Federal Securities Law Claims (the "<u>Securities Claims</u>"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("<u>RICO</u>"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "<u>HarbourVest Claims</u>").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.     <u>Settlement Discussions</u>**

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

      30.    During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

      31.    After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.    Summary of Settlement Terms

      32.    The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of

the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has

specified two additional factors that bear on the decision to approve a proposed settlement. First,

the court should consider "the paramount interest of creditors with proper deference to their

reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster

Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the

"extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or

collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations

omitted).

     36. There is ample basis to approve the proposed Settlement Agreement based

on the Rule 9019 factors set forth by the Fifth Circuit.

     37. First, although the Debtor believes that it has valid defenses to the

HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with

HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in

part, on the credibility of witnesses whose veracity has already been called into question by this

Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis

Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted

HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

     38. The second factor—the complexity, duration, and costs of litigation—also

weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the

events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis

Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already

cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not

approved, then the parties will expend significant resources litigating a host of fact-intensive

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors.  Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length.  The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario."  Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

DOCS_NY:41802.6 36027/002

001279

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# APPENDIX 3

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

### R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS,** on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS,** the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

US-DOCS\115534291.12

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

**EXECUTION VERSION**

4.  <u>**Representations and Warranties**</u>.  Subject in all respects to Section 3 hereof:

(a)  each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)  the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.  <u>**Plan Support**</u>.

(a)  Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)  In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)  The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7. **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

001286

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9. **Advice of Counsel**. Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10. **Entire Agreement**. This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11. **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12. **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

001287

**EXECUTION VERSION**

       14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

001288

EXECUTION VERSION

IT IS HEREBY AGREED.

<div align="right">

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

</div>

By: /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its: CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its
Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed
Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director


**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General
Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC,
its Managing Member**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

US-DOCS\115534291.12

001290

# Exhibit A

**TRANSFER AGREEMENT**

**FOR ORDINARY SHARES OF**

**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of December [__], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

    a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

    b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

ActiveUS 183646253v.3

001292

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

001293

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

   a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

   b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

   c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

   a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

   b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

    Prior to the Effective Date the Transferee shall procure that:

   c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

   a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement. In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto. No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 183646253v.3

001295

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**

**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

ActiveUS 183646253v.3

001296

*[Additional Signatures on Following Page]*

001297

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

## TRANSFERORS:

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By: HIPEP VIII Associates L.P.
     Its General Partner

By: HarbourVest GP LLC
     Its General Partner

By: HarbourVest Partners, LLC
     Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By: HarbourVest Partners (Ireland) Limited
     Its Alternative Investment Fund Manager

By: HarbourVest Partners L.P.
     Its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC
     Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By: HarbourVest Partners (Ireland) Limited
     Its Alternative Investment Fund Manager

By: HarbourVest Partners L.P.
     Its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC
     Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

001298

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

001299

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [ ] | [ ] |
| HarbourVest 2017 Global AIF L.P. | [ ] | [ ] |
| HarbourVest 2017 Global Fund L.P. | [ ] | [ ] |
| HV International VIII Secondary L.P. | [ ] | [ ] |
| HarbourVest Skew Base AIF L.P. | [ ] | [ ] |

ActiveUS 183646253v.3

# APPENDIX 4

001301

Case 19-34054-sgj11 Doc 1673 Filed 01/06/21 Entered 01/06/21 17:50:19 Page 1 of 15
Case 3:23-cv-01503-B Document 86-4 Filed 05/22/23 Page 120 of 263 PageID 1535
Docket #1697 Date Filed: 01/06/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## JAMES DONDERO'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY
## OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
### [Relates to Docket No. 1625]

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this Objection to *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154)* [Docket No. 1625] (the "Motion") filed by Highland Capital Management, L.P. (the "Debtor"). Through the Motion, the Debtor seeks approval of its compromise with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). In support of this objection, Respondent respectfully represents as follows:

## I.  <u>INTRODUCTION</u>

1.      Under Bankruptcy Rule 9019, the Bankruptcy Court is tasked with making an independent judgment on the merits of a proposed settlement to ensure that the proposed settlement is "fair, equitable, and in the best interest of the estate."[1] While Respondent recognizes the Debtor's efforts in arranging a settlement, there are at least three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim (as hereinafter defined); (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a significant claim to which it would not otherwise be entitled; and (iii) the proposed settlement seeks to improperly classify the HarbourVest Claim[2] in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. Moreover, the proposed settlement does not satisfy the factors for approval fixed by case law. On information and belief, Debtor's CEO/CRO, Mr. Seery, has previously asserted on multiple occasions that the HarbourVest Claim had no value and that the Debtor could resolve such claim for no more than $5 million. While Respondent and Mr. Seery have had a number of disagreements in this case, Respondent agrees with Mr. Seery's initial conclusion that the HarbourVest Claim is substantially without merit. Respondent understands that any settlement will not necessarily provide the best possible outcome for the Debtor, but in this instance the proposed settlement far exceeds the bounds of reasonableness and, on its face, is an attempt by the Debtor to purchase votes in favor

---

[1] *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

[2] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

of confirmation of its Plan. Given the Debtor's prior positions as to the merits of HarbourVest Claim it is necessary for the Court to closely scrutinize the settlement to determine why the Debtor now believes granting HarbourVest a net claim of nearly $60 million[3] resulting from HarbourVest's investment in a non-debtor entity (which was and is managed by a non-debtor) to be in the best interest of the estate. Upon close scrutiny, Respondent believes the Court will find that the proposed settlement is not reasonable or in the best interest of the estate and the Motion therefore should be denied.

## II.     BACKGROUND

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].

5.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

---

[3] The proposed settlement provides that HarbourVest shall receive an allowed general unsecured (Class 8) claim in the amount of $45 million and an allowed subordinated general unsecured (Class 9) claim in the amount of $35 million. As part of the settlement, HarbourVest will then transfer its entire interest in Highland CLO Funding, Ltd. ("HCLOF") to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately $22 million as of December 1, 2020.

6.      In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, for the Debtor's general partner, Strand Advisors, Inc. (the "Board").  The members of the Board are James P. Seery, Jr., John S. Dubel, and Russell F. Nelms.

7.      On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. *See* Docket No. 854.

8.      On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[4].

9.      On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

10.     On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response").

11.     On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. Docket No. 1625.

### III.     LEGAL STANDARD

12.     The merits of a proposed compromise should be judged under the criteria set forth in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).  *TMT Trailer* requires that a compromise must be "fair and equitable."  *TMT Trailer*, 390

---

[4] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

U.S. at 424; *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984). The terms "fair and equitable," commonly referred to as the "absolute priority rule," mean that (i) senior interests are entitled to full priority over junior interests; and (ii) the compromise is reasonable in relation to the likely rewards of litigation. *In re Cajun Electric Power Coop.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

13.     In determining whether a proposed compromise is fair and equitable, a Court should consider the following factors:

(i)     the probabilities of ultimate success should the claim be litigated;

(ii)    the complexity, expense, and likely duration of litigating the claim;

(iii)   the difficulties of collecting a judgment rendered from such litigation; and,

(iv)    all other factors relevant to a full and fair assessment of the wisdom of the compromise.

*TMT Trailer*, 390 U.S. at 424.

14.     In considering whether to approve a proposed compromise, the bankruptcy judge "may not simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber stamp' the trustee's proposal." *In re Am. Res. Corp.*, 841 F.2d 159, 162 (7th Cir. 1987). "[T]he bankruptcy judge must apprise himself of all facts necessary to evaluate the settlement and make an informed and independent judgment about the settlement." *See TMT Trailer*, 390 U.S. at 424, 434.

15.     While the trustee's business judgment is entitled to a certain deference, "business judgment is not alone determinative of the issue of court approval." *See In re Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011). Further, the business judgment rule does not provide a debtor with "unfettered freedom" to do as it wishes. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("[A]s a fiduciary holding its estate in trust and responsible

to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight."). The Court must conduct an "intelligent, objective and educated evaluation"[5] of the proposed settlement "to ensure that the settlement is fair, equitable, and in the best interest of the estate and creditors." *See In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006) (quoting *Conn. Gen. Life Ins. Co. v. Foster Mortgage Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)).

## IV.  ARGUMENT AND AUTHORITIES

16.     As discussed in detail below, there are three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim; (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a substantial claim to which it is not entitled; and (iii) the proposed settlement seeks to improperly classify HarbourVest's one claim in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. For these and certain additional reasons as discussed below, the Motion should be denied.

### A.  Through its Claim, HarbourVest Seeks to Revisit this Court's Orders in the Acis Case

17.     As an initial matter, through its proofs of claim, HarbourVest appears to be second guessing the Court's judgment in the Chapter 11 case of Acis Capital Management, LP and Acis Capital Management GP, LLC (collectively, "Acis") and seeking to revisit the Court's orders entered in that case years ago. HarbourVest appears to being arguing that the TRO and injunction

---

[5] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) ("To assure a proper compromise the bankruptcy judge, must be apprised of all the necessary facts for an intelligent, objective and educated evaluation. He must compare the terms of the compromise with the likely rewards of litigation.").

entered in the Acis case that prevented redemptions or resets in the CLOs are now the root cause of the decrease in value of its investment in HCLOF.

18.     Specifically, the claim states that HarbourVest incurred "financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF."[6]

19.     Essentially, HarbourVest is saying that the orders entered in the Acis case did not actually protect the investors and their investments, but instead were a triggering cause for the alleged diminution in value of its investment in HCLOF. Nevertheless, even though the value of HCLOF dropped dramatically only after the Effective Date of Acis's Plan, years later and despite the lack of Debtor involvement in managing HarbourVest's investment, HarbourVest now seeks to impute liability to the Debtor through a flimsy narrative designed to recoup investment losses unrelated to the Debtor and for which the Debtor owed HarbourVest no duty.

20.     That HarbourVest now, years later, seeks to revisit this Court's Acis orders raises a number of issues, including those as to HarbourVest's involvement (or lack thereof) in the Acis case, whether the orders, Plan, or Confirmation Order in the Acis case may bar some of the relief requested by HarbourVest here, and questions related to the merits of the HarbourVest Claim and the legal grounds allegedly supporting it.

---

[6] See Proof of Claim 143, para. 3 ("Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF.").

**B.  The HarbourVest Claim Lacks Merit and the Proposed Settlement is Not Reasonable**

21.     Based on the HarbourVest Claim and its filed response to the Debtor's objection, Respondent believes that the HarbourVest claim is meritless and the proposed settlement is not reasonable, fair and equitable, or in the best interest of the estate.

22.     First, the proposed settlement is concerning particularly because HarbourVest's bare bones proof of claim contains very little in terms of allegations of specific conduct against the Debtor that would give rise to a $60 million claim against this estate. While HarbourVest's response to the Debtor's claim objection is lengthy, it contains very little in real substance supporting its right to such a claim against the estate. The response also omits a number of key facts that are relevant and potentially fatal to its claim for damages against the Debtor's estate. Among them is the fact that Acis (and thereafter Reorganized Acis), along with Mr. Joshua Terry, managed HarbourVest's investment for years after it was made.[7] Despite this fact, HarbourVest's alleged damages appear to be based largely on the difference between the value of its initial investment at confirmation of Acis's Plan and the current value of the investment—which amount was directly determined by the performance of the CLOs that Acis managed during this time.[8] Neither the claim nor the response directly address the implications of Acis's management of the CLOs during the period following HarbourVest's investment. Nor does HarbourVest address or discuss performance of the CLOs, the market forces that may have caused HarbourVest's investment to lose value, or other factors influencing the current value of its investment. The

---

[7] *See, e.g.*, HarbourVest Proof of Claim 143, p. 5 ("The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.").

[8] *See* HarbourVest Response, Docket No. 1057, para. 40 ("HarbourVest has been injured from the Investment: not only has the Investment failed to accrue value, its value plummeted. The Investment's current value is far less than HarbourVest's initial contribution.").

---

speculative nature of the damages and the lack of specificity of the HarbourVest Claim and the role of Acis in the loss of value to HarbourVest all call into question the reliability of the allegations and the legal basis for the claim amount awarded in the settlement.

23.     Also absent from Harbourvest's papers is any discussion of any contract or agreement between (i) HarbourVest and the Debtor; and (ii) any agreement that was executed in conjunction with HarbourVest's initial investment. While the proof of claim references a number of agreements, there is no explanation in the claim or in HarbourVest's response to the Debtor's claim objection of how these agreements give rise to liability against the *Debtor*. For example, neither the claim nor the HarbourVest Response (which includes more than 600 pages of attachments) attach *any* written agreement between HarbourVest and **any other party**. While HarbourVest has alleged a number of claims sounding in tort, many of those claims cannot exist absent a contract or other express relationship between the parties. Moreover, the terms of the relevant contracts themselves likely contain a number of provisions that may call into question Debtor's liability or would be otherwise relevant to merits of the HarbourVest Claim. For example, HarbourVest in its papers appears to assert or imply that the Debtor made a number of false or fraudulent representations to solicit HarbourVest's investment, but then fails to discuss or even identify the applicable agreements it alleges it was induced into signing in connection with its investment (this despite the substantial value of the investment when the Acis plan was confirmed).

24.     Given these issues, among many others, the HarbourVest Claim is unsustainable both from a liability and damages standpoint and there are many very high hurdles HarbourVest would have to clear in seeking to prove liability against the Debtor and in proving its damages. For a long period of time, its investment was managed by Acis and the investment's performance was directly tied to Acis's inadequate performance as portfolio manager. Further, the value of

HarbourVest's investment is also directly tied to various market forces that may have impacted its value. The HarbourVest Claim is largely lacking in relevant facts and omits much salient information, such as who it contracted with in connection with its investment, the terms of such agreements, who controlled its investment during the entire period from November 2017 to the present, and the performance of its investment during the last two years. Given these issues, HarbourVest will be unable to demonstrate a causal connection between any conduct of the Debtor and the alleged damages it suffered from a reduction in value of its investment.

25.     Because of the speculative nature of the HarbourVest Claim, and the fact that very little pleading or litigation has occurred, the proposed settlement in granting such a large claim is unreasonable, not fair and equitable, and not in the best interest of the estate. The lack of pending litigation, narrowing of threshold questions, and lack of detail in HarbourVest Claim make it impossible to determine whether the huge claim awarded under the proposed settlement is justified under the facts. Accordingly, the Motion should be denied.

**C.  The Proposed Settlement is an Improper Attempt by the Debtor to Purchase Votes in Support of its Plan and the Separate Classification of the HarbourVest Claim Constitutes Gerrymandering in Violation of 11 U.S.C. § 1122**

26.     The proposed settlement is a flagrant attempt by the Debtor to purchase votes in support of its Plan by giving HarbourVest a significant claim to which it has not shown itself entitled. Moreover, the separate classification of the HarbourVest Claim into two separate classes constitutes impermissible gerrymandering in violation of section 1122 of the Bankruptcy Code. The proposed settlement essentially gives HarbourVest a claim it is not entitled to in exchange for votes in two separate classes. This is not a proper basis for a settlement and the Court should deny the Motion.

27.     Section 1122 of the Bankruptcy Code provides as follows:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

28.    "Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991).

29.    "Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections suggests that ordinarily substantially similar claims, those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id.* at 1278.

30.    The Fifth Circuit has stated that there is "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1279. The Court observed:

> There must be some limit on a debtor's power to classify creditors in such a manner. . . . Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986)).

31.     Here, the HarbourVest settlement and the classification of the HarbourVest Claim under the Plan blatantly violate the Fifth Circuit's "one rule" concerning the classification of claims under section 1122. To the extent that HarbourVest even has a legitimate claim, not only should its claim be classified together with other unsecured creditors, its claim should be classified solely in one class. To allow the Debtor to do otherwise as proposed is improper gerrymandering in order to obtain a consenting class in express violation of section 1122.

**D. There Are Other Reasons for the Court to Closely Scrutinize the Proposed Settlement that May Warrant Denial of the Motion**

32.     There are a number of other reasons for the Court to closely scrutinize the proposed settlement that may warrant denial of the Motion.

33.     First, the granting to HarbourVest of a claim in the total amount of $80 million potentially allows HarbourVest to achieve a significant windfall at the expense of other creditors and equity holders. The Debtor has asserted numerous times that the estate is solvent and, for this reason, the purported subordinated claim of $35 million (if allowed and approved) may be worth just as much as its general unsecured claim. This is a huge figure in this case, outshined only by the Redeemer Committee, which has an actual arbitration award obtained after lengthy litigation. By contrast, the HarbourVest Claim contains only a few paragraphs of generalized allegations that essentially argue that the Debtor's alleged actions related to the Acis bankruptcy, and this Court's orders in the Acis case, are a "but for" cause of the loss of its investment. While the HarbourVest Response is lengthy, it lacks necessary details for the Court to determine whether HarbourVest *may* be entitled to the relief requested by the Motion. The other significant creditors in this case— *inter alia*, Redeemer, UBS and Acis—all had pending claims that were litigated. Nor is HarbourVest a trade creditor, vendor, or other contract counter-party of the Debtor. The HarbourVest Claim is thus uniquely situated in this case and, given the size and the nature of its

claims, should invite close scrutiny. Under these facts, the potential allowance of an $80 million claim (less the value of its share in HCLOF, which may suffer by continued management by Acis) against the estate for an investment which was not held or managed by the Debtor would be a huge undue windfall.

34.      Second, the Motion states that HarbourVest will vote its proposed allowed Class 8 (proposed at $45 million) and Class 9 (proposed at $35 million) claims in support of confirmation. There are at least two potential issues with this proposal. First, the deadline for parties to submit ballots was January 5, 2021, and as of the close of business on January 5, the HarbourVest Claim has not been allowed for voting purposes.[9] Second, the Motion and proposed settlement agreement state that the HarbourVest Claim will be allowed for voting purposes only as a general unsecured claim in the amount of $45 million. It is unclear how HarbourVest can, or would be authorized to, vote its purported Class 8 and 9 Claims in support of the Plan after the voting deadline and when the settlement provides only for a voting claim in Class 8.

35.      Third, while the Motion addresses the factor of probability of success in the litigation, it does not discuss in detail the cost of doing so in relation to the amount to be paid to HarbourVest under the settlement or the likelihood that the Debtor will succeed in the litigation. In addition, unlike the claims filed by Acis and UBS, the HarbourVest Claim does not arise from pending litigation. At this point, relatively little litigation has occurred and the parties have not addressed threshold issues that might dramatically narrow the scope of the HarbourVest Claim. Rule 9019 requires an analysis as to whether the probability of success in litigation is outweighed by the consideration achieved under the settlement.  *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (The Court must "compare the terms of the compromise with the likely rewards

---

[9] The hearing on the 3018 and 9019 motions are set concurrently with confirmation.

of litigation."). Given the excessive amount to be paid under the settlement and the weakness of the HarbourVest Claim, this factor weighs in favor of denial of the Motion.

36.     Fourth, it is unclear from the settlement papers whether the transfer by HarbourVest of its interest in HCLOF to the Debtor or an entity the Debtor designates will cause the value of the investment to be received by the Debtor's estate. Further, the interest of HCLOF being conveyed under the proposed settlement may be subject to the Acis plan injunction, which could potentially prevent the Debtor's estate from realizing the value of this interest. In the event the Court is inclined to approve the settlement, the order should make clear that the available value of the investment should be realized by the Debtor's estate.

## CONCLUSION

For the reasons set forth above, Respondent respectfully requests that the Court enter an order denying the Motion and providing Respondent such other and further relief to which he may be justly entitled.

**[Remainder of Page Intentionally Left Blank]**

Dated: January 6, 2021              Respectfully submitted,

                              */s/ D. Michael Lynn*
                              D. Michael Lynn
                              State Bar I.D. No. 12736500
                              John Y. Bonds, III
                              State Bar I.D. No. 02589100
                              John T. Wilson, IV
                              State Bar I.D. No. 24033344
                              Bryan C. Assink
                              State Bar I.D. No. 24089009
                              BONDS ELLIS EPPICH SCHAFER JONES LLP
                              420 Throckmorton Street, Suite 1000
                              Fort Worth, Texas 76102
                              (817) 405-6900 telephone
                              (817) 405-6902 facsimile
                              Email: michael.lynn@bondsellis.com
                              Email: john@bondsellis.com
                              Email: john.wilson@bondsellis.com
                              Email: bryan.assink@bondsellis.com

                              **ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

    I, the undersigned, hereby certify that, on January 6, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

                              */s/ Bryan C. Assink*
                              Bryan C. Assink

# APPENDIX 5

001317

Case 19-34054-sgj11 Doc 1726 Filed 04/09/21 Entered 04/09/21 17:50:19 Page 1 of 10
Case 3:23-cv-01503-B Document 6-5 Filed 09/22/23 Page 136 of 263 PageID 1551
Docket #1726 Date Filed: 01/08/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

<div align="center">

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

### OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

The Dugaboy Investment Trust and Get Good Trust (jointly, "Objectors"), submit this Objection for the purpose of objecting to the *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Dkt. #1625] (the "Motion") filed by Highland Capital Management, L.P. (the "Debtor"). Through the Motion, the Debtor seeks approval of its compromise with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the

{00374914-6}                    1



Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this objection, Objectors respectfully represent as follows:

## I. INTRODUCTION

1.      Objectors recognize that Courts favorably view settlements and, as a matter of course, generally approve settlements as being in the best interest of the bankruptcy estate. The settlement proposed herein, however, is different than other settlements inasmuch as it represents a 180 degree departure from the Debtor's own analysis of the Claim of HarbourVest and the fact that the settlement is tied to HarbourVest approving the Debtor's plan.  Little or no information is provided by the Debtor as to why its initial analysis was flawed and what information or legal principal it discovered to change a zero claim into a massive claim that will have a significant impact on the recovery to creditors.

## II.  BACKGROUND

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.      On December 4, 2019, the venue of this case was transferred. [Dkt. #186].

5.      On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. [See Dkt. #854].

6.      On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[1].

7.      On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Dkt. #906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

8.      On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Dkt. #1057] (the "HarbourVest Response").

9.      The Debtor, in its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. #1473 pgs. 40-41], described its position relative to the HarbourVest Claim as follows:

> The Debtor intends to **vigorously** defend the HarbourVest Claims on various grounds ….. The HarbourVest Entities invested approximately $80,000,000.00 in HCLOF but seek an allowed claim in excess of 300 million dollars (after giving effect to treble damages for the alleged RICO violations)

10.     On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. [Dkt. # 1625].

11.     The proposed settlement provides HarbourVest with the following:

a.      An allowed, general unsecured claim in the amount of $45,000,000.00 [Dkt. #1625 pg. 9 pp.f]; and

---

[1] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. See Claim Nos. 143, 147, 149, 150, 153, and 154.

Case 8-19-23347-rdd Doc 1726 Filed 04/08/21 Entered 04/08/21 13:37:40 Page 4 of 10
Case 8-19-23347-rdd Doc 1726 Filed 04/08/21 Entered 04/08/21 13:37:40 Page 4 of 10
Case 8:22-cv-01043-BD Document 86-5 Filed 09/15/23 Page 139 of 263 PageID 3054

      b.   A $35,000,000 claim in Class 9 [Dkt. #1625 pg. 9 pp.f].

12.     An integral element of the settlement requires that HarbourVest will "support confirmation of the Debtor's Plan including, but not limited to, voting its claims in support of the Plan."

13.     The settlement also contains a provision that HarbourVest will transfer its entire interest in HCLOF to an entity to be designated by the Debtor.  It is unclear whether HarbourVest has a right to transfer the interest and secondly, what the Debtor will do with the interest [Dkt. #1625 pp.f].

14.     The sole support for the Motion is the Declaration of John Morris [Dkt. #1631] which fails to account for the enormous change in the Debtor's position between November 24, 2020 when the Disclosure Statement was approved and December 23, 2020 when the Motion was filed, a period of less than thirty (30) days.

15.     The Declaration of John Morris [Dkt. #1631] also contains no information as to the potential cost of the litigation, whether HarbourVest can transfer the interest or reasons, other than conclusory reasons, as to why the settlement is beneficial to the estate.  The Debtor makes the assertion that the interest it is acquiring was worth $22,000,000.00 as of December 1, 2020 without advising as to the basis for the valuation.  Is it a book value and, if not, what was the methodology employed to arrive at the valuation?  The Court has no basis to evaluate the settlement without essential information as to 1) how the asset being acquired is valued; 2) can the Debtor acquire the interest; and 3) how will the Debtor bring value to the estate in connection with the interest inasmuch as the Debtor has discretion as to where to place the asset to be acquired.

## A.    LEGAL STANDARDS

16.     The law relative to approval of motions pursuant to BR 9019 is well settled.  The settlement must be fair and equitable**.** *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).  The factors the Court should consider are the following:

(i)      the probabilities of ultimate success should the claim be litigated;

(ii)     the complexity, expense, and likely duration of litigating the claim;

(iii)    the difficulties of collecting a judgment rendered from such litigation; and,

(iv)    all other factors relevant to a full and fair assessment of the wisdom of the compromise.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

17.     Although the Debtor's business judgment is entitled to a certain deference, "business judgment" is not alone determinative of the issue of court approval. *See In re Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011).  However, notwithstanding the business judgment rule, a debtor does not have unfettered freedom to do what it wishes.  *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("[A]s a fiduciary holding its estate in trust and responsible  to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight.").

**B.     ISSUES WITH THE SETTLEMENT**

18.     Objectors believe that the following issues are not explained or addressed in the Motion and, thus, the Motion should be denied:

a)  The settlement represents a radical change in the Debtor's position that was set forth in its Disclosure Statement.  While the Debtor asserts that its position is

based on its fear of parties' oral testimony, the size of the transactions at issue make the case a document case, as opposed to who said what, when and how. A review of the applicable documents to determine whether they support the Debtor's initial position is warranted, as opposed to stating that the case is based upon the credibility of a witness. This settlement is not the settlement of an automobile accident where the parties are disputing who ran a red light;

b)  The settlement requires HarbourVest to support and vote in favor of the Debtor's Plan. On its face this appears to be vote buying. The settlement should not be conditioned upon HarbourVest's support or non-support of the Plan and its vote in favor or against the Plan; and

c)  No information is provided as to whether the Debtor can acquire the interest in HCLOF, liquidate the interest, who will receive the interest, or how will the estate benefit from the interest to be acquired.

## CONCLUSION

The settlement with HarbourVest has too many questions to be approved on the record before this Court and the parties, due to the Notice of the Motion, the holidays and the press of other litigation in this case, do not have the time to adequately investigate the propriety of the settlement.

January 8, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216

{00374914-6}                                  6

gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 8th day of January, 2021, a copy of the above and foregoing *Objection To Debtor's Motion For Entry Of An Order Approving Settlement With Harbourvest (Claim Nos. 143, 147, 149, 150, 153, 154) And Authorizing Actions Consistent Therewith* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams     david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson     aanderson@joneswalker.com, lfields@joneswalker.com
- Zachery Z. Annable     zannable@haywardfirm.com
- Bryan C. Assink     bryan.assink@bondsellis.com
- Asif Attarwala     asif.attarwala@lw.com
- Joseph E. Bain     JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird     baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach     bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette     pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds     john@bondsellis.com, joyce.rehill@bondsellis.com
- Larry R. Boyd     lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner     jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy     gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant     dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson     Candice.Carson@butlersnow.com
- Annmarie Antoinette Chiarello     achiarello@winstead.com
- Shawn M. Christianson     schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke     robbie.clarke@bondsellis.com
- Matthew A. Clemente     mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com

001324

- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov

001325

- Ryan E. Manns  ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer  tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery  pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com
- J. Seth Moore  smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris  jmorris@pszjlaw.com
- Edmon L. Morton  emorton@ycst.com
- David Neier  dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil  honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel  rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons  cpersons@sidley.com
- Mark A. Platt  mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz  jpomerantz@pszjlaw.com
- Kimberly A. Posin  kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece  lreece@pbfcm.com
- Penny Packard Reid  preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Davor Rukavina  drukavina@munsch.com
- Amanda Melanie Rush  asrush@jonesday.com
- Alyssa Russell  alyssa.russell@sidley.com
- Douglas J. Schneller  douglas.schneller@rimonlaw.com
- Brian Patrick Shaw  shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro  mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich  nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade  jared.slade@alston.com
- Frances Anne Smith  frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund  eric.soderlund@judithwross.com
- Martin A. Sosland  martin.sosland@butlersnow.com, ecf.notices@butlersnow.com;velvet.johnson@butlersnow.com
- Laurie A. Spindler  Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer  jsundhimer@btlaw.com
- Kesha Tanabe  kesha@tanabelaw.com
- Chad D. Timmons  bankruptcy@abernathy-law.com
- Dennis M. Twomey  dtwomey@sidley.com
- Basil A. Umari  BUmari@dykema.com, pelliott@dykema.com
- United States Trustee  ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz  artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

001326

- Donna K. Webb      donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber      bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller      dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka      danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd      hwinograd@pszjlaw.com
- Megan Young-John      myoung-john@porterhedges.com

*/s/Douglas S. Draper*

001327

Case 3:23-cv-01503-B-BD Document 86-6 Filed 09/11/23 Page 146 of 263 PageID 3561

# APPENDIX 6

001328

Case 19-34054-sgj11 Doc 1728 Filed 01/09/21 Entered 01/09/21 15:17:50 Page 1 of 10
Case 3:21-cv-01583-B Document 88-5 Filed 09/22/21 Page 147 of 263 PageID 1362
Docket #1796 Date Filed: 01/08/2021

Joseph M. Coleman (State Bar No. 04566100)
John J. Kane (State Bar No. 24066794)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-SGJ |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

---

<div align="center">

**CLO HOLDCO, LTD.'S OBJECTION TO HARBOURVEST SETTLEMENT**

</div>

---

**TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:**

CLO Holdco, Ltd. ("**CLO Holdco**") respectfully files this *Objection to Harbourvest Settlement* (the "**Harbourvest Settlement Objection**") which seeks entry of an order from this Court denying the Debtor's *Motion for Entry of an Order Approving Settlement with Harbourvest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* (the "**Harbourvest Settlement Motion**") for the reasons stated below. In support of the Harbourvest Settlement Objection, CLO Holdco respectfully states as follows:

<div align="center">

**I.**
**BACKGROUND**

</div>

**A.** **TRANSFERRING SHARES IN HCLOF**

---

1934054210108000000000005

001329

1.      CLO Holdco owns 75,061,630.55 shares, or about 49.02% of Highland CLO Funding, Ltd. ("**HCLOF**").    Other shareholders include Harbourvest 2017 Global AIF L.P., Harbourvest Global Fund L.P., Harbourvest Dover Street IX Investment L.P., and Harbourvest Skew Base AIF L.P., and HV International VIII Secondary L.P. (collectively, "**Harbourvest**"). Harbourvest owns approximately 49.98% of HCLOF.  The remaining 1% is owned by the Debtor and a five other investors.

2.      HCLOF is governed by a *Members Agreement Relating to the Company* dated November 15, 2017 by and between each of the members of HCLOF, including Harbourvest, the Debtor, and CLO Holdco (the "**Member Agreement**").    A copy of that agreement is attached hereto as **Exhibit A**.

3.      Section 6 of the Member Agreement addresses the "Transfer or Disposals of Shares." MEMBER AGREEMENT, § 6.  The Member Agreement places strict restrictions on the sale or transfer of shares to entities other than the initial Member's own affiliates.  *See id.* at §§ 6.1, 6.2. Before a Member can transfer its interests to a party other than its own affiliates it must: (i) obtain the prior written consent of the Portfolio Manager; and (ii) "offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter" (the "**Right of First Refusal**").  *Id.*  As further stated in section 6.2 of the Member Agreement, "The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred." *Id.* at § 6.2.

**B.      THE HARBOURVEST SETTLEMENT**

4.      On December 23, 2020, the Debtor filed the Harbourvest Settlement Motion.  On the following day, the Debtor filed a copy of the Settlement Agreement referenced in the

Harbourvest Settlement Motion (the **"Settlement Agreement"**) [Dkt. No. 3]. In the Settlement Agreement, Harbourvest represents and warrants that it is authorized to transfer its interest in HCLOF to the Transferee, HCMLP Investments, LLC (the **"Transferee"**). SETTLEMENT AGREEMENT, Ex. A. § 3. Further, the Transferee and Debtor agree to be bound by the terms and conditions of the Member Agreement. *Id.* at § 1.c.

5.     In exchange for conveniently classified allowed claims under the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the **"Plan"**) [Dkt. No. 1472], Harbourvest agrees to vote in favor of the Plan and to transfer all of its interests in HCLOF to the Transferee. SETTLEMENT AGREEMENT, § 1.

6.     As detailed below, CLO Holdco objects to the Harbourvest Settlement Motion because Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally inaccurate interpretation of the Member Agreement's contractual provisions that would render specific passages redundant and meaningless. More simply put, the only way Harbourvest and the Debtor could effectuate the Settlement Agreement is by violating fundamental tenets of contract interpretation.

## II.
## ARGUMENTS AND AUTHORITIES

A.     CONTRACT INTERPRETATION – AVOIDING REDUNDANCIES AND SURPLUS LANGUAGE

7.     The Fifth Circuit recognizes fundamental tenets of contract interpretation, and notes that "contracts should be read as a whole, viewing particular language in the context in which it appears. *Woolley v. Clifford Chance Rogers & Wells, L.L.P.*, 51 F. App'x 930 (5th Cir. 2002) (citing Restatement (Second) of Contracts § 202 (1981)). The Fifth Circuit has applied substantially the same tenets of contract interpretation across the laws of various jurisdictions, and consistently reasons that "[a]ll parts of the agreement are to be reconciled, if possible, in order to avoid an

inconsistency. A specific provision will not be set aside in favor of a catch-all clause." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947 (5th Cir. 1981) (internal citations omitted); and *see Hawthorne Land Co. v. Equilon Pipeline Co., LLC*, 309 F.3d 888, 892–93 (5th Cir. 2002); *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016); *Wooley*, 51 F.Appx. at 930.

8.      Reconciliation of terms that would otherwise render other parts of a contract redundant is fundamental to proper contract interpretation. *Hawthorne Land*, 309 F.3d at 892-93. As the Firth Circuit explained in *Hawthorne Land*, "each provision of a contract must be read in light of the other provisions so that each is given the meaning suggested by the contract as a whole. A contract should be interpreted so as to avoid neutralizing or ignoring a provision or treating it as surplusage." *Id.* (internal citations and quotations omitted). In other words, provisions of a contract should be read to create harmony, not internal inconsistencies, redundancies, and unnecessary surplus language. *See, e.g., Luv N' Care*, 844 F.3d at 447 (overturning district court on appeal by interpreting contract in manner that eliminated perceived redundancy).

## B.      ANALYZING THE MEMBER AGREEMENT

9.      Section 6.1 of the Member Agreement will almost certainly be cited by the Debtor and Harbourvest as authority for their entry into the Settlement Agreement, regardless of whether other Members or the Portfolio Manager consent. It states, in pertinent part, that:

> No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio Manager…

MEMBER AGREEMENT, § 6.1. Harbourvest will likely stress that under the terms of the Member Agreement, it can transfer its interests so long as the transfer is to "an Affiliate of an initial Member." Indeed, the Debtor will no doubt point out to this Court that Harbourvest is

conveniently transferring its interests in HCLOF to an Affiliate of the Debtor, and that the Debtor is an initial Member listed in the Member Agreement.

10.     Section 6.1, however, must be read in the context of the Member Agreement, and in conjunction with the transfer restrictions found in section 6.2.  Read together it is clear that the consent exception allowing a transfer in 6.1 was intended to allow a Member to transfer its shares to *its* own Affiliate, without required consents and effectuating a Right of First Refusal.  Doing so would allow inter-company transfers within a corporate structure without the need for complicated procedures.  Applying Fifth Circuit precedent, this interpretation fits squarely within the agreement and gives weight to the terms of section 6.2 of the Member Agreement, as explained below.

(i)     **Surplusage – Specific Allowance of Transfers by CLO Holdco to Debtor Affiliates**

11.     Recall that both CLO Holdco and the Debtor are initial Members to the Member Agreement.  MEMBER AGREEMENT, p. 3.  Section 6.2 of the Member Agreement states, in pertinent part, that "Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, *in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal*) a Member must first…" comply with the Right of First Refusal.  *Id.* at § 6.2 (emphasis added).  The italicized language above is important for two reasons: (i) it specifically enumerates that CLO Holdco can transfer its interests to Debtor Affiliates without having to pursue the Right of First Refusal; and (ii) it allows only limited transfers between Members, as opposed to between a Member and an Affiliate of an initial Member.

12.     If, as the Debtor and Harbourvest will likely argue, Members are allowed to transfer their interests to any Affiliates of any other initial Members, there is absolutely no need for the Member Agreement to specifically authorize CLO Holdco to transfer its interests to the Debtor's Affiliates.  Per Fifth Circuit fundamentals of contract interpretation, that purported redundancy

should <u>not</u> be discarded as mere surplusage, and the Member Agreement should be interpreted in a manner that gives weight to that provision. *Hawthorne Land,* <mark>309 F.3d at 892-93</mark>.

13.     If the Member Agreement is read to literally allow all "Transfers to Affiliates of an initial Member" there would be no reason to expressly set forth allowed transfers between specific Members and other Member's Affiliates. If the Member Agreement sought to list all allowed transfers between Members and their Affiliates, it should have similarly noted that any Member could transfer its interest to any Harbourvest Member entity, as each Harbourvest Member entity is an Affiliate of the other Harbourvest Member entities. Alternatively, if the specific enumeration of CLO Holdco and the Highland Principals' transfer rights was surplusage, it would presumably have listed other parties' rights, or had inclusive language such as "including but not limited to" or "for example." The Member Agreement lacks such language and, as a result, should be interpreted in a manner that both gives weight to the specific provision while reconciling other provisions of the contract.

**(ii)     Absurd Results – Disparate Transfer Rights Between Members**

14.     Note that the Member Agreement does not generally allow a transfer of interests from Member to Member unless specifically enumerated. Section 6.2 specifically allows only CLO Holdco and the Highland Principals to make transfers to other Members, but those other Members include only the Debtor or another Highland Principal. MEMBER AGREEMENT, § 6.2. It does not allow the Debtor to transfer interests to any Member, and does not expressly allow any Member, other than limited transfers by CLO Holdco and the Highland Principals, to transfer interests to any other Member. *Id.* For instance, if the Debtor wished to transfer its interests to CLO Holdco, it would first have to offer *all* of the other Members their Right of First Refusal. *Id.*

15.     Similarly, if Harbourvest wished to transfer its interest to CLO Holdco, it could not do so without first providing the Right of First Refusal to all other Members. *Id.* As noted above,

however, allowing a Member to transfer its interest to an Affiliate of any initial Member would allow _all_ of the Members to transfer their interests to any Harbourvest Member entity, as the Harbourvest Members are Affiliates of each other. Given the specific enumeration of CLO Holdco and the Highland Principals' rights to inter-Member transfers, it would be inconsistent to expand that specific provision to allow all transfers by all Members to any Harbourvest entity without first providing a Right of First Refusal.

16. Such a reading would lead to absurd results. It would grant similarly situated Members profoundly disparate rights under the agreement, and could easily lead to manipulation. For instance, because the Harbourvest Members are technically Affiliates of an initial Member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer. No other Member could do that. For instance, if CLO Holdco wished to acquire other Members' interests, the transferring member (including Harbourvest) would have to offer a Right of First Refusal in _every instance_. To resolve that potential disparate treatment—though CLO Holdco and Harbourvest own nearly identical ownership interests in HCLOF—CLO Holdco would have to form an Affiliate and acquire interests through the Affiliate. That simply _cannot_ be the intended result of the Member Agreement.

17. Instead, the Member Agreement must be read to require Harbourvest to provide a Right of First Refusal to the other Members of HCLOF before transferring its interests to either the Debtor or the Transferee.

## C.  THE RIGHT OF FIRST REFUSAL IN BANKRUPTCY

18. Most cases addressing third party rights of first refusal in bankruptcy involve the assignment of leases and landlords' rights of first refusal. In those cases, courts analyze whether such a provision in the _debtor's_ contract is a defacto restriction on assignment that may be excised

from the agreement. This case is very different. Here, it is a creditor that owes a right of first refusal to another non-debtor entity.

19.     Even so, at least one court has issued telling commentary on a bankruptcy court's ability to excise provisions of a bargained-for contract, stating "A bankruptcy court's authority to excise a bargained for element of a contract is questionable and modification of a nondebtor contracting party's rights is not to be taken lightly." *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 51-52 (Bankr. M.D.N.C. 2003) (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1991)). CLO Holdco was unable to find any case that would allow a bankruptcy court to invalidate or otherwise excise a third party's right of first refusal in what largely amounts to a non-debtor contract.

20.     As the Member Agreement requires Harbourvest to provide a Right of First Refusal to the non-Debtor Members under section 6.2 of the Agreement, and such Members have 30 days to review and determine whether to purchase their pro-rata shares offered by Harbourvest, Harbourvest lacks contractual authority to enter into the Settlement Agreement.

## D.     HARBOURVEST'S LACK OF AUTHORITY PRECLUDES ENFORCEMENT OF SETTLEMENT

21.     Harbourvest has not completed its conditions precedent to the transfer of its interest to Transferee under the Member Agreement. As detailed above, and in section 6.2 of the Agreement, Harbourvest must effectuate the Right of First Refusal before it can transfer its interests in HCLOF. MEMBER AGREEMENT, § 6.2. Harbourvest is, in essence, bound by the condition precedent of effectuating the Right of First Refusal before it is authorized under the Member Agreement to enter into the Settlement Agreement.

22.     Courts should not enforce a settlement agreement where a party has a condition precedent to entry into the agreement and fails to satisfy that condition. *In re De La Fuente*, 409 B.R. 842, 846 (Bankr. S.D. Tex. 2009). As noted in part in *De La Fuente*, the court would not recognize

or enforce a settlement where the parties were subject to conditions precedent before the settlement could be effective, and the conditions precedent were not satisfied. This Court should similarly deny Harbourvest's proposed settlement, as it would deny the Members' Right of First Refusal, which is the benefit of their bargain under the Member Agreement.

### III.
### PRAYER FOR RELIEF

WHEREFORE, CLO Holdco requests that this Court grant the Objection and enter an order denying the Harbourvest Settlement Motion.

DATED: January 8, 2020

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By:  */s/ John J. Kane*
        Joseph M. Coleman
        State Bar No. 04566100
        John J. Kane
        State Bar No. 24066794

901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## CERTIFICATE OF SERVICE

     I hereby certify that on January 8, 2020, a true and correct copy of the foregoing CLO Holdco Objection was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the United States Trustee at Lisa.L.Lambert@usdoj.gov and upon the following parties:

Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Email:  pmontgomery@sidley.com
       preid@sidley.com
       jhoffman@sidley.com

Bojan Guzina
Matthew A. Clemente
Dennis M. Twomey
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Email:  bguzina@sidley.com
      mclemente@sidley.com
      dtwomey@sidley.com
      alyssa.russell@sidley.com

Counsel for Harbourvest:
M. Natasha Labovitz
Erica S. Weisgerber
Daniel E. Stroik
Vickie L. Driver
Christina W. Stephenson
Email:  nlabovitz@debevoise.com
      eweisgerber@debevoise.com
      destroik@debevoise.com
      vickie.driver@crowedunlevy.com
      crissie.stephenson@crowedunlevy.com

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email:  jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      jmorris@pszjlaw.com
      gdemo@pszjlaw.com

Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email:  MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

                                  */s/ John J. Kane*
                                  John J. Kane

# APPENDIX 7

Page 1

1

2    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
3           DALLAS DIVISION

4   IN RE:

5                       CHAPTER 11

6                   CASE NO.
    HIGHLAND CAPITAL          19-34054-
7   MANAGEMENT, L.P.          SGJLL

8
       Debtor.
9

10

11    Confidential - Under Protective Order

12        REMOTE DEPOSITION OF
          MICHAEL PUGATCH
13      Zoom Videoconference
          01/11/2021
14        1:07 P.M. (EDT)

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  AMANDA GORRONO, CLR
     CLR NO. 052005-01
25   JOB NO. 188591

**Page 2**

```
1
2              01/11/2021
3              1:07 P.M. (EDT)
4
5
6      REMOTE ORAL DEPOSITION OF MICHAEL
7  PUGATCH, held virtually via Zoom
8  Videoconferencing, pursuant to the
9  Federal Rules of Civil Procedure before
10 Amanda Gorrono, Certified Live Note
11 Reporter, and Notary Public of the State
12 of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2  A P P E A R A N C E S: (Via Remote)
3  PACHULSKI STANG ZIEHL & JONES
4  Attorneys for Debtor
5  780 Third Avenue
6  New York, New York 10017
7  BY:  JOHN MORRIS, ESQ.
8       HAYLEY WINOGRAD, ESQ.
9
10 BONDS ELLIS EPPICH SCHAFER JONES
11 Attorneys for Jim Dondero
12 420 Throckmorton Street
13 Fort Worth, Texas 76102
14 BY:  JOHN WILSON, ESQ.
15      BRYAN ASSINK, ESQ.
16
17 DEBEVOISE & PLIMPTON
18 Attorneys for HarbourVest
19 919 Third Avenue
20 New York, New York 10022
21 BY:  ERICA WEISGERBER, ESQ.
22      M. NATASHA LABOVITZ, ESQ.
23      EMILY HUSH, ESQ.
24      DANIEL STROIK, ESQ.
25
```

**Page 4**

```
1
2  A P P E A R A N C E S: (Via Remote)
3  KANE RUSSELL COLEMAN & LOGAN
4  Attorneys for CLO Holdco Limited
5  Bank of America Plaza
6  901 Main Street
7  Dallas, Texas 75202
8  BY:  JOHN KANE, ESQ.
9
10 HELLER, DRAPER, HAYDEN, PATRICK, & HORN
11 Attorneys for The Dugaboy Investment
12 Trust and the Get Good Trust
13 650 Poydras Street
14 New Orleans, Louisiana 70130
15 BY:  DOUGLAS DRAPER, ESQ.
16
17 LATHAM & WATKINS
18 Attorney For UBS
19 885 Third Avenue
20 New York, New York
21 BY: SHANNON MCLAUGHLIN, ESQ.
22
23
24
25
```

**Page 5**

```
1
2  A P P E A R A N C E S: (Via Remote)
3  KING & SPALDING
4  Attorney for Highland CLO Funding, Ltd.
5  1180 Peachtree Street, NE
6  Atlanta, Georgia 30309
7  BY:  MARK MALONEY, ESQ.
8
9
10
11 ALSO PRESENT:
12 ALIZA GOREN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| | Page 6 |
|---|---|
| 1 | |
| 2 | I N D E X |
| 3 | |
| | WITNESS    EXAMINATION BY    PG |
| 4 | MICHAEL PUGATCH   MR. WILSON    10, 148 |
| | MR. KANE    122 |
| 5 | MS. WEISGERBER    147 |
| 6 | |
| | E X H I B I T S |
| 7 | |
| | EXHIBIT |
| | DESCRIPTION    PAGE |
| 9 | Exhibit 1  Proof of Claim 143 filed    16 |
| 10 | 4/08/2020 nine pages....... |
| 11 | Exhibit 2  Proof of Claim 149 filed    17 |
| 12 | 4/08/2020 nine pages....... |
| 13 | Exhibit 3  Declaration of Michael    18 |
| 14 | Pugatch in Support of |
| 15 | Motion of HarbourVest |
| 16 | Pursuant to Rule 3018(a)... |
| 17 | Exhibit 4  Member Agreement 28 pages..  21 |
| 18 | Exhibit 5  HarbourVest Response to    22 |
| 19 | Debtor's First Omnibus |
| 20 | Objection 617 pages........ |
| 21 | Exhibit 6  Offering Memorandum 122    61 |
| 22 | pages..................... |
| 23 | Exhibit 7  Share Subscription and    63 |
| 24 | Transfer Agreement 31 |
| 25 | pages..................... |

| | Page 7 |
|---|---|
| 1 | |
| 2 | Exhibit 8  E-mail 08/15/2017..........  68 |
| 3 | Exhibit 9  11/29/2017 E-mail with    79 |
| 4 | cover letter Highland |
| 5 | Capital Management........ |
| 6 | Exhibit 10  2004 Examination of    83 |
| 7 | Investor in Highland CLO |
| 8 | Funding Ltd. 10/10/2018.... |
| 9 | Exhibit 11  Declaration of John A.    109 |
| 10 | Morris in Support of the |
| 11 | Debtor's Motion For Entry |
| 12 | of an Order Approving |
| 13 | Settlement With |
| 14 | Harbourvest (Claim Nos. |
| 15 | 143, 147, 149, 150, 153, |
| 16 | 154) and Authorizing |
| 17 | Actions, 82 pages.......... |
| 18 | |
| 19 | |
| 20 | R E Q U E S T S |
| 21 | DESCRIPTION    PG |
| 22 | Transcript be marked Confidential    10 |
| 23 | under the Protective Order............ |
| 24 | |
| 25 | |

| | Page 8 |
|---|---|
| 1 | |
| 2 | MR. WILSON:  I'm John Wilson |
| 3 | with the firm of Bonds Ellis Eppich |
| 4 | Schafer Jones LP.  And I represent Jim |
| 5 | Dondero. |
| 6 | MR. MORRIS:  John Morris and |
| 7 | Hayley Winograd of Pachulski Stang |
| 8 | Ziehl & Jones for the Debtor. |
| 9 | MS. WEISGERBER: Erica |
| 10 | Weisgerber from Debevoise & Plimpton |
| 11 | for HarbourVest. |
| 12 | MR. KANE:  John Kane of Kane |
| 13 | Russell Coleman & Logan, for CLO |
| 14 | Holdco Limited. |
| 15 | MR. DRAPER:  Douglas Draper of |
| 16 | Heller Draper & Horn, for The Dugaboy |
| 17 | Investment Trust and the Get Good |
| 18 | Trust. |
| 19 | MS. McLAUGHLIN: Shannon |
| 20 | McLaughlin from Latham & Watkins LLP |
| 21 | for UBS. |
| 22 | MR. MALONEY:  Mark Maloney from |
| 23 | King & Spalding, on behalf of Highland |
| 24 | CLO Funding Limited. |
| 25 | MS. WEISGERBER:  I'm joined on |

| | Page 9 |
|---|---|
| 1 | |
| 2 | the line by my colleagues from |
| 3 | Debevoise, Natasha Labovitz and Emily |
| 4 | Hush, and Aliza Goren from HarbourVest |
| 5 | is on the line, as well. |
| 6 | MR. WILSON:  As a preliminary |
| 7 | matter, the witness' counsel has |
| 8 | produced some documents to us that |
| 9 | they've requested be subject to the |
| 10 | confidentiality order or a brief |
| 11 | protective order entered at Document |
| 12 | Number 382, in this case. |
| 13 | And she's also requested that |
| 14 | all counsel and participants in this |
| 15 | deposition agree to be bound by the |
| 16 | terms of that order, because some of |
| 17 | the documents that were produced are |
| 18 | stamped "confidential," and they want |
| 19 | to maintain that confidentially. |
| 20 | Do we have an agreement of all |
| 21 | counsel and participants on the |
| 22 | deposition to be bound by the terms of |
| 23 | that agreed protective order? |
| 24 | (All agreed.) |
| 25 | MS. WEISGERBER:  Okay.  I think |

| Page 10 | Page 11 |
|---|---|
| Confidential - Pugatch | Confidential - Pugatch |
| 1     Confidential - Pugatch<br>2   that was everyone.  Thank you all for<br>3   confirming.  And the deposition will<br>4   be marked "confidential" until and<br>5   unless HarbourVest designates the<br>6   testimony otherwise.<br>7      MR. WILSON:  And that's fine.<br>8      (Whereupon, a request for<br>9   Transcript be marked Confidential<br>10  under the Protective Order was made.)<br>11 M I C H A E L  P U G A T C H,<br>12    called as a witness, having been<br>13 first duly affirmed by a Notary Public of<br>14 the State of New York, was examined and<br>15 testified as follows:<br>16 EXAMINATION<br>17 BY MR. WILSON:<br>18   Q.  All right.  Mr. Pugatch, how do<br>19 you pronounce your name?  I'm sorry.<br>20   A.  Yep, you've got it.  Pugatch.<br>21   Q.  Pugatch.  Okay.  Can you state<br>22 your full name for the record?<br>23   A.  Yeah.  Michael Pugatch.<br>24   Q.  Okay.  And you've been<br>25 designated by HarbourVest to discuss some | 1     Confidential - Pugatch<br>2   matters related to the 9019 motion.  And<br>3   specifically we asked that HarbourVest<br>4   produce a witness who could talk about the<br>5   negotiations of the settlement with the<br>6   Debtor, and also the factual allegations<br>7   underlying HarbourVest's Proof of Claim,<br>8   and those described in HarbourVest's<br>9   response to the claim objection, including<br>10 without limitation, its investment with<br>11 Acis/HCLOF in the alleged representations<br>12 made by the Debtor and/or Acis/HCLOF to<br>13 HarbourVest, and any and all agreements<br>14 entered into between HarbourVest and any<br>15 other party related to its investment.<br>16    Do you agree that you're the<br>17 best person to talk about these matters on<br>18 behalf of HarbourVest?<br>19   A.  Yes.  Yes.<br>20   Q.  Okay.  Have you given a<br>21 deposition before?<br>22   A.  I have.<br>23   Q.  Okay.  So you understand how it<br>24 works that you're under oath, and that I'm<br>25 going to be asking questions and you're |

| Page 12 | Page 13 |
|---|---|
| Confidential - Pugatch | Confidential - Pugatch |
| 1     Confidential - Pugatch<br>2   going to be giving answers.  If at any<br>3   time I ask a question that you don't<br>4   understand, or we've had some problems<br>5   with sometimes connectivity issues with<br>6   Zoom.  But yeah, any time that you don't<br>7   understand my question or you didn't catch<br>8   it, I'll be happy to repeat it.<br>9    Also, one thing I found with<br>10 Zoom is that it's easier to talk over<br>11 people.  I'll try not to talk over you.  I<br>12 would ask that you try to ensure that I've<br>13 finished asking my question before you<br>14 start your answer.  And I will likewise<br>15 try to ensure that you've finished your<br>16 answer before start my next question.<br>17    And at any time during this<br>18 deposition if you feel the need to take a<br>19 break, that's totally okay with me.  The<br>20 one thing that I would ask is if I've just<br>21 asked a question, that you answer the<br>22 question before requesting the break.<br>23    And if we have that agreement<br>24 and the ground rules, then I think I'm<br>25 ready to start asking you my questions. | 1     Confidential - Pugatch<br>2   A.  Sounds good.<br>3   Q.  What's your current address?<br>4   A.  47 Wayne Road in Needham,<br>5 Massachusetts.<br>6   Q.  Okay.  And where are you located<br>7 today?<br>8   A.  At that address.<br>9   Q.  Okay.  That's your home address?<br>10   A.  Correct.<br>11   Q.  And is anyone in the room with<br>12 you there?<br>13   A.  No.<br>14   Q.  And did you talk with anyone<br>15 about your deposition today?<br>16   A.  Only counsel.<br>17   Q.  Okay.  And did you go over the<br>18 facts of the underlying investment and the<br>19 settlement negotiations with your counsel?<br>20    MS. WEISGERBER:  I'm going to<br>21 object on privilege grounds.  He<br>22 can -- he prepared for the deposition<br>23 with counsel.  I don't think you can<br>24 inquire into specifics of the<br>25 preparation. |

Page 14

Confidential - Pugatch

1    Confidential - Pugatch
2        MR. WILSON:  Okay.  Well, you
3    know, he was designated to talk about
4    these matters, and I'm just asking if
5    he discussed these matters with his
6    counsel his before his testimony.
7    That's all.  I'm not asking the
8    substance of those communications.
9        MS. WEISGERBER:  You're asking
10    about conversations with counsel.  How
11    about you just ask if he's prepared to
12    talk about those topics today?
13        MR. WILSON:  Okay.
14    BY MR. WILSON:
15    Q.   Are you prepared to talk about
16    those topics today?
17    A.   Yes.
18    Q.   Okay.  Now, HarbourVest has
19    filed several proofs of claim in this
20    matter, and it looks like those are
21    numbered 143 on behalf of HarbourVest,
22    217 Global Fund L.P., and 144 HarbourVest
23    2017 Global AIF, 149 HarbourVest Partners
24    L.P., 150 HarbourVest Dover Street, IX
25    Investment L.P., 153 HarbourVest -- or I'm

Page 15

1    sorry, HV International VIII Secondary
2    L.P., and 154 HarbourVest Skew Base AIF
3    LP.
4        And you're here to talk on
5    behalf of all of those entities, and you
6    have, for purpose of this settlement and
7    you're -- the 9019 motion, these proofs of
8    claim are all lumped together as one
9    claim; is that correct?
10        MS. WEISGERBER:  I'm just going
11    to object quickly and clarify that
12    he's not here as a 30(b)(6) witness,
13    but he is here as someone from
14    HarbourVest who signed those proofs of
15    claim.  So with that, I'll let you
16    continue.
17    A.   I'll just answered the question,
18    yes, as a representative on behalf of all
19    of those entities.  I would defer to
20    counsel, from a legal perspective, whether
21    these are treated as a single or separate
22    claims.
23        MR. WILSON:  Okay.  And we can
24    move on for now.

Page 16

1    Confidential - Pugatch
2        I'm going to submit the first
3    exhibit.  It's going to be Exhibit
4    No. 1 to the deposition.  I'm sending
5    it by E-mail, and I'm also going to
6    use a share screen.
7        (Whereupon, Exhibit 1, Proof of
8    Claim 143 filed 4/08/2020 nine pages,
9    was marked for identification.)
10        MR. WILSON:  So this document
11    right here is Claim Number 143 filed
12    on April 8, 2020, and this one is
13    filed on behalf of HarbourVest 2017
14    Global Fund L.P.
15        If we go down, scroll to the
16    annex to proof of claim, it's Page 5
17    of the document.  It says that the
18    Claimant is a limited partner in one
19    of the Debtor's managed vehicles,
20    Highland CLO Funding, Ltd.
21        And I'm going to now send out an
22    E-mail with Exhibit No. 2.  I'm going
23    to pull this Exhibit No. 2 document up
24    on the share screen, as well.  I guess
25    that's right.

Page 17

1    Confidential - Pugatch
2        (Whereupon, Exhibit 2, Proof of
3    Claim 149 filed 4/08/2020 nine pages,
4    was marked for identification.)
5    BY MR. WILSON:
6    Q.   Can you see the official proof,
7    official form 410 proof of claim on your
8    screen?
9    A.   The first one that you shared?
10    Q.   I'm now on Exhibit No. 2.  Is it
11    showing up on your screen?
12    A.   No.
13    Q.   Okay.  Actually, I'm sorry.  Is
14    it now showing up on your screen?
15    A.   Now, it's showing up, yep.
16    Q.   Okay.  So this one is Proof of
17    Claim 149, filed on the same date.  And
18    this one's filed on behalf HarbourVest
19    Partners L.P.  And I'm going to scroll
20    down to the annex to proof of claim, which
21    looks largely like the annex to the
22    previous proof of claim we looked at.
23        But this one says, in Paragraph
24    No. 2, the Claimant manages investment
25    funds that are limited partners in one of

**Page 18**

Confidential - Pugatch

1  the Debtor's managed vehicles, Highland
2  CLO Funding, Ltd.
3      And can you tell me why this
4  HarbourVest Partners L.P. filed a separate
5  proof of claim, from the entities that
6  were investors in HCLOF?
7      A.   I would only be able to answer
8  that, based on conversations with counsel.
9      Q.   But in any event, HarbourVest
10  Partners L.P. did not invest in HCLOF,
11  correct?
12     A.   Not directly on behalf of
13  itself, no.
14     Q.   All right.  I'm going to stop
15  that share screen.
16         MR. WILSON:  And this is going
17  to be Exhibit Number 3.
18         (Whereupon, Exhibit 3,
19  Declaration of Michael Pugatch in
20  Support of Motion of HarbourVest
21  Pursuant to Rule 3018(a), was marked
22  for identification.)
23         MR. WILSON:  And Exhibit No. 3
24  that I've just submitted via E-mail,

**Page 19**

Confidential - Pugatch

1  and I'm about to put it up on the
2  screen, is the Declaration of
3  HarbourVest.  Let me get it up here,
4  so you can see it.  This is the
5  declaration of Michael Pugatch in
6  support of motion of HarbourVest
7  pursuant to Rule 3018(a).
8  BY MR. WILSON:
9      Q.   Have you seen this document
10  before?
11     A.   Yes.
12     Q.   And, in fact, this is your
13  declaration; is that correct?
14     A.   Yes.
15     Q.   And at the first line of this,
16  of Paragraph 1 says that you're the
17  managing director of HarbourVest Partners
18  LLC?
19     A.   Correct.
20     Q.   And how is HarbourVest Partners
21  LLC connected to these claims?
22     A.   That is the corporate entity or
23  managing member of all of the underlying
24  funds that are managed on behalf of

**Page 20**

Confidential - Pugatch

1  HarbourVest Partners L.P.
2      Q.   And you're the managing director
3  of that entity?
4      A.   A managing director to that
5  entity, yes.
6      Q.   You said "a managing director,"
7  are there others?
8      A.   Yes.
9      Q.   Who are the others?
10     A.   There are over 50 managing
11  directors at HarbourVest Partners LLC.
12     Q.   And are you the managing
13  director that has charge of this
14  particular HarbourVest investment, the one
15  in HCLOF?
16     A.   Yes.
17         MR. WILSON:  All right.  I beg
18  your patience.  I'm trying to conduct
19  this deposition solo.  I've got a lot
20  of stuff I've got to go through.  So
21  I'll do my best to do it efficiently.
22         But this next exhibit I'm going
23  to submit is going to be Exhibit No.
24  4.  I'm sending it in the E-mail now.

**Page 21**

Confidential - Pugatch

1         (Whereupon, Exhibit 4, Member
2  Agreement 28 pages, was marked for
3  identification.)
4  BY MR. WILSON:
5      Q.   Can you see this on your share
6  screen?
7      A.   I can.
8      Q.   This is the Members Agreement
9  relating to the Company.
10     A.   (Nods.)
11     Q.   I'm just going to scroll down.
12  Okay.  So this is the signature page for
13  the HarbourVest entities that were
14  invested in this company.  And it says
15  that you were the authorized person to
16  sign on behalf of the first two entities:
17  HarbourVest Dover Street, HarbourVest 2017
18  Global, and then the next one here it says
19  you're managing director.  And here we see
20  that HarbourVest Partners LLC.
21         And if we scroll down, we see
22  that you're the managing director of
23  HarbourVest Partners LLC, again, on behalf
24  of HV International, and that you're an

Page 22

Confidential - Pugatch

1     Confidential - Pugatch
2   authorized person on behalf of HarbourVest
3   Skew Base.
4        So you signed all these
5   agreements on behalf of the HarbourVest
6   entities, when HarbourVest made its
7   investment in HCLOF.  Would that be
8   correct?
9        A.   Correct.
10       Q.   Okay.  Sorry that was
11  cumbersome, but I needed to get through
12  it.
13           MR. WILSON:  I'm going to now
14       stop that share screen.  And I'll need
15       to go to Exhibit No. 5.  I'm E-mailing
16       out Exhibit No. 5 right now.
17           (Whereupon, Exhibit 5,
18       HarbourVest Response to Debtor's First
19       Omnibus Objection 617 pages, was
20       marked for identification.)
21  BY MR. WILSON:
22       Q.   This is -- I'll do another share
23  screen -- this is Docket 1057 filed in the
24  Highland bankruptcy.  And this is
25  HarbourVest Response to Debtor's First

Page 23

Confidential - Pugatch

1     Confidential - Pugatch
2   Omnibus Objection.
3        Did you participate in the
4   creation of this document?
5        A.   Yes.
6        Q.   So you had an opportunity to
7   review this document, before it was filed?
8        A.   Correct.
9        Q.   And you agree with the
10  statements and the positions taken in this
11  document?
12       A.   I do.
13       Q.   All right.  So what this says in
14  Paragraph 8, that by the summer of 2017,
15  HarbourVest was engaged in preliminary
16  discussions with Highland, regarding the
17  investment.
18       First off, why was HarbourVest
19  engaged in preliminary discussions with
20  Highland?
21       A.   Highland had approached
22  HarbourVest with an investment
23  opportunity.  This was really borne out of
24  discussions that we had with them around a
25  couple of investment opportunities, that

Page 24

Confidential - Pugatch

1     Confidential - Pugatch
2   this opportunity with HCLOF being the one
3   that by the summer of 2017, as stated
4   here, was in, was advancing through
5   discussions.
6        Q.   And which individuals at
7   Highland were you engaged in discussions
8   with?  By "you," I mean HarbourVest.
9        A.   Yeah, I mean, originally it was
10  through a couple of members of their
11  investor relations team.  My first point
12  of contact was with Brad Eden, and then
13  subsequently progressed to a larger subset
14  of employees of Highland.
15       Q.   And who on behalf of HarbourVest
16  was engaging in these discussions?
17       A.   It was primarily myself, my
18  colleague, or two -- two colleagues
19  primarily, alongside myself.
20       Q.   I'm sorry.  I didn't catch the
21  last part.
22       A.   Sorry.  Myself and two other
23  colleagues primarily.
24       Q.   And who are these two other
25  colleagues?

Page 25

Confidential - Pugatch

1     Confidential - Pugatch
2        A.   Dustin Willard and then a more
3   junior member of the HarbourVest team.
4        Q.   When you say "the HarbourVest
5   team," what does that mean?
6        A.   So the broader investment team
7   and specifically in this context, the
8   secondary investment team at HarbourVest,
9   that this was an opportunity for.
10       Q.   So who made the final decision,
11  on behalf of HarbourVest, to make this
12  investment?
13       A.   Ultimately it was a decision
14  made by the investment committee of
15  HarbourVest.
16       Q.   And who's on that investment
17  committee?
18       A.   It's a four-member committee
19  comprised of managing directors within the
20  firm.
21       Q.   And who are those managing
22  directors?
23       A.   I don't recall at the time who
24  the members were.  I can tell you the
25  members now, of that committee.  It has

Page 26

Confidential - Pugatch

1        Confidential - Pugatch
2    changed or evolved over time.
3        Q.    And that committee included you?
4        A.    I was involved in the
5    decisionmaking of that, yes, correct.
6        Q.    So you were part of the four-man
7    committee that made this decision?
8        A.    Yes.
9        Q.    All right.  I'm going to go back
10   to what we've marked as Exhibit 3, which
11   is your declaration.  And it says in
12   Paragraph 2, that HarbourVest is a passive
13   minority investor in Highland CLO funds,
14   HCLOF, and by the way, I haven't stated
15   this before, but in this deposition if I
16   say HCLOF, I'm going to be referring to
17   Highland CLO funds.
18          But it says that the vehicle is
19   managed by Highland Capital Management,
20   L.P.
21          And why do you say that that
22   vehicle was managed by Highland Capital
23   Management, L.P.?
24       A.    I believe that is the named
25   investment manager of HCLOF, per the

Page 27

Confidential - Pugatch

1    organization documents of that vehicle.
2        Q.    You believe that that was the
3    investment manager on the organization
4    documents, which --
5        A.    Of the various transaction
6    documents that we entered into, in
7    connection with our investment.
8        Q.    Would those have been the
9    documents that you had entered on November
10   the 15 of 2017?
11       A.    Yes.
12       Q.    Okay.  It says that HarbourVest
13   initially invested $73,522,928 for roughly
14   49 percent interest in HCLOF; and more
15   specifically, that would be a 49.98
16   percent interest in HCLOF, correct?
17       A.    Sounds right, yes.
18       Q.    Okay.  And then HarbourVest
19   contributed an additional $4,998,501
20   following a capital call, and it's
21   received three dividends, each totally
22   $1,570,429.
23          Is all of that correct?
24       A.    Yes.

Page 28

Confidential - Pugatch

1        Confidential - Pugatch
2        Q.    And has HarbourVest received any
3    additional dividends, since the making of
4    this declaration?
5        A.    No, we have not.
6        Q.    Now, I want to skip down to
7    Paragraph 3, where it says that
8    HarbourVest expected proceeds from the
9    original HCLOF investment were projected
10   to exceed 135 million.
11          Do you agree with that?
12       A.    That was the original projected
13   value of the investment, yes.
14       Q.    Well, whose expectation was
15   that?
16       A.    Those were figures, as I recall,
17   that were originally provided to us by
18   Highland to form the basis of our due
19   diligence that we went through, and
20   penultimately were included as part of our
21   investment thesis in making the
22   investment.
23       Q.    So your testimony is that
24   Highland told you that your investment
25   would be worth over $135 million?

Page 29

Confidential - Pugatch

1        Confidential - Pugatch
2        A.    Yes.
3          MS. WEISGERBER:  Objection to
4    the form.  Misstates testimony.
5          Go ahead, Mike.
6        A.    That was, that was part of our
7    original due diligence, on the investment
8    opportunity.
9        Q.    When you say part of your due
10   diligence, are you saying that the number
11   originated from Highland or that the
12   number originated from your due diligence
13   operations?
14          MS. WEISGERBER:  Objection to
15   form.
16       A.    The number originally came from
17   Highland and formed the basis upon which
18   we conducted due diligence on the
19   investment opportunity.
20       Q.    And after performing due
21   diligence, you were satisfied that that
22   was a reasonable projection?
23       A.    Yes.
24       Q.    And what was the, what was the
25   estimated date, in which the value of your

Page 30

1    Confidential - Pugatch
2  investment would exceed the $135 million?
3      MS. WEISGERBER:  Objection to
4  form.
5      A.    I don't recall exactly.  That
6  would have been over, over several years.
7  And again, this was the -- this was the
8  projected value based on the original
9  investment or the assets that were held by
10  HCLOF, at the time of our investment.
11      Q.    Now, when you talk about a
12  portfolio manager -- I'm sorry, when you
13  talk about investment manager, are you
14  referring to the portfolio manager?
15      A.    No.
16      Q.    So what's the difference in an
17  investment manager and a portfolio
18  manager?
19      A.    So in the context of this
20  investment, the investment manager.  We --
21  we had -- HarbourVest had an investment
22  with HCLOF.  Highland was the investment
23  manager of HCLOF that in turn held equity
24  positions in a variety of CLOs, which had
25  various portfolio managers associated with

Page 31

1    Confidential - Pugatch
2  those, all Highland affiliates.
3      Q.    And so who was the portfolio
4  manager for the HarbourVest investment in
5  HCLOF?
6      MS. WEISGERBER:  Objection to
7  form.
8      A.    There were various underling
9  portfolio managers, depending on the
10  underlying CLO position.
11      Q.    Well, who was the initial
12  portfolio manager?
13      A.    So, again it would depend on
14  which underlying assets we're talking
15  about.  HCLOF was a diversified portfolio
16  of multiple underlying CLO equity
17  positions, all with portfolio managers
18  that were Highland affiliates, as we
19  understood it.
20      Q.    Well, I'm going to go back to
21  Exhibit 1, Paragraph 2, this says, in the
22  second sentence, "Acis Capital Management
23  GP, LLC, and Acis Capital Management,
24  L.P., together Acis, the portfolio manager
25  for HCLOF," and then it continues on,

Page 32

1    Confidential - Pugatch
2  "filed for Chapter 11."
3      Is this proof of claim correct,
4  when it states that Acis Capital
5  Management GP, LLC, and Acis Capital
6  Management, L.P., were the portfolio
7  manager for HCLOF?
8      MS. WEISGERBER:  Objection to
9  form.
10      A.    I know that there was an issue
11  with the portfolio manager for at least
12  the Acis CLOs that were held by HCLOF.
13      Q.    Well, how do you distinguish
14  between the Acis CLOs and the Highland
15  CLOs?  Is that based on who was managing
16  them?
17      MS. WEISGERBER:  Objection to
18  form.
19      A.    Again, they were all underlying
20  investments of HCLOF.  We didn't
21  distinguish the portfolio manager, if you
22  will, of those vehicles, other than again
23  they were Highland affiliates.
24      Q.    But it's fair to say that Acis
25  was managing at least a portion of the

Page 33

1    Confidential - Pugatch
2  HCLOF investment, correct?
3      A.    Correct.  The underlying
4  investments held by HCLOF, correct.
5      Q.    And did anything -- from the
6  time that you -- well, let's just go to
7  the -- I think we had the members
8  agreement up a second ago.  This would
9  have been Exhibit 4.
10      Yeah, right here.  No. 14,
11  Highland HCF Advisor, Ltd. is listed as
12  the portfolio manager on the members
13  agreement.
14      Is that accurate, that Highland
15  HCF Advisor, Ltd. was the portfolio
16  manager?
17      MS. WEISGERBER:  Objection to
18  form.  Can you state as of what date
19  you're asking, Counsel?
20      MR. WILSON:  Well, the date of
21  this memorandum is, it says right
22  here, 15 November 2017.
23  BY MR. WILSON:
24      Q.    So as of the date November 15,
25  2017, who was the portfolio manager for

Page 34

Confidential - Pugatch

1  this investment?
2      A.   I don't recall the specific
3  names of the various entities that sat
4  below the HCLOF level or below Highland
5  Capital, as the investment manager of
6  HCLOF.
7
8      Q.   Well, are you familiar with a
9  company called Brigade?
10     A.   Yes.
11     Q.   And was that company a
12 sub-manager of this investment?
13         MS. WEISGERBER:  Objection to
14 form.
15     A.   Not at the time of our
16 investment.
17     Q.   Not at the time.  Well, when did
18 the portfolio managers begin to change in
19 this investment?
20         MS. WEISGERBER:  Objection to
21 form.
22     A.   Do you mean subsequent to our
23 investment?
24     Q.   Yes.
25     A.   So as I understand it in

Page 35

Confidential - Pugatch

1  connection with the Acis bankruptcy that
2  took place, there was a change in the
3  underling either portfolio manager of
4  certain of the CLOs, the Acis-managed CLOs
5  or Acis-branded CLOs, I should say, and/or
6  sub-advisor of those CLOs.
7
8      Q.   And was that at the direction of
9  the Chapter 11 trustee?
10         MS. WEISGERBER:  Objection.
11     A.   That's my understanding.
12     Q.   And so when this investment was
13 initially made, was Highland HCF Advisor,
14 Ltd. the portfolio manager of the entire
15 investment?
16         MS. WEISGERBER:  Objection to
17 form.
18     A.   I don't recall the specifics
19 underneath the HCLOF entity.
20     Q.   Well, there aren't any other
21 portfolio managers listed on this
22 document, that I can see.
23         Is there any place in this
24 document that you can point me to that
25 would identify another portfolio manager?

Page 36

Confidential - Pugatch

1
2          MS. WEISGERBER:  Objection to
3  form.  The document speaks for itself.
4      A.   Again, I think we may be
5  distinguishing here between portfolio
6  manager at the HCLOF level and portfolio
7  manager sub-advisor, again, I'm not sure
8  the proper terminology as it relates to
9  each of the underlying CLOs that were
10 partially owned by HCLOF.
11     Q.   Well, after the Acis bankruptcy
12 was filed, and after the Chapter 11
13 trustee appointed Acis as a portfolio
14 manager of at least part of HCLOF, did
15 Highland HCF Advisor continue to serve as
16 portfolio manager?
17         MS. WEISGERBER:  Objection to
18 form.
19     A.   All of HarbourVest's interaction
20 was with Highland as the investment
21 manager of HCLOF.  My understanding of the
22 change in those entities related to the
23 portfolio management of the underlying
24 Acis CLOs, not a change in the portfolio
25 manager, at the HCLOF level.

Page 37

Confidential - Pugatch

1
2      Q.   Well, Highland is listed as a
3  member under this -- Highland Capital
4  Management LLP is listed as a member under
5  this Member Agreement; is that correct?
6          MS. WEISGERBER:  Objection to
7  form.
8      A.   If that's what the document
9  says, yes.
10     Q.   I'm going to look -- let me stop
11 my share screen for a second.
12         All right.  I'm now at the top
13 of Page 5 of this Exhibit 4, where it
14 says, "Dover IX shall mean HarbourVest
15 Dover Street IX Investment L.P."
16         And Dover IX was the largest
17 single investor of the HarbourVest Group;
18 is that correct?
19     A.   Correct.
20     Q.   All right.  I'm now going to go
21 down to Paragraph 5.  I'm sorry, it's not
22 Paragraph 5.  Paragraph 4, where it says
23 "Composition of Advisory Board" in
24 Paragraph 4.1, The Company shall establish
25 an Advisory Board composed of two

Page 38

Confidential - Pugatch

1    individuals, one of whom shall be a
2    representative of CLO Holdco and one of
3    whom shall be a representative of
4    Dover IX.
5         And did this Advisory Board get
6    created?
7    A.   I believe it was created, yes.
8    Q.   And who was the representative
9    for CLO Holdco on the Advisory Board?
10   A.   I don't know.
11   Q.   Who was the representative for
12   Dover IX on the Advisory Board?
13   A.   I can't recall whether it was
14   myself or one other colleague who jointly
15   manages this investment with me.
16   Q.   You don't recall if you were on
17   the Advisory Board?
18   A.   The Advisory Board never met
19   formally under its capacity as an Advisory
20   Board.
21   Q.   Well, if you look down in
22   Paragraph 4.3, I've got my mouse pointed
23   here, I don't know if you can see it.
24   About two-thirds of the way down in this

Page 39

Confidential - Pugatch

1    paragraph it says, "The consent of the
2    Advisory Board shall be required to
3    approve the following actions," and then
4    it lists a number of things.
5         Did the Advisory Board not have
6    to -- was it not required that the
7    Advisory Board ever meet, because they
8    didn't take any of these actions?
9    MS. WEISGERBER:  Objection.
10   Objection to form.
11   A.   There may have been one or two
12   actions taken by the Advisory Board, I'm
13   looking at the list here to see what those
14   may even have been, during the duration of
15   our investment; but if so, those would
16   have been written resolutions or written
17   consents, as opposed to any meeting that
18   was convened amongst the entire Advisory
19   Board.
20   Q.   Okay.  And the entire Advisory
21   Board is just two individuals, correct?
22   A.   Correct, that's my
23   understanding.
24   Q.   Okay.  And if you go up a few

Page 40

Confidential - Pugatch

1    sentences above that in Paragraph 4.3 it
2    says, The portfolio manager shall not act
3    contrary to advice of the Advisory Board
4    with respect to any action or
5    determination expressly conditioned herein
6    or in the offering memorandum on the
7    consider approval of the Advisory Board.
8         So the portfolio manager did not
9    have the authority to disregard the advice
10   of the Advisory Board; is that correct?
11   MS. WEISGERBER:  Objection to
12   form; misstates the document.
13   A.   With respect to the limited role
14   that the Advisory Board would have to
15   play, yes, that would be my read.
16   Q.   Now, what is your understanding
17   of a reset transaction?
18   A.   Has to do with a refinancing and
19   reset of the investment period of an
20   underlying CLO.
21   Q.   And would a reset transaction be
22   contained within this -- these actions
23   that the Advisory Board's consent is
24   required to approve?

Page 41

Confidential - Pugatch

1    A.   No, it would not.
2    MS. WEISGERBER:  Objection.
3    MR. MALONEY:  Join.
4    Q.   It would not?
5    A.   It would not.
6    Q.   Well, if a reset was to be
7    proposed, who would have the discretion to
8    make that decision to enter a reset
9    transaction?
10   MS. WEISGERBER:  Objection to
11   form and foundation.
12   MR. MALONEY:  Join.
13   A.   That would be Highland as the
14   manager of HCLOF, who owns the equity
15   position to the underlying CLOs.
16   Q.   So you're saying that Highland
17   would have the exclusive authority to
18   enter a reset transaction?
19   A.   Correct.
20   MS. WEISGERBER:  Objection to
21   form.
22   MR. MALONEY:  Join.
23   Q.   What if HarbourVest objected to
24   a reset transaction?  Would it have any

1      Confidential - Pugatch
2    rights or remedies, in your understanding?
3         MS. WEISGERBER:  I'm going to
4    object to form.  And also just object
5    to the extent that this is calling for
6    legal conclusions.
7         Mike --
8         MR. WILSON:  I've ask the
9    witness, within his understanding of
10   the way this investment worked.
11        MS. WEISGERBER:  If you have an
12   understanding separate from any other
13   conversations with counsel, Mike, you
14   can certainly answer.
15   A.    Within my understanding,
16   HarbourVest would not have had any ability
17   or rights to object to a reset or for
18   similar actions by Highland, as the
19   manager of the HCLOF.
20   Q.    Okay.  And just to, just for
21   clarity, in 4.2 it says that, All actions
22   taken by the Advisory Board shall be (i)
23   by a unanimous vote of all of the members
24   of the Advisory Board in attendance; or
25   (ii), by written consent in lieu of a

1      Confidential - Pugatch
2    meeting signed by all of the members of
3    the Advisory Board.
4         And we've talked about how there
5    were two members, one of which represented
6    CLO Holdco and one of which represented
7    HarbourVest, and it was your testimony
8    that you don't recall a meeting ever being
9    conducted that you believed that there had
10   been some written consents issued by the
11   Advisory Board; is that correct?
12        MS. WEISGERBER:  Objection to
13   form.
14   A.    That is my recollection, yes.
15   Q.    I'm sorry?  I didn't hear your
16   answer.
17   A.    That is my recollection, yes.
18   Q.    Okay.  So what is the Advisory
19   Board's general function in your
20   understanding?
21        MS. WEISGERBER:  Objection to
22   form.
23        You can answer, Mike, if you
24   know, other than, you know, legal
25   conclusions, things like that, legal

1      Confidential - Pugatch
2    advice.
3         And also, Mike, you're welcome
4    to look at the document, I think John
5    is E-mailing you the documents as
6    well.  I don't know if you have the
7    full document in front of you.
8         THE WITNESS:  Yeah, I can pull
9    it up here.
10   A.    I mean, my understanding is the
11   Advisory Board, the Advisory Board's
12   involvement is as spelled as in Section
13   4.3 of the agreement that you have on the
14   screen.  And that is the extent of the
15   role that the Advisory Board would play.
16   Q.    Well, but as a practical matter,
17   what did that entail?
18        MS. WEISGERBER:  Objection to
19   form.
20   A.    Again, as a practical matter,
21   the listed items, which I can't see, that
22   are off the screen further down in 4.3 are
23   the items that would require approval by
24   the Advisory Board.
25   Q.    But other than those items, the

1      Confidential - Pugatch
2    Advisory Board was not a routine part of
3    the decision-making of the portfolio
4    manager?
5         MS. WEISGERBER:  Objection to
6    form.
7    A.    Not at all.
8    Q.    Did you say "not at all"?
9    A.    Not at all, no.
10   Q.    I'm going to refer back to
11   Exhibit 5, which was Document -- or Docket
12   1057.  I'll put that back on the share
13   screen.  I wanted you to scroll, sorry.
14   It's a long document.
15        I want you to look at
16   Paragraph 37, which should be on your
17   screen.  And it says that these are
18   misrepresentations that HarbourVest
19   alleges were made by Highland.  And the
20   first bullet point states that, "Highland
21   never informed HarbourVest that Highland
22   had no intention of paying the Arbitration
23   Award and was undertaking steps to ensure
24   that Mr. Terry could not collect on his
25   judgment."

Page 46

1    Confidential - Pugatch
2        Now, Mr. Terry did not have an
3    arbitration award against Highland; is
4    that correct?
5        MS. WEISGERBER:  Objection to
6        form and foundation.
7    A.    My understanding is there was an
8    Arbitration Award, awarded for the benefit
9    of Mr. Terry.
10    Q.    But that award was against Acis,
11   correct?
12       MS. WEISGERBER:  Objection to
13       form.
14   A.    I don't know all of the details.
15   I do know that Acis was a subsidiary of
16   Highland, and there was an arbitration
17   award that was for the benefit of
18   Mr. Terry.
19   Q.    But you would agree with me that
20   if, if Highland, or I'm sorry if Mr. Terry
21   had an arbitration award against Acis,
22   then Highland would not have any
23   obligation to pay that award?
24       MR. MORRIS:  Objection to the
25       form of the question.

Page 47

1    Confidential - Pugatch
2        MS. WEISGERBER:  Objection to
3    the form.  Objection to the extent
4    that it calls for a legal conclusion.
5        I don't -- Mike, if you have a
6    layman's understanding of the answer
7    to that question, you're welcome to
8    answer.  But if not, don't answer.
9    A.    My understanding was Acis was a
10   controlled subsidiary of Highland's.
11   Q.    Okay.  Well, the next bullet
12   point says that, "Highland did not inform
13   HarbourVest that it undertook the
14   transfers to siphon assets away from Acis,
15   L.P., and that such transfers would
16   prevent Mr. Terry from collecting on the
17   Arbitration Award."
18       So if your understanding was
19   that Highland was responsible for the
20   arbitration award, then why is it relevant
21   that Highland siphoned assets away from
22   Acis, L.P.?
23       MS. WEISGERBER:  Objection to
24       form.  Misstates testimony.
25       Can you clarify that question,

Page 48

1    Confidential - Pugatch
2    John?  I think the beginning of it was
3    a little muddled.
4    BY MR. WILSON:
5    Q.    Well, this objection says that
6    Highland had -- or response to objection,
7    says that Highland had no intention of
8    paying the arbitration award, but that
9    seems to conflict with the next bullet
10   point that says that it undertook
11   transfers to siphon assets away from Acis,
12   L.P., to prevent Mr. Terry from collecting
13   on the arbitration award.
14       So where were those assets being
15   siphoned to?
16       MS. WEISGERBER:  Objection to
17       form and foundation.
18       If you're capable of answering
19       that question, Mike, you can.
20   A.    I don't know the specific
21   details of where those assets were
22   siphoned off to, other than it was to
23   another Highland affiliate.
24   Q.    The next sentence says that,
25   "Highland simply did not inform

Page 49

1    Confidential - Pugatch
2    HarbourVest and represented to HarbourVest
3    that the reason for changing the portfolio
4    manager for HCLOF was because Acis was
5    toxic in the industry."
6        Do you see that?
7    A.    Yes.
8    Q.    And it seems when I read these
9    documents that have been filed in the
10   Highland bankruptcy, and also the Acis
11   bankruptcy, that there's a difference in
12   position as to which entity, being either
13   Highland or HarbourVest, had the belief
14   that the Acis name was toxic.  Can you
15   shed any light on that?
16       MS. WEISGERBER:  Objection to
17       form.
18   A.    I can unequivocally say that the
19   idea to change the portfolio manager or
20   the idea that the Acis brand was toxic did
21   not come from HarbourVest.
22   Q.    That was not at HarbourVest's
23   suggestion or insistence?
24   A.    Absolutely not.
25   Q.    Well, whose suggestion was it

Page 50

Confidential - Pugatch

1  that the Acis name was toxic?
2      A.   Somebody at Highland.
3      Q.   Do you know who?
4      A.   I don't recall the conversation
5  where that first came up or who said, or
6  who at Highland said that.
7      Q.   But that conversation did occur
8  prior to HarbourVest's investment?
9      A.   Yes.
10     Q.   So Acis was previously the
11  portfolio manager for HCLOF prior to
12  November 15, 2017, and now November 17 --
13  or 15th, 2017, the portfolio manager was
14  changed.
15         And what is HarbourVest's
16  position as to why that change in
17  portfolio manager damaged it?
18         MS. WEISGERBER:  Objection;
19  form, objection to the extent it calls
20  for a legal conclusion.
21         Mike, you can answer --
22         MR. WILSON:  I'm not asking for
23  a -- with all due respect, I'm not
24  asking for a legal conclusion.  I'm


1  that the Acis name was toxic?
2      A.   Somebody at Highland.
3      Q.   Do you know who?
4      A.   I don't recall the conversation
5  where that first came up or who said, or
6  who at Highland said that.
7      Q.   But that conversation did occur
8  prior to HarbourVest's investment?
9      A.   Yes.
10     Q.   So Acis was previously the
11  portfolio manager for HCLOF prior to
12  November 15, 2017, and now November 17 --
13  or 15th, 2017, the portfolio manager was
14  changed.
15         And what is HarbourVest's
16  position as to why that change in
17  portfolio manager damaged it?
18         MS. WEISGERBER:  Objection;
19  form, objection to the extent it calls
20  for a legal conclusion.
21         Mike, you can answer --
22         MR. WILSON:  I'm not asking for
23  a -- with all due respect, I'm not
24  asking for a legal conclusion.  I'm

Page 51

Confidential - Pugatch

1  asking for his understanding why the
2  change in the portfolio manager
3  damaged HarbourVest.
4      MS. WEISGERBER:  Same objection.
5      You can provide any
6  non-privileged answer that you have,
7  Mike, if any.
8      A.   Ultimately my understanding is
9  that that change in portfolio manager and
10  the subsequent litigation between Acis,
11  Highland, and Josh Terry led to material
12  diminution in value, as it relates to the
13  underlying assets of HCLOF stemming from
14  Highland's decision not to comply with the
15  arbitration award to Mr. Terry.
16     Q.   Okay.  Now, if you go up to
17  Page 4 in this document, it says that on
18  October 27th, and this is Paragraph 11
19  now, "On October 27, 2017, Acis' portfolio
20  management rights for HCLOF were
21  transferred to Highland HCF"; is that
22  correct?
23     A.   That sounds right, yes.
24     Q.   And this is over two weeks prior

Page 52

Confidential - Pugatch

1  to HarbourVest's investment, correct?
2      A.   Correct.
3      Q.   So HarbourVest had full
4  knowledge that that the portfolio manager
5  of HCLOF was being changed prior to its
6  investment, correct?
7      A.   Correct.
8      MS. WEISGERBER:  Objection to
9  form.
10         And just to clarify, you're
11  asking him, HarbourVest, he's
12  testifying on behalf of himself.  I
13  could just take a standing objection
14  to that because I know sometimes
15  you're just saying HarbourVest meaning
16  Mike, so...
17  BY MR. WILSON:
18     Q.   Okay.  And just to be clear,
19  HCLOF changed its portfolio manager on
20  October 27, 2017, but after the Acis
21  bankruptcy was initiated the Chapter 11
22  trustee made changes to the portfolio
23  manager, correct?
24         MS. WEISGERBER:  Objection to

Page 53

Confidential - Pugatch

1  form, foundation.
2      A.   I know there were changes
3  subsequent to the Acis bankruptcy, to the
4  underlying management of the Acis CLOs.
5      Q.   All right.  I'm going to go back
6  to Paragraph 37, and I want to look at
7  these next two bullet points.
8         It says that, in the third
9  bullet point, that "Highland indicated to
10  HarbourVest that the dispute with
11  Mr. Terry (which appeared on a litigation
12  schedule presented to HarbourVest during
13  diligence) would have no impact on
14  investment activities."
15         And that would be the opinion of
16  Highland, correct?
17         MS. WEISGERBER:  Objection to
18  form.  The opinion of Highland?  Is
19  that what you meant to ask?
20         MR. WILSON:  Right.
21  BY MR. WILSON:
22     Q.   That's Highland expressing its
23  opinion to HarbourVest, correct?
24         MS. WEISGERBER:  Objection to

Page 54

1    Confidential - Pugatch
2    form.
3    A.    I would just say Highland
4    presented that as facts to HarbourVest.
5    Q.    Okay.  And the next one, it says
6    that "Highland expressed confidence in the
7    ability of HCLOF to reset or redeem the
8    CLOs notwithstanding that Highland was
9    using HCLOF as part of its scheme to avoid
10   the pending Arbitration Award."
11        That's again an opinion, right,
12   that Highland expressed confidence in the
13   ability of HCLOF?
14        MS. WEISGERBER:  Objection to
15   form.  Objection to the extent it
16   calls for a legal conclusion.
17   A.    Ultimately, their ability, or
18   HCLOF's ability to reset or redeem the
19   CLOs would be subject to market conditions
20   and the ability to actually affect those
21   transactions, but they expressed their,
22   you know, their belief or view in HCLOF's
23   ability to do that notwithstanding the,
24   that change in portfolio manager.
25   Q.    Well, in Paragraph 39 on that

Page 55

1    Confidential - Pugatch
2    same page, it says, "In reliance on
3    Highland's misrepresentations and
4    omissions, HarbourVest invested in HCLOF."
5    Q.    Now, HarbourVest is a
6    sophisticated investor, correct?
7    A.    Correct.
8    Q.    And if we were to go to
9    Paragraph 36, it says, right here in the
10   middle, "These facts were material:
11   indeed, HarbourVest expressed concern and
12   requested further information regarding
13   the Transfers, the Arbitration Award, and
14   their implications for HCLOF, and the
15   investment's closing date was delayed."
16        And the closing date was
17   ultimately November 15, 2017, correct?
18   A.    Correct.
19   Q.    What was the initial closing
20   date that had to be delayed?
21   A.    I believe it was scheduled for
22   November 1st.
23   Q.    So HarbourVest had full
24   knowledge of these facts that it, that it
25   lays out here forming the basis of the

Page 56

1    Confidential - Pugatch
2    alleged misrepresentations, and they
3    requested further information regarding
4    those facts.
5        Did they receive any further
6    information?
7        MR. MORRIS:  Objection to the
8    form of the question.
9        MS. WEISGERBER:  Objection to
10   form.  Misstates testimony.
11   A.    We did have subsequent
12   conversations and, I believe, receive
13   subsequent information describing the
14   intent around, and the, you know, new
15   structure, pro forma structure, of the
16   action that Highland had undertaken.  And
17   part of the reason for the delay in the
18   closing was to ensure that we had adequate
19   time to diligence those changes, ask
20   questions, in connection with a thorough
21   due diligence process, and ensure that the
22   underlying legal structure was still
23   sound.
24   Q.    And HarbourVest was investing
25   over $73 million, correct?

Page 57

1    Confidential - Pugatch
2    A.    Right.
3    Q.    And HarbourVest had made
4    investments of this nature previously,
5    correct?
6    A.    We did.
7        MS. WEISGERBER:  Objection to
8    form.
9    A.    HarbourVest has made hundreds of
10   investment over its years, yes.
11   Q.    And HarbourVest has conducted
12   due diligence regarding its investments in
13   the past, correct?
14   A.    Correct.
15   Q.    And HarbourVest received
16   additional information on items of concern
17   and reviewed that information and
18   satisfied itself that this was an
19   appropriate investment, correct?
20        MS. WEISGERBER:  Objection to
21   form.  Misstates testimony.
22   A.    On the back of
23   misrepresentations by Highland, yes.
24        MR. WILSON:  Well, I think
25   that's nonresponsive and I object.

Page 58

1      Confidential - Pugatch
2      Q.   I'm just, I'm just, reading from
3    your pleading that you filed in the
4    bankruptcy, where you say that these were
5    material facts, and HarbourVest sought
6    more information regarding these facts.
7    And then you've testified that they
8    performed additional due diligence
9    regarding that information they received,
10   and then they determined that the
11   investment was appropriate, correct?
12        MS. WEISGERBER:  Objection to
13      form.  Misstates testimony.
14        Go ahead, Mike.
15      A.   Yeah, that is correct, on the
16   back of the additional information we
17   received from Highland.
18        And I would add, with, you know,
19   with the benefit of external advisors and
20   outside counsel reviewing those structural
21   changes, as well.
22      Q.   All right.  Thank you.
23        Now, going back to your
24   declaration, which we've marked as
25   Exhibit 3, Paragraph 3 says that "The

Page 59

1    unaudited net asset value of HCLOF, as of
2    August 31, 2020, was $44,587,820."
3        And is that a -- is that a book
4    value, I guess?
5      A.   That is a fair market value, in
6    accordance with the valuation policy of
7    HCLOF.
8      Q.   Do you happen to know the net
9    asset value of HCLOF as of February 1,
10   2019?  And I don't want an exact number, I
11   just want an approximation.
12      A.   No, I do not.
13      Q.   Do you know where I could get
14   that information?
15      A.   Presumably from the Debtor.
16      Q.   We'll come back to this in a
17   minute, but I'm going to --
18        MS. WEISGERBER:  I think we've
19      been going about an hour, John, if we
20      can take a quick break.
21        MR. WILSON:  Yeah, a break is
22      fine.
23        MS. WEISGERBER:  Actually,
24      Mike...

Page 60

1      Confidential - Pugatch
2        MR. WILSON:  I'm sorry?  I
3    didn't hear you.
4        MS. WEISGERBER:  It can be up to
5    Mike.
6        Mike, do you want to take a
7    quick break?  Do you want to keep
8    going?
9        MR. WILSON:  No, we can, if
10   y'all need a break, we can take a
11   break, like 10, 15 minutes.
12        THE WITNESS:  Yeah, why don't we
13   take a break, please.
14        MR. WILSON:  What do y'all
15   prefer?  10, 15?
16        MS. WEISGERBER:  Ten minutes is
17   fine.
18        Mike, is that good with you.
19        THE WITNESS:  Yeah, ten-minute
20   break is fine.
21        MR. WILSON:  Okay.  Well, we'll
22   break till, let's say, 1:20 central
23   time.
24        THE WITNESS:  Perfect.
25        MR. WILSON:  All right.  Thanks

Page 61

1      Confidential - Pugatch
2    guys.
3        (Recess taken.)
4        MR. WILSON:  Yes, I just sent
5    out an E-mail with Exhibit 6, and I'm
6    going to pull that up on the screen
7    share, as well.
8        (Whereupon, Exhibit 6, Offering
9    Memorandum 122 pages, was marked for
10   identification.)
11   BY MR. WILSON:
12      Q.   All right.  So this is the
13   Offering Memorandum, and I'm looking at
14   the bottom of Page 1 -- I mean, the top of
15   Page 1, I'm sorry.
16        The Company that was being
17   invested in is Highland CLO Funding, Ltd.
18   Do you see that, Mr. Pugatch?
19        MS. WEISGERBER:  Objection to
20      form.
21      A.   I do.  Okay.
22      Q.   And then this document defines
23   Highland, as Highland Capital Management,
24   L.P.  Do you see that?
25      A.   Yes.

| | |
|---|---|
| Page 62 | Page 63 |

**Page 62**

1    Confidential - Pugatch
2    Q.   Okay.  Now, if we go down to, I
3  guess it's Page 8 of this document, and
4  this first full paragraph at the top, it
5  says, "No voting member of the Advisory
6  Board shall be a controlled affiliate of
7  Highland."
8       Do you see that?
9    A.   I do.
10    Q.   And then it also says that, "It
11  being understood that none of CLO Holdco
12  Ltd., it's wholly-owned subsidiaries, or
13  any of their respective directors or
14  trustees shall be deemed to be a
15  controlled affiliate of Highland, due to
16  their preexisting non-discretionary
17  advisory relationship with Highland."
18       Do you see that?
19    A.   Yes.
20    Q.   So there were no affiliates of
21  Highland on the Advisory Board, correct?
22       MS. WEISGERBER:  Objection to
23  form.
24    A.   For voting purposes under the
25  document, that is how this reads, correct.

**Page 63**

1    Confidential - Pugatch
2       MR. WILSON:  All right.  I'm
3  going to turn to the next exhibit.
4  And this is going to be Exhibit No. 7
5  coming in the E-mail.  I'm also going
6  to put Exhibit No. 7 on the screen.
7       (Whereupon, Exhibit 7, Share
8  Subscription and Transfer Agreement 31
9  pages, was marked for identification.)
10    Q.   All right.  Do you see that?
11  The "Subscription and Transfer Agreement
12  For Ordinary Shares"?
13    A.   Yep.
14    Q.   All right.  So what this
15  document says is that, it repeats that
16  Highland HCLF Advisory Ltd. is the
17  portfolio manager.  Highland CLO Funding
18  Ltd. is the fund, and CLO Holdco Ltd. is
19  the existing shareholder.
20       And if we go down to the bottom
21  half of this page, it says that
22  HarbourVest was acquiring its shares in
23  this investment from CLO Holdco, correct?
24    A.   Yes.
25       MS. WEISGERBER:  Objection to

| | |
|---|---|
| Page 64 | Page 65 |

**Page 64**

1    Confidential - Pugatch
2  form.
3    Q.   And prior to the date of this
4  document, which I believe is November 15,
5  2017, CLO Holdco held 100 percent of the
6  shares of HCLOF, correct?
7       MS. WEISGERBER:  Objection to
8  form, foundation.
9    A.   I don't recall.  I know they
10  were the largest, the largest investor.  I
11  don't recall if it was 100 percent.
12    Q.   Well, if you look at the chart
13  below Paragraph A, it says that CLO Holdco
14  Ltd. immediately prior to the placing on
15  100 percent share percentage.
16       Do you have any reason to
17  disagree with that?
18    A.   No.
19       MS. WEISGERBER:  Objection to
20  form.
21    Q.   All right.  Now, below CLO
22  Holdco Ltd., these are the five
23  HarbourVest entities that have filed
24  proofs of claim in this bankruptcy,
25  correct?

**Page 65**

1    Confidential - Pugatch
2       MS. WEISGERBER:  Objection to
3  form.
4    A.   Those are the five HarbourVest
5  entities with a direct investment in
6  HCLOF.
7    Q.   And each one of those entities
8  has filed a proof of claim in this
9  bankruptcy, correct?
10    A.   Yes.
11    Q.   And the largest – I think we
12  discussed this earlier, but Dover Street
13  IX is the largest of those investors, with
14  a 35.49 percent share percentage, correct?
15       MS. WEISGERBER:  Objection to
16  form.
17    A.   Correct.
18    Q.   And if you take the total of
19  those investments of the HarbourVest
20  entities, you get a 49.98 percent total.
21  Is that your understanding?
22       MS. WEISGERBER:  Objection to
23  form.
24    A.   I know it has 49 percent, and
25  some percentage.  I'll take your math as

Page 66

Confidential - Pugatch

1    correct.
2    Q.    And 49.98 percent is larger than
3    the next largest shareholder, which is CLO
4    Holdco which is 49.02 percent, correct?
5        MS. WEISGERBER:  Objection to
6    form.
7    A.    In taking all of the HarbourVest
8    entities, collectively, yes, correct.
9    Q.    And so I want to go back to
10    earlier where we saw in documents filed by
11    HarbourVest, where it refers to itself as
12    a passive investor.  What do you, I
13    apologize if I've already asked you this
14    question, but what do you mean by passive
15    investor?
16    A.    Meaning we were a minority
17    investor in HCLOF.  HCLOF was fully
18    controlled by Highland as the investment
19    manager.  So HarbourVest did not have any
20    governance, rights, or control as it
21    related to the ongoing investment
22    management and decisionmaking of HCLOF.
23    Q.    HarbourVest has the largest
24    percentage of the shares of any of these

Page 67

Confidential - Pugatch

1    investors, correct?
2        MS. WEISGERBER:  Objection to
3    form.
4    A.    Taken collectively, yes.
5    Q.    And HarbourVest owned one of the
6    two spots on the Advisory Board, correct?
7        MS. WEISGERBER:  Objection to
8    form.
9    A.    Correct.
10    Q.    And if you look down below the
11    HarbourVest entities on this chart, you
12    see that Highland Capital Management, L.P.
13    is purchasing a .63 percent interest,
14    correct?
15        MS. WEISGERBER:  Objection to
16    form.  The document speaks for itself.
17    A.    According to the document, yes.
18    Q.    Do you have any reason to
19    disagree with that document?
20        MS. WEISGERBER:  Objection to
21    form.
22    A.    I do not.
23        MR. WILSON:  All right.  I'm
24    going to stop that screen share.  I'm

Page 68

Confidential - Pugatch

1    going to E-mail out the next exhibit.
2    This was Exhibit 8 that I just sent,
3    and I'll pull it up on the screen
4    share.
5        (Whereupon, Exhibit 8, E-mail
6    08/15/2017, was marked for
7    identification.)
8    Q.    Now, I'll represent to you that
9    I received this document this morning from
10    your counsel.  Do you recognize this
11    E-mail?  Have you seen it before?
12    A.    Yes, I have.
13    Q.    And this E-mail is sent by Brad
14    Eden.  I think you mentioned that he was
15    one of the representatives that was
16    involved in the pre-investment discussions
17    with Highland?
18    A.    Correct.
19    Q.    And I think you told me that
20    Dustin Willard was involved in those
21    discussions on the HarbourVest side,
22    correct?
23    A.    Correct.
24    Q.    And so this is an E-mail sent on

Page 69

Confidential - Pugatch

1    August 15, 2017 from Brad Eden to Dustin
2    Willard.  Are you familiar with Thomas
3    Surgent?
4    A.    Yes.
5    Q.    Was he involved in those
6    discussions with you and HarbourVest as
7    well?
8    A.    In some of those discussions,
9    yes.
10    Q.    Okay.  So when it says, "Dustin,
11    attached is a legal summary.  Of course,
12    Thomas is available to answer any
13    follow-up questions."  Do you know if
14    Thomas was consulted with any follow-up
15    questions?
16    A.    I recall --
17        MS. WEISGERBER:  Objection to
18    form.
19    A.    -- having follow-up
20    conversations with Highland, I don't --
21    around these legal summaries.  I don't
22    recall with whom.
23    Q.    Okay.  And just to show you the
24    attachment that's referenced in the

Page 70

1    Confidential - Pugatch
2    E-mail, this says that SEC financial
3    crisis matter crusader, Terry, Daugherty
4    and UBS.  So then I guess these are --
5    this is information provided by Highland
6    to HarbourVest regarding these matters.
7    Why were these particular matters
8    addressed in this E-mail, to your
9    knowledge?
10           MS. WEISGERBER:  Objection to
11       form and foundation.
12       A.   These were all outstanding
13   litigation matters that we had become
14   aware of in connection with our diligence
15   that we asked for a further explanation
16   from Highland on the underlying substance.
17       Q.   Now, did you become
18   independently aware of these in the course
19   of your due diligence, or were these
20   brought to your attention by Highland
21   first?
22       A.   I don't know.
23           MS. WEISGERBER:  Objection to
24       form.
25       Q.   You don't know?

Page 71

1    Confidential - Pugatch
2    A.   (Nods.)
3    Q.   Okay.  And particularly with
4    respect to Mr. Terry, is it your opinion
5    that there are any material
6    misrepresentations made in this summary?
7           MS. WEISGERBER:  Objection to
8       form.  Objection to the extent it
9       calls for a legal conclusion.
10          Mike, to the extent you have an
11      answer that does not infringe on
12      conversations with counsel, you can
13      provide it.
14      A.   Yeah, I would say our
15   understanding or interpretation of that,
16   or the answer to that question would be
17   based on conversations with counsel.
18      Q.   Well, this document was provided
19   to you in the course of the discussions
20   prior to HarbourVest's investment, and
21   you've stated that Highland, or you've
22   taken the position that Highland made
23   material misrepresentations to
24   HarbourVest, in the course of these
25   discussions.

Page 72

1    Confidential - Pugatch
2           Does this document evidence
3    those material misrepresentations?
4           MS. WEISGERBER:  Objection to
5       form.  Objection to the extent it
6       calls for a legal conclusion.
7       A.   Yeah, same answer as previous.
8       Q.   Well, I'm not asking you for a
9    legal conclusion.  I'm asking you are
10   there misrepresentations in this document
11   that you claim Highland made?
12          MS. WEISGERBER:  Same
13      objections.
14          I think misrepresentations calls
15      for a legal conclusion regarding legal
16      misrepresentations, actionable
17      misrepresentations.  So if he doesn't
18      have any non-privileged testimony to
19      give, he can't give any testimony.
20          MR. WILSON:  Well, I'm here
21      today to investigate HarbourVest's
22      claim and one of the basis of
23      HarbourVest's claim is
24      misrepresentation.  So I'm trying to
25      figure out what those

Page 73

1    Confidential - Pugatch
2    misrepresentations were.
3           And I would ask that the witness
4       tell me if there's a misrepresentation
5       in this document that was provided in
6       this E-mail.
7           MS. WEISGERBER:  Same
8       objections.
9           Mike, if you have a general
10      understanding of, generally,
11      misrepresentations that HarbourVest
12      believes were made in connection or
13      regarding the Terry litigation,
14      et cetera, you can provide that
15      information.
16          THE WITNESS:  Yeah, sure.
17      A.   So in general, my understanding
18   and the way that Highland had
19   characterized the ongoing litigation with
20   Mr. Terry was that it was nothing more
21   than an employment dispute with a former
22   employee and that, you know, the
23   arbitration -- well, actually, it was
24   before the Arbitration Board, but the
25   ongoing litigation had no impact, bearing,

Page 74

Confidential - Pugatch

1  or ultimate result on the underlying CLOs
2  that Highland managed, including the Acis
3  CLOs.
4      Q.   So you're saying that
5  Highland --
6      MR. MORRIS:  John, I'm sorry to
7  interrupt.  Before you go on, somebody
8  with the initials DSD just joined the
9  deposition.  Can you please identify
10  yourself?
11      MR. DRAPER:  This is Douglas
12  Draper.  I just changed machines.
13      MR. MORRIS:  Okay.  No problem,
14  Doug.  Thank you.
15  BY MR. WILSON:
16      Q.   So, and I'm not trying to put
17  words in your mouth, but is the gist of
18  what you're telling me that Highland
19  represented that this was a minor dispute
20  with a former employee and it would not
21  affect its CLO business?
22      A.   Correct.
23      MS. WEISGERBER:  Objection to
24  form.
25

Page 75

Confidential - Pugatch

1      A.   Correct.
2      Q.   Well, are there any more
3  specific E-mails or written
4  communications, that you're aware of, that
5  would contain misrepresentations by
6  Highland to HarbourVest?
7      MS. WEISGERBER:  Objection to
8  form.
9      Are you asking about from
10  today's production, or are you asking
11  about just, in general?
12      MR. WILSON:  Well, you produced
13  two E-mails to us today.  I'm just
14  asking if there's anything else he's
15  aware of where there's written
16  misrepresentations from Highland to
17  HarbourVest.
18      MS. WEISGERBER:  Mike, if you
19  have an answer separate from
20  conversations with lawyers, et cetera,
21  you can certainly answer.
22      A.   Yeah, my understanding of the
23  documents I reviewed that were part of the
24  production to you earlier today, there is
25

Page 76

Confidential - Pugatch

1  another document that would also include
2  misrepresentations on the part of this,
3  the Terry lawsuit and ultimate impact on
4  the CLO business.
5  BY MR. WILSON:
6      Q.   And what document is that?
7      A.   That was the E-mail, E-mail with
8  an attachment around a response to a Wall
9  Street Journal article and some of the
10  content in the E-mail itself.
11      Q.   Okay.  We'll look at that one.
12      What was the -- HarbourVest had
13  seen the Terry Arbitration Award, correct?
14      MS. WEISGERBER:  Objection to
15  form.
16      Q.   Prior to making its investment
17  in HCLOF?
18      A.   We were aware of the existence
19  and the outcome of the Arbitration Award.
20      Q.   Had you read the Arbitration
21  Award?
22      A.   No.
23      Q.   Well, how did you know the
24  substance of the Arbitration Award without
25

Page 77

Confidential - Pugatch

1  reading it?
2      MS. WEISGERBER:  Objection to
3  form.
4      A.   We were informed by Highland of
5  the outcome of the ongoing litigation and
6  the outcome of the Arbitration Award.
7      Q.   Was that part of the
8  documentation that you requested Highland
9  provide you to continue your due
10  diligence, before making the investment?
11      MS. WEISGERBER:  Objection to
12  form.
13      A.   We certainly requested more
14  color around the outcome of that, and any
15  impact that it could have to HCLOF or the
16  ongoing viability of Highland's CLO
17  business.
18      Q.   And what, what were you provided
19  with respect to the Terry Arbitration
20  Award?
21      MS. WEISGERBER:  Objection to
22  form.
23      A.   The existence of that award, the
24  quantum of that award, the judgment of
25

Page 78

Confidential - Pugatch

1    Confidential - Pugatch
2    just under $8 million in connection with
3    that award.  That was the information that
4    was disclosed at -- and represented as a
5    settlement or, you know, arbitration
6    ruling, in connection with the employee
7    litigation, wrongful termination suit.
8        Q.    So did HarbourVest not request a
9    copy of the Arbitration Award to review?
10        MS. WEISGERBER:  Objection to
11    form.
12        A.    We did not specifically, no.
13        Q.    And so, to this day, have you
14    read the Arbitration Award?
15        A.    I have not.
16        MS. WEISGERBER:  Objection to
17    form.
18        Q.    You have not?
19        A.    I have not.
20        MR. WILSON:  Okay.  I think my
21    last E-mail went out with Exhibit 9 on
22    it.  I will pull that up.
23        Q.    Can you see that on the screen
24    share?
25        A.    Yes.

Page 79

Confidential - Pugatch

1    Confidential - Pugatch
2        (Whereupon, Exhibit 9,
3    11/29/2017 E-mail with cover letter
4    Highland Capital Management, was
5    marked for identification.)
6        Q.    Okay.  So I think this is out of
7    order, but this should have been first in
8    the exhibit.  But this is an E-mail from
9    Hunter Covitz to Dustin Willard, Michael
10    Pugatch and Nick Bellisario, carbon copies
11    to Trey Parker and Brad Eden.
12        And Trey Parker and Brad Eden
13    are Highland affiliates, right?
14        A.    Yes.
15        Q.    And we've talked about Dustin
16    Willard.  Who's Nick Bellisario?
17        A.    He was another member of the
18    HarbourVest team.
19        Q.    And was he on the, the
20    four-member board that you talked about
21    earlier, that made the investment
22    decision?
23        A.    No, he was the junior member of
24    the investment team that I alluded to.
25        Q.    Okay.  And this, this E-mail

Page 80

Confidential - Pugatch

1    Confidential - Pugatch
2    came out about two weeks after the
3    HarbourVest investment, correct?
4        A.    Correct.
5        Q.    And it's your opinion or
6    position that this E-mail contains
7    misrepresentations that Highland made to
8    HarbourVest?
9        MS. WEISGERBER:  Objection to
10    form.  Objection to the extent it
11    calls for a legal conclusion.
12        A.    Yes.
13        Q.    And there was a Wall Street
14    Journal article that had come out shortly
15    before this E-mail, correct?
16        A.    Correct.
17        Q.    And how did you became aware of
18    that Wall Street Journal article?
19        A.    I certainly would have seen it.
20    I may have been sent it separately by
21    Highland, I don't recall.
22        Q.    You don't recall if you saw it
23    independently or Highland telling you
24    about it?
25        A.    I don't.

Page 81

Confidential - Pugatch

1    Confidential - Pugatch
2        Q.    And what did you -- what was
3    your reaction to receiving these E-mails
4    from Highland regarding that article?
5        MS. WEISGERBER:  Objection to
6    form.
7        A.    The article or the accusations
8    in the article were something that
9    required more explanation from our
10    perspective.
11        Q.    And attached to this E-mail
12    was -- we just scrolled through it a
13    second ago -- but a letter from James
14    Dondero that was sent to the
15    editor-in-chief of the Wall Street
16    Journal, Mr. Gerard Baker, on November
17    28th.
18        And did you read this
19    attachment?
20        A.    Yes.
21        Q.    And did this attachment to this
22    E-mail aleve your concerns that you had
23    regarding the article?
24        MS. WEISGERBER:  Objection to
25    form.

Page 82

| | Confidential - Pugatch |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | A.  I wouldn't say alleviated the |
| 3 | concerns but certainly provided an |
| 4 | explanation or refute to some of the |
| 5 | claims made in the, in the article. |
| 6 | Q.  And do you contend that this |
| 7 | letter that was written to Gerard Baker |
| 8 | and provided later to HarbourVest was a |
| 9 | material misrepresentation? |
| 10 | MS. WEISGERBER:  Objection to |
| 11 | form. |
| 12 | Don't answer that, Mike.  It |
| 13 | calls for a legal conclusion. |
| 14 | MR. WILSON:  I'm asking for his |
| 15 | understanding. |
| 16 | Q.  Do you contend that there's |
| 17 | misrepresentations in this letter? |
| 18 | MS. WEISGERBER:  Material |
| 19 | misrepresentations absolutely calls |
| 20 | for a legal conclusion, John. |
| 21 | MR. WILSON:  Well, I've |
| 22 | shortened it to misrepresentations. |
| 23 | So I just want to know if he thinks |
| 24 | there's anything that's misrepresented |
| 25 | in this letter. |

Page 83

| | Confidential - Pugatch |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | MS. WEISGERBER:  Same |
| 3 | objections. |
| 4 | Mike, if you have an |
| 5 | understanding, separate from |
| 6 | conversations with lawyers, you can |
| 7 | answer. |
| 8 | A.  I would need to reread the |
| 9 | letter to definitively answer that outside |
| 10 | of conversations with counsel. |
| 11 | Q.  But to be clear, this letter was |
| 12 | issued two weeks after HarbourVest's |
| 13 | investment, correct? |
| 14 | A.  Correct. |
| 15 | MS. WEISGERBER:  Objection; |
| 16 | asked and answered. |
| 17 | MR. WILSON:  I'm going to now |
| 18 | send out the next exhibit, which is |
| 19 | going to be Exhibit No. 10. |
| 20 | (Whereupon, Exhibit 10, 2004 |
| 21 | Examination of Investor in Highland |
| 22 | CLO Funding Ltd. 10/10/2018, was |
| 23 | marked for identification.) |
| 24 | MR. WILSON:  It just went |
| 25 | through.  So I'm going to pull it up |

Page 84

| | Confidential - Pugatch |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | on my screen share. |
| 3 | So this Exhibit 10, the document |
| 4 | I received this morning, filed in the |
| 5 | Acis bankruptcy, it looks like, well, |
| 6 | let's see, dated in, dated October 10, |
| 7 | 2018. |
| 8 | BY MR. WILSON: |
| 9 | Q.  Have you seen this document |
| 10 | before? |
| 11 | A.  Yes. |
| 12 | Q.  And it's a motion for 2004 |
| 13 | Examination of Investor in Highland CLO |
| 14 | Funding, Ltd., correct? |
| 15 | A.  Sorry.  Was there a question, |
| 16 | John? |
| 17 | Q.  Yeah.  I was just asking you to |
| 18 | confirm that this was the motion for 2004 |
| 19 | Examination of Investor in Highland CLO |
| 20 | Funding? |
| 21 | A.  Yes. |
| 22 | Q.  And so if I scroll down to |
| 23 | Paragraph 6, which is on, it looks like |
| 24 | it's on Page 4.  In the second sentence, |
| 25 | it says that "Although HCLOF/ALF was a one |

Page 85

| | Confidential - Pugatch |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | time wholly-owned by an affiliate of |
| 3 | Highland, it did an offering memorandum in |
| 4 | November of 2017 and as a result, is now |
| 5 | owned 49.985% by certain affiliates of a |
| 6 | large investor and manager of private |
| 7 | equity funds." |
| 8 | And that's defined as investor. |
| 9 | So the Investor is the HarbourVest |
| 10 | entities collectively, correct? |
| 11 | A.  Correct. |
| 12 | Q.  All right.  And then the next |
| 13 | sentence, says that "Despite its large |
| 14 | ownership percentage in HCLOF in the |
| 15 | alleged millions in losses that will |
| 16 | result if the Acis CLOs are not reset to |
| 17 | make them consistent with prevailing |
| 18 | market conditions the Investor has not yet |
| 19 | appeared in this case or taken any |
| 20 | position in this bankruptcy case." |
| 21 | Do you see that? |
| 22 | A.  I do. |
| 23 | Q.  Is that correct? |
| 24 | MS. WEISGERBER:  Objection to |
| 25 | form. |

Page 86

Confidential - Pugatch

1        Confidential - Pugatch
2        A.   Is what correct?
3        Q.   Well, I guess, I'm most
4   concerned with this last part of the
5   sentence.  It starts with "The Investor
6   has not yet appeared in this case or taken
7   any position in the bankruptcy case."
8        Do you agree with that?
9        MS. WEISGERBER:  Objection to
10   form.
11        Mike, if you want to look at the
12   whole document, you're welcome to.
13   This is not a document that's a
14   HarbourVest-prepared document.
15   BY MR. WILSON:
16        Q.   Maybe a better way of asking the
17   question is:  As of the date of this
18   document, which was in October of 2018,
19   had HarbourVest appeared in the Acis
20   bankruptcy?
21        A.   No, we did not.
22        Q.   And had they asserted any
23   positions regarding the Acis bankruptcy?
24        A.   Not through the court.
25        MS. WEISGERBER:  Objection to

Page 87

Confidential - Pugatch

1        Confidential - Pugatch
2   form.
3        Q.   Okay.  Had Highland encouraged
4   HarbourVest to participate in the Acis
5   bankruptcy?
6        MS. WEISGERBER:  Objection to
7   form.
8        A.   No.
9        Q.   They did not?
10        MS. WEISGERBER:  Objection to
11   form.
12        Q.   Highland did not encourage
13   HarbourVest to participate in the Acis
14   bankruptcy?
15        A.   When you say "participate," can
16   you define that, please.
17        Q.   Well, appear in the case, as
18   stated in this motion.
19        A.   No, they had not.
20        Q.   Did Harbour -- I'm sorry -- did
21   Highland keep HarbourVest apprised of the
22   events that occurred in the Acis
23   bankruptcy?
24        MS. WEISGERBER:  Objection to
25   form.  I'm just going to restate my

Page 88

Confidential - Pugatch

1        Confidential - Pugatch
2   objection to the extent you're asking
3   questions about HarbourVest.  This is
4   Mr. Pugatch answering, based on his
5   knowledge.
6        A.   We were kept informed from time
7   to time throughout the Acis bankruptcy
8   proceeding.
9        Q.   Well, did you, in fact, have
10   weekly conference calls with Highland
11   representatives regarding the Acis
12   bankruptcy?
13        MS. WEISGERBER:  Objection to
14   form.
15        A.   I don't recall them being
16   weekly, no.
17        Q.   You can agree with me you
18   participated in the conference calls with
19   Highland regarding the Acis bankruptcy?
20        A.   Yes.
21        MS. WEISGERBER:  Same objection.
22        Q.   And on what, on what --
23        MR. WILSON:  Sorry.  Strike
24   that.
25        Q.   With what regularity would you

Page 89

Confidential - Pugatch

1        Confidential - Pugatch
2   estimate those conference calls occurred,
3   if it's not weekly?
4        MS. WEISGERBER:  Objection to
5   form.
6        A.   From memory, maybe once, once a
7   month on average.  Sometimes more
8   frequently, sometimes less frequently.
9        Q.   Did Highland provide you with
10   documents and evidence that were filed in
11   the Acis bankruptcy?
12        MS. WEISGERBER:  Objection to
13   form.
14        We're really starting to get
15   pretty far afield here, John, from
16   HarbourVest.  You know, I'm not sure
17   where you're going with this.  This is
18   a settlement motion that's teed up for
19   the court.
20        You're welcome to keep going,
21   but at some point we're going to cut
22   it off.
23        MR. WILSON:  Well, I think -- I
24   don't think I'm going to go too far
25   down this path, but I think this

1    Confidential - Pugatch
2    directly relates to the claims that
3    HarbourVest has made.  But I'll repeat
4    my question.
5    BY MR. WILSON:
6    Q.    Did Highland provide HarbourVest
7    with documents and evidence that were
8    filed in the Acis bankruptcy?
9        MS. WEISGERBER:  Objection to
10    form.
11    A.    I don't recall what documents
12    Highland may have provided to us, at that
13    point in time.
14    Q.    I don't want you to recall
15    specific documents that were provided, but
16    did, did Highland provide documents from
17    the Acis bankruptcy to HarbourVest?
18        MS. WEISGERBER:  Objection to
19    form.  Asked and answered.
20    A.    I don't recall.
21    Q.    You don't?
22    A.    (Nods.)
23    Q.    Would you dispute that between
24    2018 and 2019 that Highland provided over
25    40,000 pages of documents related to the

1    Confidential - Pugatch
2    Acis bankruptcy to HarbourVest?
3        MS. WEISGERBER:  Objection to
4    form, foundation.
5    A.    I don't know and I don't recall.
6    Q.    And the Acis plan became
7    effective on February 1st, 2019.  Is that
8    your understanding?
9    A.    I believe so, yes.
10    Q.    And do you -- I asked you this
11    earlier, but I'm going to ask again.  Do
12    you have any understanding of what the
13    value of HCLOF was, at that date?
14    A.    I don't recall.
15        MS. WEISGERBER:  Objection to
16    form.
17    Q.    You don't?
18    A.    I don't recall, no.
19    Q.    And there was an injunction put
20    in place in the Acis bankruptcy that
21    prevented certain actions with respect to
22    HCLOF, correct?
23        MS. WEISGERBER:  Objection to
24    form, foundation.
25        MR. MALONEY:  Join.

1    Confidential - Pugatch
2    A.    Yes.
3    Q.    Now, I'm going to go back up to
4    Paragraph 2.  This says that Acis LP
5    manages the Acis CLOs, that certain
6    portfolio management agreement between
7    Acis, and then it goes on.  So what are
8    the Acis CLOs, as it relates to the
9    investment that HarbourVest made?
10        MR. MALONEY:  Objection to the
11    form of the question.
12        MS. WEISGERBER:  Objection to
13    form.
14    A.    The Acis CLOs -- or HCLOF owned
15    equity in certain of the Acis CLOs as a
16    portion of its investment portfolio.
17    Q.    And I think you were trying to
18    distinguish earlier between who the
19    portfolio manager was.  And that would
20    depend on whether it was an Acis CLO or a
21    Highland CLO; is that correct?
22        MR. MALONEY:  Objection to form.
23        MS. WEISGERBER:  Objection to
24    form, misstates testimony.
25    A.    I was referencing the portfolio

1    Confidential - Pugatch
2    manager of the underlying CLOs, yes.
3    Q.    But we can agree that Acis had
4    responsibility for managing at least a
5    portion of HCLOF, correct?
6    A.    Highland --
7        MR. WILSON:  Objection to form.
8        MR. MALONEY:  Objection to form
9    as well, foundation, and legal
10    conclusion.
11        (Reporter clarification.)
12    A.    It's my understanding it's
13    Highlands' subsidiaries, yes.
14    Q.    Okay.  Well, I'm going to go
15    down to Paragraph 4, at the top of your
16    screen here where it says, "Recently
17    William Scott, the director of HCLOF,
18    testified that he wants to reset the Acis
19    CLOs to bring them in line with current
20    market interest rates, that the inability
21    to do the reset is causing damages to
22    HCLOF in the amount of approximately
23    $295,000 per week."
24        Is that an accurate statement?
25        MS. WEISGERBER:  Objection to

1    Confidential - Pugatch
2    form and foundation.
3        MR. MALONEY:  Mark Maloney.
4    Object to form and foundation.
5        A.    I don't know.  You'd have to ask
6    William Scott.
7        Q.    Well, were you aware, I mean,
8    there's a citation to a, well, I don't
9    know if there's a citation on this one.
10    But it says that he recently testified.
11    Were you aware that he testified that he
12    wanted to reset the Acis CLOs?
13        MS. WEISGERBER:  Same objection.
14    We're really getting far afield.
15        MR. WILSON:  I'm just asking if
16    he was aware that this statement
17    occurred.
18        A.    At some point in time, yes, I
19    became aware of that.
20        Q.    Okay.  Do you agree that the
21    inability to do a reset was causing
22    damages in the amount of $295,000 per
23    week?
24        MS. WEISGERBER:  Objection to
25    form and foundation.  This is not a

1    Confidential - Pugatch
2    HarbourVest-prepared document.
3        MR. WILSON:  Well, I understand
4    that.  I'm just asking if he agrees
5    with it.
6        A.    I don't have enough information
7    to assess that, specifically the $295,000
8    per week number.
9        Q.    I want to go down to Paragraph 7
10    of this document, and this is going to be
11    at the top of Page 5.  It says
12    "Mr. Ellington also testified that because
13    it would be putting in additional capital
14    in connection with any reset CLOs, the
15    Investor," and we discussed that that's
16    HarbourVest, "had the ability to start
17    'calling the shots' and dictate the terms
18    of any reset transactions."
19        Do you agree with that?
20        A.    No.
21        MS. WEISGERBER:  Objection to
22    form.
23        Q.    I want to go down to Paragraph
24    9.
25        It says, "The Trustee also needs

1    Confidential - Pugatch
2    information regarding whether the Investor
3    presently has any concerns about pursuing
4    reset transactions with the Reorganized
5    Acis and Brigade, under the plan now that
6    Acis has been able to successfully serve
7    as the portfolio manager for the Acis CLOs
8    on a post-petition basis, and there are no
9    impediments to the ability of the
10    Reorganized Acis and Brigade to pursue a
11    reset on the Acis CLOs."
12        Do you know whether the Investor
13    had any concerns about pursuing a reset?
14        MS. WEISGERBER:  Objection to
15    form, foundation.
16        A.    The context of a reset or
17    refinancing of the various CLOs in HCLOF
18    was part of the original investment
19    thesis.  So there would not have been
20    concerns about the ability to do so.  Our
21    concerns were more in the inability to do
22    so, as a result of the Acis bankruptcy.
23        Q.    But here, you've got the Trustee
24    representing in Paragraph 5, that
25    according to the Trustee's Second Amended

1    Confidential - Pugatch
2    Joint Plan, it provides for such a reset
3    to be performed by the Reorganized Acis
4    and supervised by Brigade Capital
5    Management.
6        And it appears to me that the
7    Trustee is trying to get the Investor's
8    position on whether a reset should be
9    pursued.  And I'm just asking you whether
10    HarbourVest objected to a reset at this
11    time?
12        MS. WEISGERBER:  I'm going to
13    object to all of the colloquy before.
14    I'm going to object to any extent
15    Mike's being asked about what the
16    Trustee wanted or viewed.  If you want
17    to ask your question in isolation, go
18    ahead.
19        Q.    What was HarbourVest's position
20    regarding a reset, as of the date that
21    this was filed, and I'll look again,
22    October 10, 2018?
23        MS. WEISGERBER:  Objection to
24    form.  Objection to the extent it's
25    asking HarbourVest's position.  And I

Page 98

```
1      Confidential - Pugatch
2   cannot conceive how this is relevant
3   to the 9019 motion before the court
4   right now.
5      Nonetheless, Mike, if you have
6   an answer, on behalf of yourself, you
7   can answer.
8      A.   HarbourVest was a passive
9   minority investor in HCLOF.  It had no
10  ability to control the underlying
11  portfolio management or ability to reset,
12  refinance, or call in any of the equity of
13  the underlying CLOs.  That was all under
14  the purview of Highland.
15     Q.   Did you understand that
16  Mr. Ellington had given sworn testimony
17  that the Investor is the party calling the
18  shots for HCLOF, with respect to any reset
19  transactions?
20     MS. WEISGERBER:  Objection to
21     form.
22     A.   I did became aware of it, yes.
23     Q.   When did you become aware of
24  that?
25     A.   At some point subsequent to that
```

Page 99

```
1      Confidential - Pugatch
2   testimony being given.
3      Q.   But was it when you read this
4   motion that we're looking at as
5   Exhibit 10?
6      MS. WEISGERBER:  Objection to
7      form.
8      A.   It may have been.  I don't
9   recall the exact time or medium that I
10  became aware of that.
11     Q.   Was a deposition given as a
12  result of this motion?
13     MS. WEISGERBER:  Objection to
14     form.  If you have the whole document,
15     Mike, that may make sense.
16     MR. WILSON:  Well, this motion
17     at the top says it's a Motion for 2004
18     Examination of Investor.  And then
19     attached to this motion are some
20     document requests, and then deposition
21     topics for a corporate representative
22     of the Investor, and then a proposed
23     order.
24  BY MR. WILSON:
25     Q.   Do you recall whether a
```

Page 100

```
1      Confidential - Pugatch
2   deposition was given, after this motion
3   was filed?
4      A.   Yes.
5      Q.   And who was the designated
6   deponent?
7      A.   I was.
8      Q.   And were documents produced, as
9   a result of this?
10     A.   Yes, there were.
11     Q.   And were you asked at that
12  deposition what the Investor's position on
13  a reset was?
14     MS. WEISGERBER:  Objection to
15     form.
16     If you recall.
17     A.   I don't recall specifically that
18  question being asked.
19     Q.   Well, do you know what
20  the Debtor's position -- I'm sorry, the
21  Debtor's -- the Investor's position on a
22  reset was as of that day?
23     MS. WEISGERBER:  Objection to
24     form.  Asked and answered.
25     A.   I would just say again, in
```

Page 101

```
1      Confidential - Pugatch
2   general, the original investment thesis
3   here was predicated on a refinancing reset
4   of the various CLOs, and we were not in
5   control as a passive minority investor
6   here to --
7      Q.   Well, you said you weren't in
8   control, but what would HarbourVest's
9   preference have been?
10     MS. WEISGERBER:  Objection to
11     form.
12     A.   I do not recall.
13     MS. WEISGERBER:  If you recall.
14     A.   I don't recall the specifics
15  around what Acis CLO were referring to
16  here or what the specific implications of
17  a reset were at that time; but regardless,
18  that was a decision for the investment
19  manager of HCLO.
20     Q.   But was it your opinion, your
21  personal opinion, that a reset was
22  appropriate?
23     MS. WEISGERBER:  Objection to
24     form.
25     A.   Again, we were not the portfolio
```

Page 102

1    Confidential - Pugatch
2  manager of HCLOF. We were not in control
3  of those decisions or making
4  recommendations on those decisions. That
5  was the delegated authority of Highland,
6  as the investment manager.
7    Q.   I'm not asking for that. I'm
8  asking for your personal feelings toward a
9  reset.
10    MS. WEISGERBER: Same objection.
11    He's only answering on behalf of
12    himself, and it's been asked and
13    answered three times since.
14    MR. WILSON: Well, he hasn't
15    answered the question. He's just told
16    me they don't have the authority to do
17    the reset.
18    MS. WEISGERBER: And he told you
19    the other information he'd be required
20    to even have an opinion on it. So
21    same objection stands. It's not a
22    specific enough question for him.
23    Mike, you're welcome, if you
24    have, if you have an answer, you're
25    welcome to give it.

Page 103

1    Confidential - Pugatch
2    A.   Yeah, the investment guidelines
3  of HCLOF, from the documents that we
4  signed at the time we entered into the
5  transaction, laid out the specific, again,
6  investment guidelines that HCLOF would be
7  guided under, including the opportunity to
8  refinance or reset various CLOs over time,
9  in accordance with Highland's, you know,
10  expectations and ultimate decision to do
11  so.
12    Q.   But did you believe, at this
13  time, that a reset was appropriate?
14    MS. WEISGERBER: Objection to
15    form. This is asked and answered
16    several times now, I think we should
17    move on. He's given you an answer.
18    MR. WILSON: Well, I want to
19    know what his personal opinion was
20    about whether the reset was
21    appropriate.
22    A.   What reset are you referring to?
23    Q.   A reset as of October 10, 2018.
24  At that time, did you believe that a reset
25  was appropriate?

Page 104

1    Confidential - Pugatch
2    A.   A reset of what?
3    MS. WEISGERBER: Same objection.
4    Q.   A reset as been discussed all
5  through this motion, the same reset we're
6  talking about.
7    MS. WEISGERBER: Objection.
8    Same objections. I just don't see how
9    he could possibly answer this vague
10    question.
11    Q.   Okay. So William Scott,
12  director of HCLOF, testified that he
13  wanted to reset the Acis CLOs because if
14  they don't, they are losing $295,000 a
15  week.
16    Did you think that a reset was
17  appropriate in line with what Mr. Scott
18  believed?
19    MR. MALONEY: Objection to form,
20    foundation.
21    MS. WEISGERBER: Same
22    objections. And asked and answered
23    numerous times.
24    A.   We were not managing the
25  portfolio. We were an investor in a

Page 105

1    Confidential - Pugatch
2  company, an investment company that was
3  managing this. We were not, we were not
4  proximate enough to any of the underlying
5  happenings of the look through CLO
6  positions of HCLOF to have an informed
7  view on this, at this time.
8    Q.   Is your testimony that you did
9  not have an opinion as to whether the Acis
10  CLO should be reset in late 2018?
11    MS. WEISGERBER: Objection to
12    form. Misstates testimony.
13    A.   My view is that the original
14  investment guidelines here called for a
15  reset or refinance of the CLOs and that
16  Highland was subsequently in full control
17  of whether or not to pursue this, and we,
18  HarbourVest, as an investor had no ability
19  to object or to force that on a go-forward
20  basis.
21    MR. WILSON: Objection.
22    Nonresponsive.
23    Q.   I want to know your personal
24  opinion of whether you thought a reset was
25  appropriate in October of 2018.

Page 106

Confidential - Pugatch

1    Confidential - Pugatch
2        MR. MORRIS:  Objection to the
3    form of the question.  That's been
4    asked and answered.
5        MR. WILSON:  He has yet to give
6    his answer to --
7        MR. MORRIS:  He just told you he
8    didn't have enough information.  He
9    just told you that, crystal clear.
10       MR. WILSON:  Well, I'm not going
11   to argue with you, John, but I just
12   want an answer to my question.
13       His answer, he wouldn't agree
14   with my, with my summation that he had
15   no opinion, so I just want to know
16   what his opinion is.
17       MS. WEISGERBER:  Same
18   objections.
19       You're not giving him enough
20   information to answer the question,
21   and at this point, it would be
22   speculation.  We can just keep going
23   in circles on this, but your --
24       MR. WILSON:  His opinion would
25   be speculation?

Page 107

1    Confidential - Pugatch
2        MS. WEISGERBER:  He said that,
3    he actually testified at some point
4    that he doesn't recall specifics of
5    the time, so that was another piece of
6    the puzzle.
7        I mean, I don't want to be
8    coaching the witness or giving
9    testimony here, but I think you're not
10   listening to the things he's saying,
11   John, just because you don't like it.
12   BY MR. WILSON:
13       Q.    Mr. Pugatch, did you have an
14   opinion, in October of 2019, about whether
15   the Acis CLOs should be reset?
16       MS. WEISGERBER:  Objection to
17       form.
18       A.    I don't recall any definitive
19   opinion I would have had, but as stated,
20   was not proximate enough to have an
21   informed opinion, in any event.
22       Q.    And to your knowledge, have the
23   Acis CLOs ever been reset?
24       MS. WEISGERBER:  Objection to
25       form, foundation.

Page 108

1    Confidential - Pugatch
2        A.    I do not believe that any of the
3    Acis CLOs were ever reset.
4        Q.    All right.  So who negotiated
5    this claim, the settlement of this claim
6    on behalf of HarbourVest?
7        A.    I did.
8        Q.    And who negotiated for the
9    Debtor?
10       A.    Jim Seery.
11       Q.    And when did those negotiations
12   begin?
13       A.    It started sometime in November,
14   I believe.
15       Q.    And are you aware that Jim Seery
16   has ever taken the position that the
17   HarbourVest claim was worthless?
18       MS. WEISGERBER:  Objection to
19       form, foundation.
20       A.    No, I'm not aware of that.
21       Q.    Has Jim Seery ever offered
22   $5 million to settle the HarbourVest
23   claim?
24       A.    Not to my knowledge.
25       MS. WEISGERBER:  Objection to

Page 109

1    Confidential - Pugatch
2        form.
3        MR. WILSON:  I'm going to send
4    out Exhibit 11.
5        (Whereupon, Exhibit 11,
6    Declaration of John A. Morris in
7    Support of the Debtor's Motion For
8    Entry of an Order Approving Settlement
9    With Harbourvest (Claim Nos. 143, 147,
10   149, 150, 153, 154) and Authorizing
11   Actions, 82 pages, was marked for
12   identification.)
13   BY MR. WILSON:
14       Q.    I want pull this up on the
15   screen share.  This Exhibit 11 is the
16   Declaration of John Morris in Support of
17   the Debtor's 9019 Motion, bears
18   Document 1631.  And attached to this
19   exhibit is a trim cut copy of the
20   Settlement Agreement executed December 23,
21   2020.
22       And the Settlement Agreement has
23   Paragraph 1, Settlement of Claims, that
24   HarbourVest is going to receive a
25   $45 million unsecured, general unsecured

Confidential - Pugatch
1    claim, and a $35 million subordinated
2    claim.
3          And then Part B of that
4    paragraph states that HarbourVest is going
5    to transfer all its rights, titles, and
6    interests to its investment in CLOF to the
7    Debtor or its nominee.
8          Is that your understanding of
9    the general terms of this settlement?
10         MS. WEISGERBER: Objection to
11   form.
12   A.    Yes, it is.
13   Q.    Okay. And also in Paragraph 5,
14   Each HarbourVest party agrees that it will
15   vote all of HarbourVest claims held by
16   such HarbourVest party to accept the plan.
17         And I won't read all of that.
18   But the gist of this paragraph is that
19   HarbourVest is going to vote for the
20   Debtor's proposed plan; is that correct?
21         MS. WEISGERBER: Objection to
22   form.
23   A.    Yes, correct.
24   Q.    And how did that term come to be

Confidential - Pugatch
1    in this Settlement Agreement?
2          MS. WEISGERBER: Objection to
3    form.
4    A.    I believe it was put there as
5    part of the drafting of the ultimate
6    agreement to the fund.
7    Q.    Well, whose suggestion was it
8    that it be added to the drafting?
9          MS. WEISGERBER: Objection to
10   form.
11   A.    I believe that it came from
12   Debtor's counsel, as they took the lead on
13   drafting the documentation here.
14   Q.    Did Jim Seery ever tell you that
15   it was important to him that HarbourVest
16   vote in support of the plan?
17         MS. WEISGERBER: Objection to
18   form.
19   A.    I don't recall that ever being
20   discussed. Certainly it was not the
21   prominent feature of any of the
22   discussions or negotiations that I ever
23   had with Jim.
24   Q.    Okay.

Confidential - Pugatch
1          MR. WILSON: I'm going to take a
2    ten-minute break, and I think I'm
3    almost ready to wrap up. So I want to
4    stop my screen share. And let's,
5    well, let's start back at 2:30, and I
6    think I'll be quick. Thank you.
7          (Recess taken.)
8    BY MR. WILSON:
9    Q.    Mr. Pugatch, earlier you
10   testified that consistent with your
11   declaration you filed that as of August
12   31, 2020, the value of HCLOF was
13   $44.5 million. And then if we look at --
14   I don't remember which --
15         Okay. So this would have been
16   Exhibit 7. I'll do a share screen.
17         As of November 15, 2017 these
18   shares were purchased at $1.02 and change
19   apiece, and there were a total number of
20   143 million shares.
21         Was the value of this investment
22   roughly $150 million, as of November 15,
23   2017?
24         MS. WEISGERBER: Objection to

Confidential - Pugatch
1    form. Foundation.
2          MR. MALONEY: Join.
3          MS. WEISGERBER: I don't know,
4    Mike, if you're comfortable doing that
5    math or what.
6    A.    Yes, approximately that's
7    correct.
8    Q.    Okay. And you know, and I've
9    read your papers and you talk about
10   attorneys' fees that you say weren't
11   appropriate to be charged to HCLOF and
12   that part of it, but as to the loss of
13   value of the actual investment, what's
14   your understanding of what led to that?
15         MS. WEISGERBER: Objection to
16   form. Objection to the extent it
17   calls for a legal conclusion.
18         Mike, to the extent you have a
19   nonlegal opinion on that, that's not
20   based on conversations with counsel,
21   you can answer.
22   A.    Yeah, I think a lot of the value
23   erosion was due to the inability to
24   refinance, reset a number of the

---

Page 114

Confidential - Pugatch

1    underlying CLOs that was part of the
2    original investment thesis here, largely
3    as a result of the ongoing litigation,
4    that Highland was involved in, and the
5    subsequent Acis bankruptcy.
6        Q.    And so during the period of time
7    when the injunction prohibited certain
8    actions with respect to this investment,
9    is it your opinion that this investment
10   was losing value?
11       MR. MALONEY:  Objection.
12       MS. WEISGERBER:  Objection to
13   form.
14       A.    Can you repeat the question,
15   John?
16       Q.    Well, I guess I want to know,
17   like, in a, on a timeline kind of basis,
18   do you think that the significant
19   reduction of value occurred prior to or
20   after the confirmation of the Acis plan on
21   February 1, 2019?
22       MS. WEISGERBER:  Objection to
23   form.  Objection to the extent it
24   calls for a legal conclusion.
25

---

Page 115

Confidential - Pugatch

1        You can give your lay opinion,
2    if you have one, Mike.
3        A.    I think it's all been as a
4    result of the events leading up to the
5    Acis bankruptcy, including the inability
6    to refinance or reset the CLOs which would
7    have been to the benefit of the CLO equity
8    holders including HCLOF.
9        Q.    And so what, what was the cause
10   of the inability to reset?
11       MS. WEISGERBER:  Same
12   objections:  form, foundation, legal
13   conclusion.
14       If you have a non-privileged
15   answer, Mike, go ahead.
16       A.    Yeah, my understanding was
17   originally the TRO, preventing Highland
18   and HCLOF from pursuing that, and then
19   subsequent to the Acis bankruptcy ruling,
20   a similar injunction that remained around
21   the inability for the equity holders of
22   those CLOs to redeem or refinances or
23   reset.
24       Q.    So do you -- is there any
25

---

Page 116

Confidential - Pugatch

1    component, in your opinion, of the loss of
2    value of these investments due to
3    portfolio mismanagement?
4        MS. WEISGERBER:  Objection to
5    form, foundation, legal conclusion, or
6    expert opinion, calling for
7    speculation.
8        If you have a view, Mike.
9        A.    Yeah.  Can you be more specific
10   with the question, John?
11       Q.    Well, I'll ask it a different
12   way.
13       Do you think that portfolio
14   mismanagement was a portion of the cause
15   of the reduction in value?
16       MS. WEISGERBER:  Same objection.
17       A.    I can't speculate as to, you
18   know, the underlying management decisions
19   around the CLOs, but what I do know is
20   that the mismanagement and
21   misrepresentations at the HCLOF level,
22   that would ultimately result in the Acis
23   bankruptcy and subsequent to that, the TRO
24   and the inability to refinance or reset

---

Page 117

Confidential - Pugatch

1    that has been the, far and away, the
2    largest contributor to loss of value
3    within the portfolio.
4        Q.    One of the allegations that
5    HarbourVest has made is that Highland
6    improperly changed the portfolio manager.
7    Is it your opinion that if that had not
8    been done, the portfolio manager had not
9    been changed at the inception of
10   HarbourVest's investment, that that would
11   have preserved any value of this fund?
12       MR. MORRIS:  Objection to the
13   form of the question.
14       MS. WEISGERBER:  Same objection.
15   Calling for speculation, hypothetical
16   lay opinion.
17       If you have testimony, go ahead,
18   Mike.
19       A.    Sorry, could you just repeat the
20   question, John?  I want to make sure I'm
21   answering it correctly.
22       Q.    I guess I just want to know, and
23   I think you kind of hinted at this a
24   little bit earlier today, but I guess what
25

Page 118

Confidential - Pugatch

1          Confidential - Pugatch
2    I really want to know is do you think that
3    the particular portfolio manager made a
4    difference in the loss of value that HCLOF
5    suffered?
6          MS. WEISGERBER:  Same
7    objections.
8          A.    Again, it sounds like you're
9    asking a different question there than
10   what I thought I understood your question
11   to be initially.  What I would say to that
12   is the decision originally to change the
13   portfolio manager, and ultimately the
14   events that took place following the
15   Arbitration Award for Mr. Terry, resulted
16   in the subsequent Acis bankruptcy, which
17   in turn has led to the destruction of
18   value, because of the inability to
19   refinance or reset, the underlying CLOs.
20         Q.    So HarbourVest is not alleging
21   that the portfolio manager made any
22   particular decisions or participated in
23   any mismanagement that led to reduction in
24   value?
25         MS. WEISGERBER:  Objection to

Page 119

1          Confidential - Pugatch
2    form.
3          A.    When you're asking about
4    portfolio manager, are we referring to the
5    portfolio manager at the underlying CLO
6    level or at the HCLOF level?  I think
7    there are two different levels here of
8    portfolio management.
9          Q.    Well, I'm talking about the
10   portfolio manager, and you can tell me
11   which one it is, but which portfolio
12   manager has the ability to, to impact the
13   performance of these funds?
14         MR. MORRIS:  Objection.
15         A.    If you're referring to HCLOF,
16   the --
17         MS. WEISGERBER:  Objection to
18   form.
19         A.    -- investment manager, or the
20   portfolio manager of HCLOF has the ability
21   to drive value creation by virtue of its
22   equity position in the underlying CLOs.
23         Q.    Well, which portfolio manager
24   makes the day-to-day decisions about
25   selling assets, trading assets, that, that

Page 120

1          Confidential - Pugatch
2    I guess --
3          A.    If you're referring to
4    underlaying credits, that would be the
5    portfolio manager in each of the
6    individual CLOs.  The impact in value to
7    the equity investment in the CLOs is a
8    decision at the HCLOF level, where the
9    majority of that value erosion has
10   resulted from the inability to refinance
11   or reset those CLO entities.
12         Q.    And that's what we're talking
13   about when you said that they, that
14   Highland changed the portfolio manager,
15   you're talking about at the HCLOF level,
16   right?
17         MS. WEISGERBER:  Objection to
18   form.
19         A.    Well, I was responding to the
20   question that I thought you asked.  I
21   wasn't necessarily stating that.
22         Q.    I guess all I'm really trying to
23   do here is just understand HarbourVest's
24   position.  And it sounds to me, and
25   correct me if I'm wrong, it sounds to me

Page 121

1          Confidential - Pugatch
2    that what you're saying is that the
3    diminution of value wasn't attributable to
4    poor investment decisions by a portfolio
5    manager, as much as it was the
6    consequences in the Acis bankruptcy of the
7    change in portfolio manager; is that fair?
8          MS. WEISGERBER:  Objection to
9    form.  Misstates testimony.
10         A.    Yes, it is.  That is my general
11   understanding, yes.
12         MR. WILSON:  Okay.  No further
13   questions.
14         MR. MORRIS:  All right.  Well,
15   thank you very much.
16         THE REPORTER:  Does anybody have
17   any other questions?
18         MR. KANE:  Yes.  This is John
19   Kane with CLO Holdco.  I'll jump on
20   video.  I've got some questions, but
21   I'm going to be relatively short.  If
22   anybody else has a little bit heavier
23   schedule, let me know.
24         All right.  I'll take that as a
25   go-ahead.

Page 122

1     Confidential - Pugatch
2  EXAMINATION
3  BY MR. KANE:
4     Q.   This is John Kane.  I represent
5  CLO Holdco.
6          Hi, Mike Pugatch.  It's nice to
7  talk to you.
8     A.   Likewise.
9     Q.   I just wanted to briefly
10 confirm.  I believe you testified you
11 participated in negotiations that lead to
12 the Settlement Agreement, that is part of
13 the 9019 motion, before the bankruptcy
14 court; is that correct?
15    A.   Correct.
16    Q.   And did you actively negotiate
17 the terms of that Settlement Agreement?
18    A.   Yes.
19    Q.   As in dollar amounts, what the
20 consideration exchanged, how it would
21 work, that kind of stuff, obviously with
22 the assistance of counsel?
23    A.   Yes.  All of that.  The
24 negotiations were, you know, over the
25 course of a number of weeks and a number

Page 123

1  of conversations directly with the Debtor,
2  with counsel, all-hands calls, et cetera.
3     Q.   Okay.  And as part of that in
4  the Settlement Agreement, you say the
5  HarbourVest entities were members in HCLOF
6  are in essence selling their shares to the
7  Debtor, and also in exchange getting some
8  claims back in the Debtor's plan.  Is that
9  a fair summary?
10         MS. WEISGERBER:  Objection to
11    form.  Compound question.
12    Q.   Let me ask it a different way.
13    Can you re-ask that, please?
14    Q.   Yeah.  I'm happy to do that.
15         Why don't you describe for me
16 how you would summarize that settlement?
17    A.   Largely, as I think you just
18 described it, which was in exchange for,
19 in exchange for the, both the unsecured
20 creditors' claim, and subordinated
21 creditors' claim, that settlement value is
22 in exchange for us transferring the
23 interest in HCLOF to the Debtor, as part
24 of that overall negotiating package.

Page 124

1     Confidential - Pugatch
2     Q.   And what would you estimate, I
3  going to have to imagine, let me rephrase
4  the question.
5          Have you guys done kind of an
6  internal best guess of what your unsecured
7  and subordinated claims would be, under
8  the plan, the value?
9          MS. WEISGERBER:  Objection.
10    Objection to form.
11    A.   Just to be clear, John, are you
12 referring to the expected recovery value
13 of our claims?
14    Q.   Yes, sir.
15         MS. WEISGERBER:  Objection to
16    form.  Can we just clarify, so you're
17    talking about what they'll recover
18    ultimately?  Is that the question,
19    John?  I'm confused myself.  I just
20    want to be sure I am following.
21         MR. KANE:  Yeah.  So I'm asking
22    Mike how much he believes, based on
23    his analysis, that HarbourVest is
24    likely to recover from the $45 million
25    allowed general unsecured claim and

Page 125

1     Confidential - Pugatch
2  $35 million allowed subordinated
3  claim, if the settlement is approved
4  and the plan is confirmed.
5         MS. WEISGERBER:  Objection to
6    form.
7          But you can answer, if you have
8    an answer, Mike.
9     A.   We do have a sense.  It's really
10 a range of projected outcomes, as you can
11 imagine, based on the recoveries, largely
12 informed by conversations with the Debtor.
13    Q.   And what is that range of value?
14         MS. WEISGERBER:  Objection to
15    form.
16    A.   Our understanding, again, based
17 on those conversations, is that the
18 general unsecured claim could be valued in
19 a 75 to 80 cents on the dollar recovery.
20 And then a, you know, that the junior
21 class claim is really sort of upside
22 potential, to the extent there is more
23 recovery or more asset value of the
24 estate, for the benefit of creditors over
25 time.

Page 126

Confidential - Pugatch

1    Q.   What is your understanding of
2   the current value of the HarbourVest
3   shares in HCLOF that would be transferred
4   under this Agreement?
5    A.   It's roughly $22.5 million of
6   their value.
7    Q.   So doing a little bit of, you
8   know, back-of-the-table-cloth math, how do
9   you allocate value between the releases
10  that you are receiving and the shares that
11  you are transferring?
12       MR. KANE:  I'm sorry.  Let me
13       rephrase that.  Let me ask that
14       question differently.
15   Q.   In addition to the claims under
16  the plan, HarbourVest is providing the
17  Debt -- sorry, in addition to the shares
18  that are being transferred, HarbourVest is
19  providing to the Debtor certain releases
20  for its litigation claims; is that
21  correct?
22       MS. WEISGERBER:  Objection to
23       form.
24   A.   Correct.
25

Page 127

Confidential - Pugatch

1    Q.   So how has HarbourVest allocated
2   value, as far as this Settlement Agreement
3   is concerned?
4        And to make sure we're on the
5   same page about what I'm asking,
6   HarbourVest is trading a bundle of sticks,
7   right?  And there's really two things
8   within that bundle of sticks, and please
9   confirm that's correct, you're trading
10  shares, and in addition, releases; is that
11  right?  In exchange you're getting back
12  claims that have a potential future value.
13       So, how have you allocated value
14  among the shares transferred and the
15  releases that are being granted?
16       MR. MORRIS:  Objection.
17       MS. WEISGERBER:  Objection.
18       You can go ahead, Mike.
19   A.   Yeah.  So ultimately we looked
20  at it as a package, and so it was less
21  about the attribution of value between the
22  two different sticks, as you described it,
23  and more about the overall package value
24  in exchange for the transfer of our

Page 128

Confidential - Pugatch

1   interest and the release of the claims
2   that we had outstanding as the Debtor.
3        MR. KANE:  Now, I want to turn
4       your attention to what I've included
5       in the chat.  You can pull it down
6       pretty easily if you want.  But it
7       would be Holdco Depo Exhibit 2.  If
8       that would be easier than a screen
9       share, if you'd like, I'm happy to do
10      that as well.
11       MS. WEISGERBER:  Which document
12      is it, John?  Because I just can't
13      pull stuff off the Zoom right now.
14       MR. KANE:  Oh, I'm sorry.  It's
15      the Settlement Agreement with the
16      attached exhibits.  I can share my
17      screen so we're all on the same page.
18       Just to confirm we're looking at
19      the same thing, here's the Settlement
20      Agreement.  There's a docket entry at
21      the top so you can see it, 1631 filed
22      by the Debtor 12/24/20.
23       This is Exhibit 1 to the
24      Declaration of John Morris in Support

Page 129

Confidential - Pugatch

1   of Debtor's Motion for an Entry
2   Approving Settlement with HarbourVest.
3   BY MR. KANE:
4    Q.   Now, this Settlement Agreement
5   is a document that you assisted in
6   negotiations; is that correct?
7    A.   Correct.
8    Q.   Okay.  And here in Section 1B,
9   this addresses the transfer of the shares
10  of the HarbourVest entities to a Debtor
11  affiliate; is that correct?
12       MS. WEISGERBER:  Objection to
13       form.
14   A.   Correct.
15   Q.   Is that your understanding,
16  Mr. Pugatch?
17   A.   Yes, correct.
18   Q.   Okay.  Thank you.  Section 4A,
19  and is this your understanding that
20  HarbourVest is representing that it has
21  the authority to enter into this agreement
22  and to transfer the shares to the Debtor's
23  affiliate if this is approved?
24       MS. WEISGERBER:  Objection to

| | Page 130 | | Page 131 |
|---|---|---|---|
| | Confidential - Pugatch | | Confidential - Pugatch |
| 1 | Confidential - Pugatch | 1 | Confidential - Pugatch |
| 2 | form.  The document speaks for itself. | 2 | with this document? |
| 3 | Is that a question, John? | 3 | A.   Yes.  I've seen it. |
| 4 | MR. KANE:  Yeah.  I asked if | 4 | Q.   And did you assist with the |
| 5 | that was his understanding, that this | 5 | preparation or negotiation of this |
| 6 | is a representation by HarbourVest | 6 | Agreement? |
| 7 | that it has the authority to transfer | 7 | A.   Yes. |
| 8 | the shares if the Settlement Agreement | 8 | Q.   Okay.  Did you understand that |
| 9 | is approved. | 9 | HarbourVest would need the consent of the |
| 10 | MS. WEISGERBER:  Objection to | 10 | HCLOF portfolio advisor to effectuate the |
| 11 | form.  Objection to the extent it | 11 | transfer? |
| 12 | calls for a legal conclusion. | 12 | MS. WEISGERBER:  Objection to |
| 13 | To the extent you have a | 13 | form.  Objection to the extent it |
| 14 | nonlegal conclusion, non-privileged | 14 | calls for a legal conclusion. |
| 15 | understanding, Mike, you can share | 15 | Mike, if you have a view other |
| 16 | that. | 16 | than from privileged conversation, you |
| 17 | A.   Yeah, I'm just saying I can only | 17 | can answer, otherwise do not answer. |
| 18 | answer that based on conversations with | 18 | A.   Yeah, I'm sorry.  I can only |
| 19 | counsel. | 19 | answer that based on conversation with |
| 20 | MR. KANE:  Okay.  I won't push | 20 | counsel and the read of the document. |
| 21 | that.  That's fine. | 21 | Q.   So to make sure I understand |
| 22 | Q.   If we keep going down here as | 22 | that, you have no independent |
| 23 | part of this attachment, there's a | 23 | understanding of whether or not consent |
| 24 | Transfer Agreement, Exhibit A to the | 24 | was required from the portfolio manager |
| 25 | Settlement Agreement.  Are you familiar | 25 | before you could effectuate a transfer; is |

| | Page 132 | | Page 133 |
|---|---|---|---|
| 1 | Confidential - Pugatch | 1 | Confidential - Pugatch |
| 2 | that correct? | 2 | calls for a privileged conversation. |
| 3 | MS. WEISGERBER:  Same objection. | 3 | A.   As I answered before, based on |
| 4 | I think you can give your | 4 | conversations with counsel, my |
| 5 | general understanding, but then not | 5 | understanding is that consent is requiring |
| 6 | get into specific conversations. | 6 | in connection to transfer. |
| 7 | A.   My understanding of that is | 7 | Q.   I'd like to turn your attention |
| 8 | based on conversations with counsel, but | 8 | now -- this is a document you've seen |
| 9 | yes, that is my understanding, John. | 9 | before during your deposition.  This is |
| 10 | Q.   Okay.  I'm going to highlight a | 10 | the member's agreement related to the |
| 11 | passage here.  Can you see this | 11 | Company for HCLOF.  This is previously |
| 12 | highlighted area?  "Whereas, the Portfolio | 12 | produced by the Debtor, that's why it's |
| 13 | Manager desires to consent to such | 13 | got the Bates stamp on it.  This is dated |
| 14 | transfers and to the admission of | 14 | November 15, 2017. |
| 15 | Transferee as a shareholder..." | 15 | Are you familiar with this |
| 16 | Were you aware of that | 16 | document? |
| 17 | provision? | 17 | A.   Yes. |
| 18 | MS. WEISGERBER:  Objection to | 18 | Q.   Do you see on Line 14, in the |
| 19 | form. | 19 | between, on Page 1 shows Highland HCF |
| 20 | A.   Yes.  It's in the document. | 20 | Advisor, Ltd. as the portfolio manager? |
| 21 | Q.   Do you have any understanding of | 21 | A.   Yes, I see that. |
| 22 | why that provision was included in this | 22 | Q.   I know there was quite a bit |
| 23 | agreement? | 23 | of -- quite a few questions about this |
| 24 | MS. WEISGERBER:  Objection to | 24 | earlier, but you understand that Highland |
| 25 | form.  Objection to the extent it | 25 | HCF Advisor, Ltd. is still the HCLOF |

Page 134

Confidential - Pugatch

1  portfolio manager?
2     MS. WEISGERBER:  Objection to
3  form.
4     A.   Honestly, I don't have -- I
5  don't have enough information to answer
6  that definitively.
7     Q.   Okay.  Going back to the
8  Settlement Agreement, there's a reference
9  in here to a defined term, "portfolio
10  manager."
11        Do you see that?
12     A.   Yep.
13     Q.   And is this the same one that's
14  listed in the Member Agreement, Highland
15  HCF Advisor, Ltd.?
16     A.   I believe that seems to be the
17  position, yes.
18     Q.   Okay.  So when we're talking
19  about down here, "Whereas, the Portfolio
20  Manager desires to consent," this consent
21  provision is referring to the same
22  definition of portfolio manager that's
23  included in this Member Agreement; is that
24  correct?
25

Page 135

Confidential - Pugatch

1     MR. MORRIS:  Objection to the
2  form.
3     MS. WEISGERBER:  Objection --
4  same objections.  Objection to the
5  extent it calls for privileged
6  information.
7     A.   That sounds like a legal
8  conclusion.
9     Q.   I would have thought it was
10  reading, Mr. Pugatch.
11     A.   Well, if you're asking me to
12  definitively confirm that, that sounds
13  like a legal interpretation.
14     Q.   Let me ask that a different way.
15        Do you understand that the
16  portfolio manager is listed as Highland
17  HCF Advisor, Ltd. in the Member Agreement?
18     A.   Yes.
19     Q.   And in this Transfer Agreement,
20  the portfolio manager is listed as
21  Highland HCF Advisor, Ltd.?
22     A.   Yes.
23     Q.   And those are the same entities?
24     A.   Yes.
25

Page 136

Confidential - Pugatch

1     Q.   All right.  Are you familiar
2  with Section 6 of this Member Agreement?
3     A.   (Nods.)
4     Q.   Have you ever read this
5  document?
6     A.   I have.
7     Q.   Okay.  And can you give me your
8  understanding of what must take place
9  under this document for HarbourVest to
10  transfer its shares?
11     MS. WEISGERBER:  Object to the
12  form.  Object to the extent it calls
13  for a legal conclusion.  Object to the
14  extent it calls for any privileged
15  information or conversations.
16        Mike, to the extent you have an
17  independent understanding, separate
18  from conversations with counsel, you
19  can answer the question.
20     A.   I would say my understanding of
21  what's required in connection with the
22  transfer is based on conversations with
23  counsel.
24     Q.   Do you believe that the
25

Page 137

Confidential - Pugatch

1  HarbourVest entities can transfer its
2  shares without obtaining the consent of
3  the portfolio manager?
4     MS. WEISGERBER:  Objection to
5  form.  Objection to the extent it
6  calls for a legal conclusion.
7     Same instruction, Mike, as to
8  privileged conversations.
9     A.   Again, my view on that would be
10  based on conversations with counsel.
11     Q.   Are you aware of whether
12  HarbourVest provided any notice to other
13  members of its intent to transfer its
14  shares to the Debtor's affiliate under the
15  Settlement Agreement, other than the
16  filing of the 9019 motion?
17     MS. WEISGERBER:  Same objection.
18     But there is a factual question in
19  there if you can answer it, Mike, but
20  no privileged conversation.
21     A.   Yeah, I'm not aware of that.
22     Q.   Did you provide members 30 days
23  after the receipt of notice of
24  HarbourVest's intent to transfer its
25

Page 138

Confidential - Pugatch

1    shares to the Debtor's affiliate and
2    provide those members with an opportunity
3    to purchase their pro rata amount of the
4    shares?
5    Q.    MS. WEISGERBER:  Same objection.
6    A.    No.
7    Q.    And just to make sure I'm not
8    asking this question in a way that you
9    don't understand what I'm asking:  Do you
10   see this highlighted provision here?
11   A.    Yes.
12   Q.    I'm asking whether HarbourVest
13   provided members 30 days after the receipt
14   of a notice letter and an opportunity to
15   purchase their entire pro rata share of
16   the shares proposed to be transferred by
17   the HarbourVest entities?
18         MS. WEISGERBER:  Objection to
19   form.  Objection to the extent it
20   calls for privileged conversations or
21   a legal conclusion.  Objection to the
22   extent it's asking about one piece of
23   the document.
24         And you're welcome to look at

Page 139

Confidential - Pugatch

1    the full document if you'd like, Mike.
2    I think it was one of the ones that
3    was E-mailed as well, or maybe you
4    were able to pull it down.
5         THE WITNESS:  Yeah, no, I was.
6    Thank you.
7    A.    And I'm sorry, John, could you
8    just repeat the question?
9    BY MR. KANE:
10   Q.    Yeah, sure, absolutely.  And I'm
11   not calling for any conversations with
12   counsel.  I'm asking you if you know
13   whether HarbourVest did something or not.
14   So let's -- let's keep it to that, because
15   I --
16         MR. KANE:  Erica, I appreciate
17   your concerns, but I really don't want
18   to have any disclosures from Mike
19   about his discussions with you on
20   whether something needed to be done or
21   not.  I'm asking simply the facts of
22   whether HarbourVest did it or not.
23   Q.    So did HarbourVest provide
24   notice, 30 days' notice, to the members

Page 140

Confidential - Pugatch

1    listed under this Member Agreement of
2    HarbourVest's intent to transfer the
3    shares that are the subject to the
4    Settlement Agreement?
5    A.    No.
6    Q.    Has HarbourVest provided any
7    members with a right of first refusal and
8    a cash purchase price for which it would
9    sell its shares instead of transferring
10   those shares to the Debtor or the Debtor's
11   affiliate under the Settlement Agreement?
12         MS. WEISGERBER:  Same
13   objections.  Objection to form.
14   Objection to extent it calls for a
15   legal conclusion or privileged
16   conversations, including -- regarding
17   the specifics of that provision.
18         I don't think that's a purely
19   factual question.
20   Q.    Did HarbourVest offer to sell
21   the shares to the other members?  That's
22   not a factual question?
23         MS. WEISGERBER:  Objection --
24   A.    On the basis of that factual

Page 141

Confidential - Pugatch

1    question, no.
2    Q.    So let me ask this question
3    again, I don't recall if I got an answer
4    or not.
5         Did HarbourVest affirmatively
6    seek to obtain the consent of Highland HCF
7    Advisors to transfer its shares to the
8    Debtor affiliate under the Settlement
9    Agreement?
10        MS. WEISGERBER:  Same
11   objections.  Same instruction
12   regarding the privileged conversation.
13   A.    I mean, as a Highland-affiliated
14   entity, the Debtor, who's obviously the
15   other party here involved in the transfer,
16   you know, was involved in these
17   discussions.
18   Q.    I'm sorry.  Would you mind
19   clarifying?  Did you say that Highland HCF
20   Advisors was involved in those discussions
21   or the Debtor was involved in those
22   discussions and you assume Highland HCF
23   Advisors was?
24        MS. WEISGERBER:  Objection to

Page 142

1      Confidential - Pugatch
2      form.  Misstates testimony.
3      A.   Sorry, could you just repeat the
4   question, please, John?
5      Q.   Yes, Mr. Pugatch.
6          I'm actually just trying to get
7   some clarification from you, because I
8   don't think I understood your answer
9   about -- I had asked just -- again, I
10  don't want any correspondence with your
11  counsel or what your counsel advised, I'm
12  asking:  Do you know whether HarbourVest
13  sought written consent from Highland HCF
14  Advisor for its -- or to transfer its
15  shares to the Debtor or the Debtor's
16  affiliate under the Settlement Agreement?
17         MS. WEISGERBER:  Same objection.
18     A.   My understanding is HarbourVest
19  did not explicitly have those
20  conversations or seek that consent.
21     Q.   Okay.  Are you aware of whether
22  HarbourVest received any written consent
23  from Highland HCF Advisors, other than
24  what's in the Transfer Agreement attached
25  to the Settlement Agreement?

Page 143

1      Confidential - Pugatch
2      A.   I am not.
3          MS. WEISGERBER:  Same objection.
4      Q.   Do you know if HarbourVest has
5   any written consent?  Not just to seek it,
6   but do you know if HarbourVest has a piece
7   of paper, other than the transfer
8   agreement, in which Highland HCF advisors
9   provided its consent to the transfer of
10  shares to the Debtor's affiliate?
11         MS. WEISGERBER:  Same
12  objections.
13     A.   I would have to speak with
14  counsel.  I am not aware of that directly,
15  no.
16     Q.   Are you aware of whether
17  HarbourVest had any correspondence with
18  HCLOF representatives about effectuating
19  the transfer of the shares to the Debtor's
20  affiliate under the Settlement Agreement?
21         MS. WEISGERBER:  Same objection.
22         You can answer.
23     A.   We have had discussions with
24  them, yes.
25     Q.   Did HCLOF representatives

Page 144

1      Confidential - Pugatch
2   provide consent, whether written or
3   otherwise, to the transfer?
4      A.   I am not aware that that consent
5   has been provided as of yet.
6      Q.   Are you aware of whether any
7   HarbourVest representatives have had
8   conversations with the Debtor's
9   representatives about the necessity of
10  consent to the transfer of their shares?
11         MS. WEISGERBER:  Objection to
12  form --
13         MR. KANE:  I'll re-ask the
14  question.  I want to clarify that
15  point.
16  BY MR. KANE:
17     Q.   Mr. Pugatch, are you aware of
18  whether any HarbourVest representatives
19  had conversations with the Debtor's
20  representatives about the necessity of
21  obtaining the HCLOF portfolio manager's
22  written consent before transferring the
23  shares to the Debtor's representative or
24  affiliate under the terms of the
25  Settlement Agreement?

Page 145

1      Confidential - Pugatch
2          MS. WEISGERBER:  Objection to
3   form.
4          And, John, I'm sorry to do this,
5   can you just clarify what you mean by
6   "representative"?
7          MR. KANE:  Yeah.  I mean,
8   anybody that has agency authority to
9   act on behalf of the Debtor in
10  negotiations, in the preparation of
11  the documents, in negotiation of the
12  terms of the Settlement Agreement.
13         I mean, I think that it's, you
14  know, a pretty broad term here.
15         MS. WEISGERBER:  Objection to
16  form.  Objection to the extent it
17  calls for discussions with counsel.
18         As a factual matter, if you have
19  an answer, you can give it.
20     A.   I'm aware of conversations that
21  have taken place about all of the terms of
22  the Transfer Agreement in connection with
23  the settlement, with all parties.
24     Q.   Is it your understanding based
25  on those conversations that written

Confidential - Pugatch

1    consent of the portfolio manager as
2    defined in the Transfer Agreement was
3    required before the shares could be
4    transferred under the Settlement
5    Agreement?
6        MS. WEISGERBER:  Objection to
7    the form.  Objection to the extent it
8    calls for a legal conclusion or
9    privileged conversation.  And I think
10   that one does, John.
11       A.    Yeah, I can only answer that
12   based on conversation with lawyers.
13       Q.    Wasn't the question whether --
14   I'm sorry.  Maybe I forgot my own
15   question.
16       But I thought it was based on
17   your conversations with the Debtor's
18   representative, was it your understanding,
19   not based on your conversation with
20   counsel.
21       MS. WEISGERBER:  Can you repeat
22   the whole question because I
23   definitely misunderstood it then too.
24       Q.    Okay.  Based on your
25

Confidential - Pugatch

1    conversations with the Debtor's
2    representatives, was it your understanding
3    that the consent of the portfolio manager
4    was required for the shares to be
5    transferred from the HarbourVest entities
6    to the Debtor's affiliate under the terms
7    of the Settlement Agreement?
8        MS. WEISGERBER:  Okay.  Same
9    objections.  Also objection to the
10   extent there is a common interest
11   privilege.
12       A.    I don't recall having that
13   explicit conversation with representative
14   of the Debtor.
15       MR. KANE:  I'll pass the
16   witness.
17       Thank you, Mr. Pugatch.
18       MR. MORRIS:  Anybody else?
19   Thank you, all.
20       MS. WEISGERBER:  Can we --
21   before we break, could we have a
22   two-minute break and then come back
23   before we conclude.
24   BY MS. WEISGERBER:
25

Confidential - Pugatch

1    Q.    Mr. Pugatch, during Mr. Wilson's
2    questioning, I believe his last question
3    related to identifying as between two
4    choices the primary source or the cause of
5    HarbourVest's damages.
6        In your opinion, is -- are
7    HarbourVest damages attributable to any
8    one cause?
9        A.    No, I would say there were
10   multiple root causes of the damages and
11   diminution in value that was suffered in
12   connection with the investment.
13       MS. WEISGERBER:  Okay.  I don't
14   have any further questions.
15       MR. WILSON:  I think I'd like to
16   ask a couple more.
17   BY MR. WILSON:
18   Q.    Mr. Pugatch, I think you
19   testified earlier that the investment in
20   HCLOF was comprised of multiple CLOs,
21   correct?
22       A.    Correct.
23       Q.    And some of those CLOs were
24   managed by Acis, to your understanding?
25

Confidential - Pugatch

1        MS. WEISGERBER:  Objection.
2    A.    Correct.
3        MS. WEISGERBER:  Just to
4    clarify, John, is this within the
5    scope of the questions I asked
6    Mr. Pugatch?
7        MR. WILSON:  I believe it is.
8    I'm going to be really short.  But
9    so --
10       MS. WEISGERBER:  I would like to
11   have a standing objection to the
12   extent it's not within the scope of
13   the questions that was asked to
14   Mr. Pugatch.
15   BY MR. WILSON:
16   Q.    So some of those CLOs you
17   contend are managed by Acis?
18       MS. WEISGERBER:  Objection to
19   form.
20   A.    A majority.
21   Q.    And just generally, do you
22   contend that Highland managed the balance
23   of those CLOs?
24       MR. MORRIS:  Objection to the
25

Confidential - Pugatch

1   form of the question.
2   MS. WEISGERBER:  Objection.
3   Same objection.
4   A.   Yes.
5   Q.   Yes.  Okay.  Thank you.
6   And I just had two more
7   questions.
8   So, if there was going to be a
9   reset, that would have to be done at the
10  CLO level, each CLO would have to be
11  reset?
12  MR. MORRIS:  Objection.
13  MS. WEISGERBER:  Objection to
14  form.
15  A.   That is correct.
16  Q.   And do you know of any specific
17  CLO that requested a reset but was not
18  granted a reset?
19  MR. MORRIS:  Objection to form.
20  MS. WEISGERBER:  Same objection.
21  And foundation.
22  A.   When you say "CLOs who requested
23  a reset," can be more clear, please?
24  Q.   We just talked about how this

Confidential - Pugatch

1   investment is comprised of multiple CLOs
2   and each of those CLOs would have to
3   be reset, according to its own terms, I
4   guess.  Do you know of any one of those
5   CLOs that requested a reset?
6   MR. MORRIS:  Objection to the
7   form of the question.
8   MS. WEISGERBER:  Same objection.
9   A.   I'm aware of Highland having in
10  its capacity as manager of the HCLOF
11  having requested or pursued resets of
12  certain of the Acis HCLOs.
13  Q.   Your understanding is that
14  Highland requested a reset of the Acis
15  CLOs?
16  MS. WEISGERBER:  Objection to
17  form.
18  A.   I'm sorry.  I'm trying to
19  understand what you said.
20  MS. WEISGERBER:  I'm really
21  wondering how this relates at all to
22  the scope of the questions I asked Mr.
23  Pugatch on follow up.
24  I think it's time to wrap this

Confidential - Pugatch

1   up, John.
2   MR. WILSON:  This was my last
3   question, I just need an answer to it.
4   And I think he tried to answer, but I
5   didn't understand what he said.
6   MS. WEISGERBER:  Objection.  Can
7   you re-ask the question so we have a
8   clear question.
9   MR. WILSON:  Well, Madam Court
10  Reporter, can you read back his last
11  response?
12  (Record read.)
13  BY MR. WILSON:
14  Q.   Can you repeat what you intended
15  to answer to the last question?
16  MS. WEISGERBER:  Same objection.
17  If you recall, Mike.
18  A.   I'm sorry, John.  Can you just
19  repeat the question, please, make sure I'm
20  answering what you want me to answer.
21  Q.   My question is the same as it's
22  been:  Are you aware of any CLO that
23  requested a reset and was not granted one?
24  MS. WEISGERBER:  Objection to

Confidential - Pugatch

1   form.  Objection to foundation.
2   MR. MORRIS:  Objection to the
3   form of the question.
4   A.   Again, my understanding is the
5   CLOs do not request the reset.  Highland,
6   as manager of HCLOF in its capacity as
7   majority equity owner of certain of the
8   CLOs, have requested a reset post our
9   original investment.
10  Q.   Okay.
11  MR. WILSON:  I'll pass the
12  witness.
13  MS. WEISGERBER:  I think we're
14  done.
15  THE REPORTER:  Will everyone put
16  their orders on the record, please?
17  MR. MORRIS:  John Morris for the
18  Debtor.  Expedited, please.
19  MR. WILSON:  John Wilson.  I'm
20  not sure what arrangements my office
21  has previously made, but we want an
22  expedited transcript, as well.
23  THE REPORTER:  Do you want a
24  rough too?

**Page 154**

1  Confidential - Pugatch

2  MR. WILSON:  Yes, please.

3  MR. MORRIS:  Yes, please.

4  MS. WEISGERBER:  Same for

5  HarbourVest, please.

6  MR. MALONEY:  I don't need an

7  expedited transcript.  I'd just be

8  happy to get one regular copy.  I'll

9  take whatever you would produce in the

10  ordinary course.  Same as what

11  everyone else ordered.

12  (Time Noted:  4:35 p.m. EDT.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 155**

1

2  ACKNOWLEDGEMENT OF DEPONENT

3

4  I, MICHAEL PUGATCH, do hereby

5  acknowledge that I have read and

6  examined the foregoing testimony, and

7  the same is a true, correct and

8  complete transcription of the

9  testimony given by me, and any

10  corrections appear on the attached

11  Errata sheet signed by me.

12

13

14  _____  _____

15  (DATE)        (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

**Page 156**

1

2  CERTIFICATE OF SHORTHAND REPORTER-NOTARY

3  PUBLIC

4  I, Amanda Gorrono, the officer

5  before whom the foregoing deposition

6  was taken, do hereby certify that the

7  foregoing transcript is a true and

8  correct record of the testimony given;

9  that said testimony was taken by me

10  stenographically and thereafter

11  reduced to typewriting under my

12  direction; and that I am neither

13  counsel for, related to, nor employed

14  by any of the parties to this case and

15  have no interest, financial or

16  otherwise, in its outcome.

17  IN WITNESS WHEREOF, I have

18  hereunto set my hand this 12th day of

19  January, 2021.

20

21  _____

22  AMANDA GORRONO, CLR

CLR NO:  052005 - 01

23

Notary Public in and for the State of New

24  York

County of Suffolk

25

**Page 157**

1  ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads    Should Read   Reason

6  ___  ___  _____   _____   _____

7  ___  ___  _____   _____   _____

8  ___  ___  _____   _____   _____

9  ___  ___  _____   _____   _____

10  ___  ___  _____   _____   _____

11  ___  ___  _____   _____   _____

12  ___  ___  _____   _____   _____

13  ___  ___  _____   _____   _____

14  ___  ___  _____   _____   _____

15  ___  ___  _____   _____   _____

16  ___  ___  _____   _____   _____

17  ___  ___  _____   _____   _____

18  ___  ___  _____   _____   _____

19  ___  ___  _____   _____   _____

20

_____

21  Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 20___.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____

Index: $1,570,429..additional

---

**$**

**$1,570,429** 27:23

**$1.02** 112:19

**$135** 28:25 30:2

**$150** 112:23

**$22.5** 126:6

**$295,000** 93:23
94:22 95:7 104:14

**$35** 110:2 125:2

**$4,998,501** 27:20

**$44,587,820** 59:3

**$44.5** 112:14

**$45** 109:25 124:24

**$5** 108:22

**$73** 56:25

**$73,522,928** 27:14

**$8** 78:2

---

**(**

**(i)** 42:22

---

**0**

**08/15/2017** 68:7

---

**1**

**1** 16:4,7 19:17 31:21
59:10 61:14,15
109:23 114:22
128:24 133:19

**10** 60:11,15 83:19,20
84:3,6 97:22 99:5
103:23

**10/10/2018** 83:22

**100** 64:5,11,15

**1057** 22:23 45:12

**11** 32:2 35:9 36:12
51:19 52:22 109:4,5,
15

**11/29/2017** 79:3

**12/24/20** 128:23

**122** 61:9

**135** 28:10

**14** 33:10 133:18

**143** 14:21 16:8,11
109:9 112:21

**144** 14:22

**147** 109:9

**149** 14:23 17:3,17
109:10

**15** 27:11 33:22,24
50:13 55:17 60:11,15
64:4 69:2 112:18,23
133:14

**150** 14:24 109:10

**153** 14:25 109:10

**154** 15:3 109:10

**15th** 50:14

**1631** 109:18 128:22

**17** 50:13

**1:20** 60:22

**1B** 129:9

**1st** 55:22 91:7

---

**2**

**2** 16:22,23 17:2,10,24
26:12 31:21 92:4
128:8

**2004** 83:20 84:12,18
99:17

**2017** 14:23 16:13
21:18 23:14 24:3
27:11 33:22,25
50:13,14 51:20 52:21
55:17 64:5 69:2 85:4
112:18,24 133:14

**2018** 84:7 86:18
90:24 97:22 103:23
105:10,25

**2019** 59:11 90:24
91:7 107:14 114:22

**2020** 16:12 59:3
109:21 112:13

**217** 14:22

**23** 109:20

**27** 51:20 52:21

**27th** 51:19

**28** 21:3

**28th** 81:17

**2:30** 112:6

---

**3**

**3** 18:18,19,24 26:10
28:7 58:25

**30** 137:23 138:14
139:25

**30(b)(6)** 15:13

**3018(a)** 18:22 19:8

**31** 59:3 63:8 112:13

**35.49** 65:14

**36** 55:9

**37** 45:16 53:7

**382** 9:12

**39** 54:25

---

**4**

**4** 20:25 21:2 33:9
37:13,22 51:18 84:24
93:15

**4.1** 37:24

**4.2** 42:21

**4.3** 38:23 40:2 44:13,
22

**4/08/2020** 16:8 17:3

**40,000** 90:25

**410** 17:7

**47** 13:4

**49** 27:15 65:24

**49.02** 66:5

---

**49.98** 27:16 65:20
66:3

**49.985%** 85:5

**4A** 129:19

---

**5**

**5** 16:16 22:15,16,17
37:13,21,22 45:11
95:11 96:24 110:14

**50** 20:11

---

**6**

**6** 61:5,8 84:23 136:3

**617** 22:19

**63** 67:14

---

**7**

**7** 63:4,6,7 95:9 112:17

**75** 125:19

---

**8**

**8** 16:12 23:14 62:3
68:3,6

**80** 125:19

**82** 109:11

---

**9**

**9** 78:21 79:2 95:24

**9019** 11:2 15:8 98:3
109:17 122:13
137:17

---

**A**

**ability** 42:16 54:7,13,
17,18,20,23 95:16
96:9,20 98:10,11
105:18 119:12,20

**absolutely** 49:24
82:19 139:11

---

**accept** 110:17

**accordance** 59:7
103:9

**accurate** 33:14
93:24

**accusations** 81:7

**Acis** 31:22,23,24
32:4,5,12,14,24 35:2
36:11,13,24 46:10,
15,21 47:9,14,22
48:11 49:4,10,14,20
50:2,11 51:11 52:21
53:4,5 74:3 84:5
85:16 86:19,23 87:4,
13,22 88:7,11,19
89:11 90:8,17 91:2,6,
20 92:4,5,7,8,14,15,
20 93:3,18 94:12
96:5,6,7,10,11,22
97:3 101:15 104:13
105:9 107:15,23
108:3 114:6,21
115:6,20 116:23
118:16 121:6 148:25
149:18 151:13,15

**Acis'** 51:20

**Acis-branded** 35:6

**Acis-managed** 35:5

**Acis/hclof** 11:11,12

**acquiring** 63:22

**act** 40:3 145:9

**action** 40:5 56:16

**actionable** 72:16

**actions** 39:4,9,13
40:23 42:18,21 91:21
109:11 114:9

**actively** 122:16

**activities** 53:15

**actual** 113:14

**add** 58:18

**added** 111:9

**addition** 126:16,18
127:11

**additional** 27:20
28:3 57:16 58:8,16
95:13

---

Case 21-03067-sgj    Doc 28-7    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 67-7 Filed 04/27/23 Page 200 of 263 PageID 1615
Appendix 7 Page 00200

Index: Bellisario..confidential

**Bellisario** 79:10,16

**benefit** 46:8,17 58:19 115:8 125:24

**bit** 117:25 121:22 126:8 133:22

**board** 37:23,25 38:6, 10,13,18,19,21 39:3, 6,8,13,20,22 40:4,8, 11,15 42:22,24 43:3, 11 44:11,15,24 45:2 62:6,21 67:7 73:24 79:20

**Board's** 40:24 43:19 44:11

**Bonds** 8:3

**book** 59:4

**borne** 23:23

**bottom** 61:14 63:20

**bound** 9:15,22

**Brad** 24:12 68:14 69:2 79:11,12

**brand** 49:20

**break** 12:19,22 59:21,22 60:7,10,11, 13,20,22 112:3 147:22,23

**briefly** 122:9

**Brigade** 34:9 96:5,10 97:4

**bring** 93:19

**broad** 145:14

**broader** 25:6

**brought** 70:20

**bullet** 45:20 47:11 48:9 53:8,10

**bundle** 127:7,9

**business** 74:22 76:5 77:18

---

**C**

**call** 27:21 98:12

**called** 10:12 34:9 105:14

**calling** 42:5 95:17 98:17 116:7 117:16 139:12

**calls** 47:4 50:20 54:16 71:9 72:6,14 80:11 82:13,19 88:10,18 89:2 113:18 114:25 123:3 130:12 131:14 133:2 135:6 136:13,15 137:7 138:21 140:15 145:17 146:9

**capable** 48:18

**capacity** 38:20 151:11 153:7

**capital** 26:19,22 27:21 31:22,23 32:4, 5 34:6 37:3 61:23 67:13 79:4 95:13 97:4

**carbon** 79:10

**case** 9:12 85:19,20 86:6,7 87:17

**cash** 140:9

**catch** 12:7 24:20

**causing** 93:21 94:21

**central** 60:22

**cents** 125:19

**cetera** 73:14 75:21 123:3

**change** 34:18 35:3 36:22,24 49:19 50:17 51:3,10 54:24 112:19 118:12 121:7

**changed** 26:2 50:15 52:6,20 74:13 117:7, 10 120:14

**changing** 49:3

**Chapter** 32:2 35:9 36:12 52:22

**characterized** 73:19

**charge** 20:14

**charged** 113:12

**chart** 64:12 67:12

**chat** 128:6

**choices** 148:5

**circles** 106:23

**citation** 94:8,9

**claim** 11:7,9 14:19 15:9,10,16 16:8,11, 16 17:3,7,17,20,22 18:6 32:3 64:24 65:8 72:11,22,23 108:5, 17,23 109:9 110:2,3 123:21,22 124:25 125:3,18,21

**Claimant** 16:18 17:24

**claims** 15:23 19:22 82:5 90:2 109:23 110:16 123:9 124:7, 13 126:16,21 127:13 128:2

**clarification** 93:11 142:7

**clarify** 15:12 47:25 52:11 124:16 144:14 145:5 149:5

**clarifying** 141:20

**clarity** 42:21

**class** 125:21

**clear** 52:19 83:11 106:9 124:11 150:24 152:9

**CLO** 8:13,24 16:20 18:3 26:13,17 31:10, 16 38:3,10 40:21 43:6 61:17 62:11 63:17,18,23 64:5,13, 21 66:4 74:22 76:5 77:17 83:22 84:13,19 92:20,21 101:15 105:5,10 115:8 119:5 120:11 121:19 122:5 150:11,18 152:23

**CLOF** 110:7

**CLOS** 30:24 32:12, 14,15 35:5,6,7 36:9, 24 41:16 53:5 54:8, 19 74:2,4 85:16 92:5, 8,14,15 93:2,19 94:12 95:14 96:7,11, 17 98:13 101:4 103:8 104:13 105:15

107:15,23 108:3 114:2 115:7,23 116:20 118:19 119:22 120:6,7 148:21,24 149:17,24 150:23 151:2,3,6,16 153:6,9

**closing** 55:15,16,19 56:18

**coaching** 107:8

**Coleman** 8:13

**colleague** 24:18 38:15

**colleagues** 9:2 24:18,23,25

**collect** 45:24

**collecting** 47:16 48:12

**collectively** 66:9 67:5 85:10

**colloquy** 97:13

**color** 77:15

**comfortable** 113:5

**committee** 25:14,17, 18,25 26:3,7

**common** 147:11

**communications** 14:8 75:5

**company** 21:10,15 34:9,11 37:24 61:16 105:2 133:11

**comply** 51:15

**component** 116:2

**composed** 37:25

**Composition** 37:23

**Compound** 123:12

**comprised** 25:19 148:21 151:2

**conceive** 98:2

**concern** 55:11 57:16

**concerned** 86:4 127:4

**concerns** 81:22 82:3 96:3,13,20,21 139:18

**conclude** 147:24

**conclusion** 47:4 50:21,25 54:16 71:9 72:6,9,15 80:11 82:13,20 93:10 113:18 114:25 115:14 116:6 130:12, 14 131:14 135:9 136:14 137:7 138:22 140:16 146:9

**conclusions** 42:6 43:25

**conditioned** 40:6

**conditions** 54:19 85:18

**conduct** 20:19

**conducted** 29:18 43:9 57:11

**conference** 88:10, 18 89:2

**confidence** 54:6,12

**confidential** 9:18 10:1,4,9 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1

Case 21-03067-sgj    Doc 28-7    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 67-7 Filed 10/25/23 Page 201 of 263 PageID 1626
Appendix 7 Page 205 of 263

Index: confidentially..difference

113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1

**confidentially** 9:10, 19

**confirm** 84:18
122:10 127:10
128:19 135:13

**confirmation** 114:21

**confirmed** 125:4

**confirming** 10:3

**conflict** 48:9

**confused** 124:19

**connected** 19:22

**connection** 27:8
35:2 56:20 70:14
73:12 78:2,6 95:14
133:6 136:22 145:22
148:13

**connectivity** 12:5

**consent** 39:2 40:24
42:25 131:9,23
132:13 133:5 134:21
137:3 141:7 142:13,
20,22 143:5,9 144:2,
4,10,22 146:2 147:4

**consents** 39:18
43:10

**consequences**
121:6

**consideration**
122:20

**consistent** 85:17
112:11

**consulted** 69:15

**contact** 24:12

**contained** 40:23

**contend** 82:6,16
149:18,23

**content** 76:11

**context** 25:7 30:19
96:16

**continue** 15:17
36:15 77:10

**continues** 31:25

**contrary** 40:4

**contributed** 27:20

**contributor** 117:3

**control** 66:21 98:10
101:5,8 102:2 105:16

**controlled** 47:10
62:6,15 66:19

**convened** 39:19

**conversation** 50:5,8
131:16,19 133:2
137:21 141:13
146:10,13,20 147:14

**conversations**
14:10 18:9 42:13
56:12 69:21 71:12,17
75:21 83:6,10 113:21
123:2 125:12,17
130:18 132:6,8 133:4
136:16,19,23 137:9,
11 138:21 139:12
140:17 142:20 144:8,
19 145:20,25 146:18
147:2

**copies** 79:10

**copy** 78:9 109:19

**corporate** 19:23
99:21

**correct** 13:10 15:10
18:12 19:14,20 22:8,
9 23:8 26:5 27:17,24
32:3 33:2,3,4 37:5,
18,19 39:22,23 40:11
41:20 43:11 46:4,11
51:23 52:2,3,7,8,24
53:17,24 55:6,7,17,
18 56:25 57:5,13,14,
19 58:11,15 62:21,25
63:23 64:6,25 65:9,

14,17 66:2,5,9 67:2,
7,10,15 68:19,23,24
74:23 75:2 76:14
80:3,4,15,16 83:13,
14 84:14 85:10,11,23
86:2 91:22 92:21
93:5 110:21,24 113:8
120:25 122:14,15
126:22,25 127:10
129:7,8,12,15,18
132:2 134:25 148:22,
23 149:3 150:16

**correctly** 117:22

**correspondence**
142:10 143:17

**counsel** 9:7,14,21
13:16,19,23 14:6,10
15:21 18:9 33:19
42:13 58:20 68:11
71:12,17 83:10
111:13 113:21
122:22 123:3 130:19
131:20 132:8 133:4
136:19,24 137:11
139:13 142:11
143:14 145:17
146:21

**couple** 23:25 24:10
148:17

**court** 86:24 89:19
98:3 122:14 152:10

**cover** 79:3

**Covitz** 79:9

**created** 38:7,8

**creation** 23:4 119:21

**creditors** 125:24

**creditors'** 123:21,22

**credits** 120:4

**crisis** 70:3

**crusader** 70:3

**crystal** 106:9

**cumbersome** 22:11

**current** 13:3 93:19
126:3

**cut** 89:21 109:19

14,17 66:2,5,9 67:2,

## D

**damaged** 50:18 51:4

**damages** 93:21
94:22 148:6,8,11

**date** 17:17 29:25
33:18,20,24 55:15,
16,20 64:3 86:17
91:13 97:20

**dated** 84:6 133:13

**Daugherty** 70:3

**day** 78:13 100:22

**day-to-day** 119:24

**days** 137:23 138:14

**days'** 139:25

**Debevoise** 8:10 9:3

**Debt** 126:18

**Debtor** 8:8 11:6,12
59:16 108:9 110:8
123:2,8,24 125:12
126:20 128:3,23
129:11 133:12
140:11 141:9,15,22
142:15 145:9 147:15
153:19

**Debtor's** 16:19 18:2
22:18,25 100:20,21
109:17 110:21
111:13 123:9 129:2,
23 137:15 138:2
140:11 142:15
143:10,19 144:8,19,
23 146:18 147:2,7

**Debtor's** 109:7

**December** 109:20

**decision** 25:10,13
26:7 41:9 51:15
79:22 101:18 103:10
118:12 120:8

**decision-making**
45:3

**decisionmaking**
26:5 66:23

**decisions** 102:3,4
116:19 118:22

119:24 121:4

**declaration** 18:20
19:3,6,14 26:11 28:4
58:24 109:6,16
112:12 128:25

**deemed** 62:14

**defer** 15:20

**define** 87:16

**defined** 85:8 134:10
146:3

**defines** 61:22

**definition** 134:23

**definitive** 107:18

**definitively** 83:9
134:7 135:13

**delay** 56:17

**delayed** 55:15,20

**delegated** 102:5

**depend** 31:13 92:20

**depending** 31:9

**Depo** 128:8

**deponent** 100:6

**deposition** 9:15,22
10:3 11:21 12:18
13:15,22 16:4 20:20
26:15 74:10 99:11,20
100:2,12 133:9

**describe** 123:16

**describing** 56:13

**designated** 10:25
14:3 100:5

**designates** 10:5

**desires** 132:13
134:21

**destruction** 118:17

**details** 46:14 48:21

**determination** 40:6

**determined** 58:10

**dictate** 95:17

**difference** 30:16
49:11 118:4

Case 21-03067-sgj    Doc 28-7    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 687 Filed 10/26/22 Page 202 of 263 PageID 1637
Appendix 7 Page 10735 Page 202 of 263 PageID 1637

Index: differently..fact

**differently** 126:15

**diligence** 28:19
29:7,10,12,18,21
53:14 56:19,21 57:12
58:8 70:14,19 77:11

**diminution** 51:13
121:3 148:12

**direct** 65:5

**direction** 35:8

**directly** 18:13 90:2
123:2 143:14

**director** 19:18 20:3,
5,7,14 21:20,23
93:17 104:12

**directors** 20:12
25:19,22 62:13

**disagree** 64:17
67:20

**disclosed** 78:4

**disclosures** 139:19

**discretion** 41:8

**discuss** 10:25

**discussed** 14:5
65:12 95:15 104:4
111:21

**discussions** 23:16,
19,24 24:5,7,16
68:17,22 69:7,9
71:19,25 111:23
139:20 141:18,21,23
143:23 145:17

**dispute** 53:11 73:21
74:20 90:23

**disregard** 40:10

**distinguish** 32:13,
21 92:18

**distinguishing** 36:5

**diversified** 31:15

**dividends** 27:22
28:3

**docket** 22:23 45:11
128:21

**document** 9:11
16:10,17,23 19:10

23:4,7,11 35:22,24
36:3 37:8 40:13 44:4,
7 45:11,14 51:18
61:22 62:3,25 63:15
64:4 67:17,18,20
68:10 71:18 72:2,10
73:5 76:2,7 84:3,9
86:12,13,14,18 95:2,
10 99:14,20 109:18
128:12 129:6 130:2
131:2,20 132:20
133:8,16 136:6,10
138:24 139:2

**documentation**
77:9 111:14

**documents** 9:8,17
27:2,5,7,10 44:5 49:9
66:11 75:24 89:10
90:7,11,15,16,25
100:8 103:3 145:11

**dollar** 122:19 125:19

**Dondero** 8:5 81:14

**Doug** 74:15

**Douglas** 8:15 74:12

**Dover** 14:24 21:18
37:14,15,16 38:5,13
65:12

**drafting** 111:6,9,14

**Draper** 8:15,16
74:12,13

**drive** 119:21

**DSD** 74:9

**due** 28:18 29:7,9,12,
18,20 50:24 56:21
57:12 58:8 62:15
70:19 77:10 113:24
116:3

**Dugaboy** 8:16

**duly** 10:13

**duration** 39:15

**Dustin** 25:2 68:21
69:2,11 79:9,15

---

**E**

**E-MAIL** 16:5,22
18:25 20:25 61:5

63:5 68:2,6,12,14,25
70:2,8 73:6 76:8,11
78:21 79:3,8,25 80:6,
15 81:11,22

**E-MAILED** 139:4

**E-MAILING** 22:15
44:5

**E-MAILS** 75:4,14
81:3

**earlier** 65:12 66:11
75:25 79:21 91:11
92:18 112:10 117:25
133:24 148:20

**easier** 12:10 128:9

**easily** 128:7

**Eden** 24:12 68:15
69:2 79:11,12

**editor-in-chief**
81:15

**effective** 91:7

**effectuate** 131:10,25

**effectuating** 143:18

**efficiently** 20:22

**Ellington** 95:12
98:16

**Ellis** 8:3

**Emily** 9:3

**employee** 73:22
74:21 78:6

**employees** 24:14

**employment** 73:21

**encourage** 87:12

**encouraged** 87:3

**engaged** 23:15,19
24:7

**engaging** 24:16

**ensure** 12:12,15
45:23 56:18,21

**entail** 44:17

**enter** 41:9,19 129:22

**entered** 9:11 11:14
27:7,10 103:4

**entire** 35:14 39:19,21
138:16

**entities** 15:6,20 18:6
21:14,17 22:6 34:4
36:22 64:23 65:5,7,
20 66:9 67:12 85:10
120:11 123:6 129:11
135:24 137:2 138:18
147:6

**entity** 19:23 20:4,6
35:19 49:12 141:15

**entry** 109:8 128:21
129:2

**Eppich** 8:3

**equity** 30:23 31:16
41:15 85:7 92:15
98:12 115:8,22
119:22 120:7 153:8

**Erica** 8:9 139:17

**erosion** 113:24
120:9

**essence** 123:7

**establish** 37:24

**estate** 125:24

**estimate** 89:2 124:2

**estimated** 29:25

**event** 18:10 107:21

**events** 87:22 115:5
118:14

**evidence** 72:2 89:10
90:7

**evolved** 26:2

**exact** 59:11 99:9

**Examination** 10:16
83:21 84:13,19 99:18
122:2

**examined** 10:14

**exceed** 28:10 30:2

**exchange** 123:8,19,
20,23 127:12,25

**exchanged** 122:20

**exclusive** 41:18

**executed** 109:20

**entire** 35:14 39:19,21
138:16

**exhibit** 16:3,7,22,23
17:2,10 18:18,19,24
20:23,24 21:2 22:15,
16,17 26:10 31:21
33:9 37:13 45:11
58:25 61:5,8 63:3,4,
6,7 68:2,3,6 78:21
79:2,8 83:18,19,20
84:3 99:5 109:4,5,15,
19 112:17 128:8,24
130:24

**exhibits** 128:17

**existence** 76:19
77:24

**existing** 63:19

**expectation** 28:14

**expectations**
103:10

**expected** 28:8
124:12

**expedited** 153:19,23

**expert** 116:7

**explanation** 70:15
81:9 82:4

**explicit** 147:14

**explicitly** 142:19

**expressed** 54:6,12,
21 55:11

**expressing** 53:23

**expressly** 40:6

**extent** 42:5 44:14
47:3 50:20 54:15
71:8,10 72:5 80:10
88:2 97:14,24
113:17,19 114:24
125:22 130:11,13
131:13 132:25 135:6
136:13,15,17 137:6
138:20,23 140:15
145:16 146:8 147:11
149:13

**external** 58:19

---

**F**

**fact** 19:13 88:9

**facts** 13:18 54:4 55:10,24 56:4 58:5,6 139:22

**factual** 11:6 137:19 140:20,23,25 145:18

**fair** 32:24 59:6 121:7 123:10

**familiar** 34:8 69:3 130:25 133:15 136:2

**feature** 111:22

**February** 59:10 91:7 114:22

**feel** 12:18

**feelings** 102:8

**fees** 113:11

**figure** 72:25

**figures** 28:16

**filed** 14:19 16:8,11,13 17:3,17,18 18:5 22:23 23:7 32:2 64:23 65:8 66:11 84:4 89:10 90:8 97:21 100:3 112:12 128:22

**filing** 137:17

**final** 25:10

**financial** 70:2

**fine** 10:7 59:23 60:17, 20 130:21

**finished** 12:13,15

**firm** 8:3 25:20

**follow** 151:24

**follow-up** 69:14,15, 20

**force** 105:19

**forgot** 146:15

**form** 17:7 28:18 29:4, 15 30:4 31:7 32:9,18 33:18 34:14,21 35:17 36:3,18 37:7 39:11 40:13 41:12,22 42:4 43:13,22 44:19 45:6 46:6,13,25 47:3,24

**front** 44:7

**full** 10:22 44:7 52:4 55:23 62:4 105:16 139:2

**fully** 66:18

**function** 43:19

**fund** 14:22 16:14 63:18 111:7 117:12

**Funding** 8:24 16:20 18:3 61:17 63:17 83:22 84:14,20

**funds** 17:25 19:25 26:13,17 85:7 119:13

**future** 127:13

---

## G

**general** 43:19 73:9, 17 75:12 101:2 109:25 110:10 121:10 124:25 125:18 132:5

**generally** 73:10 149:22

**Gerard** 81:16 82:7

**gist** 74:18 110:19

**give** 72:19 102:25 106:5 115:2 132:4 136:8 145:19

**giving** 12:2 106:19 107:8

**Global** 14:22,23 16:14 21:19

**go-ahead** 121:25

**go-forward** 105:19

**good** 8:17 13:2 60:18

**Goren** 9:4

**governance** 66:21

**GP** 31:23 32:5

**granted** 127:16 150:19 152:24

**ground** 12:24

**grounds** 13:21

**Group** 37:17

**guess** 16:24 59:5 62:3 70:4 86:3 114:17 117:23,25 120:2,22 124:6 151:5

**guided** 103:7

**guidelines** 103:2,6 105:14

**guys** 61:2 124:5

---

## H

**half** 63:21

**happen** 59:9

**happenings** 105:5

**happy** 12:8 123:15 128:10

**Harbour** 87:20

**Harbourvest** 8:11 9:4 10:5,25 11:3,13, 14,18 14:18,21,22, 23,24,25 15:3,15 16:13 17:18 18:5,10, 21 19:4,7,18,21 20:2, 12,15 21:14,18,21,24 22:2,5,6,18,25 23:15, 18,22 24:8,15 25:3,4, 8,11,15 26:12 27:13, 19 28:2,8 30:21 31:4 37:14,17 41:24 42:16 43:7 45:18,21 47:13 49:2,13,21 51:4 52:4, 12,16 53:11,13,24 54:4 55:4,5,11,23 56:24 57:3,9,11,15 58:5 63:22 64:23 65:4,19 66:8,12,20, 24 67:6,12 68:22 69:7 70:6 71:24 73:11 75:7,18 76:13 78:8 79:18 80:3,8 82:8 85:9 86:19 87:4, 13,21 88:3 89:16 90:3,6,17 91:2 92:9 95:16 97:10 98:8 105:18 108:6,17,22 109:9,24 110:5,15, 16,17,20 111:16 117:6 118:20 123:6 124:23 126:3,17,19 127:2,7 129:3,11,21

**filed** (cont.) 48:17 49:17 50:20 52:10 53:2,19 54:2, 15 56:8,10 57:8,21 58:13 61:20 62:23 64:2,8,20 65:3,16,23 66:7 67:4,9,17,22 69:19 70:11,24 71:8 72:5 74:25 75:9 76:16 77:4,13,23 78:11,17 80:10 81:6, 25 82:11 85:25 86:10 87:2,7,11,25 88:14 89:5,13 90:10,19 91:4,16,24 92:11,13, 22,24 93:7,8 94:2,4, 25 95:22 96:15 97:24 98:21 99:7,14 100:15,24 101:11,24 103:15 104:19 105:12 106:3 107:17, 25 108:19 109:2 110:12,23 111:4,11, 19 113:2,17 114:14, 24 115:13 116:6 117:14 119:2,18 120:18 121:9 123:12 124:10,16 125:6,15 126:24 129:14 130:2, 11 131:13 132:19,25 134:4 135:3 136:13 137:6 138:20 140:14 142:2 144:12 145:3, 16 146:8 149:20 150:2,15,20 151:8,18 153:2,4

**forma** 56:15

**formally** 38:20

**formed** 29:17

**forming** 55:25

**found** 12:9

**foundation** 41:12 46:6 48:17 53:2 64:8 70:11 91:4,24 93:9 94:2,4,25 96:15 104:20 107:25 108:19 113:2 115:13 116:6 150:22 153:2

**four-man** 26:6

**four-member** 25:18 79:20

**frequently** 89:8

**Group** 130:6 131:9 136:10 137:2,13 138:13,18 139:14,23,24 140:7, 21 141:6 142:12,18, 22 143:4,6,17 144:7, 18 147:6 148:8

**Harbourvest's** 11:7, 8 36:19 49:22 50:9, 16 52:2 71:20 72:21, 23 83:12 97:19,25 101:8 117:11 120:23 137:25 140:3 148:6

**Harbourvest-prepared** 86:14 95:2

**Hayley** 8:7

**HCF** 33:11,15 35:13 36:15 51:22 133:19, 25 134:16 135:18,22 141:7,20,23 142:13, 23 143:8

**HCLF** 63:16

**HCLO** 101:19

**HCLOF** 18:7,11 20:16 22:7 24:2 26:14,16,25 27:15,17 28:9 30:10,22,23 31:5,15,25 32:7,12, 20 33:2,4 34:5,7 35:19 36:6,10,14,21, 25 41:15 42:19 49:4 50:12 51:14,21 52:6, 20 54:7,9,13 55:4,14 59:2,8,10 64:6 65:6 66:18,23 76:18 77:16 85:14 91:13,22 92:14 93:5,17,22 96:17 98:9,18 102:2 103:3, 6 104:12 105:6 112:13 113:12 115:9, 19 116:22 118:4 119:6,15,20 120:8,15 123:6,24 126:4 131:10 133:11,25 143:18,25 144:21 148:21 151:11 153:7

**HCLOF's** 54:18,22

**HCLOF/ALF** 84:25

**HCLOS** 151:13

**hear** 43:15 60:3

Case 21-03067-sgj    Doc 28-7    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01082-B Document 87 Filed 09/29/23 Page 204 of 263 PageID 1659
Appendix 7 Page 240255 Page 204

Index: heavier..Kane

**heavier** 121:22

**held** 30:9,23 32:12 33:4 64:5 110:16

**Heller** 8:16

**Highland** 8:23 16:20 18:2 22:24 23:16,20, 21 24:7,14 26:13,17, 19,22 28:18,24 29:11,17 30:22 31:2, 18 32:14,23 33:11,14 34:5 35:13 36:15,20 37:2,3 41:14,17 42:18 45:19,20,21 46:3,16,20,22 47:12, 19,21 48:6,7,23,25 49:10,13 50:3,7 51:12,22 53:10,17, 19,23 54:3,6,8,12 56:16 57:23 58:17 61:17,23 62:7,15,17, 21 63:16,17 66:19 67:13 68:18 69:21 70:5,16,20 71:21,22 72:11 73:18 74:3,6, 19 75:7,17 77:5,9 79:4,13 80:7,21,23 81:4 83:21 84:13,19 85:3 87:3,12,21 88:10,19 89:9 90:6, 12,16,24 92:21 93:6 98:14 102:5 105:16 114:5 115:18 117:6 120:14 133:19,24 134:15 135:17,22 141:7,20,23 142:13, 23 143:8 149:23 151:10,15 153:6

**Highland's** 47:10 51:15 53:3 77:17 103:9

**Highland-affiliated** 141:14

**Highlands'** 93:13

**highlight** 132:10

**highlighted** 132:12 138:11

**hinted** 117:24

**Holdco** 8:14 38:3,10 43:6 62:11 63:18,23 64:5,13,22 66:5 121:19 122:5 128:8

**holders** 115:9,22

**home** 13:9

**Honestly** 134:5

**Horn** 8:16

**hour** 59:20

**hundreds** 57:9

**Hunter** 79:9

**Hush** 9:4

**HV** 15:2 21:25

**hypothetical** 117:16

**I**

**idea** 49:19,20

**identification** 16:9 17:4 18:23 21:4 22:20 61:10 63:9 68:8 79:5 83:23 109:12

**identify** 35:25 74:10

**identifying** 148:4

**ii** 42:25

**imagine** 124:3 125:11

**immediately** 64:14

**impact** 53:14 73:25 76:4 77:16 119:12 120:6

**impediments** 96:9

**implications** 55:14 101:16

**important** 111:16

**improperly** 117:7

**inability** 93:20 94:21 96:21 113:24 115:6, 11,22 116:25 118:18 120:10

**inception** 117:10

**include** 76:2

**included** 26:3 28:20 128:5 132:22 134:24

**including** 11:9 74:3

103:7 115:6,9 140:17

**independent** 131:22 136:18

**independently** 70:18 80:23

**individual** 120:6

**individuals** 24:6 38:2 39:22

**industry** 49:5

**inform** 47:12 48:25

**information** 55:12 56:3,6,13 57:16,17 58:6,9,16 59:15 70:5 73:15 78:3 95:6 96:2 102:19 106:8,20 134:6 135:7 136:16

**informed** 45:21 77:5 88:6 105:6 107:21 125:12

**infringe** 71:11

**initial** 31:11 55:19

**initially** 27:14 35:13 118:11

**initials** 74:9

**initiated** 52:22

**injunction** 91:19 114:8 115:21

**inquire** 13:24

**insistence** 49:23

**instruction** 137:8 141:12

**intended** 152:15

**intent** 56:14 137:14, 25 140:3

**intention** 45:22 48:7

**interaction** 36:19

**interest** 27:15,17 67:14 93:20 123:24 128:2 147:11

**interests** 110:7

**internal** 124:6

**International** 15:2 21:25

**interpretation** 71:15 135:14

**interrupt** 74:8

**invest** 18:11

**invested** 21:15 27:14 55:4 61:17

**investigate** 72:21

**investing** 56:24

**investment** 8:17 11:10,15 13:18 14:25 17:24 20:15 22:7 23:17,22,25 25:6,8, 12,14,16 26:25 27:4, 8 28:9,13,21,22,24 29:7,19 30:2,9,10,13, 17,20,21,22 31:4 33:2 34:2,6,12,16,19, 23 35:12,15 36:20 37:15 38:16 39:16 40:20 42:10 50:9 52:2,7 53:15 57:10, 19 58:11 63:23 65:5 66:19,22 71:20 76:17 77:11 79:21,24 80:3 83:13 92:9,16 96:18 101:2,18 102:6 103:2,6 105:2,14 110:7 112:22 113:14 114:3,9,10 117:11 119:19 120:7 121:4 148:13,20 151:2 153:10

**investment's** 55:15

**investments** 32:20 33:4 57:4,12 65:19 116:3

**investor** 24:11 26:13 37:17 55:6 64:10 66:13,16,18 83:21 84:13,19 85:6,8,9,18 86:5 95:15 96:2,12 98:9,17 99:18,22 101:5 104:25 105:18

**Investor's** 97:7 100:12,21

**investors** 18:7 65:13 67:2

**involved** 26:4 68:17, 21 69:6 114:5 141:16,17,21,22

**involvement** 44:12

**isolation** 97:17

**issue** 32:10

**issued** 43:10 83:12

**issues** 12:5

**items** 44:21,23,25 57:16

**IX** 14:24 37:14,15,16 38:5,13 65:13

**J**

**James** 81:13

**Jim** 8:4 108:10,15,21 111:15,24

**John** 8:2,6,12 44:4 48:2 59:20 74:7 82:20 84:16 89:15 106:11 107:11 109:6, 16 114:16 116:11 117:21 121:18 122:4 124:11,19 128:13,25 130:3 132:9 139:8 142:4 145:4 146:11 149:5 152:2,19 153:18,20

**Join** 41:4,13,23 91:25 113:3

**joined** 8:25 74:9

**Joint** 97:2

**jointly** 38:15

**Jones** 8:4,8

**Josh** 51:12

**Journal** 76:10 80:14, 18 81:16

**judgment** 45:25 77:25

**jump** 121:19

**junior** 25:3 79:23 125:20

**K**

**Kane** 8:12 121:18,19 122:3,4 124:21

126:13 128:4,15
129:4 130:4,20
139:10,17 144:13,16
145:7 147:16

**kind** 114:18 117:24
122:21 124:5

**King** 8:23

**knowledge** 52:5
55:24 70:9 88:5
107:22 108:24

---

**L**

**L.P.** 14:22,24,25 15:3
16:14 17:19 18:5,11
20:2 26:20,23 31:24
32:6 37:15 47:15,22
48:12 61:24 67:13

**Labovitz** 9:3

**laid** 103:5

**large** 85:6,13

**largely** 17:21 114:3
123:18 125:11

**larger** 24:13 66:3

**largest** 37:16 64:10
65:11,13 66:4,24
117:3

**late** 105:10

**Latham** 8:20

**lawsuit** 76:4

**lawyers** 75:21 83:6
146:13

**lay** 115:2 117:17

**layman's** 47:6

**lays** 55:25

**lead** 111:13 122:11

**leading** 115:5

**led** 51:12 113:15
118:17,23

**legal** 15:21 42:6
43:24,25 47:4 50:21,
25 54:16 56:22
69:12,22 71:9 72:6,9,
15 80:11 82:13,20
93:9 113:18 114:25

**letter** 79:3 81:13
82:7,17,25 83:9,11
138:15

**level** 34:5 36:6,25
116:22 119:6 120:8,
15 150:11

**levels** 119:7

**lieu** 42:25

**light** 49:15

**likewise** 12:14 122:8

**limitation** 11:10

**limited** 8:14,24 16:18
17:25 40:14

**list** 39:14

**listed** 33:11 35:21
37:2,4 44:21 134:15
135:17,21 140:2

**listening** 107:10

**lists** 39:5

**litigation** 51:11
53:12 70:13 73:13,
19,25 77:6 78:7
114:4 126:21

**LLC** 19:19,22 20:12
21:21,24 31:23 32:5

**LLP** 8:20 37:4

**located** 13:6

**Logan** 8:13

**long** 45:14

**looked** 17:22 127:20

**losing** 104:14 114:11

**loss** 113:13 116:2
117:3 118:4

**losses** 85:15

**lot** 20:20 113:23

**LP** 8:4 15:4 92:4

**lumped** 15:9

---

**M**

**machines** 74:13

**Madam** 152:10

**made** 10:10 11:12
22:6 25:10,14 26:7
35:13 45:19 52:23
57:3,9 71:6,22 72:11
73:12 79:21 80:7
82:5 90:3 92:9 117:6
118:3,21 153:22

**maintain** 9:19

**majority** 120:9
149:21 153:8

**make** 25:11 41:9
85:17 99:15 117:21
127:5 131:21 138:8
152:20

**makes** 119:24

**making** 28:3,21
76:17 77:11 102:3

**Maloney** 8:22 41:4,
13,23 91:25 92:10,22
93:8 94:3 104:19
113:3 114:12

**managed** 16:19 18:2
19:25 26:19,22 74:3
148:25 149:18,23

**management** 26:19,
23 31:22,23 32:5,6
36:23 37:4 51:21
53:5 61:23 66:23
67:13 79:4 92:6 97:5
98:11 116:19 119:8

**manager** 26:25 27:4
30:12,13,14,17,18,
20,23 31:4,12,24
32:7,11,21 33:12,16,
25 34:6 35:4,14,25
36:6,7,14,16,21,25
40:3,9 41:15 42:19
45:4 49:4,19 50:12,
14,18 51:3,10 52:5,
20,24 54:24 63:17
66:20 85:6 92:19
93:2 96:7 101:19
102:2,6 117:7,9
118:3,13,21 119:4,5,
10,12,19,20,23

**manager's** 144:21

**managers** 30:25
31:9,17 34:18 35:21

**manages** 17:24
38:16 92:5

**managing** 19:18,24
20:3,5,7,11,13 21:20,
23 25:19,21 32:15,25
93:4 104:24 105:3

**Mark** 8:22 94:3

**marked** 10:4,9 16:9
17:4 18:22 21:3
22:20 26:10 58:24
61:9 63:9 68:7 79:5
83:23 109:11

**market** 54:19 59:6
85:18 93:20

**Massachusetts**
13:5

**material** 51:12 55:10
58:5 71:5,23 72:3
82:9,18

**math** 65:25 113:6
126:9

**matter** 9:7 14:20
44:16,20 70:3 145:18

**matters** 11:2,17
14:4,5 70:6,7,13

**Mclaughlin** 8:19,20

**meaning** 52:16
66:17

**meant** 53:20

**medium** 99:9

**meet** 39:8

**meeting** 39:18 43:2,
8

**member** 19:24 21:2
25:3 37:3,4,5 62:5
79:17,23 134:15,24
135:18 136:3 140:2

**member's** 133:10

**members** 21:9 24:10
25:24,25 33:7,12
42:23 43:2,5 123:6
137:14,23 138:3,14
139:25 140:8,22

**memorandum**
33:21 40:7 61:9,13
85:3

**memory** 89:6

**mentioned** 68:15

**met** 38:19

**Michael** 10:23 18:20
19:6 79:9

**middle** 55:10

**Mike** 29:5 42:7,13
43:23 44:3 47:5
48:19 50:22 51:8
52:17 58:14 59:25
60:5,6,18 71:10 73:9
75:19 82:12 83:4
86:11 98:5 99:15
102:23 113:5,19
115:3,16 116:9
117:19 122:6 124:22
125:8 127:19 130:15
131:15 136:17 137:8,
20 139:2,19 152:18

**Mike's** 97:15

**million** 28:10,25 30:2
56:25 78:2 108:22
109:25 110:2 112:14,
21,23 124:24 125:2
126:6

**millions** 85:15

**mind** 141:19

**minor** 74:20

**minority** 26:13 66:17
98:9 101:5

**minute** 59:18

**minutes** 60:11,16

**mismanagement**
116:4,15,21 118:23

**misrepresentation**
72:24 73:4 82:9

**misrepresentations**

**member** 120:5,14 121:5,7
131:24 132:13
133:20 134:2,11,21,
23 135:17,21 137:4
146:2 147:4 151:11
153:7

Case 21-03067-sgj    Doc 28-7    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 67-7 Filed 05/07/25 Page 206 of 263 PageID 1621
Case 3:21-cv-01603-B Document 87-7 Filed 05/07/25 Page 206 of 263 PageID 1621

Index: misrepresented..paragraph

45:18 55:3 56:2
57:23 71:6,23 72:3,
10,14,16,17 73:2,11
75:6,17 76:3 80:7
82:17,19,22 116:22

**misrepresented**
82:24

**misstates** 29:4
40:13 47:24 56:10
57:21 58:13 92:24
105:12 121:9 142:2

**misunderstood**
146:24

**month** 89:7

**morning** 68:10 84:4

**Morris** 8:6 46:24 56:7
74:7,14 106:2,7
109:6,16 117:13
119:14 121:14
127:17 128:25 135:2
147:19 149:25
150:13,20 151:7
153:3,18

**motion** 11:2 15:8
18:21 19:7 84:12,18
87:18 89:18 98:3
99:4,12,16,17,19
100:2 104:5 109:7,17
122:13 129:2 137:17

**mouse** 38:23

**mouth** 74:18

**move** 15:25 103:17

**muddled** 48:3

**multiple** 31:16
148:11,21 151:2

—————

**N**

**named** 26:24

**names** 34:4

**Natasha** 9:3

**nature** 57:4

**necessarily** 120:21

**necessity** 144:9,20

**needed** 22:11 139:21

**Needham** 13:4

**negotiate** 122:16

**negotiated** 108:4,8

**negotiating** 123:25

**negotiation** 131:5
145:11

**negotiations** 11:5
13:19 108:11 111:23
122:11,24 129:7
145:10

**net** 59:2,9

**nice** 122:6

**Nick** 79:10,16

**Nods** 21:11 71:2
90:22 136:4

**nominee** 110:8

**non-discretionary**
62:16

**non-privileged** 51:7
72:18 115:15 130:14

**Nonetheless** 98:5

**nonlegal** 113:20
130:14

**nonresponsive**
57:25 105:22

**Nos** 109:9

**Notary** 10:13

**notice** 137:13,24
138:15 139:25

**notwithstanding**
54:8,23

**November** 27:10
33:22,24 50:13
55:17,22 64:4 81:16
85:4 108:13 112:18,
23 133:14

**number** 9:12 16:11
18:18 29:10,12,16
39:5 59:11 95:8
112:20 113:25
122:25

**numbered** 14:21

**numerous** 104:23

—————

**O**

**oath** 11:24

**object** 13:21 15:12
42:4,17 57:25 94:4
97:13,14 105:19
136:12,13,14

**objected** 41:24
97:10

**objection** 11:9 22:19
23:2 29:3,14 30:3
31:6 32:8,17 33:17
34:13,20 35:10,16
36:2,17 37:6 39:10,
11 40:12 41:3,11,21
43:12,21 44:18 45:5
46:5,12,24 47:2,3,23
48:5,6,16 49:16
50:19,20 51:5 52:9,
14,25 53:18,25
54:14,15 56:7,9 57:7,
20 58:12 61:19 62:22
63:25 64:7,19 65:2,
15,22 66:6 67:3,8,16,
21 69:18 70:10,23
71:7,8 72:4,5 74:24
75:8 76:15 77:3,12,
22 78:10,16 80:9,10
81:5,24 82:10 83:15
85:24 86:9,25 87:6,
10,24 88:2,13,21
89:4,12 90:9,18 91:3,
15,23 92:10,12,22,23
93:7,8,25 94:13,24
95:21 96:14 97:23,24
98:20 99:6,13
100:14,23 101:10,23
102:10,21 103:14
104:3,7,19 105:11,21
106:2 107:16,24
108:18,25 110:11,22
111:3,10,18 112:25
113:16,17 114:12,13,
23,24 116:5,17
117:13,15 118:25
119:14,17 120:17
121:8 123:11 124:9,
10,15 125:5,14
126:23 127:17,18
129:13,25 130:10,11
131:12,13 132:3,18,
24,25 134:3 135:2,4,
5 137:5,6,18 138:6,

19,20,22 140:14,15,
24 141:25 142:17
143:3,21 144:11
145:2,15,16 146:7,8
147:10 149:2,12,19,
25 150:3,4,13,14,20,
21 151:7,9,17 152:7,
17,25 153:2,3

**objections** 72:13
73:8 83:3 104:8,22
106:18 115:13 118:7
135:5 140:14 141:12
143:12 147:10

**obligation** 46:23

**obtain** 141:7

**obtaining** 137:3
144:21

**occur** 50:8

**occurred** 87:22 89:2
94:17 114:20

**October** 51:19,20
52:21 84:6 86:18
97:22 103:23 105:25
107:14

**offer** 140:21

**offered** 108:21

**offering** 40:7 61:8,13
85:3

**office** 153:21

**official** 17:6,7

**omissions** 55:4

**Omnibus** 22:19 23:2

**one's** 17:18

**ongoing** 66:22
73:19,25 77:6,17
114:4

**operations** 29:13

**opinion** 53:16,19,24
54:11 71:4 80:5
101:20,21 102:20
103:19 105:9,24
106:15,16,24 107:14,
19,21 113:20 114:10
115:2 116:2,7 117:8,
17 148:7

**opportunities** 23:25

**opportunity** 23:6,23
24:2 25:9 29:8,19
103:7 138:3,15

**opposed** 39:18

**order** 9:10,11,16,23
10:10 79:7 99:23
109:8

**orders** 153:17

**Ordinary** 63:12

**organization** 27:2,4

**original** 28:9,12 29:7
30:8 96:18 101:2
105:13 114:3 153:10

**originally** 24:9 28:17
29:16 115:18 118:12

**originated** 29:11,12

**outcome** 76:20 77:6,
7,15

**outcomes** 125:10

**outstanding** 70:12
128:3

**owned** 36:10 67:6
85:5 92:14

**owner** 153:8

**ownership** 85:14

**owns** 41:15

—————

**P**

**Pachulski** 8:7

**package** 123:25
127:21,24

**pages** 16:8 17:3 21:3
22:19 61:9 63:9
90:25 109:11

**paper** 143:7

**papers** 113:10

**paragraph** 17:23
19:17 23:14 26:12
28:7 31:21 37:21,22,
24 38:23 39:2 40:2
45:16 51:19 53:7
54:25 55:9 58:25
62:4 64:13 84:23
92:4 93:15 95:9,23

Case 21-03067-sgj Doc 28-7 Filed 09/29/21 Entered 09/29/21 17:50:19 Desc
Case 3:21-cv-01082-B Document 87 Filed 05/11/23 Page 207 of 263 PageID 1682

Index: Parker..Pugatch

96:24 109:23 110:5,
14,19

**Parker** 79:11,12

**part** 24:21 26:6 28:20
29:6,9 36:14 45:2
54:9 56:17 75:24
76:3 77:8 86:4 96:18
110:4 111:6 113:13
114:2 122:12 123:4,
24 130:23

**partially** 36:10

**participants** 9:14,21

**participate** 23:3
87:4,13,15

**participated** 88:18
118:22 122:11

**parties** 145:23

**partner** 16:18

**partners** 14:23
17:19,25 18:5,11
19:18,21 20:2,12
21:21,24

**party** 11:15 98:17
110:15,17 141:16

**pass** 147:16 153:12

**passage** 132:11

**passive** 26:12 66:13,
15 98:8 101:5

**past** 57:13

**path** 89:25

**patience** 20:19

**pay** 46:23

**paying** 45:22 48:8

**pending** 54:10

**penultimately** 28:20

**people** 12:11

**percent** 27:15,17
64:5,11,15 65:14,20,
24 66:3,5 67:14

**percentage** 64:15
65:14,25 66:25 85:14

**Perfect** 60:24

**performance** 119:13

**performed** 58:8 97:3

**performing** 29:20

**period** 40:20 114:7

**person** 11:17 21:16
22:2

**personal** 101:21
102:8 103:19 105:23

**perspective** 15:21
81:10

**piece** 107:5 138:23
143:6

**place** 35:3,23 91:20
118:14 136:9 145:21

**placing** 64:14

**plan** 91:6 96:5 97:2
110:17,21 111:17
114:21 123:9 124:8
125:4 126:17

**play** 40:16 44:15

**pleading** 58:3

**Plimpton** 8:10

**point** 24:11 35:24
45:20 47:12 48:10
53:10 89:21 90:13
94:18 98:25 106:21
107:3 144:15

**pointed** 38:23

**points** 53:8

**policy** 59:7

**poor** 121:4

**portfolio** 30:12,14,
17,25 31:3,9,12,15,
17,24 32:6,11,21
33:12,15,25 34:18
35:4,14,21,25 36:5,6,
13,16,23,24 40:3,9
45:3 49:3,19 50:12,
14,18 51:3,10,20
52:5,20,23 54:24
63:17 92:6,16,19,25
96:7 98:11 101:25
104:25 116:4,14
117:4,7,9 118:3,13,
21 119:4,5,8,10,11,
20,23 120:5,14

121:4,7 131:10,24
132:12 133:20 134:2,
10,20,23 135:17,21
137:4 144:21 146:2
147:4

**portion** 32:25 92:16
93:5 116:15

**position** 31:10 41:16
49:12 50:17 71:22
80:6 85:20 86:7 97:8,
19,25 100:12,20,21
108:16 119:22
120:24 134:18

**positions** 23:10
30:24 31:17 86:23
105:6

**possibly** 104:9

**post** 153:9

**post-petition** 96:8

**potential** 125:22
127:13

**practical** 44:16,20

**pre-investment**
68:17

**predicated** 101:3

**preexisting** 62:16

**prefer** 60:15

**preference** 101:9

**preliminary** 9:6
23:15,19

**preparation** 13:25
131:5 145:10

**prepared** 13:22
14:11,15

**presented** 53:13
54:4

**presently** 96:3

**preserved** 117:12

**pretty** 89:15 128:7
145:14

**prevailing** 85:17

**prevent** 47:16 48:12

**prevented** 91:21

**preventing** 115:18

**previous** 17:22 72:7

**previously** 50:11
57:4 133:11 153:22

**price** 140:9

**primarily** 24:17,19,
23

**primary** 148:5

**prior** 50:9,12 51:25
52:6 64:3,14 71:20
76:17 114:20

**private** 85:6

**privilege** 13:21
147:12

**privileged** 131:16
133:2 135:6 136:15
137:9,21 138:21
140:16 141:13
146:10

**pro** 56:15 138:4,16

**problem** 74:14

**problems** 12:4

**proceeding** 88:8

**proceeds** 28:8

**process** 56:21

**produce** 11:4

**produced** 9:8,17
75:13 100:8 133:12

**production** 75:11,25

**progressed** 24:13

**prohibited** 114:8

**projected** 28:9,12
30:8 125:10

**projection** 29:22

**prominent** 111:22

**pronounce** 10:19

**proof** 11:7 16:7,16
17:2,6,7,16,20,22
18:6 32:3 65:8

**proofs** 14:19 15:8,15
64:24

**proper** 36:8

**proposed** 41:8 99:22
110:21 138:17

**protective** 9:11,23
10:10

**provide** 51:6 71:13
73:14 77:10 89:9
90:6,16 137:23 138:3
139:24 144:2

**provided** 28:17 70:5
71:18 73:5 77:19
82:3,8 90:12,15,24
137:13 138:14 140:7
143:9 144:5

**providing** 126:17,20

**provision** 132:17,22
134:22 138:11
140:18

**proximate** 105:4
107:20

**Public** 10:13

**Pugatch** 10:1,18,20,
21,23 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1,20 19:1,6 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1,18 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1,
10 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1,4 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1,13
108:1 109:1 110:1
111:1 112:1,10 113:1
114:1 115:1 116:1

Case 21-03067-sgj   Doc 28-7   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:21-cv-01603-B   Document 87-7 Filed 05/12/23   Page 208 of 263   PageID 1623
Appendix 7 Page 5205

Index: pull..respective

117:1 118:1 119:1
120:1 121:1 122:1,6
123:1 124:1 125:1
126:1 127:1 128:1
129:1,17 130:1 131:1
132:1 133:1 134:1
135:1,11 136:1 137:1
138:1 139:1 140:1
141:1 142:1,5 143:1
144:1,17 145:1 146:1
147:1,18 148:1,2,19
149:1,7,15 150:1
151:1,24 152:1 153:1

**pull** 16:23 44:8 61:6
68:4 78:22 83:25
109:14 128:6,14
139:5

**purchase** 138:4,16
140:9

**purchased** 112:19

**purchasing** 67:14

**purely** 140:19

**purpose** 15:7

**purposes** 62:24

**pursuant** 18:22 19:8

**pursue** 96:10 105:17

**pursued** 97:9 151:12

**pursuing** 96:3,13
115:19

**purview** 98:14

**push** 130:20

**put** 19:2 45:12 63:6
74:17 91:19 111:5
153:16

**putting** 95:13

**puzzle** 107:6

---

**Q**

**quantum** 77:25

**question** 12:3,7,13,
16,21,22 15:18 46:25
47:7,25 48:19 56:8
66:15 71:16 84:15
86:17 90:4 92:11
97:17 100:18 102:15,

22 104:10 106:3,12,
20 114:15 116:11
117:14,21 118:9,10
120:20 123:12 124:4,
18 126:15 130:3
136:20 137:19 138:9
139:9 140:20,23
141:2,3 142:4 144:14
146:14,16,23 148:3
150:2 151:8 152:4,8,
9,16,20,22 153:4

**questioning** 148:3

**questions** 11:25
12:25 56:20 69:14,16
88:3 121:13,17,20
133:23 148:15 149:6,
14 150:8 151:23

**quick** 59:21 60:7
112:7

**quickly** 15:12

---

**R**

**range** 125:10,13

**rata** 138:4,16

**rates** 93:20

**re-ask** 123:14 144:13
152:8

**reaction** 81:3

**read** 40:16 49:8
76:21 78:14 81:18
99:3 110:18 113:10
131:20 136:5 152:11,
13

**reading** 58:2 77:2
135:11

**reads** 62:25

**ready** 12:25 112:4

**reason** 49:3 56:17
64:16 67:19

**reasonable** 29:22

**recall** 25:23 28:16
30:5 34:3 35:18
38:14,17 43:8 50:5
64:9,11 69:17,23
80:21,22 88:15
90:11,14,20,21 91:5,

14,18 99:9,25
100:16,17 101:12,13,
14 107:4,18 111:20
141:4 147:13 152:18

**receipt** 137:24
138:14

**receive** 56:5,12
109:24

**received** 27:22 28:2
57:15 58:9,17 68:10
84:4 142:22

**receiving** 81:3
126:11

**recently** 93:16 94:10

**recess** 61:3 112:8

**recognize** 68:11

**recollection** 43:14,
17

**recommendations**
102:4

**record** 10:22 152:13
153:17

**recover** 124:17,24

**recoveries** 125:11

**recovery** 124:12
125:19,23

**redeem** 54:7,18
115:23

**reduction** 114:20
116:16 118:23

**refer** 45:10

**reference** 134:9

**referenced** 69:25

**referencing** 92:25

**referring** 26:16
30:14 101:15 103:22
119:4,15 120:3
124:12 134:22

**refers** 66:12

**refinance** 98:12
103:8 105:15 113:25
115:7 116:25 118:19
120:10

**refinances** 115:23

**refinancing** 40:19
96:17 101:3

**refusal** 140:8

**refute** 82:4

**regularity** 88:25

**related** 11:2,15 36:22
66:22 90:25 133:10
148:4

**relates** 36:8 51:13
90:2 92:8 151:22

**relating** 21:10

**relations** 24:11

**relationship** 62:17

**release** 128:2

**releases** 126:10,20
127:11,16

**relevant** 47:20 98:2

**reliance** 55:2

**remained** 115:21

**remedies** 42:2

**remember** 112:15

**Reorganized** 96:4,
10 97:3

**repeat** 12:8 90:3
114:15 117:20 139:9
142:3 146:22 152:15,
20

**repeats** 63:15

**rephrase** 124:3
126:14

**reporter** 93:11
121:16 152:11
153:16,24

**represent** 8:4 68:9
122:4

**representation**
130:6

**representations**
11:11

**representative**
15:19 38:3,4,9,12
99:21 144:23 145:6

146:19 147:14

**representatives**
68:16 88:11 143:18,
25 144:7,9,18,20
147:3

**represented** 43:5,6
49:2 74:20 78:4

**representing** 96:24
129:21

**request** 10:8 78:8
153:6

**requested** 9:9,13
55:12 56:3 77:9,14
150:18,23 151:6,12,
15 152:24 153:9

**requesting** 12:22

**requests** 99:20

**require** 44:23

**required** 39:3,7
40:25 81:9 102:19
131:24 136:22 146:4
147:5

**requiring** 133:5

**reread** 83:8

**reset** 40:18,20,22
41:7,9,19,25 42:17
54:7,18 85:16 93:18,
21 94:12,21 95:14,18
96:4,11,13,16 97:2,8,
10,20 98:11,18
100:13,22 101:3,17,
21 102:9,17 103:8,
13,20,22,23,24
104:2,4,5,13,16
105:10,15,24 107:15,
23 108:3 113:25
115:7,11,24 116:25
118:19 120:11
150:10,12,18,19,24
151:4,6,15 152:24
153:6,9

**resets** 151:12

**resolutions** 39:17

**respect** 40:5,14
50:24 71:4 77:20
91:21 98:18 114:9

**respective** 62:13

Case 21-03067-sgj    Doc 28-7    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 87-7 Filed 05/07/25 Page 209 of 263 PageID 1604
Appendix 7 Filed 05/07/25 Page 209 of 263 PageID 1604

Index: responding..subsequently

**responding** 120:19

**response** 11:9
22:18,25 48:6 76:9
152:12

**responsibility** 93:4

**responsible** 47:19

**restate** 87:25

**result** 74:2 85:4,16
96:22 99:12 100:9
114:4 115:5 116:23

**resulted** 118:15
120:10

**review** 23:7 78:9

**reviewed** 57:17
75:24

**reviewing** 58:20

**rights** 42:2,17 51:21
66:21 110:6

**Road** 13:4

**role** 40:14 44:15

**room** 13:11

**root** 148:11

**rough** 153:25

**roughly** 27:14
112:23 126:6

**routine** 45:2

**Rule** 18:22 19:8

**rules** 12:24

**ruling** 78:6 115:20

**Russell** 8:13

———

**S**

**sat** 34:4

**satisfied** 29:21 57:18

**Schafer** 8:4

**schedule** 53:13
121:23

**scheduled** 55:21

**scheme** 54:9

**scope** 149:6,13

151:23

**Scott** 93:17 94:6
104:11,17

**screen** 16:6,24 17:8,
11,14 18:16 19:3
21:7 22:14,23 37:11
44:14,22 45:13,17
61:6 63:6 67:25 68:4
78:23 84:2 93:16
109:15 112:5,17
128:9,18

**scroll** 16:15 17:19
21:12,22 45:13 84:22

**scrolled** 81:12

**SEC** 70:2

**secondary** 15:2 25:8

**Section** 44:12 129:9,
19 136:3

**seek** 141:7 142:20
143:5

**Seery** 108:10,15,21
111:15

**sell** 140:10,21

**selling** 119:25 123:7

**send** 16:21 83:18
109:3

**sending** 16:4 20:25

**sense** 99:15 125:9

**sentence** 31:22
48:24 84:24 85:13
86:5

**sentences** 40:2

**separate** 15:22 18:5
42:12 75:20 83:5
136:18

**separately** 80:20

**serve** 36:15 96:6

**settle** 108:22

**settlement** 11:5
13:19 15:7 78:5
89:18 108:5 109:8,
20,22,23 110:10
111:2 122:12,17
123:5,17,22 125:3
127:3 128:16,20

129:3,5 130:8,25
134:9 137:16 140:5,
12 141:9 142:16,25
143:20 144:25
145:12,23 146:5
147:8

**Shannon** 8:19

**share** 16:6,24 18:16
21:6 22:14,22 37:11
45:12 61:7 63:7
64:15 65:14 67:25
68:5 78:24 84:2
109:15 112:5,17
128:10,17 130:15
138:16

**shared** 17:9

**shareholder** 63:19
66:4 132:15

**shares** 63:12,22 64:6
66:25 112:19,21
123:7 126:4,11,18
127:11,15 129:10,23
130:8 136:11 137:3,
15 138:2,5,17 140:4,
10,11,22 141:8
142:15 143:10,19
144:10,23 146:4
147:5

**shed** 49:15

**short** 121:21 149:9

**shortened** 82:22

**shortly** 80:14

**shots** 95:17 98:18

**show** 69:24

**showing** 17:11,14,15

**shows** 133:19

**side** 68:22

**sign** 21:17

**signature** 21:13

**signed** 15:15 22:4
43:2 103:4

**significant** 114:19

**similar** 42:18 115:21

**simply** 48:25 139:22

**single** 15:22 37:17

**siphon** 47:14 48:11

**siphoned** 47:21
48:15,22

**sir** 124:14

**Skew** 15:3 22:3

**skip** 28:6

**solo** 20:20

**sophisticated** 55:6

**sort** 125:21

**sought** 58:5 142:13

**sound** 56:23

**sounds** 13:2 27:18
51:24 118:8 120:24,
25 135:8,13

**source** 148:5

**Spalding** 8:23

**speak** 143:13

**speaks** 36:3 67:17
130:2

**specific** 34:3 48:20
75:4 90:15 101:16
102:22 103:5 116:10
132:6 150:17

**specifically** 11:3
25:7 27:16 78:12
95:7 100:17

**specifics** 13:24
35:18 101:14 107:4
140:18

**speculate** 116:18

**speculation** 106:22,
25 116:8 117:16

**spelled** 44:12

**spots** 67:7

**stamp** 133:13

**stamped** 9:18

**standing** 52:14
149:12

**stands** 102:21

**Stang** 8:7

**start** 12:14,16,25
95:16 112:6

**started** 108:13

**starting** 89:14

**starts** 86:5

**state** 10:14,21 33:18

**stated** 24:3 26:14
71:21 87:18 107:19

**statement** 93:24
94:16

**statements** 23:10

**states** 32:4 45:20
110:5

**stating** 120:21

**stemming** 51:14

**steps** 45:23

**sticks** 127:7,9,23

**stop** 18:15 22:14
37:10 67:25 112:5

**Street** 14:24 21:18
37:15 65:12 76:10
80:13,18 81:15

**Strike** 88:23

**structural** 58:20

**structure** 56:15,22

**stuff** 20:21 122:21
128:14

**sub-advisor** 35:7
36:7

**sub-manager** 34:12

**subject** 9:9 54:19
140:4

**submit** 16:2 20:24

**submitted** 18:25

**subordinated** 110:2
123:21 124:7 125:2

**Subscription** 63:8,
11

**subsequent** 34:22
51:11 53:4 56:11,13
98:25 114:6 115:20
116:24 118:16

**subsequently** 24:13
105:16

Index: subset..vote

subset 24:13

subsidiaries 62:12
93:13

subsidiary 46:15
47:10

substance 14:8
70:16 76:25

successfully 96:6

suffered 118:5
148:12

suggestion 49:23,
25 111:8

suit 78:7

summaries 69:22

summarize 123:17

summary 69:12 71:6
123:10

summation 106:14

summer 23:14 24:3

supervised 97:4

support 18:21 19:7
109:7,16 111:17
128:25

Surgent 69:4

sworn 98:16

**T**

taking 66:8

talk 11:4,17 12:10,11
13:14 14:3,12,15
15:5 30:11,13 113:10
122:7

talked 43:4 79:15,20
150:25

talking 31:14 104:6
119:9 120:12,15
124:17 134:19

team 24:11 25:3,5,6,
8 79:18,24

teed 89:18

telling 74:19 80:23

Ten 60:16

ten-minute 60:19
112:3

term 110:25 134:10
145:14

termination 78:7

terminology 36:8

terms 9:16,22 95:17
110:10 122:17
144:24 145:12,21
147:7 151:4

Terry 45:24 46:2,9,
18,20 47:16 48:12
51:12,16 53:12 70:3
71:4 73:13,20 76:4,
14 77:20 118:15

testified 10:15 58:7
93:18 94:10,11 95:12
104:12 107:3 112:11
122:10 148:20

testifying 52:13

testimony 10:6 14:6
28:23 29:4 43:7
47:24 56:10 57:21
58:13 72:18,19 92:24
98:16 99:2 105:8,12
107:9 117:18 121:9
142:2

thesis 28:21 96:19
101:2 114:3

thing 12:9,20 128:20

things 39:5 43:25
107:10 127:8

thinks 82:23

Thomas 69:3,13,15

thought 105:24
118:10 120:20
135:10 146:17

till 60:22

time 12:3,6,17 25:23
26:2 30:10 33:6
34:15,17 56:19 60:23
85:2 88:6,7 90:13
94:18 97:11 99:9
101:17 103:4,8,13,24
105:7 107:5 114:7
125:25 151:25

timeline 114:18

times 102:13 103:16
104:23

titles 110:6

today 13:7,15 14:12,
16 72:21 75:14,25
117:25

today's 75:11

told 28:24 68:20
102:15,18 106:7,9

top 37:12 61:14 62:4
93:15 95:11 99:17
128:22

topics 14:12,16
99:21

total 65:18,20 112:20

totally 12:19 27:22

toxic 49:5,14,20 50:2

trading 119:25
127:7,10

transaction 27:6
40:18,22 41:10,19,25
103:5

transactions 54:21
95:18 96:4 98:19

transcript 10:9
153:23

transfer 63:8,11
110:6 127:25 129:10,
23 130:7,24 131:11,
25 133:6 135:20
136:11,23 137:2,14,
25 140:3 141:8,16
142:14,24 143:7,9,19
144:3,10 145:22
146:3

Transferee 132:15

transferred 51:22
126:4,19 127:15
138:17 146:5 147:6

transferring 123:23
126:12 140:10
144:22

transfers 47:14,15
48:11 55:13 132:14

treated 15:22

Trey 79:11,12

trim 109:19

TRO 115:18 116:24

Trust 8:17,18

trustee 35:9 36:13
52:23 95:25 96:23
97:7,16

Trustee's 96:25

trustees 62:14

turn 30:23 63:3
118:17 128:4 133:7

two-minute 147:23

two-thirds 38:25

**U**

UBS 8:21 70:4

ultimate 74:2 76:4
103:10 111:6

ultimately 25:13
51:9 54:17 55:17
116:23 118:13
124:18 127:20

unanimous 42:23

unaudited 59:2

underlaying 120:4

underling 31:8 35:4

underlying 11:7
13:18 19:24 31:10,
14,16 32:19 33:3
36:9,23 40:21 41:16
51:14 53:5 56:22
70:16 74:2 93:2
98:10,13 105:4 114:2
116:19 118:19 119:5,
22

underneath 35:19

understand 11:23
12:4,7 34:25 95:3
98:15 120:23 131:8,
21 133:24 135:16
138:10 151:20 152:6

understanding
35:11 36:21 39:24
40:17 42:2,9,12,15

43:20 44:10 46:7
47:6,9,18 51:2,9
65:21 71:15 73:10,17
75:23 82:15 83:5
91:8,12 93:12 110:9
113:15 115:17
121:11 125:16 126:2
129:16,20 130:5,15
131:23 132:5,7,9,21
133:5 136:9,18,21
142:18 145:24
146:19 147:3 148:25
151:14 153:5

understood 31:19
62:11 118:10 142:8

undertaken 56:16

undertaking 45:23

undertook 47:13
48:10

unequivocally
49:18

unsecured 109:25
123:20 124:6,25
125:18

upside 125:21

**V**

vague 104:9

valuation 59:7

valued 125:18

variety 30:24

vehicle 26:18,22
27:2

vehicles 16:19 18:2
32:22

viability 77:17

video 121:20

view 54:22 105:7,13
116:9 131:15 137:10

viewed 97:16

VIII 15:2

virtue 119:21

vote 42:23 110:16,20
111:17

**voting** 62:5,24

---

## W

**Wall** 76:9 80:13,18 81:15

**wanted** 45:13 94:12 97:16 104:13 122:9

**Watkins** 8:20

**Wayne** 13:4

**week** 93:23 94:23 95:8 104:15

**weekly** 88:10,16 89:3

**weeks** 51:25 80:2 83:12 122:25

**Weisgerber** 8:9,10, 25 9:25 13:20 14:9 15:11 29:3,14 30:3 31:6 32:8,17 33:17 34:13,20 35:10,16 36:2,17 37:6 39:10 40:12 41:3,11,21 42:3,11 43:12,21 44:18 45:5 46:5,12 47:2,23 48:16 49:16 50:19 51:5 52:9,25 53:18,25 54:14 56:9 57:7,20 58:12 59:19, 24 60:4,16 61:19 62:22 63:25 64:7,19 65:2,15,22 66:6 67:3, 8,16,21 69:18 70:10, 23 71:7 72:4,12 73:7 74:24 75:8,19 76:15 77:3,12,22 78:10,16 80:9 81:5,24 82:10, 18 83:2,15 85:24 86:9,25 87:6,10,24 88:13,21 89:4,12 90:9,18 91:3,15,23 92:12,23 93:25 94:13,24 95:21 96:14 97:12,23 98:20 99:6, 13 100:14,23 101:10, 13,23 102:10,18 103:14 104:3,7,21 105:11 106:17 107:2, 16,24 108:18,25 110:11,22 111:3,10, 18 112:25 113:4,16 114:13,23 115:12 116:5,17 117:15

118:6,25 119:17 120:17 121:8 123:11 124:9,15 125:5,14 126:23 127:18 128:12 129:13,25 130:10 131:12 132:3, 18,24 134:3 135:4 136:12 137:5,18 138:6,19 140:13,24 141:11,25 142:17 143:3,11,21 144:11 145:2,15 146:7,22 147:9,21,25 148:14 149:2,4,11,19 150:3, 14,21 151:9,17,21 152:7,17,25 153:14

**wholly-owned** 62:12 85:2

**Willard** 25:2 68:21 69:3 79:9,16

**William** 93:17 94:6 104:11

**Wilson** 8:2 9:6 10:7, 17 14:2,13,14 15:24 16:10 17:5 18:17,24 19:9 20:18 21:5 22:13,21 33:20,23 42:8 48:4 50:23 52:18 53:21,22 57:24 59:22 60:2,9,14,21, 25 61:4,11 63:2 67:24 72:20 74:16 75:13 76:6 78:20 82:14,21 83:17,24 84:8 86:15 88:23 89:23 90:5 93:7 94:15 95:3 99:16,24 102:14 103:18 105:21 106:5,10,24 107:12 109:3,13 112:2,9 121:12 148:16,18 149:8,16 152:3,10,14 153:12, 20

**Wilson's** 148:2

**Winograd** 8:7

**witness'** 9:7

**wondering** 151:22

**words** 74:18

**work** 122:21

**worked** 42:10

**works** 11:24

**worth** 28:25

**worthless** 108:17

**wrap** 112:4 151:25

**written** 39:17 42:25 43:10 75:4,16 82:7 142:13,22 143:5 144:2,22 145:25

**wrong** 120:25

**wrongful** 78:7

---

## Y

**y'all** 60:10,14

**years** 30:6 57:10

**York** 10:14

---

## Z

**Ziehl** 8:8

**Zoom** 12:6,10 128:14

# APPENDIX 8

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) | **Re: Docket Nos. 1625, 1697, 1706, 1707** |
|  | ) |  |

<div align="center">

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR
ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
(CLAIM NOS. 143, 147, 149, 150, 153, 154), AND AUTHORIZING ACTIONS
CONSISTENT THEREWITH**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦
1934054210130000000000010

**001395**

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") in support of its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim No.143,147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      If granted, the Motion will resolve a $300 million general unsecured claim against the Debtor's estate for less than $16.8 million in actual value.[3]  The settlement is another solid achievement for the Debtor and – not surprisingly – is opposed by no one except Mr. Dondero and entities affiliated with him.

2.      As discussed in the Motion, in November 2017, HarbourVest invested $80 million in exchange for a 49.98% membership interest in HCLOF – an entity managed by a subsidiary of the Debtor.  The balance of HCLOF's interests are held by CLO Holdco, Ltd. (an entity affiliated with Mr. Dondero), the Debtor, and certain of the Debtor's employees.  Subsequent to its investment in HCLOF, HarbourVest incurred substantial losses on its investment in HCLOF and filed claims against the Debtor's estate.

3.      HarbourVest asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] Under the proposed settlement, HarbourVest would receive an allowed, general unsecured claim of $45 million and an allowed, subordinated claim of $35 million.  Based on the estimated recovery for general unsecured creditors of 87.44% (which is a recovery based on certain outdated assumptions discussed *infra*), HarbourVest's $45 million general unsecured claim is estimated to be worth approximately $39.3 million and the $35 million subordinated claim, which is junior to the general unsecured claim, is currently estimated to have value only if there are litigation recoveries.  In addition, HarbourVest is transferring to an affiliate of the Debtor its interest in HCLOF, which is estimated to be worth approximately $22.5 million.  Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims is estimated at approximately $16.8 million on a net economic basis.  This estimate, however, is dated and is based on the claims that were settled as of the filing of the Debtor's plan in November 2020.

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. In furtherance of these claims, HarbourVest alleges it was misled by the Debtor and its employees, including Mr. Scott Ellington (then the Debtor's general counsel), and that subsequent to investing in HCLOF, Mr. Dondero and the Debtor used HCLOF both as a piggybank to fund the litigation against Acis Capital Management, L.P. ("Acis") and as a scapegoat for the Debtor's litigation strategy, in each case to HarbourVest's substantial detriment.

4.  Specifically, HarbourVest alleges that:

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to Mr. Terry's arbitration award against Acis and orchestrated a series of fraudulent transfers and corporate restructurings, the true purpose of which was to denude Acis of assets and make it judgment proof;

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- the Debtor, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- the Debtor improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- the Debtor used HarbourVest as a scapegoat in its litigation against Acis by asserting that the Debtor's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

5.  The Debtor believed, and continues to believe, that it has viable defenses to HarbourVest's claims. Nevertheless, those defenses would be subject to substantial factual disputes and would require expensive and time-consuming litigation that would likely be resolved only after a lengthy trial all while the Debtor (or its successor) assumes the risk that the defenses might fail. The evidence will show that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the

principals and their counsel. The evidence will also show that one of HarbourVest's primary concerns in settling its claim was that part of that settlement would include the extrication of HarbourVest from the Highland web of entities and the related litigation. The proposed settlement accomplishes that and does so in compliance with HCLOF's governing agreements.

6. Pursuant to the proposed settlement, (a) HarbourVest will receive (i) an allowed, general unsecured claim in the amount of $45 million, and (ii) an allowed, subordinated claim in the amount of $35 million; (b) HarbourVest will transfer its 49.98% interest in HCLOF (valued at approximately $22.5 million) to a wholly-owned subsidiary of the Debtor; and (c) the parties will exchange mutual and general releases. The Debtor believes that the proposed settlement is reasonable and results from the valid and proper exercise of its business judgment. And the Debtor's creditors apparently agree. None of the major parties-in-interest or creditors in this case has objected to the Motion: not the Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS.

7. In distinction, the only objecting parties are Mr. Dondero, his family trusts (the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts")), and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF")) (collectively, the "Objectors"). Each of the Objectors has only the most tenuous economic interest in and connection to the Debtor's settlement with HarbourVest. Each of the Objectors is also controlled directly or indirectly by Mr. Dondero who has coordinated each of the Objectors litigation strategies against the Debtor.[4] Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – should be rebuffed, and the objections overruled. The following is a brief summary of the objections.

---

[4] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q.

DOCS_NY:41952.8 36027/002

| Pleading | Objection/Reservation | Response |
|---|---|---|
| *Objection of James Dondero* [Docket No. 1697] (the "Dondero Objection") | Because HarbourVest was damaged by the injunction entered in Acis, the settlement seeks to revisit this Court's rulings in Acis. | Mr. Dondero is misdirecting the Court. HarbourVest's claim arises from the misrepresentations of Mr. Dondero, Mr. Ellington, and others, not this Court's rulings in Acis, including the failure to disclose the fraudulent transfer of assets. |
| | The settlement is not fair and equitable because it does not address (1) Acis's mismanagement, (2) how the Debtor is liable for HarbourVest's damages, (3) the success on the merits, (4) the costs of litigation, and (5) the Debtor's ability to realize the value of the HCLOF interests in light of the Acis injunction. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. The Debtor has assessed the value of the HCLOF interests in light of all factors, including the Acis injunction. |
| | The HarbourVest settlement represents a substantial windfall to HarbourVest. | Mr. Dondero ignores the economics of this case, which have value breaking in Class 8 (General Unsecured Claims). The value of the settlement is not $60 million; it is approximately $16.8 million against a claim of $300 million. There is no windfall. |
| | The HarbourVest settlement is improper gerrymandering because it provides HarbourVest with a general unsecured claim and a subordinated claim in order to secure votes for the plan. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| *Objection of the Dugaboy Investment Trust and Get Good Trust* [Docket No. 1706] (the "Trusts Objection") | The settlement represents a radical change in the Debtor's earlier position on the HarbourVest settlement. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. |
| | The settlement appears to buy HarbourVest's vote. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| | No information is provided as to whether the Debtor can acquire HarbourVest's interest in HCLOF or the value of that interest to the estate. | As discussed below, the HCLOF interest will be transferred to a wholly-owned subsidiary of the Debtor. Mr. Seery will testify as to the benefit of the HCLOF interests to the estate. |
| *Objection of CLO Holdco* [Docket No. 1707] ("CLOH Objection") | HarbourVest cannot transfer its interests in HCLOF unless it complies with the right of first refusal. | CLO Holdco misinterprets the operative agreements and tries to create ambiguity where none exists. |

DOCS_NY:41952.8 36027/002

001399

8.      These objections are just the latest objections filed by Mr. Dondero and his related entities to any attempt by the Debtor to resolve this case,[5] including the Debtor's settlement with Acis [Docket No. 1087] and the seven separate objections filed by Mr. Dondero and his related entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[6]  It will not shock this Court to hear that each of the Objectors is also objecting to the Plan.  In contradistinction, the Debtor has heard this Court's admonishments about old Highland's culture of litigation as evidenced by this case, Acis's bankruptcy, and beyond.  Although the Debtor has vigorously contested claims when appropriate, the Debtor has also sought to settle claims and limit the senseless fighting.  The Debtor has successfully resolved the largest claims against the estate, including the claims of the Redeemer Committee, Acis, and, as recently announced to this Court, UBS.  The Debtor would ask this Court to see through the pretense of the Dondero-related entities' objections to the HarbourVest settlement and approve it as a valid exercise of the Debtor's business judgment.

---

[5] As an example of Mr. Dondero's litigiousness, on January 12, 2021, Mr. Dondero filed notice that he will be appealing the preliminary injunction entered against him earlier on January 12, 2021.

[6] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667]; (3) *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670]; (5) *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].

001400

## REPLY

### A.   Standing

9.     **James Dondero.**  In the Dondero Objection, Mr. Dondero asserts he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. While that claim is ostensibly true, it is tenuous at best.  On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[7] More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[8]

10.    Mr. Dondero's claim as an "indirect equity security holder" is also a stretch.  Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner.  Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

11.    **Dugaboy and Get Good.**  Dugaboy and Get Good are sham Dondero "trusts" with only the most attenuated standing.  Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177].  In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy

---

[7] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

[8] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

001401

for its postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. The Debtor believes that each of the foregoing claims is frivolous and has objected to them. [Docket No. 906].

12. In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its prior ownership of limited partnership interests in the Debtor. Because each these claims arises from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time. As set forth above, these interests are out of the money and are not expected to receive any economic recovery.

13. Consequently, Mr. Dondero, Dugaboy, and Get Good's standing to object to the HarbourVest settlement is attenuated and their chances of recovery in this case are extremely speculative at best. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero, Dugaboy, and Get Good's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity

holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

**B.    Mr. Dondero's Objection and his "Trusts" Objection Are Without Merit**

14.    As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted). *See also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

15.    **The Settlement Seeks to Revisit the Acis Orders.**  In the Dondero Objection, Mr. Dondero argues that HarbourVest's claim is based on the financial harm caused to HarbourVest from Acis's bankruptcy and the orders entered in the Acis bankruptcy.  Mr. Dondero extrapolates from this that HarbourVest is seeking to challenge this Court's rulings in Acis.  (Dondero Obj., ¶¶ 17-20)  Mr. Dondero misinterprets HarbourVest's claims and the dangers such claims pose to the Debtor's estate.

16.    HarbourVest's claims are for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. HarbourVest is not arguing that Acis or this Court caused its damages; HarbourVest is arguing that *the Debtor* – led by Mr. Dondero – (a) misled HarbourVest as to the nature of Mr. Terry's claims against the Debtor and the litigation with Acis, (b) knowingly and intentionally failed to disclose that the Debtor was engaged in the fraudulent transfer of assets to prevent Mr. Terry from collecting his judgment, and (c) that *the Debtor* – under the control of Mr. Dondero – improperly engaged in a crusade against Mr. Terry and Acis, which substantially damaged HarbourVest and its investment in HCLOF, in each case in order to induce HarbourVest to invest in HCLOF.

17.     Again, HarbourVest does not contend that Acis caused its damages.  Rather, HarbourVest contends that the fraudulent transfer of assets as part of the Debtor's crusade against Mr. Terry and Acis and the false statements and omissions about those matters caused HarbourVest to make an investment it would never have made had Mr. Dondero and the Debtor been honest and transparent.  The Acis litigation – in HarbourVest's estimation – never should have happened.  Acis did not cause HarbourVest's damages.  Mr. Dondero's crusade against Mr. Terry and the Debtor's allegedly fraudulent statements to HarbourVest about the fraudulent transfers, Mr. Terry and Acis caused HarbourVest's damages.

18.     **The HarbourVest Claim Lacks Merit.**  In their objections, Mr. Dondero and the Trusts argue that the HarbourVest settlement is not fair and equitable and not in the best interests of the estate because (a) it does not address the Debtor's arguments against the HarbourVest claims and (b) there is a lack of pending litigation seeking to narrow the claims against the estate. These arguments only summarily address the first two factors of *Cajun Electric*, which deal with success in the litigation, and, in doing so, mischaracterize the dangers to the Debtor's estate

posed by HarbourVest's claims.  (Dondero Obj., ¶¶ 21-25; Trusts Obj., ¶ 18(a))

      19.    Both the Dondero Objection and – to a much lesser extent - the "Trusts" Objection allege that (a) HarbourVest's losses were caused by Acis and its (mis)management of HCLOF's investments (Dondero Obj.,¶ 22, 24), (b) there is no contract that supports HarbourVest's claims (Dondero Obj. ¶ 23; Trusts Obj., ¶ 18(a)), (c) there is no causal connection between HarbourVest's losses and the Debtor's conduct (Dondero Obj., ¶ 24), and (d) the Debtor should litigate all or a portion of HarbourVest's claim before settling (Dondero Obj., ¶ 25). Again, though, as set forth above, both Mr. Dondero and the "Trusts" seek to shift the cause of HarbourVest's damages away from the Debtor's misrepresentations and to Mr. Terry's management of HCLOF's investments.  This is simple misdirection.

      20.    HarbourVest's claims are that it invested in HCLOF based on the Debtor's fraudulent misrepresentations.  Fraudulent misrepresentation sounds in tort, not contract. *See, e.g., Clark v. Constellation Brands, Inc.*, 348 Fed. Appx. 19, 21 (5th Cir. 2009) (referring to party's claim based on fraudulent misrepresentation as a tort); *Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 717 (S.D. Tex. 2000) (noting that party had common law duty not to commit intentional tort of fraudulent misrepresentation).  There is thus no need for HarbourVest to point to a contractual provision to support its claim.[9]  Moreover, in order to defend against HarbourVest's claims, the Debtor would need to elicit evidence showing that its employees did not make misrepresentations to HarbourVest.  Such a defense would require the Debtor to rely on the veracity of Mr. Ellington's testimony, among others.  That is a high hurdle, and no reasonable person would expect the Debtor to stake the resolution of HarbourVest's $300 million claim on the Debtor's ability to convince this Court that Mr. Ellington was telling HarbourVest

---

[9] Subsequent to filing the Motion, the Objectors requested all agreements between HarbourVest, HCLOF, and the Debtor, and such agreements were provided.

DOCS_NY:41952.8 36027/002

the truth. This is especially true in light of the evidence supporting Mr. Ellington's recent termination for cause and the evidence recently provided by HarbourVest supporting its claim for fraudulent misrepresentations.

21.     Finally, neither Mr. Dondero nor the "Trusts" even address the third factor analyzed by the Fifth Circuit:  all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." This is telling because no creditor or party in interest has objected to the settlement.  Mr. Dondero and his proxies' preference for constant litigation should not outweigh the preference of the Debtor and its creditors for a reasonable and expeditious settlement of HarbourVest's claims.

22.     **The HarbourVest Settlement Is a Windfall to HarbourVest.**  Both the Dondero Objection and the "Trusts" Objection argue that the HarbourVest settlement represents a substantial windfall to HarbourVest.  Both Mr. Dondero and the "Trusts" ignore the facts. Specifically, Mr. Dondero argues that HarbourVest is receiving $60 million dollars in *actual* value for its claims.  Mr. Dondero's contention, however, wrongly assumes that both the $45 million general unsecured claim and the $35 million subordinated claim provided to HarbourVest under the settlement will be paid 100% in full and that HarbourVest will receive $80 million in cash.  From that $80 million, Mr. Dondero subtracts $20 million, which represents the value Mr. Dondero ascribes to HarbourVest's interests in HCLOF that are being transferred to the Debtor.  Mr. Dondero's math ignores the reality of this case.

23.     The Debtor very clearly disclosed in the projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.,* [Docket No. 1473] (the "Projections") that general unsecured claims would receive an 87.44% recovery *only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr.

Daugherty, and the Hunter Mountain Investment Trust were zero. Because of the Debtor's success is settling litigation, that assumption is proving to be inaccurate. Regardless, even if general unsecured claims receive a recovery of 87.44%, because the subordinated claims are junior to the general unsecured claims, the subordinated claims' projected recovery is currently zero. As such, assuming the HCLOF's interests are worth $22.5 million,[10] the actual recovery to HarbourVest will be less than $16.8 million. This is not a windfall. HarbourVest's investment in HCLOF was $80 million and its claim against the estate was over $300 million. The settlement represents a substantial discount.

24.    **Improper Gerrymandering and/or Vote Buying.** Each of Mr. Dondero and the Trusts argue in one form or another that the HarbourVest settlement is improper as it provides HarbourVest a windfall on its claims in exchange for HarbourVest voting to approve the Plan. These unsubstantiated allegations of vote buying should be disregarded. As an initial matter, and as set forth above, HarbourVest is *not* getting a windfall. HarbourVest is accepting a substantial discount in the settlement. HarbourVest's incentive to support the Plan comes from HarbourVest's determination that the Plan is in its best interests. There is also nothing shocking about a settling creditor supporting a plan. Indeed, it would be nonsensical for a creditor to settle its claims and then object to the plan that would pay those claims.

25.    More importantly, HarbourVest's votes in Class 9 (Subordinated Claims) are not needed to confirm the Plan. As will be set forth in the voting declaration, Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) have voted in favor of the Plan.[11] In brief, the Plan was approved without HarbourVest's Class 9 vote,

---

[10] It is currently anticipated that Mr. James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, will testify as to the value of the HCLOF interests to the Debtor's estate.

[11] The Debtor anticipates that Mr. Dondero and his related entities will argue that neither Class 7 nor Class 8 voted to accept the Plan because of the votes cast against the Plan in those Classes by current and former Debtor

and the Debtor, therefore, has no need to "buy" HarbourVest's Class 9 claims.  Accordingly, any claims of gerrymandering or vote buying are without merit.

## C.      CLOH Objection

26.     CLO Holdco (and to a much lesser extent, the "Trusts") object to HarbourVest's transfer of its interests in HCLOF as part of the settlement.  Currently, the settlement contemplates that HarbourVest will transfer 100% of its collective interests in HCLOF to HCMLP Investments, LLC ("HCMLPI"), a wholly-owned subsidiary of the Debtor.  As set forth in the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd*. (which was appended as Exhibit A to the Settlement Agreement) [Docket No. 1631-1], each of the Debtor, HarbourVest, Highland HCF Advisors, Ltd. (HCLOF's investment manager) ("HHCFA"), and HCLOF agree that HarbourVest is entitled to transfer its interests to HCMLPI pursuant to that certain *Members Agreement Relating to the Company*, dated November 15, 2017 (the "Members Agreement"),[12] without offering that interest to other investors in HCLOF.

27.     The *only* party to object to the transfer of HarbourVest's interests in HCLOF to HCMLPI is CLO Holdco.  CLO Holdco holds approximately a 49.02% interest in HCLOF and is the wholly-owned subsidiary of the DAF, Mr. Dondero's donor-advised fund.  CLO Holdco argues that the Member Agreement requires HarbourVest to offer its interest first to the other investors in HCLOF before it can transfer its interests to HCMLPI.  In so arguing, CLO Holdco attempts to create ambiguity in an unambiguous contract and to use that ambiguity to disrupt the Debtor's settlement with HarbourVest.

28.     As an initial matter, the Debtor and CLO Holdco agree that the transfer of HarbourVest's interests in HCLOF to HCMLPI is governed by Article 6 (Transfers or Disposals

---

employees, including Mr. Ellington and Mr. Isaac Leventon.  The Debtor will demonstrate at confirmation that those objections are without merit and that Class 7 and Class 8 voted to accept the Plan.

[12] A true and accurate copy of the Members Agreement is attached hereto as Exhibit A.

DOCS_NY:41952.8 36027/002

of Shares) of the Members Agreement (an agreement governed by Guernsey law). (CLOH Obj.,

¶ 3) The parties diverge, however, as to how to interpret Article 6. The Debtor, as set forth

below, believes Article 6 is clear in that it allows HarbourVest to transfer its interests in HCLOF

to any "Affiliate of an initial Member party" without requiring the right of first refusal in Section

6.2 of the Members Agreement. CLO Holdco's position appears to be that the Members

Agreement, despite its clear language, should be interpreted as limiting transfers to an "initial

Member's *own* affiliates" and that any other transfer requires the consent of HHCFA and

satisfaction of the right of first refusal. (*Id.* (emphasis added)) CLO Holdco's reading is

contrary to the actual language of the Members Agreement.

29. First, Section 6.1 of the Members Agreement provides, in pertinent part:





(Members Agmt, § 6.1 (emphasis added)) Under the Members Agreement, "Affiliate" is

defined, in pertinent part, as "███████████████████████████████████████

██████████████████████████████████████████████████████████████████

(Id., § 1.1) A "Member" in turn is a ██████████████████████." The "initial

Member[s]" are the initial Members of HCLOF listed on the first page of the Members

Agreement and include the Debtor, HarbourVest, and CLO Holdco.

30. As such, under the plain language of Section 6.1, HarbourVest is entitled –

without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any

of the Debtor, HarbourVest, or CLO Holdco. And that is exactly what is contemplated by the

settlement. HarbourVest is transferring its interests to HCMLPI, a wholly owned and controlled

subsidiary of the Debtor, and therefore an "Affiliate" of the Debtor. That transfer is indisputably

allowed under Section 6.1; it is a transfer to an "Affiliate of an initial Member."  CLO Holdco

may, tongue in cheek, call this structure "convenient" but that sarcasm is an attempt to avoid the

fact that the Members Agreement clearly allows HarbourVest to transfer its interest to HCMLPI

without the consent of any party.[13]  The fact that CLO Holdco does not now like the language it

previously agreed to when CLO Holdco and the Debtor were both controlled by Mr. Dondero is

not a reason to re-write Section 6.1 of the Members Agreement.

31.     Second, Section 6.2 of the Members Agreement is also unambiguous and, by its

plain language, allows HarbourVest to "Transfer" its interests in HCLOF to "Affiliates of an

initial Member" (*i.e.*, HCMLPI) without having to first offer those interests to the other Members

(such obligation, the "<u>ROFO</u>").  CLO Holdco attempts to create ambiguity in Section 6.2 by

arguing that it must be read in conjunction with Section 6.1 and that interpreting the plain

language of Section 6.2 to allow HarbourVest to transfer its interests to HCMLPI without

restriction makes certain other language surplus and meaningless.  (CLOH Obj., ¶ 11-13)  Again,

CLO Holdco is attempting to create controversy and ambiguity where none exists.

32.     Section 6.2 of the Members Agreement provides, in pertinent part:



(Members Agmt., § 6.2 (emphasis added))  Like Section 6.1, Section 6.2 is clear on its face.  It

exempts from the requirement to comply with the ROFO two categories of "Transfers":  (1)

Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the

---

[13] Although HHCFA's consent is not necessary for HarbourVest to transfer its interests to HCMLPI, HHCFA will consent to the transfer.

DOCS_NY:41952.8 36027/002

001410

"Highland Principals" (*i.e.*, the Debtor and certain of its employees)[14] and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal. The fact that a narrower exemption is provided to CLO Holdco and the Debtor than to HarbourVest (or any other Member) under Section 6.2 is of no moment; the language says what it says and was agreed to by all Members, including CLO Holdco, when they executed the Members Agreement.

33.    In addition, and although not relevant, the language of Section 6.2 makes sense in the context of the deal. Although CLO Holdco and the Debtor may have disclaimed an "Affiliate" relationship, they are related through Mr. Dondero and invest side by side with the Debtor in multiple deals.[15] The different standards in Section 6.2 serve to ensure that HarbourVest's (or any successor to HarbourVest) right to Transfer its shares without satisfying the ROFO is limited to three parties: (i) HarbourVest's Affiliates, (ii) the Debtor's Affiliates, and (iii) CLO Holdco's Affiliates. This restriction keeps the relative voting power of each Member static and ensures that CLO Holdco and the Debtor, together, will *always* have more than fifty percent of HCLOF's total interests and that HarbourVest will *always* have less than fifty percent. This counterintuitively also explains the greater restrictions placed on CLO Holdco and the "Highland Principals." The Highland Principals include certain Debtor employees. Those employees – as well as CLO Holdco and the Debtor – are prohibited from transferring their HCLOF interests outside of the Dondero family. This restriction makes sense. If, for example, a Debtor employee wanted to transfer its interests to an Affiliate of HarbourVest, HarbourVest could have more than fifty percent of the HCLOF interests because of the thinness

---

[14] "**Highland Principals**" means: ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ (Members Agmt., § 1.1)

[15] There can be no real dispute that Mr. Dondero effectively controls CLO Holdco.

001411

of the Dondero-family's majority (approximately 0.2%). At the time the Members Agreement was executed, CLO Holdco and the Debtor were under common control. Section 6.2 preserves those related entities' control over HCLOF by restricting transactions that would transfer that control unless the ROFO is complied with.

34.     As such, and notwithstanding CLO Holdco's protestations, Section 6.1 and Section 6.2 are consistent as written and clear on their face. This consistency is further evidenced by HCLOF's Articles of Incorporation[16] and HCLOF's offering memorandum, which each include language identical to Section 6.1 and 6.2 of the Members Agreement.[17] It seems highly unlikely, if not implausible, that sophisticated parties such as CLO Holdco would include the exact same language in six separate places over three documents without a reason for that language and without the intent that such language be interpreted as it is clearly written – not as CLO Holdco now wants it to be interpreted. Accordingly, since HarbourVest is transferring its interests to HCMLPI, an Affiliate of an initial Member, the plain language of Section 6.2

---

[16] *See* Articles of Incorporation, adopted November 15, 2017, a true and correct copy of which is attached hereto as Exhibit B.



(Articles of Incorporation, § 18.1)

(*Id.*, § 18.2)

[17] *See* Offering Memorandum, dated November 15, 2017, a true and correct copy of which is attached hereto as Exhibit C.



(Offering Memorandum, page 89)

DOCS_NY:41952.8 36027/002

001412

exempts HarbourVest from having to comply with the ROFO.

35.     Third, and finally, CLO Holdco makes the nonsensical argument that because Section 6.2 provides different treatment to similarly situated Members that this Court should re-write Section 6.2. (CLOH Obj., ¶¶ 15-17)  Contracts provide different treatment to ostensibly similarly situated parties all the time and no one objects that that creates an absurd result.  It just means that different parties bargained for and received different rights.

36.     CLO Holdco's attempt to justify why this Court should re-write the Members Agreement to correct the "disparate treatment" is also unavailing.  As an example of the absurd result caused by the "disparate treatment," CLO Holdco states:  "[B]ecause the HarbourVest Members are technically Affiliates of an initial member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer."  (*Id.*, ¶ 16)  The scenario posited by CLO Holdco, however, is *exactly* the scenario prevented by the clear language of Section 6.2.  For HarbourVest to obtain control of HCLOF, it would – as a matter of mathematical necessity – need the interests held by CLO Holdco (49.02%) and/or the Highland Principals (1% in the aggregate).  Section 6.2, however, *expressly* prohibits CLO Holdco and the Highland Principals from transferring their interests to HarbourVest or its Affiliates without satisfying the ROFO.  As set forth above, it is Section 6.2 that prevents control from being transferred away from the Dondero family without compliance with the ROFO.  In fact, Section 6.2 would only break down if the limiting language in Section 6.2 were read out of it in the manner advocated by CLO Holdco.

37.     Ultimately, Article 6 of the Members Agreement is clear as written and expressly allows HarbourVest to transfer its interests to HCMLPI.  If CLO Holdco had an objection to the rights provided to HarbourVest under the Members Agreement, CLO Holdco

19

001413

should have raised that objection three and a half years ago before agreeing to the Members Agreement.  CLO Holdco should not be allowed to create ambiguity in an unambiguous contract or to re-write that agreement to impose additional restrictions on HarbourVest. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) (enforcing the "unambiguous language in a contract as written," noting that where a contract is unambiguous, a party may not create ambiguity or "give the contract a meaning different from that which its language imports") (internal quotations omitted); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.").

38.     It should go without saying, but CLO Holdco (and the other parties to the Members Agreement) should also be required to satisfy their obligations under the Members Agreement and execute the "Adherence Agreement" as required by Section 6.6 of the Members Agreement in connection with the Transfer of HarbourVest's interests to HCMLPI or any other permitted Transfer.

39.     Finally, and notably, although CLO Holdco spends considerable time arguing that HarbourVest should be required to comply with the ROFO, nowhere in the CLOH Objection does CLO Holdco state that it wishes to purchase HarbourVest's interests in HCLOF.  This omission is telling.  CLO Holdco and the other Objectors have no interest in actually exercising their alleged right of first refusal contained in the Members Agreement.  Rather, their only interest is in causing the Debtor to spend time and money responding to a legion of related (and coordinated) objections.[18]

---

[18] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q; Exhibit T (email from Mr. Dondero as forwarded to Mr. Ellington stating "Holy bananas….. make sure we object [to the HarbourVest Settlement]"); Exhibit Y.

DOCS_NY:41952.8 36027/002

*[Remainder of Page Intentionally Blank]*

001415

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  January 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

001416

Case 3:21-cv-01603-B Document 67-9 Filed 12/07/21 Page 235 of 263 PageID 1660

# APPENDIX 9

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
 2
                                     )   Case No. 19-34054-sgj-11
 3   In Re:                          )   Chapter 11
                                     )
 4   HIGHLAND CAPITAL                )   Dallas, Texas
     MANAGEMENT, L.P.,               )   Thursday, January 14, 2021
 5                                   )   9:30 a.m. Docket
                                     )
          Debtor.                    )
 6                                   )   - MOTION TO PREPAY LOAN
                                     )     [1590]
 7                                   )   - MOTION TO COMPROMISE
                                     )     CONTROVERSY [1625]
 8                                   )   - MOTION TO ALLOW CLAIMS OF
                                     )     HARBOURVEST [1207]
 9   _____)
10                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11               UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
14                              10100 Santa Monica Blvd.,
                                 13th Floor
15                              Los Angeles, CA  90067-4003
                                (310) 277-6910
16
     For the Debtor:            John A. Morris
17                              Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
18                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
19                              (212) 561-7700

20   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:    SIDLEY AUSTIN, LLP
21                              One South Dearborn Street
                                Chicago, IL  60603
22                              (312) 853-7539

23   For CLO Holdco, Ltd.:      John J. Kane
                                KANE RUSSELL COLEMAN LOGAN, P.C.
24                              901 Main Street, Suite 5200
                                Dallas, TX  75202
25                              (214) 777-4261
```

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          John T. Wilson
                                 D. Michael Lynn
 3                               John Y. Bonds, III
                                 Bryan C. Assink
 4                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
 5                               420 Throckmorton Street,
                                   Suite 1000
 6                               Fort Worth, TX  76102
                                 (817) 405-6900
 7
     For Get Good Trust and      Douglas S. Draper
 8   Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
                                 650 Poydras Street, Suite 2500
 9                               New Orleans, LA  70130
                                 (504) 299-3300
10
     For HarbourVest, et al.:    Erica S. Weisgerber
11                               M. Natasha Labovitz
                                 Daniel E. Stroik
12                               DEBEVOISE & PLIMPTON, LLP
                                 919 Third Avenue
13                               New York, NY  10022
                                 (212) 909-6621
14
     For Highland CLO Funding,   Rebecca Matsumura
15   Ltd.:                       KING & SPALDING, LLP
                                 500 West 2nd Street, Suite 1800
16                               Austin, TX  78701
                                 (512) 457-2024
17
     Recorded by:                Michael F. Edmond, Sr.
18                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
19                               Dallas, TX  75242
                                 (214) 753-2062
20
     Transcribed by:             Kathy Rehling
21                               311 Paradise Cove
                                 Shady Shores, TX  76208
22                               (972) 786-3063

23

24

25        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.
```

1          DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.

2              THE CLERK:  All rise.  The United States Bankruptcy

3     Court for the Northern District of Texas, Dallas Division, is

4     now in session, the Honorable Stacey Jernigan presiding.

5              THE COURT:  Good morning.  Please be seated.  All

6     right.  We're a little late getting started because we had

7     lots of reading material for the Court today.  All right.

8     This is Judge Jernigan, and we have a couple of Highland

9     settings.  The HarbourVest matters are the primary thing we

10    have set today, and then we also have a Debtor's motion

11    pursuant to protocols for authority for Highland Multi-Strat

12    to prepay a loan.

13         All right.  Well, let's get a few appearances.  First, for

14    the Debtor team, who do we have appearing this morning?

15             MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16    Pomerantz, John Morris, and Greg Demo here on behalf of the

17    Debtor.

18             THE COURT:  Okay.  Thank you.

19         All right.  We have objections on HarbourVest.  Who do we

20    have appearing for Mr. Dondero this morning?

21             MR. WILSON:  Your Honor, it's John Wilson, and I'm

22    also joined by Michael Lynn, John Bonds, and Bryan Assink.

23             THE COURT:  Okay.  I'm sorry.  Could -- the court

24    reporter does yeoman's work in this case.  Let me just make

25    sure we got all three of those names.  Say again, Mr. Wilson.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 30-9 Filed 02/23/24 Page 239 of 263 PageID 4064

4

1    MR. WILSON:  John Bonds and Michael Lynn and Bryan

2 Assink.

3    THE COURT:  Oh, okay.  So, see, I thought I heard

4 somebody Wilson in all of that, which was why I was pressing

5 the issue.

6  All right.  Is Mr. Dondero present on the video for

7 today's hearing?

8    MR. WILSON:  I believe he is, Your Honor.

9    THE COURT:  Mr. Dondero, could you confirm that you

10 are out there?  (No response.)  Okay.  My court reporter says

11 he sees the name out there.  Is he in your office?

12    MR. WILSON:  Your Honor, he is appearing remotely

13 from my office.  I'm not sure exactly where he's appearing

14 from.

15    THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16 there and you're speaking up to confirm you're present, we're

17 not hearing you.  Maybe your device is on mute.  So please

18 unmute yourself.

19  (No response.)

20    THE COURT:  All right.  I'm going to take some other

21 appearances and you -- you need to try to communicate with

22 your client and let him know I need to confirm he's present.

23 Okay?

24  All right.  Meanwhile, let's go to our other Objectors.

25 CLO Holdco.  Who do we have appearing today?

1        MR. KANE:  John Kane; Kane Russell Coleman & Logan;

2   on behalf of CLO Holdco.

3        THE COURT:  All right.  Thank you, Mr. Kane.

4      We had an objection from Dugaboy Investment Trust and Get

5   Good Trust.  Who do we have appearing?

6        MR. DRAPER:  Douglas Draper, Your Honor, for -- for

7   Draper.

8        THE COURT:  All right.  Thank you, Mr. Draper.

9      All right.  I think those were the only written objections

10  we had.  Mr. Pomerantz, do you confirm, we don't have any

11  other objectors for the motions set, correct?

12       MR. POMERANTZ:  Your Honor, there was those three.

13       THE COURT:  I'm sorry.  I didn't catch your full

14  sentence.

15       MR. POMERANTZ:  That is correct, Your Honor.  There

16  were three objections to the motion.

17       THE COURT:  Okay.  Mr. Clemente, you're there for the

18  Creditors' Committee?

19       MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

20  Clemente on behalf of the Official Committee of Unsecured

21  Creditors.

22       THE COURT:  All right.  Good morning.  Thank you.

23  All right.  We have a lot of other folks on the video.  I'm

24  not going to go ahead and take a roll call of other lawyers.

25       MS. WEISGERBER:  Your Honor?

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:21-cv-01603-B   Document 37-9   Filed 05/27/22   Page 241 of 263   PageID 4636

6

```
1            THE COURT:  Yes?

2            MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

3    Weisgerber from Debevoise on behalf of HarbourVest.

4            THE COURT:  Okay.

5            MS. WEISGERBER:  And I'm joined by Natasha Labovitz

6    and Dan Stroik --

7            THE COURT:  Okay.

8            MS. WEISGERBER:  -- from Debevoise as well.

9            THE COURT:  Thank you.  I was neglectful in not

10   getting your appearance, because, of course, you're at the

11   front and center of this motion to compromise, and I did see

12   that you filed a reply brief yesterday afternoon.  Okay.

13   Thank you.

14       All right.  Do we have -- do we have Mr. Dondero on the

15   line?  I'm going to check again.

16       (No response.)

17           THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18   so please unmute your device.

19           MR. WILSON:  Your Honor, it appears to me that Mr.

20   Dondero's device was unmuted as soon as you asked if he was

21   available.  I sent him a communication a second ago asking if

22   he's having technical difficulties.  I have not received a

23   response, so I --

24           MR. DONDERO:  Hello.  Can anybody hear me?

25           THE COURT:  Oh.
```

7

1          MR. WILSON:  Okay.  I hear him.

2          THE COURT:  Mr. Dondero?

3          MR. DONDERO:  Hello?

4          THE COURT:  Is that you?

5          MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6   everything since the beginning.  It's just we've had technical

7   difficulties.  I couldn't use the Highland offices.  We've

8   been trying to set up something else.

9          THE COURT:  All right.

10         MR. DONDERO:  But I'm on now, if -- yes.

11         THE COURT:  All right.  Very good.  Well, I'm glad

12  we've got you.

13     All right.  Well, Mr. Pomerantz, how did you want to

14  proceed this morning?

15         MR. POMERANTZ:  Your Honor, we could take up the

16  HarbourVest motion first, and I will turn it over to John

17  Morris.  He and Greg Demo will be handling that.  And then

18  after that we can handle the other motion, which is unopposed.

19         THE COURT:  All right.  Mr. Morris?

20         MR. KANE:  Your Honor, this is -- sorry.  This is

21  John Kane for CLO Holdco.  Just very briefly, if I may.  And

22  this will affect, I think, the Debtor's case in chief, so I'll

23  expedite things a little bit, I believe.

24     CLO Holdco has had an opportunity to review the reply

25  briefing, and after doing so has gone back and scrubbed the

001424

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:21-cv-01603-B Document 87-9 Filed 02/07/24   Page 243 of 263   PageID 1658

8

1    HCLOF corporate documents.  Based on our analysis of Guernsey

2    law and some of the arguments of counsel in those pleadings

3    and our review of the appropriate documents, I obtained

4    authority from my client, Grant Scott, as Trustee for CLO

5    Holdco, to withdraw the CLO Holdco objection based on the

6    interpretation of the member agreement.

7              THE COURT:  All right.  Well, thank you for that, Mr.

8    Kane.  I think that -- that eliminates one of the major

9    arguments that we had anticipated this morning.  So, thank you

10   for that.

11       Any other housekeeping matters that maybe someone had that

12   I didn't ask about?

13             MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca

14   Matsumura from King & Spalding representing Highland CLO

15   Funding, Ltd.  I just wanted to put on the record, we -- our

16   client had requested that some of its organizational documents

17   be filed under seal.  But we have given permission for the

18   parties to present the relevant excerpts, to the extent it's

19   still relevant after Mr. Kane's announcement, in court.  And

20   we'd just ask that the underlying documents remain sealed, but

21   we're not going to object if they show them on a PowerPoint or

22   anything like that.

23       So, to the extent that you had that on your radar, I just

24   wanted to clear that up for the proceedings.

25             THE COURT:  All right.  Well, I did sign an order

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 48-9    Filed 05/17/23    Page 244 of 263    PageID 14659

9

```
 1   late last night.  I don't know if it's popped up on the

 2   docket.

 3            MS. MATSUMURA:  Yes, Your Honor.  That's what this

 4   referred to.  That was what -- these are the documents that

 5   were being sealed.  And so I just wanted to note, if you --

 6   you know, if the Debtor puts up an excerpt of those documents

 7   and you're like, wait a minute, didn't I seal those, that we

 8   were the party that requested them be under seal and we're

 9   fine with them being shown in court, as long as the underlying

10   documents aren't publicly accessible.

11            THE COURT:  Okay.  Got you.  Thank you.

12        All right.  Any other housekeeping matters?

13            MR. MORRIS:  Yes, Your Honor.  This is John Morris

14   from Pachulski Stang for the Debtor.  Good morning.

15            THE COURT:  Good morning.

16            MR. MORRIS:  The only other matter that I wanted to

17   raise, and I can do it now or I can do it later, or Your Honor

18   may tell me that it's not appropriate to do at this time, is

19   to schedule the Debtor's motion to hold Mr. Dondero in

20   contempt for violation of the TRO.

21            THE COURT:  All right.  Well, let's do that at the

22   conclusion today.  And please make sure I do it.  I think I

23   was going to address this last Friday, and we went very late

24   and it slipped off my radar screen.  But I did see from my

25   courtroom deputy that you all were reaching out to her
```

001426

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 36-9    Filed 05/12/03 174  Page 245 of 263    PageID 14660

10

1    yesterday to get this set, and then Mr. Dondero's counsel

2    reached out to her and said, We're going to file an objection

3    to a setting next Wednesday, or I think you had asked for a

4    setting next Tuesday or Wednesday.

5            MR. MORRIS:  I did.

6            THE COURT:  And I don't -- I don't know if that

7    response/objection was ever filed last night.  I haven't seen

8    it if it was.  So, we'll -- please, make sure I don't forget.

9    We'll take that up at the end of today's matters.  All right.

10   Well, --

11           MR. MORRIS:  All right.  So, --

12           MS. WEISGERBER:  Your Honor, one last housekeeping

13   item from -- I'm joined this morning by Michael Pugatch of

14   HarbourVest, who will present some testimony this morning.  I

15   just want to confirm he's on the line and confirm no

16   objections to him sitting in for the rest of the hearing.

17           THE COURT:  All right.  Mr. Pugatch, this is Judge

18   Jernigan.  Could you respond?  Are you there with us?

19           MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20   Pugatch from HarbourVest here.

21           THE COURT:  All right.  Very good.  I think we had

22   you testify once before in the Acis matter, if I'm not

23   mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24   I can't remember.

25       All right.  So, we're going to let Mr. Pugatch sit in on

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-9    Filed 09/27/23    Page 246 of 263    PageID 14571

11

1    this.  Anyone want to say anything about that?  I consider him

2    a party representative, so I don't -- I don't think anyone

3    could invoke the Rule.

4        All right.  Very good.  Well, let's go forward if there

5    are no more housekeeping matters.

6            MR. MORRIS:  Okay.

7            THE COURT:  Mr. Morris?

8            MR. MORRIS:  Thank you.  Thank you very much, Your

9    Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10   Debtor.

11       It's a rather straightforward motion today.  It's a motion

12   under Rule 9019, pursuant to which the Debtor requests the

13   Court's authority and approval to enter into a settlement

14   agreement with HarbourVest that will resolve a number of

15   claims that HarbourVest has filed against the Debtor.

16       What I -- the way I propose to proceed this morning, Your

17   Honor, is to give what I hope is an informative but relatively

18   brief opening statement.  I'll defer to HarbourVest and its

19   counsel as to whether they want to make a presentation in

20   advance of the offer of evidence.  Any objecting party, I

21   suppose, should then be given the opportunity to present their

22   case to the Court.  Then the Debtor will call Jim Seery, the

23   Debtor's CEO and CRO.  We will offer documents into evidence.

24   I would propose then that the objecting parties take the

25   opportunity to ask Mr. Seery any questions they'd like on the

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/13/23   Page 247 of 263   PageID 14662

12

1   matter.

2        After the Debtor rests, I think HarbourVest would like to

3   put Mr. Pugatch on the stand to offer some testimony on their

4   behalf.  And I think that that will conclude the case.  We can

5   finish up with some closing arguments as to what we believe

6   the evidence showed, but that's the way that I'd like to

7   proceed, if that's okay with the Court.

8             THE COURT:  All right.  That sounds fine.

9             OPENING STATEMENT ON BEHALF OF THE DEBTOR

10            MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11  is a -- this should be a very straightforward motion under

12  Rule 9019.  The standard is well-known to the Court.  There

13  are four elements to a 9019 motion.  The Debtor clearly has

14  the burden of proof on each one.  And we easily meet that

15  burden, Your Honor.

16       The standard, just to be clear, the first part is that we

17  have to establish a probability of success, with due

18  consideration for uncertainty of law and fact.  The second one

19  is the complexity, likely duration, expense and inconvenience

20  of the litigation.  The third part of the test is the

21  paramount interest of creditors.  And the fourth part of the

22  test is whether or not the proposed settlement was reached

23  after arm's-length negotiations.

24       The Debtor believes that it easily meets this standard,

25  and frankly, is a little bit frustrated that it's being forced

001429

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-9    Filed 09/12/23    Page 248 of 263    PageID 14563

13

1  to incur the expense by Mr. Dondero in going through this

2  process.

3      A plain reading, a fair reading of the economics here

4  relative to the claim shows that this is a very reasonable

5  settlement.  I don't need to go beyond that, Your Honor.  I

6  don't even need to use the word reasonable.  It surely meets

7  the lowest standard.

8      We've prepared a couple of demonstrative exhibits, Your

9  Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10  just put one up on the screen now, if I may.

11      Ms. Canty, can you please put up Demonstrative Exhibit #3?

12      Demonstrative Exhibit #3 is an outline of the economics of

13  the settlement.  It includes the various pieces, the

14  components that the parties have agreed to.  And it shows, at

15  least from the Debtor's perspective, just what HarbourVest is

16  being given here.

17      Up on the screen is a demonstrative exhibit.  It has

18  citations to the evidence that will be admitted by the Court.

19  The first line shows that HarbourVest will receive a $45

20  million allowed general unsecured nonpriority claim.  And that

21  -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22  Page 2.

23      That claim is discounted by the expected recovery that

24  general unsecured creditors are supposed to get.  As of

25  November, in the liquidation analysis that was part of the

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 68-9 Filed 05/15/23 174 Page 249 of 263   PageID 14564

14

1    disclosure statement -- that's the citation in the footnote --

2    the Debtor believed that unsecured creditors were estimated to

3    recover approximately eighty-seven and a half cents on the

4    dollar.  And so we just did the arithmetic there to get to the

5    net economic value of the proposed general unsecured claim.

6         And from that, we reduced $22-1/2 million because that is

7    the net asset value of HarbourVest's interest in HCLOF, which,

8    pursuant to the settlement agreement, it will transfer back to

9    the Debtor, so that the net economic value is approximately

10   $16.8 million.

11        You will hear testimony from Mr. Seery that this number

12   is, in fact, overstated, and it's overstated because, since

13   the time the disclosure statement was filed in November, a

14   number of events have occurred that will -- that have caused

15   the estimated recovery percentage to be reduced from

16   approximately 87-1/2 percent to something lower than that.  We

17   don't have the exact number, Your Honor, but Mr. Seery will --

18   and the evidence will show that there's been more expenses,

19   that there's been some resolution of certain claims.  There's

20   been some positive issues, too.  But that number is probably

21   in the 70s somewhere.

22        And in any event, I think the point here is, Your Honor,

23   HarbourVest invested $80 million in HCLOF, which was going to

24   participate in the investment in CLOs.  They filed a claim for

25   $300 million, through treble damages and other claims.  But

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-9    Filed 05/15/23    Page 250 of 263    PageID 14565

15

1    the net economic impact of this is going to be somewhere

2    probably in between $12 and $14 million.  I'll let Mr. Seery

3    give more precision to that.  And it represents less than -- a

4    less than five percent recovery on the total claim.

5        And we think it's important for the Court to keep that in

6    mind.  What are the economics here?  Are we overpaying?  Is

7    this an unreasonable settlement?  And I think the evidence

8    will show that the Debtor is not, but that this settlement

9    that you see before you was the product of arm's length, and

10   I'm going to go in reverse order of the four-part test under

11   9019.

12       So, the last part is whether or not the settlement, the

13   proposed settlement was the product of arm's-length

14   negotiation.  You'll hear lots of evidence that this

15   settlement that's up on the screen right now very much was the

16   product of arm's-length negotiation.

17       The third part of the test, Your Honor, is whether it

18   meets the paramount interest of creditors.  You know,

19   regrettably, Mr. Dondero is the only purported creditor who is

20   objecting here.  He may have done so through different

21   vehicles, but every objecting party here is a debtor [sic]

22   owned and controlled by Mr. Dondero.  No other creditor -- not

23   the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24   -- nobody is objecting to this settlement except for Mr.

25   Dondero.  And we believe that that highlights the Debtor's

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/12/23   Page 251 of 263   PageID 14566

16

1    ability to meet the third prong of the test, and that is these

2    are -- this settlement is in the paramount interest of

3    creditors.

4         Again, going in reverse, the second part of the test is

5    the complexity, duration, and expense of litigation.  There

6    will be no disputed evidence that we meet -- the Debtor easily

7    meets this prong of the test.  The evidence is going to show

8    that HarbourVest's claim is based on fraud, fraud in the

9    inducement, fraudulent statements and omissions, the kind of

10   case, Your Honor, that I'm sure you're familiar with that is

11   incredibly fact-intensive, that will be incredibly difficult

12   to navigate through.  It will be prolonged, it will be

13   expensive, because you're necessarily relying on he said/she

14   said, basically.  And so we're going to have to get testimony

15   from every person that spoke in connection with the events

16   leading up to the transaction.  So we think the second prong

17   will be easily met, Your Honor.

18        And then the last prong -- the first prong, if you will --

19   is the likelihood of success on the merits.  We think that the

20   settlement, the economic recovery that's up on the screen

21   here, which ultimately will be less than five percent of the

22   claimed amount, in and of itself shows that the settlement is

23   consistent with the Debtor's perception of its likely success

24   on the merits.  I'm certain that HarbourVest disagrees, but

25   that's okay, we're here today and that's the Debtor's view,

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 48-9    Filed 05/13/24    Page 252 of 263    PageID 14567

17

1  and the Court is here to assess the Debtor's business judgment

2  and whether the Debtor has properly analyzed the issues and

3  gone through the process.  And the evidence will show

4  conclusively that it will.  That it has.

5      Mr. Seery will testify at some length as to the risks that

6  he saw.  I think that you'll hear counsel for Mr. Dondero ask

7  both Mr. Seery and Mr. Pugatch a number of questions designed

8  to elicit testimony about this defense or that defense.  And

9  it's a little -- it's a little ironic, Your Honor, because,

10 really, every defense that they're going to try to suggest to

11 the Court was a valid defense is a defense that the Debtor

12 considered.  In fact, it's, you know, it's a little spooky,

13 how they've -- how they've been able to identify kind of the

14 arguments that the Debtor had already considered in the

15 prosecution of their objections here.

16     But be that as it may, the evidence will conclusively show

17 that the Debtor acted consistent with its fiduciary duties,

18 acted in the best interests of the Debtor's estate, acted

19 completely appropriately here in getting yet another very

20 solid achievement for the Debtor, leaving very few claims that

21 are disputed at this point, all but one of which I believe are

22 in the hands of Mr. Dondero.

23     So, that's what we think that the evidence will show.

24     I do want to express my appreciation to Mr. Kane for

25 reflecting on the arguments that we made with respect to the

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/29/21   Page 253 of 263   PageID 14568

18

1   ability of the Debtor to engage in the transfer or the

2   acquisition of the asset from HarbourVest.  I would -- I would

3   respectfully request that we just enter into a short

4   stipulation on the record reflecting that the Debtor's

5   acquisition of HarbourVest's interests in HCLOF is compliant

6   with all of the applicable agreements between the parties.

7        And with that, Your Honor, I look forward to putting Mr.

8   Seery on the stand and presenting the Debtor's case.

9            THE COURT:  All right.  Other opening statements?

10           OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11           MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12   behalf of CLO Holdco.

13        In response to Mr. Morris, I'm not going to enter into a

14   stipulation on behalf of my client, but the Debtor is

15   compliant with all aspects of the contract.  We withdrew our

16   objection, and we believe that's sufficient.

17           THE COURT:  All right.  Well, I'm content with that.

18        Other opening statements?

19           OPENING STATEMENT ON BEHALF OF HARBOURVEST

20           MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21   behalf of HarbourVest.

22        HarbourVest joins in Mr. Morris's comments in support of

23   the settlement, and we believe that the question of whether

24   the settlement between HarbourVest and the Debtor satisfies

25   the Rule 9019 standard is not even a close one.

001435

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 68-9   Filed 09/20/23   Page 254 of 263   PageID 14669

19

1          Some Objectors have made arguments about the merits of

2     HarbourVest's claims, which is why we're here.  As Your Honor

3     will hear this morning, HarbourVest has meaningful and

4     meritorious claims against Highland, but made the business

5     decision to avoid the time, expense, and inherent risk of

6     litigation in the interest of preserving value, both for

7     itself and for the estate.

8          Today, Michael Pugatch, a managing director of

9     HarbourVest, will testify before the Court.  He'll explain

10    that HarbourVest claims against Highland arise out of certain

11    misrepresentations and omissions by Highland to HarbourVest in

12    connection with HarbourVest's purchase of an interest in

13    HCLOF, one of Highland's managed funds.  Those

14    misrepresentations and omissions, as Your Honor will hear,

15    relate to Highland's litigation with its former employee,

16    Joshua Terry, and transfers that were conducted in 2017 to

17    strip Acis of value and prevent Mr. Terry from collecting on

18    an $8 million judgment.

19         Mr. Pugatch will further explain that HarbourVest would

20    not have invested in HCLOF had it known the underlying facts

21    about those Acis transfers.

22         Mr. Pugatch will also testify that not only did

23    HarbourVest not know about those transfers, it learned about

24    those transfers when it was accused of orchestrating the

25    transfers itself in the Acis bankruptcy.  Your Honor will hear

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 09/21/23    Page 255 of 263    PageID 14670

20

1 that the Acis trustee sought extensive discovery from

2 HarbourVest after numerous accusations that HarbourVest was

3 behind the transfers.

4     Mr. Pugatch will also testify that Highland charged legal

5 fees for itself and its affiliates to HCLOF, essentially

6 forcing HCLOF to fund the litigation involving the Acis

7 bankruptcy and Mr. Terry.

8     In total, HarbourVest's claims for damages are over a

9 hundred million dollars in investment-related losses, lost

10 profits, legal fees inappropriately charged to HCLOF, its own

11 legal fees.  And that's before interest or trebling damages.

12     But HarbourVest stands ready to litigate its claims, but

13 following hard-fought and extensive negotiations with the

14 Debtors, the parties reached the settlement that's now before

15 the Court.  Mr. Pugatch's testimony regarding the strong

16 factual bases for HarbourVest's claims against Highland and

17 its recoverable damages will further underscore the risks that

18 the Debtors faced if they chose to litigate these claims, and

19 why this settlement is fair, equitable, and in the best

20 interest of the estate.

21       THE COURT:  All right.  Thank you, Counsel.

22     Other opening statements?

23   OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24       MR. DRAPER:  Your Honor, this is Douglas Draper on

25 behalf of one of the Objectors.  I'd like to just make a few

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 46-9    Filed 09/27/23    Page 256 of 263    PageID 14671

21

 1    comments with respect to what I've heard and what the Court is

 2    going to hear.

 3        The first issue I'd like to address is the comment by

 4    counsel for the Debtor that no other party has objected.  The

 5    9019 motion is one of the issues that this Court has to rule

 6    on, whether or not there was an objection or not.  So the fact

 7    that this may be -- bankruptcy is not a popularity contest and

 8    not an issue of who votes for what and doesn't vote.  This,

 9    along with the 1129(a) tests, are clearly within your

10    province, and you need to listen carefully because you'll have

11    to make your own independent analysis whether my objection is

12    correct or incorrect.

13        Two other points I'd like to make that I think are very

14    salient.  Number one is, if you look at the Debtor's

15    disclosure statement, it basically took the position that the

16    HarbourVest claim is of little or no value.  And lo and

17    behold, thirty days later, there's a settlement that brings

18    about a significant recovery to HarbourVest.  The timing is

19    interesting, and I think the Court needs to pay careful

20    attention to what transpired between the two dates.

21        And then the last point I'd like to make is, as you listen

22    to the evidence, and what I learned abundantly clear from

23    hearing the depositions, is that the claim of HarbourVest, if

24    there is a claim at all, is probably one hundred percent --

25    should be subordinated in that it appears to arise out of the

1   purchase or sale of a security.  And, again, I would ask the

2   Court to listen carefully to this because that's what it

3   appears to be and that's what the evidence is going to show to

4   the Court.

5            THE COURT:  All right.  Mr. Draper, let me clarify

6   something I'm not sure if I heard you say or not.  Were you

7   saying that the Court still needs to drill down on the issue

8   of whether the Debtor can acquire HarbourVest's interest in

9   HCLOF?

10           MR. DRAPER:  No.

11           THE COURT:  Okay.  I was confused whether you were

12  saying I needed to take an independent look at that, now that

13  the objection has been withdrawn of Holdco.  You are not

14  pressing that issue?

15           MR. DRAPER:  No, I am not.  Basically, I think it's

16  the fairness of the settlement.  I think the transferability

17  of the interest is separate and apart from the fairness of the

18  settlement itself.  I think the fairness -- the

19  transferability was a contractual issue between two parties

20  that the Court does not have to drill down on.

21           THE COURT:  All right.  I have another question for

22  you.  I want to clarify your client's standing.  Tell me --

23  I'm looking through a chart I printed out a while back.  I

24  guess Dugaboy Investment Trust filed a couple of proofs of

25  claim; is that right?

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-9    Filed 09/27/23    Page 258 of 263    PageID 1467

23

1              MR. DRAPER:  Yes.

2              THE COURT:  Okay.  What --

3              MR. DRAPER:  And objections are pending.

4              THE COURT:  Pardon?

5              MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7              THE COURT:  Okay.

8              MR. DRAPER:  -- and have not been litigated.

9              THE COURT:  And what about Get Good Trust?

10             MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12             THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16             MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22        And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25        The second part to the Dugaboy ownership is we own an

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 86-9 Filed 09/25/23   Page 259 of 263   PageID 14574

24

```
 1    interest in the Debtor.  And so we are, in fact, a party in

 2    interest.

 3              THE COURT:  Okay.

 4              MR. DRAPER:  It may be a small interest, but it is an

 5    interest.

 6              THE COURT:  It has a limited partnership interest in

 7    the Debtor?

 8              MR. DRAPER:  Yes.

 9              THE COURT:  Is that correct?

10              MR. DRAPER:  Yes.

11              THE COURT:  Okay.  Well, I'll move forward.  Thank

12    you.

13         Does that cover -- any other opening statements?  I think

14    that covered everyone who was -- who filed some sort of

15    pleading today.  No.

16              MR. WILSON:  Your Honor, John Wilson on behalf of --

17              THE COURT:  I'm sorry.  I'm sorry.

18              MR. WILSON:  -- Mr. Dondero.

19              THE COURT:  I missed Mr. Dondero's counsel.  I knew

20    we had visited at some point this morning.  I just got

21    confused there.  Go ahead, Mr. Wilson.

22              MR. WILSON:  No problem, Your Honor.  I was just

23    going to say that we will reserve our comments until after the

24    conclusion of the testimony.

25              THE COURT:  All right.  Very well.
```

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/25/03   Page 260 of 263   PageID 14675

25

```
 1          Mr. Morris, you may call your first witness.

 2              MR. MORRIS:  Thank you, Your Honor.  Before I do,

 3   just two very, very quick points.

 4              THE COURT:  Okay.

 5              MR. MORRIS:  To be clear, Dugaboy's interest in the

 6   Debtor is 0.1866 percent.  Less than two-tenths of one

 7   percent.

 8          Secondly, the argument that Mr. Draper just made with

 9   respect to subordination is one that appears in nobody's

10   papers.  And, in fact, not only doesn't it appear in anybody's

11   papers, but Mr. Dondero, I believe, specifically took issue

12   with the fact that a portion of the consideration that

13   HarbourVest would receive would be on a subordinated basis,

14   and he would -- and I think he took the position there is no

15   basis to give them a subordinated claim.

16          So, I just wanted to point those items out to the Court,

17   not that I think either one makes a large difference today,

18   but I do want to deal with the facts.

19              THE COURT:  Thank you.

20              MR. MORRIS:  The Debtor would call -- you're welcome,

21   Your Honor.  The Debtor calls Mr. James Seery.

22              THE COURT:  All right.  Mr. Seery, welcome back to

23   virtual court.  If you could say, "Testing, one, two" so I can

24   see you and swear you in.

25              MR. SEERY:  Testing, one, two.
```

Case 21-03067-sgj Doc 28-9 Filed 09/29/21 Entered 09/29/21 17:50:19 Desc
Case 3:23-cv-01503-B Document 28-9 Filed 09/27/03 Page 261 of 263 PageID 14576

Seery - Direct                                        26

1          THE COURT:  All right.  I heard you but I'm not yet

2    seeing your video.  Is your video turned on?

3          MR. SEERY:  Video is on.  Yes, Your Honor.

4          THE COURT:  Okay.  I see you now.  Please raise your

5    right hand.

6              JAMES SEERY, DEBTOR'S WITNESS, SWORN

7          THE COURT:  Thank you.  Mr. Morris?

8          MR. MORRIS:  Thank you, Your Honor.

9                      DIRECT EXAMINATION

10   BY MR. MORRIS:

11   Q    Good morning, Mr. Seery.  Can you hear me?

12   A    I can.  Thank you, Mr. Morris.

13   Q    Okay.  Let's just cut to the chase here.  Are you familiar

14   with HarbourVest's claims filed against the Debtor?

15   A    I am, yes.

16   Q    And did you personally review them?

17   A    I did, yes.

18   Q    Do you recall that over the summer the Debtor objected to

19   HarbourVest's claim?

20   A    Yes, we did.

21   Q    Why -- can you explain to the judge why Harbour -- why the

22   Debtor objected to HarbourVest's claim last summer?

23   A    Sure.  The HarbourVest claims, I believe there are about

24   six of them, initially were filed, and they were -- they were

25   relatively vague in terms of what the specifics of the claims

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/27/23   Page 262 of 263   PageID 14677

Seery - Direct                                    27

1   were.

2         So, we saw the claims but didn't, frankly, pay a lot of

3   attention to the underlying transaction that was referred to

4   in the proofs of claim and the losses that HarbourVest had

5   claimed to suffer -- to suffer with respect to their purchase

6   of securities related to HCLOF and the damages caused by the

7   Acis case.  So we filed a pretty pro forma objection.  I

8   believe it was a simply stated objection that we didn't have

9   any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q   Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A   Yes.  Yes, I am aware.

15  Q   And did you familiarize yourself with that particular

16  response?

17  A   I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/29/03174   Page 263 of 263   PageID 14578

Seery - Direct                                28

1    In addition, and this was the first time we saw that,

2    HarbourVest brought forth its claims that it was entitled to

3    effectively rescind the transaction.  And I say rescind the

4    transaction:  In security parlance, they claim that they were

5    induced by fraud, I think as most are -- to enter into the

6    transaction.

7    As most are aware, the liability limitations in the OMs

8    and the exculpation in the documents are pretty broad, and

9    HarbourVest's position was that they weren't going to be

10   subject to those limitations because the actual transaction

11   that they entered into was a fraud on them, designed by Mr.

12   Dondero, Mr. Ellington, and the Highland team.

13   Q   All right.  Let's talk about your understanding, the

14   Debtor's understanding of the factual background to

15   HarbourVest's claim.  What is your understanding of the

16   investment that HarbourVest made?

17   A   Well, HarbourVest made an investment in the Highland CLO

18   business.  The Highland CLO business was -- was Acis.  And

19   effectively, the business had been separated, but in name

20   only.  Acis was just a shell, with a few partners --

21   obviously, Mr. Terry as well -- but it was all Highland

22   personnel doing all the work.

23   And what they were trying to do with Acis was, in essence,

24   resuscitate a business that had been in a bit of a decline

25   from its pre-crisis heyday.