**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

  **[167]** Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

# Volume 8

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | |

*INDEX*

### APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.  STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital
  Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.  DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*
1.  Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11
[Doc. 168].

*000042*
2.  The judgment, order, or decree appealed from: Memorandum Opinion and Order
Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to
Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*
3.  Docket Sheet kept by the Bankruptcy Clerk.

4.  Documents listed below and as described in the Docket Sheet for Bankruptcy Case
Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br>*Thru Vol. 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001905 thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883* *Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18* *00363 7* | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| *00 3666* | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| *003843* | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| *00 3844* | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| *003851* | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19* *003882* *Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21* *004395* | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| Vol. 22 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
|---|---|---|---|---|
| Vol. 23 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| Vol. 24 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 Thru Vol. 25 | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| Vol. 26 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| Vol. 27 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| Vol. 28 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|

*006133*

*Thru Vol. 31*

| | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
|---|---|---|---|---|

*Vol. 32*
*006925*

| | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
|---|---|---|---|---|

*006942*

| | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
|---|---|---|---|---|

*006960*

| | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |
|---|---|---|---|---|

TRANSCRIPTS

*006961*

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

---

Appellants' Second Amended Statement of Issues and Designation of Record on Appeal          Page 11

Dated:  July 14, 2023                    Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         */s/ Mazin A. Sbaiti*
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                             jeb@sbaitilaw.com

                                         **Counsel for Appellants**


## CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.


                                         */s/ Mazin A. Sbaiti*
                                         Mazin A. Sbaiti

1      They were looking to take additional outside capital.

2  They would -- they would pay down or take money out of the

3  transaction, Highland would, or ultimately Mr. Dondero, and

4  they would -- they would seek to invest in Acis CLOs,

5  Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6  and potentially new CLOs, but with the Acis CLOs, they'd seek

7  to reset those and capture what they thought would be an

8  opportunity in the market to -- to really use the assets that

9  were there, not have to gather assets in the warehouse but be

10 able to use those assets to reset them to market prices for

11 the liabilities and then make money on the equity.

12 Q    Do you have an understanding --

13 A    Then --

14 Q    I'm sorry.  Go ahead.

15 A    Why don't I continue?  So, the transaction, they found

16 HarbourVest as a potential investor, and the basis of the

17 transaction was that they would make an investment into Acis.

18      Shortly before the transaction, and while they were doing

19 diligence, Mr. Terry received his arbitration award.  I

20 believe that was in October of 2017.  The transaction with

21 HarbourVest closed in mid- to late November of 2017.  But Mr.

22 Terry was not an integral part.  Indeed, he wasn't going to be

23 a key man.  He had been long gone from Highland by that time.

24      What the -- I think you asked me originally what the basis

25 of their claim was.  The transaction went forward, and the

001446

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 26-9   Filed 03/17/23   Page 15 of 278   PageID 1698

Seery - Direct                    30

1   basis of their claim is that they really were never -- nothing

2   was disclosed to them about the nature of the dispute with Mr.

3   Terry other than in the highest-level terms; the animosity

4   with respect to which that dispute was held by Highland and

5   potentially Mr. Terry; and really, how those costs would be

6   borne and risks be borne by the investment that they were

7   making.

8       That was, in essence, the transaction and the high-level

9   view of their claim.

10  Q   Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A   Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q   And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A   They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 05/21/23    Page 16 of 278    PageID 1694

Seery - Direct                              31

 1   U.S. investors unless they qualify, and these are sold under

 2   Reg S to -- to investors that otherwise qualify.  And

 3   HarbourVest was investing in that transaction through the

 4   Guernsey structure.

 5   Q    And do you have an understanding as to who owned the 50-

 6   plus percent of HCLOF that HarbourVest was not going to

 7   acquire?

 8   A    Yeah.  There's -- you can tell by the name.  HCLOF is

 9   Highland CLO Funding.  This is a Highland vehicle.  So

10   Highland owned and controlled the vehicle.  The DAF, which is

11   -- which is Dondero-controlled trusts, have the -- 49 percent.

12   Highland has, I believe, around .63-65 percent directly.  And

13   then Highland employees at the time who were involved in the

14   business owned another small percentage.

15        So the majority was going to be controlled by Highland

16   through its control of DAF and its control of the employees

17   that worked for it.  HarbourVest would be a minority investor.

18   Q    Okay.  And I believe you testified that the investment was

19   made in mid-November; is that right?

20   A    That's correct.  I think it was the 15th, may have been

21   the 17th of November.

22   Q    And do you recall when in October the Terry arbitration

23   award was rendered?

24   A    It was about a month before.  I think it was right around

25   the 20th, the 17th to the 20th.  I may be slightly wrong on

1    each of those dates.

2    Q    Okay.  What is your understanding as to what happened

3    after the issuance of the award that is the basis or at least

4    one of the bases for HarbourVest's claim?

5    A    I don't think there's -- I don't think there's any

6    dispute.  And there certainly are judicial findings.  Dondero

7    and Highland went about stripping Acis of all of its assets.

8    So, remember that Acis is not a separate standalone company,

9    in any event.  It's controlled and dominated completely by

10   Highland at the time.  But it did have contracts.  And those

11   contracts had value.

12        So the first idea was to strip out the management contract

13   and put it into a separate vehicle, which we called HCF

14   Advisor, which Highland still owns.  The second piece was to

15   strip out some valuable assets, the risk retention piece,

16   which was a loan that in essence was equity that Highland had

17   put into Acis but structured as a loan, as many of the

18   transactions we'll see down the road are, in order to deal

19   with some -- avoid taxes in any way possible.  And that

20   structure, that value moved value out of Acis for the express

21   purpose of trying to run, in essence, the Highland business

22   back in Highland.

23        Remember, as I said, Acis is just a Highland business

24   moved to a separate shell.  When Mr. Terry got his arbitration

25   award against Acis and was seeking to enforce it, it was

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00603-B   Document 26-9   Filed 05/24/23   Page 18 of 278   PageID 1696
Appendix 009   Page000174

Seery - Direct                           33

1  pretty straightforward, let's take all the assets -- Dondero

2  scheme -- let's take all the assets and move them back into

3  Highland so Terry can't get anything.

4  Q    And how does that scheme relate to the HarbourVest claim,

5  to the best of your knowledge?

6  A    Well, HarbourVest -- HarbourVest's position is that they

7  invested in Acis and -- and whether Acis was called Acis or

8  called Highland, it doesn't really matter; there were valuable

9  assets in the -- in the entity that they were going to be

10  investing in through the equity in these CLOs and some of the

11  debt securities in those CLOs.

12      And then the stripping out and the fraudulent conveyances

13  out of Acis caused them damages because that's what left the

14  damage to Mr. Terry.

15      The quick math on Acis, by the way, is Acis has probably

16  lost, total damages, 175 million bucks.  And that's pretty

17  easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18  fees charged to HCLOF.  Another five million of fees, at

19  least, incurred by Mr. Terry.  Ten million that went to Mr.

20  Terry, 15 to Highland fees, another five, plus Mr. Terry's

21  settlement in this case, over eight million bucks.

22      So HarbourVest's position, which, on a factual basis, you

23  know, is problematic for the estate, is, wait a second, we

24  invested in this vehicle with Highland.  That was supposed to

25  invest in Highland CLOs.  They were called Acis, but they were

1   Highland CLOs.  And then you went about causing tremendous

2   damage to that vehicle that we ultimately were investing in,

3   and then charge us for the pleasure.

4   Q    You used the phrase earlier "OM," I believe.

5   A    Offering memorandum.

6   Q    Offering memorandum?  Can you just explain to the Court

7   your understanding of what an offering memorandum is?

8   A    Typically, under U.S. law, and foreign jurisdictions have

9   similar laws, you have to have a document that explains the

10  securities that you're selling.  And it goes into extreme

11  detail about the securities and the risks related to those

12  securities.

13       And the idea is not to have a document that tells you

14  whether it's a good investment or a bad investment, but it's a

15  document that discloses to the potential investor all of the

16  risks with respect to that security or related to the

17  investment over the duration of the security.  It doesn't

18  predict the future, but it's supposed to make sure that it

19  gives you a very clean view of the past and a very clean view

20  of what the facts from the past are and how they would

21  implicate the future of the investment.

22  Q    And in the course of its diligence, did the Debtor have an

23  opportunity to review the offering memorandum in the context

24  of the claims that were being asserted by HarbourVest?

25  A    Oh, absolutely.  It was originally effectively -- it's an

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/07/21   Page 20 of 278   PageID 1698

Seery - Direct                              35

1   HCLOF offering memorandum.  But as I said, HCLOF was managed

2   and controlled by Highland, and Highland originally prepared

3   it.  And then, of course, in connection with -- with this

4   dispute and these claims, we reviewed it, both myself and my

5   legal team.

6   Q    All right.

7             MR. MORRIS:  Your Honor, the offering memorandum is

8   on the Debtor's exhibit list, and I think this is an

9   appropriate time to move into evidence Debtor's Exhibits A

10  through EE, all of which appear at Docket No. 1732.

11            THE COURT:  1732?

12            MR. MORRIS:  It's the Debtor's Second Amended Witness

13  and Exhibit List.

14            THE COURT:  All right.  Any objection to admission of

15  A through EE?

16            MR. DRAPER:  Douglas Draper.  No objection, Your

17  Honor.

18            THE COURT:  All right.  Mr. --

19            MR. MORRIS:  May I proceed?

20            THE COURT:  Yeah.  Mr. Wilson, did you want to

21  confirm no objection?

22       (Echoing.)

23            THE COURT:  All right.  Hearing no objection,

24  Debtor's A through EE are admitted.

25       (Debtor's Exhibits A through EE are received into

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00603-B   Document 26-9   Filed 05/27/23   Page 21 of 278   PageID 1699

Seery - Direct                              36

 1   evidence.)

 2              THE COURT:  Go ahead, Mr. Morris.

 3              MR. MORRIS:  Thank you, Your Honor.  The offering

 4   memorandum itself is one of the documents that we filed under

 5   seal, and we did so at the request of counsel to HCLOF.  But

 6   HCLOF has consented to our sharing up on the screen certain

 7   very limited provisions of the document, without waiving the

 8   request that the agreement otherwise be maintained under seal.

 9              THE COURT:  All right.

10              MR. MORRIS:  So may I proceed on that basis, Your

11   Honor?

12              THE COURT:  You may.  Uh-huh.

13              MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14   on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15   is there a way to just expand that just a bit, Ms. Canty?

16   Thank you very much.  And if we could just scroll it up?

17   Thank you very much.  Perfect.

18      Okay.  So, Your Honor, this, as the footnote says, is an

19   excerpt from the offering memorandum that can be found at

20   Debtor's Exhibit AA.  Double A.  And this particular portion

21   of the offering memorandum is at Page 35.

22              THE COURT:  Okay.

23   BY MR. MORRIS:

24   Q   Mr. Seery, have you seen this portion of the offering

25   memorandum before?

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/30/24   Page 22 of 278   PageID 1400

Seery - Direct                                    37

1  A   Yes, I have.  But before I continue, I just -- I should

2  have checked.  Are you able to hear me clearly?  Am I speaking

3  too quickly or am I cutting out?  I just want to make sure.

4  I'm using a different set of audio today.

5              THE COURT:  All right.

6              MR. MORRIS:  That's fine.

7              THE COURT:  I hear you very well.

8              MR. MORRIS:  Yeah.

9              THE COURT:  So I think we're good right now.  Thank

10  you.

11             THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13             THE COURT:  Okay.

14             THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q   Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A   Yes, I did.

20  Q   Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A   With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

001454

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/29/21   Page 23 of 278   PageID 1704
Appendix 9   Page 37 of 174

Seery - Direct                    38

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q    Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A    No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18       I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23       That, in my opinion, is wholly inadequate.

24  Q    Okay.

25            MR. MORRIS:  And let's put up -- actually, let's just

001455

1    move on.

2    BY MR. MORRIS:

3    Q    Let's go to the settlement itself.

4             MR. MORRIS:  Can we put back up Demonstrative Exhibit

5    #3?

6    BY MR. MORRIS:

7    Q    Mr. Seery, can you see that?

8    A    Yes, I can.

9    Q    Does this generally describe the net economic recovery of

10   the HarbourVest settlement based on estimated recoveries for

11   general unsecured creditors as of November 2020?

12   A    As of November 2020, it does.  And you alluded to this in

13   your opening, but to be clear, the numbers have shifted.

14   Costs have increased.  The -- so the -- effectively, the

15   numerator, in terms of distributable value that we estimate,

16   is lower.  And settlements, the denominator, have also

17   increased.  So the claims against the estate that have been

18   recognized have increased.  And that, that probably takes it

19   down closer, in our view, to about seventy cents distribution,

20   a number closer to nine to ten million, maybe a little bit

21   less.

22        However, there's also some additional value that we -- we

23   believe we will recover directly.  There are north of $150

24   million of intercompany notes owed by Dondero entities to

25   Highland.  A number of those notes are demand notes, and we've

1    already made demand.  We'll be initiating actions next week.

2    So those are -- those value, we believe, we'll recover

3    directly from Mr. Dondero and from related entities.

4         To the extent those related entities don't have value, we

5    feel very strongly about our ability to pierce the veil and

6    reach in to Mr. Dondero.  And then his assets, either his

7    personal assets or the assets that he claims are in trusts.

8         In addition, there are a significant amount of notes that

9    were extended in two -- I believe around 2017, for no

10   consideration.  Those notes were demand notes, I believe, and

11   then extended it 30 years.  So they have 2047 maturities.

12   Those were probably going to have to be subject to fraudulent

13   conveyance type actions or -- or some sort of sale at a very

14   discounted value because third parties wouldn't want long-

15   dated notes with Mr. Dondero as the counterparty for very much

16   money.

17        Those -- they defaulted on some of those parties, so we

18   effectively turned them into demand notes.  We've accelerated,

19   and we'll be bringing actions against those entities next week

20   as well.

21        So I think (garbled) have come up, so I apologize.  One

22   way of saying I think the sixteen and a half is a bit high

23   right now, based upon what we know, but the value is going to

24   be higher than our estimate a couple of weeks ago because we

25   do believe we'll be able to recover on the notes.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 16-9   Filed 05/27/23   Page 26 of 278   PageID 1704
Appendix 09   Page 9721.74   Page 28 of 278   PageID 1704

Seery - Direct                              41

1      One additional caveat, just to be fully transparent here.

2  This summary with the 16.8 doesn't include the subordinated

3  piece of this -- of this claim and our resolution.  That --

4  recovery of that piece will be dependent upon the success of

5  litigations.

6      In order for the subordinated piece to get paid, all

7  general unsecured claims in Class -- Classes 7 and 8 will have

8  to be paid in full.  And then -- and then the subordinated

9  class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q   And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A   That's correct, yes.

16  Q   Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A   Yes.

19  Q   And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A   Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

1  complexity to it to satisfy some of HarbourVest's concerns

2  that they be able to effectively rescind the transaction, at

3  least from an optical perspective.  Value was important, but

4  optics were as well.  The twenty-two and a half is the current

5  -- actually, the November value of HCL -- the HarbourVest

6  interests in HCLOF.  And that's based upon Highland's

7  evaluation of those interests.

8       So we do believe that that is a fair value as of that

9  date.  It has not gone done.  It hasn't gone up explosively,

10  either, but it hasn't gone down.  We think that's good, real

11  value.  That value is in the Acis CLOs, the equity in those

12  CLOs, which is 2 through 6, that we -- we will be working with

13  the HCLOF folks to get Mr. Terry to monetize those assets and

14  those longer-dated CLOs.

15       In addition, I think it's 85 percent of the equity in Acis

16  7 -- Acis 7 is managed by Highland -- that is also beyond its

17  reinvestment period.  And in talking to the directors -- and

18  they're new directors, and I'll get to that in a minute, for

19  HCLOF -- they'll seek to push Highland, which is the

20  reorganized Highland, to monetize that asset, with due regard

21  to fair value.

22       In addition, Harbour -- HCLOF owned a significant amount

23  of the preferred or equity pieces, if you will, in the

24  Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25  really CLOs.  Those are effectively closed-end funds with

 1  illiquid assets, primarily illiquid assets in them.  We've had

 2  some dispute in front of the Court about selling the liquid

 3  assets in them, which we can go into it another time.  Those

 4  are being liquidated in the market at fair value.

 5       But HCLOF also is a significant holder of those preferred

 6  shares, and those directors would -- have indicated to me that

 7  they would like to see those interests also monetized.

 8  Q    All right.  Let's shift gears for a moment to talk about

 9  the diligence that the Debtor did before entering into this

10  agreement.  Can you just describe for the Court generally the

11  diligence that was undertaken at your direction?

12  A    Well, when we first received the reply to our objection,

13  we dug into that reply and the specifics in it very

14  aggressively.  So we reviewed all of the underlying documents

15  related to the original transaction.  We discussed with

16  counsel the legal basis for the HarbourVest claims.  We

17  interviewed our own HCMLP employees who were involved in the

18  transaction and tested their recollection, specifically around

19  who dealt with HarbourVest, who had the discussions with

20  HarbourVest, what was disclosed to HarbourVest with respect to

21  the Terry dispute and the Acis litigation.

22       We also had done, as I think the Court is well aware from

23  prior 9019 testimony, extensive work around the transfers and

24  the issues related to Acis.  So we were familiar with their

25  impact on HCLOF.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/05/23    Page 29 of 278    PageID 1707

Seery - Direct                    44

1    We also did extensive work valuing the remaining HCLOF

2    interests to get a good feel of not only how much HarbourVest

3    originally invested, but how much they actually lost in this

4    transaction.  And as I said, their original investment was

5    around, in total, in two tranches, about $80 million, of which

6    they got about $5 million back, and they've lost $22 million.

7    So it -- I mean, remaining with $22 million.  So they've lost,

8    you know, in excess of $50 million.

9    Q    Do you recall whether the Debtor reviewed and analyzed all

10   of the documents that were cited in HarbourVest's response to

11   the Debtor's objection to the HarbourVest proofs of claim?

12   A    Yeah.  I think -- I forget, to be honest, which -- exactly

13   what documents were in there.  But we went through their

14   objection with a fine-toothed comb, not only with respect to

15   the issues related to the Acis case, but also their references

16   to Guernsey law, other U.S. law, any of the documents between

17   the parties.  And obviously, as I mentioned before, the

18   offering memorandum.

19        MR. MORRIS:  Your Honor, I would just note for the

20   record that Debtor's Exhibits I through X are all of the

21   documents that are cited in HarbourVest's response to the

22   Debtor's objection to the HarbourVest proofs of claim, and

23   those are the documents that Mr. Seery just referred to.

24        THE COURT:  All right.

25        MR. MORRIS:  Just, they're in evidence now, and I

1  just wanted the Court to understand why they're in evidence.

2            THE COURT:  Okay.  Thank you.

3            MR. MORRIS:  You're welcome.

4  BY MR. MORRIS:

5  Q    Let's talk about the Debtor and whether or not it had or

6  has any viable defenses.  Did the Debtor form any views as to

7  whether or not it had any defenses to the HarbourVest claims?

8  A    Yes, we did.

9  Q    Can you describe for the Court the defenses that were

10 reviewed and analyzed by the Debtor?

11 A    Yeah.  I think we -- we had very significant defenses.

12 So, first and foremost, with respect to the original proof of

13 claim, as I mentioned earlier, it alluded to the expenses and

14 the overcharge.  And I think with respect to the 15 million of

15 fees that were charged to HCLOF by Highland, we didn't have a

16 lot of defenses to that claim.

17        It's pretty clear, by any fair view of the Acis case, that

18 HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19 had no real responsibility for fighting with Acis and Josh

20 Terry and shouldn't have been charged those fees.  I don't --

21 I don't think there's a legitimate investor that would

22 actually think that that was an appropriate amount to be

23 charged to a fund.

24        However, the claim was not as broad -- the proof of claim

25 was not as fulsome in terms of discussing and only vaguely

1   referred to other damages.  So we did -- we did, as a

2   threshold matter, think about whether we could argue that it

3   was time-barred because they had not met their obligations to

4   fully disclose under the proof of claim.

5        Secondly, we considered the defenses to the overall claim

6   of fraudulent inducement.  Our perspective was that if we

7   could stop the claim of fraudulent inducement, the damages

8   would likely be limited to the 15 and maybe some -- some other

9   damages.  With respect to the 15, again, the problem that we

10  had when we got past -- past motions for summary judgment is

11  the factual predicate for our defense was going to be that we

12  divulged these things to HarbourVest and that they did not

13  reasonably -- it was -- reasonably rely on some failure to

14  divulge because they're a sophisticated investor.

15       The problem with that defense is that our witnesses, which

16  really would have primarily been Mr. Dondero and Mr.

17  Ellington, and one other employee who runs the CLO business,

18  Mr. Covitz, would not be pretty good.  They've been -- two of

19  them have been in front of this Court and they're not viewed

20  favorably and their testimony would be challenged and

21  potentially suspect.

22       So that gave us a real focus on trying to make sure that

23  we could, if we had to litigate, that we would litigate around

24  the fraudulent inducement.

25       As I said, reasonable reliance, what was disclosed, lack

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 16-9   Filed 05/03/23   Page 32 of 278   PageID 1740
Appendix 09   Page 3 of 174

Seery - Direct                                    47

1    of digging into the public record, because you don't have to

2    go far on Google to find "fraud" within two words of

3    "Highland," and the tremendous, you know, litigious nature of

4    Highland.  You know, even at that point, when this investment

5    was made, aside from Mr. Terry's arbitration, which by that

6    point, at least by the time (inaudible) was public, there was,

7    you know, significant public disclosure around the Credit

8    Strat and the litigation, the Crusader litigation, the UBS

9    litigation, the, gosh knows, the Daugherty litigation.

10       So our defense was going to be that you should have

11   figured this out, you're a sophisticated investor, and you

12   should have been able to figure out that there was significant

13   risk that, with respect to Mr. Terry, that Mr. Dondero would

14   not stop litigating and that those costs would put significant

15   risk on the investment.

16       The problem with that, as I mentioned earlier, is that the

17   OM is wholly deficient.  If you have a typical risk factor in

18   the offering memorandum, you would have disclosed that there

19   was a litigation with Mr. Terry, a former partner in the

20   business, and that the Debtor had no intention of settling it.

21   There was no intention of settling.  That litigation would go

22   on.  It could go on for years and it could result in

23   bankruptcy or attachments and other risks to the business, and

24   that the investor should be fully aware that the Offeror does

25   not intend to be involved in any -- or the manager, in any

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/07/24   Page 33 of 278   PageID 1744
Appendix 09   Page 474 of 174

Seery - Direct                                    48

 1   settlement with Mr. Terry, and the fact it undermined the

 2   investment.  That wasn't there.

 3       But that was our preliminary focus, to try to stop fraud

 4   in the inducement.  And then we -- we had specific facts

 5   related to that.  You know, once they knew about the

 6   bankruptcy in HarbourVest of -- I'm sorry, of Acis,

 7   HarbourVest made a second funding, which was there was a -- it

 8   was an initial $75 million draw, and then a second, I believe,

 9   about a $5 million draw, which was in -- I believe in

10   February.  And they made it without -- without objection, and

11   that was after the commencement of the bankruptcy.

12       In addition, they were -- they were active in the

13   bankruptcy, so the -- some of the things that happened in the

14   bankruptcy, there were many opportunities to settle that case,

15   from our examination, all of which were turned down to -- by

16   Mr. Dondero.  But you don't see HarbourVest pounding the table

17   to settle, either, either with respect to the Oaktree

18   transaction or any other transaction.

19       Now, HarbourVest's defense to that is, well, we were

20   taking advice and all of our information from Highland, and we

21   were getting that information directly from senior folks at

22   Highland why -- what the value was and why we shouldn't do

23   those things.  We thought that that would mitigate some of the

24   arguments that -- some of the damages that we might have, I'm

25   sorry, if we -- if we lost.

001465

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/01/24   Page 34 of 278   PageID 1442

Seery - Direct                              49

1      But the focus at that point, you know, our legal strategy,

2   was can we stop HarbourVest at the very forefront to say,

3   You've got to come into the factual realm and get out of the

4   fraud in the inducement realm.  And then the defenses and the

5   exculpations and the liability limitations in the documents

6   would also come into play.

7      So that -- those are some of the defenses that we focused

8   on and our analytical thinking around them.

9   Q   So, if the Debtor had viable defenses, why is it settling?

10  A   Well, this is a significant claim.  And we -- we looked at

11  it with respect to both the impact on the case, but, really,

12  the merits of the claim.

13     As I said, there's really little dispute that the legal

14  fees should not have been charged to HarbourVest.  We think

15  based upon the testimony in Acis, the suspect credibility of

16  those who would have been our witnesses, and the experience in

17  Acis that the Court has had in terms of the completely hell-

18  bent on litigation, it would be hard for anyone to justifiably

19  defend those fees being charged.  So, as an initial matter, we

20  had exposure there.

21     In addition, if HarbourVest got by our defense of -- was

22  able, for example, to claim fraud in the inducement, then we

23  were open to significant damages.

24     We really didn't put much value, frankly, on the RICO part

25  of it.  We think that that's waved around often to show treble

001466

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 26-9   Filed 05/17/23 174 Page 35 of 278   PageID 1718

Seery - Direct                          50

1   damages.  Although in this case certainly somebody could lay

2   out the predicate acts and put forth a RICO-type argument, we

3   just didn't think that that had real merit in this commercial

4   dispute, even with a fraud claim.

5       But even without the trebling of the damages, there's no

6   dispute that HarbourVest lost more than $50 million in this

7   investment.  You know, we -- we thought about that risk as

8   well.

9       In addition, because the case would really be fact-based,

10  even if we had a high degree of confidence based upon our

11  discussions with our employees and the factual testimony, it

12  was going to be expensive to litigate this case, and time-

13  consuming.

14      And so we looked at the economic value, the potential

15  risks, and the actual value that we were giving up, and found

16  this to be an extremely, extremely reasonable settlement.

17      Importantly, and I think what drove it, you -- one of --

18  one of the things that drove it is another one of our defenses

19  on why, notwithstanding their -- what they held out as

20  meritorious claims, I don't think HarbourVest really wanted to

21  publicly litigate this claim.  And we were aggressive in our

22  discussions with HarbourVest of how we would litigate it,

23  which would be quite publicly.

24      Now, that may or may not be fair, but that does put risk

25  on the counterparty.  And so I think that helped drive the

001467

1    settlement.

2         In addition, the structure of the settlement we think is

3    extremely favorable to the Debtor and to the estate because,

4    rather than taking the full claim and putting it into a senior

5    unsecured position, we have bifurcated it.  We did think about

6    whether this was a claim that could be subordinated under 510.

7    There won't be any arguments, I would be surprised if there's

8    arguments today that we didn't actually give to the Highland

9    employees who have given them to Mr. Dondero's respective

10   counsel.

11        We did structure it in a way that we thought gave

12   HarbourVest the opportunity to effectively claim a rescission,

13   even though that's not really what it is, and then be able to

14   claim that their recovery is based on the bankruptcy, which it

15   is, but not really dilute all the other stakeholders in the

16   case.

17        (Pause.)

18             THE COURT:  Mr. Morris?  Anything else?

19             MR. MORRIS:  I can hear you, Your Honor.

20             THE COURT:  Okay.

21             MR. MORRIS:  I can hear you.

22             THE COURT:  Okay.  Now can you --

23             MR. MORRIS:  I got cut off from Mr. Seery for a

24   moment.

25             THE COURT:  Okay.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/30/23   Page 37 of 278   PageID 1748
Appendix 09   Page 553 of 174

Seery - Direct                          52

1    BY MR. MORRIS:

2    Q    Okay.  I appreciate that.  Are you done giving the

3    Debtor's basis for entering into this settlement, Mr. Seery,

4    if you can hear me?

5    A    I think so, but I think as the Court has probably seen, I

6    can go on.

7    Q    Yes.

8    A    So I will try to be -- I'll try to be more concise.  But

9    this was a -- this was a difficult settlement.  We felt good

10   about our defenses.  Felt that we could -- we could try them.

11   But it would be extremely expensive, time-consuming, and there

12   would be a lot of risk.  And settling at a level which we

13   believe is actually below the damages that were clearly caused

14   only by the fees was a -- was a -- is a -- is a very

15   reasonable settlement.

16   Q    Okay.  Let's just talk about the process by which we got

17   to the settlement.  Do you recall generally when the

18   settlement negotiations have -- were commenced?

19   A    I believe it was -- was late summer, early -- early fall.

20   Q    Okay.  Before I move on, I just want to go back to the

21   Acis matter that you were talking about, one last issue.  Do

22   you know how, if at all, the injunction that was entered in

23   the Acis bankruptcy impacted or related to the HarbourVest

24   claims?

25   A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/29/21   Page 38 of 278   PageID 1470

Seery - Direct                                    53

1    think there's an argument, and we analyzed it thoroughly, that

2    the injunction effectively caused a lot of the damages.

3    Because if you look at the values of the equity that

4    HarbourVest had, the -- and HCLOF had in the CLOs, it went

5    down dramatically after the Trustee in the Acis case took over

6    and then subsequently, when the case was reorganized and Mr.

7    Terry took over, you know, with Brigade as the sub-advisor.

8          Now, that would -- you know, we would -- we could

9    certainly attempt to throw, in our defense, the causation at

10   Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11   retort is that none of this would have occurred but for the

12   burn-it-down litigation that Mr. Dondero engaged in with

13   Highland.

14         In addition, in Mr. Terry's defense, you know, he did try

15   multiple times with HCLOF, tried to petition, if you will, the

16   HCLOF entity to -- and directors, former directors, to reset

17   the CLOs to make them more economically viable, based upon the

18   current level of asset returns versus the debt costs in the

19   CLOs.  And that was rejected by the HCLOF and the Debtor as

20   the controlling party of HCLOF.  So, we thought about those

21   risks.

22         You know, similarly, the economic values in Acis 7 went

23   down pretty significantly from that date as well.  So I think

24   there's -- there are some defenses, but that's really Mr.

25   Terry's issue, not our issue.  So we thought about those

 1    issues, we analyzed them, and we certainly did all the work

 2    around month-to-month reductions in NAVs and how different

 3    events in the Acis case might have -- might have caused those

 4    and was that some sort of break from the original

 5    transgression that HarbourVest claims, which was the

 6    fraudulent inducement.

 7    Q    Do you recall that in November HarbourVest's motion under

 8    3018 was scheduled to be heard?

 9    A    Yes.

10    Q    And can you just tell the Court your understanding of what

11    the 3018 motion was about?

12    A    Well, the 3018 motion was going to be on voting.  And we

13    took the view that it really was not -- it shouldn't have been

14    that big an issue and HarbourVest should have been content

15    with just taking their actual losses of roughly a $50-$60

16    million claim for voting purposes and then we would move on.

17         HarbourVest was very insistent that they have a $300

18    million claim, because they took the position -- and with

19    extensive documentation; not only the pleadings they filed,

20    but also detailed decks that were prepared by their counsel,

21    which they had presented to us on the merits of their claim --

22    that they were going to litigate for -- the 3018 and for the

23    full $300 million value.

24         And that became the genesis, if you will, of the

25    negotiations to settle.

1        So, we started talking about the 3018.  It was very

2   contentious.  My apologies to Ms. Weisgerber and her counsel,

3   her partners, because it was a significant and contentious

4   negotiating call.  But the reasons for that I think were that

5   -- their insistence on litigating the 3018 and our view that

6   this was just, you know, another -- another of a series of

7   delays and costs in this case that we really were hoping to

8   avoid.

9        That led to Mr. Pugatch and I stepping away from counsel,

10  no offense to counsel, you know, ours and his, to begin

11  negotiations around the potential for a settlement.  First, it

12  started with a 3018, and then, you know, argued that we would,

13  if we got past the 3018, we were going to litigate this,

14  because we effectively had -- thought we could get everyone

15  else done at -- in and around that time.  And I think we were

16  also probably a little bit optimistic about UBS at that time

17  and the mediation, which subsequently we have settled.  But

18  that was the genesis of those settlements.

19  Q    And how did the structure, how did the Debtor and

20  HarbourVest derive at the structure whereby there is a general

21  unsecured claim, there is a subordinated piece, and there's

22  the takeback of the HCLOF interest?

23  A    Well, as I outlined, we -- we aggressively set forth our

24  various defenses.  Their position was that they -- they should

25  never have been in this transaction before.  And they --

1   HarbourVest is, in essence, a fund of funds, and they have

2   investors, and it certainly wouldn't be their, I'm sure, the

3   best-performing asset in their portfolio, to have made this

4   investment and lost $50 million over this period of time.  So

5   they felt strongly that they should never have been in this

6   investment, and but for the failure to disclose and the

7   improper disclosures, they would not have been in this

8   investment.

9        So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12       Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16       So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q    Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00603-B    Document 28-9    Filed 05/31/23    Page 42 of 278    PageID 1420

Seery - Direct                                          57

1    any agreement in principle with HarbourVest?

2    A    If we had, it would have been reflected, so I don't -- I

3    don't think we were agreed by then.  I don't recall the

4    specific dates, but if we had, it would have -- it would have

5    been reflected.

6    Q    If I can refresh your recollection that the motion was

7    filed on December 24th, does that help form your understanding

8    or refresh your recollection that there was no agreement in

9    principle on November 24th?

10   A    Yeah.  Well, I'm quite sure there was no agreement in

11   principle or we would have reflected it minimally by a

12   footnote.  There's -- there's no chance.  It's a material

13   reduction in the claims pool that we were previously telling

14   people that, at least for purposes of distribution, like UBS

15   and a couple others we said we thought we would get to zero

16   on.  So we didn't calculate in that amount.  So I'm quite sure

17   we didn't have a deal when we filed the disclosure statement.

18        In terms of the timing, anyone who's done this business

19   for any degree of time knows that the crucible of bankruptcy

20   brings people to the settlement when they see something

21   happening in the case, and not before.  I think HarbourVest

22   looked at our -- this is my supposition -- HarbourVest looked

23   at our plan, our ability to get this done, our settlement with

24   Redeemer, our settlement with Mr. Terry and Acis, and saw that

25   this plan was coming together, and if they didn't think about

 1  the settlement, they were going to think about not only the

 2  risks that we laid forth for them with respect our defenses,

 3  but also the opportunity to litigate with the Claimant Trustee

 4  over a long period of time, which couldn't have been

 5  particularly appetizing.

 6  Q   Can you describe for the Court the role played by the

 7  independent board of Strand, the general partner of the

 8  Debtor, in analyzing and participating in the approval

 9  process?

10  A   Yes.  I think, as the Court is aware and I've testified

11  before, Mr. Russell Nelms and Mr. John Dubel are fellow

12  independent directors with me, appointed pursuant to the Court

13  order.  They are kept abreast of every detail, and -- along

14  the way, not just in a summary form at the end.  We have

15  reviewed and analyzed collectively each of the issues.  Mr.

16  Dubel has extensive experience in these types of litigation

17  matters.  Obviously, Mr. Nelms, from his -- both his practice

18  and his time on the bench, has a keen insight into how to

19  resolve and what the risks and benefits are from settling

20  litigation.  So I consult them every step of the way.

21  Q   And as part of this process, did the Debtor reach out to

22  the directors of HCLOF?

23  A   Yes, we did.  So, we reached out and we've had several

24  conversations on video chats with the directors.  The

25  directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/20/23   Page 44 of 278   PageID 1722

Seery - Direct                                59

1    and Mr. Dicky Burwood.  They are extremely professional.  They

2    are exceptionally well-informed.  They are truly careful, and

3    I would say very experienced professional not only directors,

4    but experienced in -- in these matters, both in respect of

5    structured finance as well as these types of vehicles and

6    litigation.

7         They were appointed by the old directors, Scott and

8    Bestwick, and they have been in control.  They have outside

9    counsel, which is King & Spalding in the U.S.  They have

10   Guernsey counsel.  They have accountants and professional

11   advisors, and are being, in my opinion, exceptionally careful.

12   I've got -- very quickly developed a lot of respect for them,

13   and we consulted with them on this settlement and how it would

14   work.

15        They've been very clear that they represent HCLOF and they

16   work for the benefit of the equity, whomever owns it, and

17   taking a view that they would like to see these assets

18   monetized swiftly, with due regard to value, for the benefit

19   of the equity.

20   Q    And is it your understanding that the directors of HCLOF

21   approved of this transaction?

22   A    They -- I don't know that their approval was required.

23   It's really -- there are a number of hoops to jump through

24   under the documentation, including opinion of outside counsel

25   that we received from WilmerHale in terms of the effectiveness

1   of the transfer under the documents.  We had a negotiation

2   with -- with those directors, and making sure that we did

3   everything correct -- correctly, excuse me -- with respect to

4   the requirements for the transfer under the documents.  And

5   they've indicated their support and acknowledgement that we're

6   doing it correctly.

7        I don't know if it's fair to say they approved it.  I'd

8   just have to go check the documents.  But they certainly

9   support it.  And I think they generally support our position

10  with respect to how to move forward with the assets.

11  Q    I appreciate that.  I guess I meant approval with a small

12  a and not a capital A.

13       You mentioned WilmerHale.  Who do they represent in all of

14  this?

15  A    WilmerHale is the Debtor's outside corporate counsel, in

16  particular with respect to the fund issues that we don't

17  handle in-house.  We have significant support for fund issues

18  from the expertise of Mr. Surgent, who's been the CCO, and he

19  is also a lawyer, with respect to, you know, some of the

20  difficult fund issues that Highland has.  But when we use

21  outside counsel, we use WilmerHale for that, and they've been

22  -- they've been exceptional.

23  Q    Okay.  Just the last two points that were made in Mr.

24  Dondero's objection, I believe.  Did the Debtor overpay in

25  this settlement in order to gain the support of HarbourVest in

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00503-B   Document 26-9   Filed 05/27/23   Page 46 of 278   PageID 1424
Appendix 09   Page 62 of 174

Seery - Direct                        61

1  connection with its -- with the Debtor's attempt to get its

2  plan confirmed?

3  A    Not in any way.  My -- I believe the settlement is

4  extremely reasonable.  As I testified, it's -- it's less than

5  the -- the actual value going out, depending on unless there's

6  successful litigation, and there well could be, is less than

7  on a pro forma basis the fees that were taken and charged to

8  HCLOF.  We didn't do this for votes.  We will have Class 2,

9  Class 7, Class 8, and Class 9.  So I don't think that's a --

10 there's no vote purchasing, I think you called it.  No, not at

11 all.

12 Q    Yeah.  Well, on that topic, I think the phrase that was

13 used was gerrymandering.  Are you aware of the argument that's

14 been made that the subordinated claim was dropped in there in

15 order to gerrymander a positive vote for the impaired class of

16 Class 9, I believe?

17 A    In a word, I would say that's preposterous.  The -- as I

18 said, we have a number of classes that will vote for the plan.

19 The plan is -- the plan is a monetization plan.  And if -- if

20 the creditors determine that they don't want to pursue this

21 plan, we'll go forward with another -- we'll try to get

22 another plan.  We tried to have a grand bargain plan.  We

23 tried to have a pot plan, as I've testified previously.  I'm

24 quite certain that I've done more work on that than anyone

25 else, including Mr. Dondero and anybody who works for him.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 26-9    Filed 05/31/23    Page 47 of 278    PageID 1728
Appendix 09    Page 000174

Seery - Direct                          62

1  And he hasn't been willing to do that.

2      This is a -- this is a plan that's come together.  We

3  think it's going to be in the best interests of the estate.

4  That'll be confirmation next week.  Or two weeks, I guess.

5  But I don't see how this is any way related -- this settlement

6  is not any way related to the voting on that -- on that -- on

7  that plan.

8  Q   Just to put the finest point on it, is the Debtor relying

9  on Class 9 to be the impaired consenting class?

10 A   No.  I think -- I think what I've -- as I said, I believe

11 we already have the votes in Class -- I think it's 2 or 3, 7,

12 8, and -- and 9 will vote in favor as well.  So that won't be

13 an issue.

14        MR. MORRIS:  Your Honor, I have no further questions

15 of Mr. Seery.

16        THE COURT:  All right.  Pass the witness.  I'll ask

17 HarbourVest counsel first:  Do you have any questions of Mr.

18 Seery?

19        MS. WEISGERBER:  No, Your Honor.

20        THE COURT:  All right.  Thank you.

21    What about cross-examination?  Mr. Dondero's counsel?

22                    CROSS-EXAMINATION

23 BY MR. WILSON:

24 Q   Mr. Seery, how are you doing today?

25 A   I'm well, thank you.

1    Q    I'm John Wilson, and I represent Jim Dondero.  I have a

2    few questions for you today.

3        Now, the HarbourVest proof of claims were filed on April

4    8th, 2020; is that your recollection?

5    A    I believe that's correct.  I don't recall the specific

6    date.

7    Q    Okay.  And do you know when you first became aware of the

8    HarbourVest claims?

9    A    I believe it was early in the summer when we filed the

10   omnibus objection.  It may have been in late spring, shortly

11   after that.  I don't recall the specific date of the filing.

12   Q    And before the time of the filing of the omnibus

13   objection, did Highland educate itself regarding the

14   HarbourVest proof of claims?

15   A    I'm sorry, could you say that again?  I didn't quite

16   understand it.

17   Q    Before the omnibus objection was filed, did HarbourVest --

18   I'm sorry, did Highland educate itself on the HarbourVest

19   proof of claims?

20   A    Not especially, no.

21   Q    Okay.  And -- but at some point, Highland did investigate

22   those proofs of claim, correct?

23   A    That's correct.

24   Q    And when would you -- when do you recall that that

25   investigation began?

1    A    I don't recall the date, but the triggering event was

2    HarbourVest's response to our omnibus objection.

3    Q    Okay.  And that would have been filed September 11th of

4    2020?

5    A    I'll take your representation.  I don't -- I don't recall

6    the specific date.

7    Q    Okay.  And so when you began to investigate the

8    HarbourVest claims, what was your initial reaction?

9    A    My initial reaction was that the -- the larger claims that

10   they were asserting -- the fraud in the inducement, the RICO

11   -- that those claims were, in my view, attorney-made and that

12   when we dug in and did the work, we saw that HarbourVest

13   clearly lost north of $50 million on the investment.  We had

14   just started to uncover the fee issue and saw the risk we had

15   there.

16       But I thought the bulk of those claims were attorney-made.

17   Clever, but attorney-made, as opposed to what I would think

18   are more legitimate.  And so we started to develop our

19   defenses around that.

20   Q    And was your initial reaction that the HarbourVest claims

21   were largely worthless?

22   A    I think with respect to the claim around the fees, I

23   believed there was significant risk.  With respect to the

24   other claims, I thought our defenses would make them

25   worthless, yes.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 05/17/23   Page 50 of 278   PageID 1728
Appendix 09   Page 565 of 174

Seery - Cross                                    65

1    Q    And did you ever represent to any party that the

2    HarbourVest claim was worth, at most, $5 million?

3    A    I think I represented often, including to HarbourVest,

4    that it was worth nothing.  I don't recall if I specifically

5    said $5 million.  $5 million would have been a nominal amount

6    to -- which is litigation costs.  So it may -- it may have

7    been in my models that I put in that as a settlement amount,

8    but I -- I thought that there were valid and good defenses to

9    those larger claims.

10   Q    And you recognize that HarbourVest was a large,

11   sophisticated investor, correct?

12   A    Yes.  I think they manage north of -- right around a

13   hundred billion dollars.

14   Q    And you recognize that HarbourVest routinely structured

15   complex customized investments, correct?

16   A    I believe that -- I don't know the intricate part of their

17   businesses, but as a fund of funds who does creative

18   investments, I think that they do do quite a bit of that.

19   This, I believe, was their first investment in the CLO space.

20   Q    And it was not -- or I should say, you did not believe

21   that HarbourVest was simply a passive investor in HCLOF,

22   correct?

23   A    I don't think that that's true, no.

24   Q    You don't -- you don't believe that you denied their claim

25   to be a passive investor?

001482

1    A    Oh, I think -- I'm sure that in defense of their claims I

2    would argue that they were -- they were more than a passive

3    investor.  But it was pretty clear when you look at the

4    structure of what they invested that there was an intent that

5    they be passive on their part.  They didn't take a majority

6    interest.

7         In fact, Highland made it clear in the structure of the

8    deal that they couldn't -- it would be hard for them to get a

9    majority interest because Highland entities would control that

10   and Dondero-controlled entities or individuals would control

11   the majority.

12        I think that they -- they had hoped to be a passive

13   investor.

14   Q    But was it not your position that HarbourVest was actually

15   an active, involved investor?

16   A    I think our defense was going to be that they knew exactly

17   what was going on, that they participated, that they were

18   active, and that, indeed, that they were in and around some of

19   the subsequent issues in the Acis case.

20   Q    And you understood that HarbourVest played a material role

21   in the various outcomes in the Acis bankruptcy case, correct?

22   A    I don't believe that to be correct, no.

23   Q    Have you ever made that representation to anyone before?

24   A    Not -- not that I recall.

25   Q    Well, do you recall giving statements to a reporter named

1  Syed Khaderi?

2  A    I've never spoken to a reporter named Syed Khaderi in my

3  life.

4  Q    Well, did you participate in the preparation of statements

5  to be given to Syed Khaderi?

6  A    I've never heard of Syed Khaderi, nor have I participated

7  in any preparation of statements.  I don't know who that is.

8        MR. WILSON:  All right.  I'm going to have Bryan

9  Assink put on the screen a document.

10     And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q    Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A    Yes.

16  Q    And who is Lucy Bannon?

17  A    She is the Highland public relations person.

18        MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q    Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A    Yes.

24  Q    Have you seen this email before?

25  A    Not that I recall, no.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 16-9    Filed 05/27/23    Page 53 of 278    PageID 1484

Seery - Cross                                    68

1   Q   All right.  It continues on that, I saw the filing on

2   Friday about HarbourVest claims against Highland for a CLO

3   investment, and I'm looking to put out a report tomorrow

4   morning London time.  Ahead of that, I wanted to check if

5   Highland would like to comment on the matter.

6           MR. MORRIS:  Your Honor, this is -- the Debtor

7   respectfully objects.  A, this document is not in evidence.

8   B, it's rank hearsay.

9           THE COURT:  Response, Mr. Wilson?

10          MR. WILSON:  Your Honor, I am attempting to

11  authenticate this document, but I'm using it in rebuttal to

12  the testimony that Mr. Seery just offered.

13          THE COURT:  All right.  I'll allow it.  Overrule the

14  objection.

15          MR. WILSON:  All right.  Thank you, Your Honor.

16  BY MR. WILSON:

17  Q   All right.  Now, if we -- and oh, that September 14th

18  date, that was three days after the September 11th date that

19  we discussed was the date that HarbourVest filed its response

20  to the omnibus objection, correct?

21  A   Yes.  If that's the date that they filed it, then I -- if

22  you're representing that, I concede that the 14th is three

23  days after the 11th.

24  Q   All right.  And if you go back to the first page of this,

25  it looks like, on the following day, Lucy Bannon sends an

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9 Filed 05/10/23174 Page 54 of 278   PageID 1482

Seery - Cross                              69

1   email to you, and is that your email address,

2   jpseeryjr@gmail.com?

3   A    That's correct, yes.

4   Q    And do you recall receiving this email from Lucy Bannon?

5           MR. MORRIS:  Your Honor, I renew my objection that

6   this is hearsay.  He's not rebutting anything that Mr. Seery

7   testified to.  He testified that he'd never heard of the

8   gentleman at the bottom of the document.  There's nothing in

9   this document that rebuts Mr. Seery's testimony at all.

10          THE COURT:  Response, Mr. Wilson?

11          MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12  his statement that he hadn't -- that he hadn't heard of Syed

13  Khaderi.  My rebuttal is attempted to -- attempting to show

14  that he has made various statements that he denied.

15          THE COURT:  I'll overrule the objection.

16  BY MR. WILSON:

17  Q    All right.  So, back to this exhibit, Mr. Seery.  You

18  recall receiving this email from Lucy Bannon on Tuesday,

19  September 15, 2020?

20  A    Not specifically.  But to be clear, I recall talking to

21  Lucy Bannon about the HCMLP dispute with HarbourVest.

22  Q    Okay.  And --

23          MR. WILSON:  Bryan, can you go down to the next page?

24  Scroll down to where -- the James Seery email.

25  BY MR. WILSON:

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 26-9   Filed 07/10/23   Page 55 of 278   PageID 1488
Appendix 09   Page 971 of 174

Seery - Cross                                    70

1  Q    Do you see this email on your screen that's dated

2  September 15, 2020 at 10:33 p.m.?

3  A    Yes, I do.

4  Q    And do you recall sending this email to Lucy?

5  A    Not specifically, no.

6  Q    Well, do you deny that you sent this email to Lucy?

7  A    It appears to be my email.

8          MR. WILSON:  Your Honor, we would move to admit this

9  document into evidence as Dondero Exhibit Letter N.

10          THE COURT:  Any objections?

11          MR. MORRIS:  I would consent to the admission of Mr.

12  Seery's email, but the balance of it ought to be excluded as

13  hearsay.

14          THE COURT:  What about that?

15          MR. WILSON:  Well, Your Honor, I think that this

16  document -- and I'll get into this in a little more detail in

17  a second -- but I think this document is a combination of the

18  work product of Lucy Bannon and Mr. Seery in preparing a

19  response for the reporter who requested comment from Highland.

20          THE COURT:  Okay.  I --

21          MR. MORRIS:  Your Honor, um, --

22          THE COURT:  Go ahead.

23          MR. MORRIS:  I just -- I do question how they got

24  this document, but that's for another day.  That's number one.

25  Number two, in addition to the hearsay argument, I just --

 1   relevance grounds.

 2           THE COURT:  Okay.  I'll allow the portion that is the

 3   communication of Seery, that portion of Exhibit N.  All right?

 4           MR. WILSON:  Okay.  With due -- thank you, Your

 5   Honor.  With due respect, I -- to use that portion, I need to

 6   refer to the portion below it, because he says, Good to submit

 7   with your final edit/revisions.  And so we need to know what

 8   those final edit/revisions are, which are contained in the

 9   email directly below that on the document that was four

10   minutes earlier in time.

11           THE COURT:  All right.  Fair enough.  That'll be

12   allowed.

13           MR. WILSON:  All right.  Thank you, Your Honor.

14       (James Dondero's Exhibit N is received into evidence as

15   specified.)

16           MR. WILSON:  So, Bryan, now can you scroll to the

17   next page?  Oh, actually, let's just -- let's just stop at the

18   top -- at the bottom of the page.  What's this statement?

19   BY MR. WILSON:

20   Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21   Khaderi's request for information and comment, you prepared

22   actually two responses, and one of those was a statement on

23   the record attributed to a spokesperson for HCMLP or something

24   along those lines.  And then --

25           MR. WILSON:  Can you scroll down to that next page?

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00603-B   Document 26-9   Filed 05/30/23   Page 57 of 278   PageID 1488

Seery - Cross                                72

1   BY MR. WILSON:

2   Q   And this says -- I think part of this got cut off for some

3   reason, but it looks like the official statement is in

4   quotation marks.  It says, "We dispute the allegations made in

5   the filing and believe the underlying claims are invalid and

6   will be found to be without merit.  Our focus continues to be

7   treating all valid claims in a transparent, orderly, and

8   equitable manner, and vigorously disputing meritless in the

9   court.  That focus will assure that HCMLP's reorganization

10  process -- progress is towards an efficient and equitable

11  resolution."

12      And then below that there's another section of this email

13  that says, Background/Clarification, Not for Attribution.  And

14  do you know the purpose of this second section of the

15  response?

16  A   Do I know the purpose of that?  Yes.

17  Q   And what would that purpose be?

18  A   Ms. Bannon was speaking on background to reporters.  As I

19  said earlier, I've -- I never heard of the gentleman from

20  London.  If he's at the bottom of the email, I didn't pay any

21  mind, never heard of him.  Nor have I heard it since.  Ms.

22  Bannon didn't ever reference the specific person.

23      But she is the public relations person.  So, as I

24  testified earlier, she does communicate with the press.  And

25  as I previously testified when Mr. Morris questioned me, one

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 6-9    Filed 09/14/23    Page 58 of 278    PageID 1466
Appendix 09    Page 721 of 1374

Seery - Cross                            73

1  of our tactics and our defenses for HarbourVest was going to

2  be that we were going to be very public and aggressive about

3  the investment and it would have a negative impact or negative

4  perspective for viewers, in our opinion, about HarbourVest's

5  investment.

6  Q    All right.  Well, look with me in the middle of that

7  paragraph right after the closed parenthetical, where it says,

8  "But it's important to note the background of HarbourVest's

9  active and deep involvement in the investment of which it now

10  complains."

11      And so it was your position that HarbourVest had an active

12  and deep involvement in the investment, correct?

13  A    No.  I don't think that's correct.  Ms. Bannon prepared

14  the statement, it was a litigation defense on background, and

15  that's our -- that was our position for this purpose.  It was

16  not my view that they were active and deeply involved.  They

17  were certainly involved.  There's no doubt about it.  But they

18  got all their information, in our estimation and our research,

19  from Highland.

20  Q    But in any event, you would agree with me that four

21  minutes after receiving this email, you approved this

22  statement to go out to the reporter, correct?

23  A    No, that's not correct.  That's -- this portion is on

24  background.  That statement doesn't go out.  The previous

25  statement was the official statement.  This is the background

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 09/25/23    Page 59 of 278    PageID 1737

Seery - Cross                                    74

1    discussion that she would have.  So, no, she was not

2    authorized in any way whatsoever to send that out.  She was

3    authorized to have conversations with those general facts.

4            MR. WILSON:  Okay.  Bryan, go to the top, or the

5    bottom of the page immediately preceding that.  That's it.

6    Yes, that's it right there.

7    BY MR. WILSON:

8    Q   Now, you'll see that this email from Lucy Bannon on

9    September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10   what you think of the below.  And, again, the first would be

11   on the record and the second will be sent for information

12   purposes to ensure accuracy, not for attribution."

13       So the intent was that this -- that this entire statement

14   be sent to the reporter, correct?

15   A   I don't believe that's correct.  I think when she goes on

16   background she doesn't send them a written doc.  It's got to

17   be clear to the reporter, at least my understanding is that

18   what on background means -- I've been involved with this

19   before -- is that typically that's done orally.  I don't know

20   if she's done it in a written statement before.  I have never

21   seen that done in a written statement before.  You give the

22   official statement and then you walk the reporter through your

23   other views on background.  And you're not quoted.  And it's

24   usually attributed to a source with knowledge.

25   Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                            75

 1   sentence after the one I just read to you --

 2            MR. WILSON:  Go back to where we were on the

 3   background.

 4   BY MR. WILSON:

 5   Q   Now, we just read you the sentence that starts with, "Then

 6   it's important."  The following sentence says, "HarbourVest

 7   was not simply invested in HCLOF as an ignorant,

 8   unsophisticated, passive investor, but was an active and

 9   informed participant in the inception of its investment

10   through all of the Acis bankruptcy proceedings, and

11   HarbourVest played a material role in various outcomes related

12   to that case and its impact on HCLOF."

13       And is it -- did you not just tell me before we

14   investigated this document that HarbourVest did not play a

15   material role in the various outcomes of the Acis bankruptcy?

16   A   I don't know exactly what I said, but I think that's

17   correct, after we'd done the research on it, yeah.

18   Q   But you took the position in this email that you approved

19   to go out to a reporter that says that -- that HarbourVest was

20   an active and informed participant in the inception of -- of

21   its investment through all of the Acis bankruptcy proceedings

22   and played a material role in various outcomes related to that

23   case and its impact on HCLOF.  Can we agree with that?

24   A   Yes.

25   Q   And then the final sentence of this paragraph says that,

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00603-B   Document 28-9   Filed 09/27/23   Page 61 of 278   PageID 1439

Seery - Cross                           76

 1   We believe that neither the facts nor the law support

 2   HarbourVest's, quote, We-were-too-lazy-to-know allegations.

 3        Whose words were those, "We-were-too-lazy-to-know

 4   allegations"?

 5   A    I don't recall.  They may be mine.  It's aggressive the

 6   way I am, so that -- that may well be the case.

 7             MR. WILSON:  All right.  Go -- go down to the next

 8   page.

 9   BY MR. WILSON:

10   Q    And with respect your comment that that second paragraph

11   would not have gone to the reporter, look at this email in the

12   middle of the page from Lucy Bannon to Syed Khaderi, September

13   16, 2020, at 1:51 a.m.  And --

14             MR. MORRIS:  Your Honor, this I will object to as

15   hearsay.  There is no witness here to testify to anything on

16   this document.

17             THE COURT:  All right.  How about that?

18             MR. WILSON:  Well, it's -- well, scroll up just a

19   little bit.  This email at the top of the page is three

20   minutes after the one in the middle of the page, where Lucy

21   Bannon is forwarding this to James Seery, saying, See below

22   for responses sent to *Creditflux*.  Will follow up with the

23   story when it runs or with any other updates.

24             MR. MORRIS:  Your Honor, these --

25             MR. WILSON:  So I think this --

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/30/23   Page 62 of 278   PageID 1740

Seery - Cross                    77

1          MR. MORRIS:  These documents don't appear on the

2     witness list.  They're not being offered to impeach anything.

3     They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5     trying to rebut the statements that Mr. Seery made.  In fact,

6     he told me just a minute ago that that second paragraph would

7     not have gone out to the reporter.  However, this email from

8     Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10    questioning, with an undisclosed document, is to rebut the

11    earlier testimony he gave before you even put this exhibit in

12    front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14    that Mr. Seery has made today, and I think it -- you know, if

15    he's going to testify that this information did not go out to

16    a reporter, I think I'm allowed to rebut that to demonstrate

17    that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19    in advance?  It's feeling less and less like an impeachment

20    document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22    actually have this document at the time we filed our witness

23    and exhibit list, but I would also say that I didn't have any

24    purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 05/21/23    Page 63 of 278    PageID 1744
Appendix 09   Page 570 of 174

Seery - Cross                                        78

1    disclose all exhibits you anticipate using except those for

2    purposes of impeachment.  Okay?  Not rebuttal, to be

3    technical.

4        So, if you didn't disclose this exhibit, the only way you

5    can use it, subject to other possible objections, is if you're

6    impeaching a statement.  And I'm just saying I think we're

7    going beyond trying to impeach the original statement and now

8    we're trying to impeach statements he's made after seeing

9    portions of the document.

10       What did you mean, you didn't have this document in time

11   to disclose it?

12            MR. WILSON:  Well, I actually just received this

13   document this morning, Your Honor.

14            THE COURT:  Where did you receive it from?

15            MR. MORRIS:  From who?

16            MR. WILSON:  I -- I honestly do not know the source

17   of this document, although it was provided to me by my client.

18            MR. MORRIS:  Your client being Mr. Dondero?

19            THE COURT:  Could you answer that, Mr. Wilson?

20            MR. WILSON:  Yes, that's -- yes, that's correct.

21            THE COURT:  All right.  I will -- that's --

22            MR. MORRIS:  Your Honor, I'd like to --

23            THE COURT:  That's a different can of worms.  But for

24   now, I sustain the objection.  You're done questioning on this

25   document.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/20/23   Page 64 of 278   PageID 1442

                          Seery - Cross                    79

```
 1              MR. WILSON:  That's fine, Your Honor.  I can move on.
 2    BY MR. WILSON:
 3    Q   Now, Mr. Seery, you would agree with me that whether or
 4    not HarbourVest played an active role in the Acis bankruptcy,
 5    it was kept apprised of the -- of the ongoings in the
 6    bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?
 7    A    Yes.  My understanding is that -- that they were.
 8    Q    And in fact, did Highland have weekly conference calls
 9    with HarbourVest during the Acis bankruptcy to discuss what
10    was going on in the bankruptcy?
11    A    I don't know if they were weekly.  I've been told that
12    they had regular calls updating HarbourVest, yes.
13    Q    Okay.  And did Highland produce over 40,000 pages of
14    documents to HarbourVest related to the Acis bankruptcy?
15    A    I'm not aware of that, no.
16    Q    Have those documents been provided to you?
17    A    I hope not.
18    Q    So, in your role --
19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents
20    from anybody.
21    Q    Well, did you receive any number of documents that were
22    provided by Highland to HarbourVest during the Acis
23    bankruptcy?
24    A    I wasn't involved in this during the Acis bankruptcy.  I'm
25    sorry.
```

1  Q   Well, I'm referring to, after you became involved in this

2  Highland bankruptcy, whether you were provided with these

3  documents that were sent from Highland to HarbourVest.

4  A   I don't -- I don't know what the documents are.  I've

5  reviewed tons of documents with respect to the HarbourVest

6  claims, but I don't know of the documents to which you're

7  referring.

8  Q   Okay.  And after you performed your investigation into the

9  HarbourVest claim, what was your opinion as to the cause in

10  the reduction in value of HarbourVest's investment in HCLOF?

11  A   I think the main cause of the reduction in the investment

12  was the imposition of the Trustee and the failure of Highland

13  HCLOF and then subsequently with the injunction to reset the

14  CLOs.

15      You know, these are -- these are some of the worst-

16  performing CLOs in the market because they weren't reset.  And

17  when the liabilities of the CLOs are set at a level to match

18  assets, and then liability -- the assets run off, and the

19  asset financings or the new deals come in at much lower

20  levels, and the obligations of the CLO are not reset, the

21  arbitrage that is the CLO shrinks.  And that's what happened

22  to these CLOs.

23  Q   And during the course of the Acis bankruptcy, Acis and

24  Brigade were given management responsibilities over the CLOs

25  and HCLOF, correct?

1    A    I believe that the Trustee had the overall, and then

2    subsequently, with the confirmation of the plan, they took it

3    over.  So I think that ultimately Mr. Terry had the management

4    authority, full management authority, and some advice through

5    Brigade.  But I think technically it wasn't actually during

6    the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7    Phelan had the actual authority.

8        (Echoing.)

9    Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10   the actual authority but he delegated that authority to Josh

11   Terry and Brigade?

12   A    I think that's fair, yes.

13   Q    And do you know when that occurred?

14   A    I believe that the control of the CLOs was in July of

15   2018, and then the ultimate confirmation of the case was at

16   the very beginning of '19.

17   Q    So, after being instituted as portfolio manager, and

18   during the time when Acis and Brigade were working under the

19   direction of the Trustee, who would have receive the fees for

20   managing those portfolios?

21   A    I believe -- I don't know.  I believe the -- that the Acis

22   estate would have received those fees.

23   Q    And who -- and so is that your testimony, that prior to

24   confirmation the Acis estate would have received the

25   management fees?

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 05/31/23174   Page 67 of 278   PageID 1748

Seery - Cross                          82

1  A    I believe that -- I believe they would have if they were

2  the manager, yeah.

3  Q    Okay.  And who would have received the fees after

4  confirmation?

5  A    Acis.

6  Q    Okay.  And who would have had the discretion to set the

7  amount of those management fees?

8  A    They would be agreed to in the -- in the investment

9  management agreement.

10 Q    They would be agreed to?

11 A    Yes.  As far as I've seen, I've -- I haven't seen

12 unilateral ability of a manager to set fees at its -- at its

13 whim.

14 Q    So is it your understanding that Acis and Brigade ended up

15 charging substantially more fees than Highland had charged

16 when it was under Highland's management?

17 A    I think the fees were -- the fees were -- the fees were

18 set by the agreement.

19       MR. MORRIS:  Your Honor, I just object to the line of

20 questioning on relevance grounds.  This is a 9019 hearing,

21 Your Honor.  How -- I just don't think this has any relevance

22 at all.

23       THE COURT:  All right.  Mr. Wilson, what is the

24 relevance?

25       MR. WILSON:  The relevance is that Mr. Seery has

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/27/23   Page 68 of 278   PageID 1746
Appendix 09   Page 001500.174

Seery - Cross                               83

1    testified that these Acis CLOs were among the worst-performing

2    in the market, and frankly, we would agree with that, and I'm

3    trying to get his understanding as to why, because I think

4    there's direct relevance in the reason that the value of the

5    HarbourVest investment diminished.

6          MR. MORRIS:  I don't think that was his testimony,

7    Your Honor.  But at the end of the day, Your Honor has heard

8    the litany of reasons why the Debtor is entering into this

9    agreement.  I just, I just think it's irrelevant, Your Honor.

10         THE COURT:  All right.  Mr. Wilson, I barely think

11   this is relevant.  I mean, I'm going to give you some benefit

12   of the doubt on that because of, you know, the testimony that

13   HarbourVest lost $50 million of value and --

14       (Echoing.)

15         THE COURT:  -- maybe that shouldn't, you know, lie at

16   the feet of Highland.  I think the compromise reflects that

17   they don't -- it doesn't lie entirely at the feet of Highland.

18   But, you know, maybe two or three more questions.

19         MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20   didn't have very much more on this point.  But to be a hundred

21   percent honest, I can't remember my question right before the

22   objection.

23         THE WITNESS:  I think you were asking me about the

24   fees and somehow alluding or implying that the manager could

25   unilaterally set fees.

1      The fees are set in the investment management contract.

2   The manager doesn't get to wake up on Wednesday and say, you

3   know, I'd like another half a basis point.  It doesn't work

4   that way.

5   BY MR. WILSON:

6   Q    But you would agree with me that the fees and expenses

7   charged to an investment would impact the performance of that

8   investment in the market?

9   A    Absolutely.

10   Q    Would you also agree with me that there was one CLO -- and

11   I think you referred to it in your direct testimony -- but CLO

12   7, which continued to be managed by Highland?

13   A    That's correct.

14   Q    And is it fair to say that CLO 7 exceeded the performance

15   of the CLOs that were managed by Acis and Brigade?

16   A    I think that's fair.  I don't -- I don't recall the

17   magnitude, but I think it's outperformed those -- those CLOs,

18   yes.

19   Q    All right.  Well, thank you.  I want to turn your

20   attention to the portion of the settlement agreement that

21   deals with voting of the HarbourVest claim.  How did

22   HarbourVest's commitment to vote for the plan become a part of

23   the settlement?

24   A    Pretty straightforward negotiation.  We -- in negotiating

25   the settlement, one of the key factors was the cost and

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/05/23   Page 70 of 278   PageID 1748

Seery - Cross                          85

1    expense of the litigation, in addition to the risk on the --

2    on the fees, and whether we could wrap this up in a global

3    settlement now.  So in my experience, it's fairly typical, we

4    would try to do this in every settlement, have the settling

5    party, be that the claimant, agree to support the case and the

6    plan.

7        You know, we did not do that with the Committee members,

8    although we wanted to.  (Echoing) I frankly still wish I had.

9    Those little -- little bits that have been difficult

10   (echoing).  The Committee members have a different interest in

11   (echoing) than their more global interest for creditors at

12   large, which is more difficult than traditionally in

13   bankruptcy cases, less likely to have a Committee member, a

14   sitting Committee member, actually support the (echoing) of

15   the plan.

16           THE COURT:  Mr. Wilson, could you be careful to put

17   your device on mute every time you're not talking?  Because

18   we're getting some feedback loop from you when Mr. Seery

19   answers your questions.  Okay?

20       (Echoing continues.)

21           THE COURT:  Like right now.  I'm hearing feedback of

22   my own voice through your speakers.

23       Right, Mike?  Isn't that what --

24           A VOICE:  I am, too.

25           THE COURT:  Yes.  Okay.  So please be sure you put

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 03/07/24   Page 71 of 278   PageID 1739
Appendix 09   Page 001703

Seery - Cross                          86

1  your device on mute whenever you are not speaking.  All right.

2  Go ahead.

3  BY MR. WILSON:

4  Q   I mean, I think you just answered this question, but there

5  was -- there was no similar voting provision in the Acis or

6  the Redeemer settlements, correct?

7  A   There is not, no.  And just as a -- by way of explanation,

8  if it's okay, the reason was my counsel advised against it.  I

9  did ask for it.

10 Q   Your counsel advised against putting that voting

11 requirement in the Acis and Redeemer settlements?

12 A   For the reasons I stated.  And in my experience, that's

13 consistent, where sitting members of Committees don't

14 generally sign up to resolve their own claims and support the

15 plan because of their larger fiduciary duties to the creditor

16 body as a whole.

17 Q   And during the settlement negotiations of the HarbourVest

18 claim, was this commitment to vote a topic of discussion?

19 A   Not -- not particularly, no.  It was pretty clear that

20 HarbourVest, if they were going to agree to the settlement and

21 the numbers, could see structure.  Obviously, it wanted to

22 understand what the potential distributions would be under the

23 plan, but this was not a hotly-negotiated point.

24 Q   And would you consider HarbourVest's commitment to vote

25 for the plan an important part of the settlement?

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/27/23   Page 72 of 278   PageID 1480
Appendix 09   Page 001504

Seery - Cross                         87

1  A   I think it's an important part of the settlement, that the

2  part of the settlement is the subordinated claim.  We could

3  put that into presumably any plan.  But our plan does -- does

4  have a Class 9 for that.  So I think it's a -- it's a part of

5  the settlement that is important or we wouldn't have included

6  it.  It clearly wraps everything up and moves us towards

7  confirmation.

8  Q   And would you have made the deal with HarbourVest if they

9  had pushed back on the commitment to vote for the plan?

10 A   Yeah, I would have.

11 Q   All right.  Thank you.

12      MR. WILSON:  No further questions.

13      THE COURT:  All right.  Mr. Draper, anything from

14 you?

15      MR. DRAPER:  Yes, Your Honor.

16                  CROSS-EXAMINATION

17 BY MR. DRAPER:

18 Q   Mr. Seery, I may not understand the settlement, and I

19 apologize, but the way I think the settlement reads, the

20 interest that you're acquiring, you have the right to place in

21 any entity.  Is that my -- is that correct?

22 A   I don't recall the -- the specifics, but just from a

23 structural standpoint, we wanted to be able to put it into a

24 subsidiary as opposed to putting it directly in HCMLP.  If we

25 couldn't do that, we would -- we would put it into HCMLP.  So

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9   Filed 06/20/23   Page 73 of 278    PageID 1751

Seery - Cross                              88

1   there wasn't a -- I don't recall the actual specifics, but we

2   certainly thought about holding that interest in a -- in a

3   subsidiary, just to have a cleaner hold.

4   Q   Why aren't you putting it into the Debtor so the Court and

5   the estate have jurisdiction over that?

6   A   I think the Court certainly has jurisdiction over an

7   entity that the estate owns a hundred percent of.  I don't

8   think that's -- that's even a close call.  So the important --

9   Q   Now, --

10  A   Can I finish?

11  Q   Sure.

12  A   You asked me why.  To the extent that somebody thinks that

13  problematic, I will consent to the Court having complete

14  jurisdiction over it, since I control it a hundred percent.

15  Q   No.  The real reason is, if I remember correctly, Mr.

16  Dondero and Judge Lynn filed a motion to have some say or some

17  information as to sales by subsidiaries, and I think you took

18  the position that they weren't entitled to it.  And so my

19  concern was that putting this in a subsidiary in a sense gave

20  you unfettered control without any review of the item.

21  A   I don't -- I don't think that's the case where we --

22  there's a directly-held subsidiary where we own a hundred

23  percent of it.  I don't think that that's the case.

24  Q   Okay.  But you're willing to (a) put this into the Debtor,

25  number one; and number two, have the estate and have the Court

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/29/23   Page 74 of 278   PageID 1482
Appendix 09   Page 970 of 1174

Seery - Cross                          89

```
 1  have complete control over the disposition of it and its
 2  actions, correct?
 3  A    That's not correct, no.
 4  Q    What -- what is incorrect about my statement?
 5  A    The debtor-in-possession has control of its assets.  The
 6  Court doesn't have complete control over its assets.  There's
 7  --
 8  Q    Well, --
 9  A    -- issues -- hold on a second.  This is not -- this is not
10  a game and a trap.  We put it in a subsidiary for specific
11  reasons.  You asked why.  I'm giving you the why.  It's not to
12  hide it from anybody.  We're not going to sell the asset
13  unless somebody comes up with a great price for it.  We're
14  going to monetize the assets.  We're going to control HCLOF by
15  a majority.
16  Q    But, again, the issue is, if it's in the estate, the Court
17  has supervision over it.  If it's not in the estate, the Court
18  has no supervision of it.
19  A    I don't think that's correct, because the Court has
20  supervision over the estate, which owns a hundred percent of
21  the special-purpose entity that will own the shares.
22  Q    Okay.  All right.  Now, let's talk about the $15 million
23  that you discussed and the legal fees that were incurred.  Is
24  that the total amount that was spent, or is -- or is that --
25  was the total amount $30 million and HarbourVest was only
```

001506

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00603-B    Document 28-9    Filed 09/01/23    Page 75 of 278    PageID 1788

Seery - Cross                              90

1    responsible for one half of it or functionally took the brunt

2    of one half of it?

3    A    I think the total amount is between $15 and $20 million.

4    I don't have the exact numbers.

5    Q    So, in fact, the HarbourVest loss due to its ownership

6    would have been one half of that, not $15 million?

7    A    Well, the vehicle lost the money.  HarbourVest owned 49.98

8    percent of it, and Highland controlled the rest.  So if you

9    allocate it that way, I suppose that would be a -- that's how

10   you would divide it, in -- roughly in half, yes.

11   Q    And so HarbourVest's actual dollar loss due to the legal

12   fees is really the 49-point-whatever percent of $15 million,

13   not $15 million?

14   A    I don't know if -- I certainly would argue that.  I don't

15   think that HarbourVest has that position.

16   Q    Okay.  Now, in connection -- you were asked a question

17   about the documentation that was provided by Highland to

18   HarbourVest both during the bankruptcy of Acis and before.

19   You have control over the Harbour -- over the Highland server,

20   correct?

21   A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22   Draper, I can't see you, so it would be better if I could see

23   you during the questioning.

24   Q    Okay.

25   A    And could you repeat the question?

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9 Filed 09/27/23 Page 76 of 278   PageID 1784
Appendix 09 Page 20134174

Seery - Cross                                    91

1    Q   All right.  I'll be happy to.  You were asked a question

2    about the documentation that was provided by Highland to

3    HarbourVest during the Acis bankruptcy and meetings that took

4    place between the parties.  Correct?

5    A   Yes.

6    Q   And you stated you were unaware of the material that was

7    sent over?

8    A   I think I testified that I didn't receive the 40,000

9    documents that were mentioned.

10   Q   Did you do any search or order a search of the Highland

11   server to see what material was sent over by any party to

12   HarbourVest to analyze what -- what information they had

13   available to them and what was provided to them?

14   A   Yes, we did a search.

15   Q   And did you review the documentation that was sent over?

16   A   The -- the documentation that we looked at was very

17   specific to the investment and to the OM.  So we didn't look

18   for the -- the supposed 40,000 documents, no.

19   Q   Did you look for the material that was provided to them

20   during the Acis bankruptcy and the periodic meetings that you

21   discussed?  Or that you testified to earlier?

22   A   The answer is no.

23   Q   One last question.  I think, and just so I understand your

24   testimony, you've broken out the HarbourVest claim into two

25   pieces.  One is the legal fee amount that we've just

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00603-B    Document 28-9    Filed 09/30/23    Page 77 of 278    PageID 1488

Seery - Cross                                        92

1  discussed, and I gather the other piece of that is the fraud

2  in the inducement to enter into the CLO purchase?

3  A    It's -- it's more -- it's much more than that.

4  Q    Okay.  Well, let me say it in a different way.  The other

5  part of it is the losses as a result of the fraud in the

6  inducement to purchase the interest?

7  A    I don't think that's -- that's fair.  If I could explain?

8  Q    Sure.

9  A    Yeah.  The legal fee piece is pretty clear.  The other

10 piece starts with fraud in the inducement, but it's extensive

11 fraud claims.  Fraud in the inducement, as I testified

12 earlier, would get them around the exculpation and liability

13 limitations in the OM.  You don't get around all of those with

14 just the fraud.  And so that's -- that's the split of that

15 claim.  So the fraud in the inducement contains fraud

16 allegations.  Even if you didn't have inducement, you'd have

17 other potential fraud claims.

18 Q    But let me state it in a different fashion.  But for the

19 investment, the fraud that you allege wouldn't have occurred?

20 A    I -- HarbourVest alleges it.

21 Q    No, I'm just -- in your analysis of the claim, but for the

22 inducement, the rest of the damages wouldn't have flowed?

23 A    That's HarbourVest's position, yes.  But for the fraud,

24 they wouldn't have made the investment.

25 Q    All right.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/29/21   Page 78 of 278   PageID 1456

Seery - Redirect                          93

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4   Just a very few questions.

5                    REDIRECT EXAMINATION

6   BY MR. MORRIS:

7   Q    Mr. Seery,  you were asked about that document that Lucy

8   prepared.  Do you remember that?

9   A    Yes, I do.

10  Q    In your experience, don't defendants often deny liability

11  before entering into settlements, or even worse, getting

12  adverse judgments entered against them?

13  A    Of course.  Yes.

14  Q    Okay.  And in response to Mr. Draper's questions, isn't

15  the Guernsey claim another claim that the Debtor took into

16  account in assessing the potential risks of this settlement?

17  A    There's a number of claims contained in it.  As I

18  mentioned earlier, I mentioned the RICO claim.  But there is a

19  Guernsey shadow director claim, which is not dissimilar to

20  U.S. claims that somebody effectively controls an enterprise,

21  notwithstanding them not having the official role.

22  Q    Okay.

23         MR. MORRIS:  I have nothing further, Your Honor.

24         THE COURT:  All right.  Any recross on that redirect?

25  All right.

001510

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 05/02/13 74  Page 79 of 278    PageID 1497

Seery - Redirect                    94

1              MR. WILSON:  No, Your Honor.

2              MR. DRAPER:  No, Your Honor.

3              THE COURT:  Thank you.  Mr. Seery, that concludes

4    your testimony.  Thank you.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  We need to take a bathroom break.  Before

7    we do, I just want to be clear with what we have left.  As I

8    understood it, we were having Mr. Pugatch from HarbourVest.

9    Mr. Morris, will that conclude the Debtor's evidence?

10   (Pause.)  Okay.  You were on mute, but I think you were saying

11   yes.

12             MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13   going to be putting their witness on the stand.

14             THE COURT:  Okay.

15             MR. MORRIS:  But it's part of the evidence in support

16   of the motion.

17             THE COURT:  All right.  Do the Objectors have any

18   witnesses today?

19             MR. WILSON:  Your Honor, Mr. Dondero intends to

20   examine Mr. Pugatch, but if he's going to be called by his

21   counsel, then we will do that as a cross-examination.

22             THE COURT:  All right.

23             MR. DRAPER:  This is Douglas Draper.  I have no

24   witnesses.

25             THE COURT:  Okay.  All right.  Well, I'm asking --

001511

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 05/07/24   Page 80 of 278   PageID 1498

95

```
 1   well, I do want to ask:  Can we get a time estimate
 2   potentially for Mr. Pugatch?
 3           MS. WEISGERBER:  For my examination, Your Honor,
 4   twenty minutes, perhaps.
 5           THE COURT:  Okay.
 6           MS. WEISGERBER:  Or less.
 7           THE COURT:  All right.  Well, let me tell you what
 8   we're going to do.  We're going to take a ten-minute bathroom
 9   break.  But I have a 1:30 hearing and I have a 2:00 o'clock.
10   Well, I have a 1:30 docket, multiple matters, and a 2:00
11   o'clock docket.  So, you know, I'm really intending that we
12   get finished in time to give me and my staff a little bit of a
13   lunch break before launching into the 1:30 docket, so I'm
14   hopeful we can get done around 1:00-ish.  If we can't, then
15   we're going to have to reconvene, I'm going to say probably
16   3:00-ish Central time.  So let's hope we can get through
17   everything.  All right?  Ten-minute break.
18           THE CLERK:  All rise.
19       (A recess ensued from 11:58 a.m. until 12:08 p.m.)
20           THE CLERK:  All rise.
21           THE COURT:  All right.  Please be seated.  We're
22   going back on the record in the Highland matters.  Do we have
23   everyone?  It looks like we do.  Ms. Weisgerber is going to
24   call the next witness; is that correct?
25           MS. WEISGERBER:  Yes, Your Honor.  We call Michael
```

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/07/23   Page 81 of 278   PageID 1499
Appendix 09   Page 007174

Pugatch - Direct                                    96

1   Pugatch of HarbourVest to the stand.

2          THE COURT:  All right.  Mr. Pugatch, if you could

3   turn on your video and say, "Testing one, two."

4          MR. PUGATCH:  Two.

5          THE COURT:  All right.  There you are.  Please raise

6   your right hand.

7          MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8          THE COURT:  Thank you.  You may proceed.

9          MS. WEISGERBER:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q    Good morning.  Can you please state your name for the

13  record?

14  A    Sure.  It's Michael Pugatch.

15  Q    And where do you work, Mr. Pugatch?

16  A    HarbourVest Partners.

17  Q    And what is your title?

18  A    I'm a managing director in our secondary investment

19  group.

20  Q    Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A    We did, yes.  Several claims, in fact.

23  Q    What was the basis for those claims?

24  A    Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

001513

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-9    Filed 09/23/23    Page 82 of 278    PageID 1760

Pugatch - Direct                              97

1  connection with our original investment, mismanagement at the

2  HCLOF level, including inappropriate fees that were charged

3  to investors, among a number of other items as well.

4  Q   Can you explain what you mean by misrepresentations made

5  to HarbourVest by Highland?

6  A   Yeah, sure.  So, you know, based on a number of

7  statements that were made to us around the litigation

8  involving Mr. Terry, some of the intentions found, the

9  structural changes that came to light with respect to HCLOF

10  and our investment, as well as the fact that the arbitration

11  award specifically against Mr. Terry would have no impact or

12  implication on Highland's sale or business.

13  Q   And can you explain what you mean by omissions made by

14  Highland to HarbourVest?

15  A   Sure.  So I would say, really, the implications behind

16  the structural changes that were made at the time of our

17  investment into HCLOF.  Also, the intention, clear intentions

18  that Highland had to never, in fact, pay the arbitration

19  award that came to light during our due diligence period to

20  Mr. -- to Mr. Terry as part of the investment.  And

21  ultimately the -- what Highland went about doing in terms of

22  stripping assets of Acis that led to the material value

23  declines and destruction of value that we've experienced

24  since our investment.

25  Q   You mentioned a diligence period.  Did HarbourVest

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/27/23   Page 83 of 278   PageID 1761

Pugatch - Direct                                        98

1  conduct diligence on the investment?

2  A    We did.  We conducted very detailed due diligence, as we

3  do for all of our investments.  That diligence period lasted

4  several months ahead of our investment decision.

5  Q    And did HarbourVest conduct that diligence by itself?

6  A    No.  So, in addition to internal investment professionals

7  at HarbourVest, we engage with outside advisors, both

8  consultants as well as legal advisors, in connection with

9  that due diligence.

10  Q    And did Highland answer all of HarbourVest's questions

11  during that diligence period?

12  A    They did.  And they were numerous.  But yes, they

13  answered all the questions that we had for them.

14  Q    Was the Terry dispute part of HarbourVest's diligence?

15  A    It was.  That came up as one of the outstanding items of

16  litigation as part of our due diligence.

17  Q    I'm going to ask my colleague to pull up on the screen an

18  exhibit that was on our exhibit list as Items -- Exhibits 34

19  and 35.  It's an August 15, 2017 email from Brad Eden to

20  Dustin Willard.  Mr. Pugatch, do you recognize this document?

21  A    I do, yes.

22  Q    And what is it?

23  A    This was an email sent to us during our due diligence

24  period in response to a request for more information on the

25  outstanding litigation that Highland was involved with.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/07/23   Page 84 of 278   PageID 1765

Pugatch - Direct                99

1         MS. WEISGERBER:  And if my colleague can just scroll

2    to the attachment to that email.

3    BY MS. WEISGERBER:

4    Q   And do you recall the attachment as well, Mr. Pugatch?

5    A   Yes, I do.

6         MS. WEISGERBER:  And if you can scroll back up to the

7    first email.

8    BY MS. WEISGERBER:

9    Q   Who is Dustin Willard?

10   A   Yes.  Dustin is a colleague of mine at HarbourVest who

11   worked closely with me on this investment.

12   Q   And you said that this document was shared with

13   HarbourVest during the diligence period before the HCLOF

14   investment?

15   A   It was, correct.

16   Q   Is it typical during diligence to receive a description

17   of litigation such as this?

18   A   It is.  It's a question that we always ask.  Certainly a

19   component of our diligence to understand any outstanding

20   litigation on the part of our counterparty or manager that

21   we're investing in.

22        MS. WEISGERBER:  Your Honor, I'd move to offer this

23   exhibit into evidence.

24        THE COURT:  Any objection?

25        MR. DRAPER:  No objection, Your Honor.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/01/23   Page 85 of 278   PageID 17536

Pugatch - Direct                                        100

 1          MR. MORRIS:  No objection from the Debtor, Your

 2   Honor.

 3          THE COURT:  All right.  What is the letter or number

 4   for this exhibit?

 5          MS. WEISGERBER:  It's HarbourVest Exhibit 34.

 6          THE COURT:  All right.  So HarbourVest Exhibit 34 is

 7   admitted.

 8      (HarbourVest's Exhibit 34 is received into evidence.)

 9          THE COURT:  And I need to be clear where it appears

10   on the docket.  Can someone tell me?

11          MS. WEISGERBER:  So, it's identified on our exhibit

12   list, not -- it's not attached to the exhibits.  It is on the

13   docket.  We were -- when we initially filed the exhibit list,

14   we were working out confidentiality issues.  But it was

15   subsequently filed with our reply last night.  It's at Docket

16   No. 1735 --

17          THE COURT:  All right.

18          MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19          THE COURT:  All right.  Very well.  Thank you.

20   BY MS. WEISGERBER:

21   Q   Mr. Pugatch, we'll just scroll down to the second page of

22   the attachment.  Can you describe generally what the

23   litigation says regarding the Terry dispute?

24   A   Yes.  Generally speaking, this dispute was described as

25   an employee dispute, employment agreement dispute, with Mr.

1    Terry, who was a former employee of Highland involved in

2    their CLO business, and is described by Highland to us really

3    having to do with a series of false claims, in their opinion,

4    but having to do with a disgruntled former employee.

5    Q    And did it strike you as an unusual or significant

6    dispute?

7    A    No.  I would say we often -- we'll see, you know, former

8    employees with, you know, claims against a former employer in

9    connection with wrongful termination.  I wouldn't say it's

10   extremely common, but certainly not entirely out of the

11   ordinary.  And based on the explanations that we'd received

12   from Highland, seemed to be more of an ordinary-course type

13   former employee litigation suit.

14   Q    Based on what you now know about the Terry dispute, do

15   you believe that this was an adequate disclosure regarding

16   the dispute?

17   A    I would say very clearly not, you know, based on the

18   facts that came to light subsequently, the various rulings in

19   connection with the Acis bankruptcy case.  What was very

20   clearly not stated are the actual facts and implications of

21   the ongoing litigation with Mr. Terry.

22        MS. WEISGERBER:  I'd ask my colleague to put up the

23   next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24   list, which is Document No. 1723.  It's Exhibit 36 on that.

25   Same issue with respect to initially not filed, but it is on

001518

Pugatch - Direct                    102

1    the docket at our response last evening at ECF No. 1735 at

2    Page A351.

3           THE COURT:  Page what?

4           MS. WEISGERBER:  A351.

5           THE COURT:  A351.  Thank you.

6           MS. WEISGERBER:  You're welcome.

7    BY MS. WEISGERBER:

8    Q   Mr. Pugatch, I just put up a November 29, 2017 email from

9    Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10   Bellisario.  Do you recall this document?

11   A   I do, yes.

12   Q   And what is this document?

13   A   This was an email sent to us by Highland a couple weeks

14   after we closed on our investment on the (inaudible) in

15   response to a *Wall Street Journal* article that had come out

16   regarding Highland, a number of actions that they had taken,

17   and what Highland was articulating to us, a number of false

18   claims that had been made about Highland's prior actions, and

19   specifically trying to explain some of that and also share

20   with HarbourVest a letter that was being sent to the editor

21   of the *Wall Street Journal* highlighting, in their view, some

22   of the inaccuracies around the reporting.

23   Q   And did you receive this document?

24   A   We did, yes.

25          MS. WEISGERBER:  I'd move to offer this, so

001519

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 26-9   Filed 09/04/23   Page 881 of 2784   PageID 1766

Pugatch - Direct                            103

1   HarbourVest Exhibit 36, into evidence.

2           THE COURT:  Any objections?

3           MR. WILSON:  Your Honor, John Wilson.  I would object

4   as to the relevance of this document.

5           THE COURT:  All right.  What's your response?

6           MS. WEISGERBER:  Your Honor, it shows

7   misrepresentations that the witness will testify how it

8   relates back to prior representations prior to HarbourVest's

9   investment, as well as misrepresentations at that time.

10          THE COURT:  Okay.  I overrule the objection.  I'm

11  going to admit it.

12      (HarbourVest's Exhibit 36 is received into evidence.)

13  BY MS. WEISGERBER:

14  Q   Mr. Pugatch, can you describe generally -- we spoke about

15  this a little bit -- just what this communication from

16  Highland was conveying to HarbourVest at the time?

17  A   Yes.  Specifically, again, responding to this *Wall Street*

18  *Journal* article that had been published, trying to defend,

19  again, Highland's own views why there were inaccuracies in

20  the reporting.  But importantly, from our perspective, trying

21  to reassure us as to the fact that, you know, these

22  accusations would have no bearing and any results from it

23  would have no bearing on their ongoing business or

24  partnership or the investment that we had made in HCLOF.

25          MS. WEISGERBER:  And if you can scroll to the second

Pugatch - Direct                                    104

1   page.

2   BY MS. WEISGERBER:

3   Q    We'll just look at the last paragraph of another email

4   from Mr. Covitz.  Can you just read that first sentence of

5   the last paragraph?

6   A    Sure.  (reading)  While the dispute has no impact on our

7   investment activities, as always, we welcome any questions

8   you may have.

9   Q    Mr. Pugatch, was this email and the discussion regarding

10  the Terry dispute consistent with the representations made to

11  you prior to HarbourVest's investment into HCLOF?

12  A    It was, yes.  Both the message, the lack of any impact

13  that ultimately the dispute with Mr. Terry, the arbitration

14  award would have around Highland's ongoing CLO business, or

15  HCLOF specifically, was all, you know, very clear in this

16  document, but all consistent with the representations that

17  had been made to us leading up to our investment in the

18  middle of November 2017 as well.

19  Q    Thank you.

20       MS. WEISGERBER:  And you can take down the exhibit,

21  Emily.  Thank you.

22  BY MS. WEISGERBER:

23  Q    You mentioned, Mr. Pugatch, an arbitration award to Mr.

24  Terry.  How did you learn about that arbitration award?

25  A    That was initially disclosed to us by Highland as we were

001521

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-9   Filed 09/07/23   Page 90 of 278   PageID 1761

Pugatch - Direct                    105

1  in the late stages of our diligence and closing process on
2  the investment into HCLOF.
3  Q    And generally, what did Highland tell you about the
4  arbitration award?
5  A    We were aware of its existence.  We were aware of the
6  quantum of the award, I think it was around an $8 million
7  arbitration award in the favor of Mr. Terry, and that was
8  following the litigation around the wrongful termination and
9  employee dispute that Highland had described to us
10 previously.
11 Q    Did you ask to see a copy of the arbitration award?
12 A    No, we did not.
13 Q    Why not?
14 A    Ultimately, we -- you know, the explanations that
15 Highland had provided to us all seemed very reasonable.  We
16 relied on their representations that this was, again, nothing
17 more than a dispute with a former disgruntled employee, in
18 their words, that had no bearing or, you know, would not have
19 any bearing on our investment in HCLOF or their ongoing CLO
20 business, which all very clearly was not the case, as
21 we've -- as we've learned over the last several years.
22 Q    Following learning about the arbitration award, did
23 HarbourVest do other diligence?
24 A    We did.  So, in addition to asking questions related to
25 the arbitration award and any impact that it would have, we

001522

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 09/07/23    Page 91 of 278    PageID 17502

Pugatch - Direct                                    106

1   also spent some time diligencing a couple of structural

2   changes that were proposed by Highland, and, in fact, ended

3   up delaying the closing of our investment by about two weeks

4   as we vetted some of those structural changes that Highland

5   had proposed.  Vetted those both, you know, internally with

6   Highland directly and with external counsel in order to make

7   sure that those structural changes were in fact legally sound

8   in ultimately making our investment.

9   Q    And were those changes proposed following the arbitration

10  award?

11  A    They were, yes.

12  Q    Did Highland tell you the reason for the structural

13  changes?

14  A    Yeah.  So, so some of this -- and specifically, this

15  involved a change of the portfolio manager at the HCLOF level

16  that was really in connection with a rebranding as Highland

17  was going through a rebuild of its CLO business and wanting

18  to align, from a brand perspective, their business on an

19  ongoing basis with the Highland brand as opposed to the Acis

20  brand.  But more specifically, in the case of a late change

21  from a structured standpoint, the -- part of the intention

22  and the investment thesis of HCLOF was to pursue a reset, a

23  refinancing of all the underlying CLOs as they approached the

24  end of their investment period or came out of their

25  investment period.

1      And in connection with that, in light of the arbitration

2  award, Highland's view was that there may be difficulties in

3  the market in resetting certain of those Acis CLOs with the

4  Acis brand associated with them, given, again, the existence

5  of the arbitration award and concerns in the market around

6  the Acis brand reputation.

7  Q   And what did they tell you was the market view of Acis,

8  or the Acis brand?

9  A   Yeah.  Their view or their concern was that the, you

10  know, because of the existence of that arbitration award, the

11  brand would be viewed as toxic.

12  Q   Didn't this put you on notice that perhaps there was

13  something wrong with the structural changes?

14  A   I mean, we -- I mean, short answer, no.  We ultimately

15  asked questions, we diligenced the legal structure, but

16  relied on the representations that were made to us by

17  Highland around the rationale for the structural changes,

18  that these are all changes that were within a Highland-

19  managed vehicle or sat below the vehicle that we were

20  investing in, and so ultimately were in Highland's purview,

21  was the representations that we relied on.

22  Q   And did HarbourVest alone do that diligence of the

23  structural changes?

24  A   So, no.  I mean, in connection with the diligence that we

25  did internally and with Highland directly, we engaged with

001524

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-9    Filed 09/09/23    Page 93 of 278    PageID 11501

Pugatch - Direct                                    108

1  outside counsel who was working with us at the time to vet

2  those structural changes as well.

3  Q    Did HarbourVest rely on Highland's representations

4  regarding the arbitration award and the structural changes in

5  making its investment in HCLOF?

6  A    We did, absolutely.

7  Q    If Highland had disclosed the nature of the structural

8  changes, of removing Acis as the portfolio manager and

9  related transfers, would HarbourVest have proceeded with its

10 investment?

11 A    Definitively, no, we would not have.

12 Q    Why not?

13 A    I think the reality is if we had understood the intent,

14 you know, that Highland was ultimately undertaking here, we

15 would not have wanted to be any part of this, and certainly

16 getting dragged into all of this, the hassle, the value

17 destruction that we've seen on behalf of the investors and

18 the funds that we manage.  And I would say, lastly, we just

19 full stop would not have done business with a firm who

20 engages with this type of behavior, had we actually known the

21 truth.

22 Q    Mr. Pugatch, are you familiar with the bankruptcy that

23 followed of Acis?

24 A    Yes.

25 Q    And what was your -- or, did HarbourVest participate in

1  that bankruptcy?

2  A    So, initially, no.  Subsequently, we ended up getting

3  dragged into that on account of a number of misstatements by

4  Highland about the role that HarbourVest had played as part

5  of our investment into HCLOF and some of that structure and

6  the structural changes that I alluded to.

7  Q    How did HarbourVest learn about those misstatements in

8  the bankruptcy about HarbourVest's role?

9  A    So, ultimately, those came to light on -- you know, on

10 account of the ongoing proceedings within the Acis bankruptcy

11 process, and specifically brought to light to us by the Acis

12 trustee at the time, who decided to pursue, you know, further

13 diligence or discovery around the claims that Highland had

14 made around HarbourVest's involvement in those changes.

15 Q    And what is your understanding of what the allegations

16 were that caused the Acis trustee to investigate HarbourVest?

17 A    Sure.  So, you know, our understanding was that Highland

18 had made statements, again, false statements that HarbourVest

19 had actually instructed some of those structural changes,

20 that we were the ones that had said that we would not do

21 business with Acis and had ordered some of the underlying

22 transfer of assets or, again, structural changes, that, you

23 know, very clearly I would say were not the case.  Also, that

24 HarbourVest was -- was calling the shots as it relates to any

25 of the ongoing management or future resets of the CLOs.

1  Q    Did HarbourVest instruct any of those structural changes

2  or transfers to occur?

3  A    We did not.  Absolutely not.

4  Q    Why didn't HarbourVest itself appear in the Acis

5  bankruptcy and file a claim?

6  A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7  passive investor in a Highland-managed company.  We had no

8  direct interaction with or relationship with Acis.  There was

9  really no reason for us to be directly involved until we were

10 subsequently dragged into involvement on account of those

11 misstatements.  And then at that point our focus really

12 pivoted to, you know, whether we needed to defend ourselves

13 against those accusations that had been made by Highland and

14 after a request for further information in discovery by the

15 Acis trustee.

16 Q    Did HCLOF participate in the Acis bankruptcy?

17 A    They did, yes.

18 Q    Did HCLOF incur fees for participating in the Acis

19 bankruptcy?

20 A    Yes.  In fact, very meaningful fees, to the tune of well

21 in excess of $15 million of legal fees, as we understand it,

22 that have been incurred, largely in connection with the

23 ongoing Acis bankruptcy and Highland's continued pursuit of

24 and in connection with the litigation with Mr. Terry, which

25 we firmly believe was entirely inappropriate that HCLOF and

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00145-B    Document 28-9    Filed 03/12/23    Page 96 of 278    PageID 1504

Pugatch - Direct                    111

1   ultimately investors in HCLOF bear those expenses, which were

2   not just expenses of HCLOF but of Highland and a number of

3   other Highland affiliates.

4   Q    Do those expenses form a basis of separate claims filed

5   by HarbourVest against Highland?

6   A    They do, yes.  One of the multiple claims that we had

7   filed against Highland.

8   Q    And a few more questions, just for the record, Mr.

9   Pugatch.  How much did HarbourVest initially invest in HCLOF?

10  A    Sure.  So, our initial investment in November of 2017 was

11  right about $73-1/2 million, I believe.

12  Q    Did HarbourVest invest any additional money in HCLOF?

13  A    We did.  There was a subsequent capital call investment

14  of about $5 million, bringing our total investment to just

15  under $80 million in aggregate.

16  Q    When HarbourVest initially made the investment, did it

17  anticipate making a profit on it?

18  A    We did, yes.

19  Q    How much did HarbourVest anticipate earning from the

20  investment?

21  A    Yeah.  So, our -- based on the original $73-1/2 million

22  investment, we had expected a total return of about $137

23  million on that -- on that investment.

24  Q    What was that projection based on?

25  A    So, that projection was based on materials that we had

1    received from Highland, their internal projection models on

2    the future performance of the underlying CLOs that we were

3    acquiring exposure to through our investment in HCLOF, and

4    was one of the inputs or formed the basis in connection with

5    our diligence that we ultimately ran different sensitivities

6    -- projections around and helped employ -- helped inform our

7    investment thesis.

8    Q    Do you know the current value of HarbourVest's investment

9    in HCLOF?

10   A    Yes.  The current value is right around $22-1/2 million.

11   Q    So roughly how much has the investment itself decreased

12   from HarbourVest's initial investment?

13   A    So, net of what was about $4-1/2 million of distributions

14   that we received early on in the investment, we've lost, to

15   date, in excess of $50 million on our original investment.

16   Q    And just for -- to close out, Mr. Pugatch, knowing all

17   that you know, if HarbourVest had known that -- about the

18   nature of the transfers by Acis or Highland's intent with

19   respect to the arbitration award, would HarbourVest have made

20   this investment?

21   A    No.  The reality is, had we known the truth, or even had

22   a sense of the truth, the true intentions behind some of

23   those transfers and ultimately what would have happened, we

24   never would have made this investment, full stop.

25   Q    Thank you, Mr. Pugatch.

001529

Pugatch - Cross                                    113

1              THE COURT:  All right.  I didn't hear you, Ms.

2    Weisgerber.  Do you pass the witness?

3              MS. WEISGERBER:  Yes, I pass the witness.

4              THE COURT:  All right.  Thank you.

5         Mr. Morris, any examination from you?

6              MR. MORRIS:  No, thank you, Your Honor.

7              THE COURT:  All right.

8         (Interruption.)

9              THE COURT:  All right.  I'm not sure whose voice that

10   was, but please, again, mute your devices when you're not

11   talking.

12        Any cross-examination of Mr. Pugatch?  I'll start with

13   you, Mr. Wilson.

14             MR. WILSON:  Yes, Your Honor.

15             THE COURT:  Okay.

16                       CROSS-EXAMINATION

17   BY MR. WILSON:

18   Q    How are you -- I guess we're afternoon now.  How are you

19   this afternoon, Mr. Pugatch?

20   A    I'm doing well.  Yourself?

21   Q    I'm doing well as well.  Do you recall that on Monday of

22   this week I took your deposition?

23   A    Yes, I do.

24   Q    And so you understand that my name is John Wilson and I

25   represent Jim Dondero, who has filed an objection to the 9019

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-9    Filed 09/15/23    Page 99 of 278    PageID 1517

                          Pugatch - Cross                      114

```
 1  motion filed by the Debtor?

 2       I've got a few questions for you today.  Has HarbourVest

 3  been around for over 35 years?

 4  A    We have, yes.

 5  Q    And does HarbourVest have ten offices around the world?

 6  A    Correct, yes.

 7  Q    And does HarbourVest employ over 150 investment

 8  professionals?

 9  A    Yes.

10  Q    Does HarbourVest have over $74 billion in assets under

11  management?

12  A    Correct, yes.

13  Q    And is HarbourVest's client base largely comprised of

14  institutional investors?

15  A    Also correct.

16  Q    And you would agree with me that HarbourVest is a

17  sophisticated investor, right?

18  A    I would, yes.

19  Q    How long have you worked for HarbourVest?

20  A    I've been employed by HarbourVest for 17 years now.

21  Q    And how long have you been a managing director?

22  A    I've been a managing director for approximately six

23  years.

24  Q    And you were, in fact, the managing director for the

25  investment that HarbourVest made in Highland CLO Funding,
```

001531

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00802-B    Document 28-9    Filed 09/15/23    Page 100 of 278    PageID 1578

Pugatch - Cross                           115

1    Ltd., which has been referred to today as HCLOF, correct?

2    A    I was, correct.

3    Q    And HarbourVest, I think you just testified, invested

4    approximately $73 million as its initial investment in HCLOF?

5    A    Yes, correct.

6    Q    And before HarbourVest made that investment, it had made

7    many investments of this type, correct?

8    A    Yeah.  We've made hundreds of investments into

9    partnerships over our history, correct.

10   Q    So HarbourVest was well-experienced in evaluating and

11   deciding whether to invest in large investments, correct?

12   A    It was, yes.

13   Q    Now, in your -- and by your, I mean HarbourVest -- in the

14   response to the Debtor's omnibus objection, it says that by

15   summer 2017 HarbourVest was engaged in preliminary

16   discussions with Highland regarding the investment.  Is that

17   a correct statement?

18   A    Correct, yes.

19   Q    And, in fact, those talks began in the second quarter of

20   2017, correct?

21   A    Yes.

22   Q    And so the investment closed ultimately on November 15th,

23   2017?

24   A    Yes, that's correct.

25   Q    So it's fair to say that HarbourVest considered and

001532

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 05/17/23    Page 101 of 278    PageID 1579
Appendix    Filed 05/17/23    Page 101 of 278    PageID 1579

Pugatch - Cross                              116

1   evaluated this transaction for over six months before

2   investing its $73 million, right?

3   A    From the time of the initial conversations that we had

4   with Highland, yes.

5   Q    And one of the reasons that it took over six months to

6   complete the investment is that HarbourVest performs due

7   diligence before it makes an investment, correct?

8   A    Correct.

9   Q    And when you're performing due diligence -- well, first

10  off, you would agree with me that that's a common practice

11  amongst sophisticated investors such as HarbourVest, correct?

12  A    To perform due diligence?

13  Q    Yes.

14  A    Yes.

15  Q    And describe -- describe what HarbourVest does in a

16  general sense when it performs its due diligence.

17  A    Sure.  So, we spend time with the manager -- in this

18  case, Highland -- certainly around the investment thesis, the

19  opportunity, receive materials around the underlying assets.

20  We take that and perform our own independent due diligence

21  around the value of those assets, perform due diligence on

22  the manager itself, the go-forward opportunity.  In many

23  cases, and certainly in this case, engage with outside

24  advisors to assist with that due diligence.  It's a very

25  robust and thorough process.

1    Q    And by outside advisors, are you referring to the outside

2    counsel that you testified about earlier?

3    A    Yes.  Both outside counsel and outside consultants.

4    Q    Okay.  And so did you say that it's typical to engage

5    outside counsel when performing due diligence?

6    A    Yes.

7    Q    And which outside counsel did you retain with respect to

8    this due diligence?

9    A    Debevoise and Plimpton as well as Milbank.

10    Q    And during the course of HarbourVest's due diligence, did

11    it identify some items of concern?

12    A    As with any investment, there are always items that are

13    identified that require further diligence, risks that are

14    identified that we look to mitigate through our due

15    diligence, et cetera.

16    Q    And if Harbour -- I'm sorry, did you say something else?

17    A    No.

18    Q    You were finished?  Okay.  Now, if HarbourVest identifies

19    an item of concern, is it typical to request additional

20    information regarding those items of concern?

21    A    It is, yes.

22    Q    And so that actually happened with respect to the HCLOF

23    investment, correct?

24    A    In certain cases, yes.

25    Q    HarbourVest identified several litigation matters that it

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/29/21    Page 103 of 278    PageID 1534

Pugatch - Cross                                118

1   had questions about, correct?

2   A    Correct.  As we would with any investment.

3   Q    And it went back to Highland and asked them to explain

4   their position on those litigation matters?

5   A    Correct.

6   Q    And one of those litigation matters was the Joshua Terry

7   litigation, correct?

8   A    Yes.

9   Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

1  litigation, was issued months before the arbitration award to

2  Josh Terry, correct?

3  A    I don't remember the exact timing, but it was certainly

4  during our due diligence period and prior to the arbitration

5  award, yes.

6  Q    Well, it seems to me that that email that you -- your

7  counsel admitted as an exhibit was issued in August of 2017.

8  Does that sound right to you?

9  A    If that's what the email said, yes.

10  Q    And if the Terry arbitration award came out in October,

11  then you would agree with me that that is several months

12  prior to the -- or at least two months prior to the

13  arbitration award?

14  A    Yes.

15  Q    And so when HarbourVest made requests of Highland to

16  provide information regarding its items of concern, Highland

17  complied with those requests, correct?

18  A    It did, correct.

19  Q    And was there ever a time when HarbourVest requested

20  Highland to provide information and that information was not

21  provided?

22  A    Our requests for information, or at least, you know,

23  responses or color to a question, were always met either

24  with, you know, written or verbal communication back to us,

25  yeah.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/21/23    Page 105 of 278    PageID 1588

Pugatch - Cross                                    120

1    Q    And you would agree with me that, in fact, HarbourVest

2    delayed the closing of the investment by two weeks to

3    continue its due diligence, correct?

4    A    Correct, related to the structural changes that were made

5    close to closing.  That's right.

6    Q    And after conducting that due diligence, HarbourVest

7    satisfied itself that the investment was sound?

8    A    That the legal structure that had been put in place in

9    connection with those proposed changes by Highland was -- was

10   legally sound, yes, and on the back of, again, statements and

11   misrepresentations on the part of Highland around the nature

12   and potential impact to their ongoing CLO business and HCLOF.

13          MR. WILSON:  Well, I'm going to object to the latter

14   part of your response as nonresponsive.

15          THE COURT:  Sustained.

16   BY MR. WILSON:

17   Q    Now, after you conducted the due diligence, HarbourVest

18   made the investment of $73 million on November 15th, 2017,

19   correct?

20   A    Correct.

21   Q    And so I think you testified earlier that prior to that

22   investment HarbourVest had become aware that that Josh Terry

23   litigation had resulted in an arbitration award, correct?

24   A    Yes.

25   Q    But I think you've also testified that HarbourVest did

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/22/23    Page 106 of 278    PageID 1584

Pugatch - Cross                        121

 1  not request that Highland provide a copy of the arbitration

 2  award, correct?

 3  A    That's correct.

 4  Q    And you further testified that you were represented by

 5  outside counsel at the time, correct?

 6  A    Correct.

 7  Q    And as of Monday of this week, you had not reviewed that

 8  arbitration award; is that correct?

 9  A    That's correct.

10  Q    Have you reviewed that arbitration award since Monday of

11  this week?

12  A    I have not.

13  Q    But in any event, you testified that Highland told you

14  about the award?

15  A    Yes.

16  Q    And they told you the amount of the award?

17  A    Yes.

18  Q    And then they told you that the award had been converted

19  to a judgment?

20  A    When you say the award had been converted to a judgment,

21  can you be more specific?

22  Q    Well, I don't know how familiar you are with the

23  litigation process, but in this instance, that award was

24  taken to a court and the court entered a judgment on the

25  arbitration award.  Did you -- were you aware of that?

001538

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 26-9 Filed 09/22/23 174age 107 of 278    PageID 1388

Pugatch - Cross                        122

```
 1   A    I don't recall the specific legal terms of judgment

 2   against it.  I was award of the existence of the arbitration

 3   award and the -- and the obligation for Highland to comply

 4   with that arbitration award.

 5   Q    And HarbourVest did not make an appearance in the Acis

 6   bankruptcy, right?

 7   A    We did not.

 8   Q    But you were aware of the Acis bankruptcy, correct?

 9   A    Yes.

10   Q    And you were kept apprised of the Acis bankruptcy by

11   Highland individuals, correct?

12   A    We had conversations with a couple of Highland

13   individuals throughout the Acis bankruptcy process, yes.

14   Q    Right.  And in fact, you testified that you participated

15   in regular conference calls with Highland regarding that

16   bankruptcy?

17   A    That's correct, yes.

18   Q    And do you recall having been provided with over 40,000

19   documents by Highland related to the Acis bankruptcy?

20   A    I do not recall that, no.

21   Q    Would those documents have been provided to your outside

22   counsel, had you received them?

23   A    I don't know the answer to that.

24   Q    Did the outside counsel that represented you in the due

25   diligence continue to represent you throughout the Acis
```

001539

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/27/23    Page 108 of 278    PageID 1580

Pugatch - Cross                                123

1    bankruptcy?

2    A    They did.  One of the counsels did, correct.

3    Q    And which counsel was that?

4    A    Debevoise.

5    Q    So was your counsel actively involved with monitoring the

6    Acis bankruptcy?

7    A    They were, yes, particularly after we were ultimately

8    accused of having something to do with the original structure

9    and -- as a result of misstatements by Highland.

10   Q    Did your counsel attend hearings in the Acis bankruptcy?

11   A    I don't recall.

12   Q    Are you familiar with the PACER system?

13   A    I am not.

14   Q    Now, I think that HarbourVest has been described as a

15   passive investor.  You recall that description of HarbourVest

16   in this instance?

17   A    Yes.

18   Q    But, in fact, HarbourVest invested substantial assets

19   such that it owned a 49.98 percent share of HCLOF.  Would you

20   agree with that?

21   A    That's correct.

22   Q    And in fact, the next largest investor was CLO Holdco,

23   which owned 49.02 percent of the shares, correct?

24   A    That sounds right.

25   Q    And there was an advisory board that was created pursuant

001540

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/25/23    Page 109 of 278    PageID 1587

Pugatch - Cross                                    124

1    to the formation documents of this investment, correct?

2    A    That's correct.

3    Q    And in fact, that advisory board only had two members,

4    and one was a representative of HarbourVest and one was a

5    representative of CLO Holdco, correct?

6    A    Correct.

7    Q    And the advisor -- I'm sorry, the portfolio manager was

8    not allowed to disregard the recommendations of the advisory

9    board, correct?

10   A    With respect to the limited set of items that the

11   advisory board could opine on, that is correct.

12   Q    All right.  I want to go over a couple of the

13   misrepresentations that HarbourVest has identified in its

14   filings related to its claim.  The first one is -- and just

15   for the record, I'm reading from Docket No. 1057 filed on

16   September 11, 2020, HarbourVest Response to Debtor's First

17   Omnibus Objection.

18        But the first misrepresentation identified in that

19   document says that Highland never informed HarbourVest that

20   Highland had no intention of paying the arbitration award.

21   And was -- was Highland obligated to pay the Josh Terry

22   arbitration award against Acis?

23        MR. MORRIS:  Objection to the question to the extent

24   it calls for a legal conclusion.

25        THE COURT:  Sustained.

001541

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/27/23    Page 110 of 278    PageID 1588

Pugatch - Cross                              125

 1              MS. WEISGERBER:  Join in that objection.

 2              THE COURT:  Sustained.  I think --

 3    BY MR. WILSON:

 4    Q    Your understanding was --

 5              MR. WILSON:  I'm sorry, Judge?

 6              THE COURT:  I sustained the objection as calling for

 7    a legal conclusion.  So, next question.

 8              MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

 9    Honor.

10    BY MR. WILSON:

11    Q    In your understanding, was Highland responsible for

12    paying the arbitration award to Josh Terry?

13    A    My understanding is on the account of the fact that Acis

14    --

15              MS. WEISGERBER:  Objection, Your Honor.  Objection,

16    Your Honor, same basis.

17              THE COURT:  Sustained.  It was essentially the same

18    question.

19              MR. WILSON:  Well, Your Honor, I didn't ask --

20              THE COURT:  It was essentially the same question, Mr.

21    Wilson.  Move on.

22              MR. WILSON:  Okay.

23    BY MR. WILSON:

24    Q    The next misrepresentation identified by HarbourVest said

25    that Highland did not inform HarbourVest that it undertook

001542

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/27/23    Page 111 of 278    PageID 1539
Appendix 89    Page 1271 of 174

Pugatch - Cross                                    126

1   the transfers to siphon assets away from Acis, LP and that

2   such transfers would prevent Mr. Terry from collecting on the

3   arbitration award.  So the basis for that allegation would be

4   that Highland was siphoning assets from Acis to avoid having

5   Acis pay the arbitration award, correct?

6   A    That -- that would be the implication, yes.

7   Q    Okay.  And then that misrepresentation continues on and

8   says that Highland represented to HarbourVest that it was

9   changing the portfolio manager because Acis was toxic.  And

10  do you recall that representation being made to you?

11  A    Yes, I do.

12  Q    And would you agree with me that whether or not Acis is

13  toxic in the industry would be an opinion?

14  A    I suppose it would be an opinion, but by the manager of

15  the vehicle responsible for managing the HCLOF investment and

16  the underlying CLOs.  Yeah, we viewed the Acis name and the

17  Highland name as synonymous, if you will.  I mean, Acis was a

18  subsidiary of Highland.  For all intents and purposes, it was

19  the same from our perspective as we made the investment into

20  HCLOF.

21  Q    So did HarbourVest have an independent understanding of

22  whether or not the Acis name was toxic in the industry?

23  A    We did not, no.  We relied on Highland's views of that as

24  manager of HCLOF.

25           MR. WILSON:  Your Honor, just a brief housekeeping

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 26-9    Filed 09/27/23    Page 112 of 278    PageID 1590
Appendix 89    Page 127 of 274

Pugatch - Cross                    127

1   item.  Did you say that we need to be done at 1:00 o'clock?

2          THE COURT:  Well, I said I really wanted you to be

3   done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4   o'clock docket and I'd rather not have to hang up 70-

5   something people and reconnect them again at 3:00 o'clock.

6   How close are you to being finished?

7          MR. WILSON:  Well, --

8          THE COURT:  This is going at a very slow pace.

9          MR. WILSON:  Well, I apologize for that, Your Honor.

10  I think I've got at least ten more minutes, but -- but I know

11  we also have closing remarks.  And I was just going to ask if

12  Your Honor had a preference of --

13         THE COURT:  Keep going.

14         MR. WILSON:  -- of breaking now --

15         THE COURT:  Keep -- let's --

16         MR. WILSON:  -- or keep going?  Okay.

17         THE COURT:  Let's talk fast and try to get through.

18  You know, even if I'm sacrificing lunch today, I don't want

19  to inconvenience 75 people this way.  So we'll just probably

20  start our 1:30 hearing a little late and inconvenience those

21  people.

22      All right.  Go ahead.

23         MR. WILSON:  All right.  Thank you, Your Honor.

24  BY MR. WILSON:

25  Q    Did Acis form its -- I can't recall if you answered this

001544

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/29/21    Page 113 of 278    PageID 1594
Appendix 89    Page 122 of 174

Pugatch - Cross                    128

1    question, but did Acis form its own opinion on whether or not

2    -- I'm sorry, strike that.  Did HarbourVest form its own

3    opinion on whether or not the Acis name was toxic in the

4    industry?

5            MS. WEISGERBER:  Objection, --

6            THE WITNESS:  We did not.  We didn't have a basis.

7            THE COURT:  I'm sorry, did I have an objection?

8    BY MR. WILSON:

9    Q   You did not --

10           THE COURT:  Did I have an objection?

11           MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12   asked and answered, Your Honor.

13           THE COURT:  Overruled.  He can answer.

14   BY MR. WILSON:

15   Q   Okay.  But --

16   A   We did not.

17   Q   Did Highland have the ability to investigate the Acis

18   name and make its own determination of whether that name was

19   toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20   A   HarbourVest had the ability to do that, yes.

21   Q   I apologize I misspoke.  I meant HarbourVest.  Did

22   HarbourVest have the ability to investigate that name and

23   determine if it was toxic?

24   A   It was irrelevant to our investment thesis.  And as I

25   said before, Acis was a subsidiary of Highland.  We viewed

1  them as interchangeable in the context of our investment.

2  Q   Okay.  The next misrepresentation that you refer to says

3  that Highland indicated to HarbourVest that the dispute with

4  Mr. Terry would have no impact on its investment activities.

5  Would you agree with me that that is also an opinion?

6  A   It was a statement that --

7          MS. WEISGERBER:  Your Honor, I'm going to object to

8  the extent these questions are seeking a legal conclusion

9  regarding, you know, if something's an opinion or not.

10         THE COURT:  Okay.  Overruled.  He can answer.

11         THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q   And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A   On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/21/23   Page 115 of 278   PageID 1596
Appendix 99   Page 130 of 174   PageID 1596

Pugatch - Cross                    130

1  Q    And you just testified that you thought that Acis and

2  Highland were interchangeable from the perspective of the

3  investment opportunity, correct?

4  A    Correct.

5  Q    But you also accepted Highland's recommendation because

6  HarbourVest agreed that the change in the -- to a Highland

7  manager made commercial sense, correct?

8  A    We took at face value what Highland recommended because

9  this all had to do with the structuring of an entity that

10  they fully managed with respect to multiple underlying

11  subsidiaries that weren't managed by Highland.

12  Q    But would you agree that, at the time, you -- HarbourVest

13  thought that made commercial sense?

14  A    It did not seem unreasonable to us based on the

15  explanation we were given.

16  Q    Okay.

17        MR. WILSON:  I want to refer to HarbourVest Exhibit

18  39.

19     (Pause.)

20        THE COURT:  What are we waiting on?  What are we

21  waiting on?

22        MR. WILSON:  I'm trying to get the document on the

23  screen, Your Honor.

24     (Pause.)

25        THE COURT:  We can't hear you.  We can't hear you.

1          MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2     speaking with my --

3          THE COURT:  Okay.

4          MR. WILSON:  -- co-counsel here.

5          THE COURT:  All right.

6      (Pause.)

7          MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8     you're referring to?

9          MR. WILSON:  39.  HarbourVest 9019 motion on the

10    main -- on the Dondero file.  And then there's the -- it's --

11    it's John  -- and then there's the HarbourVest, and then the

12    exhibits are all in one file.

13         MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14    was subject to confidentiality based on HCLOF's request.

15    HCLOF's counsel is present.  I think they know it's an

16    excerpt.  But I'd just -- that for HCLOF's counsel.

17         MR. WILSON:  Well, is there an objection to showing

18    this document on the screen? Yes.  All right.  We're not

19    going to put Document 39 on the screen.

20         A VOICE:  Yes.

21         MR. WILSON:  All right.  Scroll down to the next

22    page.

23    BY MR. WILSON:

24    Q   This is a -- this is a document that was produced to us

25    this week, the Highland production.  It appears to be a

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/30/23   Page 117 of 278   PageID 1598
Appendix 89   Page 11730 174

Pugatch - Cross                    132

1    Highland CLO Funding, Ltd. Statement of Operations for the

2    Year Ended 31 December 2017.  Do you see at the top of that --

3    at the top of that document where it says total investment

4    income of $26 million?

5    A    I do, yes.

6    Q    And total expenses were roughly $1.8 million?

7    A    Yes.

8    Q    And then net change and unrealized depreciation on

9    investments and net realized loss on investments was $4.26

10   million cumulative, resulting in a net increase in net assets

11   resulting from operations of $20.224 million.  Do you agree

12   with that?

13   A    Yes.

14   Q    Okay.

15         MR. WILSON:  Go to the next one.

16   BY MR. WILSON:

17   Q    And you understand that, in the course of the Acis

18   bankruptcy, the portfolio managers for certain of the CLOs

19   were changed by the Trustee, correct?

20   A    Yes, around the underlying CLOs.  That's -- that's my

21   understanding, yes.

22   Q    And, in fact, Mr. Seery testified earlier today that that

23   occurred in the summer of 2018, correct?

24         MR. WILSON:  Scroll.

25         THE WITNESS:  I don't recall the timing, but that's

001549

 1   what he testified to.

 2   BY MR. WILSON:

 3   Q    Well, this document is HarbourVest Exhibit 40, and this is

 4   the statement of operations for the financial year ended 31

 5   December 2018.  Here, the total investment income is only

 6   $11.1 million.  Do you see that?

 7   A    I do.

 8   Q    And do you see where the expenses have increased to $13.6

 9   million?

10   A    I do, yes.

11         MR. WILSON:  Okay.  Scroll down some more.

12   BY MR. WILSON:

13   Q    And do you see where it says net change and unrealized

14   loss on investments of $48.47 million?

15   A    Yes.

16   Q    And so after Acis and Brigade took over the managements of

17   these CLOs, we had a net decrease in net assets resulting from

18   operations of $52.483 million in the year 2018, correct?

19         MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20   fact not in evidence.

21         THE COURT:  Overruled.  He --

22         MR. WILSON:  Your Honor, --

23         THE COURT:  We're just looking at this statement and

24   testifying about it says, so I overrule the objection.

25         MR. WILSON:  Thank you, Your Honor.  Thank you, Your

1   Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2   right.  I'll --

3   BY MR. WILSON:

4   Q    Did you answer the question, Mr. Pugatch?

5   A    No, I -- I would agree with the second part of your

6   statement that for the year 2018 the -- the loss was $52

7   million.  I don't -- I don't believe that jives with the first

8   part of your statement that that was after Acis and Brigade

9   took over.  As I understand, that was in the middle of the

10  year.

11  Q    But in any event, Acis and Brigade had been managing this

12  for at least six months of 2018 when that loss occurred,

13  correct?

14  A    They had been managing a portion of the underlying CLO

15  portfolio held by Highland CLO Funding.

16  Q    All right.  We're now looking at Exhibit #41, which is the

17  Draft Unaudited Statement of Comprehensive Income, 31 December

18  2019.  Total income has now dropped to $4.664 million.

19          MR. WILSON:  And scroll down.

20  BY MR. WILSON:

21  Q    Expenditures are at $3.645 million.  And then it says

22  investment gains and losses net out to $11.493 million, a

23  negative $11.493 million.  And --

24          MR. WILSON:  Scroll down to the --

25  BY MR. WILSON:

1   Q    And so would you agree with me that in the year 2019,

2   HCLOF showed a net loss of $10.476 million?

3   A    Yes, that's what the financial statements say.

4   Q    And in this year, the Acis CLOs were solely managed by

5   Acis and Brigade, correct?

6   A    The Acis CLOs were.  Yes, correct.

7   Q    All right.

8           MR. WILSON:  Now, go to 42.

9   BY MR. WILSON:

10   Q    Now, this is HarbourVest #42.

11           MR. WILSON:  Go down to the next page.

12   BY MR. WILSON:

13   Q    And this is the Highland CLO Funding, Ltd. Unaudited

14   Condensed Statement of Operations for the Financial Period

15   Ended 30 June 2020.  And so this is just half a year of

16   operations.  And would you -- and this actually has a

17   comparison between 2019 and 2020.  But do you see where it

18   says investment income has dropped from a million dollars in

19   the first half of 2019 to $381,000 in the first half of 2020?

20   A    Yes.

21           MR. WILSON:  Okay.  Scroll down.

22   BY MR. WILSON:

23   Q    And do you see where, in the first half of 2019, total

24   expenses were $1.85 million, and then in the first half of

25   2020 total expenses were $2.16 million?  Do you see that?

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 26-9    Filed 05/27/24    Page 121 of 278    PageID 1599

Pugatch - Cross                            136

1  A    I do.

2  Q    And if you go down below that, where it says Net Realized

3  and Unrealized Gain/Loss on Investments, the first half of

4  2019 HCLOF lost $12 million, and in the first half of 2020 it

5  lost $39.472 million?

6          MR. MORRIS:  Your Honor, I'm going to object.  It's

7  John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8  he can offer this document into evidence.  There's no

9  foundation that Mr. Pugatch has any particularized knowledge

10  about any of the numbers behind this.  All he's asking him to

11  do is to confirm what the document says.  It says what it

12  says.  But this -- I'll object on that basis, Your Honor.

13          THE COURT:  All right.  Mr. Wilson, what about it?

14  You're just getting him to read numbers off of these exhibits.

15          MR. WILSON:  Well, --

16          THE COURT:  Shall we just --

17          MR. WILSON:  -- I understood --

18          THE COURT:  -- by stipulation get them into evidence?

19          MR. WILSON:  Well, --

20          MR. MORRIS:  No objection, Your Honor.

21          MS. WEISGERBER:  No objection.

22          THE COURT:  All right.  So these are exhibits what?

23  We've gone through 39, 41, and I don't know what else.  40,

24  maybe?

25          MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01803-B   Document 28-9   Filed 09/29/21   Page 122 of 278   PageID 1800

Pugatch - Cross                                137

```
 1   were on the HarbourVest exhibit list.

 2            THE COURT:  All right.  Those will be admitted, and

 3   we've already discussed what docket entry number they appear

 4   at.

 5      (HarbourVest's Exhibits 39 through 42 are received into

 6   evidence.)

 7            THE COURT:  All right.  Anything else?  You told me

 8   you had 10 more minutes about 15 minutes ago.

 9            MR. WILSON:  Well, I'm sorry if I -- I think I had

10   said I had at least ten more minutes, and I was looking at the

11   -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12   have longer than that.  I'm sorry, Your Honor.

13            THE COURT:  Well, --

14            MR. WILSON:  But --

15            THE COURT:  -- I feel like I'm being --

16            MR. WILSON:  -- I'll try to proffer --

17            THE COURT:  Okay, Mr. Wilson, let me just tell you

18   something.  I feel like I'm being disrespected now, and the

19   parties are.  We really need to pick up the pace.  I've told

20   you I've got a 1:30 docket -- with four or five matters on it,

21   by the way.  I've got a 2:00 o'clock docket.  I'm starting

22   them late.  No one advised my courtroom deputy that we were

23   going to need all day today for this, okay?  So you've got

24   five more minutes to wrap it up, and then, of course, I have

25   to go to Mr. Draper and see if he has cross.  All right?  So
```

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00802-B    Document 28-9    Filed 09/29/21    Page 123 of 278    PageID 1804

Pugatch - Cross                    138

 1  please don't test my patience any more.  Five minutes to

 2  finish.

 3          MR. DRAPER:  Judge, I have no questions.

 4          THE COURT:  I didn't hear you, Mr. Draper.  What did

 5  you say?

 6          MR. DRAPER:  I have no questions.

 7          THE COURT:  All right.  Very good.

 8          MR. WILSON:  I apologize, Your Honor.  I was actually

 9  trying to be respectful of your time when I informed you that

10  I had at least ten more minutes left at 12:50, but I will try

11  to be as expedient as I can as I finish up.

12  BY MR. WILSON:

13  Q   And I don't see you on my screen.

14          MR. WILSON:  You can take that document down.

15          THE WITNESS:  Here.

16  BY MR. WILSON:

17  Q   Mr. Pugatch, do you have an opinion as to what caused

18  these incredible losses of value at HCLOF?

19          MS. WEISGERBER:  Objection to the extent it calls for

20  a legal conclusion.

21          THE COURT:  Overruled.  He can answer.

22          THE WITNESS:  I would say that there's no one cause

23  for the decline in value.  I can point to a number of

24  different things, including the exorbitant fees that were

25  charged to HCLOF, including the inability to be able to re --

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/29/21    Page 124 of 278    PageID 1802

Pugatch - Cross                    139

1  refinance the CLOs on the part of HCLOF, all of which stems

2  from the actions that Highland took prior to our investment in

3  HCLOF.

4  BY MR. WILSON:

5  Q    And you've -- I think it's been referenced several times

6  in HarbourVest's arguments that -- that the reset was a

7  fundamental -- the inability to get a reset was a fundamental

8  cause of the loss in value.  Is that -- is that HarbourVest's

9  position?

10 A    That -- that is a part of the -- the cause in the

11 declining value of the CLOs, yes.

12 Q    And you would agree with me that a reset is fundamentally

13 a reset of interest rates, correct?

14 A    Of the interest rates of the liabilities of the -- the

15 timing for repayment of those liabilities, yes.

16 Q    Now, just say with -- for the sake of a hypothetical

17 example.  If you had a home that was valued at $5 million, or

18 let's just say $500,000, let's make it more realistic.  If you

19 had a $500,000 home and you had a mortgage on that home at

20 five percent interest, your inability to refinance that home

21 at a lower interest rate would not affect the underlying value

22 of that home, correct?

23          MS. WEISGERBER:  Objection, Your Honor. Hypothetical.

24 And objection to relevance as well.

25          THE COURT:  Sustained.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/21/23    Page 125 of 278    PageID 1806
Appendix 09    Page 125 of 174

Pugatch - Cross                              140

 1              MS. WEISGERBER:  Calls for speculation.

 2              THE COURT:  Sustained.

 3   BY MR. WILSON:

 4   Q    Is there any reason to believe that the change in the

 5   interest rate would have prevented the massive losses of

 6   investment value that occurred in HCLOF?

 7              MS. WEISGERBER:  Object on the same grounds.

 8              THE COURT:  Sustained.

 9              THE WITNESS:  The short -- the short answer is yes,

10   with a -- with the amount of leverage --

11              MS. WEISGERBER:  I --

12              THE WITNESS:  -- that exists.  Oh, sorry.

13              MS. WEISGERBER:  The objection was sustained.

14              THE COURT:  Yeah, I sustained the objection.  That

15   means you don't answer.

16              THE WITNESS:  I'm sorry, Your Honor.

17   BY MR. WILSON:

18   Q    So, would you agree with me that if the expenses and the

19   fees charged by the portfolio manager increased dramatically,

20   that would -- that would impact the value of the investment,

21   correct?

22              MS. WEISGERBER:  Objection on the same grounds, and

23   relevance.  This is a 9019 hearing, Your Honor.  We are not

24   here to try every minutia.  And in fact, we're trying to avoid

25   a trial on the merits.  And it feels like we're getting a bit

Pugatch - Cross                         141

1  far afield now.

2            THE COURT:  I sustain.

3            MR. WILSON:  All right.  I'll pass the witness.

4            THE COURT:  All right.  Mr. Draper said he had no

5  cross.  So, any redirect, Ms. Weisgerber?

6            MS. WEISGERBER:  No, Your Honor.

7            THE COURT:  All right.  Mr. Morris, did you have any

8  redirect?

9            MR. MORRIS:  I do not, Your Honor.  I have a very

10 brief closing and then some additional remarks if -- if we

11 finish.

12           THE COURT:  All right.  So, Mr. Pugatch, that

13 concludes your testimony.  Thank you.  You're excused if you

14 want to be.

15      All right.  So, as I understood it, there would be no more

16 evidence after this.

17           MR. WILSON:  Well, Your Honor, along those lines, as

18 a housekeeping measure, I think everything on my exhibit list

19 is included on someone else's exhibit list, but just for belt

20 and suspenders I would move to admit all of the exhibits on

21 the -- on Mr. Dondero's exhibit list.

22           THE COURT:  Well, is that agreed or not?  Because we

23 didn't have a witness to get them in.

24           MR. MORRIS:  No objection, Your Honor.

25           THE COURT:  Any objection?  All right.  If there's no

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 38-9   Filed 09/29/23   Page 127 of 278   PageID 1808

142

 1  objection, I'll --

 2          MR. MORRIS:  Your Honor, --

 3          THE COURT:  I'm sorry.  Was there an objection?  I

 4  will admit Dondero Exhibits A through M, and those appear at

 5  Docket Entry 1721, correct, Mr. Wilson?

 6          MR. WILSON:  That is correct, Your Honor.

 7          THE COURT:  All right.

 8          MR. WILSON:  That is correct, Your Honor.

 9      (James Dondero's Exhibits A through M are received into

10  evidence.)

11          MR. WILSON:  And one final matter is, during the

12  examination of Mr. Seery, you at least partially admitted

13  Dondero's Exhibit N, and I was wondering if we need to -- how

14  we'd need to submit that for the record.

15          THE COURT:  Okay.  First, I'm confused.  I think you

16  said Mr. Terry's testimony.  You --

17          MR. WILSON:  I said Seery.  I'm sorry.

18          THE COURT:  Oh, Seery?

19          MR. WILSON:  Or I may have said Terry, but I meant to

20  say Seery.

21          THE COURT:  Okay.  Maybe you said it.  Okay.  During

22  Mr. Seery's testimony -- oh, the email that I admitted a

23  portion of?

24          MR. WILSON:  That is -- that's correct, Your Honor.

25          THE COURT:  What -- what are you asking?  It's not in

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00802-B   Document 28-9   Filed 09/27/23   Page 128 of 278   PageID 1806

143

1  your notebook.  Are you asking do you need to separately

2  submit it or what?

3          MR. WILSON:  Yeah, I was just asking what the Court's

4  preference on how we submit that for the -- put it in the

5  record.

6          THE COURT:  Okay.  That was so garbled I didn't hear

7  you.  You need to file that on the docket as a supplemental

8  exhibit that was admitted, okay?

9          MR. WILSON:  Okay.  Thank you, Your Honor.

10          THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13          MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/25/23    Page 129 of 278    PageID 1807

144

1  about.  They just don't.  The fraudulent transfers led to the

2  bankruptcy, led to the appointment of a trustee, led to --

3  right?  So, so it's -- that's why -- but they're getting

4  something for their claim.

5       It was a hard negotiation, Your Honor.  There is no

6  dispute that if we litigated this it would be complex.  It

7  would fact-intensive.  The Debtor would be forced to rely upon

8  witnesses who are no longer employed by it.  That it would be

9  expensive, for sure.  There's no dispute about any of that.

10  There's no dispute that the creditor body has spoken loudly

11  here by unanimously refraining from objecting except for Mr.

12  Dondero and the entities controlled by him.

13       And you heard Mr. Seery's testimony.  I think he

14  exhaustively informed the Court as to the process by which the

15  transaction was analyzed and negotiated, and there's no

16  evidence to the contrary that this was an arm's-length

17  negotiation.

18       Unless Your Honor has any questions, we would request that

19  the motion be granted.

20            THE COURT:  Thank you.  Ms. Weisgerber, your closing

21  argument?

22              CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23            MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24  also be brief.  We again join in Mr. Morris's arguments and

25  comments.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 26-9    Filed 09/20/23    Page 130 of 278    PageID 1808

145

1    The Court has now heard testimony from Mr. Pugatch

2  regarding the factual detail underlying HarbourVest's claims.

3  The Court has also heard about the significant damages that

4  HarbourVest stands to recover for those claims.  And

5  HarbourVest came to this Court ready to litigate.  It would --

6  it's ready to do so if needed.  It believes it would prevail

7  on its claims if it had to do so.

8    But the Court also heard from Mr. Seery about his

9  understanding of HarbourVest's claims, his calculus, and his

10  decision to settle them.  And we submit that nothing further

11  is needed by this Court in order to approve the settlement.

12  This is a question of the Debtor's business judgment.  We're

13  not here to have a trial on the merits of HarbourVest's

14  claims.  The Objectors have made various arguments, including

15  about the cause of HarbourVest's damages.  But even the nature

16  of the legal claims that HarbourVest is asserting, some do not

17  require a loss causation.  So we submit that's not even

18  relevant to the merits of the claims.

19    The settlement is clearly in the best interest of the

20  estate, and we respectfully request that the Court approve it.

21         THE COURT:  Thank you.  All right.  Mr. Wilson, your

22  closing argument?

23         MR. LYNN:  Michael Lynn.  I will give the closing

24  argument, if that's satisfactory to the Court.

25         THE COURT:  All right.  Go ahead.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9 Filed 09/27/23 174age 131 of 278   PageID 1809

146

```
 1              CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

 2              MR. LYNN:  Good afternoon, Your Honor.  I just want

 3   to make a few points, and I'll try to do it as quickly as

 4   possible.

 5      First, I feel compelled to address the argument of the

 6   Debtor that Mr. Dondero is repeating his litigious behavior

 7   from the Acis case.  I don't know about the Acis case.  I

 8   wasn't involved except very, very peripherally.  But with

 9   respect to this case, we have only taken positions in court

10   that we believed -- that is, his lawyers -- believed were

11   warranted by law, facts as we knew them, and that are

12   consistent with professionalism.  I'd be glad to explain any

13   position we took.

14      Often, through the Debtor's very persuasive powers, we

15   never had the chance to explain our position previously to the

16   Court.  In fact, for the most part, as today, we have been

17   reactive rather than commencing proceedings.  In fact, during

18   the first seven months of this case, we only appeared in court

19   a few times, when we felt we had to -- for example, when

20   discovery was being sought by the Creditors' Committee that we

21   feared might invade privilege.  Then, much to the Debtor's

22   fury, we opposed the Acis 9019.  We did so because we thought

23   it was too much.

24      Since, as the Court can see, the principal instigators of

25   litigation have been the Debtor, and to a lesser extent, the
```

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00802-B    Document 28-9    Filed 09/22/23    Page 132 of 278    PageID 1840
Appendix 09

147

 1    Committee.

 2         Indeed, in an apparent effort to drown Mr. Dondero and his

 3    counsel in litigation, the Debtor has repeatedly sought court

 4    action on a very short fuse, claiming need for expedited

 5    hearing.

 6         Perhaps the most startling example of this is the recent

 7    contempt motion, for which there is no good reason for a quick

 8    hearing.  Resolution of that motion is not necessary to reach

 9    the confirmation hearing.  The motion could be heard after the

10    confirmation hearing.  There is no need to put Mr. Dondero and

11    his professionals in a position where they have to respond in

12    a couple of days, two business days, and then will have two

13    days to prepare for trial.

14         Second, Your Honor, Mr. Seery has repeatedly asserted,

15    contrary to today's motion, that the HarbourVest claim was of

16    no merit.  That is why, when he came in to settle for tens of

17    millions of dollars, we opposed this motion.  It appears that

18    the motion is occurring without any cross-party discovery.

19    There is no consideration, apparently, of trying dispositive

20    -- dispositive motions first.  There is no consideration for

21    junior classes of equity, which Mr. Seery has previously

22    opined were in the money.  This, even though there's no reason

23    that this settlement is necessary pre-confirmation, unless Mr.

24    Seery wants HarbourVest's vote.

25         Third, for whatever reason, that seems to be the driving

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/29/21   Page 133 of 278   PageID 1844

148

1  factor for settling.  On its face, the vote seems to be a key

2  factor of the settlement.  About the longest provision of the

3  settlement agreement relates to voting.  The motion itself --

4  in the motion itself, five of seven bullet points cited by the

5  Debtor for approval of the settlement deal with and emphasize

6  support of the plan or the vote that is to be cast for the

7  plan.

8      If the settlement is a good deal, it didn't need to have

9  as one of its parts the requirement that HarbourVest vote for

10  the plan.

11     Your Honor, I'll stop there.  I know Your Honor would like

12  to get just a few minutes before your 1:30 docket.  I've been

13  there and I understand that, and I do apologize for taking the

14  time we have, but I think that responsibility is shared with

15  the Debtor and HarbourVest.

16     Thank you, Your Honor.

17         THE COURT:  All right.  Thank you for that.

18     Mr. Draper, any closing argument from you?

19   CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20         MR. DRAPER:  Yes, I have three comments.  The first

21  is the claim -- the loss claim, absent the fraud claim, is, at

22  best, $7 million.  I think Mr. Seery's argument that a hundred

23  -- one hundred percent is attributable to there is just wrong.

24  If he and I both invested in a company 50-50 and it goes

25  broke, we only lost 50 cents each.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00802-B   Document 28-9   Filed 09/15/23   Page 134 of 278   PageID 1842

149

1    Number two, I think the Court heard the evidence.  I think

2    this is, at best, a subordinated claim under 5 -- under the

3    Bankruptcy Code.  It's really a "But for the

4    misrepresentations, we wouldn't have invested."

5    And the last one is the -- Judge Lynn represented the

6    voting, so I won't deal with that.  But the one that troubles

7    me the most is the fact that this asset that is ultimately

8    being paid for in claim dollars that's being transferred over

9    to the Debtor and being put it outside the estate, outside the

10   purview of this Court, and placed in some subsidiary, this --

11   this transaction, if it is approved, must -- should contain a

12   provision that the asset that's being acquired come into the

13   Debtor and be owned by the Debtor.

14            THE COURT:  All right.

15            MR. DRAPER:  I have nothing further, Your Honor.

16            THE COURT:  Thank you, Mr. Draper.

17       Mr. Morris, you get the last word since it's your motion.

18            MR. MORRIS:  Very quickly, Your Honor.  The

19   subordination argument doesn't hold water.  This is not a

20   claim against the Debtor for the security; it's a claim for

21   fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,

22   that might make sense, but this is a claim against the Debtor.

23   And it's a Debtor -- it's a claim for fraud.  That's number

24   one.

25       Number two, we need to keep this exactly as it's been

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01802-B    Document 28-9    Filed 09/15/23    Page 135 of 278    PageID 1848

150

1    structured in order to avoid litigation.  Mr. Seery told the

2    Court.  I'm sure the Court can make its own assessment as to

3    Mr. Seery's credibility as to whether or not the Debtor is

4    intending to somehow get this asset beyond the Court.

5        But there are reasons why we've done this, Your Honor.

6    They could have made an objection on that basis.  In fact, if

7    they did, it would be overruled, because there's no -- there's

8    no basis for this Court to find that somehow the Debtor and

9    Mr. Seery are doing something untoward to get assets away from

10    this Court's jurisdiction.

11        You know, I don't know what to say about Mr. Lynn's

12    commentary.  Much of it had nothing to do with any evidence in

13    the record.

14        The fact remains, Your Honor, that this settlement is

15    fair.  It's reasonable.  It's in the best interest of the

16    estate.  And we would respectfully request that the Court

17    grant the motion.

18            THE COURT:  All right.  Thank you.  Well, I

19    appreciate all the arguments and evidence I have heard today.

20    I'm going to be brief in my ruling here, but I reserve the

21    right to supplement in a more fulsome written order, which I'm

22    going to instruct Mr. Morris to submit.  I am approving the

23    motion to compromise the HarbourVest claim today, and I guess

24    subsumed in that is granting the motion to allow their claim

25    for 3018 voting purposes.

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/15/23    Page 136 of 278    PageID 1844

151

1          I in all ways find this compromise to meet the required

2     legal standard set forth in such cases as *TMT Trailer Ferry*,

3     *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4     cases.

5          First, I'm going to specifically say for the record that I

6     found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7     very credible.  Very credible testimony and meaningful

8     testimony was provided to the Court today.  And based on that

9     testimony, I find, first, that this compromise was the product

10    of arm's-length negotiations.  It was a hard-fought

11    negotiation, as far as I'm concerned.  The Debtor objected to

12    these numerous HarbourVest proofs of claim.  The Debtor did

13    not want to allow HarbourVest a significant claim for voting

14    purposes.  I duly note the statements made in the disclosure

15    statement before this compromise was reached suggesting, you

16    know, the Debtor didn't think HarbourVest should have a large

17    claim.

18         That is consistent with everything I typically see in a

19    bankruptcy case when there's a claim objection.  The objector

20    vehemently denies the claimant should have a proof of claim,

21    and then people sit down and think about the risks and rewards

22    of litigating things.  And I believe very fervently that's

23    what happened here.  There were good-faith, arm's-length

24    negotiations that resulted in this proposed compromise.

25         I find the compromise -- and I'll add to that point, on

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 68-9   Filed 09/25/23   Page 137 of 278   PageID 1848

152

1    the good-faith point, I find nothing sinister or improper

2    about the fact that the compromise includes a commitment of

3    HarbourVest to vote in favor of the plan. Again, we see this

4    a lot. You know, there's even a buzz word that doesn't even

5    exist in the Bankruptcy Code: "plan support agreement." You

6    know, we see those a lot -- you know, oftentimes negotiated

7    before the case, but sometimes after. You know, it may be

8    improper in certain situations, but there was nothing here

9    that troubles me about that component of the compromise.

10      I find the compromise to meet the paramount interest of

11    creditors here. Notably, we have very large creditors in this

12    case who have not objected. The *Foster Mortgage* case from the

13    Fifth Circuit tells me I am supposed to consider support or

14    opposition of creditors. No opposition of UBS. No opposition

15    of the Redeemer Committee Crusader Fund. No opposition from

16    Josh Terry or Acis. No opposition from Daugherty.

17      But moreover, when considering the paramount interest of

18    creditors, I find this compromise to be in all ways fair and

19    equitable and in the best interest of the estate, and

20    certainly within the range of reasonableness. The evidence

21    showed that HarbourVest asserted over $300 million. Over $300

22    million. Granted, that was based on all kinds of legal

23    theories that would be contested and expensive to litigate,

24    but the evidence also showed that they invested over $70

25    million. You know, close to $75 million. I forget the exact

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/25/23   Page 138 of 278   PageID 1846
Appendix   Page 152 of 174

153

1    number.  $75 or $80 million, somewhere in that range.  And now

2    the credible evidence is that investment is worth about $22

3    million.

4         So, certainly, while the claim may not have, at the

5    ultimate end of the day in litigation, resulted in a $300

6    million proof of claim, certainly, certainly there were strong

7    arguments for a very sizeable claim, more than this compromise

8    amount.  So it's certainly fair and equitable and reasonable

9    when considering the complexity and duration of further

10   litigation, the risks and rewards, the expense, delay, and

11   likely success.

12        A couple of last things I'm going to say are these.  I

13   understand, you know, there is vehement disagreement on the

14   part of our Objectors to the notion that Highland might have

15   caused a $50 million loss to HarbourVest.  But I will tell

16   you, for what it's worth -- I want the record clear that this

17   is part of my evaluation of the reasonableness of the

18   settlement -- my reaction is that, indeed, Highland's

19   litigation strategy in the Acis case caused HCLOF to lose a

20   huge portion of its value, to the detriment of HarbourVest.

21   You know, whether all evidence at the end of the day would

22   convince me of that, I don't know, but that's -- that is

23   definitely this judge's impression.

24        I'm very sympathetic to HarbourVest.  It appears in all

25   ways from the record, not just the record before me today, but

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/25/23   Page 139 of 278   PageID 1850

154

1    the record in the Acis case that I presided over, that

2    Highland back then would have rather spent HarbourVest's

3    investment for HCLOF legal fees than let Josh Terry get paid

4    on his judgment.  They were perfectly happy to direct the

5    spending of other people's money, is what the record suggested

6    to me.

7         And then, you know, I have alluded to this very recently,

8    as recently as last Friday:  I can still remember Mr.

9    Ellington sitting on the witness stand over here to my left

10   and telling the Court, telling the parties under oath, that

11   HarbourVest -- he didn't use its name back then, okay?  For

12   the first phase of the Acis case, or most of the Acis case, we

13   were told it was an investor from Boston.  And at some point

14   someone even said their name begins with H.  I mean, it seemed

15   almost humorous.  But Mr. Ellington said it was they,

16   HarbourVest, the undisclosed investor, who was insistent that

17   the Acis name was toxic, and so that's what all of this had

18   been about:  the rebranding, the wanting to extract or move

19   things away from Acis.

20        So, you know, I have heard for the -- well, at least the

21   second time today, from Mr. Pugatch, what I perceive to be

22   very credible testimony that that's just not the way it

23   happened.

24        And I guess the last thing I want to say here today, and

25   you know, I guess I have multiple reasons for saying this, not

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9 Filed 05/15/23   Page 140 of 278   PageID 1858

155

1    just in connection with approving the settlement, you know,

2    I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

3    you know, a crazy amount of value, that they underperform in

4    the market, that, you know, during the Acis/Brigade tenure

5    and, you know, they should have been reset.  You know, I hope

6    those who have not been around as long as some of us in this

7    whole saga know that the -- Mr. Terry, Mr. Phelan, I think

8    Brigade, they all desperately wanted to reset these things,

9    but it was HCLOF, I believe directed by Highland, that wanted

10   to redeem, wanted to liquidate, take the pot of money,

11   warehouse it, and then do their own thing.

12       And there was, I think, from my vantage point, a

13   monumental effort to try to get everyone to the table to do

14   reasonable resets that would be good for the stakeholders at

15   HCLOF and be good for the creditors of Acis, including Josh

16   Terry.  That was always the balancing act that most of us were

17   focused on during the Acis bankruptcy.  But Highland, I

18   believe, directing HCLOF's strategy, just did not want the

19   resets to happen.

20       So, again, part of me, I suppose, just wants to make the

21   record clear on something that I fear not everyone is clear

22   about.  And I say that because the comment was made that the

23   injunctions, the preliminary injunctions sought by the Acis

24   trustee caused the plummet in value, and I think that's just

25   not an accurate statement.  I think litigation strategies are

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00802-B   Document 28-9   Filed 05/17/23   Page 141 of 278   PageID 1859

156

1   what caused the plummet in value, and that's why I think

2   ultimately HarbourVest would potentially have a meritorious

3   claim here in a significant amount if this litigation were to

4   go forward.

5        So, I approve this under 9019.  And again, Mr. Morris,

6   you'll upload an order.

7        It is now 1:41, so let's as quickly as possible hear the

8   other motion that I don't think had any objections.  Mr.

9   Morris?

10            MR. MORRIS:  Your Honor, just -- yes, just very

11   quickly, just four things.

12        With respect to the order, I just want to make it clear

13   that we are going to include a provision that specifically

14   authorizes the Debtor to engage in -- to receive from

15   HarbourVest the asset, you know, the HCLOF interest, and that

16   that's consistent with its obligations under the agreement.

17        The objection has been withdrawn, I think the evidence is

18   what it is, and we want to make sure that nobody thinks that

19   they're going to go to a different court somehow to challenge

20   the transfer.  So I just want to put the Court on notice and

21   everybody on notice that we are going to put in a specific

22   finding as to that.

23            THE COURT:  All right.  Fair --

24            MR. MORRIS:  Number two is --

25            THE COURT:  Fair enough.  I do specifically approve

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/29/21   Page 142 of 278   PageID 1820

157

```
1    that mechanism and find it is appropriate and supported by the

2    underlying agreements.

3        And just so you know, I spent some time noodling this

4    yesterday before I knew it was going to be settled, so I'm not

5    just casually doing that.  I think it's fine.

6        Okay.  Next?

7            MR. MORRIS:  Thank you very much, Your Honor.  Number

8    two, with respect to the motion to pay, there is no objection.

9    If we can just submit an order.  Or if Your Honor has other

10   guidance for us, we're happy to take it.

11           THE COURT:  Okay.  Does anyone have anything they

12   want to say about that motion?

13       Again, I looked at it.  I didn't see any objections.  I

14   didn't see any problem with it.  It's -- you know, you're

15   going through this exercise because of the earlier protocol

16   order.

17           MR. MORRIS:  Correct.

18           THE COURT:  All right.  Well, if there's nothing,

19   then, I will approve that, finding there is good cause to

20   grant that motion.

21           MR. MORRIS:  Okay.

22           THE COURT:  All right.  Is the only other

23   housekeeping matter --

24           MR. MORRIS:  I --

25           THE COURT:  -- we have the contempt motion?
```

001574

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/29/21   Page 143 of 278   PageID 1824

158

 1          MR. MORRIS:  It is, and I do -- I do have to point

 2    out how troubled the Debtor is to learn that Mr. Dondero was

 3    still receiving documents from Highland as late as this

 4    morning.  It's got to be a violation of both the TRO -- I

 5    guess it's now the preliminary injunction.

 6       I would respectfully request -- I know that time is what

 7    it is -- but maybe Mr. Dondero can answer now where he got the

 8    document, who he got the document from, what other documents

 9    he's gotten from the Debtor since Your Honor ordered him not

10    to communicate with the Debtor's employees.

11       This is not saying hello in the hallway.  I mean, this is

12    just -- it is really troubling, Your Honor, and it's why we

13    need the contempt motion heard as soon as possible.

14          THE COURT:  Well, Mr. Wilson, do you want to address

15    that?  I think the words I heard were that you just got the

16    document this morning, and you got it from Mr. Dondero, but we

17    don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18    you there?

19          MR. LYNN:  I'm afraid I'm back, Your Honor.

20          THE COURT:  Okay.

21          MR. LYNN:  I am not sure whether Mr. Dondero had it

22    in his files from some -- from back before he was asked not to

23    communicate with members or with employees of the Debtor.  I

24    believe -- I believe he's with us, though I don't think he's

25    available by video.

001575

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 26-9   Filed 05/10/23   Page 144 of 278   PageID 1822

159

1          Are you there, Mr. Dondero?

2                    THE COURT:  We can't hear you, Mr. Dondero.

3                    MR. DONDERO:  Judge?

4                    THE COURT:  Oh, go ahead.

5                    MR. DONDERO:  Can you hear me now?

6                    THE COURT:  Yes.

7                    MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8    found it in a stack of paper, and --

9                    MR. LYNN:  I understand it shows that his microphone

10   is working.

11                   THE COURT:  Okay.  Go ahead.

12                   MR. DONDERO:  Can you hear me?

13                   THE COURT:  Yes, go ahead.

14                   MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15   I've got everything in boxes.  I was going through everything

16   yesterday, and I found those emails in a stack of papers and I

17   sent them over because I thought they would be relevant

18   relative to Seery's initial impression.

19                   THE COURT:  Okay.  Well, let's talk about the timing

20   of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21   you why --

22                   MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23   waste the Court's time.  We have not made available anything

24   to the Court objecting to the expedited hearing on the

25   contempt motion.  We've been here.

1    I would say to Your Honor that if Mr. Dondero is indeed in

2  contempt, or was in contempt toward the motion, which has

3  nothing to do with the document that was presented as Dondero

4  Exhibit N, there is no need to hear this on an expedited

5  basis.

6    Every time we turn around, Your Honor, the Debtor is

7  asking that something be heard on an expedited basis.  And we

8  have not opposed that.  We have not fought that, to speak of,

9  to date.  But this is getting a little ridiculous.  We're

10  within days of confirmation of the Debtor's plan, and it is

11  simply a means of causing pain and suffering to Mr. Dondero

12  and those who are working with him and for him.  And he does

13  have employees at NexPoint who are assisting him.

14    So we most strongly object to being put on a schedule

15  where we are expected to get a response to the contempt motion

16  on file by Monday, today being Thursday, and a weekend

17  intervening.  And we strongly object to any setting of this

18  contempt motion on Tuesday or Wednesday.  It is absurd, and it

19  is done solely, solely, Your Honor, to cause pain.

20        THE COURT:  All right.

21        MR. MORRIS:  Your Honor, if I may?

22        THE COURT:  Please.

23        MR. MORRIS:  Just very briefly, we had a hearing the

24  other day.  The evidence is the exact same.  The evidence is

25  crystal clear that the violations are meaningful, they're

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/29/21    Page 146 of 278    PageID 1824

161

1   substantial, and they are repeated.

2       After the TRO was entered into, Mr. Dondero and only Mr.

3   Dondero chose to interfere with the Debtor's business.  Mr.

4   Dondero and only Mr. Dondero chose to communicate with the

5   Debtor's employees, not about saying hello in the hallway but

6   about coordinating a legal defense strategy against the

7   Debtor.

8       The need is immediate, Your Honor, and I would

9   respectfully request that the hearing be set for Tuesday or

10  Wednesday.  They've had this motion now since the 7th of

11  January.  They had a full evidentiary hearing, so they know

12  most of the evidence that's going to be presented.  They have

13  a whole team of -- they have an army of lawyers, Your Honor,

14  and half a dozen firms working on behalf of Mr. Dondero and

15  his interests.  For him to cry here, for him to cry that this

16  is too much is really -- it's obscene.  It just is.

17          THE COURT:  All right.  I'm going to say a couple --

18          MR. LYNN:  That is absurd.

19          THE COURT:  I'm going to say a couple of things.  One

20  is that I -- well, the one time I remember getting reversed

21  for holding someone in contempt of court, the District Court

22  felt like I had not given enough notice of that.  The District

23  Courts, what they think is reasonable notice, is sometimes

24  very different from what the bankruptcy judges think.  We're

25  used to going very lickety-split fast in the bankruptcy

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/25/23    Page 147 of 278    PageID 1828

162

1  courts.  And the Courts of Appeals, District Court, Courts of

2  Appeals obviously, for good reason, are very concerned about

3  due process in this kind of context.  So I'm sensitive to

4  that.

5      I'm also sensitive to the fact that it is monetary damages

6  that are being sought here to purge the contempt.  Okay?  The

7  shifting of attorneys' fees is basically what I understand is

8  being sought at this point.  You know, we have a preliminary

9  injunction halting behavior at this point, and so I think

10  that's another reason I'm hesitant to give an emergency

11  hearing.  I feel like monetary damages can wait and we can

12  give 21-plus days' notice of the hearing.

13      But I'm going to throw this out there as well.  If I do

14  feel like there is a showing of contempt, if I do feel like

15  the phone -- as I told you the other day, I'm very, very

16  fixated on the phone that may have been destroyed or thrown

17  away, maybe at Mr. Dondero's suggestion.  I mean, the

18  potential monetary sanction here may be very, very large if

19  the evidence plays out in the way I fear it might play out.

20  So I need to make sure everybody has adequate time to prepare

21  for that hearing and make sure I get all the evidence I need

22  to see.  All right?  Contempt of court is very, very, very,

23  very serious, and I don't think anyone would deny that.

24      So, with that, it was filed what day?  January 4th?  Is

25  that what I heard?  Or --

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01802-B    Document 28-9    Filed 09/29/21    Page 148 of 278    PageID 1826

163

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3     are you there?  Hopefully, you're not in a hunger coma at this

4     point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7     go to that first week of February, right?  Because we've got

8     the confirmation hearing that, you know, late in January, and

9     then --

10         THE CLERK:  Yes.  Uh-huh.

11         THE COURT:  Okay.  Do you have an available date to

12    give right now?

13         THE CLERK:  How about -- if you're willing to hear

14    them on Friday, February 5th.

15         THE COURT:  Okay.  I can do that.  February 5th at

16    9:30.  Any -- anybody want to argue about that?

17         MR. MORRIS:  Thank you, Your Honor.  That's

18    acceptable to the Debtor.

19         THE COURT:  Okay.  Mr. Lynn, is that good with you?

20         MR. LYNN:  We'll do that, Your Honor.  I would say,

21    by the way, that I'll be happy to buy Mr. Seery, out of my own

22    pocket, five cell phones, which ought to make up for the one

23    that was lost, though I recognize that those cell phones will

24    not have on them the privileged information, the conversations

25    between his lawyers and Mr. Dondero that I imagine he was

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/25/23   Page 149 of 278   PageID 1807

164

 1 || looking forward to seeing.

 2 ||        THE COURT:  Well, I wouldn't want him to see that

 3 || information, but I do think he's entitled to any nonprivileged

 4 || information, texting, or calls that are on that phone.  So,

 5 || again, I'm either going to hear good explanations for that or

 6 || not, but it's something very concerning to me.

 7 ||     All right.  So we have a game plan.

 8 ||     I'm going to ask, Did we have good-faith negotiations

 9 || between Dondero and the Committee and anything positive to

10 || report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11 ||        MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12 || Honor.  Mr. Lynn and I have exchanged several emails over the

13 || weekend, and the message that I sent to Mr. Lynn was very

14 || clear.  There had been a term sheet that Mr. Seery had sent

15 || back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16 || out and be very specific as to what it was Mr. Dondero was

17 || prepared to do in connection with the pot plan.  I instructed

18 || him that some of the issues that the Committee still has is

19 || obviously the overall value, along with the concept that's

20 || signing up to a promise from Mr. Dondero to comply with

21 || (indiscernible) as part of that value.  As Your Honor may

22 || understand, the Committee is obviously very skeptical of Mr.

23 || Dondero's future performance under an agreement that he enters

24 || into.

25 ||     Those are but a couple of issues, Your Honor, that I

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/25/23   Page 160 of 278   PageID 1808
Appendix 99   Page 165 of 174

165

1    advised Mr. Lynn were very concerning to the Committee.  And I

2    suggested to him that if he wanted to move things forward, the

3    best way to do it would be to come to us with a fulsome term

4    sheet that explained exactly what it was in clear and precise

5    detail that Mr. Dondero was proposing, and that would be the

6    best way to move the process forward, Your Honor.

7              THE COURT:  All right.  Mr. Lynn, anything to add to

8    that?

9              MR. LYNN:  Well, Your Honor, my experience in

10   negotiations is that it is useful to agree on substantive

11   terms, or at least be in the ballpark, before term sheets are

12   exchanged.  Long ago, a term sheet was prepared and presented

13   to the Committee.  Ultimately, I think it was rejected, though

14   I don't know if we ever received a formal rejection.

15       I explained in my emails, which I'm happy to share with

16   the Court if Your Honor wants to see them, why I was reluctant

17   to try to put into a term sheet form the proposal that I

18   suggested to Mr. Clemente.  As I said, I'm more than happy to

19   provide you with that email chain and let you form your own

20   judgment, Your Honor, as to whether we're proceeding in good

21   faith.

22             THE COURT:  All right.  Well I'm not going to ask --

23             MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24   Pomerantz.

25             THE COURT:  -- to see any of that.  Mr. Pomerantz?

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00803-B    Document 28-9    Filed 09/25/23    Page 151 of 278    PageID 1809

166

1          MR. POMERANTZ:  May I just be heard real quickly?

2          THE COURT:  Sure.

3          MR. POMERANTZ:  Your Honor, we also took Your Honor's

4    comments to heart.  We, Mr. Seery and I, had an over-an-hour

5    conversation with Mr. Lynn and with Mr. Bonds.  We provided

6    them with our thoughts as to what they needed to do in order

7    to move forward.  Of course, it's not really the Debtor to

8    agree.  It's the creditors to agree.  But as Mr. Seery has

9    testified many times before and as I have told the Court, we

10   would support a plan that the Committee and Mr. Dondero could

11   get behind.

12      So we again -- I'm not going to divulge the nature of

13   those communications, but we suggested several things that Mr.

14   Dondero could do in order to move the ball forward, and

15   unfortunately, we have not seen any of those things done thus

16   far.  So we are, at this point, not optimistic that there will

17   be a grand bargain plan.

18          THE COURT:  All right.

19          MR. DONDERO:  Your Honor, could I comment for a

20   second?  This is Mr. Dondero.

21          THE COURT:  If you and your counsel want you to

22   comment, you can comment.

23          MR. DONDERO:  I'd love to do a pot plan.  I would

24   love to reach some kind of settlement and everybody move on

25   with their lives.  The estate started with $360 million of

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00803-B   Document 28-9   Filed 09/29/21   Page 152 of 278   PageID 1880

167

1    third-party assets and $90 million of notes.  The $360 million

2    of third-party assets are down to $130 million.

3              MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4    I did this at the last hearing, and it's not my practice to

5    interrupt, but issues regarding what the value is or not, it's

6    going to require a response, and that's not really before Your

7    Honor.  I think before Your Honor is --

8              MR. DONDERO:  Okay.

9              MR. POMERANTZ:  -- have there been negotiations?

10   Have they been in good faith?  If Mr. Dondero wanted to

11   address that, that's fine, but I object to having any

12   discussion at this point, especially with Mr. Dondero not even

13   under oath, on what the nature of the value of the assets and

14   why they have changed and what not.

15             THE COURT:  Well, --

16             MR. POMERANTZ:  It's just not appropriate.

17             THE COURT:  I understand --

18             MR. DONDERO:  Okay.  Can I --

19             THE COURT:  Stop.

20             MR. DONDERO:  Can I -- can I finish?

21             THE COURT:  Let me please respond to that.  I

22   understand your concern, but I've heard from Mr. Seery

23   testimony many months ago about the value plummeting during

24   the case.  And I asked why, and I got some explanations.  This

25   is not evidence.  This is just, you know, this is not going to

1   be binding in any way.  Mr. Dondero can speak as to what he

2   thinks, you know, the situation is.

3       Go ahead, Mr. Dondero.

4           MR. DONDERO:  Okay.  I'm not trying to fixate on the

5   numbers.  And as far as the third-party assets are, we would

6   be willing to pay -- I would be willing to pay for those.  I'd

7   be willing to pay more, and even some value for the affiliate

8   notes that were really part of compensation agreements

9   throughout the history of Highland and avoid the POC

10  arguments.  I'd be willing to pay for the assets and I'd be

11  willing to pay even more than that.

12      I have no transparency in terms of what the assets are,

13  and there's no fulsome discussion in terms of, well, here are

14  the assets, here are the notes, here's what we think the

15  values are, can you get to this number?  It's just a -- you --

16  the -- it -- I don't view there is good-faith negotiations

17  going on because it's always just a:  You need to put a big

18  number on a piece of paper; otherwise, you're going to get run

19  over.

20      And there's no back and forth going on, but it's not due

21  to a lack of willingness on my part.  And maybe there needs to

22  be a committee set up.  Maybe there needs to be, I don't know,

23  a mediator or an examiner or somebody to try and push through

24  the pot plan, but there's nothing happening.  People are not

25  returning the judge's calls, I mean, Mr. Lynn's calls, or my

Case 21-03067-sgj    Doc 28-9    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-00802-B    Document 28-9    Filed 09/27/23    Page 154 of 278    PageID 1882

169

1    calls.  They're -- there's -- despite efforts of our -- of my

2    own and a willingness of my own, there's no negotiations of

3    any sort going on at the moment.

4           THE COURT:  All right.  I don't want anyone to

5    respond to that.  I know people have different views of what's

6    going on.  But let me just say a couple of things, and then

7    we're done.

8        We do have a Committee in this case.  We have a Committee

9    with very sophisticated members and very sophisticated

10   professionals.  Okay?  That's who I wanted you to be talking

11   to before the end of the day Tuesday.

12       We have had co-mediators in this case.  Okay?  And, you

13   know, I identified very sophisticated human beings for that

14   role.  Okay?  And in fact, there ended up being settlements

15   that flowed out of the co-mediator process.

16       We're now 15 months into the case.  There are major,

17   significant compromises now:  HarbourVest, UBS, Acis, Terry,

18   and Redeemer Committee.  I hate to use a worn-out metaphor,

19   but the train is leaving the station.  We've got confirmation.

20   I've pushed out two weeks.  I mean, you all are either going

21   to get there in the next few days or we're just going to go

22   forward with I think what everyone, you know, would rather be

23   a pot plan, but if we can't get there, we're just going to

24   have to consider the plan that's on the table now.  Okay?

25       You know, the Committee, again, they're sophisticated.

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00802-B   Document 28-9   Filed 09/27/21   Page 155 of 278   PageID 1888

170

1    They can compare apples to oranges and decide whether the plan

2    on the table, with its risks of future litigation and

3    recoveries, whether it's better or worse than whatever

4    consideration you're offering, Mr. Dondero.

5        And you know, as we all know, there is distrust here,

6    there, and everywhere among these parties.  So I can totally

7    understand them, you know, taking a hard line:  We either get

8    all cash or we're just not going to mess with it.  We don't

9    want to risk broken promises.  We'd rather just do litigation.

10        So, anyway, that's as much as I'm going to say except I am

11    going to further direct good-faith negotiations.  It sounds

12    like to me a written term sheet might be the appropriate next

13    step, given where I've heard things are at the moment.  But,

14    you know, I guess we don't have any hearings between now and

15    the 26th, right?  No Highland hearings that I can think of

16    between now and the 26th.

17            MR. POMERANTZ:  I don't think so.

18            MR. MORRIS:  I think that's correct, Your Honor.

19            THE COURT:  So you have all this time --

20            MR. MORRIS:  At the moment.

21            THE COURT:  You have all this time to negotiate and

22    simultaneously get ready for the confirmation hearing without

23    any other battles.  So I know you will use the time well.

24        All right.  We're adjourned.

25            THE CLERK:  All rise.

001587

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01803-B   Document 26-9   Filed 09/27/23   Page 156 of 278   PageID 1864

171

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 2:04 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                              **01/16/2021**

24   _____        _____

Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

172

                                INDEX

1

PROCEEDINGS                                                    3

2

OPENING STATEMENTS

3

- By Mr. Morris                                              12
4    - By Mr. Kane                                                18
- By Ms. Weisgerber                                        18
5    - By Mr. Draper                                              20

6

WITNESSES

7

Debtor's Witnesses

8

James Seery
9    - Direct Examination by Mr. Morris                         26
- Cross-Examination by Mr. Wilson                          62
10   - Cross-Examination by Mr. Draper                          87
- Redirect Examination by Mr. Morris                       93

11

HarbourVest's Witnesses

12

Michael Pugatch
13   - Direct Examination by Ms. Weisgerber                     96
- Cross-Examination by Mr. Wilson                         113

14

EXHIBITS

15

16   Debtor's Exhibits A through EE                Received  35

17   James Dondero's Exhibits A through M          Received 142
James Dondero's Exhibit N (as specified)      Received  71

18

19   HarbourVest's Exhibit 34                      Received 100
HarbourVest's Exhibit 36                      Received 103
20   HarbourVest's Exhibits 39 through 42          Received 137

21   CLOSING ARGUMENTS

22   - By Mr. Morris                                           143
- By Ms. Weisgerber                                       144
23   - By Mr. Lynn                                             146
- By Mr. Draper                                           148

24

25

Case 21-03067-sgj   Doc 28-9   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-00802-B   Document 28-9 Filed 09/27/23 Page 158 of 278   PageID 1886

173

1
2

INDEX
Page 2

3

RULINGS

4      Motion to Compromise Controversy with HarbourVest 2017      150
       Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
5      HarbourVest Dover Street IX Investment L.P., HV
       International VIII Secondary L.P., HarbourVest Skew Base
6      AIF L.P., and HarbourVest Partners L.P. filed by Debtor
       Highland Capital Management, L.P. (1625)

7      Motion to Allow Claims of HarbourVest Pursuant to Rule      150
8      3018(a) of the Federal Rules of Bankruptcy Procedure for
       Temporary Allowance of Claims for Purposes of Voting to
9      Accept or Reject the Plan filed by Creditor HarbourVest
       et al. (1207)

10     Debtor's Motion Pursuant to the Protocols for Authority     157
11     for Highland Multi-Strategy Credit Fund, L.P. to Prepay
       Loan (1590)

12     END OF PROCEEDINGS                                          171

13     INDEX                                                    172-173

14
15
16
17
18
19
20
21
22
23
24
25

# APPENDIX 10

Case 19-34054-sgj11 Doc 1788-1 Filed 09/29/21 Entered 09/29/21 17:50:19 Page 6 of 23
Case 3:21-cv-01603-B Document 681 Filed 02/22/21 Page 160 of 278 PageID 1838
Docket #1781 Date Filed 01/21/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

1934054210121000000000001

**001592**

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "<u>Morris Declaration</u>"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "<u>Settlement Agreement</u>"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "<u>Dondero Objection</u>"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "<u>Trusts' Objection</u>"), filed by the Dugaboy Investment Trust ("<u>Dugaboy</u>") and Get Good Trust ("<u>Get Good,</u>" and together with Dugaboy, the "<u>Trusts</u>"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "<u>CLOH Objection</u>" and collectively, with the Dondero Objection and the Trusts' Objection, the "<u>Objections</u>"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "<u>Debtor's Reply</u>"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "<u>HarbourVest Reply</u>"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "<u>Hearing</u>"), including assessing the credibility of the witnesses; and (j) the

DOCS_NY:41987.4 36027/002

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

DOCS_NY:41987.4 36027/002

001594

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

DOCS_NY:41987.4 36027/002

001595

# EXHIBIT 1

001596

**EXECUTION VERSION**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

# R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.    **Settlement of Claims.**

      (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

           (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

           (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

      (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.    **Releases.**

      (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.** The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court. The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

EXECUTION VERSION

4. **Representations and Warranties**. Subject in all respects to Section 3 hereof:

(a) each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b) the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support**.

(a) Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b) In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c) The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.   **No Admission of Liability**.   The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.   **Successors-in-Interest.**   This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.   **Notice**.   Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.  **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.  **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.  **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.  **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.  **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

Case 19-34054-sgj11 Doc 1728 Filed 01/29/21 Entered 01/29/21 15:50:18 Page 12 of 23
Case 3:23-cv-01503-B Document 36-1 Filed 09/11/24 Page 713 of 278 PageID 11849
EXECUTION VERSION

14.     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

7

US-DOCS\115534291.12

001603

EXECUTION VERSION

IT IS HEREBY AGREED.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its: CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

8

001604

EXECUTION VERSION

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

US-DOCS\115534291.12

001605

# Exhibit A

**TRANSFER AGREEMENT**
**FOR ORDINARY SHARES OF**
**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

001607

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

001608

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

   a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

   b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

   c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

   a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

   b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

   Prior to the Effective Date the Transferee shall procure that:

   c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

   a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 184668980v.2

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer
    Agreement are the result of arms'-length negotiations between the parties and their
    respective counsel. Each party and its counsel cooperated in the drafting and preparation
    of this Transfer Agreement.  In any construction to be made of this Transfer Agreement,
    the language or drafting of this Transfer Agreement will not be construed against any
    party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance
    with, the internal substantive laws of the state of Delaware, without giving effect to
    conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall
    remain in full force and effect following the transfer of the Interest, and the Fund and the
    Portfolio Manager thereafter may rely on all such representations, warranties and
    covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall
    be deemed to be an original, but all of which together shall constitute one and the same
    instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be
    used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be
    a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party
    hereto shall have any right herein as a third-party beneficiary or otherwise except as
    expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

001610

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

*[Additional Signatures on Following Page]*

5

001611

      IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
        Its General Partner

By:    HarbourVest GP LLC
        Its General Partner

By:    HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

001612

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director


*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

001613

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

001614

# APPENDIX 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| *directly and derivatively*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Cause No. _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P. , HIGHLAND HCF ADVISOR, LTD., | § | |
| and HIGHLAND CLO FUNDING, LTD., | § | |
| *nominally*, | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

### I.

### INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

Case 3:23-cv-00503-B Document 6-11 Filed 04/24/21 Page 186 of 278 PageID 1864

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.    Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.    Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.    Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.    Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.    Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.    Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

001618

Case 3:21-cv-01053-B Document 6-11 Filed 06/22/21 Page 185 of 278 PageID 1865

## III.

## JURISDICTION AND VENUE

**7.**     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.**     Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.**     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.**     Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**     Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

---

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

---

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.    Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.    While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.    In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.    HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.    On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.    HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.    On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

001622

32.    An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.    As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.    HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.    Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.    At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.    It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.    On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.    The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

001623

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53.    Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.    HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.    HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.    The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

001626

58.      HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.      In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.      The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.      While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.      HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.      As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.      The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value

of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair

market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest

confirmation, implicitly suggested that a proper current valuation had been performed.

76.      Defendant's principal, Seery, testified in January 2021 that the then-current fair

market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But

by then, it was worth almost double that amount and has continued to appreciate. Seery knew or

should have known that fact because the value of some of the HCLOF assets had increased, and

he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly

fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper

diligence and information that was plainly available.

77.      Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via

various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors

meeting in December 2020 that Highland would have to restrict its trading in MGM because of its

insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.      Furthermore, Seery controlled the Board of CCS Medical. And in or around

October 2020, Seery was advocating an equatization that would have increased the value of the

CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's

holdings.

79.      Seery's knowledge is imputed to HCM.

80.      Moreover, it is a breach of fiduciary duty to commit corporate waste, which is

effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

### SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

**100.**    Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.**    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.**    Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.**    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.**    Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.**    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.**    It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

---

**108.**    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.**    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.**    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.**    Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.**    Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.**    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.**    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.     The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.     Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.     HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.     In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.     On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest

Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount,

which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to

which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities

because Seery had learned from James Dondero, who was on the Board of MGM, of a potential

purchase of the company.  The news of the MGM purchase should have caused Seery to revalue

the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was

pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain

securities by 25%. In several communications through the U.S. interstate wires and/or mails, and

with Plaintiffs, and the several communications with Harbourvest during the negotiations of the

settlement, Seery failed to disclose these changes which were responsible in part for the ever-

growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud

laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of

racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000

payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to

include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions

require full transparency and accountability to an advisers' investors and clients and does not

require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.   Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.   Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

134.   Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.   At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.   At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.   Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.   HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

a.  Actual damages;

b.  Disgorgement;

c.  Treble damages;

d.  Exemplary and punitive damages;

e.  Attorneys' fees and costs as allowed by common law, statute or contract;

f.  A constructive trust to avoid dissipation of assets;

g.  All such other relief to which Plaintiff is justly entitled.

001640

Dated:  April 12, 2021                          Respectfully submitted,

                                                **SBAITI & COMPANY PLLC**

                                                */s/  Mazin A. Sbaiti*

                                                **Mazin A. Sbaiti**
                                                Texas Bar No. 24058096
                                                **Jonathan Bridges**
                                                Texas Bar No. 24028835
                                                JPMorgan Chase Tower
                                                2200 Ross Avenue – Suite 4900W
                                                Dallas, TX  75201
                                                T:  (214) 432-2899
                                                F:  (214) 853-4367
                                                E:  mas@sbaitilaw.com
                                                     jeb@sbaitilaw.com


                                                **Counsel for Plaintiffs**

---

# APPENDIX 12

1                GRANT SCOTT - 1/21/2021

2            IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
3                     DALLAS DIVISION

4      IN RE:                       )
                                    )      Chapter 11
5      HIGHLAND CAPITAL MANAGEMENT, )
       L.P.                         )       Case No.
6                                   )     19-34054-sgj11
                       Debtor.      )
7      -------------------------    )
       HIGHLAND CAPITAL MANAGEMENT, )
8      L.P.,                        )
                       Plaintiff,   )
9                                   )      Adversary
           vs.                      )    Proceeding No.
10                                  )      21-03000-sgj
       HIGHLAND CAPITAL MANAGEMENT  )
11     FUND ADVISORS, L.P.; NEXPOINT)
       ADVISORS, L.P.; HIGHLAND     )
12     INCOME FUND; NEXPOINT        )
       STRATEGIC OPPORTUNITIES FUND;)
13     NEXPOINT CAPITAL, INC.; and  )
       CLO HoldCo, LTD.,            )
14                                  )
                       Defendants.  )
15     ------------------------------

16

17      VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18           Thursday, 21st of January, 2021

19

20

21

22

23     Reported by: Lisa A. Wheeler, RPR, CRR

24     Job No: 188910

25

Page 2

```
 1              GRANT SCOTT - 1/21/2021
 2              January 21, 2021
 3              2:02 p.m.
 4
 5
 6        Videoconference deposition of Grant
 7  SCOTT, pursuant to the Federal Rules of
 8  Civil Procedure before Lisa A. Wheeler,
 9  RPR, CRR, a Notary Public of the State of
10  North Carolina.  The court reporter
11  reported the proceeding remotely and the
12  witness was present via videoconference.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              GRANT SCOTT - 1/21/2021
 2  REMOTE APPEARANCES:
 3        PACHULSKI STANG ZIEHL & JONES
 4        Attorneys for Debtor
 5            780 Third Avenue
 6            New York, NY 10017
 7        BY:  JOHN MORRIS, ESQ.
 8
 9        LATHAM & WATKINS
10        Attorneys for UBS
11            885 Third Avenue
12            New York, NY 10022
13        BY:  SHANNON McLAUGHLIN, ESQ.
14
15        SIDLEY AUSTIN
16        Attorneys for the Creditors Committee
17            2021 McKinney Avenue
18            Dallas, TX 75201
19        BY:  PENNY REID, ESQ.
20            ALYSSA RUSSELL, ESQ.
21            PAIGE MONTGOMERY, ESQ.
22
23
24
25
```

Page 4

```
 1              GRANT SCOTT - 1/21/2021
 2  REMOTE APPEARANCES:  (Continued)
 3        KING & SPALDING
 4        Attorneys for Highland CLO Funding, Ltd.
 5            500 West 2nd Street
 6            Austin, TX 78701
 7        BY:  REBECCA MATSUMURA, ESQ.
 8
 9        K&L GATES
10        Attorneys for Highland Capital Management
11        Fund Advisors, L.P., et al.
12            4350 Lassiter at North Hills Avenue
13            Raleigh, NC 27609
14        BY:  A. LEE HOGEWOOD, III, ESQ.
15            EMILY MATHER, ESQ.
16
17        HELLER DRAPER & HORN
18        Attorneys for The Dugaboy Investment Trust
19        and The Get Good Trust
20            650 Poydras Street
21            New Orleans, LA 70130
22        BY:  MICHAEL LANDIS, ESQ.
23
24
25
```

Page 5

```
 1              GRANT SCOTT - 1/21/2021
 2  REMOTE APPEARANCES:  (Continued)
 3        KANE RUSSELL COLEMAN & LOGAN
 4        Attorneys for Defendant CLO HoldCo Limited
 5            Bank of America Plaza
 6            901 Main Street
 7            Dallas, TX 75202
 8        BY:  BRIAN CLARK, ESQ.
 9            JOHN KANE, ESQ.
10
11  ALSO PRESENT:  La Asia Canty
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

GRANT SCOTT - 1/21/2021

1
2  G R A N T   S C O T T,
3          called as a witness, having been duly sworn
4      by a Notary Public, was examined and
5      testified as follows:
6          MR. MORRIS:  Good afternoon.  My
7      name is John Morris.  I'm an attorney with
8      Pachulski Stang Ziehl & Jones, a law firm
9      who represents the debtor in the bankruptcy
10     known as In Re: Highland Capital
11     Management, L.P., and we're here today for
12     the deposition of Grant Scott.
13         Before I begin, I would just like to
14     have confirmation on the record that
15     everybody here who's representing their
16     respective parties agrees that this
17     deposition can be used in evidence in any
18     subsequent hearing, notwithstanding the
19     fact that it's being conducted remotely,
20     and that the witness is not in the same
21     room as the court reporter.
22         Does anybody have an objection to
23     the admissibility of the transcript subject
24     to any reservation of -- of actual
25     objections on the record to using this

Page 7

GRANT SCOTT - 1/21/2021

1
2  transcript going forward?
3          Okay.  Nobody's spoken up, so I --
4      I'd like to begin.
5                EXAMINATION
6  BY MR. MORRIS:
7      Q.   Good afternoon, Mr. Scott.  As I
8  mentioned, my name is John Morris, and we're
9  here for your deposition today.  Have you ever
10 been deposed before?
11     A.   On two occasions.
12     Q.   And -- and when did the -- when did
13 those depositions take place?
14     A.   This past October and maybe six to
15 eight years ago.
16     Q.   Okay.  Can you just tell me
17 generally what the subject matter was of the
18 deposition this past October.
19     A.   It was relating to Jim Dondero's --
20 it was a family law issue in -- in -- with
21 respect to Jim Dondero.
22     Q.   Okay.  And did you testify in a
23 courtroom, or was it a deposition like this?
24     A.   I -- right here, actually.
25     Q.   Okay.  Super.  And -- and what about

Page 8

GRANT SCOTT - 1/21/2021

1
2  the -- the deposition six to eight years ago,
3  do you have a recollection as to what that was
4  about?
5      A.   Yeah.  It was a -- it was a patent I
6  wrote for Samsung Electronics.
7      Q.   Okay.
8      A.   And as being the person that I --
9  that wrote it and the patent was in litigation,
10 not -- not being handled by me, but by virtue
11 of having written the patent, I was -- I was
12 deposed --
13     Q.   Okay.  So you --
14     A.   -- on the -- on the patent.
15     Q.   Okay.  So you've had a little bit of
16 experience with depositions.  But just
17 generally speaking, I'm going to ask you a
18 series of questions.  It's very important that
19 you allow me to finish my question before you
20 begin your answer.
21         Is that fair?
22     A.   Absolutely.
23     Q.   And I will certainly try to extend
24 the same courtesy to you, but if I -- if I step
25 on your words, will you let me know that?

Page 9

GRANT SCOTT - 1/21/2021

1
2      A.   Okay.
3      Q.   And if there's anything that I ask
4  that you don't understand, will you let me know
5  that as well?
6      A.   Yes.  I'll try -- I'll do my best.
7      Q.   Okay.  So this is a virtual
8  deposition.  We're not in the same room.  I am
9  going to be showing you documents today.  The
10 documents will be put up on the screen.  This
11 isn't a -- trick of any kind.  If at any time
12 you see a document up on the screen and either
13 you believe or you have any reason to want to
14 read other portions of the document, will you
15 let me know that?
16     A.   Yes, I -- yes, I will.  Uh-huh.
17     Q.   With respect to the Dondero family
18 matter, I really don't want to go into the
19 substance of that, but I do want to know
20 whether you testified voluntarily in that
21 matter or whether you -- whether you testified
22 pursuant to subpoena.
23     A.   I would have done that, but the
24 first time I found out about it was a -- was a
25 subpoena that I received.  I wasn't given the

Case 3:21-cv-01603-BB Document 10-1 Filed 05/27/22 Page 215 of 278 PageID 1892

GRANT SCOTT - 1/21/2021

1 choice.

2    Q.   Okay.  And do you recall who served
3 the subpoena on you?  Actually, let me ask a
4 different question because I'm really not
5 interested in the -- in the details.

6         Did Mr. Dondero serve that subpoena
7 on you or did somebody else?

8    A.   His counsel for his ex-wife.

9    Q.   Mr. -- so -- so the lawyer acting on
10 behalf of Mr. Dondero's ex-wife served you with
11 the subpoena?

12    A.   Correct.

13    Q.   Okay.  You're familiar with an
14 entity called CLO HoldCo Limited; is that
15 right?

16    A.   Yes.

17    Q.   Do you know what that entity is?

18    A.   Yes.

19    Q.   What -- what -- can you describe for
20 me what CLO HoldCo Limited is.

21    A.   It's a holding company of assets
22 including collateralized loan obligation-type
23 assets.  That's a portion of the overall
24 portfolio.  It's an organization that is

GRANT SCOTT - 1/21/2021

1 integrated with other entities as part of a
2 charitable -- loosely what we -- what we refer
3 to as a charitable foundation equivalent.
4 Yeah.

5    Q.   All right.  We'll -- we'll get into
6 some detail about the corporate structure in a
7 moment.  Do you personally play any role at CLO
8 HoldCo Limited?

9    A.   Yes.  My technical title is
10 director, but I -- I don't necessarily know
11 specifically what that title means other than I
12 act, as I understand it, as -- as a trustee for
13 those -- for those assets.

14    Q.   And where did you get that
15 understanding?

16    A.   Approximately ten years ago from the
17 group that -- that set up the hierarchy.

18    Q.   And which group set up the
19 hierarchy?

20    A.   Employees at Jim Don- -- as I
21 understand it, employees of Highland along with
22 outside counsel, as I understand it, and also,
23 I guess, input from -- from Jim Dondero.

24    Q.   At the time that you assumed the

GRANT SCOTT - 1/21/2021

1 role of director of CLO HoldCo Limited, was
2 that entity already in existence?

3    A.   I believe so.  I'm not certain.  I'm
4 not certain.

5    Q.   What are your duties and
6 responsibilities as a director of CLO HoldCo
7 Limited?

8    A.   Well, my day-to-day responsibilities
9 are to interface with -- with the manager of
10 the -- of the assets of CLO.  I do have some
11 role in -- with respect to some of the entities
12 that are -- I -- I have a limited role with
13 respect to a subset of the charitable
14 foundations that receive money from the CLO
15 HoldCo structure, which is commonly referred to
16 as the DAF.  There's -- sometimes those are
17 used interchangeably.

18    Q.   What terms are used interchangeably?

19    A.   Well, the DAF and CLO HoldCo are
20 frequently -- by -- by other people they're --
21 it's the short -- it's the -- I guess it's
22 easier to use the acronym DAF than CLO HoldCo
23 Limited, so I'm frequently having to -- there
24 is a DAF entity so -- that's above -- above CLO

GRANT SCOTT - 1/21/2021

1 in terms of the management, and so it's
2 frequently confusing and I'm having to clarify
3 at times which entity we're talking about,
4 but -- but other parties frequently use those
5 terms interchangeably.

6    Q.   Okay.

7         MR. MORRIS:  Lisa, when we use the
8    phrase DAF, because you'll hear that a lot,
9    it's all caps, D-A-F.

10 BY MR. MORRIS:

11    Q.   You mentioned that you interface
12 with the manager of assets of CLOs.  Do I have
13 that right?

14    A.   Well, of all the assets.

15    Q.   Okay.  Who is the manager of the
16 assets that you're referring to?

17    A.   Highland Capital Management.

18    Q.   Highland Capital Management manages
19 all of the assets -- withdrawn.

20         Is it your understanding that
21 Highland Capital Management manages all the
22 assets that are owned by CLO HoldCo Limited?

23    A.   Yes.

24    Q.   Who makes the investment decisions

Page 14

GRANT SCOTT - 1/21/2021

1  on behalf of CLO HoldCo Limited?
2      A.   Highland -- those managers that you
3  mentioned.
4      Q.   Okay.  I didn't mention anybody in
5  particular.
6      A.   Oh, I'm sorry.  The -- the -- the
7  money manager -- could you repeat that
8  question?  I'm sorry.  I'm so sorry.
9      Q.   Can you just -- can you just
10  identify for me the person who makes investment
11  decisions on behalf of CLO HoldCo Limited.
12      A.   It's -- well, it's -- it's persons
13  as I understand it.  I inter- -- interface with
14  a -- with a group, but it's -- it's Highland
15  Capital employee -- Highland Capital Management
16  employees.
17      Q.   Okay.  Can you just name any of
18  them, please.
19      A.   Hunter Covitz, Jim Dondero.  Mark
20  Okada's no longer there, but I believe he was
21  involved, and there are others that I interface
22  with.
23      Q.   Can you -- can you recall the name
24  of anybody other than Mr. Okada and Mr. Dondero

Page 15

GRANT SCOTT - 1/21/2021

1  and Mr. Covitz?
2      A.   Yeah.  Over the years I've worked
3  with Tim Cournoyer, Thomas Surgent, but I
4  think -- I think that's the core -- the core
5  group.
6      Q.   All right.  And is there anybody
7  within that core group who has the final
8  decision-making authority concerning the
9  investments in CLO HoldCo Limited?
10      A.   I don't -- I don't know.  I'm sorry.
11  Say that again.  I just want to -- I'm sorry.
12  I'm trying to be -- I'm not trying to -- I'm
13  trying to be --
14      Q.   I understand.  And --
15      A.   Sorry.  If you could just repeat it.
16      Q.   Sure.  Is there any particular
17  person who has the final decision-making
18  authority for investments that are being made
19  on behalf of CLO HoldCo Limited?
20      A.   Amongst that group I am -- I am not
21  sure.
22      Q.   Okay.  So are there any other
23  directors of CLO HoldCo besides yourself?
24      A.   No.

Page 16

GRANT SCOTT - 1/21/2021

1      Q.   Is it fair to say that you do not
2  make decisions, investment decisions, on behalf
3  of CLO HoldCo Limited?
4      A.   Yes.
5      Q.   Does CLO HoldCo Limited have any
6  employees that you know of?
7      A.   No.
8      Q.   Does CLO HoldCo have any --
9  withdrawn.
10      Does CLO HoldCo Limited have any
11  officers that you know of?
12      A.   No.
13      Q.   So am I correct that you're the only
14  representative in the world of CLO HoldCo in
15  terms of being a director, officer, or
16  employee?
17      A.   Yes.
18      Q.   Do you receive any compensation from
19  CLO HoldCo for your services as the director?
20      A.   I do now.
21      Q.   When did that begin?
22      A.   I believe in the middle of 2012.
23      Q.   Okay.  And had you served as a
24  director prior to that time without

Page 17

GRANT SCOTT - 1/21/2021

1  compensation?
2      A.   Yes.
3      Q.   And have you been the sole director
4  of CLO HoldCo Limited since the time of your
5  appointment approximately ten years ago?
6      A.   Yes.
7      Q.   Nobody else has served in that
8  capacity; is that right?
9      A.   That is correct.
10      Q.   There have been no employees or
11  officers of that entity during the time that
12  you've served as director, correct?
13      A.   Yes.
14      Q.   Do you know who formed CLO HoldCo
15  Limited?
16      A.   I do not.
17      Q.   Do you know why CLO HoldCo Limited
18  was formed?
19      A.   I believe so.
20      Q.   Can you explain to me why -- your
21  understanding as to why CLO HoldCo was formed.
22      A.   So as I understand things, Jim
23  Dondero wanted to create a charitable
24  foundation-like entity or entities, and tax

Page 18

GRANT SCOTT - 1/21/2021

1  people particularly, I guess, finance people,
2  lawyers, they created this network of entities
3  to carry out that charitable goal.  At one
4  point, I thought it was a novel type of
5  institution, if you want to call it, or a
6  novel -- novel type of group of entities, but
7  over time, I came to understand that although
8  not cookie cutter, it -- it follows a general
9  arrangement of entities for legal and tax
10  purposes, compliance purposes, IRS purposes,
11  various insulating purposes to maintain -- or
12  to meet the necessary requisites to carry out
13  that charitable function.
14       Q.    When did you come to that
15  understanding?
16       A.    Over the last couple of years.  I
17  periodically have to refresh my recollection.
18  It's -- it's fairly complex.
19       Q.    Okay.  In your capacity as the sole
20  director of CLO HoldCo Limited, do you report
21  to anybody?
22       A.    No.
23       Q.    Other than interfacing with the
24  manager of the assets of the CLO, do you have

Page 19

GRANT SCOTT - 1/21/2021

1  any other duties and responsibilities as a
2  director of CLO HoldCo Limited?
3       A.    Yes.  Sorry.  My mouth is a little
4  dry.
5       Q.    By the way, if you ever need to take
6  a break, just let me know.
7       A.    Okay.  Thank you.  Now I forgot your
8  question.  The -- the -- the --
9       Q.    I understand.
10       A.    The answer -- the -- the answer is
11  yes.  I -- why don't you ask -- ask your
12  question again.  I'm sorry.
13       Q.    Sure.  Other than interfacing with
14  the manager of the assets of the CLO, do you
15  have any other duties and responsibilities as
16  the sole director of CLO HoldCo Limited?
17       A.    Yes.  So Highland Capital because of
18  its -- the way it's set up to manage or service
19  CLO HoldCo and the DAF, it has a relatively
20  large group of people that I have to interface
21  with to do everything from -- everything from
22  soup to nuts.  Finances and the money
23  management is one aspect, but most of my
24  time -- on a day-to-day or week-to-week basis,

Page 20

GRANT SCOTT - 1/21/2021

1  most of my time is spent working with the
2  various compliance and other people for
3  addressing issues of get- -- you know, getting
4  taxes filed.  It runs -- it runs the gamut of
5  every aspect of the organization being -- being
6  handled by Highland.
7       Q.    Okay.
8       A.    You know, unlike -- unlike my
9  financial -- unlike a financial planner that
10  might, you know, manage assets, they -- they do
11  it all, and I interface with them regularly to
12  maintain -- mostly to deal with compliance
13  issues.
14       Q.    Who's the com- -- is there a person
15  who's in charge of compliance?
16       A.    I believe Thomas Surgent.  I
17  mentioned him.  I believe he also has that
18  role, but it's -- you know, they do have
19  turnover, I guess, in that.  It's -- I guess
20  they refer to it as the back office.  I've
21  heard that term be used, but -- basically, it's
22  a large number of people that have changed over
23  time, but it's -- it's more -- I believe it's
24  more than one collectively.

Page 21

GRANT SCOTT - 1/21/2021

1       Q.    How much time do you devote -- you
2  know, can you estimate either on a weekly or a
3  monthly basis how many -- how much time do you
4  devote to serving as the director of CLO HoldCo
5  Limited?
6       A.    I thought about that.  Well, let --
7  let's put it this way:  There was the
8  prebankruptcy time I spent per day, and then
9  there was the postbankruptcy time I've spent
10  per -- per -- or per week -- excuse me, or
11  per -- I've estimated it as probably a day --
12  it's so intermittent it's -- it's hard, okay?
13  It's -- I don't dedicate my Mondays to only
14  doing that and then Tuesday through Friday I
15  don't, right?  I -- it's -- I have to piece
16  together everything that occurs during the
17  week.  There might be some weeks where I don't
18  have any contact.  There might be every day of
19  the week I have multiple contact.  There may be
20  days where from morning to night there is so
21  much contact, it precludes me from doing
22  anything else meaningfully.  So -- but I would
23  estimate it's probably three or four -- maybe
24  three days, four days a month when things are

Page 22

GRANT SCOTT - 1/21/2021

1  going well.
2      Q.   And -- and I think you -- you
3  testified just now that there was kind of a
4  difference between prebankruptcy and
5  postbankruptcy.  Do I have that right?
6      A.   Yes.
7      Q.   And can you tell me -- is it fair to
8  say that before the bankruptcy, you didn't
9  devote much time to CLO HoldCo, or do I have
10 that wrong?
11     A.   Well, I -- just the time that --
12 that I mentioned just -- I'm sorry.  The -- the
13 time I just mentioned now when you asked me,
14 that was the pre period.  Excuse me.  I haven't
15 talked about the postbankruptcy period.
16     Q.   So are you -- are you -- are you
17 devoting more time or less time since the
18 bankruptcy?
19     A.   Much more.
20     Q.   Much more since the bankruptcy
21 filing?
22     A.   Yes.
23     Q.   And so why did the bankruptcy filing
24 cause you to spend more time as a director of
25

Page 23

GRANT SCOTT - 1/21/2021

1  CLO HoldCo Limited?
2      A.   Well, initially, and this would
3  be -- this would be late 2019, it was --
4  aft- -- after the bankruptcy was -- was filed
5  and I obtained counsel, who are on the phone
6  now -- or in this deposition now, excuse me,
7  that was -- that transition occurred because
8  CLO was a debtor -- excuse me, a creditor to --
9  to the debtor and had to take steps to
10 establish its -- its claim.  So if I understand
11 the -- things correctly, the -- the debtor
12 identified as part of the filing -- I don't
13 know how bankruptcy works, but if I under- --
14 if my recollection is correct, there's a
15 hierarchy from biggest to smallest, and we were
16 relatively high up.  And when I say we or I,
17 I -- I just mean CLO was relatively high up.
18 And so initially, for the first period of so
19 many months, the -- the exclusive focus was on
20 our position as a creditor -- a creditor having
21 a certain claim against a debtor.
22     Q.   Can you describe for me your
23 understanding of the nature of the claim
24 against the debtor.
25

Page 24

GRANT SCOTT - 1/21/2021

1
2      A.   It was various obligations that were
3  owed to -- to CLO, things that had been
4  previously donated or -- or agreements that had
5  been set up that transferred certain assets,
6  and it was basically the -- the -- the amounts
7  were derived from those sorts of transactions.
8      Q.   Okay.  You're a patent lawyer; is
9  that right?
10     A.   I -- I'm exclusively a patent
11 attorney, yes.
12     Q.   Have you been a patent lawyer on an
13 exclusive basis since the time you graduated
14 from law school?
15     A.   From law school, yes.
16     Q.   Can you just describe for me
17 generally your educational background.
18     A.   So I'm an electrical engineer by
19 training.  I graduated from the University of
20 Virginia in 1984.  I then went to graduate
21 school at the University of Illinois.  I
22 received my master's degree in 1986, and then I
23 immediately joined IBM Research at the Thomas
24 Watson Institute in New York where I was a --
25 my title was research scientist, but I was -- I

Page 25

GRANT SCOTT - 1/21/2021

1  guess I was more of a research engineer, if
2  that matters.  And I did that until I
3  transitioned -- or I began law school in the
4  fall of 1988, and then I graduated law school
5  in May of 1991.
6      Q.   And where did you go to law school?
7      A.   University of North Carolina.
8      Q.   Do you have any formal training in
9  investing or finance?
10     A.   I do not.
11     Q.   Do you hold yourself out as an
12 expert in any field of investment?
13     A.   None -- none at all.
14     Q.   Have you had any formal training
15 with respect to compliance issues?  You
16 mentioned compliance issues earlier.
17     A.   No.
18     Q.   Now, do you have any knowledge about
19 compliance rules or regulations?
20     A.   Minimal that I've -- that have
21 occurred organically but -- but generally, no.
22     Q.   You don't hold yourself out as an
23 expert in com- -- in the area of compliance,
24 correct?
25

Page 26

GRANT SCOTT - 1/21/2021

1    
2    A.    No.  No.  I'm -- no.
3    Q.    Do you have any particular
4    investment philosophy or strategy?
5         MR. CLARK:  I'm going to object to
6    the form of the question.  And, John,
7    can -- can we get an agreement that -- I
8    know you were objecting just simply on the
9    form basis yesterday -- that objection to
10   form is sufficient today?
11        MR. MORRIS:  Sure.
12        MR. CLARK:  Okay.  And I object to
13   form.  Grant, you can answer to the extent
14   you can.
15        THE WITNESS:  I forget the question
16   now that you interrupted.  I'm sorry.
17   BY MR. MORRIS:
18   Q.    So -- so -- and I'm going to ask a
19   different question because in hindsight, that's
20   a good objection.
21        In your capacity as the director
22   of -- withdrawn.
23        Do the employees of Highland that
24   you identified earlier, do they make investment
25   decisions on behalf of CLO HoldCo Limited

Page 27

GRANT SCOTT - 1/21/2021

1    without your prior knowledge on occasion?
2    A.    On occasion, they do.
3    Q.    So there's no rule that your prior
4    approval is needed before investments are made,
5    right?
6    A.    I don't know whether they have an
7    internal guideline as to the amount that
8    triggers when they get in touch with me or
9    whether it's a new -- a change, something new,
10   or -- versus recurring.  So I don't -- I don't
11   know what they use internally for the metric.
12   Q.    Okay.  Are you aware of any
13   guideline that was ever used by the Highland
14   employees whereby they were required to obtain
15   your consent prior to effectuating transactions
16   on behalf of CLO HoldCo Limited?
17   A.    I understand there was one or more,
18   but I do not know that.
19   Q.    Okay.  Did you ever see such a
20   policy or list of rules that would require your
21   prior consent before the Highland employees
22   effectuated transactions on behalf of CLO
23   HoldCo Limited?
24   A.    Possibly some time ago, but I -- I

Page 28

GRANT SCOTT - 1/21/2021

1    don't recall.
2    Q.    Okay.  So -- withdrawn.  I'll --
3    I'll go on.
4         How did you come to be the director
5    of CLO HoldCo?
6    A.    I was asked either by Jim Dondero
7    or -- directly or indirectly by -- by Jim
8    Dondero.
9    Q.    And who is Jim Dondero?
10   A.    Well, at the time, he was the head
11   or one of the heads of Highland Capital
12   Management, a friend of mine.
13   Q.    How long have you known Mr. Dondero?
14   A.    Since high school so that -- 1976.
15   Q.    Where did you and Mr. Dondero grow
16   up?
17   A.    In northern New Jersey.
18   Q.    Do you consider him among the
19   closest friends you have?
20   A.    I think he is my closest friend.
21   Q.    Did you two go to college together?
22   A.    We actually -- for the last -- last
23   two years I was at UVA, University of Virginia,
24   excuse me, he and I were -- were at UVA.  So we

Page 29

GRANT SCOTT - 1/21/2021

1    did not start out at UVA initially, but -- but
2    we both transferred -- I transferred my
3    sophomore year.  I was actually a chemical
4    engineer at the University of Delaware when I
5    transferred in, and then he transferred in his
6    junior year.  So we were there at college for
7    two years.
8    Q.    And -- and based on your
9    relationship with him, is it your understanding
10   that one of the reasons he chose to transfer to
11   UVA is -- is to -- because you were there?
12   A.    Oh, no.  He transferred -- he --
13   he -- he transferred there because of the -- so
14   he went to the University of -- he -- he went
15   to Virginia Tech University, which is more
16   known as being an engineering school, which I
17   might have wanted to go to, and less a finance
18   business school.  And if I understand things
19   correctly, and I believe I do, he transferred
20   to UVA because of the well-known
21   business/finance program, accounting program.
22   Q.    And did you -- did you and
23   Mr. Dondero become roommates at UVA?
24   A.    We weren't roommates, but we lived

Page 30

GRANT SCOTT - 1/21/2021

1  in the -- we were housemates.  I'm sorry.  We
2  were housemates.
3
4      Q.    So you shared a house together.  How
5  would you describe your relationship with
6  Mr. Dondero today?
7      A.    It's -- it's been strained a while,
8  for some time, but -- but generally, very good.
9  Good to very good.
10     Q.    Without -- without getting personal
11 here, can you just generally identify the
12 source of the strain that you described.
13     A.    This -- I think it would be fair to
14 say that this bankruptcy, particularly events
15 in 2020 so some months after the bankruptcy was
16 declared, things have become -- we -- we still
17 have a close friendship, but -- but things
18 are -- are a bit -- are a bit more difficult.
19     Q.    Were you ever married?
20     A.    I've never been married.
21     Q.    Did you serve as Mr. Dondero's best
22 man at his wedding?
23     A.    I did.
24     Q.    Is it fair to say that -- that
25 Mr. Dondero trusts you?

Page 31

GRANT SCOTT - 1/21/2021

1      MR. CLARK:  Objection, form.
2  BY MR. MORRIS:
3      Q.    Withdrawn.
4            Do you believe that Mr. Dondero
5  trusts you?
6      A.    I do.
7      Q.    Over the years, is it fair to say
8  that Mr. Dondero has confided in you?
9      MR. CLARK:  Objection, form.
10 BY MR. MORRIS:
11     Q.    You can answer if you understand it.
12     A.    I think so.
13     Q.    I -- I what's your answer?  You
14 think so?
15     A.    Maybe you can de- -- I think of
16 confide as -- could you define confide, please.
17     Q.    Sure.  Is it -- is it fair to say
18 that over the -- let me -- you've known
19 Mr. Dondero for almost 45 years, right?
20     A.    Yes.
21     Q.    And you consider him to be your
22 closest friend in the world, right?
23     A.    Yes.
24     Q.    And is it fair to say over the

Page 32

GRANT SCOTT - 1/21/2021

1  course of those 45 years, Mr. Dondero has
2  shared confidential information with you that
3  he didn't want you to reveal publicly to other
4  people?
5      A.    Yes.
6      Q.    And is it your understanding that
7  because of the nature of your relationship with
8  him, he asked you to serve as the director of
9  CLO HoldCo Limited?
10     A.    Yes.  I believe it's because he --
11 he trusted -- trusted me with -- with assets
12 relating to his charitable vision.  I -- I --
13 yeah.  Yes.
14     Q.    And is it your understanding that he
15 thought you would help him execute his
16 charitable vision?
17     A.    That was the point of attraction
18 initially.  It wasn't for money.  I wasn't
19 being paid.  That was -- the charitable mission
20 was the attraction.
21     Q.    Does Mr. Dondero play any role in
22 the management of the CLO HoldCo Limited asset
23 pool?
24     MR. CLARK:  Objection, form.

Page 33

GRANT SCOTT - 1/21/2021

1      A.    I'm sorry.  Could you repeat that?
2  My -- my screen went small and then big again.
3  I was distracted.
4      Q.    What role does Mr. Dondero play with
5  respect to the management of the CLO HoldCo
6  Limited asset pool?
7      MR. CLARK:  Objection, form.
8      A.    He is with the company that manages
9  that asset pool.  He's one of the people I
10 named previously as managing those assets.
11     Q.    He is -- he -- he is the -- do you
12 understand that he has the final
13 decision-making power with respect to the
14 management of the assets that are held by CLO
15 HoldCo Limited?
16     MR. CLARK:  Objection, form.
17     A.    I believe I ansel -- answered that
18 previously.  I -- I don't know who has -- for
19 certainty I do not know who has that within
20 that company.  I don't.  If -- if -- I -- I
21 don't know, consistent with my prior answer.
22     Q.    Did you ever ask anybody who had the
23 final decision-making authority for investments
24 on behalf of CLO HoldCo Limited?

Page 34

GRANT SCOTT - 1/21/2021

1     A.   I -- I did not.

2     Q.   Did you ever make a decision on
3  behalf of -- withdrawn.

4          In your capacity as a director --
5  withdrawn.

6          In your capacity as the sole
7  director of CLO HoldCo Limited, can you think
8  of any decision that you've ever made that
9  Mr. Dondero disagreed with?

10    A.   Since -- prior to the bankruptcy,
11  no, not that I'm aware of.

12    Q.   And since the bankruptcy?

13    A.   There are decisions that I've made
14  that he's disagreed with.

15    Q.   Can you identify them?

16    A.   Yes.

17    Q.   Please do so.

18    A.   Okay.  So the reason I'm pausing is
19  I'm trying to put these in chronological order
20  and, at the same time, identify maybe some of
21  the more important ones versus the lesser
22  important ones.  One of the decisions I made
23  related to a request that I received from the
24  independent board of Highland.  I don't know

Page 35

GRANT SCOTT - 1/21/2021

1  how the request was transmitted to me, but I
2  believe the way it played out is as follows:  I
3  believe I was asked to call Jim Seery, and the
4  other -- and Russell Nelms, and the third
5  independent director, I believe his name is
6  John.  I -- I forget right now what his last
7  name is.  They were in New York, said they were
8  in a conference room.  I called in.  They were
9  very pleasant.  They identified who they were,
10  and they had a request, and the request was
11  that I agree to a transfer -- or that I -- that
12  I agree to allow certain assets that were not
13  Highland's assets but they were CLO's as-- --
14  assets -- apparently, there was no dispute
15  about that at any point in time, but that I
16  agree to allow certain assets that were due CLO
17  to be transferred to the registry of the
18  bankruptcy court.  And either on that call I
19  immediately agreed or ended the call, called my
20  attorney, and then immediately agreed.  It was
21  a very -- I accommodated the request quickly.

22    Q.   Okay.  And can you just tell me at
23  what point in time you spoke with Mr. Dondero,
24  and what did he say that you recall?

Page 36

GRANT SCOTT - 1/21/2021

1     A.   I don't know when he became aware of
2  that decision.  I'm not sure I ever volunteered
3  that the decision was even made, but at some
4  point, it became an issue because he found out
5  through -- if I understand the sequence of
6  events correctly, he found out possibly through
7  his counsel because there was ultimately
8  litigation about that issue.  It became known
9  to everyone at some point what I had done, I --
10  I think.  And subsequent to that, it became an
11  issue because of CLO HoldCo having fairly
12  significant cash flow issues with respect to
13  its expenses and obligations, including payment
14  of management fees as well as some of the
15  scheduled charitable giving that was -- that
16  was by contract already predefined.  My
17  decision to tuck that money -- or to agree
18  to -- my agreement to let that money be tucked
19  away created some -- created some -- created
20  some problems --

21    Q.   And -- and --

22    A.   -- for CLO HoldCo.

23    Q.   Okay.  And I just want to focus
24  specifically on my question, and that is, what

Page 37

GRANT SCOTT - 1/21/2021

1  did Mr. Dondero say to you that -- that causes
2  you to testify as you did, that this is one
3  issue that he didn't agree with?

4     A.   I believe his concern was that
5  because it was money that was undisputably to
6  flow to CLO HoldCo that -- which had many, many
7  other nonliquid assets -- this was a form of a
8  liquid asset.  It was cash in effect, proceeds.
9  -- that the money should have been allowed to
10  flow to be available for obligations.  He
11  didn't under-- -- I -- I -- I don't know what he
12  was thinking, but the -- the issue was that the
13  decision to put it into escrow was -- was --
14  was in-- -- incorrect, that there was no basis
15  for it.

16    Q.   That -- that's an issue where after
17  learning of your decision, he didn't agree with
18  it; is that fair?

19    A.   That's right.

20    Q.   Okay.  Can you think of any decision
21  that you've ever made on behalf of CLO HoldCo
22  Limited where Mr. Dondero had advance knowledge
23  of what you were going to do and he objected to
24  it, but you nevertheless overruled his

**Page 38**

GRANT SCOTT - 1/21/2021

1  objection and went ahead and did what -- did
2  what you thought was right?
3      A.   Okay.  Let me -- let me -- I have --
4  I'm sorry.
5      Q.   We're here.
6      A.   Oh, I'm sorry.  I'm having some
7  issues with my screen.  So that may have
8  occurred with respect to the original proof of
9  claim.  Then there was a subsequent amendment
10 to the proof of claim, and I -- I believe it --
11 I believe that he might have been aware of both
12 of those and was in disagreement with -- with
13 those.  But after working with my attorney, I
14 just -- you know, we did what we thought was
15 right, and I still think what we did was right.
16 There was an issue with respect to Har- --
17 HarbourVest that occurred relatively recently
18 where he objected to a decision that I had
19 made.  As I understand it, I could have
20 contacted my attorney and changed the decision,
21 but I didn't, and I still think that was the
22 right decision.
23          We have filed plan objections.  I
24 can't say if he has any -- in that regard, I --

**Page 39**

GRANT SCOTT - 1/21/2021

1  I -- I don't know what his thoughts are on
2  objections.  They would not have been
3  communicated with -- by me to him, but my
4  attorney might have consulted with his
5  attorney, and there -- they may know what that
6  difference is, but I -- that was just another
7  big decision.  I -- I -- maybe that --
8      Q.   All right.  Let me see if I can --
9  let me see if I can summarize this.  So two
10 proofs of claim.  Is it fair to say that
11 Mr. Dondero saw those proofs of claim before
12 they were filed?
13          MR. CLARK:  Objection, form.
14 BY MR. MORRIS:
15     Q.   Withdrawn.
16     A.   It --
17     Q.   Do -- do you know whether
18 Mr. Dondero saw the proofs of claim before they
19 were filed?
20     A.   I don't believe he did.
21     Q.   What -- what steps in filing the
22 proofs of claim did he object to that you
23 overruled?  Did he think there was -- something
24 should be different about them?

**Page 40**

GRANT SCOTT - 1/21/2021

1      A.   So we had to interface with Highland
2  employees at some point to get information to
3  support our proof of claim, and my guess, and
4  it's just a guess, is that he was aware of
5  those inquiries.  I -- I'm sorry.  I shouldn't
6  speculate.  I don't know.  But he -- with
7  respect to the original proof of claim, I'm --
8  I'm not aware of what specifically he was
9  objecting to or was -- thought should have been
10 different, but the -- with respect to the
11 amended proof of claim, which reduced the
12 original proof of claim to zero, I think that's
13 where he had a -- an issue.
14     Q.   And did you speak with him about
15 that topic prior to the time the amended claim
16 was filed, or did you only speak with him after
17 it was filed?
18     A.   I'm not sure the timing of that.
19     Q.   And with respect to HarbourVest, did
20 he ask you to object to the settlement on
21 behalf of CLO HoldCo Limited, and is that
22 something that you declined to do?
23          MR. CLARK:  Objection, form.
24     A.   I'm -- I'm sorry.  I was confused

**Page 41**

GRANT SCOTT - 1/21/2021

1  with the word.  Could you please repeat that?
2      Q.   Yes.  You mentioned HarbourVest
3  before, right?
4      A.   Yes.
5      Q.   And you mentioned that there was an
6  issue with Mr. Dondero and you concerning
7  HarbourVest; is that right?
8      A.   Yes.
9      Q.   And did that have to do with whether
10 or not CLO HoldCo Limited would -- would object
11 to the debtor's motion to get the HarbourVest
12 settlement approved?
13     A.   Would -- would get the
14 HarbourVest --
15     Q.   Settlement approved by the court.
16     A.   I'm not trying to be difficult.
17 I'm -- I'm -- could you just repeat that one
18 more time?  I'm --
19     Q.   What was -- what was --
20     A.   There was --
21     Q.   Let me try again.
22     A.   Okay.
23     Q.   What was the issue with respect to
24 HarbourVest that he objected to and -- and you

GRANT SCOTT - 1/21/2021

1  overrode his objection and did what you thought
2  was right anyway?
3      A.    Okay.  Okay.  That's -- that's
4  easier for me to understand.  I'm sorry.  So I
5  had worked with my attorney or he did the work
6  and consulted with -- we consulted, but we had
7  filed an objection, motion objecting to the
8  settlement, if I understand the terminology and
9  nomenclature correctly.  Okay.  He had -- we
10  had come to an agreement that we had a very
11  valid argument.  That argument was evidenced
12  by, I guess it was, our motion that was
13  submitted to the court.  On the day of the
14  hearing to resolve this issue, we pulled our
15  request, and that was because I believed it did
16  not have a good-faith basis in law to move
17  forward on.
18      Q.    And did you discuss that issue with
19  Mr. Dondero before informing the court that CLO
20  HoldCo Limited was withdrawing its objection,
21  or did he learn about that for the first time
22  during the hearing --
23          MR. CLARK:  Objection, form.
24  BY MR. MORRIS:
25

GRANT SCOTT - 1/21/2021

1      Q.    -- if you know?
2      A.    I -- I understand that he learned it
3  during the hearing.  I don't know the -- I -- I
4  don't know the -- whether there was any -- I --
5  I don't know for certain on the second half of
6  your question.
7      Q.    Let me -- let me try it -- let me
8  try it this way:  Did you speak with
9  Mr. Dondero about your decision to withdraw the
10  objection to the HarbourVest settlement prior
11  to the time your counsel made the announcement
12  in court?
13      A.    I don't -- I don't believe so.  No.
14  No.  No.  I'm sorry.  No.
15      Q.    And did --
16      A.    Okay.  No.  Here -- here's where
17  I'm -- I can clarify, okay?  I'm sorry.  I can
18  clarify.
19      Q.    That's all right.
20      A.    I gave the decision to my
21  attorney -- I -- I agreed with the
22  recommendation of my attorney, okay?  It wasn't
23  my --
24      Q.    Did you have a good --
25

GRANT SCOTT - 1/21/2021

1      A.    -- thought, okay?
2          THE REPORTER:  I didn't --
3      A.    Okay.  So he --
4      Q.    It was a recommendation.
5      A.    Yeah.  So he -- he called me with a
6  recommendation.  It was highly urgent.  You
7  know, I was coming out of the men's room, had
8  my phone with me.  I got the call.
9          MR. CLARK:  Hey, Grant, I -- Grant,
10      I just want to caution you not to -- to --
11      and I don't think counsel is looking for
12      this but not to disclose the -- the
13      substance of any of your communications
14      with counsel, okay?
15          THE WITNESS:  Thank you.
16      A.    So --
17          THE WITNESS:  Thank you.  I'm -- I'm
18      sorry.
19  BY MR. MORRIS:
20      Q.    It's -- it's really a very simple
21  question.  Do you recall --
22      A.    He made a recommendation.  I -- I --
23  I think I can answer your question without
24  going off tangent.  I'm sorry.  So he -- my
25

GRANT SCOTT - 1/21/2021

1  attorney made a recommendation.  I agreed with
2  it.  We with-- -- I -- I told him to withdraw --
3  or I authorized him to withdraw.
4      Q.    Okay.
5      A.    Then I received a communication, and
6  I -- I guess the most likely scenario is the
7  motion had been withdrawn by the time Jim
8  Dondero found out.
9      Q.    And -- and did he write to you, or
10  did he call you?  Did he send you a text?
11      A.    He called me.
12      Q.    What did he say?
13      A.    He was asking why, and I explained,
14  and I said I agreed with the decision and I was
15  sticking with the decision.
16      Q.    Let's just -- let's just move on to
17  a new topic, and let's talk about the structure
18  of -- of CLO HoldCo.  Are you generally
19  familiar with the ownership structure of CLO
20  HoldCo?
21      A.    Yeah.  I mean, in terms --
22      Q.    Are -- are you -- are you generally
23  familiar with it?  It's not a test.  I'm just
24  asking do you have a general familiarity --
25

Page 46

GRANT SCOTT - 1/21/2021

2    A.    With CLO HoldCo or the entities
3 associated with CLO HoldCo?
4    Q.    The latter.
5    A.    Yes, I believe so.
6    Q.    All right.  I've prepared what's
7 called a demonstrative exhibit.  It's just --
8    A.    Yes.
9    Q.    -- just -- it's a document that, I
10 think, reflects facts, but I want to ask you
11 about it.
12        MR. MORRIS:  La Asia, can we please
13    put up Exhibit 1.
14        (SCOTT EXHIBIT 1, Organizational
15    Structure:  CLO HoldCo, Ltd., was marked
16    for identification.)
17 BY MR. MORRIS:
18    Q.    Okay.  Can you see that, Mr. Scott?
19    A.    Yes, I can.
20    Q.    Okay.  So I think I took the
21 information from resolutions that were attached
22 to the CLO HoldCo proof of claim, and that's
23 why you got that little footnote there at the
24 bottom of the page.  But let's start in the
25 lower right-hand corner and see if this chart

Page 47

GRANT SCOTT - 1/21/2021

2 comports with your understanding of the facts.
3        Do you know that CLO HoldCo Limited
4 was formed in the Cayman Islands?
5    A.    Yes.
6    Q.    And to the best of your knowledge,
7 is CLO HoldCo Limited 100 percent owned by the
8 Charitable DAF Fund, L.P.?  If you're not sure,
9 just say you're not sure if you don't know.
10 It's not a test.
11    A.    So the -- the -- the familiarity
12 I -- I'm -- I'm familiar with the different --
13 I'm confused with the arrangement of the boxes
14 and the ownership interest versus managerial
15 interest.  I believe that's -- that's right.
16    Q.    Okay.  And -- and you're the sole
17 director of CLO HoldCo Limited, right?
18    A.    Yes.
19    Q.    And this whole structure was -- the
20 idea for this structure, to the best of your
21 knowledge, was to implement Mr. Dondero's plan
22 for charitable giving; is that fair?
23    A.    Yes.  Ultimately, yes.
24    Q.    And is it fair to say then that
25 he -- he made the decision to establish this

Page 48

GRANT SCOTT - 1/21/2021

2 particular structure, to the best of your
3 knowledge?
4    A.    I -- I didn't -- I'm sorry.  I
5 didn't hear you very well.
6    Q.    To the best of your knowledge, did
7 Mr. Dondero make the decisions to establish the
8 structure that's reflected on this page?
9    A.    Oh, I don't know if he made the
10 decision to establish this structure, although
11 it's -- it's -- I'm sorry.  Strike that.  I --
12 if -- if what you're saying is did he approve
13 of this structure, to my knowledge, yes.
14    Q.    Okay.  Do you hold any position with
15 respect to Charitable DAF Fund, L.P.?
16    A.    I -- I -- your chart says no.  I --
17 I -- I thought I had a role there, too.
18    Q.    I don't know.  I don't have
19 information on that.  That's why I'm asking the
20 question.
21    A.    I -- I -- I believe -- yes, I
22 believe I have the same role as I do in -- in
23 CLO HoldCo.
24    Q.    And that would be director?
25    A.    Yes.

Page 49

GRANT SCOTT - 1/21/2021

2    Q.    And to the best of your knowledge,
3 is the Charitable DAF GP, LLC, the general
4 partner of Charitable DAF Fund, L.P.?
5    A.    Yes.
6    Q.    And is it your understanding that
7 you are the managing member of Charitable DAF
8 GP, LLC?
9    A.    Yes.
10    Q.    Does Charitable DAF GP, LLC, have
11 any employees?
12    A.    No.
13    Q.    Does Charitable DAF GP, LLC, have
14 any officers or directors?
15    A.    No.
16    Q.    Are you the only person affiliated
17 with Charitable DAF GP, LLC, to the best of
18 your --
19    A.    I believe so.
20    Q.    Do you receive any compensation for
21 serving as the managing member of Charitable
22 DAF GP, LLC?
23    A.    No.  The -- I don't interact with it
24 very often.  It's -- no, I don't receive any
25 compensation.

Page 50

GRANT SCOTT - 1/21/2021

Q.   Can you tell me in your capacity as the managing member of Charitable DAF GP, LLC, what's the nature of that entity's business?

A.   It -- it doesn't perform any day-to-day operations.  My understanding is -- is that it's -- it's there for purposes of compliance.  I can't recall the last time I had any activity with respect to that.

Q.   How about the Charitable DAF Fund, L.P.?  I apologize if I've asked you these questions.

A.   It -- it's the same.  I -- I -- my activity is almost exclusively CLO HoldCo.

Q.   All right.  Let me just ask the questions nevertheless.  Does Charitable DAF Fund, L.P., have any employees?

A.   Employees?  No.

Q.   Does it have any officers and directors?

A.   No.

Q.   Are you the sole director of Charitable DAF Fund, L.P.?

A.   Yes, I believe so.

Q.   So if we -- if we put under

Page 51

GRANT SCOTT - 1/21/2021

Charitable DAF Fund, L.P., Grant Scott, director, and we put under CLO HoldCo Limited Grant Scott, director, would everything on the right side of that page be accurate, to the best of your --

A.   I believe so.

Q.   Well, let's move to the left side of the page.  Have you heard of the entity Charitable DAF HoldCo Limited?

A.   Yes.

Q.   Are you the sole director of Charitable DAF HoldCo Limited?

A.   Yes.

Q.   How did you become -- how did you come to be the char-- -- the sole director of Charitable DAF HoldCo Limited?

A.   That was when it was established.

Q.   And did Mr. Dondero ask you to serve in that capacity?

A.   Yes.

Q.   And did Mr. Dondero ask you to serve as the managing member of Charitable DA- -- DAF GP, LLC?

A.   Yes.

Page 52

GRANT SCOTT - 1/21/2021

Q.   And did Mr. Dondero ask you to serve as the director of Charitable DAF, L.P. -- withdrawn.

Did Mr. Dondero ask you to serve as director of Charitable DAF Fund, L.P.?

A.   Yes.

Q.   To the best of your knowledge, does Charitable DAF HoldCo Limited own 99 percent of the limited partnership interests in Charitable DAF Fund, L.P.?

A.   Yes.  The -- the feed -- the -- the feeds -- the -- the three horizontal blocks there that identify Highland Dallas Foundation, Kansas City, Santa Barbara -- there's a fourth of -- relatively de minimus in terms of participation.  There's a fourth entity that's missing.  It's Dallas -- I forget the name.  That -- that -- that structure is -- is a bit dated --

Q.   Okay.

A.   -- as it -- as is shown.

Q.   Okay.  So I will tell you and we can look the documents if you want, but attached to CLO HoldCo Limited's claim are a number of

Page 53

GRANT SCOTT - 1/21/2021

resolutions, and there's one that I have in mind that shows Charitable DAF HoldCo Limited holding 99 percent of the limited partnership interests of Charitable DAF Fund, L.P., and there's another that shows it being a hundred percent.  Do you -- do you know which is accurate at least at this time?

A.   There's a 1 percent/99 percent division, and I am -- I believe it's the 99 percent, but I'm -- I'm getting confused by the -- by the arrangement.  I'm so used to another arrangement.  I -- I believe the 99 percent is correct.

Q.   Okay.  Do you have any understanding as to who owns the other 1 percent of the limited partnership interests of Charitable DAF Fund, L.P.?

A.   No.  This -- this is confusing to me.  No.

Q.   Okay.  There are, at least on this page, three foundations that I think you've identified.  Are those three foundations together with the fourth that you mentioned the owners of the Charitable DAF HoldCo Limited?

Page 54

GRANT SCOTT - 1/21/2021

1
2    A.    Owners?
3    Q.    Yes.
4          MR. CLARK:  Objection, form.
5    A.    They -- they only participate in the
6    money that flows up to them.
7    Q.    And what does that mean exactly?
8    A.    What's that?
9    Q.    What does that -- what do you mean
10   by that?  Do the foundations fund Charitable
11   DAF Fund HoldCo Limited?
12   A.    Initially.  Initially, as I
13   understand it, the money flows downward into
14   the Charitable DAF HoldCo Limited before it
15   ultimately makes its way to CLO HoldCo, and
16   then each of those three entities, the various
17   foundations, obtain participation interest in
18   the money that flows back to them.
19   Q.    And -- and is that par- -- are those
20   participation interests in Charitable -- you
21   know what, let -- let me just pull up one
22   document and see if that helps.
23         MR. MORRIS:  Can we put up -- I
24   think it's Exhibit Number 5.
25         (SCOTT EXHIBIT 2, Unanimous Written

Page 55

GRANT SCOTT - 1/21/2021

1
2    Consent of Directors In Lieu of Meeting,
3    was marked for identification.)
4          MR. MORRIS:  I apologize.  Let's go
5    to --
6          MS. CANTY:  I'm sorry, John.  I
7    can't hear you.  Was that not the exhibit?
8          MR. MORRIS:  4.
9          MS. CANTY:  Okay.
10         THE REPORTER:  And Mr. Morris, you
11   are -- Mr. Morris, you are breaking up just
12   a little bit at the end of your questions.
13   BY MR. MORRIS:
14   Q.    Okay.  Do you see the document on
15   the screen, sir?
16   A.    Yes, I do.
17   Q.    Okay.  And so this is a unanimous
18   written consent of the directors of the
19   Highland Dallas Foundation.  That's one of the
20   entities that was on the chart.
21         MR. MORRIS:  Can we scroll down to
22   the -- bottom of the document where the
23   signature lines are.  Right there.
24   BY MR. MORRIS:
25   Q.    Are you a director of the Highland

Page 56

GRANT SCOTT - 1/21/2021

1
2    Dallas Foundation?
3    A.    Yes, selected by them.
4    Q.    Selected by whom?
5    A.    By that foundation.
6    Q.    Are you -- are you a director of all
7    of the four foundations that feed into the
8    Charitable DAF HoldCo Limited entities that --
9    A.    No.
10   Q.    Which of the four foundations are
11   you a director of?
12   A.    This and the Santa Barbara -- I'm
13   sorry, Santa Barbara and Kansas City.
14   Q.    So is -- there's one that you're not
15   a director of; is that right?
16   A.    Yes.
17   Q.    And which one is that?
18   A.    The -- could you go back to the --
19   Q.    Yeah.
20         MR. MORRIS:  Go back to the
21   demonstrative.
22   A.    It's the Highland Dallas Foundation
23   and Santa Barbara Foundation.
24   Q.    Those are the two that you're a
25   director of?

Page 57

GRANT SCOTT - 1/21/2021

1
2    A.    Yes.
3    Q.    To the best of your knowledge, does
4    Mr. Dondero serve as the president for each of
5    the foundations that we're talking about?
6    A.    Yes.
7    Q.    To the best of your knowledge, is
8    Mr. Dondero a director of each of the
9    foundations that we're talking about?
10   A.    Say that again.  I'm sorry.
11   Q.    Is he also a director of each of the
12   foundations?
13   A.    Yes.
14   Q.    Do you know whether any of the
15   foundations has any employees?
16   A.    I believe they do, but I -- I -- I
17   can't say for certain.
18   Q.    Does -- withdrawn.
19         Do you know if there are any
20   officers of any of the four foundations other
21   than Mr. Dondero's service as president?
22   A.    I'm sorry.  Say that one more time,
23   please.
24   Q.    Yes.  Do you know whether any of the
25   four foundations has any officers other than

Page 58

GRANT SCOTT - 1/21/2021

1    GRANT SCOTT - 1/21/2021
2    Mr. Dondero's service as president?
3        A.    No.
4        Q.    You don't know, or they do not?
5        A.    I -- I don't believe anyone else
6    has.  I -- actually, I should say I don't -- I
7    don't recall.  I -- I don't know.  I don't -- I
8    don't know.
9        Q.    As a director of the Dallas and
10   Santa Barbara foundations, are you aware of any
11   officers serving for either of those
12   foundations other than Mr. Dondero?
13       A.    No.
14       Q.    Do you know who the beneficial owner
15   of the Charitable DAF HoldCo Limited entity is?
16       A.    The beneficial owner?
17       Q.    Correct.
18       A.    The various -- various trusts that
19   were used to -- that were the vehicles by which
20   the money originally was established within --
21   within -- within CLO HoldCo.
22       Q.    Would that be -- would one of them
23   be the Get Good Nonexempt Trust?
24       A.    Yes.
25       Q.    And you're a trustee of the Get Good

Page 59

1    GRANT SCOTT - 1/21/2021
2    Nonexempt Trust, right?
3        A.    Yes.
4        Q.    When did you become a trustee of the
5    Get Good Nonexempt Trust?
6        A.    Many years ago.  I -- I don't
7    remember.
8        Q.    Are there any other trustees of the
9    Get Good Nonexempt Trust?
10       A.    No.
11       Q.    Does the Get Good Nonexempt Trust
12   have any officers, directors, or employees?
13       A.    No.
14             MR. CLARK:  Objection, form.  Sorry.
15   BY MR. MORRIS:
16       Q.    Withdrawn.
17             Do you know whether the Get Good
18   Nonexempt Trust has any officers, directors, or
19   employees?
20       A.    It does not.
21       Q.    And I apologize if I asked this, but
22   are you the only trustee of the Get Good
23   Nonexempt Trust?
24       A.    Yes.
25       Q.    Is the Dugaboy Investment Trust also

Page 60

1    GRANT SCOTT - 1/21/2021
2    one of the trusts that has an interest in
3    Charitable DAF HoldCo Limited?
4        A.    Yes.
5        Q.    Are you a trustee of the Dugaboy
6    Investment Trust?
7        A.    I am not.
8        Q.    Do you know who is?
9        A.    I believe it's his sister.
10       Q.    And is that -- you're referring to
11   Mr. Dondero's sister?
12       A.    I'm sorry.  Yes.
13       Q.    And what's the basis for your
14   understanding that Mr. Dondero's siv- -- sister
15   serves as the trustee of the Dugaboy Investment
16   Trust?
17       A.    Many years ago there was a -- there
18   was a clerical error that identified me as the
19   trustee of the Dugaboy.  That error was present
20   for approximately two weeks or a week and a
21   half before it was detected and corrected, and
22   so I know from that correction that it's Nancy
23   Dondero.
24       Q.    Are there any other trusts that have
25   an interest in Charitable DAF HoldCo Limited

Page 61

1    GRANT SCOTT - 1/21/2021
2    besides those trusts, to the best of your
3    knowledge?
4        A.    No.
5        Q.    Is it your understanding based on
6    what we've just talked about that the Get Good
7    Nonexempt Trust and the Dugaboy Investment
8    Trust are the indirect beneficiaries of CLO
9    HoldCo Limited?
10       A.    Yes.
11       Q.    Can you tell me who the
12   beneficiaries are of the Get Good trust?
13       A.    I mean, Jim Dondero.
14       Q.    And -- and what is that -- is that
15   based on the trust agreement -- your knowledge
16   of the trust agreement?
17       A.    Yes.
18       Q.    Do you have an understanding of who
19   the beneficiary is of the Dugaboy Investment
20   Trust?
21       A.    I don't know anything about that
22   trust.
23             MR. MORRIS:  Okay.  All right.
24   Let's take a short break and reconvene at
25   3:30 Eastern Time.  We've been going for a

Page 62

GRANT SCOTT - 1/21/2021

1    while.
2
3            MR. CLARK:  Thank you.
4            MR. MORRIS:  Okay.  Thank you.
5            (Whereupon, there was a recess in
6        the proceedings from 3:20 p.m. to
7        3:31 p.m.)
8    BY MR. MORRIS:
9        Q.    Mr. Scott, earlier I think you
10   testified that you interfaced with the folks at
11   Highland in connection with your duties as the
12   director of CLO HoldCo Limited, right?
13       A.    Yes.
14       Q.    Are you aware of any written
15   agreement between Highland Capital Management
16   and CLO HoldCo Limited?
17       A.    Yes, the various servicer
18   agreements.
19       Q.    Okay.  Are you aware that
20   Mr. Dondero resigned from his position at
21   Highland Capital Management sometime in
22   October?
23       A.    No.
24       Q.    Have you communicated with anybody
25   at Highland Capital Management about the

Page 63

GRANT SCOTT - 1/21/2021

1    affairs of CLO HoldCo Limited at any time since
2    October?
3        A.    Yes.
4        Q.    Anybody other than Jim Seery?
5        A.    Yes.
6        Q.    Okay.  Let's start with Mr. Seery.
7    You've spoken with him before, right?
8        A.    Yes.
9        Q.    Do you have his phone number?
10       A.    Yes.
11       Q.    How many times have you spoken with
12   Mr. Seery, to the best of your recollection,
13   just generally?  It's not a test.
14       A.    Three, maybe four times.
15       Q.    Okay.  Can you identify by name
16   anybody else at Highland that you've spoken
17   with since -- in the last two or three months?
18       A.    I spoke to Jim Dondero.  I've spoken
19   with Mike Throckmorton.  The usual suspects, so
20   to speak.  Mark Patrick, Mel- -- Melissa
21   Schroth.
22       Q.    Can you recall anybody else?
23       A.    No.  No.  Sorry.
24       Q.    Did you -- did you -- withdrawn.

Page 64

GRANT SCOTT - 1/21/2021

1
2            Do you recall the subject matter of
3    your discussions with Mr. Throckmorton?
4            MR. CLARK:  Objection, form.
5    BY MR. MORRIS:
6        Q.    Withdrawn.
7            Do you recall your -- the subject
8    matter of your communications with
9    Mr. Throckmorton?
10           MR. CLARK:  Objection, form.
11   BY MR. MORRIS:
12       Q.    You can answer.
13       A.    I -- I regularly interface with
14   Mr. Throckmorton regarding approvals of
15   expenses, and he's my sort of -- he's my point
16   person for approving wire transfers and things
17   of that nature.
18       Q.    How about Mr. Patrick, what -- what
19   area of responsibility does he have with
20   respect to CLO HoldCo Limited?
21       A.    He -- he doesn't, to my knowledge.
22       Q.    Do you recall the nature of the
23   substance of any communications that you've had
24   with Mr. Patrick since -- you know, the last
25   two or three months?

Page 65

GRANT SCOTT - 1/21/2021

1        A.    Yes.  Or -- yes.
2        Q.    And what -- what are the nature of
3    those conversations or the substance?
4        A.    He was -- he was one of the
5    individuals that helped to establish the
6    hierarchy for the -- what I keep referring to
7    as the charitable foundation.
8        Q.    And -- and do you recall why you
9    spoke to him in the last -- or -- withdrawn.
10           Do you recall the nature of your
11   communications in the last two or three months
12   with Mr. Patrick?
13       A.    I --
14           MR. CLARK:  And hold on, Grant.  I'm
15       going to caution -- my understanding -- I
16       believe Mr. Patrick's an attorney, and so
17       I'm going to caution you that you shouldn't
18       disclose the substance of -- of those
19       communications based on the attorney-client
20       privilege.
21           MR. MORRIS:  Well, I'm -- I -- I am
22       the lawyer for the company so -- I guess
23       there are other people on the phone and I
24       appreciate that, but let's see if we can --

Page 66

GRANT SCOTT - 1/21/2021

1          I don't mean to be contentious here, so it
2  wouldn't -- I -- I'd be part of the
3  privilege anyway.
4  BY MR. MORRIS:
5      Q.    But in any event, can you tell me
6  generally -- I'm just looking for general
7  subject matter of your conversations with
8  Mr. Patrick.
9      A.    I asked him how I would go about
10 re- -- resigning my position.
11     Q.    And when did that conversation take
12 place?
13     A.    Within the last two weeks.
14     Q.    Have you made a decision to resign?
15     A.    No.
16     Q.    I think you mentioned Melissa
17 Schroth.  Do I have that right?
18     A.    Yes.
19     Q.    Can you describe generally the
20 communications you had with Ms. Schroth in the
21 last few months.
22     A.    They -- she has e-mailed me certain
23 documents that I needed to sign.  I had a
24 conversation with her about -- about some

Page 67

GRANT SCOTT - 1/21/2021

1  home -- home improvements, home construction
2  with respect to Jim Dondero's home in Colorado,
3  and that's -- I -- I think that's -- that's it.
4      Q.    Okay.  Do you recall communicating
5  with anybody at Highland in the last three
6  months other than Mr. Dondero,
7  Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?
8      A.    I -- I spoke with Jim Seery this
9  week.
10     Q.    Anybody else?
11     A.    I don't -- I don't know.
12     Q.    Okay.
13     A.    I don't think so.
14     Q.    In your communications with
15 Mr. Seery, did you two ever discuss his reasons
16 for making any trade on behalf of any CLO?
17     A.    No.
18     Q.    In your discussions with Mr. Seery,
19 did you ever tell him that you believed that
20 Highland Capital Management had breached any
21 agreement in relation to any CLO?
22     A.    Have I had that discussion with Jim
23 Seery?
24     Q.    Yes.

Page 68

GRANT SCOTT - 1/21/2021

1      A.    No.
2      Q.    In your discussions with Mr. Seery,
3  did you ever tell him that you thought Highland
4  Capital Management was in default under any
5  agreement in relation to the CLOs?
6      A.    No.
7      Q.    I want to focus in particular on the
8  shared services agreement.  In -- in your
9  discussions with Mr. Seery, did you ever tell
10 him that you believed that Highland Capital
11 Management was in default or in breach of its
12 shared services agreement with CLO HoldCo
13 Limited?
14     A.    No.
15     Q.    In your communications with
16 Mr. Seery, did you ever indicate any concern on
17 the part of CLO HoldCo Limited with respect to
18 Highland Capital's Man- -- Highland Capital
19 Management's performance under the shared
20 services agreement?
21     A.    No.
22     Q.    As you sit here today, do you have
23 any reason to believe that Highland Capital
24 Management has done anything wrong in

Page 69

GRANT SCOTT - 1/21/2021

1  connection with its performance as the
2  portfolio manager of the CLOs in which CLO
3  HoldCo Limited has invested?
4          MR. CLARK:  Object to form.
5      A.    In terms of the -- are you saying --
6  please say that again.  I'm sorry.
7      Q.    That's okay.  I ask long questions
8  sometimes so forgive me, but I'm trying to
9  get -- I'm trying to be precise so that's why
10 it's difficult sometimes.  But let me try
11 again.
12         Does CLO HoldCo Limited contend that
13 Highland Capital Management has done anything
14 wrong in the performance of its duties as
15 portfolio manager of the CLOs in which CLO
16 HoldCo has invested?
17         MR. CLARK:  Objection, form.
18     A.    Yes.  It's -- it's outlined in our
19 objections to -- to the plan.
20     Q.    Okay.  Any -- are you aware of
21 anything that's not contained within CLO Holdco
22 Limited's objection to the plan?
23         MR. CLARK:  Objection, form.
24     A.    I don't know if this is responsive

GRANT SCOTT - 1/21/2021

1  to your quest -- request, but two -- two
2  issues, I believe, also pose an in- -- a
3  problem for CLO HoldCo.  One is we are paying
4  for services.  I think I referred to the
5  services as being soup to nuts, but we are not
6  getting the full services.  We haven't been for
7  some time.  So we're likely overpaying.  There
8  was a Highland Select Equity issue, 11-month
9  payment that was delayed which I was unaware of
10 was due.  Normally, I would have interfaced
11 with someone at Highland about that, but my
12 attorney -- but my -- my attorney had to make a
13 request for payment, and that payment was
14 ultimately made.  I -- other than that, I -- I
15 don't -- I don't know.  I don't believe so.
16
17     Q.    I want to distinguish between the
18 shared services agreement between Highland
19 Capital Management and CLO HoldCo Limited on
20 the one hand and on the other hand the
21 management agreements pursuant to which
22 Highland Capital Management manages certain
23 CLOs that CLO HoldCo invests in.
24          You understand the distinction that
25 I'm making?

GRANT SCOTT - 1/21/2021

1     A.    Now I do.  I'm sorry.  I didn't
2  appreciate that.
3     Q.    Okay.  So let's just take each of
4  those pieces one at a time.  You mentioned your
5  concern about services.  That's a concern that
6  arises under the shared services agreement,
7  right?
8
9     A.    Yes.
10    Q.    And you mentioned something about a
11 delayed payment having to do with Highland
12 Select.  Do I have that generally right?
13    A.    Correct.
14    Q.    And is that a concern that you have
15 that arises under the shared services
16 agreement?
17    A.    It's not the agreement with respect
18 to the CLOs as I understand it.
19    Q.    Okay.  So then let's turn to that
20 second bucket.  You were aware -- you are
21 aware, are you not, that Highland Capital
22 Management has certain agreements with CLOs
23 pursuant to which it manages the assets that
24 are owned by the CLOs?
25    A.    I'm so sorry.  Could you please --

GRANT SCOTT - 1/21/2021

1     Q.    I'll try again.
2     A.    I'm just -- I'm sorry.  I was
3  distracted and -- and I -- I'm sorry for asking
4  you to repeat it again.  Please --
5     Q.    Okay.
6     A.    Please re- --
7     Q.    Are you aware that CLO HoldCo
8  Limited has made investments in certain CLOs?
9     A.    Oh, yes, certainly.
10    Q.    And are you aware that those CLOs
11 are managed by Highland Capital Management?
12    A.    Yes.  As the -- as the servicer,
13 yes.
14    Q.    Okay.  Have you ever seen any of the
15 agreements pursuant to which Highland Capital
16 Management acts as a servicer?
17    A.    I've seen a few, yes.
18    Q.    Does CLO HoldCo Limited contend that
19 it is a party to any agreement between Highland
20 Capital Management and the CLOs?
21          MR. CLARK:  Object to form.  And I
22    just want to note for the record that
23    Mr. Scott is here testifying in his
24    individual capacity, I believe, not as a

GRANT SCOTT - 1/21/2021

1  corporate representative.
2          MR. MORRIS:  Fair enough.  But he is
3    the only representative so...
4          MR. CLARK:  Fair enough.  I just
5    want that made -- stated for the record,
6    but I also object as to form.
7          MR. MORRIS:  Got it.
8     A.    It's a third-party beneficiary under
9  the agreements.
10    Q.    And is that because of something you
11 read in the document, or is that just your
12 belief and understanding?
13    A.    My belief and understanding.
14    Q.    And is that belief and understanding
15 based on anything other than conversations with
16 counsel?
17    A.    In -- in -- recently it has, but I
18 don't recall from previous interactions over
19 the years how we discussed that or how I came
20 to -- to understand that.
21    Q.    Does HCLO [sic] HoldCo -- did -- in
22 your capacity as the sole director of HCLO
23 HoldCo Limited, are you aware of anything that
24 Highland Capital Management has done wrong in

Case 21-03067-sgj Doc 28-12 Filed 09/29/21 Entered 09/29/21 17:50:19 Desc

Page 74

GRANT SCOTT - 1/21/2021
1 connection with the services provided under the
2 CLO management agreements?
3     MR. CLARK: Objection, form.
4     A.   I -- I don't -- I don't -- I
5 don't -- your answer's no.
6     Q.   In your capacity as the director of
7 CLO HoldCo Limited, are you aware of any
8 default or breach under the CLO management
9 agreements that -- that Highland Capital
10 Management has caused?
11     MR. CLARK: Objection, form.
12     A.   We have raised the issue about
13 ongoing sales in various -- I'm not sure
14 whether they represent a technical breach,
15 though.
16     Q.   Okay.  Are you aware of any
17 technical breach?
18     MR. CLARK: Objection, form.
19     A.   No.
20     Q.   I'm sorry.  You said, no, sir?
21     A.   My answer's no.
22     Q.   Thank you.  Do you know who made the
23 decision to cause the CLO HoldCo Limited entity
24 to invest in the CLOs that are managed by

Page 75

GRANT SCOTT - 1/21/2021
1 Highland Capital?
2     A.   The select -- ultimately, I had to.
3     Q.   I thought you testified earlier that
4 you didn't make decisions as to investment.  Do
5 I have that wrong?
6     A.   The selection.
7     Q.   Okay.
8     A.   I -- I'm --
9     Q.   So -- so explain to me --
10     A.   I have to approve -- I have to
11 approve the selection.  I'm sorry.  But the
12 people making -- I was putting that in the camp
13 of the people that make the selection.
14     Q.   Okay.  Do you know if -- do you know
15 if there are CLOs in the world that exist that
16 aren't managed by Highland Capital Management?
17     MR. CLARK: Objection, form.
18     A.   Are there CLOs in the -- in the
19 world that are not --
20     Q.   Yes.
21     A.   Yes.  It's -- it's a well-known --
22 it's a well-known --
23     Q.   In your capacity as the director of
24 CLO HoldCo Limited, did you ever consider

Page 76

GRANT SCOTT - 1/21/2021
1 making an investment in a CLO that wasn't
2 managed by Highland?
3     A.   No.
4     Q.   Is there any particular reason why
5 you haven't given that any consideration?
6     A.   That hasn't been my role.  That's
7 not my expertise.  That's been something
8 Highland has done, and, quite frankly, over the
9 years brilliantly so, no.
10     Q.   You're aware that HCM, L.P., has
11 filed for bankruptcy, right?
12     A.   Yes.
13     Q.   When did you learn that Highland had
14 filed for bankruptcy?
15     A.   After the fact sometime in late --
16 late 2019.
17     Q.   Since the bankruptcy filing, have
18 you made any attempt to sell CLO HoldCo
19 Limited's position in any of the CLOs that are
20 managed by Highland?
21     A.   No.
22     Q.   So notwithstanding the bankruptcy
23 filing, you as the director haven't made any
24 attempt to transfer out of the CLOs that are

Page 77

GRANT SCOTT - 1/21/2021
1 managed by Highland, correct?
2     A.   Correct.
3     Q.   Did you ever give any thought to
4 exiting the CLO vehicles that were managed by
5 Highland in light of its bankruptcy filing?
6     A.   No.
7     Q.   Have you ever discussed with
8 Mr. Seery anything having to do with the
9 management -- withdrawn.
10     Have you ever discussed with
11 Mr. Seery any aspect of the debtor's management
12 of the CLOs in which CLO HoldCo Limited is
13 invested?
14     A.   No.
15     Q.   You mentioned earlier a request to
16 stop trading.  Do I have that right?
17     A.   Yes.
18     Q.   Okay.  And are you aware that a
19 letter was written purportedly on behalf of CLO
20 HoldCo Limited in which a request to stop
21 trading was made?
22     A.   As a cos- -- yeah.  Yes.
23     Q.   Okay.  Have you ever seen that
24 letter before?

TSG Reporting - Worldwide    877-702-9580

001662

Page 78

```
1              GRANT SCOTT - 1/21/2021
2       A.    Yes.
3             MR. MORRIS:  Can we put up on the
4       screen -- I think it's now Exhibit 6.  It's
5       Exhibit DDDD.
6             (SCOTT EXHIBIT 3, Letter to James A.
7       Wright, III, et al., from Gregory Demo,
8       December 24, 2020, with Exhibit A
9       Attachment, was marked for identification.)
10            MR. MORRIS:  Can we scroll down to,
11      I guess, what's Exhibit A.  Ri- -- right
12      there.
13 BY MR. MORRIS:
14      Q.    You see this is a letter Dece- --
15 dated December 22nd?
16      A.    Yes.
17      Q.    In the first paragraph there there's
18 a reference to the entities on whose behalf
19 this letter is being sent.
20            Do you see that?
21      A.    Yes.
22      Q.    Okay.  So this letter was sent on
23 December 22nd.  Did you see a copy of it before
24 it was sent?
25      A.    A -- a draft -- an earlier draft of
```

Page 79

```
1              GRANT SCOTT - 1/21/2021
2  this I did.
3       Q.    Okay.  Did you provide any comments
4  to it?
5       A.    I did.
6             MR. CLARK:  Well, hold on.  Grant,
7       let me caution you.  To the extent you
8       provided comments to counsel, we're going
9       to assert the attorney-client privilege on
10      those comments.
11            MR. MORRIS:  It's just a yes-or-no
12      question.  I'm not looking for the
13      specifics.
14            MR. CLARK:  Thank you.
15      A.    Yes.
16      Q.    Are you aware that earlier letters
17 were -- withdrawn.
18            Are you aware that prior to December
19 22nd, the entities other than CLO HoldCo
20 Limited that are listed in this pers- -- first
21 paragraph had sent a letter making the same
22 request?
23      A.    With respect to a letter, no.  No,
24 I -- I did not.
25      Q.    Are you aware as you sit here now
```

Page 80

```
1              GRANT SCOTT - 1/21/2021
2  that the entities other than CLO HoldCo Limited
3  that are listed in the first paragraph made a
4  motion in the court asking the court for an
5  order that would have prevented Highland from
6  making any transactions for a limited period of
7  time?
8       A.    Yes.
9       Q.    Did you know that motion was being
10 made prior to the time that it was made?
11      A.    I'm not sure.
12      Q.    Did you ever think about whether CLO
13 HoldCo Limited should join that particular
14 motion?
15      A.    I believe we were -- my attorney was
16 aware of it.  I don't recall our discussion
17 about it.  We were aware -- when I say we, I
18 mean collectively -- and did not join it.
19      Q.    Okay.  Can you tell me why you did
20 not join it.
21            MR. CLARK:  And, again, Grant, to --
22      to the extent it's based on communications
23      with counsel, you're free to say that
24      but -- but not to disclose any substance of
25      communications with counsel.
```

Page 81

```
1              GRANT SCOTT - 1/21/2021
2       A.    The subject of this letter on the
3  22nd which yielded the original letter you
4  briefly showed me on the 24th as well as an
5  additional letter on the 28th identified two
6  points as I understand it.  The first point is
7  what I believe is the somewhat innocuous
8  request to halt sales, not a demand in any way.
9  And the second more substantive issue has to do
10 with steps to remove Highland or a subsequent
11 derived entity from Highland from the various
12 services agreements that you had previously --
13 we had previously discussed.  Neither of those
14 issues met the require- -- neither of those
15 issues led us to believe that a motion such as
16 what you've just mentioned was -- was right --
17      Q.    Okay.
18      A.    -- because no -- no decision has
19 been made on that.
20      Q.    Okay.
21            MR. MORRIS:  So I want to go back to
22      my question and move to strike as
23      nonresponsive, and I'll just ask my
24      question again.
25 BY MR. MORRIS:
```

---

**Page 82**

GRANT SCOTT - 1/21/2021

1
2     Q.    Why did CLO HoldCo Limited decide
3  not to participate in the earlier motion that
4  was brought by the other entities that are
5  identified in Paragraph 1 that asked the court
6  to stop Highland from engaging in trades?
7     A.    John, I'm so sorry.  There was a
8  feedback loop that came up when you started to
9  re- -- re- -- recite -- restate your question.
10 I'm sorry.
11    Q.    That's okay.  Why did CLO HoldCo
12 Limited decide not to join in the earlier
13 motion where the entities listed in Paragraph 1
14 asked the court to order Highland not to make
15 any further trades?  Why did they not join that
16 motion?
17    A.    The -- the issue didn't rise to
18 the -- I don't believe we had formulated a
19 legal basis sufficient to justify such steps.
20 We hadn't laid the foundation necessary to --
21 to do that.
22    Q.    Are you aware of what the court
23 decided?
24    A.    By virtue of the original letter you
25 sent me dated the -- or show -- showed

---

**Page 83**

GRANT SCOTT - 1/21/2021

1  initially dated the 24th, I have a general
2  understanding of what they decided.
3     Q.    Did you -- did you ever review the
4  transcript of the hearing where the other
5  parties asked the court to stop Highland from
6  engaging in any further trades on the CLOs?
7     A.    I did not.
8     Q.    Is there anything different about
9  the request in this letter, to the best of your
10 knowledge, from the request that was made of
11 the court just six days earlier?
12    MR. CLARK:  Objection, form.
13    A.    Yes.  There's a -- in -- in my -- my
14 view there's a substantial difference between
15 filing an action converting a request into
16 essentially a demand versus a gentle request
17 with multiple caveats, that that request is not
18 a demand.
19    Q.    Okay.  Let me ask you this:  Are you
20 aware -- what -- when did you first learn that
21 Highland was making trades in its capacity as
22 the servicer of the CLOs?  When -- when did you
23 first learn that Highland was doing that?  Ten
24 years ago, right?  I mean --
25

---

**Page 84**

GRANT SCOTT - 1/21/2021

1
2     A.    Oh.  Oh.  Oh, I'm -- yeah.  Yeah.
3  Oh, yes.  I'm sorry.  Of course.
4     Q.    Right?  I mean, Highland has been
5  making trades on behalf of CLOs for years,
6  right?
7     A.    Yes.
8     Q.    And Highland was making trades on
9  behalf of CLOs throughout 2020, to the best of
10 your knowledge, right?
11    A.    Yes.
12    Q.    And you know when Jim Dondero was
13 still with Highland, he was making trades on
14 behalf of CLO -- on behalf of the CLOs, right?
15    A.    Yes.
16    Q.    And you never objected when Jim
17 Dondero was doing it; is that right?
18    A.    That is correct.
19    Q.    Okay.  So what changed that caused
20 you in your capacity as the director of CLO
21 HoldCo to request a full stoppage of trading?
22    A.    It was my understanding that because
23 of the bankruptcy and the removal of Jim
24 Dondero that the replacement decision-makers
25 did not have the expertise where I felt

---

**Page 85**

GRANT SCOTT - 1/21/2021

1
2  comfortable with them making those decisions,
3  but...
4     Q.    I thought you testified earlier that
5  you weren't aware that Mr. Dondero left
6  Highland.  Am I mistaken in my recollection?
7     A.    I think you said in October, and
8  I -- as I -- there's some con- -- I have
9  confusion about when he left versus when he was
10 still there but other -- but he was not making
11 those trades.
12    Q.    Okay.  Fair enough.  The bankruptcy
13 has nothing to do with your desire to stop
14 trading, right, because Highland traded for a
15 year after the bankruptcy and never took any
16 action to try to stop Highland from trading on
17 behalf of the CLOs, fair?
18    A.    The -- Highland as of right now
19 isn't the same entity it was -- well, the
20 decision-making team -- the -- the financial
21 decision-making team for CLO Holdco's is no
22 longer the team I have worked with, and upon
23 discussion with counsel, we agreed -- I agreed
24 to this letter, which I did, to just maintain
25 the status quo.

GRANT SCOTT - 1/21/2021

1                 GRANT SCOTT - 1/21/2021

2       Q.   How did you form your opinion that

3   the debtor doesn't have the expertise to

4   execute trades on behalf of the CLOs today?

5   What's the basis for that belief?

6       A.   I -- as I understood it, the -- the

7   people historically making that decision were

8   no longer making that decision.

9       Q.   Who besides Mr. Dondero --

10  withdrawn.

11          Who are you referring to?

12      A.   Well, Mr. Dondero is one.  I don't

13  know the names, but I -- I understood it to

14  mean that the group previously responsible, for

15  exam- -- for example, Hunter Covitz, including

16  Hun- -- him, were no longer involved in the

17  decision-making process, but...

18      Q.   How did you -- how -- how -- who

19  gave you the information that led you to

20  conclude that Hunter Covitz was no longer

21  involved in the decision-making process?

22      A.   Specifically him and that name being

23  mentioned, I -- I -- I wasn't informed of his

24  speci- -- him -- him being removed.  I was

25  under the impression that the team that had

GRANT SCOTT - 1/21/2021

1   previously been doing that was no longer doing

2   it.

3       Q.   And what gave you that impression?

4       A.   Was communications I had with my

5   attorney.

6       Q.   Okay.  Is there any source for your

7   information that led you to conclude that the

8   team was no longer there that was able to

9   engage in the trades on behalf of the CLOs

10  other than your attorneys?

11      A.   Well, this -- this letter -- I -- I

12  think the answer is no.

13      Q.   Thank you.  Do you know if Jim -- do

14  you have an opinion or a view as to whether Jim

15  Seery is qualified to make trades?

16      A.   This --

17      MR. CLARK:  Objection, form.

18      A.   I don't know -- I spoke to Jim Seery

19  earlier this week.  You -- you asked me whether

20  I had his number.  I said I did.  That's only

21  because he called me.  My phone rang with his

22  number.  It was a number I did not recognize,

23  it was not in my contacts, but he left me a

24  voice mail so I called him back.  Then I

GRANT SCOTT - 1/21/2021

1                 GRANT SCOTT - 1/21/2021

2   updated my contacts to -- to add his name so

3   now I have his name.  And during that

4   conversation he informed me that he did have

5   that expertise --

6       Q.   And --

7       A.   -- without me making any inquiry.

8   He volunteered that.

9       Q.   But you hadn't made any inquiry

10  prior to the time that you authorized the

11  sending of this letter; is that fair?

12      A.   That's correct.

13      Q.   Do you know whether Mr. Seery, in

14  fact, engaged in transactions on behalf of the

15  debtor since he was appointed back in January?

16      A.   I do not.

17      Q.   Did you ask that question prior to

18  the time you authorized the sending of this

19  letter?

20      A.   I did not.

21      Q.   Can you identify a single

22  transaction that Jim Seery has ever made that

23  you disagree with?

24      A.   No.

25      Q.   Can you identify any transaction

GRANT SCOTT - 1/21/2021

1   that the debtor made on behalf of any of the

2   CLOs since the time that you understand

3   Mr. Dondero left Highland that you disagree

4   with?

5       A.   No.

6       Q.   Did you have any discussion with any

7   representative of any of the entities listed on

8   this document where they told you they believe

9   Jim Seery didn't have the expertise to engage

10  in transactions on behalf of the whole -- of

11  the CLOs?

12      A.   You -- your question -- I'm -- I'm

13  sorry.  I'm trying to be -- I'm trying to be a

14  hundred perc- -- I'm trying to be accurate

15  here.

16      Q.   Let me interrupt you and just say,

17  I'm very grateful for your testimony.  I know

18  this is not easy, and I do believe that you're

19  earnestly and honestly trying to answer the

20  questions the best you can.  So no apologies

21  necessary anymore.  If you need me to repeat

22  the question or rephrase it, just say that,

23  okay?

24      A.   Please -- yes.

Page 90

GRANT SCOTT - 1/21/2021

2  Q.   Okay.

3  A.   Please -- please repeat that.

4  Q.   Did you ever communicate with any
5  employee, officer, director, representative of
6  any of the entities that are on this page
7  concerning the debtor's ability to service the
8  CLOs?

9  A.   I believe so.

10  Q.   And can you identify the person or
11  persons?

12  A.   I think it's Jim Dondero.

13  Q.   Anybody else other than Mr. Dondero?

14  A.   No.

15  Q.   When did you have that conversation
16  or those conversations with Mr. Dondero?

17  A.   This letter is dated the 22nd --

18  Q.   Correct.

19  A.   -- right?

20  Q.   Yes.

21  A.   I believe that's the Tuesday before
22  Christmas, and this would have been on the
23  21st, the Monday.

24  Q.   What do you recall about your
25  conversation on the 21st regarding the

---

Page 91

GRANT SCOTT - 1/21/2021

1  substance of this particular letter?

3  A.   Jim Dondero described why he
4  believed sales being made on an ongoing basis
5  after a request was made to stop was im- --
6  improper.

7  Q.   Do you -- do you rely on what
8  Mr. Dondero said to you during that phone call
9  on December 21st in -- in deciding to join in
10  this particular letter?

11  A.   No.

12  Q.   Did you only then rely on the
13  information you obtained from counsel?

14  A.   Yes.  I -- I -- I -- I considered
15  this letter to be nearly the most gentle
16  request imaginable amongst lawyers to maintain
17  the status quo.

18  Q.   And the request that's made in this
19  letter is perfectly consistent with what
20  Mr. Dondero told you on the 21st of December,
21  correct?

22  A.   I don't -- no.

23  Q.   How --

24  MR. MORRIS:  Can we go to the end of
25  this letter, please.  All right.  Right

---

Page 92

GRANT SCOTT - 1/21/2021

2  there.

3  BY MR. MORRIS:

4  Q.   Do you see the request that's in the
5  last sentence?

6  A.   Yes.

7  Q.   Is that the same thing that
8  Mr. Dondero told you should happen, that --
9  that there should be no further CLO
10  transactions at least until the issues raised
11  and addressed by the debtor's plan were
12  resolved substantively?

13  A.   Yes.

14  Q.   Is there anything that he said
15  that's inconsistent with the request that's
16  made here?

17  MR. CLARK:  Objection, form.

18  A.   This -- and can you -- can you show
19  me earlier pages?

20  Q.   Of course.  You know what, I'll
21  withdraw the question.

22  And let me see if I can do it this
23  way:  In your discussion with Mr. Dondero, did
24  he indicate that he had seen a draft of this
25  letter?

---

Page 93

GRANT SCOTT - 1/21/2021

2  A.   No.  And I didn't -- I didn't have a
3  discussion with him.  I -- I merely listened to
4  him.  There was no -- I -- I had no input to
5  the conversation.

6  Q.   Okay.  I -- I did -- I didn't --
7  I -- I appreciate that.  So he called you; is
8  that right?

9  A.   We -- we called in.

10  Q.   Oh, was it --

11  A.   I --

12  Q.   Was it --

13  A.   I don't know --

14  Q.   Was it --

15  A.   I don't know the sequence of the
16  calls.  I'm sorry.

17  Q.   Was there anybody on the call other
18  than you and Mr. Dondero, the call that you're
19  describing on December 21st?

20  A.   Yes, my attorney and an attorney --
21  I believe the attorney that signed this letter.

22  Q.   Okay.  And I just want to focus on
23  what Mr. Dondero said.  Did he -- did he say
24  during the call that Highland should not be
25  engaging in any further CLO transactions?

---

GRANT SCOTT - 1/21/2021

1  
2      A.    He took a more -- if I can
3  characterize his mental -- I looked at the
4  issue of maintaining the status quo since there
5  was somebody that was complaining about it,
6  that that -- because it -- it isn't assets of
7  Highland, it doesn't adversely affect Highland.
8  If -- if stopping the sales -- you know, my --
9  my thought was -- is if stopping the sales
10  reduces the likelihood of litigation
11  disputes -- you already saw that there was the
12  one from middle of December.  I -- I thought
13  that would be the more appropriate way to go.
14  I didn't think there'd be any harm.
15      Q.    And was that your --
16      A.    I think -- I think Jim Dondero had a
17  more legalistic view of its impro- -- im- --
18  improper nature.
19      Q.    And did he share that view with you?
20      A.    On Monday, yes.
21      Q.    Can you describe for me your
22  recollection of what he said about the
23  legalistic view?
24      A.    Just the mention of -- all I recall
25  is in terms of -- the law associated with it

GRANT SCOTT - 1/21/2021

1  was -- the Advisers Act was mentioned --
2      Q.    Did you have --
3      A.    -- but I don't -- I don't know what
4  that is.  You know, I don't know what that is.
5      Q.    And you -- and -- and you never --
6  it never occurred to you to pick up the phone
7  and -- and to speak with Mr. Seery to see why
8  it was he thought he should be engaging in
9  transactions?
10      A.    No.  And -- but I -- my lack of
11  volunteering a phone call to Jim Seery isn't --
12  it's -- it's because of -- I -- I thought any
13  phone call by me to Jim Seery would be
14  inappropriate because he's represented by
15  counsel.  I mean, we were working on claims
16  against him --
17      Q.    Okay.
18      A.    -- right, so...
19      Q.    Did you -- did you -- did you think
20  to instruct your lawyers to reach out to
21  Mr. Seery to actually speak to him instead of
22  just sending a letter like this and to -- and
23  to ask -- and to maybe inquire as to why he
24  thought it was appropriate to engage in

GRANT SCOTT - 1/21/2021

1  transactions before they made a request six
2  days after the court threw out their suit as
3  frivolous?  I'll withdraw that.  That's too
4  much.
5          A few days later did you authorize
6  the sending of another letter to the debtor in
7  which you suggested that the -- the entities on
8  behoove -- on -- on whose behalf the letter was
9  sent might take steps to terminate the CLO
10  management agreements?
11      A.    I did not see -- so there is a --
12  there is a December 28th letter.
13      MR. MORRIS:  Let's just go to the
14  next letter, and -- and let's just call
15  that up.
16  BY MR. MORRIS:
17      Q.    I think it's -- I think it's
18  actually dated December 23rd.  It was the next
19  day.
20      A.    Yes.
21          (SCOTT EXHIBIT 4, Letter to James A.
22  Wright, III, et al., from Gregory Demo,
23  December 24, 2020, with Exhibit A
24  Attachment, was marked for identification.)

GRANT SCOTT - 1/21/2021

1  BY MR. MORRIS:
2      Q.    And do you recall that the next day
3  CLO HoldCo Limited joined in another letter to
4  the debtors?  Do you have that recollection?
5      A.    Yes.  Not -- not be- -- yes, I do,
6  but -- yes, I do.
7      Q.    Did you see this letter before it
8  was sent?
9      A.    I don't believe so.
10      Q.    Did you authorize the sending of
11  this letter?
12      A.    I gave -- I relied on my attorney to
13  guide me through this process.
14      Q.    I appreciate that.
15      A.    I let him make that call on this
16  letter, which is -- copies most of the prior
17  letter and then adds another issue.
18      Q.    Okay.  Do you have an understanding
19  of what that issue is?
20      A.    Yes.
21      Q.    And what is your understanding of
22  what that additional issue is?
23      A.    Somewhere in this letter of the 23rd
24  there's an -- there's an -- an inclusion of

GRANT SCOTT - 1/21/2021

1  a -- a statement of an -- a future intent.
2      Q.    A future intent to do what?
3      A.    To remove Highland as the servicer
4  of the agreements you talked to me about
5  previously.
6      Q.    Can you tell me whether there's a
7  factual basis on which CLO HoldCo Limited
8  believes that the debtor should be removed as
9  the servicer of the portfolio manager of the
10 CLOs?
11     A.    Yes.  There are -- there are
12 multiple bases to consider subject to all the
13 other conditional language in the request of
14 these letters to consider that going forward
15 but no decision.  That intent is an intent to
16 evaluate, not an intent to take any action.  I
17 haven't authorized any action.  I don't feel
18 comfortable with my knowledge base at this
19 time, but it's something being explored.
20     Q.    So knowing everything that you know
21 as of today, you have not yet formed a decision
22 as to whether CLO HoldCo Limited will take any
23 steps to terminate Highland's portfolio
24 management agreements, correct?

GRANT SCOTT - 1/21/2021

1      A.    I don't -- I don't want to be
2  difficult, but I'm -- I'm confused yet again
3  with your question.  But I have not -- there --
4  there are a number of cr- -- a number of issues
5  that with my nonfinance background would
6  suggest to me that they -- they may be bases
7  for -- for cause, to -- to assert a cause.  And
8  I've been conferring with my attorney about
9  that, but it's very preliminary and no -- no
10 decision has been made.  I -- no decision is
11 being made.
12     Q.    So what -- what are the factors that
13 are causing you to consider possibly seeking to
14 begin the process of terminating the CLO
15 management agreements?
16     A.    Well, I guess I would break them
17 down into maybe two categories, maybe more.
18 The one that resonates most with me -- I don't
19 know -- maybe because even though I'm a patent
20 attorney, I guess at one point I was an
21 attorney.  But the thing that resonates most
22 with me --
23     Q.    You are an attorney.
24     A.    -- at the moment -- well, now you

GRANT SCOTT - 1/21/2021

1  know why I'm a patent attorney and not one of
2  you guys.  But the thing that resonates with me
3  the most from a legal substantive, black letter
4  law sort of issue is the plan for
5  reorganization, which we've objected to.  I've
6  re- -- I've reviewed the objection, and that
7  sets forth our -- that sets forth my position,
8  and I consider that to be quite material.  The
9  others are issues of practical effects of
10 what's happened thus far with the bankruptcy,
11 the termination of the experts with a long
12 track record of success, the soon-to-be
13 termination of all employees, the cancellation
14 of various representation agreements, things of
15 that nature looked at from an additive sort of
16 perspective.
17     Q.    You know that -- can we refer to the
18 counterparties under the CLO management
19 agreements as the issuers?  Are you familiar
20 with that term?
21     A.    I -- I am familiar with the term
22 issuers, yes.
23     Q.    Okay.  And do you understand --
24     A.    There's an agreement between the --

GRANT SCOTT - 1/21/2021

1  I'm sorry.
2      Q.    There's an agreement between the
3  issuers and Highland pursuant to which Highland
4  manages the CLO assets, right?
5      A.    With res- -- yes.
6      Q.    Okay.  And do you understand what's
7  going to happen to those management contracts
8  in connection with the plan of reorganization?
9      A.    Partially.
10     Q.    What's your partial understanding?
11     A.    Well, I -- I wouldn't want to
12 characterize it as a partial understanding.  I
13 mean, with respect to part of the agreement.
14     Q.    Okay.
15     A.    Okay.  Our plan objection lays out
16 our basis for objecting to steps that Highland
17 is actively taking to preclude us from the full
18 rights that we have as third-party
19 beneficiaries under that agreement, and they're
20 not de minimus.  They're quite material.  They
21 relate to cause issues and no-cause issues, for
22 example, as out- -- as outlined in our --
23 our -- our objections.
24     Q.    Okay.  Did you ever make any attempt

| Page 102 | Page 103 |
|---|---|
| GRANT SCOTT - 1/21/2021 | GRANT SCOTT - 1/21/2021 |

Page 102

GRANT SCOTT - 1/21/2021

1 to speak with any issuer concerning Highland's
2 performance under the CLO management
3 agreements?
4     A.   No.
5     Q.   Why not?
6     A.   I -- I don't have any facts --
7 understand I -- I get all of the reports
8 periodically from Highland -- from Highland.
9 I -- I don't have a basis that I'm aware of to
10 complain about performance issues.  This is a
11 legal issue that I'm talking about.
12     Q.   So you have no basis to suggest that
13 Highland hasn't performed under the CLO
14 management agreements, correct?
15     A.   Well, Highland as of right now,
16 the -- the issue really is as -- as to what's
17 next, not -- not -- I -- I don't -- I don't
18 believe I have facts that support a com- --
19 a -- an issue right now.  It's -- it's --
20 it's -- it's going forward that is the problem.
21     Q.   I --
22     A.   That's -- you know, that's --
23     Q.   Have you given any thought to
24 speaking with the issuers to try to get their

Page 103

GRANT SCOTT - 1/21/2021

1 views as to what they think is going to happen
2 in the future?
3     A.   No.
4     Q.   They're the -- they're the actual
5 direct beneficiaries under the CLO management
6 agreements, to the best of your understanding,
7 right?
8     A.   Yes.  Their rights may not be
9 impacted; it's CLO Holdco's rights that are
10 going to be adversely impacted.  So it's -- I
11 don't know that our view is in alignment with
12 their view.  But to answer your question, no,
13 we did not contact them.
14     Q.   Do you have any knowledge or
15 information as to any assertion by the issuers
16 that Highland is in breach of any of the CLO
17 management agreements?
18     A.   No.
19     Q.   Do you have any knowledge or
20 information as to whether or not any of the
21 issuers believe that Highland is in default
22 under the CLO management agreements?
23     A.   No, I don't have any of those facts.
24     Q.   Are you aware that the issuers are

Page 104

GRANT SCOTT - 1/21/2021

1 negotiating with Highland to permit Highland to
2 assume the CLO management agreements and to
3 continue operating under them?
4     A.   I believe so --
5     Q.   Is that --
6     A.   -- but they're --
7     Q.   Go ahead.  I'm sorry.
8     A.   As I understand it, Highland
9 wants -- Highland or its subsidiary -- or
10 its -- its -- its postbankruptcy relative --
11 post- -- excuse me, that Highland
12 postbankruptcy -- or postplan confirmation
13 wants to move forward, substitute itself for
14 the prior issuer -- no, sorry, substitute
15 itself for the prior servicer under those
16 agreements to assume those agreements but in
17 the process of assuming those agreements,
18 carving out a bunch of provisions that from a
19 legal standpoint and a potentially future
20 practical and monetary standpoint are quite
21 substantial, and that has to relate to the
22 removal rights based on cause and without
23 cause.  As I understand it, that's all set
24 forth in our plan objection.

Page 105

GRANT SCOTT - 1/21/2021

1     Q.   Okay.  Are you aware of a third
2 letter that was sent to Highland on behalf of
3 CLO HoldCo and the other entities that are
4 listed in this document?
5     A.   The December 28th letter, is that
6 what you mean?
7     Q.   It's actually December 31st, if I
8 can refresh your recollection.
9          MR. MORRIS:  Can we put up Exhibit
10 F?
11          (SCOTT EXHIBIT 5, Letter to Jeffrey
12 N. Pomerantz from R. Charles Miller,
13 December 31, 2020, was marked for
14 identification.)
15 BY MR. MORRIS:
16     Q.   You remember that there was a letter
17 dated on or about December 31st that was
18 sent -- oh, actually, you know, I apologize.
19 If we scroll down to the -- to the next -- to
20 the first box, there actually is no mention of
21 CLO HoldCo.
22          Are you aware that Mr. Dondero was
23 evicted from Highland's offices as of the end
24 of the year?

---

**Page 106**

GRANT SCOTT - 1/21/2021

1   A.   I -- I didn't know the time, but I
2  understand he's no longer there.
3      Q.   Does CLO HoldCo Limited contend that
4  it was damaged in any way by Mr. Dondero's
5  eviction from the Highland suite of offices?
6          MR. CLARK:  Objection, form.
7      A.   I -- I don't have any information to
8  support that as of this time.
9      Q.   It's not -- it's not a belief that
10 you hold today?
11     A.   I don't have a belief of that, yes.
12         MR. MORRIS:  All right.  Let's take
13 a short break.  I may be done.  I -- I'm
14 grateful, Mr. Scott, and don't want to
15 abuse your time.  Give me -- let -- just
16 let -- let's come back at 4:50, just eight
17 minutes, and if I have anything further, it
18 will be brief.
19         (Whereupon, there was a recess in
20 the proceedings from 4:42 p.m. to
21 4:49 p.m.)
22         MR. MORRIS:  Okay.  Mr. Scott, thank
23 you very much for your time.  I have no
24 further questions.

---

**Page 107**

GRANT SCOTT - 1/21/2021

1          THE WITNESS:  Thank you.
2          MR. CLARK:  We will reserve our
3  questions.
4          THE WITNESS:  I appreciate it, John.
5          MR. MORRIS:  Take care.  Thanks for
6  your time and your -- and your diligence.
7  I do appreciate it.  Take care, guys.
8          THE REPORTER:  Okay.
9          MR. CLARK:  Thank you.
10         MR. HOGEWOOD:  No questions from us.
11         (Time Noted:  4:50 p.m.)
12
13
14
15         ---------------------
16         GRANT SCOTT
17
18 Subscribed and sworn to before me
19 this      day of            2021.
20
21 -------------------------------------

---

**Page 108**

GRANT SCOTT - 1/21/2021

1          C E R T I F I C A T E
2  STATE OF NORTH CAROLINA  )
3                           ) ss.:
4  COUNTY OF WAKE           )
5
6          I, LISA A. WHEELER, RPR, CRR, a
7  Notary Public within and for the State of New
8  York, do hereby certify:
9          That GRANT SCOTT, the witness whose
10 deposition is hereinbefore set forth, having
11 produced satisfactory evidence of
12 identification and having been first duly sworn
13 by me, according to the emergency video
14 notarization requirements contained in G.S.
15 10B-25, and that such deposition is a true
16 record of the testimony given by such witness.
17         I further certify that I am not
18 related to any of the parties to this action by
19 blood or marriage; and that I am in no way
20 interested in the outcome of this matter.
21         IN WITNESS WHEREOF, I have hereunto
22 set my hand this 21st day of January, 2021.
23              ----Lisa Wheeler----
24
25              LISA A. WHEELER, RPR, CRR

---

**Page 109**

GRANT SCOTT - 1/21/2021

1  -------------------I N D E X------------------
2                                    PAGE
3  EXAMINATION BY MR. MORRIS             7
4
5
6  ------------------EXHIBITS-------------------
7
8                                    PAGE
9  EXHIBIT 1  Organizational Structure:    46
10            CLO HoldCo, Ltd.
11 EXHIBIT 2  Unanimous Written Consent of  54
12            Directors In Lieu of Meeting
13
14 EXHIBIT 3  Letter to James A. Wright,    78
15            III, et al., from Gregory
16            Demo, December 24, 2020, with
17            Exhibit A Attachment
18 EXHIBIT 4  Letter to James A. Wright,    96
19            III, et al. From Gregory
20            Demo, December 24, 2020, with
21            Exhibit A Attachment
22
23 EXHIBIT 5  Letter to Jeffrey N.         105
24            Pomerantz from R. Charles
25            Miller, December 31, 2020

Case 21-03067-sgj    Doc 28-12    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-12    Filed 08/30/24    Page 239 of 278    PageID 1657

Index: 1..aware

**1**

**1** 46:13,14 53:9,16
82:5,13

**1/21/2021** 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1

**100** 47:7

**11-month** 70:9

**1976** 28:15

**1984** 24:20

**1986** 24:22

**1988** 25:5

**1991** 25:6

**2**

**2** 54:25

**2012** 16:23

**2019** 23:4 76:17

**2020** 30:15 78:8 84:9
96:24 105:14

**2021** 107:19

**21st** 90:23,25 91:9,20
93:19

**22nd** 78:15,23 79:19
81:3 90:17

**23rd** 96:19 97:24

**24** 78:8 96:24

**24th** 81:4 83:2

**28th** 81:5 96:13 105:6

**3**

**3** 78:6

**31** 105:14

**31st** 105:8,18

**3:20** 62:6

**3:30** 61:25

**3:31** 62:7

**4**

**4** 55:8 96:22

**45** 31:20 32:2

**4:42** 106:21

**4:49** 106:22

**4:50** 106:17 107:12

**5**

**5** 54:24 105:12

**6**

**6** 78:4

**9**

**99** 52:9 53:4,10,13

**A**

**ability** 90:7

**Absolutely** 8:22

**abuse** 106:16

**accommodated**
35:22

**accounting** 29:22

**accurate** 51:5 53:8
89:15

**acronym** 12:23

**act** 11:13 95:2

**acting** 10:10

**action** 83:16 85:16
98:17,18

**actively** 101:18

**activity** 50:9,14

**acts** 72:17

**actual** 6:24 103:5

**add** 88:2

**additional** 81:5
97:23

**additive** 100:16

**addressed** 92:11

**addressing** 20:4

**adds** 97:18

**admissibility** 6:23

**advance** 37:23

**adversely** 94:7
103:11

**Advisers** 95:2

**affairs** 63:2

**affect** 94:7

**affiliated** 49:16

**aft-** 23:5

**afternoon** 6:6 7:7

**agree** 35:12,13,17
36:18 37:4,18

**agreed** 35:20,21
43:22 45:2,15 85:23

**agreement** 26:7
36:19 42:11 61:15,16
62:15 67:22 68:6,9,
13,21 70:18 71:7,16,
17 72:20 100:25
101:3,14,20

**agreements** 24:4
62:18 70:21 71:22
72:16 73:10 74:3,10
81:12 96:11 98:5,25
99:16 100:15,20
102:4,15 103:7,18,23
104:3,17,18

**agrees** 6:16

**ahead** 38:2 104:8

**alignment** 103:12

**allowed** 37:10

**amended** 40:12,16

**amendment** 38:10

**amount** 27:8

**amounts** 24:6

**announcement**
43:12

**ansel** 33:18

**answer's** 74:6,22

**anymore** 89:22

**apologies** 89:21

**apologize** 50:11
55:4 59:21 105:19

**apparently** 35:15

**appointed** 88:15

**appointment** 17:6

**approval** 27:5

**approvals** 64:14

**approve** 48:12
75:11,12

**approved** 41:13,16

**approving** 64:16

**approximately**
11:17 17:6 60:20

**area** 25:24 64:19

**argument** 42:12

**arises** 71:7,15

**arrangement** 18:10
47:13 53:12,13

**as-** 35:14

**Asia** 46:12

**aspect** 19:24 20:6
77:12

**assert** 79:9 99:8

**assertion** 103:16

**asset** 32:23 33:7,10
37:9

**assets** 10:22,24
11:14 12:11 13:13,
15,17,20,23 18:25
19:15 20:11 24:5
32:12 33:11,15
35:13,14,15,17 37:8
71:23 94:6 101:5

**assume** 104:3,17

**assumed** 11:25

**assuming** 104:18

**attached** 46:21
52:24

**Attachment** 78:9
96:25

**attempt** 76:19,25
101:25

**attorney** 6:7 24:11
35:21 38:14,21 39:5,
6 42:6 43:22,23 45:2
65:17 70:13 80:15
87:6 93:20,21 97:13
99:9,21,22,24 100:2

**attorney-client**
65:20 79:9

**attorneys** 87:11

**attraction** 32:18,21

**authority** 15:9,19
33:24

**authorize** 96:6 97:11

**authorized** 45:4
88:10,18 98:18

**aware** 27:13 34:12
36:2 38:12 40:5,9
58:10 62:14,19 69:21
71:20,21 72:8,11
73:24 74:8,17 76:11
77:19 79:16,18,25
80:16,17 82:22 83:21
85:5 102:10 103:25

Case 21-03067-sgj    Doc 28-12    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-11    Filed 01/31/24    Page 240 of 278    PageID 16518

Index: back..compensation

105:2,23

**B**

**back** 20:21 54:18 56:18,20 81:21 87:25 88:15 106:17

**background** 24:17 99:6

**bankruptcy** 6:9 22:9,19,21,24 23:5, 14 30:14,15 34:11,13 35:19 76:12,15,18,23 77:6 84:23 85:12,15 100:11

**Barbara** 52:15 56:12, 13,23 58:10

**base** 98:19

**based** 29:9 61:5,15 65:20 73:16 80:22 104:23

**bases** 98:13 99:7

**basically** 20:22 24:6

**basis** 19:25 21:4 24:13 26:9 37:15 42:17 60:13 82:19 86:5 91:4 98:8 101:17 102:10,13

**be-** 97:6

**began** 25:4

**begin** 6:13 7:4 8:20 16:22 99:15

**behalf** 10:11 14:2,12 15:20 16:3 26:25 27:17,23 33:25 34:4 37:22 40:22 67:17 77:20 78:18 84:5,9, 14 85:17 86:4 87:10 88:14 89:2,11 96:9 105:3

**behoove** 96:9

**belief** 73:13,14,15 86:5 106:10,12

**believed** 42:16 67:20 68:11 91:4

**believes** 98:9

**beneficial** 58:14,16

**beneficiaries** 61:8, 12 101:20 103:6

**beneficiary** 61:19 73:9

**big** 33:3 39:8

**biggest** 23:16

**bit** 8:15 30:18 52:19 55:12

**black** 100:4

**blocks** 52:13

**board** 34:25

**bottom** 46:24 55:22

**box** 105:21

**boxes** 47:13

**breach** 68:12 74:9, 15,18 103:17

**breached** 67:21

**break** 19:7 61:24 99:17 106:14

**breaking** 55:11

**briefly** 81:4

**brilliantly** 76:10

**brought** 82:4

**bucket** 71:20

**bunch** 104:19

**business** 29:19 50:4

**business/finance** 29:22

**C**

**call** 18:6 35:4,19,20 44:9 45:11 91:8 93:17,18,24 95:12,14 96:15 97:16

**called** 6:3 10:15 35:9,20 44:6 45:12 46:7 87:22,25 93:7,9

**calls** 93:16

**camp** 75:13

**cancellation** 100:14

**CANTY** 55:6,9

**capacity** 17:9 18:20 26:21 34:5,7 50:2 51:20 72:25 73:23 74:7 75:24 83:22 84:20

**Capital** 6:10 13:18, 19,22 14:16 19:18 28:12 62:15,21,25 67:21 68:5,11,19,24 69:14 70:19,22 71:21 72:12,16,21 73:25 74:10 75:2,17

**Capital's** 68:19

**caps** 13:10

**care** 107:6,8

**Carolina** 25:8

**carry** 18:4,13

**carving** 104:19

**cash** 36:13 37:9

**categories** 99:18

**caused** 74:11 84:19

**causing** 99:14

**caution** 44:11 65:16, 18 79:7

**caveats** 83:18

**Cayman** 47:4

**certainty** 33:20

**change** 27:10

**changed** 20:23 38:21 84:19

**char-** 51:16

**characterize** 94:3 101:13

**charge** 20:16

**charitable** 11:3,4 12:14 17:24 18:4,14 32:13,17,20 36:16 47:8,22 48:15 49:3,4, 7,10,13,17,21 50:3, 10,16,23 51:2,10,13, 17,23 52:3,6,9,10 53:3,5,17,25 54:10,

14,20 56:8 58:15 60:3,25 65:8

**Charles** 105:13

**chart** 46:25 48:16 55:20

**chemical** 29:4

**choice** 10:2

**chose** 29:11

**Christmas** 90:22

**chronological** 34:20

**City** 52:15 56:13

**claim** 23:11,22,24 38:10,11 39:11,12, 19,23 40:4,8,12,13, 16 46:22 52:25

**claims** 95:16

**clarify** 13:3 43:18,19

**CLARK** 26:5,12 31:2, 10 32:25 33:8,17 39:14 40:24 42:24 44:10 54:4 59:14 62:3 64:4,10 65:15 69:5,18,24 72:22 73:5 74:4,12,19 75:18 79:6,14 80:21 83:13 87:18 92:17 106:7 107:3,10

**clerical** 60:18

**CLO** 10:15,21 11:8 12:2,7,11,15,20,23, 25 13:23 14:2,12 15:10,20,24 16:4,6,9, 11,15,20 17:5,15,18, 22 18:21,25 19:3,15, 17,20 21:5 22:10 23:2,9,18 24:3 26:25 27:17,23 28:6 32:10, 23 33:6,15,25 34:8 35:17 36:12,23 37:7, 22 40:22 41:11 42:20 45:19,20 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3 52:25 54:15 58:21 61:8 62:12,16 63:2 64:20 67:17,22 68:13,18 69:3,13,16,22 70:4, 19,23 72:8,19 74:3,8, 9,24 75:25 76:2,19

**77:5,13,20 79:19 80:2,12 82:2,11 84:14,20 85:21 92:9 93:25 96:10 97:4 98:8,23 99:15 100:19 101:5 102:3,14 103:6,10,17,23 104:3 105:4,22 106:4

**CLO's** 35:14

**CLOS** 13:13 68:6 69:3,16 70:23 71:18, 22,24 72:9,11,21 74:25 75:16,19 76:20,25 77:13 83:7, 23 84:5,9,14 85:17 86:4 87:10 89:3,12 90:8 98:11

**close** 30:17

**closest** 28:20,21 31:23

**collateralized** 10:23

**collectively** 20:25 80:18

**college** 28:22 29:7

**Colorado** 67:3

**com-** 20:15 25:24 102:19

**comfortable** 85:2 98:19

**comments** 79:3,8,10

**commonly** 12:16

**communicate** 90:4

**communicated** 39:4 62:24

**communicating** 67:5

**communication** 45:6

**communications** 44:14 64:8,23 65:12, 20 66:21 67:15 68:16 80:22,25 87:5

**company** 10:22 33:9,21 65:23

**compensation** 16:19 17:2 49:20,25

**complain** 102:11

**complaining** 94:5

**complex** 18:19

**compliance** 18:11 20:3,13,16 25:16,17, 20,24 50:8

**comports** 47:2

**con-** 85:8

**concern** 37:5 68:17 71:6,14

**conclude** 86:20 87:8

**conditional** 98:14

**conducted** 6:19

**conference** 35:9

**conferring** 99:9

**confide** 31:17

**confided** 31:9

**confidential** 32:3

**confirmation** 6:14 104:13

**confused** 40:25 47:13 53:11 99:3

**confusing** 13:3 53:19

**confusion** 85:9

**connection** 62:11 69:2 74:2 101:9

**consent** 27:16,22 55:2,18

**consideration** 76:6

**considered** 91:14

**consistent** 33:22 91:19

**construction** 67:2

**consulted** 39:5 42:7

**contact** 21:19,20,22 103:14

**contacted** 38:21

**contacts** 87:24 88:2

**contained** 69:22

**contend** 69:13 72:19 106:4

**contentious** 66:2

**continue** 104:4

**contract** 36:17

**contracts** 101:8

**conversation** 66:12, 25 88:4 90:15,25 93:5

**conversations** 65:4 66:8 73:16 90:16

**converting** 83:16

**cookie** 18:9

**copies** 97:17

**copy** 78:23

**core** 15:5,8

**corner** 46:25

**corporate** 11:7 73:2

**correct** 10:13 16:14 17:10,13 23:15 25:25 53:14 58:17 71:13 77:2,3 84:18 88:12 90:18 91:21 98:25 102:15

**corrected** 60:21

**correction** 60:22

**correctly** 23:12 29:20 36:7 42:10

**cos-** 77:23

**counsel** 10:9 11:23 23:6 36:8 43:12 44:12,15 73:17 79:8 80:23,25 85:23 91:13 95:16

**counterparties** 100:19

**couple** 18:17

**Cournoyer** 15:4

**court** 6:21 35:19 41:16 42:14,20 43:13 80:4 82:5,14,22 83:6, 12 96:3

**courtesy** 8:24

**courtroom** 7:23

**Covitz** 14:20 15:2 86:15,20

**cr-** 99:5

**create** 17:24

**created** 18:3 36:20

**creditor** 23:9,21

**cutter** 18:9

---

### D

**D-A-F** 13:10

**DA-** 51:23

**DAF** 12:17,20,23,25 13:9 19:20 47:8 48:15 49:3,4,7,10,13, 17,22 50:3,10,16,23 51:2,10,13,17,23 52:3,6,9,11 53:3,5, 17,25 54:11,14 56:8 58:15 60:3,25

**Dallas** 52:14,18 55:19 56:2,22 58:9

**damaged** 106:5

**dated** 52:20 78:15 82:25 83:2 90:17 96:19 105:18

**day** 21:9,12,19 42:14 96:20 97:3 107:19

**day-to-day** 12:9 19:25 50:6

**days** 21:21,25 83:12 96:3,6

**DDDD** 78:5

**de** 52:16 101:21

**de-** 31:16

**deal** 20:13

**debtor** 6:9 23:9,10, 12,22,25 86:3 88:15 89:2 96:7 98:9

**debtor's** 41:12 77:12 90:7 92:11

**debtors** 97:5

**Dece-** 78:14

**December** 78:8,15, 23 79:18 91:9,20 93:19 94:12 96:13, 19,24 105:6,8,14,18

**decide** 82:2,12

**decided** 82:23 83:3

**deciding** 91:9

**decision** 34:3,9 36:3, 4,18 37:14,18,21 38:19,21,23 39:8 43:10,21 45:15,16 47:25 48:10 66:15 74:24 81:18 86:7,8 98:16,22 99:11

**decision-makers** 84:24

**decision-making** 15:9,18 33:14,24 85:20,21 86:17,21

**decisions** 13:25 14:12 16:3 26:25 34:14,23 48:7 75:5 85:2

**declared** 30:16

**declined** 40:23

**dedicate** 21:14

**default** 68:5,12 74:9 103:22

**define** 31:17

**degree** 24:22

**Delaware** 29:5

**delayed** 70:10 71:11

**demand** 81:8 83:17, 19

**Demo** 78:7 96:23

**demonstrative** 46:7 56:21

**deposed** 7:10 8:12

**deposition** 6:12,17 7:9,18,23 8:2 9:8 23:7

**depositions** 7:13 8:16

**derived** 24:7 81:11

**describe** 10:20 23:23 24:16 30:5 66:20 94:21

**describing** 93:19

**desire** 85:13

**detail** 11:7

**details** 10:6

**detected** 60:21

**devote** 21:2,5 22:10

**devoting** 22:18

**difference** 22:5 39:7 83:15

**difficult** 30:18 41:17 69:11 99:3

**diligence** 107:7

**direct** 103:6

**directly** 28:8

**director** 11:11 12:2,7 16:16,20,25 17:4,13 18:21 19:3,17 21:5 22:25 26:21 28:5 32:9 34:5,8 35:6 47:17 48:24 50:22 51:3,4,12,16 52:3,6 55:25 56:6,11,15,25 57:8,11 58:9 62:12 73:23 74:7 75:24 76:24 84:20 90:5

**directors** 15:24 49:14 50:20 55:2,18 59:12,18

**disagree** 88:23 89:4

**disagreed** 34:10,15

**disagreement** 38:13

**disclose** 44:13 65:19 80:24

**discuss** 42:19 67:16

**discussed** 73:20 77:8,11 81:13

**discussion** 67:23 80:16 85:23 89:7 92:23 93:3

Case 21-03067-sgj    Doc 28-12    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 26-12    Filed 09/13/24    Page 242 of 278    PageID 16520

Index: discussions..foundation

**discussions** 64:3
67:19 68:3,10

**dispute** 35:15

**disputes** 94:11

**distinction** 70:24

**distinguish** 70:17

**distracted** 33:4 72:4

**division** 53:10

**document** 9:12,14
46:9 54:22 55:14,22
73:12 89:9 105:5

**documents** 9:9,10
52:24 66:24

**Don-** 11:21

**donated** 24:4

**Dondero** 7:21 9:17
10:7 11:24 14:20,25
17:24 28:7,9,10,14,
16 29:24 30:6,25
31:5,9,20 32:2,22
33:5 34:10 35:24
37:2,23 39:12,19
41:7 42:20 43:10
45:9 48:7 51:19,22
52:2,5 57:4,8 58:12
60:23 61:13 62:20
63:19 67:7 84:12,17,
24 85:5 86:9,12 89:4
90:12,13,16 91:3,8,
20 92:8,23 93:18,23
94:16 105:23

**Dondero's** 7:19
10:11 30:21 47:21
57:21 58:2 60:11,14
67:3 106:5

**downward** 54:13

**draft** 78:25 92:24

**dry** 19:5

**due** 35:17 70:11

**Dugaboy** 59:25 60:5,
15,19 61:7,19

**duly** 6:3

**duties** 12:6 19:2,16
62:11 69:15

**E**

**e-mailed** 66:23

**earlier** 25:17 26:24
62:9 75:4 77:16
78:25 79:16 82:3,12
83:12 85:4 87:20
92:19

**earnestly** 89:20

**easier** 12:23 42:5

**Eastern** 61:25

**easy** 89:19

**educational** 24:17

**effect** 37:9

**effects** 100:10

**effectuated** 27:23

**effectuating** 27:16

**electrical** 24:18

**Electronics** 8:6

**employee** 14:16
16:17 90:5

**employees** 11:21,22
14:17 16:7 17:11
26:23 27:15,22 40:3
49:11 50:17,18 57:15
59:12,19 100:14

**end** 55:12 91:24
105:24

**ended** 35:20

**engage** 87:10 89:10
95:25

**engaged** 88:14

**engaging** 82:6 83:7
93:25 95:9

**engineer** 24:18 25:2
29:5

**engineering** 29:17

**entities** 11:2 12:12
17:25 18:3,7,10 46:2
54:16 55:20 56:8
78:18 79:19 80:2
82:4,13 89:8 90:6
96:8 105:4

**entity** 10:15,18 12:3,
25 13:4 17:12,25
51:9 52:17 58:15
74:24 81:11 85:19

**entity's** 50:4

**Equity** 70:9

**equivalent** 11:4

**error** 60:18,19

**escrow** 37:14

**essentially** 83:17

**establish** 23:11
47:25 48:7,10 65:6

**established** 51:18
58:20

**estimate** 21:3,24

**estimated** 21:12

**et al** 78:7 96:23

**evaluate** 98:17

**event** 66:6

**events** 30:14 36:7

**evicted** 105:24

**eviction** 106:6

**evidence** 6:17

**evidenced** 42:12

**ex-wife** 10:9,11

**exam-** 86:15

**EXAMINATION** 7:5

**examined** 6:4

**exclusive** 23:20
24:13

**exclusively** 24:10
50:14

**excuse** 21:11 22:15
23:7,9 28:25 104:12

**execute** 32:16 86:4

**exhibit** 46:7,13,14
54:24,25 55:7 78:4,5,
6,8,11 96:22,24
105:10,12

**exist** 75:16

**existence** 12:3

**exiting** 77:5

**expenses** 36:14
64:15

**experience** 8:16

**expert** 25:13,24

**expertise** 76:8 84:25
86:3 88:5 89:10

**experts** 100:12

**explain** 17:21 75:10

**explained** 45:14

**explored** 98:20

**extend** 8:23

**extent** 26:13 79:7
80:22

**F**

**fact** 6:19 76:16 88:14

**factors** 99:13

**facts** 46:10 47:2
102:7,19 103:24

**factual** 98:8

**fair** 8:21 16:2 22:8
30:13,24 31:8,18,25
37:19 39:11 47:22,24
73:3,5 85:12,17
88:11

**fairly** 18:19 36:12

**fall** 25:5

**familiar** 10:14 45:20,
24 47:12 100:20,22

**familiarity** 45:25
47:11

**family** 7:20 9:17

**feed** 52:12 56:7

**feedback** 82:8

**feeds** 52:13

**feel** 98:18

**fees** 36:15

**felt** 84:25

**field** 25:13

**filed** 20:5 23:5 38:24
39:13,20 40:17,18
42:8 76:12,15

**filing** 22:22,24 23:13
39:22 76:18,24 77:6
83:16

**final** 15:8,18 33:13,24

**finance** 18:2 25:10
29:18

**Finances** 19:23

**financial** 20:10 85:20

**finish** 8:19

**firm** 6:8

**flow** 36:13 37:7,11

**flows** 54:6,13,18

**focus** 23:20 36:24
68:8 93:22

**folks** 62:10

**footnote** 46:23

**forget** 26:15 35:7
52:18

**forgive** 69:9

**forgot** 19:8

**form** 26:6,9,10,13
31:2,10 32:25 33:8,
17 37:8 39:14 40:24
42:24 54:4 59:14
64:4,10 69:5,18,24
72:22 73:7 74:4,12,
19 75:18 83:13 86:2
87:18 92:17 106:7

**formal** 25:9,15

**formed** 17:15,19,22
47:4 98:22

**formulated** 82:18

**forward** 7:2 42:18
98:15 102:21 104:14

**found** 9:24 36:5,7
45:9

**foundation** 11:4
52:14 55:19 56:2,5,
22,23 65:8 82:20

Case 21-03067-sgj    Doc 28-12    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-12    Filed 09/24/21    Page 243 of 278    PageID 16921

Index: foundation-like..inclusion

**foundation-like** 17:25

**foundations** 12:15 53:22,23 54:10,17 56:7,10 57:5,9,12,15, 20,25 58:10,12

**fourth** 52:15,17 53:24

**frankly** 76:9

**free** 80:23

**frequently** 12:21,24 13:3,5

**Friday** 21:15

**friend** 28:13,21 31:23

**friends** 28:20

**friendship** 30:17

**frivolous** 96:4

**full** 70:7 84:21 101:18

**function** 18:14

**fund** 47:8 48:15 49:4 50:10,17,23 51:2 52:6,11 53:5,18 54:10,11

**future** 98:2,3 103:3 104:20

**G**

**gamut** 20:5

**gave** 43:21 86:19 87:4 97:13

**general** 18:9 45:25 49:3 66:7 83:2

**generally** 7:17 8:17 24:17 25:22 30:8,11 45:19,23 63:14 66:7, 20 71:12

**gentle** 83:17 91:15

**get all** 102:8

**get-** 20:4

**give** 77:4 106:16

**giving** 36:16 47:22

**goal** 18:4

**good** 6:6 7:7 26:20 30:8,9 43:25 58:23, 25 59:5,9,11,17,22 61:6,12

**good-faith** 42:17

**GP** 49:3,8,10,13,17, 22 50:3 51:24

**graduate** 24:20

**graduated** 24:13,19 25:5

**Grant** 6:1,12 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1,13 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,10 45:1 46:1 47:1 48:1 49:1 50:1 51:1,2,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1, 15 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1,21 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,16

**grateful** 89:18 106:15

**Gregory** 78:7 96:23

**group** 11:18,19 14:15 15:6,8,21 18:7 19:21 86:14

**grow** 28:16

**guess** 11:24 12:22 18:2 20:20 25:2 40:4, 5 42:13 45:7 65:23 78:11 99:17,21

**guide** 97:14

**guideline** 27:8,14

**guys** 100:3 107:8

**H**

**half** 43:6 60:21

**halt** 81:8

**hand** 70:20

**handled** 8:10 20:7

**happen** 92:8 101:8 103:2

**happened** 100:11

**Har-** 38:17

**Harbourvest** 38:18 40:20 41:3,8,12,15, 25 43:11

**hard** 21:13

**harm** 94:14

**HCLO** 73:22,23

**HCM** 76:11

**head** 28:11

**heads** 28:12

**hear** 13:9 48:5 55:7

**heard** 20:22 51:9

**hearing** 6:18 42:15, 23 43:4 83:5

**held** 33:15

**helped** 65:6

**helps** 54:22

**Hey** 44:10

**hierarchy** 11:18,20 23:16 65:7

**high** 23:17,18 28:15

**Highland** 6:10 11:22 13:18,19,22 14:3,15, 16 19:18 20:7 26:23 27:14,22 28:12 34:25 56:22 62:11,15,21,25 63:17 67:6,21 68:4, 11,19,24 69:14 70:9, 12,18,22 71:11,21 72:12,16,20 73:25

**74**:10 75:2,17 76:3,9, 14,21 77:2,6 80:5 81:10,11 82:6,14 83:6,22,24 84:4,8,13 85:6,14,16,18 89:4 93:24 94:7 98:4 101:4,17 102:9,14,16 103:17,22 104:2,9, 10,12 105:3 106:6

**Highland's** 35:14 98:24 102:2 105:24

**highly** 44:7

**hindsight** 26:19

**historically** 86:7

**HOGEWOOD** 107:11

**hold** 25:12,23 48:14 65:15 79:6 106:11

**Holdco** 10:15,21 11:9 12:2,7,16,20,23 13:23 14:2,12 15:10, 20,24 16:4,6,9,11,15, 20 17:5,15,18,22 18:21 19:3,17,20 21:5 22:10 23:2 26:25 27:17,24 28:6 32:10,23 33:6,16,25 34:8 36:12,23 37:7, 22 40:22 41:11 42:21 45:19,21 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3,10,13,17 52:9,25 53:3,25 54:11,14,15 56:8 58:15,21 60:3,25 61:9 62:12,16 63:2 64:20 68:13,18 69:4, 13,17,22 70:4,19,23 72:8,19 73:22,24 74:8,24 75:25 76:19 77:13,21 79:19 80:2, 13 82:2,11 84:21 97:4 98:8,23 105:4, 22 106:4

**Holdco's** 85:21 103:10

**holding** 10:22 53:4

**home** 67:2,3

**honestly** 89:20

**horizontal** 52:13

**house** 30:4

**housemates** 30:2,3

**Hun-** 86:16

**hundred** 53:6 89:15

**Hunter** 14:20 86:15, 20

**I**

**IBM** 24:23

**idea** 47:20

**identification** 46:16 55:3 78:9 96:25 105:15

**identified** 23:13 26:24 35:10 53:23 60:18 81:5 82:5

**identify** 14:11 30:11 34:16,21 52:14 63:16 88:21,25 90:10

**Ill** 78:7 96:23

**Illinois** 24:21

**im-** 91:5 94:17

**imaginable** 91:16

**immediately** 24:23 35:20,21

**impacted** 103:10,11

**implement** 47:21

**important** 8:18 34:22,23

**impression** 86:25 87:4

**impro-** 94:17

**improper** 91:6 94:18

**improvements** 67:2

**in-** 37:15 70:3

**inappropriate** 95:15

**including** 10:23 36:14 86:15

**inclusion** 97:25

Case 21-03067-sgj    Doc 28-12    Filed 09/29/21    Entered 09/29/21 17:50:19    Desc
Case 3:23-cv-01503-B    Document 28-12 Filed 09/25/24 Page 245 of 278    PageID 16922

Index: inconsistent..mail

**inconsistent** 92:15

**incorrect** 37:15

**independent** 34:25 35:6

**indirect** 61:8

**indirectly** 28:8

**individual** 72:25

**individuals** 65:6

**information** 32:3 40:3 46:21 48:19 86:19 87:8 91:13 103:16,21 106:8

**informed** 86:23 88:4

**informing** 42:20

**initially** 23:3,19 29:2 32:19 54:12 83:2

**innocuous** 81:7

**input** 11:24 93:4

**inquire** 95:24

**inquiries** 40:6

**inquiry** 88:7,9

**Institute** 24:24

**institution** 18:6

**instruct** 95:21

**insulating** 18:12

**integrated** 11:2

**intent** 98:2,3,16,17

**inter-** 14:14

**interact** 49:23

**interactions** 73:19

**interchangeably** 12:18,19 13:6

**interest** 47:14,15 54:17 60:2,25

**interested** 10:6

**interests** 52:10 53:5, 17 54:20

**interface** 12:10 13:12 14:14,22 19:21 20:12 40:2 64:13

**interfaced** 62:10 70:11

**interfacing** 18:24 19:14

**intermittent** 21:13

**internal** 27:8

**internally** 27:12

**interrupt** 89:17

**interrupted** 26:16

**invest** 74:25

**invested** 69:4,17 77:14

**investing** 25:10

**investment** 13:25 14:11 16:3 25:13 26:4,24 59:25 60:6, 15 61:7,19 75:5 76:2

**investments** 15:10, 19 27:5 33:24 72:9

**invests** 70:23

**involved** 14:22 86:16,21

**IRS** 18:11

**Islands** 47:4

**issue** 7:20 36:5,9,12 37:4,13,17 38:17 40:14 41:7,24 42:15, 19 70:9 74:13 81:9 82:17 94:4 97:18,20, 23 100:5 102:12,17, 20

**issuer** 102:2 104:15

**issuers** 100:20,23 101:4 102:25 103:16, 22,25

**issues** 20:4,14 25:16,17 36:13 38:8 70:3 81:14,15 92:10 99:5 100:10 101:22 102:11

---

**J**

**James** 78:6 96:22

---

**January** 88:15

**Jeffrey** 105:12

**Jersey** 28:18

**Jim** 7:19,21 11:21,24 14:20 17:23 28:7,8, 10 35:4 45:8 61:13 63:5,19 67:3,9,23 84:12,16,23 87:14, 15,19 88:22 89:10 90:12 91:3 94:16 95:12,14

**John** 6:7 7:8 26:6 35:7 55:6 82:7 107:5

**join** 80:13,18,20 82:12,15 91:9

**joined** 24:23 97:4

**Jones** 6:8

**junior** 29:7

**justify** 82:19

---

**K**

**Kansas** 52:15 56:13

**kind** 9:11 22:4

**knowing** 98:21

**knowledge** 25:19 27:2 37:23 47:6,21 48:3,6,13 49:2 52:8 57:3,7 61:3,15 64:21 83:11 84:10 98:19 103:15,20

---

**L**

**L.P.** 6:11 47:8 48:15 49:4 50:11,17,23 51:2 52:3,6,11 53:5, 18 76:11

**La** 46:12

**lack** 95:11

**laid** 82:20

**language** 98:14

**large** 19:21 20:23

**late** 23:4 76:16,17

---

**law** 6:8 7:20 24:14,15 25:4,5,7 42:17 94:25 100:5

**lawyer** 10:10 24:8,12 65:23

**lawyers** 18:3 91:16 95:21

**lays** 101:16

**learn** 42:22 76:14 83:21,24

**learned** 43:3

**learning** 37:18

**led** 81:15 86:19 87:8

**left** 51:8 85:5,9 87:24 89:4

**legal** 18:10 82:19 100:4 102:12 104:20

**legalistic** 94:17,23

**lesser** 34:22

**letter** 77:20,25 78:6, 14,19,22 79:21,23 81:2,3,5 82:24 83:10 85:24 87:12 88:11,19 90:17 91:2,10,15,19, 25 92:25 93:21 95:23 96:7,9,13,15,22 97:4, 8,12,17,18,24 100:4 105:3,6,12,17

**letters** 79:16 98:15

**Lieu** 55:2

**light** 77:6

**likelihood** 94:10

**limited** 10:15,21 11:9 12:2,8,13,24 13:23 14:2,12 15:10,20 16:4,6,11 17:5,16,18 18:21 19:3,17 21:6 23:2 26:25 27:17,24 32:10,23 33:7,16,25 34:8 37:23 40:22 41:11 42:21 47:3,7, 17 51:3,10,13,17 52:9,10 53:3,4,17,25 54:11,14 56:8 58:15 60:3,25 61:9 62:12, 16 63:2 64:20 68:14, 18 69:4,13 70:19

---

**law** (cont.) [column 5]
72:9,19 73:24 74:8, 24 75:25 77:13,21 79:20 80:2,6,13 82:2, 12 97:4 98:8,23 106:4

**Limited's** 52:25 69:23 76:20

**lines** 55:23

**liquid** 37:9

**Lisa** 13:8

**list** 27:21

**listed** 79:20 80:3 82:13 89:8 105:5

**listened** 93:3

**litigation** 8:9 36:9 94:10

**lived** 29:25

**LLC** 49:3,8,10,13,17, 22 50:3 51:24

**loan** 10:23

**long** 28:14 69:8 100:12

**longer** 14:21 85:22 86:8,16,20 87:2,9 106:3

**looked** 94:3 100:16

**loop** 82:8

**loosely** 11:3

**lot** 13:9

**lower** 46:25

---

**M**

**made** 15:19 27:5 34:9,14,23 36:4 37:22 38:20 43:12 44:23 45:2 47:25 48:9 66:15 70:15 72:9 73:6 74:23 76:19,24 77:22 80:3, 10 81:19 83:11 88:9, 22 89:2 91:4,5,18 92:16 96:2 99:11,12

**mail** 87:25

**maintain** 18:12
20:13 85:24 91:16

**maintaining** 94:4

**make** 16:3 26:24 34:3
48:7 70:13 75:5,14
82:14 87:16 97:16
101:25

**makes** 13:25 14:11
54:15

**making** 67:17 70:25
75:13 76:2 79:21
80:6 83:22 84:5,8,13
85:2,10 86:7,8 88:7

**man** 30:22

**Man-** 68:19

**manage** 19:19 20:11

**managed** 72:12
74:25 75:17 76:3,21
77:2,5

**management** 6:11
13:2,18,19,22 14:16
19:24 28:13 32:23
33:6,15 36:15 62:15,
21,25 67:21 68:5,12,
25 69:14 70:19,21,22
71:22 72:12,17,21
73:25 74:3,9,11
75:17 77:10,12 96:11
98:25 99:16 100:19
101:8 102:3,15
103:6,18,23 104:3

**Management's**
68:20

**manager** 12:10
13:13,16 14:8 18:25
19:15 69:3,16 98:10

**managerial** 47:14

**managers** 14:3

**manages** 13:19,22
33:9 70:22 71:23
101:5

**managing** 33:11
49:7,21 50:3 51:23

**Mark** 14:20 63:21

**marked** 46:15 55:3
78:9 96:25 105:14

**married** 30:19,20

**master's** 24:22

**material** 100:9
101:21

**matter** 7:17 9:18,21
64:2,8 66:8

**matters** 25:3

**meaningfully** 21:23

**means** 11:12

**meet** 18:13

**Meeting** 55:2

**Mel-** 63:21

**Melissa** 63:21 66:17

**member** 49:7,21
50:3 51:23

**men's** 44:8

**mental** 94:3

**mention** 14:5 94:24
105:21

**mentioned** 7:8 13:12
14:4 20:18 22:13,14
25:17 41:3,6 53:24
66:17 71:5,10 77:16
81:16 86:23 95:2

**met** 81:14

**metric** 27:12

**middle** 16:23 94:12

**Mike** 63:20

**Miller** 105:13

**mind** 53:3

**mine** 28:13

**Minimal** 25:21

**minimus** 52:16
101:21

**minutes** 106:18

**missing** 52:18

**mission** 32:20

**mistaken** 85:6

**moment** 11:8 99:25

**Monday** 90:23 94:20

**Mondays** 21:14

**monetary** 104:21

**money** 12:15 14:8
19:23 32:19 36:18,19
37:6,10 54:6,13,18
58:20

**month** 21:25

**monthly** 21:4

**months** 23:20 30:15
63:18 64:25 65:12
66:22 67:7

**morning** 21:21

**Morris** 6:6,7 7:6,8
13:8,11 26:11,17
31:3,11 39:15 42:25
44:20 46:12,17 54:23
55:4,8,10,11,13,21,
24 56:20 59:15 61:23
62:4,8 64:5,11 65:22
66:5 73:3,8 78:3,10,
13 79:11 81:21,25
91:24 92:3 96:14,17
97:2 105:10,16
106:13,23 107:6

**motion** 41:12 42:8,
13 45:8 80:4,9,14
81:15 82:3,13,16

**mouth** 19:4

**move** 42:17 45:17
51:8 81:22 104:14

**multiple** 21:20 83:18
98:13

**N**

**named** 33:11

**names** 86:13

**Nancy** 60:22

**nature** 23:24 32:8
50:4 64:17,22 65:3,
11 94:18 100:16

**necessarily** 11:11

**needed** 27:5 66:24

**negotiating** 104:2

**Nelms** 35:5

**network** 18:3

**night** 21:21

**no-cause** 101:22

**Nobody's** 7:3

**nomenclature** 42:10

**Nonexempt** 58:23
59:2,5,9,11,18,23
61:7

**nonfinance** 99:6

**nonliquid** 37:8

**nonresponsive**
81:23

**North** 25:8

**northern** 28:18

**Notary** 6:4

**note** 72:23

**Noted** 107:12

**notwithstanding**
6:18 76:23

**number** 20:23 52:25
54:24 63:10 87:21,23
99:5

**nuts** 19:23 70:6

**O**

**object** 26:5,12 39:23
40:21 41:11 69:5
72:22 73:7

**objected** 37:24
38:19 41:25 84:16
100:6

**objecting** 26:8 40:10
42:8 101:17

**objection** 6:22 26:9,
20 31:2,10 32:25
33:8,17 38:2 39:14
40:24 42:2,8,21,24
43:11 54:4 59:14
64:4,10 69:18,23,24
74:4,12,19 75:18
83:13 87:18 92:17
100:7 101:16 104:25
106:7

**objections** 6:25
38:24 39:3 69:20
101:24

**obligation-type**
10:23

**obligations** 24:2
36:14 37:11

**obtain** 27:15 54:17

**obtained** 23:6 91:13

**occasion** 27:2,3

**occasions** 7:11

**occurred** 23:8 25:22
38:9,18 95:7

**occurs** 21:17

**October** 7:14,18
62:22 63:3 85:7

**office** 20:21

**officer** 16:16 90:5

**officers** 16:12 17:12
49:14 50:19 57:20,25
58:11 59:12,18

**offices** 105:24 106:6

**Okada** 14:25

**Okada's** 14:21

**ongoing** 74:14 91:4

**operating** 104:4

**operations** 50:6

**opinion** 86:2 87:15

**order** 34:20 80:5
82:14

**organically** 25:22

**organization** 10:25
20:6

**Organizational**
46:14

**original** 38:9 40:8,13
81:3 82:24

**originally** 58:20

**out-** 101:23

**outlined** 69:19
101:23

**overpaying** 70:8

**overrode** 42:2

**overruled** 37:25 39:24

**owed** 24:3

**owned** 13:23 47:7 71:24

**owner** 58:14,16

**owners** 53:25 54:2

**ownership** 45:20 47:14

**owns** 53:16

**P**

**p.m.** 62:6,7 106:21,22 107:12

**Pachulski** 6:8

**paid** 32:20

**par-** 54:19

**paragraph** 78:17 79:21 80:3 82:5,13

**part** 11:2 23:13 66:3 68:18 101:14

**partial** 101:11,13

**Partially** 101:10

**participate** 54:5 82:3

**participation** 52:17 54:17,20

**parties** 6:16 13:5 83:6

**partner** 49:4

**partnership** 52:10 53:4,17

**parts** 92:19

**party** 72:20

**past** 7:14,18

**patent** 8:5,9,11,14 24:8,10,12 99:20 100:2

**Patrick** 63:21 64:18, 24 65:13 66:9 67:8

**Patrick's** 65:17

**pausing** 34:19

**paying** 70:4

**payment** 36:14 70:10,14 71:11

**people** 12:21 18:2 19:21 20:3,23 32:5 33:10 65:24 75:13,14 86:7

**perc-** 89:15

**percent** 47:7 52:9 53:4,7,9,11,14,16

**percent/99** 53:9

**perfectly** 91:19

**perform** 50:5

**performance** 68:20 69:2,15 102:3,11

**performed** 102:14

**period** 22:15,16 23:19 80:6

**periodically** 18:18 102:9

**permit** 104:2

**pers-** 79:20

**person** 8:8 14:11 15:18 20:15 49:16 64:16 90:10

**personal** 30:10

**personally** 11:8

**persons** 14:13 90:11

**perspective** 100:17

**philosophy** 26:4

**phone** 23:6 44:9 63:10 65:24 87:22 91:8 95:7,12,14

**phrase** 13:9

**pick** 95:7

**piece** 21:16

**pieces** 71:5

**place** 7:13 66:13

**plan** 38:24 47:21

69:20,23 92:11 100:5 101:9,16 104:25

**planner** 20:10

**play** 11:8 32:22 33:5

**played** 35:3

**pleasant** 35:10

**point** 18:5 32:18 35:16,24 36:5,10 40:3 64:15 81:6 99:21

**points** 81:6

**policy** 27:21

**Pomerantz** 105:13

**pool** 32:24 33:7,10

**portfolio** 10:25 69:3, 16 98:10,24

**portion** 10:24

**portions** 9:14

**pose** 70:3

**position** 23:21 48:14 62:20 66:11 76:20 100:8

**possibly** 27:25 36:7 99:14

**post-** 104:12

**postbankruptcy** 21:10 22:6,16 104:11,13

**postplan** 104:13

**potentially** 104:20

**power** 33:14

**practical** 100:10 104:21

**pre** 22:15

**prebankruptcy** 21:9 22:5

**precise** 69:10

**preclude** 101:18

**precludes** 21:22

**predefined** 36:17

**preliminary** 99:10

**prepared** 46:6

**present** 60:19

**president** 57:4,21 58:2

**prevented** 80:5

**previous** 73:19

**previously** 24:4 33:11,19 81:12,13 86:14 87:2 98:6

**prior** 16:25 27:2,4,16, 22 33:22 34:11 40:16 43:11 79:18 80:10 88:10,17 97:17 104:15,16

**privilege** 65:21 66:4 79:9

**problem** 70:4 102:21

**problems** 36:21

**proceedings** 62:6 106:21

**proceeds** 37:9

**process** 86:17,21 97:14 99:15 104:18

**program** 29:22

**proof** 38:9,11 40:4,8, 12,13 46:22

**proofs** 39:11,12,19, 23

**provide** 79:3

**provided** 74:2 79:8

**provisions** 104:19

**Public** 6:4

**publicly** 32:4

**pull** 54:21

**pulled** 42:15

**purportedly** 77:20

**purposes** 18:11,12 50:7

**pursuant** 9:22 70:21 71:23 72:16 101:4

**put** 9:10 21:8 34:20 37:14 46:13 50:25

51:3 54:23 78:3 105:10

**putting** 75:13

**Q**

**qualified** 87:16

**quest** 70:2

**question** 8:19 10:5 14:9 19:9,13 26:6,15, 19 36:25 43:7 44:22, 24 48:20 79:12 81:22,24 82:9 88:17 89:13,23 92:21 99:4 103:13

**questions** 8:18 50:12,16 55:12 69:8 89:21 106:25 107:4, 11

**quickly** 35:22

**quo** 85:25 91:17 94:4

**R**

**raised** 74:13 92:10

**rang** 87:22

**re-** 66:11 72:7 82:9 100:7

**reach** 95:21

**read** 9:14 73:12

**reason** 9:13 34:19 68:24 76:5

**reasons** 29:11 67:16

**recall** 10:3 14:24 28:2 35:25 44:22 50:8 58:7 63:23 64:2, 7,22 65:9,11 67:5 73:19 80:16 90:24 94:24 97:3

**receive** 12:15 16:19 49:20,24

**received** 9:25 24:22 34:24 45:6

**recently** 38:18 73:18

**recess** 62:5 106:20

Case 21-03067-sgj   Doc 28-12   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:21-cv-01509-B   Document 26-12   Filed 05/13/24   Page 247 of 278   PageID 16925

Index: recite..short

**recite** 82:9

**recognize** 87:23

**recollection** 8:3
18:18 23:15 63:13
85:6 94:22 97:5
105:9

**recommendation**
43:23 44:5,7,23 45:2

**reconvene** 61:24

**record** 6:14,25 72:23
73:6 100:13

**recurring** 27:11

**reduced** 40:12

**reduces** 94:10

**refer** 11:3 20:21
100:18

**reference** 78:18

**referred** 12:16 70:5

**referring** 13:17
60:10 65:7 86:11

**reflected** 48:8

**reflects** 46:10

**refresh** 18:18 105:9

**regard** 38:25

**registry** 35:18

**regularly** 20:12
64:13

**regulations** 25:20

**relate** 101:22 104:22

**related** 34:24

**relating** 7:19 32:13

**relation** 67:22 68:6

**relationship** 29:10
30:5 32:8

**relative** 104:11

**relied** 97:13

**rely** 91:7,12

**remember** 59:7
105:17

**remotely** 6:19

**removal** 84:23
104:23

**remove** 81:10 98:4

**removed** 86:24 98:9

**reorganization**
100:6 101:9

**repeat** 14:8 15:16
33:2 41:2,18 72:5
89:22 90:3

**rephrase** 89:23

**replacement** 84:24

**report** 18:21

**reporter** 6:21 44:3
55:10 107:9

**reports** 102:8

**represent** 74:15

**representation**
100:15

**representative**
16:15 73:2,4 89:8
90:5

**represented** 95:15

**representing** 6:15

**represents** 6:9

**request** 34:24 35:2,
11,22 42:16 70:2,14
77:16,21 79:22 81:8
83:10,11,16,17,18
84:21 91:5,16,18
92:4,15 96:2 98:14

**require** 27:21

**require-** 81:14

**required** 27:15

**requisites** 18:13

**res-** 101:6

**research** 24:23,25
25:2

**reservation** 6:24

**reserve** 107:3

**resign** 66:15

**resigned** 62:20

**resigning** 66:11

**resolutions** 46:21
53:2

**resolve** 42:15

**resolved** 92:12

**resonates** 99:19,22
100:3

**respect** 7:21 9:17
12:12,14 25:16 33:6,
14 36:13 38:9,17
40:8,11,20 41:24
48:15 50:9 64:20
67:3 68:18 71:17
79:23 101:14

**respective** 6:16

**responsibilities**
12:7,9 19:2,16

**responsibility** 64:19

**responsible** 86:14

**responsive** 69:25

**restate** 82:9

**reveal** 32:4

**review** 83:4

**reviewed** 100:7

**Ri-** 78:11

**right-hand** 46:25

**rights** 101:19 103:9,
10 104:23

**rise** 82:17

**role** 11:8 12:2,12,13
20:19 32:22 33:5
48:17,22 76:7

**room** 6:21 9:8 35:9
44:8

**roommates** 29:24,
25

**rule** 27:4

**rules** 25:20 27:21

**runs** 20:5

**Russell** 35:5

**S**

**sales** 74:14 81:8 91:4
94:8,9

**Samsung** 8:6

**Santa** 52:15 56:12,
13,23 58:10

**scenario** 45:7

**scheduled** 36:16

**school** 24:14,15,21
25:4,5,7 28:15 29:17,
19

**Schroth** 63:22 66:18,
21 67:8

**scientist** 24:25

**scott** 6:1,12 7:1,7 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1,14,18 47:1
48:1 49:1 50:1 51:1,
2,4 52:1 53:1 54:1,25
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1,9
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1,24 73:1
74:1 75:1 76:1 77:1
78:1,6 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1,22
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1,12
106:1,15,23 107:1,16

**screen** 9:10,12 33:3
38:8 55:15 78:4

**scroll** 55:21 78:10
105:20

**seeking** 99:14

**Seery** 35:4 63:5,7,13
67:9,16,19,24 68:3,
10,17 77:9,12 87:16,
19 88:13,22 89:10
95:8,12,14,22

**select** 70:9 71:12
75:3

**selected** 56:3,4

**selection** 75:7,12,14

**sell** 76:19

**send** 45:11

**sending** 88:11,18
95:23 96:7 97:11

**sentence** 92:5

**sequence** 36:6
93:15

**series** 8:18

**serve** 10:7 30:21
32:9 51:19,22 52:2,5
57:4

**served** 10:3,11 16:24
17:8,13

**serves** 60:15

**service** 19:19 57:21
58:2 90:7

**servicer** 62:17
72:13,17 83:23 98:4,
10 104:16

**services** 16:20 68:9,
13,21 70:5,6,7,18
71:6,7,15 74:2 81:12

**serving** 21:5 49:21
58:11

**set** 11:18,19 19:19
24:5 104:24

**sets** 100:8

**settlement** 40:21
41:13,16 42:9 43:11

**share** 94:19

**shared** 30:4 32:3
68:9,13,20 70:18
71:7,15

**short** 12:22 61:24
106:14

**show** 82:25 92:18

**showed** 81:4 82:25

**showing** 9:9

**shown** 52:22

**shows** 53:3,6

**sic** 73:22

**side** 51:5,8

**sign** 66:24

**signature** 55:23

**signed** 93:21

**significant** 36:13

**simple** 44:21

**simply** 26:8

**single** 88:21

**sir** 55:15 74:21

**sister** 60:9,11,14

**sit** 68:23 79:25

**siv-** 60:14

**small** 33:3

**smallest** 23:16

**sole** 17:4 18:20 19:17
34:7 47:16 50:22
51:12,16 73:23

**soon-to-be** 100:13

**sophomore** 29:4

**sort** 64:15 100:5,16

**sorts** 24:7

**soup** 19:23 70:6

**source** 30:12 87:7

**speak** 40:15,17 43:9
63:21 95:8,22 102:2

**speaking** 8:17
102:25

**speci-** 86:24

**specifically** 11:12
36:25 40:9 86:22

**specifics** 79:13

**speculate** 40:7

**spend** 22:25

**spent** 20:2 21:9,10

**spoke** 35:24 63:19
65:10 67:9 87:19

**spoken** 7:3 63:8,12,
17,19

**standpoint** 104:20,
21

**Stang** 6:8

**start** 29:2 46:24 63:7

**started** 82:8

**stated** 73:6

**statement** 98:2

**status** 85:25 91:17
94:4

**step** 8:24

**steps** 23:10 39:22
81:10 82:19 96:10
98:24 101:17

**sticking** 45:16

**stop** 77:17,21 82:6
83:6 85:13,16 91:5

**stoppage** 84:21

**stopping** 94:8,9

**strain** 30:12

**strained** 30:7

**strategy** 26:4

**strike** 48:11 81:22

**structure** 11:7 12:16
45:18,20 46:15
47:19,20 48:2,8,10,
13 52:19

**subject** 6:23 7:17
64:2,7 66:8 81:2
98:13

**submitted** 42:14

**subpoena** 9:22,25
10:4,7,12

**Subscribed** 107:18

**subsequent** 6:18
36:11 38:10 81:10

**subset** 12:14

**subsidiary** 104:10

**substance** 9:19
44:14 64:23 65:4,19
80:24 91:2

**substantial** 83:15
104:22

**substantive** 81:9
100:4

**substantively** 92:12

**substitute** 104:14,15

**success** 100:13

**sufficient** 26:10
82:19

**suggest** 99:7 102:13

**suggested** 96:8

**suit** 96:3

**suite** 106:6

**summarize** 39:10

**Super** 7:25

**support** 40:4 102:19
106:9

**Surgent** 15:4 20:17

**suspects** 63:20

**sworn** 6:3 107:18

_____

**T**

**taking** 101:18

**talk** 45:18

**talked** 22:16 61:6
98:5

**talking** 13:4 57:5,9
102:12

**tangent** 44:25

**tax** 17:25 18:10

**taxes** 20:5

**team** 85:20,21,22
86:25 87:9

**Tech** 29:16

**technical** 11:10

**74**:15,18

**ten** 11:17 17:6 83:24

**term** 20:22 100:21,22

**terminate** 96:10
98:24

**terminating** 99:15

**termination** 100:12,
14

**terminology** 42:9

**terms** 12:19 13:2,6
16:16 45:22 52:16
69:6 94:25

**test** 45:24 47:10
63:14

**testified** 6:5 9:20,21
22:4 62:10 75:4 85:4

**testify** 7:22 37:3

**testifying** 72:24

**testimony** 89:18

**text** 45:11

**there'd** 94:14

**thing** 92:7 99:22
100:3

**things** 17:23 21:25
23:12 24:3 29:19
30:16,17 64:16
100:15

**thinking** 37:13

**third-party** 73:9
101:19

**Thomas** 15:4 20:17
24:23

**thought** 18:5 21:7
32:16 38:3,15 40:10
42:2 44:2 48:17 68:4
75:4 77:4 85:4 94:9,
12 95:9,13,25 102:24

**thoughts** 39:2

**threw** 96:3

**Throckmorton**
63:20 64:3,9,14 67:8

**Tim** 15:4

**time** 9:11,24 11:25
16:25 17:5,12 18:8
19:25 20:2,24 21:2,4,
9,10 22:10,12,14,18,
25 24:13 27:25 28:11
30:8 34:21 35:16,24
40:16 41:19 42:22
43:12 45:8 50:8 53:8
57:22 61:25 63:2
70:8 71:5 80:7,10
88:10,18 89:3 98:20
106:2,9,16,24 107:7,
12

**times** 13:4 63:12,15

**timing** 40:19

**title** 11:10,12 24:25

**today** 6:11 7:9 9:9
26:10 30:6 68:23
86:4 98:22 106:11

**told** 45:3 89:9 91:20
92:8

**topic** 40:16 45:18

**touch** 27:9

**track** 100:13

**trade** 67:17

**traded** 85:14

**trades** 82:6,15 83:7,
22 84:5,8,13 85:11
86:4 87:10,16

**trading** 77:17,22
84:21 85:14,16

**training** 24:19 25:9,
15

**transaction** 88:22,
25

**transactions** 24:7
27:16,23 80:6 88:14
89:11 92:10 93:25
95:10 96:2

**transcript** 6:23 7:2
83:5

**transfer** 29:11 35:12
76:25

**transferred** 24:5
29:3,6,13,14,20
35:18

Case 21-03067-sgj   Doc 28-12   Filed 09/29/21   Entered 09/29/21 17:50:19   Desc
Case 3:23-cv-01503-B   Document 28-12 Filed 09/24/24 Page 249 of 278   PageID 11927

Index: transfers..Ziehl

**transfers** 64:16

**transition** 23:8

**transitioned** 25:4

**transmitted** 35:2

**trick** 9:11

**triggers** 27:9

**trust** 58:23 59:2,5,9, 11,18,23,25 60:6,16 61:7,8,12,15,16,20, 22

**trusted** 32:12

**trustee** 11:13 58:25 59:4,22 60:5,15,19

**trustees** 59:8

**trusts** 30:25 31:6 58:18 60:2,24 61:2

**tuck** 36:18

**tucked** 36:19

**Tuesday** 21:15 90:21

**turn** 71:19

**turnover** 20:20

**type** 18:5,7

### U

**Uh-huh** 9:16

**ultimately** 36:8 47:23 54:15 70:15 75:3

**unanimous** 54:25 55:17

**unaware** 70:10

**under-** 23:14 37:12

**understand** 9:4 11:13,22,23 14:14 15:15 17:23 18:8 19:10 23:11 27:18 29:19 31:12 33:13 36:6 38:20 42:5,9 43:3 54:13 70:24 71:18 73:21 81:6 89:3 100:24 101:7 102:8 104:9,24 106:3

**understanding** 11:16 13:21 17:22 18:16 23:24 29:10 32:7,15 47:2 49:6 50:6 53:15 60:14 61:5,18 65:16 73:13, 14,15 83:3 84:22 97:19,22 101:11,13 103:7

**understood** 86:6,13

**undisputably** 37:6

**University** 24:19,21 25:8 28:24 29:5,15, 16

**unlike** 20:9,10

**updated** 88:2

**urgent** 44:7

**usual** 63:20

**UVA** 28:24,25 29:2, 12,21,24

### V

**valid** 42:12

**vehicles** 58:19 77:5

**versus** 27:11 34:22 47:14 83:17 85:9

**view** 83:15 87:15 94:17,19,23 103:12, 13

**views** 103:2

**Virginia** 24:20 28:24 29:16

**virtual** 9:7

**virtue** 8:10 82:24

**vision** 32:13,17

**voice** 87:25

**voluntarily** 9:20

**volunteered** 36:3 88:8

**volunteering** 95:12

### W

**wanted** 17:24 29:18

**Watson** 24:24

**wedding** 30:22

**week** 21:11,18,20 60:20 67:10 87:20

**week-to-week** 19:25

**weekly** 21:3

**weeks** 21:18 60:20 66:14

**well-known** 29:21 75:22,23

**wire** 64:16

**with-** 45:3

**withdraw** 43:10 45:3,4 92:21 96:4

**withdrawing** 42:21

**withdrawn** 13:20 16:10 26:22 28:3 31:4 34:4,6 39:16 45:8 52:4 57:18 59:16 63:25 64:6 65:10 77:10 79:17 86:10

**word** 41:2

**words** 8:25

**work** 42:6

**worked** 15:3 42:6 85:22

**working** 20:2 38:14 95:16

**works** 23:14

**world** 16:15 31:23 75:16,20

**Wright** 78:7 96:23

**write** 45:10

**written** 8:11 54:25 55:18 62:14 77:20

**wrong** 22:11 68:25 69:15 73:25 75:6

**wrote** 8:6,9

### Y

**year** 29:4,7 85:15 105:25

**years** 7:15 8:2 11:17 15:3 17:6 18:17 28:24 29:8 31:8,20 32:2 59:6 60:17 73:20 76:10 83:25 84:5

**yes-or-no** 79:11

**yesterday** 26:9

**yielded** 81:3

**York** 24:24 35:8

### Z

**Ziehl** 6:8

# APPENDIX 13

Between

**CLO HOLDCO, LTD.**

And

**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

And

**HARBOURVEST 2017 GLOBAL AIF L.P.**

And

**HARBOURVEST 2017 GLOBAL FUND L.P.**

And

**HV INTERNATIONAL VIII SECONDARY L.P.**

And

**HARBOURVEST SKEW BASE AIF L.P.**

And

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

And

**LEE BLACKWELL PARKER, III**

And

**QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311**

And

**QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811**

And

**QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612**

And

**QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211**

And

**HIGHLAND CLO FUNDING, LTD.**

And

**HIGHLAND HCF ADVISOR, LTD.**

---

**MEMBERS AGREEMENT RELATING TO THE COMPANY**

---

TABLE OF CONTENTS

1.    INTERPRETATION ........................................................................ 2

2.    THE BUSINESS OF THE COMPANY ........................................... 4

3.    VOTING RIGHTS ......................................................................... 4

4.    ADVISORY BOARD ...................................................................... 4

5.    DEFAULTING MEMBERS .............................................................. 4

6.    TRANSFERS OR DISPOSALS OF SHARES ................................ 4

7.    CONFIDENTIALITY ...................................................................... 4

8.    DIVIDENDS .................................................................................. 9

9.    TERM OF THE COMPANY ........................................................... 9

10.   ERISA MATTERS ........................................................................ 9

11.   TAX MATTERS ............................................................................ 9

12.   AMENDMENTS TO CERTAIN AGREEMENTS .............................. 9

13.   FINANCIAL REPORTS ................................................................. 9

14.   TERMINATION AND LIQUIDATION ............................................... 9

15.   WHOLE AGREEMENT .................................................................. 12

16.   STATUS OF AGREEMENT ........................................................... 12

17.   ASSIGNMENTS ........................................................................... 12

18.   VARIATION AND WAIVER ............................................................ 12

19.   SERVICE OF NOTICE ................................................................. 12

20.   GENERAL ................................................................................... 13

21.   GOVERNING LAW AND JURISDICTION ...................................... 14

SCHEDULE ......................................................................................... 18
Adherence Agreement ........................................................................ 18

**THIS AGREEMENT** is made the 15th day of November 2017

**BETWEEN**

(1)     **CLO HOLDCO, LTD.** whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)     **HARBOURVEST DOVER IX INVESTMENT L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)     **HARBOURVEST 2017 GLOBAL AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)     **HARBOURVEST 2017 GLOBAL FUND L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)     **HV INTERNATIONAL VIII SECONDARY L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)     **HARBOURVEST SKEW BASE AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)     **HIGHLAND CAPITAL MANAGEMENT, L.P.** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)     **LEE BLACKWELL PARKER, III** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)     **QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311** of 17171 Park Row #100, Houston, Texas 77084, USA

(10)    **QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811** of 17171 Park Row #100, Houston, Texas 77084, USA

(11)    **QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612** of 17171 Park Row #100, Houston, Texas 77084, USA

(12)    **QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211** of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "**Members**") and

(13)    **HIGHLAND CLO FUNDING, LTD.,** with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**") and

(14)    **HIGHLAND HCF ADVISOR, LTD.,** whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**WHEREAS**:

(A)     The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)     The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "**Offering Memorandum**"), subject to the restrictions set forth therein.

001685

(C)    The Members are the owners of the entire issued capital of the Company.

(D)    The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

**OPERATIVE PROVISIONS**

1.    **INTERPRETATION**

In this Agreement, including the Schedule:

1.1    the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"**Adherence Agreement**" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"**Advisers Act**" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"**Affiliate**" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above. For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"**Agreement**" means this agreement together with the Schedule;

"**Articles**" means the articles of incorporation of the Company as amended from time to time;

"**Business**" means the business of the Company as described in Recital (B);

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"**Directors**" means the directors of the Company from time to time;

"**CLO Holdco**" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Directors**" means the directors of the Company from time to time;

"**Dover IX**" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"**DOL**" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"**DOL Regulations**" shall mean the regulations of the DOL included within ==29 C.F.R. section 2510.3-101==.

001686

"**Dover IX**" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"**ERISA**" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"**ERISA Member**" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"**HarbourVest Entities**" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"**Highland Principals**" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"**Law**" means the Companies (Guernsey) Law, 2008, as amended;

"**Member**" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"**Parties**" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"**Shares**" means ordinary shares in the Company;

"**Subsidiary**" shall have the meaning ascribed to it in the Law;

"**Subscription and Transfer Agreement**" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2    any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3    any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4    any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5    any reference to time shall be to Guernsey time;

1.6    except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

1.7     unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8     Clause headings are for ease of reference only and do not affect the construction of any provision.

## 2.    THE BUSINESS OF THE COMPANY

2.1     The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2     The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3     The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

## 3.    VOTING RIGHTS

3.1     The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2     The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

     3.2.1     any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

     3.2.2     any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

     3.2.3     any conversion or redemption of Shares, except pursuant to Clause 5.5,

     3.2.4     any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

     3.2.5     the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

     3.2.6     the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.    **ADVISORY BOARD.**

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "**Advisory Board**") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum. Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4    Term of Members of Advisory Board.  A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5    No Duties to Other Members.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.    **DEFAULTING MEMBERS**

5.1    In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "**Outstanding Settlement Amount**"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "**Default Interest Rate**") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "**Defaulting Member**"), the following provisions shall apply:

5.2    Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3    The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

5.4    The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5    The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6    The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7    At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8    The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9    Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.    **TRANSFERS OR DISPOSALS OF SHARES**

6.1    No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1   such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2   such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3   such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4   such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2   Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again.  Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3   No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4   Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5   The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6   All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

001692

7.   **CONFIDENTIALITY**

7.1   Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2   Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.   **DIVIDENDS**

8.1   The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.   **TERM OF THE COMPANY**

9.1   Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "**Term**"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2   Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.  **ERISA MATTERS**

10.1  The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.  **TAX MATTERS**

11.1  <u>PFIC</u>. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

001693

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2 <u>CFC</u>. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3 <u>Other Tax Information</u>. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4 <u>Withholding and Other Taxes</u>. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12. **AMENDMENTS TO CERTAIN AGREEMENTS**

12.1 The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "**Management Agreement**") without the consent of the Parties.

12.2 The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3 The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13. **FINANCIAL REPORTS**

13.1 The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

001694

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2   After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.   **TERMINATION AND LIQUIDATION**

14.1   Save as provided for in Clause 13.2, this Agreement shall terminate:

   14.1.1   when one Party holds all the Shares;

   14.1.2   when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

   14.1.3   with the written consent of all the Parties.

14.2   The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3   Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4   Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

   14.4.1   all existing contracts of the Company are performed to the extent that there are sufficient resources;

   14.4.2   the Company shall not enter into any new contractual obligations;

   14.4.3   the Company is dissolved and its assets are distributed as soon as practical; and

   14.4.4   any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

15. **WHOLE AGREEMENT**

15.1  This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2  Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3  Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16. **STATUS OF AGREEMENT**

16.1  Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2  If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17. **ASSIGNMENTS**

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18. **VARIATION AND WAIVER**

18.1  A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2  A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3  A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19. **SERVICE OF NOTICE**

19.1  Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

19.1.1  to the Company:
Address:
First Floor, Dorey Court, Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

19.1.2  to CLO Holdco:

001696

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3 to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4 to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2 Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee **PROVIDED THAT** if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3 In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20. **GENERAL**

20.1 Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2 Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3 The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4 All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5 Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

23981765.11. BUSINESS                    13

20.6    Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7    This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.    **STATUS OF AGREEMENT**

21.1    The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2    If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22.    **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[*Signature Page Follows*.]

001698

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:................................................................
**Name:** Grant Scott
**Title:** Director

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:   HarbourVest Partners (Europe) Limited,
      its Alternative Investment Fund Manager

**By:** ...........................................................
**Name:**   Michael J. Pugatch
**Title:**   Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:   HarbourVest Partners (Europe) Limited,
      its Alternative Investment Fund Manager

**By:** ...........................................................
**Name:**   Michael J. Pugatch
**Title:**   Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:   HarbourVest 2017 Global Associates L.P.,
      its General Partner

By:   HarbourVest GP LLC,
      its General Partner

By:   HarbourVest Partners, LLC,
      its Managing Member

**By:** ...........................................................
**Name:**   Michael J. Pugatch
**Title:**   Managing Director


SIGNATURE PAGE TO MEMBERS' AGREEMENT

001700

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:    HIPEP VIII Associates L.P.
        Its General Partner
By:    HarbourVest GP LLC
        Its General Partner
By:    HarbourVest Partners, LLC
        Its Managing Member

**By:** .............................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .............................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person

SIGNATURE PAGE TO MEMBERS' AGREEMENT

001701

**SIGNED**

......................................................................................
Lee Blackwell Parker, III

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

X

By:
Name: Emmanuel Maceli
Title: Transactions supervisor

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO LEE B. PARKER III, ACCT. # 3058311


By: ...............................................................
Name:
Title:


SIGNED for and on behalf of
QUEST IRA, INC.
FBO HUNTER COVITZ, ACCT. # 1469811

By: ...............................................................
Name: *Emmanuel Macei*
Title: *Transaction Supervisor*

*Rec'd & Approved*

SIGNED for and on behalf of
QUEST IRA, INC.
FBO JON POGLITSCH, ACCT. # 1470612


By: ...............................................................
Name:
Title:


SIGNED for and on behalf of
QUEST IRA, INC.
FBO NEIL DESAI, ACCT. # 3059211


By: ...............................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

001704

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**


By:...................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**


By:...................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:...................................................................
Name: _Emmanuel Mager_
Title: _Transaction Supervisor_

_Read and Approved:_

_11/7/17_


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**


By:...................................................................
Name:
Title:

001705

SIGNED for and on behalf of
QUEST IRA, INC.
FBO LEE B. PARKER III, ACCT. # 3058311


By:..................................................................
Name:
Title:


SIGNED for and on behalf of
QUEST IRA, INC.
FBO HUNTER COVITZ, ACCT. # 1469811


By:..................................................................
Name:
Title:


SIGNED for and on behalf of
QUEST IRA, INC.
FBO JON POGLITSCH, ACCT. # 1470612


By:..................................................................
Name:
Title:


SIGNED for and on behalf of
QUEST IRA, INC.
FBO NEIL DESAI, ACCT. # 3059211

By:..................................................................
Name: *Emmanuel Mace*
Title: *Transaction Supervisor*

*Read and approved*

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:        Strand Advisors, Inc.,
             its General Partner

**By**:..............................................................
**Name:** James Dondero
**Title:**   President

001707

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

By: ............................................................

**Name:** James Dondero
**Title:**   President

001708

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

**By**:..............................................................

**Name:** William Scott
**Title:** Director

001709

## SCHEDULE

### Adherence Agreement

**THIS ADHERENCE AGREEMENT** is made on [●] 200[●]

**BETWEEN**:

(1)     [●] of [●] (the "**Covenantor**");

(2)     CLO HOLDCO, LTD. of [                    ] (a "**Member**");

(3)     [●] of [                    ] (a "**Member**");

(4)     [●] of [                    ] (a "**Member**");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").


### RECITAL

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "**Members Agreement**").

**IT IS HEREBY AGREED** as follows:

1.     The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.     Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.     This Agreement shall be governed by and construed in accordance with Guernsey law.

**IN WITNESS** of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.