**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

  **[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.**

## Volume 9

## APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.    STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.    DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.    Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2.    The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.    Docket Sheet kept by the Bankruptcy Clerk.

4.    Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| Vol. 2<br><br>000139 | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 000232 | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 000239 | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 000270<br><br>Thru Vol. 6 | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| Vol. 7<br><br>001196 | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7* *001203* *thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001905 Thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

*Vol. 14*

*002878*

*002883*

*Thru* *Vol. 16*

*Vol. 17*

*003392*

*003394*

*003583*

*003585*

*003611*

| | | | | |
|---|---|---|---|---|
| | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| **Vol. 18** **003637** | | | | |
| | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| **003666** | | | | |
| | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| **003843** | | | | |
| | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| **003844** | | | | |
| | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| **003851** | | | | |
| **Vol. 19** **003882** **Thru Vol 20** | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| **Vol. 21** **004395** | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*0047475* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*0047770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6_Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
| | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

*006133*

*Thru Vol. 31*

*Vol. 32*
*006925*

*006942*

*006960*

TRANSCRIPTS

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |

*006961*

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Appellants**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

JS 44 (Rev. 10/20) — TXND (10/20)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Charitable DAF Fund, L.P. and CLO Holdco, Ltd.

**DEFENDANTS**
Highland Capital Management, L.P., et al

**(b)** County of Residence of First Listed Plaintiff   Cayman Islands
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, TX 75201 (214-432-2899)

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [x] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

### V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC 1961, et seq.
Brief description of cause:
Defendants used wire and mail in relationship to Title 11 proceeding to commit fraud.

### VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Stacey G. Jernigan
DOCKET NUMBER   19-34054-sgj11 NDTXBK

DATE   6/22/21
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

001711

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P. and
CLO Holdco, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| ***directly and derivatively,*** | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| ***nominally,*** | § | |
| | § | |
| ***Defendants.*** | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S
MOTION FOR AN ORDER TO ENFORCE THE ORDER OF REFERENCE**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

I.      PRELIMINARY STATEMENT ...........................................................1

II.     BACKGROUND ...................................................................................2

III.    ARGUMENT & AUTHORITY ............................................................3

        A.      The Motion Should Be Denied Because Withdrawal of
                the Reference is Mandatory .....................................................3

        B.      Automatic Referral is Unnecessary and Would Be Inefficient...........9

                1.      The causes of action asserted by the Plaintiffs do not
                        "arise under," or "arise in" Title 11 are not "core"
                        proceedings ...............................................................10

                2.      The Bankruptcy Court has limited post-confirmation
                        "related to" jurisdiction..............................................12

        C.      The *Res Judicata* Argument is Not Relevant to the Relief
                Sought in This Motion .............................................................15

        D.      The Local Rule 3.3 Argument is Unavailing...........................16

        E.      The Litigious-Nature Argument is Likewise Unavailing .................17

        F.      Plaintiffs' Cross-Motion Should be Granted ..........................18

VI.     CONCLUSION...................................................................................19

## TABLE OF AUTHORITIES

### **Cases**

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.),*
 203 F.3d 914 (5th Cir. 2000) ...................................................................15

*Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),*
 266 F.3d 388 (5th Cir.2001) ....................................................................18

*Beitel v. OCA, Inc. (In re OCA, Inc.),*
 551 F.3d 359 (5th Cir. 2008) ...................................................................13

*Belmont v. MB Inv. Partners, Inc.,*
 708 F.3d 470 (3d Cir. 2013)......................................................................6

*Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.),*
 No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018)............................7

*Burch v. Freedom Mortg. Corp. (In re Burch),*
 835 F. App'x 741 (5th Cir. 2021) ..............................................................18

*Celotex Corp. v. Edwards,*
 514 U.S. 300 (1995)...............................................................................15

*Chalmers v. Gavin,*
 No. 3:01-CV-528-H, 2002 U.S. Dist. LEXIS 5636  (N.D. Tex., Apr. 2, 2002) .....................15

*Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.),*
 309 B.R. 217 (Bankr. N.D. Tex. 2004)........................................................14

*Davis v. Dall. Area Rapid Transit,*
 383 F.3d 309 (5th Cir. 2004) ...................................................................15

*Davis v. Life Inv'rs Ins. Co. of Am.,*
 282 B.R. 186 (S.D. Miss.2002)..................................................................10

*Faulkner v. Eagle View Capital Mmgt. (In re The Heritage Org., L.L.C.),,*
 454 B.R. 353 (Bankr. N.D. Tex. 2011).........................................................13

*Faulkner v. Kornman,*
 No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) ..............................14

*Feld v. Zale Corp. (In re Zale Corp.),*
 62 F.3d 746 (5th Cir.1995) ......................................................................12

001714

*Gupta v. Quincy Med. Ctr.*,
   858 F.3d 657 (1st Cir. 2017) ................................................................... 11-124

*In re Cont'l Airlines Corp.*,
   50 B.R. 342 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) ........................4

*In re Exide Tech*s.,
   544 F.3d 196 (3d Cir. 2008) .......................................................................10

*In re Harrah's Entm't*,
   No. 95-3925, 1996 U.S. Dist. LEXIS 18097 (E.D. La. 1996) ...................1, 5, 9, 19

*In re IQ Telecomms., Inc.*,
   70 B.R. 742 (N.D. Ill. 1987) ........................................................................6

*In re Nat'l Gypsum Co.*,
   134 B.R. 188 (N.D. Tex. 1991).....................................................................8

*In re Pegasus Gold Corp.*,
   394 F.3d 1189 (9th Cir. 2005) ....................................................................14

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   454 B.R. 307 (S.D.N.Y. 2011).....................................................................3-4

*Kuzmin v. Thermaflo, Inc.*,
   No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810
   (E.D. Tex. May 20, 2009) ........................................................................ 16-17

*Legal Xtranet, Inc. v. AT&T Mgmt. Servx., l.P. (In re Legal Xtranet, Inc.)*,
   453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011)............................................10, 11

*LightSquared Inc. v. Deere & Co.*,
   2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014)..............................................3-4

*Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*,
   783 F.2d 1283 (5th Cir. 1986) ....................................................................15

*Montana v. Goldin (In re Pegasus Gold Corp.)*,
   394 F.3d 1189 (9th Cir. 2005) ....................................................................14

*Price v. Rochford*,
   947 F.2d 829 (7th Cir. 1991) .....................................................................14

*Rannd Res. v. Von Harten (In re Rannd Res.)*,
   175 B.R. 393 (D. Nev. 1994) .....................................................................5-6

001715

*Reynolds v. Tombone*,
  Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS 9995
  (N.D. Tex., June 24, 1999)......................................................................................15

*Risby v. United States*,
  No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006) ...................................15

*SEC v. Capital Gains Research Bureau, Inc.,*
  375 U.S. 180, 84 S. Ct. 275 (1963)...........................................................................6

*S. Pac. Transp. Co.  v. Voluntary Purchasing Grps.*
  252 B.R. 373 (E.D. Tex. 2000)................................................................................8

*Stern v. Marshall*,
  564 U.S. 462 (2011)....................................................................................10, 13

*Stoe v. Flaherty*,
  436 F.3d 209 (3d Cir. 2006)...................................................................................11

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),*
  764 F.3d 512 (5th Cir. 2014) ..............................................................................3, 18

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009)...........................................................................................15

*Travelers Ins. Co. v. St. Jude Hosp.*,
  37 F.3d 193 (5th Cir. 1994) ..................................................................................15

*Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holding),*
  477 B.R. 517 (Bankr. D. Del. 2012) ..........................................................................14

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC,*
  622 B.R. 680 (Bankr. N.D. Tex. 2020)........................................................................10

*UPH Holdings, Inc. v. sprint Nextel Corp.,*
  No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349
  (W.D. Tex. 2013) ............................................................................................7-8

*United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.),*
  301 F.3d 296 (5th Cir. 2002) .................................................................................10

*Valley Historic Ltd. P'ship v. Bank of N.Y.*,
  486 F.3d 831 (4th Cir. 2007) .................................................................................15

*Wood v. Wood (In re Wood),*
  825 F.2d 90 (5th Cir.1987) ...................................................................................11

001716

*Zerand-Bernal Grp. v. Cox*,
  23 F.3d 159 (7th Cir. 1994)--------------------------------------------------------------15

**Rules & Statutes**

Fed. R. Civ. P. 12(b)(6)........................................................................................18

LRCi 3.3.................................................................................................16, 17

LRCi 7(a)..........................................................................................................17

LRCi 7(h)..........................................................................................................17

LRCi 7(i)...........................................................................................................17

LRCi 7.1(i)........................................................................................................17

17 C.F.R. 275.206(4)-7....................................................................................7

27 C.F.R. part 275............................................................................................7

15 U.S.C. § 80b-1.............................................................................................8

28 U.S.C. § 157(d)...............................................................................6,18, 19

28 U.S.C. § 1927.............................................................................................18

**Other**

Collier on Bankruptcy ¶ 3.02[2] (16th ed. 2010)........................................13

Investment Advisers Act of 1940 ............................................................ *passim*

Investment Advisers Act Release No. 2106 (Jan. 31, 2003) .........................7

Investment Advisers Act Release No. 3060 (July 28, 2010) .........................7

Investment Advisers Act Release No. 4197 (Sept. 17, 2015)........................7

Racketeer Influenced and Corrupt Organizations Act (RICO)............ *passim*

Securities Act of 1933, § 12(2)......................................................................6

Securities Exchange Act of 1934, § 10..........................................................6

Securities Exchange Act, Rule 10b-5 ............................................................6

001717

**PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL
MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE
<u>THE ORDER OF REFERENCE AND CROSS MOTION</u>**

## I.

### PRELIMINARY STATEMENT

Plaintiffs The Charitable DAF Fund, L.P. and CLO Holdco Ltd. oppose Defendant

Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference.

This action primarily involves fiduciary duties imposed upon Registered Investment

Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and corresponding state law

claims for breach of those duties. It also involves causes of action under the civil RICO statute, for

which breaches of Advisers Act fiduciary duties serve as the predicate act. As a result, presiding

over this action will require extensive consideration of federal laws regulating interstate

commerce, which renders withdrawal of the reference to bankruptcy court mandatory under 28

U.S.C. § 157(d) ("The district court shall, on timely motion of a party, so withdraw a proceeding

if the court determines that resolution of the proceeding requires consideration of both title 11 and

other laws of the United States regulating organizations or activities affecting interstate

commerce.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it

return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't*,

No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.) ("Although

'related to' bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal

securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the

bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal

---

of the reference. Rather than *waste judicial resources* on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit." (emphasis added)). Defendant's arguments to the contrary are unsupported by law.

Defendant's attempts to smear Plaintiffs with 12 pages of irrelevant facts and a 926-page appendix provide no additional support for the Motion. This action involves matters well outside the experience of bankruptcy courts and requires adjudication in an Article III court.

Because the reasons for denying Defendant's Motion are also reasons that this Court should withdraw the reference under 28 U.S.C. § 157(d), and because deciding the same issue twice would be inefficient and unnecessary, Plaintiffs cross-move for withdrawal of the reference.

## II.

## BACKGROUND

Defendant's factual assertions include considerable bluster and vitriol, unsupported by the lengthy materials in its appendix. Importantly, the opening sentence under the heading "Factual Background" is unsupported and false. Memorandum of Law [Doc. 23] ¶ 7. Plaintiffs are not controlled or directed by James Dondero; Plaintiffs are both controlled and directed by Mark Patrick. APP_16-17, 22; *see also* APP_10-14; *see generally* APP_1-22. And Patrick's testimony to this extent went unchallenged in a hearing before the bankruptcy court earlier this month. *Id*.

Of equal importance is Defendant's assertion that all aspects of the Harbourvest settlement, including the valuation of the assets involved, were fully disclosed. Memorandum of Law [Doc. 23] ¶ 12. This statement is unsupported by the appendix cite accompanying it, which at most constitutes a self-serving denial. And it is a hotly contested issue between the parties. The impetus to this action, in fact, was Plaintiffs having learned that the value of the assets transferred in the Harbourvest settlement was *not* as represented. Original Complaint ("Complaint" [Doc. 1]), ¶¶ 36-

48. Plaintiffs disagree with much of the remainder of what Defendant presents as "fact" in its

Memorandum of Law. But Plaintiffs respectfully submit that none of it is relevant to resolution of

the present Motion. And so, for brevity's sake, Plaintiffs have not elected to engage in a blow-by-

blow effort to litigate those issues.

Instead, Plaintiffs' brief will focus on the nature of their causes of action as that pertains to

which court—district or bankruptcy—should preside over them.

III.

ARGUMENT & AUTHORITY

Plaintiffs respectfully submit that Defendant's Motion should be denied and Plaintiffs'

cross-motion granted for the reasons provided below:

**A. The Motion Should Be Denied Because Withdrawal of the Reference Is Mandatory**

Because the Complaint relies extensively on and largely is predicated on the Investment

Advisers Act of 1940, withdrawal of the reference to the bankruptcy court is mandatory here under

28 U.S.C. § 157(d). That statute requires withdrawal of the reference when a proceeding "requires

consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any
> party, for cause shown. The district court shall, on timely motion of a party,
> so withdraw a proceeding if the court determines that resolution of the
> proceeding requires consideration of both title 11 and other laws of the
> United States regulating organizations or activities affecting interstate
> commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement*

*Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited

jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere*

*& Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard*

---

*L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. 2011), for the proposition that, "[i]n

determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the

parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve

consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D.

Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) ("While that second clause [of § 157(d)] might not apply

when some 'other law' *only tangentially affects the proceeding*, it surely does apply when federal

labor legislation *will likely be material* to the proceeding's resolution.") (emphasis added).

Plainly here, the claims in the Complaint at least involve federal laws "regulating

organizations or activities affecting interstate commerce." The Advisers Act and the RICO statute

are such laws, and at least the first and fourth counts of the Complaint sound under them. *See, e.g.*,

Complaint ¶¶ 57 & n.5, 66, 69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers

Act and accompanying regulations), 114, 117, 131, 132 (invoking the RICO statute). Defendant's

entire argument against withdrawal of the reference thus turns on whether these laws "must be

considered."

It is remarkable that Defendant suggests these statutes need not be considered. The briefing

already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law

and the Advisers Act, including

1. Whether Defendant owed fiduciary duties under the Advisers Act that are
   unwaivable;

2. To whom such duties are owed and whether they were violated;

3. Whether such Advisers Act fiduciary duties can be terminated by a blanket release
   in a bankruptcy settlement;

4. Whether *res judicata* applies to bar claims for breach of Advisers Act duties that
   had not yet accrued at the time of the action alleged to have barred them;

---

5. Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

6. Whether such waivers can be enforced as to non-parties to the waiver;

7. Whether breach of Advisers Act fiduciary duties can serve as a predicate for civil RICO liability under the RICO statute, among other significant legal issues.

Presiding over this action most certainly will require consideration of all these issues.

Before joining the Fifth Circuit, Judge Clement addressed a motion similar to Defendant's during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, despite finding that the bankruptcy court had related-to jurisdiction. Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit.

*Id*. at *11.

Judge Clement rejected the argument Defendant parrots here that the case would "only involve the simple application of established federal securities laws." *Id*. at *7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id*. Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, [t]his federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id*. (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R.

---

393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where resolution requires more than simple application of federal securities laws, even though that court's determination was based solely on a review of the complaint's alleged violations of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

This authority applies here. In the Complaint, Plaintiffs allege violations of federal securities law (the Advisers Act), as well as the RICO statute. Deciding even the pending motion to dismiss will require far more than simple application of these laws. Nothing more is necessary to satisfy § 157(d). *Cf. In re IQ Telecomms., Inc.*, 70 B.R. 742, 745 (N.D. Ill. 1987) ("Nevertheless, Central's second amended complaint easily meets [the § 157(d)] standard. Count 2 of the complaint consists of 76 pages and alleges that 29 individuals and entities violated RICO by engaging in a pattern of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and 139 specific instances of bankruptcy fraud, 18 U.S.C. § 152.").

Although it is unnecessary here to demonstrate that Plaintiffs' Advisers Act allegations will require application of *underdeveloped* law, that is certainly the case. As the Third Circuit pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that federal law (the Advisers Act) provides "the duty and the standard to which investment advisers are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the "confusion [that this situation] engenders may explain why there has been *little development in either state or federal law* on the applicable standards." *Id.* (emphasis added). "Half a century later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research* [,*Inc.*, 375 U.S. 180, 192 (1963),] for a description of an investment adviser's fiduciary duties." *Id.* at 503;

---

*see also* Plaintiffs' Response to Motion to Dismiss (addressing Defendant's erroneous argument that the Advisers Act creates no private right of action).

This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

None of the cases Defendant cites even remotely suggests that this type of complicated litigation involving underdeveloped securities laws does not require "consideration" of federal laws. In its lead case, *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.)*, No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018), the court only held that a state-law contract claim did not require substantial reliance on federal law merely because it involved a trust created under federal law (the OCSLA). *Id*. at *16-17. Moreover, the court's determination appears to have relied primarily, if not solely, on the fact that the bankruptcy court had already submitted a memorandum opinion on the defendant's summary judgment motion, disposing of the case without the need to rely on non-bankruptcy federal law. *Id*. at *14-15, 17.

Next, Defendant cites *UPH Holdings, Inc. v. Sprint Nextel Corp*., No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349 (W.D. Tex. 2013), which is, at most, only slightly on point. There, the court declined to withdraw the reference with regard to a turnover action under the Bankruptcy Code, with little analysis other than having repeated the parties' arguments. Thus, it is difficult to draw any significance from the decision. But the court seems to rely on the fact that "the primary dispute center[ed] around the existence of a 'regulatory black hole,' a span of time during which the rules concerning how to set [a telecom] intercarrier compensation rate were left undetermined." *Id*. at *6. And for that reason, the court seemed to believe there was little non-bankruptcy federal

law to consider. *Id.* at 7. Here, in contrast, the causes of action do not arise under the Bankruptcy

Code, and there is an extensive regulatory scheme that, plainly, must be considered.

The other cases Defendant cites add little to the analysis, except that *S. Pac. Transp. Co. v.

Voluntary Purchasing Gps*, 252 B.R. 373, 382 (E.D. Tex. 2000), holds against Defendant's

position, having determined that even the court's "limited" role in approving a CERCLA

settlement "necessarily involves the substantial and material consideration of CERCLA and not

merely its straightforward application to the facts of this case." *Id.* at 384. The court's reason for

this conclusion: its decision "will require the court to examine the unique facts of the case in light

of those CERCLA provisions which create the causes of action at issue." *Id.* Of course, the same

examination will be necessary here.

Notably, in *S. Pac. Transp.*, the court also stated, "[i]t is well settled that CERCLA is a

statute "'rooted in the commerce clause' and is precisely 'the type of law . . . Congress had in mind

when it enacted the statutory withdrawal provision [in § 157(d)].'" *Id.* at 382 (quoting *In re Nat'l

Gypsum Co.*, 134 B.R. 188, 191 (N.D. Tex. 1991), (alterations in original)). The court could just

as easily have been talking about the Advisers Act. *See* 15 U.S.C. § 80b-1 ("Upon the basis of

facts disclosed by the record and report of the Securities and Exchange Commission made pursuant

to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed

and ascertained, it is hereby found that investment advisers are of national concern, in that, among

other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished

and distributed, and their contracts, subscription agreements, and other arrangements with clients

are negotiated and performed, by the use of the mails and means and instrumentalities of interstate

commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily

relate to the purchase and sale of securities traded on national securities exchanges and in interstate

over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.").

In sum, the Complaint alleges violations of non-bankruptcy federal law. In presiding over the case—indeed, in addressing the currently pending Motion to Dismiss—this Court will have to substantially and materially consider those laws and their interplay with bankruptcy law. Under § 157(d), this requires withdrawal of the reference, and Defendant's motion should be denied.

**B. Automatic Referral Is Unnecessary and Would Be Inefficient**

As noted previously, Judge Clement's ruling in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. 1996), establishes that reference to the bankruptcy court—only to have the reference withdrawn—is unnecessary:

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. *Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit*.

*Id*. at *11 (emphasis added).

Defendant nonetheless argues this Court must do precisely that. Plaintiffs submit this is both wrong and tenuous, because at this stage of the bankruptcy proceedings—post confirmation—it is unclear that the bankruptcy court has jurisdiction at all.

---

1.  **The causes of action asserted by the Plaintiffs do not "arise under," or "arise in" Title 11 and are not "core" proceedings.**

In the Complaint, Plaintiffs do not seek relief that would undo or reverse any settlement approved by the bankruptcy court. Neither do they attempt an end run around the provisions of any approval, Defendant's protestations notwithstanding. A proper jurisdictional analysis demonstrates Plaintiffs' causes of action asserted here are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

First of all, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case*." Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.*), 453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011*); Davis v. Life Inv'rs Ins. Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Tech*s., 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

Second, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); *Stern v. Marshall*, 564 U.S. 462, 476 (2011).

---

Third, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

Fourth and finally, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, *not their particular factual circumstance*, could *only* arise in the context of a bankruptcy case." *Legal Xtranet, Inc*., 453 B.R. at 708–09 (emphasis added) (citing *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). Defendants contend that, because the factual circumstances giving rise to the causes of action included the HarbourVest Settlement, which was approved by the bankruptcy court, this somehow transforms these causes of action into core claims. *See* Memorandum of Law ¶ 36. But it is the nature of the causes of action that determines whether they are core, not their "particular factual circumstance."

To illustrate the point, in *Gupta v. Quincy Med. Ctr.,* 858 F.3d 657, 660 (1st Cir. 2017), the bankruptcy court issued a sale order which approved an asset purchase agreement whereby the purchaser became obligated to make certain payments to employees. The purchaser failed to make these payments so the employees sued the purchaser in bankruptcy court, and the bankruptcy rendered a judgment in favor of the employees. On appeal, the district court concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims plainly related to and

existing only because of the approved sale order that gave rise to them. The First Circuit affirmed,

explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a bankruptcy case
> does not ipso facto mean that the proceeding qualifies as an 'arising in' proceeding.
> Instead, the fundamental question is whether the proceeding by its nature, *not its
> particular factual circumstance*, could arise only in the context of a bankruptcy
> case. In other words, it is not enough that Appellants' claims arose in the context
> of a bankruptcy case or even that those claims exist only because Debtors
> (Appellants' former employer) declared bankruptcy; rather, "arising in"
> jurisdiction exists only if Appellants' claims are the type of claims that can only
> exist in a bankruptcy case.

*Id*. at 664–65 (emphasis added).

Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context of a

transaction approved in a bankruptcy case. But obviously, the causes of action are not "the type of

claims that can only exist in a bankruptcy case." And that ends the analysis. Because Plaintiffs'

causes of action do arise under the Bankruptcy Code, and because they are not claims that could

only arise in the context of bankruptcy, this action is not a core proceeding.

### 2. The Bankruptcy Court has limited post-confirmation "related to" jurisdiction.

Plaintiffs do not contest that this action is related to the bankruptcy case in some fashion.

That is why they amended the Civil Cover Sheet to note the bankruptcy matter. But "related to"

jurisdiction is a term of art with differing requirements depending on the status of the bankruptcy

case. In its current, post-confirmation status, Plaintiffs submit that the bankruptcy court lacks even

"related to" jurisdiction over this action.

"Related to" jurisdiction is meant to avoid piecemeal adjudication and promote judicial

economy by aiding in the efficient and expeditious resolution of all matters connected to the

debtor's estate. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir.1995).

Importantly, proceedings merely "related to" a case under title 11 are considered "non-core"

---

proceedings. *Stern*, 564 U.S. at 477; Collier on Bankruptcy ¶ 3.02[2], p. 3–26, n.5 (16th ed. 2010)

("The terms 'non-core' and 'related' are synonymous."). The jurisdictional standard for related to

jurisdiction varies depending on whether the proceeding at issue was commenced pre or post

confirmation. *See Beitel v. OCA, Inc. (In re OCA, Inc.),* 551 F.3d 359, 367 at n.10 (5th Cir. 2008).

And "after confirmation of a reorganization plan, a stricter post-confirmation standard applies."

*See Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388,

390–91 (5th Cir.2001) (explaining this distinction).

Essentially, "after a debtor's reorganization plan has been confirmed, the debtor's estate,

and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the

implementation or execution of the plan." *Id*. 266 F.3d at 390; *Faulkner v. Eagle View Capital

Mmgt. (In re The Heritage Org., L.L.C.),* 454 B.R. 353, 358 (Bankr. N.D. Tex. 2011).

Here, on February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the

Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and

(II) Granting Related Relief* [Bankruptcy Court Dkt. No. 1943]. The Complaint was filed on April

12, 2021. Thus, the proceeding was commenced post confirmation.

Defendant does not argue that this action involves "matters pertaining to the

implementation or execution of the plan," as required under *Craig's Stores*. It does not even cite

to that authority. Certainly Plaintiffs can think of no way that their action affects plan

implementation or execution. Thus, it seems, Defendant's argument for bankruptcy court

jurisdiction fails entirely.

While Defendant does argue that the bankruptcy court has "related to" jurisdiction as a

result of a judgment potentially reducing available cash to pay creditors under the Confirmed Plan,

Memorandum of Law ¶ 39, this is precisely the argument that the Fifth Circuit rejected in *Craig's*

---

*Stores.* See *Coho Oil & Gas, Inc. v. Finley Res., Inc.* (*In re Coho Energy, Inc.*), 309 B.R. 217, 220 (Bankr. N.D. Tex. 2004) (recognizing the rejection of this argument). As the Fifth Circuit explained: "while Craig's insists that the status of its contract with the Bank will affect its distribution to creditors under the plan, the same could be said of any other post-confirmation contractual relations in which Craig's is engaged." 266 F.3d at 391. And that type of effect does not meet the threshold for post-confirmation related-to jurisdiction.

Defendant also contends that there is post-confirmation "related to" jurisdiction because the lawsuit will delay payments to creditors under the Confirmed Plan. *Id.* But this is just a re-packaged reduction-in-assets argument. The same would be true of any post-confirmation lawsuit against Defendant and does not meet the "more exacting theory of post-confirmation bankruptcy jurisdiction" required by *Craig's Stores.*

Defendant may argue that the bankruptcy court's confirmation order has not yet gone effective due to having been appealed. But even if this distinction matters, at minimum, there ought to be a sliding scale toward narrower application of "related to" jurisdiction once the bankruptcy court has issued a final confirmation order. *See Montana v. Goldin (In re Pegasus Gold Corp.),* 394 F.3d 1189, 1194 (9th Cir. 2005) (stating "post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction, and … the *Pacor* formulation [used to analyze related-to jurisdiction] may be somewhat overbroad in the post-confirmation context"); *Faulkner v. Kornman*, No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) (stating "[t]he general rule is that post-confirmation subject matter jurisdiction is limited"); *Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp (In re Am. Home Mortg. Holding)*, 477 B.R. 517, 529-30 (Bankr. D. Del. 2012) (stating "[a]fter confirmation… the test for 'related to 'jurisdiction becomes more

---

stringent if the plaintiff *files* its action after the confirmation date") (emphasis in original); *cf.*
*rabbd*

v. *Rochford*, 947 F.2d 829, 832 n.1 (7th Cir. 1991) (noting that "after a bankruptcy is over,
it may well be more appropriate to bring suit in district court").

Finally, the retention of jurisdiction in the confirmed plan does nothing to alter the forgoing
analysis. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). A bankruptcy court may not
"retain" jurisdiction it does not have. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).
"[N]either the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting
a retention of jurisdiction provision in a plan of reorganization if jurisdiction otherwise is lacking."
*Valley Historic Ltd. P'ship. v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *see also Zerand–
Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("[O]rders approving [a] bankruptcy
sale [or] . . . plan of reorganization . . . [cannot] confer jurisdiction. A court cannot write its own
jurisdictional ticket.").

## C. The Res Judicata Argument Is Not Relevant to the Relief Sought in This Motion

Defendant's *res-judicata* argument does not belong in this Motion. It has no bearing on the
issue presented here. This is because, to begin with, *res judicata* is always addressed by the second
court in the second action. *See, e.g., Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc.
(In re Braniff Airways, Inc).*, 783 F.2d 1283 (5th Cir. 1986); *Davis v. Dall. Area Rapid Transit*,
383 F.3d 309 (5th Cir. 2004); *Travelers Ins. Co. v. St. Jude Hosp.*, 37 F.3d 193 (5th Cir. 1994);
*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203
F.3d 914 (5th Cir. 2000); *Risby v. United States*, No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS
8798 (N.D. Tex. 2006); *Chalmers v. Gavin*, 2002 U.S. Dist. LEXIS 5636, 2002 WL 511512 (N.D.
Tex. Apr. 2, 2002); *Reynolds v. Tombone*, Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS

9995 (N.D. Tex. June 24, 1999). Moreover, *res judicata* is not a basis for referring a matter to the bankruptcy court, and Defendant offers no authority for the notion that it is.

Instead of arguing that its *res judicata* affirmative defense should result in referral to the bankruptcy court, Defendant argues that "the Complaint . . . must be dismissed on the basis of *res judicata*. Memorandum of Law at 24; *see also id.* at 23 (subheading: "The Complaint Is Barred by the Doctrine of Res Judicata"). But dismissal is the relief sought in Defendant's pending Motion to Dismiss, which raises the same *res judicata* arguments asserted here. Plaintiffs therefore will address *res judicata* in their concurrently filed response to the Motion to Dismiss.

**D. The Local Rule 3.3 Argument Is Unavailing**

Defendant argues that Plaintiffs failed to disclose the related bankruptcy case by omitting it on the Civil Cover Sheet accompanying the Complaint, although Defendant does not request that the Court take any action as a result of the omission.

Plaintiffs submit that the omission was inadvertent, harmless, and has been corrected. The omission was inadvertent in that Plaintiffs intended to identify the Highland bankruptcy on the Civil Cover Sheet but inadvertently failed to do so and have since submitted an amended Civil Cover Sheet correcting the error. [Doc. 33]. The omission was harmless because the Complaint discloses both the bankruptcy and its relationship to the present action, a disclosure that was supplemented by Plaintiffs' Motion for Leave to Amend, which provides additional detail regarding the related bankruptcy case and attaches two orders issued in that case. Complaint ¶¶ 15-36; Motion for Leave and Exhibits [Docs. 6, 6-1, 6-2].

Defendant refers the Court to *Kuzmin v. Thermaflo.*, No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at *4-7 (E.D. Tex. May 20, 2009), for the proposition that failing to disclose a related case is a violation of the Local Rules. In *Kuzmin*, however, the plaintiff was faulted for

---

numerous failings, including (1) the failure to submit a Civil Cover Sheet at all, (2) the failure, upon receiving notice of the deficiency, to provide sufficient information for the clerk to identify the related action, and (3) filing a third action without any information indicating it was related to the previous two. *Id*. at *5. The court continued, finding that plaintiff's counsel in that case had also committed violations of the mandate for professionalism in the Texas Lawyer's Creed by failing to communicate about the filings with known counsel for the opposition. *Id*. at *6-12.

Plaintiffs respectfully submit that the *Kuzmin* case is inapposite. Plaintiffs here did not fail to submit a Civil Cover Sheet. They corrected the omission after it was brought to their attention, and their original filing did disclose, in the text of the Complaint, the information that was inadvertently omitted from the Civil Cover Sheet. Further, Plaintiffs here communicated promptly with counsel for the Defendant regarding the action and the related bankruptcy case by asking the Defendant's counsel in the related action if they would accept service of the Complaint and whether they objected to Plaintiffs' Motion for Leave to Amend.

These circumstances, Plaintiffs submit, do not rise to the level of a violation of Local Rule 3.3 or, alternatively, they constitute a harmless, corrected error at most. Plaintiffs ask the Court to treat them as no worse than Defendant's failure to include a certificate of conference with this Motion (Local Rule 7(h)), or its failure to confer with Plaintiffs' counsel before filing it (Local Rule 7(a)), or its failure to paginate its appendix consecutively (Local Rule 7(i)).

Finally, Plaintiffs submit that the omission complained of does not justify or even relate to the relief sought in this Motion.

## E. The Litigious-Nature Argument Is Likewise Unavailing

Defendant's claims regarding James Dondero's litigiousness are likewise unconnected to the relief they are requesting here. Dondero is not a party to this case. Neither does he control either Plaintiff. APP_16-17.

For this argument, Defendant relies solely on *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 F. App'x 741 (5th Cir. 2021), and 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Neither authority addresses whether jurisdiction appropriately lies here or in the bankruptcy court. It appears that they are cited here merely to raise the specter of potential sanctions.

Plaintiffs respectfully submit that their claims here have merit and are not frivolous. And Defendant's contrary position can and should be addressed in connection with Defendant's pending motion under Rule 12(b)(6) rather than in connection with this Motion.

## F. Plaintiffs' Cross-Motion Should Be Granted

For the same reasons Defendant's Motion should be denied, Plaintiffs' cross-motion should be granted. Presiding over this action will require consideration of non-bankruptcy federal laws regulating interstate commerce, as well as their interplay with the Bankruptcy Code. Thus, the mandatory-withdrawal-of-the-reference provision of 28 U.S.C. § 157(d) applies.

Moreover, the bankruptcy court's jurisdiction is limited, both by § 157(d) and by plan confirmation. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *Bank of La. v. Craig's*

---

*Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390–91 (5th Cir.2001) (explaining that, "after confirmation of a reorganization plan, a stricter post-confirmation standard applies," and "after a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't,* No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.). Thus, this Court should deny Defendant's Motion, withdraw the reference under § 157(d), and retain jurisdiction over this action.

## VI.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully submit Defendant's Motion should be denied.

Dated:  June 29, 2021                    Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         _/s Jonathan Bridges_
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         JPMorgan Chase Tower
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                            jeb@sbaitilaw.com

                                         **Counsel for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE THE ORDER OF REFERENCE AND CROSS-MOTION

| App'x No. | Description | Bates Range |
|---|---|---|
| 1 | Declaration of Jonathan Bridges | APP_002 |
| 2 | Excerpts from June 8, 2021 Transcript of Hearing of Show Cause, Motion to Modify Order Authorizing Retention of James Seery, and Motion for Order Further Extending the Period Within Which Debtor May Remove Actions | APP_003 - 019 |
| 3 | DAF/CLO Holdco Structure Chart introduced as Exhibit 25 in Hearing of Show Cause, Motion to Modify Order Authorizing Retention of James Seery, and Motion for Order Further Extending the Period Within Which Debtor May Remove Actions | APP_020 - 022 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| ***Defendants.*** | § | |

### DECLARATION OF JONATHAN BRIDGES

1.      My name is Jonathan Bridges. I am over twenty-one years old and fully competent in all respects to make this Declaration.

2.      I am a partner at Sbaiti & Company PLLC, and I represent Plaintiffs Charitable DAF Fund, L.P. and CLO Holdco, Ltd. in this matter. The facts stated in this Declaration are based on my personal knowledge.

3.      Attached as Exhibit 1 is a true and correct copy of excerpts from a June 8, 2021 transcript of a hearing before the bankruptcy court at which Mr. Mark Patrick provided sworn testimony regarding Plaintiffs, his right to control them, and Mr. James Dondero's lack of any such right.

4.      Attached as Exhibit 2 is a true and correct copy of Exhibit 25 from that same hearing, which is proved up by Mr. Patrick's testimony in Exhibit 1, and which constitutes an organizational chart depicting the corporate relationships described in the testimony.

Executed on June 29, 2021.

*/s/ Jonathan Bridges*
Jonathan Bridges

# EXHIBIT 1

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                      )   Case No. 19-34054-sgj-11
In Re:                                )   Chapter 11
                                      )
HIGHLAND CAPITAL                      )   Dallas, Texas
MANAGEMENT, L.P.,                     )   Tuesday, June 8, 2021
                                      )   9:30 a.m. Docket
         Debtor.                      )
                                      )   - SHOW CAUSE HEARING (2255)
                                      )   - MOTION TO MODIFY ORDER
                                      )     AUTHORIZING RETENTION OF
                                      )     JAMES SEERY (2248)
                                      )   - MOTION FOR ORDER FURTHER
                                      )     EXTENDING THE PERIOD WITHIN
                                      )     WHICH DEBTOR MAY REMOVE
                                      )     ACTIONS (2304)
_____)

                       TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             Gregory V. Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Debtor:              Zachery Z. Annable
                             HAYWARD & ASSOCIATES, PLLC
                             10501 N. Central Expressway,
                              Suite 106
                             Dallas, TX  75231
                             (972) 755-7104
```

Case 21-03067-sgj   Doc 37   Filed 09/29/21   Entered 09/29/21 18:09:39   Desc Main
Case 3:21-cv-01584-B   Document 1689   Filed 09/30/22   Page 45 of 210   PageID 7001

2

```
 1    APPEARANCES, cont'd.:

 2    For the Charitable DAF,     Mazin A. Sbaiti
      CLO Holdco, Show Cause      Jonathan E. Bridges
 3    Respondents, Movants,       SBAITI & COMPANY, PLLC
      and Sbaiti & Company:       Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6    For Mark Patrick:           Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9    For Mark Patrick:           Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12    For James Dondero:          Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
      For the Official Committee  Matthew A. Clemente
17    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
      For the Official Committee  Paige Holden Montgomery
20    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
      Recorded by:                Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

3

1   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX   76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.
25

Case 21-03067-sgj   Doc 37   Filed 09/29/21   Entered 09/29/21 18:09:39   Desc Main
Case 3:23-cv-01034-B Document 1889t Filed 08/17/22   Page 47 of 210   PageID 2803

Patrick - Direct                           95

 1  our witness stand and I'll swear you in.  Please raise your

 2  right hand.

 3       (The witness is sworn.)

 4            THE COURT:  All right.  Please take a seat.

 5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7  BY MR. MORRIS:

 8  Q    Good afternoon, Mr. Patrick.

 9  A    Good afternoon.

10  Q    Can you hear me okay?

11  A    Yes, I can.

12  Q    Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18       Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A    I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q    Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A    That is my understanding, correct.

25  Q    And your understanding is that Mr. Dondero doesn't have an

Case 21-03067-sgj   Doc 37   Filed 09/29/21   Entered 09/29/21 18:09:39   Desc Main
Case 3:21-cv-01534-B-BD   Document 1889   Filed 09/30/22   Page 48 of 210   PageID 7904

Patrick - Direct                              118

1   Q   Okay.  Let's talk for a little bit about the line of

2   succession for the DAF and CLO Holdco.  Can we please go to

3   Exhibit 25, which is in the other binder?  It's in the other

4   binder, sir.

5       (Pause.)

6   Q   I guess you could look on the screen or you can look in

7   the binder, whatever's easier for you.

8   A   Yeah.  I prefer the screen.  I prefer the screen.

9   Q   Okay.

10  A   It's much easier.

11  Q   All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A   Yes, I do.

14  Q   All right.  Do you know what it is?

15  A   This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20          MR. MORRIS:  Your Honor, may I interrupt?

21          THE COURT:  You may.

22          MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q   I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

Case 21-03067-sgj    Doc 37    Filed 09/29/21    Entered 09/29/21 18:09:39    Desc Main
Case 3:21-cv-01805-B-BD    Document 1689    Filed 09/29/22    Page 49 of 210    PageID 7005

Patrick - Direct                              119

 1  to tell me.  But I just want to understand what this chart is.

 2  This chart is the DAF, CLO Holdco, structure chart.  Correct?

 3  A    Correct.

 4  Q    Okay.  And you were personally involved in creating this

 5  organizational structure, correct?

 6  A    I -- yes.

 7  Q    Okay.  And from time to time, the Charitable DAF Holdco

 8  Limited distributes cash to the foundations that are above it.

 9  Correct?

10  A    Correct.

11  Q    All right.  I want to talk a little bit more specifically

12  about how this happens.  The source of the cash distributed by

13  Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14  entity, the Cayman Islands entity near the bottom.  Correct?

15        MR. ANDERSON:  Your Honor, I have an objection.

16  Completely irrelevant.  I'm objecting on relevance grounds.

17  This has nothing to do with the contempt proceeding.  We've

18  already gone over that he authorized the filing of the

19  complaint, that he authorized the filing of the motion to

20  amend.  It's all in the record.  This is completely irrelevant

21  at this point.

22        THE COURT:  Okay.  Relevance objection.  Your

23  response?

24        MR. MORRIS:  I believe that it's relevant to the

25  Debtor's motion to hold Mr. Dondero in contempt for pursuing

Patrick - Direct                               127

1    transaction, because I was not a part of it -- that by Mr.

2    Dondero holding that GP interest, that it would be -- the

3    Plaintiffs, if you will, would be an affiliate entity for

4    regulatory purposes, and so he advised that if he -- if Mr.

5    Dondero transferred his GP interest to Mr. Scott, it would no

6    longer be an affiliate, is my recollection.

7    Q    Okay.  You didn't appoint Mr. Scott, did you?

8    A    No.

9    Q    That was Mr. Dondero.  Is that right?

10   A    Yes.

11   Q    Okay.  Let's go to 2021.  Let's come back to the current

12   time.  Sometime in February, Mr. Scott called you to ask about

13   the mechanics of how he could resign.  Correct?

14   A    That is correct.

15   Q    But the decision to have you replace Mr. Scott was not

16   made until March 24th, the day you sent an email to Mr. Scott

17   with the transfer documents.  Correct?

18   A    That is correct.

19   Q    And it's your understanding that he could have transferred

20   the management shares and control of the DAF to anyone in the

21   world.  Correct?

22   A    Correct.

23   Q    That's what the docu... that he had the authority under

24   the documentation, as you understood it, to freely trade or

25   transfer the management shares.  Correct?

Case 21-03067-sgj    Doc 37    Filed 09/29/21    Entered 09/29/21 18:09:39    Desc Main
Case 3:23-cv-01503-B Document 88    Filed 06/19/2022    Page 51 of 210    PageID 2407

Patrick - Direct                              128

 1   A    Wait.  Now, let's be precise here.

 2   Q    Okay.

 3   A    Are you talking about the GP interests or the management

 4   shares held by Charitable DAF Holdco, Ltd.?

 5   Q    Let's start with the management shares.  Can you explain

 6   to the Court what the management shares are?

 7              MR. ANDERSON:  Your Honor?  Hang on one second.  Your

 8   Honor, I want to object again on relevance.  We're going way

 9   beyond the scope of the contempt issue, whether or not --

10              MR. MORRIS:  This is about control.

11              MR. ANDERSON:  -- the motion to amend somehow

12   violated the prior order of this Court.  Getting into the

13   management structure, transfer of shares, that's way outside

14   the bounds.  I object on relevance.

15              THE COURT:  Okay.  Relevance objection?

16              MR. MORRIS:  Your Honor, they have probably 30

17   documents, maybe 20 documents, on their exhibit list that

18   relate to management and control.  I'm asking questions about

19   management and control.  Okay?  This is important, again, to

20   (a) establish his authority, but (b) the circumstances under

21   which he came to be the purported control person.

22              THE COURT:  Okay.  Overruled.  Go ahead.

23              THE WITNESS:  It might be helpful to look at the

24   organizational chart, but if not -- but I'll describe it to

25   you again.  With respect to the entity called --

 1          MR. MORRIS:  Hold on one second.  Can we put up the

 2   organizational chart again, Ms. Canty, if you can?  There you

 3   go.

 4          THE WITNESS:  Okay.  So with respect to the

 5   Charitable DAF Holdco, Ltd., it is my understanding that Mr.

 6   Scott, he organized that entity when he was the independent

 7   director of the Charitable Remainder Trust, and he caused the

 8   issuance of the management shares to be issued to himself.

 9   And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11          And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q    Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A    It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

Case 21-03067-sgj    Doc 37    Filed 09/29/21    Entered 09/29/21 18:09:39    Desc Main
Case 3:23-cv-01503-B Document 089 Filed 06/19/2022 Page 53 of 210 PageID 2009

Patrick - Direct                    130

1    member-managed Delaware limited liability company.  And from

2    that, he -- that authority kind of trickles down to where he

3    can appoint directorships.

4    Q    All right.  I think I want to just follow up on that a

5    bit.  Which entity is the issuer of the manager shares, the

6    management shares?

7    A    Yeah, the -- per the organizational chart, it is accurate,

8    it's the Charitable DAF Holdco, Ltd. which issued the

9    management shares to Mr. Scott.

10   Q    Okay.  And that's why you have the arrow from Mr. Scott

11   into that entity?

12   A    Correct.

13   Q    And do those -- does the holder of the management shares

14   have the authority to control the Charitable DAF Holdco, Ltd.?

15   A    Yes.

16   Q    Okay.  And as the control person for the Charitable DAF

17   Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18   Holdco Limited owns a hundred percent of the limited

19   partnership interests of the Charitable DAF Fund, LP.

20   Correct?

21   A    Correct.

22   Q    And so does the holder of that hundred percent limited

23   partnership interest have the authority to decide who acts on

24   behalf of the Charitable DAF Fund, LP?

25   A    I would say no.  I mean, you know, just -- I would love to

APP. 013

Case 21-03067-sgj    Doc 37    Filed 09/29/21    Entered 09/29/21 18:09:39    Desc Main
Case 3:23-cv-01503-B    Document 1-1    Filed 06/14/22    Page 54 of 210    PageID 2510

Patrick - Direct                    131

1    read the partnership agreement again.  But I, conceptually,

2    what I know with partnerships, I would say the limited partner

3    would not.  It would be through the Charitable DAF GP, LLC

4    interest.

5    Q    The one on the left, the general partner?

6    A    The general partner.

7    Q    I see.  So when Mr. Scott transferred to you the one

8    hundred percent of the management shares as well as the title

9    of the managing member of the Charitable DAF GP, LLC, did

10   those two events give you the authority to control the

11   entities below it?

12   A    Yes.

13   Q    Thank you.  And so prior to the time that he transferred

14   those interests to you, is it your understanding that Mr.

15   Scott had the unilateral right to transfer those interests to

16   anybody in the world?

17   A    Yes.

18   Q    Okay.  And you have that right today, don't you?

19   A    Yes, I do.

20   Q    If you wanted, you could transfer it to me, right?

21   A    Yes, I could.

22   Q    Okay.  But of all the people in the world, Mr. Scott

23   decided to transfer the management shares and the managing

24   member title of the DAF GP to you, correct?

25   A    Restate that question again?

App. 1014

Patrick - Direct                          132

1  Q   Of all the people in the world, Mr. Scott decided to

2  transfer it to you, correct?

3  A   Yeah.  Mr. Scott transferred those interests to me.

4  Q   Okay.  And you accepted them, right?

5  A   Yes.

6  Q   You're not getting paid anything for taking on this

7  responsibility, correct?

8  A   I am not paid by any of the entities depicted on this

9  chart.

10  Q   And Mr. Scott used to get $5,000 a month, didn't he?

11  A   I believe that's what he testified to.

12  Q   Yeah.  But you don't get anything, right?

13  A   Correct.

14  Q   In fact, you get the exact same salary and compensation

15  from Skyview that you had before you became the authorized

16  representative of the DAF entities and CLO Holdco.  Correct?

17  A   Correct.

18          MR. MORRIS:  Okay.  Your Honor, if I may just take a

19  moment, I may be done.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, I have no further questions.

23          THE COURT:  All right.  Pass the witness.  Any

24  examination of the witness?

25                          CROSS-EXAMINATION

Case 21-03067-sgj    Doc 37    Filed 09/29/21    Entered 09/29/21 18:09:39    Desc Main
Case 3:23-cv-01503-B  Document 38-1  Filed 06/16/22  Page 56 of 210  PageID 2012

Patrick - Cross                          136

1  Q    So did Mr. Dondero both have the control shares of the GP,

2  LLC and DAF Holdco Limited?

3  A    No, I believe not.  I believe he only held the Charitable

4  DAF GP interest and that Mr. Scott at all times held the

5  Charitable DAF Holdco, LTD interest, until he decided to

6  transfer it to me.

7  Q    Can you just tell us how Mr. Scott came to hold the

8  control shares of the Charitable DAF Holdco, LTD?

9  A    When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q    And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A    Yes, it does.

16  Q    What kind of control is that?

17  A    I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A    Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q    So nine years ago?

Patrick - Cross                    137

1    A    Yes.

2    Q    Does Mr. Dondero today exercise any control over the

3    activities of the DAF Charitable -- the Charitable DAF, GP or

4    the Charitable DAF Holdco, LTD?

5    A    No.

6    Q    Is he a board member of sorts for either of those

7    entities?

8    A    No.

9    Q    Is he a board members of CLO Holdco?

10   A    No.

11   Q    Does he have any decision-making authority at CLO Holdco?

12   A    None.

13   Q    The decision to authorize the lawsuit and the decision to

14   authorize the motion that you've been asked about, who made

15   that authorization?

16   A    I did.

17   Q    Did you have to ask for anyone's permission?

18   A    No.

19             MR. SBAITI:  No more questions, Your Honor.

20             THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21        All right.  Any redirect?

22                        REDIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q    Since becoming the authorized representative of the

25   Plaintiffs, have you ever made a decision on behalf of those

Case 21-03067-sgj    Doc 37    Filed 09/29/21    Entered 09/29/21 18:09:39    Desc Main
Case 3:23-cv-01503-B    Document 881    Filed 06/12/2022    Page 58 of 210    PageID 2014

Patrick - Cross                          138

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13           MR. MORRIS:  Okay.  No further questions, Your Honor.

14           THE COURT:  Any further examination?  Recross on that

15  redirect?

16           MR. ANDERSON:  No further questions.

17           MR. SBAITI:  No further questions, Your Honor.

18           MR. ANDERSON:  Sorry.

19           THE COURT:  Nothing?

20           MR. ANDERSON:  I think we're good.

21           THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24           THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

296

1          THE COURT:  I guess I'll see you Thursday on the

2   WebEx.  Thank you.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 6:00 p.m.)

5                       --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                              **06/09/2021**

24  _____          _____
    Kathy Rehling, CETD-444                              Date
25  Certified Electronic Court Transcriber


001756

# EXHIBIT 2

App. 020

# EXHIBIT 25

App. 022

**DAF/CLO Holdco
Structure Chart**

GScott000007

001759

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **Highland CAPITAL MANAGEMENT,** | § | |
| **L.P., Highland HCF ADVISOR, LTD.,** | § | |
| **and Highland CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| ***Defendants.*** | § | |

## PLAINTIFFS' RESPONSE TO MOTION TO DISMISS COMPLAINT

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
 Texas Bar No. 24058096
**Jonathan Bridges**
 Texas Bar No. 24028835
J.P. Morgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
      jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................... 2

III.    LEGAL STANDARD .......................................................................................... 5

IV.     THE PRECLUSION DOCTRINES DO NOT APPLY ...................................... 5

        A.      Highland's Preclusion Defenses Fail ...................................................... 5

                1.      *Res Judicata* Does Not Apply Because the Court's 9019
                        Order Does Not Specifically Release Plaintiff's Claims or
                        Resolve them on the Merits ......................................................... 6

                2.      The Bankruptcy Court Was Not a Court of Proper Jurisdiction
                        to Hear the Causes of Action ....................................................... 9

                3.      The Claims Do Not Arise Out of the Same Nucleus of
                        Operative Facts ......................................................................... 10

                4.      Highland's Litany of Attachments Changes Nothing................... 10

        B.      Judicial Estoppel Fails ......................................................................... 12

V.      PLAINTIFFS HAVE STATED A CLAIM FOR RELIEF ................................. 13

        A.      The Motion Fails Under Rule 12(g) and is Premature............................ 13

        B.      Plaintiffs Have Pled Claims for Breach of Fiduciary Duty..................... 13

                1.      The Complaint Pleads that Highland and HCFA Owe
                        Fiduciary Duties Under the Advisers Act and Other
                        Bases........................................................................................ 14

                2.      The Fiduciary Duties Imposed by the Advisers Act Are
                        Actionable Under Texas Law and Are Owed to Investors
                        Like CLO Holdings.................................................................... 16

                3.      Plaintiffs Have Alleged Several Breaches of Fiduciary
                        Duty.......................................................................................... 20

                4.      Rule 9(b) Does Not Apply—But Even if it Did, it Has Been Met .............. 22

i

001761

C.      Plaintiff CLO Holdco Has Pled a Claim for Breach of Contract and
        Tortious Interference ...................................................................................23

D.      Plaintiffs Have Pled a Claim for Negligence ..............................................25

E.      Plaintiffs Have Pled a Cause of Action Under RICO ...................................25

        1.      Highland is a "RICO" Person ............................................................26

        2.      Plaintiffs Have Pled a RICO "Enterprise" .......................................26

        3.      Plaintiffs Have Pled a Pattern of Racketeering Activity
                With Particularity ............................................................................27

        4.      Plaintiffs Have Pled a Basis to Infer Scienter ...............................31

        5.      Plaintiffs Have Pled Injury to Their Business or Property
                Due to the RICO Violations ..............................................................32

        6.      Highland's Defenses Are Legally Infirm or Improper at the
                12(b)(6) Stage ...................................................................................33

VI.     MOTION FOR LEAVE TO AMEND ..........................................................................34

VII.    CONCLUSION .........................................................................................................35

001762

# TABLE OF AUTHORITIES

## **Cases**

*Abraham v. Singh,*
480 F.3d 351 (5th Cir. 2007) ......................................................................25, 27

*Aloe Creme Labs., Inc. v. Francine Co.,*
425 F.2d 1295 (5th Cir. 1970) ..........................................................................19

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.),*
203 F.3d 914 (5th Cir. 2000) ......................................................................... 6-7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................................5

*Basic Capital Mgmt. v. Dynex Commer., Inc.,*
402 S.W.3d 257 (Tex. App.—Dallas 2013).......................................................24

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007).............................................................................................5

*Belmont v. MB Inv. Partners, Inc.,*
708 F.3d 470 (3d Cir. 2013)........................................................................17, 18

*Benson & Ford, Inc. v. Wanda Petroleum Co.,*
833 F.2d 1172 (5th Cir. 1987) ..........................................................................11

*Bridge v. Phx. Bond & Indem. Co.,*
553 U.S. 639 (2008).....................................................................................32, 33

*Chalmers v. Gavin,*
No. 3:01-CV-528-H, 2002 U.S. Dist. LEXIS 5636 (N.D. Tex., Apr. 2, 2002) ........................8

*Collins v. Morgan Stanley Dean Witter,*
224 F.3d 496 (5th Cir. 2000) .............................................................................5

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.),*
68 F.3d 914 (5th Cir. 1995) ................................................................................8

*Crowe v. Henry,*
43 F.3d 198 (5th Cir. 1995) ........................................................................26, 27

*Cudd Pressure Control, Inc. v. Roles,*
328 F. App'x 961 (5th Cir. 2009).......................................................................14

iii

001763

*Davis v. Dall, Area Rapid Transit*,
383 F.3d 309 (5th Cir. 2004) ...............................................................6

*Douglass v. Beakley*,
900 F. Supp. 2d 736 (N.D. Tex. 2012) ...................................................16

*Dussouy v. Gulf Coast Inv. Corp.,*
660 F.2d 594 (5th Cir. 1981) ...............................................................34

*Fuqua v. Taylor*,
683 S.W. 2d 735 (Tex. App.—Dallas 1984)...........................................16

*Goldenson v. Steffens*,
No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 201258 (D. Me. 2014)............................17

*Hall v. GE Plastic Pac. PTE Ltd.*,
327 F.3d 391 (5th Cir. 2003) ...............................................................13

*Hand v. Dean Witter Reynolds, Inc.*,
889 S.W. 2d 483 (Tex. App.—Houston [14th Dist.] 1994)........................16

*Harrison Co. LLC v. A-Z Wholesalers, Inc.*,
No. 3:19-CV-1057-B, 2021 U.S. Dist. LEXIS 44534 (N.D. Tex. 2021) ........................ 12-13

*Hishon v. King & Spalding*,
467 U.S. 69 (1984)............................................................................5

*In re Alfonso*,
No. 16-51448-RBK, 2019 Bankr. LEXIS 2816 (Bankr. W.D. Tex. 2019) ..............................8

*In re Katrina Canal Breaches Litigation*,
495 F.3d 191 (5th Cir. 2007) ...............................................................26

*In re Texas Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) ..............................................................8

*Jackson v. Dear and Seven Others*,
[2013 GLR 167] Guernsey Royal Ct. ....................................................14

*Jacobsen v. Osborne*,
133 F.3d 315 (5th Cir. 1998) ...............................................................35

*Laird v. Integrated Res.*,
897 F.2d 826 (5th Cir. 1990) ...........................................................16, 17

iv

*Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*,
   238 F. Supp.3d 799 (S.D. Tex. 2017) .................................................................16

*Leffall v. Dallas Indep. Sch. Dist.*,
   28 F.3d 521 (5th Cir. 1994) ...............................................................................35

*Lovelace v. Software Spectrum*,
   78 F.3d 1015 (5th Cir. 1996) .............................................................................11

*Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*
   783 F.2d 1283 (5ᵗʰ Cir. 1986) ......................................................................... 5-6

*Nabors Drilling, U.S.A., Inc. v. Escoto*,
   288 S.W.3d 401 (Tex. 2009) ..............................................................................25

*Navigant Consulting, Inc. v. Wilkinson*,
   508 F.3d 277 (5th Cir. 2007) .............................................................................14

*Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*,
   801 F.3d 530 (5th Cir. 2015) ...............................................................................9

*Petras v. Mole*,
   Civil Action No. 3:11-CV-1402-N, 2012 U.S. Dist. LEXIS 207745
   (N.D. Tex. 2012) ......................................................................................... 11-12

*Pool v. Johnson*,
   Civil Action No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613
   (N.D. Tex. 2002) .................................................................................................15

*R.A.G.S. Couture, Inc. v. Hyatt*,
   774 F.2d 1350 (5th Cir.1985) .............................................................................33

*Reneker v. Offill*,
   No. 3:08-cv-1394-D, 2010 U.S. Dist. LEXIS 38526 (N.D. Tex. Apr. 19. 2010)....................11

*Reynolds v. Tombone*,
   Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS 9995
   (N.D. Tex., June 24, 1999) ...................................................................................8

*Risby v. United States*,
   No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006) ...........................7, 10

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
   30 F.3d 339 (2d Cir. 1994)...................................................................................27

001765

*Sassen v. Tanglegrove Townhouse Condo. Ass'n*,
    877 S.W.2d 489 (Tex. App.—Texarkana 1994) .......................................................15

*Scanlan v. Texas A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003) ...........................................................................5

*S.E.C. v. Blavin*,
    760 F.2d 706 (6th Cir. 1985) .....................................................................17, 20

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) .................................................................................17, 22

*Snowden v. Wells Fargo Bank, N.A.*,
    No. 3:18-cv-1797-K-BN, 2019 U.S. Dist. LEXIS 23557
    (N.D. Tex. 2019) .........................................................................................24

*State ex rel. Udall v. Colonial Penn Ins. Co.*,
    112 N.M. 123, 812 P.2d 777 (N.M. 1991) ......................................................17

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
    964 F. Supp. 783 (S.D.N.Y. 1997) ................................................................17

*Strougo v. Bassini*,
    282 F.3d 162 (2d Cir. 2002) ........................................................................17

*Taylor v. Charter Med. Corp.*,
    162 F.3d 82 (5th Cir. 1998) ........................................................................11

*Tigue Inv. Co. v. Chase Bank of Tex., N.A.*,
    Civil Action No. 3:03-CV-2490-N, 2004 U.S. Dist. LEXIS 27582
    (N.D. Tex. 2004) .....................................................................................23, 23

*Transamerica Mortg. Advisors (tama) v. Lewis*,
    444 U.S. 11 (1979) ................................................................................19, 35

*Travelers Ins. Co. v. St. Jude Hosp.*,
    37 F.3d 193 (5th Cir. 1994) ......................................................................6, 10

*United States v. Beggerly*,
    524 U.S. 38 (1998) ....................................................................................12

*United States v. Bruno*,
    809 F.2d 1097 (5th Cir. 1987) ....................................................................28

*United States SEC v. Markusen*,
    143 F. Supp. 3d 877 (D. Minn. 2015) ...........................................................19

001766

*United States v. Westbo,*
  746 F.2d 1022 (5th Cir. 1984*)* ........................................................................................28

*Victaulic Co. v. Tieman,*
  499 F.3d 227 (3d Cir. 2007)...........................................................................................11

*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,*
  90 F.3d 118 (5th Cir. 1996) ............................................................................................25

*Youmans v. Simon,*
  791 F.2d 341 (5th Cir. 1986) ..........................................................................................30

## Rules & Statutes

15 U.S.C. § 80b-6 ............................................................................................... *passim*

15 U.S.C. § 80b-6(4).......................................................................................... *passim*

15 U.S.C. § 80b-8(d).......................................................................................... *passim*

18 U.S.C.S. § 1961(4)....................................................................................................26

18 U.S.C.S. § 1961(5)....................................................................................................28

18 U.S.C.S. § 1961(1)(B)..........................................................................................28, 30

18 U.S.C.S. § 1961(1)(D)..............................................................................................30

28 U.S.C. § 157(d)..........................................................................................................9

Fed. R. Bankr. P. 2002(a)(3) ........................................................................................10

Fed. R. Bankr. P. 9019 ...................................................................................................4

Fed. R. Civ. P. 9(b) ........................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1)...............................................................................................13

Fed. R. Civ. P. 12(b)(3)...............................................................................................13

Fed. R. Civ. P. 12(b)(6)..................................................................................... *passim*

Fed. R. Civ. P. 12(c)....................................................................................................13

Fed. R. Civ. P. 12(g)(2)...............................................................................................13

001767

Fed. R. Civ. P. 12(h)(2) ........................................................................13

Fed. R. Civ. P. 15(a) ............................................................................34

Fed. R. Civ.. P. 60(d) ...........................................................................12

LRCiv 7.1(i)(4) ....................................................................................11

LRCiv 7.2(e) ........................................................................................11

Tex. Civ. P. Rem. Code § 16.004 ........................................................ 11


**Other**

17 C.F.R. § 275.206(4)-8 ......................................................................19

Advisers Act of 1940 .................................................................... *passim*

Securities and Exchange Interpretative Release, *Commission
Interpretation Regarding Standard of Conduct for Investment
Advisers*, 84 FR 33681 SEC Release No. IA-5248; File No. S7-07-18
17 CFR Part 276, June 5, 2019 ........................................................12, 17

Uniform Requirements for the Investment Adviser *Brochure* and *Brochure
Supplement,* General Instruction 3 to Part 2 of Form ADV ....................12

001768

# I.

## <u>INTRODUCTION</u>

Defendant's Motion asking this Court to dismiss Plaintiffs' detailed, 26 page Complaint is not based on that pleading but on over 500 pages of material submitted in an appendix that does not comply with the Local Rules. The Motion asks this Court to bar Plaintiffs' claims under the doctrine of res judicata, not because Plaintiffs have obtained judgments on their claims in previous litigation but because they are forced to participate in Defendant's sprawling bankruptcy proceedings. The Motion invokes the doctrine of judicial estoppel, not because Plaintiffs have convinced a prior court to rule in their favor but because one of them submitted and then *withdrew* an objection that was therefore not considered by the prior court, and for that obvious reason had no bearing on its decision. The Motion asks this Court to ignore federal law imposing fiduciary duties, not because they do not apply, but because it is an inconvenient truth that they cannot shake. The Motion asks this Court to dismiss Plaintiffs claims as implausible, not because they are foreclosed by any contract or admission of Plaintiffs', but because Defendant and its agents have contradicted Plaintiffs' factual allegations in some of the voluminous documents in Defendant's appendix, for which it improperly seeks judicial notice.

Plaintiffs respectfully submit the Motion is without merit.

This action arose when Plaintiffs learned—after the fact—that Defendant had failed to disclose to them the true value of securities sold in connection with a settlement that was approved in Defendant's bankruptcy proceedings. But that settlement—and the facts underlying it--does not form the basis of Plaintiffs' claims or constitute the occurrence or transaction at issue here. The case arises from Defendant's role as an Investment Adviser to the Plaintiffs under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>"). It seeks damages and other remedies for Defendant's

---

mismanagement of a securities transaction (including its omission the true value of assets transferred in connection with the HarbourVest Settlement and the benefit Highland would gain). Defendant's actions thus violated fiduciary duties arising as a matter of federal securities law under the Advisers Act.

The bankruptcy court's approval of the HarbourVest Settlement in no way undermines Plaintiffs' claims that Defendant breached fiduciary duties by failing to make appropriate disclosures and through self-dealing (Count I), that Defendant breached contractual obligations by doing the same (Count II), that Defendant acted negligently in failing to make accurate, appropriate disclosures (Count III), or that Defendant is liable under the civil RICO statute, for which violations of the Advisers Act serve as a predicate act.

## II.

## FACTUAL BACKGROUND

Plaintiff Charitable DAF Fund, L.P. ("DAF") is a charitable fund that helps several causes throughout the country, including providing millions of dollars every year to local charities in Dallas and around the country, such as family shelters, education initiatives, veteran's welfare associations, public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Original Complaint ("Compl.") at ¶ 10.

Since 2012, DAF was advised by its registered investment adviser, Defendant Highland Capital Management, L.P. ("Highland"), and its various subsidiaries about where to invest. Compl. at ¶ 11). This relationship was governed by an investment advisory agreement. (Compl. at ¶ 12). As the DAF's investment advisor, Highland owed the DAF fiduciary obligations, including the duty to put the DAF's best interest ahead of its own. (Compl. at ¶¶ 56–57, 62).

---

In 2017, Highland advised the DAF to acquire 143,454,001 shares of Highland CLO Funding, Ltd ("HCLOF"), which the DAF did via a holding entity, Plaintiff CLO Holdco, Ltd. ("CLO Holdco"). (Compl. at ¶ 12).

Shortly thereafter, CLO Holdco entered into a Subscription and Transfer Agreement whereby a series of related entities collectively referred to as "HarbourVest" acquired a 49.98% membership interest in HCLOF (the "HarbourVest Interests"). (Compl. at ¶¶ 13–14). As part of this transaction DAF retained a 49.02% membership interest, (Compl. at ¶ 13). and Highland took a 0.6% membership interest HCLOF (Compl. at ¶ 25).

HCLOF's portfolio manager is Highland Highland Advisor, Ltd. ("HCFA"), which is subsidiary of Highland and is controlled and operated by Highland. (Compl. at ¶ 24). As such, both Highland and HCFA owed fiduciary duties to CLO Holdco as an investor in the HCLOF fund. James P. Seery, Jr., CEO of Highland, testified that Highland owed such fiduciary duties under the Advisers Act to investors in the funds that Highland manages (App_0008-10, 0014).

The HCLOF parties' rights and obligations as members of HCLOF were governed by the *Members Agreement Relating to the Company* dated November 15, 2017 ("Company Agreement"). (Compl. at ¶¶ 93–94) (App_0018-35). Under the Company Agreement, no member was allowed to sell shares to another member without first providing all other members the right to purchase a pro rata portion thereof at the same price. (Compl. at ¶ 95; App_0026-27).

In October 2019, Highland filed for Chapter 11 (Compl. at ¶ 15). As part of this bankruptcy, HarbourVest filed proof of claims against Highland totaling over $300 million, notionally (Compl. at ¶¶ 16, 21-23). Highland denied the validity of these claims. (Compl. at ¶ 17, 26).

In the meantime, Highland continued to control HCLOF through its subsidiary HCFA. (Compl. at ¶¶ 115–124). In September 2020, HCLOF was underperforming, and the value of the

---

investment had diminished—the HarbourVest Interests had diminished $52 million in value. (Compl. at ¶ 27). In September 30, 2020, Highland utilized interstate wires to transmit information to the HCLOF investors regarding the value of their respective interests. (Compl. at ¶ 121).

In the following months, however, the value HCLOF began to improve; by the end of November 2020, the value of HCLOF's total assets increased to $72,969,492 ($36,484,746 allocated to HarbourVest) and by the end of December, HCLOF's net asset value reached $86,440,024 (with $43,202,724 allocated to HarbourVest's Interests). (Compl. at ¶¶ 123–124). However, Highland did not transmit these valuations to Plaintiffs (Compl. at ¶ 120).

Around November 2020, Highland and HarbourVest—utilizing the interstate wires—entered into discussions about settling HarbourVest's claims in the bankruptcy. (Compl. at ¶ 119). Highland and HarbourVest reached a settlement, which Highland requested the bankruptcy court to approve on December 23, 2020. (Compl. at ¶ 29; App_0046-64). As part of the settlement, Highland agreed to allow HarbourVest $45 million in unsecured claims, which were expected to yield about to cents on the dollar to HarbourVest (roughly $31,500,000). (Compl. at ¶ 32; App_46-64). As part of the consideration for the $45 million in allowed claims, HarbourVest agreed to sell its interest in HCLOF to Highland (Compl. at ¶ 33) (the "HarbourVest Settlement").

Despite Highland's fiduciary obligations to Plaintiffs, Highland concealed the rising value of HCLOF and the Harbourview Interests, as well as the value that it was buying the interest for. It diverted the entire opportunity to participate in this windfall transaction to itself in violation of its fiduciary duties (Compl. at ¶ 67).

At the January 14, 2021, Bankruptcy Rule 9019 hearing to approve the settlement, HCF's CEO testified that the value allocated to the HarbourVest Interests was $22.5 million, despite that this interest was actually valued at $41,750,000 just two weeks before. (Compl. at ¶¶ 34, 37). In

_____

other words, Highland obtained a windfall. The bankruptcy court issued an order approving the

HarbourVest Settlement (App_0065-68) (the "9019 Order"). The sale of the HarbourVest Interests

transformed Highland from a minority member with a 0.6% interest into the controlling member

with a 50.49% interest.

### III.

### LEGAL STANDARD

Motions to dismiss for failure to state a claim are viewed with disfavor and are seldom

granted. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Under

Federal Rule of Civil Procedure 8(a)(2), a pleading must contain 'a short and plain statement of

the claim showing that the pleader is entitled to the relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-

678 (2009). Rule 8 does not demand "'detailed factual allegations[.]'" *Id.* at 678 (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In ruling upon a Rule 12(b)(6) motion, the Court cannot decide disputed fact issues. The

court may grant a motion under Rule 12(b)(6) *only if* it can determine with certainty that *the*

*plaintiff cannot prove facts that would allow the relief sought* in the complaint. *See Hishon v. King*

*& Spalding*, 467 U.S. 69, 73 (1984); *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir.

2003) (emphasis added). In its consideration, a court must draw all reasonable inferences in favor

of the plaintiff. *See Collins*, 224 F.3d at 498.

### IV.

### THE PRECLUSION DOCTRINES DO NOT APPLY

**A. HIGHLAND'S RES JUDICATA DEFENSES FAIL**

Highland's preclusion defenses fail. As the proponent of the affirmative defense, Highland

must establish all elements of those defenses as a matter of law. *See Memphis-Shelby Cty. Airport*

---

*Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1289 (5th Cir. 1986).

"The doctrine of res judicata, or claim preclusion, forecloses relitigation of claims that were or could have been raised in a prior action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 312-13 (citation omitted). "In this circuit, an action is barred by the doctrine of res judicata only if: (1) the parties are identical in both actions; (2) the prior judgment was rendered by a court of competent jurisdiction; (3) the prior judgment was final on the merits; and (4) the cases involve the same cause of action." *Travelers Ins. Co. v. St. Jude Hosp.*, 37 F.3d 193, 195 (5th Cir. 1994).

Importantly, the Original Complaint does not seek to reverse or unwind the HarbourVest Settlement. Nothing in the Original Complaint seeks to put the parties to that settlement in the same position they were prior to January 14, 2021. Suing a party to a transaction for harm caused in the course of conducting that transaction is not the same thing as suing to rescind the transaction.

This false equivalency is what Highland's entire argument is based upon.

**1. *Res Judicata* Does Not Apply Because the Court's 9019 Order Does Not Specifically Release Plaintiffs' Claims or Resolve them on the Merits**

The Fifth Circuit previously held that a bankruptcy court's final order confirming a plan of reorganization did not have *res judicata* effect on third party claims against the debtors' insiders, when the plan did not specifically identify the claims or conclusively resolve them on the merits. In *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000), the Fifth Circuit addressed whether general release language in a bankruptcy order applied to unenumerated claims. The bankruptcy court's order provided that:

> The provisions of the confirmed plan shall bind all creditors and parties in interest, whether or not they accept the plan and shall discharge the Debtor, its officers, shareholders and directors from all claims that arose prior to Confirmation.

*Id.* at 919.

---

Admitting that this language would have released the personal guarantees of certain officers, shareholders and directors—the "Spiveys'—the Fifth Circuit nonetheless refused to apply *res judicata* to preclude the plaintiff's suit on those guarantees. The court explained that the merits of those guarantees had not been litigated, and importantly, "[n]o specific discharge or release of the Spiveys' individual guarantees to [a creditor] was enumerated or approved by the bankruptcy court in this matter." *Id*. This was enough to prevent the application of *res judicata*.

Here, the 9019 Order does not even seek to resolve the entire Highland bankruptcy, as did the plan confirmation order in *Applewood*. Rather, it merely approves a settlement agreement—a privately negotiated contract—between Highland and HarbourVest. There is no dispute that the 9019 Order is a final order as to Highland and HarbourVest's settlement—but nothing suggests that it bestows immunity on Highland (or anyone else) for *any and all* violations committed in the process of obtaining that settlement. Neither of the Plaintiffs here were parties to the litigation between HarbourVest and Highland, nor were they parties to the settlement agreement itself.

Similarly, the 9019 Order does not purport to resolve Plaintiffs' claims on the merits, nor does it specifically purport to release Plaintiffs' claims that are raised herein. (App_0065-69). The 9019 Order simply overrules objections *en masse* without addressing the merits thereof. (App_67 ("All objections to the Motion are overruled.")). Accordingly, *res judicata* cannot apply because the 9019 Order neither addressed nor disposed of Plaintiffs' causes of action *on the merits*. *Accord Applewood,* 203 F.3d 914, 919; *Risby v. United States*, No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798, at *19-21 (N.D. Tex. 2006) (R&R) (denying *res judicata* because "to operate as a *res judicata* bar, a final judgment must address the merits of a claim. …").

Defendant's contention that CLO Holdco's withdrawal of its objection to the settlement is an abandonment of the merits of its causes of action—all of them—arising in any way from

---

Highland's misconduct is baseless. The withdrawal did not purport to be "with prejudice," and

cannot implicitly have been with prejudice as to matters not addressed by the Court on the merits.

*See Chalmers v. Gavin*, 2002 U.S. Dist. LEXIS 5636, *3 (N.D. Tex., Apr. 2, 2002) (finding that

*res judicata* did not bar action where previous claims were dismissed without prejudice and thus

did not operate as an adjudication on the merits); *cf. Reynolds v. Tombone*, 1999 U.S. Dist. LEXIS

9995, at *12 and n.5 (N.D. Tex., June 24, 1999) (finding that *res judicata* did not bar later action

where prior motion was not adjudicated on the merits).

Notably, Highland cites no authority for the proposition that a withdrawal of an objection

to a settlement in bankruptcy is with prejudice to the substantive legal rights of the objector who

might be injured. Nor can Highland do so. The court's role of approving an otherwise privately

negotiated settlement is a far cry from its role finder of fact after a trial. The bankruptcy court has

*discretion* to overrule an objection;. *See* Fed. R. Bankr. 9019; *In re Texas Extrusion Corp.*, 844

F.2d 1142 (5th Cir. 1988). The Fifth Circuit has specifically stated that a Rule 9019 approval order

does NOT involve a "mini trial". *Official Comm. of Unsecured Creditors v. Moeller (In re Age*

*Ref., Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015). A bankruptcy court "is to 'canvas the issues' to see

if the settlement falls 'below the lowest point in the range of reasonableness.'" *In re Alfonso*, No.

16-51448-RBK, 2019 Bankr. LEXIS 2816, at *8 (Bankr. W.D. Tex. 2019) (citation omitted).

In other words, a bankruptcy court *may* approve a settlement *notwithstanding* the merits or

any claim or objection that is raised by a third party, if the court finds that the settlement is

nonetheless fair to the *debtor*. *See Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster*

*Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Among the factors that a bankruptcy court is

required to consider in determining whether a settlement is in the best interests of the estate—none

requires dispensing with the "claims" of any objectors on the merits; at best, the court is only

_____

required to consider "the best interests of the creditors, with proper deference to their reasonable views[.]"[1] Here, the bankruptcy court did not state it was doing anything more than that in approving the HarbourVest Settlement—in fact, it specifically recited that line *verbatim* (App_67).

Accordingly, while the 9019 Order is final as to the settled claims themselves. To say that it resolves all causes of action for damages that could have been brought by any third-party objector on the merits is, well, meritless. The bankruptcy court's having the sole *discretion* in approving the HarbourVest Settlement is completely at odds with the premise that it was necessarily resolving anything else *on the merits*. Therefore, the 9019 Order is insufficient to support preclusion.

## 2. The Bankruptcy Court Was Not a Court of Proper Jurisdiction to Hear the Causes of Action

While the bankruptcy court could hear Plaintiff CLO Holdco's objection to the HarbourVest Settlement, it lacked the power under 28 U.S.C. § 157(d) to claim jurisdiction over the causes of action. Much ink is being spilled on the bankruptcy court's province to hear the claims raised in this action. Pending before this Court is Highland's *Motion for an Order to Enforce the Order of Reference*, and Plaintiffs' Response and *Cross-Motion to Withdraw the Reference* under § 157(d)'s mandatory withdrawal language. Plaintiffs incorporate here their briefing in the Response and Cross-Motion, and respectfully submit that if this Court decides that

---

[1] "In determining whether a settlement is fair and equitable, we apply the three-part test set out in *Jackson Brewing* with a focus on comparing "the terms of the compromise with the likely rewards of litigation." A bankruptcy court must evaluate: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise. These "other" factors—the so-called *Foster Mortgage* factors—include: (i) "**the best interests of the creditors, 'with proper deference to their reasonable views'**"; and (ii) "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (citations omitted) (bolding added).

---

mandatory withdrawal applies, then it cannot find that the bankruptcy court's already-entered final

judgement was rendered on Plaintiffs' causes of action and had jurisdiction to do so.

### 3.  **These Claims Do Not Arise Out of the Same Nucleus of Operative Facts**

In order to assess the "same causes of action" element, the Fifth Circuit asks "whether the

claims arise out of the same nucleus of operative facts." *Travelers*, 37 F.3d at 195 (citations

omitted). Where a different legal duty is implicated in the subsequent action, it is not the same

nucleus of operative facts. *Id.* Additionally, where a litigant could not have litigated the claims in

the prior litigation, then they do not arise from the same nucleus of operative facts, and res judicata

will not apply. *Id.*

Here, the claims raised in the Original Complaint did not ripen until after the HarbourVest

Settlement was consummated, which itself was accomplished only *after* the bankruptcy court

entered its 9019 Order. *Compare, e.g.,* Compl. ¶¶ 76, 81, 88, 90, 92-99, 113-133, 136-140.

Specifically, the first time Plaintiffs ever heard about the valuation of the HarbourVest

Interests in HCLOF was during the January 14, 2021 approval hearing. Compl. ¶ 31, 76. The

motion papers and exhibits Highland filed on December 23, 2020, contained no such valuation;

they instead lumped in the $80 million in claims allowed by Highland as undifferentiated

consideration for both (a) the releases of HarbourVest's causes of action against Highland, and (b)

the sale of the HCLOF shares to Highland. *See* Compl. ¶ 29; App_0047. Therefore, it would have

been impossible for Plaintiffs to bring these claims in the bankruptcy court prior to January 14,

2021, and so it is impossible that they were, or could have been, decided on the merits at that time.

*Risby*, 2006 U.S. Dist. LEXIS 8798, at *19-21.

### 4.  **Highland's Litany of Attachments Changes Nothing**

---

Highland attaches a litany of documents in the hopes of convincing this Court that the claims in this lawsuit were already fulsomely litigated.[2] They were not. Although the 9019 Motion barely complied with the twenty-one day notice requirement set forth in Fed. R. Bankr. P. 2002(a)(3), it is preposterous to claim that a motion, filed on December 23, 2020, and heard 22 days later (with Christmas and New Year's in the middle), gave Plaintiffs a reasonable opportunity to litigate their dispute (which had not even ripened yet).

Note that the statute of limitations for Plaintiffs' lead claims is *four* years[3]—but Defendant contends that 22 days is all Plaintiffs had to discover and bring these claims on pain of permanent disposition. This would surely be a violation of Plaintiffs' due process rights. *See Benson & Ford,*

---

[2] Highland's appendix violates this Court's local rules requiring pagination, Local Rule 7.1(i)(4), and references to specifically paginated appendices, Local Rule 7.2(e). The lack of such reference, and the lack of any specificity in Highland's general request for this Court to take judicial notice of adjudicative facts found in 500 pages of appendices—without specifically explaining why judicial notice can be taken—should cause this Court to reject the invitation. This Court's sister court has held that a court should only take judicial notice of facts "'sparingly at the pleadings stage.'" *Reneker v. Offill*, No. 3:08-cv-1394-D, 2010 U.S. Dist. LEXIS 38526, at *5 (N.D. Tex. Apr. 19. 2010) (Fitzwater, J.) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007)). "'Only in the clearest cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point.'" *Id.* Courts in the Fifth Circuit have been very careful to note while they may take judicial notice of the fact of certain filings, they cannot take notice of the *facts recounted in them* unless they are undisputed, or facts found by another court. *See Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996) (noting that at 12(b)(6) stage, judicial notice of filed documents "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents"); *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829-30 (5th Cir. 1998) (noting the general rule that a court cannot take judicial notice of the findings of another court because it would undermine the standards applicable to *res judicata*). To the extent Highland asks this Court to take judicial notice of adjudicative facts, the Court should refuse to do so.

[3] The statute of limitations in Texas for breaches of contract, breach of fiduciary duty, and tortious interference are all four years. Tex. Civ. P. Rem. Code § 16.004. The RICO Statute of limitations is likewise four years. *Petras v. Mole*, Civil Action No. 3:11-CV-1402-N, 2012 U.S. Dist. LEXIS 207745, at *12-13 (N.D. Tex. 2012).

---

*Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir. 1987) ("A litigant has a due process right to a full and fair opportunity to litigate an issue.") (internal citations omitted).

In arguing, disingenuously, that Plaintiffs are at fault for trusting Highland's representations, Highland conveniently elides the fact that as a Registered Investment Adviser, the Advisers Act imposed an affirmative duty on *Highland* to—without being asked—truthfully disclose the entire extent of the transaction it was contemplating *before* it consummated it, including the value of the interest it was self-dealing in.[4,5]

## B.  HIGHLAND'S REQUEST FOR JUDICIAL ESTOPPEL FAILS

As an affirmative defense, it is Defendant's duty to prove all the elements of judicial estoppel as a matter of law. Here, Highland has failed to do so. "'[T]wo bases for judicial estoppel must be satisfied before a party can be estopped. First, it must be shown that the position of the

---

[4] The SEC explains that: "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship. Material facts relating to the advisory relationship include the capacity in which the firm is acting with respect to the advice provided." *See* Securities and Exchange Commission Interpretative Release*, Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 FR 33681 SEC Release No. IA-5248; File No. S7-07-18, 17 CFR Part 276, June 5, 2019 ("SEC Interpretation") at p. 6 (internal citations omitted). *See also* General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.").

[5] Even if Highland is correct that the HarbourVest Settlement is somehow a final order on the claims Plaintiffs' raised in the Original Complaint, the Original Complaint (as the later filing) should be construed as one seeking equitable relief from the 9019 Order under Rule 60(d). Rule 60 authorizes equitable relief from a final judgment, order, or proceeding, and subsection (d) specifically authorizes "an *independent* action to relieve a party from a judgment, order or proceeding[.]" FED. R. CIV. P. 60(d). This mechanism provides an exception to *res judicata*. *See United States v. Beggerly*, 524 U.S. 38, 46 (1998).

---

party to be estopped is clearly inconsistent with its previous one; and second, that party must have **convinced** the court to accept that previous position.'" *Harrison Co. LLC v. A-Z Wholesalers, Inc.*, No. 3:19-CV-1057-B, <mark>2021 U.S. Dist. LEXIS 44534, at *18</mark> (N.D. Tex. 2021) (quoting *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003)) (emphasis added).

      The Defendant has not met its burden as to either prong of judicial estoppel. There has been no decision on the merits in favor of the DAF or Holdco on their claims in bankruptcy court. Withdrawing an objection and then raising the argument later is not the same thing as "taking an inconsistent position" under any guise of law or common sense. Plaintiffs were clearly not "successful" on the objection before.

## V.

## <u>PLAINTIFFS HAVE STATED A CLAIM FOR RELIEF</u>

### A.  <u>THE MOTION FAILS UNDER RULE 12(G) AND IS PREMATURE</u>

      Rule 12(g) only permits one motion under Rule 12 to be filed –and that any defense not raised in the first motion is waived, except as provided in Rule 12(h)(2). *See* <mark>FED. R. CIV. P. 12(g)(2)</mark> Rule 12(h)(2) states that while the defense of failure to state a claim is not waived by failure to bring it in the first-filed Rule 12 motion, it may be only brought via a later motion under Rule 12(c). Here, Highland's first-filed motion, *Motion for an Order to Enforce the Order of Reference* is functionally a motion under Rule 12(b)(1) or 12(b)(3). Accordingly, Defendant is limited to bringing its failure to state a claim motion via a motion under Rule 12(c) after the pleadings are closed. Furthermore, the fact that Highland has shown that there are issues of fact— such as the scope of duties it owes and to whom under federal law—its motions are more appropriately reserved for summary judgment, after the close of discovery.

### B.  <u>PLAINTIFFS HAVE PLED CLAIMS FOR BREACH OF FIDUCIARY DUTY</u>

---

In  Texas,  the elements of  a breach of fiduciary duty are:  '(1)  a  fiduciary  relationship
between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the
plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the
defendant.'" *Cudd Pressure Control, Inc. v. Roles*, 328 F. App'x 961, 964 (5th Cir. 2009) (quoting
*Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007)).

1.  **The Complaint Pleads that Highland and HCFA Owe Fiduciary Duties Under
    the Advisers Act and Other Bases**

    a.  *The Fiduciary Duty of Highland and HCFA to CLO Holdco*

    The Original Complaint specifically states that a fiduciary duty is owed by Highland and
HCFA to Holdco via the Advisers Act and via corporate governance law.

    ___First___, HCFA is a wholly-owned subsidiary of Highland, and both are registered investment
advisers under the Advisers Act of 1940.  (Compl. ¶ 56). Highland operates HCFA, which serves
as the Portfolio Manager of Highland CLO Funding, Ltd. ("HCLOF"). Highland and HCFA owed
a fiduciary duty to Holdco as an investor in HCLOF. (Compl. ¶ 61).

    ___Second___, as the control person of HCLOF, Highland via HCFA owed fiduciary duties to
Holdco, and so Holdco's fiduciary duty claims are additionally derivative in nature under the
minority oppression doctrine.[6] Highland has not challenged this basis for a fiduciary duty claim.

    b.  *The Fiduciary Duty of Highland Directly to the DAF*

    The Original Complaint pleads that Highland and the DAF are in  a  direct advisory
relationship by virtue of a contractual arrangement. (Compl. ¶ 58).[7] In addition to being the RIA

---

[6] Guernsey law recognizes both derivative and double-derivative actions, especially where the
company is controlled by the alleged wrong-doer, as HCLOF is here. *See cf. Jackson v. Dear and
Seven Others*, [2013 GLR 167] Guernsey Royal Ct. (Talbot, Lieut, Bailiff).

[7] Although the Complaint pleads that the operative agreement is the Amended and Restated
Investment Advisory Agreement, we have since learned that there is a Second Amended and

to the DAF, Highland was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4. (Compl. ¶ 59).  The RIA Agreement further commits Highland to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [Highland], a copy of which will provided to the General Partner upon request." (Compl. ¶ 60). And while Highland contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF. (Compl. ¶ 61).

"Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement." (Compl. at ¶ 11). As DAF's registered investment advisor, Highland is DAF's fiduciary. *See Douglass v. Beakley,*, 900 F. Supp. 2d 736, at 751-52, n.16.

Additionally, Highland was appointed the DAF's attorney-in-fact. (Compl. at ¶ 59). "As the appointment of an attorney-in-fact creates a fiduciary relationship as a matter of law, Texas law imposes special duties on persons acting in that capacity." *Pool v. Johnson*, Civil Action No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613, at *17 (N.D. Tex. 2002) (citing *Sassen v. Tanglegrove Townhouse Condo. Ass'n*, 877 S.W.2d 489, 492 (Tex. App.—Texarkana 1994, writ denied)). Under Texas law, "[a] fiduciary owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability." *Id.* (citing *Sassen*, 877 S.W.2d at 492).

---

Restated Advisory Agreement, and our proposed amendment, among other things, corrects this error.

---

2. **The Fiduciary Duties Imposed by the Advisers Act Are Actionable Under Texas Law and are Owed to Investors Like CLO Holdco**

"Whether a fiduciary duty exists is a question of law for the court. The facts giving rise to a fiduciary duty, however, are to be determined by the fact finder." *Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*, 238 F. Supp.3d 799, 852 (S.D. Tex. 2017) (*citing Fuqua v. Taylor*, 683 S.W. 2d 735, 737 (Tex. App.—Dallas 1984, *writ ref'd n.r.e.*)).

a. *The Advisers Act's Imposition of a Fiduciary Duty is Actionable Under Texas Fiduciary Duty Law*

Under Texas law, an investment advisor /advisee client relationship is considered a formal fiduciary relationship because it is a principal and agent relationship. *Accord Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 238 F. Supp. 3d 799, 851 (S.D. Tex. 2017). Texas law provides that a fiduciary relationship is governed by the terms of the agency. *See Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.—Houston [14th Dist.] 1994, *writ denied*). The Advisers Act provides the scope of, and rules governing, the adviser/advisee agency relationship. *Laird v. Integrated Res.*, 897 F.2d 826, 834 (5th Cir. 1990).

Recognizing that fact, this very Court decided almost a decade ago that, although the Advisers Act does not itself create a cause of action, it is still actionable through state law fiduciary duty claims. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, 751-52, n.16 (N.D. Tex. 2012) (Boyle, J.) (denying motion to dismiss state fiduciary duty claims predicated on breaches of the Advisers Act, noting in footnote that the Advisers Act provided the bases for a formal fiduciary relationship and thus plaintiffs' *state* breach of fiduciary duty claims could be predicated on breach of the

Advisers Act).[8] No decision we could find has held that a Texas fiduciary duty claim cannot seek redress for breaches of the fiduciary obligations imposed under the Advisers Act.

### b. *The Advisers Act's Fiduciary Duty Extends to Investors like Holdco*

"As a fiduciary, the standard of care to which an investment adviser must adhere imposes 'an affirmative duty of 'utmost good faith, and full and fair disclosure to all material facts,' as well as an affirmative obligation to 'employ reasonable care to avoid misleading' his clients.'" *Laird v. Integrated Res.*, 897 F.2d 826, 834 (5th Cir. 1990) (quoting *S.E.C. v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1985) (citing *Capital Gains*, 375 U.S. at 194 (citations omitted)).

As explained by the SEC in its Rule making and interpretative Guidance: "under its duty of loyalty, an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." Securities and Exchange Commission Interpretative Release*, Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 FR 33681 SEC Release No. IA-5248; File No. S7-07-18, 17 CFR Part 276, June 5, 2019 ("SEC Release") at p. 8 (internal citations omitted). The SEC is empowered under the Advisers Act to give interpretive guidance, which is

---

[8] Other courts are in accord. *See Goldenson v. Steffens*, No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. 2014) ("Even assuming the [Advisers Act] provides no private right of action, this does not mean that it does not create a standard of care from which a duty arises…."); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 812 P.2d 777, 785 (N.M. 1991) (citing *Capital Gains Research*, and applying the standard set forth therein, in ruling on a state law claim for breach of fiduciary duty against an investment adviser). *Cf. Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502-06 (3d Cir. 2013) (holding that state fiduciary duty claims are a recognized vehicle for enforcing violations of the Advisers Act, but granting summary judgment on the basis that plaintiffs had not properly proven an advisory relationship or a conflict of interest); *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F.Supp. 783, 799 (S.D.N.Y. 1997) (holding that state fiduciary duty claims could be predicated on duties supplied under the Investment Company Act of 1940), *rev'd in part on other grounds in Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002).

---

accorded *Chevron* deference. *See SEC v. Zandford*, 535 U.S. 813 (2002) (SEC interpretations and rule making entitled to *Chevron* deference). "In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent." *Id.* at 24.

Further, an investment advisor's "duty of loyalty requires that an advisor not subordinate its clients' interests to its own. In other words, an investment adviser must not place its own interest ahead of its client's interests." *Id*. at 21. In sum, an investment advisor has a "duty to act in the ***client's*** best interest[,]" not its own. "Under the "best interest" test, an adviser may benefit from a transaction recommended to a client if, *and only if*, that benefit and all related details of the transaction are fully disclosed." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 503 (3d Cir. 2013). While not disagreeing with the scope and terms of the fiduciary duty, Highland contends that neither it, nor HCFA, owed a fiduciary duty to CLO Holdco, which was an investor in HCLOF. This is false for a couple of reasons:

***First***, Highland's CEO, James Seery, in discussing the necessity of his appointment as CEO and the degree to which he understood the importance of his job, he testified under oath— under *direct examination*—that he and Highland, as registered investment advisers—owed fiduciary duties to the funds they managed, and the investors in those funds. (App_0009) ("The goals of the debtor…number one, discharge Highand's, … duties to investors in the funds. Those are fiduciary duties under the Investment Advisers Act."); (App_14) ("the Investment Advisors Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors. So while we have duties to the estate, we also duties, as I mentioned in my last testimony, to each of the investors in the funds."). Seery's sworn, uncontradicted testimony, is an undisputed fact that this

---

Court may take judicial notice of at this stage. *See* Fed. R. Evid. 201(b); *Aloe Creme Labs., Inc. v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970) (per curiam)).

        *Second*, the Supreme Court has stated that the Advisor's Act's provisions in 15 U.S.C. § 80b-6, are fiduciary duties. *See Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17, 100 S. Ct. 242, 246 (1979) ("As we have previously recognized, § 206 [15 U.S.C. § 80b-6] establishes 'federal fiduciary standards' to govern the conduct of investment advisers."). Subsection (d) of that statute delegates to the SEC the power to enact standards for its enforcement. To wit, the SEC enacted 17 C.F.R. § 275.206)(4)-8, to enforce the fiduciary standards in Section 206(d) of the Advisers Act:

> (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, **to any investor** or prospective investor in the pooled investment vehicle; or
>
> (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative **with respect to any investor** or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206)(4)-8 (bold added).[9] Therefore, as a matter of statute, Highland owes duties to investors like Holdco.

        *Third*, Highland's entire premise—that it owes no duties to Holdco as an investor in HCLOF—is based upon the notion that Holdco is not a "client" under the Act because Highland and Holdco have no Advisory Agreement between them. But the Investor's Act does not state, anywhere, that an RIA has *no* duties to an investor just because they are not a client under an

_____

    [9] Although Highland does not contest that HCLOF is a "pooled investment vehicle" for the purposes of this regulation, the HCLOF does qualify because, according to the Company Agreement, it "[has] less than 100 investors and do[es] not publicly offer [its] securities." *United States SEC v. Markusen*, 143 F. Supp. 3d 877, 891 (D. Minn. 2015).

_____

advisory agreement. Accordingly, Highland's contention that it owes no fiduciary duties directly to investors like Holdco fails on its face, and is contradicted by the law and the facts.

### 3.  **Plaintiffs Have Alleged Several Breaches of Fiduciary Duty**

Highland breached multiple fiduciary obligations in the process of negotiating and consummating the HarbourVest Settlement. The materiality of misrepresenting the value and the benefit to Highland of the investment is not debatable. *Accord S.E.C. v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). And Highland cannot escape liability for this duty by conducting its advisory activities through HCFA. *See* 15 U.S.C. § 80b-8(d) ("It shall be unlawful for any person indirectly, or through or by any other person, to do any act or thing which it would be unlawful for such person to do directly under the provisions of this title [15 USCS § 80b-1 *et seq.*] or any rule or regulation thereunder.").

The core fiduciary duty that was breached is the duty against self-dealing, which is a core conflict of interest. The Advisers Act's primary purpose is to eliminate advisers' conflicts of interest. *See Laird,* 897 F.2d at 839 (purpose of § 80b-6 of Advisers Act was to eliminate conflicts of interests between advisers and their advisees). The Advisers Act also makes clear that the duty of loyalty means putting CLO Holdco's interest first.[10] Under this duty, the Advisers Act explains that an adviser must have a rational, non-self-interested basis for how it allocates investment opportunities that are appropriate for its advisees.[11] Here, the HCLOF Company Agreement makes

---

[10] *See* SEC Release at 23.

[11] SEC Release at 27 ("When allocating investment opportunities among eligible clients, an adviser may face conflicts of interest either between its own interests and those of a client … When allocating investment opportunities, an adviser is permitted to consider the nature and objectives of the client and the scope of the relationship. An adviser need not have pro rata allocation policies, or any particular method of allocation, but, **as with other conflicts and material facts, the adviser's allocation practices must not prevent it from providing advice that is in the best interest of its clients.**"); *see also* SEC Release at 21 and n.54 (noting that SEC deems it breach of

it clear that the purposes of HCLOF's investors is to acquire profitable CLO and CLO related securities—which the shares in HCLOF would fall under (App_0020).[12]

Highland entered into settlement negotiations in November 2020 with HarbourVest where it first learned of HarbourVest's intent to sell its interests in HCLOF. (Compl. ¶ 119). On December 23, 2020, Highland moved for approval of the HarborVest Settlement. On January 14, 2021, at the Bankruptcy Court for the Northern District of Texas, Highland's CEO declared the that the value of HarbourVest's Interest in HCLOF was $22.5 million. (Compl. at ¶ 34). As Defendant concedes, Counsel for Plaintiff CLO Holding, who also represented DAF, attended that hearing. (Doc. No. 27 at ¶ 10). The Bankruptcy Court approved a settlement that permitted Highland to obtain HCLOF's interest for this amount. (Compl. at ¶¶ 32-34). In truth, the HarbourVest Interests were worth in excess of $41,750,000 at that time. (Compl. at ¶ 37). Highland, however, did not disclose the true value of HarbourVest's interests to Plaintiffs—*ever*. (Compl. at ¶ 75). Highland's failure to disclose the true value of the HarbourVest Interests was a breach of its duty of full and fair disclosure, regardless of its intent.

Furthermore, the value of the trade, the potential upside in the trade, and the nature of the trade were never disclosed to Holdco or the DAF prior to the hearing—indeed, the value and nature was misrepresented to them at the hearing. (Compl. ¶ 76, ¶ 120). Highland converted its 0.6% interest into a 50.58% interest and thereby control of HCLOF. Therefore, Highland and HCFM, by allocating 100% of the investment opportunity in the HarbourVest Interests to itself (then, a

---

the duties of Section 206 of Advisers Act for an adviser to allocate the trades to its own account at the expense of advisees).

[12] The Company Agreement states that HCLOG "has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy [in the Offering Memo]."

---

mere 0.6% holder of HCLOF (Compl. at ¶ 25), and doing so without the informed consent of both

HCLOF or CLO Holdco, violated its duty of loyalty to both. The same goes to its duties to the

DAF under the Advisory Agreement.

To the extent Highland contends that the Company Agreement or any other provision

waives its obligations under the Advisers Act, or those of HCFA, those waivers are null and void

under 15 U.S.C. § 80b-15(a).[13]

### 4. Rule 9(b) Does Not Apply—But Even if it Did, it has Been Met

"By its clear terms, Rule 9(b) applies only to averments of fraud or mistake, not to

averments of negligence, breach of fiduciary duty, or non-fraudulent misstatement. *Tigue Inv. Co.*

*v. Chase Bank of Tex., N.A.*, Civil Action No. 3:03-CV-2490-N, 2004 U.S. Dist. LEXIS 27582, at

*7 (N.D. Tex. 2004). Here, Plaintiffs' fiduciary duty claims do not turn on fraudulent intent. The

Advisers Act forbids investment advisors from "engag[ing] in any act, practice, or course of

business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4).

The violations of § 80b-6 of the Advisor's Act, although called the "antifraud" provisions,

do not require a pleading of scienter. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S.

180, 195, 84 S. Ct. 275, 284-85 (1963) ("… Congress, in empowering the courts to enjoin any

practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent

to injure and actual injury to the client."). To wit, Plaintiffs also allege that Highland breached its

fiduciary duty by self-dealing when it purchased the entire HarbourVest Interests without

providing Plaintiffs with the opportunity to participate. (Compl. at ¶ 76–88). These allegation do

---

[13] Even if this court dismisses the Company Agreement claim (Count II), that would not operate
to deprive CLO Holdco or the DAF of the right to have Highland put their interests first as a matter
of Advisers Act fiduciary duty. The Company Agreement and Advisory Agreement cannot waive
those fiduciary obligations.

not require a false statement, nor require Plaintiffs' reliance, nor damage to Plaintiffs (a benefit to

Highland suffices) all of which are elements of fraud. Because fraudulent conduct does not

underlie Plaintiffs allegations, Rule 9(b) does not apply. *Tigue Inv. Co.*, Civil Action No. 3:03-

CV-2490-N, 2004 U.S. Dist. LEXIS 27582, at *7–8.

Nonetheless, the Complaint satisfies Rule 9(b). The Complaint systematically goes through

and identifies the dates, acts, communications, omissions and consequences of the breaches of

fiduciary duties under the Advisers Act and under state law. *See, e.g.,* Compl. ¶ § 55-91, 119-125,

127-129. Defendant's blythe throw-away statement that Rule 9(b) has not been met is simply

unsupportable.

## C. PLAINTIFF CLO HOLDCO HAS PLED A CLAIM FOR BREACH OF CONTRACT AND TORTIOUS INTERFERENCE

Plaintiff CLO Holdco's breach of contract claim is straightforward. Under the HCLOF

Company Agreement, a "Transfer" of the shares of HCLOF is defined to include the "sale" of the

shares. Members Agreement, § 6.1 (App_0026).

Sections 6.1 and 6.2 of the Agreement purport to allow sales by members of their interests

in HCLOF to "affiliates" of Members, but not to members themselves, without certain conditions

precedent. App_0026-27). One of those conditions precedent is that the other members have to be

afforded the right to purchase their pro-rata portion (App_0027).

Highland contends that the "transfer" to its "nominee," HCMLP Investments, LLC, is a

transfer to an "affiliate," which is consistent with the Company Agreement. But this is factual

gerrymandering and outside the scope of a 12(b)(6). The Transfer that is the basis of Plaintiffs'

contract claim is the sale by HarbourVest. That sale was accomplished through the Settlement

Agreement with Highland (App_0046-54). In the Settlement Agreement, Highland paid for the

Harbourvest Interests. In return, HarbourVest agreed to release its claims against Highland and

---

transfer the HarbourVest Interests *to Highland*. (App_0047). Highland's supposed "nominee," HCMLP Investments, LLC was not a party to this agreement. Highland's nominee did not pay for those interests. *Id*. Therefore, the Settlement Agreement constitutes a sale to *Highland.* And to the extent it was a sale to Highland, the sale violated Section 6.2 of the Company Agreement.

Defendant argues that because the shares were titled in the name of Highland's nominee, HCMLP Investments, LLC, it is an affiliate of Highland, and therefore there was no breach of contract. But this argument ignores the fact that even though the shares were ultimately titled in the name of an affiliate, the HCLOF shares were *sold* by HarbourVest to *Highland*. The addendum transfer where Highland delegated its right to receive the shares to a nominee is "form over substance" and is bad faith, in violation of the Company Agreement § 20.5's "good faith" clause.

Defendant argues that Plaintiff failed to plead actual damages. But Defendant ignores that fact that Plaintiff pleads that the breach of contract denied it the opportunity to obtain a share of the HabourVest Interests at a $20+ million discount, which it alleges are damages. (Compl. at ¶¶ 98–100, 102). Lost profits are an available remedy for breach of contract. *Basic Capital Mgmt. v. Dynex Commer., Inc.*, 402 S.W.3d 257, 268 (Tex. App.—Dallas 2013). "Recovery for loss profits does not require that the loss be susceptible of exact calculation." *Id.* (quoting *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)).

Highland claims that Plaintiff's damages are too speculative. The case it cites, *Snowden v. Wells Fargo Bank, N.A.*, No. 3:18-cv-1797, 2019 U.S. Dist. LEXIS 23557, at *13–14 (N.D. Tex. 2019), which is completely inapposite on the facts because there no one had actually lost their use and enjoyment of the home. However, Plaintiff does plead that it would have paid for the interest with cash. (Compl. ¶ 49-50). Highland's choice to disbelieve this allegation is not relevant here.

---

Because Highland's entire premise for dismissing Plaintiffs' tortious interference claim is predicated on the non-existence of an enforceable contract, Plaintiff's tortious interference claim likewise survives.

**D. PLAINTIFFS HAVE PLED A CLAIM FOR NEGLIGENCE**

Highland's entire argument for dismissal of the negligence cause of action is incorporating its other arguments. But this is a waiver because it has not articulated any basis for dismissal, and has not shown which elements have not been met. First, under long-established Texas law, the elements of a negligence claim are: (a) a legal duty owed by one person to another; (b) breach of that duty; and (c) damages proximately caused by the breach. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Here, the Motion should be denied because the elements have all been pled. *See* Compl. ¶ 103-112.

**E. PLAINTIFFS HAVE PLED A CAUSE OF ACTION UNDER RICO**

Highland seeks to dismiss Plaintiffs' Racketeer Influenced and Corrupt Organizations (15 U.S.C. § 1961 et seq.) claims ("RICO") under Rule 12(b)(6), alleging that the Complaint does not comply with Rule 9(b). The Motion should be denied because Plaintiffs have pled facts with sufficient particularity to meet the elements of a RICO violation and to give notice to Highland of the claims against it.

"Regardless of subsection, RICO claims under § 196[4] [sic] have three common elements: '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'" *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)). To recover under § 1964(c), a plaintiff must plead that the elements of a

---

substantive RICO violation as well as that it "has been injured in [its] business or property by the conduct constituting the violation." *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985).

We address the elements in turn.

### 1. Highland is a "RICO" Person

Plaintiffs have alleged that Highland is a RICO person for the purposes of the RICO claim via its conduct by James Seery. (Compl. ¶¶ 129-133). Highland takes no issue with this element in its Motion.

### 2. Plaintiffs Have Pled a RICO "Enterprise"

For the purpose of RICO, an "enterprise" may be "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Thus, "[a] RICO enterprise can be either a legal entity or an association-in-fact." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995).

Plaintiffs have alleged that HCLOF may rightly be considered an enterprise unto itself because it is a legal entity. (Compl. ¶¶ 5, 115). *Crowe*, 43 F.3d at 204.

Additionally, Plaintiffs have alleged that the association between HCLOF, HCFA and Highland is rightly an "association in fact" enterprise (Compl. ¶ 115-116). HCFA was the portfolio manager of HCLOF, and Highland operated HCFA as its wholly owned subsidiary (Compl. ¶ 24). HCFA—and by extension, Highland—was able to exert near plenary power over HCLOF under the HCLOF Company Agreement.[14] An association-in-fact enterprise "1) must have an existence separate and apart from the pattern of racketeering, 2) must be an ongoing organization and 3) its

---

[14] The HCLOF Company agreement is incorporated by reference in the Complaint, (Compl. ¶ 93). The Court is thus permitted to consider it alongside this Response. *Accord In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (contracts referenced in the complaint may be considered as part of a 12(b)(6) consideration).

members must function as a continuing unit as shown by a hierarchical or consensual decision-making structure." *Crowe*, 43 F.3d at 205. Here, all three of these have been met:

***First***, the association in fact has an existence separate and apart from the pattern of racketeering. [15] HCLOF is an investment vehicle run by HCFA and Highland pursuant to contracts between and among them, such as the HCLOF Company Agreement at Recital B which explains the "Business" in which HCLOF was to engage (App_20).

***Second***, the association-in-fact was an ongoing association amongst the three since the 2017—well before the alleged acts of racketeering began.

***Third***, they functioned as a continuing unit given their hierarchical, consensual decision-making structure. *Accord Crowe*, 43 F.3d at 205 (holding that farming venture was association in fact because it existed outside of the purpose to commit fraud and theft, and therefore satisfied association in fact enterprise).

Accordingly, the "enterprise" element has been met in two different ways.

### 3. Plaintiffs Have Pled a Pattern of Racketeering Activity with Particularity

"'Racketeering activity' consists of two or more predicate criminal acts that are (1) related and (2) 'amount to or pose a threat of continued criminal activity.'" *Abraham*, 480 F.3d at 355 (quoting *Sawyer*, 90 F.3d at 122).

RICO defines a "pattern of racketeering activity" as one comprised of "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of

---

[15] Highland contends that there is no separateness because it and HCFA are defendants. But the mere fact that Highland and HCLOF are both defendants and part of the enterprise, or that HCLOF is both an enterprise unto itself and part of an enterprise-in-fact, do not defeat the "enterprise" element. *Accord Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir. 1994).

---

which occurred within ten years (excluding any period of imprisonment) after the commission of

a prior act of racketeering activity." 18 U.S.C.S. § 1961(5). Racketeering activity includes,

relevantly, "(B) any act which is indictable under any of the following provisions of title 18, United

States Code: …section 1341 (relating to mail fraud), section 1343 (relating to wire fraud),…[or]

(D) any offense involving fraud connected with a case under title 11 […and ] fraud in the sale of

securities." *See* 18 U.S.C.S. § 1961(1)(B) and (D).

Plaintiffs plead that Highland conducted and controlled the enterprise (whether HCLOF or

the Highland-HCFA-HCLOF enterprises) through a pattern of violations of the wire fraud statute,

breaches of the Advisers Act's antifraud provisions in 15 U.S.C. § 80b-6, and the acts and

omissions designed to defraud Plaintiff of the HarbourVest Interests in HCLOF (Compl. ¶ 132).

### Wire and Mail Fraud

"To establish either mail or wire fraud, the plaintiffs must only [plead] fraudulent intent;

proof of a successful fraudulent scheme is not necessary." *Laird v. Integrated Res.*, 897 F.2d 826,

839 (5th Cir. 1990). The use of the wires to achieve any part of the scheme is sufficient—one need

not allege (much less prove) that an allegedly fraudulent statement was uttered or communicated

through the interstate mails or wires. *Accord United States v. Westbo*, 746 F.2d 1022, 1025-26 (5th

Cir. 1984) ("when a defendant is proved to be a participant in a scheme to defraud and a document

is mailed in furtherance of the scheme, the defendant may be convicted of mail fraud.").[16]

Here, the Original Complaint alleges that:

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter
11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the

---

[16] Mail fraud precedent counts for wire fraud. *United States v. Bruno*, 809 F.2d 1097, 1104 (5th
Cir. 1987) ("Because the requisite elements of 'scheme to defraud' under the wire fraud statute,
18 U.S.C. § 1343 and the mail fraud statute are identical, cases construing  mail fraud  apply to the
wire fraud statute as well.");

Northern District of Texas Bankruptcy Court, in the case styled In Re: Highland Capital Management, L.P., Debtor, Cause No. 19-34054…

17.    The debtor, HCM, made an omnibus response to the [HarbourVest] proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

29.    On December 23, 2020, HCM moved the Court to approve a settlement between itself and HarbourVest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

31.    On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

119.    In or about November 2020, HCM and HarbourVest entered into discussions about settling the HarbourVest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of HarbourVest's Interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including HarbourVest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the HarbourVest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the HarbourVest Assets at their current valuation and at fair market value. […]

126.    In supporting HCM's motion to the Bankruptcy Court to approve the HarbourVest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

_____

Plaintiffs' Response to Motion to Dismiss Complaint                                    Page 29

129.    Seery was at all relevant times operating as an agent of HCM.

Compl. ¶¶ *passim*. Defendant's contention that the allegations of the use of the mails and

wires were not sufficiently pled under Rule 9(b) is meritless.[17]

### Fraud in Connection the Sale of a Security

The violation of the securities laws, including the Investment Advisers Act if it is in

connection with the sale of securities, can serve as a predicate to a RICO claim. *See* 18 U.S.C.S. §

1961(1)(D). *See also Youmans v. Simon*, 791 F.2d 341, 348 (5th Cir. 1986); *Laird v. Integrated*

*Res.*, 897 F.2d 826, 839 (5th Cir. 1990).

Here, Plaintiffs have already addressed above why the scheme of self-dealing and self-

enrichment alleged in the Complaint constitute violations of the Advisers Act. *See supra. See also*

Comp. ¶¶ 55-91; 113-133. That these were in connection with the sale of HCLOF interests which

are securities is uncontested. Indeed, the HCLOF Company Agreement provides that the

ownership interests are "ordinary shares" and that shareholders generally own passive interests in

HCLOF.[18] 15 U.S.C. § 80b-6 specifically states that it shall be unlawful to use the interstate wires

---

[17]  There are additional allegations of using the interstate wires and instrumentalities of interstate commerce to reach the settlement because the parties were in different states (Compl. ¶¶ 1-5, 119), to conduct valuations of the HCLOF interests on or about September 30, 2020 (Compl. ¶¶ 40, 120), to communicate valuations which themselves were false (Compl. ¶ 121), to cause the motion for approval of the settlement to be filed in the bankruptcy court on December 23, 2020 via ECF (Compl. ¶ 122), misrepresenting the value of the assets in live court testimony (which was obviously conducted remotely via Webex (App_5)) (Compl. ¶ 122), that Seery had travelled to Dallas in December 2020 to attend a meeting wherein he received material information (Compl. ¶ 127), among several others.

[18]  (App__0024-25 (discussing control of business of HCLOF is in Board and Portfolio Manager)), HCLOF Company Agreement at ¶¶ 1.1 (HCFA is Portfolio Manager), ¶ 3.2 (power of Portfolio Manager to decide the value of assets), ¶ 4.1 (power of Portfolio Manager to run HCLOF's business and make investment decisions unilaterally), ¶ 4.3 (power of Portfolio Manager to take any action unless it requests approval "in its sole discretion", unless narrow exceptions apply), ¶ 5.3 (power of Portfolio Manager to take over shares from defaulting Member)), ¶ 9.1 (power of Portfolio Manager to dissolve company).

---

or mails, or "any instrumentality of interstate commerce" in connection with any of the violative courses of conduct. The violations and nexus to the instrumentalities of interstate commerce have already been addressed above and are incorporated herein.

Accordingly, because there are numerous predicate acts that allege a fraud in *connection with* the sale of a security (e.g., the sale of the HarbourVest Interests to Highland as opposed to CLO Holdco), these acts, together and when combined with the alleged acts of use of the interstate wires and mail, form a pattern of racketeering activity.

### 4. **Plaintiffs Have Pled a Basis to Infer Scienter**

To establish a RICO claim based on a pattern of mail or wire fraud, the plaintiff must plead that the defendant "act[ed] knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005). This can be met through pleading circumstantial evidence from which knowledge or intent can reasonably be inferred. *Ranieri v. Advocare Int'l, L.P.*, 336 F. Supp. 3d 701, 716 (N.D. Tex. 2018) (finding scienter met through circumstantial evidence).

Here, Plaintiffs allege that Highland knew of its disclosure obligations when trading in securities that its advisees and those to whom it owes fiduciary duties may be interested, and that it is charged with knowing them because it is a Registered Investment Adviser under the Advisers Act (Compl. ¶ 4, 11). It is charged with such an awareness of its duties as well, and with the SEC's rules. *See* SEC Release at p. 6. The Advisers Act requires Highland to maintain policies and procedures that will ensure compliance with its fiduciary duties. *See* SEC Release at p. 21-22 (and footnotes therein). Indeed, Plaintiffs alleged that Highland's policies and procedures were supposed to prevent its trading adverse to its investors (Compl. ¶ 46). Jim Seery admitted that he and Highland had these fiduciary duties under the Advisers Act (App_0009, 0014).

---

Plaintiffs' Response to Motion to Dismiss Complaint                                    Page 31

Plaintiffs have also alleged that Seery knew or should have known the value of the HarbourVest Interests at the time her was negotiating with Harborne's, and at the time of the approval hearing in January 2021. *See* Compl. ¶¶ 45, 76. The Company Agreement imposes a duty to manage that as well (App_ 0023, 0029-30 (noting the ongoing duty to calculate the NAV (net asset value, and financial reporting duties)).

These are undisputed facts. Therefore Highland cannot credibly disclaim awareness of fiduciary duties in connection with the sale of HCLOF interests from HarbourVest to itself. Plaintiffs have credibly pled that Highland was aware that it was purchasing the HarbourVest Interests at a substantial discount to the then-current NAV, which was a corporate opportunity that it contractually would have been aware belonged to HCLOF or its investors (App_0020; 0023).

Thus, a reasonable jury could infer from these facts that Highland purposefully withheld the disclosures and information it was obligated under the Advisers Act to supply, for the specific purpose of taking advantage of the HarbourVest Interests (a gain for Highland), while intending to deprive Plaintiffs of that interest (a pecuniary loss to Plaintiffs). Courts have found adequate lesser allegations of scienter. *Accord Ranieri*, 336 F. Supp. 3d at 716.

**5.  Plaintiffs Have Pled Injury to Their Business or Property Due to the RICO Violations**

Plaintiffs have been injured because it was wrongfully deprived of the HarbourVest Interests in HCLOF through a pattern of racketeering activity (Compl. ¶¶ 133). Contrary to the suggestion by the Defendant, the Supreme Court has held that a RICO plaintiff need not allege a "RICO injury" separate and apart from the injury arising from the racketeering activity itself. *See Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985).

As the Supreme Court put it in *Bridge v. Phoenix Bond & Indemnity Co.*: "[A] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any

---

misrepresentations.'" The Court explained that "[p]roof that the plaintiff relied on the defendant's misrepresentations may in some cases be sufficient to establish proximate cause, but there is no sound reason to conclude that such proof is always necessary." *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 649 (2008). "Moreover, a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id*. Specifically, if they have lost the right to obtain a valuable asset. *Id*. ("Accepting their allegations as true, respondents clearly were injured by petitioners' scheme: As a result of petitioners' fraud, respondents lost valuable liens they otherwise would have been awarded. And this is true even though they did not rely on petitioners' false attestations of compliance with the county's rules.") *Id*.

Here, Plaintiff CLO Holdco has alleged that but for Highland scheme to deprive Plaintiffs of the HarbourVest Interests, and the actions taken in connection with it, Highland would have otherwise been forced to disclose the entire transaction first because of the conflict of interest, and to purge that interest it would have had to offer it to the Plaintiffs. Plaintiff Holdco has alleged that had it been offered the HarbourVest Interests, it would have paid cash for it. (Compl. ¶ 50). Highland contends this allegation is "speculative." While Highland can investigate in discovery whether Holdco had the cash is actually true, that does not render the allegation speculative.

**6.   Highland's Defenses Are Legally Infirm or Improper at the 12(b)(6) Stage**

Highland contends that under various precedent, the fact that Plaintiffs have pled a single transaction that is alleged to be fraudulent is insufficient to make out a RICO claim, and that it lacks the requisite "continuity." However, the Fifth Circuit in *R.A.G.S. Couture, Inc. v. Hyatt*, held that two alleged uses of interstate wires, in a short period of time, and connected to a single transaction alleged to have been fraudulent, was sufficient to state a claim under RICO. 774 F.2d 1350, 1351-53 (5th Cir. 1985). The Fifth Circuit rejected the arguments raised by Highland here,

---

that "more" is needed, noting also that the Supreme Court had "held that an enterprise may be organized solely for illegitimate purposes, and that evidence of the existence of the enterprise may coalesce with evidence of the underlying pattern of racketeering." *Id.* at 1353. *Accord Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1129 (5th Cir. 1988) (following *R.A.G.S.,* and holding plaintiff's allegation of "over half a dozen acts of mail fraud and wire fraud, each of which stems from Westside's bond offer" and in a short period of time).

Highland's reliance on the Supreme Court's opinion in *H.J. Inc. v. Northwestern Bell Tel. Co.* is also misplaced. There, the Supreme Court pointed out that continuity does not require a showing of *separate* illegal schemes. 492 U.S. 229, 236 (1989) ("We find no support in those sources for the proposition, espoused by the Court of Appeals for the Eighth Circuit in this case, that predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes."). Contrary to Highland's taxing interpretation, *H.J.* merely held that the predicate acts have to relate to each other in order to constitute a "pattern". *Id.* at 239. Highland's contention that the Court's reference to a "threat of continuing activity."[19]

Therefore, Highland's objections should be overruled and its Motion denied.

## VI.

## <u>MOTION FOR LEAVE TO AMEND</u>

Plaintiffs respectfully ask for leave to amend in the alternative to cure any pleading deficiencies that the Court determines exist. A court's discretion to grant leave is severely limited by the bias of Rule 15(a) favoring amendment. *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d

---

[19] Plaintiff would further suggest that upon amendment, Plaintiff would plead that there is a pattern of violations of the Advisers Act by Highland over the course of the past year, one threatens to continue unabated into the future because Highland has clearly decided to shirk fiduciary duties to the investors in its funds.

---

594, 598 (5th Cir. 1981). Leave to amend "should not be denied 'unless there is a *substantial reason* to do so.'" *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (emphasis added) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)).

Amendment would not be futile because—to the extent necessary under Rule 9(b)—Plaintiffs could add more detail on the instrumentalities of interstate commerce and address in further detail the allegations claimed to be deficient. The balance between Rule 8 and Rule 9(b) is not always perfect on the first try, and Plaintiffs should not be dismissed for want of an opportunity to cure any deficiencies. Plaintiffs further would request the opportunity to add a Rule 10b-5 claim, which can be premised on violations of the Advisers Act. *Laird v. Integrated Res.*, 897 F.2d 826, 835 (5th Cir. 1990 (recognizing that Advisers Act violations can be a basis for 10b-5 liability, holding that "for the purpose of rule 10(b)-5, an investment adviser is a fiduciary and therefore has an affirmative duty of utmost good faith to avoid misleading clients. This duty includes disclosure of all material facts and all possible conflicts of interest."). Plaintiffs would finally request to add a claim under the Advisers Act to divest *Highland* of the rights it obtained in violation thereof under 15 U.S.C. § 80b-15(b). *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. at 17 (finding private right of action under Section 215 of Advisers Act to seek equitable relief to disgorge rights obtained in violation of the Advisers Act).

## VII.

## CONCLUSION

For the foregoing reasons, the 12(b)(6) motion should be denied in full.

Dated:  June 29, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

### APPENDIX IN SUPPORT OF PLAINTIFF'S RESPONSE TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION TO DISMISS COMPLAINT

| App'x No. | Description | Bates Range |
|---|---|---|
| 1 | Declaration of Mazin A. Sbaiti | APP_0001 - 0005 |
| 2 | Excerpts from Transcript of Hearing of Application to Employ James P. Seery, Jr. on July 14, 2020 | APP_0006 - 0017 |
| 3 | Highland CLO Funding - Members Agreement Relating to the Company | APP_0018 - 0045 |
| 4 | HarbourVest Settlement Agreement | APP_0040 - 0058 |
| 5 | Order Approving Debtor's Settlement with HarbourVest | APP_0065 - 0087 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF MAZIN A. SBAITI

1.     My name is Mazin A. Sbaiti. I am over twenty-one years old and fully competent in all respects to make this Declaration.

2.     I am a partner at Sbaiti & Company PLLC, and am admitted in good standing in this Court. I represent Plaintiffs Charitable DAF Fund, L.P. and CLO Holdco, Ltd. in this matter. The facts stated in this Declaration are based on my personal knowledge and made under penalty of purjury.

3.     Exhibit 1 is a true and correct copy of excerpts from a Transcript of the July 14, 2020 Hearing before the Northern District of Texas Bankruptcy Court, in the *In Re Highland Capital Management, LP,* Cause No. 19-34054-sgj11.

4.     Exhibit 2 is a true and correct copy of the Highland CLO Funding Members Agreement Relating to the Company, executed on

5.     Exhibit 3 is a true and correct copy of the HarbourVest Settlement Agreement, entered into between Highland Capital Management and the various Harbourvest entities in the bankruptcy.

6.     Exbibit 4 is a true and correct copy of the Order Approving Settlement with Harbourvest under Rule 9019 (the "9019 Order").

Executed on June 29, 2021.

/s/ Mazin A. Sbaiti
Mazin A. Sbaiti

001807

[Page Reserved]

[Page Reserved]

[Page Reserved]

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:23-cv-01503-E-BN Document 18-9 Filed 09/17/23 Page 114 of 210 PageID 2070
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 1 of 134

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION
 2
                                     )     Case No. 19-34054-sgj11
 3     In Re:                        )
                                     )
 4     HIGHLAND CAPITAL              )     Dallas, Texas
       MANAGEMENT, L.P.,             )     July 14, 2020
 5                                   )     1:30 p.m. Docket
                                     )
            Debtor.                  )
 6                                   )     APPLICATIONS TO EMPLOY JAMES
                                     )     P. SEERY AND DEVELOPMENT
 7                                   )     SPECIALISTS, INC. (774, 775)
                                     )
 8     _____
                            TRANSCRIPT OF PROCEEDINGS
 9              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                      UNITED STATES BANKRUPTCY JUDGE.
10
       WEBEX/TELEPHONIC APPEARANCES:
11
       For the Debtors:             Jeffrey N. Pomerantz
12                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    10100 Santa Monica Blvd.,
13                                    13th Floor
                                    Los Angeles, CA   90067
14                                  (310) 277-6910

15     For the Debtors:             John A. Morris
                                    Greg Demo
16                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    780 Third Avenue, 34th Floor
17                                  New York, NY   10017-2024
                                    (212) 561-7700
18
       For the Debtors:             Ira D. Kharasch
19                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    10100 Santa Monica Blvd.,
20                                    13th Floor
                                    Los Angeles, CA   90067-4003
21                                  (310) 277-6910

22     For the Debtors:             Zachery Z. Annable
                                    Melissa S. Hayward
23                                  HAYWARD & ASSOCIATES, PLLC
                                    10501 N. Central Expressway,
24                                    Suite 106
                                    Dallas, TX   75231
25                                  (972) 755-7104
```

Case 21-03067-sgj   Doc 39   Filed 09/29/21   Entered 09/29/21 18:13:08   Desc Main
Case 3:23-cv-01503-B   Document 8-8   Filed 06/17/23   Page 115 of 210   PageID 2071
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 16 of 134

Seery – Direct                    16

 1   matter as well as financing in distressed matters during that

 2   time.

 3       In 1999, I went to the business side and I began to manage

 4   distressed assets at Lehman Brothers as well as a leverage

 5   finance business.  That grew into my running the risky finance

 6   business as well as the loan business at Lehman globally,

 7   which included high-grade loans, high-yield loans, trading and

 8   sales of those products, a big part of distressed, all of

 9   restructuring, all of asset management, and all of the hedging

10   of the portfolio that we had.

11       From there, I left Lehman with a small group and sold it

12   to Barclay's.  I moved on and ran a hedge fund with two former

13   partners of mine who are the founding partners called River

14   Birch Capital.  It was a long-short credit fund; mostly

15   credit, though we did structured finance as well, and we also

16   handled some equities.

17   Q    Okay.  Let's spend a few minutes, as a preview, talking

18   about the Debtor and its business.  And let's start with the

19   basics.  Is there a way you can summarize the business of the

20   Debtor?

21   A    I think, from a high level, the best way to think about

22   the Debtor is that it's a registered investment advisor.  As a

23   registered investment advisor, which is really any advisor of

24   third-party money over $25 million, it has to register with

25   the SEC, and it manages funds in many different ways.

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:23-cv-01503-E-BS Document 6-8 Filed 09/13/23 Page 116 of 210 PageID 2072
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 17 of 134

Seery - Direct                    17

1        The Debtor manages approximately $200 million current

2   values -- it was more than that at the start of the case -- of

3   its own assets.  It doesn't have to be a registered investment

4   advisor for those assets, but it does manage its own assets,

5   which include directly-owned securities; loans from mostly

6   related entities, but not all; and investments in certain

7   funds which it also manages.

8        In addition, the Debtor manages about roughly $2 billion

9   in -- $2 billion in total managed assets, around $2 billion in

10  CLO assets, and then other entities, which are hedge funds or

11  PE style.

12       In addition, the Debtor provides shared services for

13  approximately $6 billion of assets.  Those are assets that are

14  owned by related entities but not owned by Debtor-owned or

15  managed entities.  And those are a combination of back office

16  services, which include timely reporting, asset management,

17  legal and compliance support, trading and research support,

18  but not the actual management of the assets.

19       The Debtors run -- and I think the way to think about it

20  is on a functional basis; at least, that's the way I think

21  about it -- and there's really six areas.  There's corporate

22  management; finance, accounting and tax; trading and research;

23  private equity and fund investing; compliance and legal; and

24  then structured equity, which really includes all of the CLO

25  businesses.

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:23-cv-00514-B-BD Document 1-89 Filed 08/01/23 Page 117 of 210 PageID 2073
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 18 of 134

Seery - Direct                                                   18

1    The goals of the Debtor generally are what you'd expect

2    out of an asset manager.  A little bit different than most

3    because the Debtor does own assets, which is a little

4    different than when money asset managers typically hold assets

5    away from the asset manager.  But number one, discharge

6    Highland's, which I'll call Highland (inaudible), LP, duties

7    to investors in the funds.  Those are fiduciary duties under

8    the Investment Advisors Act.  Each day, you've got to make

9    sure that you do that first and foremost.

10   Number two, create positive MPD in each of the funds that

11   we manage, either through sales, purchases, or hedging.

12   Next, make sure that we report timely finances of our own

13   assets, including in the funds, but also, to the third-party

14   investors.  Maximize the value of HCMLP's owned assets.  And

15   then operate as efficiently as possible for the lowest cost.

16   That's essentially how the Debtor -- how we think about

17   the Debtor from a functional perspective.  It's got about 70

18   employees laid out in those areas that I mentioned, and each

19   of those employees every day usually think about those goals

20   and try to discharge their duties by focusing on those goals.

21   Q    Thank you, Mr. Seery.  And can you describe for the Court

22   how those 70 or so employees are organized?  Is there an

23   internal corporate structure that you're working with?

24   A    Yeah.  The way -- the way -- I apologize.  The way we

25   think about it is, as I said, corporate management, which is

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:23-cv-01503-B-BD Document 18-9 Filed 08/11/23 Page 118 of 210 PageID 2974
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 19 of 134

Seery - Direct                                    19

1   really HR and overseeing the function that it's filling every

2   day, that's been really -- because Mr. Dondero was removed

3   from management.  It used to all roll up to him.  That's been

4   effectively rolling up to me since February.

5       Finance, accounting, and tax.  Each of these businesses

6   every day require certain amounts of liquidity.  Each of them

7   have requirements that they have to pay out to investors.

8   Each of them have expenses.  And all of them have different

9   kinds of tax either obligations or reporting.  Those are

10  managed by Frank Waterhouse as the CFO.  (inaudible), sorry.

11      Trading and research.  With respect to the assets, they're

12  not -- they're not static assets.  Many of them do get traded

13  on a regular basis.  A gentleman, Joe Sowin, heads up the

14  trading of the liquid assets.  John Povish (phonetic) heads up

15  the research and the trading of the more illiquid assets, but

16  not PE.  In addition, we have PE assets that require some

17  management every day, including Board seats.  That's a

18  gentleman by the name of Cameron Baynard, and also he will

19  fund investments in that area.  J.P. Sevilla is responsible

20  for working with Cameron on those investments and leading that

21  team.

22      Importantly, because of the nature of what the Debtor

23  does, the fiduciary obligations, as well as the

24  responsibilities to each investor and the legal overlay, we

25  have a robust compliance and legal department.  That's headed

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:23-cv-01580-B-BD Document 118 Filed 08/12/23 Page 129 of 210 PageID 2075
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 20 of 134

1   by Thomas Surgent and Scott Ellington.  Scott:  more focused

2   on transactional issues with respect to legal.  He is actually

3   general counsel.  Everything that has do with compliance, the

4   interrelatedness of the funds, trading between funds or

5   positions that are shared across funds, which are many, runs

6   through Thomas Surgent and his team.

7        And finally, structured equity.  Sitting on top of the

8   structured finance business that we have, understanding those

9   assets, particularly of two billion-ish assets in CLOs, that's

10  headed by Hunter Covitz.

11  Q    Can you describe for the Court your interaction with each

12  of the department heads that you just identified?

13  A    Well, depending on the nature of the issue each day, I

14  have at least -- I'd say generally at least weekly contact

15  with most, often daily contact with most.  So, for example,

16  when there are trading issues, particularly as the market was

17  extremely volatile with respect to unliquid securities, Joe

18  Sowin and I were on the phone several times a day.

19       Relating to the COVID issues, Brian Collins, who heads the

20  HR group, and I were on the phone several times a day.

21       Relating to structured equity, depending on what's

22  happening with a particular fund or what's happening in loan

23  prices, I speak to Hunter Covitz.  And it goes down the line.

24       So it really depends on each of the areas and what's going

25  on in the business, but I try to touch base with each of those

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:23-cv-01503-B-BD Document 1889nt Filed 06/19/23 8Page 120 of 210 PageID 2076
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 21 of 134

Seery - Direct                          21

1   department heads on a regular basis.

2       Frank Waterhouse, of course, is at least weekly.  We have

3   a standing call every week to make sure that we're focused on

4   liquidity, which is always a concern in a Chapter 11, and

5   Frank and his team are on that call and prepare weekly

6   materials for us.

7   Q    Okay.

8           MR. MORRIS:  Your Honor, before I move to the next

9   area of questions, the work of the Board, I just wanted to see

10  if the Court had any questions on the corporate organizational

11  structure, the internal structure of the business, or any of

12  the matters that Mr. Seery touched on?

13          THE COURT:  I do not.  And I do have in front of me a

14  demonstrative aid that Mr. Annable sent over ahead of time, so

15  I appreciate that as well.

16          MR. MORRIS:  Okay.  Your Honor, I think Mr. Seery

17  covered much of what's on that document, but if you'd like him

18  to go through that, we're happy to do it.

19          THE COURT:  No, that's fine.

20          MR. MORRIS:  Okay.

21  BY MR. MORRIS:

22  Q    Then let's shift gears a little bit and start talking

23  about the work of the Independent Board itself.  The

24  Independent Board was appointed in mid-January; is that right?

25  A    Yeah.  It was the first -- January 9th, the first week of

Case 21-03067-sgj   Doc 39   Filed 09/29/21   Entered 09/29/21 18:13:08   Desc Main
Case 3:23-cv-01504-B-BD Document 1-89 Filed 08/14/23 Page 121 of 210 PageID 6207
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 22 of 134

Seery - Direct                              22

1    January, and we started working that afternoon.

2    Q    Okay.  Can you describe for the Court what the -- the

3    Board's initial focus?  What were you focused on?

4    A    Well, if you think about the areas that I just mentioned

5    previously, the Board initially, for lack of a better term,

6    gang-tackled everything.  So we tried to make sure that we had

7    a broad base of understanding among the three of us with

8    respect to the business.

9        I, because of my background, had a lot more familiarity

10   with asset management, these type of asset security

11   businesses.  But we wanted to make sure that each of us was at

12   least facile with the main areas that we had to understand.

13   First was operations.  How does the company run each day?

14   Particularly, how was it going to run without Mr. Dondero?

15   And I went through some of those functional areas and how we

16   thought about those and who head each of those.

17       Next in the -- I don't mean to say it's second, because

18   it's always first, but liquidity.  What did the Debtors'

19   liquidity look like?  How are we going to manage that

20   liquidity, not just for the near-term, but also for the

21   medium-term, and then even into the slightly longer-term?  We

22   had to think about what assets are there, what money those

23   assets might need that we would have to invest in them, and

24   whether there was liquidity in those assets that we can create

25   liquidity in order to fund the Debtors' business.

Case 21-03067-sgj   Doc 39   Filed 09/29/21   Entered 09/29/21 18:13:08   Desc Main
Case 3:23-cv-01503-B-BD Document 18-9 Filed 09/19/23 Page 122 of 210 PageID 6278
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 23 of 134

Seery - Direct                                    23

1        Personnel, we needed a good opportunity to understand who

2    did what, not just in the senior managers that I mentioned,

3    but deeper into the staff, because we're going to rely on

4    those folks.  Particularly worked through with DSI.

5        As I mentioned, the Debtor, unlike a lot of other asset

6    managers, owns a lot of assets.  It's a disparate group of

7    assets, but getting a feel and understanding for what those

8    assets were, what the critical issues surrounding those assets

9    are, who managed them day-to-day:  We wanted to make sure that

10   each of the directors had a good (inaudible) and understanding

11   of those issues that might arise with respect to those assets,

12   and a good sense of how quickly those issues could, you know,

13   further arise.

14       We also had to get a very good understanding of each of

15   the funds that we manage.  As I said, the Investment Advisors

16   Act puts a fiduciary duty on Highland Capital to discharge its

17   duty to the investors.  So while we have duties to the estate,

18   we also have duties, as I mentioned in my last testimony, to

19   each of the investors in the funds.

20       Now, some of them are related parties, and those are a

21   little bit easier.  Some of them are owned by Highland.  But

22   there are third-party investors in these funds who have no

23   relation whatsoever to Highland, and we owe them a fiduciary

24   duty both to manage their assets prudently but also to seek to

25   maximize value.  And we wanted to make sure we had a good

Case 21-03067-sgj    Doc 39    Filed 09/29/21    Entered 09/29/21 18:13:08    Desc Main
Case 3:21-cv-01054-B-BD Document 1189t Filed 08/16/23 Page 123 of 210 PageID 32079
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 24 of 134

Seery - Direct                    24

1    understanding of that.

2         Finally, with respect to the shared service arrangements,

3    we needed to get an understanding of that $6 billion in assets

4    and how our business, HCMLP, worked with those -- those shared

5    service counterparties and exactly who did what for whom.

6    It's very complicated because it had been run much more on a

7    functional basis than on a line basis from each contract.  So

8    it's not as if your employees are allocated to NexBank.  It's

9    the whole panoply of businesses that we enter into, and

10   providing those services to NexBank, not through a central

11   point but through whatever requests come in from the counter-

12   parties.  So we needed a good understanding of what those

13   contracts looked and what those obligations were.

14        A VOICE:  John, you're on mute.

15        MR. MORRIS:  Thank you.

16   BY MR. MORRIS:

17   Q    All of that work was going on in the first weeks of the

18   appointment of the Board?

19   A    Yeah, it would not be fair to say we could do that in a

20   couple weeks.  So it took far longer than that.  But that

21   didn't mean that issues didn't start to arise immediately in

22   February.  And so, while we were learning, we were also

23   starting to get a feel for different things that could happen

24   in the company.

25        As in many companies, immediately, one of the first things

Case 21-03067-sgj   Doc 39   Filed 09/29/21   Entered 09/29/21 18:13:08   Desc Main
Case 3:21-cv-01504-B-BD Document 1-89  Filed 06/19/23  Page 124 of 210  PageID 2680
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 25 of 134

Seery - Direct                               25

1    you have to deal with is, particularly at the beginning of the

2    year, what does compensation look like; who are the -- what do

3    promotions look like; are you going to be able to hold this

4    team together to service these assets?  And yeah, we had that,

5    with an additional wrinkle that Highland's payment structure

6    defers a significant amount of compensation to its employees,

7    and it vests over time, and it has the very typical provision

8    that if you are not there when it vests -- when it is going to

9    be paid, actually, not when it vests.  Even if you're vested,

10   if you're not there when it gets paid, you're not entitled to

11   it.  And so understanding who was owed what; how the vesting

12   worked; what the compensation structure looked like compared

13   to third parties, was one of the first things we had to do.

14   And Highland has an extremely robust review process.  Brian

15   Collins manages it.  It's first-rate.  It goes through both

16   360 in terms of what other employees think of each other as

17   well as bottoms up, in terms of performance.  And then it has

18   a top-down component, which ultimately ran through Mr.

19   Dondero.  Since he was effectively removed from that role, the

20   Board had to jump in and get a full understanding with Brian

21   about what the process looked like; how it was going to work;

22   how it compared to other firms; and whether we could go

23   forward with it.  And that was one of the motions that was

24   brought early to the Court.

25   A    Let's talk a minute about the transactional work that the

Case 21-03067-sgj   Doc 39   Filed 09/29/21   Entered 09/29/21 18:13:08   Desc Main
Case 3:23-cv-01504-B   Document 18-7   Filed 08/18/23   Page 125 of 210   PageID 2681
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 133 of 134

133

1  yesterday counsel for Mr. Dondero filed a joinder in the

2  Debtors' objection to Acis's claim.  So, again, just thinking

3  about this in the context of mediation, I think, with that

4  joinder, they will be a necessary party.  So, going back to

5  Mr. Seery's point, this is not just --

6          THE COURT:  Oh, absolutely.  Mr. Dondero is --

7          MS. PATEL:  -- a two-party --

8          THE COURT:  -- going to be a required party in

9  mediation.  Absolutely.  So, --

10          MS. PATEL:  Thank you, Your Honor.

11          THE COURT:  All right.  Well, if there's nothing

12  further, we'll see you on the 21st.  And, again, my courtroom

13  deputy may be reaching out before then if we've got things

14  nailed down on mediation.

15      (Proceedings concluded at 4:54 p.m.)

16                          --oOo--

17

18

19

20

21                      CERTIFICATE

22      I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
   the proceedings in the above-entitled matter.

23

    **/s/ Kathy Rehling**                    **07/16/2020**

24
   _____      _____
25  Kathy Rehling, CETD-444                   Date
   Certified Electronic Court Transcriber

001822

**EXECUTION VERSION**

Between

**CLO HOLDCO, LTD.**

And

**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

And

**HARBOURVEST 2017 GLOBAL AIF L.P.**

And

**HARBOURVEST 2017 GLOBAL FUND L.P.**

And

**HV INTERNATIONAL VIII SECONDARY L.P.**

And

**HARBOURVEST SKEW BASE AIF L.P.**

And

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

And

**LEE BLACKWELL PARKER, III**

And

**QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311**

And

**QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811**

And

**QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612**

And

**QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211**

And

**HIGHLAND CLO FUNDING, LTD.**

And

**HIGHLAND HCF ADVISOR, LTD.**

---

**MEMBERS AGREEMENT RELATING TO THE COMPANY**

---

**EXHIBIT 2**
001823

TABLE OF CONTENTS

1.    INTERPRETATION ......................................................................... 2

2.    THE BUSINESS OF THE COMPANY ............................................ 4

3.    VOTING RIGHTS ........................................................................... 4

4.    ADVISORY BOARD ....................................................................... 4

5.    DEFAULTING MEMBERS .............................................................. 4

6.    TRANSFERS OR DISPOSALS OF SHARES ................................ 4

7.    CONFIDENTIALITY ....................................................................... 4

8.    DIVIDENDS .................................................................................... 9

9.    TERM OF THE COMPANY ........................................................... 9

10.   ERISA MATTERS .......................................................................... 9

11.   TAX MATTERS .............................................................................. 9

12.   AMENDMENTS TO CERTAIN AGREEMENTS .............................. 9

13.   FINANCIAL REPORTS .................................................................. 9

14.   TERMINATION AND LIQUIDATION ............................................... 9

15.   WHOLE AGREEMENT .................................................................. 12

16.   STATUS OF AGREEMENT ........................................................... 12

17.   ASSIGNMENTS ............................................................................. 12

18.   VARIATION AND WAIVER ............................................................ 12

19.   SERVICE OF NOTICE .................................................................. 12

20.   GENERAL ..................................................................................... 13

21.   GOVERNING LAW AND JURISDICTION ...................................... 14

SCHEDULE ............................................................................................. 18
Adherence Agreement ............................................................................. 18

**THIS AGREEMENT** is made the 15th day of November 2017

**BETWEEN**

(1)   **CLO HOLDCO, LTD.** whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)   **HARBOURVEST DOVER IX INVESTMENT L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)   **HARBOURVEST 2017 GLOBAL AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)   **HARBOURVEST 2017 GLOBAL FUND L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)   **HV INTERNATIONAL VIII SECONDARY L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)   **HARBOURVEST SKEW BASE AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)   **HIGHLAND CAPITAL MANAGEMENT, L.P.** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)   **LEE BLACKWELL PARKER, III** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)   **QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311** of 17171 Park Row #100, Houston, Texas 77084, USA

(10)  **QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811** of 17171 Park Row #100, Houston, Texas 77084, USA

(11)  **QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612** of 17171 Park Row #100, Houston, Texas 77084, USA

(12)  **QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211** of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "**Members**") and

(13)  **HIGHLAND CLO FUNDING, LTD.,** with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**") and

(14)  **HIGHLAND HCF ADVISOR, LTD.,** whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**WHEREAS**:

(A)   The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)   The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "**Offering Memorandum**"), subject to the restrictions set forth therein.

23981765.11. BUSINESS                      1

(C)     The Members are the owners of the entire issued capital of the Company.

(D)     The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

**OPERATIVE PROVISIONS**

1.     **INTERPRETATION**

       In this Agreement, including the Schedule:

1.1    the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

       "**Adherence Agreement**" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

       "**Advisers Act**" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

       "**Affiliate**" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

       "**Agreement**" means this agreement together with the Schedule;

       "**Articles**" means the articles of incorporation of the Company as amended from time to time;

       "**Business**" means the business of the Company as described in Recital (B);

       "**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

       "**Directors**" means the directors of the Company from time to time;

       "**CLO Holdco**" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

       "**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

       "**Directors**" means the directors of the Company from time to time;

       "**Dover IX**" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

       "**DOL**" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

       "**DOL Regulations**" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"**Dover IX**" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"**ERISA**" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"**ERISA Member**" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the  fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"**HarbourVest Entities**" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"**Highland Principals**" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"**Law**" means the Companies (Guernsey) Law, 2008, as amended;

"**Member**" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"**Parties**" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"**Shares**" means ordinary shares in the Company;

"**Subsidiary**" shall have the meaning ascribed to it in the Law;

"**Subscription and Transfer Agreement**" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2    any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3    any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4    any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5    any reference to time shall be to Guernsey time;

1.6    except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

23981765.11. BUSINESS                    3

001827

1.7    unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8    Clause headings are for ease of reference only and do not affect the construction of any provision.

2.    **THE BUSINESS OF THE COMPANY**

2.1    The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2    The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3    The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.    **VOTING RIGHTS**

3.1    The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2    The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

    3.2.1    any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

    3.2.2    any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

    3.2.3    any conversion or redemption of Shares, except pursuant to Clause 5.5,

    3.2.4    any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

    3.2.5    the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

    3.2.6    the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

23981765.11. BUSINESS                    4

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.   **ADVISORY BOARD.**

4.1   <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "**Advisory Board**") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2   <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3   <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum.  Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4    <u>Term of Members of Advisory Board</u>.  A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5    <u>No Duties to Other Members</u>.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.    **DEFAULTING MEMBERS**

5.1    In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "**Outstanding Settlement Amount**"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "**Default Interest Rate**") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "**Defaulting Member**"), the following provisions shall apply:

5.2    Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3    The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

5.4    The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5    The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6    The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7    At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8    The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9    Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.    **TRANSFERS OR DISPOSALS OF SHARES**

6.1    No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

23981765.11. BUSINESS                    7

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1      such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2      such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3      such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4      such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2      Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3      No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4      Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer. The transferor and/or the transferee shall bear all costs of any Transfer.

6.5      The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6      All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

7. **CONFIDENTIALITY**

7.1   Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2   Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8. **DIVIDENDS**

8.1   The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9. **TERM OF THE COMPANY**

9.1   Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "**Term**"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2   Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10. **ERISA MATTERS**

10.1  The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with such other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11. **TAX MATTERS**

11.1  <u>PFIC</u>. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

23981765.11. BUSINESS                                        9

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2 <u>CFC</u>. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3 <u>Other Tax Information</u>. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4 <u>Withholding and Other Taxes</u>. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12. **AMENDMENTS TO CERTAIN AGREEMENTS**

12.1 The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "**Management Agreement**") without the consent of the Parties.

12.2 The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3 The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13. **FINANCIAL REPORTS**

13.1 The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2    After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.    **TERMINATION AND LIQUIDATION**

14.1    Save as provided for in Clause 13.2, this Agreement shall terminate:

14.1.1    when one Party holds all the Shares;

14.1.2    when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

14.1.3    with the written consent of all the Parties.

14.2    The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3    Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4    Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

14.4.1    all existing contracts of the Company are performed to the extent that there are sufficient resources;

14.4.2    the Company shall not enter into any new contractual obligations;

14.4.3    the Company is dissolved and its assets are distributed as soon as practical; and

14.4.4    any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

001835

15. **WHOLE AGREEMENT**

15.1  This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2  Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3  Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16. **STATUS OF AGREEMENT**

16.1  Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2  If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17. **ASSIGNMENTS**

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18. **VARIATION AND WAIVER**

18.1  A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2  A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3  A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19. **SERVICE OF NOTICE**

19.1  Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

19.1.1  to the Company:
Address:
First Floor, Dorey Court, Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

19.1.2  to CLO Holdco:

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3  to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4  to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2  Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee **PROVIDED THAT** if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3  In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20.  **GENERAL**

20.1  Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2  Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3  The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4  All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5  Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

23981765.11. BUSINESS                    13

20.6  Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7  This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.  **STATUS OF AGREEMENT**

21.1  The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2  If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22.  **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[*Signature Page Follows.*]

001838

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:................................................................
**Name:** Grant Scott
**Title:** Director

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:     HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .........................................................

**Name:**  Michael J. Pugatch
**Title:**   Authorized Person

**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:     HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .........................................................

**Name:**  Michael J. Pugatch
**Title:**   Authorized Person

**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:     HarbourVest 2017 Global Associates L.P.,
        its General Partner

By:     HarbourVest GP LLC,
        its General Partner

By:     HarbourVest Partners, LLC,
        its Managing Member

**By:** .........................................................

**Name:**  Michael J. Pugatch
**Title:**   Managing Director

SIGNATURE PAGE TO MEMBERS' AGREEMENT

001840

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:    HIPEP VIII Associates L.P.
       Its General Partner
By:    HarbourVest GP LLC
       Its General Partner
By:    HarbourVest Partners, LLC
       Its Managing Member

**By:** ................................................
**Name:**   Michael J. Pugatch
**Title:**   Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
       its Alternative Investment Fund Manager

**By:** ................................................
**Name:**   Michael J. Pugatch
**Title:**   Authorized Person


SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED**

Lee Blackwell Parker, III

APP_0037

001842

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

X

By:
Name: _Emmanuel Magael_
Title: _transactions supervisor_

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By: ..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By: ..................................................................
Name: Emmanuel Mabei
Title: Transactions supervisor

Recd & approved

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By: ..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By: ..................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
Name: *Emmanuel Magey*
Title: *Transactions Supervisor*

*Read and Approved:*

*11/7/17*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

001845

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:.................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:.................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:.................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:.................................................................
Name: Emmanuel Maoel
Title: Transaction Supervisor

Read and approved

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     Strand Advisors, Inc.,
         its General Partner

**By**:...................................................................

**Name:** James Dondero
**Title:**  President

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:.....................................................

**Name:** James Dondero
**Title:** President

001848

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

**By**:

**Name:** William Scott
**Title:** Director

**SCHEDULE**

**Adherence Agreement**

**THIS ADHERENCE AGREEMENT** is made on [●] 200[●]

**BETWEEN**:

(1)     [●] of [●] (the "**Covenantor**");

(2)     CLO HOLDCO, LTD. of [                        ] (a "**Member**");

(3)     [●] of [                    ] (a "**Member**");

(4)     [●] of [                    ] (a "**Member**");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**RECITAL**

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "**Members Agreement**").

**IT IS HEREBY AGREED** as follows:

1.     The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.     Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.     This Agreement shall be governed by and construed in accordance with Guernsey law.

**IN WITNESS** of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.

APP_0045

001850

EXECUTION VERSION

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS,** on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS,** the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

EXHIBIT 3
001851

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

Case 19-34054-sgj11 Doc 631-1 Filed 09/29/20 Entered 09/29/20 18:13:49 Page Main of 20
Case 3:21-cv-01600-B-BD Document 18-9 Filed 09/29/21 Page 156 of 210 PageID 3712
EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

EXECUTION VERSION

4.  **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.  **Plan Support**.

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7. **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

APP_0050

001855

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**EXECUTION VERSION**

14.     **<u>Governing Law; Venue; Attorneys' Fees and Costs</u>**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

001857

**EXECUTION VERSION**

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:    CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

8

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

9

APP_0054

001859

# Exhibit A

001860

# TRANSFER AGREEMENT

## FOR ORDINARY SHARES OF

## HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of December [__], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

001862

3. <u>Transferors' Representations and Warranties</u>. Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>. Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 183646253v.3

001863

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

ActiveUS 183646253v.3

001865

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

001866

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director


**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
        Its General Partner

By:    HarbourVest GP LLC
        Its General Partner

By:    HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
        Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

7

ActiveUS 183646253v.3

001867

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
         Its General Partner

By:    HarbourVest GP LLC
         Its General Partner

By:    HarbourVest Partners, LLC
         Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

001868

Exhibit A

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [____] | [____] |
| HarbourVest 2017 Global AIF L.P. | [____] | [____] |
| HarbourVest 2017 Global Fund L.P. | [____] | [____] |
| HV International VIII Secondary L.P. | [____] | [____] |
| HarbourVest Skew Base AIF L.P. | [____] | [____] |

9



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

EXHIBIT 4

001870

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "<u>Morris Declaration</u>"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "<u>Settlement Agreement</u>"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "<u>Dondero Objection</u>"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "<u>Trusts' Objection</u>"), filed by the Dugaboy Investment Trust ("<u>Dugaboy</u>") and Get Good Trust ("<u>Get Good,</u>" and together with Dugaboy, the "<u>Trusts</u>"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "<u>CLOH Objection</u>" and collectively, with the Dondero Objection and the Trusts' Objection, the "<u>Objections</u>"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "<u>Debtor's Reply</u>"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "<u>HarbourVest Reply</u>"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "<u>Hearing</u>"), including assessing the credibility of the witnesses; and (j) the

DOCS_NY:41987.4 36027/002

001871

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

# EXHIBIT 1

001874

EXECUTION VERSION

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

   (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

   (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

   (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

   (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

   (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

EXECUTION VERSION

4. **Representations and Warranties**. Subject in all respects to Section 3 hereof:

    (a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

    (b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support**.

    (a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

    (b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

    (c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    <u>**No Admission of Liability**</u>. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    <u>**Successors-in-Interest.**</u> This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    <u>**Notice**</u>. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

<u>with a copy (which shall not constitute notice) to</u>:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

001879

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.       **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**APP_0075**

001880

14. **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

001881

EXECUTION VERSION

IT IS HEREBY AGREED.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its: CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

8

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch

Name: Michael Pugatch

Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch

Name: Michael Pugatch

Its: Managing Director

9

APP_0078

001883

# Exhibit A

**TRANSFER AGREEMENT**
**FOR ORDINARY SHARES OF**
**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

001885

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 184668980v.2

b.    The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.    This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.    The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.    This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.    Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.    This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

**APP_0083**

001888

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

*[Additional Signatures on Following Page]*

ActiveUS 184668980v.2

**APP_0084**

001889

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

6

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
           Its General Partner

By:    HarbourVest GP LLC
           Its General Partner

By:    HarbourVest Partners, LLC
           Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

**APP_0086**

001891

Exhibit A

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

8

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

---

|  |  |  |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § § § § § § § § § § § § § § | |
| Plaintiff, | | Case No. 3:21-cv-00842-B |
| vs. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | | |
| Defendants. | | |

---

## DEBTOR'S REPLY IN SUPPORT OF DEBTOR'S MOTION TO ENFORCE THE <u>ORDER OF REFERENCE</u>

The Debtor submits this reply in support of the *Debtor's Motion for an Order to Enforce the Order of Reference* [D.I. 22] (the "Motion").[1] In further support of its Motion, the Debtor states as follows:

## I.    PRELIMINARY STATEMENT[2]

1.    Plaintiffs argue that the Court should deny the Motion because (i) mandatory withdrawal is required under 28 U.S.C. § 157(d); (ii) the Bankruptcy Court lacks jurisdiction to adjudicate the Complaint; and (iii) their violation of Local Rule 3.3 is harmless because withdrawal of the reference was inevitable. Plaintiffs' arguments fail for several reasons.

2.    ***First***, mandatory withdrawal does not apply. The Complaint does not require substantial and material consideration of non-bankruptcy federal law. Rather, it involves application of well-settled law, including law from the Supreme Court, to address four fundamental issues: (a) did the Defendants owe Plaintiffs a fiduciary duty under the Advisers Act; (b) the scope of such duty and if it was breached; (c) remedies and damages for any breach; and (d) if a violation of the Advisers Act is a predicate act under RICO. Bankruptcy courts routinely adjudicate these issues. None of them require mandatory withdrawal.

3.    ***Second***, the Bankruptcy Court has jurisdiction to adjudicate the Complaint. Bankruptcy jurisdiction is determined when the facts giving rise to the claim arose, not when a lawsuit is filed. The facts underlying the Complaint arose ***prior*** to confirmation (and would constitute an administrative claim if a claim exists); the Plan has not yet become effective; and the Debtor's assets have not vested in the Reorganized Debtor. Under Fifth Circuit precedent, the

---

[1] All capitalized terms used but not defined herein have the meanings set forth in *Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference* [D.I. 22] (the "Memorandum").

[2] Concurrently herewith, the Debtor is filing the *Appendix in Support of Debtor's Reply in Support of the Debtor's Motion to Enforce the Order of Reference*. Citations to the Appendix are notated as follows: Appx. #.

Bankruptcy Court has jurisdiction to adjudicate the Complaint as it is integrally related to the Bankruptcy Court's prior approval of the HarbourVest Settlement.[3] Even if a narrower standard is appropriate, which it is not, the Bankruptcy Court has "related to" jurisdiction.

4.      ***Third***, Plaintiffs' failure to follow Local Rule 3.3 is not harmless. Had they followed the Rule, the Complaint would likely have been referred to the Bankruptcy Court and, under the local bankruptcy rules,[4] the ***Bankruptcy Court*** would have conducted a status conference on withdrawal of the reference and provided a recommendation to this Court as to whether mandatory withdrawal applies. Plaintiffs conveniently filed an inaccurate Civil Cover Sheet[5] and could not explain why the Complaint did not refer to 28 U.S.C. § 1334 as a jurisdictional predicate.[6] Plaintiffs' goal[7] here (and its wider strategy) is to avoid the Bankruptcy Court and allow it no input on which court should adjudicate the Complaint.[8]

## NO SUBSTANTIAL AND MATERIAL CONSIDERATION OF FEDERAL LAW

5.      Withdrawal of the reference is required under 28 U.S.C § 157(d) if a matter requires "substantial and material consideration" and "significant interpretation of federal laws" rather than a "straightforward application of a federal statute to a particular set of facts." *In re Nat'l Gypsum*,

---

[3] The claims in the Complaint are barred by *res judicata* for the reasons set forth in the *Memorandum* (Appx. 1 at 29-30) and *Debtor's Reply in Support of Motion to Dismiss Complaint* filed concurrently herewith.

[4] Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas, Rule 5011-1.

[5] Plaintiffs filed an amended Civil Cover Sheet [D.I. 33] but failed to disclose another related matter: the appeal of the HarbourVest Settlement pending in the District Court for the Northern District of Texas.

[6] Appx. 2 at 109-110.

[7] Plaintiffs attempt to distance themselves from Mr. Dondero and the vexatious litigation he has initiated directly and through his related entities. Mr. Patrick's testimony that Mr. Dondero does not control the litigation was controverted and is contradicted by Mr. Patrick's own testimony and that of Mr. Dondero, and Grant Scott. *See, e.g.,* Appx. 2 at 137-141, 155-156, 189-191, 200-201, 213, 234-240, 242; Appx. 3 at 339-380. Further, the Bankruptcy Court found in the Confirmation Order that Mr. Dondero was coordinating his related entities' efforts to "burn down the Debtor" through vexatious litigation. *See* Appx. 4 at 398-400, 436-438. A list of this litigation was included in the appendix to the Memorandum; however, it is outdated as Mr. Dondero has continued to litigate. An updated list is Appx. 5 at 543. The Motion should be viewed in the context of this litigation.

[8] The Bankruptcy Court conducted a hearing on the Contempt Motion on June 8, 2021, and subsequently said it will find certain defendants in that action, which may include Plaintiffs, in contempt. Appx. 2 at 322-323. The Bankruptcy Court has not yet issued its written order but intends to do so shortly. Appx. 6 at 676.

14 B.R. 188, 192-93 (N.D. Tex. 1991); *see also Rodriguez v Countrywide Home Loans, Inc.*, 421 B.R. 341, 347-8 (S.D. Tex. 2009) (adopting majority view requiring "material and substantial consideration of non-Bankruptcy Code federal law" for mandatory withdrawal). "Consideration" means something more than the mere process of examining, thinking about, or taking into account." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996) (internal quotations omitted). Simply asserting federal law is insufficient and mandatory withdrawal only applies when a matter requires something "more than mere application of existing law to new facts." *Vicars*, 96 F.3d at 953-54; *City of N.Y. v., Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal requires "significant interpretation, as opposed to simple application, of federal laws"). "[M]andatory withdrawal is to be applied narrowly" to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 101134, at *6 (N.D. Tex. Oct. 1, 2009), *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

6.      Plaintiffs attempt to meet this stringent standard by exaggerating the complexity of their claims. But, their claims are simple and straightforward: (1) (a) did Defendants owe Plaintiffs a fiduciary duty under the Advisers Act; (b) what was that duty and was it violated; and (c) if violated, what are the remedies and potential damages and (2) is the securities violation a predicate act under RICO? These are not difficult questions or outside the Bankruptcy Court's expertise.

7.      **Fiduciary Duty under the Advisers Act.** It is well-settled that, with limited, inapplicable exceptions, Section 206 of the Advisers Act[9] creates a fiduciary duty to an investment adviser's "client" (*i.e.*, the person or entity that is the counterparty to the investment management agreement) but not to an underlying investor in the "client." *Goldstein v. SEC*, 451 F.3d 873,

---

[9] Plaintiffs cite Rule 206(4)-8 of the Advisers Act, but Rule 206(4)-8 "does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law" or "a private right of action." Inv. Adv. Act Rel. No. 2628 (Aug. 3, 2007), Appx. 12 at 843-844.

881(D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund [i.e., the client], not to the fund's investors. . . If the investors are owed a duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.");[10] *see also, e.g., SEC v. Northshore Asset Mgmt.*, 2008 U.S. Dist. LEXIS 36160, at *18-20 (S.D.N.Y. May 5, 2008) (dismissing a claim that an investment adviser owed a duty to a fund's investors rather than just the fund); *SEC v. Trabulse*, 526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007) (same). HCLOF is a fund managed by HCFA, an affiliate of the Debtor. The DAF and CLOH are investors in HCLOF. The Debtor and HCFA's duties do not run to investors in HCLOF. The Debtor has never had a management agreement or client relationship with CLOH and owes it no fiduciary duty. The Debtor, at all relevant times, was party to a management agreement with the DAF and owed DAF certain duties under the agreement.[11] This analysis is not complicated and only requires a straightforward application of federal law to the facts.

8.    **The Scope of the Fiduciary Duty and Breach.** An adviser's fiduciary duty is satisfied by disclosure. "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *See Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18, Effective July 12, 2019, Appx. 8 at 722-723. The law is well-established; includes Supreme Court jurisprudence; and is not based on interpretation of SEC releases. *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963); *Laird v. Integrated Resources,*

---

[10] There are limited exceptions to *Goldstein*, which rely on specific features in the relationship between the adviser and the investor that are not applicable here. *See U.S. v. Lay*, 612 F.3d 440, 444 (6th Cir. 2010) (only one investor in the fund); *SEC v. Sentinel Mgmt. Grp., Inc.*, 2012 U.S. Dist. LEXIS 57579, at *13 (N.D. Ill. Mar. 30, 2012) (investment guidelines were personalized for each individual investor); *Goldenson v. Steffens*, 802 F. Supp. 2d 240, 268 (D. Me. 2011) (allegations adviser had provided personalized advice to investor).

[11] The Debtor and the DAF entered into that certain *Second Amended and Restated Investment Advisory Agreement*, effective from January 1, 2017 (the "DAF Agreement"). The DAF Agreement terminated on February 28, 2021.

*Inc.*, 897 F.2d 826, 831-36 (5th Cir. 1990). Adjudicating this issue only requires determining if appropriate disclosures were made.[12]

9.  **Remedies for Breach of Duty.** Assuming, *arguendo*, the Debtor breached its fiduciary duty to the DAF under the Advisers Act, there is no private right of action for such breach. *Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 13-14 (1979) ("[W]e hold there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable [on a client].")[13] The **only** remedy the DAF has for breach of fiduciary duty is to void the DAF Agreement (which has already been terminated), and the DAF cannot seek damages for breach of fiduciary duty (with the possibility of restitution). *See, e.g., Transamerica*, 441 U.S. at 13-14; *Corwin*, 788 F.2d at 1066; *Douglass*, 900 F.Supp.2d at 746.

10.  **Bankruptcy Courts Apply the Advisers Act.** Bankruptcy courts routinely analyze federal securities laws. In fact, prior to the commencement of the Debtor's case, the Debtor, under Mr. Dondero's control, was heavily involved in the bitterly contested *Acis* bankruptcy. Appx. 1 at 15. HCLOF invested in certain CLOs managed by Acis. Mr. Dondero owned and controlled Acis prior to the appointment of a chapter 11 trustee in the *Acis* bankruptcy and controlled HCLOF prior to the Bankruptcy Case. In *Acis*, the Debtor (controlled by Dondero) brought claims **in the Bankruptcy Court** alleging Acis was liable to it for breach of fiduciary duties under the Advisers

---

[12] Exhibit A to the DAF Agreement includes pages of disclosures, including the following: (1) "None of the [Highland Group] . . . is precluded from engaging in or owning an interest in. . . investment activities of any kind, whether or not such ventures are competitive with [the DAF]" and (2) "[T]he Highland Group. . . may actively engage in transactions in the same securities sought by [the DAF] and, therefore, may compete with [the DAF] for investment opportunities or may hold positions opposite to positions maintained by [the DAF]." Appx. 7 at 694-695.

[13] *See also Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3rd Cir. 2012) ("With the exception of a private remedy relating to certain investment advisory contracts, 'the [Advisers] Act confers no other private causes of action, legal or equitable.'") (citations omitted); *Corwin v. Marney, Orton Inv.*, 788 F.2d 1063, 1066 (5th Cir. 1986) (affirming dismissal of claims under the Advisers Act "because the investors had no private causes of action"); *Douglass*, 900 F.Supp.2d at 746-47 (same).

5

Act – asserting nearly identical claims to those made in the Complaint. Appx. 9 at 757-758. Plaintiffs' position is an about-face from Mr. Dondero's prior position, and their argument that the Bankruptcy Court cannot adjudicate these disputes is disingenuous.

11.    Further, 11 U.S.C. § 523(a)(19) requires bankruptcy courts to determine whether there were violations of "federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934),[14] any of the State securities laws, or any regulation or order issued under such Federal or State securities laws. . ." in connection with dischargeability. As part of this analysis, bankruptcy courts look to, among other things, the applicability of the Advisers Act. *See, e.g., Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 832 (Bankr. N.D. Ill. 2018) ("bankruptcy courts have jurisdiction to determine liability on an underlying securities claim for purposes of § 523(a)(19)" and "liability under § 523(a)(19) cannot be supported by an alleged violation" of the Advisers Act as there is no private remedy or "actionable claim"); *Tradex Global Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*, 538 B.R. 793, 806-08 (Bankr. N.D. Cal. 2015) (same).[15] Bankruptcy court analysis of the Advisers Act is not limited to Section 523(a)(19). *See Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604 (Bankr. W.D. Wash. 2013) (dismissing complaint alleging that defendant owed a fiduciary duty to an investor under the Advisers Act for failure to state a claim); *Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.)*, 587 B.R. 311, 317-20 (N.D. Tex. 2018) (affirming bankruptcy court's rulings under the Advisers Act), *aff'd* 916 F.3d 528 (5th Cir. 2019);

---

[14] Section 3(a)(47) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "securities laws" as "the Securities Act of 1933 (15 U.S.C. 78a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the Sarbanes-Oxley Act of 2002, the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.), *the Investment Advisers Act of 1940* (15 U.S.C. 80b et seq.), and the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa, et seq.)."

[15] *See also King v. Skolness (In re King)*, 624 B.R. 259, 301 (Bankr. N.D. Ga. 2020) (bankruptcy court could determine liability under state and federal securities laws for purposes of § 523(a)(19)); *Holzhueter v. Groth (In re Holzhueter)*, 571 B.R. 812, 822-24 (Bankr. W.D. Wis. 2017) (same).

001899

*In re Acis Capital Mgmt. L.P., et al.*, Case No. 18-30264-sgj11, D.I. 549 (Bankr. N.D. Tex. Sept. 4, 2018) (finding the Advisers Act did not prohibit assumption of a management agreement under Section 365).

      12.    **<u>Plaintiffs Cite No Applicable Case Law</u>.** Plaintiffs wave the red flag of "securities laws" and cite two factually inapposite cases to support their argument. ***First***, they cite *In re Harrah's Entertainment*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996), which has nothing to do with the Advisers Act. *Harrah's* involved a class action arising from the issuance of $435 million in publicly-traded debt; claims that the prospectus violated the Exchange Act; and attempts to hold the issuer's partners liable for the issuer's actions under the Exchange Act. The district court ruled that mandatory withdrawal applied because of the foregoing factors; however, none of them apply here. There is no public issuance; no retail investors; no class action; no derivative liability; no applicability of the Exchange Act; and no complicated factual analysis. Plaintiffs' Advisers Act claims require only the straightforward application of settled law to the facts in a dispute between two private parties. ***Second***, Plaintiffs cite *Belmont* for the proposition that there is "considerable 'confusion'" because "federal law (the Advisers Act) provides, 'the duty and the standard to which investment advisers are to be held,' but 'the cause of action is presented as springing from state law.'" Appx. 10 at 788. Plaintiffs ignore *Belmont's* holding. *Belmont* confirms no private right exists under the Advisers Act. *Belmont*, 708 F.3d at 502. The only "confusion" is if ***state, not federal, law*** creates a private right. *Id.* (finding the prohibition on private rights in the Advisers Act "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging the label 'state law' on an otherwise forbidden federal law claim" but recognizing split on state law claims). 28 U.S.C. § 157(d) deals with federal law, and state law claims are irrelevant.

13.     **The Advisers Act Is Not a Predicate for RICO:** Plaintiffs allege the violation of

the Advisers Act, among other things, in connection with a sale of a security (the HCLOF interests)

is a predicate act. Appx. 11 at 826-827. However, RICO expressly excludes securities fraud as a

predicate act. 18 U.S.C.A. § 1964(c) ("[N]o person may rely upon any conduct that would have

been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].").[16]

Plaintiffs' RICO claim is for securities fraud; is barred by statute; and cannot support mandatory

withdrawal. *See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273-80 (2d Cir.

2011) (barring RICO claims arising out of the operation of a Ponzi scheme because they involved

a purchase or sale of a security despite no private right of action existing); *Affco Invs. 2001 LLC

v. Proskauer Rose L.L.P.*, 625 F.3d 185, 189-91 (5th Cir. 2010) (same).[17]

### THE BANKRUPTCY COURT HAS JURISDICTION

14.     "Related to" jurisdiction exists if resolution of a dispute would have a "conceivable

impact on the estate." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). A judgment

against the Debtor would significantly impact the estate and there is "related to" jurisdiction.[18]

---

[16] *See also* H.R. Rep. No. 104-369, at 47 (1995) ("The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the . . . Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.").

[17] Plaintiffs' additional arguments to support mandatory withdrawal are easily disposed of. First, there is no contention that the HarbourVest Settlement Order released Plaintiffs' claims and this issue is made up. Second, there is no issue regarding whether *res judicata* applies to claims not yet accrued. The Debtor's alleged breach of duties raised in the Complaint occurred prior to approval of the HarbourVest Settlement. Third, *res judicata* is an issue, but there is no "federal issue" to consider. *See Rothstein v. Kuosenfung*, 2009 U.S. Dist. LEXIS 68329, at *4-5 (S.D.N.Y. July 29, 2009) (finding movant's Advisers Act claim barred by *res judicata* under typical analysis); *Pt Pukuafu Indo v. SEC*, 2009 U.S. Dist. LEXIS 92986, at *18 (E.D. Mich. Oct. 6, 2009) (same). Lastly, Plaintiffs' jury trial waiver argument is a red herring. The DAF waived its jury trial right in the DAF Agreement. The Debtor has not argued that CLOH waived its jury trial rights (if any). It argues the Debtor owes no fiduciary duty to CLOH and that no private right of action exists under the Advisers Act. The Court should reject the attempt to create controversy and a federal issue where none exists. *See, e.g., Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at *21-23 (D. Me. June 8, 2015) (finding no mandatory withdrawal when movant simply "tries to kick up some dust to make the relevant analysis seem complicated").

[18] A proceeding "relates to" a proceeding under title 11 *even if it arises from post-petition conduct* if "it affects the estate, not just the debtor." *Wood,* 825 F.2d at 94 (emphasis added).

15.     Plaintiffs argue that because the Bankruptcy Court confirmed the Plan its jurisdiction is limited and determined under the restrictive standard in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.),* 266 F.3d 388 (5th Cir. 2001). *Craig's Stores* did hold that a bankruptcy court may **lack** jurisdiction over **post-confirmation claims based on post-confirmation activities** but not that a bankruptcy court **loses** jurisdiction over **pre-confirmation claims based on pre-confirmation activities** just because of confirmation. *Newby v. Enron Corp. (In re Enron Corp. Sec.),* 535 F.3d 325, 335-336 (5th Cir. 2008) *citing Craig's Stores,* 266 F.3d at 389-90. Here, Plaintiffs' alleged claims arose from the HarbourVest Settlement and **prior to** confirmation of the Plan.

16.     Based on *Craig's Stores* and other decisions,[19] courts developed a six-factor test to determine if there is "related to" jurisdiction post-confirmation: (1) when the claim arose; (2) what provisions in the plan exist for resolving disputes and whether the plan retains jurisdiction; (3) if the plan has been substantially consummated; (4) the parties involved; (5) if state or bankruptcy law applies; and (6) indices of forum shopping. *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.),* 309 B.R. 217 (Bankr. N.D. Tex. 2004); *Ebner v. Woodforest Partners, L.P. (In re EBCO Land Dev., Ltd.),* 2008 Bankr. LEXIS 1207 (Bankr. S.D. Tex. Apr. 17, 2008).

17.     Even if the more restrictive standard applies, these factors support bankruptcy court jurisdiction in this case. The claims in the Complaint arose from the HarbourVest Settlement (which occurred pre-confirmation) and, if they exist, are administrative claims;[20] the Plan provides

---

[19] *See EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.),* 430 F.3d 260 (5th Cir. 2005); *U.S. Brass Corp. v. Travelers Ins. Group (In re U.S. Brass Corp.),* 301 F.3d 296 (5th Cir. 2002); *In re Case,* 937 F.2d 1014 (5th Cir. 1991).

[20] The causes of action asserted in the Complaint arose post-petition/pre-confirmation and thus the Complaint is, in effect, a motion for payment of an administrative claim under 11 U.S.C. § 503; should have been filed in the Bankruptcy Court; and is subject to allowance under the Bankruptcy Code and the Plan. A request for payment of an administrative claim is a core proceeding under 28 U.S.C. § 157(B)(2)(A) and (O), and arises in and under title 11. *See, e.g., Piper Aircraft Corp. v. Calabro (In re Piper Aircraft Corp.),* 169 B.R. 766, 776 (Bankr. S.D. Fla. 1994) (in tort context, administrative claim arises from a transaction with the debtor-in-possession, and that transaction must

a procedure for administrative claims; the Plan has not been substantially consummated;[21] the defendant is the Debtor (and possibly its CRO/CEO); and Plaintiffs are forum shopping.[22]

## NO WASTE OF JUDICIAL RESOURCES

18.     Granting the Motion would give this Court the benefit of the Bankruptcy Court's recommendation on mandatory withdrawal as required by the local rules, which require a party to file a motion for withdrawal with the bankruptcy clerk so the bankruptcy court can make a report and recommendation to this Court.[23] This is particularly important here as the Bankruptcy Court is very familiar with the parties and the issues, having conducted the evidentiary hearing to approve the HarbourVest Settlement.[24] The Bankruptcy Court's report and recommendation will aid this Court in analyzing whether withdrawal is appropriate. Plaintiffs' attempts to maneuver around the Bankruptcy Court should not be rewarded.

---

[20] have benefitted the debtor in the operation of its post-petition business.). Once paid or disallowed, Plaintiff's administrative claim will be discharged under 11 U.S.C. § 1141(d)(1).

[21] There is recognition that while 11 U.S.C. § 1141 references confirmation of the plan, the "Effective Date is the date upon which a *confirmed* plan becomes operative and distribution of property and cash is commenced." *See* Benjamin Weintraub & Michael J. Crames, *Defining Consummation, Effective Date of Plan of Reorganization and Retention of Postconfirmation Jurisdiction: Suggested Amendments to the Bankruptcy Code and Bankruptcy Rules*, 64 Am. Bankr. L.J. 245, 277 (1990) (emphasis added); *see also* 11 U.S.C. § 1129 (allowing confirmation only if certain requirements are met, including nine referencing "the effective date of the plan").

[22] Plaintiffs, without any authority, contend that confirmation is a significant event in the jurisdictional analysis. As the *Ebner* court stated: "An action impacting a confirmed, but not substantially consummated, plan would have an impact on the debtor-creditor relationship, a factor which favors continuing jurisdiction. *See Craig's Stores*, 266 F.3d at 391." *Ebner* at *20-21. The Plan is not effective and has not been substantially consummated. *See* 11 U.S.C. § 1101(2). And it makes sense that the jurisdictional analysis of a dispute arising before a plan is effective should be more expansive. The rationale for narrowing post-confirmation jurisdiction is that the debtor is no longer under the supervision and control of the bankruptcy court; has emerged from bankruptcy; and is continuing to operate its business unfettered by the strictures of the Bankruptcy Code. *Craig's Stores*, 266 F.3d 390. Because the Plan in this case is not yet effective, the Debtor's assets have not vested in the Reorganized Debtor and the Debtor continues to operate under the strictures of the Bankruptcy Code. Plaintiffs cite no cases to support a restrictive view of bankruptcy court jurisdiction in the post-confirmation, pre-effective date period.

[23] Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas, Rule 5011-1.

[24] Plaintiffs also argue allowing the Bankruptcy Court to adjudicate the *res judicata* defense is inappropriate because the *second court* determines if *res judicata* applies, not the first. Plaintiffs' argument misses the point. The Bankruptcy Court will be the *second court* if the Order of Reference is enforced and will evaluate the *res judicata* argument as the court presiding over the Complaint. Who better to determine if the proceedings in the *first court* (*i.e.* the HarbourVest Settlement) are *res judicata* in the second court than the Bankruptcy Court?

Dated: July 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:43654.3 36027/002

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD. | § § § | |
| Plaintiff, | § § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § | |
| Defendants. | § § | |

## APPENDIX IN SUPPORT OF DEBTOR'S REPLY IN SUPPORT OF THE DEBTORS' MOTION TO ENFORCE THE ORDER OF REFERENCE

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>"

or "<u>Highland</u>"), hereby files this *Appendix in Support of Debtor's Reply in Support of the Debtors'*

*Motion to Enforce the Order of Reference* (the "<u>Reply</u>").[1]

**TABLE OF CONTENTS**

| Appx. | Description |
|---|---|
| 1 | *Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference*, Case No. 3:21-cv-00842-B, D.I. 23 (N.D. Tex. May 19, 2021) |
| 2 | Hearing Transcript, June 8, 2021 |
| 3 | *Debtor's Second Amended Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held on June 8, 2021*, [Docket No. 2423][2] |
| 4 | *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] |
| 5 | Summary of Dondero Entity Litigation |
| 6 | Hearing Transcript, June 25, 2021 |
| 7 | *Second Amended and Restated Investment Advisory Agreement,* effective from January 1, 2017 |
| 8 | *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18, Effective July 12, 2019 |
| 9 | *In re Acis Capital Management*, *L.P., et al*, Case No. 18-30264-sgj11, D.I. 497 (Bankr. N.D. Tex. Aug. 13, 2018) |
| 10 | *Plaintiffs' Response to Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference*, Case No. 3:21-cv-00842-B, D.I. 36 (N.D. Tex. June 29, 2021) |
| 11 | *Original Complaint,* Case No. 3:21-cv-00842-B, D.I. 1 (N.D. Tex. Apr. 12, 2021) |
| 12 | *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. 2628 (Aug. 3, 2007) |

*[Remainder of Page Intentionally Blank]*

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Reply.

[2] Unless otherwise indicated, all docket reference numbers refer to the docket maintained by the Bankruptcy Court.

Dated:  July 13, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                          Jeffrey N. Pomerantz (CA Bar No. 143717)
                                          Robert J. Feinstein (NY Bar No. 1767805)
                                          John A. Morris (NY Bar No. 266326)
                                          Gregory V. Demo (NY Bar No. 5371992)
                                          Judith Elkin (TX Bar No. 06522200)
                                          Hayley R. Winograd (NY Bar No. 5612569)
                                          10100 Santa Monica Blvd., 13th Floor
                                          Los Angeles, CA 90067
                                          Telephone: (310) 277-6910
                                          Facsimile: (310) 201-0760
                                          Email: jpomerantz@pszjlaw.com
                                                 rfeinstein@pszjlaw.com
                                                 jmorris@pszjlaw.com
                                                 gdemo@pszjlaw.com
                                                 jelkin@pszjlaw.com
                                                 hwinograd@pszjlaw.com

                                          -and-

                                          **HAYWARD PLLC**

                                          */s/ Zachery Z. Annable*
                                          Melissa S. Hayward
                                          Texas Bar No. 24044908
                                          MHayward@HaywardFirm.com
                                          Zachery Z. Annable
                                          Texas Bar No. 24053075
                                          ZAnnable@HaywardFirm.com
                                          10501 N. Central Expy, Ste. 106
                                          Dallas, Texas 75231
                                          Tel: (972) 755-7100
                                          Fax: (972) 755-7110

                                          *Counsel for Highland Capital Management, L.P.*