**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| In Re: **Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | | |
| Appellee | § | **3:23-CV-01503-B** |

   [167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

# Volume 10

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | *INDEX* |
| | § | |

### APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.    STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital
  Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.    DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.  Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11
    [Doc. 168].

*000042*

2.  The judgment, order, or decree appealed from: Memorandum Opinion and Order
    Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to
    Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.  Docket Sheet kept by the Bankruptcy Clerk.

4.  Documents listed below and as described in the Docket Sheet for Bankruptcy Case
    Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br>*Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9* *001905 thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| **Vol. 18**<br>**003637** | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| **003666** | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| **003843** | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| **003844** | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| **003851** | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| **Vol. 19**<br>**003882**<br>**Thru Vol 20** | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| **Vol. 21**<br>**004395** | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*0047415* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*0047770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6_Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 2B*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|
| *006133* *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32* *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|
| *006961* | | | | |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Appellants**


### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.


*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

# EXHIBIT 1

001908

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD. | § § § | |
| Plaintiff, | § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § | |
| Defendants. | § § | |

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**<u>AN ORDER TO ENFORCE THE ORDER OF REFERENCE</u>**

001909

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................4

    A.    Plaintiffs' Ownership and Control ...........................................................................4
    B.    HarbourVest's Investment and Claims against the Debtor.......................................5
    C.    The HarbourVest Settlement and Objections ..........................................................6
    D.    Plaintiffs Knew of the Transfer, and Plaintiff CLOH Objected to the
          Settlement ...............................................................................................................7
    E.    The Dondero Parties Exercised their Right to Take Discovery ...............................8
    F.    The Bankruptcy Court Approves the Settlement .....................................................9
    G.    The DAF and CLOH Sue the Debtor and Others in This Court............................11
    H.    Counsel for the DAF and CLOH Willfully Ignore the Gatekeeper Orders ..........12

ARGUMENT ............................................................................................................................15

    A.    Plaintiffs Violated Local Rule 3.3(a) By Failing to Disclose the
          Bankruptcy Case ...................................................................................................15
    B.    The Complaint Should Be Automatically Referred to the Bankruptcy
          Court .....................................................................................................................16
          i.        The Complaint Should Be Heard in the Bankruptcy Court. .....................16
          ii.       The Order of Reference is Mandatory. .....................................................17
          iii.      Any Disputes Over the Settlement or the Transfer Arise Under,
                 Arise In, and Relate to Title 11 and are Core Proceedings. ......................18
          iv.      Any Disputes Over the Gatekeeper Orders Arise Under, Arise In,
                 and Relate to Title 11 and Are Core Proceedings....................................19
          v.       The Complaint Impacts Creditor Recoveries............................................20
          vi.      Mr. Seery Will Have Indemnification Claims Against the Estate. ............20
    C.    There is No Basis for a Mandatory Withdrawal of the Reference........................21
    D.    The Complaint Is Barred by the Doctrine of *Res Judicata* ...................................23
    E.    This Court Should Consider Mr. Dondero's Litigious Nature ..............................24

CONCLUSION.........................................................................................................................25

DOCS_NY:43079.11 36027/002

001910

# TABLE OF AUTHORITIES

**Cases**

Angel v. Tauch
    (In re Chiron Equities, LLC),
    552 B.R. 674 (Bankr. S.D. Tex. 2016) ................................................... 19

Beta Operating Co., LLC v. Aera Energy, LLC
    (In re Memorial Prod. Partners),
    2018 U.S. Dist. LEXIS 161159, at *9 (S.D. Tex. Sept. 20, 2018) .......................... 22

Burch v. Freedom Mortgage Corp.
    (In re Burch),
    385 Fed. Appx. 741 (5th Cir. 2021) ........................................... 17, 18, 25

Celotex Corp. v. Edwards,
    514 U.S. 300 (1995) ......................................................... 17

Centrix Fin. Liq. Trust v. Sutton,
    2019 U.S. Dist. LEXIS 154083 (D. Colo. Sept. 10, 2019) ...................................... 20

Collins v. Sidharthan
    (In re KSRP, Ltd.),
    809 F.3d 263 (5th Cir. 2015) ........................................................ 21

Comer v. Murphy Oil USA,
    718 F.3d 460 (5th Cir. 2013) ........................................................ 23

Feld v. Zale Corp.
    (In re Zale Corp.),
    62 F.3d 746 (5th Cir. 1995) ......................................................... 20

Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.,
    510 F. 2d 272 (5th Cir. 1975) ....................................................... 23

Houston Baseball Partners, LLC v. Comcast Corp.
    (In re Houston Reg'l Sports Network),
    2014 Bankr. LEXIS 2274, at *15-25 (Bankr. S.D. Tex. May 22, 2013) ............................... 21

In re Galaz,
    841 F.3d 316 (5th Cir. 2016) ........................................................ 19

In re G-I Holdings, Inc.,
    295 B.R. 211 (D. N.J. 2003) ........................................................ 22

001911

*In re Idearc, Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009) ...................................................................... 18

*In re Margaux City Lights Partners, Ltd.*,
  2014 Bankr. LEXIS 4841 at *6 (Bankr. N.D. Tex. Nov. 24, 2014) ....................................... 18

*In re Margulies*,
  476 B.R. 393 (Bankr. S.D.N.Y. 2012) .................................................................... 24

*In re National Gypsum*,
  14 B.R. 188 (N.D. Tex. 1991) ......................................................................... 22

*In re Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ....................................................................... 24

*Manila Indus., Inc. v. Ondova Ltd.*
  *(In re Ondova Ltd.)*,
  2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009) .................................... 22

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.*
  *(In re Wolverine Radio Co.)*,
  930 F.2d 1132, 1143 (6th Cir. 1991) ................................................................ 24

*Miller v. Meinhard-Commercial Corp.*,
  462 F.2d 358 (5th Cir. 1972) ........................................................................ 24

*Refinery Holdings Co., L.P. v. TRMI Holdings, Inc.*
  *(In re El Paso Refinery, L.P.)*,
  302 F.3d 343 (5th Cir. 2002) ........................................................................ 21

*Rodriguez v. EMC Mortgage Corp.*
  *(In re Rodriguez)*,
  2001 U.S. App. LEXIS 30564, at *5 (5th Cir. Mar. 15, 2001) ....................................... 19

*See Kuzmin v. Thermaflo, Inc.*,
  2:07-CV-00554-TJW, 2009 U.S. Dist. LEXIS 42810,
  at *4-7 (E.D. Tex. May 20, 2009) .................................................................... 16

*Southern Pac. Transp. v. Voluntary Purchasing Groups*,
  252 B.R. 373 (E.D. Tex. 2000) ....................................................................... 22

*UPH Holdings, Inc. v. Sprint Nextel Corp.*,
  2013 U.S. Dist. LEXIS 189349, at *4 (W.D. Tex. Dec. 10, 2013) .................................... 22

*Uralkali Trading, S.A. v. Sylvite Southeast, LLC*,
  2012 U.S. Dist. LEXIS 40455, at *3 (M.D. Fla. Mar. 26, 2012) ..................................... 17

*Villegas v. Schmidt,*
    788 F.3d 156, 159 (5th Cir. 2015)......................................................................... 18

*Welch v. Regions Bank,*
    2014 U.S. Dist. LEXIS 96175, at *5 (M.D. Fla. July 15, 2014)............................ 17

*Wood v. Wood*
    *(In re Wood),*
    825 F.2d 90 (5th Cir. 1987)................................................................................. 17, 18

**Statutes**

11 U.S.C. § 1334................................................................................................................ 16

28 U.S.C. § 157........................................................................................................... passim

28 U.S.C. § 1927............................................................................................................... 25

**Rules**

Bankr. N.D.Tex. R. 3.3................................................................................................. 15, 16

Bankr. N.D.Tex. R. 9014.................................................................................................... 8

DOCS_NY:43079.11 36027/002

001913

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>"
or "<u>Highland</u>"), submits this memorandum of law (the "<u>Memorandum</u>") in support of the *Debtor's
Motion for an Order to Enforce the Order of Reference* (the "<u>Motion</u>"). In support of its Motion,
the Debtor states as follows:

**PRELIMINARY STATEMENT**[1]

1.      Highland is the debtor and debtor-in-possession in a bankruptcy case currently
pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the
"<u>Bankruptcy Court</u>"), Case No. 19-34054-sgj11 (the "<u>Bankruptcy Case</u>"). The Bankruptcy Case
has been pending since October 16, 2019, having been filed at the direction of James Dondero,
who, on information and belief, is the person controlling and directing the actions of both The
Charitable DAF Fund, L.P. (the "<u>DAF</u>") and CLO Holdco, Ltd. ("<u>CLOH</u>" and together with the
DAF, "<u>Plaintiffs</u>") today. Both the DAF and CLOH have appeared and objected multiple times in
the Bankruptcy Case.

2.      In one of those matters, the Bankruptcy Court approved a settlement between the
Debtor and HarbourVest[2] (the "<u>Settlement</u>") pursuant to 11 U.S.C. §§ 105 and 363 of the
Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy
Rules</u>") over the objections of CLOH, a Plaintiff in this action, as well as other entities owned
and/or controlled by Mr. Dondero. The Settlement is on appeal.[3]

---

[1] Concurrently herewith, the Debtor is filing the *Appendix in Support of the Debtor's Motion to Enforce the Reference*
(the "<u>Appendix</u>"). Citations to the Appendix are notated as follows: Appx. #. The Complaint is Appx. 1.

[2] "<u>HarbourVest</u>" collectively refers to the following entities: HarbourVest 2017 Global Fund L.P., HarbourVest 2017
Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest
Skew Base AIF L.P., and HarbourVest Partners L.P.

[3] The Settlement is being appealed by Mr. Dondero's two purported family investment trusts: The Dugaboy Investment
Trust ("<u>Dugaboy</u>") and The Get Good Trust ("<u>Get Good</u>" and together with Dugaboy, the "<u>Trusts</u>"). The Trusts, like
Plaintiffs, are controlled by Mr. Dondero. The appeal and this litigation are just one battle in Mr. Dondero's
multifaceted litigation assault on the bankruptcy process.

1

3.      Plaintiffs filed their *Original Complaint* (the "<u>Complaint</u>")[4] in this Court seeking to have this Court undertake a *de facto* appeal or reconsideration of the Settlement and to assert monetary claims for actions undertaken in the Bankruptcy Case. However, the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (the "<u>Order of Reference</u>") (Appx. 2) in force in the Northern District of Texas required that this action be filed with the Bankruptcy Court presiding over the Bankruptcy Case. The Order of Reference was entered in 1984 and directs courts in this District to refer all proceedings arising under Title 11 and/or arising in or related to a case under Title 11 to the bankruptcy courts. A mandatory application of the Order of Reference prevents a race to the courthouse and inconsistent rulings by providing one forum to adjudicate ***all*** aspects of a bankruptcy case. Otherwise, debtors and creditors could blatantly forum shop and choose whether to file cases or claims in the bankruptcy court or the district court to evade what may be perceived as an unwelcoming court – which is precisely what has occurred in this case.[5] Here, the case for enforcing the Order of Reference is compelling. The Complaint addresses issues that not only arise in, arise under, and relate to Title 11 but which have already been adjudicated by the Bankruptcy Court. By this Motion, the Debtor requests that this Court enforce the Order of Reference and refer the Complaint to the Bankruptcy Court for adjudication

4.      The reason Plaintiffs filed the Complaint in this Court – rather than in the Bankruptcy Court – is obvious. Plaintiffs, under the direction of the Debtor's ousted founder, Mr.

---

[4] The Complaint contains a number of errors and material omissions, misstatements, misrepresentations, and mischaracterizations. The Debtor believes the Complaint is frivolous and should be dismissed on numerous grounds. The Debtor reserves all rights to contest the substance of the Complaint and intends to promptly inform Plaintiffs' counsel that the Debtor will seek sanctions if the Complaint is not withdrawn.

[5] Plaintiffs justify their conduct by contending that under the 1984 Amendments to the Bankruptcy Code, the Bankruptcy Court is a "unit" of this Court. Hence, in Plaintiffs' minds, the courts are indistinguishable and interchangeable and Plaintiffs can pick and choose where to file. That is not the law and would render the Order of Reference a nullity.

001915

Dondero, have found little traction in the Bankruptcy Court for the serial, frivolous, and vexatious litigation positions they have taken in more than a dozen pending matters in the Bankruptcy Case and their attempts to interfere with the Debtor's business operations – actions that have cost the Debtor millions. Plaintiffs therefore determined their best course of action was to engage in blatant forum shopping with the goal of re-opening settled litigation and closed factual records in a court Plaintiffs hope will be more hospitable.[6] The Debtor will vigorously defend this action as (a) a flagrant attack on the Bankruptcy Court; (b) a frivolous attempt to avoid settled principals of bankruptcy jurisdiction through (less than) clever pleading; and (c) barred by *res judicata*. The Debtor have also sought to hold Plaintiffs and their counsel, among others, in civil contempt for attempting to add Mr. James P. Seery, Jr., the Debtor's independent, Bankruptcy Court-appointed CEO and CRO, as a defendant in this Case in clear violation of two final Bankruptcy Court orders.[7]

5.      The fact that the Complaint was not automatically referred to the Bankruptcy Court is attributable to a blatant omission by Plaintiffs in Section VIII of their Civil Cover Sheet (Appx. 3). Because this action is undoubtedly "related to" the Bankruptcy Case and the pending appeal of the Settlement, Plaintiffs' attorneys were required to disclose that a "related case" to the Complaint existed – as that term is used in the Local Civil Rules, effective September 1, 2020, of the Northern District of Texas (the "Local Rules"). Plaintiffs' failure to make such disclosure could not have

---

[6] The Complaint is not the first time that Plaintiffs have attempted to disenfranchise the Bankruptcy Court. On March 18, 2021, Mr. Dondero, Plaintiffs, and other entities owned and/or controlled by Mr. Dondero filed *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to* 28 U.S.C. § 455 [Docket No. 2060] (the "Recusal Motion") pursuant to which they sought to recuse the Honorable Stacey Jernigan from the Bankruptcy Case. The Recusal Motion was denied by the Bankruptcy Court and has been appealed [Docket No. 2149].

[7] On April 19, 2021, filed *Plaintiff's Motion for Leave to File First Amended Complaint in the District Court* (the "Seery Motion") in this Court seeking leave to add Mr. Seery as a defendant, and, in response, on April 23, 2021, the Debtor filed *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247] (the "Contempt Motion"). The Bankruptcy Court ordered Plaintiffs, among others, to appear at an in person hearing on June 8, 2021, to show cause why they should not be held in contempt [Docket No. 2255] (the "Show Cause Order").

been inadvertent. And Plaintiffs have also not been candid with the Bankruptcy Court. On May 14, 2021, Plaintiffs filed a response to the Show Cause Order inaccurately claiming they had made full disclosure to this Court.[8]

6.      The Bankruptcy Court is the appropriate tribunal to address the Complaint as it clearly "arises under, arises in or relates to the Debtor's Chapter 11 case and the Settlement. The Court should send Plaintiffs a strong message that (a) such gamesmanship is not acceptable; (b) the Order of Reference will be enforced; and (c) the Complaint will be immediately sent to the Bankruptcy Court where it belongs.

### FACTUAL BACKGROUND

**A.      Plaintiffs' Ownership and Control**

7.      Plaintiffs are controlled and/or directed by Mr. Dondero, the Debtor's ousted founder.[9] CLOH is an entity wholly owned and controlled by the DAF. Until at least mid-January 2021, Grant Scott, Mr. Dondero's life-long friend and college roommate, was the sole director of the DAF and of CLOH (neither of which otherwise had any officers or employees).[10] As found by the Bankruptcy Court, Mr. Dondero has engaged in a coordinated litigation campaign against the Debtor both directly and through his related entities, including Plaintiffs, with the goal of

---

[8] *See Response of the Charitable DAF Fund, L.P., CLO Holdco, Ltd., and Sbaiti & Company PLLC to Show Cause Order* [Docket No. 2313], pg. 3 (the "<u>Bankruptcy Response</u>") (Appx. 28). In the Bankruptcy Response, Plaintiffs prognosticate about how this Court would rule: "… [the Debtor] seem[s] to have assumed that the Motion for Leave would be granted, and that the proposed amended complaint naming Seery would be referred to [the Bankruptcy] Court for a report and recommendation." Appx. 28 at p. 12. If that were the case, Plaintiffs should have just filed in the Bankruptcy Court or, at the very least, disclosed the Bankruptcy Case in the Civil Cover Sheet.

[9] Mr. Dondero also controls, and has appeared in the Bankruptcy Case, through, among others, his two family investment trusts: Dugaboy and Get Good.

[10] Mr. Scott previously testified during a sworn deposition in the Bankruptcy Case that he had little knowledge of the investment and other activities of the DAF and CLOH and was effectively taking direction from Mr. Dondero with respect to their activities. Appx. 27, 11:10-25; 12:1-25; 13:1-25; 14:1-25; 15:1-25; 16:1-17.

001917

"burn[ing] down the [Debtor]."[11] A list of the litigation caused by Mr. Dondero in the Bankruptcy

Case since September 2020 is Appx. 4.

## B.   HarbourVest's Investment and Claims against the Debtor

8.     Prior to the commencement of the Bankruptcy Case, HarbourVest invested

approximately $80 million (the "Investment") in HCLOF, a Guernsey-based limited company

formed and managed by the Debtor and – prior to his ouster – Mr. Dondero. Immediately following

the Investment, CLOH held 49.02% of HCLOF's interests, HarbourVest held 49.98%, and the

remaining 1% was held by the Debtor and certain current and former Debtor employees. After the

Settlement, in which HarbourVest transferred its interests to a wholly-owned subsidiary of the

Debtor, the Debtor's interest in HCLOF was 50.18% and CLOH's interest remained 49.02%.

9.     HarbourVest filed Claims[12] in the Bankruptcy Case in excess of $300 million. The

Claims alleged HarbourVest was fraudulently induced into the Investment based on the material

factual misrepresentations and omissions of Mr. Dondero and certain of his employees, including

that the Debtor: (a) did not disclose it never intended to pay an arbitration award obtained by a

former portfolio manager, Joshua Terry,[13] (b) did not disclose that Mr. Dondero and the Debtor

---

[11] The Bankruptcy Court made substantial findings of facts regarding Mr. Dondero and his related entities' (including Plaintiffs') history of serial litigation in the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order"). The Confirmation Order is Appx. 5. *See* Appx. 5, ¶¶ 17-19, 77-78. The Confirmation Order approved the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as amended, the "Plan"), which included certain amendments. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Docket No. 1875]. The Plan is attached to the Confirmation Order.

[12] "Claims" collectively refers: HarbourVest 2017 Global Fund L.P. (Claim No. 143), HarbourVest 2017 Global AIF L.P. (Claim No. 147), HarbourVest Dover Street IX Investment L.P. (Claim No. 150), HV International VIII Secondary L.P. (Claim No. 153), HarbourVest Skew Base AIF L.P. (Claim No. 154), and HarbourVest Partners L.P. (Claim No, 149). The Claims are Appx. 6.

[13] This award was entered in favor of Mr. Terry against a Debtor subsidiary, Acis Capital Management, L.P. ("Acis"). Instead of satisfying the award, the Dondero-controlled Debtor caused Acis to transfer its assets in an effort to become judgment proof. Mr. Terry filed an involuntary bankruptcy petition against Acis and, after intense litigation and the appointment of a chapter 11 trustee, confirmed a chapter 11 plan, which transferred Acis to Mr. Terry. These actions resulted in Acis filing a claim of not less than $75 million (Claim No. 23) against the estate.

001918

engaged in a series of fraudulent transfers for the purpose of preventing Mr. Terry from collecting on his arbitration award, (c) misrepresented why the investment manager for HCLOF was changed immediately prior to the Investment, (d) indicated the dispute with Mr. Terry would not impact investment activities, and (e) expressed confidence in HCLOF's ability to reset or redeem certain collateralized loan obligations ("CLOs"). The Claim also asserted causes of action under Racketeering Influenced Corrupt Organizations Act ("RICO") and breaches of fiduciary duty under Guernsey common law.

**C.    The HarbourVest Settlement and Objections**

10.    On December 23, 2020, the Debtor filed its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625][14] (the "Settlement Motion"), pursuant to which the Debtor sought Bankruptcy Court approval of the Settlement with HarbourVest pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rule 9019. Appx. 7. The Debtor concurrently filed the proposed *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* (the "Transfer Agreement") [Docket No. 1631-1]. Appx. 8. The Settlement Agreement expressly provided that it was subject to Bankruptcy Court approval. Appx. 7, ¶ 3.

11.    Among the material terms of the Settlement was that HarbourVest would transfer its interest in Highland CLO Funding, Ltd. ("HCLOF") to the Debtor or its nominee (the "Transfer"). The Transfer was a necessary component of the Settlement. HarbourVest believed the misrepresentations entitled it to a rescission of its Investment, and HarbourVest wanted to extract itself from the Highland platform. The Settlement also provided HarbourVest with (a) an allowed, general unsecured claim in the amount of $45 million, (b) a subordinated, allowed, general

---

[14] Unless otherwise noted, all docket references refer to the docket maintained by the Bankruptcy Court.

6

001919

unsecured claim in the amount of $35 million, and (c) other consideration more fully described in the Settlement Agreement. *See* Appx. 7, ¶ 32.

12.    The Settlement Motion fully disclosed all aspects of the Transfer, including (a) what HarbourVest was transferring; (b) the valuation (and method of valuation) of the asset being transferred to the Debtor; and (c) the method of the Transfer. (Appx. 7, ¶¶ 1(b) 32, 32 n.5; Appx. 8). Three objections were lodged against the proposed Settlement, all of which were filed by Mr. Dondero or entities controlled by him, including Plaintiff CLOH and Dondero's Trusts. Each of those objections was coordinated by Mr. Dondero.[15]

### D.    Plaintiffs Knew of the Transfer, and Plaintiff CLOH Objected to the Settlement

13.    On January 6, 2021, Mr. Dondero filed his *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (Appx. 9**)** contending, among other things, that the Settlement: (a) was not "reasonable or in the best interests of the estate" because the Debtor was ***grossly overpaying*** and (b) amounted to "a blatant attempt to purchase votes in support of the Debtor's plan." *Id.*, ¶ 1. Mr. Dondero did not directly challenge the Transfer but made clear that he knew exactly what was being transferred and the valuation being placed on it: "As part of the settlement, HarbourVest will [] transfer its entire interest in [HCLOF] to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately $22 million as of December 1, 2020." *Id.*, ¶ 1, n.3.

14.    On January 8, 2021, Dondero's Trusts filed their *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith.* [Docket No. 1706]. (Appx. 10) Like Mr. Dondero, the Trusts made clear that they knew of the proposed Transfer and its valuation. But,

---

[15] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Proc. 21-03190-sgj, Docket No. 46], Exhibit Q.

unlike Mr. Dondero, the Trusts directly questioned (a) whether HarbourVest had the right to effectuate the Transfer, and (b) the valuation of the HCLOF interests – matters which are directly at issue in the Complaint.

15.     Finally, and notably, on January 8, 2021, Plaintiff CLOH – presumably at the direction of its parent, the DAF – filed its *Objection to HarbourVest Settlement* [Docket No. 1707]. (Appx. 11) In its objection, CLOH challenged (as it does again in the Complaint) HarbourVest's right to implement the Transfer contending, among other things, that: (a) CLOH and the other members of HCLOF had a "Right of First Refusal" under the Members Agreement (*Id.*, ¶ 3) and (b) "HarbourVest has no authority to transfer its interest in HCLOF without first complying with the Right of First Refusal" (*Id.*, ¶ 6). In support of these contentions, CLOH offered a lengthy analysis of the Members Agreement, including CLOH's purported "Right of First Refusal" under Section 6.2 thereof. *Id.*, ¶¶ 9-22.

**E.      The Dondero Parties Exercised their Right to Take Discovery**

16.     By objecting to the Settlement Motion, Mr. Dondero, the Trusts, and CLOH (collectively, the "Dondero Objectors") initiated a "contested matter" under Bankruptcy Rule 9014[16] and, accordingly, had the unfettered right to conduct discovery under Bankruptcy Rule 9014(c).[17] Thus, for example, the Dondero Objectors had the right to request documents from, and take the depositions of, the Debtor, HarbourVest, HCLOF, and/or Highland HCF Fund Advisor,

---

[16] *See also* Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas 9014-1(a) ("a response is required with respect to a contested matter").

[17] The Debtor filed the Settlement Motion on December 23, 2020, and set the hearing on the motion for January 14, 2021 [Docket No. 1626]. The DAF and CLOH allege that the Debtor "set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal." Appx. 1, ¶ 30. This is a bald lie (one of many) and absurd. The undisputed facts are that (a) the Settlement Motion was filed on regular notice; (b) no one requested or moved for an extension of the hearing date; and (c) no one contended they had insufficient time to "scrutinize the underpinnings of the deal" (at least until the filing of the Complaint).

Ltd. ("HCFA")[18] concerning the Settlement Motion, their objections thereto, and the Debtor's

valuation of HarbourVest's interest in HCLOF and the method of valuation.

17.    The Dondero Objectors – all sophisticated parties represented by sophisticated

counsel – exercised their discovery rights.[19] In particular, Mr. Dondero and CLOH conducted a

three and a half hour deposition of Michael Pugatch, a representative of the HarbourVest claimants

[Docket No. 1705]. (Appx. 12) However, none of the Dondero Objectors, including Plaintiffs,

exercised their right to take discovery from the Debtor, HCLOF, or HCFA in connection with the

Settlement Motion, except for informal requests for documents which were provided.

18.    Notably, despite the issue of the Transfer being "front and center," none of the

Dondero Objectors, including Plaintiffs, ever asserted (as Plaintiffs do now) that: (a) the Debtor

had a fiduciary duty to offer the HCLOF interests to CLOH, or (b) the Investment Advisers Act of

1940 (the "Advisers Act") was implicated in any way by the proposed Settlement, including the

proposed Transfer. Further, although CLOH argued that the Members Agreement gave CLOH a

right of first refusal, CLOH, in connection with the Settlement, never offered to buy the HCLOF

interests or stated that it wanted to purchase those interests.

**F.    The Bankruptcy Court Approves the Settlement**

19.    On January 13, 2021, the Debtor filed its *Omnibus Reply in Support of Debtor's

Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149,

150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Omnibus

---

[18] HCLOF, HCFA (in its capacity as the portfolio manager of HCLOF), the Debtor's designee, HCMLP Investments, LLC (as transferee), and HarbourVest (as transferors) were parties to the proposed Transfer Agreement pursuant to which the Transfer would be effectuated. Appx. 7, Ex. A; Appx. 8.

[19] Plaintiffs not only failed to disclose that the Dondero Objectors took discovery, they allege the opposite ("No discovery had taken place between the parties, and plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (*or even during its pendency*) in order to investigate its rights."). Appx. 1, ¶ 29 (emphasis added).

9

DOCS_NY:43079.11 36027/002

001922

Reply"). Appx. 13. The Omnibus Reply set forth an extensive rebuttal to CLOH's flawed argument that the Transfer could not be completed without HCLOF's other members being offered HarbourVest's interest in HCLOF, as allegedly required by the "Right of First Refusal" under Section 6.2. *Id.*, ¶¶ 26-39. Both HCLOF – which was independently represented – and HarbourVest agreed with the Debtor's conclusions that the Members Agreement did not require HarbourVest to offer its interests to CLOH or any other member of HCLOF. *Id.*, ¶ 37. At the January 14, 2021, hearing, CLOH *voluntarily withdrew* its objection after reading the Debtor's analysis of the Members Agreement:

> CLO Holdco has had an opportunity to review the reply briefing, and . . . [b]ased on our analysis of Guernsey law and some of the arguments of counsel on those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as trustee for CLO Holdco, *to withdraw the CLO Holdco objection based on the interpretation of the member agreement*.

Appx. 14 at 7:20-8:6 (emphasis added). Following CLOH's withdrawal of its objection, the Trusts also abandoned their challenge to the Transfer. *Id.* at 22:5-20.

20.     The Debtor called two witnesses in support of the Settlement Motion, Mr. Seery and Mr. Pugatch. Counsel for Mr. Dondero and the Trusts cross-examined the Debtor's witnesses but did not inquire about the value of the HCLOF interests, the Debtor's fiduciary obligations, or the Transfer (except for a line of questioning concerning which entity would hold the HCLOF interests on behalf of the Debtor). *Id.*, at 87:18-89:21. At the conclusion of the hearing, the Court entered an order overruling the remaining objections and approving the Settlement [Docket No. 1788] (the "Settlement Order"). Appx. 15.

21.     The Settlement Order *expressly* authorized the transfer of HarbourVest's interest in HCLOF providing, in relevant part, that "[p]ursuant to the express terms of the [Members Agreement] . . . HarbourVest is authorized to transfer its interest in HCLOF . . . *without the need to obtain the consent of any party or to offer such interests first to any other investor in*

001923

*HCLOF*." *Id.*, ¶ 6 (emphasis added). The Bankruptcy Court specifically included this language in the Settlement Order because of concerns that Mr. Dondero and his entities would "go to a different court somehow to challenge the transfer." Appx. 14 at 156:19-20.[20] The Settlement Order also clearly provided that "[t]he [Bankruptcy] Court shall retain *exclusive jurisdiction* to hear and determine all matters arising from the implementation of this Order." *Id.,* ¶ 7 (emphasis added).

22.      Only the Trusts appealed the Settlement Order [Docket Nos. 1870, 1889]. Appx. 16. Plaintiffs elected not to appeal. However, both the Trust and Plaintiffs are controlled by Mr. Dondero, and Mr. Dondero is thus both appealing the Settlement Order and seeking reconsideration of the Settlement Order in this Court.

**G.      The DAF and CLOH Sue the Debtor and Others in This Court**

23.      On April 12, 2021, after obtaining new counsel,[21] the DAF and CLOH filed the Complaint against the Debtor, HCFA, and HCLOF in this Court. The Complaint seeks to challenge the Transfer and Settlement approved by the Bankruptcy Court over Mr. Dondero's and Plaintiffs' objections and to re-open the Bankruptcy Court's factual record. To justify this blatant attempt to re-litigate the matter, the DAF and CLOH allege they recently learned that (a) the HCLOF interests were substantially more valuable than Mr. Seery testified, and (b) the Debtor had fiduciary and

---

[20] Appx. 14 at 156:10-25; 157:1-5 (emphasis added):

MR. MORRIS: . . . With respect to the order, I just want to make it clear that we are going to include a provision that specifically authorizes the Debtor to engage in -- to receive from HarbourVest the asset, you know, the HCLOF interest, and that that's consistent with its obligations under the agreement.

***The objection has been withdrawn, I think the evidence is what it is, and we want to make sure that nobody thinks that they're going to go to a different court somehow to challenge the transfer.*** So I just want to put the Court on notice and everybody on notice that we are going to put in a specific finding as to that.

THE COURT: All right. Fair . . . Fair enough. I do specifically approve that mechanism and find it is appropriate and supported by the underlying agreements.

And just so you know, I spent some time noodling this yesterday before I knew it was going to be settled, so I'm not just casually doing that. I think it's fine.

[21] Upon information and belief, Mr. Dondero effectively fired Mr. Scott and his counsel, John Kane of Kane Russell, after Mr. Scott withdrew CLOH's objection to the HarbourVest Settlement.

001924

other duties requiring it to provide Plaintiffs with the opportunity to acquire HarbourVest's interest
in HCLOF. *See, e.g.,* Appx. 1, ¶¶ 36, 49. Plaintiffs also assert claims for breach of fiduciary duty,
breach of contract, negligence, violation of RICO, and tortious interference.

24.    In the Complaint, Plaintiffs recite certain facts relating to HarbourVest's Claims
and the process by which the Debtor obtained Bankruptcy Court approval (*Id.*, ¶¶ 16-31) but
disclose none of the undisputed facts set forth above. Plaintiffs also do not disclose that they –
through their relationship to Mr. Dondero – had the same information concerning the value of the
HarbourVest interests that Mr. Seery allegedly had. Finally, they do not even attempt to justify
why they are seeking, in this Court, to re-litigate a Bankruptcy Court order.

**H.    Counsel for the DAF and CLOH Willfully Ignore the Gatekeeper Orders**

25.    Throughout the Complaint, Plaintiffs threatened to name Mr. Seery as a
defendant,[22] and indeed, on April 19, 2021, just four days after filing the Complaint, Sbaiti & Co.
("Sbaiti"), the newly-retained counsel for the DAF and CLOH, advised the Debtor's counsel that
they "intend to move for leave today in the district court seeking permission to amend our
complaint to add claims against Mr. Seery. They are the same causes of action. We believe we are
entitled to amend as a matter of course." Counsel asked whether they could "put your client down
as unopposed?" Appx. 17. In response, the Debtor informed Sbaiti of the two "Gatekeeper Orders"
(defined below), which prohibited this action, provided copies, and told them, among other things,
that "[i]f you proceed to amend the complaint as you suggest [] without first obtaining Bankruptcy
Court approval we reserve all rights to take appropriate action and seek appropriate relief from the

---

[22] By way of example only, Plaintiffs refer to Mr. Seery as a "potential party" and suggest that he had access to and
wrongfully utilized "superior non-public information" and lied under oath about the value of the asset subject to the
Transfer in his testimony to the Bankruptcy Court. Appx. 1, at Introduction, ¶¶ 6, 43-44.

001925

Bankruptcy Court." *Id*. Later that evening, Sbaiti confirmed their intention to seek leave from this

Court to sue Mr. Seery and, on April 19, 2021, filed the Seery Motion. Appx. 18.

26.    Both Gatekeeper Orders are plain, unambiguous, and final. On January 9, 2020, the

Bankruptcy Court, **with Mr. Dondero's consent and agreement**, entered the *Order Approving

Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor

and Procedures for Operations in the Ordinary Course* [Docket No. 339] pursuant to 11 U.S.C.

§§ 105 and 363 and Rule 9019 (the "January Order"). Appx. 19. Pursuant to the January Order,

Mr. Dondero surrendered control of the Debtor and the Independent Board was appointed. To

protect the Independent Board and its agents from frivolous litigation (primarily from Mr. Dondero

and his related entities), the Debtor asked for, and the Bankruptcy Court included in the January

Order (without objection), a "gatekeeper" provision stating in pertinent part:

> No entity may commence or pursue a claim or cause of action of any kind against
> any Independent Director, any Independent Director's agents, or any Independent
> Director's advisors relating in any way to the Independent Director's role as an
> independent director of Strand without the Court (i) first determining the Court (i)
> first determining after notice that such claim or cause of action represents a
> colorable claim of willful misconduct or gross negligence against Independent
> Director, any Independent Director's agents, or any Independent Director's
> advisors and (ii) specifically authorizing such entity to bring such claim. The Court
> will have sole jurisdiction to adjudicate any such claim for which approval of the
> Court to commence or pursue has been granted.

*Id*., ¶ 10. Mr. Seery is protected under the January Order as a member of the Independent Board

and as the Debtor's CEO and CRO – an agent of the Independent Board. The January Order

provided that the Bankruptcy Court "shall retain jurisdiction over all matters arising from or related

to the interpretation and implementation of this Order. . . ."). *Id., ¶* 13.

27.    Seven months later, the Debtor sought Bankruptcy Court approval to appoint Mr.

Seery as the Debtor's CEO and CRO. After an evidentiary hearing, the Bankruptcy Court granted

the motion (without objection) and entered its *Order Approving Debtor's Motion Under*

*Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* [Docket No. 854] pursuant to 11 U.S.C. §§ 105(a) and 363(b) (the "July Order" and with the January Order, the "Gatekeeper Orders"). Appx. 20. Like the January Order, the July Order included a "gatekeeper" provision:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

*Id.*, ¶ 5. The Bankruptcy Court "retain[ed] jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of [the July] Order." *Id.,* ¶ 8.

28.    The Gatekeeper Orders are final orders, *res judicata*, and law of the case. *See* Appx. 5, ¶ 73 (finding that the Gatekeeper Orders "constitute[] law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987)").

29.    The Gatekeeper Orders also featured heavily at the Plan confirmation hearing. CLOH initially objected to the Plan, which Mr. Dondero and his proxies, including CLOH, contested.[23] In the Confirmation Order, the Bankruptcy Court provided the rationale for, and purpose of, the "gatekeeper" provisions in the Gatekeeper Orders (Appx. 5, ¶¶ 12-14) and expressly found that a "gatekeeper" provision was needed in the Plan because "Mr. Dondero and his related entities will likely commence ligation . . . after the Effective Date and do so in jurisdictions other than the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more hospitable to his claims" (Appx. 5, ¶ 78). Despite this clear finding and

---

[23] Mr. Dondero and a number of his related entities are currently appealing the Confirmation Order.

DOCS_NY:43079.11 36027/002

001927

order, Plaintiffs filed the Seery Motion to add Mr. Seery as a defendant and asked this Court to disregard the Gatekeeper Orders. Although this Court denied the Seery Motion, it stated "Plaintiffs may renew their motion after Defendants are served and have appeared" leaving open the possibility that Plaintiffs may still attempt to add Mr. Seery.[24] Appx. 21.

30.     In response, on April 23, 2021, the Debtor filed the Contempt Motion in the Bankruptcy Court for an order to show cause as to why Plaintiffs should not be held in contempt. Appx. 24. Plaintiffs then filed a motion in the Bankruptcy Court purporting to seek reconsideration of the July Order [Docket No. 2248] (the "Motion for Reconsideration").[25] Appx. 25. The Bankruptcy Court ordered Plaintiffs, among others, to appear at an in person hearing on June 8, 2021,[26] to show cause why they should not be held in contempt. Appx. 26.

31.     Finally, on May 14, 2021, Plaintiffs filed the Bankruptcy Response in which they argue that they followed the Gatekeeper Orders by filing the Complaint in this Court rather than the Bankruptcy Court because seeking to amend the Complaint to add Mr. Seery as a defendant was not "pursuing" a claim (as used in the Gatekeeper Orders). Appx. 28 at 13.

## ARGUMENT

**A.**     **Plaintiffs Violated Local Rule 3.3(a) By Failing to Disclose the Bankruptcy Case**

32.     When Plaintiffs filed the Complaint, thereby initiating the action, their counsel was required to complete a Civil Cover Sheet, Section VIII of which required them to disclose whether there were any "related cases." Local Rule 3.3(a) requires that "[w]hen a plaintiff files a complaint and there is a related case . . . the complaint must be accompanied by a notice of related case." A

---

[24] If Mr. Seery incurs any costs defending or preparing to defend against Plaintiffs' action, Mr. Seery will be entitled to indemnification directly from the Debtor under the Debtor's limited partnership agreement (Appx. 22, § 4.1(h)) and indirectly through the Strand's indemnification obligations and the Debtor's guarantee of such obligations (Appx. 23).

[25] The Contempt Motion and the Motion for Reconsideration were re-docketed on April 27, 2021, without any changes.

[26] The hearing on the Show Cause Order will be the first in person hearing since March 2020.

001928

"related case" is defined in pertinent part as a proceeding that "arises from a common nucleus of operative fact with the case being filed or removed, regardless whether the related case is a pending case. . . ." Local Rule 3.3(b)(3). As discussed above, although the Complaint asserts claims based on the same facts as the HarbourVest Settlement approved over Plaintiffs' objection by the Bankruptcy Court, the Civil Cover Sheet makes no mention of the Bankruptcy Case as a "related case." It merely describes the nature of the Complaint as one arising under RICO. Yet the Bankruptcy Case is indisputably related to this one.[27] Plaintiffs' failure to disclose the existence of a related case violates the Local Rules. *See Kuzmin v. Thermaflo, Inc.*, 2:07-CV-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at \*4-7 (E.D. Tex. May 20, 2009) (finding party violated court's local rules where they failed to indicate on civil cover sheet that case was "related to" other cases).

**B.     The Complaint Should Be Automatically Referred to the Bankruptcy Court**

      **i.     The Complaint Should Be Heard in the Bankruptcy Court.**

33.     Jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11" is conferred on district courts. 11 U.S.C. §§ 1334(a), (b). District courts, in turn, may refer proceedings to the bankruptcy courts. 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."). On August 3, 1984, this Court entered the Order of Reference, which provides, in pertinent part: "*any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 . . . be and they hereby are referred to the*

---

[27] Under 28 U.S.C. § 1334(a), this Court has original and exclusive jurisdiction over the Bankruptcy Case. Pursuant to 28 U.S.C. § 157 and the Order of Reference, this Court has referred matters in the Bankruptcy Case to the Bankruptcy Court. It is thus clear that the Bankruptcy case is pending in this District pursuant to this Court's jurisdiction, and as noted above the matters alleged in the Complaint related directly to litigated proceedings involving Plaintiffs and the Debtor in the Bankruptcy Case. These facts require appropriate disclosure in the Civil Cover Sheet.

*Bankruptcy Judges of this district for consideration and resolution consistent with law*." Appx. 2 (emphasis added). The Order of Reference therefore refers the following proceedings:

- **Proceedings "arising under Title 11":** A proceeding "arises under" Title 11 if it is a "cause of action created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987).

- **Proceedings "arising in. . . a case under Title 11":** A proceeding "arises in" Title 11 if it deals with "administrative matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 96 (emphasis in original).[28]

- **Proceedings "related to a case under Title 11":** A proceeding "relates to" a case under Title 11 if "the outcome of [the non-bankruptcy] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021) (internal citations omitted); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal. . . with all matters connected with the bankruptcy estate") A proceeding "relates to" a proceeding under Title 11 even if it arises from postpetition conduct if "it affects the estate, not just the debtor." *Wood*, 825 F.2d at 94.

### ii.    The Order of Reference is Mandatory.

34.    Under the plain language of the Order of Reference, "all proceedings under Title 11 or arising or related to a case under Title 11" are ***automatically*** referred to the bankruptcy courts, and the Debtor respectfully submits that the Order of Reference is mandatory. *See Uralkali Trading, S.A. v. Sylvite Southeast, LLC*, 2012 U.S. Dist. LEXIS 40455, at *3 (M.D. Fla. Mar. 26, 2012) (finding that a substantially similar order of reference in the Middle District of Florida "mandate[d]" referral to the appropriate bankruptcy court); *Welch v. Regions Bank*, 2014 U.S. Dist. LEXIS 96175, at *5 (M.D. Fla. July 15, 2014) ("[T]his Court has declared the enforcement of the Standing Order of Reference mandatory"). The fact that 11 U.S.C. §§ 1334 confers original jurisdiction on the district court does not change this requirement as district courts and bankruptcy

---

[28] Proceedings arising under and arising in Title 11 are "core proceedings" under 28 U.S.C. § 157(b). *Wood*, 825 F.2d at 96 ("[T]he phrases 'arising under' and 'arising in' are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding. . . If the proceeding is one that would arise only in bankruptcy. It is also a core proceeding. . . .").

courts are distinct. *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) ("Additionally, every

other circuit to address the issue has maintained the distinction between the bankruptcy court and

the district court, holding that 'a debtor must obtain leave of the bankruptcy court before initiating

an action in district court when the action is against the trustee or other bankruptcy-court-appointed

officer, for acts done in the actor's official capacity'") (citations omitted).

### iii.    Any Disputes Over the Settlement or the Transfer Arise Under, Arise In, and Relate to Title 11 and are Core Proceedings.

35.     It is black letter law that the determination of whether to approve a settlement of a

claim is a "core proceeding" and arises in and under Title 11. The statutory predicates for relief

are 11 U.S.C. §§ 105 and 363 and under Rule 9019, which are "created by the federal bankruptcy

law" and "arise only in bankruptcy." *Wood*, 825 F.2d at 96; *see also, e.g., In re Idearc, Inc.*, 423

B.R. 138, 177 (Bankr. N.D. Tex. 2009) (finding approval of a settlement under Bankruptcy Rule

9019 was a "core proceeding" under 28 U.S.C. § 157(b)); *In re Margaux City Lights Partners,*

*Ltd.*, 2014 Bankr. LEXIS 4841 at *6 (Bankr. N.D. Tex. Nov. 24, 2014) (same); Settlement Order,

¶ 2 (same). The HarbourVest Settlement also involved the allowance of HarbourVest's Claims –

a black letter core proceeding under 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include, but are

not limited to – (B) allowance of disallowance of claims against the estate. . . .").

36.     Since the Complaint seeks to re-litigate the HarbourVest Settlement and to re-open

the Bankruptcy Court's factual record, it is seeking a ruling from this Court as to the merits of the

HarbourVest Settlement and/or to litigate matters that arose from the same operative facts as the

HarbourVest Settlement – in each case, a core proceeding arising in and under Title 11. If the

Settlement Order or the Transfer is to be re-assessed it must be by the Bankruptcy Court under the

Bankruptcy Code and Bankruptcy Rules. This Court should enforce the Order of Reference and

refer the Complaint to the Bankruptcy Court. *See Burch*, 835 Fed. Appx. at 748 ("Each of Burch's

state-court claims is premised on his interpretation of a Chapter 11 bankruptcy order, and so each

arises from or is related to his Title 11 bankruptcy proceedings.").

37.    Further, the Bankruptcy Court specifically retained jurisdiction in the Settlement

Order to adjudicate all disputes arising from the implementation of the Settlement Order, including

the Transfer of the HCLOF interests, and therefore retained jurisdiction to hear the Complaint. *Id.*

¶7. Even if jurisdiction had not been explicitly retained, the Bankruptcy Court, like all federal

courts, has jurisdiction to interpret and enforce its own orders. *Rodriguez v. EMC Mortgage Corp.*

*(In re Rodriguez)*, 2001 U.S. App. LEXIS 30564, at *5 (5th Cir. Mar. 15, 2001); *In re Galaz*, 841

F.3d 316, 322 (5th Cir. 2016); *Angel v. Tauch (In re Chiron Equities, LLC)*, 552 B.R. 674, 684

(Bankr. S.D. Tex. 2016). The Complaint, which seeks to challenge the Transfer and re-litigate the

Settlement Order, is therefore itself a core proceeding arising in and under Title 11 and should be

heard in the Bankruptcy Court.

**iv.    Any Disputes Over the Gatekeeper Orders Arise Under, Arise In, and Relate to Title 11 and Are Core Proceedings.**

38.    The Seery Motion was denied, and Mr. Seery has not been added as a defendant in

this Case. Plaintiffs have also filed the Motion for Reconsideration in the Bankruptcy Court.

However, to the extent Plaintiffs seek to add Mr. Seery as a defendant in this Case, any such

proceedings must be referred to the Bankruptcy Court for the reasons forth in Section B(iii) *supra*.

Like the Settlement Order, the January Order is the result of a settlement with the Committee

approved under 11 U.S.C. §§ 105 and 363 and Bankruptcy Rule 9019. The "gatekeeper" provision

in the January Order was also a required component of that settlement and the settlement would

not have been approved without it. *See* Appx. 5, ¶ 12-14. Similarly, the July Order was the result

of a motion seeking authority to appoint Mr. Seery as CEO and CRO under 11 U.S.C. §§ 105(a)

and 363(b), an administrative action that only exists in Title 11 and thus "arises in" and "arises

DOCS_NY:43079.11 36027/002
001932

under" Title 11. Like the January Order, the "gatekeeper" provision in the July Order was a required component of Mr. Seery's appointment. *Id.* Any attempt to add Mr. Seery as a defendant would be re-litigating a core proceeding arising under, arising in, and related to Title 11.

> **v.    The Complaint Impacts Creditor Recoveries.**

39.    The Debtor's Plan provides for the orderly monetization of the Debtor's assets and the distribution of the proceeds to creditors. Because the Plan is an asset monetization plan, distributions depend on two things: (a) the total amount of allowed claims against the estate and (b) the cash available to pay those claims. Consequently, the Complaint will have a material and immediate impact on the Debtor's estate. *First*, any judgment secured by Plaintiffs against the Debtor will decrease the cash available to pay the Debtor's prepetition creditors (which cash is property of the estate under 11 U.S.C. § 541). *Second*, any delay in determining the amount owed to HarbourVest or the amount owed by the Debtor to Plaintiffs will delay payments to creditors under the Plan as the Debtor will need to reserve against such claims. This impact on creditors and the Debtor's ability to satisfy its obligations under the Plan clearly impacts the Debtor's estate and should be adjudicated by the Bankruptcy Court. *Zale*, 62 F.3d at 753 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate."); *see generally Centrix Fin. Liq. Trust v. Sutton*, 2019 U.S. Dist. LEXIS 154083 (D. Colo. Sept. 10, 2019) (finding that in a liquidating plan, the bankruptcy court has "related to" jurisdiction over all matters that impact distributions from the liquidating trust).

> **vi.    Mr. Seery Will Have Indemnification Claims Against the Estate.**

40.    This Court denied the Seery Motion without prejudice, but if Mr. Seery is ever added as a defendant or is compelled to retain personal counsel because of the completely unfounded and false allegations in the Complaint, Mr. Seery will have the right to indemnification

DOCS_NY:43079.11 36027/002

001933

from the estate. *See* ¶ n.24 *supra*. The cost of this indemnification will immediately decrease the amount available to creditors and will delay distributions. Again, this clearly "relates to" to the Debtor's bankruptcy. *See, e.g., Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263, 266-67 (5th Cir. 2015) (finding that bankruptcy court had jurisdiction because of potential indemnification claims even though bankruptcy court ultimately determined the indemnification claims were invalid); *Refinery Holdings Co., L.P. v. TRMI Holdings, Inc. (In re El Paso Refinery, L.P.)*, 302 F.3d 343, 349 (5th Cir. 2002) (finding "related to" jurisdiction when "RHC's claim against Texaco could conceivably have an effect on the Estate in light of the chain of indemnification provisions beginning with Texaco and leading directly to the Debtor."); *Houston Baseball Partners, LLC v. Comcast Corp. (In re Houston Reg'l Sports Network)*, 2014 Bankr. LEXIS 2274, at *15-25 (Bankr. S.D. Tex. May 22, 2013).

**C.    There is No Basis for a Mandatory Withdrawal of the Reference**

41.    In the Seery Motion, Plaintiffs cite 28 U.S.C. § 157(d) for the proposition that bankruptcy courts are "prohibit[ed] . . . absent the parties consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulation organizations or activities affecting interstate commerce." Appx. 18, at 7. Plaintiffs argue that, because they pled causes of action arising under the Advisers Act and RICO, this Court will have to withdraw the reference. Plaintiffs make the same argument in the Bankruptcy Response: "Respondents expected that the motion for leave [to amend] would likely be referred to [the Bankruptcy] Court for a report and recommendation. And Respondents planned, if necessary, to move to withdraw the reference. . . ." Appx. 28 at 12.

42.    Even assuming Plaintiffs' federal law claims are not frivolous (and they are), Plaintiffs misinterpret 28 U.S.C. § 157(d)' s applicability to this case. 28 U.S.C. § 157(d) provides for mandatory withdrawal of the reference in certain instances: "The district court shall, on timely

21

001934

motion of a party, so withdraw the proceeding if . . . resolution of the proceeding *requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce*." 28 U.S.C. § 157(d) (emphasis added). However, in interpreting Section 157(d), courts in this Circuit apply the majority view and require withdrawal of the reference only:

> [W]hen "substantial and material consideration" of a federal statute other than the Bankruptcy Code is necessary to the resolution of a case or proceeding. Withdrawal is not mandatory in cases that require only the "straightforward application of a federal statute to a particular set of facts." Rather, withdrawal is in order only when litigants raise "issues requiring significant interpretation of federal laws that Congress would have intended to [be] decided by a district judge rather than a bankruptcy judge."

*Southern Pac. Transp. v. Voluntary Purchasing Groups*, 252 B.R. 373, 382 (E.D. Tex. 2000) (quoting *In re National Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991). As such, even the presence of a substantial federal question is not a basis for mandatory withdrawal; mandatory withdrawal is only proper when a bankruptcy court would have to interpret and apply federal law on a novel and unsettled question. *See Beta Operating Co., LLC v. Aera Energy, LLC (In re Memorial Prod. Partners)*, 2018 U.S. Dist. LEXIS 161159, at *9 (S.D. Tex. Sept. 20, 2018); *UPH Holdings, Inc. v. Sprint Nextel Corp.*, 2013 U.S. Dist. LEXIS 189349, at *4 (W.D. Tex. Dec. 10, 2013) (holding no mandatory withdrawal when, among other reasons, "the Bankruptcy Court will be tasked with 'no more than application of federal communications law to a given set of facts.") (citations omitted). Finally, "mandatory withdrawal is to be applied narrowly to ensure bankruptcy cases are litigated in the bankruptcy courts and to prevent 157(d) from becoming an 'escape hatch' from litigating cases under the Bankruptcy Code." *See, e.g., Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009) (quoting *In re G-I Holdings, Inc.*, 295 B.R. 211, 221 (D. N.J. 2003)).

43.     None of the putative federal causes of action raised by Plaintiffs require "substantial and material consideration" of a federal statute or more than the cursory application of settled federal law. In fact, most can be summarily dismissed as they either grossly misinterpret settled law, based on materially misstated facts, or assert causes of action that belong to other parties.

**D.     The Complaint Is Barred by the Doctrine of *Res Judicata***

44.     The doctrine of *res judicata* protects the finality of judgements by preventing litigants from re-litigating the same issues over and over again. "[R]es judicata has four elements: (1) the parties are identical or in privity; (2) the judgment. . . was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Comer v. Murphy Oil USA*, 718 F.3d 460, 467 (5th Cir. 2013). Each of those elements is satisfied here, and the Complaint is barred by *res judicata*. Plaintiffs had their opportunity to challenge these orders; they do not get a second bite at the apple or to re-litigate these issues in a different forum.

45.     As set forth above, the parties are identical. Plaintiffs had the right to object to the HarbourVest Settlement and the Transfer of the HarbourVest interests, and Plaintiffs (a) actually objected to the Settlement Motion arguing that they had a "Right of First Refusal" under the Members Agreement; (b) had the right to take discovery on all issues, including the value of the HarbourVest interests; (c) could have objected based on the Advisers Act or RICO; (d) deposed HarbourVest's 30(b)(6) witness; and (e) ***withdrew their objection once they realized that they did not have a "Right of First Refusal."*** The Bankruptcy Court also indisputably had jurisdiction over the matter. Although the Settlement Order is being appealed by the Trusts, it is a final judgment for purposes of *res judicata*. *See Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.*, 510 F. 2d 272, 273 (5th Cir. 1975) ("A case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal."). Finally, as set forth above, the same claims or causes

001936

of action are involved. The Complaint is a blatant collateral attack on the Settlement Order. *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) (finding that regardless of relief sought, it is a collateral attack if it must in some fashion overrule a previous judgment).

46.     Similarly, the January Order was entered in January 2020 with Mr. Dondero's consent and with the knowledge of Plaintiffs.[29] It was never appealed and is final. The July Order was entered in July 2020 without objection and with the knowledge of Plaintiffs. It was (a) never appealed; (b) is final;[30] and (c) the Bankruptcy Court was a court of competent jurisdiction.[31] *See In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1052-53 (5th Cir. 1987) (finding a court has jurisdiction for purposes of res judicata when no party contests subject matter jurisdiction in the original proceeding). Consequently, any attempt to add Mr. Seery to the Complaint and subsequent challenges to the Gatekeeper Orders would involve the same issues addressed by the Bankruptcy Court and must be dismissed on the basis of *res judicata*.

**E.     This Court Should Consider Mr. Dondero's Litigious Nature**

47.     This Court should also consider the history of this case when determining whether to enforce the reference, including Mr. Dondero's history of vexatious litigation (brought directly and indirectly) and the Bankruptcy Court's familiarity with the Bankruptcy Case and the interrelatedness of Mr. Dondero's byzantine web of related companies. Appx. 5, ¶¶ 77-78. In fact, the Fifth Circuit recently addressed a similar issue in *Burch v. Freedom Mortgage. Corp. (In re*

---

[29] On December 4, 2019, CLOH filed a *Notice of Appearance and Request for Copies* [Docket No. 152] in the Bankruptcy Case by and through its counsel Kane Russell Coleman Logan PC. Since then, CLOH has received notice as required by the Bankruptcy Code of all pleadings filed in the Bankruptcy Case.

[30] The Bankruptcy Court specifically found that the Gatekeeper Orders were *res judicata* in the Confirmation Order. *See* Appx. 5, ¶ 73; ¶ 28 *supra*.

[3131] Plaintiffs have questioned whether the Bankruptcy Court exceeded its jurisdiction to enter the July Order in the Motion for Reconsideration. Any attempt to litigate that issue in this Court may impact the Motion for Reconsideration and must be referred to the Bankruptcy Court under the Order of Reference. *See In re Margulies*, 476 B.R. 393 (Bankr. S.D.N.Y. 2012) (citing *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.*), 930 F.2d 1132, 1143 (6th Cir. 1991)) ("If the action between third parties will have a collateral estoppel effect on the debtor, the third party action is 'related to' the bankruptcy case for jurisdictional purposes.").

001937

*Burch)*. In *Burch*, the movant sought to avoid bankruptcy court jurisdiction over claims regarding the interpretation and enforceability of prior bankruptcy court orders. *Burch*, 385 Fed. Appx. at 747. Mr. Burch, like Mr. Dondero, had also been found to be an abusive litigant. The Fifth Circuit denied Mr. Burch's attempts to avoid bankruptcy court jurisdiction through clever pleading, calling them "frivolous," and "warn[ed] Burch that any further frivolous or abusive filings in this court, the district court, or the bankruptcy court will invite the imposition of sanctions, including dismissal, monetary sanctions, and/or restrictions on his ability to file pleadings in this court and any court subject to this court's jurisdiction." *Id.*, at 749; *see also* 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."). Mr. Dondero, directly and through his proxies, is a frivolous and abusive litigant – hence the need for the "gatekeeper" provisions. This Court should not provide him a forum to further abuse the judicial process.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant its Motion and enter an order in the form annexed to the Motion as **Exhibit A**, and grant any further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

001938

Dated: May 19, 2021                    **PACHULSKI STANG ZIEHL & JONES LLP**
                                       Jeffrey N. Pomerantz (CA Bar No. 143717)
                                       Robert J. Feinstein (NY Bar No. 1767805)
                                       John A. Morris (NY Bar No. 266326)
                                       Gregory V. Demo (NY Bar No. 5371992)
                                       Judith Elkin (TX Bar No. 06522200)
                                       Hayley R. Winograd (NY Bar No. 5612569)
                                       10100 Santa Monica Blvd., 13th Floor
                                       Los Angeles, CA 90067
                                       Telephone: (310) 277-6910
                                       Facsimile: (310) 201-0760
                                       Email: jpomerantz@pszjlaw.com
                                               rfeinstein@pszjlaw.com
                                               jmorris@pszjlaw.com
                                               gdemo@pszjlaw.com
                                               jelkin@pszjlaw.com
                                               hwinograd@pszjlaw.com

                                       -and-

                                       **HAYWARD PLLC**

                                       */s/ Zachery Z. Annable*
                                       Melissa S. Hayward
                                       Texas Bar No. 24044908
                                       MHayward@HaywardFirm.com
                                       Zachery Z. Annable
                                       Texas Bar No. 24053075
                                       ZAnnable@HaywardFirm.com
                                       10501 N. Central Expy, Ste. 106
                                       Dallas, Texas 75231
                                       Tel: (972) 755-7100
                                       Fax: (972) 755-7110

                                       *Counsel for Highland Capital Management, L.P.*

001939

# EXHIBIT 2

001940

```
                         IN THE UNITED STATES BANKRUPTCY COURT
 1                        FOR THE NORTHERN DISTRICT OF TEXAS
                                    DALLAS DIVISION
 2
                                        )    Case No. 19-34054-sgj-11
 3    In Re:                            )    Chapter 11
                                        )
 4    HIGHLAND CAPITAL                  )    Dallas, Texas
      MANAGEMENT, L.P.,                 )    Tuesday, June 8, 2021
 5                                      )    9:30 a.m. Docket
             Debtor.                    )
 6                                      )    - SHOW CAUSE HEARING (2255)
                                        )    - MOTION TO MODIFY ORDER
 7                                      )      AUTHORIZING RETENTION OF
                                        )      JAMES SEERY (2248)
 8                                      )    - MOTION FOR ORDER FURTHER
                                        )      EXTENDING THE PERIOD WITHIN
 9                                      )      WHICH DEBTOR MAY REMOVE
                                        )      ACTIONS (2304)
10    _____)

11                          TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                      UNITED STATES BANKRUPTCY JUDGE.

13    APPEARANCES:

14    For the Debtor:            Jeffrey Nathan Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
15                               10100 Santa Monica Blvd.,
                                   13th Floor
16                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
17
      For the Debtor:            John A. Morris
18                               Gregory V. Demo
                                 PACHULSKI STANG ZIEHL & JONES, LLP
19                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
20                               (212) 561-7700

21    For the Debtor:            Zachery Z. Annable
                                 HAYWARD & ASSOCIATES, PLLC
22                               10501 N. Central Expressway,
                                   Suite 106
23                               Dallas, TX  75231
                                 (972) 755-7104
24

25
```

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB-D Document 18-10 Filed 09/12/23 Page 49 of 213 PageID 2215

3

1   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX   76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.
25

001943

4

| | |
|---|---|
| 1 | DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M. |
| 2 | THE COURT:  All right.  We have settings in Highland |
| 3 | this morning.  We have three settings.  We have the show cause |
| 4 | hearing with regard to a lawsuit filed in the District Court. |
| 5 | We have a couple of more, I would say, ministerial matters, |
| 6 | although I think we do have objections.  I know we have |
| 7 | objections.  We have a motion to extend the removal period in |
| 8 | this case as well as a motion to modify the order authorizing |
| 9 | Mr. Seery's retention. |
| 10 | So let's go ahead and start out by getting appearances |
| 11 | from the lawyers who are participating today.  I'll get those |
| 12 | now. |
| 13 | MR. MORRIS:  Good morning, Your Honor. |
| 14 | THE COURT:  Good morning. |
| 15 | MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl |
| 16 | & Jones for the Debtor.  I'm joined with me this morning by my |
| 17 | colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable. |
| 18 | THE COURT:  Okay. |
| 19 | MR. MORRIS:  We do have a proposal on how to proceed |
| 20 | today, a substantial portion of which is in agreement with the |
| 21 | Respondents. |
| 22 | THE COURT:  Okay. |
| 23 | MR. MORRIS:  So, at the appropriate time, I'd be |
| 24 | happy to present that to the Court. |
| 25 | THE COURT:  All right.  Well, let's get all the |

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 18-10   Filed 09/11/23   Page 51 of 213   PageID 2217

5

1    appearances and then I'll hear from you on that.

2              MR. SBAITI:  Your Honor, my name is -- would you like

3    me to approach, Your Honor?

4              THE COURT:  Yes, please.

5              MR. SBAITI:  It's my first time appearing in

6    Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

7    here on behalf of the charitable DAF Fund, CLO Holdco, and the

8    Respondents to the show cause hearing.  We are also

9    representing them as the Movants on the motion to modify the

10   Court's order appointing Mr. Seery.

11             THE COURT:  All right.  Thank you.

12             MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13   Sbaiti, also representing the Charitable DAF and CLO Holdco,

14   as well as our firm that is named in the show cause order.

15             THE COURT:  Okay.

16             MR. BRIDGES:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19   Phillips from Kelly Hart Hallman here on behalf of Mark

20   Patrick in the show cause matter.  I'm joined with my

21   colleague Michael Anderson from the Kelly Hart firm here in

22   Fort Worth.  And that's the matter that we're involved in, the

23   show cause auction.

24             THE COURT:  All right.  Thank you, Mr. Phillips.

25             MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BB Document 18-10   Filed 09/27/2 Page 52 of 213 PageID 9218

6

1    of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

2    Dondero.  I have Mr. Will Howell here with me from my firm.

3            THE COURT:  All right.  Thank you.

4            MR. CLEMENTE:  Good morning, Your Honor.  Matthew

5    Clemente from Sidley Austin on behalf of the Committee.  I'm

6    here with my partner, Paige Montgomery.

7            THE COURT:  Okay.  Thank you.

8            MR. CLEMENTE:  Good morning.

9            THE COURT:  All right.  Just to remind people, we do

10   have participants on the WebEx, but in setting the hearing I

11   made clear that participants today needed to be here live in

12   the courtroom.  So the WebEx participants are going to be only

13   observers.

14      We have a camera on the screen here that is poised to

15   capture both the lawyer podium as well as the witness box, and

16   then another camera on the bench.

17      So, please be mindful.  We want the lawyers to speak from

18   the podium so that they are captured and heard by the WebEx.

19   And so hopefully we don't have any cords you will trip over.

20   We've worked hard to make it easy to maneuver around the

21   courtroom.

22      All right.  So, Mr. Morris, you had a proposal on how we

23   would approach this today?

24            MR. MORRIS:  I do, Your Honor.  And it's rather

25   brief, but I think it makes a lot of sense.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B  Document 18-10  Filed 09/13/2852 Page 53 of 213  PageID 2219

7

1        There are three motions on the calendar for today, --

2                THE COURT:  Uh-huh.

3                MR. MORRIS:  -- only one of which required the

4        personal appearance of certain parties.

5                THE COURT:  Uh-huh.

6                MR. MORRIS:  And for that reason, and because,

7        frankly, it was the first of the three motions filed, we

8        believe that that ought to go first.

9                THE COURT:  Okay.

10               MR. MORRIS:  And then it can be followed by the

11       motion for reconsideration of the July order, assuming time

12       permits, and then the motion to extend the removal deadline.

13           And with respect to the contempt motion, Your Honor, the

14       parties have agreed that each side shall have a maximum of

15       three hours to make opening statements, closing arguments,

16       direct and cross-examination of witnesses.

17           You know, I did point out to them that from time to time

18       Your Honor has used the Court's discretion to adjust the time

19       --

20               THE COURT:  Uh-huh.

21               MR. MORRIS:  -- if the Court is making inquiries, and

22       I guess we'll deal with that matter as it comes.  But as a

23       general matter, that is what we've agreed to.  And I would

24       propose that, unless anybody has any objections, that we just

25       proceed on that basis.

```
 1              THE COURT:  Okay.

 2              MR. MORRIS:  And I could -- I could go right forward.

 3              THE COURT:  So, three hours in the aggregate?

 4              MR. MORRIS:  Uh-huh.

 5              THE COURT:  It doesn't matter how people spend it --

 6    with argument, examination, cross -- three hours in the

 7    aggregate?

 8              MR. MORRIS:  Correct.

 9              THE COURT:  Okay.  So, Nate, you'll be the timer on

10    that.

11              MR. MORRIS:  Yeah.  We thought it was very important

12    to get this done today, with people coming in from out of

13    town.

14              THE COURT:  Okay.  Sounds fine.

15              MR. MORRIS:  So does the Court want to inquire if

16    anybody has any questions or comments?

17              THE COURT:  I do.  Well, I see Mr. Bridges getting

18    up.  You confirm that that's agreeable?

19              MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20    agreeable.  We have one slight difference in our proposal.  We

21    would suggest to Your Honor that the motion for modification,

22    if Your Honor decides our way, would moot the entire motion

23    for contempt.  And we'd suggest, if that possibility is

24    realistic, that we would go first with that motion, perhaps

25    obviate having to have the evidence presented and the lengthy
```

001948

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B  Document 1-10  Filed 09/15/22  Page 55 of 213  PageID 222

9

1   hearing.

2       The motion for modification, Your Honor, asks the Court to

3   reconsider -- to modify that order because of jurisdictional

4   and other shortcomings in it that make the order

5   unenforceable.  And because that's the order that is the

6   subject of the contempt motion, we'd ask Your Honor to

7   consider putting that motion first.

8           THE COURT:  Okay.  Or second?  Ahead of the contempt

9   matter?

10          MR. BRIDGES:  Ahead of the contempt matter, --

11          THE COURT:  Uh-huh.

12          MR. BRIDGES:  -- because it has a possibility --

13          THE COURT:  We have the removal matter, which I think

14  is the shortest.  All right.

15          MR. BRIDGES:  No objection to that, Your Honor.

16  That's correct.

17          THE COURT:  Okay.  So, Mr. Morris, that's fine by

18  you?

19          MR. MORRIS:  Your Honor, that doesn't make a lot of

20  sense to us.  We don't believe there's any basis for the Court

21  to reconsider, modify, or amend in any way the July order.

22  But even if we were wrong about that, that would not

23  retroactively validate conduct which was otherwise wrongful at

24  the time it was committed.

25      The contempt motion needs to go first.  The other motion

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B B Document 18-10   Filed 09/06/22   Page 456 of 513   PageID 2222

10

 1   will have no impact on whether or not there is a finding of

 2   contempt of court.

 3          THE COURT:  All right.  And update me on this.  There

 4   was something filed yesterday, a notice of a proposed form of

 5   order that the Debtor had proposed, that I think was not

 6   agreed to, where there would be a change about any action that

 7   goes forward, the cause of action would be in the sole

 8   jurisdiction of the Court, and you all agreed to change that

 9   part of the order, correct?

10          MR. MORRIS:  So, just as a division of labor for Your

11   Honor, I'm doing the contempt motion.

12          THE COURT:  Okay.  That's Mr. Pomerantz's?

13          MR. MORRIS:  Mr. Pomerantz is going to take care of

14   that.

15          MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16   to see you again.

17          THE COURT:  Good to see you.

18          MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19   Your Honor recalls, there's really three aspects of the

20   January 9th and the July 16th order.  First, requiring people

21   to come to Bankruptcy Court before commencing or pursuing an

22   action.  Second, for the Bankruptcy Court to have the sole and

23   exclusive authority to determine whether the claim is a

24   colorable claim of willful negligence or gross misconduct.

25   And then third, if Your Honor passed the claim through the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 8-10   Filed 09/12/23   Page 57 of 213   PageID 2223

11

1   gate, whether you would have jurisdiction.

2         In Your Honor's January 9th and July 16th orders, you said

3   you would have exclusive jurisdiction.  In the motion for

4   reconsideration, and particularly the reply, Movants said, if

5   you just change that and say that if passes through the gate

6   that you'd have jurisdiction only to the extent you would

7   otherwise have it, that would resolve the motion, in the same

8   way that the plan of reorganization was amended.

9         We proposed that.  They rejected it.  We put it before

10  Your Honor.  So we believe that it moots out a good portion --

11  actually, we think it should moot out the entire motion.  They

12  obviously disagree.  But we definitely agree it moots out the

13  most significant portion of their motion, which is that Your

14  Honor would take jurisdiction to adjudicate a matter on an

15  exclusive basis when you might not otherwise have jurisdiction

16  on an exclusive basis.

17              THE COURT:  Okay.  Well, --

18         MR. BRIDGES:  Your Honor, may I respond to that?

19              THE COURT:  You may.  And --

20         MR. BRIDGES:  Thank you, Your Honor.

21              THE COURT:  -- why -- could you clarify why you think

22  it would moot out the entire show cause matter?  I wouldn't be

23  retroactively changing my order.  Is that what you're

24  proposing?

25              MR. BRIDGES:  Your Honor, with all respect, we

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1830   Filed 09/29/22   Page 58 of 213   PageID 2224

12

1  believe the order is defective and unenforceable and has to be

2  modified in order to fix it.  And because of the defects,

3  we're -- we're actually arguing, Your Honor, that it is

4  unenforceable in a contempt proceeding.  That is exactly what

5  our argument is.

6        THE COURT:  Okay.  I think I'm getting way farther

7  down this road than maybe I want to right now.  But I guess

8  here's the elephant in the room, I feel like:  *Republic Supply*

9  *versus Shoaf.*

10       MR. BRIDGES:  Uh-huh.

11       THE COURT:  The U.S. Supreme Court *Espinosa* case, for

12 that matter.  If I accept your argument that maybe there was a

13 flaw in those orders, that maybe they went too far, don't you

14 have a problem with those two cases?

15       MR. BRIDGES:  Your --

16       THE COURT:  The orders weren't appealed.

17       MR. BRIDGES:  I understand completely, Your Honor.

18       THE COURT:  Uh-huh.

19       MR. BRIDGES:  And I think the answer is no because of

20 the *Applewood* case from the Fifth Circuit.  The *Applewood* case

21 cited in our reply brief explains that in order for an order,

22 a final order of the Bankruptcy Court to have exculpatory

23 effect, in order for it to release claims, for example, that

24 the claims at issue must be enumerated in the order.  It's not

25 enough to have a blanket statement like the order, the July

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 8-10   Filed 09/22/23   Page 59 of 213   PageID 2225

13

1   order has, like the January order has, saying that Mr. Seery's

2   claims -- claims cannot be brought against him for ordinary

3   negligence at all.  The -- Your Honor, we're delving into my

4   argument.

5          THE COURT:  Okay.

6          MR. BRIDGES:  And I was hoping to do this on a

7   preliminary basis.

8          THE COURT:  Right.

9          MR. BRIDGES:  I don't mean to bog you down with that.

10  But Your Honor, no, mandatory authority from the Fifth Circuit

11  after *Shoaf* limits *Shoaf's* application and says that it does

12  not extinguish the claims that are not specifically enumerated

13  in the order.  And the reason for that is because it doesn't

14  give the kind of notice to the parties that they would need to

15  make an appearance and object to those orders at the time.  It

16  actually helps to stem the amount of litigation at the time

17  rather than to encourage it.

18         THE COURT:  All right.  Well, you'll get your

19  opportunity to make your full argument on this.  But I'm not

20  convinced, preliminarily, at least, to affect my decision on

21  the sequence, okay?  So even if it potentially wastes time

22  under your view of the law, I am going to do the removal

23  matter first -- the extension of time request, I should say --

24  and then the show cause and then the motion to modify.  And I

25  realize, those last two matters, everything is kind of

001953

14

```
1  │  interrelated.  All right?

2  │          MR. BRIDGES:  Yes, Your Honor.

3  │          THE COURT:  All right.  So, with that decided, is

4  │  there a desire on the part of the lawyers to make opening

5  │  statements, or shall we just go to the motions?  And, of

6  │  course, people can use their three hours for oral argument,

7  │  however much they want to use for oral argument.

8  │          MR. MORRIS:  Your Honor, the -- to be clear, the six-

9  │  hour time limit only applies to the contempt proceeding.

10 │          THE COURT:  Oh, yes.  Yes.  Uh-huh.

11 │          MR. MORRIS:  And I do want to make an opening

12 │  statement.

13 │          THE COURT:  Okay.

14 │          MR. MORRIS:  So, as the Movant, I'd like to go first.

15 │          THE COURT:  You want to make opening statements?

16 │          MR. BRIDGES:  Yes.  Yes, Your Honor.

17 │          THE COURT:  Okay.  Okay.

18 │          MR. BRIDGES:  I believe we've got a PowerPoint

19 │  prepared that I think can lay out our side of it.

20 │          THE COURT:  Okay.

21 │          MR. BRIDGES:  I don't think we're participating in

22 │  the motion to extend the removal time.

23 │          THE COURT:  Okay.

24 │          MR. BRIDGES:  That's going first.

25 │          THE COURT:  All right.
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB Document 18-10 Filed 05/22/85 Page 61 of 213 PageID 2227

15

1            MR. BRIDGES:  So we'll wait until that is --

2            THE COURT:  Well, so we don't get confused on the

3    timing, let's just do the motion to extend right now.  And I

4    think we only had one objection.  As Mr. Sbaiti just pointed

5    out, they're not objecting on that one.  We have a Dondero

6    objection.  So let's, without starting the timer, hear that

7    one.  Okay?

8            MR. DEMO:  Good morning, Your Honor.  Greg Demo;

9    Pachulski, Stang, Ziehl & Jones.

10           THE COURT:  Good morning.

11           MR. DEMO:  I'll be arguing the removal motion and

12   then turn it over.

13        It's fairly basic and straightforward, Your Honor.  We're

14   asking for a further extension of the statutory deadline to

15   remove cases until December 14th, 2021.  The deadline is

16   procedural only.  As Your Honor is well aware, there's a lot

17   of moving parts in this case.  You know, we don't know to this

18   date, really, the full universe of what could actually be out

19   there.  So we're just asking for a short extension of the

20   removal period to cover through December.

21        I know that there was an objection from Mr. Dondero.  I

22   know that he argues that 9006 does not allow us to extend that

23   deadline past the effective date of the plan, and he cites one

24   case for that purpose, which is *Health Support*.  I think it's

25   out of Florida.  That case dealt with the extension of the

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B  Document 38-10  Filed 09/22/23  Page 62 of 213  PageID 2228

16

1   two-year extension of the statute of limitations and was very

2   clear that you can't use 9 --

3          THE COURT:  You mean the 546 deadline?

4          MR. BRIDGES:  Yes.  Yes.

5          THE COURT:  Okay.

6          MR. BRIDGES:  That you can't use 9006 to extend non-

7   bankruptcy deadlines.  That's not what we're doing here, Your

8   Honor.  We're using 9006 to extend the bankruptcy deadline to

9   remove the cases.

10         THE COURT:  Uh-huh.

11         MR. DEMO:  And we'd just ask Your Honor for the

12  extension through December.

13         THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14         MR. HOWELL:  Good morning, Judge.  Will Howell for

15  Mr. Dondero.

16     So, the argument here is not that the Court can't do this.

17  I was just pointing that there is an outside limit to what

18  we're doing.  And so if you look at the cases that the Debtor

19  cites in support of this motion, the one that is most apt was

20  when Judge Nelms did a fourth extension of time.  But those

21  were all 90-day extensions.  Here, we're in a situation where

22  the Debtor is asking for a fourth 180-day extension of time,

23  and this is really where the, you know, objection came -- or,

24  the response in opposition came from.  They specifically asked

25  that it be without prejudice to further extensions.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01504-BB Document 18-10 Filed 09/22/23 Page 63 of 213 PageID 2229

17

1    And so, at some point, you know, does 9006 have an outside

2  limit?  You know, do we need to see some sort of a light at

3  the end of the tunnel here?

4    So we would ask that the motion, at a minimum, be denied

5  in part with respect to this open-ended request for extension

6  beyond two years for a 90-day period.  The other cases that

7  they cite, they have one extension here, one extension there,

8  120 days here, but not 180 days after 180 days after 180 days,

9  and then asking specifically for without prejudice to further

10  extensions beyond two years.  So that's -- that's where this

11  comes from.

12    THE COURT:  All right.  Do you think it matters that

13  this is a very complex case?

14    MR. BRIDGES:  I --

15    THE COURT:  There's litigation here, there, and

16  everywhere.

17    MR. HOWELL:  I also think, you know, *Mirant* was

18  complex.  I think *Pilgrim's Pride* was complex.  I think, you

19  know, it is not out of bounds for the Court to grant a fourth

20  extension.

21    THE COURT:  Uh-huh.

22    MR. BRIDGES:  But to -- you know, at some point --

23  you know, maybe the Court could grant a 90-day extension and

24  make them come back a little more frequently to kind of corral

25  this thing, rather than just saying "This grant of 180 days,

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-BD   Document 18-10   Filed 09/22/22   Page 64 of 213   PageID 2330

18

1   the fourth time, is going to be without prejudice to further

2   extensions."  It just gets kind of large.

3          THE COURT:  Okay.  Mr. Demo, your motion.  You get

4   the last word.

5          MR. DEMO:  Your Honor, I mean, it is without

6   prejudice for further extensions, but that doesn't mean that

7   Your Honor is granting the further extensions now.  It means

8   we'll have to come back.  We'll have to make our case for why

9   an extension is necessary.  And, you know, if Your Honor

10  doesn't want to give us another extension past December 2021,

11  Your Honor doesn't have to.  This is not an order saying that

12  it's a limitless grant.

13     You know, I'd also ask, you know, quite honestly, why Mr.

14  Dondero has such an issue with this.  He hasn't said that any

15  of these cases involve him.  He hasn't given any reasons why

16  this affects him.  He hasn't given any reason why this damages

17  him at all.  So I do, I guess, wonder as an initial matter

18  kind of why we're here, you know, why we're responding to Mr.

19  Dondero's request, when that request really has no impact on

20  him.

21     And then, Your Honor, to the extent that you are inclined

22  to limit this, I would say, you know, we would ask for a

23  reasonable extension of time.  We do think an extension of

24  time, because of the complexity of this case, through December

25  is warranted.  But if Your Honor for some reason does agree

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 18-10    Filed 09/13/23    Page 65 of 213    PageID 2231

19

```
 1    that a shorter extension is necessary under 9006 -- I don't
 2    think it is -- we'd just ask that Your Honor grant us leave to
 3    come back for further extensions of time.
 4              THE COURT:  Okay.  All right.  I will -- I'll grant a
 5    90-day extension, without prejudice for further extensions.
 6              MR. DEMO:  Thank you, Your Honor.
 7              THE COURT:  Maybe in 90 days we'll be farther down
 8    the road and we won't need any more extensions, but you'll
 9    have the ability to argue for more if you think it's really
10    necessary.  All right.  So that will bring us to around
11    September 14th, I guess.
12       All right.  Well, let's go ahead and hear opening
13    statements with regard to the show cause matter.  And again,
14    if you want to roll in arguments about the -- well, no, you
15    said the six hours only applies to show cause, so we'll not
16    hear opening statements with regard to the Seery retention
17    modification, just show cause.
18              MR. MORRIS:  All right.  Before I begin, Your Honor,
19    I have a small deck to guide --
20              THE COURT:  Okay.
21              MR. MORRIS:  -- to guide my opening statement.
22              THE COURT:  All right.
23              MR. MORRIS:  Can I approach the bench?
24              THE COURT:  You may.  And is your legal assistant
25    going to share her content --
```

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01504-BB    Document 8-10    Filed 09/26/22    Page 66 of 213    PageID 9282

20

1          MR. MORRIS:  Yes.

2          THE COURT:  -- so people on the WebEx will see?

3   Okay.

4          MR. MORRIS:  That's the intention, Your Honor.

5          THE COURT:  Okay.

6          MR. MORRIS:  All right.  Are you ready for me to

7   proceed?

8          THE COURT:  I am.  And obviously, everyone has a

9   copy?

10         MR. MORRIS:  Yes.

11         THE COURT:  Your opponents have a copy of this?

12         MR. MORRIS:  Yep.

13         THE COURT:  Okay.  Although we hope to see it on the

14  screen.

15             OPENING STATEMENT ON BEHALF OF THE DEBTOR

16         MR. MORRIS:  Good morning, Your Honor.  John Morris;

17  Pachulski, Stang, Ziehl & Jones; for the Debtor.

18      We're here today on the Debtor's motion to hold certain

19  entities and individuals in contempt of court for violating a

20  very clear and specific court order.  I hope to be relatively

21  brief in my opening here, Your Honor, and I'd like to begin

22  where I think we must, and that is, how do we -- how do we

23  prove this and what do we have to prove?

24      The elements of a claim for contempt of court are really

25  rather straightforward.  The Movant must establish by clear

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 18-1    Filed 09/22/23    Page 67 of 213    PageID 9233

21

 1  and convincing evidence three things.

 2            THE COURT:  Let me stop you and stop the clock.

 3  We're not seeing the shared content.

 4            MR. MORRIS:  Uh-huh.

 5            THE COURT:  Did you want her to go ahead and share

 6  her content?

 7            MR. MORRIS:  I did.

 8            THE COURT:  Okay.

 9            MR. MORRIS:  I was hoping that she'd do that.

10            THE COURT:  All right.  It says it's receiving

11  content.

12            MR. MORRIS:  There we go.  It's on my screen, anyway.

13            THE COURT:  Oh, here it is.  I don't know why it's

14  not on my Polycom.  Can you all see it out there?

15        (Chorus of affirmative replies.)

16            THE COURT:  Okay.  Very good.

17            MR. MORRIS:  Okay.

18            THE COURT:  You may proceed.

19            MR. MORRIS:  Thank you, Your Honor.

20        So, there's three elements to the cause of action for

21  contempt, for civil contempt.  We have to prove by clear and

22  convincing evidence that a court order was in effect; that the

23  order required certain conduct by the Respondents; and that

24  the Respondent failed to comply with the Court's order.

25        We've cited in the footnote the applicable case law from

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 18-10    Filed 09/18/23    Page 68 of 213    PageID 9234

22

1    the Fifth Circuit, and I don't believe that there's any

2    dispute that is indeed the legal standard.

3        The intent of the Respondents as to liability is

4    completely irrelevant.  It doesn't matter if they thought they

5    were doing the right thing.  It doesn't matter if they

6    believed in their heart of hearts that the court order was

7    invalid.  These are the three elements, and we will be able to

8    establish these elements not by clear and convincing evidence,

9    but if we ever had to, beyond reasonable doubt.

10       If we can go to the next slide, please.

11       We begin with the Court's order, the Court's July 9 order.

12    And that order states very clearly what conduct was required.

13    And the conduct that was required was that no entity could

14    commence or pursue -- those are really the magic words --

15    commence or pursue a claim against Mr. Seery without the

16    Bankruptcy Court doing certain things.  And we've referred to

17    this as the gatekeeper.  And the only question I believe the

18    Court has to ask today is whether the Respondents commenced or

19    pursued a claim against Mr. Seery without seeking Bankruptcy

20    Court approval, as set forth in this order.

21       I'll dispute that there's anything ambiguous about this.

22    I'll dispute that it could not be clearer what conduct was

23    prohibited.  It could not be clearer.  The only question is

24    whether the conduct constitutes the pursuit of a claim.

25       Let's see what they did.  If we could go to the next

1    slide.  There will be no dispute about what they did.  And

2    what they did is, a week after filing a lawsuit against the

3    Debtor and two others arising out of the HarbourVest

4    settlement, a settlement that this Court approved, after

5    notice and a hearing and participation by the Respondents,

6    after they had the opportunity to take discovery, after they

7    had the opportunity to examine Mr. Seery about the value of

8    HarbourVest's interest in HCLOF, after all of that, they

9    brought a lawsuit after Mr. Patrick took control of the DAF

10   and CLO Holdco.  And that lawsuit related to nothing but the

11   HarbourVest suit, and it named in Paragraph 2, right up above,

12   Mr. Seery as a potential party.  And a week later, Your Honor,

13   they filed what we call the Seery Motion, and it was a motion

14   for leave to amend their complaint to add Mr. Seery as a

15   defendant.

16       We believe that that clearly violates the Court's July 7

17   order.  And indeed, again, these are facts.  They're not --

18   they're not in dispute.  Just look at the first sentence of

19   their motion.  The purpose of the motion was to name James

20   Seery as a defendant.  That was the purpose of the motion.

21   And the way that they made the motion, Your Honor -- and these

22   are undisputed facts -- the way they made the motion, Your

23   Honor, shows contemptuous intent.  We don't have to prove

24   intent, but I think it might be relevant when you get to

25   remedies.  Okay?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 13-10    Filed 09/22/25    Page 70 of 213   PageID 9236

24

1    And so how do I -- why do I say that?  Because they made

2    this motion, Your Honor, and they didn't have to.  Everybody

3    knows that under Rule 15 they could have amended the complaint

4    if they wanted to.  If they wanted to, they didn't need the

5    Court's permission.  What they wanted to do was try to get the

6    District Court to do what they knew they couldn't.  And that's

7    contemptuous.

8        And they did it, Your Honor, without notice to the Debtor.

9    Even after the Debtor had accepted service of the complaint,

10   even after we told them, if you go down this path, we're going

11   to file a motion for contempt, they did it anyway.  They

12   didn't serve the Debtor.  They didn't give the Debtor a

13   courtesy copy.  They didn't notify the Debtor.  The only thing

14   that happened was the next day, when the District Court

15   dismissed it without prejudice, they sent us a copy of that

16   notice.  And within three days, we were here.

17       A court order was in effect.  Mr. Patrick is going to

18   admit to that.  There's not going to be any dispute about

19   that.  The order required that the Respondents come to this

20   Court before they pursue a claim against Mr. Seery, and they

21   failed to comply with that order.  The facts, again -- if we

22   can go to the next slide.  We can look at some of the detail,

23   because the timeline is mindboggling.

24       Mr. Patrick became the Plaintiffs' authorized

25   representative on March 24th.  And folks, when I took their

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB   Document 18-10   Filed 09/13/22   Page 71 of 213   PageID 2637

25

1    depositions, weren't specific about dates, and that's why some

2    of the entries here refer to sometime after, but there's no

3    question that the order of events is as presented here and as

4    the evidence will show today.

5        The evidence will show that sometime after Patrick became

6    the Plaintiffs' authorized representative, Mr. Dondero

7    informed Mr. Patrick that Highland had usurped an investment

8    opportunity from the Plaintiffs.  Mr. Patrick is going to

9    testify to that.  Mr. Patrick is also going to testify that,

10   without prompting, without making a request, D.C. Sauter, the

11   general counsel of NexPoint Advisors, recommended the Sbaiti

12   firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13       Mr. Patrick retained the Sbaiti firm in April.  In other

14   words, within 12 days of the filing of the complaint.  They're

15   retained and they conduct an investigation.  You're going to

16   hear the assertion of the attorney-client and the common

17   interest privilege every time I ask Mr. Dondero what he and

18   Mr. Sbaiti talked about and whether they talked about naming

19   Jim Seery as a defendant.  But with Patrick's authorization,

20   the Sbaiti firm filed the complaint on April 12th, just days

21   after they were retained.

22       It's like a -- it's an enormous complaint.  I don't know

23   how they did that so quickly.  But in any event, the important

24   point is that they all worked together.  None of this happened

25   until Mr. Patrick became the authorized representative.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B D Document 18-10    Filed 09/02/23    Page 72 of 213 PageID 9238

26

1    Mr. Patrick is going to tell you, Your Honor, he's going

2    to tell you that he had no knowledge of any wrongdoing by Mr.

3    Seery prior to the time he assumed the rein of the DAF and the

4    CLO Holdco.  He had no knowledge, Your Honor, of any claims

5    that the DAF and CLO Holdco had against the Debtor until he

6    became the Plaintiffs' authorized representative and Mr.

7    Dondero spoke to him.

8    If we can flip to the next page.  Mr. Dondero has

9    effective control of the DAF.  He has effective control of CLO

10   Holdco. You're going to be bombarded with corporate documents

11   today, because they're going to show you -- and they want you

12   to respect the corporate form, they really want you to follow

13   the rules and respect the corporate form, because only Mr.

14   Scott was responsible for the DAF and CLO Holdco until he

15   handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16   has nothing to do with this.  He's going to tell you.  He's

17   going to tell you he had nothing to do with the selection of

18   Mr. Patrick as Mr. Scott's replacement.

19   The facts are going to show otherwise, Your Honor.  The

20   DAF is a $200 million charitable organization that is funded

21   almost exclusively with assets derived from Highland or Mr.

22   Dondero or the Get Good Trust or the Dugaboy Trust.  The

23   evidence is going to show that at all times these entities had

24   shared services agreements and investment advisory agreements

25   with HCMLP.  The evidence will show that HCMLP at all times

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB   Document 10   Filed 09/22/23   Page 73 of 213   PageID 2239

27

1   was controlled by Mr. Dondero.

2         And it made sense.  The guy put in an awful lot of money

3   for charitable usage.  Is he really just going to say, I don't

4   really care who runs it?  The evidence is going to show that

5   between October 2020 and January 2021, Grant Scott actually

6   exercised independence.  Grant Scott was Mr. Dondero's

7   childhood friend.  They went to UVA together.  They were

8   roommates.  Mr. Scott was the best man at Mr. Dondero's

9   wedding.  But we were now in bankruptcy court.  We're now in

10  the fishbowl.  And I will -- this may be a little argument,

11  but there's no disputing the facts that Mr. Scott acted

12  independently, and he paid the price for it.  Mr. Scott did it

13  three times.

14        He did it when he amended CLO Holdco's proof of claim to

15  take it down to zero.  He did it again after he withdrew the

16  objection to the HarbourVest settlement motion.  And he did it

17  again when he settled the lawsuit that the Debtors had brought

18  against CLO Holdco.  And that -- and on each of those three

19  occasions, the evidence will show that Mr. Scott did not

20  communicate with Mr. Dondero in advance, that Mr. Dondero

21  found out about these acts of independence after the fact, and

22  that each time he found out about it he had a little

23  conversation with Mr. Scott.

24        Mr. Dondero is going to tell you about it, and he's going

25  to tell you that he told Mr. Scott each act was inappropriate.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1-30   Filed 09/12/23   Page 74 of 213   PageID 9240

28

1  You may have heard that word before.  Each act was not in the

2  best interests of the DAF.

3       The last of those conversations happened either on or just

4  after January 26th.  And by January 31st, Mr. Scott gave

5  notice of his resignation.  And you're going to see that

6  notice of resignation.  And he asks for releases.

7       Mr. Patrick becomes, almost two months later, the

8  successor to Mr. Scott.  Mr. Dondero is going to say he has no

9  idea how that happened.  He was just told after the fact that

10  Mr. Patrick and Mr. Scott had an agreement.  He's going to

11  tell you they had an agreement and he just heard about it

12  afterwards.  He didn't really -- for two months, I guess, he

13  sat there after Mr. Scott told him that he wanted out and did

14  nothing to try to find out who's going to take control of my

15  charitable foundation with $200 million.  He wasn't

16  interested.

17       But here's the thing, Your Honor.  If we go to the next

18  slide.  Let's see what Mr. Scott said at his deposition last

19  week.  Question, "Do you know who selected Mark?"  Answer, "I

20  do not."  Question, "Do you know how Mark was selected?"  Mark

21  is a reference to Mark Patrick.  "I do not."  "Did you ever

22  ask Mark how he was selected?"  "I did not."  "Did you ever

23  ask Mark who selected him?"  "I did not."  "Did you ever ask

24  anybody at any time how Mr. Patrick was selected to succeed

25  you?"  "No, I did not."  "Did you ever ask anybody at any time

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BD Document 18-10 Filed 09/25/23 Page 75 of 213 PageID 2241

29

1   as to who made the decision to select Mr. Patrick to succeed

2   you?"  "No, I did not."

3       So I don't know what happened between Mr. Patrick and Mr.

4   Dondero when Mr. Patrick supposedly told Mr. Dondero that

5   there was an agreement with Mr. Scott, but that is news to Mr.

6   Scott.  He had no idea.

7       Your Honor, we are going to prove by clear and convincing

8   evidence that each of the Respondents violated a very clear

9   and specific court order.  And unless the Court has any other

10  questions, I'll stop for now.

11           THE COURT:  No questions.

12           MR. MORRIS:  Thank you, Your Honor.

13           THE COURT:  All right.  Who is making the argument

14  for the Respondents?

15           MR. SBAITI:  Your Honor, I am.  I'm just trying to

16  put the PowerPoint up on the WebEx.

17           THE COURT:  Okay.

18           MR. SBAITI:  Sorry about that.

19           MR. MORRIS:  Your Honor, I'll try not to make this a

20  practice, but can I inquire as to how much time I used?

21           THE COURT:  Oh.  Nate?

22           THE CLERK:  About thirteen minutes.

23           THE COURT:  Thirteen minutes?

24           MR. MORRIS:  Thank you very much.

25           THE COURT:  Okay.  All right.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01504-BB Document 18-10 Filed 09/20/22 Page 676 of 713 PageID 2242

30

1          MR. SBAITI:  Your Honor, our PowerPoint is a little

2   bit longer than that one.  May I approach with a copy?

3          THE COURT:  You may.  Uh-huh.

4       (Pause.)

5          MR. SBAITI:  Your Honor, it does feel good to be back

6   in the courtroom.

7          THE COURT:  Okay.

8          MR. SBAITI:  It's been a long time.

9          THE COURT:  Yes.  For us, too.

10          MR. SBAITI:  Jut wish it wasn't under a circumstance

11   where someone is trying to sanction me.

12       But we're going to be dividing up this oral argument a

13   little bit.  Also, to just kind of break up a little bit of

14   the monotony, because I think we have a lot to cover at the

15   opening stage of this.  And I'll try to be as expeditious as I

16   can be.

17     OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18          MR. SBAITI:  Your Honor, the thing we -- the thing we

19   open with is the due process issue that we raised in our

20   brief.  And where this really arises from is the Court's show

21   cause order calls us violators before we've had a chance to

22   respond to the allegations and before we've obviously been

23   able to approach this hearing.  And the word violators means

24   something to us, Your Honor, because I've been a lawyer for a

25   long time, my partner has been a lawyer for a long time, our

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 18-10   Filed 09/27/23   Page 77 of 213   PageID 2243

31

 1   clients have never been sanctioned, we've never been

 2   sanctioned, and for us to be labeled violators first by

 3   counsel and then in a court order makes us wonder whether or

 4   not this process is already prejudged or predetermined.

 5           THE COURT:  I actually want to address that.  Turn

 6   off the clock.

 7       Just so you know, I looked this up a while back, because

 8   we gave a bankruptcy judges panel at some CLE.  The average

 9   bankruptcy judge in our district, back when I looked, signs

10   over 200 orders a week.

11           MR. SBAITI:  Sure.

12           THE COURT:  Many of those -- in fact, most of them --

13   are submitted by lawyers.  So, you know, a big chunk of my

14   week is signing orders.  And I obviously give more scrutiny to

15   those that are substantive in nature.  Okay?  If someone

16   submits to me a 50-page debtor-in-possession financing order,

17   I will look at that much more carefully than what I consider a

18   mere procedural order setting a hearing.

19       So I regret that that word was used, but I can assure you

20   I fairly quickly set that -- signed that, I should say --

21   regarding it as a merely procedural order setting a hearing.

22   Okay?  So it's as simple as that.  There was no hmm, I like

23   that word, violator.  I had a stack, if you will, an

24   electronic stack of probably 200 orders in front of me the day

25   I signed that.  Okay?

1       So, if that makes anyone feel any better, I don't know,

2  but that's the reality.

3       Okay.  You can start the clock again.

4           MR. SBAITI:  And I appreciate Your Honor saying that.

5  It does make us feel better, both about where the -- the

6  genesis of the order and the impact and its reflection on what

7  Your Honor thinks in terms of going into this.

8       The other thing that obviously raised concerns, and I

9  assume this comes from the same place, was four days ahead of

10 that order counsel told us the Court was going to order

11 everyone to be in person, and they had advance notice of that,

12 and we weren't sure how they had advance notice of that.  I

13 guess they assumed --

14          THE COURT:  I can assure you right here on the record

15 I never had ex parte communications with any lawyer in this

16 case, on this matter or any other matter.  Okay?  Again, those

17 are pretty strong words to venture out there with, which your

18 pleading did venture out there with those words.

19      My courtroom deputy, Traci, I think answers her phone 24

20 hours a day.  So I'm quite sure she had communications with

21 the lawyers about this, just like she probably had

22 communications with you and your firm and every other firm in

23 this case.  Okay?

24          MR. SBAITI:  Like I said, Your Honor, we appreciated

25 what Your Honor -- appreciate what Your Honor said, but that

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B Document 18-10 Filed 09/02/22 Page 79 of 213 PageID 2245

33

1    issue obviously stuck out -- stuck out to us, in combination.

2    So I'll move on from that issue.

3        This has to do with the lawsuit that was filed, and the

4    lawsuit, the genesis of the lawsuit, I think it's important to

5    say, because the argument has been raised in the briefing and

6    we wanted to address it upfront, why the lawsuit comes about.

7    And it comes about because of the Advisers Act and the

8    responsibilities that the Debtor has to the assets of the

9    funds that it manages.  And the Advisers Act imposes a duty

10   not only on Highland but obviously on its control people and

11   its supervised people.  And the lawsuit has to do with HCLOF,

12   which is what HarbourVest owned a piece of.  And Highland, as

13   the advisor to HCLOF and the advisor to the DAF, owed

14   fiduciary duties to CLO Holdco, which is the DAF's holding

15   entity of its assets in HCLOF, but Highland Capital was also

16   an advisor, a registered investment advisor to the DAF

17   directly at the time.  And so those federally-imposed

18   fiduciary duties lie at the crux of that lawsuit.

19       Moving on, Mr. Seery testified at the hearing that was in

20   this Court to be -- to get him appointed, and this was Exhibit

21   2 that was presented by the Debtor, and on Page 16 at the

22   bottom he says -- of the transcript, he says, I think, from a

23   high level, the best way to think about the Debtor is that

24   it's a registered investment advisor.  As a registered

25   investment advisor, which is really any advisor of third-party

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BB-DBD Document 1-30  Filed 09/30/22852Page 80 of 213  PageID 2246

34

1    money over $25 million, it has to register with the SEC, and

2    it manages funds in many different ways.

3         In the middle of the next page he says, In addition, the

4    Debtor manages about $2 billion, $2 billion in total managed

5    assets, around $2 billion in CLO assets, and then other

6    securities, which are hedge funds -- other entities, rather,

7    which are hedge funds or PE style.  Private equity style.

8         On Page 23 towards the bottom he says, As I said, the

9    Investment Advisers Act puts a fiduciary duty on Highland

10   Capital to discharge its duty to the investors.  So while we

11   have duties to the estate, we also have duties, as I mentioned

12   in my last testimony, to each of the investors in the funds.

13   CLO Holdco would be an investor in one of those funds, HCLOF.

14        He goes on to say, Some of them are related parties, and

15   those are a little bit easier.  Some of them are owned by

16   Highland.  HCLOF was not owned by Highland.  But there are

17   third-party investors in these funds who have no relation

18   whatsoever to Highland, and we owe them a fiduciary duty both

19   to manage their assets prudently but also to seek to maximize

20   value.

21        Now, the lawsuit alleges that Seery testified that the

22   HarbourVest portion of Highland CLO Funding was worth $22-1/2

23   million.  Now, Mr. Morris wants the Court to hinge on the fact

24   that, well, no one asked him whether he was lying.  But that's

25   not really the standard, and it certainly isn't the standard

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01504-BB Document 1830 Filed 09/13/22852 Page 81 of 213 PageID 2247

35

1    when someone's an investment advisor and owes fiduciary

2    duties, which include fiduciary duties to be transparent with

3    your investors.

4         It also includes fiduciary duties not to self-deal.

5         The lawsuit also alleges that, in reality, those assets

6    were worth double that -- double that amount at the time.  We

7    found out just, you know, in late March/early April that a

8    third -- from a third party who had access to the underlying

9    valuations at the time that those values were actually double

10   and that there was a misrepresentation, giving rise to the

11   lawsuit.  That change in circumstance is the key issue behind

12   the lawsuit.

13        We allege that Mr. Seery and the Debtor, as RIAs, had a

14   duty to not self-deal and be fully transparent with that

15   information, and we think both of those things were violated

16   under the Advisers Act.

17        We don't allege that the HarbourVest settlement should be

18   undone or unwound.  We can't unscramble that egg.  We do seek

19   damages, as I believe is our right, arising out of the

20   wrongdoing and the process of pushing forth the settlement.

21        I think one of the allegations in the actual motion for

22   the show cause order was that this was going to undo all of

23   the hard work that Court had done and basically unwind and try

24   to re-piece Humpty Dumpty back together again.  But that's

25   simply not the case.  Nowhere in our allegations or in the

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B D Document 18-10    Filed 09/12/22852 Page 82 of 213    PageID 2748

36

1    relief that we request are we trying to undo the HarbourVest

2    settlement as such.

3        Now, whether the lawsuit should be dismissed under the

4    affirmative defenses that they bring up -- res judicata,

5    waiver, release -- all of those are questionable under the

6    Advisers Act, given the change of circumstance, and therefore

7    are also questions on the merits.  They don't go to the

8    colorability of the underlying claims in and of themselves,

9    which I think is important.

10        So we asked for leave to amend from the Court.  And what

11    they want us to do, Your Honor, is they want to sanction us

12    for asking.  They're saying asking for leave to amend is the

13    same thing as pursuing a claim.  And I'll get to the specifics

14    on that in a little bit.  But that's the frame.  Can we be

15    sanctioned for asking a court, any court, even if it's the

16    wrong court, for permission to bring the lawsuit?  They don't

17    cite a single case that says that that, in and of itself, is

18    sanctionable conduct, us asking.

19        So I'd like to introduce some of the Respondents.

20        Your Honor, may I have one of these waters?

21            THE COURT:  Certainly.

22            MR. SBAITI:  Thank you.

23            THE COURT:  That's why they're there, by the way.

24            MR. SBAITI:  I didn't know if they belonged to

25    somebody else.

37

1          THE COURT:  We've scattered water bottles around for

2     people.

3          MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

4          THE COURT:  So if you see these little ones, that's

5     for anyone.

6          MR. SBAITI:  So, this is an org chart, and you'll see

7     it as -- the exhibits that the Debtor's going to bring up.

8     And when we talk about the DAF, Your Honor -- I don't know if

9     that's visible to you.  We're on Slide 19, if you're looking

10    at it on paper.  There's a little number at the lower right-

11    hand corner.  The charitable DAF GP, LLP and then the

12    Charitable DAF Holdco, Ltd. together are the principles of the

13    Charitable DAF Fund, LP.  And so when we refer to the DAF or

14    the Charitable DAF, that's really the entity structure that

15    we're referring to.  And then the GP and Holdco Ltd. have a

16    managing member.  It used to be Grant Scott at the time this

17    was done.  Today, it's Mr. Mark Patrick, who's in the room,

18    sitting next to Mr. Bridges.

19         The DAF is a charitable fund.  It's funded over $32

20    million, as the evidence will show, including Dallas-Fort

21    Worth organizations, The Family Place, Dallas Children's

22    Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23    Friends of the Dallas Police, Snowball Express, various

24    community and education initiatives, Dallas Arts, museums, the

25    Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 18-10   Filed 09/12/23   Page 84 of 213   PageID 2250

38

1  Honor.  The DAF is a real fund.  It is a real charitable fund.

2  It does real good in the community.

3      Now, Respondents -- Holdco, which you will see at the

4  bottom of that chart, is essentially the investment arm.

5  There are assets that the DAF owns in various pots, and Holdco

6  is the actual business engine that generates the money from

7  those assets that then -- that then gets passed up to the

8  charitable -- the four charitable foundations at the top.

9      I'll go back to Slide 21.  And if you look at the top,

10 Your Honor, the Dallas Foundation, Greater Kansas City

11 Community, Santa Barbara Foundation, The Community Foundation

12 of North Texas:  Those are the charities that then themselves

13 bestow the funds onto the actual recipients.  So the money

14 flows up as dividends or distributions, and then gets

15 contributed.

16     CLO Holdco invests those assets, and it's an important

17 part of the business model, so that you're not sending out

18 principal.  It's the money that CLO makes, the profits, if you

19 will, that it is able to generate that gets donated and makes

20 its way into the community.

21     So there's an important feature to the structure in that

22 it has to be able to generate money.  It's not just money that

23 sits there and waits to be distributed.  There's active

24 investing going on.

25     Mr. Mark Patrick owns the control shares of the entities

1    comprising the DAF and CLO Holdco, as I showed you, and the

2    beneficiary charitable foundations hold what we call

3    beneficial interests, where they just get money.  They don't

4    have a vote.

5        Mr. Patrick cares about the public service the DAF engages

6    in.  He's been an advisor to the DAF, CLO Holdco, and its

7    predecessor, Mr. Scott, since its inception.  He receives no

8    compensation for the job he's doing today.  And you'll hear

9    how he became -- how he inured to the control position of the

10    DAF and CLO Holdco from him, but it doesn't involve Mr.

11    Dondero, and the absence of someone saying that it did, I

12    think, is going to be striking by the end of the presentation

13    of evidence.

14        Their only argument against you, Your Honor, is going to

15    be you just can't believe them.  But not believing witnesses

16    is not a substitute for the lack of affirmative evidence.

17        Mr. Patrick has said all along he authorized the filing of

18    the motion for leave to add Mr. Seery to the lawsuit in

19    District Court.  He doesn't believe the motion to amend

20    violated this Court's orders, for the reasons stated in our

21    responsive filings to the motions for contempt and show cause

22    order.  That's why he authorized it.

23        My firm, Sbaiti & Company, we're a small Dallas litigation

24    boutique retained by the DAF and CLO Holdco to file the

25    lawsuit.  We did an investigation.  I'm tickled to death that

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB  Document 1810   Filed 09/18/2352  Page 86 of 213  PageID 9252

40

1    Mr. Morris loved our complaint so much and gave us the

2    compliment that we got it done in a short amount of time, but

3    we did get it done in a short amount of time, because, in the

4    end, it's a rather simple issue, as I was able to lay it out

5    in about three or four bullet points in a previous slide.

6        The written aspect of that doesn't take that long, as Your

7    Honor knows, but the idea that there's a suspicion that we

8    didn't write it or someone else wrote it and ghost-wrote it

9    and gave it to us, which I think is the insinuation he was

10   making, is completely unfounded.  There's no evidence of that.

11       We carefully read Your Honor's orders.  We developed a

12   good-faith basis, as required by Rule 11, that the lawsuit and

13   the motion to add Mr. Seery were not filed in bad faith or for

14   an improper purpose.  We don't think they're frivolous.  We

15   don't think they're in violation of Your Honor's orders, given

16   the current state of the law.

17       Mr. Dondero is one of the settlors of the CRT, of the

18   Charitable Remainder Trust that ultimately provided assets to

19   CLO Holdco and the DAF.  He does care about the DAF's mission.

20   I think Mr. Morris hit the nail on the head.  Of course Mr.

21   Dondero cares about what happens to it.  He's one of the

22   settlors, and it was his funds that initially were put into

23   it, so he's allowed to care.  And I don't think him caring is

24   insidious, and him caring doesn't mean he has control and

25   doesn't mean he's the driving force behind some insidious

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB-DDocument 18-10   FFiled 09/7/22 853 Page 87 of 213   PageID 2253

41

1  conspiracy that they're trying to insinuate exists.

2       He is an advisor to the DAF and CLO Holdco.  It is a lot

3  of money and it needs advice, and he's an advisor to Mr.

4  Patrick.  We don't run away from any of those facts, Your

5  Honor.

6       We also don't run away from the fact that he was the

7  source of some of the information that came in to that

8  complaint and that he relayed some of that information.  The

9  content, we do claim work product privilege and attorney-

10 client privilege, because he's an agent of our client, and as

11 lawyers doing an investigation, the content of our

12 communications is protected under the attorney-client and work

13 product privileges, as well as the joint interest privilege.

14 But the fact that we admit that those communications happened,

15 we're not running away from that fact.

16      So, what does he have to do with this?  It's interesting

17 that that opening argument you just heard spent about three

18 minutes on contempt and the other fourteen or fifteen minutes

19 or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20 negative halo effect, I believe, that they're trying to get

21 this Court to abide by.  They want to inflame Your Honor and

22 hopefully capture -- cultivate and then capitalize on whatever

23 antipathy you might have for Mr. Dondero, and then sweep us

24 all in under that umbrella and sanction everybody just because

25 he had some involvement.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 30   Filed 09/18/23   Page 88 of 213   PageID 2254

42

1        But whatever involvement he has, which we admit he had

2    some involvement in helping us marshal the facts, that's not a

3    basis for us to be sanctioned if there isn't an actual

4    sanctionable conduct that -- as we say there isn't.

5        We think there's an ulterior motive.  That's why Mr.

6    Morris just announced to Your Honor, Mr. Dondero controls it

7    all.  The ulterior motive, I believe, is, down the line, when

8    they want to argue some kind of alter ego theory, they want to

9    lay that foundation here.  I don't think this is the

10   appropriate time for that foundation, and I don't think any of

11   the information and the evidence they're trying to marshal in

12   front of you is really going to be relevant to the very

13   specific question that's before Your Honor:  Does our motion

14   asking the District Court to add Mr. Seery violate your order,

15   or violate it in a way that can be -- that we can be

16   sanctioned for?  We don't believe it violates it.

17       So, the three core standards that have to be met.  First

18   of all, civil contempt requires a valid, enforceable order.

19   It's not debatable and it's not -- I don't think that's a

20   shocking statement.  Then they have to have clear and

21   convincing evidence of a violation of a specific unambiguous

22   term therein.  Mr. Morris wants his version of the word pursue

23   to be unambiguous, and I think the word pursue is unambiguous.

24   But the way he wants you to construe it makes it completely

25   ambiguous, and we'll -- I'll get to that in a moment.

001982

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BB D Document 18-1 Filed 09/03/22 Page 89 of 213 PageID 9245

43

1    Now, for sanctioning counsel, the Fifth Circuit has held

2   you have to find bad faith.  We're adjudged under a slightly

3   separate standard under the Fifth Circuit law.  So the

4   contempt motion, though, to the extent it seeks to impose

5   double and treble attorney's fees, those are in punitive

6   fines.  They are not compensatory.  So criminal contempt

7   standards are raised, and so they have to show a violation in

8   bad faith.  In other words, our arguments that we're making

9   have to be bad faith, not simply that we're wrong, and they

10   have to show beyond a reasonable doubt, usually in front of a

11   jury.  The U.S. Supreme Court explained the difference and the

12   different procedural protections that have to be involved if

13   they're really going to seek double and treble compensatory

14   damages.

15    Now, he's right.  Saying we intended -- saying that we

16   didn't mean to violate it isn't necessarily a defense.  But

17   what you're actually going to hear from him is the opposite

18   argument, that even though we didn't violate it, we wanted to.

19   That's what he says.  That's why he quoted you the opening

20   section of our motion asking for permission to sue Mr. Seery,

21   because that's a statement of purpose.  And he says you should

22   sanction them right there.  That's literally what he said.

23   It's right there, their purpose.  If intent is irrelevant to

24   them, it's irrelevant as to us.  The fact that we wanted to

25   sue Seery is fully admitted.  We don't deny the fact that we

44

1  believe Mr. Seery should be a defendant in this lawsuit.  But

2  the fact that we didn't sue him is why we didn't violate the

3  order.  And they can't say that the fact that we eventually

4  wanted to sue him means we did violate the order.  That door

5  swings both ways, Your Honor.

6      We don't think any element is met.  The order, while writ

7  large, prohibits suing Mr. Seery without permission, and we

8  did not sue James Seery, pure and simple.  The July 12 --

9  14th, 2020 order purports to reserve exclusively to this Court

10 that which, according to the statutes and the case law, we

11 believe the Court can't exclusively reserve to itself.  And

12 Your Honor, the order prohibits commencing and pursuing a

13 claim against Jim Seery without coming here first to decide

14 the colorability of such a claim.

15     They, I believe, admit that we didn't commence a claim

16 against Jim Seery.  I think they've admitted that now.  So now

17 we're talking about what does pursue mean?  We didn't pursue a

18 claim against Jim Seery.  Is asking for leave to bring suit

19 the same thing as pursuing a claim?  That's the question

20 that's really before Your Honor.  Lawyers never talk of

21 pursuing a claim that hasn't been filed.  We don't say, I'm

22 pursuing a claim and I'm going to file it next week or next

23 year.  Usually, that type of language is in an order, because

24 when the order happens, there may already be claims against

25 Mr. Seery.  And so the pursuit of claim is supposed to attack

45

1  those cases, to come here and show colorability, presumably,

2  before they continue on with those lawsuits.  It doesn't mean

3  asking for permission.

4      If it did mean asking for permission, then complying with

5  Your Honor's order would be a violation.  If the motion for

6  leave is a violation because it is pursuing a claim, if I had

7  filed that motion in this Court, it would still be pursuing a

8  claim without Your Honor's permission.  I'd have to get

9  permission just to ask for permission.  It puts us in this

10 endless loop of, well, if asking for permission is pursuing a

11 claim, and pursuing a claim is without permission violates the

12 Court's order, we'd always be in violation of the Court's

13 order just for asking, just for following Your Honor's edict.

14         THE COURT:  I'm just, I'm going to interject.  You

15 were supposed to, under the order, file a motion in this

16 Court.

17         MR. SBAITI:  I understand that, Your Honor, and I

18 think that we can get to the specifics on why we disagree with

19 how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20 So as long as we dealt with the order, which is what our

21 position is, then we don't believe we violated the order.

22         THE COURT:  You think the order was ambiguous,

23 requiring a motion to be filed in the Bankruptcy Court?

24         MR. SBAITI:  Your Honor, what we believe is that the

25 order was ambiguous in terms of whether us asking for

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01504-B  Document 18-10   Filed 09/22/22   Page 92 of 213   PageID 2258

46

1    permission in the District Court was in and of itself a

2    violation of the order.  We don't think it was.  Actually, we

3    don't think the order's ambiguous to that extent.  The second

4    we file a suit against Mr. Seery and we don't have some

5    resolution of the issue, then I think the question of

6    sanctionability comes in.  But we never filed suit, Your

7    Honor.

8        The Court doesn't say I can't seek permission in the

9    District Court or that we can't go to the District Court with

10   -- which has general jurisdiction over this case, and has

11   jurisdiction, we believe, over the actual case and controversy

12   that's being raised.  But the idea of pursuit being a

13   violation of the order, of the letter of that order, is

14   nonsensical under that, it leads to an absurd result, and it's

15   plainly vague and ambiguous, Your Honor.

16       Asking Judge Boyle or asking a District Court for

17   permission is not a violation of this Court's order, not the

18   way it was written and not -- and I don't even believe it was

19   a violation necessarily of the Court's -- of the language that

20   the Court has.  We -- it doesn't unambiguously prevent us from

21   asking the District Court for leave.

22       The Court's order yesterday, Your Honor, applied this very

23   rule.  The TRO -- you said the TRO did not specifically state,

24   Turn your cell phone over.  And you denied motion for

25   sanctions on that.  That's basically the argument we're making

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B Document 1830 Filed 09/22/852 Page 93 of 213   PageID 2259

47

1   here, Your Honor.  We think that was the correct ruling, and

2   we think the same type of ruling applies here.

3        Your order yesterday also determined that the Court

4   ultimately believes that hiring lawyers to file motions should

5   not be viewed as having crossed the line into contemptuous

6   behavior.  That's essentially the argument they want you to

7   buy, that there's somehow a vindictiveness behind this and an

8   insidious plan to violate court orders, Your Honor.  We don't

9   have any evidence of that.

10        THE COURT:  Okay.  Take the words vindictiveness and

11   insidious out of the equation.  That's making things personal,

12   and I don't like that.  The key is the literal wording of the

13   order, is it not?

14        MR. SBAITI:  Your Honor, the key, I believe, is the

15   --

16        THE COURT:  No entity may commence or pursue a cause

17   of action of any kind against Mr. Seery relating in any way to

18   his role as the chief executive officer and chief

19   restructuring officer of the Debtor without the Bankruptcy

20   Court first determining, after notice, that such claim or

21   cause of action represents a colorable claim of willful

22   misconduct or gross negligence against Mr. Seery and

23   specifically authorizing such entity to bring such a claim.

24   So I'm trying to understand why you argue that filing a motion

25   asking the District Court for permission is not inconsistent

1  with this order.

2          MR. SBAITI:  Because it's not commencing a claim,

3  Your Honor.  It's not commencing a claim against him.

4          THE COURT:  Okay.  So is your argument that if Judge

5  Boyle authorizes amendment of the pleading to add Mr. Seery

6  and then you do it, at that point they may have grounds for a

7  motion for contempt, but not yet, because she has not actually

8  granted your motion?

9          MR. SBAITI:  Correct, Your Honor.  I mean, in a

10  nutshell.  In fact, that's one of -- I think that's probably

11  our next argument.  We think, in a sense, this argument is

12  incredibly premature.  There is three ways that this -- well,

13  I'd like to address this, so I've got -- I've got a diagram

14  that I think will actually help elucidate what our thought

15  process was.

16      There's three things she could have done.  She could have

17  referred -- referred it to Your Honor, which is what we

18  expected was likely to happen.

19          THE COURT:  But you didn't file a motion for referral

20  of the motion before her.

21          MR. SBAITI:  Well, no, I don't mean in respect of

22  enforcing the reference.  The referral we thought was most

23  likely going to happen because it's an associated case, and we

24  actually put those orders in front of her, so we expected that

25  those orders would end up -- that the question would

1    ultimately end up in front of Your Honor on that basis.

2         She could have denied our motion outright, in which case

3    we haven't filed a claim, we haven't violated it, or she could

4    have granted our motion and done one of two things.  She could

5    have granted it to the extent that she thought leave would be

6    proper but then referred it down, or she could have decided --

7    taken the decision as the court with general jurisdiction and

8    simply decided it all on her own.  She had all of those

9    options, Your Honor, and none of them results in a claim being

10   commenced or pursued without the leave of this Court, if leave

11   is absolutely necessary, Your Honor.  And that's the point

12   that we were trying to make.

13        Your Honor, the -- there's -- you know, there's no

14   evidence that, absent an order from a court with jurisdiction,

15   that we were going to file a claim against Mr. Seery, that we

16   were going to commence or pursue a claim against Mr. Seery.

17   We were cognizant of Your Honor's order.  We considered that.

18   And the reason we filed them the way we did is because,

19   according to the statutes and the case law, this is the type

20   of case that would be subject to a mandatory withdrawal of the

21   reference.

22        And so there's this paradox that arises, Your Honor.  And

23   the paradox that arises is that we show up and immediately go,

24   well, we need to be back in the District Court.  So we filed

25   our motion there, and I don't think that was contemptuous, it

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 1-30    Filed 09/22/23    Page 96 of 213    PageID 2262

50

1    wasn't intended to be contemptuous of the Court, but we showed

2    the orders to the Court, made the same arguments that we have

3    been making here, that we believe that there's problems with

4    the order, we believe the order oversteps its jurisdiction and

5    maybe is unenforceable, and it's up to that District Court, as

6    it has been in almost all of these other gatekeeper order

7    cases that get filed.  None of them result in sanctions, Your

8    Honor.  What they result in is a District Court deciding,

9    well, either they refer it or they decide I don't need to

10   refer it.  But I don't think that that is the same thing as

11   commencing or pursuing a claim in the end, Your Honor, because

12   all we did was ask for permission, and permission could have

13   been denied or granted or granted in part.

14       Your Honor, they haven't cited an injury.  You've heard

15   the testimony, Your Honor, that they -- the first time they

16   knew we had filed a motion -- which I don't understand why

17   that's the first time they knew we had filed a motion; we told

18   them we were going to file the motion -- was when I forwarded

19   an email saying that it's been denied without prejudice, Your

20   Honor.  Well, that means they didn't have to do any work to

21   respond to the motion.  They didn't have to do any work to do

22   any of the other things.

23       And one hundred percent of the damages that they're going

24   to say they incurred is the litigation of this contempt

25   hearing or this sanction motion, as opposed to some other

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BBD Document 18-10 Filed 09/07/22 Page 97 of 213 PageID 2263

51

1   simpler remedy, like going in to Judge Boyle and saying, Your

2   Honor, all that needs to go, which is what they eventually

3   did.  But they would have had to incur those costs anyway

4   because they're now moving to enforce the reference.  They

5   filed a 12(b)(6).  That briefing would have existed regardless

6   of whether or not we had filed our motion, regardless of

7   whether the sanctions hearing had commenced.

8        Your Honor, I'm going to let my partner, Mr. Bridges,

9   address this part of it, if I could.  I think that gets into

10  more of the questions that you asked, and I think he can

11  answer them a lot better than I can.

12          THE COURT:  Okay.

13          MR. SBAITI:  Thank you.

14          THE COURT:  That's fine.

15          MR. BRIDGES:  Thank you, Your Honor.  And I do want

16  to address pointedly the questions that you're asking.  First,

17  though, I was hoping to back up to some preliminary remarks

18  that you made and say that I find the 200 orders a week just

19  mindboggling.  It amazes me, and puts the entire hearing in a

20  different perspective for me.  I'm grateful that you shared

21  that with us.

22       Your expression of regret about naming us violators was

23  very meaningful to me.  It causes me -- well, the strong words

24  in our brief were mine.  I wrote them.  And your expression of

25  regret causes me to regret some of those words.  I'm hopeful

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BD Document 18-10 Filed 09/22/23 Page 98 of 213 PageID 2264

52

1    that you can understand, at least in part, our reaction out of

2    concern.

3         And Your Honor, it's awkward for me to talk about problems

4    with your order, and that's the task that's come to me, to

5    list and talk through four of them and why we think they put

6    us in a really awkward position in deciding what to do in this

7    case, in the filing of it, in where we filed it, and in how we

8    sought leave to go forward against Mr. Seery.  That was

9    awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14        The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18              THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25              MR. BRIDGES:  Yes, Your Honor.  And our reply brief

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1-10   Filed 09/12/23   Page 99 of 213   PageID 2265

53

1   devotes a page to the case, and I'm hopeful that I can

2   remember it well enough to give you what you're looking for

3   about it, but I would point you to our reply brief on that

4   topic as well.

5        The *Shoaf* case that *Applewood* quotes from and

6   distinguishes and expressly limits, the *Shoaf* case actually

7   has been cautioned and limited and distinguished numerous

8   times, if you Shepardize it, and the *Applewood* case is the

9   leading case, and it also is from the Fifth Circuit, that

10  describes and cabins the effects of *Shoaf*.  And in *Applewood*,

11  what happened is a bankruptcy confirmation order became final

12  with releases in it, and the court held that exculpatory

13  orders in a final order from the Bankruptcy Court do not have

14  res judicata effect and do not release claims unless those

15  claims are enumerated in the exculpatory order.  And --

16           THE COURT:  Okay.  So it was about specificity more

17  than anything else, right?

18           MR. BRIDGES:  Yes, Your Honor. It was a --

19           THE COURT:  Okay.

20           MR. BRIDGES:  -- a blanket release, a blanket --

21           THE COURT:  Okay.

22           MR. BRIDGES:  -- exculpatory order that didn't

23  specify what claims were released by what parties, and

24  therefore the parties didn't have the requisite notice.

25       In my mind, Your Honor, it's comparable to the Texas

1   Supreme Court's holdings on what's required in a settlement

2   release in terms of a disclaimer of reliance, --

3            THE COURT:  Okay.  But, again, --

4            MR. BRIDGES:  -- that if you aren't --

5            THE COURT:  -- it's about specificity --

6            MR. BRIDGES:  Yes, Your Honor.

7            THE COURT:  -- more than anything else?  And then

8   we've got the U.S. Supreme Court *Espinosa* case subsequent.

9            MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10  *Espinosa* you're referring to.  Can you tell me why that

11  applies?

12           THE COURT:  Well, it was a confirmation order.  It

13  was in a Chapter 13 context.  And there were provisions that

14  operated to discharge student loan debt, --

15           MR. BRIDGES:  Uh-huh.

16           THE COURT:  -- which, of course, cannot be discharged

17  without a 523 action, a separate adversary proceeding.

18  Nevertheless, the confirmation order operated to do what 523

19  suggests you cannot do, discharge student loan debt through a

20  plan confirmation order.

21      The U.S. Supreme Court says, well, that's unfortunate that

22  the confirmation order did something which it doesn't look

23  like you can do, but no one ever objected or appealed.  That's

24  my recollection of *Espinosa*.  So it seems to be the same

25  holding as *Republic Supply v. Shoaf*.  And what I -- why I

1    asked you to elaborate on *Applewood* is because it does seem to

2    deal with the specificity of the order versus the

3    enforceability, no?

4            MR. BRIDGES:  Your Honor, if it's not obvious

5    already, I'm not prepared to argue *Espinosa*.  And your

6    explanation of it is very helpful to me.  I think you're right

7    that the specificity issue from *Applewood* is what we're

8    relying on.  And it sounds like --

9            THE COURT:  Okay.  So, that being the case, how was

10   this order not specific?  Okay?

11           MR. BRIDGES:  That's easy, Your Honor, because it

12   doesn't say which parties are releasing which claims.  And

13   what we're talking specifically about there -- as we go

14   through the order, I can show you the language -- but what

15   we're talking about specifically are the ordinary negligence

16   and breach of fiduciary duty claims that your order doesn't

17   provide for at all.  Rather, it says colorability of gross

18   negligence or willful wrongdoing, if I remember the words

19   precisely, that's what must be shown to pursue a case -- a

20   cause of action against Mr. Seery, thereby -- thereby

21   indicating that claims for mere negligence, not gross

22   negligence, or breach of fiduciary duty, which is an even

23   lesser standard, that those claims are prohibited entirely.

24        And by having that kind of general all-encompassing

25   release or exculpation for potential liability involving

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01500-B-BD   Document 16-30   Filed 02/02/23   Page 102 of 213   PageID 2768

56

1    negligence, and most importantly, fiduciary duty breach under

2    the Advisers Act, that that kind of exculpation under

3    *Applewood* is not enforceable and has no res judicata effect

4    because it wasn't -- those claims weren't enumerated in the

5    order.

6        That for it to have the intended exculpatory effect, if

7    that was what was intended, that the fiduciary duty claims and

8    the parties who those claims may belong to would have to have

9    been enumerated.

10       And indeed, that kind of specificity, what was required in

11   *Applewood*, isn't even possible for a claim that hasn't yet

12   occurred for future conduct.  It's not possible to enumerate

13   the details, any details, of a future claim, because the

14   underlying act -- if the underlying basis, facts for that

15   claim, haven't yet happened.  It's something to happen in the

16   future.

17       And here, that's what we're dealing with.  We're dealing

18   with conduct that took place well after the January and July

19   2020 orders that had that exculpatory effect.  Is -- is that

20   clear?

21            THE COURT:  Understood.

22            MR. BRIDGES:  Thank you, Your Honor.  So, the four

23   areas of the order, the four functions that the order does

24   that are problematic to us that led us to do what we have done

25   are the gatekeeping function; the release; the fact that by

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01504-B-BD Document 6-31   Filed 09/30/21   Page 103 of 213   PageID 9269

57

1    stating sole jurisdiction, that it had a jurisdiction-

2    stripping effect; and then, finally, jurisdiction asserting,

3    where, respectfully, Your Honor, we think to some extent the

4    order goes beyond what this Court's jurisdiction is.  And so

5    that not only claiming exclusive jurisdiction, but claiming

6    jurisdiction over all actions against Mr. Seery, as described

7    in the order, is going too far.

8        And those are the four issues I want to talk about one at

9    a time, and here -- I went two screens instead of one.  There

10   we go.  And here's the order.  I have numbered the highlights

11   here out of sequence because this is the sequence that I wish

12   to talk about them and that I think their significance to our

13   decision applies.

14       Before we get into the words of this July 16, 2020 order,

15   I want to mention the January order as well.  Although the

16   motion for contempt recites both orders, we don't actually

17   think the January order applies to us, because our lawsuit

18   against Mr. Seery is not about his role as a director at

19   Strand in any way.  We didn't make an issue of that, other

20   than in a footnote in our brief, because we don't think that

21   distinction matters much since the orders essentially say the

22   same things.

23       I'm not sure that it matters whether we have potentially

24   violated one order or two.  If Your Honor finds we've violated

25   one, I think we're on the hook regardless.  If Your Honor

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01534-B-BD   Document 16-31    Filed 02/24/23    Page 104 of 213    PageID 9270

58

1    finds that we didn't violate the July order, I don't think you

2    will find that we violated the January order, either.  So my

3    focus is on the July order.

4        The gatekeeping function comes from the preliminary

5    language about commencing or pursuing a claim or cause of

6    action against Mr. Seery.  And it says what you want us to do

7    first before bringing such a claim.

8        The second issue of the release comes a little bit later.

9    It's the colorable claim of willful misconduct or gross

10   negligence language.  In other words, because only claims of

11   willful misconduct or gross negligence can pass the bar, can

12   pass muster under this order, that lesser claims -- ordinary

13   negligence and breach of fiduciary duty -- that those claims

14   are released by this order.  That's the second argument.

15       Third is your reference to sole jurisdiction and the

16   effect that that has of attempting to say that other courts,

17   courts of original jurisdiction, do not have jurisdiction

18   because it solely resides here.  That's the third thing I want

19   to address.

20       And then the fourth is the notion that we have to come to

21   this Court first for any action that fits the description of

22   an action against Mr. Seery, when some actions are, through

23   acts of Congress, removed from what this Court has the power

24   to address.  Under 157(d) of Title 28, Your Honor, there are

25   some kinds of actions which withdrawal of the reference is

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01504-B Document 6-30   Filed 09/25/23   Page 105 of 213   PageID 2071

59

1   mandatory, and therefore this court lacks jurisdiction to

2   address those.

3        And so those are the four issues I want to tackle,

4   starting with the first, the gatekeeping.  Your Honor, Section

5   28 -- Section 959 of Title 28 appears to be precisely on

6   point.  It calls -- it is called by some courts an exception

7   to the Barton Doctrine, which we believe is the only basis,

8   the Barton Doctrine, for this Court to claim that it has

9   jurisdiction or sole jurisdiction and can require us to come

10  here first.  We think the Barton Doctrine is the only basis

11  for that.  We haven't seen anything in the briefing from

12  opposing counsel indicating there was another basis for it.

13  We think we're talking about the Barton Doctrine here as the

14  basis for that.

15       959 is exception to the Barton Doctrine, and we think it

16  explicitly authorizes what we have done.

17       Secondly, Your Honor, the order, the gatekeeping functions

18  of the order are too broad because of its incorporation of the

19  jurisdictional problems and the release problem that we'll

20  talk about later.  But for problem number one, the key issue

21  that we're talking about is 959 as an exception to the Barton

22  Doctrine.  And I went the wrong way.

23            THE COURT:  So, we could go down a lot of rabbit

24  trails today, and I'm going to try not to do that, but are you

25  saying the very common practice of having gatekeeping

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01504-B-BD   Document 6-81   Filed 05/26/23   Page 106 of 213   PageID 2272

60

1  provisions in Chapter 11 cases is just defective law under 28

2  U.S.C. § 959(a)?

3          MR. BRIDGES:  Can I say yes and no?

4          THE COURT:  Okay.

5          MR. BRIDGES:  Yes, to some extent, for some claims.

6  No as to other claims to another extent.  We are not saying

7  gatekeeping orders are altogether wrong, --

8          THE COURT:  Okay.

9          MR. BRIDGES:  -- no.

10          THE COURT:  Okay.

11          MR. BRIDGES:  There are problems with gatekeeping

12  orders that do more than what the law, Section 959 in

13  particular, allows them to do.

14          THE COURT:  Okay.  Be more explicit.  I'm not -- I

15  think you're saying, no, except when certain situations exist,

16  but I don't know what the certain situations are.

17          MR. BRIDGES:  And Your Honor, you're exactly right.

18  It's complicated, and it takes a long explanation.  Let me

19  start --

20          THE COURT:  Okay.  I really want to know, --

21          MR. BRIDGES:  Yeah, me, too.

22          THE COURT:  -- since I do these all the time, and

23  most of my colleagues do.

24          MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25  the screen.  Managers of any property --

002000

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01504-B-BD    Document 6-30    Filed 09/07/21    Page 107 of 213    PageID 2273

61

1          THE COURT:  Uh-huh.

2          MR. BRIDGES:  -- is what we're talking about,

3    including debtors in possession.  Now, it starts off by saying

4    trustees, receivers.  I mean, this is exactly what the Barton

5    Doctrine is about, right?  We're talking about trustees and

6    receivers, but not just them.  We're also talking about

7    managers of any property, including debtors in possession, --

8          THE COURT:  Uh-huh.

9          MR. BRIDGES:  -- may be sued without leave of the

10   court appointing that.  That's contrary to the Barton Doctrine

11   so far.

12      With respect to what I've numbered five here -- these

13   numbers are mine -- the quote is directly verbatim out of the

14   U.S. Code, but the numbering one through five is mine.  With

15   respect to what acts or transactions in carrying on business

16   connected with such property.

17      And so, Your Honor, what we're talking about isn't Barton

18   Doctrine is inapplicable, or you can't have a gatekeeping

19   order for any claims, but it's about managers of property.

20   And one of the hornbook examples of this is the grocery store

21   that files for bankruptcy and then, when --

22          THE COURT:  Slip-and-fall.

23          MR. BRIDGES:  You've got it, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. BRIDGES:  And because they're managing property,

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01504-B-BD   Document 16-31   Filed 09/20/23   Page 108 of 213   PageID 2374

62

1   --

2            THE COURT:  So your cause of action, if it went

3   forward, is the equivalent of a slip-and-fall --

4            MR. BRIDGES:  Yes, Your Honor.

5            THE COURT:  -- in a grocery store?

6            MR. BRIDGES:  Yes, Your Honor.

7            THE COURT:  Okay.  Let me skip ahead.  What about the

8   last sentence of 959(a)?

9            MR. BRIDGES:  959(b)?  Or 959(a)?

10           THE COURT:  No, of 959(a).

11           MR. BRIDGES:  What we're looking at here?

12           THE COURT:  That's the sentence that I have always

13  thought was one justification for a gatekeeper provision.  And

14  I know, you know, a lot of others feel the same.

15           MR. BRIDGES:  Are we talking about what I have listed

16  in number five here?

17           THE COURT:  No.  I'm talking about the last sentence

18  of 959(a).  Such actions, okay, shall be subject to the

19  general equity power of such court, you know, meaning the

20  Bankruptcy Court, so far as the same may be necessary to the

21  ends of justice, but this shall not deprive a litigant of his

22  right to a trial by jury.

23       Isn't that one of the provisions that lawyers sometimes

24  rely on in arguing a gatekeeper provision is appropriate?

25           MR. BRIDGES:  Certain --

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B-BD Document 14-31 Filed 09/29/21 Page 109 of 213   PageID 2275

63

 1              THE COURT:  You, Bankruptcy Judge, have the power,

 2      the general equity power, so far as the same may be necessary

 3      to the ends of justice?

 4              MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

 5      is equitable power to do more.  There's no doubt that there

 6      are reliance -- there is reliance on that in many instances.

 7      So I'm not sure -- I'm not sure I'm responding to your point.

 8              THE COURT:  Well, again, I think this is the third or

 9      fourth argument down the line that really you start with in

10      the analytical framework here, but I guess I'm just saying I

11      always thought a gatekeeping provision was consistent,

12      entirely consistent with 28 U.S.C. § 959(a), the last

13      sentence.

14              MR. BRIDGES:  When you're dealing --

15              THE COURT:  You disagree with that?

16              MR. BRIDGES:  I do, Your Honor.

17              THE COURT:  Okay.

18              MR. BRIDGES:  And it's not that the Court lacks

19      equitable powers to do more.  It's that those equitable powers

20      are affected by when management of other parties, third

21      parties' property is at issue.

22          What we're talking about is similar to yesterday's

23      contempt order.  When you set the basis of describing what it

24      is that Highland's business is, that they're a registered

25      investment advisor in the business of buying, selling, and

64

1   managing assets -- assets, of course, are property, and that

2   property is not just Highland's, but it's third-party

3   property, as if a railroad loses luggage belonging to its

4   customers.  Rather than the railroad with a trustee appointed

5   having mismanaged railroad property, we're talking about

6   third-party property here, third-party property that belongs

7   to the CLOs, about a billion dollars of assets in these CLO

8   SPEs that Highland manages.

9        And again, the slide that Mr. Sbaiti showed you showing

10  Highland, yes, they manage their own assets, the assets of the

11  Debtor, but also of the third parties, including the

12  Charitable DAF and CLO Holdco, and that the Advisers Act

13  imposes fiduciary duties on them that are unwaivable when

14  they're doing that.

15       In *Anderson*, the Fifth Circuit called 959 an exception to

16  the rule requiring court's permission for leave to sue.  In

17  *Hoffman v. City of San Diego* much more recently, relying on

18  this statute again, the court rejected a *Barton* challenge and

19  called it a statutory exception.  And in *Barton* itself, from a

20  century ago, the U.S. Supreme Court even acknowledged there

21  that where a receiver misappropriated the property of another

22  -- not the debtor's property, the property of another -- that

23  the receiver could still be sued personally, without leave of

24  court.

25       Absent *Barton*, absent applicability of the Barton

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 8-10   Filed 09/01/23   Page 111 of 213   PageID 2277

65

1    Doctrine, Your Honor, the gatekeeper order is problematic.

2         *Barton* applies where a court has appointed a trustee, and

3    I don't think, Your Honor, under the circumstances in this

4    case, that it is fair to say Mr. Seery was appointed, as

5    opposed to approved by this Court.  And it involves a

6    trustee's actions under the powers conferred on him.  The

7    Barton Doctrine is not about a broader exculpation of the

8    trustee.

9         Here, what the Debtor asked for in its motion for

10   approval, approval of hiring Mr. Seery, what it asked for

11   specifically in the motion was that the Court not interfere

12   with corporate decisions absent a showing of bad faith, self-

13   interest, or gross negligence, and asking the Court to uphold

14   the board's decision to appoint Mr. Seery as the CEO as long

15   as they are attributable to any rationale business purpose.

16        At the hearing, Your Honor, at the hearing, we've quoted

17   your comments saying that the evidence amply shows a sound

18   business justification and reasonable business judgment on the

19   part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20   Your Honor, respectfully, those words don't sound like the

21   judge using its discretion to choose -- appoint a trustee.

22   They sound like the Court exercising deference to the business

23   judgment of a business.  And appropriately so.  We don't have

24   trouble with application of the business judgment rule.  Our

25   problem is with application of it and the Barton Doctrine.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01603-B B Document 30   Filed 09/02/23   Page 112 of 213   PageID 2278

66

 1    Those two do not go together.  A trustee has protection

 2    because it's acting under color of the court that appointed

 3    it.  A court that merely deferred to someone else's

 4    appointment, that's not what the Barton Doctrine is about.

 5    The Barton Doctrine is about the court's function that the

 6    trustee takes on, not deference to the business judgment of

 7    the debtor in possession or the other fiduciary appointed by

 8    the court.

 9         Problem one was the gatekeeping.  Problem two is about the

10    release and the *Applewood* case.  Your Honor, again, ordinary

11    negligence and ordinary fiduciary duty breaches do not rise to

12    the level of gross negligence and willful misconduct.  And

13    because of that, the language of this order appears to be

14    barring them entirely.  No entity may bring a lawsuit against

15    Mr. Seery in certain circumstances without the Bankruptcy

16    Court doing what?  Determining that the cause of action

17    represents a colorable claim of willful misconduct or gross

18    negligence against Mr. Seery.

19         A breach of fiduciary duty under the Advisers Act can be

20    unintentional, it can fall short of gross negligence by miles,

21    and to exculpate Mr. Seery from those kinds of claims entirely

22    is to make him no longer a fiduciary.  A fiduciary duty that

23    is unenforceable makes someone not a fiduciary.  That's

24    plainly not what Mr. Seery thinks his role is.  It's

25    inconsistent with the Advisers Act.  And Your Honor, the

002006

1    notion that he would not owe his clients fiduciary duties as

2    he manages their assets would require disclosures under the

3    SEC regulations.  It creates all kinds of problems to state

4    that a fiduciary under the Advisers Act does not have

5    enforceable fiduciary duties.  The order appears to be

6    releasing all of those.  But for *Applewood's* specificity

7    requirement, it would be doing that.

8         As an asset manager under the Advisers Act, Mr. Seery is

9    managing assets belonging to CLO Holdco and The Charitable

10   DAF.  That's precisely what the District Court action is

11   about, those fiduciary duties.  And Mr. Seery, in describing

12   these recently in testimony here -- forgive me for reading

13   through this, Your Honor, but it is pretty short -- Mr. Seery

14   testifies, I think, from a high level, the best way to think

15   about the Debtor is that it's a registered investment advisor.

16   As a registered investment advisor, which is really any

17   advisor of third-party money over $25 million, it has to

18   register with the SEC and it manages funds in many different

19   ways.  The Debtor manages approximately $200 million current

20   values -- it was more than that of the start of the case -- of

21   its own assets.

22        I'm pausing there, Your Honor.  $200 million of its own

23   assets, but we're about to talk about third-party assets.

24        It doesn't have to be a registered investment advisor for

25   those assets, but it does manage its own assets, which include

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 810   Filed 09/04/2385   Page 114 of 213   PageID 22230

68

1  directly-owned securities, loans, from mostly related entities

2  but not all, and investments in certain funds, which it also

3  manages.

4      And then here it comes:  In addition, the manager -- the

5  Debtor manages about roughly $2 billion, $2 billion in total

6  managed assets, around $2 billion in CLO assets, and then

7  other entities, which are hedge funds or PE style.

8      We also had to get a very good understanding of each of

9  the funds that we manage.  And as I said, the Investment

10  Advisers Act puts a fiduciary duty on Highland Capital to

11  discharge its duty to the investors.  So while we have duties

12  to the estate, we also have duties, as I mentioned in my last

13  testimony, to each of the investors in the funds.

14      Now, some of them are related parties, and those are a

15  little bit easier.  Some of them are owned by Highland.  But

16  there are third-party investors in these funds who have no

17  relation whatsoever to Highland, and we owe them a fiduciary

18  duty both to manage their assets prudently but also to seek to

19  manage -- maximize value.

20      Those duties do not require -- requires the opposite of

21  what I mean.  They don't merely require avoiding gross

22  negligence or willful wrongdoing.  When you're managing assets

23  of others, the fiduciary duties that you owe are far stricter

24  than that.  The highest duty known to law is a fiduciary duty.

25      The order is inconsistent with that testimony,

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B B Document 30   Filed 09/05/23   Page 115 of 213   PageID 2281

69

1  acknowledging the fiduciary duties owed to The Charitable DAF

2  and to CLO Holdco.  It appears to release the Debtor -- maybe

3  not the Debtor.  My slide may be wrong about that.  It appears

4  to release Seery from having to uphold these duties.

5      In addition to problems with the gatekeeping under the

6  Barton Doctrine, in addition to the release problem and

7  *Applewood* and the unwaivable fiduciary duties under the

8  Advisers Act, there's also a problem with telling other courts

9  that they lack jurisdiction.  Your Honor knows bankruptcy

10  court law -- bankruptcy -- and the Bankruptcy Code far better

11  than I do, I'm certain.  But a first principle, I believe, of

12  bankruptcy law is that this Court's jurisdiction is derivative

13  of the District Court's.  And the only doctrine I've heard of

14  that can allow this Court to exercise exclusive jurisdiction

15  of the District Court that it sits in is the Barton Doctrine,

16  which, again, is very problematic to apply in this case, for

17  the reasons we've discussed already.

18      By claiming to have -- by stating in the order that this

19  Court has sole jurisdiction, it appears to either be inclusive

20  of the District Court, which I understand Your Honor doesn't

21  think her order can be read that way, but if it's not read

22  that way, then it results in telling the District Court that

23  it doesn't have the original jurisdiction that Congress has

24  given it.  And that's problematic in the order as well.

25          THE COURT:  Let me ask you.  If you think the word

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 30-11 Filed 09/06/23 Page 116 of 213 PageID 2282

70

 1  "power" had been used, or "authority," versus "jurisdiction,"

 2  that would have cured it?

 3          MR. BRIDGES:  I think there would still have been

 4  other problems.  Would it have cured this?  I don't think so,

 5  Your Honor, because, again, I think the only basis for that

 6  power is the Barton Doctrine.

 7          THE COURT:  Okay.

 8          MR. BRIDGES:  To listen to opposing counsel, you'd

 9  think that our jurisdictional argument was entirely about the

10  jurisdiction stripping.  It's not.  Frankly, Your Honor,

11  that's maybe even a lesser point.  A key problem here to is

12  the assertion of jurisdiction, not over any of the claims, but

13  over all of the claims, because of 157(d), Your Honor, because

14  some claims, some causes of action, have been put outside the

15  reach of bankruptcy, the Bankruptcy Court, and those actions

16  may in some instances fit within your description of the cases

17  that are precluded here.

18      That's a problem jurisdictionally with this Court's

19  ability to say it retains jurisdiction or that it has, that it

20  asserts jurisdiction.  Over what?  Any kind of claim or cause

21  of action against Mr. Seery relating in any way to his role as

22  the chief executive officer and chief restructuring officer of

23  the Debtor.

24      Some claims that fit into that bucket also fit into the

25  description in 157(d) of cases that require both consideration

1   of bankruptcy law and federal laws affecting interstate

2   commerce or regulating it.  Right?  Some cases must fall into

3   -- under 157(d), despite having something to do with Mr.

4   Seery's role as a chief executive officer.  And Your Honor,

5   the Advisers Act fiduciary duty claims asserted by Respondents

6   in the District Court are such claims.  They cannot be decided

7   without considering the Advisers Act.

8        There are also RICO claims that, of course, require

9   consideration of the RICO statute.  But the Advisers Act

10  claims absolutely require consideration of both bankruptcy law

11  and this Court's order exonerating -- exculpating Mr. Seery

12  from some liability, in addition to the unwaivable fiduciary

13  duties imposed by the Advisers Act.

14       The assertion of jurisdiction here blanketed, in a blanket

15  manner, over all claims against Mr. Seery in any way related

16  to his CEO role is a 157(d) problem that the order has no --

17  has no solution for and we see no way around.  157(d) requires

18  withdrawal of the reference, makes it mandatory, when a case

19  requires considerations of federal law implicating interstate

20  commerce.

21       Your Honor, we think we had to do it the way we did,

22  filing in the District Court instead of filing here, in order

23  to preserve our jurisdictional arguments.  To come to this

24  Court with a motion and then what?  Immediately file a motion

25  to withdraw the reference on our own motion here?  To come

1    here and ask for a decision on colorability, when first

2    colorability would exclude the claims that we're trying to

3    bring, at least some of them, the mere negligence, mere

4    fiduciary duty breaches, because they don't rise to the level

5    necessarily of gross negligence or willful wrongdoing.

6        Your Honor, coming here and asking this Court to rule on

7    that may well have waived our jurisdictional objections.

8    Coming here to this Court and doing that and immediately

9    filing a motion --

10            THE COURT:  I don't get it.

11            MR. BRIDGES:  The ordinary --

12            THE COURT:  Subject matter jurisdiction, if it's a

13    problem, it's not waivable.

14            MR. BRIDGES:  The ordinary issue -- the ordinary

15    waiver rule, Your Honor, is that when you come and ask for a

16    court to rule on something, that you waive your right to -- to

17    later -- you're estopped judicially from taking the contrary

18    position.

19            THE COURT:  Okay.  Well, again, I don't get it.  If

20    you filed your motion and I ruled in a way you didn't like,

21    you would appeal to the District Court.

22            MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23    District Court, we would be entitled to do.  I understand, no

24    matter what happens here, we can appeal to the District Court.

25    That's different from whether or not, by coming here first,

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 30-1   Filed 09/09/22   Page 119 of 213   PageID 2285

73

1   have we waived or have we created an estoppel situation, in

2   terms of arguing jurisdiction.

3          THE COURT:  Okay.

4          MR. BRIDGES:  Because of the problems with the order,

5   we thought we were in a situation where coming here would

6   waive rights that we could avoid waiving by asking in the

7   District Court.

8       In other words, there was a jurisdictional paradox:  How

9   does a party ask a court to do something it believes the court

10  lacks the power to do?  That's the spot we found ourselves in.

11  What were we supposed to do?

12      Your Honor, it is definitely a complex case.  And coming

13  into this matter with over 2,000 filings on the docket before

14  I had ever heard of Highland was a very daunting thing, coming

15  into this case.  And whether or not there's something that we

16  missed is certainly possible, but these orders that are the

17  subject of the contempt motion, these orders are not things

18  that we overlooked.  These are things that we studied

19  carefully, that we did not ignore or have disdain for, but

20  that affected and changed our actions.

21      And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22  presentation, in his third slide, he quotes from the first

23  page of our motion for leave, the motion that he says exhibits

24  our contemptuous behavior.

25      The second paragraph is kind of tiny print there, Your

1    Honor, and it's not highlighted, but I'd like to read it.

2    Seery is not named in the original complaint, but this is only

3    out of an abundance of caution due to the Bankruptcy Court in

4    HCM's pending Chapter 11 proceeding having issued an order

5    prohibiting the filing of any causes of action against Seery

6    in any way related to his role at HCM, subject to certain

7    prerequisites.  In that order, the Bankruptcy Court also

8    asserts sole jurisdiction over all such causes of action.

9         Your Honor, our intent was not to violate the order.  Our

10   intent was to be cautious about how we proceeded, to fully

11   disclose what we were doing, and to do it in a District Court

12   that absolutely could refer the matter here to this Court for

13   a decision, but to do it in a way that didn't waive our

14   jurisdictional arguments, that didn't waive our arguments

15   regarding the release of the very claims we were trying to

16   bring, by first having to prove that they were colorful claims

17   of willful misconduct or gross negligence, when we were trying

18   to assert claims that weren't willful negligence or gross --

19   gross negligence or willful misconduct.  That was what I was

20   trying to say.

21        Your Honor, this was not disregard of your order.  If

22   we're wrong on the law, we're wrong on the law, but it's not

23   that we disregarded your order or lacked respect for it.  We

24   disclosed it.

25        Mr. Morris has argued in the briefs that we attempted to

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 830 Filed 09/11/2023 Page 121 of 213 PageID 2287

75

1   do this on an ex parte basis.  Your Honor, we did not attempt

2   to do this on an ex parte basis.  And if there are errors,

3   they probably are mine.  I know one error is mine.  On the

4   civil cover sheet in the filing in the District Court, I noted

5   and passed on that we should check the box for related case

6   and list this case on there.  I did not follow up to make sure

7   that it happened, and administratively, it didn't happen.  We

8   did not check the box on the civil cover sheet.  Mr. Morris is

9   correct that we failed to do that.  He's incorrect that that

10  was sneaky or intentional.  It was my error, having noticed it

11  but not followed up.

12       Your Honor, similarly, the argument that we didn't serve

13  them with the motion I think is disingenuous.  What happened,

14  Your Honor, is that counsel for the Debtor had agreed to

15  accept service of the complaint itself against the Debtor

16  before the motion for leave, and after accepting service, I

17  was under the impression that they'd be monitoring the docket,

18  especially when I emailed them, informed them that we were

19  filing the motion for leave to amend, because I was required

20  to submit a certificate of conference on that motion.  I

21  informed them in a polite email.  The polite email is not

22  quoted in their brief.  It is included in the record, and it's

23  quoted in full in our brief.

24       The email exchange indicates to them, Thank you for

25  pointing out the Court's orders.  We've carefully studied them

002015

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 30-1   Filed 09/12/23   Page 122 of 213   PageID 2288

76

1  and we don't think what we're doing is a violation of those

2  orders.

3       That we didn't serve them is because we thought they

4  already knew that the motion was coming and would be

5  monitoring the docket, and we didn't know which lawyers they

6  were going to have make an appearance in that case, so we

7  wouldn't have known who to serve.  But if not serving them --

8  first, the Rules do not require that service.  But if not

9  serving them out of politeness --

10              THE COURT:  Mr. Morris is standing up.  Did --

11              MR. MORRIS:  I move to strike all of this, Your

12  Honor.  If Counsel wants to take the stand and raise his hand,

13  he should testify under oath.  I'm just going to leave it at

14  that.  He's not on their witness list.

15              THE COURT:  All right.  I overrule.  You can

16  continue.

17              MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19  know of no rule that requires it.

20              THE COURT:  Can I ask you, you were talking about the

21  cover sheet mistake in not checking the box.  What about your

22  jurisdictional statement in the actual complaint not

23  mentioning 28 U.S.C. § 1334 as a possible basis for subject

24  matter jurisdiction?  Do you think that was a mistake as well,

25  or was that purposeful, not necessary?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 30-10    Filed 09/13/2385    Page 123 of 213    PageID 2289

77

1          MR. BRIDGES:  Candidly, Your Honor, standing here

2    right now, I have no recollection whatsoever of it.

3          THE COURT:  You mention 28 U.S.C. § 1331, and then

4    1367 supplemental jurisdiction, but you don't mention 1334.

5          MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6    would have written that.

7          THE COURT:  Okay.

8          MR. BRIDGES:  I have no recollection of --

9          THE COURT:  Okay.

10          MR. BRIDGES:  -- making any decision at all --

11          THE COURT:  All right.

12          MR. BRIDGES:  -- with regards to that.

13          THE COURT:  Okay.

14          MR. BRIDGES:  Your Honor, you've been very patient

15    with a very long opening argument, and I'm very grateful for

16    that.  Please know that we take this Court's order seriously.

17    We voluntarily appeared here before the Court ordered us to do

18    so by filing our motion asking for a modification of the order

19    we're accused now of having been in violation of.

20        And the last thing I'd like to say, Your Honor, Mr.

21    Morris's brief claims that the first he knew of the motion,

22    the motion seeking leave to add Mr. Seery to the District

23    Court claim, the first he knew of that was when Mr. Sbaiti

24    forwarded him the District Court's order dismissing that

25    motion, denying that motion without prejudice.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 1830 Filed 09/14/2885 Page 124 of 213 PageID 2290

78

1    Your Honor, in a civil contempt proceeding, where the

2    issue is compensating, not punishing, if the aggrieved party

3    didn't even know about the action until it had been denied by

4    the District Court, we submit that there can be no harm from

5    that having taken place.

6        That's all I have for opening.  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8        Before we give you a time check, do we have other opening

9    statements?

10            MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11   Anderson on behalf of Mr. Patrick.  If we need to take a

12   break, that's fine, too.

13            THE COURT:  Well, how long do you plan to use?

14            MR. ANDERSON:  No more than ten minutes, for sure.

15            THE COURT:  Let's go ahead and do that, and then

16   we'll take a break.

17            MR. POMERANTZ:  Your Honor, after, I would ask the

18   opportunity to respond to Mr. Bridges' argument.  Probably

19   another ten minutes.

20            THE COURT:  All right.  Let's go ahead and take a

21   ten-minute break.  And Mr. Taylor, you're going to have

22   something, because you --

23            MR. TAYLOR:  Five.

24            THE COURT:  Okay.  We'll take a ten-minute break.

25   And Nate, can you give them a time?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B  Document 30-1  Filed 09/15/22  Page 125 of 213  PageID 2291

79

1          THE CLERK:  I'm showing it was about 59-1/2 minutes.

2          THE COURT:  Fifty-nine and a half?  And is that

3     subtracting some for my questioning?

4          THE CLERK:  I stopped whenever you talked, maybe a

5     little over --

6          THE COURT:  Okay.  So he stopped it whenever I asked

7     questions and you answered, so 59 minutes has been used by the

8     Respondents.

9       All right.  We'll take a ten-minute break.  We'll come

10    back at 11:35.

11         THE CLERK:  All rise.

12      (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13         THE COURT:  All right.  We're going back on the

14    record in the Highland matter.  We have further opening

15    statements.  Counsel, you may proceed.

16    OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17         MR. ANDERSON:  Thank you.  May it please the Court,

18    Counsel.  Michael Anderson on behalf of Respondent, Mark

19    Patrick.

20      Your Honor, after listening to this and looking at the

21    filings in this case, this issue of whether there's contempt

22    -- and I would argue there's not -- is ripe for decision.  We

23    have no real undisputed facts for purposes of the contempt

24    issue.  We have your Court's July order, the subject of Mr.

25    Bridge's arguments.  We have the Plaintiffs in the underlying

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 30   Filed 09/16/2021   Page 126 of 213   PageID 2292

80

1   lawsuit at issue.  They commenced the lawsuit in April of this

2   year.  There's absolutely nothing improper about that filing.

3   It's not subject to the contempt.  A week later, there is a

4   motion for leave to add Mr. Seery.  That's the issue.  There's

5   no dispute over that.  There's no dispute that Mr. Patrick

6   authorized the filing of the motion for leave.

7       And so then the question becomes we look at the Court's

8   July order, did a motion for leave, did that violate the terms

9   of the order?  The motion for leave is not commencing a

10  lawsuit.  It's also not pursuing a claim, because whether or

11  not the Court grants the motion, denies the motion, or

12  whatever the Court does, nothing happened, because the day

13  after the motion for leave was filed it was dismissed *sua*

14  *sponte* without prejudice because not all parties had been

15  served in the case.

16      It was permission asked one day.  The matter was mooted

17  the following day by the District Court.  And so that is

18  completely undisputed.

19      And so the question is, is asking permission, is that

20  commence?  I think everybody says there's no way that's

21  commencing a lawsuit because you have asked permission.  The

22  question, then, is it pursuing a claim?  And the argument,

23  well, no, that's not pursuing a claim; it's asking permission.

24      And I think it's also important to note that when the

25  motion for leave was filed, there were no secrets there.  I

1   mean, I'm coming in this after the fact, representing Mr.

2   Patrick.  You look at a motion for leave, and right there on

3   Page 1 it talks about Your Honor's order.  Page 2, it quotes

4   the order and it gives the reasons, there's arguments being

5   made as to why that order doesn't bar adding Mr. Seery as a

6   defendant in the lawsuit, many of the arguments that Mr.

7   Bridges made.

8        So that's where we are.  And so when I hear, hey, we've

9   got six hours, three hours and three hours, and we're going to

10  split this up, you know, maybe too simplistic from Fort Worth,

11  but I'm like, wait a second, this is all undisputed.  It's

12  totally undisputed.  The -- whether or not the prior order is

13  enforceable or not enforceable, those are all legal arguments.

14  You know, no witnesses are necessary for that.  And as I

15  understood, right before we broke, counsel stood up and he's

16  going to do what generally doesn't happen in opening

17  statements, which is respond to opening statements, which

18  shows that that's a legal issue.

19       And so it really does come down to undisputed facts.

20  There's no testimony.  No -- nothing is necessary.  And a lot

21  of what this comes down to is the old statement, you know, is

22  it better to ask forgiveness or permission?  And usually that

23  statement comes up when somebody has already done something:

24  Hey, I'm going to go do it anyway and I'll ask for forgiveness

25  later.  Well, what the Plaintiffs in the underlying case did

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 80-1   Filed 09/18/23   Page 128 of 213   PageID 2294

82

1  was ask permission.  Motion for leave.  That is not

2  contemptuous.  And there's literally no damages.  As was

3  pointed out, by the time counsel found out, it had already

4  been dismissed.

5      The last thing I want to point out, Your Honor, is that

6  the argument from opposing counsel was, well, under Rule 15 of

7  the Federal Rules of Civil Procedure, since parties hadn't

8  answered yet, the Plaintiffs in the underlying case could have

9  just simply added Mr. Seery as a defendant and moved on that

10  way, but then that would be another ball of wax and then we

11  would be addressing issues as far as whether or not there is a

12  violation of the Court's order, notwithstanding Mr. Bridge's

13  arguments.  But then we would have those issues.  But that's

14  not what happened.  Everybody knows that's not what happened.

15  It was a motion for leave that was resolved the following day.

16      And so, Your Honor, for those reasons, and those

17  undisputed reasons, we would request that the Court at the end

18  of this hearing deny the request for sanctions and a contempt

19  finding against our client, Mr. Patrick.

20      Mr. Phillips is going to address one brief issue

21  bankruptcy-wise I believe that was raised earlier.

22          THE COURT:  Okay.  Mr. Phillips?

23          MR. PHILLIPS:  Your Honor, thank you very much.

24  Louis M. Phillips on behalf of Mark Patrick.

25      The only thing that I would point out, Your Honor, and I'm

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 10-1 Filed 09/19/2022 Page 129 of 213 PageID 2295
Document Page 129 of 213 PageID 2295

83

1   going to do -- try to simplistically, because that's about the

2   level at which I operate, boil down the questions about the

3   order.

4       This order was an employment order.  The problem that Mr.

5   Bridges has elucidated to Your Honor is that the precise

6   effect, one of the precise effects of that order is to bar the

7   claims of third parties that arise into the future on the

8   basis of the employment of Mr. Seery, because the order

9   required that all claims asserting gross negligence or willful

10  misconduct need to be brought before you to determine that

11  they're colorable.

12      One question I have is, does it apply to the lawsuit that

13  was filed?  Doesn't apply unless the effect of the order was

14  to release those claims and preclude any party from bringing

15  those claims at all.  And while you can say correctly that

16  this Court issues gatekeeper orders all of the time, one thing

17  I cannot imagine that you would say is that in employment

18  orders you release claims of third parties existing and as may

19  arise in the future that could be brought against the party

20  employed to be a CRO of a debtor, who, by his own testimony,

21  says we do all kinds of stuff in the billions of dollars for

22  third parties that we owe fiduciary duties to.

23      There's no way, Your Honor, that you were considering your

24  July order to bar third-party claims arising from breach of

25  fiduciary duties by Mr. Seery to third parties who held third-

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 3-8 Document 43-10 Filed 09/20/23 Page 130 of 213 PageID 2296

84

1    party claims that did not involve some assertion that, in his

2    capacity as CRO, he was in some way acting within the scope of

3    his authority as CRO for the Debtor and yet committed

4    negligence against the Debtor.

5        Now, if the order was asserting that you know what a lot

6    of people in this courtroom know, that the standard of

7    liability for a CRO doing work for a debtor, just like the

8    standard of liability for the president of a corporation or an

9    officer of the corporation, is as long as you're within the

10   course and scope of your employment, your actions for the

11   corporation have -- can -- the corporation takes care of you

12   because there's no personal claim unless you're outside the

13   scope, and you're outside the scope if you commit gross

14   negligence or willful misconduct.

15       That, if you're restating the standard of care and

16   standard of liability for a CRO, we have no problem with that,

17   because Mr. Patrick did not authorize a cause of action

18   arising against Mr. Seery against the Debtors for damage to

19   the Debtors.  He authorized the filing of a complaint in the

20   District Court with jurisdiction for a third-party claim for

21   breach of a fiduciary duty to a third party that Mr. Seery

22   admits he owes, and then sought leave because they didn't

23   understand the order that Your Honor issued.  It couldn't have

24   been to release the breach of fiduciary duty claims that

25   wouldn't rise to gross negligence or willful misconduct, it

002024

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1640   Filed 09/27/28 Page 431 of 521 PageID 22297

85

1  couldn't be that, but it might be.  But if it did, under an
2  employment order?  That's very different from *Espinosa*, that's
3  very different from *Shoaf*, when you're at the end of a case in
4  a confirmation of a plan and you're talking about matters
5  arising in the past.

6      This order, if it has the effect it could be read to have,
7  precludes any third party from asserting a breach of fiduciary
8  duty against Seery for actions that violate the duty to that
9  third party, when Seery's biggest job, it looks to us like, is
10  running third-party money.  That could not have been what Your
11  Honor was thinking.

12      And so all I'm pointing out is I'm trying to distill down.
13  The lawsuit doesn't involve gross negligence or willful
14  misconduct allegations.  It involves breach of fiduciary duty,
15  breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick
16  authorized that lawsuit.

17      Now, what we're here for today is to determine whether the
18  complaint, which was not against the Debtor -- which was not
19  against Seery, the motion for leave, which did not -- all they
20  did was ask for permission, not forgiveness.  And we can't
21  understand how the Debtor should be saying, all they had to do
22  was amend.  Well, if they amended, would we be in hotter water
23  than we are today for asking for permission to sue?  I think
24  we would have been, that should have been the prescribed
25  course, when we are more concerned and we are more risk-averse

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B   Document 8-10   Filed 09/22/23   Page 132 of 213   PageID 2298

86

1 | by asking for leave rather than just amending by right.
2 | Absolutely, that makes no sense.  We can't be held to be more
3 | contemptuous because we asked for permission, when we could
4 | have just sued him, because they're saying asking for
5 | permission was wrong.  Certainly, suing him would have been
6 | wrong.  That would have been easier.
7 | THE COURT:  But Mr. Phillips, the issue is you all
8 | didn't come to the Bankruptcy Court and ask permission.
9 | MR. PHILLIPS:  Look at your order, Your Honor.
10 | THE COURT:  It's right in front of me.
11 | MR. PHILLIPS:  Right.  That order either doesn't
12 | apply to the claims that were brought or it released the
13 | claims that were brought.  That's our point.  It couldn't have
14 | released them.  Does it apply to them?  Thank you.
15 | THE COURT:  Okay.  Mr. Taylor?
16 | MR. TAYLOR:  Good morning.
17 | THE COURT:  Good morning.
18 | OPENING STATEMENT ON BEHALF OF JAMES DONDERO
19 | MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim
20 | Dondero.  I'll be very brief because I know we've already
21 | spent a lot of time on opening argument.  But I do think it is
22 | appropriate to, one, first look at who brought the lawsuit,
23 | CLO Holdco & DAF.  That was authorized -- it's undisputed it
24 | was authorized by Mr. Patrick.  There is no dispute about
25 | that.  There's no dispute who the Plaintiffs are.  But yet my

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 68-10   Filed 09/23/0835   Page 133 of 213   PageID 22299

87

1   client is up here as an alleged violator.

2       I think it's very clear, as all the parties have said,

3   there's no dispute as to there's an order, there was a

4   complaint, and there was a motion for leave.

5       It seems to me that the rest of the evidentiary hearing

6   that you may be about to go through is going to be about pin

7   the blame on Mr. Dondero.  It is undisputed that he is not a

8   control person for the DAF or CLO Holdco.  The only type of

9   evidence you will hear is going to be insinuation that he

10  somehow controls Mr. Patrick and used to control Mr. Scott.

11  There will be no direct evidence that he authorized this or

12  that he's the control person and the proper corporate

13  authorized representative that signed off on the --

14      It seems to me, Your Honor, first of all, that's a

15  discrete issue that should be able to be decided separately

16  from this, and the first gating issue is, was there indeed a

17  violation of this Court's order?  It would seem to me that

18  there is no disputes about those facts and that we should

19  bifurcate that, and if you then find that there is a violation

20  and find that there is any even need to move into who the

21  alleged violators are, that then we could have that

22  evidentiary portion.  But there is no reason to do that now

23  before there's even been found to be a violation.

24          THE COURT:  All right.  Thank you.

25      All right.  Well, someone made the point rebuttals in

1    opening statements are not very common, --

2              MR. POMERANTZ:  Your -- Your --

3              THE COURT:  -- but you can use your three hours

4    however you want.

5               OPENING STATEMENT ON BEHALF OF THE DEBTOR

6              MR. POMERANTZ:  Your Honor, I didn't intend to stand

7    up.

8              THE COURT:  Okay.

9              MR. POMERANTZ:  I also didn't intend to have the

10   motion to modify the sealing order presented to Your Honor,

11   which it was in the course of that opening argument.  And

12   despite your comments at the beginning of the hearing, the

13   Movants have taken Your Honor down a series of rabbit holes

14   that have really no relevance to the contempt motion.  And

15   notwithstanding, as I said, your ruling that basically the

16   contempt would go first and the modification would go second,

17   there they were, persistent in making all the arguments why

18   this Court should modify the order.

19        They're just really trying to obfuscate the simple issue

20   that Mr. Morris presented and raised at the beginning of the

21   hearing:  Did they violate the order by pursuing a claim?  We

22   think the answer is undoubtedly yes.

23        I'm not going to try to address each of the issues they

24   raised in connection with the modification motion in detail.

25   I have a lengthy presentation.  I'll do it at the appropriate

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 8-10 Filed 09/25/23 Page 135 of 213 PageID 2301

89

1    time.  But there are a few issues I want to address.  I want

2    to address one of the last points Mr. Bridges raised first.

3    If they thought that the order was a problem, they could have

4    filed their motion to modify that order before Your Honor.

5    They could have had that heard first.  There was no statute of

6    limitations issue in connection with the HarbourVest matter.

7    They could have come to Your Honor to do that.  But no, they

8    didn't.  They went to the District Court first, and it was

9    only after we filed our contempt motion that they came back

10   and said, well, Your Honor, you should modify the order.

11   Their argument that if they did that there would have been

12   waiver and estoppel is just an after-the-fact justification

13   for what they did and what they tried to do, which was

14   unsuccessful.  They tried to have the District Court make the

15   decision.

16        And why?  Your Honor, they've filed motions to recuse

17   before Your Honor.  They -- they -- it's no secret the disdain

18   they have for Your Honor's rulings as it relates to them.

19   They wanted to be out of this courtroom and in another

20   courtroom.

21        And their belated argument, Mr. Bridges falling on the

22   sword, that they failed to check the box, inadvertent, it's on

23   me, it's very curious.  Because if they had done so and had

24   referred to the correct 1334 jurisdictional predicate, as Your

25   Honor had mentioned, the complaint would have been referred to

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01603-B Document 30-11 Filed 09/26/2022 Page 136 of 213 PageID 2302

90

1    this Court and the entire trajectory of the proceedings would

2    have been different.  They would have had the opportunity to

3    take their shot to go to District Court and argue that your

4    order didn't apply.

5        Your Honor, they say the January 9th order is not

6    relevant.  It is entirely relevant.  It covered the

7    independent directors and their agents.  Yes, Mr. Seery is an

8    independent director, but he was also an agent of the

9    independent directors and carried out the duties.  You heard

10   argument at the July 16th hearing that Mr. Seery had been

11   acting as the chief executive officer for several months.  And

12   why is it important?  Mr. Bridges said, well, if we violated

13   one order, we violated the other.  It's important because,

14   Your Honor, number one, Mr. Dondero supported that order.  We

15   would never have had an independent board in this case if Mr.

16   Dondero, the decision-making -- of the Debtor at that time,

17   supported that order and supported the exculpations that are

18   now claimed to have been invalid.

19       And also Your Honor heard testimony at the confirmation

20   hearing that the independent directors would never have taken

21   this job, would never have taken this job because of the

22   potential for litigation, litigation that we've now had to

23   endure for several months.  So to come back 16 months later

24   and say, well, you know, you couldn't really exculpate them,

25   it's really an employment order:  It was an employment order.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B B Document 8-10 Filed 09/27/2385 Page 137 of 213 PageID 2303

91

1    They know it.  We know it.  Your Honor knows it.  It was a

2    resolution of corporate governance issues that changed the

3    whole trajectory of the case, and luckily it -- luckily, Your

4    Honor approved it.

5        The question just is whether they violated the order,

6    period.  And I'll have a lot to say about res judicata, but I

7    won't go in too much in detail, but I will just briefly

8    address their arguments.  They're correct and the Court is

9    correct that there's a difference between *Applewood* and *Shoaf*.

10   And Your Honor got the exact difference.  In one case, a

11   release was not specific, *Applewood*.  In one case it was.

12   *Shoaf* hasn't been discredited by *Applewood*.  It was different

13   facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14   *Stoll* case and the *Chicot* case, both for the propositions that

15   a court that enters an order, a clear order, even if it didn't

16   have jurisdiction, that cannot be attacked in res judicata.

17   So here what we have is clear, unambiguous, you come to this

18   Court before commencing or pursuing a claim.  That's the

19   clarity.  The focus on the releases, that's not what we're

20   here for today, that's not what we're here for on a contempt

21   motion, on whether the release covered them or it didn't cover

22   them.  We're here on the clear issue of did they violate the

23   language, and we submit that they did.

24       And similarly, *Espinosa* applies.  Your Honor, just to

25   quote some language, "Appellees could have moved to remand the

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 68-10 Filed 09/28/23 Page 138 of 213 PageID 2304

92

1    action to state court after it improperly -- after its

2    improper removal to the federal court or challenge the

3    district court's exercise in jurisdiction on direct appeal.

4    Because they did neither, they are now barred by principles of

5    res judicata."

6        Res judicata actually does apply, and I will speak about

7    it in much more detail in the modification motion.

8        With respect to *Barton*, Your Honor, we disagree with their

9    argument that Mr. Seery is not a court-appointed agent.  We've

10   briefed it extensively in our motion to modify.  *Barton*

11   applies to debtors in possession.  *Barton* applies to general

12   partners of the debtor.  *Barton* applies to chief restructuring

13   orders -- officers who are approved by the debtor.  And it

14   applies to general counsel who are appointed by the chief

15   restructuring order.  Officer.

16       So the argument that *Barton* is somehow inapplicable is

17   just wrong.  Your Honor knows that.  Your Honor has written

18   extensively on *Barton* in connection with your *Ondova* opinion.

19       Some of the argument about 959 is all wrong, as well.

20   Your Honor got it right that 959 applies to slip-and-fall

21   cases or torts, injuries to parties that are strangers to this

22   process.  There is a legion of cases that I will cite to Your

23   Honor in connection with argument.  959 does not apply here.

24   There's nothing more core to this case than the transactions

25   surrounding the resolution of the HarbourVest claims.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 80   Filed 09/29/21   Page 139 of 213   PageID 2305

93

1    We also disagree, Your Honor, that the complaint is

2    subject to mandatory withdrawal of the reference.  We've --

3    one of our exhibits in the motion to modify is our motion to

4    enforce the reference.  We think Movants have it completely

5    wrong.  This is not the type of case that will be subject to

6    withdrawal -- mandatory withdrawal of the reference, and in

7    any event, for this contempt motion, it's irrelevant.

8        And they argue -- one of the other points Mr. Bridges

9    raises is that, because this Court would not have had

10   jurisdiction under 157 because of the mandatory withdrawal,

11   then Your Honor could not legally act as a gatekeeper.  But

12   they haven't addressed *Villegas v. Schmidt*.  We've raised it

13   throughout this case.  And again, in these series of

14   pleadings, they don't even address it.  And *Villegas v.*

15   *Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16   where the argument was that *Barton* does not apply because it's

17   a *Stern* claim and the Bankruptcy Court would not have

18   jurisdiction.  And *Villegas* said no, it does apply.  And Your

19   Honor even cited that in your *Ondova* case.  And why does it

20   apply?  Because there's nothing inconsistent with a Bankruptcy

21   Court having exclusive decision to make a *Barton*

22   determination.

23       In fact, in that case *Villegas* said, you can't go to the

24   District Court for that decision, it is the Bankruptcy Court's

25   decision.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 8-10   Filed 09/30/2023   Page 140 of 213   PageID 2306

94

1      So, again, it's a red herring, Your Honor.  Your Honor had

2  the ability to act as an exclusive gatekeeper for these types

3  of actions.

4      With that, Your Honor, I'll leave the rest of my argument

5  for the next motion.

6          THE COURT:  All right.  Thanks.

7      All right.  Nate, let's give everyone their time.

8          THE CLERK:  That was just about eight and a half

9  additional from the Debtor, and then altogether the other ones

10  were just shy of fourteen minutes.  Thirteen minutes and fifty

11  seconds for the other three combined.  Do you want me to --

12          THE COURT:  Yes, I meant for Debtor combined versus

13  --

14          THE CLERK:  Oh.  Oh.

15          THE COURT:  Respondents combined.

16          THE CLERK:  So that would be twenty one and a half

17  the Debtor.  Let me do the math on the other one.  Be an hour

18  twelve minutes and fifty seconds for --

19          THE COURT:  Okay.  All right.  Got that?  Debtors

20  used a total of twenty one and a half minutes; Responders have

21  used an hour twelve minutes and fifty seconds.

22      All right.  Mr. Morris, you may call your first witness.

23          MR. MORRIS:  Thank you very much, Your Honor.  The

24  Debtor calls Mark Patrick.

25          THE COURT:  All right.  Mr. Patrick?  Please approach

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 18-10   Filed 09/13/2023   Page 141 of 213   PageID 2367

Patrick - Direct                            95

 1  our witness stand and I'll swear you in.  Please raise your

 2  right hand.

 3        (The witness is sworn.)

 4            THE COURT:  All right.  Please take a seat.

 5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7  BY MR. MORRIS:

 8  Q    Good afternoon, Mr. Patrick.

 9  A    Good afternoon.

10  Q    Can you hear me okay?

11  A    Yes, I can.

12  Q    Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18        Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A    I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q    Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A    That is my understanding, correct.

25  Q    And your understanding is that Mr. Dondero doesn't have an

1  ownership interest in that entity, correct?

2  A    That he does not.  That is correct.

3  Q    And your understanding is that he's not an employee of

4  that -- of Skyview, correct?

5  A    That is correct.

6  Q    Prior to joining Skyview on March 1st, you had worked at

7  Highland Capital Management, LP for about 13 years, correct?

8  A    Correct.

9  Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01603-B Document 3-10 Filed 09/27/22 Page 143 of 213 PageID 2309

Patrick - Direct                                97

1    that right?

2    A    That is correct.  I worked for the tax department.

3    Q    Okay.  Let's talk about how you became the authorized

4    representative of the Plaintiffs.  You are, in fact,

5    authorized representative today of CLO Holdco, Ltd. and

6    Charitable DAF, LP, correct?

7    A    Charitable DAF Fund, LP.  Correct.

8    Q    And those are the two entities that filed the complaint in

9    the United States District Court against the Debtor and two

10   other entities, correct?

11   A    Correct.

12   Q    And may I refer to those two entities going forward as the

13   Plaintiffs?

14   A    Yes.

15   Q    You became the authorized representative of the Plaintiffs

16   on March 24th, 2021, the day you and Mr. Scott executed

17   certain transfer documents, correct?

18   A    Correct.

19   Q    And you had no authority to act on behalf of either of the

20   Plaintiffs before March 24th, correct?

21   A    Correct.

22   Q    The DAF controls about $200 million in assets, correct?

23   A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24   Fund, LP.

25   Q    Yes.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01505-B Document 18-0 Filed 09/34/22 Page 144 of 213 PageID 2310

Patrick - Direct                                98

1    A    Around there.

2    Q    Okay.  Let me try and just ask that again, and thank you

3    for correcting me.  To the best of your knowledge, the

4    Plaintiffs control about $200 million in assets, correct?

5    A    Net assets, correct.

6    Q    Okay.  And that asset base is derived largely from HCMLP,

7    Mr. Dondero, or Mr. Dondero's trusts, correct?

8    A    Can you restate that question again, Mr. Morris?

9    Q    Sure.  The asset base that you just referred to is derived

10   largely from HCMLP, Mr. Dondero, or donor trusts?

11   A    The way I would characterize it -- you're using the word

12   derived.  I would characterize it with respect to certain

13   charitable donations --

14   Q    Uh-huh.

15   A    -- that were -- that were made at certain time periods,

16   where the donors gave up complete dominion and control over

17   the respective assets and at that time claimed a federal

18   income tax deduction for that.

19        I do -- I do believe that, as far as the donor group, as

20   you specified, Highland Capital Management, I recall, provided

21   a donation to a Charitable Remainder Trust that eventually had

22   expired and that eventually such assets went into the

23   supporting organizations.  And then I do believe Mr. Dondero

24   also contributed to the Charitable Remainder Trust No. 2,

25   which seeded substantial amounts of the original assets that

 1  were eventually composed of the $200 million.  And then from

 2  time to time I do believe that Mr. Dondero's trusts made

 3  charitable donations to their respective supporting

 4  organizations.

 5  Q    Okay.  Thank you.

 6  A    Is that responsive?

 7  Q    It is.  It's very responsive.  Thank you very much.  So,

 8  to the best of your knowledge, the charitable donations that

 9  were made that form the bases of the assets came from those

10  three -- primarily from those three sources, correct?

11  A    Well, you know, there's two different trusts.  There's the

12  Dugaboy Trust and the Get Good Trust.

13  Q    Okay.

14  A    Then you have Mr. Dondero and Highland Capital Management.

15  So I would say four sources.

16  Q    Okay.  All right.  Thank you.  Prior to assuming your role

17  as the authorized representative of the Plaintiff, you had

18  never had meaningful responsibility for making investment

19  decisions, correct?

20  A    I'm sorry.  You kind of talk a little bit fast.  Please

21  slow it down --

22  Q    That's okay.

23  A    -- and restate it.  Thank you.

24  Q    And I appreciate that.  And any time you don't understand

25  what I'm saying or I speak too fast, please do exactly what

1    you're doing.  You're doing fine.

2         Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24             THE COURT:  Just a moment.  I think there's an

25   objection.

 1 ||            MR. MORRIS:  Uh-huh.

 2 ||            THE COURT:  Go ahead.

 3 ||            MR. ANDERSON:  So far -- relevance, Your Honor.  This

 4 || is way out of the bounds of the contempt proceeding.  You

 5 || know, what he did as a young person with Yahoo! stock.  We're

 6 || here to -- he authorized the lawsuit.  They filed the lawsuit.

 7 || That's it.  Getting into all this peripheral stuff is

 8 || completely irrelevant.

 9 ||            THE COURT:  Your response?

10 ||            MR. MORRIS:  My response, Your Honor, is very simple.

11 || Mr. Patrick assumed responsibility, and you're going to be

12 || told that he exercised full and complete authority over a $200

13 || million fund that was created by Mr. Dondero, --

14 ||            THE COURT:  Okay.

15 ||            MR. MORRIS:  -- that funds -- that is funded

16 || virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17 || lovely man, and I don't mean to disparage him at all -- but he

18 || has no meaningful experience in investing at all.

19 ||            THE COURT:  All right.  Counsel, I overrule.  I think

20 || there's potential relevance.

21 ||      And may I remind people that when you're back at counsel

22 || table, please make sure you speak your objections into the

23 || microphone.  Thank you.

24 || BY MR. MORRIS:

25 || Q    When you were a young lawyer, sir, you were on the board

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 18-10 Filed 09/30/21 Page 148 of 213 PageID 2814

Patrick - Direct                                    102

 1   of a nonprofit that received a donation of Yahoo! stock and

 2   the board looked to you for guidance, correct?

 3   A    Yes, correct.

 4   Q    And -- but during your 13 years at Highland, you never had

 5   formal responsibility for making investment decisions,

 6   correct?

 7   A    That is correct.

 8   Q    Yeah.  In fact, other than investment opportunities that

 9   you personally presented where you served as a co-decider, you

10   never had any responsibility or authority to make investment

11   decisions on behalf of HCMLP or any of its affiliated

12   entities, correct?

13   A    That is correct.

14   Q    And at least during your deposition, you couldn't identify

15   a single opportunity where you actually had the authority and

16   did authorize the execution of a transaction on behalf of

17   HCMLP or any of its affiliates, correct?

18   A    Correct.

19   Q    And yet today you are now solely responsible for making

20   all investment decisions with respect to a $200 million

21   charitable fund, correct?

22   A    Yes, but I get some help.  I've engaged an outside third

23   party called ValueScope, and they have been as -- effectively

24   working as a "gatekeeper" for me, and I look to them for

25   investment guidance and advice, and I informally look to Mr.

002042

Patrick - Direct                                           103

1    Dondero since the time period of when I took control on March

2    24th for any questions I may have with respect to the

3    portfolio.  So I don't feel like I'm all by myself in making

4    decisions.

5    Q    Okay.  I didn't mean to suggest that you were, sir, and I

6    apologize if you took it that way.  I was just asking the

7    question, you are the person now solely responsible for making

8    the investment decisions, correct?

9    A    Yes.

10   Q    Okay.  Let's talk about the circumstances that led to the

11   filing of the complaint for a bit.  On April 12, 2021, you

12   caused the Plaintiffs to commence an action against HCMLP and

13   two other entities, correct?

14   A    Correct.

15   Q    Okay.  One of the binders -- you've got a couple of

16   binders in front of you.  If you look at the bottom, one of

17   them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18   could grab that one and turn to Exhibit 12.  Do you have that,

19   sir?

20   A    It says -- it says the original complaint.  Is that the

21   right one?

22   Q    That is the right one.  And just as I said when we were

23   doing this virtually last Friday, if I ask you a question

24   about a particular document, you should always feel free to

25   review as much of the document as you think you need to

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 30    Filed 09/40/23    Page 150 of 213    PageID 2416

Patrick - Direct                                              104

 1  competently and fully answer the question.  Okay?

 2  A    Okay.  Thank you.

 3  Q    All right.  You instructed the Sbaiti firm to file that

 4  complaint on behalf of the Plaintiffs, correct?

 5  A    Correct.

 6  Q    And to the best of your recollection, the Plaintiffs

 7  returned -- retained the Sbaiti firm in April, correct?

 8  A    Correct.

 9  Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 18-10   Filed 09/14/22   Page 151 of 213   PageID 2467

Patrick - Direct                                            105

1  A    Yes.  After he brought certain information to myself and

2  then that I engaged the Sbaiti firm to launch an

3  investigation, I also wanted Mr. Dondero to work with the

4  Sbaiti firm with respect to their investigation of the

5  underlying facts.

6  Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7  but he did communicate with the Sbaiti firm about the

8  complaint, correct?

9  A    I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q    Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A    Correct.

17  Q    And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A    That is correct.

21  Q    At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A    I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general

1  awareness that there was a HarbourVest something or other, but

2  the specific aspects of it, I was unaware.

3  Q    Okay.  And you had no reason to believe that Mr. Seery had

4  done anything wrong with respect to the HarbourVest

5  transaction at the time you became the Plaintiffs' authorized

6  representative, correct?

7  A    That is correct.

8  Q    But you recall very specifically that some time after

9  March 24th Mr. Dondero told you that an investment opportunity

10 was essentially usurped or taken away, to the Plaintiffs' harm

11 and for the benefit of HCMLP, correct?

12 A    That is correct.

13 Q    And after Mr. Dondero brought this information to your

14 attention, you hired the Sbaiti firm to launch an

15 investigation into the facts, correct?

16 A    Correct.

17 Q    You had never worked with the Sbaiti firm before, correct?

18 A    That is correct.

19 Q    And you had hired many firms as a tax counselor at HCMLP,

20 but not the Sbaiti firm until now.  Correct?

21 A    That is correct.

22 Q    You got to the Sbaiti firm through a recommendation from

23 D.C. Sauter, correct?

24 A    Correct.

25 Q    Mr. Sauter is the in-house counsel, the in-house general

1   counsel at NexPoint Advisors, correct?

2   A    Correct.

3   Q    You didn't ask Mr. Sauter for a recommendation for a

4   lawyer; he just volunteered that you should use the Sbaiti

5   firm.  Correct?

6   A    That is correct.

7   Q    And you never used -- considered using another firm, did

8   you?

9   A    When they were presented to me, they appeared to have all

10  the sufficient skills necessary to undertake this action, and

11  so I don't recall interviewing any other firms.

12  Q    Okay.  Now, after bringing the matter to your action, Mr.

13  Dondero communicated directly with the Sbaiti firm in relation

14  to the investigation that was being undertaken.  Correct?

15  A    That is correct.

16  Q    But you weren't privy to the communications between Mr.

17  Dondero and the Sbaiti firm, correct?

18  A    I did not participate in those conversations as the --

19  what I, again, considered Mr. Dondero as the investment

20  advisor to the portfolio, and he was very versant in the

21  assets.  I wanted him to participate in the investigation that

22  the Sbaiti firm was undertaking prior to the filing of this

23  complaint.

24  Q    Let's talk for a minute about the notion of Mr. Dondero

25  being the investment advisor.  Until recently, the entity

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B Document 18-10 Filed 09/14/22 Page 454 of 521 PageID 2820

Patrick - Direct                                108

 1  known as the DAF had an investment advisory committee with HC

 2  -- an investment advisory agreement with HCMLP.  Correct?

 3  A   It's my understanding that the investment advisory

 4  agreement existed with the Plaintiffs, CLO Holdco, as well as

 5  Charitable DAF Fund, LP, up and to the end of February,

 6  throughout the HarbourVest transaction.

 7  Q   Okay.  And since February, the Plaintiffs do not have an

 8  investment advisory agreement with anybody, correct?

 9  A   That is correct.

10  Q   Okay.  So Mr. Dondero, if he serves as an investment

11  advisor, it's on an informal basis.  Is that fair?

12  A   After I took control, he serves as an informal investment

13  advisor.

14  Q   Okay.  So there's no contract that you're aware of between

15  either of the Plaintiffs and Mr. Dondero pursuant to which he

16  is authorized to act as the investment advisor for the

17  Plaintiffs, correct?

18  A   That is correct.

19  Q   Okay.  When you communicated with Grant Scott --

20  withdrawn.  You know who Grant Scott is, right?

21  A   Yes, I do.

22  Q   He's the gentleman who preceded you as the authorized

23  representative of the Plaintiffs, correct?

24  A   Yes.

25  Q   Okay.  You communicated with Mr. Scott from time to time

Patrick - Direct                                    109

1    during February and March 2021, correct?

2    A    February and March are the dates?  Yes.

3    Q    Yeah.  And from February 1st until March 21st -- well,

4    withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5    Plaintiffs' authorized representative, correct?

6    A    Correct.

7    Q    And you have no recollection of discussing with Mr. Scott

8    at any time prior to March 24th any aspect of the HarbourVest

9    settlement with Mr. Scott.  Correct?

10   A    Correct.

11   Q    And you have no recollection of discussing whether the

12   Plaintiffs had potential claims that might be brought against

13   the Debtor.  Correct?  Withdrawn.  Let me ask a better

14   question.

15        You have no recollection of discussing with Mr. Scott at

16   any time prior to March 24th whether the Plaintiffs had

17   potential claims against the Debtor.  Correct?

18   A    That is correct.

19   Q    You and Mr. Scott never discussed whether either of --

20   either of the Plaintiffs had potential claims against Mr.

21   Seery.  Correct?

22   A    Correct.

23   Q    Okay.  At the time that you became their authorized

24   representative, you had no knowledge that the Plaintiffs would

25   be filing a complaint against the Debtors relating to the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB Document 18-1 Filed 09/14/23 Page 456 of 213 PageID 2322

Patrick - Direct                                110

    1  HarbourVest settlement less than three weeks later, correct?
    2  A    That is correct.
    3  Q    Okay.  Now, if you look at Page 2 of the complaint, you'll
    4  see at the top it refers to Mr. Seery as a potential party.
    5  Do you see that?
    6  A    Yes, I do.
    7  Q    Okay.  You don't know why Mr. Seery was named --
    8  withdrawn.  You don't know why Mr. Seery was not named as a
    9  defendant in the complaint, correct?
   10  A    No, I -- that's correct.  I do not know why he was not
   11  named.  That's in the purview of the Sbaiti firm.
   12  Q    Okay.  And the Sbaiti firm also made the decision to name
   13  Mr. Seery on Page 2 there as a potential party when drafting
   14  the complaint, correct?
   15  A    That's what the document says.
   16  Q    And you weren't involved in the decision to identify Mr.
   17  Seery as a potential party, correct?
   18  A    That is correct.  Again, I rely on the law firm to decide
   19  what parties to bring a suit to -- against.
   20  Q    Okay.  Okay.  Do you recall the other day we talked about
   21  a document called the July order?
   22  A    Yes.
   23  Q    Okay.  That's in -- that's in Tab 16 in your binder, if
   24  you can turn to that.  And take a moment to look at it, if
   25  you'd like.  And my first question is simply whether this is

Patrick - Direct                                    111

1  the July order, as you understand it.

2       (Pause.)

3  A   Yes, it is.  I was just looking for the gatekeeper

4  provision.  It looks like it's Paragraph 5.  So, --

5  Q   Okay.  Thank you for that.  About a week after the

6  complaint was filed, you authorized the Plaintiffs to file a

7  motion in the District Court for leave to amend the

8  Plaintiffs' complaint to add Mr. Seery as a defendant.

9  Correct?

10 A   I authorized the filing of a motion in Federal District

11 Court that would ask the Federal District Court whether or not

12 Jim Seery could be named in the original complaint with

13 respect to the gatekeeper provision cited in that motion and

14 with respect to the arguments that were made in that motion.

15 Q   Okay.  Just to be clear, if you turn to Exhibit 17, the

16 next tab, --

17 A   I'm here.

18 Q   -- do you see that document is called Plaintiffs' Motion

19 for Leave to File First Amended Complaint?

20 A   Yes.

21 Q   And that's the document that you authorized the Plaintiffs

22 to file on or about April 19th, correct?

23 A   Correct.

24 Q   Okay.  And can we refer to that document as the motion to

25 amend?

Patrick - Direct                                    112

1    A    Yes.

2    Q    Okay.  You were aware of the July order at Tab 16 before

3    you authorized the filing of the motion to amend.  Correct?

4    A    Yes, because it's cited in the motion itself.

5    Q    Okay.  And at the time that you authorized the filing of

6    the motion to amend, you understood that the July order was

7    still in effect.  Correct?

8    A    Yes, because it was referenced in the motion, so my

9    assumption would be it would still be in effect.

10   Q    Okay.  Before the motion to amend was filed, you're -- you

11   are aware that my firm and the Sbaiti firm communicated by

12   email about the propriety of filing the motion to amend?

13   A    Before it was filed?  Communications between your firm and

14   the Sbaiti firm?  I would have to have my recollection

15   refreshed.

16   Q    I'll just ask the question a different way.  Did you know

17   before you authorized the filing of the motion to amend that

18   my firm and the Sbaiti firm had engaged in an email exchange

19   about the propriety of filing the motion to amend in the

20   District Court?

21   A    It's my recollection -- and again, I could be wrong here

22   -- but I thought the email exchange occurred after the fact,

23   not before.  But again, I -- I just --

24   Q    Okay.  In any event, on April 19th, the motion to amend

25   was filed.  Correct?

002052

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 30   Filed 09/19/23   Page 159 of 213   PageID 2325

Patrick - Direct                               113

1   A    Correct.

2   Q    That's the document that is Exhibit 17.  And you

3   personally authorized the Sbaiti firm to file the motion to

4   amend on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And you authorized the filing of the motion to amend with

7   knowledge -- withdrawn.

8        Can you read the first sentence of the motion to amend out

9   loud, please?

10  A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11  15 of the Federal Rules of Civil Procedure for one purpose:

12  to name as defendant one James P. Seery, Jr., the CEO of

13  defendant Highland Capital Management, LP (HCM) and the chief

14  perpetrator of the wrongdoing that forms the basis of the

15  Plaintiffs' causes of action.

16  Q    And does that fairly state the purpose of the motion?

17            MR. SBAITI:  Objection, Your Honor.  Asks him to make

18  a legal conclusion about the purpose of the legal motion filed

19  in court that he didn't draft.

20            THE COURT:  Okay.  I overrule.  You can answer if you

21  have an answer.

22            THE WITNESS:  It's always been my general

23  understanding that the purpose of filing this motion was to go

24  to the Federal District Court and ask that Court of reference

25  to this Court whether or not Mr. Seery could be named with

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 38-10   Filed 09/30/22   Page 160 of 213   PageID 2326

Patrick - Direct                        114

1   respect to the original complaint, citing again the gatekeeper

2   provisions and citing the various arguments that we've heard

3   much earlier.

4   BY MR. MORRIS:

5   Q    Okay.  You personally didn't learn anything between April

6   9th, when the complaint was filed, and April 19th, when the

7   motion to amend was filed, that caused you to authorize the

8   filing of the motion to amend, correct?

9   A    That is correct.

10  Q    In fact, you relied on the Sbaiti firm with respect to

11  decisions concerning the timing of the motion to amend.

12  Correct?

13  A    Correct.

14  Q    And you had no knowledge of whether anyone acting on

15  behalf of the Plaintiffs ever served the Debtor with a copy of

16  the motion to amend.  Correct?

17  A    Yes.  I have no knowledge.

18  Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19  provided my firm with a copy of the motion to amend.  Correct?

20  A    I cannot recall one way or another.

21  Q    Okay.  You never instructed anyone on behalf -- acting on

22  behalf of the Plaintiffs to inform the Debtor that the motion

23  to amend had been filed, correct?

24  A    That is correct.

25  Q    And that's because you relied on the Sbaiti firm on

002054

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 10 Filed 09/12/23 Page 161 of 213 PageID 2327

Patrick - Direct                                       115

1    procedural issues, correct?

2    A    That is correct.

3    Q    You didn't consider waiting until the Debtor --

4        (Interruption.)

5    Q    -- had appeared in the action before authorizing the

6    filing of the motion --

7    A    Yeah, --

8            THE COURT:  Yes.  Y'all are being a little bit loud.

9    Okay.

10           A VOICE:  Sorry.

11           MR. MORRIS:  No problem.

12           MR. PHILLIPS:  I've heard that before, Your Honor,

13   and I apologize.

14           THE COURT:  I bet you have.  Thank you.

15           MR. MORRIS:  Admonish Mr. Phillips, please.

16           THE COURT:  Okay.

17           MR. MORRIS:  He's always the wild card.

18           MR. PHILLIPS:  I admonish --

19           MR. MORRIS:  He's always the wild card.

20           MR. PHILLIPS:  I admonish myself.

21           THE COURT:  All right.  I think he got the message.

22   Continue.

23   BY MR. MORRIS:

24   Q    You didn't consider waiting until the Debtor had appeared

25   in the action before filing the motion to amend, correct?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01603-B    Document 18-1    Filed 09/15/22    Page 162 of 213    PageID 2328

Patrick - Direct                          116

 1  A    Again, I am the client and I rely upon the law firm that's

 2  engaged with respect to making legal decisions as to the

 3  timing and notice and appearance and what have you.  I'm a tax

 4  lawyer.

 5  Q    Okay.  You wanted the District Court to grant the relief

 6  that the Plaintiffs were seeking.  Correct?

 7  A    I wanted the District Court to consider, under the

 8  gatekeeper provisions of this Court, whether or not Mr. Seery

 9  could be named in the original complaint.  That's -- that,

10  from my perspective, is what was desired.

11  Q    All right.  You wanted the District Court to grant the

12  relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14  answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17  as not necessarily asking for specific relief, but asking the

18  Federal District Court whether or not, under the gatekeeper

19  provision, that Mr. Seery could be named on there.  What

20  happens after that would be a second step.  So I kind of -- I

21  dispute that characterization.

22  BY MR. MORRIS:

23  Q    All right.  I'm going to cross my fingers and hope that

24  Ms. Canty is on the line, and I would ask her to put up Page

25  57 from Mr. Patrick's deposition transcript.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 30    Filed 09/27/23    Page 163 of 213    PageID 2529

Patrick - Direct                                    117

1          THE COURT:  There it is.

2          MR. MORRIS:  There it is.  It's like magic.  Can we

3  go down to Lines 18 through 20?

4  BY MR. MORRIS:

5  Q   Mr. Patrick, during the deposition on Friday, did I ask

6  you this question and did you give me this answer?  Question,

7  "Did you want the Court to grant the relief you were seeking?"

8  Answer, "Yes."

9  A   I -- and it was qualified with respect to Lines 12 through

10  17.  In my view, when I answered yes, I was simply restating

11  what I stated in Line 12.  I wanted the District Court to

12  consider this motion as to whether or not Mr. Seery could be

13  named in the original complaint or the amended complaint

14  pursuant to the existing gatekeeper rules and the arguments

15  that were made in that motion.  That's -- that's what I

16  wanted.  And so then when I was asked, did you want the Court

17  to grant the relief that you were seeking, when I answered

18  yes, it was from that perspective.

19  Q   Okay.  Thank you very much.  If the District Court had

20  granted the relief that you were seeking, you would have

21  authorized the Sbaiti firm to file the amended complaint

22  naming Mr. Seery as a defendant if the Sbaiti firm recommended

23  that you do so.  Correct?

24  A   If the Sbaiti firm recommended that I do so.  That is

25  correct.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 30 Filed 09/14/2021 Page 164 of 213 PageID 2530

Patrick - Direct                              118

 1  Q    Okay.  Let's talk for a little bit about the line of

 2  succession for the DAF and CLO Holdco.  Can we please go to

 3  Exhibit 25, which is in the other binder?  It's in the other

 4  binder, sir.

 5       (Pause.)

 6  Q    I guess you could look on the screen or you can look in

 7  the binder, whatever's easier for you.

 8  A    Yeah.  I prefer the screen.  I prefer the screen.

 9  Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20           MR. MORRIS:  Your Honor, may I interrupt?

21           THE COURT:  You may.

22           MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B Document 18-10 Filed 09/15/23 Page 165 of 213 PageID 2531

Patrick - Direct                                119

 1   to tell me.  But I just want to understand what this chart is.
 2   This chart is the DAF, CLO Holdco, structure chart.  Correct?
 3   A    Correct.
 4   Q    Okay.  And you were personally involved in creating this
 5   organizational structure, correct?
 6   A    I -- yes.
 7   Q    Okay.  And from time to time, the Charitable DAF Holdco
 8   Limited distributes cash to the foundations that are above it.
 9   Correct?
10   A    Correct.
11   Q    All right.  I want to talk a little bit more specifically
12   about how this happens.  The source of the cash distributed by
13   Charitable DAF Holdco Limited is CLO Holdco, Ltd., that
14   entity, the Cayman Islands entity near the bottom.  Correct?
15          MR. ANDERSON:  Your Honor, I have an objection.
16   Completely irrelevant.  I'm objecting on relevance grounds.
17   This has nothing to do with the contempt proceeding.  We've
18   already gone over that he authorized the filing of the
19   complaint, that he authorized the filing of the motion to
20   amend.  It's all in the record.  This is completely irrelevant
21   at this point.
22          THE COURT:  Okay.  Relevance objection.  Your
23   response?
24          MR. MORRIS:  I believe that it's relevant to the
25   Debtor's motion to hold Mr. Dondero in contempt for pursuing

1    claims against Mr. Seery, in violation of the July 7 order.  I

2    think an understanding of what the Plaintiffs are, how they're

3    funded, and Mr. Dondero's interest in pursuing claims on

4    behalf of those entities is relevant to the -- to the -- just

5    -- it's just against him.  It's not against their clients,

6    frankly.  It's just against Mr. Dondero.

7              THE COURT:  I overrule.

8              MR. MORRIS:  I'll try and -- I'll try and make this

9    quick, though.

10   BY MR. MORRIS:

11   Q    CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A    Two primary sources of capital?

14   Q    Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A    That is correct.

17   Q    And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A    Correct.

20   Q    And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A    Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 30   Filed 09/17/23   Page 167 of 213 PageID 2533

Patrick - Direct                          121

 1  expired in 2011, was originally funded by Mr. Dondero.

 2  Q   Okay.  So, so the Charitable Remainder Trust that we were

 3  talking about on Friday wasn't seeded with capital from

 4  Highland Capital Management, it came from Mr. Dondero

 5  personally?

 6  A   That is correct.

 7  Q   Okay.  Thank you.  And the other primary source of capital

 8  was the Dallas Foundation, the entity that's in the upper

 9  left-hand corner of the chart.  Is that correct?

10  A   No.

11  Q   The -- you didn't tell me that the other day?

12  A   You said -- you're pointing to the Dallas Foundation.

13  That's a 501(c)(3) organization.

14  Q   I apologize.  Did you tell me the other day that the

15  Dallas Foundation was the second source of capital for HCLO

16  Hold Company?

17  A   No, I did not.  You --

18      (Pause.)

19  Q   Maybe I know the source of the confusion.  Is the Highland

20  Dallas Foundation something different?

21  A   Yes.  On this organizational chart, you'll see that it has

22  an indication, it's a supporting organization.

23  Q   Ah, okay.  So, so let me restate the question, then.  The

24  second primary source of capital for CLO Holdco, Ltd. is the

25  Highland Dallas Foundation.  Do I have that right?

Patrick - Direct                                    122

1   A    Yes.

2   Q    Okay.  And the sources of that entity's capital were

3   grantor trusts and possibly Mr. Dondero personally.  Correct?

4   A    In addition -- per my refreshing my recollection from our

5   deposition, the other Charitable Remainder Trust, I believe

6   Charitable Remainder Trust No. 1, which expired later, also

7   sent a donation, if you will, or assets to -- and I cannot

8   recall specifically whether it was just the Highland Dallas

9   Foundation or the other supporting organizations that you see

10  on this chart.

11  Q    But the source of that -- the source of the assets that

12  became the second Charitable Remainder Trust was Highland

13  Capital Management, LP.  Is that right?

14  A    I think that is accurate from my recollection.  And again,

15  I'm talking about Charitable Remainder Trust No. 1.

16  Q    Okay.  So is it fair to say -- I'm just going to try and

17  summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18  is the investment arm of the organizational structure on this

19  page?

20  A    Yes.

21  Q    And is it fair to say that nearly all of the assets that

22  are in there derived from either Mr. Dondero, one of his

23  trusts, or Highland Capital Management, LP?

24  A    Yes.  It's like the Bill Gates Foundation or the

25  Rockefeller Foundation.  These come from the folks that make

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 1830   Filed 09/29/23   Page 169 of 213   PageID 2345

Patrick - Direct                                    123

1  || their donations and put their name on it.

2  || Q    Okay.

3  ||         MR. MORRIS:  Now, now, Your Honor, I'm going to go

4  || back just for a few minutes to how Mr. Scott got appointed,

5  || because I think that lays kind of the groundwork for his

6  || replacement.  It won't take long.

7  ||         THE COURT:  Okay.  I have a question either --

8  ||         MR. MORRIS:  Sure.

9  ||         THE COURT:  -- for you or the witness.  I'm sorry,

10 || but --

11 ||         MR. MORRIS:  Sure.  Yeah.

12 ||         THE COURT:  -- the organizational chart, it's not

13 || meant to show everything that might be connected to this

14 || substructure, right?  Because doesn't CLO Holdco, Ltd. own

15 || 49.02 percent of HCLOF, --

16 ||         MR. MORRIS:  That --

17 ||         THE COURT:  -- which gets us into the whole

18 || HarbourVest transaction issue?

19 ||         MR. MORRIS:  You're exactly right, Your Honor.

20 ||         THE COURT:  Okay.

21 ||         MR. MORRIS:  But that's just an investment that HCLO

22 || Holdco made.

23 ||         THE COURT:  Right.

24 ||         MR. MORRIS:  Right?  And so I -- let me ask the

25 || witness, actually.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 1-10   Filed 09/30/21   Page 170 of 213   PageID 2536

Patrick - Direct                                    124

1          THE COURT:  Okay.  Thank you.  Thank you.

2          MR. MORRIS:  Let me ask the witness.  Yeah.

3          THE COURT:  I just want my brain --

4          MR. MORRIS:  Right.

5          THE COURT:  -- to be complete on this chart.

6   BY MR. MORRIS:

7   Q    Mr. Patrick, there are three entities under CLO Holdco,

8   Ltd.  Do you see that?

9   A    Yes.

10  Q    And does CLO Holdco, Ltd. own one hundred percent of the

11  interests in each of those three entities?

12  A    Yes.

13  Q    Do you know why those three entities are depicted on this

14  particular chart?  Is it because they're wholly-owned

15  subsidiaries?

16  A    Correct.

17  Q    Okay.  And CLO Holdco, Ltd. has interests in other

18  companies.  Isn't that right?

19  A    It has other investments.  That is correct.

20  Q    And the reason that they're not depicted on here is

21  because they're not wholly-owned subsidiaries, they're just

22  investments; is that fair?

23  A    That is fair.

24         MR. MORRIS:  Does that--?

25         THE COURT:  Yes.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BB Document 1-30 Filed 09/16/21 Page 171 of 213 PageID 2537

Patrick - Direct                                        125

1              MR. MORRIS:  Okay.

2              THE COURT:  Uh-huh.

3    BY MR. MORRIS:

4    Q    So, so let's go back to Mr. Grant for a moment.  Mr.

5    Scott, rather.  Mr. Dondero was actually the original general

6    partner.  If you look at this chart, while it's still up here,

7    you see on the left there's Charitable DAF GP, LLC?

8    A    Yes.

9    Q    And the Charitable DAF GP, LLC is the general partner of

10   the Charitable DAF Fund, LP.  Correct?

11   A    Correct.

12   Q    And on this chart, Grant Scott was the managing member of

13   Charitable DAF GP, LLC.  Right?

14   A    Correct.

15   Q    Okay.  But Mr. Dondero was the original general partner of

16   that entity, correct?

17   A    That is correct.  But I do want to point out, I just note

18   that the GP interest is indicating a one percent interest and

19   the 99 interest to Charitable DAF Holdco.  I believe that's

20   incorrect.  It's a hundred percent by Charitable DAF Holdco,

21   Ltd., and the Charitable DAF GP interest is a noneconomic

22   interest.  So that should actually reflect a zero percent to

23   the extent it may indicate some sort of profits or otherwise.

24   Q    Okay.  Thank you for the clarification.  Can you turn to

25   Exhibit 26, please, in your binder?  And is it your

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 3-10 Filed 09/27/23 Page 172 of 213 PageID 2538

Patrick - Direct                                126

 1  understanding that that is the amended and restated LLC

 2  agreement for the DAF GP, LLC?

 3  A   Yes.

 4  Q   Okay.  And this was amended and restated effective as of

 5  January 1st, 2012, correct?

 6  A   Yes.

 7  Q   And if you go to the last page, you'll see there are

 8  signatures for Mr. Scott and Mr. Dondero, correct?

 9  A   Yes.

10  Q   And Mr. Dondero is identified as the forming -- former

11  managing member and Mr. Scott is identified as the new

12  managing member.   Correct?

13  A   Correct.  That's what the document says.

14  Q   And it's your understanding that Mr. Dondero had the

15  authority to select his successor.  Correct?

16  A   Correct.

17  Q   In fact, it's based on your understanding of documents and

18  your recollection that Mr. Dondero personally selected Mr.

19  Scott as the person he was going to transfer control to,

20  correct?

21  A   Upon advice of Highland Capital Management's tax

22  compliance officer, Mr. Tom Surgent.

23  Q   What advice did Mr. Surgent give?

24  A   He gave advice that, because Mr. Dondero -- and this is

25  what I came to an understanding after the fact of this

002066

1   transaction, because I was not a part of it -- that by Mr.

2   Dondero holding that GP interest, that it would be -- the

3   Plaintiffs, if you will, would be an affiliate entity for

4   regulatory purposes, and so he advised that if he -- if Mr.

5   Dondero transferred his GP interest to Mr. Scott, it would no

6   longer be an affiliate, is my recollection.

7   Q    Okay.  You didn't appoint Mr. Scott, did you?

8   A    No.

9   Q    That was Mr. Dondero.  Is that right?

10  A    Yes.

11  Q    Okay.  Let's go to 2021.  Let's come back to the current

12  time.  Sometime in February, Mr. Scott called you to ask about

13  the mechanics of how he could resign.  Correct?

14  A    That is correct.

15  Q    But the decision to have you replace Mr. Scott was not

16  made until March 24th, the day you sent an email to Mr. Scott

17  with the transfer documents.  Correct?

18  A    That is correct.

19  Q    And it's your understanding that he could have transferred

20  the management shares and control of the DAF to anyone in the

21  world.  Correct?

22  A    Correct.

23  Q    That's what the docu... that he had the authority under

24  the documentation, as you understood it, to freely trade or

25  transfer the management shares.  Correct?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01505-B Document 18-1 Filed 09/04/23 Page 174 of 213 PageID 2540

Patrick - Direct                                   128

 1  A    Wait.  Now, let's be precise here.

 2  Q    Okay.

 3  A    Are you talking about the GP interests or the management

 4  shares held by Charitable DAF Holdco, Ltd.?

 5  Q    Let's start with the management shares.  Can you explain

 6  to the Court what the management shares are?

 7            MR. ANDERSON:  Your Honor?  Hang on one second.  Your

 8  Honor, I want to object again on relevance.  We're going way

 9  beyond the scope of the contempt issue, whether or not --

10            MR. MORRIS:  This is about control.

11            MR. ANDERSON:  -- the motion to amend somehow

12  violated the prior order of this Court.  Getting into the

13  management structure, transfer of shares, that's way outside

14  the bounds.  I object on relevance.

15            THE COURT:  Okay.  Relevance objection?

16            MR. MORRIS:  Your Honor, they have probably 30

17  documents, maybe 20 documents, on their exhibit list that

18  relate to management and control.  I'm asking questions about

19  management and control.  Okay?  This is important, again, to

20  (a) establish his authority, but (b) the circumstances under

21  which he came to be the purported control person.

22            THE COURT:  Okay.  Overruled.  Go ahead.

23            THE WITNESS:  It might be helpful to look at the

24  organizational chart, but if not -- but I'll describe it to

25  you again.  With respect to the entity called --

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 1-30    Filed 09/15/22    Page 175 of 213    PageID 2341

Patrick - Direct                                        129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2    organizational chart again, Ms. Canty, if you can?  There you

3    go.

4          THE WITNESS:  Okay.  So with respect to the

5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6    Scott, he organized that entity when he was the independent

7    director of the Charitable Remainder Trust, and he caused the

8    issuance of the management shares to be issued to himself.

9    And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q    Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A    It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

Patrick - Direct                              130

1  member-managed Delaware limited liability company.  And from

2  that, he -- that authority kind of trickles down to where he

3  can appoint directorships.

4  Q   All right.  I think I want to just follow up on that a

5  bit.  Which entity is the issuer of the manager shares, the

6  management shares?

7  A   Yeah, the -- per the organizational chart, it is accurate,

8  it's the Charitable DAF Holdco, Ltd. which issued the

9  management shares to Mr. Scott.

10  Q   Okay.  And that's why you have the arrow from Mr. Scott

11  into that entity?

12  A   Correct.

13  Q   And do those -- does the holder of the management shares

14  have the authority to control the Charitable DAF Holdco, Ltd.?

15  A   Yes.

16  Q   Okay.  And as the control person for the Charitable DAF

17  Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18  Holdco Limited owns a hundred percent of the limited

19  partnership interests of the Charitable DAF Fund, LP.

20  Correct?

21  A   Correct.

22  Q   And so does the holder of that hundred percent limited

23  partnership interest have the authority to decide who acts on

24  behalf of the Charitable DAF Fund, LP?

25  A   I would say no.  I mean, you know, just -- I would love to

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 8-10   Filed 09/16/22   Page 177 of 213   PageID 2343

Patrick - Direct                                    131

1    read the partnership agreement again.  But I, conceptually,

2    what I know with partnerships, I would say the limited partner

3    would not.  It would be through the Charitable DAF GP, LLC

4    interest.

5    Q    The one on the left, the general partner?

6    A    The general partner.

7    Q    I see.  So when Mr. Scott transferred to you the one

8    hundred percent of the management shares as well as the title

9    of the managing member of the Charitable DAF GP, LLC, did

10   those two events give you the authority to control the

11   entities below it?

12   A    Yes.

13   Q    Thank you.  And so prior to the time that he transferred

14   those interests to you, is it your understanding that Mr.

15   Scott had the unilateral right to transfer those interests to

16   anybody in the world?

17   A    Yes.

18   Q    Okay.  And you have that right today, don't you?

19   A    Yes, I do.

20   Q    If you wanted, you could transfer it to me, right?

21   A    Yes, I could.

22   Q    Okay.  But of all the people in the world, Mr. Scott

23   decided to transfer the management shares and the managing

24   member title of the DAF GP to you, correct?

25   A    Restate that question again?

Patrick - Direct                                132

1  Q    Of all the people in the world, Mr. Scott decided to

2  transfer it to you, correct?

3  A    Yeah.  Mr. Scott transferred those interests to me.

4  Q    Okay.  And you accepted them, right?

5  A    Yes.

6  Q    You're not getting paid anything for taking on this

7  responsibility, correct?

8  A    I am not paid by any of the entities depicted on this

9  chart.

10 Q    And Mr. Scott used to get $5,000 a month, didn't he?

11 A    I believe that's what he testified to.

12 Q    Yeah.  But you don't get anything, right?

13 A    Correct.

14 Q    In fact, you get the exact same salary and compensation

15 from Skyview that you had before you became the authorized

16 representative of the DAF entities and CLO Holdco.  Correct?

17 A    Correct.

18       MR. MORRIS:  Okay.  Your Honor, if I may just take a

19 moment, I may be done.

20       THE COURT:  Okay.

21    (Pause.)

22       MR. MORRIS:  Your Honor, I have no further questions.

23       THE COURT:  All right.  Pass the witness.  Any

24 examination of the witness?

25                      CROSS-EXAMINATION

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB Document 1830-1 Filed 09/19/23 Page 179 of 213 PageID 22345

Patrick - Cross                        133

```
 1   BY MR. ANDERSON:
 2   Q    Mr. Patrick, I just had a few follow-up questions.  When
 3   you authorized the filing of the lawsuit against Highland
 4   Capital Management, LP, Highland HCF Advisor Limited, and
 5   Highland CLO Funding, Limited, when that lawsuit was filed in
 6   April of this year, was Mr. Seery included as a defendant?
 7   A    No.
 8   Q    Have the two Plaintiffs in that lawsuit, have they
 9   commenced any lawsuit against Mr. Seery?
10   A    No.
11   Q    Have they pursued any lawsuit against Mr. Seery?
12   A    No.
13   Q    Have they pursued a claim or cause of action against Mr.
14   Seery?
15   A    No.
16   Q    At most, did the Plaintiffs file a motion for leave to add
17   Mr. Seery as a defendant?
18              MR. MORRIS:  Objection, Your Honor.  To the extent
19   that any of these questions are legal conclusions, I object.
20   He's using the word pursue.  If he's trying -- if he's then
21   going to argue that, But the witness testified that he didn't
22   pursue and that's somehow a finding of fact, I object.
23              THE COURT:  Okay.  I understand.
24              MR. MORRIS:  Yeah.
25              THE COURT:  But I overrule.  He can answer.
```

Patrick - Cross                                    134

1          MR. MORRIS:  That's fine.

2          THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B Document 830 Filed 07/17/08 Page 181 of 213 PageID 2347

Patrick - Cross                                      135

```
 1   Q    Was there any effort whatsoever to hide the prior order of

 2   the Bankruptcy Court?

 3   A    No.

 4           MR. ANDERSON:  Pass the witness.

 5           THE COURT:  Okay.  Other examination?

 6           MR. SBAITI:  Yes, Your Honor.  Just a couple of

 7   questions.

 8                         CROSS-EXAMINATION

 9   BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.
```

```
 1   Q    So did Mr. Dondero both have the control shares of the GP,
 2   LLC and DAF Holdco Limited?
 3   A    No, I believe not.  I believe he only held the Charitable
 4   DAF GP interest and that Mr. Scott at all times held the
 5   Charitable DAF Holdco, LTD interest, until he decided to
 6   transfer it to me.
 7   Q    Can you just tell us how Mr. Scott came to hold the
 8   control shares of the Charitable DAF Holdco, LTD?
 9   A    When he was the independent trustee of the Charitable
10   Remainder Trust, he caused that -- the creation of that
11   entity, and that's how he became in receipt of those
12   management shares.
13   Q    And does the Charitable DAF GP, LLC have any control over
14   Charitable DAF Fund, LP's actions or activities?
15   A    Yes, it does.
16   Q    What kind of control is that?
17   A    I would describe complete control.  It's the managing
18   member of that entity and can -- and effectively owns, you
19   know, the hundred percent interest in the respective
20   subsidiaries, and so the control follows down.
21   Q    And when did Mr. Scott replace Mr. Dondero as the GP --
22   managing member of the GP?
23   A    Well, I think as the -- and Mr. Morris had shown me with
24   respect to that transfer occurring on March 2012.
25   Q    So nine years ago?
```

1    A    Yes.

2    Q    Does Mr. Dondero today exercise any control over the

3    activities of the DAF Charitable -- the Charitable DAF, GP or

4    the Charitable DAF Holdco, LTD?

5    A    No.

6    Q    Is he a board member of sorts for either of those

7    entities?

8    A    No.

9    Q    Is he a board members of CLO Holdco?

10   A    No.

11   Q    Does he have any decision-making authority at CLO Holdco?

12   A    None.

13   Q    The decision to authorize the lawsuit and the decision to

14   authorize the motion that you've been asked about, who made

15   that authorization?

16   A    I did.

17   Q    Did you have to ask for anyone's permission?

18   A    No.

19            MR. SBAITI:  No more questions, Your Honor.

20            THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21       All right.  Any redirect?

22                       REDIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q    Since becoming the authorized representative of the

25   Plaintiffs, have you ever made a decision on behalf of those

Patrick - Cross                                138

1   entities that Mr. Dondero disagreed with?

2   A    I have made decisions that were adverse to Mr. Dondero's

3   financial -- financial decision.  I mean, financial interests.

4   Whether he disagreed with them or not, I don't -- he has not

5   communicated them to me.  But they have been adverse, at least

6   two very strong instances.

7   Q    Have you ever -- have you ever talked to him about making

8   a decision that would be adverse to his interests?  Did he

9   tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                 EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

002078

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01053-B   Document 30   Filed 09/15/22   Page 135 of 213   PageID 2351

Patrick - Examination by the Court                139

1   Islands?

2             THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3   even though I'm a tax lawyer, so I won't get into the tax

4   rules, but the Cayman structure is modeled after what you

5   typically see in the investment management industry, and so I

6   -- and I won't reference specific entities here with respect

7   to the Highland case, but I think you'll note some

8   similarities, if you think about it.  They're -- it's

9   described as an offshore master fund structure where you have

10  a -- and that would be the Charitable DAF Fund that's

11  organized offshore, usually in the Cayman or Bermuda Islands,

12  where the general partner, typically, in the industry, holds

13  the management --

14            THE COURT:  Yeah.  Let --

15            THE WITNESS:  Okay.

16            THE COURT:  -- me just stop you.  I've seen this

17  enough --

18            THE WITNESS:  Yeah, it's

19            THE COURT:  -- to know that it happens in the

20  investment world.  But in --

21            THE WITNESS:  Yeah.

22            THE COURT:  You know, usually, I see 501(c)(3), you

23  know, domestically-created entities for charitable purposes,

24  so I'm just curious.

25            THE WITNESS:  Yes.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 30   Filed 09/16/22   Page 186 of 213   PageID 2352

Patrick - Examination by the Court          140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3     typically will have two different types of -- they call it

4     foreign feeder funds.  One foreign feeder fund is meant to

5     accommodate foreign investors; the other foreign feeder fund

6     is meant to accommodate U.S. tax-exempt investors.

7          Why, why is it structured that way?  In order to avoid

8     something called -- I was trying not to be wonkish -- UBTI.

9     That's, let's see, Un -- Unrelated Trader Business Income.  I

10    probably have that slightly wrong.  But it's essentially,

11    it's a means to avoid active business income, which includes

12    debt finance income, which is what these CLOs tend to be, that

13    would throw off income that would be taxable normally if the

14    exempts did not go through this foreign blocker, and it

15    converts that UBTI income -- it's called (inaudible) income --

16    into passive income that flows -- that flows up to the

17    charities.

18         And so it's very typical that you'll have a U.S. tax-

19    exempt investor, when they make an investment in a fund,

20    prefer to go through an offshore feeder fund, which is

21    actually Charitable DAF Holdco, LTD.  That's essentially what,

22    from a tax perspective, represents as a UBTI blocker entity.

23    And then you have the offshore investments being held offshore

24    because there's a variety of safe harbors where the receipt of

25    interest, the portfolio interest exception, is not taxable.

1    The creation of capital gains or losses under the -- they call

2    it the trading, 864(b) trading safe harbor, is not taxable.

3    So that's why you'll find these structures operating offshore

4    to rely on those safe harbor provisions as well as -- as well

5    as what I indicated with respect to the two type blocker

6    entities.  It's very typical and industry practice to organize

7    these way.  And so when this was set --

8          THE COURT:  It's very typical in the charitable world

9    to --

10         THE WITNESS:  In the investment management --

11         THE COURT:  -- form this way?

12         THE WITNESS:  In the investment management world,

13   when you have charitable entities that are taking some

14   exposure to assets that are levered, to set this structure up

15   in this way.  It was modeled after -- they just call them

16   offshore master fund structures.  They're known as Mickey

17   Mouse structures, where you'll have U.S. investors --

18         THE COURT:  Yes.  I -- yes, I --

19         THE WITNESS:  -- enter through a U.S. partnership,

20   and the foreign investors enter through a blocker.

21         THE COURT:  It was really just the charitable aspect

22   of this that I was --

23         THE WITNESS:  Yeah.  Yeah.

24         THE COURT:  -- getting at.

25         THE WITNESS:  Yeah.  No, but I'm just trying to

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B B Document 8410 Filed 09/08/2035 Page 188 of 213 PageID 2354

                        Patrick - Recross                    142

     1  emphasize if --

     2            THE COURT:  All right.  It's --

     3            THE WITNESS:  Yeah.

     4            THE COURT:  -- neither here nor there.  All right.

     5            MR. SBAITI:  Your Honor, may I ask a slightly

     6  clarifying leading question on that, because I think I

     7  understand what he was trying to say, just for the record?

     8            THE COURT:  Well, --

     9            MR. MORRIS:  I object.

    10            THE COURT:  -- I tell you what.  Anyone who wants to

    11  ask one follow-up question on the judge's question can do so.

    12  Okay?  You can go first.

    13            MR. SBAITI:  I'll approach, Your Honor.

    14            THE COURT:  Okay.

    15                        RECROSS-EXAMINATION

    16  BY MR. SBAITI:

    17  Q    Would it be a fair summary of what you were saying a

    18  minute ago that the reason the bottom end of that structure is

    19  offshore is so that it doesn't get taxed before the money

    20  reaches the charities on the U.S. side?

    21  A    Tax -- it converts the nature of the income that is being

    22  thrown off by the investments so that it becomes a tax

    23  friendly income to the tax-exempt entity.  Passive income.

    24  That's --

    25  Q    So, essentially, --

1          THE COURT:  Okay.  Okay.

2          MR. SBAITI:  -- so it doesn't get taxed before it

3    hits the --

4          THE COURT:  I said one question.

5          MR. SBAITI:  Sorry, Your Honor.

6          THE COURT:  Okay.  He answered it.

7          MR. PHILLIPS:  And I have one question, Your Honor

8          THE COURT:  Okay.

9          MR. PHILLIPS:  I don't know if I need to ask this

10   question, but I'd rather not ask you if I need to ask it.

11         THE COURT:  Go ahead.

12         MR. PHILLIPS:  But if I do, you know, I could --

13         THE COURT:  Go ahead.

14         MR. PHILLIPS:  Well, okay.

15                         RECROSS-EXAMINATION

16   BY MR. PHILLIPS:

17   Q    We've talked about the offshore structure.  Are the

18   foundations in the top two tiers of the organizational chart

19   offshore entities?

20   A    No.

21   Q    They're --

22   A    They're onshore entities.  They're tax-exempt entities.

23   Q    Thank you.

24   A    The investments are offshore.

25   Q    Thank you.

```
 1              THE COURT:  Mr. Morris?  One question.
 2                    FURTHER REDIRECT EXAMINATION
 3   BY MR. MORRIS:
 4   Q   Do you hold yourself out as an expert on the
 5   organizational structures in the Caribbean for charitable
 6   organizations?
 7   A    I hold myself out as a tax professional versant on setting
 8   up offshore master fund structures.  It's sort of a bread-and-
 9   butter thing.  But there are plenty of people that can testify
10   that this is very typical.
11   Q    Uh-huh.  Okay.
12              THE COURT:  Okay.  Thank you.
13       All right.  You are excused, Mr. Patrick.  I suppose
14   you'll want to stay around.  I don't know if you'll
15   potentially be recalled today.
16       (The witness steps down.)
17              THE COURT:  All right.  We should take a lunch break.
18   I'm going to put this out for a democratic vote.  Forty-five
19   minutes?  Is that good with everyone?
20              MR. SBAITI:  Do we have to leave the building to eat,
21   Your Honor, or is there food in the building?
22              THE COURT:  I think --
23              MR. SBAITI:  I'm sorry to ask that question, but --
24              THE COURT:  Yes.  You know what, there used to be a
25   very bad cafeteria, but I think it closed.  Right, Mike?  So,
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 10-10   Filed 09/12/23   Page 191 of 213   PageID 2357

145

1   you know, --

2           MR. SBAITI:  Sorry I asked that.

3           A VOICE:  Hate to miss that one.

4           THE COURT:  Is 45 minutes not enough since you have

5   to go off campus?  I'll give you an hour.  It just means we

6   stay later tonight.

7           A VOICE:  Can we just say 2:00 o'clock?

8           MR. SBAITI:  That's fine with us, Your Honor.

9           THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10  you then.

11          MR. SBAITI:  Thank you.

12          A VOICE:  Your Honor, can we just get a time check?

13          THE COURT:  Okay.

14          THE CLERK:  Yeah.  The Debtors are at an hour and

15  eleven minutes.  Respondents at an hour nineteen.

16          THE COURT:  And hour and eleven and an hour and

17  nineteen.

18          A VOICE:  Wait, that's not right.

19          A VOICE:  That can't be right.

20          A VOICE:  Two hours?  We started at --

21          THE COURT:  Okay.  So, again, their side, the

22  collective Respondents?

23          THE CLERK:  An hour and eleven, responding to your

24  questions, --

25          A VOICE:  Yeah, he's not recording --

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 13-0 Filed 09/27/22 Page 192 of 213 PageID 2358

146

 1          THE CLERK:  So an hour and eleven and an hour and
 2   nineteen.
 3          THE COURT:  But they were already over an hour --
 4          A VOICE:  Yeah.  It's been over three hours.
 5          THE COURT:  -- with opening statements.
 6          THE CLERK:  An hour and twelve.  Yes.  They were very
 7   short with the questioning.  It was only like --
 8          THE COURT:  Okay.  We'll double-check that over the
 9   break with the court reporter.
10          A VOICE:  All right.  Thank you, Your Honor.
11          THE COURT:  We'll double-check and let you know.
12          THE COURT:  All rise.
13      (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)
14          THE COURT:  All right.  Please be seated.  We're
15   going back on the record in Highland after our lunch break.
16   I'm going to confirm time.  We've had the Debtor an aggregate
17   of an hour and eleven minutes.  The Respondents, an aggregate
18   of an hour and twenty minutes.  Okay?  So we've gone two hours
19   and thirty-one minutes.
20      If it seems like we've been going longer, it's because we
21   did not do the clock on the opening matters regarding removal,
22   extension of time.  And then when I interjected with
23   questions, we stopped the clock.  All right?  So let's go.
24      You may call your next witness, Mr. Morris.
25          MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 1-10 Filed 09/13/22 Page 193 of 213 PageID 2359

Dondero - Direct                                    147

 1  James Dondero.

 2          THE COURT:   All right.

 3          A VOICE:  He had to step down the hall.  We had a

 4  little trouble getting through security.  Let me --

 5          THE COURT:  All right.  Mr. Dondero, you've been

 6  called as the next witness.  So if you'll approach our witness

 7  stand, please.  All right.  Please raise your right hand.

 8      (The witness is sworn.)

 9          THE COURT:  All right.  Please be seated.

10          JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                  DIRECT EXAMINATION

12  BY MR. MORRIS:

13  Q   Good afternoon, Mr. Dondero.

14  A   Good afternoon.

15  Q   Can you hear me?

16  A   Yes.

17  Q   Okay.  So, you were here this morning, correct?

18  A   Yes.

19  Q   All right.  So, we're going to put up -- we'll put it up

20  on the screen, but if you'd prefer to look at a hard copy in

21  the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22  turn to Exhibit 25.  Or you could just follow on the screen.

23  And this is a one-page document, so maybe that's easier.

24  A   Sure.

25  Q   Do you have it?  All right.

Dondero - Direct                              148

1    A    Yes.

2    Q    This is the organizational chart for what's known as the

3    DAF, correct?

4    A    Yes.

5    Q    And Mark Patrick set up this structure, correct?

6    A    I believe he coordinated.  I believe it was set up by

7    third-party law firms.  I believe it was Hutton or a firm like

8    that.

9    Q    Mr. Patrick participated in the creation of this structure

10   because you gave him the task of setting up a charitable

11   entity for Highland at that time, correct?

12   A    Yes.

13   Q    And you approved of this organizational structure,

14   correct?

15   A    Yes.

16   Q    And Grant Scott was the Trustee of the DAF for a number of

17   years, correct?

18   A    I often use that word, trustee, but technically I think

19   it's managing member.

20   Q    That's right.  I appreciate that.  I was using your word

21   from the deposition.  But is it fair to say that, to the best

22   of your knowledge, Grant Scott was the sole authorized

23   representative of the entity known as the DAF from 2011 until

24   just recently?

25   A    Sole -- I would describe it more he was in a trustee

Dondero - Direct                    149

1   function.

2   Q   Uh-huh.

3   A   Advice was being provided by Highland on the investment

4   side.  He wasn't expected to be a financial or an investment

5   expert.  And then accounting, tax, portfolio, tracking, you

6   know, compliance with all the offshore formation documents,

7   that was all done by Highland as part of a shared services

8   agreement.

9   Q   Okay.  I appreciate that, but listen carefully to my

10  question.  All I asked you was whether he was the authorized

11  representative, the sole authorized representative for the

12  ten-year period from 2011 until recently.

13  A   Yes.

14  Q   Okay.

15  A   I believe so.

16  Q   Thank you.  You served as the managing member of the DAF

17  GP, LLC before Mr. Scott, correct?

18  A   Yes.

19  Q   Okay.  And if you turn to Exhibit 26 in your binder,

20  that's the amended and restated limited liability company

21  agreement for the DAF GP, LLC, correct?

22  A   Yes.

23  Q   And on the last page, that's your signature line, right?

24  A   Yes.

25  Q   And you stepped down as the managing member on March 12,

1    2012, and were replaced by Mr. Scott, correct?

2    A    Yes.

3    Q    And as you recall it, Mr. Scott came to be appointed the

4    trustee of the DAF based on your recommendation, right?

5    A    Based on my recommendation?  Yes, I would say that's fair.

6    Q    And you made that recommendation to Mr. Patrick, right?

7    A    I -- I don't remember who I made the recommendation to.

8    But I would echo the testimony of Mark Patrick earlier that

9    the purpose of stepping down was to make the DAF unaffiliated

10   or independent versus being in any way affiliated.

11            MR. MORRIS:  I move to strike.

12   BY MR. MORRIS:

13   Q    And I'd ask you to listen carefully to my question.

14            THE COURT:  Sustained.

15   BY MR. MORRIS:

16   Q    You made the recommendation to Mr. Patrick, correct?

17   A    I would give the same answer again.

18   Q    Okay.

19            MR. MORRIS:  Can we please put up Mr. Dondero's

20   deposition transcript from last Friday at Page 297?

21        I believe, Your Honor, that the court reporter thought

22   that this was a continuation of a prior deposition, and that's

23   why the pages begin in the, you know, high in the 200s and not

24   at Page 1.  Just to avoid any confusion.

25   BY MR. MORRIS:

1  Q   Mr. Dondero, do you see the transcript in front of you?

2  A   Yes.

3  Q   Okay.  Were you asked this question and did you give this

4  answer?  "Who did you make the" -- question, "Who did you make

5  the recommendation to?"  Answer, "It would have been Mark

6  Patrick."

7  A   I don't recall right now as I sit here, and it seems like

8  I was speculating when I answered, but it -- it probably would

9  have been Mark Patrick.  I just don't have a specific

10  recollection.

11  Q   You made the recommendation to Mr. Patrick because he was

12  responsible for setting up the overall structure, correct?

13  A   I -- I can't testify to why I did something I don't

14  remember.  I think that would be --

15  Q   Can we --

16  A   -- speculative.

17  Q   Are you finished, sir?

18  A   Yeah.

19  Q   Okay.

20        MR. MORRIS:  Can we go to Page 299, please?

21  BY MR. MORRIS:

22  Q   Lines 6 through 10.  Did I ask this question and did you

23  give me this answer?  Question, "But why did you select Mr.

24  Patrick as the person to whom to make your recommendation?"

25  Answer, "Because he was responsible for setting up the overall

Dondero - Direct                                152

1    structure."

2        Were you asked that question and did you give that answer

3    last Friday?

4    A    Yes.

5    Q    Thank you.  But it's your testimony that you don't really

6    know what process led to Mr. Scott's appointment, correct?

7    A    No, I -- I said I was refreshed by Mark Patrick's

8    testimony earlier.

9    Q    Yeah.  Were you refreshed that, in fact, you specifically

10   had the authority to and did appoint Grant Scott as the

11   managing member of the DAF GP, LLC?

12   A    I -- I don't know.

13   Q    Well, you're referring to Mr. Patrick's testimony and I'm

14   asking you a very specific question.  Did you agree -- is your

15   memory refreshed now that you're the person who put Grant

16   Scott in the position in the DAF?

17   A    I -- I don't know if I owned those secret shares that --

18   well, they're not secret, but shares that could appoint

19   anybody on the planet.  I guess if I was in that box at that

20   time before Grant, then I would have had that ability.  I'm

21   not denying at all that I recommended Grant.  I'm just saying

22   I don't -- I don't remember if I went specifically to him or

23   if it was Thomas Surgent that was orchestrating it at the

24   time.  I don't remember.

25   Q    Do you deny that you had the authority to and that you did

1    appoint Grant Scott as your successor?

2            MR. TAYLOR:  Your Honor, objection to the extent it

3    calls for a legal conclusion.  I can't get close to a mic, so

4    --

5            THE COURT:  I overrule the objection.

6            THE WITNESS:  Can you repeat the question for me?

7    BY MR. MORRIS:

8    Q    Do you deny that you had the authority to and that you

9    did, in fact, appoint Grant Scott as your successor?

10   A    It'd be better to say I don't -- I don't -- no, I don't

11   remember or I didn't know the details at the time.  But,

12   again, I -- I assume I owned those shares.  And, again, I do

13   remember recommending Grant and -- but exactly how it

14   happened, I don't remember.

15   Q    Did you hear Mark Patrick say just an hour ago that you

16   appointed Grant Scott as your successor?

17           MR. SBAITI:  Objection, Your Honor.  Misstates

18   testimony.  The witness testified he transferred shares.

19   That's different than an appointment power.

20           THE COURT:  Response?  I can't remember the exact way

21   you worded it, to be honest.

22           MR. MORRIS:  Neither can I, but I'll even take it

23   that way.

24           THE COURT:  Okay.

25           MR. MORRIS:  I think he's wrong, but I'll even take

Dondero - Direct                          154

 1   it that way.

 2              THE COURT:  Okay.

 3   BY MR. MORRIS:

 4   Q   Mr. Dondero, did you listen to Mark Patrick say that you

 5   are the person who made the decision to transfer the shares to

 6   Mr. Scott in 2012?

 7   A   Yes, I heard him say that.

 8   Q   Okay.  So, do you -- do you dispute that testimony?

 9   A   I -- I don't have any better knowledge to dispute or

10   confirm.

11   Q   You and Mr. Scott have known each other since high school,

12   correct?

13   A   Yes.

14   Q   You spent a couple of years at UVA together, correct?

15   A   Yes.

16   Q   You were housemates together, correct?

17   A   Yes.

18   Q   He was the best man at your wedding, correct?

19   A   Yes.

20   Q   He's a patent lawyer, correct?

21   A   Yes.

22   Q   He had no expertise in finance when -- when he was

23   appointed as your successor to the DAF, correct?

24   A   Correct.

25   Q   To the best of your knowledge, at the time Mr. Scott

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 18-11   Filed 09/11/23   Page 201 of 213   PageID 2367

Dondero - Direct                    155

1  assumed his position, he had never made any decisions

2  concerning collateralized loan obligations, correct?

3  A    Correct, but he wasn't hired for that.  That wasn't his

4  position.

5  Q    Was he the person who was going to make the decisions with

6  respect to the DAF's investments?

7  A    My understanding on how it was structured was the DAF was

8  paying a significant investment advisory fee to Highland.

9  Highland was doing portfolio construction and the investment

10  selection of -- or the investment recommendations for the

11  portfolio.  There is an independent trustee protocol that I

12  believe was adhered to, but it was never my direct

13  involvement.  It was always the portfolio managers or the

14  traders.

15      You have to provide three similar or at least two other

16  alternatives, and then with a rationale for each of them, but

17  a rationale for why you think one in particular is better.

18  And the trustee looks at the three, evaluates them.  And the

19  way I understand it always worked, that it works at pretty

20  much every charitable trust or trust that I'm aware of, they

21  generally, if not always, pick alongside the -- or, pick the

22  recommendation of their highly-paid investment advisory firm.

23  Q    And are you the highly-paid investment advisory firm?

24  A    Highland was at the time, yes.

25  Q    And you controlled Highland, right?

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 3-10   Filed 09/13/22   Page 202 of 213   PageID 2368

Dondero - Direct                                    156

1    A    Yes.

2    Q    Okay.  But at the end of the day, is it your understanding

3    that Mr. Scott had the exclusive responsibility for making

4    actual decisions on behalf of the charitable trust that you

5    had created?

6    A    Yeah, I mean, subject to the protocol I just described.

7    Q    Yeah, okay, so let's keep going.  Mr. Scott had no

8    experience or expertise running charitable organizations at

9    the time you decided to transfer the shares to him, correct?

10   A    Yes, I believe that's correct.

11   Q    Okay.  You didn't recommend Mr. Scott to serve as the

12   DAF's investment advisor, did you?

13   A    No.

14   Q    And until early 2021, as you testified, I believe,

15   already, HCMLP served as the DAF's investment advisor,

16   correct?

17   A    Yes.

18   Q    And until early 2021, all of the DAF's day-to-day

19   operations were conducted by HCMLP pursuant to a shared

20   services agreement, correct?

21   A    Yes.

22   Q    And from the time the DAF was formed until January 9,

23   2020, you controlled HCMLP, correct?

24   A    Yes.

25   Q    You can't think of one investment decision that HCMLP

002096

```
 1   recommended that Mr. Scott ever rejected in the ten-year
 2   period, correct?
 3              MR. SBAITI:  Objection, Your Honor.  Lacks
 4   foundation.
 5              THE COURT:  Response?
 6              MR. MORRIS:  I'm not quite sure what to say, Your
 7   Honor.  The witness has already testified that HCMLP was the
 8   investment advisor, made recommendations to Mr. Scott, and
 9   that Mr. Scott was the one who had to make the investment
10   decisions at the end of the day.
11              MR. SBAITI:  He's not here as a witness for HCMLP.
12   He's here in his personal capacity.  There's no foundation
13   he'd have personal knowledge of which specific investments
14   were proposed, which ones were rejected or accepted.  He said
15   it was done by the portfolio manager.
16              THE COURT:  Okay.  I overrule.  He can answer if he
17   has an answer.
18   BY MR. MORRIS:
19   Q   Sir, you can't think of one investment decision that HCMLP
20   ever recommended to Mr. Scott that he rejected, correct?
21   A   I can't think of one, but I would caveat with I wouldn't
22   have expected there to be any.
23   Q   So you expected him to just do exactly what HCMLP
24   recommended, correct?
25   A   No.  I would expect him to sort through the various
```

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 38-10 Filed 09/14/23 Page 204 of 213 PageID 2970

Dondero - Direct                              158

1    investments when he was given three or four to choose from and

2    be able to discern that, just as we had with our expertise,

3    which was much greater than his, discern which one was the

4    best and most suitable investment, the best risk-adjusted

5    investment, that he would come to the same conclusion.

6    Q    Okay.  You can't think of an investment that Mr. Scott

7    ever made on behalf of the DAF that didn't originate with

8    HCMLP, correct?

9    A    Again, no, but I wouldn't expect there to be.

10   Q    Okay.  And that's because you expected all of the

11   investments to originate with the company that you were

12   controlling, correct?

13   A    We were the hired investment advisor with fiduciary

14   responsibility --

15   Q    Uh-huh.

16   A    -- and with a vested interest in making sure the DAF

17   performance was the best it could be.

18   Q    Okay.  Let --

19   A    He was, as you said, a patent attorney.  It would have

20   been unusual for him to second-guess.  I'm sure, in any

21   private investment or any investment that was one off or

22   didn't have comps, you know, he probably sought third-party

23   valuations.  But you would have to talk to him about that, or

24   the people at Highland that did that.

25            MR. MORRIS:  I move to strike.  It's a very simple

Dondero - Direct                    159

1   question.

2           THE COURT:  Sustained.

3   BY MR. MORRIS:

4   Q    Sir, you can't think of one investment that Mr. Scott made

5   on behalf of the DAF that did not originate with HCMLP,

6   correct?

7   A    I'm going to give the same answer.

8   Q    Okay.  Let's go to Page 371 of the transcript, please.

9   Lines 7 through 11.

10          Oh, I apologize.  I think I might -- I think I meant 317.

11  I think I got that inverted.  Yeah.

12          Did I ask this question and did you give this answer:

13  "Can you think of any investment that Mr. Scott made on behalf

14  of the DAF that didn't original with HCMLP?"  Answer, "He

15  wasn't the investment advisor, but no, I don't -- I don't

16  recall."

17          Is that the answer you gave on Friday?

18  A    Yes.

19  Q    Thank you.  Let's --

20          MR. SBAITI:  Just for clarification, Your Honor, --

21          THE COURT:   Pardon?

22          MR. SBAITI:  -- the deposition was last Tuesday, not

23  on Friday.

24          MR. MORRIS:  I stand corrected, Your Honor.

25          THE COURT:  Okay.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B B Document 8-10 Filed 09/30/23 Page 206 of 213 PageID 2372

Dondero - Direct                    160

1              MR. MORRIS:  I apologize.

2              THE COURT:  Okay.

3              MR. MORRIS:  I apologize if the Court thinks I misled

4    it.

5    BY MR. MORRIS:

6    Q    Let's talk about Mr. Scott's decision during the

7    bankruptcy case that preceded his resignation.  After HCMLP

8    filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

9    correct?

10             MR. ANDERSON:  Your Honor, I haven't objected yet,

11   but we literally haven't covered anything that deals with

12   commencing or pursuing a claim or cause of action.  I'm going

13   to object.  This is way outside, again, the bounds of the

14   contempt hearing.  It's -- otherwise, it's other discovery for

15   something else.  It literally has nothing to do with pursue a

16   claim or cause of action.

17             THE COURT:  We have another relevance objection.

18   Your response?

19             MR. MORRIS:  Your Honor, the evidence is going to

20   show that Mr. Dondero told Mr. Scott on three separate

21   occasions that his conduct, which were acts of independence,

22   were inappropriate and were not in the best interests of the

23   DAF.  Within days of the third strike, he resigned.  Okay?

24       I think it's relevant to Mr. Dondero's control of the DAF.

25   I think that the moment that Mr. -- this is the argument I'm

1    going to make.  I'll make it right now.  You want me to make

2    it now, I'll make it now.  The moment that Mr. Scott exercised

3    independence, Mr. Dondero was all over him, and Mr. Scott

4    left.  That's what happened.  The evidence is going to be

5    crystal clear.

6        And I think that that control of the DAF is exactly what

7    led to this lawsuit.  And what led -- and I'm allowed to make

8    my argument.  So that's why it's relevant, Your Honor, because

9    I think it shows that Mr. Scott -- Mr. Scott, after exercising

10   independence, was forced out.

11        MR. ANDERSON:  That doesn't move the needle one bit

12   as to whether a lawsuit was commenced or a claim or cause of

13   action was pursued, which is the subject of the contempt

14   motion.  It doesn't move the needle one bit as to those two

15   issues, as to whether that has any bearing on was it commenced

16   or was it pursued.

17        MR. MORRIS:  Your Honor, I appreciate the very narrow

18   focus that counsel for a different party is trying to put on

19   this, but it is absolutely relevant to the question of whether

20   Mr. Dondero was involved in the pursuit of these claims.  All

21   right?  That's what the order says.  Pursue.

22        THE COURT:  All right.  Overruled.

23   BY MR. MORRIS:

24   Q    After HCMLP filed for bankruptcy, CLO Holdco filed a proof

25   of claim, correct?

```
 1   A    I believe so.

 2   Q    And in the fall of 2020, Mr. Scott amended the proof of

 3   claim to effectively reduce it to zero, correct?

 4   A    I -- I guess.

 5   Q    And Mr. Scott made that decision without discussing it

 6   with you in advance, correct?

 7   A    Yes.

 8   Q    But you did discuss it with him after you learned of that

 9   decision, correct?

10   A    I don't -- I don't recall.  I'm willing to be refreshed,

11   but I don't remember.

12   Q    Well, you told him specifically that he had given up bona

13   fide claims against the Debtor, correct?

14   A    Let me state or clarify my testimony this way.  Um, --

15              MR. MORRIS:  Your Honor, it's really just a yes or no

16   question.  His counsel can ask him if he wants to clarify, but

17   it's really just a yes or no question.

18   BY MR. MORRIS:

19   Q    You told Mr. Scott that he gave up bona fide claims

20   against the Debtor, correct?

21              THE COURT:  Okay.

22              THE WITNESS:  I don't know if I told him then with

23   regard to those claims.

24   BY MR. MORRIS:

25   Q    Okay.  Can we go to Page 321 of the transcript?  At the
```

Dondero - Direct                        163

1    bottom, Line 21?  22, I apologize.

2        Did I ask this question and did you give this answer?

3    "And what do you" -- Question, "And what do you recall about

4    your discussion with Mr. Scott afterwards?"  Answer, "That he

5    had given up bona fide claims against the Debtor and I didn't

6    understand why."

7        Did I ask that question and did you give that answer last

8    Tuesday?

9    A    Yes.

10   Q    Okay.  A short time later, in December, the Debtor filed

11   notice of their intention to enter into a settlement with

12   HarbourVest, correct?

13   A    Yes.

14   Q    And CLO Holdco, under Mr. Scott's direction, filed an

15   objection to that settlement, correct?

16   A    Yes.

17   Q    And that settlement, the substance of that settlement was

18   that the Debtor did not have the right to receive

19   HarbourVest's interests in HCLOF at the time, correct?

20   A    I don't remember the exact substance of it.

21   Q    Okay.  But you do remember that you learned that Mr. Scott

22   caused CLO Holdco to withdraw the objection, correct?

23   A    Yes, ultimately.

24   Q    Okay.  And again, Mr. Scott did not give you advance

25   notice that he was going to withdraw the HarbourVest

 1  objection, correct?

 2  A   No, he -- he did it an hour before the hearing.  He didn't

 3  give anybody notice.

 4  Q   You learned that Mr. Scott caused CLO Holdco to withdraw

 5  its objection to the HarbourVest settlement at the hearing,

 6  correct?

 7  A   Yes.

 8  Q   And you were surprised by that, weren't you?

 9  A   I believe everybody was.

10  Q   You were sur... you were surprised by that, weren't you,

11  sir?

12  A   Yes.

13  Q   And you were surprised by that because you believed Mr.

14  Scott's decision was inappropriate, right?

15  A   Partly inappropriate, and partly because 8:00 o'clock the

16  night before he confirmed that he was going forward with the

17  objection.  And I think the DAF's objection was scheduled to

18  be first, I think.

19  Q   After you learned that Mr. Scott instructed his attorneys

20  to withdraw the CLO Holdco objection to the HarbourVest

21  settlement, you again spoke with Mr. Scott, correct?

22  A   Yes.

23  Q   And that conversation took place the day of the hearing or

24  shortly thereafter, correct?

25  A   Yes.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B B Document 830 Filed 09/20/23 Page 211 of 213 PageID 12377

Dondero - Direct                          165

 1   Q    And during that conversation, you told Mr. Scott that it

 2   was inappropriate to withdraw the objection, correct?

 3   A    Yes.

 4   Q    And in response, Mr. Scott told you that he followed the

 5   advice of his lawyers, correct?

 6   A    Yes.

 7   Q    But that didn't -- that explanation didn't make sense to

 8   you, right?

 9   A    Yes.

10   Q    In fact, you believed that Mr. Scott failed to act in the

11   best interests of the DAF and CLO Holdco by withdrawing its

12   objection to the HarbourVest settlement, correct?

13   A    Yes.

14   Q    And while you didn't specifically use the words fiduciary

15   duty, you reminded Mr. Scott in your communications with him

16   that he needed to do what was in the best interests of the

17   DAF, correct?

18   A    Yes.

19   Q    You're the founder of the DAF, correct?

20   A    I put it -- I put it in motion.  Yeah.  I tasked Mark

21   Patrick and third-party law firms to do it, but if that boils

22   down to founder, I guess yes.

23   Q    Uh-huh.  And you're the primary donor to the DAF, correct?

24   A    Yes.

25   Q    You're the investment advisor to the DAF, or at least you

1  were at that time?

2  A    Yes.

3  Q    And because you served in these roles, you expected Mr.

4  Scott to discuss his decision to withdraw the HarbourVest

5  objection in advance, correct?

6  A    Yes, I -- I think it was even broader than that.  I mean,

7  he was having health and anxiety issues, and to the extent he

8  felt overwhelmed, I -- you know, yeah, you should do what's in

9  the best interests at all times, but -- but yes, I thought it

10 would be helpful if he conferred with me or Mark Patrick or

11 whoever he was comfortable with.

12 Q    Mr. Dondero, you specifically believed that Mr. Scott's

13 failure to tell you that he was going to withdraw the

14 HarbourVest objection in advance was inappropriate, right?

15 A    Yes.

16 Q    Even though he was the sole authorized representative, you

17 believed that, because you were the founder of the DAF, the

18 primary donor of the DAF, and the investment advisor to the

19 DAF, he should have discussed that before he actually made the

20 decision, correct?

21 A    No.  What I'm saying is at 8:00 o'clock at night, when he

22 confirms to numerous people he's ready to go first thing with

23 his objection, and then he or counsel or some combination of

24 them change their mind and don't tell anybody before the

25 hearing, that's odd and inappropriate behavior.

Dondero - Direct                          167

1          MR. MORRIS:  Can we go to Page 330 of the transcript,

2    please?

3        And Your Honor, before I read the testimony, there is an

4    objection there.  So I'd like you to rule --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- before I do that.  It can be found at

7    -- on Page 330 at Line 21.

8        (Pause.)

9          MR. MORRIS:  Here we go.  Page 30, beginning at Line

10   19.  330, rather.

11         THE COURT:  Okay.

12       (Pause.)

13         THE COURT:  Okay.  I overrule that objection.

14   BY MR. MORRIS:

15   Q   Mr. Dondero, were you asked this question and did you give

16   this answer last Tuesday?  Question, "Do you believe that he

17   had an obligation to inform you in advance?"  Answer, "I don't

18   know if I would use the word obligation, but, again, as the

19   founder or the primary donor and continued donor to the DAF,

20   and as the investment advisor fighting for above-average

21   returns on a daily basis for the fund, significant decisions

22   that affect the finances of the fund would be something I

23   would expect typically a trustee to discuss with the primary

24   donor."

25       Did you give that answer the other day, sir?