**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | |
|---|---|---|---|
| In Re: **Highland Capital Management, L.P** | § | Case No. | **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | | |
| Appellant | § | | |
| vs. | § | | 21-03067 |
| **Highland Capital Management, L.P** | § | | |
| | § | | |
| Appellee | § | | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

**Volume 11**

**APPELLANT RECORD**

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2. The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3. Docket Sheet kept by the Bankruptcy Clerk.

4. Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br>*thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9* *001905* *thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) (Entered: 09/20/2021). (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*<br><br>*003637* | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| *003666* | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| *003843* | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| *003844* | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| *003851* | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*<br><br>*003882*<br><br>*Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*<br><br>*004395* | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*0044100* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *0044110* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *0044142*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*0046916* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *0047177* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *0047732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *0047737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *0047742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 *Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|

*006133*
*Thru Vol. 31*

| | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
|---|---|---|---|---|

*Vol. 32*
*006925*

| | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
|---|---|---|---|---|

*006942*

| | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
|---|---|---|---|---|

*006960*

| | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |
|---|---|---|---|---|

TRANSCRIPTS

*006961*

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                    Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         */s/  Mazin A. Sbaiti*
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                              jeb@sbaitilaw.com

                                         **Counsel for Appellants**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.

                                         */s/ Mazin A. Sbaiti*
                                         Mazin A. Sbaiti

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01552-B   Document 43-11   Filed 02/04/22   Page 14 of 213   PageID 2393

Dondero - Direct                                          168

 1  A    Yes.

 2  Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

 3  that's in District Court, does he have an the obligation to

 4  tell you in advance?

 5  A    Again, I wouldn't use the word obligation.  But something

 6  that I think ultimately is going to be a $20 or $30 million,

 7  if not more, benefit to the DAF, to the detriment of Highland,

 8  if you were to give that up, I would expect him to have a

 9  rationale and I would expect him to get other people's

10  thoughts and opinions before he did that.

11  Q    Okay.  But does he have to get your opinion before he

12  acts?

13  A    No, he does not.

14  Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15  could settle the case, and if he doesn't come to you to

16  discuss it in advance, you won't be critical of him, right?

17  A    He doesn't have the obligation, but there's -- there's a

18  reasonableness in alignment of interests.  I -- a growing

19  entrepreneur sets up a trust, a lot of times they'll put their

20  wife in charge of it, and she hires investment advisers and

21  whatever, but they've got the best interests at mind for the

22  charity or the children or whatever.

23       You know, people who go rogue and move in their own self-

24  interest or panic, that stuff can happen all the time.  It

25  doesn't make it appropriate, though.

002108

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01582-B    Document 1-11    Filed 02/05/21    Page 15 of 213    PageID 2394

Dondero - Direct                          169

1  Q    A couple of weeks after Mr. Scott withdraw the objection

2  to the HarbourVest settlement, he entered into a settlement

3  agreement with the Debtor pursuant to which he settled the

4  dispute between the Debtor and CLO Holdco, correct?

5  A    Yes.

6  Q    Okay.  You didn't get advance notice of that third

7  decision, correct?

8  A    No.

9  Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10 is the settlement agreement between CLO Holdco and the Debtor,

11 correct?  Attached as the exhibit.  I apologize.

12 A    Yes.

13 Q    And do you understand that that's Mr. Scott's signature on

14 the last page?

15 A    Yep.

16 Q    And you learned about this settlement only after it had

17 been reached, correct?

18 A    Yep.

19 Q    And you believed Mr. Scott's decision not to pursue

20 certain claims against the Debtor or to remove HCMLP as the

21 manager of the CLOs was not in the best interests of the DAF,

22 correct?

23 A    Correct.

24 Q    And you let Mr. Scott know that, correct?

25 A    Yes.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01585-B   Document 43   Filed 02/06/23   Page 16 of 213   PageID 2395

Dondero - Direct                        170

1  Q    After learning about the settlement agreement on January

2  26th, you had one or two conversations with Mr. Scott on this

3  topic, correct?

4  A    Yes.

5  Q    And your message to Mr. Scott was that the compromise or

6  settlement wasn't in the DAF's best interest, correct?

7  A    It was horrible for the DAF.

8  Q    Uh-huh.  And you told him that, right?

9  A    Yes.

10 Q    Okay.  From your perspective, any time a trustee doesn't

11 do what you believe is in the trust's best interest, you leave

12 yourself open to getting sued, correct?

13 A    Who is "you" in that question?

14 Q    You.  Mr. Dondero.

15 A    Can you repeat the question, then, please?

16 Q    Sure.  From your perspective, any time you're a trustee

17 and you don't believe that the trustee is doing what's in the

18 best interests of the fund, the trustee leaves himself open to

19 getting sued, correct?

20 A    I don't know who the trustee leaves himself open to, but

21 as soon as you go down a path of self-interest or panic, you

22 -- you potentially create a bad situation.  But I don't know

23 who holds who liable.

24 Q    Did you believe that Mr. Scott was acting out of self-

25 interest or panic when he decided to settle the dispute with

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01500-B   Document 43-1   Filed 09/29/21   Page 17 of 213   PageID 2396

Dondero - Direct                         171

1  the Debtor on behalf of CLO Holdco?

2  A    Yes.

3  Q    Did you tell him that?

4  A    He told me that.

5  Q    He told you that he was acting out of panic or

6  desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7  tell you that he was acting out of self-interest?

8  A    He was having health problems, anxiety problems, and he

9  didn't want to deal with the conflict.  He didn't want to

10 testify.  He didn't want to come to court.  He didn't want to

11 do those things.  And I told him I didn't think the settlement

12 was going to get him out of that stuff.  I think, you know, it

13 got him out of some issues, but I think you guys are going to

14 go after him for other stuff.  But he -- he panicked.

15          MR. MORRIS:  I move to strike the latter remark.

16          THE COURT:   Sustained.

17 BY MR. MORRIS:

18 Q    Shortly after you had the conversation with Mr. Scott, he

19 sent you notice of his intent to resign from his positions at

20 the DAF and CLO Holdco, correct?

21 A    Yes.

22 Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23 This is Mr. Scott's notice of resignation, correct?

24 A    Yes.

25 Q    He sent it only to you, correct?

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 31-1   Filed 02/02/22   Page 18 of 213   PageID 2397

Dondero - Direct                              172

1  A    Yes.

2  Q    A couple of days before he sent this, he told you he was

3  considering resigning; isn't that right?

4  A    Yes.

5  Q    Okay.  And he told you he was considering resigning

6  because he was suffering from health and anxiety issues

7  regarding the confrontation and the challenges of

8  administering the DAF given the bankruptcy, correct?

9  A    Yes.

10  Q    He didn't tell you that he made the decision -- withdrawn.

11  Did you tell him in this same conversation -- withdrawn.  Is

12  this the same conversation where you conveyed the message that

13  the compromise or settlement wasn't in the best interests of

14  the DAF?

15  A    You mean the conversation -- or the resignation? Is that

16  -- can you rephrase the question, please?

17  Q    Yeah, I apologize.  It's my fault, sir.  You testified

18  that after the January 26th hearing you had a conversation

19  with Mr. Scott where you told him that the compromise or

20  settlement was not in the best interests of the DAF, correct?

21  A    Yes.

22  Q    Okay.  Did Mr. Scott share with you his concerns about

23  anxiety and health issues in that same conversation, or was it

24  in a subsequent conversation?

25  A    It was at or around that time.  I -- I don't remember

002112

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01586-B   Document 43-1   Filed 09/29/21   Page 19 of 213   PageID 2398

Dondero - Direct                              173

1   which conversation.

2   Q    Okay.

3   A    But it was right at or around that time.

4   Q    All right.  You never asked Mr. Scott to reconsider, did

5   you?

6   A    No.

7   Q    You don't recall sending this notice of resignation to

8   anyone, do you?

9   A    No.

10  Q    You don't remember notifying anyone that you'd received

11  notice of Mr. Scott's intent to resign from the DAF, do you?

12  A    It was -- yeah, no, I -- I don't remember.  It was a busy

13  time around that time and this was a secondary issue.

14  Q    Okay.  So the fact that the person who has been running

15  the DAF for a decade gives you and only you notice of his

16  intent to resign was a secondary issue in your mind?

17  A    Yes, because when I talked to him at about that time, I

18  said, okay, well, it's going to take a while.  I don't even

19  know how the mechanism works.  But don't do anything adverse

20  to the DAF, don't do anything else until, you know, you've

21  figured out transition.

22  Q    Uh-huh.

23  A    And so once he had confirmed he wouldn't do anything

24  outside normal course until he transitioned, I didn't worry

25  about this.  I had bigger issues to worry about at the time.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01598-B   Document 43-11   Filed 09/24/21   Page 20 of 213   PageID 2399

Dondero - Direct                           174

1   Q    In the third paragraph of his email to you, he wrote that

2   his resignation will not be effective until he approves of the

3   indemnification provisions and obtains any and all necessary

4   releases.  Do you see that?

5   A    Yes.

6   Q    And that was the condition that on January 31st Mr. Scott

7   placed on the effectiveness of his resignation, correct?

8   A    Condition?  Yeah, I -- I think he's trying to state the

9   timing will happen after that.

10   Q    After he gets the release, right?

11   A    Yes.

12   Q    And he wanted the release because you'd told him three

13   different times that he wasn't acting in the best of the DAF,

14   correct?

15          MR. TAYLOR:  Objection, Your Honor.

16          MR. SBAITI:  Objection.  Calls for --

17          MR. TAYLOR:  Objection.  Calls for speculation.

18          THE WITNESS:  Yeah, I --

19          THE COURT:  Sustained.

20          THE WITNESS:  I can't take that jump.  Yeah.

21   BY MR. MORRIS:

22    Q    In response to this email from your lifelong friend, you

23   responded, if we could scroll up, about whether divest was a

24   synonym -- if we can look at the first one -- whether divest

25   is a synonym for resigned.  Do I have that right?

002114

 1    A    (no immediate response)

 2    Q    If you will look at your response on Monday morning at

 3    9:50.

 4    A    Yes.

 5    Q    Okay.  And then after Mr. Scott responds, you respond

 6    further, if we can scroll up, and you specifically told him,

 7    "You need to tell me ASAP that you have no intent to divest

 8    assets."  Correct?

 9    A    Yes.

10    Q    And you wrote that because you believed some of his

11    behavior was unpredictable, right?

12    A    I think I wrote that because the term divest in investment

13    terms means sale or liquidate, but I guess it had a different

14    legal term in the way he was looking at it.  I wasn't aware at

15    that time of the shares that could be bequeathed to anybody,

16    and I think the divest refers to that, but I wasn't aware that

17    that's how the structure worked at that time, and I was

18    worried that divest could be the investment term and I -- it

19    wouldn't have been appropriate for him to liquidate the

20    portfolio.

21    Q    So, and you wanted to make sure he wasn't liquidating or

22    intending to liquidate any of the CLOs, correct?

23    A    Correct.

24    Q    Okay.  So he's still the authorized, the sole authorized

25    representative, but you wanted to make sure that he didn't do

Dondero - Direct                                    176

1   anything that you thought was inappropriate.  Fair?

2   A    It's because I had talked to him before this and he said

3   he wasn't going to do anything outside normal course, and then

4   the word divest scared me, but I didn't realize it was a legal

5   term in this parlance here.

6   Q    And so after he explained, you still wanted to make sure

7   that he wasn't divesting any assets, correct?

8   A    Yes.

9   Q    Okay.  Since February 1st, you've exchanged exactly one

10  text messages with Mr. Scott; is that right?

11  A    I think there've been several, several text messages.  But

12  one on his birthday.

13  Q    Yeah.  And you haven't spoken to him in months, correct?

14  A    In a couple months, yes.

15  Q    All right.  Let's talk about the replacement of Mr. Scott.

16  With -- with Mr. Scott's notice, someone needed to find a

17  replacement, correct?

18  A    Yes.

19  Q    And the replacement was going to be responsible for

20  managing a charitable organization with approximately $200

21  million of assets, most of which was seeded directly or

22  indirectly through you, correct?

23  A    Yes.

24  Q    And the replacement was going to get his and her -- his or

25  her investment advice from you and NexPoint Advisors; do I

002116

Dondero - Direct                          177

1   have that right?

2   A    That was the plan.

3   Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4   correct?

5   A    Yes.

6   Q    But it's your testimony that you had no knowledge that Mr.

7   Patrick was going to replace Mr. Scott until after it happened

8   on March 24, 2021.  Correct?

9   A    That's correct.  I believe it happened suddenly.

10  Q    So, for nearly two months after you had received notice of

11  Mr. Scott's intent to resign, you were uninvolved in the

12  process of selecting his replacement, correct?

13  A    I was uninvolved.  I'd say the process was dormant for an

14  extended period of time until Mark Patrick came on board, and

15  then Mark Patrick ran the process of interviewing multiple

16  potential candidates.

17  Q    Mark Patrick didn't have any authority prior to March

18  24th, correct?

19  A    Is March 24th the date that he transitioned the shares to

20  himself from Grant Scott?

21  Q    Yep.

22  A    That's when he then became the trustee of the DAF, yes.

23  Q    Do you know -- do you know who was instructing Mr. Patrick

24  on who to interview or how to carry the process out?

25  A    He was doing that on his own with, I think,

002117

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01590-B    Document 43-11    Filed 02/14/22    Page 24 of 213    PageID 2493

Dondero - Direct                              178

1  recommendations from third-party tax firms.

2  Q   So Mr. Patrick was trying to find a successor to Mr.

3  Scott, even though he had no authority to do that, and you

4  were completely uninvolved in the whole process?  Do I have

5  that right?

6  A   I was uninvolved, yes.  He was trying to facilitate it for

7  the benefit of his friendship with Grant Scott and knowing

8  that it -- it -- with his resignation, it had to transition to

9  somebody.  And he enjoys working on the DAF, he enjoys the

10  charitable stuff in the community, and he was the most

11  appropriate person to work on helping Grant transition.

12          MR. MORRIS:  All right.  I move to strike, Your

13  Honor.  It's hearsay.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q   You're aware that Mr. Seery was appointed the Debtor's CEO

17  and CRO last summer, correct?

18  A   Yes.

19  Q   And you're aware that Mr. Seery's appointment was approved

20  by the Bankruptcy Court, correct?

21  A   Yes.

22  Q   And you were aware of that at the time it happened,

23  correct?

24  A   Yes.

25  Q   And even before that, in January of 2020, you consented to

1    a settlement where you gave up control of the Debtor.

2    Correct?

3    A    To the independent board for a consensual Chapter 11

4    restructuring that would leave Highland intact.

5    Q    And do you understand that the gatekeeper provision in the

6    July order is exactly like the one that you agreed to in

7    January except that it applies to Mr. Seery instead of the

8    independent directors?

9    A    I -- I learned a lot about that today, but I don't think

10   it's appropriate to move what applied to the board to the CEO

11   of a registered investment advisor.

12   Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13   question.  Were you aware in January 2020 that you agreed to a

14   gatekeeper provision on behalf of the independent board?

15   A    Generally, but not specifically.

16   Q    Okay.

17   A    Not -- not like what we've been going over today.

18   Q    Okay.  And you knew that Mr. Seery had applied to be

19   appointed CEO subject to the Court's approval, correct?

20   A    Wasn't it backdated to March?  I -- I think the hearing

21   was in June, but it was backdated for -- for money and other

22   purposes, right?  I -- that's my recollection.  I don't

23   remember otherwise.

24   Q    You do remember that Mr. Seery got -- he got -- his

25   appointment got approved by the Court, right?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B    Document 31    Filed 01/16/23    Page 26 of 213    PageID 2405

Dondero - Direct                              180

1   A   Yes.  But, as far as the dates are concerned, I thought it

2   was either in March or retroactive to March.  Maybe it was

3   June or July.

4   Q   And you --

5   A   But I don't remember.

6   Q   Did you have your lawyers review the motion that was filed

7   on behalf of the Debtor?

8   A   I'm -- I assume they do their job.  I -- if they didn't, I

9   don't know.

10   Q   Okay.  That's what you hired them to do; is that fair?

11   A   Yes.

12   Q   Okay.  Can we go to Exhibit 12, please?  I think it's in

13   Binder 1.  You've seen this document before, correct?

14   A   Yes.

15   Q   In fact, you saw versions of this complaint before it was

16   filed, correct?

17   A   Yes, I saw one or two versions towards the end.  I don't

18   know if I saw the final version, but --

19   Q   Sir, you participated in discussions with Mr. Sbaiti

20   concerning the substance of this complaint before it was

21   filed, correct?

22   A   Some.  I would just use the word some.

23   Q   Okay.  Can you describe for me all of your conversations

24   with Mr. Sbaiti concerning the substance of this complaint?

25         MR. SBAITI:  Your Honor, I would object on the basis

Case 21-03067-sgj  Doc 43  Filed 09/29/21  Entered 09/29/21 18:18:16  Desc Main
Case 3:21-cv-01553-B  Document 18-11  Filed 09/11/23  Page 27 of 213  PageID 2406

Dondero - Direct                    181

 1  of work product privilege and attorney-client communications.

 2  He was an agent for my client, the DAF, at the time he was

 3  having these discussions with us, and our discussions with him

 4  were work product.  So to the extent he can reveal the

 5  conversations without discussing the actual content, we would

 6  raise privilege objection, Your Honor.

 7              THE COURT:  Mr. Morris?

 8              MR. MORRIS:  Your Honor, there is no privilege here.

 9  That's exactly why I asked Mr. Patrick the questions earlier

10  today.  Mr. Dondero is not party to any agreement with the DAF

11  today.  It's an informal agreement, perhaps, but there is no

12  contractual relationship, there is no privity any longer

13  between Mr. Dondero or any entity that owns and controls in

14  the DAF, as far as I know.  If they have evidence of it, I'm

15  happy to listen, but that -- that's exactly why I asked those

16  questions of Mr. Patrick earlier today.

17              THE COURT:  All right.

18              MR. SBAITI:  Your --

19              THE COURT:  That was the testimony.  There's an

20  informal arrangement, at best.

21              MR. SBAITI:  Well, Your Honor, I would suggest that

22  that doesn't necessarily mean that he isn't an agent of the

23  DAF.  It doesn't have to be a formal agreement for him to be

24  an agent of the DAF.

25      Everyone's agreed he was an advisor.  Everyone's agreed he

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 43-11   Filed 02/16/22   Page 28 of 213   PageID 2407

Dondero - Direct                                    182

1   was helping out.  That is an agency relationship.  It doesn't

2   have to be written down.  It doesn't have to be a formal

3   investment advisory relationship.  He's still an agent of the

4   DAF.  He was requested to do something and agreed to do it

5   under the expectation that all of us had that those would be

6   privileged, Your Honor.  That is -- that is sufficient -- that

7   is sufficient, I would argue, to get us where we need to be.

8   The privilege should apply, Your Honor, and they don't have a

9   basis for, I would say, invading the privilege, Your Honor.

10          THE COURT:  Well, do you have any authority?  Because

11  it just sounds wrong.  He's not an employee of your client.

12  He doesn't have any contractual arrangement with your client.

13          MR. SBAITI:  Your Honor, I would dispute the idea

14  that he has no contractual arrangement with my client.  The

15  question was asked, do you have a -- do you have a written

16  agreement, and then the question was, so you don't have a

17  contract, and the answer was no, I don't have a contract,

18  building upon that first -- that first question.  But the

19  testimony as he just recounted is that there is an agreement

20  that he would advise Mr. Patrick and he would advise the DAF.

21          THE COURT:  Okay.

22          MR. SBAITI:  That's -- that's a contract.

23          THE COURT:  Okay.  My question was, do you have any

24  legal authority?  That's what I meant when I said authority.

25  Any legal authority to support the privilege applying in this

 1 │ kind of --

 2 │          MR. SBAITI:  In an informal arrangement, Your Honor?

 3 │ I don't have one at my fingertips at the moment, Your Honor,

 4 │ but I don't know that that should be a reason to invade the

 5 │ privilege.

 6 │     And I would just add, Your Honor, I would just add, we've

 7 │ already -- because of the purpose of these questions, you've

 8 │ heard Mr. Morris state several times that the purpose is to

 9 │ show that Mr. -- that Mr. Dondero had some role in advising

10 │ and participating in the creation of this complaint.  That's

11 │ been conceded by myself.  I believe it was conceded by Mr.

12 │ Dondero.

13 │     The actual specific facts, the actual specific

14 │ conversations, Your Honor, shouldn't be relevant at this point

15 │ and they shouldn't be admissible, given -- given the

16 │ relevancy, given the perspective of the privilege.

17 │          THE COURT:  Okay.

18 │          MR. MORRIS:  If I might --

19 │          THE COURT:  I overrule your objection.  I don't think

20 │ a privilege has been shown here --

21 │          MR. SBAITI:  And Your Honor, --

22 │          THE COURT:  -- and I think it's relevant.

23 │          MR. SBAITI:  -- I would ask if we could *voir dire* the

24 │ witness on the basis of the privilege, if that's --

25 │          THE COURT:  All right.  You may do so.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01532-B   Document 8-11   Filed 02/07/22   Page 230 of 513   PageID 2409

Dondero - Voir Dire                        184

| | |
|---|---|
| 1 | VOIR DIRE EXAMINATION |
| 2 | BY MR. SBAITI: |
| 3 | Q    Mr. Dondero, do you have a relationship with the DAF? |
| 4 | A    Yes. |
| 5 | Q    How would you describe that relationship? |
| 6 | A    I view myself and my firm as the investment advisor.  I |
| 7 | was actually surprised by the testimony today that there |
| 8 | wasn't a contract in place, but there should be one.  There |
| 9 | should be one soon, in my opinion. |
| 10 | Q    Have you -- did you hear Mr. Patrick testify earlier that |
| 11 | he comes to you for advice? |
| 12 | A    Yes. |
| 13 | Q    Is that -- |
| 14 | A    As he should.  Yeah. |
| 15 | Q    Is that true? |
| 16 | A    Yes. |
| 17 | Q    When you render that advice, do you render that advice |
| 18 | with some expectation about him following or listening to that |
| 19 | advice? |
| 20 | A    Okay, I think there's only been one investment or one |
| 21 | change in the DAF portfolio since Mark Patrick's been |
| 22 | involved, only one, and it was a real estate investment that I |
| 23 | wasn't directly involved in.  And so the people who put that |
| 24 | investment forward worked with Mark without my involvement, |
| 25 | and then I think Mark got third-party appraisal firms and |

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01532-B   Document 14-11   Filed 09/27/21   Page 31 of 213   PageID 2460

Dondero - Voir Dire                    185

1   third-party valuation firms involved to make sure he was

2   comfortable, which was a good process.

3   Q    When you supplied information to Mr. Patrick, do you do so

4   under the belief that there is a contractual, informal or

5   formal, relationship?

6           MR. MORRIS:  Objection to the form of the question.

7           THE COURT:  Overruled.

8           MR. SBAITI:  What specific form?

9           THE COURT:  Overruled.

10          MR. SBAITI:  Thank you.

11          THE WITNESS:  Yes.  I believe it -- it's a

12  relationship that can and should be papered as -- soon.

13  That's my -- I mean, unless I get some reason from counsel not

14  to, I think it's something that should be memorialized.

15  BY MR. SBAITI:

16  Q    And when you have that -- in that relationship, when you

17  communicate with Mr. Patrick about matters, investment or

18  otherwise, is there an expectation of privacy?

19  A    Yes.

20  Q    When Mr. Patrick -- did Mr. Patrick request that you

21  interface with my firm and myself, as he testified earlier?

22  A    Yes.

23  Q    And when he did so, did he ask you to do so in an

24  investigatory manner?

25          MR. MORRIS:  Objection to the form of the question.

Dondero - Voir Dire                              186

1          THE COURT:  Sustained.  Rephrase.

2    BY MR. SBAITI:

3    Q    Did he tell you why he wanted you to talk to us?

4    A    Yeah.  At that point, he had started an investigation into

5    the HarbourVest transaction.

6    Q    And -- and when he -- when you were providing information

7    to us, did he tell you whether he wanted you to help the

8    Sbaiti firm conduct the investigation?

9    A    The -- overall, the financial numbers and tables in there

10   were prepared by not myself, but I -- I did -- I did help on

11   -- on the -- some of the registered investment advisor issues

12   as I understood them.

13   Q    Okay.  And the communications that you had with us, was

14   that part of our investigation?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18   BY MR. SBAITI:

19   Q    And did you understand that we had been retained by Mr.

20   Patrick on behalf of the DAF and CLO Holdco?

21   A    Yes.

22   Q    And did you appreciate or have any understanding of

23   whether or not you were helping the law firm perform its legal

24   function on behalf of the DAF and CLO Holdco?

25   A    Perform its legal function?  I was just helping with

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-BB Document 14-11 Filed 09/20/16 358 Page 33 of 213 PageID 2412

Dondero - Voir Dire                      187

1  regard to the registered investment advisor aspects of the

2  overall, you know, like that.

3  Q    Let me ask a more simple question.  Did you -- did you

4  appreciate that you were assisting a law firm in its

5  representation of the DAF?

6  A    Yes.

7  Q    And you were helping the law -- and were you helping the

8  law firm develop the facts for a complaint?

9  A    Yes.  I would almost say, more importantly, I wanted to

10  make sure that there weren't errors in terms of understanding

11  either how CLOs worked or how the Investment Advisers Act

12  worked.  So I was -- it was almost more of a proofing.

13         MR. SBAITI:  Your Honor, based upon that, I mean,

14  he's helping a law firm perform its function for the client.

15  That's an agency relationship that gets cloaked.  You can call

16  him a consulting expert.  You can call him, to a certain

17  extent, a fact witness, Your Honor.  If we want to take a

18  break, I'm sure we could find authority on that basis for a

19  work product privilege pretty easily.

20      But he's an agent of the DAF.  Even if it's an informal

21  agency relationship, that's still agency.  He's in some

22  respects, I guess, an agent of the law firm, to the extent

23  he's helping us perform our legal work.  And it seems like

24  invading that privilege at this juncture is (a) unnecessary,

25  because we've already conceded that there's been

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01403-E   Document 31-1   Filed 09/24/21   Page 34 of 213   PageID 2429

Dondero - Voir Dire                    188

1   conversations, which I think is the relationship they wanted

2   to establish.  And it's not unusual for a law firm to use

3   someone with specialized knowledge to understand some of the

4   intricacies of the actual issues that they're -- that they're

5   getting ready to litigate.

6        THE COURT:  Okay.  I find no privilege.  All right.

7   That's the ruling.

8        MR. BRIDGES:  Your Honor, may I add one thing to the

9   objection for the record?

10       THE COURT:  Okay, we have a rule, one lawyer per

11  witness.  Okay?  So, thank you.  A District Court rule, by the

12  way, not mine.

13       MR. SBAITI:  Your Honor, may we take a short recess,

14  given the Court's ruling?

15       THE COURT:  Well, I'd really like to finish this

16  witness.  How much longer do you have?

17       MR. MORRIS:  About eight more questions.

18       THE COURT:  All right.  We'll take a break after the

19  direct, okay?

20       MR. SBAITI:  Your Honor, I would ask that we -- if

21  he's going to ask him more questions about the content of the

22  communications, I ask respectfully for a recess so we can

23  figure out what to do about that.  Because, right now, there's

24  a ruling that he's going to have to reveal privileged

25  information, and we don't have a way to go around and figure

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 4-11   Filed 09/27/21   Page 35 of 213   PageID 2431

Dondero - Voir Dire                    189

 1  out how to resolve that issue if we needed to.

 2          THE COURT:  Okay.  I've ruled it's not privilege.

 3  Okay?

 4          MR. SBAITI:  I understand that, Your Honor, but --

 5          THE COURT:  Your client is CLO Holdco and the DAF.

 6          MR. SBAITI:  Yes, Your Honor.

 7          THE COURT:  Representative, Mark Patrick.  No

 8  contract with Mr. Dondero.  The fact that he may be very

 9  involved I don't think gives rise to a privilege.  That's my

10  ruling.

11          MR. SBAITI:  I understand, Your Honor.  I understand,

12  Your Honor, but I'm asking for a recess so that we can at

13  least undertake to provide Your Honor with some case law on a

14  reconsideration before we go there, because that bell can't be

15  unrung.

16          MR. MORRIS:  Your Honor, if I may?

17          MR. SBAITI:  And it's --

18          THE COURT:  Uh-huh.

19          MR. MORRIS:  I'm happy to give them ten minutes, Your

20  Honor, as long as they don't talk to the witness.

21          THE COURT:  Okay.

22          MR. MORRIS:  I want to give them the opportunity.  Go

23  right ahead.

24          THE COURT:  All right.  We'll take a ten-minute

25  break.

1           MR. SBAITI:  Thank you.

2           THE COURT:  It's 3:05.

3           THE CLERK:  All rise.

4       (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5           THE CLERK:  All rise.

6           THE COURT:  Okay.  Please be seated.  Going back on

7    the record in Highland.  Mr. Sbaiti?

8           MR. SBAITI:  Yes, Your Honor.  May I approach?

9           THE COURT:  You may.

10          MR. SBAITI:  Your Honor, we have some authority to

11   support the position we'd taken.  We'd ask the Court to

12   reconsider your ruling on the privilege.

13      The first bit of authority is Section 70 of the

14   Restatement (Third) of Law Governing Lawyers.  Privileged

15   persons within the meaning of Section 68, which governs the

16   privilege, says that those persons include either agents of

17   either the lawyer or the client who facilitate communications

18   between the two in order for the lawyers to perform their

19   function.

20      Another case that we found is 232 F.R.D. 103 from the

21   Southern District of New York, 2005.  It's *Express Imperial*

22   *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23   Honor, the consultant was a -- had a close working

24   relationship with the company and performed a similar role to

25   that of the employee and was assisting the law firm in

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01638-B   Document 4-31   Filed 02/04/22   Page 37 of 213   PageID 2416

Dondero - Voir Dire                    191

1    performing their functions, and the court there found that the

2    work product privilege -- actually, the attorney-client

3    privilege -- attached in what they called a Functional

4    Equivalents Doctrine, Your Honor.

5        And here we have pretty much the same set of facts that's

6    pretty much undisputed.  The fact that there -- and the fact

7    that there isn't a written agreement doesn't mean there isn't

8    a contractual arrangement for him to have rendered services

9    and advice.  And the fact that he's, you know, recruited by us

10   to help us perform our functions puts him in the realm, as I

11   said, of something of a consulting expert.

12       Either way, the work product privilege, Your Honor, should

13   apply, and we'd ask Your Honor not to invade that privilege at

14   this point, Your Honor.  And I'll ask you to reconsider your

15   prior ruling.

16       Furthermore, I believe Mr. Morris, you know, in making his

17   argument, is trying to create separation.  The fact that he

18   has no relationship, that the privilege can be invaded, seems

19   to defeat the whole premise of his whole line of questioning.

20       So, once again, Your Honor, I just -- it's a tit for a tat

21   there, and it seems to kind of eat itself.  Either he is

22   working with us, which we've admitted he is working with us,

23   us being the law firm, and helping us do our jobs, or he's

24   not.  And if he's not, then this should be done.

25           THE COURT:  Okay.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 43-11   Filed 02/22/22   Page 38 of 213   PageID 2437

Dondero - Voir Dire                    192

1          MR. MORRIS:  Your Honor, briefly?

2          THE COURT:  Well, among other things, what do you

3  want me to do?  Take a break and read your one sentence from

4  the Restatements and your one case?  And could you not have

5  anticipated this beforehand?

6          MR. SBAITI:  Your Honor, --

7          THE COURT:  This is not the way we work in the

8  bankruptcy courts, okay?  We're business courts.  We have

9  thousands of cases.  We expect briefing ahead of time.

10          MR. SBAITI:  Your Honor, this has been a rather

11  rushed process anyway.  And to be honest, --

12          THE COURT:  When was the motion filed?

13          MR. SBAITI:  Your Honor, --

14          THE COURT:  More than a month ago.

15          MR. SBAITI:  -- his deposition was a week ago.

16          THE COURT:  Well, okay.  So you could not have

17  anticipated this issue until his deposition one week ago?

18          MR. SBAITI:  Your Honor, this issue arose at the

19  deposition, obviously, because that's what he's quoting from.

20  However, at least to us, this is such a well-settled area, and

21  to be honest, --

22          THE COURT:  Such a well-settled area that you have

23  one sentence from the Restatement and one case from the

24  Southern District of New York?

25          MR. SBAITI:  No, Your Honor.  I think the work

002132

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 43-11   Filed 02/24/22   Page 39 of 213   PageID 2448

Dondero - Voir Dire                                193

 1  product privilege lexicon -- we had ten minutes to try to find

 2  something more on point than the general case law that applies

 3  the work product privilege to people that work with lawyers,

 4  consultants who work with lawyers, employees who work with

 5  lawyers, even low-down employees who normally wouldn't enjoy

 6  the privileges that attach to the corporation, when they work

 7  with the company for -- when they work with the company

 8  lawyers, it typically attaches.

 9          THE COURT:  You know, obviously, I know a few things

10  about work product privilege, but he doesn't check any of the

11  boxes you just listed out.

12          MR. SBAITI:  I disagree, Your Honor.

13          THE COURT:  He's not an employee.  He's not a low-

14  level employee.

15          MR. SBAITI:  He's a consultant.

16          THE COURT:  With no agreement.

17          MR. SBAITI:  With a verbal agreement.  He's an

18  advisor.  And he was recruited by us, and at the request of

19  the DAF, of the head of the DAF, Mr. Patrick, to help us do

20  our job for the DAF.  I don't --

21          THE COURT:  Okay.  Mr. Morris, what do you want to

22  say?

23          MR. MORRIS:  Just briefly, Your Honor.  This issue

24  has been ripe since last Tuesday.  They directed him not to

25  answer a whole host of questions about his involvement at the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01585-B   Document 4-11   Filed 02/22/23   Page 40 of 213   PageID 2449

Dondero - Voir Dire                    194

 1   deposition last Tuesday, so they've actually had six days to

 2   deal with this.  That's number one.

 3       Number two, there's absolutely nothing inconsistent with

 4   the Debtor's position that Mr. Dondero is participating in the

 5   pursuit of claims and at the same time saying that his

 6   communications with the Sbaiti firm are not privileged.

 7   There's nothing inconsistent about that.

 8       So the argument that he just made, that somehow because

 9   we're trying to create separation, that that's inconsistent

10   with our overall arching theme that Mr. Dondero is precisely

11   engaged in the pursuit of claims against Mr. Seery, I think

12   that takes care of that argument.

13       Finally, your Honor, with respect to this consultancy

14   arrangement, not only isn't there anything in writing, but

15   either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16   the terms of the agreement.  Is he getting paid?  Is he doing

17   it for free?  Who retained him?  Was it Mr. -- because the --

18   there's no such thing.  There's no such thing.

19       The fact of the matter is what happened is akin to I have

20   a slip-and-fall case and I go to a personal injury lawyer and

21   I bring my brother with me because I trust my brother with

22   everything.  It's not privileged.  Any time you bring in

23   somebody who is not the attorney or the client, the privilege

24   is broken.  It's really quite simple.  Unless there's a common

25   interest.  They can't assert that here.  There is no common

Dondero - Voir Dire                    195

 1   interest.  So --

 2            THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

 3   three more minutes to *voir dire* Mr. Dondero to try to

 4   establish some sort of agency relationship or other evidence

 5   that you think might be relevant.

 6                    VOIR DIRE, RESUMED

 7   BY MR. SBAITI:

 8   Q    Mr. Dondero, when you provided information to the law

 9   firm, were you doing so under an agency relationship?  Do you

10   know what an agency relationship is?

11   A    Generally.  When you're working on the -- or why don't you

12   tell me?

13   Q    Tell me your understanding, so we can use --

14   A    That you're working for the benefit or as a proxy for the

15   other entity or the other firm or the other person.

16   Q    Right.  So you're working for the DAF?

17   A    Yes.

18   Q    Do you do work for the DAF?

19   A    Yes.  As I stated, I'm surprised there isn't -- when we

20   reconstituted after leaving Highland, we put in shared

21   services agreements in place and asset management agreements

22   in place and tasked people with doing that for most of the

23   entities.  There might be still a few contracts that are being

24   negotiated, but I thought most of them were in place.

25        So I would imagine that there'll be an asset management

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 4311   Filed 02/23/24   Page 42 of 213   PageID 2421

Dondero - Voir Dire                                    196

 1   agreement with the DAF back to NexPoint sometime soon, so it

 2   -- it's --

 3   Q   Let me ask you this question.  When you were providing

 4   information to us and having conversations with us, were you

 5   doing that as an agent of the DAF, the way you described it,

 6   --

 7   A   Yes.

 8   Q   -- on their behalf?

 9   A   Yes.

10   Q   Were you also doing it to help us do our jobs for the DAF?

11   A   Yes.

12   Q   Did you respond to requests for information from myself?

13   A   Yes.

14   Q   Did you help coordinate other -- finding other witnesses

15   or sources of information at my request?

16   A   Yes.

17   Q   Did you do so based upon any understanding that I was

18   working on behalf of the DAF for that?

19   A   Yes.  I knew -- I knew you were working for the DAF.  No

20   one else, yeah.

21   Q   And so -- and so did you provide any expertise or any in-

22   depth understanding to myself in helping me prepare that

23   complaint?

24   A   I think so, but I give a lot of credit to your firm for

25   researching things that I -- I knew reasonably well but then

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01533-B   Document 43-11   Filed 02/24/23   Page 43 of 213   PageID 2422

Dondero - Voir Dire                        197

1   you guys researched in even more depth.

2              MR. MORRIS:  I'd move to strike the answer as

3   nonresponsive.

4              THE COURT:  Sustained.

5   BY MR. SBAITI:

6   Q   Let me ask the question again.  When you were providing us

7   information and expertise, were you doing so knowing you were

8   working -- helping us work for the DAF?

9   A   Yes.

10  Q   Now, did you demand any compensation for that?

11  A   No.

12  Q   Do you require compensation necessarily to help the DAF?

13  A   No.

14  Q   Do you do other things for the DAF sometimes without

15  compensation?

16  A   Right.  We do the right thing, whether we get paid for it

17  or not.  Yes.

18  Q   Had you known that our communications were not necessarily

19  part of an agency relationship with the DAF, as you understood

20  it, that you were just some guy out on the street, would you

21  have had the same conversations with us?

22  A    (sighs)

23  Q   Let me ask a better question.  If I had come to you

24  working for someone that wasn't the DAF, you didn't already

25  have a relationship with, would you have given us the same

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01525-B   Document 3-11   Filed 02/04/22   Page 344 of 513   PageID 2423

Dondero - Voir Dire                    198

```
 1   help?

 2   A    I wouldn't have been involved if it was somebody else.

 3   Q    Is the reason you got involved because we were the lawyers

 4   for the DAF?

 5   A    Correct.

 6            MR. MORRIS:  Objection.  It's just leading.  This is

 7   all leading.

 8            THE WITNESS:  Correct.

 9            THE COURT:  Sustained.

10            MR. SBAITI:  Can --

11            THE WITNESS:  Yeah.  Sorry.

12   BY MR. SBAITI:

13   Q    Do you get -- do -- did you -- did you do work for the --

14   did you provide the help for the DAF laboring under the

15   understanding that there was an agreement?

16            MR. MORRIS:  Objection; leading.

17            THE COURT:  Sustained.

18   BY MR. SBAITI:

19   Q    Earlier you testified you believed there was an agreement?

20   A    I thought that was an agreement, and I thought there will

21   be one shortly if there isn't one, yes.

22   Q    Okay.

23   A    And so we -- I've been operating in a bona fide way in the

24   best interests of the DAF throughout -- assuming there was an

25   agreement, but even if there wasn't a formal one, I would
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01055-E   Document 43-11   Filed 02/25/22   Page 45 of 213   PageID 2424

Dondero - Voir Dire                          199

1    still be moving in the best interests of the DAF and helping

2    your firm out or --

3    Q    And you did that because you believed there was an

4    agreement or soon would be?

5    A    Yes.

6             MR. SBAITI:  Your Honor, I mean, I believe we've

7    established a dual role here, both as an agent of the DAF and

8    as an agent of the law firm, Your Honor.

9             THE COURT:  Okay.  Just a minute.  I'm looking at

10   Texas authority on common interest privilege to see if there's

11   anything that --

12        (Pause.)

13            THE COURT:  All right.  Again, it would have been

14   very nice to get briefing ahead of time.  I think this

15   absolutely could have been anticipated.

16       I do not find the evidence supports any sort of protection

17   of this testimony under work product privilege, common

18   interest privilege.  I just haven't been given authority or

19   evidence that supports that conclusion.  So the objections are

20   overruled.

21       Mr. Morris, go ahead.

22                 DIRECT EXAMINATION, RESUMED

23   BY MR. MORRIS:

24   Q    Can you describe for the Court the substance of your

25   communications with Mr. Sbaiti concerning the complaint?

1    A    As I've stated, directing him toward the Advisers Act and

2    then largely in a proofing function regarding CLO nomenclature

3    and some of the other fund nomenclature that sometimes gets

4    chaotic in legal briefs.

5    Q    Did you communicate in writing at any time with anybody at

6    the Sbaiti firm regarding any of the matters that are the

7    subject of the complaint?

8    A    I can't remember anything in writing.  Almost everything

9    was verbal, on the phone.

10   Q    You don't tend to write much, right?

11   A    Periodically.

12   Q    Did you communicate with Mr. Patrick?  Did you communicate

13   with anybody in the world in writing regarding the substance

14   of anything having to do with the complaint?

15            MR. SBAITI:  Objection, Your Honor.  Argumentative.

16            THE COURT:  Overruled.

17            THE WITNESS:  I --

18            MR. SBAITI:  Your Honor, may I just -- one

19   housekeeping.  Rather than raise the same objection, may we

20   have a standing objection, just so we're not disruptive, as to

21   the privilege, just for preservation purposes, on the content

22   of these communications?  Otherwise, I'll just make the same

23   objections and we can go through it.

24            THE COURT:  Well, disruptive as it may be, I think

25   you need to object to every --

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 43-11   Filed 09/27/22   Page 47 of 213   PageID 2426

Dondero - Direct                    201

1          MR. SBAITI:  Okay.

2          THE COURT:  -- question you think the privilege

3    applies to.

4          MR. SBAITI:  I will do so.  Thank you, Your Honor.

5    Uh-huh.

6    BY MR. MORRIS:

7    Q   Mr. Dondero, the question was whether you've ever

8    communicated with anybody in the world in writing concerning

9    anything having to do with the complaint?

10   A   Not that I remember.

11   Q   Okay.

12         MR. MORRIS:  I will point out, Your Honor, that last

13   week, when the privilege was asserted, I had requested the

14   production of a privilege log.  I was told -- I forget exactly

15   what I was told, but we never received one.  I'll just point

16   that out as well.

17         THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q   You provided comments to the drafts of the complaint

20   before it was filed, correct?

21   A   Yes, a few.

22   Q   Can you describe for the Court all of the comments that

23   you provided to earlier drafts of the complaint?

24         MR. SBAITI:  Your Honor, we object on the basis of

25   privilege and work product and joint -- joint interest

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01585-B   Document 14-11   Filed 02/24/23   Page 48 of 213   PageID 2427

Dondero - Direct                              202

 1   privilege.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  It's along the lines of things I've

 4   said in this court several times.  The obligations under the

 5   Advisers Act cannot be negotiated away and they cannot be

 6   waived by the people involved, full stop.  I remember giving

 7   the -- Mazin the example of the only reason why we're in a

 8   bankruptcy is from an arbitration award that, even though we

 9   did what was in the best interests of the investors, we got

10   the investors out more than whole over an extended period of

11   time, they got an arbitration award that said when we

12   purchased some of the secondary interests we should have

13   offered them up to the other 800 members in the committee

14   besides the -- the 800 investors in the fund besides the eight

15   people on the committee who had approved it and that the

16   committee couldn't approve a settlement that went against the

17   Advisers Act and the Advisers Act stipulates specifically that

18   you have to offer it up to other investors before you take an

19   opportunity for yourself.  And someday, hell or high water, in

20   this court or some other, we will get justice on that.  And

21   that was the primary point that I reminded Mazin about.

22   BY MR. MORRIS:

23   Q    And that's exactly the conversation you had with Mark

24   Patrick that started this whole thing, correct?

25   A    No.

1   Q    You told Mark Patrick that you believe the Debtor had

2   usurped a corporate opportunity that should have gone to the

3   DAF, didn't you?

4   A    That was not our conversation.

5   Q    So when Mr. Patrick testified to that earlier today, he

6   just got it wrong, right?

7   A    Well, maybe later on, but it wasn't that in the beginning.

8   The beginning, any conversation I had with Mark Patrick in the

9   beginning was smelling a rat in the way that the Debtor had

10  priced the portfolio for HarbourVest.

11  Q    Hmm.  So you're the one, again, who started that piece of

12  the discussion as well, correct?

13  A    Started the -- I -- I guess I smelled a rat, but I put the

14  person who could do all the numbers in touch with the Sbaiti

15  firm.

16  Q    And was the rat Mr. Seery?

17  A    Was the rat Mr. Seery?  Or the independent board.  Or a

18  combination thereof.  I believe the independent board knew

19  exactly what Seery was doing with --

20  Q    Do you have any idea --

21  A    -- HarbourVest.

22  Q    Do you have any idea why, why the Sbaiti firm didn't name

23  the whole independent board in the -- in the motion for leave

24  to amend?

25  A    I don't know.  Maybe they will at some point.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 43-11   Filed 09/24/21   Page 450 of 523   PageID 2429

Dondero - Direct                                         204

1    Q    Yeah.

2    A    I don't know.

3    Q    But did you tell the Sbaiti firm that you thought the

4    whole independent board was acting in bad faith and was a rat?

5          MR. SBAITI:  Your Honor, I object on the basis of

6    privilege.

7          THE COURT:  Overruled.

8          MR. SBAITI:  All three.

9          THE WITNESS:  I knew Jim Seery was and I knew Jim

10   Seery had weekly meetings with the other independent board

11   members, so the HarbourVest settlement was significant enough

12   that it would have been approved, but I don't have direct

13   knowledge of their involvement.

14   BY MR. MORRIS:

15   Q    And so you -- but you believed Jim Seery was certainly a

16   rat, right?

17   A    Oh, I -- there was a defrauding of third-party investors

18   to the tune of not insignificant 30, 40, 50 million bucks, and

19   it was obfuscated, it was -- it was highly obfuscated in the

20   9019.

21   Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22   A    I believe he had monthly financials.  He knew that the

23   numbers presented in the 9019 were wrong.  And if that makes

24   him a rat, that makes him a rat.  Or maybe he's just being

25   aggressive for the benefit of his incentive or for the estate.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01543-B   Document 48-11   Filed 02/24/10   Page 51 of 213   PageID 2480

Dondero - Direct                       205

1  But I -- I believe those things wholeheartedly.

2  Q   Did you tell the Sbaiti firm you thought Jim Seery was a

3  rat?

4          MR. SBAITI:  Objection, Your Honor.  Privilege.

5          THE COURT:  Overruled.

6          THE WITNESS:  I -- I don't remember using those

7  words.

8  BY MR. MORRIS:

9  Q   Did you tell the Sbaiti Firm that you thought Jim Seery

10 had engaged in wrongful conduct?

11         MR. SBAITI:  Your Honor, objection.  Privilege.

12         THE COURT:  Overruled.

13         THE WITNESS:  I believe he violated the Advisers Act,

14 and I was clear on that throughout.

15 BY MR. MORRIS:

16 Q   Listen carefully to my question.  Did you tell the Sbaiti

17 firm that you believed that Jim Seery engaged in wrongful

18 conduct?

19         MR. SBAITI:  Objection, Your Honor.  Calls for

20 privileged communications.

21         THE COURT:  Overruled.

22         THE WITNESS:  I think I gave the answer.  I'll give

23 the same answer.  I believe he violated the Advisers Act.

24 BY MR. MORRIS:

25 Q   What other wrongful conduct did you tell the Sbaiti firm

 1  you thought Mr. Seery had engaged in?

 2           MR. SBAITI:  Same objection, Your Honor.

 3           THE COURT:  Overruled.

 4           MR. SBAITI:  Calls for privileged communications.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  I -- I just remember the obfuscating

 7  and mispricing portfolio violations of the Advisers Act was

 8  all I discussed with the Sbaiti firm regarding Seery's

 9  behavior.

10  BY MR. MORRIS:

11  Q    Did you talk to them about coming to this Court under the

12  gatekeeper order to see if you could get permission to sue Mr.

13  Seery?

14  A    I --

15           MR. SBAITI:  Objection, Your Honor.  Calls for

16  privileged communication.

17           THE COURT:  Overruled.

18           THE WITNESS:  I wasn't involved in any of the --

19  BY MR. MORRIS:

20  Q    Did you --

21  A    -- tactical stuff on who to sell or -- who to sue or when

22  or whatever.

23  Q    Did you tell the Sbaiti firm that you thought they should

24  sue Mr. Seery?

25           MR. SBAITI:  Objection, Your Honor.  Calls for

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01053-B    Document 13-11    Filed 02/04/22    Page 53 of 213    PageID 2482

Dondero - Direct                        207

 1  privileged communication.

 2              THE COURT:  Overruled.

 3              MR. SBAITI:  I'll also say, Your Honor, the question

 4  is getting a little argumentative.

 5              THE WITNESS:  I didn't get directly --

 6              THE COURT:  Overruled.

 7              THE WITNESS:  I didn't get directly involved in who

 8  was -- who was specifically liable.

 9  BY MR. MORRIS:

10  Q    How many times did you speak with the Sbaiti firm

11  concerning the complaint?

12  A    Half a dozen times, maybe.

13  Q    Did you ever meet with them in person?

14  A    I've only met with them in person a couple, three times.

15  And I don't think any of them -- no, it was, excuse me, it was

16  on deposition or other stuff.  It wasn't regarding this.

17  Q    Did you send them any information that was related to the

18  complaint?

19  A    I did not.

20  Q    Did you ask anybody to send the Sbaiti firm information

21  that related to the complaint?

22  A    I did not.  I -- I was aware that Hunter Covitz was

23  providing the historic detailed knowledge to the firm, but it

24  -- it wasn't -- I don't believe it was me who orchestrated

25  that.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-E   Document 11   Filed 09/14/23   Page 54 of 213   PageID 2433

Dondero - Direct                          208

1  Q   Did you talk to anybody at Skyview about the allegations

2  that are contained in the complaint before it was filed?

3  A   I don't -- I don't remember.

4  Q   Have you ever talked to Isaac Leventon or Scott Ellington

5  about the allegations in the complaint?

6  A   No.  They weren't involved.

7  Q   How about -- how about D.C. Sauter?  You ever speak to him

8  about it?

9  A   I don't --

10          MR. TAYLOR:  Objection, Your Honor.

11          THE WITNESS:  I don't remember.

12          MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13  employee of Skybridge and is a general counsel for some of the

14  entities which he worked for.  And to the extent he's trying

15  to ask for those communications, that would be invasion of the

16  privilege.

17          MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18  fair.

19          THE COURT:  Okay

20          MR. MORRIS:  That's fair.

21          THE COURT:  Question withdrawn.

22          THE WITNESS:  I thought you only had eight more

23  questions.

24          MR. MORRIS:  Opened the door.

25  BY MR. MORRIS:

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01598-B   Document 16-11   Filed 09/24/21   Page 55 of 213   PageID 2484

Dondero - Direct                            209

1    Q    Can you describe the general fact -- withdrawn.  You

2    provided facts and ideas to the Sbaiti firm in connection with

3    your review of the draft complaint, correct?

4    A    Ideas and proofreading.

5    Q    Anything beyond what you haven't described already?

6    A    Nope.

7    Q    Okay.  Who is your primary contact at the Sbaiti firm, if

8    you had one?

9    A    Mazin.

10   Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11   be named as a defendant in the lawsuit before it was filed?

12            MR. SBAITI:  Your Honor, calls for privileged

13   communication.  We object --

14            THE COURT:  Overruled.

15            MR. SBAITI:  -- to that answer.

16            MR. SBAITI:  Okay.

17            THE WITNESS:  Again, no.  I wasn't involved with the

18   tactics on who would be defendants and when or if other people

19   would be added.

20   BY MR. MORRIS:

21   Q    Did you -- are familiar with the motion to amend that was

22   filed by the Sbaiti firm?

23   A    I'm more familiar with it after today --

24   Q    Right.

25   A    -- than I was before.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01580-B   Document 1-11   Filed 07/24/21   Page 56 of 213   PageID 2435

Dondero - Direct                    210

1   Q   And were you aware that that motion was going to be filed

2   prior to the time that it actually was filed?

3   A   I -- I don't remember.  Probably.

4   Q   And who would have been the source of that information?

5   Would that have been Mr. Sbaiti?

6   A   Yes.

7   Q   Okay.  And did you express any support for the decision to

8   file the motion for leave to amend in the District Court?

9   A   I -- I wasn't involved.  It was very complicated legal

10  preservation conver... -- I wasn't involved.  I knew the

11  conversations were going on between different lawyers, but I

12  wasn't involved in the ultimate decision.  I didn't encourage,

13  applaud, or even know exactly what court it was going to be

14  filed in.

15          MR. MORRIS:  All right.  I have no further questions,

16  Your Honor.

17          THE COURT:  All right.  Pass the witness.

18          MR.

19  ANDERSON:  We have no questions, Your Honor.

20          THE COURT:  Okay.  Any questions from Respondents?

21          MR. SBAITI:  No questions.

22          THE COURT:  Okay.  Mr. Taylor?

23                      CROSS-EXAMINATION

24  BY MR. TAYLOR:

25  Q   Mr. Dondero, --

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 43-11    Filed 02/10/22    Page 57 of 213    PageID 2436

Dondero - Cross                              211

 1   A   Yes, sir.

 2   Q   -- you are not the authorized representative of CLO

 3   Holdco, are you?

 4   A   No.

 5   Q   You're not the authorized representative for the DAF, are

 6   you?

 7   A   No.

 8   Q   Do you know who that person is as we sit here today?

 9   A   Yes.

10   Q   Who is that?

11   A   Mark Patrick.

12   Q   Thank you.

13          MR. TAYLOR:  No further questions.

14          THE COURT:  Any redirect on that cross?

15          MR. MORRIS:  I do not, Your Honor.  I would just like

16   to finish up the Debtor's case in chief by moving my exhibits

17   into evidence.

18          THE COURT:  Okay.  Mr. Dondero, you're excused.

19       (The witness steps down.)

20          THE COURT:  All right.  So you have no more

21   witnesses; you're just going to offer exhibits?

22          MR. MORRIS:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. MORRIS:  So, at Docket #2410, --

25          THE COURT:  Uh-huh.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 43-11   Filed 04/26/23   Page 58 of 213   PageID 2437

212

 1          MR. MORRIS:  -- the Court will find Exhibits 1

 2     through 53.

 3          THE COURT:  Uh-huh.

 4          MR. MORRIS:  In advance, Your Honor, I've conferred

 5     with the Respondents' counsel.  They had previously objected

 6     to Exhibits 15 and 16, which I believe were the Grant Scott

 7     deposition transcripts.  They objected to them on the grounds

 8     of lack of completeness because I had taken the time to make

 9     deposition designations, but I'm happy to put the entirety of

10     both transcripts into evidence, and I hope that that will

11     remove the objections to Exhibits 15 and 16.

12          THE COURT:  All right.  Before we confirm, let's just

13     make sure we have the right one.

14          MR. MORRIS:  Oh, I apologize.

15          THE COURT:  I have 16 as the July order.

16          MR. MORRIS:  I apologize.  You're absolutely right,

17     Your Honor.  What I was referring to was -- oh, goodness.  One

18     second.  (Pause.)  I was referring to Exhibits 23 and 24.

19     Those are Mr. Scott's deposition designations.  They had

20     lodged an informal objection with me on grounds of

21     completeness.  And in order to resolve that objection, we're

22     happy to put the entirety of both transcripts in.

23          THE COURT:  All right.  So if our Respondents could

24     confirm with the agreement to put in the entire depos at 23

25     and 24, you stipulate to 1 through 53?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 31-1    Filed 07/05/22    Page 59 of 213    PageID 2458

213

| 1 | MR. PHILLIPS: We also -- Your Honor, -- |
|---|---|
| 2 | MR. MORRIS: Yeah, I was going to take them one at a |
| 3 | time. Just take those two. |
| 4 | MR. PHILLIPS: Yeah, can we just take those two? |
| 5 | Confirmed? |
| 6 | MR. MORRIS: Okay. |
| 7 | THE COURT: Oh, okay. |
| 8 | MR. PHILLIPS: Because there are other -- there are |
| 9 | other -- we exchanged objections to each other's witness and |
| 10 | exhibit lists. And so I think you can handle the rest of them |
| 11 | kind of in a bunch, right? |
| 12 | MR. MORRIS: Yeah. Yeah, there's two bunches, |
| 13 | actually. |
| 14 | MR. PHILLIPS: Yeah. |
| 15 | THE COURT: Okay. So you have just now stipulated to |
| 16 | 23 and 24 being admitted -- |
| 17 | MR. MORRIS: Correct. |
| 18 | THE COURT: -- with the full depos? Okay. |
| 19 | MR. PHILLIPS: Yes, ma'am. Thank you. |
| 20 | THE COURT: All right. |
| 21 | (Debtor's Exhibits 23 and 24 are received into evidence.) |
| 22 | MR. MORRIS: And then the next two that they objected |
| 23 | to are Exhibits 15 and 16. 15 is the January order and 16 is |
| 24 | the July order. They objected on relevance grounds. I think |
| 25 | 16 -- these are the two orders that the Debtors contend the |

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 8-11   Filed 02/07/22   Page 60 of 213   PageID 2459

214

1   Respondents have violated, so I don't understand the relevance

2   objection, but that's what it was and that's my response.

3           MR. PHILLIPS:  Resolved, Your Honor.

4           THE COURT:  Okay.  15 and 16 are admitted.

5       (Debtor's Exhibits 15 and 16 are received into evidence.)

6           MR. MORRIS:  Okay.  And then the last objection

7   relates to a group of exhibits.  They're Exhibits 1 through

8   11.  Those exhibits I think either come in together or stay

9   out together.  They are exhibits that relate to the

10  HarbourVest proceedings, including deposition notices,

11  including I think the transcript from the hearing, the Court's

12  order, the motion that was filed.

13      The Debtor believes that those documents are relevant

14  because they go right to the issue of the gatekeeper order and

15  had they filed, had the Respondents followed the gatekeeper

16  order, this is -- this is why they didn't do it.  You know

17  what I mean?  That's the argument, is that the Respondents,

18  one of the reasons the Respondents -- argument -- one of the

19  reasons the Respondents didn't come to this Court is because

20  they knew this Court had that kind of record before it.  And I

21  think that's very relevant.

22          THE COURT:  All right.  Response?

23          MR. PHILLIPS:  Your Honor, we think that these

24  exhibits are not relevant.  We have a very focused, we think,

25  -- we have the Court's order.  Those objections are withdrawn.

1   We have the complaint.  We have the motion to amend.  And the

2   issue is whether the motion to amend, which was dismissed one

3   day, or the next day after it was filed, constitutes criminal

4   -- constitutes contempt.

5       So we think the prior proceedings go to their underlying

6   argument, which is the lawsuit or the complaint is no good,

7   and that has nothing to do with -- there's been no foundation

8   laid and it's not relevant what happened in connection with

9   the HarbourVest settlement.  It is what it is, and there's no

10  dispute that it is what it is, but it's not relevant to

11  establish any type of -- they've even said intent is not even

12  relevant here.  So we -- that's -- we think all of that goes

13  out and simplifies the record, because it has nothing to do

14  with whether or not there was a contempt.

15          THE COURT:  Response?

16          MR. MORRIS:  We withdraw the exhibits, Your Honor.

17  I'm just going to make it simple for the Court.

18          THE COURT:  Okay.

19          MR. MORRIS:  I'm just going to make it simple for the

20  Court.

21          THE COURT:  1 through 11 are withdrawn.

22      (Debtor's Exhibits 1 through 11 are withdrawn.)

23          MR. MORRIS:  So, the balance, there was no objection.

24  So all of the Debtor's exhibits on Docket #2410 -- let me

25  restate that.  Exhibits 12 through 53 no longer have an

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 18-11   Filed 02/25/22   Page 62 of 213   PageID 2541

216

 1  objection.  Is that correct?

 2          MR. PHILLIPS:  Yes.

 3          MR. MORRIS:  Okay.  And then --

 4          MR. PHILLIPS:  Confirmed.

 5          THE COURT:   Okay.

 6      (Debtor's Exhibits 12 through 53 are received into

 7  evidence.)

 8          MR. MORRIS:  Okay.  Thank you.  And then we filed an

 9  amended list, I believe, yesterday --

10          THE COURT:  Uh-huh.

11          MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12          THE COURT:  Uh-huh.

13          MR. MORRIS:  And those exhibits are simply my firm's

14  billing records.

15          THE COURT:  Okay.

16          MR. MORRIS:  You know, we added Mr. Demo to the

17  witness list in case there was a need to establish a

18  foundation.  That's the only thing he would testify to.  I

19  don't know if there's an objection to those two exhibits,

20  because we hadn't had an opportunity to confer.

21          THE COURT:  Any objection?

22          MR. PHILLIPS:  Your Honor, we're not going to require

23  authenticity and foundation for -- we have the right, we

24  think, to say that they're not a ground -- we're not going to

25  challenge that they are the bills, and the bills say what they

1   say.  We don't need Mr. -- we don't need a witness to

2   authenticate those exhibits.  But we reserve all substantive

3   rights with respect to the effect of those exhibits.

4            THE COURT:  All right.  54 and 55 are admitted.

5        (Debtor's Exhibits 54 and 55 are received into evidence.)

6            MR. MORRIS:  And with that, Your Honor, the Debtor

7   rests.

8            THE COURT:  Okay.  All right.  Respondents?

9        (Counsel confer.)

10           MR. PHILLIPS:  If I could have a second?

11           THE COURT:  Okay.

12           A VOICE:  Sorry, Your Honor.

13       (Pause.)

14           MR. PHILLIPS:  Your Honor, we have filed in our

15  witness and exhibit list, and I have to say I don't have the

16  number, but we'll get the docket entry number, but we have 44

17  exhibits.  There's an objection to Exhibit #2, which is --

18  thank you -- it's Document 2411, Your Honor.  Thank you.

19           THE COURT:  Uh-huh.

20           MR. PHILLIPS:  There is a pending objection to

21  Exhibit #2 which we have not resolved.  There's no objection

22  to any other exhibit.  But in reviewing our exhibit list, I

23  found that we had some -- some mistakes and duplications.

24       So, with respect to 2411, we would withdraw Exhibit 13,

25  14, and 29, and we would offer Exhibit 1, and then 30 through

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01531-B   Document 18-11   Filed 09/14/21   Page 64 of 213   PageID 2443

218

1   44, with 13, 14, and 29 deleted.

2          THE COURT:  Okay.  So 1, 3 through 12, --

3          MR. PHILLIPS:  Yes.

4          THE COURT:  -- 15 through 28, and then 30 --

5          MR. PHILLIPS:  And then 30 through 44.

6          THE COURT: -- through 44?  Do you confirm, Mr.

7   Morris?

8          MR. MORRIS:  Yes, Your Honor.  The only objection we

9   have is to Exhibit #2.

10          THE COURT:  And that's -- he's not offering that?

11          MR. MORRIS:  Yeah.

12          MR. PHILLIPS:  Not at this time, Your Honor.

13          THE COURT:  Okay.

14          MR. PHILLIPS:  We would have to have testimony about

15   that.

16          THE COURT:  Okay.  All right.  So those are admitted.

17          MR. PHILLIPS:  Okay.

18     (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19   and 30 through 44 are received into evidence.)

20          THE COURT:  By the way, it looks like Exhibit 44 is

21   at a different docket number, Docket 2420.  Correct?  You have

22   --

23          MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24   hearing transcript from the July approval hearing.  At least

25   that's what it's supposed to be.

002158

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01504-B   Document 4-31   Filed 02/25/22   Page 65 of 213   PageID 2464

219

```
 1                THE COURT:  Okay.

 2                MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

 3    and then I think they took it off, so we had to add it.

 4                MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

 5    right.  They -- that's correct, Your Honor.

 6                THE COURT:  Okay.

 7                MR. PHILLIPS:  Exhibit 44 was added --

 8                THE COURT:  Okay.

 9                MR. PHILLIPS:  -- because the Debtor's withdrew it,

10    and so it was added in the second -- in the supplemental and

11    amended list.  The -- the one that I was talking about was the

12    prior list.

13                THE COURT:  Okay.  So that's at Docket 2420?

14                MR. PHILLIPS:  Yes.

15                THE COURT:  You're not offering 45 or 46?

16                MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17    well.  I'm sorry.

18                THE COURT:  Okay.  Any objections, Mr. Morris?

19                MR. MORRIS:  No, Your Honor.

20                THE COURT:  Okay.  So 45 and 46 are admitted as well.

21    They're at Docket Entry 2420.

22         (Mark Patrick's Exhibits 45 and 46 are received into

23    evidence.)

24                THE COURT:  All right.  Your witnesses?

25                MR. PHILLIPS:  Your Honor, could we have five minutes
```

220

1  to just see what we're -- our plan is, and then we'll be back

2  at 4:00?

3          THE COURT:  Okay.  We'll be back at 4:00.

4          MR. PHILLIPS:  Thank you.

5          THE CLERK:  All rise.

6      (A recess ensued from 3:55 p.m. until 4:04 p.m.)

7          THE CLERK:  All rise.

8          THE COURT:  Please be seated.  All right.  Back on

9  the record in Highland.  Mr. Phillips?

10         MR. PHILLIPS:  Your Honor, with the introduction of

11 the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12 those Respondents, and we consider Mark Patrick a Respondent

13 although not formally named as a Respondent because he is the

14 party who authorized the filing of the Seery motion -- we

15 rest.

16         THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17 closing arguments?

18         MR. MORRIS:  How much time do I have?

19         THE COURT:  You've got a lot more time than you

20 probably thought you were going to.  You're under an hour.

21         MR. MORRIS:  42 minutes?

22         THE COURT:  How much?

23         THE CLERK:  42 minutes.

24         THE COURT:  42 minutes?  Feel free not to use it all.

25         MR. SBAITI:  Out of curiosity, how long do we have?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 14-11    Filed 08/25/21    Page 67 of 213    PageID 2446

221

 1              THE COURT:  You have a lot of time, which I hope you

 2    won't use.

 3              THE CLERK:  Hour and twenty-five minutes or so.

 4              MR. SBAITI:  I was afraid it was going to be an hour

 5    and twenty, so --

 6              MR. PHILLIPS:  No, not either.

 7              MR. MORRIS:  I don't suspect I'll use all the time.

 8              THE COURT:  Okay.  Thank you.

 9              MR. MORRIS:  May I proceed?

10              THE COURT:  You may.

11              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

12              MR. MORRIS:  Good afternoon, Your Honor.  John

13    Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd

14    like to just make some closing remarks after the evidence has

15    closed.

16         This is a very, very important motion, Your Honor.  I take

17    this stuff seriously.  It's only the second contempt motion

18    I've ever brought in my life.  I've never gone after another

19    law firm.  But these facts and circumstances require it,

20    because my client is under attack, and these orders were

21    entered to prevent that.

22         It is serious stuff.  There's no question in my mind,

23    there's no question the evidence showed, clear and

24    convincingly, beyond reasonable doubt, that they violated this

25    Court's order.

002161

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 31-11   Filed 02/25/22   Page 68 of 213   PageID 2447

222

1    I started off with three very simple prongs.  So simple

2  you'd think I'd remember them.  Number one, was a court order

3  in effect?  There is no dispute.  The court order was in

4  effect.

5    Number two, did the order require certain conduct by the

6  Respondent?  We believe it did.  We heard an hour-long

7  argument styled as an opening statement, but it was really

8  argument and not an opening statement, about all the defects

9  in the order.  But the one thing that is crystal clear in the

10  order are the words commence or pursue.  You've been told many

11  times by the Respondent that nobody has commenced an action

12  against Mr. Seery.  That is true.  We all know what the word

13  commence means.  We all know what the word pursue means.

14    I heard argument this morning that pursue means after a

15  claim is filed you pursue a case.  That's the way lawyers talk

16  about it.  But that doesn't make any sense, Your Honor,

17  because once you've commenced the action you've violated the

18  order.  It's commence or pursue, it's in the disjunctive, and

19  you can't read out of the order the concept of pursuit by

20  making it an event that happens after the commencement,

21  because that's exactly what they're trying to do.  They're

22  trying to read out of the order the word pursuit.

23    And I ask you to use very simple common sense.  If filing

24  a motion for leave to amend a complaint to add Mr. Seery as a

25  defendant is not pursuit, what is?  What is?  There's nothing

1   left.  You commence an action or you do something less than

2   commencing an action when you're going after the man.  That's

3   what pursuit means.  They're going after the man.  And they

4   asked the District Court to do what they knew they couldn't.

5       Mr. Phillips is exactly right.  I made the point about

6   Rule 15 because they knew they couldn't do it.  I'm not

7   suggesting that they should have.  I'm suggesting that the

8   reason that they didn't is because they knew they were -- they

9   were in a bad place.  Because if they really just wanted to

10  name Mr. Seery as a defendant, they wouldn't have done it.

11  They knew commence was crystal clear.

12      What they're trying to do is claim that somehow there's an

13  ambiguity around the word pursuit.  Does that make any sense

14  at all?  Filing a motion for leave to amend the complaint.

15  And Mr. Patrick, to his credit, candidly admitted that if the

16  motion was granted, they were suing, yeah, as long -- as long

17  as the Sbaiti firm, you know, recommended it.  That's what

18  would have happened.

19      Those orders that you signed, nothing, absolutely

20  meaningless from their point of view.  They believed they were

21  wrong.  They believed that they were overbroad.  They believed

22  they were too narrow.  They believed they were vague.  They

23  believed they were without authority.  They don't get to be

24  the gatekeeper.  They want to be the gate -- that's this

25  Court's decision.  That's why we went through all of the

1   processes that we did.  And they just flagrantly said, I don't

2   agree.  I don't agree because it's wrong this way and it's

3   wrong that way and it's wrong the other way, and therefore let

4   me go find a higher authority to validate my thinking.  That's

5   not the way this process is supposed to work.

6       The independent directors and Mr. Seery relied on the

7   gatekeeper in accepting their positions.  It was a quid pro

8   quo.  Mr. Dondero agreed to the exact same provision, the

9   exact same gatekeeper provision in the January order that he

10  now complains about today, that the DAF complains about today.

11  Where were these people?

12      As the Court knows, nobody appealed either order.  The

13  Debtor, the independent board, Mr. Seery expected that the

14  plain and unambiguous words would be honored and enforced.  I

15  think that's fair.  I think that's the way the process is

16  supposed to work.

17      Instead, we have games.  We have these linguistic

18  gymnastics.  We have statements that are too cute by half.

19  Mr. Dondero won't even admit that he appointed Mr. Scott back

20  in 2012.  I couldn't even get him to do that, really, even

21  though the documents say it, even though Mr. Patrick says it.

22      I'll take the Respondents one at a time in a moment, but I

23  just want to deal with some of the more interesting arguments

24  they make.  The order was vague because it didn't say you

25  can't seek leave from the District Court to amend your

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01053-B    Document 31-1    Filed 02/01/22    Page 71 of 213    PageID 2450

225

1    complaint to add Mr. Seery.  They said that that's what makes

2    the order vague.

3        Your Honor, if you had thought to put that language in,

4    you know what they would have done?  They would have sued Mr.

5    Seery in New York State Supreme Court, where he lives, and

6    said, the order didn't say I couldn't do that.  Where does it

7    end?

8        There's a reason why the order was crafted broadly to say

9    no commencement or pursuit without Bankruptcy Court  approval.

10   You have to bring a colorable claim.

11       We heard an argument this morning that they couldn't

12   possibly have brought that motion for reconsideration first.

13   You know, the one they filed about eight hours after we filed

14   the contempt motion.  They couldn't possibly have brought that

15   motion before the motion for leave to amend because somehow

16   they would have been estopped or they would have been found to

17   have waived some right.

18       How could it be that anybody reasonably believes that

19   complying with a court order results in a waiver of some

20   right?  It just -- these are games.  These are not good

21   arguments.  And they certainly don't carry the day on a

22   contempt motion.

23       We've heard repeatedly, the District Court denied the

24   motion without prejudice, how have you been harmed?  They

25   shouldn't be able to rely on the District Court's prudence to

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 43-11   Filed 06/26/23   Page 72 of 213   PageID 2451

226

1   protect themselves.  The question shouldn't be, have you been

2   harmed since the District Court didn't grant the motion?  No.

3   The question should be, were we harmed by the attempt to name

4   Mr. Seery a defendant, in violation of court orders, without

5   notice?  Without notice.

6       I'm told they assumed that I'd be checking the dockets.  I

7   wasn't checking the docket, Your Honor.  I hadn't filed an

8   appearance in the case.  And, in fact, if you look at the

9   exhibits, because I could pull it out, but we put in the

10  communications between the lawyers.  The last communication

11  was from Mr. Pomerantz, and the last communication from Mr.

12  Pomerantz said, Don't do it or we're going to file a motion

13  for contempt.  That's now in the evidence.

14      So, having sent that message, I wasn't going to check the

15  docket to see if they really were going to go ahead and do it.

16  I didn't think they would.  And if they did, I certainly

17  thought I'd get notice of it.  Nothing.

18      And, again, I don't really need to establish intent at all

19  in order to meet my burden of clear and convincing evidence of

20  a contempt of court, but I think it is relevant when the Court

21  hopefully finds liability and is considering damages, because

22  that's really the most important point I have to make right

23  now, is the Court needs to enforce its own orders, because if

24  the Court doesn't, or doesn't impose a penalty that's

25  meaningful, this is just going to continue.  And Your Honor,

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01805-B   Document 43-11   Filed 02/10/22   Page 67 of 213   PageID 2452

227

1    it's all in the record.  Your Honor knows this.  Mr. Daugherty

2    has gone through it.  Right?  Mr. Terry went through it.  UBS

3    went through it.  You've seen litigation now for a year and a

4    half.  It's happening in New York, right, the Sbaiti firm is

5    reopening the Acis case.  we've got this other lawsuit that's

6    filed by an entity with like a five-tenths of one percent

7    interest who's complaining about the SSP transaction that Mr.

8    -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10   to exercise its authority.  We need the Court to protect the

11   estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13   true that he is a third-party outsider who came into this case

14   with the expectation and the promise in an order that he

15   wouldn't be subjected to frivolous litigation, that this Court

16   would be the arbiter of whether claims could be pursued

17   against him.  That was the code of conduct.  That was the quid

18   pro quo.  That was the deal that Mr. Seery made.  It's the

19   deal that the board members made.

20       What gives these people the right to just say, your order

21   is wrong, and because I think your order is wrong I'm going to

22   go to the District Court, and if the District Court agrees,

23   too bad, and if the District Court doesn't agree, we'll be

24   back before Your Honor, and no harm, no foul?  No.  It can't

25   be.  It can't be that that's the way this process works.  It

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01580-B   Document 31   Filed 02/04/22   Page 74 of 213   PageID 2453

228

1    just can't.

2         So, Your Honor, let me take the Defendants one at a time,

3    the Respondents one at a time.  CLO Holdco and the DAF are

4    corporate entities.  They've done what they've done.  Mr.

5    Patrick, bless him, I think he's a lovely man.  I don't think

6    he quite bargained for what he's getting right now, but

7    nevertheless he is where he is and he's willing to stand up

8    and be counted, and for that, at least, I admire his courage.

9    He's willing to say, I authorized those.  But you know what?

10   It's a violation of the law, it's a violation of this Court's

11   order to file that motion, and so he has -- and he was very

12   candid today.  He knew of the order.  Right?  He knew it was

13   in effect.  He pointed out that it was in their papers.

14   Right?

15        They're trying to be cute, they're trying to thread this

16   needle, but it has no hole in it.  They keep -- they keep

17   doing this.  Well, maybe if we do it this way, maybe if we do

18   it -- no.  The order was crystal clear.

19        The Sbaiti firm.  They're probably fathers and husbands

20   and good people and I wish them no ill will, but this is

21   wrong.  This is wrong.  To come into a court you've never been

22   in before and in less than twelve days to jump the shark like

23   this in twelve -- in less than twelve days, because Mr.

24   Patrick said they weren't hired until April, and the complaint

25   was filed on the 12th.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 43-11    Filed 08/25/23    Page 675 of 823    PageID 2454

229

1    We're told that they understood this was an overwhelming

2    case with two -- why don't you take your time?  What was the

3    rush?  Why not wait until the Defendant -- the Debtor appeared

4    in the action before rushing to do this?

5    It's bad conduct, Your Honor, and that's really a very

6    important point that I have to make, is that there's lots of

7    lawyers who are engaging in highly-questionable conduct here

8    that, from my perspective, goes well beyond the bounds of

9    zealous advocacy.

10    It's not aggressive lawyering.  I love aggressive

11    lawyering.  I really do.  Respectful, honest -- and I don't,

12    you know, I don't want to say that they're dishonest people.

13    I don't mean to do that.  But I think, I think they made a

14    gross error in judgment, and there's no question that they

15    violated this Court's order.

16    And then that leaves Mr. Dondero.  I don't even know what

17    to say about his testimony, Your Honor.  He pursued claims

18    against Mr. Seery.  He thinks he's a rat.  He's the one who

19    started the whole process.  He's the one who put the bug in

20    Mark Patrick's ear.  All of this is uncontested.  Right?

21    Uncontested.

22    I don't have to go back in time.  We can talk about what

23    happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24    think, did his honest best to do what he believed, on the

25    advice of counsel, was in the best interest of the DAF.  And

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01590-B    Document 14-11    Filed 02/16/22    Page 76 of 213    PageID 2455

230

1    Mr. Dondero, as you hear time and time again when he speaks

2    about Mr. Seery, it was inappropriate.  He's the arbiter of

3    what's in the best interest of entities that other people

4    control.  And they pay a price.  And they pay a price.  And so

5    Mr. Dondero felt it was his job, even though he tries to

6    distance himself from the DAF -- I have no responsibility, I

7    don't -- I'm not involved -- until, until somebody wants to

8    sue Seery and the Debtor.  Then he'll go all in on that, no

9    matter how specious the claim may be.

10        The Debtor's not going to fold its tent because a motion

11   for leave to amend was denied without prejudice.  That's not

12   the point.  The point is that people need to respect this

13   Court, people need to respect the Court's orders, and those

14   that aid and abet or otherwise support the violation of court

15   orders ought to be held to account, Your Honor.

16        I have nothing further.

17             THE COURT:  All right.  Thank you.  Respondents?

18             CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19             MR. SBAITI:  Your Honor, the fact that we're here on

20   a motion for leave, and the motion for leave is what they're

21   saying is pursuing a claim under the Court's order, and then

22   you hear that the mere act of investigating a claim against

23   Mr. Seery is also pursuing a claim, this goes to the infinite

24   regression problem with this word pursue the way they want to

25   construe it, Your Honor.  Asking for permission is not

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 43-11    Filed 02/01/23    Page 77 of 213    PageID 2476

231

1    pursuing a claim and can't be the definition of pursuing a

2    claim because it's not doing anything other than asking for

3    permission.

4         We didn't file a suit.  We didn't commence a suit.  I

5    think that's established.  We did not pursue a claim.  Mr.

6    Morris ignores, I think, the very commonsensical aspect that

7    we put out in the opening, which is that the reason pursue --

8    and sometimes the language in these types of orders is,

9    instead of pursue, it's maintain -- but the reason that word

10   is there is because sometimes the case has already been

11   started when the order is entered.  And so to pursue a claim,

12   *i.e.*, one that's already been filed as of the date of the

13   order, that would be lost if the commencement of that claim

14   hadn't happened until after the -- until the -- if the

15   commencement happened before the order was filed.  That's the

16   --

17            THE COURT:  Okay.  So are you saying it's a

18   sequential thing?

19            MR. SBAITI:  I'm not sure I understood your question,

20   Your Honor.  I'm sorry.

21            THE COURT:  Well, I'm trying to understand what it is

22   you're saying about how pursue should be interpreted.

23            MR. SBAITI:  Sure.

24            THE COURT:  I think you're saying you have to -- you

25   can either have -- well, we've got a prohibition on commencing

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 4-11   Filed 02/16/23   Page 78 of 213   PageID 2457

232

1  an action.

2         MR. SBAITI:  Yes.

3         THE COURT:  And then the separate word pursue, I

4  think you're saying that must refer to you already have an

5  action that's been commenced and you're continuing on with it.

6  Is that what you're saying?

7         MR. SBAITI:  Yes, Your Honor.

8         THE COURT:  Then why not use the word continue?

9         MR. SBAITI:  Well, Your Honor, the choice of --

10         THE COURT:  Kind of like 362(a) of the Bankruptcy

11  Code, you know, is worded.

12         MR. SBAITI:  Well, Your Honor, the choice of the

13  wording of pursue at that point, Your Honor, I believe ends up

14  being ambiguous, because by filing the motion here that would

15  be pursuing a claim under that definition.  So before I got

16  permission to pursue a claim, I've got to pursue a claim.

17  That's the problem that they have with the words that they're

18  trying to get you to adopt, or the meaning of the words

19  they're trying to get you to adopt.

20     If I came to this Court and said, Judge, I need

21  permission, I need leave to file suit against Mr. Seery, and

22  then the question is, well, you're not allowed to seek leave

23  because that's pursuing the claim, it's infinitely regressive.

24  And in fact, his closing argument just proved how it's

25  infinitely regressive.

1          THE COURT:  Okay.  Let me -- I'm not following this

2     infinitely regressive or whatever the term was.

3          MR. SBAITI:  Yes.

4          THE COURT:  Just answer this very direct question.

5     Why did you not file a motion for leave in the Bankruptcy

6     Court?  That would have clearly, clearly complied with the

7     July order.

8          MR. SBAITI:  Your Honor, I believe we explained this

9     in the opening.  I took a stab at it.  Mr. Bridges took a stab

10    at it.  We did not believe coming here and asking for leave

11    and asking for -- for Your Honor to do what we don't believe

12    Your Honor can do, would effectuate an estoppel or a waiver,

13    which we didn't think was in the best interest of our client

14    to have.  Your Honor, this happens -- I don't believe this is

15    the --

16         THE COURT:  Okay.  Connect the dots.  Make that clear

17    as clear can be for me.  You file a motion for leave --

18         MR. SBAITI:  Yes.

19         THE COURT:  -- to file this District Court action

20    against the Debtor and Seery, and if I say yes, everything is

21    fine and dandy from your perspective.  If I say no, tell me

22    again what your estoppel argument is.

23         MR. SBAITI:  Your Honor, the key question is whether

24    us putting the Court's ability to decide colorability and the

25    Court's gatekeeper functions, for us to invoke those functions

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01533-B   Document 43-11   Filed 07/27/23   Page 80 of 213   PageID 22459

234

1    concerned us because there's case law that says that that

2    effectuates an estoppel.  And so we don't get our chance in

3    front of an Article III judge to make that in the first

4    instance.

5              THE COURT:  Okay.  Tell me what cases you're talking

6    about and the exact context of those cases.

7              MR. SBAITI:  Your Honor, I would have to defer to my

8    partner on this one, Your Honor.

9              THE COURT:  Okay.

10             MR. SBAITI:  So, --

11             THE COURT:  Because I'm just letting you know --

12             MR. SBAITI:  Yes.

13             THE COURT:  -- I am at a complete loss.  I'm at a

14   complete loss understanding what you're saying.  I am.

15             MR. SBAITI:  Well, Your Honor, the --

16             THE COURT:  I don't understand.  If you have followed

17   the order to the letter and I tell you no, --

18             MR. SBAITI:  Then --

19             THE COURT:  -- what, you're saying you were worried

20   you'd be estopped from appealing my order to the District

21   Court and saying abuse of discretion or invalid order in the

22   first place?  You'd be estopped from taking an appeal?

23             MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24   from taking an appeal.

25             THE COURT:  Then why didn't you follow the letter of

235

1   the order?

2          MR. SBAITI:  For one thing, Your Honor, asking the

3   District Court made sense to us, given the order and given our

4   understanding of the law.  Certainly, we had other options, as

5   Your Honor is pointing out.  We could have come here.  Our

6   read of the law, our understanding of what we were doing, made

7   it -- put us in, like I said, put us in the sort of

8   jurisdictional and paradoxical position.

9          THE COURT:  This is your chance to tell me exactly

10  which law you think applies here.  What case?  What statute?

11         MR. SBAITI:  Your Honor, like I said, I don't have

12  those at the moment.

13         THE COURT:  Why not?  Your whole argument rides on

14  this, apparently.

15         MR. SBAITI:  Well, Your Honor, I don't know that our

16  whole argument rides on that.

17         THE COURT:  Okay.

18         MR. SBAITI:  I mean, our argument rides on we don't

19  think we violated the letter of the order.  I think that's

20  really what I'm -- what we're here to say, is that we didn't

21  commence a lawsuit and we didn't pursue a claim by filing for

22  leave in the District Court, just like filing for leave in

23  this Court would not be pursuing a claim.  It would be filing

24  for leave.

25         THE COURT:  I agree.  Filing a motion for leave in

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01659-B   Document 43-1   Filed 09/27/21   Page 782 of 813   PageID 22461

236

1  this Court would be exactly what the order contemplated.

2          MR. SBAITI:  I understand, Your Honor.

3          THE COURT:  What you did is not exactly what the

4  order contemplated.

5          MR. SBAITI:  Your Honor, but we're -- we're moving

6  back and forth between two concepts.  One, your question is

7  why didn't we file for leave?

8          THE COURT:  Uh-huh.

9          MR. SBAITI:  And the answer to that, I've tried to

10  explain.  And if we -- if you'd like us to bring up the case

11  law or to give you a better articulation of our concern, I'm

12  happy to defer to my partner.

13      What I'm really here to say, Your Honor, is a very simple

14  point, though.  Just because we didn't file for leave here and

15  we filed for leave in the District Court doesn't mean we

16  violated your order, and that's the point I'm trying to make,

17  Your Honor.  And I think that's the simplest point I can make.

18  Asking the Article III judge for leave to amend, for leave to

19  amend to add Mr. Seery, doesn't violate, facially, at least as

20  we read it, Your Honor's order.  It's not commencing a suit

21  and it's not -- it's not pursuing a claim against him.  It's

22  all preliminary to pursuing a claim against him, because a

23  claim hasn't even been filed.

24      The judge could have -- the judge could have -- the

25  District Court could have denied it, the District Court could

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 31-1   Filed 09/07/21   Page 83 of 213   PageID 2462

237

1   have referred it down here, the District Court could have

2   decided part of it and then asked Your Honor to rule on some

3   portion of it.  There are innumerable ways that could have

4   gone.  That fork -- those forks in the road is precisely why

5   we say this is not pursuing the claim.  Otherwise, where does

6   it stop?

7       Does pursuing a claim happen just when we file the motion

8   for leave?  Why didn't it happen when we started the

9   investigation?  If pursuing a claim means having the intent

10  and taking steps towards eventually filing a lawsuit, that's

11  the point that I'm making that it is infinitely regressive,

12  and that's exactly what Mr. Morris argued to you.

13      He said Mr. Dondero, by merely speaking to me, is pursuing

14  a claim and that violates your order.  Speaking to me.  Even

15  if we had never filed it.  Speaking is pursuing a claim.

16          THE COURT:  I don't agree with that, for what it's

17  worth.

18          MR. SBAITI:  Okay.  But that was his argument.  I'm

19  just responding to it.

20          THE COURT:   Okay.

21          MR. SBAITI:  And if that's not pursuing a claim,

22  filing a motion for leave likewise wouldn't be pursuing a

23  claim.  I understand it's an official act in a court, but we

24  did it in a Court that is an adjutant to this Court.  This

25  Court is an adjutant to that Court.  It's the Court with

1    original jurisdiction over the matter.  So we didn't go to New

2    York.  We didn't go to the state court in New York where I

3    learned Mr. Seery lives.  We came to the Northern District of

4    Texas, understanding that this Court and this Court's orders

5    had to be -- had to be addressed.  And that's the very first

6    thing we did.  We asked the Court to address it.

7        That judge could either decide to send it down here, which

8    is normally what I think -- what we understood would happen.

9    So it's not like we were avoiding it.  But we wanted to invoke

10   the jurisdiction which we, as the Plaintiff, we believe we had

11   the right to invoke.  We're allowed to choose our forum.  So

12   that's the forum we chose for the primary case, which there's

13   not a problem, no one's raised an issue with us filing the

14   underlying lawsuit.

15       Adding Mr. Seery to that lawsuit and filing a motion for

16   leave in the same court where we actually had the lawsuit,

17   knowing that it might get -- that might get decided or

18   referred in some way, doesn't strike me as being anything

19   improper, because he didn't get sued and we don't know what

20   Judge Boyle would have said had the motion gone forward.  And

21   for them to speculate and to say that, well, this is exactly

22   the type of thing you have to protect against, I completely

23   disagree.

24       The case law that they cited for you on these -- on most

25   of these orders really do discuss the fact that you have

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 18-1   Filed 09/07/22   Page 85 of 213   PageID 2464

239

1    somebody who is actually protecting the underlying property of

2    the Debtor.  This claim comes from a complete third party that

3    Mr. Seery himself has admitted under oath he owes a fiduciary

4    duty to.  Two third parties.  One is an investor of a fund

5    that he manages, and one to a fund that the Debtor, with Mr.

6    Seery as the head of it, was an advisor for up until recently.

7         Those fiduciary duties exist.  We felt like there was a

8    valid claim to be brought against Mr. Seery.  And the only

9    reason -- and he says this like it's a negative; I view it as

10   a positive -- the reason he wasn't named is because of Your

11   Honor's orders.  And so we asked a Court, the Court with

12   general jurisdiction, to address it for us or to tell us what

13   to do.  And I don't see how that is a violation of this

14   Court's order, nor is it contemptuous of this Court's order.

15        If every time one of these issues came up it was a

16   contempt of the court that appointed a trustee, we'd see a lot

17   more contempt orders.

18        Interestingly, the cases that were thrown out to you in

19   the opening argument by the other side, for example, *Villages*

20   [sic] *v. Schmidt*, was a trustee case, but not one that

21   involved a sanction.  And the trustee case specifically in

22   that case held that the Barton Doctrine didn't have an

23   exception for *Stern* cases, whereas the cases we cited to you,

24   *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25   1027, expressly held that Section 959 is an exception to the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01353-B   Document 13-11   Filed 02/07/22   Page 87 of 213   PageID 2465

240

1  Barton Doctrine.

2      And my partner, Mr. Bridges, can walk through the issues

3  that we had on the enforceability of the order, but all -- to

4  me, all of that is sort of a secondary issue because, *prima*

5  *facie*, we didn't violate this order.  I understand it may

6  irritate the Debtor and may raise questions about why the

7  motion wasn't filed here versus the District Court.  But it

8  was a motion for leave.  In order to sanction us, Your Honor

9  would have to find that asking for permission is sanctionable

10  conduct in the gatekeeper order.  Even if we ask the wrong

11  court.  Simply asking the wrong court is sanctionable, not

12  knowing what that court would have done, not knowing what that

13  court's mindset was, not even having the benefit of the

14  argument.  And that's, I guess, where this bottom -- the

15  bottom line is for me.

16      The evidence that they put on for you, Your Honor.

17  Everything you heard was evidence in the negative.  You know,

18  they talk about the transition from Mr. Dondero to Mr. Scott

19  and Mr. Scott to Mr. Patrick, but if you actually look at the

20  evidence he wants you to see and he wants you to rule on, it's

21  the evidence that wasn't there.  It's the evidence that Mr.

22  Dondero had no control.  In fact, I believe that was the basis

23  he argued for why there should be no privilege.  And all he

24  said is that he was promoting it.

25      But the fact of the matter is, like I said, all of that is

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 31-1   Filed 09/07/24   Page 87 of 213   PageID 2496

241

1   secondary to the core issue that we didn't violate the order.

2   We didn't take steps to violate the order.  We took steps to

3   try to not violate the order.  And they want you to punish us

4   to send a message.  Even used words like the Court needs to

5   enforce its own orders.  And he did that as a transition away

6   from the idea that there were no damages, Your Honor, and I

7   think that has implications.

8        And then he said you have to enforce a meaningful penalty.

9   Well, Your Honor, I don't think that is the purpose of these

10  sanctions.  These sanctions are supposed to be remedial,

11  according to the case law, according to the case law that they

12  cite.  So a meaningful --

13            THE COURT:  Coercive or remedial.

14            MR. SBAITI:  Sorry?

15            THE COURT:  Coercive or remedial.  Civil contempt.

16            MR. SBAITI:  Sure, Your Honor.  But usually coercive

17  sanctions require someone to do something or they are

18  sanctioned until they do it.

19            THE COURT:  Coerced compliance.  Coerced compliance

20  --

21            MR. SBAITI:  Yes.

22            THE COURT:  -- with an existing order.

23            MR. SBAITI:  Yes.

24            THE COURT:  Uh-huh.

25            MR. SBAITI:  The last thing, he says you have to

002181

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 11   Filed 09/27/21   Page 788 of 823   PageID 2467

242

1   protect the estate of the fiduciary and his expectation -- I
2   believe he's talking about Mr. Seery -- his expectation that
3   the Court would be the gatekeeper.  And Your Honor, that
4   argument rings a little bit hollow here, given that what
5   they're really saying is that we should have come here first
6   and asked for permission.  But that insinuates that, by coming
7   here, the case is dead on arrival, which I don't think is the
8   right argument.

9       I think the issue for us has been, who do we have to ask
10  and who can we ask to deal with the Court's gatekeeper order?
11  I believe we chose a court, a proper court, a court with
12  jurisdiction, to hear the issue and decide the issue.  Your
13  Court's -- Your Honor's indication of the jurisdiction of this
14  Court we believed invoked the District Court's jurisdiction at
15  the same time.

16      And so the last thing is he said -- the last thing, and
17  getting back to the core issue, is Mr. Morris wants you to
18  believe that we intended to violate the order, and now, as an
19  afterthought, we're using linguistic gymnastics to get around
20  all of that.  But it's not linguistic gymnastics.  Linguistic
21  gymnastics is saying that pursue means doing anything in
22  pursuit of a claim.  That's a little -- I believe that's
23  almost a direct quote.  They're chasing the man.  Well, that's
24  the infinite regression that I talked about, Your Honor, that
25  it's going to be impossible in any principled way to reconcile

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01500-B    Document 14-11    Filed 02/07/23    Page 89 of 213    PageID 2448

243

1   Mr. Morris's or the Debtor's definition of pursue with any

2   logical, reasonable limitation that is readable into the

3   order, Your Honor.

4        And I'm going to defer to my partner, Mr. Bridges -- oh,

5   go ahead.

6            THE COURT:  I'm going to stop you.  I mean, we have

7   the linguistic argument.  But how do you respond to this?

8            MR. SBAITI:  Sure.

9            THE COURT:  What if I tell you, in my gut, this

10  appears to be an end run?  An end run.  I mean, I'm stating

11  something that should be obvious, right?  An end run around

12  this Court.  This Court spent hours, probably, reading a

13  motion to compromise issues with HarbourVest, issues between

14  the Debtor and HarbourVest.  I had objections.  An objection

15  from CLO Holdco that was very document-oriented, as I recall.

16  Right of first refusal.  HarbourVest can't transfer its 49.98

17  percent interest in HCLOF, right?  Talk about alphabet soup.

18  We definitely have it.

19            MR. SBAITI:  Yes.

20            THE COURT:  Without giving CLO Holdco the first right

21  to buy those assets.  Read pleadings.  Law clerk and I stay up

22  late.  And then, you know, we get to the hearing and there's

23  the withdrawal -- we heard a little bit about that today --

24  withdrawal of the objection.  We kind of confirmed that two or

25  three different ways on the record.  And then I remember going

002183

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 31-1   Filed 02/20/23   Page 90 of 213   PageID 2459

244

1    to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

2    You know, are you challenging the legal propriety of doing

3    this?  And he backed off any objection.

4        So the Court ended up having a hearing where we went

5    through what I would call the standard 9019 prove-up, where we

6    looked at was it in the best interest, was it fair and

7    equitable given all the risks, rewards, dah, dah, dah, dah.

8    You know, HarbourVest had initially, you know, started at a

9    $300 million proof of claim, eye-popping, but this all put to

10   bed a very complicated claim.

11               MR. SBAITI:  Yeah.

12               THE COURT:  Tell me something that would make me feel

13   better about what is, in my core, in my gut, that this is just

14   a big, giant end run around the Bankruptcy Court approval of

15   the HarbourVest settlement, which is not on appeal, right?

16   There are a gazillion appeals in this case, but I don't think

17   the HarbourVest --

18               A VOICE:  It is on -- it is on appeal, Your Honor.

19               THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20   may be told --

21               MR. SBAITI:  I didn't know.

22               THE COURT:  I may be told, gosh, you got it wrong,

23   Judge.  You know, that happens sometimes.

24        So, this feels like an end run.  You know, the appeal is

25   either going to prevail or not.  If it's successful, then, you

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 11   Filed 02/01/23   Page 91 of 213   PageID 2470

245

1  know, do you really need this lawsuit?  You know, I don't --

2  okay.  Your chance.

3          MR. SBAITI:  Thank you, Your Honor.

4          THE COURT:  Uh-huh.

5          MS. SBAITI:  Your Honor, this wouldn't be the first

6  case where finality or where there was a settlement -- I'm not

7  familiar as well with bankruptcy, but certainly in litigation

8  -- where the settlement then reveals -- well, after a

9  settlement is done, after everyone thinks it's done, some new

10  facts come to light that change people's views about what

11  happened before the settlement or before the resolution.  And

12  that's what happened here, Your Honor.  This is what we've

13  pled.  And this is what we understand.

14      There were the instances of Mr. Seery's testimony where he

15  testified to the value of the HarbourVest assets.  I believe,

16  as I recall, he testified in I believe it's the approval

17  hearing that Your Honor is talking about that the settlement

18  gave HarbourVest a certain amount of claims of I think it's,

19  Series 8 and then Series 9 claims, and that those were

20  discounted to a certain dollar value that he quantified as

21  about $30, $31 million.  And the way he ratified and justified

22  the actual settlement value, the actual money or value he was

23  conferring on HarbourVest, given the critique of HarbourVest

24  claims that he was settling, is he explained it this way.  He

25  said $22-1/2 million of this whole pot that I'm giving them

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1-11   Filed 02/02/23   Page 92 of 213   PageID 2471

246

1    pays for the HarbourVest -- HarbourVest's interests in HCLOF

2    -- it's alphabet soup again -- and Highland CLO Funding,

3    Limited.  And so it's the other $9 million that's really

4    settling their claims.  And given the amount of expense it's

5    going to take, so on and so forth, $9 million seems like a

6    reasonable amount to settle them with, especially since we're

7    just giving them claims.

8        So that $22-1/2 million everyone apparently took to the

9    bank as being the value, including CLO Holdco at the time,

10   because they didn't have the underlying valuations.  Highland

11   was supposed to give the updated valuations.

12       So, fast-forward a couple of months -- and this is what

13   we've played in our lawsuit, Your Honor; this is why I don't

14   think it's an end run -- we pled in our lawsuit just a couple

15   months later Highland -- I believe some of the people that

16   worked at Highland started leaving, according to some

17   mechanisms that I saw where Highland didn't want to keep all

18   the staff and so the staff was migrated to other places.  And

19   one of those gentlemen, I believe Mr. Dondero referred to him

20   as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21   also an investor in HCLOF, he owns a small piece of HCLOF, he

22   had the data, he had some of the information that showed that,

23   actually, in January, when Mr. Seery said that the HarbourVest

24   settlement was worth 22 -- excuse me, the HarbourVest

25   interests in HCLOF were worth $22-1/2 million, that they're

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01584-B   Document 11   Filed 08/23/22   Page 93 of 213   PageID 2472

247

1    actually worth upwards of $45 million.

2         And so that information, Your Honor, we believe gives us a

3    different -- a different take on what happened and what was

4    supposed to happen.  This is strictly about the lack of

5    transparency.

6              THE COURT:  Okay.  Assuming --

7              MR. SBAITI:  Yeah.

8              THE COURT:  -- I buy into your argument that this is

9    newly-discovered evidence --

10             MR. SBAITI:  Yes.

11             THE COURT:  -- CLO Holdco would not have had reason

12   to know -- I guess that's what you're saying, right?

13             MR. SBAITI:  I'm saying they -- they didn't know.

14             THE COURT:  That they didn't know.

15             MR. SBAITI:  Uh-huh.

16             THE COURT:  And didn't have reason to know.  I'm

17   trying to figure out who's damaged here.

18             MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19   Your Honor.

20             THE COURT:  How?

21             MR. SBAITI:  Because one of the aspects of the -- of

22   Highland, one of the issues under, excuse me, of Highland's

23   advisory, is that it has a fiduciary duty.  And that fiduciary

24   duty, at least here, entails two, if not, three prongs.  The

25   first prong is they have to be transparent.  You can't say --

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 31-11   Filed 02/14/23   Page 94 of 213   PageID 2473

248

1            THE COURT:  How is -- you know, I know a lot about

2   fiduciary duties, believe it or not.  How is CLO Holdco harmed

3   and the DAF harmed?

4            MR. SBAITI:  Because, Your Honor, they lost out on an

5   investment opportunity to buy the piece of -- the HarbourVest

6   piece.  They would have been able to go out and raise the

7   money.  They had the opportunity --

8            THE COURT:  Okay.

9            MR. SBAITI:  They would have had the opportunity to

10   make a different argument.

11            THE COURT:  What you're saying, you're saying, if

12   they had known what they didn't have reason to know, that it

13   was worth, let's say, $45 million, that they would have gone

14   out and raised money and said, oh, we do want to exercise this

15   right of first refusal that we decided we didn't have and gave

16   in on, we're going to press the issue and then outbid the $22

17   million, because we know it's worth more?  Is that where

18   you're going? I'm trying to figure out where the heck you're

19   going, to be honest.

20            MR. SBAITI:  That's -- Your Honor, I'd push back on a

21   little of the phrasing, only because the way these duties --

22   the way we understand the SEC's duties work when you're an

23   investment advisor is you have a transparency obligation and

24   an obligation --

25            THE COURT:  Yes.  Yes.

002188

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 43-11   Filed 02/25/22   Page 95 of 213   PageID 2474

249

1           MR. SBAITI:  -- not to divert these.  So, yes, CLO

2    Holdco would have at least had the opportunity and been

3    offered the opportunity, which it could have taken advantage

4    of, to, if the assets were really on the block for $22-1/2

5    million, they should have been able to buy their percentage

6    pro rata share of that $22-1/2 million deal.  I mean, in a

7    nutshell, that's -- that's where we believe we've been harmed.

8    And we believe that the obfuscation of those values and, to a

9    certain extent, the misrepresentation of those values in the

10   settlement is not cleansable by the argument, well, you should

11   have asked.

12       Well, you should have asked is fine in normal litigation,

13   but when the person you should have asked actually owes you a

14   positive duty to inform, we believe that the should-have-asked

15   piece doesn't really apply and there's -- and that's, that's

16   the basis of our case.

17       So it's not an end run around the settlement, Your Honor.

18   I think I opened with we're not trying to undo the settlement.

19   We're not saying HarbourVest has to take its interest back.

20   We're not saying the settlement has to go on.  We're not even

21   saying any of the things that happened in Bankruptcy Court

22   need to change.  But Section 959 is pretty clear that this is

23   management of third-party property --

24           THE COURT:  I guess -- okay.  Again, rabbit trail,

25   maybe.  But CLO Holdco still owns its same 49.02 percent

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 13-1   Filed 02/26/10 13:52   Page 96 of 213   PageID 2475

250

 1   interest that it did before this transaction.  So if there's

 2   value galore in HCLOF, it still has its 49.02 percent

 3   interest.  What am I missing?

 4          MR. SBAITI:  Oh, I think Your Honor's assuming that

 5   HCLOF bought the piece back from HarbourVest.  It didn't.

 6          THE COURT:  No, I'm not.

 7          MR. SBAITI:  Oh.

 8          THE COURT:  I'm not assuming that.

 9          MR. SBAITI:  Well, --

10          THE COURT:  I know that now the Debtor has, what,

11   fifty point, you know, five percent of HCLOF, whereas it only

12   had, you know, a fraction.

13          MR. SBAITI:  Point six-ish.  Yeah.

14          THE COURT:  Point six-ish, and HarbourVest had 49.98.

15          MR. SBAITI:  Right.

16          THE COURT:  So, again, please educate me.  I'm really

17   trying to figure out how this lawsuit isn't just some crazy

18   end run around a settlement I approved.  And moreover, what's

19   the damages?

20          MR. SBAITI:  Well, Your Honor, --

21          THE COURT:  What's the damages?  CLO Holdco still has

22   its 49.02 percent interest in HCLOF.

23          MR. SBAITI:  Your Honor, again, --

24          THE COURT:  What am I missing?  I must be missing

25   something.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01803-B   Document 31-1   Filed 09/20/21   Page 97 of 213   PageID 2476

251

 1              MR. SBAITI:  I think so, Your Honor.

 2              THE COURT:  What?

 3              MR. SBAITI:  The damages is the lost opportunity, the

 4    lost opportunity to own more of HCLOF.

 5              THE COURT:  Oh, it could have owned the whole darn

 6    thing?

 7              MR. SBAITI:  I could have owned 90 -- whatever 49

 8    plus 49.98, 98.98 percent.

 9              THE COURT:  But --

10              MS. SBAITI:  Or some pro rata portion.

11              THE COURT:  But Mr. Seery had some information that

12    you think he was holding back from CLO Holdco that CLO Holdco

13    had no reason to know?

14              MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15    testified to that the value of those assets, excuse me, the

16    value of the HarbourVest interests in HCLOF or its share of

17    the underlying assets being $22-1/2 million was either, one,

18    intentionally obfuscated, or, two, and I don't think this

19    excuses it at all, he simply used ancient data and simply

20    never updated himself, not for the Court and not for any

21    representations to the investors, who he himself testified

22    under oath in this Court that he has a fiduciary duty to under

23    the Investment Advisers Act.

24              THE COURT:  This could get very --

25              MR. SBAITI:  So that's injury to my client, Your

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01502-B    Document 1-11    Filed 02/04/22    Page 98 of 213    PageID 2197

252

 1   Honor.

 2             THE COURT:  This could get really dangerous.  Maybe

 3   --

 4             MR. SBAITI:  I'm sorry.

 5             THE COURT:  This could get really dangerous.  Maybe I

 6   should cut off where I'm going on this.

 7             MR. SBAITI:  Okay.

 8             THE COURT:  Of course, someone dangled it out there

 9   in a pleading.  You know where I'm going, right?

10             MR. SBAITI:  I'm not sure I do, Your Honor.

11             THE COURT:  Hmm.  I do read the newspaper, but

12   someone put it in a pleading.  HCLOF owns MGM stock, right?

13   Is that what this is all about?  Is that what this is all

14   about?  Or shall we not do this on the record?

15             MR. SBAITI:  Well, Your Honor, this has nothing -- I

16   don't -- I don't think this has anything to do with the MGM

17   stock one way or the other.

18             THE COURT:  You don't?  OH?

19             MR. SBAITI:  Your Honor, my charge as a counsel for

20   the DAF is pretty straightforward.  We looked at the claims.

21   We looked at the newly-discovered information.  We talked to

22   the people who had it, Your Honor.  That was our

23   investigation.  We put together a complaint.  We believed that

24   we had a good basis to file suit, despite Your Honor's -- the

25   settlement approval.  We expressly, because we understand how

1   finality is so critical in a bankruptcy context, we expressly

2   didn't ask for rescission.  We expressly didn't ask for

3   anything that would undo the settlement.

4        Asking for damages because of how the settlement happened,

5   through no fault of the Court's, of course, but asking for

6   damages is not, at least not as I see it, an end run around

7   the Court's settlement, and it's a legitimate claim.  And I

8   don't think this is far from the first time that new evidence

9   has come up that's allowed someone to question how something

10   was done that actually -- that actually damaged them.

11          THE COURT:  Usually, they come in for a motion to

12   reopen evidence to the court who issued the order approving

13   the settlement.

14          MR. SBAITI:  Well, Your Honor, I mean, that's --

15          THE COURT:  Newly-discovered evidence.

16          MR. SBAITI:  That would be the case in a final

17   judgment, Your Honor.  But, you know, our understanding of the

18   way the settlement worked was that that was not necessarily

19   going to be -- not the direction anybody wanted to go, but

20   seeking damages on a straight claim for damages, which we're

21   allowed to seek, which I think is our prerogative to seek, we

22   went that direction.

23          THE COURT:  Okay.  Okay.

24          MR. SBAITI:  But this --

25          THE COURT:  My last question.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01053-B    Document 3-11    Filed 09/30/22    Page 100 of 213    PageID 2479

254

1          MR. SBAITI:  Yes, Your Honor.

2          THE COURT:  Again, I have to know.  You have filed

3     some sort of pleading to reopen litigation against Acis in New

4     York?  I'm only asking this because it's part of what's going

5     on here.  What is going on here?

6          MR. SBAITI:  Your Honor, that's a -- that's a

7     separate lawsuit, and it's not to reopen litigation against

8     Acis.  It deals with post-plan confirmation mismanagement by

9     Acis.

10         THE COURT:  Oh, okay.  Okay.

11         MR. SBAITI:  Yeah.

12         THE COURT:  All right.

13         MR. SBAITI:  But I believe there's a motion in front

14    of Your Honor, just to -- that gave notice that the suit was

15    filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16    it.  I don't know.

17         THE COURT:  A motion or a notice?  I don't know.

18         MR. SBAITI:  I don't know, Your Honor.  That's above

19    my paygrade.

20         THE COURT:  I have not seen it.  Okay?

21         MR. SBAITI:  Okay.

22         THE COURT:  Maybe it's there, but no one has called

23    it to my attention.

24         MR. SBAITI:  With the Court's permission, I'm going

25    to yield time to Mr. Bridges.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 31   Filed 09/21/23   Page 101 of 213   PageID 2480

255

1              THE COURT:  Okay.  Mr. Bridges?

2              CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

3              MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

4    that you asked most of those questions to Mr. Sbaiti.  I would

5    not have been able to answer them.  The one I can answer is

6    the one about judicial estoppel.  Apparently, I did a pretty

7    lousy job earlier.  I think I'm prepared to do a better job

8    now.

9         The case law I'd like to refer you to is the Texas Supreme

10   Court's 2009 decision in *Ferguson v. Building Materials*, 295

11   S.W.3d 642.  And this was my concern and my issue, perhaps

12   because I used to teach it and so it was at the front of my

13   mind.  But contrary to what you would think and what you said

14   earlier, it's not your ruling against us that would create a

15   judicial estoppel problem.  It's if you ruled in our favor.

16   And I know that seems weird.  Let me explain.

17        The two things that have to take place for there to be

18   judicial estoppel are, first, successfully maintaining a

19   position in one proceeding, and then taking an inconsistent

20   position in another.  And Your Honor, what we talked about

21   earlier is the notion that your July order forecloses the key

22   claim that Mr. Sbaiti was just describing, that Mr. Seery

23   should have known.  Not that he was grossly negligent or did

24   intentional wrong, but that he breached fiduciary duties

25   because he should have known and should have disclosed.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01603-B  Document 31-1  Filed 09/29/21  Page 102 of 213  PageID 2481

256

1    And if your order forecloses that and we come and convince

2    you that we nonetheless have colorable claims, colorable

3    claims of gross negligence or willful wrongdoing, that we

4    ultimately are unable to prove, our lawsuit could fail, even

5    though we had proved -- in the lawsuit we had proved he should

6    have known and that he breached fiduciary duties, but we would

7    be estopped, having succeeded from coming here and asking in

8    compliance with the order and its colorability rule, that we

9    would be estopped from then saying that this Court lacked the

10   authority to have issued that order in the first place, to

11   have released the claim on the mere breach of fiduciary duty

12   or ordinary negligence.  That's the inconsistency that I was

13   concerned about.

14   By coming here rather than trying to make our objection

15   and our position known without submitting to the foreclosure

16   of that claim that is, in many ways, the most important, the

17   headliner from our District Court complaint, is the concern,

18   Your Honor.  And frankly, if Your Honor's order does foreclose

19   that, then we're in serious trouble.  That's the claim that

20   we're trying to preserve.

21   But Your Honor, I don't think it was in anyone's

22   contemplation in July of 2000 that what that order would do is

23   terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24   that order would terminate future claims that might arise

25   based on future conduct that had not yet happened in Mr.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 8-11 Filed 09/29/21 Page 103 of 213 PageID 2482

257

1    Seery's role.  Not in his role as a manager of the Debtor's

2    property, but in his role as a registered investment advisor

3    on behalf of his clients and their property.  And that is the

4    concern that the judicial estoppel argument is about.

5            THE COURT:  I still don't understand.  I'm very well

6    aware of judicial estoppel, the old expression, you can't play

7    fast and loose with the court.  Take one position in one

8    court, you're successful, and then take another position in

9    another court.  That's the concept.

10           MR. BRIDGES:  Coming here --

11           THE COURT:  How is this judicial estoppel if you had

12   done what I think the order required and asked this Court for

13   leave?  What -- and I said fine, you have leave.  Where's the

14   judicial estoppel problem?

15           MR. BRIDGES:  If you say fine, you have leave, but

16   that leave is only, as the order states, because we have

17   colorable claims of gross negligence, colorable claims of

18   intentional wrongdoing, what happens to our mere negligence

19   and mere breach of fiduciary duty claims?  Are they

20   foreclosed?  The order on its face --

21           THE COURT:  Well, I would interpret the order to be

22   yes, and then you could appeal me, and the Court would either

23   say it's too late to appeal that because you didn't appeal it

24   in July 2020, or fine, I'll hear your appeal.  Where's the

25   estoppel?

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01003-B Document 31 Filed 09/24/21 Page 104 of 213 PageID 2483

258

1          MR. BRIDGES:  Your Honor, our claims that this Court

2    lacks the authority either to have made that order in the

3    first place or the jurisdiction to rule on colorability now

4    because of Section -- the mandatory abstention provision,

5    whose section number I've now lost.  That if we come to you

6    and ask you to rule on those things, have we not thereby

7    waived on appeal our claim that you couldn't rule in the first

8    place on those things?

9          That is what our motion for leave in the District Court

10   argues, is that there's -- there are jurisdictional

11   shortcomings with your ability to decide what we're asking

12   that Court to decide.  And Your Honor, by coming here first

13   and then appealing, that's what we fear we would have lost.

14   And instead of coming here and appealing, what we -- what we

15   would have done, in the alternative, I guess, would be to come

16   here and ask you not to rule but move to withdraw the

17   reference of our own motion.

18         That two-step, filing here and filing a motion to withdraw

19   the reference on the thing we filed here, we didn't think was

20   required, nor could we find any case law or rule saying that

21   that was appropriate.

22         THE COURT:  Okay.

23         MR. BRIDGES:  These are not games, Your Honor.  We

24   were not trying to play games.  We aren't bankruptcy court

25   lawyers.  We're not regularly in front of the Bankruptcy

002198

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 8-1 Filed 09/29/22 Page 105 of 213 PageID 2484

259

1    Court.  So the notion why didn't we come here first isn't

2    exactly at the top of our mind.  The question for trial

3    lawyers typically is, where can we file this, what are the

4    permissible venues, not why don't we come to Bankruptcy Court?

5    Especially when your order appears to say that causes of

6    action that don't rise to the level of gross negligence or

7    intentional wrongdoing are already foreclosed.

8        Your Honor, the January order, I think I have to just

9    briefly address again, even though I don't understand why it

10   makes a difference.  Apparently, counsel thinks it makes a

11   difference because Mr. Dondero apparently supported it in some

12   way.  Our position is, for whatever difference it makes, the

13   January versus the July, we don't believe there's anything in

14   the District Court complaint putting at issue Mr. Seery's role

15   as a director, so we don't understand how that order is

16   implicated.

17       Again, I'm not sure that matters at all.  I'm not raising

18   it as a defense.  I'm just telling Your Honor this is all

19   about the July order, from our perspective.  Certainly, the

20   July order puts his role as a CEO -- certainly, the District

21   Court case puts his role as a CEO at issue, and that's what

22   the July order is about.

23       Your Honor, the *Applewood* case requires specifics in order

24   to terminate our rights to sue and to bring certain causes of

25   action, and without that kind of specificity, Your Honor, we

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 8-11   Filed 09/30/21   Page 106 of 213   PageID 2485

260

1   believe that that order fails to preclude, fails to have

2   preclusive effect as to these later-arising claims.  And we

3   would submit not only that it was not contemplated, but that

4   it was not intended to have that effect, and that even Mr.

5   Seery's testimony suggests that that's not how he understood

6   that order to be effective.

7        Counsel argued that the Barton Doctrine does apply here

8   and rattled off the names of cases that don't -- to my

9   knowledge, no case, no case that I can find deals with this

10  type of deferential order where someone is asked -- where a

11  court is asked to defer to the business judgment of an entity

12  in approving an appointment, and nonetheless deciding that the

13  Barton Doctrine applies.  That's not what *Villegas* holds.

14  That's not what *Espinosa* holds.  I don't think *Barton* is

15  applicable in a situation like that.  Certainly, it's outside

16  of the context of what *Barton* anticipated itself over a

17  century ago when it was decided.

18       Your Honor, if we're wrong, please know we're wrong in

19  earnest.  These are not games.  These are not sneakiness.  No

20  such motivation is at issue here.  I was hopeful that that

21  would be plain from the text of the motion for leave itself.

22  If it's not, I'd offer this in addition.  The docket at the

23  District Court shows that immediately upon filing the motion

24  for leave, a proposed order was filed with it asking to have

25  the proposed complaint deemed filed, which as soon as I saw I

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 31-1 Filed 09/27/22 Page 107 of 213 PageID 2486

261

1  asked us to immediately retract it and to substitute a new

2  proposed order that does not ask for the amended complaint to

3  be deemed filed.  That is not what we wanted.

4      And the fear was what if our motion is granted because the

5  District Court says you have the right, you don't even need

6  leave, but as to the Bankruptcy Court, you're on your own,

7  this is at your own risk, I'm not going to rule on any of the

8  jurisdictional questions that you attempt to raise?  We did

9  not want our complaint deemed filed for that reason.  What we

10 did want was for a court where we did not risk judicial

11 estoppel to decide whether or not our key claim under the

12 Advisers Act had been foreclosed by your July order, and that

13 was the key and motivating factor.

14     On top of that, Your Honor, instead of arguing the meaning

15 of the word pursue, let me just say this.  We understood

16 pursue in that context to refer to claims or causes of action,

17 not potential, unfiled, unasserted, contemplated claims or

18 causes of action.  That until a claim or cause of action is

19 actually asserted in some way, that it can't be pursued, and

20 that the reference here was to two kinds of action, those that

21 had not yet been commenced -- and your order foreclosed the

22 commencing of them without permission -- and those that had

23 been commenced.  And your order couldn't foreclose the

24 commencing of them because they hadn't been commenced yet, but

25 your order did foreclose pursuing them.

002201

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 361   Filed 09/29/22   Page 108 of 213   PageID 2487

262

1        And that was my reading of what that order said.  And it

2   fits with this notion that a claim or cause of action isn't

3   something you're considering or even researching.  It didn't

4   dawn on us that researching or talking to a client about a

5   potential claim could violate the order because in some

6   respect that conversation could be in pursuit of the claim.

7        By the same notion, we didn't think asking a court with

8   original jurisdiction according to Congress, asking a court to

9   decide whether or not we were foreclosed from bringing our

10   claims in a motion for leave was violating your order.

11       We don't have much else, Your Honor.  In terms of the need

12   to enforce compliance with your orders, if we understand them,

13   we sure as heck are going to follow them.  And if we've

14   misconstrued the term pursue, I'm certainly very sorry about

15   that.

16       I appreciate counsel saying he thinks we're probably good

17   people.  I did not think what we did was any kind of gross

18   error in judgment.  I thought that what we were doing was

19   preserving our clients' rights, going to a court of competent

20   jurisdiction, and asking the question, can we do what we think

21   we ought to be able to do, but is -- frankly, Your Honor,

22   we're a bit confused about because of the order that seems on

23   its face to foreclose the very lawsuit that we think we should

24   be bringing on behalf on this charitable organization that

25   foreclosed it months before the conduct at issue that gave

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 18-11   Filed 09/29/23   Page 109 of 213   PageID 2448

263

1  rise to the complaint.  And with that conundrum, knowing what

2  to do was not obvious or easy for the lawyers or for the

3  client who was dependent on his lawyers to give him good,

4  sound advice.

5      I'm very grateful for you giving us the time and for your

6  very pointed questions.  Thank you, Your Honor.

7          THE COURT:  Thank you.  All right.  Who's next?

8          CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

9          MR. ANDERSON:  May it please the Court, Michael

10  Anderson on behalf of Mr. Patrick, Mark Patrick.

11      You know, this is a contempt proceeding.  It's very

12  serious.  And, you know, my stomach aches for the people here.

13          THE COURT:  Mine does, too, by the way.

14          MR. ANDERSON:  It truly aches.

15          THE COURT:  Uh-huh.

16          MR. ANDERSON:  And I mean what I said when I did

17  opening, when I said we don't need a hearing, an evidentiary

18  hearing.  And I still don't believe we did, because it comes

19  down to what does the word pursue mean, because there's

20  already been an acknowledgement --

21          THE COURT:  Do you all want to withdraw all your

22  exhibits?  I've got a lot of exhibits that I now need to go

23  through.  If I admit them into evidence, I'm going to read

24  them.

25          MR. ANDERSON:  No, I understand.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01565-B    Document 31-1    Filed 09/30/22    Page 110 of 213    PageID 2489

264

1              THE COURT:  Uh-huh.

2              MR. ANDERSON:  But it does come down to the word

3     pursue.  Counsel has already said commence doesn't do it, and

4     so then it's pursue.

5         And I could ask Your Honor, what did you mean when you

6     said pursue in the July order, but I'm not going to say that.

7     And I asked my client on the stand, you know, did you pursue a

8     claim or cause of action?  And then it was very telling.  What

9     happened with counsel?  He stood up and objected to me even

10    asking if it was pursued.  And it dawned on me, if he's going

11    to object, does pursue have some sort of legal -- that was his

12    objection.  It was he objected on legal grounds.  Does that

13    have some sort of legal meaning?

14        This is contempt.  You can't be held in contempt unless it

15    is bright-line clear that you have deviated from a standard of

16    conduct and there's no ambiguity.  Well, clearly, there is

17    ambiguity, because over on this side of the room we say filing

18    a motion for leave can't be pursue.  We can look at the order

19    and we know it doesn't mean pursue because I just heard Your

20    Honor say you should have filed a motion for leave in this

21    Court before doing anything.  All right?  So if that -- if

22    that is what without the Bankruptcy Court first determining,

23    if that's what the motion for leave is, well, then if we go up

24    to the first sentence, No entity may commence or pursue a

25    claim or cause of action, then it has this, without the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 31   Filed 09/30/22   Page 111 of 213   PageID 2490

265

1    Bankruptcy Court first determining, that means -- if pursue

2    means a motion for leave, if that's what that means, then that

3    order says you can't commence or file a motion for leave

4    before you file a motion for leave.  Because that's what it

5    means.  If pursue means motion for leave and you've said you

6    should have come here and filed a motion for leave because it

7    says, Debtor, without the Bankruptcy Court first determining

8    that notice that such claim or cause of action represents a

9    colorable claim, and specifically authorizing.  The vehicle to

10   do that would be a motion for leave, right?  And you can't

11   pursue anything until a motion for leave has been filed.

12        Now, where was the motion for leave?  And I understand,

13   Your Honor, you know, no expert at reading the room,

14   obviously, you're frustrated that the motion for leave was

15   filed in the District Court and not in this Court.  But it

16   doesn't change the fact, and neither did any of the evidence,

17   change anything, is what does pursue mean?

18        And if someone says, well, it's obviously clear it means

19   *x*, well, is it really obviously clear it means filing a motion

20   for leave?  Because nobody on my side, when you read it, when

21   you say pursue, can read it that way.  And if we're going to

22   have contempt sanctions being posed, and there has to be clear

23   and convincing evidence or beyond reasonable doubt, depending

24   upon, you know, I don't think you have to get to that part,

25   but clear --

1          THE COURT:  This is not criminal contempt.

2          MR. ANDERSON:  Clear and convincing is the civil

3    standard for contempt.

4          THE COURT:  Right.

5          MR. ANDERSON:  And if pursue is open to that much

6    interpretation, it's not the kind of thing that can be held in

7    contempt on.  And I understand the frustration.  I hear the

8    frustration.  I hear counsel talk about that was not their

9    intent when they filed it.  You know, I heard Mr. Patrick get

10   up there.  I heard counsel say, hey, Mr. Patrick's doing his

11   job, he's a good guy, seems like a good guy.  Well, Mr.

12   Patrick's up there.  Look, they filed the underlying lawsuit.

13   Nobody -- there's no motion for that in this Court about the

14   underlying lawsuit.  It's only about the motion for leave.

15   That's all we're here about.

16       And so you go to that, and we've heard all these arguments

17   about it, and we've been here almost as long as the motion for

18   leave was actually on file before it was sua sponte dismissed

19   without prejudice.

20       And so I go back to that and I say that, if pursue means

21   filing a motion for leave, then that order would require an

22   order for anyone to violate -- it would be violated upon the

23   filing of a motion for leave, because you can't pursue

24   something until the Bankruptcy Court has already first

25   determined, after notice, that such claim or cause of action

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 31    Filed 09/30/21    Page 113 of 213    PageID 2492

267

 1   represents a colorable claim and specifically authorizing the

 2   entity to bring such a claim.  Because that -- we already know

 3   that's a motion for leave in and of itself.  Therefore,

 4   pursue, just simply filing a motion for leave will put you in

 5   that.

 6        But that gets into all these -- we don't need to be having

 7   this discussion about, you know, is a motion for leave pursue?

 8   Is pursue a motion for leave?  I've heard both arguments here.

 9   It doesn't justify contempt.  And I know -- and so certainly

10   with respect to my side, I, you know -- given that, I would

11   request that the Court deny the request for contempt.

12        And again, I want to say, too, look, we hear you.

13   Absolutely hear you.  Understand the frustration.  Totally

14   hear you on that.

15        I'm going to turn over the balance of my time to Mr.

16   Phillips, --

17             THE COURT:  Okay.

18             MR. ANDERSON:  -- unless you have any questions, Your

19   Honor.  I appreciate it.

20             THE COURT:  Okay.  I do not.

21              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22             MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23   I'll be brief.  I'm going to try to bring it down to -- I was

24   not involved.  We are -- we are here because of the

25   indemnification provisions of CLO Holdco representing Mr.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1-11   Filed 09/04/23   Page 114 of 213   PageID 2493

268

1   Patrick individually.  My firm was not involved in the

2   litigation.  We were hired to represent CLO Holdco and some of

3   the defendants in the UCC litigation, and our role has

4   expanded to do some other stuff, particularly represent Mr.

5   Patrick because of the indemnification provisions of the

6   Holdco entity documents.  He's entitled to indemnification and

7   we're providing a defense for him.  That's why we're here.

8       So I come way after the order.  We have not been involved

9   in anything.  But I think I'm just going to try to distill

10  everything about the order and about the concern and about the

11  litigation, because the Court is asking about is this an end

12  run on the settlement?  The Court is also saying, all you had

13  to do was come here first.

14      But let's look.  We're here about one thing, the motion

15  for leave.  And as Mr. Anderson pointed out, the commence or

16  pursue a claim, according to the order, commence or pursue can

17  only occur after the Court has authorized the litigation.

18  Okay.  So that's what the order says.  You can't commence or

19  pursue.

20      Counsel for the Debtors says, well, it can't be after

21  commencement because you've already commenced the action.  So

22  pursue has to mean something before the commencement of the

23  action.  It would mean something before the commencement of

24  the action under this order.

25      But it doesn't mean something before the Court approves

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B  Document 6-11  Filed 09/05/23  Page 115 of 213  PageID 2494

269

1    the commencement of the action, because commence or pursue

2    under this order does not occur before the Court has acted.

3    That's the language of the order.  It only occurs after the

4    Court has authorized it.  That's the context in which commence

5    or pursue exists, after this Court has authorized.

6        Okay.  So it can't be pursuit before the Court has

7    authorized without commencement because it only is triggered

8    by the Court's authorization of the action, which means,

9    before you commence it, actions in time take time, before you

10   commence the action, you have to pursue the action to commence

11   it.  But you can't do that until you've approved it.  All

12   right?

13       That's the temporal concern and why we say the motion for

14   leave can't be pursuit of an action under this order.  It

15   might be pursuit under another definition or another order.

16   In other words, maybe an order could be issued saying, you

17   can't file a motion for leave in any other court but this one.

18   I don't know whether it'd be a good order, but the order could

19   say that.  But when you say all you had to do was file a

20   motion for leave in this Court and everything would be okay,

21   no.  The motion for leave is not, under this order, pursuit.

22   Pursuit only occurs under this order after you've done

23   something, after Your Honor has done something.

24       So if a motion for leave is violative at the District

25   Court, the motion for leave would be violative here, because

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 31-1 Filed 09/30/22 Page 116 of 213 PageID 2495

270

1   it occurs before Your Honor has taken action.

2       Now, clearly, you want people to ask, but just as clearly,

3   and this was the point of my remarks earlier at the tail-end

4   of opening, just as clearly, I have a question, because

5   frankly, I understand what these guys are saying.  These guys

6   haven't really said it.  They're a little shame-faced at what

7   these guys are asking.  Because what these guys are asking is

8   whether or not an employee Seery, as the CRO -- and we heard,

9   oh, he bargained for it, he wouldn't have done it without

10  getting the order and the protections because -- did he

11  bargain for not having to comply with the Investor Advisory

12  Act?  Did he bargain for not having a fiduciary duty to third

13  parties?  Because the one thing that Mr. Bridges has been

14  trying to tell you is that, under this order, if it's

15  interpreted one way, you would never authorize a violation of

16  the Investment Advisory Act because it wouldn't necessarily be

17  gross negligence or willful misconduct.

18      In other words, in employing Seery, did the Debtor go out

19  in this disclosure statement and say, we are advisor to $1.2

20  billion of third-party money, and guess what, our CRO has no

21  fiduciary duty to you?  We have forestalled any claim under

22  the Investment Advisory Act in our employment order.  Did that

23  happen?

24      Because if that happened, I don't know if the Court was

25  really thinking that way, because that -- that can't happen in

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B B Document 68-1    Filed 07/28/22    Page 117 of 213    PageID 2496

271

1    a confirmation order before, under the Fifth Circuit

2    authority, after disclosure statement, plan, et cetera, et

3    cetera, because that's a third party release of claims that

4    may -- that haven't occurred yet.  You would be releasing

5    because you would be saying you have no right.  You have no

6    right.  This is not temporal.  This is saying you have no

7    right, if it's saying that, to bring an Investment Advisory --

8    Investment Advisory Act or a Breach of Fiduciary Duty Act

9    that's not gross negligence or willful misconduct forever upon

10   an employment order.

11        Now, if that's not what it means, then we have another

12   conundrum.  The other conundrum -- and I'm new to this, maybe

13   this has been thought out by everybody, but I don't think so.

14   The other conundrum is this order doesn't apply to actions

15   that don't involve willful -- gross negligence or willful

16   misconduct.  It only applies to those types of actions.  So,

17   frankly, I don't know what the order does.

18        I think the problem -- I probably shouldn't be the

19   purviewer of who ought to know because my standard's probably

20   really low, given my capacity here.  But I'm a guy off the

21   street.  Seery gets hired to run the Debtor.  Seery testifies

22   and he admits, we've got Investment Advisory  Act all over the

23   place.  We're making lots of fees out of administering all

24   this third-party money.  Do they know?  Do they know he's

25   immune?  Do the third parties know?

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B Document 1-31 Filed 09/30/23 Page 118 of 213 PageID 2497

272

 1       Now, a standard about managing the Debtor?  Absolutely.

 2   That's just pure D Chapter 11, pure D corporate, pure D

 3   standard liability if you're operating an entity.  You're not

 4   liable for gross negligence or willful misconduct.  You're

 5   not.  And so any claim for damage to the Debtor or to the

 6   estate by actions taken in the CRO capacity, absolutely.

 7   Absolutely.  You don't want a bunch of yoyos suing, you did

 8   something against the Debtor and the Debtor is now worth $147

 9   less than it was because you did something, you were negligent

10   and you forgot to put the dog out.  No.  It's got to be gross

11   negligence or willful misconduct if you are talking about

12   running the Debtor and running the estate.

13       But that's not what we have here.  And you can ask all the

14   questions you want about whether the lawsuit's any good, but

15   that's not what's up before the Court.  What's up before the

16   Court is whether filing a motion for leave is contempt.  And

17   under this order, you're saying, all you had to do is come

18   here.  Well, in one reading of it, you'd have never got relief

19   because you can't bring the kind of action.  I foreclosed it

20   by employing Seery.  He no longer has a fiduciary duty and is

21   no longer bound by the Investment Advisory Act.  Case closed.

22   Get out of here.  Unless you can formulate something around so

23   that you can establish gross negligence or willful misconduct,

24   I've done away with all those causes of action.

25       I don't think that's what happened.  And if that's not

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B Document 81   Filed 09/30/23   Page 119 of 213   PageID 2498

273

1   what happened, this doesn't apply because it shouldn't apply

2   to third-party actions.  It should apply to actions for damage

3   to the estate by creditors of the estate for whom Seery is

4   acting as CRO of the Debtor, who is the -- in possession of

5   the estate.  That makes perfect sense.  Perfect sense.  And

6   nobody would say that you shouldn't have sole authority to

7   determine whether a CRO who's acting for the estate and

8   damages the estate -- because that'd be a claim against the

9   estate.  That would be an administrative claim against the

10  estate.  That is just hornbook law.

11      That's the way I see this order.  And I admit I didn't

12  write it.  I admit I didn't submit it.  I admit I didn't

13  litigate it.  I admit I'm coming in late.  But sometimes maybe

14  a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15  Because I will tell you, Judge, on one read this Court says

16  don't bother coming here because you don't have the kind of

17  claim that can be brought, even if you're a third party.  And

18  the only way that happens is if Seery's released from any

19  obligation under the Investment Advisory Act, and I think

20  everybody would like to know that.  And he can't be sued for

21  breach of fiduciary duty to third parties that he admits he

22  owes.  I think people would like to know that.

23      And if it doesn't, then this is not -- this order is not

24  about that.  But the fact -- I've been at this 40 years, and I

25  usually don't want to talk about myself.  There's really not a

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B   Document 38-1    Filed 09/30/22   Page 120 of 213   PageID 2499

274

1    lot to talk about.  But I hear Mr. Morris how he's never done

2    this, he's never done that.  I hear this, I'm a good -- you

3    know, whatever.  I'm confused.  I've been doing this 41 years.

4    Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5    doing.  And I'm confused because I don't even know if they

6    needed to come here.  I don't even know if, had they come

7    here, if they could have even presented an action for gross --

8    for negligence or breach of fiduciary duty, could have --

9    gross negligence or willful misconduct?  I don't know whether

10   this order just applies to Seery's duties as CRO vis-a-vis

11   creditors of the estate and property of the estate and damage

12   to the estate.  Because that's not what we're dealing with

13   here.

14       The point is, Judge, this is contempt.  And I understand

15   Your Honor knows all about contempt.  Your Honor knows about

16   *Matter of Hipp*.  Your Honor knows about civil contempt

17   authorization for bankruptcy courts.  Your Honor knows that

18   you can't operate without the right to impose civil contempt

19   sanctions.  And Your Honor knows, and I agree with Your Honor,

20   that civil contempt is both remedial and coercive.

21       But how do you coerce around my questions?  Maybe I am all

22   wet, but if I am, I don't think I am, and I don't understand

23   that I am, and that's why I'm concerned about going off into

24   this contempt wilderness and millions in fees, when the motion

25   for leave was dismissed and when the lawsuit doesn't ask for

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 1-1 Filed 09/31/23 Page 121 of 213 PageID 2500

275

1    or includes most of its claims.  I don't even -- I have not

2    studied the lawsuit.  I wasn't involved in it.  But if it's a

3    breach of fiduciary duty and Advisory Act and it says what

4    you've been told it says, that he should have pulled up

5    different stuff, that the valuation metrics were different,

6    that he shouldn't have used it, I don't know that they're

7    saying fraud.  I don't know that they're saying he knew he was

8    doing -- I think they're saying he breached the Investment

9    Advisory Act.  And that's not gross negligence or willful

10   misconduct.  Then does this order apply or this order -- does

11   this order foreclose that?

12        The fact is, I think we could have decided this on the

13   pleadings and on the order.  We didn't.  The fact that Mr.

14   Dondero did A, B, C.  And I will tell you this.  Mr. Patrick

15   has stood up.  He's going to get a harpoon, he's going to get

16   a harpoon, subject to his right to appeal.  But he has told

17   this Court.  We represent him.  We're not trying to get him

18   out of having authorized the order.  It's very important for

19   this Court to understand.  Mr. Patrick is one of these

20   entities.  Mr. Dondero can holler and scream all he wants to.

21   Mr. -- and look, did he terminate Grant Scott?  If I'm Grant

22   Scott, and this is my best friend and I was in his wedding and

23   I was his roommate and I was his best friend and I'm doing

24   this stuff for $5,000 and I do something and $5,000 a month

25   and I do something and I get hollered at and I've got a full a

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 3-1   Filed 07/20/22   Page 122 of 213   PageID 2501

276

1    law practice, I'm an IP lawyer, why don't I just tell him to

2    go jump in a lake, which is the other way you could look at

3    Grant Scott leaving.  I want you to jump in a lake.  I'm out

4    of here.  I don't need this.

5        Thank you.

6            THE COURT:  All right.  Thank you.

7            MR. DEMO:  Your Honor, how much time do they have

8    left, --

9            THE COURT:  Um, --

10           MR. DEMO:  -- to be honest?

11           THE COURT:  Nate, are you -- 26 minutes?  All right.

12           MR. TAYLOR:  I'll go way under, Your Honor.

13           THE COURT:  Okay.

14           CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15           MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16   behalf of Mr. Dondero.  He was named as an individual alleged

17   violator within the order.

18           THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19   Anderson, who did you represent?

20           MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21   represent --

22           THE COURT:  You're Mr. Patrick?

23           MR. PHILLIPS:  We're Mr. Patrick.

24           THE COURT:  You're both --

25           MR. PHILLIPS:  Mr. Patrick.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01500-B   Document 31   Filed 09/30/22   Page 123 of 213   PageID 2502

277

1            THE COURT:  Okay.  I'm sorry.  I'm getting my Fort

2    Worth law firms mixed up.  Okay.

3            MR. TAYLOR:  That's quite all right.  Clay Taylor

4    from Bonds Ellis here on behalf of Mr. Dondero.  And we're

5    here because he was named in the alleged violator motion

6    within the order as an alleged violator.  We don't think that

7    he is, for the reasons that we're about to explain, but we

8    were ordered to appear --

9            A VOICE:  No.

10           MR. TAYLOR:  -- and so therefore we are appearing and

11   telling you why we're not an alleged violator.

12       First of all, for all the reasons that Mr. Sbaiti and Mr.

13   Bridges and Mr. Phillips and Mr. Anderson said, the court

14   order was in effect.  We agree with that.  It required certain

15   conduct to be done.  Yes, it did.  It said you couldn't

16   commence something.  It said you couldn't pursue it.  I think

17   we have gone through what the pursuit and commence.  Nobody is

18   arguing that anything was commenced.  It comes down to

19   pursuit.

20       But let's talk about what the evidence shows about Mr.

21   Dondero.  It shows that Mr. Dondero believes that there have

22   been breaches of fiduciary duty.  He thinks that there has

23   been negligence committed.  He believes that actions should be

24   taken.  We don't run away from that.  He, frankly, told you

25   that.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 8-1    Filed 09/13/23    Page 124 of 213    PageID 2503

278

1        But here, he didn't take any action to pursue it.  The DAF

2   did.  CLO Holdco did.  It's undisputed that he's not an

3   officer, director, or control person for either of those

4   entities.  The act we're here on is a motion for leave to file

5   an amended complaint to include Mr. Seery.  That's -- Mr.

6   Dondero didn't take any of those acts.  He believes it should

7   have been done, but he's not the authorizing person.

8        He might have -- let's just pretend that he thought he was

9   authorizing something.  It doesn't matter that he thought he

10  could authorize something or that he was trying to push for

11  it.  The fact remains he can't authorize it.  You know, he can

12  say, I declare war on Afghanistan.  Well, he can't.  Congress

13  can't.  He can write a letter to his Congressman.  He already

14  wrote a letter to his Congressman.  He talked.  He talked with

15  the head of the acting CLO -- CLO Holdco and he said, I think

16  there's something wrong here.  I think you should be looking

17  into it.  You know what, he goes, you might be right.  Go talk

18  with Mazin about it.  Give him some data.  Conduct an

19  investigation.  They did.  And then they went to the

20  authorizing person and they filed a motion for leave to

21  include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22       Now, there is some personal animosity.  I think that Your

23  Honor has probably seen there seems to be some personal

24  animosity between Mr. Seery and Mr. Dondero, and that's

25  unfortunate.  But just because there's some personal animosity

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 1-31 Filed 09/15/23 Page 125 of 213 PageID 2204

279

1   doesn't mean that maybe something wasn't done wrong.  Maybe

2   that Mr. Dondero -- he's certainly allowed to at least tell

3   people, well, I think there was something done wrong.  And if

4   there is an action to be had, then those appropriate entities

5   can take it.  But he didn't do those things.

6       And so even if he says, just like Michael Scott, "I

7   declare bankruptcy," it doesn't matter.  You have to take the

8   certain actions.

9           THE COURT:  I got it.  I don't know if everyone did.

10          MR. TAYLOR:  Yes, well, yeah, you have to be a *The*

11  *Office* fan.

12      But so that's where we stand.  And for all the reasons the

13  prior people have discussed, I don't think that there was any

14  violation of this Court's order.  But even if there was, Mr.

15  Dondero in this situation was not the one.  We're going to

16  have to deal with the other order that came out yesterday in

17  due course, but for this discrete issue that is before this

18  Court today, Mr. Dondero didn't violate anything.

19      Thank you.

20          THE COURT:  All right.  Mr. Morris, you get the last

21  word.

22          REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23          MR. MORRIS:  Thank you, Your Honor.  These are going

24  to be discrete points because it's truly rebuttal.  I'm going

25  to try to respond to certain points.

1     Mr. Bridges and Mr. Phillips made extensive arguments

2     about why they believe the order is wrong, why it's

3     overreaching.  They tried to get into your head to think about

4     what you intended or what you thought.  The fact of the matter

5     is, the answer to all of those questions -- first of all, none

6     of it's relevant to this motion because we've got the order --

7     but the answer is very simple.  Forget about coming here to

8     seek leave to amend to add Mr. Seery.  We can avoid Mr.

9     Sbaiti's concerns about judicial estoppel or something.  Why

10    didn't they just file the motion for reconsideration?  They

11    filed that after they filed the motion for leave to amend,

12    after we filed the motion for contempt.  Only then did they

13    file the motion for reconsideration.

14     Now, we think it's ill-thought-out.  We think it's

15    problematic.  Probably not today, is my guess, we'll argue to

16    you as to why we think that motion ought to be denied.  But if

17    they truly believed that the order was infirm in any way,

18    wouldn't the proper thing to have been to come here and tell

19    you that?  Wouldn't the proper thing to be to come to the

20    court that issued the order that you have a problem with and

21    ask the court to review it again?  And if Your Honor overruled

22    the motion, to appeal it.

23     Why are we even doing this?  Why did they do it?  It's not

24    we.  Why did they do it?  Right?  And that solves almost

25    everything they've said.  That's point one.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 31   Filed 09/31/23   Page 127 of 213   PageID 2506

281

1          Point two, the January order.  The January order is very
2     important.  It's important not just because it applies to
3     directors, but it's important because Mr. Dondero agreed to
4     it, and it also applies -- I want to get it -- Paragraph 10.
5     It's Exhibit 15.  It applies to the independent directors and
6     the independents directors' agents.  If a CEO is not an agent
7     of an independent director, I'm not sure what is.  The
8     independent directors are the body that appointed the CEO.
9     The CEO, Mr. Seery, is acting on behalf of the board.  This is
10    the order that Mr. Dondero agreed to.  It's the order -- take
11    out the word independent director; put in Mr. Seery -- it's
12    the order everybody's complaining about.  But even the January
13    order certainly applied to Mr. Seery.  That's point two.
14         Point three.  I've heard a lot of concerns about the
15    slippery slope and what does pursuit mean and does talking to
16    a lawyer mean pursuit and doing an investigation being
17    pursuit.  I don't know, Your Honor, and I don't care, because
18    that's not what we're here to talk about.  We're here to talk
19    about a specific act -- not a hypothetical, not a slippery
20    slope.  We're talking about the filing of a motion for leave
21    to amend a complaint to add Mr. Seery as a defendant.  That's
22    all we're talking about.  So, you know, the rest of it, it's
23    just noise.  And the only question is whether, and I think
24    it's pretty clear, that means pursuit.
25         Another version on the theme of was there any alternative

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B    Document 31    Filed 09/30/21    Page 128 of 213    PageID 2507

282

1    to filing the motion in the District Court, I think there was.

2    The Sbaiti firm did file that suit against Acis in New York.

3    And if Your Honor checks the docket in the Acis bankruptcy, I

4    think you'll find that there's a motion from Mr. Rukavina, for

5    a comfort order, basically, saying that -- asking the court to

6    declare that the filing of the complaint in New York against

7    Acis didn't violate the plan injunction.  I think I have that

8    right.

9         But I point that out, Your Honor -- it's not evidence in

10   the record, but the Court can certainly take judicial notice

11   of what's on its docket -- I point that out because there's

12   another example of a lawyer who is very active in this case

13   who actually -- now, he already commenced the suit, so he did

14   -- they did both simultaneously, so I don't want to suggest

15   that that's the perfect thing to have done, but at least he's

16   here asking for -- he's bringing it to your attention, he's

17   telling you it's happened, he's asking for a comfort order,

18   and someday Your Honor may rule on it.  I don't know.

19        Number six, what's with the pursuit of Mr. Seery?  What is

20   with the pursuit of Mr. Seery?  Is there any doubt in

21   anybody's mind that the Debtor is going to have to indemnify

22   Mr. Seery and will bring in another law firm?  And while I

23   don't think it will ever happen in a hundred billion years, if

24   there is a judgment against Mr. Seery, isn't that going to be

25   the Debtor's responsibility?  Why are they even bothering to

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B Document 1 Filed 09/30/22 Page 129 of 213 PageID 2508

283

1    do this?  I think it's a fair question for the Court to ask.

2        I think Mr. Taylor came up and talked about animosity.

3    How do you explain going after Jim Seery?  How do you do it?

4    He's going to be indemnified.  It's in -- it's in like three

5    different orders.  It's in the confirmation order.  It's in

6    the CEO order.  It's -- it's probably as a matter of law.

7    It's in the Strand partnership agreement.  It's -- he's been

8    indemnified like 12 different times.  What is the purpose,

9    other than to make Mr. Seery's life miserable?  There is none.

10   You'll never hear a rational explanation for why they're doing

11   this.

12            THE COURT:  Just so you know, I've not looked at any

13   of the pleadings in the District Court --

14            MR. MORRIS:  And I'm not asking you to.

15            THE COURT: -- other than what has been presented to

16   me today.

17            MR. MORRIS:  Yeah.  That's fine, Your Honor.

18            THE COURT:  But I'm very flipped out about the causes

19   of action against the Debtor, --

20            MR. MORRIS:  Yeah.

21            THE COURT:  -- who hasn't reached an effective date.

22            MR. MORRIS:  Well, --

23            THE COURT:  And I'm most interested to know what the

24   defenses, motions --

25            MR. MORRIS:  We'll get to that.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-BB Document 31 Filed 09/30/23 Page 130 of 213 PageID 2509

284

1          THE COURT:  -- are going to be raised in that regard.

2          MR. MORRIS:  We will get to that in due course.

3      I do want to point out, just to be clear, because we keep

4  hearing that they learned about, you know, all of these

5  horrible things after the fact.  In the complaint, which I

6  think is Exhibit 12, --

7          THE COURT:  I'm there.

8          MR. MORRIS:  -- at Paragraph 127, the Plaintiffs

9  allege, "Mr. Seery was informed in late December 2020 at an

10  in-person meeting in Dallas, to which Mr. Seery had to fly,

11  that HCO" -- excuse me "HCLF and HCM had to suspend trading in

12  MGM Studios' securities because Seery had learned from James

13  Dondero, who was on the board, of a potential purchase of the

14  company.  The news of the MGM purchase should have caused

15  Seery to revalue."

16      I cannot begin to tell you the problems with that

17  paragraph.  We're not going to discuss them today.  I made a

18  promise to these folks that we wouldn't get into the merits of

19  the complaint.  But Your Honor was onto something before, and

20  those issues, you know, may see the light of day one day.  And

21  if they do, folks are going to have to deal with it.  But I

22  will point out that at the time the communication was made,

23  the other TRO was in effect.  We didn't bring that one to the

24  Court's attention.  But the important point there, Your Honor,

25  is December 2020.  It is December 2020.  That is the

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01603-B Document 8-1 Filed 09/21/2005 Page 131 of 213 PageID 2250

285

1　allegation that's being made against Mr. Seery.  And the fact

2　of the matter is, because I've done the research myself, the

3　Court will find that on December 23rd, the day the HarbourVest

4　settlement motion was filed, it was fully public knowledge

5　that Amazon and Apple, I think, had shut down negotiations

6　with MGM at that time.  Right?  So the big secret information,

7　it was in the public domain on December 23rd.

8　　　There will also never be any evidence ever that Mr. Seery

9　got on a plane and flew to Dallas in December 2020, but that's

10　a minor point.

11　　　I'd like to just conclude, Your Honor, by saying I've

12　heard pleas that they understand.  They understand, Your

13　Honor, now they understand.  It would be good if they promised

14　the Court that they won't seek to assert claims against Mr.

15　Seery anywhere but in this Court and comply with the order as

16　it's written.  That, that, that would be taking a little bit

17　of responsibility.

18　　　I have nothing further, Your Honor.

19　　　　　THE COURT:  Okay.  Thank you.

20　　　All right.  Let me give you some clue of when I'm going to

21　be able to rule.  I've been glancing at my email in hopes that

22　something set tomorrow would go away, but that's not

23　happening.  I've got a hearing that I've been told will take

24　all day tomorrow on a case involving a half-built hotel,

25　luxury hotel in Palm Springs, California.  So I have to spend

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B    Document 6-11    Filed 09/22/22    Page 132 of 213    PageID 2251

286

1    the next I don't know how long getting ready for that hearing

2    tomorrow, and then I have what looks like a full day of

3    hearings Thursday, including you people coming back on

4    something.

5              MR. POMERANTZ:  Your Honor, I was going to address

6    that.  We have Dugaboy's motion to enforce compliance on the

7    2015(3) reports.

8              THE COURT:  That's what it was.

9              MR. POMERANTZ:  Since we haven't gotten to the motion

10   to modify the Seery order, my suggestion would be we use that

11   time -- of course, Dugaboy, I'm not sure if they're on the

12   phone.  They're not here.  I'm not sure that's time sensitive.

13   But if Your Honor wanted to have a hearing on that motion,

14   which was contemplated to take place today, the Debtor would

15   be okay having that motion heard on Thursday, perhaps by

16   WebEx, unless Your Honor wants us to stay here, which we would

17   if you do, and then reschedule the 2015(3) motion.

18        But again, that wasn't my motion.  It's Dugaboy's.  I'm

19   not sure Mr. Draper is on.  But we obviously have some

20   calendar issues.

21             MR. MORRIS:  And Your Honor, just to complete it, I

22   think also on Thursday the Court is supposed to hear HCRE and

23   Highland Capital Management Services motions for leave to

24   amend their complaint in the promissory note litigation

25   against each of them.  I think that's also on the calendar for

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 8-1   Filed 09/27/23   Page 133 of 213   PageID 2512

287

 1    Thursday.  I don't expect that -- I hope that doesn't take

 2    very long, but that's also, I believe, on the calendar.

 3              THE COURT:  Okay.  Mr. Draper, are you out there?

 4              MR. PHILLIPS:  I didn't see him on the list, Your

 5    Honor.  I was just looking.  But --

 6              THE COURT:  Okay.  All right.  Well, --

 7              MR. PHILLIPS:  What is the question?  I can send him

 8    a text real quick.

 9              THE COURT:  Well, just have -- if you all could

10    follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11    am perfectly happy to continue the motion to modify the Seery

12    order to Thursday morning at 9:30 if Draper is willing to

13    continue the 2015 motion.

14              MR. POMERANTZ:  I know, if I was him, my first

15    question would be is what times does the Court have available?

16    We could work that through Ms. Ellison.

17              THE COURT:  Yes.  And I'm just letting you know --

18    talk to her.  Okay.  Number one, I'll do these by video, okay?

19    WebEx.  But I know I don't have any time Wednesday, and

20    Thursday's a busy day.

21        We have court Friday morning at 9:30 in--?

22              THE CLERK:  Cici's Pizza.

23              THE COURT:  Cici's Pizza?  That's not going to take

24    very long, right?

25              THE CLERK:  I don't think so.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B Document 8-1 Filed 09/24/22 Page 134 of 213 PageID 2513

288

```
 1              THE COURT:  I can potentially do something, you know,

 2   10:00 o'clock Friday morning.  Other than that, then you've

 3   got to wait a while, because I have a seven-day trial, live

 4   human beings in the courtroom starting next Monday.  And so my

 5   point is mainly to tell you, as much as I would like to rule

 6   very, very fast, it's going to be, it looks like, a couple of

 7   weeks or so before I can give you a ruling on this.

 8              MR. BRIDGES:  Your Honor?

 9              THE COURT:  Yes?

10              MR. BRIDGES:  May I?  It's our motion.  I would

11   propose, if counsel would agree, that we just submit it on the

12   papers.

13              THE COURT:  Everybody good with that?  I'm certainly

14   good with that.

15              MR. POMERANTZ:  Your Honor, I'd like there to be

16   argument.  I have a lengthy argument.  I think I'd like to

17   address a number of the things that -- Mr. Bridges made his

18   argument today.  Okay?

19              THE COURT:  Okay.

20              MR. POMERANTZ:  His deck, it was entitled, Motion to

21   Modify.

22              THE COURT:  Okay.

23              MR. POMERANTZ:  So that's very nice of him, but I

24   would like to make my argument.

25              THE COURT:  Okay.  Let's try to nail this down right
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B Document 31   Filed 09/29/21   Page 135 of 213   PageID 2514

289

1    now.  Friday at 10:00 o'clock, can we do the oral argument

2    WebEx?

3              MR. POMERANTZ:  On that one, yes, Your Honor.

4              THE COURT:  On that one?  Everybody good?  Okay.  So

5    we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

6         You know, I'm going to say a couple of things where --

7    I've leaned toward thinking this is a pretty simple motion

8    before me, the motion for contempt, but when people offer into

9    evidence documents, I read your documents.  Okay?  That's my

10   duty.  And so I have however many exhibits I admitted today

11   that I am going to look at and see how they sway me one way or

12   another on this issue.  But I will tell you that my gut is

13   there has been contempt of court.  Okay?  I don't see anything

14   ambiguous at all about Paragraph 5 of my July 16th, 2020

15   order.  Somebody may think I overreached, but if that was the

16   case, someone should have argued at the time I was

17   overreaching.  Someone should have appealed the order.  And I

18   think it's a *Shoaf*/*Espinosa* problem at this point for anyone

19   to argue about the enforceability of that order.

20        I think there's nothing ambiguous in the wording.  Pursue

21   is not ambiguous.  There's nothing confusing about the

22   requirement that any entity who wanted to sue or pursue a

23   claim, you know, commence claim, pursue a claim against Mr.

24   Seery, had to come to the Bankruptcy Court.  Standard-fare

25   gatekeeping order.

002229

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 8-11   Filed 08/26/25   Page 136 of 213   PageID 2515

290

1     So what I'm going to be looking at is, do these documents

2     I admitted into evidence change my view on that, and then the

3     harder question is who of the alleged contemnors am I going to

4     think it's clear and convincing committed contempt and -- who

5     are the contemnors, and then, of course, what are the damages?

6     Coercive or compensatory damages?

7     So, again, you know how I feel, to the extent that's

8     helpful in your planning purposes.  I'm pretty convinced

9     contempt of court has occurred.  It's just a matter of who's a

10    contemnor and what are the damages.

11    I'll say a couple of remaining things.  I continue to be

12    frustrated, I think was the word people used, about

13    unproductive ways we all spend our time.  I am going to spend

14    I don't know how many more hours drafting another ruling on a

15    contempt motion, and attorneys' fees are through the roof.

16    And, you know, I dangled out there a question I couldn't

17    resist about MGM.

18    And I will tell you, I mean, someone mentioned about their

19    stomach aching.  Personal story, I could hardly sleep the

20    night it became public about the Amazon purchase, because,

21    silly me, maybe, I'm thinking game-changer.  This is such

22    potentially a windfall, an economic windfall.  Maybe this

23    could be the impetus to make everyone get in a room and say

24    look, we've got this wonderful windfall of money.  I don't

25    know how much is owned directly or indirectly by the Debtor of

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B B Document 1031-1 Filed 09/27/23 Page 137 of 213 Page ID 2516

291

1 │ MGM stock.  I don't know how much the Debtor  manages.  I

2 │ don't know how much, you know, some other entity.  I know it's

3 │ probably spread out in many different entities.  But I know, I

4 │ know because I listen, that one or more of the Highland-

5 │ managed CLOs has some of this, and I think I read -- remember

6 │ that HCLOF, which now Highland owns more than 50 percent of,

7 │ has some of this stock.  Right?

8 │        MR. DONDERO:  Do you want to know what happened?

9 │        THE COURT:  Oh.

10 │        A VOICE:  No.

11 │        THE COURT:  Well, okay.  So, you know, I can

12 │ understand I'm getting into maybe uncomfortable territory in a

13 │ public proceeding, so I'll stop.

14 │     But, you know, do we need to set up a status conference?

15 │ Do you all need to like talk about this?  Am I just being

16 │ naïve?  Couldn't this be a game-changer, where maybe it would

17 │ give new incentive to --

18 │        MR. POMERANTZ:  Your Honor, I would -- he's been

19 │ pretty quiet through the whole hearing, Mr. Clemente.  He has

20 │ the Committee, that a couple of people you've heard have sold

21 │ claims.  They're now held by other parties.

22 │     You know, the door is always open.  I don't think this is

23 │ going to be game-changer, unfortunately.  We would like

24 │ nothing more, as Debtor's counsel.  We don't enjoy coming to

25 │ Your Honor for contempt hearings.

1    Mr. Clemente said that it was productive.  We would sure

2  participate.  But right now, we have creditors who are very

3  angry that millions and millions of dollars have been spent on

4  really a waste of time and a waste of the Court's time and a

5  waste of everyone's time and eating into the creditors' money.

6  So I would ask Mr. Clemente to address that.

7          MR. CLEMENTE:  I'm here.

8          THE COURT:  Yes, he's way in the back, hoping to be

9  ignored.

10          MR. CLEMENTE:  It's too cold, Your Honor, where I was

11  sitting.  For the record, Your Honor, --

12          THE COURT:  I noticed some entity called Muck

13  Holdings bought HarbourVest, according to the docket.

14          MR. CLEMENTE:  That's correct.  Muck Holdings bought

15  HarbourVest, and I believe also the Acis claim, and then

16  there's a different entity that bought the Redeemer claim.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  So, as we mentioned in our -- one of

19  our pleadings, I think it was the retention pleading for

20  Teneo, the Committee consists of two members currently, Meta-e

21  and UBS.

22          THE COURT:  Uh-huh.

23          MR. CLEMENTE:  Obviously, Your Honor just approved

24  the UBS settlement recently.  The U.S. Trustee is aware of the

25  make-up of the Committee, and is currently comfortable with

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B B Document 38-1 Filed 09/29/21 08:52 Page 139 of 213 PageID 2548

293

 1 | the Committee maintaining a two-person membership at this

 2 | point.

 3 |     In terms of whether the MGM transaction is a game-changer,

 4 | we've not yet seen, to Your Honor's point, how all of that

 5 | rolls up through the various interests that the Debtor may or

 6 | -- you know, may have --

 7 |          THE COURT:  Okay.

 8 |          MR. CLEMENTE:  -- that would be implicated by the MGM

 9 | transaction.  If ultimately the MGM transaction has to

10 | actually occur, right?  I mean, so, you know, just based on

11 | what I read in the public documents, we're not sure when that

12 | transaction may actually happen.  But obviously it's a good

13 | thing for the Debtor's estate because it's going to recognize

14 | value for the estate.

15 |     In terms of whether it ultimately changes how Mr. Dondero,

16 | you know, wishes to proceed, that's entirely up to him, Your

17 | Honor.  But we don't see it as something at this point that

18 | would suggest that there's an overall back to let's talk about

19 | a pot plan because of where the MGM transaction might

20 | ultimately come out.

21 |     So I don't know if that's helpful to Your Honor, but those

22 | are -- that's my perspective.

23 |          THE COURT:  Well, and I'm not trying to, you know,

24 | push a pot plan on anyone.

25 |          MR. CLEMENTE:  No, I understand.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B    Document 31    Filed 09/30/22    Page 140 of 213    PageID 2519

294

1              THE COURT:  I'm just saying it looked like an

2    economic windfall.  I just -- I don't know how much is

3    Highland versus other entities in the so-called byzantine

4    complex, but, gosh, I just hoped that there might be something

5    there to change the dynamic of, you know, lawsuit, lawsuit,

6    lawsuit, lawsuit, motion for contempt, motion for contempt.

7              MR. CLEMENTE:  Agreed, Your Honor.

8              THE COURT:  Uh-huh.

9              MR. CLEMENTE:  And like I said, it was a very

10   positive development obviously for the creditors for the

11   Debtor.  But whether it's the game-changer that Your Honor

12   would envision, I'm not sure that I can suggest at this point

13   that it is.

14      I think that, you know, obviously, we don't like to see

15   these lawsuits continue to be filed.  That's the whole point

16   of the gatekeeper order, Your Honor.

17             THE COURT:  Uh-huh.

18             MR. CLEMENTE:  I didn't say anything during the

19   hearing, but obviously the January 9th order, as Your Honor

20   has said many times, was in the context of a trustee being

21   appointed.

22             THE COURT:  Right.  Right.

23             MR. CLEMENTE:  Right?  So, and the July 16th order,

24   very similar vein, it's an outshoot of that.  In fact, it was

25   contemplated in the January 9th settlement that a CEO could be

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01506-B Document 3-1 Filed 09/27/21 Page 141 of 213 PageID 2520

295

1   appointed.

2       So I think, again, it's just -- it's important, the

3   context in which that January 9th order came into play, for

4   this very reason, so we could avoid this type of litigation,

5   Your Honor.

6           THE COURT:  Uh-huh.

7           MR. CLEMENTE:  And so again, I didn't -- I obviously

8   didn't rise to mention that during the hearing, but Your Honor

9   is already aware of that.  I didn't need to remind Your Honor

10  of that.

11          THE COURT:  Uh-huh.  Okay.

12          MR. CLEMENTE:  Anything else for me, Your Honor?

13          THE COURT:  No.  Thank you.

14          MR. CLEMENTE:  Okay, then, Your Honor.

15          THE COURT:  Sorry I picked on you.  But, all right.

16  Well, again, I hope the message has landed in the way I hope

17  will matter, and that is I'm going to look at your documents

18  but I feel very strongly that, unless there's something in

19  there that, whoa, is somehow eye-opening, I'm going to find

20  contempt of court.  It's just a matter of who and what the

21  damages are.  There's just not a thing in the world ambiguous

22  about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23  it as soon as we humanly can get to it.

24      Mr. Morris, anything else?

25          MR. MORRIS:  Nothing.  No, thank you.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 18-1   Filed 09/27/23   Page 142 of 213   PageID 2521

296

1              THE COURT:  I guess I'll see you Thursday on the

2   WebEx.  Thank you.

3              THE CLERK:  All rise.

4        (Proceedings concluded at 6:00 p.m.)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **06/09/2021**

24  _____      _____
    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

002236

297

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                 21
- Mr. Sbaiti                                                 31
- Mr. Bridges                                                52
- Mr. Anderson                                               80
- Mr. Phillips                                               83
- By Mr. Taylor                                              87
- By Mr. Pomerantz                                           88

WITNESSES

<u>Debtor's Witnesses</u>

Mark Patrick
- Direct Examination by Mr. Morris                           95
- Cross-Examination by Mr. Anderson                         132
- Cross-Examination by Mr. Sbaiti                           135
- Redirect Examination by Mr. Morris                        137
- Examination by the Court                                  138
- Recross-Examination by Mr. Sbaiti                         142
- Recross-Examination by Mr. Phillips                       143
- Further Redirect Examination by Mr. Morris                144

James D. Dondero
- Direct Examination by Mr. Morris                          147
- *Voir Dire* Examination by Mr. Sbaiti                     184
- Direct Examination (Resumed) by Mr. Morris               199
- Cross-Examination by Mr. Taylor                          210

EXHIBITS

Debtor's Exhibits 1 through 11              Withdrawn 215
Debtor's Exhibits 12 through 53             Received 216
Debtor's Exhibits 15 and 16                Received 214
Debtor's Exhibits 23 and 24                Received 213
Debtor's Exhibits 54 and 55                Received 217

Mark Patrick's Exhibits 1, 3 through 12,   Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46          Received 219

002237

298

INDEX
Page 2

CLOSING ARGUMENTS

- Mr. Morris                                                    221
- Mr. Sbaiti                                                    230
- Mr. Bridges                                                   255
- Mr. Anderson                                                  263
- Mr. Phillips                                                  267
- Mr. Taylor                                                    276
- Mr. Morris                                                    279

RULINGS

Motion for Entry of an Order Further Extending the Period      19
Within Which It May Remove Actions Pursuant to 28 U.S.C.
§ 1452 and Rule 9027 of the Federal Rules of Bankruptcy
Procedure filed by Debtor (2304)

Show Cause Hearing (2255) - *Taken Under Advisement*           285

Motion to Modify Order Authorizing Retention of James          285
Seery filed by Plaintiffs CLO Holdco, Ltd., The
Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

END OF PROCEEDINGS                                             296

INDEX                                                      297-298

# EXHIBIT 3

002239

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT
## TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following witness and

exhibit list with respect to the *Motion for Modification of Order Authorizing Retention of James*

*P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* [Docket No. 2248], which the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210605000000000002
002240

set for hearing at 9:30 a.m. (Central Time) on June 8, 2021 (the "Hearing") in the above-styled

bankruptcy case (the "Bankruptcy Case").

    **A.**    <u>**Witnesses:**</u>

        1.    James P. Seery, Jr.;

        2.    Grant Scott (by deposition designation);

        3.    Any witness identified by or called by any other party; and

        4.    Any witness necessary for rebuttal.

    **B.**    <u>**Exhibits:**</u>

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | Transcript of January 9, 2020 Hearing | | |
| 2. | Transcript of July 14, 2020 Hearing | | |
| 3. | Transcript of February 2, 2021 Hearing | | |
| 4. | Transcript of February 14, 2021 Hearing | | |
| 5. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] | | |
| 6. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] | | |
| 7. | CLO  Holdco, Ltd.'s Notice of Appearance and Request for Copies [Docket No. 152] | | |
| 8. | Certificate of Service [Docket No. 296] | | |
| 9. | Order Approving Settlement With Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures For Operations in the Ordinary Course [Docket No. 339] | | |
| 10. | Certificate of Service [Docket No. 345] | | |

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| 11. | Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 774] | | |
| 12. | Certificate of Service [Docket No. 779] | | |
| 13. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 854] | | |
| 14. | Redline of Fifth Amended Plan of Highland Capital Management, L.P. (AS MODIFIED) [Docket No. 1809] | | |
| 15. | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief [Docket No. 1943] | | |
| 16. | Transcript Designations from the January 21, 2021 Deposition of Grant Scott | | |
| 17. | Transcript Designations from the June 1, 2021 Deposition of Grant Scott | | |
| 18. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |
| 19. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 20. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 21. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 22. | All exhibits identified by or offered by any other party at the Hearing | | |

Dated: June 5, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
 ikharasch@pszjlaw.com
 jmorris@pszjlaw.com
 gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

002243

Case 3:23-cv-01503-B B Document 18-1    Filed 09/30/23    Page 450 of 213 PageID 2529

# EXHIBIT 16

002246

1              GRANT SCOTT - 1/21/2021

2          IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION

4    IN RE:                          )
                                     )      Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT,     )
     L.P.                            )       Case No.
6                                    )   19-34054-sgj11
                     Debtor.         )
7    --------------------------      )
     HIGHLAND CAPITAL MANAGEMENT,     )
8    L.P.,                           )
                     Plaintiff,      )
9                                    )       Adversary
        vs.                          )    Proceeding No.
10                                   )     21-03000-sgj
     HIGHLAND CAPITAL MANAGEMENT     )
11   FUND ADVISORS, L.P.; NEXPOINT   )
     ADVISORS, L.P.; HIGHLAND        )
12   INCOME FUND; NEXPOINT           )
     STRATEGIC OPPORTUNITIES FUND;   )
13   NEXPOINT CAPITAL, INC.; and     )
     CLO HoldCo, LTD.,               )
14                                   )
                     Defendants.     )
15   ------------------------------

16

17     VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18         Thursday, 21st of January, 2021

19

20

21

22

23   Reported by: Lisa A. Wheeler, RPR, CRR

24   Job No: 188910

25

Page 10

```
 1              GRANT SCOTT - 1/21/2021
 2   choice.
 3          Q.   Okay.  And do you recall who served
 4   the subpoena on you?  Actually, let me ask a
 5   different question because I'm really not
 6   interested in the -- in the details.
 7               Did Mr. Dondero serve that subpoena
 8   on you or did somebody else?
 9          A.   His counsel for his ex-wife.
10          Q.   Mr. -- so -- so the lawyer acting on
11   behalf of Mr. Dondero's ex-wife served you with
12   the subpoena?
13          A.   Correct.
14          Q.   Okay.  You're familiar with an
15   entity called CLO HoldCo Limited; is that
16   right?
17          A.   Yes.
18          Q.   Do you know what that entity is?
19          A.   Yes.
20          Q.   What -- what -- can you describe for
21   me what CLO HoldCo Limited is.
22          A.   It's a holding company of assets
23   including collateralized loan obligation-type
24   assets.  That's a portion of the overall
25   portfolio.  It's an organization that is
```

Page 11

```
 1              GRANT SCOTT - 1/21/2021
 2   integrated with other entities as part of a
 3   charitable -- loosely what we -- what we refer
 4   to as a charitable foundation equivalent.
 5   Yeah.
 6          Q.   All right.  We'll -- we'll get into
 7   some detail about the corporate structure in a
 8   moment.  Do you personally play any role at CLO
 9   HoldCo Limited?
10          A.   Yes.  My technical title is
11   director, but I -- I don't necessarily know
12   specifically what that title means other than I
13   act, as I understand it, as -- as a trustee for
14   those -- for those assets.
15          Q.   And where did you get that
16   understanding?
17          A.   Approximately ten years ago from the
18   group that -- that set up the hierarchy.
19          Q.   And which group set up the
20   hierarchy?
21          A.   Employees at Jim Don- -- as I
22   understand it, employees of Highland along with
23   outside counsel, as I understand it, and also,
24   I guess, input from -- from Jim Dondero.
25          Q.   At the time that you assumed the
```

Page 12

```
 1              GRANT SCOTT - 1/21/2021
 2   role of director of CLO HoldCo Limited, was
 3   that entity already in existence?
 4          A.   I believe so.  I'm not certain.  I'm
 5   not certain.
 6          Q.   What are your duties and
 7   responsibilities as a director of CLO HoldCo
 8   Limited?
 9          A.   Well, my day-to-day responsibilities
10   are to interface with -- with the manager of
11   the -- of the assets of CLO.  I do have some
12   role in -- with respect to some of the entities
13   that are -- I -- I have a limited role with
14   respect to a subset of the charitable
15   foundations that receive money from the CLO
16   HoldCo structure, which is commonly referred to
17   as the DAF.  There's -- sometimes those are
18   used interchangeably.
19          Q.   What terms are used interchangeably?
20          A.   Well, the DAF and CLO HoldCo are
21   frequently -- by -- by other people they're --
22   it's the short -- it's the -- I guess it's
23   easier to use the acronym DAF than CLO HoldCo
24   Limited, so I'm frequently having to -- there
25   is a DAF entity so -- that's above -- above CLO
```

Page 13

```
 1              GRANT SCOTT - 1/21/2021
 2   in terms of the management, and so it's
 3   frequently confusing and I'm having to clarify
 4   at times which entity we're talking about,
 5   but -- but other parties frequently use those
 6   terms interchangeably.
 7          Q.   Okay.
 8               MR. MORRIS:  Lisa, when we use the
 9          phrase DAF, because you'll hear that a lot,
10          it's all caps, D-A-F.
11   BY MR. MORRIS:
12          Q.   You mentioned that you interface
13   with the manager of assets of CLOs.  Do I have
14   that right?
15          A.   Well, of all the assets.
16          Q.   Okay.  Who is the manager of the
17   assets that you're referring to?
18          A.   Highland Capital Management.
19          Q.   Highland Capital Management manages
20   all of the assets -- withdrawn.
21               Is it your understanding that
22   Highland Capital Management manages all the
23   assets that are owned by CLO HoldCo Limited?
24          A.   Yes.
25          Q.   Who makes the investment decisions
```

Page 14

GRANT SCOTT - 1/21/2021

2  on behalf of CLO HoldCo Limited?
3       A.   Highland -- those managers that you
4  mentioned.
5       Q.   Okay.  I didn't mention anybody in
6  particular.
7       A.   Oh, I'm sorry.  The -- the -- the
8  money manager -- could you repeat that
9  question?  I'm sorry.  I'm so sorry.
10      Q.   Can you just -- can you just
11  identify for me the person who makes investment
12  decisions on behalf of CLO HoldCo Limited.
13      A.   It's -- well, it's -- it's persons
14  as I understand it.  I inter- -- interface with
15  a -- with a group, but it's -- it's Highland
16  Capital employee -- Highland Capital Management
17  employees.
18      Q.   Okay.  Can you just name any of
19  them, please.
20      A.   Hunter Covitz, Jim Dondero.  Mark
21  Okada's no longer there, but I believe he was
22  involved, and there are others that I interface
23  with.
24      Q.   Can you -- can you recall the name
25  of anybody other than Mr. Okada and Mr. Dondero

Page 15

GRANT SCOTT - 1/21/2021

2  and Mr. Covitz?
3       A.   Yeah.  Over the years I've worked
4  with Tim Cournoyer, Thomas Surgent, but I
5  think -- I think that's the core -- the core
6  group.
7       Q.   All right.  And is there anybody
8  within that core group who has the final
9  decision-making authority concerning the
10  investments in CLO HoldCo Limited?
11      A.   I don't -- I don't know.  I'm sorry.
12  Say that again.  I just want to -- I'm sorry.
13  I'm trying to be -- I'm not trying to -- I'm
14  trying to be --
15      Q.   I understand.  And --
16      A.   Sorry.  If you could just repeat it.
17      Q.   Sure.  Is there any particular
18  person who has the final decision-making
19  authority for investments that are being made
20  on behalf of CLO HoldCo Limited?
21      A.   Amongst that group I am -- I am not
22  sure.
23      Q.   Okay.  So are there any other
24  directors of CLO HoldCo besides yourself?
25      A.   No.

Page 16

GRANT SCOTT - 1/21/2021

2       Q.   Is it fair to say that you do not
3  make decisions, investment decisions, on behalf
4  of CLO HoldCo Limited?
5       A.   Yes.
6       Q.   Does CLO HoldCo Limited have any
7  employees that you know of?
8       A.   No.
9       Q.   Does CLO HoldCo have any --
10  withdrawn.
11      Q.   Does CLO HoldCo Limited have any
12  officers that you know of?
13      A.   No.
14      Q.   So am I correct that you're the only
15  representative in the world of CLO HoldCo in
16  terms of being a director, officer, or
17  employee?
18      A.   Yes.
19      Q.   Do you receive any compensation from
20  CLO HoldCo for your services as the director?
21      A.   I do now.
22      Q.   When did that begin?
23      A.   I believe in the middle of 2012.
24      Q.   Okay.  And had you served as a
25  director prior to that time without

Page 17

GRANT SCOTT - 1/21/2021

2  compensation?
3       A.   Yes.
4       Q.   And have you been the sole director
5  of CLO HoldCo Limited since the time of your
6  appointment approximately ten years ago?
7       A.   Yes.
8       Q.   Nobody else has served in that
9  capacity; is that right?
10      A.   That is correct.
11      Q.   There have been no employees or
12  officers of that entity during the time that
13  you've served as director, correct?
14      A.   Yes.
15      Q.   Do you know who formed CLO HoldCo
16  Limited?
17      A.   I do not.
18      Q.   Do you know why CLO HoldCo Limited
19  was formed?
20      A.   I believe so.
21      Q.   Can you explain to me why -- your
22  understanding as to why CLO HoldCo was formed.
23      A.   So as I understand things, Jim
24  Dondero wanted to create a charitable
25  foundation-like entity or entities, and tax

Page 22

GRANT SCOTT - 1/21/2021

1  GRANT SCOTT - 1/21/2021
2  going well.
3       Q.    And -- and I think you -- you
4  testified just now that there was kind of a
5  difference between prebankruptcy and
6  postbankruptcy.  Do I have that right?
7       A.    Yes.
8       Q.    And can you tell me -- is it fair to
9  say that before the bankruptcy, you didn't
10  devote much time to CLO HoldCo, or do I have
11  that wrong?
12      A.    Well, I -- just the time that --
13  that I mentioned just -- I'm sorry.  The -- the
14  time I just mentioned now when you asked me,
15  that was the pre period.  Excuse me.  I haven't
16  talked about the postbankruptcy period.
17      Q.    So are you -- are you -- are you
18  devoting more time or less time since the
19  bankruptcy?
20      A.    Much more.
21      Q.    Much more since the bankruptcy
22  filing?
23      A.    Yes.
24      Q.    And so why did the bankruptcy filing
25  cause you to spend more time as a director of

Page 23

1  GRANT SCOTT - 1/21/2021
2  CLO HoldCo Limited?
3       A.    Well, initially, and this would
4  be -- this would be late 2019, it was --
5  aft- -- after the bankruptcy was -- was filed
6  and I obtained counsel, who are on the phone
7  now -- or in this deposition now, excuse me,
8  that was -- that transition occurred because
9  CLO was a debtor -- excuse me, a creditor to --
10  to the debtor and had to take steps to
11  establish its -- its claim.  So if I understand
12  the -- things correctly, the -- the debtor
13  identified as part of the filing -- I don't
14  know how bankruptcy works, but if I under- --
15  if my recollection is correct, there's a
16  hierarchy from biggest to smallest, and we were
17  relatively high up.  And when I say we or I,
18  I -- I just mean CLO was relatively high up.
19  And so initially, for the first period of so
20  many months, the -- the exclusive focus was on
21  our position as a creditor -- a creditor having
22  a certain claim against a debtor.
23      Q.    Can you describe for me your
24  understanding of the nature of the claim
25  against the debtor.

Page 24

1  GRANT SCOTT - 1/21/2021
2       A.    It was various obligations that were
3  owed to -- to CLO, things that had been
4  previously donated or -- or agreements that had
5  been set up that transferred certain assets,
6  and it was basically the -- the -- the amounts
7  were derived from those sorts of transactions.
8       Q.    Okay.  You're a patent lawyer; is
9  that right?
10      A.    I -- I'm exclusively a patent
11  attorney, yes.
12      Q.    Have you been a patent lawyer on an
13  exclusive basis since the time you graduated
14  from law school?
15      A.    From law school, yes.
16      Q.    Can you just describe for me
17  generally your educational background.
18      A.    So I'm an electrical engineer by
19  training.  I graduated from the University of
20  Virginia in 1984.  I then went to graduate
21  school at the University of Illinois.  I
22  received my master's degree in 1986, and then I
23  immediately joined IBM Research at the Thomas
24  Watson Institute in New York where I was a --
25  my title was research scientist, but I was -- I

Page 25

1  GRANT SCOTT - 1/21/2021
2  guess I was more of a research engineer, if
3  that matters.  And I did that until I
4  transitioned -- or I began law school in the
5  fall of 1988, and then I graduated law school
6  in May of 1991.
7       Q.    And where did you go to law school?
8       A.    University of North Carolina.
9       Q.    Do you have any formal training in
10  investing or finance?
11      A.    I do not.
12      Q.    Do you hold yourself out as an
13  expert in any field of investment?
14      A.    None -- none at all.
15      Q.    Have you had any formal training
16  with respect to compliance issues?  You
17  mentioned compliance issues earlier.
18      A.    No.
19      Q.    Now, do you have any knowledge about
20  compliance rules or regulations?
21      A.    Minimal that I've -- that have
22  occurred organically but -- but generally, no.
23      Q.    You don't hold yourself out as an
24  expert in com- -- in the area of compliance,
25  correct?

**Page 26**

GRANT SCOTT - 1/21/2021

2  A.  No.  No.  I'm -- no.

3  Q.  Do you have any particular

4  investment philosophy or strategy?

5  MR. CLARK:  I'm going to object to

6  the form of the question.  And, John,

7  can -- can we get an agreement that -- I

8  know you were objecting just simply on the

9  form basis yesterday -- that objection to

10  form is sufficient today?

11  MR. MORRIS:  Sure.

12  MR. CLARK:  Okay.  And I object to

13  form.  Grant, you can answer to the extent

14  you can.

15  THE WITNESS:  I forget the question

16  now that you interrupted.  I'm sorry.

17  BY MR. MORRIS:

18  Q.  So -- so -- and I'm going to ask a

19  different question because in hindsight, that's

20  a good objection.

21  In your capacity as the director

22  of -- withdrawn.

23  Do the employees of Highland that

24  you identified earlier, do they make investment

25  decisions on behalf of CLO HoldCo Limited

**Page 27**

GRANT SCOTT - 1/21/2021

2  without your prior knowledge on occasion?

3  A.  On occasion, they do.

4  Q.  So there's no rule that your prior

5  approval is needed before investments are made,

6  right?

7  A.  I don't know whether they have an

8  internal guideline as to the amount that

9  triggers when they get in touch with me or

10  whether it's a new -- a change, something new,

11  or -- versus recurring.  So I don't -- I don't

12  know what they use internally for that metric.

13  Q.  Okay.  Are you aware of any

14  guideline that was ever used by the Highland

15  employees whereby they were required to obtain

16  your consent prior to effectuating transactions

17  on behalf of CLO HoldCo Limited?

18  A.  I understand there was one or more,

19  but I do not know that.

20  Q.  Okay.  Did you ever see such a

21  policy or list of rules that would require your

22  prior consent before the Highland employees

23  effectuated transactions on behalf of CLO

24  HoldCo Limited?

25  A.  Possibly some time ago, but I -- I

**Page 28**

GRANT SCOTT - 1/21/2021

2  don't recall.

3  Q.  Okay.  So -- withdrawn.  I'll --

4  I'll go on.

5  How did you come to be the director

6  of CLO HoldCo?

7  A.  I was asked either by Jim Dondero

8  or -- directly or indirectly by -- by Jim

9  Dondero.

10  Q.  And who is Jim Dondero?

11  A.  Well, at the time, he was the head

12  or one of the heads of Highland Capital

13  Management, a friend of mine.

14  Q.  How long have you known Mr. Dondero?

15  A.  Since high school so that -- 1976.

16  Q.  Where did you and Mr. Dondero grow

17  up?

18  A.  In northern New Jersey.

19  Q.  Do you consider him among the

20  closest friends you have?

21  A.  I think he is my closest friend.

22  Q.  Did you two go to college together?

23  A.  We actually -- for the last -- last

24  two years I was at UVA, University of Virginia,

25  excuse me, he and I were -- were at UVA.  So we

**Page 29**

GRANT SCOTT - 1/21/2021

2  did not start out at UVA initially, but -- but

3  we both transferred -- I transferred my

4  sophomore year.  I was actually a chemical

5  engineer at the University of Delaware when I

6  transferred in, and then he transferred in his

7  junior year.  So we were there at college for

8  two years.

9  Q.  And -- and based on your

10  relationship with him, is it your understanding

11  that one of the reasons he chose to transfer to

12  UVA is -- is to -- because you were there?

13  A.  Oh, no.  He transferred -- he --

14  he -- he transferred there because of the -- so

15  he went to the University of -- he -- he went

16  to Virginia Tech University, which is more

17  known as being an engineering school, which I

18  might have wanted to go to, and less a finance

19  business school.  And if I understand things

20  correctly, and I believe I do, he transferred

21  to UVA because of the well-known

22  business/finance program, accounting program.

23  Q.  And did you -- did you and

24  Mr. Dondero become roommates at UVA?

25  A.  We weren't roommates, but we lived

```
                                            Page 30
 1            GRANT SCOTT - 1/21/2021
 2   in the -- we were housemates.  I'm sorry.  We
 3   were housemates.
 4      Q.    So you shared a house together.  How
 5   would you describe your relationship with
 6   Mr. Dondero today?
 7      A.    It's -- it's been strained a while,
 8   for some time, but -- but generally, very good.
 9   Good to very good.
10      Q.    Without -- without getting personal
11   here, can you just generally identify the
12   source of the strain that you described.
13      A.    This -- I think it would be fair to
14   say that this bankruptcy, particularly events
15   in 2020 so some months after the bankruptcy was
16   declared, things have become -- we -- we still
17   have a close friendship, but -- but things
18   are -- are a bit -- are a bit more difficult.
19      Q.    Were you ever married?
20      A.    I've never been married.
21      Q.    Did you serve as Mr. Dondero's best
22   man at his wedding?
23      A.    I did.
24      Q.    Is it fair to say that -- that
25   Mr. Dondero trusts you?
```

```
                                            Page 31
 1            GRANT SCOTT - 1/21/2021
 2      MR. CLARK:  Objection, form.
 3   BY MR. MORRIS:
 4      Q.    Withdrawn.
 5            Do you believe that Mr. Dondero
 6   trusts you?
 7      A.    I do.
 8      Q.    Over the years, is it fair to say
 9   that Mr. Dondero has confided in you?
10      MR. CLARK:  Objection, form.
11   BY MR. MORRIS:
12      Q.    You can answer if you understand it.
13      A.    I think so.
14      Q.    I -- I what's your answer?  You
15   think so?
16      A.    Maybe you can de- -- I think of
17   confide as -- could you define confide, please.
18      Q.    Sure.  Is it -- is it fair to say
19   that over the -- let me -- you've known
20   Mr. Dondero for almost 45 years, right?
21      A.    Yes.
22      Q.    And you consider him to be your
23   closest friend in the world, right?
24      A.    Yes.
25      Q.    And is it fair to say over the
```

```
                                            Page 32
 1            GRANT SCOTT - 1/21/2021
 2   course of those 45 years, Mr. Dondero has
 3   shared confidential information with you that
 4   he didn't want you to reveal publicly to other
 5   people?
 6      A.    Yes.
 7      Q.    And is it your understanding that
 8   because of the nature of your relationship with
 9   him, he asked you to serve as the director of
10   CLO HoldCo Limited?
11      A.    Yes.  I believe it's because he --
12   he trusted -- trusted me with -- with assets
13   relating to his charitable vision.  I -- I --
14   yeah.  Yes.
15      Q.    And is it your understanding that he
16   thought you would help him execute his
17   charitable vision?
18      A.    That was the point of attraction
19   initially.  I wasn't for money.  I wasn't
20   being paid.  That was -- the charitable mission
21   was the attraction.
22      Q.    Does Mr. Dondero play any role in
23   the management of the CLO HoldCo Limited asset
24   pool?
25      MR. CLARK:  Objection, form.
```

```
                                            Page 33
 1            GRANT SCOTT - 1/21/2021
 2      A.    I'm sorry.  Could you repeat that?
 3   My -- my screen went small and then big again.
 4   I was distracted.
 5      Q.    What role does Mr. Dondero play with
 6   respect to the management of the CLO HoldCo
 7   Limited asset pool?
 8      MR. CLARK:  Objection, form.
 9      A.    He is with the company that manages
10   that asset pool.  He's one of the people I
11   named previously as managing those assets.
12      Q.    He is -- he -- he is the -- do you
13   understand that he has the final
14   decision-making power with respect to the
15   management of the assets that are held by CLO
16   HoldCo Limited?
17      MR. CLARK:  Objection, form.
18      A.    I believe I ansel -- answered that
19   previously.  I -- I don't know who has -- for
20   certainty I do not know who has that within
21   that company.  I don't.  If -- if -- I -- I
22   don't know, consistent with my prior answer.
23      Q.    Did you ever ask anybody who had the
24   final decision-making authority for investments
25   on behalf of CLO HoldCo Limited?
```

---

**Page 34**

GRANT SCOTT - 1/21/2021

```
2      A.   I -- I did not.
3      Q.   Did you ever make a decision on
4  behalf of -- withdrawn.
5           In your capacity as a director --
6  withdrawn.
7           In your capacity as the sole
8  director of CLO HoldCo Limited, can you think
9  of any decision that you've ever made that
10 Mr. Dondero disagreed with?
11     A.   Since -- prior to the bankruptcy,
12 no, not that I'm aware of.
13     Q.   And since the bankruptcy?
14     A.   There are decisions that I've made
15 that he's disagreed with.
16     Q.   Can you identify them?
17     A.   Yes.
18     Q.   Please do so.
19     A.   Okay.  So the reason I'm pausing is
20 I'm trying to put these in chronological order
21 and, at the same time, identify maybe some of
22 the more important ones versus the lesser
23 important ones.  One of the decisions I made
24 related to a request that I received from the
25 independent board of Highland.  I don't know
```

---

**Page 35**

GRANT SCOTT - 1/21/2021

```
2  how the request was transmitted to me, but I
3  believe the way it played out is as follows:  I
4  believe I was asked to call Jim Seery, and the
5  other -- and Russell Nelms, and the third
6  independent director, I believe his name is
7  John.  I -- I forget right now what his last
8  name is.  They were in New York, said they were
9  in a conference room.  I called in.  They were
10 very pleasant.  They identified who they were,
11 and they had a request, and the request was
12 that I agree to a transfer -- or that I -- that
13 I agree to allow certain assets that were not
14 Highland's assets but which were CLO's as- --
15 assets -- apparently, there was no dispute
16 about that at any point in time, but that I
17 agree to allow certain assets that were due CLO
18 to be transferred to the registry of the
19 bankruptcy court.  And either on that call I
20 immediately agreed or ended the call, called my
21 attorney, and then immediately agreed.  It was
22 a very -- I accommodated the request quickly.
23     Q.   Okay.  And can you just tell me at
24 what point in time you spoke with Mr. Dondero,
25 and what did he say that you recall?
```

---

**Page 36**

GRANT SCOTT - 1/21/2021

```
2      A.   I don't know when he became aware of
3  that decision.  I'm not sure I ever volunteered
4  that the decision was even made, but at some
5  point, it became an issue because he found out
6  through -- if I understand the sequence of
7  events correctly, he found out possibly through
8  his counsel because there was ultimately
9  litigation about that issue.  It became known
10 to everyone at some point what I had done, I --
11 I think.  And subsequent to that, it became an
12 issue because of CLO HoldCo having fairly
13 significant cash flow issues with respect to
14 its expenses and obligations, including payment
15 of management fees as well as some of the
16 scheduled charitable giving that was -- that
17 was by contract already predefined.  My
18 decision to tuck that money -- or to agree
19 to -- to agree to let that money be tucked
20 away created some -- created some -- created
21 some problems --
22     Q.   And -- and --
23     A.   -- for CLO HoldCo.
24     Q.   Okay.  And I just want you to focus
25 specifically on my question, and that is, what
```

---

**Page 37**

GRANT SCOTT - 1/21/2021

```
2  did Mr. Dondero say to you that -- that causes
3  you to testify as you did, that this is one
4  issue that he didn't agree with?
5      A.   I believe his concern was that
6  because it was money that was undisputably to
7  flow to CLO HoldCo that -- which had many, many
8  other nonliquid assets -- this was a form of a
9  liquid asset.  It was cash in effect, proceeds.
10 -- that the money should have been allowed to
11 flow to be available for obligations.  He
12 didn't under- -- I -- I -- I don't know what he
13 was thinking, but the -- the issue was that the
14 decision to put it into escrow was -- was --
15 was in- -- incorrect, that there was no basis
16 for it.
17     Q.   That -- that's an issue where after
18 learning of your decision, he didn't agree with
19 it; is that fair?
20     A.   That's right.
21     Q.   Okay.  Can you think of any decision
22 that you've ever made on behalf of CLO HoldCo
23 Limited where Mr. Dondero had advance knowledge
24 of what you were going to do and he objected to
25 it, but you nevertheless overruled his
```

---

Page 38

GRANT SCOTT - 1/21/2021

2  objection and went ahead and did what -- did
3  what you thought was right?
4      A.    Okay.  Let me -- let me -- I have --
5  I'm sorry.
6      Q.    We're here.
7      A.    Oh, I'm sorry.  I'm having some
8  issues with my screen.  So that may have
9  occurred with respect to the original proof of
10  claim.  Then there was a subsequent amendment
11  to the proof of claim, and I -- I believe it --
12  I believe that he might have been aware of both
13  of those and was in disagreement with -- with
14  those.  But after working with my attorney, I
15  just -- you know, we did what we thought was
16  right, and I still think what we did was right.
17  There was an issue with respect to Har--
18  HarbourVest that occurred relatively recently
19  where he objected to a decision that I had
20  made.  As I understand it, I could have
21  contacted my attorney and changed the decision,
22  but I didn't, and I still think that was the
23  right decision.
24          We have filed plan objections.  I
25  can't say if he has any -- in that regard, I --

Page 39

GRANT SCOTT - 1/21/2021

2  I -- I don't know what his thoughts are on
3  objections.  They would not have been
4  communicated with -- by me to him, but my
5  attorney might have consulted with his
6  attorney, and there -- they may know what that
7  difference is, but I -- that was just another
8  big decision.  I -- I -- maybe that --
9      Q.    All right.  Let me see if I can --
10  let me see if I can summarize this.  So two
11  proofs of claim.  Is it fair to say that
12  Mr. Dondero saw those proofs of claim before
13  they were filed?
14          MR. CLARK:  Objection, form.
15  BY MR. MORRIS:
16      Q.    Withdrawn.
17      A.    It --
18      Q.    Do -- do you know whether
19  Mr. Dondero saw the proofs of claim before they
20  were filed?
21      A.    I don't believe he did.
22      Q.    What -- what steps in filing the
23  proofs of claim did he object to that you
24  overruled?  Did he think there was -- something
25  should be different about them?

Page 40

GRANT SCOTT - 1/21/2021

2      A.    So we had to interface with Highland
3  employees at some point to get information to
4  support our proof of claim, and my guess, and
5  it's just a guess, is that he was aware of
6  those inquiries.  I -- I'm sorry.  I shouldn't
7  speculate.  I don't know.  But he -- with
8  respect to the original proof of claim, I'm --
9  I'm not aware of what specifically he was
10  objecting to or was -- thought should have been
11  different, but the -- with respect to the
12  amended proof of claim, which reduced the
13  original proof of claim to zero, I think that's
14  where he had a -- an issue.
15      Q.    And did you speak with him about
16  that topic prior to the time the amended claim
17  was filed, or did you only speak with him after
18  it was filed?
19      A.    I'm not sure the timing of that.
20      Q.    And with respect to HarbourVest, did
21  he ask you to object to the settlement on
22  behalf of CLO HoldCo Limited, and is that
23  something that you declined to do?
24          MR. CLARK:  Objection, form.
25      A.    I'm -- I'm sorry.  I was confused

Page 41

GRANT SCOTT - 1/21/2021

2  with the word.  Could you please repeat that?
3      Q.    Yes.  You mentioned HarbourVest
4  before, right?
5      A.    Yes.
6      Q.    And you mentioned that there was an
7  issue with Mr. Dondero and you concerning
8  HarbourVest; is that right?
9      A.    Yes.
10      Q.    And did that have to do with whether
11  or not CLO HoldCo Limited would -- would object
12  to the debtor's motion to get the HarbourVest
13  settlement approved?
14      A.    Would -- would get the
15  HarbourVest --
16      Q.    Settlement approved by the court.
17      A.    I'm not trying to be difficult.
18  I'm -- I'm -- could you just repeat that one
19  more time?  I'm --
20      Q.    What was -- what was --
21      A.    There was --
22      Q.    Let me try again.
23      A.    Okay.
24      Q.    What was the issue with respect to
25  HarbourVest that he objected to and -- and you

Page 42

GRANT SCOTT - 1/21/2021

1
2  overrode his objection and did what you thought
3  was right anyway?
4      A.   Okay.  Okay.  That's -- that's
5  easier for me to understand.  I'm sorry.  So I
6  had worked with my attorney or he did the work
7  and consulted with -- we consulted, but we had
8  filed an objection, motion objecting to the
9  settlement, if I understand the terminology and
10  nomenclature correctly.  Okay.  He had -- we
11  had come to an agreement that we had a very
12  valid argument.  That argument was evidenced
13  by, I guess it was, our motion that was
14  submitted to the court.  On the day of the
15  hearing to resolve this issue, we pulled our
16  request, and that was because I believed it did
17  not have a good-faith basis in law to move
18  forward on.
19      Q.   And did you discuss that issue with
20  Mr. Dondero before informing the court that CLO
21  HoldCo Limited was withdrawing its objection,
22  or did he learn about that for the first time
23  during the hearing --
24          MR. CLARK:  Objection, form.
25  BY MR. MORRIS:

Page 43

GRANT SCOTT - 1/21/2021

1
2      Q.   -- if you know?
3      A.   I -- I understand that he learned it
4  during the hearing.  I don't know the -- I -- I
5  don't know the -- whether there was any -- I --
6  I don't know for certain on the second half of
7  your question.
8      Q.   Let me -- let me try it -- let me
9  try it this way:  Did you speak with
10  Mr. Dondero about your decision to withdraw the
11  objection to the HarbourVest settlement prior
12  to the time your counsel made the announcement
13  in court?
14      A.   I don't -- I don't believe so.  No.
15  No.  No.  I'm sorry.  No.
16      Q.   And did --
17      A.   Okay.  No.  Here -- here's where
18  I'm -- I can clarify, okay?  I'm sorry.  I can
19  clarify.
20      Q.   That's all right.
21      A.   I gave the decision to my
22  attorney -- I -- I agreed with the
23  recommendation of my attorney, okay?  It wasn't
24  my --
25      Q.   Did you have a good --

Page 44

GRANT SCOTT - 1/21/2021

1
2      A.   -- thought, okay?
3          THE REPORTER:  I didn't --
4      A.   Okay.  So he --
5      Q.   It was a recommendation.
6      A.   Yeah.  So he -- he called me with a
7  recommendation.  It was highly urgent.  You
8  know, I was coming out of the men's room, had
9  my phone with me.  I got the call.
10         MR. CLARK:  Hey, Grant, I -- Grant,
11  I just want to caution you not to -- to --
12  and I don't think counsel is looking for
13  this but not to disclose the -- the
14  substance of any of your communications
15  with counsel, okay?
16         THE WITNESS:  Thank you.
17      A.   So --
18         THE WITNESS:  Thank you.  I'm -- I'm
19  sorry.
20  BY MR. MORRIS:
21      Q.   It's -- it's really a very simple
22  question.  Do you recall --
23      A.   He made a recommendation.  I -- I --
24  I think I can answer your question without
25  going off tangent.  I'm sorry.  So he -- my

Page 45

GRANT SCOTT - 1/21/2021

1
2  attorney made a recommendation.  I agreed with
3  it.  We with -- I -- I told him to withdraw --
4  or I authorized him to withdraw.
5      Q.   Okay.
6      A.   Then I received a communication, and
7  I -- I guess the most likely scenario is the
8  motion had been withdrawn by the time Jim
9  Dondero found out.
10      Q.   And -- and did he write to you, or
11  did he call you?  Did he send you a text?
12      A.   He called me.
13      Q.   What did he say?
14      A.   He was asking why, and I explained,
15  and I said I agreed with the decision and I was
16  sticking with the decision.
17      Q.   Let's just -- let's just move on to
18  a new topic, and let's talk about the structure
19  of -- of CLO HoldCo.  Are you generally
20  familiar with the ownership structure of CLO
21  HoldCo?
22      A.   Yeah.  I mean, in terms --
23      Q.   Are -- are you -- are you generally
24  familiar with it?  It's not a test.  I'm just
25  asking do you have a general familiarity --

Page 46

GRANT SCOTT - 1/21/2021

2  A.  With CLO HoldCo or the entities
3  associated with CLO HoldCo?
4  Q.  The latter.
5  A.  Yes, I believe so.
6  Q.  All right.  I've prepared what's
7  called a demonstrative exhibit.  It's just --
8  A.  Yes.
9  Q.  -- just -- it's a document that, I
10  think, reflects facts, but I want to ask you
11  about it.
12  MR. MORRIS:  La Asia, can we please
13  put up Exhibit 1.
14  (SCOTT EXHIBIT 1, Organizational
15  Structure: CLO HoldCo, Ltd., was marked
16  for identification.)
17  BY MR. MORRIS:
18  Q.  Okay.  Can you see that, Mr. Scott?
19  A.  Yes, I can.
20  Q.  Okay.  So I think I took the
21  information from resolutions that were attached
22  to the CLO HoldCo proof of claim, and that's
23  why you got that little footnote there at the
24  bottom of the page.  But let's start in the
25  lower right-hand corner and see if this chart

Page 47

GRANT SCOTT - 1/21/2021

2  comports with your understanding of the facts.
3  Do you know that CLO HoldCo Limited
4  was formed in the Cayman Islands?
5  A.  Yes.
6  Q.  And to the best of your knowledge,
7  is CLO HoldCo Limited 100 percent owned by the
8  Charitable DAF Fund, L.P.?  If you're not sure,
9  just say you're not sure if you don't know.
10  It's not a test.
11  A.  So the -- the -- the familiarity
12  I -- I'm -- I'm familiar with the different --
13  I'm confused with the arrangement of the boxes
14  and the ownership interest versus managerial
15  interest.  I believe that's -- that's right.
16  Q.  Okay.  And -- and you're the sole
17  director of CLO HoldCo Limited, right?
18  A.  Yes.
19  Q.  And this whole structure was -- the
20  idea for this structure, to the best of your
21  knowledge, was to implement Mr. Dondero's plan
22  for charitable giving; is that fair?
23  A.  Yes.  Ultimately, yes.
24  Q.  And is it fair to say then that
25  he -- he made the decision to establish this

Page 48

GRANT SCOTT - 1/21/2021

2  particular structure, to the best of your
3  knowledge?
4  A.  I -- I didn't -- I'm sorry.  I
5  didn't hear you very well.
6  Q.  To the best of your knowledge, did
7  Mr. Dondero make the decisions to establish the
8  structure that's reflected on this page?
9  A.  Oh, I don't know if he made the
10  decision to establish this structure, although
11  it's -- it's -- I'm sorry.  Strike that.  I --
12  if -- if what you're saying is did he approve
13  of this structure, to my knowledge, yes.
14  Q.  Okay.  Do you hold any position with
15  respect to Charitable DAF Fund, L.P.?
16  A.  I -- I -- your chart says no.  I --
17  I -- I thought I had a role there, too.
18  Q.  I don't know.  I don't have
19  information on that.  That's why I'm asking the
20  question.
21  A.  I -- I -- I believe -- yes, I
22  believe I have the same role as I do in -- in
23  CLO HoldCo.
24  Q.  And that would be director?
25  A.  Yes.

Page 49

GRANT SCOTT - 1/21/2021

2  Q.  And to the best of your knowledge,
3  is the Charitable DAF GP, LLC, the general
4  partner of Charitable DAF Fund, L.P.?
5  A.  Yes.
6  Q.  And is it your understanding that
7  you are the managing member of Charitable DAF
8  GP, LLC?
9  A.  Yes.
10  Q.  Does Charitable DAF GP, LLC, have
11  any employees?
12  A.  No.
13  Q.  Does Charitable DAF GP, LLC, have
14  any officers or directors?
15  A.  No.
16  Q.  Are you the only person affiliated
17  with Charitable DAF GP, LLC, to the best of
18  your --
19  A.  I believe so.
20  Q.  Do you receive any compensation for
21  serving as the managing member of Charitable
22  DAF GP, LLC?
23  A.  No.  The -- I don't interact with it
24  very often.  It's -- no, I don't receive any
25  compensation.

Page 50

GRANT SCOTT - 1/21/2021

2  Q.  Can you tell me in your capacity as
3  the managing member of Charitable DAF GP, LLC,
4  what's the nature of that entity's business?
5  A.  It -- it doesn't perform any
6  day-to-day operations.  My understanding is --
7  is that it's -- it's there for purposes of
8  compliance.  I can't recall the last time I had
9  any activity with respect to that.
10  Q.  How about the Charitable DAF Fund,
11  L.P.?  I apologize if I've asked you these
12  questions.
13  A.  It -- it's the same.  I -- I -- my
14  activity is almost exclusively CLO HoldCo.
15  Q.  All right.  Let me just ask the
16  questions nevertheless.  Does Charitable DAF
17  Fund, L.P., have any employees?
18  A.  Employees?  No.
19  Q.  Does it have any officers and
20  directors?
21  A.  No.
22  Q.  Are you the sole director of
23  Charitable DAF Fund, L.P.?
24  A.  Yes, I believe so.
25  Q.  So if we -- if we put under

Page 51

GRANT SCOTT - 1/21/2021

1  Charitable DAF Fund, L.P., Grant Scott,
2  director, and we put under CLO HoldCo Limited
3  Grant Scott, director, would everything on the
4  right side of that page be accurate, to the
5  best of your --
6
7  A.  I believe so.
8  Q.  Well, let's move to the left side of
9  the page.  Have you heard of the entity
10  Charitable DAF HoldCo Limited?
11  A.  Yes.
12  Q.  Are you the sole director of
13  Charitable DAF HoldCo Limited?
14  A.  Yes.
15  Q.  How did you become -- how did you
16  come to be the char-- the sole director of
17  Charitable DAF HoldCo Limited?
18  A.  That was when it was established.
19  Q.  And did Mr. Dondero ask you to serve
20  in that capacity?
21  A.  Yes.
22  Q.  And did Mr. Dondero ask you to serve
23  as the managing member of Charitable DA- -- DAF
24  GP, LLC?
25  A.  Yes.

Page 52

GRANT SCOTT - 1/21/2021

2  Q.  And did Mr. Dondero ask you to serve
3  as the director of Charitable DAF, L.P. --
4  withdrawn.
5  Did Mr. Dondero ask you to serve as
6  director of Charitable DAF Fund, L.P.?
7  A.  Yes.
8  Q.  To the best of your knowledge, does
9  Charitable DAF HoldCo Limited own 99 percent of
10  the limited partnership interests in Charitable
11  DAF Fund, L.P.?
12  A.  Yes.  The -- the feed -- the -- the
13  feeds -- the -- the three horizontal blocks
14  there that identify Highland Dallas Foundation,
15  Kansas City, Santa Barbara -- there's a fourth
16  of -- relatively de minimus in terms of
17  participation.  There's a fourth entity that's
18  missing.  It's Dallas -- I forget the name.
19  That -- that -- that structure is -- is a bit
20  dated --
21  Q.  Okay.
22  A.  -- as it -- as is shown.
23  Q.  Okay.  So I will tell you and we can
24  look the documents if you want, but attached to
25  CLO HoldCo Limited's claim are a number of

Page 53

GRANT SCOTT - 1/21/2021

2  resolutions, and there's one that I have in
3  mind that shows Charitable DAF HoldCo Limited
4  holding 99 percent of the limited partnership
5  interests of Charitable DAF Fund, L.P., and
6  there's another that shows it being a hundred
7  percent.  Do you -- do you know which is
8  accurate at least at this time?
9  A.  There's a 1 percent/99 percent
10  division, and I am -- I believe it's the 99
11  percent, but I'm -- I'm getting confused by
12  the -- by the arrangement.  I'm so used to
13  another arrangement.  I -- I believe the 99
14  percent is correct.
15  Q.  Okay.  Do you have any understanding
16  as to who owns the other 1 percent of the
17  limited partnership interests of Charitable DAF
18  Fund, L.P.?
19  A.  No.  This -- this is confusing to
20  me.  No.
21  Q.  Okay.  There are, at least on this
22  page, three foundations that I think you've
23  identified.  Are those three foundations
24  together with the fourth that you mentioned the
25  owners of the Charitable DAF HoldCo Limited?

Page 54

```
 1              GRANT SCOTT - 1/21/2021
 2      A.    Owners?
 3      Q.    Yes.
 4            MR. CLARK:  Objection, form.
 5      A.    They -- they only participate in the
 6 money that flows up to them.
 7      Q.    And what does that mean exactly?
 8      A.    What's that?
 9      Q.    What does that -- what do you mean
10 by that?  Do the foundations fund Charitable
11 DAF Fund HoldCo Limited?
12      A.    Initially.  Initially, as I
13 understand it, the money flows downward into
14 the Charitable DAF HoldCo Limited before it
15 ultimately makes its way to CLO HoldCo, and
16 then each of those three entities, the various
17 foundations, obtain participation interest in
18 the money that flows back to them.
19      Q.    And -- and is that par- -- are those
20 participation interests in Charitable -- you
21 know what, let -- let me just pull up one
22 document and see if that helps.
23            MR. MORRIS:  Can we put up -- I
24      think it's Exhibit Number 5.
25            (SCOTT EXHIBIT 2, Unanimous Written
```

Page 55

```
 1              GRANT SCOTT - 1/21/2021
 2      Consent of Directors In Lieu of Meeting,
 3      was marked for identification.)
 4            MR. MORRIS:  I apologize.  Let's go
 5      to --
 6            MS. CANTY:  I'm sorry, John.  I
 7      can't hear you.  Was that not the exhibit?
 8            MR. MORRIS:  4.
 9            MS. CANTY:  Okay.
10            THE REPORTER:  And Mr. Morris, you
11      are -- Mr. Morris, you are breaking up just
12      a little bit at the end of your questions.
13 BY MR. MORRIS:
14      Q.    Okay.  Do you see the document on
15 the screen, sir?
16      A.    Yes, I do.
17      Q.    Okay.  And so this is a unanimous
18 written consent of the directors of the
19 Highland Dallas Foundation.  That's one of the
20 entities that was on the chart.
21            MR. MORRIS:  Can we scroll down to
22      the -- bottom of the document where the
23      signature lines are.  Right there.
24 BY MR. MORRIS:
25      Q.    Are you a director of the Highland
```

Page 56

```
 1              GRANT SCOTT - 1/21/2021
 2 Dallas Foundation?
 3      A.    Yes, selected by them.
 4      Q.    Selected by whom?
 5      A.    By that foundation.
 6      Q.    Are you -- are you a director of all
 7 of the four foundations that feed into the
 8 Charitable DAF HoldCo Limited entities that --
 9      A.    No.
10      Q.    Which of the four foundations are
11 you a director of?
12      A.    This and the Santa Barbara -- I'm
13 sorry, Santa Barbara and Kansas City.
14      Q.    So is -- there's one that you're not
15 a director of; is that right?
16      A.    Yes.
17      Q.    And which one is that?
18      A.    The -- could you go back to the --
19      Q.    Yeah.
20            MR. MORRIS:  Go back to the
21      demonstrative.
22      A.    It's the Highland Dallas Foundation
23 and Santa Barbara Foundation.
24      Q.    Those are the two that you're a
25 director of?
```

Page 57

```
 1              GRANT SCOTT - 1/21/2021
 2      A.    Yes.
 3      Q.    To the best of your knowledge, does
 4 Mr. Dondero serve as the president for each of
 5 the foundations that we're talking about?
 6      A.    Yes.
 7      Q.    To the best of your knowledge, is
 8 Mr. Dondero a director of each of the
 9 foundations that we're talking about?
10      A.    Say that again.  I'm sorry.
11      Q.    Is he also a director of each of the
12 foundations?
13      A.    Yes.
14      Q.    Do you know whether any of the
15 foundations has any employees?
16      A.    I believe they do, but I -- I -- I
17 can't say for certain.
18      Q.    Does -- withdrawn.
19            Do you know if there are any
20 officers of any of the four foundations other
21 than Mr. Dondero's service as president?
22      A.    I'm sorry.  Say that one more time,
23 please.
24      Q.    Yes.  Do you know whether any of the
25 four foundations has any officers other than
```

Page 58

```
1              GRANT SCOTT - 1/21/2021
2    Mr. Dondero's service as president?
3        A.   No.
4        Q.   You don't know, or they do not?
5        A.   I -- I don't believe anyone else
6    has.  I -- actually, I should say I don't -- I
7    don't recall.  I -- I don't know.  I don't -- I
8    don't know.
9        Q.   As a director of the Dallas and
10   Santa Barbara foundations, are you aware of any
11   officers serving for either of those
12   foundations other than Mr. Dondero?
13       A.   No.
14       Q.   Do you know who the beneficial owner
15   of the Charitable DAF HoldCo Limited entity is?
16       A.   The beneficial owner?
17       Q.   Correct.
18       A.   The various -- various trusts that
19   were used to -- that were the vehicles by which
20   the money originally was established within --
21   within -- within CLO HoldCo.
22       Q.   Would that be -- would one of them
23   be the Get Good Nonexempt Trust?
24       A.   Yes.
25       Q.   And you're a trustee of the Get Good
```

Page 59

```
1              GRANT SCOTT - 1/21/2021
2    Nonexempt Trust, right?
3        A.   Yes.
4        Q.   When did you become a trustee of the
5    Get Good Nonexempt Trust?
6        A.   Many years ago.  I -- I don't
7    remember.
8        Q.   Are there any other trustees of the
9    Get Good Nonexempt Trust?
10       A.   No.
11       Q.   Does the Get Good Nonexempt Trust
12   have any officers, directors, or employees?
13       A.   No.
14            MR. CLARK:  Objection, form.  Sorry.
15   BY MR. MORRIS:
16       Q.   Withdrawn.
17            Do you know whether the Get Good
18   Nonexempt Trust has any officers, directors, or
19   employees?
20       A.   It does not.
21       Q.   And I apologize if I asked this, but
22   are you the only trustee of the Get Good
23   Nonexempt Trust?
24       A.   Yes.
25       Q.   Is the Dugaboy Investment Trust also
```

Page 60

```
1              GRANT SCOTT - 1/21/2021
2    one of the trusts that has an interest in
3    Charitable DAF HoldCo Limited?
4        A.   Yes.
5        Q.   Are you a trustee of the Dugaboy
6    Investment Trust?
7        A.   I am not.
8        Q.   Do you know who is?
9        A.   I believe it's his sister.
10       Q.   And is that -- you're referring to
11   Mr. Dondero's sister?
12       A.   I'm sorry.  Yes.
13       Q.   And what's the basis for your
14   understanding that Mr. Dondero's siv- -- sister
15   serves as the trustee of the Dugaboy Investment
16   Trust?
17       A.   Many years ago there was a -- there
18   was a clerical error that identified me as the
19   trustee of the Dugaboy.  That error was present
20   for approximately two weeks or a week and a
21   half before it was detected and corrected, and
22   so I know from that correction that it's Nancy
23   Dondero.
24       Q.   Are there any other trusts that have
25   an interest in Charitable DAF HoldCo Limited
```

Page 61

```
1              GRANT SCOTT - 1/21/2021
2    besides those trusts, to the best of your
3    knowledge?
4        A.   No.
5        Q.   Is it your understanding based on
6    what we've just talked about that the Get Good
7    Nonexempt Trust and the Dugaboy Investment
8    Trust are the indirect beneficiaries of CLO
9    HoldCo Limited?
10       A.   Yes.
11       Q.   Can you tell me who the
12   beneficiaries are of the Get Good trust?
13       A.   I mean, Jim Dondero.
14       Q.   And -- and what is that -- is that
15   based on the trust agreement -- your knowledge
16   of the trust agreement?
17       A.   Yes.
18       Q.   Do you have an understanding of who
19   the beneficiary is of the Dugaboy Investment
20   Trust?
21       A.   I don't know anything about that
22   trust.
23            MR. MORRIS:  Okay.  All right.
24   Let's take a short break and reconvene at
25   3:30 Eastern Time.  We've been going for a
```

---

**Page 62**

GRANT SCOTT - 1/21/2021

1
2    while.
3          MR. CLARK: Thank you.
4          MR. MORRIS: Okay. Thank you.
5          (Whereupon, there was a recess in
6    the proceedings from 3:20 p.m. to
7    3:31 p.m.)
8    BY MR. MORRIS:
9        Q.  Mr. Scott, earlier I think you
10   testified that you interfaced with the folks at
11   Highland in connection with your duties as the
12   director of CLO HoldCo Limited, right?
13       A.  Yes.
14       Q.  Are you aware of any written
15   agreement between Highland Capital Management
16   and CLO HoldCo Limited?
17       A.  Yes, the various servicer
18   agreements.
19       Q.  Okay. Are you aware that
20   Mr. Dondero resigned from his position at
21   Highland Capital Management sometime in
22   October?
23       A.  No.
24       Q.  Have you communicated with anybody
25   at Highland Capital Management about the

---

**Page 63**

GRANT SCOTT - 1/21/2021

2   affairs of CLO HoldCo Limited at any time since
3   October?
4       A.  Yes.
5       Q.  Anybody other than Jim Seery?
6       A.  Yes.
7       Q.  Okay. Let's start with Mr. Seery.
8   You've spoken with him before, right?
9       A.  Yes.
10       Q.  Do you have his phone number?
11       A.  Yes.
12       Q.  How many times have you spoken with
13   Mr. Seery, to the best of your recollection,
14   just generally? It's not a test.
15       A.  Three, maybe four times.
16       Q.  Okay. Can you identify by name
17   anybody else at Highland than Jim Seery you've spoken
18   with since -- in the last two or three months?
19       A.  I spoke to Jim Dondero. I've spoken
20   with Mike Throckmorton. The usual suspects, so
21   to speak. Mark Patrick, Mel- -- Melissa
22   Schroth.
23       Q.  Can you recall anybody else?
24       A.  No. No. Sorry.
25       Q.  Did you -- did you withdrawn.

---

**Page 64**

GRANT SCOTT - 1/21/2021

2       Do you recall the subject matter of
3   your discussions with Mr. Throckmorton?
4          MR. CLARK: Objection, form.
5   BY MR. MORRIS:
6       Q.  Withdrawn.
7       Do you recall your -- the subject
8   matter of your communications with
9   Mr. Throckmorton?
10       MR. CLARK: Objection, form.
11   BY MR. MORRIS:
12       Q.  You can answer.
13       A.  I -- I regularly interface with
14   Mr. Throckmorton regarding approvals of
15   expenses, and he's my sort of -- he's my point
16   person for approving wire transfers and things
17   of that nature.
18       Q.  How about Mr. Patrick, what -- what
19   area of responsibility does he have with
20   respect to CLO HoldCo Limited?
21       A.  He -- he doesn't, to my knowledge.
22       Q.  Do you recall the nature of the
23   substance of any communications that you've had
24   with Mr. Patrick since -- you know, the last
25   two or three months?

---

**Page 65**

GRANT SCOTT - 1/21/2021

2       A.  Yes. Or -- yes.
3       Q.  And what -- what are the nature of
4   those conversations or the substance?
5       A.  He was -- he was one of the
6   individuals that helped to establish the
7   hierarchy for the -- what I keep referring to
8   as the charitable foundation.
9       Q.  And -- and do you recall why you
10   spoke to him in the last -- or -- withdrawn.
11       Do you recall the nature of your
12   communications in the last two or three months
13   with Mr. Patrick?
14       A.  I --
15       MR. CLARK: And hold on, Grant. I'm
16   going to caution -- my understanding -- I
17   believe Mr. Patrick's an attorney, and so
18   I'm going to caution you that you shouldn't
19   disclose the substance of -- of those
20   communications based on the attorney-client
21   privilege.
22       MR. MORRIS: Well, I'm -- I -- I am
23   the lawyer for the company so -- I guess
24   there are other people on the phone and I
25   appreciate that, but let's see if we can --

Page 66

```
              GRANT SCOTT - 1/21/2021
 1
 2        I don't mean to be contentious here, so it
 3    wouldn't -- I -- I'd be part of the
 4    privilege anyway.
 5  BY MR. MORRIS:
 6        Q.    But in any event, can you tell me
 7    generally -- I'm just looking for general
 8    subject matter of your conversations with
 9    Mr. Patrick.
10        A.    I asked him how I would go about
11    re- -- resigning my position.
12        Q.    And when did that conversation take
13    place?
14        A.    Within the last two weeks.
15        Q.    Have you made a decision to resign?
16        A.    No.
17        Q.    I think you mentioned Melissa
18    Schroth.  Do I have that right?
19        A.    Yes.
20        Q.    Can you describe generally the
21    communications you had with Ms. Schroth in the
22    last few months.
23        A.    They -- she has e-mailed me certain
24    documents that I needed to sign.  I had a
25    conversation with her about -- about some
```

Page 67

```
              GRANT SCOTT - 1/21/2021
 1
 2    home -- home improvements, home construction
 3    with respect to Jim Dondero's home in Colorado,
 4    and that's -- I -- I think that's -- that's it.
 5        Q.    Okay.  Do you recall communicating
 6    with anybody at Highland in the last three
 7    months other than Mr. Dondero,
 8    Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?
 9        A.    I -- I spoke with Jim Seery this
10    week.
11        Q.    Anybody else?
12        A.    I don't -- I don't know.
13        Q.    Okay.
14        A.    I don't think so.
15        Q.    In your communications with
16    Mr. Seery, did you two ever discuss his reasons
17    for making any trade on behalf of any CLO?
18        A.    No.
19        Q.    In your discussions with Mr. Seery,
20    did you ever tell him that you believed that
21    Highland Capital Management had breached any
22    agreement in relation to any CLO?
23        A.    Have I had that discussion with Jim
24    Seery?
25        Q.    Yes.
```

Page 68

```
              GRANT SCOTT - 1/21/2021
 1
 2        A.    No.
 3        Q.    In your discussions with Mr. Seery,
 4    did you ever tell him that you thought Highland
 5    Capital Management was in default under any
 6    agreement in relation to the CLOs?
 7        A.    No.
 8        Q.    I want to focus in particular on the
 9    shared services agreement.  In -- in your
10    discussions with Mr. Seery, did you ever tell
11    him that you believed that Highland Capital
12    Management was in default or in breach of its
13    shared services agreement with CLO HoldCo
14    Limited?
15        A.    No.
16        Q.    In your communications with
17    Mr. Seery, did you ever indicate any concern on
18    the part of CLO HoldCo Limited with respect to
19    Highland Capital's Man- -- Highland Capital
20    Management's performance under the shared
21    services agreement?
22        A.    No.
23        Q.    As you sit here today, do you have
24    any reason to believe that Highland Capital
25    Management has done anything wrong in
```

Page 69

```
              GRANT SCOTT - 1/21/2021
 1
 2    connection with its performance as the
 3    portfolio manager of the CLOs in which CLO
 4    HoldCo Limited has invested?
 5             MR. CLARK:  Object to form.
 6        A.    In terms of the -- are you saying --
 7    please say that again.  I'm sorry.
 8        Q.    That's okay.  I ask long questions
 9    sometimes so forgive me, but I'm trying to
10    get -- I'm trying to be precise so that's why
11    it's difficult sometimes.  But let me try
12    again.
13             Does CLO HoldCo Limited contend that
14    Highland Capital Management has done anything
15    wrong in the performance of its duties as
16    portfolio manager of the CLOs in which CLO
17    HoldCo has invested?
18             MR. CLARK:  Objection, form.
19        A.    Yes.  It's -- it's outlined in our
20    objections to -- to the plan.
21        Q.    Okay.  Any -- are you aware of
22    anything that's not contained within CLO Holdco
23    Limited's objection to the plan?
24             MR. CLARK:  Objection, form.
25        A.    I don't know if this is responsive
```

Page 70

GRANT SCOTT - 1/21/2021

2  to your quest -- request, but two -- two
3  issues, I believe, also pose an in- -- a
4  problem for CLO HoldCo.  One is we are paying
5  for services.  I think I referred to the
6  services as being soup to nuts, but we are not
7  getting the full services.  We haven't been for
8  some time.  So we're likely overpaying.  There
9  was a Highland Select Equity issue, 11-month
10  payment that was delayed which I was unaware of
11  was due.  Normally, I would have interfaced
12  with someone at Highland about that, but my
13  attorney -- but my -- my attorney had to make a
14  request for payment, and that payment was
15  ultimately made.  I -- other than that, I -- I
16  don't -- I don't know.  I don't believe so.
17      Q.    I want to distinguish between the
18  shared services agreement between Highland
19  Capital Management and CLO HoldCo Limited on
20  the one hand and on the other hand the
21  management agreements pursuant to which
22  Highland Capital Management manages certain
23  CLOs that CLO HoldCo invests in.
24          You understand the distinction that
25  I'm making?

Page 71

GRANT SCOTT - 1/21/2021

2      A.    Now I do.  I'm sorry.  I didn't
3  appreciate that.
4      Q.    Okay.  So let's just take each of
5  those pieces one at a time.  You mentioned your
6  concern about services.  That's a concern that
7  arises under the shared services agreement,
8  right?
9      A.    Yes.
10      Q.    And you mentioned something about a
11  delayed payment having to do with Highland
12  Select.  Do I have that generally right?
13      A.    Correct.
14      Q.    And is that a concern that you have
15  that arises under the shared services
16  agreement?
17      A.    It's not the agreement with respect
18  to the CLOs as I understand it.
19      Q.    Okay.  So then let's turn to that
20  second bucket.  You were aware -- you are
21  aware, are you not, that Highland Capital
22  Management has certain agreements with CLOs
23  pursuant to which it manages the assets that
24  are owned by the CLOs?
25      A.    I'm so sorry.  Could you please --

Page 72

GRANT SCOTT - 1/21/2021

2      Q.    I'll try again.
3      A.    I'm just -- I'm sorry.  I was
4  distracted and -- and I -- I'm sorry for asking
5  you to repeat it again.  Please --
6      Q.    Okay.
7      A.    Please re- --
8      Q.    Are you aware that CLO HoldCo
9  Limited has made investments in certain CLOs?
10      A.    Oh, yes, certainly.
11      Q.    And are you aware that those CLOs
12  are managed by Highland Capital Management?
13      A.    Yes.  As the -- as the servicer,
14  yes.
15      Q.    Okay.  Have you ever seen any of the
16  agreements pursuant to which Highland Capital
17  Management acts as a servicer?
18      A.    I've seen a few, yes.
19      Q.    Does CLO HoldCo Limited contend that
20  it is a party to any agreement between Highland
21  Capital Management and the CLOs?
22          MR. CLARK:  Object to form.  And I
23      just want to note for the record that
24      Mr. Scott is here testifying in his
25      individual capacity, I believe, not as a

Page 73

GRANT SCOTT - 1/21/2021

2  corporate representative.
3          MR. MORRIS:  Fair enough.  But he is
4      the only representative so...
5          MR. CLARK:  Fair enough.  I just
6      want that made -- stated for the record,
7      but I also object as to form.
8          MR. MORRIS:  Got it.
9      A.    It's a third-party beneficiary under
10  the agreements.
11      Q.    And is that because of something you
12  read in the document, or is that just your
13  belief and understanding?
14      A.    My belief and understanding.
15      Q.    And is that belief and understanding
16  based on anything other than conversations with
17  counsel?
18      A.    In -- in -- recently it has, but I
19  don't recall from previous interactions over
20  the years how we discussed that or how I came
21  to -- to understand that.
22      Q.    Does HCLO [sic] HoldCo -- did -- in
23  your capacity as the sole director of HCLO
24  HoldCo Limited, are you aware of anything that
25  Highland Capital Management has done wrong in

Page 74

GRANT SCOTT - 1/21/2021

1    connection with the services provided under the
2    CLO management agreements?
3         MR. CLARK:  Objection, form.
4         A.    I -- I don't -- I don't -- I
5    don't -- your answer's no.
6         Q.    In your capacity as the director of
7    CLO HoldCo Limited, are you aware of any
8    default or breach under the CLO management
9    agreements that -- that Highland Capital
10   Management has caused?
11        MR. CLARK:  Objection, form.
12        A.    We have raised the issue about
13   ongoing sales in various -- I'm not sure
14   whether they represent a technical breach,
15   though.
16        Q.    Okay.  Are you aware of any
17   technical breach?
18        MR. CLARK:  Objection, form.
19        A.    No.
20        Q.    I'm sorry.  You said, no, sir?
21        A.    My answer's no.
22        Q.    Thank you.  Do you know who made the
23   decision to cause the CLO HoldCo Limited entity
24   to invest in the CLOs that are managed by

Page 75

GRANT SCOTT - 1/21/2021

1    Highland Capital?
2         A.    The select -- ultimately, I had to.
3         Q.    I thought you testified earlier that
4    you didn't make decisions as to investment.  Do
5    I have that wrong?
6         A.    The selection.
7         Q.    Okay.
8         A.    I -- I'm --
9         Q.    So -- so explain to me --
10        A.    I have to approve -- I have to
11   approve the selection.  I'm sorry.  But the
12   people making -- I was putting that in the camp
13   of the people that make the selection.
14        Q.    Okay.  Do you know if -- do you know
15   if there are CLOs in the world that exist that
16   aren't managed by Highland Capital Management?
17        MR. CLARK:  Objection, form.
18        A.    Are there CLOs in the -- in the
19   world that are not --
20        Q.    Yes.
21        A.    Yes.  It's -- it's a well-known --
22   it's a well-known --
23        Q.    In your capacity as the director of
24   CLO HoldCo Limited, did you ever consider

Page 76

GRANT SCOTT - 1/21/2021

1    making an investment in a CLO that wasn't
2    managed by Highland?
3         A.    No.
4         Q.    Is there any particular reason why
5    you haven't given that any consideration?
6         A.    That hasn't been my role.  That's
7    not my expertise.  That's been something
8    Highland has done and, quite frankly, over the
9    years brilliantly so, no.
10        Q.    You're aware that HCM, L.P., has
11   filed for bankruptcy, right?
12        A.    Yes.
13        Q.    When did you learn that Highland had
14   filed for bankruptcy?
15        A.    After the fact sometime in late --
16   late 2019.
17        Q.    Since the bankruptcy filing, have
18   you made any attempt to sell CLO HoldCo
19   Limited's position in any of the CLOs that are
20   managed by Highland?
21        A.    No.
22        Q.    So notwithstanding the bankruptcy
23   filing, you as the director haven't made any
24   attempt to transfer out of the CLOs that are

Page 77

GRANT SCOTT - 1/21/2021

1    managed by Highland, correct?
2         A.    Correct.
3         Q.    Did you ever give any thought to
4    exiting the CLO vehicles that were managed by
5    Highland in light of its bankruptcy filing?
6         A.    No.
7         Q.    Have you ever discussed with
8    Mr. Seery anything having to do with the
9    management -- withdrawn.
10        Q.    Have you ever discussed with
11   Mr. Seery any aspect of the debtor's management
12   of the CLOs in which CLO HoldCo Limited is
13   invested?
14        A.    No.
15        Q.    You mentioned earlier a request to
16   stop trading.  Do I have that right?
17        A.    Yes.
18        Q.    Okay.  And are you aware that a
19   letter was written purportedly on behalf of CLO
20   HoldCo Limited in which a request to stop
21   trading was made?
22        A.    As a cos- -- yeah.  Yes.
23        Q.    Okay.  Have you ever seen that
24   letter before?

| Page 86 | Page 87 |
|---|---|
| GRANT SCOTT - 1/21/2021 | GRANT SCOTT - 1/21/2021 |

**Page 86**

1  GRANT SCOTT - 1/21/2021

2  Q.  How did you form your opinion that

3  the debtor doesn't have the expertise to

4  execute trades on behalf of the CLOs today?

5  What's the basis for that belief?

6  A.  I -- as I understood it, the -- the

7  people historically making that decision were

8  no longer making that decision.

9  Q.  Who besides Mr. Dondero --

10  withdrawn.

11  Who are you referring to?

12  A.  Well, Mr. Dondero is one.  I don't

13  know the names, but I -- I understood it to

14  mean that the group previously responsible, for

15  exam-- -- for example, Hunter Covitz, including

16  Hun-- -- him, were no longer involved in the

17  decision-making process, but...

18  Q.  How did you -- how -- how -- who

19  gave you the information that led you to

20  conclude that Hunter Covitz was no longer

21  involved in the decision-making process?

22  A.  Specifically him and that name being

23  mentioned, I -- I -- I wasn't informed of his

24  speci-- -- him -- him being removed.  I was

25  under the impression that the team that had

**Page 87**

1  previously been doing that was no longer doing

2  it.

3  

4  Q.  And what gave you that impression?

5  A.  Was communications I had with my

6  attorney.

7  Q.  Okay.  Is there any source for your

8  information that led you to conclude that the

9  team was no longer there that was able to

10  engage in the trades on behalf of the CLOs

11  other than your attorneys?

12  A.  Well, this -- this letter -- I -- I

13  think the answer is no.

14  Q.  Thank you.  Do you know if Jim -- do

15  you have an opinion or a view as to whether Jim

16  Seery is qualified to make trades?

17  A.  This --

18  MR. CLARK:  Objection, form.

19  A.  I don't know -- I spoke to Jim Seery

20  earlier this week.  You -- you asked me whether

21  I had his number.  I said I did.  That's only

22  because he called me.  My phone rang with his

23  number.  It was a number I did not recognize,

24  it was not in my contacts, but he left me a

25  voice mail so I called him back.  Then I

**Page 88**

1  GRANT SCOTT - 1/21/2021

2  updated my contacts to -- to add his name so

3  now I have his name.  And during that

4  conversation he informed me that he did have

5  that expertise --

6  Q.  And --

7  A.  -- without me making any inquiry.

8  He volunteered that.

9  Q.  But you hadn't made any inquiry

10  prior to the time that you authorized the

11  sending of this letter; is that fair?

12  A.  That's correct.

13  Q.  Do you know whether Mr. Seery, in

14  fact, engaged in transactions on behalf of the

15  debtor since he was appointed back in January?

16  A.  I do not.

17  Q.  Did you ask that question prior to

18  the time you authorized the sending of this

19  letter?

20  A.  I did not.

21  Q.  Can you identify a single

22  transaction that Jim Seery has ever made that

23  you disagree with?

24  A.  No.

25  Q.  Can you identify any transaction

**Page 89**

1  GRANT SCOTT - 1/21/2021

2  that the debtor made on behalf of any of the

3  CLOs since the time that you understand

4  Mr. Dondero left Highland that you disagree

5  with?

6  A.  No.

7  Q.  Did you have any discussion with any

8  representative of any of the entities listed on

9  this document where they told you they believe

10  Jim Seery didn't have the expertise to engage

11  in transactions on behalf of the whole -- of

12  the CLOs?

13  A.  You -- your question -- I'm -- I'm

14  sorry.  I'm trying to be -- I'm trying to be a

15  hundred perc-- -- I'm trying to be accurate

16  here.

17  Q.  Let me interrupt you and just say,

18  I'm very grateful for your testimony.  I know

19  this is not easy, and I do believe that you're

20  earnestly and honestly trying to answer the

21  questions the best you can.  So no apologies

22  necessary anymore.  If you need me to repeat

23  the question or rephrase it, just say that,

24  okay?

25  A.  Please -- yes.

Page 90

```
 1              GRANT SCOTT - 1/21/2021
 2      Q.   Okay.
 3      A.   Please -- please repeat that.
 4      Q.   Did you ever communicate with any
 5   employee, officer, director, representative of
 6   any of the entities that are on this page
 7   concerning the debtor's ability to service the
 8   CLOs?
 9      A.   I believe so.
10      Q.   And can you identify the person or
11   persons?
12      A.   I think it's Jim Dondero.
13      Q.   Anybody else other than Mr. Dondero?
14      A.   No.
15      Q.   When did you have that conversation
16   or those conversations with Mr. Dondero?
17      A.   This letter is dated the 22nd --
18      Q.   Correct.
19      A.   -- right?
20      Q.   Yes.
21      A.   I believe that's the Tuesday before
22   Christmas, and this would have been on the
23   21st, the Monday.
24      Q.   What do you recall about your
25   conversation on the 21st regarding the
```

Page 91

```
 1              GRANT SCOTT - 1/21/2021
 2   substance of this particular letter?
 3      A.   Jim Dondero described why he
 4   believed sales being made on an ongoing basis
 5   after a request was made to stop was im- --
 6   improper.
 7      Q.   Do you -- do you rely on what
 8   Mr. Dondero said to you during that phone call
 9   on December 21st in -- in deciding to join in
10   this particular letter?
11      A.   No.
12      Q.   Did you only then rely on the
13   information you obtained from counsel?
14      A.   Yes.  I -- I -- I -- I considered
15   this letter to be nearly the most gentle
16   request imaginable amongst lawyers to maintain
17   the status quo.
18      Q.   And the request that's made in this
19   letter is perfectly consistent with what
20   Mr. Dondero told you on the 21st of December,
21   correct?
22      A.   I don't -- no.
23      Q.   How --
24           MR. MORRIS:  Can we go to the end of
25   this letter, please.  All right.  Right
```

Page 92

```
 1              GRANT SCOTT - 1/21/2021
 2   there.
 3   BY MR. MORRIS:
 4      Q.   Do you see the request that's in the
 5   last sentence?
 6      A.   Yes.
 7      Q.   Is that the same thing that
 8   Mr. Dondero told you should happen, that --
 9   that there should be no further CLO
10   transactions at least until the issues raised
11   and addressed by the debtor's plan were
12   resolved substantively?
13      A.   Yes.
14      Q.   Is there anything that he said
15   that's inconsistent with the request that's
16   made here?
17           MR. CLARK:  Objection, form.
18      A.   This -- and can you -- can you show
19   me earlier parts?
20      Q.   Of course.  You know what, I'll
21   withdraw the question.
22           And let me see if I can do it this
23   way:  In your discussion with Mr. Dondero, did
24   he indicate that he had seen a draft of this
25   letter?
```

Page 93

```
 1              GRANT SCOTT - 1/21/2021
 2      A.   No.  And I didn't -- I didn't have a
 3   discussion with him.  I -- I merely listened to
 4   him.  There was no -- I -- I had no input to
 5   the conversation.
 6      Q.   Okay.  I -- I did -- I didn't --
 7   I -- I appreciate that.  So he called you; is
 8   that right?
 9      A.   We -- we called in.
10      Q.   Oh, was it --
11      A.   I --
12      Q.   Was it --
13      A.   I don't know --
14      Q.   Was it --
15      A.   I don't know the sequence of the
16   calls.  I'm sorry.
17      Q.   Was there anybody on the call other
18   than you and Mr. Dondero, the call that you're
19   describing on December 21st?
20      A.   Yes, my attorney and an attorney --
21   I believe the attorney that signed this letter.
22      Q.   Okay.  And I just want to focus on
23   what Mr. Dondero said.  Did he -- did he say
24   during the call that Highland should not be
25   engaging in any further CLO transactions?
```

# EXHIBIT 17

002266

Case 19-34054-sgj11 Doc 2432-1 Filed 09/20/21 Entered 09/20/21 18:46:52 Page 42 of
Case 3:21-cv-01603-B Document 81 Filed 09/30/21 Page 173 of 213 PageID 2552

Page 1

```
 1                    Grant Scott

 2          IN THE UNITED STATES BANKRUPTCY COURT

 3             FOR THE NORTHERN DISTRICT OF TEXAS

 4                      DALLAS DIVISION

 5     In Re:                        Case No.

 6     HIGHLAND CAPITAL MANAGEMENT L.P.,     19-34054

 7                  Debtor,               Chapter 11

 8     _____

 9     HIGHLAND CAPITAL MANAGEMENT,      Adversary No.

10     L.P.,                            21-03003-sgi

11              Plaintiff,

12     Vs.

13     JAMES D. DONDERO,

14                  Defendant.

15

16          Virtual Zoom Deposition of Grant Scott

17                  Tuesday, June 1, 2021

18                    At 2:00 p.m.

19

20

21

22

23     Reported by LeShaunda Cass-Byrd, CSR, RPR

24     TSG Job No. 194692

25
```

Page 6

```
 1                Grant Scott
 2           GRANT SCOTT,
 3    having been first duly sworn, was examined and
 4    testified as follows:
 5                EXAMINATION
 6    BY MR. MORRIS:
 7        Q.    Good afternoon, Mr. Scott.
 8        A.    Good afternoon, John.
 9        Q.    Okay.  As you recall, my name is John
10    Morris.  I'm an attorney with Pachulski Stang Ziehl &
11    Jones.  We represent Highland Capital Management LP, a
12    debtor in a bankruptcy case that is pending in the
13    Northern District of Texas.
14           Do you recall any of that?
15        A.    Yes.
16        Q.    Okay.  And we are here today for your
17    deposition, and I appreciate your compliance with the
18    subpoena.  Just a few ground rules to remind you, I'm
19    going to ask you a series of questions, and it's
20    important that you allow me to finish my question
21    before you begin your answer; is that fair?
22        A.    Yes.
23        Q.    And I will attempt to give you the same
24    courtesy, but if for some reason I step on your words,
25    just let me know that because I don't mean to cut you
```

Page 7

```
 1                Grant Scott
 2    off.  Okay?
 3        A.    Okay.
 4        Q.    If there's anything that I ask you that you
 5    do not understand, will you let me know?
 6        A.    Yes, sir.
 7        Q.    If you need a break at any time, will you
 8    let me know?
 9        A.    Yes.
10        Q.    Okay.  Because this deposition is being
11    conducted remotely, we are going to be putting
12    documents on the screen.  I'm not attempting to trick
13    you in any way.  If you believe there is any of
14    portion of a document that you need to see, either to
15    put something in context or to refresh your
16    recollection, I encourage you to let me know that, and I
17    will be happy to accommodate you.  Okay?
18        A.    Okay.
19        Q.    Okay.  Have you seen the subpoena that the
20    debtors served on your lawyer in this case?
21        A.    The one relating to my deposition?
22        Q.    Correct.
23        A.    Yes.
24        Q.    And are you here today pursuant to that
25    subpoena?
```

Page 8

```
 1                Grant Scott
 2        A.    Yes.
 3        Q.    So today's deposition concerns a particular
 4    motion that the debtor filed recently where the debtor
 5    is seeking to hold certain individuals and entities in
 6    contempt of court.  Have you seen or reviewed the
 7    debtor's motion that was filed?
 8        A.    I have seen the e-mails which I kept, but I
 9    have not read them.
10        Q.    Okay.  I want to just begin with some
11    background.
12           MR. MORRIS:  And then I would ask Ms.
13    Canty to put up what we will mark as
14    Exhibit -- you know, let's pick up the
15    numbering from this morning, La Asia.  Did
16    we use 7 this morning?
17           Actually, this is going to be Exhibit
18    1.  It's the same document that we had this
19    morning.
20           MS. CANTY:  Yes.
21           MR. MORRIS:  We will call it Exhibit
22    1, and it's an organizational chart.  If we
23    can just put that on the screen.
24           (Deposition Exhibit 1 was marked for
25    identification.)
```

Page 9

```
 1                Grant Scott
 2    BY MR. MORRIS:
 3        Q.    Okay.  Have you seen this before,
 4    Mr. Scott?
 5        A.    Yes.
 6        Q.    Do you know what it is?
 7        A.    It's the -- yes.  The DAF CLO HoldCo
 8    structure chart.
 9        Q.    And this is structure chart that you
10    produced in response to the subpoena; is that right?
11        A.    Correct.
12        Q.    You are familiar with the gentleman named
13    Mark Patrick; is that right?
14        A.    Yes.
15        Q.    Is it your understanding that Mr. Patrick
16    was one of the individuals that helped establish the
17    hierarchy that is depicted on Exhibit 1?
18        A.    Yes.
19        Q.    And what is the basis for that
20    understanding?
21        A.    That goes back many years to the
22    origination of my role.
23        Q.    Okay.  And do you recall that you assumed
24    your role in or around 2012?
25        A.    Yes.
```

| | Page 10 |
|---|---|
| | Grant Scott |

1
2     Q.     Okay. Did you know Mr. Patrick prior to
3 the time that you assumed your role?
4     A.     I did not.
5     Q.     Okay. Do you know -- withdrawn.
6     Do you have any knowledge as to whether
7 anybody other than Mr. Patrick helped establish the
8 hierarchy that is depicted on Exhibit 1?
9     A.     There was a law firm name that came to
10 mind, and there was an expert, I gather, a lawyer that
11 was familiar with charitable entities that I believe
12 was involved.
13     Q.     Can you identify any -- withdrawn.
14     At the time that you understood Mr. Patrick
15 had helped to create this hierarchy, did you
16 understand who employed Mr. Patrick?
17     A.     Yes. I believe so.
18     Q.     Who did you believe Mr. Patrick worked for
19 at that time?
20     A.     Highland Capital Management.
21     Q.     Can you identify any other person at
22 Highland Capital Management who was involved in the
23 creation of this hierarchy?
24     A.     No.
25     Q.     Okay. Now for looking at the hierarchy

| | Page 11 |
|---|---|
| | Grant Scott |

1
2 here, for the period for approximately 10 years prior
3 to March 24th, 2021, you served as the managing member
4 of the charitable DAF GP, LLC, correct?
5     A.     Correct.
6     Q.     And for approximately 10 years prior to
7 March 30 -- 20 -- withdrawn.
8     For approximately 10 years prior to March
9 24th, 2021, you were the sole director of charitable
10 DAF HoldCo, LTD, correct?
11     A.     Correct.
12     Q.     And for approximately 10 years prior to
13 March 24th, 2021, you were the sole director of
14 charitable DAF Fund LP, correct?
15     A.     I believe that is correct.
16     Q.     And for approximately 10 years prior to
17 March 24, 2021, you served as the sole director of CLO
18 HoldCo Limited, correct?
19     A.     Yes. That is correct.
20     Q.     Did you serve in any capacity for any other
21 entity that is depicted on this sheet at any time
22 prior to March 24th, 2021?
23     A.     If you go -- if you look at the top of that
24 chart where it's directed at the charitable giving
25 components, I had some involvement with various

| | Page 12 |
|---|---|
| | Grant Scott |

1
2 members of some of those organizations.
3     Q.     And would they be the ones that are
4 labelled as third parties or as supporting
5 organizations?
6     A.     The -- the third party organizations.
7 And -- and possibly the supporting organizations.
8     Q.     Do you know what the difference is between
9 a third party and a supporting organization as those
10 phrases are used on Exhibit 1?
11     A.     I don't recall anymore what the delineation
12 is between those two.
13     Q.     Okay. Do you hold any position today with
14 any of the entities that are depicted on Exhibit 1?
15     A.     I do not -- I do not believe so. Well, I
16 believe technically, I'm still -- I may still be a
17 director of CLO HoldCo, but I -- I'm not certain of
18 the status as of today.
19     Q.     Is there a particular reason why you may
20 remain today as a director of CLO HoldCo Limited?
21     A.     I don't know if the -- I don't know if the
22 transfer after my resignation has been completely
23 finalized, and I haven't -- yeah. I don't know how
24 close it is to being completely finalized. I'm not --
25 I'm not sure.

| | Page 13 |
|---|---|
| | Grant Scott |

1
2     Q.     But your intent is to resign as the
3 director of CLO HoldCo Limited; is that right?
4     A.     Yes.
5     Q.     And the only reason that that hasn't
6 happened yet, is it fair to say, is for administrative
7 reasons?
8     MR. BRIDGES: Objection. Assumes
9   facts not in evidence.
10 BY MR. MORRIS:
11     Q.     You can answer.
12     A.     I --
13     Q.     Withdrawn. I will ask a different
14 question.
15     Do you know why your intended resignation
16 from CLO HoldCo Limited has not yet become effective?
17     MR. BRIDGES: The same objection.
18   Facts not in evidence.
19 BY MR. MORRIS:
20     Q.     You can go ahead.
21     MR. KANE: I object to form, also.
22   Grant, go ahead.
23   THE WITNESS: I do not.
24 BY MR. MORRIS:
25     Q.     Okay. Do you hold any positions of any

Page 14

Grant Scott

```
 1              Grant Scott
 2    kind today with any entity that you believe is either
 3    directly or indirectly owned or controlled by
 4    Mr. Dondero?
 5         A.    I don't believe so.
 6         Q.    Do you have -- I'm just going to explore
 7    that for a little bit.
 8              Do you know have -- do you know whether you
 9    continue to HoldCo any position with any NexBank
10    entity?
11         A.    I'm not in -- no, I don't have any
12    involvement with NexBank.
13         Q.    Okay.
14              MR. KANE:  Hey, John, can you shed a
15         little light on why that's relevant?
16              MR. MORRIS:  I'm just trying to find
17         connections between Mr. Scott and
18         Mr. Dondero because I -- I just -- I
19         think -- I think the purpose of the
20         deposition is to try to -- to try to deduce
21         facts that are related to whether or not
22         Mr. Dondero is going to be a responsible
23         party under the contempt motion.  So I'm
24         just looking for --
25              MR. KANE:  I understand.  I'm just
```

Page 15

Grant Scott

```
 1              Grant Scott
 2         trying to figure out Grant's -- you know,
 3         whether he has a --
 4              MR. MORRIS:  That is all right.  I'm
 5         moving on anyway.
 6              MR. KANE:  Appreciate it.
 7    BY MR. MORRIS:
 8         Q.    Now looking at the chart, Mr. Scott, I
 9    believe you testified that you were either the
10    managing member or a director of each of the DAF
11    entities and CLO HoldCo Limited.
12              Do I have that right?
13         A.    I believe that is correct.
14         Q.    All right.  Is it your understanding that
15    Mr. --
16         A.    Excuse me.  I am sorry.  Currently or was?
17         Q.    Was.  Up until March 24th.
18         A.    Okay.  Correct.
19         Q.    All right.  Let me ask the question again
20    so it's clean.
21              Did you serve as either the managing member
22    or the director for each of the charitable DAF
23    entities and the CLO HoldCo Limited entity for
24    approximately 10 years prior to March 24th, 2021?
25              MR. KANE:  Objection.  Form.  Go
```

Page 16

Grant Scott

```
 1              Grant Scott
 2    ahead, Grant.
 3              (Reporter clarification.)
 4              THE WITNESS:  I believe so.
 5    BY MR. MORRIS:
 6         Q.    And is it your understanding that Mr. Mark
 7    Patrick replaced you in those capacities on or about
 8    March 24th, 2021?
 9         A.    It's my understanding that on March 24th,
10    the management shares that I had previously -- that
11    had been in my name were transferred to him.  I am not
12    sure how that impacts the current status in the
13    various other entities.
14         Q.    Okay.  During the time that you served as
15    the managing member of the charitable DAF GP LLC, that
16    entity had no officers or employees, correct?
17         A.    I believe that is correct.
18              MR. KANE:  Object to the form.
19    BY MR. MORRIS:
20         Q.    And you served as the sole director of that
21    entity during the time that you served as the
22    director, correct?
23         A.    I believe that is correct.
24         Q.    And during the period of time that you
25    served as a director of charitable DAF HoldCo Limited,
```

Page 17

Grant Scott

```
 1              Grant Scott
 2    you were the only person to serve in that capacity; is
 3    that correct?
 4         A.    I believe so.
 5         Q.    And during the period that you served as
 6    director of charitable DAF HoldCo Limited, that entity
 7    had no officers or employees, correct?
 8         A.    I believe that is correct.
 9         Q.    During the time that you served as a
10    director of charitable DAF Fund LP, you were the sole
11    director of that entity, correct?
12         A.    Correct.
13         Q.    And during the time that you served as the
14    sole director of charitable DAF Fund LP, that entity
15    had no officers or employees, correct?
16         A.    I believe that is correct.
17         Q.    You served as the sole director of CLO
18    HoldCo Limited; is that right?
19         A.    Yes.  That is correct.
20         Q.    And during the period that you served as
21    the sole director of CLO HoldCo Limited, that entity
22    had no officers or employees, correct?
23         A.    That is correct.
24         Q.    Is that why the DAF had certain agreements
25    with Highland Capital Management LP pursuant to which
```

**Page 18**

```
1                    Grant Scott
2    HCMLP provided back office and advisory and investment
3    services?
4              MR. KANE:  Objection.  Form.
5              THE WITNESS:  I think that is
6         correct.
7    BY MR. MORRIS:
8         Q.    Do you recall that that DAF had agreements
9    with Highland Capital Management that were amended and
10   restated in 2014?
11             MR. KANE:  Objection.  Form.
12             THE WITNESS:  I understand there were
13        various agreements over the years that had
14        been restated.  I'm not entirely sure
15        anymore of the dates that we received
16        that --
17             MR. MORRIS:  Okay.  Let's mark --
18             THE WITNESS:  I'm sorry?
19             MR. MORRIS:  Let's mark as Exhibit
20        8 --
21             MR. BRIDGES:  Objection.  Objection.
22        Please let the witness answer his question.
23             MR. MORRIS:  Let's mark this --
24             MR. BRIDGES:  No.  Please allow the
25        witness to continue his answer.
```

**Page 19**

```
1                    Grant Scott
2    BY MR. MORRIS:
3         Q.    Grant, do you have anything else to add?
4         A.    You had asked me -- you asked about a
5    specific date, I think, 2014.  I just -- I don't know
6    what the dates are or were.
7         Q.    That is what I heard you say.  Is there
8    anything else that you have to add?
9         A.    No, I don't -- I don't think so.
10        Q.    I didn't think so either.
11             MR. MORRIS:  Let's go to Exhibit 8,
12        please, the next document.
13             (Deposition Exhibit 8 was marked for
14   identification.)
15             MR. MORRIS:  Okay.  If we could just
16        scroll down a little bit.  Just to the
17        e-mail.
18   BY MR. MORRIS:
19        Q.    All right.  Were you familiar with Caitlin
20   Nelson and Helen Kim and Thomas Surgent and David Klos
21   in and around August 2004?
22        A.    I believe they were all Highland employees.
23        Q.    Okay.
24             MR. MORRIS:  Can we just scroll up to
25        the next e-mail, please?
```

**Page 20**

```
1                    Grant Scott
2    BY MR. MORRIS:
3         Q.    Okay.  Do you see that Mrs. Kim sends you
4    an e-mail on August 26th, 2014?
5         A.    Yes.  I see that.
6         Q.    And do you see that she had attached for
7    your review and execution, drafts of an amended and
8    restated service agreement and amended and restated
9    advisory agreement and GP resolutions?
10        A.    I do see that.
11        Q.    Okay.  Do you have any recollection as to
12   whose idea it was to amend and restate those
13   agreements at that moment in time?
14        A.    I do not.
15        Q.    Do you have any recollection as to why
16   those agreements were amended and restated at that
17   time?
18        A.    No, I do not.
19        Q.    Okay.  Let's just scroll down and just show
20   Mr. Scott the agreements.  I'm not going to ask
21   anything substantive about it.  But do you see here is
22   the -- if we can stop right there -- the Amended and
23   Restated Service Agreement that is dated from the
24   first day of July, 2014, and it's between the DAF
25   Fund -- the charitable DAF Fund LP, the charitable DAF
```

**Page 21**

```
1                    Grant Scott
2    GP LLC, as well as Highland Capital Management LP.
3         Do you see that?
4         A.    I do see that.
5         Q.    Do you recall that the entity that is
6    commonly referred to as the DAF had a service
7    agreement with Highland Capital Management LP?
8         A.    I believe that is correct.  Yes.
9         Q.    Do you recall whether -- whether the
10   service agreement was ever the subject of any
11   negotiations?
12        A.    I don't know.
13        Q.    Did you participate in any negotiations
14   concerning the service agreement that was entered --
15   entered in between the entity known as the DAF and
16   Highland Capital Management LP?
17             MR. KANE:  Objection to form.
18        John, will you clarify the time
19        period?
20   BY MR. MORRIS:
21        Q.    Right here.  2014.
22        A.    Sir, I don't recall anything about this
23   with respect to 2014.
24        Q.    Do you know if -- if the agreement was ever
25   amended at any time after 2014?  And when I use the
```

Page 22

```
                    Grant Scott
1
2    phrase "agreement," I'm specifically referring to the
3    Amended and Restated Service Agreement that we are
4    looking at.
5         A.    I believe -- I think there was a further
6    amended and restated agreement.
7         Q.    Okay.  Did you participate in any
8    negotiations concerning that further amended and
9    restated agreement?
10        A.    I don't remember.
11        Q.    Do you remember offering any comments
12   concerning any subsequent amendment or restatement?
13        A.    I don't -- I don't remember.
14        Q.    Did you ever hire outside counsel to assist
15   you in the negotiation of any service agreements with
16   Highland Capital Management LP?
17        A.    I did not.
18        Q.    Do you -- do you recall who prepared each
19   of the service agreements to which the DAF was a
20   party?
21        A.    I don't remember.
22        Q.    To the best of your recollection, would it
23   have been inhouse counsel at Highland Capital
24   Management?
25             MR. KANE:  Objection.  Form.
```

Page 23

```
                    Grant Scott
1
2             THE WITNESS:  I don't -- I don't
3         know.
4    BY MR. MORRIS:
5         Q.    Can you recall the name of any law firm
6    that was involved in the drafting or the negotiation
7    of any service agreement between the entity known as
8    the DAF and Highland Capital Management LP?
9             MR. KANE:  Objection.  Form.
10            THE WITNESS:  I don't remember any.
11   BY MR. MORRIS:
12        Q.    Can you recall during your tenure as the
13   managing member of the DAF GP LLC, whether there was
14   any particular term or provision in any service
15   agreement that was the subject of negotiation or even
16   discussion?
17        A.    I don't remember those -- any of those
18   discussions.
19        Q.    Do you know if they took place or you just
20   can't remember them?
21        A.    I just can't remember them.
22        Q.    Do you recall ever seeing multiple drafts
23   of any service agreement that you -- withdrawn.
24            Did you personally sign service agreements
25   on behalf of the entity known as the DAF?
```

Page 24

```
                    Grant Scott
1
2         A.    I believe so.
3         Q.    And the agreements that you signed on
4    behalf of that entity, were any of them -- were there
5    multiple drafts of any such agreement?
6         A.    There were frequently multiple drafts or
7    agreements.  But I just don't remember them.
8         Q.    Do you remember whether you personally ever
9    provided any comments to any particular draft?
10        A.    I do not.
11        Q.    Let me ask you this:  Are you familiar with
12   the phrase "arm's length negotiations"?
13        A.    Yes.
14        Q.    And can you tell me what your understanding
15   is of an arm's length negotiation?
16        A.    Well, it would depend on the nature of the
17   parties.  For example, a -- two strangers would
18   have -- arm's length would differ from the nature of
19   an agreement between parties maybe having fiduciary or
20   related obligations.
21        Q.    Let me ask you this --
22        A.    I don't know what the black -- I don't know
23   what the blackball definition is to that term.
24        Q.    Would you agree that arm's length
25   negotiations take place between two parties that are
```

Page 25

```
                    Grant Scott
1
2    acting out of their own self interest?
3             MR. KANE:  Objection.
4             MR. BRIDGES:  Objection to form and
5         foundation.
6    BY MR. MORRIS:
7         Q.    Withdrawn.  Withdrawn.
8             MR. BRIDGES:  Calls for a legal
9         opinion.
10   BY MR. MORRIS:
11        Q.    Mr. Scott, do you believe that the service
12   agreements between the entity known as the DAF and
13   the -- and Highland Capital Management LP were arm's
14   length agreements?
15            MR. BRIDGES:  Objection.  Again, lack
16        of foundation, calls for a legal opinion.
17            MR. MORRIS:  Okay.  I'm not asking
18        for a legal opinion.  I'm asking for
19        Mr. Scott's view of it, so I will try one
20        more time.
21   BY MR. MORRIS:
22        Q.    Mr. Scott, do you believe that the service
23   agreements between the DAF and HCMLP were the subject
24   and result of arm's length negotiations?
25            MR. BRIDGES:  Objection.  Foundation,
```

**Page 46**

Grant Scott

```
 1                    Grant Scott
 2       A.    Why did I send it at the end of January?
 3       Q.    What caused you to send this e-mail at that
 4  moment in time?
 5       A.    Well, I mean, there are a couple of
 6  reasons.  It was -- it was necessary that I do it, and
 7  the time seemed right in view of the events in
 8  January.  It was like a good transition point from my
 9  perspective.
10       Q.    And why was it necessary at that time?
11       A.    Well, there was --
12             MR. BRIDGES:  Objection.  Assumes
13       facts not in evidence.
14  BY MR. MORRIS:
15       Q.    You can answer.
16       A.    I previously testified during this
17  deposition that throughout 2020, the desire -- or,
18  rather, the appropriateness of my wanting to resign
19  was expanding, and based on what had happened in
20  January and December as well, but mostly January, I
21  basically just did a critical mass on whether I could
22  sustain my role, given my commitments to my existing
23  firm and given my discussions with the managing
24  members of my existing firm.
25             And it -- there was just no way I could
```

**Page 47**

Grant Scott

```
 1  continue with the time commitment required.  I had
 2  made various promises and representations to my firm
 3  throughout 2020 that the bankruptcy would be handled
 4  relatively efficiently and wouldn't require a great
 5  deal of time commitment.  And then I guess the straw
 6  that broke the camel's back was the second lawsuit,
 7  meaning me personally, and it just -- from a personal
 8  standpoint, the most significant factor was just my --
 9  my being overwhelmed, trying to sustain my career and
10  engage in what seem like the 2021 that was going to
11  involve my having to defend two lawsuits.  And I felt
12  like I got CLO HoldCo the bankruptcy and then
13  that was a good jumping off point.
14       Q.    What -- why did you send this e-mail to
15  Mr. Dondero?
16       A.    I knew, or at least I reasonably believed
17  he would know where to who to send it to because I
18  wasn't exactly sure.
19       Q.    So you were the managing member of the
20  general partnership and the director of the other DAF
21  entities and CLO HoldCo Limited, and you were not sure
22  who to send your notice of resignation to.
23             Do I have that right?
24             MR. KANE:  Objection.  Form.  That's
25
```

**Page 48**

Grant Scott

```
 1                    Grant Scott
 2       John Kane.
 3             THE WITNESS:  Yes.  I didn't know who
 4       best to inform my decision.
 5  BY MR. MORRIS:
 6       Q.    And why did you think that Mr. Dondero
 7  would know?
 8             MR. BRIDGES:  Objection.  Asked and
 9       answered.
10             THE WITNESS:  He knows a lot more
11       about the workings of -- I mean, it was --
12       CLO HoldCo and the charitable admission was
13       something that he worked to develop with
14       others 10 years ago, and he was committed
15       to the charity and he knew all of the
16       players and I just -- I guess I just
17       assumed he would know where to direct it.
18  BY MR. MORRIS:
19       Q.    Did you ever ask?
20       A.    He knew how to effectuate -- he knew how to
21  effectuate -- or I thought he knew how to effectuate
22  my resignation by directing it to the appropriate
23  personnel.
24       Q.    Did you ever ask him who it should be
25  directed to?
```

**Page 49**

Grant Scott

```
 1                    Grant Scott
 2       A.    No.
 3       Q.    Looking at the third paragraph, it says,
 4  quote, my resignation will not be effective until I
 5  approve of the indemnification provisions and obtain
 6  any and all releases.
 7             Do you see that?
 8       A.    Yes.
 9       Q.    Why did you condition the effectiveness of
10  your resignation on those things?
11       A.    Well, although I'm a patent attorney and
12  basically just a technical writer that doesn't deal
13  with legal issues all of the time, it seemed like
14  appropriate language.
15             I have a number of outstanding litigations
16  where I am named personally, and the actions that I
17  took which resulted in my being sued were actions I
18  took on behalf of CLO HoldCo solely in that position,
19  and so I thought just to have the appropriate notice
20  that I would like indemnification to help -- to help
21  deal with those litigation matters.  That is all.
22       Q.    Did anybody suggest to you at any time
23  prior to the time that you sent this e-mail, that any
24  of the DAF entities or CLO HoldCo Limited might have
25  claims against you?
```

## Page 50

```
1                    Grant Scott
2      A.    No.  No.
3      Q.    Were you concerned that Mr. Dondero or
4  anyone acting on his behalf might sue you?
5      A.    No.
6      Q.    Did Mr. Dondero ever threaten to sue you?
7      A.    No.
8      Q.    Did you ever obtain the Indemnity provision
9  and any and all necessary releases that you asked for
10 in this e-mail?
11     A.    Not yet.
12     Q.    And what does that mean?
13     A.    I understand that those provisions are --
14 indemnification proposals are in the works, I think.
15     Q.    And do you know who is negotiating --
16 withdrawn.
17           Is somebody negotiating those
18 indemnification and release provisions on your behalf?
19     A.    My -- my attorney would be.
20     Q.    And do you know if your attorney is
21 negotiating with anybody concerning potential
22 indemnification and release provisions for you?
23     A.    I don't know specifically, no.
24     Q.    Do you know if he is -- if -- from whom do
25 you want to obtain releases?
```

## Page 51

```
1                    Grant Scott
2           MR. BRIDGES:  Objection.  Facts not
3  in evidence.
4  BY MR. MORRIS:
5      Q.    Withdrawn.
6           When you refer to any and all necessary
7  releases, who did you want to obtain releases from?
8      A.    CLO HoldCo.
9      Q.    Anybody else?
10     A.    Well, I mean, and -- and the related
11 entities in that structure chart that you showed.
12 I'm -- I'm -- understand that to me, that is just
13 boilerplate legal language to put in a resignation,
14 you know, just to cross the T's, dot the I's, so to
15 speak.  I'm not anticipating that will be -- that will
16 be a problem.  I am sorry.
17     Q.    You asked for this more than three months
18 ago now, right?
19     A.    Correct.
20     Q.    Do you know why you haven't gotten what you
21 asked for more than three months ago?
22           MR. BRIDGES:  Objection.  Form.
23           THE WITNESS:  I -- I don't.
24  BY MR. MORRIS:
25     Q.    But you still want the releases, right?
```

## Page 52

```
1                    Grant Scott
2      A.    I would like to, yes.
3      Q.    Did you ever have any discussion with
4  Mr. Dondero about the releases that you wanted?
5      A.    No.
6      Q.    Have you communicated with Mr. Dondero
7  since -- since you sent this e-mail?
8      A.    Yes.
9      Q.    Other than the birth date text that he sent
10 to you, have you spoken with him?
11     A.    In February.
12     Q.    So you haven't spoken to him since then?
13     A.    That is correct.
14     Q.    What did you speak to him about in
15 February?
16     A.    He called me to ask me if I knew anything
17 about in particular -- I think it might have been an
18 asset of CLO HoldCo, if I was aware of whether it had
19 been purchased or sold, and I just told them I didn't
20 know what he was -- I didn't know what -- I didn't
21 know what he was referring to.  That was the last
22 conversation that we had.
23     Q.    Can I refer to the period from the date of
24 this --
25           MR. MORRIS:  Actually, let's look
```

## Page 53

```
1                    Grant Scott
2  at -- let's scroll up a little bit, please.
3  BY MR. MORRIS:
4      Q.    Did Mr. Dondero ever try to talk you out of
5  resigning?
6      A.    No.
7           MR. MORRIS:  Can you scroll up?
8           THE WITNESS:  I -- I am sorry.  I
9  need to correct that.  I had conversations
10 with him where I had expressed, not so much
11 a desire to resign, but a belief that it --
12 it made strategic sense or was appropriate.
13 And it had to do with this issue of my
14 independence, and he suggested that family
15 members and friends are not precluded from
16 occupying positions of trust like trustees
17 and things like that, and that there was
18 nothing per se wrong with my -- my activity
19 with CLO HoldCo by virtue of being a friend
20 of his.  So in that sense, he was trying to
21 talk me out of that, I guess.
22  BY MR. MORRIS:
23     Q.    When did that conversation take place?
24     A.    We had a number of those in 2020 and
25 January of 2021.
```

| | Page 54 |
|---|---|
| | Grant Scott |
| 2 | MR. MORRIS: Can we scroll up just a |
| 3 | little bit on this e-mail, please? |
| 4 | MR. BRIDGES: May I ask what exhibit |
| 5 | number this is? I've lost track. I am |
| 6 | sorry. |
| 7 | MS. CANTY: This is Exhibit 5 from |
| 8 | earlier. We are continuing the numbers. |
| 9 | So this was marked as Exhibit 5 in this |
| 10 | morning's deposition. |
| 11 | MR. BRIDGES: Thank you so much. |
| 12 | BY MR. MORRIS: |
| 13 | Q. Do you see where Mr. Dondero wrote to |
| 14 | you -- it's just above the yellow highlighting |
| 15 | at -- 9:57 a.m. This is the next day. Quote, you |
| 16 | need to tell me ASAP that you have no intent to divest |
| 17 | assets. |
| 18 | Do you see that? |
| 19 | A. Yes. |
| 20 | Q. Did Mr. -- do you have any understanding as |
| 21 | to why he said that to you? |
| 22 | A. I know that he was mistaken in that |
| 23 | statement. |
| 24 | Q. Right. Do you have any understanding as to |
| 25 | whether Mr. Dondero had the ability to stop you from |

| | Page 55 |
|---|---|
| 1 | Grant Scott |
| 2 | selling assets? |
| 3 | A. No. It wasn't -- it was a misunderstanding |
| 4 | about what the word "divest" meant in the subject |
| 5 | line. |
| 6 | Q. And did you understand that until you |
| 7 | corrected him, he was concerned and he expressed the |
| 8 | concern to you not to sell any assets? |
| 9 | MR. KANE: Objection to form. |
| 10 | THE WITNESS: No. It had -- I am |
| 11 | sorry. There -- the term "divest" was |
| 12 | maybe not a term I should have used. |
| 13 | However, my understanding was that my -- my |
| 14 | status at CLO HoldCo had a property related |
| 15 | aspect to it. And I used that term to |
| 16 | emphasize that I would need to -- that that |
| 17 | property aspect would need to be |
| 18 | transferred, meaning to the next entity or |
| 19 | person. He mistook it as something being |
| 20 | sold. It had nothing to do with that. |
| 21 | That is all. |
| 22 | BY MR. MORRIS: |
| 23 | Q. I understand that. But did you |
| 24 | understand -- did you have any understanding as to |
| 25 | what interest he had and whether or not assets were |

| | Page 56 |
|---|---|
| 1 | Grant Scott |
| 2 | being sold? |
| 3 | MR. BRIDGES: Object to form. |
| 4 | MR. KANE: Objection. Asked and |
| 5 | answered. |
| 6 | BY MR. MORRIS: |
| 7 | Q. You can answer. |
| 8 | A. No. I had -- I had no idea what he was -- |
| 9 | Q. Okay. Let's -- let's -- can we -- can we |
| 10 | call the period of time between the time you sent this |
| 11 | notice of your intent to resign in March 24, 2021 as |
| 12 | the interim period? |
| 13 | A. Sure. |
| 14 | Q. And that's the period during which you had |
| 15 | expressed your intent to resign, but your resignation |
| 16 | had not yet become effective; is that fair? |
| 17 | A. I guess it was the period of time when -- |
| 18 | yes. I guess that is correct. |
| 19 | Q. Okay. Is it fair to say that there were |
| 20 | certain things you needed to do during the interim |
| 21 | period on behalf of CLO HoldCo and the DAF entities |
| 22 | before -- even before your resignation became |
| 23 | effective? |
| 24 | A. Yes. |
| 25 | Q. Okay. Was someone designated to act as |

| | Page 57 |
|---|---|
| 1 | Grant Scott |
| 2 | your liaison with respect to matters concerning the -- |
| 3 | the DAF entities and the CLO HoldCo during the interim |
| 4 | period? |
| 5 | MR. KANE: Objection. Form. |
| 6 | THE WITNESS: I had conversations |
| 7 | with Mark Patrick in February when I came |
| 8 | to -- to believe he -- he would be director |
| 9 | elect, so to speak, in terms -- in terms of |
| 10 | moving forward. |
| 11 | BY MR. MORRIS: |
| 12 | Q. During the interim period, did you have any |
| 13 | understanding as to whether Mr. Patrick had any |
| 14 | authority to act on behalf of any of the DAF entities |
| 15 | or CLO HoldCo? |
| 16 | MR. KANE: Objection. Form. |
| 17 | THE WITNESS: I came to believe he |
| 18 | did, upon signing the management shared |
| 19 | transfer agreement. |
| 20 | BY MR. MORRIS: |
| 21 | Q. Okay. So that was -- that was on or about |
| 22 | March 24th, 2021, right? |
| 23 | A. Correct. |
| 24 | Q. So I'm asking just about the interim period |
| 25 | between January 31st, 2021 when you sent your notice |

Page 58

Grant Scott

2  of intent to resign, and March 24th.  That is what I
3  am defining as the interim period.
4      So with that understanding, did you have
5  any reason to believe that Mr. Patrick had any
6  authority to act on behalf of any of the DAF entities
7  or CLO HoldCo during the interim period?
8      A.    Well, it was -- he was part of a group of
9  entity -- a group of individuals that were with an
10  entity that had taken over from -- from Highland, and
11  so in -- certainly in that capacity, he -- as -- as
12  occurred for 10 years or more prior, that -- in that
13  role, you certainly had rights to -- to perform or to
14  act on CLO's behalf here.
15      Q.    And what entity are you referring to?
16      A.    I think it's the Highgate Consulting Group,
17  the Highland employees that took over -- or that
18  created that entity.
19      Q.    And did the -- do you have an understanding
20  as to whether the Highgate Employment Group succeeded
21  to Highland Capital Management LP in the shared
22  services capacity or in the investment advisory
23  capacity or something else?
24      MR. BRIDGES:  Object to form.
25      (Reporter clarification.)

Page 59

Grant Scott

2      THE WITNESS:  I'm not entirely sure
3      of that.
4  BY MR. MORRIS:
5      Q.    So is --
6      A.    But he -- but --
7      Q.    I am sorry.  Did you finish your answer?
8      A.    I'm not -- I'm not sure of the delineation
9      between the two.
10      Q.    So on what basis did you believe that
11  Mr. Patrick had the authority to act on behalf of the
12  DAF entities and CLO HoldCo during the interim period?
13      MR. BRIDGES:  Objection.  Asked and
14      answered.
15      THE WITNESS:  We had -- we had had a
16      number of conversations.  And over the
17      course of a number of weeks, I came to -- I
18      came to understand that he would be the
19      director going forward.  So...
20  BY MR. MORRIS:
21      Q.    How did you come to that understanding?
22      A.    Through the conversations that we had had,
23  I guess.
24      Q.    What conversations did you have with Mr. --
25  were these conversations with Mr. Patrick?

Page 60

Grant Scott

2      A.    They were conversations about the workings
3  with outside counsel to arrange the -- to arrange the
4  transfer of my responsibilities to another person or
5  entity at first, and then I came to learn that that
6  person was -- was -- would be Mark.
7      Q.    Do you know who selected mark?
8      A.    I do not.
9      Q.    Do you know how Mark was selected?
10      A.    I -- I do not.
11      Q.    Did you ever ask Mark how he was selected?
12      A.    I did not.
13      Q.    Did you ever ask Mark who selected him?
14      A.    I did not.
15      Q.    Did you ever ask anybody at any time how
16  Mr. Patrick was selected to succeed you?
17      A.    No, I did not.
18      Q.    Did you ask anybody at any time as to who
19  made the decision to select Mr. Patrick to succeed
20  you?
21      A.    No, I did not.
22      MR. BRIDGES:  Objection.  Facts not
23      in evidence and foundation.
24  BY MR. MORRIS:
25      Q.    Okay.  Do you have any understanding today,

Page 61

Grant Scott

2  as to who has the authority to select your --
3  withdrawn.
4      Do you have any understanding today, as to
5  who had the authority to select your replacement?
6      A.    I do not.
7      MR. MORRIS:  All right.  Let's take a
8      short break.  And I am certainly -- I'm
9      closer to the end than the beginning.  It's
10      3:22 Eastern Time.  Let's come back at
11      3:35, please, and hopefully I will be
12      finished by about 4, 4:15.
13      (Recess taken.)
14  BY MR. MORRIS:
15      Q.    I want to go back, Mr. Scott, to the time
16  that you became appointed the managing member of the
17  general partnership and to the director of the other
18  DAF entities and CLO HoldCo.  Do you remember how that
19  came to be?
20      A.    My recollection is that various law firms
21  and Mark Patrick had a role in its creation and
22  configuration following some -- it's -- I believe it's
23  modeled after some expert -- expert in the field.  I
24  am sorry.  I don't know if I answered your question.
25      Q.    You did not.  So let me try it again.  Do

Page 62

```
 1                    Grant Scott
 2   you recall how it came to be that you assumed those
 3   positions?
 4        A.    Ten years ago I accepted that role.
 5        Q.    And who offered the role to you?
 6        A.    Jim Dondero.
 7        Q.    Did -- did you communicate with anybody
 8   other than Mr. Dondero concerning the opportunity that
 9   he presented to you to assume these roles prior to the
10   time you accepted the position?
11             MR. KANE:  Objection.  Form.
12   BY MR. MORRIS:
13        Q.    Withdrawn.
14        A.    Possibly or --
15        Q.    Withdrawn.  Let me ask -- let me ask --
16   it's a good objection.
17             Mr. Scott, prior to the time that you
18   assumed your positions with the DAF entities and
19   CLO HoldCo, did you speak with anybody other than
20   Mr. Dondero, about the duties and responsibilities of
21   those positions?
22             MR. KANE:  Objection to form.
23             THE WITNESS:  The only thing that
24        comes to mind is Hunton & Williams.  But
25        I -- I'm not sure.  I don't know.
```

Page 63

```
 1                    Grant Scott
 2   BY MR. MORRIS:
 3        Q.    Do you have any memory of interviewing with
 4   anybody?
 5        A.    I don't have any recollection of that, no.
 6        Q.    Did you submit a resume of any kind?
 7        A.    Possibly a CV.  But I -- I just don't
 8   remember anymore.
 9        Q.    Do you know who made the decision to select
10   you to serve in those capacities?
11             MR. KANE:  Objection.  Form.
12             THE WITNESS:  I don't know.
13   BY MR. MORRIS:
14        Q.    Did anybody -- withdrawn.
15             Did you meet with Patrick before or after
16   you assumed these roles?
17        A.    It's going back 10 years.  I -- I'm not
18   sure.
19             MR. MORRIS:  Can we put up on the
20        screen a document that we marked this
21        morning.  I believe it's Exhibit 2.
22   BY MR. MORRIS:
23        Q.    And this is a document titled An Amended
24   and Restated Limited Liability Company Agreement of
25   Charitable DAF GP LLC.
```

Page 64

```
 1                    Grant Scott
 2             Do you see that?
 3        A.    Yes.
 4        Q.    And do you see that it's effective January
 5   1, 2012?
 6             And if we could go to the last page.  And
 7   is that your signature, sir?
 8        A.    That is correct.
 9        Q.    And is this the document that you signed on
10   March 12th, 2012, pursuant to which you became the
11   general partner of the DAF GP?
12             MR. KANE:  Objection.  Form.
13             THE WITNESS:  It's not March 12th.
14        It's dated as March 21st, just to clarify,
15        but I believe so.
16   BY MR. MORRIS:
17        Q.    I appreciate that.  I'm going to ask the
18   question again, just because I was wrong and I want to
19   get it right.
20             Is this the document you signed on or about
21   March 21, 2012, pursuant to which you became the
22   managing member of the DAF GP, LLC?
23        A.    I believe so.
24        Q.    Okay.  And you replaced Mr. Dondero in that
25   capacity; is that right?
```

Page 65

```
 1                    Grant Scott
 2        A.    Yes.
 3        Q.    And your recollection is that Mr. Dondero
 4   presented the opportunity to you; is that right?
 5             MR. KANE:  Objection.  Form.
 6             THE WITNESS:  Yes.  I guess you could
 7        call it an opportunity.
 8   BY MR. MORRIS:
 9        Q.    And do you have any recollection as to
10   whether or not anybody else was involved in the
11   decision to offer the opportunity to you?
12        A.    I -- I don't recall.
13        Q.    Okay.  We can take that down, please.
14             Do you recall whether Mr. Patrick was
15   involved in your selection as the replacement
16   management member of the DAF GP, LLC in 2012?
17        A.    I have no recollection.
18             MR. KANE:  Objection to form.
19             Yes.  Okay.
20   BY MR. MORRIS:
21        Q.    I want to go back to what we had defined
22   earlier as the interim period, and that was the period
23   between January 31st, 2021, when you sent in that
24   notice and March 24, 2021, when you transferred the
25   shares.  That is what we were calling the interim
```

Page 66

Grant Scott

2    period, right?
3        A.    Yes.
4        Q.    Okay.  Is it fair to say that Mr. Patrick
5    served as your primary contact with respect to matters
6    concerning CLO HoldCo and the DAF during the interim
7    period?
8        A.    Yes.
9        Q.    Okay.  And, in fact, Mr. Patrick gave you
10   instructions on what to do for the DAF and the
11   CLO HoldCo on certain matters during the interim
12   period, correct?
13           MR. KANE:  Objection to form.
14           THE WITNESS:  Periodically, yes.
15   BY MR. MORRIS:
16       Q.    I am sorry.  What is the answer?
17       A.    Periodically, yes.
18       Q.    Okay.  Did somebody ever tell you that you
19   should follow Mr. Patrick's instructions?
20       A.    No, I don't believe to so.
21       Q.    And, Mr. Patrick, to the best of your
22   knowledge, didn't HoldCo any positions with any of the
23   DAF entities or CLO HoldCo Limited, correct?
24           MR. KANE:  Objection to form.
25           MR. BRIDGES:  Object to foundation.

Page 67

Grant Scott

2    BY MR. MORRIS:
3        Q.    You can answer.
4        A.    During the interim period?
5        Q.    Correct.
6        A.    I do not believe so.
7        Q.    If Mr. Patrick didn't hold any positions,
8    why did you follow his instructions?
9            MR. BRIDGES:  Objection.
10           MR. KANE:  Objection.  Go ahead,
11       sorry.
12           MR. BRIDGES:  Facts not in evidence.
13           MR. KANE:  And objection to form.
14   BY MR. MORRIS:
15       Q.    You can answer, sir.
16       A.    Yes.  Well, there -- I mean, there was a
17   lot of activity that was required to transfer over
18   from how things had been handled under Highland, to
19   how they would now be handled under -- with the
20   services being provided by Highgate, and he was a
21   member, and he was the point person, I guess, and he
22   was my main interface to get those large numbers of
23   issues resolved.
24           There was -- you know, it was a very busy,
25   challenging time.

Page 68

Grant Scott

2        Q.    Did you sign any agreement on behalf of any
3    of the DAF entities or CLO HoldCo with the entity that
4    you are referring to as Highgate?
5        A.    I'm not sure.
6        Q.    Do you have any recollection at all of ever
7    signing any agreements in your capacity as the
8    authorized representative of any of the DAF entities
9    or CLO HoldCo and Highgate?
10           MR. KANE:  Objection.  Form.
11           THE WITNESS:  I -- I don't recall.
12   BY MR. MORRIS:
13       Q.    And I may have asked you this already.  If
14   I have, I'm sure there will be an objection.  But do
15   you recall if Highgate was providing services
16   equivalent to the shared services that Highland
17   previously provided, or was it providing investment
18   advisory services of the type Highland previously
19   provided?
20           MR. KANE:  Objection to form.
21           MR. BRIDGES:  Objection.
22   BY MR. MORRIS:
23       Q.    You can answer.
24       A.    I don't know the delineation of the
25   services they were providing.

Page 69

Grant Scott

2        Q.    Do you know whether during the interim
3    period, any entity other than Highgate was providing
4    services on behalf of any of the DAF entities or
5    CLO HoldCo?
6        A.    Well, I knew from various wires that were
7    approved, that various entities were providing
8    services.  Law firms, for example.
9        Q.    But was there any -- any entity other than
10   Highgate that was providing any of the services that
11   had previously been provided by Highland?
12       A.    Well, Highland provided a lot of legal
13   services.  I don't know that Highgate had the same
14   capability.  So I don't know how to answer that.
15       Q.    All right.  I'm going to try a different
16   way.
17           Before -- before 2021, the DAF entities had
18   both a shared services arrangement and an investment
19   advisory arrangement with Highland.
20           Do I have that right?
21       A.    Yes.
22       Q.    During the interim period, Highland was no
23   longer providing any of those services, correct?
24       A.    That's what I understand, yes.
25       Q.    Did anybody replace Highland in the

**Page 70**

Grant Scott

```
 1                    Grant Scott
 2   provision of those services during the interim period?
 3              MR. BRIDGES:  Objection, asked and
 4        answered.
 5   BY MR. MORRIS:
 6        Q.    You can answer, sir.
 7        A.    I mean, besides the services Highgate
 8   were -- was -- were providing, I'm not sure.
 9        Q.    And -- and I do know that I've asked this
10   before, but now with that context:  Do you know
11   whether Highgate was providing services of the shared
12   services type, or the investment advisory type, or you
13   just don't know?
14              MR. BRIDGES:  Objection to the form.
15              THE WITNESS:  At least I would think
16        mostly the shared services type.
17   BY MR. MORRIS:
18        Q.    Okay.  Is it your understanding that under
19   the shared services agreement, that Highgate had the
20   ability to make decisions on behalf of any of the DAF
21   entities or CLO HoldCo?
22              MR. BRIDGES:  Objection.
23              MR. KANE:  Objection to form.
24              MR. BRIDGES:  Misstates testimony.
25              THE WITNESS:  Yeah, my prior
```

**Page 71**

Grant Scott

```
 1                    Grant Scott
 2        testimony was I didn't see the agreements,
 3        so I don't know.
 4   BY MR. MORRIS:
 5        Q.    You haven't seen any agreement with
 6   Highgate; is that right?
 7        A.    I don't recall that I have.
 8        Q.    Do you have any understanding as to whether
 9   Highgate had the authority to bind any of the DAF
10   entities or CLO HoldCo during the interim period?
11              MR. BRIDGES:  Objection.  Calls for a
12        legal conclusion.
13              THE WITNESS:  I don't know.
14   BY MR. MORRIS:
15        Q.    Do you have any understanding as to whether
16   Mark Patrick had the ability as an individual to bind
17   any of the DAF entities or CLO HoldCo during the
18   interim period?
19              MR. BRIDGES:  Objection.  Calls for a
20        legal conclusion.
21              MR. KANE:  Objection.  Calls for a
22        legal conclusion.
23              THE WITNESS:  I don't know.
24   BY MR. MORRIS:
25        Q.    Okay.  And I'm just asking as a matter of
```

**Page 72**

Grant Scott

```
 1                    Grant Scott
 2   fact, to be clear.  I'm not asking for any legal
 3   conclusions.  I'm asking for your understanding as the
 4   authorized representative of the DAF entities and
 5   CLO HoldCo during the interim period.
 6              So with that -- with that background as the
 7   authorized entity, then -- withdrawn.
 8              As the authorized representative during the
 9   interim period, did you have any understanding as to
10   whether Mr. Patrick had the authority to bind any of
11   the DAF entities or CLO HoldCo during that time?
12              MR. KANE:  Objection.
13              MR. BRIDGES:  Objection.  Calls for
14        legal conclusion.  Also, objection as to
15        vagueness of the question.
16   BY MR. MORRIS:
17        Q.    I'm sorry, Mr. Scott, did you answer?
18        A.    I did not.  No, I have not.  I --
19        Q.    I apologize.
20        A.    I don't know what the status of his legal
21   authorization was.
22        Q.    Do you recall that in early March, you
23   bought a couple of events to Mr. Patrick's attention?
24        A.    I know that I forwarded documents to his
25   attention, yes.
```

**Page 73**

Grant Scott

```
 1                    Grant Scott
 2        Q.    And why did you forward documents to
 3   Mr. Patrick's attention during the interim period?
 4        A.    Because I was resigning, and I understood
 5   that he was essentially going to be, or was the
 6   director elect, and I just thought it appropriate to
 7   bring such things to his attention.
 8        Q.    And when did you -- when did you learn that
 9   he was doing to be the director elect?
10        A.    I -- I believe it was February.  Sometime
11   in February.
12        Q.    Do you recall how you learned that he was
13   going to become the director elect?
14        A.    I can't point to a specific conversation.
15   I can't -- I can't point to the specific conversation.
16   At some point, it went from being some future third
17   party, and I came to believe it would be him.  I'm
18   not -- I'm not sure of the timing.
19        Q.    Okay.  Do you know from whom you learned
20   that he was going to be the director elect?
21        A.    I believe it was him.
22        Q.    Okay.  So he told you that he was going to
23   replace you; is that right?
24        A.    I don't know that he said it specifically.
25   I don't remember our conversations.
```

Page 74

Grant Scott

2    Q.   Did you ever do anything to confirm with
3  anybody that Mark Patrick was going to be the director
4  elect, or did you just take his word for it?
5    A.   I did not independently confirm it, no.
6    Q.   Did you ever ask Mr. Dondero if -- if he
7  approved of the selection of Mr. Patrick as your
8  successor?
9    A.   I did not.
10    Q.   Did you ever discuss with Mr. Dondero, the
11  topic of who would be your successor?
12    A.   Going back.  Prior to the interim period, I
13  had recommended him, Mark.
14    Q.   Did you -- did you discuss Mr. Patrick's
15  selection as your successor with anybody in the world
16  at any time other than Mr. Patrick?
17    A.   I talked with my attorney about it.  But I
18  don't think so.  No.
19    Q.   Did you talk with anybody that you believed
20  was authorized to make the decision on behalf of the
21  DAF entities and CLO HoldCo about your successor?
22    A.   No, I did not.
23    MR. MORRIS:  Can we put up the
24    document that was marked, La Asia, on Page
25    7, as Bates number 80.

Page 75

Grant Scott

2    (Deposition Exhibit 10 was marked for
3  identification.)
4  BY MR. MORRIS:
5    Q.   Do you see that -- if you scroll just down
6  a little bit.  I guess not.
7    Mr. Patrick wrote an e-mail to you and
8  said, "The successor will respond to this complaint,"
9  and at the top you wrote "understood" --
10    A.   Yes.
11    Q.   -- or the top of the e-mail.
12    Do you recall that in early March, you
13  received a new complaint in which CLO HoldCo was named
14  the defendant?
15    A.   I believe this -- this was the unsecured
16  creditors' committee complaint; is that correct?
17    Q.   I think so, but it's your testimony.  I'm
18  just asking you if you recall that in early March,
19  CLO HoldCo was sued?
20    A.   Yes.  I think this was the second lawsuit
21  that I was referring to personally.
22    Q.   Okay.  And so this -- this actually
23  occurred after the time you had already given notice,
24  right?
25    A.   Yes.

Page 76

Grant Scott

2    Q.   Yeah.  And was the first lawsuit, the one
3  that you settled, before you gave notice?
4    A.   No.  The -- no, both lawsuits are pending.
5    Q.   Okay.  Do you know when the -- who's the
6  plaintiff in the first one?
7    A.   Acis.
8    (Reporter clarification.)
9    THE WITNESS:  Acis, A-C-I-S.
10  BY MR. MORRIS:
11    Q.   So the debtor never sued you personally; is
12  that right?
13    A.   Not yet.
14    Q.   And is it right that Mr. Patrick told you
15  that -- that the successor will respond to the
16  complaint?
17    A.   Yes.
18    Q.   Now, he's not referring to himself yet, is
19  he?
20    A.   That appears correct, yes.
21    Q.   Does that refresh your recollection that
22  you had not known yet as of March 2nd who the
23  successor would be?
24    A.   I guess it does.
25    MR. MORRIS:  Can we put up the next

Page 77

Grant Scott

2  exhibit, please, the one ending in -- the
3  one Bates number 85.  And please remind us,
4  La Asia, what exhibit number are we up to?
5    MS. CANTY:  We're up to 10, but the
6  one I'm about to put up is Exhibit 6 from
7  earlier today.
8    MR. MORRIS:  Thank you very much.
9  BY MR. MORRIS:
10    Q.   Now, if we can just scroll down a little
11  bit.  Do you remember something called an Adherence
12  Agreement being discussed in March of 2021?
13    A.   A what agreement?
14    Q.   Adherence Agreement.
15    A.   I see that.  Was it directed to me?
16    Q.   Yeah.  If we can just scroll up.
17    Okay.  So right there, do you see that
18  Thomas Surgent sends it to Mr. Kane?  The subject is
19  'Adherence Agreement."
20    A.   Yes.
21    Q.   And you do see that you forwarded that
22  e-mail to Mr. Patrick on the same day, March 2nd?
23    A.   Yes.
24    Q.   And it says "This relates to the second
25  issue from the debtor."

| | Page 86 |
|---|---|
| | Grant Scott |

1             Grant Scott

2          MR. BRIDGES: Objection.

3          MR. MORRIS: Withdrawn. Withdrawn.

4 BY MR. MORRIS:

5     Q.    You didn't provide a substantive response

6 to Elysium; is that right?

7          MR. KANE: Objection. Assumes facts

8    not in evidence.

9          MR. MORRIS: That is why I'm asking

10    the question.

11 BY MR. MORRIS:

12     Q.    Go ahead, Mr. Scott. You can answer.

13     A.    I did not provide a substantive response to

14 their inquiry.

15     Q.    Okay. Thank you.

16       Can we go to the top. In fact -- in fact,

17 you were instructed by Mr. Patrick to do nothing,

18 correct?

19          MR. BRIDGES: Objection. Misstates

20    the testimony.

21          THE WITNESS: No.

22 BY MR. MORRIS?

23     Q.    Sir, the e-mail says "Do nothing," correct?

24     A.    That is correct, and they were handling it,

25 not me.

---

**Page 87**

            Grant Scott

2     Q.    Okay. Now, did you resign on or about

3 March 24th, 2021?

4     A.    Yes. That's -- that's when the transfer --

5 share of transfer.

6     Q.    Okay.

7          MR. MORRIS: Can we put the next

8    exhibit up, please. It's the one at the

9    top at page 10. It's file 3, document 5.

10          MR. BRIDGES: Mr. Morris, can I ask

11    you how it is for time because you told us

12    earlier -- you teased us with a 4:15 end

13    time, potentially.

14          MR. MORRIS: Yeah, I'm just on the

15    last couple of documents.

16          MR. BRIDGES: Thank you.

17          MR. MORRIS: You bet.

18 BY MR. MORRIS:

19     Q.    Do you see this is a document called an

20 Assignment and Assumption of Membership Interest

21 Agreement?

22     A.    Yes.

23          MR. MORRIS: And if we can scroll

24    down.

25 BY MR. MORRIS:

---

**Page 88**

            Grant Scott

2     Q.    Did you sign this document?

3     A.    Yes, sir.

4     Q.    Okay. Do you know what this document is?

5     A.    I believe it's the Management Share

6 Transfer Agreement.

7     Q.    Okay. And do you know who prepared it?

8     A.    I do not.

9     Q.    Did you assign something pursuant to this

10 document?

11     A.    Yes. The -- the -- the management shares.

12          MR. MORRIS: Okay. Can we go to the

13    first page, please?

14 BY MR. MORRIS:

15     Q.    And do you see in paragraph 1, there is a

16 description of the assignment and assumption of the

17 signed interest?

18     A.    Yes, I see that.

19     Q.    Okay. Does that paragraph describe

20 everything that you assigned to Mr. Patrick?

21     A.    In this agreement. Yes.

22          MR. BRIDGES: Objection. Calls --

23    objection. Calls for a legal conclusion.

24          MR. KANE: I join the objection.

25 BY MR. MORRIS:

---

**Page 89**

            Grant Scott

2     Q.    You can answer, sir.

3     A.    Yes. I mean, it says what it says. But

4 yes, that is what I was transferring.

5     Q.    And can you identify for me anything that

6 you know that you ever assigned to Mr. Patrick that is

7 not set forth in paragraph 1?

8          MR. BRIDGES: Objection. Form.

9          THE WITNESS: I'm unaware of

10    anything.

11 BY MR. MORRIS:

12     Q.    Do you know if -- if the items and assets

13 that are set forth in paragraph 1 had any value?

14          MR. KANE: Objection. Form.

15          THE WITNESS: They had value, maybe

16    not monetary.

17 BY MR. MORRIS:

18     Q.    And what value did they have?

19     A.    I believe they had the property interest

20 that I referred to previously.

21     Q.    And what property interest are you

22 referring to?

23          MR. KANE: Objection. Form. Calls

24    for a legal conclusion.

25 BY MR. MORRIS:

Page 90

Grant Scott

```
 1                    Grant Scott
 2      Q.    You can answer.  Sir, it's your words we
 3   need.
 4      A.    The shares were the -- these management
 5   shares were the -- I was treating as property.
 6      Q.    Do you have any understanding as to what
 7   the value of the management shares was at the time you
 8   entered into this agreement?
 9      A.    I did not.
10      Q.    Did you have any understanding as to
11   whether those management shares held any particular
12   rights at the time you entered into this agreement?
13            MR. KANE:  Objection to form.
14            THE WITNESS:  My understanding was
15         they had my rights previously.  Ultimately.
16   BY MR. MORRIS:
17      Q.    And what rights did you believe flowed from
18   the management shares?
19      A.    The controlling rights that flowed down to
20   the various entities.
21      Q.    Did you receive anything in return in
22   exchange for your assignment of these property
23   interests and the other assets set forth in paragraph
24   1?
25      A.    It allowed me to finally resign.  That is
```

Page 91

Grant Scott

```
 2   what I received.  I mean, it ended my -- it ended my
 3   role as a -- maybe as an agent, or an employee or
 4   whatever.  Those were my substantive rights, as I
 5   understood it.
 6      Q.    Okay.  So you -- you surrendered the
 7   substantive rights in an exchange -- you no longer had
 8   your substantive rights?
 9            MR. BRIDGES:  Objection.  Asked and
10         answered.
11            MR. KANE:  Objection.  Form.
12   BY MR. MORRIS:
13      Q.    You can answer, sir.  Did you get anything
14   other than -- withdrawn.
15            Did you get anything other than what you
16   already described?
17      A.    Relief.  Yes.
18      Q.    Excellent.  Did you ever consider assigning
19   these interests or assets to anybody other than
20   Mr. Patrick?
21      A.    I did not.
22      Q.    Did you ever consider -- did you have any
23   belief as to whether the interests that were assigned
24   were freely tradeable?
25            MR. BRIDGES:  Objection.  Calls for a
```

Page 92

Grant Scott

```
 1                    Grant Scott
 2   legal conclusion.
 3            MR. KANE:  I join the objection.
 4            THE WITNESS:  I didn't make -- I did
 5         not make an assessment of that.
 6   BY MR. MORRIS:
 7      Q.    Do you know -- withdrawn.
 8            Do you have any understanding as to whether
 9   there were any restrictions on the transferability of
10   the interests that you assigned pursuant to this
11   agreement?
12            MR. KANE:  Objection.  Calls for a
13         legal conclusion.
14            THE WITNESS:  I did not.
15   BY MR. MORRIS:
16      Q.    Did you let anybody know that you were
17   willing to assign the interests that are described in
18   paragraph 1 other than Mr. Patrick?
19      A.    Anyone that I -- conceivably, anyone that I
20   let know that was at all familiar with the structure,
21   anyone that was informed of my desire to resign would
22   have arguably have known that.
23      Q.    Okay.  I'm not asking you to put yourself
24   in the shoes of anybody else.  I'm asking for what you
25   recall telling people.
```

Page 93

Grant Scott

```
 2            Did you ever tell anybody at any time that
 3   you were ready, willing and able to transfer and
 4   assign the interests that are in this document other
 5   than Mr. Patrick and your lawyers?
 6      A.    I am sorry.  I misunderstood your question.
 7   The answer is no.
 8      Q.    Did you ever think to try to assign these
 9   interests for a profit?
10      A.    Good grief, no.
11            (Reporter clarification.)
12      A.    No.
13      Q.    Did you -- was anybody, other than
14   Mr. Patrick, ever identified as a potential assignee
15   of the interests that are described in paragraph 1?
16            MR. KANE:  Objection to form.
17            THE WITNESS:  I was unaware of any.
18   BY MR. MORRIS:
19      Q.    Okay.  Did you make any effort to identify
20   anybody other than Mr. Patrick as a potential assignee
21   for the interests that are set forth in paragraph 1?
22      A.    No, I did not.
23      Q.    Did any -- did anybody acting on your
24   behalf, to the best of your knowledge, ever make any
25   efforts to identify any potential assignee other than
```

Page 94

```
                    Grant Scott
1
2   Mr. Patrick for the interests set forth in paragraph
3   1?
4           MR. BRIDGES:  Objection.  Foundation.
5           THE WITNESS:  I don't have that
6       knowledge.  No.
7           MR. MORRIS:  Can we go to the next
8       exhibit, please?
9           (Deposition Exhibit 14 was marked for
10  identification.)
11  BY MR. MORRIS:
12      Q.     Okay.  And do you see that these are
13  written resolutions dated the next day, March 25th?
14      A.     Yes.
15      Q.     And these resolutions provide for the
16  shared transfer described in the document?
17      A.     It appears so, yes.
18      Q.     And are these the management shares that
19  you were referring to earlier?
20      A.     I believe so.
21      Q.     Did you believe at the time that you owned
22  all of the management shares of charitable DAF HoldCo
23  Limited?
24      A.     That was my understanding.
25      Q.     How did you acquire those shares?
```

Page 95

```
                    Grant Scott
1
2       A.     I'm not sure the exact timing, but I
3   believe that was all established when I became
4   involved.
5       Q.     Did you pay anything of value for the
6   shares at the time that you acquired them?
7       A.     I am -- I don't believe so, no.
8       Q.     Did you need to obtain anybody's approval
9   before you could transfer the shares?
10      A.     No.  I don't believe so.
11      Q.     Did you make any effort to obtain anybody's
12  approval before you transferred the shares?
13      A.     I did not.
14      Q.     Did you have any reason to believe that
15  Mr. Dondero approved of the transfer of the management
16  shares to Mr. Patrick?
17      A.     I -- I don't know that.
18      Q.     Did you testify earlier, that you had
19  discussed with Mr. Dondero in January, Mark Patrick
20  succeeding you?
21          MR. BRIDGES:  Objection.  Misstates
22      prior testimony.
23  BY MR. MORRIS:
24      Q.     You can answer, sir.
25      A.     I believe it was prior to that.
```

Page 96

```
                    Grant Scott
1
2       Q.     Were you paid anything of value for your
3   services as the, either the managing member of the DAF
4   GP, or as a director of any of the other DAF or
5   CLO HoldCo Limited entities at any time?
6       A.     For a majority of the years, yes, I
7   received a monthly statement.
8       Q.     And is that -- how much was the monthly
9   statement?
10      A.     I believe it was $5,000.
11      Q.     Did it ever increase to an amount more than
12  $5,000?
13      A.     No.
14      Q.     Did you receive anything else of value for
15  your service to the DAF entities and CLO HoldCo
16  Limited other than the $5,000 monthly stipend that you
17  just described?
18      A.     I did not.
19      Q.     Do you recall that after you resigned, you
20  got reappointed, and then subsequently replaced again
21  by Mr. Patrick?
22          MR. KANE:  Objection to form.
23      (Reporter clarification.)
24          THE WITNESS:  Can you repeat -- did
25      you say -- it went away, and then it came
```

Page 97

```
                    Grant Scott
1
2   back.  I don't understand the question.  I
3   am sorry.
4   BY MR. MORRIS:
5       Q.     That is okay.  I just saw this in the
6   documents, and I thought it was odd.  But let me put
7   the documents up and see if you can shed any light.
8           MR. MORRIS:  Let's start with the
9       next exhibit, Patrick File 3, Document 9.
10          (Deposition Exhibit 15 was marked for
11  identification.)
12  BY MR. MORRIS:
13      Q.     And do you see in the resolutions, if we
14  can go up just a bit, dated March 24th, and it was
15  resolved that you were removed as a director of the
16  company and Mr. Patrick was appointed as your
17  replacement, if that is a fair characterization?
18          Do you see that?
19      A.     I see that.
20          MR. MORRIS:  And now if we can put up
21      the next document.
22          (Deposition Exhibit 16 was marked for
23  identification.)
24  BY MR. MORRIS:
25      Q.     So this is a week later.  It's March 31st.
```

**Page 98**

```
 1                    Grant Scott
 2          MR. MORRIS:  And if we can just
 3       scroll down and see if it's signed.
 4   BY MR. MORRIS:
 5       Q.    Do you see that Mr. Patrick was removed as
 6   the director and you were reappointed?
 7       A.    Yes, I do see that.
 8       Q.    Do you have any understanding as to why
 9   Mr. Patrick resigned and reappointed you as the
10   director a week later?
11       A.    I don't have -- I don't -- I don't know.
12       Q.    Did you even know this happened?
13       A.    Is my signature on that agreement?
14       Q.    No.
15       A.    I'm not sure.
16       Q.    Do you have any -- do you have any
17   recollection as -- as to whether or not you were ever
18   reappointed as the director of the company on or about
19   March 31st, 2021?
20       A.    I don't know if I have received any
21   communication about this or not.
22       Q.    Okay.
23            MR. MORRIS:  Can we go to the next
24       document, please?
25            (Deposition Exhibit 17 was marked for
```

**Page 99**

```
 1                    Grant Scott
 2   identification.)
 3            MR. KANE:  Mr. Morris, can you help
 4       me with the exhibit numbers?  Was that 16,
 5       or are we still on 15, additional portions
 6       of it?
 7            MS. CANTY:  That was 16 but not going
 8       to 17.
 9            MR. KANE:  Thank you.  I apologize.
10            MR. MORRIS:  That is okay, Jonathan.
11       We will get to everything and clear up any
12       confusion.
13   BY MR. MORRIS:
14       Q.    So if you go to the bottom of that
15   document, can you see that it was signed?
16            All right.  Do you see Mr. Patrick signed
17   this document?
18       A.    Yes, I see that.
19       Q.    Do you see that it's dated -- if we can go
20   back up to the top.  It's April 2nd, and do you see
21   that you are -- pursuant to these resolutions, you
22   were removed as the director again and replaced by
23   Mr. Patrick?
24       A.    Yes, I see that.  And they seem to be
25   correcting an error of some sort.
```

**Page 100**

```
 1                    Grant Scott
 2       Q.    Did anybody ever describe for you or
 3   explain to you what error had been made?
 4       A.    I am sorry.  I'm not familiar with these
 5   documents.
 6       Q.    Okay.  Is it fair to say that -- well, I
 7   will just leave it at that.
 8            So nobody ever informed you that there was
 9   a mistake that had to be corrected; is that right?
10            MR. BRIDGES:  Objection.  Asked and
11       answered.
12   BY MR. MORRIS:
13       Q.    You can answer.
14       A.    I don't know that there was this -- this
15   may have -- I don't know that there was a mistake.
16       Q.    You have no knowledge of --
17       A.    I have no knowledge of this.  I was in a
18   very complex process.  I think there...
19       Q.    And nobody ever asked -- nobody ever asked
20   your consent to be reappointed as the director of the
21   company, correct?
22            MR. BRIDGES:  Objection.  Asked and
23       answered.
24            THE WITNESS:  I didn't receive any
25       communications about this.
```

**Page 101**

```
 1                    Grant Scott
 2   BY MR. MORRIS:
 3       Q.    And so you didn't provide your consent to
 4   be reappointed as the director of the company,
 5   correct?
 6            MR. BRIDGES:  Objection.  Asked and
 7       answered.
 8            THE WITNESS:  That's correct.
 9   BY MR. MORRIS:
10       Q.    Okay.  Did you become aware that after you
11   resigned, that DAF and CLO HoldCo started a lawsuit
12   against the debtor and some other defendants related
13   to the HarbourVest settlement?
14       A.    I did become aware of it, yes.
15       Q.    And were you aware of the lawsuit -- were
16   you aware that DAF and CLO HoldCo were considering
17   filing the lawsuit before it was actually commenced?
18       A.    No.
19       Q.    Did you have any communications with
20   anybody at any time about the possibility that the DAF
21   and CLO HoldCo would commence a lawsuit against the
22   debtor and others relating to the HarbourVest
23   settlement prior to the time that the lawsuit was
24   commenced?
25       A.    I did not.
```

| Page 102 | | Page 103 | |
|---|---|---|---|
| | Grant Scott | | Grant Scott |
| 1 | | 1 | |
| 2 | Q.   So is it fair to say that you did not | 1 | just follow-up for clarification purposes. |
| 3 | provide any information to anybody at any time to | 2 | |
| 4 | support the claim -- the complaint that was filed | 3 | EXAMINATION |
| 5 | against the debtor and the other defendants in the | 4 | BY MR. KANE: |
| 6 | lawsuit that was brought by the DAF and CLO HoldCo? | 5 | Q.   Grant, earlier you were testifying about |
| 7 | MR. BRIDGES:  Objection.  Foundation. | 6 | resigning and noted -- I believe your testimony was |
| 8 | THE WITNESS:  I didn't provide | 7 | one of the reasons was an issue of independence.  Can |
| 9 | anything with respect to the litigation | 8 | you clarify what you meant by issue of independence? |
| 10 | that was filed. | 9 | A.   I came to believe that there was a |
| 11 | BY MR. MORRIS: | 10 | perception, and my friendship with Jim Dondero |
| 12 | Q.   And did anybody ever ask you for | 11 | precluded my -- my independence. |
| 13 | information relating to potential claims against the | 12 | Q.   Perception by whom? |
| 14 | debtor and others? | 13 | A.   The judge in the case. |
| 15 | A.   No. | 14 | (Reporter clarification.) |
| 16 | Q.   Did you ever have any discussions with | 15 | A.   The judge in the bankruptcy case. |
| 17 | anybody at any time as to whether Jim Seery should be | 16 | Q.   Was there a specific reason or instance |
| 18 | named as a defendant in the lawsuit that was bought by | 17 | that caused you to have that belief? |
| 19 | the DAF and CLO HoldCo against the debtor and others? | 18 | A.   Yes.  When I spoke with you about the -- |
| 20 | A.   No. | 19 | Q.   Well, I don't want to go into any |
| 21 | MR. MORRIS:  I have no further | 20 | attorney-client communications. |
| 22 | questions.  Thank you, Mr. Scott. | 21 | A.   I am sorry. |
| 23 | MR. BRIDGES:  I don't have any | 22 | Q.   So let me ask you a different question. |
| 24 | questions. | 23 | Were you provided a transcript of the Court's ruling |
| 25 | MR. KANE:  Can I -- I've got a couple | 24 | on the escrow hearing for the registry dispute? |
| | | 25 | A.   I believe so. |

| Page 104 | | Page 105 | |
|---|---|---|---|
| | Grant Scott | | Grant Scott |
| 1 | | 1 | |
| 2 | Q.   And did you read that transcript? | 2 | EXAMINATION |
| 3 | A.   I believe we discussed it.  I'm not -- I'm | 3 | BY MR. MORRIS: |
| 4 | not sure. | 4 | Q.   Did you ever testify before Judge Jernigan? |
| 5 | Q.   Did you have a recollection that Judge | 5 | A.   I have not. |
| 6 | Jernigan made a comment or comments about you and | 6 | Q.   So is it fair to say that you had no reason |
| 7 | Jim Dondero during her ruling? | 7 | to believe that she could ever access your credibility |
| 8 | A.   Yes. | 8 | as a witness? |
| 9 | Q.   Do you believe that Judge Jernigan's | 9 | MR. BRIDGES:  I'm going to object. |
| 10 | comments were inaccurate? | 10 | That calls for a legal conclusion. |
| 11 | MR. MORRIS:  Objection to the form of | 11 | BY MR. MORRIS: |
| 12 | the question.  No foundation.  Leading. | 12 | Q.   You can answer. |
| 13 | BY MR. KANE: | 13 | A.   From -- from what I understand from the |
| 14 | Q.   I will rephrase.  I will rephrase. | 14 | transcript of that hearing, a number of comments were |
| 15 | I will ask it -- a different question. | 15 | made by the judge regarding my independence, that sort |
| 16 | Mr. Scott, do you believe that you acted | 16 | of thing, that made me -- that made me think that |
| 17 | independently during the bankruptcy case? | 17 | maybe I could just remove that as an issue in the case |
| 18 | A.   Yes. | 18 | by resigning.  That is essentially, what my conclusion |
| 19 | Q.   Do you believe you acted in the best | 19 | was from that hearing. |
| 20 | interests of CLO HoldCo? | 20 | Q.   But you didn't resign at the time that the |
| 21 | A.   Yes, I do. | 21 | judge made those statements, did you? |
| 22 | MR. KANE:  I'm done. | 22 | MR. BRIDGES:  Objection. |
| 23 | MR. MORRIS:  Just some follow-up | 23 | Argumentative. |
| 24 | questions, Mr. Scott. | 24 | BY MR. MORRIS: |
| 25 | | 25 | Q.   You can answer. |

Page 106

Grant Scott

2  A.  I did not at that time.
3  Q.  In fact, you didn't resign for probably
4  seven months after, correct?
5  MR. BRIDGES:  Objection.  Asked and
6  answered.  Really?
7  THE WITNESS:  Yes.
8  BY MR. MORRIS:
9  Q.  And you continued to actively participate
10  in the bankruptcy case, correct?
11  A.  That is correct.
12  Q.  And months later, you made the decision to
13  amend CLO HoldCo's proof of claim, correct?
14  A.  Correct.
15  Q.  And months later, you made the decision to
16  file an objection to the HarbourVest settlement,
17  correct?
18  A.  Correct.
19  Q.  And months after this hearing, you made the
20  decision to withdraw that objection, correct?
21  MR. BRIDGES:  Objection to repeating
22  the same questions from the last two hours
23  over and over again.  Are we going to keep
24  going all the way to the end.
25  BY MR. MORRIS:

Page 107

Grant Scott

2  Q.  Only -- only if people keep opening the
3  door.
4  Can you please answer my question?
5  A.  Yes, I removed the objection.
6  Q.  And -- and you remained in the case, and
7  you remained active in the case, and you filed on
8  behalf of your -- withdrawn.
9  You stayed in the case even after
10  CLO HoldCo was sued by the debtor, correct?
11  A.  Yes.
12  Q.  And you stayed in the case long enough to
13  negotiate a settlement on behalf of CLO HoldCo with
14  the debtor, correct?
15  A.  Correct.
16  Q.  And you can't identify anything that the
17  judge said following the escrow hearing that had
18  anything to do with you personally, correct?
19  MR. KANE:  Objection.  Form.
20  MR. MORRIS:  Withdrawn.
21  BY MR. MORRIS:
22  Q.  Can you identify anything that the judge
23  said following the escrow hearing that had to do with
24  your independence?
25  A.  I don't remember -- I'm -- what I'm telling

Page 108

Grant Scott

2  you is -- let's just be clear here since I think the
3  point is -- is being missed.  The issue of when I
4  wanted to resign or when I first thought about
5  resigning has been raised.  It was raised during my
6  first deposition with you as well.  And what I'm
7  saying is -- is that after I heard about the hearing,
8  and what was said, I don't remember the exact
9  language.  My first reflection was, hey, maybe that
10  is -- maybe that is -- if I'm going to be in this
11  court having to make a claim, maybe it would be best
12  if it wasn't being made by me.  That is all.
13  Q.  And I appreciate that.  And I am just
14  trying to test the credibility of that statement.
15  Okay?
16  MR. BRIDGES:  Objection to the
17  sidebar.
18  BY MR. MORRIS:
19  Q.  Did Judge Jernigan ever issue a ruling
20  against you personally?
21  MR. BRIDGES:  Asked and answered.
22  Objection.
23  MR. MORRIS:  It is not asked and
24  answered.
25  BY MR. MORRIS:

Page 109

Grant Scott

2  Q.  But go ahead, sir.
3  A.  Not against me personally.
4  Q.  Did Judge Jernigan ever issue a ruling
5  against CLO HoldCo Limited?
6  A.  Well, to my --
7  MR. BRIDGES:  Objection.  Objection.
8  Calls for legal conclusion as to the
9  meaning of "against."
10  (Reporter clarification.)
11  THE WITNESS:  The denial of the
12  escrow motion created a fairly big headache
13  for CLO HoldCo in the remainder of 2020.
14  So I believe that was a ruling
15  against CLO HoldCo, to answer your
16  question.
17  BY MR. MORRIS:
18  Q.  Okay.  Are you aware of any others?
19  MR. BRIDGES:  Objection.  Calls for a
20  legal conclusion as to the meaning of
21  "against."
22  BY MR. MORRIS:
23  Q.  You can answer.
24  A.  I don't know that she's made any other
25  rulings except to approve the settlement.

| | | | |
|---|---|---|---|

Page 110

```
                        Grant Scott
 1
 2    Q.      Which settlement are you referring to?
 3    A.      The -- the TRO settlement.
 4    Q.      And were you on the -- did you listen in to
 5  the hearing during that hearing when -- when the judge
 6  approved the settlement?
 7    A.      I did not.
 8    Q.      Did you read the transcript?
 9    A.      I did not.
10    Q.      Did anybody ever tell you that the judge
11  said anything during that hearing to question your
12  independence?
13          MR. KANE:  Objection to the extent it
14      calls for attorney/client privileged
15      information.
16          THE WITNESS:  No.  No, I think you
17      misunderstand.  I had one data point to go
18      on, and that's what made me start the
19      process of thinking of resigning.  That's
20      all.
21  BY MR. MORRIS:
22    Q.      I appreciate that.
23    A.      The issue -- the issue has been raised
24  repeatedly, whether it was my idea or somebody else's
25  idea, that's all I'm saying.  If you can, it was my
```

Page 111

```
                        Grant Scott
 1
 2    idea.
 3    Q.      Okay.  And I'm asking you if you have any
 4  other data points after that hearing to support the
 5  notion that Judge Jernigan questioned your
 6  independence?
 7    A.      No.
 8          MR. MORRIS:  I have no further
 9      questions.
10          MR. BRIDGES:  Me either.
11          MR. KANE:  I'm done.  Thank you.
12      Mr. Scott.
13          (Deposition adjourned at 4:42 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 112

```
                        Grant Scott
 1
 2          REPORTER'S CERTIFICATE
 3      I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,
 4  Registered Professional Reporter, certify that the
 5  foregoing proceedings were taken before me at the time
 6  and place therein set forth, at which time the witness
 7  was put under oath by me;
 8      That the testimony of the witness, the questions
 9  propounded, and all objections and statements made at
10  the time of the examination were recorded
11  stenographically by me and were thereafter
12  transcribed;
13      That the foregoing is a true and correct
14  transcript of my shorthand notes to taken.
15  I further certify that I am not a relative or employee
16  of any attorney or the parties, nor financially
17  interested in the action.
18      I declare under penalty of perjury under the laws
19  of North Carolina that the foregoing is true and
20  correct.
21      Dated this June 1, 2021.
22
23      Leshaunda Byrd
24      LESHAUNDA CASS-BYRD, CCR-B-2291, RPR
25
```

Page 113

```
                        ERRATA SHEET
 1
 2  Case Name:
 3  Deposition Date:
 4  Deponent:
 5  Pg.  No. Now Reads      Should Read  Reason
 6  ___  ___ _____     _____   _____
 7  ___  ___ _____     _____   _____
 8  ___  ___ _____     _____   _____
 9  ___  ___ _____     _____   _____
10  ___  ___ _____     _____   _____
11  ___  ___ _____     _____   _____
12  ___  ___ _____     _____   _____
13  ___  ___ _____     _____   _____
14  ___  ___ _____     _____   _____
15  ___  ___ _____     _____   _____
16  ___  ___ _____     _____   _____
17  ___  ___ _____     _____   _____
18  ___  ___ _____     _____   _____
19  ___  ___ _____     _____   _____
20
21                          _____
21                          Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

# EXHIBIT 4

Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 18:18:16 Desc Main Document Page 1 of 61
Case 3:21-cv-01503-B Document 31 Filed 09/22/21 Page 855 of 2274
Docket #1943 Date Filed: 02/22/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a. entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.



*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.   set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c.   set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d.   initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.   reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f.   reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g.   reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.  reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.  reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.    reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.    conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.    heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.    considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

Case 3:21-cv-01503-B Document 81 Filed 09/29/23 Page 199 of 213 PageID 2578

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.     **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

002293

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.      **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.      **Not Your Garden Variety Debtor**. The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

002294

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5.  **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the

Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6.  **The Highland Enterprise.** Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these

affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

002295

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

       7.    **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

       8.    **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals.  There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York.  The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.  **UBS Securities LLC and UBS AG London Branch ("UBS").**  UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case.  The UBS Claim was based on a judgment that UBS received from a New York state court in 2020.  The underlying decision was issued in November 2020, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex.  The UBS litigation related to activities that occurred in 2008 and 2009.  The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history).  The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.  **Meta-E Discovery ("Meta-E").**  Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years.  It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel.  They fought hard before and during this Chapter 11 Case.  The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them.  They have represented their constituency in this case as fiduciaries extremely well.

9.  **Other Key Creditor Constituents.**  In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts.  Mr. Daugherty filed an amended

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure.** Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Delaware to Dallas. Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12.    **Post-Petition Corporate Governance Settlement with Committee.** After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5] As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand. As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

DOCS_SF:104487.21 36027/002

002300

13.     **Appointment of Independent Directors.**     As part of the Bankruptcy

Court-approved settlement, three eminently qualified independent directors were chosen to lead

Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen

by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are

each technically independent directors of Strand (Mr. Dondero had previously been the sole

director of Strand and, thus, the sole person in ultimate control of the Debtor).   The three

independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr.

Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and

Foreign Representative.   Suffice it to say that this settlement and the appointment of the

independent directors changed the entire trajectory of the case and saved the Debtor from the

appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent

directors.  They were the right solution at the right time.  Because of the unique character of the

Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent

directors was a far better outcome for creditors than the appointment of a conventional chapter 11

trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in

particular, knew and had vast experience at prominent firms with high-yield and distressed

investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring

large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not

only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver

through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis,

the former affiliate of Highland that the Bankruptcy Court presided over and which company was

DOCS_SF:104487.21 36027/002

002301

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case. The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically. Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved.  They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court.  As noted previously, they completely changed the trajectory of this case.

15.     **Not Your Garden Variety Mediators.**  And still another reason why this was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

15

002303

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a. *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b. *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c. A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d. *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e. *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17. **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18. **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

18

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated. Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently