**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | |
|---|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. | **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | | |
| Appellant | § | | |
| vs. | § | | 21-03067 |
| **Highland Capital Management, L.P** | § | | |
| | § | | |
| Appellee | § | | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

# Volume 13

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.     STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital
  Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.     DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.   Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11
[Doc. 168].

*000042*

2.   The judgment, order, or decree appealed from: Memorandum Opinion and Order
Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to
Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.   Docket Sheet kept by the Bankruptcy Clerk.

4.   Documents listed below and as described in the Docket Sheet for Bankruptcy Case
Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-B from U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| Vol. 7<br><br>001203<br>thru Vol. 8 | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| Vol. 9<br><br>001711 | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001712 | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001738 | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001760 | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001805 | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001893 | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9*  *001905 thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.*  *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) (Annable, Zachery). |
| *002883* *Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18* 003637 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| 003666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing). (Sbaiti, Mazin) |
| 003843 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 003844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 003851 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19* 003882 *Thru Vol. 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21* 004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*0047415* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*0047770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6_Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
| --- | --- | --- | --- | --- |
| | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

*006133*
*Thru Vol. 31*

*Vol. 32*
*006925*

*006942*

*006960*

TRANSCRIPTS

*006961*

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
| --- | --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| 57 | 2/21/23 | 164 | | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*Vol. 33* (handwritten, left margin)

*007065* (handwritten, left margin)

Dated:  July 14, 2023                          Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/  Mazin A. Sbaiti*
                                               **Mazin A. Sbaiti**
                                               Texas Bar No. 24058096
                                               **Jonathan Bridges**
                                               Texas Bar No. 24028835
                                               2200 Ross Avenue – Suite 4900W
                                               Dallas, TX  75201
                                               T:  (214) 432-2899
                                               F:  (214) 853-4367
                                               E:  mas@sbaitilaw.com
                                                    jeb@sbaitilaw.com

                                               **Counsel for Appellants**


                        **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                               */s/ Mazin A. Sbaiti*
                                               Mazin A. Sbaiti

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01585-B   Document 3-13   Filed 08/04/22   Page 14 of 262   PageID 2809

46

1  Mr. Dondero, has ever appeared in this Court to challenge the

2  Debtor's activities.

3       But more fundamentally, Your Honor, the Debtor does not

4  owe fiduciary duties to investors in any of the funds that the

5  Debtor advises.  The fiduciary duty that the Debtor owes is to

6  the funds themselves, not the investors in the funds.

7       And while Movants point to Mr. Seery's prior testimony to

8  support the argument that the Debtor owes a duty to investors,

9  Mr. Seery was not testifying as a lawyer and his testimony

10 just cannot change the law.

11      As to each of the funds that the Debtor manages, HCLOF and

12 the CLOs, they were each provided with actual notice of the

13 January 16th -- the July 16th order and didn't object.  And as

14 Your Honor will recall, the Trustees for the CLOs, the party

15 that could potentially have claims for breach of fiduciary

16 duty, they participated in the January 9th hearing.  They came

17 to the Court and were concerned about the protocols that the

18 Debtor was agreeing to with the Committee.  We revised them.

19 The Trustees didn't object.  They didn't object then; they

20 didn't object now.  And, in fact, they consented to the

21 assumption of the contracts between the Debtor and the CLOs.

22      So the argument that the orders, by having this

23 exculpation for future conduct, violated due process rights of

24 anyone and is the type -- essentially, the type of order that

25 *Espinosa* would have contemplated could be attacked, is --

002508

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 31-3   Filed 06/06/23   Page 55 of 262   PageID 3820

47

1    relies on faulty legal and factual premises.  No duty to

2    investors.  No private right of action.  And both -- and all

3    the funds received due process.

4        In addition, Your Honor, as we argue in our brief and I'll

5    get to in a few moments, both of the orders are justified

6    under the *Barton* doctrine, as Mr. Seery is entitled to

7    protection based upon how courts around the country have

8    interpreted the *Barton* doctrine.  As such, Mr. Seery is

9    performing his role both as an agent of the independent board

10   under the January 9th order, as a CEO under the July 16th

11   order, as a quasi-judicial officer.  And as Your Honor

12   examined in the *Ondova* opinion which you mentioned, trustees

13   are entitled to qualified immunity for damage to third parties

14   resulting from simple negligence, provided that the trustee is

15   operating within the scope of his duties and is not acting in

16   an *ultra vires* manner.

17       So, exculpating the independent directors, their agents,

18   and the CEO in the January 9th and July 16th orders was a

19   recognition by this Court that they would be entitled to

20   qualified immunity, much in the same way trustees are.

21       No doubt that Movants contend that this was error and that

22   the Court overreached.  However, the remedy for that overreach

23   was an appeal, not a reconsideration 16 months later.  The

24   Court's orders based upon the determination that in this

25   highly contentious case that these court officers needed to be

48

1    protected from negligence suits is not the exceptional case

2    where the Court lacked any arguable basis for jurisdiction.

3    Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4    and *Chicot* and reject the attack on the prior court orders.

5        The only case Movants cite to challenge the Supreme

6    Court's decision -- to challenge the Supreme Court precedent I

7    mentioned and the Fifth Circuit's *Shoaf* decision is the

8    *Applewood* case.  *Applewood* is totally consistent with *Shoaf*.

9    *Applewood* also involved a plan that purported to release a

10   guaranty claim that the guarantor argued was res judicata in

11   subsequent litigation regarding the guaranty.  The Fifth

12   Circuit held in that case that the plan was not res judicata.

13   It made that ruling because the plan did not contain clear and

14   unambiguous language releasing the guaranty.  In that way, the

15   Fifth Circuit distinguished *Shoaf*.

16       *Applewood* and *Shoaf* are consistent.  A Bankruptcy Court

17   order will be given res judicata effect, even if the Court

18   didn't have jurisdiction to enter it, if the order was clear

19   and unambiguous.  In *Shoaf*, the release was.  In *Applewood*, it

20   wasn't.

21       Movants argued on June 8th and argue now that the

22   *Applewood* case really argues -- really deals with prospective

23   exculpation of claims.  I went back and read Mr. Bridges'

24   comments carefully of June 8th.  He said *Applewood*,

25   exculpation.  Well, that's just not correct.  *Applewood* is all

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01599-B   Document 33-13   Filed 09/07/21   Page 17 of 262   PageID 2322

49

1    about requiring specificity of a (garbled) to give it res

2    judicata effect.  Claims that existed at that time, were they

3    described clearly and unambiguously?  Yes?  *Shoaf* applies.

4    No?  *Applewood* does -- applies.

5         So how should the Court apply these principles here?  The

6    Court approved a procedure for certain claims in the

7    governance orders.   The procedure:  come to Bankruptcy Court

8    before pursuing a claim against the independent directors and

9    Seery or their agents so that the Court can make a

10   colorability determination.  Clear and unambiguous.  The

11   governance orders each provide that the Bankruptcy Court had

12   jurisdiction to enter the orders, and the orders were not

13   appealed.

14        Movants attempt to confuse the Court and argue *Applewood*

15   is on point because the January 9th and July 16th orders do

16   not clearly identify specific claims that Movants now have

17   that are being released.  And because they're not specific,

18   then basically it's an ambiguous release and *Applewood*

19   applies.

20        The problem with the Movants' argument is that neither the

21   January 9th or July 16th orders released claims that existed

22   at that time.  If they did, and if there wasn't an adequate

23   description, I might agree with Mr. Bridges that *Applewood*

24   applied.  But there were no claims.  It was prospective.  It

25   was a standard of care.  The Court clearly and unambiguously

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01590-E   Document 13   Filed 06/04/21   Page 18 of 262   PageID 2823

50

1  said what the standard of care would be going forward.

2  Clearly, under *Shoaf* and Supreme Court precedent, they are

3  entitled to res judicata because it's a clear and unambiguous

4  provision.  *Applewood* just simply doesn't apply.

5      Mr. Phillips at the last hearing made an impassioned plea

6  to the Court for a narrow interpretation of the exculpation

7  provisions in the January 9th and July 16th orders, and he

8  argued that the Court could not possibly have intended for the

9  exculpation for negligence to apply on a go forward basis.  He

10  thus argued to the Court that the Court should construe the

11  exculpation narrowly and only apply it to potential claims of

12  harm caused to the Debtor, as opposed to harm caused to third

13  parties, which he said included thousands of innocent

14  investors.

15      Of course, Mr. Phillips made those arguments unburdened by

16  the actual facts and the prior proceedings which led to the

17  entry of these orders, because, as he was the first to admit,

18  he only became involved in the case a month ago.

19      As the Court recalls, and as reinforced by Mr. Seery's and

20  Mr. Dubel's testimony I just mentioned, the exculpation

21  provisions were included precisely to prevent Mr. Dondero,

22  through any one of the entities he's owned and controlled, the

23  Movants being two of those, from asserting baseless claims

24  against the beneficiaries of those orders, exactly the

25  situation Mr. Seery now finds himself in.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 1-3   Filed 09/09/21   Page 19 of 262   PageID 2324

51

1    And, again, it bears emphasizing:  throughout this case,

2    not one of the purported public investors Mr. Phillips

3    lamented would be prevented from holding Mr. Seery responsible

4    for his conduct has ever appeared in this case to object about

5    anything.  And none of the directors of the funds, the funds

6    where the Debtor acts as an investment adviser, have ever

7    stepped foot in this court, either.

8    Even if the Court declines to apply res judicata, Your

9    Honor, to prevent challenges to the governance orders, the

10   Court has the jurisdiction, had the jurisdiction to include

11   the gatekeeping provisions in those orders.  The Bankruptcy

12   Court derives its jurisdiction from 28 U.S.C. Section 157, and

13   bankruptcy jurisdiction is divided into two parts:  core

14   matters, which are those arising in or arising under Title 11,

15   and noncore matters, those matters which are related to a

16   Chapter 11 case.

17   Bankruptcy Courts may enter final orders in core

18   proceedings, and with the consent of parties, noncore

19   proceedings.  If a party does not consent to a final judgment

20   in the noncore matters or waives its right to consent, then

21   the Bankruptcy Court -- or does not waive its right to

22   consent, then the Bankruptcy Court issues a report and

23   recommendation to the District Court.

24   The seminal Fifth Circuit case on bankruptcy court

25   jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

52

1   There, the Fifth Circuit held that the Bankruptcy Court has

2   related to jurisdiction over matters if the outcome of that

3   proceeding could conceivably have any effect on the estate

4   being administered in the bankruptcy.

5        More recently, the Fifth Circuit, in the 2005 case, in

6   *Stonebridge Tech's*, elaborated on when a matter has a

7   conceivable effect on the estate such as to confer Bankruptcy

8   Court jurisdiction.  There, the Fifth Circuit held that an

9   action is related to bankruptcy if the outcome could alter the

10  debtor's rights, liabilities, options, or freedom of action,

11  either positively or negatively, and which in any way impacts

12  upon the handling and the administration of the bankruptcy

13  estate.  It is against this backdrop, Your Honor, that the

14  Court should evaluate its jurisdiction to have entered the

15  orders.

16       So, again, what did the orders do?  They established

17  governance over the Chapter 11 debtor with new independent

18  directors being approved.  They established the procedures and

19  protocols of how transactions were going to be presented to

20  and approved by the Committee.  They vested in the Committee

21  certain related-party claims, and they provided for the

22  procedures parties would have to follow to assert any claims

23  against the independent directors and the CRO and the agents

24  and advisors.

25       Your Honor, it's hard to imagine that there is a more core

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01503-B   Document 13-1   Filed 10/01/21   Page 21 of 262   PageID 2826

53

1 order than the entry of these orders.  At the time the orders

2 were entered, the Court was well aware of the potential for

3 acrimony from Mr. Dondero and his related entities, and

4 included the gatekeeper provisions to prevent the Debtor's

5 estate from being embroiled in frivolous litigation against

6 the board and the CEO.

7  Such protections were clearly within the Court's

8 jurisdiction, both to protect the administration of the estate

9 but also under applicable Fifth Circuit law dealing with

10 vexatious litigants, as set forth in the *Baum* and *Carroll*

11 cases that the Court cited in its confirmation order.

12  Not that it was hard to predict, but the last several

13 months have reinforced how important the gatekeeping

14 provisions in the order are and how important similar

15 provisions in the plan are.

16  The Court heard extensive testimony at the confirmation

17 hearing regarding the havoc continued litigation by Mr.

18 Dondero and his related entities would cause, which

19 predictions have unfortunately been borne out by the

20 unprecedented blizzard of litigation involving Mr. Dondero and

21 his related entities that has consumed the Court over the last

22 several months and caused the estate to incur millions of

23 dollars in fees that could have been used to pay its

24 creditors.

25  And these attacks are continuing.  As I mentioned before,

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01598-B   Document 13   Filed 06/02/22   Page 22 of 262   PageID 2827

54

1    in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2    against the Debtor on behalf of PCMG, another related entity,

3    alleging postpetition mismanagement of the Select Fund.

4         And to complete the hat trick, they are the lawyers

5    seeking to sue Acis in the Southern District of New York for

6    allegedly post-confirmation matters.

7         The Court knew then and certainly knows now that the

8    potential for sizable indemnification claims could consume the

9    estate.  The Court used that as the potential basis for

10   determining that the orders were within its jurisdiction, just

11   as it used that potential to justify the exculpation

12   provisions in the plan as being consistent with *Pacific*

13   *Lumber*.

14        Movants also ignore the cases -- and we cited in our

15   opposition -- where courts in this district, including Judge

16   Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17   *Group* in 2016, approved gatekeeper provisions that provided

18   the Bankruptcy Court with exclusive jurisdiction to adjudicate

19   claims against postpetition fiduciaries.

20        Movants also ignore cases outside this district, including

21   *General Motors* and *Madoff*, which we cited in our brief as

22   examples of cases where Bankruptcy Courts have been used as

23   gatekeepers to determine if claims are colorable or being

24   asserted against the correct entity.

25        And there's another reason, Your Honor, why Movants may

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 13-1   Filed 09/01/22   Page 23 of 262   PageID 2828

55

1    now not contest the Court's jurisdiction to have entered those

2    orders.  Each of those orders, as I said before, include a

3    finding that the Court had core jurisdiction to enter the

4    orders.  No party contested that finding or refused to consent

5    to the core jurisdiction.

6        Under well-established Supreme Court precedent, parties

7    can waive their right to challenge the Bankruptcy Court's

8    jurisdiction, core jurisdiction, by failing to object.  In

9    *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10   that Article III was not violated if parties knowingly and

11   voluntarily consented to adjudication of *Stern v. Marshall*-

12   type alter ego claims, and that the consent need not be

13   express, so long as it was knowing and voluntary.

14       And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15   Circuit in the 1995 *McFarland* case, which held that a person

16   who fails to object to the Bankruptcy Court's assumption of

17   core jurisdiction is deemed to have consented to the entry of

18   a final order by the Bankruptcy Court.

19       Your Honor, I'd now like to turn to the *Barton* doctrine.

20   The Court also has jurisdiction to have entered the orders

21   based upon the *Barton* doctrine.  The *Barton* doctrine dates

22   back to an old United States Supreme Court case and provides

23   as a general rule that, before a suit may be brought against a

24   trustee, consent from the appointing court must be obtained.

25       Movants essentially make two arguments why the *Barton*

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-00583-B   Document 13-1   Filed 06/14/17   Page 124 of 262   PageID 2329

56

1 | doctrine doesn't apply.

2 | First, Movants, without citing any authority, argue that

3 | it does not apply to Mr. Seery because he is not a trustee or

4 | receiver and was not appointed by the Court.  Although the

5 | doctrine was originally applied to receivers, it has been

6 | extended over time to cover various court-appointed

7 | fiduciaries and their agents in bankruptcy cases, including

8 | debtors in possession, officers and directors of the debtor,

9 | and the general partner of the debtor.  And although Mr.

10 | Bridges says he couldn't find one case that applied the *Barton*

11 | doctrine to a court-retained professional, I will now talk

12 | about several such cases.

13 | In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14 | District Court for the Northern District of Alabama

15 | extensively analyzed the *Barton* doctrine jurisprudence from

16 | the Eleventh Circuit and beyond and concluded that it applied

17 | to debtors in possession.  The *Helmer* Court relied in part on

18 | a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19 | *Rodgers*, which held that the doctrine applies to both court-

20 | appointed and court-approved officers of the debtor, which is

21 | consistent with the law in other circuits.

22 | And subsequently, the Eleventh Circuit again considered --

23 | and in that case, the distinction of a court-appointed as a

24 | court-retained professional was -- was not persuasive to the

25 | Court, and the Court held that a court-retained professional

002518

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01638-B   Document 43-13   Filed 06/01/22   Page 25 of 262   PageID 2880

57

1  can still have *Barton* protection, notwithstanding that he

2  wasn't appointed, the argument that Mr. Bridges tries to make.

3       And subsequently, --

4            THE COURT:  I wonder, was that -- was that Judge

5  Clifton Jessup, by chance?  Or maybe Bennett?

6            MR. POMERANTZ:  Your Honor, this was -- this was the

7  Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8  was --

9            THE COURT:  Oh, I thought you were still talking

10  about the Alabama case.  No?

11            MR. POMERANTZ:  Yeah, the Alabama -- well, the

12  Alabama case referred to the Eleventh Circuit case, *Carter v.*

13  *Rodgers*, --

14            THE COURT:  Okay.

15            MR. POMERANTZ:  -- and the appointment and -- or

16  retention issue was discussed in the *Carter v. Rodgers* case.

17            THE COURT:  Okay.

18            MR. POMERANTZ:  And subsequently, the Eleventh

19  Circuit again considered the contours of the *Barton* doctrine

20  in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

21  case, which Your Honor referenced in your *Ondova* opinion,

22  which I will discuss in a few moments, the Eleventh Circuit

23  held that a debtor's general counsel who had been approved by

24  the Court, who was appointed by a chief restructuring officer

25  who was also approved by the Court, was covered by the *Barton*

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01652-B   Document 18-3   Filed 09/01/22   Page 26 of 262   PageID 2331

58

1    doctrine for acts taken in furtherance of the administration

2    of the estate and the liquidation of the assets.

3        And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4    F.3d 204, reaffirmed that court-approved counsel who function

5    as the equivalent of court-appointed officers are entitled to

6    protection under *Barton*.  While the Court in that case

7    ultimately ruled that counsel could be sued without first

8    going to the Bankruptcy Court, it did so because it determined

9    that the suit between two sets of lawyers would not have any

10   effect on the administration of the estate.

11       So, Your Honor, not only is there authority, there is

12   overwhelming authority that Mr. Seery is entitled to the

13   protections.

14       In *Gordon v. Nick*, a District -- a case from 1998 from the

15   Fourth Circuit, the Court that the *Barton* doctrine applied to

16   a lawsuit against a general partner who was responsible for

17   administering the bankruptcy estate.

18       And as I mentioned, Your Honor, and as Your Honor

19   mentioned, Your Honor had reason to look at the *Barton*

20   doctrine in length and in depth in the 2017 *Ondova* opinion.

21   And in the course of the opinion, Your Honor discussed one of

22   the policy rationales for the doctrine, which you took from

23   the Seventh Circuit's *Linton* opinion, and you said as follows:

24   "Finally, another policy concern underlying the doctrine is a

25   concern for the overall integrity of the bankruptcy process

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01568-E    Document 41-3    Filed 06/11/2022    Page 27 of 262    PageID 2832

59

1 and the threat of trustees being distracted from or

2 intimidated from doing their jobs.  For example, losers in the

3 bankruptcy process might turn to other courts to try to become

4 winners there by alleging the trustee did a negligent job."

5      Here, the independent board was approved by the Court as

6 an alternative to the appointment of a Chapter 11 trustee.

7 And it and its agent, including Mr. Seery as the CEO, even

8 before the July 16th order, were provided protections in the

9 form of the gatekeeper order and exculpation.

10     I'm sure the Court has a good recollection of the January

11 9th hearing -- we've talked about it a lot in the proceedings

12 before Your Honor -- where the Debtor and the Committee

13 presented the governance resolution to Your Honor.  And as

14 Your Honor will recall, the appointment of the board was a

15 hotly-contested issue among the Debtor and the Committee and

16 was heavily negotiated.  And the appointment of the

17 independent board was even contested by the United States

18 Trustee at a hearing on January 20th, 2020.

19     I refer the Court to the transcripts of the hearings on

20 January 9th and January 20th of 2020, which clearly

21 demonstrate that appointing this board and giving it the

22 rights and protections and its agents the rights and

23 protections was not your typical corporate governance issue,

24 but it was essentially the Court's alternative to appointing a

25 trustee.  And recognizing that the members of the independent

002521

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01502-B   Document 13-3   Filed 06/14/23   Page 28 of 262   PageID 2833

60

1    board were essentially officers of the Court, the Court

2    approved the gatekeeper provision, requiring parties first to

3    come and seek the Court's permission before suing them, in

4    order to prevent them from being harassed by frivolous

5    litigation.

6        And the independent board was given the responsibility in

7    the January 9th order to retain a CEO it deemed appropriate,

8    and it did so by retaining Mr. Seery.

9        Recognizing the *Barton* doctrine as it applies to Mr. Seery

10   is consistent with a legion of cases throughout the United

11   States, and Movants' argument that Mr. Seery is not court-

12   appointed is just wrong.

13       Second, Your Honor, Movants cite without any authority,

14   argue that even if the *Barton* doctrine applied there is an

15   exception which would allow it to pursue a claim against Mr.

16   Seery without leave of the Court.

17       The Debtor agrees the 28 U.S.C. § 959 is an exception to

18   the *Barton* doctrine.  Section 959(a) provides that trustees,

19   receivers, or managers of any property, including debtors in

20   possession, may be sued without leave of the court appointing

21   them with respect to any of their acts or transactions in

22   carrying on business connected with such property.

23       As the Court also pointed out at the June 8th hearing, and

24   Mr. Bridges alluded to in his argument, the last sentence of

25   959(a) provides that such actions -- clearly referring to

002522

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01508-B    Document 43-3    Filed 09/01/21    Page 29 of 262    PageID 2534

61

1    actions that may be pursued without leave of the appointing

2    court -- shall be subject to the general equity power of such

3    court, so far as the same may be necessary to the ends of

4    justice.

5        And Mr. Bridges made a plea, saying you can't take away my

6    jury trial right there.  You just cannot do that.  Well, I

7    have two answers to that, Your Honor.  One, they relinquished

8    their jury trial right.  We've established that.  Okay?

9        The second is allowing Your Honor to act as a gatekeeper

10   has nothing to do with their jury trial right.  Allowing Your

11   Honor to act as a gatekeeper allows you to determine whether

12   the action could go forward, and it'll either go forward in

13   Your Honor's court or some other court.

14       And the argument that the exculpation was essentially a

15   violation of 959 is just -- is just -- it just is twisting

16   what happened.  You have an exculpation provision.  We already

17   went through the authority the Court had to give an

18   exculpation.  With respect to these litigants who are before

19   Your Honor -- we're not talking about anyone else who's coming

20   in to try to get relief from the order; we're talking about

21   these litigants -- we've already established that they were

22   here, they're bound by res judicata.  So their 959 argument

23   goes away.

24       And as the Court -- and separate and apart from that, the

25   issue at issue in the District Court litigation is -- is not

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 13    Filed 06/07/22    Page 30 of 262    PageID 2835

62

1  even subject to 959.

2       Mr. Bridges says, well, of course it is because it deals

3  with the administration of the estate.  I'd like to refer to

4  what the Court said -- this Court said in its *Ondova* opinion:

5  The exception generally applies to situations in which the

6  trustee is operating a business and some stranger to the

7  bankruptcy process might be harmed, such as a negligence claim

8  in a slip-and-fall case, and is inapplicable to suits based

9  upon actions taken to further the administering or liquidating

10  the bankruptcy estate.

11       And your *Ondova* opinion is consistent with the Third and

12  Eleventh Circuit opinions Your Honor cited in your opinion, as

13  well as numerous other --

14       (Interruption.)

15            MR. POMERANTZ:   -- from the -- from around the

16  country, including cases from the First, Second, Sixth,

17  Seventh, and Ninth Circuits.  And I'm not going to give all

18  the cites to those cases, but it's not a -- it's not a

19  remarkable proposition that Your Honor relied on in *Ondova*.

20       In addition, several of these cases, including the

21  Eleventh Circuit's *Carter* opinion, have been cited with

22  approval by the Fifth Circuit in *National Business Association*

23  *v. Lightfoot*, a 2008 unpublished opinion for this very point.

24  The *Barton* exception of 959 does not apply to actions taken in

25  the administration of the case and the liquidation of assets

002524

1   in the estate.

2       Suffice it to say that it's clear that the Section 959

3   exception to *Barton* has no applicability in this case.

4   Movants, hardly strangers to the bankruptcy case, want to sue

5   Mr. Seery for acts taken relating to a settlement of very

6   complex and significant claims against the estate.  They want

7   to sue a court-appointed fiduciary for doing his job,

8   resolving claims against the estate and his management of the

9   bankruptcy estate.  And they want to do this outside of the

10  Bankruptcy Court.

11      Settlement of the HarbourVest claim, which is where this

12  claim arises under -- whether it's a collateral attack now or

13  not, and we say it is, is for another issue -- but it clearly

14  arises in the context of settlement of the HarbourVest claim,

15  is the quintessential act to further the administration and

16  liquidation of the bankruptcy estate, and certainly doesn't

17  fall within the 959 exception.

18      Movants seem to be arguing that 959(a) makes a distinction

19  between claims against Mr. Seery that damaged the Debtor and

20  claims against Mr. Seery that damaged third parties.  However,

21  the Movants make up that distinction, and it's not in the

22  statute, it's not in the case law.  The focus is not on who

23  the conduct damages, but it's rather on whether the conduct

24  was taken in connection with the administration or the

25  liquidation of the estate.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 13-3   Filed 06/22/22   Page 32 of 262   PageID 2837

64

1    And even if the Debtor is wrong, Your Honor, which it's

2  not, the savings clause allows the Court to determine whether

3  leave to be -- sue will be granted.  Given that these claims

4  are asserted by Dondero-related entities, if not controlled

5  entities, no serious argument exists that the equities do not

6  permit this Court to determine if leave to sue is appropriate.

7    Accordingly, Movants' argument that the orders create this

8  tension with 959 is simply an over-dramatization.  And in any

9  event, Your Honor, there's a basis independent of *Barton* that

10  supports the jurisdiction to enter the orders, as I mentioned.

11    But even if the orders only relied on *Barton*, there is an

12  easy fix to Movants' concerns:  let them come to court and

13  argue that the type of suit they are bringing allegedly falls

14  within the exception of 959.

15    Your Honor, Movants argue that the Bankruptcy Court may

16  not act as a gatekeeper if it would not have jurisdiction to

17  deal with the underlying action.  They essentially argue that

18  an Article I judge may not pass on the colorability of a

19  claim, that it should be decided by an Article III judge.

20  This is the same argument, Your Honor, that Your Honor

21  rejected in connection with plan confirmation and which I

22  touched on earlier.

23    And the reason why Your Honor rejected it is because

24  there's no law to support it.  In fact, there is Fifth Circuit

25  law that holds to the contrary.  And we talked about a little

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 43-13    Filed 06/21/22    Page 33 of 262    PageID 2538

65

1  bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2  2015.  And *Villegas* is a simple case.  Schmidt was appointed

3  trustee over a debtor and liquidated its estate and the

4  Bankruptcy Court approved his final fees.  Four years later,

5  Villegas and the prior debtor sued Schmidt in District Court,

6  the district in which the Bankruptcy Court was pending,

7  arguing that he was negligent in the performance of his

8  duties.  The District Court dismissed the case because

9  Villegas failed to obtain Bankruptcy Court approval to bring

10  the suit under the *Barton* doctrine.

11      On appeal, Villegas argued *Barton* didn't apply for two

12  reasons.  First, that *Stern v. Marshall* created an exception

13  to the *Barton* doctrine for claims that the Bankruptcy Court

14  would not have the jurisdiction to adjudicate.  And second,

15  that *Barton* did not apply if the suit is brought in the

16  District Court, which exercises supervisory authority over the

17  Bankruptcy Court that appointed the trustee.  Pretty much the

18  argument that was made by Movants at the contempt hearing.

19      The Fifth Circuit rejected both arguments.  It held that

20  the existence of a *Stern* claim does not impact the Bankruptcy

21  Court's authority because *Stern* did not overrule *Barton* and

22  the Supreme Court had cautioned circuit courts against

23  interpreting later cases as impliedly overruling prior cases.

24      More importantly, the Fifth Circuit pointed to a post-

25  *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

002527

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 13-1   Filed 07/21/22   Page 34 of 262   PageID 2839

66

1   (2014), which held that *Stern* does not decide how a Bankruptcy

2   Court or District Courts should proceed when a *Stern* creditor

3   is identified, as support for the argument that *Barton* is

4   still good law, even dealing with a *Stern* claim.

5        Second, the Fifth Circuit, joining every circuit to have

6   addressed the issue, ruled that the District Court and the

7   Bankruptcy Court are distinct from one another and the

8   Bankruptcy Court has the exclusive authority to determine the

9   colorability of *Barton* claims and that the supervisory

10  District Court does not.

11       Movants didn't address *Villegas* in their reply.  Briefly

12  tried to distinguish it, unconvincingly, today.  The bottom

13  line is *Villegas* is directly applicable.  Your Honor cited it

14  in the *Ondova* opinion for precisely the proposition that

15  *Barton* applies whether or not the Court has authority to

16  adjudicate the claim.

17       Accordingly, Your Honor, it was within the Court's

18  jurisdiction to require a party to seek approval of Your Honor

19  on the colorability of a claim before an action may be

20  commenced or pursued against the protected parties, even if

21  Your Honor wouldn't have authority to adjudicate the claim at

22  the end of the day.

23       In fact, some courts have even addressed the proper

24  procedure for doing so, requiring the putative plaintiff to

25  not only seek leave of Bankruptcy Court but also to provide a

002528

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 13-3   Filed 06/25/22   Page 35 of 262   PageID 2840

67

1   draft complaint and a basis for the Court to determine if the

2   claim is colorable.

3       Movants have done neither, and they should not be

4   permitted to modify the final orders of the Court as a

5   workaround.

6       Your Honor, that concludes my presentation.  I'm happy to

7   answer any questions Your Honor may have.

8           THE COURT:  All right.  Not at this time.  All right.

9   I'm going to figure out, do we need a break or not, depending

10  on what Mr. Bridges tells me.  I assume we're just doing this

11  on argument today.  I think that's what I heard.  No witnesses

12  or exhibits.

13          MR. BRIDGES:  That is correct, Your Honor.

14          THE COURT:  Okay.  Mr. Bridges, how long do you

15  expect your rebuttal to take so I can figure out does the

16  Court need a break?

17          MR. BRIDGES:  Fifteen minutes plus whatever it takes

18  to submit agreed-to exhibits.

19          THE COURT:  Okay.  Let's take a five-minute bathroom

20  break.  We'll come back.  It's -- what time is it?  It's 1:11

21  Central time.  We'll come back in five minutes.

22          THE CLERK:  All rise.

23      (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24          THE CLERK:  All rise.

25          THE COURT:  All right.  Please be seated.  We're

002529

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01503-B    Document 13-3    Filed 06/16/22    Page 36 of 262    PageID 2841

68

1  going back on the record in the Highland matters.

2       Mr. Bridges, time for your rebuttal.  I want to ask you a

3  question right off the bat.  Mr. Pomerantz pointed out

4  something that was on my list that I forgot to ask you when

5  you made your initial presentation.  What is the authority

6  you're relying on?  You did not cite a statute or a rule *per*

7  *se*, but I guess we can probably all agree that Bankruptcy Rule

8  9024 and Federal Rule 60 is the authority that would govern

9  your motion, correct?

10       MR. BRIDGES:  I don't agree, Your Honor.  I don't

11  believe this is a final order that we're contesting here.  And

12  I think that's demonstrated by the Court's final confirmation

13  -- plan -- plan confirmation order that seeks to modify this

14  order or will modify this order upon being -- being effective.

15  So I don't think so.

16       In the alternative, if we are challenging a final order,

17  then I think you're right as to the rules that would be

18  controlling.

19       THE COURT:  All right.  Well, let me back up.  Why

20  exactly do you say this would be an interlocutory order as

21  opposed to a final order?

22       MR. BRIDGES:  Because of its nature, Your Honor.

23  While the appointment in the order or the approval of the

24  appointment in the order might, as a separate component of the

25  order, have -- have finality, the provisions -- the provisions

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01590-E   Document 18-13   Filed 08/24/21   Page 37 of 262   PageID 2342

69

1    in it relating to gatekeeping and exculpation are, we think,

2    by their very nature, quite obviously interlocutory and not

3    permanent.  They don't seem to indicate an intention by any of

4    the parties that, 30 years from now, if Mr. Seery is still CEO

5    at Highland, long after the bankruptcy case has ended, that

6    nonetheless parties would be prohibited from bringing claims,

7    strangers to this action would be prohibited from bringing

8    claims related to his CEO role.

9        I think the nature of it demonstrates that, the

10   modifications to it, and even the inclusion of it in the final

11   plan confirmation, as well as -- can't read that.

12            THE COURT:  Can you give me some authority?  Because

13   as we know, there's a lot of authority out there in the

14   bankruptcy universe on what discrete orders are interlocutory

15   in nature that a bankruptcy judge might routinely enter and

16   which ones are final.  You know, it would just probably, if I

17   flipped open *Collier's*, I could -- you know, it would be mind-

18   numbing.

19       So what authority can you rely on?  I mean, is there any

20   authority that says an employment order is not a final order?

21   That would be shocking to me if you have cases to that effect,

22   but, I mean, of course, sometimes we do interim on short

23   notice and then final.  But this would be shocking to me if

24   there is case authority to support the argument this is not a

25   final order.  But I learn something new every day, so maybe I

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01502-B   Document 13-3   Filed 02/07/22   Page 38 of 262   PageID 2543

70

1  would be shocked and there is.

2          MR. BRIDGES:  Your Honor, I'd point you to *In re*

3  *Smyth*, <mark>207 F.3d 758</mark>, and *In re Royal Manor*, 525 B.K. 338

4  [sic], for the proposition that retaining a bankruptcy

5  professional is an interlocutory order.

6          THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7  case.  Which court is that?

8          MR. BRIDGES:  Fifth Circuit.

9          THE COURT:  Okay.  So tell me the facts.  I'm

10 surprised I don't know about this case.  But, again, I don't

11 know every case.  So, it held that an employment order is an

12 interlocutory order?

13         MR. BRIDGES:  Appointing counsel.  A professional in

14 the bankruptcy context, Your Honor.

15         THE COURT:  Counsel for a debtor-in-possession?  An

16 order approving counsel was an interlocutory order?

17         MR. BRIDGES:  Yes, or the Trustee's counsel.

18         THE COURT:  Or the Trustee's counsel?  Okay.  What

19 were the circumstances?  Was this on an expedited basis and

20 there wasn't a follow-up final order, or what?

21         MR. BRIDGES:  Your Honor, I don't have -- I don't

22 have that at the tip of my memory.  I'm sorry.

23         THE COURT:  Okay.  And the other one, <mark>525 B.R. 338</mark>,

24 what court was that?

25         MR. BRIDGES:  It's a Bankruptcy Court within the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01532-B   Document 18-13   Filed 09/29/21   Page 39 of 262   PageID 2844

71

1  Sixth Circuit.  I'm not certain which district.

2          THE COURT:  All right.  Well, maybe one of you two

3  over there can look them up and give me the context, because

4  that is surprising authority.  Or other lawyers on the WebEx

5  maybe can do some quickie research.

6      Okay.  We'll come back to that.  But assuming that this

7  was a final order, which I have just been presuming it was,

8  Rule 60 is the authority you're going under?  9024 and Rule

9  60, correct?

10         MR. BRIDGES:  Your Honor, we have not invoked those

11  rules.  Alternatively, I think you're right that they would

12  control if we are wrong about the interlocutory nature of the

13  order.

14         THE COURT:  Well, you have to be going under certain

15  -- some kind of authority when you file a motion.  So I'm --

16         MR. BRIDGES:  As an alternative --

17         THE COURT:  I'm approaching this exactly, I assure

18  you, as the District Court or a Court of Appeals would.  You

19  know, you start out, what is the legal authority that is being

20  invoked here?

21         MR. BRIDGES:  Well, --

22         THE COURT:  So I just assume Rule 60.  I can't, you

23  know, come up with anything else that would be the authority.

24         MR. BRIDGES:  Yes, Your Honor.  You also have

25  inherent power to modify orders that are in violation of the

Case 21-03067-sgj  Doc 43  Filed 09/29/21  Entered 09/29/21 18:18:16  Desc Main
Case 3:21-cv-01630-B  Document 13-3  Filed 09/30/21  Page 40 of 262  PageID 2845

72

1  law.  And we pointed you to --

2          THE COURT:  Now, is that right?  Is that really

3  right?  Why do we have Rule 60 if I can just willy-nilly, oh,

4  I feel like I got that wrong two years ago?  I can't do that,

5  can I?  Rule 60 is the template for when a court can do that.

6  Parties are entitled to rely on orders of courts.  And that's

7  why we have Rule 60, right?  So, --

8          MR. BRIDGES:  Your Honor, I think -- I think that

9  we're miscommunicating.  I'm trying not to rely on Rule 60 in

10  the first instance because in the first instance we view this

11  as not a final order.  So, in the first instance, --

12          THE COURT:  I got that.  And I've got my law clerks

13  looking up your cases to see if they convince me.  But I'm

14  asking you to go to layer two.  Assuming I don't agree with

15  you these are final orders, what is your authority for the

16  relief you're seeking?

17          MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18  in the alternative.

19          THE COURT:  All right.

20          MR. BRIDGES:  That's correct.

21          THE COURT:  So, which provision?  Which provision of

22  Rule 60?  (b) what?

23          MR. BRIDGES:  Your Honor, I'm not prepared to concede

24  any of them.  I don't have the rule in front of me.

25          THE COURT:  You're not prepared to concede what?

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01585-B   Document 13-1   Filed 09/29/21   Page 41 of 262   PageID 2846

73

1          MR. BRIDGES:  Any of the provisions of Rule 60.  Just

2     (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

3     basis, as is the particulars (b)(1), (2), (6) --

4          (Garbled audio.)

5          THE COURT:  Okay.  You're breaking up.  Can you

6     restate?

7          MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

8     any other provision, Your Honor, of Rule 60.

9          THE COURT:  Okay.  Well, so (1), mistake,

10    inadvertence, surprise, excusable neglect.  Which one of

11    those?

12         MR. BRIDGES:  All of the above, Your Honor.

13         THE COURT:  Surprise?  Who's surprised?

14         MR. BRIDGES:  Your Honor, I think every potential

15    litigant who discovers that your order purports to bar

16    prospective unaccrued claims at the time the order issued

17    would be surprised.

18     Frankly, I think Mr. Seery would be surprised, given his

19    testimony that he owes fiduciary duty -- duties that he must

20    abide by and that he appears to have, as I continue to

21    represent to clients, to advisees, and to the SEC, that those

22    duties are owing.

23         THE COURT:  Okay.  I'm giving you one more chance

24    here to make clear on the record what provision of Rule 60(b)

25    are you relying on, okay?  I need to know.  It's not in your

1  pleading.

2          MR. BRIDGES:  Your Honor, --

3          THE COURT:  So tell me specifically.  I can only --

4          MR. BRIDGES:  -- (b)(1) --

5          THE COURT:  -- come up with a result here if I know

6  exactly what's being presented.

7          MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)

8  --

9          THE COURT:  Which, okay, there are multiple parts to

10  (1).  You're saying somebody's surprised by the ruling.  I

11  don't know who.  Really, all that matters is your client, the

12  Movants.  You're saying, even though they participated, --

13          MR. BRIDGES:  Yes, Your Honor.

14          THE COURT:  -- got notice, they're somehow surprised?

15  Why are they surprised?

16          MR. BRIDGES:  Yes, Your Honor.

17          THE COURT:  Do you have evidence of their surprise?

18          MR. BRIDGES:  Your Honor, our brief shows the

19  intentions of all involved were not the interpretation of that

20  order being advanced at this -- at this point in time.  And

21  so, yes, I believe that is evidence.  The transcripts of the

22  hearings I believe evidence that as well, that the

23  understanding of everyone involved was not that future --

24  unspecified future claims that had not accrued yet would be

25  released under (b)(1).  Yes, Your Honor.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01580-B   Document 13-1   Filed 06/30/22   Page 43 of 262   PageID 2848

75

```
 1              THE COURT:  Okay.

 2              MR. BRIDGES:  Under (b)(2), --

 3              THE COURT:  I don't have any evidence of that.  All I

 4    have is the clear wording of the order.  Okay.  Let me just --

 5    just let me go through this.

 6       Assuming Rule 60 (1) through (6) are what you're arguing

 7    here, what about Rule 60(c):  a motion under Rule 60(b) must

 8    be made within a reasonable time?  We're now 11 months --

 9              MR. BRIDGES:  Your Honor, --

10              THE COURT:  We're now 11 months past the July 2020

11    order.  What is your authority for this being a reasonable

12    time?

13              MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14    step before answering your question.  Under (b)(2), we're

15    relying on newly-discovered evidence that was discovered in

16    late March and caused both the filing of this motion and the

17    filing of the District Court action.

18       Under (b)(4), we believe that the order is --

19              THE COURT:  Let me stop.  Let me stop.  What is my

20    evidence that you're putting in the record that's newly

21    discovered?

22              MR. BRIDGES:  The evidence is detailed in the

23    complaint that is in the record.  You know, --

24              THE COURT:  That's not evidence.

25              MR. BRIDGES:  -- honestly, Your Honor, --
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01598-B   Document 13   Filed 09/24/21   Page 44 of 262   PageID 2849

76

1           THE COURT:  That is not evidence.  Okay?  A lawyer-

2    drafted complaint in another court is not evidence.  Okay?

3           MR. BRIDGES:  Your Honor, I think, to be technical,

4    that there is not a record yet, that we have evidence yet to

5    be admitted on our exhibit list.  I believe in this

6    circumstance -- I understand that, in general, allegations in

7    a pleading are not evidence.  In this instance, when we're

8    talking about whether or not new facts led to the filing of a

9    lawsuit, I do believe that the allegations in the lawsuit are

10   evidence of those new facts.

11          THE COURT:  All right.  Go on.

12          MR. BRIDGES:  Under (b)(4), we believe the order is,

13   in part, void.  It is void because of the jurisdictional and

14   other defects noted in our argument.

15      And also, under (b)(6) (garbled) ground for relief that

16   we're appealing to the equitable powers of this Court to

17   correct errors and manifest injustice towards not just the

18   litigants here but to correct the order of the Court to make

19   it comply with -- with the law, with the statutes promulgated

20   by Congress and to respect the jurisdiction of the District

21   Court.

22          THE COURT:  All right.  Do you agree with Mr.

23   Pomerantz that the case law standard for Rule 60(b)(4) is

24   exceptional circumstances?  It's only applied so that a

25   judgment is voided in exceptional circumstances.  Do you

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01590-B   Document 13   Filed 09/30/22   Page 45 of 262   PageID 2550

77

1   disagree with that case authority?

2            MR. BRIDGES:  I would -- I would agree, in part, that

3   unusual circumstances is not the ordinary case.  I'm not

4   entirely sure what you mean by exceptional, but I think we're

5   on the same page.

6            THE COURT:  Okay.  It's not what I mean.  That's just

7   the case law standard.  And I'm asking, do you agree with Mr.

8   Pomerantz that that is the standard set forth in case law when

9   applying 60(b)(4)?  There have to be some sort of exceptional

10  circumstances where there's just basically no chance the Court

11  had authority to do what it did.

12           MR. BRIDGES:  Out of the ordinary would be the phrase

13  I would use, Your Honor.

14           THE COURT:  Okay.  So I guess then I'll go from

15  there.  Is it your argument that gatekeeping provisions in the

16  bankruptcy world are out of the ordinary?

17           MR. BRIDGES:  The exculpation of Mr. Seery for

18  liability falling short of gross negligence or intentional

19  wrongdoing in connection with his continuing to conduct the

20  business of the Debtor as an investment advisor subject to the

21  Advisers Act, yes, I would say that is out of the ordinary,

22  that it is extraordinary, that it is --

23           THE COURT:  Okay.  What is your authority or evidence

24  on that?  Because this Court approves exculpation provisions

25  regularly in connection with employment orders, and pretty

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01533-B   Document 13   Filed 02/16/22   Page 46 of 262   PageID 2951

78

1   much every judge I know does.  In fact, I'm wondering why this

2   isn't just a term of compensation.  You know, he's going to do

3   x, y, z in the case.  His compensation is going to be a, b, c,

4   d, e.  And by the way, we're going to set a standard of

5   liability for his performance as CEO or investment banker,

6   financial advisor, whatever, so that no one can sue him

7   regarding his performance of his job duties unless it rises to

8   the level of gross negligence, willful misconduct.

9        It's a term of employment that, from my vantage point,

10  seems to be employed all the time.  So it would be anything

11  but exceptional circumstances.  Do you have authority or

12  evidence --

13            MR. BRIDGES:  Your Honor, frankly, --

14            THE COURT:  -- to the contrary?

15            MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16  your view of that situation, that it would merely be a term of

17  his employment, that vitiates the entire fiduciary duty

18  standard created by the Advisers Act that tells him, with

19  hundreds of millions of dollars of assets under management for

20  people he's advising as a registered investment advisor,

21  people he's advising who believe that he has a fiduciary duty

22  to them and that it's enforceable, that the SEC, who monitors,

23  believes he has an enforceable fiduciary duty to those people,

24  and that he's testified that he has fiduciary duties to those

25  people, and that Your Honor is saying no, just as a regular

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01802-B    Document 13-13    Filed 06/17/22    Page 47 of 262    PageID 2852

79

1    term of employment we have undone the Advisers Act's

2    imposition of an unwaivable fiduciary duty.

3         Your Honor, the order is void to the extent that it

4    attempts to do so.

5         This is not an ordinary employment agreement, Your Honor.

6    This is an attempt to exculpate someone from the key thing

7    that our entire investment system depends upon, regulation by

8    the SEC and the requirement in investment advisors to act as

9    fiduciaries when they manage the money of another.

10        It would be the equivalent of telling lawyers who are

11   appointed in a bankruptcy proceeding that they don't have any

12   duties to their client, or at least not fiduciary duties.

13   That the lawyers merely owe a duty not to be grossly negligent

14   to their clients.  That's not an ordinary term of employment,

15   Your Honor.

16             THE COURT:  All right.  So I guess we're back to my

17   question, was this brought within a reasonable time under Rule

18   60(c)?

19             MR. BRIDGES:  It was brought very quickly after the

20   new evidence was discovered at the end of March, Your Honor,

21   yes.

22             THE COURT:  Okay.  Well, I guess I'll just ask you

23   one more question before you continue on with your rebuttal

24   argument.  I mean, again, I want your best argument of why

25   *Villegas* doesn't absolutely permit the gatekeeping provisions

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01505-B    Document 14-13    Filed 03/04/22    Page 48 of 262    PageID 2953

80

1    that you're challenging.  And many cases were cited by Mr.

2    Pomerantz in his brief where courts have extended the *Barton*

3    doctrine to persons other than trustees.  And so what is your

4    best rebuttal to that?

5         MR. BRIDGES:  Your Honor, we've already given it.

6    I'm afraid --

7         THE COURT:  Okay.  If you don't want to say more, --

8         MR. BRIDGES:  -- what I have is not --

9         THE COURT:  -- I'm not going to make you say more.

10        MR. BRIDGES:  I --

11        THE COURT:  I'm just telling you what's on my brain.

12        MR. BRIDGES:  I do.  I want to -- I am apologizing in

13   advance for repeating, but yes, *Villegas*, *Villegas*, however

14   that case is pronounced, says that *Stern* is not an exception

15   to the *Barton* doctrine.

16        THE COURT:  Uh-huh.

17        MR. BRIDGES:  959(a) is an exception to the *Barton*

18   doctrine.  You are not operating under the *Barton* doctrine

19   here.  Even counsel's brief, the Debtor's brief, doesn't say

20   *Barton* applies.  It says it's consistent with *Barton*.

21        Your Honor, in our previous hearing, you directed me to

22   the second sentence of 959(a) because you believe it's what

23   empowers you to do the gatekeeping.  It limits the gatekeeping

24   that you can do by protecting jury rights, the right to trial,

25   says you cannot discharge, undo, deprive a litigant of their

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 143-3    Filed 06/20/23    Page 49 of 262    PageID 2554

81

1    right to a trial, a jury trial.

2              THE COURT:  Well, you mentioned it again, jury trial

3    rights.  Do you have any argument --

4              MR. BRIDGES:  Yes, Your Honor.

5              THE COURT:  -- of why that hasn't flown out the

6    window?

7              MR. BRIDGES:  Yes, Your Honor.  I am told that

8    Section 14(f) that counsel for the Debtor referred to is not a

9    waiver of jury rights at all.  It is an arbitration agreement.

10   Your Honor is probably familiar how arbitration agreements

11   work, is that they need not be elected.  They need not be

12   invoked by the parties.  When they are, they create a

13   situation where arbitration may be required.  But a waiver of

14   a jury right outside of arbitration is not part of this

15   arbitration clause, or of any.  The issue is not briefed or in

16   evidence before the Court.  We're relying on representations

17   of counsel as to what that provision contains.  That Mr. Seery

18   wasn't even a party to that agreement, the advisory agreement,

19   with the Charitable DAF.  The arbitration agreement is subject

20   to defenses that are not at issue here before the Court.  That

21   Movants' rights, their contractual rights to invoke the

22   arbitration clause, also appear to be terminated by the

23   orders' assertion of sole jurisdiction in this matter.

24        Your Honor, yes, our jury rights survive Section 14(f) in

25   the advisory agreement with the DAF for all of those potential

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01082-B   Document 13   Filed 06/01/22   Page 50 of 262   PageID 2455

82

 1   reasons.

 2        On top of that, it doesn't go to all of our causes of

 3   action.  It goes to the contract cause of action.  And to the

 4   extent they can argue that the other claims are subject to

 5   arbitration, that also is a defense and -- defensible and

 6   complex issue requiring the application of the Federal

 7   Arbitration Act, requiring consideration of the Federal

 8   Arbitration Act, which this Court doesn't have jurisdiction to

 9   do under 157(d).

10             THE COURT:  What?  Repeat that.

11             MR. BRIDGES:  Yes.  This Court does not have

12   jurisdiction to determine whether or not arbitration --

13   arbitration is enforceable due to the mandatory withdrawal of

14   the reference provisions of 157(d).

15             THE COURT:  That's just not consistent with Fifth

16   Circuit authority.  *National Gypsum*.  What are some of these

17   other arbitration cases?  I've written an article on it.  I

18   can't remember them.  That's just not right.  Bankruptcy

19   courts look at arbitration clauses all the time.  Motions to

20   compel arbitration.

21             MR. BRIDGES:  Your Honor, under 157(d), in the

22   circumstances of this case, if the Court is going to take into

23   consideration an arbitration clause under the Federal

24   Arbitration Act, when that clause is not in evidence and is

25   not before the Court, then Movants respectfully move to

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 13   Filed 04/01/22   Page 51 of 262   PageID 2456

83

1   withdraw the reference of your consideration of that issue and

2   of any proceeding and ask that you would issue only a report

3   and recommendation rather than an order on that issue.

4          THE COURT:  Okay.  I regret that we even got off on

5   this trail.  I'm sorry.  So just proceed with your rebuttal

6   argument as you had envisioned it, Mr. Bridges.

7          MR. BRIDGES:  Thank you, Your Honor.

8      Debtor's counsel says there's no private right of action

9   under the Advisers Act.  That is both inaccurate and

10  misleading.  The Advisory Act creates, imposes fiduciary

11  duties that state law provides the cause of action for.  It is

12  a state law breach of fiduciary duty claim regarding --

13  regarding fiduciary duties imposed as a matter of law by the

14  Investment Advisers Act that is Count One in the District

15  Court action.

16      Furthermore, that Act does create a private right of

17  action for rescission.  That would be rescission of the

18  advisory agreement with the Charitable DAF, not rescission of

19  the HarbourVest settlement.

20      Second, Your Honor, the notion that this Court has related

21  to jurisdiction is irrelevant and beside the point.  I would

22  like to note for the record that the District Court civil

23  cover sheet that omitted to state that this was a related

24  action has been corrected, has been amended, and that that has

25  taken place.

84

1       Counsel for the Debtor also appears to agree with us that

2   the order ought to be modified for having asserted exclusive

3   jurisdiction over colorable claims to the extent it's not

4   legally permissible to do.  And in trying to invoke the

5   discussions between us as to how the orders might be fixed,

6   what counsel does is tries to cabin the legally-permissible

7   caveat to just the second half of the paragraph at issue.  It

8   is both -- both portions, the gatekeeping and the subsequent

9   hearing of the claims, that should be limited to the extent it

10  would be impermissible legally for this Court to make those

11  decisions.

12      On top of that, Your Honor, merely stating "to the extent

13  legally permissible" would result in a considerable amount of

14  ambiguity in the order that would lead it, I fear, to be

15  unenforceable as a matter of law.

16      Next, Your Honor, when Debtor's counsel talks about the

17  authority in this case, it feels like we're ships passing in

18  the night.  He says that we're wrong in asserting that no case

19  we can find involves both the *Barton* doctrine and the

20  application of the business judgment rule where the Court is

21  asked to defer, and he mentions cases that apply the *Barton*

22  doctrine to an approval rather than an appointment.  The Court

23  is asked to --

24      (Garbled audio.)

25          THE COURT:  I lost you for a moment.  Could you

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 13-1   Filed 04/01/24   Page 53 of 262   PageID 2958

85

1    repeat the last 30 seconds?

2        MR. BRIDGES:  Thank you, Your Honor.  Yes.  He points

3    -- opposing counsel points us to case law where the *Barton*

4    doctrine has been applied despite the Bankruptcy Court having

5    merely approved rather than appointed the trustee or the, I'm

6    sorry, the professional.  But in doing so, he doesn't

7    reference any case that has done so in the context of business

8    judgment rule deference.  It's like we're ships passing in the

9    night.

10     What we're saying isn't that a mere approval can never

11    rise to the level of the *Barton* doctrine.  What we're saying

12    is that, in combination with the business judgment rule

13    deference, the two cannot go together.  There's no authority

14    for saying that they do.

15     We -- I further feel like we're ships passing in the night

16    when he talks about *Shoaf*.  Counsel says that in *Shoaf* there

17    was a confirmed final plan and it specifically identified the

18    released guaranty.  And yeah, that distinguishes it from this

19    case, just as it distinguished -- just as the *Applewood Chair*

20    case distinguished it when there's not that specific

21    identification.  And here, we don't even have a final plan

22    confirmation at the time these orders are being issued.

23    Without that express -- express notion of what the claims are

24    being discharged, *Shoaf* doesn't apply.

25     There, there was a guaranty to a party on a specific

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01599-B   Document 13-13   Filed 04/11/22   Page 54 of 262   PageID 23459

86

1    indebtedness that was listed, identified with specificity, and

2    disappeared as a result of the judgment, as a result of the

3    judgment in the underlying case.  Here, we're talking about

4    any potential claim that might arise in the future.  As of the

5    July order's issuance, it didn't apply on its -- either it

6    didn't apply to future claims that had not yet accrued or else

7    in violation of *Applewood Chair*, it was releasing claims

8    without identifying them.

9        Who does Seery owe a fiduciary duty to?  Is it, as

10   Debtor's counsel says, only to the funds and not to the

11   investors, or does he also owe those duties to the investors

12   as well?  Your Honor, that is going to be a hotly-contested

13   issue in this litigation, and it involves -- it requires

14   consideration of the Advisers Act and the multitude of

15   accompanying regulations.  To just state that his fiduciary

16   duties are limited in a way that couldn't affect anyone that

17   is -- whose claims are precluded by the July order is both

18   wrong on the law and is invoking something that will be a

19   hotly-contested issue that falls under 157(d), where, again,

20   this Court doesn't have the jurisdiction to decide that, other

21   than in a report and recommendation.

22       The order is legally infirm because it's issued without

23   jurisdiction for doing that as well.

24       Finally, Your Honor, I think (garbled) wrong direction

25   with a statement that suggests that Mr. Seery is an agent of

 1   the independent directors under the January order.  He is, in

 2   fact, not an independent agent -- not an agent of any of the

 3   independent directors, but, at most, of the company that is

 4   controlled by the board, not -- not of individual directors

 5   who could confer on him -- who could confer on him any

 6   immunity that they have obtained from the January order just

 7   by having appointed him.

 8       The proposed order from the other side failed to address

 9   either the ambiguity in the order or its attempt to exculpate

10   Mr. Seery from the liability, including liability for which

11   there is a jury trial right, and it is not a fix to the

12   problem for that reason.

13       In order to make the order enforceable and to fix its

14   infirmities, the Court would have to do significantly more.

15   It would have to both apply the caveat from the final

16   confirmation plan order, rope that caveat to the first part of

17   the relevant paragraph, as well as the second part, and it

18   would have to provide directive clarity to be enforceable

19   rather than too vague.

20       Your Honor, I think that's all I have.

21           THE COURT:  Okay.  Just FYI, my law clerk pulled the

22   *Smyth* case from 21 years ago from the Fifth Circuit.  And

23   while it more prominently deals with the issue of whether

24   trustees -- in this case, it was a Chapter 11 trustee -- could

25   be subjected to personal liability for damages to the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01802-B   Document 13-13   Filed 09/04/16 735 Page 56 of 262   PageID 2861

88

```
 1   bankruptcy estate --

 2        (Echoing.)

 3            THE COURT:  Someone, put your phone on mute.  I don't

 4   know who that is.

 5        It dealt with, you know, the standard of liability, that

 6   the trustee could not be sued for matters not to the level of

 7   gross negligence.

 8        But it does say, in the very last paragraph, to my shock

 9   and amazement, that -- it's just one sentence in a 10-page

10   opinion -- orders appointing counsel -- and it was talking

11   about the trustee's lawyer he hired to handle appeals to the

12   Fifth Circuit -- orders appointing counsel under the

13   Bankruptcy Code are interlocutory and are not generally

14   considered final and appealable.  And it cites one case from

15   1993, the Middle District of Florida.  Live and learn.  There

16   is one sentence in that opinion that says that.  But I don't

17   know that it's hugely impactful here, but I did not know about

18   that opinion and I'm rather surprised.

19        All right.  You were going to walk me through evidence,

20   you said?

21            MR. BRIDGES:  Well, do I -- Your Honor, do you want

22   to do that first before I submit --

23            THE COURT:  Yes, please.

24            MR. BRIDGES:  -- my rebuttal argument?

25            THE COURT:  Please.
```

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 14-13   Filed 06/20/22   Page 57 of 262   PageID 2862

89

 1              MR. BRIDGES:  Okay.

 2              THE COURT:  Uh-huh.

 3              MR. BRIDGES:  Your Honor, we would submit and offer

 4     Exhibits 1 through 44, with the exception of those that have

 5     been withdrawn, that are 2, 13 --

 6              THE COURT:  Okay.  Slow down.  Slow down.  I need to

 7     get to the docket entry number we're talking about.  Are we

 8     talking -- are your -- the Debtor's exhibits are at 2412.  But

 9     Nate, I misplaced my notes.  Where are Charitable DAF and

10     Holdco's?

11              THE CLERK:  I have 2411.

12              THE COURT:  2411?  Is that it?

13              MR. BRIDGES:  2420, Your Honor.

14              THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15     2420?

16              MR. BRIDGES:  Yes, Your Honor.

17              THE COURT:  Okay, I'm there.  And it's which

18     exhibits?

19              MR. BRIDGES:  It's Exhibits 1 through 44, Your

20     Honor, with four exceptions.  We have agreed to withdraw

21     Exhibit 2, 13, 14, and 29.

22              THE COURT:  All right.

23              MR. BRIDGES:  Also, Your Honor, we'd like to submit

24     Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25     would be anything offered by the other side.  But we'd like

1    to make sure that Debtor's Exhibit 1 gets in the record as

2    well.

3              THE COURT:  Let me back up.  When I pull up the

4    docket entry you just told me, I have Exhibits 44, 45, and 46

5    only.  Am I misreading this?

6              MR. BRIDGES:  I have a chart showing Exhibits 1

7    through 49 titled Docket 2420 filed 6/7/21.

8              THE COURT:  Okay.  The docket entry number you told

9    me, 2420, it only has three exhibits:  44, 45, and 46.  So,

10   first off, I understand -- are you offering 45 and 46 or not?

11             MR. BRIDGES:  No, Your Honor.

12             THE COURT:  Okay.  So you said you were offering 1

13   through 44 minus certain ones.  44 is here.

14             MR. BRIDGES:  Yes.

15             THE COURT:  But I've got to go back to a different

16   docket number.

17             THE CLERK:  It's actually 2411.

18             THE COURT:  It's at 2411.  That has all the others?

19             THE CLERK:  Yes.

20             THE COURT:  Okay.

21        So, Mr. Pomerantz, do you have any objection to Exhibits

22   1 through 44, which he's excepted out 2, 13, 14, and 29, and

23   then he's added Debtor's Exhibit 1?  Any objection?

24             MR. POMERANTZ:  I don't believe so.  I just would

25   confirm with John Morris, who has been focused on the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 43-3   Filed 06/04/21 Page 59 of 262   PageID 2364

91

1   exhibits, just to confirm.

2              THE COURT:  Mr. Morris?

3              MR. MORRIS:  No objection, Your Honor.  It's fine.

4              THE COURT:  Okay.  They're admitted.

5         (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

6   through 44 are received into evidence.  Debtor's Exhibit 1 is

7   received into evidence.)

8              THE COURT:  So, any --

9              MR. BRIDGES:  Thank you, Your Honor.

10             THE COURT:  Anything you wanted to call to my

11  attention about these?

12             MR. BRIDGES:  Your Honor, the things that we

13  mentioned in the argument, for sure, but especially that the

14  word "trustee" is not used in the January hearing's

15  transcript, nor is it under discussion in that transcript

16  that it would be a trustee-like role being played by the

17  Strand directors, as well as the transcript of the July

18  hearing on the order at issue here, Your Honor, where you are

19  asked to defer both in that transcript and in the motion, the

20  motion that was at issue in that hearing, you are asked to

21  defer to the business judgment of the company.

22        And finally, Your Honor, I'd ask you to look at the

23  allegations in the District Court complaint.

24             THE COURT:  All right.

25        Mr. Pomerantz or Morris, let's see what exhibits you're

1  wanting the Court to consider.  Your exhibits, it looks like,

2  are at Docket Entry 2412.

3          MR. MORRIS:  As subsequently amended at 2423.

4          THE COURT:  Oh.  All right.  So which ones are you

5  offering?

6          MR. MORRIS:  We're offering all of the exhibits on

7  2423, which is 1 through 17.

8      (Echoing.)

9          THE COURT:  Whoops.  We got some distortion there.

10  Say again?

11          MR. MORRIS:  Yeah.  All of the exhibits that are on

12  2423, which are Exhibits 1 through 17.  But I want to make

13  sure that, as I did earlier, that that has the exhibits that

14  we're relying on.  Does that --

15      (Pause.)

16          THE COURT:  Okay.  Let me make sure I know what's

17  going on here.  You're double-checking your exhibits, Mr.

18  Morris?

19          MR. MORRIS:  Yes, Your Honor.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, we start with Docket No.

23  2419, --

24          THE COURT:  Okay.

25          MR. MORRIS:  -- which was the amended exhibit list.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01802-B   Document 14-13   Filed 09/05/21   Page 61 of 262   PageID 2366

93

1    And that actually had Exhibits 1 through 17.  And then that

2    was amended at Docket 2423.  So, the exhibits on both of

3    those lists.

4            THE COURT:  Well, they're one and the same, it looks

5    like, right?

6            MR. MORRIS:  Yes.

7            THE COURT:  Okay.  So you're offering those?

8            MR. MORRIS:  I think -- yeah.

9            THE COURT:  Any objection?

10           MR. BRIDGES:  No objection.

11           THE COURT:  All right.  They're admitted.

12        (Debtor's Exhibits 1 through 17 are received into

13   evidence.)

14           MR. POMERANTZ:  Your Honor, if I may take a few

15   moments to respond to Mr. Bridges' reply?

16           THE COURT:  All right.   Is he still within his hour

17   and a half?

18           THE CLERK:  At an hour and one minute.

19           THE COURT:  Okay.  All right.  You have a little

20   time left, so go ahead.

21           MR. POMERANTZ:  Thank you, Your Honor.

22        So look, I -- it sort of was really not fair to us.  Mr.

23   Bridges was really making things up on the fly.  He was

24   changing the theories of his case and responding to Your

25   Honor.  But I'm going to do my best to respond to the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-01503-B   Document 14-13   Filed 06/21/23   Page 62 of 262   PageID 2867

94

1    arguments made, many of which I sort of anticipated.

2        I'll first start with the issue that Your Honor raised,

3    which was whether this is under Rule 60 or not.  Mr. Bridges

4    identified a couple of cases, said that the order was

5    interlocutory, said that somehow the orders have anything to

6    do with a plan confirmation order.  They do not.  Your Honor

7    didn't hear that argument at the plan confirmation.  The

8    January 9th and July 16th orders are old and cold.  There's

9    an exculpation provision in the plan.  There's a gatekeeper

10   in the plan.  The provisions do not overlap entirely.  The

11   gatekeeper applies prospectively.  The exculpation provision

12   includes additional parties.

13       So the arguments that basically the plan had anything to

14   do -- and the fact that the plan is not a final order -- has

15   anything to do with the January 9th and July 16th orders is

16   just wrong.  It's just wrong.

17       More fundamentally, Your Honor, as Your Honor pointed

18   out, the *Smyth* case is a professional employment order.  And

19   ironically, if you abide by the *Smyth* case, that order is

20   never appealable because it's interlocutory.

21       But more fundamentally, Your Honor, that's dealing with

22   327 professionals.  And again, there's not much analysis in

23   the *Smyth* case, but we're not dealing with a 327

24   professional.  We're dealing with orders that were approved

25   under 363.

95

1    So the premise of the argument that Rule 60(b) -- 60

2    doesn't apply and they have other arguments just doesn't make

3    any sense.

4    Okay.  So now that gets us to Rule 60.  And Your Honor,

5    Your Honor hit the nail on the head.  They haven't presented

6    any evidence.  Allegations in a complaint aren't evidence.

7    They can't stand up there and say surprise evidence.  They

8    had the opportunity -- and this hearing's been continued a

9    few weeks -- they had the opportunity to bring it up, and

10   it's -- they had the opportunity to claim that there was

11   surprise, but they just didn't.  Okay?

12   So to go on to the Rule 60 arguments.  Surprise.

13   Surprise and reasonable delay are really -- go hand in hand

14   with Mr. Bridges' argument.  He says, well, we didn't find

15   out that -- months after the order was entered that he

16   violated a duty to us, so we are surprised by that, and it's

17   a reasonable time.  Well, Your Honor, the order provided for

18   an exculpation.  CLO Holdco and DAF knew that it applied to

19   an exculpation.  They were bound.  They knew based upon that

20   order that they would not be able to bring claims for normal

21   negligence.  There is no surprise.

22   If you take Mr. Bridges' argument to its conclusion, he

23   could wait until the end of the statute of limitations after

24   an order and have come in four years from now and say, Your

25   Honor, we just found out facts so we should go back four

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 13-3   Filed 08/04/22   Page 64 of 262   PageID 2869

96

 1    years before.  That, Your Honor, that's not how the surprise

 2    works.  That's not how the reasonable time works.

 3        Mr. Bridges did not contest that they're bound by res

 4    judicata.  He did not contest that the exculpation itself was

 5    clear and unambiguous.  Of course he argued Your Honor

 6    couldn't enter an order saying there was exculpation, again,

 7    with no authority.  And he seemed surprised, as I suspect he

 8    should, since he's not a bankruptcy lawyer, that retention

 9    orders, whether it's investment bankers, financial advisors,

10    include exculpations all the time.  So there's no grounds

11    under surprise.

12        There's no grounds -- the motions are late under 60(c).

13        And they're not void.  I went through a painstaking

14    analysis, Your Honor, and I described in detail what the

15    *Espinosa* case held, and the exceptional circumstances which

16    Mr. Bridges tried to get away from as much as he could.

17    Maybe he can try to get away from language in a district

18    Court opinion, in a Bankruptcy Court opinion, in a Circuit

19    Court opinion.  You can't get away from language in a Supreme

20    Court opinion.  The Supreme Court opinion said exceptional

21    circumstances, where there was arguably no basis for

22    jurisdiction for what the Court did.  They have not even come

23    close to convincing Your Honor that there was absolutely no

24    basis.

25        Now, they disagree.  We granted, we think it's a good-

1   faith disagreement, but they haven't come close to

2   establishing the *Espinosa* standard, so their motion under 60

3   does not -- it fails.

4        And I don't think -- look, these are good lawyers.  Mr.

5   Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6   inadvertently not mention Rule 60.  They never mentioned it

7   because they knew they had no claim under Rule 60.

8        Your Honor, Mr. Bridges has made comments about the

9   fiduciary duty of Mr. Seery, about what the Investor's Act

10   provides.  He's just wrong on the law.  Now, Your Honor

11   doesn't have to decide that.  Whichever court adjudicates the

12   DAF lawsuit will have to decide it.  But there is no private

13   cause of action for damages.  There are no fiduciary duties to

14   the investors.

15        And what Mr. Bridges doesn't even mention, in that the

16   investment agreement that's so prominent in his complaint,

17   they waived claims other than willful misconduct and gross

18   negligence against Highland.  They waived those claims.  So

19   for Mr. Bridges to come in here and argue that there's some

20   surprise, when he hasn't even bothered to look at the document

21   that's underlying the contractual relationship between the DAF

22   and the Debtor, is -- you know, I'll just say it's

23   inadvertence.

24        Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25   not a beneficiary of the January 9th order.  He's not an

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01585-B    Document 13-3    Filed 10/06/21    Page 66 of 262    PageID 2871

98

1    agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2    Your Honor and we were.  On January 9th, an independent board

3    was picked, and at the time Mr. Dondero ceased to become the

4    CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5    Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6    chaotic time.  They had to act through their agents.  There

7    was no expectation that this board was going to actually run

8    the day-to-day operations of the Debtor.  Of course not.  They

9    needed someone to run.  And they picked Mr. Seery.  And the

10   argument that well, he's an agent of the company, he's not an

11   agent of the board, that just doesn't make sense.  The

12   independent board had to act.  The directors had to act.  And

13   the directors, how do they deal with that?  They acted through

14   Mr. Seery.  So he is most certainly governed by the January

15   9th order.

16       Your Honor, I want to talk about the jury trial right.

17   Mr. Bridges said that Paragraph 14 is an arbitration clause

18   and not a jury trial waiver.  Now, again, I will forgive Mr.

19   Bridges because I assume he didn't read the provision, okay,

20   and he -- somebody told him that, and that person just got it

21   wrong.  But what I would like to do is read for Your Honor

22   Paragraph 14(f).  It doesn't have to do with arbitration.

23   It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24   Waiver of Jury Trial.  The parties hereby agree that any

25   action, claim, litigation, or proceeding of any kind

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 43-13    Filed 09/07/23    Page 67 of 262    PageID 2872

99

1    whatsoever against any other party in any way arising from or

2    relating to this agreement and all contemplated transactions,

3    including claims sounding in contract, equity, tort, fraud,

4    statute defined as a dispute shall be submitted exclusively to

5    the U.S. District Court for the Northern District of Texas, or

6    if such court does not have subject matter jurisdiction, the

7    courts of the State of Texas, City of Dallas County, and any

8    appellate court thereof, defined as the enforcement court.

9    Each party ethically and unconditionally submits to the

10   exclusive personal and subject matter jurisdiction of the

11   enforcement court for any dispute and agrees to bring any

12   dispute only in the enforcement court.  Each party further

13   agrees it shall not commence any dispute in any forum,

14   including administrative, arbitration, or litigation, other

15   than the enforcement court.  Each party agrees that a final

16   judgment in any such action, litigation, or proceeding is

17   conclusive and may be enforced through other jurisdictions by

18   suit on the judgment or in any manner provided by law.

19        And then the kick, Your Honor, all caps, as jury trial

20   waiver always are:  Each party irrevocably and unconditionally

21   waives to the fullest extent permitted by law any right it may

22   have to a trial by jury in any legal action, proceeding, cause

23   of action, or counterclaim arising out of or relating to this

24   agreement, including any exhibits, schedules, and appendices

25   attached to this agreement or the transactions contemplated

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01590-B    Document 13-3    Filed 06/03/22    Page 68 of 262    PageID 2873

100

1  hereby.  Each party certifies and acknowledges that no

2  representative of the owner of the other party has represented

3  expressly or otherwise that the other party won't seek to

4  enforce the foregoing waiver in the event of a legal action.

5  It has considered the implications of this waiver, it makes

6  this waiver knowingly and voluntarily, and it has been induced

7  to enter into this agreement by, among other things, the

8  mutual waivers and certifications in this section.

9      Your Honor, I will forgive Mr. Bridges.  I assume he just

10  did not read that.  But to represent to the Court that that

11  language does not contain a jury trial waiver is -- is just

12  wrong.

13          THE COURT:  All right.  I'm going to stop right

14  there.  And you were reading from the Second Amended and

15  Restated Shared Services Agreement between Highland --

16          MR. POMERANTZ:  Not shared services.  I'm reading

17  from the Second Amended and Restated Investment Advisory

18  Agreement --

19          THE COURT:  Investment --

20          MR. POMERANTZ:  -- between the Charitable DAF, the

21  Charitable DAF GP, and Highland Capital Management.  The

22  agreement whereby the Debtor was the investment advisor to the

23  Charitable DAF Fund and the Charitable DAF GP.

24          THE COURT:  All right.  Well, Mr. Bridges, I'm going

25  to bounce quickly back to you.  This is your chance to defend

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 31-3   Filed 06/01/22   Page 69 of 262   PageID 2874

101

 1 | your honor.

 2 |         MR. BRIDGES:  Yeah, we're -- we're looking at a

 3 | different agreement, where -- where literally the words that

 4 | were read to you are not in the agreement in front of us and

 5 | it is news to me.  So, Your Honor, this is a problem --

 6 |         THE COURT:  What is the agreement you're looking at?

 7 |         MR. BRIDGES:  It is the Amended -- I assume that

 8 | means First Amended -- Restated Advisory Agreement.

 9 |         MR. POMERANTZ:  Your Honor, we are happy to file this

10 | agreement with the Court so the Court has the benefit of it in

11 | connection with Your Honor's ruling.

12 |         THE COURT:  Okay.  I would like you to do that.  Uh-

13 | huh.

14 |         MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15 | withdraw that.

16 |         THE COURT:  Okay.  Go on, Mr. Pomerantz.

17 |         MR. POMERANTZ:  Mr. Bridges, if you could put us on

18 | mute.  If you could put us on mute, Mr. Bridges, so I don't

19 | hear your feedback.  Thank you.

20 |     Mr. Bridges also complains about the language "to the

21 | extent permissible by law."  As Your Honor knows and as has

22 | been my practice over 30 years, that language is probably in

23 | every plan where there's a retention of jurisdiction:  to the

24 | extent permissible by law.  And Mr. Bridges says that this

25 | will create ambiguity in the order that couldn't be enforced.

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01508-B    Document 13    Filed 06/01/22    Page 70 of 262    PageID 2875

102

1    There's no basis for that.  Our including the language "to the

2    extent permissible by law" in the orders, as we are prepared

3    to do, is consistent with the plan confirmation order where we

4    addressed that issue.  And we addressed that issue because we

5    didn't want to put Your Honor in a position where thereby Your

6    Honor may have an action before Your Honor that passes the

7    colorability gate that Your Honor may not be able to assert

8    jurisdiction.  And since jurisdiction can't be waived in that

9    regard, we will agree to amend that.

10        There's nothing ambiguous about that, and there's no

11    reason, though, that clause has to modify the Court's ability

12    to act as a gatekeeper, because, as we've argued *ad nauseam*,

13    gatekeeper provisions where the Court has that ability is not

14    only part of general bankruptcy jurisprudence but also part of

15    the Bankruptcy Code.

16        Counsel says that *Barton* doesn't apply because the

17    business judgment of Your Honor was used in retaining Mr.

18    Seery as opposed to in some other capacity.  There's no basis

19    for that, Your Honor.  A court-appointed -- a court-approved

20    CEO, CRO, professional, they are all entitled to protection

21    under the *Barton* act.  And the argument -- and again, this is

22    separate and apart from whether he's entitled to protection

23    under the January 9th order. But the argument that because it

24    was the business judgment -- again, business judgment in doing

25    something that Your Honor expressly contemplated under the

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01590-B   Document 13-13   Filed 06/02/22   Page 71 of 262   PageID 2876

103

1    January 9th corporate governance order -- there's just no law

2    to support that.  And I guess he's trying to get around the

3    plethora of cases that deal with the situation where *Barton*

4    has been extended.

5        Your Honor, Mr. Bridges, again, in arguing that we're

6    ships passing in the night on *Shoaf* and *Applewood* and

7    *Espinosa*, no, we're not ships passing in the night.  We have a

8    difference in agreement on what these cases stand for.  These

9    cases stand for the proposition that a clear and unambiguous

10   provision, plain and simple, if it's clear and unambiguous, it

11   will be given res judicata effect.  The release in *Shoaf*,

12   clear and unambiguous.  The release in *Applewood*, not.  The

13   issue here is the exculpation language.  That was clear and

14   unambiguous.  It applied prospectively.  The argument makes no

15   sense that we didn't identify -- we didn't identify claims

16   that might arise in the future, so therefore an exculpation

17   clause doesn't apply?  That doesn't make any sense.

18       Your Honor clearly exculpated parties.  Mr. Dondero knew

19   it.  CLO Holdco knew it.  The DAF knew it.  So the issue Your

20   Honor has to decide is whether that exculpation was a clear

21   and unambiguous provision such that it should be entitled to

22   res judicata effect.  And we submit that the answer is

23   unequivocally yes.

24       That's all I have, Your Honor.

25           THE COURT:  All right.  Well, --

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 43-13   Filed 06/02/22   Page 72 of 262   PageID 22877

104

1              MR. MORRIS:  Your Honor?  I apologize.

2              THE COURT:  Okay.

3              MR. MORRIS:  This is John Morris.

4              THE COURT:  Yes?

5              MR. MORRIS:  I just want to, with respect to the

6   exhibits, I know there was no objection, but I had cited to

7   Docket Nos. 2419 and 2423.  The original exhibit list is at

8   Docket No. 2412.  So it's the three of those lists together.

9   2412, as amended by 2419, as amended by 2423.  Thank you very

10  much.

11             THE COURT:  All right.  Thank you.  All right.

12             MR. BRIDGES:  Your Honor, I still have no objection

13  to that, but may I have the last word on my motion?

14             THE COURT:  Is there time left?

15             THE CLERK:  Yes.

16             THE COURT:  Okay.  Go ahead.

17             MR. BRIDGES:  I just need a minute, Your Honor.  They

18  agreed to change the order.  They proposed it to us.  They

19  proposed it in a proposed order to you.  They can't also say

20  that it cannot be changed.

21       Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22  580, the Eastern District of Virginia points out that the

23  Fourth Circuit treats appointment of estate professionals as

24  interlocutory orders as well.

25       That's all.  Thank you, Your Honor.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01523-B   Document 43-13   Filed 06/06/23   Page 73 of 262   PageID 2878

105

1          THE COURT:  All right.  Here's what we're going to

2    do.  We've been going a very long time.  I'm going to take a

3    break to look through these exhibits, see if there's anything

4    in there that I haven't looked at before and that might affect

5    the decision here.  So we will come back at 3:00 o'clock

6    Central Time -- it's 2:22 right now -- and I will give you my

7    bench ruling on this.  All right.

8       So, Mike, they can all stay on the line, right?

9       Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10          THE CLERK:  All rise.

11       (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Please be seated.  All right.

14   Everyone presented and accounted for.  We're going back on the

15   record.

16          MR. POMERANTZ:  Your Honor, before you start, this is

17   Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18   got to you, a copy of the Second Amended and Restated

19   Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20   it as well.  And we would also like to move that into

21   evidence, just so that it's part of the Court's record.

22          THE COURT:  All right.

23          MR. BRIDGES:  We would object to that, Your Honor.

24   We haven't had an opportunity to even verify its authenticity

25   yet.

002567

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01590-BB   Document 1-13   Filed 06/04/21   Page 74 of 262   PageID 2879

106

1           THE COURT:  All right.  Well, I'll tell you what.

2   I'm going to address this in my ruling.  So it's not going to

3   be part of the record for this decision, and yet -- well, I'll

4   get to it.

5       All right.  So we're back on the record in Case Number 19-

6   34054, Highland Capital.  The Court has deliberated, after

7   hearing a lot of argument and allowing in a lot of documentary

8   evidence, and the Court concludes that the motion of CLO

9   Holdco, Ltd. and The Charitable DAF to modify the retention

10  order of James Seery, which was entered almost a year ago, on

11  July 16th, 2020, should be denied.

12      This is the Court's oral bench ruling, but the Court

13  reserves discretion to supplement or amend in a more fulsome

14  written order what I'm going to announce right now, pursuant

15  to Rule 7052.

16      First, what is the Movants' authority to request the

17  modification of a bankruptcy court order that has been in

18  place for so many months, which was issued after reasonable

19  notice to the Movants, and after a hearing, which was not

20  objected to by the Movants, or appealed, when the Movants were

21  represented by sophisticated counsel, I might add, and which

22  order was relied upon by parties in this case, most notably

23  Mr. Seery and the Debtor, and in fact was entered after

24  significant negotiations involving a sophisticated court-

25  appointed Unsecured Creditors' Committee with sophisticated

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:23-cv-00582-B   Document 13-3   Filed 06/26/13   Page 75 of 262   PageID 2880

107

1   professionals and sophisticated members, and after negotiation

2   with an independent board of directors, court-appointed, one

3   of whose members is a retired bankruptcy judge?  What is the

4   Movants' authority?

5        Movants fumbled a little on that question, in that the

6   exact authority wasn't set forth in the motion.  But Movants'

7   primary argument is that Movants think the Seery retention

8   order was an interlocutory order and that the Court simply has

9   the inherent authority to modify it as an interlocutory order.

10       The Court disagrees with this analysis.  I do not think

11  the Fifth Circuit's *Smyth* case dictates that the Seery

12  retention order is still interlocutory.  The Seery retention

13  order was an order entered pursuant to Section 363 of the

14  Bankruptcy Code, not a Section 327 professionals to a debtor-

15  in-possession, professionals to a trustee employment order

16  such as the one involved in the *Smyth* case.

17       But even if the Seery retention order is interlocutory --

18  the Court feels strongly that it's not, but even if it is --

19  the Court believes it would be an abuse of this Court's

20  inherent discretion or authority to modify that order almost a

21  year after the fact and under the circumstances of this case.

22       Now, assuming Rule 60(b) applies to the Movants' request,

23  the Court determines that the Movants have not made their

24  motion anywhere close to within a reasonable time, as Rule

25  60(c) requires, nor do I think the Movants have demonstrated

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01505-B   Document 13-3   Filed 09/06/22   Page 76 of 262   PageID 2381

108

1    any exceptional circumstances to declare the order or any of

2    its provisions void.  The Movants have put on no evidence that

3    constitutes surprise or constitutes newly-disputed evidence.

4    So why are there no exceptional circumstances here such that

5    the Court might find, you know, a void order or void

6    provisions of an order?

7        First, this Court concludes that there's no credible

8    argument that the Court overreached its jurisdiction with the

9    gatekeeping provisions in the order.  Gatekeeping provisions

10   are not only very common in the bankruptcy world -- in

11   retention orders and in plan confirmation orders, for example

12   -- but they are wholly consistent with the *Barton* case, the

13   U.S. Supreme Court's *Barton's* case, and its progeny that has

14   become known collectively as the *Barton* doctrine.  Gatekeeping

15   provisions are wholly consistent with 28 U.S.C. Section

16   959(a)'s complete language.

17       The Fifth Circuit has blessed gatekeeping provisions in

18   all sorts of contexts.  It has blessed them in the situation

19   of when *Stern* claims are involved in the *Villegas* case.  It

20   even blessed Bankruptcy Courts' gatekeeping functions a long

21   time ago, in 1988, in a case that I don't think anyone

22   mentioned in the briefing, but as I've said, my brain

23   sometimes goes down trails, and I'm thinking of the *Louisiana*

24   *World Exposition* case in 1988, when the Fifth Circuit blessed

25   there a procedure where an unsecured creditors' committee can

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01802-B   Document 13-3   Filed 06/07/23   Page 77 of 262   PageID 2882

109

 1    bring causes of action against persons, such as officers and

 2    directors or other third parties, if they first come to the

 3    Bankruptcy Court and show a colorable claim.  They have to

 4    come to the Bankruptcy Court, show they have a colorable claim

 5    and they're the ones that should be able to pursue them.  Not

 6    exactly on point, but it's just one of many cases that one

 7    could cite that certainly approve gatekeeper functions of

 8    various sorts of Bankruptcy Courts.

 9         It doesn't matter which court might ultimately adjudicate

10    the claims; the Bankruptcy Court can be the gatekeeper.

11         And the Court agrees with the many cases cited from

12    outside this circuit, such as the case in Alabama, in the

13    Eleventh Circuit, and there was another circuit-level case, at

14    least one other, that have held that the *Barton* doctrine

15    should be extended to other types of case fiduciaries, such as

16    debtor-in-possession management, among others.

17         Finally, as I pointed out in my confirmation ruling in

18    this case, gatekeeping provisions are commonplace for all

19    types of courts, not just Bankruptcy Courts, when vexatious

20    litigants are involved.  I have commented before that we seem

21    to have vexatious litigation behavior with regard to Mr.

22    Dondero and his many controlled entities.

23         Now, as far as the Movants' argument that there was not

24    just improper gatekeeping provisions but actually an improper

25    discharge in the Seery retention order of negligence claims or

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01584-B   Document 13-1   Filed 06/02/22   Page 78 of 262   PageID 2883

110

1  other claims that don't rise to the level of gross negligence

2  or willful misconduct, again, I reiterate there's nothing

3  exceptional in the bankruptcy world about exculpation

4  provisions like this.  They absolutely are a term of

5  employment very often.  Just like compensation, they're

6  frequently requested, negotiated, and approved.  They are

7  normal in the corporate governance world, generally.  They are

8  normal in corporate contracts between sophisticated parties.

9  And most importantly of all, even if this Court overreached

10  with the exculpation provisions in the Seery retention order,

11  even if it did, res judicata bars the attack of these

12  provisions at this late stage, under cases such as *Shoaf,*

13  *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14  case from the U.S. Supreme Court, and even *Applewood*, since

15  the Court finds the language in this order was clear,

16  specific, and unambiguous with regard to the gatekeeping

17  provisions and the exculpation provisions.

18      Last, and this is the part where I said I'm going to get

19  to this agreement that has been submitted, the Second Amended

20  and Restated Investment Advisor Agreement or whatever the

21  title is.  I am more than a little disturbed that so much of

22  the theme of the Movants' pleadings and arguments, and I think

23  even representations to the District Court, have been they

24  have these sacred jury trial rights, these inviolate jury

25  trial rights, and an Article I Court like this Court should

002572

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01508-B   Document 18-13   Filed 06/01/22   Page 79 of 262   PageID 2384

111

1 have no business through a gatekeeping provision impinging on

2 the possible pursuit of an action where there's a jury trial

3 right.

4     I was surprised initially when I thought about this.  I

5 thought, wow, I've seen so many agreements over the months.  I

6 can't say every one of them waived the jury trial right, but I

7 just remembered seeing that a lot, and seeing arbitration

8 provisions, and so that's why I asked.  It just was lingering

9 in my brain.  So I'm going to look at what is submitted.  I'm

10 not relying on that as part of my ruling.  As you just heard,

11 I had a multi-part ruling, and whether there's a jury trial

12 right or not is irrelevant to how I'm choosing to rule on this

13 motion.  But I do want to see the agreement, and then I want

14 Movants within 10 days to respond with a post-hearing trial

15 brief either saying you agree that this is the controlling

16 document or you don't agree and explain the oversight, okay?

17 Because it feels like a gross omission here to have such a

18 strong theme in your argument -- we have a jury trial right,

19 we have a jury trial right, by God, the gatekeeping

20 provisions, among other things, impinge on our sacred pursuit

21 of our jury trial right -- and then maybe it was very

22 conspicuous in the controlling agreement that you'd waived

23 that, the Movants had waived that.

24     So, anyway, I'm requiring some post-hearing briefing, if

25 you will, on whether omissions, misrepresentations were made

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01638-B   Document 13-3   Filed 09/07/21   Page 80 of 262   PageID 2885

112

1   to the Court.

2        Anyway, so I reserve the right to supplement or amend this

3   ruling with a more fulsome written order.  I am asking Mr.

4   Pomerantz to upload a form of order that is consistent with

5   this ruling, and --

6             MR. POMERANTZ:  Your Honor, we will do so.  I do have

7   one thing to bring to the Court's attention, unrelated to the

8   motion, before Your Honor leaves the bench.

9             THE COURT:  All right.  So just a couple of follow-up

10  things.  Have you -- I'm not clear I heard what you said about

11  this agreement.  Did you email it to my courtroom deputy or

12  did you file it on the docket?

13            MR. POMERANTZ:  We emailed it to your courtroom

14  deputy.  We're happy to file it on the docket.  And we also

15  provided a copy to Mr. Sbaiti.

16       I would note for the Court that it's signed both by The

17  Charitable DAFs by Grant Scott, just for what it's worth.

18            THE COURT:  Okay.  All right.  Well, I'm trying to

19  think what I want -- I do want you to file it on the docket,

20  and I'm trying to think of what you label it.  Just call it

21  Post-Hearing Submission or something and link it to the motion

22  that we adjudicated here today.  And then, again, you've got

23  10 days, Mr. Bridges, to say whatever you want to say about

24  that agreement.

25       I guess the last thing I wanted to say is we sure devoted

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 43-13   Filed 09/01/21   Page 81 of 262   PageID 2886

113

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10  courts involved in the administration of this case, I'm going

11  to make a very thorough record so nobody is confused about

12  what we did, what I considered, what my reasoning was.

13       So I kind of think it's unfortunate for us to have to

14  spend case resources and so much time and fees on things like

15  this, but I'm going to make sure a Court of Appeals is not

16  ever confused about what happened and what we did.  So that's

17  just the way it's going to be.  And I feel like we have no

18  choice, given, again, the pattern of appeals.

19       All right.  So, with that, Mr. Pomerantz, you had one

20  other case matter, you said?

21            MR. POMERANTZ:  Yes.  But before I get to that, Your

22  Honor, I assume that, in response to the Movants' submission

23  on the agreement, that we would have right at four or seven

24  days to respond if we deem it's appropriate?

25            THE COURT:  I think that's reasonable.  That's

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01527-B   Document 43-3   Filed 09/21/22   Page 82 of 262   PageID 2887

114

 1  reasonable.

 2          MR. POMERANTZ:  Okay.  Thank you, Your Honor.

 3          THE COURT:  So let me think of how I want to do this.

 4  I'll just do a short scheduling order of sorts that just, it

 5  says in one or two paragraphs, at the hearing on this motion,

 6  the Court raised questions about the jury trial rights and the

 7  Debtor has now submitted the controlling agreements, I'm

 8  giving the Movants 10 days to respond to whether this is

 9  indeed a controlling agreement, and why, if it is, the Movants

10  have heretofore taken the position they have jury trial

11  rights.  And then I will give you seven days thereafter to

12  reply, and then the Court will set a further status conference

13  if it determines it's necessary.  Okay?

14      So, Nate, we'll do a short little order to that effect.

15  Okay?

16          MR. POMERANTZ:  Thank you, Your Honor.

17      I -- again, before I raise the other issue, I want to pick

18  up on a comment Your Honor just made towards the end.  I know

19  the Court has been frustrated with the time and effort we've

20  been spending.  The Debtor and the creditors have been

21  extremely frustrated, because in addition to the time and

22  effort everyone's spending, we're spending millions of

23  dollars, millions of dollars on litigation that --

24          THE COURT:  It's one of the reasons you needed an

25  exit loan, right?

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:23-cv-01503-B    Document 43-13    Filed 06/07/16    Page 83 of 262    PageID 23788

115

1          MR. POMERANTZ:  Right.  No, exactly.  That's

2    frivolous, that we think is made in bad faith.

3          And Your Honor, and everyone else who's hearing this on

4    behalf of Mr. Dondero, should understand we're looking into

5    what appropriate authority Your Honor would have to shift some

6    of the costs.  Your Honor did that in the contempt motion.

7    Your Honor can surely do that in connection with the notes

8    litigation.  But all this other stuff that is requiring us to

9    spend hundreds and hundreds of hours and spend millions of

10   dollars, we are clearly looking into whether it would be

11   appropriate and what authority there is.  I just wanted to let

12   Your Honor know that.

13         And in connection with that, the last point, Your Honor, I

14   can't actually even believe I'm saying this, but there was

15   another lawsuit filed -- we just found out in the break -- on

16   Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17   District Court.

18         Now, to make matters worse, Your Honor, the litigation

19   relates to alleged improper management by the Debtor of Multi-

20   Strat.  If Your Honor will recall, at many times I've told

21   this Court what Dugaboy's claims they filed in this case.

22   Dugaboy has a claim that is filed in this case for

23   mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24   firm, in addition to representing CLO Holdco, in addition to

25   representing the DAF, and whatever the Plaintiffs' lawyers are

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 14-13    Filed 07/14/23    Page 84 of 262    PageID 2889

116

1  in that other District Court, PCMG, and in connection with the

2  Acis matter, they've decided they haven't had enough.  They've

3  now filed another motion that -- you know, why they filed it

4  in District Court and there's a proof of claim on the same

5  issues, I don't know.  But I thought Your Honor should know.

6  I'm not asking Your Honor to do anything about it.  But we

7  will act aggressively, strongly, and promptly.

8      Thank you, Your Honor.

9          THE COURT:  All right.  Well, you've reminded me of

10 what came out earlier today about the entity -- I left my

11 notepad in my chambers -- PMC or PMG or something.

12     Mr. Bridges, we're not going to have a hearing right now

13 on me doing anything, but what are you thinking?  What are you

14 doing?

15         MR. BRIDGES:  Your Honor, I'm not trying to duck your

16 question.  I literally have no involvement with any other

17 claim, and we would have to ask Mr. Sbaiti to answer your

18 questions.

19         THE COURT:  All right.  Is he there?

20         MR. BRIDGES:  He is.

21         THE COURT:  I'll listen.

22         MR. BRIDGES:  I'll switch seats and give him this

23 chair.

24         MR. SBAITI:  Sorry, Your Honor.  We had two computers

25 going and weren't able to use the sound on one, so we ended up

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 3-13   Filed 07/07/21   Page 85 of 262   PageID 2890

117

1    turning that off.

2        Your Honor, I'm not sure what the question is about when

3    you say what are we thinking.  We have a client that's asked

4    us to file something, and when we're advised by bankruptcy

5    counsel that it's not prohibited for us to do so, and don't

6    know why we're precluded from doing so, and when the time

7    comes I'm sure we'll be able to explain to Your Honor --

8    someone will be able to explain to Your Honor why what we're

9    doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10   exasperation, why that wasn't improper.  It's our belief that

11   it wasn't improper or a violation of the Court's rule.

12       THE COURT:  Just give me a quick shorthand *Readers'*

13   *Digest* of why you don't think it's improper.

14       MR. SBAITI:  Sure.  My understanding is, Your Honor,

15   there's not a rule that says we can't file it against the

16   Debtor for postpetition actions.  So that, that's as -- that's

17   as much as I understand.  And I'm going to -- I'm not trying

18   to duck it, either.  And if I'm wrong about that and someone

19   wants to correct me on our side offline and if we have to

20   explain to the Court why that's so or what rule has been

21   violated, I'm sure we'll be able to put together something for

22   that.  But that's what I've been advised.

23       THE COURT:  Have you done thorough --

24       MR. POMERANTZ:  Your Honor, I think what --

25       MR. SBAITI:  (garbled), Your Honor.

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01582-B   Document 43-13   Filed 06/07/22   Page 86 of 262   PageID 2891

118

1          THE COURT:  Have you done thorough research yourself?

2   Your Rule 11 signature is on the line, not some bankruptcy

3   counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5   research and advice of people who are experts, and I believe

6   my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8   know if it's Mr. Draper's firm who has been representing

9   Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10  attorney-client privilege issue.  If Mr. Sbaiti is going to be

11  here and sort of say, hey, bankruptcy counsel said it was

12  okay, I think we would like to know and I'm sure Your Honor

13  would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16  Draper and with consultation with other counsel that we've

17  spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20  some of these things for the PCMG and the Acis case.  We've

21  talked to the people who, when they tell us you can't do this

22  because they're bankruptcy counsel for our client, then we

23  don't do something.  So, and I'm not trying to throw anybody

24  under the bus, but my understanding of what goes on in

25  Bankruptcy Court is incredibly limited, so, you know, and if

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01583-B   Document 13-3   Filed 09/07/21   Page 87 of 262   PageID 2592

119

1   it's a mistake then I'll own it, if I have a mistaken

2   understanding, but I also wasn't anticipating having to make a

3   presentation about this right here right now, so --

4          THE COURT:  Well, you're filing lawsuits that involve

5   this bankruptcy case during the hearing, so --

6          MR. SBAITI:  Oh, we didn't file it during the

7   hearing, Your Honor.  It was filed last night, I believe.

8          THE COURT:  Okay.  Well, I assume that you're going

9   to go back and hit the books, hit the computer, and be

10   prepared to defend your actions, because your bankruptcy

11   experts, they may think they know a lot, but the judge is not

12   very happy about what she's hearing.

13          MR. POMERANTZ:  Your Honor, if I may ask when Your

14   Honor intends to issue the contempt ruling in connection with

15   the June 8th hearing?  I strongly believe -- and, obviously,

16   this has nothing to do with the contempt hearing; this

17   happened after -- but I strongly believe that sending a

18   message that Your Honor is inclined to hold counsel in

19   contempt, which obviously is one of the violators we said

20   should be held in contempt, it may be important to do that

21   sooner rather than later so that people know that Your Honor

22   is serious.

23          THE COURT:  All right.  Well, I understand and

24   respect that request.  And let me tell you all, I had a seven-

25   day -- okay.  You all were here on that motion June 8th.  I

Case 21-03067-sgj   Doc 43   Filed 09/29/21   Entered 09/29/21 18:18:16   Desc Main
Case 3:21-cv-01603-B   Document 13   Filed 07/01/21   Page 88 of 262   PageID 2893

120

1   had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2   lunch break, in-person hearing with a dozen or so live

3   witnesses that I just finished Tuesday at 5:00 o'clock.  So

4   you all were here on the 8th, and then -- what day was that --

5   what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

6   started on the 14th, okay?  So you all were here on the 8th

7   and I had a live jury trial -- I mean, not jury trial, a live

8   bench trial -- live human beings in the courtroom, beginning

9   June 14th.  So you're here the 8th.  June 14th through 22nd, I

10  did my trial.  And here we are on the 25th.  And guess what, I

11  have another live human-being bench trial next week, Monday

12  through Friday.

13      So we've been working in other things like this in between

14  those two.  So I'm telling you that not to whine, I'm just

15  telling you that, that's the only reason I didn't get out a

16  quick ruling on this, okay?

17          MR. POMERANTZ:  And Your Honor, I was not at all

18  making that comment to imply anything about the Court.

19          THE COURT:  Well, --

20          MR. POMERANTZ:  The time and effort that you have

21  given to this case is extraordinary, --

22          THE COURT:  Okay.

23          MR. POMERANTZ:  -- so please don't misunderstand my

24  comment.

25          THE COURT:  Okay.  And I didn't mean to express

Case 21-03067-sgj    Doc 43    Filed 09/29/21    Entered 09/29/21 18:18:16    Desc Main
Case 3:21-cv-01583-B    Document 13-13    Filed 06/07/22    Page 89 of 262    PageID 2894

121

1   annoyance or anything like that.  I guess what I'm trying to

2   do is I don't want anyone to mistake the delay in ruling on

3   the contempt motion to mean I'm just not that -- you know, I'm

4   not prioritizing it, other things are more serious to me or

5   important to me, or I'm going to take two months to get to it.

6   It's literally been I've been in trial almost all day long

7   every day since you were here.  But trust me, I'm about as

8   upset as upset can be about what I heard on June 8th, and I'm

9   going to get to that ruling, and I know what I'm going to do.

10  And, well, like I said, it's just a matter of figuring out

11  dollars and whom, okay?  There's going to be contempt.  I just

12  haven't put it on paper because I've been in court all day and

13  I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15  it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                              --oOo--

19

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    **/s/ Kathy Rehling**                              **06/29/2021**

24  _____    _____

25  Kathy Rehling, CETD-444                        Date
    Certified Electronic Court Transcriber

122

                              INDEX
                            *Excerpt*
                   *11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Bridges                                              3
- By Mr. Pomerantz                                          23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through    Received 91
28, and 30 through 44

Debtor's Exhibit 1                               Received 91
Debtor's Exhibits 1 through 17                   Received 93

RULINGS                                                     106

END OF PROCEEDINGS                                          121

INDEX                                                       122

002584

# EXHIBIT 7

SECOND AMENDED AND RESTATED
INVESTMENT ADVISORY AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "**Agreement**"), dated to be effective from January 1, 2017 (the "**Effective Date**") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "**Fund**"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "**General Partner**"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "**Investment Advisor**"). Each of the signatories hereto is sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that certain Investment Advisory Agreement dated January 1, 2012 (the "**Original Agreement**");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July 1, 2014 (the "**Existing Agreement**");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as follows:

1.      Investment Advisory Services.   Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2.      Custody.   The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian"). The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the Financial Instruments. The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

002586

3.    <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)    investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)    engaging in such other lawful Financial Instruments transactions;

(c)    research and analysis;

(d)    purchasing Financial Instruments and holding them for investment;

(e)    entering into contracts for or in connection with investments in Financial Instruments;

(f)    investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

002587

(g)    possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)    lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)    opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)    opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)    combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("**_Other Accounts_**") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)    entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)    organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)    causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)    engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)    voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.    <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

002588

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)    to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)    to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)    to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)    to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)    to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5.    <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.    <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

4

002589

7.    <u>Investments</u>.    ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.    <u>Reimbursement by the General Partner</u>.    The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "***Sub-Advisor***"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.    <u>Expenses</u>.

(a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

002590

(b)    To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.    Fees.

(a)    The Fund shall pay the Investment Advisor a quarterly fee (the "**Management Fee**") equal to 2.0% per annum (0.5% per quarter) of the Net Assets (as defined below) of the Fund, payable in advance at and calculated as of the first business day of each calendar quarter. For purposes of calculating the Management Fee, the Net Assets of the Fund will be determined before giving effect to any of the following amounts payable by the Fund generally or in respect of any Investment which are effective as of the date on which such determination is made: (i) any fee payable to the Investment Advisor as of the date on which such determination is made; (ii) any capital withdrawals or distributions payable by the Fund which are effective as of the date on which such determination is made; and (iii) withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdback or other amounts specially allocated ending as of the date on which such determination is made. The Management Fee shall be prorated for partial periods and any applicable excess fees should be returned to the Fund by the Investment Advisor. Capital contributions made to the Fund after the commencement of a calendar quarter shall be subject to a prorated Management Fee based on the number of days remaining during such quarter.

(b)    Subject to clauses (c) and (d) below, at the end of each Calculation Period (as defined below), an amount equal to 20% of the net capital appreciation of the Fund's Investments (as defined below) after deducting the Management Fee shall be paid to the Investment Advisor (the "**_Performance Fee_**"); *provided*, *however*, that the net capital appreciation upon which the calculation of the Performance is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (as defined below) maintained on the books and records of the Fund. The amount of the unrecovered balance remaining in the Loss Recovery Account at the time of calculating the Performance Fee shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of clause (c) below.

(c)    There shall be established on the books of the Fund a memorandum account (the "**_Loss Recovery Account_**"), the opening balance of which shall be zero. At the end of each Calculation Period, the balance in the Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, net capital depreciation of the Fund's Investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period (or with respect to the initial Calculation Period, since the Effective Date), an amount equal to such net capital depreciation shall be credited to the Loss Recovery Account, and, second, if there has been, in the aggregate, net capital appreciation of the Fund's investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period, an amount equal to such net capital appreciation, before taking into account any Performance Fee to be paid to the Investment Advisor, shall be debited to and reduce any unrecovered balance in the Loss Recovery Account, but not below zero. Solely for purposes of this paragraph, in determining the Loss Recovery Account, net capital appreciation and net capital

6

002591

depreciation for any applicable Calculation Period shall be calculated by taking into account the amount of the Management Fee paid for such period.

(d)     In the event that all or a portion of the Fund's capital is distributed or withdrawn while there exists an unrecovered balance in the Loss Recovery Account, the unrecovered balance in the Loss Recovery Account shall be reduced as of the beginning of the next Calculation Period by an amount equal to the product obtained by multiplying the balance in such Loss Recovery Account by a fraction, the numerator of which is the amount distributed or withdrawn with respect to the immediately preceding distribution or withdrawal date, and the denominator of which is the total fair value of the Fund's Investment immediately prior to such distribution or withdrawal.

(e)     For purposes of this Section 10, the net capital appreciation and net capital depreciation of the Fund's Investments for any given period will be calculation in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided upon the General Partner's request.  As soon as reasonably practicable following the end of a Calculation Period, the Investment Advisor shall deliver, or cause to be delivered, to the General Partner a statement showing the calculation of the Performance Fee, if any, with respect to such Calculation Period.  The Performance Fee, if any, shall be payable within three (3) business days of the General Partner's receipt of such statement.

(f)     Payments due to the Investment Advisor shall be made by wire transfer to:

| | |
|---|---|
| Bank Name: | Compass Bank |
| ABA#: | 113010547 |
| FBO: | Highland Capital Management, L.P. (Master Operating Account) |
| Acct#: | 0025876342 |

(g)     For purposes of this Section 10, the following terms have the definitions set forth below:

"*Calculation Period*" means the period commencing on the Effective Date (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period, and ending as of the close of business on the first to occur of the following: (i) the last day of a calendar year; (ii) the distribution or withdrawal of capital of the Fund (but only with respect to such distributed or withdrawn amount); (iii) the permitted transfer of all or any portion of a partner's interest in the Fund; and (iv) the final capital distribution of the Fund following its dissolution;

"*Investments*" means all investments, securities, cash, receivables, financial instruments, contracts and other assets, whether tangible or intangible, owned by the Fund;

002592

"***Net Assets***" means, with respect to the Fund as of any date, the excess of the total fair value of all Investments over the total liabilities, debts and obligations of the Fund, in each case, calculated on an accrual basis in accordance with accounting principles generally accepted in the United States and the then current valuation policy of the Service Provider, a copy of which will be provided to the General Partner upon request; and

"***Services Agreement***" means that certain Second Amended and Restated Service Agreement, dated effective as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

11.   Exculpation; Indemnification.

(a)   Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "***Covered Person***" and collectively, "***Covered Persons***") shall be subject to the provisions of this Section.

(b)   To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)   Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)   To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "***Indemnified***

002593

*Party*"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence.  As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment

002594

Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct, fraud or gross negligence or the ability to waive or limit such Losses under applicable law.  Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements.  Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.    Activities of the Investment Advisor and Others.  The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund.  Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate.  In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund.  The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar.  The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager.  Each of the General Partner and the Fund acknowledges that it has received, reviewed and had an opportunity with respect to (a) a copy of Part 2 of the Investment Advisor's Form ADV, and (b) the supplemental disclosures attached hereto as Exhibit A, each of which further describes conflicts of interest relating to the Investment Advisor, its affiliates and their respective advised accounts.

13.    Term.  This Agreement shall remain in effect through an initial term concluding December 31, 2017 and shall be automatically extended for additional one-year terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

14.    Miscellaneous.

(a)    Notices.  Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

002595

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number:  (972) 628-4100
Facsimile Number:  (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott
Telephone Number:  (919) 854-1407
Facsimile Number:  (919) 854-1401

(b)     <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)     <u>Amendments and Waivers</u>.  No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)     <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; <u>provided</u>; <u>however</u>, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)     <u>Governing Law</u>.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

11

(f)    <u>Jurisdiction; Venue; Waiver of Jury Trial</u>.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("***Dispute***") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("***Enforcement Court***").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)    <u>Headings</u>.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)    <u>Counterparts</u>.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)    <u>Survival</u>.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)    <u>Pronouns.</u>  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

002597

        (k)   <u>Arm's-Length Agreement</u>.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

002598

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:  6/21/17


CHARITABLE DAF GP, LLC


By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:


CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner


By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:

002599

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:


CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date: 6/21/2017


CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general
       partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date: 6/21/2017

002600

## EXHIBIT A

## Supplemental Disclosures

**Potential Conflicts of Interest**

The scope of the activities of Highland Capital Management, L.P. (the "***Investment Adviser***"), its affiliates, and the funds and clients managed or advised by the Investment Adviser or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on Charitable DAF Fund, L.P. and its subsidiaries (collectively, the "***Fund***") in the future that cannot be foreseen or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.  Additional conflicts are described in the Investment Adviser's Form ADV.  You are urged to review the Investment Adviser's Form ADV in its entirety prior to investing in the Fund.[1]

*Highland Group & Highland Accounts*.  None of the Investment Adviser, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Adviser is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Adviser or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations and collateralized loan obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group (collectively, "***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Adviser may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Adviser has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the

---

[1]  The Investment Adviser's latest Form ADV filed and Part 2 Brochures can be accessed here: https://adviserinfo.sec.gov/IAPD/IAPDFirmSummary.aspx?ORG_PK=110126

Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained by the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Adviser will devote to the Fund only as much time as the Investment Adviser deems necessary and appropriate to manage the Fund's business.

The Investment Adviser undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*.  It is the policy of the Investment Adviser to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Adviser has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order for any accounts cannot be fully allocated under prevailing market conditions, the Investment Adviser may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.  The Investment Adviser will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the U.S. Investment Advisers Act of 1940, as amended.  The Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all investment opportunities that are suitable for it.

The Investment Adviser and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day for the Fund, the Highland Accounts or affiliates of the Investment Adviser are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Highland Group Trading*.  As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Adviser may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Adviser in accordance with its fiduciary duties to its other clients, the Investment Adviser may take, or be required to take, actions which adversely affect the interests of the Fund.

The Highland Group has invested and may continue to invest in investments that would also be appropriate for the Fund. Such investments may be different from those made by the Fund. The Highland Group does not have any duty, in making or maintaining such investments, to act in a way that is favorable to the Fund or to offer any such opportunity to the Fund, subject to the Investment Adviser's internal allocation policy. The investment policies, fee arrangements and other circumstances applicable to such other accounts and investments may vary from those applicable to the Fund and its investments. The Highland Group may also provide advisory or other services for a customary fee with respect to investments made or held by the Fund, and neither the Fund nor its investors shall have any right to such fees. The Highland Group may also have ongoing relationships with, render services to or engage in transactions with other clients who make investments of a similar nature to those of the Fund, and with companies whose securities or properties are acquired by the Fund.

As further described below, in connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Adviser to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Adviser's inability to use such information for

advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Adviser will devote as much time to the Fund as the Investment Adviser deems appropriate to perform its duties in accordance with the Fund's advisory agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Adviser's other accounts.

*Various Activities of the Investment Adviser and its Affiliates*.  The directors, officers, personnel, employees and agents of the Investment Adviser and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories or provide banking, agency, insurance and/or other services, and receive arm's length fees in connection with such services, for the Fund or its investments or other entities that operate in the same or a related line of business as the, for other clients managed by the Investment Adviser or its affiliates, or for any obligor or issuer in respect of the CDOs, and the Fund shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.  The Fund may compete with other Highland Accounts for capital and investment opportunities.

There is no limitation or restriction on the Investment Adviser or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Adviser's investment committee, the Investment Adviser or its affiliates have to other clients.

The Investment Adviser and its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of an investment of the Fund or another account.  In such circumstances, the Investment Adviser or its affiliates may take positions on behalf of themselves or another account that are adverse to the interests of the Fund.

The Investment Adviser and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CDOs, Highland Accounts and other investments purchased by the Fund. Such transactions shall be subject to fees that are intended to be no greater than arm's-length fees, and the Fund shall have no right to any such fees. There is no expectation for preferential access to transactions involving CDOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Adviser and/or its affiliates and the Fund shall not have any right to any such fees.

*Investments in Highland Accounts Managed by the Investment Manager or its Affiliates*.  The Fund may invest a significant portion of its capital in Highland Accounts.  The Investment Adviser or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Highland Accounts.  If the Fund invests in Highland Accounts in secondary transactions, the Fund will indirectly pay the fees (senior and subordinated) of such Highland Accounts and any

carried interest. If the Fund provides all of the equity for a Highland Account, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Adviser or its affiliates will have conflicting division of loyalties and responsibilities regarding the Fund and a Highland Account, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of a Highland Account or to other interests of the Investment Adviser.

*Multiple Levels of Fees*. The Investment Adviser and the Highland Accounts are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if investors in the Fund were able to invest directly in the Highland Accounts or their respective underlying investments. Investors in the Fund should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a Highland Account may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).

*Cross Transactions and Principal Transactions.* The Investment Adviser may effect client cross-transactions where the Investment Adviser causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Fund any time that the Investment Adviser believes such transaction to be fair to the Fund and such other client.

The Investment Adviser may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Adviser and/or its affiliates, in each case in accordance with applicable law, which will include the Investment Adviser obtaining independent consent on behalf of the Fund prior to engaging in any such principal transaction between the Fund and the Investment Adviser or its affiliates.

The Investment Adviser may advise the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Adviser's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Adviser or its affiliates. In each such case, the Investment Adviser and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Fund and the other parties to such trade. Under certain circumstances, the Investment Adviser and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Adviser's valuation procedures to another client managed or advised by the Investment Adviser or such affiliates. In addition, the Investment Adviser may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Adviser may obtain independent consent

in writing on behalf of the Fund, which consent may be provided by the managing member of the General Partner or any other independent party on behalf of the Fund, if any such transaction requires the consent of the Fund under Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended.

*Material Non-Public Information*. There are generally no ethical screens or information barriers among the Investment Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Adviser, any of its personnel or its affiliates were to receive material non-public information about a particular obligor or issuer, or have an interest in causing the Fund to acquire a particular security, the Investment Adviser may be prevented from advising the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material nonpublic information, it is possible that such controls could fail and result in the Investment Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material nonpublic information could have adverse effects on the Investment Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Adviser's ability to perform its portfolio management services to the Fund. In addition, while the Investment Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Investment Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

*Conflicts Relating to Equity and Debt Ownership by the Fund and Affiliates*. In certain circumstances, the Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Fund and such other accounts may have competing claims for the remaining assets of such issuers.  Under these circumstances it may not be feasible for the Investment Adviser to reconcile the conflicting interests in the Fund and such other accounts in a way that protects the Fund's interests.  Additionally, the Investment Adviser or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Adviser in that such votes or actions may favor the interests of one account over another account.  Furthermore, the Investment Adviser's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Other Fees*. The Investment Adviser and its affiliates are permitted to receive consulting fees, investment banking fees, advisory fees, breakup fees, director's fees, closing fees, transaction fees and similar fees in connection with actual or contemplated investments. Such fees will not reduce

or offset the Management Fee.  Conflicts of interest may also arise due to the allocation of such fees to or among co-investors.

*Soft Dollars*.  The Investment Adviser's authority to use "soft dollar" credits generated by the Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Adviser may give the Investment Adviser an incentive to select brokers or dealers for transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Adviser rather than giving exclusive consideration to the interests of the Fund.

# EXHIBIT 8

*Conformed to Federal Register version*

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 276**

**[Release No. IA-5248; File No. S7-07-18]**

**RIN: 3235-AM36**

**Commission Interpretation Regarding Standard of Conduct for Investment Advisers**

**AGENCY:**  Securities and Exchange Commission.

**ACTION:**  Interpretation.

**SUMMARY:**  The Securities and Exchange Commission (the "SEC" or the "Commission") is publishing an interpretation of the standard of conduct for investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act" or the "Act").

**DATES:**  Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:**  Olawalé Oriola, Senior Counsel; Matthew Cook, Senior Counsel; or Jennifer Songer, Branch Chief, at (202) 551-6787 or *IArules@sec.gov*, Investment Adviser Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-8549.

**SUPPLEMENTARY INFORMATION:**  The Commission is publishing an interpretation of the standard of conduct for investment advisers under the Advisers Act [15 U.S.C. 80b].[1]

---

[1]     15 U.S.C. 80b.  Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

002609

# TABLE OF CONTENTS

I.     INTRODUCTION

    A.     Overview of Comments

II.    INVESTMENT ADVISERS' FIDUCIARY DUTY

    A.     Application of Duty Determined by Scope of Relationship

    B.     Duty of Care

        1.     *Duty to Provide Advice that is in the Best Interest of the Client*

        2.     *Duty to Seek Best Execution*

        3.     *Duty to Provide Advice and Monitoring over the Course of the Relationship*

    C.     Duty of Loyalty

III.   ECONOMIC CONSIDERATIONS

    A.     Background

    B.     Potential Economic Effects

## I.     INTRODUCTION

Under federal law, an investment adviser is a fiduciary.[2]  The fiduciary duty an investment adviser owes to its client under the Advisers Act, which comprises a duty of care and a duty of loyalty, is important to the Commission's investor protection efforts.  Also important to the Commission's investor protection efforts is the standard of conduct that a broker-dealer owes to a retail customer when it makes a recommendation of any securities transaction or investment strategy involving securities.[3]  Both investment advisers and broker-dealers play an important

---

[2]     *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) ("SEC v. Capital Gains"); *see also infra* footnotes 34–44 and accompanying text; Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 2, 2004); Compliance Programs of Investment Companies and Investment Advisers, Investment Advisers Act Release No. 2204 (Dec. 17, 2003); Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000).  Investment advisers also have antifraud liability with respect to prospective clients under section 206 of the Advisers Act.

[3]     *See* Regulation Best Interest, Exchange Act Release No. 34-86031 (June 5, 2019) ("Reg. BI Adoption").  This final interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Final Interpretation") interprets section 206 of the Advisers Act, which is applicable to both SEC- and

002610

role in our capital markets and our economy more broadly.  Investment advisers and broker-

dealers have different types of relationships with investors, offer different services, and have

different compensation models.  This variety is important because it presents investors with

choices regarding the types of relationships they can have, the services they can receive, and how

they can pay for those services.

On April 18, 2018, the Commission proposed rules and forms intended to enhance the

required standard of conduct for broker-dealers[4] and provide retail investors with clear and

succinct information regarding the key aspects of their brokerage and advisory relationships.[5]  In

connection with the publication of these proposals, the Commission published for comment a

separate proposed interpretation regarding the standard of conduct for investment advisers under

the Advisers Act ("Proposed Interpretation").[6]  We stated in the Proposed Interpretation, and we

continue to believe, that it is appropriate and beneficial to address in one release and reaffirm—

and in some cases clarify—certain aspects of the fiduciary duty that an investment adviser owes

---

state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.  This Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty.  It is not, however, intended to be the exclusive resource for understanding these principles.  Separately, in various circumstances, case law, statutes (such as the Employee Retirement Income Security Act of 1974 ("ERISA")), and state law impose obligations on investment advisers.  In some cases, these standards may differ from the standard enforced by the Commission.

[4]  Regulation Best Interest, Exchange Act Release No. 83062 (Apr. 18, 2018) ("Reg. BI Proposal").

[5]  Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888 (Apr. 18, 2018) ("Relationship Summary Proposal").

[6]  Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, Investment Advisers Act Release No. 4889 (Apr. 18, 2018).

002611

to its clients under section 206 of the Advisers Act.[7]  After considering the comments received,

we are publishing this Final Interpretation with some clarifications to address comments.[8]

### A.    Overview of Comments

We received over 150 comment letters on our Proposed Interpretation from individuals,

investment advisers, trade or professional organizations, law firms, consumer advocacy groups,

and bar associations.[9]  Although many commenters generally agreed that the Proposed

Interpretation was useful,[10] some noted the challenges inherent in a Commission interpretation

covering the broad scope of the fiduciary duty that an investment adviser owes to its clients

under the Advisers Act.[11]  Some of these commenters suggested modifications to or withdrawal

---

[7]       Further, the Commission recognizes that many advisers provide impersonal investment advice.  *See, e.g.*, Advisers Act rule 203A-3 (defining "impersonal investment advice" in the context of defining "investment adviser representative" as "investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts").  This Final Interpretation does not address the extent to which the Advisers Act applies to different types of impersonal investment advice.

[8]       In the Proposed Interpretation, the Commission also requested comment on: licensing and continuing education requirements for personnel of SEC-registered investment advisers; delivery of account statements to clients with investment advisory accounts; and financial responsibility requirements for SEC-registered investment advisers, including fidelity bonds.  We are continuing to evaluate the comments received in response.

[9]       Comment letters submitted in File No. S7-09-18 are available on the Commission's website at https://www.sec.gov/comments/s7-09-18/s70918.htm.  We also considered those comments submitted in File No. S7-08-18 (Comments on Relationship Summary Proposal) and File No. S7-07-18 (Comments on Reg. BI Proposal).  Those comments are available on the Commission's website at https://www.sec.gov/comments/s7-08-18/s70818.htm and https://www.sec.gov/comments/s7-07-18/s70718.htm.

[10]      *See, e.g.*, Comment Letter of North American Securities Administrators Association (Aug. 23, 2018) ("NASAA Letter") (stating that the Proposed Interpretation is a "useful resource"); Comment Letter of Invesco (Aug. 7, 2018) ("Invesco Letter") (agreeing that "there are benefits to having a clear statement regarding the fiduciary duty that applies to an investment adviser").

[11]      *See, e.g.*, Comment Letter of Pickard Djinis and Pisarri LLP (Aug. 7, 2018) ("Pickard Letter") (noting the Commission's "efforts to synthesize case law, legislative history, academic literature, prior Commission releases and other sources to produce a comprehensive explanation of the fiduciary standard of conduct"); Comment Letter of Dechert LLP (Aug. 7, 2018) ("Dechert Letter") ("It is crucial that any universal interpretation of an adviser's fiduciary duty be based on sound and time-tested principles.  Given the difficulty of defining and encompassing all of an adviser's responsibilities to its clients, while also accommodating the diversity of advisory arrangements, interpretive issues will arise in the future."); Comment Letter of the Hedge Funds Subcommittee of the Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association (Aug. 24, 2018) ("ABA Letter") ("We note at

---

4

of the Proposed Interpretation.[12]  Although most commenters agreed that an investment adviser's

fiduciary duty comprises a duty of care and a duty of loyalty, as described in the Proposed

Interpretation, they had differing views on aspects of the fiduciary duty and in some cases sought

clarification on its application.[13]

Some commenters requested that we adopt rule text instead.[14]  The relationship between

an investment adviser and its client has long been based on fiduciary principles not generally set

forth in specific statute or rule text.  We believe that this principles-based approach should

continue as it expresses broadly the standard to which investment advisers are held while

allowing them flexibility to meet that standard in the context of their specific services.  In our

view, adopting rule text is not necessary to achieve our goal in this Final Interpretation of

reaffirming and in some cases clarifying certain aspects of the fiduciary duty.

---

the outset that it is difficult to capture the nature of an investment adviser's fiduciary duty in a broad
statement that has universal applicability.").

[12]   *See, e.g.*, Comment Letter of L.A. Schnase (Jul. 30, 2018) (urging the Commission not to issue the
Proposed Interpretation in final form, or at least not without substantial rewriting or reshaping); Comment
Letter of Money Management Institute (Aug. 7, 2018) ("MMI Letter") (urging the Commission to "revise
the interpretation so that it reflects the common law principles in which an investment adviser's fiduciary
duty is grounded"); Dechert Letter (recommending that we withdraw the Proposed Interpretation and
instead rely on existing authority and sources of law, as well as existing Commission practices for
providing interpretive guidance, in order to define the source and scope of an investment adviser's
fiduciary duty).

[13]   *See, e.g.*, Comment Letter of Cambridge Investment Research Inc. (Aug. 7, 2018) ("Cambridge Letter")
(stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability
to craft such policies and procedures, as well as support the elimination of confusion for retail clients and
investment professionals"); Comment Letter of Institutional Limited Partners Association (Aug. 6, 2018)
("ILPA Letter 1") ("Interpretation will provide more certainty regarding the fiduciary duties owed by
private fund advisers to their clients."); Comment Letter of New York City Bar Association (Jun. 26, 2018)
("NY City Bar Letter") (stating that the uniform interpretation of an investment adviser's fiduciary duty is
necessary).

[14]   Some commenters suggested that we codify the Proposed Interpretation.  *See, e.g.,* Comment Letter of Roy
Tanga (Apr. 25, 2018); Comment Letter of Financial Engines (Aug. 6, 2018) ("Financial Engines Letter");
ILPA Letter 1; Comment Letter of AARP (Aug. 7, 2018) ("AARP Letter"); Comment Letter of Gordon
Donohue (Aug. 6, 2018); Comment Letter of Financial Planning Coalition (Aug. 7, 2018) ("FPC Letter").

002613

## II.   INVESTMENT ADVISERS' FIDUCIARY DUTY

The Advisers Act establishes a federal fiduciary duty for investment advisers.[15]   This

fiduciary duty is based on equitable common law principles and is fundamental to advisers'

relationships with their clients under the Advisers Act.[16]   The investment adviser's fiduciary duty

is broad and applies to the entire adviser-client relationship.[17]   The fiduciary duty to which

advisers are subject is not specifically defined in the Advisers Act or in Commission rules, but

reflects a Congressional recognition "of the delicate fiduciary nature of an investment advisory

relationship" as well as a Congressional intent to "eliminate, or at least to expose, all conflicts of

interest which might incline an investment adviser—consciously or unconsciously—to render

advice which was not disinterested."[18]   An adviser's fiduciary duty is imposed under the

---

[15]   *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) ("Transamerica Mortgage v. Lewis") ("§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.") (quotation marks omitted); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing SEC v. Capital Gains, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); SEC v. Capital Gains, *supra* footnote 2; Amendments to Form ADV, Investment Advisers Act Release No. 3060 (July 28, 2010) ("Investment Advisers Act Release 3060") ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

[16]   *See* SEC v. Capital Gains, *supra* footnote 2 (discussing the history of the Advisers Act, and how equitable principles influenced the common law of fraud and changed the suits brought against a fiduciary, "which Congress recognized the investment adviser to be").

[17]   The Commission has previously recognized the broad scope of section 206 of the Advisers Act in a variety of contexts. *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15; Timbervest, LLC, et al., Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) (" [O]nce an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship."); *see also SEC v. Lauer*, 2008 WL 4372896, at 24 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'"); Thomas P. Lemke & Gerald T. Lins, Regulation of Investment Advisers (2013 ed.), at § 2:30 ("[T]he SEC has … applied [sections 206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.").

[18]   *See* SEC v. Capital Gains, *supra* footnote 2; *see also* In the Matter of Arleen W. Hughes, Exchange Act Release No. 4048 (Feb. 18, 1948) ("Arleen Hughes") (Commission Opinion) (discussing the relationship of

6

002614

Advisers Act in recognition of the nature of the relationship between an investment adviser and a

client and the desire "so far as is presently practicable to eliminate the abuses" that led to the

enactment of the Advisers Act.[19]  It is made enforceable by the antifraud provisions of the

Advisers Act.[20]

An investment adviser's fiduciary duty under the Advisers Act comprises a duty of care

and a duty of loyalty.[21]  This fiduciary duty requires an adviser "to adopt the principal's goals,

---

trust and confidence between the client and a dual registrant and stating that the registrant was a fiduciary
and subject to liability under the antifraud provisions of the Securities Act of 1933 and the Securities
Exchange Act of 1934).

[19]   *See* SEC v. Capital Gains, *supra* footnote 2 (noting that the "declaration of policy" in the original bill,
which became the Advisers Act, declared that "the national public interest and the interest of investors are
adversely affected … when the business of investment advisers is so conducted as to defraud or mislead
investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients.  It
is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this
title shall be interpreted, *are to mitigate and, so far as is presently practicable to eliminate* the abuses
enumerated in this section") (citing S. 3580, 76th Cong., 3d Sess., § 202 and Investment Trusts and
Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the
Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment
Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28)
(emphasis added).

[20]   *Id.*; Transamerica Mortgage v. Lewis, *supra* footnote 15 ("[T]he Act's legislative history leaves no doubt
that Congress intended to impose enforceable fiduciary obligations.").  Some commenters questioned the
standard to which the Advisers Act holds investment advisers.  *See, e.g.,* Comment Letter of Stark & Stark,
PC (undated) ("The duty of care at common law and under the Advisers Act only requires that advisers not
be negligent in performing their duties.") (internal citation omitted); Comment Letter of Institutional
Limited Partners Association (Nov. 21, 2018) ("ILPA Letter 2") ("The Advisers Act standard is a lower
simple 'negligence' standard.").  Claims arising under Advisers Act section 206(2) are not scienter-based
and can be adequately pled with only a showing of negligence.  *Robare Group, Ltd., et al. v. SEC,* 922 F.3d
468, 472(D.C. Cir. 2019) ("Robare v. SEC"); *SEC v. Steadman,* 967 F.2d 636, 643, n.5 (D.C. Cir. 1992)
(citing SEC v. Capital Gains, *supra* footnote 2) ("[A] violation of § 206(2) of the Investment Advisers Act
may rest on a finding of simple negligence."); *SEC v. DiBella,* 587 F.3d 553, 567 (2d Cir. 2009) ("the
government need not show intent to make out a section 206(2) violation"); *SEC v. Gruss,* 859 F. Supp. 2d
653, 669 (S.D.N.Y. 2012) ("Claims arising under Section 206(2) are not scienter-based and can be
adequately pled with only a showing of negligence.").  However, claims arising under Advisers Act section
206(1) require scienter.  *See, e.g.,* Robare v. SEC; *SEC v. Moran,* 922 F. Supp. 867, 896 (S.D.N.Y. 1996*);
Carroll v. Bear, Stearns & Co.,* 416 F. Supp. 998, 1001 (S.D.N.Y. 1976).

[21]   *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15.  These duties were generally
recognized by commenters.  *See, e.g.,* Comment Letter of Consumer Federation of America (Aug. 7, 2018)
("CFA Letter"); Comment Letter of the Investment Adviser Association (Aug. 6, 2018) ("IAA Letter");
Comment Letter of Investments & Wealth Institute (Aug. 6, 2018); Comment Letter of Raymond James
(Aug. 7, 2018); FPC Comment Letter.  *But see* Dechert Letter (questioning the sufficiency of support for a
duty of care).

objectives, or ends."[22]  This means the adviser must, at all times, serve the best interest of its

client and not subordinate its client's interest to its own.  In other words, the investment adviser

cannot place its own interests ahead of the interests of its client.  This combination of care and

loyalty obligations has been characterized as requiring the investment adviser to act in the "best

interest" of its client at all times.[23]  In our view, an investment adviser's obligation to act in the

best interest of its client is an overarching principle that encompasses both the duty of care and

the duty of loyalty.  As discussed in more detail below, in our view, the duty of care requires an

investment adviser to provide investment advice in the best interest of its client, based on the

client's objectives.  Under its duty of loyalty, an investment adviser must eliminate or make full

and fair disclosure of all conflicts of interest which might incline an investment adviser—

consciously or unconsciously—to render advice which is not disinterested such that a client can

provide informed consent to the conflict.[24]  We believe this is another part of an investment

adviser's obligation to act in the best interest of its client.

### A. Application of Duty Determined by Scope of Relationship

An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the

---

[22]  Arthur B. Laby, *The Fiduciary Obligations as the Adoption of Ends*, 56 Buffalo Law Review 99 (2008); *see also* Restatement (Third) of Agency, §2.02 Scope of Actual Authority (2006) (describing a fiduciary's authority in terms of the fiduciary's reasonable understanding of the principal's manifestations and objectives).

[23]  Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that "under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, *supra* footnote 15).  *See SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("SEC v. Tambone") ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund…"); *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y 1996) ("SEC v. Moran") ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").  Although most commenters agreed that an adviser has an obligation to act in its client's best interest, some questioned whether the Proposed Interpretation appropriately considered the best interest obligation as part of the duty of care, or whether it instead should be considered part of the duty of loyalty. *See, e.g.*, MMI Letter; Comment Letter of Investment Company Institute (Aug. 7, 2018) ("ICI Letter").

[24]  *See infra* footnotes 67-70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

002616

nature of the relationship between an adviser and its client—a relationship of trust and

confidence.[25]  The adviser's fiduciary duty is principles-based and applies to the entire

relationship between the adviser and its client.  The fiduciary duty follows the contours of the

relationship between the adviser and its client, and the adviser and its client may shape that

relationship by agreement, provided that there is full and fair disclosure and informed consent.[26]

With regard to the scope of the adviser-client relationship, we recognize that investment advisers

provide a wide range of services, from a single financial plan for which a client may pay a one-

time fee, to ongoing portfolio management for which a client may pay a periodic fee based on

the value of assets in the portfolio.  Investment advisers also serve a large variety of clients, from

retail clients with limited assets and investment knowledge and experience to institutional clients

with very large portfolios and substantial knowledge, experience, and analytical resources.[27]  In

our experience, the principles-based fiduciary duty imposed by the Advisers Act has provided

sufficient flexibility to serve as an effective standard of conduct for investment advisers,

regardless of the services they provide or the types of clients they serve.

    Although all investment advisers owe each of their clients a fiduciary duty under the

Advisers Act, that fiduciary duty must be viewed in the context of the agreed-upon scope of the

---

[25]    *See, e.g.*, Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess. (leading investment advisers emphasized their relationship of "trust and confidence" with their clients); SEC v. Capital Gains, *supra* footnote 2 (citing same).

[26]    Several commenters asked that we clarify that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies through contract.  *See, e.g.*, MMI Letter; Financial Engines Letter; ABA Letter.

[27]    This Final Interpretation also applies to automated advisers, which are often colloquially referred to as "robo-advisers."  Automated advisers, like all SEC-registered investment advisers, are subject to all of the requirements of the Advisers Act, including the requirement that they provide advice consistent with the fiduciary duty they owe to their clients.  *See* Division of Investment Management, Robo Advisers, IM Guidance Update No. 2017-02 (Feb. 2017), *available at* https://www.sec.gov/investment/im-guidance-2017-02.pdf (describing Commission staff's guidance as to three distinct areas under the Advisers Act that automated advisers should consider, due to the nature of their business model, in seeking to comply with their obligations under the Advisers Act).

002617

relationship between the adviser and the client.  In particular, the specific obligations that flow

from the adviser's fiduciary duty depend upon what functions the adviser, as agent, has agreed to

assume for the client, its principal.  For example, the obligations of an adviser providing

comprehensive, discretionary advice in an ongoing relationship with a retail client (*e.g.*,

monitoring and periodically adjusting a portfolio of equity and fixed income investments with

limited restrictions on allocation) will be significantly different from the obligations of an

adviser to a registered investment company or private fund where the contract defines the scope

of the adviser's services and limitations on its authority with substantial specificity (*e.g.*, a

mandate to manage a fixed income portfolio subject to specified parameters, including

concentration limits and credit quality and maturity ranges).[28]

    While the application of the investment adviser's fiduciary duty will vary with the scope

of the relationship, the relationship in all cases remains that of a fiduciary to the client.  In other

words, an adviser's federal fiduciary duty may not be waived, though it will apply in a manner

that reflects the agreed-upon scope of the relationship.[29]  A contract provision purporting to

waive the adviser's federal fiduciary duty generally, such as (i) a statement that the adviser will

not act as a fiduciary, (ii) a blanket waiver of all conflicts of interest, or (iii) a waiver of any

---

[28]    *See, e.g., infra* text following footnote 35.

[29]    Because an adviser's federal fiduciary obligations are enforceable through section 206 of the Advisers Act,
we would view a waiver of enforcement of section 206 as implicating section 215(a) of the Advisers Act,
which provides that "any condition, stipulation or provision binding any person to waive compliance with
any provision of this title. . . shall be void."  *See also* Restatement (Third) of Agency, § 8.06 Principal's
Consent (2006) ("[T]he law applicable to relationships of agency as defined in § 1.01 imposes mandatory
limits on the circumstances under which an agent may be empowered to take disloyal action.  These limits
serve protective and cautionary purposes.  Thus, an agreement that contains general or broad language
purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is
not likely to be enforceable.  This is because a broadly sweeping release of an agent's fiduciary duty may
not reflect an adequately informed judgment on the part of the principal; if effective, the release would
expose the principal to the risk that the agent will exploit the agent's position in ways not foreseeable by
the principal at the time the principal agreed to the release.  In contrast, when a principal consents to
specific transactions or to specified types of conduct by the agent, the principal has a focused opportunity
to assess risks that are more readily identifiable.").

002618

specific obligation under the Advisers Act, would be inconsistent with the Advisers Act,[30]

regardless of the sophistication of the client.[31]

---

[30]     *See* sections 206 and 215(a).  Commenters generally agreed that a client cannot waive an investment adviser's fiduciary duty through agreement.  *See* Dechert Letter; Comment Letter of Ropes & Gray LLP (Aug. 7, 2018) ("Ropes & Gray Letter"), at n.20; *see also supra* footnote 29.  In the Proposed Interpretation, we stated that "the investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty."  One commenter disputed this broad statement, believing that it called into question "the ability of an investment adviser and client to define the scope of the adviser's services and duties."  ABA Letter; *see also* Financial Engines Letter.  We have modified this statement to clarify that a general waiver of the fiduciary duty would violate that duty and to provide examples of such a general waiver.

[31]     Some commenters mentioned a 2007 No-Action Letter in which staff indicated that whether a clause in an advisory agreement that purports to limit an adviser's liability under that agreement (a so-called "hedge clause") would violate sections 206(1) and 206(2) of the Advisers Act depends on all of the surrounding facts and circumstances.  Heitman Capital Management, LLC, SEC Staff No-Action Letter (Feb. 12, 2007) ("Heitman Letter").  A few commenters indicated that the Heitman Letter expanded the ability of investment advisers to private funds, and potentially other sophisticated clients, to disclaim their fiduciary duties under state law in an advisory agreement.  *See, e.g.*, ILPA Letter 1; ILPA Letter 2.  The commenters' descriptions of the Heitman Letter suggest that it may have been applied incorrectly.  The Heitman Letter does not address the scope or substance of an adviser's federal fiduciary duty; rather, it addresses the extent to which hedge clauses may be misleading in violation of the Advisers Act's antifraud provisions.  Another commenter agreed with this reading of the Heitman Letter.  *See* Comment Letter of American Investment Council (Feb. 25, 2019).  In response to these comments, we express below the Commission's views about an adviser's obligations under sections 206(1) and 206(2) of the Advisers Act with respect to the use of hedge clauses.  Accordingly, because we are expressing our views in this Final Interpretation, the Heitman Letter is withdrawn.

This Final Interpretation makes clear that an adviser's federal fiduciary duty may not be waived, though its application may be shaped by agreement.  This Final Interpretation does not take a position on the scope or substance of any fiduciary duty that applies to an adviser under applicable state law.  *See supra* footnote 3.  The question of whether a hedge clause violates the Advisers Act's antifraud provisions depends on all of the surrounding facts and circumstances, including the particular circumstances of the client (*e.g.,* sophistication).  In our view, however, there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions, where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law.  Such a hedge clause generally is likely to mislead those retail clients into not exercising their legal rights, in violation of the antifraud provisions, even where the agreement otherwise specifies that the client may continue to retain its non-waivable rights.  Whether a hedge clause in an agreement with an institutional client would violate the Advisers Act's antifraud provisions will be determined based on the particular facts and circumstances.  To the extent that a hedge clause creates a conflict of interest between an adviser and its client, the adviser must address the conflict as required by its duty of loyalty.

002619

### B. Duty of Care

As fiduciaries, investment advisers owe their clients a duty of care.[32]  The Commission

has discussed the duty of care and its components in a number of contexts.[33]  The duty of care

includes, among other things: (i) the duty to provide advice that is in the best interest of the

client, (ii) the duty to seek best execution of a client's transactions where the adviser has the

responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice

and monitoring over the course of the relationship.

### 1. Duty to Provide Advice that is in the Best Interest of the Client

The duty of care includes a duty to provide investment advice that is in the best interest

of the client, including a duty to provide advice that is suitable for the client.[34]  In order to

---

[32]    *See* Investment Advisers Act Release 2106, *supra* footnote 15 (stating that under the Advisers Act, "an
adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services
undertaken on the client's behalf, including proxy voting," which is the subject of the release, and citing
SEC v. Capital Gains *supra* footnote 2, to support this point).  This Final Interpretation does not address the
specifics of how an investment adviser might satisfy its fiduciary duty when voting proxies.  *See also*
Restatement (Third) of Agency, § 8.08 (discussing the duty of care that an agent owes its principal as a
matter of common law); Tamar Frankel & Arthur B. Laby, The Regulation of Money Managers (updated
2017) ("Advice can be divided into three stages.  The first determines the needs of the particular client.
The second determines the portfolio strategy that would lead to meeting the client's needs.  The third
relates to the choice of securities that the portfolio would contain.  The duty of care relates to each of the
stages and depends on the depth or extent of the advisers' obligation towards their clients.").

[33]    *See, e.g.*, Suitability of Investment Advice Provided by Investment Advisers; Custodial Account Statements
for Certain Advisory Clients, Investment Advisers Act Release No. 1406 (Mar. 16, 1994) ("Investment
Advisers Act Release 1406") (stating that advisers have a duty of care and discussing advisers' suitability
obligations); Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of
1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 28, 1986) ("Exchange Act Release
23170") ("an adviser, as a fiduciary, owes its clients a duty of obtaining the best execution on securities
transactions").  We highlight certain contexts, but not all, in which the Commission has addressed the duty
of care.  *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15.

[34]    In 1994, the Commission proposed a rule that would have made express the fiduciary obligation of
investment advisers to make only suitable recommendations to a client.  Investment Advisers Act Release
1406, *supra* footnote 33.  Although never adopted, the rule was designed, among other things, to reflect the
Commission's interpretation of an adviser's *existing* suitability obligation under the Advisers Act.  In
addition, we do not cite Investment Advisers Act Release 1406 as the source of authority for the view we
express here, which at least one comment letter suggested, but cite it merely to show that the Commission
has long held this view.  *See* Comment Letter of the Managed Funds Association and the Alternative
Investment Management Association (Aug. 7, 2018) (indicating that the Commission's failure to adopt the
proposed suitability rule means "investment advisers are not subject to an express 'suitability' standard

---

002620

provide such advice, an adviser must have a reasonable understanding of the client's objectives.

The basis for such a reasonable understanding generally would include, for retail clients, an

understanding of the investment profile, or for institutional clients, an understanding of the

investment mandate.[35]  The duty to provide advice that is in the best interest of the client based

on a reasonable understanding of the client's objectives is a critical component of the duty of

care.

     *Reasonable Inquiry into Client's Objectives*

How an adviser develops a reasonable understanding will vary based on the specific facts

and circumstances, including the nature of the client, the scope of the adviser-client relationship,

and the nature and complexity of the anticipated investment advice.

In order to develop a reasonable understanding of a retail client's objectives, an adviser

should, at a minimum, make a reasonable inquiry into the client's financial situation, level of

financial sophistication, investment experience, and financial goals (which we refer to

collectively as the retail client's "investment profile").  For example, an adviser undertaking to

formulate a comprehensive financial plan for a retail client would generally need to obtain a

---

under existing regulation").  We believe that this obligation to make only suitable recommendations to a client is part of an adviser's fiduciary duty to act in the best interest of its client.  Accordingly, an adviser must provide investment advice that is suitable for its client in providing advice that is in the best interest of its client.  *See* SEC v. Tambone, *supra* footnote 23 ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund…."); SEC v. Moran, *supra* footnote 23 ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

[35]    Several commenters stated that the duty to make a reasonable inquiry into a client's investment profile may not apply in the institutional client context. *See, e.g.,* Comment Letter of BlackRock, Inc. (Aug. 7, 2018); Comment Letter of Teachers Insurance and Annuity Association of America (Aug. 7, 2018); Comment Letter of Allianz Global Investors U.S. LLC (Aug. 7, 2018) ("Allianz Letter"); Comment Letter of John Hancock Life Insurance Company (U.S.A.) (Aug. 3, 2018).  Accordingly, we are describing the duty as a duty to have a reasonable understanding of the client's objectives.  While not every client will have an investment profile, every client will have objectives.  For example, an institutional client's objectives may be ascertained through its investment mandate.

002621

range of personal and financial information about the client such as current income, investments, assets and debts, marital status, tax status, insurance policies, and financial goals.[36]

In addition, it will generally be necessary for an adviser to a retail client to update the client's investment profile in order to maintain a reasonable understanding of the client's objectives and adjust the advice to reflect any changed circumstances.[37]  The frequency with which the adviser must update the client's investment profile in order to consider changes to any advice the adviser provides would itself turn on the facts and circumstances, including whether the adviser is aware of events that have occurred that could render inaccurate or incomplete the investment profile on which the adviser currently bases its advice.  For instance, in the case of a financial plan where the investment adviser also provides advice on an ongoing basis, a change in the relevant tax law or knowledge that the client has retired or experienced a change in marital status could trigger an obligation to make a new inquiry.

By contrast, in providing investment advice to institutional clients, the nature and extent of the reasonable inquiry into the client's objectives generally is shaped by the specific investment mandates from those clients.  For example, an investment adviser engaged to advise on an institutional client's investment grade bond portfolio would need to gain a reasonable understanding of the client's objectives within that bond portfolio, but not the client's objectives

---

[36]     Investment Advisers Act Release 1406, *supra* footnote 33.  After making a reasonable inquiry into the client's investment profile, it generally would be reasonable for an adviser to rely on information provided by the client (or the client's agent) regarding the client's financial circumstances, and an adviser should not be held to have given advice not in its client's best interest if it is later shown that the client had misled the adviser concerning the information on which the advice was based.

[37]     Such updating would not be needed with one-time investment advice.  In the Proposed Interpretation, we stated that an adviser "must" update a client's investment profile in order to adjust the advice to reflect any changed circumstances.  We believe that any obligation to update a client's investment profile, like the nature and extent of the reasonable inquiry into a retail client's objectives, turns on what is reasonable under the circumstances.  Accordingly, we have revised the wording of this statement in this Final Interpretation.

14

002622

within its entire investment portfolio.  Similarly, an investment adviser whose client is a

registered investment company or a private fund would need to have a reasonable understanding

of the fund's investment guidelines and objectives.  For advisers acting on specific investment

mandates for institutional clients, particularly funds, we believe that the obligation to update the

client's objectives would not be applicable except as may be set forth in the advisory agreement.

*Reasonable belief that advice is in the best interest of the client*

An investment adviser must have a reasonable belief that the advice it provides is in the

best interest of the client based on the client's objectives.  The formation of a reasonable belief

would involve considering, for example, whether investments are recommended only to those

clients who can and are willing to tolerate the risks of those investments and for whom the

potential benefits may justify the risks.[38]  Whether the advice is in a client's best interest must be

evaluated in the context of the portfolio that the adviser manages for the client and the client's

objectives.

For example, when an adviser is advising a retail client with a conservative investment

objective, investing in certain derivatives may be in the client's best interest when they are used

to hedge interest rate risk or other risks in the client's portfolio, whereas investing in certain

directionally speculative derivatives on their own may not.  For that same client, investing in a

particular security on margin may not be in the client's best interest, even if investing in that

same security without the use of margin may be in the client's best interest.  However, for

---

[38]     Item 8 of Part 2A of Form ADV requires an investment adviser to describe its methods of analysis and
investment strategies and disclose that investing in securities involves risk of loss which clients should be
prepared to bear.  This item also requires that an adviser explain the material risks involved for each
significant investment strategy or method of analysis it uses and particular type of security it recommends,
with more detail if those risks are significant or unusual.  Accordingly, investment advisers are required to
identify and explain certain risks involved in their investment strategies and the types of securities they
recommend.  An investment adviser needs to consider those same risks in determining the clients to which
the adviser recommends those investments.

002623

example, when advising a financially sophisticated client, such as a fund or other sophisticated

client that has an appropriate risk tolerance, it may be in the best interest of the client to invest in

such derivatives or in securities on margin, or to invest in other complex instruments or other

products that may have limited liquidity.

Similarly, when an adviser is assessing whether high risk products—such as penny stocks

or other thinly-traded securities—are in a retail client's best interest, the adviser should generally

apply heightened scrutiny to whether such investments fall within the retail client's risk tolerance

and objectives.  As another example, complex products such as inverse or leveraged exchange-

traded products that are designed primarily as short-term trading tools for sophisticated investors

may not be in the best interest of a retail client absent an identified, short-term, client-specific

trading objective and, to the extent that such products are in the best interest of a retail client

initially, they would require daily monitoring by the adviser.[39]

A reasonable belief that investment advice is in the best interest of a client also requires

that an adviser conduct a reasonable investigation into the investment sufficient not to base its

advice on materially inaccurate or incomplete information.[40]  We have taken enforcement action

where an investment adviser did not independently or reasonably investigate securities before

recommending them to clients.[41]

---

[39]     See Exchange-Traded Funds, Securities Act Release No. 10515 (June 28, 2018); SEC staff and FINRA,
Investor Alert, Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold
Investors (Aug. 1, 2009); SEC Office of Investor Education and Advocacy, Investor Bulletin: Exchange-
Traded Funds (ETFs) (Aug. 2012); see also FINRA Regulatory Notice 09-31, Non-Traditional ETFs –
FINRA Reminds Firms of Sales Practice Obligations Relating to Leveraged and Inverse Exchange-Traded
Funds (June 2009).

[40]     See, e.g., Concept Release on the U.S. Proxy System, Investment Advisers Act Release No. 3052 (July 14,
2010) (indicating that a fiduciary "has a duty of care requiring it to make a reasonable investigation to
determine that it is not basing its recommendations on materially inaccurate or incomplete information").

[41]     See, e.g., In the Matter of Larry C. Grossman, Investment Advisers Act Release No. 4543 (Sept. 30, 2016)
(Commission Opinion) ("In re Grossman") (in connection with imposing liability on a principal of a

002624

The cost (including fees and compensation) associated with investment advice would generally be one of many important factors—such as an investment product's or strategy's investment objectives, characteristics (including any special or unusual features), liquidity, risks and potential benefits, volatility, likely performance in a variety of market and economic conditions, time horizon, and cost of exit—to consider when determining whether a security or investment strategy involving a security or securities is in the best interest of the client. When considering similar investment products or strategies, the fiduciary duty does not necessarily require an adviser to recommend the lowest cost investment product or strategy.

Moreover, an adviser would not satisfy its fiduciary duty to provide advice that is in the client's best interest by simply advising its client to invest in the lowest cost (to the client) or least remunerative (to the investment adviser) investment product or strategy without any further analysis of other factors in the context of the portfolio that the adviser manages for the client and the client's objective. Rather, the adviser could recommend a higher-cost investment or strategy if the adviser reasonably concludes that there are other factors about the investment or strategy that outweigh cost and make the investment or strategy in the best interest of the client, in light of that client's objectives. For example, it might be consistent with an adviser's fiduciary duty to advise a client with a high risk tolerance and significant investment experience to invest in a private equity fund with relatively higher fees and significantly less liquidity as compared with a fund that invests in publicly-traded companies if the private equity fund was in the client's best

---

registered investment adviser for recommending offshore private investment funds to clients), *stayed in part,* Investment Advisers Act 4563 (Nov. 1, 2016), *response to remand*, Investment Advisers Act Release No. 4871 (Mar. 29, 2018) (reinstating the Sept. 30, 2016 opinion and order, except with respect to the disgorgement and prejudgment interest in light of the Supreme Court's decision in *Kokesh v. SEC,* 137 S. Ct. 1635 (2017)).

002625

interest because it provided exposure to an asset class that was appropriate in the context of the client's overall portfolio.

An adviser's fiduciary duty applies to all investment advice the investment adviser provides to clients, including advice about investment strategy, engaging a sub-adviser, and account type.[42]  Advice about account type includes advice about whether to open or invest through a certain type of account (*e.g.*, a commission-based brokerage account or a fee-based advisory account) and advice about whether to roll over assets from one account (*e.g.*, a retirement account) into a new or existing account that the adviser or an affiliate of the adviser manages.[43]  In providing advice about account type, an adviser should consider all types of accounts offered by the adviser and acknowledge to a client when the account types the adviser offers are not in the client's best interest.[44]

---

[42]   In addition, with respect to prospective clients, investment advisers have antifraud liability under section 206 of the Advisers Act, which, among other things, applies to transactions, practices, or courses of business which operate as a fraud or deceit upon prospective clients, including those regarding investment strategy, engaging a sub-adviser, and account type.  We believe that, in order to avoid liability under this antifraud provision, an investment adviser should have sufficient information about the prospective client and its objectives to form a reasonable basis for advice before providing any advice about these matters.  At the point in time at which the prospective client becomes a client of the investment adviser (*e.g.*, at account opening), the fiduciary duty applies.  Accordingly, while advice to prospective clients about these matters must comply with the antifraud provisions under section 206 of the Advisers Act, the adviser must also satisfy its fiduciary duty with respect to any such advice (*e.g.*, regarding account type) when a prospective client becomes a client.

[43]   We consider advice about "rollovers" to include advice about account type, in addition to any advice regarding the investments or investment strategy with respect to the assets to be rolled over, as the advice necessarily includes the advice about the account type into which assets are to be rolled over.  As noted below, as a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest.  *See infra* text accompanying footnote 52.

[44]   Accordingly, in providing advice to a client or customer about account type, a financial professional who is dually licensed (*i.e.,* an associated person of a broker-dealer and a supervised person of an investment adviser (regardless of whether the professional works for a dual registrant, affiliated firms, or unaffiliated firms)) should consider all types of accounts offered (*i.e.,* both brokerage accounts and advisory accounts) when determining whether the advice is in the client's best interest.  A financial professional who is only a supervised person of an investment adviser (regardless of whether that advisory firm is a dual registrant or affiliated with a broker-dealer) may only recommend an advisory account the adviser offers when the account is in the client's best interest. If a financial professional who is only a supervised person of an

002626

## 2.  Duty to Seek Best Execution

An investment adviser's duty of care includes a duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades (typically in the case of discretionary accounts).[45]  In meeting this obligation, an adviser must seek to obtain the execution of transactions for each of its clients such that the client's total cost or proceeds in each transaction are the most favorable under the circumstances.  An adviser fulfills this duty by seeking to obtain the execution of securities transactions on behalf of a client with the goal of maximizing value for the client under the particular circumstances occurring at the time of the transaction.  Maximizing value encompasses more than just minimizing cost.  When seeking best execution, an adviser should consider "the full range and quality of a broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness" to the adviser.[46]  In other words, the "determinative factor" is not the lowest possible commission cost, "but whether the transaction represents the best qualitative execution."[47]  Further, an

---

investment adviser chooses to advise a client to consider a non-advisory account (or to speak with other personnel at a dual registrant or affiliate about a non-advisory account), that advice should be in the best interest of the client.  This same framework applies in the case of a prospective client, but any advice or recommendation given to a prospective client would be subject to the antifraud provisions of the federal securities laws.  *See supra* footnote 42 and Reg. BI Adoption, *supra* footnote 3.

[45]   *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 54165 (July 18, 2006) (stating that investment advisers have "best execution obligations"); Investment Advisers Act Release 3060, *supra* footnote 15 (discussing an adviser's best execution obligations in the context of directed brokerage arrangements and disclosure of soft dollar practices); *see also* Advisers Act rule 206(3)-2(c) (referring to adviser's duty of best execution of client transactions).

[46]   Exchange Act Release 23170, *supra* footnote 33.

[47]   *Id.*

002627

investment adviser should "periodically and systematically" evaluate the execution it is receiving for clients.[48]

### 3. Duty to Provide Advice and Monitoring over the Course of the Relationship

An investment adviser's duty of care also encompasses the duty to provide advice and monitoring at a frequency that is in the best interest of the client, taking into account the scope of the agreed relationship.[49]  For example, when the adviser has an ongoing relationship with a client and is compensated with a periodic asset-based fee, the adviser's duty to provide advice and monitoring will be relatively extensive as is consistent with the nature of the relationship.[50]  Conversely, absent an express agreement regarding the adviser's monitoring obligation, when the adviser and the client have a relationship of limited duration, such as for the provision of a

---

[48]    *Id*.  The Advisers Act does not prohibit advisers from using an affiliated broker to execute client trades.  However, the adviser's use of such an affiliate involves a conflict of interest that must be fully and fairly disclosed and the client must provide informed consent to the conflict.  *See also* Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732 (Jul. 17, 1998) (discussing application of section 206(3) of the Advisers Act to certain principal and agency transactions).  Two commenters requested that we prescribe specific obligations related to best execution.  Comment Letter of the Healthy Markets Association (Aug. 7, 2018); Comment Letter of ICE Data Services (Aug. 7, 2018).  However, prescribing specific requirements of how an adviser might satisfy its best execution obligations is outside of the scope of this Final Interpretation.

[49]    *Cf.* SEC v. Capital Gains, *supra* footnote 2 (describing advisers' "basic function" as "furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments" (quoting Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28)).  *Cf.* Barbara Black, *Brokers and Advisers-What's in a Name?*, 32 Fordham Journal of Corporate and Financial Law XI (2005) ("[W]here the investment adviser's duties include management of the account, [the adviser] is under an obligation to monitor the performance of the account and to make appropriate changes in the portfolio."); Arthur B. Laby, *Fiduciary Obligations of Broker-Dealers and Investment Advisers*, 55 Villanova Law Review 701 (2010) ("Laby Villanova Article") (stating that the scope of an adviser's activity can be altered by contract and that an adviser's fiduciary duty would be commensurate with the scope of the relationship) (internal citations omitted).

[50]    However, an adviser and client may scope the frequency of the adviser's monitoring (*e.g.*, agreement to monitor quarterly or monthly and as appropriate in between based on market events), provided that there is full and fair disclosure and informed consent.  We consider the frequency of monitoring, as well as any other material facts relating to the agreed frequency, such as whether there will also be interim monitoring when there are market events relevant to the client's portfolio, to be a material fact relating to the advisory relationship about which an adviser must make full and fair disclosure and obtain informed consent as required by its fiduciary duty.

002628

one-time financial plan for a one-time fee, the adviser is unlikely to have a duty to monitor.  In

other words, in the absence of any agreed limitation or expansion, the scope of the duty to

monitor will be indicated by the duration and nature of the agreed advisory arrangement.[51]  As a

general matter, an adviser's duty to monitor extends to all personalized advice it provides to the

client, including, for example, in an ongoing relationship, an evaluation of whether a client's

account or program type (for example, a wrap account) continues to be in the client's best

interest.[52]

### C.  Duty of Loyalty

The duty of loyalty requires that an adviser not subordinate its clients' interests to its

own.[53]  In other words, an investment adviser must not place its own interest ahead of its client's

interests.[54]  To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients

---

[51]  *See also* Laby Villanova Article, *supra* footnote 49, at 728 (2010) ("If an adviser has agreed to provide continuous supervisory services, the scope of the adviser's fiduciary duty entails a continuous, ongoing duty to supervise the client's account, regardless of whether any trading occurs.  This feature of the adviser's duty, even in a non-discretionary account, contrasts sharply with the duty of a broker administering a non-discretionary account, where no duty to monitor is required.") (internal citations omitted).

[52]  Investment advisers also may consider whether written policies and procedures relating to monitoring would be appropriate under Advisers Act rule 206(4)-7, which requires any investment adviser registered or required to be registered under the Advisers Act to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules thereunder by the adviser and its supervised persons.

[53]  Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that "[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, *supra* footnote 15).  The duty of loyalty applies not just to advice regarding potential investments, but to all advice the investment adviser provides to an existing client, including advice about investment strategy, engaging a sub-adviser, and account type.  *See supra* text accompanying footnotes 42-43.

[54]  For example, an adviser cannot favor its own interests over those of a client, whether by favoring its own accounts or by favoring certain client accounts that pay higher fee rates to the adviser over other client accounts.  The Commission has brought numerous enforcement actions against advisers that allocated trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts.  *See, e.g., SEC v. Strategic Capital Management, LLC and Michael J. Breton*, Litigation Release No. 23867 (June 23, 2017) (partial settlement) (adviser placed trades through a master brokerage account and then allocated profitable trades to adviser's account while placing unprofitable trades into the client accounts in

002629

of all material facts relating to the advisory relationship.[55]  Material facts relating to the advisory relationship include the capacity in which the firm is acting with respect to the advice provided. This will be particularly relevant for firms or individuals that are dually registered as broker-dealers and investment advisers and who serve the same client in both an advisory and a brokerage capacity.  Thus, such firms and individuals generally should provide full and fair disclosure about the circumstances in which they intend to act in their brokerage capacity and the circumstances in which they intend to act in their advisory capacity.  This disclosure may be accomplished through a variety of means, including, among others, written disclosure at the beginning of a relationship that clearly sets forth when the dual registrant would act in an advisory capacity and how it would provide notification of any changes in capacity.[56]  Similarly, a dual registrant acting in its advisory capacity should disclose any circumstances under which its advice will be limited to a menu of certain products offered through its affiliated broker-dealer or affiliated investment adviser.

---

violation of fiduciary duty and contrary to disclosures).  In the Proposed Interpretation, we stated that the duty of loyalty requires an adviser to "put its client's interest first."  One commenter suggested that the requirement of an adviser to put its client's interest "first" is very different from a requirement not to "subordinate" or "subrogate" clients' interests, and is inconsistent with how the duty of loyalty had been applied in the past.  *See* Comment Letter of the Asset Management Group of the Securities Industry and Financial Markets Association (Aug. 7, 2018) ("SIFMA AMG Letter").  Accordingly, we have revised the description of the duty of loyalty in this Final Interpretation to be more consistent with how we have previously described the duty.  *See* Investment Advisers Act Release 3060, *supra* footnote 15 ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own.") (citing Investment Advisers Act Release 2106, *supra* footnote 15).  In practice, referring to putting a client's interest first is a plain English formulation commonly used by investment advisers to explain their duty of loyalty in a way that may be more understandable to retail clients.

[55]     *See* SEC v. Capital Gains, *supra* footnote 2 ("Failure to disclose material facts must be deemed fraud or deceit within its intended meaning."); Investment Advisers Act Release 3060, *supra* footnote 15 ("as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship"); *see also* General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.").

[56]     *See also* Reg. BI Adoption, *supra* footnote 3, at 99.

002630

In addition, an adviser must eliminate or at least expose through full and fair disclosure
all conflicts of interest which might incline an investment adviser—consciously or
unconsciously—to render advice which was not disinterested.[57]  We believe that while full and
fair disclosure of all material facts relating to the advisory relationship or of conflicts of interest
and a client's informed consent prevent the presence of those material facts or conflicts
themselves from violating the adviser's fiduciary duty, such disclosure and consent do not
themselves satisfy the adviser's duty to act in the client's best interest.[58]  To illustrate what

---

[57]    In the Proposed Interpretation, we stated that an adviser must seek to avoid conflicts of interest with its
clients.  Proposed Interpretation, *supra* footnote 6.  Some commenters requested clarity on what it means to
"seek to avoid" conflicts of interest.  *See, e.g.,* Comment Letter of Schulte Roth & Zabel LLP (Aug. 8,
2018); ABA Letter (stating that this wording could be read to require an adviser to first seek to avoid a
conflict, before addressing a conflict through disclosure, rather than being able to provide full and fair
disclosure of a conflict, and only seek avoidance if the conflict cannot be addressed through disclosure).
The Commission first used this phrasing when adopting amendments to the Form ADV Part 2 instructions.
*See* Investment Advisers Act Release 3060, *supra* footnote 15 and General Instruction 3 to Part 2 of Form
ADV ("As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a
minimum, make full disclosure of all material conflicts of interest between you and your clients that could
affect the advisory relationship.").  The release adopting this instruction clarifies the Commission's intent
that it capture the fiduciary duty described in SEC v. Capital Gains and Arleen Hughes.  *See* Investment
Advisers Act Release 3060, *supra* footnote 15, at n.4 and accompanying text (citing SEC v. Capital Gains,
*supra* footnote 2, and Arleen Hughes, *supra* footnote 18, as the basis of this language).  Both of these cases
emphasized that the adviser, as a fiduciary, should seek to avoid conflicts, but at a minimum must make full
and fair disclosure of the conflict and obtain the client's informed consent.  *See* SEC v. Capital Gains,
*supra* footnote 2 ("The Advisers Act thus reflects . . . a congressional intent to eliminate, or at least to
expose, all conflicts of interest which might incline an investment adviser—consciously or
unconsciously—to render advice which was not disinterested."); Arleen Hughes, *supra* footnote 18 ("Since
loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a
fiduciary must not put himself into a position where his own interests may come in conflict with those of
his principal" but if a fiduciary "chooses to assume a role in which she is motivated by conflicting interests,
. . . she may do so if, but only if, she obtains her client's consent after disclosure . . .").  We believe the
Commission's reference to "seek to avoid" conflicts in the Form ADV Part 2 instructions is consistent with
the Final Interpretation's statement that an adviser "must eliminate or at least expose all conflicts of interest
which might incline an investment adviser—consciously or unconsciously—to render advice which was
not disinterested" as well as the substantively identical statements in SEC v. Capital Gains, *supra* footnote
2, and Arleen Hughes, *supra* footnote 18.  While an adviser may satisfy its duty of loyalty by making full
and fair disclosure of conflicts of interest and obtaining the client's informed consent, an adviser is
prohibited from overreaching or taking unfair advantage of a client's trust.

[58]    As noted above, an investment adviser's obligation to act in the best interest of its client is an overarching
principle that encompasses both the duty of care and the duty of loyalty.  *See* SEC v. Tambone, *supra*
footnote 23 (stating that Advisers Act section 206 "imposes a fiduciary duty on investment advisers to act
at all times in the best interest of the fund . . . and *includes* an obligation to provide 'full and fair disclosure
of all material facts'") (emphasis added) (citing SEC v. Capital Gains, *supra* footnote 2).  We describe

23

002631

constitutes full and fair disclosure, we are providing the following guidance on (i) the

appropriate level of specificity, including the appropriateness of stating that an adviser "may"

have a conflict, and (ii) considerations for disclosure regarding conflicts related to the allocation

of investment opportunities among eligible clients.

In order for disclosure to be full and fair, it should be sufficiently specific so that a client

is able to understand the material fact or conflict of interest and make an informed decision

whether to provide consent.[59]  For example, it would be inadequate to disclose that the adviser

has "other clients" without describing how the adviser will manage conflicts between clients if

and when they arise, or to disclose that the adviser has "conflicts" without further description.

---

above in this Final Interpretation how the application of an investment adviser's fiduciary duty to its client will vary with the scope of the advisory relationship.  *See supra* section II.A.

[59]    Arleen Hughes, *supra* footnote 18, at 4 and 8 (stating, "[s]ince loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal.  To prevent any conflict and the possible subordination of this duty to act solely for the benefit of his principal, a fiduciary at common law is forbidden to deal as an adverse party with his principal.  An exception is made, however, where the principal gives his informed consent to such dealings," and adding that, "[r]egistrant has an affirmative obligation to disclose all material facts to her clients in a manner which is clear enough so that a client is fully apprised of the facts and is in a position to give his informed consent."); *see also Hughes v. Securities and Exchange Commission*, 174 F.2d 969 (1949) (affirming the SEC decision in Arleen Hughes); General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them"); Investment Advisers Act Release 3060, *supra* footnote 15; Restatement (Third) of Agency §8.06 ("Conduct by an agent that would otherwise constitute a breach of duty as stated in §§ 8.01, 8.02, 8.03, 8.04, and 8.05 [referencing the fiduciary duty] does not constitute a breach of duty if the principal consents to the conduct, provided that (a) in obtaining the principal's consent, the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.").  *See infra* footnotes 67-70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

002632

Similarly, disclosure that an adviser "may" have a particular conflict, without more, is not

adequate when the conflict actually exists.[60]  For example, we would consider the use of "may"

inappropriate when the conflict exists with respect to some (but not all) types or classes of

clients, advice, or transactions without additional disclosure specifying the types or classes of

clients, advice, or transactions with respect to which the conflict exists.  In addition, the use of

"may" would be inappropriate if it simply precedes a list of all possible or potential conflicts

regardless of likelihood and obfuscates actual conflicts to the point that a client cannot provide

informed consent.  On the other hand, the word "may" could be appropriately used to disclose to

a client a potential conflict that does not currently exist but might reasonably present itself in the

future.[61]

Whether the disclosure is full and fair will depend upon, among other things, the nature

of the client, the scope of the services, and the material fact or conflict.  Full and fair disclosure

for an institutional client (including the specificity, level of detail, and explanation of

terminology) can differ, in some cases significantly, from full and fair disclosure for a retail

client because institutional clients generally have a greater capacity and more resources than

---

[60]    We have brought enforcement actions in such cases.  *See, e.g.,* In the Matter of The Robare Group, Ltd., et al., Investment Advisers Act Release No. 4566 (Nov. 7, 2016) (Commission Opinion) (finding, among other things, that adviser's disclosure that it *may* receive a certain type of compensation was inadequate because it did not reveal that the adviser actually had an arrangement pursuant to which it received fees that presented a potential conflict of interest); *aff'd in part and rev'd in part on other grounds Robare* v. SEC, *supra* footnote 20; *In re Grossman*, *supra* footnote 41 (indicating that "the use of the prospective 'may' in [the relevant Form ADV disclosures] is misleading because it suggested the mere possibility that [the broker] would make a referral and/or be paid 'referral fees' at a later point, when in fact a commission-sharing arrangement was already in place and generating income").  *Cf. Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("The Commission noted the critical distinction between disclosing the risk that a future event *might* occur and disclosing actual knowledge the event *will* occur.") (emphasis in original).  For Form ADV Part 2 purposes, advisers are instructed that when they have a conflict or engage in a practice with respect to some (but not all) types or classes of clients, advice, or transactions, to indicate as such rather than disclosing that they "may" have the conflict or engage in the practice.  General Instruction 2 to Part 2 of Form ADV.

[61]    We have added this example of a circumstance where "may" could be appropriately used in response to the request of some commenters.  *See, e.g.,* Pickard Letter; ICI Letter; Ropes & Gray Letter; IAA Letter.

002633

retail clients to analyze and understand complex conflicts and their ramifications.[62]

Nevertheless, regardless of the nature of the client, the disclosure must be clear and detailed

enough for the client to make an informed decision to consent to the conflict of interest or reject

it.

When allocating investment opportunities among eligible clients, an adviser may face

conflicts of interest either between its own interests and those of a client or among different

clients.[63]  If so, the adviser must eliminate or at least expose through full and fair disclosure the

conflicts associated with its allocation policies, including how the adviser will allocate

investment opportunities, such that a client can provide informed consent.[64]  When allocating

investment opportunities, an adviser is permitted to consider the nature and objectives of the

client and the scope of the relationship.[65]  An adviser need not have *pro rata* allocation policies,

or any particular method of allocation, but, as with other conflicts and material facts, the

---

[62]     *Arleen Hughes, supra* footnote 18 (the "method and extent of disclosure depends upon the particular client involved," and an unsophisticated client may require "a more extensive explanation than the informed investor").

[63]     *See* Restatement (Third) of Agency, § 8.01 General Fiduciary Principle (2006) ("Unless the principal consents, the general fiduciary principle, as elaborated by the more specific duties of loyalty stated in §§ 8.02 to 8.05, also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.").

[64]     The Commission has brought numerous enforcement actions alleging that advisers unfairly allocated client trades to preferred clients without making full and fair disclosure.  *See* Staff of the U.S. Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers As Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Jan. 2011), *available at* https://www.sec.gov/news/studies/2011/913studyfinal.pdf, at 23–24 (citing enforcement actions).  This Final Interpretation sets forth the Commission's views regarding what constitutes full and fair disclosure.  *See, e.g., supra* text accompanying footnote 59; *see also* Barry Barbash and Jai Massari, *The Investment Advisers Act of 1940; Regulation by Accretion*, 39 Rutgers Law Journal 627 (2008) (stating that under section 206 of the Advisers Act and traditional notions of fiduciary and agency law, an adviser must not give preferential treatment to some clients or systematically exclude eligible clients from participating in specific opportunities without providing the clients with appropriate disclosure regarding the treatment).

[65]     An adviser and a client may even agree that certain investment opportunities or categories of investment opportunities will not be allocated or offered to a client.

002634

adviser's allocation practices must not prevent it from providing advice that is in the best interest

of its clients.[66]

 While most commenters agreed that informed consent is a component of the fiduciary

duty, a few commenters objected to what they saw as subjectivity in the use of the term

"informed" to describe a client's consent to a disclosed conflict.[67]  The fact that disclosure must

be full and fair such that a client can provide informed consent does not require advisers to make

an affirmative determination that a particular client understood the disclosure and that the

client's consent to the conflict of interest was informed.  Rather, disclosure should be designed to

put a client in a position to be able to understand and provide informed consent to the conflict of

interest.  A client's informed consent can be either explicit or, depending on the facts and

circumstances, implicit.[68]  We believe, however, that it would not be consistent with an adviser's

fiduciary duty to infer or accept client consent where the adviser was aware, or reasonably

should have been aware, that the client did not understand the nature and import of the conflict.[69]

---

[66] In the Proposed Interpretation, we stated that "in allocating investment opportunities among eligible clients, an adviser must treat all clients fairly."  Some commenters interpreted this statement to mean that it would be impermissible for an adviser to allocate a particular investment to one eligible client instead of a second eligible client, even when the second client had received full and fair disclosure and provided informed consent to such an investment being allocated to the first client.  *See, e.g.,* Ropes & Gray Letter; SIFMA AMG Letter.  We have removed that sentence from this Final Interpretation and replaced it with this discussion that clarifies our views regarding allocation of investment opportunities.

[67] *See, e.g.,* Comment Letter of LPL Financial LLC (Aug. 7, 2018); Ropes & Gray Letter.

[68] We do not interpret an adviser's fiduciary duty to require that full and fair disclosure or informed consent be achieved in a written advisory contract or otherwise in writing.  For example, an adviser could provide a client full and fair disclosure of all material facts relating to the advisory relationship as well as full and fair disclosure of all conflicts of interest which might incline the adviser, consciously or unconsciously, to render advice that was not disinterested, through a combination of Form ADV and other disclosure and the client could implicitly consent by entering into or continuing the investment advisory relationship with the adviser.

[69] *See* Arleen Hughes, *supra* footnote 18 ("Registrant cannot satisfy this duty by executing an agreement with her clients which the record shows some clients do not understand and which, in any event, does not contain the essential facts which she must communicate.").  In the Proposed Interpretation, we stated that inferring or accepting client consent to a conflict would not be consistent with the fiduciary duty where "the material facts concerning the conflict could not be fully and fairly disclosed."  Some commenters expressed

002635

In some cases, conflicts may be of a nature and extent that it would be difficult to provide

disclosure to clients that adequately conveys the material facts or the nature, magnitude, and

potential effect of the conflict sufficient for a client to consent to or reject it.[70]  In other cases,

disclosure may not be specific enough for a client to understand whether and how the conflict

could affect the advice it receives.  For retail clients in particular, it may be difficult to provide

disclosure regarding complex or extensive conflicts that is sufficiently specific, but also

understandable.  In all of these cases where an investment adviser cannot fully and fairly disclose

a conflict of interest to a client such that the client can provide informed consent, the adviser

should either *eliminate* the conflict or adequately *mitigate* (*i.e.,* modify practices to reduce) the

conflict such that full and fair disclosure and informed consent are possible.

Full and fair disclosure of all material facts relating to the advisory relationship, and all

conflicts of interest which might incline an investment adviser—consciously or unconsciously—

to render advice which was not disinterested, can help clients and prospective clients in

evaluating and selecting investment advisers.  Accordingly, we require advisers to deliver to

their clients a "brochure," under Part 2A of Form ADV, which sets out minimum disclosure

requirements, including disclosure of certain conflicts.[71]  Investment advisers are required to

---

agreement with this statement.  *See, e.g.,* CFA Letter (agreeing that "advisers should be precluded from inferring or accepting client consent to a conflict" where the material facts concerning the conflict could not be fully and fairly disclosed).  Other commenters expressed doubt that such disclosure could be impossible.  *See, e.g.,* Allianz Letter ("[W]e have not encountered a situation in which we could not fully and fairly disclose the material facts, including the nature, extent, magnitude and potential effects of the conflict.").  In response to commenters, we have replaced the general statement about an inability to fully and fairly disclose material facts about the conflict with more specific examples of how advisers can make such full and fair disclosure.  *See supra* text accompanying footnotes 59-66.

[70]   As discussed above, institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications.  *See supra* text accompanying footnote 62.

[71]   Investment Advisers Act Release 3060, *supra* footnote 15; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of

002636

deliver the brochure to a prospective client at or before entering into a contract so that the prospective client can use the information contained in the brochure to decide whether or not to enter into the advisory relationship.[72]  In a concurrent release, we are requiring all investment advisers to deliver to retail investors, at or before the time the adviser enters into an investment advisory agreement, a relationship summary, which would include, among other things, a plain English summary of certain of the firm's conflicts of interest, and would encourage retail investors to inquire about those conflicts.[73]

## III.   ECONOMIC CONSIDERATIONS

As noted above, this Final Interpretation is intended to reaffirm, and in some cases clarify, certain aspects of an investment adviser's fiduciary duty under the Advisers Act.  The Final Interpretation does not itself create any new legal obligations for advisers.  Nonetheless, the Commission recognizes that to the extent an adviser's practices are not consistent with the Final Interpretation provided above, the Final Interpretation could have potential economic effects.  We discuss these potential effects below.

---

interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship.  This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.")  *See also* Robare v. SEC, *supra* footnote 20 ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

[72]   Investment Advisers Act rule 204-3.  *See* Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that, "A client may use this disclosure to select his or her own adviser and evaluate the adviser's business practices and conflicts on an ongoing basis.  As a result, the disclosure clients and prospective clients receive is critical to their ability to make an informed decision about whether to engage an adviser and, having engaged the adviser, to manage that relationship.").  To the extent that the information required for inclusion in the brochure does not satisfy an adviser's disclosure obligation, the adviser "may have to disclose to clients information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require" and this disclosure may be made "in [the] brochure or by some other means."  General Instruction 3 to Part 2 of Form ADV.

[73]   Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 5247 (June 5, 2019) ("Relationship Summary Adoption").

002637

### A. Background

The Commission's interpretation of the standard of conduct for investment advisers under the Advisers Act set forth in this Final Interpretation would affect investment advisers and their associated persons as well as the clients of those investment advisers, and the market for financial advice more broadly.[74]  As of December 31, 2018, there were 13,299 investment advisers registered with the Commission with over $84 trillion in assets under management as well as 17,268 investment advisers registered with states with approximately $334 billion in assets under management and 3,911 investment advisers who submit Form ADV as exempt reporting advisers.[75]  As of December 31, 2018, there are approximately 41 million client accounts advised by SEC-registered investment advisers.[76]

These investment advisers currently incur ongoing costs related to their compliance with their legal and regulatory obligations, including costs related to understanding the standard of conduct.  We believe, based on the Commission's experience, that the interpretations set forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act.[77]  However, we recognize that as the scope of the

---

[74]    *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A (discussing the market for financial advice generally).

[75]    Data on investment advisers is based on staff analysis of Form ADV, particularly Item 5.F.(2)(c) of Part 1A for Regulatory Assets under Management.  Because this Final Interpretation interprets an adviser's fiduciary duty under section 206 of the Advisers Act, this interpretation would be applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.

[76]    Item 5.F.(2)(f) of Part 1A of Form ADV.

[77]    *See supra* section II.B.i.  For example, some commenters asked that we clarify from the Proposed Interpretation that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies, through contract.  *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter.  *See supra* footnotes 67–69 and accompanying text, including clarifications addressing these commenters' concerns.  More generally, some commenters requested clarifications from the Proposed Interpretation, and we are issuing this Final Interpretation to address those issues raised by commenters, as discussed in more detail above.

002638

adviser-client relationship varies and in many cases can be broad, there may be certain current circumstances where investment advisers interpret their fiduciary duty to require something less, and other current circumstances where they interpret their fiduciary duty to require something more, than this Final Interpretation.  We lack data to identify which investment advisers currently understand their fiduciary duty to require something different from the standard of conduct articulated in this Final Interpretation.  Based on our experience over decades of interacting with the investment management industry as its primary regulator, however, we generally believe that it is not a significant portion of the market.

One commenter suggested that the Proposed Interpretation's discussion of how an adviser fulfills its fiduciary duty appeared to be based in the context of having as a client an individual investor, and not a fund.[78]  This commenter indicated its concerns about the ability of a fund manager to infer consent from a client that is a fund, and that issues regarding inferring consent from funds could significantly increase compliance costs for venture capital funds.[79] Our discussion above in this Final Interpretation includes clarifications to address comments, and expressly acknowledges that while all investment advisers owe each of their clients a fiduciary duty, the specific application of the investment adviser's fiduciary duty must be viewed in the context of the agreed-upon scope of the adviser-client relationship.[80]  This Final Interpretation, as compared to the Proposed Interpretation, includes significantly more examples of the application of the fiduciary duty to institutional clients, and clarifies the Commission's interpretation of what constitutes full and fair disclosure and informed consent, acknowledging a number of comments

---

[78]     *See* Comment Letter of National Venture Capital Association (Aug. 7, 2018) ("NVCA Letter").

[79]     *Id.*

[80]     *See supra* section II.A.

002639

on this topic.[81]  We believe that these clarifications will help address some of this commenter's concerns with respect to increased compliance costs for venture capital funds, in part by clarifying how the fiduciary duty can apply to institutional clients.  We continue to believe, based on our experience with investment advisers to different types of clients, that advisers understand their fiduciary duty to be generally consistent with the standards of this Final Interpretation.

### B.  Potential Economic Effects

Based on our experience as the long-standing regulator of the investment adviser industry, the Commission's interpretation of the fiduciary duty under section 206 of the Advisers Act described in this Final Interpretation generally reaffirms the current practices of investment advisers.  Therefore, we expect there to be no significant economic effects from this Final Interpretation.  However, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, we acknowledge that affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them.  Further, to the extent certain investment advisers currently understand the practices necessary to comply with their fiduciary duty to be different from those discussed in this Final Interpretation, there could be some economic effects, which we discuss below.

*Clients of investment advisers*

The typical relationship between an investment adviser and a client is a principal-agent relationship, where the principal (the client) hires an agent (the investment adviser) to perform

---

[81]     In particular, this Final Interpretation expressly notes our belief that a client generally may provide its informed consent implicitly "by entering into or continuing the investment advisory relationship with the adviser" after disclosure of a conflict of interest.  *See supra* footnote 68.

002640

some service (investment advisory services) on the principal's behalf.[82]  Because investors and

investment advisers are likely to have different preferences and goals, the investment adviser

relationship is subject to agency problems, including those resulting from conflicts: that is,

investment advisers may take actions that increase their well-being at the expense of investors,

thereby imposing agency costs on investors.[83]  A fiduciary duty, such as the duty investment

advisers owe their clients, can mitigate these agency problems and reduce agency costs by

deterring investment advisers from taking actions that expose them to legal liability.[84]

To the extent this Final Interpretation causes a change in behavior of those investment

advisers, if any, who currently interpret their fiduciary duty to require something different from

this Final Interpretation, we expect a potential reduction in agency problems and, consequently, a

reduction of agency costs to the client.[85]  For example, an adviser that, as part of its duty of

loyalty, fully and fairly discloses[86] a conflict of interest and receives informed consent from its

client with respect to the conflict may reduce agency costs by increasing the client's awareness

of the conflict and improving the client's ability to monitor the adviser with respect to this

conflict.  Alternatively, the client may choose to not consent given the information the adviser

---

[82]    *See, e.g.*, James A. Brickley, Clifford W. Smith, Jr. & Jerold L. Zimmerman, *Managerial Economics and Organizational Architecture* (2004), at 265 ("An agency relationship consists of an agreement under which one party, the principal, engages another party, the agent, to perform some service on the principal's behalf."); *see also* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 Journal of Financial Economics 305-360 (1976) ("Jensen and Meckling").

[83]    *See, e.g.*, Jensen and Meckling, *supra* footnote 82.

[84]    *See*, *e.g.*, Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty*, 36 Journal of Law & Economics 425-46 (1993).

[85]    To the extent that this Final Interpretation clarifies the fiduciary duty for investment advisers, one commenter suggested it may then clarify what clients expect of their investment advisers.  *See* Cambridge Letter (stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals").

[86]    As discussed above, whether such a disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the conflict.  *See supra* section II.C.

33

002641

disdoses about a conflict of interest if the perceived risk associated with the conflict is too

significant, and instead try to renegotiate the contract with the adviser or look for an alternative

adviser or other financial professional.  In addition, the obligation to fully and fairly disclose a

current conflict may cause the adviser to take other actions, for example eliminating or

adequately mitigating (*i.e.*, modifying practices to reduce) that conflict rather than taking the risk

that the client will not provide informed consent or will look for an alternative adviser or other

financial professional.  The extent to which agency costs would be reduced by such a disclosure

is difficult to assess given that we are unable to ascertain the total number of investment advisers

that currently interpret their fiduciary duty to require something different from the Commission's

interpretation,[87] and consequently we are not able to estimate the agency costs such advisers

currently impose on investors.  In addition, we believe that there may be potential benefits for

clients of those investment advisers, if any, to the extent this Final Interpretation is effective at

strengthening investment advisers' understanding of their obligations to their clients.  Further, to

the extent that this Final Interpretation enhances the understanding of any investment advisers of

their duty of care, it may potentially raise the quality of investment advice and also lead to

increased compliance with the duty to monitor, for example whether advice about an account or

program type remains in the client's best interest, thereby increasing the likelihood that the

advice fits with a client's objectives.

     In addition, to the extent that this Final Interpretation causes some investment advisers to

properly identify circumstances in which conflicts may be of a nature and extent that it would be

---

[87]    One commenter did not agree that the discussion of fiduciary obligations in the Proposed Interpretation
applied to advisers to funds as well as advisers to retail investors.  *See* NVCA Letter.  As discussed above,
this Final Interpretation has clarified the discussion to address this commenter's concerns and
acknowledges that the application of the fiduciary duty of an adviser to a retail client would be different
from the specific application of the fiduciary duty of an adviser to a registered investment company or
private fund.

002642

difficult to provide disclosure to clients that adequately conveys the material facts or nature,

magnitude, and potential effect of the conflict sufficient for clients to consent to it or reject it, or

in which the disclosure may not be specific enough for clients to understand whether and how

the conflict could affect the advice they receive, this Final Interpretation may lead those

investment advisers to take additional steps to improve their disclosures or to determine whether

adequately mitigating (*i.e.,* modifying practices to reduce) the conflict may be appropriate such

that full and fair disclosure and informed consent are possible.  This Final Interpretation may

also cause some investment advisers to conclude in some circumstances that they cannot fully

and fairly disclose a conflict of interest to a client such that the client can provide informed

consent.  We would expect that these advisers would either eliminate the conflict or adequately

mitigate (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and

informed consent would be possible.  Thus, to the extent this Final Interpretation would cause

investment advisers to better understand their obligations and therefore to modify their business

practices in ways that (i) reduce the likelihood that conflicts and other agency costs will cause an

adviser to place its interests ahead of the interests of the client or (ii) help those advisers to

provide full and fair disclosure, it would be expected to ameliorate the agency conflict between

investment advisers and their clients.  In turn, this may improve the quality of advice that the

clients receive and therefore produce higher overall returns for clients and increase the efficiency

of portfolio allocation.  However, as discussed above, we would generally expect these effects to

be minimal because we believe that the interpretations we are setting forth in this Final

Interpretation are generally consistent with investment advisers' current understanding of their

fiduciary duty under the Advisers Act.  Finally, this Final Interpretation would also benefit

35

002643

clients of investment advisers to the extent it assists the Commission in its oversight of investment advisers' compliance with their regulatory obligations.

*Investment advisers and the market for investment advice*

In general, we expect this Final Interpretation to affirm investment advisers' understanding of the fiduciary duty they owe their clients under the Advisers Act, reduce uncertainty for advisers, and facilitate their compliance.  Further, by addressing in one release certain aspects of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act, this Final Interpretation could reduce investment advisers' costs associated with comprehensively assessing their compliance obligations.  We acknowledge that, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them.  Moreover, as discussed above, there may be certain investment advisers who currently understand their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation.  Those investment advisers would experience an increase in their compliance costs as they change their systems, processes, disclosures, and behavior, and train their supervised persons, to align with this Final Interpretation.  However, this increase in costs would be mitigated by potential benefits in efficiency for investment advisers that are able to understand aspects of their fiduciary duty by reference to a single Commission release that reaffirms—and in some cases clarifies—certain aspects of the fiduciary duty.[88]  In addition, and as discussed above, in the case of an investment adviser that believed it owed its clients a lower

---

[88]     As noted above, *supra* footnote 3, this Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty.  It is not, however, intended to be the exclusive resource for understanding these principles.

002644

standard of conduct, there will be client benefits from the ensuing adaptation of a higher standard of conduct and related change in policies and procedures.

Moreover, to the extent any investment advisers that understood their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation change their behavior to align with this Final Interpretation, there could also be some economic effects on the market for investment advice.  For example, any improved compliance may not only reduce agency costs in current investment advisory relationships and increase the value of those relationships to current clients, it may also increase trust in the market for investment advice among all investors, which may result in more investors seeking advice from investment advisers.  This may, in turn, benefit investors by improving the efficiency of their portfolio allocation.  To the extent it is costly or difficult, at least in the short term, to expand the supply of investment advisory services to meet an increase in demand, any such new demand for investment advisory services could put some upward price pressure on fees.  At the same time, however, if any such new demand increases the overall profitability of investment advisory services, then we expect it would encourage entry by new investment advisers—or hiring of new representatives by current investment advisers—such that competition would increase over time. Indeed, the recent growth in the investment adviser segment of the market, both in terms of number of firms and number of representatives,[89] may suggest that the costs of expanding the supply of investment advisory services are currently relatively low.

Additionally, we acknowledge that to the extent certain investment advisers recognize, as a result of this Final Interpretation, that their fiduciary duty is stricter than the fiduciary duty as they currently interpret it, it could potentially affect competition.  Specifically, this Final

---

[89]     *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A.1.d.

002645

Interpretation of certain aspects of the standard of conduct for investment advisers may result in additional compliance costs for investment advisers seeking to meet their fiduciary duty. This increase in compliance costs, in turn, may discourage competition for client segments that generate lower revenues, such as clients with relatively low levels of financial assets, which could reduce the supply of investment advisory services and raise fees for these client segments. However, the investment advisers who already are complying with the understanding of their fiduciary duty reflected in this Final Interpretation, and who may therefore currently have a comparative cost disadvantage, could find it more profitable to compete for the clients of those investment advisers who would face higher compliance costs as a result of this Final Interpretation, which would mitigate negative effects on the supply of investment advisory services. Further, as noted above, there has been a recent growth trend in the supply of investment advisory services, which is likely to mitigate any potential negative supply effects from this Final Interpretation.[90]

One commenter discussed that, in its view, any statement in the Proposed Interpretation that certain circumstances may require the elimination of material conflicts, rather than full and fair disclosure or the mitigation of such conflicts, could lead to an effect on the market and costs to advisers, if such a requirement would cause advisers who had not shared that interpretation to change their business models or product offerings or the ways in which they interact with

---

[90]    Beyond having an effect on competition in the market for investment adviser services, it is possible that this Final Interpretation could affect competition between investment advisers and other providers of financial advice, such as broker-dealers, banks, and insurance companies. This may be the case if certain investors base their choice between an investment adviser and another provider of financial advice, at least in part, on their perception of the standards of conduct each owes to their customers. To the extent that this Final Interpretation increases investors' trust in investment advisers' overall compliance with their standard of conduct, certain of these investors may become more willing to hire an investment adviser rather than one of their non-investment adviser competitors. As a result, investment advisers as a group may become more competitive compared to that of other types of providers of financial advice. On the other hand, if this Final Interpretation raises costs for investment advisers, they could become less competitive with other financial advice providers.

002646

clients.[91]  We disagree that this Final Interpretation includes a requirement to eliminate conflicts

of interest. As discussed in more detail above, elimination of a conflict is one method of

addressing that conflict; when appropriate advisers may also address the conflict by providing

full and fair disclosure such that a client can provide informed consent to the conflict.[92]  Further,

we believe that any potential costs or market effects resulting from investment advisers

addressing conflicts of interest may be decreased by the flexibility advisers have to meet their

federal fiduciary duty in the context of the specific scope of services that they provide to their

clients, as discussed in this Final Interpretation.

The commenter also drew particular attention to the question of whether the

Commission's discussion of the fiduciary duty in the Proposed Interpretation applied to advisers

to institutional clients as well as those to retail clients.  The same commenter indicated that

failing to accommodate the application of the concepts in the Proposed Interpretation to

sophisticated clients could risk changing the marketplace or limiting investment opportunities for

sophisticated clients, increasing compliance burdens for advisers to sophisticated clients, or

chilling innovation.  As explained above, this Final Interpretation, as compared to the Proposed

Interpretation, discusses in more detail the ability of investment advisers and different types of

clients to shape the scope of the relationship to which the fiduciary duty applies.[93]  In particular,

this Final Interpretation acknowledges that while advisers owe each of their clients a fiduciary

duty, the specific obligations of, for example, an adviser providing comprehensive, discretionary

advice in an ongoing relationship with a retail client will be significantly different from the

---

[91]     *See* Dechert Letter.

[92]     *See supra* section II.C.

[93]     *See supra* footnotes 78-81 and accompanying text.

002647

obligations of an adviser to an institutional client, such as a registered investment company or private fund, where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity.[94]

Finally, to the extent this Final Interpretation causes some investment advisers to reassess their compliance with their duty of loyalty, it could lead to a reduction in the expected profitability of advice relating to particular investments for which compliance costs would increase following the reassessment.[95]  As a result, the number of investment advisers willing to advise a client to make these investments may be reduced.  A decline in the supply of investment adviser advice regarding these types of investments could affect efficiency for investors; it could reduce the efficiency of portfolio allocation for those investors who might otherwise benefit from investment adviser advice regarding these types of investments and are no longer able to receive such advice.  At the same time, if providing full and fair disclosure and appropriate monitoring for highly complex products (*e.g.*, those with a complex payout structure, such as those that include variable or contingent payments or payments to multiple parties) results in these products becoming less profitable for investment advisers, investment advisers may be discouraged from supplying advice regarding such products.  However, investors may benefit from (1) no longer receiving inadequate disclosure or monitoring for such products, (2) potentially receiving advice regarding other, less complex or expensive products that may be more efficient for the investor, and (3) only receiving recommendations for highly complex or high cost products for which an

---

[94]     *See supra* section II.A.

[95]     For example, such products could include highly complex, high cost products with risk and return characteristics that are hard for retail investors to fully understand, or where the investment adviser and its representatives receive complicated payments from affiliates that create conflicts of interest that are difficult for retail investors to fully understand.

002648

investment adviser can provide full and fair disclosure regarding its conflicts and appropriate

monitoring.

**List of Subjects in 17 CFR Part 276**

Securities.

**Amendments to the Code of Federal Regulations**

For the reasons set out above, the Commission is amending Title 17, chapter II of the

Code of Federal Regulations as set forth below:

**PART 276–INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT**

**ADVISERS ACT OF 1940 AND GENERAL RULES AND REGULATIONS**

**THEREUNDER**

1.      Part 276 is amended by adding Release No. IA–5428 and the release date of June 5,

2019, to the end of the list of interpretive releases to read as follows"

| Subject | Release No. | Date | Fed. Reg. Vol. and Page |
|---|---|---|---|
| * * * * * * * | | | |
| Commission Interpretation Regarding Standard of Conduct for Investment Advisers | IA-5248 | June 5, 2019 | [Insert FR Volume Number] FR [Insert FR Page Number] |

41

002649

By the Commission.


Dated: June 5, 2019.


Vanessa A. Countryman,

Acting Secretary.

002650

# EXHIBIT 9

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482) (admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

## JOINT OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND HIGHLAND CLO FUNDING, LTD. TO FINAL APPROVAL OF DISCLOSURE STATEMENT AND TO CONFIRMATION OF THE JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

Highland Capital Management, L.P. ("**Highland**") and Highland CLO Funding, Ltd. ("**HCLOF**") hereby file their joint objection (the "**Objection**") to final approval of the disclosure statement [Doc. No. 442] (as amended, the "**Disclosure Statement**") and to confirmation of the *First Amended Joint Plan for Acis Capital Management, L.P. and Acis*

*Capital Management GP, LLC* [Doc. No. 441] (as amended, the "**Plan**"),[1] and respectfully state

as follows:[2]

# I.
## PRELIMINARY STATEMENT

"If at first you don't succeed, try, try again." *–William Edward Hickson*

1.      In proposing Plans A, B and C, it would appear that the Chapter 11 Trustee has

taken this old adage to heart.  Although originally penned as a motivator to would-be teachers, in

the context of these bankruptcy proceedings, this approach by the Chapter 11 Trustee has proven

to be a colossal waste of time and resources at a cost to the estates that eclipses not only the

value of the estates' assets, but the very pre-petition claims the Chapter 11 Trustee is purportedly

responsible for paying.  The result of this case appears to be nothing more than functionally

administratively insolvent estates with mountains of administrative claims continuing to accrue

daily.

2.      By their literal interpretation, the Chapter 11 Trustee's Plans, supported by

unequivocal admissions in his pleadings, establish that post-petition, he has intentionally

breached pre-petition contractual obligations of the Debtors to create a purported $100 million

post-petition claim against the estates for an entity that had no claims against the estates when

the Orders for Relief were entered.  By his own account, he has rendered the estates

administratively insolvent.  Having thus admitted to putting the estates into this predicament—

which under almost every other measure would be considered a flagrant breach of fiduciary

---

[1] Defined terms herein shall be as set forth in the Plan unless otherwise provided herein.
[2] HCLOF has filed no proof of claim in these cases, seeks no monetary relief from the Debtors, and has moved to amend its pending adversary proceeding claim to reflect that it no longer seeks the equitable claims that it sought previously (such claims are moot in any event).  Nonetheless, HCLOF objects on the basis that the proposed plans propose either to take its property or alter its contractual and legal rights.  HCLOF asserts no creditor standing in any of the objections set forth herein, and makes these objections as a party in interest given the substantial harm the plans propose to impose on it.

4815-0110-1423.4

002653

duty—he is now championing to "fix" the situation by either (i) taking non-estate property from the purported (involuntary) claimant and selling it along with some executory contracts of the estates that are otherwise valueless, then distributing the ill-gotten proceeds after carving off a substantial fee for himself, or (ii) re-writing multiple securities contracts to which the estates are not a party in order to not only insulate the estates from the consequences of his self-proclaimed intentional breach, but to radically alter the bargained-for rights of third party market participants in five collateralized loan obligation funds with over $2 billion at stake, none of which ever belonged to the Debtors.

3.      What the Chapter 11 Trustee is proposing under each of Plans A, B and C violates some of the most basic tenets of Title 11 and ignores the very confines of this Court's jurisdiction.  These Plans are patently unconfirmable with an unconscionable premise: that a Chapter 11 Trustee should be handsomely rewarded for an intentional post-petition breach of the estates pre-petition contractual obligations.  Such a conclusion is beyond the pale no matter how allegedly noble  the cause.  These cases should be either dismissed or, at most, converted back to Chapter 7 liquidation.

**II.**
**RELEVANT BACKGROUND**

4.      On January 30, 2018, Joshua N. Terry ("**Terry**") filed involuntary petitions for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("**Acis GP**," and with Acis LP, the "**Debtors**").  A Chapter 7 Trustee was thereafter appointed.

5.      On May 4, 2018, the Chapter 7 Trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**").  Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis*

4815-0110-1423.4

002654

*Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

6.      On May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206]. Thereafter, the United States Trustee appointed Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").[3]

7.      On July 5, 2018, the Chapter 11 Trustee filed the initial Plan [Doc. No. 383], which proposed three (3) alternatives – Plans A, B and C. In summary, Plan A of the Chapter 11 Trustee's Plan proposes to transfer HCLOF's Equity Notes, along with the portfolio management agreements (the "**PMAs**") to which Acis LP is a counter-party, to a third party "plan funder," which is Oaktree. Through this transaction, the Chapter 11 Trustee claims that all creditors will be satisfied in full. Alternatively, the Chapter 11 Trustee has proposed Plans B and C, which are effectively identical in their treatment of creditors and call for Acis LP to retain the PMAs and pay out creditors from future cash flow streams therefrom, as well as potential recoveries from estates' causes of action. Both Plans B and C require radical modification to of the CLO Indentures, ostensibly to ensure the future income stream to the estates.

8.      On July 13, 2018, the Chapter 11 Trustee filed (i) the Disclosure Statement [Doc. No. 405]; (ii) the *First Modification to the Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Doc. No. 406]; and (iii) *the Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines; (C)*

---

[3] Mr. Phelan was initially appointed on May 11, 2018 as the Chapter 11 Trustee of Acis LP and was appointed on May 16, 2018 as the Chapter 11 Trustee of Acis GP.

002655

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* [Doc. No. 407] (the "**Motion for Conditional Approval**").

9. On July 24, 2018, Highland and HCLOF filed respective objections to the Motion for Conditional Approval, [Doc. No. 431] and [Doc. No. 432]. On July 28, 2018, Highland filed a supplement to such objection [Doc. No. 440]. In each objection, Highland and HCLOF reserved rights to object to the final approval of the Disclosure Statement.

10. On July 29, 2018, the Chapter 11 Trustee amended the Plan and Disclosure Statement following an expedited hearing on the Motion for Conditional Approval held earlier that day. Thereafter, on July 30, 2018, the Court entered the *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV) Approving Related Matters* [Doc. No. 446] (the "**Conditional Approval Order**"), conditionally approving the Disclosure Statement, setting an August 21, 2018 combined hearing for final approval of the Disclosure Statement and confirmation of the Plan, and setting related deadlines, including a compressed and expedited discovery schedule (the "**Discovery Schedule**").

11. The Conditional Approval Order required the Chapter 11 Trustee to file a "**Limited Issues Brief**" on or before 4:00 p.m. on August 10, 2018, addressing: (a) issues related to section 1142 of the Bankruptcy Code in connection with the proposed transfer of HCLOF's subordinated notes under the Plan A alternative, and (b) issues related to sections 365 and 1123(a)(5)(F) of the Bankruptcy Code in connection with the proposed modification of the existing Indentures under the proposed Plan B and Plan C (collectively, the "**Limited Issues**").

Also as per the Conditional Approval Order, the deadline for parties to respond to the Limited Issues Brief is 4:00 p.m. on August 16, 2018.

12.     Per the Discovery Schedule, the Chapter 11 Trustee filed the Limited Issues Brief on August 10, 2018 [Doc. No. 493]. Highland and/or HCLOF intend to timely respond to the Limited Issues Brief per the Discovery Schedule. As such, while certain Limited Issues are mentioned herein, Highland and HCLOF reserve all rights on those issues for subsequent objection. Per the Discovery Schedule, this joint objection is to cover matters other than the Limited Issues; provided, however, discovery is actually occurring after the deadline to file this objection. Thus, Highland and HCLOF reserve their rights to supplement these objections.

### III.
### OBJECTION

13.     In order to confirm the Plan, the Chapter 11 Trustee bears the burden of establishing the various provisions of Bankruptcy Code section 1129 by a preponderance of the evidence. *See In re Couture Hotel Corp.*, 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015). The Plan is deficient on almost every applicable subsection of 1129 and, as a result, the Plan is unconfirmable as a matter of law.

**A.     The Bankruptcy Court Lacks Subject Matter Jurisdiction to Confirm the Plan**

14.     The Bankruptcy Court lacks subject matter jurisdiction over this proceeding and, therefore, proceeding with confirmation of any plan will be void *ab initio*. This Court should have dismissed the involuntary petitions that were filed by Joshua Terry in bad faith, and because this Court lacks subject matter jurisdiction over essentially a two-party dispute subject to arbitration. *See* Brief of Appellant Neutra (Case No. 3:18-cv-01056 (N.D. Tex.), [Doc. No. 11].

15.     Even assuming this Court has subject matter over this proceeding, the Plans violate the strictures of that jurisdiction in at least two critical and insurmountable ways:

    a.    Plan A is premised on the taking of non-estate property without its owners consent; and

    b.    Plans B and C are premised on radically altering non-estate executory contracts.

16.    The Court's lack of subject matter jurisdiction is so fundamental, that frankly the Court need look no further. The Chapter 11 Trustee has presented the Court with patently unconfirmable Plans. Section 1129(a)(1) and (a)(2) require, respectively, that the plan and the plan proponent, comply with the applicable provisions of the Bankruptcy Code. The Chapter 11 Trustee's Plan A, however, asks this Court to exceed its constitutional and statutory authority to infringe upon the rights of a non-creditor and effect a taking of non-estate property (the "**Equity Notes**") via an equitable subrogation theory that is completely contrary to the law, and convert that non-estate property into "property of the estate," so that he can then sell it to a third party (Oaktree). This Court cannot approve this scheme because it has no jurisdiction to do so. Confirming Plan B or C likewise would require the Court to exceed its authority because both plans are premised on the nonconsensual alteration of non-executory contracts. Worse yet, the amendments will be to the determent of third parties who are not creditors of these estates and who are not remotely implicated in these proceedings. This Court simply has no such jurisdiction.

17.    It is fundamental that bankruptcy courts do not have subject matter jurisdiction over property that does not belong to a debtor's estate. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 (5th Cir. 2014) (bankruptcy court did not have in rem jurisdiction over assets that were not "property of the estate"); *see also Scott v. Bierman*, 429 F. App'x. 225, 231 (4th Cir. 2011) ("[A] bankruptcy court's jurisdiction does not extend to property not part of a debtor's estate."); *see also NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.)*, 267 B.R. 46, 59

(Bankr. D. Del. 2001) (same); *In re Funneman*, 155 B.R. 197, 199-200 (Bankr. S.D. Ill. 1993) (partnership property was not property of the debtor-partner's estate and, therefore, outside the court's subject matter jurisdiction).

18.     These jurisdictional principles exist to protect the very type of non-debtor property interests that are at issue in this case.  And they apply even when the property would benefit a debtor's estate.  *See, e.g., Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013 (5th Cir. 1985) (noting the limitations placed on the trustee's strong arm powers by section 541, and stating that "Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own.").

19.     Before the Court can order a transfer of the Equity Notes to Oaktree, it would necessarily have to find that they constitute "property of the estate."  If the Court cannot conclude that the Equity Notes are property of the estate, then it will lack jurisdiction to order their transfer by any means.  *See, e.g., In re Murchison*, 54 B.R. 721, 725 (Bankr. N.D. Tex. 1985). (finding that the court was without jurisdiction to approve the sale of property that was not property of the estate: "Because the criterion of § 541(a)(1) has not been satisfied, § 363(b)(1) cannot apply.").[4]

20.     Section 541 of the Bankruptcy Code defines "property of the estate" as, in relevant part, (i) "all legal or equitable interests of the debtor in property as of the commence of the case," (ii) "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title," and (iii) "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. §§ 541(a)(1), (a)(3), (a)(7).

---

[4] Bankruptcy courts have been held to be without jurisdiction to order the sale of non-estate assets, even where the sale was entirely consensual. *See, e.g., First Nat'l Bank v. Community Trust Bank*, No. 05-1610, 2006 WL 724882, at *4 (W.D. La. Mar. 21, 2006) ("Since the property was not part of the bankruptcy estate, the Bankruptcy Court had no authority or jurisdiction to order the consensual sale and, therefore, the sale was void").

21.      Neither the Chapter 11 Trustee nor his proposed transferee, Oaktree, dispute that the Equity Notes are the property of HCLOF. *See* July 6, 2018 Hrg. Tr. at 71:19-25; 119:11-18. Nor has the Chapter 11 Trustee obtained an interest in the Equity Notes via any of the Bankruptcy Code sections enumerated in section 541(a)(3). Thus, for the Equity Notes to be "property of the estate," they would necessarily have to be "property that the estate[s] acquire after the commencement of the case" under section 541(a)(7).[5]

22.      Upon first blush, that would seem to require only that the Chapter 11 Trustee prevail upon his equitable subrogation theory, thereby converting the Equity Notes into "property of the estate." However, even if the Chapter 11 Trustee successfully can obtain ownership of the Equity Notes, such property acquired post-petition is not "property of the estate" under section 541(a)(7).

23.      Under controlling Fifth Circuit law, section 541(a)(7) only applies to "property interest that are themselves traceable to 'property of the estate' or generated in the normal course of the debtor's business." *In re TMT Procurement Corp.*, 764 F.3d at 524-25 ("As we previously recognized in *In re McLain*, 'Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate") (citing *In re McLain*, 516 F.3d 301 (5th Cir. 2008)) (emphasis added); *see also In re Cent. Med. Ctr.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) ("Congress did not intend Section 541 'to enlarge a debtor's rights against others beyond those

---

[5] The Chapter 11 Trustee also does not, and cannot, dispute the axiom that the debtor in possession or trustee steps into the shoes of a debtor and possesses no greater rights than that of the debtor. *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a given that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on the date the bankruptcy case was commenced.") (internal alterations omitted); *In re Gibralter Res., Inc.*, 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor and stands in the shoes of the debtor"); *In re Brooks*, 60 B.R. 155, 160 (Bankr. N.D. Tex. 1986) ("Of course, a bankruptcy trustee can acquire no greater rights in property than the debtor possessed.") (citation omitted)). The Debtors had no right to sell the Equity Notes before the commencement of these bankruptcy cases and have no such rights now.

existing at the commencement of the case..'") (citing *In re N.S. Garrott & Sons*, <mark>772 F.2d 462, 466</mark> (8th Cir. 1985)). That is not the case with the Equity Notes, which are not traceable to any property of the estate, but under the Chapter 11 Trustee's (unsupportable) theory, are property of the estate as a result of a subrogation right that purportedly vested with the estates post-petition.

24. The property at issue in *In re TMT Procurement* was certain corporate shares that were pledged by a non-debtor third party into a court-ordered escrow that served as the collateral for the debtors' DIP loan. *In re TMT Procurement Corp.*, <mark>764 F.3d at 524</mark>. The shares never belonged to the debtors at issue. *Id.* at 524-25. The corporation whose shares had been pledged appealed the orders of the district court (which had withdrawn the reference from the bankruptcy court), arguing that the district court did not have jurisdiction to issue orders with respect to the shares, which were not "property of the estate." *Id.* at 522-23.

25. The Fifth Circuit, vacating the district court's order, rejected the debtors' argument that the shares were property of the estate under section 541(a)(7). In doing so, the Fifth Circuit made clear that: "[T]he Vantage Shares are not 'property of the estate' under § 541(a)(7) because they were not created with or by property of the estate, they were not acquired in the estate's normal course of business, and they are not traceable to or arise out of any pre-petition interest included in the bankruptcy estate." *Id.* at 525 (rejecting also the argument that the tracing limitation did not apply to corporate debtors in chapter 11 bankruptcies).

26. The Plan does not satisfy sections 1129(a)(1) and (a)(2) because it seeks to impermissibly expand the scope of estate property and requires the Court to exceed its jurisdiction. The Equity Notes were not "property of the estate" at the commencement of these cases and the Chapter 11 Trustee has not obtained the Equity Notes through one of the

4815-0110-1423.4

enumerated sections in Section 541(a)(3). Nor are the Equity Notes traceable to any property of the estate. Therefore, the Plan cannot be confirmed. *See In re Cent. Med. Ctr.*, 122 B.R. at 573 (holding that the plan failed to satisfy section 1129(a) "[b]ecause the Plan violates Section 541(a) due to its improper expansion of the estate's interest" in certain funds in which it only had a reversionary interest at the commencement of the case; the plan "baldly seeks to divest the bondholders of property which is rightfully theirs.").

## B. Sections 1129(a)(1), (3) – The Plan Violates the Bankruptcy Code and Violates Other Applicable Law

27. Bankruptcy Code section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title," and section 1129(a)(3) states that a plan cannot be proposed "by any means forbidden by law." As to section 1129(a)(1), the Plan violates well-accepted tenets of bankruptcy law because the Chapter 11 Trustee seeks to (i) take possession of non-estate property and (ii) fundamentally alter non-debtor executory contracts. These are included among the Limited Issues and will be set forth in the response to the Limited Issues Brief.

28. As to section 1129(a)(3), despite the Chapter 11 Trustee's obfuscations regarding "transfers" and other similar self-serving characterizations, the practical reality is that the Plan A transaction effects a sale of the Equity Notes to Oaktree. The Equity Notes are undoubtedly securities. *See Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-43 (S.D.N.Y. 2013) (finding sale of CLO notes to be a sale of a security under *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010)). Any sale of securities must comport with the requirements of federal securities laws, including the Securities Act of 1933 (the "**'33 Act**").[6]

---

[6] Moreover, none of the Indentures or other relevant documents permit the Chapter 11 Trustee, on behalf of Acis, or otherwise, to market HCLOF's Equity Notes for sale. The Chapter 11 Trustee cannot sell the Equity Notes in violation of the terms of the Indentures, and seek at the same time to retain the benefits of the Indentures.

29.     Section 77e of the '33 Act makes it unlawful "to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(c).[7]  The Chapter 11 Trustee has not filed a registration statement covering his proposed sale of the Equity Notes.

30.     Section 1145(a)(1) and (a)(2) do not absolve the Chapter 11 Trustee from compliance with these requirements because Oaktree is not receiving the Equity Notes on account of claims against the estates.  *See also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 425 (S.D.N.Y. 2007) ("[T]he section 1145(a) exemption is available only when the offerees are receiving the securities, at least in part, in exchange for claims against or interests in the debtor which they hold." (internal citation omitted)).

31.     The mechanism set forth in the Plan for the transfer of the Equity Notes makes plain that Oaktree is not the initial transferee (or subrogee).  Instead, the initial transferee are the bankruptcy estates.  As described, the estates will then transfer the notes to Oaktree.  Because Oaktree will not be receiving the Equity Notes in exchange for claims or interests that Oaktree has against the Debtors, the section 1145(a) exemption cannot, and does not, apply.

32.     Bankruptcy Code section 1145 provides a limited exemption when the Chapter 11 Trustee sells a security "of an issuer other than the debtor or an affiliate" 11 U.S.C. § 1145(a)(3).  The exemption allows trustees to raise cash for an estate while protecting purchasers by requiring that adequate information about the securities is available.  This "portfolio securities" exemption should be strictly construed because public policy strongly supports the registration of securities.  *See Quinn & Co. v. S.E.C.*, 452 F.2d 943, 946 (10th Cir. 1971); 8

---

[7] In any litigation or enforcement action, it would be the Chapter 11 Trustee's burden to show the applicability of an exemption to this requirement.  *E.g.*, *SEC v. Carrillo Huettell LLP*, No. 13 Civ. 1735(GBD)(JCF), 2017 WL 213067, at *3 n.7 (S.D.N.Y. Jan. 17, 2017).  The Chapter 11 Trustee has not argued that any of these exemptions apply.  *See* 15 U.S.C. § 77d (providing exemptions to registration requirements).

002663

Collier on Bankr. ¶ 1145.02 (16th ed. 2018). This exemption requires that (1) the debtor own the security on the date the bankruptcy petition was filed; (2) any exempt securities are not securities of the debtor's affiliates; (3) the issuer of the securities is in full compliance with registration and disclosure laws; and (4) the volume of the securities sold be limited to less than 4% of shares outstanding. 11 U.S.C. § 1145(a)(3).

33.     The Chapter 11 Trustee's Plan A transaction clearly does not qualify for this exemption. First, neither the Chapter 11 Trustee nor the Debtors owned the Equity Notes on the date the bankruptcy petition was filed, nor do they own them now. Second, the proposed sale would be far in excess of the 4% threshold permitted by the exemption. Because the section 1145 exemptions do not apply, the Chapter 11 Trustee will be in violation of the '33 Act.

34.     In addition to violating the '33 Act, the Plan violates the Investment Advisors Act of 1940 (the "**IAA**"). It is clear that the Chapter 11 Trustee owes fiduciary duties to HCLOF and its investors. In agreeing to manage the CLO investments, Acis LP represented to the CLOs that it is "registered as an investment adviser" under the IAA and agreed to perform its portfolio management services consistent with the IAA. *See, e.g.*, 2013-1 PMA § 17(b)(i). The IAA imposes a fiduciary duty on Acis LP to act for the benefit of the CLO and its investors, including Equity Noteholders like HCLOF. *See Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 36 (1979) ("Congress intended to impose enforceable fiduciary obligations" in passing the Act); 15 U.S.C. § 80b-6.[8] The scope of Acis LP's (and thus the Chapter 11 Trustee's) fiduciary duties is broad. The Chapter 11 Trustee's obligations include a duty to refrain from conduct that directly harms the CLOs, as well as the more general duty of undivided loyalty. *See Bullmore v. Banc of*

---

[8] Acis LP also owes fiduciary duties as an investment advisor under New York's common law. *See Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties . . . .'") (citations omitted).

4815-0110-1423.4

002664

*Am. Sec. LLC*, <mark>485 F. Supp. 2</mark>d. 464, 471 (S.D.N.Y. 2007) (applying New York law). Each of
the plans proposed by the Chapter 11 Trustee rest upon a flagrant violation of Acis LP's
fiduciary duties: Plan A proposes to sell HCLOF's property without its consent and Plan B and
Plan C propose to impermissibly modify the Indentures to strip HCLOF and the other
noteholders of their right to call a redemption. These issues will be more thoroughly addressed
in HCLOF and Highland's response to the Chapter 11 Trustee's Limited Issues Brief.

35. Moreover, the Chapter 11 Trustee cannot disclaim the duties he owes to the CLOs
and the investors under the contracts and securities laws, including the IAA. In one analogous
case, *In re New Center Hospital*, <mark>200 B.R. 592</mark> (E.D. Mich. 1996), the chapter 11 trustee sought
to escape the duties of the debtor-hospital as the administrator of an employee benefit plan
governed by ERISA. The chapter 11 trustee argued that if he were to administer the plan, he
would be required to act solely in the interest of the ERISA plan beneficiaries which would be in
conflict with his duties to the bankruptcy estates; therefore, he could not serve as an ERISA
fiduciary and a bankruptcy estate fiduciary at the same time. *Id.* The district court rejected this
argument and overturned the decision of the bankruptcy court, concluding that, "[t]he
Bankruptcy Trustee assumes the positon of the debtor as to that debtor's many obligations.
Courts have held that statutory obligations that bind the debtor will subsequently bind the
bankruptcy estate." *Id.* (internal citations omitted). Likewise, the Chapter 11 Trustee is bound to
perform the obligations and duties of Acis LP under relevant contract and applicable law,
including the IAA. Because the Chapter 11 Trustee has put forth a Plan that violates such duties,
he cannot meet the section 1129(a)(3) standard that the Plan is not "forbidden by law."

**C.      Section 1129(a)(3) – The Plan Was Not Proposed in Good Faith**

36.      Bankruptcy Code section 1129(a)(3) further provides that a plan must be
proposed in good faith. The Chapter 11 Trustee, as proponent of the Plan, bears the burden of

demonstrating that it was filed in good faith.  *In re Barnes*, 309 B.R. 888, 892 (Bankr. N.D. Tex.

2003).  A good faith plan "must fairly achieve a result consistent with the [Bankruptcy] Code."

*Id.* (quoting *In re Block Shim Dev. Co. – Irving*, 939 F.2d 289, 292 (5th Cir. 1991)).  Good faith

itself is "evaluated in light of the totality of the circumstances surrounding establishment of [the]

plan, mindful of the purposes underlying the Bankruptcy Code."  *In re Village at Camp Bowie I,*

*L.P.*, 710 F.3d 239, 247 (5th Cir. 2013).  The ultimate goal of the analysis is to determine the

"subjective motive" of a plan proponent.  *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 694

(Bankr. N.D. Tex. 2013).

37.     The record demonstrates there was virtually no negotiation of the economic terms

of the Oaktree proposal, and in particular there was no effort by the Chapter 11 Trustee to secure

the highest possible price for the Equity Notes.[9]  The purported consideration for the PMAs was

clearly based not on any actual metric of value for those contract rights, but on an amount

necessary to pay Josh Terry's claim.  Certainly as to the Equity Notes, this was not a negotiation

between a willing seller and a willing buyer – the seller was not even present.  It is instead a

scheme, concocted in bad faith, to take property from one party and provide a windfall to other

parties.

38.     Moreover, improper motives have tainted these bankruptcy cases from the

beginning.  Joshua Terry initiated these  proceedings on the eve of a state court hearing to

consider the very relief he then requested from this Court.  From the very beginning, Terry has

made clear  his motivation for initiating the involuntary bankruptcy:  to prevent Acis LP from

---

[9] The Chapter 11 Trustee has testified that he engaged in no substantive negotiation concerning the sale price of the
Equity Notes.  *See* Transcript of July 6, 2018 hearing at 75:14-16; 76:6-8:

> MR. MALONEY.  Was there any negotiation over the price formula that they were proposing for
> the subordinated notes?
> MR. PHELAN.  No . . .
> . . .
> Q.  Now you didn't ask that they increase that at all?
> A.  No.

meeting its contractual obligation to effectuate the reset requested by the equity—so that the Debtors could continue to earn management fees they are not entitled to.[10]

39.    The Chapter 11 Trustee has adopted Terry's cause.

40.    At the end of the day, these bankruptcy cases and the Plan amount to nothing but a free option play by Terry, the Chapter 11 Trustee, and Oaktree to monetize PMAs with less than nominal value, at the expense of Highland (who is effectively funding the administrative expenses of these cases on account of the substantial management fees being withheld from it) and HCLOF (who is being denied its contractual rights with non-debtor parties and stripped of its own property against its will to fund that payment).  The Chapter 11 Trustee has nothing to lose from this strategy – he can turn an asset with little or no value into a big pay day for Terry and himself.  Oaktree similarly has nothing to lose – if it doesn't end up getting the Equity Notes, it walks away with all its expenses paid and a $2.5 million break-up fee for its time.

41.    In these circumstances, the Court should not make a good faith finding.

## D.    Section 1129(a)(5) – The Plan Does Not Properly Disclose or Address Insider Issues

42.    Bankruptcy Code section 1129(a)(5)(A)(i) requires a plan proponent to disclose "The identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."  Under both Plan B and Plan C, Terry is slated to receive 100% of the equity in the Reorganized Debtor (as well as, inexplicably, any residual assets of the Acis Trust upon payment in full of all creditors).  Terry therefore clearly comes within the definition of individuals described in section 1129(a)(5)(A)(i).

---

[10] Among the things acknowledged by Terry at the involuntary trial in March 2018 was the fact that he "had no issues with the rest or refinance transaction. [Rather,] the issue was that these collateral-management agreements were transferred for no consideration to Acis."  March 21, 2018 Hrg. Tr. At 132:16-19.  Note, however, that fees would not continue to be payable under the PMAs following a reset in any circumstance.  *See also Id.* at 27:22-28:1: "Q: And you knew there was an extreme likelihood that the [reset] transaction was not going forward as a result of the bankruptcy filing, correct?  MR. TERRY: Yes, that was our goal on filing the involuntary petitions."

002667

While Terry's identity is disclosed in Plans B and C, his affiliations are not. Specifically, the Chapter 11 Trustee makes no effort to describe Terry's relationship and affiliations with other parties in interest in this case including (without limitation) Oaktree, Brigade Capital Management, L.P., and Cortland Capital Markets Services LLC. Furthermore, the Chapter 11 Trustee does not disclose or otherwise describe the post-petition affiliation between Terry and the Chapter 11 Trustee himself. Discovery in this matter has revealed, and evidence at the confirmation hearing will further demonstrate, that Terry has essentially acted as the co-trustee in this case. This includes: taking it upon himself to market the Debtors' assets, introducing the Chapter 11 Trustee to Oaktree, participating in most substantive communications with Oaktree, and participating in the formulation of a Plan that (under Plans B and C) hands control of the Debtors over to him. On this record, it is clear that Terry's affiliations have not been disclosed, in violation of section 1129(a)(5)(A)(i).

43. While Terry's undisclosed affiliations is a significant issue in and of itself, the relationship between Terry and the Chapter 11 Trustee raises yet another, troubling issue. The facts of this case lead inexorably to the conclusion that Terry is an insider of the Plan proponent (i.e., the Chapter 11 Trustee). The term "insider" is defined in Bankruptcy Code section 101(31) to "include" parties who have certain officer, director, or ownership interests in a debtor. However, the concept of a non-statutory insider has been recognized by many courts, including the Supreme Court. *See U.S. Bank N.A. v. Village at Lakeside, LLC*, 138 S. Ct. 960 (2018). The Fifth Circuit has identified the following factors to consider when determining whether a party is non-statutory insider: (1) the closeness of the relationship between the party and the debtor; and (2) whether the transactions between the party and the debtor were conducted at arms-length. *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

Importantly, cases recognize that control over the debtor is <u>not</u> a requirement for determining non-statutory insider status. *See, e.g., In re The Village at Lakeridge, LLC,* 814 F.3d 993, 1001 (9th Cir. 2016); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.),* 531 F.3d 1272, 1277 n.5 (10th Cir. 2008).

44.     The ultimate point of analyzing whether any party is an insider is to determine whether such party is using "their privileged position to disadvantage non-insider creditors." *See In re South Beach Secs., Inc.,* 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007). Insider status is also critical for determining whether a party's desire to obtain, or maintain, control over a debtor is motivating the party. *See In re Rexford Props., LLC,* 557 B.R. 788, 799 (Bankr. C.D. Cal. 2016) (noting that insiders seeking to retain ownership of the reorganized debtor were "influenced by totally different considerations from those motivating the other creditors.") (quoting *In re Featherworks Corp.,* 25 B.R. 634, 640 (1st Cir. BAP 1982)).

45.     In this case, the Chapter 11 Trustee is the proponent of the Plan. Plan proponent insiders should be scrutinized because they, like a debtor insider, may be using a plan process to benefit their "privileged position." For example, in *In re Allegheny Int'l, Inc.,* 118 B.R. 282 (Bankr. W.D. Pa. 1982), the court found that a non-debtor plan proponent (Japonica Partners, L.P.) was considered an insider because Japonica during the case had access to "voluminous and thorough" information available only to insiders. Moreover, the court noted that while Japonica "did not have actual control or legal decision making power [over the debtor] . . . [Japonica] attempted to influence, in not very subtle ways, decisions made by the debtor." *Id.* at 298.

46.     Terry's actions fit perfectly into such a non-statutory insider analysis. A review of the Plan makes plain Terry's favorable treatment. His claim is separately classified, the claim is treated the same as an entirely secured claim would be, despite the fact that Terry did not even

alleged his claim was fully secured, he is being permitted to use $1 million to acquire Acis LP's equity, despite the fact that the claim on file is less than $1 million, and the Chapter 11 Trustee has made no indication that Terry's secured claim may be avoided, despite the fact that the garnishment took place well within the 90-day pre-petition preference period.

47.     In addition, while Terry is not in formal "control" of the Chapter 11 Trustee, Terry had access to voluminous insider information during the pendency of this case and he clearly influenced decisions made by the Chapter 11 Trustee.  Nothing about the relationship between Terry and the Chapter 11 Trustee suggests that they acted at arms-length.  Moreover, Terry used his close relationship to further his non-creditor motivation to put into place provisions that will allow him to take sole control over the Reorganized Debtor.  Thus, Terry meets every single element for establishing that he is a non-statutory insider of the Plan proponent in this case.  Moreover, any attempt by the Chapter 11 Trustee to distinguish the facts and cases on the basis that the Chapter 11 Trustee is not the same entity as the Debtors is specious.  Once again, the Chapter 11 Trustee is the Plan proponent in this case.  If a Chapter 11 trustee were able to hide behind an "I am not the debtor" argument, then it would follow that parties could engage in all manner of inside dealing and wrongful acts with a trustee with impunity.  That makes no sense.  The non-statutory insider analysis is designed to identify whether a party has a close relationship that allows the party to influence the process to further non-creditor goals (i.e., control).  Terry meets that test with respect to the Plan proponent in this case.  And, as discussed below, the fact that Terry is a non-statutory insider means the Chapter 11 Trustee cannot cram down the Plan.

## E.    Sections 1129(a)(7) and 1129(b) – The Plan Is Not In the Best Interest of Creditors and Is Not Fair And Equitable

48.      Bankruptcy Code sections 1129(a)(7) and 1129(b) require that a plan be in the best interest of creditors and otherwise fair and equitable.  First and foremost, Plans A, B, and C are premised on actions that are not supported by the law.  How could it ever be in the best interest of creditors for a plan proponent to act outside the law?  The Plan is a legal fallacy and, even if confirmed, will be the subject of years of litigation and ever-increasing administrative expense claims.  That is not in the creditors' best interests.

49.      Also, included in a best interest of creditors analysis is a determination that creditors who have not accepted the plan will receive no less under the Plan then they would in a hypothetical Chapter 7 liquidation.  *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993).  This requires a valuation analysis comparing what the creditor would receive if the property were sold today versus the value such creditor would receive as a creditor in a Chapter 7 case.  *Id.*

50.      The Chapter 11 Trustee cannot meet his burden on this valuation issue with respect to HCLOF.[11]  It is undisputable that HCLOF was not a creditor as of the Petition Date.  That is, the basis for the Chapter 11 Trustee asserting that HCLOF is a creditor is the equitable relief sought in an adversary proceeding brought by HCLOF against the Chapter 11 Trustee after the Petition Date.  In a hypothetical Chapter 7 case, there would simply be an orderly liquidation and therefore no need to twist the law of equitable relief and subrogation to support a plan process and HCLOF would keep its subordinated notes.  As such, any liquidation analysis by the Chapter 11 Trustee is a non-sequitur from the beginning because it would be based on the facially incorrect assumption that HCLOF was a creditor on the Petition Date.  Moreover, even if

---

[11] As noted, HCLOF asserts no creditor standing.

**PAGE 20**

4815-0110-1423.4

that flaw is simply ignored (and there is no reason to do so), the valuation numbers do not add

up. The Plan proposes to pay HCLOF amounts based entirely on a May 2018 letter sent by

Highland. Evidence has shown in this case that circumstances have changed dramatically since

May 2018, and further, that HCLOF values its Equity Notes much higher than what is being

proposed under the Plan. The Chapter 11 Trustee bears the burden of rebutting that valuation

evidence and, based on the record of this case, he will not be able to meet such burden. In fact,

the Chapter 11 Trustee has not even substantively included HCLOF in its analysis purporting to

satisfy section 1129(a)(7)[12] and he has advanced no expert witness to address the valuation issues

necessary to do so at the confirmation hearing. Therefore, the Chapter 11 Trustee cannot satisfy

the required test under section 1129(a)(7).

## F. Sections 1129(a)(8), (10) and 1129(b) – The Plan Does Not Meet the Requirements for Cram Down

51. Bankruptcy Code sections 1129(a)(8) requires that each impaired class vote in

favor of a plan. Bankruptcy Code section 1129(a)(10) permits a plan proponent to cram down a

plan on non-voting classes, as long as one class of impaired creditors votes in favor of the plan.

Insider votes are not counted for the purposes of consent under 1129(a)(10). Section 1129(b), in

turn, requires in a cram down plan that the plan not unfairly discriminate and is fair and equitable

to the non-voting creditors. Based on the record of this case, it is assumed that Class 3 (the Terry

Secured Claim) will be the only class with the claim amount and numerosity to be deemed

(according to the Chapter 11 Trustee) a consenting class. Therefore, in order to meet the cram

down confirmation requirements, the Chapter 11 Trustee has the burden of showing that:

(i) Terry is impaired; (ii) Terry is not an insider; and (iii) cramming the Plan down solely on

---

[12] The Chapter 11 Trustee's liquidation analysis is attached as Exhibit 2-D to the Disclosure Statement. The amount of the Class 2 HCLOF claim is listed as "TBD." *Id.*

Terry's vote does not unfairly discriminate and is fair and equitable to other creditors. The Chapter 11 Trustee cannot meet such a burden.

52.     The Fifth Circuit interprets the concept of impairment broadly to include any alternation of a creditor's rights. *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 245. However, a broad interpretation does not mean that the concept of impairment does not exist. The policy reason for requiring an impaired class to accept the plan under a cram down is to ensure that at least one group of creditors that is "hurt . . . nonetheless favors the plan." *In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 776-77 (S.D.N.Y. 1994) (emphasis added).

53.     Here, no viable argument can be made that Terry is impaired under Plan A because Plan A proposes to pay Terry in full with interest. The interest element, of course, compensates Terry for any delay in receiving what he alleges he is owed. Paying a creditor in full with interest is the very definition of non-impairment. Using a lone creditor, let alone in insider such as Terry, should not be sufficient to fulfill the section 1129(a)(10) requirement. This is a textbook case of using artificial impairment to generate an impaired accepting class.

54.     Moreover, even if Terry were considered impaired under Plan A, Terry's votes should not be counted under any of the plans (A, B, or C) because Terry is a non-statutory insider. The basis for deeming Terry a non-statutory insider is set forth above. Because of his status as such, the Chapter 11 Trustee is prohibited by the plain language of section 1129(a)(10) from relying on Terry's votes to support a plan.

55.     The final requirement for a cram down plan is that it is fair and equitable and does not unfairly discriminate. Whether a plan is proposed in good faith is a critical element of this determination. *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247 (citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)). Because, as set forth above, the Chapter 11

Trustee is unable to establish that the Plan was proposed in good faith, he likewise will be unable to establish that he meets the cram down standard. The Plan also unfairly discriminates on a number of different bases. Moreover, the Chapter 11 Trustee provides no basis for classifying Highland's claims separately under the Plan, other than to gerrymander the classes.

**G.      Section 1129(a)(10) – The Plan's Claim Classifications are Improper**

56.      A further requirement under section 1129(a)(10) and related case law is that claims be properly classified under a plan. *See, e.g., In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (prohibiting the gerrymandering of classes to create a consenting impaired class). Claims that are "substantially similar" must be classified together. Terry's claim treatment under the Plan is a blatant example of gerrymandering. Terry has alleged a partial secured claim based on pre-petition garnishment of certain funds. However, the garnishment occurred within the 90-day preference period and is *per se* avoidable. As such, Terry is nothing more than a general unsecured creditor in this case. His claim should be classified alongside other general unsecured creditors in Class 4.

57.      Highland is a general unsecured creditor in the case, but its claim has been separately classified from other general unsecured creditors. Similarly, HCLOF is a Class 2 claimant under Plan A, but is effectively a Class 5B claimant under Plan B and Plan C. Presumably, the Chapter 11 Trustee bases such separate classification and disparate treatment on his allegation that Highland and/or HCLOF are liable for a fraudulent transfer. However, that matter remains subject to an on-going adversary proceeding. In other words, the Chapter 11 Trustee has simply made an allegation and is yet to prove his case. Permitting separate classification based on unproven allegations would seem an invitation for plan proponents to

engage in all manner of mischief in order to craft around the requirement that substantially similar claims be classified together.[13]

## H.    Section 1129(a)(11) – The Plan is Not Feasible

58.    Bankruptcy Code section 1129(a)(11) has been interpreted to require a finding that a plan is economically feasible.  This requires the Chapter 11 Trustee to demonstrate that the plan has a "reasonable assurance of commercial viability." *In re Briscoe Enters., Ltd. II*, 994 F.2d at 1166.  Moreover, the Chapter 11 Trustee must "present proof through reasonable projections that there will be sufficient cash flow to funder the [Plan]." *See In re Couture Hotel Corp.*, 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015).

59.    On the record before the Court, the Chapter 11 Trustee has failed to demonstrate sufficient funds to meet all the obligations set forth in the Plan.  That includes the very substantial administrative expense burden that appears to have surpassed the total claims alleged by the Chapter 11 Trustee to be payable in this case.

## I.    The Plan Cannot Effect an Assumption and Assignment of the PMAs Without Consent.

60.    The Plan A transaction cannot be confirmed because it proposes to assume and assign the PMAs to Oaktree (*see* Plan § 2.17(c)) in violation of section 365(c)(1) of the Bankruptcy Code and without the requisite consent. *See* 11 U.S.C. § 365(c)(1) (trustee "may not

---

[13] HCLOF and Highland object to the Chapter 11 Trustee's apparent attempt to litigate the fraudulent transfer claims currently pending in the adversary proceeding as part of the plan confirmation process.  As set forth in their separately-filed joint motion to strike the expert report of Kevin Haggard of Miller Buckfire, any such attempts are procedurally improper and inconsistent with the parties' understanding and agreed-upon schedule.  Highland and HCLOF have a right under the Bankruptcy Code and applicable rules to litigate the fraudulent transfer claims in a proceeding subject to the heighted procedural protections available in an adversary proceeding—not in the context of a harried and accelerated confirmation process (a process of the Trustee's own making). *See In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008) ("[W]here the Rules require an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue without one.").  The Court should not condone this type of "litigation by ambush." *See In re Vidal*, No. 12-11758 BLS, 2013 WL 441605, at *5 (Bankr. D. Del. Feb. 5, 2013) (applying *Mansaray-Ruffin* to avoid "lien-stripping by ambush").

002675

assume or assign any executory contract . . .if applicable law excuses a party, other than the

debtor, to such contract . . . from accepting performance from or rendering performance to an

entity other than the debtor . . . and such party does not consent to such assumption or

assignment"); *In re Cedar Chem. Corp.*, 294 B.R. 224, 232 (Bankr. S.D.N.Y. 2003) ("a contract

otherwise unassignable under § 365(c)(1) can be assumed and assigned if the non-debtor party

consents"). The IAA and New York state law provide the relevant "applicable law" prohibiting

assignment and excusing HCLOF from accepting performance from anyone other than Acis

and/or Highland.

61.     The IAA prohibits the assumption and assignment of the PMAs to Oaktree

without, among other things, the Equity Noteholders' consent. Section 205(a)(2) of the IAA

prohibits investment advisers (i.e., Acis LP) from entering into an investment advisory contract

with a client (here, the CLOs) that "fails to provide, in substance, that no assignment of such

contract shall be made by the investment adviser without the consent of the other party by the

contract." 15 U.S.C. § 80b–5(a)(2). Section 202(a)(1) of the IAA defines "assignment"

generally to include "any direct or indirect transfer . . . of an investment advisory contract" by an

adviser. 15 U.S.C. § 80b–2(a)(1) (emphasis added).

62.     Section 14 of the PMAs (titled "Delegations/Assignments") provides the

provisions intended to satisfy section 205(a)(2) of the IAA. Those sections, in relevant part,

prohibit Acis from assigning its responsibilities under the PMAs without the written consent of

each relevant CLO, at least a majority of the Equity Notes of each CLO, at least a majority of the

Controlling Class (as defined in the indentures), and satisfaction of the Global Rating Agency

Condition. *See*, *e.g.*, 2013-1 PMA, § 14(a). Acis cannot transfer, either directly or indirectly, its

responsibilities under the PMAs without first satisfying the requisite conditions, including

obtaining the written consent of a majority of the Equity Noteholders of each CLO (which the Chapter 11 Trustee has not obtained).

63.     The *CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, No. 17 Civ. 9463, 2018 U.S. Dist. LEXIS 90174 (S.D.N.Y. May 23, 2018) case does not mandate a different result. First, the language the Trustee quotes is from a decades-old SEC no-action letter. *Id.* at \*12 (quoting *SEC No-Action Letter, Am. Century Cos.*, 1997 WL 1879138, at \*5 (Dec. 23, 1997)). SEC no-action letters are only binding with respect to the party requesting guidance, have no precedential value unless the SEC agrees to allow a party to rely on them, and the SEC is free to change their interpretation at any time. *See* SEC, Fast Answers, available at https://www.sec.gov/fast-answers/answersnoactionhtm.html. Second, CWCapital did not decide whether the IAA separately requires client consent. 2018 U.S. Dist. LEXIS 90174, at \*12-13. Third, a reported case from a court in this District recently found to be well-pleaded a cause of action for "assigning the benefits of [an] agreement to provide investment advisory services to others" based on the IAA. *Douglass v. Beakley*, 900 F. Supp. 2d 736, 748 (N.D. Tex. 2012).

64.     The proposed assumption and assignment undermines the public policy reasons for section 205(a)(2) of the IAA. The Chapter 11 Trustee's transfer of portfolio management duties to Oaktree thus violates section 205(a)(2) of the IAA, and in turn, violates section 365(c)(1) of the Bankruptcy Code. The Chapter 11 Trustee and this Court cannot ignore the dictates of the IAA. *Cf. In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 78-79 (Bankr. S.D.N.Y. 2007) (local ordinances provided "applicable law" that prohibited assignment).

65.     The PMAs are also a personal services contract that cannot be assigned under New York law without consent. *See Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 482 (N.Y. 2006) (hotel management contract held below to be personal services contract;

"personal services contracts generally may not be assigned absent the principal's consent")
(citing 9 Corbin, Contracts § 865 [interim ed.]; 3 Farnsworth, Contracts §§ 11.4, 11.10 [3d ed]);
*Marriott Int'l, Inc. v. Eden Roc, LLLP*, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013)
("The parties' detailed management agreement places full discretion with plaintiffs to manage
virtually every aspect of the hotel. Such an agreement, in which a party has discretion to execute
tasks that cannot be objectively measured, is a classic example of a personal services contract
that may not be enforced by injunction"); *see also* 6A N.Y. Jur., Assignments § 11 ("[T]he
principle that all ordinary business contracts are assignable is subject to the exception that
executory contracts for personal services or those involving a relationship of personal confidence
are not assignable by one party unless the other party consents or waives the right to object.
Thus, as a general rule, an employment contract for the performance of personal duties or
services is not assignable by the employer so as to vest in the assignee the right to the labor of
someone who never agreed to such employment. In fact, generally, no executory contract for
personal services can be assigned by either party.").

66. Under New York law, personal service contracts are generally those that depend
on the skill or reputation of the performing party. *See In re Schick*, 235 B.R. 318, 323 (Bankr.
S.D.N.Y. 1999) ("Faced with a state law restricting assignment . . . a court must inquire into its
rationale and uphold the restriction under section 365(c) if the identity of the contracting party is
material to the agreement"). As one bankruptcy court has stated with respect to New York law
on the issue:

> It is well settled that when an executory contract is of such a nature as to be based
> upon personal services or skills, or upon personal trust or confidence, the debtor-
> in-possession or trustee is unable to assume or assign the rights of the bankrupt in
> such contract. . . . It is patently unfair in such cases to require a non-debtor third
> party to accept performance from anyone other than the original contract vendee,

unless the contract clearly provides for the right to assign to another contract vendee.

*In re Grove Rich Realty Corp.*, ==200 B.R. 502, 510== (Bankr. E.D.N.Y. 1996); *see also Donald Rubin, Inc. v. Schwartz*, ==559 N.Y.S. 2d 307, 310== (N.Y. App. Div. 1990) (describing a consulting agreement as being "in the nature of a personal services contract"); *Carbo Indus., Inc. v. Coastal Ref & Mktg., Inc*., ==154 F. App'x 218, 220== (2d Cir. 2005) ("this case does not fall within the limited exception developed for 'personal services contracts'—*e.g.*, consulting contracts.") (citing *Donald Rubin*, ==559 N.Y.S. 2d at 310==) (emphasis added).

67. As has been previously explained, HCLOF and its investors invested in reliance on the skill and expertise of Highland to manage the CLOs. In this case, a witness put on by the Chapter 11 Trustee – Zach Alpern of Stifel, Niocolas – testified to the fact investors pick sub-advisors based on the fact that different advisors "have different styles and make different creditor choices."[14] Mr. Alpern further testified that "equity holders make an informed decision when they make their investment and their opinion of the advisor is one of the considerations that they may make at the time of their investment, and it's a consideration that they probably take into account whether they hold or sell that investment."[15]

68. Replacing Acis/Highland with Oaktree/Brigade frustrates the investment objective of the parties, denies them the benefit of their bargain, and undermines and violates the IAA as well as black-letter New York law relating to personal service contracts. The assumption and assignment of the PMAs cannot be approved.

---

[14] *See* Transcript of August 1, 2018 hearing on the Chapter 11 Trustee's *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC*, at 67:24-25.
[15] *Id.* at 69:9-14.

**J.    The Disclosure Statement Should Not be Finally Approved**

69.    As to the Disclosure Statement, Highland and HCLOF renew their objections to its final approval based on the fact that it describes a patently unconfirmable Plan.  S*ee In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007); *In re Arnold*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2002).

**IV.**
**RESERVATION OF RIGHTS**

70.    Nothing herein shall be construed as an admission of, or concession to, any fact contained in the Disclosure Statement or the Plan, and Highland and HCLOF reserve all rights to contest and rebut any and all factual allegations at the Confirmation Hearing.  As previously mentioned herein, because discovery is ongoing per the Discovery Schedule, Highland and HCLOF reserve their rights to amend these Objections.

WHEREFORE, Highland and HCLOF respectfully request entry of an order (i) denying confirmation of the Plan; (ii) denying final approval of the Disclosure Statement; and (iii) granting such other and further relief to which Highland and HCLOF are entitled.

4815-0110-1423.4

002680

Dated:  August 13, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac
vice*)
W. Austin Jowers (GA 405482)
Paul R. Bessette (TX 02263050) (admitted *pro hac
vice*)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING,
LTD.**

4815-0110-1423.4

002681

## CERTIFICATE OF SERVICE

This is to certify that on August 13, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Melina Bales*
Melina Bales

002682

# EXHIBIT 10

002683

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P. and*
*CLO Holdco, Ltd.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**MOTION FOR AN ORDER TO ENFORCE THE ORDER OF REFERENCE**

002684

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.      PRELIMINARY STATEMENT ...............................................................................1

II.     BACKGROUND ........................................................................................................2

III.    ARGUMENT & AUTHORITY ................................................................................3

        A.      The Motion Should Be Denied Because Withdrawal of
                the Reference is Mandatory .........................................................................3

        B.      Automatic Referral is Unnecessary and Would Be Inefficient............................9

                1.      The causes of action asserted by the Plaintiffs do not
                        "arise under," or "arise in" Title 11 are not "core"
                        proceedings .......................................................................................10

                2.      The Bankruptcy Court has limited post-confirmation
                        "related to" jurisdiction....................................................................12

        C.      The *Res Judicata* Argument is Not Relevant to the Relief
                Sought in This Motion .................................................................................15

        D.      The Local Rule 3.3 Argument is Unavailing ..................................................16

        E.      The Litigious-Nature Argument is Likewise Unavailing ................................17

        F.      Plaintiffs' Cross-Motion Should be Granted ..................................................18

VI.     CONCLUSION.........................................................................................................19

002685

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) .......................................................................................15

*Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*,
   266 F.3d 388 (5th Cir.2001) ........................................................................................18

*Beitel v. OCA, Inc. (In re OCA, Inc.)*,
   551 F.3d 359 (5th Cir. 2008) .......................................................................................13

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013).........................................................................................6

*Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.)*,
   No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018)............................7

*Burch v. Freedom Mortg. Corp. (In re Burch)*,
   835 F. App'x 741 (5th Cir. 2021) ................................................................................18

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)......................................................................................................15

*Chalmers v. Gavin*,
   No. 3:01-CV-528-H, 2002 U.S. Dist. LEXIS 5636  (N.D. Tex., Apr. 2, 2002) .....................15

*Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*,
   309 B.R. 217 (Bankr. N.D. Tex. 2004)........................................................................14

*Davis v. Dall. Area Rapid Transit*,
   383 F.3d 309 (5th Cir. 2004) .......................................................................................15

*Davis v. Life Inv'rs Ins. Co. of Am.*,
   282 B.R. 186 (S.D. Miss.2002).....................................................................................10

*Faulkner v. Eagle View Capital Mmgt. (In re The Heritage Org., L.L.C.)*,,
   454 B.R. 353 (Bankr. N.D. Tex. 2011).........................................................................13

*Faulkner v. Kornman*,
   No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) ................................14

*Feld v. Zale Corp. (In re Zale Corp.)*,
   62 F.3d 746 (5th Cir.1995) ..........................................................................................12

ii

*Gupta v. Quincy Med. Ctr.*,
858 F.3d 657 (1st Cir. 2017) ........................................................................ 11-124

*In re Cont'l Airlines Corp.*,
50 B.R. 342 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) .......................4

*In re Exide Tech*s.,
544 F.3d 196 (3d Cir. 2008)..........................................................................10

*In re Harrah's Entm't*,
No. 95-3925, 1996 U.S. Dist. LEXIS 18097 (E.D. La. 1996) .....................1, 5, 9, 19

*In re IQ Telecomms., Inc.*,
70 B.R. 742 (N.D. Ill. 1987) ..........................................................................6

*In re Nat'l Gypsum Co.*,
134 B.R. 188 (N.D. Tex. 1991).......................................................................8

*In re Pegasus Gold Corp.*,
394 F.3d 1189 (9th Cir. 2005) .......................................................................14

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
454 B.R. 307 (S.D.N.Y. 2011).......................................................................3-4

*Kuzmin v. Thermaflo, Inc.*,
No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810
(E.D. Tex. May 20, 2009) ............................................................................ 16-17

*Legal Xtranet, Inc. v. AT&T Mgmt. Servx., l.P. (In re Legal Xtranet, Inc.)*,
453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011)............................................10, 11

*LightSquared Inc. v. Deere & Co.*,
2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014)..............................................3-4

*Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*,
783 F.2d 1283 (5th Cir. 1986) .......................................................................15

*Montana v. Goldin (In re Pegasus Gold Corp.)*,
394 F.3d 1189 (9th Cir. 2005) .......................................................................14

*Price v. Rochford*,
947 F.2d 829 (7th Cir. 1991) .........................................................................14

*Rannd Res. v. Von Harten (In re Rannd Res.)*,
175 B.R. 393 (D. Nev. 1994) .........................................................................5-6

002687

*Reynolds v. Tombone,*
  Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS 9995
  (N.D. Tex., June 24, 1999) .................................................................................................15

*Risby v. United States,*
  No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006) ..................................15

*SEC v. Capital Gains Research Bureau, Inc.,*
  375 U.S. 180, 84 S. Ct. 275 (1963) ........................................................................................6

*S. Pac. Transp. Co. v. Voluntary Purchasing Grps.*
  252 B.R. 373 (E.D. Tex. 2000) ...............................................................................................8

*Stern v. Marshall,*
  564 U.S. 462 (2011) ...................................................................................................10, 13

*Stoe v. Flaherty,*
  436 F.3d 209 (3d Cir. 2006) ..................................................................................................11

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),*
  764 F.3d 512 (5th Cir. 2014) ...........................................................................................3, 18

*Travelers Indem. Co. v. Bailey,*
  557 U.S. 137 (2009) ..............................................................................................................15

*Travelers Ins. Co. v. St. Jude Hosp.,*
  37 F.3d 193 (5th Cir. 1994) ...................................................................................................15

*Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holding),*
  477 B.R. 517 (Bankr. D. Del. 2012) .....................................................................................14

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC,*
  622 B.R. 680 (Bankr. N.D. Tex. 2020) .................................................................................10

*UPH Holdings, Inc. v. sprint Nextel Corp.,*
  No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349
  (W.D. Tex. 2013) ............................................................................................................... 7-8

*United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.),*
  301 F.3d 296 (5th Cir. 2002) .................................................................................................10

*Valley Historic Ltd. P'ship v. Bank of N.Y.,*
  486 F.3d 831 (4th Cir. 2007) .................................................................................................15

*Wood v. Wood (In re Wood),*
  825 F.2d 90 (5th Cir.1987) ....................................................................................................11

iv

002688

*Zerand-Bernal Grp. v. Cox,*
  23 F.3d 159 (7th Cir. 1994)-------------------------------------------------------------------------------15

## **Rules & Statutes**

Fed. R. Civ. P. 12(b)(6)..........................................................................................................18

LRCi 3.3....................................................................................................................16, 17

LRCi 7(a) ............................................................................................................................17

LRCi 7(h) ............................................................................................................................17

LRCi 7(i) .............................................................................................................................17

LRCi 7.1(i).........................................................................................................................17

17 C.F.R. 275.206(4)-7 .......................................................................................................7

27 C.F.R. part 275 ...............................................................................................................7

15 U.S.C. § 80b-1 ...............................................................................................................8

28 U.S.C. § 157(d) ................................................................................................6,18, 19

28 U.S.C. § 1927................................................................................................................18

## **Other**

Collier on Bankruptcy ¶ 3.02[2] (16th ed. 2010)..............................................................13

Investment Advisers Act of 1940 ............................................................................ *passim*

Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ...............................................7

Investment Advisers Act Release No. 3060 (July 28, 2010) ..............................................7

Investment Advisers Act Release No. 4197 (Sept. 17, 2015) .............................................7

Racketeer Influenced and Corrupt Organizations Act (RICO)................................ *passim*

Securities Act of 1933, § 12(2) ...........................................................................................6

Securities Exchange Act of 1934, § 10 ...............................................................................6

Securities Exchange Act, Rule 10b-5 .................................................................................6

002689

**PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL
MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE
THE ORDER OF REFERENCE AND CROSS MOTION**

# I.

## PRELIMINARY STATEMENT

Plaintiffs The Charitable DAF Fund, L.P. and CLO Holdco Ltd. oppose Defendant
Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference.

This action primarily involves fiduciary duties imposed upon Registered Investment
Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and corresponding state law
claims for breach of those duties. It also involves causes of action under the civil RICO statute, for
which breaches of Advisers Act fiduciary duties serve as the predicate act. As a result, presiding
over this action will require extensive consideration of federal laws regulating interstate
commerce, which renders withdrawal of the reference to bankruptcy court mandatory under 28
U.S.C. § 157(d) ("The district court shall, on timely motion of a party, so withdraw a proceeding
if the court determines that resolution of the proceeding requires consideration of both title 11 and
other laws of the United States regulating organizations or activities affecting interstate
commerce.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it
return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't*,
No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.) ("Although
'related to' bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal
securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the
bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal

---

Plaintiffs' Response to Defendant's Motion for an Order to Enforce
the Order of Reference and Cross Motion                                      Page 1

of the reference. Rather than *waste judicial resources* on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit." (emphasis added)). Defendant's arguments to the contrary are unsupported by law.

Defendant's attempts to smear Plaintiffs with 12 pages of irrelevant facts and a 926-page appendix provide no additional support for the Motion. This action involves matters well outside the experience of bankruptcy courts and requires adjudication in an Article III court.

Because the reasons for denying Defendant's Motion are also reasons that this Court should withdraw the reference under 28 U.S.C. § 157(d), and because deciding the same issue twice would be inefficient and unnecessary, Plaintiffs cross-move for withdrawal of the reference.

## II.

## BACKGROUND

Defendant's factual assertions include considerable bluster and vitriol, unsupported by the lengthy materials in its appendix. Importantly, the opening sentence under the heading "Factual Background" is unsupported and false. Memorandum of Law [Doc. 23] ¶ 7. Plaintiffs are not controlled or directed by James Dondero; Plaintiffs are both controlled and directed by Mark Patrick. APP_16-17, 22; *see also* APP_10-14; *see generally* APP_1-22. And Patrick's testimony to this extent went unchallenged in a hearing before the bankruptcy court earlier this month. *Id*.

Of equal importance is Defendant's assertion that all aspects of the Harbourvest settlement, including the valuation of the assets involved, were fully disclosed. Memorandum of Law [Doc. 23] ¶ 12. This statement is unsupported by the appendix cite accompanying it, which at most constitutes a self-serving denial. And it is a hotly contested issue between the parties. The impetus to this action, in fact, was Plaintiffs having learned that the value of the assets transferred in the Harbourvest settlement was *not* as represented. Original Complaint ("Complaint" [Doc. 1]), ¶¶ 36-

48. Plaintiffs disagree with much of the remainder of what Defendant presents as "fact" in its Memorandum of Law. But Plaintiffs respectfully submit that none of it is relevant to resolution of the present Motion. And so, for brevity's sake, Plaintiffs have not elected to engage in a blow-by-blow effort to litigate those issues.

Instead, Plaintiffs' brief will focus on the nature of their causes of action as that pertains to which court—district or bankruptcy—should preside over them.

## III.

## ARGUMENT & AUTHORITY

Plaintiffs respectfully submit that Defendant's Motion should be denied and Plaintiffs' cross-motion granted for the reasons provided below:

### A. The Motion Should Be Denied Because Withdrawal of the Reference Is Mandatory

Because the Complaint relies extensively on and largely is predicated on the Investment Advisers Act of 1940, withdrawal of the reference to the bankruptcy court is mandatory here under 28 U.S.C. § 157(d). That statute requires withdrawal of the reference when a proceeding "requires consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere & Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard*

---

*L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. 2011), for the proposition that, "[i]n determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) ("While that second clause [of § 157(d)] might not apply when some 'other law' *only tangentially affects the proceeding*, it surely does apply when federal labor legislation *will likely be material* to the proceeding's resolution.") (emphasis added).

Plainly here, the claims in the Complaint at least involve federal laws "regulating organizations or activities affecting interstate commerce." The Advisers Act and the RICO statute are such laws, and at least the first and fourth counts of the Complaint sound under them. *See, e.g.*, Complaint ¶¶ 57 & n.5, 66, 69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers Act and accompanying regulations), 114, 117, 131, 132 (invoking the RICO statute). Defendant's entire argument against withdrawal of the reference thus turns on whether these laws "must be considered."

It is remarkable that Defendant suggests these statutes need not be considered. The briefing already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law and the Advisers Act, including

1. Whether Defendant owed fiduciary duties under the Advisers Act that are unwaivable;

2. To whom such duties are owed and whether they were violated;

3. Whether such Advisers Act fiduciary duties can be terminated by a blanket release in a bankruptcy settlement;

4. Whether *res judicata* applies to bar claims for breach of Advisers Act duties that had not yet accrued at the time of the action alleged to have barred them;

5. Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

6. Whether such waivers can be enforced as to non-parties to the waiver;

7. Whether breach of Advisers Act fiduciary duties can serve as a predicate for civil RICO liability under the RICO statute, among other significant legal issues.

Presiding over this action most certainly will require consideration of all these issues.

Before joining the Fifth Circuit, Judge Clement addressed a motion similar to Defendant's during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, despite finding that the bankruptcy court had related-to jurisdiction. Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit.

*Id*. at *11.

Judge Clement rejected the argument Defendant parrots here that the case would "only involve the simple application of established federal securities laws." *Id*. at *7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id*. Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, [t]his federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id*. (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R.

---

393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where

resolution requires more than simple application of federal securities laws, even though that court's

determination was based solely on a review of the complaint's alleged violations of § 12(2) of the

Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

    This authority applies here. In the Complaint, Plaintiffs allege violations of federal

securities law (the Advisers Act), as well as the RICO statute. Deciding even the pending motion

to dismiss will require far more than simple application of these laws. Nothing more is necessary

to satisfy § 157(d). *Cf. In re IQ Telecomms., Inc.*, 70 B.R. 742, 745 (N.D. Ill. 1987) ("Nevertheless,

Central's second amended complaint easily meets [the § 157(d)] standard. Count 2 of the

complaint consists of 76 pages and alleges that 29 individuals and entities violated RICO by

engaging in a pattern of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and 139

specific instances of bankruptcy fraud, 18 U.S.C. § 152.").

    Although it is unnecessary here to demonstrate that Plaintiffs' Advisers Act allegations

will require application of *underdeveloped* law, that is certainly the case. As the Third Circuit

pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that

federal law (the Advisers Act) provides "the duty and the standard to which investment advisers

are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB*

*Inv. Partners, Inc.*, 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the

"confusion [that this situation] engenders may explain why there has been *little development in*

*either state or federal law* on the applicable standards." *Id*. (emphasis added). "Half a century

later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research* [*,Inc.*, 375

U.S. 180, 192 (1963),] for a description of an investment adviser's fiduciary duties." *Id*. at 503;

---

Plaintiffs' Response to Defendant's Motion for an Order to Enforce
the Order of Reference and Cross Motion                                 Page 6

*see also* Plaintiffs' Response to Motion to Dismiss (addressing Defendant's erroneous argument that the Advisers Act creates no private right of action).

This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

None of the cases Defendant cites even remotely suggests that this type of complicated litigation involving underdeveloped securities laws does not require "consideration" of federal laws. In its lead case, *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.)*, No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018), the court only held that a state-law contract claim did not require substantial reliance on federal law merely because it involved a trust created under federal law (the OCSLA). *Id.* at *16-17. Moreover, the court's determination appears to have relied primarily, if not solely, on the fact that the bankruptcy court had already submitted a memorandum opinion on the defendant's summary judgment motion, disposing of the case without the need to rely on non-bankruptcy federal law. *Id.* at *14-15, 17.

Next, Defendant cites *UPH Holdings, Inc. v. Sprint Nextel Corp.*, No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349 (W.D. Tex. 2013), which is, at most, only slightly on point. There, the court declined to withdraw the reference with regard to a turnover action under the Bankruptcy Code, with little analysis other than having repeated the parties' arguments. Thus, it is difficult to draw any significance from the decision. But the court seems to rely on the fact that "the primary dispute center[ed] around the existence of a 'regulatory black hole,' a span of time during which the rules concerning how to set [a telecom] intercarrier compensation rate were left undetermined." *Id.* at *6. And for that reason, the court seemed to believe there was little non-bankruptcy federal

law to consider. *Id*. at 7. Here, in contrast, the causes of action do not arise under the Bankruptcy

Code, and there is an extensive regulatory scheme that, plainly, must be considered.

The other cases Defendant cites add little to the analysis, except that *S. Pac. Transp. Co. v.

Voluntary Purchasing Gps*, 252 B.R. 373, 382 (E.D. Tex. 2000), holds against Defendant's

position, having determined that even the court's "limited" role in approving a CERCLA

settlement "necessarily involves the substantial and material consideration of CERCLA and not

merely its straightforward application to the facts of this case." *Id*. at 384. The court's reason for

this conclusion: its decision "will require the court to examine the unique facts of the case in light

of those CERCLA provisions which create the causes of action at issue." *Id*. Of course, the same

examination will be necessary here.

Notably, in *S. Pac. Transp.*, the court also stated, "[i]t is well settled that CERCLA is a

statute "'rooted in the commerce clause' and is precisely 'the type of law . . . Congress had in mind

when it enacted the statutory withdrawal provision [in § 157(d)].'" *Id*. at 382 (quoting *In re Nat'l

Gypsum Co.*, 134 B.R. 188, 191 (N.D. Tex. 1991), (alterations in original)). The court could just

as easily have been talking about the Advisers Act. *See* 15 U.S.C. § 80b-1 ("Upon the basis of

facts disclosed by the record and report of the Securities and Exchange Commission made pursuant

to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed

and ascertained, it is hereby found that investment advisers are of national concern, in that, among

other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished

and distributed, and their contracts, subscription agreements, and other arrangements with clients

are negotiated and performed, by the use of the mails and means and instrumentalities of interstate

commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily

relate to the purchase and sale of securities traded on national securities exchanges and in interstate

over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.").

In sum, the Complaint alleges violations of non-bankruptcy federal law. In presiding over the case—indeed, in addressing the currently pending Motion to Dismiss—this Court will have to substantially and materially consider those laws and their interplay with bankruptcy law. Under § 157(d), this requires withdrawal of the reference, and Defendant's motion should be denied.

## B. Automatic Referral Is Unnecessary and Would Be Inefficient

As noted previously, Judge Clement's ruling in *In re Harrah's Entm't*, ==1996 U.S. Dist. LEXIS 18097== (E.D. La. 1996), establishes that reference to the bankruptcy court—only to have the reference withdrawn—is unnecessary:

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. *Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit*.

*Id*. at *11 (emphasis added).

Defendant nonetheless argues this Court must do precisely that. Plaintiffs submit this is both wrong and tenuous, because at this stage of the bankruptcy proceedings—post confirmation— it is unclear that the bankruptcy court has jurisdiction at all.

---

1. **The causes of action asserted by the Plaintiffs do not "arise under," or "arise in" Title 11 and are not "core" proceedings.**

In the Complaint, Plaintiffs do not seek relief that would undo or reverse any settlement approved by the bankruptcy court. Neither do they attempt an end run around the provisions of any approval, Defendant's protestations notwithstanding. A proper jurisdictional analysis demonstrates Plaintiffs' causes of action asserted here are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

First of all, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case." *Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.)*, 453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011*); Davis v. Life Inv'rs Ins. Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Tech*s., 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

Second, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); *Stern v. Marshall*, 564 U.S. 462, 476 (2011).

---

Third, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood),* ==825 F.2d 90, 97== (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

Fourth and finally, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, *not their particular factual circumstance*, could *only* arise in the context of a bankruptcy case." *Legal Xtranet, Inc.,* ==453 B.R. at 708==–09 (emphasis added) (citing *Stoe v. Flaherty,* ==436 F.3d 209, 216== (3d Cir. 2006). Defendants contend that, because the factual circumstances giving rise to the causes of action included the HarbourVest Settlement, which was approved by the bankruptcy court, this somehow transforms these causes of action into core claims. *See* Memorandum of Law ¶ 36. But it is the nature of the causes of action that determines whether they are core, not their "particular factual circumstance."

To illustrate the point, in *Gupta v. Quincy Med. Ctr.,* ==858 F.3d 657, 660== (1st Cir. 2017), the bankruptcy court issued a sale order which approved an asset purchase agreement whereby the purchaser became obligated to make certain payments to employees. The purchaser failed to make these payments so the employees sued the purchaser in bankruptcy court, and the bankruptcy rendered a judgment in favor of the employees. On appeal, the district court concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims plainly related to and

existing only because of the approved sale order that gave rise to them. The First Circuit affirmed,

explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a bankruptcy case does not ipso facto mean that the proceeding qualifies as an 'arising in' proceeding. Instead, the fundamental question is whether the proceeding by its nature, *not its particular factual circumstance*, could arise only in the context of a bankruptcy case. In other words, it is not enough that Appellants' claims arose in the context of a bankruptcy case or even that those claims exist only because Debtors (Appellants' former employer) declared bankruptcy; rather, "arising in" jurisdiction exists only if Appellants' claims are the type of claims that can only exist in a bankruptcy case.

*Id*. at 664–65 (emphasis added).

Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context of a

transaction approved in a bankruptcy case. But obviously, the causes of action are not "the type of

claims that can only exist in a bankruptcy case." And that ends the analysis. Because Plaintiffs'

causes of action do arise under the Bankruptcy Code, and because they are not claims that could

only arise in the context of bankruptcy, this action is not a core proceeding.

**2. The Bankruptcy Court has limited post-confirmation "related to" jurisdiction.**

Plaintiffs do not contest that this action is related to the bankruptcy case in some fashion.

That is why they amended the Civil Cover Sheet to note the bankruptcy matter. But "related to"

jurisdiction is a term of art with differing requirements depending on the status of the bankruptcy

case. In its current, post-confirmation status, Plaintiffs submit that the bankruptcy court lacks even

"related to" jurisdiction over this action.

"Related to" jurisdiction is meant to avoid piecemeal adjudication and promote judicial

economy by aiding in the efficient and expeditious resolution of all matters connected to the

debtor's estate. *See Feld v. Zale Corp. (In re Zale Corp.*), 62 F.3d 746, 752 (5th Cir.1995).

Importantly, proceedings merely "related to" a case under title 11 are considered "non-core"

---

Plaintiffs' Response to Defendant's Motion for an Order to Enforce
the Order of Reference and Cross Motion                                              Page 12

proceedings. *Stern*, 564 U.S. at 477; Collier on Bankruptcy ¶ 3.02[2], p. 3–26, n.5 (16th ed. 2010)

("The terms 'non-core' and 'related' are synonymous."). The jurisdictional standard for related to

jurisdiction varies depending on whether the proceeding at issue was commenced pre or post

confirmation. *See Beitel v. OCA, Inc. (In re OCA, Inc.),* 551 F.3d 359, 367 at n.10 (5th Cir. 2008).

And "after confirmation of a reorganization plan, a stricter post-confirmation standard applies."

*See Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388,

390–91 (5th Cir.2001) (explaining this distinction).

Essentially, "after a debtor's reorganization plan has been confirmed, the debtor's estate,

and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the

implementation or execution of the plan." *Id.* 266 F.3d at 390; *Faulkner v. Eagle View Capital

Mmgt. (In re The Heritage Org., L.L.C.),* 454 B.R. 353, 358 (Bankr. N.D. Tex. 2011).

Here, on February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the

Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and

(II) Granting Related Relief* [Bankruptcy Court Dkt. No. 1943]. The Complaint was filed on April

12, 2021. Thus, the proceeding was commenced post confirmation.

Defendant does not argue that this action involves "matters pertaining to the

implementation or execution of the plan," as required under *Craig's Stores*. It does not even cite

to that authority. Certainly Plaintiffs can think of no way that their action affects plan

implementation or execution. Thus, it seems, Defendant's argument for bankruptcy court

jurisdiction fails entirely.

While Defendant does argue that the bankruptcy court has "related to" jurisdiction as a

result of a judgment potentially reducing available cash to pay creditors under the Confirmed Plan,

Memorandum of Law ¶ 39, this is precisely the argument that the Fifth Circuit rejected in *Craig's*

---

*Stores*. See *Coho Oil & Gas, Inc. v. Finley Res., Inc.* (*In re Coho Energy, Inc.*), 309 B.R. 217, 220 (Bankr. N.D. Tex. 2004) (recognizing the rejection of this argument). As the Fifth Circuit explained: "while Craig's insists that the status of its contract with the Bank will affect its distribution to creditors under the plan, the same could be said of any other post-confirmation contractual relations in which Craig's is engaged." 266 F.3d at 391. And that type of effect does not meet the threshold for post-confirmation related-to jurisdiction.

Defendant also contends that there is post-confirmation "related to" jurisdiction because the lawsuit will delay payments to creditors under the Confirmed Plan. *Id*. But this is just a re-packaged reduction-in-assets argument. The same would be true of any post-confirmation lawsuit against Defendant and does not meet the "more exacting theory of post-confirmation bankruptcy jurisdiction" required by *Craig's Stores*.

Defendant may argue that the bankruptcy court's confirmation order has not yet gone effective due to having been appealed. But even if this distinction matters, at minimum, there ought to be a sliding scale toward narrower application of "related to" jurisdiction once the bankruptcy court has issued a final confirmation order. *See Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005) (stating "post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction, and … the *Pacor* formulation [used to analyze related-to jurisdiction] may be somewhat overbroad in the post-confirmation context"); *Faulkner v. Kornman*, No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) (stating "[t]he general rule is that post-confirmation subject matter jurisdiction is limited"); *Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp (In re Am. Home Mortg. Holding)*, 477 B.R. 517, 529-30 (Bankr. D. Del. 2012) (stating "[a]fter confirmation… the test for 'related to 'jurisdiction becomes more

---

stringent if the plaintiff *files* its action after the confirmation date") (emphasis in original); *cf. rabbd*

  *v. Rochford*, 947 F.2d 829, 832 n.1 (7th Cir. 1991) (noting that "after a bankruptcy is over, it may well be more appropriate to bring suit in district court").

  Finally, the retention of jurisdiction in the confirmed plan does nothing to alter the forgoing analysis. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). A bankruptcy court may not "retain" jurisdiction it does not have. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). "[N]either the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting a retention of jurisdiction provision in a plan of reorganization if jurisdiction otherwise is lacking." *Valley Historic Ltd. P'ship. v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *see also Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("[O]rders approving [a] bankruptcy sale [or] . . . plan of reorganization . . . [cannot] confer jurisdiction. A court cannot write its own jurisdictional ticket.").

## C. The Res Judicata Argument Is Not Relevant to the Relief Sought in This Motion

  Defendant's *res-judicata* argument does not belong in this Motion. It has no bearing on the issue presented here. This is because, to begin with, *res judicata* is always addressed by the second court in the second action. *See, e.g., Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*, 783 F.2d 1283 (5th Cir. 1986); *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004); *Travelers Ins. Co. v. St. Jude Hosp.*, 37 F.3d 193 (5th Cir. 1994); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914 (5th Cir. 2000); *Risby v. United States*, No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006); *Chalmers v. Gavin*, 2002 U.S. Dist. LEXIS 5636, 2002 WL 511512 (N.D. Tex. Apr. 2, 2002); *Reynolds v. Tombone*, Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS

Plaintiffs' Response to Defendant's Motion for an Order to Enforce
the Order of Reference and Cross Motion       Page 15

002704

9995 (N.D. Tex. June 24, 1999). Moreover, *res judicata* is not a basis for referring a matter to the bankruptcy court, and Defendant offers no authority for the notion that it is.

Instead of arguing that its *res judicata* affirmative defense should result in referral to the bankruptcy court, Defendant argues that "the Complaint . . . must be dismissed on the basis of *res judicata*. Memorandum of Law at 24; *see also id.* at 23 (subheading: "The Complaint Is Barred by the Doctrine of Res Judicata"). But dismissal is the relief sought in Defendant's pending Motion to Dismiss, which raises the same *res judicata* arguments asserted here. Plaintiffs therefore will address *res judicata* in their concurrently filed response to the Motion to Dismiss.

### D. The Local Rule 3.3 Argument Is Unavailing

Defendant argues that Plaintiffs failed to disclose the related bankruptcy case by omitting it on the Civil Cover Sheet accompanying the Complaint, although Defendant does not request that the Court take any action as a result of the omission.

Plaintiffs submit that the omission was inadvertent, harmless, and has been corrected. The omission was inadvertent in that Plaintiffs intended to identify the Highland bankruptcy on the Civil Cover Sheet but inadvertently failed to do so and have since submitted an amended Civil Cover Sheet correcting the error. [Doc. 33]. The omission was harmless because the Complaint discloses both the bankruptcy and its relationship to the present action, a disclosure that was supplemented by Plaintiffs' Motion for Leave to Amend, which provides additional detail regarding the related bankruptcy case and attaches two orders issued in that case. Complaint ¶¶ 15-36; Motion for Leave and Exhibits [Docs. 6, 6-1, 6-2].

Defendant refers the Court to *Kuzmin v. Thermaflo.*, No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at *4-7 (E.D. Tex. May 20, 2009), for the proposition that failing to disclose a related case is a violation of the Local Rules. In *Kuzmin*, however, the plaintiff was faulted for

---

Plaintiffs' Response to Defendant's Motion for an Order to Enforce
the Order of Reference and Cross Motion

numerous failings, including (1) the failure to submit a Civil Cover Sheet at all, (2) the failure, upon receiving notice of the deficiency, to provide sufficient information for the clerk to identify the related action, and (3) filing a third action without any information indicating it was related to the previous two. *Id*. at *5. The court continued, finding that plaintiff's counsel in that case had also committed violations of the mandate for professionalism in the Texas Lawyer's Creed by failing to communicate about the filings with known counsel for the opposition. *Id*. at *6-12.

Plaintiffs respectfully submit that the *Kuzmin* case is inapposite. Plaintiffs here did not fail to submit a Civil Cover Sheet. They corrected the omission after it was brought to their attention, and their original filing did disclose, in the text of the Complaint, the information that was inadvertently omitted from the Civil Cover Sheet. Further, Plaintiffs here communicated promptly with counsel for the Defendant regarding the action and the related bankruptcy case by asking the Defendant's counsel in the related action if they would accept service of the Complaint and whether they objected to Plaintiffs' Motion for Leave to Amend.

These circumstances, Plaintiffs submit, do not rise to the level of a violation of Local Rule 3.3 or, alternatively, they constitute a harmless, corrected error at most. Plaintiffs ask the Court to treat them as no worse than Defendant's failure to include a certificate of conference with this Motion (Local Rule 7(h)), or its failure to confer with Plaintiffs' counsel before filing it (Local Rule 7(a)), or its failure to paginate its appendix consecutively (Local Rule 7(i)).

Finally, Plaintiffs submit that the omission complained of does not justify or even relate to the relief sought in this Motion.

---

Plaintiffs' Response to Defendant's Motion for an Order to Enforce
the Order of Reference and Cross Motion                                   Page 17

## E. The Litigious-Nature Argument Is Likewise Unavailing

Defendant's claims regarding James Dondero's litigiousness are likewise unconnected to the relief they are requesting here. Dondero is not a party to this case. Neither does he control either Plaintiff. APP_16-17.

For this argument, Defendant relies solely on *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 F. App'x 741 (5th Cir. 2021), and 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Neither authority addresses whether jurisdiction appropriately lies here or in the bankruptcy court. It appears that they are cited here merely to raise the specter of potential sanctions.

Plaintiffs respectfully submit that their claims here have merit and are not frivolous. And Defendant's contrary position can and should be addressed in connection with Defendant's pending motion under Rule 12(b)(6) rather than in connection with this Motion.

## F. Plaintiffs' Cross-Motion Should Be Granted

For the same reasons Defendant's Motion should be denied, Plaintiffs' cross-motion should be granted. Presiding over this action will require consideration of non-bankruptcy federal laws regulating interstate commerce, as well as their interplay with the Bankruptcy Code. Thus, the mandatory-withdrawal-of-the-reference provision of 28 U.S.C. § 157(d) applies.

Moreover, the bankruptcy court's jurisdiction is limited, both by § 157(d) and by plan confirmation. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *Bank of La. v. Craig's*

---

*Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390–91 (5th Cir.2001)
(explaining that, "after confirmation of a reorganization plan, a stricter post-confirmation standard
applies," and "after a debtor's reorganization plan has been confirmed, the debtor's estate, and
thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the
implementation or execution of the plan.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it
return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't*,
No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.). Thus, this Court
should deny Defendant's Motion, withdraw the reference under § 157(d), and retain jurisdiction
over this action.

## VI.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully submit Defendant's Motion should be
denied.

Dated:  June 29, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s Jonathan Bridges*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

**Counsel for Plaintiffs**

---

# EXHIBIT 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

002711

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

---

Original Complaint                                                                                          Page 3

## III.

## JURISDICTION AND VENUE

**7.**     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.**     Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.**     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.**     Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**     Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.    The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.    Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.    Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.    Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.    In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.    The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.    Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.    HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40. Typically, the value of the securities reflected by a market price quote.

41. However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42. There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43. Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off by the mark by a mile.

44. Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45. It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; or (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46. For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.    Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.    Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.    Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.    Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.    That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.    The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

**V.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
*Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

---

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equitization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

002725

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**SECOND CAUSE OF ACTION**
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

100.     Had Plaintiff been allowed to do so, it would have obtained the interests with a net

equity value over their purchase price worth in excess of $20 million.

101.     No discovery or opportunity to investigate was afforded Plaintiff prior to lodging

an objection in the Bankruptcy Court.

102.     Plaintiff is entitled to specific performance or, alternatively, disgorgement,

constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

103.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set

forth herein, and further alleges the following:

104.     Plaintiffs incorporate the foregoing causes of action and note that all the foregoing

violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA

and HCM.

105.     Each of these Defendants should have known that their actions were violations of

the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.     Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies

and procedures regarding both the propriety and means of trading with a customer [Harbourvest],

the propriety and means of trading as a principal in an account but in a manner adverse to another

customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held

by HCLOF.

107.     It would be foreseeable that failing to disclose the current value of the assets in the

HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

002732

126.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.    Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.    In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.    Seery was at all relevant times operating as an agent of HCM.

130.    This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.    The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.    Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

134.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.   Actual damages;

    b.   Disgorgement;

    c.   Treble damages;

    d.   Exemplary and punitive damages;

    e.   Attorneys' fees and costs as allowed by common law, statute or contract;

    f.   A constructive trust to avoid dissipation of assets;

    g.   All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

/s/  *Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# EXHIBIT 12

002737

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 275**

**[Release No. IA-2628; File No. S7-25-06]**

**RIN 3235-AJ67**

**Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles**

**AGENCY:**  Securities and Exchange Commission.

**ACTION:**  Final rule.

**SUMMARY:**  The Securities and Exchange Commission is adopting a new rule that prohibits advisers to pooled investment vehicles from making false or misleading statements to, or otherwise defrauding, investors or prospective investors in those pooled vehicles.  This rule is designed to clarify, in light of a recent court opinion, the Commission's ability to bring enforcement actions under the Investment Advisers Act of 1940 against investment advisers who defraud investors or prospective investors in a hedge fund or other pooled investment vehicle.

**EFFECTIVE DATE:** September 10, 2007.

**FOR FURTHER INFORMATION CONTACT:**  David W. Blass, Assistant Director, Daniel S. Kahl, Branch Chief, or Vivien Liu, Senior Counsel, at 202-551-6787, Division of Investment Management, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-5041.

**SUPPLEMENTARY INFORMATION:**  The Commission is adopting new rule 206(4)-8 under the Investment Advisers Act of 1940 ("Advisers Act").[1]

---

[1]     15 U.S.C. 80b.  Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified.

## I.    INTRODUCTION

On December 13, 2006, we proposed a new rule under the Advisers Act that would

prohibit advisers to pooled investment vehicles from defrauding investors or prospective

investors in pooled investment vehicles they advise.[2]  We proposed the rule in response to the

opinion of the Court of Appeals for the District of Columbia Circuit in Goldstein v. SEC, which

created some uncertainty regarding the application of sections 206(1) and 206(2) of the Advisers

Act in certain cases where investors in a pool are defrauded by an investment adviser to that

pool.[3]  In addressing the scope of the exemption from registration in section 203(b)(3) of the

Advisers Act and the meaning of "client" as used in that section, the Court of Appeals expressed

the view that, for purposes of sections 206(1) and (2) of the Advisers Act, the "client" of an

investment adviser managing a pool is the pool itself, not an investor in the pool.  As a result, it

was unclear whether the Commission could continue to rely on sections 206(1) and (2) of the

Advisers Act to bring enforcement actions in certain cases where investors in a pool are

defrauded by an investment adviser to that pool.[4]

---

[2]    Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles; Accredited Investors in
Certain Private Investment Vehicles, Investment Advisers Act Release No. 2576 (Dec. 27, 2006)
[72 FR 400 (Jan. 4, 2007)] (the "Proposing Release").  In the Proposing Release, we also
proposed two new rules that would define the term "accredited natural person" under Regulation
D and section 4(6) of the Securities Act of 1933 [15 USC 77d(6)] ("Securities Act").  As
proposed, these rules would add to the existing definition of "accredited investor" and apply to
private offerings of certain unregistered investment pools.  On May 23, 2007, we voted to
propose more general amendments to the definition of accredited investor.  Proposed
Modernization of Smaller Company Capital-Raising and Disclosure Requirements, Securities Act
Release No.    (    , 2007) [72 FR  (    , 2007)].  We plan to defer consideration of our
proposal to define the term accredited natural person until we have had the opportunity to
evaluate fully the comments we received on that proposal together with those we receive on our
May 2007 proposal.

[3]    451 F.3d 873 (D.C. Cir. 2006) ("Goldstein").

[4]    Prior to the issuance of the Goldstein decision, we brought enforcement actions against advisers
alleging false and misleading statements to investors under sections 206(1) and (2) of the
Advisers Act.  See, e.g., SEC v. Kirk S. Wright, International Management Associates, LLC,
Litigation Release No. 19581 (Feb. 28, 2006); SEC v. Wood River Capital Management, LLC,

In its opinion, the Court of Appeals distinguished sections 206(1) and (2) from section

206(4) of the Advisers Act, which is not limited to conduct aimed at clients or prospective clients

of investment advisers.[5]  Section 206(4) provides us with rulemaking authority to define, and

prescribe means reasonably designed to prevent, fraud by advisers.[6]  We proposed rule 206(4)-8

under this authority.

We received 45 comment letters in response to our proposal.[7]  Most commenters

generally supported the proposal.  Eighteen endorsed the rule as proposed, noting that the rule

would strengthen the antifraud provisions of the Advisers Act or that the rule would clarify the

Commission's enforcement authority with respect to advisers.[8]  Others, however, urged that we

---

Litigation Release No. 19428 (Oct. 13, 2005); SEC v. Samuel Israel III; Daniel E. Marino; Bayou Management, LLC; Bayou Accredited Fund, LLC; Bayou Affiliates Fund, LLC; Bayou No Leverage Fund, LLC; and Bayou Superfund, LLC, Litigation Release No. 19406 (Sept. 29, 2005); SEC v. Beacon Hill Asset Management LLC, Litigation Release No. 18745A (June 16, 2004).

[5]   See Goldstein, supra note 3, at note 6.  See also United States v. Elliott, 62 F.3d 1304, 1311 (11th Cir. 1995).

[6]   Section 206(4) of the Advisers Act makes it unlawful for an investment adviser to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" and authorizes us "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

[7]   We received over 600 comment letters that addressed the proposed amendments to the term "accredited natural person" under Regulation D and section 4(6) of the Securities Act.  All of the public comments we received are available for inspection in our Public Reference Room at 100 F Street, NE, Washington DC, 20549 in File No. S7-25-06, or may be viewed at www.sec.gov/comments/s7-25-06/s72506.shtml.

[8]   E.g., Letter of the Alternative Investments Compliance Association (Mar. 5, 2007); Letter of the CFA Center for Financial Market Integrity (Mar. 9, 2007) ("CFA Center Letter"); Letter of the Coalition of Private Investment Companies (Mar. 9, 2007); Letter of the Commonwealth of Massachusetts (Mar. 9, 2007) ("Massachusetts Letter"); Letter of the Department of Banking of the State of Connecticut (Mar. 8, 2007); Letter of the North America Securities Administrators Association (Apr. 2, 2007) ("NASAA Letter"); and Letter of the U.S. Chamber of Commerce (Mar. 9, 2007).  Another commenter observed that the proposed rules are broadly similar to current U.K. legislation and regulations.  See Letter of Alternative Investment Management Association (Mar. 9, 2007) ("AIMA Letter").

make revisions that would restrict the scope of the rule to more narrowly define the conduct or acts it prohibits.[9]

Today, we are adopting new rule 206(4)-8 as proposed.  The rule prohibits advisers from (i) making false or misleading statements to investors or prospective investors in hedge funds and other pooled investment vehicles they advise, or (ii) otherwise defrauding these investors. The rule clarifies that an adviser's duty to refrain from fraudulent conduct under the federal securities laws extends to the relationship with ultimate investors and that the Commission may bring enforcement actions under the Advisers Act against investment advisers who defraud investors or prospective investors in those pooled investment vehicles.

## II.    DISCUSSION

Rule 206(4)-8 prohibits advisers to pooled investment vehicles from (i) making false or misleading statements to investors or prospective investors in those pools or (ii) otherwise defrauding those investors or prospective investors.  We will enforce the rule through civil and administrative enforcement actions against advisers who violate it.

Section 206(4) authorizes the Commission to adopt rules and regulations that "define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."  In adopting rule 206(4)-8, we intend to employ all of the broad authority that Congress provided us in section 206(4) and direct it at adviser conduct affecting an investor or potential investor in a pooled investment vehicle.

---

[9]    E.g., Letter of American Bar Association (Mar. 12, 2007) ("ABA Letter"); Letter of Davis Polk & Wardwell (Mar. 9, 2007) ("Davis Polk Letter"); Letter of Dechert LLP (Mar. 8, 2007) ("Dechert Letter"); Letter of New York City Bar (Mar. 8, 2007) ("NYCB Letter"); Letter of Schulte Roth & Zabel LLP (Mar. 9, 2007) ("Schulte Roth Letter"); and Letter of Sullivan & Cromwell LLP (Mar. 9, 2007) ("Sullivan & Cromwell Letter").

### A.  Scope of Rule 206(4)-8

Some commenters questioned the scope of the rule, arguing that the Commission should define fraud.[10]  We believe that we have done so, only more broadly than some commenters would have us do.  As the Proposing Release indicated, our intent is to prohibit all fraud on investors in pools managed by investment advisers.  Congress expected that we would use the authority provided by section 206(4) to "promulgate general antifraud rules capable of flexibility."[11]  The terms material false statements or omissions and "acts, practices, and courses of business as are fraudulent, deceptive, or manipulative" encompass the well-developed body of law under the antifraud provisions of the federal securities laws.  The legal authorities identifying the types of acts, practices, and courses of business that are fraudulent, deceptive, or manipulative under the federal securities laws are numerous, and we believe that the conduct prohibited by rule 206(4)-8 is sufficiently clear and well understood.[12]

---

[10]     E.g., ABA Letter, supra note 9; Letter of Debevoise & Plimpton LLP (Mar. 14, 2007); and NYCB Letter, supra note 9.

[11]     S.Rep. No. 1760, 86th Cong., 2d. Sess. (June 28, 1960) at 4.  See rule 206(4)-1(a)(5) [17 CFR. 275.206(4)-1(a)(5)] under the Advisers Act; rule 17j-1(b) [17 CFR 270.17j-1(b)] under the Investment Company Act of 1940 [15 U.S.C. 80a-1] ("Investment Company Act"); and rule 13e-3(b)(1) [17 CFR 240.13e-3(b)(1)] under the Securities Exchange Act of 1934 [15 U.S.C. 77a] ("Exchange Act").

[12]     Loss, Seligman, & Paredes, Securities Regulation, Chap. 9 (Fraud) (Fourth Ed. 2006); Hazen, Treatise on The Law of Securities Regulation, Vol. 3, Ch. 12 (Manipulation and Fraud – Civil Liability; Implied Private Remedies; SEC Rule 10b-5; Fraud in Connection With the Purchase or Sale of Securities; Improper Trading on Nonpublic Material Information) (Fifth Ed. 2005).  See, e.g., Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 11 n. 7 (1971) ("'We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.  Novel or atypical methods should not provide immunity from the securities laws.'" (quoting A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (CA2 1967))); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices.").  Moreover, the established legal principles are sufficiently flexible to encompass future novel factual scenarios.  United States v. Brown, 555 F.2d 336, 339-40 (2d Cir. 1977) ("The fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sanctions of the securities fraud provisions here involved.").

### 1. Investors and Prospective Investors

Rule 206(4)-8 prohibits investment advisers from making false or misleading statements to, or engaging in other fraud on, investors or prospective investors in a pooled investment vehicle they manage. The scope of the rule is modeled on that of sections 206(1) and (2) of the Advisers Act, which make unlawful fraud by advisers against clients or prospective clients. Rule 206(4)-8 prohibits false or misleading statements made, for example, to existing investors in account statements as well as to prospective investors in private placement memoranda, offering circulars, or responses to "requests for proposals," electronic solicitations, and personal meetings arranged through capital introduction services.

Some commenters argued that the rule should not prohibit fraud against prospective investors in a pooled investment vehicle, asserting that such fraud does not actually harm investors until they, in fact, make an investment.[13] We disagree. False or misleading statements and other frauds by advisers are no less objectionable when made in an attempt to draw in new investors than when made to existing investors.[14] For similar policy reasons that we believe led Congress to apply the protections of sections 206(1) and (2) to prospective clients, we have decided to apply those of rule 206(4)-8 to prospective investors.[15] We believe that prohibiting false or misleading statements made to, or other fraud on, any prospective investors is a means reasonably designed to prevent fraud.

---

[13]     Davis Polk Letter, supra note 9; Dechert Letter, supra note 9; NYCB Letter, supra note 9; Letter of the Securities Industry and Financial Markets Association (Mar. 9, 2007); Sullivan & Cromwell Letter, supra note 9.

[14]     See CFA Center Letter, supra note 8.

[15]     We have used the term "prospective investor" to give the term similar scope to the term "prospective client" in sections 206(1) and (2). See, e.g., In the Matter of Ralph Harold Seipel, 38 S.E.C. 256, 257-58 (1958) (the solicitation of clients is part of the activity of an investment adviser and it is immaterial for purposes of an enforcement action under sections 206(1) and (2) that an adviser engaging in fraudulent solicitations was not successful in his efforts to obtain clients).

### 2.  Unregistered Investment Advisers

Rule 206(4)-8 applies to both registered and unregistered investment advisers.[16]  As we

noted in the Proposing Release, many of our enforcement cases against advisers to pooled

investment vehicles have been brought against advisers that are not registered under the Advisers

Act, and we believe it is critical that we continue to be in a position to bring actions against

unregistered advisers that manage pools and that defraud investors in those pools.[17]  The two

commenters that expressed an explicit view on this aspect of the proposal supported our

application of the rule to advisers that are not registered with the Commission.[18]

### 3.  Pooled Investment Vehicles

The rule we are adopting today applies to investment advisers with respect to any "pooled

investment vehicle" they advise.  The rule defines a pooled investment vehicle[19] as any

investment company defined in section 3(a) of the Investment Company Act[20] and any privately

offered pooled investment vehicle that is excluded from the definition of investment company by

reason of either section 3(c)(1) or 3(c)(7) of the Investment Company Act.[21]  As a result, the rule

---

[16]     A few commenters requested that we clarify how we intend to apply rule 206(4)-8 to offshore
advisers' interaction with non-U.S. investors.  See AIMA Letter, supra note 8; Letter of Jones
Day (Mar. 9, 2007); Sullivan & Cromwell Letter, supra note 9.  Our adoption of this rule will not
alter our jurisdictional authority.

[17]     Proposing Release, supra note 2, at note 14.

[18]     Massachusetts Letter, supra note 8; NASAA Letter, supra note 8.

[19]     Rule 206(4)-8(b).

[20]     15 U.S.C. 80a-3(a).  Unless otherwise noted, when we refer to the Investment Company Act, or
any paragraph of the Investment Company Act, we are referring to 15 U.S.C. 80a of the United
States Code, at which the Company Act is codified.

[21]     Section 3(c)(1) of the Investment Company Act excludes from the definition of investment
company an issuer the securities (other than short-term paper) of which are beneficially owned by
not more than 100 persons and that is not making or proposing to make a public offering of its
securities.  Section 3(c)(7) of the Investment Company Act excludes from the definition of
investment company an issuer the outstanding securities of which are owned exclusively by
persons who, at the time of acquisition of such securities, are "qualified purchasers" and that is
not making or proposing to make a public offering of its securities.  "Qualified purchaser" is

applies to advisers to hedge funds, private equity funds, venture capital funds, and other types of

privately offered pools that invest in securities, as well as advisers to investment companies that

are registered with us.[22]

Several commenters supported applying the protection of the new antifraud rule to

investors in all these kinds of pooled investment vehicles, noting, for example, that every

investor, not just the wealthy or sophisticated that typically invest in private pools, should be

protected from fraud.[23]  Some other commenters urged us not to apply the rule to advisers to

registered investment companies, arguing that the rule is unnecessary because other provisions of

the federal securities laws prohibiting fraud are available to the Commission to address these

matters.[24]  They expressed concern that application of another antifraud provision with different

elements would be burdensome.  These commenters claimed that the rule would, for example,

make it necessary for advisers to conduct extensive reviews of all communications with clients.

But the other antifraud provisions available to us contain different elements because they were

not specifically designed to address frauds by investment advisers with respect to investors in

pooled investment vehicles.  In some cases, the other antifraud provisions may not permit us to

---

defined in section 2(a)(51) of the Investment Company Act generally to include a natural person (or a company owned by two or more related natural persons) who owns not less than $5,000,000 in investments; a person, acting for its own account or accounts of other qualified purchasers, who owns and invests on a discretionary basis, not less than $25,000,000; and a trust whose trustee, and each of its settlors, is a qualified purchaser.

[22]    We have brought enforcement actions under the Advisers Act against advisers to these types of funds.  See, e.g., In the Matter of Askin Capital Management, L.P and David J. Askin, Investment Advisers Act Release No. 1492 (May 23, 1995) (hedge fund); In the Matter of Thayer Capital Partners, Investment Advisers Act Release No. 2276 (Aug. 12, 2004) (private equity fund); SEC v. Michael A. Liberty, Litigation Release No. 19601 (Mar. 8, 2006) (venture capital fund).

[23]    E.g., NASAA Letter, supra note 8.

[24]    E.g., ABA Letter, supra note 9; Letter of Investment Adviser Association (Mar. 9, 2007); Letter of Investment Company Institute (Mar. 9, 2007) ("ICI Letter"); Sullivan & Cromwell Letter, supra note 9.  Commenters noted in particular that section 34(b) of the Investment Company Act already prohibits an adviser from making fraudulent material statements or omissions in a fund's registration statement or in required records.

proceed against the adviser.[25]  As a result, the existing antifraud provisions may not be available

to us in all cases.  As we discussed above, before the <u>Goldstein</u> decision we had brought actions

against advisers to mutual funds under sections 206(1) and (2) for defrauding investors in mutual

funds.[26]  Because, before the <u>Goldstein</u> decision, advisers to pooled investment vehicles operated

with the understanding that the Advisers Act prohibited the conduct that this rule prohibits, we

believe that advisers that are attentive to their traditional compliance responsibilities will not

need to alter their business practices or take additional steps and incur new costs as a result of

this rule's adoption.

### B.  Prohibition on False or Misleading Statements

Rule 206(4)-8(a)(1) prohibits any investment adviser to a pooled investment vehicle from

making an untrue statement of a material fact to any investor or prospective investor in the

pooled investment vehicle, or omitting to state a material fact necessary in order to make the

statements made to any investor or prospective investor in the pooled investment vehicle, in the

light of the circumstances under which they were made, not misleading.[27]

The provision is very similar to those in many of our antifraud laws and rules that,

depending upon the circumstances, may also be applicable to the same investor

---

[25]    This may be the case with respect to section 34(b) of the Investment Company Act, for example,
if the adviser's fraudulent statements are not made in a document described in that section, or
with respect to rule 10b-5 under the Exchange Act, where the fraudulent conduct does not relate
to a misstatement or omission in connection with the purchase or sale of any security.

[26]    <u>See, e.g.</u>, <u>In the Matter of Van Kampen Investment Advisory Corp.</u>, Investment Advisers Act
Release No. 1819 (Sept. 8, 1999); <u>In the Matter of  The Dreyfus Corporation</u>, Investment
Advisers Act Release No. 1870 (May 10, 2000); <u>In the Matter of Federated Investment
Management Company</u>, Investment Advisers Act Release No. 2448 (Nov. 28, 2005).

[27]    A fact is material if there is a substantial likelihood that a reasonable investor in making an
investment decision would consider it as having significantly altered the total mix of information
available.  <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988); <u>TSC Industries, Inc. v.
Northway, Inc.</u>, 426 U.S. 438, 449 (1976).  <u>See also</u> <u>In the Matter of Van Kampen Investment
Advisory Corp.</u>, <u>supra</u> note 26; <u>In the Matter of the Dreyfus Corporation</u>, <u>supra</u> note 26.

communications.[28]  Sections 206(1) and (2) have imposed similar obligations on advisers since

1940 and, before <u>Goldstein</u>, were commonly accepted as imposing similar requirements on

communications with investors in a fund.  For these reasons, and because the nature of the duty

to communicate without false statements is so well developed in current law, we believe that

commenters' concerns about the breadth of the prohibition or any chilling effect the new rule

might have on investor communications are misplaced.[29]  Advisers to pooled investment vehicles

attentive to their traditional compliance responsibilities will not need to alter their

communications with investors.

Rule 206(4)-8(a)(1) prohibits advisers to pooled investment vehicles from making any

materially false or misleading statements to investors in the pool regardless of whether the pool

is offering, selling, or redeeming securities.  While the new rule differs in this aspect from rule

10b-5 under the Exchange Act, the conduct prohibited is similar.  The new rule prohibits, for

example, materially false or misleading statements regarding investment strategies the pooled

investment vehicle will pursue, the experience and credentials of the adviser (or its associated

persons), the risks associated with an investment in the pool, the performance of the pool or other

funds advised by the adviser, the valuation of the pool or investor accounts in it, and practices

---

[28]    <u>See, e.g.</u>, sections 12 and 17 of the Securities Act [15 U.S.C. 77l, 77q]; section 14 of the
Exchange Act [15 U.S.C. 78n]; section 34 of the Investment Company Act; rules 156, 159, and
610 under the Securities Act [17 CFR 230.156, 230.159, 230.610]; rules 10b-5, 13e-3, 13e-4, and
15c1-2 under the Exchange Act [17 CFR 240.10b-5, 240.13e-3, 240.13e-4, 240.15c1-2]; and rule
17j-1 under the Investment Company Act [17 CFR 270.17j-1]).

[29]    Letter of Managed Funds Association (Mar. 9, 2007) ("MFA Letter"); NYCB Letter, <u>supra</u> note
9; Davis Polk Letter, <u>supra</u> note 9; Dechert Letter, <u>supra</u> note 9; Letter of Seward & Kissel LLP
(Mar. 8, 2007) ("Seward & Kissel Letter").

the adviser follows in the operation of its advisory business such as how the adviser allocates investment opportunities.[30]

### C.  Prohibition of Other Frauds

Rule 206(4)-8(a)(2) makes it a fraudulent, deceptive, or manipulative act, practice, or course of business for any investment adviser to a pooled investment vehicle to "otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."[31]  As we noted in the Proposing Release, the wording of this provision is drawn from the first sentence of section 206(4) and is designed to apply more broadly to deceptive conduct that may not involve statements.[32]

Some commenters asserted that section 206(4) provides us authority only to adopt prophylactic rules that explicitly identify conduct that would be fraudulent under the new rule.[33] We believe our authority is broader.  We do not believe that the commenters' suggested approach would be consistent with the purposes of the Advisers Act or the protection of investors.  That approach would have us adopt the rule prohibiting fraudulent communications but not fraudulent conduct.[34]  But, section 206(4) itself specifically authorizes us to adopt rules defining and prescribing "acts, practices and courses of business," (*i.e.*, conduct), and does not explicitly refer to communications, which, nonetheless, represent a form of an act, practice, or

---

[30]     We have previously brought enforcement actions alleging these or similar types of frauds.  See Proposing Release, supra note 2, at note 29.

[31]     Rule 206(4)-8(a)(2).

[32]     See Section II.C of the Proposing Release, supra note 2.

[33]     ABA Letter, supra note 9; ICI Letter, supra note 24; Schulte Roth Letter, supra note 9; Sullivan & Cromwell Letter, supra note 9.

[34]     See, e.g., ABA Letter, supra note 9.

course of business.  In addition, rule 206(4)-8 as adopted would provide greater protection to investors in pooled investment vehicles.

Alternatively, commenters would have us adopt a rule prohibiting identified known fraudulent conduct or would have us provide detailed commentary describing specific forms of fraudulent conduct that the rule would prohibit.[35]  Either approach would fail to prohibit fraudulent conduct we did not identify, and could provide a roadmap for those wishing to engage in fraudulent conduct.  This approach would be inconsistent with our historical application of the federal securities laws under which broad prohibitions have been applied against specific harmful activity.

### D.  Other Matters

We noted in the Proposing Release that, unlike violations of rule 10b-5 under the Exchange Act, the Commission would not need to demonstrate that an adviser violating rule 206(4)-8 acted with scienter.[36]  Commenters questioned whether the rule should encompass negligent conduct, arguing that it would "expand the concept of fraud itself beyond its original meaning."[37]  We read the language of section 206(4) as not by its terms limited to knowing or deliberate conduct.  For example, section 206(4) encompasses "acts, practices, and courses of business as are . . . deceptive," thereby reaching conduct that is negligently deceptive as well as conduct that is recklessly or deliberately deceptive.  In addition, the Court of Appeals for the District of Columbia Circuit concluded that "scienter is not required under section 206(4)."[38]

---

[35]     Id.

[36]     Section II.B of the Proposing Release, supra note 2.

[37]     See ABA Letter, supra note 9 at page 3.

[38]     SEC v. Steadman, 967 F.2d 636, at 647 (D.C. Cir. 1992).  The court in Steadman analogized section 206(4) of the Advisers Act to section 17(a)(3) of the Securities Act, which the Supreme Court had held did not require a finding of scienter, id. (citing Aaron v. SEC, 446 U.S. 680 (1980)).  In discussing section 17(a)(3) and its lack of a scienter requirement, the Steadman court

We believe use of a negligence standard also is appropriate as a method reasonably designed to prevent fraud. As the Supreme Court noted in <u>U.S. v. O'Hagan</u>, "[a] prophylactic measure, because its mission is to prevent, typically encompasses more than the core activity prohibited."[39] In <u>O'Hagan</u>, the Court held that under section 14(e) "the Commission may prohibit acts, not themselves fraudulent under the common law or §10(b), if the prohibition is 'reasonably designed to prevent . . . acts and practices [that] are fraudulent.'"[40] Along these lines, the prohibitions in rule 206(4)-8 are reasonably designed to prevent fraud. We believe that, by taking sufficient care to avoid negligent conduct, advisers will be more likely to avoid reckless deception. Since the Commission clearly is authorized to prescribe conduct that goes beyond fraud as a means reasonably designed to prevent fraud, prohibiting deceptive conduct done negligently is a way to accomplish this objective.

Rule 206(4)-8 does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law. Nor does the rule alter any duty or obligation an adviser has under the Advisers Act, any other federal law or regulation, or any state law or regulation (including state securities laws) to investors in a pooled investment vehicle it advises.[41] The rule, for example, will permit us to bring an enforcement action against an investment adviser that violates a fiduciary duty imposed by other law if the violation of such law or obligation also constitutes an act, practice, or course of

---

observed that, similarly, a violation of section 206(2) of the Advisers Act could rest on a finding of simple negligence. <u>Id.</u> at 643, note 5. <u>But see</u> <u>Aaron</u> at 690-91 (citing <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 199 (1976)); <u>cf.</u> S. Rep. No. 1760, 86th Cong., 2d. Sess. (June 28, 1960) at 8 and H. R. Rep. 2179, 86th Cong., 2d Sess. (Aug. 26, 1960) at 8 (comparing section 206(4) to section 15(c)(2) of the Exchange Act).

[39]    <u>U.S. v. O'Hagan</u>, 521 U.S. 642, 672-73 (1997).

[40]    <u>Id.</u> at 673.

[41]    For example, under the Uniform Limited Partnership Act, advisers who serve as general partners owe fiduciary duties to the limited partners. UNIF. LIMITED PARTNERSHIP ACT § 408 (2001).

business that is fraudulent, deceptive, or manipulative within the meaning of the rule and section 206(4).[42]

Finally, the rule does not create a private right of action.[43]

## III.   PAPERWORK REDUCTION ACT

The Paperwork Reduction Act of 1995 does not apply because rule 206(4)-8 does not impose a new "collection of information" within the meaning of the Paperwork Reduction Act of 1995. The rule does not create any filing, reporting, recordkeeping, or disclosure requirements for investment advisers subject to the rule. Accordingly, there is no "collection of information" under the Paperwork Reduction Act that requires the approval of the Office of Management and Budget under 44 U.S.C. 3501.

## IV.   COST-BENEFIT ANALYSIS

The Commission is sensitive to costs imposed by our rules and the benefits that derive from them. In the Proposing Release, we encouraged commenters to discuss any potential costs and benefits that we did not consider in our discussion. Three commenters addressed the issue of cost. Two of them stated their belief that the rule would increase advisers' costs of compliance, by, for example, making it necessary for advisers to conduct extensive reviews of all communications with clients.[44] One stated that the rule would achieve a reasonable balance of

---

[42]   For example, if an adviser has a duty from a source other than the rule to make a material disclosure to an investor in a fund and negligently or deliberately fails to make the disclosure, the rule would apply to the failure.

[43]   The Supreme Court has held that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment adviser's contract, but that the Act confers no other private causes of action, legal or equitable." Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 at 24 (1979) (footnote omitted).

[44]   NYCB Letter, supra note 9; Seward & Kissel Letter, supra note 29.

providing important benefits to investors at an acceptable cost.[45]  None of the three commenters,

however, provided analysis or empirical data in connection with their statements.

The rule makes it a fraudulent, deceptive, or manipulative act, practice, or course of

business within the meaning of section 206(4) for any investment adviser to a pooled investment

vehicle to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading, to any investor or prospective investor in the pooled investment

vehicle.  The rule also makes it a fraudulent, deceptive, or manipulative act, practice, or course

of business within the meaning of section 206(4) for any investment adviser to a pooled

investment vehicle to otherwise engage in any act, practice, or course of business that is

fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the

pooled investment vehicle.  For the reasons discussed, we do not believe that the rule will require

advisers to incur new or additional costs.

Investment advisers to pooled investment vehicles should not be making untrue

statements or omitting material facts or otherwise be engaged in fraud with respect to investors

or prospective investors in pooled investment vehicles today, because federal authorities, state

authorities, and private litigants often can, and do, seek redress from the adviser for the untrue

statements or omissions or other frauds.  In most cases, the conduct that the rule prohibits is

already prohibited by federal securities statutes,[46] other federal statutes (including federal wire

fraud statutes),[47] as well as state law.[48]

---

[45]     CFA Center Letter, supra note 8.

[46]     See, e.g., section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and section 17(a) of the Securities
Act [15 U.S.C. 77q] which would apply when the false statements are made "in connection with
the purchase or sale of a security" or involve the "offer or sale" of a security, and section 34(b) of
the Investment Company Act which makes it unlawful "to make any untrue statement of a

We recognize that there are costs involved in assuring that communications to investors and prospective investors do not contain untrue or misleading statements and preventing other frauds.  Advisers have incurred, and will continue to incur, these costs due to the prohibitions and deterrent effect of the law and rules that apply under these circumstances.  While each of the provisions noted above may have different limitation periods, apply in different factual circumstances, or require the government (or a private litigant) to prove different states of mind than the rule, as discussed above we believe that the multiple prohibitions against fraud, and the consequences under both criminal and civil law for fraud, should currently cause an adviser to take the precautions it deems necessary to refrain from such conduct.

Furthermore, prior to <u>Goldstein</u>, advisers operated with the understanding that the Advisers Act prohibited the same conduct that would be prohibited by the rule.  Accordingly, we do not believe that advisers to pooled investment vehicles attentive to their traditional compliance responsibilities will need to take steps or alter their business practices in such a way that will require them to incur new or additional costs as a result of the adoption of the rule.

---

material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to [the Investment Company Act] . . . . "

[47] <u>See, e.g.</u>, 18 U.S.C. 1341 (Frauds and Swindles) and 18 U.S.C. 1343 (Fraud by wire, radio, or television) which make it a criminal offense to use the mails or to communicate by means of wire, having devised a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, and 18 U.S.C. 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) which makes it a criminal racketeering offense to engage or attempt to engage in a transaction in criminally derived property of a value greater than $10,000.

[48] <u>See, e.g.</u>, <u>Metro Communications Corp. BVI v. Advanced Mobilecomm Technologies</u>, 854 A.2d 121, 156 (Del. Ch. 2004) (court held that plaintiff-former member of LLC had sufficiently alleged a common law fraud claim based on allegation that a series of reports by LLC's managers contained misleading statements; court stated that "[i]n the usual fraud case, the speaking party who is subject to an accusation of fraud is on the opposite side of a commercial transaction from the plaintiff, who alleges that but for the material misstatements or omissions of the speaking party he would not have contracted with the speaking party").

We also recognize that the rule may cause some advisers to pay more attention to the information they present to better guard against making an untrue or misleading statement to an investor or prospective investor and to reevaluate measures that are intended to prevent fraud. As a consequence, some advisers might seek guidance, legal or otherwise, and more closely review the information that they disseminate to investors and prospective investors and the antifraud related policies and procedures they have implemented.  While increased concern about making false statements or committing fraud could be attributable to the new rule, advisers should already be incurring these costs to ensure truthfulness and prevent fraud, regardless of the rule, because of the myriad of laws or regulations that may already apply.

The principal benefit of the rule is that it clearly enables the Commission to bring enforcement actions under the Advisers Act, if an adviser to a pooled investment vehicle disseminates false or misleading information to investors or prospective investors or otherwise commits fraud with respect to any investor or prospective investor.  As noted above, the existing antifraud provisions may not be available to us in all cases.  Through our enforcement actions we are able to protect fund investor assets by stopping ongoing frauds,[49] barring persons that have committed certain specified violations or offenses from being associated with an investment adviser,[50] imposing penalties,[51] seeking court orders to protect fund assets,[52] and to order disgorgement of ill-gotten gains.[53]  Moreover, we believe that rule 206(4)-8 will deter advisers to pooled investment vehicles from engaging in fraudulent conduct with respect to investors in

---

[49]     See section 203(k) of the Advisers Act (Commission authority to issue cease and desist orders).

[50]     See section 203(f) of the Advisers Act (Commission authority to bar a person from being associated with an investment adviser).

[51]     See section 203(i) of the Advisers Act (Commission authority to impose civil penalties).

[52]     See section 209(d) of the Advisers Act (Commission authority to seek injunctions and restraining orders in federal court).

[53]     See section 203(j) of the Advisers Act (Commission authority to order disgorgement).

those pools and will provide investors with greater confidence when investing in pooled investment vehicles.

## V.    REGULATORY FLEXIBILITY ACT ANALYSIS

The Commission certified, pursuant to section 605(b) of the Regulatory Flexibility Act, that rule 206(4)-8 will not have a significant economic impact on a substantial number of small entities.[54]  This certification was included in the Proposing Release.[55]  While we encouraged written comment regarding this certification, none of the commenters responded to this request.

## VI.    STATUTORY AUTHORITY

We are adopting new rule 206(4)-8 pursuant to our authority set forth in sections 206(4) and 211(a) of the Advisers Act (15 U.S.C. 80b-6(4) and 80b-11(a)).

**List of Subjects**

**17 CFR Part 275**

Reporting and recordkeeping requirements, Securities.

## VII.    TEXT OF RULES

For the reasons set out in the preamble, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

**PART 275 – RULES AND REGULATIONS, INVESTMENT ADVISERS ACT OF 1940**

1.    The authority citation for Part 275 continues to read in part as follows:

<u>Authority</u>: 15 U.S.C. 80b-2(a)(11)(F), 80b-2(a)(17), 80b-3, 80b-4, 80b-4a, 80b-6(4), 80b-6a, and 80b-11, unless otherwise noted.

\*        \*        \*        \*        \*

---

[54]        5 U.S.C. 605(b).

[55]        Section VII.A of the Proposing Release, <u>supra</u> note 2.

19

2.      Section 275.206(4)-8 is added to read as follows:

**§206(4)-8  Pooled investment vehicles.**

(a)      <u>Prohibition</u>.  It shall constitute a fraudulent, deceptive, or manipulative act,

practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-

6(4)) for any investment adviser to a pooled investment vehicle to:

(1)      Make any untrue statement of a material fact or to omit to state a material fact

necessary to make the statements made, in the light of the circumstances under which they were

made, not misleading, to any investor or prospective investor in the pooled investment vehicle;

or

(2)      Otherwise engage in any act, practice, or course of business that is fraudulent,

deceptive, or manipulative with respect to any investor or prospective investor in the pooled

investment vehicle.

(b)      <u>Definition</u>.  For purposes of this section "pooled investment vehicle" means any

investment company as defined in section 3(a) of the Investment Company Act of 1940 (15

U.S.C. 80a-3(a)) or any company that would be an investment company under section 3(a) of

that Act but for the exclusion provided from that definition by either section 3(c)(1) or section

3(c)(7) of that Act (15 U.S.C. 80a-3(c)(1) or (7)).

By the Commission.

Nancy M. Morris
Secretary

August 3, 2007