**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

**Volume 14**

**APPELLANT RECORD**

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

### APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2. The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3. Docket Sheet kept by the Bankruptcy Clerk.

4. Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br>*Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *vol. 9* *001905 thru vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) (Annable, Zachery). |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*<br>003637 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| 003666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| 003843 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 003844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 003851 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*<br>003882<br>thru *Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*<br>004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 *Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|

*006133*

*Thru Vol. 31*

| | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
|---|---|---|---|---|

*Vol. 32*
*006925*

| | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
|---|---|---|---|---|

*006942*

| | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
|---|---|---|---|---|

*006960*

| | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |
|---|---|---|---|---|

TRANSCRIPTS

*006961*

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                          Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/  Mazin A. Sbaiti*
                                               **Mazin A. Sbaiti**
                                               Texas Bar No. 24058096
                                               **Jonathan Bridges**
                                               Texas Bar No. 24028835
                                               2200 Ross Avenue – Suite 4900W
                                               Dallas, TX  75201
                                               T:  (214) 432-2899
                                               F:  (214) 853-4367
                                               E:  mas@sbaitilaw.com
                                                   jeb@sbaitilaw.com

                                               **Counsel for Appellants**


                          **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                               */s/ Mazin A. Sbaiti*
                                               Mazin A. Sbaiti

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § § § | |
| Plaintiff, | § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § | |
| Defendants. | § § | |

**<u>DEBTOR'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   PLAINTIFFS' CLAIMS ARE BARRED BY RES JUDICATA ...................................... 2

    A.    Plaintiffs' Argument that Settlement does not "Release" Claims
Is Without Merit.................................................................... 2

    B.    The Settlement Is a Final Order That Resolved the Claims and Issues on the
Merits ............................................................................ 2

    C.    The Bankruptcy Court Possessed Jurisdiction to Hear the Claims................... 4

    D.    The Claims Arise from the Same Common Nucleus of Operative Facts as Those
Raised in the Prior Proceeding................................................... 5

III   PLAINTIFFS' CLAIMS ARE BARRED BY JUDICIAL ESTOPPEL.......................... 7

IV.   PLAINTIFFS FAIL TO STATE CLAIMS FOR RELIEF ................................ 8

    A.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty ............... 8

    B.    Plaintiffs Fail to State a Claim for Breach of Members Agreement.................... 11

    C.    Plaintiffs Fail to State a Claim for Tortious Interference with Contract.............. 13

    D.    Plaintiffs Fail to Plead a Claim for Negligence ................................... 13

    E.    Plaintiffs Fail to State a Claim under RICO ........................................ 13

CONCLUSION.................................................................... 15

## **TABLE OF AUTHORITIES**

**CASES**

*Accord Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.),*
  238 F. Supp. 3d 799 (S.D. Tex. 2017) ................................................................. 10

*Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.,*
  625 F.3d 185 (5th Cir. 2010) ............................................................................... 17

*Anderson v. Wells Fargo Bank, N.A.,*
  953 F.3d 311 (5th Cir. 2020) ................................................................................. 7

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.),*
  203 F.3d 914 (5th Cir. 2000) ................................................................................. 2

*Basic Capital Mgmt. v. Dynex Commer., Inc.,*
  402 S.W.3d 257 (Tex. App.—Dallas 2013) ........................................................ 14

*Baumstimler v. Rankin,*
  677 F.2d 1061 (5th Cir. 1982) ............................................................................. 14

*Belmont v. MB Inv. Partners, Inc.,*
  708 F.3d 470 (3d Cir. 2013) ................................................................................ 11

*Benson and Ford, Inc. v. Wanda Petroleum Co.,*
  833 F.2d 1172 (5th Cir. 1987) .......................................................................... 6, 7

*Chalmers v. Gavin,*
  No. 3:01–CV–528–H, 2002 WL 511512 (N.D. Tex. Apr. 2, 2002) ...................... 3

*Collins v. Morgan Stanley Dean Witter,*
  224 F.3d 496 (5th Cir. 2000) .............................................................................. 13

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.),*
  68 F.3d 914 (5th Cir. 1995) .................................................................................. 4

*Crowe v. Henry,*
  43 F.3d 198 (5th Cir. 1995) ................................................................................. 17

*Douglass v. Beakley,*
  900 F. Supp. 2d 736 (N.D. Tex. 2012) ................................................................ 11

*Goldenson v. Steffens,*
  No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 201258 (D. Me. Mar. 7, 2014) ................. 11

*Goldstein v. SEC,*
  451 F.3d 873 (D.C. Cir. 2006) ............................................................................ 10

*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989) ....................................................................................... 16, 17

*Hall v. Hodgkins,*
  305 Fed.Appx. 224, 229 (5th Cir. 2008) ............................................................ 7, 9

DOCS_NY:43642.3 36027/002

002759

*I Love Omni, LLC v. Omnitrition Int'l, Inc.*,
   No. 3:16-CV-2410-G, 2017 WL 3086035 (N.D. Tex. July 20, 2017) ................................... 14

*In re Alfonso*,
   No. 16-51448-RBK, 2019 WL 4254329 (Bankr. W.D. Tex. Sept. 6, 2019) ............................ 4

*In re Burzynski*,
   989 F.2d 733 (5th Cir. 1993) ................................................................................................ 16

*In re Coastal Plains Inc.*, 179 F.3d 197 (5th Cir. 1999) .............................................................. 8, 9

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) ................................................................................................ 13

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
   802 F. Supp. 2d 725 (E.D. La. 2011) ................................................................................... 18

*In re Paige*,
   610 F.3d 865 (5th Cir. 2010) .................................................................................................. 7

*In re Save Our Springs (S.O.S.) All., Inc.*,
   393 B.R. 452 (Bankr. W.D. Tex. 2008) .................................................................................. 9

*Laird v. Integrated Res.*,
   897 F.2d 826 (5th Cir. 1990) ........................................................................................... 10, 11

*Little v. KPMG LLP*,
   No. SA-07-CA-621-FB, 2008 WL 576226 (W.D. Tex. Jan. 22, 2008) ............................ 12, 14

*Lovelace v. Software Spectrum*,
   78 F.3d 1015 (5th Cir. 1996) .................................................................................................. 8

*Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Young*,
   No. 91 Civ. 2923, 1994 WL 88129 (S.D.N.Y. Mar, 14, 1994) ............................................. 16

*Meyers v. Textron, Inc.*,
   540 F. App'x 408 (5th Cir. 2013) ........................................................................................... 7

*Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*,
   801 F.3d 530 (5th Cir. 2015) .................................................................................................. 4

*Payne v. Doe*,
   2017 U.S. Dist. LEXIS 49875 (E.D. Va. Mar. 31, 2017) ....................................................... 5

*R.A.G.S. Couture, Inc. v. Hyatt*,
   774 F.2d 1350 (5th Cir. 1985) .............................................................................................. 17

*Reneker v. Offill*,
   No. CIV.A.3:08-CV-1394-D, 2009 WL 3365616 (N.D. Tex. Oct. 20, 2009) ..................... 7, 15

*Reynolds v. Tombone*,
   No. 3:96-CV-3330-BC, 1999 WL 439088 (N.D. Tex. June 24, 1999) .................................... 3

*Risby v. United States*,
   CIV.A.3:04-CV-1414-H, 2006 WL 770428 (N.D. Tex. Mar. 7, 2006) ................................ 2, 3

*SEC v. Northshore Asset Mgmt.*,
  2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008) ...................... 10

*SEC v. Trabulse*,
  526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007) ........................... 10

*Smith v. Cooper/T. Smith Corp.*,
  886 F.2d 755 (5th Cir. 1989) ....................................... 17

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ....................................... 12

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
  964 F.Supp. 783 (S.D.N.Y. 1997) .................................... 11

*Taylor v. Charter Med. Corp.*,
  162 F.3d 827 (5th Cir. 1998) ........................................ 8

*Travelers Ins. Co. v. St. Jude Hosp. of Kenner, Louisiana, Inc.*,
  37 F.3d 193 (5th Cir. 1994) ...................................... 5, 6

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>"

or "<u>Highland</u>"), submits this reply (the "<u>Reply</u>") in support of the *Debtor's Motion to Dismiss the*

*Original Complaint* (the "<u>Motion</u>").

## I.    PRELIMINARY STATEMENT

1.      In their response [Docket No. 38] (the "<u>Response</u>"), Plaintiffs attempt to cure the

deficiencies in their Complaint by mischaracterizing the facts of the Prior Proceeding and

misleading the Court as to the relevant issues.  Plaintiffs contend that their Claims are not barred

by *res judicata* or judicial estoppel because (i) the Settlement does not "release" the Claims, and

(ii) Plaintiffs were not "successful" and the objections were not decided on the "merits."  That the

Settlement does not "release" the Debtor from liability has no bearing on whether the Claims arise

from the same core facts as those in the Prior Proceeding.  That Plaintiffs did not succeed on their

objections has no relevance to whether Plaintiffs' Claims are inconsistent with positions taken by

Plaintiffs during the Settlement hearing.  Plaintiffs' assertion that their state fiduciary claim can be

predicated on the Advisers Act fails because (i) there is no duty to CLOH; (ii) a private right of

action under the Advisers Act does not exist, and (iii) Plaintiffs fail to allege any state law claim.

Plaintiffs' claim for breach of the Members Agreement fails because the Agreement and

Settlement Order, by their plain terms, authorize the Transfer of HCLOF assets.  Plaintiffs' new

theory of their breach of contract claim that the Settlement violated the "good faith" clause of the

Agreement, and constituted a "sale" to the Debtor because HCMLPI did not "pay" for the HCLOF

interests is frivolous.  In support of their negligence and tortious interference claims, Plaintiffs

recite the elements thereof, while disregarding the Debtor's arguments for dismissal.  In support

of their RICO claim, Plaintiffs restate the same conclusory allegations that are insufficient to

support the heightened pleading standard under RICO.  To the extent their RICO claim is premised

on securities laws, any such claim fails because RICO forecloses securities fraud as a "predicate"

act.

## II.    PLAINTIFFS' CLAIMS ARE BARRED BY *RES JUDICATA*

### A.    Plaintiffs' Argument that Settlement Does Not "Release" Claims Is Without Merit

2.      Plaintiffs argue that their Claims are not barred because the Settlement Order does

not "release" Plaintiffs' Claims. Response at 6-7.  Plaintiffs' citation to *Applewood Chair Co. v.*

*Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914 (5th Cir. 2000) is

misguided.   There, the court addressed whether a plan discharged creditors' claims against

guarantors under section 524 of the Bankruptcy Code.  Here, Plaintiffs do not seek to hold

guarantors liable for any of the Debtor's debt, and section 524 of the Bankruptcy Code is not at

issue.  The relevant question is whether all claims against the debtor Highland were fully and

finally resolved, and as set forth below and in the Motion, they were.

### B.    The Settlement Is a Final Order That Resolved the Claims and Issues on the Merits

3.      Plaintiffs' contention that the Settlement Order "overrules objections *en masse*

without addressing the merits thereof" is simply false. *See* Response at 7.  The Bankruptcy Court

overruled the objections after Plaintiffs had the opportunity to litigate their Claims and withdrew

the objection.  Plaintiffs' cite to *Applewood* is inapplicable for the reasons discussed *supra*.

Plaintiffs' citation to *Risby v. United States*, CIV.A.3:04-CV-1414-H, 2006 WL 770428 (N.D.

Tex. Mar. 7, 2006) is misplaced.  The court found that the government failed to establish that a

claim for the return of property was barred by *res judicata* where it "has not demonstrated the

finality" of the order at issue, and where the "procedural posture" of such an order was "not clear."

*Id.* at *5.  The court found that if the issue was "still pending on remand," or had been previously

held as "moot," the judgment "would not be final." *Id.* at *6.  Here, unlike in *Risby*, the Settlement

Order is clear and unambiguous.  It is a final order entered after an evidentiary hearing on the

proposed Settlement in which CLOH objected and fully participated.   The order is not pending

before a court on remand, nor were the issues at hand ever deemed "moot."

4.       Plaintiffs contend that because CLOH's withdrawal of its objection was not "with

prejudice," it is not barred by *res judicata*. Response at 8.   Plaintiffs misrepresent the facts.

Counsel for CLOH voluntarily withdrew its objection on the record after extensive litigation on

the issue.  Plaintiffs' citations to *Chalmers v. Gavin,* No. 3:01–CV–528–H, 2002 WL 511512, at

* 3 (N.D. Tex. Apr. 2, 2002) and *Reynolds v. Tombone*, No. 3:96-CV-3330-BC, 1999 WL 439088,

at *2 (N.D. Tex. June 24, 1999) are inapplicable.  In *Chalmers*, the court held that *res judicata* did

not bar plaintiff from litigating his state law claims brought in a prior civil rights action where the

court "explicitly dismissed" the claim "without prejudice to [p]laintiff refiling his complaint after

the Texas courts had been given an opportunity to address the state law issues raised in the

complaint." 2002 WL 511512, at * 3.  In *Reynolds*, the court held that *res judicata* did not bar an

indigent plaintiff's motion for return of property where it was "not adjudicated on the merits" and

was dismissed without prejudice pending compliance with the *in forma pauperis* provisions

pertaining to prisoner litigation." *Id.* at *12 and n.5.

5.       Plaintiffs' contention that the bankruptcy court generally has "*discretion*" to

"overrule an objection," Response at 8, is irrelevant, as are the cases Plaintiffs rely on in support

thereof.  They involve direct appeals of 9019 settlements, where the reviewing court simply notes

the standard by which the bankruptcy court generally reviews such settlements. *See Official Comm.*

*of Unsecured Creditors v. Moeller (In re Age Ref., Inc.),* 801 F.3d 530, 541 (5th Cir. 2015)

(reviewing direct appeal of a 9019 settlement for abuse of discretion, noting that "[i]n evaluating

a Rule 9019 settlement, a bankruptcy court *need not* 'conduct a mini-trial to determine the probable

outcome of any claims waived in the settlement.' [] The bankruptcy court must 'apprise [itself] of

the relevant facts and law so that [it] can make an informed and intelligent decision.'".[1]  None of

these cases are relevant to Plaintiffs' argument that their Claims are not barred by *res judicata*.

      6.      When evaluating the Settlement, the Bankruptcy Court determined that the

Settlement was fair and reasonable and in the best interest of the estate.  The Bankruptcy Court

was presented with evidence regarding the merits of the Claims asserted by HarbourVest and the

value of the assets being conveyed to the estate.  At no point did Plaintiffs raise the contention that

if the Debtor performed pursuant to the Settlement, they would sue the Debtor for its conduct,

giving rise to the possibility of a large administrative claim.  To the extent there were any valid

claims (there are not), the Bankruptcy Court may have made a different determination with respect

to the Settlement.  Plaintiffs sat on their hands until months after the Settlement Order was entered

and now attempt to retroactively gut the value of the Settlement.  This gamesmanship is improper

and is foreclosed by *res judicata*.

## C.      The Bankruptcy Court Possessed Jurisdiction to Hear the Claims

      7.      Plaintiffs contend without any legal support that the Bankruptcy Court lacked the

power under 28 U.S.C. § 157(d) to hear the Claims.  *See* Response at 9-10.  Plaintiffs request that

if the Court finds that, in accordance with the *Debtor's Motion for an Order to Enforce the Order

of Reference* [Docket No. 22], "mandatory withdrawal applies, then it cannot find that the

bankruptcy court's [] final judgment was rendered on Plaintiffs' causes of action and had

jurisdiction to do so." *Id.*  Plaintiffs conflate two separate issues pending before this Court:  (i)

whether the Complaint should be mandatorily withdrawn from this Court pursuant to 28 U.S.C. §

157(a), and (ii) whether the Claims in the Complaint are barred by *res judicata*.  The concept of

---

[1] *See also In re Alfonso*, No. 16-51448-RBK, 2019 WL 4254329 (Bankr. W.D. Tex. Sept. 6, 2019) (same); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (same).

DOCS_NY:43642.3 36027/002

mandatory withdrawal has nothing to do with this Motion, and Plaintiffs' arguments with respect to same should be summarily rejected by the Court.[2]

## D.    The Claims Arise from the Same Common Nucleus of Operative Facts as Those Raised in the Prior Proceeding

8.    Plaintiffs argue that this lawsuit and the matters adjudicated in the motion to approve the Settlement do not arise from the same nucleus of operative facts.  Plaintiffs assert that a "different legal duty is implicated" in the current action than in the Prior Proceeding, Response at 10, but offer no support for this contention other than one case, *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, Louisiana, Inc.*, 37 F.3d 193, 196 (5th Cir. 1994), which is inapposite.  *Travelers* dealt with Louisiana's "entity theory of partnership," and whether a creditor's claim against a partner for his share of a judgment against the partnership arises out of the same nucleus of operative facts as the partnership's debt. *Id.* at 196.  In holding that that *res judicata* did not bar an action to collect against the partner, the court reasoned that the claim "does not rest on an identical obligation" where the creditor was not pursuing a new theory of recovery or seeking to "relitigate" any issues raised in the prior proceeding, but instead, "sought merely to collect a pre-existing judgment in its favor." *Id.*  Here, by contrast, Plaintiffs do not seek to bring claims against the Debtor to collect on a pre-existing judgment.  Plaintiffs seek to relitigate the same Claims and issues raised in the Prior Proceeding, including whether Plaintiffs held a valid right of first refusal, a specious argument they asserted and then withdrew after they were shown it was baseless.

9.    Plaintiffs also assert a due process argument that is nothing short of frivolous.  They contend that they "only" had "22 days" to bring the Claims and that this is a violation of their "due

---

[2] The Court should first decide the *Debtor's Motion for an Order to Enforce the Order of Reference* because if it grants that motion, this Motion will properly be before the Bankruptcy Court. *See Payne v. Doe*, 2017 U.S. Dist. LEXIS 49875, at *4-5 (E.D. Va. Mar. 31, 2017) ("[M]andatory abstention argument is addressed first [before *res judicata*] because in the event mandatory abstention is warranted, it is unnecessary to reach or decide the remaining issues.")

5

process rights." Response at 11-12.  The Debtor does not argue that Plaintiffs should have brought the Claims *prior* to the Settlement hearing.   Rather, the Debtor argues in its Motion that the Claims arise from the same common nucleus of operative facts as those claims and issues raised during the Prior Proceeding and are thus barred by *res judicata*. Motion ¶¶ 15-22.  The valuation issues asserted in the Complaint were central to the Prior Proceeding through objections, motion practice, testimony, and extensive discovery.  *See id.* ¶ 20; *see also* Complaint ¶ 34 ("HCM rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase HarbourVest's interests in HCLOF"); *id.* ¶ 43 ("Seery testified that the fair market value of the HarbourVest HCLOF interests was $22.5 million").  Plaintiffs' citation to *Benson and Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172 (5th Cir. 1987), in support of their due process argument provides no support.  There, the court found that a party was not prohibited from bringing an action where, in the prior suit, they did not "control" the litigation and their interests were not "adequately" represented. *Id.* at 1174-75.   Unlike in *Benson,* Plaintiffs fully participated in, and had control over their role in, protecting their interests throughout the Settlement hearing where the very same matters were adjudicated.[3]

10.     Plaintiffs' position that the "first time" they learned about the valuation of the HLCOF interests was during the Settlement hearing is demonstrably false.  The Settlement Agreement disclosed (i) the valuation and (ii) the method of valuation. *See* Appx. 2, 3.  Plaintiffs were aware of the core facts underlying their current Claims throughout the Prior Proceeding and had a full and fair opportunity to investigate and litigate them.  This is precisely the type of situation contemplated by the doctrine of *res judicata*. *In re Paige*, 610 F.3d 865, 874 (5th Cir.

---

[3] For these same reasons, Plaintiffs' statute of limitations argument is of no moment, *see* Response at 11-12, and should be summarily disregarded by the Court.

2010); *Hall v. Hodgkins*, 305 Fed.Appx. 224, 229 (5th Cir. 2008).[4]  The Claims and issues arise

from the same nucleus of operative facts as those raised in the Prior Proceeding and are foreclosed

*by res judicata*.

### III   PLAINTIFFS' CLAIMS ARE BARRED BY JUDICIAL ESTOPPEL

11.     Plaintiffs maintain that the Debtor "has not met its burden" of showing that the

Claims are barred by judicial estoppel because (i) there has been "no decision on the merits" on

Plaintiffs' Claims, and (ii) "withdrawing an objection and then raising the argument later" does

not constitute an "inconsistent position" and Plaintiffs were "clearly not successful" on the

objection.  Response at 13.   Plaintiffs' arguments are without merit.

12.     Both prongs of judicial estoppel are satisfied here. *In re Coastal Plains Inc.*, 179

F.3d 197, 206 (5th Cir. 1999).  Plaintiffs' Claims are clearly inconsistent with the positions

Plaintiffs assumed during the Prior Proceeding.  During the Settlement hearing, Plaintiff CLOH

expressly stated on the record that it withdrew its objection premised on the alleged "Right of First

Refusal" under the Members Agreement after it "had an opportunity to review the reply briefing"

and based on its "analysis" of applicable law. Appx. 9 at 7:20-8:6.  Plaintiffs' current Claim for

breach of contract is premised on this same "Right of First Refusal" under the Members

Agreement. Complaint ¶ ¶ 92-102.  Plaintiffs offer no legal basis in support of the notion that

because they "withdrew an objection" during a hearing, this somehow does not constitute an

---

[4] Plaintiffs argue that the Court should "refuse" to take judicial notice of the Record. Response at 11, n. 2. In deciding
whether claims are barred by *res judicata* on a 12(b)(6) motion, it is proper for the Court to consider the Record
submitted by the Debtor.  *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020); *Meyers v. Textron,
Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013).  Plaintiffs' case cites are misplaced. *Reneker v. Offill*, Civil Action No.
3:08-CV-1394-D, 2010 U.S. Dist. LEXIS 38526, at *12 (N.D. Tex. Apr. 19, 2010) did not involve a 12(b)(6) motion
premised on *res judicata*.  The court held that where *facts are in dispute*, "courts must limit their inquiry to the facts
stated in the complaint."  Here, for purposes of the Motion, the Debtor does not dispute the facts alleged in the
Complaint.  The Debtor relies on public documents to show the four elements of *res judicata*.  Plaintiffs' cites to
*Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996) and *Taylor v. Charter Med. Corp.*, 162 F.3d 827,
829-30 (5th Cir. 1998) are distinguishable for these same reasons.

"inconsistent" position if this same issue is raised in a subsequent proceeding.   This is the type of "self-contradiction" and forum shopping that the doctrine of judicial estoppel is designed to prevent. *In re Save Our Springs (S.O.S.) All., Inc.*, 393 B.R. 452, 458 (Bankr. W.D. Tex. 2008) (judicial estoppel barred party from bringing position where party "expressly" assumed contradictory position "on the record" in a prior hearing); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 398 (5th Cir. 2003).

13.     The Bankruptcy Court accepted Plaintiffs' withdrawal of its objection premised on the Members Agreement.  This was a central issue in the Prior Proceeding. Appx. 6 ¶¶ 3, 6, 9-22; Appx. 7 at 140:7-25.  The Bankruptcy Court expressly stated that such a withdrawal "eliminates one of the major arguments" related to the proposed Settlement. Appx. 9 at 8:1-10; *Save Our Springs*, 393 B.R. at 460 (bankruptcy court accepted party's position in prior proceeding where "a significant amount of the Court's time and attention" at the hearing "were devoted to resolving the issues" raised by that party).  The Order explicitly authorized the transfer of the HCLOF assets because of concerns that Mr. Dondero and his entities would "go to a different court somehow to challenge the transfer." Appx. 9 at 156:19-20.  Plaintiffs' argument that it was not "successful" on its objection has no bearing on judicial estoppel. *In re Coastal Plains, Inc.*, 179 F.3d 197, 206 (5th Cir. 1999); *Hall*, 327 F.3d at 398.  The Claims are barred by the doctrine of judicial estoppel.

## IV.    PLAINTIFFS FAIL TO STATE CLAIMS FOR RELIEF

### A.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty

14.     There is no duty owed to CLOH.  Rule 206 of the Advisers Act creates a fiduciary duty to an investment adviser's "client" (*i.e.* a counterparty to the investment management agreement) but not an underlying investor in the "client." *Goldstein v. SEC*, 451 F.3d 873,

881(D.C. Cir. 2006).[5]  The Debtor has never had a management agreement with CLOH; CLOH is a shell entity through which DAF invested in HCLOF.  The Debtor does not "owe[] a fiduciary duty to [CLOH] as an investor in HCLOF [i.e., the "client"]." Complaint ¶ 62.

15.     Plaintiffs acknowledge that there is no private right of action under the Advisers Act for breach of duty. Response at 16.  As a fallback, they attempt to manufacture a breach of fiduciary duty claim under Texas state law premised on an imagined duty imported from the Advisers Act, but they offer no credible legal support thereof.  Plaintiffs broadly contend that "[u]nder Texas law, an investment advisor / advisee client relationship is considered a formal fiduciary relationship because it is a principal and agent relationship." Response at 16.  This does not address Plaintiffs' argument that such a state-law claim can be premised specifically on the Advisers Act.  Plaintiffs' citation to *Accord Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 238 F. Supp. 3d 799, 851 (S.D. Tex. 2017) lends no support for their argument either.  That case dealt with federal claims–not state law claims–and fiduciary duties owed by investment *brokers*–not investment advisors. *See id.*

16.     Plaintiffs' cite to *Laird v. Integrated Res.*, 897 F.2d 826, 834 (5th Cir. 1990), Response at 16, is also misplaced.  *Laird* involves federal claims under RICO, the Advisers Act, and the SEC, but not state-law fiduciary claims.  Plaintiffs mischaracterize *Douglass v. Beakley*, 900 F. Supp. 2d 736, 751-52, n.16 (N.D. Tex. 2012) in support of their argument that "although the Advisers Act does not itself create a cause of action, it is still actionable through state law fiduciary claims." Response at 16.   In *Douglass*, the court held that a plaintiff stated a state law fiduciary claim because they adequately pled such a claim under state law, not because it was

<hr />

[5] *See also SEC v. Northshore Asset Mgmt.*, 2008 U.S. Dist. LEXIS 36160, at *18-20 (S.D.N.Y. May 5, 2008); *SEC v. Trabulse*, 526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007).

premised on the Advisers Act. *See id.* at 751-52.  The court noted that *Transamerica* set forth the

"federal fiduciary standards" under the Advisers Act, *see id.* at 751-52, n.16, but did not state that

the state law fiduciary claim was "predicated on the Advisers Act." Response at 16-17.  Here,

unlike in *Douglass*, Plaintiffs fail to adequately plead a state-law claim for breach of fiduciary

duty. [6]

17.    Plaintiffs fail to plausibly allege breach of fiduciary duty premised on either state

or securities laws.   Plaintiffs' conclusory allegations regarding its state law claim fail to

sufficiently allege the: (1) nature of the fiduciary relationship; (2) the breach; and (3) any actual

injury to Plaintiffs as a result of any purported breach. Complaint ¶¶ 5-91. *In re ATP Oil & Gas

Corp.*, 711 Fed. App'x 216, 221 (5th Cir. 2017).  Plaintiffs' allegation of damages in the form of

lost opportunity, *see* Complaint ¶ 88, is equally deficient. *See Little v. KPMG LLP*, No. SA-07-

CA-621-FB, 2008 WL 576226, at *5 (W.D. Tex. Jan. 22, 2008) (rejecting damages claim

consisting of "lost profits they would have received" had they know about the conduct at issue,

noting that allegations are "speculative and conjectural.")  To the extent Plaintiffs' fiduciary claim

is premised on fraud, Plaintiffs necessarily fail to satisfy the heightened pleading standard required

under Rule 9(b).  The allegations fail to state with particularity the specific omissions by the

Debtor, nor do they give rise to any "strong inference of scienter" or deceptive motive on the part

of the Debtor.   Plaintiffs' vague allegations regarding the Debtor's "diversion of corporate

---

[6] Plaintiffs' remaining cites are unhelpful. *See Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F.Supp. 783, 799 (S.D.N.Y. 1997), (plaintiff sufficiently plead a state-law fiduciary claim under Maryland law; not because claim arose from Advisers Act); *Goldenson v. Steffens*, No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. Mar. 7, 2014) ("at a *conceptual* level, it is *possible* that the IAA could create a fiduciary duty); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 12 (applying NM law where there was contract between parties); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502-06 (3d Cir. 2013) (applying PA law: "[w]e need not resolve whether the Investors' fiduciary claims can properly be brought as a matter of state law"). Contrary to Plaintiffs' contention, Rule 206(4)-8 of the Advisers Act "does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law" or "a private right of action." Inv. Adv. Act Rel. No. 2628 (Aug. 3, 2007).

opportunity" is insufficient. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368

(5th Cir. 2004) (plaintiff must plead "more than allegations of motive and opportunity to withstand

dismissal" for claim of securities fraud).

**B.     Plaintiffs Fail to State a Claim for Breach of Members Agreement**

        18.     Plaintiffs note that Sections 6.1 and 6.2 of the Agreement "allow sales by members

of their interests in HCLOF to 'affiliates' of Members, but not members themselves, without

certain conditions precedent." Response at 23.  Plaintiffs fail to address the fact that the Settlement

Order explicitly authorized the transfer of the interests to "a wholly-owned and controlled

subsidiary of the Debtor" "without the need to obtain the consent of any party or to first offer such

interests to any other investor in HCLOF." Appx. 10 ¶ 6.  Moreover, the "conditions precedent,

*i.e.*, that "other members have to be afforded the right to purchase their pro-rata portion," do not

apply in these circumstances.  Pursuant to Section 6.2 of the Members Agreement, the "Right of

First Refusal" does <u>not</u> apply where the Transfer of the HCLOF interests is to "affiliates of an

initial Member" from Members other than CLOH. Appx. 13.  This is exactly what is contemplated

by the Settlement and authorized by the Bankruptcy Court.  HarbourVest transferred its interest in

HCLOF to the HCMLPI, an "Affiliate" of the Debtor, an "initial Member."  In contending that (i)

such an argument is "outside the scope of a 12(b)(6)" motion and (ii) the Transfer was made in

"bad faith," Response at 23-24, Plaintiffs willfully ignore the express ruling of the Bankruptcy

Court.  The Debtor's argument that the Members Agreement was not violated is well within the

scope of the Debtor's 12(b)(6) Motion.   The terms of the Settlement Order and Members

Agreement are appropriately considered by the Court in assessing the Motion because: (i) they

were referenced in the Complaint, (ii) they are central to Plaintiffs' Claims, and (iii) the Debtor

attached them to the Motion. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.

2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

19.    Plaintiffs argue for the first time in their Response that HCMLPI "was not a party to" the Settlement and "did not pay for those interests," and that the Settlement "constitutes a sale to *Highland*," in violation of the "good faith" clause of the Members Agreement. Response at 24. This is nonsense.  There is no basis to argue that the Debtor violated the "good faith" clause by complying with a federal court order.  Pursuant to the Settlement Order, HarbourVest transferred its interests in HCLOF to HCMLPI, consistent with the Members Agreement.  Plaintiffs fail to offer any legal or factual basis in support of their newly asserted theory of their breach of contract claim.  Based on the clear and unambiguous terms of the Members Agreement and Settlement Order, Plaintiffs' claim for breach of the Members Agreement fails as a matter of law.

20.    Plaintiffs fail to sufficiently allege damages.  Damages in the form of lost profits must be plead with "reasonable certainty." *Baumstimler v. Rankin*, 677 F.2d 1061, 1072 (5th Cir. 1982).[7]  Plaintiffs' cite to *Basic Capital Mgmt. v. Dynex Commer., Inc.*, 402 S.W.3d 257, 268 (Tex. App.—Dallas 2013) is distinguishable.  There, the court held that the evidence supported an award for lost opportunity resulting from a lender's breach of a commitment to provide investors with $160 million in financing to purchase commercial properties, where, as a result of such breach, the trusts could no longer purchase those properties because they did not have financing. *Id.* at 266-77.  Here, unlike in *Basic Capital*, there was no contract between Plaintiffs and the Debtor pursuant to which the Plaintiffs were to purchase the HCLOF interests.  Plaintiffs' contention that "had plaintiff been allowed to do so, it would have obtained the interests" in HCLOF, Complaint. ¶ 100, is precisely the type of conclusory allegation of lost profits rejected by courts. *I Love Omni, LLC v. Omnitrition Int'l, Inc.*, No. 3:16-CV-2410-G, 2017 WL 3086035, at

---

[7] *See also Little*, 2008 WL 576226, at *5.

*4 (N.D. Tex. July 20, 2017) (allegations of "lost business" and "lost income" fail

"to allege the damages [] suffered with any specific factual support.")

## C.   Plaintiffs Fail to State a Claim for Tortious Interference with Contract

21.    Plaintiffs maintain that since the Debtor's "entire premise" for dismissing

Plaintiffs' tortious interference claim is "predicated on the non-existence of an enforceable

contract," this claim survives. Response at 25.  The Debtor does not premise its dismissal of this

claim on the non-existence or enforceability of the Members Agreement.  The Debtor argues that

the claim for tortious interference with contract should be dismissed precisely because Plaintiffs:

(i) "fail to sufficiently allege how the Debtor intentionally interfered with the Members

Agreement," (ii) "fail to allege proximate causation," or (iii) "actual damages," and (iv) have

admitted in court that the Settlement did not violate the Members Agreement. Motion at 25-25.

## D.   Plaintiffs Fail to Plead a Claim for Negligence

22.    Plaintiffs recite the elements of a negligence claim, stating that the Debtor has

waived its argument for dismissal thereof because "it has not shown which elements have not been

met." Response at 25.   In its Motion, the Debtor argues that Plaintiffs' negligence claim is deficient

regarding "duty" and "proximate cause." Motion at 24.  Plaintiffs' allegations of a long chain of

attenuated events surrounding the Settlement which they contend "proximately" caused their harm

are too speculative to show that the Debtor's actions were the "cause in fact" or "substantial factor"

in bringing about any injury. *Reneker*, 2009 WL 3365616, at *6 (dismissing negligence claim

where allegations of "proximate cause" "depend on an attenuated chain of causation which

speculates," as to uncertain events).

## E.   Plaintiffs Fail to State a Claim under RICO

23.    Plaintiffs contend they adequately pled a pattern of racketeering activity through (i)

"wire and mail fraud," and (ii) violations of the securities laws, including the Advisers Act.

Response at 28-31.   Plaintiffs list a series of allegations, only a few of which even mention the terms "wires" and "mails." *Id.* at 28-29.   These are the same conclusory allegations that fail to meet the heightened pleading standard under RICO. Motion at ¶ 29.   Plaintiffs fail to plead with particularity: (ii) the specific acts of communication by mail or interstate wire undertaken by the Debtor in furtherance of the alleged fraudulent scheme, or (ii) details about the contents of any of these alleged communications, when they were made, to whom, or where they were directed. Complaint ¶¶ 113-33; *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at *11 (S.D.N.Y. Mar, 14, 1994).  Plaintiffs fail to plead a "pattern" of any alleged racketeering activity because there is no specific "threat of repetition" or threat or long-term criminal conduct.   Plaintiffs complain of a single transaction—the transfer of interests as part of the Settlement.   There is nothing to support the allegation that the Debtor "operates as part of a long-term association that exists for criminal purposes." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).   The allegations concern short-term conduct from September 2020 to January 2021 leading up to one discreet activity—the Settlement.   Plaintiffs' allegations premised on wire or mail fraud fail to meet the heightened pleading standard in support of a RICO claim.   *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993).[8]   Moreover, RICO prohibits securities fraud as a predicate act.   18 U.S.C.A. § 1964(c).   Plaintiffs allege as predicate acts the violation of securities laws and the Advisers Act in connection with a sale of a security, Complaint ¶¶ 131-33, and the RICO claim should also be dismissed on this basis. *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 191 (5th Cir. 2010).

---

[8] *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir. 1985) is misguided; a plaintiff sufficiently alleged "two acts of mail fraud" in the complaint. *Id.* at 1354.  Here, the allegations do not allege *any* predicate acts under RICO. *R.A.G.S* was also overturned by *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 235 (1989); *see also Smith v. Cooper/T. Smith Corp.*, 886 F.2d 755, 756 (5th Cir. 1989).

DOCS_NY:43642.3 36027/002

24.     Plaintiffs fail to rebut the argument that they fail to allege an "association in fact." They argue that: (i) HCLOF is a vehicle "run by HCFA and Highland;" (ii) the association was "ongoing" since 2017; and (iii) they "functioned as a continuing unit given their hierarchical" structure. Response at 25.  The allegations fail to show that Defendants existed as a continuing unit separate from the alleged RICO violations or identify the roles of each of the entities and how each participated in the alleged enterprise.  Plaintiffs' cite to *Crowe v. Henry*, 43 F.3d 198 (5th Cir. 1995) is inapposite.  There, the plaintiff plead an "association-in-fact" enterprise where the allegations show that the venture existed "*separate and apart* from the pattern of racketeering." *Id.* at 205.  Here, Plaintiffs allege the opposite—that the "purpose of the association-in-fact" was the perpetuation of the alleged racketeering activity. Complaint ¶¶ 115-17.  Plaintiffs also fail to plead causation or damages.  Allegations that Plaintiffs "would have paid cash" for the HCLOF interests are premised on a series of attenuated events that are too speculative to support a RICO claim. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 802 F. Supp. 2d 725, 729 (E.D. La. 2011).[9]

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) grant its Motion and enter an order in the form annexed to the Motion as **Exhibit A**, and (ii) grant any further relief as the Court deems just and proper.

---

[9] *See also In re Taxable Mun. Bond Sec. Litig,* 51 F.3d 518, 523 (5th Cir.1995); *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir.1994).

002776

Dated:  July 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

16

**002777**

Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

Jonathan W. Jordan
Texas Bar No. 00784360
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
jjordan@kslaw.com

*Counsel for Highland CLO Funding, Ltd.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.,** <br> **and CLO HOLDCO, LTD.,** <br> ***directly and derivatively,*** <br><br> **PLAINTIFFS,** <br><br> **v.** <br><br> **HIGHLAND CAPITAL MANAGEMENT,** <br> **L.P., HIGHLAND HCF ADVISOR, LTD.,** <br> **and HIGHLAND CLO FUNDING, LTD.,** <br> **Nominally,** <br><br> **DEFENDANTS.** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | **Case No. 3:21-cv-00842-b** |

---

**HIGHLAND CLO FUNDING, LTD.'S**
**MOTION TO DISMISS AND JOINDER IN MOTION TO DISMISS**
**OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

Highland CLO Funding, Ltd. ("HCLOF") moves to dismiss the complaint of plaintiffs

Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco," and with DAF,

"Plaintiffs") [ECF No. 1] (the "Complaint") as against HCLOF, and joins in the motion of

Highland Capital Management, L.P. ("HCM") to dismiss this case [Docket No. 26] (the "HCM

1

Motion to Dismiss").

## **RELIEF REQUESTED**

1.      HCLOF requests that this Court issue the proposed form of order attached to this Motion as Exhibit A pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. For the reasons that are more fully set forth in HCLOF's Brief in Support of Motion to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P., filed contemporaneously herewith, HCLOF respectfully requests that the Court (a) dismiss the Complaint as against HCLOF, and (b) grant HCLOF such other and further relief as is just.

2.      Subject to and without waiver of its personal jurisdiction defense, HCLOF also joins in the HCM Motion to Dismiss and HCM's related filings with the Court, and incorporates the arguments, evidence and authorities herein as if fully set forth in this motion.

## **CONCLUSION**

For the foregoing reasons, HCLOF respectfully requests that the Court (i) enter the proposed order substantially in the form attached as Exhibit A, and (ii) grant HCLOF such other and further relief as is just.

002779

Dated:  August 30, 2021

Respectfully submitted,

**KING & SPALDING LLP**

*/s/ Paul R. Bessette*
Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

Jonathan W. Jordan
Texas Bar No. 00784360
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
jjordan@kslaw.com

***Counsel for Highland CLO Funding, Ltd.***

002780

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served electronically by

the Court's ECF system on August 30, 2021.

/s/ Paul R. Bessette
Paul R. Bessette

002781

**Exhibit A – Proposed Order**

002782

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P.,<br>and CLO HOLDCO, LTD.,<br>*directly and derivatively,*<br><br>PLAINTIFFS,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT,<br>L.P., HIGHLAND HCF ADVISOR, LTD.,<br>and HIGHLAND CLO FUNDING, LTD.,<br>Nominally,<br><br>DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 3:21-cv-00842-b |

**ORDER GRANTING**
**HIGHLAND CLO FUNDING, LTD.'S MOTION TO DISMISS**

Before the Court is nominal defendant Highland CLO Funding, Ltd. ("HCLOF")'s motion to dismiss the complaint of plaintiffs Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco," and with DAF, "Plaintiffs") [ECF No. 1] (the "Complaint") as against HCLOF, [Docket No. ___] (the "Motion"). The Court has considered the Motion, HCLOF's Brief in Support of Motion to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (the "Brief") and (c) the Appendix in Support of HCLOF's motion to Dismiss (the "Appendix").[1] This Court having subject matter jurisdiction under 28 U.S.C. § 1331, and having found that venue is proper pursuant to 28 U.S.C. § 1391; and having found that the Complaint should be dismissed as against HCLOF;  it is hereby ORDERED THAT:

    1.   The Motion is GRANTED as set forth herein.

    2.   The Complaint is dismissed in its entirety against HCLOF.

---

[1] Capitalized terms not otherwise defined have the meanings ascribed to them in the Brief.

002783

So ordered this _____ day of _____, 2021.

_____
The Honorable Jane J. Boyle
United States District Judge

002784

Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

Jonathan W. Jordan
Texas Bar No. 00784360
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
jjordan@kslaw.com

*Counsel for Highland CLO Funding, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.,**<br>**and CLO HOLDCO, LTD.,**<br>***directly and derivatively,***<br><br>**PLAINTIFFS,**<br><br>**v.**<br><br>**HIGHLAND CAPITAL MANAGEMENT,**<br>**L.P., HIGHLAND HCF ADVISOR, LTD.,**<br>**and HIGHLAND CLO FUNDING, LTD.,**<br>**Nominally,**<br><br>**DEFENDANTS.** | § § § § § § § § § § § § § § § § | **Case No. 3:21-cv-00842-b** |

## HIGHLAND CLO FUNDING, LTD.'S
## BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
## AND JOINDER IN MOTION TO DISMISS
## OF HIGHLAND CAPITAL MANAGEMENT, L.P.

Highland CLO Funding, Ltd. ("HCLOF") submits this brief in support of its motion to

dismiss the complaint of plaintiffs Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd.

("CLO Holdco," and with DAF, "Plaintiffs") [ECF No. 1] (the "Complaint") as against HCLOF,

and joinder with the motion of Highland Capital Management, L.P. ("HCM") to dismiss this case

[Docket No. 26] (the "HCM Motion to Dismiss").

## INTRODUCTION

The Complaint alleges no wrongful conduct, breach of contract, or statutory liability against HCLOF. It pleads for no legal or equitable relief against HCLOF. Count II (breach of contract) names HCLOF in the caption, but does not allege that HCLOF breached any contract. The other counts (breach of fiduciary duty, negligence, RICO, and tortious interference) do not name HCLOF, and like Count II, they do not allege that HCLOF did anything wrong. With no allegations against HCLOF, HCLOF is entitled to dismissal for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).

To the extent that Count I (breach of fiduciary duty) pleads for relief against defendants HCM and Highland HCF Advisor, Ltd. ("HCFA") as a result of acts that harmed HCLOF (*i.e.,* shareholder derivative claims), Plaintiffs have not pleaded a predicate for derivative standing. HCLOF is a separate entity formed in Guernsey and controlled by independent directors. Under Guernsey law, derivative standing requires that the alleged wrongdoers (HCM and HCFA) control the company they harmed (HCLOF). The Complaint is deficient because Plaintiffs do not allege that HCM or HCFA are authorized to make decisions to sue or not sue on behalf of HCLOF, as required for derivative standing. Moreover, HCLOF has not been harmed; Plaintiffs' claim that HCM or HCFA exposed HCLOF to "massive liability" to Harbourvest is unfounded, as Harbourvest has released HCLOF from any such claims. Plaintiffs are not alleging derivative claims on behalf of HCLOF, but instead are alleging direct claims by either Harbourvest or Plaintiffs against HCM or HCFA.

Additionally, this Court lacks personal jurisdiction over HCLOF for purposes of litigating Plaintiffs' claims.  HCLOF is a Guernsey company whose two directors transact substantially all of its business from Guernsey. It did not conduct activities in Texas and the Complaint alleges no

2

conduct by HCLOF within Texas (or the United States). The Court should dismiss the Complaint as to HCLOF for failure to establish personal jurisdiction.

No one benefits by keeping HCLOF in this case. It is not alleged to have done anything wrong, and HCLOF's presence is unnecessary for the fiduciary duty, contract, RICO, negligence and tortious interference claims Plaintiffs allege against HCM and HCFA. To the contrary, Plaintiffs suffer from forcing HCLOF to spend money on this case, because Plaintiffs are 49 percent shareholders of HCLOF.

Finally, subject to and without waiver of its personal jurisdiction defense, HCLOF also joins in the HCM Motion to Dismiss and incorporates the arguments set forth in HCM's memorandum of law supporting the HCM Motion to Dismiss [Docket No. 27] and related filings.

## ARGUMENT

### I.    The Complaint Should Be Dismissed Against HCLOF Under Rule 12(b)(6) Because It Does Not Allege any Claims Against HCLOF or Request Relief From HCLOF.

The Complaint requests no legal or equitable relief against HCLOF. Its prayer for relief lies against "Defendants," a term the Complaint defines to include defendants HCM and HCFA, but not HCLOF. As will be seen, none of the allegations in the Complaint's five counts purport to assert, or otherwise give rise to, liability as against HCLOF.

In Count I (breach of fiduciary duty), the Complaint alleges that "Defendants" (defined as HCM and HCFA, not HCLOF) and potential defendant James P. Seery, Jr. ("Seery") breached fiduciary duties owed to DAF and CLO Holdco (Count I, paragraphs 56, 67). Nowhere does the Complaint allege that HCLOF breached a fiduciary duty.

Count II (breach of contract) indicates in its title that it is "by Holdco against HCLOF, HCM and HCFA," but its factual allegations claim only that "Defendants" (again, defined to

002787

exclude HCLOF) failed to offer CLO Holdco a pro rata share of Harbourvest's interests in HCLOF (Count II, paragraphs 96, 99). HCLOF is not alleged to have breached any contract.

Count III (negligence) indicates in its title that it lies "against HCM and HCFA." It alleges that Seery, HCFA and HCM were negligent (Count III, paragraphs 104-106) and that "Defendants" (defined to exclude HCLOF) were negligent and caused harm to CLO Holdco (Count III, paragraph 111).

Count IV (RICO) indicates in its title that it lies "against HCM." It alleges that HCM, HCFA, and Seery committed RICO violations, including federal wire fraud, mail fraud, bankruptcy fraud, and securities fraud (Count IV, paragraphs 117, 120). HCLOF is not alleged to have committed any RICO predicate acts.

Count V (tortious interference) also indicates in its title that it lies against HCM. It alleges that HCM, through Seery, tortuously interfered with CLO Holdco's contractual rights (Count V, paragraphs 138-39). It does not allege any wrongful conduct by HCLOF (Count V, paragraph 141).

With no claims against HCLOF, HCLOF is entitled to dismissal under Federal Rule of Civil Procedure 12(b)(6).

## II.     The Complaint Should Be Dismissed Against HCLOF Under Rule 12(b)(6) Because Plaintiffs Lack Derivative Standing to Sue for Breach of Fiduciary Duty.

Although the thrust of Count I (breach of fiduciary duty) alleges a direct fiduciary relationship between HCM and DAF pursuant to a Restated Investment Advisory Agreement and federal securities law, Complaint paragraphs 78, 80, 81, and 83 vaguely allege that HCM, HCFA and/or Seery committed corporate waste, self-dealing and diversion of a corporate opportunity that harmed HCLOF. These claims are held by HCLOF against its fiduciaries and can only be brought by Plaintiffs if they properly plead derivative standing to bring such claims.

A derivative claim alleges harm to the corporation, such that all shareholders are equally harmed in their capacities as shareholders. *See, e.g., Smith v. Waste Mgt. Inc.,* 407 F.3d 381, 384 (5th Cir. 2005) (test for derivative claim is "Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"). This principle applies under Guernsey law, the law governing HCLOF. *See, e.g., Jackson v. Dear and Others* (2013) 10/2013, 26 March 2013 ¶ 6 ("[W]here a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue."). (Appendix Exhibit A)

A. **Under Guernsey Law, Plaintiffs Lack Standing to Bring a Derivative Claim for Alleged Wrongs Suffered by HCLOF.**

Courts within the Fifth Circuit and elsewhere analyze standing as a matter of substantive law of the state of incorporation. *See, e.g., In re Parkcentral Global Litigation,* 884 F.Supp. 2d 464, 471-72 (N.D. Tex. 2012) (Lynn, J.) (analyzing derivative standing under Delaware law); *Schwartz v. TXU Corp.*, 2005 WL 3148350 (N.D. Tex. 2005, remanded on other grounds, 162 Fed. Appx. 376) (5th Cir. 2006)) (Kinkead, J.) (analyzing derivative standing under Texas law).

As the Complaint correctly states, HCLOF is organized under the laws of the Bailiwick of Guernsey. Complaint, ¶ 5. Guernsey law provides, "[W]here a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue." *Jackson v. Dear*, *supra*. To qualify for an exception to this longstanding Guernsey rule, a plaintiff must establish that the wrongdoers remain in control—that is, that wrongdoer control of the company prevented the company from bringing the lawsuit in its own name. *Jackson v. Dear, supra* ("The two basic requirements at common law for a derivative action were: (i) that the alleged wrong or breach of duty was by a director and was incapable of being ratified by a simple majority of the members (*e.g.* a fraudulent breach by a director or the deliberate misappropriation of

5

company assets, but not a bona fide misuse of powers or an incidental profit making); and (ii) that
the alleged wrongdoers are in control of the company, so that the company, which is the 'proper
plaintiff cannot claim by itself."). *See also Prudential Assurance Co. Ltd. v. Newman Industries
Ltd.* (No. 2) [1982], 1 All E.R. 354, 366-67, [1982] Ch. 204, 211 ("There is an exception to the
rule where what has been done amounts to fraud and the wrongdoers are themselves in control of
the company…. The reason for this is that, if they were denied that right, their grievance could
never reach the court because the wrongdoers themselves, being in control, would not allow the
company to sue."). (Appendix Exhibit B)

Plaintiffs do not allege that HCM, Seery, or HCFA control HCLOF, or prevented HCLOF
from bringing the lawsuit in its own name. They instead allege that "any pre-suit demand would
have been futile since asking HCM to bring suit against its principal, Seery, would have been
futile." Complaint, ¶ 91. That allegation is a *non sequitur,* because HCLOF is under the direct
corporate control, not of HCM, but of two independent directors unaffiliated with either HCM or
Seery. While portfolio management is vested in HCFA, *see* Complaint ¶ 24, Plaintiffs do not allege
that HCFA or HCM have the corporate authority to file suit (or decline to file suit) against HCM,
HCFA, or Seery. With no allegation of wrongdoer control, Plaintiffs have failed to plead a basis
of derivative standing to sue for wrongs under Guernsey law. Count I, to the extent it alleges
derivative claims, should be dismissed under Federal Rule 12(b)(6) for lack of standing.

**B.    Any Derivative Claims Should Be Dismissed Because No Actual Harm to
HCLOF Is Alleged or Could Ever Ripen to Actual Harm**.

Standing is not the only flaw in Plaintiffs' derivative theories. The only potential harm to
HCLOF that Plaintiffs identify is alleged in paragraph 89: "Defendants' malfeasance has also
exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is

002790

now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information."

This Complaint's premise of potential harm to HCLOF through "massive liability" to Harbourvest is contradicted by judicially-noticeable documents.    In the settlement agreement between HCM and Harbourvest discussed at paragraphs 29 through 35 of the Complaint, Harbourvest broadly released HCLOF from any claims, known or unknown, that were or could have been asserted in, in connection with, or with respect to, HCM's bankruptcy case. *See* Case No. 19-bk-34054, Docket No. 1631-1, section 2(a). (Appendix Exhibit C)[1] With no allegation of actual damage to HCLOF—and with such damage foreclosed by the settlement repeatedly referred to in the Complaint—Plaintiffs' derivative claims should be dismissed under Federal Rule 12(b)(6) for this independent reason.

### C.    Plaintiffs Do Not Allege a Derivative Claim for Harm to HCLOF.

Plaintiffs conflate *assets of* HCLOF with *equity interests in* HCLOF. They complain that *equity interests in* HCLOF held by Harbourvest were sold for less than their fair value. *See, e.g.,* Complaint ¶¶ 36 ("At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that."), 43, 48, 67, 76. These allegations, if they could be proven, might establish harm to Harbourvest for receiving less than it should have received. Or they may establish harm to the Plaintiffs, for

---

[1] In evaluating a motion to dismiss, the Court may consider documents referred to in a complaint that are central to the plaintiff's claims. *See, e.g., Dawes v. City of Dallas,* 2020 WL 3603090 *3 (N.D. Tex. July 2, 2020) ("a court may consider documents that are referred to in a complaint and are central to a plaintiff's claims"). The Harbourvest settlement, referred to in at least seven paragraphs of the Complaint, is central to Plaintiffs' claims. Alternatively, "Judicial notice may be taken of matters of public record. *Walker v. Beaumont Indep. School Dist.,* 938 F.3d 724, 735 (5th Cir. 2019) (citing *Firefighters' Retirement Sys., v. EisnerAmper,* 898 F.3d 553, 558 n.2 (5th Cir. 2018)). The Harbourvest settlement, which is archived as Document Number 1631-1 on the bankruptcy court's docket, and which was approved by the bankruptcy court, is part of the public record.

002791

depriving them of the right to purchase Harbourvest's interests for "less than 50% of what those interests were worth." *See* Complaint ¶ 48. But they do not establish harm to HCLOF, which is a prerequisite to any derivative claim.

Because no harm is alleged to have befallen HCLOF, Plaintiffs lack a derivative claim to bring on behalf of HCLOF. With no colorable derivative claim on behalf of HCLOF—and no claim alleged against HCLOF—there is no reason to keep HCLOF in this case as a "nominal defendant." HCLOF should be dismissed.

## III. The Complaint Should Be Dismissed Against HCLOF Under Rule 12(b)(2) Because the Court Lacks Personal Jurisdiction Over HCLOF.

The Plaintiff "ha[s] the initial burden to plead and prove the requisite contacts with the United States" to support the exercise of personal jurisdiction over HCLOF. *Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 499 (5th Cir. 2018). "Once a motion to dismiss for lack of personal jurisdiction has been presented to a district court by a nonresident defendant, the party who seeks to invoke the jurisdiction of the district court bears the burden of establishing contacts by the nonresident defendant sufficient to invoke the jurisdiction of the court." *WNS, Inc. v. Farrow,* 884 F.2d 200, 203 (5th Cir. 1989).

In the Complaint, Plaintiffs blandly allege that personal jurisdiction lies "because [Defendants] reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here." Complaint, ¶ 8. They further allege, "Jurisdiction is proper under 18 U.S.C. § 1965(d)." *Id.* These allegations are insufficient to plead personal jurisdiction.

### A. Plaintiff Has Not Established Contacts That Render HCLOF Subject to Personal Jurisdiction of this Court.

#### 1. The Court Lacks General Personal Jurisdiction Over HCLOF.

"General jurisdiction is established where the defendant has 'continuous and systematic' contacts with the forum state." *Dontos v. Vendomation NZ Ltd.,* 582 Fed. Appx. 338, 342 (5th Cir.

8

002792

2014) (quoting *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 368

(5th Cir. 2010)); *Maruyama U.S. Inc. v. Frazier Corporation,* 2016 WL 836205 *3 (N.D. Tex.

Feb. 12, 2016) (Ramirez, M.J.). "To establish general jurisdiction, a nonresident defendant'

contacts with the forum state 'must be substantial; random, fortuitous, or attenuated contacts are

not sufficient.'" *Innova Hosp. San Antonio L.P. v. Blue Cross & Blue Shield of Ga., Inc.,* 995

F.Supp. 2d 587, 616 (N.D. Tex. 2014).

HCLOF is a Guernsey company, *see* Complaint ¶ 5, with its principal place of business in

Guernsey. Its two independent directors reside in and transact substantially all of HCLOF's

business from the Channel Islands of Jersey and Guernsey. HCLOF does not conduct business in

the United States, and its connection with the United States is limited to this litigation and other

litigation arising from the acts of its portfolio managers. *See* Declaration of Richard Boléat

(Appendix Exhibit D).[2]

Plaintiffs have not pleaded any continuous and specific contacts by HCLOF within Texas,

or even the United States. Indeed, the Complaint is devoid of *any* allegations of activity by HCLOF

within the United States. The actors in the Complaint are HCM, Seery, HCFA or Plaintiffs;

throughout the Complaint, HCLOF is a passive entity.

### 2.    The Court Lacks Specific Personal Jurisdiction Over HCLOF.

Plaintiffs have alleged no facts to support finding specific personal jurisdiction over

HCLOF related to the claims raised in the Complaint. "Courts may exercise specific jurisdiction

if a nonresident defendant 'purposefully avails himself of the privileges of conducting activities in

---

[2] "In resolving a [personal] jurisdiction issue, the court may review pleadings, affidavits, interrogatories, depositions, oral testimony, exhibits, any part of the record, and any combination thereof…. Allegations in plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *International Truck and Engine Corp. v. Quintana*, 259 F.Supp. 2d 553, 556-57 (N.D. Tex. 2003) (citations omitted).

002793

the forum state' and 'the controversy arises out of or is related to the defendant's contacts with the
forum state.'" *Innova Hosp.*, 995 F. Supp. 2d at 618 (quoting *Choice Healthcare*, 615 F.3d at
369)); *see also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004)
("[The Fifth Circuit] has repeatedly held that the combination of mailing payments to the forum
state, engaging in communications related to the execution and performance of the contract, and
the existence of a contract between the nonresident defendant and a resident of the forum are
insufficient to establish the minimum contacts necessary to support the exercise of specific
personal jurisdiction over the nonresident defendant." (collecting cases)).

Plaintiffs have alleged no contacts with the United States from which the claims raised in
the Complaint arise or relate. Indeed, there are no alleged actions of HCLOF, of any kind, giving
rise to claims pleaded in the Complaint. For these reasons, the Complaint should be dismissed as
to HCLOF.

**B.     18 U.S.C. § 1965(d) Does Not Confer Personal Jurisdiction Over HCLOF.**

Contrary to Plaintiff's claim in Complaint paragraph 8, 18 U.S.C. § 1965(d) does not confer
personal jurisdiction over HCLOF. The provision, titled "venue and process" in the chapter
addressing RICO claims, merely sets forth the proper place for service of a RICO proceeding. It
does not purport to confer personal jurisdiction where none is otherwise recognized. Besides, the
RICO claims are not alleged against HCLOF. This statute has no bearing on jurisdiction over
HCLOF.

## JOINDER IN HCM'S MOTION TO DISMISS

Subject to and without waiver of its personal jurisdiction defense, HCLOF also joins in the
HCM Motion to Dismiss and accompanying filings with the Court, and incorporates them herein
as if fully set forth.

## CONCLUSION

For these reasons, the Complaint should be dismissed as to HCLOF.

Dated:  August 30, 2021

Respectfully submitted,

**KING & SPALDING LLP**

*/s/ Paul R. Bessette*
Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

Jonathan W. Jordan
Texas Bar No. 00784360
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
jjordan@kslaw.com

***Counsel for Highland CLO Funding, Ltd.***

002795

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served electronically by the Court's ECF system on August 30, 2021.

/s/ Paul R. Bessette

Paul R. Bessette

002796

Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

Jonathan W. Jordan
Texas Bar No. 00784360
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
jjordan@kslaw.com

*Counsel for Highland CLO Funding, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P., and CLO HOLDCO, LTD.,** *directly and derivatively,* <br><br> **PLAINTIFFS,** <br><br> v. <br><br> **HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., and HIGHLAND CLO FUNDING, LTD.,** Nominally, <br><br> **DEFENDANTS.** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | **Case No. 3:21-cv-00842-b** |

## APPENDIX IN SUPPORT OF
## <u>HIGHLAND CLO FUNDING, LTD.'S MOTION TO DISMISS</u>

Highland CLO Funding, Ltd. ("HCLOF") files this appendix in support of its motion to dismiss the complaint against HCLOF in the above-captioned case.

1

002797

| Exhibit A | *Jackson v. Dear and Others* (2013) 10/2013, 26, March 2013 |
| Exhibit B | *Prudential Assurance Co. Ltd. v. Newman Industries Ltd.* (No. 2) [1982], 1 All E.R. 354, 366-67 |
| Exhibit C | HCM-Harbourvest Settlement Agreement |
| Exhibit D | Declaration of Richard Boléat |

Dated:  August 30, 2021

Respectfully submitted,

**KING & SPALDING LLP**

*/s/ Paul R. Bessette*
Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

Jonathan W. Jordan
Texas Bar No. 00784360
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
jjordan@kslaw.com

*Counsel for Highland CLO Funding, Ltd.*

2

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served electronically by

the Court's ECF system on August 30, 2021.

> */s/ Paul R. Bessette*                  
> Paul R. Bessette

002799

Judgment 10/2013                                   Jackson and Dear et al
                                                   Royal Court
                                                   26th March 2013

---

**Derivative action – strike out application.**

## IN THE ROYAL COURT OF THE ISLAND OF GUERNSEY

## (ORDINARY DIVISION)

Between:                    **ALEXANDER JACKSON**                    Plaintiff

-  and -

**PATRICK DEAR (1)**

**READE GRIFFITH (2)**

**RUPERT DOREY (3)**

**DAVID JEFFREYS (4)**

**BYRON KNIEF (5)**

**GREVILLE WARD (6)**

**TETRAGON FINANCIAL GROUP LIMITED (7)**

**TETRAGON FINANCIAL GROUP
MASTER FUND LIMITED (8)**          Defendants

### J U D G M E N T   O N   S T R I K E   O U T

### A P P L I C A T I O N

#### of Lieutenant Bailiff Patrick John Talbot QC

Date of hearings:    12th and 13th October, 28th, 29th and 30th November and
1st and 2nd December 2011

Judgment handed down:    26th March 2013

**Advocate Jeremy Le Tissier** appeared on behalf of the Plaintiff

**Advocate Christian Hay** appeared on behalf of the First and Second Defendants
("**the Executive Directors**")

**Advocate Tim Corfield** appeared on behalf of the Third, Fourth, Fifth and Sixth Defendants
(together referred to as "**the Independent Directors**")

**Advocate Simon Davies** appeared on behalf of the Seventh and Eighth Defendants (together
referred to as "**Tetragon**")

1. These proceedings are, it is believed, the first derivative action placed on the court rôle of the Royal Court of Guernsey.  They relate to a real estate joint venture transaction called the GreenOak Real Estate Transaction ("**the GORE Transaction**"), into which Tetragon, both of which are Guernsey companies, entered on about 29 July 2010.  At the heart of the Plaintiff's claim is the board meetings of both companies held on that day and the resolution passed that day by a 6-1 majority which approved Tetragon entering into the GORE Transaction, the 6 being the First to Sixth Defendants and the 1 being the Plaintiff.  Accordingly, the Plaintiff was the only director who opposed Tetragon doing so.

2. The Plaintiff, who was then a director of Tetragon, expressed disapproval of the then proposed transaction, both in correspondence and in e-mails to his fellow directors of Tetragon and their advisers in the months preceding 29 July 2010 and also during a joint board meeting of both Tetragon companies held, largely as a telephone directors' meeting, on 29 July 2010.  The board meeting appears to have taken about two hours, and, in due course, it was resolved at the meeting, by a resolution of all directors except the Plaintiff, that Tetragon should enter into the GORE Transaction.  In other words, the Executive Directors and the Independent Directors voted in favour of the resolution and the Plaintiff voted against the resolution.

3. In the derivative action, the Plaintiff seeks to contend, on behalf of Tetragon, that the Executive Directors and the Independent Directors broke their directors' duties, and acted negligently, in deciding that Tetragon should enter into the GORE Transaction.  As part of the Plaintiff's claims, on behalf of Tetragon, against the Executive Directors only he also contends that they broke their fiduciary duties to Tetragon in voting in favour of the GORE Transaction.

4. Historically, the courts in England took a restrictive approach to allowing derivative claims.  In the words of Lord Eldon in Carlen v Drury (1812)1 Ves & B 154:

    *"This court is not to be required on each occasion to take the management of every playhouse and brewhouse in the kingdom."*

5. Over the years the attitude of the English courts to derivative actions developed and there is a valuable exposition of this development in the judgment of Lord Millett in ***Waddington Ltd v Chan Chun Hoo*** (2008) 9 HKCFA 63.

6. The shortest way to describe the development is to cite further from Lord Millett's judgment.

    *"The common law derivative action*

    *47. A company is a legal entity separate and distinct from its members. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. If the company has a cause of action, this represents a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue. This is the first rule in Foss v. Harbottle (1843) 2 Hare 461. No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see Wallersteiner v. Moir(No.2) [1975] 1 QB 373 CA at p.390; Prudential Assurance Co. Ltd v. Newman Industries Ltd (No.2) [1982] Ch 204 CA ("Prudential") at p.210; Johnson v. Gore Wood & Co. [2002] 2 AC 1 at p.61 et seq.*

48. The injustice which would result if a derivative action were not available where the company is controlled by the alleged wrongdoers is vividly described by Lord Denning MR in Wallersteiner v. Moir (No.2) (supra) at p.390:

> "But suppose [the company] is defrauded by insiders who control its affairs - by directors who hold a majority of the shares - who then can sue for damages? Those directors are themselves the wrongdoers. If a board meeting is held, they will not authorise the proceedings to be taken by the company against themselves. If a general meeting is called, they will vote down any suggestion that the company should sue them themselves. Yet the company is the one person who is damnified. It is the one person who should sue. In one way or another some means must be found for the company to sue. Otherwise the law would fail in its purpose. Injustice would be done without redress." (my emphasis)

49. Sir James Wigram V-C recognised the problem in Foss v. Harbottle itself. He suggested that proceedings could be brought by the individual shareholders in their private characters seeking the protection of the rights to which they were entitled in their corporate character. This suggestion was adopted, and it became accepted practice for minority shareholders to file a bill in the Companies Court and ask for leave to use the name of the company to bring an action: see Atwool v. Merryweather(1867-8) LR 5 Eq pp 464-7n. If they made out a reasonable case for being allowed to do so, the court would appoint them as representatives of the company to bring proceedings in the name of the company against the wrongdoers. If the action was successful, any damages recoverable were payable to the company.

50. The need to apply to the court for leave to use the company's name provided a useful filter to prevent frivolous and abusive actions or actions which it was not in the interests of the company to bring. It also gave the court an opportunity to adjourn the proceedings in order to discover whether the impugned transactions, if capable of ratification by the company (not for example being ultra vires or a fraud on the minority),would be ratified by the independent shareholders.

51. This filter was soon abandoned. The minority shareholders were permitted to bring an action against the wrongdoers without the leave of the court, joining the company as defendant in order to receive any damages that might be awarded: see Menier v. Hooper's Telegraph Works (1874) 9 Ch App 350. Since the company was a defendant it could not also be a plaintiff, and accordingly the action was traditionally framed as an action by the plaintiff "on behalf of himself and all other shareholders in the company except the defendants". In reality, as every one appreciated, the action was brought on behalf of the company in which the cause of action was vested. This form of action was described by Lord Davey in Burland v. Earle [1902] AC 83 at p.93 as a "mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress".

52. By the 1980's the absence of any appropriate filter to prevent unmeritorious claims or claims which it was not in the interests of the company to pursue was having unfortunate results. A defendant's only recourse was to apply to strike out the action under RSC O.18 r.19 or to have the plaintiff's right to bring a derivative action determined as a preliminary issue. Matters came to a head in Prudential, where the determination of the preliminary issue threatened to subject the company to a 30-day action in

> *order to decide whether the plaintiffs were entitled to bring a 30-day action. There was, as the Court of Appeal observed, a dilemma, for at the time of the application the alleged fraud had not been proved. Either the court must assume the truth of every allegation in the statement of claim as in a true demurrer, in which case the company and its innocent shareholders might be subjected to groundless claims, or the action had to be fought to a conclusion before the plaintiffs' right to bring a derivative action could be established. Neither course was acceptable.*

> *53. The solution which the Court of Appeal found in Prudential was to require the plaintiff, whether at the trial of a preliminary issue or on an application to strike out the proceedings, to establish a prima facie case both that the company was entitled to the relief claimed and that the plaintiff was entitled to bring the claim on its behalf by way of a derivative action. In an appropriate case the court could adjourn the proceedings in order to ascertain whether the independent shareholders considered that it was in the interests of the company to pursue the claim.*

> *54. This approach was followed in Smith v. Croft (No.2) [1988] Ch 114 and was subsequently adopted by the Rules Committee when the Rules of the Supreme Court were amended by adding O.15 r.12A (later CPR r.19.9 and now s.260 of the Companies Act 2006). This imposed a requirement for the plaintiff in a derivative action to obtain the leave of the court to continue the action, thereby providing the filter which had been discarded more than a century earlier. The plaintiff has consistently been required on the application for leave to establish a prima facie case both that the company would be likely to succeed if it brought the action itself and that the case falls within an exception to the rule in Foss v. Harbottle."*

7. It was accepted before me that the Royal Court would entertain a derivative action. Furthermore, it was not really argued before me on behalf of the Defendants that the Royal Court would not entertain a double or other multiple derivative action. Like Lord Millett in Waddington Ltd v Chan Chun Hoo, at paragraphs 61-80, I am convinced that public policy requires the Royal Court to entertain double derivative actions and I find that our customary law allows such actions to be brought.  On this point I also draw attention to the very recent judgment of Mr Justice Briggs in Universal Project Management v Fort Gilkicker [2013] EWHC 348 where the learned judge, who at paragraph 34 had described derivative actions as the means by which a court may do justice in cases of wrongdoer control, said, at paragraphs 45-47:

> *"First, there was before 2006 a common law procedural device called the derivative action by which the court could permit a person or persons with the closest sufficient interest to litigate on behalf of a company by seeking for the company relief in respect of a cause of action vested in it. Those persons would usually be a minority of the company's members, but might, if the company was wholly owned by another company, be a minority of the holding company's members. These were not separate derivative actions, but simply examples of the efficient application of the procedural device, designed to avoid injustice, to different factual circumstances."  (See also paragraph 26 of the judgment.)*

8. It therefore follows that the English common law, primarily under the 'fraud on a minority' exception to the rule in Foss v Harbottle (1843) 2 Hare 461, per Wigram V.-C., allowed shareholders under certain, limited circumstances to bring claims on behalf of their companies. The two basic requirements at common law for a derivative action were: (i) that the alleged wrong or breach of duty was by a director and was incapable of

being ratified by a simple majority of the members (e.g. a fraudulent breach by a director or the deliberate misappropriation of company assets, but not a bona fide misuse of powers or an incidental profit making); and (ii) that the alleged wrongdoers are in control of the company, so that the company, which is the "proper plaintiff" cannot claim by itself.

9.  The original Cause was lodged on 25 February 2011 and the strike-out application was served on 28 April 2011.   It is clear that the application was made under rule 52 of the Royal Court Civil Rules 2007 and the inherent jurisdiction of the Court and was founded on a claim that the Cause disclosed no reasonable ground for bringing the action and should be struck out as an abuse of process since the Plaintiff was unable to satisfy the proper test relating to the bringing of derivative actions, a matter to which I shall refer later.

10. During the lengthy oral hearings in October to December 2011  the oral and written arguments of the parties ranged widely across legal authorities and textbook writings within the Commonwealth, and covered, *inter alia*, (i) the approach which Counsel submitted that the Royal Court should take on applications to strike out derivative and double derivative actions generally, including the correct evidential approach for the Court to take on such applications, (ii) the current state of the company law of Guernsey on the rule in *Foss v Harbottle* relating to the conduct of the internal affairs of Guernsey companies, the law relating to ratification by shareholders of decisions of the boards of directors of Guernsey  companies and legal issues relating to the meaning and effect of Rule 3.01 of the Guernsey Authorised Closed Ended Investment Scheme Rules ("the Scheme Rules") and of section 298 of the Companies (Guernsey) Law, 2008, which is the latest consolidation of Guernsey company law statutes.  In connection with the customary or common law relating to companies within the Bailiwick I was reminded by Advocate Le Tissier for the Plaintiff that Lieutenant Bailiff Southwell QC had said in **Flightlease Holdings (Guernsey) Ltd v Flightlease (Ireland) Ltd** (2009) that

> "*the concept of a limited company was imported into Guernsey law from English law [and] … since its importation into Guernsey in the late 1880s, it has naturally been appropriate to look to English law to help in the solution of problems concerning companies which are not covered by Guernsey statutes or customary law.*"

I respectfully agree and propose to take the same approach on this application.

11. It is important for me at the outset to state, as Mr Le Tissier also submitted, that, whatever the correct test may be for me to apply on the Defendants' strike out application, I should be careful not to conduct a mini-trial or to allow the application to become satellite litigation.  I believe that that object was attained during the long oral hearings and in preparing this judgment I have re-read all the transcripts and the long and helpful written submissions of Counsel, together with the affidavit evidence lodged for both sides to the application and am satisfied that I have neither conducted a mini-trial nor allowed satellite litigation to arise.  I am particularly aware as well that I heard the application at a very early stage of the proceedings, before any Defences have been lodged, and before disclosure of documents and lodging of witness statements or, with the exception of a report from Mr Graham Harrison for the Plaintiff filed in late November 2011, upon which much submission was made, before any experts' reports have been prepared; this is an important point for me to bear in mind throughout this judgment since experience tells us that much could change after disclosure of documents.

12. Both sides clearly, and I think understandably, regard the application as extremely important to them and, bearing in mind the financial extent of the GORE Transaction,

they have committed large resources in terms of time and money towards the arguments presented to the Court for and against the application. But I hope they will forgive me if in this judgment I do not do full justice to all the arguments of Counsel, which proved most helpful to me; for I am conscious that I should only determine those questions which I consider necessary for me to decide in order for me to decide whether or not to strike out the Cause. The original Cause was amended in draft on two later occasions during the oral hearings and in this judgment all later references to the Cause should be treated as being to the second draft Cause, which was presented to me by Mr Le Tissier, according to my note, on 12 October 2011, and upon the basis of which all Counsel were happy to proceed for the purposes of the application.

13. Before turning to an analysis of the Cause I must decide two important questions which will partly govern the way in which I approach the allegations of breach of duty and negligence in the Cause.

14. First, does the full rigour of the rule in ***Foss v Harbottle*** apply in Guernsey or, as the Plaintiff contends, has the rule been relaxed here, as it has been in England as a result of section 260(3) of the Companies Act 2006, so as to allow derivative actions where the alleged cause of action of a company is in negligence or breach of duty and where there is no element of actual or equitable fraud alleged?

15. In my judgment, the rule applies in Guernsey as it did in England before the change in the law brought into English law by section 260(3). My reasons are these. First, although the substantive and procedural changes brought into English law by sections 260 to 263 by the 2006 Act must have been available to the States and the Law Officers when the proposals which led to the 2008 Law were before the States, no proposal was made for similar changes to be introduced in our law by the 2008 Law, where no mention appears of either the rule in ***Foss v Harbottle*** or derivative actions and no equivalent of sections 260 to 263 appear at all. Secondly, although I was reminded by Mr Le Tissier of the guidance of the Court of Appeal in ***Morton v Paint*** (1996) 21 GLJ 61 and of some criticism of the limited effect, in particular, of the fraud on the minority exception to the rule in textbooks and learned articles and in the Report of the Law Commission which led to the English statutory changes, I was not satisfied either that this criticism was entirely widespread or that it was clear which way Guernsey law should proceed, taking into account Lord Lowry's five "*aids to navigation*" in the House of Lords case of ***C v Director of Public Prosecutions*** [1996] 1 AC 1. For, after all, the Plaintiff only seeks the inclusion into Guernsey law of the substantive change made in section 260(3) and not the detailed procedural changes contained in sections 261 and 263, in particular, which impose a preliminary stage, in two parts, where a Plaintiff for derivative relief is obliged to require the permission of the High Court to bring the derivative action before the action can be instituted. The procedural changes are very detailed and complex. In my judgment, such a limited inclusion of section 260(3) into our law cannot be justified. I consider that such a change would require an amendment of the Companies Law and that I should introduce such a change by some sort of judicial law-making. I add that I also agree with the submission of Mr Davies relating to ***Morton v Paint*** which appears at paragraph 7.5 of his Outline of Applicable Law.

16. On the topic of the aids to navigation towards a change of the law, I am doubtful whether or not the proposal for which Mr Le Tissier contends in this part of his case would find favour with the States and so I am wary of imposing my own remedy by importing either section 260(3) alone or the entire English code on derivative actions in sections 260 to 264 of the Companies Act 2006 and caution must, as I see it, prevail since the States have legislated in the field of company law soon after the passing of the 2006 Act leaving the rule in ***Foss v Harbottle*** untouched. It might also well be said that to accede to the Plaintiff's suggested change to our law I would be setting aside a

fundamental doctrine of Guernsey company law. Finally, paragraph 7.12 of Mr Davies' Outline of Applicable Law gives, as he there submitted, an idea of the wide consultation process which was apparently gone through before the Companies Law 2008 was brought into Guernsey's statute law. In my judgment, any change in our law to replace the rule in *Foss v Harbottle* so as to allow cases in negligence or breach of duty as a new exception to the rule must be a matter for the States to consider, and not for me to decide is necessary or appropriate.

17. If I were wrong on this point, I would not have been able to agree that only section 260(3) had become part of Guernsey law some time before the passing of the Companies Law 2008 but would have been forced to conclude that it was a case of 'All or Nothing' and that all the statutory code had then come into our law. As the Defendants rightly submit, the new English statutory code relating to the bringing of derivative actions is "*a composite whole*".

18. Secondly, I must rule on the submissions of the parties about the correct test to apply on the strike out application.

19. The Plaintiff seemed to me to be contending that all that he needed to establish was that his case as set out in the Cause was an arguable case and that therefore, in accordance with established law in Guernsey on strike out applications under what is now rule 52 of the Royal Court Civil Rules 2007, he should be permitted to have a full trial of the derivative action on behalf of Tetragon against the Executive Directors and the Independent Directors on all the different bases on which his case is put in the Cause. He cited a large amount of cases in support of the arguable test, but, understandably since this is the first derivative action known to have been started in the Royal Court, none of them relates to a derivative action. Furthermore, little of Mr Jackson's affidavit evidence dealt with the facts leading up to the Board meetings on 29 July 2010, including the negotiations which the Second Defendant largely conducted leading to the term sheet signed on 18 May 2010 and the later negotiations which produced amendments to the terms on the term sheet.

20. In support of the application to strike out the Defendants submit that, in accordance with the approach taken by Wigram V.-C in *Foss v Harbottle* itself, the Court of Appeal in *Prudential Assurance Co. Ltd v Newman Industries No. 2* [1982] Ch. 204 and Knox J. in *Smith v Croft No. 2* [1988] Ch. 114 the Plaintiff must first establish that he has a *prima facie* case on all or any of the seven alleged causes of action pleaded in the Cause and, to the extent that there is such a *prima facie* case established, that any of such causes of action come within an exception to the rule in *Foss v Harbottle* – see also paragraph 17 of the judgment of Briggs J. in *Universal Project Management v Fort Gilkicker*. Accordingly, the Defendants argue that the usual demurrer approach to strike out applications on the ground that a Cause does not disclose a reasonable cause of action is not correct test to apply when a defendant applies in the Royal Court to strike out a derivative action and drew my attention to the helpful list of six general principles governing derivative actions provided by Lord Justice Peter Gibson in *Barrett v Duckett* [1995] BCC 362, which I think it would be helpful to include at this stage.

> "*The general principles governing actions in respect of wrongs done to a company or irregularities in the conduct of its affairs are not in dispute:*
>
> *1. The proper plaintiff is prima facie the company.*
>
> *2. Where the wrong or irregularity might be made binding on the company by a simple majority of its members, no individual shareholder is allowed to maintain an action in respect of that matter.*

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-00688-B  Exhibit Part 4  Filed 09/30/21  Page 64 of 213  PageID 3131
Case 3:23-cv-01503-B Document 4-1 Filed 09/11/23 Page 64 of 33 PageID 3131

*3. There are however recognised exceptions, one of which is where the
wrongdoer has control which is or would be exercised to prevent a proper
action being brought against the wrongdoer: in such a case the shareholder
may bring a derivative action (his rights being derived from the company) on
behalf of the company.*

*4. When a challenge is made to the right claimed by a shareholder to bring a
derivative action on behalf of the company, it is the duty of the Court to
decide as a preliminary issue the question whether or not the plaintiff should
be allowed to sue in that capacity.*

*5. In taking that decision it is not enough for the Court to say that there is no
plain and obvious case for striking out; it is for the shareholder to establish
to the satisfaction of the Court that he should be allowed to sue on behalf of
the company.*

*6. The shareholder will be allowed to sue on behalf of the company if he is
bringing the action bona fide for the benefit of the company for wrongs to the
company for which no other remedy is available. Conversely if the action is
brought for an ulterior purpose or if another adequate remedy is available,
the Court will not allow the derivative action to proceed.*" [The highlighting
is mine.]

21.  I accept the Defendants' submissions as being the correct test on their application to
strike out the Cause.  In my view, the valiant contentions of Mr Le Tissier simply do not
apply to an application to strike out a derivative action where very different
considerations apply than in an orthodox strike out application and the two-stage *prima
facie* test is so long-standing under common law as really to preclude much argument to
the contrary, absent statutory provision like those in sections 261 and 263 of the
Companies Act 2006, but even there a *prima facie* test of a special nature is required to
be satisfied by a claimant seeking relief in a  derivative action – see especially
**Prudential Assurance Co. Ltd v Newman Industries No. 2** at pp. 211A-B and 221H-
222B for further details of the reasoning of the Court of Appeal.  The same test has also
been adopted recently in the Grand Court of the Cayman Islands by Foster J. in **Renova
Resources v Gilbertson** [2009] CILR 268, where the learned judge, rightly in my view,
said that a *prima facie* case was more than a good arguable case – paragraph 33.  At
paragraph 35 he provided a further analysis of a *prima facie* case, with which I
respectfully agree:

"*35    The purpose of requiring the plaintiff to obtain leave to continue the
derivative action, as I understand it, is to prevent the expense and time of
(and to protect the defendants against) vexatious or unfounded litigation
which has little or no prospect of success or which is clearly brought by an
aggrieved shareholder for his own reasons rather than in the interests of the
company. The phrase "prima facie" has various shades of meaning but
literally means "at first sight." Given that there is not to be a mini-trial of the
plaintiff's case, it seems to me that I must form a view of the plaintiff's case
based on my first impressions, having regard to my assessment of all the
evidence before me, including that submitted by the defendants. For the
plaintiff to obtain leave to continue with the action, I consider that I must be
satisfied in the exercise of my discretion that its case is not spurious or
unfounded, that it is a serious as opposed to a speculative case, that it is a
case brought bona fide on reasonable grounds, on behalf of and in the
interests of the company and that it is sufficiently strong to justify granting
leave for the action to continue rather than dismissing it at this preliminary
stage.*"

002807

22. I now turn back to the facts, which are largely agreed. There may be an element of overlap between the summary included above, but I have decided to give as full a recital of the facts so that the appropriate test in relation each part of the Cause can be addressed against the background of the full facts, in so far as it has been possible at this early procedural stage of the proceedings.  I shall do so partially by reliance on the Defendants' Recap Note of the first two days of the oral hearing, *i.e.* 12 and 13 October 2011, and their Remainder of the Facts document which completed their analysis of the facts.  I have found these documents particularly helpful, but I have also checked the central documents to ensure that the references are accurate and I have removed, I believe, all comments from the Defendants' Notes which are not strictly factual.

23. In the past decade, the Plaintiff and the Executive Directors have collaborated in two main business ventures.  First, in 2002, they founded Polygon and the Polygon Global Opportunities Master Fund.  As that fund grew, they built up business in London and New York and elsewhere.   They did so through two subsidiaries of the fund's investment manager Polygon Investments Limited ("PIL").  In 2005, they founded the Seventh and Eighth Defendants,Tetragon Financial Group Limited ("TFG") and Tetragon Financial Group Master Fund Limited (the "Master Fund") (together, Tetragon or the "Fund") and also its investment manager, Tetragon Financial Management ("TFM").   Tetragon is a closed-ended investment company under the Protection of Investors (Bailiwick of Guernsey) Law, 1987.  It is managed on a day to day basis by TFM under the terms of an investment management agreement (the "IMA"), to which I shall refer below.

24. In 2008, the Plaintiff was asked by The Executive Directors to resign from the Polygon manager.  The Plaintiff agreed to 'exit his interests' in Polygon in favour of The Executive Directors but remained in the Tetragon business and became a director of the Fund and continued as a member of TFM's Investment Committee.

25. In 2009, a related-party transaction took place, which was referred to as the "LCM Transaction", and to which I shall refer later.

26. In 2010, TFM considered a second related-party transaction, the GORE Transaction.  The GORE Transaction was a related-party transaction because of Polygon's participation in the joint venture.  The First and Second Defendants were interested in the GORE Transaction by virtue of their ownership of Polygon; so was the Plaintiff (though his interest was by then a declining economic interest).

27. Under the terms of the IMA, TFM had two options where a significant related-party transaction was under consideration.  It could either submit it to the board of Tetragon and obtain approval from a majority of the directors not interested in the transaction, or it could obtain a fairness opinion from a recognised bank or firm.  In this case, it is common ground that TFM did both.  A fairness opinion was obtained from Houlihan Lokey, to which I refer in detail below, and approval was sought and obtained at the board meeting on 29 July 2010 from all the Independent Directors.

28. At that time, Tetragon's Board comprised Tetragon's three founders, the Plaintiff and the Executive Directors, and the Independent Directors.  Mr Ward had become an Independent Director on 30 April 2010 in place of Mr Olesky.

29. The affidavit evidence from the Defendants shows that the Independent Directors are experienced professional men and that the purpose of their appointment was to protect the interests of non-voting shareholders in TFG. Two of them are Guernsey residents, one is English and the other is a United States citizen.  The Independent Directors were separately advised by US lawyers Simpson Thacher and by Carey Olsen in relation to

the GORE Transaction and Tetragon was represented by US lawyers Cravath Swaine & Moore and by Ogier.

30. The Independent Directors swore affidavits confirming that they were alive to the interests of the Executive Directors in the GORE Transaction. The clear effect of this evidence is that in the knowledge that the Executive Directors were interested through their interests in Polygon in the GORE Transaction, and with the benefit of independent legal advice in the US and Guernsey, and with the benefit of a fairness opinion from Houlihan Lokey, all of the Independent Directors voted in favour of the GORE Transaction. The Plaintiff also accepts that Independent Directors acted at all material times in good faith; there is no allegation against the Independent Directors which is based on actual or equitable fraud or breach of fiduciary duty.

31. It also appears that the Plaintiff and all the other members of the Board, i.e. the Executive Directors and the Independent Directors, received the same documents and electronic materials in the run-up to the board meeting held on 29 July 2010.

### The Structure of Tetragon

**a. Tetragon's structure diagram**



32. The Tetragon structure diagram, which is a useful tool, was helpfully explained to me during Mr Davies' oral submissions. I draw from those submissions and from the Recap Note itself for the following explanation.

33. It is the Master Fund which makes investments; TFG's only investment is in shares in the Master Fund and TFG feeds funds through to the Master Fund.

34. Tetragon has ten voting shares, which are held by Polygon Credit Holdings II Limited, ("PCH II"), a Cayman Islands company, which is owned by the three founders, the Executive Directors and the Plaintiff. The Plaintiff and the Second Defendant each own 40% and the First Defendant owns 20%. PCH II is not a Defendant in these proceedings, but Mr Davies accepted that, if the derivative action were not struck out, PCH II would have to be joined so as to be bound by any judgment after the full trial.

35. Public investors hold TFG's non-voting shares. Most of them hold through Euroclear and so their identity is not visible to Tetragon. In 2007, there was an IPO of 30 million non-voting shares which was over-subscribed. TFG's shares are traded on the NYSE Euronext Amsterdam stock exchange. As a listed entity, TFG is subject to disclosure obligations, including as regards process and directors' interests. At the time of the IPO, 70 million shares held by existing investors were exchanged into interests in the listed entity. Overall, the IPO concerned some U.S.$1.35 billion investor funds, new and existing. Mr Côté refers to the IPO in this first affidavit at paragraph 22.

36. Following the IPO, Tetragon's website has contained all of Tetragon's up-to-date disclosures. What is now available to prospective investors is real-time disclosure on the website – paragraph 48 of Mr Côté's first affidavit. TFM, the investment manager, is a Delaware limited partnership. TFM manages Tetragon's investments in return for a flat fee of 1.5% of Tetragon's net asset value, plus a 25% performance fee on any increase in net asset value above a hurdle rate (which at the time of the IPO was approximately 8% and which fluctuates based on LIBOR).

37. 50% of the economics in TFM are owned by a Delaware corporation called HRW Holdings, which is owned in turn by David Wishnow, Michael Rosenberg and Jeffrey Herlyn. Each of them swore affidavits supporting the position of Tetragon on the strike out application. Mr Wishnow's relevant financial interests are in TFM, and he is also (like Mr Rosenberg and Mr Herlyn) a non-voting shareholder in Tetragon. His view, having participated in the negotiation of the GORE term sheet, and having witnessed and supported the presentation of the transaction to Tetragon's board, is that the GORE Transaction was in Tetragon's interests.

38. Messrs. Wishnow, Rosenberg and Herlyn have no interest in Polygon. They are members of TFM's Investment and Risk Committees and they have not been joined as Defendants in these proceedings; it is clear that they thought the GORE Transaction was in Tetragon's best interests.

39. The balance of 50% of the economics in TFM is beneficially owned by the Second Defendant, the Plaintiff and the First Defendant through another Polygon Cayman Islands entity, PCH. PCH holds all the voting shares in TFM, and 50% of the economics.

40. In voting terms, the Second Defendant and the Plaintiff each has a 40% interest in PCH, and the First Defendant 20%. In economic terms, because of the 50% economic interest which PCH has in TFM, the Second Defendant and the Plaintiff each have a 20% interest and the First Defendant has a 10% interest in TFM.

**Polygon's structure diagram**



41. TFM sources its infrastructure services from two Polygon entities shown in the Polygon diagram (*i.e.* staff, offices, equipment and computer systems), PIP LP (U.S.) and PIP LLP (U.K.). PIP stands for Polygon Investment Partners. PIP LP is a Delaware limited partnership and PIP LLP is an English limited liability partnership, and they provide infrastructure services in New York and in London respectively.

42. PIP LP and PIP LLP are owned by Polygon Investments Limited, PIL, and in turn PIL is shown as being owned by the Plaintiff and the Executive Directors. Since the breakdown in relations between the Plaintiff and his two co-founders back in 2008, the Plaintiff 'exited' his interest in PIL, leaving the Executive Directors, I was told, by the end of 2012 as the sole owners of PIL and the service providers. PIL was the original Polygon business (which is sometimes referred to as "old Polygon").

43. To the right of PIL on the Polygon structure diagram is Polygon Holdco (which is sometimes referred to as "new Polygon"). The Plaintiff has no interests in Polygon Holdco. There is a distinction between old Polygon, where the Plaintiff had a residual declining interest, and new Polygon because the 13% Polygon equity interest in the GORE Transaction is on the Polygon Holdco (new Polygon) side, and the provision of services to GORE, is on the PIL (old Polygon) side.

44. As is required by company law, there is a set of Articles for each of TFG and the Master Fund. As the provisions mirrored each other, it was agreed that the submissions of Counsel would relate to the Articles of TFG.

45. Article 6(a) states that TFG's share capital is U.S.$1 million divided into ten "voting shares" and 999,999,990 unclassified shares.  Article 6(b) provides:

> *"Unclassified shares may be issued as Non-Voting Shares."*

All ten Voting Shares have been issued and all of them are owned by PCH II.  It is also common ground that more than 100 million non-voting (unclassified) shares have been issued.

46. Dividends are dealt with at Articles 106 and 107:

> *"The Directors may, upon the recommendation of the Manager, declare periodic dividends from time to time in respect of Non-Voting Shares, in accordance with the respective rights of the Members, subject to the approval of the Voting Shares by Resolution…  No dividends shall be declared or paid on the Voting Shares."*

47. By Article 138, on a winding up the maximum that PCH II could realise is less than one US cent.

48. All the voting shares carry the right to vote.  Article 12 provides that the non-voting shareholders can only vote where the resolution at issue will, if passed, adversely affect the rights attaching to the non-voting shares.

49. So, as the Defendants accurately put it, the voting shares afford control but with no economic interest, and the non-voting shares offer economic participation but no control.  This is the structure into which non-voting shareholders in TFG (and persons acquiring interests in such shares on the Amsterdam Stock Exchange) enter.

50. I shall now address Articles concerning the Board. The provisions concerning the Board begin at Article 80 which provides that the number of directors shall be seven unless otherwise determined by Resolution of the Voting Shares.  At all times up until the approval of the GORE Transaction on 29 July 2010, there was a board of seven directors.   The Plaintiff was removed as a director of Tetragon on 24 January 2011 and thereafter there have been six directors.

51. Article 81 provides that

> *"[E]xcept as provided not less than a majority of Directors shall be Independent Directors."*

52. Article 83 is the general provision that the business of the company shall be managed by the directors, but

> *"subject … to any directions given by Resolution of the holders of Voting Shares".*

53. Article 91 is a very important Article dealing with directors' interests.  It states:

> *"Provided that he has disclosed to the Directors the nature and extent of any interests of his in accordance with the Companies Law, a Director, notwithstanding his office: (a) may be a party to, or otherwise interested in,*

*any transaction or arrangement with the Company or in which the Company is otherwise interested".*

54. Article 91 (c) provides that a director

*"shall not ... by reason of his office, be accountable to the Company for any benefit which he derives from any such office ... or from any such transaction or arrangement ... and no such transaction or arrangement shall be void or voidable on the ground of any such interest or benefit or because such Director is present at or participates in the meeting of the Directors or a committee thereof that approves such transaction or arrangement, provided that [the interest] and the  material facts as to the interest ... have been disclosed or are known to the Directors ... and the Directors ... in good faith authorise the transaction or arrangement".*

55. Article 91 (c) (ii) provides that the approval of the board must include the votes of a majority of the directors who are not interested in the transaction.

*"or such transaction is otherwise found by the Directors (before or after the fact) to be fair to the Company as of the time it is authorised".*

56. Both those routes were followed in relation to the GORE Transaction. The GORE Transaction was approved by a majority of the directors not interested in the transaction at the board meeting on 29 July 2010, *i.e.* by all four Independent Directors, and on 7 June 2011, the then directors, who by then did not include the Plaintiff, resolved that the GORE Transaction was fair to Tetragon.

57. Article 92(a) provides:

*"For the purposes of the preceding Article: a general notice given to the Directors that a Director is to be regarded as having an interest of the nature and extent specified in the notice in any transaction or arrangement with a specified person or class of persons shall be deemed to be sufficient disclosure of his interest in any such transaction or arrangement".*

58. Article 93 provides that

*"the affirmative vote of* five *Directors shall constitute a resolution of the Directors".*

59. Article 94 provides that

*"The quorum for the transaction of the business of the Directors shall be five".*

60. Article 99 is also an important article and provides that directors can vote, and have their vote counted, on transactions they are interested in as long as they have disclosed their interest in accordance with the articles and the Companies Law.

61. Broadly speaking these provisions reflect sections 162, 166 and 167 of the Companies Law regarding disclosure of interests and entitlement to vote.  Section 162 provides that immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the company a director must make disclosure to the board of directors on either of the two alternative bases set out in paragraphs (i) and (ii) of the

002813

section.

62. The Recap Note, with the definitions used in this judgment, provided as follows:

> "*At the time the GORE Transaction was considered, the Board consisted of seven directors, of whom at least four had to be independent. Five directors are required, first for an affirmative vote, secondly for a quorum, and thirdly to pass a written resolution. The point to note here is the central role played by the Independent Directors in the management of the company. As a practical matter, the relevant business of the company cannot be conducted without the participation of at least two of the Independent Directors and no resolutions are going to be passed without the support of at least two. Under Article 91, the power to decide whether a related-party transaction is to be approved rests on the route followed on 29 July 2010: with the directors who had no interest in the underlying transaction. In the case of GORE, that was the Independent Directors. The minimum requirement for approval was the votes of three of the four Independent Directors, i.e., majority Independent Director approval. On the other route, where the directors additionally needed to determine the fairness of the transaction to the company, (i.e. the route subsequently taken on 7 June 2011), the minimum requirement for approval was again the three of the four Independent Directors (if five votes from the then six directors was to be achieved).*"

63. As I have mentioned, the Cause is concerned with a decision reached by the Board, including each of the four Independent Directors, first on 29 July 2010 and then again on 7 June 2011. After a period of negotiation, which seems to have commenced in about January/February 2010, with the benefit of independent legal advice from Simpson Thacher and Carey Olsen, considerable additional materials were provided to them for them to review and after considering a fairness opinion from Houlihan Lokey, obtained by TFM under the terms of the IMA, and after questioning Houlihan Lokey during the board meeting, the Independent Directors decided on 29 July 2010 that the GORE Transaction should be approved.

**The Investment Management Agreement**

64. The IMA is an agreement governed by New York law. The first and second parties to the IMA are the Seventh and Eighth Defedants, Tetragon. The fourth party is TFM, the Investment Manager, which was then known as Polygon Credit Management LP, but has since changed its name to Tetragon Financial Management LP, *i.e.* TFM. Details of the provisions of the IMA are pleaded in paragraphs 27 and 28 of the Cause.

65. By Clause 2 TFM was appointed as exclusive investment manager to the Funds (Clause 2 (a)). Clause 2 (b) provides:

> "*Subject to Clause 4 hereof, the Manager shall have full power and discretionary authority on behalf of and for the account of the Funds to manage and invest cash and other assets of the Funds pursuant to and in accordance with the investment objective of the Funds*".

66. Clause 4 (a) of the IMA provides that

> "*the Manager shall have the authority … to determine the investment strategy to be pursued in furtherance of the investment objective of the Funds*".

It is common ground that Tetragon's investment objective is and always has been "*to generate distributable income and capital appreciation*", which I described during oral argument as a very broad objective indeed.

67. Clause 4 (c) provides:

> "*In carrying out its duties under this Agreement, the Manager shall have due regard to the investment objective to generate distributable income and capital appreciation*".

68. Much mention was made in argument of Clause 4(d) of the IMA, which provides as follows:

> "*The Manager is authorized to enter into transactions on behalf of the Funds with persons who are Affiliates of the Manager*".  ("*Affiliates*" is defined by reference to the U.S. Securities Act and it was not disputed that for these purposes Polygon would be an "*Affiliate of the Manager*".)

69. Under clause 4(d) TFM is authorised to enter into transactions

> "*provided that in connection with any such transaction that exceeds $5 million of aggregate investment the Manager informs the Boards of Directors of the Offshore Fund and the Master Fund and obtains either (i) the approval of a majority of the members of the Boards of Directors that do not have a material interest in such transaction (whether as part of a board resolution or otherwise) or (ii) an opinion from a recognized investment bank, auditing firm or other appropriate professional firm substantively to the effect that the financial terms of the transaction are fair to the Funds from a financial point of view*".

70. So, where a related-party transaction might exceed US $5 million, TFM may either obtain board approval from a majority of the disinterested directors, or itself obtain a fairness opinion, or, as in this case, both.

**The LCM Transaction**

71. I was introduced by Mr Davies in his oral submissions on 12 and 13 October 2011 in more detail to the first related-party transaction into which Tetragon entered in November 2009, the LCM Transaction, under which Tetragon acquired an operating business.  Previously it seems that Tetragon had been holding investment securities, which primarily were CLOs, collateralised loan obligations.  The LCM Transaction is not directly at issue in these proceedings but a number of its features were similar to those of the GORE Transaction.  The Plaintiff ultimately voted in favour of the LCM Transaction at the Board meeting when it was approved by all of the directors.

72. The similar features were shown to have included these:

  i.   Each transaction represented, for Tetragon, the acquisition of an interest in an operating business.

  ii.  Each transaction involved related-party aspects, with Polygon receiving equity in exchange for the provision of infrastructure and service at cost.

002815

    iii.    A fairness opinion was obtained by TFM from the same provider, Houlihan Lokey.

    iv.    TFM also submitted each transaction to Tetragon's board for majority approval by those with no interest in it, who on each occasion were the Independent Directors.

    v.    External US lawyers were retained for the Independent Directors.

    vi.    During negotiations the Plaintiff on each occasion argued that the transaction was outside Tetragon's investment objectives.

73. LCM was owned by Calyon, which is the investment banking arm of the Credit Agricole group. While it was part of Calyon, LCM had used Calyon's infrastructure including offices, non-investment staff (*i.e.*, legal, compliance, financial control, computer systems and technology) in managing the loan assets. If Tetragon acquired LCM from Calyon, that infrastructure would no longer be available to LCM from Calyon and so LCM would need either to develop its own 'infrastructure capability' or source it from a third party.

74. When the LCM acquisition opportunity arose, the Second Defendant and the First Defendant proposed that the same Polygon entities should make infrastructure services available to LCM at cost, in exchange for the right to receive a percentage of LCM's profits.

75. Because Polygon was owned by the Executive Directors, and because the Plaintiff had a continuing but declining interest (see above), the related-party provisions of the IMA came into play. As with the GORE Transaction, TFM both obtained Board approval (on 3 November 2009) and obtained a fairness opinion which was submitted to the Board as one part of the materials to be considered by them in deciding whether or not to enter the LCM Transaction.

76. As with the GORE Transaction, external US lawyers Simpson Thacher were retained to assist the Independent Directors.

77. In the event, all of the members of Tetragon's Board, including the Plaintiff, voted in favour of the LCM Transaction, but originally, as I have mentioned, the Plaintiff had opposed it. In a letter dated 20 October 2009 to the Board, the Plaintiff set out his objections "*I write to express my strong opposition. It is wrong to divert 16.5% of the operating profits from LCM to two entities that are owned by Reade Griffith and Paddy Dear.*" The Plaintiff also complained that the proposed investment represented a significant departure from Tetragon's investment objectives. In his letter the Plaintiff accepted that the investment mandate was broad but said that he had some doubts as to whether it was broad enough to encompass the purchase of an operating business.

78. Another complaint in common with the GORE Transaction was the Plaintiff's allegation of what he called 'double-dipping', *i.e.* that Tetragon was unnecessarily paying two sets of fees. He alleged:

> "*The Related-party Transaction cannot withstand scrutiny. It is double dipping and an unlawful diversion of profits to a related-party. Our shareholders are essentially being charged twice for the same services by a related-party. Any shareholder or regulator who heard about this will be outraged for very good reason*."

002816

But on 3 November 2009 the Plaintiff voted in favour of Tetragon entering the LCM Transaction.

**The GORE Transaction**

79.  The negotiations which led to Polygon and Tetragon entering into the GORE Transaction began in about January/February 2010.  To a large extent the Second Defendant conducted those parts of the negotiations which were with the 'GORE Founders'.  Later, after the original version of the Term Sheet, which comprised the detailed terms which had been negotiated, had been prepared, which was by 18 May 2010, and especially between about 16 June 2010 and 28 July 2010, the proposed transaction was reviewed by members of the Board before the Board meeting was held on 29 July 2010.  During that period the Plaintiff raised objections to the proposed GORE Transaction and was represented by lawyers, The Nelson Law Firm, Fladgate LLP in London and Appleby in Guernsey.

80.  There can, in my judgment, be absolutely no doubt that each of the Plaintiff and the Independent Directors of Tetragon had the opportunity to use, and did use, the services of skilled lawyers during the period of negotiations and that the lawyers for the parties reviewed all aspects of the proposed transactions most carefully.

81.  It is also noteworthy, I think, that no allegations are made by the Plaintiff that any negligent advice was given to the Independent Directors by either Simpson Thacher or Carey Olsen or to Tetragon or TFM by either Cravath Swaine & Moore or Ogier.  So, the Plaintiff's derivative action is directed against the Executive Directors and the Independent Directors, and not against either TFM or Mr Wishnow, Mr Herlyn or Mr Rosenberg of TFM or Houlihan Lokey or any of the lawyers and other advisers used by TFM, the Independent Directors or Tetragon.

82.  The three real estate specialists at the heart of the proposed GORE Transaction, John Carrafiell, Sonny Kalsi and Fred Schmidt, (together "the GORE Founders",) had previously worked at Morgan Stanley.  The Second Defendant knew Mr Carrafiell personally and all members of the Investment Committee of TFM met the GORE Founders in February 2010.

83.  The Plaintiff's first impression of the proposed GORE Transaction appears to have been a favourable one.  In his e-mail dated 25 February 2010 and sent by him to the other members of the Investment Committee of TFM he set out his reaction:

>  "*It could be an exciting deal to do.  ... I think that these are exactly the type of deals that Tetragon should be looking at.*" In this e-mail he added: "*From TFG's point of view a big stake in there* [sic] *firm is exciting.*"

84.  The GORE Transaction was referred to its Board for approval because of Polygon's participation and because it was recognised that the Second Defendant and the First Defendant owned Polygon.  This was the same review and approval process as had been followed for the LCM Transaction.

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B-BN Document 18-14 Filed 08/31/23    Page 75 of 213    PageID 3142
Guernsey Judgment ??/2013 – Jackson and Dear et al

85.  The first communication from TFM to the Board in connection with the approval was an e-mail from Mike Adams, Associate Counsel for TFM, to Tetragon's Board dated 22 June 2010.  The Investment Committee of TFM had met on 18 June 2010 and, whilst at that meeting the Plaintiff had objected to the proposed GORE Transaction, the majority of the committee had agreed with it.  Attached to Mr Adams' e-mail were:

  i.   a letter from the Second Defendant to the Board dated 18 June 2010,

  ii.  a confidential presentation from TFM to the Directors,

  iii. extracts from the IMA and the articles of both Tetragon companies, the Term Sheet, and

  iv.  a business plan.

86.  The Second Defendant's letter of 18 June 2010 included the following:

  "*Tetragon has continually sought to realise TFG's potential to become a broad-based financial services firm, capable of pursuing attractive investment opportunities.*"

The Second Defendant then set out his belief that Tetragon

  "*can function not only as an investment holding company, but also as a company.*"

He also referred to the LCM transaction as a

  "*… first natural step in realising its potential ... receives very positive feedback from shareholders and analysts.*"

He also considered that

  "*... there's an opportunity to further fulfil TFG's potential*"

and he said that TFM was very excited to present a proposed real estate joint venture, which he believed would build on recent success.

87.  The Second Defendant continued:

  "*Due to the fact that various Polygon entities will be involved in the Transaction (including entities owned by Paddy and myself as well as owned by Paddy, Alex and myself), the three of us may be considered to have an "interest" in the proposed Transaction.*" "*…As you will recall under the articles and the IMA, these sorts of related party transactions need to be approved by the boards, including a majority of the disinterested directors, or the directors need to find that the affiliate transaction is fair to each of the companies, or be otherwise authorised.*"

In the final paragraph of his letter the Second Defendant said:

  "*... there will be a detailed discussion of the related party matters.  We understand the board should take whatever time the directors consider is necessary to evaluate the terms of the related party aspects of the joint venture and to consult with outside advisers as appropriate.*"

88.  The presentation from TFM to the Board which was attached to Mr Adams' e-mail summarised the principal terms of the GORE venture; the headings used included: "*Why*

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B   Document 18-14   Filed 08/31/23   Page 76 of 213   PageID 3143
Guernsey Judgment ??/2013 – Jackson and Dear et al

*Real Estate*", "*Why Green Oak*", "*Why with Polygon*", *etc*. The summary paragraph of the presentation stated:

> "*Given that Polygon and the other infrastructure providers are related parties to TFG and TFGMFL it is important that the relationships of the joint venture partners be thoroughly disclosed and properly thought through, and we look forward to working with the Boards of Directors on that aspect of the transaction*".

89. The GORE Term Sheet, a document upon which great attention was given during the argument of Counsel, was also attached to Mr Adams' e-mail of 22 June 2010. The Term Sheet is helpfully pleaded in depth in paragraphs 37 and 43-50 of the Cause.

90. The parties to the Term Sheet were identified as:

    i.   the three real estate professionals who were going to form GreenOak Real Estate, *i.e.* the GORE Founders;

    ii.  the Polygon holding company which was going to receive an equity interest in GORE and which was going to provide working capital for the joint venture;

    iii. the two Polygon "*Infrastructure Providers*": the US and UK partnerships which were going to participate because the joint venture would require an operational centre and trading and support facilities; and

    iv.  Tetragon which was going to provide working capital and a financing commitment in exchange for an equity interest.

91. The GORE Founders' interest in the venture was described and it was stated that between them they would own 77% of the joint venture vehicle. Polygon was to receive 13% and Tetragon 10% and their interests were to be non-dilutable. The GORE Founders would also receive a 3.6% interest in Polygon HoldCo. (There were forfeiture provisions if a GORE Founder were to leave.)

92. Under the heading "*Options in TFG*" the Term Sheet provided that the GORE Founders would receive options on 3% of Tetragon's shares at a strike price of US $5.50, vesting only after five years. The shares were to be issued for cash. There was a further forfeiture provision to the extent that a GORE Founder was not active in the business at the vesting date of the options. Changes in Tetragon's favour were negotiated to this aspect of the GORE Transaction after the Term sheet was signed as shown in the Defendants' Counsel's summary headed "Changes to the GORE Transaction post Term Sheet". The negotiated change was that the TFG options were only to vest after five years and following the GORE Founders' repayment of all working capital loans and were conditional on the GORE Founders being actively involved in the management of the real estate business.

93. The Term Sheet also provided that the GORE Founders would manage the venture, subject to the Board which was to include one appointee from each of Polygon and Tetragon. Reference was also made to an Infrastructure Services Agreement under which PIP LP and PIP LLP were to provide operational, financial control, trade settlement, marketing, legal, compliance, payroll and other infrastructural services to GORE at cost.

94. Under the heading "*Co-investment of TFG Master Fund*" the Term Sheet provided that Tetragon was to make available US $100 million which could be drawn by GORE for co-investment purposes, subject to various constraints including a condition that the amount drawn down in respect of any given investment programme could not be more than 9% of the total equity contributed to that programme, and that those co-investments were on the

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B    Document 18-14    Filed 09/11/23    Page 77 of 213    PageID 3144
Guernsey Judgment ??/2013 – Jackson and Dear et al

best terms made available to any other investor in a given opportunity, which was referred to in the proceedings as a "*most favoured nation*" clause.

95.    A further change was made to the proposed GORE Transaction after the Term Sheet was signed to ensure that Tetragon did not find itself committed only to less attractive investments, allowing it to choose (if it wished) to increase its participation in any investment up to the maximum of 9%.

96.    The Term Sheet also provided that working capital loans were to be made by both Polygon Holdco and Tetragon of US $10 million each.

97.    Under the heading "*Time Commitments and Exclusivity*" each GORE Founder agreed to devote his whole time and attention to the business of GORE.

98.    Finally, there was a "*Condition Precedent*" set out in these terms in the Term Sheet, which was signed by the Second Defendant on 18 May 2010, *i.e.* about ten weeks before 29 July 2010:

> "*The obligations of the Parties set forth in this Term Sheet shall be subject to Tetragon obtaining the requisite approval from the Board of Directors of Tetragon.*"

Accordingly, the Term Sheet acknowledged that its terms would not be binding unless and until Tetragon Board approval was obtained.

99.    The "*Exclusivity*" and "*Documentation/Binding Effect*" section of the Term Sheet referred to a 60-day exclusivity period in which an initial business plan was to be formally agreed between the parties and if the initial business plan was not agreed within this period, the Term Sheet "*shall automatically terminate and no Party shall have any liability or obligation to any other Party*".  (This provision was not enforced by any party in the period of the first 60 days of the GORE Transaction.)

100.   On 2 July 2010, Mr Adams circulated by e-mail to the directors of Tetragon a further background presentation headed "*GreenOak Real Estate Advisers*", which provided information about the GORE Founders and their credentials and about the market environment and also dealt with the TFM rationale underlying the proposed GORE Transaction.

101.   Also on 2 July 2010, Mr Adams sent to the Board under separate cover a document containing extracts from Tetragon's IPO Prospectus, the Tetragon website, Tetragon's 2009 annual report and various other materials relating to Tetragon's investment objective and its strategy, asset selection and uses of cash.  Under the heading "*Risk Factors*" from the IPO Prospectus the following extract appeared:

> "*The Issuer and the Master Fund have approved a very broad investment objective and the Investment Manager will have substantial discretion when making investment decisions.*"

The Board were reminded of disclosure material about the ability of TFM to change the investment      strategy and to expand asset classes and investment vehicles over time.

102.   On 6 July 2010 the Plaintiff wrote to the other members of the Tetragon Board expressing his opposition to the proposed GORE Transaction. The letter is addressed to the Directors as a whole, care of Gary Horowitz at Simpson Thacher, the US lawyers for the Independent Directors.  (Mr Horowitz was the partner advising the Independent Directors.)

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B  Document 1814  Filed 09/11/23  Page 78 of 213  PageID 5145
Guernsey Judgment ??/2013 – Jackson and Dear et al

103.  The Plaintiff expressed his opposition to the proposed joint venture amongst Tetragon and certain affiliates, and in the introduction he listed four specific complaints:

    i.  First, that Tetragon should not be investing in real estate.  The Plaintiff asserted that: "*My consent is required to change the general nature of Tetragon's business*" and "*I do not intend to provide my consent*".

    ii.  Secondly, he referred to the track record of the GORE Founders.

    iii.  Thirdly, he said: "*The Price Tetragon is Paying is High; the Terms are Poor*".  He predicted that Tetragon's stock price would fall if the GORE joint venture went forward, which at the time when the evidence for the Defendants was sworn and the oral hearings held, had turned out to be an inaccurate prediction on his part.  For example, whereas Tetragon's stock price was US $4.27 when the GORE Transaction was announced, it had risen to US $7.80 by the time the Cause was issued seven months later.

    iv.  Fourthly, he raised the related-party issue as between Polygon and Tetragon.

104.  Accordingly, by 6 July 2010 the Plaintiff had informed the Executive Directors and the Independent Directors in some detail of the grounds of his opposition to the then proposed GORE Transaction.  Furthermore, in his letter of 6 July 2010 the Plaintiff had made some other contentions in his position as a shareholder in PCH II; he argued that under the Memorandum and Articles of Association of PCH II any change in the general nature of Tetragon's business was something which required his approval as the Class B shareholder in PCH II.

105.  All the other directors of Tetragon were, therefore, on notice that the Plaintiff strongly objected to the proposed GORE Transaction, both as a director of Tetragon and as a PCH II shareholder.

106.  On the same day, 6 July 2010, the Plaintiff's New York lawyers, The Nelson Law Firm, wrote a letter to the Executive Directors, which was copied to Simpson Thacher, the US lawyers for the Independent Directors.  The letter threatened legal action in the event that the GORE Transaction proceeded.  It accused the Executive Directors of breaches of fiduciary duty, and described the GORE transaction as "… *a thinly-veiled effort to funnel Tetragon's assets to Polygon to support its elaborate infrastructure*".  The Nelson Law Firm letter was also copied to Mr Côté of PIP LLP (General Counsel to TFM), Cravath Swaine & Moore LLP (the Fund's U.S. Counsel), Fladgate LLP (the Plaintiff's London lawyers), the directors c/o Simpson Thacher (the Independent Directors' US lawyers) and the Plaintiff himself.

At the end of their letter The Nelson Law Firm said:

> "*On behalf of The Plaintiff, we therefore demand that PCH II cause Tetragon to reject the proposed GORE joint venture and terminate any further discussions with Polygon, GORE or any of its principals in contemplation thereof.  Any failure by you to cause Tetragon to reject the GORE joint venture forthwith will subject you to liability for breach of your duty to The Plaintiff as the sole Class B shareholder of PCH II and for breach of contract.  You should be aware that The Plaintiff intends to take all lawful actions necessary to enforce his rights*."

(It is to be noted that it does not seem to be part of the Plaintiff's case in the Cause that the Executive Directors committed breaches of PCH II's Articles.)

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01508-E    Document 18-14    Exhibit K - Guernsey Judgment ??/2013 – Jackson and Dear et al    Filed 03/17/23    Page 79 of 213    PageID 8146
Guernsey Judgment ??/2013 – Jackson and Dear et al

107.  On 8 July 2010 Tetragon's US law firm, Cravath Swaine & Moore, responded to The Nelson Law Firm's letter dated 6 July 2010 and explained why, in their view, the Plaintiff did not in fact have a right of veto at a PCH II level:

> "*You are wrong in asserting that The Plaintiff's consent to the investment transactions with respect of GreenOak Real Estate is required pursuant to Article 36 of the articles of PCH II. You don't even explain why the articles restrict actions taken by separate legal entities, which are not bound by and do not have rights or obligations under such articles. That is not surprising. Article 36(a) does not impose any limits on the businesses which may be pursued by Tetragon. Such limits, if any, are confined to the organisational documents of Tetragon and the IMA… The PCH II articles only apply to actions taken by PCH II, and Article 36(a) only gives the Plaintiff rights with respect to PCH II not Tetragon.*"

108.  On 15 July 2010, TFM sent additional material to Simpson Thacher relating to the share option valuation in response to the Independent Directors' request, promising some information on the GORE Founders' track record and scheduling a board call. Attached to that document was a Board Information Pack , the introduction to which stated:

> "*The following slides have been compiled in response to questions raised by the Board of TFG when considering the proposed investment in GORE… How should we approach the valuation of the 3% options being awarded by TFG as part of the consideration for the transaction; anticipated fee flows and cash flow implications?*"

TFM next dealt with valuation of the options and the reasons, as they saw them, for the options, saying that they were intended to be a low cost means of aligning interests of the GORE Founders with those of Tetragon's shareholders, which only pay out if GORE and TFG are successful and were intended to incentivise everyone to work together to improve the share price of GORE. So, TFM explained, if Tetragon's value increased as a result of the GORE venture being successful, it would only be then that the options would become exercisable; and in order to achieve that, the GORE Founders would have to work hard and be successful. Then the valuation of the options was explained and fee flows considered. TFM also explained the then current management fee structure.

109.  Under the heading "*GORE investments*", TFM said that if the GORE Transaction proceeded, GORE would receive management fees and, in that context as well, Tetragon has most favoured nation status and so would incur a management fee equal to the lowest management fee applicable to any other equity investor in the relevant programme. The fee structure set out and considered by the Board and their advisers, including the Plaintiff and his advisers, was, it seems, in general terms at least, the same as the structure agreed to by the Plaintiff in relation to LCM, when one of his original objections to the had been to such so-called "double-dipping".

110.  A section followed in which TFM explained that the proposed investment in the GORE Transaction would leave plenty of money left in Tetragon to pursue its other initiatives, to pay dividends and to pay operating expenses.

111.  On 16 July 2010, additional information relating to the GORE Founders was sent by e-mail from Simpson Thacher to the Independent Directors including relating to information to the track record of the three GORE Founders. On 13 July 2010, Simpson Thacher had also circulated further materials to the Independent Directors, including the news reports relating to Mr Kalsi's leave from Morgan Stanley.

112.  The Independent Directors were therefore made aware, prior to the Board meeting on 29 July 2010, of information relating to Mr Kalsi and his circumstances.

© Royal Court of Guernsey

002822

Case 21-03067-sgj   Doc 59-1   Filed 09/29/21   Entered 09/29/21 18:48:45   Desc
Case 3:23-cv-01503-B   Document 18-14   Filed 08/31/23   Page 80 of 213   PageID 3147
Guernsey Judgment ??/2013 – Jackson and Dear et al

113.  On 21 July 2010, the Plaintiff's Guernsey lawyers, Appleby, wrote directly to Simpson Thacher's letter dated 8 July 2010.  The Plaintiff's three main concerns were said to be (i) the disclosure of interests, (ii) the Prospectus and straying from the path of CLOs, which he said were a core part of the Tetragon business, and (iii) Rule 3.01 of the Scheme Rules. First, Appleby mentioned commercial reasons why Tetragon should not proceed and then noted that there were "*specific legal reasons why the Directors must be prudent in considering the transaction*".  In the next paragraph of their letter Appleby contended that there would be a change in investment objectives if the proposed GORE Transaction proceeded which should be put to non-voting shareholders for their approval, and in their final paragraph they stated, somewhat surprisingly I think, that the letter was "*written entirely without prejudice*".

114.  It must, in my judgment, have been made clear to the Independent Directors, and to the Executive Directors, from the Plaintiff's objections and his US and Guernsey lawyers' arguments about the proposed GORE Transaction, that they should take all necessary steps to satisfy themselves of the validity of the commercial arguments put by TFM for Tetragon to invest in the GORE Transaction and to obtain legal advice from both their US lawyers and their Guernsey lawyers.  The affidavits of the Independent Directors demonstrated that this correspondence did, in fact, heighten the level of concern and attention given by them and their advisers to the proposed GORE Transaction.

115.  One of the ingredients in the consideration by all the Tetragon directors of the GORE Transaction and in the Independent Directors' evaluation of the related-party components was the so-called fairness opinion obtained by TFM from Houlihan Lokey under the terms of the IMA.  The Plaintiff argued that the instructions to Houlihan Lokey should have come from the Independent Directors or the whole board of Tetragon rather than from TFM; but, since the IMA makes it clear that the Investment Manager, *i.e.* TFM, should obtain a fairness opinion, it is clear to me that there is no merit in this point.

116.  The Fairness Opinion was one of the components of the process which the Board, including the Plaintiff and the Independent Directors, went through before voting on investment by Tetragon in the GORE Transaction.  The Fairness Opinion was addressed to TFG.

117.  At the top of the second page of the Fairness Opinion, the Polygon element was referred to: "*as to which we express no opinion*".  Both before and at the board meeting on 29 July 2010 the Plaintiff was critical of the fact that Houlihan Lokey did not undertake any comparison of the benefits receivable under the transaction by, on the one hand, Tetragon, and, on the other hand, Polygon.  However, as the Defendants rightly submitted, the IMA did not require any comparative analysis to be undertaken.  The effect of clause 4(d) of the IMA was that if TFM was going to proceed with a related-party transaction without going to the Board of Tetragon, then what was required under the IMA was

> "*an opinion from a recognized investment bank, auditing firm or other appropriate professional firm substantively to the effect that the financial terms of the transaction are fair to the Funds from a financial point of view.*"

118.  In The Fairness Opinion Houlihan Lokey also stated:

> "*You have requested that Houlihan Lokey… provide an opinion… as to whether, as of the date hereof, the Aggregate Consideration to be received in the Transaction pursuant to the Term Sheet is fair to TFG from a financial point of view after giving effect to the Transaction and the Polygon Transaction.*"

The Fairness Opinion later stated:

002823

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01508-B   Exhibit A - Book Judgment Part 2   Page 25 of 33   Page 31 of 213   PageID 8148
Guernsey Judgment ??/2013 – Jackson and Dear et al

> "*Based upon and subject to the foregoing, and in reliance thereon, it is our opinion that, as of the date hereof, Aggregate Consideration to be received in the Transaction pursuant to the Term Sheet is fair to TFG from a financial point of view after giving effect to the Transaction and the Polygon Transaction.*"

119.    On 26 July 2010, notice was given of the board meeting of Tetragon to be held on 29 July 2010 and an agenda was circulated.  Point C of the agenda read:  "*Update on GreenOak Real Estate business proposal*".  Whereas approval of the GORE Transaction was not expressly listed on the agenda, in the light of what had preceded the board meeting, the directors including the Plaintiff were, in my view, adequately put on notice that it would be discussed and that, if the directors agreed, put to the vote.  In any event, In an e-mail exchange between the Plaintiff and Mr Adams dated 27 July 2010, the Plaintiff asked whether the GORE Transaction was going to be considered, Mr Adams confirmed that it was on the agenda, and the Plaintiff responded: "*OK thanks*".

120.    After the agenda was circulated, on 27 July 2010 Mr Adams distributed various further materials to Tetragon's Board.  The e-mail attached a further set of slides called the "*GreenOak Real Estate Opportunity Further Board Information Pack*" which had been compiled in response to further questions raised by the Board of Tetragon.

121.    The additional slides considered six main issues:

   o   "*Transaction Origination and GreenOak Founders Background*"

   o   "*Deal Terms*"

   o   "*Valuation of TFG options*"

   o   "*Controls*"

   o   "*Background and information on GP Co-Investment*"

   o   "*Anticipated fee flows and waterfall of distributions*".

Further information was provided about the GORE Founders. The "*GreenOak Real Estate Opportunity Further Board Information Pack*" included a section called "*Deal Terms: Comparative of relative value received*".  The slides also set out TFM's view that the terms of the GORE Transaction were not, in terms of comparative relative value, unduly favourable to Polygon and set out what Tetragon was getting and what it was giving.  The slides also included the calculations underlying those figures.  The directors addressed themselves to the issue of relative comparative value and took due account of the related-party issue.  In relation to the options, the Board were informed that two exercises had been conducted, that TFM had sought to value them and that Houlihan Lokey had valued them.  The slides analysed the different approaches adopted.

122.    The Plaintiff wrote two further e-mails to the Independent Directors.  The first was dated 28 July 2010, the day before the scheduled board meeting, and was addressed to the four Independent Directors and Mr Horowitz.  The Plaintiff attacked the fairness opinion.  He contended:

   o   that Houlihan Lokey was wrong not to place any value on Tetragon's US $100 million co-investment commitment;

   o   that the value they had put on the Tetragon share options was wrong.  The Plaintiff argues that the price of US$5.50 was "*completely wrong*".  He

Case 21-03067-sgj   Doc 59-1   Filed 09/29/21   Entered 09/29/21 18:48:45   Desc
Case 3:23-cv-01508-B   Document 18-14   Filed 09/11/23   Page 82 of 213   PageID 9149
Guernsey Judgment ??/2013 – Jackson and Dear et al

described it as a "*ridiculously low price*".

The Plaintiff also argued that the Independent Directors should have engaged a separate financial institution.

123.   Very early on the morning of the 29 July 2010, the day of the board meeting, a further e-mail was sent by the Plaintiff addressed to the Independent Directors and the First Defendant and copied to Simpson Thacher.  The Plaintiff attached a four page spreadsheet analysis and commentary setting out his assessment and valuation of the respective contributions of Tetragon and Polygon.

124.   The board meeting at the heart of these proceedings took place, as has been mentioned by me several times, on 29 July 2010.  Several lawyers attended, including two lawyers from Cravath Swaine & Moore for Tetragon, two lawyers from Simpson Thacher for the Independent Directors, two lawyers from Ogier for Tetragon including Advocate Simpson and two representatives from State Street Fund Services, Tetragon's company secretary.  Mr Côté, Mr Adams and Mr Robinson were in attendance, all of whom are internal lawyers from TFM.

125.   The meeting was chaired by one of the Independent Directors, the Third Defendant Mr Rupert Dorey.  All three principals of the Investment were in attendance, *i.e.* Mr Wishnow, Mr Herlyn and Mr Rosenberg.  Declarations of interest were recorded and it seems that there was no suggestion made by the Plaintiff during the meeting that the disclosures were to any extent inadequate, or that it was improper for the Executive Directors to participate in the discussion of the GORE Transaction and the vote to approve it.  On about 25 November 2011 the Plaintiff disclosed that he had secretly taped a large part of the Board meeting and rather late in the day a transcript was produced of this tape, which proved useful and assisted all parties and the Court in following the course of the meeting, which seems to me to have been conducted professionally and courteously and without anyone hurrying matters on unduly or seeking to limit discussion by the Board before any vote to approve the GORE Transaction.  Although this tape was available to the Plaintiff and his lawyers at the time of the resumed hearing on 12 and 13 October 2011, no mention of it was made until about 25 November 2011, just before the oral hearing resumed.  In the event, the transcript of the tape proved to be the best place for me to visit in order to form a view of the Board meeting against the allegations made by the Plaintiff in the Cause.

126.   On the following day 30 July 2010 there was the exchange of friendly e-mails between the Plaintiff and Mr Dorey.  The Plaintiff wrote the following words which made a great deal of impact on me when I read them and which, in my judgment, probably represent the feelings of the Plaintiff at the end of the Board meeting on 29 July 2010 as well as anything could:

> "*Rupert, thank you for your comments.  While I do not agree with the final decision, I do appreciate the time all of you spent listening to and considering my comments on the transaction.  The transaction was quite complicated and needed a lot of analysis which I hope I helped with.  I left the meeting feeling that I had done everything that needed to be done and said what needed to be said.  We reached different conclusions, but guess that will happen from time to time.*"

127.   On 2 September 2010 draft minutes of the Board meeting held on 29 July 2010 were circulated by Mr Adams for comments by the directors.  The Plaintiff objected to them.  His original comments included a suggestion that: "*The minutes should include that the related party instructed Houlihan Lokey*".

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B    Document 18-14    Filed 09/11/23    Page 83 of 213    PageID 9150
Guernsey Judgment ??/2013 – Jackson and Dear et al

128.  In response to the Plaintiff's comments on the draft minutes, Cravath Swaine & Moore, Ogier and Simpson Thacher sent a joint reply by e-mail to the Plaintiff on 23 September 2010.  They said:

> "*Our three firms were represented at the meeting and we believe that the minutes already accurately reflect the discussion which took place at the meeting, including with respect to the legal standards governing the Board's consideration and approval of the GORE transactions.  As such, no changes in this regard need to be made to the minutes.*"

129.  On 10 November 2010, Mr Dorey sought confirmation that the minutes of the Board meeting of 29 July 2010 could be signed.   The Plaintiff again objected, but gave no specific objections to the draft, which Mr Dorey then requested on 11 November 2010.   On 12 November 2010 the Plaintiff identified two changes which he wanted to propose

> "*Paragraph (5) on page 4 needs to be deleted.  The board never discussed the arms-length requirement.*
>
> *Paragraph (3) of page 4 needs to reflect that Houlihan Lokey did not examine the GORE/Polygon transaction and therefore did not and could not give the board an opinion on whether TFG was getting as good a deal as Polygon was getting.  It should also be clear that Houlihan Lokey was not engaged by the Master Fund.  [The Executive Directors engaged them and gave them all of their instructions.*"

130.  On 17 December 2010, Appleby sent letters before action to Tetragon, for the attention of the First to Sixth Defendants, setting out the basis of the Plaintiff's claim against the director Defendants.  The letter before action was passed on to the First to Sixth Defendants by Tetragon, as appears from Ogier's letter to Appleby dated 5 January 2011.

131.  The Cause was presented on 25 February 2011; attached to it was a helpful diagram explaining the complicated corporate structure of the corporations involved in the GORE Transaction. I have considered this diagram as well as the two structure plans included within this judgment and hope that in this judgment I have adequately described those companies or corporations which were centrally involved in Tetragon entering into the GORE Transaction.

132.  As one would expect, the lodging of the Cause had been preceded by correspondence between Advocate Jeremy Le Tissier of Appleby, on behalf of the Plaintiff, and Ogier, the Advocates for Tetragon.  Advocate Simon Davies of Ogier represented Tetragon on the hearings before me and, by arrangement agreed between himself and Advocate Christian Hay of Collas Crill, who appeared for the Executive Directors, and Advocate Tim Corfield of Carey Olsen, who appeared for the Independent Directors, made the principal written and oral submissions on behalf of all the Defendants.  This course enabled the Defendants' submissions to be made with very little duplication.

133.  By order of the Deputy Bailiff dated 13 May 2011, the Defendants' obligation to table defences to the Cause was stayed pending determination of their strike-out application.

134.  By letter dated 7 March 2011 Ogier gave Appleby notice of Tetragon's intention to apply, with the Executive Directors and the Independent Directors, to strike out the Cause and informed them that Tetragon opposed the claims which the Plaintiff was bringing derivatively for Tetragon and considered the claims "*without merit or prospects of success*".  In due course, on 28 April 2011 the Defendants issued the strike out application.

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B   Document 18-14   Filed 08/17/23   Page 84 of 213   PageID 3151
Guernsey Judgment ??/2013 – Jackson and Dear et al

135.  Since I think it would be helpful, and since I have concluded that the test adopted taken by the Court of Appeal in *Prudential v Newman Industries* is the test which I must apply on this application, I now remind myself of the test which I must apply to the application.  The Plaintiff must first establish that he has a *prima facie* case on all or any of the seven alleged causes of action pleaded in the Cause and, to the extent that there is such a *prima facie* case established, that any of such causes of action come within the exception to the rule in *Foss v Harbottle*.  If and to the extent that he cannot do so, either all or such relevant part of the Cause which does not 'pass the test' must be struck out as an abuse of process.  I should not apply any lesser test, for instance whether the Plaintiff has satisfied me that all or part of his case is arguable or tenable or stands a reasonable chance of success and I have not allowed myself to be distracted by any argument of Mr Le Tissier, however attractively it may have been put, that some lesser test 'will do'.  The *prima facie* case test is understandably quite a high hurdle for the Plaintiff to get over and the reason for that is, I believe, the Courts' traditional view in England, at least before the changes introduced by the Companies Act 2006 and quite possibly thereafter too, that the right to bring a derivative action is to be regarded as an exceptional right.

136.  For the reasons which follow I have decided that the Plaintiff cannot achieve the standard required by the test which I must apply to his case on any part of his derivative action and also that, since Mr Le Tissier accepted, as I think he had to accept, during his oral submissions in reply that the Plaintiff's case for relief under the oppressed minority provisions of the Companies Law depended on the same facts as his 'true' derivative action claims, it must follow that the Plaintiff's alternative claim under the Companies Law for minority shareholders' relief or the equivalent falls to be struck out as well.

137.  The primary conclusion which I came to when reviewing the relevant facts of the case at this preliminary stage was that the starting point was that, as Lewison J. put it in *Iesini v Westrip Holdings Ltd* [2010] BCC 420, Courts are ill-equipped to enter the commercial arena and decide commercial issues; the converse to this point is the first rule in *Foss v Harbottle* itself which, as a general rule, leave matters of a commercial nature, sometimes in the earlier cases called matters of internal administration or internal management, to the directors to decide.  This point came out of the documents, as I read them, loud and clear in this case.  Although I cannot decide the point and the proper test to be applied does not require or allow me to do so, but only, I think, to form a provisional view, the approach taken by the Plaintiff when objecting to the GORE Transaction at all times up to and after the Board meeting certainly suggests to me that he seemed to understand that the majority decision taken by all the other directors of Tetragon on 29 July 2010 to approve the GORE Transaction was taken by them on commercial grounds after considering his objections carefully and after taking into account the very considerable body of materials supplied to all directors and the exchanges between their lawyers and that he was bound by it under the internal rules of Tetragon, that is to say, under Tetragon's constitution as provided in the Articles.  The Plaintiff's e-mail to the Third Defendant on 30 July 2010, the very next day after the board meeting on 29 July 2010, in my view, demonstrates the point I am making quite well.

138.  Turning now to the Cause, which I have read several times and taken into account most carefully in preparing this judgment, I remind myself that it is the second draft amended version, handed up by Mr Le Tissier on 12 October 2011, which is the version of the Cause to which all submissions were finally directed.

139.  In section D of the Cause the Plaintiff claims that the Executive Directors are obliged to account to Tetragon for the benefits derived by them from the GORE Transaction since they had breached their duty of full and frank disclosure to Tetragon.  The case is that they had not disclosed the nature and extent of their interests so as to come within the protection given by article 91(c).  The pleading is short and the Cause does not set out in full detail the whole range of correspondence, e-mails and presentations which I have mentioned above.

002827

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01508-B-BW Document 1844 Filed 09/30/23    Page 85 of 213    PageID 3152
Guernsey Judgment ??/2013 – Jackson and Dear et al

Under this head of claim I have considered articles 91 and 92 and the terms of section 162 of the Companies Law.

140. The central point, in my judgment, is whether or not the Executive Directors, and especially Mr Griffith, disclosed sufficient details of their interests in the GORE Transaction to enable the other directors to understand what their interests were and the extent of their interests. As Vinelott J. was satisfied in ***Movitex Ltd v Bulfield*** [1986] 2 BCC when examining the articles of the company in question, I am also satisfied first that the effect of articles 91 and 92 of Tetragon's articles is to exclude the no conflicts rule which otherwise affects self-dealing by a director.

141. I am satisfied that the Executive Directors disclosed their ownership of Polygon and that they owned almost 100% of it, subject to the Plaintiff's declining interest in one part of the Polygon structures. I agree with the submissions set out in paragraph 3 of the Outline of Tetragon's submissions of 30 November 2011 in relation to the heads of claim in the Cause. In my judgment, the disclosure in the Second Defendant's letter of 18 June 2010 and the further oral disclosures made at the board meeting, tempered, as Mr Davies put it in his Outline, by the directors' prior familiarity with Polygon and its ownership, was adequate disclosure to satisfy the articles and section 162. As to Mr Le Tissier's argument that such disclosure was not made immediately and therefore did not satisfy the strict requirement of section 162, I reject this argument for the reasons submitted by Advocate Hay for the Executive Directors in his written submissions of 30 November 2011 as further developed in his oral submissions. In particular, I accept Mr Hay's submissions on both section 162 and the compliance by his clients with the disclosure requirements of article 91. Further, I accept Mr Hay's practical, common-sense interpretation of the requirement in section 162 for the disclosure to be made '*immediately*', *i.e.* that it meant the final oral disclosure at the board meeting on 29 July 2010 when considered against the background of the previous disclosure, and I am satisfied that his analysis of the disclosure by the Executive Directors, under the headings of mode, timing and nature of disclosure, demonstrates clearly that the Plaintiff cannot show a *prima facie* case of breach by them of their duties of disclosure leading to an obligation to account, as relied on by him under section D of the Cause. It follows that I am also of the view that the Plaintiff has not established a *prima facie* case that the Executive Directors should, in the context of this area of company law, be regarded as '*wrongdoers*' thus bringing into play a consideration of the exceptions to the rule in ***Foss v Harbottle***, in particular the fraud on the minority exception.

142. If I were wrong in this conclusion, I would also have decided that the Plaintiff was not able to pursue this head of claim since the resolution of the board of directors of Tetragon on 7 June 2011 that the GORE Transaction was fair to Tetragon as of the time that it was authorised on 29 July 2010 complied with the part of article 91 which absolves a director from a liability to account for profits if the transaction in question is found by the board of directors, before or after the fact, to be fair to the company as of the time that it was authorised.

143. In section E of the Cause the Plaintiff argues that the Executive Directors are liable to account to Tetragon for profits derived by them from the GORE Transaction for breaching their duties to Tetragon by placing themselves in a conflict of interest. The head of claim is developed in paragraphs 92 to 94 of the Cause and the Plaintiff claims in paragraph 95 that there had been no authorisation or approval by Tetragon of such breaches.

144. For the reasons given under head D above, I conclude that the Plaintiff has failed to establish a *prima facie* case under head E and this claim must be struck out as well. In particular, against the background of the disclosure by the Executive Directors of the details of the proposed GORE Transaction (see especially paragraph 140 above) the Plaintiff cannot, in my judgment, establish such a case.

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B-BT   Document 13-14    Filed 08/31/23    Page 86 of 213   PageID 3153
Guernsey Judgment ??/2013 – Jackson and Dear et al

145.  I now turn to section B of the Cause where the Plaintiff claims that the GORE Transaction was not in the best interests of Tetragon and that the Executive Directors and the Independent Directors acted in breach of their duty to act in the best interests of Tetragon in passing the resolution to approve Tetragon entering into the GORE Transaction at the board meeting on 29 July 2010. The point is pleaded in detail at paragraphs 77 to 81 of the Cause.

146.  I am not satisfied that the Plaintiff can establish a *prima facie* case under this head of a breach of duty by any of the Executive Directors and the Independent Directors. The duty in question is, in my judgment, properly to be examined subjectively. The Court should not attempt to substitute its view of whether a reasonable director would or would not have concluded that the GORE Transaction was in the best interests of Tetragon for the views of the directors. Furthermore, it is not suggested by the Plaintiff that any of the Executive Directors and the Independent Directors acted in bad faith. Their position was, and remains, that the GORE Transaction was in the best interests of Tetragon and that they voted in favour of Tetragon entering into it for that reason, just as much as the Plaintiff voted against the resolution since he was of the view that GORE Transaction was not in the best interests of Tetragon. Nor, in my judgment, can the Plaintiff establish to the required standard of a *prima facie* case that any of the Executive Directors and the Independent Directors failed to consider or understand the objections which he and his lawyers had raised either before or at the board meeting before the vote took place. I am persuaded, on the necessarily provisional basis at this stage of the proceedings, that this head of claim raises commercial issues and that the Plaintiff cannot show a *prima facie* case of breach of this duty. As the Defendants submitted, and as is often discussed in the case on this area of the law, such questions involve commercial judgement on the part of directors and the Courts are, as a general rule, ill-equipped to enter into consideration of such matters.

147.  In summary, there is, in my judgment, no evidence before the Court to establish a *prima facie* case under head B. The Plaintiff did obtain, at a rather late stage of the application, a written report from Mr Graham Harrison, an expert in the area of investments occupied by Tetragon. But I was not persuaded that I could safely accept his evidence as determinative of the required test under this head of claim, or, indeed, of any head of claim since, for no fault of Mr Harrison's, he was instructed to produce his report on the basis of what I consider to have been far too limited a selection of facts and documents.

148.  Under head F in the Cause, the Plaintiff claims that each of the Executive Directors and the Independent Directors acted negligently or, as it is pleaded, in breach of the duty to act to act with reasonable  care, skill and diligence. The details of the claim are pleaded in paragraphs 97 to 99 of the Cause. It is clear from the opening words in paragraph 97, and it was also made clear in argument, that the facts underlying this claim were essentially the same as those relied upon by the Plaintiff under heads D, E and B of the Cause.

149.  I am not persuaded that the Plaintiff has established a *prima facie* case under head F. As the Defendants submitted under paragraph 19 of Mr Davies' Outline document,

> "*[T]he directors spent five weeks analysing the transaction and reviewing materials prepared by [TFM] among others. It is common ground that they sought and received independent legal advice. The fact that they reached one conclusion, while [the Plaintiff] reached another, does not found a claim in negligence*."

I entirely agree with this submission.

150.  I also agree that, in a case like this case, where the Plaintiff does not suggest that the company should seek to rescind its entry into the transaction in question, it is to be expected that the case in damages should be carefully and fully pleaded. When the original version of the Cause was lodged, the case in damages was, in my view, rather minimally pleaded and

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B   Exhibit A - Transcription of Page 87 of 213   Page ID 3154
Guernsey Judgment ??/2013 – Jackson and Dear et al

the argument of Mr Le Tissier was that the loss to Tetragon from entering into the GORE Transaction would be found out on the carrying out of an inquiry as to damages.  I thought then that this was a case of putting the cart before the horse and that, on an application to strike out a derivative action, the Plaintiff would be expected to plead his (or, to be more precise, Tetragon's) case in damages, and to support it in evidence, sufficiently fully as to be able to establish a *prima facie* case.  I still hold this view, but no more than provisionally, although the case in damages has been more fully pleaded in the Cause, the draft of which was presented on 12 October 2011, which I think was amended to include the views of Mr Harrison and a Mr Deetz, who helped the Plaintiff and his advisers in presenting a case to the Court, but who did not give evidence himself.  But, since I have held that the Plaintiff has not on the facts shown a *prima facie* case of negligent breach of duty against any of the Executive Directors or the Independent Directors, it is not, in my view, either necessary or appropriate for me to deal further, at this preliminary stage of the proceedings, with the pleaded case in damages.

151.   I now turn to heads of claim A and AA in the Cause, which are developed in paragraphs 63 to 76 of the Cause.  The Scheme Rules are rules issued by the Guernsey Financial Services Commission ("the GFSC") and they impose requirements for the disclosure of information to investors and for notification in certain circumstances to the GFSC itself.

152.   Under rule 3.01 of the Scheme Rules "*relevant persons*" as defined in subsection 1 are prohibited from doing certain things unless the arm's length requirement in subsection 9 is satisfied.  This requirement is that the relevant arrangements must be at least as favourable to Tetragon as would be any comparable arrangement effected on normal commercial terms negotiated at arm's length with an independent party.  Under subsection 1 it is the obligation of the directors to take "*all reasonable steps to ensure*" that the relevant persons do not breach the arm's length requirement.  Attention was drawn to subsections 4 and 5 of rule 3.01.

153.   Interesting and lengthy argument was put to me by both parties on the impact, if any, of the Scheme Rules to the GORE Transaction.  I do not find it necessary for me to decide these questions on this application.  The Plaintiff's arguments that rule 3.01 was engaged were, in my judgment, *possibly* correct, but, in the light of my conclusion on the application of the proper test on this application to which I now turn, I shall not decide the questions relating to the application of rule 3.01.

154.   I agree with the submissions of the Defendants at paragraph 14 of Mr Davies' Outline document and in paragraphs 4 to 22 of his further Outline document of, I think, 1 or 2 December 2011, and I have decided that if the Scheme Rules were engaged, the Plaintiff has not established a *prima facie* case of breach of the rules by any of the Executive Directors or the Independent Directors.  I am satisfied that the Plaintiff has not shown to the required standard of a *prima facie* case that they failed to take reasonable steps to ensure that the arm's length requirement was met.

155.   The important points of evidence to note are, in my judgment, that the Independent Directors sought legal advice from Simpson Thacher, and more importantly on this aspect of the case, from their Guernsey Advocates Carey Olsen, and also sought the views of TFM and Houlihan Lokey.  Furthermore, as is made clear from pages 170-180 of the transcript of the Board meeting on 29 July 2010, issues relating to the Scheme Rules were raised and discussed during the meeting itself, including a passage where Mr Simpson of Ogier referred the directors, including, of course, the Plaintiff, to the requirements of rule 3.01.  Further, in my judgment, the Plaintiff's case under this head is, at most, well described as a mere technicality and he has not satisfied me, in any event, that there is *prima facie* case that Tetragon has suffered any loss by virtue of the alleged breaches of rule 3.01.

Case 21-03067-sgj    Doc 59-1    Filed 09/29/21    Entered 09/29/21 18:48:45    Desc
Case 3:23-cv-01503-B    Exhibit A - Jackson Document 18-4 Filed 08/31/23    Page 88 of 213    PageID 5155
Guernsey Judgment ??/2013 – Jackson and Dear et al

156.  A further claim, as developed in paragraphs 74 to 76 of the Cause, the claim under head AA
of the Cause, was added to the draft Cause in the 2nd amended draft.  The claim is alleged to
arise under section 34 of the Protection of Investors (Bailiwick of Guernsey) Law, 1987.
The Plaintiff, who was intimately involved in the events leading up to the board meeting on
29 July 2010 in his capacity as a director of Tetragon, claims to be entitled as an investor in
Tetragon, *i.e.* as a person adversely affected by the alleged breaches by the Executive
Directors and the Independent Directors; (*ex hypothesi* he must, I think, on his own case also
have been in such breach of duty to Tetragon.)

157.  I found this argument surprising and a little difficult to follow.  But, in any event, I was
persuaded that, in the event that I had found that the Plaintiff had not established a *prima
facie* case of a breach of rule 3.01, the case under section 34 cannot possibly get off the
ground.  In such circumstances, I consider the claim now to be virtually hopeless and it
should be struck out of the Cause.  In any event, although the claim under section 34 was
made by the Plaintiff personally, it was made clear in paragraph 76 of the Cause that any
damages recovered by the Plaintiff "*it was made clear that it shall accrue for the benefit of [Tetragon]*" and I formed
the view that the claim was realistically part of the derivative claims put forward by him on
behalf of Tetragon, and not a personal claim of any substance.

158.  I now turn to head of claim C in the Cause as developed in paragraphs 82 to 87 of the Cause
for damages from the Executive Directors and the Independent Directors for breach of
section 298 of the Companies Law, which relates to the provision of a certificate within a
Guernsey company's records, in circumstances where the terms of the section so require.

159.  This is also, in my view, an almost hopeless claim for the fundamental reason that the
Companies Law provides no civil remedy for a Guernsey company when such a breach has
been established.  Accordingly, any such breach cannot, in my judgment, sound in damages
at the suit of Tetragon.  The claim under head C must, therefore, be struck out on this
ground alone.  If I were wrong, I would have decided that the preponderance of the evidence
went to show that the provisions of section 298 were complied with in relation to the option
price included within the terms of the GORE Transaction and that the Plaintiff was not able
to establish a *prima facie* case that the statute had not been complied with by the board of
directors.  I would also mention, in passing the point, that the Plaintiff himself was a
director of Tetragon during the period from 29 July 2010 to about 24 January 2011 and it
would have been his responsibility as well as that of the rest of the Board to have ensured
that section 298 had been complied with.

160.  Since I have decided (i) that the entire Cause should be struck out as the Plaintiff has not
satisfied me that he has a *prima facie* case under any of the derivative claims in the Cause
and (ii) that his alleged personal claim under section 34 of the Protection of Investors
(Bailiwick of Guernsey) Law, 1987 was almost hopeless, I have not proceeded to deal with
the detailed submissions of both sides relating to matters which would only arise on the
second stage of the test set out in **Prudential Assurance v Newman Industries**.  The second
stage of the test would only come into play if a court were to find that a *prima facie* case had
been established, in which event the court would then proceed to decide whether or not any
of the claims set out in the pleading of the case, *i.e.* in our procedure under the Cause, were
able to stand free from the application of the rule in **Foss v Harbottle** as a result of an
exception to the rule applying.  No such point requires a decision in this case since the
Plaintiff has not satisfied the first limb of the test and I have accordingly struck out all of the
derivative claims.  On this basis the arguments based on ratification do not require a
decision from me either.

161.  As I did in my judgment on the injunction application, I apologise to the parties and to
Counsel that it has taken me such a very long time to deliver this judgment and thank them
for their patience and polite enquiries in the meantime.

© Royal Court of Guernsey

002831

Case 21-03067-sgj   Doc 59-1   Filed 09/29/21   Entered 09/29/21 18:48:45   Desc
Case 3:23-cv-01503-B-BT   Document 15-14   Filed 08/11/23   Page 89 of 213   PageID 9156
Guernsey Judgment ??/2013 – Jackson and Dear et al

162.  I shall hear any ancillary applications flowing from this judgment on Tuesday 26 March
2013.

**PATRICK TALBOT QC**
**Lieutenant Bailiff**
**26 March 2013**



# *204 **Prudential Assurance** Co. Ltd. v **Newman** Industries Ltd. and Others (No. 2)

 Positive/Neutral Judicial Consideration

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
5 October 1981

**Report Citation**
[1976 P. No. 112]; [1982] 2 W.L.R. 31
[1982] Ch. 204

Court of Appeal

Cumming-Bruce , Templeman and Brightman L.JJ.

1981 March 23, 24, 25, 26, 27, 30, 31; April 1, 2, 3, 6, 7, 8, 9, 13, 14, 15, 28, 29, 30; May 1, 5, 6, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22; June 2, 3, 4, 5, 10, 11, 22; July 27, 28, 30, 31; Oct. 5

*Company—Shareholder—Rights against company directors—Minority shareholder's action—Directors advising acquisition of another company's assets—Majority of shareholders voting to acquire assets—Directors having no control over voting rights —Whether minority shareholder entitled to bring action on behalf of itself, company and other shareholders suffering damage —Whether right to bring derivative action to be determined as preliminary issue*

The plaintiffs, P Ltd., held 3.2 per cent. of the issued ordinary shares in N Ltd., the first defendant. B, the second defendant, was at the material time the chairman and chief executive of N Ltd. and the third defendant, L, was a non-executive director and its vice-chairman. B was also the non-executive chairman of the fourth defendant, T.P.G., and its vice-chairman and chief executive.

Between 1972 and the end of 1974, T.P.G. acquired the assets of S Ltd. whose shares were beneficially owned by B and L and which owned 35 per cent. of T.P.G.'s shares and some of N Ltd.'s shares. T.P.G. increased its holding in Ltd. to 25 per cent. and also acquired shares in various other companies which it financed by the issue of its own shares and bank loans. By January 1975, T.P.G. was in serious financial difficulties and the "January agreements" were entered into whereby, undisclosed to the board of N Ltd., N Ltd. agreed to buy T.P.G.'s holdings in two companies for £85,000 and £146,000 respectively, and under the agreement, unbeknown to the board, N Ltd. paid £215,950.

B then prepared a memorandum ("the strategy document") which recommended that the board of N Ltd. should purchase from T.P.G. all its assets, except its shareholding in N Ltd. and a loan from S Ltd. of £100,000, in consideration of N Ltd. assuming T.P.G.'s liabilities and paying T.P.G. the sum of £350,000. At a board meeting all the directors except M agreed to accept the proposals in principle. On M's suggestion a report was obtained from N Ltd.'s auditors. The January agreements were concealed from the auditors who valued the assets as £325,000 and the board of N Ltd. accepted that valuation as a basis of negotiation.

© 2021 Thomson Reuters.

On June 3, 1975, B signed the agreement on behalf of N Ltd. ("the June agreement") for the purchase of the assets of T.P.G. for £325,000 which was conditional, as required by Stock Exchange regulations, on the approval of the shareholders of N Ltd. and T.P.G. Extraordinary general meetings  *205  of both companies were convened. The notice which convened the extraordinary general meeting of N Ltd. contained a letter signed by B, with documents annexed ("the circular") which recommended shareholders to vote in favour of the proposal and which referred to a payment of £216,000 by N Ltd. as being an advance payment for the purchase of T.P.G.'s assets. All the members of a committee of the board approved the letter apart from M. The extraordinary general meeting was postponed as a result of the pressure by M, the plaintiffs and other institutional investors in order that a report be prepared by a merchant bank, but before the report was ready, the meeting was held on July 29, 1975, and a resolution passed approving the purchase of T.P.G.'s assets by N Ltd.

By an amended writ and statement of claim, the plaintiffs claimed, inter alia, declaratory relief and as against B, L and T.P.G. damages on behalf of the plaintiffs, N Ltd. and all the shareholders of N Ltd. on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to relief. The plaintiffs were claiming in a direct capacity, in a derivative action on behalf of N Ltd. and in a representative capacity on behalf of the shareholders.

By a summons of May 10, 1979, the defendants applied to have heard as a preliminary issue whether the plaintiffs as a minority shareholder in N Ltd. were entitled to maintain the claim against them. On June 18, 1979, Vinelott J. refused the application and dismissed the summons.

On the hearing of the action in February 1980, Vinelott J. held, inter alia, that B and L, in order to benefit T.P.G. had conspired to injure N Ltd. and indirectly its shareholders whereby the shareholders had suffered damage and that, on the evidence, the interests of justice required that the plaintiffs as a minority shareholder in N Ltd. should be permitted to prosecute an action on behalf of the company.

On appeal by B and L:-

Held, allowing the appeal in part, (1) that on the evidence the serious findings against B and L of conspiracy and fraudulent conduct were not substantiated other than that they dishonestly concealed the January agreements and payments thereunder from the directors and shareholders of N Ltd. in order to facilitate the acceptance of the proposals in the strategy document; and that the dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment by N Ltd. of £216,000 to T.P.G. whereby the assets purchased by N Ltd. were overvalued by £45,000, thereby causing damage to N Ltd. by that amount (post, pp. 232B-D, 234D-E).

(2)  That where fraud was practised on a company, it was the company that prima facie should bring the action and it was only in circumstances where the board of the company was under the control of the fraudsters that a derivative action should be brought; that the question whether a company was under the control of those practising an alleged fraud on it should be determined before a derivative action was heard and, accordingly, the judge erred in not determining as a preliminary issue whether the plaintiffs should be allowed to proceed in their derivative action (post, pp. 211A, B, 221A-B); but that, since the action had been heard and N Ltd. had indicated that it would, as a party to the action, take the benefit of an order made in its favour, the question  *206  whether the plaintiffs had status to bring the derivative action did not arise for determination (post, p. 220C-F).

Per curiam. It is doubtful whether it is a practical test of an exception to the rule in *Foss v. Harbottle (1843) 2 Hare 461* that the justice of the case requires the bringing of a derivative action (post, pp. 221F - 222B). The right to bring a derivative action should not be determined as a preliminary issue on the hypothesis that all the allegations in the statement of claim of "fraud" and "control" are facts. Whatever may be the properly defined boundaries of the exception to the rule, the plaintiff before proceeding with his action ought at least to be required to establish a prima facie case that the company is entitled

© 2021 Thomson Reuters.

to the relief claimed and the action falls within the proper boundaries of the exception to the rule in *Foss v. Harbottle* (post, pp. 221F - 222B).

(3) That the plaintiffs' personal action, to which the representative action was linked, was an action to recover damages on the basis that the company in which the plaintiffs were interested had suffered damage; that, since the plaintiffs' right as holders of shares was merely a right of participation in the company on the terms of the articles of association, any damage done to the company had not affected that right and, accordingly, the action was misconceived (post, pp. 222F - 223B).

*Order of Vinelott J. [1981] Ch. 257; [1980] 3 W.L.R. 543; [1980] 2 All E.R. 841* varied in part.


The following cases are referred to in the judgment:

*Atwool v. Merryweather (1867) L.R. 5 Eq. 464; 37 L.J.Ch. 35* .
*Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, C.A.* .
*Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450* .
*Cotter v. National Union of Seamen [1929] 2 Ch. 58, C.A.* .
*East Pant Du United Lead Mining Co. Ltd. v. Merryweather (1864) 2 Hem. & M. 254* .
*Edwards v. Halliwell [1950] 2 All E.R. 1064, C.A.* .
*Foss v. Harbottle (1843) 2 Hare 461* .
*Gray v. Lewis (1873) L.R. 8 Ch.App. 1035* .
*Heyting v. Dupont [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97* ; *[1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A.* .
*Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474* .

The following additional cases were cited in argument:

*Cockburn v. Thompson (1809) 16 Ves.Jun. 321* .
*Wallworth v. Holt* (1841) 4 My1. &; Cr. 619.

APPEAL from Vinelott J.

The plaintiffs, Prudential Assurance Co. Ltd., held 3.2 per cent. of the issued ordinary shares of the first defendant, Newman Industries Ltd. The second defendant, Alan Frank Bartlett, was at the material time the chairman and chief executive of Newman and the third defendant, John Knox Laughton, was a non-executive director and its vice-chairman. Mr. Bartlett was also the non-executive chairman of the fourth defendant, Thomas Poole & Gladstone China Ltd. (T.P.G.) and Mr. Laughton its vice-chairman and chief executive.

*207

Between 1972 and the end of 1974, T.P.G. acquired interests in various companies including the assets of Strongpoint Ltd., whose shares were beneficially owned by Mr. Bartlett and Mr. Laughton and which owned 35 per cent. of the shares of T.P.G. and a number of Newman shares. T.P.G. also increased its holding in Newman to 25 per cent. and acquired shares in Alfred Clough Ltd., S. Newman Ltd. (a private company), Dover Engineering Ltd., Metropole Industries Ltd. and Agar Cross Ltd. T.P.G. also formed a new company, Smithamcote Ltd., to acquire shares in two other companies in exchange for shares in Smithamcote. T.P.G. took 49 per cent. of voting shares of Smithamcote and sold to Smithamcote for £100,000 (which remained outstanding as a debt due from Smithamcote) shares of an investment company into which had been put T.P.G.'s minority holding of shares of S. Newman Ltd. T.P.G.'s acquisitions were financed by the issue of its own shares and loans from banks. By January 1975 it was in serious financial difficulty and, in those circumstances, the "January agreements" were entered into by which, undisclosed to the Newman board, Newman agreed to buy T.P.G.'s shareholdings in Metropole and Dover for £85,000 and £146,000 respectively. The amount was above the value of those shares on the Stock Exchange and, under the agreements, Newman paid £215,950 unknown to the Newman board, although the sum mentioned in the circular referred to below was £216,000.

Mr. Bartlett then prepared a memorandum ("the strategy document"), which made a recommendation to the Newman board, inter alia, that Newman should purchase from T.P.G. all its assets, except its shareholding in Newman and a loan from Strongpoint of £100,000, in consideration for Newman assuming T.P.G.'s liabilities and paying to T.P.G. the sum of £350,000. At a board meeting all the directors, except Mr. Angus Murray, agreed to accept the recommendation in principle and, on Mr. Murray's suggestion, a report was to be obtained from Newman's auditors, Deloitte & Co. Mr. Cooper of Deloitte made a valuation of the net assets to be acquired by Newman but, in making that valuation, the January agreements were concealed from him, and, after

speaking to Mr. Laughton, he increased his provisional assessment of the assets from £235,000 to £325,000. The board accepted that valuation as a basis for negotiation. On June 3, Mr. Bartlett signed on behalf of Newman an agreement for the purchase of the assets of T.P.G. for £325,000 ("the June agreement") but the agreement was conditional on the approval of Newman and T.P.G. As the agreement was between companies having among their directors the same people, the Stock Exchange regulations required that the agreement be approved at extraordinary general meetings of Newman and T.P.G. With the notice convening the extraordinary general meeting of Newman, a letter signed by Mr. Bartlett with documents annexed ("the circular") was sent to the shareholders. The letter stated that the directors of the Newman board recommended that the shareholders voted in favour of the proposal. The letter had been approved by the members of a committee of the board except for Mr. Murray, who objected to it on the basis that not all the directors had considered and approved the proposals. The extraordinary general meeting was postponed as a result of pressure from Mr. Murray, the plaintiffs and other institutional investors, so that *208* a report could be prepared by the merchant bankers, Schroder, Wagg & Co. The report could not be produced in time, and a resolution was passed at an extraordinary general meeting of Newman held on July 29, 1975, approving the purchase of T.P.G.'s assets by Newman.

By an amended writ and statement of claim, the plaintiffs, Prudential Assurance Co. Ltd., sued (i) on behalf of themselves and all the shareholders of Newman other than Mr. Bartlett and T.P.G.; (ii) in the plaintiffs' personal capacity; and (iii) on behalf of all the shareholders of Newman on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to damages. They claimed, inter alia, a declaration that the circular sent by Newman to their shareholders and signed by Mr. Bartlett, was and had at all times been misleading and/or tricky; damages against Mr. Bartlett and Mr. Laughton for conspiracy and breach of duty; and further or in the alternative as against the fourth defendant T.P.G., a declaration that in entering the agreement of June 3, 1975, or in the alternative in receiving the money under the terms of the agreement, when it knew or ought reasonably to have known that for Newman to enter into the agreement, upon the terms on which it did so, involved a conspiracy and breach of duty on the part of Mr. Bartlett and Mr. Laughton, T.P.G. (a) acquired the benefit of the agreement as constructive trustees of Newman and, accordingly, held the benefit of the agreement on trust for Newman, and (b) was liable to account to Newman for the full amount of the loss suffered by Newman as a result of the acquisition of the benefit.

By their defence the defendants denied the allegations made by the plaintiffs and claimed that the plaintiffs were not entitled to any of the relief claimed. They sought to have heard as a preliminary issue whether the plaintiffs, as a minority shareholder in Newman, were entitled under the rule in *Foss v. Harbottle (1843) 2 Hare 461* to maintain the claim against them. On June 18, 1979, Vinelott J. refused the defendants' application: see *[1981] Ch. 229* , 233.

Vinelott J. found that Mr. Bartlett and Mr. Laughton had conspired to injure Newman and indirectly the shareholders with the result that Newman had acquired T.P.G.'s assets for £445,000 more than Newman need have paid for them. He held that since the plaintiffs' personal, derivative and representative claims were all founded on the conspiracy to injure Newman, there was no objection to them being joined in one action and, although Mr. Bartlett and Mr. Laughton did not have control of Newman, it was doubtful whether the shareholders would have the independent advice which would enable them to exercise a proper judgment on whether Newman should bring an action and, in those circumstances, justice required the court to entertain the action of a minority shareholder.

The defendants Mr. Bartlett and Mr. Laughton appealed. On July 27, 28, 30, 31 the Court of Appeal delivered a reserved judgment divided into seven chapters under the headings: (1) Introduction; (2) The position of Newman Ltd. and T.P.G. Ltd. on March 31, 1973; (3) Events after March 31, 1973; (4) The proceedings; (5) The law; (6) The examination *209* of the judgment of Vinelott J.; and (7) Conclusions. Only chapters 5 and 7 are included in this report.

On July 31, no order was made by the court and the matter was adjourned for argument on the form of the order and costs. On October 5 the parties stated that all outstanding matters between them had been settled.

The second and third defendants, Mr. Bartlett and Mr. Laughton, appeared in person on the hearing of the appeal.

*Leonard Caplan Q.C., Peter Curry Q.C.* and *Philip Heslop* for the plaintiffs.

*Robert Reid Q.C.* and *David Hodge* for the first defendant.

The fourth defendant did not appear and was not represented on the hearing of the appeal.

*Judith Jackson,* on October 5, for the second and third defendants.

© 2021 Thomson Reuters.

002836    4

*Jules Sher Q.C.* and *Charles Turnbull,* on October 5, for the fourth defendant.

*Caplan Q.C.* for the plaintiffs. The rule in *Foss v. Harbottle (1843) 2 Hare 461* is a rule of procedure and not of substantive law. A minority shareholder can sue the company where the needs of justice so require. The rule is of respectable antiquity and on the facts of the present case, the plaintiffs were entitled to prosecute an action on behalf of the company as a minority shareholder in the interests of justice.

[On June 10, 1981, the court stated that argument on the exception to the rule in *Foss v. Harbottle* was not open to the plaintiffs as a demurrer because the preliminary issue was not the subject of appeal in the court. The preliminary point had been overtaken by the decision in the trial before Vinelott J. *[1981] Ch. 257* . For these reasons, the court did not wish to hear further argument on the matter.]

*Cur. adv. vult.*

July 27, 28, 30, 31. CUMMING-BRUCE, TEMPLEMAN andBRIGHTMAN L.JJ.

took it in turns to read the following judgment of the court. In the course of the introduction their Lordships said:

The great length of this judgment has naturally caused us to consider whether it would be sensible to hand down a typed or printed version, as an alternative to the many hours in court which will inevitably be spent on delivering our judgment. We have rejected this obvious and convenient expedient for two reasons. First, the appellants have been found guilty by the trial judge of a civil conspiracy in circumstances which, subject to stricter procedures, could equally well have led to their conviction on a charge of criminal conspiracy. In such circumstances we think that whichever way our verdict may go we should express our conclusions orally in open court. Secondly, the delay which would be caused by typing or printing and then proof-reading a written judgment suitable for handing down would postpone judgment over the Long Vacation. When men's reputations are at stake, we do not think it is right to impose an avoidable two months delay. [Having read chapters one to four, they continued:]

   *\*210  Chapter 5 - The law*

As we have indicated, when, on January 9, 1976, the writ was issued the plaintiffs, Prudential Assurance Co. Ltd., sued only in their personal capacity and sought only to establish that the June agreement had not been duly approved at a valid meeting. When the writ was first amended in red on March 8, 1976, the title of the plaintiffs was altered so as to indicate that it was suing on behalf of Newman, the first defendant, using the time-honoured formula for this purpose "On behalf of themselves and all other shareholders, etc...." The writ was also amended by adding Mr. Laughton and T.P.G. as defendants. The writ was expanded by claiming as against T.P.G. rescission of the agreement and damages; and also, as against Mr. Bartlett and Mr. Laughton, damages for breach of duty and damages for conspiracy.

As we have already related, it was a matter of debate in the court below whether the action as reconstituted was exclusively a "derivative" action for an injury allegedly done to Newman, as counsel for Mr. Bartlett and Mr. Laughton assumed, or was additionally a "personal" action for injury allegedly done to the plaintiffs and other shareholders. Whether the action as then constituted and the claim as then formulated could properly be regarded as pursuing both derivative and personal remedies is not a matter which we need to consider.

A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule ir *Foss v. Harbottle (1843) 2 Hare 461* when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence. The rule in *Foss v. Harbottle* also embraces a related principle, that an individual shareholder cannot bring an action in the courts to complain of an irregularity (as distinct from an illegality) in the conduct of the company's internal affairs if the irregularity is one which can be cured by a vote of the company in general meeting. We are not concerned with this aspect of the rule.

The classic definition of the rule in *Foss v. Harbottle* is stated in the judgment of Jenkins L.J. in *Edwards v. Halliwell [1950] 2 All E.R. 1064* as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule

if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm *211 a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

By their summons issued on May 10, 1979, Mr. Bartlett and Mr. Laughton invoked the rule in *Foss v. Harbottle.* After some 2½ days of argument Vinelott J. dismissed the summons on June 18, 1979, not on the ground that the plaintiffs were entitled to bring a derivative action but on the ground that it was more convenient to decide that issue after the action had been tried. For reasons which we explain later we have no doubt whatever that that was a wrong decision.

Although not a party to the summons of May 10, Newman supported it. Newman was represented by leading counsel, who made a forceful statement on day 1 to the effect that, although the action was brought for the benefit of Newman, "it is the concern of the board that the company shall not be killed by kindness." He added that not only was it the view of the board that the action was one which they did not wish to pursue on behalf of the company but that it was quite contrary to the interests of the company that the transaction should now be the subject of any rescission or criticism. He said: "I am therefore concerned ... that this action ... shall not proceed - a fortiori ... it should be disposed of as quickly as possible." This protest was repeated at the close of the plaintiffs' case on day 34, when counsel formally withdrew in order to avoid needless expense. This is what counsel then told the court:

"My clients, Newman Industries Ltd., are necessary formal parties to this action, but they are neither prosecuting it as a corporate entity nor now defending it in a combative role. The circumstances of the case ... as far as my researches go are unique. They are unique from the company's point of view in this particular material respect in that, although the action is framed in part as a minority shareholder's action, there is in fact no shareholding or board control vested in the personal defendants. Indeed, as regards the Newman board Mr. Laughton has not been a director since before the commencement of this action, and Mr. Bartlett, although holding such office, has at all material times been but one only of a number of directors comprising the present Newman board. As I indicated briefly to your Lordship at the commencement of this trial, my learned junior and I were at pains to defend it by decision of the independent board, that is to say Mr. Bartlett taking no part in that decision. The independent board, so I have it, was motivated by the desire and wish that your Lordship might be afforded every assistance which a substantial public quoted company might be expected to render a court concerned with its affairs.... The independent board itself has throughout maintained the view that, whilst it was powerless to prevent the Prudential from pursuing the action, it was not one it, the independent board, *212 wished to adopt on Newman's behalf, nor had it been approached by any shareholder requesting that it should. It has been and in fact remains the view of the independent board that any advantage to the company which this action could procure for it is vastly outweighed by harm being inflicted upon it by the action continuing with the consequent adverse publicity and other side effects."

Observe what was being said on behalf of Newman to the judge: "any advantage to the company which this action could procure is *vastly outweighed* by harm being inflicted upon it." This was an apparently responsible statement made by eminent leading counsel on the instructions of persons said to be the independent members of the board. The judge does not refer to this statement in his judgment; he does not say that he did not believe it; he does not say that he regarded the independent members of the board as acting under the influence of Mr. Bartlett. He does not seem to have asked himself the all-important question: "Ought I to be trying a derivative action?"

The assertion by Newman's counsel that the independent board "was powerless to prevent the Prudential from pursuing the action" may have been based on the supposition that the plaintiffs had on the facts alleged in the statement of claim a personal cause of action for damages against Mr. Bartlett and Mr. Laughton independently of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued its own summons before the trial in order to test the right of the Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings.

At the end of the day the judge found that a fraud had been committed by Mr. Bartlett and Mr. Laughton against Newman. The judge then addressed his mind to the question whether the right of a shareholder to sue in a case of fraud extended beyond a

002838

6

case of voting control by the wrongdoers. It was not pleaded, and could not be alleged, that Mr. Bartlett and Mr. Laughton had voting control. The conclusion reached by the judge was that a shareholder was entitled to prosecute an action on behalf of the company if "the interests of justice do require that a minority action should be permitted" see *[1981] Ch. 257* , 327; and that this was established in the instant case because the judge was satisfied on the evidence as a whole:

> "that there was no way in which Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction including in particular Mr. Cooper's valuation."

In widening the scope of the accepted exception to the rule in *Foss v. Harbottle* by holding that a derivative action can be maintained whenever the interests of justice so require, the judge, at pp. 322-323, drew attention to references to "the justice of the case" which appear in some of the  *\*213*  reported authorities on this topic: *Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474* , 480 and *Edwards v. Halliwell [1950] 2 All E.R. 1064* , 1067; to which may be added *Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503* , 518; *Cotter v. National Union of Seamen [1929] 2 Ch. 58* , 69 and *Heyting v. Dupont [1964] 1 W.L.R. 843* , 851.

We turn now to certain of the authorities, starting with *Foss v. Harbottle, 2 Hare 461* . It came before Sir James Wigram V.-C., on demurrer. The facts are narrated in that report at intimidating length and can be summarised as follows. The company concerned was the Victoria Park Company, which had been incorporated by Act of Parliament in 1837 to develop certain plots of land. There were eight promoters, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane. The directors were the first five of these gentlemen.

Lane was the architect and Bunting the solicitor. Foss and Turton were the complaining shareholders. They filed a bill on behalf of themselves and all other shareholders in the company (except the defendants) against the eight promoters, including the assignees of three of them who had become bankrupt. It was alleged that the plots had been bought by the company in pursuance of an arrangement fraudulently concocted between seven of the promoters to enable them to derive a personal benefit from the establishment of the company and the sale to it of the plots at exorbitant prices. It was further alleged, at pp. 478-479, 480:

> "... the defendants concealed from the plaintiffs ... the several fraudulent and improper acts of the ... defendants, and the plaintiffs ... had only recently ascertained the particulars thereof ... and they were unable to set forth the same more particularly, - the defendants having refused to make any discovery thereof, or to allow the plaintiffs to inspect the books, accounts, or papers of the company ... and that at [general meetings of the company] false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed."

The bill charged that, in the circumstances, the defendants were jointly and severally liable to make good to the company the losses incurred in consequence of the wrongful and fraudulent acts and proceedings to which they were parties or privies. The defendants (except Byrom, who took no part) demurred to the bill on the ground that the corporation was not before the court, and that the defect could not be cured by making the corporation a defendant because the plaintiffs were not entitled to represent the corporation.

For the purposes of the application Wigram V.-C. made the assumption that the company was entitled, as matters then stood, to complain of the transactions mentioned in the bill. He continued at pp. 490-491, 492:

> "... the bill ... is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation,  *\*214*  except those who committed the injuries complained of, - the plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.
>
> "It was not, nor could it successfully be argued, that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law, the corporation, and the aggregate members of the corporation, are not the same thing for purposes like this; and the only question can be, whether the facts alleged in this case justify a departure from the rule which prima facie would require that the corporation should sue in its own name and in its corporate character, or in the name of some one whom the law has appointed to be its representative.... If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except

© 2021 Thomson Reuters.

that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth v. Holt,* and other cases, would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

"But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, - rules, which, though in a sense technical, are founded on general principles of justice and convenience; and the question is, whether a case is stated in this bill, entitling the plaintiffs to sue in their private characters."

Wigram V.-C. then proceeded to answer this question in the negative, for the reasons indicated in the following extracts from his judgment, at pp. 492-493:

"... the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within the scope of the company's powers, as well as to control the directors in any acts which they may have originated.... The first ground of complaint is one which, though it might prima facie entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation...."

Wigram V.-C. then considered the second ground of complaint (which we need not deal with) and continued, at pp. 493, 494-495:

"... whilst the supreme governing body, the proprietors at a special  *215  general meeting assembled, retain the power of exercising the functions conferred upon them by the act of incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the plaintiffs on the present record ... the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the court may be declaring the acts complained of to be void at the suit of the present plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority, is decisive to show that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained, it must be shown either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is, whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a court of justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights."

These questions were answered against the plaintiffs.

The next case which falls for consideration related to the fraudulent promotion of some worthless lead mines. There were in fact two actions. It is important to observe that in the first action there was a motion to strike out, but no such motion in the second action, which proceeded to trial. The first action is reported as *East Pant Du United Lead Mining Co. Ltd. v. Merryweather (1864) 2 Hem. & M. 254* . It was alleged that Merryweather, a director of the company, acting in concert with one of his co-directors, Whitworth, had fraudulently sold the mines to the company for £4,000 cash, which they shared between themselves, and 600 shares, to be allotted to Merryweather. In June 1864 a bill was filed in the name of the company against Merryweather to set aside the sale. In August the defendant moved to strike out the bill by way of demurrer. The court adjourned the application in order to allow an opportunity for a general meeting to be held. The meeting was held in October. A  *216  resolution was

002840

Case 21-03067-sgj   Doc 59-2   Filed 09/29/21   Entered 09/29/21 18:48:45   Desc
Case 3:21-cv-01604-X Document 1-4 Filed 07/09/21 Page 98 of 213 PageID 2765
Prudential Assurance Co Ltd v. Newman Industries Ltd. [1982] Ch. 204 (1981)
Exhibit B to Declaration of Robert W. Wood Page 98 of 213 PageID 2765

proposed for adopting the proceedings and continuing the action. Whitworth proposed an amendment to stay the action and refer the dispute to arbitration. The amendment was put to the vote, and a poll was taken. Out of 668 votes cast 324 were against the stay and 344 were in favour of the stay, but of the latter 78 votes were cast by Merryweather and 28 votes by Whitworth; if Merryweather had not voted, the motion would have been supported by only 266 votes and would have been lost. It was argued by counsel for the company, at p. 257:

> "If a minority of a company were allowed to file a bill in the company's name, charging fraud against some of the majority, and alleging that those persons were not to be considered as shareholders or entitled to vote, and thus endeavouring to turn their minority into a majority so as to acquire the right to use the name of the company, any company's affairs might be made the subject of litigation, upon allegations of fraud which might be entirely false; and yet, as this could not be proved till the hearing, irremediable mischief might be done in the meantime."

Page Wood V.-C. acceded to the motion, expressing his reasons, at p. 261:

> "Then comes the question, has the company now sanctioned the suit? To decide that it has done so, would be to discard Mr. Merryweather's votes, and to do that would, in effect, be to decide now on this application the question at issue in the suit. But if I assume, as upon this motion I must assume, that Mr. Merryweather was entitled to the 600 shares which he actually holds in the company, the further question occurs, has he a right to vote in respect of such shares upon a question in which he is personally interested? Now as to the management of the company by the board, no director is entitled to vote as a director in respect of any contract in which he is interested; but the case is different when he acts as one of the whole body of shareholders. The shareholders of one company may have dealings with interests in other companies, and therefore it would be manifestly unfair to prevent an individual shareholder from voting as a shareholder in the affairs of the company. At a general meeting, therefore, Mr. Merryweather's votes must be held to be good, so long as he continues to hold his shares. Further than this, the court cannot be asked now to give an opinion, for to do so would be to decide the very question at issue in the cause."

A shareholder then began another action in December, suing on behalf of himself and all other shareholders (except Merryweather and Whitworth) against Merryweather, Whitworth and the company. This is reported as *Atwool v. Merryweather* in a footnote to *Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450* , 464, and more fully in *37 L.J.Ch. 35* . On this occasion the defendant did not move to strike out the bill. The action was fought to a finish. Page Wood V.-C. held, first, that the contract was a complete fraud, and secondly, that there was not such a defect in the constitution of the suit as would be fatal according to the authority of *Foss v. Harbottle.* Page Wood V.-C. referred to the fact that there was  *217*  plainly a majority of shareholders, independent of those implicated in the fraud, who supported the bill.

The principles which seem to emerge from these two cases are (i) that if the defendant against whom fraud is alleged applies to strike out the action in limine, it will not be assumed that he was guilty of fraud so as to disentitle him from casting his votes at a general meeting against the action; but, (ii) that if the action is in fact fought to a conclusion, and the court finds the defendant guilty of fraud, it will in those circumstances discount the votes of those implicated in the fraud in reaching a conclusion whether the plaintiff is authorised to sue on the company's behalf. What the two cases leave open is the question in what circumstances the alleged delinquent, or the company, can halt the proceedings in limine.

Vinelott J. placed considerable reliance on this case in widening the accepted exception to the rule in *Foss v. Harbottle.* He said *[1981] Ch. 257* , 320:

> "... *Atwool v. Merryweather, L.R. 5 Eq. 464* shows that the court has jurisdiction to entertain a claim by a minority shareholder and to make an order in favour of the defendant company even where the other defendants, alone or together with the plaintiffs, do not have a majority of votes in general meeting and where the other shareholders are not parties. If that is so, then as I see it, the exception can only be founded on a general jurisdiction of the court to make an order for recovery of property or damages in favour of a defendant company against co-defendants where the jurisdiction is invoked by a minority shareholder."

We doubt whether *Atwool v. Merryweather* goes so far in support of the judge's conclusion. It was not a case in which the company or the delinquents sought to stop the action in limine. The action had been fought to a conclusion, the liability of

© 2021 Thomson Reuters.

the defendant directors had been established, and nothing, therefore, remained except for the company to reap the benefit of the judgment. The court could hardly deny the right of the plaintiff to an order in favour of the company to give effect to its proved rights, in the face of a resolution which, excluding the votes of the proven fraudsters, was a majority resolution. Page Wood V.-C. said, at p. 468:

"having it plainly before me that I have a majority of the shareholders, independent of those implicated in the fraud, supporting the bill, it would be idle to go through the circuitous course of saying that leave must be obtained to file a bill for the company, and pro forma have a totally different litigation."

There is a clear distinction to be drawn between the application of the rule in *Foss v. Harbottle* when it is sought to stay proceedings in limine, and its application when nothing remains but to enforce a judgment in a derivative action which has been permitted to proceed.

A simple application of the first aspect of the rule in *Foss v. Harbottle* is to be found in *Gray v. Lewis (1873) L.R. 8 Ch.App. 1035* . The facts, shortly stated, were as follows: Charles Lafitte & Co. Ltd. ("the company") was incorporated in December 1865 to purchase the right to extend to this *\*218* country the business of Charles Lafitte & Co. of Paris ("the partnership"). The plaintiff Gray subscribed for shares. The company never acquired anything from the partnership, and was ordered to be wound up in November 1866. Shortly thereafter Gray filed a bill on behalf of himself and all other shareholders in the company, against the company, its directors, its liquidator and the National Bank, alleging that the assets of the company had been misapplied by the National Bank and by the directors of the company, and seeking an order that the bank and the directors of the company might be declared liable to make "good to the shareholders of the company" the loss sustained "by the shareholders." Sir Richard Malins V.-C. made a decree declaring that the bank and the directors were liable to replace the money, and directed that the amount found due should be paid into court. The National Bank, and Lewis and Henshaw, two of the directors, appealed. The appeal of the National Bank was compromised with the concurrence of the liquidator, on the basis (clearly unobjectionable) that the National Bank should discharge the debts of the company. The appeal by Lewis and Henshaw came before the Court of Appeal in Chancery, and was allowed. The reasons were put trenchantly by James L.J., with whom Mellish L.J. agreed, in these words at p. 1050:

"The bill should not have been filed by a shareholder on behalf of himself and all other shareholders. It is very important, in order to avoid oppressive litigation, to adhere to the rule laid down in *Mozley v. Alston (1847) 1 Ph. 790* and *Foss v. Harbottle, 2 Hare 464* , which cases have always been considered as settling the law of this court, that where there is a corporate body capable of filing a bill for itself to recover property either from its directors or officers, or from any other person, that corporate body is the proper plaintiff, and the only proper plaintiff. One object of incorporating bodies of this kind was, in my opinion, to avoid the multiplicity of suits which might have arisen where one shareholder was allowed to file a bill on behalf of himself and a great number of other shareholders. The shareholder who first filed a bill might dismiss it, and if he was a poor man the defendant would be unable to obtain his costs, then another shareholder might file a bill, and so on. It was also stated to us in the course of the argument that even after the plaintiff had dismissed his bill against a particular defendant a fresh bill might be filed against the defendant so dismissed. Therefore there might be as many bills as there are shareholders multiplied into the number of defendants. The result would be fearful, and I think the defendant has a right to have the case made against him by the real body who are entitled to complain of what he has done.

"Now in this case I am of opinion that the only person - if you may call it a person - having a right to complain was the incorporated society called Charles Laffitte & Co. In its corporate character it was liable to be sued, and was entitled to sue; and if the company sued in its corporate character, the defendant might allege a release or a compromise by the company in its corporate character - a defence which would not be open in a suit where a plaintiff is suing on behalf of himself and other shareholders. I think it is of the utmost *\*219* importance to maintain the rule laid down in *Mozley v. Alston* and *Foss v. Harbottle,* to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their powers for the purpose of doing something fraudulent against the minority, who are overwhelmed by them, as in *Atwool v. Merryweather, L.R. 5 Eq. 464* , where Page Wood V.-C. under those circumstances, sustained a bill by a shareholder on behalf of himself and others, and there it was after an attempt had been made to obtain a proper authority from the corporate body itself in public meeting assembled."

This case highlights what the rule in *Foss v. Harbottle* is primarily concerned with, namely, is a plaintiff shareholder entitled to prosecute an action on behalf of the company for a wrong done to it, or ought the action to be struck out on the footing that it is for the company and not for a shareholder to sue? That is what *Foss v. Harbottle* itself was about, and what the first *East*

© 2021 Thomson Reuters.

*Pant Ducase, 2 Hem. & M. 254* , was about. The second *East Pant Du* case, *Atwool v. Merryweather, L.R. 5 Eq. 464* , raised a related but different question, namely, if at the end of the day fraud is proved, are the circumstances such that the company is capable of condoning the fraud? Clearly not, if the fraud will only be confirmed by a majority by the use of the fraudsters' own voting power.

It is commonly said that an exception to the rule in *Foss v. Harbottle* arises if the corporation is "controlled" by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see *Russell v. Wakefield Waterworks Co., L.R. 20 Eq. 474* , 482. But this proposition leaves two questions at large, first, what is meant by "control," which embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Secondly, what course is to be taken by the court if, as happened in *Foss v. Harbottle,* in the *East Pant Du* case and in the instant case, but did not happen in *Atwool v. Merryweather,* the court is confronted by a motion on the part of the delinquent or by the company, seeking to strike out the action? For at the time of the application the existence of the fraud is unproved. It is at this point that a dilemma emerges. If, upon such an application, the plaintiff can require the court to assume as a fact every allegation in the statement of claim, as in a true demurrer, the plaintiff will frequently be able to outmanoeuvre the primary purpose of the rule in *Foss v. Harbottle* by alleging fraud and "control" by the fraudster. If on the other hand the plaintiff has to prove fraud and "control" before he can establish his title to prosecute his action, then the action may need to be fought to a conclusion before the court can decide whether or not the plaintiff should be permitted to prosecute it. In the latter case the purpose of the rule in *Foss v. Harbottle* disappears. Either the fraud has not been proved, so cadit quaestio; or the fraud has been proved and the delinquent is accountable unless there is a valid decision of the board or a valid decision of the company in general meeting, reached without impropriety or unfairness, to condone the fraud.
*\*220*

We think that this brief look at the authorities is sufficient for present purposes. For it so happens that this court cannot properly on this appeal decide the scope of the exception to the rule in *Foss v. Harbottle.* The reason is this. Vinelott J. permitted the action by the plaintiffs on behalf of Newman to proceed, and there was no appeal from that decision. In the result he found that Newman was entitled as against Mr. Bartlett and Mr. Laughton to damages for conspiracy and breach of fiduciary duty, and he directed an inquiry as to damages subject to a stay in case of an appeal. Thereafter, Newman had three choices, subject to the operation of the stay. First, it might do nothing. In this case the plaintiffs would be entitled, if they so desired, to issue a summons to proceed with the inquiry. Secondly, Newman might decide for some proper reason, assuming that a proper reason might exist, and duly resolve at a proper board or general meeting, to proceed no further with the claim against Mr. Bartlett and Mr. Laughton. In this event, assuming that the resolution of the board or of the company in general meeting was in all respects proper, the plaintiffs would be unable to proceed with the inquiry because a valid release could be pleaded by Mr. Bartlett and Mr. Laughton. Thirdly, Newman might adopt the order which the plaintiffs had obtained on its behalf and pursue the inquiry accordingly. This would occasion no procedural problem nor even any special procedural step. Any party, plaintiff or defendant, can issue a summons to proceed upon an order. It would not be necessary for Newman to apply to be made a plaintiff, or to start a fresh action and rely upon the principle of res judicata, as was suggested at one time in the course of the argument. The order has been made. Newman is a party to the action. Newman can enforce the order. If this course were adopted, the rule in *Foss v. Harbottle* is irrelevant. The rule has no room to operate where the company itself is proceeding with an action, or to enforce a judgment, pursuant to a valid board or company resolution.

Newman by its counsel, acting (as we must assume) upon due authority conferred by the company, stated before us that if the finding of fraud stood it would accept the benefit of the order made in its favour. That is the end of *Foss v. Harbottle* so far as this appeal is concerned. It is plainly impossible for Mr. Bartlett or Mr. Laughton to prevent the board of Newman instructing its solicitors to proceed with the inquiry, and recovering from Mr. Bartlett and Mr. Laughton what may be certified to be due.

It was in the light of these considerations that we declined to hear any argument from Mr. Caplan and Mr. Curry on the topic of *Foss v. Harbottle.* However desirable it might be in the public interest that we should express our conclusions on Vinelott J.'s analysis of the rule in *Foss v. Harbottle* and what he saw as the exception to it, it was necessary for us to bear in mind that the rule had ceased to be of the slightest relevance to the case. It would have been a grave injustice to all parties to increase the already horrendous costs of this litigation by allowing time for argument on an interesting but irrelevant point. Such consideration of the law as appears in this judgment is, apart from a few  *\*221*  missions made by Mr. Bartlett, merely a reflection of our own thoughts without the benefit of sustained argument.

In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in *Foss v. Harbottle.* We desire, however, to say two things. First, as we have already said, we have no doubt whatever that

Vinelott J. erred in dismissing the summons of May 10, 1979. He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action. Such an approach defeats the whole purpose of the rule in *Foss v. Harbottle* and sanctions the very mischief that the rule is designed to prevent. By the time a derivative action is concluded, the rule in *Foss v. Harbottle* can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company; or the wrong is not proved, so cadit quaestio. In the present case a board, of which all the directors save one were disinterested, had, with the benefit of the Schroder-Harman report, reached the conclusion before the start of the action that the prosecution of the action was likely to do more harm than good. That might prove a sound or unsound assessment, but it was the commercial assessment of an apparently independent board. Obviously the board would not have expected at that stage to be as well informed about the affairs of the company as it might be after 36 days of evidence in court and an intense examination of some 60 files of documents. But the board clearly doubted whether there were sufficient reasons for supposing that the company would at the end of the day be in a position to count its blessings; and clearly feared, as counsel said, that it might be killed by kindness. Whether in the events which have happened Newman (more exactly the disinterested body of shareholders) will feel that it has all been well worth while, or must lick its wounds and render no thanks to those who have interfered in its affairs, is not a question which we can answer. But we think it is within the bounds of possibility that if the preliminary issue had been argued, a judge might have reached the considered view that the prosecution of this great action should be left to the decision of the board or of a specially convened meeting of the shareholders, albeit less well informed than a judge after a 72-day action.

So much for the summons of May 10. The second observation which we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in *Foss v. Harbottle* whenever the justice of the case so requires. We are not convinced that this is a practical test, particularly if it involves a full-dress trial before the test is applied. On the other hand we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of "fraud" and "control" are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding   *222  with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v. Harbottle.* On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting.

We turn to the personal action. In the statement of claim, as amended on day 12. the plaintiffs pleaded that Mr. Bartlett and Mr. Laughton

"in breach ... of their obligation to the shareholders ... conspired together to benefit T.P.G. at the expense of ... the shareholders," and that "in furtherance of such conspiracy and in breach of ... their obligation to the shareholders ... the defendants Bartlett and Laughton procured the circular to be ... distributed ... well knowing and intending it to be misleading and tricky"; and "by reason of the foregoing the defendants Bartlett and Laughton are in breach of ... their obligation to the shareholders."

In the amended prayer the plaintiffs in their personal capacity as a shareholder in Newman claimed damages for conspiracy against Mr. Bartlett and Mr. Laughton, and a declaration to the like effect on behalf of all other shareholders who had suffered damages and were on the register on July 29, 1975 (the date of the adjourned extraordinary general meeting). Counsel for the plaintiffs agreed before us that no facts are relied upon in support of the personal claim which are not relied upon in support of the derivative claim.

Vinelott J. upheld the plaintiffs' personal claim, and also the representative claim with which it was linked. He began with the proposition, which accorded with his findings, that Newman had been induced by fraud to approve an agreement under which Newman paid more (he thought about £445,000 more) than the value of the assets acquired and thus £445,000 more than it needed to pay; therefore Newman's indebtedness to its bankers immediately after the transaction (about £5m.) was £445,000 more than it would have been but for the fraud; therefore the fraud caused a reduction in net profits, which must have affected the quoted price of Newman shares; therefore, the plaintiffs suffered some damage in consequence of the conspiracy and that was sufficient to complete the cause of action, the quantum of damages being left to an inquiry.

© 2021 Thomson Reuters.

In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr. Bartlett did not dispute, that he and Mr. Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the  *223  market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.

Counsel for the plaintiffs sought to answer this objection by agreeing that there cannot be double recovery from the defendants, but suggesting that the personal action will lie if the company's remedy is for some reason not pursued. But how can the failure of the company to pursue its remedy against the robber entitle the shareholder to recover for himself? What happens if the robbery takes place in year 1, the shareholder sues in year 2, and the company makes up its mind in year 3 to pursue its remedy? Is the shareholder's action stayed, if still on foot? Supposing judgment has already been recovered by the shareholder and satisfied, what then?

A personal action could have the most unexpected consequences. If a company with assets of £500m. and an issued share capital of £50m. were defrauded of £500,000 the effect on dividends and share prices would not be discernible. If a company with assets of £10m. were defrauded, there would be no effect on share prices until the fraud was discovered; if it were first reported that the company had been defrauded of £500,000 and subsequently reported that the company had discovered oil in property acquired by the company as part of the fraud and later still reported that the initial loss to the company could not have exceeded £50,000, the effect on share prices would be bewildering and the effect on dividends would either be negligible or beneficial.

The plaintiffs in this action were never concerned to recover in the personal action. The plaintiffs were only interested in the personal action  *224  as a means of circumventing the rule in *Foss v. Harbottle. The* plaintiffs succeeded. A personal action would subvert the rule in *Foss v. Harbottle* and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed upon them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration. In this case it is neither necessary nor desirable to draw any general conclusions.

The rule in *Foss v. Harbottle* is founded on principle but it also operates fairly by preserving the rights of the majority. We were invited to give judicial approval to the public spirit of the plaintiffs who, it was said, are pioneering a method of controlling companies in the public interest without involving regulation by a statutory body. In our view the voluntary regulation of companies is a matter for the City. The compulsory regulation of companies is a matter for Parliament. We decline to draw general conclusions from the exceptional circumstances of the present case. But the results of the present action give food for thought. Vinelott J. thought it possible that Newman had suffered damage amounting to £445,000 by the fraud of Mr. Bartlett

002845

and Mr. Laughton. Counsel for Newman submitted in the court below that damage to Newman by the prosecution of the action exceeded the benefits liable to be derived from the action. The costs of the proceedings at the end of the trial were said in newspaper reports to be in the region of £750,000. If the judge's order is upheld and if the damages suffered by Newman are assessed at £445,000 and the costs at £750,000 then those damages and about 95 per cent. of the costs will fall on T.P.G. pursuant to the judge's order except in so far as they are recovered from Mr. Bartlett and Mr. Laughton. If Newman recover any damages they must indemnify the plaintiffs thereout against the difference between the costs of the plaintiffs paid by T.P.G. and (with small exceptions) the costs of the plaintiffs on a common fund basis. Part of Newman's costs must be borne by Newman in any event. Part of the plaintiffs' costs must be borne by the plaintiffs in any event.

If this appeal succeeds the burden of the costs on the plaintiffs will be enormous. The innocent shareholders of Newman, T.P.G. and the plaintiffs may well wonder, whether this appeal succeeds or not, if there is not something to be said after all for the old fashioned rule in *Foss v. Harbottle.*  *225  [Their Lordships then read Chapter 6 in which they examined the judgment of Vinelott J. and continued:]


Chapter 7 - Conclusions

The problems involved in this case were caused by the fact that the Prudential were the wrong plaintiffs.

If, indeed, Mr. Bartlett and Mr. Laughton defrauded Newman then the proper plaintiff was Newman. In an action by Newman against Mr. Bartlett and Mr. Laughton for defrauding the company, and against T.P.G. for enjoying the fruits of the fraud, the circular would be largely evidential The principal frauds pleaded would have been frauds practised on the directors and practised on Mr. Cooper. Each fraudulent representation or fraudulent concealment would have been pleaded with particularity. Furthermore, in an action by Newman against Mr. Bartlett and Mr. Laughton all the documents necessary to enable Newman to plead its case and to make sensible discovery would have been in the possession of Newman at the outset. Newman would have known which documents held by T.P.G. were relevant to be discovered. Newman would then have been in a position to determine which of the discovered documents were sufficiently important to produce to the court.

Mr. Caplan frankly admitted that the plaintiffs pleaded and relied upon the circular because that was the only document revealed to the plaintiffs as a shareholder and the only document upon which they could make out a case on the pleadings prior to discovery. Mr. Caplan also frankly admitted that conspiracy was only pleaded because the plaintiffs thought that a direct action could not succeed in the absence of a plea of conspiracy. The direct action was only pleaded because it was feared that the derivative action might be defeated by the rule in *Foss v. Harbottle, 2 Hare 461* .

In these circumstances discovery was a shambles, there was no proper selection of documents to be used at the trial because no one knew what to select and what to discard, and the pleadings were never adequately clarified or timeously amended. The complications and obscurities of the statement of claim and the reliance on the circular and the enormous weight of the discovered documents made it impossible for the defendants adequately to prepare for the trial or to foresee the course or length of the trial or to cope with the many trials of strength with regard to their recollection and probity.

The obscurities and confusion of the pleadings, the mass of documentary evidence, the fact that the Prudential, not being the proper plaintiffs, had no knowledge of what had gone on inside Newman and the assumed need to prove conspiracy led to the plaintiffs submitting that every Newman and T.P.G. document and every act or omission by Mr. Bartlett or Mr. Laughton was a badge of fraud, and to submit that Mr. Cooper's valuation was only explicable by cunning on the part of Mr. Laughton and incompetence on the part of Mr. Cooper, and that the directors of Newman were bemused and the advisers of Newman blinded.

The task of the judge was made very difficult because the pleadings of the plaintiffs were concentrated on the circular for tactical reasons  *226  connected with the personal action; the statement of claim was vague and obscure; the real issues were buried under general assertions of trickiness. The defendants' advisers, no doubt overwhelmed by the number of ingenious accusations of fraud which emerged, were not able adequately to assist the judge by defining those accusations which were material and sounded in damages, those accusations which were relevant but which did not give rise to any damage, and those accusations which were wholly irrelevant save as to credit.

As the case proceeded and the nature of the plaintiffs' accusations were gradually disclosed, it is not surprising that the judge decided to intervene and himself to ask questions in order to clarify the evidence being given by the witnesses. But we must criticise some of the interventions of the judge. When Mr. Murray was giving evidence, some of the interventions appeared only capable of being answered in a way which would confirm the views already formed by the judge. In the case of the evidence

© 2021 Thomson Reuters.

of Mr. Bartlett and Mr. Cooper some of the judge's interventions indicated that he had already formed a hostile view of the explanations that the witnesses were trying to give. Experienced counsel represented the plaintiffs and Mr. Bartlett. The judge should have allowed Mr. Scott to elucidate from his witnesses the evidence that they were trying to give, without interruption save in so far as it was necessary for clarification. and it was for Mr. Scott and Mr. Caplan to make their points in cross-examination. It is not appropriate for leading questions to be put from the Bench.

The judge found a conspiracy which had never been pleaded, and fraudulent conduct which had never been particularised. The plaintiffs, in this court, attempted to overwhelm us with 30 or more accusations of fraud, but in the end fell back on six claims which they submitted had been pleaded and found proven. Of those six the second was abandoned in the course of the submissions of Mr. Caplan.

The first claim concerns the commercial reasons. Those reasons must be read in the context of the information furnished by the circular with regard to the size of the minority shareholdings which were to be acquired in associated companies, the activities and trading results of the principal associated companies and the management influence said to have been obtained by the vendor T.P.G. through those minority shareholdings. So read, the commercial reasons informed the Newman shareholders that Newman would benefit from a development and expansion of Newman's international trade which would result from a partnership between Newman and the associated companies secured by the acquisition of T.P.G.'s minority shareholdings. In effect, Mr. Bartlett was imparting to the Newman shareholders his belief that he could influence the management of the affairs of Newman and the associated companies for the benefit of all concerned. So he believed. Therefore, to this limited extent the circular was not misleading or tricky to the knowledge of Mr. Bartlett and Mr. Laughton. But it does not follow, because there were valid commercial reasons for the transaction, that Mr. Bartlett and Mr. Laughton, as directors of Newman, recommended the transaction to the Newman shareholders in the bona fide belief that it was a transaction into  *227  which Newman ought to enter. On this aspect we express our conclusion later.

The second claim was abandoned. The third claim was that the circular was tricky and misleading in concealing that the attributed values of quoted associated companies were much higher than their current stock market values: see statement of claim added by amendment after the trial began, and the judgment *[1981] Ch. 257* , 294, 297.

The argument is that appendix 3 of the circular ought to have included a comparison between the stock market price and Mr. Cooper's value of each quoted shareholding in Metropole, Dover, Agar Cross and Clough.

The exact charge against Mr. Bartlett and Mr. Laughton is still not spelled out. The claim may mean that Mr. Bartlett and Mr. Laughton believed that Mr. Cooper's value exceeded a fair value for Newman to pay. It may mean that Mr. Bartlett and Mr. Laughton knew and believed that it was excessive for Newman to pay a price significantly in excess of the stock market price. It may mean that Mr. Bartlett and Mr. Laughton believed that Mr. Cooper's value represented a fair price for Newman to pay but realised that nevertheless the shareholders of Newman ought to have an opportunity of comparing the Stock Exchange price with Mr. Cooper's value. Whichever charge is made we consider that it has not been proved.

There is no evidence that Mr. Bartlett or Mr. Laughton thought that the value of the shares of Clough, Dover, Agar Cross and Metropole suggested in Mr. Laughton's letter to Mr. Cooper of April 11, 1975, was excessive for Newman to pay. There is no evidence that they were afraid of revealing Stock Exchange prices. Mr. Bartlett gave evidence that he did not believe that Stock Exchange prices were a reliable guide to the value of the shareholdings, carrying with them the opportunities and potentialities for which they had been purchased and which Newman acquired from T.P.G. Neither Mr. Cooper nor Schroders appear to have taken the view that Stock Exchange prices were a reliable guide. It was impossible for Mr. Bartlett to explain to the shareholders in the circular that Clough was a buy or sell situation together with the reasons. It was impossible to reveal to the shareholders the plans of Mr. Laughton and Mr. Bartlett with regard to Dover, Metropole and Agar Cross.

The fourth claim was that the circular was tricky and misleading in the indication that the £100,000 Smithamcote loan was worth its face value: statement of claim, paragraph 16; judgment *[1981] Ch. 257* , 296. The evidence is that Mr. Bartlett and Mr. Laughton believed that the loan was worth the S. Newman Ltd. shares and that the S. Newman Ltd. shares were worth more than £100,000.

The fifth claim is that the circular was tricky and misleading in the indication that the £30,000 Abbott debt was worth its face value: statement of claim, paragraph 16A added after the trial began, and judgment at p. 297. The evidence is that Mr. Bartlett and Mr. Laughton believed the Abbott loan to be worth £30,000 and that T.P.G. was willing to give Newman a guarantee of payment of principal and interest.

© 2021 Thomson Reuters.

It did not occur to Mr. Cooper to reduce the value of the debt because of the terms of the payment or the rate of interest. That being so, it is *228 not permissible to infer that Mr. Bartlett or Mr. Laughton considered that the value of the loan ought to be reduced and fraudulently concealed their belief.

The sixth claim is that the circular was tricky and misleading in that it concealed the January agreements: statement of claim, paragraph 18A.

We have already indicated that there was ample evidence to justify the finding of the judge that the January agreements, and the payments thereunder, were dishonestly concealed from the directors of Newman (to the extent that we have indicated) and from the shareholders of Newman with the object, inter alia, of facilitating the acceptance of the proposals set forth in the strategy document, and that this dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment of £216,000 by Newman to T.P.G.

As Mr. Angus Murray made plain in his evidence, he was always puzzled because it was difficult, in discussions with Mr. Bartlett, to discover whether, as he spoke, he was wearing a Newman or a T.P.G. hat. T.P.G. was a dealing and investment holding company. Newman was a trading company. If T.P.G. identified and developed a commercial opportunity, the moment might come when it would be sensible, in the interests of the companies, for Newman to take over the T.P.G. interest in a particular company. Hence Mr. Bartlett's proposals for "restructure" of Newman and T.P.G. interests in associated companies in early December 1974. and in its development of opportunities by improving the management of associates T.P.G. introduced into its associated companies those directors of Newman who were most suited to bring T.P.G.'s plans to fruition. Further, the T.P.G. holding in Newman shares, and the option held by Newman over shares of T.P.G., had the double effect that T.P.G. had a financial interest in the success of Newman, and Newman could use T.P.G.'s shareholding to protect Newman from a takeover by a third party at a time when its shares were unduly depressed on the market as a consequence of the general financial climate which had nothing to do with the profitability or assets of Newman. The period at the end of 1974, when T.P.G. was in serious liquidity trouble, coincided with the occasion when Mr. Bartlett genuinely regarded Newman as needing strengthening through diversification as Newman's existing manufacturing activities showed signs of contraction. Mr. Bartlett and Mr. Laughton were optimists, and Mr. Bartlett was always eager to impress his personal commercial judgment upon his colleagues on the Newman board. He met his match in Mr. Angus Murray, who was a concerned about the administrative capacity and organisation in Newman, worried about the risk of muddle through the close relationship of Newman and T.P.G., and rightly cautious about the risk of overstretching Newman's resources. He knew very little about the T.P.G. shareholdings, or about the reasons of Mr. Laughton in selecting them. In this his position was vastly different from that of Mr. Bartlett, Mr. Laughton, Mr. Bush and Mr. Baldwin, and from officials such as Mr. Gollop who understood the opportunities presented to Newman when the chance for stepping into T.P.G.'s shoes presented itself to Newman in February 1975. The first *229 serious Newman boardroom conflict was manifested on January 2, 1975. The evidence proves that Mr. Bartlett, with Mr. Laughton's support, then used every weapon available to carry the board with him as far as he could. He kept Mr. Murray in the dark and proceeded to enter into the January agreements and to arrange payments of the consideration to T.P.G. which in the event amounted to £216,000, knowing full well that Mr. Murray would have tried to prevent it had he known what w as happening. Once embarked on this course Mr. Bartlett and Mr. Laughton could or would not disclose to Mr. Murray and the Newman board as a board what they had done, and Mr. Bartlett ended by confusing the history of the £216,000 to Mr. Fryer of the Stock Exchange and misrepresenting it to the shareholders on July 8.

But these deceptions of Mr. Murray and of the shareholders at the extraordinary general meeting were not because they believed that the net consideration of £350 to £325,000 was too high. We are satisfied that throughout Mr. Bartlett believed that his original figure was about right and was content to rely upon his expectation that Deloittes would, after their independent investigation, arrive at much the same conclusion.

The judge accepted the plaintiffs' submission that Mr. Bartlett and Mr. Laughton must have known, and did know, that £350 to £325,000 was much too much. So he never had to consider the question whether the explanation of the facts lay in an attempt by Mr. Bartlett, with Mr. Laughton's concurrence, to keep Mr. Murray in the dark and thus carry the rest of the board with him.

So what the judge would have found about this explanation must remain unknown. But we are ourselves satisfied that this is the inference that should be drawn from the evidence of primary fact about the concealment of the January agreements and the advance payments of £216,000 made pursuant thereto.

Turning from the plaintiffs' claims as submitted in this court to the issues which we indicated in chapter 6, the first issue is whether Mr. Bartlett and Mr. Laughton genuinely believed that it was in Newman's interest to accept the proposals contained

© 2021 Thomson Reuters.

002848

16

in the strategy document. The evidence establishes that the transaction recommended in the strategy document, namely, the purchase by Newman of the undertaking of T.P.G. with certain exceptions, was a gamble from the start. In our judgment Mr. Angus Murray was quite right in 1975 in urging that it was not a gamble which Newman ought to take. The question, however, is whether Mr. Bartlett and Mr. Laughton genuinely believed that it was a gamble which it was in the interests of Newman to take, or whether they merely put forward the strategy document because T.P.G. needed to be rescued from a gamble which had failed. If Mr. Bartlett and Mr. Laughton urged Newman to gamble on the strategy document transaction not because they believed Newman should take the gamble but only because they could see no other way of rescuing T.P.G., then Mr. Bartlett and Mr. Laughton were fraudulent; it would matter not that they hoped the gamble would succeed and were content for the price to be assessed by an independent valuer. If, on the other hand, they believed that the strategy document recommendation was for the benefit of Newman because it represented  *230  a golden opportunity for Newman to reap the benefit of T.P.G.'s initiative at a fair price, then they were not fraudulent.

Quite rightly, counsel for the plaintiffs emphasised, both here and below, the financial difficulties which faced T.P.G. It does not follow that Mr. Bartlett and Mr. Laughton were guilty of fraud or breach of duty because the transaction benefited T.P.G. more than Newman, or even that it was inspired as a rescue operation for T.P.G. If a conflict of interest and duty arises because a transaction is proposed between two companies, and directors of one company are also directors of the other company, there are two, and only two, possible legal views on the legal viability of the transaction. Either the transaction is one which the directors can properly propose to each company, *despite* their conflict of interest and duty, or it is one which they cannot properly propose *because* of their conflict of interest and duty. The second view is basically correct in the case of overlapping trusteeships. The first view is rightly accepted as correct in the present case.

If, as we must assume, the transaction could properly go ahead despite the conflict of interest and duty, then Mr. Bartlett and Mr. Laughton were entitled to propose the transaction in order to benefit T.P.G.; and similarly they were entitled to propose the transaction in order to benefit Newman. Indeed, they were not entitled to propose the transaction except for the purpose of benefiting both Newman and T.P.G.

The court cannot and will not enter into an inquiry in order to discover whether the transaction would benefit one company more than the other, or whether Mr. Bartlett and Mr. Laughton believed it would. If such an inquiry were relevant, it would mean that the court would have to hold such a transaction void unless the transaction would be, or was thought to be, of equal benefit (whatever that might mean) to each company. Such an inquiry would be quite impracticable. It also follows that the transaction is capable of being upheld although initiated as a rescue operation for T.P.G. Every contract of sale must be initiated either by the vendor or by the purchaser. If a sale is legally viable between a particular vendor and a particular purchaser, the existence and nature and weight of the pressures affecting the initiator may explain the existence of a fraud but do not justify an inference of fraud.

The judge's findings that there was a conspiracy to benefit T.P.G. at the expense of Newman appear to indicate that he believed that the strategy document was not bona fide propounded by Mr. Bartlett and Mr. Laughton in the interests of Newman. But this and other indications in the judgment to the like effect are contradicted by the judge's comment *[1981] Ch. 257* , 330, that Mr. Bartlett

> "may well have believed that it would be for the ultimate benefit of Newman that it should be placed in relation to the network of associated companies in the central position which was originally to have been occupied by T.P.G."

We need not resolve these contradictions in the judgment because we do not consider that a dishonest motive on the part of Mr. Bartlett and Mr.  *231  Laughton in urging the adoption of the recommendations contained in the strategy document can now sound in damages.

Even if the recommendation by Mr. Bartlett and Mr. Laughton that Newman should gamble on the strategy document proposal was not bona fide made in the interests of Newman, in the result Newman did gamble, and gambled successfully. For obvious reasons Newman decided to keep the fruits of the gamble rather than demand repayment of the stake and hand over the fruits. If a punter is induced by fraud to bet on a horse and the horse loses, then the punter can recover his stake from the fraudster. But if the horse wins, then the punter cannot both keep his winnings and claim back his stake. In the present case Newman decided to keep its winnings. It is true that the purchase of the Smithamcote shares shows a loss against the value attributed to the Smithamcote shares by Mr. Cooper, but the transaction offered by T.P.G. and accepted by Newman was one transaction in which Newman gambled £1.5 million and obtained advantages which it has elected to keep. If Newman were induced to purchase the T.P.G. assets by fraud, then Newman, on discovering the fraud, could rescind the contract of purchase and claim damages, or,

© 2021 Thomson Reuters.

alternatively, claim damages for the fraud without rescission. But Newman having abandoned the remedy of rescission because the gamble paid off, has suffered no damage as a result of that fraud.

The second issue is whether Mr. Bartlett and Mr. Laughton believed that £350,000 was a fair price for Newman to pay for the acquisition of T.P.G.'s undertaking. The net consideration of £350,000 was based on assets worth £1.5 million subject to liabilities of £1,150,000. If Mr. Bartlett and Mr. Laughton thought that the assets were not worth £1.5 million but were only worth, for example, £1.3 million, then irrespective of any fraud involved in inducing Newman to gamble at all, Mr. Bartlett and Mr. Laughton were guilty of fraud in advising Newman to pay a price which to the knowledge of Mr. Bartlett and Mr. Laughton exceeded the price which Newman should be advised to pay. The fact that the gamble succeeded and that Newman intend to keep its winnings is irrelevant. Newman, on this hypothesis, lost £200,000 because they paid £200,000 more than Mr. Bartlett and Mr. Laughton knew to be a fair price for Newman to pay to acquire the assets.

In our judgment, however, there was no, or no sufficient, evidence from which the judge could properly find that Mr. Bartlett and Mr. Laughton did not genuinely believe that the assets were worth £1.5 million subject to an independent valuation.

There was no challenge to Mr. Bartlett's explanation of the origin of the figure of £350,000 in the strategy document or in the origin of the pro forma balance sheet. There was no, or no sufficient, evidence to support the theory of a conspiracy to procure a persuadable accountant instead of a non-persuadable merchant banker to act as valuer and then to persuade the valuer to accept inflated values for the Smithamcote shares, the Smithamcote loan and the Abbott loan, which were not capable of being inflated. There is no evidence that Mr. Laughton did not genuinely believe in the values he put forward in his letter dated April 11, 1975. All the events which we have chronicled and all the  *232  contemporaneous written evidence go to show that Mr. Bartlett and Mr. Laughton were confident rather than crooked and that Mr. Laughton's disappointment when Mr. Cooper first put forward a net consideration of less than £350,000 was genuine. The theory that Mr. Laughton then over-persuaded Mr. Cooper over the telephone is not supported by any evidence and was contradicted by Mr. Cooper. The theory that Mr. Cooper was over-persuaded was then fortified by the theory that Mr. Cooper was not competent.

The third issue is whether Mr. Bartlett or Mr. Laughton made false representations to, or knowingly concealed facts from, Mr. Cooper which might influence his valuation.

There is no, or no sufficient, evidence of any false representations to, or deliberate concealment from, Mr. Cooper in relation to any matter other than the January agreements and the payments thereunder. Again the plaintiffs' theories are unsupported by the contemporaneous evidence. We have dealt fully with the facts and inferences which are relevant to the January agreements and to the payments thereunder.

It must now be accepted that the January agreements and the payments thereunder were dishonestly concealed from the board of Newman to the extent indicated. They were not disclosed to Mr. Cooper. They should have been disclosed to Mr. Cooper because by accepting and retaining £215,950 in advance under the January agreements T.P.G. was adhering to the prices specified in the January agreements. Thus Mr. Bartlett should have mentioned the January agreements in the body of the strategy document, should have mentioned the January agreements to the board and should have told Mr. Cooper the facts concerning the January agreements and the payments. The January agreements and the payments should have been disclosed also because Mr. Laughton, who had agreed on behalf of T.P.G. to sell 800,000 Dover shares for £146,000 and to sell the Metropole shares for £85,000, had written to Mr. Cooper on April 11, 1975, saying that 832,000 Dover shares were worth £240,000 and that the Metropole shares were worth £350,000. The last payment of the instalments of the aggregate sum of £215,950 was made after Mr. Cooper had been instructed. Mr. Laughton should have told Mr. Cooper that £215,950 had been paid in advance when he was putting forward his arguments that £75,000 should be included in Mr. Cooper's valuation under the heading of interest. When Mr. Cooper later found out about the payment of £215,950 he was allowed to believe that the payments had been made on account of the strategy document transaction. Then Mr. Bartlett lied about the origin and purpose of the payments in advance to the shareholders at the extraordinary general meeting. He did that in order to conceal the existence of the January agreements, but there was no point in concealing the January agreements unless they were thought to be relevant or possibly relevant to the strategy document proposals and to the value of the assets. If Mr. Bartlett had been truthful at the extraordinary general meeting then at the very least there would, or might, have been a demand for Mr. Cooper to reconsider his valuation in the light of the January agreements and the payments thereunder. When the circular was prepared Mr. Bartlett knew that the January agreements  *233  were material because in evidence he said that the position was that if the strategy document proposals had not been accepted by the shareholders, then the January agreements would have been put forward. When the circular was prepared Mr. Bartlett and Mr. Laughton must have known that the statement that £216,000 was an advance payment for the strategy document transaction was at best a half-truth. They were originally payments on account of the January agreements and those payments had never been formally ratified and continued as payments on account of the strategy document proposal.

© 2021 Thomson Reuters.

002850

If the circular had been revised so as to disclose the January agreements and the payments, then Mr. Cooper, as a member of Deloittes considering and playing a prominent part in the production of the circular, would have had at least an opportunity to inquire about the January agreements and to reconsider his valuation in the light of those agreements.

The judge appears to have found that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper, because in his judgment Vinelott J. said:

"Mr. Cooper was not told of the sale in January of the shares in Metropole to Newman at the price of £85,000. He agreed that if he had known of this sale he would have found it impossible to attribute any value to the shares of Metropole except the agreed £85,000."

The judge made a similar comment about the Dover shares.

It is unsatisfactory that because the statement of claim was directed wholly to the circular, Mr. Bartlett and Mr. Laughton were not directly accused, and the judge did not directly hold, that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper. But we consider that the dishonest concealment from the board and the shareholders (amply proved) necessarily involved dishonest concealment from Mr. Cooper, even if Mr. Bartlett and Mr. Laughton did not appreciate wholly or at all the significance to Mr. Cooper of the January agreements in connection with value. Mr. Bartlett's untrue statements to the shareholders at the extraordinary general meeting and his acquiescence in misleading Mr. Cooper and in the form of the circular support the inference that from start to finish Mr. Bartlett and Mr. Laughton were dishonest in concealing the agreements from everybody concerned, namely, the board, Mr. Cooper and the shareholders. Although the statement of claim was directed in terms solely to the circular, Mr. Bartlett and Mr. Laughton must have appreciated, once the statement of claim raised the issue of the January agreements, that they were accused of concealing the January agreements and the payments thereunder at all times from January 7, 1975, until completion of the sale in July 1975, including concealment from Mr. Cooper. Mr. Bartlett gave evidence to explain why the January agreements and the payments thereunder were not disclosed and that explanation was not accepted by the judge.

It is not possible to be certain whether and to what extent Mr. Cooper's valuation would have been affected by a disclosure of the January agreements and payments. It was only after some tendentious  *234  cross-examination by Mr. Caplan and some forceful intervention by the judge that Mr. Cooper was persuaded to reach the conclusion which the judge had already reached, and to make the remarks upon which the judge relied.

Nevertheless we think that Mr. Cooper must have been impressed, and ought to have been impressed, by the fact that T.P.G. had accepted the prices specified in the January agreements as fair and reasonable values for the Dover and Metropole shares, provided that the £215,950 was paid by instalments beginning in January. and £215,950 was paid in advance by Newman and accepted by T.P.G. between January and April 1975. Had Mr. Cooper known the facts he would have valued the Dover shares at £150,000, i.e. the January price of £146,000 for 800,000 Dover shares adjusted for the fact that Mr. Cooper was valuing 832,000 shares. He would have valued the Metropole shares at £85,000, the January price, instead of £100,000. This would have reduced the net consideration by £45,000, originally from £225,000 to £180,000.

On this basis the damage caused to Newman by the dishonest concealment of the January agreements and the payments thereunder from Mr. Cooper was £45,000. The damages are not affected by the fact that Newman have accepted the transaction from T.P.G. and have kept their winnings instead of reclaiming their stake.

In the result we consider that the evidence, the statement of claim and the judgment of Vinelott J. establish Newman's entitlement to damages for dishonest concealment of the January agreements. That concealment caused foreseeable loss to Newman of £45,000. Where such dishonest concealment causes foreseeable loss, a cause of action in fraud is established, even though the defendants did not deliberately intend to cause the loss. This fraud having been established, we do not consider that the uncertain character of the pleadings requires this court to relieve Mr. Bartlett or Mr. Laughton from the consequences of that fraud.

No amount of further evidence by Mr. Laughton or any other witness could explain away the admitted fact that T.P.G. had accepted £215,950 as advance consideration under the January agreements, that Mr. Angus Murray and Mr. Cooper knew nothing of the January agreements or the payments thereunder and that Mr. Bartlett, with the acquiescence and knowledge of Mr. Laughton, lied to the shareholders about the nature of the payments.

© 2021 Thomson Reuters.

The issue of fraud in connection with the January agreements was clearly raised by the pleadings, albeit that the express allegation was directed to the circular. The dishonest concealment of the January agreements was, we think, clearly established by the evidence. We have commented adversely on the manner in which the whole action was clouded by the pleadings and the presentation of the case, but we do not consider that these defects enable Mr. Bartlett and Mr. Laughton to escape from the consequences of the one relevant fraud which was pleaded, proved, argued and decided.

We wish to hear argument in due course about costs in the court below and in this court. T.P.G. may wish to ask this court to review the order for costs against them made by the judge. We also wish to hear  *235  argument about the plaintiffs' costs and their possible responsibility for Newman's costs in the light of the plaintiffs' responsibility for pleading the personal action and thereby prevailing upon the judge to hear the derivative action despite the protests of Newman. We also wish to hear arguments as to whether the enormous costs incurred by the plaintiffs as a result of their own pleadings and presentation of the case ought to be visited upon Mr. Bartlett and Mr. Laughton. We also wish to hear argument whether in the exceptional circumstances of the present case Mr. Bartlett and Mr. Laughton are entitled to be relieved by the plaintiffs in respect of the costs, or part of the costs, which were incurred by Mr. Bartlett and Mr. Laughton themselves in repelling the indiscriminate attacks which were made upon them, in a case in which the dishonesty which alone founds our finding of damages was never clearly pleaded. We may have to consider whether it was practicable for the defendants to consider paying something into court, if they were so minded - not£450,000, but perhaps £45,000 or thereabouts - and so save themselves the risk of paying lawyers' costs due to one side or the other of half a million or more. At present we know nothing about the costs of this lamentable litigation, and we wish to know about the figures involved on all sides as costs in the High Court and this court. We expect all parties to present those figures when we hear the argument about costs on the date arranged for restoring the appeal in order to settle the order of the court, and to decide upon the proper orders for costs. We wish to hear argument as to whether the £45,000 should be paid by T.P.G., who benefited from the fraud, or by Mr. Bartlett and Mr. Laughton.

We would add this. The plaintiffs have painted Mr. Bartlett and Mr. Laughton as crooks, deliberately milking Newman of vast sums of money for their own benefit. This very serious allegation, persisted in to the end in this court, has not been proved. Mr. Bartlett and Mr. Laughton have successfully established that that case was based on a series of misunderstandings. The plaintiffs have proved that in order to win the boardroom battle in January, and to carry through a transaction which has proved to be advantageous to Newman, Mr. Bartlett and Mr. Laughton kept Mr. Angus Murray in the dark about the January agreements and the advance payments made thereunder. Once embarked on this course of concealment they could not, or would not, make a belated disclosure of the matters they had concealed, and so were led into two further concealments - from Mr. Cooper and ultimately from the shareholders. It was foreseeable that as a consequence of the non-disclosure to Mr. Cooper his valuation would be too high, and though £45,000 is not a great amount in relation to £1.5 million, it is significant enough to escape the description of minimal.

We are sorry that Mr. Laughton was not here to hear this court pronounce that all but one of the serious allegations made against him were not proved.

Before we rise we would say one thing. It is proposed to restore the case in order to determine the form of the order and to hear the submissions of the parties about costs, and the date that is provisionally arranged is October 2. It is difficult to predict how long the submissions  *236  of the parties will be. There are five parties concerned and the submissions may be fairly long. Mr. Bartlett and Mr, Laughton in the court below evidently spent a small fortune on their own costs and we know nothing about their present financial position; but if it is practicable for them, they may think that there would be great advantage in their instructing their solicitors again to instruct counsel, who are already familiar with the case, in order to argue those questions of costs which Mr. Bartlett and Mr. Laughton wish to submit, and also to make any submissions which are appropriate on how the liability for the£45,000 should fall as between T.P.G., who enjoyed the cash consideration from the purchase, and the two personal defendants. Whether it will be practicable for Mr. Bartlett and Mr. Laughton to dig again into their pockets for the purpose of legal representation on the order for costs we do not know. As we have said, we do not know what the figures are. It may be that the figures altogether might run into, not five figures but six. So that if it is practicable for the two gentlemen we have mentioned to make a further investment - whether it would be properly described as commercial judgment or a gamble we know not - that might be to their advantage.

\*

October 5. On the resumed hearing, counsel announced that the parties had agreed the terms of a settlement and by consent the following order was made.

© 2021 Thomson Reuters.

**Representation**

Solicitors: C. F. Whitehorn ; Macfarlanes .


**Representation**

Solicitors: Simmons & Simmons ; C. F. Whitehorn ; Macfarlanes ; Hopkins, Fuller .


*Hearing adjourned. Appeal allowed in part. Respondent's notice dismissed. Order of Vinelott J. varied to extent stated in judgment. Leave granted to fourth defendant to proceed with appeal from judgment of Vinelott J. in terms of amended notice of appeal. On basis that all parties had agreed terms of settlement on all matters (including any party's rights to damages, costs or any other relief) no further order made. All further proceedings stayed. (L. G. S. )*


(c) Incorporated Council of Law Reporting for England & Wales

© 2021 Thomson Reuters.

# EXHIBIT 1

002854

**EXECUTION VERSION**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

# R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

002855

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.     **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

    (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

    (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.     **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

002856

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

002857

EXECUTION VERSION

4. **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support.**

(a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.   **No Admission of Liability**.   The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.   Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.   **Successors-in-Interest.**   This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.   **Notice**.   Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

002859

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.     **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**EXECUTION VERSION**

       14.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

EXECUTION VERSION

IT IS HEREBY AGREED.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:      /s/ James P. Seery, Jr.
Name:  James P. Seery, Jr.
Its:       CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:      /s/ Michael Pugatch
Name:  Michael Pugatch
Its:       Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name:  Michael Pugatch
Its:       Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name:  Michael Pugatch
Its:       Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name:  Michael Pugatch
Its:       Managing Director

002862

**EXECUTION VERSION**


**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**


By:    /s/ Michael Pugatch

Name: Michael Pugatch

Its:    Managing Director


**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**


By:    /s/ Michael Pugatch

Name: Michael Pugatch

Its:    Managing Director

US-DOCS\115534291.12

002863

# Exhibit A

# TRANSFER AGREEMENT

# FOR ORDINARY SHARES OF

# HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of December [__], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2.  <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

002866

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

   a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

   b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

   c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

   a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

   b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

    Prior to the Effective Date the Transferee shall procure that:

   c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

   a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 183646253v.3

002867

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement. In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto. No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 183646253v.3

002868

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of
the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member


By:  _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer



**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**


By:  _____

Name:  James P. Seery, Jr.

Title:  President



**FUND:**
**Highland CLO Funding, Ltd.**


By:  _____

Name:  _____

Title:  _____

ActiveUS 183646253v.3

002869

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

002870

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By: HIPEP VIII Associates L.P.
    Its General Partner

By: HarbourVest GP LLC
    Its General Partner

By: HarbourVest Partners, LLC
    Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By: HarbourVest Partners (Ireland) Limited
    Its Alternative Investment Fund Manager

By: HarbourVest Partners L.P.
    Its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC
    Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By: HarbourVest Partners (Ireland) Limited
    Its Alternative Investment Fund Manager

By: HarbourVest Partners L.P.
    Its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC
    Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

7

002871

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
         Its General Partner

By:    HarbourVest GP LLC
         Its General Partner

By:    HarbourVest Partners, LLC
         Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

002872

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [     ] | [     ] |
| HarbourVest 2017 Global AIF L.P. | [     ] | [     ] |
| HarbourVest 2017 Global Fund L.P. | [     ] | [     ] |
| HV International VIII Secondary L.P. | [     ] | [     ] |
| HarbourVest Skew Base AIF L.P. | [     ] | [     ] |

9

**Exhibit D**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.,** <br> **and CLO HOLDCO, LTD.,** <br> *directly and derivatively,* <br><br>              **PLAINTIFFS,** <br><br> **v.** <br><br> **HIGHLAND CAPITAL MANAGEMENT,** <br> **L.P., HIGHLAND HCF ADVISOR, LTD.,** <br> **and HIGHLAND CLO FUNDING, LTD.,** <br> **Nominally,** <br><br>              **DEFENDANTS.** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | **Case No. 3:21-cv-00842-b** |

## DECLARATION OF RICHARD BOLEAT IN SUPPORT OF
## HIGHLAND CLO FUNDING, LTD.'S MOTION TO DISMISS

I, Richard Boléat, pursuant to 28 U.S.C. § 1746(a), declare under penalty of perjury the following:

1.      I am one of two directors of Highland CLO Funding, Ltd. ("HCLOF"). I have been a director of HCLOF since 7th July 2020. The other director, Richard M. Burwood, was also appointed on 7th July 2020.

2.      Mr. Burwood and I are the only directors of HCLOF.

3.      HCLOF's corporate headquarters is in the Bailiwick of Guernsey, a Channel Island lying between the United Kingdom and France. All operations of HCLOF take place within Guernsey's limits. Mr. Burwood is a resident of Guernsey, and I am a resident of the Bailiwick of Jersey, another Channel Island.

4.      HCLOF conducts no business operations or activities in the United States. It manages its holdings in various Acis entities, and directs its counsel, from Guernsey. It has no

002875

continuous or systematic contacts with the United States, and its directors have not traveled to the United States in connection with HCLOF's business.

5.     HCLOF's connection with the United States is limited to this litigation and other litigation arising from the acts of its portfolio managers.

Dated: 30 August 2021

_____   _____
Richard Boleat

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., and | § | |
| CLO HOLDCO, LTD., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0842-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., HIGHLAND | § | |
| HCF ADVISOR, LTD., and | § | |
| HIGHLAND CLO FUNDING, LTD., | § | |
| | § | |
| Defendants. | § | |

## ORDER OF REFERENCE

Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby **REFERRED** to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No. 19-34054. The Clerk of this Court and the Clerk of the Bankruptcy Court to which this case is hereby referred are directed to take such actions as are necessary and appropriate to cause this matter to be docketed as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Case No. 19-34054.

SO ORDERED.

SIGNED: September 20, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 1 -

002877

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
FACSIMILE: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATELY, | § | |
| | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

002878

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that the following motions (collectively, the "Motions") pending in the above-referenced adversary proceeding have been scheduled for hearing on **Tuesday, November 23, 2021 at 9:30 a.m. (Central Time)** (the "Hearing"):

1.  *Plaintiffs' Motion to Stay All Proceedings* [AP Docket No. 55];

2.  *Motion to Strike Reply Appendix* [AP Docket No. 47]; and

3.  *Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint* [AP Docket No. 26].

The Hearing on the Motions will be held via WebEx videoconference before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge.  The WebEx video participation/attendance link for the Hearing is:  https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing is attached hereto as **Exhibit A**; alternatively, the WebEx Hearing Instructions for the Hearing may be obtained from Judge Jernigan's hearing/calendar site at: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

*[Remainder of Page Intentionally Left Blank]*

Dated:  October 19, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

002880

# EXHIBIT A

Case 3:23-cv-01503-B   Document 28-1   Filed 09/15/23   Page 139 of 213   PageID 3206

**WebEx Hearing Instructions**
## Judge Stacey G. Jernigan

Pursuant to General Order 2020-14 issued by the Court on May 20, 2020, all hearings before Judge Stacey G. Jernigan are currently being conducted by WebEx videoconference unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:   https://us-courts.webex.com/meet/jerniga

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In: 1.650.479.3207
Meeting ID: 479 393 582

**Participation/Attendance Requirements**:

- Counsel and other parties in interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above.  Counsel and other parties in interest who will not be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic only mode may attend the hearing in the WebEx telephonic only mode using the WebEx dial-in and meeting ID above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time.  Please be advised that a hearing may already be in progress.  During hearings, participants are required to keep their lines on mute at all times that they are not addressing the Court or otherwise actively participating in the hearing.  **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings**.  For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode and live testimony will only be accepted from witnesses who have the WebEx video function activated**.  Telephonic testimony without accompanying video will not be accepted by the Court.

- All WebEx hearing attendees are required to comply with Judge Jernigan's Telephonic and Videoconference Hearing Policy (included within Judge Jernigan's Judge-Specific Guidelines):  https://www.txnb.uscourts.gov/content/judge-stacey-g-c-jernigan

**Exhibit Requirements**:

- Any party intending to introduce documentary evidence at the hearing must file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a separate, individual attachment thereto so that the Court and all participants have ready access to all designated exhibits.

- If the number of pages of such exhibits exceeds 100, then such party must also deliver two (2) sets of such exhibits in exhibit binders to the Court by no later than twenty-four (24) hours in advance of the hearing.

**Notice of Hearing Content and Filing Requirements:**

IMPORTANT: For all hearings that will be conducted by WebEx only:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

- When electronically filing the Notice of Hearing via CM/ECF select "at https://us-courts.webex.com/meet/jerniga" as the location of the hearing (note: this option appears immediately after the first set of Wichita Falls locations).  Do not select Judge Jernigan's Dallas courtroom as the location for the hearing.

002882

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P., | § | |
| and CLO HOLDCO, LTD., | § | |
| *directly and derivatively,* | § | Adversary Proceeding No. |
| | § | |
| Plaintiffs, | § | 21-03067 |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND HCF ADVISOR, LTD., | § | |
| AND HIGHLAND CLO FUNDING, LTD., | § | |
| Nominally, | § | |
| | § | |
| Defendants. | § | |

## DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT
## TO EVIDENTIARY HEARING TO BE HELD ON NOVEMBER 23, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following witness and exhibit list with respect to *Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint* [Docket No. 26], which the Court has set for hearing at 9:30 a.m. (Central Time) on November 23, 2021 (the "Hearing") in the above-styled adversary proceeding (the "Adversary Proceeding").

A.   **Witnesses**:

    1.   Any witness identified by or called by any other party; and

    2.   Any witness necessary for rebuttal.

B.   **Exhibits**:

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | HarbourVest 2017 Global Fund L.P. Proof of Claim No. 143, HarbourVest 2017 Global AIF L.P., Proof of Claim No. 147, HarbourVest Dover Street IX Investment L.P., Proof of Claim No. 150, HV International VIII Secondary L.P., Proof of Claim No. 153, HarbourVest Skew Base AIF L.P., Proof of Claim No. 154, and HarbourVest Partners L.P., Proof of Claim No, 149. | | |
| 2. | *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Case No. 19-34054, Docket No. 1625] | | |
| 3. | *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* [Case No. 19-34054, Docket No. 1631-1] | | |
| 4. | *James Dondero's Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest*, [Case No. 19-34054, Docket No. 1697] | | |
| 5. | The Dugaboy Investment Trust and Get Good Trust's *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Case No. 19-34054, Docket No. 1706] | | |
| 6. | CLO Holdco, LTD.'s *Objection to HarbourVest Settlement* [Case No. 19-34054, Docket No. 1707] | | |

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 7. | Deposition Transcript of Michael Pugatch, January 11, 2021 | | |
| 8. | *Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Case No. 19-34054, Docket No. 1731] | | |
| 9. | Hearing Transcript, January 14, 2021 [Case No. 19-34054] | | |
| 10. | *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Case No. 19-34054, Docket No. 1788] | | |
| 11. | *Original Complaint* [Docket No. 1] | | |
| 12. | Deposition Transcript of Grant Scott, January 21, 2021 | | |
| 13. | Members Agreement, November 15, 2017 | | |
| 14. | Any document entered or filed in the Reorganized Debtor's Bankruptcy Case, including any exhibits thereto | | |
| 15. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 16. | All exhibits identified by or offered by any other party at the Hearing | | |

Dated:  November 22, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com -and-

-and-

**HAYWARD PLLC**

*/s/ Melissa S. Hayward*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

# CLAIM 143

Case 21-03067-sgj    Doc 71-1    Filed 11/22/21    Entered 11/22/21 14:33:46    Desc
Case 3:23-cv-01503-B    Document 14-1    Filed 09/11/23    Page 146 of 213    PageID 3213
Exhibits 1-15 Page 146 of 213

Claim #143  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___    District of ___Texas___
(State)

Case number    ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HarbourVest 2017 Global Fund L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HarbourVest 2017 Global Fund L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone ___2129096000___
Contact email ___eweisgerber@debevoise.com___

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone ___6173483773___
Contact email ___agoren@harbourvest.com___

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____    Filed on ___/___/___
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                              **Proof of Claim**

1934054200040800000000000055

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**    $  See Annex_____.  **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

 See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000055

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|---|
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |
|---|---|---|

---

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. **FRBP 9011(b).**<br><br>If you file this claim electronically, **FRBP 5005(a)(2)** authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☑ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  <u>04/08/2020</u><br>MM / DD / YYYY<br><br><br><u>/s/Michael Pugatch</u><br>Signature<br><br>**Print the name of the person who is completing and signing this claim:** |

| Name | <u>Michael Pugatch</u> |
|---|---|
| | First name          Middle name          Last name |
| Title | <u>Managing Director - Company: HarbourVest 2017 Global Fund L.P., by Harbo</u> |
| Company | <u>by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL</u> |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____          Email          _____ |

1934054200408000000000055

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global Fund L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global Fund L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | **Annual Interest Rate:** | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | | |
| No | **Amount Unsecured:** | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:40:16 p.m. Eastern Time | |
| **Title:** | |
| Managing Director - Company: HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its Gen Partner | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

VN: 0DB62642624B41D1B004FEABCD97B964

002892

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global Fund L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g., Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

002893

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.        Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.        Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.        The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

002894

documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

002895

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.      This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.      The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

002896

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*** 

002897

# CLAIM 147

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: ___Northern___  District of __Texas__
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest 2017 Global AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HarbourVest 2017 Global AIF L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A. | See summary page |
| Contact phone  2129096000 | Contact phone  6173483773 |
| Contact email  eweisgerber@debevoise.com | Contact email  agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____  Filed on ___/___/_____
                                                                          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410

**Proof of Claim**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                              **Proof of Claim**

1934054200408000000000059

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

- [x] No
- [ ] Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|

- [ ] Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

- [ ] Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

- [ ] Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

- [ ] Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

- [ ] Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

- [ ] Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

- [x] No
- [ ] Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

- [ ] I am the creditor.
- [x] I am the creditor's attorney or authorized agent.
- [ ] I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
- [ ] I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2020
                   MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael Pugatch |
|---|---|
| | First name          Middle name          Last name |
| Title | Managing Director-Company: HarbourVest 2017 Global AIF L.P., by Harbour\ |
| Company | Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____   Email   _____ |

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |

**District:**
Northern District of Texas, Dallas Division

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

**Disbursement/Notice Parties:**
HarbourVest 2017 Global AIF L.P. c/o HarbourVest Partners, LLC

One Financial Center

Boston, MA, 02111

**Phone:**
6173483773

**Phone 2:**

**Fax:**

**E-mail:**
agoren@harbourvest.com

**DISBURSEMENT ADDRESS**

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

**Submitted By:**
Michael Pugatch on 08-Apr-2020 4:49:59 p.m. Eastern Time

**Title:**
Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative

**Company:**
Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr

VN: D6DFC1C831960C5278458EB4F287C249

002902

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## <u>ANNEX TO PROOF OF CLAIM</u>

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest 2017 Global AIF L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.   The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.   *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].   As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.       Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.       Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.       The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.    This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.    Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

002905

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

002906

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

002907

# CLAIM 150

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern District of Texas (State) |
| Case number | 19-34054 |

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest Dover Street IX Investment L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| See summary page | See summary page |
| Contact phone  2129096000 | Contact phone  6173483773 |
| Contact email  eweisgerber@debevoise.com | Contact email  agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____   Filed on ___/___/___  MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

1934054200408000000000060

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?**  $ See Annex _____.  **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Annex _____

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                              $_____

**Amount of the claim that is secured:**           $_____

**Amount of the claim that is unsecured:**         $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000060

**12. Is all or part of the claim entitled to priority under** <mark>**11 U.S.C. § 507(a)**</mark>**?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. **Check all that apply:**

| | | Amount entitled to priority |
|---|---|---|
| ☐ | Domestic support obligations (including alimony and child support) under <mark>11 U.S.C. § 507(a)(1)(A)</mark> or (a)(1)(B). | $_____ |
| ☐ | Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. <mark>11 U.S.C. § 507(a)(7).</mark> | $_____ |
| ☐ | Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. <mark>11 U.S.C. § 507(a)(4).</mark> | $_____ |
| ☐ | Taxes or penalties owed to governmental units. <mark>11 U.S.C. § 507(a)(8).</mark> | $_____ |
| ☐ | Contributions to an employee benefit plan. <mark>11 U.S.C. § 507(a)(5).</mark> | $_____ |
| ☐ | Other. Specify subsection of <mark>11 U.S.C. § 507(a)(___)</mark> that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to** <mark>**11 U.S.C. § 503(b)(9)**</mark>**?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it.** <mark>**FRBP 9011(b).**</mark>

If you file this claim electronically, <mark>FRBP 5005(a)(2)</mark> authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** <mark>**18 U.S.C. §§ 152, 157, and 3571.**</mark>

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael Pugatch |
| | First name        Middle name        Last name |
| Title | Managing Director-Company: HarbourVest Dover Street IX Investment L.P., |
| Company | Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____    Email    _____ |

1934054200408000000000060

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Dover Street IX Investment L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Dover Street IX Investment L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| | | |
|---|---|---|
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** | |
| No | **Amount Unsecured:** | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:59:00 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners Ireland Limited, its Alter |
| **Company:** |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

### ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Dover Street IX Investment L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

002913

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.        Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.        Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.        The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

002914

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.     Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

002915

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.      This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.      The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

002916

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

002917

# CLAIM 153

Claim #153  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HV International VIII Secondary L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HV International VIII Secondary L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone   2129096000
Contact email   eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone   6173483773
Contact email   agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____   Filed on ____/____/____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

Official Form 410   **Proof of Claim**

1934054200040800000000000065

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|-------------------------------------------------------------------|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?**

$ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                   $_____

**Amount of the claim that is secured:**      $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**      $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000065

| 12. | **Is all or part of the claim entitled to priority under** <mark>11 U.S.C. § 507(a)</mark>**?** | ☑ | No | |
| --- | --- | --- | --- | --- |
| | | ☐ | Yes. *Check all that apply:* | **Amount entitled to priority** |
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ | Domestic support obligations (including alimony and child support) under <mark>11 U.S.C. § 507(a)(1)(A)</mark> or (a)(1)(B). | $_____ |
| | | ☐ | Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. <mark>11 U.S.C. § 507(a)(7).</mark> | $_____ |
| | | ☐ | Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. <mark>11 U.S.C. § 507(a)(4).</mark> | |
| | | ☐ | Taxes or penalties owed to governmental units. <mark>11 U.S.C. § 507(a)(8).</mark> | $_____ |
| | | ☐ | Contributions to an employee benefit plan. <mark>11 U.S.C. § 507(a)(5).</mark> | $_____ |
| | | ☐ | Other. Specify subsection of <mark>11 U.S.C. § 507(a)(___)</mark> that applies. | $_____ |
| | | \* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. | **Is all or part of the claim pursuant to** <mark>11 U.S.C. § 503(b)(9)</mark>**?** | ☑ | No | |
| --- | --- | --- | --- | --- |
| | | ☐ | Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | | | $_____ | |

| **Part 3:** | **Sign Below** |
| --- | --- |

**The person completing this proof of claim must sign and date it.** <mark>FRBP 9011(b).</mark>

If you file this claim electronically, <mark>FRBP 5005(a)(2)</mark> authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** <mark>18 U.S.C. §§ 152,</mark> <mark>157,</mark> **and** <mark>3571.</mark>

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    <u>04/08/2020</u>
                      MM  /  DD  /  YYYY

<u>/s/Michael Pugatch</u>
       Signature

**Print the name of the person who is completing and signing this claim:**

| Name | <u>Michael Pugatch</u> |
| --- | --- |
| | First name    Middle name    Last name |
| Title | <u>Managing Director-Company: HV International VIII Secondary L.P.,  by HI</u> |
| Company | <u>by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL</u> |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____    Email    _____ |

1934054200408000000000065

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HV International VIII Secondary L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| **Disbursement/Notice Parties:** |
|---|
| HV International VIII Secondary L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| U.S.A. |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| **Other Names Used with Debtor:** | **Amends Claim:** | |
|---|---|---|
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | **Arrearage Amount:** | |
| **Based on Lease:** | | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| **Submitted By:** |
|---|
| Michael Pugatch on 08-Apr-2020 5:16:54 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HV International VIII Secondary L.P.,  by HIPEP VIII Associates L.P., its General Partner, |
| **Company:** |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member |

VN: 671DA480298CC9959BF07710FFD6AEBF

002922

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## <u>ANNEX TO PROOF OF CLAIM</u>

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HV International VIII Secondary L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

002924

documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

002925

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.      This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.      The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

002927

# CLAIM 154

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: ___Northern___ District of __Texas__
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HarbourVest Skew Base AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HarbourVest Skew Base AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone __2129096000__
Contact email __eweisgerber@debevoise.com__

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone __6173483773__
Contact email __agoren@harbourvest.com__

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.  Claim number on court claims registry (if known) _____  Filed on ___ / ___ / _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

Official Form 410                    **Proof of Claim**

1934054200040800000000000064

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**    $ __See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

__See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                    $_____

**Amount of the claim that is secured:**     $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes**.** Identify the property: _____

Official Form 410                                    **Proof of Claim**

1934054200408000000000064

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | | Amount entitled to priority |
|---|---|---|
| ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ | Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ | Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

_/s/Michael Pugatch_____
Signature

Print the name of the person who is completing and signing this claim:

Name    Michael Pugatch
        First name        Middle name        Last name

Title    Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVe

Company    Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investme
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____        Email    _____

---

Case 21-03067-sgi    Doc 71-1    Filed 11/22/21    Entered 11/22/21 14:33:46    Desc
Case 3:23-cv-01503-B  Document 18 - Proof of Claim / Filing Summary 3  PageID 3256

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| Debtor: | |
| --- | --- |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| Creditor: | Has Supporting Documentation: |
| --- | --- |
| HarbourVest Skew Base AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| Disbursement/Notice Parties: |
| --- |
| HarbourVest Skew Base AIF L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| Other Names Used with Debtor: | Amends Claim: | |
| --- | --- | --- |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| Submitted By: |
| --- |
| Michael Pugatch on 08-Apr-2020 5:11:50 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative Inv |
| **Company:** |
| Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## <u>ANNEX TO PROOF OF CLAIM</u>

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest Skew Base AIF L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.   The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.   *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), <mark>Dkt. No. 118</mark>].   As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), <mark>Dkt. No 827</mark>] and related filings

in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.   The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

002935

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

4

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

002937

# CLAIM 149

Case 3:23-cv-01503-B    Document 18-14    Filed 09/11/23    Page 196 of 213    PageID 3263

**Fill in this information to identify the case:**

Debtor    Highland Capital Management, L.P.

United States Bankruptcy Court for the:   Northern    District of   Texas
                                                              (State)

Case number    19-34054

## Official Form 410
# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

HarbourVest Partners L.P. on behalf of funds and accounts under management
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

See summary page

Contact phone   2129096000
Contact email   eweisgerber@debevoise.com

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone   6173483773
Contact email   agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

       **Proof of Claim**

1934054200408000000000061

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**    $ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                            $_____

**Amount of the claim that is secured:**        $_____

**Amount of the claim that is unsecured:**      $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**        $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**        $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. **Check all that apply:**

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

**Check the appropriate box:**

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2020
                  MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

Name       Michael Pugatch
           First name        Middle name        Last name

Title      Managing Director

Company    HarbourVest Partners L.P., on behalf of funds and accounts under manage
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____        Email _____

---

Official Form 410                    **Proof of Claim**

1934054200040800000000061

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Partners L.P. on behalf of funds and accounts under management | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| | No |
| New York, NY, 10022 | **Related Claim Filed By:** |
| U.S.A. | |
| **Phone:** | **Filing Party:** |
| 2129096000 | Authorized agent |
| **Phone 2:** | |
| | |
| **Fax:** | |
| | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Partners L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| | |
| **Fax:** | |
| | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| | | |
|---|---|---|
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** | |
| No | **Amount Unsecured:** | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:06:59 p.m. Eastern Time | |
| **Title:** | |
| Managing Director | |
| **Company:** | |
| HarbourVest Partners L.P., on behalf of funds and accounts under management,  by HarbourVest Partners, LLC, its Gen Partner | |

VN: EA86458428780C11DA6B606EDE1FA40A

002942

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

<u>**ANNEX TO PROOF OF CLAIM**</u>

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest Partners L.P. on behalf of funds and accounts under management (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant manages investment funds that are limited partners in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").    Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), <mark>Dkt. No. 118</mark>]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third*

*Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and

related filings in the Acis bankruptcy cases, there has been extensive litigation regarding alleged

improper conduct associated with the management of, and transactions relating to, Acis,

including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint*

[Case No. 18-03078(SGJ), Dkt. No. 157].

3.    Due to the Acis bankruptcy and certain conduct alleged to have been undertaken

by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were

officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm

includes, but is not limited to, financial harm resulting from, among other things (i) court orders

in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being

refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and

(ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF.

*See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.    Claimant hereby files this Claim to assert any and all of its rights to payment,

remedies, and other claims (including contingent or unliquidated claims) against the Debtor in

connection with and relating to the foregoing harm, including for any amounts due or owed

under the various agreements with the Debtor in connection with HCLOF (including, but not

limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO

Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the

Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering

Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of

action relating to the foregoing harm.

002944

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

002945

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor, as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

002946

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

002947

# EXHIBIT 2

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20 Entered 12/23/20 21:54:23 Page 1 of 13
Case 3:23-cv-01503-B Document 18-141 Filed 09/11/23 Page 206 of 213 PageID 3273
Docket #1625 Date Filed: 12/23/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054201223000000000013
002949

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("<u>Highland</u>" or the "<u>Debtor</u>"), files this motion (the "<u>Motion</u>") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the <mark>Federal Rules of Bankruptcy Procedure (the</mark> "<u>Bankruptcy Rules</u>"), approving a settlement agreement (the "<u>Settlement Agreement</u>"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("<u>Morris Dec.</u>"), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>").  In support of this Motion, the Debtor represents as follows:

<u>**JURISDICTION**</u>

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

002950

## **RELEVANT BACKGROUND**

### A.    **Procedural Background**

3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.      On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.      In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.      On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

DOCS_NY:41802.6 36027/002

002951

B.    **Overview of HarbourVest's Claims**

10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

002952

C.      **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

002953

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19. Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20. After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21. On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.     The Parties' Pleadings and Positions Concerning HarbourVest's
        Proofs of Claim**

22.     On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.     The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.     HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "<u>Claim Objection</u>").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "<u>Fraud Claims</u>"), U.S. State and Federal Securities Law Claims (the "<u>Securities Claims</u>"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("<u>RICO</u>"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "<u>HarbourVest Claims</u>").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.    <u>Settlement Discussions</u>**

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

002956