**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P** § Case No. **19-34054-SGJ11**
**Charitable DAF Fund, L.P et al**

|  |  |  |
|---|---|---|
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

## Volume 18

## APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

---

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2. The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3. Docket Sheet kept by the Bankruptcy Clerk.

4. Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7* *001203* *Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* *001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #42 ON 07/13/2021 IN U.S. |

|  |  |  |  | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9* *001905* *thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*<br><br>*003637* | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| *003666* | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| *003843* | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| *003844* | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| *003851* | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*<br><br>*003882*<br><br>*Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*<br><br>*004395* | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21* *004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442* *Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22* *004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*0047415* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*0047770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|
| *006133* *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32* *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

*006961*

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                          Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/  Mazin A. Sbaiti*
                                               **Mazin A. Sbaiti**
                                               Texas Bar No. 24058096
                                               **Jonathan Bridges**
                                               Texas Bar No. 24028835
                                               2200 Ross Avenue – Suite 4900W
                                               Dallas, TX  75201
                                               T:  (214) 432-2899
                                               F:  (214) 853-4367
                                               E:  mas@sbaitilaw.com
                                                   jeb@sbaitilaw.com

                                               **Counsel for Appellants**


                           **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                               */s/ Mazin A. Sbaiti*
                                               Mazin A. Sbaiti


---

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § |  21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1: Identify the appellant(s)**

1.  Name(s) of appellant(s):

> The Charitable DAF Fund, L.P.
> CLO Holdco, Ltd.

003637

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:

☒ Plaintiff
☐ Defendant
☐ Other (describe)
_____

For appeals in a bankruptcy case and not in an adversary proceeding:

☐ Debtor
☐ Creditor
☐ Trustee
☐ Other (describe)

## Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from:

> Order Granting Motion to Dismiss the Adversary Proceeding [Doc. 100]

2. State the date on which the judgment, order, or decree was entered: March 11, 2022

## Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys:

1. *Party/Appellee:*   Debtor:   Highland Capital Management, L.P.
                       Non-Debtor:   Highland HCF Advisor, Ltd.

Attorney:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Fax: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Fax: (972) 755-7110

2.  *Party/Appellants:*  Plaintiffs:  The Charitable DAF Fund, L.P.
                                        CLO Holdco, Ltd.

Attorney:

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

**Part 4:  Optional election to have appeal heard by District Court (applicable only in certain
districts):**  Not applicable.

Dated:  March 21, 2022                          Respectfully submitted,

                                                **SBAITI & COMPANY PLLC**

                                                */s/  Mazin A. Sbaiti*
                                                **Mazin A. Sbaiti**
                                                Texas Bar No. 24058096
                                                **Jonathan Bridges**
                                                Texas Bar No. 24028835
                                                JPMorgan Chase Tower
                                                2200 Ross Avenue – Suite 4900W
                                                Dallas, TX  75201
                                                T:  (214) 432-2899
                                                F:  (214) 853-4367
                                                E:  mas@sbaitilaw.com
                                                     jeb@sbaitilaw.com

                                                **Counsel for Plaintiffs**



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed March 11, 2022**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT L.P., | § | CASE NO. 19-34054-SGJ-11 |
| | § | (CHAPTER 11) |
| REORGANIZED DEBTOR. | § | |
| _____ | § | |
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § | |
| | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 21-03067 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD., | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS. | § | |

---

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS THE ADVERSARY PROCEEDING

003640

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. ("Highland," the "Debtor," or sometimes the "Reorganized Debtor") filed a voluntary Chapter 11 petition on October 16, 2019, in the United States Bankruptcy Court for the District of Delaware. That court subsequently transferred venue of the Bankruptcy Case to the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), on December 4, 2019.

Before the court is Highland's motion to dismiss (the "Motion to Dismiss") the Adversary Proceeding. Highland obtained confirmation of a reorganization plan on February 22, 2021, and the plan went effective on August 11, 2021.  The Adversary Proceeding was filed in April 2021 (*i.e.,* after confirmation but before the effective date of Highland's Chapter 11 plan).  There were originally three Defendants named in the Adversary Proceeding: (i) Highland, and (ii) two non-Debtor affiliates which Highland controls that are called Highland HCF Advisor, Ltd. ("HHCFA") and Highland CLO Funding Ltd. ("HCLOF").   Defendant HCLOF was later dismissed by agreement with the Plaintiffs.[2] Highland's CEO, James P. Seery ("Mr. Seery"), was named in the Complaint initiating the Adversary Proceeding (the "Complaint") as a "potential" Defendant but has not been added. The Plaintiffs are two entities that are allegedly controlled and/or directed by James Dondero, Highland's founder and former CEO ("Mr. Dondero"): (i) Charitable DAF Fund, L.P. (the "DAF"), which is a Cayman Island-based hedge fund designated as a "donor-advised fund," originally seeded with funds from Highland, and (ii) CLO Holdco, Ltd. ("CLO Holdco"),

---

[1] Bankruptcy Case No. 19-34054.

[2] At the hearing held on the Motion to Dismiss, the parties announced an agreement that HCLOF would be dismissed from the Adversary Proceeding with prejudice. HCLOF was apparently only named nominally in the Adversary Proceeding and no actual relief was sought against it.  An order dismissing HCLOF was entered on December 7, 2021. Highland and HHCFA were unaffected by the dismissal order.

003641

which is also a Cayman Island-based entity, wholly owned and controlled by the DAF. Until at least mid-January 2021, Grant Scott, Mr. Dondero's life-long friend and college roommate, was the sole director of the DAF and also of CLO Holdco (neither of which otherwise had any officers or employees).

The Complaint, which was originally filed in the United States District Court for the Northern District of Texas, Dallas Division ("District Court"), but was referred to the Bankruptcy Court (as further described herein), asserts claims against Highland and HHCFA under the Racketeer Influenced and Corrupt Organizations statute (15 U.S.C. § 1961, et seq. ("RICO")), Breach of Fiduciary Duty, Breach of Contract, Negligence, and Tortious Interference with Contract—all relating to the Debtor's pursuit and effectuation *during the Bankruptcy Case* of a compromise and settlement agreement with a creditor known as HarbourVest, which *agreement was fully vetted and approved by the Bankruptcy Court* (after notice to creditors and parties in interest), pursuant to Federal Rule of Bankruptcy Procedure 9019. Accepting all facts pleaded as true and construing the Complaint in the light most favorable to the Plaintiffs, this court concludes that all of the claims in the Complaint are precluded by the doctrines of collateral estoppel and judicial estoppel. Thus, the Complaint, in its entirety, must be dismissed.

In order to understand the conclusion of this court, one must review matters that happened during the Bankruptcy Case. Although a court generally limits its inquiry on a motion to dismiss to the plaintiff's complaint or any documents attached to the complaint, a court may also take judicial notice of matters that are part of the public record when considering a motion to dismiss. *See T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.,* No. 4:07–cv–0419, 2008 WL 7627807, at *2 (S.D. Tex. 2008); *Cade v. Henderson*, No. CIV A 01-943, 2001 WL 1012251, at *2 (E.D. La. Aug. 31, 2001). The relevant public record here includes: (a) the HarbourVest

003642

Settlement Motion,[3] and the exhibits admitted into evidence in support; (b) the Transfer

Agreement;[4] (c) Mr. Dondero's Objection to the HarbourVest Settlement;[5] (d) the Objection to

the HarbourVest Settlement of Dugaboy Investment Trust and Get Good Trust (*i.e,* Mr. Dondero's

family trusts),[6] (e) CLO Holdco's Objection to the HarbourVest Settlement,[7] (f) the Omnibus

Replies;[8] (g) the January 14, 2021 Hearing Transcript at which the Bankruptcy Court considered

and approved the HarbourVest Settlement;[9] and (h) the HarbourVest Settlement Order.[10]

## II.   BACKGROUND

The creditor HarbourVest was actually a collective of investors that, in 2017, invested

approximately $80 million into the entity known as HCLOF (*i.e.,* the previously dismissed nominal

Defendant), thereby acquiring a 49.98% interest in it. HarbourVest filed six proofs of claim against

the Debtor in the Bankruptcy Case, totaling $300 million, alleging that the Debtor had committed

fraud back in 2017, in connection with its encouraging HarbourVest to invest in and acquire that

49.98% interest in HCLOF. As alluded to earlier, the Debtor and HarbourVest eventually

negotiated a settlement of HarbourVest's proofs of claim.

---

[3] Debtor's Motion for an Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1625 (the "Settlement Motion"). Note: all references herein to "DE # ____" shall refer to the docket entry number at which a pleading appears in the docket maintained in the Highland main bankruptcy case. All references to "DE # ____ in the AP" refer to the docket entry number at which a pleading appears in the docket maintained in the Adversary Proceeding.

[4] Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1631, Exhibit 1.

[5] James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest, DE # 1697.

[6] Objection to Debtor's Motion for an Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1706.

[7] CLO Holdco, Ltd.'s Objection to HarbourVest Settlement, DE # 1707.

[8] Debtor's Omnibus Reply in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1731; HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith, DE # 1734.

[9] Transcript of Hearing Held 1/14/2021, DE # 1765.

[10] *Order Approving Debtor's Settlement with Harbourvest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith*, DE # 1788 (the "HarbourVest Settlement Order").

003643

In December 2020, the Debtor filed a motion in the Bankruptcy Court for an order approving its settlement with HarbourVest (the "HarbourVest Settlement"), pursuant to which, *inter alia*, HarbourVest would significantly reduce its $300 million of alleged claims against the Debtor and transfer its 49.98% interest in HCLOF to an entity designated by the Debtor (the "Transfer"). At the time of the Transfer, the Debtor already owned a 0.6% interest in HCLOF, so the Transfer would give it a controlling interest (49.98% + 0.6% = 50.58%) in HCLOF.

CLO Holdco objected to the proposed HarbourVest Settlement, presumably at the direction of its parent, the DAF. CLO Holdco owned (and still owns) 49.02% of HCLOF. CLO Holdco challenged the HarbourVest Settlement on the grounds that: (i) CLO Holdco had a "Right of First Refusal" to acquire HarbourVest's interest in HCLOF pursuant to the HCLOF Members Agreement among the Debtor, HarbourVest, and CLO Holdco ("HCLOF Members Agreement"), and (ii) HarbourVest had no right to transfer its interest without complying with the purported "Right of First Refusal." Two other objections were lodged against the proposed HarbourVest Settlement, one by Mr. Dondero and the other by Mr. Dondero's two family trusts: The Dugaboy Investment Trust ("Dugaboy") and The Get Good Trust ("Get Good" and, together with Dugaboy, the "Dondero Family Trusts"). Mr. Dondero objected on the grounds that (a) the HarbourVest Settlement was not reasonable or in the best interests of the estate because the Debtor was grossly over-compensating HarbourVest, and (b) it amounted to a blatant attempt to purchase HarbourVest's votes in support of the Debtor's plan. The Dondero Family Trusts raised separate concerns regarding: (a) whether HarbourVest had the right to effectuate the Transfer, and (b) the valuation methodology the Debtor used for the HCLOF interests. Each of the objecting parties had a right to take discovery concerning the HarbourVest Settlement, including the valuation of the HCLOF interests and the Transfer.

003644

The court held an evidentiary hearing, on January 14, 2021, on the HarbourVest Settlement and heard argument in support of the parties' objections and defenses. Highland's current CEO, Mr. Seery, and a HarbourVest representative, Michael Pugatch ("Mr. Pugatch"), were each called to testify. During the hearing, surprisingly, ***CLO Holdco voluntarily withdrew its objection, which had been premised on its alleged "Right of First Refusal,"*** based on CLO Holdco's "interpretation of the [HCLOF] member agreement."[11] Subsequent to CLO Holdco withdrawing its objection at the hearing, the Bankruptcy Court asked counsel for the Dondero Family Trusts whether they planned to press the issue of the transferability of HarbourVest's interest in HCLOF. In response, counsel responded: "No, I am not. Basically, I think it's the fairness of the settlement. I think the transferability of the interest is separate and apart from the fairness of the settlement itself. I think the fairness -- the transferability was a contractual issue between two parties that the Court does not have to drill down on." Transcript of Hearing Held 1/14/2021, DE # 1765, at 22:5-20.

At the conclusion of the hearing, the Bankruptcy Court overruled the remaining objections (*i.e.,* of Mr. Dondero and the Dondero Family Trusts) and approved the HarbourVest Settlement as fair and equitable and in the best interests of the bankruptcy estate. The HarbourVest Settlement Order made clear that HarbourVest could transfer its interest in HCLOF "without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF."[12]

In summary, pursuant to the HarbourVest Settlement that the Bankruptcy Court approved, HarbourVest, in pertinent part, would (a) transfer its interest in HCLOF to the Debtor or its nominee, (b) be allowed a general unsecured claim against the Debtor in the amount of $45 million,

---

[11] Transcript of Hearing Held 1/14/2021, DE # 1765, at 7:20-8:6.
[12] HarbourVest Settlement Order, DE # 1788.

003645

and (c) be allowed a subordinated, general unsecured claim against the Debtor in the amount of $35 million. The HarbourVest Settlement was essentially a recission of the investment HarbourVest had made in HCLOF and also provided HarbourVest allowed, reduced claims against Highland in settlement of its alleged $300 million of damages.

The HarbourVest Settlement Order was appealed by the Dondero Family Trusts, with notice of the appeal being filed in the Bankruptcy Court on February 5, 2021. The Dondero Family Trusts argue on appeal that the Debtor overpaid for the HCLOF interests, and the HarbourVest Settlement was an attempt to gerrymander the Debtor's plan and purchase votes. No stay pending appeal has been approved and the HarbourVest Settlement was implemented. The appeal remains pending before Judge Sam Lindsay in the District Court.[13]

On April 12, 2021, the Plaintiffs, DAF and CLO Holdco, filed the Complaint initiating this Adversary Proceeding in the District Court. The action was assigned to Judge Jane Boyle. ***The subject matter of the Adversary Proceeding is entirely centered around the bona fides and permissibility of aspects of the HarbourVest Settlement.*** Despite the full vetting in the Bankruptcy Court of the HarbourVest Settlement and an order approving the HarbourVest Settlement—which, by the way, was not appealed by Plaintiffs DAF or CLO Holdco—various torts and other causes of action are now being alleged by DAF and CLO Holdco against the Debtor ***relating entirely to the HarbourVest Settlement***. As earlier alluded to, the Complaint raises claims that Highland, while a debtor-in-possession, committed: (1) breach of fiduciary duties to the Plaintiffs; (2) breach of the HCLOF Members Agreement; (3) negligence; (4) RICO violations; and (5) tortious interference.

---

[13] Case No. 3:21-cv-00261-L.

003646

On September 20, 2021, Judge Boyle issued an Order of Reference[14] referring this action to be adjudicated as an adversary proceeding related to the Bankruptcy Case, pursuant 28 U.S.C. § 157 and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. Thus, the Complaint is now pending before the Bankruptcy Court.

In its claim for breach of fiduciary duty (**Count 1**), Plaintiffs allege that the Debtor violated its "broad" duties to Plaintiffs under the "Investment Advisers Act of 1940" and the Debtor's "internal policies and procedures" by: (i) engaging in "insider trading with HarbourVest"; (ii) "concealing" the value of the HarbourVest interest; and (iii) "diverting" the investment opportunity in the HarbourVest entities to the Debtor without offering it to Plaintiffs.

In support of its claim for breach of the HCLOF Members Agreement (**Count 2**), Plaintiffs allege that the Debtor breached the "Right of First Refusal" provision therein, by diverting the investment opportunity away from CLO Holdco to the Debtor.

In its negligence claim (**Count 3**), Plaintiffs assert that the Debtor's actions violated the HCLOF Members Agreement and the Debtor's internal policies by failing to accurately calculate the HCLOF interests and failing to give Plaintiffs the Right of First Refusal to purchase the interests.

In their RICO Claim (**Count 4**), Plaintiffs allege that Defendant Highland and two affiliated entities were an "association-in-fact" engaged in a pattern of racketeering activity for this same underlying conduct; namely, failing to disclose the valuation of HCLOF's interest and, ultimately, effectuating the HarbourVest Settlement.

---

[14] District Court Order of Reference, DE # 64 in the AP.

8

003647

Finally, Plaintiffs' tortious interference claim (**Count 5**) is premised on the Debtor's alleged interference with Plaintiff's "Right of First Refusal" under the Members Agreement.

Highland, in response to the Complaint, filed its Motion to Dismiss on May 27, 2021. In the Motion to Dismiss, Highland argues that, based on the previous HarbourVest Settlement contested proceeding, the Plaintiffs' claims are precluded or barred by the doctrines of res judicata, collateral estoppel, [15] and judicial estoppel. Alternatively, Highland also alleges that each of the claims in the Complaint should be dismissed for failing to sufficiently state claims for relief under Rule 12(b)(6). The Motion to Dismiss seeks to have the Complaint dismissed in its entirety.

The Bankruptcy Court held a hearing on Highland's Motion to Dismiss the Adversary Proceeding now before the court. At the conclusion of the Motion to Dismiss hearing, the court took the matter under advisement.

### III. Legal Analysis

#### A. Jurisdiction and Authority

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This Adversary Proceeding is, at a minimum, "related to" the Highland Bankruptcy Case. Moreover, it "arises in" a bankruptcy case (making it "core"), in that a claim is being asserted against a debtor (which was not yet a "reorganized debtor" at the time the action was filed) and involves actions of a debtor-in-possession in administering its case. It involves orders of this Bankruptcy Court and activities and litigation over which the Bankruptcy Court presided. This Bankruptcy Court has authority to exercise bankruptcy subject matter jurisdiction here, pursuant to 28 U.S.C. § 157(a) and (b)(2)(A), (B), and (O), and the Standing Order of Reference of

---

[15] The court notes that Highland, in the Brief in Support of the Motion to Dismiss, lists collateral estoppel, in its summary of arguments, as grounds for dismissal of the Complaint. However, nowhere else is collateral estoppel mentioned within the Motion to Dismiss and Brief in Support. Rather, Highland focuses only on res judicata and judicial estoppel.

003648

Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. The case was referred to the Bankruptcy Court by the District Court and there are no pending motions to withdraw the reference.

       B.    <u>Legal Standard</u>

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* Dismissal is proper under Rule 12(b)(6) when, taking the facts alleged in the complaint as true, it appears that the plaintiff "cannot prove any set of facts that would entitle it to the relief it seeks." *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995). The court may take judicial notice of matters of public record when considering a motion to dismiss for failure to state a claim. *See T.L. Dallas (Special Risks), Ltd.*, 2008 WL 7627807, at *2; Cade, 2001 WL 1012251, at *2.

       C.    <u>Res Judicata</u>

The first preclusion doctrine argued by Highland in its Motion to Dismiss is res judicata.[16]

Res judicata, otherwise known as "claim preclusion," literally means "the thing has been decided."

---

[16] As mentioned earlier, there is a pending appeal of the HarbourVest Settlement Order. This fact is irrelevant for purposes of Highland's preclusion arguments. The federal rule and the rule in this circuit is that, *despite an appeal, final orders of a court still maintain full force and effect for res judicata and collateral estoppel purposes until reversed on appeal*. *Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.*, 510 F.2d 272, 273 (5th Cir.1975)

003649

"Though it is not often the case, a finding of res judicata is appropriate on a motion to dismiss when the res judicata bar is apparent from the face of the pleadings and judicially noticed facts." *See Wade v. Household Fin. Corp. III*, No. 1:18-CV-570-RP, 2019 WL 433741, at \*2 (W.D. Tex. Feb. 1, 2019). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The elements of res judicata are: "(1) the parties are identical or at least in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both suits." *Comer v. Murphy Oil USA, Inc.,* 718 F.3d 460, 466 (5th Cir. 2013) (quoting *Test Masters Educ. Services, Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005)). Dismissal under Rule 12(b)(6) is proper if the elements of res judicata are apparent based on the facts pleaded and judicially noticed. *See Hall v. Hodgkins*, 305 F. Appx. 224, 227–28 (5th Cir. 2008); *Mitchell v. Ocwen Loan Servicing, LLC*, No. 4:18-cv-00820-P, 2019 WL 5647599, at \*3 (N.D. Tex. 2019). The fourth element of res judicata can be met where a claim or cause of action relates to the same "transaction, or series of transactions, out of which the [original] action arose." *Ries v. Paige* (*In re Paige*), 610 F.3d 865, 872 (5th Cir. 2010). "When applying this test, the primary question is whether the lawsuits were based on 'the same nucleus of operative fact,' regardless of the relief requested, or the claims brought. *Wade*, 2019 WL 433741, at \*3.

Highland argues that, when taking judicial notice of the docket created in connection with the HarbourVest Settlement, it is apparent that the four elements of res judicata are met: (1) CLO

---

("[a] case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal"); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.,* 740 F.2d 1011, 1018 (D.C. Cir. 1984) "([w]e note that the federal rule and the rule in this circuit is that collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal"); *see Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) ("To the same effect, in the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, it does not—until and unless reversed—detract from its decisiveness and finality").

003650

Holdco objected to the HarbourVest Settlement, and the DAF is in privity with CLO Holdco as its

100% parent; (2) the Bankruptcy Court was a court of competent jurisdiction over the HarbourVest

Settlement; (3) the Bankruptcy Court entered a final order based upon the merits of the

HarbourVest Settlement; and (4) the claims or causes of action arise out of the same "common

nucleus of operative facts" as those raised at the HarbourVest Settlement hearing.

To be clear, Highland argues the fourth element of res judicata is met because the claims

brought by the Plaintiffs in the Complaint are substantially similar to, and arise from the very same

facts, as those allegations that the Plaintiffs put forth during the Bankruptcy Court hearing on the

HarbourVest Settlement. In connection with the HarbourVest Settlement, Plaintiff CLO Holdco

argued to the Bankruptcy Court that the Debtor: (i) violated the HCLOF Members Agreement by

failing to offer such interests to Plaintiffs pursuant to a "Right of First Refusal" provision; and (ii)

diverted the investment opportunity to the Debtor without offering it to Plaintiffs. And the other

objectors (*i.e.,* the Dondero Family Trusts) argued to the Bankruptcy Court that the Debtor did not

accurately value the HCLOF 49.98% interest that was being transferred by HarbourVest back to

the Debtor.  The Bankruptcy Court overruled all of these arguments.

This court agrees that the claims being brought in the Adversary Proceeding arise from the

same "transaction or series of transactions" and are based on the "same nucleus of operative facts"

as were litigated and adjudicated in the Bankruptcy Court in connection with the HarbourVest

Settlement. The allegations take the form of causes of action for breach of fiduciary duties, breach

of contract, RICO violations, and tort claims, but ***all include the very same underlying factual***

***allegations as articulated in connection with the HarbourVest Settlement***.

However, while this court agrees with Highland that CLO Holdco's claims arise from "the

same common nucleus of operative fact" as the HarbourVest Settlement, this is not the end of the

003651

court's analysis. "Even if the two actions are the same under the transactional test, res judicata does not bar this action unless" the Plaintiffs "could and should have" brought the claims in the Complaint in the prior proceeding. *Osherow v. Ernst & Young (In re Intelogic, Inc.)*, 200 F.3d 382, 388 (5th Cir. 2000). The Fifth Circuit has recognized procedural differences between contested matters under Bankruptcy Rule 9014, such as the HarbourVest Settlement hearing, and adversary proceedings. The Fifth Circuit noted that "[c]ounterclaims are only compulsory in 'adversary proceedings,'" as Bankruptcy Rule 7013 (which adopts Federal Rule of Civil Procedure 13) does not automatically apply to "contested matters" under Bankruptcy Rule 9014. *D-1 Enterprises, Inc. v. Commercial State Bank*, 864 F.2d 36, 39 (5th Cir. 1989). The Fifth Circuit proceeded to suggest, under the "quick motion-and-hearing style" of contested matters, a party is not required, or even allowed, to bring all of its claims. *Howe v. Vaughn (Matter of Howe)*, 913 F.2d 1138, 1146 (5th Cir. 1990). The Fifth Circuit clarified that, whether the earlier proceeding that is being suggested as holding res judicata effect is a contested matter or an adversary is not dispositive; rather, it is a factor in determining whether the claim at issue could or should have been effectively litigated in the earlier proceeding. *See id.* at 1146 n.28; *see also Osherow*, 200 F.3d at 388 (the court weighed "whether the bankruptcy court possessed procedural mechanisms that would have allowed" the party to assert claims in the prior contested matter).

It is important to note that the Fifth Circuit has found, on numerous occasions in which the prior proceeding was a contested matter, versus an adversary proceeding, that res judicata still applied. *See, e.g., Osherow*, 200 F.3d at 388-91 (finding res judicata applied to malpractice claims that could have been asserted at a fee hearing); *In re Baudoin*, 981 F.2d 736, 744 (5th Cir. 1993) (ruling that res judicata barred lender liability claims based on loans that had been deemed allowed claims without objection in a previous bankruptcy); *Eubanks v. FDIC*, 977 F.2d 166, 174 (5th Cir.

003652

1992) (barring a lender liability action which could have and should have been brought as an objection to the lender's claim in a prior bankruptcy proceeding); *Southmark Properties v. Charles House Corp.,* 742 F.2d 862, 869 (5th Cir. 1984) (applying res judicata to bar a claim that could have been raised as an objection to a claim asserted in a previous bankruptcy reorganization). These opinions came in the context of a cause of action not being asserted to contest a proof of claim in a bankruptcy case. The Fifth Circuit found that objections to claims in the bankruptcy process, generally contested matters, provide procedural mechanisms to bring a claim for affirmative relief under Bankruptcy Rule 3007, which allows the claim objection to be converted to an adversary proceeding.[17] *Osherow,* 200 F.3d at 389-90.

But here, the Bankruptcy Court concludes that the Plaintiffs were not provided with procedural mechanisms needed in order to bring their causes of action in the Complaint during the HarbourVest Settlement contested matter. Despite the "transactional test" being met through a finding that the claims stem from "the same nucleus of operative facts," the procedures of Bankruptcy Rule 9014 do not allow for claims of affirmative relief—whether it be RICO violations, breach of contract, breach of fiduciary duties, or tort claims—to be asserted in response to a Bankruptcy Rule 9019 motion to compromise a controversy. The Fifth Circuit has not addressed procedural mechanisms supporting res judicata in the context of a Bankruptcy Rule 9019 motion to compromise a controversy, where the bankruptcy court is limited to determining whether or not to "approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a). Unlike in the context of claim objections, mentioned above, where counterclaims can allow the claim objection to be converted through Bankruptcy Rule 3007 to an adversary proceeding, such causes

---

[17] The court in *Osherow* went on to find that Bankruptcy Rule 9014 gives discretion to the bankruptcy court to allow other rules in Part VII of the Bankruptcy Rules to apply to contested matters. In that case, it suggested the bankruptcy court could have stayed the proceedings and allowed discovery to be commenced under the Part VII Rules to develop the affirmative causes of action to raise in the claim objection.

003653

of action have no mechanism to exist in the context of a Bankruptcy Rule 9019 motion. The bankruptcy court is limited to granting or denying a proposed settlement as relief in ruling on a Bankruptcy Rule 9019 motion—regardless of its findings on issues that may also serve for the foundation of the causes of action asserted in the subsequent hearing (*but see* "**Collateral Estoppel**" discussion below). Procedurally, this would not allow the subsequent causes of action to ever be raised, if res judicata were to apply to a contested matter under Bankruptcy Rule 9019, which does not allow for the assertion of counterclaims or other forms of affirmative relief.

Thus, the court finds that the Plaintiffs were not given the procedural mechanisms to bring the causes of action asserted in the Complaint during the pendency of the HarbourVest Settlement contested matter. The court finds that res judicata does not apply as a doctrine to preclude the claims asserted by the Plaintiffs in the Complaint.

D.    Collateral Estoppel

On the contrary, collateral estoppel **does** have applicability here. Arguments potentially relevant to the collateral estoppel doctrine were made by the parties in their pleadings and at the hearing on the Motion to Dismiss (phrased in terms of res judicata), but collateral estoppel *per se* was not addressed independently.[18] The Bankruptcy Court now addresses collateral estoppel *sua sponte*. Raising preclusion doctrines *sua sponte* is in the interest of judicial economy and is appropriate, especially where both actions are before the same court. *See Carbonell v. La. Dep't of Health & Human Res.*, 772 F.2d 185, 189 (5th Cir. 1985).

To be clear, "res judicata encompasses two separate, but linked, preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Hous. Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (quoting *Comer v. Murphy Oil*

---

[18] As mentioned at footnote 15, Highland did make a passing reference to the collateral estoppel doctrine in its Brief in Support of its Motion to Dismiss.

003654

*USA, Inc.,* 718 F.3d 460, 466–67 (5th Cir. 2013)). Thus, while res judicata precludes relitigating claims or causes of action that were or could have been previously litigated in a prior action, collateral estoppel is referred to as "issue preclusion" and prevents relitigating the same *issues or facts* decided in a prior proceeding. Collateral estoppel precludes only the relitigation of issues or facts *actually litigated* in the original action, whether or not the second suit is based on the same cause of action. *Moch v. East Baton Rouge Parish School Board,* 548 F.2d 594, 596 (5th Cir. 1977). "[A] *right, question, or fact distinctly put in issue and directly determined* as a ground of recovery by a court of competent jurisdiction collaterally estops a party ... from relitigating the issue in a subsequent action," if the party had reasonable notice and an opportunity to be heard against the claim. *Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 338 (5th Cir. 1982) (emphasis added). "Collateral estoppel applies when, in the initial litigation, (1) the issue at stake in the pending litigation is the same, (2) the issue was actually litigated, and (3) the determination of the issue in the initial litigation was a necessary part of the judgment." *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.,* 434 F.3d 320, 323 (5th Cir. 2005). Each condition must be met in order for collateral estoppel to apply. "Collateral estoppel will apply in a second proceeding that involves separate claims if the claims involve the same issue . . . and the subject matter of the suits may be different as long as the requirements for collateral estoppel are met." *In re Devoll,* No. 15-50122-CAG, 2015 WL 9460110, at *3 (Bankr. W.D. Tex. Dec. 23, 2015) (citation omitted).

So were each of these three collateral estoppel factors met? Were the *same* facts or issues *actually litigated* and was a determination of these facts and issues a *necessary part* of approving the HarbourVest Settlement? The Plaintiffs argued, in their response to the Motion to Dismiss, that the Bankruptcy Court did not resolve anything on the merits other than the approval of a

16

003655

settlement, and that was done solely using its discretion to approve a settlement. The court thinks that this is a mischaracterization of the court's role in approving the HarbourVest Settlement.

In considering a proposed compromise and settlement agreement, a bankruptcy court must determine whether it is "fair and equitable." *Matter of Jackson Brewing*, 624 F.2d 599, 602 (5th Cir. 1980); *United States v. AWECO, Inc. (In re AWECO)*, 725 F.2d 293, 298 (5th Cir. 1984), *cert. denied* 105 S. Ct. 244 (1984). A bankruptcy court applies a three-part test set out in *Jackson Brewing* with a focus on comparing "the terms of the compromise with the likely rewards of litigation." A bankruptcy court must evaluate: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise. These "other" factors—sometimes called the *Foster Mortgage* factors[19]—include: (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Official Comm. of Unsecured Creditors v. Moeller* (*In re Age Ref., Inc.*), 801 F.3d 530, 540 (5th Cir. 2015) (citations omitted).

In connection with evaluating the HarbourVest Settlement and whether it was "fair and equitable" and in the "best interests of creditors," and whether it was the "product of arms-length bargaining, and not of fraud or collusion," the Bankruptcy Court held a multi-hour hearing that included lengthy direct and cross-examination of multiple witnesses and documentary evidence. The Bankruptcy Court was required to "appraise [itself] of the relevant facts and law so that [it could] make an informed and intelligent decision." *See In re Cajun Elec. Power Coop.*, 119 F.3d 349, 356 (5th Cir. 1997). The hearing included considering the arguments and evidence regarding

---

[19] *Connecticut Gen. Life Ins. v. United Cos. Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d 914 (5th Cir. 1995).

003656

the methodology for the valuation of the HCLOF interest and the existence or non-existence of a "Right of First Refusal." The court heard credible testimony on, among other things, the value of the HCLOF interests from Mr. Seery and Mr. Pugatch. Both witnesses were subject to cross examination. The court heard how the value of the HCLOF interests plummeted nearly $50 million, which was caused, at least in part, by the litigation strategies taken by Highland while it was still under the control of Mr. Dondero.[20] The Plaintiffs allege in the Complaint that Mr. Seery's $22.5 million value of the HCLOF interest was baseless. The Plaintiffs believed the interests had a net asset value ("NAV") of at least $34.5 million on November 30, 2020, and a value of $41.75 million on December 31, 2020, leading up to the HabourVest Settlement hearing. Further, the Plaintiffs allege in the Complaint that Mr. Seery was receiving insider information from Mr. Dondero in December 2020 regarding the HCLOF interests and used improper valuation methods. But, for whatever reason, the Plaintiffs decided not to ask questions of Mr. Seery at the hearing or further challenge Mr. Seery's source or method of valuation for the HCLOF interests at the hearing.[21] The allegations in the Complaint surrounding Mr. Seery's method for valuation of the HCLOF interests were discoverable at the time of the HarbourVest Settlement hearing and directly relevant to the Bankruptcy Court's analysis in approving the HarbourVest Settlement. The Bankruptcy Court found the testimony elicited from Mr. Seery by Highland and the objectors to be credible in ultimately finding a $22.5 million value of the HCLOF interests was reasonable.

---

[20] Transcript of Hearing Held 1/14/2021, DE # 1765, at 96:20-97:24.

[21] Mr. Dondero and CLO Holdco appeared at and examined the HarbourVest witness, Mr. Pugatch, at a deposition before the hearing on the HarbourVest Settlement. Declaration of John Morris, Exhs. 7 & 8 thereto [DE # 2237]. Moreover, it is rather astounding to this court for anyone to suggest that any human being (Mr. Seery or anyone else) knew more, or withheld, any information that wasn't well known to Mr. Dondero and all principals/agents of DAF and CLO Holdco. Mr. Dondero and any personnel associated with DAF and CLO Holdco should have been as (or more) familiar with HCLOF's assets and their potential value than any human beings on the planet—having managed these assets for years.

003657

While a bankruptcy court does not delve into the merits of every possible claim that is waived or compromised through a settlement, here, (a) **consideration of the value that the estate was both receiving and paying**, as well as (b) the potential existence of a "Right of First Refusal" that might have prohibited the Transfer contemplated in the HarbourVest Settlement, were very much a focus of the hearing on the HarbourVest Settlement. These are the very same issues that are the gravamen of the Plaintiffs' Complaint. They were very much "actually litigated." The Bankruptcy Court would never have approved the HarbourVest Settlement if it thought the value being exchanged was not fair, or if it thought the HCLOF Interests could not be transferred and that someone might later sue the Debtor, claiming the Transfer was improper. All parties had the chance to argue and present evidence about this. The Bankruptcy Court made a ruling based on the evidence and argument.

Further, the Bankruptcy Court included in the HarbourVest Settlement Order language to specifically avoid any future assertions or litigation as to whether a "Right of First Refusal" prevented the transfer of HCLOF interests to Highland or a Highland designee/subsidiary:

> Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, **HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor** pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* **without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF**. (Emphasis added.)

The court included this express language to document its finding that no "Right of First Refusal" was enforceable under the HCLOF Members Agreement based on the court's analysis of the underlying agreements, as well as representations made by CLO Holdco that it was withdrawing its objection (that was wholly based on the alleged "Right of First Refusal"). A possible "Right of First Refusal" was fully briefed by the Debtor and CLO Holdco (with whom the DAF is in privity,

003658

as its 100% parent), and the merits of such was fully considered by this court in approving the HarbourVest Settlement.

Despite this court's conclusion that res judicata does not apply here because procedural mechanisms did not allow an assertion of causes of action in the context of a Bankruptcy Rule 9019 settlement, ***no barrier prevented the Plaintiffs from fully litigating the issues, rights, and facts at the HarbourVest Settlement hearing that form the gravamen of the Complaint***. While the causes of action in the Complaint could not be brought in connection with the HarbourVest Settlement contested matter, the issues and facts underlying the causes of action in the Complaint were fully litigated and ruled on in connection with the HarbourVest Settlement. Those issues were raised in objections and subject to witness testimony at the HarbourVest Settlement hearing and were the primary considerations that had to be evaluated for the Bankruptcy Court to approve of the HarbourVest Settlement. The Complaint fails to allege any facts independent of: (a) an improper valuation by Mr. Seery or (b) a failure by Highland to honor a "Right of First Refusal" in favor of CLO Holdco to support relief under its causes of action. Count 1 in the Complaint alleges that Highland breached a fiduciary duty to the Plaintiffs through diverting a corporate opportunity by not ***first offering*** the HCLOF interests to the Plaintiffs. While labeled as a claim for a "breach of fiduciary" duty, as opposed to a "breach of contract," the arguments are the same. Both counts argue that the HCLOF interests should have been offered to the Plaintiffs who held a superior right to purchase the interests. Again, this argument was presented in CLO Holdco's objection to the HarbourVest Settlement, which was withdrawn by CLO Holdco during the hearing. The Plaintiffs do not get a second bite of the apple at litigating a purported superior right, by dressing it up as different cause of action, when the issue at stake has already been litigated. Thus, both the HarbourVest Settlement and Complaint involve the same issues.

003659

In summary, the first and second elements of collateral estoppel are met. The issues of valuation and a "Right of First Refusal" were one and the same as those articulated in the Complaint and were "actually litigated" in connection with the HarbourVest Settlement.

Going through the third prong of collateral estoppel, it is also met. The facts regarding valuation of the HCLOF interests and whether Highland was required to offer the HarbourVest's HCLOF interests to CLO Holdco were very much **_necessary_** or **_essential_** to the Bankruptcy Court's ruling approving the HarbourVest Settlement. The Bankruptcy Court was required to consider the value of the HCLOF interests to determine whether the consideration the estate was receiving in the compromise was fair and equitable. Further, the court noted at the settlement hearing that the "Right of First Refusal" was one of the "major arguments" in connection with the HarbourVest Settlement and the court included language in the HarbourVest Settlement Order specifically finding no such right existed. The court would not have approved the HarbourVest Settlement if it thought that it could not be accomplished or would result in Highland later being sued. This would not have been in the best interests of the estate. Thus, the HCLOF interest valuation and the ability or propriety of Highland transferring the HCLOF interest were "a necessary part of the judgment."

Further, the Plaintiffs do not dispute CLO Holdco is in privity with DAF, as DAF is the parent and controlling entity of CLO Holdco. Instead, CLO Holdco argues that it somehow was not a party to the ongoing dispute between Highland and HarbourVest that led to the HarbourVest Settlement (although it was allowed to file objections and take discovery).

Bankruptcy is a collective proceeding that allows creditors to object and raise any argument they think the court should consider that bear on the wisdom of the compromise. Generally, for a party to be bound by orders issued by the bankruptcy court, the party must receive adequate notice of the proceedings for due process reasons. *In re Reagor-Dykes Motors, LP*, 613 B.R. 878, 885

(Bankr. N.D. Tex. 2020); *In re Grumman Olson Indus., Inc.,* 467 B.R. 694, 706 (S.D.N.Y. 2012); *see also Richards v. Jefferson Cty., Ala.,* 517 U.S. 793, 799, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) ("Additionally, where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate pre-existing rights if the scheme is otherwise consistent with due process."). The Bankruptcy Rules and bankruptcy jurisprudence provide for due process protection for settlements under Rule 9019(a) by requiring that a debtor in possession give creditors and parties in interest "adequate notice and opportunity to be heard before their interests may be adversely affected." *In re Reagor-Dykes Motors,* 613 B.R. at 885 (citing *W. Auto Supply Co. v. Savage Arms, Inc.* (*In re Savage Indus., Inc.*), 43 F.3d 714, 720 (1st Cir. 1994)). Rule 9019(a) further protects interested parties "[b]y requiring court approval following a hearing before any compromise or settlement may be enforced" to ensure a transparent settlement process and provide "other creditors an opportunity to voice their concerns." *In re Reagor-Dykes Motors,* LP, 613 B.R. at 886 (citing *In re Big Apple Volkswagen,* LLC, 571 B.R. 43, 57 (S.D.N.Y. 2017)). The Plaintiffs were properly noticed, as well as appeared and participated, in the Rule 9019 process.

Thus, the court concludes all three elements of collateral estoppel are met with regard to the fact issues of value of the HCLOF interests and any "Right of First Refusal" (and the ability/propriety of transferring the HCLOF interests). ***All of the causes of action in the Complaint (Counts 1-5) revolve around these two issues that were previously fully litigated.*** Thus, all causes of action asserted in the Complaint are precluded by the doctrine of collateral estoppel.

E.     Judicial Estoppel

The final preclusion doctrine, asserted by Highland, is judicial estoppel. Judicial estoppel is "a common law doctrine by which a party who has assumed one position in [their] pleadings may be estopped from assuming an inconsistent position." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988). The doctrine is made "to protect the integrity of the judicial process" by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest." *Id.* "[A] party cannot advance one argument and then, for convenience or gamesmanship after that argument has served its purpose, advance a different and inconsistent argument." *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 818 (5th Cir. 2002). "Statements made in a previous suit by an attorney before the court can be imputed to a party and subject to judicial estoppel." *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003). In order for a party to be estopped, two elements must be satisfied: (1) it must be shown "the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position. *In re Coastal Plains Inc.*, 179 F.3d 197, 206 (5th Cir. 1999).

The Plaintiffs argue, first, that withdrawing an objection and then raising the same argument later is not taking an "inconsistent position." Second, the Plaintiffs argue that, since the HarbourVest Settlement was approved and the objection was ***unsuccessful***, CLO Holdco could not "have convinced the court to accept that previous position."

Highland argues that CLO Holdco's withdrawal of its objection at the HarbourVest hearing, that was premised on a "Right of First Refusal" under the HCLOF Members Agreement, is, in fact, directly at odds with the Complaint, which asserts claims for violations of the same "Right of First Refusal." Further, Highland argues that the Bankruptcy Court, in ruling on the HarbourVest Settlement, relied on the withdrawal of that objection—noting that the withdrawal "eliminate[d] one of the major arguments" being heard in connection with the HarbourVest

Settlement. Highland cites Fifth Circuit authority noting that the "judicial acceptance' requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits." *Hall*, 327 F.3d at 398.

Here, the court believes that the first prong of judicial estoppel is met. At the HarbourVest Settlement hearing, CLO Holdco withdrew its objection, stating that it had determined it had no "Right of First Refusal," based on its "interpretation of the member agreement." Now Plaintiffs claim in their Complaint that CLO Holdco's "Right of First Refusal" was violated by the HarbourVest Settlement. These positions are clearly inconsistent. If that weren't enough, when asked by Debtor's counsel at the HarbourVest Settlement hearing to enter a stipulation reflecting the HarbourVest Settlement was compliant with all applicable agreements between CLO Holdco and the Debtor, counsel for CLO Holdco stated: "I'm not going to enter into a stipulation on behalf of my client, but *the Debtor is compliant with all aspects of the contract*. We withdrew our objection, and we believe that's sufficient."[22] This statement cannot conceivably coexist with the current assertion of a "Right of First Refusal." Moreover, to the extent Plaintiffs argue that CLO Holdco merely withdrew an objection pertaining to an alleged "Right of First Refusal" *in the HCLOF Members Agreement* (and not an objection arguing that Highland had some non-contractual obligation to offer the HarbourVest Interest to CLO Holdco first, based on "fiduciary duty" concepts), this is "no more than ineffectual hair splitting." *See Systems. Ahrens v. Perot Sys. Corp.*, 39 F.Supp.2d 773, 778 (N.D.Tex.1999) (in response to plaintiffs arguing a position taken in one suit could coexist with a position taken in a subsequent suit, despite each position being non-qualified, unconditional statements). It would seem to be the classic example of playing fast and loose with the court.

---

[22] Transcript of Hearing Held 1/14/2021, DE # 1765, at 17:24-18:16 (emphasis added).

003663

The court also believes that the second prong of judicial estoppel is met. The Fifth Circuit has held that judicial estoppel may be applied whenever a party makes an argument "with the explicit intent to induce the district court's reliance." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1047 (5th Cir. 1998). Further, the success requirement is satisfied when a court "necessarily accepted, and relied on" a party's position in making a determination. *Ahrens v. Perot Systems Corporation*, 205 F.3d 831, 836 (5th Cir. 2000). Here, while the Plaintiffs did not succeed in stopping the approval of the HarbourVest Settlement, that is not the proper inquiry. Instead, what matters is that the Bankruptcy Court carefully considered CLO Holdco's "Right of First Refusal" argument set out in its lengthy, written objection to the HarbourVest Settlement and perceived it as one of the major arguments that was relevant to the HarbourVest Settlement. At the HarbourVest Settlement hearing, the Plaintiffs stated: "CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. Based on our analysis of Guernsey law and some of the arguments of counsel in those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as Trustee for CLO Holdco, to withdraw the CLO Holdco objection based on the interpretation of the member agreement."[23] The Bankruptcy Court relied upon that withdrawal of CLO Holdco's objection in making the determination to approve of the HarbourVest Settlement and, specifically, that Highland would not be running afoul of any obligation in entering into the HarbourVest Settlement. There is no question that, by withdrawing the objection, CLO Holdco caused the court to rely upon its withdrawal in making such determination. Thus, the Plaintiffs "convinced the court to accept that previous position."

---

[23] *Id.* at 7:24-8:6.

003664

The Bankruptcy Court concludes both elements of judicial estoppel are met. Counts 2 and 5 of the Complaint are based solely upon a "Right of First Refusal" under the HCLOF Members Agreement. Thus, judicial estoppel bars Counts 2 and 5 of the Complaint.

## IV.     Conclusion

Based upon the facts alleged in the Complaint, the judicially noticed docket entries from the HarbourVest Settlement, and the arguments presented to the court, the court rules that, together, collateral estoppel and judicial estoppel preclude all claims brought in the Complaint. Therefore, the Motion to Dismiss is ***granted*** and the Complaint is dismissed in its entirety with prejudice.

Because this court believes the doctrines of collateral estoppel and judicial estoppel bar the claims of the Plaintiffs as a matter of law, the court—for the sake of efficiency and judicial economy—will forego addressing the other arguments of Highland. Specifically, Highland has argued that, even if all of the Plaintiffs' claims are not barred as a matter of law by preclusion or estoppel theories, Plaintiffs have failed to state plausible claims upon which relief can be granted with regard to the all of counts in the Complaint based on the RICO statute, Breach of Fiduciary Duty, Breach of Contract, Negligence, and Tortious Interference with Contract. While this court is inclined to agree with these arguments, the court will refrain from addressing them until such time as any higher court may instruct this court to address them.

Accordingly, it is

**ORDERED** that the Motion to Dismiss is **GRANTED** as to all causes of action (Counts 1-5) asserted in the Complaint with prejudice.

### ###END OF MEMORANDUM OPINION AND ORDER###

003665

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| CHARITABLE DAF FUND, L.P. AND CLO | § |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § |
| | § |
| Plaintiffs, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03067-sgj11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| HIGHLAND HCF ADVISOR, LTD., AND | § |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § |
| | § |
| Defendant. | § |
| | § |

## MOTION TO SUPPLEMENT APPELLATE RECORD

CLO Holdco, Ltd., and the Charitable Donor Advised Fund, Appellants in the above-styled

appeal from the United States Bankruptcy Court for the Northern District of Texas, respectfully

move to supplement the appellate record.

Currently before the District Court is the appeal of the bankruptcy court's dismissal of the adversary proceeding. One of the bases cited by the bankruptcy court for imposing judicial estoppel is a transcript of a hearing that occurred before the bankruptcy court, on January 14, 2021.[1] In the transcript of that hearing, counsel for the debtor, Mr. Morris, is quoted as stating (in relevant part),

> I would respectfully request that we just enter into a short stipulation on the record reflecting that the Debtor's acquisition of Harbourvest's interests in HCLOF is compliant with all of the applicable agreements between the parties.[2]

Immediately thereafter, prior counsel for CLO Holdco, Ltd., is quoted as responding:

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client, but the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.[3]

The bankruptcy court's dismissal of the entire adversary on judicial estoppel grounds hones in on the sentence "but the Debtor is compliant with all aspects of the contract" as a judicial admission which has been contradicted by the filing of the underlying suit.

Undersigned counsel requested the original recording of the hearing to verify the transcription. That recording was delivered on May 25, 2022. The recording makes clear that the word "but" at the beginning of "but the Debtor is compliant with all aspects of the contract" was wrongfully transcribed. The recording makes clear that what Mr. Kane said in actuality was:

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client **that** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient (emphasis added).

---

[1] *See* APP_000053.

[2] APP_001020.

[3] *Compare* APP_000053 (Order) *with* APP_001020 (Tr. Of Hearing).

**MOTION TO SUPPLEMENT APPELLATE RECORD**                                    **PAGE 2**

It is this correction—seemingly minor, but in the context of the opinion, is of significant consequence—that Appellants ask this for.

Federal Rule of Appellate Procedure 10(e) allows a court to correct a transcription error to ensure that the record accurately reflects what occurred in the lower court:

**(e) Correction or Modification of the Record.**

(1) If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.

(2) If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:

    (A) on stipulation of the parties;

    (B) by the district court before or after the record has been forwarded; or

    (C) by the court of appeals.

FED. R. APP. P. 10(e)(1)-(2)(A).

The bankruptcy court issued a corrected transcript on May 26, 2022. *See In re Highland Capital Management, L.P.,* No. 19-bk-34054, Docket No. 3348. Movants respectfully request that this corrected transcript be made part of the appellate record.

Dated: May 26, 2022               Respectfully submitted,

                                 **SBAITI & COMPANY PLLC**

                                 */s/ Mazin A. Sbaiti*
                                 **Mazin A. Sbaiti**
                                 Texas Bar No. 24058096
                                 **Jonathan Bridges**
                                 Texas Bar No. 24028835
                                 JPMorgan Chase Tower
                                 2200 Ross Avenue – Suite 4900W
                                 Dallas, TX  75201
                                 T:  (214) 432-2899
                                 F:  (214) 853-4367

003668

E:  mas@sbaitilaw.com
jeb@sbaitilaw.com

**Counsel for Plaintiffs**

## <u>CERTIFICATE OF CONFERENCE</u>

Undersigned counsel attempted to meet and confer with counsel for the debtor via email on May 25, 2022. Counsel for the debtor related that they would confirm whether they opposed or consented. At the time of preparation of this brief, 6:00 pm on May 26, 2022, we have not heard back. Should they respond we will supplement or amend this certificate.

*/s/  Mazin A. Sbaiti*
Mazin A. Sbaiti

1                                          **Amended 05/26/2022**

2                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
3                               DALLAS DIVISION

4                                     )   **Case No. 19-34054-sgj-11**
      In Re:                          )   Chapter 11
5                                     )
      HIGHLAND CAPITAL                 )   Dallas, Texas
6     MANAGEMENT, L.P.,               )   Thursday, January 14, 2021
                                      )   9:30 a.m. Docket
7            Debtor.                  )
                                      )   - MOTION TO PREPAY LOAN
8                                     )     [1590]
                                      )   - MOTION TO COMPROMISE
9                                     )     CONTROVERSY [1625]
                                      )   - MOTION TO ALLOW CLAIMS OF
10    _____)     HARBOURVEST [1207]

11                        TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                  UNITED STATES BANKRUPTCY JUDGE.

13    WEBEX APPEARANCES:

14    For the Debtor:           Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
15                              10100 Santa Monica Blvd.,
                                  13th Floor
16                              Los Angeles, CA  90067-4003
                                (310) 277-6910

17    For the Debtor:           John A. Morris
                                Gregory V. Demo
18                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
19                              New York, NY  10017-2024
                                (212) 561-7700
20
      For the Official Committee  Matthew A. Clemente
21    of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                                One South Dearborn Street
22                              Chicago, IL  60603
                                (312) 853-7539
23
      For CLO Holdco, Ltd.:     John J. Kane
24                              KANE RUSSELL COLEMAN LOGAN, P.C.
                                901 Main Street, Suite 5200
25                              Dallas, TX  75202
                                (214) 777-4261

Case 24-03406-sgj Doc 3-20 Filed 05/16/25 Entered 05/16/25 22:13:52 Page 2 of 173
Case 3:23-cv-01503-B Transcript of January Hearing Page 48 of 258 PageID 4047

2

| 1 | APPEARANCES, cont'd.: | |
|---|---|---|
| 2 | For James Dondero: | John T. Wilson |
| | | D. Michael Lynn |
| 3 | | John Y. Bonds, III |
| | | Bryan C. Assink |
| 4 | | BONDS ELLIS EPPICH SCHAFER |
| | | JONES, LLP |
| 5 | | 420 Throckmorton Street, |
| | | Suite 1000 |
| 6 | | Fort Worth, TX 76102 |
| | | (817) 405-6900 |
| 7 | | |
| | For Get Good Trust and | Douglas S. Draper |
| 8 | Dugaboy Investment Trust: | HELLER, DRAPER & HORN, LLC |
| | | 650 Poydras Street, Suite 2500 |
| 9 | | New Orleans, LA 70130 |
| | | (504) 299-3300 |
| 10 | | |
| 11 | For HarbourVest, et al.: | Erica S. Weisgerber |
| | | M. Natasha Labovitz |
| 12 | | Daniel E. Stroik |
| | | DEBEVOISE & PLIMPTON, LLP |
| 13 | | 919 Third Avenue |
| | | New York, NY 10022 |
| 14 | | (212) 909-6621 |
| 15 | For Highland CLO Funding, | Rebecca Matsumura |
| | Ltd.: | KING & SPALDING, LLP |
| 16 | | 500 West 2nd Street, Suite 1800 |
| | | Austin, TX 78701 |
| 17 | | (512) 457-2024 |
| 18 | Recorded by: | Michael F. Edmond, Sr. |
| | | UNITED STATES BANKRUPTCY COURT |
| 19 | | 1100 Commerce Street, 12th Floor |
| | | Dallas, TX 75242 |
| 20 | | (214) 753-2062 |
| 21 | Transcribed by: | Kathy Rehling |
| | | 311 Paradise Cove |
| 22 | | Shady Shores, TX 76208 |
| | | (972) 786-3063 |
| 23 | | |
| 24 | | |
| 25 | Proceedings recorded by electronic sound recording; | |
| | transcript produced by transcription service. | |

Case 19-34054-sgj11 Doc 3420-2 Filed 05/26/22 Entered 05/26/22 12:39:52 Page 3 of 173
Case 3:23-cv-01503-B Transcript of January 14, 2021 Hearing Page 49 of 258 PageID 4048

3

| 1 | <u>DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.</u> |
|---|---|
| 2 | THE CLERK:  All rise.  The United States Bankruptcy |
| 3 | Court for the Northern District of Texas, Dallas Division, is |
| 4 | now in session, the Honorable Stacey Jernigan presiding. |
| 5 | THE COURT:  Good morning.  Please be seated.  All |
| 6 | right.  We're a little late getting started because we had |
| 7 | lots of reading material for the Court today.  All right. |
| 8 | This is Judge Jernigan, and we have a couple of Highland |
| 9 | settings.  The HarbourVest matters are the primary thing we |
| 10 | have set today, and then we also have a Debtor's motion |
| 11 | pursuant to protocols for authority for Highland Multi-Strat |
| 12 | to prepay a loan. |
| 13 | All right.  Well, let's get a few appearances.  First, for |
| 14 | the Debtor team, who do we have appearing this morning? |
| 15 | MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff |
| 16 | Pomerantz, John Morris, and Greg Demo here on behalf of the |
| 17 | Debtor. |
| 18 | THE COURT:  Okay.  Thank you. |
| 19 | All right.  We have objections on HarbourVest.  Who do we |
| 20 | have appearing for Mr. Dondero this morning? |
| 21 | MR. WILSON:  Your Honor, it's John Wilson, and I'm |
| 22 | also joined by Michael Lynn, John Bonds, and Bryan Assink. |
| 23 | THE COURT:  Okay.  I'm sorry.  Could -- the court |
| 24 | reporter does yeoman's work in this case.  Let me just make |
| 25 | sure we got all three of those names.  Say again, Mr. Wilson. |

1        MR. WILSON:  John Bonds and Michael Lynn and Bryan

2  Assink.

3        THE COURT:  Oh, okay.  So, see, I thought I heard

4  somebody Wilson in all of that, which was why I was pressing

5  the issue.

6    All right.  Is Mr. Dondero present on the video for

7  today's hearing?

8        MR. WILSON:  I believe he is, Your Honor.

9        THE COURT:  Mr. Dondero, could you confirm that you

10  are out there?  (No response.)  Okay.  My court reporter says

11  he sees the name out there.  Is he in your office?

12        MR. WILSON:  Your Honor, he is appearing remotely

13  from my office.  I'm not sure exactly where he's appearing

14  from.

15        THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16  there and you're speaking up to confirm you're present, we're

17  not hearing you.  Maybe your device is on mute.  So please

18  unmute yourself.

19    (No response.)

20        THE COURT:  All right.  I'm going to take some other

21  appearances and you -- you need to try to communicate with

22  your client and let him know I need to confirm he's present.

23  Okay?

24    All right.  Meanwhile, let's go to our other Objectors.

25  CLO Holdco.  Who do we have appearing today?

003673

 1          MR. KANE:  John Kane; Kane Russell Coleman & Logan;

 2    on behalf of CLO Holdco.

 3          THE COURT:  All right.  Thank you, Mr. Kane.

 4      We had an objection from Dugaboy Investment Trust and Get

 5    Good Trust.  Who do we have appearing?

 6          MR. DRAPER:  Douglas Draper, Your Honor, for -- for

 7    Draper.

 8          THE COURT:  All right.  Thank you, Mr. Draper.

 9      All right.  I think those were the only written objections

10    we had.  Mr. Pomerantz, do you confirm, we don't have any

11    other objectors for the motions set, correct?

12          MR. POMERANTZ:  Your Honor, there was those three.

13          THE COURT:  I'm sorry.  I didn't catch your full

14    sentence.

15          MR. POMERANTZ:  That is correct, Your Honor.  There

16    were three objections to the motion.

17          THE COURT:  Okay.  Mr. Clemente, you're there for the

18    Creditors' Committee?

19          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

20    Clemente on behalf of the Official Committee of Unsecured

21    Creditors.

22          THE COURT:  All right.  Good morning.  Thank you.

23    All right.  We have a lot of other folks on the video.  I'm

24    not going to go ahead and take a roll call of other lawyers.

25          MS. WEISGERBER:  Your Honor?

Case 3:40-cv-00670-L-BT Document 342 Filed 05/26/22 Entered 05/26/22 21:39:04 Page Desc173
Case 3:23-cv-01503-B Transcript of January Filed 09/11/23 Hearing Page 52 of 258 PageID 4051

6

```
 1              THE COURT:  Yes?

 2              MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

 3   Weisgerber from Debevoise on behalf of HarbourVest.

 4              THE COURT:  Okay.

 5              MS. WEISGERBER:  And I'm joined by Natasha Labovitz

 6   and Dan Stroik --

 7              THE COURT:  Okay.

 8              MS. WEISGERBER:  -- from Debevoise as well.

 9              THE COURT:  Thank you.  I was neglectful in not

10   getting your appearance, because, of course, you're at the

11   front and center of this motion to compromise, and I did see

12   that you filed a reply brief yesterday afternoon.  Okay.

13   Thank you.

14       All right.  Do we have -- do we have Mr. Dondero on the

15   line?  I'm going to check again.

16       (No response.)

17              THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18   so please unmute your device.

19              MR. WILSON:  Your Honor, it appears to me that Mr.

20   Dondero's device was unmuted as soon as you asked if he was

21   available.  I sent him a communication a second ago asking if

22   he's having technical difficulties.  I have not received a

23   response, so I --

24              MR. DONDERO:  Hello.  Can anybody hear me?

25              THE COURT:  Oh.
```

1          MR. WILSON:  Okay.  I hear him.

2          THE COURT:  Mr. Dondero?

3          MR. DONDERO:  Hello?

4          THE COURT:  Is that you?

5          MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6    everything since the beginning.  It's just we've had technical

7    difficulties.  I couldn't use the Highland offices.  We've

8    been trying to set up something else.

9          THE COURT:  All right.

10          MR. DONDERO:  But I'm on now, if -- yes.

11          THE COURT:  All right.  Very good.  Well, I'm glad

12    we've got you.

13       All right.  Well, Mr. Pomerantz, how did you want to

14    proceed this morning?

15          MR. POMERANTZ:  Your Honor, we could take up the

16    HarbourVest motion first, and I will turn it over to John

17    Morris.  He and Greg Demo will be handling that.  And then

18    after that we can handle the other motion, which is unopposed.

19          THE COURT:  All right.  Mr. Morris?

20          MR. KANE:  Your Honor, this is -- sorry.  This is

21    John Kane for CLO Holdco.  Just very briefly, if I may.  And

22    this will affect, I think, the Debtor's case in chief, so I'll

23    expedite things a little bit, I believe.

24       CLO Holdco has had an opportunity to review the reply

25    briefing, and after doing so has gone back and scrubbed the

003676

```
 1   HCLOF corporate documents.  Based on our analysis of Guernsey
 2   law and some of the arguments of counsel in those pleadings
 3   and our review of the appropriate documents, I obtained
 4   authority from my client, Grant Scott, as Trustee for CLO
 5   Holdco, to withdraw the CLO Holdco objection based on the
 6   interpretation of the member agreement.
 7              THE COURT:  All right.  Well, thank you for that, Mr.
 8   Kane.  I think that -- that eliminates one of the major
 9   arguments that we had anticipated this morning.  So, thank you
10   for that.
11        Any other housekeeping matters that maybe someone had that
12   I didn't ask about?
13              MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca
14   Matsumura from King & Spalding representing Highland CLO
15   Funding, Ltd.  I just wanted to put on the record, we -- our
16   client had requested that some of its organizational documents
17   be filed under seal.  But we have given permission for the
18   parties to present the relevant excerpts, to the extent it's
19   still relevant after Mr. Kane's announcement, in court.  And
20   we'd just ask that the underlying documents remain sealed, but
21   we're not going to object if they show them on a PowerPoint or
22   anything like that.
23        So, to the extent that you had that on your radar, I just
24   wanted to clear that up for the proceedings.
25              THE COURT:  All right.  Well, I did sign an order
```

Case 24-03647-sgj Doc 34-2 Filed 05/26/22 Entered 05/26/22 23:52:45 Desc 173
Case 3:23-cv-01503-B Document of January Filed 00/11/23 Page 55 of 258 PageID 4054

9

1    late last night.  I don't know if it's popped up on the

2    docket.

3         MS. MATSUMURA:  Yes, Your Honor.  That's what this

4    referred to.  That was what -- these are the documents that

5    were being sealed.  And so I just wanted to note, if you --

6    you know, if the Debtor puts up an excerpt of those documents

7    and you're like, wait a minute, didn't I seal those, that we

8    were the party that requested them be under seal and we're

9    fine with them being shown in court, as long as the underlying

10   documents aren't publicly accessible.

11        THE COURT:  Okay.  Got you.  Thank you.

12      All right.  Any other housekeeping matters?

13        MR. MORRIS:  Yes, Your Honor.  This is John Morris

14   from Pachulski Stang for the Debtor.  Good morning.

15        THE COURT:  Good morning.

16        MR. MORRIS:  The only other matter that I wanted to

17   raise, and I can do it now or I can do it later, or Your Honor

18   may tell me that it's not appropriate to do at this time, is

19   to schedule the Debtor's motion to hold Mr. Dondero in

20   contempt for violation of the TRO.

21        THE COURT:  All right.  Well, let's do that at the

22   conclusion today.  And please make sure I do it.  I think I

23   was going to address this last Friday, and we went very late

24   and it slipped off my radar screen.  But I did see from my

25   courtroom deputy that you all were reaching out to her

1    yesterday to get this set, and then Mr. Dondero's counsel

2    reached out to her and said, We're going to file an objection

3    to a setting next Wednesday, or I think you had asked for a

4    setting next Tuesday or Wednesday.

5           MR. MORRIS:  I did.

6           THE COURT:  And I don't -- I don't know if that

7    response/objection was ever filed last night.  I haven't seen

8    it if it was.  So, we'll -- please, make sure I don't forget.

9    We'll take that up at the end of today's matters.  All right.

10   Well, --

11          MR. MORRIS:  All right.  So, --

12          MS. WEISGERBER:  Your Honor, one last housekeeping

13   item from -- I'm joined this morning by Michael Pugatch of

14   HarbourVest, who will present some testimony this morning.  I

15   just want to confirm he's on the line and confirm no

16   objections to him sitting in for the rest of the hearing.

17          THE COURT:  All right.  Mr. Pugatch, this is Judge

18   Jernigan.  Could you respond?  Are you there with us?

19          MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20   Pugatch from HarbourVest here.

21          THE COURT:  All right.  Very good.  I think we had

22   you testify once before in the Acis matter, if I'm not

23   mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24   I can't remember.

25      All right.  So, we're going to let Mr. Pugatch sit in on

Case 19-34054-sgj1 Doc 3648 Filed 05/26/22 Entered 05/26/22 11:29:52 Page Desc
Case 3:23-cv-01503-B Document 18-8 Filed 01/11/23 Hearing Page 57 of 258 PageID 4056

11

1    this.  Anyone want to say anything about that?  I consider him

2    a party representative, so I don't -- I don't think anyone

3    could invoke the Rule.

4         All right.  Very good.  Well, let's go forward if there

5    are no more housekeeping matters.

6              MR. MORRIS:  Okay.

7              THE COURT:  Mr. Morris?

8              MR. MORRIS:  Thank you.  Thank you very much, Your

9    Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10   Debtor.

11        It's a rather straightforward motion today.  It's a motion

12   under Rule 9019, pursuant to which the Debtor requests the

13   Court's authority and approval to enter into a settlement

14   agreement with HarbourVest that will resolve a number of

15   claims that HarbourVest has filed against the Debtor.

16        What I -- the way I propose to proceed this morning, Your

17   Honor, is to give what I hope is an informative but relatively

18   brief opening statement.  I'll defer to HarbourVest and its

19   counsel as to whether they want to make a presentation in

20   advance of the offer of evidence.  Any objecting party, I

21   suppose, should then be given the opportunity to present their

22   case to the Court.  Then the Debtor will call Jim Seery, the

23   Debtor's CEO and CRO.  We will offer documents into evidence.

24   I would propose then that the objecting parties take the

25   opportunity to ask Mr. Seery any questions they'd like on the

Case 3:21-cv-00071-sgj Doc 36-1 Filed 05/26/22 Entered 05/26/22 21:59:52 Page Desc
Case 3:23-cv-00058-B Document 18-18 Filed 09/11/23 Page 58 of 173 PageID 4057

12

1    matter.

2         After the Debtor rests, I think HarbourVest would like to

3    put Mr. Pugatch on the stand to offer some testimony on their

4    behalf.  And I think that that will conclude the case.  We can

5    finish up with some closing arguments as to what we believe

6    the evidence showed, but that's the way that I'd like to

7    proceed, if that's okay with the Court.

8              THE COURT:  All right.  That sounds fine.

9              OPENING STATEMENT ON BEHALF OF THE DEBTOR

10             MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11   is a -- this should be a very straightforward motion under

12   Rule 9019.  The standard is well-known to the Court.  There

13   are four elements to a 9019 motion.  The Debtor clearly has

14   the burden of proof on each one.  And we easily meet that

15   burden, Your Honor.

16        The standard, just to be clear, the first part is that we

17   have to establish a probability of success, with due

18   consideration for uncertainty of law and fact.  The second one

19   is the complexity, likely duration, expense and inconvenience

20   of the litigation.  The third part of the test is the

21   paramount interest of creditors.  And the fourth part of the

22   test is whether or not the proposed settlement was reached

23   after arm's-length negotiations.

24        The Debtor believes that it easily meets this standard,

25   and frankly, is a little bit frustrated that it's being forced

Case 19-34054-sgj11 Doc 3642 Filed 05/26/23 Entered 05/26/23 11:29:57 Page 1 of 173
Case 3:23-cv-01503-B Document 18-18 Filed 09/11/23 Page 59 of 258 PageID 4058

13

1    to incur the expense by Mr. Dondero in going through this

2    process.

3        A plain reading, a fair reading of the economics here

4    relative to the claim shows that this is a very reasonable

5    settlement.  I don't need to go beyond that, Your Honor.  I

6    don't even need to use the word reasonable.  It surely meets

7    the lowest standard.

8        We've prepared a couple of demonstrative exhibits, Your

9    Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10   just put one up on the screen now, if I may.

11       Ms. Canty, can you please put up Demonstrative Exhibit #3?

12       Demonstrative Exhibit #3 is an outline of the economics of

13   the settlement.  It includes the various pieces, the

14   components that the parties have agreed to.  And it shows, at

15   least from the Debtor's perspective, just what HarbourVest is

16   being given here.

17       Up on the screen is a demonstrative exhibit.  It has

18   citations to the evidence that will be admitted by the Court.

19   The first line shows that HarbourVest will receive a $45

20   million allowed general unsecured nonpriority claim.  And that

21   -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22   Page 2.

23       That claim is discounted by the expected recovery that

24   general unsecured creditors are supposed to get.  As of

25   November, in the liquidation analysis that was part of the

003682

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 11:29:52 Page 1 of 173
Case 3:23-cv-00583-B Document 18-18 Filed 09/11/23 Hearing Page 60 of 173 PageID 4059

14

1    disclosure statement -- that's the citation in the footnote --
2    the Debtor believed that unsecured creditors were estimated to
3    recover approximately eighty-seven and a half cents on the
4    dollar.  And so we just did the arithmetic there to get to the
5    net economic value of the proposed general unsecured claim.

6        And from that, we reduced $22-1/2 million because that is
7    the net asset value of HarbourVest's interest in HCLOF, which,
8    pursuant to the settlement agreement, it will transfer back to
9    the Debtor, so that the net economic value is approximately
10   $16.8 million.

11       You will hear testimony from Mr. Seery that this number
12   is, in fact, overstated, and it's overstated because, since
13   the time the disclosure statement was filed in November, a
14   number of events have occurred that will -- that have caused
15   the estimated recovery percentage to be reduced from
16   approximately 87-1/2 percent to something lower than that.  We
17   don't have the exact number, Your Honor, but Mr. Seery will --
18   and the evidence will show that there's been more expenses,
19   that there's been some resolution of certain claims.  There's
20   been some positive issues, too.  But that number is probably
21   in the 70s somewhere.

22       And in any event, I think the point here is, Your Honor,
23   HarbourVest invested $80 million in HCLOF, which was going to
24   participate in the investment in CLOs.  They filed a claim for
25   $300 million, through treble damages and other claims.  But

003683

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 61 of 173
Case 3:23-cv-00688-B Document 18-13 Filed 09/11/23 Page 61 of 173 PageID 4060

15

1    the net economic impact of this is going to be somewhere

2    probably in between $12 and $14 million.  I'll let Mr. Seery

3    give more precision to that.  And it represents less than -- a

4    less than five percent recovery on the total claim.

5         And we think it's important for the Court to keep that in

6    mind.  What are the economics here?  Are we overpaying?  Is

7    this an unreasonable settlement?  And I think the evidence

8    will show that the Debtor is not, but that this settlement

9    that you see before you was the product of arm's length, and

10   I'm going to go in reverse order of the four-part test under

11   9019.

12        So, the last part is whether or not the settlement, the

13   proposed settlement was the product of arm's-length

14   negotiation.  You'll hear lots of evidence that this

15   settlement that's up on the screen right now very much was the

16   product of arm's-length negotiation.

17        The third part of the test, Your Honor, is whether it

18   meets the paramount interest of creditors.  You know,

19   regrettably, Mr. Dondero is the only purported creditor who is

20   objecting here.  He may have done so through different

21   vehicles, but every objecting party here is a debtor [sic]

22   owned and controlled by Mr. Dondero.  No other creditor -- not

23   the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24   -- nobody is objecting to this settlement except for Mr.

25   Dondero.  And we believe that that highlights the Debtor's

Case 3:23-cv-05038-1-sgj Doc 364 Filed 05/26/23 Entered 05/26/23 21:39:52 Page Desc of 173
Case 3:23-cv-05038-B Document 18-13 Filed 2021 Hearing Page 62 of 258 PageID 4061

16

 1  ability to meet the third prong of the test, and that is these

 2  are -- this settlement is in the paramount interest of

 3  creditors.

 4      Again, going in reverse, the second part of the test is

 5  the complexity, duration, and expense of litigation.  There

 6  will be no disputed evidence that we meet -- the Debtor easily

 7  meets this prong of the test.  The evidence is going to show

 8  that HarbourVest's claim is based on fraud, fraud in the

 9  inducement, fraudulent statements and omissions, the kind of

10  case, Your Honor, that I'm sure you're familiar with that is

11  incredibly fact-intensive, that will be incredibly difficult

12  to navigate through.  It will be prolonged, it will be

13  expensive, because you're necessarily relying on he said/she

14  said, basically.  And so we're going to have to get testimony

15  from every person that spoke in connection with the events

16  leading up to the transaction.  So we think the second prong

17  will be easily met, Your Honor.

18      And then the last prong -- the first prong, if you will --

19  is the likelihood of success on the merits.  We think that the

20  settlement, the economic recovery that's up on the screen

21  here, which ultimately will be less than five percent of the

22  claimed amount, in and of itself shows that the settlement is

23  consistent with the Debtor's perception of its likely success

24  on the merits.  I'm certain that HarbourVest disagrees, but

25  that's okay, we're here today and that's the Debtor's view,

1  and the Court is here to assess the Debtor's business judgment

2  and whether the Debtor has properly analyzed the issues and

3  gone through the process. And the evidence will show

4  conclusively that it will. That it has.

5      Mr. Seery will testify at some length as to the risks that

6  he saw. I think that you'll hear counsel for Mr. Dondero ask

7  both Mr. Seery and Mr. Pugatch a number of questions designed

8  to elicit testimony about this defense or that defense. And

9  it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered. In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

003686

1  ability of the Debtor to engage in the transfer or the

2  acquisition of the asset from HarbourVest. I would -- I would

3  respectfully request that we just enter into a short

4  stipulation on the record reflecting that the Debtor's

5  acquisition of HarbourVest's interests in HCLOF is compliant

6  with all of the applicable agreements between the parties.

7      And with that, Your Honor, I look forward to putting Mr.

8  Seery on the stand and presenting the Debtor's case.

9          THE COURT: All right. Other opening statements?

10         OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11         MR. KANE: Yes, Your Honor. Sorry. John Kane on

12  behalf of CLO Holdco.

13      In response to Mr. Morris, I'm not going to enter into a

14  stipulation on behalf of my client that the Debtor is

15  compliant with all aspects of the contract. We withdrew our

16  objection, and we believe that's sufficient.

17         THE COURT: All right. Well, I'm content with that.

18      Other opening statements?

19          OPENING STATEMENT ON BEHALF OF HARBOURVEST

20         MS. WEISGERBER: Your Honor, Erica Weisgerber on

21  behalf of HarbourVest.

22      HarbourVest joins in Mr. Morris's comments in support of

23  the settlement, and we believe that the question of whether

24  the settlement between HarbourVest and the Debtor satisfies

25  the Rule 9019 standard is not even a close one.

Case 19-34054-sgj11 Doc 3642 Filed 05/26/22 Entered 05/26/22 11:29:52 Page 19 of 173
Case 3:23-cv-01503-B Document 18-8 Filed 09/11/23 Page 65 of 258 PageID 4064

19

 1      Some Objectors have made arguments about the merits of

 2   HarbourVest's claims, which is why we're here.  As Your Honor

 3   will hear this morning, HarbourVest has meaningful and

 4   meritorious claims against Highland, but made the business

 5   decision to avoid the time, expense, and inherent risk of

 6   litigation in the interest of preserving value, both for

 7   itself and for the estate.

 8      Today, Michael Pugatch, a managing director of

 9   HarbourVest, will testify before the Court.  He'll explain

10   that HarbourVest claims against Highland arise out of certain

11   misrepresentations and omissions by Highland to HarbourVest in

12   connection with HarbourVest's purchase of an interest in

13   HCLOF, one of Highland's managed funds.  Those

14   misrepresentations and omissions, as Your Honor will hear,

15   relate to Highland's litigation with its former employee,

16   Joshua Terry, and transfers that were conducted in 2017 to

17   strip Acis of value and prevent Mr. Terry from collecting on

18   an $8 million judgment.

19      Mr. Pugatch will further explain that HarbourVest would

20   not have invested in HCLOF had it known the underlying facts

21   about those Acis transfers.

22      Mr. Pugatch will also testify that not only did

23   HarbourVest not know about those transfers, it learned about

24   those transfers when it was accused of orchestrating the

25   transfers itself in the Acis bankruptcy.  Your Honor will hear

1  that the Acis trustee sought extensive discovery from

2  HarbourVest after numerous accusations that HarbourVest was

3  behind the transfers.

4      Mr. Pugatch will also testify that Highland charged legal

5  fees for itself and its affiliates to HCLOF, essentially

6  forcing HCLOF to fund the litigation involving the Acis

7  bankruptcy and Mr. Terry.

8      In total, HarbourVest's claims for damages are over a

9  hundred million dollars in investment-related losses, lost

10 profits, legal fees inappropriately charged to HCLOF, its own

11 legal fees.  And that's before interest or trebling damages.

12     But HarbourVest stands ready to litigate its claims, but

13 following hard-fought and extensive negotiations with the

14 Debtors, the parties reached the settlement that's now before

15 the Court.  Mr. Pugatch's testimony regarding the strong

16 factual bases for HarbourVest's claims against Highland and

17 its recoverable damages will further underscore the risks that

18 the Debtors faced if they chose to litigate these claims, and

19 why this settlement is fair, equitable, and in the best

20 interest of the estate.

21         THE COURT:  All right.  Thank you, Counsel.

22     Other opening statements?

23   OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24         MR. DRAPER:  Your Honor, this is Douglas Draper on

25 behalf of one of the Objectors.  I'd like to just make a few

1    comments with respect to what I've heard and what the Court is

2    going to hear.

3        The first issue I'd like to address is the comment by

4    counsel for the Debtor that no other party has objected.  The

5    9019 motion is one of the issues that this Court has to rule

6    on, whether or not there was an objection or not.  So the fact

7    that this may be -- bankruptcy is not a popularity contest and

8    not an issue of who votes for what and doesn't vote.  This,

9    along with the 1129(a) tests, are clearly within your

10   province, and you need to listen carefully because you'll have

11   to make your own independent analysis whether my objection is

12   correct or incorrect.

13       Two other points I'd like to make that I think are very

14   salient.  Number one is, if you look at the Debtor's

15   disclosure statement, it basically took the position that the

16   HarbourVest claim is of little or no value.  And lo and

17   behold, thirty days later, there's a settlement that brings

18   about a significant recovery to HarbourVest.  The timing is

19   interesting, and I think the Court needs to pay careful

20   attention to what transpired between the two dates.

21       And then the last point I'd like to make is, as you listen

22   to the evidence, and what I learned abundantly clear from

23   hearing the depositions, is that the claim of HarbourVest, if

24   there is a claim at all, is probably one hundred percent --

25   should be subordinated in that it appears to arise out of the

003690

Case 3:21-cv-01054-L Document 36-4 Filed 05/26/22 Entered 05/26/22 11:39:52 Page 22 of 173
Case 3:23-ap-03003-Brad Document 1-8 By Filed 09/11/23 Hearing Page 68 of 258 PageID 4067

22

1  purchase or sale of a security. And, again, I would ask the

2  Court to listen carefully to this because that's what it

3  appears to be and that's what the evidence is going to show to

4  the Court.

5          THE COURT: All right. Mr. Draper, let me clarify

6  something I'm not sure if I heard you say or not. Were you

7  saying that the Court still needs to drill down on the issue

8  of whether the Debtor can acquire HarbourVest's interest in

9  HCLOF?

10          MR. DRAPER: No.

11          THE COURT: Okay. I was confused whether you were

12  saying I needed to take an independent look at that, now that

13  the objection has been withdrawn of Holdco. You are not

14  pressing that issue?

15          MR. DRAPER: No, I am not. Basically, I think it's

16  the fairness of the settlement. I think the transferability

17  of the interest is separate and apart from the fairness of the

18  settlement itself. I think the fairness -- the

19  transferability was a contractual issue between two parties

20  that the Court does not have to drill down on.

21          THE COURT: All right. I have another question for

22  you. I want to clarify your client's standing. Tell me --

23  I'm looking through a chart I printed out a while back. I

24  guess Dugaboy Investment Trust filed a couple of proofs of

25  claim; is that right?

003691

Case 3:23-cv-00609-sdj Document 364-2 Filed 05/26/23 Entered 05/26/23 21:29:52 Page 28 of 173
Case 3:23-ap-00609-BR Document 18-2 By Filed 2021 Hearing Page Page 23 of 173 PageID 4068

23

1          MR. DRAPER:  Yes.

2          THE COURT:  Okay.  What --

3          MR. DRAPER:  And objections are pending.

4          THE COURT:  Pardon?

5          MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7          THE COURT:  Okay.

8          MR. DRAPER:  -- and have not been litigated.

9          THE COURT:  And what about Get Good Trust?

10         MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12         THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16         MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22       And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25       The second part to the Dugaboy ownership is we own an

 1  interest in the Debtor.  And so we are, in fact, a party in
 2  interest.
 3            THE COURT:  Okay.
 4            MR. DRAPER:  It may be a small interest, but it is an
 5  interest.
 6            THE COURT:  It has a limited partnership interest in
 7  the Debtor?
 8            MR. DRAPER:  Yes.
 9            THE COURT:  Is that correct?
10            MR. DRAPER:  Yes.
11            THE COURT:  Okay.  Well, I'll move forward.  Thank
12  you.
13       Does that cover -- any other opening statements?  I think
14  that covered everyone who was -- who filed some sort of
15  pleading today.  No.
16            MR. WILSON:  Your Honor, John Wilson on behalf of --
17            THE COURT:  I'm sorry.  I'm sorry.
18            MR. WILSON:  -- Mr. Dondero.
19            THE COURT:  I missed Mr. Dondero's counsel.  I knew
20  we had visited at some point this morning.  I just got
21  confused there.  Go ahead, Mr. Wilson.
22            MR. WILSON:  No problem, Your Honor.  I was just
23  going to say that we will reserve our comments until after the
24  conclusion of the testimony.
25            THE COURT:  All right.  Very well.

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 11:29:52 Page 25 of 173
Case 3:23-cv-01503-B Document 18-18 Filed 09/11/23 Hearing Page 71 of 258 PageID 4070

25

1        Mr. Morris, you may call your first witness.

2           MR. MORRIS:  Thank you, Your Honor.  Before I do,

3 just two very, very quick points.

4           THE COURT:  Okay.

5           MR. MORRIS:  To be clear, Dugaboy's interest in the

6 Debtor is 0.1866 percent.  Less than two-tenths of one

7 percent.

8        Secondly, the argument that Mr. Draper just made with

9 respect to subordination is one that appears in nobody's

10 papers.  And, in fact, not only doesn't it appear in anybody's

11 papers, but Mr. Dondero, I believe, specifically took issue

12 with the fact that a portion of the consideration that

13 HarbourVest would receive would be on a subordinated basis,

14 and he would -- and I think he took the position there is no

15 basis to give them a subordinated claim.

16        So, I just wanted to point those items out to the Court,

17 not that I think either one makes a large difference today,

18 but I do want to deal with the facts.

19           THE COURT:  Thank you.

20           MR. MORRIS:  The Debtor would call -- you're welcome,

21 Your Honor.  The Debtor calls Mr. James Seery.

22           THE COURT:  All right.  Mr. Seery, welcome back to

23 virtual court.  If you could say, "Testing, one, two" so I can

24 see you and swear you in.

25           MR. SEERY:  Testing, one, two.

003694

Seery - Direct                    26

1           THE COURT:  All right.  I heard you but I'm not yet

2   seeing your video.  Is your video turned on?

3           MR. SEERY:  Video is on.  Yes, Your Honor.

4           THE COURT:  Okay.  I see you now.  Please raise your

5   right hand.

6           JAMES SEERY, DEBTOR'S WITNESS, SWORN

7           THE COURT:  Thank you.  Mr. Morris?

8           MR. MORRIS:  Thank you, Your Honor.

9                   DIRECT EXAMINATION

10  BY MR. MORRIS:

11  Q    Good morning, Mr. Seery.  Can you hear me?

12  A    I can.  Thank you, Mr. Morris.

13  Q    Okay.  Let's just cut to the chase here.  Are you familiar

14  with HarbourVest's claims filed against the Debtor?

15  A    I am, yes.

16  Q    And did you personally review them?

17  A    I did, yes.

18  Q    Do you recall that over the summer the Debtor objected to

19  HarbourVest's claim?

20  A    Yes, we did.

21  Q    Why -- can you explain to the judge why Harbour -- why the

22  Debtor objected to HarbourVest's claim last summer?

23  A    Sure.  The HarbourVest claims, I believe there are about

24  six of them, initially were filed, and they were -- they were

25  relatively vague in terms of what the specifics of the claims

003695

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 11:29:52 Page 27 of 173
Case 3:23-cv-01503-B Document 18-13 Filed 09/11/23 Page 73 of 258 PageID 4072

Seery - Direct                                    27

1   were.

2        So, we saw the claims but didn't, frankly, pay a lot of

3   attention to the underlying transaction that was referred to

4   in the proofs of claim and the losses that HarbourVest had

5   claimed to suffer -- to suffer with respect to their purchase

6   of securities related to HCLOF and the damages caused by the

7   Acis case.  So we filed a pretty pro forma objection.  I

8   believe it was a simply stated objection that we didn't have

9   any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q    Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A    Yes.  Yes, I am aware.

15  Q    And did you familiarize yourself with that particular

16  response?

17  A    I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

Seery - Direct                    28

1        In addition, and this was the first time we saw that,

2   HarbourVest brought forth its claims that it was entitled to

3   effectively rescind the transaction.  And I say rescind the

4   transaction:  In security parlance, they claim that they were

5   induced by fraud, I think as most are -- to enter into the

6   transaction.

7        As most are aware, the liability limitations in the OMs

8   and the exculpation in the documents are pretty broad, and

9   HarbourVest's position was that they weren't going to be

10  subject to those limitations because the actual transaction

11  that they entered into was a fraud on them, designed by Mr.

12  Dondero, Mr. Ellington, and the Highland team.

13  Q    All right.  Let's talk about your understanding, the

14  Debtor's understanding of the factual background to

15  HarbourVest's claim.  What is your understanding of the

16  investment that HarbourVest made?

17  A    Well, HarbourVest made an investment in the Highland CLO

18  business.  The Highland CLO business was -- was Acis.  And

19  effectively, the business had been separated, but in name

20  only.  Acis was just a shell, with a few partners --

21  obviously, Mr. Terry as well -- but it was all Highland

22  personnel doing all the work.

23       And what they were trying to do with Acis was, in essence,

24  resuscitate a business that had been in a bit of a decline

25  from its pre-crisis heyday.

003697

Case 19-34054-sgj1 Doc 3648 Filed 05/26/23 Entered 05/26/23 21:29:52 Page 29 of 173
Case 3:23-cv-01503-B Document 18-13 Filed 09/11/23 Page 75 of 258 PageID 4074

Seery - Direct                                    29

1    They were looking to take additional outside capital.

2    They would -- they would pay down or take money out of the

3    transaction, Highland would, or ultimately Mr. Dondero, and

4    they would -- they would seek to invest in Acis CLOs,

5    Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6    and potentially new CLOs, but with the Acis CLOs, they'd seek

7    to reset those and capture what they thought would be an

8    opportunity in the market to -- to really use the assets that

9    were there, not have to gather assets in the warehouse but be

10   able to use those assets to reset them to market prices for

11   the liabilities and then make money on the equity.

12   Q    Do you have an understanding --

13   A    Then --

14   Q    I'm sorry.  Go ahead.

15   A    Why don't I continue?  So, the transaction, they found

16   HarbourVest as a potential investor, and the basis of the

17   transaction was that they would make an investment into Acis.

18        Shortly before the transaction, and while they were doing

19   diligence, Mr. Terry received his arbitration award.  I

20   believe that was in October of 2017.  The transaction with

21   HarbourVest closed in mid- to late November of 2017.  But Mr.

22   Terry was not an integral part.  Indeed, he wasn't going to be

23   a key man.  He had been long gone from Highland by that time.

24        What the -- I think you asked me originally what the basis

25   of their claim was.  The transaction went forward, and the

Case 3:21-cv-03827-1 Document 384-2 Filed 05/20/22 Entered 05/20/22 11:29:52 Page 30 of 173
Case 3:23-cv-00583-B Document 18-23 Filed 2021 Hearing Page 76 of 258 PageID 4075

Seery - Direct                                                          30

 1  basis of their claim is that they really were never -- nothing

 2  was disclosed to them about the nature of the dispute with Mr.

 3  Terry other than in the highest-level terms; the animosity

 4  with respect to which that dispute was held by Highland and

 5  potentially Mr. Terry; and really, how those costs would be

 6  borne and risks be borne by the investment that they were

 7  making.

 8      That was, in essence, the transaction and the high-level

 9  view of their claim.

10  Q   Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A   Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q   And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A   They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Case 3:23-cv-06071-sg Doc 36482 Filed 05/26/22 Entered 05/26/22 13:59:52 Page 31 of 173
Case 3:23-cv-06071-B Document 18-18 Filed 2021 Hearing Page 77 of 173 PageID 4076

Seery - Direct                                    31

1    U.S. investors unless they qualify, and these are sold under

2    Reg S to -- to investors that otherwise qualify.  And

3    HarbourVest was investing in that transaction through the

4    Guernsey structure.

5    Q    And do you have an understanding as to who owned the 50-

6    plus percent of HCLOF that HarbourVest was not going to

7    acquire?

8    A    Yeah.  There's -- you can tell by the name.  HCLOF is

9    Highland CLO Funding.  This is a Highland vehicle.  So

10   Highland owned and controlled the vehicle.  The DAF, which is

11   -- which is Dondero-controlled trusts, have the -- 49 percent.

12   Highland has, I believe, around .63-65 percent directly.  And

13   then Highland employees at the time who were involved in the

14   business owned another small percentage.

15       So the majority was going to be controlled by Highland

16   through its control of DAF and its control of the employees

17   that worked for it.  HarbourVest would be a minority investor.

18   Q    Okay.  And I believe you testified that the investment was

19   made in mid-November; is that right?

20   A    That's correct.  I think it was the 15th, may have been

21   the 17th of November.

22   Q    And do you recall when in October the Terry arbitration

23   award was rendered?

24   A    It was about a month before.  I think it was right around

25   the 20th, the 17th to the 20th.  I may be slightly wrong on

Case 3:21-cv-00842 Document 1-18 Filed 05/26/21 Entered 05/26/21 21:52 Page 32 of 173
Case 3:23-cv-00668-B Document 18-18 Filed 09/11/23 Hearing Page 78 of 258 PageID 4077

Seery - Direct                                              32

 1  each of those dates.

 2  Q    Okay.  What is your understanding as to what happened

 3  after the issuance of the award that is the basis or at least

 4  one of the bases for HarbourVest's claim?

 5  A    I don't think there's -- I don't think there's any

 6  dispute.  And there certainly are judicial findings.  Dondero

 7  and Highland went about stripping Acis of all of its assets.

 8  So, remember that Acis is not a separate standalone company,

 9  in any event.  It's controlled and dominated completely by

10  Highland at the time.  But it did have contracts.  And those

11  contracts had value.

12       So the first idea was to strip out the management contract

13  and put it into a separate vehicle, which we called HCF

14  Advisor, which Highland still owns.  The second piece was to

15  strip out some valuable assets, the risk retention piece,

16  which was a loan that in essence was equity that Highland had

17  put into Acis but structured as a loan, as many of the

18  transactions we'll see down the road are, in order to deal

19  with some -- avoid taxes in any way possible.  And that

20  structure, that value moved value out of Acis for the express

21  purpose of trying to run, in essence, the Highland business

22  back in Highland.

23       Remember, as I said, Acis is just a Highland business

24  moved to a separate shell.  When Mr. Terry got his arbitration

25  award against Acis and was seeking to enforce it, it was

003701

Seery - Direct                    33

1   pretty straightforward, let's take all the assets -- Dondero

2   scheme -- let's take all the assets and move them back into

3   Highland so Terry can't get anything.

4   Q    And how does that scheme relate to the HarbourVest claim,

5   to the best of your knowledge?

6   A    Well, HarbourVest -- HarbourVest's position is that they

7   invested in Acis and -- and whether Acis was called Acis or

8   called Highland, it doesn't really matter; there were valuable

9   assets in the -- in the entity that they were going to be

10  investing in through the equity in these CLOs and some of the

11  debt securities in those CLOs.

12       And then the stripping out and the fraudulent conveyances

13  out of Acis caused them damages because that's what left the

14  damage to Mr. Terry.

15       The quick math on Acis, by the way, is Acis has probably

16  lost, total damages, 175 million bucks.  And that's pretty

17  easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18  fees charged to HCLOF.  Another five million of fees, at

19  least, incurred by Mr. Terry.  Ten million that went to Mr.

20  Terry, 15 to Highland fees, another five, plus Mr. Terry's

21  settlement in this case, over eight million bucks.

22       So HarbourVest's position, which, on a factual basis, you

23  know, is problematic for the estate, is, wait a second, we

24  invested in this vehicle with Highland.  That was supposed to

25  invest in Highland CLOs.  They were called Acis, but they were

Case 19-34054-sgj11 Doc 3642 Filed 05/26/23 Entered 05/26/23 11:39:52 Page 84 of 173
Case 3:23-cv-01503-B Document 18-83 Filed 09/11/23 Hearing Page 30 of 173 PageID 4079

Seery - Direct                                    34

1    Highland CLOs.  And then you went about causing tremendous

2    damage to that vehicle that we ultimately were investing in,

3    and then charge us for the pleasure.

4    Q    You used the phrase earlier "OM," I believe.

5    A    Offering memorandum.

6    Q    Offering memorandum?  Can you just explain to the Court

7    your understanding of what an offering memorandum is?

8    A    Typically, under U.S. law, and foreign jurisdictions have

9    similar laws, you have to have a document that explains the

10   securities that you're selling.  And it goes into extreme

11   detail about the securities and the risks related to those

12   securities.

13       And the idea is not to have a document that tells you

14   whether it's a good investment or a bad investment, but it's a

15   document that discloses to the potential investor all of the

16   risks with respect to that security or related to the

17   investment over the duration of the security.  It doesn't

18   predict the future, but it's supposed to make sure that it

19   gives you a very clean view of the past and a very clean view

20   of what the facts from the past are and how they would

21   implicate the future of the investment.

22   Q    And in the course of its diligence, did the Debtor have an

23   opportunity to review the offering memorandum in the context

24   of the claims that were being asserted by HarbourVest?

25   A    Oh, absolutely.  It was originally effectively -- it's an

 1    HCLOF offering memorandum.  But as I said, HCLOF was managed

 2    and controlled by Highland, and Highland originally prepared

 3    it.  And then, of course, in connection with -- with this

 4    dispute and these claims, we reviewed it, both myself and my

 5    legal team.

 6    Q    All right.

 7              MR. MORRIS:  Your Honor, the offering memorandum is

 8    on the Debtor's exhibit list, and I think this is an

 9    appropriate time to move into evidence Debtor's Exhibits A

10    through EE, all of which appear at Docket No. 1732.

11              THE COURT:  1732?

12              MR. MORRIS:  It's the Debtor's Second Amended Witness

13    and Exhibit List.

14              THE COURT:  All right.  Any objection to admission of

15    A through EE?

16              MR. DRAPER:  Douglas Draper.  No objection, Your

17    Honor.

18              THE COURT:  All right.  Mr. --

19              MR. MORRIS:  May I proceed?

20              THE COURT:  Yeah.  Mr. Wilson, did you want to

21    confirm no objection?

22         (Echoing.)

23              THE COURT:  All right.  Hearing no objection,

24    Debtor's A through EE are admitted.

25         (Debtor's Exhibits A through EE are received into

Seery - Direct                    36

1    evidence.)

2              THE COURT:  Go ahead, Mr. Morris.

3              MR. MORRIS:  Thank you, Your Honor.  The offering

4    memorandum itself is one of the documents that we filed under

5    seal, and we did so at the request of counsel to HCLOF.  But

6    HCLOF has consented to our sharing up on the screen certain

7    very limited provisions of the document, without waiving the

8    request that the agreement otherwise be maintained under seal.

9              THE COURT:  All right.

10             MR. MORRIS:  So may I proceed on that basis, Your

11   Honor?

12             THE COURT:  You may.  Uh-huh.

13             MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14   on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15   is there a way to just expand that just a bit, Ms. Canty?

16   Thank you very much.  And if we could just scroll it up?

17   Thank you very much.  Perfect.

18       Okay.  So, Your Honor, this, as the footnote says, is an

19   excerpt from the offering memorandum that can be found at

20   Debtor's Exhibit AA.  Double A.  And this particular portion

21   of the offering memorandum is at Page 35.

22             THE COURT:  Okay.

23   BY MR. MORRIS:

24   Q   Mr. Seery, have you seen this portion of the offering

25   memorandum before?

Case 3:21-cv-00879-sgj Doc 364 Filed 05/26/22 Entered 05/26/22 11:29:52 Page 37 of 173
Case 3:23-cv-00568-Brab Document 18-18 By Filed 2021 Hearing Page 83 of 258 17PageID 4082

Seery - Direct                                37

1   A    Yes, I have.  But before I continue, I just -- I should

2   have checked.  Are you able to hear me clearly?  Am I speaking

3   too quickly or am I cutting out?  I just want to make sure.

4   I'm using a different set of audio today.

5            THE COURT:  All right.

6            MR. MORRIS:  That's fine.

7            THE COURT:  I hear you very well.

8            MR. MORRIS:  Yeah.

9            THE COURT:  So I think we're good right now.  Thank

10  you.

11           THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13           THE COURT:  Okay.

14           THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

Case 3:21-cv-00474-sig Doc 364 Filed 05/26/22 Entered 05/26/22 13:52 Page 38 of 173
Case 3:23-cv-00503-B Document 18-13 Filed 2021 Hearing Page 83 of 173 PageID 4083

Seery - Direct                                   38

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q    Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A    No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18       I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23       That, in my opinion, is wholly inadequate.

24  Q    Okay.

25            MR. MORRIS:  And let's put up -- actually, let's just

Case 3:21-cv-00671-sg Doc 3642 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 39 of 173
Case 3:23-cv-00063-Brandon Document 18-18 Filed 2021 Hearing Page 85 of 258 PageID 4084

Seery - Direct                                    39

1   move on.

2   BY MR. MORRIS:

3   Q    Let's go to the settlement itself.

4         MR. MORRIS:  Can we put back up Demonstrative Exhibit

5   #3?

6   BY MR. MORRIS:

7   Q    Mr. Seery, can you see that?

8   A    Yes, I can.

9   Q    Does this generally describe the net economic recovery of

10  the HarbourVest settlement based on estimated recoveries for

11  general unsecured creditors as of November 2020?

12  A    As of November 2020, it does.  And you alluded to this in

13  your opening, but to be clear, the numbers have shifted.

14  Costs have increased.  The -- so the -- effectively, the

15  numerator, in terms of distributable value that we estimate,

16  is lower.  And settlements, the denominator, have also

17  increased.  So the claims against the estate that have been

18  recognized have increased.  And that, that probably takes it

19  down closer, in our view, to about seventy cents distribution,

20  a number closer to nine to ten million, maybe a little bit

21  less.

22        However, there's also some additional value that we -- we

23  believe we will recover directly.  There are north of $150

24  million of intercompany notes owed by Dondero entities to

25  Highland.  A number of those notes are demand notes, and we've

Case 3:21-cv-03607-sig Doc 36-12 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 40 of 173
Case 3:23-ap-03003-Brab Document 18-1 By Filed 2021 Hearing Page 4258 173 PageID 4085

Seery - Direct                                        40

 1    already made demand.  We'll be initiating actions next week.

 2    So those are -- those value, we believe, we'll recover

 3    directly from Mr. Dondero and from related entities.

 4        To the extent those related entities don't have value, we

 5    feel very strongly about our ability to pierce the veil and

 6    reach in to Mr. Dondero.  And then his assets, either his

 7    personal assets or the assets that he claims are in trusts.

 8        In addition, there are a significant amount of notes that

 9    were extended in two -- I believe around 2017, for no

10    consideration.  Those notes were demand notes, I believe, and

11    then extended it 30 years.  So they have 2047 maturities.

12    Those were probably going to have to be subject to fraudulent

13    conveyance type actions or -- or some sort of sale at a very

14    discounted value because third parties wouldn't want long-

15    dated notes with Mr. Dondero as the counterparty for very much

16    money.

17        Those -- they defaulted on some of those parties, so we

18    effectively turned them into demand notes.  We've accelerated,

19    and we'll be bringing actions against those entities next week

20    as well.

21        So I think (garbled) have come up, so I apologize.  One

22    way of saying I think the sixteen and a half is a bit high

23    right now, based upon what we know, but the value is going to

24    be higher than our estimate a couple of weeks ago because we

25    do believe we'll be able to recover on the notes.

Case 3:21-cv-03687-sig Doc 34 Filed 05/26/22 Entered 05/26/22 19:52 Page 41 of 173
Case 3:23-cv-01503-B Document 18-13 Filed 2021 Hearing Page 87 of 173 PageID 4086

Seery - Direct                                    41

1      One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6      In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q   And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A   That's correct, yes.

16  Q   Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A   Yes.

19  Q   And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A   Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

003710

Case 19-34054-sgj11 Doc 3648 Filed 05/26/23 Entered 05/26/23 12:59:52 Page 42 of 173
Case 3:23-cv-01503-B Document 18-18 Filed 02/11/23 Page 88 of 173 PageID 4087

Seery - Direct                                    42

 1    complexity to it to satisfy some of HarbourVest's concerns

 2    that they be able to effectively rescind the transaction, at

 3    least from an optical perspective.  Value was important, but

 4    optics were as well.  The twenty-two and a half is the current

 5    -- actually, the November value of HCL -- the HarbourVest

 6    interests in HCLOF.  And that's based upon Highland's

 7    evaluation of those interests.

 8         So we do believe that that is a fair value as of that

 9    date.  It has not gone done.  It hasn't gone up explosively,

10    either, but it hasn't gone down.  We think that's good, real

11    value.  That value is in the Acis CLOs, the equity in those

12    CLOs, which is 2 through 6, that we -- we will be working with

13    the HCLOF folks to get Mr. Terry to monetize those assets and

14    those longer-dated CLOs.

15         In addition, I think it's 85 percent of the equity in Acis

16    7 -- Acis 7 is managed by Highland -- that is also beyond its

17    reinvestment period.  And in talking to the directors -- and

18    they're new directors, and I'll get to that in a minute, for

19    HCLOF -- they'll seek to push Highland, which is the

20    reorganized Highland, to monetize that asset, with due regard

21    to fair value.

22         In addition, Harbour -- HCLOF owned a significant amount

23    of the preferred or equity pieces, if you will, in the

24    Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25    really CLOs.  Those are effectively closed-end funds with

003711

Seery - Direct                                    43

1    illiquid assets, primarily illiquid assets in them.  We've had

2    some dispute in front of the Court about selling the liquid

3    assets in them, which we can go into it another time.  Those

4    are being liquidated in the market at fair value.

5         But HCLOF also is a significant holder of those preferred

6    shares, and those directors would -- have indicated to me that

7    they would like to see those interests also monetized.

8    Q    All right.  Let's shift gears for a moment to talk about

9    the diligence that the Debtor did before entering into this

10   agreement.  Can you just describe for the Court generally the

11   diligence that was undertaken at your direction?

12   A    Well, when we first received the reply to our objection,

13   we dug into that reply and the specifics in it very

14   aggressively.  So we reviewed all of the underlying documents

15   related to the original transaction.  We discussed with

16   counsel the legal basis for the HarbourVest claims.  We

17   interviewed our own HCMLP employees who were involved in the

18   transaction and tested their recollection, specifically around

19   who dealt with HarbourVest, who had the discussions with

20   HarbourVest, what was disclosed to HarbourVest with respect to

21   the Terry dispute and the Acis litigation.

22        We also had done, as I think the Court is well aware from

23   prior 9019 testimony, extensive work around the transfers and

24   the issues related to Acis.  So we were familiar with their

25   impact on HCLOF.

Case 19-34054-sgj11 Doc 3648 Filed 05/26/23 Entered 05/26/23 21:29:52 Page 4 of 173
Case 3:23-cv-01503-B Document 18-18 Filed 09/11/23 Page 90 of 258 PageID 4089

1      We also did extensive work valuing the remaining HCLOF

2   interests to get a good feel of not only how much HarbourVest

3   originally invested, but how much they actually lost in this

4   transaction.  And as I said, their original investment was

5   around, in total, in two tranches, about $80 million, of which

6   they got about $5 million back, and they've lost $22 million.

7   So it -- I mean, remaining with $22 million.  So they've lost,

8   you know, in excess of $50 million.

9   Q   Do you recall whether the Debtor reviewed and analyzed all

10  of the documents that were cited in HarbourVest's response to

11  the Debtor's objection to the HarbourVest proofs of claim?

12  A   Yeah.  I think -- I forget, to be honest, which -- exactly

13  what documents were in there.  But we went through their

14  objection with a fine-toothed comb, not only with respect to

15  the issues related to the Acis case, but also their references

16  to Guernsey law, other U.S. law, any of the documents between

17  the parties.  And obviously, as I mentioned before, the

18  offering memorandum.

19          MR. MORRIS:  Your Honor, I would just note for the

20  record that Debtor's Exhibits I through X are all of the

21  documents that are cited in HarbourVest's response to the

22  Debtor's objection to the HarbourVest proofs of claim, and

23  those are the documents that Mr. Seery just referred to.

24          THE COURT:  All right.

25          MR. MORRIS:  Just, they're in evidence now, and I

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 45 of 173
Case 3:23-cv-01503-B Document 18-18 Filed 2021 Hearing Page 91 of 173 PageID 4090

Seery - Direct                    45

 1   just wanted the Court to understand why they're in evidence.

 2             THE COURT:  Okay.  Thank you.

 3             MR. MORRIS:  You're welcome.

 4   BY MR. MORRIS:

 5   Q    Let's talk about the Debtor and whether or not it had or

 6   has any viable defenses.  Did the Debtor form any views as to

 7   whether or not it had any defenses to the HarbourVest claims?

 8   A    Yes, we did.

 9   Q    Can you describe for the Court the defenses that were

10   reviewed and analyzed by the Debtor?

11   A    Yeah.  I think we -- we had very significant defenses.

12   So, first and foremost, with respect to the original proof of

13   claim, as I mentioned earlier, it alluded to the expenses and

14   the overcharge.  And I think with respect to the 15 million of

15   fees that were charged to HCLOF by Highland, we didn't have a

16   lot of defenses to that claim.

17        It's pretty clear, by any fair view of the Acis case, that

18   HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19   had no real responsibility for fighting with Acis and Josh

20   Terry and shouldn't have been charged those fees.  I don't --

21   I don't think there's a legitimate investor that would

22   actually think that that was an appropriate amount to be

23   charged to a fund.

24        However, the claim was not as broad -- the proof of claim

25   was not as fulsome in terms of discussing and only vaguely

003714

1  referred to other damages.  So we did -- we did, as a

2  threshold matter, think about whether we could argue that it

3  was time-barred because they had not met their obligations to

4  fully disclose under the proof of claim.

5      Secondly, we considered the defenses to the overall claim

6  of fraudulent inducement.  Our perspective was that if we

7  could stop the claim of fraudulent inducement, the damages

8  would likely be limited to the 15 and maybe some -- some other

9  damages.  With respect to the 15, again, the problem that we

10  had when we got past -- past motions for summary judgment is

11  the factual predicate for our defense was going to be that we

12  divulged these things to HarbourVest and that they did not

13  reasonably -- it was -- reasonably rely on some failure to

14  divulge because they're a sophisticated investor.

15      The problem with that defense is that our witnesses, which

16  really would have primarily been Mr. Dondero and Mr.

17  Ellington, and one other employee who runs the CLO business,

18  Mr. Covitz, would not be pretty good.  They've been -- two of

19  them have been in front of this Court and they're not viewed

20  favorably and their testimony would be challenged and

21  potentially suspect.

22      So that gave us a real focus on trying to make sure that

23  we could, if we had to litigate, that we would litigate around

24  the fraudulent inducement.

25      As I said, reasonable reliance, what was disclosed, lack

003715

Case 3:21-cv-00007-sg Doc 36-12 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 47 of 173
Case 3:23-cv-00008-B Document 18-13 Filed 2021/12 Hearing Page 93 of 258 PageID 4092

Seery - Direct                                    47

1    of digging into the public record, because you don't have to

2    go far on Google to find "fraud" within two words of

3    "Highland," and the tremendous, you know, litigious nature of

4    Highland.  You know, even at that point, when this investment

5    was made, aside from Mr. Terry's arbitration, which by that

6    point, at least by the time (inaudible) was public, there was,

7    you know, significant public disclosure around the Credit

8    Strat and the litigation, the Crusader litigation, the UBS

9    litigation, the, gosh knows, the Daugherty litigation.

10       So our defense was going to be that you should have

11   figured this out, you're a sophisticated investor, and you

12   should have been able to figure out that there was significant

13   risk that, with respect to Mr. Terry, that Mr. Dondero would

14   not stop litigating and that those costs would put significant

15   risk on the investment.

16       The problem with that, as I mentioned earlier, is that the

17   OM is wholly deficient.  If you have a typical risk factor in

18   the offering memorandum, you would have disclosed that there

19   was a litigation with Mr. Terry, a former partner in the

20   business, and that the Debtor had no intention of settling it.

21   There was no intention of settling.  That litigation would go

22   on.  It could go on for years and it could result in

23   bankruptcy or attachments and other risks to the business, and

24   that the investor should be fully aware that the Offeror does

25   not intend to be involved in any -- or the manager, in any

 1  settlement with Mr. Terry, and the fact it undermined the

 2  investment.  That wasn't there.

 3      But that was our preliminary focus, to try to stop fraud

 4  in the inducement.  And then we -- we had specific facts

 5  related to that.  You know, once they knew about the

 6  bankruptcy in HarbourVest of -- I'm sorry, of Acis,

 7  HarbourVest made a second funding, which was there was a -- it

 8  was an initial $75 million draw, and then a second, I believe,

 9  about a $5 million draw, which was in -- I believe in

10  February.  And they made it without -- without objection, and

11  that was after the commencement of the bankruptcy.

12      In addition, they were -- they were active in the

13  bankruptcy, so the -- some of the things that happened in the

14  bankruptcy, there were many opportunities to settle that case,

15  from our examination, all of which were turned down to -- by

16  Mr. Dondero.  But you don't see HarbourVest pounding the table

17  to settle, either, either with respect to the Oaktree

18  transaction or any other transaction.

19      Now, HarbourVest's defense to that is, well, we were

20  taking advice and all of our information from Highland, and we

21  were getting that information directly from senior folks at

22  Highland why -- what the value was and why we shouldn't do

23  those things.  We thought that that would mitigate some of the

24  arguments that -- some of the damages that we might have, I'm

25  sorry, if we -- if we lost.

003717

Case 3:21-cv-03066-X Document 34-28 Filed 05/26/22 Entered 05/26/22 21:39:52 Page 49 of 173
Case 3:23-cv-01503-B Document 18-8 Filed 2021 Hearing Page 95 of 258 PageID 4094

Seery - Direct                           49

1    But the focus at that point, you know, our legal strategy,

2    was can we stop HarbourVest at the very forefront to say,

3    You've got to come into the factual realm and get out of the

4    fraud in the inducement realm.  And then the defenses and the

5    exculpations and the liability limitations in the documents

6    would also come into play.

7        So that -- those are some of the defenses that we focused

8    on and our analytical thinking around them.

9    Q    So, if the Debtor had viable defenses, why is it settling?

10   A    Well, this is a significant claim.  And we -- we looked at

11   it with respect to both the impact on the case, but, really,

12   the merits of the claim.

13       As I said, there's really little dispute that the legal

14   fees should not have been charged to HarbourVest.  We think

15   based upon the testimony in Acis, the suspect credibility of

16   those who would have been our witnesses, and the experience in

17   Acis that the Court has had in terms of the completely hell-

18   bent on litigation, it would be hard for anyone to justifiably

19   defend those fees being charged.  So, as an initial matter, we

20   had exposure there.

21       In addition, if HarbourVest got by our defense of -- was

22   able, for example, to claim fraud in the inducement, then we

23   were open to significant damages.

24       We really didn't put much value, frankly, on the RICO part

25   of it.  We think that that's waved around often to show treble

003718

Case 3:21-cv-03076-ag Doc 3648 Filed 05/26/22 Entered 05/26/22 21:39:52 Page 50 of 173
Case 3:23-cv-01503-B Document 18-13 Filed 2021 Hearing Page 50 of 173 PageID 4095

Seery - Direct                                                    50

1    damages.  Although in this case certainly somebody could lay

2    out the predicate acts and put forth a RICO-type argument, we

3    just didn't think that that had real merit in this commercial

4    dispute, even with a fraud claim.

5         But even without the trebling of the damages, there's no

6    dispute that HarbourVest lost more than $50 million in this

7    investment.  You know, we -- we thought about that risk as

8    well.

9         In addition, because the case would really be fact-based,

10   even if we had a high degree of confidence based upon our

11   discussions with our employees and the factual testimony, it

12   was going to be expensive to litigate this case, and time-

13   consuming.

14        And so we looked at the economic value, the potential

15   risks, and the actual value that we were giving up, and found

16   this to be an extremely, extremely reasonable settlement.

17        Importantly, and I think what drove it, you -- one of --

18   one of the things that drove it is another one of our defenses

19   on why, notwithstanding their -- what they held out as

20   meritorious claims, I don't think HarbourVest really wanted to

21   publicly litigate this claim.  And we were aggressive in our

22   discussions with HarbourVest of how we would litigate it,

23   which would be quite publicly.

24        Now, that may or may not be fair, but that does put risk

25   on the counterparty.  And so I think that helped drive the

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 11:29:52 Page 51 of 173
Case 3:23-cv-01503-B Document 18-3 Filed 2021 Hearing Page 97 of 173 PageID 4096

Seery - Direct                                        51

 1   settlement.

 2        In addition, the structure of the settlement we think is

 3   extremely favorable to the Debtor and to the estate because,

 4   rather than taking the full claim and putting it into a senior

 5   unsecured position, we have bifurcated it.  We did think about

 6   whether this was a claim that could be subordinated under 510.

 7   There won't be any arguments, I would be surprised if there's

 8   arguments today that we didn't actually give to the Highland

 9   employees who have given them to Mr. Dondero's respective

10   counsel.

11        We did structure it in a way that we thought gave

12   HarbourVest the opportunity to effectively claim a rescission,

13   even though that's not really what it is, and then be able to

14   claim that their recovery is based on the bankruptcy, which it

15   is, but not really dilute all the other stakeholders in the

16   case.

17        (Pause.)

18             THE COURT:  Mr. Morris?  Anything else?

19             MR. MORRIS:  I can hear you, Your Honor.

20             THE COURT:  Okay.

21             MR. MORRIS:  I can hear you.

22             THE COURT:  Okay.  Now can you --

23             MR. MORRIS:  I got cut off from Mr. Seery for a

24   moment.

25             THE COURT:  Okay.

003720

Seery - Direct                                    52

1  BY MR. MORRIS:

2  Q    Okay.  I appreciate that.  Are you done giving the

3  Debtor's basis for entering into this settlement, Mr. Seery,

4  if you can hear me?

5  A    I think so, but I think as the Court has probably seen, I

6  can go on.

7  Q    Yes.

8  A    So I will try to be -- I'll try to be more concise.  But

9  this was a -- this was a difficult settlement.  We felt good

10  about our defenses.  Felt that we could -- we could try them.

11  But it would be extremely expensive, time-consuming, and there

12  would be a lot of risk.  And settling at a level which we

13  believe is actually below the damages that were clearly caused

14  only by the fees was a -- was a -- is a -- is a very

15  reasonable settlement.

16  Q    Okay.  Let's just talk about the process by which we got

17  to the settlement.  Do you recall generally when the

18  settlement negotiations have -- were commenced?

19  A    I believe it was -- was late summer, early -- early fall.

20  Q    Okay.  Before I move on, I just want to go back to the

21  Acis matter that you were talking about, one last issue.  Do

22  you know how, if at all, the injunction that was entered in

23  the Acis bankruptcy impacted or related to the HarbourVest

24  claims?

25  A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Seery - Direct                                    53

1   think there's an argument, and we analyzed it thoroughly, that

2   the injunction effectively caused a lot of the damages.

3   Because if you look at the values of the equity that

4   HarbourVest had, the -- and HCLOF had in the CLOs, it went

5   down dramatically after the Trustee in the Acis case took over

6   and then subsequently, when the case was reorganized and Mr.

7   Terry took over, you know, with Brigade as the sub-advisor.

8       Now, that would -- you know, we would -- we could

9   certainly attempt to throw, in our defense, the causation at

10  Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11  retort is that none of this would have occurred but for the

12  burn-it-down litigation that Mr. Dondero engaged in with

13  Highland.

14      In addition, in Mr. Terry's defense, you know, he did try

15  multiple times with HCLOF, tried to petition, if you will, the

16  HCLOF entity to -- and directors, former directors, to reset

17  the CLOs to make them more economically viable, based upon the

18  current level of asset returns versus the debt costs in the

19  CLOs.  And that was rejected by the HCLOF and the Debtor as

20  the controlling party of HCLOF.  So, we thought about those

21  risks.

22      You know, similarly, the economic values in Acis 7 went

23  down pretty significantly from that date as well.  So I think

24  there's -- there are some defenses, but that's really Mr.

25  Terry's issue, not our issue.  So we thought about those

003722

Case 3:21-cv-01171-B Document 186-12 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 54 of 173
Case 3:23-cv-01503 Trial Transcript of January 11/23 Hearing Page 100 of 258 PageID 4099

Seery - Direct                                    54

1   issues, we analyzed them, and we certainly did all the work

2   around month-to-month reductions in NAVs and how different

3   events in the Acis case might have -- might have caused those

4   and was that some sort of break from the original

5   transgression that HarbourVest claims, which was the

6   fraudulent inducement.

7   Q    Do you recall that in November HarbourVest's motion under

8   3018 was scheduled to be heard?

9   A    Yes.

10  Q    And can you just tell the Court your understanding of what

11  the 3018 motion was about?

12  A    Well, the 3018 motion was going to be on voting.  And we

13  took the view that it really was not -- it shouldn't have been

14  that big an issue and HarbourVest should have been content

15  with just taking their actual losses of roughly a $50-$60

16  million claim for voting purposes and then we would move on.

17       HarbourVest was very insistent that they have a $300

18  million claim, because they took the position -- and with

19  extensive documentation; not only the pleadings they filed,

20  but also detailed decks that were prepared by their counsel,

21  which they had presented to us on the merits of their claim --

22  that they were going to litigate for -- the 3018 and for the

23  full $300 million value.

24       And that became the genesis, if you will, of the

25  negotiations to settle.

003723

Case 3:21-cv-03607-sug Doc 364-8 Filed 05/26/23 Entered 05/26/23 21:29:52 Page 55 of 173
Case 3:23-cv-01502-B Transcript of January Filed 09/11/23 hearing Page 101 of 258 PageID 4100

Seery - Direct                                                    55

 1    So, we started talking about the 3018.  It was very

 2  contentious.  My apologies to Ms. Weisgerber and her counsel,

 3  her partners, because it was a significant and contentious

 4  negotiating call.  But the reasons for that I think were that

 5  -- their insistence on litigating the 3018 and our view that

 6  this was just, you know, another -- another of a series of

 7  delays and costs in this case that we really were hoping to

 8  avoid.

 9    That led to Mr. Pugatch and I stepping away from counsel,

10  no offense to counsel, you know, ours and his, to begin

11  negotiations around the potential for a settlement.  First, it

12  started with a 3018, and then, you know, argued that we would,

13  if we got past the 3018, we were going to litigate this,

14  because we effectively had -- thought we could get everyone

15  else done at -- in and around that time.  And I think we were

16  also probably a little bit optimistic about UBS at that time

17  and the mediation, which subsequently we have settled.  But

18  that was the genesis of those settlements.

19  Q   And how did the structure, how did the Debtor and

20  HarbourVest derive at the structure whereby there is a general

21  unsecured claim, there is a subordinated piece, and there's

22  the takeback of the HCLOF interest?

23  A   Well, as I outlined, we -- we aggressively set forth our

24  various defenses.  Their position was that they -- they should

25  never have been in this transaction before.  And they --

Case 3:21-cv-00881-X Doc 184 Filed 05/26/23 Entered 05/26/23 21:29:52 Page 56 of 173
Case 3:23-cv-01503-B Transcript of January Filed 09/11/23 Hearing Page 102 of 258 PageID 4101

Seery - Direct                                          56

1  HarbourVest is, in essence, a fund of funds, and they have

2  investors, and it certainly wouldn't be their, I'm sure, the

3  best-performing asset in their portfolio, to have made this

4  investment and lost $50 million over this period of time.  So

5  they felt strongly that they should never have been in this

6  investment, and but for the failure to disclose and the

7  improper disclosures, they would not have been in this

8  investment.

9       So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12       Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16       So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q    Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

003725

Case 3:21-cv-03599-sgj Doc 36-4 Filed 05/26/22 Entered 05/26/22 21:39:52 Page 57 of 173
Case 3:23-cv-01503-B Transcript of January Hearing Page 57 of 173 PageID 4102

Seery - Direct                                                57

1  any agreement in principle with HarbourVest?

2  A    If we had, it would have been reflected, so I don't -- I

3  don't think we were agreed by then.  I don't recall the

4  specific dates, but if we had, it would have -- it would have

5  been reflected.

6  Q    If I can refresh your recollection that the motion was

7  filed on December 24th, does that help form your understanding

8  or refresh your recollection that there was no agreement in

9  principle on November 24th?

10  A    Yeah.  Well, I'm quite sure there was no agreement in

11  principle or we would have reflected it minimally by a

12  footnote.  There's -- there's no chance.  It's a material

13  reduction in the claims pool that we were previously telling

14  people that, at least for purposes of distribution, like UBS

15  and a couple others we said we thought we would get to zero

16  on.  So we didn't calculate in that amount.  So I'm quite sure

17  we didn't have a deal when we filed the disclosure statement.

18       In terms of the timing, anyone who's done this business

19  for any degree of time knows that the crucible of bankruptcy

20  brings people to the settlement when they see something

21  happening in the case, and not before.  I think HarbourVest

22  looked at our -- this is my supposition -- HarbourVest looked

23  at our plan, our ability to get this done, our settlement with

24  Redeemer, our settlement with Mr. Terry and Acis, and saw that

25  this plan was coming together, and if they didn't think about

 1   the settlement, they were going to think about not only the

 2   risks that we laid forth for them with respect our defenses,

 3   but also the opportunity to litigate with the Claimant Trustee

 4   over a long period of time, which couldn't have been

 5   particularly appetizing.

 6   Q   Can you describe for the Court the role played by the

 7   independent board of Strand, the general partner of the

 8   Debtor, in analyzing and participating in the approval

 9   process?

10   A   Yes.  I think, as the Court is aware and I've testified

11   before, Mr. Russell Nelms and Mr. John Dubel are fellow

12   independent directors with me, appointed pursuant to the Court

13   order.  They are kept abreast of every detail, and -- along

14   the way, not just in a summary form at the end.  We have

15   reviewed and analyzed collectively each of the issues.  Mr.

16   Dubel has extensive experience in these types of litigation

17   matters.  Obviously, Mr. Nelms, from his -- both his practice

18   and his time on the bench, has a keen insight into how to

19   resolve and what the risks and benefits are from settling

20   litigation.  So I consult them every step of the way.

21   Q   And as part of this process, did the Debtor reach out to

22   the directors of HCLOF?

23   A   Yes, we did.  So, we reached out and we've had several

24   conversations on video chats with the directors.  The

25   directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Case 3:21-cv-03607-sgj Doc 364-2 Filed 05/26/22 Entered 05/26/22 11:39:52 Page 59 of 173
Case 3:23-cv-01503-B Document 18-1 January Filed 09/11/23 Hearing Page 105 of 258 PageID 4104

Seery - Direct                                                 59

1    and Mr. Dicky Burwood.  They are extremely professional.  They

2    are exceptionally well-informed.  They are truly careful, and

3    I would say very experienced professional not only directors,

4    but experienced in -- in these matters, both in respect of

5    structured finance as well as these types of vehicles and

6    litigation.

7         They were appointed by the old directors, Scott and

8    Bestwick, and they have been in control.  They have outside

9    counsel, which is King & Spalding in the U.S.  They have

10   Guernsey counsel.  They have accountants and professional

11   advisors, and are being, in my opinion, exceptionally careful.

12   I've got -- very quickly developed a lot of respect for them,

13   and we consulted with them on this settlement and how it would

14   work.

15        They've been very clear that they represent HCLOF and they

16   work for the benefit of the equity, whomever owns it, and

17   taking a view that they would like to see these assets

18   monetized swiftly, with due regard to value, for the benefit

19   of the equity.

20   Q    And is it your understanding that the directors of HCLOF

21   approved of this transaction?

22   A    They -- I don't know that their approval was required.

23   It's really -- there are a number of hoops to jump through

24   under the documentation, including opinion of outside counsel

25   that we received from WilmerHale in terms of the effectiveness

003728

Case 3:21-cv-00881-X Document 186-1 Filed 05/26/23 Entered 05/26/23 21:59:52 Page 60 of 173
Case 3:23-cv-01503-B Transcript of January Filed 09/11/23 Hearing Page 106 of 258 PageID 4105

Seery - Direct                                    60

1    of the transfer under the documents.  We had a negotiation

2    with -- with those directors, and making sure that we did

3    everything correct -- correctly, excuse me -- with respect to

4    the requirements for the transfer under the documents.  And

5    they've indicated their support and acknowledgement that we're

6    doing it correctly.

7        I don't know if it's fair to say they approved it.  I'd

8    just have to go check the documents.  But they certainly

9    support it.  And I think they generally support our position

10   with respect to how to move forward with the assets.

11   Q   I appreciate that.  I guess I meant approval with a small

12   a and not a capital A.

13       You mentioned WilmerHale.  Who do they represent in all of

14   this?

15   A   WilmerHale is the Debtor's outside corporate counsel, in

16   particular with respect to the fund issues that we don't

17   handle in-house.  We have significant support for fund issues

18   from the expertise of Mr. Surgent, who's been the CCO, and he

19   is also a lawyer, with respect to, you know, some of the

20   difficult fund issues that Highland has.  But when we use

21   outside counsel, we use WilmerHale for that, and they've been

22   -- they've been exceptional.

23   Q   Okay.  Just the last two points that were made in Mr.

24   Dondero's objection, I believe.  Did the Debtor overpay in

25   this settlement in order to gain the support of HarbourVest in

Seery - Direct                                      61

1   connection with its -- with the Debtor's attempt to get its

2   plan confirmed?

3   A    Not in any way.  My -- I believe the settlement is

4   extremely reasonable.  As I testified, it's -- it's less than

5   the -- the actual value going out, depending on unless there's

6   successful litigation, and there well could be, is less than

7   on a pro forma basis the fees that were taken and charged to

8   HCLOF.  We didn't do this for votes.  We will have Class 2,

9   Class 7, Class 8, and Class 9.  So I don't think that's a --

10  there's no vote purchasing, I think you called it.  No, not at

11  all.

12  Q    Yeah.  Well, on that topic, I think the phrase that was

13  used was gerrymandering.  Are you aware of the argument that's

14  been made that the subordinated claim was dropped in there in

15  order to gerrymander a positive vote for the impaired class of

16  Class 9, I believe?

17  A    In a word, I would say that's preposterous.  The -- as I

18  said, we have a number of classes that will vote for the plan.

19  The plan is -- the plan is a monetization plan.  And if -- if

20  the creditors determine that they don't want to pursue this

21  plan, we'll go forward with another -- we'll try to get

22  another plan.  We tried to have a grand bargain plan.  We

23  tried to have a pot plan, as I've testified previously.  I'm

24  quite certain that I've done more work on that than anyone

25  else, including Mr. Dondero and anybody who works for him.

003730

 1   And he hasn't been willing to do that.

 2        This is a -- this is a plan that's come together.  We

 3   think it's going to be in the best interests of the estate.

 4   That'll be confirmation next week.  Or two weeks, I guess.

 5   But I don't see how this is any way related -- this settlement

 6   is not any way related to the voting on that -- on that -- on

 7   that plan.

 8   Q    Just to put the finest point on it, is the Debtor relying

 9   on Class 9 to be the impaired consenting class?

10   A    No.  I think -- I think what I've -- as I said, I believe

11   we already have the votes in Class -- I think it's 2 or 3, 7,

12   8, and -- and 9 will vote in favor as well.  So that won't be

13   an issue.

14        MR. MORRIS:  Your Honor, I have no further questions

15   of Mr. Seery.

16        THE COURT:  All right.  Pass the witness.  I'll ask

17   HarbourVest counsel first:  Do you have any questions of Mr.

18   Seery?

19        MS. WEISGERBER:  No, Your Honor.

20        THE COURT:  All right.  Thank you.

21      What about cross-examination?  Mr. Dondero's counsel?

22                      CROSS-EXAMINATION

23   BY MR. WILSON:

24   Q    Mr. Seery, how are you doing today?

25   A    I'm well, thank you.

Seery - Cross                          63

1    Q    I'm John Wilson, and I represent Jim Dondero.  I have a

2    few questions for you today.

3         Now, the HarbourVest proof of claims were filed on April

4    8th, 2020; is that your recollection?

5    A    I believe that's correct.  I don't recall the specific

6    date.

7    Q    Okay.  And do you know when you first became aware of the

8    HarbourVest claims?

9    A    I believe it was early in the summer when we filed the

10   omnibus objection.  It may have been in late spring, shortly

11   after that.  I don't recall the specific date of the filing.

12   Q    And before the time of the filing of the omnibus

13   objection, did Highland educate itself regarding the

14   HarbourVest proof of claims?

15   A    I'm sorry, could you say that again?  I didn't quite

16   understand it.

17   Q    Before the omnibus objection was filed, did HarbourVest --

18   I'm sorry, did Highland educate itself on the HarbourVest

19   proof of claims?

20   A    Not especially, no.

21   Q    Okay.  And -- but at some point, Highland did investigate

22   those proofs of claim, correct?

23   A    That's correct.

24   Q    And when would you -- when do you recall that that

25   investigation began?

Seery - Cross                                                    64

 1  A    I don't recall the date, but the triggering event was

 2  HarbourVest's response to our omnibus objection.

 3  Q    Okay.  And that would have been filed September 11th of

 4  2020?

 5  A    I'll take your representation.  I don't -- I don't recall

 6  the specific date.

 7  Q    Okay.  And so when you began to investigate the

 8  HarbourVest claims, what was your initial reaction?

 9  A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16       But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

003733

1  Q    And did you ever represent to any party that the

2  HarbourVest claim was worth, at most, $5 million?

3  A    I think I represented often, including to HarbourVest,

4  that it was worth nothing.  I don't recall if I specifically

5  said $5 million.  $5 million would have been a nominal amount

6  to -- which is litigation costs.  So it may -- it may have

7  been in my models that I put in that as a settlement amount,

8  but I -- I thought that there were valid and good defenses to

9  those larger claims.

10 Q    And you recognize that HarbourVest was a large,

11 sophisticated investor, correct?

12 A    Yes.  I think they manage north of -- right around a

13 hundred billion dollars.

14 Q    And you recognize that HarbourVest routinely structured

15 complex customized investments, correct?

16 A    I believe that -- I don't know the intricate part of their

17 businesses, but as a fund of funds who does creative

18 investments, I think that they do do quite a bit of that.

19 This, I believe, was their first investment in the CLO space.

20 Q    And it was not -- or I should say, you did not believe

21 that HarbourVest was simply a passive investor in HCLOF,

22 correct?

23 A    I don't think that that's true, no.

24 Q    You don't -- you don't believe that you denied their claim

25 to be a passive investor?

1  A    Oh, I think -- I'm sure that in defense of their claims I

2  would argue that they were -- they were more than a passive

3  investor.  But it was pretty clear when you look at the

4  structure of what they invested that there was an intent that

5  they be passive on their part.  They didn't take a majority

6  interest.

7       In fact, Highland made it clear in the structure of the

8  deal that they couldn't -- it would be hard for them to get a

9  majority interest because Highland entities would control that

10 and Dondero-controlled entities or individuals would control

11 the majority.

12      I think that they -- they had hoped to be a passive

13 investor.

14 Q    But was it not your position that HarbourVest was actually

15 an active, involved investor?

16 A    I think our defense was going to be that they knew exactly

17 what was going on, that they participated, that they were

18 active, and that, indeed, that they were in and around some of

19 the subsequent issues in the Acis case.

20 Q    And you understood that HarbourVest played a material role

21 in the various outcomes in the Acis bankruptcy case, correct?

22 A    I don't believe that to be correct, no.

23 Q    Have you ever made that representation to anyone before?

24 A    Not -- not that I recall.

25 Q    Well, do you recall giving statements to a reporter named

Seery - Cross                                    67

1   Syed Khaderi?

2   A    I've never spoken to a reporter named Syed Khaderi in my

3   life.

4   Q    Well, did you participate in the preparation of statements

5   to be given to Syed Khaderi?

6   A    I've never heard of Syed Khaderi, nor have I participated

7   in any preparation of statements.  I don't know who that is.

8            MR. WILSON:  All right.  I'm going to have Bryan

9   Assink put on the screen a document.

10       And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q    Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A    Yes.

16  Q    And who is Lucy Bannon?

17  A    She is the Highland public relations person.

18           MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q    Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A    Yes.

24  Q    Have you seen this email before?

25  A    Not that I recall, no.

003736

Case 3:23-cv-01503-B Document 18-1 Filed 09/21/23 Page 68 of 173
Case 3:23-cv-01503-B Transcript of January Hearing Page 68 of 173 PageID 4113

Seery - Cross                                                          68

1  Q   All right.  It continues on that, I saw the filing on
2  Friday about HarbourVest claims against Highland for a CLO
3  investment, and I'm looking to put out a report tomorrow
4  morning London time.  Ahead of that, I wanted to check if
5  Highland would like to comment on the matter.
6       MR. MORRIS:  Your Honor, this is -- the Debtor
7  respectfully objects.  A, this document is not in evidence.
8  B, it's rank hearsay.
9       THE COURT:  Response, Mr. Wilson?
10      MR. WILSON:  Your Honor, I am attempting to
11 authenticate this document, but I'm using it in rebuttal to
12 the testimony that Mr. Seery just offered.
13      THE COURT:  All right.  I'll allow it.  Overrule the
14 objection.
15      MR. WILSON:  All right.  Thank you, Your Honor.
16 BY MR. WILSON:
17 Q   All right.  Now, if we -- and oh, that September 14th
18 date, that was three days after the September 11th date that
19 we discussed was the date that HarbourVest filed its response
20 to the omnibus objection, correct?
21 A   Yes.  If that's the date that they filed it, then I -- if
22 you're representing that, I concede that the 14th is three
23 days after the 11th.
24 Q   All right.  And if you go back to the first page of this,
25 it looks like, on the following day, Lucy Bannon sends an

Case 3:21-cv-00538-G Doc 264-2 Filed 05/26/22 Entered 05/26/22 21:59 Page 69 of 173
Case 3:23-cv-01505-B Document 18-1 Filed 09/11/23 Hearing Page 65 of 173 PageID 4114

Seery - Cross                    69

 1  email to you, and is that your email address,

 2  jpseeryjr@gmail.com?

 3  A    That's correct, yes.

 4  Q    And do you recall receiving this email from Lucy Bannon?

 5         MR. MORRIS:  Your Honor, I renew my objection that

 6  this is hearsay.  He's not rebutting anything that Mr. Seery

 7  testified to.  He testified that he'd never heard of the

 8  gentleman at the bottom of the document.  There's nothing in

 9  this document that rebuts Mr. Seery's testimony at all.

10         THE COURT:  Response, Mr. Wilson?

11         MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12  his statement that he hadn't -- that he hadn't heard of Syed

13  Khaderi.  My rebuttal is attempted to -- attempting to show

14  that he has made various statements that he denied.

15         THE COURT:  I'll overrule the objection.

16  BY MR. WILSON:

17  Q    All right.  So, back to this exhibit, Mr. Seery.  You

18  recall receiving this email from Lucy Bannon on Tuesday,

19  September 15, 2020?

20  A    Not specifically.  But to be clear, I recall talking to

21  Lucy Bannon about the HCMLP dispute with HarbourVest.

22  Q    Okay.  And --

23         MR. WILSON:  Bryan, can you go down to the next page?

24  Scroll down to where -- the James Seery email.

25  BY MR. WILSON:

003738

1   Q    Do you see this email on your screen that's dated

2   September 15, 2020 at 10:33 p.m.?

3   A    Yes, I do.

4   Q    And do you recall sending this email to Lucy?

5   A    Not specifically, no.

6   Q    Well, do you deny that you sent this email to Lucy?

7   A    It appears to be my email.

8          MR. WILSON:  Your Honor, we would move to admit this

9   document into evidence as Dondero Exhibit Letter N.

10         THE COURT:  Any objections?

11         MR. MORRIS:  I would consent to the admission of Mr.

12  Seery's email, but the balance of it ought to be excluded as

13  hearsay.

14         THE COURT:  What about that?

15         MR. WILSON:  Well, Your Honor, I think that this

16  document -- and I'll get into this in a little more detail in

17  a second -- but I think this document is a combination of the

18  work product of Lucy Bannon and Mr. Seery in preparing a

19  response for the reporter who requested comment from Highland.

20         THE COURT:  Okay.  I --

21         MR. MORRIS:  Your Honor, um, --

22         THE COURT:  Go ahead.

23         MR. MORRIS:  I just -- I do question how they got

24  this document, but that's for another day.  That's number one.

25  Number two, in addition to the hearsay argument, I just --

003739

1   relevance grounds.

2           THE COURT:  Okay.  I'll allow the portion that is the

3   communication of Seery, that portion of Exhibit N.  All right?

4           MR. WILSON:  Okay.  With due -- thank you, Your

5   Honor.  With due respect, I -- to use that portion, I need to

6   refer to the portion below it, because he says, Good to submit

7   with your final edit/revisions.  And so we need to know what

8   those final edit/revisions are, which are contained in the

9   email directly below that on the document that was four

10  minutes earlier in time.

11          THE COURT:  All right.  Fair enough.  That'll be

12  allowed.

13          MR. WILSON:  All right.  Thank you, Your Honor.

14      (James Dondero's Exhibit N is received into evidence as

15  specified.)

16          MR. WILSON:  So, Bryan, now can you scroll to the

17  next page?  Oh, actually, let's just -- let's just stop at the

18  top -- at the bottom of the page.  What's this statement?

19  BY MR. WILSON:

20  Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21  Khaderi's request for information and comment, you prepared

22  actually two responses, and one of those was a statement on

23  the record attributed to a spokesperson for HCMLP or something

24  along those lines.  And then --

25          MR. WILSON:  Can you scroll down to that next page?

003740

 1  BY MR. WILSON:

 2  Q    And this says -- I think part of this got cut off for some

 3  reason, but it looks like the official statement is in

 4  quotation marks.  It says, "We dispute the allegations made in

 5  the filing and believe the underlying claims are invalid and

 6  will be found to be without merit.  Our focus continues to be

 7  treating all valid claims in a transparent, orderly, and

 8  equitable manner, and vigorously disputing meritless in the

 9  court.  That focus will assure that HCMLP's reorganization

10  process -- progress is towards an efficient and equitable

11  resolution."

12       And then below that there's another section of this email

13  that says, Background/Clarification, Not for Attribution.  And

14  do you know the purpose of this second section of the

15  response?

16  A    Do I know the purpose of that?  Yes.

17  Q    And what would that purpose be?

18  A    Ms. Bannon was speaking on background to reporters.  As I

19  said earlier, I've -- I never heard of the gentleman from

20  London.  If he's at the bottom of the email, I didn't pay any

21  mind, never heard of him.  Nor have I heard it since.  Ms.

22  Bannon didn't ever reference the specific person.

23       But she is the public relations person.  So, as I

24  testified earlier, she does communicate with the press.  And

25  as I previously testified when Mr. Morris questioned me, one

Case 3:21-cv-03607-sgj Doc 364-2 Filed 05/26/22 Entered 05/26/22 21:52:05 Page 78 of 173
Case 3:23-cv-01503-E Transcript of January Hearing Page 119 of 258 PageID 4118
Case 3:23-cv-01503-E Document 16-1 Filed 09/21/23 Page 73 of 173 PageID 4118

Seery - Cross                                    73

1  of our tactics and our defenses for HarbourVest was going to

2  be that we were going to be very public and aggressive about

3  the investment and it would have a negative impact or negative

4  perspective for viewers, in our opinion, about HarbourVest's

5  investment.

6  Q    All right.  Well, look with me in the middle of that

7  paragraph right after the closed parenthetical, where it says,

8  "But it's important to note the background of HarbourVest's

9  active and deep involvement in the investment of which it now

10  complains."

11      And so it was your position that HarbourVest had an active

12  and deep involvement in the investment, correct?

13  A    No.  I don't think that's correct.  Ms. Bannon prepared

14  the statement, it was a litigation defense on background, and

15  that's our -- that was our position for this purpose.  It was

16  not my view that they were active and deeply involved.  They

17  were certainly involved.  There's no doubt about it.  But they

18  got all their information, in our estimation and our research,

19  from Highland.

20  Q    But in any event, you would agree with me that four

21  minutes after receiving this email, you approved this

22  statement to go out to the reporter, correct?

23  A    No, that's not correct.  That's -- this portion is on

24  background.  That statement doesn't go out.  The previous

25  statement was the official statement.  This is the background

1    discussion that she would have.  So, no, she was not

2    authorized in any way whatsoever to send that out.  She was

3    authorized to have conversations with those general facts.

4              MR. WILSON:  Okay.  Bryan, go to the top, or the

5    bottom of the page immediately preceding that.  That's it.

6    Yes, that's it right there.

7    BY MR. WILSON:

8    Q    Now, you'll see that this email from Lucy Bannon on

9    September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10   what you think of the below.  And, again, the first would be

11   on the record and the second will be sent for information

12   purposes to ensure accuracy, not for attribution."

13        So the intent was that this -- that this entire statement

14   be sent to the reporter, correct?

15   A    I don't believe that's correct.  I think when she goes on

16   background she doesn't send them a written doc.  It's got to

17   be clear to the reporter, at least my understanding is that

18   what on background means -- I've been involved with this

19   before -- is that typically that's done orally.  I don't know

20   if she's done it in a written statement before.  I have never

21   seen that done in a written statement before.  You give the

22   official statement and then you walk the reporter through your

23   other views on background.  And you're not quoted.  And it's

24   usually attributed to a source with knowledge.

25   Q    Okay.  We'll come back to that in a minute.  The next

 1  sentence after the one I just read to you --

 2            MR. WILSON:  Go back to where we were on the

 3  background.

 4  BY MR. WILSON:

 5  Q   Now, we just read you the sentence that starts with, "Then

 6  it's important."  The following sentence says, "HarbourVest

 7  was not simply invested in HCLOF as an ignorant,

 8  unsophisticated, passive investor, but was an active and

 9  informed participant in the inception of its investment

10  through all of the Acis bankruptcy proceedings, and

11  HarbourVest played a material role in various outcomes related

12  to that case and its impact on HCLOF."

13      And is it -- did you not just tell me before we

14  investigated this document that HarbourVest did not play a

15  material role in the various outcomes of the Acis bankruptcy?

16  A   I don't know exactly what I said, but I think that's

17  correct, after we'd done the research on it, yeah.

18  Q   But you took the position in this email that you approved

19  to go out to a reporter that says that -- that HarbourVest was

20  an active and informed participant in the inception of -- of

21  its investment through all of the Acis bankruptcy proceedings

22  and played a material role in various outcomes related to that

23  case and its impact on HCLOF.  Can we agree with that?

24  A   Yes.

25  Q   And then the final sentence of this paragraph says that,

Case 3:21-cv-03070-Dtg Document 48 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 28 of 173
Case 3:23-cv-01503-B Transcript of January Filed 09/21/23 Hearing Page 122 of 258 PageID 4121

Seery - Cross                                                    76

1   We believe that neither the facts nor the law support

2   HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3       Whose words were those, "We-were-too-lazy-to-know

4   allegations"?

5   A   I don't recall.  They may be mine.  It's aggressive the

6   way I am, so that -- that may well be the case.

7           MR. WILSON:  All right.  Go -- go down to the next

8   page.

9   BY MR. WILSON:

10  Q   And with respect your comment that that second paragraph

11  would not have gone to the reporter, look at this email in the

12  middle of the page from Lucy Bannon to Syed Khaderi, September

13  16, 2020, at 1:51 a.m.  And --

14          MR. MORRIS:  Your Honor, this I will object to as

15  hearsay.  There is no witness here to testify to anything on

16  this document.

17          THE COURT:  All right.  How about that?

18          MR. WILSON:  Well, it's -- well, scroll up just a

19  little bit.  This email at the top of the page is three

20  minutes after the one in the middle of the page, where Lucy

21  Bannon is forwarding this to James Seery, saying, See below

22  for responses sent to *Creditflux*.  Will follow up with the

23  story when it runs or with any other updates.

24          MR. MORRIS:  Your Honor, these --

25          MR. WILSON:  So I think this --

Case 3:24-cv-05608-jg Doc 86-12 Filed 05/26/22 Entered 05/26/22 12:29:52 Page 7 of 173
Case 3:23-cv-01508 Transcript of January Filed 09/11/23 Hearing Page 123 of 258 PageID 4122

Seery - Cross                                    77

1          MR. MORRIS:  These documents don't appear on the

2     witness list.  They're not being offered to impeach anything.

3     They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5     trying to rebut the statements that Mr. Seery made.  In fact,

6     he told me just a minute ago that that second paragraph would

7     not have gone out to the reporter.  However, this email from

8     Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10    questioning, with an undisclosed document, is to rebut the

11    earlier testimony he gave before you even put this exhibit in

12    front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14    that Mr. Seery has made today, and I think it -- you know, if

15    he's going to testify that this information did not go out to

16    a reporter, I think I'm allowed to rebut that to demonstrate

17    that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19    in advance?  It's feeling less and less like an impeachment

20    document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22    actually have this document at the time we filed our witness

23    and exhibit list, but I would also say that I didn't have any

24    purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

003746

Case 3:20-cv-03678-1g Doc 364 Filed 05/26/23 Entered 05/26/23 21:52:53 Page 3 of 173
Case 3:23-cv-01503-B Document 18-8 Filed 09/21/23 Hearing Page 124 of 258 PageID 4123

Seery - Cross                                                    78

 1   disclose all exhibits you anticipate using except those for

 2   purposes of impeachment.  Okay?  Not rebuttal, to be

 3   technical.

 4       So, if you didn't disclose this exhibit, the only way you

 5   can use it, subject to other possible objections, is if you're

 6   impeaching a statement.  And I'm just saying I think we're

 7   going beyond trying to impeach the original statement and now

 8   we're trying to impeach statements he's made after seeing

 9   portions of the document.

10       What did you mean, you didn't have this document in time

11   to disclose it?

12           MR. WILSON:  Well, I actually just received this

13   document this morning, Your Honor.

14           THE COURT:  Where did you receive it from?

15           MR. MORRIS:  From who?

16           MR. WILSON:  I -- I honestly do not know the source

17   of this document, although it was provided to me by my client.

18           MR. MORRIS:  Your client being Mr. Dondero?

19           THE COURT:  Could you answer that, Mr. Wilson?

20           MR. WILSON:  Yes, that's -- yes, that's correct.

21           THE COURT:  All right.  I will -- that's --

22           MR. MORRIS:  Your Honor, I'd like to --

23           THE COURT:  That's a different can of worms.  But for

24   now, I sustain the objection.  You're done questioning on this

25   document.

1           MR. WILSON:  That's fine, Your Honor.  I can move on.

2    BY MR. WILSON:

3    Q    Now, Mr. Seery, you would agree with me that whether or

4    not HarbourVest played an active role in the Acis bankruptcy,

5    it was kept apprised of the -- of the ongoings in the

6    bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

7    A    Yes.  My understanding is that -- that they were.

8    Q    And in fact, did Highland have weekly conference calls

9    with HarbourVest during the Acis bankruptcy to discuss what

10   was going on in the bankruptcy?

11   A    I don't know if they were weekly.  I've been told that

12   they had regular calls updating HarbourVest, yes.

13   Q    Okay.  And did Highland produce over 40,000 pages of

14   documents to HarbourVest related to the Acis bankruptcy?

15   A    I'm not aware of that, no.

16   Q    Have those documents been provided to you?

17   A    I hope not.

18   Q    So, in your role --

19   A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20   from anybody.

21   Q    Well, did you receive any number of documents that were

22   provided by Highland to HarbourVest during the Acis

23   bankruptcy?

24   A    I wasn't involved in this during the Acis bankruptcy.  I'm

25   sorry.

Seery - Cross                                    80

1   Q    Well, I'm referring to, after you became involved in this

2   Highland bankruptcy, whether you were provided with these

3   documents that were sent from Highland to HarbourVest.

4   A    I don't -- I don't know what the documents are.  I've

5   reviewed tons of documents with respect to the HarbourVest

6   claims, but I don't know of the documents to which you're

7   referring.

8   Q    Okay.  And after you performed your investigation into the

9   HarbourVest claim, what was your opinion as to the cause in

10  the reduction in value of HarbourVest's investment in HCLOF?

11  A    I think the main cause of the reduction in the investment

12  was the imposition of the Trustee and the failure of Highland

13  HCLOF and then subsequently with the injunction to reset the

14  CLOs.

15      You know, these are -- these are some of the worst-

16  performing CLOs in the market because they weren't reset.  And

17  when the liabilities of the CLOs are set at a level to match

18  assets, and then liability -- the assets run off, and the

19  asset financings or the new deals come in at much lower

20  levels, and the obligations of the CLO are not reset, the

21  arbitrage that is the CLO shrinks.  And that's what happened

22  to these CLOs.

23  Q    And during the course of the Acis bankruptcy, Acis and

24  Brigade were given management responsibilities over the CLOs

25  and HCLOF, correct?

003749

Case 3:21-cv-00842-B Document 36-1 Filed 05/26/22 Entered 05/26/22 21:39:52 Page 81 of 173
Case 3:23-cv-01503-E Transcript of January Hearing Filed 09/11/23 Page 127 of 258 PageID 4126

Seery - Cross                                          81

 1   A    I believe that the Trustee had the overall, and then

 2   subsequently, with the confirmation of the plan, they took it

 3   over.  So I think that ultimately Mr. Terry had the management

 4   authority, full management authority, and some advice through

 5   Brigade.  But I think technically it wasn't actually during

 6   the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

 7   Phelan had the actual authority.

 8        (Echoing.)

 9   Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10   the actual authority but he delegated that authority to Josh

11   Terry and Brigade?

12   A    I think that's fair, yes.

13   Q    And do you know when that occurred?

14   A    I believe that the control of the CLOs was in July of

15   2018, and then the ultimate confirmation of the case was at

16   the very beginning of '19.

17   Q    So, after being instituted as portfolio manager, and

18   during the time when Acis and Brigade were working under the

19   direction of the Trustee, who would have receive the fees for

20   managing those portfolios?

21   A    I believe -- I don't know.  I believe the -- that the Acis

22   estate would have received those fees.

23   Q    And who -- and so is that your testimony, that prior to

24   confirmation the Acis estate would have received the

25   management fees?

Seery - Cross                                    82

1  A    I believe that -- I believe they would have if they were

2  the manager, yeah.

3  Q    Okay.  And who would have received the fees after

4  confirmation?

5  A    Acis.

6  Q    Okay.  And who would have had the discretion to set the

7  amount of those management fees?

8  A    They would be agreed to in the -- in the investment

9  management agreement.

10 Q    They would be agreed to?

11 A    Yes.  As far as I've seen, I've -- I haven't seen

12 unilateral ability of a manager to set fees at its -- at its

13 whim.

14 Q    So is it your understanding that Acis and Brigade ended up

15 charging substantially more fees than Highland had charged

16 when it was under Highland's management?

17 A    I think the fees were -- the fees were -- the fees were

18 set by the agreement.

19         MR. MORRIS:  Your Honor, I just object to the line of

20 questioning on relevance grounds.  This is a 9019 hearing,

21 Your Honor.  How -- I just don't think this has any relevance

22 at all.

23         THE COURT:  All right.  Mr. Wilson, what is the

24 relevance?

25         MR. WILSON:  The relevance is that Mr. Seery has

003751

Seery - Cross                                    83

1    testified that these Acis CLOs were among the worst-performing

2    in the market, and frankly, we would agree with that, and I'm

3    trying to get his understanding as to why, because I think

4    there's direct relevance in the reason that the value of the

5    HarbourVest investment diminished.

6            MR. MORRIS:  I don't think that was his testimony,

7    Your Honor.  But at the end of the day, Your Honor has heard

8    the litany of reasons why the Debtor is entering into this

9    agreement.  I just, I just think it's irrelevant, Your Honor.

10           THE COURT:  All right.  Mr. Wilson, I barely think

11   this is relevant.  I mean, I'm going to give you some benefit

12   of the doubt on that because of, you know, the testimony that

13   HarbourVest lost $50 million of value and --

14       (Echoing.)

15           THE COURT:  -- maybe that shouldn't, you know, lie at

16   the feet of Highland.  I think the compromise reflects that

17   they don't -- it doesn't lie entirely at the feet of Highland.

18   But, you know, maybe two or three more questions.

19           MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20   didn't have very much more on this point.  But to be a hundred

21   percent honest, I can't remember my question right before the

22   objection.

23           THE WITNESS:  I think you were asking me about the

24   fees and somehow alluding or implying that the manager could

25   unilaterally set fees.

Seery - Cross                                    84

1       The fees are set in the investment management contract.

2   The manager doesn't get to wake up on Wednesday and say, you

3   know, I'd like another half a basis point.  It doesn't work

4   that way.

5   BY MR. WILSON:

6   Q   But you would agree with me that the fees and expenses

7   charged to an investment would impact the performance of that

8   investment in the market?

9   A   Absolutely.

10  Q   Would you also agree with me that there was one CLO -- and

11  I think you referred to it in your direct testimony -- but CLO

12  7, which continued to be managed by Highland?

13  A   That's correct.

14  Q   And is it fair to say that CLO 7 exceeded the performance

15  of the CLOs that were managed by Acis and Brigade?

16  A   I think that's fair.  I don't -- I don't recall the

17  magnitude, but I think it's outperformed those -- those CLOs,

18  yes.

19  Q   All right.  Well, thank you.  I want to turn your

20  attention to the portion of the settlement agreement that

21  deals with voting of the HarbourVest claim.  How did

22  HarbourVest's commitment to vote for the plan become a part of

23  the settlement?

24  A   Pretty straightforward negotiation.  We -- in negotiating

25  the settlement, one of the key factors was the cost and

Case 3:21-cv-03071-sig Doc 36-18 Filed 05/26/22 Entered 05/26/22 21:39:52 Page 85 of 173
Case 3:23-cv-01509-B Document January Filed 09/11/23 Page 131 of 258 PageID 4130

Seery - Cross                                          85

1    expense of the litigation, in addition to the risk on the --

2    on the fees, and whether we could wrap this up in a global

3    settlement now.  So in my experience, it's fairly typical, we

4    would try to do this in every settlement, have the settling

5    party, be that the claimant, agree to support the case and the

6    plan.

7        You know, we did not do that with the Committee members,

8    although we wanted to.  (Echoing) I frankly still wish I had.

9    Those little -- little bits that have been difficult

10   (echoing).  The Committee members have a different interest in

11   (echoing) than their more global interest for creditors at

12   large, which is more difficult than traditionally in

13   bankruptcy cases, less likely to have a Committee member, a

14   sitting Committee member, actually support the (echoing) of

15   the plan.

16           THE COURT:  Mr. Wilson, could you be careful to put

17   your device on mute every time you're not talking?  Because

18   we're getting some feedback loop from you when Mr. Seery

19   answers your questions.  Okay?

20       (Echoing continues.)

21           THE COURT:  Like right now.  I'm hearing feedback of

22   my own voice through your speakers.

23       Right, Mike?  Isn't that what --

24           A VOICE:  I am, too.

25           THE COURT:  Yes.  Okay.  So please be sure you put

003754

 1  your device on mute whenever you are not speaking.  All right.

 2  Go ahead.

 3  BY MR. WILSON:

 4  Q   I mean, I think you just answered this question, but there

 5  was -- there was no similar voting provision in the Acis or

 6  the Redeemer settlements, correct?

 7  A   There is not, no.  And just as a -- by way of explanation,

 8  if it's okay, the reason was my counsel advised against it.  I

 9  did ask for it.

10  Q   Your counsel advised against putting that voting

11  requirement in the Acis and Redeemer settlements?

12  A   For the reasons I stated.  And in my experience, that's

13  consistent, where sitting members of Committees don't

14  generally sign up to resolve their own claims and support the

15  plan because of their larger fiduciary duties to the creditor

16  body as a whole.

17  Q   And during the settlement negotiations of the HarbourVest

18  claim, was this commitment to vote a topic of discussion?

19  A   Not -- not particularly, no.  It was pretty clear that

20  HarbourVest, if they were going to agree to the settlement and

21  the numbers, could see structure.  Obviously, it wanted to

22  understand what the potential distributions would be under the

23  plan, but this was not a hotly-negotiated point.

24  Q   And would you consider HarbourVest's commitment to vote

25  for the plan an important part of the settlement?

Case 19-34054-sgj11 Doc 3648 Filed 05/26/22 Entered 05/26/22 21:59:52 Page 87 of 173
Case 3:23-cv-01503-B Document 18-1 Filed 09/11/23 Page 136 of 258 PageID 4132

Seery - Cross                                           87

1    A    I think it's an important part of the settlement, that the

2    part of the settlement is the subordinated claim.  We could

3    put that into presumably any plan.  But our plan does -- does

4    have a Class 9 for that.  So I think it's a -- it's a part of

5    the settlement that is important or we wouldn't have included

6    it.  It clearly wraps everything up and moves us towards

7    confirmation.

8    Q    And would you have made the deal with HarbourVest if they

9    had pushed back on the commitment to vote for the plan?

10   A    Yeah, I would have.

11   Q    All right.  Thank you.

12           MR. WILSON:  No further questions.

13           THE COURT:  All right.  Mr. Draper, anything from

14   you?

15           MR. DRAPER:  Yes, Your Honor.

16                       CROSS-EXAMINATION

17   BY MR. DRAPER:

18   Q    Mr. Seery, I may not understand the settlement, and I

19   apologize, but the way I think the settlement reads, the

20   interest that you're acquiring, you have the right to place in

21   any entity.  Is that my -- is that correct?

22   A    I don't recall the -- the specifics, but just from a

23   structural standpoint, we wanted to be able to put it into a

24   subsidiary as opposed to putting it directly in HCMLP.  If we

25   couldn't do that, we would -- we would put it into HCMLP.  So

003756

1    there wasn't a -- I don't recall the actual specifics, but we

2    certainly thought about holding that interest in a -- in a

3    subsidiary, just to have a cleaner hold.

4    Q    Why aren't you putting it into the Debtor so the Court and

5    the estate have jurisdiction over that?

6    A    I think the Court certainly has jurisdiction over an

7    entity that the estate owns a hundred percent of.  I don't

8    think that's -- that's even a close call.  So the important --

9    Q    Now, --

10   A    Can I finish?

11   Q    Sure.

12   A    You asked me why.  To the extent that somebody thinks that

13   problematic, I will consent to the Court having complete

14   jurisdiction over it, since I control it a hundred percent.

15   Q    No.  The real reason is, if I remember correctly, Mr.

16   Dondero and Judge Lynn filed a motion to have some say or some

17   information as to sales by subsidiaries, and I think you took

18   the position that they weren't entitled to it.  And so my

19   concern was that putting this in a subsidiary in a sense gave

20   you unfettered control without any review of the item.

21   A    I don't -- I don't think that's the case where we --

22   there's a directly-held subsidiary where we own a hundred

23   percent of it.  I don't think that that's the case.

24   Q    Okay.  But you're willing to (a) put this into the Debtor,

25   number one; and number two, have the estate and have the Court

1  have complete control over the disposition of it and its

2  actions, correct?

3  A    That's not correct, no.

4  Q    What -- what is incorrect about my statement?

5  A    The debtor-in-possession has control of its assets.  The

6  Court doesn't have complete control over its assets.  There's

7  --

8  Q    Well, --

9  A    -- issues -- hold on a second.  This is not -- this is not

10 a game and a trap.  We put it in a subsidiary for specific

11 reasons.  You asked why.  I'm giving you the why.  It's not to

12 hide it from anybody.  We're not going to sell the asset

13 unless somebody comes up with a great price for it.  We're

14 going to monetize the assets.  We're going to control HCLOF by

15 a majority.

16 Q    But, again, the issue is, if it's in the estate, the Court

17 has supervision over it.  If it's not in the estate, the Court

18 has no supervision of it.

19 A    I don't think that's correct, because the Court has

20 supervision over the estate, which owns a hundred percent of

21 the special-purpose entity that will own the shares.

22 Q    Okay.  All right.  Now, let's talk about the $15 million

23 that you discussed and the legal fees that were incurred.  Is

24 that the total amount that was spent, or is -- or is that --

25 was the total amount $30 million and HarbourVest was only

Case 3:21-cv-00711-sg Doc 364-2 Filed 05/26/23 Entered 05/26/23 21:29:52 Page 90 of 173
Case 3:23-cv-01503 Transcript of January Filed 09/11/23 Hearing Page 90 of 173 PageID 4135

Seery - Cross                                                    90

 1   responsible for one half of it or functionally took the brunt

 2   of one half of it?

 3   A    I think the total amount is between $15 and $20 million.

 4   I don't have the exact numbers.

 5   Q    So, in fact, the HarbourVest loss due to its ownership

 6   would have been one half of that, not $15 million?

 7   A    Well, the vehicle lost the money.  HarbourVest owned 49.98

 8   percent of it, and Highland controlled the rest.  So if you

 9   allocate it that way, I suppose that would be a -- that's how

10   you would divide it, in -- roughly in half, yes.

11   Q    And so HarbourVest's actual dollar loss due to the legal

12   fees is really the 49-point-whatever percent of $15 million,

13   not $15 million?

14   A    I don't know if -- I certainly would argue that.  I don't

15   think that HarbourVest has that position.

16   Q    Okay.  Now, in connection -- you were asked a question

17   about the documentation that was provided by Highland to

18   HarbourVest both during the bankruptcy of Acis and before.

19   You have control over the Harbour -- over the Highland server,

20   correct?

21   A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22   Draper, I can't see you, so it would be better if I could see

23   you during the questioning.

24   Q    Okay.

25   A    And could you repeat the question?

003759

1   Q    All right.  I'll be happy to.  You were asked a question

2   about the documentation that was provided by Highland to

3   HarbourVest during the Acis bankruptcy and meetings that took

4   place between the parties.  Correct?

5   A    Yes.

6   Q    And you stated you were unaware of the material that was

7   sent over?

8   A    I think I testified that I didn't receive the 40,000

9   documents that were mentioned.

10  Q    Did you do any search or order a search of the Highland

11  server to see what material was sent over by any party to

12  HarbourVest to analyze what -- what information they had

13  available to them and what was provided to them?

14  A    Yes, we did a search.

15  Q    And did you review the documentation that was sent over?

16  A    The -- the documentation that we looked at was very

17  specific to the investment and to the OM.  So we didn't look

18  for the -- the supposed 40,000 documents, no.

19  Q    Did you look for the material that was provided to them

20  during the Acis bankruptcy and the periodic meetings that you

21  discussed?  Or that you testified to earlier?

22  A    The answer is no.

23  Q    One last question.  I think, and just so I understand your

24  testimony, you've broken out the HarbourVest claim into two

25  pieces.  One is the legal fee amount that we've just

1   discussed, and I gather the other piece of that is the fraud

2   in the inducement to enter into the CLO purchase?

3   A    It's -- it's more -- it's much more than that.

4   Q    Okay.  Well, let me say it in a different way.  The other

5   part of it is the losses as a result of the fraud in the

6   inducement to purchase the interest?

7   A    I don't think that's -- that's fair.  If I could explain?

8   Q    Sure.

9   A    Yeah.  The legal fee piece is pretty clear.  The other

10  piece starts with fraud in the inducement, but it's extensive

11  fraud claims.  Fraud in the inducement, as I testified

12  earlier, would get them around the exculpation and liability

13  limitations in the OM.  You don't get around all of those with

14  just the fraud.  And so that's -- that's the split of that

15  claim.  So the fraud in the inducement contains fraud

16  allegations.  Even if you didn't have inducement, you'd have

17  other potential fraud claims.

18  Q    But let me state it in a different fashion.  But for the

19  investment, the fraud that you allege wouldn't have occurred?

20  A    I -- HarbourVest alleges it.

21  Q    No, I'm just -- in your analysis of the claim, but for the

22  inducement, the rest of the damages wouldn't have flowed?

23  A    That's HarbourVest's position, yes.  But for the fraud,

24  they wouldn't have made the investment.

25  Q    All right.

Case 3:23-cv-01503-B Document 36-8 Filed 05/26/23 Entered 05/26/23 21:59:52 Page 98 of 173
Case 3:23-cv-01503-B Transcript of January 18 2023 Hearing Page 93 of 258 PageID 4138

Seery - Redirect                                          93

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4     Just a very few questions.

5                    REDIRECT EXAMINATION

6     BY MR. MORRIS:

7     Q    Mr. Seery,  you were asked about that document that Lucy

8     prepared.  Do you remember that?

9     A    Yes, I do.

10    Q    In your experience, don't defendants often deny liability

11    before entering into settlements, or even worse, getting

12    adverse judgments entered against them?

13    A    Of course.  Yes.

14    Q    Okay.  And in response to Mr. Draper's questions, isn't

15    the Guernsey claim another claim that the Debtor took into

16    account in assessing the potential risks of this settlement?

17    A    There's a number of claims contained in it.  As I

18    mentioned earlier, I mentioned the RICO claim.  But there is a

19    Guernsey shadow director claim, which is not dissimilar to

20    U.S. claims that somebody effectively controls an enterprise,

21    notwithstanding them not having the official role.

22    Q    Okay.

23         MR. MORRIS:  I have nothing further, Your Honor.

24         THE COURT:  All right.  Any recross on that redirect?

25    All right.

Case 3:21-cv-00571-tg Doc 364 Filed 05/26/22 Entered 05/26/22 11:52 Page 94 of 173
Case 3:23-cv-01503-T Document of January Filed 09/11/23 Hearing Page 94 of 173 PageID 4139

Seery - Redirect                    94

 1          MR. WILSON:  No, Your Honor.

 2          MR. DRAPER:  No, Your Honor.

 3          THE COURT:  Thank you.  Mr. Seery, that concludes

 4   your testimony.  Thank you.

 5          THE WITNESS:  Thank you, Your Honor.

 6          THE COURT:  We need to take a bathroom break.  Before

 7   we do, I just want to be clear with what we have left.  As I

 8   understood it, we were having Mr. Pugatch from HarbourVest.

 9   Mr. Morris, will that conclude the Debtor's evidence?

10   (Pause.)  Okay.  You were on mute, but I think you were saying

11   yes.

12          MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13   going to be putting their witness on the stand.

14          THE COURT:  Okay.

15          MR. MORRIS:  But it's part of the evidence in support

16   of the motion.

17          THE COURT:  All right.  Do the Objectors have any

18   witnesses today?

19          MR. WILSON:  Your Honor, Mr. Dondero intends to

20   examine Mr. Pugatch, but if he's going to be called by his

21   counsel, then we will do that as a cross-examination.

22          THE COURT:  All right.

23          MR. DRAPER:  This is Douglas Draper.  I have no

24   witnesses.

25          THE COURT:  Okay.  All right.  Well, I'm asking --

Case 3:23-cv-01503-sj Doc 364 Filed 05/26/22 Entered 05/26/22 21:39:52 Page 95 of 173
Case 3:23-cv-01503 Transcript of January Filed 02/11/23 Hearing Page 95 of 173 PageID 4140

95

```
 1   well, I do want to ask:  Can we get a time estimate

 2   potentially for Mr. Pugatch?

 3          MS. WEISGERBER:  For my examination, Your Honor,

 4   twenty minutes, perhaps.

 5          THE COURT:  Okay.

 6          MS. WEISGERBER:  Or less.

 7          THE COURT:  All right.  Well, let me tell you what

 8   we're going to do.  We're going to take a ten-minute bathroom

 9   break.  But I have a 1:30 hearing and I have a 2:00 o'clock.

10   Well, I have a 1:30 docket, multiple matters, and a 2:00

11   o'clock docket.  So, you know, I'm really intending that we

12   get finished in time to give me and my staff a little bit of a

13   lunch break before launching into the 1:30 docket, so I'm

14   hopeful we can get done around 1:00-ish.  If we can't, then

15   we're going to have to reconvene, I'm going to say probably

16   3:00-ish Central time.  So let's hope we can get through

17   everything.  All right?  Ten-minute break.

18          THE CLERK:  All rise.

19      (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  All right.  Please be seated.  We're

22   going back on the record in the Highland matters.  Do we have

23   everyone?  It looks like we do.  Ms. Weisgerber is going to

24   call the next witness; is that correct?

25          MS. WEISGERBER:  Yes, Your Honor.  We call Michael
```

003764

1   Pugatch of HarbourVest to the stand.

2           THE COURT:  All right.  Mr. Pugatch, if you could

3   turn on your video and say, "Testing one, two."

4           MR. PUGATCH:  Two.

5           THE COURT:  All right.  There you are.  Please raise

6   your right hand.

7           MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8           THE COURT:  Thank you.  You may proceed.

9           MS. WEISGERBER:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q    Good morning.  Can you please state your name for the

13  record?

14  A    Sure.  It's Michael Pugatch.

15  Q    And where do you work, Mr. Pugatch?

16  A    HarbourVest Partners.

17  Q    And what is your title?

18  A    I'm a managing director in our secondary investment

19  group.

20  Q    Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A    We did, yes.  Several claims, in fact.

23  Q    What was the basis for those claims?

24  A    Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

003765

Case 3:21-cv-00538-N Document 84 Filed 05/26/22 Entered 05/26/22 11:59:52 Page 97 of 173
Case 3:23-cv-01502 Document 18-1 Filed 09/11/23 Hearing Page 97 of 173 PageID 4142

Pugatch - Direct                                          97

```
 1    connection with our original investment, mismanagement at the
 2    HCLOF level, including inappropriate fees that were charged
 3    to investors, among a number of other items as well.
 4    Q   Can you explain what you mean by misrepresentations made
 5    to HarbourVest by Highland?
 6    A   Yeah, sure.  So, you know, based on a number of
 7    statements that were made to us around the litigation
 8    involving Mr. Terry, some of the intentions found, the
 9    structural changes that came to light with respect to HCLOF
10    and our investment, as well as the fact that the arbitration
11    award specifically against Mr. Terry would have no impact or
12    implication on Highland's sale or business.
13    Q   And can you explain what you mean by omissions made by
14    Highland to HarbourVest?
15    A   Sure.  So I would say, really, the implications behind
16    the structural changes that were made at the time of our
17    investment into HCLOF.  Also, the intention, clear intentions
18    that Highland had to never, in fact, pay the arbitration
19    award that came to light during our due diligence period to
20    Mr. -- to Mr. Terry as part of the investment.  And
21    ultimately the -- what Highland went about doing in terms of
22    stripping assets of Acis that led to the material value
23    declines and destruction of value that we've experienced
24    since our investment.
25    Q   You mentioned a diligence period.  Did HarbourVest
```

Case 3:21-cv-03070-sg Doc 364-2 Filed 05/26/22 Entered 05/26/22 13:52 Page 98 of 173
Case 3:23-cv-01503-B Document 18-18 Filed 09/11/23 Hearing Page 98 of 173 PageID 4143

Pugatch - Direct                                               98

1  conduct diligence on the investment?

2  A    We did.  We conducted very detailed due diligence, as we

3  do for all of our investments.  That diligence period lasted

4  several months ahead of our investment decision.

5  Q    And did HarbourVest conduct that diligence by itself?

6  A    No.  So, in addition to internal investment professionals

7  at HarbourVest, we engage with outside advisors, both

8  consultants as well as legal advisors, in connection with

9  that due diligence.

10 Q    And did Highland answer all of HarbourVest's questions

11 during that diligence period?

12 A    They did.  And they were numerous.  But yes, they

13 answered all the questions that we had for them.

14 Q    Was the Terry dispute part of HarbourVest's diligence?

15 A    It was.  That came up as one of the outstanding items of

16 litigation as part of our due diligence.

17 Q    I'm going to ask my colleague to pull up on the screen an

18 exhibit that was on our exhibit list as Items -- Exhibits 34

19 and 35.  It's an August 15, 2017 email from Brad Eden to

20 Dustin Willard.  Mr. Pugatch, do you recognize this document?

21 A    I do, yes.

22 Q    And what is it?

23 A    This was an email sent to us during our due diligence

24 period in response to a request for more information on the

25 outstanding litigation that Highland was involved with.

Case 3:20-cv-06071-sgp Doc 364-2 Filed 05/26/22 Entered 05/26/22 21:29:52 Page 99 of 173
Case 3:23-cv-01508-BT Document January Filed 09/11/23 Hearing Page 145 of 258 PageID 4144

Pugatch - Direct                                    99

  1        MS. WEISGERBER:  And if my colleague can just scroll
  2   to the attachment to that email.
  3   BY MS. WEISGERBER:
  4   Q   And do you recall the attachment as well, Mr. Pugatch?
  5   A   Yes, I do.
  6        MS. WEISGERBER:  And if you can scroll back up to the
  7   first email.
  8   BY MS. WEISGERBER:
  9   Q   Who is Dustin Willard?
 10   A   Yes.  Dustin is a colleague of mine at HarbourVest who
 11   worked closely with me on this investment.
 12   Q   And you said that this document was shared with
 13   HarbourVest during the diligence period before the HCLOF
 14   investment?
 15   A   It was, correct.
 16   Q   Is it typical during diligence to receive a description
 17   of litigation such as this?
 18   A   It is.  It's a question that we always ask.  Certainly a
 19   component of our diligence to understand any outstanding
 20   litigation on the part of our counterparty or manager that
 21   we're investing in.
 22        MS. WEISGERBER:  Your Honor, I'd move to offer this
 23   exhibit into evidence.
 24        THE COURT:  Any objection?
 25        MR. DRAPER:  No objection, Your Honor.

Case 23-10063-jgj Doc 3430 Filed 05/26/25 Entered 05/26/25 21:39:05 Page 130 of
Case 3:23-Amended-Transcript-of-January-18-2023-Hearing Page 146 of 258 PageID 4145

Pugatch - Direct                              100

 1          MR. MORRIS:  No objection from the Debtor, Your

 2   Honor.

 3          THE COURT:  All right.  What is the letter or number

 4   for this exhibit?

 5          MS. WEISGERBER:  It's HarbourVest Exhibit 34.

 6          THE COURT:  All right.  So HarbourVest Exhibit 34 is

 7   admitted.

 8       (HarbourVest's Exhibit 34 is received into evidence.)

 9          THE COURT:  And I need to be clear where it appears

10   on the docket.  Can someone tell me?

11          MS. WEISGERBER:  So, it's identified on our exhibit

12   list, not -- it's not attached to the exhibits.  It is on the

13   docket.  We were -- when we initially filed the exhibit list,

14   we were working out confidentiality issues.  But it was

15   subsequently filed with our reply last night.  It's at Docket

16   No. 1735 --

17          THE COURT:  All right.

18          MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19          THE COURT:  All right.  Very well.  Thank you.

20   BY MS. WEISGERBER:

21   Q   Mr. Pugatch, we'll just scroll down to the second page of

22   the attachment.  Can you describe generally what the

23   litigation says regarding the Terry dispute?

24   A   Yes.  Generally speaking, this dispute was described as

25   an employee dispute, employment agreement dispute, with Mr.

 1  Terry, who was a former employee of Highland involved in

 2  their CLO business, and is described by Highland to us really

 3  having to do with a series of false claims, in their opinion,

 4  but having to do with a disgruntled former employee.

 5  Q    And did it strike you as an unusual or significant

 6  dispute?

 7  A    No.  I would say we often -- we'll see, you know, former

 8  employees with, you know, claims against a former employer in

 9  connection with wrongful termination.  I wouldn't say it's

10  extremely common, but certainly not entirely out of the

11  ordinary.  And based on the explanations that we'd received

12  from Highland, seemed to be more of an ordinary-course type

13  former employee litigation suit.

14  Q    Based on what you now know about the Terry dispute, do

15  you believe that this was an adequate disclosure regarding

16  the dispute?

17  A    I would say very clearly not, you know, based on the

18  facts that came to light subsequently, the various rulings in

19  connection with the Acis bankruptcy case.  What was very

20  clearly not stated are the actual facts and implications of

21  the ongoing litigation with Mr. Terry.

22        MS. WEISGERBER:  I'd ask my colleague to put up the

23  next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24  list, which is Document No. 1723.  It's Exhibit 36 on that.

25  Same issue with respect to initially not filed, but it is on

003770

Case 9:23-05067-jsj Doc 83-20 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 102 of
Case 3:23-Amended-Brady-document January Filed 2021 Hearing Page 148 of 258 17 PageID 4147

Pugatch - Direct                                                102

1   the docket at our response last evening at ==ECF No. 1735 at==

2   ==Page A351.==

3           THE COURT:  Page what?

4           MS. WEISGERBER:  A351.

5           THE COURT:  A351.  Thank you.

6           MS. WEISGERBER:  You're welcome.

7   BY MS. WEISGERBER:

8   Q   Mr. Pugatch, I just put up a November 29, 2017 email from

9   Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10  Bellisario.  Do you recall this document?

11  A   I do, yes.

12  Q   And what is this document?

13  A   This was an email sent to us by Highland a couple weeks

14  after we closed on our investment on the (inaudible) in

15  response to a *Wall Street Journal* article that had come out

16  regarding Highland, a number of actions that they had taken,

17  and what Highland was articulating to us, a number of false

18  claims that had been made about Highland's prior actions, and

19  specifically trying to explain some of that and also share

20  with HarbourVest a letter that was being sent to the editor

21  of the *Wall Street Journal* highlighting, in their view, some

22  of the inaccuracies around the reporting.

23  Q   And did you receive this document?

24  A   We did, yes.

25          MS. WEISGERBER:  I'd move to offer this, so

Pugatch - Direct                          103

 1 │ HarbourVest Exhibit 36, into evidence.

 2 │         THE COURT:  Any objections?

 3 │         MR. WILSON:  Your Honor, John Wilson.  I would object

 4 │ as to the relevance of this document.

 5 │         THE COURT:  All right.  What's your response?

 6 │         MS. WEISGERBER:  Your Honor, it shows

 7 │ misrepresentations that the witness will testify how it

 8 │ relates back to prior representations prior to HarbourVest's

 9 │ investment, as well as misrepresentations at that time.

10 │         THE COURT:  Okay.  I overrule the objection.  I'm

11 │ going to admit it.

12 │     (HarbourVest's Exhibit 36 is received into evidence.)

13 │ BY MS. WEISGERBER:

14 │ Q   Mr. Pugatch, can you describe generally -- we spoke about

15 │ this a little bit -- just what this communication from

16 │ Highland was conveying to HarbourVest at the time?

17 │ A   Yes.  Specifically, again, responding to this *Wall Street*

18 │ *Journal* article that had been published, trying to defend,

19 │ again, Highland's own views why there were inaccuracies in

20 │ the reporting.  But importantly, from our perspective, trying

21 │ to reassure us as to the fact that, you know, these

22 │ accusations would have no bearing and any results from it

23 │ would have no bearing on their ongoing business or

24 │ partnership or the investment that we had made in HCLOF.

25 │         MS. WEISGERBER:  And if you can scroll to the second

003772

Case 9:34-05065-gjj Doc 3420 Filed 05/20/26 Entered 05/20/26 21:39:05 Page 104 of
Case 3:23-av-05063-B Document 14-18 Filed 2021 Hearing Page 150 of 258 PageID 4149

Pugatch - Direct                                                        104

 1  page.
 2  BY MS. WEISGERBER:
 3  Q    We'll just look at the last paragraph of another email
 4  from Mr. Covitz.  Can you just read that first sentence of
 5  the last paragraph?
 6  A    Sure.  (reading)  While the dispute has no impact on our
 7  investment activities, as always, we welcome any questions
 8  you may have.
 9  Q    Mr. Pugatch, was this email and the discussion regarding
10  the Terry dispute consistent with the representations made to
11  you prior to HarbourVest's investment into HCLOF?
12  A    It was, yes.  Both the message, the lack of any impact
13  that ultimately the dispute with Mr. Terry, the arbitration
14  award would have around Highland's ongoing CLO business, or
15  HCLOF specifically, was all, you know, very clear in this
16  document, but all consistent with the representations that
17  had been made to us leading up to our investment in the
18  middle of November 2017 as well.
19  Q    Thank you.
20       MS. WEISGERBER:  And you can take down the exhibit,
21  Emily.  Thank you.
22  BY MS. WEISGERBER:
23  Q    You mentioned, Mr. Pugatch, an arbitration award to Mr.
24  Terry.  How did you learn about that arbitration award?
25  A    That was initially disclosed to us by Highland as we were

Case 23-40506-jpg Doc 348 Filed 05/26/22 Entered 05/26/22 13:52:05 Page 105 of
Case 3:23-cv-01503-B Amended Brady Document 18-7 Filed 2021 Hearing Page 151 of 258 PageID 4150
Pugatch - Direct                                     105

```
 1   in the late stages of our diligence and closing process on
 2   the investment into HCLOF.
 3   Q    And generally, what did Highland tell you about the
 4   arbitration award?
 5   A    We were aware of its existence.  We were aware of the
 6   quantum of the award, I think it was around an $8 million
 7   arbitration award in the favor of Mr. Terry, and that was
 8   following the litigation around the wrongful termination and
 9   employee dispute that Highland had described to us
10   previously.
11   Q    Did you ask to see a copy of the arbitration award?
12   A    No, we did not.
13   Q    Why not?
14   A    Ultimately, we -- you know, the explanations that
15   Highland had provided to us all seemed very reasonable.  We
16   relied on their representations that this was, again, nothing
17   more than a dispute with a former disgruntled employee, in
18   their words, that had no bearing or, you know, would not have
19   any bearing on our investment in HCLOF or their ongoing CLO
20   business, which all very clearly was not the case, as
21   we've -- as we've learned over the last several years.
22   Q    Following learning about the arbitration award, did
23   HarbourVest do other diligence?
24   A    We did.  So, in addition to asking questions related to
25   the arbitration award and any impact that it would have, we
```

Case 9:23-cv-05063-gj sj Doc 3480 Filed 05/05/26 Entered 05/05/26 02:13:02 Page 106 of
Case 3:23-cv-01568-B Document 18-1 Filed 2021 Hearing Page 152 of 258 17 PageID 4151

Pugatch - Direct                                    106

1   also spent some time diligencing a couple of structural

2   changes that were proposed by Highland, and, in fact, ended

3   up delaying the closing of our investment by about two weeks

4   as we vetted some of those structural changes that Highland

5   had proposed.  Vetted those both, you know, internally with

6   Highland directly and with external counsel in order to make

7   sure that those structural changes were in fact legally sound

8   in ultimately making our investment.

9   Q    And were those changes proposed following the arbitration

10  award?

11  A    They were, yes.

12  Q    Did Highland tell you the reason for the structural

13  changes?

14  A    Yeah.  So, so some of this -- and specifically, this

15  involved a change of the portfolio manager at the HCLOF level

16  that was really in connection with a rebranding as Highland

17  was going through a rebuild of its CLO business and wanting

18  to align, from a brand perspective, their business on an

19  ongoing basis with the Highland brand as opposed to the Acis

20  brand.  But more specifically, in the case of a late change

21  from a structured standpoint, the -- part of the intention

22  and the investment thesis of HCLOF was to pursue a reset, a

23  refinancing of all the underlying CLOs as they approached the

24  end of their investment period or came out of their

25  investment period.

003775

Case 3:21-cv-05075-sgj Doc 83480 Filed 05/05/26/22 Entered 05/05/26/22 23:52:05 Page 107 of
Case 3:23-Amended-Brasourefonudlalry Hdedl20211Hearing Page 153 of 258 17PageID 4152

Pugatch - Direct                                             107

 1      And in connection with that, in light of the arbitration

 2   award, Highland's view was that there may be difficulties in

 3   the market in resetting certain of those Acis CLOs with the

 4   Acis brand associated with them, given, again, the existence

 5   of the arbitration award and concerns in the market around

 6   the Acis brand reputation.

 7   Q    And what did they tell you was the market view of Acis,

 8   or the Acis brand?

 9   A    Yeah.  Their view or their concern was that the, you

10   know, because of the existence of that arbitration award, the

11   brand would be viewed as toxic.

12   Q    Didn't this put you on notice that perhaps there was

13   something wrong with the structural changes?

14   A    I mean, we -- I mean, short answer, no.  We ultimately

15   asked questions, we diligenced the legal structure, but

16   relied on the representations that were made to us by

17   Highland around the rationale for the structural changes,

18   that these are all changes that were within a Highland-

19   managed vehicle or sat below the vehicle that we were

20   investing in, and so ultimately were in Highland's purview,

21   was the representations that we relied on.

22   Q    And did HarbourVest alone do that diligence of the

23   structural changes?

24   A    So, no.  I mean, in connection with the diligence that we

25   did internally and with Highland directly, we engaged with

Case 23-03062-sgj Doc 83-80 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 108 of
Case 3:23-cv-01503-B Document 18-8 Filed 2021 Hearing Page 154 of 258 PageID 4153

Pugatch - Direct                                    108

 1  outside counsel who was working with us at the time to vet

 2  those structural changes as well.

 3  Q   Did HarbourVest rely on Highland's representations

 4  regarding the arbitration award and the structural changes in

 5  making its investment in HCLOF?

 6  A   We did, absolutely.

 7  Q   If Highland had disclosed the nature of the structural

 8  changes, of removing Acis as the portfolio manager and

 9  related transfers, would HarbourVest have proceeded with its

10  investment?

11  A   Definitively, no, we would not have.

12  Q   Why not?

13  A   I think the reality is if we had understood the intent,

14  you know, that Highland was ultimately undertaking here, we

15  would not have wanted to be any part of this, and certainly

16  getting dragged into all of this, the hassle, the value

17  destruction that we've seen on behalf of the investors and

18  the funds that we manage.  And I would say, lastly, we just

19  full stop would not have done business with a firm who

20  engages with this type of behavior, had we actually known the

21  truth.

22  Q   Mr. Pugatch, are you familiar with the bankruptcy that

23  followed of Acis?

24  A   Yes.

25  Q   And what was your -- or, did HarbourVest participate in

Case 19-34054-sgj Doc 3480 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 100 of
Case 3:23-cv-01503-B Document 18-18 Filed 2021 Hearing Page 155 of 258 PageID 4154
Pugatch - Direct                           109

 1  that bankruptcy?

 2  A    So, initially, no.  Subsequently, we ended up getting

 3  dragged into that on account of a number of misstatements by

 4  Highland about the role that HarbourVest had played as part

 5  of our investment into HCLOF and some of that structure and

 6  the structural changes that I alluded to.

 7  Q    How did HarbourVest learn about those misstatements in

 8  the bankruptcy about HarbourVest's role?

 9  A    So, ultimately, those came to light on -- you know, on

10  account of the ongoing proceedings within the Acis bankruptcy

11  process, and specifically brought to light to us by the Acis

12  trustee at the time, who decided to pursue, you know, further

13  diligence or discovery around the claims that Highland had

14  made around HarbourVest's involvement in those changes.

15  Q    And what is your understanding of what the allegations

16  were that caused the Acis trustee to investigate HarbourVest?

17  A    Sure.  So, you know, our understanding was that Highland

18  had made statements, again, false statements that HarbourVest

19  had actually instructed some of those structural changes,

20  that we were the ones that had said that we would not do

21  business with Acis and had ordered some of the underlying

22  transfer of assets or, again, structural changes, that, you

23  know, very clearly I would say were not the case.  Also, that

24  HarbourVest was -- was calling the shots as it relates to any

25  of the ongoing management or future resets of the CLOs.

003778

1   Q    Did HarbourVest instruct any of those structural changes

2   or transfers to occur?

3   A    We did not.  Absolutely not.

4   Q    Why didn't HarbourVest itself appear in the Acis

5   bankruptcy and file a claim?

6   A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7   passive investor in a Highland-managed company.  We had no

8   direct interaction with or relationship with Acis.  There was

9   really no reason for us to be directly involved until we were

10  subsequently dragged into involvement on account of those

11  misstatements.  And then at that point our focus really

12  pivoted to, you know, whether we needed to defend ourselves

13  against those accusations that had been made by Highland and

14  after a request for further information in discovery by the

15  Acis trustee.

16  Q    Did HCLOF participate in the Acis bankruptcy?

17  A    They did, yes.

18  Q    Did HCLOF incur fees for participating in the Acis

19  bankruptcy?

20  A    Yes.  In fact, very meaningful fees, to the tune of well

21  in excess of $15 million of legal fees, as we understand it,

22  that have been incurred, largely in connection with the

23  ongoing Acis bankruptcy and Highland's continued pursuit of

24  and in connection with the litigation with Mr. Terry, which

25  we firmly believe was entirely inappropriate that HCLOF and

Case 9:23-cv-05068-gjgj Doc 83420 Filed 05/05/26/22 Entered 05/05/26/22 12:39:25 Page Dist of
Case 3:23-cv-01503-B Amended Bran Document-18 by Filed 2021 Hearing Page 157 of 258 17 PageID 4156

Pugatch - Direct                                            111

 1   ultimately investors in HCLOF bear those expenses, which were

 2   not just expenses of HCLOF but of Highland and a number of

 3   other Highland affiliates.

 4   Q   Do those expenses form a basis of separate claims filed

 5   by HarbourVest against Highland?

 6   A   They do, yes.  One of the multiple claims that we had

 7   filed against Highland.

 8   Q   And a few more questions, just for the record, Mr.

 9   Pugatch.  How much did HarbourVest initially invest in HCLOF?

10   A   Sure.  So, our initial investment in November of 2017 was

11   right about $73-1/2 million, I believe.

12   Q   Did HarbourVest invest any additional money in HCLOF?

13   A   We did.  There was a subsequent capital call investment

14   of about $5 million, bringing our total investment to just

15   under $80 million in aggregate.

16   Q   When HarbourVest initially made the investment, did it

17   anticipate making a profit on it?

18   A   We did, yes.

19   Q   How much did HarbourVest anticipate earning from the

20   investment?

21   A   Yeah.  So, our -- based on the original $73-1/2 million

22   investment, we had expected a total return of about $137

23   million on that -- on that investment.

24   Q   What was that projection based on?

25   A   So, that projection was based on materials that we had

003780

Case 23-03040-sgj Doc 83-20 Filed 05/26/23 Entered 05/26/23 21:39:05 Page 12 of
Case 3:23-cv-01503-B Document 18-1 Filed 11/08/24 Page 158 of 258 PageID 4157

Pugatch - Direct                                           112

 1  received from Highland, their internal projection models on

 2  the future performance of the underlying CLOs that we were

 3  acquiring exposure to through our investment in HCLOF, and

 4  was one of the inputs or formed the basis in connection with

 5  our diligence that we ultimately ran different sensitivities

 6  -- projections around and helped employ -- helped inform our

 7  investment thesis.

 8  Q    Do you know the current value of HarbourVest's investment

 9  in HCLOF?

10  A    Yes.  The current value is right around $22-1/2 million.

11  Q    So roughly how much has the investment itself decreased

12  from HarbourVest's initial investment?

13  A    So, net of what was about $4-1/2 million of distributions

14  that we received early on in the investment, we've lost, to

15  date, in excess of $50 million on our original investment.

16  Q    And just for -- to close out, Mr. Pugatch, knowing all

17  that you know, if HarbourVest had known that -- about the

18  nature of the transfers by Acis or Highland's intent with

19  respect to the arbitration award, would HarbourVest have made

20  this investment?

21  A    No.  The reality is, had we known the truth, or even had

22  a sense of the truth, the true intentions behind some of

23  those transfers and ultimately what would have happened, we

24  never would have made this investment, full stop.

25  Q    Thank you, Mr. Pugatch.

Case 23-03067-sgj Doc 83-20 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 18 of
Case 3:23-cv-01503-B Document 18-19 Filed 02/14/23 Page 159 of 258 PageID 4158

Pugatch - Cross                                    113

1          THE COURT:  All right.  I didn't hear you, Ms.

2    Weisgerber.  Do you pass the witness?

3          MS. WEISGERBER:  Yes, I pass the witness.

4          THE COURT:  All right.  Thank you.

5       Mr. Morris, any examination from you?

6          MR. MORRIS:  No, thank you, Your Honor.

7          THE COURT:  All right.

8       (Interruption.)

9          THE COURT:  All right.  I'm not sure whose voice that

10   was, but please, again, mute your devices when you're not

11   talking.

12      Any cross-examination of Mr. Pugatch?  I'll start with

13   you, Mr. Wilson.

14         MR. WILSON:  Yes, Your Honor.

15         THE COURT:  Okay.

16                    CROSS-EXAMINATION

17   BY MR. WILSON:

18   Q    How are you -- I guess we're afternoon now.  How are you

19   this afternoon, Mr. Pugatch?

20   A    I'm doing well.  Yourself?

21   Q    I'm doing well as well.  Do you recall that on Monday of

22   this week I took your deposition?

23   A    Yes, I do.

24   Q    And so you understand that my name is John Wilson and I

25   represent Jim Dondero, who has filed an objection to the 9019

Case 23-34051-sgj Doc 3420 Filed 05/05/26 Entered 05/05/26 21:39:05 Desc
Case 3:23-cv-01503-B Document 18-1 Filed 2021 Hearing Page 160 of 258 PageID 4159

Pugatch - Cross                                    114

 1 | motion filed by the Debtor?

 2 |     I've got a few questions for you today.  Has HarbourVest

 3 | been around for over 35 years?

 4 | A   We have, yes.

 5 | Q   And does HarbourVest have ten offices around the world?

 6 | A   Correct, yes.

 7 | Q   And does HarbourVest employ over 150 investment

 8 | professionals?

 9 | A   Yes.

10 | Q   Does HarbourVest have over $74 billion in assets under

11 | management?

12 | A   Correct, yes.

13 | Q   And is HarbourVest's client base largely comprised of

14 | institutional investors?

15 | A   Also correct.

16 | Q   And you would agree with me that HarbourVest is a

17 | sophisticated investor, right?

18 | A   I would, yes.

19 | Q   How long have you worked for HarbourVest?

20 | A   I've been employed by HarbourVest for 17 years now.

21 | Q   And how long have you been a managing director?

22 | A   I've been a managing director for approximately six

23 | years.

24 | Q   And you were, in fact, the managing director for the

25 | investment that HarbourVest made in Highland CLO Funding,

Case 23-03056-sgj Doc 84-30 Filed 05/05/26 Entered 05/05/26 21:39:05 Desc
Case 3:23-cv-01560-B Document 18-1 Filed 2021 Hearing Page 161 of 258 PageID 4160

Pugatch - Cross                                                    115

1    Ltd., which has been referred to today as HCLOF, correct?

2    A    I was, correct.

3    Q    And HarbourVest, I think you just testified, invested

4    approximately $73 million as its initial investment in HCLOF?

5    A    Yes, correct.

6    Q    And before HarbourVest made that investment, it had made

7    many investments of this type, correct?

8    A    Yeah.  We've made hundreds of investments into

9    partnerships over our history, correct.

10   Q    So HarbourVest was well-experienced in evaluating and

11   deciding whether to invest in large investments, correct?

12   A    It was, yes.

13   Q    Now, in your -- and by your, I mean HarbourVest -- in the

14   response to the Debtor's omnibus objection, it says that by

15   summer 2017 HarbourVest was engaged in preliminary

16   discussions with Highland regarding the investment.  Is that

17   a correct statement?

18   A    Correct, yes.

19   Q    And, in fact, those talks began in the second quarter of

20   2017, correct?

21   A    Yes.

22   Q    And so the investment closed ultimately on November 15th,

23   2017?

24   A    Yes, that's correct.

25   Q    So it's fair to say that HarbourVest considered and

Case 23-10063-gj Doc 3420 Filed 05/05/26 Entered 05/05/26 12:39:05 Page 16 of
Case 3:23-cv-01538-Brad Document 148-8 Filed 02/11 Hearing Page 162 of 258 PageID 4161

Pugatch - Cross                                    116

```
 1    evaluated this transaction for over six months before

 2    investing its $73 million, right?

 3    A    From the time of the initial conversations that we had

 4    with Highland, yes.

 5    Q    And one of the reasons that it took over six months to

 6    complete the investment is that HarbourVest performs due

 7    diligence before it makes an investment, correct?

 8    A    Correct.

 9    Q    And when you're performing due diligence -- well, first

10    off, you would agree with me that that's a common practice

11    amongst sophisticated investors such as HarbourVest, correct?

12    A    To perform due diligence?

13    Q    Yes.

14    A    Yes.

15    Q    And describe -- describe what HarbourVest does in a

16    general sense when it performs its due diligence.

17    A    Sure.  So, we spend time with the manager -- in this

18    case, Highland -- certainly around the investment thesis, the

19    opportunity, receive materials around the underlying assets.

20    We take that and perform our own independent due diligence

21    around the value of those assets, perform due diligence on

22    the manager itself, the go-forward opportunity.  In many

23    cases, and certainly in this case, engage with outside

24    advisors to assist with that due diligence.  It's a very

25    robust and thorough process.
```

Case 1:23-cv-05065-pgg Doc 3480 Filed 05/05/26 Entered 05/05/26 12:13:92 Page Desc of
Case 3:23-cv-01503-Brad Document January Filed 2021 Hearing Page 163 of 258 PageID 4162

Pugatch - Cross                                117

 1   Q   And by outside advisors, are you referring to the outside

 2   counsel that you testified about earlier?

 3   A   Yes.  Both outside counsel and outside consultants.

 4   Q   Okay.  And so did you say that it's typical to engage

 5   outside counsel when performing due diligence?

 6   A   Yes.

 7   Q   And which outside counsel did you retain with respect to

 8   this due diligence?

 9   A   Debevoise and Plimpton as well as Milbank.

10   Q   And during the course of HarbourVest's due diligence, did

11   it identify some items of concern?

12   A   As with any investment, there are always items that are

13   identified that require further diligence, risks that are

14   identified that we look to mitigate through our due

15   diligence, et cetera.

16   Q   And if Harbour -- I'm sorry, did you say something else?

17   A   No.

18   Q   You were finished?  Okay.  Now, if HarbourVest identifies

19   an item of concern, is it typical to request additional

20   information regarding those items of concern?

21   A   It is, yes.

22   Q   And so that actually happened with respect to the HCLOF

23   investment, correct?

24   A   In certain cases, yes.

25   Q   HarbourVest identified several litigation matters that it

1   had questions about, correct?

2   A    Correct.  As we would with any investment.

3   Q    And it went back to Highland and asked them to explain

4   their position on those litigation matters?

5   A    Correct.

6   Q    And one of those litigation matters was the Joshua Terry

7   litigation, correct?

8   A    Yes.

9   Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

Case 9:23-cv-05006-gjg Doc 3480 Filed 05/26/22 Entered 05/26/22 21:39:25 Page Desc
Case 3:23-cv-01538-B Amended Transcript of July 18, 2021 Hearing Page 165 of 258 PageID 4164

Pugatch - Cross                                    119

1  litigation, was issued months before the arbitration award to

2  Josh Terry, correct?

3  A    I don't remember the exact timing, but it was certainly

4  during our due diligence period and prior to the arbitration

5  award, yes.

6  Q    Well, it seems to me that that email that you -- your

7  counsel admitted as an exhibit was issued in August of 2017.

8  Does that sound right to you?

9  A    If that's what the email said, yes.

10  Q    And if the Terry arbitration award came out in October,

11  then you would agree with me that that is several months

12  prior to the -- or at least two months prior to the

13  arbitration award?

14  A    Yes.

15  Q    And so when HarbourVest made requests of Highland to

16  provide information regarding its items of concern, Highland

17  complied with those requests, correct?

18  A    It did, correct.

19  Q    And was there ever a time when HarbourVest requested

20  Highland to provide information and that information was not

21  provided?

22  A    Our requests for information, or at least, you know,

23  responses or color to a question, were always met either

24  with, you know, written or verbal communication back to us,

25  yeah.

Case 9:23-05067-gjgl Doc 3420 Filed 05/26/22 Entered 05/26/22 21:39:07 Page 130 of
Case 3:23-cv-01503-B Amended Brady Document 18-By Filed 2022 11 Hearing Page 166 of 258 17 PageID 4165
Pugatch - Cross                                           120

1  Q   And you would agree with me that, in fact, HarbourVest

2  delayed the closing of the investment by two weeks to

3  continue its due diligence, correct?

4  A   Correct, related to the structural changes that were made

5  close to closing.  That's right.

6  Q   And after conducting that due diligence, HarbourVest

7  satisfied itself that the investment was sound?

8  A   That the legal structure that had been put in place in

9  connection with those proposed changes by Highland was -- was

10 legally sound, yes, and on the back of, again, statements and

11 misrepresentations on the part of Highland around the nature

12 and potential impact to their ongoing CLO business and HCLOF.

13         MR. WILSON:  Well, I'm going to object to the latter

14 part of your response as nonresponsive.

15         THE COURT:  Sustained.

16 BY MR. WILSON:

17 Q   Now, after you conducted the due diligence, HarbourVest

18 made the investment of $73 million on November 15th, 2017,

19 correct?

20 A   Correct.

21 Q   And so I think you testified earlier that prior to that

22 investment HarbourVest had become aware that that Josh Terry

23 litigation had resulted in an arbitration award, correct?

24 A   Yes.

25 Q   But I think you've also testified that HarbourVest did

Pugatch - Cross                                    121

1   not request that Highland provide a copy of the arbitration

2   award, correct?

3   A    That's correct.

4   Q    And you further testified that you were represented by

5   outside counsel at the time, correct?

6   A    Correct.

7   Q    And as of Monday of this week, you had not reviewed that

8   arbitration award; is that correct?

9   A    That's correct.

10  Q    Have you reviewed that arbitration award since Monday of

11  this week?

12  A    I have not.

13  Q    But in any event, you testified that Highland told you

14  about the award?

15  A    Yes.

16  Q    And they told you the amount of the award?

17  A    Yes.

18  Q    And then they told you that the award had been converted

19  to a judgment?

20  A    When you say the award had been converted to a judgment,

21  can you be more specific?

22  Q    Well, I don't know how familiar you are with the

23  litigation process, but in this instance, that award was

24  taken to a court and the court entered a judgment on the

25  arbitration award.  Did you -- were you aware of that?

Case 19-34054-sgj Doc 3430 Filed 05/05/26 Entered 05/05/26 21:32:05 Page 182 of
Case 3:23-cv-01503-B Document 148-8 Filed 2021 Hearing Page 168 of 258 PageID 4167

Pugatch - Cross                                           122

 1    A    I don't recall the specific legal terms of judgment

 2    against it.  I was award of the existence of the arbitration

 3    award and the -- and the obligation for Highland to comply

 4    with that arbitration award.

 5    Q    And HarbourVest did not make an appearance in the Acis

 6    bankruptcy, right?

 7    A    We did not.

 8    Q    But you were aware of the Acis bankruptcy, correct?

 9    A    Yes.

10    Q    And you were kept apprised of the Acis bankruptcy by

11    Highland individuals, correct?

12    A    We had conversations with a couple of Highland

13    individuals throughout the Acis bankruptcy process, yes.

14    Q    Right.  And in fact, you testified that you participated

15    in regular conference calls with Highland regarding that

16    bankruptcy?

17    A    That's correct, yes.

18    Q    And do you recall having been provided with over 40,000

19    documents by Highland related to the Acis bankruptcy?

20    A    I do not recall that, no.

21    Q    Would those documents have been provided to your outside

22    counsel, had you received them?

23    A    I don't know the answer to that.

24    Q    Did the outside counsel that represented you in the due

25    diligence continue to represent you throughout the Acis

Case 19-34054-sgj Doc 3428 Filed 05/20/26 Entered 05/20/26 21:39:05 Page 133 of
Case 3:23-cv-01503-B Document 14-18 Filed 2021 Hearing Page 169 of 258 PageID 4168

Pugatch - Cross                                           123

 1  bankruptcy?

 2  A    They did.  One of the counsels did, correct.

 3  Q    And which counsel was that?

 4  A    Debevoise.

 5  Q    So was your counsel actively involved with monitoring the

 6  Acis bankruptcy?

 7  A    They were, yes, particularly after we were ultimately

 8  accused of having something to do with the original structure

 9  and -- as a result of misstatements by Highland.

10  Q    Did your counsel attend hearings in the Acis bankruptcy?

11  A    I don't recall.

12  Q    Are you familiar with the PACER system?

13  A    I am not.

14  Q    Now, I think that HarbourVest has been described as a

15  passive investor.  You recall that description of HarbourVest

16  in this instance?

17  A    Yes.

18  Q    But, in fact, HarbourVest invested substantial assets

19  such that it owned a 49.98 percent share of HCLOF.  Would you

20  agree with that?

21  A    That's correct.

22  Q    And in fact, the next largest investor was CLO Holdco,

23  which owned 49.02 percent of the shares, correct?

24  A    That sounds right.

25  Q    And there was an advisory board that was created pursuant

1  to the formation documents of this investment, correct?

2  A    That's correct.

3  Q    And in fact, that advisory board only had two members,

4  and one was a representative of HarbourVest and one was a

5  representative of CLO Holdco, correct?

6  A    Correct.

7  Q    And the advisor -- I'm sorry, the portfolio manager was

8  not allowed to disregard the recommendations of the advisory

9  board, correct?

10  A    With respect to the limited set of items that the

11  advisory board could opine on, that is correct.

12  Q    All right.  I want to go over a couple of the

13  misrepresentations that HarbourVest has identified in its

14  filings related to its claim.  The first one is -- and just

15  for the record, I'm reading from Docket No. 1057 filed on

16  September 11, 2020, HarbourVest Response to Debtor's First

17  Omnibus Objection.

18       But the first misrepresentation identified in that

19  document says that Highland never informed HarbourVest that

20  Highland had no intention of paying the arbitration award.

21  And was -- was Highland obligated to pay the Josh Terry

22  arbitration award against Acis?

23            MR. MORRIS:  Objection to the question to the extent

24  it calls for a legal conclusion.

25            THE COURT:  Sustained.

Pugatch - Cross                                    125

1          MS. WEISGERBER:  Join in that objection.

2          THE COURT:  Sustained.  I think --

3   BY MR. WILSON:

4   Q   Your understanding was --

5          MR. WILSON:  I'm sorry, Judge?

6          THE COURT:  I sustained the objection as calling for

7   a legal conclusion.  So, next question.

8          MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

9   Honor.

10  BY MR. WILSON:

11  Q   In your understanding, was Highland responsible for

12  paying the arbitration award to Josh Terry?

13  A   My understanding is on the account of the fact that Acis

14  --

15         MS. WEISGERBER:  Objection, Your Honor.  Objection,

16  Your Honor, same basis.

17         THE COURT:  Sustained.  It was essentially the same

18  question.

19         MR. WILSON:  Well, Your Honor, I didn't ask --

20         THE COURT:  It was essentially the same question, Mr.

21  Wilson.  Move on.

22         MR. WILSON:  Okay.

23  BY MR. WILSON:

24  Q   The next misrepresentation identified by HarbourVest said

25  that Highland did not inform HarbourVest that it undertook

003794

Case 3:21-cv-03066-gjj Doc 3480 Filed 05/26/22 Entered 05/26/22 13:32:05 Page 126 of
Case 3:23-cv-01503-B Amended Brief Document 1-18 Filed 2021 Hearing Page 172 of 258 PageID 4171

Pugatch - Cross                                                      126

 1  the transfers to siphon assets away from Acis, LP and that

 2  such transfers would prevent Mr. Terry from collecting on the

 3  arbitration award.  So the basis for that allegation would be

 4  that Highland was siphoning assets from Acis to avoid having

 5  Acis pay the arbitration award, correct?

 6  A    That -- that would be the implication, yes.

 7  Q    Okay.  And then that misrepresentation continues on and

 8  says that Highland represented to HarbourVest that it was

 9  changing the portfolio manager because Acis was toxic.  And

10  do you recall that representation being made to you?

11  A    Yes, I do.

12  Q    And would you agree with me that whether or not Acis is

13  toxic in the industry would be an opinion?

14  A    I suppose it would be an opinion, but by the manager of

15  the vehicle responsible for managing the HCLOF investment and

16  the underlying CLOs.  Yeah, we viewed the Acis name and the

17  Highland name as synonymous, if you will.  I mean, Acis was a

18  subsidiary of Highland.  For all intents and purposes, it was

19  the same from our perspective as we made the investment into

20  HCLOF.

21  Q    So did HarbourVest have an independent understanding of

22  whether or not the Acis name was toxic in the industry?

23  A    We did not, no.  We relied on Highland's views of that as

24  manager of HCLOF.

25           MR. WILSON:  Your Honor, just a brief housekeeping

Case 9:23-cv-05006-gjsj Doc 3480 Filed 05/26/22 Entered 05/26/22 13:92:05 Page 137 of
Case 3:23-cv-01553-B Document 1448-8 Filed 2021 Hearing Page 173 of 258 PageID 4172

Pugatch - Cross                                      127

```
 1    item.  Did you say that we need to be done at 1:00 o'clock?
 2              THE COURT:  Well, I said I really wanted you to be
 3    done by 1:00 o'clock because I have a 1:30 docket and a 2:00
 4    o'clock docket and I'd rather not have to hang up 70-
 5    something people and reconnect them again at 3:00 o'clock.
 6    How close are you to being finished?
 7              MR. WILSON:  Well, --
 8              THE COURT:  This is going at a very slow pace.
 9              MR. WILSON:  Well, I apologize for that, Your Honor.
10    I think I've got at least ten more minutes, but -- but I know
11    we also have closing remarks.  And I was just going to ask if
12    Your Honor had a preference of --
13              THE COURT:  Keep going.
14              MR. WILSON:  -- of breaking now --
15              THE COURT:  Keep -- let's --
16              MR. WILSON:  -- or keep going?  Okay.
17              THE COURT:  Let's talk fast and try to get through.
18    You know, even if I'm sacrificing lunch today, I don't want
19    to inconvenience 75 people this way.  So we'll just probably
20    start our 1:30 hearing a little late and inconvenience those
21    people.
22         All right.  Go ahead.
23              MR. WILSON:  All right.  Thank you, Your Honor.
24    BY MR. WILSON:
25    Q    Did Acis form its -- I can't recall if you answered this
```

Case 19-34054-sgj Doc 3428 Filed 05/05/26 Entered 05/05/26 22:39:05 Page 128 of
Case 3:23-Amended-Brief-of-Appellee-January-Filed-2021-Hearing-Page-174-of-258 1 PageID 4173

Pugatch - Cross                                    128

 1  question, but did Acis form its own opinion on whether or not

 2  -- I'm sorry, strike that.  Did HarbourVest form its own

 3  opinion on whether or not the Acis name was toxic in the

 4  industry?

 5          MS. WEISGERBER:  Objection, --

 6          THE WITNESS:  We did not.  We didn't have a basis.

 7          THE COURT:  I'm sorry, did I have an objection?

 8  BY MR. WILSON:

 9  Q   You did not --

10          THE COURT:  Did I have an objection?

11          MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12  asked and answered, Your Honor.

13          THE COURT:  Overruled.  He can answer.

14  BY MR. WILSON:

15  Q   Okay.  But --

16  A   We did not.

17  Q   Did Highland have the ability to investigate the Acis

18  name and make its own determination of whether that name was

19  toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20  A   HarbourVest had the ability to do that, yes.

21  Q   I apologize I misspoke.  I meant HarbourVest.  Did

22  HarbourVest have the ability to investigate that name and

23  determine if it was toxic?

24  A   It was irrelevant to our investment thesis.  And as I

25  said before, Acis was a subsidiary of Highland.  We viewed

Case 23-10063-hlb Doc 3428 Filed 05/26/22 Entered 05/26/22 12:39:05 Page 138 of
Case 3:23-cv-01503-B Document 114-8 Filed 2021 Hearing Page 175 of 258 PageID 4174

Pugatch - Cross                                              129

1  them as interchangeable in the context of our investment.

2  Q    Okay.  The next misrepresentation that you refer to says

3  that Highland indicated to HarbourVest that the dispute with

4  Mr. Terry would have no impact on its investment activities.

5  Would you agree with me that that is also an opinion?

6  A    It was a statement that --

7        MS. WEISGERBER:  Your Honor, I'm going to object to

8  the extent these questions are seeking a legal conclusion

9  regarding, you know, if something's an opinion or not.

10       THE COURT:  Okay.  Overruled.  He can answer.

11       THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q    And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A    On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

1  Q   And you just testified that you thought that Acis and

2  Highland were interchangeable from the perspective of the

3  investment opportunity, correct?

4  A   Correct.

5  Q   But you also accepted Highland's recommendation because

6  HarbourVest agreed that the change in the -- to a Highland

7  manager made commercial sense, correct?

8  A   We took at face value what Highland recommended because

9  this all had to do with the structuring of an entity that

10 they fully managed with respect to multiple underlying

11 subsidiaries that weren't managed by Highland.

12 Q   But would you agree that, at the time, you -- HarbourVest

13 thought that made commercial sense?

14 A   It did not seem unreasonable to us based on the

15 explanation we were given.

16 Q   Okay.

17         MR. WILSON:  I want to refer to HarbourVest Exhibit

18 39.

19     (Pause.)

20         THE COURT:  What are we waiting on?  What are we

21 waiting on?

22         MR. WILSON:  I'm trying to get the document on the

23 screen, Your Honor.

24     (Pause.)

25         THE COURT:  We can't hear you.  We can't hear you.

1              MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2    speaking with my --

3              THE COURT:  Okay.

4              MR. WILSON:  -- co-counsel here.

5              THE COURT:  All right.

6         (Pause.)

7              MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8    you're referring to?

9              MR. WILSON:  39.   HarbourVest 9019 motion on the

10   main -- on the Dondero file.  And then there's the -- it's --

11   it's John  -- and then there's the HarbourVest, and then the

12   exhibits are all in one file.

13             MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14   was subject to confidentiality based on HCLOF's request.

15   HCLOF's counsel is present.  I think they know it's an

16   excerpt.  But I'd just -- that for HCLOF's counsel.

17             MR. WILSON:  Well, is there an objection to showing

18   this document on the screen? Yes.  All right.  We're not

19   going to put Document 39 on the screen.

20             A VOICE:  Yes.

21             MR. WILSON:  All right.  Scroll down to the next

22   page.

23   BY MR. WILSON:

24   Q    This is a -- this is a document that was produced to us

25   this week, the Highland production.  It appears to be a

003800

Case 3:23-cv-00056-B Document 148-1 Filed 05/26/21 Hearing Page 178 of 258 PageID 4177
Case 3:23-cv-00063-gpg-jg Doc 3420 Filed 05/26/22 Entered 05/26/22 12:39:05 Page 132 of

Pugatch - Cross                                132

 1  Highland CLO Funding, Ltd. Statement of Operations for the

 2  Year Ended 31 December 2017.  Do you see at the top of that --

 3  at the top of that document where it says total investment

 4  income of $26 million?

 5  A    I do, yes.

 6  Q    And total expenses were roughly $1.8 million?

 7  A    Yes.

 8  Q    And then net change and unrealized depreciation on

 9  investments and net realized loss on investments was $4.26

10  million cumulative, resulting in a net increase in net assets

11  resulting from operations of $20.224 million.  Do you agree

12  with that?

13  A    Yes.

14  Q    Okay.

15          MR. WILSON:  Go to the next one.

16  BY MR. WILSON:

17  Q    And you understand that, in the course of the Acis

18  bankruptcy, the portfolio managers for certain of the CLOs

19  were changed by the Trustee, correct?

20  A    Yes, around the underlying CLOs.  That's -- that's my

21  understanding, yes.

22  Q    And, in fact, Mr. Seery testified earlier today that that

23  occurred in the summer of 2018, correct?

24          MR. WILSON:  Scroll.

25          THE WITNESS:  I don't recall the timing, but that's

Case 23-03067-sgj Doc 83-20 Filed 05/20/25 Entered 05/20/25 21:39:05 Page 138 of
Case 3:23-cv-01503-B Document 18-18 Filed 2021 Hearing Page 179 of 258 PageID 4178

Pugatch - Cross                                    133

 1  what he testified to.

 2  BY MR. WILSON:

 3  Q   Well, this document is HarbourVest Exhibit 40, and this is

 4  the statement of operations for the financial year ended 31

 5  December 2018.  Here, the total investment income is only

 6  $11.1 million.  Do you see that?

 7  A   I do.

 8  Q   And do you see where the expenses have increased to $13.6

 9  million?

10  A   I do, yes.

11        MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q   And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A   Yes.

16  Q   And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19        MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21        THE COURT:  Overruled.  He --

22        MR. WILSON:  Your Honor, --

23        THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25        MR. WILSON:  Thank you, Your Honor.  Thank you, Your

Case 3:23-cv-06507-jsj Doc 3430 Filed 05/26/22 Entered 05/26/22 13:52:05 Page 134 of
Case 3:23-cv-06503-Bra Document 111-8 Filed 2021 Hearing Page 180 of 258 PageID 4179

Pugatch - Cross                                    134

 1  Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

 2  right.  I'll --

 3  BY MR. WILSON:

 4  Q    Did you answer the question, Mr. Pugatch?

 5  A    No, I -- I would agree with the second part of your

 6  statement that for the year 2018 the -- the loss was $52

 7  million.  I don't -- I don't believe that jives with the first

 8  part of your statement that that was after Acis and Brigade

 9  took over.  As I understand, that was in the middle of the

10  year.

11  Q    But in any event, Acis and Brigade had been managing this

12  for at least six months of 2018 when that loss occurred,

13  correct?

14  A    They had been managing a portion of the underlying CLO

15  portfolio held by Highland CLO Funding.

16  Q    All right.  We're now looking at Exhibit #41, which is the

17  Draft Unaudited Statement of Comprehensive Income, 31 December

18  2019.  Total income has now dropped to $4.664 million.

19          MR. WILSON:  And scroll down.

20  BY MR. WILSON:

21  Q    Expenditures are at $3.645 million.  And then it says

22  investment gains and losses net out to $11.493 million, a

23  negative $11.493 million.  And --

24          MR. WILSON:  Scroll down to the --

25  BY MR. WILSON:

Case 3:21-cv-01058-B Document 145 Filed 05/26/22 Page 181 of 258 PageID 4180
Case 3:23-cv-01538-B Amended Brad Document Ministry Hearing Page 181 of 258 PageID 4180

Pugatch - Cross                                135

1   Q   And so would you agree with me that in the year 2019,

2   HCLOF showed a net loss of $10.476 million?

3   A   Yes, that's what the financial statements say.

4   Q   And in this year, the Acis CLOs were solely managed by

5   Acis and Brigade, correct?

6   A   The Acis CLOs were.  Yes, correct.

7   Q   All right.

8           MR. WILSON:  Now, go to 42.

9   BY MR. WILSON:

10  Q   Now, this is HarbourVest #42.

11          MR. WILSON:  Go down to the next page.

12  BY MR. WILSON:

13  Q   And this is the Highland CLO Funding, Ltd. Unaudited

14  Condensed Statement of Operations for the Financial Period

15  Ended 30 June 2020.  And so this is just half a year of

16  operations.  And would you -- and this actually has a

17  comparison between 2019 and 2020.  But do you see where it

18  says investment income has dropped from a million dollars in

19  the first half of 2019 to $381,000 in the first half of 2020?

20  A   Yes.

21          MR. WILSON:  Okay.  Scroll down.

22  BY MR. WILSON:

23  Q   And do you see where, in the first half of 2019, total

24  expenses were $1.85 million, and then in the first half of

25  2020 total expenses were $2.16 million?  Do you see that?

Case 9:23-05067-sgj Doc 3430 Filed 05/06/26 Entered 05/06/26 21:39:05 Page 136 of
Case 3:23-cv-01503-B Document 18-1 Filed 2021 Hearing Page 182 of 258 PageID 4181

Pugatch - Cross                                    136

 1  A    I do.

 2  Q    And if you go down below that, where it says Net Realized

 3  and Unrealized Gain/Loss on Investments, the first half of

 4  2019 HCLOF lost $12 million, and in the first half of 2020 it

 5  lost $39.472 million?

 6          MR. MORRIS:  Your Honor, I'm going to object.  It's

 7  John Morris for the Debtor.  I'm happy to stipulate.  In fact,

 8  he can offer this document into evidence.  There's no

 9  foundation that Mr. Pugatch has any particularized knowledge

10  about any of the numbers behind this.  All he's asking him to

11  do is to confirm what the document says.  It says what it

12  says.  But this -- I'll object on that basis, Your Honor.

13          THE COURT:  All right.  Mr. Wilson, what about it?

14  You're just getting him to read numbers off of these exhibits.

15          MR. WILSON:  Well, --

16          THE COURT:  Shall we just --

17          MR. WILSON:  -- I understood --

18          THE COURT:  -- by stipulation get them into evidence?

19          MR. WILSON:  Well, --

20          MR. MORRIS:  No objection, Your Honor.

21          MS. WEISGERBER:  No objection.

22          THE COURT:  All right.  So these are exhibits what?

23  We've gone through 39, 41, and I don't know what else.  40,

24  maybe?

25          MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Case 9:23-05065-gjq Doc 3420 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 137 of
Case 3:23-Amended-Bradscum on January Filed 2021 Hearing Page 183 of 258 17 PageID 4182

Pugatch - Cross                                    137

 1  were on the HarbourVest exhibit list.

 2          THE COURT:  All right.  Those will be admitted, and

 3  we've already discussed what docket entry number they appear

 4  at.

 5      (HarbourVest's Exhibits 39 through 42 are received into

 6  evidence.)

 7          THE COURT:  All right.  Anything else?  You told me

 8  you had 10 more minutes about 15 minutes ago.

 9          MR. WILSON:  Well, I'm sorry if I -- I think I had

10  said I had at least ten more minutes, and I was looking at the

11  -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12  have longer than that.  I'm sorry, Your Honor.

13          THE COURT:  Well, --

14          MR. WILSON:  But --

15          THE COURT:  -- I feel like I'm being --

16          MR. WILSON:  -- I'll try to proffer --

17          THE COURT:  Okay, Mr. Wilson, let me just tell you

18  something.  I feel like I'm being disrespected now, and the

19  parties are.  We really need to pick up the pace.  I've told

20  you I've got a 1:30 docket -- with four or five matters on it,

21  by the way.  I've got a 2:00 o'clock docket.  I'm starting

22  them late.  No one advised my courtroom deputy that we were

23  going to need all day today for this, okay?  So you've got

24  five more minutes to wrap it up, and then, of course, I have

25  to go to Mr. Draper and see if he has cross.  All right?  So

 1   please don't test my patience any more.  Five minutes to

 2   finish.

 3            MR. DRAPER:  Judge, I have no questions.

 4            THE COURT:  I didn't hear you, Mr. Draper.  What did

 5   you say?

 6            MR. DRAPER:  I have no questions.

 7            THE COURT:  All right.  Very good.

 8            MR. WILSON:  I apologize, Your Honor.  I was actually

 9   trying to be respectful of your time when I informed you that

10   I had at least ten more minutes left at 12:50, but I will try

11   to be as expedient as I can as I finish up.

12   BY MR. WILSON:

13   Q   And I don't see you on my screen.

14            MR. WILSON:  You can take that document down.

15            THE WITNESS:  Here.

16   BY MR. WILSON:

17   Q   Mr. Pugatch, do you have an opinion as to what caused

18   these incredible losses of value at HCLOF?

19            MS. WEISGERBER:  Objection to the extent it calls for

20   a legal conclusion.

21            THE COURT:  Overruled.  He can answer.

22            THE WITNESS:  I would say that there's no one cause

23   for the decline in value.  I can point to a number of

24   different things, including the exorbitant fees that were

25   charged to HCLOF, including the inability to be able to re --

1    refinance the CLOs on the part of HCLOF, all of which stems

2    from the actions that Highland took prior to our investment in

3    HCLOF.

4    BY MR. WILSON:

5    Q    And you've -- I think it's been referenced several times

6    in HarbourVest's arguments that -- that the reset was a

7    fundamental -- the inability to get a reset was a fundamental

8    cause of the loss in value.  Is that -- is that HarbourVest's

9    position?

10   A    That -- that is a part of the -- the cause in the

11   declining value of the CLOs, yes.

12   Q    And you would agree with me that a reset is fundamentally

13   a reset of interest rates, correct?

14   A    Of the interest rates of the liabilities of the -- the

15   timing for repayment of those liabilities, yes.

16   Q    Now, just say with -- for the sake of a hypothetical

17   example.  If you had a home that was valued at $5 million, or

18   let's just say $500,000, let's make it more realistic.  If you

19   had a $500,000 home and you had a mortgage on that home at

20   five percent interest, your inability to refinance that home

21   at a lower interest rate would not affect the underlying value

22   of that home, correct?

23         MS. WEISGERBER:  Objection, Your Honor. Hypothetical.

24   And objection to relevance as well.

25         THE COURT:  Sustained.

Case 9:23-cv-03506-sgj Doc 3480 Filed 05/26/22 Entered 05/26/22 13:52:05 Page 140 of
Case 3:23-cv-01503-B Document 34-18 Filed 09/11/23 Page 186 of 258 PageID 4185

Pugatch - Cross                                    140

 1              MS. WEISGERBER:  Calls for speculation.

 2              THE COURT:  Sustained.

 3   BY MR. WILSON:

 4   Q    Is there any reason to believe that the change in the

 5   interest rate would have prevented the massive losses of

 6   investment value that occurred in HCLOF?

 7              MS. WEISGERBER:  Object on the same grounds.

 8              THE COURT:  Sustained.

 9              THE WITNESS:  The short -- the short answer is yes,

10   with a -- with the amount of leverage --

11              MS. WEISGERBER:  I --

12              THE WITNESS:  -- that exists.  Oh, sorry.

13              MS. WEISGERBER:  The objection was sustained.

14              THE COURT:  Yeah, I sustained the objection.  That

15   means you don't answer.

16              THE WITNESS:  I'm sorry, Your Honor.

17   BY MR. WILSON:

18   Q    So, would you agree with me that if the expenses and the

19   fees charged by the portfolio manager increased dramatically,

20   that would -- that would impact the value of the investment,

21   correct?

22              MS. WEISGERBER:  Objection on the same grounds, and

23   relevance.  This is a 9019 hearing, Your Honor.  We are not

24   here to try every minutia.  And in fact, we're trying to avoid

25   a trial on the merits.  And it feels like we're getting a bit

003809

 1   far afield now.

 2            THE COURT:  I sustain.

 3            MR. WILSON:  All right.  I'll pass the witness.

 4            THE COURT:  All right.  Mr. Draper said he had no

 5   cross.  So, any redirect, Ms. Weisgerber?

 6            MS. WEISGERBER:  No, Your Honor.

 7            THE COURT:  All right.  Mr. Morris, did you have any

 8   redirect?

 9            MR. MORRIS:  I do not, Your Honor.  I have a very

10   brief closing and then some additional remarks if -- if we

11   finish.

12            THE COURT:  All right.  So, Mr. Pugatch, that

13   concludes your testimony.  Thank you.  You're excused if you

14   want to be.

15       All right.  So, as I understood it, there would be no more

16   evidence after this.

17            MR. WILSON:  Well, Your Honor, along those lines, as

18   a housekeeping measure, I think everything on my exhibit list

19   is included on someone else's exhibit list, but just for belt

20   and suspenders I would move to admit all of the exhibits on

21   the -- on Mr. Dondero's exhibit list.

22            THE COURT:  Well, is that agreed or not?  Because we

23   didn't have a witness to get them in.

24            MR. MORRIS:  No objection, Your Honor.

25            THE COURT:  Any objection?  All right.  If there's no

Case 19-34054-sgj Doc 3430 Filed 05/26/22 Entered 05/26/22 13:92:05 Page 142 of
Case 3:23-cv-01503-B Document 18-17 Filed 02/11/24 Page 188 of 258 PageID 4187

142

```
 1    objection, I'll --

 2              MR. MORRIS:  Your Honor, --

 3              THE COURT:  I'm sorry.  Was there an objection?  I

 4    will admit Dondero Exhibits A through M, and those appear at

 5    Docket Entry 1721, correct, Mr. Wilson?

 6              MR. WILSON:  That is correct, Your Honor.

 7              THE COURT:  All right.

 8              MR. WILSON:  That is correct, Your Honor.

 9       (James Dondero's Exhibits A through M are received into

10    evidence.)

11              MR. WILSON:  And one final matter is, during the

12    examination of Mr. Seery, you at least partially admitted

13    Dondero's Exhibit N, and I was wondering if we need to -- how

14    we'd need to submit that for the record.

15              THE COURT:  Okay.  First, I'm confused.  I think you

16    said Mr. Terry's testimony.  You --

17              MR. WILSON:  I said Seery.  I'm sorry.

18              THE COURT:  Oh, Seery?

19              MR. WILSON:  Or I may have said Terry, but I meant to

20    say Seery.

21              THE COURT:  Okay.  Maybe you said it.  Okay.  During

22    Mr. Seery's testimony -- oh, the email that I admitted a

23    portion of?

24              MR. WILSON:  That is -- that's correct, Your Honor.

25              THE COURT:  What -- what are you asking?  It's not in
```

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3          MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6          THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9          MR. WILSON:  Okay.  Thank you, Your Honor.

10          THE COURT:  All right.  Closing arguments?  Mr.

11   Morris?

12              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13          MR. MORRIS:  Yes, very briefly, Your Honor.  The

14   Debtor easily meets the standard here.  The settlement

15   consideration relative to the claim establishes and reflects

16   the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18   deposition the other day, but I otherwise haven't heard from

19   him.  I found him to be incredibly credible, Your Honor, and I

20   regret the fact that he and HarbourVest are being blamed twice

21   here.  The fact that they got 40,000 documents or didn't read

22   the arbitration award, it's just -- it's a shame that they're

23   being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25   made the disclosures that HarbourVest claims -- complains

Case 19-34054-sgj Doc 3480 Filed 05/26/21 Entered 05/26/21 13:32:05 Page 144 of
Case 3:23-cv-01503-B Document 18-18 Filed 02/11/24 Page 190 of 258 PageID 4189

144

1    about.  They just don't.  The fraudulent transfers led to the

2    bankruptcy, led to the appointment of a trustee, led to --

3    right?  So, so it's -- that's why -- but they're getting

4    something for their claim.

5        It was a hard negotiation, Your Honor.  There is no

6    dispute that if we litigated this it would be complex.  It

7    would fact-intensive.  The Debtor would be forced to rely upon

8    witnesses who are no longer employed by it.  That it would be

9    expensive, for sure.  There's no dispute about any of that.

10   There's no dispute that the creditor body has spoken loudly

11   here by unanimously refraining from objecting except for Mr.

12   Dondero and the entities controlled by him.

13       And you heard Mr. Seery's testimony.  I think he

14   exhaustively informed the Court as to the process by which the

15   transaction was analyzed and negotiated, and there's no

16   evidence to the contrary that this was an arm's-length

17   negotiation.

18       Unless Your Honor has any questions, we would request that

19   the motion be granted.

20           THE COURT:  Thank you.  Ms. Weisgerber, your closing

21   argument?

22             CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23           MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24   also be brief.  We again join in Mr. Morris's arguments and

25   comments.

Case 23-40506-cgj  Doc 3430  Filed 05/05/26  Entered 05/05/26 21:39:05  Page 45 of
Case 3:23-Amended-Bankruptcy Filed 2021 Hearing  Page 191 of 258  PageID 4190

145

1    The Court has now heard testimony from Mr. Pugatch

2    regarding the factual detail underlying HarbourVest's claims.

3    The Court has also heard about the significant damages that

4    HarbourVest stands to recover for those claims.  And

5    HarbourVest came to this Court ready to litigate.  It would --

6    it's ready to do so if needed.  It believes it would prevail

7    on its claims if it had to do so.

8         But the Court also heard from Mr. Seery about his

9    understanding of HarbourVest's claims, his calculus, and his

10   decision to settle them.  And we submit that nothing further

11   is needed by this Court in order to approve the settlement.

12   This is a question of the Debtor's business judgment.  We're

13   not here to have a trial on the merits of HarbourVest's

14   claims.  The Objectors have made various arguments, including

15   about the cause of HarbourVest's damages.  But even the nature

16   of the legal claims that HarbourVest is asserting, some do not

17   require a loss causation.  So we submit that's not even

18   relevant to the merits of the claims.

19        The settlement is clearly in the best interest of the

20   estate, and we respectfully request that the Court approve it.

21             THE COURT:  Thank you.  All right.  Mr. Wilson, your

22   closing argument?

23             MR. LYNN:  Michael Lynn.  I will give the closing

24   argument, if that's satisfactory to the Court.

25             THE COURT:  All right.  Go ahead.

003814

Case 19-34054-sgj11 Doc 3430 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 146 of
Case 3:23-cv-01503-B Document 18-18 Filed 2021 Hearing Page 192 of 258 PageID 4191

146

```
1              CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

2              MR. LYNN:  Good afternoon, Your Honor.  I just want

3    to make a few points, and I'll try to do it as quickly as

4    possible.

5         First, I feel compelled to address the argument of the

6    Debtor that Mr. Dondero is repeating his litigious behavior

7    from the Acis case.  I don't know about the Acis case.  I

8    wasn't involved except very, very peripherally.  But with

9    respect to this case, we have only taken positions in court

10   that we believed -- that is, his lawyers -- believed were

11   warranted by law, facts as we knew them, and that are

12   consistent with professionalism.  I'd be glad to explain any

13   position we took.

14        Often, through the Debtor's very persuasive powers, we

15   never had the chance to explain our position previously to the

16   Court.  In fact, for the most part, as today, we have been

17   reactive rather than commencing proceedings.  In fact, during

18   the first seven months of this case, we only appeared in court

19   a few times, when we felt we had to -- for example, when

20   discovery was being sought by the Creditors' Committee that we

21   feared might invade privilege.  Then, much to the Debtor's

22   fury, we opposed the Acis 9019.  We did so because we thought

23   it was too much.

24        Since, as the Court can see, the principal instigators of

25   litigation have been the Debtor, and to a lesser extent, the
```

1 | Committee.

2 | Indeed, in an apparent effort to drown Mr. Dondero and his

3 | counsel in litigation, the Debtor has repeatedly sought court

4 | action on a very short fuse, claiming need for expedited

5 | hearing.

6 | Perhaps the most startling example of this is the recent

7 | contempt motion, for which there is no good reason for a quick

8 | hearing. Resolution of that motion is not necessary to reach

9 | the confirmation hearing. The motion could be heard after the

10 | confirmation hearing. There is no need to put Mr. Dondero and

11 | his professionals in a position where they have to respond in

12 | a couple of days, two business days, and then will have two

13 | days to prepare for trial.

14 | Second, Your Honor, Mr. Seery has repeatedly asserted,

15 | contrary to today's motion, that the HarbourVest claim was of

16 | no merit. That is why, when he came in to settle for tens of

17 | millions of dollars, we opposed this motion. It appears that

18 | the motion is occurring without any cross-party discovery.

19 | There is no consideration, apparently, of trying dispositive

20 | -- dispositive motions first. There is no consideration for

21 | junior classes of equity, which Mr. Seery has previously

22 | opined were in the money. This, even though there's no reason

23 | that this settlement is necessary pre-confirmation, unless Mr.

24 | Seery wants HarbourVest's vote.

25 | Third, for whatever reason, that seems to be the driving

Case 23-40607-elm7 Doc 348 Filed 05/26/25 Entered 05/26/25 21:39:05 Page 148 of
Case 3:23-cv-01503-B Document 114-18 Filed 06/21/24 Hearing Page 194 of 258 PageID 4193

148

1    factor for settling.  On its face, the vote seems to be a key

2    factor of the settlement.  About the longest provision of the

3    settlement agreement relates to voting.  The motion itself --

4    in the motion itself, five of seven bullet points cited by the

5    Debtor for approval of the settlement deal with and emphasize

6    support of the plan or the vote that is to be cast for the

7    plan.

8        If the settlement is a good deal, it didn't need to have

9    as one of its parts the requirement that HarbourVest vote for

10   the plan.

11       Your Honor, I'll stop there.  I know Your Honor would like

12   to get just a few minutes before your 1:30 docket.  I've been

13   there and I understand that, and I do apologize for taking the

14   time we have, but I think that responsibility is shared with

15   the Debtor and HarbourVest.

16       Thank you, Your Honor.

17           THE COURT:  All right.  Thank you for that.

18       Mr. Draper, any closing argument from you?

19     CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20           MR. DRAPER:  Yes, I have three comments.  The first

21   is the claim -- the loss claim, absent the fraud claim, is, at

22   best, $7 million.  I think Mr. Seery's argument that a hundred

23   -- one hundred percent is attributable to there is just wrong.

24   If he and I both invested in a company 50-50 and it goes

25   broke, we only lost 50 cents each.

Case 19-34054-sgj Doc 3430 Filed 05/05/26 Entered 05/05/26 22:13:05 Page 148 of
Case 3:23-cv-01503-B Document 18-18 Filed 09/11/24 Page 195 of 258 PageID 4194

149

1        Number two, I think the Court heard the evidence.  I think

2   this is, at best, a subordinated claim under 5 -- under the

3   Bankruptcy Code.  It's really a "But for the

4   misrepresentations, we wouldn't have invested."

5        And the last one is the -- Judge Lynn represented the

6   voting, so I won't deal with that.  But the one that troubles

7   me the most is the fact that this asset that is ultimately

8   being paid for in claim dollars that's being transferred over

9   to the Debtor and being put it outside the estate, outside the

10  purview of this Court, and placed in some subsidiary, this --

11  this transaction, if it is approved, must -- should contain a

12  provision that the asset that's being acquired come into the

13  Debtor and be owned by the Debtor.

14            THE COURT:  All right.

15            MR. DRAPER:  I have nothing further, Your Honor.

16            THE COURT:  Thank you, Mr. Draper.

17       Mr. Morris, you get the last word since it's your motion.

18            MR. MORRIS:  Very quickly, Your Honor.  The

19  subordination argument doesn't hold water.  This is not a

20  claim against the Debtor for the security; it's a claim for

21  fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,

22  that might make sense, but this is a claim against the Debtor.

23  And it's a Debtor -- it's a claim for fraud.  That's number

24  one.

25       Number two, we need to keep this exactly as it's been

003818

Case 19-34054-sgj11 Doc 3480 Filed 05/05/26 Entered 05/05/26 08:22:39 Page 150 of
Case 3:23-cv-01503-B Document 38-18 Filed 2021 Hearing Page 196 of 258 PageID 4195

150

```
 1   structured in order to avoid litigation.  Mr. Seery told the
 2   Court.  I'm sure the Court can make its own assessment as to
 3   Mr. Seery's credibility as to whether or not the Debtor is
 4   intending to somehow get this asset beyond the Court.
 5       But there are reasons why we've done this, Your Honor.
 6   They could have made an objection on that basis.  In fact, if
 7   they did, it would be overruled, because there's no -- there's
 8   no basis for this Court to find that somehow the Debtor and
 9   Mr. Seery are doing something untoward to get assets away from
10   this Court's jurisdiction.
11       You know, I don't know what to say about Mr. Lynn's
12   commentary.  Much of it had nothing to do with any evidence in
13   the record.
14       The fact remains, Your Honor, that this settlement is
15   fair.  It's reasonable.  It's in the best interest of the
16   estate.  And we would respectfully request that the Court
17   grant the motion.
18           THE COURT:  All right.  Thank you.  Well, I
19   appreciate all the arguments and evidence I have heard today.
20   I'm going to be brief in my ruling here, but I reserve the
21   right to supplement in a more fulsome written order, which I'm
22   going to instruct Mr. Morris to submit.  I am approving the
23   motion to compromise the HarbourVest claim today, and I guess
24   subsumed in that is granting the motion to allow their claim
25   for 3018 voting purposes.
```

Case 19-34054-sgj11 Doc 3428 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 1 of
Case 3:23-cv-01503-B Document 18-18 Filed 02/11/24 Hearing Page 197 of 258 PageID 4196

151

1      I in all ways find this compromise to meet the required

2    legal standard set forth in such cases as *TMT Trailer Ferry*,

3    *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4    cases.

5      First, I'm going to specifically say for the record that I

6    found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7    very credible.  Very credible testimony and meaningful

8    testimony was provided to the Court today.  And based on that

9    testimony, I find, first, that this compromise was the product

10   of arm's-length negotiations.  It was a hard-fought

11   negotiation, as far as I'm concerned.  The Debtor objected to

12   these numerous HarbourVest proofs of claim.  The Debtor did

13   not want to allow HarbourVest a significant claim for voting

14   purposes.  I duly note the statements made in the disclosure

15   statement before this compromise was reached suggesting, you

16   know, the Debtor didn't think HarbourVest should have a large

17   claim.

18     That is consistent with everything I typically see in a

19   bankruptcy case when there's a claim objection.  The objector

20   vehemently denies the claimant should have a proof of claim,

21   and then people sit down and think about the risks and rewards

22   of litigating things.  And I believe very fervently that's

23   what happened here.  There were good-faith, arm's-length

24   negotiations that resulted in this proposed compromise.

25     I find the compromise -- and I'll add to that point, on

Case 19-34054-sgj11 Doc 3420 Filed 05/26/22 Entered 05/26/22 21:39:25 Page 1 of
Case 3:23-cv-01503-B Document 18-18 Filed 02/11/24 Hearing Page 198 of 258 PageID 4197

152

1    the good-faith point, I find nothing sinister or improper

2    about the fact that the compromise includes a commitment of

3    HarbourVest to vote in favor of the plan.  Again, we see this

4    a lot.  You know, there's even a buzz word that doesn't even

5    exist in the Bankruptcy Code:  "plan support agreement."  You

6    know, we see those a lot -- you know, oftentimes negotiated

7    before the case, but sometimes after.  You know, it may be

8    improper in certain situations, but there was nothing here

9    that troubles me about that component of the compromise.

10       I find the compromise to meet the paramount interest of

11   creditors here.  Notably, we have very large creditors in this

12   case who have not objected.  The *Foster Mortgage* case from the

13   Fifth Circuit tells me I am supposed to consider support or

14   opposition of creditors.  No opposition of UBS.  No opposition

15   of the Redeemer Committee Crusader Fund.  No opposition from

16   Josh Terry or Acis.  No opposition from Daugherty.

17       But moreover, when considering the paramount interest of

18   creditors, I find this compromise to be in all ways fair and

19   equitable and in the best interest of the estate, and

20   certainly within the range of reasonableness.  The evidence

21   showed that HarbourVest asserted over $300 million.  Over $300

22   million.  Granted, that was based on all kinds of legal

23   theories that would be contested and expensive to litigate,

24   but the evidence also showed that they invested over $70

25   million.  You know, close to $75 million.  I forget the exact

003821

```
 1    number.  $75 or $80 million, somewhere in that range.  And now

 2    the credible evidence is that investment is worth about $22

 3    million.

 4          So, certainly, while the claim may not have, at the

 5    ultimate end of the day in litigation, resulted in a $300

 6    million proof of claim, certainly, certainly there were strong

 7    arguments for a very sizeable claim, more than this compromise

 8    amount.  So it's certainly fair and equitable and reasonable

 9    when considering the complexity and duration of further

10    litigation, the risks and rewards, the expense, delay, and

11    likely success.

12          A couple of last things I'm going to say are these.  I

13    understand, you know, there is vehement disagreement on the

14    part of our Objectors to the notion that Highland might have

15    caused a $50 million loss to HarbourVest.  But I will tell

16    you, for what it's worth -- I want the record clear that this

17    is part of my evaluation of the reasonableness of the

18    settlement -- my reaction is that, indeed, Highland's

19    litigation strategy in the Acis case caused HCLOF to lose a

20    huge portion of its value, to the detriment of HarbourVest.

21    You know, whether all evidence at the end of the day would

22    convince me of that, I don't know, but that's -- that is

23    definitely this judge's impression.

24          I'm very sympathetic to HarbourVest.  It appears in all

25    ways from the record, not just the record before me today, but
```

Case 19-34054-sgj11 Doc 3428 Filed 05/20/26 Entered 05/20/26 21:39:05 Desc
Case 3:23-cv-01503-B Document 14-18 Filed 2021 Hearing Page 200 of 258 PageID 4199

154

1    the record in the Acis case that I presided over, that

2    Highland back then would have rather spent HarbourVest's

3    investment for HCLOF legal fees than let Josh Terry get paid

4    on his judgment.  They were perfectly happy to direct the

5    spending of other people's money, is what the record suggested

6    to me.

7         And then, you know, I have alluded to this very recently,

8    as recently as last Friday:  I can still remember Mr.

9    Ellington sitting on the witness stand over here to my left

10   and telling the Court, telling the parties under oath, that

11   HarbourVest -- he didn't use its name back then, okay?  For

12   the first phase of the Acis case, or most of the Acis case, we

13   were told it was an investor from Boston.  And at some point

14   someone even said their name begins with H.  I mean, it seemed

15   almost humorous.  But Mr. Ellington said it was they,

16   HarbourVest, the undisclosed investor, who was insistent that

17   the Acis name was toxic, and so that's what all of this had

18   been about:  the rebranding, the wanting to extract or move

19   things away from Acis.

20        So, you know, I have heard for the -- well, at least the

21   second time today, from Mr. Pugatch, what I perceive to be

22   very credible testimony that that's just not the way it

23   happened.

24        And I guess the last thing I want to say here today, and

25   you know, I guess I have multiple reasons for saying this, not

003823

Case 19-34054-sgj11 Doc 3480 Filed 05/02/26 Entered 05/02/26 21:39:05 Page 155 of
Case 3:23-cv-01503-B Amended Brancum on Jan 18, filed 2024 Hearing Page 201 of 258 17 PageID 4200

155

 1  just in connection with approving the settlement, you know,

 2  I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

 3  you know, a crazy amount of value, that they underperform in

 4  the market, that, you know, during the Acis/Brigade tenure

 5  and, you know, they should have been reset.  You know, I hope

 6  those who have not been around as long as some of us in this

 7  whole saga know that the -- Mr. Terry, Mr. Phelan, I think

 8  Brigade, they all desperately wanted to reset these things,

 9  but it was HCLOF, I believe directed by Highland, that wanted

10  to redeem, wanted to liquidate, take the pot of money,

11  warehouse it, and then do their own thing.

12      And there was, I think, from my vantage point, a

13  monumental effort to try to get everyone to the table to do

14  reasonable resets that would be good for the stakeholders at

15  HCLOF and be good for the creditors of Acis, including Josh

16  Terry.  That was always the balancing act that most of us were

17  focused on during the Acis bankruptcy.  But Highland, I

18  believe, directing HCLOF's strategy, just did not want the

19  resets to happen.

20      So, again, part of me, I suppose, just wants to make the

21  record clear on something that I fear not everyone is clear

22  about.  And I say that because the comment was made that the

23  injunctions, the preliminary injunctions sought by the Acis

24  trustee caused the plummet in value, and I think that's just

25  not an accurate statement.  I think litigation strategies are

Case 23-10597-BLS Doc 3480 Filed 05/26/23 Entered 05/26/23 12:39:05 Page 156 of
Case 3:23-cv-01508-BR Document 18-18 Filed 2021 Hearing Page 202 of 258 PageID 4201

156

 1   what caused the plummet in value, and that's why I think

 2   ultimately HarbourVest would potentially have a meritorious

 3   claim here in a significant amount if this litigation were to

 4   go forward.

 5        So, I approve this under 9019.  And again, Mr. Morris,

 6   you'll upload an order.

 7        It is now 1:41, so let's as quickly as possible hear the

 8   other motion that I don't think had any objections.  Mr.

 9   Morris?

10             MR. MORRIS:  Your Honor, just -- yes, just very

11   quickly, just four things.

12        With respect to the order, I just want to make it clear

13   that we are going to include a provision that specifically

14   authorizes the Debtor to engage in -- to receive from

15   HarbourVest the asset, you know, the HCLOF interest, and that

16   that's consistent with its obligations under the agreement.

17        The objection has been withdrawn, I think the evidence is

18   what it is, and we want to make sure that nobody thinks that

19   they're going to go to a different court somehow to challenge

20   the transfer.  So I just want to put the Court on notice and

21   everybody on notice that we are going to put in a specific

22   finding as to that.

23             THE COURT:  All right.  Fair --

24             MR. MORRIS:  Number two is --

25             THE COURT:  Fair enough.  I do specifically approve

Case 9:23-cv-05006-gjj Doc 3430 Filed 05/26/22 Entered 05/26/22 13:92:05 Page Desc of
Case 3:23-cv-01568-B Amended Transcript of July 18 2021 Hearing Page 203 of 258 17 PageID 4202

157

1   that mechanism and find it is appropriate and supported by the

2   underlying agreements.

3       And just so you know, I spent some time noodling this

4   yesterday before I knew it was going to be settled, so I'm not

5   just casually doing that.  I think it's fine.

6       Okay.  Next?

7           MR. MORRIS:  Thank you very much, Your Honor.  Number

8   two, with respect to the motion to pay, there is no objection.

9   If we can just submit an order.  Or if Your Honor has other

10  guidance for us, we're happy to take it.

11          THE COURT:  Okay.  Does anyone have anything they

12  want to say about that motion?

13      Again, I looked at it.  I didn't see any objections.  I

14  didn't see any problem with it.  It's -- you know, you're

15  going through this exercise because of the earlier protocol

16  order.

17          MR. MORRIS:  Correct.

18          THE COURT:  All right.  Well, if there's nothing,

19  then, I will approve that, finding there is good cause to

20  grant that motion.

21          MR. MORRIS:  Okay.

22          THE COURT:  All right.  Is the only other

23  housekeeping matter --

24          MR. MORRIS:  I --

25          THE COURT:  -- we have the contempt motion?

003826

Case 19-34054-sgj11 Doc 3420 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 158 of
Case 3:23-cv-01503-B Amended Brady Document 18-19 Filed 2021 Hearing Page 204 of 258 PageID 4203

158

```
1           MR. MORRIS:  It is, and I do -- I do have to point
2      out how troubled the Debtor is to learn that Mr. Dondero was
3      still receiving documents from Highland as late as this
4      morning.  It's got to be a violation of both the TRO -- I
5      guess it's now the preliminary injunction.
6         I would respectfully request -- I know that time is what
7      it is -- but maybe Mr. Dondero can answer now where he got the
8      document, who he got the document from, what other documents
9      he's gotten from the Debtor since Your Honor ordered him not
10     to communicate with the Debtor's employees.
11        This is not saying hello in the hallway.  I mean, this is
12     just -- it is really troubling, Your Honor, and it's why we
13     need the contempt motion heard as soon as possible.
14          THE COURT:  Well, Mr. Wilson, do you want to address
15     that?  I think the words I heard were that you just got the
16     document this morning, and you got it from Mr. Dondero, but we
17     don't know where and when Mr. Dondero got it.  Mr. Wilson, are
18     you there?
19          MR. LYNN:  I'm afraid I'm back, Your Honor.
20          THE COURT:  Okay.
21          MR. LYNN:  I am not sure whether Mr. Dondero had it
22     in his files from some -- from back before he was asked not to
23     communicate with members or with employees of the Debtor.  I
24     believe -- I believe he's with us, though I don't think he's
25     available by video.
```

003827

Case 9:23-cv-03006-sgj Doc 83430 Filed 05/26/25 Entered 05/26/25 12:39:05 Page 150 of
Case 3:23-Amended-Brabour Document 18-4 Filed 2021 Hearing Page 205 of 258 17 PageID 4204

159

1          Are you there, Mr. Dondero?

2                THE COURT:  We can't hear you, Mr. Dondero.

3                MR. DONDERO:  Judge?

4                THE COURT:  Oh, go ahead.

5                MR. DONDERO:  Can you hear me now?

6                THE COURT:  Yes.

7                MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8    found it in a stack of paper, and --

9                MR. LYNN:  I understand it shows that his microphone

10   is working.

11               THE COURT:  Okay.  Go ahead.

12               MR. DONDERO:  Can you hear me?

13               THE COURT:  Yes, go ahead.

14               MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15   I've got everything in boxes.  I was going through everything

16   yesterday, and I found those emails in a stack of papers and I

17   sent them over because I thought they would be relevant

18   relative to Seery's initial impression.

19               THE COURT:  Okay.  Well, let's talk about the timing

20   of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21   you why --

22               MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23   waste the Court's time.  We have not made available anything

24   to the Court objecting to the expedited hearing on the

25   contempt motion.  We've been here.

003828

Case 19-34054-sgj11 Doc 3480 Filed 05/26/22 Entered 05/26/22 13:05:05 Page 160 of
Case 3:23-cv-01503-B Document 18-18 Filed 2021 Hearing Page 206 of 258 PageID 4205

160

1      I would say to Your Honor that if Mr. Dondero is indeed in

2   contempt, or was in contempt toward the motion, which has

3   nothing to do with the document that was presented as Dondero

4   Exhibit N, there is no need to hear this on an expedited

5   basis.

6      Every time we turn around, Your Honor, the Debtor is

7   asking that something be heard on an expedited basis.  And we

8   have not opposed that.  We have not fought that, to speak of,

9   to date.  But this is getting a little ridiculous.  We're

10  within days of confirmation of the Debtor's plan, and it is

11  simply a means of causing pain and suffering to Mr. Dondero

12  and those who are working with him and for him.  And he does

13  have employees at NexPoint who are assisting him.

14     So we most strongly object to being put on a schedule

15  where we are expected to get a response to the contempt motion

16  on file by Monday, today being Thursday, and a weekend

17  intervening.  And we strongly object to any setting of this

18  contempt motion on Tuesday or Wednesday.  It is absurd, and it

19  is done solely, solely, Your Honor, to cause pain.

20          THE COURT:  All right.

21          MR. MORRIS:  Your Honor, if I may?

22          THE COURT:  Please.

23          MR. MORRIS:  Just very briefly, we had a hearing the

24  other day.  The evidence is the exact same.  The evidence is

25  crystal clear that the violations are meaningful, they're

Case 19-34054-sgj Doc 3430 Filed 05/05/26 Entered 05/05/26 12:39:05 Page Desc
Case 3:23-cv-01503-B Amended Brad Document 18-8 Filed 2021 Hearing Page 207 of 258 PageID 4206

161

 1   substantial, and they are repeated.

 2       After the TRO was entered into, Mr. Dondero and only Mr.

 3   Dondero chose to interfere with the Debtor's business.  Mr.

 4   Dondero and only Mr. Dondero chose to communicate with the

 5   Debtor's employees, not about saying hello in the hallway but

 6   about coordinating a legal defense strategy against the

 7   Debtor.

 8       The need is immediate, Your Honor, and I would

 9   respectfully request that the hearing be set for Tuesday or

10   Wednesday.  They've had this motion now since the 7th of

11   January.  They had a full evidentiary hearing, so they know

12   most of the evidence that's going to be presented.  They have

13   a whole team of -- they have an army of lawyers, Your Honor,

14   and half a dozen firms working on behalf of Mr. Dondero and

15   his interests.  For him to cry here, for him to cry that this

16   is too much is really -- it's obscene.  It just is.

17           THE COURT:  All right.  I'm going to say a couple --

18           MR. LYNN:  That is absurd.

19           THE COURT:  I'm going to say a couple of things.  One

20   is that I -- well, the one time I remember getting reversed

21   for holding someone in contempt of court, the District Court

22   felt like I had not given enough notice of that.  The District

23   Courts, what they think is reasonable notice, is sometimes

24   very different from what the bankruptcy judges think.  We're

25   used to going very lickety-split fast in the bankruptcy

 1    courts.  And the Courts of Appeals, District Court, Courts of
 2    Appeals obviously, for good reason, are very concerned about
 3    due process in this kind of context.  So I'm sensitive to
 4    that.
 5        I'm also sensitive to the fact that it is monetary damages
 6    that are being sought here to purge the contempt.  Okay?  The
 7    shifting of attorneys' fees is basically what I understand is
 8    being sought at this point.  You know, we have a preliminary
 9    injunction halting behavior at this point, and so I think
10    that's another reason I'm hesitant to give an emergency
11    hearing.  I feel like monetary damages can wait and we can
12    give 21-plus days' notice of the hearing.
13        But I'm going to throw this out there as well.  If I do
14    feel like there is a showing of contempt, if I do feel like
15    the phone -- as I told you the other day, I'm very, very
16    fixated on the phone that may have been destroyed or thrown
17    away, maybe at Mr. Dondero's suggestion.  I mean, the
18    potential monetary sanction here may be very, very large if
19    the evidence plays out in the way I fear it might play out.
20    So I need to make sure everybody has adequate time to prepare
21    for that hearing and make sure I get all the evidence I need
22    to see.  All right?  Contempt of court is very, very, very,
23    very serious, and I don't think anyone would deny that.
24        So, with that, it was filed what day?  January 4th?  Is
25    that what I heard?  Or --

Case 19-34054-sgj Doc 3430 Filed 05/26/22 Entered 05/26/22 13:52:05 Page 168 of
Case 3:23-cv-01503-B Document 18-18 Filed 2021 Hearing Page 209 of 258 PageID 4208

163

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3    are you there?  Hopefully, you're not in a hunger coma at this

4    point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7    go to that first week of February, right?  Because we've got

8    the confirmation hearing that, you know, late in January, and

9    then --

10          THE CLERK:  Yes.  Uh-huh.

11          THE COURT:  Okay.  Do you have an available date to

12    give right now?

13          THE CLERK:  How about -- if you're willing to hear

14    them on Friday, February 5th.

15          THE COURT:  Okay.  I can do that.  February 5th at

16    9:30.  Any -- anybody want to argue about that?

17          MR. MORRIS:  Thank you, Your Honor.  That's

18    acceptable to the Debtor.

19          THE COURT:  Okay.  Mr. Lynn, is that good with you?

20          MR. LYNN:  We'll do that, Your Honor.  I would say,

21    by the way, that I'll be happy to buy Mr. Seery, out of my own

22    pocket, five cell phones, which ought to make up for the one

23    that was lost, though I recognize that those cell phones will

24    not have on them the privileged information, the conversations

25    between his lawyers and Mr. Dondero that I imagine he was

Case 19-34054-sgj Doc 3430 Filed 05/26/22 Entered 05/26/22 13:52:05 Page 164 of
Case 3:23-cv-01503-B Document 18-18 Filed 2022 Hearing Page 210 of 258 PageID 4209

164

 1  looking forward to seeing.

 2        THE COURT:  Well, I wouldn't want him to see that

 3  information, but I do think he's entitled to any nonprivileged

 4  information, texting, or calls that are on that phone.  So,

 5  again, I'm either going to hear good explanations for that or

 6  not, but it's something very concerning to me.

 7     All right.  So we have a game plan.

 8     I'm going to ask, Did we have good-faith negotiations

 9  between Dondero and the Committee and anything positive to

10  report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11        MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12  Honor.  Mr. Lynn and I have exchanged several emails over the

13  weekend, and the message that I sent to Mr. Lynn was very

14  clear.  There had been a term sheet that Mr. Seery had sent

15  back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16  out and be very specific as to what it was Mr. Dondero was

17  prepared to do in connection with the pot plan.  I instructed

18  him that some of the issues that the Committee still has is

19  obviously the overall value, along with the concept that's

20  signing up to a promise from Mr. Dondero to comply with

21  (indiscernible) as part of that value.  As Your Honor may

22  understand, the Committee is obviously very skeptical of Mr.

23  Dondero's future performance under an agreement that he enters

24  into.

25     Those are but a couple of issues, Your Honor, that I

Case 19-34054-sgj11 Doc 3430 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 165 of
Case 3:23-cv-01503-B Document 18-5 Filed 02/11/24 Page 214 of 258 PageID 4210

165

1    advised Mr. Lynn were very concerning to the Committee.  And I

2    suggested to him that if he wanted to move things forward, the

3    best way to do it would be to come to us with a fulsome term

4    sheet that explained exactly what it was in clear and precise

5    detail that Mr. Dondero was proposing, and that would be the

6    best way to move the process forward, Your Honor.

7              THE COURT:  All right.  Mr. Lynn, anything to add to

8    that?

9              MR. LYNN:  Well, Your Honor, my experience in

10   negotiations is that it is useful to agree on substantive

11   terms, or at least be in the ballpark, before term sheets are

12   exchanged.  Long ago, a term sheet was prepared and presented

13   to the Committee.  Ultimately, I think it was rejected, though

14   I don't know if we ever received a formal rejection.

15     I explained in my emails, which I'm happy to share with

16   the Court if Your Honor wants to see them, why I was reluctant

17   to try to put into a term sheet form the proposal that I

18   suggested to Mr. Clemente.  As I said, I'm more than happy to

19   provide you with that email chain and let you form your own

20   judgment, Your Honor, as to whether we're proceeding in good

21   faith.

22             THE COURT:  All right.  Well I'm not going to ask --

23             MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24   Pomerantz.

25             THE COURT:  -- to see any of that.  Mr. Pomerantz?

Case 19-34054-sgj11 Doc 3420 Filed 05/25/22 Entered 05/25/22 21:39:05 Page 166 of
Case 3:23-cv-01503-B Document 18-18 Filed 02/11/24 Hearing Page 212 of 258 PageID 4211

166

<table>
<tbody>
<tr><td>1</td><td>MR. POMERANTZ: May I just be heard real quickly?</td></tr>
</tbody>
</table>

1    MR. POMERANTZ: May I just be heard real quickly?

2    THE COURT: Sure.

3    MR. POMERANTZ: Your Honor, we also took Your Honor's

4    comments to heart. We, Mr. Seery and I, had an over-an-hour

5    conversation with Mr. Lynn and with Mr. Bonds. We provided

6    them with our thoughts as to what they needed to do in order

7    to move forward. Of course, it's not really the Debtor to

8    agree. It's the creditors to agree. But as Mr. Seery has

9    testified many times before and as I have told the Court, we

10    would support a plan that the Committee and Mr. Dondero could

11    get behind.

12    So we again -- I'm not going to divulge the nature of

13    those communications, but we suggested several things that Mr.

14    Dondero could do in order to move the ball forward, and

15    unfortunately, we have not seen any of those things done thus

16    far. So we are, at this point, not optimistic that there will

17    be a grand bargain plan.

18    THE COURT: All right.

19    MR. DONDERO: Your Honor, could I comment for a

20    second? This is Mr. Dondero.

21    THE COURT: If you and your counsel want you to

22    comment, you can comment.

23    MR. DONDERO: I'd love to do a pot plan. I would

24    love to reach some kind of settlement and everybody move on

25    with their lives. The estate started with $360 million of

003835

Case 23-03067-sgj Doc 83-30 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 167 of
Case 3:23-cv-01503-B Document 18-8 Filed 2021 Hearing Page 213 of 258 PageID 4212

167

1   third-party assets and $90 million of notes.  The $360 million

2   of third-party assets are down to $130 million.

3           MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4   I did this at the last hearing, and it's not my practice to

5   interrupt, but issues regarding what the value is or not, it's

6   going to require a response, and that's not really before Your

7   Honor.  I think before Your Honor is --

8           MR. DONDERO:  Okay.

9           MR. POMERANTZ:  -- have there been negotiations?

10  Have they been in good faith?  If Mr. Dondero wanted to

11  address that, that's fine, but I object to having any

12  discussion at this point, especially with Mr. Dondero not even

13  under oath, on what the nature of the value of the assets and

14  why they have changed and what not.

15          THE COURT:  Well, --

16          MR. POMERANTZ:  It's just not appropriate.

17          THE COURT:  I understand --

18          MR. DONDERO:  Okay.  Can I --

19          THE COURT:  Stop.

20          MR. DONDERO:  Can I -- can I finish?

21          THE COURT:  Let me please respond to that.  I

22  understand your concern, but I've heard from Mr. Seery

23  testimony many months ago about the value plummeting during

24  the case.  And I asked why, and I got some explanations.  This

25  is not evidence.  This is just, you know, this is not going to

Case 19-34054-sgj Doc 3420 Filed 05/26/22 Entered 05/26/22 13:29:05 Page 168 of
Case 3:23-cv-01503-B Document 18-18 Filed 09/21/23 Hearing Page 214 of 258 PageID 4213

168

1  be binding in any way.  Mr. Dondero can speak as to what he

2  thinks, you know, the situation is.

3      Go ahead, Mr. Dondero.

4      MR. DONDERO:  Okay.  I'm not trying to fixate on the

5  numbers.  And as far as the third-party assets are, we would

6  be willing to pay -- I would be willing to pay for those.  I'd

7  be willing to pay more, and even some value for the affiliate

8  notes that were really part of compensation agreements

9  throughout the history of Highland and avoid the POC

10  arguments.  I'd be willing to pay for the assets and I'd be

11  willing to pay even more than that.

12      I have no transparency in terms of what the assets are,

13  and there's no fulsome discussion in terms of, well, here are

14  the assets, here are the notes, here's what we think the

15  values are, can you get to this number?  It's just a -- you --

16  the -- it -- I don't view there is good-faith negotiations

17  going on because it's always just a:  You need to put a big

18  number on a piece of paper; otherwise, you're going to get run

19  over.

20      And there's no back and forth going on, but it's not due

21  to a lack of willingness on my part.  And maybe there needs to

22  be a committee set up.  Maybe there needs to be, I don't know,

23  a mediator or an examiner or somebody to try and push through

24  the pot plan, but there's nothing happening.  People are not

25  returning the judge's calls, I mean, Mr. Lynn's calls, or my

Case 19-34054-sgj Doc 3430 Filed 05/05/26 Entered 05/05/26 21:39:05 Page 160 of
Case 3:23-cv-01503-B Document 18-8 Filed 2021 Hearing Page 215 of 258 PageID 4214

169

1  calls.  They're -- there's -- despite efforts of our -- of my

2  own and a willingness of my own, there's no negotiations of

3  any sort going on at the moment.

4        THE COURT:  All right.  I don't want anyone to

5  respond to that.  I know people have different views of what's

6  going on.  But let me just say a couple of things, and then

7  we're done.

8     We do have a Committee in this case.  We have a Committee

9  with very sophisticated members and very sophisticated

10  professionals.  Okay?  That's who I wanted you to be talking

11  to before the end of the day Tuesday.

12     We have had co-mediators in this case.  Okay?  And, you

13  know, I identified very sophisticated human beings for that

14  role.  Okay?  And in fact, there ended up being settlements

15  that flowed out of the co-mediator process.

16     We're now 15 months into the case.  There are major,

17  significant compromises now:  HarbourVest, UBS, Acis, Terry,

18  and Redeemer Committee.  I hate to use a worn-out metaphor,

19  but the train is leaving the station.  We've got confirmation.

20  I've pushed out two weeks.  I mean, you all are either going

21  to get there in the next few days or we're just going to go

22  forward with I think what everyone, you know, would rather be

23  a pot plan, but if we can't get there, we're just going to

24  have to consider the plan that's on the table now.  Okay?

25        You know, the Committee, again, they're sophisticated.

Case 23-03067-sgj Doc 83-40 Filed 05/26/23 Entered 05/26/23 21:39:05 Page 170 of
Case 3:23-cv-01503-B Document 18-15 Filed 2021 Hearing Page 216 of 258 PageID 4215

170

1  They can compare apples to oranges and decide whether the plan

2  on the table, with its risks of future litigation and

3  recoveries, whether it's better or worse than whatever

4  consideration you're offering, Mr. Dondero.

5      And you know, as we all know, there is distrust here,

6  there, and everywhere among these parties.  So I can totally

7  understand them, you know, taking a hard line:  We either get

8  all cash or we're just not going to mess with it.  We don't

9  want to risk broken promises.  We'd rather just do litigation.

10      So, anyway, that's as much as I'm going to say except I am

11  going to further direct good-faith negotiations.  It sounds

12  like to me a written term sheet might be the appropriate next

13  step, given where I've heard things are at the moment.  But,

14  you know, I guess we don't have any hearings between now and

15  the 26th, right?  No Highland hearings that I can think of

16  between now and the 26th.

17          MR. POMERANTZ:  I don't think so.

18          MR. MORRIS:  I think that's correct, Your Honor.

19          THE COURT:  So you have all this time --

20          MR. MORRIS:  At the moment.

21          THE COURT:  You have all this time to negotiate and

22  simultaneously get ready for the confirmation hearing without

23  any other battles.  So I know you will use the time well.

24      All right.  We're adjourned.

25          THE CLERK:  All rise.

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 2:04 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                   CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                    **01/16/2021**

23   **/s/ Kathy Rehling**              **As Amended 05/26/2022**

24  _____      _____

25  Kathy Rehling, CETD-444                       Date
    Certified Electronic Court Transcriber

003840

172

                          INDEX

1

    PROCEEDINGS                                           3

2

    OPENING STATEMENTS

3

    - By Mr. Morris                                      12
4   - By Mr. Kane                                        18
    - By Ms. Weisgerber                                  18
5   - By Mr. Draper                                      20

6

    WITNESSES

7

    Debtor's Witnesses

8

    James Seery
9   - Direct Examination by Mr. Morris                   26
    - Cross-Examination by Mr. Wilson                    62
10  - Cross-Examination by Mr. Draper                    87
    - Redirect Examination by Mr. Morris                 93
11

    HarbourVest's Witnesses
12

    Michael Pugatch
13  - Direct Examination by Ms. Weisgerber               96
    - Cross-Examination by Mr. Wilson                   113
14

15  EXHIBITS

16  Debtor's Exhibits A through EE           Received  35

17  James Dondero's Exhibits A through M     Received 142
    James Dondero's Exhibit N (as specified) Received  71
18
    HarbourVest's Exhibit 34                 Received 100
19  HarbourVest's Exhibit 36                 Received 103
    HarbourVest's Exhibits 39 through 42     Received 137
20

21  CLOSING ARGUMENTS

22  - By Mr. Morris                                     143
    - By Ms. Weisgerber                                 144
23  - By Mr. Lynn                                       146
    - By Mr. Draper                                     148
24

25

003841

1                                    INDEX
                                     Page 2
2

3       RULINGS

4       Motion to Compromise Controversy with HarbourVest 2017      150
        Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
5       HarbourVest Dover Street IX Investment L.P., HV
        International VIII Secondary L.P., HarbourVest Skew Base
6       AIF L.P., and HarbourVest Partners L.P. filed by Debtor
        Highland Capital Management, L.P. (1625)

7       Motion to Allow Claims of HarbourVest Pursuant to Rule      150
        3018(a) of the Federal Rules of Bankruptcy Procedure for
8       Temporary Allowance of Claims for Purposes of Voting to
        Accept or Reject the Plan filed by Creditor HarbourVest
9       et al. (1207)

10      Debtor's Motion Pursuant to the Protocols for Authority     157
        for Highland Multi-Strategy Credit Fund, L.P. to Prepay
11      Loan (1590)

12      END OF PROCEEDINGS                                          171

13      INDEX                                                   172-173

14

15

16

17

18

19

20

21

22

23

24

25

# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P. *and* | § | |
| CLO HOLDCO, LTD., | § | |
| | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-CV-695-S |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., *et al.* | § | |

### <u>ORDER</u>

The above-numbered case is hereby transferred to the docket of the Honorable Judge Jane

J. Boyle for consolidation with *The Charitable DAF Fund LP, et al. v. Highland Capital*

*Management LP*, Case No. 3:21-cv-3129-N.  All future pleadings shall be filed under case number

3:21-cv-3129-B.

**SO ORDERED.**

SIGNED June 9, 2022.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**

003843

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | ) | Adv. Pro. No. 21-03067-sgj |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

003844

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**RENEWED MOTION TO DISMISS COMPLAINT**

Highland Capital Management, L.P. ("Highland"), a defendant in the above-captioned adversary proceeding, by and through its undersigned counsel, files this renewed motion (the "Motion") seeking entry of an order dismissing the *Original Complaint* [Docket No. 1] (the "Complaint") filed by Plaintiffs Charitable DAF Fund, L.P. (the "DAF") and CLO Holdco, Ltd. ("CLOH") (together, "Plaintiffs"). In support of its Motion, Highland states as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. 157(b).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

**RELIEF REQUESTED**

4.      Highland requests that this Court issue the proposed form of order attached as **Exhibit A** (the "Proposed Order") pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.      For the reasons set forth more fully in the *Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* (the "Memorandum of Law") filed contemporaneously with this Motion, Highland requests that the Court: (a) dismiss the Complaint in its entirety and (b) grant Highland such other and further relief as the Court deems just and proper under the circumstances.

6.      In accordance with Rule 7007-1(g) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas*, contemporaneously herewith and in support of this Motion, Highland is filing: (a) its Memorandum of Law, and (b) the *Appendix in*

003845

*Support of Defendant Highland Capital Management L.P.'s Renewed Motion to Dismiss the Complaint* (the "Appendix") together with the exhibits annexed thereto.

7.     Based on the exhibits annexed to the Appendix, and the arguments contained in the Memorandum of Law, Highland is entitled to the relief requested herein as set forth in the Proposed Order.

8.     Notice of this Motion has been provided to all parties.  Highland submits that no other or further notice need be provided.

WHEREFORE, Highland respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant Highland such other and further relief as the Court may deem proper.

[*Remainder of Page Intentionally Blank*]

DOCS_NY:46482.2 36027/003

003846

Dated:  October 14, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

4

003847

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants. | |

## ORDER GRANTING DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## RENEWED MOTION TO DISMISS COMPLAINT

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

003849

Before the Court is *Defendant Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. __] (the "Motion").  Having considered: (a) the Motion; (b) the *Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. __] (the "Memorandum of Law");[2] and (c) the *Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. __] (the "Appendix") and the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court having found that (a) Counts 2 and 5 are barred by judicial estoppel, and (b) the Complaint should be dismissed in its entirety because the Complaint fails to allege any Claim for relief that is plausible for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure; and this Court having found that the Highland's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The Complaint is dismissed in its entirety.

### ###End of Order###

---

[2] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Memorandum of Law.

003850

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS COMPLAINT

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

003851

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND................................................................................. 3

   A.   Highland Settles with HarbourVest ............................................................... 3

   B.   CLOH, Dondero and Dondero-Controlled Trusts Object to the Settlement Motion.......... 4

   C.   Plaintiffs File this Adversary Case ............................................................... 6

   D.   Highland's Motion to Dismiss and the Decision ......................................... 7

III.    ARGUMENT ....................................................................................................... 7

   A.   Legal Standard ............................................................................................. 8

   B.   Counts 2 And 5 are Barred by Judicial Estoppel ........................................ 8

   C.   Plaintiffs Fail to State a Claim under RICO in Count 4 ............................ 12

      1.   Plaintiffs Fail to Allege a Pattern of Racketeering Activity ......................... 13

      2.   Plaintiffs Fails to Allege a RICO Association-in-Fact Enterprise ................ 16

      3.   Plaintiffs Fail to Allege Causation ................................................................. 17

   D.   Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty in Count 1 ........ 18

   E.   Plaintiffs Fail to State a Claim for Breach of Members Agreement in Count 2.............. 22

   F.   Plaintiffs Fail to State a Claim for Negligence in Count 3 ............................... 23

   G.   Plaintiffs Fail to State a Claim for Tortious Interference with Contract in Count 5......... 24

IV.     CONCLUSION................................................................................................... 25

003852

## TABLE OF AUTHORITIES

**Page No.**

**CASES**

*Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*,
  625 F.3d 185 (5th Cir. 2010) .................................................................. 13

*Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*,
  606 F.2d 602 (5th Cir. 1979) .................................................................. 18

*Allstate Ins. Co. v. Donovan*,
  2012 WL 2577546 (S.D. Tex. July 3, 2012)............................................ 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................. 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................. 8

*Bordelon v. Wells Fargo Fin. La., LLC*,
  2018 U.S. Dist. LEXIS 124877 (E.D. La. July 25, 2018) ...................... 16

*Brandon v. Interfirst Corp.*,
  858 F.2d 266 (5th Cir.1988) ..................................................................... 9

*C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*,
  61 F.3d 288 (5th Cir. 1995) ...................................................................... 8

*Cade v. Henderson*,
  2001 WL 1012251, 2001 U.S. Dist. LEXIS 13685 (E.D. La. Aug. 31, 2001), *aff'd sub nom*
  *Cade v. USPS*, 45 Fed. App'x 323 (5th Cir. 2002)................................... 8

*Calcasieu Marine Nat'l Bank v. Grant*,
  943 F.2d 1453 (5th Cir.1991) ........................................................... 15, 16

*D&T Partners v. Baymark Partners LP*,
  2022 U.S. Dist. LEXIS 83140 (N.D. Tex. May 9, 2022) ....................... 13

*Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*,
  2022 U.S. Dist. LEXIS 172351 (N.D. Tex. Sept. 22, 2022).................... 21

*Gabarick v. Laurin Mar. (Am.) Inc.*,
  753 F.3d 550 (5th Cir. 2014) .................................................................... 9

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006).................................................................. 22

*Grigsby v. CMI Corp.*,
  765 F.2d 1369 (9th Cir.1985) .................................................................. 19

*H. J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)........................................................................... 15, 16

DOCS_NY:46481.14 36027/003

003853

*Hall v. GE Plastic Pac. PTE Ltd.*,
 327 F.3d 391 (5th Cir. 2003) ..................................................................... 9

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
 258 F. Supp. 2d 576 (S.D. Tex. 2003) ....................................................... 19

*In re Oil Spill by the Oil Rig "Deepwater Horizon"*
 802 F. Supp. 2d 725 (E.D. La. 2011) ................................................... 17, 18

*In re Soporex, Inc.*,
 463 B.R. 344 (Bankr. N.D. Tex. 2011) ...................................................... 20

*Jethroe v. Omnova Sols., Inc.*,
 412 F.3d 598 (5th Cir. 2005) .................................................................. 9, 10

*Little v. KPMG LLP*,
 2008 WL 576226 (W.D. Tex. Jan. 22, 2008) ............................................ 23

*Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Young*,
 1994 WL 88129 (S.D.N.Y. Mar, 14, 1994) ............................................... 15

*Montesano v. Seafirst Commercial Corp.*,
 818 F.2d 423 (5th Cir.1987) ................................................................ 12, 16

*MWK Recruiting, Inc. v. Jowers*,
 2020 U.S. Dist. LEXIS 229755 (W.D. Tex. Dec. 8, 2020) .............. 12, 14, 15

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
 No. 21-10449, 2022 U.S. App. LEXIS 25107 (5th Cir. Sept. 7, 2022)................... 21

*NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*,
 2022 U.S. Dist. LEXIS 142029 (S.D.N.Y. Aug. 9, 2022)............................ 21

*Partain v. City of S. Padre Island*,
 2018 U.S. Dist. LEXIS 220850 (S.D. Tex. Dec. 5, 2018)............................ 16

*Pridgin v. Safety-Kleen Corp.*, Civil Action No. 3:21-CV-00720-K, 2021 U.S. Dist. LEXIS
 240210 (N.D. Tex. Dec. 16, 2021) ............................................................ 19

*Reed v. City of Arlington*,
 650 F.3d 571 (5th Cir. 2011) ...................................................................... 9

*Robinson v. Standard Mortg. Corp.*,
 191 F. Supp. 3d 630 (E.D. La. 2016)........................................... 12, 14, 15, 17

*Rodgers v. City of Lancaster Police*,
 2017 WL 457084 (N.D. Tex. Jan. 6, 2017) ................................................ 24

*Santa Fe Industries, Inc. v. Green*,
 430 U.S. 462 (1977) ................................................................................. 18

*SEC v. Cap. Gains Research Bureau, Inc.*,
 375 U.S. 180 (1963).................................................................................. 21

*Sivertsen v. Citibank, N.A. as Tr. for Registered Holders of WAMU Asset-Back Certificates
 WAMU Series No. 2007-HE2 Tr.*,
 390 F. Supp. 3d 769 (E.D. Tex. 2019)....................................................... 24

iii

*Snowden v. Wells Fargo Bank, N.A.*,
  2019 WL 587304 (N.D. Tex. Jan. 18, 2019),
  *adopted by* 2019 WL 586005 (N.D. Tex. Feb. 12, 2019) ..................................................... 23

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ........................................................................................... 18, 19

*Specialties of Mexico Inc. v. Masterfoods USA*,
  2010 WL 2488031 (S.D. Tex. June 14, 2010) ...................................................................... 24

*St. Germain v. Howard*,
  556 F.3d 261 (5th Cir. 2009) ................................................................................................. 13

*St. Paul Mercury Ins. Co. v. Williamson*,
  224 F.3d 425 (5th Cir. 2000) ................................................................................................. 14

*Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*,
  374 F.3d 330, 335 (5th Cir. 2004) ........................................................................ 9, 10, 11, 12

*T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.*,
  2008 WL 7627807 2008 U.S. Dist. LEXIS 112613 (S.D. Tex. May 22, 2008) ......................... 8

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*,
  975 F.2d 1134 (5th Cir. 1992) ....................................................................................... 12, 14, 15

*Tigue Inv. Co. v. Chase Bank of Texas, N.A.*,
  2004 WL 3170789 (N.D. Tex. Nov. 15, 2004) ...................................................................... 18

*Transamerica Mtg. Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979) ................................................................................................................ 21

*U.S. ex rel. Long v. GSDMIdea City, L.L.C.*,
  798 F.3d 265 (5th Cir. 2015) ................................................................................................. 11

*United States v. Gray*,
  96 F.3d 769 (5th Cir. 1996) ................................................................................................... 14

*United States v. McCaskey*,
  9 F.3d 368 (5th Cir.1993) ......................................................................................................... 9

*Woods v. Michael*,
  No. 20-80651-CV, 2021 U.S. Dist. LEXIS 26563 (S.D. Fla. Feb. 9, 2021) ........................... 13

**STATUTES**

18 U.S.C. § 1961(4) ..................................................................................................................... 18

18 U.S.C. § 1964(c) .............................................................................................................. 14, 19

iv

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>" or "<u>Highland</u>," as applicable), submits this memorandum of law in support of Highland's *Renewed Motion to Dismiss Complaint* (the "<u>Motion</u>").[2]

## I.    INTRODUCTION[3]

1.    This matter comes back to the Court on remand from the United States District Court for the Northern District of Texas (the "<u>District Court</u>").  On September 2, 2022, the District Court entered its memorandum opinion and order (the "<u>Decision</u>")[4] on Plaintiffs' appeal of this Court's order (the "<u>MTD Order</u>")[5] granting Highland's motion to dismiss this action (the "<u>Original MTD</u>").[6]  In short, the District Court (i) reversed this Court's finding that collateral estoppel barred Plaintiffs' claims and (ii) remanded the judicial estoppel finding for a determination as to whether Plaintiffs' withdrawal of its objection to the Settlement on a claimed Right of First Refusal was "inadvert*.*"  Decision at 17.

2.    There can be no credible dispute that Plaintiff CLOH's withdrawal of its objection to the Settlement was "advertent" and, therefore, that judicial estoppel bars Counts 2 and 5 of the Complaint.  In addition, all Counts of Plaintiffs' Complaint[7] should be dismissed on the substantive grounds Highland advanced in the Original MTD and renews and restates herein.

3.    In January 2021, the Debtor moved for an order approving its Settlement with HarbourVest pursuant to which, *inter alia*, HarbourVest settled its claims against the Debtor and

---

[2] Concurrently herewith, Highland is filing the *Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* (the "<u>Appendix</u>"). Citations to the Appendix are notated as follows: Ex. #, Appx. #.

[3] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[4] *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-cv-03129-B (N.D. Tex. Sept. 2, 2022) (slip op.), District Court Docket No. 28 (also available at 2022 U.S. Dist. LEXIS 159461), **Ex. 12, Appx. 437-458**.

[5] District Court Docket No. 100 (slip op.) (also available at 2022 Bankr. LEXIS 659).

[6] Docket No. 26. Unless otherwise indicated, "Docket No." refers to the docket maintained in this Adversary Proceeding.

[7] Docket No. 1-1.

transferred its interest in HCLOF, to a subsidiary of the Debtor (the "Prior Proceeding"). **Ex. 2, Appx. 62-75.** CLOH objected to the Settlement, presumably at the direction of its parent, the "Charitable" DAF Fund, L.P. (the "DAF")[8] (**Ex. 6, Appx. 123-133**) on the grounds that: (i) it had a "Right of First Refusal" to acquire HarbourVest's interest in HCLOF and (ii) HarbourVest could not transfer its interest without complying with that purported right. *Id.* Two other objections were lodged, one by Mr. Dondero and the other by his Trusts.[9] **Exs. 4-5, Appx. 96-122.** Each objecting party had the right to, and took advantage of, discovery, and the Court held an evidentiary hearing on the proposed Settlement and heard argument in support of parties' objections and defenses. During the hearing, CLOH voluntarily withdrew its objection premised on the "Right of First Refusal," after which the Court overruled the remaining objections and approved the Settlement.[10]

4.       Three months later, Plaintiffs—with a new trustee and new counsel—filed their Complaint asserting that the Debtor violated the "Right of First Refusal," breached the Members Agreement, and otherwise violated its alleged duties to Plaintiffs. But, as discussed below, Plaintiffs are judicially estopped from arguing the "Right of First Refusal" was violated. CLOH asserted this very argument during the Prior Proceeding, and knowingly, voluntarily, and advertently withdraw it after due deliberation of the underlying facts, relevant documents, and

---

[8] The Court observed at the time that DAF, the parent of CLOH, "was seeded with contributions from Highland, is managed/advised by Highland, and [its] independent trustee is a long-time friend of Highland's chief executive officer[], Mr. Dondero." *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 292, at *19 (Bankr. N.D. Tex. Jan. 31, 2019) (emphasis in original). Mark Patrick—Mr. Dondero's employee and senior tax counsel of more than a decade—subsequently was appointed trustee of the DAF but this Court has found, and the District Court affirmed, that James Dondero ("Mr. Dondero") exerted significant control over both Mr. Patrick and the DAF. *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 175778, at *17-23 (N.D. Tex. Sept. 28, 2022); *see also Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 2780, at *5 n.5 (Bankr. N.D. Tex. Sept. 30, 2022).

[9] "Trusts" means The Dugaboy Investment Trust and The Get Good Trust, Mr. Dondero's family "trusts:"

[10] The Trusts appealed the Settlement, claiming (ironically and cynically) that the Debtor overpaid. On September 26, 2022, the District Court denied the appeal for lack of standing and affirmed this Court's order approving the Settlement. *See* 3:21-cv-00261-L, Docket No. 38.

DOCS_NY:46481.14 36027/003

003857

applicable law.  Judicial estoppel thus bars Counts 2 and 5 of the Complaint.  Plaintiffs also fail to

state any claims on which relief can be granted, and the Complaint must be dismissed under Rule

12(b)(6), applicable here via Bankruptcy Rule 7012.

## II.      FACTUAL BACKGROUND

### A.      Highland Settles with HarbourVest

5.      Highland CLO Funding, Ltd. ("HCLOF") is a Guernsey-based investment vehicle

managed by its Guernsey-based board of directors.  Highland HCF Advisors, Ltd. ("HCFA"), a

wholly-owned subsidiary of Highland, is its portfolio manager.[11]  Prior to the commencement of

the Bankruptcy Case, HarbourVest[12] invested approximately $80 million in HCLOF.  Following

its investment, CLO Holdco, Ltd. ("CLOH") held 49.02% of HCLOF's interests, HarbourVest

held 49.98%, and the remaining 1% was held by the Debtor and certain Debtor employees.  After

the Debtor filed bankruptcy, HarbourVest filed claims against the Debtor in excess of $300

million, alleging that it was fraudulently induced into its investment by factual misrepresentations

and omissions made by Mr. Dondero and certain of his employees prior to the bankruptcy.

(HarbourVest proofs of claim).  **Ex. 1, Appx. 1-61**

6.      On December 23, 2020, the Debtor filed its motion [Docket No. 1625] (the

"Settlement Motion") seeking Bankruptcy Court approval of its settlement with HarbourVest (the

"Settlement").  **Ex. 2, Appx. 62-75**.  Pursuant to the Settlement, HarbourVest was to transfer its

interest in HCLOF to the Debtor's nominee (the "Transfer") in exchange for allowed claims

against the estate and certain other consideration. **Ex. 2 ¶ 32, Appx. 71-72; Ex. 3, Appx. 76-95.**

---

[11] HCLOF is past its investment period, and HCFA's role is limited to advising on the liquidation of HCLOF's portfolio and the recovery of cash for distributions to HCLOF's members.

[12] "HarbourVest" means, collectively, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

DOCS_NY:46481.14 36027/003

003858

The Transfer was a necessary component of the Settlement—HarbourVest was essentially seeking rescission of its investment in HCLOF—and the Settlement Motion disclosed all aspects of the Settlement and Transfer, including (i) what HarbourVest was transferring; (ii) the valuation (and method of valuation) of the interests being transferred; (iii) the method of transfer; and (iv) the claims against Highland that HarbourVest would receive.  **Ex. 2 ¶ 32 & n.5, Appx. 71-72; Ex. 3, ¶ 1(b), Appx. 78**.

## B.    CLOH, Dondero and Dondero-Controlled Trusts Object to the Settlement Motion

7.    On January 6, 2021, Mr. Dondero filed his objection to the Settlement [Docket No. 1697] ("Dondero's Objection").  **Ex. 4, Appx. 96-111**.  On January 8, 2021, the Trusts filed their objection [Docket No. 1706] (the "Trusts' Objection").  **Ex. 5, Appx. 112-122**.

8.    CLOH also objected to the Settlement on January 8, 2021 [Docket No. 1707] ("CLOH's Objection").  **Ex. 6, Appx. 123-133**.    CLOH challenged HarbourVest's right to effectuate the Transfer contending that: (i) CLOH and the other members of HCLOF had a "Right of First Refusal" under the Members Agreement, *id.* **¶ 3, Appx. 125,** and (ii) "HarbourVest has no authority to transfer its interest in HCLOF without first complying with the Right of First Refusal." *Id.* **¶ 6, Appx. 126**.  CLOH offered a lengthy, but faulty, analysis of the Members Agreement, including CLOH's purported "Right of First Refusal" under Article 6 thereof.  *See id.* **¶¶ 9-22, Appx. 127-132**.

9.    After filing their objections, CLOH and Mr. Dondero exercised their right to conduct discovery under Bankruptcy Rule 9014(c) and deposed Michael Pugatch, a representative of HarbourVest [Docket No. 1705]. **Ex. 7, Appx. 134-188**.  CLOH never contended that: (i) the Debtor had a fiduciary duty to offer the HCLOF interests to CLOH (and it did not) or (ii) the Investment Advisers Act of 1940 (the "IAA") was implicated by the Settlement (and it is not).

DOCS_NY:46481.14 36027/003

10.     On January 13, 2021, the Debtor filed its reply [Docket No. 1731] (the "Omnibus Reply") (**Ex. 8, Appx. 189-211**), in which it established that the Members Agreement did not impede the Settlement and rebutted CLOH's argument that the Transfer could not be completed without complying with the "Right of First Refusal" under Article 6, ***id*. ¶¶ 26-39, Appx. 203-209**.

11.     Subsequently, at the January 14, 2021, hearing, CLOH *voluntarily withdrew* its objection after considering the Debtor's analysis of the Members Agreement and applicable law. CLOH's counsel unequivocally stated on the record:

> CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. ***Based on our analysis of Guernsey law and some of the arguments of counsel on those pleadings and our review of the appropriate documents***, I obtained authority from my client, Grant Scott, as trustee for CLO Holdco, ***to withdraw the CLO Holdco objection based on the interpretation of the Members Agreement***.

**Ex. 9 at 7:20-8:6, Appx. 219-220** (emphasis added).

12.     The Debtor called two witnesses in support of the Settlement Motion—its court-appointed Chief Executive Officer, James P. Seery, Jr., and Mr. Pugatch. Counsel for Mr. Dondero and the Trusts cross-examined the Debtor's witnesses but did not inquire about the value of the HCLOF interests, the Debtor's purported fiduciary obligations, or the Transfer. **Ex. 9 at 87:18-89:21, Appx. 299-301**. At the conclusion of the hearing, in reliance on CLOH's withdrawal of its Objection, and the evidence admitted at the hearing, the Court entered an order overruling the remaining objections and approving the Settlement [Docket No. 1788] (the "Settlement Order"). **Ex. 10, Appx. 386-409.** The Settlement Order ***expressly*** authorized the transfer of HarbourVest's interest in HCLOF to a Debtor subsidiary providing, in relevant part, that "[p]ursuant to the express terms of the [Members Agreement] … HarbourVest is authorized to transfer its interest in HCLOF to a wholly-owned and controlled subsidiary of the Debtor … ***without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF*.**" ***Id.* ¶ 6,**

003860

**Appx. 390** (emphasis added).[13]  This Court included this language because of concerns that Mr. Dondero would "go to a different court somehow to challenge the transfer." **Ex. 9 at 156:17-22, Appx. 368**.[14]

**C.      Plaintiffs File this Adversary Case**

13.      With a new trustee and new counsel, on April 12, 2021, Plaintiffs effectively resurrected the CLOH Objection by filing their Complaint in the District Court, in which they, *inter alia*, challenged the Transfer premised on the "Right of First Refusal." **Ex. 11, Appx. 410-436**. The District Court subsequently referred the case to this Court.  [Docket No. 1-1].  The Complaint raises claims for: (i) breach of fiduciary duty (Count 1); (ii) breach of the Members Agreement (Count 2); (iii) RICO violations (Count 3); (iv) negligence (Count 4); (v) tortious interference (Count 5) (each, a "Count" and collectively, the "Counts").  In Count 1 (breach of fiduciary duty), Plaintiffs allege that the Debtor violated its "broad" duties to Plaintiffs under the IAA and the Debtor's "internal policies and procedures" by: (i) engaging in "insider trading with HarbourVest"; (ii) "concealing" the value of the HarbourVest interest; and (iii) "diverting" the investment opportunity in the HarbourVest entities to the Debtor without offering it to Plaintiffs. *Id.* ¶¶ **67-74**.[15]  In Count 3 (RICO), Plaintiffs allege that the Debtor and two affiliated entities were an "association-in-fact" engaged in a pattern of racketeering activity for this same underlying conduct; namely, failing to disclose the valuation of HCLOF's interest and ultimately effectuating the HarbourVest Settlement.  *Id.* ¶¶ **113-133**.

---

[13] *See also* **Ex. 9 at 156:10-25; 157:5**.

[14] *Id.* **at 156:10-25; 157:1-5, Appx. 368-369** (emphasis added).

[15] Ironically (and cynically), Plaintiffs' baseless insider trading allegations are premised on Mr. Dondero's unsolicited disclosure of alleged material non-public information regarding MGM Holdings.  Mr. Dondero's disclosure to Mr. Seery violated the injunction issued by this Court and presumably violated Mr. Dondero's duties and obligations as a director of MGM Holdings.

003861

14.     Plaintiffs' state-law Counts rest on the same underlying allegations.  In support of Count 2 for breach of the Members Agreement, Plaintiffs again allege that the Debtor breached the "Right of First Refusal." **Complaint ¶¶ 92-102**.  In Count 4 (negligence), Plaintiffs assert that the Debtor's actions violated the Members Agreement and the Debtor's internal policies by failing to accurately calculate the HCLOF interests and failing to give Plaintiffs the Right of First Refusal to purchase the interests. *Id.* **¶¶ 103-112**.  Count 5 (tortious interference) is again premised on the Debtor's alleged interference with Plaintiffs' "Right of First Refusal" under the Members Agreement. *Id.* **¶¶ 134-141**.

**D.     Highland's Motion to Dismiss and the Decision**

15.     On May 27, 2021, Highland filed the Original MTD, which this Court granted on the grounds of collateral and judicial estoppel.[16]  MTD Order at 22, 26.  Plaintiffs appealed the MTD Order to the District Court and that appeal was consolidated with Plaintiffs' appeal of this Court's order denying their motion for a stay.  *See* 3:21-cv-03129-B, Docket No. 20.[17]  On September 2, 2022, the District Court issued the Decision in which it reversed and remanded the MTD Order.[18]  The District Court reversed this Court's finding that Plaintiffs' claims were barred by collateral estoppel.  On judicial estoppel, the District Court affirmed this Court's findings that the first two elements of judicial estoppel were satisfied (Decision at 14-17) but remanded solely for a determination on whether Plaintiffs' inconsistent position was "inadvertent." *Id.* at 17-18.

**III.     ARGUMENT**

16.     Counts 2 and 5 are barred by judicial estoppel, and Plaintiff fails to state claims for relief under Rule 12(b)(6) as to all Counts of the Complaint.

---

[16] Because this Court granted the Original MTD on these bases, it "refrain[ed] from addressing" Highland's motion to dismiss on Rule 12(b)(6) grounds.  MTD Order at 26.

[17] Defendant HCLOF was voluntarily dismissed from this case on December 7, 2021. Docket No. 80.

[18] Plaintiffs did not appeal the Decision.

003862

## A.    Legal Standard

17.    To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "When well-pleaded facts fail to meet th[e] [*Twombly*] standard, 'the complaint has alleged—but it has not shown—that the pleader is entitled to relief.'" Decision at 5 (quoting *Iqbal*, 556 U.S. at 679).  Dismissal is proper under Rule 12(b)(6) when, taking the facts alleged in the complaint as true, it appears that the plaintiff "cannot prove any set of facts that would entitle it to the relief it seeks." *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995).  The Court may take judicial notice of matters of public record when considering a motion to dismiss for failure to state a claim.[19]

## B.    Counts 2 And 5 are Barred by Judicial Estoppel

18.    Counts 2 and 5, for breach of the Members Agreement and tortious interference with the Members Agreement, are barred by judicial estoppel.  Judicial estoppel is "a common law doctrine by which a party who has assumed one position in [its] pleadings may be estopped from

---

[19] *See T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.*, 2008 U.S. Dist. LEXIS 112613, at *5 (S.D. Tex. May 22, 2008); *Cade v. Henderson*, 2001 U.S. Dist. LEXIS 13685, at *6-7 (E.D. La. Aug. 31, 2001), *aff'd sub nom Cade v. USPS*, 45 Fed. App'x 323 (5th Cir. 2002).

DOCS_NY:46481.14 36027/003

assuming an inconsistent position." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988);

Decision at 14.  The purpose of the doctrine is "to protect the integrity of the judicial process" by

"prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self-

interest." *Brandon*, 858 F.2d 266, 268 (internal quotations omitted); *United States v. McCaskey*, 9

F.3d 368, 378 (5th Cir. 1993); Decision at 14.

19.     As set out in the Decision: "A court examines three criteria when determining the

applicability of judicial estoppel: '(1) the party against whom judicial estoppel is sought has

asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted

the prior position; and (3) the party did not act inadvertently.'" Decision at 14 (quoting *Reed v.

City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (*en banc*)).[20]  As discussed *supra*, the District

Court affirmed this Court's determination on the first two criteria but remanded for a determination

as to whether Plaintiffs' change of position was "inadvertent." *Id.* at 18.  Thus, the only issue

before this Court on a judicial estoppel determination is the element of "inadvertence"—an issue

not raised by Plaintiffs in their prior briefing to this Court.

20.     A failure to disclose is considered "'inadvertent' only when, in general, the *debtor*

either lacks knowledge of the undisclosed claims *or* has no motive for their concealment."

*Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374

F.3d 330 (5th Cir. 2004); *see also Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598, 600-01 (5th Cir.

2005) ("To establish that [debtor's] failure to disclose was inadvertent, [debtor] may prove either

---

[20] In the Fifth Circuit, the element of "inadvertence" is generally applied in a bankruptcy context where a debtor, post-discharge, seeks to assert a claim that had or could have been addressed within the bankruptcy.  Thus, it is unclear whether the element of "inadvertence" applies in this case, which relates to a *non-debtor plaintiff's* change of position in an adversary proceeding.  *See Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 n.3 (5th Cir. 2014) (rejecting appellant's argument that the third factor of "inadvertence" applies in a non-bankruptcy case, noting, "we apply [inadvertence] only when the judicial estoppel is based on the non-disclosure of a claim in a prior bankruptcy proceeding."); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (applying two-factor test to judicial estoppel determination in non-bankruptcy case, namely, (a) whether position was inconsistent, and (b) whether court relied on such position).  Regardless, there can be no viable dispute that Plaintiffs' conduct was "advertent."

003864

that she did not know of the inconsistent position or that she had no motive to conceal it from the court … at the time she filed her bankruptcy petition.")

21.     Plaintiffs' inconsistent position with regard to their Claims premised on the "Right of First Refusal" was not "inadvertent."  Plaintiffs knew of and analyzed the factual and legal issues concerning Counts 2 and 5 when they unequivocally withdrew their Objection to the Transfer in the Prior Proceeding; indeed, CLOH's thorough, multi-page objection to the Transfer was premised on an alleged violation of the "Right of First Refusal."  *See* **Ex. 6 ¶¶ 3, 6, Appx. 125-126**.

22.     After "review[ing] the reply briefing," "scrubb[ing] the HCLOF corporate documents," analyzing Guernsey law, and reviewing the "appropriate documents," CLOH, on the record, withdrew its Objection to the Transfer premised on the "Right of First Refusal" "based on the interpretation of the Members Agreement." *See* **Ex. 9 at 7:20-8:6, Appx. 219-220.**  Thus, Plaintiffs[21] knew of the underlying facts and legal issues underlying Counts 2 and 5 when CLOH withdrew its Objection in the Prior Proceeding.  Based on the record, CLOH's inconsistent positions regarding the "Right of First Refusal" under the Members Agreement are deliberate, directed, and advertent.  They cannot possibly be deemed "inadvertent." *See Superior Crewboats, Inc.*, 374 F.3d at 335-36 (debtors' non-disclosure of a viable personal injury claim in schedules filed in their no asset bankruptcy case was not "inadvertent" where debtors "were aware of the facts underlying the claim" for months, noting, "[a]lleged confusion as to a limitations period does not evince a lack of knowledge as to the existence of the claim."); *Jethroe*, 412 F.3d at 601 (failure to disclose claim was not "inadvertent" where party was aware of "the facts giving rise to them"

---

[21] It is indisputable that the DAF is in privity with CLOH and therefore cannot be heard to argue that only CLOH should be bound by judicial estoppel for filing and then withdrawing its objection. *Charitable DAF Fund L.P.*, 2022 U.S. Dist. LEXIS 175778, at *12-13 ("DAF is in privity with CLO Holdco because it controls and owns 100% of CLO Holdco … [DAF] had a fair chance to challenge the gatekeeping orders or [is] in privity with an entity that did.")

003865

at the time she filed her bankruptcy petition); *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 272 (5th Cir. 2015) (failure to disclose claims was not "inadvertent" where party "was aware of the facts underlying his claims as early as 2010 and [] filed this lawsuit in 2011," noting that, inadvertence through lack of knowledge cannot be shown "as long as the debtor has enough information to suggest that he may have a potential claim; the debtor need not know all of the underlying facts or even the legal basis of the claim.").

23.     Accordingly, Plaintiffs' inconsistent legal positions with regard to the Transfer violating the "Right of First Refusal" in the Members Agreement were in no way, shape, or form the result of "inadvertence." [22]

24.     Any claim of inadvertence is also belied by Plaintiffs' self-evident financial interest in the way that they have chosen to proceed here.  In the (unlikely) event they succeed on their claims for breach of contract or tortious interference, Plaintiffs would have "reaped a windfall" in withdrawing their Right of First Refusal objection. *See Superior Crewboats*, 337 F.3d at 336.  Had Plaintiffs acquired the Interests, they would have had to pay tens of millions of dollars to HarbourVest.[23]  Those Interests would have been speculative, illiquid, hard to value (by their own admission), and subject to portfolio performance risk.  By contrast, in the Complaint, Plaintiffs now seek monetary recovery or specific performance.  ***See* Complaint ¶ 143** (ad damnum).  But

---

[22] Plaintiffs' allegation in support of Count 2 that "Plaintiff was not informed of the fact that HarbourVest had offered its shares to Defendant HCM for $22.5 million …" (**Complaint ¶ 98**) is irrelevant, inaccurate, and contradicted by the record.  The allegation is irrelevant because the "Right of First Refusal" is not dependent on the value of the shares.  The allegation is inaccurate because HarbourVest did not "offer" its interest in HCLOF to Highland.  Rather, pursuant to the Settlement, HarbourVest *transferred* its interest in HCLOF to Highland's nominee in exchange for allowed claims against the estate and other consideration given to resolve HarbourVest's claim for, among other things, rescission of its investment in HCLOF. **Ex. 2 ¶ 32, Appx. 71-72; Ex. 3, Appx. 76-95.**  Finally, the allegation is contradicted by the record because the Settlement Motion expressly stated that the net asset value of the interest was "estimated to be approximately $22 million as of December 1, 2020." **Ex. 2 ¶ 32 & n.5, Appx. 71-72; Ex. 3, ¶ 1(b), Appx. 78.**

[23] HarbourVest received a total of $80 million in allowed claims in the Settlement.  Presumably, Plaintiffs would have had to have paid that much for the Interests.

HCLOF's investments have been (with limited exception) reduced to cash or equivalents. Accordingly, the only current risk with respect to the Interests is litigation risk—a risk generally created by Plaintiffs.[24]  Their financial interest in bringing the claim in this posture—they allowed the Debtor to assume the speculative risk yet now seek to seize the non-speculative reward—on its own vitiates any claim of inadvertence. *See Superior Crewboats*, 337 F.3d at 336 (debtors "had the requisite motivation to conceal the claim as they would certainly reap a windfall had they been able to recover on the undisclosed claim").  For this additional reason, Counts 2 and 5 are barred by judicial estoppel.

25.    Accordingly, Plaintiffs' inconsistent position is not the result of "inadvertence," and Counts 2 and 5 should, therefore, be dismissed on grounds of judicial estoppel.

## C.    Plaintiffs Fail to State a Claim under RICO in Count 4

26.    To state a RICO claim, a plaintiff must allege: "1) the conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 424 (5th Cir.1987).  To defeat a motion to dismiss, "a RICO plaintiff must allege facts sufficient to establish each of the essential elements of his or her RICO claim." *Robinson v. Standard Mortg. Corp.*, 191 F. Supp. 3d 630, 638 (E.D. La. 2016).  The RICO claim must be plead "with sufficient particularity" under Rule 9(b). *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992); *see also MWK Recruiting, Inc. v. Jowers*, 2020 U.S. Dist. LEXIS 229755, at *23 (W.D. Tex. Dec. 8, 2020).  "Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [they] obtained thereby." *Tel-Phonic Servs*, 975 F.2d at 1134 (internal quotations omitted).  "[T]o establish a RICO claim based on a pattern of mail or wire

---

[24] *See, e.g.*, Bankr. Docket Nos. 3507, 3550.

fraud, the plaintiff must plead that the defendant act[ed] knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to [themselves]." *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 715 (N.D. Tex. 2018) (internal quotations omitted).

1.  **Plaintiffs Fail to Allege a Pattern of Racketeering Activity**

27.   "'A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity.'" *D&T Partners v. Baymark Partners LP*, 2022 U.S. Dist. LEXIS 83140, at *15 (N.D. Tex. May 9, 2022) (quoting *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009)).   Plaintiffs allege three predicate offenses: (i) wire fraud, (ii) mail fraud, and (iii) violation of the IAA's antifraud provisions.   *See* **Complaint ¶¶ 130-132**.   Plaintiffs fail to sufficiently plead any predicate act.

28.   First, alleged violations of securities laws cannot be predicate acts for a RICO claim. *See* 18 U.S.C. § 1964(c); *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 191 (5th Cir. 2010).   Thus, to the extent that Plaintiffs' RICO claims, however pitched, allege "conduct that would have been actionable as fraud in connection with the purchase or sale of securities" (18 U.S.C. § 1964(c)), the claims are barred by statute.   "Courts have interpreted the scope of § 1964(c)'s so-called 'securities fraud exception' broadly to apply even where a plaintiff does not expressly plead securities fraud as the predicate act, where a plaintiff could not have even brought a securities fraud claim against the particular defendant, and where a plaintiff pleads securities fraud violations but fails to state a claim for relief." *Woods v. Michael*, No. 20-80651-CV, 2021 U.S. Dist. LEXIS 26563, at *8 (S.D. Fla. Feb. 9, 2021).   Plaintiffs' RICO claim is wholly predicated on violations of the securities laws: "Defendants' conduct violated the wire fraud and mail fraud laws, and the [IAA's] antifraud provisions."   **Complaint ¶ 132**.   Because the RICO claim is improperly founded on alleged securities fraud, it must be dismissed.

29.     Second, the Complaint fails to state a claim for mail or wire fraud.  To state a claim for mail fraud, a plaintiff must allege: "(1) a scheme to defraud, (2) which involves the use of the mails, (3) for the purpose of executing the scheme." *United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996).  The elements of wire fraud are the same but apply to "wire communications in furtherance of the scheme." *Id.*  "[B]oth RICO mail and wire fraud require evidence of intent to defraud, i.e., evidence of a scheme to defraud by false or fraudulent representations." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000); *Robinson*, 191 F. Supp. 3d at 639–40 ("[A] scheme to defraud must involve fraudulent misrepresentations or omissions"). Accordingly, the specificity requirements and heightened pleading standards of Rule 9(b) apply. *See MWK Recruiting*, 2020 U.S. Dist. LEXIS 229755, at *23-24 (claim failed to allege time or location of fraudulent occurrences).  The Complaint fails to satisfy Rule 9(b).

30.     The thrust of Plaintiffs' claim is that the Debtor operated in such a way as to "violate insider trading rules and regulations when it traded with HarbourVest" by concealing "non-public information that it had not supplied" to Plaintiffs. **Complaint ¶ 118**.  Plaintiffs' RICO claim is nothing more than a series of conclusory allegations predicated on allegations of mail, wire, and securities fraud. ***See id.* ¶¶ 113-133**.  The Complaint only vaguely alleges, for instance, that Mr. Seery (i) "utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests," ***id.* ¶ 120**; (ii) "transmitted or caused to be transmitted through the interstate wires information to HCLOF investors from HCM," ***id.* ¶ 121** and (iii) "operated [the Debtor] in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations…" ***id.* ¶ 122**. Plaintiffs do not plead with particularity details about the contents of those alleged communications, when the Debtor had them, to whom, or where such communications were

003869

directed. *See Merrill Lynch, Pierce, Fenner & Smith v. Young*, 91 Civ. 2923 (CSH), 1994 U.S. Dist. LEXIS 2929, at \*22-27 (S.D.N.Y. Mar. 15, 1994); *Tel-Phonic Servs.*, 975 F.2d at 1138. Plaintiffs only generally allege that Mr. Seery testified about the valuation of the HCLOF interests (**Complaint ¶ 125**) but provide no details about mail or wire fraud.

31.     The Complaint therefore "does not identify specific acts of communication by mail or by interstate wires" undertaken by the Debtor "in furtherance of a fraudulent scheme" as required by Rule 9(b). *See Merrill Lynch*, 1994 U.S. Dist. LEXIS 2929, at \*31-32; *Tel-Phonic Servs*, 975 F.2d at 1134 (Rule 9(b) requires pleading particulars of time, place, content and maker of the misrepresentation). Plaintiffs' allegations are insufficient to state a plausible claim for relief under RICO. *See Robinson*, 191 F. Supp. 3d at 640 (dismissing RICO claims where plaintiff provided no factual details); *see also MWK Recruiting*, 2020 U.S. Dist. LEXIS 229755 at \*23-24.

32.     Finally, Plaintiffs also fail to plead a "pattern of racketeering activity." "To prove a pattern of racketeering activity, a plaintiff must show at least two predicate acts of racketeering that are related and amount to or pose a threat of continued criminal activity." *MWK Recruiting*, 2020 U.S. Dist. LEXIS 229755, at \*25 (quoting *Tel-Phonic Servs.*, 975 F.2d at 1139-40 (W.D. Tex. Dec. 8, 2020)). To constitute a "pattern," the activities must show "continuity." *Tel-Phonic Servs.*, 975 F.2d at 1140. "Continuity" refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 1139-40. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* (quoting *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)); *see also Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1464 (5th Cir.1991) ("Short-term criminal conduct is not the concern of RICO.")

33.     Here, the Complaint does not allege "continuity."  There is no specific "threat of repetition" or distinct threat of long-term criminal conduct.  Nor do the allegations suggest the Debtor is "operating as part of a long-term association that exists for criminal purposes." *See Partain v. City of S. Padre Island*, 2018 U.S. Dist. LEXIS 220850, at *43 (S.D. Tex. Dec. 5, 2018) (quoting *H. J. Inc.,* 492 U.S. at 242-43).  Plaintiffs' RICO bald allegations concern only non-specific conduct allegedly occurring in a limited period, September 2020 to January 2021, concerning one transaction—the HarbourVest Settlement. ***See, e.g.,* Complaint ¶¶ 119-128**.  Such allegations concern short-term, discrete transactions, and do not show a "pattern of activity," or threat of "continuing racketeering activity."  *See Calcasieu*, 943 F.2d at 1464.

## 2.     Plaintiffs Fails to Allege a RICO Association-in-Fact Enterprise

34.     A RICO "enterprise" can be either a legal entity or an "association in fact" enterprise.  18 U.S.C. 1961(4).  "A RICO association in fact enterprise must be shown to have continuity."  *Calcasieu*, 943 F.2d at 1461.  "The linchpin of enterprise status is the continuity or ongoing nature of the association." *Bordelon v. Wells Fargo Fin. La., LLC*, 2018 U.S. Dist. LEXIS 124877, at *8 (E.D. La. July 25, 2018) (internal quotation marks omitted).

> The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose. . . An association in fact enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure.

*Calcasieu*, 943 F.2d at 1461 (internal quotations omitted).  That is, an "association in fact enterprise must have an existence separate and apart from the pattern of racketeering." *Id.*

35.     Plaintiffs argue that the Defendants, together, constitute an "association-in fact" enterprise because "the purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the HarbourVest settlement as a vehicle to enrich persons other than the HCLOF investors, including [Plaintiffs]." **Complaint ¶ 115.**  However, these allegations fail to show that

Defendants functioned as a continuing unit, separate and apart from the alleged RICO violation, and fail to allege that Defendants are an "enterprise" within the purview of RICO. *See Montesano*, 818 F.2d at 427 (association-in-fact enterprise not pled under RICO where plaintiffs alleged only that defendants "conspired in this one instance").

36.     Plaintiffs also fail to identify the roles of the two affiliates of the Debtor, HCFA and HCLOF, and how they, with the Debtor, participated in the alleged criminal enterprise.[25]  *See Allstate Ins. Co. v. Donovan*, 2012 U.S. Dist. LEXIS 92401, at *31-32 (S.D. Tex. July 3, 2012) (complaint lacked factual allegations scheme formation, who was in charge, how each defendant participated, and whether there were communications or understanding among the defendants advancing the fraud).

**3.      Plaintiffs Fail to Allege Causation**

37.     Plaintiffs also fail to plausibly allege causation.  RICO provides civil remedies to "[a]ny person injured in [their] business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added). "An injured party must show that the violation was the but-for and proximate cause of the injury." *Robinson*, 191 F. Supp. 3d at 645 (internal quotations omitted).  Causation requires "[a] direct relationship between the fraud and the injury." *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, 802 F. Supp. 2d 725, 730 (E.D. La. 2011).

38.     Here, Plaintiffs fail to allege that the Debtor's actions induced them to act or that any Debtor's actions were the proximate cause of any cognizable injury.  Plaintiffs generally allege that "had Plaintiff been offered those [HCLOF] interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the HarbourVest Settlement." **Complaint ¶ 50**.  Such conclusory and speculative

---

[25] Highland and Mr. Seery are subject to this Court's oversight.  Mr. Seery was specifically appointed by this Court to oversee the Debtor.  The Debtor and Mr. Seery were thus risibly unlikely participants in a RICO enterprise.

"would have" allegations are insufficient to show proximate and but-for causation.[26]   *See Robinson*, <mark>191 F. Supp. 3d at 645</mark> (allegations failed to state causation where plaintiff's "after-the-fact" and "bare assertion that she would have acted differently" had she known of certain facts were insufficient "absent additional factual allegations to support or explain this assertion,"); *In re Oil Spill by Oil Rig Deepwater Horizon*, <mark>802 F. Supp. 2d at 729</mark> (no causation where economic harms suffered by plaintiffs were "too remote" and causation theory "depends on a series of speculative assumptions to link the alleged fraud" with the harm).

39.    Plaintiffs' RICO claim fails every element and should be dismissed.

**D.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty in Count 1**

40.    Plaintiffs fail to state a claim for breach of fiduciary duty.  Plaintiffs' fiduciary duty claim is premised on the Debtor's alleged: (i) insider trading; (ii) concealment of the value of the HarbourVest interests; and (iii) diversion of an investment opportunity from Plaintiffs to the Debtor, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and the IAA. ***See Complaint ¶¶ 67-80***.  Where, as here, a plaintiff's breach of fiduciary duty claim is premised on theories of securities fraud, Rule 9(b)'s heightened pleadings standards apply.  *See Tigue Inv. Co. v. Chase Bank of Tex., N.A.*, <mark>2004 U.S. Dist. LEXIS 27582, at *4</mark> (N.D. Tex. Nov. 15, 2004).  "Section 10(b) of the Securities and Exchange Act of 1934 makes unlawful the use of 'any manipulative or deceptive device or contrivance' in contravention of SEC rules."  *Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, <mark>606 F.2d 602, 608</mark> (5th Ci<mark>r. 1979)</mark>.  "A cause of action lies under Rule 10b-5 'only if the conduct alleged can be fairly viewed as manipulative or deceptive' within the meaning of the statute."  *Id.* (quoting *Santa Fe Industries, Inc. v. Green*, <mark>430 U.S. 462, 473</mark> (1977)).  To state a securities-fraud claim under section 10(b) and Rule 10b–5,

---

[26] At no time prior to filing the Complaint did CLOH indicate it wanted to acquire the Interests or state that it was interested in, willing, or able to purchase the HarbourVest interests.

plaintiffs must plead: "(1) a misstatement or omission; (2) of a material fact; (3) made with

scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries."

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004).  "A fact is

material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would

have assumed actual significance in the deliberations of the reasonable shareholder.'" *Id.* (quoting

*Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir.1985)).  "[S]cienter is a crucial element of

the securities fraud claims." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th

Cir. 1994).

41.    Plaintiffs' allegations underlying their breach of fiduciary duty claim are premised

on largely the same conclusory allegations as those underlying their fraud-based RICO claim. ***See***

**Complaint ¶¶ 67-91**.  Because Plaintiffs fail to properly plead securities fraud, any fiduciary claim

premised on such allegations necessarily fails as well.  *See Town North Bank, N.A. v. Shay Fin.*

*Servs.*, 2014 U.S. Dist. LEXIS 137551, at *74 (N.D. Tex. Sep. 30, 2014).  Plaintiffs fail to plead

with particularity that any alleged omissions by the Debtor assumed any real significance for the

Plaintiffs.  ***See, e.g.***, **Complaint ¶¶ 82-89** (speculating about Plaintiffs' "lost opportunity cost,"

and vaguely asserting that "Defendants' malfeasance" has "exposed HCLOF to a massive liability

from HarbourVest").  These allegations also fail to give rise to a "strong interference of scienter"

sufficient to state a claim under Rule 10(b).  *See In re Enron Corp. Sec., Derivative & ERISA*

*Litig.*, 258 F. Supp. 2d 576, 635 (S.D. Tex. 2003); *Southland*, 365 F.3d at 368 (plaintiff must plead

"more than allegations of motive and opportunity to withstand dismissal" for claim of securities

fraud).  Plaintiffs' allegations regarding proximate cause are equally deficient.  ***See* Complaint**

**¶¶ 88-89** (vaguely alleging that because of Defendants' actions, "Plaintiffs have lost over $25

million").

42.     Plaintiffs also fail to allege any breach of fiduciary claims premised on state law. Texas law[27] provides "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant."  *Matter of ATP Oil & Gas Corp.*, 711 F. App'x 216, 221 (5th Cir. 2017) (internal quotations omitted).   "The plaintiff must plead some facts as to the nature of the relationship to state a plausible claim that that a fiduciary duty has been breached."  *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019).

43.     The Complaint fails to sufficiently allege facts regarding the nature of the relationship between Plaintiffs and the Debtor.  ***See* Complaint ¶¶ 62-63** (generally alleging simply that (i) the Debtor "owed a fiduciary duty to [Plaintiffs]" pursuant to which the Debtor "agreed to provide sound investment advice, and (ii) this fiduciary relationship is "broad and applies to the entire advisors-client relationship").  The Complaint also fails to adequately allege that any state law or Guernsey fiduciary duty existed, let alone was breached for the same reasons. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019) (no allegation of "the nature of the fiduciary duty owed" to plaintiff).   The allegations of the Debtor's breach of its "internal policies and procedures" or the diversion of "corporate opportunities" are vague and conclusory. **Complaint ¶¶ 72-89**.  *See In re Soporex, Inc.*, 463 B.R. 344, 417 (Bankr. N.D. Tex. 2011).

44.     Plaintiffs allege the Debtor breached its "unwaivable" fiduciary obligation under the IAA by, among other things, "diverting a corporate opportunity."  **Complaint ¶¶ 82-84**.  This

---

[27] Plaintiffs allege breach of fiduciary duty under state law; however, HCLOF is a Guernsey entity and the Members Agreement is governed by Guernsey law.  *See* Ex. 13 at 14.  Under the internal affairs doctrine, Guernsey law controls on issues of fiduciary duties to the members.  *See Pridgin v. Safety-Kleen Corp.*, 2021 U.S. Dist. LEXIS 240210, at *6 (N.D. Tex. Dec. 16, 2021).

Count is purportedly premised on the IAA because (i) the Debtor was the DAF's investment adviser under an advisory agreement and (ii) HCFA is HCLOF's investment adviser under a separate advisory agreement.[28]  However, under clear Supreme Court precedent, the IAA does not provide a private right of action to sue for damages arising from breach of fiduciary duty.[29] *Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) (holding there is no private right of action under Section 206 of the IAA); *see also Charitable DAF Fund, L.P.*, 2022 Bankr. LEXIS 2780, at *13, n. 23 ("The court notes that the … Supreme Court has held [in *Transamerica*] that there is not a private right of action for damages under the [IAA]."); *NexPoint Diversified Real Estate Tr.*, 2022 U.S. Dist. LEXIS 142029, at *8 ("Plaintiff has not adequately pleaded a claim … under the IAA … there is no private right of action to bring a claim pursuant to [Section 206 of the IAA].")[30]

45.     Even if there were a right of action under the IAA, Plaintiffs' allegations would still be deficient for failure to plead "duty" or "breach."  The Debtor owed no duty to offer the Interests to Plaintiffs.  The Transfer was effectuated in compliance with the Members Agreement and "Right of First Refusal."  The DAF's advisory agreement included full and clear disclosure that the Debtor could compete with the DAF for investments with no obligation to offer those investments to the DAF.[31]  *SEC v. Cap. Gains Research Bureau, Inc.*, 375 U.S. 180, 181-82 (1963) (finding disclosure of an adviser's "practice of purchasing shares … for his own account" satisfied the

---

[28] Plaintiffs cite to Section 47(b) of the IAA for the proposition that the Transfer is unenforceable.  **Complaint ¶ 89**.  There is no Section 47(b) in the IAA.

[29] A party can seek to void an investment management agreement under Section 215 of the IAA if the agreement's formation or performance would violate the IAA.  *NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 142029, at *9-10 (S.D.N.Y. Aug. 9, 2022).  Plaintiffs have not pled such claim nor could they.

[30] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 U.S. App. LEXIS 25107, at *26 (5th Cir. Sept. 7, 2022).

[31] *See, e.g.*, **Ex. 14 at Appx. 504** ("The Fund will be subject to a number of actual and potential conflicts of interest … including … that … Highland … may actively engage in transactions in the same securities sought by the Fund and, therefore, may compete with the Fund for investment opportunities…").

adviser's fiduciary obligations under the IAA); *Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 172351, at *10-11 (N.D. Tex. Sept. 22, 2022) (addressing argument that fiduciary obligations under the IAA cannot be waived and finding no breach of duty when conflict disclosed).  Defendants also owed no duty to CLOH as an investor in HCLOF; there is no fiduciary relationship between an adviser to a fund and the fund's investors.  *Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006).

46.     There was also no corporate opportunity to divert.  HarbourVest asserted a claim against the Debtor seeking, among other things, effectively the rescission of its investment in HCLOF, an investment allegedly induced by fraud.  The Settlement effectuated that remedy. Because HarbourVest had no claims against Plaintiffs, there was no taking of a corporate opportunity.  The Debtor was resolving a claim against the Debtor, not purchasing a security for cash, and could not transfer its liability to HarbourVest to Plaintiffs.

47.     Accordingly, Count 1, for breach of fiduciary duty, should be dismissed.

**E.     Plaintiffs Fail to State a Claim for Breach of Members Agreement in Count 2**

48.     In addition to Count 2 being barred by judicial estoppel, Plaintiffs fail to plead sufficient facts to state a breach of the Members Agreement's Right of First Refusal.  **Complaint ¶¶ 92-102**.  Further, Plaintiffs' claim of breach is contradicted by the Members Agreement itself. Section 6.1 of the Members Agreement **(Ex. 13, § 6.1, Appx. 468-469)** grants members the unconditional right to transfer its interests to an "Affiliate of an initial Member."  Section 6.2 **(Id., § 6.2, Appx. 469)** sets forth the Right of First Refusal and has two exceptions:  (i) transfers to "affiliates of an initial Member" from Members *other than* CLOH and the "Highland Principals" and (ii) transfers from CLOH or a Highland Principal to (a) the Debtor, (b) the Debtor's "Affiliates," or (c) another Highland Principal.  Under the Members Agreement, "Affiliate" is defined as, "with respect to a person, (i) any other person who, directly or indirectly, is in control

003877

of, or controlled by, or is under common control with, such person …" *Id.* § 1.1, Appx. 463. A "Member" is a "holder of shares in the Company." *Id.*, § 1.1, Appx. 464. The "initial Member[s]" are the initial Members of HCLOF listed on the first page of the Members Agreement and include the Debtor, HarbourVest, and CLOH. *Id.*, § 6.2, Appx. 469. Since HarbourVest transferred its interests directly to the Debtor's wholly-owned subsidiary—an Affiliate of an initial Member—the transfer was permitted, without restriction, under section 6.1 and satisfied the exception to the Right of First Refusal in section 6.2. *See* Ex. 13, Appx. 459-487; Ex. 8 ¶¶ 28-35, Appx. 203-208.

49.     Plaintiffs also fail to plead actual damages resulting from the alleged breach of the Members Agreement, other than contending, that "had plaintiff been allowed to do so, it would have obtained the interests" in HCLOF. *E.g.,* **Complaint ¶ 100**. Such conclusory allegations ignore the fact that CLOH elected not to make an offer to purchase the HCLOF interests[32] and, in any event, are insufficient to state a claim. *See Snowden v. Wells Fargo Bank, N.A.*, 2019 WL 587304, at *6 (N.D. Tex. Jan. 18, 2019), *adopted by* 2019 U.S. Dist. LEXIS 22982 (N.D. Tex. Feb. 12, 2019) (actual damages inadequately pled); Little v. KPMG LLP, 2008 U.S. Dist. LEXIS 26281, at *15 (W.D. Tex. Jan. 22, 2008) (lost profits claim "speculative and conjectural.")

## F.     Plaintiffs Fail to State a Claim for Negligence in Count 3

50.     The Complaint fails to state a claim for negligence. First, this Count is barred by the Plan.[33] Highland has been exculpated from all claims for "conduct occurring on or after [October 16, 2019] in connection with or arising out of (i) the … administration of the Chapter 11 Case … and (v) any negotiations, transactions, and documentation in connection with the foregoing" unless such conduct constituted "bad faith, gross negligence, criminal misconduct, or

---

[32] *See* note 26 *supra*.

[33] "Plan" means the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808].

willful misconduct."[34]   The negotiation and consummation of the Settlement were part of the "administration of the Chapter 11 Case," and Highland, therefore, has been exculpated from Plaintiffs' claim for negligence.  *NexPoint Advisors, L.P.*, 2022 U.S. App. LEXIS 25107, at *33. Second, even absent exculpation, Plaintiffs fail to state a claim.   "The elements of a negligence claim under Texas law are: '(1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach.'"  *Sivertsen v. Citibank, N.A. as Tr. for Registered Holders of WAMU Asset-Back Certificates WAMU Series No. 2007-HE2 Tr.*, 390 F. Supp. 3d 769, 789 (E.D. Tex. 2019).   The negligence allegations (**Complaint ¶¶ 106-107**) are speculative, conclusory, and fail to allege proximate cause; the claim must be dismissed.  *See Rodgers v. City of Lancaster Police*, 2017 U.S. Dist. LEXIS 14588, *37 (N.D. Tex. Jan. 6, 2017). To the extent Plaintiffs' negligence claim is premised on a breach of the Members Agreement, the advisory agreement with DAF, or the IAA, they are duplicative of Plaintiffs' other Counts and fail for the reasons set forth above.

**G.    Plaintiffs Fail to State a Claim for Tortious Interference with Contract in Count 5**

51.    Plaintiffs' tortious interference claim is premised on the Debtor's alleged violation of the Members Agreement and concealment of the value of HCLOF. **Complaint ¶¶ 134-141**. The elements of tortious interference with contract are: "(1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss."  *Specialties of Mexico Inc. v. Masterfoods USA*, 2010 U.S. Dist. LEXIS 58782, at *15 (S.D. Tex. June 14, 2010).  Plaintiffs fail to allege how the Debtor intentionally interfered with the Members Agreement, and Plaintiffs have conceded—and are judicially estopped from arguing otherwise—that the transfer of the HCLOF interests did not violate the

---

[34] Plan, Art. I.B.62; Art. IX.C, *aff'd* 2022 U.S. App. LEXIS 25107, at *33.

003879

Members Agreement.  Plaintiffs also fail to allege proximate causation or any actual damages sustained as a result of the alleged interference.  This claim should be dismissed.

### IV.    <u>CONCLUSION</u>

WHEREFORE, Highland respectfully requests that the Court grant the Motion, enter an order in the form annexed to the Motion as <u>**Exhibit A**</u>, and grant such further relief as the Court deems just and proper.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

DOCS_NY:46481.14 36027/003

003880

Dated:  October 14, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:46481.14 36027/003

003881