**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

## Volume 19

## APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

---

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital
  Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11
   [Doc. 168].

*000042*

2. The judgment, order, or decree appealed from: Memorandum Opinion and Order
   Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to
   Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3. Docket Sheet kept by the Bankruptcy Clerk.

4. Documents listed below and as described in the Docket Sheet for Bankruptcy Case
   Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-B from U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| Vol. 7<br><br>001203<br>thru Vol. 8 | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| Vol. 9<br><br>001711 | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001712 | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001738 | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001760 | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001805 | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 001893 | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9* *001905* *thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17*<br>*003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
|---|---|---|---|---|
| | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

Handwritten annotations (left margin):
Vol. 18
003637
003666
003843
003844
003851
Vol. 19
003882
Thru Vol 20
Vol. 21
004395

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*004745* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*004770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25.* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br><br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
| --- | --- | --- | --- | --- |
| *006133*<br><br>*Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32*<br><br>*006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

## TRANSCRIPTS

| *006961* | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
| --- | --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                          Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/  Mazin A. Sbaiti*
                                               **Mazin A. Sbaiti**
                                               Texas Bar No. 24058096
                                               **Jonathan Bridges**
                                               Texas Bar No. 24028835
                                               2200 Ross Avenue – Suite 4900W
                                               Dallas, TX  75201
                                               T:  (214) 432-2899
                                               F:  (214) 853-4367
                                               E:  mas@sbaitilaw.com
                                                   jeb@sbaitilaw.com

                                               **Counsel for Appellants**


                          <u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                               */s/ Mazin A. Sbaiti*
                                               Mazin A. Sbaiti

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants. | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

003882

**APPENDIX IN SUPPORT OF DEFENDANT HIGHLAND CAPITAL
MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS COMPLAINT**

| Ex. | Description | Appx. # |
|---|---|---|
| 1. | HarbourVest 2017 Global Fund L.P. Proof of Claim No. 143, HarbourVest 2017 Global AIF L.P., Proof of Claim No. 147, HarbourVest Dover Street IX Investment L.P., Proof of Claim No. 150, HV International VIII Secondary L.P., Proof of Claim No. 153, HarbourVest Skew Base AIF L.P., Proof of Claim No. 154, and HarbourVest Partners L.P., Proof of Claim No, 149. | 1-61 |
| 2. | *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] | 62-75 |
| 3. | *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* [Docket No. 1631-1] | 76-95 |
| 4. | *James Dondero's Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest,* [Docket No. 1697] | 96-111 |
| 5. | The Dugaboy Investment Trust and Get Good Trust's *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] | 112-122 |
| 6. | *CLO Holdco, Ltd.'s Objection to HarbourVest Settlement* [Docket No. 1707] | 123-133 |
| 7. | Deposition Transcript of Michael Pugatch, January 21, 2021 | 134-188 |
| 8. | *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1731] | 189-211 |
| 9. | Hearing Transcript, January 14, 2021 | 212-385 |
| 10. | *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1788] | 386-409 |
| 11. | *Original Complaint*, Case No. 21-cv-00842-B, Docket No. 1 (N.D. Tex. Apr. 12, 2021) | 410-436 |
| 12. | *Memorandum Opinion and Order*, Case No. 21-cv-03129-B, Docket No. 28 (N.D. Tex. September 2, 2021) | 437-458 |
| 13. | Members Agreement, November 15, 2017 | 459-487 |
| 14. | Second Amended and Restated Investment Advisory Agreement | 488-510 |

003883

Dated:  October 14, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

003884

# EXHIBIT 1

# CLAIM 143

Claim #143  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor __Highland Capital Management, L.P.__

United States Bankruptcy Court for the: __Northern__ District of __Texas__
(State)

Case number __19-34054__

Official Form 410

# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to ==11 U.S.C. § 503==.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. ==18 U.S.C. §§ 152==, ==157==, and ==3571==.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HarbourVest 2017 Global Fund L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

==Federal Rule of Bankruptcy Procedure== (FRBP) 2002(g)

Where should notices to the creditor be sent?

HarbourVest 2017 Global Fund L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone _2129096000_
Contact email _eweisgerber@debevoise.com_

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone _6173483773_
Contact email _agoren@harbourvest.com_

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

003887

| **Part 2:** | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                    $_____

**Amount of the claim that is secured:**      $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes**.** Identify the property: _____

Official Form 410                              **Proof of Claim**                              page 2

003888

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
| | | ☐ **Yes.** Check all that apply: | | **Amount entitled to priority** |
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ _____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ _____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $ _____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | | $ _____ | |

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___04/08/2020___
               MM / DD / YYYY

___/s/Michael Pugatch___
    Signature

**Print the name of the person who is completing and signing this claim:**

Name    ___Michael Pugatch___
         First name    Middle name    Last name

Title    ___Managing Director - Company: HarbourVest 2017 Global Fund L.P., by Harbo___

Company    ___by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL___
        Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____ |

¨¨1¤}HV4

1034542004080000000000055

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global Fund L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global Fund L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| | | |
|---|---|---|
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |

| | |
|---|---|
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |

| | |
|---|---|
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | |
| No | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:40:16 p.m. Eastern Time |
| **Title:** |
| Managing Director - Company: HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its Gen Partner |
| **Company:** |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member |

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global Fund L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

003891

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

003892

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.     Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

003894

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

003895

# CLAIM 147

003896

Claim #147   Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___ District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim
04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest 2017 Global AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HarbourVest 2017 Global AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone   2129096000
Contact email   eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone   6173483773
Contact email   agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

Official Form 410                **Proof of Claim**                page 1

003897

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**   $ __See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

__See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes**.** Identify the property: _____

Official Form 410            **Proof of Claim**            page 2

003898

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check all that apply:*

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2020
                   MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

Name    Michael Pugatch
        First name        Middle name        Last name

Title   Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourV

Company   Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone   _____

¨¨1¤}HV4$(     [%«
1034520200400900000000050

---

Official Form 410                          **Proof of Claim**                          page 3

003899

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | |
| New York, NY, 10022 | **Has Related Claim:** |
| U.S.A. | No |
| **Phone:** | **Related Claim Filed By:** |
| 2129096000 | |
| **Phone 2:** | |
| | **Filing Party:** |
| **Fax:** | Authorized agent |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:**     **Uniform Claim Identifier:** |
| See Annex | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** |
| No | **Amount Unsecured:** |
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:49:59 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative | |
| **Company:** | |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | |

003900

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

003901

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.   *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

003902

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

003903

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

4

003904

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*** 

003905

# CLAIM 150

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___ District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

___HarbourVest Dover Street IX Investment L.P.___
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| See summary page | See summary page |

Contact phone ___2129096000___        Contact phone ___6173483773___
Contact email ___eweisgerber@debevoise.com___   Contact email ___agoren@harbourvest.com___

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                     **Proof of Claim**                     page 1

003907

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|-------------------------------------------------------------------|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ _See Annex_____.   **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____
**Amount of the claim that is secured:**   $_____
**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes**.** Identify the property: _____

003908

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
| | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ | Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ | Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | $_____ | |

---

## Part 3:   Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date    04/08/2020
                    MM / DD / YYYY

/s/Michael Pugatch
Signature

**Print the name of the person who is completing and signing this claim:**

Name        Michael Pugatch
            First name            Middle name            Last name

Title       Managing Director-Company: HarbourVest Dover Street IX Investment L.P.,

Company     Inv Fund Mgr. by HarbourVest Partners L.P., its Duly Appointed Investme
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____

`¨1¤}HV4$(   \3«`
`1034500200409000000000060`

---

Official Form 410                    Proof of Claim                    page 3

003909

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | | | |
|---|---|---|---|
| **Debtor:** | | | |
| 19-34054 - Highland Capital Management, L.P. | | | |
| **District:** | | | |
| Northern District of Texas, Dallas Division | | | |
| **Creditor:** | | **Has Supporting Documentation:** | |
| HarbourVest Dover Street IX Investment L.P. | | Yes, supporting documentation successfully uploaded | |
| Attn: Erica Weisgerber | | **Related Document Statement:** | |
| Debevoise and Plimpton LLP | | | |
| 919 Third Avenue | | **Has Related Claim:** | |
| New York, NY, 10022 | | No | |
| U.S.A. | | **Related Claim Filed By:** | |
| **Phone:** | | | |
| 2129096000 | | **Filing Party:** | |
| **Phone 2:** | | Authorized agent | |
| **Fax:** | | | |
| **Email:** | | | |
| eweisgerber@debevoise.com | | | |
| **Disbursement/Notice Parties:** | | | |
| HarbourVest Dover Street IX Investment L.P. c/o HarbourVest Partners, LLC | | | |
| One Financial Center | | | |
| Boston, MA, 02111 | | | |
| U.S.A. | | | |
| **Phone:** | | | |
| 6173483773 | | | |
| **Phone 2:** | | | |
| **Fax:** | | | |
| **E-mail:** | | | |
| agoren@harbourvest.com | | | |
| **DISBURSEMENT ADDRESS** | | | |
| **Other Names Used with Debtor:** | | **Amends Claim:** | |
| | | No | |
| | | **Acquired Claim:** | |
| | | No | |
| **Basis of Claim:** | | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | | No | |
| **Total Amount of Claim:** | | **Includes Interest or Charges:** | |
| See Annex | | None | |
| **Has Priority Claim:** | | **Priority Under:** | |
| No | | | |
| **Has Secured Claim:** | | **Nature of Secured Amount:** | |
| No | | **Value of Property:** | |
| **Amount of 503(b)(9):** | | **Annual Interest Rate:** | |
| No | | | |
| **Based on Lease:** | | **Arrearage Amount:** | |
| No | | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | | **Amount Unsecured:** | |
| No | | | |
| **Submitted By:** | | | |
| Michael Pugatch on 08-Apr-2020 4:59:00 p.m. Eastern Time | | | |
| **Title:** | | | |
| Managing Director-Company: HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners Ireland Limited, its Alter | | | |
| **Company:** | | | |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | | | |

VN: 2FF3E3B762AB4570A51AF333808C6C3D

003910

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. |  |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Dover Street IX Investment L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

003911

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.    Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.    Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.    The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

003913

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

4

003914

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

<div align="center">***</div>

003915

# CLAIM 153

Claim #153  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor ____Highland Capital Management, L.P.____

United States Bankruptcy Court for the: __Northern__  District of __Texas__
                                                                        (State)

Case number ___19-34054___

Official Form 410

# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

__HV International VIII Secondary L.P.__
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| HV International VIII Secondary L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A. | See summary page |

Contact phone __2129096000__                          Contact phone __6173483773__
Contact email __eweisgerber@debevoise.com__    Contact email __agoren@harbourvest.com__

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
                                                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                                   **Proof of Claim**                                          page 1

003917

**Part 2:**  Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $ _See Annex_ . **Does this amount include interest or other charges?** |
| | | ☐ No |
| | | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

003918

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | | |
|---|---|---|---|
| | ☐ **Yes.** *Check all that apply:* | | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $ _____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | $ _____ | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

_/s/Michael Pugatch_
Signature

**Print the name of the person who is completing and signing this claim:**

Name    Michael Pugatch
        First name          Middle name          Last name

Title    Managing Director-Company: HV International VIII Secondary L.P.,  by HII

Company    by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____

¨1¤}HV4$( av«

1024664200408000000000065

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** 19-34054 - Highland Capital Management, L.P. | |
| **District:** Northern District of Texas, Dallas Division | |
| **Creditor:** HV International VIII Secondary L.P. Attn: Erica Weisgerber Debevoise and Plimpton LLP 919 Third Avenue New York, NY, 10022 U.S.A. **Phone:** 2129096000 **Phone 2:** **Fax:** **Email:** eweisgerber@debevoise.com | **Has Supporting Documentation:** Yes, supporting documentation successfully uploaded **Related Document Statement:** |
| | **Has Related Claim:** No **Related Claim Filed By:** |
| | **Filing Party:** Authorized agent |

| **Disbursement/Notice Parties:** |
|---|
| HV International VIII Secondary L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 U.S.A. **Phone:** 6173483773 **Phone 2:** **Fax:** **E-mail:** agoren@harbourvest.com **DISBURSEMENT ADDRESS** |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** No **Acquired Claim:** No |
| **Basis of Claim:** See Annex | **Last 4 Digits:** No | **Uniform Claim Identifier:** |
| **Total Amount of Claim:** See Annex | **Includes Interest or Charges:** None |
| **Has Priority Claim:** No | **Priority Under:** |
| **Has Secured Claim:** No | **Nature of Secured Amount:** |
| **Amount of 503(b)(9):** No | **Value of Property:** **Annual Interest Rate:** |
| **Based on Lease:** No | **Arrearage Amount:** **Basis for Perfection:** |
| **Subject to Right of Setoff:** No | **Amount Unsecured:** |

| **Submitted By:** Michael Pugatch on 08-Apr-2020 5:16:54 p.m. Eastern Time |
|---|
| **Title:** Managing Director-Company: HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, |
| **Company:** by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member |

VN: 671DA480298CC9959BF07710FFD6AEBF

003920

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HV International VIII Secondary L.P.  (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.   *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.     Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.     Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.     The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

003922

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6. This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7. Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

003923

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.    Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.    This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

003924

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

<p style="text-align:center">***</p>

003925

# CLAIM 154

003926

Claim #154  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor _____ Highland Capital Management, L.P. _____

United States Bankruptcy Court for the: Northern _____ District of Texas _____
                                                                              (State)

Case number    19-34054 _____

Official Form 410
# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HarbourVest Skew Base AIF L.P.

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HarbourVest Skew Base AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone    2129096000
Contact email    eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone    6173483773
Contact email    agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.   Claim number on court claims registry (if known) _____    Filed on _____
                                                                                      MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

Official Form 410                                    **Proof of Claim**                                    page 1

003927

**Part 2:  Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?** $ See Annex . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Annex

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

003928

| | | Amount entitled to priority |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | $_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** 18 U.S.C. §§ 152, 157, and 3571. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date ___04/08/2020___
MM / DD / YYYY

___/s/Michael Pugatch___
Signature

**Print the name of the person who is completing and signing this claim:**

Name     ___Michael Pugatch___
          First name        Middle name            Last name

Title     ___Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVes___

Company   ___Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investme___
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

                                                    ¨¨1¤}HV4$(     `k«
Contact phone  _____              1034562200408000000000064

---

Official Form 410                           **Proof of Claim**                           page 3

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Skew Base AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Skew Base AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** |
| No | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 5:11:50 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative Inv |
| **Company:** |
| Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Skew Base AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings

003931

in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.       Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.       Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.       The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6. This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7. Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

003933

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.      This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.      The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

003934

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

003935

# CLAIM 149

Claim #149  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: _Northern____ District of _Texas__
(State)

Case number _19-34054_____

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to ==11 U.S.C. § 503.==

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. ==18 U.S.C. §§ 152,== ==157,== and ==3571.==

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | _HarbourVest Partners L.P. on behalf of funds and accounts under management_<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. | **Where should notices and payments to the creditor be sent?**<br><br>==Federal Rule of Bankruptcy Procedure== (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>See summary page<br><br><br>Contact phone  _2129096000_<br>Contact email  _eweisgerber@debevoise.com_<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | **Where should payments to the creditor be sent?** (if different)<br><br>See summary page<br><br><br>Contact phone  _6173483773_<br>Contact email  _agoren@harbourvest.com_ |
| 4. | **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____  Filed on _____<br>                                                            MM  /  DD  /  YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

Official Form 410                     **Proof of Claim**                                      page 1

**003937**

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No |
| | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7. **How much is the claim?**  $ _See Annex_____ . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes**. Identify the property:** _____

Official Form 410                         **Proof of Claim**                         page 2

003938

| | | | Amount entitled to priority |
|---|---|---|---|
| **12.** | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13.** | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ | |

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date ____04/08/2020____<br>        MM / DD / YYYY<br><br><br>_/s/Michael Pugatch_____<br>Signature<br><br>Print the name of the person who is completing and signing this claim:<br><br>Name    __Michael Pugatch_____<br>        First name       Middle name      Last name<br><br>Title     __Managing Director_____<br><br>Company __HarbourVest Partners L.P., on behalf of funds and accounts under manage<br>        Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address<br><br>Contact phone _____ |

¨1¤}HV4$(     1A«
1034620200408000000000061

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HarbourVest Partners L.P. on behalf of funds and accounts under management | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Partners L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| **Other Names Used with Debtor:** | **Amends Claim:** | |
|---|---|---|
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** | |
| No | **Amount Unsecured:** | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:06:59 p.m. Eastern Time | |
| **Title:** | |
| Managing Director | |
| **Company:** | |
| HarbourVest Partners L.P., on behalf of funds and accounts under management,  by HarbourVest Partners, LLC, its Gen Partner | |

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Partners L.P. on behalf of funds and accounts under management (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant manages investment funds that are limited partners in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.   The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.   *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third*

*Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3. Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4. Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

003942

5.     The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7. Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor, as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

4

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

<div align="center">***</div>

003945

# EXHIBIT 2

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-12    Filed 09/01/23    Page 79 of 263    PageID 4336
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 1 of 13

Docket #1625 Date Filed: 12/23/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054201223000000000013

003947

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/01/23    Page 80 of 263    PageID 4337
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the <mark>Federal Rules of Bankruptcy Procedure (the</mark> "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

DOCS_NY:41802.6 36027/002

003948

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-12    Filed 09/01/23    Page 81 of 263    PageID 4338
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 3 of 13

## RELEVANT BACKGROUND

### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

003949

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-2    Filed 05/01/24    Page 82 of 263    PageID 4339
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 4 of 13

**B.**     **Overview of HarbourVest's Claims**

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

003950

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-12    Filed 09/01/23    Page 83 of 263    PageID 4340
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 5 of 13

C.    **Summary of HarbourVest's Factual Allegations**

14.    At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

DOCS_NY:41802.6 36027/002

003951

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-12    Filed 07/11/24    Page 84 of 263    PageID 4341
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 6 of 13

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

DOCS_NY:41802.6 36027/002

003952

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-2    Filed 09/11/23    Page 85 of 263    PageID 4342
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 7 of 13

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

003953

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/01/23    Page 86 of 263    PageID 4343
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 8 of 13

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.    Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.    On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.    On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.    Settlement Discussions**

28.    In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.    In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

003954

Case 21-03067-sgj   Doc 124-2   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-12   Filed 09/01/23   Page 87 of 263   PageID 4344
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20   Entered 12/23/20 22:25:24   Page 9 of 13

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.    During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.    After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.    Summary of Settlement Terms

32.    The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

DOCS_NY:41802.6 36027/002

003955

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/11/23    Page 88 of 263    PageID 4345
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 10 of 13

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age*

*Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,*

*Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power*

*Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson*

*Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

DOCS_NY:41802.6 36027/002

003956

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/20/23    Page 89 of 263    PageID 4346
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 11 of 13

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of

the compromise." *Id.*  Under the rubric of the third factor referenced above, the Fifth Circuit has

specified two additional factors that bear on the decision to approve a proposed settlement.  First,

the court should consider "the paramount interest of creditors with proper deference to their

reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster

Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).  Second, the court should consider the

"extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or

collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations

omitted).

      36.     There is ample basis to approve the proposed Settlement Agreement based

on the Rule 9019 factors set forth by the Fifth Circuit.

      37.     First, although the Debtor believes that it has valid defenses to the

HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with

HarbourVest.  Indeed, to establish its defenses, the Debtor would be required to rely, at least in

part, on the credibility of witnesses whose veracity has already been called into question by this

Court.  Moreover, it will be difficult to dispute that the Transfers precipitated the Acis

Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted

HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

      38.     The second factor—the complexity, duration, and costs of litigation—also

weighs heavily in favor of approving the Settlement Agreement.  As this Court is aware, the

events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis

Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already

cost the Debtor's estate millions of dollars in legal fees.  If the Settlement Agreement is not

approved, then the parties will expend significant resources litigating a host of fact-intensive

003957

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/01/23    Page 90 of 263    PageID 4347
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 12 of 13

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.    Third, approval of the Settlement Agreement is justified by the paramount interest of creditors.  Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.    Finally, the Settlement Agreement was unquestionably negotiated at arm's-length.  The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario."  Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.    No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

DOCS_NY:41802.6 36027/002

Case 21-03067-sgj    Doc 124-2    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B   Document 18-12   Filed 09/01/23   Page 91 of 263   PageID 4348
Case 19-34054-sgj11 Doc 1625 Filed 12/23/20    Entered 12/23/20 22:25:24    Page 13 of 13

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      jmorris@pszjlaw.com
      gdemo@pszjlaw.com
      hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:41802.6 36027/002

003959

# EXHIBIT 3

003960

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-13    Filed 02/11/23    Page 93 of 263    PageID 4350
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 2 of 20

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

    This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

    **WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

    **WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

    **WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

    **WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

    **WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

    **WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

    **WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

    **WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

003961

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-3    Filed 02/01/23    Page 94 of 263    PageID 4351
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 3 of 20

**EXECUTION VERSION**

WHEREAS, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

WHEREAS, the Debtor disputes the HarbourVest Claims;

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

WHEREAS, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

WHEREAS, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

NOW THEREFORE, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.  **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.  **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

US-DOCS\115534291.12

003962

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/11/23    Page 95 of 263    PageID 4352
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 4 of 20

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)    Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)    Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.    **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

003963

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-3    Filed 05/01/23    Page 96 of 263    PageID 4353
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 5 of 20

**EXECUTION VERSION**

4.    <u>**Representations and Warranties**</u>.  Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.    <u>**Plan Support**</u>.

(a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

US-DOCS\115534291.12

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-13    Filed 09/11/23    Page 97 of 263    PageID 4354
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 6 of 20

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

US-DOCS\115534291.12

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-13    Filed 07/11/23    Page 98 of 263    PageID 4355
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 7 of 20

**EXECUTION VERSION**

<u>with a copy (which shall not constitute notice) to</u>:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

003966

Case 21-03067-sgj   Doc 124-3   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-13   Filed 09/01/23   Page 99 of 263   PageID 4356
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20   Entered 12/24/20 12:19:49   Page 8 of 20

**EXECUTION VERSION**

14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

003967

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-103    Filed 09/01/23    Page 100 of 263    PageID 4357
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 9 of 20

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:    CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

US-DOCS\115534291.12

003968

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/01/23    Page 101 of 263    PageID 4358
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 10 of
20

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:   /s/ Michael Pugatch

Name: Michael Pugatch

Its:    Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:   /s/ Michael Pugatch

Name: Michael Pugatch

Its:    Managing Director

US-DOCS\115534291.12

003969

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-3    Filed 09/11/23    Page 102 of 263    PageID 4359
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 11 of
20

# Exhibit A

003970

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-18    Filed 09/21/230    Page 103 of 263    PageID 4360
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 12 of
20

**TRANSFER AGREEMENT**

**FOR ORDINARY SHARES OF**

**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of December [    ], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-3    Filed 09/31/220    Page 104 of 263    PageID 4361
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 13 of
20

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

003972

Case 21-03067-sgj   Doc 124-3   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/41/23   Page 105 of 263   PageID 4362
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20   Entered 12/24/20 12:19:49   Page 14 of 20

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

  Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 183646253v.3

003973

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/11/23    Page 106 of 263    PageID 4363
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 15 of
20

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 183646253v.3

003974

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-19    Filed 09/01/23    Page 107 of 263    PageID 4364
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 16 of
20

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member

By:  _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By:  _____

Name:  James P. Seery, Jr.

Title:  President

**FUND:**
**Highland CLO Funding, Ltd.**

By:  _____

Name:

Title:

ActiveUS 183646253v.3

003975

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/17/23    Page 108 of 263    PageID 4365
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 17 of
20

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

003976

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-19    Filed 09/18/23    Page 109 of 263    PageID 4366
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 18 of
20

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

003977

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/19/23    Page 110 of 263    PageID 4367
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 19 of 20

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

003978

Case 21-03067-sgj    Doc 124-3    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/01/23    Page 111 of 263    PageID 4368
Case 19-34054-sgj11 Doc 1631-1 Filed 12/24/20    Entered 12/24/20 12:19:49    Page 20 of
20

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | | |
| HarbourVest 2017 Global AIF L.P. | | |
| HarbourVest 2017 Global Fund L.P. | | |
| HV International VIII Secondary L.P. | | |
| HarbourVest Skew Base AIF L.P. | | |

ActiveUS 183646253v.3

003979

**EXHIBIT 4**

003980

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-194 Filed 09/2017236    Page 113 of 263    PageID 4370
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 1 of 15

Docket #1697  Date Filed: 01/06/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

### JAMES DONDERO'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY
### OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
### [Relates to Docket No. 1625]

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this Objection to *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154)* [Docket No. 1625] (the "Motion") filed by Highland Capital Management, L.P. (the "Debtor"). Through the Motion, the Debtor seeks approval of its compromise with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the Federal

---

1934054210106000000000029

**003981**

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-19  Filed 09/01/23    Page 114 of 263    PageID 4371
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 2 of 15

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this objection, Respondent

respectfully represents as follows:

## I.    INTRODUCTION

1.    Under Bankruptcy Rule 9019, the Bankruptcy Court is tasked with making an

independent judgment on the merits of a proposed settlement to ensure that the proposed settlement

is "fair, equitable, and in the best interest of the estate."[1] While Respondent recognizes the

Debtor's efforts in arranging a settlement, there are at least three significant issues with the terms

of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or

in the best interest of the estate given the weakness of the HarbourVest Claim (as hereinafter

defined); (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's

plan by giving HarbourVest a significant claim to which it would not otherwise be entitled; and

(iii) the proposed settlement seeks to improperly classify the HarbourVest Claim[2] in two separate

classes in order to gerrymander an affirmative vote on its reorganization plan. Moreover, the

proposed settlement does not satisfy the factors for approval fixed by case law. On information

and belief, Debtor's CEO/CRO, Mr. Seery, has previously asserted on multiple occasions that the

HarbourVest Claim had no value and that the Debtor could resolve such claim for no more than

$5 million. While Respondent and Mr. Seery have had a number of disagreements in this case,

Respondent agrees with Mr. Seery's initial conclusion that the HarbourVest Claim is substantially

without merit. Respondent understands that any settlement will not necessarily provide the best

possible outcome for the Debtor, but in this instance the proposed settlement far exceeds the

bounds of reasonableness and, on its face, is an attempt by the Debtor to purchase votes in favor

---

[1] *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

[2] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the
claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document Exhibit Filed 09/10/23    Page 115 of 263    PageID 4372
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 3 of 15

of confirmation of its Plan. Given the Debtor's prior positions as to the merits of HarbourVest Claim it is necessary for the Court to closely scrutinize the settlement to determine why the Debtor now believes granting HarbourVest a net claim of nearly $60 million[3] resulting from HarbourVest's investment in a non-debtor entity (which was and is managed by a non-debtor) to be in the best interest of the estate. Upon close scrutiny, Respondent believes the Court will find that the proposed settlement is not reasonable or in the best interest of the estate and the Motion therefore should be denied.

## II.    BACKGROUND

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].

5.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

---

[3] The proposed settlement provides that HarbourVest shall receive an allowed general unsecured (Class 8) claim in the amount of $45 million and an allowed subordinated general unsecured (Class 9) claim in the amount of $35 million. As part of the settlement, HarbourVest will then transfer its entire interest in Highland CLO Funding, Ltd. ("HCLOF") to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately $22 million as of December 1, 2020.

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document Exhibit 4    Filed 09/10/13    Page 116 of 263    PageID 4373
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 4 of 15

6.      In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, for the Debtor's general partner, Strand Advisors, Inc. (the "Board"). The members of the Board are James P. Seery, Jr., John S. Dubel, and Russell F. Nelms.

7.      On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. *See* Docket No. 854.

8.      On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[4].

9.      On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

10.     On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response").

11.     On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. Docket No. 1625.

### III.    LEGAL STANDARD

12.     The merits of a proposed compromise should be judged under the criteria set forth in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). *TMT Trailer* requires that a compromise must be "fair and equitable." *TMT Trailer*, 390

---

[4] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-104    Filed 06/10/16    Page 117 of 263    PageID 4374
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 5 of 15

U.S. at 424; *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984). The terms "fair and equitable,"

commonly referred to as the "absolute priority rule," mean that (i) senior interests are entitled to

full priority over junior interests; and (ii) the compromise is reasonable in relation to the likely

rewards of litigation. *In re Cajun Electric Power Coop.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re*

*Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

13.    In determining whether a proposed compromise is fair and equitable, a Court should

consider the following factors:

(i)    the probabilities of ultimate success should the claim be litigated;

(ii)    the complexity, expense, and likely duration of litigating the claim;

(iii)    the difficulties of collecting a judgment rendered from such litigation; and,

(iv)    all other factors relevant to a full and fair assessment of the wisdom of the

compromise.

*TMT Trailer*, 390 U.S. at 424.

14.    In considering whether to approve a proposed compromise, the bankruptcy judge

"may not simply accept the trustee's word that the settlement is reasonable, nor may he merely

'rubber stamp' the trustee's proposal." *In re Am. Res. Corp.*, 841 F.2d 159, 162 (7th Cir. 1987).

"[T]he bankruptcy judge must apprise himself of all facts necessary to evaluate the settlement and

make an informed and independent judgment about the settlement." *See TMT Trailer*, 390 U.S. at

424, 434.

15.    While the trustee's business judgment is entitled to a certain deference, "business

judgment is not alone determinative of the issue of court approval." *See In re Endoscopy Ctr. of S.*

*Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011). Further, the business judgment rule does not

provide a debtor with "unfettered freedom" to do as it wishes. *See In re Pilgrim's Pride Corp.*, 403

B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("[A]s a fiduciary holding its estate in trust and responsible

Case 21-03067-sgj   Doc 124-4   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-19   Filed 09/10/16   Page 118 of 263   PageID 4375
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21   Entered 01/06/21 20:42:24   Page 6 of 15

to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight."). The Court must conduct an "intelligent, objective and educated evaluation"[5] of the proposed settlement "to ensure that the settlement is fair, equitable, and in the best interest of the estate and creditors." *See In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006) (quoting *Conn. Gen. Life Ins. Co. v. Foster Mortgage Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)).

## IV.   ARGUMENT AND AUTHORITIES

16.   As discussed in detail below, there are three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim; (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a substantial claim to which it is not entitled; and (iii) the proposed settlement seeks to improperly classify HarbourVest's one claim in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. For these and certain additional reasons as discussed below, the Motion should be denied.

### A.  Through its Claim, HarbourVest Seeks to Revisit this Court's Orders in the Acis Case

17.   As an initial matter, through its proofs of claim, HarbourVest appears to be second guessing the Court's judgment in the Chapter 11 case of Acis Capital Management, LP and Acis Capital Management GP, LLC (collectively, "Acis") and seeking to revisit the Court's orders entered in that case years ago. HarbourVest appears to being arguing that the TRO and injunction

---

[5] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) ("To assure a proper compromise the bankruptcy judge, must be apprised of all the necessary facts for an intelligent, objective and educated evaluation. He must compare the terms of the compromise with the likely rewards of litigation.").

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-19    Filed 08/10/23    Page 119 of 263    PageID 4376
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 7 of 15

entered in the Acis case that prevented redemptions or resets in the CLOs are now the root cause of the decrease in value of its investment in HCLOF.

18.    Specifically, the claim states that HarbourVest incurred "financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF."[6]

19.    Essentially, HarbourVest is saying that the orders entered in the Acis case did not actually protect the investors and their investments, but instead were a triggering cause for the alleged diminution in value of its investment in HCLOF. Nevertheless, even though the value of HCLOF dropped dramatically only after the Effective Date of Acis's Plan, years later and despite the lack of Debtor involvement in managing HarbourVest's investment, HarbourVest now seeks to impute liability to the Debtor through a flimsy narrative designed to recoup investment losses unrelated to the Debtor and for which the Debtor owed HarbourVest no duty.

20.    That HarbourVest now, years later, seeks to revisit this Court's Acis orders raises a number of issues, including those as to HarbourVest's involvement (or lack thereof) in the Acis case, whether the orders, Plan, or Confirmation Order in the Acis case may bar some of the relief requested by HarbourVest here, and questions related to the merits of the HarbourVest Claim and the legal grounds allegedly supporting it.

---

[6] See Proof of Claim 143, para. 3 ("Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF.").

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-1    Filed 09/01/23    Page 120 of 263    PageID 4377
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 8 of 15

**B. The HarbourVest Claim Lacks Merit and the Proposed Settlement is Not Reasonable**

21.    Based on the HarbourVest Claim and its filed response to the Debtor's objection, Respondent believes that the HarbourVest claim is meritless and the proposed settlement is not reasonable, fair and equitable, or in the best interest of the estate.

22.    First, the proposed settlement is concerning particularly because HarbourVest's bare bones proof of claim contains very little in terms of allegations of specific conduct against the Debtor that would give rise to a $60 million claim against this estate. While HarbourVest's response to the Debtor's claim objection is lengthy, it contains very little in real substance supporting its right to such a claim against the estate. The response also omits a number of key facts that are relevant and potentially fatal to its claim for damages against the Debtor's estate. Among them is the fact that Acis (and thereafter Reorganized Acis), along with Mr. Joshua Terry, managed HarbourVest's investment for years after it was made.[7] Despite this fact, HarbourVest's alleged damages appear to be based largely on the difference between the value of its initial investment at confirmation of Acis's Plan and the current value of the investment—which amount was directly determined by the performance of the CLOs that Acis managed during this time.[8] Neither the claim nor the response directly address the implications of Acis's management of the CLOs during the period following HarbourVest's investment. Nor does HarbourVest address or discuss performance of the CLOs, the market forces that may have caused HarbourVest's investment to lose value, or other factors influencing the current value of its investment. The

---

[7] *See, e.g.*, HarbourVest Proof of Claim 143, p. 5 ("The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.").

[8] *See* HarbourVest Response, Docket No. 1057, para. 40 ("HarbourVest has been injured from the Investment: not only has the Investment failed to accrue value, its value plummeted. The Investment's current value is far less than HarbourVest's initial contribution.").

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-14    Filed 09/01/23    Page 121 of 263    PageID 4378
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 9 of 15

speculative nature of the damages and the lack of specificity of the HarbourVest Claim and the

role of Acis in the loss of value to HarbourVest all call into question the reliability of the allegations

and the legal basis for the claim amount awarded in the settlement.

23.    Also absent from Harbourvest's papers is any discussion of any contract or

agreement between (i) HarbourVest and the Debtor; and (ii) any agreement that was executed in

conjunction with HarbourVest's initial investment. While the proof of claim references a number

of agreements, there is no explanation in the claim or in HarbourVest's response to the Debtor's

claim objection of how these agreements give rise to liability against the *Debtor*. For example,

neither the claim nor the HarbourVest Response (which includes more than 600 pages of

attachments) attach *any* written agreement between HarbourVest and **any other party**. While

HarbourVest has alleged a number of claims sounding in tort, many of those claims cannot exist

absent a contract or other express relationship between the parties. Moreover, the terms of the

relevant contracts themselves likely contain a number of provisions that may call into question

Debtor's liability or would be otherwise relevant to merits of the HarbourVest Claim. For example,

HarbourVest in its papers appears to assert or imply that the Debtor made a number of false or

fraudulent representations to solicit HarbourVest's investment, but then fails to discuss or even

identify the applicable agreements it alleges it was induced into signing in connection with its

investment (this despite the substantial value of the investment when the Acis plan was confirmed).

24.    Given these issues, among many others, the HarbourVest Claim is unsustainable

both from a liability and damages standpoint and there are many very high hurdles HarbourVest

would have to clear in seeking to prove liability against the Debtor and in proving its damages.

For a long period of time, its investment was managed by Acis and the investment's performance

was directly tied to Acis's inadequate performance as portfolio manager. Further, the value of

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/11/23    Page 122 of 263    PageID 4379
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 10 of 15

HarbourVest's investment is also directly tied to various market forces that may have impacted its value. The HarbourVest Claim is largely lacking in relevant facts and omits much salient information, such as who it contracted with in connection with its investment, the terms of such agreements, who controlled its investment during the entire period from November 2017 to the present, and the performance of its investment during the last two years. Given these issues, HarbourVest will be unable to demonstrate a causal connection between any conduct of the Debtor and the alleged damages it suffered from a reduction in value of its investment.

25.    Because of the speculative nature of the HarbourVest Claim, and the fact that very little pleading or litigation has occurred, the proposed settlement in granting such a large claim is unreasonable, not fair and equitable, and not in the best interest of the estate. The lack of pending litigation, narrowing of threshold questions, and lack of detail in HarbourVest Claim make it impossible to determine whether the huge claim awarded under the proposed settlement is justified under the facts. Accordingly, the Motion should be denied.

**C. The Proposed Settlement is an Improper Attempt by the Debtor to Purchase Votes in Support of its Plan and the Separate Classification of the HarbourVest Claim Constitutes Gerrymandering in Violation of 11 U.S.C. § 1122**

26.    The proposed settlement is a flagrant attempt by the Debtor to purchase votes in support of its Plan by giving HarbourVest a significant claim to which it has not shown itself entitled. Moreover, the separate classification of the HarbourVest Claim into two separate classes constitutes impermissible gerrymandering in violation of section 1122 of the Bankruptcy Code. The proposed settlement essentially gives HarbourVest a claim it is not entitled to in exchange for votes in two separate classes. This is not a proper basis for a settlement and the Court should deny the Motion.

27.    Section 1122 of the Bankruptcy Code provides as follows:

Case 21-03067-sgj   Doc 124-4   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 14   Filed 09/21/23   Page 123 of 263   PageID 4380
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21   Entered 01/06/21 20:42:24   Page 11 of 15

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

28.     "Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991).

29.     "Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections suggests that ordinarily substantially similar claims, those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id.* at 1278.

30.     The Fifth Circuit has stated that there is "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1279. The Court observed:

> There must be some limit on a debtor's power to classify creditors in such a manner. . . . Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986)).

Case 21-03067-sgj   Doc 124-4   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-19   Filed 09/31/28   Page 124 of 263   PageID 4381
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21   Entered 01/06/21 20:42:24   Page 12 of 15

31.     Here, the HarbourVest settlement and the classification of the HarbourVest Claim under the Plan blatantly violate the Fifth Circuit's "one rule" concerning the classification of claims under section 1122. To the extent that HarbourVest even has a legitimate claim, not only should its claim be classified together with other unsecured creditors, its claim should be classified solely in one class. To allow the Debtor to do otherwise as proposed is improper gerrymandering in order to obtain a consenting class in express violation of section 1122.

### D. There Are Other Reasons for the Court to Closely Scrutinize the Proposed Settlement that May Warrant Denial of the Motion

32.     There are a number of other reasons for the Court to closely scrutinize the proposed settlement that may warrant denial of the Motion.

33.     First, the granting to HarbourVest of a claim in the total amount of $80 million potentially allows HarbourVest to achieve a significant windfall at the expense of other creditors and equity holders. The Debtor has asserted numerous times that the estate is solvent and, for this reason, the purported subordinated claim of $35 million (if allowed and approved) may be worth just as much as its general unsecured claim. This is a huge figure in this case, outshined only by the Redeemer Committee, which has an actual arbitration award obtained after lengthy litigation. By contrast, the HarbourVest Claim contains only a few paragraphs of generalized allegations that essentially argue that the Debtor's alleged actions related to the Acis bankruptcy, and this Court's orders in the Acis case, are a "but for" cause of the loss of its investment. While the HarbourVest Response is lengthy, it lacks necessary details for the Court to determine whether HarbourVest *may* be entitled to the relief requested by the Motion. The other significant creditors in this case—*inter alia*, Redeemer, UBS and Acis—all had pending claims that were litigated. Nor is HarbourVest a trade creditor, vendor, or other contract counter-party of the Debtor. The HarbourVest Claim is thus uniquely situated in this case and, given the size and the nature of its

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-14    Filed 09/41/236    Page 125 of 263    PageID 4382
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 13 of 15

claims, should invite close scrutiny. Under these facts, the potential allowance of an $80 million claim (less the value of its share in HCLOF, which may suffer by continued management by Acis) against the estate for an investment which was not held or managed by the Debtor would be a huge undue windfall.

34.    Second, the Motion states that HarbourVest will vote its proposed allowed Class 8 (proposed at $45 million) and Class 9 (proposed at $35 million) claims in support of confirmation. There are at least two potential issues with this proposal. First, the deadline for parties to submit ballots was January 5, 2021, and as of the close of business on January 5, the HarbourVest Claim has not been allowed for voting purposes.[9] Second, the Motion and proposed settlement agreement state that the HarbourVest Claim will be allowed for voting purposes only as a general unsecured claim in the amount of $45 million. It is unclear how HarbourVest can, or would be authorized to, vote its purported Class 8 and 9 Claims in support of the Plan after the voting deadline and when the settlement provides only for a voting claim in Class 8.

35.    Third, while the Motion addresses the factor of probability of success in the litigation, it does not discuss in detail the cost of doing so in relation to the amount to be paid to HarbourVest under the settlement or the likelihood that the Debtor will succeed in the litigation. In addition, unlike the claims filed by Acis and UBS, the HarbourVest Claim does not arise from pending litigation. At this point, relatively little litigation has occurred and the parties have not addressed threshold issues that might dramatically narrow the scope of the HarbourVest Claim. Rule 9019 requires an analysis as to whether the probability of success in litigation is outweighed by the consideration achieved under the settlement. *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (The Court must "compare the terms of the compromise with the likely rewards

---

[9] The hearing on the 3018 and 9019 motions are set concurrently with confirmation.

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-4    Filed 09/15/23    Page 126 of 263    PageID 4383
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 14 of 15

of litigation."). Given the excessive amount to be paid under the settlement and the weakness of the HarbourVest Claim, this factor weighs in favor of denial of the Motion.

36.    Fourth, it is unclear from the settlement papers whether the transfer by HarbourVest of its interest in HCLOF to the Debtor or an entity the Debtor designates will cause the value of the investment to be received by the Debtor's estate. Further, the interest of HCLOF being conveyed under the proposed settlement may be subject to the Acis plan injunction, which could potentially prevent the Debtor's estate from realizing the value of this interest. In the event the Court is inclined to approve the settlement, the order should make clear that the available value of the investment should be realized by the Debtor's estate.

<div align="center">

**CONCLUSION**

</div>

For the reasons set forth above, Respondent respectfully requests that the Court enter an order denying the Motion and providing Respondent such other and further relief to which he may be justly entitled.

<div align="center">

**[Remainder of Page Intentionally Left Blank]**

</div>

Case 21-03067-sgj    Doc 124-4    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 19-4    Filed 09/01/23    Page 127 of 263    PageID 4384
Case 19-34054-sgj11 Doc 1697 Filed 01/06/21    Entered 01/06/21 20:42:24    Page 15 of 15

Dated: January 6, 2021                    Respectfully submitted,

                                          */s/ D. Michael Lynn*               
                                          D. Michael Lynn
                                          State Bar I.D. No. 12736500
                                          John Y. Bonds, III
                                          State Bar I.D. No. 02589100
                                          John T. Wilson, IV

John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
Bᴏɴᴅs Eʟʟɪs Eᴘᴘɪᴄʜ Sᴄʜᴀғᴇʀ Jᴏɴᴇs LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: john.wilson@bondsellis.com
Email: bryan.assink@bondsellis.com

Aᴛᴛᴏʀɴᴇʏs ғᴏʀ Jᴀᴍᴇs Dᴏɴᴅᴇʀᴏ

## CERTIFICATE OF SERVICE

    I, the undersigned, hereby certify that, on January 6, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

                                            */s/ Bryan C. Assink*         
                                            Bryan C. Assink

# EXHIBIT 5

003996

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/21/23    Page 129 of 263    PageID 4386
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 1 of 10

Docket #1706  Date Filed: 01/08/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF  AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Objectors"), submit this

Objection for the purpose of objecting to the *Debtor's Motion for Entry of an Order Approving*

*Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions*

*Consistent Therewith* [Dkt. #1625] (the "Motion") filed by Highland Capital Management, L.P.

(the "Debtor"). Through the Motion, the Debtor seeks approval of its compromise with

HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover

Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF

L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the

1934054210108000000000004

003997

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document Exhibit 5    Filed 09/30/23    Page 130 of 263    PageID 4387
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 2 of 10

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this objection, Objectors respectfully represent as follows:

## I. INTRODUCTION

1.      Objectors recognize that Courts favorably view settlements and, as a matter of course, generally approve settlements as being in the best interest of the bankruptcy estate. The settlement proposed herein, however, is different than other settlements inasmuch as it represents a 180 degree departure from the Debtor's own analysis of the Claim of HarbourVest and the fact that the settlement is tied to HarbourVest approving the Debtor's plan.  Little or no information is provided by the Debtor as to why its initial analysis was flawed and what information or legal principal it discovered to change a zero claim into a massive claim that will have a significant impact on the recovery to creditors.

## II. BACKGROUND

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.      On December 4, 2019, the venue of this case was transferred. [Dkt. #186].

5.      On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. [See Dkt. #854].

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/10/13    Page 131 of 263    PageID 4388
Case 19-34054-sgj11    Doc 1706    Filed 01/08/21    Entered 01/08/21 13:43:14    Page 3 of 10

6.      On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[1].

7.      On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Dkt. #906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

8.      On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Dkt. #1057] (the "HarbourVest Response").

9.      The Debtor, in its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. #1473 pgs. 40-41], described its position relative to the HarbourVest Claim as follows:

> The Debtor intends to **vigorously** defend the HarbourVest Claims on various grounds ….. The HarbourVest Entities invested approximately $80,000,000.00 in HCLOF but seek an allowed claim in excess of 300 million dollars (after giving effect to treble damages for the alleged RICO violations)

10.     On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. [Dkt. # 1625].

11.     The proposed settlement provides HarbourVest with the following:

    a. An allowed, general unsecured claim in the amount of $45,000,000.00 [Dkt. #1625 pg. 9 pp.f]; and

---

[1] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. See Claim Nos. 143, 147, 149, 150, 153, and 154.

003999

Case 21-03067-sgj   Doc 124-5   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-1   Filed 09/11/23   Page 132 of 263   PageID 4389
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21   Entered 01/08/21 13:43:14   Page 4 of 10

b.  A $35,000,000 claim in Class 9 [Dkt. #1625 pg. 9 pp.f].

12.    An integral element of the settlement requires that HarbourVest will "support confirmation of the Debtor's Plan including, but not limited to, voting its claims in support of the Plan."

13.    The settlement also contains a provision that HarbourVest will transfer its entire interest in HCLOF to an entity to be designated by the Debtor.  It is unclear whether HarbourVest has a right to transfer the interest and secondly, what the Debtor will do with the interest [Dkt. #1625 pp.f].

14.    The sole support for the Motion is the Declaration of John Morris [Dkt. #1631] which fails to account for the enormous change in the Debtor's position between November 24, 2020 when the Disclosure Statement was approved and December 23, 2020 when the Motion was filed, a period of less than thirty (30) days.

15.    The Declaration of John Morris [Dkt. #1631] also contains no information as to the potential cost of the litigation, whether HarbourVest can transfer the interest or reasons, other than conclusory reasons, as to why the settlement is beneficial to the estate.  The Debtor makes the assertion that the interest it is acquiring was worth $22,000,000.00 as of December 1, 2020 without advising as to the basis for the valuation.  Is it a book value and, if not, what was the methodology employed to arrive at the valuation?  The Court has no basis to evaluate the settlement without essential information as to 1) how the asset being acquired is valued; 2) can the Debtor acquire the interest; and 3) how will the Debtor bring value to the estate in connection with the interest inasmuch as the Debtor has discretion as to where to place the asset to be acquired.

A.    **LEGAL STANDARDS**

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-105    Filed 09/01/23    Page 133 of 263    PageID 4390
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 5 of 10

16.     The law relative to approval of motions pursuant to BR 9019 is well settled.  The

settlement must be fair and equitable*. See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th

Cir. 1980).  The factors the Court should consider are the following:

(i)        the probabilities of ultimate success should the claim be litigated;

(ii)       the complexity, expense, and likely duration of litigating the claim;

(iii)      the difficulties of collecting a judgment rendered from such litigation; and,

(iv)      all other factors relevant to a full and fair assessment of the wisdom of the

compromise.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414

(1968).

17.     Although the Debtor's business judgment is entitled to a certain deference,

"business judgment" is not alone determinative of the issue of court approval. *See In re

Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011).   However,

notwithstanding the business judgment rule, a debtor does not have unfettered freedom to do

what it wishes.  *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009)

("[A]s a fiduciary holding its estate in trust and responsible  to the court, a debtor in possession

must administer its case and conduct its business in a fashion amenable to the scrutiny to be

expected from creditor and court oversight.").

**B.     ISSUES WITH THE SETTLEMENT**

18.     Objectors believe that the following issues are not explained or addressed in the

Motion and, thus, the Motion should be denied:

a)  The settlement represents a radical change in the Debtor's position that was set

forth in its Disclosure Statement.  While the Debtor asserts that its position is

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-105   Filed 09/10/23    Page 134 of 263    PageID 4391
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 6 of 10

based on its fear of parties' oral testimony, the size of the transactions at issue make the case a document case, as opposed to who said what, when and how. A review of the applicable documents to determine whether they support the Debtor's initial position is warranted, as opposed to stating that the case is based upon the credibility of a witness. This settlement is not the settlement of an automobile accident where the parties are disputing who ran a red light;

b) The settlement requires HarbourVest to support and vote in favor of the Debtor's Plan. On its face this appears to be vote buying. The settlement should not be conditioned upon HarbourVest's support or non-support of the Plan and its vote in favor or against the Plan; and

c) No information is provided as to whether the Debtor can acquire the interest in HCLOF, liquidate the interest, who will receive the interest, or how will the estate benefit from the interest to be acquired.

## CONCLUSION

The settlement with HarbourVest has too many questions to be approved on the record before this Court and the parties, due to the Notice of the Motion, the holidays and the press of other litigation in this case, do not have the time to adequately investigate the propriety of the settlement.

January 8, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216

004002

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-105   Filed 09/01/23    Page 135 of 263    PageID 4392
Exhibit 105    Page 98 of 113
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 7 of 10

gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 8th day of January, 2021, a copy of the above and foregoing *Objection To Debtor's Motion For Entry Of An Order Approving Settlement With Harbourvest (Claim Nos. 143, 147, 149, 150, 153, 154) And Authorizing Actions Consistent Therewith* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoinette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-105    Filed 09/01/23    Page 136 of 263    PageID 4393
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 8 of 10

- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov

{00374914-6}                                8

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-15    Filed 09/01/23    Page 137 of 263    PageID 4394
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 9 of 10

- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

004005

Case 21-03067-sgj    Doc 124-5    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-15    Filed 09/11/23    Page 138 of 263    PageID 4395
Case 19-34054-sgj11 Doc 1706 Filed 01/08/21    Entered 01/08/21 13:43:14    Page 10 of 10

- Donna K. Webb      donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber      bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller      dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka      danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd      hwinograd@pszjlaw.com
- Megan Young-John      myoung-john@porterhedges.com

*/s/Douglas S. Draper*

# EXHIBIT 6

Case 21-03067-sgj   Doc 124-6   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-6   Filed 09/20/23   Page 140 of 263   PageID 4397
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21   Entered 01/08/21 15:54:15   Page 1 of 10

Docket #1707   Date Filed: 01/08/2021

Joseph M. Coleman (State Bar No. 04566100)
John J. Kane (State Bar No. 24066794)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-SGJ |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

## CLO HOLDCO, LTD.'S OBJECTION TO HARBOURVEST SETTLEMENT

**TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:**

CLO Holdco, Ltd. (**"CLO Holdco"**) respectfully files this *Objection to Harbourvest Settlement* (the **"Harbourvest Settlement Objection"**) which seeks entry of an order from this Court denying the Debtor's *Motion for Entry of an Order Approving Settlement with Harbourvest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* (the **"Harbourvest Settlement Motion"**) for the reasons stated below. In support of the Harbourvest Settlement Objection, CLO Holdco respectfully states as follows:

## I.
## BACKGROUND

**A.     TRANSFERRING SHARES IN HCLOF**

1934054210108000000000005
004008

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-196    Filed 09/10/23    Page 141 of 263    PageID 4398
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 2 of 10

1.      CLO Holdco owns 75,061,630.55 shares, or about 49.02% of Highland CLO Funding, Ltd. ("**HCLOF**").   Other shareholders include Harbourvest 2017 Global AIF L.P., Harbourvest Global Fund L.P., Harbourvest Dover Street IX Investment L.P., and Harbourvest Skew Base AIF L.P., and HV International VIII Secondary L.P. (collectively, "**Harbourvest**"). Harbourvest owns approximately 49.98% of HCLOF.  The remaining 1% is owned by the Debtor and a five other investors.

2.      HCLOF is governed by a *Members Agreement Relating to the Company* dated November 15, 2017 by and between each of the members of HCLOF, including Harbourvest, the Debtor, and CLO Holdco (the "**Member Agreement**").  A copy of that agreement is attached hereto as **Exhibit A**.

3.      Section 6 of the Member Agreement addresses the "Transfer or Disposals of Shares." MEMBER AGREEMENT, § 6.  The Member Agreement places strict restrictions on the sale or transfer of shares to entities other than the initial Member's own affiliates.  *See id.* at §§ 6.1, 6.2. Before a Member can transfer its interests to a party other than its own affiliates it must: (i) obtain the prior written consent of the Portfolio Manager; and (ii) "offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter" (the "**Right of First Refusal**").  *Id.*  As further stated in section 6.2 of the Member Agreement, "The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred." *Id.* at § 6.2.

**B.      THE HARBOURVEST SETTLEMENT**

4.      On December 23, 2020, the Debtor filed the Harbourvest Settlement Motion.  On the following day, the Debtor filed a copy of the Settlement Agreement referenced in the

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-106    Filed 09/10/23    Page 142 of 263    PageID 4399
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 3 of 10

Harbourvest Settlement Motion (the **"Settlement Agreement"**) [Dkt. No. 3]. In the Settlement Agreement, Harbourvest represents and warrants that it is authorized to transfer its interest in HCLOF to the Transferee, HCMLP Investments, LLC (the **"Transferee"**). SETTLEMENT AGREEMENT, Ex. A. § 3. Further, the Transferee and Debtor agree to be bound by the terms and conditions of the Member Agreement. *Id.* at § 1.c.

5.     In exchange for conveniently classified allowed claims under the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the **"Plan"**) [Dkt. No. 1472], Harbourvest agrees to vote in favor of the Plan and to transfer all of its interests in HCLOF to the Transferee. SETTLEMENT AGREEMENT, § 1.

6.     As detailed below, CLO Holdco objects to the Harbourvest Settlement Motion because Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally inaccurate interpretation of the Member Agreement's contractual provisions that would render specific passages redundant and meaningless. More simply put, the only way Harbourvest and the Debtor could effectuate the Settlement Agreement is by violating fundamental tenets of contract interpretation.

## II.
## ARGUMENTS AND AUTHORITIES

### A.    CONTRACT INTERPRETATION – AVOIDING REDUNDANCIES AND SURPLUS LANGUAGE

7.     The Fifth Circuit recognizes fundamental tenets of contract interpretation, and notes that "contracts should be read as a whole, viewing particular language in the context in which it appears. *Woolley v. Clifford Chance Rogers & Wells, L.L.P.*, 51 F. App'x 930 (5th Cir. 2002) (citing Restatement (Second) of Contracts § 202 (1981)). The Fifth Circuit has applied substantially the same tenets of contract interpretation across the laws of various jurisdictions, and consistently reasons that "[a]ll parts of the agreement are to be reconciled, if possible, in order to avoid an

Case 21-03067-sgj   Doc 124-6   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-06   Exhibit 96   Filed 05/10/23   Page 143 of 263   PageID 4400
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21   Entered 01/08/21 15:54:15   Page 4 of 10

inconsistency. A specific provision will not be set aside in favor of a catch-all clause." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947 (5th Cir. 1981) (internal citations omitted); and *see Hawthorne Land Co. v. Equilon Pipeline Co., LLC*, 309 F.3d 888, 892–93 (5th Cir. 2002); *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016); *Wooley*, 51 F.Appx. at 930.

8.      Reconciliation of terms that would otherwise render other parts of a contract redundant is fundamental to proper contract interpretation. *Hawthorne Land*, 309 F.3d at 892-93. As the Firth Circuit explained in *Hawthorne Land*, "each provision of a contract must be read in light of the other provisions so that each is given the meaning suggested by the contract as a whole. A contract should be interpreted so as to avoid neutralizing or ignoring a provision or treating it as surplusage." *Id.* (internal citations and quotations omitted).  In other words, provisions of a contract should be read to create harmony, not internal inconsistencies, redundancies, and unnecessary surplus language. *See, e.g., Luv N' Care*, 844 F.3d at 447 (overturning district court on appeal by interpreting contract in manner that eliminated perceived redundancy).

**B.      ANALYZING THE MEMBER AGREEMENT**

9.      Section 6.1 of the Member Agreement will almost certainly be cited by the Debtor and Harbourvest as authority for their entry into the Settlement Agreement, regardless of whether other Members or the Portfolio Manager consent.  It states, in pertinent part, that:

> No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio Manager…

MEMBER AGREEMENT, § 6.1.  Harbourvest will likely stress that under the terms of the Member Agreement, it can transfer its interests so long as the transfer is to "an Affiliate of an initial Member."  Indeed, the Debtor will no doubt point out to this Court that Harbourvest is

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/01/23    Page 144 of 263    PageID 4401
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 5 of 10

conveniently transferring its interests in HCLOF to an Affiliate of the Debtor, and that the Debtor is an initial Member listed in the Member Agreement.

10.     Section 6.1, however, must be read in the context of the Member Agreement, and in conjunction with the transfer restrictions found in section 6.2.  Read together it is clear that the consent exception allowing a transfer in 6.1 was intended to allow a Member to transfer its shares to *its* own Affiliate, without required consents and effectuating a Right of First Refusal.  Doing so would allow inter-company transfers within a corporate structure without the need for complicated procedures.  Applying Fifth Circuit precedent, this interpretation fits squarely within the agreement and gives weight to the terms of section 6.2 of the Member Agreement, as explained below.

### (i)     Surplusage – Specific Allowance of Transfers by CLO Holdco to Debtor Affiliates

11.     Recall that both CLO Holdco and the Debtor are initial Members to the Member Agreement.  MEMBER AGREEMENT, p. 3.  Section 6.2 of the Member Agreement states, in pertinent part, that "Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, *in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal*) a Member must first…" comply with the Right of First Refusal.  *Id.* at § 6.2 (emphasis added).  The italicized language above is important for two reasons: (i) it specifically enumerates that CLO Holdco can transfer its interests to Debtor Affiliates without having to pursue the Right of First Refusal; and (ii) it allows only limited transfers between Members, as opposed to between a Member and an Affiliate of an initial Member.

12.     If, as the Debtor and Harbourvest will likely argue, Members are allowed to transfer their interests to any Affiliates of any other initial Members, there is absolutely no need for the Member Agreement to specifically authorize CLO Holdco to transfer its interests to the Debtor's Affiliates.  Per Fifth Circuit fundamentals of contract interpretation, that purported redundancy

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-106    Filed 09/10/23    Page 145 of 263    PageID 4402
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 6 of 10

should <u>not</u> be discarded as mere surplusage, and the Member Agreement should be interpreted in a manner that gives weight to that provision. *Hawthorne Land*, 309 F.3d at 892-93.

13.     If the Member Agreement is read to literally allow all "Transfers to Affiliates of an initial Member" there would be no reason to expressly set forth allowed transfers between specific Members and other Member's Affiliates.  If the Member Agreement sought to list all allowed transfers between Members and their Affiliates, it should have similarly noted that any Member could transfer its interest to any Harbourvest Member entity, as each Harbourvest Member entity is an Affiliate of the other Harbourvest Member entities.  Alternatively, if the specific enumeration of CLO Holdco and the Highland Principals' transfer rights was surplusage, it would presumably have listed other parties' rights, or had inclusive language such as "including but not limited to" or "for example."  The Member Agreement lacks such language and, as a result, should be interpreted in a manner that both gives weight to the specific provision while reconciling other provisions of the contract.

**(ii)     Absurd Results – Disparate Transfer Rights Between Members**

14.     Note that the Member Agreement does not generally allow a transfer of interests from Member to Member unless specifically enumerated.  Section 6.2 specifically allows only CLO Holdco and the Highland Principals to make transfers to other Members, but those other Members include only the Debtor or another Highland Principal.  MEMBER AGREEMENT, § 6.2.  It does not allow the Debtor to transfer interests to any Member, and does not expressly allow any Member, other than limited transfers by CLO Holdco and the Highland Principals, to transfer interests to any other Member.  *Id.*  For instance, if the Debtor wished to transfer its interests to CLO Holdco, it would first have to offer <u>*all*</u> of the other Members their Right of First Refusal. *Id.*

15.     Similarly, if Harbourvest wished to transfer its interest to CLO Holdco, it could not do so without first providing the Right of First Refusal to all other Members.  *Id.*  As noted above,

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-106    Filed 09/11/23    Page 146 of 263    PageID 4403
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 7 of 10

however, allowing a Member to transfer its interest to an Affiliate of any initial Member would allow _all_ of the Members to transfer their interests to any Harbourvest Member entity, as the Harbourvest Members are Affiliates of each other.  Given the specific enumeration of CLO Holdco and the Highland Principals' rights to inter-Member transfers, it would be inconsistent to expand that specific provision to allow all transfers by all Members to any Harbourvest entity without first providing a Right of First Refusal.

16.    Such a reading would lead to absurd results.  It would grant similarly situated Members profoundly disparate rights under the agreement, and could easily lead to manipulation. For instance, because the Harbourvest Members are technically Affiliates of an initial Member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer.  No other Member could do that.  For instance, if CLO Holdco wished to acquire other Members' interests, the transferring member (including Harbourvest) would have to offer a Right of First Refusal in _every instance_.  To resolve that potential disparate treatment—though CLO Holdco and Harbourvest own nearly identical ownership interests in HCLOF—CLO Holdco would have to form an Affiliate and acquire interests through the Affiliate.  That simply _cannot_ be the intended result of the Member Agreement.

17.    Instead, the Member Agreement must be read to require Harbourvest to provide a Right of First Refusal to the other Members of HCLOF before transferring its interests to either the Debtor or the Transferee.

## C.    THE RIGHT OF FIRST REFUSAL IN BANKRUPTCY

18.    Most cases addressing third party rights of first refusal in bankruptcy involve the assignment of leases and landlords' rights of first refusal.  In those cases, courts analyze whether such a provision in the _debtor's_ contract is a defacto restriction on assignment that may be excised

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-106  Filed 09/01/23    Page 147 of 263    PageID 4404
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 8 of 10

from the agreement. This case is very different. Here, it is a creditor that owes a right of first refusal to another non-debtor entity.

19.    Even so, at least one court has issued telling commentary on a bankruptcy court's ability to excise provisions of a bargained-for contract, stating "A bankruptcy court's authority to excise a bargained for element of a contract is questionable and modification of a nondebtor contracting party's rights is not to be taken lightly." *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 51-52 (Bankr. M.D.N.C. 2003) (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1991)). CLO Holdco was unable to find any case that would allow a bankruptcy court to invalidate or otherwise excise a third party's right of first refusal in what largely amounts to a non-debtor contract.

20.    As the Member Agreement requires Harbourvest to provide a Right of First Refusal to the non-Debtor Members under section 6.2 of the Agreement, and such Members have 30 days to review and determine whether to purchase their pro-rata shares offered by Harbourvest, Harbourvest lacks contractual authority to enter into the Settlement Agreement.

**D.    HARBOURVEST'S LACK OF AUTHORITY PRECLUDES ENFORCEMENT OF SETTLEMENT**

21.    Harbourvest has not completed its conditions precedent to the transfer of its interest to Transferee under the Member Agreement. As detailed above, and in section 6.2 of the Agreement, Harbourvest must effectuate the Right of First Refusal before it can transfer its interests in HCLOF. MEMBER AGREEMENT, § 6.2. Harbourvest is, in essence, bound by the condition precedent of effectuating the Right of First Refusal before it is authorized under the Member Agreement to enter into the Settlement Agreement.

22.    Courts should not enforce a settlement agreement where a party has a condition precedent to entry into the agreement and fails to satisfy that condition. *In re De La Fuente*, 409 B.R. 842, 846 (Bankr. S.D. Tex. 2009). As noted in part in *De La Fuente*, the court would not recognize

Case 21-03067-sgj    Doc 124-6    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-19    Filed 09/01/23    Page 148 of 263    PageID 4405
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21    Entered 01/08/21 15:54:15    Page 9 of 10

or enforce a settlement where the parties were subject to conditions precedent before the settlement could be effective, and the conditions precedent were not satisfied.  This Court should similarly deny Harbourvest's proposed settlement, as it would deny the Members' Right of First Refusal, which is the benefit of their bargain under the Member Agreement.

### III.
### PRAYER FOR RELIEF

WHEREFORE, CLO Holdco requests that this Court grant the Objection and enter an order denying the Harbourvest Settlement Motion.

DATED: January 8, 2020                    Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By:      */s/ John J. Kane*
            Joseph M. Coleman
            State Bar No. 04566100
            John J. Kane
            State Bar No. 24066794

901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

Case 21-03067-sgj   Doc 124-6   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-19   Filed 09/11/23   Page 149 of 263   PageID 4406
Case 19-34054-sgj11 Doc 1707 Filed 01/08/21   Entered 01/08/21 15:54:15   Page 10 of 10

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2020, a true and correct copy of the foregoing CLO Holdco Objection was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the United States Trustee at Lisa.L.Lambert@usdoj.gov and upon the following parties:

Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Email:  pmontgomery@sidley.com
        preid@sidley.com
        jhoffman@sidley.com

Bojan Guzina
Matthew A. Clemente
Dennis M. Twomey
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Email:  bguzina@sidley.com
        mclemente@sidley.com
        dtwomey@sidley.com
        alyssa.russell@sidley.com

Counsel for Harbourvest:
M. Natasha Labovitz
Erica S. Weisgerber
Daniel E. Stroik
Vickie L. Driver
Christina W. Stephenson
Email: nlabovitz@debevoise.com
        eweisgerber@debevoise.com
        destroik@debevoise.com
        vickie.driver@crowedunlevy.com
        crissie.stephenson@crowedunlevy.com

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com

Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email:  MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*/s/ John J. Kane*
John J. Kane

# EXHIBIT 7

Page 1

1

2    IN THE UNITED STATES BANKRUPTCY COURT
   FOR THE NORTHERN DISTRICT OF TEXAS
3          DALLAS DIVISION

4  IN RE:

5                    CHAPTER 11

6                    CASE NO.
   HIGHLAND CAPITAL          19-34054-
7  MANAGEMENT, L.P.          SGJLL

8
      Debtor.
9

10

11    Confidential - Under Protective Order

12       REMOTE DEPOSITION OF
         MICHAEL PUGATCH
13      Zoom Videoconference
         01/11/2021
14       1:07 P.M. (EDT)

15

16

17

18

19

20

21

22

23

24    REPORTED BY:  AMANDA GORRONO, CLR
   CLR NO. 052005-01
25   JOB NO. 188591

## Page 2

1
2              01/11/2021
3              1:07 P.M. (EDT)
4
5
6        REMOTE ORAL DEPOSITION OF MICHAEL
7  PUGATCH, held virtually via Zoom
8  Videoconferencing, pursuant to the
9  Federal Rules of Civil Procedure before
10 Amanda Gorrono, Certified Live Note
11 Reporter, and Notary Public of the State
12 of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2  A P P E A R A N C E S: (Via Remote)
3  PACHULSKI STANG ZIEHL & JONES
4  Attorneys for Debtor
5  780 Third Avenue
6  New York, New York 10017
7  BY:  JOHN MORRIS, ESQ.
8        HAYLEY WINOGRAD, ESQ.
9
10  BONDS ELLIS EPPICH SCHAFER JONES
11  Attorneys for Jim Dondero
12  420 Throckmorton Street
13  Fort Worth, Texas 76102
14  BY:  JOHN WILSON, ESQ.
15        BRYAN ASSINK, ESQ.
16
17  DEBEVOISE & PLIMPTON
18  Attorneys for HarbourVest
19  919 Third Avenue
20  New York, New York 10022
21  BY:  ERICA WEISGERBER, ESQ.
22        M. NATASHA LABOVITZ, ESQ.
23        EMILY HUSH, ESQ.
24        DANIEL STROIK, ESQ.
25

## Page 4

1
2  A P P E A R A N C E S: (Via Remote)
3  KANE RUSSELL COLEMAN & LOGAN
4  Attorney for CLO Holdco Limited
5  Bank of America Plaza
6  901 Main Street
7  Dallas, Texas 75202
8  BY:  JOHN KANE, ESQ.
9
10  HELLER, DRAPER, HAYDEN, PATRICK, & HORN
11  Attorneys for The Dugaboy Investment
12  Trust and the Get Good Trust
13  650 Poydras Street
14  New Orleans, Louisiana 70130
15  BY:  DOUGLAS DRAPER, ESQ.
16
17  LATHAM & WATKINS
18  Attorney For UBS
19  885 Third Avenue
20  New York, New York
21  BY: SHANNON MCLAUGHLIN, ESQ.
22
23
24
25

## Page 5

1
2  A P P E A R A N C E S: (Via Remote)
3  KING & SPALDING
4  Attorney for Highland CLO Funding, Ltd.
5  1180 Peachtree Street, NE
6  Atlanta, Georgia 30309
7  BY:  MARK MALONEY, ESQ.
8
9
10
11  ALSO PRESENT:
12  ALIZA GOREN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 6

1

2                I N D E X

3

    WITNESS        EXAMINATION BY      PG
4  MICHAEL PUGATCH   MR. WILSON    10, 148

                    MR. KANE      122
5                   MS. WEISGERBER   147

6

7          E X H I B I T S

7

    EXHIBIT
                DESCRIPTION          PAGE
9  Exhibit 1  Proof of Claim 143 filed    16

10          4/08/2020 nine pages.......

11 Exhibit 2  Proof of Claim 149 filed    17

12          4/08/2020 nine pages.......

13 Exhibit 3  Declaration of Michael      18

14          Pugatch in Support of

15          Motion of HarbourVest

16          Pursuant to Rule 3018(a)...

17 Exhibit 4  Member Agreement 28 pages..  21

18 Exhibit 5  HarbourVest Response to      22

19          Debtor's First Omnibus

20          Objection 617 pages........

21 Exhibit 6  Offering Memorandum 122      61

22          pages.....................

23 Exhibit 7  Share Subscription and       63

24          Transfer Agreement 31

25          pages.....................

---

Page 7

1

2  Exhibit 8  E-mail 08/15/2017..........  68

3  Exhibit 9  11/29/2017 E-mail with        79

4          cover letter Highland

5          Capital Management.........

6  Exhibit 10 2004 Examination of           83

7          Investor in Highland CLO

8          Funding Ltd. 10/10/2018....

9  Exhibit 11 Declaration of John A.       109

10          Morris in Support of the

11          Debtor's Motion For Entry

12          of an Order Approving

13          Settlement With

14          Harbourvest (Claim Nos.

15          143, 147, 149, 150, 153,

16          154) and Authorizing

17          Actions, 82 pages.........

18

19

20              R E Q U E S T S

21 DESCRIPTION                    PG

22 Transcript be marked Confidential     10

23 under the Protective Order............

24

25

---

Page 8

1        MR. WILSON:  I'm John Wilson

2  with the firm of Bonds Ellis Eppich

3  Schafer Jones LP.  And I represent Jim

4  Dondero.

5        MR. MORRIS:  John Morris and

6  Hayley Winograd of Pachulski Stang

7  Ziehl & Jones for the Debtor.

8        MS. WEISGERBER:  Erica

9  Weisgerber from Debevoise & Plimpton

10 for HarbourVest.

11       MR. KANE:  John Kane of Kane

12 Russell Coleman & Logan, for CLO

13 Holdco Limited.

14       MR. DRAPER:  Douglas Draper of

15 Heller Draper & Horn, for The Dugaboy

16 Investment Trust and the Get Good

17 Trust.

18       MS. McLAUGHLIN:  Shannon

19 McLaughlin from Latham & Watkins LLP

20 for UBS.

21       MR. MALONEY:  Mark Maloney from

22 King & Spalding, on behalf of Highland

23 CLO Funding Limited.

24       MS. WEISGERBER:  I'm joined on

25

---

Page 9

1  the line by my colleagues from

2  Debevoise, Natasha Labovitz and Emily

3  Hush, and Aliza Goren from HarbourVest

4  is on the line, as well.

5        MR. WILSON:  As a preliminary

6  matter, the witness' counsel has

7  produced some documents to us that

8  they've requested be subject to the

9  confidentiality order or a brief

10 protective order entered at Document

11 Number 382, in this case.

12       And she's also requested that

13 all counsel and participants in this

14 deposition agree to be bound by the

15 terms of that order, because some of

16 the documents that were produced are

17 stamped "confidential," and they want

18 to maintain this confidentially.

19       Do we have an agreement of all

20 counsel and participants on the

21 deposition to be bound by the terms of

22 that agreed protective order?

23       (All agreed.)

24       MS. WEISGERBER:  Okay.  I think

25

**Page 10**

Confidential - Pugatch

1
2  that was everyone.  Thank you all for
3  confirming.  And the deposition will
4  be marked "confidential" until and
5  unless HarbourVest designates the
6  testimony otherwise.
7      MR. WILSON:  And that's fine.
8      (Whereupon, a request for
9  Transcript be marked Confidential
10     under the Protective Order was made.)
11 M I C H A E L   P U G A T C H,
12     called as a witness, having been
13 first duly affirmed by a Notary Public of
14 the State of New York, was examined and
15 testified as follows:
16 EXAMINATION
17 BY MR. WILSON:
18     Q.   All right.  Mr. Pugatch, how do
19 you pronounce your name?  I'm sorry.
20     A.   Yep, you've got it.  Pugatch.
21     Q.   Pugatch.  Okay.  Can you state
22 your full name for the record?
23     A.   Yeah.  Michael Pugatch.
24     Q.   Okay.  And you've been
25 designated by HarbourVest to discuss some

**Page 11**

Confidential - Pugatch

1
2  matters related to the 9019 motion.  And
3  specifically we asked that HarbourVest
4  produce a witness who could talk about the
5  negotiations of the settlement with the
6  Debtor, and also the factual allegations
7  underlying HarbourVest's Proof of Claim,
8  and those described in HarbourVest's
9  response to the claim objection, including
10 without limitation, its investment with
11 Acis/HCLOF in the alleged representations
12 made by the Debtor and/or Acis/HCLOF to
13 HarbourVest, and any and all agreements
14 entered into between HarbourVest and any
15 other party related to its investment.
16     Do you agree that you're the
17 best person to talk about these matters on
18 behalf of HarbourVest?
19     A.   Yes.  Yes.
20     Q.   Okay.  Have you given a
21 deposition before?
22     A.   I have.
23     Q.   Okay.  So you understand how it
24 works that you're under oath, and that I'm
25 going to be asking questions and you're

**Page 12**

Confidential - Pugatch

1
2  going to be giving answers.  If at any
3  time I ask a question that you don't
4  understand, or we've had some problems
5  with sometimes connectivity issues with
6  Zoom.  But yeah, any time that you don't
7  understand my question or you didn't catch
8  it, I'll be happy to repeat it.
9      Also, one thing I found with
10 Zoom is that it's easier to talk over
11 people.  I'll try not to talk over you.  I
12 would ask that you try to ensure that I've
13 finished asking my question before you
14 start your answer.  And I will likewise
15 try to ensure that you've finished your
16 answer before start my next question.
17     And at any time during this
18 deposition if you feel the need to take a
19 break, that's totally okay with me.  The
20 one thing that I would ask is if I've just
21 asked a question, that you answer the
22 question before requesting the break.
23     And if we have that agreement
24 and the ground rules, then I think I'm
25 ready to start asking you my questions.

**Page 13**

Confidential - Pugatch

1
2      A.   Sounds good.
3      Q.   What's your current address?
4      A.   47 Wayne Road in Needham,
5  Massachusetts.
6      Q.   Okay.  And where are you located
7  today?
8      A.   At that address.
9      Q.   Okay.  That's your home address?
10     A.   Correct.
11     Q.   And is anyone in the room with
12 you there?
13     A.   No.
14     Q.   And did you talk with anyone
15 about your deposition today?
16     A.   Only counsel.
17     Q.   Okay.  And did you go over the
18 facts of the underlying investment and the
19 settlement negotiations with your counsel?
20     MS. WEISGERBER:  I'm going to
21     object on privilege grounds.  He
22     can -- he prepared for the deposition
23     with counsel.  I don't think you can
24     inquire into specifics of the
25     preparation.

Page 14

Confidential - Pugatch

1      MR. WILSON: Okay. Well, you
2 know, he was designated to talk about
3 these matters, and I'm just asking if
4 he discussed these matters with his
5 counsel his before his testimony.
6 That's all. I'm not asking the
7 substance of those communications.
8      MS. WEISGERBER: You're asking
9 about conversations with counsel. How
10 about you just ask if he's prepared to
11 talk about those topics today?
12      MR. WILSON: Okay.
13 BY MR. WILSON:
14      Q. Are you prepared to talk about
15 those topics today?
16      A. Yes.
17      Q. Okay. Now, HarbourVest has
18 filed several proofs of claim in this
19 matter, and it looks like those are
20 numbered 143 on behalf of HarbourVest,
21 217 Global Fund L.P., and 144 HarbourVest
22 2017 Global AIF, 149 HarbourVest Partners
23 L.P., 150 HarbourVest Dover Street, IX
24 Investment L.P., 153 HarbourVest -- or I'm

Page 15

Confidential - Pugatch

1 sorry, HV International VIII Secondary
2 L.P., and 154 HarbourVest Skew Base AIF
3 LP.
4      And you're here to talk on
5 behalf of all of those entities, and you
6 have, for purpose of this settlement and
7 you're -- the 9019 motion, these proofs of
8 claim are all lumped together as one
9 claim; is that correct?
10      MS. WEISGERBER: I'm just going
11 to object quickly and clarify that
12 he's not here as a 30(b)(6) witness,
13 but he is here as someone from
14 HarbourVest who signed those proofs of
15 claim. So with that, I'll let you
16 continue.
17      A. I'll just answered the question,
18 yes, as a representative on behalf of all
19 of those entities. I would defer to
20 counsel, from a legal perspective, whether
21 these are treated as a single or separate
22 claims.
23      MR. WILSON: Okay. And we can
24 move on for now.

Page 16

Confidential - Pugatch

1      I'm going to submit the first
2 exhibit. It's going to be Exhibit
3 No. 1 to the deposition. I'm sending
4 it by E-mail, and I'm also going to
5 use a share screen.
6      (Whereupon, Exhibit 1, Proof of
7 Claim 143 filed 4/08/2020 nine pages,
8 was marked for identification.)
9      MR. WILSON: So this document
10 right here is Claim Number 143 filed
11 on April 8, 2020, and this one is
12 filed on behalf of HarbourVest 2017
13 Global Fund L.P.
14      If we go down, scroll to the
15 annex to proof of claim, it's Page 5
16 of the document. It says that the
17 Claimant is a limited partner in one
18 of the Debtor's managed vehicles,
19 Highland CLO Funding, Ltd.
20      And I'm going to now send out an
21 E-mail with Exhibit No. 2. I'm going
22 to pull this Exhibit No. 2 document up
23 on the share screen, as well. I guess
24 that's right.

Page 17

Confidential - Pugatch

1      (Whereupon, Exhibit 2, Proof of
2 Claim 149 filed 4/08/2020 nine pages,
3 was marked for identification.)
4 BY MR. WILSON:
5      Q. Can you see the official proof,
6 official form 410 proof of claim on your
7 screen?
8      A. The first one that you shared?
9      Q. I'm now on Exhibit No. 2. Is it
10 showing up on your screen?
11      A. No.
12      Q. Okay. Actually, I'm sorry. Is
13 it now showing up on your screen?
14      A. Now, it's showing up, yep.
15      Q. Okay. So this one is Proof of
16 Claim 149, filed on the same date. And
17 this one's filed on behalf HarbourVest
18 Partners L.P. And I'm going to scroll
19 down to the annex to proof of claim, which
20 looks largely like the annex to the
21 previous proof of claim we looked at.
22      But this one says, in Paragraph
23 No. 2, the Claimant manages investment
24 funds that are limited partners in one of

Page 18

Confidential - Pugatch

1  the Debtor's managed vehicles, Highland
2  CLO Funding, Ltd.
3        And can you tell me why this
4  HarbourVest Partners L.P. filed a separate
5  proof of claim, from the entities that
6  were investors in HCLOF?
7     A.   I would only be able to answer
8  that, based on conversations with counsel.
9     Q.   But in any event, HarbourVest
10 Partners L.P. did not invest in HCLOF,
11 correct?
12    A.   Not directly on behalf of
13 itself, no.
14    Q.   All right.  I'm going to stop
15 that share screen.
16        MR. WILSON:  And this is going
17 to be Exhibit Number 3.
18        (Whereupon, Exhibit 3,
19 Declaration of Michael Pugatch in
20 Support of Motion of HarbourVest
21 Pursuant to Rule 3018(a), was marked
22 for identification.)
23        MR. WILSON:  And Exhibit No. 3
24 that I've just submitted via E-mail,

Page 19

Confidential - Pugatch

1  and I'm about to put it up on the
2  screen, is the Declaration of
3  HarbourVest.  Let me get it up here,
4  so you can see it.  This is the
5  declaration of Michael Pugatch in
6  support of motion of HarbourVest
7  pursuant to Rule 3018(a).
8  BY MR. WILSON:
9     Q.   Have you seen this document
10 before?
11    A.   Yes.
12    Q.   And, in fact, this is your
13 declaration; is that correct?
14    A.   Yes.
15    Q.   And at the first line of this,
16 of Paragraph 1 says that you're the
17 managing director of HarbourVest Partners
18 LLC?
19    A.   Correct.
20    Q.   And how is HarbourVest Partners
21 LLC connected to these claims?
22    A.   That is the corporate entity or
23 managing member of all of the underlying
24 funds that are managed on behalf of

Page 20

Confidential - Pugatch

1  HarbourVest Partners L.P.
2     Q.   And you're the managing director
3  of that entity?
4     A.   A managing director to that
5  entity, yes.
6     Q.   You said "a managing director,"
7  are there others?
8     A.   Yes.
9     Q.   Who are the others?
10    A.   There are over 50 managing
11 directors at HarbourVest Partners LLC.
12    Q.   And are you the managing
13 director that has charge of this
14 particular HarbourVest investment, the one
15 in HCLOF?
16    A.   Yes.
17        MR. WILSON:  All right.  I beg
18 your patience.  I'm trying to conduct
19 this deposition solo.  I've got a lot
20 of stuff I've got to go through.  So
21 I'll do my best to do it efficiently.
22        But this next exhibit I'm going
23 to submit is going to be Exhibit No.
24 4.  I'm sending it in the E-mail now.

Page 21

Confidential - Pugatch

1        (Whereupon, Exhibit 4, Member
2  Agreement 28 pages, was marked for
3  identification.)
4  BY MR. WILSON:
5     Q.   Can you see this on your share
6  screen?
7     A.   I can.
8     Q.   This is the Members Agreement
9  relating to the Company.
10    A.   (Nods.)
11    Q.   I'm just going to scroll down.
12 Okay.  So this is the signature page for
13 the HarbourVest entities that were
14 invested in this company.  And it says
15 that you were the authorized person to
16 sign on behalf of the first two entities:
17 HarbourVest Dover Street, HarbourVest 2017
18 Global, and then the next one here it says
19 you're managing director.  And here we see
20 that HarbourVest Partners LLC.
21        And if we scroll down, we see
22 that you're the managing director of
23 HarbourVest Partners LLC, again, on behalf
24 of HV International, and that you're an

Page 22

Confidential - Pugatch

1
2  authorized person on behalf of HarbourVest
3  Skew Base.
4       So you signed all these
5  agreements on behalf of the HarbourVest
6  entities, when HarbourVest made its
7  investment in HCLOF.  Would that be
8  correct?
9       A.  Correct.
10      Q.  Okay.  Sorry that was
11  cumbersome, but I needed to get through
12  it.
13      MR. WILSON:  I'm going to now
14  stop that share screen.  And I'll need
15  to go to Exhibit No. 5.  I'm E-mailing
16  out Exhibit No. 5 right now.
17      (Whereupon, Exhibit 5,
18  HarbourVest Response to Debtor's First
19  Omnibus Objection 617 pages, was
20  marked for identification.)
21  BY MR. WILSON:
22      Q.  This is -- I'll do another share
23  screen -- this is Docket 1057 filed in the
24  Highland bankruptcy.  And this is
25  HarbourVest Response to Debtor's First

Page 23

Confidential - Pugatch

1
2  Omnibus Objection.
3       Did you participate in the
4  creation of this document?
5       A.  Yes.
6       Q.  So you had an opportunity to
7  review this document, before it was filed?
8       A.  Correct.
9       Q.  And you agree with the
10  statements and the positions taken in this
11  document?
12      A.  I do.
13      Q.  All right.  So what this says in
14  Paragraph 8, that by the summer of 2017,
15  HarbourVest was engaged in preliminary
16  discussions with Highland, regarding the
17  investment.
18       First off, why was HarbourVest
19  engaged in preliminary discussions with
20  Highland?
21      A.  Highland had approached
22  HarbourVest with an investment
23  opportunity.  This was really borne out of
24  discussions that we had with them around a
25  couple of investment opportunities, that

Page 24

Confidential - Pugatch

1
2  this opportunity with HCLOF being the one
3  that by the summer of 2017, as stated
4  here, was in, was advancing through
5  discussions.
6       Q.  And which individuals at
7  Highland were you engaged in discussions
8  with?  By "you," I mean HarbourVest.
9       A.  Yeah, I mean, originally it was
10  through a couple of members of their
11  investor relations team.  My first point
12  of contact was with Brad Eden, and then
13  subsequently progressed to a larger subset
14  of employees of Highland.
15      Q.  And who on behalf of HarbourVest
16  was engaging in these discussions?
17      A.  It was primarily myself, my
18  colleague, or two -- two colleagues
19  primarily, alongside myself.
20      Q.  I'm sorry.  I didn't catch the
21  last part.
22      A.  Sorry.  Myself and two other
23  colleagues primarily.
24      Q.  And who are these two other
25  colleagues?

Page 25

Confidential - Pugatch

1
2       A.  Dustin Willard and then a more
3  junior member of the HarbourVest team.
4       Q.  When you say "the HarbourVest
5  team," what does that mean?
6       A.  So the broader investment team
7  and specifically in this context, the
8  secondary investment team at HarbourVest,
9  that this was an opportunity for.
10      Q.  So who made the final decision,
11  on behalf of HarbourVest, to make this
12  investment?
13      A.  Ultimately it was a decision
14  made by the investment committee of
15  HarbourVest.
16      Q.  And who's on that investment
17  committee?
18      A.  It's a four-member committee
19  comprised of managing directors within the
20  firm.
21      Q.  And who are those managing
22  directors?
23      A.  I don't recall at the time who
24  the members were.  I can tell you the
25  members now, of that committee.  It has

004025

Page 26

Confidential - Pugatch

1   changed or evolved over time.
2       Q.   And that committee included you?
3       A.   I was involved in the
4   decisionmaking of that, yes, correct.
5       Q.   So you were part of the four-man
6   committee that made this decision?
7       A.   Yes.
8       Q.   All right.  I'm going to go back
9   to what we've marked as Exhibit 3, which
10  is your declaration.  And it says in
11  Paragraph 2, that HarbourVest is a passive
12  minority investor in Highland CLO funds,
13  HCLOF, and by the way, I haven't stated
14  this before, but in this deposition if I
15  say HCLOF, I'm going to be referring to
16  Highland CLO funds.
17          But it says that the vehicle is
18  managed by Highland Capital Management,
19  L.P.
20          And why do you say that that
21  vehicle was managed by Highland Capital
22  Management, L.P.?
23      A.   I believe that is the named
24  investment manager of HCLOF, per the

Page 27

Confidential - Pugatch

1   organization documents of that vehicle.
2       Q.   You believe that that was the
3   investment manager on the organization
4   documents, which --
5       A.   Of the various transaction
6   documents that we entered into, in
7   connection with our investment.
8       Q.   Would those have been the
9   documents that you had entered on November
10  the 15 of 2017?
11      A.   Yes.
12      Q.   Okay.  It says that HarbourVest
13  initially invested $73,522,928 for roughly
14  49 percent interest in HCLOF; and more
15  specifically, that would be a 49.98
16  percent interest in HCLOF, correct?
17      A.   Sounds right, yes.
18      Q.   Okay.  And then HarbourVest
19  contributed an additional $4,998,501
20  following a capital call, and it's
21  received three dividends, each totaling
22  $1,570,429.
23          Is all of that correct?
24      A.   Yes.

Page 28

Confidential - Pugatch

1       Q.   And has HarbourVest received any
2   additional dividends, since the making of
3   this declaration?
4       A.   No, we have not.
5       Q.   Now, I want to skip down to
6   Paragraph 3, where it says that
7   HarbourVest expected proceeds from the
8   original HCLOF investment were projected
9   to exceed 135 million.
10          Do you agree with that?
11      A.   That was the original projected
12  value of the investment, yes.
13      Q.   Well, whose expectation was
14  that?
15      A.   Those were figures, as I recall,
16  that were originally provided to us by
17  Highland to form the basis of our due
18  diligence that we went through, and
19  penultimately were included as part of our
20  investment thesis in making the
21  investment.
22      Q.   So your testimony is that
23  Highland told you that your investment
24  would be worth over $135 million?

Page 29

Confidential - Pugatch

1       A.   Yes.
2           MS. WEISGERBER:  Objection to
3   the form.  Misstates testimony.
4           Go ahead, Mike.
5       A.   That was, that was part of our
6   original due diligence, on the investment
7   opportunity.
8       Q.   When you say part of your due
9   diligence, are you saying that the number
10  originated from Highland or that the
11  number originated from your due diligence
12  operations?
13          MS. WEISGERBER:  Objection to
14  form.
15      A.   The number originally came from
16  Highland and formed the basis upon which
17  we conducted due diligence on the
18  investment opportunity.
19      Q.   And after performing due
20  diligence, you were satisfied that that
21  was a reasonable projection?
22      A.   Yes.
23      Q.   And what was the, what was the
24  estimated date, in which the value of your

Page 30

Confidential - Pugatch

1 investment would exceed the $135 million?
2       MS. WEISGERBER: Objection to
3 form.
4    A.   I don't recall exactly.  That
5 would have been over, over several years.
6 And again, this was the -- this was the
7 projected value based on the original
8 investment or the assets that were held by
9 HCLOF, at the time of our investment.
10    Q.   Now, when you talk about a
11 portfolio manager -- I'm sorry, when you
12 talk about investment manager, are you
13 referring to the portfolio manager?
14    A.   No.
15    Q.   So what's the difference in an
16 investment manager and a portfolio
17 manager?
18    A.   So in the context of this
19 investment, the investment manager.  We --
20 we had -- HarbourVest had an investment
21 with HCLOF.  Highland was the investment
22 manager of HCLOF that in turn held equity
23 positions in a variety of CLOs, which had
24 various portfolio managers associated with

Page 31

Confidential - Pugatch

1 those, all Highland affiliates.
2    Q.   And so who was the portfolio
3 manager for the HarbourVest investment in
4 HCLOF?
5       MS. WEISGERBER: Objection to
6 form.
7    A.   There were various underling
8 portfolio managers, depending on the
9 underlying CLO position.
10    Q.   Well, who was the initial
11 portfolio manager?
12    A.   So, again it would depend on
13 which underlying assets we're talking
14 about.  HCLOF was a diversified portfolio
15 of multiple underlying CLO equity
16 positions, all with portfolio managers
17 that were Highland affiliates, as we
18 understood it.
19    Q.   Well, I'm going to go back to
20 Exhibit 1, Paragraph 2, this says, in the
21 second sentence, "Acis Capital Management
22 GP, LLC, and Acis Capital Management,
23 L.P., together Acis, the portfolio manager
24 for HCLOF," and then it continues on,

Page 32

Confidential - Pugatch

1 "filed for Chapter 11."
2       Is this proof of claim correct,
3 when it states that Acis Capital
4 Management GP, LLC, and Acis Capital
5 Management, L.P., were the portfolio
6 manager for HCLOF?
7       MS. WEISGERBER: Objection to
8 form.
9    A.   I know that there was an issue
10 with the portfolio manager for at least
11 the Acis CLOs that were held by HCLOF.
12    Q.   Well, how do you distinguish
13 between the Acis CLOs and the Highland
14 CLOs?  Is that based on who was managing
15 them?
16       MS. WEISGERBER: Objection to
17 form.
18    A.   Again, they were all underlying
19 investments of HCLOF.  We didn't
20 distinguish the portfolio manager, if you
21 will, of those vehicles, other than again
22 they were Highland affiliates.
23    Q.   But it's fair to say that Acis
24 was managing at least a portion of the

Page 33

Confidential - Pugatch

1 HCLOF investment, correct?
2    A.   Correct.  The underlying
3 investments held by HCLOF, correct.
4    Q.   And did anything -- from the
5 time that you -- well, let's just go to
6 the -- I think we had the members
7 agreement up a second ago.  This would
8 have been Exhibit 4.
9       Yeah, right here.  No. 14,
10 Highland HCF Advisor, Ltd. is listed as
11 the portfolio manager on the members
12 agreement.
13       Is that accurate, that Highland
14 HCF Advisor, Ltd. was the portfolio
15 manager?
16       MS. WEISGERBER: Objection to
17 form.  Can you state as of what date
18 you're asking, Counsel?
19       MR. WILSON:  Well, the date of
20 this memorandum is, it says right
21 here, 15 November 2017.
22 BY MR. WILSON:
23    Q.   So as of the date November 15,
24 2017, who was the portfolio manager for

004027

Page 34

Confidential - Pugatch

1  this investment?
2      A.   I don't recall the specific
3  names of the various entities that sat
4  below the HCLOF level or below Highland
5  Capital, as the investment manager of
6  HCLOF.
7      Q.   Well, are you familiar with a
8  company called Brigade?
9      A.   Yes.
10     Q.   And was that company a
11 sub-manager of this investment?
12          MS. WEISGERBER:  Objection to
13     form.
14     A.   Not at the time of our
15 investment.
16     Q.   Not at the time.  Well, when did
17 the portfolio managers begin to change in
18 this investment?
19          MS. WEISGERBER:  Objection to
20     form.
21     A.   Do you mean subsequent to our
22 investment?
23     Q.   Yes.
24     A.   So as I understand it in

Page 35

Confidential - Pugatch

1  connection with the Acis bankruptcy that
2  took place, there was a change in the
3  underling either portfolio manager of
4  certain of the CLOs, the Acis-managed CLOs
5  or Acis-branded CLOs, I should say, and/or
6  sub-advisor of those CLOs.
7      Q.   And was that at the direction of
8  the Chapter 11 trustee?
9          MS. WEISGERBER:  Objection.
10     A.   That's my understanding.
11     Q.   And so when this investment was
12 initially made, was Highland HCF Advisor,
13 Ltd. the portfolio manager of the entire
14 investment?
15          MS. WEISGERBER:  Objection to
16     form.
17     A.   I don't recall the specifics
18 underneath the HCLOF entity.
19     Q.   Well, there aren't any other
20 portfolio managers listed on this
21 document, that I can see.
22          Is there any place in this
23 document that you can point me to that
24 would identify another portfolio manager?

Page 36

Confidential - Pugatch

1          MS. WEISGERBER:  Objection to
2      form.  The document speaks for itself.
3      A.   Again, I think we may be
4  distinguishing here between portfolio
5  manager at the HCLOF level and portfolio
6  manager sub-advisor, again, I'm not sure
7  the proper terminology as it relates to
8  each of the underlying CLOs that were
9  partially owned by HCLOF.
10     Q.   Well, after the Acis bankruptcy
11 was filed, and after the Chapter 11
12 trustee appointed Acis as a portfolio
13 manager of at least part of HCLOF, did
14 Highland HCF Advisor continue to serve as
15 portfolio manager?
16          MS. WEISGERBER:  Objection to
17     form.
18     A.   All of HarbourVest's interaction
19 was with Highland as the investment
20 manager of HCLOF.  My understanding of the
21 change in those entities related to the
22 portfolio management of the underlying
23 Acis CLOs, not a change in the portfolio
24 manager, at the HCLOF level.

Page 37

Confidential - Pugatch

1      Q.   Well, Highland is listed as a
2  member under this -- Highland Capital
3  Management LLP is listed as a member under
4  this Member Agreement; is that correct?
5          MS. WEISGERBER:  Objection to
6      form.
7      A.   If that's what the document
8  says, yes.
9      Q.   I'm going to look -- let me stop
10 my share screen for a second.
11          All right.  I'm now at the top
12 of Page 5 of this Exhibit 4, where it
13 says, "Dover IX shall mean HarbourVest
14 Dover Street IX Investment L.P."
15          And Dover IX was the largest
16 single investor of the HarbourVest Group;
17 is that correct?
18     A.   Correct.
19     Q.   All right.  I'm now going to go
20 down to Paragraph 5.  I'm sorry, it's not
21 Paragraph 5.  Paragraph 4, where it says
22 "Composition of Advisory Board" in
23 Paragraph 4.1, The Company shall establish
24 an Advisory Board composed of two

Page 38

Confidential - Pugatch

1  individuals, one of whom shall be a
2  representative of CLO Holdco and one of
3  whom shall be a representative of
4  Dover IX.
5       And did this Advisory Board get
6  created?
7  created?
8  A.   I believe it was created, yes.
9  Q.   And who was the representative
10 for CLO Holdco on the Advisory Board?
11 A.   I don't know.
12 Q.   Who was the representative for
13 Dover IX on the Advisory Board?
14 A.   I can't recall whether it was
15 myself or one other colleague who jointly
16 manages this investment with me.
17 Q.   You don't recall if you were on
18 the Advisory Board?
19 A.   The Advisory Board never met
20 formally under its capacity as an Advisory
21 Board.
22 Q.   Well, if you look down in
23 Paragraph 4.3, I've got my mouse pointed
24 here, I don't know if you can see it.
25 About two-thirds of the way down in this

Page 39

Confidential - Pugatch

1  paragraph it says, "The consent of the
2  Advisory Board shall be required to
3  approve the following actions," and then
4  it lists a number of things.
5       Did the Advisory Board not have
6  to -- was it not required that the
7  Advisory Board ever meet, because they
8  didn't take any of these actions?
9       MS. WEISGERBER:  Objection.
10 Objection to form.
11 A.   There may have been one or two
12 actions taken by the Advisory Board, I'm
13 looking at the list here to see what those
14 may even have been, during the duration of
15 our investment; but if so, those would
16 have been written resolutions or written
17 consents, as opposed to any meeting that
18 was convened amongst the entire Advisory
19 Board.
20 Q.   Okay.  And the entire Advisory
21 Board is just two individuals, correct?
22 A.   Correct, that's my
23 understanding.
24 Q.   Okay.  And if you go up a few

Page 40

Confidential - Pugatch

1  sentences above that in Paragraph 4.3 it
2  says, The portfolio manager shall not act
3  contrary to advice of the Advisory Board
4  with respect to any action or
5  determination expressly conditioned herein
6  or in the offering memorandum on the
7  consider approval of the Advisory Board.
8       So the portfolio manager did not
9  have the authority to disregard the advice
10 of the Advisory Board; is that correct?
11      MS. WEISGERBER:  Objection to
12 form; misstates the document.
13 A.   With respect to the limited role
14 that the Advisory Board would have to
15 play, yes, that would be my read.
16 Q.   Now, what is your understanding
17 of a reset transaction?
18 A.   Has to do with a refinancing and
19 reset of the investment period of an
20 underlying CLO.
21 Q.   And would a reset transaction be
22 contained within this -- these actions
23 that the Advisory Board's consent is
24 required to approve?

Page 41

Confidential - Pugatch

1  A.   No, it would not.
2       MS. WEISGERBER:  Objection.
3       MR. MALONEY:  Join.
4  Q.   It would not?
5  A.   It would not.
6  Q.   Well, if a reset was to be
7  proposed, who would have the discretion to
8  make that decision to enter a reset
9  transaction?
10      MS. WEISGERBER:  Objection to
11 form and foundation.
12      MR. MALONEY:  Join.
13 A.   That would be Highland as the
14 manager of HCLOF, who owns the equity
15 position to the underlying CLOs.
16 Q.   So you're saying that Highland
17 would have the exclusive authority to
18 enter a reset transaction?
19 A.   Correct.
20      MS. WEISGERBER:  Objection to
21 form.
22      MR. MALONEY:  Join.
23 Q.   What if HarbourVest objected to
24 a reset transaction?  Would it have any

004029

Page 42

Confidential - Pugatch

1    rights or remedies, in your understanding?
2        MS. WEISGERBER:  I'm going to
3    object to form.  And also just object
4    to the extent that this is calling for
5    legal conclusions.
6        Mike --
7        MR. WILSON:  I've ask the
8    witness, within his understanding of
9    the way this investment worked.
10        MS. WEISGERBER:  If you have an
11    understanding separate from any other
12    conversations with counsel, Mike, you
13    can certainly answer.
14    A.    Within my understanding,
15    HarbourVest would not have had any ability
16    or rights to object to a reset or for
17    similar actions by Highland, as the
18    manager of the HCLOF.
19    Q.    Okay.  And just to, just for
20    clarity, in 4.2 it says that, All actions
21    taken by the Advisory Board shall be (i)
22    by a unanimous vote of all of the members
23    of the Advisory Board in attendance; or
24    (ii), by written consent in lieu of a

Page 43

Confidential - Pugatch

1    meeting signed by all of the members of
2    the Advisory Board.
3        And we've talked about how there
4    were two members, one of which represented
5    CLO Holdco and one of which represented
6    HarbourVest, and it was your testimony
7    that you don't recall a meeting ever being
8    conducted that you believed that there had
9    been some written consents issued by the
10    Advisory Board; is that correct?
11        MS. WEISGERBER:  Objection to
12    form.
13    A.    That is my recollection, yes.
14    Q.    I'm sorry?  I didn't hear your
15    answer.
16    A.    That is my recollection, yes.
17    Q.    Okay.  So what is the Advisory
18    Board's general function in your
19    understanding?
20        MS. WEISGERBER:  Objection to
21    form.
22        You can answer, Mike, if you
23    know, other than, you know, legal
24    conclusions, things like that, legal

Page 44

Confidential - Pugatch

1    advice.
2        And also, Mike, you're welcome
3    to look at the document, I think John
4    is E-mailing you the documents as
5    well.  I don't know if you have the
6    full document in front of you.
7        THE WITNESS:  Yeah, I can pull
8    it up here.
9    A.    I mean, my understanding is the
10    Advisory Board, the Advisory Board's
11    involvement is as spelled as in Section
12    4.3 of the agreement that you have on the
13    screen.  And that is the extent of the
14    role that the Advisory Board would play.
15    Q.    Well, but as a practical matter,
16    what did that entail?
17        MS. WEISGERBER:  Objection to
18    form.
19    A.    Again, as a practical matter,
20    the listed items, which I can't see, that
21    are off the screen further down in 4.3 are
22    the items that would require approval by
23    the Advisory Board.
24    Q.    But other than those items, the

Page 45

Confidential - Pugatch

1    Advisory Board was not a routine part of
2    the decision-making of the portfolio
3    manager?
4        MS. WEISGERBER:  Objection to
5    form.
6    A.    Not at all.
7    Q.    Did you say "not at all"?
8    A.    Not at all, no.
9    Q.    I'm going to refer back to
10    Exhibit 5, which was Document -- or Docket
11    1057. I'll put that back on the share
12    screen. I wanted you to scroll, sorry.
13    It's a long document.
14        I want you to look at
15    Paragraph 37, which should be on your
16    screen.  And it says that these are
17    misrepresentations that HarbourVest
18    alleges were made by Highland.  And the
19    first bullet point states that, "Highland
20    never informed HarbourVest that Highland
21    had no intention of paying the Arbitration
22    Award and was undertaking steps to ensure
23    that Mr. Terry could not collect on his
24    judgment."

Page 46

Confidential - Pugatch

1      Now, Mr. Terry did not have an
2  arbitration award against Highland; is
3  that correct?
4      MS. WEISGERBER:  Objection to
5   form and foundation.
6      A.   My understanding is there was an
7  Arbitration Award, awarded for the benefit
8  of Mr. Terry.
9      Q.   But that award was against Acis,
10  correct?
11     MS. WEISGERBER:  Objection to
12   form.
13     A.   I don't know all of the details.
14  I do know that Acis was a subsidiary of
15  Highland, and there was an arbitration
16  award that was for the benefit of
17  Mr. Terry.
18     Q.   But you would agree with me that
19  if, if Highland, or I'm sorry if Mr. Terry
20  had an arbitration award against Acis,
21  then Highland would not have any
22  obligation to pay that award?
23     MR. MORRIS:  Objection to the
24   form of the question.

Page 47

Confidential - Pugatch

1      MS. WEISGERBER:  Objection to
2   the form.  Objection to the extent
3   that it calls for a legal conclusion.
4      I don't -- Mike, if you have a
5   layman's understanding of the answer
6   to that question, you're welcome to
7   answer.  But if not, don't answer.
8      A.   My understanding was Acis was a
9  controlled subsidiary of Highland's.
10     Q.   Okay.  Well, the next bullet
11  point says that, "Highland did not inform
12  HarbourVest that it undertook the
13  transfers to siphon assets away from Acis,
14  L.P., and that such transfers would
15  prevent Mr. Terry from collecting on the
16  Arbitration Award."
17     So if your understanding was
18  that Highland was responsible for the
19  arbitration award, then why is it relevant
20  that Highland siphoned assets away from
21  Acis, L.P.?
22     MS. WEISGERBER:  Objection to
23   form.  Misstates testimony.
24     Can you clarify that question,

Page 48

Confidential - Pugatch

1      John?  I think the beginning of it was
2   a little muddled.
3  BY MR. WILSON:
4      Q.   Well, this objection says that
5  Highland had -- or response to objection,
6  says that Highland had no intention of
7  paying the arbitration award, but that
8  seems to conflict with the next bullet
9   point that says that it undertook
10  transfers to siphon assets away from Acis,
11  L.P., to prevent Mr. Terry from collecting
12  on the arbitration award.
13     So where were those assets being
14  siphoned to?
15     MS. WEISGERBER:  Objection to
16   form and foundation.
17     If you're capable of answering
18  that question, Mike, you can.
19     A.   I don't know the specific
20  details of where those assets were
21  siphoned off to, other than it was to
22  another Highland affiliate.
23     Q.   The next sentence says that,
24  "Highland simply did not inform

Page 49

Confidential - Pugatch

1      HarbourVest and represented to HarbourVest
2  that the reason for changing the portfolio
3  manager for HCLOF was because Acis was
4  toxic in the industry."
5      Do you see that?
6      A.   Yes.
7      Q.   And it seems when I read these
8  documents that have been filed in the
9  Highland bankruptcy, and also the Acis
10  bankruptcy, that there's a difference in
11  position as to which entity, being either
12  Highland or HarbourVest, had the belief
13  that the Acis name was toxic.  Can you
14  shed any light on that?
15     MS. WEISGERBER:  Objection to
16   form.
17     A.   I can unequivocally say that the
18  idea to change the portfolio manager or
19  the idea that the Acis brand was toxic did
20  not come from HarbourVest.
21     Q.   That was not at HarbourVest's
22  suggestion or insistence?
23     A.   Absolutely not.
24     Q.   Well, whose suggestion was it

Page 50

Confidential - Pugatch

1  that the Acis name was toxic?
2      A.  Somebody at Highland.
3      Q.  Do you know who?
4      A.  I don't recall the conversation
5  where that first came up or who said, or
6  who at Highland said that.
7      Q.  But that conversation did occur
8  prior to HarbourVest's investment?
9      A.  Yes.
10     Q.  So Acis was previously the
11 portfolio manager for HCLOF prior to
12 November 15, 2017, and now November 17 --
13 or 15th, 2017, the portfolio manager was
14 changed.
15         And what is HarbourVest's
16 position as to why that change in
17 portfolio manager damaged it?
18     MS. WEISGERBER:  Objection;
19     form, objection to the extent it calls
20     for a legal conclusion.
21         Mike, you can answer --
22     MR. WILSON:  I'm not asking for
23     a -- with all due respect, I'm not
24     asking for a legal conclusion.  I'm

Page 51

Confidential - Pugatch

1  asking for his understanding why the
2  change in the portfolio manager
3  damaged HarbourVest.
4      MS. WEISGERBER:  Same objection.
5          You can provide any
6      non-privileged answer that you have,
7      Mike, if any.
8      A.  Ultimately my understanding is
9  that that change in portfolio manager and
10 the subsequent litigation between Acis,
11 Highland, and Josh Terry led to material
12 diminution in value, as it relates to the
13 underlying assets of HCLOF stemming from
14 Highland's decision not to comply with the
15 arbitration award to Mr. Terry.
16     Q.  Okay.  Now, if you go up to
17 Page 4 in this document, it says that on
18 October 27th, and this is Paragraph 11
19 now, "On October 27, 2017, Acis' portfolio
20 management rights for HCLOF were
21 transferred to Highland HCF"; is that
22 correct?
23     A.  That sounds right, yes.
24     Q.  And this is over two weeks prior

Page 52

Confidential - Pugatch

1  to HarbourVest's investment, correct?
2      A.  Correct.
3      Q.  So HarbourVest had full
4  knowledge that that the portfolio manager
5  of HCLOF was being changed prior to its
6  investment, correct?
7      A.  Correct.
8      MS. WEISGERBER:  Objection to
9      form.
10         And just to clarify, you're
11     asking him, HarbourVest, he's
12     testifying on behalf of himself.  I
13     could just take a standing objection
14     to that because I know sometimes
15     you're just saying HarbourVest meaning
16     Mike, so...
17 BY MR. WILSON:
18     Q.  Okay.  And just to be clear,
19 HCLOF changed its portfolio manager on
20 October 27, 2017, but after the Acis
21 bankruptcy was initiated the Chapter 11
22 trustee made changes to the portfolio
23 manager, correct?
24     MS. WEISGERBER:  Objection to

Page 53

Confidential - Pugatch

1  form, foundation.
2      A.  I know there were changes
3  subsequent to the Acis bankruptcy, to the
4  underlying management of the Acis CLOs.
5      Q.  All right.  I'm going to go back
6  to Paragraph 37, and I want to look at
7  these next two bullet points.
8          It says that, in the third
9  bullet point, that "Highland indicated to
10 HarbourVest that the dispute with
11 Mr. Terry (which appeared on a litigation
12 schedule presented to HarbourVest during
13 diligence) would have no impact on
14 investment activities."
15         And that would be the opinion of
16 Highland, correct?
17     MS. WEISGERBER:  Objection to
18     form.  The opinion of Highland?  Is
19     that what you meant to ask?
20     MR. WILSON:  Right.
21 BY MR. WILSON:
22     Q.  That's Highland expressing its
23 opinion to HarbourVest, correct?
24     MS. WEISGERBER:  Objection to

004032

Page 54

Confidential - Pugatch

1    form.
2        A.   I would just say Highland
3    presented that as facts to HarbourVest.
4        Q.   Okay.  And the next one, it says
5    that "Highland expressed confidence in the
6    ability of HCLOF to reset or redeem the
7    CLOs notwithstanding that Highland was
8    using HCLOF as part of its scheme to avoid
9    the pending Arbitration Award."
10       That's again an opinion, right,
11   that Highland expressed confidence in the
12   ability of HCLOF?
13       MS. WEISGERBER:  Objection to
14   form.  Objection to the extent it
15   calls for a legal conclusion.
16       A.   Ultimately, their ability, or
17   HCLOF's ability to reset or redeem the
18   CLOs would be subject to market conditions
19   and the ability to actually affect those
20   transactions, but they expressed their,
21   you know, their belief or view in HCLOF's
22   ability to do that notwithstanding the,
23   that change in portfolio manager.
24       Q.   Well, in Paragraph 39 on that
25

Page 55

Confidential - Pugatch

1    same page, it says, "In reliance on
2    Highland's misrepresentations and
3    omissions, HarbourVest invested in HCLOF."
4        Now, HarbourVest is a
5    sophisticated investor, correct?
6        A.   Correct.
7        Q.   And if we were to go to
8    Paragraph 36, it says, right here in the
9    middle, "These facts were material:
10   indeed, HarbourVest expressed concern and
11   requested further information regarding
12   the Transfers, the Arbitration Award, and
13   their implications for HCLOF, and the
14   investment's closing date was delayed."
15       And the closing date was
16   ultimately November 15, 2017, correct?
17       A.   Correct.
18       Q.   What was the initial closing
19   date that had to be delayed?
20       A.   I believe it was scheduled for
21   November 1st.
22       Q.   So HarbourVest had full
23   knowledge of these facts that it, that it
24   lays out here forming the basis of the
25

Page 56

Confidential - Pugatch

1    alleged misrepresentations, and they
2    requested further information regarding
3    those facts.
4        Did they receive any further
5    information?
6        MR. MORRIS:  Objection to the
7    form of the question.
8        MS. WEISGERBER:  Objection to
9    form.  Misstates testimony.
10       A.   We did have subsequent
11   conversations and, I believe, receive
12   subsequent information describing the
13   intent around, and the, you know, new
14   structure, pro forma structure, of the
15   action that Highland had undertaken.  And
16   part of the reason for the delay in the
17   closing was to ensure that we had adequate
18   time to diligence those changes, ask
19   questions, in connection with a thorough
20   due diligence process, and ensure that the
21   underlying legal structure was still
22   sound.
23       Q.   And HarbourVest was investing
24   over $73 million, correct?
25

Page 57

Confidential - Pugatch

1        A.   Right.
2        Q.   And HarbourVest had made
3    investments of this nature previously,
4    correct?
5        A.   We did.
6        MS. WEISGERBER:  Objection to
7    form.
8        A.   HarbourVest has made hundreds of
9    investment over its years, yes.
10       Q.   And HarbourVest has conducted
11   due diligence regarding its investments in
12   the past, correct?
13       A.   Correct.
14       Q.   And HarbourVest received
15   additional information on items of concern
16   and reviewed that information and
17   satisfied itself that this was an
18   appropriate investment, correct?
19       MS. WEISGERBER:  Objection to
20   form.  Misstates testimony.
21       A.   On the back of
22   misrepresentations by Highland, yes.
23       MR. WILSON:  Well, I think
24   that's nonresponsive and I object.
25

004033

Page 58

Confidential - Pugatch

1    Q.   I'm just, I'm just, reading from
2 your pleading that you filed in the
3 bankruptcy, where you say that these were
4 material facts, and HarbourVest sought
5 more information regarding these facts.
6 And then you've testified that they
7 performed additional due diligence
8 regarding that information they received,
9 and then they determined that the
10 investment was appropriate, correct?
11    MS. WEISGERBER:  Objection to
12    form.  Misstates testimony.
13    Go ahead, Mike.
14    A.   Yeah, that is correct, on the
15 back of the additional information we
16 received from Highland.
17    And I would add, with, you know,
18 with the benefit of external advisors and
19 outside counsel reviewing those structural
20 changes, as well.
21    Q.   All right.  Thank you.
22    Now, going back to your
23 declaration, which we've marked as
24 Exhibit 3, Paragraph 3 says that "The

Page 59

Confidential - Pugatch

1 unaudited net asset value of HCLOF, as of
2 August 31, 2020, was $44,587,820."
3    And is that a -- is that a book
4 value, I guess?
5    A.   That is a fair market value, in
6 accordance with the valuation policy of
7 HCLOF.
8    Q.   Do you happen to know the net
9 asset value of HCLOF as of February 1,
10 2019?  And I don't want an exact number, I
11 just want an approximation.
12    A.   No, I do not.
13    Q.   Do you know where I could get
14 that information?
15    A.   Presumably from the Debtor.
16    Q.   We'll come back to this in a
17 minute, but I'm going to --
18    MS. WEISGERBER:  I think we've
19    been going about an hour, John, if we
20    can take a quick break.
21    MR. WILSON:  Yeah, a break is
22    fine.
23    MS. WEISGERBER:  Actually,
24    Mike...

Page 60

Confidential - Pugatch

1    MR. WILSON:  I'm sorry?  I
2 didn't hear you.
3    MS. WEISGERBER:  It can be up to
4 Mike.
5    Mike, do you want to take a
6 quick break?  Do you want to keep
7 going?
8    MR. WILSON:  No, we can, if
9 y'all need a break, we can take a
10 break, like 10, 15 minutes.
11    THE WITNESS:  Yeah, why don't we
12 take a break, please.
13    MR. WILSON:  What do y'all
14 prefer?  10, 15?
15    MS. WEISGERBER:  Ten minutes is
16 fine.
17    Mike, is that good with you.
18    THE WITNESS:  Yeah, ten-minute
19 break is fine.
20    MR. WILSON:  Okay.  Well, we'll
21 break till, let's say, 1:20 central
22 time.
23    THE WITNESS:  Perfect.
24    MR. WILSON:  All right.  Thanks

Page 61

Confidential - Pugatch

1 guys.
2    (Recess taken.)
3    MR. WILSON:  Yes, I just sent
4 out an E-mail with Exhibit 6, and I'm
5 going to pull that up on the screen
6 share, as well.
7    (Whereupon, Exhibit 6, Offering
8 Memorandum 122 pages, was marked for
9 identification.)
10 BY MR. WILSON:
11    Q.   All right.  So this is the
12 Offering Memorandum, and I'm looking at
13 the bottom of Page 1 -- I mean, the top of
14 Page 1, I'm sorry.
15    The Company that was being
16 invested in is Highland CLO Funding, Ltd.
17 Do you see that, Mr. Pugatch?
18    MS. WEISGERBER:  Objection to
19    form.
20    A.   I do.  Okay.
21    Q.   And then this document defines
22 Highland, as Highland Capital Management,
23 L.P.  Do you see that?
24    A.   Yes.

Page 62

Confidential - Pugatch

1
2    Q.   Okay.  Now, if we go down to, I
3    guess it's Page 8 of this document, and
4    this first full paragraph at the top, it
5    says, "No voting member of the Advisory
6    Board shall be a controlled affiliate of
7    Highland."
8        Do you see that?
9    A.   I do.
10    Q.   And then it also says that, "It
11    being understood that none of CLO Holdco
12    Ltd., it's wholly-owned subsidiaries, or
13    any of their respective directors or
14    trustees shall be deemed to be a
15    controlled affiliate of Highland, due to
16    their preexisting non-discretionary
17    advisory relationship with Highland."
18        Do you see that?
19    A.   Yes.
20    Q.   So there were no affiliates of
21    Highland on the Advisory Board, correct?
22        MS. WEISGERBER:  Objection to
23    form.
24    A.   For voting purposes under the
25    document, that is how this reads, correct.

Page 63

Confidential - Pugatch

1
2        MR. WILSON:  All right.  I'm
3    going to turn to the next exhibit.
4    And this is going to be Exhibit No. 7
5    coming in the E-mail.  I'm also going
6    to put Exhibit No. 7 on the screen.
7        (Whereupon, Exhibit 7, Share
8    Subscription and Transfer Agreement 31
9    pages, was marked for identification.)
10    Q.   All right.  Do you see that?
11    The "Subscription and Transfer Agreement
12    For Ordinary Shares"?
13    A.   Yep.
14    Q.   All right.  So what this
15    document says is that, it repeats that
16    Highland HCLF Advisory Ltd. is the
17    portfolio manager.  Highland CLO Funding
18    Ltd. is the fund, and CLO Holdco Ltd. is
19    the existing shareholder.
20        And if we go down to the bottom
21    half of this page, it says that
22    HarbourVest was acquiring its shares in
23    this investment from CLO Holdco, correct?
24    A.   Yes.
25        MS. WEISGERBER:  Objection to

Page 64

Confidential - Pugatch

1
2    form.
3    Q.   And prior to the date of this
4    document, which I believe is November 15,
5    2017, CLO Holdco held 100 percent of the
6    shares of HCLOF, correct?
7        MS. WEISGERBER:  Objection to
8    form, foundation.
9    A.   I don't recall.  I know they
10    were the largest, the largest investor.  I
11    don't recall if it was 100 percent.
12    Q.   Well, if you look at the chart
13    below Paragraph A, it says that CLO Holdco
14    Ltd. immediately prior to the placing on
15    100 percent share percentage.
16        Do you have any reason to
17    disagree with that?
18    A.   No.
19        MS. WEISGERBER:  Objection to
20    form.
21    Q.   All right.  Now, below CLO
22    Holdco Ltd., these are the five
23    HarbourVest entities that have filed
24    proofs of claim in this bankruptcy,
25    correct?

Page 65

Confidential - Pugatch

1
2        MS. WEISGERBER:  Objection to
3    form.
4    A.   Those are the five HarbourVest
5    entities with a direct investment in
6    HCLOF.
7    Q.   And each one of those entities
8    has filed a proof of claim in this
9    bankruptcy, correct?
10    A.   Yes.
11    Q.   And the largest -- I think we
12    discussed this earlier, but Dover Street
13    IX is the largest of those investors, with
14    a 35.49 percent share percentage, correct?
15        MS. WEISGERBER:  Objection to
16    form.
17    A.   Correct.
18    Q.   And if you take the total of
19    those investments of the HarbourVest
20    entities, you get a 49.98 percent total.
21    Is that your understanding?
22        MS. WEISGERBER:  Objection to
23    form.
24    A.   I know it has 49 percent, and
25    some percentage.  I'll take your math as

Page 66

Confidential - Pugatch

1    correct.
2    Q.    And 49.98 percent is larger than
3    the next largest shareholder, which is CLO
4    Holdco which is 49.02 percent, correct?
5        MS. WEISGERBER:  Objection to
6    form.
7    A.    In taking all of the HarbourVest
8    entities, collectively, yes, correct.
9    Q.    And so I want to go back to
10   earlier where we saw in documents filed by
11   HarbourVest, where it refers to itself as
12   a passive investor.  What do you, I
13   apologize if I've already asked you this
14   question, but what do you mean by passive
15   investor?
16   A.    Meaning we were a minority
17   investor in HCLOF.  HCLOF was fully
18   controlled by Highland as the investment
19   manager.  So HarbourVest did not have any
20   governance, rights, or control as it
21   related to the ongoing investment
22   management and decisionmaking of HCLOF.
23   Q.    HarbourVest has the largest
24   percentage of the shares of any of these

Page 67

Confidential - Pugatch

1    investors, correct?
2        MS. WEISGERBER:  Objection to
3    form.
4    A.    Taken collectively, yes.
5    Q.    And HarbourVest owned one of the
6    two spots on the Advisory Board, correct?
7        MS. WEISGERBER:  Objection to
8    form.
9    A.    Correct.
10   Q.    And if you look down below the
11   HarbourVest entities on this chart, you
12   see that Highland Capital Management, L.P.
13   is purchasing a .63 percent interest,
14   correct?
15       MS. WEISGERBER:  Objection to
16   form.  The document speaks for itself.
17   A.    According to the document, yes.
18   Q.    Do you have any reason to
19   disagree with that document?
20       MS. WEISGERBER:  Objection to
21   form.
22   A.    I do not.
23       MR. WILSON:  All right.  I'm
24   going to stop that screen share.  I'm

Page 68

Confidential - Pugatch

1    going to E-mail out the next exhibit.
2    This was Exhibit 8 that I just sent,
3    and I'll pull it up on the screen
4    share.
5        (Whereupon, Exhibit 8, E-mail
6    08/15/2017, was marked for
7    identification.)
8    Q.    Now, I'll represent to you that
9    I received this document this morning from
10   your counsel.  Do you recognize this
11   E-mail?  Have you seen it before?
12   A.    Yes, I have.
13   Q.    And this E-mail is sent by Brad
14   Eden.  I think you mentioned that he was
15   one of the representatives that was
16   involved in the pre-investment discussions
17   with Highland?
18   A.    Correct.
19   Q.    And I think you told me that
20   Dustin Willard was involved in those
21   discussions on the HarbourVest side,
22   correct?
23   A.    Correct.
24   Q.    And so this is an E-mail sent on

Page 69

Confidential - Pugatch

1    August 15, 2017 from Brad Eden to Dustin
2    Willard.  Are you familiar with Thomas
3    Surgent?
4    A.    Yes.
5    Q.    Was he involved in those
6    discussions with you and HarbourVest as
7    well?
8    A.    In some of those discussions,
9    yes.
10   Q.    Okay.  So when it says, "Dustin,
11   attached is a legal summary.  Of course,
12   Thomas is available to answer any
13   follow-up questions."  Do you know if
14   Thomas was consulted with any follow-up
15   questions?
16   A.    I recall —
17       MS. WEISGERBER:  Objection to
18   form.
19   A.    — having follow-up
20   conversations with Highland, I don't —
21   around these legal summaries.  I don't
22   recall with whom.
23   Q.    Okay.  And just to show you the
24   attachment that's referenced in the

Page 70

Confidential - Pugatch

1    E-mail, this says that SEC financial
2    crisis matter crusader, Terry, Daugherty
3    and UBS. So and then I guess these are --
4    this is information provided by Highland
5    to HarbourVest regarding these matters.
6    Why were these particular matters
7    addressed in this E-mail, to your
8    knowledge?
9         MS. WEISGERBER: Objection to
10        form and foundation.
11    A.    These were all outstanding
12   litigation matters that we had become
13   aware of in connection with our diligence
14   that we asked for a further explanation
15   from Highland on the underlying substance.
16    Q.    Now, did you become
17   independently aware of these in the course
18   of your due diligence, or were these
19   brought to your attention by Highland
20   first?
21    A.    I don't know.
22        MS. WEISGERBER: Objection to
23        form.
24    Q.    You don't know?

Page 71

Confidential - Pugatch

1    A.    (Nods.)
2    Q.    Okay. And particularly with
3    respect to Mr. Terry, is it your opinion
4    that there are any material
5    misrepresentations made in this summary?
6         MS. WEISGERBER: Objection to
7         form. Objection to the extent it
8         calls for a legal conclusion.
9         Mike, to the extent you have an
10        answer that does not infringe on
11        conversations with counsel, you can
12        provide it.
13    A.    Yeah, I would say our
14   understanding or interpretation of that,
15   or the answer to that question would be
16   based on conversations with counsel.
17    Q.    Well, this document was provided
18   to you in the course of the discussions
19   prior to HarbourVest's investment, and
20   you've stated that Highland, or you've
21   taken the position that Highland made
22   material misrepresentations to
23   HarbourVest, in the course of these
24   discussions.

Page 72

Confidential - Pugatch

1         Does this document evidence
2    those material misrepresentations?
3         MS. WEISGERBER: Objection to
4         form. Objection to the extent it
5         calls for a legal conclusion.
6    A.    Yeah, same answer as previous.
7    Q.    Well, I'm not asking you for a
8    legal conclusion. I'm asking you are
9    there misrepresentations in this document
10   that you claim Highland made?
11        MS. WEISGERBER: Same
12        objections.
13        I think misrepresentations calls
14   for a legal conclusion regarding legal
15   misrepresentations, actionable
16   misrepresentations. So if he doesn't
17   have any non-privileged testimony to
18   give, he can't give any testimony.
19        MR. WILSON: Well, I'm here
20   today to investigate HarbourVest's
21   claim and one of the basis of
22   HarbourVest's claim is
23   misrepresentation. So I'm trying to
24   figure out what those

Page 73

Confidential - Pugatch

1    misrepresentations were.
2         And I would ask that the witness
3    tell me if there's a misrepresentation
4    in this document that was provided in
5    this E-mail.
6         MS. WEISGERBER: Same
7         objections.
8         Mike, if you have a general
9    understanding of, generally,
10   misrepresentations that HarbourVest
11   believes were made in connection or
12   regarding the Terry litigation,
13   et cetera, you can provide that
14   information.
15        THE WITNESS: Yeah, sure.
16    A.    So in general, my understanding
17   and the way that Highland had
18   characterized the ongoing litigation with
19   Mr. Terry was that it was nothing more
20   than an employment dispute with a former
21   employee and that, you know, the
22   arbitration -- well, actually, it was
23   before the Arbitration Board, but the
24   ongoing litigation had no impact, bearing,

004037

Page 74

Confidential - Pugatch

1  or ultimate result on the underlying CLOs
2  that Highland managed, including the Acis
3  CLOs.
4      Q.  So you're saying that
5  Highland --
6      MR. MORRIS:  John, I'm sorry to
7  interrupt.  Before you go on, somebody
8  with the initials DSD just joined the
9  deposition.  Can you please identify
10  yourself?
11     MR. DRAPER:  This is Douglas
12  Draper.  I just changed machines.
13     MR. MORRIS:  Okay.  No problem,
14  Doug.  Thank you.
15  BY MR. WILSON:
16     Q.  So, and I'm not trying to put
17  words in your mouth, but is the gist of
18  what you're telling me that Highland
19  represented that this was a minor dispute
20  with a former employee and it would not
21  affect its CLO business?
22     A.  Correct.
23     MS. WEISGERBER:  Objection to
24  form.

Page 75

Confidential - Pugatch

1      A.  Correct.
2      Q.  Well, are there any more
3  specific E-mails or written
4  communications, that you're aware of, that
5  would contain misrepresentations by
6  Highland to HarbourVest?
7      MS. WEISGERBER:  Objection to
8  form.
9      Are you asking about from
10  today's production, or are you asking
11  about just, in general?
12     MR. WILSON:  Well, you produced
13  two E-mails to us today.  I'm just
14  asking if there's anything else he's
15  aware of where there's written
16  misrepresentations from Highland to
17  HarbourVest.
18     MS. WEISGERBER:  Mike, if you
19  have an answer separate from
20  conversations with lawyers, et cetera,
21  you can certainly answer.
22  23  A.  Yeah, my understanding of the
23  documents I reviewed that were part of the
24  production to you earlier today, there is

Page 76

Confidential - Pugatch

1      another document that would also include
2  misrepresentations on the part of this,
3  the Terry lawsuit and ultimate impact on
4  the CLO business.
5  BY MR. WILSON:
6      Q.  And what document is that?
7      A.  That was the E-mail, E-mail with
8  an attachment around a response to a Wall
9  Street Journal article and some of the
10  content in the E-mail itself.
11     Q.  Okay.  We'll look at that one.
12     What was the -- HarbourVest had
13  seen the Terry Arbitration Award, correct?
14     MS. WEISGERBER:  Objection to
15  form.
16     Q.  Prior to making its investment
17  in HCLOF?
18     A.  We were aware of the existence
19  and the outcome of the Arbitration Award.
20     Q.  Had you read the Arbitration
21  Award?
22     A.  No.
23     Q.  Well, how did you know the
24  substance of the Arbitration Award without

Page 77

Confidential - Pugatch

1      reading it?
2      MS. WEISGERBER:  Objection to
3  form.
4      A.  We were informed by Highland of
5  the outcome of the ongoing litigation and
6  the outcome of the Arbitration Award.
7      Q.  Was that part of the
8  documentation that you requested Highland
9  provide you to continue your due
10  diligence, before making the investment?
11     MS. WEISGERBER:  Objection to
12  form.
13     A.  We certainly requested more
14  color around the outcome of that, and any
15  impact that it could have to HCLOF or the
16  ongoing viability of Highland's CLO
17  business.
18     Q.  And what, what were you provided
19  with respect to the Terry Arbitration
20  Award?
21     MS. WEISGERBER:  Objection to
22  form.
23     A.  The existence of that award, the
24  quantum of that award, the judgment of

Page 78

Confidential - Pugatch

1  just under $8 million in connection with
2  that award.  That was the information that
3  was disclosed at -- and represented as a
4  settlement or, you know, arbitration
5  ruling, in connection with the employee
6  litigation, wrongful termination suit.
7  Q.    So did HarbourVest not request a
8  copy of the Arbitration Award to review?
9        MS. WEISGERBER:  Objection to
10  form.
11  A.    We did not specifically, no.
12  Q.    And so, to this day, have you
13  read the Arbitration Award?
14  A.    I have not.
15        MS. WEISGERBER:  Objection to
16  form.
17  Q.    You have not?
18  A.    I have not.
19        MR. WILSON:  Okay.  I think my
20  last E-mail went out with Exhibit 9 on
21  it.  I will pull that up.
22  Q.    Can you see that on the screen
23  share?
24  A.    Yes.

Page 79

Confidential - Pugatch

1        (Whereupon, Exhibit 9,
2        11/29/2017 E-mail with cover letter
3        Highland Capital Management, was
4        marked for identification.)
5  Q.    Okay.  So I think this is out of
6  order, but this should have been first in
7  the exhibit.  But this is an E-mail from
8  Hunter Covitz to Dustin Willard, Michael
9  Pugatch and Nick Bellisario, carbon copies
10  to Trey Parker and Brad Eden.
11        And Trey Parker and Brad Eden
12  are Highland affiliates, right?
13  A.    Yes.
14  Q.    And we've talked about Dustin
15  Willard.  Who's Nick Bellisario?
16  A.    He was another member of the
17  HarbourVest team.
18  Q.    And was he on the, the
19  four-member board that you talked about
20  earlier, that made the investment
21  decision?
22  A.    No, he was the junior member of
23  the investment team that I alluded to.
24  Q.    Okay.  And this, this E-mail

Page 80

Confidential - Pugatch

1  came out about two weeks after the
2  HarbourVest investment, correct?
3  A.    Correct.
4  Q.    And it's your opinion or
5  position that this E-mail contains
6  misrepresentations that Highland made to
7  HarbourVest?
8        MS. WEISGERBER:  Objection to
9  form.  Objection to the extent it
10  calls for a legal conclusion.
11  A.    Yes.
12  Q.    And there was a Wall Street
13  Journal article that had come out shortly
14  before this E-mail, correct?
15  A.    Correct.
16  Q.    And how did you became aware of
17  that Wall Street Journal article?
18  A.    I certainly would have seen it.
19  I may have been sent it separately by
20  Highland, I don't recall.
21  Q.    You don't recall if you saw it
22  independently or Highland telling you
23  about it?
24  A.    I don't.

Page 81

Confidential - Pugatch

1  Q.    And what did you -- what was
2  your reaction to receiving these E-mails
3  from Highland regarding that article?
4        MS. WEISGERBER:  Objection to
5  form.
6  A.    The article or the accusations
7  in the article were something that
8  required more explanation from our
9  perspective.
10  Q.    And attached to this E-mail
11  was -- we just scrolled through it a
12  second ago -- but a letter from James
13  Dondero that was sent to the
14  editor-in-chief of the Wall Street
15  Journal, Mr. Gerard Baker, on November
16  28th.
17        And did you read this
18  attachment?
19  A.    Yes.
20  Q.    And did this attachment to this
21  E-mail aleve your concerns that you had
22  regarding the article?
23        MS. WEISGERBER:  Objection to
24  form.

Confidential - Pugatch

A. I wouldn't say alleviated the concerns but certainly provided an explanation or refute to some of the claims made in the, in the article.

Q. And do you contend that this letter that was written to Gerard Baker and provided later to HarbourVest was a material misrepresentation?

MS. WEISGERBER: Objection to form.

Don't answer that, Mike. It calls for a legal conclusion.

MR. WILSON: I'm asking for his understanding.

Q. Do you contend that there's misrepresentations in this letter?

MS. WEISGERBER: Material misrepresentations absolutely calls for a legal conclusion, John.

MR. WILSON: Well, I've shortened it to misrepresentations. So I just want to know if he thinks there's anything that's misrepresented in this letter.


Confidential - Pugatch

MS. WEISGERBER: Same objections.

Mike, if you have an understanding, separate from conversations with lawyers, you can answer.

A. I would need to reread the letter to definitively answer that outside of conversations with counsel.

Q. But to be clear, this letter was issued two weeks after HarbourVest's investment, correct?

A. Correct.

MS. WEISGERBER: Objection; asked and answered.

MR. WILSON: I'm going to now send out the next exhibit, which is going to be Exhibit No. 10.

(Whereupon, Exhibit 10, 2004 Examination of Investor in Highland CLO Funding Ltd. 10/10/2018, was marked for identification.)

MR. WILSON: It just went through. So I'm going to pull it up


Confidential - Pugatch

on my screen share.

So this Exhibit 10, the document I received this morning, filed in the Acis bankruptcy, it looks like, well, let's see, dated in, dated October 10, 2018.

BY MR. WILSON:

Q. Have you seen this document before?

A. Yes.

Q. And it's a motion for 2004 Examination of Investor in Highland CLO Funding, Ltd., correct?

A. Sorry. Was there a question, John?

Q. Yeah. I was just asking you to confirm that this was the motion for 2004 Examination of Investor in Highland CLO Funding?

A. Yes.

Q. And so if I scroll down to Paragraph 6, which is on, it looks like it's on Page 4. In the second sentence, it says that "Although HCLOF/ALF was a one


Confidential - Pugatch

time wholly-owned by an affiliate of Highland, it did an offering memorandum in November of 2017 and as a result, is now owned 49.985% by certain affiliates of a large investor and manager of private equity funds."

And that's defined as investor. So the Investor is the HarbourVest entities collectively, correct?

A. Correct.

Q. All right. And then the next sentence, says that "Despite its large ownership percentage in HCLOF in the alleged millions in losses that will result if the Acis CLOs are not reset to make them consistent with prevailing market conditions the Investor has not yet appeared in this case or taken any position in this bankruptcy case."

Do you see that?

A. I do.

Q. Is that correct?

MS. WEISGERBER: Objection to form.

Page 86

Confidential - Pugatch

1    A.   Is what correct?
2    Q.   Well, I guess, I'm most
3    concerned with this last part of the
4    sentence.  It starts with "The Investor
5    has not yet appeared in this case or taken
6    any position in the bankruptcy case."
7        Do you agree with that?
8        MS. WEISGERBER:  Objection to
9    form.
10       Mike, if you want to look at the
11   whole document, you're welcome to.
12   This is not a document that's a
13   HarbourVest-prepared document.
14   BY MR. WILSON:
15   Q.   Maybe a better way of asking the
16   question is:  As of the date of this
17   document, which was in October of 2018,
18   had HarbourVest appeared in the Acis
19   bankruptcy?
20   A.   No, we did not.
21   Q.   And had they asserted any
22   positions regarding the Acis bankruptcy?
23   A.   Not through the court.
24       MS. WEISGERBER:  Objection to

Page 87

Confidential - Pugatch

1    form.
2    Q.   Okay.  Had Highland encouraged
3    HarbourVest to participate in the Acis
4    bankruptcy?
5        MS. WEISGERBER:  Objection to
6    form.
7    A.   No.
8    Q.   They did not?
9        MS. WEISGERBER:  Objection to
10   form.
11   Q.   Highland did not encourage
12   HarbourVest to participate in the Acis
13   bankruptcy?
14   A.   When you say "participate," can
15   you define that, please.
16   Q.   Well, appear in the case, as
17   stated in this motion.
18   A.   No, they had not.
19   Q.   Did Harbour -- I'm sorry -- did
20   Highland keep HarbourVest apprised of the
21   events that occurred in the Acis
22   bankruptcy?
23       MS. WEISGERBER:  Objection to
24   form.  I'm just going to restate my

Page 88

Confidential - Pugatch

1    objection to the extent you're asking
2    questions about HarbourVest.  This is
3    Mr. Pugatch answering, based on his
4    knowledge.
5    A.   We were kept informed from time
6    to time throughout the Acis bankruptcy
7    proceeding.
8    Q.   Well, did you, in fact, have
9    weekly conference calls with Highland
10   representatives regarding the Acis
11   bankruptcy?
12       MS. WEISGERBER:  Objection to
13   form.
14   A.   I don't recall them being
15   weekly, no.
16   Q.   You can agree with me you
17   participated in the conference calls with
18   Highland regarding the Acis bankruptcy?
19   A.   Yes.
20       MS. WEISGERBER:  Same objection.
21   Q.   And on what, on what --
22       MR. WILSON:  Sorry.  Strike
23   that.
24   Q.   With what regularity would you

Page 89

Confidential - Pugatch

1    estimate those conference calls occurred,
2    if it's not weekly?
3        MS. WEISGERBER:  Objection to
4    form.
5    A.   From memory, maybe once, once a
6    month on average.  Sometimes more
7    frequently, sometimes less frequently.
8    Q.   Did Highland provide you with
9    documents and evidence that were filed in
10   the Acis bankruptcy?
11       MS. WEISGERBER:  Objection to
12   form.
13       We're really starting to get
14   pretty far afield here, John, from
15   HarbourVest.  You know, I'm not sure
16   where you're going with this.  This is
17   a settlement motion that's teed up for
18   the court.
19       You're welcome to keep going,
20   but at some point we're going to cut
21   it off.
22       MR. WILSON:  Well, I think -- I
23   don't think I'm going to go too far
24   down this path, but I think this

Page 90

Confidential - Pugatch

1      directly relates to the claims that
2      HarbourVest has made.  But I'll repeat
3      my question.
4  BY MR. WILSON:
5      Q.   Did Highland provide HarbourVest
6  with documents and evidence that were
7  filed in the Acis bankruptcy?
8          MS. WEISGERBER:  Objection to
9      form.
10     A.   I don't recall what documents
11  Highland may have provided to us, at that
12  point in time.
13     Q.   I don't want you to recall
14  specific documents that were provided, but
15  did, did Highland provide documents from
16  the Acis bankruptcy to HarbourVest?
17         MS. WEISGERBER:  Objection to
18     form.  Asked and answered.
19     A.   I don't recall.
20     Q.   You don't recall?
21     A.   (Nods.)
22     Q.   Would you dispute that between
23  2018 and 2019 that Highland provided over
24  40,000 pages of documents related to the

Page 91

Confidential - Pugatch

1  Acis bankruptcy to HarbourVest?
2          MS. WEISGERBER:  Objection to
3      form, foundation.
4      A.   I don't know and I don't recall.
5      Q.   And the Acis plan became
6  effective on February 1st, 2019.  Is that
7  your understanding?
8      A.   I believe so, yes.
9      Q.   And do you -- I asked you this
10  earlier, but I'm going to ask again.  Do
11  you have any understanding of what the
12  value of HCLOF was, at that date?
13     A.   I don't recall.
14         MS. WEISGERBER:  Objection to
15     form.
16     Q.   You don't?
17     A.   I don't recall, no.
18     Q.   And there was an injunction put
19  in place in the Acis bankruptcy that
20  prevented certain actions with respect to
21  HCLOF, correct?
22         MS. WEISGERBER:  Objection to
23     form, foundation.
24         MR. MALONEY:  Join.

Page 92

Confidential - Pugatch

1      A.   Yes.
2      Q.   Now, I'm going to go back up to
3  Paragraph 2.  This says that Acis LP
4  manages the Acis CLOs, that certain
5  portfolio management agreement between
6  Acis, and then it goes on.  So what are
7  the Acis CLOs, as it relates to the
8  investment that HarbourVest made?
9          MR. MALONEY:  Objection to the
10     form of the question.
11         MS. WEISGERBER:  Objection to
12     form.
13     A.   The Acis CLOs -- or HCLOF owned
14  equity in certain of the Acis CLOs as a
15  portion of its investment portfolio.
16     Q.   And I think you were trying to
17  distinguish earlier between who the
18  portfolio manager was.  And that would
19  depend on whether it was an Acis CLO or a
20  Highland CLO; is that correct?
21         MR. MALONEY:  Objection to form.
22         MS. WEISGERBER:  Objection to
23     form, misstates testimony.
24     A.   I was referencing the portfolio

Page 93

Confidential - Pugatch

1  manager of the underlying CLOs, yes.
2      Q.   But we can agree that Acis had
3  responsibility for managing at least a
4  portion of HCLOF, correct?
5      A.   Highland --
6          MR. WILSON:  Objection to form.
7          MR. MALONEY:  Objection to form
8      as well, foundation, and legal
9      conclusion.
10         (Reporter clarification.)
11     A.   It's my understanding it's
12  Highlands' subsidiaries, yes.
13     Q.   Okay.  Well, I'm going to go
14  down to Paragraph 4, at the top of your
15  screen here where it says, "Recently
16  William Scott, the director of HCLOF,
17  testified that he wants to reset the Acis
18  CLOs to bring them in line with current
19  market interest rates, that the inability
20  to do the reset is causing damages to
21  HCLOF in the amount of approximately
22  $295,000 per week."
23         Is that an accurate statement?
24         MS. WEISGERBER:  Objection to

Confidential - Pugatch

1    Confidential - Pugatch
2    form and foundation.
3        MR. MALONEY:  Mark Maloney.
4    Object to form and foundation.
5    A.    I don't know.  You'd have to ask
6    William Scott.
7    Q.    Well, were you aware, I mean,
8    there's a citation to a, well, I don't
9    know if there's a citation on this one.
10   But it says that he recently testified.
11   Were you aware that he testified that he
12   wanted to reset the Acis CLOs?
13       MS. WEISGERBER:  Same objection.
14   We're really getting far afield.
15       MR. WILSON:  I'm just asking if
16   he was aware that this statement
17   occurred.
18   A.    At some point in time, yes, I
19   became aware of that.
20   Q.    Okay.  Do you agree that the
21   inability to do a reset was causing
22   damages in the amount of $295,000 per
23   week?
24       MS. WEISGERBER:  Objection to
25   form and foundation.  This is not a

1    Confidential - Pugatch
2    HarbourVest-prepared document.
3        MR. WILSON:  Well, I understand
4    that.  I'm just asking if he agrees
5    with it.
6    A.    I don't have enough information
7    to assess that, specifically the $295,000
8    per week number.
9    Q.    I want to go down to Paragraph 7
10   of this document, and this is going to be
11   at the top of Page 5.  It says
12   "Mr. Ellington also testified that because
13   it would be putting in additional capital
14   in connection with any reset CLOs, the
15   Investor," and we discussed that that's
16   HarbourVest, "had the ability to start
17   'calling the shots' and dictate the terms
18   of any reset transactions."
19       Do you agree with that?
20   A.    No.
21       MS. WEISGERBER:  Objection to
22   form.
23   Q.    I want to go down to Paragraph
24   9.
25       It says, "The Trustee also needs

1    Confidential - Pugatch
2    information regarding whether the Investor
3    presently has any concerns about pursuing
4    reset transactions with the Reorganized
5    Acis and Brigade, under the plan now that
6    Acis has been able to successfully serve
7    as the portfolio manager for the Acis CLOs
8    on a post-petition basis, and there are no
9    impediments to the ability of the
10   Reorganized Acis and Brigade to pursue a
11   reset on the Acis CLOs."
12       Do you know whether the Investor
13   had any concerns about pursuing a reset?
14       MS. WEISGERBER:  Objection to
15   form, foundation.
16   A.    The context of a reset or
17   refinancing of the various CLOs in HCLOF
18   was part of the original investment
19   thesis.  So there would not have been
20   concerns about the ability to do so.  Our
21   concerns were more in the inability to do
22   so, as a result of the Acis bankruptcy.
23   Q.    But here, you've got the Trustee
24   representing in Paragraph 5, that
25   according to the Trustee's Second Amended

1    Confidential - Pugatch
2    Joint Plan, it provides for such a reset
3    to be performed by the Reorganized Acis
4    and supervised by Brigade Capital
5    Management.
6        And it appears to me that the
7    Trustee is trying to get the Investor's
8    position on whether a reset should be
9    pursued.  And I'm just asking you whether
10   HarbourVest objected to a reset at this
11   time?
12       MS. WEISGERBER:  I'm going to
13   object to all of the colloquy before.
14   I'm going to object to any extent
15   Mike's being asked about what the
16   Trustee wanted or viewed.  If you want
17   to ask your question in isolation, go
18   ahead.
19   Q.    What was HarbourVest's position
20   regarding a reset, as of the date that
21   this was filed, and I'll look again,
22   October 10, 2018?
23       MS. WEISGERBER:  Objection to
24   form.  Objection to the extent it's
25   asking HarbourVest's position.  And I

Page 98

Confidential - Pugatch

1    cannot conceive how this is relevant
2    to the 9019 motion before the court
3    right now.
4         Nonetheless, Mike, if you have
5    an answer, on behalf of yourself, you
6    can answer.
7    A.    HarbourVest was a passive
8    minority investor in HCLOF.  It had no
9    ability to control the underlying
10   portfolio management or ability to reset,
11   refinance, or call in any of the equity of
12   the underlying CLOs.  That was all under
13   the purview of Highland.
14   Q.    Did you understand that
15   Mr. Ellington had given sworn testimony
16   that the Investor is the party calling the
17   shots for HCLOF, with respect to any reset
18   transactions?
19        MS. WEISGERBER:  Objection to
20   form.
21   A.    I did became aware of it, yes.
22   Q.    When did you become aware of
23   that?
24   A.    At some point subsequent to that

Page 99

Confidential - Pugatch

1    testimony being given.
2    Q.    But was it when you read this
3    motion that we're looking at as
4    Exhibit 10?
5         MS. WEISGERBER:  Objection to
6    form.
7    A.    It may have been.  I don't
8    recall the exact time or medium that I
9    became aware of that.
10   Q.    Was a deposition given as a
11   result of this motion?
12        MS. WEISGERBER:  Objection to
13   form.  If you have the whole document,
14   Mike, that may make sense.
15        MR. WILSON:  Well, this motion
16   at the top says it's a Motion for 2004
17   Examination of Investor.  And then
18   attached to this motion are some
19   document requests, and then deposition
20   topics for a corporate representative
21   of the Investor, and then a proposed
22   order.
23   BY MR. WILSON:
24   Q.    Do you recall whether a

Page 100

Confidential - Pugatch

1    deposition was given, after this motion
2    was filed?
3    A.    Yes.
4    Q.    And who was the designated
5    deponent?
6    A.    I was.
7    Q.    And were documents produced, as
8    a result of this?
9    A.    Yes, there were.
10   Q.    And were you asked at that
11   deposition what the Investor's position on
12   a reset was?
13        MS. WEISGERBER:  Objection to
14   form.
15        If you recall.
16   A.    I don't recall specifically that
17   question being asked.
18   Q.    Well, do you know what
19   the Debtor's position -- I'm sorry, the
20   Debtor's -- the Investor's position on a
21   reset was as of that day?
22        MS. WEISGERBER:  Objection to
23   form.  Asked and answered.
24   A.    I would just say again, in

Page 101

Confidential - Pugatch

1    general, the original investment thesis
2    here was predicated on a refinancing reset
3    of the various CLOs, and we were not in
4    control as a passive minority investor
5    here to --
6    Q.    Well, you said you weren't in
7    control, but what would HarbourVest's
8    preference have been?
9         MS. WEISGERBER:  Objection to
10   form.
11   A.    I do not recall.
12        MS. WEISGERBER:  If you recall.
13   A.    I don't recall the specifics
14   around what Acis CLO were referring to
15   here or what the specific implications of
16   a reset were at that time; but regardless,
17   that was a decision for the investment
18   manager of HCLO.
19   Q.    But was it your opinion, your
20   personal opinion, that a reset was
21   appropriate?
22        MS. WEISGERBER:  Objection to
23   form.
24   A.    Again, we were not the portfolio

Page 102

Confidential - Pugatch

1  manager of HCLOF.  We were not in control
2  of those decisions or making
3  recommendations on those decisions.  That
4  was the delegated authority of Highland,
5  as the investment manager.
6      Q.   I'm not asking for that.  I'm
7  asking for your personal feelings toward a
8  reset.
9          MS. WEISGERBER:  Same objection.
10  He's only answering on behalf of
11  himself, and it's been asked and
12  answered three times since.
13          MR. WILSON:  Well, he hasn't
14  answered the question.  He's just told
15  me they don't have the authority to do
16  the reset.
17          MS. WEISGERBER:  And he told you
18  the other direction he'd be required
19  to even have an opinion on it.  So
20  same objection stands.  It's not a
21  specific enough question for him.
22  Mike, you're welcome, if you
23  have, if you have an answer, you're
24  welcome to give it.

Page 103

Confidential - Pugatch

1      A.   Yeah, the investment guidelines
2  of HCLOF, from the documents that we
3  signed at the time we entered into the
4  transaction, laid out the specific, again,
5  investment guidelines that HCLOF would be
6  guided under, including the opportunity to
7  refinance or reset various CLOs over time,
8  in accordance with Highland's, you know,
9  expectations and ultimate decision to do
10  so.
11      Q.   But did you believe, at this
12  time, that a reset was appropriate?
13          MS. WEISGERBER:  Objection to
14  form.  This is asked and answered
15  several times now, I think we should
16  move on.  He's given you an answer.
17          MR. WILSON:  Well, I want to
18  know what his personal opinion was
19  about whether the reset was
20  appropriate.
21      A.   What reset are you referring to?
22      Q.   A reset as of October 10, 2018.
23  At that time, did you believe that a reset
24  was appropriate?

Page 104

Confidential - Pugatch

1      A.   A reset of what?
2          MS. WEISGERBER:  Same objection.
3      Q.   A reset as been discussed all
4  through this motion, the same reset we're
5  talking about.
6          MS. WEISGERBER:  Objection.
7  Same objections.  I just don't see how
8  he could possibly answer this vague
9  question.
10      Q.   Okay.  So William Scott,
11  director of HCLOF, testified that he
12  wanted to reset the Acis CLOs because if
13  they don't, they are losing $295,000 a
14  week.
15          Did you think that a reset was
16  appropriate in line with what Mr. Scott
17  believed?
18          MR. MALONEY:  Objection to form,
19  foundation.
20          MS. WEISGERBER:  Same
21  objections.  And asked and answered
22  numerous times.
23      A.   We were not managing the
24  portfolio.  We were an investor in a

Page 105

Confidential - Pugatch

1  company, an investment company that was
2  managing this.  We were not, I was not
3  proximate enough to any of the underlying
4  happenings of the look through CLO
5  positions of HCLOF to have an informed
6  view on this, at this time.
7      Q.   Is your testimony that you did
8  not have an opinion as to whether the Acis
9  CLO should be reset in late 2018?
10          MS. WEISGERBER:  Objection to
11  form.  Misstates testimony.
12      A.   My view is that the original
13  investment guidelines here called for a
14  reset or refinance of the CLOs and that
15  Highland was subsequently in full control
16  of whether or not to pursue this, and we,
17  HarbourVest, as an investor had no ability
18  to object or to force that on a go-forward
19  basis.
20          MR. WILSON:  Objection.
21  Nonresponsive.
22      Q.   I want to know your personal
23  opinion of whether you thought a reset was
24  appropriate in October of 2018.

004045

Page 106

Confidential - Pugatch

1    MR. MORRIS:  Objection to the
2  form of the question.  That's been
3  asked and answered.
4    MR. WILSON:  He has yet to give
5  his answer to --
6    MR. MORRIS:  He just told you he
7  didn't have enough information.  He
8  just told you that, crystal clear.
10    MR. WILSON:  Well, I'm not going
11  to argue with you, John, but I just
12  want an answer to my question.
13    His answer, he wouldn't agree
14  with my, with my summation that he had
15  no opinion, so I just want to know
16  what his opinion is.
17    MS. WEISGERBER:  Same
18  objections.
19    You're not giving him enough
20  information to answer the question,
21  and at this point, it would be
22  speculation.  We can just keep going
23  in circles on this, but your --
24    MR. WILSON:  His opinion would
25  be speculation?

Page 107

Confidential - Pugatch

1    MS. WEISGERBER:  He said that,
2  he actually testified at some point
3  that he doesn't recall specifics of
4  the time, so that was another piece of
5  the puzzle.
6    I mean, I don't want to be
7  coaching the witness or giving
8  testimony here, but I think you're not
9  listening to the things he's saying,
10  John, just because you don't like it.
12  BY MR. WILSON:
13    Q.   Mr. Pugatch, did you have an
14  opinion, in October of 2019, about whether
15  the Acis CLOs should be reset?
16    MS. WEISGERBER:  Objection to
17  form.
18    A.   I don't recall any definitive
19  opinion I would have had, but as stated,
20  was not proximate enough to have an
21  informed opinion, in any event.
22    Q.   And to your knowledge, have the
23  Acis CLOs ever been reset?
24    MS. WEISGERBER:  Objection to
25  form, foundation.

Page 108

Confidential - Pugatch

1    A.   I do not believe that any of the
2  Acis CLOs were ever reset.
3    Q.   All right.  So who negotiated
4  this claim, the settlement of this claim
5  on behalf of HarbourVest?
6    A.   I did.
7    Q.   And who negotiated for the
8  Debtor?
9    A.   Jim Seery.
10    Q.   And when did those negotiations
11  begin?
12    A.   It started sometime in November,
13  I believe.
14    Q.   And are you aware that Jim Seery
15  has ever taken the position that the
16  HarbourVest claim was worthless?
17    MS. WEISGERBER:  Objection to
18  form, foundation.
19    A.   No, I'm not aware of that.
20    Q.   Has Jim Seery ever offered
21  $5 million to settle the HarbourVest
22  claim?
23    A.   Not to my knowledge.
24    MS. WEISGERBER:  Objection to

Page 109

Confidential - Pugatch

1  form.
2    MR. WILSON:  I'm going to send
3  out Exhibit 11.
4    (Whereupon, Exhibit 11,
5  Declaration of John A. Morris in
6  Support of the Debtor's Motion For
7  Entry of an Order Approving Settlement
8  With Harbourvest (Claim Nos. 143, 147,
9  149, 150, 153, 154) and Authorizing
10  Actions, 82 pages, was marked for
11  identification.)
12  BY MR. WILSON:
13    Q.   I want pull this up on the
14  screen share.  This Exhibit 11 is the
15  Declaration of John Morris in Support of
16  the Debtor's 9019 Motion, bears
17  Document 1631.  And attached to this
18  exhibit is a trim copy of the
19  Settlement Agreement executed December 23,
20  2020.
21    And the Settlement Agreement has
22  Paragraph 1, Settlement of Claims, that
23  HarbourVest is going to receive a
24  $45 million unsecured, general unsecured

Page 110

Confidential - Pugatch

1  claim, and a $35 million subordinated
2  claim.
3      And then Part B of that
4  paragraph states that HarbourVest is going
5  to transfer all its rights, titles, and
6  interests to its investment in CLOF to the
7  Debtor or its nominee.
8      Is that your understanding of
9  the general terms of this settlement?
10     MS. WEISGERBER:  Objection to
11 form.
12 A.   Yes, it is.
13 Q.   Okay.  And also in Paragraph 5,
14 Each HarbourVest party agrees that it will
15 vote all of HarbourVest claims held by
16 such HarbourVest party to accept the plan.
17     And I won't read all of that.
18 But the gist of this paragraph is that
19 HarbourVest is going to vote for the
20 Debtor's proposed plan; is that correct?
21     MS. WEISGERBER:  Objection to
22 form.
23 A.   Yes, correct.
24 Q.   And how did that term come to be

Page 111

Confidential - Pugatch

1  in this Settlement Agreement?
2      MS. WEISGERBER:  Objection to
3  form.
4  A.   I believe it was put there as
5  part of the drafting of the ultimate
6  agreement to the fund.
7  Q.   Well, whose suggestion was it
8  that it be added to the drafting?
9      MS. WEISGERBER:  Objection to
10 form.
11 A.   I believe that it came from
12 Debtor's counsel, as they took the lead on
13 drafting the documentation here.
14 Q.   Did Jim Seery ever tell you that
15 it was important to him that HarbourVest
16 vote in support of the plan?
17     MS. WEISGERBER:  Objection to
18 form.
19 A.   I don't recall that ever being
20 discussed.  Certainly it was not the
21 prominent feature of any of the
22 discussions or negotiations that I ever
23 had with Jim.
24 Q.   Okay.

Page 112

Confidential - Pugatch

1      MR. WILSON:  I'm going to take a
2  ten-minute break, and I think I'm
3  almost ready to wrap up.  So I want to
4  stop my screen share.  And let's,
5  well, let's start back at 2:30, and I
6  think I'll be quick.  Thank you.
7      (Recess taken.)
8  BY MR. WILSON:
9  Q.   Mr. Pugatch, earlier you
10 testified that consistent with your
11 declaration you filed that as of August
12 31, 2020, the value of HCLOF was
13 $44.5 million.  And then if we look at --
14 I don't remember which --
15     Okay.  So this would have been
16 Exhibit 7.  I'll do a share screen.
17     As of November 15, 2017 these
18 shares were purchased at $1.02 and change
19 apiece, and there were a total number of
20 143 million shares.
21     Was the value of this investment
22 roughly $150 million, as of November 15,
23 2017?
24     MS. WEISGERBER:  Objection to

Page 113

Confidential - Pugatch

1  form.  Foundation.
2      MR. MALONEY:  Join.
3      MS. WEISGERBER:  I don't know,
4  Mike, if you're comfortable doing that
5  math or what.
6  A.   Yes, approximately that's
7  correct.
8  Q.   Okay.  And you know, and I've
9  read your papers and you talk about
10 attorneys' fees that you say weren't
11 appropriate to be charged to HCLOF and
12 that part of it, but as to the loss of
13 value of the actual investment, what's
14 your understanding of what led to that?
15     MS. WEISGERBER:  Objection to
16 form.  Objection to the extent it
17 calls for a legal conclusion.
18     Mike, to the extent you have a
19 nonlegal opinion on that, that's not
20 based on conversations with counsel,
21 you can answer.
22 A.   Yeah, I think a lot of the value
23 erosion was due to the inability to
24 refinance, reset a number of the

Page 114

Confidential - Pugatch

1           Confidential - Pugatch
2  underlying CLOs that was part of the
3  original investment thesis here, largely
4  as a result of the ongoing litigation,
5  that Highland was involved in, and the
6  subsequent Acis bankruptcy.
7      Q.   And so during the period of time
8  when the injunction prohibited certain
9  actions with respect to this investment,
10  is it your opinion that this investment
11  was losing value?
12        MR. MALONEY:  Objection.
13        MS. WEISGERBER:  Objection to
14    form.
15      A.   Can you repeat the question,
16  John?
17      Q.   Well, I guess I want to know,
18  like, in a, on a timeline kind of basis,
19  do you think that the significant
20  reduction of value occurred prior to or
21  after the confirmation of the Acis plan on
22  February 1, 2019?
23        MS. WEISGERBER:  Objection to
24    form.  Objection to the extent it
25    calls for a legal conclusion.

Page 115

1           Confidential - Pugatch
2        You can give your lay opinion,
3    if you have one, Mike.
4      A.   I think it's all been as a
5  result of the events leading up to the
6  Acis bankruptcy, including the inability
7  to refinance or reset the CLOs which would
8  have been to the benefit of the CLO equity
9  holders including HCLOF.
10      Q.   And so what, what was the cause
11  of the inability to reset?
12        MS. WEISGERBER:  Same
13    objections:  form, foundation, legal
14    conclusion.
15      If you have a non-privileged
16    answer, Mike, go ahead.
17      A.   Yeah, my understanding was
18  originally the TRO, preventing Highland
19  and HCLOF from pursuing that, and then
20  subsequent to the Acis bankruptcy ruling,
21  a similar injunction that remained around
22  the inability for the equity holders of
23  those CLOs to redeem or refinances or
24  reset.
25      Q.   So do you -- is there any

Page 116

1           Confidential - Pugatch
2  component, in your opinion, of the loss of
3  value of these investments due to
4  portfolio mismanagement?
5        MS. WEISGERBER:  Objection to
6    form, foundation, legal conclusion, or
7    expert opinion, calling for
8    speculation.
9      If you have a view, Mike.
10      A.   Yeah.  Can you be more specific
11  with the question, John?
12      Q.   Well, I'll ask it a different
13  way.
14      Do you think that portfolio
15  mismanagement was a portion of the cause
16  of the reduction in value?
17        MS. WEISGERBER:  Same objection.
18      A.   I can't speculate as to, you
19  know, the underlying management decisions
20  around the CLOs, but what I do know is
21  that the mismanagement and
22  misrepresentations at the HCLOF level,
23  that would ultimately result in the Acis
24  bankruptcy and subsequent to that, the TRO
25  and the inability to refinance or reset

Page 117

1           Confidential - Pugatch
2  that has been the, far and away, the
3  largest contributor to loss of value
4  within the portfolio.
5      Q.   One of the allegations that
6  HarbourVest has made is that Highland
7  improperly changed the portfolio manager.
8  Is it your opinion that if that had not
9  been done, the portfolio manager had not
10  been changed at the inception of
11  HarbourVest's investment, that that would
12  have preserved any value of this fund?
13        MR. MORRIS:  Objection to the
14    form of the question.
15        MS. WEISGERBER:  Same objection.
16    Calling for speculation, hypothetical
17    lay opinion.
18      If you have testimony, go ahead,
19    Mike.
20      A.   Sorry, could you just repeat the
21  question, John?  I want to make sure I'm
22  answering it correctly.
23      Q.   I guess I just want to know, and
24  I think you kind of hinted at this a
25  little bit earlier today, but I guess what

Page 118

Confidential - Pugatch

1  I really want to know is do you think that
2  the particular portfolio manager made a
3  difference in the loss of value that HCLOF
4  suffered?
5      MS. WEISGERBER: Same
6  objections.
7      A.   Again, it sounds like you're
8  asking a different question there than
9  what I thought I understood your question
10 to be initially.  What I would say to that
11 is the decision originally to change the
12 portfolio manager, and ultimately the
13 events that took place following the
14 Arbitration Award for Mr. Terry, resulted
15 in the subsequent Acis bankruptcy, which
16 in turn has led to the destruction of
17 value, because of the inability to
18 refinance or reset, the underlying CLOs.
19     Q.   So HarbourVest is not alleging
20 that the portfolio manager made any
21 particular decisions or participated in
22 any mismanagement that led to reduction in
23 value?
24     MS. WEISGERBER: Objection to

Page 119

Confidential - Pugatch

1  form.
2      A.   When you're asking about
3  portfolio manager, are we referring to the
4  portfolio manager at the underlying CLO
5  level or at the HCLOF level?  I think
6  there are two different levels here of
7  portfolio management.
8      Q.   Well, I'm talking about the
9  portfolio manager, and you can tell me
10 which one it is, but which portfolio
11 manager has the ability to, to impact the
12 performance of these funds?
13     MR. MORRIS: Objection.
14     A.   If you're referring to HCLOF,
15 the —
16     MS. WEISGERBER: Objection to
17 form.
18     A.   – investment manager, or the
19 portfolio manager of HCLOF has the ability
20 to drive value creation by virtue of its
21 equity position in the underlying CLOs.
22     Q.   Well, which portfolio manager
23 makes the day-to-day decisions about
24 selling assets, trading assets, that, that

Page 120

Confidential - Pugatch

1  I guess –
2      A.   If you're referring to
3  underlaying credits, that would be the
4  portfolio manager in each of the
5  individual CLOs.  The impact in value to
6  the equity investment in the CLOs is a
7  decision at the HCLOF level, where the
8  majority of that value erosion has
9  resulted from the inability to refinance
10 or reset those CLO entities.
11     Q.   And that's what we're talking
12 about when you said that they, that
13 Highland changed the portfolio manager,
14 you're talking about at the HCLOF level,
15 right?
16     MS. WEISGERBER: Objection to
17 form.
18     A.   Well, I was responding to the
19 question that I thought you asked.  I
20 wasn't necessarily stating that.
21     Q.   I guess all I'm really trying to
22 do here is just understand HarbourVest's
23 position.  And it sounds to me, and
24 correct me if I'm wrong, it sounds to me

Page 121

Confidential - Pugatch

1  that what you're saying is that the
2  diminution of value wasn't attributable to
3  poor investment decisions by a portfolio
4  manager, as much as it was the
5  consequences in the Acis bankruptcy of the
6  change in portfolio manager; is that fair?
7      MS. WEISGERBER: Objection to
8  form.  Misstates testimony.
9      A.   Yes, it is.  That is my general
10 understanding, yes.
11     MR. WILSON: Okay.  No further
12 questions.
13     MR. MORRIS: All right.  Well,
14 thank you very much.
15     THE REPORTER:  Does anybody have
16 any other questions?
17     MR. KANE:  Yes.  This is John
18 Kane with CLO Holdco.  I'll jump on
19 video.  I've got some questions, but
20 I'm going to be relatively short.  If
21 anybody else has a little bit heavier
22 schedule, let me know.
23     All right.  I'll take that as a
24 go-ahead.

Page 122

Confidential - Pugatch

1      EXAMINATION
2      BY MR. KANE:
3          Q.   This is John Kane.  I represent
4      CLO Holdco.
5              Hi, Mike Pugatch.  It's nice to
6      talk to you.
7          A.   Likewise.
8          Q.   I just wanted to briefly
9      confirm.  I believe you testified you
10     participated in negotiations that lead to
11     the Settlement Agreement, that is part of
12     the 9019 motion, before the bankruptcy
13     court; is that correct?
14         A.   Correct.
15         Q.   And did you actively negotiate
16     the terms of that Settlement Agreement?
17         A.   Yes.
18         Q.   As in dollar amounts, what the
19     consideration exchanged, how it would
20     work, that kind of stuff, obviously with
21     the assistance of counsel?
22         A.   Yes.  All of that.  The
23     negotiations were, you know, over the
24     course of a number of weeks and a number

Page 123

Confidential - Pugatch

1      of conversations directly with the Debtor,
2      with counsel, all-hands calls, et cetera.
3          Q.   Okay.  And as part of that in
4      the Settlement Agreement, you say the
5      HarbourVest entities were members in HCLOF
6      are in essence selling their shares to the
7      Debtor, and also in exchange getting some
8      claims back in the Debtor's plan.  Is that
9      a fair summary?
10             MS. WEISGERBER:  Objection to
11     form.  Compound question.
12         Q.   Let me ask it a different way.
13         A.   Can you re-ask that, please?
14         Q.   Yeah.  I'm happy to do that.
15             Why don't you describe for me
16     how you would summarize that settlement?
17         A.   Largely, as I think you just
18     described it, which was in exchange for,
19     in exchange for the, both the unsecured
20     creditors' claim, and subordinated
21     creditors' claim, that settlement value is
22     in exchange for us transferring the
23     interest in HCLOF to the Debtor, as part
24     of that overall negotiating package.

Page 124

Confidential - Pugatch

1          Q.   And what would you estimate, I
2      going to have to imagine, let me rephrase
3      the question.
4              Have you guys done kind of an
5      internal best guess of what your unsecured
6      and subordinated claims would be, under
7      the plan, the value?
8              MS. WEISGERBER:  Objection.
9      Objection to form.
10         A.   Just to be clear, John, are you
11     referring to the expected recovery value
12     of our claims?
13         Q.   Yes, sir.
14             MS. WEISGERBER:  Objection to
15     form.  Can we just clarify, so you're
16     talking about what they'll recover
17     ultimately?  Is that the question,
18     John?  I'm confused myself.  I just
19     want to be sure I am following.
20             MR. KANE:  Yeah.  So I'm asking
21     Mike how much he believes, based on
22     his analysis, that HarbourVest is
23     likely to recover from the $45 million
24     allowed general unsecured claim and

Page 125

Confidential - Pugatch

1      $35 million allowed subordinated
2      claim, if the settlement is approved
3      and the plan is confirmed.
4              MS. WEISGERBER:  Objection to
5      form.
6              But you can answer, if you have
7      an answer, Mike.
8          A.   We do have a sense.  It's really
9      a range of projected outcomes, as you can
10     imagine, based on the recoveries, largely
11     informed by conversations with the Debtor.
12         Q.   And what is that range of value?
13             MS. WEISGERBER:  Objection to
14     form.
15         A.   Our understanding, again, based
16     on those conversations, is that the
17     general unsecured claim could be valued in
18     a 75 to 80 cents on the dollar recovery.
19     And then a, you know, that the junior
20     class claim is really sort of upside
21     potential, to the extent there is more
22     recovery or more asset value of the
23     estate, for the benefit of creditors over
24     time.

Page 126

Confidential - Pugatch

1    Q.    What is your understanding of
2  the current value of the HarbourVest
3  shares in HCLOF that would be transferred
4  under this Agreement?
5    A.    It's roughly $22.5 million of
6  their value.
7    Q.    So doing a little bit of, you
8  know, back-of-the-table-cloth math, how do
9  you allocate value between the releases
10  that you are receiving and the shares that
11  you are transferring?
12    MR. KANE:  I'm sorry.  Let me
13  rephrase that.  Let me ask that
14  question differently.
15    Q.    In addition to the claims under
16  the plan, HarbourVest is providing the
17  Debt -- sorry, in addition to the shares
18  that are being transferred, HarbourVest is
19  providing to the Debtor certain releases
20  for its litigation claims; is that
21  correct?
22    MS. WEISGERBER:  Objection to
23  form.
24    A.    Correct.

Page 127

Confidential - Pugatch

1    Q.    So how has HarbourVest allocated
2  value, as far as this Settlement Agreement
3  is concerned?
4    And to make sure we're on the
5  same page about what I'm asking,
6  HarbourVest is trading a bundle of sticks,
7  right?  And there's really two things
8  within that bundle of sticks, and please
9  confirm that's correct, you're trading
10  shares, and in addition, releases; is that
11  right?  In exchange you're getting back
12  claims that have a potential future value.
13    So, how have you allocated value
14  among the shares transferred and the
15  releases that are being granted?
16    MR. MORRIS:  Objection.
17    MS. WEISGERBER:  Objection.
18    You can go ahead, Mike.
19    A.    Yeah.  So ultimately we looked
20  at it as a package, and so it was less
21  about the attribution of value between the
22  two different sticks, as you described it,
23  and more about the overall package value
24  in exchange for the transfer of our

Page 128

Confidential - Pugatch

1  interest and the release of the claims
2  that we had outstanding as the Debtor.
3    MR. KANE:  Now, I want to turn
4  your attention to what I've included
5  in the chat.  You can pull it down
6  pretty easily if you want.  But it
7  would be Holdco Depo Exhibit 2.  If
8  that would be easier than a screen
9  share, if you'd like, I'm happy to do
10  that as well.
11    MS. WEISGERBER:  Which document
12  is it, John?  Because I just can't
13  pull stuff off the Zoom right now.
14    MR. KANE:  Oh, I'm sorry.  It's
15  the Settlement Agreement with the
16  attached exhibits.  I can share my
17  screen so we're all on the same page.
18    Just to confirm we're looking at
19  the same thing, here's the Settlement
20  Agreement.  There's a docket entry at
21  the top so you can see it, 1631 filed
22  by the Debtor 12/24/20.
23    This is Exhibit 1 to the
24  Declaration of John Morris in Support

Page 129

Confidential - Pugatch

1  of Debtor's Motion for an Entry
2    Approving Settlement with HarbourVest.
3  BY MR. KANE:
4    Q.    Now, this Settlement Agreement
5  is a document that you assisted in
6  negotiations; is that correct?
7    A.    Correct.
8    Q.    Okay.  And here in Section 1B,
9  this addresses the transfer of the shares
10  of the HarbourVest entities to a Debtor
11  affiliate; is that correct?
12    MS. WEISGERBER:  Objection to
13  form.
14    A.    Correct.
15    Q.    Is that your understanding,
16  Mr. Pugatch?
17    A.    Yes, correct.
18    Q.    Okay.  Thank you.  Section 4A,
19  and is this your understanding that
20  HarbourVest is representing that it has
21  the authority to enter into this agreement
22  and to transfer the shares to the Debtor's
23  affiliate if this is approved?
24    MS. WEISGERBER:  Objection to

Page 130

| | |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | form. The document speaks for itself. |
| 3 | Is that a question, John? |
| 4 | MR. KANE: Yeah. I asked if |
| 5 | that was his understanding, that this |
| 6 | is a representation by HarbourVest |
| 7 | that it has the authority to transfer |
| 8 | the shares if the Settlement Agreement |
| 9 | is approved. |
| 10 | MS. WEISGERBER: Objection to |
| 11 | form. Objection to the extent it |
| 12 | calls for a legal conclusion. |
| 13 | To the extent you have a |
| 14 | nonlegal conclusion, non-privileged |
| 15 | understanding, Mike, you can share |
| 16 | that. |
| 17 | A. Yeah, I'm just saying I can only |
| 18 | answer that based on conversations with |
| 19 | counsel. |
| 20 | MR. KANE: Okay. I won't push |
| 21 | that. That's fine. |
| 22 | Q. If we keep going down here as |
| 23 | part of this attachment, there's a |
| 24 | Transfer Agreement, Exhibit A to the |
| 25 | Settlement Agreement. Are you familiar |

Page 131

| | |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | with this document? |
| 3 | A. Yes. I've seen it. |
| 4 | Q. And did you assist with the |
| 5 | preparation or negotiation of this |
| 6 | Agreement? |
| 7 | A. Yes. |
| 8 | Q. Okay. Did you understand that |
| 9 | HarbourVest would need the consent of the |
| 10 | HCLOF portfolio advisor to effectuate the |
| 11 | transfer? |
| 12 | MS. WEISGERBER: Objection to |
| 13 | form. Objection to the extent it |
| 14 | calls for a legal conclusion. |
| 15 | Mike, if you have a view other |
| 16 | than from privileged conversation, you |
| 17 | can answer, otherwise do not answer. |
| 18 | A. Yeah, I'm sorry. I can only |
| 19 | answer that based on conversation with |
| 20 | counsel and the read of the document. |
| 21 | Q. So to make sure I understand |
| 22 | that, you have no independent |
| 23 | understanding of whether or not consent |
| 24 | was required from the portfolio manager |
| 25 | before you could effectuate a transfer; is |

Page 132

| | |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | that correct? |
| 3 | MS. WEISGERBER: Same objection. |
| 4 | I think you can give your |
| 5 | general understanding, but then not |
| 6 | get into specific conversations. |
| 7 | A. My understanding of that is |
| 8 | based on conversations with counsel, but |
| 9 | yes, that is my understanding, John. |
| 10 | Q. Okay. I'm going to highlight a |
| 11 | passage here. Can you see this |
| 12 | highlighted area? "Whereas, the Portfolio |
| 13 | Manager desires to consent to such |
| 14 | transfers and to the admission of |
| 15 | Transferee as a shareholder..." |
| 16 | Were you aware of that |
| 17 | provision? |
| 18 | MS. WEISGERBER: Objection to |
| 19 | form. |
| 20 | A. Yes. It's in the document. |
| 21 | Q. Do you have any understanding of |
| 22 | why that provision was included in this |
| 23 | agreement? |
| 24 | MS. WEISGERBER: Objection to |
| 25 | form. Objection to the extent it |

Page 133

| | |
|---|---|
| 1 | Confidential - Pugatch |
| 2 | calls for a privileged conversation. |
| 3 | A. As I answered before, based on |
| 4 | conversations with counsel, my |
| 5 | understanding is that consent is requiring |
| 6 | in connection to transfer. |
| 7 | Q. I'd like to turn your attention |
| 8 | now -- this is a document you've seen |
| 9 | before during your deposition. This is |
| 10 | the member's agreement related to the |
| 11 | Company for HCLOF. This is previously |
| 12 | produced by the Debtor, that's why it's |
| 13 | got the Bates stamp on it. This is dated |
| 14 | November 15, 2017. |
| 15 | Are you familiar with this |
| 16 | document? |
| 17 | A. Yes. |
| 18 | Q. Do you see on Line 14, in the |
| 19 | between, on Page 1 shows Highland HCF |
| 20 | Advisor, Ltd. as the portfolio manager? |
| 21 | A. Yes, I see that. |
| 22 | Q. I know there was quite a bit |
| 23 | of -- quite a few questions about this |
| 24 | earlier, but you understand that Highland |
| 25 | HCF Advisor, Ltd. is still the HCLOF |

Page 134

Confidential - Pugatch

1    portfolio manager?
2        MS. WEISGERBER:  Objection to
3    form.
4        A.    Honestly, I don't have -- I
5    don't have enough information to answer
6    that definitively.
7        Q.    Okay.  Going back to the
8    Settlement Agreement, there's a reference
9    in here to a defined term, "portfolio
10   manager."
11       Do you see that?
12       A.    Yep.
13       Q.    And is this the same one that's
14   listed in the Member Agreement, Highland
15   HCF Advisor, Ltd.?
16       A.    I believe that seems to be the
17   position, yes.
18       Q.    Okay.  So when we're talking
19   about down here, "Whereas, the Portfolio
20   Manager desires to consent," this consent
21   provision is referring to the same
22   definition of portfolio manager that's
23   included in this Member Agreement; is that
24   correct?
25

Page 135

Confidential - Pugatch

1        MR. MORRIS:  Objection to the
2    form.
3        MS. WEISGERBER:  Objection --
4    same objections.  Objection to the
5    extent it calls for privileged
6    information.
7        A.    That sounds like a legal
8    conclusion.
9        Q.    I would have thought it was
10   reading, Mr. Pugatch.
11       A.    Well, if you're asking me to
12   definitively confirm that, that sounds
13   like a legal interpretation.
14       Q.    Let me ask that a different way.
15       Do you understand that the
16   portfolio manager is listed as Highland
17   HCF Advisor, Ltd. in the Member Agreement?
18       A.    Yes.
19       Q.    And in this Transfer Agreement,
20   the portfolio manager is listed as
21   Highland HCF Advisor, Ltd.?
22       A.    Yes.
23       Q.    And those are the same entities?
24       A.    Yes.
25

Page 136

Confidential - Pugatch

1        Q.    All right.  Are you familiar
2    with Section 6 of this Member Agreement?
3        A.    (Nods.)
4        Q.    Have you ever read this
5    document?
6        A.    I have.
7        Q.    Okay.  And can you give me your
8    understanding of what must take place
9    under this document for HarbourVest to
10   transfer its shares?
11       MS. WEISGERBER:  Object to the
12   form.  Object to the extent it calls
13   for a legal conclusion.  Object to the
14   extent it calls for any privileged
15   information or conversations.
16       Mike, to the extent you have an
17   independent understanding, separate
18   from conversations with counsel, you
19   can answer the question.
20       A.    I would say my understanding of
21   what's required in connection with the
22   transfer is based on conversations with
23   counsel.
24       Q.    Do you believe that the

Page 137

Confidential - Pugatch

1    HarbourVest entities can transfer its
2    shares without obtaining the consent of
3    the portfolio manager?
4        MS. WEISGERBER:  Objection to
5    form.  Objection to the extent it
6    calls for a legal conclusion.
7        Same instruction, Mike, as to
8    privileged conversations.
9        A.    Again, my view on that would be
10   based on conversations with counsel.
11       Q.    Are you aware of whether
12   HarbourVest provided any notice to other
13   members of its intent to transfer its
14   shares to the Debtor's affiliate under the
15   Settlement Agreement, other than the
16   filing of the 9019 motion?
17       MS. WEISGERBER:  Same objection.
18   But there is a factual question in
19   there if you can answer it, Mike, but
20   no privileged conversation.
21       A.    Yeah, I'm not aware of that.
22       Q.    Did you provide members 30 days
23   after the receipt of notice of
24   HarbourVest's intent to transfer its
25

Page 138

Confidential - Pugatch

1          Confidential - Pugatch
2    shares to the Debtor's affiliate and
3    provide those members with an opportunity
4    to purchase their pro rata amount of the
5    shares?
6          MS. WEISGERBER:  Same objection.
7    A.   No.
8    Q.   And just to make sure I'm not
9    asking this question in a way that you
10   don't understand what I'm asking:  Do you
11   see this highlighted provision here?
12   A.   Yes.
13   Q.   I'm asking whether HarbourVest
14   provided members 30 days after the receipt
15   of a notice letter and an opportunity to
16   purchase their entire pro rata share of
17   the shares proposed to be transferred by
18   the HarbourVest entities?
19         MS. WEISGERBER:  Objection to
20         form.  Objection to the extent it
21         calls for privileged conversations or
22         a legal conclusion.  Objection to the
23         extent it's asking about one piece of
24         the document.
25              And you're welcome to look at

Page 139

Confidential - Pugatch

1          Confidential - Pugatch
2    the full document if you'd like, Mike.
3    I think it was one of the ones that
4    was E-mailed as well, or maybe you
5    were able to pull it down.
6          THE WITNESS:  Yeah, no, I was.
7    Thank you.
8    A.   And I'm sorry, John, could you
9    just repeat the question?
10   BY MR. KANE:
11   Q.   Yeah, sure, absolutely.  And I'm
12   not calling for any conversations with
13   counsel.  I'm asking you if you know
14   whether HarbourVest did something or not.
15   So let's -- let's keep it to that, because
16   I --
17         MR. KANE:  Erica, I appreciate
18         your concerns, but I really don't want
19         to have any disclosures from Mike
20         about his discussions with you on
21         whether something needed to be done or
22         not.  I'm asking simply the facts of
23         whether HarbourVest did it or not.
24   Q.   So did HarbourVest provide
25   notice, 30 days' notice, to the members

Page 140

Confidential - Pugatch

1          Confidential - Pugatch
2    listed under this Member Agreement of
3    HarbourVest's intent to transfer the
4    shares that are the subject to the
5    Settlement Agreement?
6    A.   No.
7    Q.   Has HarbourVest provided any
8    members with a right of first refusal and
9    a cash purchase price for which it would
10   sell its shares instead of transferring
11   those shares to the Debtor or the Debtor's
12   affiliate under the Settlement Agreement?
13         MS. WEISGERBER:  Same
14         objections.  Objection to form.
15         Objection to extent it calls for a
16         legal conclusion or privileged
17         conversations, including -- regarding
18         the specifics of that provision.
19              I don't think that's a purely
20         factual question.
21   Q.   Did HarbourVest offer to sell
22   the shares to the other members?  That's
23   not a factual question?
24         MS. WEISGERBER:  Objection --
25   A.   On the basis of that factual

Page 141

Confidential - Pugatch

1          Confidential - Pugatch
2    question, no.
3    Q.   So let me ask this question
4    again, I don't recall if I got an answer
5    or not.
6              Did HarbourVest affirmatively
7    seek to obtain the consent of Highland HCF
8    Advisors to transfer its shares to the
9    Debtor affiliate under the Settlement
10   Agreement?
11         MS. WEISGERBER:  Same
12         objections.  Same instruction
13         regarding the privileged conversation.
14   A.   I mean, as a Highland-affiliated
15   entity, the Debtor, who's obviously the
16   other party here involved in the transfer,
17   you know, was involved in these
18   discussions.
19   Q.   I'm sorry.  Would you mind
20   clarifying?  Did you say that Highland HCF
21   Advisors was involved in those discussions
22   or the Debtor was involved in those
23   discussions and you assume Highland HCF
24   Advisors was?
25         MS. WEISGERBER:  Objection to

004054

Page 142

Confidential - Pugatch

1          form.  Misstates testimony.
2          A.   Sorry, could you just repeat the
3     question, please, John?
4          Q.   Yes, Mr. Pugatch.
5               I'm actually just trying to get
6     some clarification from you, because I
7     don't think I understood your answer
8     about -- I had asked just -- again, I
9     don't want any correspondence with your
10    counsel or what your counsel advised, I'm
11    asking:  Do you know whether HarbourVest
12    sought written consent from Highland HCF
13    Advisor for its -- or to transfer its
14    shares to the Debtor or the Debtor's
15    affiliate under the Settlement Agreement?
16         MS. WEISGERBER:  Same objection.
17         A.   My understanding is HarbourVest
18    did not explicitly have those
19    conversations or seek that consent.
20         Q.   Okay.  Are you aware of whether
21    HarbourVest received any written consent
22    from Highland HCF Advisors, other than
23    what's in the Transfer Agreement attached
24    to the Settlement Agreement?

Page 143

Confidential - Pugatch

1          A.   I am not.
2          MS. WEISGERBER:  Same objection.
3          Q.   Do you know if HarbourVest has
4     any written consent?  Not just to seek it,
5     but do you know if HarbourVest has a piece
6     of paper, other than the transfer
7     agreement, in which Highland HCF advisors
8     provided its consent to the transfer of
9     shares to the Debtor's affiliate?
10         MS. WEISGERBER:  Same
11    objections.
12         A.   I would have to speak with
13    counsel.  I am not aware of that directly,
14    no.
15         Q.   Are you aware of whether
16    HarbourVest had any correspondence with
17    HCLOF representatives about effectuating
18    the transfer of the shares to the Debtor's
19    affiliate under the Settlement Agreement?
20         MS. WEISGERBER:  Same objection.
21              You can answer.
22         A.   We have had discussions with
23    them, yes.
24         Q.   Did HCLOF representatives

Page 144

Confidential - Pugatch

1     provide consent, whether written or
2     otherwise, to the transfer?
3          A.   I am not aware that that consent
4     has been provided as of yet.
5          Q.   Are you aware of whether any
6     HarbourVest representatives have had
7     conversations with the Debtor's
8     representatives about the necessity of
9     consent to the transfer of their shares?
10         MS. WEISGERBER:  Objection to
11    form --
12         MR. KANE:  I'll re-ask the
13    question.  I want to clarify that
14    point.
15    BY MR. KANE:
16         Q.   Mr. Pugatch, are you aware of
17    whether any HarbourVest representatives
18    had conversations with the Debtor's
19    representatives about the necessity of
20    obtaining the HCLOF portfolio manager's
21    written consent before transferring the
22    shares to the Debtor's representative or
23    affiliate under the terms of the
24    Settlement Agreement?

Page 145

Confidential - Pugatch

1          MS. WEISGERBER:  Objection to
2     form.
3          And, John, I'm sorry to do this,
4     can you just clarify what you mean by
5     "representative"?
6          MR. KANE:  Yeah.  I mean,
7     anybody that has agency authority to
8     act on behalf of the Debtor in
9     negotiations, in the preparation of
10    the documents, in negotiation of the
11    terms of the Settlement Agreement.
12         I mean, I think that it's, you
13    know, a pretty broad term here.
14         MS. WEISGERBER:  Objection to
15    form.  Objection to the extent it
16    calls for discussions with counsel.
17         As a factual matter, if you have
18    an answer, you can give it.
19         A.   I'm aware of conversations that
20    have taken place about all of the terms of
21    the Transfer Agreement in connection with
22    the settlement, with all parties.
23         Q.   Is it your understanding based
24    on those conversations that written

004055

Page 146

Confidential - Pugatch

1    consent of the portfolio manager as
2    defined in the Transfer Agreement was
3    required before the shares could be
4    transferred under the Settlement
5    Agreement?
6    
7        MS. WEISGERBER:  Objection to
8    the form.  Objection to the extent it
9    calls for a legal conclusion or
10    privileged conversation.  And I think
11    that one does, John.
12    A.    Yeah, I can only answer that
13    based on conversation with lawyers.
14    Q.    Wasn't the question whether --
15    I'm sorry.  Maybe I forgot my own
16    question.
17        But I thought it was based on
18    your conversations with the Debtor's
19    representative, was it your understanding,
20    not based on your conversation with
21    counsel.
22        MS. WEISGERBER:  Can you repeat
23    the whole question because I
24    definitely misunderstood it then too.
25    Q.    Okay.  Based on your

Page 147

Confidential - Pugatch

1    conversations with the Debtor's
2    representatives, was it your understanding
3    that the consent of the portfolio manager
4    was required for the shares to be
5    transferred from the HarbourVest entities
6    to the Debtor's affiliate under the terms
7    of the Settlement Agreement?
8        MS. WEISGERBER:  Okay.  Same
9    objections.  Also objection to the
10    extent there is a common interest
11    privilege.
12    A.    I don't recall having that
13    explicit conversation with representative
14    of the Debtor.
15        MR. KANE:  I'll pass the
16    witness.
17        Thank you, Mr. Pugatch.
18        MR. MORRIS:  Anybody else?
19        Thank you, all.
20        MS. WEISGERBER:  Can we --
21    before we break, could we have a
22    two-minute break and then come back
23    before we conclude.
24    BY MS. WEISGERBER:
25

Page 148

Confidential - Pugatch

1    Q.    Mr. Pugatch, during Mr. Wilson's
2    questioning, I believe his last question
3    related to identifying as between two
4    choices the primary source or the cause of
5    HarbourVest's damages.
6        In your opinion, is -- are
7    HarbourVest damages attributable to any
8    one cause?
9    A.    No, I would say there were
10    multiple root causes of the damages and
11    diminution in value that was suffered in
12    connection with the investment.
13        MS. WEISGERBER:  Okay.  I don't
14    have any further questions.
15        MR. WILSON:  I think I'd like to
16    ask a couple more.
17    BY MR. WILSON:
18    Q.    Mr. Pugatch, I think you
19    testified earlier that the investment in
20    HCLOF was comprised of multiple CLOs,
21    correct?
22    A.    Correct.
23    Q.    And some of those CLOs were
24    managed by Acis, to your understanding?
25

Page 149

Confidential - Pugatch

1        MS. WEISGERBER:  Objection.
2    A.    Correct.
3        MS. WEISGERBER:  Just to
4    clarify, John, is this within the
5    scope of the questions I asked
6    Mr. Pugatch?
7        MR. WILSON:  I believe it is.
8    I'm going to be really short.  But
9    so --
10        MS. WEISGERBER:  I would like to
11    have a standing objection to the
12    extent it's not within the scope of
13    the questions that was asked to
14    Mr. Pugatch.
15    BY MR. WILSON:
16    Q.    So some of those CLOs you
17    contend are managed by Acis?
18        MS. WEISGERBER:  Objection to
19    form.
20    A.    A majority.
21    Q.    And just generally, do you
22    contend that Highland managed the balance
23    of those CLOs?
24        MR. MORRIS:  Objection to the
25

Page 150

Confidential - Pugatch

1    form of the question.
2        MS. WEISGERBER:  Objection.
3    Same objection.
4    A.    Yes.
5    Q.    Yes.  Okay.  Thank you.
6        And I just had two more
7    questions.
8        So, if there was going to be a
9    reset, that would have to be done at the
10   CLO level, each CLO would have to be
11   reset?
12       MR. MORRIS:  Objection.
13       MS. WEISGERBER:  Objection to
14   form.
15   A.    That is correct.
16   Q.    And do you know of any specific
17   CLO that requested a reset but was not
18   granted a reset?
19       MR. MORRIS:  Objection to form.
20       MS. WEISGERBER:  Same objection.
21   And foundation.
22   A.    When you say "CLOs who requested
23   a reset," can be more clear, please?
24   Q.    We just talked about how this

Page 151

Confidential - Pugatch

1    investment is comprised of multiple CLOs
2    and each one of those CLOs would have to
3    be reset, according to its own terms, I
4    guess.  Do you know of any one of those
5    CLOs that requested a reset?
6        MR. MORRIS:  Objection to the
7    form of the question.
8        MS. WEISGERBER:  Same objection.
9    A.    I'm aware of Highland having in
10   its capacity as manager of the HCLOF
11   having requested or pursued resets of
12   certain of the Acis HCLOs.
13   Q.    Your understanding is that
14   Highland requested a reset of the Acis
15   CLOs?
16       MS. WEISGERBER:  Objection to
17   form.
18   A.    I'm sorry.  I'm trying to
19   understand what you said.
20       MS. WEISGERBER:  I'm really
21   wondering how this relates at all to
22   the scope of the questions I asked Mr.
23   Pugatch on follow up.
24       I think it's time to wrap this

Page 152

Confidential - Pugatch

1    up, John.
2        MR. WILSON:  This was my last
3    question, I just need an answer to it.
4    And I think he tried to answer, but I
5    didn't understand what he said.
6        MS. WEISGERBER:  Objection.  Can
7    you re-ask the question so we have a
8    clear question.
9        MR. WILSON:  Well, Madam Court
10   Reporter, can you read back his last
11   response?
12       (Record read.)
13   BY MR. WILSON:
14   Q.    Can you repeat what you intended
15   to answer to the last question?
16       MS. WEISGERBER:  Same objection.
17       If you recall, Mike.
18   A.    I'm sorry, John.  Can you just
19   repeat the question, please, make sure I'm
20   answering what you want me to answer?
21   Q.    My question is the same as it's
22   been:  Are you aware of any CLO that
23   requested a reset and was not granted one?
24       MS. WEISGERBER:  Objection to

Page 153

Confidential - Pugatch

1    form.  Objection to foundation.
2        MR. MORRIS:  Objection to the
3    form of the question.
4    A.    Again, my understanding is the
5    CLOs do not request the reset.  Highland,
6    as manager of HCLOF in its capacity as
7    majority equity owner of certain of the
8    CLOs, have requested a reset post our
9    original investment.
10   Q.    Okay.
11       MR. WILSON:  I'll pass the
12   witness.
13       MS. WEISGERBER:  I think we're
14   done.
15       THE REPORTER:  Will everyone put
16   their orders on the record, please?
17       MR. MORRIS:  John Morris for the
18   Debtor.  Expedited, please.
19       MR. WILSON:  John Wilson.  I'm
20   not sure what arrangements my office
21   has previously made, but we want an
22   expedited transcript, as well.
23       THE REPORTER:  Do you want a
24   rough too?

Page 154

1  Confidential - Pugatch
2   MR. WILSON:  Yes, please.
3   MR. MORRIS:  Yes, please.
4   MS. WEISGERBER:  Same for
5  HarbourVest, please.
6   MR. MALONEY:  I don't need an
7  expedited transcript.  I'd just be
8  happy to get one regular copy.  I'll
9  take whatever you would produce in the
10  ordinary course.  Same as what
11  everyone else ordered.
12   (Time Noted:  4:35 p.m. EDT.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 155

1
2   ACKNOWLEDGEMENT OF DEPONENT
3
4   I, MICHAEL PUGATCH, do hereby
5  acknowledge that I have read and
6  examined the foregoing testimony, and
7  the same is a true, correct and
8  complete transcription of the
9  testimony given by me, and any
10   corrections appear on the attached
11   Errata sheet signed by me.
12
13
14  _____  _____
15   (DATE)    (SIGNATURE)
16
17
18
19
20
21
22
23
24
25

Page 156

1
2  CERTIFICATE OF SHORTHAND REPORTER-NOTARY
3   PUBLIC
4   I, Amanda Gorrono, the officer
5  before whom the foregoing deposition
6  was taken, do hereby certify that the
7  foregoing transcript is a true and
8  correct record of the testimony given;
9  that said testimony was taken by me
10  stenographically and thereafter
11  reduced to typewriting under my
12  direction; and that I am neither
13  counsel for, related to, nor employed
14  by any of the parties to this case and
15  have no interest, financial or
16  otherwise, in its outcome.
17   IN WITNESS WHEREOF, I have
18  hereunto set my hand this 12th day of
19  January, 2021.
20
21  _____
22  AMANDA GORRONO, CLR
   CLR NO:  052005 - 01
23
   Notary Public in and for the State of New
24  York
   County of Suffolk
25

Page 157

1   ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg. No. Now Reads  Should Read  Reason
6  ___ ___ _____  _____  _____
7  ___ ___ _____  _____  _____
8  ___ ___ _____  _____  _____
9  ___ ___ _____  _____  _____
10  ___ ___ _____  _____  _____
11  ___ ___ _____  _____  _____
12  ___ ___ _____  _____  _____
13  ___ ___ _____  _____  _____
14  ___ ___ _____  _____  _____
15  ___ ___ _____  _____  _____
16  ___ ___ _____  _____  _____
17  ___ ___ _____  _____  _____
18  ___ ___ _____  _____  _____
19  ___ ___ _____  _____  _____
20
   _____
21   Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 20___.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____

Case 21-03067-sgj   Doc 124-7   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-17   Filed 09/21/23   Page 191 of 263   PageID 4448

Index: $1,570,429..additional

## $

**$1,570,429** 27:23

**$1.02** 112:19

**$135** 28:25 30:2

**$150** 112:23

**$22.5** 126:6

**$295,000** 93:23
94:22 95:7 104:14

**$35** 110:2 125:2

**$4,998,501** 27:20

**$44,587,820** 59:3

**$44.5** 112:14

**$45** 109:25 124:24

**$5** 108:22

**$73** 56:25

**$73,522,928** 27:14

**$8** 78:2

## (

**(i)** 42:22

## 0

**08/15/2017** 68:7

## 1

**1** 16:4,7 19:17 31:21
59:10 61:14,15
109:23 114:22
128:24 133:19

**10** 60:11,15 83:19,20
84:3,6 97:22 99:5
103:23

**10/10/2018** 83:22

**100** 64:5,11,15

**1057** 22:23 45:12

**11** 32:2 35:9 36:12
51:19 52:22 109:4,5,
15

**11/29/2017** 79:3

**12/24/20** 128:23

**122** 61:9

**135** 28:10

**14** 33:10 133:18

**143** 14:21 16:8,11
109:9 112:21

**144** 14:22

**147** 109:9

**149** 14:23 17:3,17
109:10

**15** 27:11 33:22,24
50:13 55:17 60:11,15
64:4 69:2 112:18,23
133:14

**150** 14:24 109:10

**153** 14:25 109:10

**154** 15:3 109:10

**15th** 50:14

**1631** 109:18 128:22

**17** 50:13

**1:20** 60:22

**1B** 129:9

**1st** 55:22 91:7

## 2

**2** 16:22,23 17:2,10,24
26:12 31:21 92:4
128:8

**2004** 83:20 84:12,18
99:17

**2017** 14:23 16:13
21:18 23:14 24:3
27:11 33:22,25
50:13,14 51:20 52:21
55:17 64:5 69:2 85:4
112:18,24 133:14

**2018** 84:7 86:18
90:24 97:22 103:23
105:10,25

**2019** 59:11 90:24
91:7 107:14 114:22

**2020** 16:12 59:3
109:21 112:13

**217** 14:22

**23** 109:20

**27** 51:20 52:21

**27th** 51:19

**28** 21:3

**28th** 81:17

**2:30** 112:6

## 3

**3** 18:18,19,24 26:10
28:7 58:25

**30** 137:23 138:14
139:25

**30(b)(6)** 15:13

**3018(a)** 18:22 19:8

**31** 59:3 63:8 112:13

**35.49** 65:14

**36** 55:9

**37** 45:16 53:7

**382** 9:12

**39** 54:25

## 4

**4** 20:25 21:2 33:9
37:13,22 51:18 84:24
93:15

**4.1** 37:24

**4.2** 42:21

**4.3** 38:23 40:2 44:13,
22

**4/08/2020** 16:8 17:3

**40,000** 90:25

**410** 17:7

**47** 13:4

**49** 27:15 65:24

**49.02** 66:5

**49.98** 27:16 65:20
66:3

**49.985%** 85:5

**4A** 129:19

## 5

**5** 16:16 22:15,16,17
37:13,21,22 45:11
95:11 96:24 110:14

**50** 20:11

## 6

**6** 61:5,8 84:23 136:3

**617** 22:19

**63** 67:14

## 7

**7** 63:4,6,7 95:9 112:17

**75** 125:19

## 8

**8** 16:12 23:14 62:3
68:3,6

**80** 125:19

**82** 109:11

## 9

**9** 78:21 79:2 95:24

**9019** 11:2 15:8 98:3
109:17 122:13
137:17

## A

**ability** 42:16 54:7,13,
17,18,20,23 95:16
96:9,20 98:10,11
105:18 119:12,20

**absolutely** 49:24
82:19 139:11

**accept** 110:17

**accordance** 59:7
103:9

**accurate** 33:14
93:24

**accusations** 81:7

**Acis** 31:22,23,24
32:4,5,12,14,24 35:2
36:11,13,24 46:10,
15,21 47:9,14,22
48:11 49:4,10,14,20
50:2,11 51:11 52:21
53:4,5 74:3 84:5
85:16 86:19,23 87:4,
13,22 88:7,11,19
89:11 90:8,17 91:2,6,
20 92:4,5,7,8,14,15,
20 93:3,18 94:12
96:5,6,7,10,11,22
97:3 101:15 104:13
105:9 107:15,23
108:3 114:6,21
115:6,20 116:23
118:16 121:6 148:25
149:18 151:13,15

**Acis'** 51:20

**Acis-branded** 35:6

**Acis-managed** 35:5

**Acis/hclof** 11:11,12

**acquiring** 63:22

**act** 40:3 145:9

**action** 40:5 56:16

**actionable** 72:16

**actions** 39:4,9,13
40:23 42:18,21 91:21
109:11 114:9

**actively** 122:16

**activities** 53:15

**actual** 113:14

**add** 58:18

**added** 111:9

**addition** 126:16,18
127:11

**additional** 27:20
28:3 57:16 58:8,16
95:13

Index: address..believes

**address** 13:3,8,9

**addressed** 70:8

**addresses** 129:10

**adequate** 56:18

**admission** 132:14

**advancing** 24:4

**advice** 40:4,10 44:2

**advised** 142:11

**advisor** 33:11,15
35:13 36:15 131:10
133:20,25 134:16
135:18,22 142:14

**advisors** 58:19
141:8,21,24 142:23
143:8

**advisory** 37:23,25
38:6,10,13,18,19,20
39:3,6,8,13,19,21
40:4,8,11,15,24
42:22,24 43:3,11,18
44:11,15,24 45:2
62:5,17,21 63:16
67:7

**affect** 54:20 74:22

**affiliate** 48:23 62:6,
15 85:2 129:12,24
137:15 138:2 140:12
141:9 142:16 143:10,
20 144:24 147:7

**affiliates** 31:2,18
32:23 62:20 79:13
85:5

**affirmatively** 141:6

**affirmed** 10:13

**afield** 89:15 94:14

**agency** 145:8

**agree** 9:15 11:16
23:9 28:11 46:19
86:8 88:17 93:3
94:20 95:19 106:13

**agreed** 9:23,24

**agreement** 9:20
12:23 21:3,9 33:8,13
37:5 44:13 63:8,11
92:6 109:20,22
111:2,7 122:12,17

**agreements** 11:13
22:5

**agrees** 95:4 110:15

**ahead** 29:5 58:14
97:18 115:16 117:18
127:19

**AIF** 14:23 15:3

**aleve** 81:22

**Aliza** 9:4

**all-hands** 123:3

**allegations** 11:6
117:5

**alleged** 11:11 56:2
85:15

**alleges** 45:19

**alleging** 118:20

**alleviated** 82:2

**allocate** 126:10

**allocated** 127:2,14

**allowed** 124:25
125:2

**alluded** 79:24

**alongside** 24:19

**Amended** 96:25

**amount** 93:22 94:22
138:4

**amounts** 122:19

**analysis** 124:23

**and/or** 11:12 35:6

**annex** 16:16 17:20,
21

**answering** 48:18
88:4 102:11 117:22

**answers** 12:2

**apiece** 112:20

**apologize** 66:14

**appeared** 53:12
85:19 86:6,19

**appears** 97:6

**appointed** 36:13

**apprised** 87:21

**approached** 23:21

**approval** 40:8 44:23

**approve** 39:4 40:25

**approved** 125:3
129:24 130:9

**Approving** 109:8
129:3

**approximately**
93:22 113:7

**approximation**
59:12

**April** 16:12

**arbitration** 45:22
46:3,8,16,21 47:17,
20 48:8,13 51:16
54:10 55:13 73:23,24
76:14,20,21,25 77:7,
20 78:5,9,14 118:15

**area** 132:12

**argue** 106:11

**arrangements**
153:21

**article** 76:10 80:14,
18 81:4,7,8,23 82:5

**asserted** 86:22

**assess** 95:7

**asset** 59:2,10 125:23

**assets** 30:9 31:14
47:14,21 48:11,14,21
51:14 119:25

**assist** 131:4

**assistance** 122:22

**assisted** 129:6

**assume** 141:23

**attached** 69:12
81:11 99:19 109:18
128:17 142:24

**attachment** 69:25
76:9 81:19,21 130:23

**attendance** 42:24

**attention** 70:20
128:5 133:7

**attorneys'** 113:11

**attributable** 121:3
148:8

**attribution** 127:22

**August** 59:3 69:2
112:12

**authority** 40:10
41:18 102:5,16
129:22 130:7 145:8

**authorized** 21:16
22:2

**Authorizing** 109:10

**average** 89:7

**avoid** 54:9

**award** 45:23 46:3,8,
10,17,21,23 47:17,20
48:8,13 51:16 54:10
55:13 76:14,20,22,25
77:7,21,24,25 78:3,9,
14 118:15

**awarded** 46:8

**aware** 70:14,18 75:5,
16 76:19 80:17 94:7,
11,16,19 98:22,23
99:10 108:15,20
132:16 137:12,22
142:21 143:14,16
144:4,6,17 145:20
151:10 152:23

——————————

**B**

**back** 26:9 31:20
45:10,12 53:6 57:22
58:16,23 59:17 66:10
92:3 112:6 123:9

**127:12** 134:8 147:23
152:11

**back-of-the-table-
cloth** 126:9

**Baker** 81:16 82:7

**balance** 149:23

**bankruptcy** 22:24
35:2 36:11 49:10,11
52:22 53:4 58:4
64:24 65:9 84:5
85:20 86:7,20,23
87:5,14,23 88:7,12,
19 89:11 90:8,17
91:2,20 96:22 114:6
115:6,20 116:24
118:16 121:6 122:13

**Base** 15:3 22:3

**based** 18:9 30:8
32:15 71:17 88:4
113:21 124:22
125:11,16 130:18
131:19 132:8 133:3
136:23 137:11
145:24 146:13,17,20,
25

**basis** 28:18 29:17
55:25 72:22 96:8
105:20 114:18
140:25

**Bates** 133:13

**bearing** 73:25

**bears** 109:17

**beg** 20:18

**begin** 34:18 108:12

**beginning** 48:2

**behalf** 8:23 11:18
14:21 15:6,19 16:13
17:18 18:13 19:25
21:17,24 22:2,5
24:15 25:11 52:13
98:6 102:11 108:6
145:9

**belief** 49:13 54:22

**believed** 43:9 104:18

**believes** 73:12
124:22

**Bellisario** 79:10,16

**benefit** 46:8,17 58:19 115:8 125:24

**bit** 117:25 121:22 126:8 133:22

**board** 37:23,25 38:6, 10,13,18,19,21 39:3, 6,8,13,20,22 40:4,8, 11,15 42:22,24 43:3, 11 44:11,15,24 45:2 62:6,21 67:7 73:24 79:20

**Board's** 40:24 43:19 44:11

**Bonds** 8:3

**book** 59:4

**borne** 23:23

**bottom** 61:14 63:20

**bound** 9:15,22

**Brad** 24:12 68:14 69:2 79:11,12

**brand** 49:20

**break** 12:19,22 59:21,22 60:7,10,11, 13,20,22 112:3 147:22,23

**briefly** 122:9

**Brigade** 34:9 96:5,10 97:4

**bring** 93:19

**broad** 145:14

**broader** 25:6

**brought** 70:20

**bullet** 45:20 47:11 48:9 53:8,10

**bundle** 127:7,9

**business** 74:22 76:5 77:18

---

**C**

**call** 27:21 98:12

**called** 10:12 34:9 105:14

**calling** 42:5 95:17 98:17 116:7 117:16 139:12

**calls** 47:4 50:20 54:16 71:9 72:6,14 80:11 82:13,19 88:10,18 89:2 113:18 114:25 123:3 130:12 131:14 133:2 135:6 136:13,15 137:7 138:21 140:15 145:17 146:9

**capable** 48:18

**capacity** 38:20 151:11 153:7

**capital** 26:19,22 27:21 31:22,23 32:4, 5 34:6 37:3 61:23 67:13 79:4 95:13 97:4

**carbon** 79:10

**case** 9:12 85:19,20 86:6,7 87:17

**cash** 140:9

**catch** 12:7 24:20

**causing** 93:21 94:21

**central** 60:22

**cents** 125:19

**cetera** 73:14 75:21 123:3

**change** 34:18 35:3 36:22,24 49:19 50:17 51:3,10 54:24 112:19 118:12 121:7

**changed** 26:2 50:15 52:6,20 74:13 117:7, 10 120:14

**changing** 49:3

**Chapter** 32:2 35:9 36:12 52:22

**characterized** 73:19

**charge** 20:14

**charged** 113:12

**chart** 64:12 67:12

**chat** 128:6

**choices** 148:5

**circles** 106:23

**citation** 94:8,9

**claim** 11:7,9 14:19 15:9,10,16 16:8,11, 16 17:3,7,17,20,22 18:6 32:3 64:24 65:8 72:11,22,23 108:5, 17,23 109:9 110:2,3 123:21,22 124:25 125:3,18,21

**Claimant** 16:18 17:24

**claims** 15:23 19:22 82:5 90:2 109:23 110:16 123:9 124:7, 13 126:16,21 127:13 128:2

**clarification** 93:11 142:7

**clarify** 15:12 47:25 52:11 124:16 144:14 145:5 149:5

**clarifying** 141:20

**clarity** 42:21

**class** 125:21

**clear** 52:19 83:11 106:9 124:11 150:24 152:9

**CLO** 8:13,24 16:20 18:3 26:13,17 31:10, 16 38:3,10 40:21 43:6 61:17 62:11 63:17,18,23 64:5,13, 21 66:4 74:22 76:5 77:17 83:22 84:13,19 92:20,21 101:15 105:5,10 115:8 119:5 120:11 121:19 122:5 150:11,18 152:23

**CLOF** 110:7

**CLOS** 30:24 32:12, 14,15 35:5,6,7 36:9, 24 41:16 53:5 54:8, 19 74:2,4 85:16 92:5, 8,14,15 93:2,19 94:12 95:14 96:7,11, 17 98:13 101:4 103:8 104:13 105:15

**107:15,23 108:3 114:2 115:7,23 116:20 118:19 119:22 120:6,7 148:21,24 149:17,24 150:23 151:2,3,6,16 153:6,9**

**closing** 55:15,16,19 56:18

**coaching** 107:8

**Coleman** 8:13

**colleague** 24:18 38:15

**colleagues** 9:2 24:18,23,25

**collect** 45:24

**collecting** 47:16 48:12

**collectively** 66:9 67:5 85:10

**colloquy** 97:13

**color** 77:15

**comfortable** 113:5

**committee** 25:14,17, 18,25 26:3,7

**common** 147:11

**communications** 14:8 75:5

**company** 21:10,15 34:9,11 37:24 61:16 105:2 133:11

**comply** 51:15

**component** 116:2

**composed** 37:25

**Composition** 37:23

**Compound** 123:12

**comprised** 25:19 148:21 151:2

**conceive** 98:2

**concern** 55:11 57:16

**concerned** 86:4 127:4

**concerns** 81:22 82:3 96:3,13,20,21 139:18

**conclude** 147:24

**conclusion** 47:4 50:21,25 54:16 71:9 72:6,9,15 80:11 82:13,20 93:10 113:18 114:25 115:14 116:6 130:12, 14 131:14 135:9 136:14 137:7 138:22 140:16 146:9

**conclusions** 42:6 43:25

**conditioned** 40:6

**conditions** 54:19 85:18

**conduct** 20:19

**conducted** 29:18 43:9 57:11

**conference** 88:10, 18 89:2

**confidence** 54:6,12

**confidential** 9:18 10:1,4,9 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1**

Case 21-03067-sgj    Doc 124-7    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-17    Filed 09/15/23    Page 194 of 263    PageID 4451

Index: confidentially..difference

113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1

**confidentially** 9:10,
19

**confirm** 84:18
122:10 127:10
128:19 135:13

**confirmation** 114:21

**confirmed** 125:4

**confirming** 10:3

**conflict** 48:9

**confused** 124:19

**connected** 19:22

**connection** 27:8
35:2 56:20 70:14
73:12 78:2,6 95:14
133:6 136:22 145:22
148:13

**connectivity** 12:5

**consent** 39:2 40:24
42:25 131:9,23
132:13 133:5 134:21
137:3 141:7 142:13,
20,22 143:5,9 144:2,
4,10,22 146:2 147:4

**consents** 39:18
43:10

**consequences**
121:6

**consideration**
122:20

**consistent** 85:17
112:11

**consulted** 69:15

**contact** 24:12

**contained** 40:23

**contend** 82:6,16
149:18,23

**content** 76:11

**context** 25:7 30:19
96:16

**continue** 15:17
36:15 77:10

**continues** 31:25

**contrary** 40:4

**contributed** 27:20

**contributor** 117:3

**control** 66:21 98:10
101:5,8 102:2 105:16

**controlled** 47:10
62:6,15 66:19

**convened** 39:19

**conversation** 50:5,8
131:16,19 133:2
137:21 141:13
146:10,13,20 147:14

**conversations**
14:10 18:9 42:13
56:12 69:21 71:12,17
75:21 83:6,10 113:21
123:2 125:12,17
130:18 132:6,8 133:4
136:16,19,23 137:9,
11 138:21 139:12
140:17 142:20 144:8,
19 145:20,25 146:18
147:2

**copies** 79:10

**copy** 78:9 109:19

**corporate** 19:23
99:21

**correct** 13:10 15:10
18:12 19:14,20 22:8,
9 23:8 26:5 27:17,24
32:3 33:2,3,4 37:5,
18,19 39:22,23 40:11
41:20 43:11 46:4,11
51:23 52:2,3,7,8,24
53:17,24 55:6,7,17,
18 56:25 57:5,13,14,
19 58:11,15 62:21,25
63:23 64:6,25 65:9,

14,17 66:2,5,9 67:2,
7,10,15 68:19,23,24
74:23 75:2 76:14
80:3,4,15,16 83:13,
14 84:14 85:10,11,23
86:2 91:22 92:21
93:5 110:21,24 113:8
120:25 122:14,15
126:22,25 127:10
129:7,8,12,15,18
132:2 134:25 148:22,
23 149:3 150:16

**correctly** 117:22

**correspondence**
142:10 143:17

**counsel** 9:7,14,21
13:16,19,23 14:6,10
15:21 18:9 33:19
42:13 58:20 68:11
71:12,17 83:10
111:13 113:21
122:22 123:3 130:19
131:20 132:8 133:4
136:19,24 137:11
139:13 142:11
143:14 145:17
146:21

**couple** 23:25 24:10
148:17

**court** 86:24 89:19
98:3 122:14 152:10

**cover** 79:3

**Covitz** 79:9

**created** 38:7,8

**creation** 23:4 119:21

**creditors** 125:24

**creditors'** 123:21,22

**credits** 120:4

**crisis** 70:3

**crusader** 70:3

**crystal** 106:9

**cumbersome** 22:11

**current** 13:3 93:19
126:3

**cut** 89:21 109:19

**D**

**damaged** 50:18 51:4

**damages** 93:21
94:22 148:6,8,11

**date** 17:17 29:25
33:18,20,24 55:15,
16,20 64:3 86:17
91:13 97:20

**dated** 84:6 133:13

**Daugherty** 70:3

**day** 78:13 100:22

**day-to-day** 119:24

**days** 137:23 138:14

**days'** 139:25

**Debevoise** 8:10 9:3

**Debt** 126:18

**Debtor** 8:8 11:6,12
59:16 108:9 110:8
123:2,8,24 125:12
126:20 128:3,23
129:11 133:12
140:11 141:9,15,22
142:15 145:9 147:15
153:19

**Debtor's** 16:19 18:2
22:18,25 100:20,21
109:17 110:21
111:13 123:9 129:2,
23 137:15 138:2
140:11 142:15
143:10,19 144:8,19,
23 146:18 147:2,7

**Debtor's** 109:7

**December** 109:20

**decision** 25:10,13
26:7 41:9 51:15
79:22 101:18 103:10
118:12 120:8

**decision-making**
45:3

**decisionmaking**
26:5 66:23

**decisions** 102:3,4
116:19 118:22

119:24 121:4

**declaration** 18:20
19:3,6,14 26:11 28:4
58:24 109:6,16
112:12 128:25

**deemed** 62:14

**defer** 15:20

**define** 87:16

**defined** 85:8 134:10
146:3

**defines** 61:22

**definition** 134:23

**definitive** 107:18

**definitively** 83:9
134:7 135:13

**delay** 56:17

**delayed** 55:15,20

**delegated** 102:5

**depend** 31:13 92:20

**depending** 31:9

**Depo** 128:8

**deponent** 100:6

**deposition** 9:15,22
10:3 11:21 12:18
13:15,22 16:4 20:20
26:15 74:10 99:11,20
100:2,12 133:9

**describe** 123:16

**describing** 56:13

**designated** 10:25
14:3 100:5

**designates** 10:5

**desires** 132:13
134:21

**destruction** 118:17

**details** 46:14 48:21

**determination** 40:6

**determined** 58:10

**dictate** 95:17

**difference** 30:16
49:11 118:4

Case 21-03067-sgj   Doc 124-7   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-17   Filed 06/01/23   Page 195 of 263   PageID 4452
Index: differently..fact

**differently** 126:15

**diligence** 28:19
29:7,10,12,18,21
53:14 56:19,21 57:12
58:8 70:14,19 77:11

**diminution** 51:13
121:3 148:12

**direct** 65:5

**direction** 35:8

**directly** 18:13 90:2
123:2 143:14

**director** 19:18 20:3,
5,7,14 21:20,23
93:17 104:12

**directors** 20:12
25:19,22 62:13

**disagree** 64:17
67:20

**disclosed** 78:4

**disclosures** 139:19

**discretion** 41:8

**discuss** 10:25

**discussed** 14:5
65:12 95:15 104:4
111:21

**discussions** 23:16,
19,24 24:5,7,16
68:17,22 69:7,9
71:19,25 111:23
139:20 141:18,21,23
143:23 145:17

**dispute** 53:11 73:21
74:20 90:23

**disregard** 40:10

**distinguish** 32:13,
21 92:18

**distinguishing** 36:5

**diversified** 31:15

**dividends** 27:22
28:3

**docket** 22:23 45:11
128:21

**document** 9:11
16:10,17,23 19:10

23:4,7,11 35:22,24
36:3 37:8 40:13 44:4,
7 45:11,14 51:18
61:22 62:3,25 63:15
64:4 67:17,18,20
68:10 71:18 72:2,10
73:5 76:2,7 84:3,9
86:12,13,14,18 95:2,
10 99:14,20 109:18
128:12 129:6 130:2
131:2,20 132:20
133:8,16 136:6,10
138:24 139:2

**documentation**
77:9 111:14

**documents** 9:8,17
27:2,5,7,10 44:5 49:9
66:11 75:24 89:10
90:7,11,15,16,25
100:8 103:3 145:11

**dollar** 122:19 125:19

**Dondero** 8:5 81:14

**Doug** 74:15

**Douglas** 8:15 74:12

**Dover** 14:24 21:18
37:14,15,16 38:5,13
65:12

**drafting** 111:6,9,14

**Draper** 8:15,16
74:12,13

**drive** 119:21

**DSD** 74:9

**due** 28:18 29:7,9,12,
18,20 50:24 56:21
57:12 58:8 62:15
70:19 77:10 113:24
116:3

**Dugaboy** 8:16

**duly** 10:13

**duration** 39:15

**Dustin** 25:2 68:21
69:2,11 79:9,15

**E**

**E-MAIL** 16:5,22
18:25 20:25 61:5

63:5 68:2,6,12,14,25
70:2,8 73:6 76:8,11
78:21 79:3,8,25 80:6,
15 81:11,22

**E-MAILED** 139:4

**E-MAILING** 22:15
44:5

**E-MAILS** 75:4,14
81:3

**earlier** 65:12 66:11
75:25 79:21 91:11
92:18 112:10 117:25
133:24 148:20

**easier** 12:10 128:9

**easily** 128:7

**Eden** 24:12 68:15
69:2 79:11,12

**editor-in-chief**
81:15

**effective** 91:7

**effectuate** 131:10,25

**effectuating** 143:18

**efficiently** 20:22

**Ellington** 95:12
98:16

**Ellis** 8:3

**Emily** 9:3

**employee** 73:22
74:21 78:6

**employees** 24:14

**employment** 73:21

**encourage** 87:12

**encouraged** 87:3

**engaged** 23:15,19
24:7

**engaging** 24:16

**ensure** 12:12,15
45:23 56:18,21

**entail** 44:17

**enter** 41:9,19 129:22

**entered** 9:11 11:14
27:7,10 103:4

**entire** 35:14 39:19,21
138:16

**entities** 15:6,20 18:6
21:14,17 22:6 34:4
36:22 64:23 65:5,7,
20 66:9 67:12 85:10
120:11 123:6 129:11
135:24 137:2 138:18
147:6

**entity** 19:23 20:4,6
35:19 49:12 141:15

**entry** 109:8 128:21
129:2

**Eppich** 8:3

**equity** 30:23 31:16
41:15 85:7 92:15
98:12 115:8,22
119:22 120:7 153:8

**Erica** 8:9 139:17

**erosion** 113:24
120:9

**essence** 123:7

**establish** 37:24

**estate** 125:24

**estimate** 89:2 124:2

**estimated** 29:25

**event** 18:10 107:21

**events** 87:22 115:5
118:14

**evidence** 72:2 89:10
90:7

**evolved** 26:2

**exact** 59:11 99:9

**Examination** 10:16
83:21 84:13,19 99:18
122:2

**examined** 10:14

**exceed** 28:10 30:2

**exchange** 123:8,19,
20,23 127:12,25

**exchanged** 122:20

**exclusive** 41:18

**executed** 109:20

**exhibit** 16:3,7,22,23
17:2,10 18:18,19,24
20:23,24 21:2 22:15,
16,17 26:10 31:21
33:9 37:13 45:11
58:25 61:5,8 63:3,4,
6,7 68:2,3,6 78:21
79:2,8 83:18,19,20
84:3 99:5 109:4,5,15,
19 112:17 128:8,24
130:24

**exhibits** 128:17

**existence** 76:19
77:24

**existing** 63:19

**expectation** 28:14

**expectations**
103:10

**expected** 28:8
124:12

**expedited** 153:19,23

**expert** 116:7

**explanation** 70:15
81:9 82:4

**explicit** 147:14

**explicitly** 142:19

**expressed** 54:6,12,
21 55:11

**expressing** 53:23

**expressly** 40:6

**extent** 42:5 44:14
47:3 50:20 54:15
71:8,10 72:5 80:10
88:2 97:14,24
113:17,19 114:24
125:22 130:11,13
131:13 132:25 135:6
136:13,15,17 137:6
138:20,23 140:15
145:16 146:8 147:11
149:13

**external** 58:19

**F**

**fact** 19:13 88:9

Case 21-03067-sgj   Doc 124-7   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-17   Filed 09/11/25   Page 196 of 263   PageID 4453

Index: facts..hear

**facts** 13:18 54:4
55:10,24 56:4 58:5,6
139:22

**factual** 11:6 137:19
140:20,23,25 145:18

**fair** 32:24 59:6 121:7
123:10

**familiar** 34:8 69:3
130:25 133:15 136:2

**feature** 111:22

**February** 59:10 91:7
114:22

**feel** 12:18

**feelings** 102:8

**fees** 113:11

**figure** 72:25

**figures** 28:16

**filed** 14:19 16:8,11,13
17:3,17,18 18:5
22:23 23:7 32:2
36:12 49:9 58:3
64:23 65:8 66:11
84:4 89:10 90:8
97:21 100:3 112:12
128:22

**filing** 137:17

**final** 25:10

**financial** 70:2

**fine** 10:7 59:23 60:17,
20 130:21

**finished** 12:13,15

**firm** 8:3 25:20

**follow** 151:24

**follow-up** 69:14,15,
20

**force** 105:19

**forgot** 146:15

**form** 17:7 28:18 29:4,
15 30:4 31:7 32:9,18
33:18 34:14,21 35:17
36:3,18 37:7 39:11
40:13 41:12,22 42:4
43:13,22 44:19 45:6
46:6,13,25 47:3,24

48:17 49:17 50:20
52:10 53:2,19 54:2,
15 56:8,10 57:8,21
58:13 61:20 62:23
64:2,8,20 65:3,16,23
66:7 67:4,9,17,22
69:19 70:11,24 71:8
72:5 74:25 75:9
76:16 77:4,13,23
78:11,17 80:10 81:6,
25 82:11 85:25 86:10
87:2,7,11,25 88:14
89:5,13 90:10,19
91:4,16,24 92:11,13,
22,24 93:7,8 94:2,4,
25 95:22 96:15 97:24
98:21 99:7,14
100:15,24 101:11,24
103:15 104:19
105:12 106:3 107:17,
25 108:19 109:2
110:12,23 111:4,11,
19 113:2,17 114:14,
24 115:13 116:6
117:14 119:2,18
120:18 121:9 123:12
124:10,16 125:6,15
126:24 129:14 130:2,
11 131:13 132:19,25
134:4 135:3 136:13
137:6 138:20 140:14
142:2 144:12 145:3,
16 146:8 149:20
150:2,15,20 151:8,18
153:2,4

**forma** 56:15

**formally** 38:20

**formed** 29:17

**forming** 55:25

**found** 12:9

**foundation** 41:12
46:6 48:17 53:2 64:8
70:11 91:4,24 93:9
94:2,4,25 96:15
104:20 107:25
108:19 113:2 115:13
116:6 150:22 153:2

**four-man** 26:6

**four-member** 25:18
79:20

**frequently** 89:8

**front** 44:7

**full** 10:22 44:7 52:4
55:23 62:4 105:16
139:2

**fully** 66:18

**function** 43:19

**fund** 14:22 16:14
63:18 111:7 117:12

**Funding** 8:24 16:20
18:3 61:17 63:17
83:22 84:14,20

**funds** 17:25 19:25
26:13,17 85:7 119:13

**future** 127:13

**G**

**general** 43:19 73:9,
17 75:12 101:2
109:25 110:10
121:10 124:25
125:18 132:5

**generally** 73:10
149:22

**Gerard** 81:16 82:7

**gist** 74:18 110:19

**give** 72:19 102:25
106:5 115:2 132:4
136:8 145:19

**giving** 12:2 106:19
107:8

**Global** 14:22,23
16:14 21:19

**go-ahead** 121:25

**go-forward** 105:19

**good** 8:17 13:2 60:18

**Goren** 9:4

**governance** 66:21

**GP** 31:23 32:5

**granted** 127:16
150:19 152:24

**ground** 12:24

**grounds** 13:21

**Group** 37:17

**guess** 16:24 59:5
62:3 70:4 86:3
114:17 117:23,25
120:2,22 124:6 151:5

**guided** 103:7

**guidelines** 103:2,6
105:14

**guys** 61:2 124:5

**H**

**half** 63:21

**happen** 59:9

**happenings** 105:5

**happy** 12:8 123:15
128:10

**Harbour** 87:20

**Harbourvest** 8:11
9:4 10:5,25 11:3,13,
14,18 14:18,21,22,
23,24,25 15:3,15
16:13 17:18 18:5,10,
21 19:4,7,18,21 20:2,
12,15 21:14,18,21,24
22:2,5,6,18,25 23:15,
18,22 24:8,15 25:3,4,
8,11,15 26:12 27:13,
19 28:2,8 30:21 31:4
37:14,17 41:24 42:16
43:7 45:18,21 47:13
49:2,13,21 51:4 52:4,
12,16 53:11,13,24
54:4 55:4,5,11,23
56:24 57:3,9,11,15
58:5 63:22 64:23
65:4,19 66:8,12,20,
24 67:6,12 68:22
69:7 70:6 71:24
73:11 75:7,18 76:13
78:8 79:18 80:3,8
82:8 85:9 86:19 87:4,
13,21 88:3 89:16
90:3,6,17 91:2 92:9
95:16 97:10 98:8
105:18 108:6,17,22
109:9,24 110:5,15,
16,17,20 111:16
117:6 118:20 123:6
124:23 126:3,17,19
127:2,7 129:3,11,21

130:6 131:9 136:10
137:2,13 138:13,18
139:14,23,24 140:7,
21 141:6 142:12,18,
22 143:4,6,17 144:7,
18 147:6 148:8

**Harbourvest's** 11:7,
8 36:19 49:22 50:9,
16 52:2 71:20 72:21,
23 83:12 97:19,25
101:8 117:11 120:23
137:25 140:3 148:6

**Harbourvest-
prepared** 86:14 95:2

**Hayley** 8:7

**HCF** 33:11,15 35:13
36:15 51:22 133:19,
25 134:16 135:18,22
141:7,20,23 142:13,
23 143:8

**HCLF** 63:16

**HCLO** 101:19

**HCLOF** 18:7,11
20:16 22:7 24:2
26:14,16,25 27:15,17
28:9 30:10,22,23
31:5,15,25 32:7,12,
20 33:2,4 34:5,7
35:19 36:6,10,14,21,
25 41:15 42:19 49:4
50:12 51:14,21 52:6,
20 54:7,9,13 55:4,14
59:2,8,10 64:6 65:6
66:18,23 76:18 77:16
85:14 91:13,22 92:14
93:5,17,22 96:17
98:9,18 102:2 103:3,
6 104:12 105:6
112:13 113:12 115:9,
19 116:22 118:4
119:6,15,20 120:8,15
123:6,24 126:4
131:10 133:11,25
143:18,25 144:21
148:21 151:11 153:7

**HCLOF's** 54:18,22

**HCLOF/ALF** 84:25

**HCLOS** 151:13

**hear** 43:15 60:3

**heavier** 121:22

**held** 30:9,23 32:12
33:4 64:5 110:16

**Heller** 8:16

**Highland** 8:23 16:20
18:2 22:24 23:16,20,
21 24:7,14 26:13,17,
19,22 28:18,24
29:11,17 30:22 31:2,
18 32:14,23 33:11,14
34:5 35:13 36:15,20
37:2,3 41:14,17
42:18 45:19,20,21
46:3,16,20,22 47:12,
19,21 48:6,7,23,25
49:10,13 50:3,7
51:12,22 53:10,17,
19,23 54:3,6,8,12
56:16 57:23 58:17
61:17,23 62:7,15,17,
21 63:16,17 66:19
67:13 68:18 69:21
70:5,16,20 71:21,22
72:11 73:18 74:3,6,
19 75:7,17 77:5,9
79:4,13 80:7,21,23
81:4 83:21 84:13,19
85:3 87:3,12,21
88:10,19 89:9 90:6,
12,16,24 92:21 93:6
98:14 102:5 105:16
114:5 115:18 117:6
120:14 133:19,24
134:15 135:17,22
141:7,20,23 142:13,
23 143:8 149:23
151:10,15 153:6

**Highland's** 47:10
51:15 55:3 77:17
103:9

**Highland-affiliated**
141:14

**Highlands'** 93:13

**highlight** 132:10

**highlighted** 132:12
138:11

**hinted** 117:24

**Holdco** 8:14 38:3,10
43:6 62:11 63:18,23
64:5,13,22 66:5
121:19 122:5 128:8

**holders** 115:9,22

**home** 13:9

**Honestly** 134:5

**Horn** 8:16

**hour** 59:20

**hundreds** 57:9

**Hunter** 79:9

**Hush** 9:4

**HV** 15:2 21:25

**hypothetical** 117:16

---

**I**

**idea** 49:19,20

**identification** 16:9
17:4 18:23 21:4
22:20 61:10 63:9
68:8 79:5 83:23
109:12

**identify** 35:25 74:10

**identifying** 148:4

**ii** 42:25

**imagine** 124:3
125:11

**immediately** 64:14

**impact** 53:14 73:25
76:4 77:16 119:12
120:6

**impediments** 96:9

**implications** 55:14
101:16

**important** 111:16

**improperly** 117:7

**inability** 93:20 94:21
96:21 113:24 115:6,
11,22 116:25 118:18
120:10

**inception** 117:10

**include** 76:2

**included** 26:3 28:20
128:5 132:22 134:24

**including** 11:9 74:3

103:7 115:6,9 140:17

**independent** 131:22
136:18

**independently**
70:18 80:23

**individual** 120:6

**individuals** 24:6
38:2 39:22

**industry** 49:5

**inform** 47:12 48:25

**information** 55:12
56:3,6,13 57:16,17
58:6,9,16 59:15 70:5
73:15 78:3 95:6 96:2
102:19 106:8,20
134:6 135:7 136:16

**informed** 45:21 77:5
88:6 105:6 107:21
125:12

**infringe** 71:11

**initial** 31:11 55:19

**initially** 27:14 35:13
118:11

**initials** 74:9

**initiated** 52:22

**injunction** 91:19
114:8 115:21

**inquire** 13:24

**insistence** 49:23

**instruction** 137:8
141:12

**intended** 152:15

**intent** 56:14 137:14,
25 140:3

**intention** 45:22 48:7

**interaction** 36:19

**interest** 27:15,17
67:14 93:20 123:24
128:2 147:11

**interests** 110:7

**internal** 124:6

**International** 15:2
21:25

**interpretation** 71:15
135:14

**interrupt** 74:8

**invest** 18:11

**invested** 21:15 27:14
55:4 61:17

**investigate** 72:21

**investing** 56:24

**investment** 8:17
11:10,15 13:18 14:25
17:24 20:15 22:7
23:17,22,25 25:6,8,
12,14,16 26:25 27:4,
8 28:9,13,21,22,24
29:7,19 30:2,9,10,13,
17,20,21,22 31:4
33:2 34:2,6,12,16,19,
23 35:12,15 36:20
37:15 38:16 39:16
40:20 42:10 50:9
52:2,7 53:15 57:10,
19 58:11 63:23 65:5
66:19,22 71:20 76:17
77:11 79:21,24 80:3
83:13 92:9,16 96:18
101:2,18 102:6
103:2,6 105:2,14
110:7 112:22 113:14
114:3,9,10 117:11
119:19 120:7 121:4
148:13,20 151:2
153:10

**investment's** 55:15

**investments** 32:20
33:4 57:4,12 65:19
116:3

**investor** 24:11 26:13
37:17 55:6 64:10
66:13,16,18 83:21
84:13,19 85:6,8,9,18
86:5 95:15 96:2,12
98:9,17 99:18,22
101:5 104:25 105:18

**Investor's** 97:7
100:12,21

**investors** 18:7 65:13
67:2

**involved** 26:4 68:17,
21 69:6 114:5
141:16,17,21,22

**involvement** 44:12

**isolation** 97:17

**issue** 32:10

**issued** 43:10 83:12

**issues** 12:5

**items** 44:21,23,25
57:16

**IX** 14:24 37:14,15,16
38:5,13 65:13

---

**J**

**James** 81:13

**Jim** 8:4 108:10,15,21
111:15,24

**John** 8:2,6,12 44:4
48:2 59:20 74:7
82:20 84:16 89:15
106:11 107:11 109:6,
16 114:16 116:11
117:21 121:18 122:4
124:11,19 128:13,25
130:3 132:9 139:8
142:4 145:4 146:11
149:5 152:2,19
153:18,20

**Join** 41:4,13,23 91:25
113:3

**joined** 8:25 74:9

**Joint** 97:2

**jointly** 38:15

**Jones** 8:4,8

**Josh** 51:12

**Journal** 76:10 80:14,
18 81:16

**judgment** 45:25
77:25

**jump** 121:19

**junior** 25:3 79:23
125:20

---

**K**

**Kane** 8:12 121:18,19
122:3,4 124:21

Case 21-03067-sgj   Doc 124-7   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-17   Filed 09/01/23   Page 198 of 263   PageID 4455

Index: kind..misrepresentations

126:13 128:4,15
129:4 130:4,20
139:10,17 144:13,16
145:7 147:16

**kind** 114:18 117:24
122:21 124:5

**King** 8:23

**knowledge** 52:5
55:24 70:9 88:5
107:22 108:24

---

**L**

**L.P.** 14:22,24,25 15:3
16:14 17:19 18:5,11
20:2 26:20,23 31:24
32:6 37:15 47:15,22
48:12 61:24 67:13

**Labovitz** 9:3

**laid** 103:5

**large** 85:6,13

**largely** 17:21 114:3
123:18 125:11

**larger** 24:13 66:3

**largest** 37:16 64:10
65:11,13 66:4,24
117:3

**late** 105:10

**Latham** 8:20

**lawsuit** 76:4

**lawyers** 75:21 83:6
146:13

**lay** 115:2 117:17

**layman's** 47:6

**lays** 55:25

**lead** 111:13 122:11

**leading** 115:5

**led** 51:12 113:15
118:17,23

**legal** 15:21 42:6
43:24,25 47:4 50:21,
25 54:16 56:22
69:12,22 71:9 72:6,9,
15 80:11 82:13,20
93:9 113:18 114:25

115:13 116:6 130:12
131:14 135:8,14
136:14 137:7 138:22
140:16 146:9

**letter** 79:3 81:13
82:7,17,25 83:9,11
138:15

**level** 34:5 36:6,25
116:22 119:6 120:8,
15 150:11

**levels** 119:7

**lieu** 42:25

**light** 49:15

**likewise** 12:14 122:8

**limitation** 11:10

**limited** 8:14,24 16:18
17:25 40:14

**list** 39:14

**listed** 33:11 35:21
37:2,4 44:21 134:15
135:17,21 140:2

**listening** 107:10

**lists** 39:5

**litigation** 51:11
53:12 70:13 73:13,
19,25 77:6 78:7
114:4 126:21

**LLC** 19:19,22 20:12
21:21,24 31:23 32:5

**LLP** 8:20 37:4

**located** 13:6

**Logan** 8:13

**long** 45:14

**looked** 17:22 127:20

**losing** 104:14 114:11

**loss** 113:13 116:2
117:3 118:4

**losses** 85:15

**lot** 20:20 113:23

**LP** 8:4 15:4 92:4

**lumped** 15:9

---

**M**

**machines** 74:13

**Madam** 152:10

**made** 10:10 11:12
22:6 25:10,14 26:7
35:13 45:19 52:23
57:3,9 71:6,22 72:11
73:12 79:21 80:7
82:5 90:3 92:9 117:6
118:3,21 153:22

**maintain** 9:19

**majority** 120:9
149:21 153:8

**make** 25:11 41:9
85:17 99:15 117:21
127:5 131:21 138:8
152:20

**makes** 119:24

**making** 28:3,21
76:17 77:11 102:3

**Maloney** 8:22 41:4,
13,23 91:25 92:10,22
93:8 94:3 104:19
113:3 114:12

**managed** 16:19 18:2
19:25 26:19,22 74:3
148:25 149:18,23

**management** 26:19,
23 31:22,23 32:5,6
36:23 37:4 51:21
53:5 61:23 66:23
67:13 79:4 92:6 97:5
98:11 116:19 119:8

**manager** 26:25 27:4
30:12,13,14,17,18,
20,23 31:4,12,24
32:7,11,21 33:12,16,
25 34:6 35:4,14,25
36:6,7,14,16,21,25
40:3,9 41:15 42:19
45:4 49:4,19 50:12,
14,18 51:3,10 52:5,
20,24 54:24 63:17
66:20 85:6 92:19
93:2 96:7 101:19
102:2,6 117:7,9
118:3,13,21 119:4,5,
10,12,19,20,23

120:5,14 121:5,7
131:24 132:13
133:20 134:2,11,21,
23 135:17,21 137:4
146:2 147:4 151:11
153:7

**manager's** 144:21

**managers** 30:25
31:9,17 34:18 35:21

**manages** 17:24
38:16 92:5

**managing** 19:18,24
20:3,5,7,11,13 21:20,
23 25:19,21 32:15,25
93:4 104:24 105:3

**Mark** 8:22 94:3

**marked** 10:4,9 16:9
17:4 18:22 21:3
22:20 26:10 58:24
61:9 63:9 68:7 79:5
83:23 109:11

**market** 54:19 59:6
85:18 93:20

**Massachusetts**
13:5

**material** 51:12 55:10
58:5 71:5,23 72:3
82:9,18

**math** 65:25 113:6
126:9

**matter** 9:7 14:20
44:16,20 70:3 145:18

**matters** 11:2,17
14:4,5 70:6,7,13

**Mclaughlin** 8:19,20

**meaning** 52:16
66:17

**meant** 53:20

**medium** 99:9

**meet** 39:8

**meeting** 39:18 43:2,
8

**member** 19:24 21:2
25:3 37:3,4,5 62:5
79:17,23 134:15,24
135:18 136:3 140:2

**member's** 133:10

**members** 21:9 24:10
25:24,25 33:7,12
42:23 43:2,5 123:6
137:14,23 138:3,14
139:25 140:8,22

**memorandum**
33:21 40:7 61:9,13
85:3

**memory** 89:6

**mentioned** 68:15

**met** 38:19

**Michael** 10:23 18:20
19:6 79:9

**middle** 55:10

**Mike** 29:5 42:7,13
43:23 44:3 47:5
48:19 50:22 51:8
52:17 58:14 59:25
60:5,6,18 71:10 73:9
75:19 82:12 83:4
86:11 98:5 99:15
102:23 113:5,19
115:3,16 116:9
117:19 122:6 124:22
125:8 127:19 130:15
131:15 136:17 137:8,
20 139:2,19 152:18

**Mike's** 97:15

**million** 28:10,25 30:2
56:25 78:2 108:22
109:25 110:2 112:14,
21,23 124:24 125:2
126:6

**millions** 85:15

**mind** 141:19

**minor** 74:20

**minority** 26:13 66:17
98:9 101:5

**minute** 59:18

**minutes** 60:11,16

**mismanagement**
116:4,15,21 118:23

**misrepresentation**
72:24 73:4 82:9

**misrepresentations**

Case 21-03067-sgj    Doc 124-7    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-17    Filed 09/10/25    Page 199 of 263    PageID 4456

Index: misrepresented..paragraph

45:18 53:3 56:2
57:23 71:6,23 72:3,
10,14,16,17 73:2,11
75:6,17 76:3 80:7
82:17,19,22 116:22

**misrepresented**
82:24

**misstates** 29:4
40:13 47:24 56:10
57:21 58:13 92:24
105:12 121:9 142:2

**misunderstood**
146:24

**month** 89:7

**morning** 68:10 84:4

**Morris** 8:6 46:24 56:7
74:7,14 106:2,7
109:6,16 117:13
119:14 121:14
127:17 128:25 135:2
147:19 149:25
150:13,20 151:7
153:3,18

**motion** 11:2 15:8
18:21 19:7 84:12,18
87:18 89:18 98:3
99:4,12,16,17,19
100:2 104:5 109:7,17
122:13 129:2 137:17

**mouse** 38:23

**mouth** 74:18

**move** 15:25 103:17

**muddled** 48:3

**multiple** 31:16
148:11,21 151:2

---

**N**

**named** 26:24

**names** 34:4

**Natasha** 9:3

**nature** 57:4

**necessarily** 120:21

**necessity** 144:9,20

**needed** 22:11 139:21

**Needham** 13:4

**negotiate** 122:16

**negotiated** 108:4,8

**negotiating** 123:25

**negotiation** 131:5
145:11

**negotiations** 11:5
13:19 108:11 111:23
122:11,24 129:7
145:10

**net** 59:2,9

**nice** 122:6

**Nick** 79:10,16

**Nods** 21:11 71:2
90:22 136:4

**nominee** 110:8

**non-discretionary**
62:16

**non-privileged** 51:7
72:18 115:15 130:14

**Nonetheless** 98:5

**nonlegal** 113:20
130:14

**nonresponsive**
57:25 105:22

**Nos** 109:9

**Notary** 10:13

**notice** 137:13,24
138:15 139:25

**notwithstanding**
54:8,23

**November** 27:10
33:22,24 50:13
55:17,22 64:4 81:16
85:4 108:13 112:18,
23 133:14

**number** 9:12 16:11
18:18 29:10,12,16
39:5 59:11 95:8
112:20 113:25
122:25

**numbered** 14:21

**numerous** 104:23

---

**O**

**oath** 11:24

**object** 13:21 15:12
42:4,17 57:25 94:4
97:13,14 105:19
136:12,13,14

**objected** 41:24
97:10

**objection** 11:9 22:19
23:2 29:3,14 30:3
31:6 32:8,17 33:17
34:13,20 35:10,16
36:2,17 37:6 39:10,
11 40:12 41:3,11,21
43:12,21 44:18 45:5
46:5,12,24 47:2,3,23
48:5,6,16 49:16
50:19,20 51:5 52:9,
14,25 53:18,25
54:14,15 56:7,9 57:7,
20 58:12 61:19 62:22
63:25 64:7,19 65:2,
15,22 66:6 67:3,8,16,
21 69:18 70:10,23
71:7,8 72:4,5 74:24
75:8 76:15 77:3,12,
22 78:10,16 80:9,10
81:5,24 82:10 83:15
85:24 86:9,25 87:6,
10,24 88:2,13,21
89:4,12 90:9,18 91:3,
15,23 92:10,12,22,23
93:7,8,25 94:13,24
95:21 96:14 97:23,24
98:20 99:6,13
100:14,23 101:10,23
102:10,21 103:14
104:3,7,19 105:11,21
106:2 107:16,24
108:18,25 110:11,22
111:3,10,18 112:25
113:16,17 114:12,13,
23,24 116:5,17
117:13,15 118:25
119:14,17 120:17
121:8 123:11 124:9,
10,15 125:5,14
126:23 127:17,18
129:13,25 130:10,11
131:12,13 132:3,18,
24,25 134:3 135:2,4,
5 137:5,6,18 138:6,

19,20,22 140:14,15,
24 141:25 142:17
143:3,21 144:11
145:2,15,16 146:7,8
147:10 149:2,12,19,
25 150:3,4,13,14,20,
21 151:7,9,17 152:7,
17,25 153:2,3

**objections** 72:13
73:8 83:3 104:8,22
106:18 115:13 118:7
135:5 140:14 141:12
143:12 147:10

**obligation** 46:23

**obtain** 141:7

**obtaining** 137:3
144:21

**occur** 50:8

**occurred** 87:22 89:2
94:17 114:20

**October** 51:19,20
52:21 84:6 86:18
97:22 103:23 105:25
107:14

**offer** 140:21

**offered** 108:21

**offering** 40:7 61:8,13
85:3

**office** 153:21

**official** 17:6,7

**omissions** 55:4

**Omnibus** 22:19 23:2

**one's** 17:18

**ongoing** 66:22
73:19,25 77:6,17
114:4

**operations** 29:13

**opinion** 53:16,19,24
54:11 71:4 80:5
101:20,21 102:20
103:19 105:9,24
106:15,16,24 107:14,
19,21 113:20 114:10
115:2 116:2,7 117:8,
17 148:7

**opportunities** 23:25

**opportunity** 23:6,23
24:2 25:9 29:8,19
103:7 138:3,15

**opposed** 39:18

**order** 9:10,11,16,23
10:10 79:7 99:23
109:8

**orders** 153:17

**Ordinary** 63:12

**organization** 27:2,4

**original** 28:9,12 29:7
30:8 96:18 101:2
105:13 114:3 153:10

**originally** 24:9 28:17
29:16 115:18 118:12

**originated** 29:11,12

**outcome** 76:20 77:6,
7,15

**outcomes** 125:10

**outstanding** 70:12
128:3

**owned** 36:10 67:6
85:5 92:14

**owner** 153:8

**ownership** 85:14

**owns** 41:15

---

**P**

**Pachulski** 8:7

**package** 123:25
127:21,24

**pages** 16:8 17:3 21:3
22:19 61:3 63:9
90:25 109:11

**paper** 143:7

**papers** 113:10

**paragraph** 17:23
19:17 23:14 26:12
28:7 31:21 37:21,22,
24 38:23 39:2 40:2
45:16 51:19 53:7
54:25 55:9 58:25
62:4 64:13 84:23
92:4 93:15 95:9,23

96:24 109:23 110:5, 14,19

**Parker** 79:11,12

**part** 24:21 26:6 28:20 29:6,9 36:14 45:2 54:9 56:17 75:24 76:3 77:8 86:4 96:18 110:4 111:6 113:13 114:2 122:12 123:4, 24 130:23

**partially** 36:16

**participants** 9:14,21

**participate** 23:3 87:4,13,15

**participated** 88:18 118:22 122:11

**parties** 145:23

**partner** 16:18

**partners** 14:23 17:19,25 18:5,11 19:18,21 20:2,12 21:21,24

**party** 11:15 98:17 110:15,17 141:16

**pass** 147:16 153:12

**passage** 132:11

**passive** 26:12 66:13, 15 98:8 101:5

**past** 57:13

**path** 89:25

**patience** 20:19

**pay** 46:23

**paying** 45:22 48:8

**pending** 54:10

**penultimately** 28:20

**people** 12:11

**percent** 27:15,17 64:5,11,15 65:14,20, 24 66:3,5 67:14

**percentage** 64:15 65:14,25 66:25 85:14

**Perfect** 60:24

**performance** 119:13

**performed** 58:8 97:3

**performing** 29:20

**period** 40:20 114:7

**person** 11:17 21:16 22:2

**personal** 101:21 102:8 103:19 105:23

**perspective** 15:21 81:10

**piece** 107:5 138:23 143:6

**place** 35:3,23 91:20 118:14 136:9 145:21

**placing** 64:14

**plan** 91:6 96:5 97:2 110:17,21 111:17 114:21 123:9 124:8 125:4 126:17

**play** 40:16 44:15

**pleading** 58:3

**Plimpton** 8:10

**point** 24:11 35:24 45:20 47:12 48:10 53:10 89:21 90:13 94:18 98:25 106:21 107:3 144:15

**pointed** 38:23

**points** 53:8

**policy** 59:7

**poor** 121:4

**portfolio** 30:12,14, 17,25 31:3,9,12,15, 17,24 32:6,11,21 33:12,15,25 34:18 35:4,14,21,25 36:5,6, 13,16,23,24 40:3,9 45:3 49:3,19 50:12, 14,18 51:3,10,20 52:5,20,23 54:24 63:17 92:6,16,19,25 96:7 98:11 101:25 104:25 116:4,14 117:4,7,9 118:3,13, 21 119:4,5,8,10,11, 20,23 120:5,14

**portion** 32:25 92:16 93:5 116:15

**position** 31:10 41:16 49:12 50:17 71:22 80:6 85:20 86:7 97:8, 19,25 100:12,20,21 108:16 119:22 120:24 134:18

**positions** 23:10 30:24 31:17 86:23 105:6

**possibly** 104:9

**post** 153:9

**post-petition** 96:8

**potential** 125:22 127:13

**practical** 44:16,20

**pre-investment** 68:17

**predicated** 101:3

**preexisting** 62:16

**prefer** 60:15

**preference** 101:9

**preliminary** 9:6 23:15,19

**preparation** 13:25 131:5 145:10

**prepared** 13:22 14:11,15

**presented** 53:13 54:4

**presently** 96:3

**preserved** 117:12

**pretty** 89:15 128:7 145:14

**prevailing** 85:17

**prevent** 47:16 48:12

**prevented** 91:21

**preventing** 115:18

**previous** 17:22 72:7

**previously** 50:11 57:4 133:11 153:22

**price** 140:9

**primarily** 24:17,19, 23

**primary** 148:5

**prior** 50:9,12 51:25 52:6 64:3,14 71:20 76:17 114:20

**private** 85:6

**privilege** 13:21 147:12

**privileged** 131:16 133:2 135:6 136:15 137:9,21 138:21 140:16 141:13 146:10

**pro** 56:15 138:4,16

**problem** 74:14

**problems** 12:4

**proceeding** 88:8

**proceeds** 28:8

**process** 56:21

**produce** 11:4

**produced** 9:8,17 75:13 100:8 133:12

**production** 75:11,25

**progressed** 24:13

**prohibited** 114:8

**projected** 28:9,12 30:8 125:10

**projection** 29:22

**prominent** 111:22

**pronounce** 10:19

**proof** 11:7 16:7,16 17:2,6,7,16,20,22 18:6 32:3 65:8

**proofs** 14:19 15:8,15 64:24

**proper** 36:8

**proposed** 41:8 99:22 110:21 138:17

**protective** 9:11,23 10:10

**provide** 51:6 71:13 73:14 77:10 89:9 90:6,16 137:23 138:3 139:24 144:2

**provided** 28:17 70:5 71:18 73:5 77:19 82:3,8 90:12,15,24 137:13 138:14 140:7 143:9 144:5

**providing** 126:17,20

**provision** 132:17,22 134:22 138:11 140:18

**proximate** 105:4 107:20

**Public** 10:13

**Pugatch** 10:1,18,20, 21,23 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,20 19:1,6,20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1,18 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1, 10 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,4 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,13 108:1 109:1 110:1 111:1 112:1,10 113:1 114:1 115:1 116:1

117:1 118:1 119:1
120:1 121:1 122:1,6
123:1 124:1 125:1
126:1 127:1 128:1
129:1,17 130:1 131:1
132:1 133:1 134:1
135:1,11 136:1 137:1
138:1 139:1 140:1
141:1 142:1,5 143:1
144:1,17 145:1 146:1
147:1,18 148:1,2,19
149:1,7,15 150:1
151:1,24 152:1 153:1

**pull** 16:23 44:8 61:6
68:4 78:22 83:25
109:14 128:6,14
139:5

**purchase** 138:4,16
140:9

**purchased** 112:19

**purchasing** 67:14

**purely** 140:19

**purpose** 15:7

**purposes** 62:24

**pursuant** 18:22 19:8

**pursue** 96:10 105:17

**pursued** 97:9 151:12

**pursuing** 96:3,13
115:19

**purview** 98:14

**push** 130:20

**put** 19:2 45:12 63:6
74:17 91:19 111:5
153:16

**putting** 95:13

**puzzle** 107:6

---

### Q

**quantum** 77:25

**question** 12:3,7,13,
16,21,22 15:18 46:25
47:7,25 48:19 56:8
66:15 71:16 84:15
86:17 90:4 92:11
97:17 100:18 102:15,

22 104:10 106:3,12,
20 114:15 116:11
117:14,21 118:9,10
120:20 123:12 124:4,
18 126:15 130:3
136:20 137:19 138:9
139:9 140:20,23
141:2,3 142:4 144:14
146:14,16,23 148:3
150:2 151:8 152:4,8,
9,16,20,22 153:4

**questioning** 148:3

**questions** 11:25
12:25 56:20 69:14,16
88:3 121:13,17,20
133:23 148:15 149:6,
14 150:8 151:23

**quick** 59:21 60:7
112:7

**quickly** 15:12

---

### R

**range** 125:10,13

**rata** 138:4,16

**rates** 93:20

**re-ask** 123:14 144:13
152:8

**reaction** 81:3

**read** 40:16 49:8
76:21 78:14 81:18
99:3 110:18 113:10
131:20 136:5 152:11,
13

**reading** 58:2 77:2
135:11

**reads** 62:25

**ready** 12:25 112:4

**reason** 49:3 56:17
64:16 67:19

**reasonable** 29:22

**recall** 25:23 28:16
30:5 34:3 35:18
38:14,17 43:8 50:5
64:9,11 69:17,23
80:21,22 88:15
90:11,14,20,21 91:5,

14,18 99:9,25
100:16,17 101:12,13,
14 107:4,18 111:20
141:4 147:13 152:18

**receipt** 137:24
138:14

**receive** 56:5,12
109:24

**received** 27:22 28:2
57:15 58:9,17 68:10
84:4 142:22

**receiving** 81:3
126:11

**recently** 93:16 94:10

**recess** 61:3 112:8

**recognize** 68:11

**recollection** 43:14,
17

**recommendations**
102:4

**record** 10:22 152:13
153:17

**recover** 124:17,24

**recoveries** 125:11

**recovery** 124:12
125:19,23

**redeem** 54:7,18
115:23

**reduction** 114:20
116:16 118:23

**refer** 45:10

**reference** 134:9

**referenced** 69:25

**referencing** 96:24

**referring** 26:16
30:14 101:15 103:22
119:4,15 120:3
124:12 134:22

**refers** 66:12

**refinance** 98:12
103:8 105:15 113:25
115:7 116:25 118:19
120:10

**refinances** 115:23

**refinancing** 40:19
96:17 101:3

**refusal** 140:8

**refute** 82:4

**regularity** 88:25

**related** 11:2,15 36:22
66:22 90:25 133:10
148:4

**relates** 36:8 51:13
90:2 92:8 151:22

**relating** 21:10

**relations** 24:11

**relationship** 62:17

**release** 128:2

**releases** 126:10,20
127:11,16

**relevant** 47:20 98:2

**reliance** 55:2

**remained** 115:21

**remedies** 42:2

**remember** 112:15

**Reorganized** 96:4,
10 97:3

**repeat** 12:8 90:3
114:15 117:20 139:9
142:3 146:22 152:15,
20

**repeats** 63:15

**rephrase** 124:3
126:14

**reporter** 93:11
121:16 152:11
153:16,24

**represent** 8:4 68:9
122:4

**representation**
130:6

**representations**
11:11

**representative**
15:19 38:3,4,9,12
99:21 144:23 145:6

146:19 147:14

**representatives**
68:16 88:11 143:18,
25 144:7,9,18,20
147:3

**represented** 43:5,6
49:2 74:20 78:4

**representing** 96:24
129:21

**request** 10:8 78:8
153:6

**requested** 9:9,13
55:12 56:3 77:9,14
150:18,23 151:6,12,
15 152:24 153:9

**requesting** 12:22

**requests** 99:20

**require** 44:23

**required** 39:3,7
40:25 81:9 102:19
131:24 136:22 146:4
147:5

**requiring** 133:5

**reread** 83:8

**reset** 40:18,20,22
41:7,9,19,25 42:17
54:7,18 85:16 93:18,
21 94:12,21 95:14,18
96:4,11,13,16 97:2,8,
10,20 98:11,18
100:13,22 101:3,17,
21 102:9,17 103:8,
13,20,22,23,24
104:2,4,5,13,16
105:10,15,24 107:15,
23 108:3 113:25
115:7,11,24 116:25
118:19 120:11
150:10,12,18,19,24
151:4,6,15 152:24
153:6,9

**resets** 151:12

**resolutions** 39:17

**respect** 40:5,14
50:24 71:4 77:20
91:21 98:18 114:9

**respective** 62:13

Case 21-03067-sgj   Doc 124-7   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-17   Filed 09/30/25   Page 202 of 263   PageID 4459

Index: responding..subsequently

**responding** 120:19

**response** 11:9
22:18,25 48:6 76:9
152:12

**responsibility** 93:4

**responsible** 47:19

**restate** 87:25

**result** 74:2 85:4,16
96:22 99:12 100:9
114:4 115:5 116:23

**resulted** 118:15
120:10

**review** 23:7 78:9

**reviewed** 57:17
75:24

**reviewing** 58:20

**rights** 42:2,17 51:21
66:21 110:6

**Road** 13:4

**role** 40:14 44:15

**room** 13:11

**root** 148:11

**rough** 153:25

**roughly** 27:14
112:23 126:6

**routine** 45:2

**Rule** 18:22 19:8

**rules** 12:24

**ruling** 78:6 115:20

**Russell** 8:13

---

**S**

**sat** 34:4

**satisfied** 29:21 57:18

**Schafer** 8:4

**schedule** 53:13
121:23

**scheduled** 55:21

**scheme** 54:9

**scope** 149:6,13

151:23

**Scott** 93:17 94:6
104:11,17

**screen** 16:6,24 17:8,
11,14 18:16 19:3
21:7 22:14,23 37:11
44:14,22 45:13,17
61:6 63:6 67:25 68:4
78:23 84:2 93:16
109:15 112:5,17
128:9,18

**scroll** 16:15 17:19
21:12,22 45:13 84:22

**scrolled** 81:12

**SEC** 70:2

**secondary** 15:2 25:8

**Section** 44:12 129:9,
19 136:3

**seek** 141:7 142:20
143:5

**Seery** 108:10,15,21
111:15

**sell** 140:10,21

**selling** 119:25 123:7

**send** 16:21 83:18
109:3

**sending** 16:4 20:25

**sense** 99:15 125:9

**sentence** 31:22
48:24 84:24 85:13
86:5

**sentences** 40:2

**separate** 15:22 18:5
42:12 75:20 83:5
136:18

**separately** 80:20

**serve** 36:15 96:6

**settle** 108:22

**settlement** 11:5
13:19 15:7 78:5
89:18 108:5 109:8,
20,22,23 110:10
111:2 122:12,17
123:5,17,22 125:3
127:3 128:16,20

129:3,5 130:8,25
134:9 137:16 140:5,
12 141:9 142:16,25
143:20 144:25
145:12,23 146:5
147:8

**Shannon** 8:19

**share** 16:6,24 18:16
21:6 22:14,22 37:11
45:12 61:7 63:7
64:15 65:14 67:25
68:5 78:24 84:2
109:15 112:5,17
128:10,17 130:15
138:16

**shared** 17:9

**shareholder** 63:19
66:4 132:15

**shares** 63:12,22 64:6
66:25 112:19,21
123:7 126:4,11,18
127:11,15 129:10,23
130:8 136:11 137:3,
15 138:2,5,17 140:4,
10,11,22 141:8
142:15 143:10,19
144:10,23 146:4
147:5

**shed** 49:15

**short** 121:21 149:9

**shortened** 82:22

**shortly** 80:14

**shots** 95:17 98:18

**show** 69:24

**showing** 17:11,14,15

**shows** 133:19

**side** 68:22

**sign** 21:17

**signature** 21:13

**signed** 15:15 22:4
43:2 103:4

**significant** 114:19

**similar** 42:18 115:21

**simply** 48:25 139:22

**single** 15:22 37:17

**siphon** 47:14 48:11

**siphoned** 47:21
48:15,22

**sir** 124:14

**Skew** 15:3 22:3

**skip** 28:6

**solo** 20:20

**sophisticated** 55:6

**sort** 125:21

**sought** 58:5 142:13

**sound** 56:23

**sounds** 13:2 27:18
51:24 118:8 120:24,
25 135:8,13

**source** 148:5

**Spalding** 8:23

**speak** 143:13

**speaks** 36:3 67:17
130:2

**specific** 34:3 48:20
75:4 90:15 101:16
102:22 103:5 116:10
132:6 150:17

**specifically** 11:3
25:7 27:16 78:12
95:7 100:17

**specifics** 13:24
35:18 101:14 107:4
140:18

**speculate** 116:18

**speculation** 106:22,
25 116:8 117:16

**spelled** 44:12

**spots** 67:7

**stamp** 133:13

**stamped** 9:18

**standing** 52:14
149:12

**stands** 102:21

**Stang** 8:7

**start** 12:14,16,25
95:16 112:6

**started** 108:13

**starting** 89:14

**starts** 86:5

**state** 10:14,21 33:18

**stated** 24:3 26:14
71:21 87:18 107:19

**statement** 93:24
94:16

**statements** 23:10

**states** 32:4 45:20
110:5

**stating** 120:21

**stemming** 51:14

**steps** 45:23

**sticks** 127:7,9,23

**stop** 18:15 22:14
37:10 67:25 112:5

**Street** 14:24 21:18
37:15 65:12 76:10
80:13,18 81:15

**Strike** 88:23

**structural** 58:20

**structure** 56:15,22

**stuff** 20:21 122:21
128:14

**sub-advisor** 35:7
36:7

**sub-manager** 34:12

**subject** 9:9 54:19
140:4

**submit** 16:2 20:24

**submitted** 18:25

**subordinated** 110:2
123:21 124:7 125:2

**Subscription** 63:8,
11

**subsequent** 34:22
51:11 53:4 56:11,13
98:25 114:6 115:20
116:24 118:16

**subsequently** 24:13
105:16

Case 21-03067-sgj   Doc 124-7   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-17   Filed 09/01/23   Page 203 of 263   PageID 4460
Exhibit 7   Page 94 of 255

Index: subset..vote

**subset** 24:13

**subsidiaries** 62:12 93:13

**subsidiary** 46:15 47:10

**substance** 14:8 70:16 76:25

**successfully** 96:6

**suffered** 118:5 148:12

**suggestion** 49:23, 25 111:8

**suit** 78:7

**summaries** 69:22

**summarize** 123:17

**summary** 69:12 71:6 123:10

**summation** 106:14

**summer** 23:14 24:3

**supervised** 97:4

**support** 18:21 19:7 109:7,16 111:17 128:25

**Surgent** 69:4

**sworn** 98:16

**T**

**taking** 66:8

**talk** 11:4,17 12:10,11 13:14 14:3,12,15 15:5 30:11,13 113:10 122:7

**talked** 43:4 79:15,20 150:25

**talking** 31:14 104:6 119:9 120:12,15 124:17 134:19

**team** 24:11 23:3,5,6, 8 79:18,24

**teed** 89:18

**telling** 74:19 80:23

**Ten** 60:16

**ten-minute** 60:19 112:3

**term** 110:25 134:10 145:14

**termination** 78:7

**terminology** 36:8

**terms** 9:16,22 95:17 110:10 122:17 144:24 145:12,21 147:7 151:4

**Terry** 45:24 46:2,9, 18,20 47:16 48:12 51:12,16 53:12 70:3 71:4 73:13,20 76:4, 14 77:20 118:15

**testified** 10:15 58:7 93:18 94:10,11 95:12 104:12 107:3 112:11 122:10 148:20

**testifying** 52:13

**testimony** 10:6 14:6 28:23 29:4 43:7 47:24 56:10 57:21 58:13 72:18,19 92:24 98:16 99:2 105:8,12 107:9 117:18 121:9 142:2

**thesis** 28:21 96:19 101:2 114:3

**thing** 12:9,20 128:20

**things** 39:5 43:25 107:10 127:8

**thinks** 82:23

**Thomas** 69:3,13,15

**thought** 105:24 118:10 120:20 135:10 146:17

**till** 60:22

**time** 12:3,6,17 25:23 26:2 30:10 33:6 34:15,17 56:19 60:23 85:2 88:6,7 90:13 94:18 97:11 99:9 101:17 103:4,8,13,24 105:7 107:5 114:7 125:25 151:25

**timeline** 114:18

**times** 102:13 103:16 104:23

**titles** 110:6

**today** 13:7,15 14:12, 16 72:21 75:14,25 117:25

**today's** 75:11

**told** 28:24 68:20 102:15,18 106:7,9

**top** 37:12 61:14 62:4 93:15 95:11 99:17 128:22

**topics** 14:12,16 99:21

**total** 65:18,20 112:20

**totally** 12:19 27:22

**toxic** 49:5,14,20 50:2

**trading** 119:25 127:7,10

**transaction** 27:6 40:18,22 41:10,19,25 103:5

**transactions** 54:21 95:18 96:4 98:19

**transcript** 10:9 153:23

**transfer** 63:8,11 110:6 127:25 129:10, 23 130:7,24 131:11, 25 133:6 135:20 136:11,23 137:2,14, 25 140:3 141:8,16 142:14,24 143:7,9,19 144:3,10 145:22 146:3

**Transferee** 132:15

**transferred** 51:12 126:4,19 127:15 138:17 146:5 147:6

**transferring** 123:23 126:12 140:10 144:22

**transfers** 47:14,15 48:11 55:13 132:14

**treated** 15:22

**Trey** 79:11,12

**trim** 109:19

**TRO** 115:18 116:24

**Trust** 8:17,18

**trustee** 35:9 36:13 52:23 95:25 96:23 97:7,16

**Trustee's** 96:25

**trustees** 62:14

**turn** 30:23 63:3 118:17 128:4 133:7

**two-minute** 147:23

**two-thirds** 38:25

**U**

**UBS** 8:21 70:4

**ultimate** 74:2 76:4 103:10 111:6

**ultimately** 25:13 51:9 54:17 55:17 116:23 118:13 124:18 127:20

**unanimous** 42:23

**unaudited** 59:2

**underlaying** 120:4

**underling** 31:8 35:4

**underlying** 11:7 13:18 19:24 31:10, 14,16 32:19 33:3 36:9,23 40:21 41:16 51:14 53:5 56:22 70:16 74:2 93:2 98:10,13 105:4 114:2 116:19 118:19 119:5, 22

**underneath** 35:19

**understand** 11:23 12:4,7 34:25 95:3 98:15 120:23 131:8, 21 133:24 135:16 138:10 151:20 152:6

**understanding** 35:11 36:21 39:24 40:17 42:2,9,12,15

**understood** 31:19 62:11 118:10 142:8

**undertaken** 56:16

**undertaking** 45:23

**undertook** 47:13 48:10

**unequivocally** 49:18

**unsecured** 109:25 123:20 124:6,25 125:18

**upside** 125:21

**V**

**vague** 104:9

**valuation** 59:7

**valued** 125:18

**variety** 30:24

**vehicle** 26:18,22 27:2

**vehicles** 16:19 18:2 32:22

**viability** 77:17

**video** 121:20

**view** 54:22 105:7,13 116:9 131:15 137:10

**viewed** 97:16

**VIII** 15:2

**virtue** 119:21

**vote** 42:23 110:16,20 111:17

43:20 44:10 46:7 47:6,9,18 51:2,9 65:21 71:15 73:10,17 75:23 82:15 83:5 91:8,12 93:12 110:9 113:15 115:17 121:11 125:16 126:2 129:16,20 130:5,15 131:23 132:5,7,9,21 133:5 136:9,18,21 142:18 145:24 146:19 147:3 148:25 151:14 153:5

Case 21-03067-sgj    Doc 124-7    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-17    Filed 09/11/23    Page 204 of 263    PageID 4461

Index: voting..Zoom

**voting** 62:5,24

**W**

**Wall** 76:9 80:13,18
81:15

**wanted** 45:13 94:12
97:16 104:13 122:9

**Watkins** 8:20

**Wayne** 13:4

**week** 93:23 94:23
95:8 104:15

**weekly** 88:10,16 89:3

**weeks** 51:25 80:2
83:12 122:25

**Weisgerber** 8:9,10,
25 9:25 13:20 14:9
15:11 29:3,14 30:3
31:6 32:8,17 33:17
34:13,20 35:10,16
36:2,17 37:6 39:10
40:12 41:3,11,21
42:3,11 43:12,21
44:18 45:5 46:5,12
47:2,23 48:16 49:16
50:19 51:5 52:9,25
53:18,25 54:14 56:9
57:7,20 58:12 59:19,
24 60:4,16 61:19
62:22 63:25 64:7,19
65:2,15,22 66:6 67:3,
8,16,21 69:18 70:10,
23 71:7 72:4,12 73:7
74:24 75:8,19 76:15
77:3,12,22 78:10,16
80:9 81:5,24 82:10,
18 83:2,15 85:24
86:9,25 87:6,10,24
88:13,21 89:4,12
90:9,18 91:3,15,23
92:12,23 93:25
94:13,24 95:21 96:14
97:12,23 98:20 99:6,
13 100:14,23 101:10,
13,23 102:10,18
103:14 104:3,7,21
105:11 106:17 107:2,
16,24 108:18,25
110:11,22 111:3,10,
18 112:25 113:4,16
114:13,23 115:12
116:5,17 117:15

118:6,25 119:17
120:17 121:8 123:11
124:9,15 125:5,14
126:23 127:18
128:12 129:13,25
130:10 131:12 132:3,
18,24 134:3 135:4
136:12 137:5,18
138:6,19 140:13,24
141:11,25 142:17
143:3,11,21 144:11
145:2,15 146:7,22
147:9,21,25 148:14
149:2,4,11,19 150:3,
14,21 151:9,17,21
152:7,17,25 153:14

**wholly-owned**
62:12 85:2

**Willard** 25:2 68:21
69:3 79:9,16

**William** 93:17 94:6
104:11

**Wilson** 8:2 9:6 10:7,
17 14:2,13,14 15:24
16:10 17:5 18:17,24
19:9 20:18 21:5
22:13,21 33:20,23
42:8 48:4 50:23
52:18 53:21,22 57:24
59:22 60:2,9,14,21,
25 61:4,11 63:2
67:24 72:20 74:16
75:13 76:6 78:20
82:14,21 83:17,24
84:8 86:15 88:23
89:23 90:5 93:7
94:15 95:3 99:16,24
102:14 103:18
105:21 106:5,10,24
107:12 109:3,13
112:2,9 121:12
148:16,18 149:8,16
152:3,10,14 153:12,
20

**Wilson's** 148:2

**Winograd** 8:7

**witness'** 9:7

**wondering** 151:22

**words** 74:18

**work** 122:21

**worked** 42:10

**works** 11:24

**worth** 28:25

**worthless** 108:17

**wrap** 112:4 151:25

**written** 39:17 42:25
43:10 75:4,16 82:7
142:13,22 143:5
144:2,22 145:25

**wrong** 120:25

**wrongful** 78:7

**Y**

**y'all** 60:10,14

**years** 30:6 57:10

**York** 10:14

**Z**

**Ziehl** 8:8

**Zoom** 12:6,10 128:14

# EXHIBIT 8

004073

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-108    Filed 09/21/23    Page 206 of 263    PageID 4463
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 1 of 22

Docket #1731 Date Filed: 01/13/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) | **Re: Docket Nos. 1625, 1697, 1706, 1707** |
|  | ) |  |

<div align="center">

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR
ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
(CLAIM NOS. 143, 147, 149, 150, 153, 154), AND AUTHORIZING ACTIONS
CONSISTENT THEREWITH**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41952.8 36027/002



004074

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-108 Filed 08/31/23    Page 207 of 263    PageID 4464
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 2 of 22

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") in support of its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim No.143,147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

### PRELIMINARY STATEMENT

1.      If granted, the Motion will resolve a $300 million general unsecured claim against the Debtor's estate for less than $16.8 million in actual value.[3]  The settlement is another solid achievement for the Debtor and – not surprisingly – is opposed by no one except Mr. Dondero and entities affiliated with him.

2.      As discussed in the Motion, in November 2017, HarbourVest invested $80 million in exchange for a 49.98% membership interest in HCLOF – an entity managed by a subsidiary of the Debtor.  The balance of HCLOF's interests are held by CLO Holdco, Ltd. (an entity affiliated with Mr. Dondero), the Debtor, and certain of the Debtor's employees.  Subsequent to its investment in HCLOF, HarbourVest incurred substantial losses on its investment in HCLOF and filed claims against the Debtor's estate.

3.      HarbourVest asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] Under the proposed settlement, HarbourVest would receive an allowed, general unsecured claim of $45 million and an allowed, subordinated claim of $35 million.  Based on the estimated recovery for general unsecured creditors of 87.44% (which is a recovery based on certain outdated assumptions discussed *infra*), HarbourVest's $45 million general unsecured claim is estimated to be worth approximately $39.3 million and the $35 million subordinated claim, which is junior to the general unsecured claim, is currently estimated to have value only if there are litigation recoveries.  In addition, HarbourVest is transferring to an affiliate of the Debtor its interest in HCLOF, which is estimated to be worth approximately $22.5 million.  Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims is estimated at approximately $16.8 million on a net economic basis.  This estimate, however, is dated and is based on the claims that were settled as of the filing of the Debtor's plan in November 2020.

DOCS_NY:41952.8 36027/002

004075

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-108    Filed 09/10/23    Page 208 of 263    PageID 4465
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 3 of 22

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO.  In furtherance of these claims, HarbourVest alleges it was misled by the Debtor and its employees, including Mr. Scott Ellington (then the Debtor's general counsel), and that subsequent to investing in HCLOF, Mr. Dondero and the Debtor used HCLOF both as a piggybank to fund the litigation against Acis Capital Management, L.P. ("Acis") and as a scapegoat for the Debtor's litigation strategy, in each case to HarbourVest's substantial detriment.

4.        Specifically, HarbourVest alleges that:

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to Mr. Terry's arbitration award against Acis and orchestrated a series of fraudulent transfers and corporate restructurings, the true purpose of which was to denude Acis of assets and make it judgment proof;

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- the Debtor, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- the Debtor improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- the Debtor used HarbourVest as a scapegoat in its litigation against Acis by asserting that the Debtor's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

5.        The Debtor believed, and continues to believe, that it has viable defenses to HarbourVest's claims.  Nevertheless, those defenses would be subject to substantial factual disputes and would require expensive and time-consuming litigation that would likely be resolved only after a lengthy trial all while the Debtor (or its successor) assumes the risk that the defenses might fail.  The evidence will show that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-108    Filed 09/01/23    Page 209 of 263    PageID 4466
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 4 of 22

principals and their counsel. The evidence will also show that one of HarbourVest's primary concerns in settling its claim was that part of that settlement would include the extrication of HarbourVest from the Highland web of entities and the related litigation. The proposed settlement accomplishes that and does so in compliance with HCLOF's governing agreements.

6.     Pursuant to the proposed settlement, (a) HarbourVest will receive (i) an allowed, general unsecured claim in the amount of $45 million, and (ii) an allowed, subordinated claim in the amount of $35 million; (b) HarbourVest will transfer its 49.98% interest in HCLOF (valued at approximately $22.5 million) to a wholly-owned subsidiary of the Debtor; and (c) the parties will exchange mutual and general releases. The Debtor believes that the proposed settlement is reasonable and results from the valid and proper exercise of its business judgment. And the Debtor's creditors apparently agree. None of the major parties-in-interest or creditors in this case has objected to the Motion: not the Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS.

7.     In distinction, the only objecting parties are Mr. Dondero, his family trusts (the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts")), and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF")) (collectively, the "Objectors"). Each of the Objectors has only the most tenuous economic interest in and connection to the Debtor's settlement with HarbourVest. Each of the Objectors is also controlled directly or indirectly by Mr. Dondero who has coordinated each of the Objectors litigation strategies against the Debtor.[4] Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – should be rebuffed, and the objections overruled. The following is a brief summary of the objections.

---

[4] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q.

Case 21-03067-sgj   Doc 124-8   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-100 Filed 09/01/23   Page 210 of 263   PageID 4467
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 5 of 22

| Pleading | Objection/Reservation | Response |
|---|---|---|
| *Objection of James Dondero* [Docket No. 1697] (the "Dondero Objection") | Because HarbourVest was damaged by the injunction entered in Acis, the settlement seeks to revisit this Court's rulings in Acis. | Mr. Dondero is misdirecting the Court. HarbourVest's claim arises from the misrepresentations of Mr. Dondero, Mr. Ellington, and others, not this Court's rulings in Acis, including the failure to disclose the fraudulent transfer of assets. |
| | The settlement is not fair and equitable because it does not address (1) Acis's mismanagement, (2) how the Debtor is liable for HarbourVest's damages, (3) the success on the merits, (4) the costs of litigation, and (5) the Debtor's ability to realize the value of the HCLOF interests in light of the Acis injunction. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation.  The Debtor has assessed the value of the HCLOF interests in light of all factors, including the Acis injunction. |
| | The HarbourVest settlement represents a substantial windfall to HarbourVest. | Mr. Dondero ignores the economics of this case, which have value breaking in Class 8 (General Unsecured Claims).  The value of the settlement is not $60 million; it is approximately $16.8 million against a claim of $300 million.  There is no windfall. |
| | The HarbourVest settlement is improper gerrymandering because it provides HarbourVest with a general unsecured claim and a subordinated claim in order to secure votes for the plan. | The HarbourVest settlement provides for the resolution of HarbourVest's claim.  It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement.  Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| *Objection of the Dugaboy Investment Trust and Get Good Trust* [Docket No. 1706] (the "Trusts Objection") | The settlement represents a radical change in the Debtor's earlier position on the HarbourVest settlement. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. |
| | The settlement appears to buy HarbourVest's vote. | The HarbourVest settlement provides for the resolution of HarbourVest's claim.  It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement.  Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| | No information is provided as to whether the Debtor can acquire HarbourVest's interest in HCLOF or the value of that interest to the estate. | As discussed below, the HCLOF interest will be transferred to a wholly-owned subsidiary of the Debtor.  Mr. Seery will testify as to the benefit of the HCLOF interests to the estate. |
| *Objection of CLO Holdco* [Docket No. 1707] ("CLOH Objection") | HarbourVest cannot transfer its interests in HCLOF unless it complies with the right of first refusal. | CLO Holdco misinterprets the operative agreements and tries to create ambiguity where none exists. |

DOCS_NY:41952.8 36027/002

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-108    Filed 09/10/23    Page 211 of 263    PageID 4468
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 6 of 22

8.      These objections are just the latest objections filed by Mr. Dondero and his related entities to any attempt by the Debtor to resolve this case,[5] including the Debtor's settlement with Acis [Docket No. 1087] and the seven separate objections filed by Mr. Dondero and his related entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[6]  It will not shock this Court to hear that each of the Objectors is also objecting to the Plan.  In contradistinction, the Debtor has heard this Court's admonishments about old Highland's culture of litigation as evidenced by this case, Acis's bankruptcy, and beyond.  Although the Debtor has vigorously contested claims when appropriate, the Debtor has also sought to settle claims and limit the senseless fighting.  The Debtor has successfully resolved the largest claims against the estate, including the claims of the Redeemer Committee, Acis, and, as recently announced to this Court, UBS.  The Debtor would ask this Court to see through the pretense of the Dondero-related entities' objections to the HarbourVest settlement and approve it as a valid exercise of the Debtor's business judgment.

---

[5] As an example of Mr. Dondero's litigiousness, on January 12, 2021, Mr. Dondero filed notice that he will be appealing the preliminary injunction entered against him earlier on January 12, 2021.

[6] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667]; (3) *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670]; (5) *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].

6

004079

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/01/23    Page 212 of 263    PageID 4469
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 7 of 22

<div align="center">

**REPLY**

</div>

A.    <u>**Standing**</u>

9.    **James Dondero.**    In the Dondero Objection, Mr. Dondero asserts he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. While that claim is ostensibly true, it is tenuous at best.  On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[7] More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[8]

10.    Mr. Dondero's claim as an "indirect equity security holder" is also a stretch.  Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("<u>Strand</u>"), the Debtor's general partner.  Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

11.    **Dugaboy and Get Good.**    Dugaboy and Get Good are sham Dondero "trusts" with only the most attenuated standing.  Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177].  In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy

---

[7] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice.  *See* Docket No. 1460.

[8] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

<div align="center">7</div>

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 16-108    Filed 09/06/23    Page 213 of 263    PageID 4470
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 8 of 22

for its postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle.  The Debtor believes that each of the foregoing claims is frivolous and has objected to them.  [Docket No. 906].

12.    In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor).  Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its prior ownership of limited partnership interests in the Debtor.  Because each these claims arises from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time.  As set forth above, these interests are out of the money and are not expected to receive any economic recovery.

13.    Consequently, Mr. Dondero, Dugaboy, and Get Good's standing to object to the HarbourVest settlement is attenuated and their chances of recovery in this case are extremely speculative at best.  *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing).  Mr. Dondero, Dugaboy, and Get Good's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected.  "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity

DOCS_NY:41952.8 36027/002

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-9    Filed 09/01/23    Page 214 of 263    PageID 4471
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 9 of 22

holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

**B.    Mr. Dondero's Objection and his "Trusts" Objection Are Without Merit**

14.    As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted). *See also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

15.    **The Settlement Seeks to Revisit the Acis Orders.**    In the Dondero Objection, Mr. Dondero argues that HarbourVest's claim is based on the financial harm caused to HarbourVest from Acis's bankruptcy and the orders entered in the Acis bankruptcy. Mr. Dondero extrapolates from this that HarbourVest is seeking to challenge this Court's rulings in Acis. (Dondero Obj., ¶¶ 17-20) Mr. Dondero misinterprets HarbourVest's claims and the dangers such claims pose to the Debtor's estate.

16.    HarbourVest's claims are for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

DOCS_NY:41952.8 36027/002

Case 21-03067-sgj   Doc 124-8   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18   Filed 09/11/23   Page 215 of 263   PageID 4472
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 10 of 22

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. HarbourVest is not arguing that Acis or this Court caused its damages; HarbourVest is arguing that *the Debtor* – led by Mr. Dondero – (a) misled HarbourVest as to the nature of Mr. Terry's claims against the Debtor and the litigation with Acis, (b) knowingly and intentionally failed to disclose that the Debtor was engaged in the fraudulent transfer of assets to prevent Mr. Terry from collecting his judgment, and (c) that *the Debtor* – under the control of Mr. Dondero – improperly engaged in a crusade against Mr. Terry and Acis, which substantially damaged HarbourVest and its investment in HCLOF, in each case in order to induce HarbourVest to invest in HCLOF.

17.   Again, HarbourVest does not contend that Acis caused its damages.  Rather, HarbourVest contends that the fraudulent transfer of assets as part of the Debtor's crusade against Mr. Terry and Acis and the false statements and omissions about those matters caused HarbourVest to make an investment it would never have made had Mr. Dondero and the Debtor been honest and transparent.  The Acis litigation – in HarbourVest's estimation – never should have happened.  Acis did not cause HarbourVest's damages.  Mr. Dondero's crusade against Mr. Terry and the Debtor's allegedly fraudulent statements to HarbourVest about the fraudulent transfers, Mr. Terry and Acis caused HarbourVest's damages.

18.   **The HarbourVest Claim Lacks Merit.**  In their objections, Mr. Dondero and the Trusts argue that the HarbourVest settlement is not fair and equitable and not in the best interests of the estate because (a) it does not address the Debtor's arguments against the HarbourVest claims and (b) there is a lack of pending litigation seeking to narrow the claims against the estate. These arguments only summarily address the first two factors of *Cajun Electric*, which deal with success in the litigation, and, in doing so, mischaracterize the dangers to the Debtor's estate

DOCS_NY:41952.8 36027/002

004083

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18    Filed 09/21/23    Page 216 of 263    PageID 4473
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 11 of 22

posed by HarbourVest's claims.  (Dondero Obj., ¶¶ 21-25; Trusts Obj., ¶ 18(a))

19.    Both the Dondero Objection and – to a much lesser extent - the "Trusts"
Objection allege that (a) HarbourVest's losses were caused by Acis and its (mis)management of
HCLOF's investments (Dondero Obj.,¶ 22, 24), (b) there is no contract that supports
HarbourVest's claims (Dondero Obj. ¶ 23; Trusts Obj., ¶ 18(a)), (c) there is no causal connection
between HarbourVest's losses and the Debtor's conduct (Dondero Obj., ¶ 24), and (d) the Debtor
should litigate all or a portion of HarbourVest's claim before settling (Dondero Obj., ¶ 25).
Again, though, as set forth above, both Mr. Dondero and the "Trusts" seek to shift the cause of
HarbourVest's damages away from the Debtor's misrepresentations and to Mr. Terry's
management of HCLOF's investments.  This is simple misdirection.

20.    HarbourVest's claims are that it invested in HCLOF based on the Debtor's
fraudulent misrepresentations.  Fraudulent misrepresentation sounds in tort, not contract.  *See,
e.g., Clark v. Constellation Brands, Inc.*, 348 Fed. Appx. 19, 21 (5th Cir. 2009) (referring to
party's claim based on fraudulent misrepresentation as a tort); *Eastman Chem. Co. v. Niro, Inc.*,
80 F. Supp. 2d 712, 717 (S.D. Tex. 2000) (noting that party had common law duty not to commit
intentional tort of fraudulent misrepresentation).  There is thus no need for HarbourVest to point
to a contractual provision to support its claim.[9]   Moreover, in order to defend against
HarbourVest's claims, the Debtor would need to elicit evidence showing that its employees did
not make misrepresentations to HarbourVest.  Such a defense would require the Debtor to rely
on the veracity of Mr. Ellington's testimony, among others.  That is a high hurdle, and no
reasonable person would expect the Debtor to stake the resolution of HarbourVest's $300 million
claim on the Debtor's ability to convince this Court that Mr. Ellington was telling HarbourVest

---

[9] Subsequent to filing the Motion, the Objectors requested all agreements between HarbourVest, HCLOF, and the
Debtor, and such agreements were provided.

Case 21-03067-sgj   Doc 124-8   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18   Filed 09/31/23   Page 217 of 263   PageID 4474
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 12 of 22

the truth.  This is especially true in light of the evidence supporting Mr. Ellington's recent termination for cause and the evidence recently provided by HarbourVest supporting its claim for fraudulent misrepresentations.

21.     Finally, neither Mr. Dondero nor the "Trusts" even address the third factor analyzed by the Fifth Circuit:  all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." This is telling because no creditor or party in interest has objected to the settlement.  Mr. Dondero and his proxies' preference for constant litigation should not outweigh the preference of the Debtor and its creditors for a reasonable and expeditious settlement of HarbourVest's claims.

22.     **The HarbourVest Settlement Is a Windfall to HarbourVest.**  Both the Dondero Objection and the "Trusts" Objection argue that the HarbourVest settlement represents a substantial windfall to HarbourVest.  Both Mr. Dondero and the "Trusts" ignore the facts. Specifically, Mr. Dondero argues that HarbourVest is receiving $60 million dollars in *actual* value for its claims.  Mr. Dondero's contention, however, wrongly assumes that both the $45 million general unsecured claim and the $35 million subordinated claim provided to HarbourVest under the settlement will be paid 100% in full and that HarbourVest will receive $80 million in cash.  From that $80 million, Mr. Dondero subtracts $20 million, which represents the value Mr. Dondero ascribes to HarbourVest's interests in HCLOF that are being transferred to the Debtor.  Mr. Dondero's math ignores the reality of this case.

23.     The Debtor very clearly disclosed in the projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.,* [Docket No. 1473] (the "Projections") that general unsecured claims would receive an 87.44% recovery *only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr.

DOCS_NY:41952.8 36027/002

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-8    Filed 09/41/23    Page 218 of 263    PageID 4475
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 13 of 22

Daugherty, and the Hunter Mountain Investment Trust were zero.  Because of the Debtor's success is settling litigation, that assumption is proving to be inaccurate.  Regardless, even if general unsecured claims receive a recovery of 87.44%, because the subordinated claims are junior to the general unsecured claims, the subordinated claims' projected recovery is currently zero.  As such, assuming the HCLOF's interests are worth $22.5 million,[10] the actual recovery to HarbourVest will be less than $16.8 million.  This is not a windfall.  HarbourVest's investment in HCLOF was $80 million and its claim against the estate was over $300 million.  The settlement represents a substantial discount.

24.    **Improper Gerrymandering and/or Vote Buying.**  Each of Mr. Dondero and the Trusts argue in one form or another that the HarbourVest settlement is improper as it provides HarbourVest a windfall on its claims in exchange for HarbourVest voting to approve the Plan.  These unsubstantiated allegations of vote buying should be disregarded.  As an initial matter, and as set forth above, HarbourVest is *not* getting a windfall.  HarbourVest is accepting a substantial discount in the settlement.   HarbourVest's incentive to support the Plan comes from HarbourVest's determination that the Plan is in its best interests.  There is also nothing shocking about a settling creditor supporting a plan.  Indeed, it would be nonsensical for a creditor to settle its claims and then object to the plan that would pay those claims.

25.    More importantly, HarbourVest's votes in Class 9 (Subordinated Claims) are not needed to confirm the Plan.  As will be set forth in the voting declaration, Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) have voted in favor of the Plan.[11]  In brief, the Plan was approved without HarbourVest's Class 9 vote,

---

[10] It is currently anticipated that Mr. James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, will testify as to the value of the HCLOF interests to the Debtor's estate.

[11] The Debtor anticipates that Mr. Dondero and his related entities will argue that neither Class 7 nor Class 8 voted to accept the Plan because of the votes cast against the Plan in those Classes by current and former Debtor

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-9    Filed 09/15/23    Page 219 of 263    PageID 4476
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 14 of 22

and the Debtor, therefore, has no need to "buy" HarbourVest's Class 9 claims.  Accordingly, any claims of gerrymandering or vote buying are without merit.

## C.    CLOH Objection

26.    CLO Holdco (and to a much lesser extent, the "Trusts") object to HarbourVest's transfer of its interests in HCLOF as part of the settlement.  Currently, the settlement contemplates that HarbourVest will transfer 100% of its collective interests in HCLOF to HCMLP Investments, LLC ("HCMLPI"), a wholly-owned subsidiary of the Debtor.  As set forth in the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd*. (which was appended as Exhibit A to the Settlement Agreement) [Docket No. 1631-1], each of the Debtor, HarbourVest, Highland HCF Advisors, Ltd. (HCLOF's investment manager) ("HHCFA"), and HCLOF agree that HarbourVest is entitled to transfer its interests to HCMLPI pursuant to that certain *Members Agreement Relating to the Company*, dated November 15, 2017 (the "Members Agreement"),[12] without offering that interest to other investors in HCLOF.

27.    The *only* party to object to the transfer of HarbourVest's interests in HCLOF to HCMLPI is CLO Holdco.  CLO Holdco holds approximately a 49.02% interest in HCLOF and is the wholly-owned subsidiary of the DAF, Mr. Dondero's donor-advised fund.  CLO Holdco argues that the Member Agreement requires HarbourVest to offer its interest first to the other investors in HCLOF before it can transfer its interests to HCMLPI.  In so arguing, CLO Holdco attempts to create ambiguity in an unambiguous contract and to use that ambiguity to disrupt the Debtor's settlement with HarbourVest.

28.    As an initial matter, the Debtor and CLO Holdco agree that the transfer of HarbourVest's interests in HCLOF to HCMLPI is governed by Article 6 (Transfers or Disposals

---

employees, including Mr. Ellington and Mr. Isaac Leventon.  The Debtor will demonstrate at confirmation that those objections are without merit and that Class 7 and Class 8 voted to accept the Plan.

[12] A true and accurate copy of the Members Agreement is attached hereto as Exhibit A.

Case 21-03067-sgj   Doc 124-8   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-9   Filed 09/11/23   Page 220 of 263   PageID 4477
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 15 of 22

of Shares) of the Members Agreement (an agreement governed by Guernsey law).  (CLOH Obj.,

¶ 3)  The parties diverge, however, as to how to interpret Article 6.  The Debtor, as set forth

below, believes Article 6 is clear in that it allows HarbourVest to transfer its interests in HCLOF

to any "Affiliate of an initial Member party" without requiring the right of first refusal in Section

6.2 of the Members Agreement.  CLO Holdco's position appears to be that the Members

Agreement, despite its clear language, should be interpreted as limiting transfers to an "initial

Member's *own* affiliates" and that any other transfer requires the consent of HHCFA and

satisfaction of the right of first refusal.  (*Id.* (emphasis added))  CLO Holdco's reading is

contrary to the actual language of the Members Agreement.

29.     First, Section 6.1 of the Members Agreement provides, in pertinent part:



(Members Agmt, § 6.1 (emphasis added))  Under the Members Agreement, "Affiliate" is

defined, in pertinent part, as "███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

(*Id.*, § 1.1)  A "Member" in turn is a █████████████████████."  The "initial

Member[s]" are the initial Members of HCLOF listed on the first page of the Members

Agreement and include the Debtor, HarbourVest, and CLO Holdco.

30.     As such, under the plain language of Section 6.1, HarbourVest is entitled –

without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any

of the Debtor, HarbourVest, or CLO Holdco.  And that is exactly what is contemplated by the

settlement.  HarbourVest is transferring its interests to HCMLPI, a wholly owned and controlled

subsidiary of the Debtor, and therefore an "Affiliate" of the Debtor.  That transfer is indisputably

DOCS_NY:41952.8 36027/002

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18    Filed 09/11/23    Page 221 of 263    PageID 4478
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 16 of 22

allowed under Section 6.1; it is a transfer to an "Affiliate of an initial Member." CLO Holdco may, tongue in cheek, call this structure "convenient" but that sarcasm is an attempt to avoid the fact that the Members Agreement clearly allows HarbourVest to transfer its interest to HCMLPI without the consent of any party.[13]  The fact that CLO Holdco does not now like the language it previously agreed to when CLO Holdco and the Debtor were both controlled by Mr. Dondero is not a reason to re-write Section 6.1 of the Members Agreement.

31.    Second, Section 6.2 of the Members Agreement is also unambiguous and, by its plain language, allows HarbourVest to "Transfer" its interests in HCLOF to "Affiliates of an initial Member" (*i.e.*, HCMLPI) without having to first offer those interests to the other Members (such obligation, the "<u>ROFO</u>").  CLO Holdco attempts to create ambiguity in Section 6.2 by arguing that it must be read in conjunction with Section 6.1 and that interpreting the plain language of Section 6.2 to allow HarbourVest to transfer its interests to HCMLPI without restriction makes certain other language surplus and meaningless. (CLOH Obj., ¶ 11-13)  Again, CLO Holdco is attempting to create controversy and ambiguity where none exists.

32.    Section 6.2 of the Members Agreement provides, in pertinent part:



(Members Agmt., § 6.2 (emphasis added))  Like Section 6.1, Section 6.2 is clear on its face.  It exempts from the requirement to comply with the ROFO two categories of "Transfers":  (1) Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the

---

[13] Although HHCFA's consent is not necessary for HarbourVest to transfer its interests to HCMLPI, HHCFA will consent to the transfer.

DOCS_NY:41952.8 36027/002

004089

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18    Filed 09/8/23    Page 222 of 263    PageID 4479
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 17 of 22

"Highland Principals" (*i.e.*, the Debtor and certain of its employees)[14] and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal.  The fact that a narrower exemption is provided to CLO Holdco and the Debtor than to HarbourVest (or any other Member) under Section 6.2 is of no moment; the language says what it says and was agreed to by all Members, including CLO Holdco, when they executed the Members Agreement.

33.    In addition, and although not relevant, the language of Section 6.2 makes sense in the context of the deal.  Although CLO Holdco and the Debtor may have disclaimed an "Affiliate" relationship, they are related through Mr. Dondero and invest side by side with the Debtor in multiple deals.[15]  The different standards in Section 6.2 serve to ensure that HarbourVest's (or any successor to HarbourVest) right to Transfer its shares without satisfying the ROFO is limited to three parties:  (i) HarbourVest's Affiliates, (ii) the Debtor's Affiliates, and (iii) CLO Holdco's Affiliates.  This restriction keeps the relative voting power of each Member static and ensures that CLO Holdco and the Debtor, together, will *always* have more than fifty percent of HCLOF's total interests and that HarbourVest will *always* have less than fifty percent.  This counterintuitively also explains the greater restrictions placed on CLO Holdco and the "Highland Principals."  The Highland Principals include certain Debtor employees.  Those employees – as well as CLO Holdco and the Debtor – are prohibited from transferring their HCLOF interests outside of the Dondero family.  This restriction makes sense.  If, for example, a Debtor employee wanted to transfer its interests to an Affiliate of HarbourVest, HarbourVest could have more than fifty percent of the HCLOF interests because of the thinness

---

[14] "**Highland Principals**" means: ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████    (Members Agmt., § 1.1)
[15] There can be no real dispute that Mr. Dondero effectively controls CLO Holdco.

DOCS_NY:41952.8 36027/002

004090

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18    Filed 09/19/23    Page 223 of 263    PageID 4480
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 18 of 22

of the Dondero-family's majority (approximately 0.2%). At the time the Members Agreement was executed, CLO Holdco and the Debtor were under common control. Section 6.2 preserves those related entities' control over HCLOF by restricting transactions that would transfer that control unless the ROFO is complied with.

34.    As such, and notwithstanding CLO Holdco's protestations, Section 6.1 and Section 6.2 are consistent as written and clear on their face. This consistency is further evidenced by HCLOF's Articles of Incorporation[16] and HCLOF's offering memorandum, which each include language identical to Section 6.1 and 6.2 of the Members Agreement.[17] It seems highly unlikely, if not implausible, that sophisticated parties such as CLO Holdco would include the exact same language in six separate places over three documents without a reason for that language and without the intent that such language be interpreted as it is clearly written – not as CLO Holdco now wants it to be interpreted. Accordingly, since HarbourVest is transferring its interests to HCMLPI, an Affiliate of an initial Member, the plain language of Section 6.2

---

[16] *See* Articles of Incorporation, adopted November 15, 2017, a true and correct copy of which is attached hereto as Exhibit B.



(Articles of Incorporation, § 18.1)

(*Id.*, § 18.2)

[17] *See* Offering Memorandum, dated November 15, 2017, a true and correct copy of which is attached hereto as Exhibit C.



(Offering Memorandum, page 89)

DOCS_NY:41952.8 36027/002

004091

Case 21-03067-sgj   Doc 124-8   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18   Filed 09/01/23   Page 224 of 263   PageID 4481
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 19 of 22

exempts HarbourVest from having to comply with the ROFO.

35.     Third, and finally, CLO Holdco makes the nonsensical argument that because Section 6.2 provides different treatment to similarly situated Members that this Court should re-write Section 6.2.  (CLOH Obj., ¶¶ 15-17)  Contracts provide different treatment to ostensibly similarly situated parties all the time and no one objects that that creates an absurd result.  It just means that different parties bargained for and received different rights.

36.     CLO Holdco's attempt to justify why this Court should re-write the Members Agreement to correct the "disparate treatment" is also unavailing.  As an example of the absurd result caused by the "disparate treatment," CLO Holdco states:  "[B]ecause the HarbourVest Members are technically Affiliates of an initial member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer."  (*Id.*, ¶ 16)  The scenario posited by CLO Holdco, however, is *exactly* the scenario prevented by the clear language of Section 6.2.  For HarbourVest to obtain control of HCLOF, it would – as a matter of mathematical necessity – need the interests held by CLO Holdco (49.02%) and/or the Highland Principals (1% in the aggregate).  Section 6.2, however, *expressly* prohibits CLO Holdco and the Highland Principals from transferring their interests to HarbourVest or its Affiliates without satisfying the ROFO.  As set forth above, it is Section 6.2 that prevents control from being transferred away from the Dondero family without compliance with the ROFO.  In fact, Section 6.2 would only break down if the limiting language in Section 6.2 were read out of it in the manner advocated by CLO Holdco.

37.     Ultimately, Article 6 of the Members Agreement is clear as written and expressly allows HarbourVest to transfer its interests to HCMLPI.  If CLO Holdco had an objection to the rights provided to HarbourVest under the Members Agreement, CLO Holdco

DOCS_NY:41952.8 36027/002

004092

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-8    Filed 09/11/23    Page 225 of 263    PageID 4482
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 20 of 22

should have raised that objection three and a half years ago before agreeing to the Members Agreement. CLO Holdco should not be allowed to create ambiguity in an unambiguous contract or to re-write that agreement to impose additional restrictions on HarbourVest. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) (enforcing the "unambiguous language in a contract as written," noting that where a contract is unambiguous, a party may not create ambiguity or "give the contract a meaning different from that which its language imports") (internal quotations omitted); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.").

38.     It should go without saying, but CLO Holdco (and the other parties to the Members Agreement) should also be required to satisfy their obligations under the Members Agreement and execute the "Adherence Agreement" as required by Section 6.6 of the Members Agreement in connection with the Transfer of HarbourVest's interests to HCMLPI or any other permitted Transfer.

39.     Finally, and notably, although CLO Holdco spends considerable time arguing that HarbourVest should be required to comply with the ROFO, nowhere in the CLOH Objection does CLO Holdco state that it wishes to purchase HarbourVest's interests in HCLOF.  This omission is telling.  CLO Holdco and the other Objectors have no interest in actually exercising their alleged right of first refusal contained in the Members Agreement.  Rather, their only interest is in causing the Debtor to spend time and money responding to a legion of related (and coordinated) objections.[18]

---

[18] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q; Exhibit T (email from Mr. Dondero as forwarded to Mr. Ellington stating "Holy bananas….. make sure we object [to the HarbourVest Settlement]"); Exhibit Y.

004093

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-9    Filed 09/21/23    Page 226 of 263    PageID 4483
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 21 of 22

*[Remainder of Page Intentionally Blank]*

DOCS_NY:41952.8 36027/002

004094

Case 21-03067-sgj    Doc 124-8    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-18    Filed 09/13/23    Page 227 of 263    PageID 4484
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 22 of 22

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  January 13, 2021           **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:41952.8 36027/002

004095

# EXHIBIT 9

```
                    IN THE UNITED STATES BANKRUPTCY COURT
  1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
  2
                                )   Case No. 19-34054-sgj-11
  3   In Re:                     )   Chapter 11
                                 )
  4   HIGHLAND CAPITAL           )   Dallas, Texas
      MANAGEMENT, L.P.,          )   Thursday, January 14, 2021
  5                              )   9:30 a.m. Docket
                                 )
  6           Debtor.            )
                                 )   - MOTION TO PREPAY LOAN
  7                              )     [1590]
                                 )   - MOTION TO COMPROMISE
  8                              )     CONTROVERSY [1625]
                                 )   - MOTION TO ALLOW CLAIMS OF
  9   _____)     HARBOURVEST [1207]

 10                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 11                UNITED STATES BANKRUPTCY JUDGE.

 12   WEBEX APPEARANCES:

 13   For the Debtor:          Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
 14                            10100 Santa Monica Blvd.,
                                13th Floor
 15                            Los Angeles, CA  90067-4003
                               (310) 277-6910
 16
      For the Debtor:          John A. Morris
 17                            Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
 18                            780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
 19                            (212) 561-7700

 20   For the Official Committee  Matthew A. Clemente
      of Unsecured Creditors:   SIDLEY AUSTIN, LLP
 21                            One South Dearborn Street
                               Chicago, IL  60603
 22                            (312) 853-7539

 23   For CLO Holdco, Ltd.:    John J. Kane
                               KANE RUSSELL COLEMAN LOGAN, P.C.
 24                            901 Main Street, Suite 5200
                               Dallas, TX  75202
 25                            (214) 777-4261
```

2

APPEARANCES, cont'd.:

For James Dondero:          John T. Wilson
                            D. Michael Lynn
                            John Y. Bonds, III
                            Bryan C. Assink
                            BONDS ELLIS EPPICH SCHAFER
                                JONES, LLP
                            420 Throckmorton Street,
                                Suite 1000
                            Fort Worth, TX  76102
                            (817) 405-6900

For Get Good Trust and      Douglas S. Draper
Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
                            650 Poydras Street, Suite 2500
                            New Orleans, LA  70130
                            (504) 299-3300

For HarbourVest, et al.:    Erica S. Weisgerber
                            M. Natasha Labovitz
                            Daniel E. Stroik
                            DEBEVOISE & PLIMPTON, LLP
                            919 Third Avenue
                            New York, NY  10022
                            (212) 909-6621

For Highland CLO Funding,   Rebecca Matsumura
Ltd.:                       KING & SPALDING, LLP
                            500 West 2nd Street, Suite 1800
                            Austin, TX  78701
                            (512) 457-2024

Recorded by:                Michael F. Edmond, Sr.
                            UNITED STATES BANKRUPTCY COURT
                            1100 Commerce Street, 12th Floor
                            Dallas, TX  75242
                            (214) 753-2062

Transcribed by:             Kathy Rehling
                            311 Paradise Cove
                            Shady Shores, TX  76208
                            (972) 786-3063



        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

3

<u>DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.</u>

2          THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6    right.  We're a little late getting started because we had

7    lots of reading material for the Court today.  All right.

8    This is Judge Jernigan, and we have a couple of Highland

9    settings.  The HarbourVest matters are the primary thing we

10   have set today, and then we also have a Debtor's motion

11   pursuant to protocols for authority for Highland Multi-Strat

12   to prepay a loan.

13      All right.  Well, let's get a few appearances.  First, for

14   the Debtor team, who do we have appearing this morning?

15          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16   Pomerantz, John Morris, and Greg Demo here on behalf of the

17   Debtor.

18          THE COURT:  Okay.  Thank you.

19      All right.  We have objections on HarbourVest.  Who do we

20   have appearing for Mr. Dondero this morning?

21          MR. WILSON:  Your Honor, it's John Wilson, and I'm

22   also joined by Michael Lynn, John Bonds, and Bryan Assink.

23          THE COURT:  Okay.  I'm sorry.  Could -- the court

24   reporter does yeoman's work in this case.  Let me just make

25   sure we got all three of those names.  Say again, Mr. Wilson.

4

1          MR. WILSON:  John Bonds and Michael Lynn and Bryan

2    Assink.

3          THE COURT:  Oh, okay.  So, see, I thought I heard

4    somebody Wilson in all of that, which was why I was pressing

5    the issue.

6       All right.  Is Mr. Dondero present on the video for

7    today's hearing?

8          MR. WILSON:  I believe he is, Your Honor.

9          THE COURT:  Mr. Dondero, could you confirm that you

10   are out there?  (No response.)  Okay.  My court reporter says

11   he sees the name out there.  Is he in your office?

12         MR. WILSON:  Your Honor, he is appearing remotely

13   from my office.  I'm not sure exactly where he's appearing

14   from.

15         THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16   there and you're speaking up to confirm you're present, we're

17   not hearing you.  Maybe your device is on mute.  So please

18   unmute yourself.

19      (No response.)

20         THE COURT:  All right.  I'm going to take some other

21   appearances and you -- you need to try to communicate with

22   your client and let him know I need to confirm he's present.

23   Okay?

24      All right.  Meanwhile, let's go to our other Objectors.

25   CLO Holdco.  Who do we have appearing today?

5

1          MR. KANE:  John Kane; Kane Russell Coleman & Logan;
2    on behalf of CLO Holdco.

3          THE COURT: All right.  Thank you, Mr. Kane.
4      We had an objection from Dugaboy Investment Trust and Get
5    Good Trust.  Who do we have appearing?

6          MR. DRAPER:  Douglas Draper, Your Honor, for -- for
7    Draper.

8          THE COURT: All right.  Thank you, Mr. Draper.
9      All right.  I think those were the only written objections
10   we had.  Mr. Pomerantz, do you confirm, we don't have any
11   other objectors for the motions set, correct?

12         MR. POMERANTZ:  Your Honor, there was those three.

13         THE COURT:  I'm sorry.  I didn't catch your full
14   sentence.

15         MR. POMERANTZ:  That is correct, Your Honor.  There
16   were three objections to the motion.

17         THE COURT:  Okay.  Mr. Clemente, you're there for the
18   Creditors' Committee?

19         MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt
20   Clemente on behalf of the Official Committee of Unsecured
21   Creditors.

22         THE COURT:  All right.  Good morning.  Thank you.
23   All right.  We have a lot of other folks on the video.  I'm
24   not going to go ahead and take a roll call of other lawyers.

25         MS. WEISGERBER:  Your Honor?

6

 1           THE COURT:  Yes?

 2           MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

 3   Weisgerber from Debevoise on behalf of HarbourVest.

 4           THE COURT:  Okay.

 5           MS. WEISGERBER:  And I'm joined by Natasha Labovitz

 6   and Dan Stroik --

 7           THE COURT:  Okay.

 8           MS. WEISGERBER:  -- from Debevoise as well.

 9           THE COURT:  Thank you.  I was neglectful in not

10   getting your appearance, because, of course, you're at the

11   front and center of this motion to compromise, and I did see

12   that you filed a reply brief yesterday afternoon.  Okay.

13   Thank you.

14       All right.  Do we have -- do we have Mr. Dondero on the

15   line?  I'm going to check again.

16       (No response.)

17           THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18   so please unmute your device.

19           MR. WILSON:  Your Honor, it appears to me that Mr.

20   Dondero's device was unmuted as soon as you asked if he was

21   available.  I sent him a communication a second ago asking if

22   he's having technical difficulties.  I have not received a

23   response, so I --

24           MR. DONDERO:  Hello.  Can anybody hear me?

25           THE COURT:  Oh.

7

 1            MR. WILSON:  Okay.  I hear him.

 2            THE COURT:  Mr. Dondero?

 3            MR. DONDERO:  Hello?

 4            THE COURT:  Is that you?

 5            MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

 6    everything since the beginning.  It's just we've had technical

 7    difficulties.  I couldn't use the Highland offices.  We've

 8    been trying to set up something else.

 9            THE COURT:  All right.

10            MR. DONDERO:  But I'm on now, if -- yes.

11            THE COURT:  All right.  Very good.  Well, I'm glad

12    we've got you.

13        All right.  Well, Mr. Pomerantz, how did you want to

14    proceed this morning?

15            MR. POMERANTZ:  Your Honor, we could take up the

16    HarbourVest motion first, and I will turn it over to John

17    Morris.  He and Greg Demo will be handling that.  And then

18    after that we can handle the other motion, which is unopposed.

19            THE COURT:  All right.  Mr. Morris?

20            MR. KANE:  Your Honor, this is -- sorry.  This is

21    John Kane for CLO Holdco.  Just very briefly, if I may.  And

22    this will affect, I think, the Debtor's case in chief, so I'll

23    expedite things a little bit, I believe.

24        CLO Holdco has had an opportunity to review the reply

25    briefing, and after doing so has gone back and scrubbed the

8

1    HCLOF corporate documents.  Based on our analysis of Guernsey

2    law and some of the arguments of counsel in those pleadings

3    and our review of the appropriate documents, I obtained

4    authority from my client, Grant Scott, as Trustee for CLO

5    Holdco, to withdraw the CLO Holdco objection based on the

6    interpretation of the member agreement.

7            THE COURT:  All right.  Well, thank you for that, Mr.

8    Kane.  I think that -- that eliminates one of the major

9    arguments that we had anticipated this morning.  So, thank you

10   for that.

11       Any other housekeeping matters that maybe someone had that

12   I didn't ask about?

13           MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca

14   Matsumura from King & Spalding representing Highland CLO

15   Funding, Ltd.  I just wanted to put on the record, we -- our

16   client had requested that some of its organizational documents

17   be filed under seal.  But we have given permission for the

18   parties to present the relevant excerpts, to the extent it's

19   still relevant after Mr. Kane's announcement, in court.  And

20   we'd just ask that the underlying documents remain sealed, but

21   we're not going to object if they show them on a PowerPoint or

22   anything like that.

23       So, to the extent that you had that on your radar, I just

24   wanted to clear that up for the proceedings.

25           THE COURT:  All right.  Well, I did sign an order

9

 1   late last night.  I don't know if it's popped up on the

 2   docket.

 3          MS. MATSUMURA:  Yes, Your Honor.  That's what this

 4   referred to.  That was what -- these are the documents that

 5   were being sealed.  And so I just wanted to note, if you --

 6   you know, if the Debtor puts up an excerpt of those documents

 7   and you're like, wait a minute, didn't I seal those, that we

 8   were the party that requested them be under seal and we're

 9   fine with them being shown in court, as long as the underlying

10   documents aren't publicly accessible.

11          THE COURT:  Okay.  Got you.  Thank you.

12      All right.  Any other housekeeping matters?

13          MR. MORRIS:  Yes, Your Honor.  This is John Morris

14   from Pachulski Stang for the Debtor.  Good morning.

15          THE COURT:  Good morning.

16          MR. MORRIS:  The only other matter that I wanted to

17   raise, and I can do it now or I can do it later, or Your Honor

18   may tell me that it's not appropriate to do at this time, is

19   to schedule the Debtor's motion to hold Mr. Dondero in

20   contempt for violation of the TRO.

21          THE COURT:  All right.  Well, let's do that at the

22   conclusion today.  And please make sure I do it.  I think I

23   was going to address this last Friday, and we went very late

24   and it slipped off my radar screen.  But I did see from my

25   courtroom deputy that you all were reaching out to her

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 19   Filed 09/11/23   Page 238 of 263   PageID 4495
Exhibit 9   Page 110 of 134

10

1  yesterday to get this set, and then Mr. Dondero's counsel

2  reached out to her and said, We're going to file an objection

3  to a setting next Wednesday, or I think you had asked for a

4  setting next Tuesday or Wednesday.

5        MR. MORRIS:  I did.

6        THE COURT:  And I don't -- I don't know if that

7  response/objection was ever filed last night.  I haven't seen

8  it if it was.  So, we'll -- please, make sure I don't forget.

9  We'll take that up at the end of today's matters.  All right.

10 Well, --

11        MR. MORRIS:  All right.  So, --

12        MS. WEISGERBER:  Your Honor, one last housekeeping

13 item from -- I'm joined this morning by Michael Pugatch of

14 HarbourVest, who will present some testimony this morning.  I

15 just want to confirm he's on the line and confirm no

16 objections to him sitting in for the rest of the hearing.

17        THE COURT:  All right.  Mr. Pugatch, this is Judge

18 Jernigan.  Could you respond?  Are you there with us?

19        MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20 Pugatch from HarbourVest here.

21        THE COURT:  All right.  Very good.  I think we had

22 you testify once before in the Acis matter, if I'm not

23 mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24 I can't remember.

25     All right.  So, we're going to let Mr. Pugatch sit in on

11

1  this.  Anyone want to say anything about that?  I consider him

2  a party representative, so I don't -- I don't think anyone

3  could invoke the Rule.

4      All right.  Very good.  Well, let's go forward if there

5  are no more housekeeping matters.

6          MR. MORRIS:  Okay.

7          THE COURT:  Mr. Morris?

8          MR. MORRIS:  Thank you.  Thank you very much, Your

9  Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10 Debtor.

11     It's a rather straightforward motion today.  It's a motion

12 under Rule 9019, pursuant to which the Debtor requests the

13 Court's authority and approval to enter into a settlement

14 agreement with HarbourVest that will resolve a number of

15 claims that HarbourVest has filed against the Debtor.

16     What I -- the way I propose to proceed this morning, Your

17 Honor, is to give what I hope is an informative but relatively

18 brief opening statement.  I'll defer to HarbourVest and its

19 counsel as to whether they want to make a presentation in

20 advance of the offer of evidence.  Any objecting party, I

21 suppose, should then be given the opportunity to present their

22 case to the Court.  Then the Debtor will call Jim Seery, the

23 Debtor's CEO and CRO.  We will offer documents into evidence.

24 I would propose then that the objecting parties take the

25 opportunity to ask Mr. Seery any questions they'd like on the

12

1   matter.

2       After the Debtor rests, I think HarbourVest would like to

3   put Mr. Pugatch on the stand to offer some testimony on their

4   behalf.  And I think that that will conclude the case.  We can

5   finish up with some closing arguments as to what we believe

6   the evidence showed, but that's the way that I'd like to

7   proceed, if that's okay with the Court.

8               THE COURT:  All right.  That sounds fine.

9               OPENING STATEMENT ON BEHALF OF THE DEBTOR

10              MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11  is a -- this should be a very straightforward motion under

12  Rule 9019.  The standard is well-known to the Court.  There

13  are four elements to a 9019 motion.  The Debtor clearly has

14  the burden of proof on each one.  And we easily meet that

15  burden, Your Honor.

16      The standard, just to be clear, the first part is that we

17  have to establish a probability of success, with due

18  consideration for uncertainty of law and fact.  The second one

19  is the complexity, likely duration, expense and inconvenience

20  of the litigation.  The third part of the test is the

21  paramount interest of creditors.  And the fourth part of the

22  test is whether or not the proposed settlement was reached

23  after arm's-length negotiations.

24      The Debtor believes that it easily meets this standard,

25  and frankly, is a little bit frustrated that it's being forced

13

1   to incur the expense by Mr. Dondero in going through this

2   process.

3       A plain reading, a fair reading of the economics here

4   relative to the claim shows that this is a very reasonable

5   settlement.  I don't need to go beyond that, Your Honor.  I

6   don't even need to use the word reasonable.  It surely meets

7   the lowest standard.

8       We've prepared a couple of demonstrative exhibits, Your

9   Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10  just put one up on the screen now, if I may.

11      Ms. Canty, can you please put up Demonstrative Exhibit #3?

12      Demonstrative Exhibit #3 is an outline of the economics of

13  the settlement.  It includes the various pieces, the

14  components that the parties have agreed to.  And it shows, at

15  least from the Debtor's perspective, just what HarbourVest is

16  being given here.

17      Up on the screen is a demonstrative exhibit.  It has

18  citations to the evidence that will be admitted by the Court.

19  The first line shows that HarbourVest will receive a $45

20  million allowed general unsecured nonpriority claim.  And that

21  -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22  Page 2.

23      That claim is discounted by the expected recovery that

24  general unsecured creditors are supposed to get.  As of

25  November, in the liquidation analysis that was part of the

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-19   Filed 09/11/23   Page 242 of 263   PageID 4499
Exhibit 9   Page 951 of 234

14

1   disclosure statement -- that's the citation in the footnote --

2   the Debtor believed that unsecured creditors were estimated to

3   recover approximately eighty-seven and a half cents on the

4   dollar.  And so we just did the arithmetic there to get to the

5   net economic value of the proposed general unsecured claim.

6        And from that, we reduced $22-1/2 million because that is

7   the net asset value of HarbourVest's interest in HCLOF, which,

8   pursuant to the settlement agreement, it will transfer back to

9   the Debtor, so that the net economic value is approximately

10  $16.8 million.

11       You will hear testimony from Mr. Seery that this number

12  is, in fact, overstated, and it's overstated because, since

13  the time the disclosure statement was filed in November, a

14  number of events have occurred that will -- that have caused

15  the estimated recovery percentage to be reduced from

16  approximately 87-1/2 percent to something lower than that.  We

17  don't have the exact number, Your Honor, but Mr. Seery will --

18  and the evidence will show that there's been more expenses,

19  that there's been some resolution of certain claims.  There's

20  been some positive issues, too.  But that number is probably

21  in the 70s somewhere.

22       And in any event, I think the point here is, Your Honor,

23  HarbourVest invested $80 million in HCLOF, which was going to

24  participate in the investment in CLOs.  They filed a claim for

25  $300 million, through treble damages and other claims.  But

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-19   Filed 09/10/234   Page 243 of 263   PageID 4500

15

1  the net economic impact of this is going to be somewhere

2  probably in between $12 and $14 million.  I'll let Mr. Seery

3  give more precision to that.  And it represents less than -- a

4  less than five percent recovery on the total claim.

5      And we think it's important for the Court to keep that in

6  mind.  What are the economics here?  Are we overpaying?  Is

7  this an unreasonable settlement?  And I think the evidence

8  will show that the Debtor is not, but that this settlement

9  that you see before you was the product of arm's length, and

10  I'm going to go in reverse order of the four-part test under

11  9019.

12      So, the last part is whether or not the settlement, the

13  proposed settlement was the product of arm's-length

14  negotiation.  You'll hear lots of evidence that this

15  settlement that's up on the screen right now very much was the

16  product of arm's-length negotiation.

17      The third part of the test, Your Honor, is whether it

18  meets the paramount interest of creditors.  You know,

19  regrettably, Mr. Dondero is the only purported creditor who is

20  objecting here.  He may have done so through different

21  vehicles, but every objecting party here is a debtor [sic]

22  owned and controlled by Mr. Dondero.  No other creditor -- not

23  the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24  -- nobody is objecting to this settlement except for Mr.

25  Dondero.  And we believe that that highlights the Debtor's

16

1    ability to meet the third prong of the test, and that is these

2    are -- this settlement is in the paramount interest of

3    creditors.

4        Again, going in reverse, the second part of the test is

5    the complexity, duration, and expense of litigation.  There

6    will be no disputed evidence that we meet -- the Debtor easily

7    meets this prong of the test.  The evidence is going to show

8    that HarbourVest's claim is based on fraud, fraud in the

9    inducement, fraudulent statements and omissions, the kind of

10   case, Your Honor, that I'm sure you're familiar with that is

11   incredibly fact-intensive, that will be incredibly difficult

12   to navigate through.  It will be prolonged, it will be

13   expensive, because you're necessarily relying on he said/she

14   said, basically.  And so we're going to have to get testimony

15   from every person that spoke in connection with the events

16   leading up to the transaction.  So we think the second prong

17   will be easily met, Your Honor.

18       And then the last prong -- the first prong, if you will --

19   is the likelihood of success on the merits.  We think that the

20   settlement, the economic recovery that's up on the screen

21   here, which ultimately will be less than five percent of the

22   claimed amount, in and of itself shows that the settlement is

23   consistent with the Debtor's perception of its likely success

24   on the merits.  I'm certain that HarbourVest disagrees, but

25   that's okay, we're here today and that's the Debtor's view,

17

1   and the Court is here to assess the Debtor's business judgment

2   and whether the Debtor has properly analyzed the issues and

3   gone through the process.  And the evidence will show

4   conclusively that it will.  That it has.

5       Mr. Seery will testify at some length as to the risks that

6   he saw.  I think that you'll hear counsel for Mr. Dondero ask

7   both Mr. Seery and Mr. Pugatch a number of questions designed

8   to elicit testimony about this defense or that defense.  And

9   it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered.  In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

1   ability of the Debtor to engage in the transfer or the

2   acquisition of the asset from HarbourVest.  I would -- I would

3   respectfully request that we just enter into a short

4   stipulation on the record reflecting that the Debtor's

5   acquisition of HarbourVest's interests in HCLOF is compliant

6   with all of the applicable agreements between the parties.

7        And with that, Your Honor, I look forward to putting Mr.

8   Seery on the stand and presenting the Debtor's case.

9             THE COURT:  All right.  Other opening statements?

10            OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11            MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12   behalf of CLO Holdco.

13        In response to Mr. Morris, I'm not going to enter into a

14   stipulation on behalf of my client, but the Debtor is

15   compliant with all aspects of the contract.  We withdrew our

16   objection, and we believe that's sufficient.

17            THE COURT:  All right.  Well, I'm content with that.

18        Other opening statements?

19            OPENING STATEMENT ON BEHALF OF HARBOURVEST

20            MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21   behalf of HarbourVest.

22        HarbourVest joins in Mr. Morris's comments in support of

23   the settlement, and we believe that the question of whether

24   the settlement between HarbourVest and the Debtor satisfies

25   the Rule 9019 standard is not even a close one.

Case 21-03067-sgj    Doc 124-9    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-19    Filed 09/01/23    Page 247 of 263    PageID 4504

19

1      Some Objectors have made arguments about the merits of

2    HarbourVest's claims, which is why we're here.  As Your Honor

3    will hear this morning, HarbourVest has meaningful and

4    meritorious claims against Highland, but made the business

5    decision to avoid the time, expense, and inherent risk of

6    litigation in the interest of preserving value, both for

7    itself and for the estate.

8      Today, Michael Pugatch, a managing director of

9    HarbourVest, will testify before the Court.  He'll explain

10   that HarbourVest claims against Highland arise out of certain

11   misrepresentations and omissions by Highland to HarbourVest in

12   connection with HarbourVest's purchase of an interest in

13   HCLOF, one of Highland's managed funds.  Those

14   misrepresentations and omissions, as Your Honor will hear,

15   relate to Highland's litigation with its former employee,

16   Joshua Terry, and transfers that were conducted in 2017 to

17   strip Acis of value and prevent Mr. Terry from collecting on

18   an $8 million judgment.

19     Mr. Pugatch will further explain that HarbourVest would

20   not have invested in HCLOF had it known the underlying facts

21   about those Acis transfers.

22     Mr. Pugatch will also testify that not only did

23   HarbourVest not know about those transfers, it learned about

24   those transfers when it was accused of orchestrating the

25   transfers itself in the Acis bankruptcy.  Your Honor will hear

1    that the Acis trustee sought extensive discovery from

2    HarbourVest after numerous accusations that HarbourVest was

3    behind the transfers.

4        Mr. Pugatch will also testify that Highland charged legal

5    fees for itself and its affiliates to HCLOF, essentially

6    forcing HCLOF to fund the litigation involving the Acis

7    bankruptcy and Mr. Terry.

8        In total, HarbourVest's claims for damages are over a

9    hundred million dollars in investment-related losses, lost

10   profits, legal fees inappropriately charged to HCLOF, its own

11   legal fees.  And that's before interest or trebling damages.

12       But HarbourVest stands ready to litigate its claims, but

13   following hard-fought and extensive negotiations with the

14   Debtors, the parties reached the settlement that's now before

15   the Court.  Mr. Pugatch's testimony regarding the strong

16   factual bases for HarbourVest's claims against Highland and

17   its recoverable damages will further underscore the risks that

18   the Debtors faced if they chose to litigate these claims, and

19   why this settlement is fair, equitable, and in the best

20   interest of the estate.

21           THE COURT:  All right.  Thank you, Counsel.

22       Other opening statements?

23    OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24           MR. DRAPER:  Your Honor, this is Douglas Draper on

25   behalf of one of the Objectors.  I'd like to just make a few

1    comments with respect to what I've heard and what the Court is

2    going to hear.

3        The first issue I'd like to address is the comment by

4    counsel for the Debtor that no other party has objected.  The

5    9019 motion is one of the issues that this Court has to rule

6    on, whether or not there was an objection or not.  So the fact

7    that this may be -- bankruptcy is not a popularity contest and

8    not an issue of who votes for what and doesn't vote.  This,

9    along with the 1129(a) tests, are clearly within your

10   province, and you need to listen carefully because you'll have

11   to make your own independent analysis whether my objection is

12   correct or incorrect.

13       Two other points I'd like to make that I think are very

14   salient.  Number one is, if you look at the Debtor's

15   disclosure statement, it basically took the position that the

16   HarbourVest claim is of little or no value.  And lo and

17   behold, thirty days later, there's a settlement that brings

18   about a significant recovery to HarbourVest.  The timing is

19   interesting, and I think the Court needs to pay careful

20   attention to what transpired between the two dates.

21       And then the last point I'd like to make is, as you listen

22   to the evidence, and what I learned abundantly clear from

23   hearing the depositions, is that the claim of HarbourVest, if

24   there is a claim at all, is probably one hundred percent --

25   should be subordinated in that it appears to arise out of the

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 19   Filed 08/07/24   Page 250 of 263   PageID 4507
Exhibit 9   Page 230 of 274

22

1   purchase or sale of a security.  And, again, I would ask the

2   Court to listen carefully to this because that's what it

3   appears to be and that's what the evidence is going to show to

4   the Court.

5           THE COURT:  All right.  Mr. Draper, let me clarify

6   something I'm not sure if I heard you say or not.  Were you

7   saying that the Court still needs to drill down on the issue

8   of whether the Debtor can acquire HarbourVest's interest in

9   HCLOF?

10          MR. DRAPER:  No.

11          THE COURT:  Okay.  I was confused whether you were

12  saying I needed to take an independent look at that, now that

13  the objection has been withdrawn of Holdco.  You are not

14  pressing that issue?

15          MR. DRAPER:  No, I am not.  Basically, I think it's

16  the fairness of the settlement.  I think the transferability

17  of the interest is separate and apart from the fairness of the

18  settlement itself.  I think the fairness -- the

19  transferability was a contractual issue between two parties

20  that the Court does not have to drill down on.

21          THE COURT:  All right.  I have another question for

22  you.  I want to clarify your client's standing.  Tell me --

23  I'm looking through a chart I printed out a while back.  I

24  guess Dugaboy Investment Trust filed a couple of proofs of

25  claim; is that right?

Case 21-03067-sgj    Doc 124-9    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-19    Filed 04/10/24    Page 251 of 263    PageID 4508
Exhibit 19    Page 241 of 273

23

1              MR. DRAPER:  Yes.

2              THE COURT:  Okay.  What --

3              MR. DRAPER:  And objections are pending.

4              THE COURT:  Pardon?

5              MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7              THE COURT:  Okay.

8              MR. DRAPER:  -- and have not been litigated.

9              THE COURT:  And what about Get Good Trust?

10             MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12             THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16             MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22        And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25        The second part to the Dugaboy ownership is we own an

24

1  interest in the Debtor.  And so we are, in fact, a party in

2  interest.

3          THE COURT:  Okay.

4          MR. DRAPER:  It may be a small interest, but it is an

5  interest.

6          THE COURT:  It has a limited partnership interest in

7  the Debtor?

8          MR. DRAPER:  Yes.

9          THE COURT:  Is that correct?

10          MR. DRAPER:  Yes.

11          THE COURT:  Okay.  Well, I'll move forward.  Thank

12  you.

13      Does that cover -- any other opening statements?  I think

14  that covered everyone who was -- who filed some sort of

15  pleading today.  No.

16          MR. WILSON:  Your Honor, John Wilson on behalf of --

17          THE COURT:  I'm sorry.  I'm sorry.

18          MR. WILSON:  -- Mr. Dondero.

19          THE COURT:  I missed Mr. Dondero's counsel.  I knew

20  we had visited at some point this morning.  I just got

21  confused there.  Go ahead, Mr. Wilson.

22          MR. WILSON:  No problem, Your Honor.  I was just

23  going to say that we will reserve our comments until after the

24  conclusion of the testimony.

25          THE COURT:  All right.  Very well.

25

1      Mr. Morris, you may call your first witness.

2           MR. MORRIS:  Thank you, Your Honor.  Before I do,

3   just two very, very quick points.

4           THE COURT:  Okay.

5           MR. MORRIS:  To be clear, Dugaboy's interest in the

6   Debtor is 0.1866 percent.  Less than two-tenths of one

7   percent.

8      Secondly, the argument that Mr. Draper just made with

9   respect to subordination is one that appears in nobody's

10  papers.  And, in fact, not only doesn't it appear in anybody's

11  papers, but Mr. Dondero, I believe, specifically took issue

12  with the fact that a portion of the consideration that

13  HarbourVest would receive would be on a subordinated basis,

14  and he would -- and I think he took the position there is no

15  basis to give them a subordinated claim.

16     So, I just wanted to point those items out to the Court,

17  not that I think either one makes a large difference today,

18  but I do want to deal with the facts.

19          THE COURT:  Thank you.

20          MR. MORRIS:  The Debtor would call -- you're welcome,

21  Your Honor.  The Debtor calls Mr. James Seery.

22          THE COURT:  All right.  Mr. Seery, welcome back to

23  virtual court.  If you could say, "Testing, one, two" so I can

24  see you and swear you in.

25          MR. SEERY:  Testing, one, two.

Seery - Direct                          26

1          THE COURT:  All right.  I heard you but I'm not yet

2    seeing your video.  Is your video turned on?

3          MR. SEERY:  Video is on.  Yes, Your Honor.

4          THE COURT:  Okay.  I see you now.  Please raise your

5    right hand.

6               JAMES SEERY, DEBTOR'S WITNESS, SWORN

7          THE COURT:  Thank you.  Mr. Morris?

8          MR. MORRIS:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. MORRIS:

11   Q    Good morning, Mr. Seery.  Can you hear me?

12   A    I can.  Thank you, Mr. Morris.

13   Q    Okay.  Let's just cut to the chase here.  Are you familiar

14   with HarbourVest's claims filed against the Debtor?

15   A    I am, yes.

16   Q    And did you personally review them?

17   A    I did, yes.

18   Q    Do you recall that over the summer the Debtor objected to

19   HarbourVest's claim?

20   A    Yes, we did.

21   Q    Why -- can you explain to the judge why Harbour -- why the

22   Debtor objected to HarbourVest's claim last summer?

23   A    Sure.  The HarbourVest claims, I believe there are about

24   six of them, initially were filed, and they were -- they were

25   relatively vague in terms of what the specifics of the claims

004122

Seery - Direct                          27

1   were.

2       So, we saw the claims but didn't, frankly, pay a lot of

3   attention to the underlying transaction that was referred to

4   in the proofs of claim and the losses that HarbourVest had

5   claimed to suffer -- to suffer with respect to their purchase

6   of securities related to HCLOF and the damages caused by the

7   Acis case.  So we filed a pretty pro forma objection.  I

8   believe it was a simply stated objection that we didn't have

9   any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q   Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A   Yes.  Yes, I am aware.

15  Q   And did you familiarize yourself with that particular

16  response?

17  A   I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

Seery - Direct                              28

1    In addition, and this was the first time we saw that,

2    HarbourVest brought forth its claims that it was entitled to

3    effectively rescind the transaction.  And I say rescind the

4    transaction:  In security parlance, they claim that they were

5    induced by fraud, I think as most are -- to enter into the

6    transaction.

7    As most are aware, the liability limitations in the OMs

8    and the exculpation in the documents are pretty broad, and

9    HarbourVest's position was that they weren't going to be

10   subject to those limitations because the actual transaction

11   that they entered into was a fraud on them, designed by Mr.

12   Dondero, Mr. Ellington, and the Highland team.

13   Q   All right.  Let's talk about your understanding, the

14   Debtor's understanding of the factual background to

15   HarbourVest's claim.  What is your understanding of the

16   investment that HarbourVest made?

17   A   Well, HarbourVest made an investment in the Highland CLO

18   business.  The Highland CLO business was -- was Acis.  And

19   effectively, the business had been separated, but in name

20   only.  Acis was just a shell, with a few partners --

21   obviously, Mr. Terry as well -- but it was all Highland

22   personnel doing all the work.

23   And what they were trying to do with Acis was, in essence,

24   resuscitate a business that had been in a bit of a decline

25   from its pre-crisis heyday.

004124

Seery - Direct                        29

1    They were looking to take additional outside capital.

2    They would -- they would pay down or take money out of the

3    transaction, Highland would, or ultimately Mr. Dondero, and

4    they would -- they would seek to invest in Acis CLOs,

5    Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6    and potentially new CLOs, but with the Acis CLOs, they'd seek

7    to reset those and capture what they thought would be an

8    opportunity in the market to -- to really use the assets that

9    were there, not have to gather assets in the warehouse but be

10   able to use those assets to reset them to market prices for

11   the liabilities and then make money on the equity.

12   Q    Do you have an understanding --

13   A    Then --

14   Q    I'm sorry.  Go ahead.

15   A    Why don't I continue?  So, the transaction, they found

16   HarbourVest as a potential investor, and the basis of the

17   transaction was that they would make an investment into Acis.

18        Shortly before the transaction, and while they were doing

19   diligence, Mr. Terry received his arbitration award.  I

20   believe that was in October of 2017.  The transaction with

21   HarbourVest closed in mid- to late November of 2017.  But Mr.

22   Terry was not an integral part.  Indeed, he wasn't going to be

23   a key man.  He had been long gone from Highland by that time.

24        What the -- I think you asked me originally what the basis

25   of their claim was.  The transaction went forward, and the

004125

Seery - Direct                            30

1   basis of their claim is that they really were never -- nothing

2   was disclosed to them about the nature of the dispute with Mr.

3   Terry other than in the highest-level terms; the animosity

4   with respect to which that dispute was held by Highland and

5   potentially Mr. Terry; and really, how those costs would be

6   borne and risks be borne by the investment that they were

7   making.

8       That was, in essence, the transaction and the high-level

9   view of their claim.

10  Q    Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A    Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q    And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A    They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Seery - Direct                                31

 1   U.S. investors unless they qualify, and these are sold under

 2   Reg S to -- to investors that otherwise qualify.  And

 3   HarbourVest was investing in that transaction through the

 4   Guernsey structure.

 5   Q   And do you have an understanding as to who owned the 50-

 6   plus percent of HCLOF that HarbourVest was not going to

 7   acquire?

 8   A   Yeah.  There's -- you can tell by the name.  HCLOF is

 9   Highland CLO Funding.  This is a Highland vehicle.  So

10   Highland owned and controlled the vehicle.  The DAF, which is

11   -- which is Dondero-controlled trusts, have the -- 49 percent.

12   Highland has, I believe, around .63-65 percent directly.  And

13   then Highland employees at the time who were involved in the

14   business owned another small percentage.

15       So the majority was going to be controlled by Highland

16   through its control of DAF and its control of the employees

17   that worked for it.  HarbourVest would be a minority investor.

18   Q   Okay.  And I believe you testified that the investment was

19   made in mid-November; is that right?

20   A   That's correct.  I think it was the 15th, may have been

21   the 17th of November.

22   Q   And do you recall when in October the Terry arbitration

23   award was rendered?

24   A   It was about a month before.  I think it was right around

25   the 20th, the 17th to the 20th.  I may be slightly wrong on

Seery - Direct                        32

1   each of those dates.

2   Q   Okay.  What is your understanding as to what happened

3   after the issuance of the award that is the basis or at least

4   one of the bases for HarbourVest's claim?

5   A   I don't think there's -- I don't think there's any

6   dispute.  And there certainly are judicial findings.  Dondero

7   and Highland went about stripping Acis of all of its assets.

8   So, remember that Acis is not a separate standalone company,

9   in any event.  It's controlled and dominated completely by

10  Highland at the time.  But it did have contracts.  And those

11  contracts had value.

12      So the first idea was to strip out the management contract

13  and put it into a separate vehicle, which we called HCF

14  Advisor, which Highland still owns.  The second piece was to

15  strip out some valuable assets, the risk retention piece,

16  which was a loan that in essence was equity that Highland had

17  put into Acis but structured as a loan, as many of the

18  transactions we'll see down the road are, in order to deal

19  with some -- avoid taxes in any way possible.  And that

20  structure, that value moved value out of Acis for the express

21  purpose of trying to run, in essence, the Highland business

22  back in Highland.

23      Remember, as I said, Acis is just a Highland business

24  moved to a separate shell.  When Mr. Terry got his arbitration

25  award against Acis and was seeking to enforce it, it was

Seery - Direct                              33

1   pretty straightforward, let's take all the assets -- Dondero
2   scheme -- let's take all the assets and move them back into
3   Highland so Terry can't get anything.
4   Q    And how does that scheme relate to the HarbourVest claim,
5   to the best of your knowledge?
6   A    Well, HarbourVest -- HarbourVest's position is that they
7   invested in Acis and -- and whether Acis was called Acis or
8   called Highland, it doesn't really matter; there were valuable
9   assets in the -- in the entity that they were going to be
10  investing in through the equity in these CLOs and some of the
11  debt securities in those CLOs.
12       And then the stripping out and the fraudulent conveyances
13  out of Acis caused them damages because that's what left the
14  damage to Mr. Terry.
15       The quick math on Acis, by the way, is Acis has probably
16  lost, total damages, 175 million bucks.  And that's pretty
17  easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of
18  fees charged to HCLOF.  Another five million of fees, at
19  least, incurred by Mr. Terry.  Ten million that went to Mr.
20  Terry, 15 to Highland fees, another five, plus Mr. Terry's
21  settlement in this case, over eight million bucks.
22       So HarbourVest's position, which, on a factual basis, you
23  know, is problematic for the estate, is, wait a second, we
24  invested in this vehicle with Highland.  That was supposed to
25  invest in Highland CLOs.  They were called Acis, but they were

Seery - Direct                            34

1   Highland CLOs.  And then you went about causing tremendous

2   damage to that vehicle that we ultimately were investing in,

3   and then charge us for the pleasure.

4   Q    You used the phrase earlier "OM," I believe.

5   A    Offering memorandum.

6   Q    Offering memorandum?  Can you just explain to the Court

7   your understanding of what an offering memorandum is?

8   A    Typically, under U.S. law, and foreign jurisdictions have

9   similar laws, you have to have a document that explains the

10  securities that you're selling.  And it goes into extreme

11  detail about the securities and the risks related to those

12  securities.

13       And the idea is not to have a document that tells you

14  whether it's a good investment or a bad investment, but it's a

15  document that discloses to the potential investor all of the

16  risks with respect to that security or related to the

17  investment over the duration of the security.  It doesn't

18  predict the future, but it's supposed to make sure that it

19  gives you a very clean view of the past and a very clean view

20  of what the facts from the past are and how they would

21  implicate the future of the investment.

22  Q    And in the course of its diligence, did the Debtor have an

23  opportunity to review the offering memorandum in the context

24  of the claims that were being asserted by HarbourVest?

25  A    Oh, absolutely.  It was originally effectively -- it's an

Seery - Direct                          35

1    HCLOF offering memorandum.  But as I said, HCLOF was managed

2    and controlled by Highland, and Highland originally prepared

3    it.  And then, of course, in connection with -- with this

4    dispute and these claims, we reviewed it, both myself and my

5    legal team.

6    Q   All right.

7            MR. MORRIS:  Your Honor, the offering memorandum is

8    on the Debtor's exhibit list, and I think this is an

9    appropriate time to move into evidence Debtor's Exhibits A

10   through EE, all of which appear at Docket No. 1732.

11           THE COURT:  1732?

12           MR. MORRIS:  It's the Debtor's Second Amended Witness

13   and Exhibit List.

14           THE COURT:  All right.  Any objection to admission of

15   A through EE?

16           MR. DRAPER:  Douglas Draper.  No objection, Your

17   Honor.

18           THE COURT:  All right.  Mr. --

19           MR. MORRIS:  May I proceed?

20           THE COURT:  Yeah.  Mr. Wilson, did you want to

21   confirm no objection?

22       (Echoing.)

23           THE COURT:  All right.  Hearing no objection,

24   Debtor's A through EE are admitted.

25       (Debtor's Exhibits A through EE are received into