**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P**  § Case No. **19-34054-SGJ11**
**Charitable DAF Fund, L.P et al**

|  |  |  |
|---|---|---|
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

**Volume 20**

**APPELLANT RECORD**

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

### APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.  STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital
  Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.  DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.  Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11
    [Doc. 168].

*000042*

2.  The judgment, order, or decree appealed from: Memorandum Opinion and Order
    Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to
    Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.  Docket Sheet kept by the Bankruptcy Clerk.

4.  Documents listed below and as described in the Docket Sheet for Bankruptcy Case
    Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | | |
|---|---|---|---|---|
| *Vol. 2*<br><br>*000139* | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000232* | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000239* | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *000270*<br><br>*Thru Vol. 6* | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 7*<br><br>*001196* | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br>*Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001905* *thru Vol. 13* | | | | |
| *Vol. 14.* *002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18* 0036<u>3</u>7 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| 003666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| 003843 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 003844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 003851 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19* 003882 *Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21* 004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*0047415* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*0047770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|
| *006133*  *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32*  *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|
| *006961* | | | | |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                    Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         */s/  Mazin A. Sbaiti*
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                             jeb@sbaitilaw.com

                                         **Counsel for Appellants**


## CERTIFICATE OF SERVICE

        I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                         */s/ Mazin A. Sbaiti*
                                         Mazin A. Sbaiti

Seery - Direct                                    36

1   evidence.)

2          THE COURT:  Go ahead, Mr. Morris.

3          MR. MORRIS:  Thank you, Your Honor.  The offering

4   memorandum itself is one of the documents that we filed under

5   seal, and we did so at the request of counsel to HCLOF.  But

6   HCLOF has consented to our sharing up on the screen certain

7   very limited provisions of the document, without waiving the

8   request that the agreement otherwise be maintained under seal.

9          THE COURT:  All right.

10         MR. MORRIS:  So may I proceed on that basis, Your

11  Honor?

12         THE COURT:  You may.  Uh-huh.

13         MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14  on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15  is there a way to just expand that just a bit, Ms. Canty?

16  Thank you very much.  And if we could just scroll it up?

17  Thank you very much.  Perfect.

18      Okay.  So, Your Honor, this, as the footnote says, is an

19  excerpt from the offering memorandum that can be found at

20  Debtor's Exhibit AA.  Double A.  And this particular portion

21  of the offering memorandum is at Page 35.

22         THE COURT:  Okay.

23  BY MR. MORRIS:

24  Q   Mr. Seery, have you seen this portion of the offering

25  memorandum before?

Seery - Direct                          37

1   A    Yes, I have.  But before I continue, I just -- I should

2   have checked.  Are you able to hear me clearly?  Am I speaking

3   too quickly or am I cutting out?  I just want to make sure.

4   I'm using a different set of audio today.

5            THE COURT:  All right.

6            MR. MORRIS:  That's fine.

7            THE COURT:  I hear you very well.

8            MR. MORRIS:  Yeah.

9            THE COURT:  So I think we're good right now.  Thank

10  you.

11           THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13           THE COURT:  Okay.

14           THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

Seery - Direct                          38

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q   Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A   No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18      I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23      That, in my opinion, is wholly inadequate.

24  Q   Okay.

25          MR. MORRIS:  And let's put up -- actually, let's just

Seery - Direct                              39

1   move on.

2   BY MR. MORRIS:

3   Q    Let's go to the settlement itself.

4         MR. MORRIS:  Can we put back up Demonstrative Exhibit

5   #3?

6   BY MR. MORRIS:

7   Q    Mr. Seery, can you see that?

8   A    Yes, I can.

9   Q    Does this generally describe the net economic recovery of

10  the HarbourVest settlement based on estimated recoveries for

11  general unsecured creditors as of November 2020?

12  A    As of November 2020, it does.  And you alluded to this in

13  your opening, but to be clear, the numbers have shifted.

14  Costs have increased.  The -- so the -- effectively, the

15  numerator, in terms of distributable value that we estimate,

16  is lower.  And settlements, the denominator, have also

17  increased.  So the claims against the estate that have been

18  recognized have increased.  And that, that probably takes it

19  down closer, in our view, to about seventy cents distribution,

20  a number closer to nine to ten million, maybe a little bit

21  less.

22        However, there's also some additional value that we -- we

23  believe we will recover directly.  There are north of $150

24  million of intercompany notes owed by Dondero entities to

25  Highland.  A number of those notes are demand notes, and we've

Seery - Direct                        40

1   already made demand.  We'll be initiating actions next week.

2   So those are -- those value, we believe, we'll recover

3   directly from Mr. Dondero and from related entities.

4        To the extent those related entities don't have value, we

5   feel very strongly about our ability to pierce the veil and

6   reach in to Mr. Dondero.  And then his assets, either his

7   personal assets or the assets that he claims are in trusts.

8        In addition, there are a significant amount of notes that

9   were extended in two -- I believe around 2017, for no

10  consideration.  Those notes were demand notes, I believe, and

11  then extended it 30 years.  So they have 2047 maturities.

12  Those were probably going to have to be subject to fraudulent

13  conveyance type actions or -- or some sort of sale at a very

14  discounted value because third parties wouldn't want long-

15  dated notes with Mr. Dondero as the counterparty for very much

16  money.

17       Those -- they defaulted on some of those parties, so we

18  effectively turned them into demand notes.  We've accelerated,

19  and we'll be bringing actions against those entities next week

20  as well.

21       So I think (garbled) have come up, so I apologize.  One

22  way of saying I think the sixteen and a half is a bit high

23  right now, based upon what we know, but the value is going to

24  be higher than our estimate a couple of weeks ago because we

25  do believe we'll be able to recover on the notes.

Seery - Direct                         41

1    One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6    In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q   And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A   That's correct, yes.

16  Q   Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A   Yes.

19  Q   And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A   Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

Seery - Direct                    42

1    complexity to it to satisfy some of HarbourVest's concerns

2    that they be able to effectively rescind the transaction, at

3    least from an optical perspective.  Value was important, but

4    optics were as well.  The twenty-two and a half is the current

5    -- actually, the November value of HCL -- the HarbourVest

6    interests in HCLOF.  And that's based upon Highland's

7    evaluation of those interests.

8         So we do believe that that is a fair value as of that

9    date.  It has not gone done.  It hasn't gone up explosively,

10   either, but it hasn't gone down.  We think that's good, real

11   value.  That value is in the Acis CLOs, the equity in those

12   CLOs, which is 2 through 6, that we -- we will be working with

13   the HCLOF folks to get Mr. Terry to monetize those assets and

14   those longer-dated CLOs.

15        In addition, I think it's 85 percent of the equity in Acis

16   7 -- Acis 7 is managed by Highland -- that is also beyond its

17   reinvestment period.  And in talking to the directors -- and

18   they're new directors, and I'll get to that in a minute, for

19   HCLOF -- they'll seek to push Highland, which is the

20   reorganized Highland, to monetize that asset, with due regard

21   to fair value.

22        In addition, Harbour -- HCLOF owned a significant amount

23   of the preferred or equity pieces, if you will, in the

24   Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25   really CLOs.  Those are effectively closed-end funds with

004138

Seery - Direct                              43

1   illiquid assets, primarily illiquid assets in them.  We've had

2   some dispute in front of the Court about selling the liquid

3   assets in them, which we can go into it another time.  Those

4   are being liquidated in the market at fair value.

5       But HCLOF also is a significant holder of those preferred

6   shares, and those directors would -- have indicated to me that

7   they would like to see those interests also monetized.

8   Q   All right.  Let's shift gears for a moment to talk about

9   the diligence that the Debtor did before entering into this

10  agreement.  Can you just describe for the Court generally the

11  diligence that was undertaken at your direction?

12  A   Well, when we first received the reply to our objection,

13  we dug into that reply and the specifics in it very

14  aggressively.  So we reviewed all of the underlying documents

15  related to the original transaction.  We discussed with

16  counsel the legal basis for the HarbourVest claims.  We

17  interviewed our own HCMLP employees who were involved in the

18  transaction and tested their recollection, specifically around

19  who dealt with HarbourVest, who had the discussions with

20  HarbourVest, what was disclosed to HarbourVest with respect to

21  the Terry dispute and the Acis litigation.

22      We also had done, as I think the Court is well aware from

23  prior 9019 testimony, extensive work around the transfers and

24  the issues related to Acis.  So we were familiar with their

25  impact on HCLOF.

004139

Seery - Direct                    44

1      We also did extensive work valuing the remaining HCLOF

2    interests to get a good feel of not only how much HarbourVest

3    originally invested, but how much they actually lost in this

4    transaction.  And as I said, their original investment was

5    around, in total, in two tranches, about $80 million, of which

6    they got about $5 million back, and they've lost $22 million.

7    So it -- I mean, remaining with $22 million.  So they've lost,

8    you know, in excess of $50 million.

9    Q    Do you recall whether the Debtor reviewed and analyzed all

10   of the documents that were cited in HarbourVest's response to

11   the Debtor's objection to the HarbourVest proofs of claim?

12   A    Yeah.  I think -- I forget, to be honest, which -- exactly

13   what documents were in there.  But we went through their

14   objection with a fine-toothed comb, not only with respect to

15   the issues related to the Acis case, but also their references

16   to Guernsey law, other U.S. law, any of the documents between

17   the parties.  And obviously, as I mentioned before, the

18   offering memorandum.

19          MR. MORRIS:  Your Honor, I would just note for the

20   record that Debtor's Exhibits I through X are all of the

21   documents that are cited in HarbourVest's response to the

22   Debtor's objection to the HarbourVest proofs of claim, and

23   those are the documents that Mr. Seery just referred to.

24          THE COURT:  All right.

25          MR. MORRIS:  Just, they're in evidence now, and I

004140

Seery - Direct                          45

1   just wanted the Court to understand why they're in evidence.

2               THE COURT:  Okay.  Thank you.

3               MR. MORRIS:  You're welcome.

4   BY MR. MORRIS:

5   Q   Let's talk about the Debtor and whether or not it had or

6   has any viable defenses.  Did the Debtor form any views as to

7   whether or not it had any defenses to the HarbourVest claims?

8   A   Yes, we did.

9   Q   Can you describe for the Court the defenses that were

10  reviewed and analyzed by the Debtor?

11  A   Yeah.  I think we -- we had very significant defenses.

12  So, first and foremost, with respect to the original proof of

13  claim, as I mentioned earlier, it alluded to the expenses and

14  the overcharge.  And I think with respect to the 15 million of

15  fees that were charged to HCLOF by Highland, we didn't have a

16  lot of defenses to that claim.

17      It's pretty clear, by any fair view of the Acis case, that

18  HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19  had no real responsibility for fighting with Acis and Josh

20  Terry and shouldn't have been charged those fees.  I don't --

21  I don't think there's a legitimate investor that would

22  actually think that that was an appropriate amount to be

23  charged to a fund.

24      However, the claim was not as broad -- the proof of claim

25  was not as fulsome in terms of discussing and only vaguely

Seery - Direct                                  46

1  referred to other damages.  So we did -- we did, as a

2  threshold matter, think about whether we could argue that it

3  was time-barred because they had not met their obligations to

4  fully disclose under the proof of claim.

5       Secondly, we considered the defenses to the overall claim

6  of fraudulent inducement.  Our perspective was that if we

7  could stop the claim of fraudulent inducement, the damages

8  would likely be limited to the 15 and maybe some -- some other

9  damages.  With respect to the 15, again, the problem that we

10  had when we got past -- past motions for summary judgment is

11  the factual predicate for our defense was going to be that we

12  divulged these things to HarbourVest and that they did not

13  reasonably -- it was -- reasonably rely on some failure to

14  divulge because they're a sophisticated investor.

15       The problem with that defense is that our witnesses, which

16  really would have primarily been Mr. Dondero and Mr.

17  Ellington, and one other employee who runs the CLO business,

18  Mr. Covitz, would not be pretty good.  They've been -- two of

19  them have been in front of this Court and they're not viewed

20  favorably and their testimony would be challenged and

21  potentially suspect.

22       So that gave us a real focus on trying to make sure that

23  we could, if we had to litigate, that we would litigate around

24  the fraudulent inducement.

25       As I said, reasonable reliance, what was disclosed, lack

Seery - Direct                                    47

1    of digging into the public record, because you don't have to

2    go far on Google to find "fraud" within two words of

3    "Highland," and the tremendous, you know, litigious nature of

4    Highland.  You know, even at that point, when this investment

5    was made, aside from Mr. Terry's arbitration, which by that

6    point, at least by the time (inaudible) was public, there was,

7    you know, significant public disclosure around the Credit

8    Strat and the litigation, the Crusader litigation, the UBS

9    litigation, the, gosh knows, the Daugherty litigation.

10       So our defense was going to be that you should have

11   figured this out, you're a sophisticated investor, and you

12   should have been able to figure out that there was significant

13   risk that, with respect to Mr. Terry, that Mr. Dondero would

14   not stop litigating and that those costs would put significant

15   risk on the investment.

16       The problem with that, as I mentioned earlier, is that the

17   OM is wholly deficient.  If you have a typical risk factor in

18   the offering memorandum, you would have disclosed that there

19   was a litigation with Mr. Terry, a former partner in the

20   business, and that the Debtor had no intention of settling it.

21   There was no intention of settling.  That litigation would go

22   on.  It could go on for years and it could result in

23   bankruptcy or attachments and other risks to the business, and

24   that the investor should be fully aware that the Offeror does

25   not intend to be involved in any -- or the manager, in any

Seery - Direct                              48

 1   settlement with Mr. Terry, and the fact it undermined the

 2   investment.  That wasn't there.

 3      But that was our preliminary focus, to try to stop fraud

 4   in the inducement.  And then we -- we had specific facts

 5   related to that.  You know, once they knew about the

 6   bankruptcy in HarbourVest of -- I'm sorry, of Acis,

 7   HarbourVest made a second funding, which was there was a -- it

 8   was an initial $75 million draw, and then a second, I believe,

 9   about a $5 million draw, which was in -- I believe in

10   February.  And they made it without -- without objection, and

11   that was after the commencement of the bankruptcy.

12      In addition, they were -- they were active in the

13   bankruptcy, so the -- some of the things that happened in the

14   bankruptcy, there were many opportunities to settle that case,

15   from our examination, all of which were turned down to -- by

16   Mr. Dondero.  But you don't see HarbourVest pounding the table

17   to settle, either, either with respect to the Oaktree

18   transaction or any other transaction.

19      Now, HarbourVest's defense to that is, well, we were

20   taking advice and all of our information from Highland, and we

21   were getting that information directly from senior folks at

22   Highland why -- what the value was and why we shouldn't do

23   those things.  We thought that that would mitigate some of the

24   arguments that -- some of the damages that we might have, I'm

25   sorry, if we -- if we lost.

004144

Seery - Direct                          49

1        But the focus at that point, you know, our legal strategy,

2   was can we stop HarbourVest at the very forefront to say,

3   You've got to come into the factual realm and get out of the

4   fraud in the inducement realm.  And then the defenses and the

5   exculpations and the liability limitations in the documents

6   would also come into play.

7        So that -- those are some of the defenses that we focused

8   on and our analytical thinking around them.

9   Q    So, if the Debtor had viable defenses, why is it settling?

10  A    Well, this is a significant claim.  And we -- we looked at

11  it with respect to both the impact on the case, but, really,

12  the merits of the claim.

13       As I said, there's really little dispute that the legal

14  fees should not have been charged to HarbourVest.  We think

15  based upon the testimony in Acis, the suspect credibility of

16  those who would have been our witnesses, and the experience in

17  Acis that the Court has had in terms of the completely hell-

18  bent on litigation, it would be hard for anyone to justifiably

19  defend those fees being charged.  So, as an initial matter, we

20  had exposure there.

21       In addition, if HarbourVest got by our defense of -- was

22  able, for example, to claim fraud in the inducement, then we

23  were open to significant damages.

24       We really didn't put much value, frankly, on the RICO part

25  of it.  We think that that's waved around often to show treble

Seery - Direct                    50

1    damages.  Although in this case certainly somebody could lay

2    out the predicate acts and put forth a RICO-type argument, we

3    just didn't think that that had real merit in this commercial

4    dispute, even with a fraud claim.

5        But even without the trebling of the damages, there's no

6    dispute that HarbourVest lost more than $50 million in this

7    investment.  You know, we -- we thought about that risk as

8    well.

9        In addition, because the case would really be fact-based,

10   even if we had a high degree of confidence based upon our

11   discussions with our employees and the factual testimony, it

12   was going to be expensive to litigate this case, and time-

13   consuming.

14       And so we looked at the economic value, the potential

15   risks, and the actual value that we were giving up, and found

16   this to be an extremely, extremely reasonable settlement.

17       Importantly, and I think what drove it, you -- one of --

18   one of the things that drove it is another one of our defenses

19   on why, notwithstanding their -- what they held out as

20   meritorious claims, I don't think HarbourVest really wanted to

21   publicly litigate this claim.  And we were aggressive in our

22   discussions with HarbourVest of how we would litigate it,

23   which would be quite publicly.

24       Now, that may or may not be fair, but that does put risk

25   on the counterparty.  And so I think that helped drive the

Seery - Direct                          51

1  settlement.

2     In addition, the structure of the settlement we think is

3  extremely favorable to the Debtor and to the estate because,

4  rather than taking the full claim and putting it into a senior

5  unsecured position, we have bifurcated it.  We did think about

6  whether this was a claim that could be subordinated under 510.

7  There won't be any arguments, I would be surprised if there's

8  arguments today that we didn't actually give to the Highland

9  employees who have given them to Mr. Dondero's respective

10 counsel.

11    We did structure it in a way that we thought gave

12 HarbourVest the opportunity to effectively claim a rescission,

13 even though that's not really what it is, and then be able to

14 claim that their recovery is based on the bankruptcy, which it

15 is, but not really dilute all the other stakeholders in the

16 case.

17    (Pause.)

18         THE COURT:  Mr. Morris?  Anything else?

19         MR. MORRIS:  I can hear you, Your Honor.

20         THE COURT:  Okay.

21         MR. MORRIS:  I can hear you.

22         THE COURT:  Okay.  Now can you --

23         MR. MORRIS:  I got cut off from Mr. Seery for a

24 moment.

25         THE COURT:  Okay.

004147

Seery - Direct                              52

 1  BY MR. MORRIS:
 2  Q    Okay.  I appreciate that.  Are you done giving the
 3  Debtor's basis for entering into this settlement, Mr. Seery,
 4  if you can hear me?
 5  A    I think so, but I think as the Court has probably seen, I
 6  can go on.
 7  Q    Yes.
 8  A    So I will try to be -- I'll try to be more concise.  But
 9  this was a -- this was a difficult settlement.  We felt good
10  about our defenses.  Felt that we could -- we could try them.
11  But it would be extremely expensive, time-consuming, and there
12  would be a lot of risk.  And settling at a level which we
13  believe is actually below the damages that were clearly caused
14  only by the fees was a -- was a -- is a -- is a very
15  reasonable settlement.
16  Q    Okay.  Let's just talk about the process by which we got
17  to the settlement.  Do you recall generally when the
18  settlement negotiations have -- were commenced?
19  A    I believe it was -- was late summer, early -- early fall.
20  Q    Okay.  Before I move on, I just want to go back to the
21  Acis matter that you were talking about, one last issue.  Do
22  you know how, if at all, the injunction that was entered in
23  the Acis bankruptcy impacted or related to the HarbourVest
24  claims?
25  A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Seery - Direct                    53

1  think there's an argument, and we analyzed it thoroughly, that

2  the injunction effectively caused a lot of the damages.

3  Because if you look at the values of the equity that

4  HarbourVest had, the -- and HCLOF had in the CLOs, it went

5  down dramatically after the Trustee in the Acis case took over

6  and then subsequently, when the case was reorganized and Mr.

7  Terry took over, you know, with Brigade as the sub-advisor.

8        Now, that would -- you know, we would -- we could

9  certainly attempt to throw, in our defense, the causation at

10 Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11 retort is that none of this would have occurred but for the

12 burn-it-down litigation that Mr. Dondero engaged in with

13 Highland.

14       In addition, in Mr. Terry's defense, you know, he did try

15 multiple times with HCLOF, tried to petition, if you will, the

16 HCLOF entity to -- and directors, former directors, to reset

17 the CLOs to make them more economically viable, based upon the

18 current level of asset returns versus the debt costs in the

19 CLOs.  And that was rejected by the HCLOF and the Debtor as

20 the controlling party of HCLOF.  So, we thought about those

21 risks.

22       You know, similarly, the economic values in Acis 7 went

23 down pretty significantly from that date as well.  So I think

24 there's -- there are some defenses, but that's really Mr.

25 Terry's issue, not our issue.  So we thought about those

Seery - Direct                          54

1   issues, we analyzed them, and we certainly did all the work

2   around month-to-month reductions in NAVs and how different

3   events in the Acis case might have -- might have caused those

4   and was that some sort of break from the original

5   transgression that HarbourVest claims, which was the

6   fraudulent inducement.

7   Q    Do you recall that in November HarbourVest's motion under

8   3018 was scheduled to be heard?

9   A    Yes.

10  Q    And can you just tell the Court your understanding of what

11  the 3018 motion was about?

12  A    Well, the 3018 motion was going to be on voting.  And we

13  took the view that it really was not -- it shouldn't have been

14  that big an issue and HarbourVest should have been content

15  with just taking their actual losses of roughly a $50-$60

16  million claim for voting purposes and then we would move on.

17      HarbourVest was very insistent that they have a $300

18  million claim, because they took the position -- and with

19  extensive documentation; not only the pleadings they filed,

20  but also detailed decks that were prepared by their counsel,

21  which they had presented to us on the merits of their claim --

22  that they were going to litigate for -- the 3018 and for the

23  full $300 million value.

24      And that became the genesis, if you will, of the

25  negotiations to settle.

004150

Seery - Direct                      55

1      So, we started talking about the 3018.  It was very

2   contentious.  My apologies to Ms. Weisgerber and her counsel,

3   her partners, because it was a significant and contentious

4   negotiating call.  But the reasons for that I think were that

5   -- their insistence on litigating the 3018 and our view that

6   this was just, you know, another -- another of a series of

7   delays and costs in this case that we really were hoping to

8   avoid.

9      That led to Mr. Pugatch and I stepping away from counsel,

10  no offense to counsel, you know, ours and his, to begin

11  negotiations around the potential for a settlement.  First, it

12  started with a 3018, and then, you know, argued that we would,

13  if we got past the 3018, we were going to litigate this,

14  because we effectively had -- thought we could get everyone

15  else done at -- in and around that time.  And I think we were

16  also probably a little bit optimistic about UBS at that time

17  and the mediation, which subsequently we have settled.  But

18  that was the genesis of those settlements.

19  Q   And how did the structure, how did the Debtor and

20  HarbourVest derive at the structure whereby there is a general

21  unsecured claim, there is a subordinated piece, and there's

22  the takeback of the HCLOF interest?

23  A   Well, as I outlined, we -- we aggressively set forth our

24  various defenses.  Their position was that they -- they should

25  never have been in this transaction before.  And they --

Seery - Direct                          56

1   HarbourVest is, in essence, a fund of funds, and they have

2   investors, and it certainly wouldn't be their, I'm sure, the

3   best-performing asset in their portfolio, to have made this

4   investment and lost $50 million over this period of time.  So

5   they felt strongly that they should never have been in this

6   investment, and but for the failure to disclose and the

7   improper disclosures, they would not have been in this

8   investment.

9        So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12       Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16       So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q   Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

004152

Seery - Direct                          57

1   any agreement in principle with HarbourVest?

2   A   If we had, it would have been reflected, so I don't -- I

3   don't think we were agreed by then.  I don't recall the

4   specific dates, but if we had, it would have -- it would have

5   been reflected.

6   Q   If I can refresh your recollection that the motion was

7   filed on December 24th, does that help form your understanding

8   or refresh your recollection that there was no agreement in

9   principle on November 24th?

10  A   Yeah.  Well, I'm quite sure there was no agreement in

11  principle or we would have reflected it minimally by a

12  footnote.  There's -- there's no chance.  It's a material

13  reduction in the claims pool that we were previously telling

14  people that, at least for purposes of distribution, like UBS

15  and a couple others we said we thought we would get to zero

16  on.  So we didn't calculate in that amount.  So I'm quite sure

17  we didn't have a deal when we filed the disclosure statement.

18      In terms of the timing, anyone who's done this business

19  for any degree of time knows that the crucible of bankruptcy

20  brings people to the settlement when they see something

21  happening in the case, and not before.  I think HarbourVest

22  looked at our -- this is my supposition -- HarbourVest looked

23  at our plan, our ability to get this done, our settlement with

24  Redeemer, our settlement with Mr. Terry and Acis, and saw that

25  this plan was coming together, and if they didn't think about

Seery - Direct                         58

1   the settlement, they were going to think about not only the

2   risks that we laid forth for them with respect our defenses,

3   but also the opportunity to litigate with the Claimant Trustee

4   over a long period of time, which couldn't have been

5   particularly appetizing.

6   Q   Can you describe for the Court the role played by the

7   independent board of Strand, the general partner of the

8   Debtor, in analyzing and participating in the approval

9   process?

10  A   Yes.  I think, as the Court is aware and I've testified

11  before, Mr. Russell Nelms and Mr. John Dubel are fellow

12  independent directors with me, appointed pursuant to the Court

13  order.  They are kept abreast of every detail, and -- along

14  the way, not just in a summary form at the end.  We have

15  reviewed and analyzed collectively each of the issues.  Mr.

16  Dubel has extensive experience in these types of litigation

17  matters.  Obviously, Mr. Nelms, from his -- both his practice

18  and his time on the bench, has a keen insight into how to

19  resolve and what the risks and benefits are from settling

20  litigation.  So I consult them every step of the way.

21  Q   And as part of this process, did the Debtor reach out to

22  the directors of HCLOF?

23  A   Yes, we did.  So, we reached out and we've had several

24  conversations on video chats with the directors.  The

25  directors of HCLOF are two new gentlemen, Mr. Richard Boleat

004154

Seery - Direct                        59

1   and Mr. Dicky Burwood.  They are extremely professional.  They

2   are exceptionally well-informed.  They are truly careful, and

3   I would say very experienced professional not only directors,

4   but experienced in -- in these matters, both in respect of

5   structured finance as well as these types of vehicles and

6   litigation.

7        They were appointed by the old directors, Scott and

8   Bestwick, and they have been in control.  They have outside

9   counsel, which is King & Spalding in the U.S.  They have

10  Guernsey counsel.  They have accountants and professional

11  advisors, and are being, in my opinion, exceptionally careful.

12  I've got -- very quickly developed a lot of respect for them,

13  and we consulted with them on this settlement and how it would

14  work.

15       They've been very clear that they represent HCLOF and they

16  work for the benefit of the equity, whomever owns it, and

17  taking a view that they would like to see these assets

18  monetized swiftly, with due regard to value, for the benefit

19  of the equity.

20  Q   And is it your understanding that the directors of HCLOF

21  approved of this transaction?

22  A   They -- I don't know that their approval was required.

23  It's really -- there are a number of hoops to jump through

24  under the documentation, including opinion of outside counsel

25  that we received from WilmerHale in terms of the effectiveness

Seery - Direct                          60

1  of the transfer under the documents.  We had a negotiation

2  with -- with those directors, and making sure that we did

3  everything correct -- correctly, excuse me -- with respect to

4  the requirements for the transfer under the documents.  And

5  they've indicated their support and acknowledgement that we're

6  doing it correctly.

7      I don't know if it's fair to say they approved it.  I'd

8  just have to go check the documents.  But they certainly

9  support it.  And I think they generally support our position

10 with respect to how to move forward with the assets.

11 Q   I appreciate that.  I guess I meant approval with a small

12 a and not a capital A.

13     You mentioned WilmerHale.  Who do they represent in all of

14 this?

15 A   WilmerHale is the Debtor's outside corporate counsel, in

16 particular with respect to the fund issues that we don't

17 handle in-house.  We have significant support for fund issues

18 from the expertise of Mr. Surgent, who's been the CCO, and he

19 is also a lawyer, with respect to, you know, some of the

20 difficult fund issues that Highland has.  But when we use

21 outside counsel, we use WilmerHale for that, and they've been

22 -- they've been exceptional.

23 Q   Okay.  Just the last two points that were made in Mr.

24 Dondero's objection, I believe.  Did the Debtor overpay in

25 this settlement in order to gain the support of HarbourVest in

Seery - Direct                          61

 1   connection with its -- with the Debtor's attempt to get its

 2   plan confirmed?

 3   A    Not in any way.  My -- I believe the settlement is

 4   extremely reasonable.  As I testified, it's -- it's less than

 5   the -- the actual value going out, depending on unless there's

 6   successful litigation, and there well could be, is less than

 7   on a pro forma basis the fees that were taken and charged to

 8   HCLOF.  We didn't do this for votes.  We will have Class 2,

 9   Class 7, Class 8, and Class 9.  So I don't think that's a --

10   there's no vote purchasing, I think you called it.  No, not at

11   all.

12   Q    Yeah.  Well, on that topic, I think the phrase that was

13   used was gerrymandering.  Are you aware of the argument that's

14   been made that the subordinated claim was dropped in there in

15   order to gerrymander a positive vote for the impaired class of

16   Class 9, I believe?

17   A    In a word, I would say that's preposterous.  The -- as I

18   said, we have a number of classes that will vote for the plan.

19   The plan is -- the plan is a monetization plan.  And if -- if

20   the creditors determine that they don't want to pursue this

21   plan, we'll go forward with another -- we'll try to get

22   another plan.  We tried to have a grand bargain plan.  We

23   tried to have a pot plan, as I've testified previously.  I'm

24   quite certain that I've done more work on that than anyone

25   else, including Mr. Dondero and anybody who works for him.

Seery - Direct                          62

1  And he hasn't been willing to do that.

2      This is a -- this is a plan that's come together.  We

3  think it's going to be in the best interests of the estate.

4  That'll be confirmation next week.  Or two weeks, I guess.

5  But I don't see how this is any way related -- this settlement

6  is not any way related to the voting on that -- on that -- on

7  that plan.

8  Q   Just to put the finest point on it, is the Debtor relying

9  on Class 9 to be the impaired consenting class?

10 A   No.  I think -- I think what I've -- as I said, I believe

11 we already have the votes in Class -- I think it's 2 or 3, 7,

12 8, and -- and 9 will vote in favor as well.  So that won't be

13 an issue.

14         MR. MORRIS:  Your Honor, I have no further questions

15 of Mr. Seery.

16         THE COURT:  All right.  Pass the witness.  I'll ask

17 HarbourVest counsel first:  Do you have any questions of Mr.

18 Seery?

19         MS. WEISGERBER:  No, Your Honor.

20         THE COURT:  All right.  Thank you.

21     What about cross-examination?  Mr. Dondero's counsel?

22                   CROSS-EXAMINATION

23 BY MR. WILSON:

24 Q   Mr. Seery, how are you doing today?

25 A   I'm well, thank you.

Seery - Cross                           63

1   Q    I'm John Wilson, and I represent Jim Dondero.  I have a
2   few questions for you today.
3        Now, the HarbourVest proof of claims were filed on April
4   8th, 2020; is that your recollection?
5   A    I believe that's correct.  I don't recall the specific
6   date.
7   Q    Okay.  And do you know when you first became aware of the
8   HarbourVest claims?
9   A    I believe it was early in the summer when we filed the
10  omnibus objection.  It may have been in late spring, shortly
11  after that.  I don't recall the specific date of the filing.
12  Q    And before the time of the filing of the omnibus
13  objection, did Highland educate itself regarding the
14  HarbourVest proof of claims?
15  A    I'm sorry, could you say that again?  I didn't quite
16  understand it.
17  Q    Before the omnibus objection was filed, did HarbourVest --
18  I'm sorry, did Highland educate itself on the HarbourVest
19  proof of claims?
20  A    Not especially, no.
21  Q    Okay.  And -- but at some point, Highland did investigate
22  those proofs of claim, correct?
23  A    That's correct.
24  Q    And when would you -- when do you recall that that
25  investigation began?

Seery - Cross                          64

 1  A    I don't recall the date, but the triggering event was

 2  HarbourVest's response to our omnibus objection.

 3  Q    Okay.  And that would have been filed September 11th of

 4  2020?

 5  A    I'll take your representation.  I don't -- I don't recall

 6  the specific date.

 7  Q    Okay.  And so when you began to investigate the

 8  HarbourVest claims, what was your initial reaction?

 9  A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16      But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

004160

Seery - Cross                         65

1   Q    And did you ever represent to any party that the

2   HarbourVest claim was worth, at most, $5 million?

3   A    I think I represented often, including to HarbourVest,

4   that it was worth nothing.  I don't recall if I specifically

5   said $5 million.  $5 million would have been a nominal amount

6   to -- which is litigation costs.  So it may -- it may have

7   been in my models that I put in that as a settlement amount,

8   but I -- I thought that there were valid and good defenses to

9   those larger claims.

10  Q    And you recognize that HarbourVest was a large,

11  sophisticated investor, correct?

12  A    Yes.  I think they manage north of -- right around a

13  hundred billion dollars.

14  Q    And you recognize that HarbourVest routinely structured

15  complex customized investments, correct?

16  A    I believe that -- I don't know the intricate part of their

17  businesses, but as a fund of funds who does creative

18  investments, I think that they do do quite a bit of that.

19  This, I believe, was their first investment in the CLO space.

20  Q    And it was not -- or I should say, you did not believe

21  that HarbourVest was simply a passive investor in HCLOF,

22  correct?

23  A    I don't think that that's true, no.

24  Q    You don't -- you don't believe that you denied their claim

25  to be a passive investor?

Seery - Cross                          66

1   A    Oh, I think -- I'm sure that in defense of their claims I

2   would argue that they were -- they were more than a passive

3   investor.  But it was pretty clear when you look at the

4   structure of what they invested that there was an intent that

5   they be passive on their part.  They didn't take a majority

6   interest.

7        In fact, Highland made it clear in the structure of the

8   deal that they couldn't -- it would be hard for them to get a

9   majority interest because Highland entities would control that

10  and Dondero-controlled entities or individuals would control

11  the majority.

12       I think that they -- they had hoped to be a passive

13  investor.

14  Q    But was it not your position that HarbourVest was actually

15  an active, involved investor?

16  A    I think our defense was going to be that they knew exactly

17  what was going on, that they participated, that they were

18  active, and that, indeed, that they were in and around some of

19  the subsequent issues in the Acis case.

20  Q    And you understood that HarbourVest played a material role

21  in the various outcomes in the Acis bankruptcy case, correct?

22  A    I don't believe that to be correct, no.

23  Q    Have you ever made that representation to anyone before?

24  A    Not -- not that I recall.

25  Q    Well, do you recall giving statements to a reporter named

Seery - Cross                            67

1   Syed Khaderi?

2   A    I've never spoken to a reporter named Syed Khaderi in my

3   life.

4   Q    Well, did you participate in the preparation of statements

5   to be given to Syed Khaderi?

6   A    I've never heard of Syed Khaderi, nor have I participated

7   in any preparation of statements.  I don't know who that is.

8         MR. WILSON:  All right.  I'm going to have Bryan

9   Assink put on the screen a document.

10       And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q    Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A    Yes.

16  Q    And who is Lucy Bannon?

17  A    She is the Highland public relations person.

18         MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q    Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A    Yes.

24  Q    Have you seen this email before?

25  A    Not that I recall, no.

Seery - Cross                                68

1  Q   All right.  It continues on that, I saw the filing on

2  Friday about HarbourVest claims against Highland for a CLO

3  investment, and I'm looking to put out a report tomorrow

4  morning London time.  Ahead of that, I wanted to check if

5  Highland would like to comment on the matter.

6          MR. MORRIS:  Your Honor, this is -- the Debtor

7  respectfully objects.  A, this document is not in evidence.

8  B, it's rank hearsay.

9          THE COURT:  Response, Mr. Wilson?

10          MR. WILSON:  Your Honor, I am attempting to

11  authenticate this document, but I'm using it in rebuttal to

12  the testimony that Mr. Seery just offered.

13          THE COURT:  All right.  I'll allow it.  Overrule the

14  objection.

15          MR. WILSON:  All right.  Thank you, Your Honor.

16  BY MR. WILSON:

17  Q   All right.  Now, if we -- and oh, that September 14th

18  date, that was three days after the September 11th date that

19  we discussed was the date that HarbourVest filed its response

20  to the omnibus objection, correct?

21  A   Yes.  If that's the date that they filed it, then I -- if

22  you're representing that, I concede that the 14th is three

23  days after the 11th.

24  Q   All right.  And if you go back to the first page of this,

25  it looks like, on the following day, Lucy Bannon sends an

Seery - Cross                          69

1   email to you, and is that your email address,

2   jpseeryjr@gmail.com?

3   A    That's correct, yes.

4   Q    And do you recall receiving this email from Lucy Bannon?

5           MR. MORRIS:  Your Honor, I renew my objection that

6   this is hearsay.  He's not rebutting anything that Mr. Seery

7   testified to.  He testified that he'd never heard of the

8   gentleman at the bottom of the document.  There's nothing in

9   this document that rebuts Mr. Seery's testimony at all.

10          THE COURT:  Response, Mr. Wilson?

11          MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12  his statement that he hadn't -- that he hadn't heard of Syed

13  Khaderi.  My rebuttal is attempted to -- attempting to show

14  that he has made various statements that he denied.

15          THE COURT:  I'll overrule the objection.

16  BY MR. WILSON:

17  Q    All right.  So, back to this exhibit, Mr. Seery.  You

18  recall receiving this email from Lucy Bannon on Tuesday,

19  September 15, 2020?

20  A    Not specifically.  But to be clear, I recall talking to

21  Lucy Bannon about the HCMLP dispute with HarbourVest.

22  Q    Okay.  And --

23          MR. WILSON:  Bryan, can you go down to the next page?

24  Scroll down to where -- the James Seery email.

25  BY MR. WILSON:

Seery - Cross                                    70

1    Q    Do you see this email on your screen that's dated

2    September 15, 2020 at 10:33 p.m.?

3    A    Yes, I do.

4    Q    And do you recall sending this email to Lucy?

5    A    Not specifically, no.

6    Q    Well, do you deny that you sent this email to Lucy?

7    A    It appears to be my email.

8            MR. WILSON:  Your Honor, we would move to admit this

9    document into evidence as Dondero Exhibit Letter N.

10           THE COURT:  Any objections?

11           MR. MORRIS:  I would consent to the admission of Mr.

12   Seery's email, but the balance of it ought to be excluded as

13   hearsay.

14           THE COURT:  What about that?

15           MR. WILSON:  Well, Your Honor, I think that this

16   document -- and I'll get into this in a little more detail in

17   a second -- but I think this document is a combination of the

18   work product of Lucy Bannon and Mr. Seery in preparing a

19   response for the reporter who requested comment from Highland.

20           THE COURT:  Okay.  I --

21           MR. MORRIS:  Your Honor, um, --

22           THE COURT:  Go ahead.

23           MR. MORRIS:  I just -- I do question how they got

24   this document, but that's for another day.  That's number one.

25   Number two, in addition to the hearsay argument, I just --

Seery - Cross                           71

1    relevance grounds.

2            THE COURT:  Okay.  I'll allow the portion that is the

3    communication of Seery, that portion of Exhibit N.  All right?

4            MR. WILSON:  Okay.  With due -- thank you, Your

5    Honor.  With due respect, I -- to use that portion, I need to

6    refer to the portion below it, because he says, Good to submit

7    with your final edit/revisions.  And so we need to know what

8    those final edit/revisions are, which are contained in the

9    email directly below that on the document that was four

10   minutes earlier in time.

11           THE COURT:  All right.  Fair enough.  That'll be

12   allowed.

13           MR. WILSON:  All right.  Thank you, Your Honor.

14      (James Dondero's Exhibit N is received into evidence as

15   specified.)

16           MR. WILSON:  So, Bryan, now can you scroll to the

17   next page?  Oh, actually, let's just -- let's just stop at the

18   top -- at the bottom of the page.  What's this statement?

19   BY MR. WILSON:

20   Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21   Khaderi's request for information and comment, you prepared

22   actually two responses, and one of those was a statement on

23   the record attributed to a spokesperson for HCMLP or something

24   along those lines.  And then --

25           MR. WILSON:  Can you scroll down to that next page?

Seery - Cross                                72

1  BY MR. WILSON:

2  Q    And this says -- I think part of this got cut off for some

3  reason, but it looks like the official statement is in

4  quotation marks.  It says, "We dispute the allegations made in

5  the filing and believe the underlying claims are invalid and

6  will be found to be without merit.  Our focus continues to be

7  treating all valid claims in a transparent, orderly, and

8  equitable manner, and vigorously disputing meritless in the

9  court.  That focus will assure that HCMLP's reorganization

10 process -- progress is towards an efficient and equitable

11 resolution."

12     And then below that there's another section of this email

13 that says, Background/Clarification, Not for Attribution.  And

14 do you know the purpose of this second section of the

15 response?

16 A    Do I know the purpose of that?  Yes.

17 Q    And what would that purpose be?

18 A    Ms. Bannon was speaking on background to reporters.  As I

19 said earlier, I've -- I never heard of the gentleman from

20 London.  If he's at the bottom of the email, I didn't pay any

21 mind, never heard of him.  Nor have I heard it since.  Ms.

22 Bannon didn't ever reference the specific person.

23     But she is the public relations person.  So, as I

24 testified earlier, she does communicate with the press.  And

25 as I previously testified when Mr. Morris questioned me, one

Seery - Cross                        73

1  of our tactics and our defenses for HarbourVest was going to

2  be that we were going to be very public and aggressive about

3  the investment and it would have a negative impact or negative

4  perspective for viewers, in our opinion, about HarbourVest's

5  investment.

6  Q   All right.  Well, look with me in the middle of that

7  paragraph right after the closed parenthetical, where it says,

8  "But it's important to note the background of HarbourVest's

9  active and deep involvement in the investment of which it now

10  complains."

11      And so it was your position that HarbourVest had an active

12  and deep involvement in the investment, correct?

13  A   No.  I don't think that's correct.  Ms. Bannon prepared

14  the statement, it was a litigation defense on background, and

15  that's our -- that was our position for this purpose.  It was

16  not my view that they were active and deeply involved.  They

17  were certainly involved.  There's no doubt about it.  But they

18  got all their information, in our estimation and our research,

19  from Highland.

20  Q   But in any event, you would agree with me that four

21  minutes after receiving this email, you approved this

22  statement to go out to the reporter, correct?

23  A   No, that's not correct.  That's -- this portion is on

24  background.  That statement doesn't go out.  The previous

25  statement was the official statement.  This is the background

Seery - Cross                              74

1   discussion that she would have.  So, no, she was not

2   authorized in any way whatsoever to send that out.  She was

3   authorized to have conversations with those general facts.

4          MR. WILSON:  Okay.  Bryan, go to the top, or the

5   bottom of the page immediately preceding that.  That's it.

6   Yes, that's it right there.

7   BY MR. WILSON:

8   Q   Now, you'll see that this email from Lucy Bannon on

9   September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10  what you think of the below.  And, again, the first would be

11  on the record and the second will be sent for information

12  purposes to ensure accuracy, not for attribution."

13      So the intent was that this -- that this entire statement

14  be sent to the reporter, correct?

15  A   I don't believe that's correct.  I think when she goes on

16  background she doesn't send them a written doc.  It's got to

17  be clear to the reporter, at least my understanding is that

18  what on background means -- I've been involved with this

19  before -- is that typically that's done orally.  I don't know

20  if she's done it in a written statement before.  I have never

21  seen that done in a written statement before.  You give the

22  official statement and then you walk the reporter through your

23  other views on background.  And you're not quoted.  And it's

24  usually attributed to a source with knowledge.

25  Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                          75

1   sentence after the one I just read to you --

2            MR. WILSON:  Go back to where we were on the

3   background.

4   BY MR. WILSON:

5   Q    Now, we just read you the sentence that starts with, "Then

6   it's important."  The following sentence says, "HarbourVest

7   was not simply invested in HCLOF as an ignorant,

8   unsophisticated, passive investor, but was an active and

9   informed participant in the inception of its investment

10  through all of the Acis bankruptcy proceedings, and

11  HarbourVest played a material role in various outcomes related

12  to that case and its impact on HCLOF."

13       And is it -- did you not just tell me before we

14  investigated this document that HarbourVest did not play a

15  material role in the various outcomes of the Acis bankruptcy?

16  A    I don't know exactly what I said, but I think that's

17  correct, after we'd done the research on it, yeah.

18  Q    But you took the position in this email that you approved

19  to go out to a reporter that says that -- that HarbourVest was

20  an active and informed participant in the inception of -- of

21  its investment through all of the Acis bankruptcy proceedings

22  and played a material role in various outcomes related to that

23  case and its impact on HCLOF.  Can we agree with that?

24  A    Yes.

25  Q    And then the final sentence of this paragraph says that,

Seery - Cross                          76

1    We believe that neither the facts nor the law support

2    HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3        Whose words were those, "We-were-too-lazy-to-know

4    allegations"?

5    A   I don't recall.  They may be mine.  It's aggressive the

6    way I am, so that -- that may well be the case.

7            MR. WILSON:  All right.  Go -- go down to the next

8    page.

9    BY MR. WILSON:

10   Q   And with respect your comment that that second paragraph

11   would not have gone to the reporter, look at this email in the

12   middle of the page from Lucy Bannon to Syed Khaderi, September

13   16, 2020, at 1:51 a.m.  And --

14           MR. MORRIS:  Your Honor, this I will object to as

15   hearsay.  There is no witness here to testify to anything on

16   this document.

17           THE COURT:  All right.  How about that?

18           MR. WILSON:  Well, it's -- well, scroll up just a

19   little bit.  This email at the top of the page is three

20   minutes after the one in the middle of the page, where Lucy

21   Bannon is forwarding this to James Seery, saying, See below

22   for responses sent to *Creditflux*.  Will follow up with the

23   story when it runs or with any other updates.

24           MR. MORRIS:  Your Honor, these --

25           MR. WILSON:  So I think this --

Seery - Cross                          77

1          MR. MORRIS:  These documents don't appear on the

2     witness list.  They're not being offered to impeach anything.

3     They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5     trying to rebut the statements that Mr. Seery made.  In fact,

6     he told me just a minute ago that that second paragraph would

7     not have gone out to the reporter.  However, this email from

8     Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10    questioning, with an undisclosed document, is to rebut the

11    earlier testimony he gave before you even put this exhibit in

12    front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14    that Mr. Seery has made today, and I think it -- you know, if

15    he's going to testify that this information did not go out to

16    a reporter, I think I'm allowed to rebut that to demonstrate

17    that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19    in advance?  It's feeling less and less like an impeachment

20    document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22    actually have this document at the time we filed our witness

23    and exhibit list, but I would also say that I didn't have any

24    purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Seery - Cross                       78

 1  disclose all exhibits you anticipate using except those for

 2  purposes of impeachment.  Okay?  Not rebuttal, to be

 3  technical.

 4      So, if you didn't disclose this exhibit, the only way you

 5  can use it, subject to other possible objections, is if you're

 6  impeaching a statement.  And I'm just saying I think we're

 7  going beyond trying to impeach the original statement and now

 8  we're trying to impeach statements he's made after seeing

 9  portions of the document.

10      What did you mean, you didn't have this document in time

11  to disclose it?

12          MR. WILSON:  Well, I actually just received this

13  document this morning, Your Honor.

14          THE COURT:  Where did you receive it from?

15          MR. MORRIS:  From who?

16          MR. WILSON:  I -- I honestly do not know the source

17  of this document, although it was provided to me by my client.

18          MR. MORRIS:  Your client being Mr. Dondero?

19          THE COURT:  Could you answer that, Mr. Wilson?

20          MR. WILSON:  Yes, that's -- yes, that's correct.

21          THE COURT:  All right.  I will -- that's --

22          MR. MORRIS:  Your Honor, I'd like to --

23          THE COURT:  That's a different can of worms.  But for

24  now, I sustain the objection.  You're done questioning on this

25  document.

Seery - Cross                                79

1          MR. WILSON:  That's fine, Your Honor.  I can move on.

2    BY MR. WILSON:

3    Q    Now, Mr. Seery, you would agree with me that whether or

4    not HarbourVest played an active role in the Acis bankruptcy,

5    it was kept apprised of the -- of the ongoings in the

6    bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

7    A    Yes.  My understanding is that -- that they were.

8    Q    And in fact, did Highland have weekly conference calls

9    with HarbourVest during the Acis bankruptcy to discuss what

10   was going on in the bankruptcy?

11   A    I don't know if they were weekly.  I've been told that

12   they had regular calls updating HarbourVest, yes.

13   Q    Okay.  And did Highland produce over 40,000 pages of

14   documents to HarbourVest related to the Acis bankruptcy?

15   A    I'm not aware of that, no.

16   Q    Have those documents been provided to you?

17   A    I hope not.

18   Q    So, in your role --

19   A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20   from anybody.

21   Q    Well, did you receive any number of documents that were

22   provided by Highland to HarbourVest during the Acis

23   bankruptcy?

24   A    I wasn't involved in this during the Acis bankruptcy.  I'm

25   sorry.

Seery - Cross                          80

1   Q    Well, I'm referring to, after you became involved in this

2   Highland bankruptcy, whether you were provided with these

3   documents that were sent from Highland to HarbourVest.

4   A    I don't -- I don't know what the documents are.  I've

5   reviewed tons of documents with respect to the HarbourVest

6   claims, but I don't know of the documents to which you're

7   referring.

8   Q    Okay.  And after you performed your investigation into the

9   HarbourVest claim, what was your opinion as to the cause in

10  the reduction in value of HarbourVest's investment in HCLOF?

11  A    I think the main cause of the reduction in the investment

12  was the imposition of the Trustee and the failure of Highland

13  HCLOF and then subsequently with the injunction to reset the

14  CLOs.

15       You know, these are -- these are some of the worst-

16  performing CLOs in the market because they weren't reset.  And

17  when the liabilities of the CLOs are set at a level to match

18  assets, and then liability -- the assets run off, and the

19  asset financings or the new deals come in at much lower

20  levels, and the obligations of the CLO are not reset, the

21  arbitrage that is the CLO shrinks.  And that's what happened

22  to these CLOs.

23  Q    And during the course of the Acis bankruptcy, Acis and

24  Brigade were given management responsibilities over the CLOs

25  and HCLOF, correct?

004176

1   A    I believe that the Trustee had the overall, and then

2   subsequently, with the confirmation of the plan, they took it

3   over.  So I think that ultimately Mr. Terry had the management

4   authority, full management authority, and some advice through

5   Brigade.  But I think technically it wasn't actually during

6   the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7   Phelan had the actual authority.

8        (Echoing.)

9   Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10  the actual authority but he delegated that authority to Josh

11  Terry and Brigade?

12  A    I think that's fair, yes.

13  Q    And do you know when that occurred?

14  A    I believe that the control of the CLOs was in July of

15  2018, and then the ultimate confirmation of the case was at

16  the very beginning of '19.

17  Q    So, after being instituted as portfolio manager, and

18  during the time when Acis and Brigade were working under the

19  direction of the Trustee, who would have receive the fees for

20  managing those portfolios?

21  A    I believe -- I don't know.  I believe the -- that the Acis

22  estate would have received those fees.

23  Q    And who -- and so is that your testimony, that prior to

24  confirmation the Acis estate would have received the

25  management fees?

Seery - Cross                          82

1   A    I believe that -- I believe they would have if they were

2   the manager, yeah.

3   Q    Okay.  And who would have received the fees after

4   confirmation?

5   A    Acis.

6   Q    Okay.  And who would have had the discretion to set the

7   amount of those management fees?

8   A    They would be agreed to in the -- in the investment

9   management agreement.

10  Q    They would be agreed to?

11  A    Yes.  As far as I've seen, I've -- I haven't seen

12  unilateral ability of a manager to set fees at its -- at its

13  whim.

14  Q    So is it your understanding that Acis and Brigade ended up

15  charging substantially more fees than Highland had charged

16  when it was under Highland's management?

17  A    I think the fees were -- the fees were -- the fees were

18  set by the agreement.

19          MR. MORRIS:  Your Honor, I just object to the line of

20  questioning on relevance grounds.  This is a 9019 hearing,

21  Your Honor.  How -- I just don't think this has any relevance

22  at all.

23          THE COURT:  All right.  Mr. Wilson, what is the

24  relevance?

25          MR. WILSON:  The relevance is that Mr. Seery has

Seery - Cross                                    83

1    testified that these Acis CLOs were among the worst-performing

2    in the market, and frankly, we would agree with that, and I'm

3    trying to get his understanding as to why, because I think

4    there's direct relevance in the reason that the value of the

5    HarbourVest investment diminished.

6            MR. MORRIS:  I don't think that was his testimony,

7    Your Honor.  But at the end of the day, Your Honor has heard

8    the litany of reasons why the Debtor is entering into this

9    agreement.  I just, I just think it's irrelevant, Your Honor.

10           THE COURT:  All right.  Mr. Wilson, I barely think

11   this is relevant.  I mean, I'm going to give you some benefit

12   of the doubt on that because of, you know, the testimony that

13   HarbourVest lost $50 million of value and --

14       (Echoing.)

15           THE COURT:  -- maybe that shouldn't, you know, lie at

16   the feet of Highland.  I think the compromise reflects that

17   they don't -- it doesn't lie entirely at the feet of Highland.

18   But, you know, maybe two or three more questions.

19           MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20   didn't have very much more on this point.  But to be a hundred

21   percent honest, I can't remember my question right before the

22   objection.

23           THE WITNESS:  I think you were asking me about the

24   fees and somehow alluding or implying that the manager could

25   unilaterally set fees.

Seery - Cross                          84

1       The fees are set in the investment management contract.

2   The manager doesn't get to wake up on Wednesday and say, you

3   know, I'd like another half a basis point.  It doesn't work

4   that way.

5   BY MR. WILSON:

6   Q    But you would agree with me that the fees and expenses

7   charged to an investment would impact the performance of that

8   investment in the market?

9   A    Absolutely.

10  Q    Would you also agree with me that there was one CLO -- and

11  I think you referred to it in your direct testimony -- but CLO

12  7, which continued to be managed by Highland?

13  A    That's correct.

14  Q    And is it fair to say that CLO 7 exceeded the performance

15  of the CLOs that were managed by Acis and Brigade?

16  A    I think that's fair.  I don't -- I don't recall the

17  magnitude, but I think it's outperformed those -- those CLOs,

18  yes.

19  Q    All right.  Well, thank you.  I want to turn your

20  attention to the portion of the settlement agreement that

21  deals with voting of the HarbourVest claim.  How did

22  HarbourVest's commitment to vote for the plan become a part of

23  the settlement?

24  A    Pretty straightforward negotiation.  We -- in negotiating

25  the settlement, one of the key factors was the cost and

Seery - Cross                           85

1   expense of the litigation, in addition to the risk on the --

2   on the fees, and whether we could wrap this up in a global

3   settlement now.  So in my experience, it's fairly typical, we

4   would try to do this in every settlement, have the settling

5   party, be that the claimant, agree to support the case and the

6   plan.

7        You know, we did not do that with the Committee members,

8   although we wanted to.  (Echoing) I frankly still wish I had.

9   Those little -- little bits that have been difficult

10  (echoing).  The Committee members have a different interest in

11  (echoing) than their more global interest for creditors at

12  large, which is more difficult than traditionally in

13  bankruptcy cases, less likely to have a Committee member, a

14  sitting Committee member, actually support the (echoing) of

15  the plan.

16        THE COURT:  Mr. Wilson, could you be careful to put

17  your device on mute every time you're not talking?  Because

18  we're getting some feedback loop from you when Mr. Seery

19  answers your questions.  Okay?

20        (Echoing continues.)

21        THE COURT:  Like right now.  I'm hearing feedback of

22  my own voice through your speakers.

23        Right, Mike?  Isn't that what --

24        A VOICE:  I am, too.

25        THE COURT:  Yes.  Okay.  So please be sure you put

Seery - Cross                                86

1   your device on mute whenever you are not speaking.  All right.

2   Go ahead.

3   BY MR. WILSON:

4   Q    I mean, I think you just answered this question, but there

5   was -- there was no similar voting provision in the Acis or

6   the Redeemer settlements, correct?

7   A    There is not, no.  And just as a -- by way of explanation,

8   if it's okay, the reason was my counsel advised against it.  I

9   did ask for it.

10  Q    Your counsel advised against putting that voting

11  requirement in the Acis and Redeemer settlements?

12  A    For the reasons I stated.  And in my experience, that's

13  consistent, where sitting members of Committees don't

14  generally sign up to resolve their own claims and support the

15  plan because of their larger fiduciary duties to the creditor

16  body as a whole.

17  Q    And during the settlement negotiations of the HarbourVest

18  claim, was this commitment to vote a topic of discussion?

19  A    Not -- not particularly, no.  It was pretty clear that

20  HarbourVest, if they were going to agree to the settlement and

21  the numbers, could see structure.  Obviously, it wanted to

22  understand what the potential distributions would be under the

23  plan, but this was not a hotly-negotiated point.

24  Q    And would you consider HarbourVest's commitment to vote

25  for the plan an important part of the settlement?

Seery - Cross                              87

1   A   I think it's an important part of the settlement, that the

2   part of the settlement is the subordinated claim.  We could

3   put that into presumably any plan.  But our plan does -- does

4   have a Class 9 for that.  So I think it's a -- it's a part of

5   the settlement that is important or we wouldn't have included

6   it.  It clearly wraps everything up and moves us towards

7   confirmation.

8   Q   And would you have made the deal with HarbourVest if they

9   had pushed back on the commitment to vote for the plan?

10  A   Yeah, I would have.

11  Q   All right.  Thank you.

12          MR. WILSON:  No further questions.

13          THE COURT:  All right.  Mr. Draper, anything from

14  you?

15          MR. DRAPER:  Yes, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. DRAPER:

18  Q   Mr. Seery, I may not understand the settlement, and I

19  apologize, but the way I think the settlement reads, the

20  interest that you're acquiring, you have the right to place in

21  any entity.  Is that my -- is that correct?

22  A   I don't recall the -- the specifics, but just from a

23  structural standpoint, we wanted to be able to put it into a

24  subsidiary as opposed to putting it directly in HCMLP.  If we

25  couldn't do that, we would -- we would put it into HCMLP.  So

004183

Seery - Cross                                88

1   there wasn't a -- I don't recall the actual specifics, but we

2   certainly thought about holding that interest in a -- in a

3   subsidiary, just to have a cleaner hold.

4   Q    Why aren't you putting it into the Debtor so the Court and

5   the estate have jurisdiction over that?

6   A    I think the Court certainly has jurisdiction over an

7   entity that the estate owns a hundred percent of.  I don't

8   think that's -- that's even a close call.  So the important --

9   Q    Now, --

10  A    Can I finish?

11  Q    Sure.

12  A    You asked me why.  To the extent that somebody thinks that

13  problematic, I will consent to the Court having complete

14  jurisdiction over it, since I control it a hundred percent.

15  Q    No.  The real reason is, if I remember correctly, Mr.

16  Dondero and Judge Lynn filed a motion to have some say or some

17  information as to sales by subsidiaries, and I think you took

18  the position that they weren't entitled to it.  And so my

19  concern was that putting this in a subsidiary in a sense gave

20  you unfettered control without any review of the item.

21  A    I don't -- I don't think that's the case where we --

22  there's a directly-held subsidiary where we own a hundred

23  percent of it.  I don't think that that's the case.

24  Q    Okay.  But you're willing to (a) put this into the Debtor,

25  number one; and number two, have the estate and have the Court

004184

Seery - Cross                                89

1   have complete control over the disposition of it and its

2   actions, correct?

3   A    That's not correct, no.

4   Q    What -- what is incorrect about my statement?

5   A    The debtor-in-possession has control of its assets.  The

6   Court doesn't have complete control over its assets.  There's

7   --

8   Q    Well, --

9   A    -- issues -- hold on a second.  This is not -- this is not

10  a game and a trap.  We put it in a subsidiary for specific

11  reasons.  You asked why.  I'm giving you the why.  It's not to

12  hide it from anybody.  We're not going to sell the asset

13  unless somebody comes up with a great price for it.  We're

14  going to monetize the assets.  We're going to control HCLOF by

15  a majority.

16  Q    But, again, the issue is, if it's in the estate, the Court

17  has supervision over it.  If it's not in the estate, the Court

18  has no supervision of it.

19  A    I don't think that's correct, because the Court has

20  supervision over the estate, which owns a hundred percent of

21  the special-purpose entity that will own the shares.

22  Q    Okay.  All right.  Now, let's talk about the $15 million

23  that you discussed and the legal fees that were incurred.  Is

24  that the total amount that was spent, or is -- or is that --

25  was the total amount $30 million and HarbourVest was only

Seery - Cross                        90

1    responsible for one half of it or functionally took the brunt

2    of one half of it?

3    A    I think the total amount is between $15 and $20 million.

4    I don't have the exact numbers.

5    Q    So, in fact, the HarbourVest loss due to its ownership

6    would have been one half of that, not $15 million?

7    A    Well, the vehicle lost the money.  HarbourVest owned 49.98

8    percent of it, and Highland controlled the rest.  So if you

9    allocate it that way, I suppose that would be a -- that's how

10   you would divide it, in -- roughly in half, yes.

11   Q    And so HarbourVest's actual dollar loss due to the legal

12   fees is really the 49-point-whatever percent of $15 million,

13   not $15 million?

14   A    I don't know if -- I certainly would argue that.  I don't

15   think that HarbourVest has that position.

16   Q    Okay.  Now, in connection -- you were asked a question

17   about the documentation that was provided by Highland to

18   HarbourVest both during the bankruptcy of Acis and before.

19   You have control over the Harbour -- over the Highland server,

20   correct?

21   A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22   Draper, I can't see you, so it would be better if I could see

23   you during the questioning.

24   Q    Okay.

25   A    And could you repeat the question?

Seery - Cross                           91

1   Q    All right.  I'll be happy to.  You were asked a question

2   about the documentation that was provided by Highland to

3   HarbourVest during the Acis bankruptcy and meetings that took

4   place between the parties.  Correct?

5   A    Yes.

6   Q    And you stated you were unaware of the material that was

7   sent over?

8   A    I think I testified that I didn't receive the 40,000

9   documents that were mentioned.

10  Q    Did you do any search or order a search of the Highland

11  server to see what material was sent over by any party to

12  HarbourVest to analyze what -- what information they had

13  available to them and what was provided to them?

14  A    Yes, we did a search.

15  Q    And did you review the documentation that was sent over?

16  A    The -- the documentation that we looked at was very

17  specific to the investment and to the OM.  So we didn't look

18  for the -- the supposed 40,000 documents, no.

19  Q    Did you look for the material that was provided to them

20  during the Acis bankruptcy and the periodic meetings that you

21  discussed?  Or that you testified to earlier?

22  A    The answer is no.

23  Q    One last question.  I think, and just so I understand your

24  testimony, you've broken out the HarbourVest claim into two

25  pieces.  One is the legal fee amount that we've just

004187

Seery - Cross                                92

 1   discussed, and I gather the other piece of that is the fraud
 2   in the inducement to enter into the CLO purchase?
 3   A    It's -- it's more -- it's much more than that.
 4   Q    Okay.  Well, let me say it in a different way.  The other
 5   part of it is the losses as a result of the fraud in the
 6   inducement to purchase the interest?
 7   A    I don't think that's -- that's fair.  If I could explain?
 8   Q    Sure.
 9   A    Yeah.  The legal fee piece is pretty clear.  The other
10   piece starts with fraud in the inducement, but it's extensive
11   fraud claims.  Fraud in the inducement, as I testified
12   earlier, would get them around the exculpation and liability
13   limitations in the OM.  You don't get around all of those with
14   just the fraud.  And so that's -- that's the split of that
15   claim.  So the fraud in the inducement contains fraud
16   allegations.  Even if you didn't have inducement, you'd have
17   other potential fraud claims.
18   Q    But let me state it in a different fashion.  But for the
19   investment, the fraud that you allege wouldn't have occurred?
20   A    I -- HarbourVest alleges it.
21   Q    No, I'm just -- in your analysis of the claim, but for the
22   inducement, the rest of the damages wouldn't have flowed?
23   A    That's HarbourVest's position, yes.  But for the fraud,
24   they wouldn't have made the investment.
25   Q    All right.

Seery - Redirect                    93

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4   Just a very few questions.

5                  REDIRECT EXAMINATION

6   BY MR. MORRIS:

7   Q    Mr. Seery,  you were asked about that document that Lucy

8   prepared.  Do you remember that?

9   A    Yes, I do.

10  Q    In your experience, don't defendants often deny liability

11  before entering into settlements, or even worse, getting

12  adverse judgments entered against them?

13  A    Of course.  Yes.

14  Q    Okay.  And in response to Mr. Draper's questions, isn't

15  the Guernsey claim another claim that the Debtor took into

16  account in assessing the potential risks of this settlement?

17  A    There's a number of claims contained in it.  As I

18  mentioned earlier, I mentioned the RICO claim.  But there is a

19  Guernsey shadow director claim, which is not dissimilar to

20  U.S. claims that somebody effectively controls an enterprise,

21  notwithstanding them not having the official role.

22  Q    Okay.

23          MR. MORRIS:  I have nothing further, Your Honor.

24          THE COURT:  All right.  Any recross on that redirect?

25  All right.

004189

Seery - Redirect                    94

1          MR. WILSON:  No, Your Honor.

2          MR. DRAPER:  No, Your Honor.

3          THE COURT:  Thank you.  Mr. Seery, that concludes

4    your testimony.  Thank you.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  We need to take a bathroom break.  Before

7    we do, I just want to be clear with what we have left.  As I

8    understood it, we were having Mr. Pugatch from HarbourVest.

9    Mr. Morris, will that conclude the Debtor's evidence?

10   (Pause.)  Okay.  You were on mute, but I think you were saying

11   yes.

12         MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13   going to be putting their witness on the stand.

14         THE COURT:  Okay.

15         MR. MORRIS:  But it's part of the evidence in support

16   of the motion.

17         THE COURT:  All right.  Do the Objectors have any

18   witnesses today?

19         MR. WILSON:  Your Honor, Mr. Dondero intends to

20   examine Mr. Pugatch, but if he's going to be called by his

21   counsel, then we will do that as a cross-examination.

22         THE COURT:  All right.

23         MR. DRAPER:  This is Douglas Draper.  I have no

24   witnesses.

25         THE COURT:  Okay.  All right.  Well, I'm asking --

004190

95

 1  well, I do want to ask:  Can we get a time estimate

 2  potentially for Mr. Pugatch?

 3          MS. WEISGERBER:  For my examination, Your Honor,

 4  twenty minutes, perhaps.

 5          THE COURT:  Okay.

 6          MS. WEISGERBER:  Or less.

 7          THE COURT:  All right.  Well, let me tell you what

 8  we're going to do.  We're going to take a ten-minute bathroom

 9  break.  But I have a 1:30 hearing and I have a 2:00 o'clock.

10  Well, I have a 1:30 docket, multiple matters, and a 2:00

11  o'clock docket.  So, you know, I'm really intending that we

12  get finished in time to give me and my staff a little bit of a

13  lunch break before launching into the 1:30 docket, so I'm

14  hopeful we can get done around 1:00-ish.  If we can't, then

15  we're going to have to reconvene, I'm going to say probably

16  3:00-ish Central time.  So let's hope we can get through

17  everything.  All right?  Ten-minute break.

18          THE CLERK:  All rise.

19      (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  All right.  Please be seated.  We're

22  going back on the record in the Highland matters.  Do we have

23  everyone?  It looks like we do.  Ms. Weisgerber is going to

24  call the next witness; is that correct?

25          MS. WEISGERBER:  Yes, Your Honor.  We call Michael

                        Pugatch - Direct                    96


 1  Pugatch of HarbourVest to the stand.

 2          THE COURT:  All right.  Mr. Pugatch, if you could

 3  turn on your video and say, "Testing one, two."

 4          MR. PUGATCH:  Two.

 5          THE COURT:  All right.  There you are.  Please raise

 6  your right hand.

 7          MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

 8          THE COURT:  Thank you.  You may proceed.

 9          MS. WEISGERBER:  Thank you, Your Honor.

10                      DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q   Good morning.  Can you please state your name for the

13  record?

14  A   Sure.  It's Michael Pugatch.

15  Q   And where do you work, Mr. Pugatch?

16  A   HarbourVest Partners.

17  Q   And what is your title?

18  A   I'm a managing director in our secondary investment

19  group.

20  Q   Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A   We did, yes.  Several claims, in fact.

23  Q   What was the basis for those claims?

24  A   Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

Pugatch - Direct                    97

1  connection with our original investment, mismanagement at the

2  HCLOF level, including inappropriate fees that were charged

3  to investors, among a number of other items as well.

4  Q    Can you explain what you mean by misrepresentations made

5  to HarbourVest by Highland?

6  A    Yeah, sure.  So, you know, based on a number of

7  statements that were made to us around the litigation

8  involving Mr. Terry, some of the intentions found, the

9  structural changes that came to light with respect to HCLOF

10 and our investment, as well as the fact that the arbitration

11 award specifically against Mr. Terry would have no impact or

12 implication on Highland's sale or business.

13 Q    And can you explain what you mean by omissions made by

14 Highland to HarbourVest?

15 A    Sure.  So I would say, really, the implications behind

16 the structural changes that were made at the time of our

17 investment into HCLOF.  Also, the intention, clear intentions

18 that Highland had to never, in fact, pay the arbitration

19 award that came to light during our due diligence period to

20 Mr. -- to Mr. Terry as part of the investment.  And

21 ultimately the -- what Highland went about doing in terms of

22 stripping assets of Acis that led to the material value

23 declines and destruction of value that we've experienced

24 since our investment.

25 Q    You mentioned a diligence period.  Did HarbourVest

Pugatch - Direct                          98

 1  conduct diligence on the investment?

 2  A   We did.  We conducted very detailed due diligence, as we

 3  do for all of our investments.  That diligence period lasted

 4  several months ahead of our investment decision.

 5  Q   And did HarbourVest conduct that diligence by itself?

 6  A   No.  So, in addition to internal investment professionals

 7  at HarbourVest, we engage with outside advisors, both

 8  consultants as well as legal advisors, in connection with

 9  that due diligence.

10  Q   And did Highland answer all of HarbourVest's questions

11  during that diligence period?

12  A   They did.  And they were numerous.  But yes, they

13  answered all the questions that we had for them.

14  Q   Was the Terry dispute part of HarbourVest's diligence?

15  A   It was.  That came up as one of the outstanding items of

16  litigation as part of our due diligence.

17  Q   I'm going to ask my colleague to pull up on the screen an

18  exhibit that was on our exhibit list as Items -- Exhibits 34

19  and 35.  It's an August 15, 2017 email from Brad Eden to

20  Dustin Willard.  Mr. Pugatch, do you recognize this document?

21  A   I do, yes.

22  Q   And what is it?

23  A   This was an email sent to us during our due diligence

24  period in response to a request for more information on the

25  outstanding litigation that Highland was involved with.

Pugatch - Direct                          99

 1          MS. WEISGERBER:  And if my colleague can just scroll

 2   to the attachment to that email.

 3   BY MS. WEISGERBER:

 4   Q    And do you recall the attachment as well, Mr. Pugatch?

 5   A    Yes, I do.

 6          MS. WEISGERBER:  And if you can scroll back up to the

 7   first email.

 8   BY MS. WEISGERBER:

 9   Q    Who is Dustin Willard?

10   A    Yes.  Dustin is a colleague of mine at HarbourVest who

11   worked closely with me on this investment.

12   Q    And you said that this document was shared with

13   HarbourVest during the diligence period before the HCLOF

14   investment?

15   A    It was, correct.

16   Q    Is it typical during diligence to receive a description

17   of litigation such as this?

18   A    It is.  It's a question that we always ask.  Certainly a

19   component of our diligence to understand any outstanding

20   litigation on the part of our counterparty or manager that

21   we're investing in.

22          MS. WEISGERBER:  Your Honor, I'd move to offer this

23   exhibit into evidence.

24          THE COURT:  Any objection?

25          MR. DRAPER:  No objection, Your Honor.

Pugatch - Direct                              100

1              MR. MORRIS:  No objection from the Debtor, Your

2    Honor.

3              THE COURT:  All right.  What is the letter or number

4    for this exhibit?

5              MS. WEISGERBER:  It's HarbourVest Exhibit 34.

6              THE COURT:  All right.  So HarbourVest Exhibit 34 is

7    admitted.

8          (HarbourVest's Exhibit 34 is received into evidence.)

9              THE COURT:  And I need to be clear where it appears

10   on the docket.  Can someone tell me?

11             MS. WEISGERBER:  So, it's identified on our exhibit

12   list, not -- it's not attached to the exhibits.  It is on the

13   docket.  We were -- when we initially filed the exhibit list,

14   we were working out confidentiality issues.  But it was

15   subsequently filed with our reply last night.  It's at Docket

16   No. 1735 --

17             THE COURT:  All right.

18             MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19             THE COURT:  All right.  Very well.  Thank you.

20   BY MS. WEISGERBER:

21   Q   Mr. Pugatch, we'll just scroll down to the second page of

22   the attachment.  Can you describe generally what the

23   litigation says regarding the Terry dispute?

24   A   Yes.  Generally speaking, this dispute was described as

25   an employee dispute, employment agreement dispute, with Mr.

Pugatch - Direct                        101

1   Terry, who was a former employee of Highland involved in

2   their CLO business, and is described by Highland to us really

3   having to do with a series of false claims, in their opinion,

4   but having to do with a disgruntled former employee.

5   Q    And did it strike you as an unusual or significant

6   dispute?

7   A    No.  I would say we often -- we'll see, you know, former

8   employees with, you know, claims against a former employer in

9   connection with wrongful termination.  I wouldn't say it's

10  extremely common, but certainly not entirely out of the

11  ordinary.  And based on the explanations that we'd received

12  from Highland, seemed to be more of an ordinary-course type

13  former employee litigation suit.

14  Q    Based on what you now know about the Terry dispute, do

15  you believe that this was an adequate disclosure regarding

16  the dispute?

17  A    I would say very clearly not, you know, based on the

18  facts that came to light subsequently, the various rulings in

19  connection with the Acis bankruptcy case.  What was very

20  clearly not stated are the actual facts and implications of

21  the ongoing litigation with Mr. Terry.

22       MS. WEISGERBER:  I'd ask my colleague to put up the

23  next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24  list, which is Document No. 1723.  It's Exhibit 36 on that.

25  Same issue with respect to initially not filed, but it is on

004197

Pugatch - Direct                                    102

1    the docket at our response last evening at ECF No. 1735 at

2    Page A351.

3              THE COURT:  Page what?

4              MS. WEISGERBER:  A351.

5              THE COURT:  A351.  Thank you.

6              MS. WEISGERBER:  You're welcome.

7    BY MS. WEISGERBER:

8    Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9    Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10   Bellisario.  Do you recall this document?

11   A    I do, yes.

12   Q    And what is this document?

13   A    This was an email sent to us by Highland a couple weeks

14   after we closed on our investment on the (inaudible) in

15   response to a *Wall Street Journal* article that had come out

16   regarding Highland, a number of actions that they had taken,

17   and what Highland was articulating to us, a number of false

18   claims that had been made about Highland's prior actions, and

19   specifically trying to explain some of that and also share

20   with HarbourVest a letter that was being sent to the editor

21   of the *Wall Street Journal* highlighting, in their view, some

22   of the inaccuracies around the reporting.

23   Q    And did you receive this document?

24   A    We did, yes.

25             MS. WEISGERBER:  I'd move to offer this, so

Pugatch - Direct                           103

1   HarbourVest Exhibit 36, into evidence.

2         THE COURT:  Any objections?

3         MR. WILSON:  Your Honor, John Wilson.  I would object

4   as to the relevance of this document.

5         THE COURT:  All right.  What's your response?

6         MS. WEISGERBER:  Your Honor, it shows

7   misrepresentations that the witness will testify how it

8   relates back to prior representations prior to HarbourVest's

9   investment, as well as misrepresentations at that time.

10        THE COURT:  Okay.  I overrule the objection.  I'm

11   going to admit it.

12      (HarbourVest's Exhibit 36 is received into evidence.)

13   BY MS. WEISGERBER:

14   Q   Mr. Pugatch, can you describe generally -- we spoke about

15   this a little bit -- just what this communication from

16   Highland was conveying to HarbourVest at the time?

17   A   Yes.  Specifically, again, responding to this *Wall Street*

18   *Journal* article that had been published, trying to defend,

19   again, Highland's own views why there were inaccuracies in

20   the reporting.  But importantly, from our perspective, trying

21   to reassure us as to the fact that, you know, these

22   accusations would have no bearing and any results from it

23   would have no bearing on their ongoing business or

24   partnership or the investment that we had made in HCLOF.

25        MS. WEISGERBER:  And if you can scroll to the second

Pugatch - Direct                                         104

1   page.

2   BY MS. WEISGERBER:

3   Q    We'll just look at the last paragraph of another email

4   from Mr. Covitz.  Can you just read that first sentence of

5   the last paragraph?

6   A    Sure.  (reading)  While the dispute has no impact on our

7   investment activities, as always, we welcome any questions

8   you may have.

9   Q    Mr. Pugatch, was this email and the discussion regarding

10  the Terry dispute consistent with the representations made to

11  you prior to HarbourVest's investment into HCLOF?

12  A    It was, yes.  Both the message, the lack of any impact

13  that ultimately the dispute with Mr. Terry, the arbitration

14  award would have around Highland's ongoing CLO business, or

15  HCLOF specifically, was all, you know, very clear in this

16  document, but all consistent with the representations that

17  had been made to us leading up to our investment in the

18  middle of November 2017 as well.

19  Q    Thank you.

20       MS. WEISGERBER:  And you can take down the exhibit,

21  Emily.  Thank you.

22  BY MS. WEISGERBER:

23  Q    You mentioned, Mr. Pugatch, an arbitration award to Mr.

24  Terry.  How did you learn about that arbitration award?

25  A    That was initially disclosed to us by Highland as we were

Pugatch - Direct                    105

 1  in the late stages of our diligence and closing process on

 2  the investment into HCLOF.

 3  Q    And generally, what did Highland tell you about the

 4  arbitration award?

 5  A    We were aware of its existence.  We were aware of the

 6  quantum of the award, I think it was around an $8 million

 7  arbitration award in the favor of Mr. Terry, and that was

 8  following the litigation around the wrongful termination and

 9  employee dispute that Highland had described to us

10  previously.

11  Q    Did you ask to see a copy of the arbitration award?

12  A    No, we did not.

13  Q    Why not?

14  A    Ultimately, we -- you know, the explanations that

15  Highland had provided to us all seemed very reasonable.  We

16  relied on their representations that this was, again, nothing

17  more than a dispute with a former disgruntled employee, in

18  their words, that had no bearing or, you know, would not have

19  any bearing on our investment in HCLOF or their ongoing CLO

20  business, which all very clearly was not the case, as

21  we've -- as we've learned over the last several years.

22  Q    Following learning about the arbitration award, did

23  HarbourVest do other diligence?

24  A    We did.  So, in addition to asking questions related to

25  the arbitration award and any impact that it would have, we

1   also spent some time diligencing a couple of structural

2   changes that were proposed by Highland, and, in fact, ended

3   up delaying the closing of our investment by about two weeks

4   as we vetted some of those structural changes that Highland

5   had proposed.  Vetted those both, you know, internally with

6   Highland directly and with external counsel in order to make

7   sure that those structural changes were in fact legally sound

8   in ultimately making our investment.

9   Q    And were those changes proposed following the arbitration

10  award?

11  A    They were, yes.

12  Q    Did Highland tell you the reason for the structural

13  changes?

14  A    Yeah.  So, so some of this -- and specifically, this

15  involved a change of the portfolio manager at the HCLOF level

16  that was really in connection with a rebranding as Highland

17  was going through a rebuild of its CLO business and wanting

18  to align, from a brand perspective, their business on an

19  ongoing basis with the Highland brand as opposed to the Acis

20  brand.  But more specifically, in the case of a late change

21  from a structured standpoint, the -- part of the intention

22  and the investment thesis of HCLOF was to pursue a reset, a

23  refinancing of all the underlying CLOs as they approached the

24  end of their investment period or came out of their

25  investment period.

Pugatch - Direct                    107

1      And in connection with that, in light of the arbitration

2   award, Highland's view was that there may be difficulties in

3   the market in resetting certain of those Acis CLOs with the

4   Acis brand associated with them, given, again, the existence

5   of the arbitration award and concerns in the market around

6   the Acis brand reputation.

7   Q    And what did they tell you was the market view of Acis,

8   or the Acis brand?

9   A    Yeah.  Their view or their concern was that the, you

10  know, because of the existence of that arbitration award, the

11  brand would be viewed as toxic.

12  Q    Didn't this put you on notice that perhaps there was

13  something wrong with the structural changes?

14  A    I mean, we -- I mean, short answer, no.  We ultimately

15  asked questions, we diligenced the legal structure, but

16  relied on the representations that were made to us by

17  Highland around the rationale for the structural changes,

18  that these are all changes that were within a Highland-

19  managed vehicle or sat below the vehicle that we were

20  investing in, and so ultimately were in Highland's purview,

21  was the representations that we relied on.

22  Q    And did HarbourVest alone do that diligence of the

23  structural changes?

24  A    So, no.  I mean, in connection with the diligence that we

25  did internally and with Highland directly, we engaged with

004203

1    outside counsel who was working with us at the time to vet

2    those structural changes as well.

3    Q   Did HarbourVest rely on Highland's representations

4    regarding the arbitration award and the structural changes in

5    making its investment in HCLOF?

6    A   We did, absolutely.

7    Q   If Highland had disclosed the nature of the structural

8    changes, of removing Acis as the portfolio manager and

9    related transfers, would HarbourVest have proceeded with its

10   investment?

11   A   Definitively, no, we would not have.

12   Q   Why not?

13   A   I think the reality is if we had understood the intent,

14   you know, that Highland was ultimately undertaking here, we

15   would not have wanted to be any part of this, and certainly

16   getting dragged into all of this, the hassle, the value

17   destruction that we've seen on behalf of the investors and

18   the funds that we manage.  And I would say, lastly, we just

19   full stop would not have done business with a firm who

20   engages with this type of behavior, had we actually known the

21   truth.

22   Q   Mr. Pugatch, are you familiar with the bankruptcy that

23   followed of Acis?

24   A   Yes.

25   Q   And what was your -- or, did HarbourVest participate in

Pugatch - Direct                              109

1   that bankruptcy?

2   A    So, initially, no.  Subsequently, we ended up getting

3   dragged into that on account of a number of misstatements by

4   Highland about the role that HarbourVest had played as part

5   of our investment into HCLOF and some of that structure and

6   the structural changes that I alluded to.

7   Q    How did HarbourVest learn about those misstatements in

8   the bankruptcy about HarbourVest's role?

9   A    So, ultimately, those came to light on -- you know, on

10  account of the ongoing proceedings within the Acis bankruptcy

11  process, and specifically brought to light to us by the Acis

12  trustee at the time, who decided to pursue, you know, further

13  diligence or discovery around the claims that Highland had

14  made around HarbourVest's involvement in those changes.

15  Q    And what is your understanding of what the allegations

16  were that caused the Acis trustee to investigate HarbourVest?

17  A    Sure.  So, you know, our understanding was that Highland

18  had made statements, again, false statements that HarbourVest

19  had actually instructed some of those structural changes,

20  that we were the ones that had said that we would not do

21  business with Acis and had ordered some of the underlying

22  transfer of assets or, again, structural changes, that, you

23  know, very clearly I would say were not the case.  Also, that

24  HarbourVest was -- was calling the shots as it relates to any

25  of the ongoing management or future resets of the CLOs.

1   Q    Did HarbourVest instruct any of those structural changes

2   or transfers to occur?

3   A    We did not.  Absolutely not.

4   Q    Why didn't HarbourVest itself appear in the Acis

5   bankruptcy and file a claim?

6   A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7   passive investor in a Highland-managed company.  We had no

8   direct interaction with or relationship with Acis.  There was

9   really no reason for us to be directly involved until we were

10  subsequently dragged into involvement on account of those

11  misstatements.  And then at that point our focus really

12  pivoted to, you know, whether we needed to defend ourselves

13  against those accusations that had been made by Highland and

14  after a request for further information in discovery by the

15  Acis trustee.

16  Q    Did HCLOF participate in the Acis bankruptcy?

17  A    They did, yes.

18  Q    Did HCLOF incur fees for participating in the Acis

19  bankruptcy?

20  A    Yes.  In fact, very meaningful fees, to the tune of well

21  in excess of $15 million of legal fees, as we understand it,

22  that have been incurred, largely in connection with the

23  ongoing Acis bankruptcy and Highland's continued pursuit of

24  and in connection with the litigation with Mr. Terry, which

25  we firmly believe was entirely inappropriate that HCLOF and

Pugatch - Direct                         111

1  ultimately investors in HCLOF bear those expenses, which were

2  not just expenses of HCLOF but of Highland and a number of

3  other Highland affiliates.

4  Q   Do those expenses form a basis of separate claims filed

5  by HarbourVest against Highland?

6  A   They do, yes.  One of the multiple claims that we had

7  filed against Highland.

8  Q   And a few more questions, just for the record, Mr.

9  Pugatch.  How much did HarbourVest initially invest in HCLOF?

10 A   Sure.  So, our initial investment in November of 2017 was

11 right about $73-1/2 million, I believe.

12 Q   Did HarbourVest invest any additional money in HCLOF?

13 A   We did.  There was a subsequent capital call investment

14 of about $5 million, bringing our total investment to just

15 under $80 million in aggregate.

16 Q   When HarbourVest initially made the investment, did it

17 anticipate making a profit on it?

18 A   We did, yes.

19 Q   How much did HarbourVest anticipate earning from the

20 investment?

21 A   Yeah.  So, our -- based on the original $73-1/2 million

22 investment, we had expected a total return of about $137

23 million on that -- on that investment.

24 Q   What was that projection based on?

25 A   So, that projection was based on materials that we had

Pugatch - Direct                                  112

1  received from Highland, their internal projection models on

2  the future performance of the underlying CLOs that we were

3  acquiring exposure to through our investment in HCLOF, and

4  was one of the inputs or formed the basis in connection with

5  our diligence that we ultimately ran different sensitivities

6  -- projections around and helped employ -- helped inform our

7  investment thesis.

8  Q    Do you know the current value of HarbourVest's investment

9  in HCLOF?

10 A    Yes.  The current value is right around $22-1/2 million.

11 Q    So roughly how much has the investment itself decreased

12 from HarbourVest's initial investment?

13 A    So, net of what was about $4-1/2 million of distributions

14 that we received early on in the investment, we've lost, to

15 date, in excess of $50 million on our original investment.

16 Q    And just for -- to close out, Mr. Pugatch, knowing all

17 that you know, if HarbourVest had known that -- about the

18 nature of the transfers by Acis or Highland's intent with

19 respect to the arbitration award, would HarbourVest have made

20 this investment?

21 A    No.  The reality is, had we known the truth, or even had

22 a sense of the truth, the true intentions behind some of

23 those transfers and ultimately what would have happened, we

24 never would have made this investment, full stop.

25 Q    Thank you, Mr. Pugatch.

Pugatch - Cross                          113

 1            THE COURT:  All right.  I didn't hear you, Ms.

 2   Weisgerber.  Do you pass the witness?

 3            MS. WEISGERBER:  Yes, I pass the witness.

 4            THE COURT:  All right.  Thank you.

 5         Mr. Morris, any examination from you?

 6            MR. MORRIS:  No, thank you, Your Honor.

 7            THE COURT:  All right.

 8         (Interruption.)

 9            THE COURT:  All right.  I'm not sure whose voice that

10   was, but please, again, mute your devices when you're not

11   talking.

12         Any cross-examination of Mr. Pugatch?  I'll start with

13   you, Mr. Wilson.

14            MR. WILSON:  Yes, Your Honor.

15            THE COURT:  Okay.

16                     CROSS-EXAMINATION

17   BY MR. WILSON:

18   Q    How are you -- I guess we're afternoon now.  How are you

19   this afternoon, Mr. Pugatch?

20   A    I'm doing well.  Yourself?

21   Q    I'm doing well as well.  Do you recall that on Monday of

22   this week I took your deposition?

23   A    Yes, I do.

24   Q    And so you understand that my name is John Wilson and I

25   represent Jim Dondero, who has filed an objection to the 9019

```
 1   motion filed by the Debtor?

 2       I've got a few questions for you today.  Has HarbourVest

 3   been around for over 35 years?

 4   A   We have, yes.

 5   Q   And does HarbourVest have ten offices around the world?

 6   A   Correct, yes.

 7   Q   And does HarbourVest employ over 150 investment

 8   professionals?

 9   A   Yes.

10   Q   Does HarbourVest have over $74 billion in assets under

11   management?

12   A   Correct, yes.

13   Q   And is HarbourVest's client base largely comprised of

14   institutional investors?

15   A   Also correct.

16   Q   And you would agree with me that HarbourVest is a

17   sophisticated investor, right?

18   A   I would, yes.

19   Q   How long have you worked for HarbourVest?

20   A   I've been employed by HarbourVest for 17 years now.

21   Q   And how long have you been a managing director?

22   A   I've been a managing director for approximately six

23   years.

24   Q   And you were, in fact, the managing director for the

25   investment that HarbourVest made in Highland CLO Funding,
```

Pugatch - Cross                                    115

 1   Ltd., which has been referred to today as HCLOF, correct?

 2   A    I was, correct.

 3   Q    And HarbourVest, I think you just testified, invested

 4   approximately $73 million as its initial investment in HCLOF?

 5   A    Yes, correct.

 6   Q    And before HarbourVest made that investment, it had made

 7   many investments of this type, correct?

 8   A    Yeah.  We've made hundreds of investments into

 9   partnerships over our history, correct.

10   Q    So HarbourVest was well-experienced in evaluating and

11   deciding whether to invest in large investments, correct?

12   A    It was, yes.

13   Q    Now, in your -- and by your, I mean HarbourVest -- in the

14   response to the Debtor's omnibus objection, it says that by

15   summer 2017 HarbourVest was engaged in preliminary

16   discussions with Highland regarding the investment.  Is that

17   a correct statement?

18   A    Correct, yes.

19   Q    And, in fact, those talks began in the second quarter of

20   2017, correct?

21   A    Yes.

22   Q    And so the investment closed ultimately on November 15th,

23   2017?

24   A    Yes, that's correct.

25   Q    So it's fair to say that HarbourVest considered and

Pugatch - Cross                          116

1    evaluated this transaction for over six months before

2    investing its $73 million, right?

3    A    From the time of the initial conversations that we had

4    with Highland, yes.

5    Q    And one of the reasons that it took over six months to

6    complete the investment is that HarbourVest performs due

7    diligence before it makes an investment, correct?

8    A    Correct.

9    Q    And when you're performing due diligence -- well, first

10   off, you would agree with me that that's a common practice

11   amongst sophisticated investors such as HarbourVest, correct?

12   A    To perform due diligence?

13   Q    Yes.

14   A    Yes.

15   Q    And describe -- describe what HarbourVest does in a

16   general sense when it performs its due diligence.

17   A    Sure.  So, we spend time with the manager -- in this

18   case, Highland -- certainly around the investment thesis, the

19   opportunity, receive materials around the underlying assets.

20   We take that and perform our own independent due diligence

21   around the value of those assets, perform due diligence on

22   the manager itself, the go-forward opportunity.  In many

23   cases, and certainly in this case, engage with outside

24   advisors to assist with that due diligence.  It's a very

25   robust and thorough process.

004212

Pugatch - Cross                117

1   Q    And by outside advisors, are you referring to the outside

2   counsel that you testified about earlier?

3   A    Yes.  Both outside counsel and outside consultants.

4   Q    Okay.  And so did you say that it's typical to engage

5   outside counsel when performing due diligence?

6   A    Yes.

7   Q    And which outside counsel did you retain with respect to

8   this due diligence?

9   A    Debevoise and Plimpton as well as Milbank.

10  Q    And during the course of HarbourVest's due diligence, did

11  it identify some items of concern?

12  A    As with any investment, there are always items that are

13  identified that require further diligence, risks that are

14  identified that we look to mitigate through our due

15  diligence, et cetera.

16  Q    And if Harbour -- I'm sorry, did you say something else?

17  A    No.

18  Q    You were finished?  Okay.  Now, if HarbourVest identifies

19  an item of concern, is it typical to request additional

20  information regarding those items of concern?

21  A    It is, yes.

22  Q    And so that actually happened with respect to the HCLOF

23  investment, correct?

24  A    In certain cases, yes.

25  Q    HarbourVest identified several litigation matters that it

004213

Pugatch - Cross                                    118

1   had questions about, correct?

2   A   Correct.  As we would with any investment.

3   Q   And it went back to Highland and asked them to explain

4   their position on those litigation matters?

5   A   Correct.

6   Q   And one of those litigation matters was the Joshua Terry

7   litigation, correct?

8   A   Yes.

9   Q   And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A   Correct.

14  Q   And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A   Are you referring to the document that we looked at

21  earlier?

22  Q   I am.  And I can put it on the screen if we need to.

23  A   No.  Right, I recall that, and yes, that's correct.

24  Q   Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

Pugatch - Cross                                119

 1  litigation, was issued months before the arbitration award to
 2  Josh Terry, correct?
 3  A   I don't remember the exact timing, but it was certainly
 4  during our due diligence period and prior to the arbitration
 5  award, yes.
 6  Q   Well, it seems to me that that email that you -- your
 7  counsel admitted as an exhibit was issued in August of 2017.
 8  Does that sound right to you?
 9  A   If that's what the email said, yes.
10  Q   And if the Terry arbitration award came out in October,
11  then you would agree with me that that is several months
12  prior to the -- or at least two months prior to the
13  arbitration award?
14  A   Yes.
15  Q   And so when HarbourVest made requests of Highland to
16  provide information regarding its items of concern, Highland
17  complied with those requests, correct?
18  A   It did, correct.
19  Q   And was there ever a time when HarbourVest requested
20  Highland to provide information and that information was not
21  provided?
22  A   Our requests for information, or at least, you know,
23  responses or color to a question, were always met either
24  with, you know, written or verbal communication back to us,
25  yeah.

Pugatch - Cross                          120

1    Q    And you would agree with me that, in fact, HarbourVest

2    delayed the closing of the investment by two weeks to

3    continue its due diligence, correct?

4    A    Correct, related to the structural changes that were made

5    close to closing.  That's right.

6    Q    And after conducting that due diligence, HarbourVest

7    satisfied itself that the investment was sound?

8    A    That the legal structure that had been put in place in

9    connection with those proposed changes by Highland was -- was

10   legally sound, yes, and on the back of, again, statements and

11   misrepresentations on the part of Highland around the nature

12   and potential impact to their ongoing CLO business and HCLOF.

13           MR. WILSON:  Well, I'm going to object to the latter

14   part of your response as nonresponsive.

15           THE COURT:  Sustained.

16   BY MR. WILSON:

17   Q    Now, after you conducted the due diligence, HarbourVest

18   made the investment of $73 million on November 15th, 2017,

19   correct?

20   A    Correct.

21   Q    And so I think you testified earlier that prior to that

22   investment HarbourVest had become aware that that Josh Terry

23   litigation had resulted in an arbitration award, correct?

24   A    Yes.

25   Q    But I think you've also testified that HarbourVest did

Pugatch - Cross                              121

1  not request that Highland provide a copy of the arbitration

2  award, correct?

3  A    That's correct.

4  Q    And you further testified that you were represented by

5  outside counsel at the time, correct?

6  A    Correct.

7  Q    And as of Monday of this week, you had not reviewed that

8  arbitration award; is that correct?

9  A    That's correct.

10 Q    Have you reviewed that arbitration award since Monday of

11 this week?

12 A    I have not.

13 Q    But in any event, you testified that Highland told you

14 about the award?

15 A    Yes.

16 Q    And they told you the amount of the award?

17 A    Yes.

18 Q    And then they told you that the award had been converted

19 to a judgment?

20 A    When you say the award had been converted to a judgment,

21 can you be more specific?

22 Q    Well, I don't know how familiar you are with the

23 litigation process, but in this instance, that award was

24 taken to a court and the court entered a judgment on the

25 arbitration award.  Did you -- were you aware of that?

1  A    I don't recall the specific legal terms of judgment

2  against it.  I was award of the existence of the arbitration

3  award and the -- and the obligation for Highland to comply

4  with that arbitration award.

5  Q    And HarbourVest did not make an appearance in the Acis

6  bankruptcy, right?

7  A    We did not.

8  Q    But you were aware of the Acis bankruptcy, correct?

9  A    Yes.

10 Q    And you were kept apprised of the Acis bankruptcy by

11 Highland individuals, correct?

12 A    We had conversations with a couple of Highland

13 individuals throughout the Acis bankruptcy process, yes.

14 Q    Right.  And in fact, you testified that you participated

15 in regular conference calls with Highland regarding that

16 bankruptcy?

17 A    That's correct, yes.

18 Q    And do you recall having been provided with over 40,000

19 documents by Highland related to the Acis bankruptcy?

20 A    I do not recall that, no.

21 Q    Would those documents have been provided to your outside

22 counsel, had you received them?

23 A    I don't know the answer to that.

24 Q    Did the outside counsel that represented you in the due

25 diligence continue to represent you throughout the Acis

Pugatch - Cross                        123

1  bankruptcy?

2  A    They did.  One of the counsels did, correct.

3  Q    And which counsel was that?

4  A    Debevoise.

5  Q    So was your counsel actively involved with monitoring the

6  Acis bankruptcy?

7  A    They were, yes, particularly after we were ultimately

8  accused of having something to do with the original structure

9  and -- as a result of misstatements by Highland.

10 Q    Did your counsel attend hearings in the Acis bankruptcy?

11 A    I don't recall.

12 Q    Are you familiar with the PACER system?

13 A    I am not.

14 Q    Now, I think that HarbourVest has been described as a

15 passive investor.  You recall that description of HarbourVest

16 in this instance?

17 A    Yes.

18 Q    But, in fact, HarbourVest invested substantial assets

19 such that it owned a 49.98 percent share of HCLOF.  Would you

20 agree with that?

21 A    That's correct.

22 Q    And in fact, the next largest investor was CLO Holdco,

23 which owned 49.02 percent of the shares, correct?

24 A    That sounds right.

25 Q    And there was an advisory board that was created pursuant

004219

Pugatch - Cross                                      124

1   to the formation documents of this investment, correct?

2   A    That's correct.

3   Q    And in fact, that advisory board only had two members,

4   and one was a representative of HarbourVest and one was a

5   representative of CLO Holdco, correct?

6   A    Correct.

7   Q    And the advisor -- I'm sorry, the portfolio manager was

8   not allowed to disregard the recommendations of the advisory

9   board, correct?

10  A    With respect to the limited set of items that the

11  advisory board could opine on, that is correct.

12  Q    All right.  I want to go over a couple of the

13  misrepresentations that HarbourVest has identified in its

14  filings related to its claim.  The first one is -- and just

15  for the record, I'm reading from ==Docket No. 1057== filed on

16  September 11, 2020, HarbourVest Response to Debtor's First

17  Omnibus Objection.

18       But the first misrepresentation identified in that

19  document says that Highland never informed HarbourVest that

20  Highland had no intention of paying the arbitration award.

21  And was -- was Highland obligated to pay the Josh Terry

22  arbitration award against Acis?

23       MR. MORRIS:  Objection to the question to the extent

24  it calls for a legal conclusion.

25       THE COURT:  Sustained.

Pugatch - Cross                              125

1           MS. WEISGERBER:  Join in that objection.

2           THE COURT:  Sustained.  I think --

3    BY MR. WILSON:

4    Q    Your understanding was --

5           MR. WILSON:  I'm sorry, Judge?

6           THE COURT:  I sustained the objection as calling for

7    a legal conclusion.  So, next question.

8           MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

9    Honor.

10   BY MR. WILSON:

11   Q    In your understanding, was Highland responsible for

12   paying the arbitration award to Josh Terry?

13   A    My understanding is on the account of the fact that Acis

14   --

15          MS. WEISGERBER:  Objection, Your Honor.  Objection,

16   Your Honor, same basis.

17          THE COURT:  Sustained.  It was essentially the same

18   question.

19          MR. WILSON:  Well, Your Honor, I didn't ask --

20          THE COURT:  It was essentially the same question, Mr.

21   Wilson.  Move on.

22          MR. WILSON:  Okay.

23   BY MR. WILSON:

24   Q    The next misrepresentation identified by HarbourVest said

25   that Highland did not inform HarbourVest that it undertook

Pugatch - Cross                              126

1    the transfers to siphon assets away from Acis, LP and that

2    such transfers would prevent Mr. Terry from collecting on the

3    arbitration award.  So the basis for that allegation would be

4    that Highland was siphoning assets from Acis to avoid having

5    Acis pay the arbitration award, correct?

6    A    That -- that would be the implication, yes.

7    Q    Okay.  And then that misrepresentation continues on and

8    says that Highland represented to HarbourVest that it was

9    changing the portfolio manager because Acis was toxic.  And

10   do you recall that representation being made to you?

11   A    Yes, I do.

12   Q    And would you agree with me that whether or not Acis is

13   toxic in the industry would be an opinion?

14   A    I suppose it would be an opinion, but by the manager of

15   the vehicle responsible for managing the HCLOF investment and

16   the underlying CLOs.  Yeah, we viewed the Acis name and the

17   Highland name as synonymous, if you will.  I mean, Acis was a

18   subsidiary of Highland.  For all intents and purposes, it was

19   the same from our perspective as we made the investment into

20   HCLOF.

21   Q    So did HarbourVest have an independent understanding of

22   whether or not the Acis name was toxic in the industry?

23   A    We did not, no.  We relied on Highland's views of that as

24   manager of HCLOF.

25        MR. WILSON:  Your Honor, just a brief housekeeping

Pugatch - Cross                    127

1    item.  Did you say that we need to be done at 1:00 o'clock?

2          THE COURT:  Well, I said I really wanted you to be

3    done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4    o'clock docket and I'd rather not have to hang up 70-

5    something people and reconnect them again at 3:00 o'clock.

6    How close are you to being finished?

7          MR. WILSON:  Well, --

8          THE COURT:  This is going at a very slow pace.

9          MR. WILSON:  Well, I apologize for that, Your Honor.

10   I think I've got at least ten more minutes, but -- but I know

11   we also have closing remarks.  And I was just going to ask if

12   Your Honor had a preference of --

13         THE COURT:  Keep going.

14         MR. WILSON:  -- of breaking now --

15         THE COURT:  Keep -- let's --

16         MR. WILSON:  -- or keep going?  Okay.

17         THE COURT:  Let's talk fast and try to get through.

18   You know, even if I'm sacrificing lunch today, I don't want

19   to inconvenience 75 people this way.  So we'll just probably

20   start our 1:30 hearing a little late and inconvenience those

21   people.

22      All right.  Go ahead.

23         MR. WILSON:  All right.  Thank you, Your Honor.

24   BY MR. WILSON:

25   Q   Did Acis form its -- I can't recall if you answered this

Pugatch - Cross                    128

1   question, but did Acis form its own opinion on whether or not

2   -- I'm sorry, strike that.  Did HarbourVest form its own

3   opinion on whether or not the Acis name was toxic in the

4   industry?

5           MS. WEISGERBER:  Objection, --

6           THE WITNESS:  We did not.  We didn't have a basis.

7           THE COURT:  I'm sorry, did I have an objection?

8   BY MR. WILSON:

9   Q   You did not --

10          THE COURT:  Did I have an objection?

11          MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12  asked and answered, Your Honor.

13          THE COURT:  Overruled.  He can answer.

14  BY MR. WILSON:

15  Q   Okay.  But --

16  A   We did not.

17  Q   Did Highland have the ability to investigate the Acis

18  name and make its own determination of whether that name was

19  toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20  A   HarbourVest had the ability to do that, yes.

21  Q   I apologize I misspoke.  I meant HarbourVest.  Did

22  HarbourVest have the ability to investigate that name and

23  determine if it was toxic?

24  A   It was irrelevant to our investment thesis.  And as I

25  said before, Acis was a subsidiary of Highland.  We viewed

Pugatch - Cross                     129

1  them as interchangeable in the context of our investment.

2  Q   Okay.  The next misrepresentation that you refer to says

3  that Highland indicated to HarbourVest that the dispute with

4  Mr. Terry would have no impact on its investment activities.

5  Would you agree with me that that is also an opinion?

6  A   It was a statement that --

7        MS. WEISGERBER:  Your Honor, I'm going to object to

8  the extent these questions are seeking a legal conclusion

9  regarding, you know, if something's an opinion or not.

10        THE COURT:  Okay.  Overruled.  He can answer.

11        THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q   And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A   On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

004225

Pugatch - Cross                         130

1  Q    And you just testified that you thought that Acis and

2  Highland were interchangeable from the perspective of the

3  investment opportunity, correct?

4  A    Correct.

5  Q    But you also accepted Highland's recommendation because

6  HarbourVest agreed that the change in the -- to a Highland

7  manager made commercial sense, correct?

8  A    We took at face value what Highland recommended because

9  this all had to do with the structuring of an entity that

10 they fully managed with respect to multiple underlying

11 subsidiaries that weren't managed by Highland.

12 Q    But would you agree that, at the time, you -- HarbourVest

13 thought that made commercial sense?

14 A    It did not seem unreasonable to us based on the

15 explanation we were given.

16 Q    Okay.

17       MR. WILSON:  I want to refer to HarbourVest Exhibit

18 39.

19    (Pause.)

20       THE COURT:  What are we waiting on?  What are we

21 waiting on?

22       MR. WILSON:  I'm trying to get the document on the

23 screen, Your Honor.

24    (Pause.)

25       THE COURT:  We can't hear you.  We can't hear you.

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-20   Exhibit 20   Page 109 of 276   Page 109 of 276   PageID 4629

Pugatch - Cross                              131

 1            MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

 2    speaking with my --

 3            THE COURT:  Okay.

 4            MR. WILSON:  -- co-counsel here.

 5            THE COURT:  All right.

 6        (Pause.)

 7            MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

 8    you're referring to?

 9            MR. WILSON:  39.   HarbourVest 9019 motion on the

10    main -- on the Dondero file.  And then there's the -- it's --

11    it's John  -- and then there's the HarbourVest, and then the

12    exhibits are all in one file.

13            MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14    was subject to confidentiality based on HCLOF's request.

15    HCLOF's counsel is present.  I think they know it's an

16    excerpt.  But I'd just -- that for HCLOF's counsel.

17            MR. WILSON:  Well, is there an objection to showing

18    this document on the screen?  Yes.  All right.  We're not

19    going to put Document 39 on the screen.

20            A VOICE:  Yes.

21            MR. WILSON:  All right.  Scroll down to the next

22    page.

23    BY MR. WILSON:

24    Q   This is a -- this is a document that was produced to us

25    this week, the Highland production.  It appears to be a

Pugatch - Cross                          132

1    Highland CLO Funding, Ltd. Statement of Operations for the

2    Year Ended 31 December 2017.  Do you see at the top of that --

3    at the top of that document where it says total investment

4    income of $26 million?

5    A    I do, yes.

6    Q    And total expenses were roughly $1.8 million?

7    A    Yes.

8    Q    And then net change and unrealized depreciation on

9    investments and net realized loss on investments was $4.26

10   million cumulative, resulting in a net increase in net assets

11   resulting from operations of $20.224 million.  Do you agree

12   with that?

13   A    Yes.

14   Q    Okay.

15            MR. WILSON:  Go to the next one.

16   BY MR. WILSON:

17   Q    And you understand that, in the course of the Acis

18   bankruptcy, the portfolio managers for certain of the CLOs

19   were changed by the Trustee, correct?

20   A    Yes, around the underlying CLOs.  That's -- that's my

21   understanding, yes.

22   Q    And, in fact, Mr. Seery testified earlier today that that

23   occurred in the summer of 2018, correct?

24            MR. WILSON:  Scroll.

25            THE WITNESS:  I don't recall the timing, but that's

004228

Pugatch - Cross                          133

1  what he testified to.

2  BY MR. WILSON:

3  Q   Well, this document is HarbourVest Exhibit 40, and this is

4  the statement of operations for the financial year ended 31

5  December 2018.  Here, the total investment income is only

6  $11.1 million.  Do you see that?

7  A   I do.

8  Q   And do you see where the expenses have increased to $13.6

9  million?

10  A   I do, yes.

11         MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q   And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A   Yes.

16  Q   And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19         MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21         THE COURT:  Overruled.  He --

22         MR. WILSON:  Your Honor, --

23         THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25         MR. WILSON:  Thank you, Your Honor.  Thank you, Your

Pugatch - Cross                        134

1    Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2    right.  I'll --

3    BY MR. WILSON:

4    Q    Did you answer the question, Mr. Pugatch?

5    A    No, I -- I would agree with the second part of your

6    statement that for the year 2018 the -- the loss was $52

7    million.  I don't -- I don't believe that jives with the first

8    part of your statement that that was after Acis and Brigade

9    took over.  As I understand, that was in the middle of the

10   year.

11   Q    But in any event, Acis and Brigade had been managing this

12   for at least six months of 2018 when that loss occurred,

13   correct?

14   A    They had been managing a portion of the underlying CLO

15   portfolio held by Highland CLO Funding.

16   Q    All right.  We're now looking at Exhibit #41, which is the

17   Draft Unaudited Statement of Comprehensive Income, 31 December

18   2019.  Total income has now dropped to $4.664 million.

19           MR. WILSON:  And scroll down.

20   BY MR. WILSON:

21   Q    Expenditures are at $3.645 million.  And then it says

22   investment gains and losses net out to $11.493 million, a

23   negative $11.493 million.  And --

24           MR. WILSON:  Scroll down to the --

25   BY MR. WILSON:

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 20   Page 113 of 274   Page 113 of 276   PageID 4633

Pugatch - Cross                     135

1  Q    And so would you agree with me that in the year 2019,

2  HCLOF showed a net loss of $10.476 million?

3  A    Yes, that's what the financial statements say.

4  Q    And in this year, the Acis CLOs were solely managed by

5  Acis and Brigade, correct?

6  A    The Acis CLOs were.  Yes, correct.

7  Q    All right.

8       MR. WILSON:  Now, go to 42.

9  BY MR. WILSON:

10 Q    Now, this is HarbourVest #42.

11      MR. WILSON:  Go down to the next page.

12 BY MR. WILSON:

13 Q    And this is the Highland CLO Funding, Ltd. Unaudited

14 Condensed Statement of Operations for the Financial Period

15 Ended 30 June 2020.  And so this is just half a year of

16 operations.  And would you -- and this actually has a

17 comparison between 2019 and 2020.  But do you see where it

18 says investment income has dropped from a million dollars in

19 the first half of 2019 to $381,000 in the first half of 2020?

20 A    Yes.

21      MR. WILSON:  Okay.  Scroll down.

22 BY MR. WILSON:

23 Q    And do you see where, in the first half of 2019, total

24 expenses were $1.85 million, and then in the first half of

25 2020 total expenses were $2.16 million?  Do you see that?

Pugatch - Cross                    136

1   A    I do.

2   Q    And if you go down below that, where it says Net Realized

3   and Unrealized Gain/Loss on Investments, the first half of

4   2019 HCLOF lost $12 million, and in the first half of 2020 it

5   lost $39.472 million?

6          MR. MORRIS:  Your Honor, I'm going to object.  It's

7   John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8   he can offer this document into evidence.  There's no

9   foundation that Mr. Pugatch has any particularized knowledge

10  about any of the numbers behind this.  All he's asking him to

11  do is to confirm what the document says.  It says what it

12  says.  But this -- I'll object on that basis, Your Honor.

13         THE COURT:  All right.  Mr. Wilson, what about it?

14  You're just getting him to read numbers off of these exhibits.

15         MR. WILSON:  Well, --

16         THE COURT:  Shall we just --

17         MR. WILSON:  -- I understood --

18         THE COURT:  -- by stipulation get them into evidence?

19         MR. WILSON:  Well, --

20         MR. MORRIS:  No objection, Your Honor.

21         MS. WEISGERBER:  No objection.

22         THE COURT:  All right.  So these are exhibits what?

23  We've gone through 39, 41, and I don't know what else.  40,

24  maybe?

25         MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Pugatch - Cross                    137

1  were on the HarbourVest exhibit list.

2           THE COURT:  All right.  Those will be admitted, and

3  we've already discussed what docket entry number they appear

4  at.

5      (HarbourVest's Exhibits 39 through 42 are received into

6  evidence.)

7           THE COURT:  All right.  Anything else?  You told me

8  you had 10 more minutes about 15 minutes ago.

9           MR. WILSON:  Well, I'm sorry if I -- I think I had

10  said I had at least ten more minutes, and I was looking at the

11  -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12  have longer than that.  I'm sorry, Your Honor.

13           THE COURT:  Well, --

14           MR. WILSON:  But --

15           THE COURT:  -- I feel like I'm being --

16           MR. WILSON:  -- I'll try to proffer --

17           THE COURT:  Okay, Mr. Wilson, let me just tell you

18  something.  I feel like I'm being disrespected now, and the

19  parties are.  We really need to pick up the pace.  I've told

20  you I've got a 1:30 docket -- with four or five matters on it,

21  by the way.  I've got a 2:00 o'clock docket.  I'm starting

22  them late.  No one advised my courtroom deputy that we were

23  going to need all day today for this, okay?  So you've got

24  five more minutes to wrap it up, and then, of course, I have

25  to go to Mr. Draper and see if he has cross.  All right?  So

Pugatch - Cross                                138

 1   please don't test my patience any more.  Five minutes to

 2   finish.

 3            MR. DRAPER:  Judge, I have no questions.

 4            THE COURT:  I didn't hear you, Mr. Draper.  What did

 5   you say?

 6            MR. DRAPER:  I have no questions.

 7            THE COURT:  All right.  Very good.

 8            MR. WILSON:  I apologize, Your Honor.  I was actually

 9   trying to be respectful of your time when I informed you that

10   I had at least ten more minutes left at 12:50, but I will try

11   to be as expedient as I can as I finish up.

12   BY MR. WILSON:

13   Q   And I don't see you on my screen.

14            MR. WILSON:  You can take that document down.

15            THE WITNESS:  Here.

16   BY MR. WILSON:

17   Q   Mr. Pugatch, do you have an opinion as to what caused

18   these incredible losses of value at HCLOF?

19            MS. WEISGERBER:  Objection to the extent it calls for

20   a legal conclusion.

21            THE COURT:  Overruled.  He can answer.

22            THE WITNESS:  I would say that there's no one cause

23   for the decline in value.  I can point to a number of

24   different things, including the exorbitant fees that were

25   charged to HCLOF, including the inability to be able to re --

Pugatch - Cross                            139

1    refinance the CLOs on the part of HCLOF, all of which stems

2    from the actions that Highland took prior to our investment in

3    HCLOF.

4    BY MR. WILSON:

5    Q    And you've -- I think it's been referenced several times

6    in HarbourVest's arguments that -- that the reset was a

7    fundamental -- the inability to get a reset was a fundamental

8    cause of the loss in value.  Is that -- is that HarbourVest's

9    position?

10   A    That -- that is a part of the -- the cause in the

11   declining value of the CLOs, yes.

12   Q    And you would agree with me that a reset is fundamentally

13   a reset of interest rates, correct?

14   A    Of the interest rates of the liabilities of the -- the

15   timing for repayment of those liabilities, yes.

16   Q    Now, just say with -- for the sake of a hypothetical

17   example.  If you had a home that was valued at $5 million, or

18   let's just say $500,000, let's make it more realistic.  If you

19   had a $500,000 home and you had a mortgage on that home at

20   five percent interest, your inability to refinance that home

21   at a lower interest rate would not affect the underlying value

22   of that home, correct?

23        MS. WEISGERBER:  Objection, Your Honor. Hypothetical.

24   And objection to relevance as well.

25        THE COURT:  Sustained.

Pugatch - Cross                         140

1          MS. WEISGERBER:  Calls for speculation.

2          THE COURT:  Sustained.

3   BY MR. WILSON:

4   Q   Is there any reason to believe that the change in the

5   interest rate would have prevented the massive losses of

6   investment value that occurred in HCLOF?

7          MS. WEISGERBER:  Object on the same grounds.

8          THE COURT:  Sustained.

9          THE WITNESS:  The short -- the short answer is yes,

10  with a -- with the amount of leverage --

11         MS. WEISGERBER:  I --

12         THE WITNESS:  -- that exists.  Oh, sorry.

13         MS. WEISGERBER:  The objection was sustained.

14         THE COURT:  Yeah, I sustained the objection.  That

15  means you don't answer.

16         THE WITNESS:  I'm sorry, Your Honor.

17  BY MR. WILSON:

18  Q   So, would you agree with me that if the expenses and the

19  fees charged by the portfolio manager increased dramatically,

20  that would -- that would impact the value of the investment,

21  correct?

22         MS. WEISGERBER:  Objection on the same grounds, and

23  relevance.  This is a 9019 hearing, Your Honor.  We are not

24  here to try every minutia.  And in fact, we're trying to avoid

25  a trial on the merits.  And it feels like we're getting a bit

1   far afield now.

2            THE COURT:  I sustain.

3            MR. WILSON:  All right.  I'll pass the witness.

4            THE COURT:  All right.  Mr. Draper said he had no

5   cross.  So, any redirect, Ms. Weisgerber?

6            MS. WEISGERBER:  No, Your Honor.

7            THE COURT:  All right.  Mr. Morris, did you have any

8   redirect?

9            MR. MORRIS:  I do not, Your Honor.  I have a very

10  brief closing and then some additional remarks if -- if we

11  finish.

12           THE COURT:  All right.  So, Mr. Pugatch, that

13  concludes your testimony.  Thank you.  You're excused if you

14  want to be.

15      All right.  So, as I understood it, there would be no more

16  evidence after this.

17           MR. WILSON:  Well, Your Honor, along those lines, as

18  a housekeeping measure, I think everything on my exhibit list

19  is included on someone else's exhibit list, but just for belt

20  and suspenders I would move to admit all of the exhibits on

21  the -- on Mr. Dondero's exhibit list.

22           THE COURT:  Well, is that agreed or not?  Because we

23  didn't have a witness to get them in.

24           MR. MORRIS:  No objection, Your Honor.

25           THE COURT:  Any objection?  All right.  If there's no

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 20   Page 193 of 374   Page 120 of 276   PageID 4640

142

 1  objection, I'll --

 2          MR. MORRIS:  Your Honor, --

 3          THE COURT:  I'm sorry.  Was there an objection?  I

 4  will admit Dondero Exhibits A through M, and those appear at

 5  Docket Entry 1721, correct, Mr. Wilson?

 6          MR. WILSON:  That is correct, Your Honor.

 7          THE COURT:  All right.

 8          MR. WILSON:  That is correct, Your Honor.

 9     (James Dondero's Exhibits A through M are received into

10  evidence.)

11          MR. WILSON:  And one final matter is, during the

12  examination of Mr. Seery, you at least partially admitted

13  Dondero's Exhibit N, and I was wondering if we need to -- how

14  we'd need to submit that for the record.

15          THE COURT:  Okay.  First, I'm confused.  I think you

16  said Mr. Terry's testimony.  You --

17          MR. WILSON:  I said Seery.  I'm sorry.

18          THE COURT:  Oh, Seery?

19          MR. WILSON:  Or I may have said Terry, but I meant to

20  say Seery.

21          THE COURT:  Okay.  Maybe you said it.  Okay.  During

22  Mr. Seery's testimony -- oh, the email that I admitted a

23  portion of?

24          MR. WILSON:  That is -- that's correct, Your Honor.

25          THE COURT:  What -- what are you asking?  It's not in

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Page 0141 of 1374   Page 121 of 276   PageID 4641

143

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3           MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6           THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9           MR. WILSON:  Okay.  Thank you, Your Honor.

10          THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13          MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

144

1   about.  They just don't.  The fraudulent transfers led to the

2   bankruptcy, led to the appointment of a trustee, led to --

3   right?  So, so it's -- that's why -- but they're getting

4   something for their claim.

5        It was a hard negotiation, Your Honor.  There is no

6   dispute that if we litigated this it would be complex.  It

7   would fact-intensive.  The Debtor would be forced to rely upon

8   witnesses who are no longer employed by it.  That it would be

9   expensive, for sure.  There's no dispute about any of that.

10  There's no dispute that the creditor body has spoken loudly

11  here by unanimously refraining from objecting except for Mr.

12  Dondero and the entities controlled by him.

13       And you heard Mr. Seery's testimony.  I think he

14  exhaustively informed the Court as to the process by which the

15  transaction was analyzed and negotiated, and there's no

16  evidence to the contrary that this was an arm's-length

17  negotiation.

18       Unless Your Honor has any questions, we would request that

19  the motion be granted.

20           THE COURT:  Thank you.  Ms. Weisgerber, your closing

21  argument?

22             CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23           MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24  also be brief.  We again join in Mr. Morris's arguments and

25  comments.

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-9   Page 346 of 874   Page 123 of 276   PageID 4643

145

 1      The Court has now heard testimony from Mr. Pugatch

 2   regarding the factual detail underlying HarbourVest's claims.

 3   The Court has also heard about the significant damages that

 4   HarbourVest stands to recover for those claims.  And

 5   HarbourVest came to this Court ready to litigate.  It would --

 6   it's ready to do so if needed.  It believes it would prevail

 7   on its claims if it had to do so.

 8      But the Court also heard from Mr. Seery about his

 9   understanding of HarbourVest's claims, his calculus, and his

10   decision to settle them.  And we submit that nothing further

11   is needed by this Court in order to approve the settlement.

12   This is a question of the Debtor's business judgment.  We're

13   not here to have a trial on the merits of HarbourVest's

14   claims.  The Objectors have made various arguments, including

15   about the cause of HarbourVest's damages.  But even the nature

16   of the legal claims that HarbourVest is asserting, some do not

17   require a loss causation.  So we submit that's not even

18   relevant to the merits of the claims.

19      The settlement is clearly in the best interest of the

20   estate, and we respectfully request that the Court approve it.

21           THE COURT:  Thank you.  All right.  Mr. Wilson, your

22   closing argument?

23           MR. LYNN:  Michael Lynn.  I will give the closing

24   argument, if that's satisfactory to the Court.

25           THE COURT:  All right.  Go ahead.

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 9   Page 197 of 287   Page 124 of 276   PageID 4644

146

<pre>
 1                CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

 2           MR. LYNN:  Good afternoon, Your Honor.  I just want

 3     to make a few points, and I'll try to do it as quickly as

 4     possible.

 5        First, I feel compelled to address the argument of the

 6     Debtor that Mr. Dondero is repeating his litigious behavior

 7     from the Acis case.  I don't know about the Acis case.  I

 8     wasn't involved except very, very peripherally.  But with

 9     respect to this case, we have only taken positions in court

10     that we believed -- that is, his lawyers -- believed were

11     warranted by law, facts as we knew them, and that are

12     consistent with professionalism.  I'd be glad to explain any

13     position we took.

14        Often, through the Debtor's very persuasive powers, we

15     never had the chance to explain our position previously to the

16     Court.  In fact, for the most part, as today, we have been

17     reactive rather than commencing proceedings.  In fact, during

18     the first seven months of this case, we only appeared in court

19     a few times, when we felt we had to -- for example, when

20     discovery was being sought by the Creditors' Committee that we

21     feared might invade privilege.  Then, much to the Debtor's

22     fury, we opposed the Acis 9019.  We did so because we thought

23     it was too much.

24        Since, as the Court can see, the principal instigators of

25     litigation have been the Debtor, and to a lesser extent, the
</pre>

147

1   Committee.

2        Indeed, in an apparent effort to drown Mr. Dondero and his

3   counsel in litigation, the Debtor has repeatedly sought court

4   action on a very short fuse, claiming need for expedited

5   hearing.

6        Perhaps the most startling example of this is the recent

7   contempt motion, for which there is no good reason for a quick

8   hearing.  Resolution of that motion is not necessary to reach

9   the confirmation hearing.  The motion could be heard after the

10  confirmation hearing.  There is no need to put Mr. Dondero and

11  his professionals in a position where they have to respond in

12  a couple of days, two business days, and then will have two

13  days to prepare for trial.

14       Second, Your Honor, Mr. Seery has repeatedly asserted,

15  contrary to today's motion, that the HarbourVest claim was of

16  no merit.  That is why, when he came in to settle for tens of

17  millions of dollars, we opposed this motion.  It appears that

18  the motion is occurring without any cross-party discovery.

19  There is no consideration, apparently, of trying dispositive

20  -- dispositive motions first.  There is no consideration for

21  junior classes of equity, which Mr. Seery has previously

22  opined were in the money.  This, even though there's no reason

23  that this settlement is necessary pre-confirmation, unless Mr.

24  Seery wants HarbourVest's vote.

25       Third, for whatever reason, that seems to be the driving

148

 1  factor for settling.  On its face, the vote seems to be a key

 2  factor of the settlement.  About the longest provision of the

 3  settlement agreement relates to voting.  The motion itself --

 4  in the motion itself, five of seven bullet points cited by the

 5  Debtor for approval of the settlement deal with and emphasize

 6  support of the plan or the vote that is to be cast for the

 7  plan.

 8      If the settlement is a good deal, it didn't need to have

 9  as one of its parts the requirement that HarbourVest vote for

10  the plan.

11      Your Honor, I'll stop there.  I know Your Honor would like

12  to get just a few minutes before your 1:30 docket.  I've been

13  there and I understand that, and I do apologize for taking the

14  time we have, but I think that responsibility is shared with

15  the Debtor and HarbourVest.

16      Thank you, Your Honor.

17          THE COURT:  All right.  Thank you for that.

18      Mr. Draper, any closing argument from you?

19    CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20          MR. DRAPER:  Yes, I have three comments.  The first

21  is the claim -- the loss claim, absent the fraud claim, is, at

22  best, $7 million.  I think Mr. Seery's argument that a hundred

23  -- one hundred percent is attributable to there is just wrong.

24  If he and I both invested in a company 50-50 and it goes

25  broke, we only lost 50 cents each.

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-20   Page 150 of 374   Page 127 of 276   PageID 4647

149

1      Number two, I think the Court heard the evidence.  I think
2   this is, at best, a subordinated claim under 5 -- under the
3   Bankruptcy Code.  It's really a "But for the
4   misrepresentations, we wouldn't have invested."
5      And the last one is the -- Judge Lynn represented the
6   voting, so I won't deal with that.  But the one that troubles
7   me the most is the fact that this asset that is ultimately
8   being paid for in claim dollars that's being transferred over
9   to the Debtor and being put it outside the estate, outside the
10  purview of this Court, and placed in some subsidiary, this --
11  this transaction, if it is approved, must -- should contain a
12  provision that the asset that's being acquired come into the
13  Debtor and be owned by the Debtor.
14          THE COURT:  All right.
15          MR. DRAPER:  I have nothing further, Your Honor.
16          THE COURT:  Thank you, Mr. Draper.
17      Mr. Morris, you get the last word since it's your motion.
18          MR. MORRIS:  Very quickly, Your Honor.  The
19  subordination argument doesn't hold water.  This is not a
20  claim against the Debtor for the security; it's a claim for
21  fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,
22  that might make sense, but this is a claim against the Debtor.
23  And it's a Debtor -- it's a claim for fraud.  That's number
24  one.
25      Number two, we need to keep this exactly as it's been

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 20   Page 137 of 287   Page 128 of 276   PageID 4648

150

1   structured in order to avoid litigation.  Mr. Seery told the

2   Court.  I'm sure the Court can make its own assessment as to

3   Mr. Seery's credibility as to whether or not the Debtor is

4   intending to somehow get this asset beyond the Court.

5       But there are reasons why we've done this, Your Honor.

6   They could have made an objection on that basis.  In fact, if

7   they did, it would be overruled, because there's no -- there's

8   no basis for this Court to find that somehow the Debtor and

9   Mr. Seery are doing something untoward to get assets away from

10  this Court's jurisdiction.

11      You know, I don't know what to say about Mr. Lynn's

12  commentary.  Much of it had nothing to do with any evidence in

13  the record.

14      The fact remains, Your Honor, that this settlement is

15  fair.  It's reasonable.  It's in the best interest of the

16  estate.  And we would respectfully request that the Court

17  grant the motion.

18          THE COURT:  All right.  Thank you.  Well, I

19  appreciate all the arguments and evidence I have heard today.

20  I'm going to be brief in my ruling here, but I reserve the

21  right to supplement in a more fulsome written order, which I'm

22  going to instruct Mr. Morris to submit.  I am approving the

23  motion to compromise the HarbourVest claim today, and I guess

24  subsumed in that is granting the motion to allow their claim

25  for 3018 voting purposes.

151

1    I in all ways find this compromise to meet the required

2    legal standard set forth in such cases as *TMT Trailer Ferry*,

3    *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4    cases.

5        First, I'm going to specifically say for the record that I

6    found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7    very credible.  Very credible testimony and meaningful

8    testimony was provided to the Court today.  And based on that

9    testimony, I find, first, that this compromise was the product

10   of arm's-length negotiations.  It was a hard-fought

11   negotiation, as far as I'm concerned.  The Debtor objected to

12   these numerous HarbourVest proofs of claim.  The Debtor did

13   not want to allow HarbourVest a significant claim for voting

14   purposes.  I duly note the statements made in the disclosure

15   statement before this compromise was reached suggesting, you

16   know, the Debtor didn't think HarbourVest should have a large

17   claim.

18       That is consistent with everything I typically see in a

19   bankruptcy case when there's a claim objection.  The objector

20   vehemently denies the claimant should have a proof of claim,

21   and then people sit down and think about the risks and rewards

22   of litigating things.  And I believe very fervently that's

23   what happened here.  There were good-faith, arm's-length

24   negotiations that resulted in this proposed compromise.

25       I find the compromise -- and I'll add to that point, on

004247

152

1   the good-faith point, I find nothing sinister or improper

2   about the fact that the compromise includes a commitment of

3   HarbourVest to vote in favor of the plan.  Again, we see this

4   a lot.  You know, there's even a buzz word that doesn't even

5   exist in the Bankruptcy Code:  "plan support agreement."  You

6   know, we see those a lot -- you know, oftentimes negotiated

7   before the case, but sometimes after.  You know, it may be

8   improper in certain situations, but there was nothing here

9   that troubles me about that component of the compromise.

10      I find the compromise to meet the paramount interest of

11  creditors here.  Notably, we have very large creditors in this

12  case who have not objected.  The *Foster Mortgage* case from the

13  Fifth Circuit tells me I am supposed to consider support or

14  opposition of creditors.  No opposition of UBS.  No opposition

15  of the Redeemer Committee Crusader Fund.  No opposition from

16  Josh Terry or Acis.  No opposition from Daugherty.

17      But moreover, when considering the paramount interest of

18  creditors, I find this compromise to be in all ways fair and

19  equitable and in the best interest of the estate, and

20  certainly within the range of reasonableness.  The evidence

21  showed that HarbourVest asserted over $300 million.  Over $300

22  million.  Granted, that was based on all kinds of legal

23  theories that would be contested and expensive to litigate,

24  but the evidence also showed that they invested over $70

25  million.  You know, close to $75 million.  I forget the exact

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 16-20   Page 154 of 874   Page 131 of 276   PageID 4651

153

1   number.  $75 or $80 million, somewhere in that range.  And now

2   the credible evidence is that investment is worth about $22

3   million.

4        So, certainly, while the claim may not have, at the

5   ultimate end of the day in litigation, resulted in a $300

6   million proof of claim, certainly, certainly there were strong

7   arguments for a very sizeable claim, more than this compromise

8   amount.  So it's certainly fair and equitable and reasonable

9   when considering the complexity and duration of further

10  litigation, the risks and rewards, the expense, delay, and

11  likely success.

12       A couple of last things I'm going to say are these.  I

13  understand, you know, there is vehement disagreement on the

14  part of our Objectors to the notion that Highland might have

15  caused a $50 million loss to HarbourVest.  But I will tell

16  you, for what it's worth -- I want the record clear that this

17  is part of my evaluation of the reasonableness of the

18  settlement -- my reaction is that, indeed, Highland's

19  litigation strategy in the Acis case caused HCLOF to lose a

20  huge portion of its value, to the detriment of HarbourVest.

21  You know, whether all evidence at the end of the day would

22  convince me of that, I don't know, but that's -- that is

23  definitely this judge's impression.

24       I'm very sympathetic to HarbourVest.  It appears in all

25  ways from the record, not just the record before me today, but

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 9   Page 195 of 374   Page 132 of 276   PageID 4652

154

1    the record in the Acis case that I presided over, that

2    Highland back then would have rather spent HarbourVest's

3    investment for HCLOF legal fees than let Josh Terry get paid

4    on his judgment.  They were perfectly happy to direct the

5    spending of other people's money, is what the record suggested

6    to me.

7         And then, you know, I have alluded to this very recently,

8    as recently as last Friday:  I can still remember Mr.

9    Ellington sitting on the witness stand over here to my left

10   and telling the Court, telling the parties under oath, that

11   HarbourVest -- he didn't use its name back then, okay?  For

12   the first phase of the Acis case, or most of the Acis case, we

13   were told it was an investor from Boston.  And at some point

14   someone even said their name begins with H.  I mean, it seemed

15   almost humorous.  But Mr. Ellington said it was they,

16   HarbourVest, the undisclosed investor, who was insistent that

17   the Acis name was toxic, and so that's what all of this had

18   been about:  the rebranding, the wanting to extract or move

19   things away from Acis.

20        So, you know, I have heard for the -- well, at least the

21   second time today, from Mr. Pugatch, what I perceive to be

22   very credible testimony that that's just not the way it

23   happened.

24        And I guess the last thing I want to say here today, and

25   you know, I guess I have multiple reasons for saying this, not

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 9   Page 196 of 237   Page 133 of 276   PageID 4653

155

1   just in connection with approving the settlement, you know,

2   I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

3   you know, a crazy amount of value, that they underperform in

4   the market, that, you know, during the Acis/Brigade tenure

5   and, you know, they should have been reset.  You know, I hope

6   those who have not been around as long as some of us in this

7   whole saga know that the -- Mr. Terry, Mr. Phelan, I think

8   Brigade, they all desperately wanted to reset these things,

9   but it was HCLOF, I believe directed by Highland, that wanted

10  to redeem, wanted to liquidate, take the pot of money,

11  warehouse it, and then do their own thing.

12      And there was, I think, from my vantage point, a

13  monumental effort to try to get everyone to the table to do

14  reasonable resets that would be good for the stakeholders at

15  HCLOF and be good for the creditors of Acis, including Josh

16  Terry.  That was always the balancing act that most of us were

17  focused on during the Acis bankruptcy.  But Highland, I

18  believe, directing HCLOF's strategy, just did not want the

19  resets to happen.

20      So, again, part of me, I suppose, just wants to make the

21  record clear on something that I fear not everyone is clear

22  about.  And I say that because the comment was made that the

23  injunctions, the preliminary injunctions sought by the Acis

24  trustee caused the plummet in value, and I think that's just

25  not an accurate statement.  I think litigation strategies are

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 20   Page 197 of 2874 Page 134 of 276   PageID 4654

156

1  what caused the plummet in value, and that's why I think

2  ultimately HarbourVest would potentially have a meritorious

3  claim here in a significant amount if this litigation were to

4  go forward.

5      So, I approve this under 9019.  And again, Mr. Morris,

6  you'll upload an order.

7      It is now 1:41, so let's as quickly as possible hear the

8  other motion that I don't think had any objections.  Mr.

9  Morris?

10         MR. MORRIS:  Your Honor, just -- yes, just very

11  quickly, just four things.

12      With respect to the order, I just want to make it clear

13  that we are going to include a provision that specifically

14  authorizes the Debtor to engage in -- to receive from

15  HarbourVest the asset, you know, the HCLOF interest, and that

16  that's consistent with its obligations under the agreement.

17      The objection has been withdrawn, I think the evidence is

18  what it is, and we want to make sure that nobody thinks that

19  they're going to go to a different court somehow to challenge

20  the transfer.  So I just want to put the Court on notice and

21  everybody on notice that we are going to put in a specific

22  finding as to that.

23         THE COURT:  All right.  Fair --

24         MR. MORRIS:  Number two is --

25         THE COURT:  Fair enough.  I do specifically approve

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-20   Page 158 of 874 Page 135 of 276   PageID 4655

157

 1  that mechanism and find it is appropriate and supported by the

 2  underlying agreements.

 3      And just so you know, I spent some time noodling this

 4  yesterday before I knew it was going to be settled, so I'm not

 5  just casually doing that.  I think it's fine.

 6      Okay.  Next?

 7          MR. MORRIS:  Thank you very much, Your Honor.  Number

 8  two, with respect to the motion to pay, there is no objection.

 9  If we can just submit an order.  Or if Your Honor has other

10  guidance for us, we're happy to take it.

11          THE COURT:  Okay.  Does anyone have anything they

12  want to say about that motion?

13      Again, I looked at it.  I didn't see any objections.  I

14  didn't see any problem with it.  It's -- you know, you're

15  going through this exercise because of the earlier protocol

16  order.

17          MR. MORRIS:  Correct.

18          THE COURT:  All right.  Well, if there's nothing,

19  then, I will approve that, finding there is good cause to

20  grant that motion.

21          MR. MORRIS:  Okay.

22          THE COURT:  All right.  Is the only other

23  housekeeping matter --

24          MR. MORRIS:  I --

25          THE COURT:  -- we have the contempt motion?

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-20   Page 159 of 274   Page 136 of 276   PageID 4656
Exhibit 20   Page 095 of 28

158

1          MR. MORRIS:  It is, and I do -- I do have to point

2     out how troubled the Debtor is to learn that Mr. Dondero was

3     still receiving documents from Highland as late as this

4     morning.  It's got to be a violation of both the TRO -- I

5     guess it's now the preliminary injunction.

6        I would respectfully request -- I know that time is what

7     it is -- but maybe Mr. Dondero can answer now where he got the

8     document, who he got the document from, what other documents

9     he's gotten from the Debtor since Your Honor ordered him not

10    to communicate with the Debtor's employees.

11       This is not saying hello in the hallway.  I mean, this is

12    just -- it is really troubling, Your Honor, and it's why we

13    need the contempt motion heard as soon as possible.

14          THE COURT:  Well, Mr. Wilson, do you want to address

15    that?  I think the words I heard were that you just got the

16    document this morning, and you got it from Mr. Dondero, but we

17    don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18    you there?

19          MR. LYNN:  I'm afraid I'm back, Your Honor.

20          THE COURT:  Okay.

21          MR. LYNN:  I am not sure whether Mr. Dondero had it

22    in his files from some -- from back before he was asked not to

23    communicate with members or with employees of the Debtor.  I

24    believe -- I believe he's with us, though I don't think he's

25    available by video.

159

1        Are you there, Mr. Dondero?

2              THE COURT:  We can't hear you, Mr. Dondero.

3              MR. DONDERO:  Judge?

4              THE COURT:  Oh, go ahead.

5              MR. DONDERO:  Can you hear me now?

6              THE COURT:  Yes.

7              MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8    found it in a stack of paper, and --

9              MR. LYNN:  I understand it shows that his microphone

10   is working.

11             THE COURT:  Okay.  Go ahead.

12             MR. DONDERO:  Can you hear me?

13             THE COURT:  Yes, go ahead.

14             MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15   I've got everything in boxes.  I was going through everything

16   yesterday, and I found those emails in a stack of papers and I

17   sent them over because I thought they would be relevant

18   relative to Seery's initial impression.

19             THE COURT:  Okay.  Well, let's talk about the timing

20   of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21   you why --

22             MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23   waste the Court's time.  We have not made available anything

24   to the Court objecting to the expedited hearing on the

25   contempt motion.  We've been here.

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 10-20   Page 139 of 2374   Page 138 of 276   PageID 4658

160

1      I would say to Your Honor that if Mr. Dondero is indeed in

2  contempt, or was in contempt toward the motion, which has

3  nothing to do with the document that was presented as Dondero

4  Exhibit N, there is no need to hear this on an expedited

5  basis.

6      Every time we turn around, Your Honor, the Debtor is

7  asking that something be heard on an expedited basis.  And we

8  have not opposed that.  We have not fought that, to speak of,

9  to date.  But this is getting a little ridiculous.  We're

10  within days of confirmation of the Debtor's plan, and it is

11  simply a means of causing pain and suffering to Mr. Dondero

12  and those who are working with him and for him.  And he does

13  have employees at NexPoint who are assisting him.

14      So we most strongly object to being put on a schedule

15  where we are expected to get a response to the contempt motion

16  on file by Monday, today being Thursday, and a weekend

17  intervening.  And we strongly object to any setting of this

18  contempt motion on Tuesday or Wednesday.  It is absurd, and it

19  is done solely, solely, Your Honor, to cause pain.

20          THE COURT:  All right.

21          MR. MORRIS:  Your Honor, if I may?

22          THE COURT:  Please.

23          MR. MORRIS:  Just very briefly, we had a hearing the

24  other day.  The evidence is the exact same.  The evidence is

25  crystal clear that the violations are meaningful, they're

Case 21-03067-sgj    Doc 124-9    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 15-20    Exhibit 20    Page 097 of 274    Page 139 of 276    PageID 4659

161

1  substantial, and they are repeated.

2       After the TRO was entered into, Mr. Dondero and only Mr.

3  Dondero chose to interfere with the Debtor's business.  Mr.

4  Dondero and only Mr. Dondero chose to communicate with the

5  Debtor's employees, not about saying hello in the hallway but

6  about coordinating a legal defense strategy against the

7  Debtor.

8       The need is immediate, Your Honor, and I would

9  respectfully request that the hearing be set for Tuesday or

10  Wednesday.  They've had this motion now since the 7th of

11  January.  They had a full evidentiary hearing, so they know

12  most of the evidence that's going to be presented.  They have

13  a whole team of -- they have an army of lawyers, Your Honor,

14  and half a dozen firms working on behalf of Mr. Dondero and

15  his interests.  For him to cry here, for him to cry that this

16  is too much is really -- it's obscene.  It just is.

17            THE COURT:  All right.  I'm going to say a couple --

18            MR. LYNN:  That is absurd.

19            THE COURT:  I'm going to say a couple of things.  One

20  is that I -- well, the one time I remember getting reversed

21  for holding someone in contempt of court, the District Court

22  felt like I had not given enough notice of that.  The District

23  Courts, what they think is reasonable notice, is sometimes

24  very different from what the bankruptcy judges think.  We're

25  used to going very lickety-split fast in the bankruptcy

162

1   courts.  And the Courts of Appeals, District Court, Courts of

2   Appeals obviously, for good reason, are very concerned about

3   due process in this kind of context.  So I'm sensitive to

4   that.

5       I'm also sensitive to the fact that it is monetary damages

6   that are being sought here to purge the contempt.  Okay?  The

7   shifting of attorneys' fees is basically what I understand is

8   being sought at this point.  You know, we have a preliminary

9   injunction halting behavior at this point, and so I think

10  that's another reason I'm hesitant to give an emergency

11  hearing.  I feel like monetary damages can wait and we can

12  give 21-plus days' notice of the hearing.

13      But I'm going to throw this out there as well.  If I do

14  feel like there is a showing of contempt, if I do feel like

15  the phone -- as I told you the other day, I'm very, very

16  fixated on the phone that may have been destroyed or thrown

17  away, maybe at Mr. Dondero's suggestion.  I mean, the

18  potential monetary sanction here may be very, very large if

19  the evidence plays out in the way I fear it might play out.

20  So I need to make sure everybody has adequate time to prepare

21  for that hearing and make sure I get all the evidence I need

22  to see.  All right?  Contempt of court is very, very, very,

23  very serious, and I don't think anyone would deny that.

24      So, with that, it was filed what day?  January 4th?  Is

25  that what I heard?  Or --

004258

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 20   Page 094 of 374 Page 141 of 276   PageID 4661

163

 1          MR. MORRIS:  January 7th, I believe, Your Honor.

 2          THE COURT:  January 7th?  All right.  Well, Traci,

 3   are you there?  Hopefully, you're not in a hunger coma at this

 4   point.

 5          THE CLERK:  I am here.

 6          THE COURT:  Okay.  We have -- we're going to have to

 7   go to that first week of February, right?  Because we've got

 8   the confirmation hearing that, you know, late in January, and

 9   then --

10          THE CLERK:  Yes.  Uh-huh.

11          THE COURT:  Okay.  Do you have an available date to

12   give right now?

13          THE CLERK:  How about -- if you're willing to hear

14   them on Friday, February 5th.

15          THE COURT:  Okay.  I can do that.  February 5th at

16   9:30.  Any -- anybody want to argue about that?

17          MR. MORRIS:  Thank you, Your Honor.  That's

18   acceptable to the Debtor.

19          THE COURT:  Okay.  Mr. Lynn, is that good with you?

20          MR. LYNN:  We'll do that, Your Honor.  I would say,

21   by the way, that I'll be happy to buy Mr. Seery, out of my own

22   pocket, five cell phones, which ought to make up for the one

23   that was lost, though I recognize that those cell phones will

24   not have on them the privileged information, the conversations

25   between his lawyers and Mr. Dondero that I imagine he was

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Exhibit 20   Page 195 of 874   Page 142 of 276   PageID 4662

164

1 | looking forward to seeing.

2 |      THE COURT:  Well, I wouldn't want him to see that

3 | information, but I do think he's entitled to any nonprivileged

4 | information, texting, or calls that are on that phone.  So,

5 | again, I'm either going to hear good explanations for that or

6 | not, but it's something very concerning to me.

7 |      All right.  So we have a game plan.

8 |      I'm going to ask, Did we have good-faith negotiations

9 | between Dondero and the Committee and anything positive to

10 | report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11 |      MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12 | Honor.  Mr. Lynn and I have exchanged several emails over the

13 | weekend, and the message that I sent to Mr. Lynn was very

14 | clear.  There had been a term sheet that Mr. Seery had sent

15 | back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16 | out and be very specific as to what it was Mr. Dondero was

17 | prepared to do in connection with the pot plan.  I instructed

18 | him that some of the issues that the Committee still has is

19 | obviously the overall value, along with the concept that's

20 | signing up to a promise from Mr. Dondero to comply with

21 | (indiscernible) as part of that value.  As Your Honor may

22 | understand, the Committee is obviously very skeptical of Mr.

23 | Dondero's future performance under an agreement that he enters

24 | into.

25 |      Those are but a couple of issues, Your Honor, that I

Case 21-03067-sgj  Doc 124-9  Filed 10/14/22  Entered 10/14/22 15:31:06  Desc
Case 3:23-cv-01503-B  Document 15-20  Page 196 of 274  Page 143 of 276  PageID 4663

165

1  advised Mr. Lynn were very concerning to the Committee.  And I

2  suggested to him that if he wanted to move things forward, the

3  best way to do it would be to come to us with a fulsome term

4  sheet that explained exactly what it was in clear and precise

5  detail that Mr. Dondero was proposing, and that would be the

6  best way to move the process forward, Your Honor.

7          THE COURT:  All right.  Mr. Lynn, anything to add to

8  that?

9          MR. LYNN:  Well, Your Honor, my experience in

10  negotiations is that it is useful to agree on substantive

11  terms, or at least be in the ballpark, before term sheets are

12  exchanged.  Long ago, a term sheet was prepared and presented

13  to the Committee.  Ultimately, I think it was rejected, though

14  I don't know if we ever received a formal rejection.

15      I explained in my emails, which I'm happy to share with

16  the Court if Your Honor wants to see them, why I was reluctant

17  to try to put into a term sheet form the proposal that I

18  suggested to Mr. Clemente.  As I said, I'm more than happy to

19  provide you with that email chain and let you form your own

20  judgment, Your Honor, as to whether we're proceeding in good

21  faith.

22          THE COURT:  All right.  Well I'm not going to ask --

23          MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24  Pomerantz.

25          THE COURT:  -- to see any of that.  Mr. Pomerantz?

004261

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 20   Exhibit 9   Page 197 of 274   Page 144 of 276   PageID 4664

166

```
 1            MR. POMERANTZ:  May I just be heard real quickly?

 2            THE COURT:  Sure.

 3            MR. POMERANTZ:  Your Honor, we also took Your Honor's

 4   comments to heart.  We, Mr. Seery and I, had an over-an-hour

 5   conversation with Mr. Lynn and with Mr. Bonds.  We provided

 6   them with our thoughts as to what they needed to do in order

 7   to move forward.  Of course, it's not really the Debtor to

 8   agree.  It's the creditors to agree.  But as Mr. Seery has

 9   testified many times before and as I have told the Court, we

10   would support a plan that the Committee and Mr. Dondero could

11   get behind.

12       So we again -- I'm not going to divulge the nature of

13   those communications, but we suggested several things that Mr.

14   Dondero could do in order to move the ball forward, and

15   unfortunately, we have not seen any of those things done thus

16   far.  So we are, at this point, not optimistic that there will

17   be a grand bargain plan.

18            THE COURT:  All right.

19            MR. DONDERO:  Your Honor, could I comment for a

20   second?  This is Mr. Dondero.

21            THE COURT:  If you and your counsel want you to

22   comment, you can comment.

23            MR. DONDERO:  I'd love to do a pot plan.  I would

24   love to reach some kind of settlement and everybody move on

25   with their lives.  The estate started with $360 million of
```

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Page 198 of 23/4   Page 145 of 276   PageID 4665

167

1   third-party assets and $90 million of notes.  The $360 million

2   of third-party assets are down to $130 million.

3          MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4   I did this at the last hearing, and it's not my practice to

5   interrupt, but issues regarding what the value is or not, it's

6   going to require a response, and that's not really before Your

7   Honor.  I think before Your Honor is --

8          MR. DONDERO:  Okay.

9          MR. POMERANTZ:  -- have there been negotiations?

10  Have they been in good faith?  If Mr. Dondero wanted to

11  address that, that's fine, but I object to having any

12  discussion at this point, especially with Mr. Dondero not even

13  under oath, on what the nature of the value of the assets and

14  why they have changed and what not.

15         THE COURT:  Well, --

16         MR. POMERANTZ:  It's just not appropriate.

17         THE COURT:  I understand --

18         MR. DONDERO:  Okay.  Can I --

19         THE COURT:  Stop.

20         MR. DONDERO:  Can I -- can I finish?

21         THE COURT:  Let me please respond to that.  I

22  understand your concern, but I've heard from Mr. Seery

23  testimony many months ago about the value plummeting during

24  the case.  And I asked why, and I got some explanations.  This

25  is not evidence.  This is just, you know, this is not going to

168

1   be binding in any way.  Mr. Dondero can speak as to what he

2   thinks, you know, the situation is.

3       Go ahead, Mr. Dondero.

4           MR. DONDERO:  Okay.  I'm not trying to fixate on the

5   numbers.  And as far as the third-party assets are, we would

6   be willing to pay -- I would be willing to pay for those.  I'd

7   be willing to pay more, and even some value for the affiliate

8   notes that were really part of compensation agreements

9   throughout the history of Highland and avoid the POC

10  arguments.  I'd be willing to pay for the assets and I'd be

11  willing to pay even more than that.

12      I have no transparency in terms of what the assets are,

13  and there's no fulsome discussion in terms of, well, here are

14  the assets, here are the notes, here's what we think the

15  values are, can you get to this number?  It's just a -- you --

16  the -- it -- I don't view there is good-faith negotiations

17  going on because it's always just a:  You need to put a big

18  number on a piece of paper; otherwise, you're going to get run

19  over.

20      And there's no back and forth going on, but it's not due

21  to a lack of willingness on my part.  And maybe there needs to

22  be a committee set up.  Maybe there needs to be, I don't know,

23  a mediator or an examiner or somebody to try and push through

24  the pot plan, but there's nothing happening.  People are not

25  returning the judge's calls, I mean, Mr. Lynn's calls, or my

169

 1   calls.  They're -- there's -- despite efforts of our -- of my

 2   own and a willingness of my own, there's no negotiations of

 3   any sort going on at the moment.

 4          THE COURT:  All right.  I don't want anyone to

 5   respond to that.  I know people have different views of what's

 6   going on.  But let me just say a couple of things, and then

 7   we're done.

 8      We do have a Committee in this case.  We have a Committee

 9   with very sophisticated members and very sophisticated

10   professionals.  Okay?  That's who I wanted you to be talking

11   to before the end of the day Tuesday.

12      We have had co-mediators in this case.  Okay?  And, you

13   know, I identified very sophisticated human beings for that

14   role.  Okay?  And in fact, there ended up being settlements

15   that flowed out of the co-mediator process.

16      We're now 15 months into the case.  There are major,

17   significant compromises now:  HarbourVest, UBS, Acis, Terry,

18   and Redeemer Committee.  I hate to use a worn-out metaphor,

19   but the train is leaving the station.  We've got confirmation.

20   I've pushed out two weeks.  I mean, you all are either going

21   to get there in the next few days or we're just going to go

22   forward with I think what everyone, you know, would rather be

23   a pot plan, but if we can't get there, we're just going to

24   have to consider the plan that's on the table now.  Okay?

25      You know, the Committee, again, they're sophisticated.

Case 21-03067-sgj   Doc 124-9   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 15-20   Page 97 of 2374   Page 148 of 276   PageID 4668

170

1   They can compare apples to oranges and decide whether the plan

2   on the table, with its risks of future litigation and

3   recoveries, whether it's better or worse than whatever

4   consideration you're offering, Mr. Dondero.

5       And you know, as we all know, there is distrust here,

6   there, and everywhere among these parties.  So I can totally

7   understand them, you know, taking a hard line:  We either get

8   all cash or we're just not going to mess with it.  We don't

9   want to risk broken promises.  We'd rather just do litigation.

10      So, anyway, that's as much as I'm going to say except I am

11  going to further direct good-faith negotiations.  It sounds

12  like to me a written term sheet might be the appropriate next

13  step, given where I've heard things are at the moment.  But,

14  you know, I guess we don't have any hearings between now and

15  the 26th, right?  No Highland hearings that I can think of

16  between now and the 26th.

17          MR. POMERANTZ:  I don't think so.

18          MR. MORRIS:  I think that's correct, Your Honor.

19          THE COURT:  So you have all this time --

20          MR. MORRIS:  At the moment.

21          THE COURT:  You have all this time to negotiate and

22  simultaneously get ready for the confirmation hearing without

23  any other battles.  So I know you will use the time well.

24      All right.  We're adjourned.

25          THE CLERK:  All rise.

171

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 2:04 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                    **01/16/2021**

24 _____      _____

   Kathy Rehling, CETD-444                    Date
25 Certified Electronic Court Transcriber

172

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                              12
- By Mr. Kane                                               18
- By Ms. Weisgerber                                         18
- By Mr. Draper                                             20

WITNESSES

Debtor's Witnesses

James Seery
- Direct Examination by Mr. Morris                          26
- Cross-Examination by Mr. Wilson                           62
- Cross-Examination by Mr. Draper                           87
- Redirect Examination by Mr. Morris                        93

HarbourVest's Witnesses

Michael Pugatch
- Direct Examination by Ms. Weisgerber                      96
- Cross-Examination by Mr. Wilson                          113

EXHIBITS

Debtor's Exhibits A through EE                Received  35

James Dondero's Exhibits A through M          Received 142
James Dondero's Exhibit N (as specified)      Received  71

HarbourVest's Exhibit 34                      Received 100
HarbourVest's Exhibit 36                      Received 103
HarbourVest's Exhibits 39 through 42          Received 137

CLOSING ARGUMENTS

- By Mr. Morris                                            143
- By Ms. Weisgerber                                        144
- By Mr. Lynn                                              146
- By Mr. Draper                                            148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

004268

173

1                                    INDEX
                                    Page 2
2

3    RULINGS

4    Motion to Compromise Controversy with HarbourVest 2017        150
     Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
5    HarbourVest Dover Street IX Investment L.P., HV
     International VIII Secondary L.P., HarbourVest Skew Base
6    AIF L.P., and HarbourVest Partners L.P. filed by Debtor
     Highland Capital Management, L.P. (1625)

7    Motion to Allow Claims of HarbourVest Pursuant to Rule        150
     3018(a) of the Federal Rules of Bankruptcy Procedure for
8    Temporary Allowance of Claims for Purposes of Voting to
     Accept or Reject the Plan filed by Creditor HarbourVest
9    et al. (1207)

10   Debtor's Motion Pursuant to the Protocols for Authority       157
     for Highland Multi-Strategy Credit Fund, L.P. to Prepay
11   Loan (1590)

12   END OF PROCEEDINGS                                            171

13   INDEX                                                      172-173

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 10

004270

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10 Filed 09/21/23    Page 153 of 276    PageID 4673
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 1 of 23

Docket #1788  Date Filed: 01/21/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed January 20, 2021

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

## ORDER APPROVING DEBTOR'S SETTLEMENT
## WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
## AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order*

*Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and*

*Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland

Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-

captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

DOCS_NY:41987.4 36027/002


1934054210121000000000001

**004271**

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document Exhibit 10 Filed 09/31/23    Page 154 of 276    PageID 4674
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 2 of 23

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

2

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 8-10 Filed 09/41/24    Page 155 of 276    PageID 4675
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 3 of 23

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

DOCS_NY:41987.4 36027/002

004273

Case 21-03067-sgj   Doc 124-10   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-10 Filed 09/15/23   Page 156 of 276   PageID 4676
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21   Entered 01/21/21 09:20:56   Page 4 of 23

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

DOCS_NY:41987.4 36027/002

004274

Case 19-34054-sgj11 Doc 1788 Filed 01/21/21 Entered 01/21/21 09:20:56 Page 5 of 23

# **EXHIBIT 1**

004275

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10  Exhibit 10  Filed 09/11/24  Page 158 of 276    PageID 4678
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 6 of 23

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an an 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10 Filed 09/81/224    Page 159 of 276    PageID 4679
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 7 of 23

**EXECUTION VERSION**

        **WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

        **WHEREAS**, the Debtor disputes the HarbourVest Claims;

        **WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

        **WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

        **WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

        **NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

    1.    **Settlement of Claims.**

        (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

        (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

    2.    **Releases.**

        (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

US-DOCS\115534291.12

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10    Filed 09/11/23    Page 160 of 276    PageID 4680
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 8 of 23

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)    Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)    Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.    **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

004278

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10    Filed 09/01/23    Page 161 of 276    PageID 4681
Exhibit 10    Page 9 of 24
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 9 of 23

**EXECUTION VERSION**

4.     **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.     **Plan Support**.

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10    Filed 09/11/24    Page 162 of 276    PageID 4682
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 10 of 23

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.    The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**    This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

004280

Case 21-03067-sgj   Doc 124-10   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-10   Filed 09/21/24   Page 163 of 276   PageID 4683
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21   Entered 01/21/21 09:20:56   Page 11 of 23

**EXECUTION VERSION**

<u>with a copy (which shall not constitute notice) to</u>:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.     **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

US-DOCS\115534291.12

004281

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10   Filed 09/13/23   Page 164 of 276    PageID 4684
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 12 of 23

**EXECUTION VERSION**

14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

004282

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10    Filed 09/11/23    Page 165 of 276    PageID 4685
Exhibit 10    Page 14 of 24
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 13 of 23

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    /s/ James P. Seery, Jr.
Name:  James P. Seery, Jr.
Its:     CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

004283

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 30-10    Filed 09/15/23    Page 166 of 276    PageID 4686
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 14 of 23

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

9

004284



Case 19-34054-sgj11 Doc 1788 Filed 01/21/21   Entered 01/21/21 09:20:56   Page 15 of 23

# Exhibit A

004285

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-10    Filed 09/17/24    Page 168 of 276    PageID 4688
Exhibit 10    Page 17 of 23
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 16 of 23

**TRANSFER AGREEMENT
FOR ORDINARY SHARES OF
HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

    a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

    b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

004286

Case 21-03067-sgj   Doc 124-10   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-10   Filed 09/18/23   Page 169 of 276   PageID 4689
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21   Entered 01/21/21 09:20:56   Page 17 of 23

    c.   Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of  the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

    d.   Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

    e.   This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2.   <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

    a.   This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

    b.   This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

    c.   The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

    d.   The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

    e.   The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

004287

Case 21-03067-sgj Doc 124-10 Filed 10/14/22 Entered 10/14/22 15:31:06 Desc
Case 3:23-cv-01503-B Document 100 Filed 09/19/23 Page 170 of 276 PageID 4690
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21 Entered 01/21/21 09:20:56 Page 18 of 23

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.   This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.   This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.   As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.   each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.   the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

   Prior to the Effective Date the Transferee shall procure that:

    c.   the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.   Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

004288

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 10-20    Filed 09/01/24    Page 171 of 276    PageID 4691
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 19 of 23

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

004289

Case 21-03067-sgj   Doc 124-10   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-20   Filed 09/11/24   Page 172 of 276   PageID 4692
Exhibit 10   Page 21 of 23
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21   Entered 01/21/21 09:20:56   Page 20 of 23

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member

By:  _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By:  _____

Name:  James P. Seery, Jr.

Title:  President

**FUND:**
**Highland CLO Funding, Ltd.**

By:  _____

Name:

Title:

*[Additional Signatures on Following Page]*

ActiveUS 184668980v.2

004290

Case 21-03067-sgj    Doc 124-10    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 10-2    Filed 09/22/23    Page 173 of 276    PageID 4693
Exhibit 10    Page 22 of 24
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21    Entered 01/21/21 09:20:56    Page 21 of 23

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
       Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
       Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
       Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

6

Case 21-03067-sgj   Doc 124-10   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-20   Filed 09/23/24   Page 174 of 276   PageID 4694
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21   Entered 01/21/21 09:20:56   Page 22 of 23

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

ActiveUS 184668980v.2

004292

Case 21-03067-sgj  Doc 124-10  Filed 10/14/22  Entered 10/14/22 15:31:06  Desc
Case 3:23-cv-01503-B  Document 18-2  Filed 09/21/24  Page 175 of 276  PageID 4695
Exhibit 10  Page 24 of 24
Case 19-34054-sgj11 Doc 1788 Filed 01/21/21  Entered 01/21/21 09:20:56  Page 23 of 23

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

004293

# EXHIBIT 11

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document Exhibit 11Filed 09/21/23    Page 177 of 276    PageID 4697
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 1 of 20    PageID 1
Docket #0001  Date Filed: 4/12/2021

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

1934054210506000000000010
004295

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-11 Filed 09/31/0237    Page 178 of 276    PageID 4698
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 2 of 26    PageID 2

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-11 Filed 09/41/23    Page 179 of 276    PageID 4699
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 3 of 26    PageID 3

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

### PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-201 Filed 09/51/23   Page 180 of 276   PageID 4700
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 4 of 26   PageID 4

## III.

## <u>JURISDICTION AND VENUE</u>

**7.**      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.**      Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.**      Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## <u>RELEVANT BACKGROUND</u>

### *HCLOF IS FORMED*

**10.**      Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**      Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-201 1 Filed 09/01/23    Page 181 of 276    PageID 4701
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 5 of 26    PageID 5

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 1-11 Filed 09/10/23   Page 182 of 276   PageID 4702
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 6 of 26   PageID 6

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-1   Filed 09/8.1/23   Page 183 of 276   PageID 4703
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 7 of 26   PageID 7

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

004301

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-11 Filed 09/11/23    Page 184 of 276    PageID 4704
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 8 of 26    PageID 8

32.    An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.    As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.    HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.    Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.    At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.    It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.    On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.    The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 1-21 Filed 09/11/23   Page 185 of 276   PageID 4705
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 9 of 26   PageID 9

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

004303

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-201   Filed 09/11/23   Page 186 of 276   PageID 4706
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 10 of 26   PageID 10

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 1-21   Filed 09/11/23   Page 187 of 276   PageID 4707
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 11 of 26   PageID 11

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 1-201   Filed 09/13/27   Page 188 of 276   PageID 4708
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 12 of 26   PageID 12

**58.**     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

**59.**     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

**60.**     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

**61.**     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

**62.**     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

**63.**     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

**64.**     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 101    Filed 09/11/23    Page 189 of 276    PageID 4709
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 13 of 26    PageID 13

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/15/23    Page 190 of 276    PageID 4710
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 14 of 26    PageID 14

71.    Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.    HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.    HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.    In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.    At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-201    Filed 09/16/23    Page 191 of 276    PageID 4711
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 15 of 26    PageID 15

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.    Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.    Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.    Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.    Seery's knowledge is imputed to HCM.

80.    Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-1 Filed 09/11/23    Page 192 of 276    PageID 4712
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 16 of 26    PageID 16

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.    As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.    Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.    Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.    Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.    In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-201  Filed 09/18/23  Page 193 of 276   PageID 4713
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 17 of 26    PageID 17

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-1    Filed 09/19/23    Page 194 of 276    PageID 4714
Exhibit 201    Page 191 of 273
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 18 of 26    PageID 18

SECOND CAUSE OF ACTION
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

92.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.    On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.    The Company Agreement governs the rights and duties of the members of HCLOF.

95.    Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.    Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.    The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.    Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.    Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

004312

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 1-1   Filed 09/21/23   Page 195 of 276   PageID 4715
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 19 of 26   PageID 19

100.     Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101.     No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102.     Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### *Negligence*
### (By the DAF and CLO Holdco against HCM and HCFA)

103.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104.     Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105.     Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.     Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107.     It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-201    Filed 09/21/23    Page 196 of 276    PageID 4716
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 20 of 26    PageID 20

108.    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

109.    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

110.    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

111.    Defendants' negligence foreseeably and directly caused Plaintiff harm.

112.    Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

113.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

114.    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

115.    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/22/23    Page 197 of 276    PageID 4717
Exhibit 201    Page 22 of 27
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 21 of 26    PageID 21

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-201   Filed 09/23/27   Page 198 of 276   PageID 4718
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 22 of 26   PageID 22

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-11   Filed 09/21/23   Page 199 of 276   PageID 4719
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 23 of 26   PageID 23

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-11   Filed 10/25/23   Page 200 of 276   PageID 4720
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 24 of 26   PageID 24

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.    Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

### FIFTH CAUSE OF ACTION
### *Tortious Interference*
### (CLO Holdco against HCM)

134.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

Case 21-03067-sgj    Doc 124-11    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 1-11    Filed 09/25/23    Page 201 of 276    PageID 4721
Case 3:21-cv-00842-B    Document 1    Filed 04/12/21    Page 25 of 26    PageID 25

**139.** HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

**140.** But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

**141.** Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

**VI.**

**JURY DEMAND**

**142.** Plaintiff demands trial by jury on all claims so triable.

**VII.**

**PRAYER FOR RELIEF**

**143.** Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a. Actual damages;

    b. Disgorgement;

    c. Treble damages;

    d. Exemplary and punitive damages;

    e. Attorneys' fees and costs as allowed by common law, statute or contract;

    f. A constructive trust to avoid dissipation of assets;

    g. All such other relief to which Plaintiff is justly entitled.

Case 21-03067-sgj   Doc 124-11   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-1   Filed 09/27/23   Page 202 of 276   PageID 4722
Case 3:21-cv-00842-B   Document 1   Filed 04/12/21   Page 26 of 26   PageID 26

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

004320

# EXHIBIT 12

Case 21-03067-sgj   Doc 124-12   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-12Filed 09/21/22   Page 204 of 276   PageID 4724
Docket #0028  Date Filed: 9/2/2022
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 1 of 21   PageID 3611

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Debtor, | § | |
| ------------------------------------------------- | § | |
| THE CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| | § | |
| Plaintiffs/Appellants, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-3129-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Defendant/Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Appellants The Charitable DAF Fund, L.P. (Charitable DAF) and CLO

Holdco, Ltd. (CLO Holdco)'s appeals from the bankruptcy court's Motion to Dismiss Order and

Motion to Stay Order. For the reasons that follow, the Motion to Dismiss Order is **REVERSED** and

**REMANDED**. The Motion to Stay Order is **AFFIRMED**.



004322

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/30/22    Page 205 of 276    PageID 4725
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 2 of 21    PageID 3612

# I.

## BACKGROUND[1]

These are consolidated appeals from an adversary proceeding in a bankruptcy case. The Debtor, Highland Capital Management, L.P. (HCM), filed for Chapter 11 bankruptcy on October 16, 2019, in the United States Bankruptcy Court for the District of Delaware and that court transferred venue to the United States Bankruptcy Court for the North District of Texas. *In re Highland Cap. Mgmt. L.P.*, 2022 WL 780991, at *1 (Bankr. N.D. Tex. Mar. 11, 2022).

In 2017, Charitable DAF—through the holding entity CLO Holdco—purchased 49.02% of the available shares of Highland CLO Funding, Ltd. (HCLOF) based upon investment advice from HCM.[2] Doc. 9, Appellant's Br., 5. Another entity, HarbourVest, acquired 49.98% of the HCLOF shares and HCM and its employees acquired the remaining 1%. *Id.*; Doc. 21, Appellee's Br., 7. A company agreement (the HCLOF Member Agreement) governing the rights and obligations of HCLOF shareholders purportedly prohibited a member from "sell[ing] shares to another member without first providing all other members the right to purchase a pro rata portion thereof at the same price" (the Right of First Refusal). Doc. 9, Appellant's Br., 6. The value of the HCLOF shares fluctuated throughout the bankruptcy proceedings; the actual value is one of the issues giving rise to some of Charitable DAF's causes of action. *Id.* at 6–7; R. at 551–65.

---

[1] Because these are two consolidated appeals with separate appellate records, the Court indicates when it switches between the separate appellate records by footnotes. The Appellant's Brief and record cites in this Background section are in Doc. 6 in case No. 3:22-CV-0695-B. Appellee's Brief, which was filed after consolidation, is in case No. 21-CV-3129-B.

[2] Except where otherwise stated, the Court refers to Charitable DAF and CLO Holdco collectively as Charitable DAF because Charitable DAF controls and owns CLO Holdco and both entities have the same director. Doc. 21, Appellee's Br., 7 & n.6. Appellant Charitable DAF does not dispute this relationship and imputes the actions of CLO Holdco to itself throughout Appellant's brief. *See* Doc. 9, Appellant's Br., 13–14 (imputing the Objection to both Appellants).

004323

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/11/23    Page 206 of 276    PageID 4726
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 3 of 21    PageID 3613

During the bankruptcy, "HarbourVest filed proof of claims against [HCM] totaling over $300 million, notionally." Doc. 9, Appellant's Br., 6. As part of the settlement for these claims, "HarbourVest agreed to sell its interest in HCLOF to [HCM]." *Id.* at 8. HCM would then have majority ownership of HCLOF. *See id.* at 5; Doc. 21, Appellee's Br., 7. "CLO Holdco filed an objection to the settlement, contending that the HCLOF Member Agreement entitled [CLO] Holdco to a Right of first Refusal" (the Objection). Doc. 9, Appellant's Br., 8. At the beginning of the settlement hearing (the Rule 9019 Settlement Hearing), CLO Holdco withdrew its Objection. Doc. 21, Appellee's Br., 10–11; R. at 6269–70. After overruling the remaining objections from the other parties, the bankruptcy court approved the HarbourVest Settlement. Doc. 9, Appellant's Br., 9.

This Adversary Proceeding stems from the complaint filed by Appellants on April 12, 2021, in this Court in *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P., et al.*, Case No. 3:21-CV-0842-B. *Id.*; Complaint, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D Tex. Apr. 12, 2021), Doc. 1. On September 20, 2021, this Court referred that case to the bankruptcy court for "docket[ing] as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P." Order of Reference, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D. Tex. Sept. 20, 2021), Doc. 64. During the Adversary Proceeding, Appellants moved for a stay of the case (the Motion to Stay) and Appellees moved to dismiss the case (the Motion to Dismiss). R. at 1634–67, 3248–52. On November 23, 2021, the bankruptcy court held a hearing on the Motion to Stay and Motion to Dismiss. *Id.* at 5951. The bankruptcy court denied the Motion to Stay at the hearing and later entered an order granting the Motion to Dismiss, dismissing all causes of action with prejudice. *Id.* at 5977; *In re Highland*, 2022 WL 780991, at *12. Appellants promptly appealed both orders; this

004324

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12 Filed 09/11/23    Page 207 of 276    PageID 4727
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 4 of 21    PageID 3614

Court consolidated the appeals. *In re Highland Cap. Mgmt.*, 2022 WL 2193000, at *1, *4 (N.D. Tex. June 17, 2022). While the appeals were pending, the Fifth Circuit affirmed the HCM reorganization plan (the Plan), but vacated the exculpatory provision "as to all parties *except* [HCM], the Committee and its members, and the Independent Directors for conduct within the scope of their duties." *Highland Cap. Mgmt., L.P. v. NexPoint Advisors, L.P.*, 2022 WL 3571094, at *14 (5th Cir. Aug. 19, 2022).

The appeals are fully briefed and ripe for review. The Court considers them below.

## II.

## LEGAL STANDARDS

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a). Because the district court functions as an appellate court in this scenario, it applies the same standards of review that federal appellate courts use when reviewing district court decisions. *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992) (citations omitted).

A.    *Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiffs complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

- 4 -

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12 Filed 09/16/22    Page 208 of 276    PageID 4728
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 5 of 21    PageID 3615

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotation marks and alterations omitted).

B.       *Motion to Stay*

Incidental to a court's inherent power to control its docket is the power to stay proceedings before it. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A court considers four factors when determining whether to stay a case pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quoting *Nken*, 556 U.S. at 434).

004326

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/11/23    Page 209 of 276    PageID 4729
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 6 of 21    PageID 3616

## III.

## ANALYSIS

The Court begins with the appeal of the Motion to Dismiss Order because it can only review the appeal of the Motion to Stay Order if it reverses the bankruptcy court's decision to dismiss the causes of action in the adversary proceeding. *In re Highland*, 2022 WL 2193000, at *2. Finding reversal of the Motion to Dismiss Order warranted, the Court then reviews the appeal of the Motion to Stay Order.

A.    *Appeal of the Motion to Dismiss Order[3]*

Charitable DAF raises three issues in its appeal of the Motion to Dismiss Order: (1) whether the bankruptcy court "commit[ted] reversible error by sua sponte dismissing this action on the basis of collateral estoppel without giving notice and an opportunity to respond"; (2) whether collateral estoppel barred Charitable DAF's claims when the claims were adjudicated in a Rule 9019 Settlement Hearing; and (3) whether the bankruptcy court's application of judicial estoppel erroneously relied on a transcription error, an ostensibly inconsistent position of Charitable DAF, or a failure to conclude that "subsequently discovered evidence . . . render[ed] the ostensible inconsistency 'inadvertent.'" Doc. 9, Appellant's Br., 2.

An appellate court reviews a dismissal under Rule 12(b)(6) de novo. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 868 (5th Cir. 2000). "[T]he application of collateral estoppel is" also reviewed de novo. *Id.* (quoting *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997)). However, "a [bankruptcy] court's decision to invoke the equitable doctrine of judicial estoppel [is reviewed] for abuse of discretion." *Cox v. Richards*, 761 F. App'x 244, 246 (5th Cir. 2019) (citing

---

[3] For this appeal, the record and document citations are in case No. 3:22-CV-0695-B. However, Appellee's Brief is in case No. 21-CV-3129-B.

Case 21-03067-sgj   Doc 124-12   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-12   Filed 09/01/22   Page 210 of 276   PageID 4730
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 7 of 21   PageID 3617

*United States ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 271 (5th Cir. 2015)). Therefore, this Court reviews the bankruptcy court's sua sponte invocation of collateral estoppel de novo, the application of collateral estoppel de novo, and the invocation of judicial estoppel for abuse of discretion. The Court addresses each in turn below.

    1.    <u>Sua Sponte Dismissal</u>

The bankruptcy court dismissed Charitable DAF's claims with prejudice based on collateral estoppel—even though neither party raised the issue "per se"—finding their res judicata arguments relevant to the issue. *In re Highland*, 2022 WL 780991, at *7. The Court first considers whether the sua sponte application was proper.

Charitable DAF challenges the bankruptcy court's sua sponte invocation of collateral estoppel to dismiss its claims. Doc. 9, Appellant's Br., 11–12. Specifically, Charitable DAF argues that the bankruptcy court could "only do so if the 'procedure employed is fair'—that is, if prior notice is given with adequate time for the plaintiff to prepare a response." *Id.* at 12 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177–78 (5th Cir. 2006)). The failure to provide "notice and an opportunity to dispute the claimed bases for dismissal is reversible error," according to Charitable DAF. *Id.*

The Court disagrees. The Fifth Circuit has recognized two instances when a court may dismiss a case sua sponte on the basis of collateral estoppel: when (1) "both actions were brought in courts of the same district" or (2) "all of the relevant facts are contained in the record and . . . uncontroverted." *OneBeacon Am. Ins. Co. v. Barnett*, 761 F. App'x 396, 399 (5th Cir. 2019) (first quoting *Trammell Crow Residential Co. v. Am. Prot. Ins. Co.*, 574 F. App'x 513, 522 (5th Cir. 2014); and then quoting *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 281 (5th Cir. 2001)). This case easily

004328

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 12-12 Filed 09/01/22    Page 211 of 276    PageID 4731
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 8 of 21    PageID 3618

fits into the first category because all of the proceedings at issue took place in the bankruptcy court

before the same judge. *See In re Highland*, 2022 WL 780991, at *7 (relying on the former category

to dismiss the case). Thus, the bankruptcy court did not err by raising the collateral estoppel issue

sua sponte.

This case is unlike the *Carroll* case cited by Charitable DAF, which did not involve collateral

estoppel. 470 F.3d 1171. In *Carroll*, the Fifth Circuit held that a court may dismiss a case sua sponte

under Federal Rule of Civil Procedure 12(b)(6) if the "procedure employed is fair[,]" which requires

"both notice of the court's intention and an opportunity to respond." *Id.* at 1177 (quoting *Bazrowx

v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)). The district court erred by not providing "notice or

opportunity to be heard" and "did not even . . . mention [some of the dismissed] claims in its order

of dismissal." *Id.*

This case is more akin to *McIntyre v. Ben E. Keith Co.* where the Fifth Circuit upheld the

district court's sua sponte raising of the issue of res judicata to dismiss the case under Rule 12(b)(6).

754 F. App'x 262, 265 (5th Cir. 2018). In *McIntyre*, the plaintiff's "Civil Rights Act and FLSA

actions were brought before the same federal district court." *Id.* Because the latter action closely

resembled the former action, the Fifth Circuit found no reversible error with the district court's

raising the issue of res judicata sua sponte. *Id.*

First, dismissal for failure to state a claim like in *Carroll* and dismissal for collateral estoppel

as in the instant case are conceptually and procedurally different. In the former, the plaintiff is in the

process of attempting to "allege[] [their] best case," *Bazrowx*, 136 F.3d at 1054, while collateral

estoppel occurs after a plaintiff "alleged [their] best case" and fully litigated the issue. *See Allen v.

McCurry*, 449 U.S. 90, 94 (1980). Put more succinctly, collateral estoppel eliminates "unnecessary

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-2    Exhibit 12    Filed 09/11/23    Page 212 of 276    PageID 4732
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 9 of 21    PageID 3619

judicial waste" from repeated attempts at alleging the best case. *Arizona v. California*, 530 U.S. 392,
412 (2000) (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J.,
dissenting)). Second, the parties addressed res judicata during oral argument and in their pleadings
before the bankruptcy court. While res judicata is not collateral estoppel, it is closely related. *Hous.
Prof'l Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016) ("[R]es judicata
encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion
and (2) collateral estoppel or issue preclusion."). Thus, the bankruptcy court employed a fair
procedure by allowing the parties to litigate the issues, including res judicata, before dismissing the
case sua sponte. *See generally Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) ("District courts
may, for appropriate reasons, dismiss cases *sua sponte*.").

The Court next considers whether the bankruptcy court's substantive application of collateral
estoppel was proper.

2.    Collateral Estoppel

"Collateral estoppel prevents litigation of an issue when: '(1) the identical issue was previously
adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary
to the decision.'"[4] *Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548 (5th Cir. 2013) (quoting *Pace v.
Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005)). "Relitigation of an issue is not precluded
unless the facts and the legal standard used to assess them are the same in both proceedings." *In re
Southmark Corp.*, 163 F.3d at 932.

Charitable DAF attacks each element of collateral estoppel, so the Court addresses each

---

[4] Appellant lists a fourth element occasionally referenced by the Fifth Circuit—"there is no special
circumstance that would make it unfair to apply the doctrine"—but the Court finds no reason to address this
possible fourth element in this case. *See In re Southmark Corp.*, 163 F.3d 925, 932 n.9 (5th Cir. 1999)
(declining to apply the fourth element because appellant "failed to support it factually").

004330

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/11/23    Page 213 of 276    PageID 4733
Exhibit 202    Page 91 of 32
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 10 of 21    PageID 3620

element individually.

      *i.    Identical issue*

      The bankruptcy court found "(a) consideration of the value that the estate was both receiving and paying, as well as (b) the potential existence of a 'Right of First Refusal' . . . [were] the gravamen of [Charitable DAF's] Complaint." *In re Highland*, 2022 WL 780991, at *9 (emphasis omitted). During the settlement hearing, the bankruptcy court had to determine whether the HarbourVest Settlement "was 'fair and equitable' and in the 'best interests of creditors,' and whether it was the 'product of arms-length bargaining, and not of fraud or collusion[.]'" *Id.* at *8. This determination entailed "arguments and evidence regarding the methodology for the valuation of the HCLOF interest and the existence or non-existence of a 'Right of First Refusal.'" *Id.*

      Charitable DAF argues that the issues are not identical because the Objection "only addressed whether HarbourVest . . . had performed all conditions precedent to being able to transfer the interest to Highland *as another co-investor*" and did not present an identical claim "for breach of the HCLOF [Member] Agreement" and associated damages. Doc. 9, Appellant's Br., 13–14. Further, "even if this one contract issue was fully . . . litigated," only the second cause of action in Charitable DAF's complaint arguably parallels that issue, according to Charitable DAF—the others are distinct. *Id.* at 14–15. Charitable DAF contends that these non-contract causes of action rely on evidence that was not known at the Rule 9019 Settlement Hearing, "stem from events that either occurred post-hearing, or were not discovered until after the hearing." *Id.* at 15.

      The Court finds the issues are identical. CLO Holdco's Objection specifically argued:

      Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 202    Filed 09/12/22    Page 214 of 276    PageID 4734
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 11 of 21    PageID 3621

inaccurate interpretation of the Member Agreement's contractual provisions that would render specific passages redundant and meaningless.

R. at 4730. The bankruptcy court also heard argument and testimony from Seery, HCM's chief executive and chief restructuring officer, and Pugatch, a managing director of HarbourVest, about the valuation of HCLOF's assets at the settlement hearing. *Id.* at 6273, 6292, 6303–05 ("The twenty-two and a half [million] is the current—actually, the November value of HCLOF—the HarbourVest interests in HCLOF."), 6358, 6374 ("The current value is right around $22-1/2 million.").

In the Original Complaint, Charitable DAF brought five causes of action: breach of fiduciary duties, breach of the HCLOF Member Agreement, negligence, RICO, and tortious interference. *Id.* at 551–65. The breach of fiduciary duties and negligence causes of action center around the alleged concealment of the rising value of HCLOF's assets and failing to offer the purchase of the assets to CLO Holdco or Charitable DAF before offering to HCM. *Id.* at 553–55, 559–60. The breach of the HCLOF Member Agreement cause of action encompasses the Right of First Refusal in the agreement. *Id.* at 558–59. The RICO cause of action alleges that HCM used mail and wire fraud "to obtain or arrive at valuations of the HCLOF interests," and "conceal[ ] the true value of the HCLOF interests." *Id.* at 560–64. Lastly, the tortious interference cause of action stems from HCM's alleged interference with CLO Holdco's Right of First Refusal in the Member Agreement and "misrepresenting the fair market value" of HCLOF's assets. *Id.* at 564–65. In sum, all of these causes of action involve either the valuation of HCLOF or the Right of First Refusal, so the issues are the same as those before the bankruptcy court at the Rule 2019 Settlement Hearing.

     *ii.*    *Actually Litigated*

The bankruptcy court found the same arguments were also actually litigated, reasoning:

Case 21-03067-sgj   Doc 124-12   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-2   Filed 09/13/22   Page 215 of 276   PageID 4735
Exhibit 12   Page 913 of 22
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 12 of 21   PageID 3622

The Bankruptcy Court would never have approved the HarbourVest Settlement if it thought the value being exchanged was not fair, or if it thought the HCLOF Interests could not be transferred and that someone might later sue the Debtor, claiming the Transfer was improper. All parties had the chance to argue and present evidence about this. The Bankruptcy Court made a ruling based on the evidence and argument.

*In re Highland*, 2022 WL 780991, at *9.

Charitable DAF argues that because the Objection was withdrawn and no one objected to the withdrawal, the issue asserted therein was not litigated. Doc. 9, Appellant's Br., 16. Additionally, it claims the Rule 9019 Settlement Hearing is not a mini-trial and, therefore, cannot serve as an opportunity for a party to litigate their claims. *Id.* at 17–18 (citing *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015)).

An issue is not actually litigated and, thus, precluded unless the legal standard in the prior action mirrors the legal standard of the latter action. *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995) (citations omitted). The bankruptcy court approved the HarbourVest Settlement after applying the *Jackson Brewing* test, which considers:

> (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

R. at 5568; *see also In re Highland*, 2022 WL 780991, at *8 (quoting *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015)). Stated more succinctly, when faced with a settlement, the bankruptcy court ensures the "compromise is truly 'fair and equitable' and 'in the best interest of the estate.'" *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/11/23    Page 216 of 276    PageID 4736
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 13 of 21    PageID 3623

Cir. 1980) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer)*, 390 U.S. 414, 424 (1968)).

However, in the context of litigating actual claims—such as those asserted by Charitable DAF—a court applies a preponderance of the evidence standard, not the probability of success standard from *Jackson Brewing. Copeland*, 47 F.3d at 1423; *In re Zale Corp.*, 62 F.3d 746, 766 n.60 (5th Cir. 1995) ("We also note for future reference that the legal standard in a settlement hearing differs from that applicable in an adversary proceeding or state court trial . . . . Consequently, we doubt that the findings of the bankruptcy court in a settlement hearing would have preclusive effect in adversary proceedings or state court trials."). *See generally Weaver v. Aquila Energy Mktg.*, 196 B.R. 945, 957 (S.D. Tex. 1996) ("[S]ettlement hearings and preference actions involve the application of different legal standards."). "Examining whether a particular settlement is fair or equitable and in the best interest of the estate and creditors is a different inquiry, driven by different policies, than litigation of the actual claim." *Copeland*, 47 F.3d at 1423. While the issues of the Right of First Refusal and the valuation of HCLOF were raised in the Rule 9019 Settlement Hearing, the parties did not fully litigate the issues as one would at trial, and the bankruptcy court did not resolve the issues according to a preponderance of the evidence standard. Because the bankruptcy court applied a legal standard in the Rule 9019 Settlement Hearing that is inapplicable to the adjudication of Charitable DAF's causes of action, the issues were not actually litigated in the Rule 9019 Settlement Hearing and collateral estoppel does not apply.[5] The Court **REVERSES** the bankruptcy court on this issue.

---

[5] Having found the second element of collateral estoppel unmet, the Court need not address the third element—necessity of the previous determination to the prior decision.

004334

Case 21-03067-sgj   Doc 124-12   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 202   Filed 09/15/23   Page 217 of 276   PageID 4737
Exhibit 12   Page 15 of 22
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 14 of 21   PageID 3624

3.      Judicial Estoppel

The bankruptcy court found the elements of judicial estoppel met and barred the second and fifth causes of action, which rely on the Right of First Refusal. *In re Highland*, 2022 WL 780991, at *12. The Court now addresses whether judicial estoppel applies to Charitable DAF's second and fifth causes of action.

Judicial estoppel is an equitable common law doctrine aimed at preventing a party from asserting an inconsistent legal position from a previous proceeding. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999). "The purpose of the doctrine is 'to protect the integrity of the judicial process', by 'prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest.'" *Id.* (alteration in original) (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). A court examines three criteria when determining the applicability of judicial estoppel: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc).

Charitable DAF raises arguments for each of the judicial estoppel elements, so the Court addresses each element below.

    i.      *Inconsistent legal position*

Charitable DAF argues that the bankruptcy court's determination relies on a transcription error that amounted to an admission of HCM's compliance with the Right of First Refusal. Doc. 9, Appellant's Br., 22–23. The corrected transcript makes clear that no admission was made on behalf of CLO Holdco, according to Charitable DAF. *Id.* at 23–24.

The relevant portion of the original transcript reads:

004335

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-2    Filed 09/16/23    Page 218 of 276    PageID 4738
Exhibit 12    Page 16 of 22
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 15 of 21    PageID 3625

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client, **but** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.

R. at 6280. The corrected transcript reads:

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client **that** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.

Doc. 9-1, Appellant's Br. Ex. A, 4.

Accepting this verison of the record, CLO Holdco refused to "enter into a short stipulation on the record reflecting that the Debtor's acquisition of HarbourVest's interests in HCLOF is compliant with all of the applicable agreements between the parties." *Id.*; R. at 6280. However, moments before this, CLO Holdco withdrew its Objection premised on the Right of First Refusal stating:

> CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. Based on our analysis of Guernsey law and some of the arguments of counsel in those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as Trustee for CLO Holdco, to withdraw the CLO Holdco objection based on the interpretation of the member agreement.

R. at 6269–70. The bankruptcy court's decision rests primarily on this earlier withdrawal of the Objection and only later buttresses its argument with the then-unknown transcription error. *In re Highland*, 2022 WL 780991, at *11 (following discussion of the withdrawal of the Objection with "[i]f that weren't enough" before mentioning the then-unknown transcription error). Thus, if the earlier withdrawal—without the transcription error—satisfies the first element of judicial estoppel then the bankruptcy court did not commit any error even if it referenced an incorrect transcription of the latter exchange.

004336

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/11/23    Page 219 of 276    PageID 4739
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 16 of 21    PageID 3626

The Court finds the bankruptcy court did not err in finding the first element of judicial estoppel. CLO Holdco made clear in the withdrawal of its objection that it no longer disputed the other parties' interpretation of the Right of First Refusal, which now forms the basis of Charitable DAF's second and fifth causes of action. *See* R. at 6269–70. Thus, the withdrawal of the objection put CLO Holdco on the opposite side of the legal argument that Charitable DAF now makes in its second and fifth causes of action. The first element of judicial estoppel is established because Charitable DAF has taken inconsistent positions in separate proceedings.

ii.    *The bankruptcy court accepted the prior position*

The bankruptcy court solely relied on the withdrawal of the Objection to find the second element of judicial estoppel established. *In re Highland*, 2022 WL 780991, at *12. In the words of the bankruptcy court, it "perceived [this objection] as one of the major arguments that was relevant to the HarbourVest Settlement." *Id.* "The [b]ankruptcy [c]ourt relied upon that withdrawal of CLO Holdco's objection in making the determination to approve of the HarbourVest Settlement and, specifically, that Highland would not be running afoul of any obligation in entering into the HarbourVest Settlement." *Id.*

Charitable DAF argues that there is no acceptance by the bankruptcy court of a prior position because without the transcription error, there is no admission and no inconsistent position. Doc. 9, Appellant's Br., 25–26. Further, it contends that the withdrawal of the Objection is not the equivalent of stating the Right of First Refusal causes of action are meritless. *Id.* at 26–27.

The bankruptcy court did not err in finding the second element of judicial estoppel met because it necessarily relied on the change in CLO Holdco's assessment of its Objection. The Right of First Refusal created a major obstacle to approval of the HarbourVest Settlement. When CLO

004337

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/18/23    Page 220 of 276    PageID 4740
Exhibit 12    Page 18 of 22
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 17 of 21    PageID 3627

Holdco withdrew its Objection based on the Right of First Refusal, the Court had to accept CLO Holdco's position that the Right of First Refusal no longer posed an obstacle to the HarbourVest Settlement. Thus, the Court finds no error by the bankruptcy court for the second element of judicial estoppel.

        *iii.*     *Inadvertence of Charitable DAF*

The bankruptcy court did not examine the inadvertence of Charitable DAF in asserting inconsistent legal positions. *See In re Highland*, 2022 WL 780991, at *12.

Charitable DAF argues that it did not know the facts for several of its claims until after the settlement hearings, so it could not have asserted these claims at the hearing. Doc. 9, Appellant's Br., 27. Charitable DAF relies on the allegations surrounding the valuations of the HCLOF assets and the alleged acts violating the RICO statutes. *Id.* at 27–29. Additionally, the bankruptcy court did not address the inadvertence element for judicial estoppel and a failure to apply the correct legal standard is reversible error, Charitable DAF contends. Doc. 9, Appellant's Br., 27; Doc. 27, Appellant's Reply, 3–4.

The Court agrees with Appellant's last argument. A court abuses its discretion by applying the wrong legal standard. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Def. Distrib. v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022). And the misapplication of a legal standard is reviewed de novo. *In re Woerner*, 783 F.3d 266, 270–71 (5th Cir. 2015). By not addressing the third element of judicial estoppel, the bankruptcy court applied the wrong legal standard. The Fifth Circuit implicitly recognized this third element—inadvertence—in *In re Coastal Plains, Inc.*, 179 F.3d at 206, 210, which the bankruptcy court cited for its legal standard. *In re Highland*, 2022 WL 780991, at *11. The Fifth Circuit has since clarified that "[t]his circuit . . . recognizes *three* particular requirements"

004338

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 102    Filed 09/19/22    Page 221 of 276    PageID 4741
Exhibit 12    Page 19 of 22
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 18 of 21    PageID 3628

for judicial estoppel. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008) (emphasis

added). Because the bankruptcy court did not address the inadvertence element in its order

dismissing Charitable DAF's second and fifth causes of action, the bankruptcy court abused its

discretion. While the district court finds no issue in the bankruptcy court's analysis of the first two

elements of judicial estoppel, the bankruptcy court did not address this third element, warranting

remand for determination by the bankruptcy court whether Charitable DAF acted inadvertently to

change its legal position.

3.    Leave to Amend

Charitable DAF requested leave to amend its complaint in its response to the motion to

dismiss, R. at 2272–73, which the bankruptcy court denied by dismissing all claims with prejudice.

*In re Highland*, 2022 WL 780991, at *12. The Court need not address this argument because, upon

remand, the bankruptcy court will have the opportunity to reassess Charitable DAF's claims and

determine whether amendment should be allowed under Federal Rule of Civil Procedure 15(a). *See*

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (listing

factors a court considers when determining whether to allow amendment of the complaint).

C.    *Appeal of the Motion to Stay Order*[6]

Appellant Charitable DAF raises one issue on appeal of the Motion to Stay Order: "Did the

bankruptcy court err by proceeding with the case rather than staying it" when Charitable DAF was

enjoined "from litigating any action against Appellee [HCM]"? Doc. 11, Appellant's Br., 2. The

bankruptcy court denied Charitable DAF's Motion to Stay All Proceedings and the subsequent

Amended Motion to Stay All Proceedings, reasoning:

---

[6] For this appeal, the record and document citations are in case No. 3:21-CV-3129-B.

Case 21-03067-sgj   Doc 124-12   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 202   Filed 09/20/22   Page 222 of 276   PageID 4742
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 19 of 21   PageID 3629

> I just don't think that you have shown that, you know, either the exculpation clause
> or the injunction provisions of the plan somehow tie your hands in arguing the
> 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that
> your arguments reflect, frankly, a misunderstanding of how the injunction language
> and exculpation language applies here.

R. at 2087; *see also id.* at 4–5.

On appeal, Charitable DAF argues that the bankruptcy court erred in its denial of the motion for a stay because the Plan Confirmation Order's injunction prohibited Charitable DAF from participating in the case, "terminat[ing] any case or controversy and stripp[ing] the bankruptcy court of jurisdiction." Doc. 11, Appellant's Br., 7. Accordingly, "[t]he bankruptcy court could only stay the case pending the [appeal of the Plan Confirmation Order's injunction], or dismiss the case as barred by the injunction[,]" Charitable DAF contends." *Id.* at 9.

As noted above, the Fifth Circuit affirmed the Plan in all respects except one and specifically affirmed the injunction. *Highland*, 2022 WL 3571094, at *13–14. The injunction in the Plan provides that "all Enjoined Parties are and shall be permanently enjoined . . . from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind . . . against or affecting the Debtor or the property of the Debtor." R. at 2401. And the term Enjoined Parties includes "(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor [and] . . . (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case." *Id.* at 2358.

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 202    Filed 09/21/23    Page 223 of 276    PageID 4743
Exhibit 12    Page 20 of 22
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 20 of 21    PageID 3630

Relatedly, the Plan exculpates HCM[7] "from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of [execution of the Plan]." *Id.* at 2398. However, this exculpation provision[8] does "not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) [other specific entities actions]." *Id.* at 2398–99.

The bankruptcy court did not abuse its discretion[9] in denying the motion for a stay of the case. The bankruptcy court found that the Plan's injunction and exculpation provisions—*which it approved*—did not prevent Charitable DAF from pursuing its causes of action. *Id.* at 2087. In effect, the bankruptcy court held that Charitable DAF could continue to litigate its causes of action and the Court agrees. *See id.* Just like the bankruptcy court, this Court does not see how the injunction and exculpation provisions prohibit Charitable DAF from participating in the below action. The exculpation provision permits Charitable DAF to bring claims against HCM for "bad faith, fraud,

---

[7] The Plan makes clear that the term Exculpated Party does not include Charitable DAF. R. at 2359 ("Exculpated Parties" means, collectively, (i) the Debtor . . . provided, however, that, for the avoidance of doubt, none of . . . the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities) . . . is included in the term 'Exculpated Party.'").

[8] Subsequently to this appeal, the Fifth Circuit vacated a portion of the exculpation provision. *Highland*, 2022 WL 3571094, at *12. The Fifth Circuit held that "the exculpation of certain non-debtors . . . was unlawful" so the court "str[uck] all exculpated parties from the Plan except for [HCM], the Committee and its members, and the Independent Debtors." *Id.* Charitable DAF brings its causes of action against HCM, so what remains of the exculpation provision still applies to this case. *See id.*

[9] The parties disagree on whether this Court reviews the denial of the stay for abuse of discretion or de novo. Doc. 11, Appellant's Br., 6 ("Questions of law are reviewed de novo."); Doc. 16, Appellee's Br., 2 ("The Court reviews the bankruptcy court's order for abuse of discretion."). Charitable DAF does not pursue this argument in its Reply, so this argument is considered waived, *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006), as well as incorrect. *See Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 392 (5th Cir. 2013) (citing *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992)) ("We review a district court's denial of a stay pending appeal for abuse of discretion.").

- 20 -

Case 21-03067-sgj    Doc 124-12    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-12    Filed 09/21/23    Page 224 of 276    PageID 4744
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 21 of 21    PageID 3631

gross negligence, criminal misconduct, or willful misconduct" and Charitable DAF's causes of action—breach of fiduciary duty, breach of contract, negligence, and RICO—appear to fit within these categories of claims. *Id.* at 490–504, 2398–99. Further, Charitable DAF continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss. *See* Section III(A) *supra*. Lastly and importantly, Charitable DAF did not even attempt to address the traditional stay elements. R. at 2087 ("I guess one might say the traditional four-factor test for a stay of a proceeding has really not been the subject of the argument here for a stay."). Without argument on the factors for a stay, this Court lacks any basis to overturn the bankruptcy court.

The bankruptcy court's Motion to Stay Order is **AFFIRMED**.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **REVERSES** and **REMANDS** the bankruptcy court's Motion to Dismiss Order and **AFFIRMS** the bankruptcy court's Motion to Stay Order.

SO ORDERED.

SIGNED: September 2, 2022.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

004342

# EXHIBIT 13

004343

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13 Filed 09/21/0729    Page 226 of 276    PageID 4746
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 2 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 2 of 29    PageID 1662

**EXECUTION VERSION**

Between

**CLO HOLDCO, LTD.**

And

**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

And

**HARBOURVEST 2017 GLOBAL AIF L.P.**

And

**HARBOURVEST 2017 GLOBAL FUND L.P.**

And

**HV INTERNATIONAL VIII SECONDARY L.P.**

And

**HARBOURVEST SKEW BASE AIF L.P.**

And

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

And

**LEE BLACKWELL PARKER, III**

And

**QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311**

And

**QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811**

And

**QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612**

And

**QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211**

And

**HIGHLAND CLO FUNDING, LTD.**

And

**HIGHLAND HCF ADVISOR, LTD.**

---

**MEMBERS AGREEMENT RELATING TO THE COMPANY**

---

004344

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13 Filed 09/31/22    Page 227 of 276    PageID 4747
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 3 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 3 of 29    PageID 1663

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTERPRETATION | 2 |
| 2. | THE BUSINESS OF THE COMPANY | 4 |
| 3. | VOTING RIGHTS | 4 |
| 4. | ADVISORY BOARD | 4 |
| 5. | DEFAULTING MEMBERS | 4 |
| 6. | TRANSFERS OR DISPOSALS OF SHARES | 4 |
| 7. | CONFIDENTIALITY | 4 |
| 8. | DIVIDENDS | 9 |
| 9. | TERM OF THE COMPANY | 9 |
| 10. | ERISA MATTERS | 9 |
| 11. | TAX MATTERS | 9 |
| 12. | AMENDMENTS TO CERTAIN AGREEMENTS | 9 |
| 13. | FINANCIAL REPORTS | 9 |
| 14. | TERMINATION AND LIQUIDATION | 9 |
| 15. | WHOLE AGREEMENT | 12 |
| 16. | STATUS OF AGREEMENT | 12 |
| 17. | ASSIGNMENTS | 12 |
| 18. | VARIATION AND WAIVER | 12 |
| 19. | SERVICE OF NOTICE | 12 |
| 20. | GENERAL | 13 |
| 21. | GOVERNING LAW AND JURISDICTION | 14 |
| SCHEDULE | | 18 |
| Adherence Agreement | | 18 |

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 04/12/23   Page 228 of 276   PageID 4748
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 4 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 4 of 29   PageID 1664

**THIS AGREEMENT** is made the 15th day of November 2017

**BETWEEN**

(1)      **CLO HOLDCO, LTD.** whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)      **HARBOURVEST DOVER IX INVESTMENT L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)      **HARBOURVEST 2017 GLOBAL AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)      **HARBOURVEST 2017 GLOBAL FUND L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)      **HV INTERNATIONAL VIII SECONDARY L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)      **HARBOURVEST SKEW BASE AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)      **HIGHLAND CAPITAL MANAGEMENT, L.P.** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)      **LEE BLACKWELL PARKER, III** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)      **QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311** of 17171 Park Row #100, Houston, Texas 77084, USA

(10)     **QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811** of 17171 Park Row #100, Houston, Texas 77084, USA

(11)     **QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612** of 17171 Park Row #100, Houston, Texas 77084, USA

(12)     **QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211** of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "**Members**") and

(13)     **HIGHLAND CLO FUNDING, LTD.,** with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**") and

(14)     **HIGHLAND HCF ADVISOR, LTD.,** whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**WHEREAS**:

(A)      The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)      The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "**Offering Memorandum**"), subject to the restrictions set forth therein.

23981765.11. BUSINESS                              1

004346

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/11/23   Page 229 of 276   PageID 4749
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 5 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 5 of 29   PageID 1665

(C)     The Members are the owners of the entire issued capital of the Company.

(D)     The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

**OPERATIVE PROVISIONS**

1.     **INTERPRETATION**

       In this Agreement, including the Schedule:

1.1    the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

       "**Adherence Agreement**" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

       "**Advisers Act**" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

       "**Affiliate**" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

       "**Agreement**" means this agreement together with the Schedule;

       "**Articles**" means the articles of incorporation of the Company as amended from time to time;

       "**Business**" means the business of the Company as described in Recital (B);

       "**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

       "**Directors**" means the directors of the Company from time to time;

       "**CLO Holdco**" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

       "**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

       "**Directors**" means the directors of the Company from time to time;

       "**Dover IX**" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

       "**DOL**" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

       "**DOL Regulations**" shall mean the regulations of the DOL included within <mark>29 C.F.R. section 2510.3-101</mark>.

004347

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13 Filed 10/16/22   Page 230 of 276   PageID 4750
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 6 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 6 of 29   PageID 1666

"**Dover IX**" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"**ERISA**" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"**ERISA Member**" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"**HarbourVest Entities**" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"**Highland Principals**" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"**Law**" means the Companies (Guernsey) Law, 2008, as amended;

"**Member**" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"**Parties**" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"**Shares**" means ordinary shares in the Company;

"**Subsidiary**" shall have the meaning ascribed to it in the Law;

"**Subscription and Transfer Agreement**" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2   any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3   any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4   any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5   any reference to time shall be to Guernsey time;

1.6   except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

004348

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13 Filed 09/10/23    Page 231 of 276    PageID 4751
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 7 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 7 of 29    PageID 1667

1.7    unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8    Clause headings are for ease of reference only and do not affect the construction of any provision.

2.    **THE BUSINESS OF THE COMPANY**

2.1    The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2    The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3    The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.    **VOTING RIGHTS**

3.1    The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2    The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

3.2.1    any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

3.2.2    any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

3.2.3    any conversion or redemption of Shares, except pursuant to Clause 5.5,

3.2.4    any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

3.2.5    the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

3.2.6    the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

004349

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13 Filed 09/81/23    Page 232 of 276    PageID 4752
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 8 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 8 of 29    PageID 1668

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.    **ADVISORY BOARD.**

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "**Advisory Board**") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters. The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

004350

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13 Filed 09/21/23    Page 233 of 276    PageID 4753
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 9 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 9 of 29    PageID 1669

Memorandum.  Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4    <u>Term of Members of Advisory Board</u>.  A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5    <u>No Duties to Other Members</u>.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.    **DEFAULTING MEMBERS**

5.1    In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "**Outstanding Settlement Amount**"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "**Default Interest Rate**") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "**Defaulting Member**"), the following provisions shall apply:

5.2    Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3    The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

004351

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 118-13   Filed 09/11/23   Page 234 of 276   PageID 4754
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 10 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 10 of 29   PageID 1670

5.4   The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5   The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6   The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7   At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8   The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9   Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.   **TRANSFERS OR DISPOSALS OF SHARES**

6.1   No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

004352

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-203    Filed 09/11/23    Page 235 of 276    PageID 4755
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 11 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 11 of 29    PageID 1671

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1    such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2    such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3    such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4    such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2    Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal provisions again.  Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3    No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4    Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5    The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6    All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

004353

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/11/23    Page 236 of 276    PageID 4756
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 12 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 12 of 29    PageID 1672

7.  **CONFIDENTIALITY**

7.1  Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2  Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.  **DIVIDENDS**

8.1  The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.  **TERM OF THE COMPANY**

9.1  Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "**Term**"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2  Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.  **ERISA MATTERS**

10.1  The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.  **TAX MATTERS**

11.1  <u>PFIC</u>. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

004354

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/13/23   Page 237 of 276   PageID 4757
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 13 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 13 of 29   PageID 1673

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2 <u>CFC</u>. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3 <u>Other Tax Information</u>. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4 <u>Withholding and Other Taxes</u>. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12.  **AMENDMENTS TO CERTAIN AGREEMENTS**

12.1 The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "**Management Agreement**") without the consent of the Parties.

12.2 The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3 The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13.  **FINANCIAL REPORTS**

13.1 The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

004355

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/11/23   Page 238 of 276   PageID 4758
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 14 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 14 of 29   PageID 1674

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2   After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

## 14.   TERMINATION AND LIQUIDATION

14.1   Save as provided for in Clause 13.2, this Agreement shall terminate:

    14.1.1   when one Party holds all the Shares;

    14.1.2   when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

    14.1.3   with the written consent of all the Parties.

14.2   The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3   Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4   Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

    14.4.1   all existing contracts of the Company are performed to the extent that there are sufficient resources;

    14.4.2   the Company shall not enter into any new contractual obligations;

    14.4.3   the Company is dissolved and its assets are distributed as soon as practical; and

    14.4.4   any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

004356

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 103    Filed 09/15/23    Page 239 of 276    PageID 4759
Case 21-03067-sgj    Doc 28-13    Filed 09/29/21    Entered 09/29/21 17:50:19    Page 15 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 15 of 29    PageID 1675

15.  **WHOLE AGREEMENT**

15.1  This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2  Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3  Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16.  **STATUS OF AGREEMENT**

16.1  Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2  If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17.  **ASSIGNMENTS**

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18.  **VARIATION AND WAIVER**

18.1  A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2  A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3  A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19.  **SERVICE OF NOTICE**

19.1  Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

  19.1.1  to the Company:
        Address:
        First Floor, Dorey Court, Admiral Park
        St Peter Port, Guernsey GY1 6HJ
        Channel Islands

  19.1.2  to CLO Holdco:

004357

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 103    Filed 09/16/23    Page 240 of 276    PageID 4760
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 16 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 16 of 29    PageID 1676

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3    to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4    to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2    Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee **PROVIDED THAT** if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3    In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20.    **GENERAL**

20.1    Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles. In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles. Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2    Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3    The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4    All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5    Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

004358

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/11/23    Page 241 of 276    PageID 4761
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 17 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 17 of 29    PageID 1677

20.6    Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7    This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.    **STATUS OF AGREEMENT**

21.1    The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2    If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22.    **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[*Signature Page Follows.*]

004359

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/13/23   Page 242 of 276   PageID 4762

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 18 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 18 of 29   PageID 1678

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:...........................................................

**Name:** Grant Scott

**Title:** Director

004360

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 103    Filed 09/11/22    Page 243 of 276    PageID 4763

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 19 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 19 of 29    PageID 1679

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:      HarbourVest Partners (Europe) Limited,
         its Alternative Investment Fund Manager

By:......................................................
**Name:** Michael J. Pugatch
**Title:** Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:      HarbourVest Partners (Europe) Limited,
         its Alternative Investment Fund Manager

By:......................................................
**Name:** Michael J. Pugatch
**Title:** Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:      HarbourVest 2017 Global Associates L.P.,
         its General Partner

By:      HarbourVest GP LLC,
         its General Partner

By:      HarbourVest Partners, LLC,
         its Managing Member

By:......................................................
**Name:** Michael J. Pugatch
**Title:** Managing Director


SIGNATURE PAGE TO MEMBERS' AGREEMENT

004361

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/01/23   Page 244 of 276   PageID 4764

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 20 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 20 of 29   PageID 1680

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:   HIPEP VIII Associates L.P.
       Its General Partner
By:   HarbourVest GP LLC
       Its General Partner
By:   HarbourVest Partners, LLC
       Its Managing Member
By: ...................................................................
**Name:** Michael J. Pugatch
**Title:**  Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager
By: ...................................................................
**Name:** Michael J. Pugatch
**Title:**  Authorized Person


SIGNATURE PAGE TO MEMBERS' AGREEMENT

004362

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-203   Filed 09/11/23   Page 245 of 276   PageID 4765

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 21 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 21 of 29   PageID 1681

SIGNED

Lee Blackwell Parker, III

SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-3    Filed 09/21/23    Page 246 of 276    PageID 4766

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 22 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 22 of 29    PageID 1682

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

By:
Name: Emmanuel Maael
Title: Transactions supervisor

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

004364

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-203    Filed 09/23/24    Page 247 of 276    PageID 4767

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 23 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 23 of 29    PageID 1683

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
**Name:**
**Title:**


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
**Name:** Emmanuel Maciel
**Title:** Transaction supervisor

Read & Approved


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
**Name:**
**Title:**


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
**Name:**
**Title:**


SIGNATURE PAGE TO MEMBERS' AGREEMENT

004365

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 103    Filed 09/11/23    Page 248 of 276    PageID 4768

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 24 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 24 of 29    PageID 1684

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
Name: *Emmanuel Martin*
Title: *Transaction Supervisor*

*Read and Approved:*

*11/7/17*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-3   Filed 09/25/23   Page 249 of 276   PageID 4769

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 25 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 25 of 29   PageID 1685

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**


By:.....................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**


By:.....................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**


By:.....................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**


By:.....................................................................
Name: Emmanuel Mace
Title: Transaction Supervisor

*Read and approved*

SIGNATURE PAGE TO MEMBERS' AGREEMENT

004367

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/26/23   Page 250 of 276   PageID 4770

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 26 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 26 of 29   PageID 1686

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:      Strand Advisors, Inc.,
           its General Partner

**By**:...........................................................
**Name:** James Dondero
**Title:**  President

SIGNATURE PAGE TO MEMBERS' AGREEMENT

004368

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Case 3:23-cv-01503-B   Document 18-13   Filed 09/27/23   Page 251 of 276   PageID 4771

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 27 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 27 of 29   PageID 1687

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:...................................................

**Name:** James Dondero
**Title:**   President

SIGNATURE PAGE TO MEMBERS' AGREEMENT

004369

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 10-20-3    Filed 08/31/23    Page 252 of 276    PageID 4772
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 28 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 28 of 29    PageID 1688

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

By: .........................................................

**Name:** William Scott
**Title:** Director

SIGNATURE PAGE TO MEMBERS AGREEMENT

004370

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Case 3:23-cv-01503-B    Document 18-13    Filed 09/29/29    Page 253 of 276    PageID 4773
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 29 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 29 of 29    PageID 1689

**SCHEDULE**

**Adherence Agreement**

**THIS ADHERENCE AGREEMENT** is made on [●] 200[●]

**BETWEEN**:

(1)     [●] of [●] (the "**Covenantor**");

(2)     CLO HOLDCO, LTD. of [                           ] (a "**Member**");

(3)     [●] of [                      ] (a "**Member**");

(4)     [●] of [                      ] (a "**Member**");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**RECITAL**

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "**Members Agreement**").

**IT IS HEREBY AGREED** as follows:

1.     The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.     Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.     This Agreement shall be governed by and construed in accordance with Guernsey law.

**IN WITNESS** of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.

004371

# EXHIBIT 14

SECOND AMENDED AND RESTATED
INVESTMENT ADVISORY AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY
AGREEMENT (this "***Agreement***"), dated to be effective from January 1, 2017 (the "***Effective
Date***") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted
limited partnership (the "***Fund***"), **Charitable DAF GP, LLC**, a limited liability company
organized under the laws of the State of Delaware (the "***General Partner***"), the general partner of
the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the
laws of the State of Delaware (the "***Investment Advisor***").  Each of the signatories hereto is
sometimes referred to herein individually as a "***Party***" and collectively as the "***Parties***."

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that
certain Investment Advisory Agreement dated January 1, 2012 (the "***Original Agreement***");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the
terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July
1, 2014 (the "***Existing Agreement***");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety
with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for
other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties
hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as
follows:

1.      Investment Advisory Services.    Subject to Section 7, the Investment
Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund
and its subsidiaries and shall provide investment advice with respect to the investment and
reinvestment of the cash, Financial Instruments and other properties comprising the assets and
liabilities of the Fund and its subsidiaries.

2.      Custody.  The Financial Instruments shall be held in the custody of Jefferies
& Company, Inc. or one or more banks selected by the General Partner (each such bank, a
"Custodian").  The General Partner will notify the Investment Advisor promptly of the proposed
selection of any other Custodians. The Custodian shall at all times be responsible for the physical
custody of the Financial Instruments; for the collection of interest, dividends, and other income
attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial
Instruments after consultation with and as then directed by the General Partner. At no time shall
the Investment Advisor have possession of or maintain custody over any of the Financial
Instruments.  The Investment Advisor shall not be responsible for any loss incurred by reason of
any act or omission of the Custodian.

004373

3.      <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)      investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)      engaging in such other lawful Financial Instruments transactions;

(c)      research and analysis;

(d)      purchasing Financial Instruments and holding them for investment;

(e)      entering into contracts for or in connection with investments in Financial Instruments;

(f)      investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)    possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)    lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)    opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)    opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)    combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("**Other Accounts**") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)    entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)    organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)    causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)    engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)    voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.    <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

004375

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)    to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)    to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)    to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)    to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)    to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5.    <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.    <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

4

004376

7.    Investments.    ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.    Reimbursement by the General Partner.    The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "*Sub-Advisor*"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.    Expenses.

(a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

004377

(b)      To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.    Fees.

(a)      The Fund shall pay the Investment Advisor a quarterly fee (the "**_Management Fee_**") equal to 2.0% per annum (0.5% per quarter) of the Net Assets (as defined below) of the Fund, payable in advance at and calculated as of the first business day of each calendar quarter.  For purposes of calculating the Management Fee, the Net Assets of the Fund will be determined before giving effect to any of the following amounts payable by the Fund generally or in respect of any Investment which are effective as of the date on which such determination is made: (i) any fee payable to the Investment Advisor as of the date on which such determination is made; (ii) any capital withdrawals or distributions payable by the Fund which are effective as of the date on which such determination is made; and (iii) withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdback or other amounts specially allocated ending as of the date on which such determination is made.  The Management Fee shall be prorated for partial periods and any applicable excess fees should be returned to the Fund by the Investment Advisor.  Capital contributions made to the Fund after the commencement of a calendar quarter shall be subject to a prorated Management Fee based on the number of days remaining during such quarter.

(b)      Subject to clauses (c) and (d) below, at the end of each Calculation Period (as defined below), an amount equal to 20% of the net capital appreciation of the Fund's Investments (as defined below) after deducting the Management Fee shall be paid to the Investment Advisor (the "**_Performance Fee_**"); _provided_, _however_, that the net capital appreciation upon which the calculation of the Performance is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (as defined below) maintained on the books and records of the Fund. The amount of the unrecovered balance remaining in the Loss Recovery Account at the time of calculating the Performance Fee shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of clause (c) below.

(c)      There shall be established on the books of the Fund a memorandum account (the "**_Loss Recovery Account_**"), the opening balance of which shall be zero.  At the end of each Calculation Period, the balance in the Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, net capital depreciation of the Fund's Investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period (or with respect to the initial Calculation Period, since the Effective Date), an amount equal to such net capital depreciation shall be credited to the Loss Recovery Account, and, second, if there has been, in the aggregate, net capital appreciation of the Fund's investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period, an amount equal to such net capital appreciation, before taking into account any Performance Fee to be paid to the Investment Advisor, shall be debited to and reduce any unrecovered balance in the Loss Recovery Account, but not below zero. Solely for purposes of this paragraph, in determining the Loss Recovery Account, net capital appreciation and net capital

6

depreciation for any applicable Calculation Period shall be calculated by taking into account the amount of the Management Fee paid for such period.

(d)  In the event that all or a portion of the Fund's capital is distributed or withdrawn while there exists an unrecovered balance in the Loss Recovery Account, the unrecovered balance in the Loss Recovery Account shall be reduced as of the beginning of the next Calculation Period by an amount equal to the product obtained by multiplying the balance in such Loss Recovery Account by a fraction, the numerator of which is the amount distributed or withdrawn with respect to the immediately preceding distribution or withdrawal date, and the denominator of which is the total fair value of the Fund's Investment immediately prior to such distribution or withdrawal.

(e)  For purposes of this Section 10, the net capital appreciation and net capital depreciation of the Fund's Investments for any given period will be calculation in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided upon the General Partner's request.  As soon as reasonably practicable following the end of a Calculation Period, the Investment Advisor shall deliver, or cause to be delivered, to the General Partner a statement showing the calculation of the Performance Fee, if any, with respect to such Calculation Period.  The Performance Fee, if any, shall be payable within three (3) business days of the General Partner's receipt of such statement.

(f)  Payments due to the Investment Advisor shall be made by wire transfer to:

|  |  |
|---|---|
| Bank Name: | Compass Bank |
| ABA#: | 113010547 |
| FBO: | Highland Capital Management, L.P. (Master Operating Account) |
| Acct#: | 0025876342 |

(g)  For purposes of this Section 10, the following terms have the definitions set forth below:

"*Calculation Period*" means the period commencing on the Effective Date (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period, and ending as of the close of business on the first to occur of the following: (i) the last day of a calendar year; (ii) the distribution or withdrawal of capital of the Fund (but only with respect to such distributed or withdrawn amount); (iii) the permitted transfer of all or any portion of a partner's interest in the Fund; and (iv) the final capital distribution of the Fund following its dissolution;

"*Investments*" means all investments, securities, cash, receivables, financial instruments, contracts and other assets, whether tangible or intangible, owned by the Fund;

004379

"***Net Assets***" means, with respect to the Fund as of any date, the excess of the total fair value of all Investments over the total liabilities, debts and obligations of the Fund, in each case, calculated on an accrual basis in accordance with accounting principles generally accepted in the United States and the then current valuation policy of the Service Provider, a copy of which will be provided to the General Partner upon request;  and

"***Services Agreement***" means that certain Second Amended and Restated Service Agreement, dated effective as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

11.    Exculpation; Indemnification.

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "***Covered Person***" and collectively, "***Covered Persons***") shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)    Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)    To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "***Indemnified***

8

*Party*"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

(e)      Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)      The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)      The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)      In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)      No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)      Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence.  As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment

004381

Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct, fraud or gross negligence or the ability to waive or limit such Losses under applicable law.  Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements.  Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.      Activities of the Investment Advisor and Others.  The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund.  Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate.  In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund.  The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar.  The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager.  Each of the General Partner and the Fund acknowledges that it has received, reviewed and had an opportunity with respect to (a) a copy of Part 2 of the Investment Advisor's Form ADV, and (b) the supplemental disclosures attached hereto as Exhibit A, each of which further describes conflicts of interest relating to the Investment Advisor, its affiliates and their respective advised accounts.

13.      Term.  This Agreement shall remain in effect through an initial term concluding December 31, 2017 and shall be automatically extended for additional one-year terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

14.      Miscellaneous.

(a)      Notices.  Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

004382

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number:  (972) 628-4100
Facsimile Number:  (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott
Telephone Number:  (919) 854-1407
Facsimile Number:  (919) 854-1401

(b)     Entire Agreement.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)     Amendments and Waivers.  No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)     Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided; however, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)     Governing Law.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

11

004383

(f)      Jurisdiction; Venue; Waiver of Jury Trial.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("*Dispute*") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("***Enforcement Court***").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)      Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)      Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)      Survival.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)      Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

004384

(k)    <u>Arm's-Length Agreement</u>.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

13

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:  6/21/17


CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:


CHARITABLE DAF FUND, L.P.

By:   Charitable DAF GP, LLC, its general
      partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:

14

004386

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed
to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____

Name:  James Dondero
Title:  President
Date:

CHARITABLE DAF GP, LLC

By: _____

Name:  Grant J. Scott
Title:  Managing Member
Date: 6/21/2017

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general
       partner

By: _____

Name:  Grant J. Scott
Title:  Managing Member
Date: 6/21/2017

14

004387

## EXHIBIT A

## Supplemental Disclosures

**Potential Conflicts of Interest**

The scope of the activities of Highland Capital Management, L.P. (the "***Investment Adviser***"), its affiliates, and the funds and clients managed or advised by the Investment Adviser or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on Charitable DAF Fund, L.P. and its subsidiaries (collectively, the "***Fund***") in the future that cannot be foreseen or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.  Additional conflicts are described in the Investment Adviser's Form ADV.  You are urged to review the Investment Adviser's Form ADV in its entirety prior to investing in the Fund.[1]

*Highland Group & Highland Accounts*.  None of the Investment Adviser, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Adviser is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Adviser or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations and collateralized loan obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group (collectively, "***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Adviser may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Adviser has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the

---

[1]  The Investment Adviser's latest Form ADV filed and Part 2 Brochures can be accessed here: https://adviserinfo.sec.gov/IAPD/IAPDFirmSummary.aspx?ORG_PK=110126

Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained by the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Adviser will devote to the Fund only as much time as the Investment Adviser deems necessary and appropriate to manage the Fund's business.

The Investment Adviser undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*.   It is the policy of the Investment Adviser to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Adviser has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order for any accounts cannot be fully allocated under prevailing market conditions, the Investment Adviser may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.  The Investment Adviser will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the U.S. Investment Advisers Act of 1940, as amended.  The Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all investment opportunities that are suitable for it.

The Investment Adviser and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day for the Fund, the Highland Accounts or affiliates of the Investment Adviser are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Highland Group Trading.*  As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Adviser may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Adviser in accordance with its fiduciary duties to its other clients, the Investment Adviser may take, or be required to take, actions which adversely affect the interests of the Fund.

The Highland Group has invested and may continue to invest in investments that would also be appropriate for the Fund. Such investments may be different from those made by the Fund. The Highland Group does not have any duty, in making or maintaining such investments, to act in a way that is favorable to the Fund or to offer any such opportunity to the Fund, subject to the Investment Adviser's internal allocation policy. The investment policies, fee arrangements and other circumstances applicable to such other accounts and investments may vary from those applicable to the Fund and its investments. The Highland Group may also provide advisory or other services for a customary fee with respect to investments made or held by the Fund, and neither the Fund nor its investors shall have any right to such fees. The Highland Group may also have ongoing relationships with, render services to or engage in transactions with other clients who make investments of a similar nature to those of the Fund, and with companies whose securities or properties are acquired by the Fund.

As further described below, in connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Adviser to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Adviser's inability to use such information for

advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Adviser will devote as much time to the Fund as the Investment Adviser deems appropriate to perform its duties in accordance with the Fund's advisory agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Adviser's other accounts.

*Various Activities of the Investment Adviser and its Affiliates*.  The directors, officers, personnel, employees and agents of the Investment Adviser and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories or provide banking, agency, insurance and/or other services, and receive arm's length fees in connection with such services, for the Fund or its investments or other entities that operate in the same or a related line of business as the, for other clients managed by the Investment Adviser or its affiliates, or for any obligor or issuer in respect of the CDOs, and the Fund shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.  The Fund may compete with other Highland Accounts for capital and investment opportunities.

There is no limitation or restriction on the Investment Adviser or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Adviser's investment committee, the Investment Adviser or its affiliates have to other clients.

The Investment Adviser and its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of an investment of the Fund or another account.  In such circumstances, the Investment Adviser or its affiliates may take positions on behalf of themselves or another account that are adverse to the interests of the Fund.

The Investment Adviser and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CDOs, Highland Accounts and other investments purchased by the Fund. Such transactions shall be subject to fees that are intended to be no greater than arm's-length fees, and the Fund shall have no right to any such fees. There is no expectation for preferential access to transactions involving CDOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Adviser and/or its affiliates and the Fund shall not have any right to any such fees.

*Investments in Highland Accounts Managed by the Investment Manager or its Affiliates*.  The Fund may invest a significant portion of its capital in Highland Accounts.  The Investment Adviser or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Highland Accounts.  If the Fund invests in Highland Accounts in secondary transactions, the Fund will indirectly pay the fees (senior and subordinated) of such Highland Accounts and any

004391

carried interest. If the Fund provides all of the equity for a Highland Account, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis.  The Investment Adviser or its affiliates will have conflicting division of loyalties and responsibilities regarding the Fund and a Highland Account, and certain other conflicts of interest would be inherent in the situation.  There can be no assurance that the interests of the Fund would not be subordinated to those of a Highland Account or to other interests of the Investment Adviser.

*Multiple Levels of Fees*. The Investment Adviser and the Highland Accounts are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income.  This may result in greater expense than if investors in the Fund were able to invest directly in the Highland Accounts or their respective underlying investments.  Investors in the Fund should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a Highland Account may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).

*Cross Transactions and Principal Transactions.* The Investment Adviser may effect client cross-transactions where the Investment Adviser causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Fund any time that the Investment Adviser believes such transaction to be fair to the Fund and such other client.

The Investment Adviser may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Adviser and/or its affiliates, in each case in accordance with applicable law, which will include the Investment Adviser obtaining independent consent on behalf of the Fund prior to engaging in any such principal transaction between the Fund and the Investment Adviser or its affiliates.

The Investment Adviser may advise the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Adviser's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Adviser or its affiliates. In each such case, the Investment Adviser and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Fund and the other parties to such trade. Under certain circumstances, the Investment Adviser and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Adviser's valuation procedures to another client managed or advised by the Investment Adviser or such affiliates. In addition, the Investment Adviser may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Adviser may obtain independent consent

in writing on behalf of the Fund, which consent may be provided by the managing member of the General Partner or any other independent party on behalf of the Fund, if any such transaction requires the consent of the Fund under Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended.

*Material Non-Public Information.* There are generally no ethical screens or information barriers among the Investment Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Adviser, any of its personnel or its affiliates were to receive material non-public information about a particular obligor or issuer, or have an interest in causing the Fund to acquire a particular security, the Investment Adviser may be prevented from advising the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material nonpublic information, it is possible that such controls could fail and result in the Investment Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material nonpublic information could have adverse effects on the Investment Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Adviser's ability to perform its portfolio management services to the Fund. In addition, while the Investment Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Investment Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

*Conflicts Relating to Equity and Debt Ownership by the Fund and Affiliates.* In certain circumstances, the Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Adviser to reconcile the conflicting interests in the Fund and such other accounts in a way that protects the Fund's interests. Additionally, the Investment Adviser or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Adviser in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Adviser's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Other Fees.* The Investment Adviser and its affiliates are permitted to receive consulting fees, investment banking fees, advisory fees, breakup fees, director's fees, closing fees, transaction fees and similar fees in connection with actual or contemplated investments. Such fees will not reduce

or offset the Management Fee.  Conflicts of interest may also arise due to the allocation of such fees to or among co-investors.

*Soft Dollars*.  The Investment Adviser's authority to use "soft dollar" credits generated by the Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Adviser may give the Investment Adviser an incentive to select brokers or dealers for transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Adviser rather than giving exclusive consideration to the interests of the Fund.