**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| In Re: **Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

# Volume 21

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § |  21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

### APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I. STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II. DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2. The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3. Docket Sheet kept by the Bankruptcy Clerk.

4. Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*Handwritten annotations in left margin:* Vol. 2 / 000139 / 000232 / 000239 / 000270 / Thru Vol. 6 / Vol. 7 / 001196

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br><br>*001203*<br><br>*Thru  Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9*<br>*001905*<br>*Thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.*<br>*002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17 003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*<br>*003637* | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| *003666* | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| *003843* | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| *003844* | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| *003851* | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*<br>*003882*<br>*Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*<br>*004395* | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21* *004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442* *Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22* *004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22*<br>*0047745* | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23*<br>*0047770* | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24*<br>*005050* | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *005056*<br>*Thru Vol. 25* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26*<br>*005570* | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27*<br>*005850* | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6_Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| *006071* | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28*<br>*006074* | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|
| *006133* *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32* *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| *006961* | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
      jeb@sbaitilaw.com

**Counsel for Appellants**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
FACSIMILE: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATELY, | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY, | § | |
| | § | |
| Defendants. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

004395

## NOTICE OF HEARING AND BRIEFING SCHEDULE ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS COMPLAINT

**PLEASE TAKE NOTICE** that the following matter pending in the above-referenced adversary proceeding is scheduled for hearing on **Thursday, December 8, 2022, at 9:30 a.m. (Central Time)** (the "Hearing"):

1.  *Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. 122].

The Hearing on the Motion will be held via WebEx videoconference before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge.  The WebEx video participation/attendance link for the Hearing is:  https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing is attached hereto as **Exhibit A**; alternatively, the WebEx Hearing Instructions for the Hearing may be obtained from Judge Jernigan's hearing/calendar site at: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

Any response (each, a "Response") to the relief requested in the Motion shall be filed with the Clerk of the Court on or before **Friday, November 18, 2022, at 5:00 p.m. (Central Time)**.

Highland Capital Management, L.P., may file a reply (each, a "Reply") to any Response. Any Reply shall be filed with the Clerk of the Court on or before **Friday, December 2, 2022, at 5:00 p.m. (Central Time)**.

*[Remainder of Page Intentionally Left Blank]*

004396

Dated:  October 27, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

004397

# EXHIBIT A

004398

WebEx Hearing Instructions

# WebEx Hearing Instructions
## Judge Stacey G. Jernigan

Pursuant to General Order 2020-14 issued by the Court on May 20, 2020, all hearings before Judge Stacey G. Jernigan are currently being conducted by WebEx videoconference unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:    https://us-courts.webex.com/meet/jerniga

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In: 1.650.479.3207
Meeting ID: 479 393 582

**Participation/Attendance Requirements**:

- Counsel and other parties in interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above. Counsel and other parties in interest who <u>not</u> be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic only mode may attend the hearing in the WebEx telephonic only mode using the WebEx dial-in and meeting ID above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time. Please be advised that a hearing may already be in progress. <u>During hearings, participants are required to keep their lines on mute at all times that they are not addressing the Court or otherwise actively participating in the hearing</u>. **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings**. For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode and live testimony will only be accepted from witnesses who have the WebEx video function activated**. Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.

- All WebEx hearing attendees are required to comply with Judge Jernigan's Telephonic and Videoconference Hearing Policy (included within Judge Jernigan's Judge-Specific Guidelines): https://www.txnb.uscourts.gov/content/judge-stacey-g-c-jernigan

**Exhibit Requirements**:

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual attachment thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- If the number of pages of such exhibits exceeds 100, then such party <u>must</u> also deliver two (2) sets of such exhibits in exhibit binders to the Court by no later than twenty-four (24) hours in advance of the hearing.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-courts.webex.com/meet/jerniga" as the location of the hearing</u> (note: this option appears immediately after the first set of Wichita Falls locations). Do <u>not</u> select Judge Jernigan's Dallas courtroom as the location for the hearing.

004399

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § |  21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendants. | § | |
| | § | |

## RENEWED MOTION TO WITHDRAW THE REFERENCE

The Charitable DAF Fund, L.P. and CLO Holdco, Ltd., Plaintiffs in the above-referenced

adversary proceeding, file this Motion under 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules

of Bankruptcy Procedure, Rule 5011-1 of the Local Bankruptcy Rules, and this Court's standing

order, Order of Reference of Bankruptcy Cases & Proceedings Nunc Pro Tunc, In re Miscellaneous

Order  No.  3:04-MI-00033  (N.D.  Tex.  Oct.  4,  1982),  as  to  the  above-referenced  adversary

proceeding. Plaintiffs respectfully re-urge withdrawal of the reference in light of Highland Capital Management, L.P.'s Renewed Motion to Dismiss and arguments advanced therein.

## I.

## <u>BACKGROUND</u>

1.      Plaintiffs filed this action in district court. In response to Highland's motion seeking reference to the bankruptcy court [Doc. 1-1], Plaintiffs filed an opposition and cross-motion seeking withdrawal of the reference [Doc. 36]. The district court granted Highland's motion and referred the action to the bankruptcy court without addressing the merits of Plaintiff's cross-motion or the underlying statutory basis for withdrawal [Doc. 64].

2.      In the bankruptcy court, Plaintiffs filed a proposed motion to withdraw the reference as an exhibit to their Motion for Stay [Doc. 69-1], explaining in the stay motion that they understood the Plan Injunction to prohibit them from advocating for withdrawal of the reference at that time, but that they would do so if allowed.

3.      Highland moved to dismiss the action under Rule 12 of the Federal Rules of Civil Procedure [Doc. 26]. The bankruptcy court granted that motion [Doc. 80]. The district court reversed [Doc. 99].

4.      Highland now re-urges dismissal under Rule 12 for the same and other reasons [Doc. 123], relying on arguments that implicate federal statutes and require, Plaintiffs submit, withdrawal of the reference now.

## II.

## <u>WITHDRAWAL OF THE REFERENCE IS MANDATORY</u>

5.      This adversary proceeding primarily involves fiduciary duties imposed upon Registered Investment Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and

corresponding state law claims for breach of those duties. As a result, presiding over this action

will require extensive consideration of federal laws regulating interstate commerce, which renders

withdrawal of the reference to bankruptcy court mandatory under 28 U.S.C. § 157(d).

      6.     Under § 157(d), withdrawal of the reference is mandatory when a proceeding

"requires consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any
> party, for cause shown. The district court shall, on timely motion of a party,
> so withdraw a proceeding if the court determines that resolution of the
> proceeding requires consideration of both title 11 and other laws of the
> United States regulating organizations or activities affecting interstate
> commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement

Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited

jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere

& Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. Jan. 31, 2011), for the proposition that,

"[i]n determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the

parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve

consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D.

Tex. 1985), *aff'd*, 790 F.2d 35 (5th Cir. 1986) ("While that second clause [of § 157(d)] might not

apply when some 'other law' only tangentially affects the proceeding, it surely does apply when

federal labor legislation will likely be material to the proceeding's resolution.") (emphasis added).

      7.     Plainly here, the claims in the Complaint at least involve federal laws "regulating

organizations or activities affecting interstate commerce." The Advisers Act is such a law, and at

least the first count of the Complaint implicates it. *See, e.g.*, Complaint [Doc. 1-1] ¶¶ 57 & n.5, 66,

69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers Act and accompanying regulations). Defendant's entire argument against withdrawal of the reference thus turns on whether these laws "must be considered."

8.      It is readily apparent that these statutes must be considered in this adversary proceeding. The briefing already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law and these federal statutes, including

- Whether Defendant owed federal fiduciary duties under the Advisers Act that are unwaivable;

- To whom such duties are owed and whether they were violated;

- Whether they are actionable under federal law;

- Whether such Advisers Act fiduciary duties can be terminated by a blanket injunction in a bankruptcy plan;

- Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

- Whether such waivers can be enforced as to non-parties to the waiver.

Presiding over this action most certainly will require consideration of these issues.

9.      Before joining the Fifth Circuit, Judge Clement addressed a similar matter during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, relying on a rationale fully applicable here. Despite finding that the bankruptcy court had related-to jurisdiction, Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference.

*Id*. at *11.

10.    Judge Clement rejected the argument that the case would "only involve the simple application of established federal securities laws." *Id.* at \*7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id*.

11.    Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, "This federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id.* (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R. 393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where resolution requires more than simple application of federal securities laws, even though that court's determination was based solely on a review of the complaint's alleged violations of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

12.    This authority is on all fours here. In the Complaint, Plaintiffs allege violations of federal securities law (the Advisers Act), as well as the RICO statute. Highland has taken the position that the RICO Statute cannot apply because of exclusions under RICO for claims that raise securities laws violations. Deciding the renewed motion to dismiss will require far more than simple application of these laws. Nothing more is necessary to satisfy § 157(d). *Cf. S. Pac. Transp. Co. v. Voluntary Purchasing Grps.*, 252 B.R. 373, 382-84 (E.D. Tex. 2000) (holding that even the court's "limited" role in approving a CERCLA settlement "necessarily involves the substantial and material consideration of CERCLA" and "will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue"). *Compare id.* at 382 ("It is well settled that CERCLA is a statute "'rooted in the commerce clause'

and is precisely 'the type of law . . . Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d)].'") *with* the Advisers Act, 15 U.S.C. § 80b-1 ("Upon the basis of facts disclosed by the record and report of the Securities and Exchange Commission made pursuant to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed and ascertained, it is hereby found that investment advisers are of national concern, in that, among other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.").

13.     Although it is unnecessary to demonstrate that Plaintiffs' Advisers Act allegations will require application of underdeveloped law, that certainly is the case. As the Third Circuit pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that federal law (the Advisers Act) provides "the duty and the standard to which investment advisers are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the "confusion [that this situation] engenders may explain why there has been little development in either state or federal law on the applicable standards." *Id*. (emphasis added). "Half a century

---

later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research [, Inc.*, 375 U.S. 180, 192 (1963),] for a description of an investment adviser's fiduciary duties." *Id*. at 503; *see also* Plaintiffs' Response to Renewed Motion to Dismiss (addressing the Debtor's erroneous argument that the Advisers Act creates no private right of action). This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

## III.

## THIS ADVERSARY PROCEEDING IS NOT A CORE PROCEEDING

14.     In previous briefing, the Debtor has suggested that this adversary proceeding should remain in bankruptcy court because it is a core proceeding under Title 11. Plaintiffs respectfully submit this is incorrect because the causes of action asserted in the Complaint do not "arise under," or "arise in" Title 11 and therefore cannot be "core" proceedings.

15.     To be clear, Plaintiffs are not seeking and have disclaimed any relief that would literally unwind or reverse any settlement approved by the bankruptcy court. Neither do Plaintiffs attempt an end run around the provisions of any approval. They merely seek vindication of their rights via damages, and they respectfully submit that a proper jurisdictional analysis demonstrates their causes of action are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

16.     ***First***, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case." *Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.)*, 453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011); *Davis v. Life Inv'rs Ins.*

*Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Techs.*, 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

17.    **Second**, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); Stern v. Marshall, 564 U.S. 462, 476 (2011).

18.    **Third**, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

19.    **Fourth**, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case." *Legal*

*Xtranet, Inc.*, <mark>453 B.R. at 708</mark>–09 (emphasis added) (citing *Stoe v. Flaherty*, <mark>436 F.3d 209, 216</mark> (3d

Cir. 2006). The Debtor has previously argued that, because the factual circumstances giving rise

to the causes of action included the HarbourVest Settlement, which was approved by the

bankruptcy court, this somehow transforms Plaintiffs' causes of action into core claims. But it is

the nature of the causes of action that determines whether they are core, not their "particular factual

circumstance." *Id.*

20.      To illustrate the point, in *Gupta v. Quincy Med. Ctr.*, <mark>858 F.3d 657, 660</mark> (1st Cir.

2017), the bankruptcy court had issued a sale order which approved an asset purchase agreement

whereby the purchaser became obligated to make certain payments to employees. The purchaser

failed to make these payments, so the employees sued the purchaser in bankruptcy court, and the

bankruptcy court rendered a judgment in favor of the employees. On appeal, the district court

concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims

plainly related to and existing only because of the approved sale order that gave rise to them. The

First Circuit affirmed, explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a
> bankruptcy case does not ipso facto mean that the proceeding qualifies as
> an 'arising in' proceeding. Instead, the fundamental question is whether the
> proceeding by its nature, not its particular factual circumstance, could arise
> only in the context of a bankruptcy case. In other words, it is not enough
> that Appellants' claims arose in the context of a bankruptcy case or even
> that those claims exist only because Debtors (Appellants' former employer)
> declared bankruptcy; rather, "arising in" jurisdiction exists only if
> Appellants' claims are the type of claims that can only exist in a bankruptcy
> case.

*Id.* at 664–65 (emphasis added).

21.      Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context

of a transaction approved in a bankruptcy case. But obviously, the causes of action are not "the

type of claims that can only exist in a bankruptcy case." And that ends the analysis. Because

Plaintiffs' causes of action do arise under the Bankruptcy Code, and because they are not claims that could only arise in the context of bankruptcy, this action is not a core proceeding.

## IV.

## <u>CONCLUSION</u>

In sum, because 28 U.S.C. § 157(d) mandates withdrawal of the reference here, and because this is not a "core" proceeding, the Court should withdraw the reference as to this adversary proceeding and grant Plaintiffs all additional relief to which they may be entitled.

Dated:  November 18, 2022                      Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Jonathan Bridges*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   jeb@sbaitilaw.com

**Counsel for Plaintiffs**

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFFS' RESPONSE TO RENEWED MOTION TO DISMISS COMPLAINT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

I.      INTRODUCTION ............................................................................................1

II.     FACTUAL BACKGROUND ...........................................................................2

III.    MOTIONS TO STRIKE ...................................................................................5

        A.      Defendant's Successive Motion to Dismiss Should Be Stricken ...........5

        B.      Defendant's Exhibits Should Be Stricken .............................................6

IV.     PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF .................................6

        A.      Judicial Estoppel Should Not Be Applied to Counts 2 or 5 .................7

                1.      Highland's Reliance on Collateral Evidence is Improper ..........7

                2.      Highland Has Not Shown a Lack of Inadvertence ...................8

                        a.      Holdco Did Not Intentionally Conceal its Breach of
                                Contract or Tortious Interference Claims from the
                                Court and Had No Motive to Do So ...............................8

                        b.      New Facts Giving Rise to the Claims Were Not
                                Known to Holdco ..........................................................9

        B.      Plaintiffs Have Properly Pled Claims for Breach of Fiduciary
                Duty .....................................................................................................9

                1.      Highland and HCFA Owe Fiduciary Duties Under the
                        Advisers Act ............................................................................9

                2.      Holdco Has Standing to Bring a Breach of Fiduciary
                        Duty Claim Directly and Derivatively ...................................11

                3.      The DAF Has Direct Standing to Bring Fiduciary Duty
                        Claims ...................................................................................16

                4.      Plaintiffs Have Alleged Several Breaches of Fiduciary
                        Duty .......................................................................................17

004411

5.      Rule 9(b) Does Not Apply to These Fiduciary Duty
        Claims .................................................................................................18

C.      Plaintiffs Pled Claims for Breach of Contract and Tortious
        Interference .........................................................................................20

D.      Plaintiffs Have Pled a Claim for Negligence .......................................22

E.      Motion to Dismiss RICO Claim Under Rule 41 ...................................23

F.      Highland's Request for Fees Fails ........................................................23

VI.     MOTION IN THE ALTERNATIVE FOR LEAVE TO AMEND ...............................23

VII.    CONCLUSION ..............................................................................................24

004412

# TABLE OF AUTHORITIES

**Cases**

*Abrahamson v. Fleschner*,
   568 F.2d 862 (2d Cir. 1977).........................................................................14

*Alphonse v. Arch Bay Holdings, L.L.C.*,
   548 F. App'x 979 (5th Cir. 2013) .............................................................12

*Anderson* v. *Abbott*,
   321 U.S. 349 (1944)..................................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................6-7

*Basic Capital Mgmt. v. Dynex Commer., Inc.*,
   402 S.W.3d 257 (Tex. App.—Dallas 2013, pet. denied) .........................21

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................7

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013)....................................................................13

*Broyles v. Cantor Fitzgerald & Co.*,
   No. 10-854, 2014 U.S. Dist. LEXIS 169364 (M.D. La. Dec. 8, 2014) ................13

*Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*,
   No. 7841-VCP, 2015 Del. Ch. LEXIS 237 (Del. Ch. Sep. 10, 2015)....................15

*Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P.*
*(In re Highland Cap. Mgmt., L.P.)*,
   643 B.R. 162 (N.D. Tex. 2022)..................................................................7

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) .....................................................................6

*Commerce Bank v. Malloy*,
   No. 13-CV-252, 2013 U.S. Dist. LEXIS 106329 (N.D. Okla. July 30, 2013) ...................8-9

*Cudd Pressure Control, Inc. v. Roles*,
   328 F. App'x 961 (5th Cir. 2009) (unpublished)........................................9

*Dandridge v. Williams*,
   397 U.S. 471 (1970).................................................................................5

004413

*Douglass v. Beakley*,
    900 F. Supp. 2d 736 (N.D. Tex. 2012) ........................................................12, 16

*Dussouy v. Gulf Coast Inv. Corp.*,
    660 F.2d 594 (5th Cir. 1981) .................................................................23

*Du Bois v. Martin Luther King Jr. Family Clinic, Inc.*,
    No. 3:17-CV-2668-L, 2018 U.S. Dist. LEXIS 246910,
    (N.D. Tex. May 29, 2018).....................................................................6

*Edgar v. Mite Corp.*,
    457 U.S. 624 (1982)...........................................................................12

*Fink v. Nat'l Sav. & Tr. Co.*,
    772 F.2d 951 (D.C. Cir. 1985) ..............................................................18

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*,
    462 U.S. 611 (1983)...........................................................................12

*Fisk Elec. Co. v. DQSI, L.L.C.*,
    740 F. App'x 399 (5th Cir. 2018) (unpublished) ..................................................23

*Fund of Funds, Ltd. v. Vesco*,
    74-Civ-1980, 1976 U.S. Dist. LEXIS 14183 (S.D.N.Y. July 12, 1976)................................20

*Goldenson v. Steffens*,
    No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258 (D. Me. Mar. 7, 2014) ........................13

*Hand v. Dean Witter Reynolds, Inc.*,
    889 S.W.2d 483 (Tex. App.—Houston [14th Dist.] 1994, writ denied)...............................11

*Holt Atherton Industries, Inc. v. Heine*,
    835 S.W.2d 80 (Tex. 1992) ...................................................................21

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
    305 F. Supp. 2d 658 (E.D. Tex. 2004) ......................................................18, 19

*Jackson v. Dear and Seven Others*,
    [2013 GLR 167] Guernsey Royal Ct. ...........................................................15

*Jacobsen v. Osborne*,
    133 F.3d 315 (5th Cir. 1998) ................................................................23

*Laird v. Integrated Res.*,
    897 F.2d 826 (5th Cir. 1990) .............................................................11, 17

004414

*Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.),*
238 F. Supp.3d 799 (S.D. Tex. 2017) .................................................................. 11

*Leffall v. Dall. Indep. Sch. Dist.,*
28 F.3d 521 (5th Cir. 1994) ................................................................................ 23

*Legate v. Livingston,*
822 F.3d 207 (5th Cir. 2016) ............................................................................. 5-6

*Leyse v. Bank of Am. Nat'l Ass'n,*
804 F.3d 316 (3d Cir. 2015) .................................................................................. 6

*Lovelace v. Software Spectrum,*
78 F.3d 1015 (5th Cir. 1996) ................................................................................. 6

*Nabors Drilling, U.S.A., Inc. v. Escoto,*
288 S.W.3d 401 (Tex. 2009) ................................................................................ 22

*Navigant Consulting, Inc. v. Wilkinson,*
508 F.3d 277 (5th Cir. 2007) ................................................................................. 9

*Pool v. Johnson,*
No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613
(N.D. Tex. Apr. 15, 2002) .................................................................................... 16

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,*
29 S.W.3d 74 (Tex. 2000) .................................................................................... 21

*Reneker v. Offill,*
No. 3:08-cv-1394-D, 2010 U.S. Dist. LEXIS 38526
(N.D. Tex. Apr. 19. 2010) ...................................................................................... 6

*Romano v. Merrill Lynch, Pierce, Fenner & Smith,*
834 F.2d 523 (5th Cir. 1987) ............................................................................... 11

*Santa Fe Indus. v. Green,*
430 U.S. 462 (1977) .......................................................................................... 9-10

*Sassen v. Tanglegrove Townhouse Condo. Ass'n,*
877 S.W.2d 489 (Tex. App.—Texarkana 1994, writ denied) ............................... 16

*Scanlan v. Texas A&M Univ.,*
343 F.3d 533 (5th Cir. 2003) ................................................................................. 7

*SEC v. ABS Manager, LLC,*
No. 13cv319, 2014 U.S. Dist. LEXIS 80542 (S.D. Cal. June 11, 2014) ......... 14-15

004415

*SEC v. Ambassador Advisors, LLC,*
   576 F. Supp. 3d 286 (E.D. Pa. 2021) ........................................................... 10

*SEC v. Blavin,*
   760 F.2d 706 (6th Cir. 1985) ...................................................................... 17

*SEC v. Tambone,*
   550 F.3d 106 (1st Cir. 2008) ................................................................. 10, 14

*SEC v. World Tree Fin., L.L.C.,*
   43 F.4th 448 (5th Cir. 2022) ................................................................. 10, 18

*SEC v. Zandford,*
   535 U.S. 813 (2002) ................................................................................... 10

*Snowden v. Wells Fargo Bank, N.A.,*
   No. 3:18-cv-1797, 2019 U.S. Dist. LEXIS 23557 (N.D. Tex. Jan. 18, 2019) ...................... 21

*State ex rel. Udall v. Colonial Penn Ins. Co.,*
   812 P.2d 777 (N.M. 1991) ...................................................................... 12-13

*Strougo ex rel. Braz. Fund v. Scudder, Stevens & Clark, Inc.,*
   964 F. Supp. 783 (S.D.N.Y. 1997) ................................................................ 13

*Strougo v. Bassini,*
   282 F.3d 162 (2d Cir. 2002) ...................................................................... 13

*Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.),*
   374 F.3d 330 (5th Cir. 2004) ..................................................................... 8

*Tigue Inv. Co. v. Chase Bank of Tex., N.A.,*
   No. 3:03-CV-2490, 2004 U.S. Dist. LEXIS 27582 (N.D. Tex. Nov. 15, 2004) .................... 19

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,*
   444 U.S. 11 (1979) ............................................................................ 9-10

*United States SEC v. Markusen,*
   143 F. Supp. 3d 877 (D. Minn. 2015) ............................................................ 15

*Victaulic Co. v. Tieman,*
   499 F.3d 227 (3d Cir. 2007) ...................................................................... 6

*W. Res. Life Assurance Co. v. Graben,*
   233 S.W.3d 360 (Tex. App.—Fort Worth 2007, no pet.) ........................................... 11

*ZPR Inv. Mgmt. v. SEC,*
   861 F.3d 1239 (11th Cir. 2017) ................................................................. 19

vi

004416

## Codes, Rules and Statutes

15 U.S.C. § 80a-3(a)(1)(A) ................................................................. 14

15 U.S.C. § 80a-3(a)(1)(C) ................................................................. 14

15 U.S.C. § 80b-8(d) ......................................................................... 17

15 U.S.C. § 80b-15(a) ........................................................ 13, 15, 18, 22

15 U.S.C. § 80b-6(2) .................................................................. 14, 19

15 U.S.C. § 80b-6(4) .................................................................. 14, 19

15 U.S.C. § 80b-15(a) ............................................................ 13, 18, 22

17 C.F.R. § 206(4)-8 .................................................................. 14, 15

17 C.F.R. § 275.204A-1 ................................................................... 10

Fed. R. Civ. P. 9(b) ...................................................... 18-19, 20, 24

Fed. R. Civ. P. 12(b)(6) ............................................... 6, 7, 20, 24

Fed. R. Civ. P. 12(g) ........................................................... 6, 12

Fed. R. Civ. P. 15(a) ................................................................. 23

Fed. R. Evid. 201(b) ............................................................... 13

## Other

Commission Interpretation Regarding Standard of Conduct for Investment Advisers,
Investment Advisers Act Release No. IA-5248, 84 Fed. Reg. 33,669 (July 12, 2019) ........ 10, 17

Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003) ................................ 10

Investment Advisers Act Release No. 3060, 75 Fed. Reg. 49,234 (Aug. 12, 2010) ................. 10

Restatement (Third) of Agency § 8.01 (Am. L. Inst. 2006) ................................ 10

004417

I.

**<u>INTRODUCTION</u>**

This action arises from Defendant's role as an investment advisor to the Plaintiffs under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>"). Plaintiffs learned—after the fact—that Defendant had failed to disclose to them the true value of securities sold in connection with a settlement that was approved in Defendant's bankruptcy proceedings and failed to obtain their informed consent to the transaction. Defendant's actions thus violated unwaivable fiduciary duties arising under the Advisers Act.

***<u>First</u>***, Highland's arguments concerning "judicial estoppel" improperly rely upon evidence outside the four corners of Plaintiffs' pleadings and raise new arguments that were not raised previously. The Court should not consider this extraneous evidence or successive motion practice. Moreover, Highland ignores the pleadings stating that there was evidence then unknown to Plaintiffs—namely, the falsity of the representation of the value of the assets in question—at the time of the HarbourVest 9019 settlement hearing—making any inconsistency in their positions inadvertent. With this inadvertence, judicial estoppel cannot apply.

***<u>Second</u>***, Highland feigns ignorance of the Advisers Act § 206(4) which imposes direct liability on an advisor to investors—something recognized by the Supreme Court and the Securities and Exchange Commission. Indeed, Highland's own CEO testified under oath that he and Highland owed direct fiduciary duties to investors. Highland misleads this Court by suggesting there is no private cause of action under the Investment Advisers Act—which is false under Supreme Court precedent. Highland then fails to disclose that the Act gives rise to unwaivable fiduciary duties actionable at common law via claims for fiduciary duty and negligence, and which can also be brought derivatively.

---

***Third***, other than judicial estoppel, Highland has no articulated basis for dismissing the contract and tortious interference claims. Highland's arguments are conclusory and superficial at best—as are its arguments for dismissing the negligence claim. Highland's reliance on the Plan injunction entered by this Court to vitiate liability for unwaivable fiduciary duties is baseless.

As has been the case all along, Highland is seeking to avoid fair scrutiny of its self-dealing. Highland's assumption that Plaintiffs have not been harmed ignores Supreme Court precedent holding that injury is not an element of an Advisers Act violation, and ignores the fact that Plaintiffs were denied a prime investment opportunity—of the sort Highland and its subsidiary were advising Plaintiffs about—so that Highland and its current CEO could reap a windfall at Plaintiffs' expense. Discovery will bear out the allegations which have been pleaded with particularity and in good faith. In the unlikely event the Court considers the Renewed Motion to Dismiss to have any validity, then the Plaintiffs request leave to amend their pleadings to cure any identified deficiencies.

## II.

## **FACTUAL BACKGROUND**

Plaintiff Charitable DAF Fund, L.P. ("DAF") is a charitable fund that helps several causes throughout the country, including providing millions of dollars every year to local charities in Dallas and around the country, such as family shelters, education initiatives, veteran's welfare associations, public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Original Complaint ("Compl.") at ¶ 10.

Since 2012, the DAF was advised by its registered investment advisor, Defendant Highland Capital Management, L.P. ("Highland"), and its various subsidiaries about where to invest. (Compl. at ¶ 11). This relationship was governed by an investment advisory agreement. (Compl.

---

at ¶ 12). As the DAF's investment advisor, Highland owed the DAF fiduciary obligations, including the duty against self-dealing, the duty to put the DAF's best interest ahead of its own, and the duty to obtain informed consent from the DAF. (Compl. at ¶¶ 56–57, 62).

In 2017, Highland advised the DAF to acquire 143,454,001 shares of Highland CLO Funding, Ltd ("HCLOF"), which the DAF did via a holding entity, Plaintiff CLO Holdco, Ltd. ("CLO Holdco"). (Compl. at ¶ 12).

Shortly thereafter, CLO Holdco entered into a Subscription and Transfer Agreement whereby a series of related entities collectively referred to as "HarbourVest" acquired a 49.98% membership interest in HCLOF (the "HarbourVest Interests"). (Compl. at ¶¶ 13–14). As part of this transaction Holdco retained a 49.02% membership interest. (Compl. at ¶ 13), and Highland took a 0.6% membership interest HCLOF (Compl. at ¶ 25).

HCLOF's portfolio manager is Highland HCF Advisor, Ltd. ("HCFA"), which is subsidiary of Highland and is controlled and operated by Highland. (Compl. at ¶ 24). Both are registered investment advisers ("RIA"). As such, both Highland and HCFA owed fiduciary duties to CLO Holdco as an investor in the HCLOF fund. James P. Seery, Jr., CEO of Highland, testified that Highland owed such fiduciary duties under the Investment Advisers Act of 1940 (the "Advisers Act") to investors in the funds that Highland manages (App_0008-10, 0014).

The HCLOF parties' rights and obligations as members of HCLOF were governed by the *Members Agreement Relating to the Company* dated November 15, 2017 ("Company Agreement"). (Compl. at ¶¶ 93–94) (App_0018-35). Under the Company Agreement, no member was allowed to sell shares to another member without first providing all other members the opportunity and right to purchase a *pro rata* portion thereof at the same price being offered. (Compl. at ¶ 95; App_0026-27).

In October 2019, Highland filed for Chapter 11 (Compl. at ¶ 15). As part of this bankruptcy, HarbourVest filed its proof of claim against Highland totaling over $300 million (Compl. at ¶¶ 16, 21-23). Highland denied the validity of these claims. (Compl. at ¶ 17, 26).

In the meantime, Highland continued to control HCLOF through its subsidiary HCFA. (Compl. at ¶¶ 115–124). In September 2020, HCLOF was underperforming, and the value of the investment had diminished—the HarbourVest Interests had diminished $52 million in value. (Compl. at ¶ 27). On September 30, 2020, Highland utilized interstate wires to transmit information to the HCLOF investors regarding the value of their respective interests. (Compl. at ¶ 121). In the following months, however, the value HCLOF began to improve and Highland did not update investors; by the end of November 2020, the value of HCLOF's total assets increased to $72,969,492 ($36,484,746 allocated to HarbourVest) and by the end of December, HCLOF's reached $86,440,024 ($43,202,724 allocated to HarbourVest's Interests). (Compl. at ¶¶ 123–124). However, Highland did not transmit these valuations to Plaintiffs (Compl. at ¶ 120).

Around November 2020, Highland and HarbourVest—utilizing the interstate wires— entered into discussions about settling HarbourVest's claims in the bankruptcy. (Compl. at ¶ 119). Highland and HarbourVest reached a settlement, which Highland requested the bankruptcy court approve on December 23, 2020 (the "9019 Hearing"). (Compl. at ¶ 29; App_0046-64). As part of the settlement, Highland agreed to allow HarbourVest $45 million in unsecured claims, which were expected to yield about seventy cents on the dollar to HarbourVest (roughly $31,500,000). (Compl. at ¶ 32; App_46-64). As part of the consideration for the $45 million in allowed claims, HarbourVest sold its interest in HCLOF to Highland for $22,500,000 (Compl. at ¶ 33) (the "HarbourVest Settlement").

Despite Highland's fiduciary obligations to Plaintiffs, Highland concealed the rising value

of HCLOF and the Harbourview Interests, as well as the value that it was buying the interest for. It diverted the entire opportunity to participate in this windfall transaction to itself in violation of its fiduciary duties (Compl. at ¶ 67).

At the January 14, 2021, Bankruptcy Rule 9019 hearing to approve the settlement, HCF's CEO testified that the value allocated to the HarbourVest Interests was $22.5 million. (Compl. at ¶¶ 34, 37). The bankruptcy court issued an order approving the HarbourVest Settlement (App_0065-68) (the "9019 Order"). The sale of the HarbourVest Interests transformed Highland from a minority member with a 0.6% interest into the controlling member with a 50.49% interest.

The truth was otherwise. As Plaintiffs learned only after the fact from former Highland employees who were familiar with the valuation, the HarbourVest interest was actually worth $41,750,000 on a net asset value basis. (Compl. at ¶¶ 34, 37). Highland's failure to inform HCLOF—whom it controlled through HCFA—or Holdco, means Highland reaped a $20 million-plus windfall by self-dealing and without proper disclosure, resting on affirmative misrepresentations by its CEO, and without obtaining informed consent from its investors.

This lawsuit followed and is now subject to a second successive motion to dismiss in violation of the Rules of Civil Procedure and precedent.

## III.

## MOTIONS TO STRIKE

### A.   DEFENDANTS' SUCCESSIVE MOTION TO DISMISS SHOULD BE STRICKEN

This Court presumptively denied Highland's bases for dismissal on the merits by not ruling on them, and during the first appeal, Highland did not ask the district court to rule on the merits or to affirm on that basis as it could have. *See Dandridge v. Williams,* 397 U.S. 471, 475 n.6 (1970). By failing to raise those presumptively denied bases for dismissal on appeal, Highland waived

them, *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016), and cannot re-assert them now.

The Fifth Circuit and the district courts within it have repeatedly held that successive Rule 12(b)(6) motions are not allowed under Rule 12(g) and (h), and that a motion such as this one can only be brought as a 12(c) motion after the pleadings have closed. *See* Fed. R. Civ. P. 12(g) and (h); *see, e.g., Du Bois v. Martin Luther King Jr. Family Clinic, Inc.*, No. 3:17-CV-2668-L, 2018 U.S. Dist. LEXIS 246910, at *5-6 (N.D. Tex. May 29, 2018). Accordingly, this is not a "renewed motion;" it is an improper *successive* motion to dismiss and should be stricken. *DuBois*, 2018 U.S. Dist. LEXIS 246910, at *5-6; *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 322 n.5 (3d Cir. 2015) ("district courts should enforce [the rule against successive motions] even if their failure to do so is not a ground for reversal").

## B. DEFENDANTS' EXHIBITS SHOULD BE STRICKEN

The district courts in this district have also held that a court should only take judicial notice of facts "'sparingly at the pleadings stage.'" *Reneker v. Offill*, No. 3:08-cv-1394-D, 2010 U.S. Dist. LEXIS 38526, at *5 (N.D. Tex. Apr. 19. 2010) (Fitzwater, J.) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007)). Courts in the Fifth Circuit have held that, other than legal documents, a court cannot take judicial notice of unpled *facts* unless the facts are undisputed. *See Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996). Thus, this Court should strike the appendix submitted with the motion as impertinent and improper.

## IV.

## PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF

Motions to dismiss for failure to state a claim are viewed with disfavor and are seldom granted. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain 'a short and plain statement of

the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-678 (2009). This Court must draw all reasonable inferences in favor of the plaintiff.  *See Collins*, 224 F.3d at 498. Rule 8 does not demand "'detailed factual allegations[.]'" *Id*. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In ruling upon a Rule 12(b)(6) motion, the Court cannot decide disputed fact issues. The court may grant a motion under Rule 12(b)(6) *only if* it can determine with certainty that the plaintiff cannot prove a set of facts that would allow the relief sought in the complaint. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

## A.  JUDICIAL ESTOPPEL SHOULD NOT BE APPLIED TO COUNTS 2 OR 5

The district court on appeal remanded for consideration of whether judicial estoppel applied to Counts 2 or 5 of the Complaint. *Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 174-75 (N.D. Tex. 2022) ("Remand Order"). Plaintiffs still disagree that there was any judicial admission, but nonetheless address the questions that were remanded.[1]

### 1.  Highland's Reliance on Collateral Evidence is Improper

Highland's entire argument on judicial estoppel fails for two reasons already addressed: First, it relies on new arguments not raised previously. And second, it relies on evidence outside of the four corners of the Complaint. For instance, the question of inadvertence which the district court remanded for this Court's consideration is not one that can be resolved on the pleading because it asks *why* Holdco withdrew its objection. That cannot be determined at this early stage, and Highland's selective document-dump is not competent evidence, not properly admitted, and therefore not proper for this Court to consider at the 12(b)(6) stage.

---

[1] Plaintiffs adopt and incorporate the arguments made previously to this Court and before the district court on appeal as to why judicial estoppel does not apply, and reserve all rights on appeal. For the purposes of this briefing and for the sake of brevity, Plaintiffs address the issues reserved for remand to this Court.

### 2.  Highland Has Not Shown a Lack of Inadvertence

The Fifth Circuit has addressed "inadvertence" in the bankruptcy context by citing a debtor's duty to disclose all claims at the beginning of a bankruptcy. *See Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004) ("The debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment.") (italics in original). Here, no such duty to object to a 9019 settlement exists. Nonetheless, Holdco's 9019 objection addressed *HarbourVest*'s violations of the Member Agreement. But Count 2 of the Complaint alleges that *Highland* violated the HCLOF Company Agreement by failing to offer the interest to Holdco (and other members) before it transferred the interest to its subsidiary. HoldCo never brought its objection as to Highland or its subsidiary. And Count 5 alleges that Highland HCF Advisors L.P. tortiously interfered with the Company Agreement in its investment advisory role, another claim that was not brought as an objection (and for which no duty to object existed).

### a.  Holdco Did Not Intentionally Conceal its Breach of Contract or Tortious Interference Claims From the Court and Had No Motive to Do So

There is no evidence in the record that Holdco intentionally concealed its claims from the Court for breach of contract or tortious interference—nor that it had any reason to do so. The opposite is true. The contract claims were disclosed, albeit they were withdrawn without prejudice. There was no motive to conceal the claims to the extent they were known to Holdco at the time. This Court and the district court has already ruled that the withdrawal of those claims did not attach *res judicata* or *collateral estoppel* preclusion. Other courts have found that unsuccessful legal positions taken during a 9019 hearing are not a basis for finding that judicial estoppel applies where those legal positions relate to matters more properly addressed in an adversary proceeding. *See,*

*e.g., Commerce Bank v. Malloy*, No. 13-CV-252, 2013 U.S. Dist. LEXIS 106329, at *15-17 (N.D.

Okla. 2013). Therefore, their withdrawal without prejudice did not, and was not expected to, have

any preclusive effect making the withdrawal inadvertent as to any alleged inconsistency.

### b.  New Facts Giving Rise to the Claims Were Not Known to Holdco

The facts giving rise to the lawsuit arose after the 9019 hearing. To wit, the tortious

interference claim stems from Highland's concealment and misrepresentation of the net asset value

of HCLOF prior to and during the 9019 hearing—the true value of which only became known to

Holdco well after this Court's 9019 hearing and 9019 Order (Compl. ¶¶ 36-45, 47-52). Because of

the misrepresentation and the self-dealing entailed therein, Holdco is able to state a tortious

interference claim based upon inadvertence. And but for the misrepresentation, Holdco would not

have withdrawn its objection, and would have made a more robust objection to the settlement or

sought a different path. Therefore, judicial estoppel is improper.

### B.  PLAINTIFFS HAVE PROPERLY PLED CLAIMS FOR BREACH OF FIDUCIARY DUTY

In Texas, the elements of a breach of fiduciary duty are: "(1) a fiduciary relationship

between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the

plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the

defendant.'" *Cudd Pressure Control, Inc. v. Roles*, 328 F. App'x 961, 964 (5th Cir. 2009) (quoting

*Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007)).

### 1.  Highland and HCFA Owe Fiduciary Duties Under the Advisers Act

"The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate

certain abuses in the securities industry, abuses which were found to have contributed to the stock

market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau,

Inc.*, 375 U.S. 180, 186 (1963). The Advisers Act thus "establishes 'federal fiduciary standards' to

---

govern the conduct of investment advisers." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (citing *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977)).

The Advisers Act imposes both a duty of care and a duty of loyalty on investment advisors. *See SEC v. Tambone,* 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6] imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors."); *SEC v. Ambassador Advisors, LLC,* 576 F. Supp. 3d 286, 300 (E.D. Pa. 2021) ("The fiduciary duties under § 206(2) also require investment advisers to seek "best execution" for all their clients' transactions. "Best execution" means obtaining 'the most favorable terms reasonably available under the circumstances.'"); 17 C.F.R. § 275.204A-1 (describing the required investment adviser code of ethics, and its focus on conflicts of interest).

The Advisers Act was also enacted in part to prevent conflicts of interest, self-dealing and fraud by investment advisors. *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. at 186–87. A key prohibition is that the advisor cannot engage in cherry picking—selecting the best securities and opportunities in a way that enriches itself. *Accord SEC v. World Tree Fin., L.L.C.,* 43 F.4th 448, 460 (5th Cir. 2022) ("Because cherry-picking involves allocating more profitable trades to certain accounts, an adviser is 'stealing from one customer to enrich himself'"). *See also* Investment Advisers Act Release No. 3060, 75 Fed. Reg. 49,234 (Aug. 12, 2010) ("Under the Advisers Act, an advisor is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).[2]

---

[2] The SEC's interpretive guidance of the Advisers Act is accorded *Chevron* deference. *See SEC v. Zandford,* 535 U.S. 813 (2002). In interpreting § 206 of the Advisers Act, the SEC has recognized that conflicts of interest arise where an advisor seeks to take advantage of an opportunity that it otherwise might offer to its client. *See* Commission Interpretation Regarding Standard of Conduct for Investment, Release No. IA–5248, Fed. Reg./Vol. 84, No. 134 at 33675-77 (citing Restatement (Third) of Agency, § 8.01 (2006)

Texas courts have also found that advisors owe fiduciary duties of care and loyalty. *W. Res. Life Assurance Co.   v. Graben*, ==233 S.W.3d 360, 374== (Tex. App.—Fort Worth 2007, no pet.); *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, ==834 F.2d 523, 530== (5th Cir. 1987) (holding that advisors owe investors fiduciary duties under Texas law); *Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, ==238 F. Supp. 3d 799, 851== (S.D. Tex. 2017) (under Texas law, an investment advisor and investors are in a formal fiduciary relationship). Texas law provides that a fiduciary relationship is governed by the terms of the agency. *See Hand v. Dean Witter Reynolds, Inc.*, ==889 S.W. 2d 483, 492== (Tex. App.—Houston [14th Dist.] 1994, *writ denied*). The Advisers Act provides the scope of, and rules governing, the advisor/advisee agency relationship. *See Laird v. Integrated Res.*, ==897 F.2d 826, 834== (5th Cir. 1990).

Here, HCFA is a wholly-owned subsidiary of Highland. Both are registered investment advisors under the Advisers Act of 1940 (Compl. ¶ 56). Highland operates HCFA, which serves as the Portfolio Manager of Highland CLO Funding, Ltd. ("HCLOF"). Highland was a direct advisor to the DAF. Therefore, Highland and HCFA each owed fiduciary duties to the DAF and Holdco respectively.

## 2. Holdco Has Standing to Bring a Breach of Fiduciary Duty Claim Directly and Derivatively

Highland contends that Holdco, as a mere investor in HCLOF who is not in privity with

---

(explaining that "the general fiduciary principle, …also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.")). A necessary but not sufficient measure by the advisor is full and fair disclosure and obtaining the client's informed consent before the advisor takes such an action. *Id*. at 33676-77. "In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material facts or conflicts of interest and make an informed decision whether to provide consent." *Id.* at 33676. This includes all information about an advisor's potential gain or advantage—especially hidden ones and ulterior motives. *Id.* at 33677. The failure to make such disclosures and obtain informed consent in a manner that is not disinterested is a breach of the fiduciary duty under the Adviser's Act. *Id.* at 33677.

---

Highland or HCFA, lacks standing. This is incorrect as a matter of law.

*First*, Highland incorrectly states that there is no private right of action under the Advisers Act. This is simply not true. Section 215 recognizes a limited private right of action for equitable relief including disgorgement, wherein one may seek to void the rights of a violator who performs a contract in violation of the Advisers Act. *See* 15 U.S.C. § 215. *TAMA*, 444 U.S. at 19 ("[W]hen Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution."). Plaintiff has pled disgorgement and is entitled to it under this statute.

*Second*, the Northern District of Texas decided almost a decade ago that, although the Advisers Act does not itself create a cause of action for damages, state law fiduciary duty claims can be brought for violations of the Advisers Act. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, 751-52, n.16 (N.D. Tex. 2012) (Boyle, J.) (denying motion to dismiss state fiduciary duty claims predicated on breaches of the Advisers Act).[3] Therefore, Holdco has standing to bring its claims

---

[3] Highland newly contends that because HCLOF is a Guernsey company, Guernsey fiduciary duty law applies under the internal affairs doctrine to decide whether a fiduciary duty claim by an investor can be brought against an investment advisor. This argument fails. For one thing, it was not raised originally—meaning it was waived under Rule 12(g) and (h). For another, the argument incorrectly supposes—without any support—that the internal affairs doctrine would apply and would select Guernsey law for duties related to HCLOF. The internal affairs doctrine only applies to HCLOF's *internal* affairs—i.e., the duties of officers and directors towards the company and shareholders. *Accord Alphonse v. Arch Bay Holdings, L.L.C.*, 548 F. App'x 979, 986 (5th Cir. 2013) (noting that internal affairs doctrine does not apply where rights with respect to "third parties external to the corporation are at issue") (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621-22 (1983)). The internal affairs doctrine is NOT at issue here as neither Highland nor HCFA is alleged to be an officer or director of HCLOF, nor is their fiduciary duty alleged to arise out of service in such a role. Nor can the internal affairs doctrine circumvent federal securities laws. The Supreme court in *Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982) held that the internal affairs doctrine was irrelevant where the issue was the violation of the securities laws between a shareholder and a third party who was not an officer or director of the company, and that the internal affairs doctrine could not be used to circumvent federal securities laws. *See id; cf. Anderson* v. *Abbott*, 321 U.S. 349, 365 (1944) (declining to apply the law of the State of incorporation to determine

---

for violations of the Advisers Act under applicable state law. *Id*. Other courts are in accord. *See Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. Mar. 7, 2014) *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502-06 (3d Cir. 2013); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 785 (N.M. 1991); *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 799 (S.D.N.Y. 1997), *rev'd in part on other grounds in Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002).

*__Third__*, the fiduciary duties under the Advisers Act are not limited to direct advisees. Highland's CEO, James Seery, testified under oath—under *direct examination by Highland's lawyers*—that he and Highland, as registered investment advisors, owed fiduciary duties to the funds they managed, and the *investors* in those funds. (App_0009) ("The goals of the debtor…number one, discharge Highland's, … duties to investors in the funds. Those are fiduciary duties under the Investment Advisers Act."); (App_14) ("the Investment Advisors Act puts a fiduciary duty on Highland Capital to discharge its duty to the **investors**. So, while we have duties to the estate, we also have duties, as I mentioned in my last testimony, **to each of the investors in the funds**.") (bolding added). Seery's sworn, uncontradicted testimony is a judicial admission and an undisputed fact that this Court may take judicial notice of at this stage. *See* Fed. R. Evid. 201(b).

---

whether a banking corporation complied with the requirements of federal banking laws because "no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning national banks which Congress has announced"); *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854, 2014 U.S. Dist. LEXIS 169364 (M.D. La., Dec. 8, 2014) (internal affairs doctrine does not apply to claims of breach of a fiduciary duty against stockbroker). Here, Highland's and HCFA's fiduciary duties arise out of their roles as registered investment advisors to the DAF directly and to HCLOF, and so are non-waivable. *See* 15 U.S.C. § 80b-6 and § 80b-15(a). Those duties are subject to their Advisory Agreements, neither of which select Guernsey law—actually, they expressly select Texas law. *See* Offering Memo p. 82 ("[HCFA]'s Portfolio Management Agreement is governed by the laws of the State of Texas.") (APP_0175); DAF/HCMLP Advisory Agmt at ¶ 14(e) (APP_0219) Moreover, the Offering Memorandum (which is incorporated via the Company Agreement § 2.2), states that HCFA is "subject to the provisions of the Investment Advisers Act." Offering Memo at p. 13 and 59 (APP_0106 and 0152).

---

**_Fourth_**, the Advisers Act § 206 expressly imposes duties owed directly to investors in a fund. *See* 15 U.S.C. § 80b-6(4). Highland attempts to circumscribe the issue to just "clients". But Section 206(4) says nothing about clients while §§ 206(1) and (2) expressly limit duties only to "clients". *Accord SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6(4)] imposes a fiduciary duty on investment advisors to act at all times in the best interest of the fund *and its investors*." (emphasis added)). The Supreme Court and circuit courts long ago recognized the right of investors in pools of funds to bring direct actions against the fund managers for breaches of the Advisers Act. *See, e.g., TAMA*, 444 U.S. at 13; *Abrahamson v. Fleschner*, 568 F.2d 862, 871-74 (2d Cir. 1977) *rev'd in part on other grounds*.

Furthermore, § 206(4) empowered the SEC to enact regulations refining the scope of the duties under § 206(4). Pursuant to its grant of authority, the SEC promulgated 17 C.F.R. § 275.206(4)-8 ("Rule 206(4)-8") to enforce the fiduciary standards in Section 206(d), making it unlawful for an advisor to a "pooled investment vehicle" to:

> (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, **to any investor** or prospective investor in the pooled investment vehicle; or
>
> (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative **with respect to any investor** or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206(4)-8 (bolding added). By its plain terms, Rule 206(4)-8(a) expressly anticipates a lack of direct privity and imposes direct duties on investment advisors to investment funds with respect to the investors in those funds—which includes Holdco.[4] *SEC v. ABS Manager,*

---

[4] Highland does not appear to contest that HCLOF is a "pooled investment vehicle" for the purposes of this regulation. Normally, HCLOF would have to register under the Investment Company Act. The Investment Company Act, 15 U.S.C. § 80a-3(a)(1)(A), (C) states that an investment company is an issuer that "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of

---

*LLC*, No. 13cv319, <mark>2014 U.S. Dist. LEXIS 80542, at *45</mark> (S.D. Cal. June 11, 2014) (adopting

SEC's position and granting summary judgment as to violations of Rule 206(4)-8 because "section

206(4) and Rule 275.206(4)-8. . .prohibit the same conduct as sections 206(1) and 206(2) but in

connection with 'pooled investment vehicles'"); *SEC v. Markusen*, <mark>143 F. Supp. 3d 877,891</mark> (D.

Minn. 2015) (denying motion to dismiss action by investors against manager of fund); *Goldenson*,

<mark>2014 U.S. Dist. LEXIS 201258, at *139</mark> (holding that an advisor to a pooled vehicle had general

fiduciary duty to investors even as to outside investments made by the advisor).

 ***Fifth***, Holdco also pled its claims derivatively (Compl. at Caption and at ¶ 91). Thus, to

the extent HCLOF has a breach of fiduciary duty claim (which it also does), because HCLOF is a

Guernsey entity, Guernsey law determines derivative standing. Here, Guernsey law recognizes

both derivative and double-derivative standing, especially where, as here, the company is

controlled by the alleged wrongdoer. *See Jackson v. Dear and Seven Others*, [2013 GLR 167]

Guernsey Royal Ct. (Talbot, Lieut, Bailiff) (adopting English company law on derivative actions

and finding that double derivative actions are recognized vehicles in Guernsey corporations and

customary law); *see also Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, No. 7841-VCP, 2015

Del. Ch. LEXIS 237, at *49 (Del. Ch. Sep. 10, 2015) (noting derivative action for Guernsey entity

---

investing, reinvesting, or trading in securities" or that "is engaged or proposes to engage in the business of
investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment
securities having a value exceeding 40 per centum of the value of such issuer's total assets[.]" HCLOF
Meets this definition. *See, e.g.,* Company Agreement recital B and § 2.2 (APP_0017-18); Offering Memo
(APP_0094-97, 0106-107). The exceptions identified in Rule 206(4)-8(2) are for investment companies
that do not publicly offer their shares and have fewer than 100 investors. *Markusen*, <mark>143 F.Supp.3d at 891</mark>
(holding that investment fund not required to register where it "[has] less than 100 investors and do[es] not
publicly offer [its] securities"). HCLOF meets this definition. *See* Offering Memo at i ("There will be no
public offer of the Placing Shares") (APP_0085) and at p. 75 (shareholders list) (APP_0168). Thus, because
HCLOF would have to register under the Investment Company Act but for the exceptions to identified in
Rule 206(4)-8, *id.* at p. i ("[HCLOF] has not been and will not be registered under the Investment Company
Act of 1940"), HCLOF qualifies as a "pooled investment vehicle".

---

could proceed). Highland nowhere so much as purports to challenge the derivative standing of Holdco nor cites a single legal authority contravening it.

Therefore, Holdco has standing to bring claims for breach of the Advisers Act fiduciary duties as well as state law fiduciary duty claims.

### 3. The DAF Has Direct Standing to Bring Fiduciary Duty Claims

The Original Complaint pleads that Highland and the DAF are in a direct advisory relationship by virtue of a contractual arrangement. (Compl. ¶ 58). As the DAF's registered investment advisor, Highland is DAF's fiduciary. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, at 751-52, n.16. The Advisory Agreement further commits Highland to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [Highland], a copy of which will provided to the General Partner upon request." (Compl. ¶ 60). And while Highland contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given to the DAF, (Advisory Agreement ¶ 12), nowhere did it purport to *waive* the fiduciary duties owed to the DAF not to trade as a principal in a manner that was self-dealing or harmed the DAF. (Compl. ¶ 61). Additionally, Highland was appointed the DAF's attorney-in-fact. (Compl. at ¶ 59). "As the appointment of an attorney-in-fact creates a fiduciary relationship as a matter of law, Texas law imposes special duties on persons acting in that capacity." *Pool v. Johnson*, No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613, at *17 (N.D. Tex. Apr. 15, 2002) (citing *Sassen v. Tanglegrove Townhouse Condo. Ass'n*, 877 S.W.2d 489, 492 (Tex. App.— Texarkana 1994, *writ denied*)). Under Texas law, "[a] fiduciary owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability." *Id.* (citing *Sassen*, 877 S.W.2d at 492).

Here, Highland cannot to subrogate the DAF's rights to its own, nor self-deal, nor mislead

the DAF as to a competitive purchase. The DAF further has the right to full and fair disclosure by Highland before it usurps an opportunity that it was advising the DAF on. This is especially so because Highland cannot do indirectly what it cannot do directly. 15 U.S.C. § 80b-8(d).

### 4. Plaintiffs Have Alleged Several Breaches of Fiduciary Duty

Highland breached multiple fiduciary obligations in the process of negotiating and consummating the HarbourVest Settlement. The materiality of misrepresenting the value and the benefit to Highland of the investment is not debatable. *Accord SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). And Highland cannot escape liability for this duty by conducting its advisory activities through HCFA. *See* 15 U.S.C. § 80b-8(d).

Highland and HCFA breached the duty of care and the duty of loyalty. The Advisers Act's primary purpose is to eliminate advisors' conflicts of interest and ensure that advisors always act in the best interest of the investor. *See Laird*, 897 F.2d at 839. The Advisers Act also makes clear that the duty of loyalty means putting CLO Holdco's interest first. *See* Securities and Exchange Commission Interpretative Release*, Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 FR 33681 SEC Release No. IA-5248; File No. S7-07-18, 17 CFR Part 276, June 5, 2019 ("SEC Release") at p. 8, 23 (internal citations omitted). Under this duty, the Advisers Act explains that an advisor must have a rational, non-self-interested basis for how it allocates investment opportunities. *Id*. at 27.

Here, the HCLOF Company Agreement makes it clear that the purposes of HCLOF's investors is to acquire profitable CLO and CLO-related securities—which the shares in HCLOF would fall under (App_0020).[5] The Offering Memorandum specifically incorporated the Advisers

---

[5] The Company Agreement states that HCLOG "has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy [in the Offering Memo]."

Act as a governing limit on Highland's ability to usurp investment opportunities. Offering Memo at p. 59 (APP_0151 to 0152).

Defendants' reserving for themselves without proper disclosure the entire HarbourVest interest in HCLOF is plainly a violation of fiduciary duty—and a knowing one at that.[6] The fact that it was alleged to have been done knowingly, if not purposefully, satisfies the scienter requirement. "[A]s other courts have pointed out, cherry picking can satisfy the scienter element because it involves the knowing conduct of picking certain accounts over others." *World Tree Fin.,* 43 F.4th 448, 463 (citing cases).

And to the extent Highland contends that the Company Agreement or any other provision waives its obligations under the Advisers Act, or those of HCFA, those waivers are null and void under 15 U.S.C. § 80b-15(a).[7]

## 5. Rule 9(b) Does Not Apply to These Fiduciary Duty Claims

For Rule 9(b) to apply, the claim must sound in fraud. *See* FED. R. CIV. P. 9(b). "Allegations of breach of fiduciary duty are not necessarily fraud allegations." *In re Elec. Data Sys. Corp.* "ERISA" Litig., 305 F. Supp. 2d 658, 672 (E.D. Tex. 2004) (citing *Fink v. Nat'l Sav. & Trust Co.,*

---

[6] Highland entered into settlement negotiations in November 2020 with HarbourVest where it first learned of HarbourVest's intent to sell its interests in HCLOF. (Compl. ¶ 119). On December 23, 2020, Highland moved for approval of the HarbourVest Settlement. On January 14, 2021, at the Bankruptcy Court for the Northern District of Texas, Highland's CEO declared the that the value of HarbourVest's Interest in HCLOF was $22.5 million (Compl. at ¶ 34). The Bankruptcy Court approved a settlement that permitted Highland to obtain HCLOF's interest for this amount (Compl. at ¶¶ 32-34). In truth, the HarbourVest Interests were worth in excess of $41,750,000 at that time. (Compl. at ¶ 37). Highland, however, did not disclose the true value of HarbourVest's interests to Plaintiffs. (Compl. at ¶ 75). Furthermore, the value of the trade, the potential upside in the trade, and the nature of the trade were never disclosed to Holdco or the DAF prior to the hearing—indeed, the value and nature was misrepresented to them at the hearing. (Compl. ¶ 76, ¶ 120). Highland converted its 0.6% interest into a 50.58% interest and thereby control of HCLOF.

[7] Even if this court dismisses the contract claim (Count 2), that would not operate to deprive CLO Holdco or the DAF of the right to have Highland put their interests first as a matter of Advisers Act fiduciary duty. Defendants cannot waive those fiduciary obligations. *See* 15 U.S.C. § 80b-15(a).

---

249 U.S. App. D.C. 33, 772 F.2d 951, 959 (C.A.D.C. 1985) (holding that plaintiffs did not plead fraud where the complaint only alleged a breach of fiduciary duty of loyalty or care)). Plaintiffs also allege that Highland breached fiduciary duties by self-dealing when Highland purchased the entire HarbourVest Interests without providing Plaintiffs with the opportunity to participate. (Compl. at ¶ 76–88). These allegations do not require a false statement, nor require Plaintiffs' reliance, nor damage to Plaintiffs (a benefit to Highland suffices), all of which are elements of fraud. Because fraudulent conduct does not underlie Plaintiffs allegations, Rule 9(b) does not apply. *Tigue Inv. Co. v. Chase Bank of Tex. N.A.*, No. 3:03-CV-2490-N, 2004 U.S. Dist. LEXIS 27582, at *7–8 (N.D. Tex. Nov. 15, 2004). "Although fraud and breach of a duty to inform may both involve an omission, the Court does not find that every breach of a fiduciary duty to inform is a scheme to defraud." *EDS,* 305 F. Supp. 2d at 672.

Thus, Rule 9(b) does not apply here because violations of §§ 206(2) and (4) of the Advisers Act do not require proving or even alleging all the elements of fraud. 15 U.S.C. § 80b-6(4). Negligence is sufficient to establish liability under § 206(2) and (4). *See Capital Gains,* 375 U.S. at 195 ("… Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent to injure and actual injury to the client."); *ZPR Inv. Mgmt. v. SEC,* 861 F.3d 1239, 1247 (11th Cir. 2017) ("Sections 206(2) and (4) require no showing of scienter, and a showing of negligence is sufficient.") (internal citations omitted). Nor is a showing of reliance required. *Id.*

Even if Rule 9(b) did apply, it was met here. Plaintiff alleges the specific disclosures and statements in the Complaint made by Jim Seery under oath—when they were made, who made them, where they were made, and in what context. (Compl. ¶¶ 25-45; 47-51, 53, 55-91). Plaintiffs

---

further allege why those statements were false and how the falsity caused Plaintiffs injury. *Id.*[8]

*Accord Fund of Funds, Ltd. v. Vesco*, 74-Civ-1980, 1976 U.S. Dist. LEXIS 14183, at *31

(S.D.N.Y. 1976) ("The complaint identifies the alleged fraudulent transactions and how the fraud

was accomplished. Defendant's roles in those events are described and specific actions by

defendant, as a participant in allegedly unlawful activity, is delineated.").

Therefore, Rule 9(b) is not a basis for dismissing the claims herein.

## C.  PLAINTIFFS PLED CLAIMS FOR BREACH OF CONTRACT AND TORTIOUS INTERFERENCE

Plaintiff CLO Holdco's breach of contract claim is straightforward. Under the HCLOF

Company Agreement, a "Transfer" of the shares of HCLOF is defined to include the "sale" of the

shares. Company Agreement, § 6.1 (App_0026). Sections 6.1 and 6.2 of the Agreement purport to

allow sales by members of their interests in HCLOF to "affiliates" of members, but not to members

themselves, without certain conditions precedent. App_0026-27). One of those conditions is that

the other members have to be afforded the right to purchase their pro-rata portion (App_0027).

Highland contends that the "transfer" to its "nominee," HCMLP Investments, LLC, is a

transfer to an "affiliate." But this is factual gerrymandering and outside the scope of a 12(b)(6).

The transfer that is the basis of Plaintiffs' contract claim is the sale by HarbourVest to Highland.

That sale was accomplished through the Settlement Agreement with Highland (App_0046-54). In

the Settlement Agreement, Highland paid for the HarbourVest Interests. In return, HarbourVest

agreed to release its claims against Highland and transfer the HarbourVest Interests *to Highland*.

(App_0047). Highland's supposed "nominee," HCMLP Investments, LLC was not a party to this

agreement and Highland's nominee did not pay for those interests. *Id*. Therefore, the Settlement

---

[8] Indeed, Seery's testimony that is averted to specifically stated that Class 8 interests were only going to be paid some seventy cents on the dollar. Yet, according to publicly filed documents, almost 100% of Class 8 interests have been paid. What changed? Nothing.

---

Agreement constitutes a sale to *Highland*, and the sale violated Section 6.2 of the Company Agreement. The addendum transfer where Highland delegated its right to receive the shares to a nominee is "form over substance" and is bad faith, in violation of the Company Agreement § 20.5's "good faith" clause.

Defendant argues that Plaintiffs failed to plead actual damages. But Defendant ignores that fact that Plaintiffs plead that the breach of contract denied them the opportunity to obtain a share of the HabourVest Interests at a $20+ million discount, which it alleges are damages. (Compl. at ¶¶ 98–100, 102). Lost profits are an available remedy for breach of contract. *Basic Capital Mgmt. v. Dynex Commer., Inc.*, 402 S.W.3d 257, 268 (Tex. App.—Dallas, 2013). "Recovery for loss profits does not require that the loss be susceptible of exact calculation." *Id.* (quoting *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). Highland claims that Plaintiffs' damages are too speculative. The case it cites, *Snowden v. Wells Fargo Bank, N.A.*, No. 3:18-cv-1797, 2019 U.S. Dist. LEXIS 23557, at *13–14 (N.D. Tex. Jan. 18, 2019), which is completely inapposite on the facts because there no one had actually lost their use and enjoyment of the home. However, Plaintiffs do plead that it would have paid for the interest with cash. (Compl. ¶ 49-50). Highland's choice to disbelieve this allegation is not relevant here.

Turning to tortious interference. The elements are "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

Because Highland's entire premise for dismissing Plaintiffs' tortious interference claim is predicated on the non-existence of an enforceable contract and/or judicial estoppel, Plaintiff's tortious interference claim likewise survives. Plaintiffs' tortious interference claim survives for

---

another reason: the self-dealing and misleading statements by Highland as to the value of HarbourVest, which enabled it to circumvent the contractual duties, and the right of first refusal was a willful interference with Holdco's rights under the Company Agreement. There is no motion suggesting that Holdco did not allege that it suffered an injury due to the failure to be offered the HarbourVest interest and lose control of HCLOF to Highland. Nothing in the record states that Plaintiffs conceded that the HarbourVest sale did not violate the Company Agreement.

## D.  PLAINTIFFS HAVE PLED A CLAIM FOR NEGLIGENCE

Highland's entire argument for dismissal of the negligence cause of action is incorporating its other arguments. But this is a waiver because it has not articulated any basis for dismissal and has not shown which elements have not been met. First, under long-established Texas law, the elements of a negligence claim are: (a) a legal duty owed by one person to another; (b) breach of that duty; and (c) damages proximately caused by the breach. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Here, the Motion should be denied because the elements have all been pled. *See* Compl. ¶ 103-112. As argued before, the Advisers Act imposes a duty of care and loyalty under § 206(4). Even if Highland's misleading statements were unintentional, and/or its disclosure failures were unintentional, they were doubtlessly in violation of the standard of care, and Highland makes no argument to the contrary.

Highland's attempt to argue that the Plan exculpation precludes this claim is a non-starter. It was raised previously, meaning it is waived under Rule (g) and (h) and therefore should be stricken. Moreover, the duty of care here is a *federally imposed duty* which is *unwaivable* under 15 U.S.C. § 80b-15(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void."). No case undersigned could find—and no case cited by Highland—makes an

---

Plaintiffs' Response to Renewed Motion to Dismiss Complaint

exception for a Chapter 11 debtor to be able to violate the securities laws with impunity.

## E.  MOTION TO DISMISS RICO CLAIM UNDER RULE 41

Plaintiffs respectfully dismiss the RICO claim under Rule 41(a) to the extent such a claim is revealed to have existed under non-securities bases. Because Highland has conceded that Plaintiffs' claims are actionable under the federal securities laws and the Advisers Act, and has cited same as a basis for dismissing the RICO claim, Highland is precluded and estopped from denying the violations of the Securities Laws and the Advisers Act. As such, to the extent that other, non-securities law violations may give rise to RICO violations, Plaintiffs respectfully reserve the right to bring such a claim but respectfully dismiss their RICO claim at this time.

## F.  HIGHLAND'S REQUEST FOR FEES FAILS

Defendants' oblique request for fees is baseless. Absent a contract or law shifting the responsibility for fees, a party is expected to bear their own fees in litigation. *See Fisk Elec. Co. v. DQSI, L.L.C.*, 740 F. App'x 399, 401-02 (5th Cir. 2018). This is as true for a successful defendant as it is for a successful plaintiff. *Id*. Here, no contract or law provides for attorneys' fees to even a prevailing defendant. Therefore, no fees may be awarded.

## V.

## MOTION IN THE ALTERNATIVE FOR LEAVE TO AMEND

Plaintiffs respectfully ask for leave to amend in the alternative to cure any pleading deficiencies that the Court determines exist. A court's discretion to deny leave is severely limited by the bias of Rule 15(a) favoring amendment. *See Dussouy v. Gulf Coast Invest. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). Leave to amend "should not be denied 'unless there is a *substantial reason* to do so.'" *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (emphasis added) (quoting *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)).

Amendment would not be futile because—to the extent necessary under Rules 8 or 9(b)—Plaintiffs could add more detail, if necessary, on the representations and falsity, and on the allegations claimed to be deficient. The balance between Rule 8 and Rule 9(b) is not always perfect on the first try, and Plaintiffs should not be dismissed for want of an opportunity to cure any deficiencies. Plaintiffs could further add, if necessary, other acts by Highland wherein it has sold assets and used the funds to pay off its own creditors, which would buttress the allegations that this is not an isolated set of facts. Plaintiffs would further suggest that upon amendment, Plaintiffs would plead that there is a pattern of violations of the Advisers Act by Highland over the course of the past year which threatens to continue unabated into the future because Highland has clearly decided to shirk fiduciary duties to the investors in its funds.

## VI.

## CONCLUSION

For the foregoing reasons, the successive 12(b)(6) motion should be denied.

Dated:  November 18, 2022

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

***Counsel for Plaintiffs***

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFFS' RESPONSE TO RENEWED MOTION TO DISMISS COMPLAINT

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES .......................................................................... iii

I.   INTRODUCTION ..................................................................................1

II.  FACTUAL BACKGROUND ...................................................................2

III. MOTIONS TO STRIKE .........................................................................5

    A.   Defendant's Successive Motion to Dismiss Should Be Stricken .........................5

    B.   Defendant's Exhibits Should Be Stricken ....................................................6

IV.  PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF ...............................6

    A.   Judicial Estoppel Should Not Be Applied to Counts 2 or 5 ...............................7

        1.   Highland's Reliance on Collateral Evidence is Improper .........................7

        2.   Highland Has Not Shown a Lack of Inadvertence ..................................8

            a.   Holdco Did Not Intentionally Conceal its Breach of
            Contract or Tortious Interference Claims from the
            Court and Had No Motive to Do So ...............................................8

            b.   New Facts Giving Rise to the Claims Were Not
            Known to Holdco ..........................................................................9

    B.   Plaintiffs Have Properly Pled Claims for Breach of Fiduciary
    Duty .........................................................................................................9

        1.   Highland and HCFA Owe Fiduciary Duties Under the
        Advisers Act ...........................................................................................9

        2.   Holdco Has Standing to Bring a Breach of Fiduciary
        Duty Claim Directly and Derivatively ...................................................11

        3.   The DAF Has Direct Standing to Bring Fiduciary Duty
         Claims ...................................................................................................16

        4.   Plaintiffs Have Alleged Several Breaches of Fiduciary
        Duty .......................................................................................................17

004443

5.      Rule 9(b) Does Not Apply to These Fiduciary Duty
                Claims ................................................................................18

        C.      Plaintiffs Pled Claims for Breach of Contract and Tortious
                Interference ........................................................................20

        D.      Plaintiffs Have Pled a Claim for Negligence ......................................22

        E.      Motion to Dismiss RICO Claim Under Rule 41 ..................................23

        F.      Highland's Request for Fees Fails ...................................................23

VI.     MOTION IN THE ALTERNATIVE FOR LEAVE TO AMEND ...............................23

VII.    CONCLUSION ...............................................................................24

004444

# TABLE OF AUTHORITIES

## Cases

*Abrahamson v. Fleschner*,
   568 F.2d 862 (2d Cir. 1977)..............................................................14

*Alphonse v. Arch Bay Holdings, L.L.C.*,
   548 F. App'x 979 (5th Cir. 2013) .....................................................12

*Anderson* v. *Abbott*,
   321 U.S. 349 (1944)..........................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................6-7

*Basic Capital Mgmt. v. Dynex Commer., Inc.*,
   402 S.W.3d 257 (Tex. App.—Dallas 2013, pet. denied) ....................21

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................7

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013)..............................................................13

*Broyles v. Cantor Fitzgerald & Co.*,
   No. 10-854, 2014 U.S. Dist. LEXIS 169364 (M.D. La. Dec. 8, 2014) ................13

*Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*,
   No. 7841-VCP, 2015 Del. Ch. LEXIS 237 (Del. Ch. Sep. 10, 2015)..................15

*Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P.*
*(In re Highland Cap. Mgmt., L.P.)*,
   643 B.R. 162 (N.D. Tex. 2022)............................................................7

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) ..............................................................6

*Commerce Bank v. Malloy*,
   No. 13-CV-252, 2013 U.S. Dist. LEXIS 106329 (N.D. Okla. July 30, 2013) ...................8-9

*Cudd Pressure Control, Inc. v. Roles*,
   328 F. App'x 961 (5th Cir. 2009) (unpublished) ..................................9

*Dandridge v. Williams*,
   397 U.S. 471 (1970)............................................................................5

004445

*Douglass v. Beakley*,
   900 F. Supp. 2d 736 (N.D. Tex. 2012) .......................................................12, 16

*Dussouy v. Gulf Coast Inv. Corp.*,
   660 F.2d 594 (5th Cir. 1981) ..........................................................................23

*Du Bois v. Martin Luther King Jr. Family Clinic, Inc.*,
   No. 3:17-CV-2668-L, 2018 U.S. Dist. LEXIS 246910,
   (N.D. Tex. May 29, 2018)..................................................................................6

*Edgar v. Mite Corp.*,
   457 U.S. 624 (1982)........................................................................................12

*Fink v. Nat'l Sav. & Tr. Co.*,
   772 F.2d 951 (D.C. Cir. 1985) .........................................................................18

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*,
   462 U.S. 611 (1983).........................................................................................12

*Fisk Elec. Co. v. DQSI, L.L.C.*,
   740 F. App'x 399 (5th Cir. 2018) (unpublished) ................................................23

*Fund of Funds, Ltd. v. Vesco*,
   74-Civ-1980, 1976 U.S. Dist. LEXIS 14183 (S.D.N.Y. July 12, 1976)................20

*Goldenson v. Steffens*,
   No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258 (D. Me. Mar. 7, 2014) .......13

*Hand v. Dean Witter Reynolds, Inc.*,
   889 S.W.2d 483 (Tex. App.—Houston [14th Dist.] 1994, writ denied)...............11

*Holt Atherton Industries, Inc. v. Heine*,
   835 S.W.2d 80 (Tex. 1992)..............................................................................21

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
   305 F. Supp. 2d 658 (E.D. Tex. 2004) .......................................................18, 19

*Jackson v. Dear and Seven Others*,
   [2013 GLR 167] Guernsey Royal Ct. .................................................................15

*Jacobsen v. Osborne*,
   133 F.3d 315 (5th Cir. 1998) ...........................................................................23

*Laird v. Integrated Res.*,
   897 F.2d 826 (5th Cir. 1990) .....................................................................11, 17

004446

*Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*,
    238 F. Supp.3d 799 (S.D. Tex. 2017) ...................................................................11

*Leffall v. Dall. Indep. Sch. Dist.*,
    28 F.3d 521 (5th Cir. 1994) ........................................................................23

*Legate v. Livingston*,
    822 F.3d 207 (5th Cir. 2016) ....................................................................... 5-6

*Leyse v. Bank of Am. Nat'l Ass'n*,
    804 F.3d 316 (3d Cir. 2015).............................................................................6

*Lovelace v. Software Spectrum*,
    78 F.3d 1015 (5th Cir. 1996) .........................................................................6

*Nabors Drilling, U.S.A., Inc. v. Escoto*,
    288 S.W.3d 401 (Tex. 2009)..........................................................................22

*Navigant Consulting, Inc. v. Wilkinson*,
    508 F.3d 277 (5th Cir. 2007) .........................................................................9

*Pool v. Johnson*,
No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613
(N.D. Tex. Apr. 15, 2002)..............................................................................16

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*,
    29 S.W.3d 74 (Tex. 2000).............................................................................21

*Reneker v. Offill*,
    No. 3:08-cv-1394-D, 2010 U.S. Dist. LEXIS 38526
    (N.D. Tex. Apr. 19. 2010)..............................................................................6

*Romano v. Merrill Lynch, Pierce, Fenner & Smith*,
    834 F.2d 523 (5th Cir. 1987) .......................................................................11

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977)....................................................................................9-10

*Sassen v. Tanglegrove Townhouse Condo. Ass'n*,
    877 S.W.2d 489 (Tex. App.—Texarkana 1994, writ denied)..............................16

*Scanlan v. Texas A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003) .........................................................................7

*SEC v. ABS Manager, LLC*,
    No. 13cv319, 2014 U.S. Dist. LEXIS 80542 (S.D. Cal. June 11, 2014) ......... 14-15

004447

*SEC v. Ambassador Advisors, LLC,*
   576 F. Supp. 3d 286 (E.D. Pa. 2021) ............................................... 10

*SEC v. Blavin,*
   760 F.2d 706 (6th Cir. 1985) ......................................................... 17

*SEC v. Tambone,*
   550 F.3d 106 (1st Cir. 2008) ...................................................... 10, 14

*SEC v. World Tree Fin., L.L.C.,*
   43 F.4th 448 (5th Cir. 2022) ...................................................... 10, 18

*SEC v. Zandford,*
   535 U.S. 813 (2002) ....................................................................... 10

*Snowden v. Wells Fargo Bank, N.A.,*
   No. 3:18-cv-1797, 2019 U.S. Dist. LEXIS 23557 (N.D. Tex. Jan. 18, 2019) ...................... 21

*State ex rel. Udall v. Colonial Penn Ins. Co.,*
   812 P.2d 777 (N.M. 1991) .......................................................... 12-13

*Strougo ex rel. Braz. Fund v. Scudder, Stevens & Clark, Inc.,*
   964 F. Supp. 783 (S.D.N.Y. 1997) ................................................... 13

*Strougo v. Bassini,*
   282 F.3d 162 (2d Cir. 2002) ........................................................... 13

*Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.),*
   374 F.3d 330 (5th Cir. 2004) ............................................................ 8

*Tigue Inv. Co. v. Chase Bank of Tex., N.A.,*
   No. 3:03-CV-2490, 2004 U.S. Dist. LEXIS 27582 (N.D. Tex. Nov. 15, 2004) .................. 19

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,*
   444 U.S. 11 (1979) ..................................................................... 9-10

*United States SEC v. Markusen,*
   143 F. Supp. 3d 877 (D. Minn. 2015) ............................................... 15

*Victaulic Co. v. Tieman,*
   499 F.3d 227 (3d Cir. 2007) ............................................................. 6

*W. Res. Life Assurance Co. v. Graben,*
   233 S.W.3d 360 (Tex. App.—Fort Worth 2007, no pet.) ........................... 11

*ZPR Inv. Mgmt. v. SEC,*
   861 F.3d 1239 (11th Cir. 2017) ...................................................... 19

vi

004448

## Codes, Rules and Statutes

15 U.S.C. § 80a-3(a)(1)(A) .................................................................. 14

15 U.S.C. § 80a-3(a)(1)(C) .................................................................. 14

15 U.S.C. § 80b-8(d) ......................................................................... 17

15 U.S.C. § 80b-15(a) ............................................................ 13, 15, 18, 22

15 U.S.C. § 80b-6(2) ...................................................................... 14, 19

15 U.S.C. § 80b-6(4) ...................................................................... 14, 19

15 U.S.C. § 80b-15(a) ................................................................. 13, 18, 22

17 C.F.R. § 206(4)-8 ...................................................................... 14, 15

17 C.F.R. § 275.204A-1 ...................................................................... 10

FED. R. CIV. P. 9(b) ..................................................................18-19, 20, 24

FED. R. CIV. P. 12(b)(6) ............................................................... 6, 7, 20, 24

FED. R. CIV. P. 12(g) .................................................................... 6, 12

FED. R. CIV. P. 15(a) ....................................................................... 23

FED. R. EVID. 201(b) ........................................................................ 13

## Other

Commission Interpretation Regarding Standard of Conduct for Investment Advisers,
Investment Advisers Act Release No. IA-5248, 84 Fed. Reg. 33,669 (July 12, 2019) ........10, 17

Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003) .................................. 10

Investment Advisers Act Release No. 3060, 75 Fed. Reg. 49,234 (Aug. 12, 2010) ................. 10

RESTATEMENT (THIRD) OF AGENCY § 8.01 (AM. L. INST. 2006) .................................. 10

004449

# I.

## <u>INTRODUCTION</u>

This action arises from Defendant's role as an investment advisor to the Plaintiffs under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>"). Plaintiffs learned—after the fact—that Defendant had failed to disclose to them the true value of securities sold in connection with a settlement that was approved in Defendant's bankruptcy proceedings and failed to obtain their informed consent to the transaction. Defendant's actions thus violated unwaivable fiduciary duties arising under the Advisers Act.

*__First__*, Highland's arguments concerning "judicial estoppel" improperly rely upon evidence outside the four corners of Plaintiffs' pleadings and raise new arguments that were not raised previously. The Court should not consider this extraneous evidence or successive motion practice. Moreover, Highland ignores the pleadings stating that there was evidence then unknown to Plaintiffs—namely, the falsity of the representation of the value of the assets in question—at the time of the HarbourVest 9019 settlement hearing—making any inconsistency in their positions inadvertent. With this inadvertence, judicial estoppel cannot apply.

*__Second__*, Highland feigns ignorance of the Advisers Act § 206(4) which imposes direct liability on an advisor to investors—something recognized by the Supreme Court and the Securities and Exchange Commission. Indeed, Highland's own CEO testified under oath that he and Highland owed direct fiduciary duties to investors. Highland misleads this Court by suggesting there is no private cause of action under the Investment Advisers Act—which is false under Supreme Court precedent. Highland then fails to disclose that the Act gives rise to unwaivable fiduciary duties actionable at common law via claims for fiduciary duty and negligence, and which can also be brought derivatively.

***Third***, other than judicial estoppel, Highland has no articulated basis for dismissing the contract and tortious interference claims. Highland's arguments are conclusory and superficial at best—as are its arguments for dismissing the negligence claim. Highland's reliance on the Plan injunction entered by this Court to vitiate liability for unwaivable fiduciary duties is baseless.

As has been the case all along, Highland is seeking to avoid fair scrutiny of its self-dealing. Highland's assumption that Plaintiffs have not been harmed ignores Supreme Court precedent holding that injury is not an element of an Advisers Act violation, and ignores the fact that Plaintiffs were denied a prime investment opportunity—of the sort Highland and its subsidiary were advising Plaintiffs about—so that Highland and its current CEO could reap a windfall at Plaintiffs' expense. Discovery will bear out the allegations which have been pleaded with particularity and in good faith. In the unlikely event the Court considers the Renewed Motion to Dismiss to have any validity, then the Plaintiffs request leave to amend their pleadings to cure any identified deficiencies.

## II.

## FACTUAL BACKGROUND

Plaintiff Charitable DAF Fund, L.P. ("DAF") is a charitable fund that helps several causes throughout the country, including providing millions of dollars every year to local charities in Dallas and around the country, such as family shelters, education initiatives, veteran's welfare associations, public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Original Complaint ("Compl.") at ¶ 10.

Since 2012, the DAF was advised by its registered investment advisor, Defendant Highland Capital Management, L.P. ("Highland"), and its various subsidiaries about where to invest. (Compl. at ¶ 11). This relationship was governed by an investment advisory agreement. (Compl.

at ¶ 12). As the DAF's investment advisor, Highland owed the DAF fiduciary obligations, including the duty against self-dealing, the duty to put the DAF's best interest ahead of its own, and the duty to obtain informed consent from the DAF. (Compl. at ¶¶ 56–57, 62).

In 2017, Highland advised the DAF to acquire 143,454,001 shares of Highland CLO Funding, Ltd ("HCLOF"), which the DAF did via a holding entity, Plaintiff CLO Holdco, Ltd. ("CLO Holdco"). (Compl. at ¶ 12).

Shortly thereafter, CLO Holdco entered into a Subscription and Transfer Agreement whereby a series of related entities collectively referred to as "HarbourVest" acquired a 49.98% membership interest in HCLOF (the "HarbourVest Interests"). (Compl. at ¶¶ 13–14). As part of this transaction Holdco retained a 49.02% membership interest. (Compl. at ¶ 13), and Highland took a 0.6% membership interest HCLOF (Compl. at ¶ 25).

HCLOF's portfolio manager is Highland HCF Advisor, Ltd. ("HCFA"), which is subsidiary of Highland and is controlled and operated by Highland. (Compl. at ¶ 24). Both are registered investment advisers ("RIA"). As such, both Highland and HCFA owed fiduciary duties to CLO Holdco as an investor in the HCLOF fund. James P. Seery, Jr., CEO of Highland, testified that Highland owed such fiduciary duties under the Investment Advisers Act of 1940 (the "Advisers Act") to investors in the funds that Highland manages (App_0008-10, 0014).

The HCLOF parties' rights and obligations as members of HCLOF were governed by the *Members Agreement Relating to the Company* dated November 15, 2017 ("Company Agreement"). (Compl. at ¶¶ 93–94) (App_0018-35). Under the Company Agreement, no member was allowed to sell shares to another member without first providing all other members the opportunity and right to purchase a *pro rata* portion thereof at the same price being offered. (Compl. at ¶ 95; App_0026-27).

In October 2019, Highland filed for Chapter 11 (Compl. at ¶ 15). As part of this bankruptcy, HarbourVest filed its proof of claim against Highland totaling over $300 million (Compl. at ¶¶ 16, 21-23). Highland denied the validity of these claims. (Compl. at ¶ 17, 26).

In the meantime, Highland continued to control HCLOF through its subsidiary HCFA. (Compl. at ¶¶ 115–124). In September 2020, HCLOF was underperforming, and the value of the investment had diminished—the HarbourVest Interests had diminished $52 million in value. (Compl. at ¶ 27). On September 30, 2020, Highland utilized interstate wires to transmit information to the HCLOF investors regarding the value of their respective interests. (Compl. at ¶ 121). In the following months, however, the value HCLOF began to improve and Highland did not update investors; by the end of November 2020, the value of HCLOF's total assets increased to $72,969,492 ($36,484,746 allocated to HarbourVest) and by the end of December, HCLOF's reached $86,440,024 ($43,202,724 allocated to HarbourVest's Interests). (Compl. at ¶¶ 123–124). However, Highland did not transmit these valuations to Plaintiffs (Compl. at ¶ 120).

Around November 2020, Highland and HarbourVest—utilizing the interstate wires— entered into discussions about settling HarbourVest's claims in the bankruptcy. (Compl. at ¶ 119). Highland and HarbourVest reached a settlement, which Highland requested the bankruptcy court approve on December 23, 2020 (the "9019 Hearing"). (Compl. at ¶ 29; App_0046-64). As part of the settlement, Highland agreed to allow HarbourVest $45 million in unsecured claims, which were expected to yield about seventy cents on the dollar to HarbourVest (roughly $31,500,000). (Compl. at ¶ 32; App_46-64). As part of the consideration for the $45 million in allowed claims, HarbourVest sold its interest in HCLOF to Highland for $22,500,000 (Compl. at ¶ 33) (the "HarbourVest Settlement").

Despite Highland's fiduciary obligations to Plaintiffs, Highland concealed the rising value

of HCLOF and the Harbourview Interests, as well as the value that it was buying the interest for. It diverted the entire opportunity to participate in this windfall transaction to itself in violation of its fiduciary duties (Compl. at ¶ 67).

At the January 14, 2021, Bankruptcy Rule 9019 hearing to approve the settlement, HCF's CEO testified that the value allocated to the HarbourVest Interests was $22.5 million. (Compl. at ¶¶ 34, 37). The bankruptcy court issued an order approving the HarbourVest Settlement (App_0065-68) (the "9019 Order"). The sale of the HarbourVest Interests transformed Highland from a minority member with a 0.6% interest into the controlling member with a 50.49% interest.

The truth was otherwise. As Plaintiffs learned only after the fact from former Highland employees who were familiar with the valuation, the HarbourVest interest was actually worth $41,750,000 on a net asset value basis. (Compl. at ¶¶ 34, 37). Highland's failure to inform HCLOF—whom it controlled through HCFA—or Holdco, means Highland reaped a $20 million-plus windfall by self-dealing and without proper disclosure, resting on affirmative misrepresentations by its CEO, and without obtaining informed consent from its investors.

This lawsuit followed and is now subject to a second successive motion to dismiss in violation of the Rules of Civil Procedure and precedent.

### III.

### MOTIONS TO STRIKE

#### A. DEFENDANTS' SUCCESSIVE MOTION TO DISMISS SHOULD BE STRICKEN

This Court presumptively denied Highland's bases for dismissal on the merits by not ruling on them, and during the first appeal, Highland did not ask the district court to rule on the merits or to affirm on that basis as it could have. *See Dandridge v. Williams,* 397 U.S. 471, 475 n.6 (1970). By failing to raise those presumptively denied bases for dismissal on appeal, Highland waived

them, *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016), and cannot re-assert them now.

The Fifth Circuit and the district courts within it have repeatedly held that successive Rule 12(b)(6) motions are not allowed under Rule 12(g) and (h), and that a motion such as this one can only be brought as a 12(c) motion after the pleadings have closed. *See* Fed. R. Civ. P. 12(g) and (h); *see, e.g., Du Bois v. Martin Luther King Jr. Family Clinic, Inc.*, No. 3:17-CV-2668-L, 2018 U.S. Dist. LEXIS 246910, at *5-6 (N.D. Tex. May 29, 2018). Accordingly, this is not a "renewed motion;" it is an improper *successive* motion to dismiss and should be stricken. *DuBois*, 2018 U.S. Dist. LEXIS 246910, at *5-6; *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 322 n.5 (3d Cir. 2015) ("district courts should enforce [the rule against successive motions] even if their failure to do so is not a ground for reversal").

## B. DEFENDANTS' EXHIBITS SHOULD BE STRICKEN

The district courts in this district have also held that a court should only take judicial notice of facts "'sparingly at the pleadings stage.'" *Reneker v. Offill*, No. 3:08-cv-1394-D, 2010 U.S. Dist. LEXIS 38526, at *5 (N.D. Tex. Apr. 19. 2010) (Fitzwater, J.) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007)). Courts in the Fifth Circuit have held that, other than legal documents, a court cannot take judicial notice of unpled *facts* unless the facts are undisputed. *See Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996). Thus, this Court should strike the appendix submitted with the motion as impertinent and improper.

## IV.

## PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF

Motions to dismiss for failure to state a claim are viewed with disfavor and are seldom granted. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain 'a short and plain statement of

the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-678 (2009). This Court must draw all reasonable inferences in favor of the plaintiff.  *See Collins*, 224 F.3d at 498. Rule 8 does not demand "'detailed factual allegations[.]'" *Id*. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In ruling upon a Rule 12(b)(6) motion, the Court cannot decide disputed fact issues. The court may grant a motion under Rule 12(b)(6) *only if* it can determine with certainty that the plaintiff cannot prove a set of facts that would allow the relief sought in the complaint. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

## A.  JUDICIAL ESTOPPEL SHOULD NOT BE APPLIED TO COUNTS 2 OR 5

The district court on appeal remanded for consideration of whether judicial estoppel applied to Counts 2 or 5 of the Complaint. *Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 174-75 (N.D. Tex. 2022) ("Remand Order"). Plaintiffs still disagree that there was any judicial admission, but nonetheless address the questions that were remanded.[1]

### 1.  Highland's Reliance on Collateral Evidence is Improper

Highland's entire argument on judicial estoppel fails for two reasons already addressed: First, it relies on new arguments not raised previously. And second, it relies on evidence outside of the four corners of the Complaint. For instance, the question of inadvertence which the district court remanded for this Court's consideration is not one that can be resolved on the pleading because it asks *why* Holdco withdrew its objection. That cannot be determined at this early stage, and Highland's selective document-dump is not competent evidence, not properly admitted, and therefore not proper for this Court to consider at the 12(b)(6) stage.

---

[1] Plaintiffs adopt and incorporate the arguments made previously to this Court and before the district court on appeal as to why judicial estoppel does not apply, and reserve all rights on appeal. For the purposes of this briefing and for the sake of brevity, Plaintiffs address the issues reserved for remand to this Court.

---

### 2.  Highland Has Not Shown a Lack of Inadvertence

The Fifth Circuit has addressed "inadvertence" in the bankruptcy context by citing a debtor's duty to disclose all claims at the beginning of a bankruptcy. *See Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004) ("The debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment.") (italics in original). Here, no such duty to object to a 9019 settlement exists. Nonetheless, Holdco's 9019 objection addressed *HarbourVest*'s violations of the Member Agreement. But Count 2 of the Complaint alleges that *Highland* violated the HCLOF Company Agreement by failing to offer the interest to Holdco (and other members) before it transferred the interest to its subsidiary. HoldCo never brought its objection as to Highland or its subsidiary. And Count 5 alleges that Highland HCF Advisors L.P. tortiously interfered with the Company Agreement in its investment advisory role, another claim that was not brought as an objection (and for which no duty to object existed).

### a.  Holdco Did Not Intentionally Conceal its Breach of Contract or Tortious Interference Claims From the Court and Had No Motive to Do So

There is no evidence in the record that Holdco intentionally concealed its claims from the Court for breach of contract or tortious interference—nor that it had any reason to do so. The opposite is true. The contract claims were disclosed, albeit they were withdrawn without prejudice. There was no motive to conceal the claims to the extent they were known to Holdco at the time. This Court and the district court has already ruled that the withdrawal of those claims did not attach *res judicata* or *collateral estoppel* preclusion. Other courts have found that unsuccessful legal positions taken during a 9019 hearing are not a basis for finding that judicial estoppel applies where those legal positions relate to matters more properly addressed in an adversary proceeding. *See,*

---

*e.g.*, *Commerce Bank v. Malloy*, No. 13-CV-252, 2013 U.S. Dist. LEXIS 106329, at *15-17 (N.D. Okla. 2013). Therefore, their withdrawal without prejudice did not, and was not expected to, have any preclusive effect making the withdrawal inadvertent as to any alleged inconsistency.

### b.  New Facts Giving Rise to the Claims Were Not Known to Holdco

The facts giving rise to the lawsuit arose after the 9019 hearing. To wit, the tortious interference claim stems from Highland's concealment and misrepresentation of the net asset value of HCLOF prior to and during the 9019 hearing—the true value of which only became known to Holdco well after this Court's 9019 hearing and 9019 Order (Compl. ¶¶ 36-45, 47-52). Because of the misrepresentation and the self-dealing entailed therein, Holdco is able to state a tortious interference claim based upon inadvertence. And but for the misrepresentation, Holdco would not have withdrawn its objection, and would have made a more robust objection to the settlement or sought a different path. Therefore, judicial estoppel is improper.

### B.  PLAINTIFFS HAVE PROPERLY PLED CLAIMS FOR BREACH OF FIDUCIARY DUTY

In Texas, the elements of a breach of fiduciary duty are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.'" *Cudd Pressure Control, Inc. v. Roles*, 328 F. App'x 961, 964 (5th Cir. 2009) (quoting *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007)).

### 1.  Highland and HCFA Owe Fiduciary Duties Under the Advisers Act

"The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). The Advisers Act thus "establishes 'federal fiduciary standards' to

---

govern the conduct of investment advisers." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (citing *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977)).

The Advisers Act imposes both a duty of care and a duty of loyalty on investment advisors. *See SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6] imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors."); *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 300 (E.D. Pa. 2021) ("The fiduciary duties under § 206(2) also require investment advisers to seek "best execution" for all their clients' transactions. "Best execution" means obtaining 'the most favorable terms reasonably available under the circumstances.'"); 17 C.F.R. § 275.204A-1 (describing the required investment adviser code of ethics, and its focus on conflicts of interest).

The Advisers Act was also enacted in part to prevent conflicts of interest, self-dealing and fraud by investment advisors. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 186–87. A key prohibition is that the advisor cannot engage in cherry picking—selecting the best securities and opportunities in a way that enriches itself. *Accord SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 460 (5th Cir. 2022) ("Because cherry-picking involves allocating more profitable trades to certain accounts, an adviser is 'stealing from one customer to enrich himself'"). *See also* Investment Advisers Act Release No. 3060, 75 Fed. Reg. 49,234 (Aug. 12, 2010) ("Under the Advisers Act, an advisor is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).[2]

---

[2] The SEC's interpretive guidance of the Advisers Act is accorded *Chevron* deference. *See SEC v. Zandford*, 535 U.S. 813 (2002). In interpreting § 206 of the Advisers Act, the SEC has recognized that conflicts of interest arise where an advisor seeks to take advantage of an opportunity that it otherwise might offer to its client. *See* Commission Interpretation Regarding Standard of Conduct for Investment, Release No. IA–5248, Fed. Reg./Vol. 84, No. 134 at 33675-77 (citing Restatement (Third) of Agency, § 8.01 (2006)

Texas courts have also found that advisors owe fiduciary duties of care and loyalty. *W. Res. Life Assurance Co. v. Graben*, 233 S.W.3d 360, 374 (Tex. App.—Fort Worth 2007, no pet.); *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987) (holding that advisors owe investors fiduciary duties under Texas law); *Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 238 F. Supp. 3d 799, 851 (S.D. Tex. 2017) (under Texas law, an investment advisor and investors are in a formal fiduciary relationship). Texas law provides that a fiduciary relationship is governed by the terms of the agency. *See Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.—Houston [14th Dist.] 1994, *writ denied*). The Advisers Act provides the scope of, and rules governing, the advisor/advisee agency relationship. *See Laird v. Integrated Res.*, 897 F.2d 826, 834 (5th Cir. 1990).

Here, HCFA is a wholly-owned subsidiary of Highland. Both are registered investment advisors under the Advisers Act of 1940 (Compl. ¶ 56). Highland operates HCFA, which serves as the Portfolio Manager of Highland CLO Funding, Ltd. ("HCLOF"). Highland was a direct advisor to the DAF. Therefore, Highland and HCFA each owed fiduciary duties to the DAF and Holdco respectively.

### 2. Holdco Has Standing to Bring a Breach of Fiduciary Duty Claim Directly and Derivatively

Highland contends that Holdco, as a mere investor in HCLOF who is not in privity with

---

(explaining that "the general fiduciary principle, …also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.")). A necessary but not sufficient measure by the advisor is full and fair disclosure and obtaining the client's informed consent before the advisor takes such an action. *Id*. at 33676-77. "In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material facts or conflicts of interest and make an informed decision whether to provide consent." *Id.* at 33676. This includes all information about an advisor's potential gain or advantage—especially hidden ones and ulterior motives. *Id.* at 33677. The failure to make such disclosures and obtain informed consent in a manner that is not disinterested is a breach of the fiduciary duty under the Adviser's Act. *Id.* at 33677.

---

Highland or HCFA, lacks standing. This is incorrect as a matter of law.

    **_First_**, Highland incorrectly states that there is no private right of action under the Advisers Act. This is simply not true. Section 215 recognizes a limited private right of action for equitable relief including disgorgement, wherein one may seek to void the rights of a violator who performs a contract in violation of the Advisers Act. *See* 15 U.S.C. § 215. *TAMA*, 444 U.S. at 19 ("[W]hen Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution."). Plaintiff has pled disgorgement and is entitled to it under this statute.

    **_Second_**, the Northern District of Texas decided almost a decade ago that, although the Advisers Act does not itself create a cause of action for damages, state law fiduciary duty claims can be brought for violations of the Advisers Act. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, 751-52, n.16 (N.D. Tex. 2012) (Boyle, J.) (denying motion to dismiss state fiduciary duty claims predicated on breaches of the Advisers Act).[3] Therefore, Holdco has standing to bring its claims

---

    [3] Highland newly contends that because HCLOF is a Guernsey company, Guernsey fiduciary duty law applies under the internal affairs doctrine to decide whether a fiduciary duty claim by an investor can be brought against an investment advisor. This argument fails. For one thing, it was not raised originally—meaning it was waived under Rule 12(g) and (h). For another, the argument incorrectly supposes—without any support—that the internal affairs doctrine would apply and would select Guernsey law for duties related to HCLOF. The internal affairs doctrine only applies to HCLOF's *internal* affairs—i.e., the duties of officers and directors towards the company and shareholders. *Accord Alphonse v. Arch Bay Holdings, L.L.C.*, 548 F. App'x 979, 986 (5th Cir. 2013) (noting that internal affairs doctrine does not apply where rights with respect to "third parties external to the corporation are at issue") (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621-22 (1983)). The internal affairs doctrine is NOT at issue here as neither Highland nor HCFA is alleged to be an officer or director of HCLOF, nor is their fiduciary duty alleged to arise out of service in such a role. Nor can the internal affairs doctrine circumvent federal securities laws. The Supreme court in *Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982) held that the internal affairs doctrine was irrelevant where the issue was the violation of the securities laws between a shareholder and a third party who was not an officer or director of the company, and that the internal affairs doctrine could not be used to circumvent federal securities laws. *See id; cf. Anderson v. Abbott*, 321 U.S. 349, 365 (1944) (declining to apply the law of the State of incorporation to determine

---

for violations of the Advisers Act under applicable state law. *Id*. Other courts are in accord. *See Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. Mar. 7, 2014) *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502-06 (3d Cir. 2013); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 785 (N.M. 1991); *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 799 (S.D.N.Y. 1997), *rev'd in part on other grounds in Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002).

**_Third_**, the fiduciary duties under the Advisers Act are not limited to direct advisees. Highland's CEO, James Seery, testified under oath—under *direct examination by Highland's lawyers*—that he and Highland, as registered investment advisors, owed fiduciary duties to the funds they managed, and the *investors* in those funds. (App_0009) ("The goals of the debtor…number one, discharge Highland's, … duties to investors in the funds. Those are fiduciary duties under the Investment Advisers Act."); (App_14) ("the Investment Advisors Act puts a fiduciary duty on Highland Capital to discharge its duty to the **investors**. So, while we have duties to the estate, we also have duties, as I mentioned in my last testimony, **to each of the investors in the funds**.") (bolding added). Seery's sworn, uncontradicted testimony is a judicial admission and an undisputed fact that this Court may take judicial notice of at this stage. *See* Fed. R. Evid. 201(b).

---

whether a banking corporation complied with the requirements of federal banking laws because "no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning national banks which Congress has announced"); *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854, 2014 U.S. Dist. LEXIS 169364 (M.D. La., Dec. 8, 2014) (internal affairs doctrine does not apply to claims of breach of a fiduciary duty against stockbroker). Here, Highland's and HCFA's fiduciary duties arise out of their roles as registered investment advisors to the DAF directly and to HCLOF, and so are non-waivable. *See* 15 U.S.C. § 80b-6 and § 80b-15(a). Those duties are subject to their Advisory Agreements, neither of which select Guernsey law—actually, they expressly select Texas law. *See* Offering Memo p. 82 ("[HCFA]'s Portfolio Management Agreement is governed by the laws of the State of Texas.") (APP_0175); DAF/HCMLP Advisory Agmt at ¶ 14(e) (APP_0219) Moreover, the Offering Memorandum (which is incorporated via the Company Agreement § 2.2), states that HCFA is "subject to the provisions of the Investment Advisers Act." Offering Memo at p. 13 and 59 (APP_0106 and 0152).

---

**_Fourth_**, the Advisers Act § 206 expressly imposes duties owed directly to investors in a fund. *See* 15 U.S.C. § 80b-6(4). Highland attempts to circumscribe the issue to just "clients". But Section 206(4) says nothing about clients while §§ 206(1) and (2) expressly limit duties only to "clients". *Accord SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6(4)] imposes a fiduciary duty on investment advisors to act at all times in the best interest of the fund *and its investors*." (emphasis added)). The Supreme Court and circuit courts long ago recognized the right of investors in pools of funds to bring direct actions against the fund managers for breaches of the Advisers Act. *See, e.g., TAMA*, 444 U.S. at 13; *Abrahamson v. Fleschner*, 568 F.2d 862, 871-74 (2d Cir. 1977) *rev'd in part on other grounds*.

Furthermore, § 206(4) empowered the SEC to enact regulations refining the scope of the duties under § 206(4). Pursuant to its grant of authority, the SEC promulgated 17 C.F.R. § 275.206(4)-8 ("Rule 206(4)-8") to enforce the fiduciary standards in Section 206(d), making it unlawful for an advisor to a "pooled investment vehicle" to:

> (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, **to any investor** or prospective investor in the pooled investment vehicle; or
>
> (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative **with respect to any investor** or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206(4)-8 (bolding added). By its plain terms, Rule 206(4)-8(a) expressly anticipates a lack of direct privity and imposes direct duties on investment advisors to investment funds with respect to the investors in those funds—which includes Holdco.[4] *SEC v. ABS Manager,*

---

[4] Highland does not appear to contest that HCLOF is a "pooled investment vehicle" for the purposes of this regulation. Normally, HCLOF would have to register under the Investment Company Act. The Investment Company Act, 15 U.S.C. § 80a-3(a)(1)(A), (C) states that an investment company is an issuer that "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of

---

*LLC*, No. 13cv319, 2014 U.S. Dist. LEXIS 80542, at \*45 (S.D. Cal. June 11, 2014) (adopting

SEC's position and granting summary judgment as to violations of Rule 206(4)-8 because "section

206(4) and Rule 275.206(4)-8. . .prohibit the same conduct as sections 206(1) and 206(2) but in

connection with 'pooled investment vehicles'"); *SEC v. Markusen*, 143 F. Supp. 3d 877,891 (D.

Minn. 2015) (denying motion to dismiss action by investors against manager of fund); *Goldenson*,

2014 U.S. Dist. LEXIS 201258, at \*139 (holding that an advisor to a pooled vehicle had general

fiduciary duty to investors even as to outside investments made by the advisor).

  ***Fifth***, Holdco also pled its claims derivatively (Compl. at Caption and at ¶ 91). Thus, to

the extent HCLOF has a breach of fiduciary duty claim (which it also does), because HCLOF is a

Guernsey entity, Guernsey law determines derivative standing. Here, Guernsey law recognizes

both derivative and double-derivative standing, especially where, as here, the company is

controlled by the alleged wrongdoer. *See Jackson v. Dear and Seven Others*, [2013 GLR 167]

Guernsey Royal Ct. (Talbot, Lieut, Bailiff) (adopting English company law on derivative actions

and finding that double derivative actions are recognized vehicles in Guernsey corporations and

customary law); *see also Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, No. 7841-VCP, 2015

Del. Ch. LEXIS 237, at \*49 (Del. Ch. Sep. 10, 2015) (noting derivative action for Guernsey entity

---

investing, reinvesting, or trading in securities" or that "is engaged or proposes to engage in the business of
investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment
securities having a value exceeding 40 per centum of the value of such issuer's total assets[.]" HCLOF
Meets this definition. *See, e.g.,* Company Agreement recital B and § 2.2 (APP_0017-18); Offering Memo
(APP_0094-97, 0106-107). The exceptions identified in Rule 206(4)-8(2) are for investment companies
that do not publicly offer their shares and have fewer than 100 investors. *Markusen*, 143 F.Supp.3d at 891
(holding that investment fund not required to register where it "[has] less than 100 investors and do[es] not
publicly offer [its] securities"). HCLOF meets this definition. *See* Offering Memo at i ("There will be no
public offer of the Placing Shares") (APP_0085) and at p. 75 (shareholders list) (APP_0168). Thus, because
HCLOF would have to register under the Investment Company Act but for the exceptions to identified in
Rule 206(4)-8, *id.* at p. i ("[HCLOF] has not been and will not be registered under the Investment Company
Act of 1940"), HCLOF qualifies as a "pooled investment vehicle".

---

could proceed). Highland nowhere so much as purports to challenge the derivative standing of Holdco nor cites a single legal authority contravening it.

Therefore, Holdco has standing to bring claims for breach of the Advisers Act fiduciary duties as well as state law fiduciary duty claims.

### 3.   The DAF Has Direct Standing to Bring Fiduciary Duty Claims

The Original Complaint pleads that Highland and the DAF are in a direct advisory relationship by virtue of a contractual arrangement. (Compl. ¶ 58). As the DAF's registered investment advisor, Highland is DAF's fiduciary. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, at 751-52, n.16. The Advisory Agreement further commits Highland to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [Highland], a copy of which will provided to the General Partner upon request." (Compl. ¶ 60). And while Highland contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given to the DAF, (Advisory Agreement ¶ 12), nowhere did it purport to *waive* the fiduciary duties owed to the DAF not to trade as a principal in a manner that was self-dealing or harmed the DAF. (Compl. ¶ 61). Additionally, Highland was appointed the DAF's attorney-in-fact. (Compl. at ¶ 59). "As the appointment of an attorney-in-fact creates a fiduciary relationship as a matter of law, Texas law imposes special duties on persons acting in that capacity." *Pool v. Johnson*, No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613, at *17 (N.D. Tex. Apr. 15, 2002) (citing *Sassen v. Tanglegrove Townhouse Condo. Ass'n*, 877 S.W.2d 489, 492 (Tex. App.—Texarkana 1994, *writ denied*)). Under Texas law, "[a] fiduciary owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability." *Id*. (citing *Sassen*, 877 S.W.2d at 492).

Here, Highland cannot to subrogate the DAF's rights to its own, nor self-deal, nor mislead

the DAF as to a competitive purchase. The DAF further has the right to full and fair disclosure by Highland before it usurps an opportunity that it was advising the DAF on. This is especially so because Highland cannot do indirectly what it cannot do directly. 15 U.S.C. § 80b-8(d).

**4.  Plaintiffs Have Alleged Several Breaches of Fiduciary Duty**

Highland breached multiple fiduciary obligations in the process of negotiating and consummating the HarbourVest Settlement. The materiality of misrepresenting the value and the benefit to Highland of the investment is not debatable. *Accord SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). And Highland cannot escape liability for this duty by conducting its advisory activities through HCFA. *See* 15 U.S.C. § 80b-8(d).

Highland and HCFA breached the duty of care and the duty of loyalty. The Advisers Act's primary purpose is to eliminate advisors' conflicts of interest and ensure that advisors always act in the best interest of the investor. *See Laird*, 897 F.2d at 839. The Advisers Act also makes clear that the duty of loyalty means putting CLO Holdco's interest first. *See* Securities and Exchange Commission Interpretative Release*, Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 FR 33681 SEC Release No. IA-5248; File No. S7-07-18, 17 CFR Part 276, June 5, 2019 ("SEC Release") at p. 8, 23 (internal citations omitted). Under this duty, the Advisers Act explains that an advisor must have a rational, non-self-interested basis for how it allocates investment opportunities. *Id*. at 27.

Here, the HCLOF Company Agreement makes it clear that the purposes of HCLOF's investors is to acquire profitable CLO and CLO-related securities—which the shares in HCLOF would fall under (App_0020).[5] The Offering Memorandum specifically incorporated the Advisers

---

[5] The Company Agreement states that HCLOG "has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy [in the Offering Memo]."

Act as a governing limit on Highland's ability to usurp investment opportunities. Offering Memo at p. 59 (APP_0151 to 0152).

Defendants' reserving for themselves without proper disclosure the entire HarbourVest interest in HCLOF is plainly a violation of fiduciary duty—and a knowing one at that.[6] The fact that it was alleged to have been done knowingly, if not purposefully, satisfies the scienter requirement. "[A]s other courts have pointed out, cherry picking can satisfy the scienter element because it involves the knowing conduct of picking certain accounts over others." *World Tree Fin.,* 43 F.4th 448, 463 (citing cases).

And to the extent Highland contends that the Company Agreement or any other provision waives its obligations under the Advisers Act, or those of HCFA, those waivers are null and void under 15 U.S.C. § 80b-15(a).[7]

### 5. Rule 9(b) Does Not Apply to These Fiduciary Duty Claims

For Rule 9(b) to apply, the claim must sound in fraud. *See* FED. R. CIV. P. 9(b). "Allegations of breach of fiduciary duty are not necessarily fraud allegations." *In re Elec. Data Sys. Corp.* "ERISA" Litig., 305 F. Supp. 2d 658, 672 (E.D. Tex. 2004) (citing *Fink v. Nat'l Sav. & Trust Co.,*

---

[6] Highland entered into settlement negotiations in November 2020 with HarbourVest where it first learned of HarbourVest's intent to sell its interests in HCLOF. (Compl. ¶ 119). On December 23, 2020, Highland moved for approval of the HarbourVest Settlement. On January 14, 2021, at the Bankruptcy Court for the Northern District of Texas, Highland's CEO declared the that the value of HarbourVest's Interest in HCLOF was $22.5 million (Compl. at ¶ 34). The Bankruptcy Court approved a settlement that permitted Highland to obtain HCLOF's interest for this amount (Compl. at ¶¶ 32-34). In truth, the HarbourVest Interests were worth in excess of $41,750,000 at that time. (Compl. at ¶ 37). Highland, however, did not disclose the true value of HarbourVest's interests to Plaintiffs. (Compl. at ¶ 75). Furthermore, the value of the trade, the potential upside in the trade, and the nature of the trade were never disclosed to Holdco or the DAF prior to the hearing—indeed, the value and nature was misrepresented to them at the hearing. (Compl. ¶ 76, ¶ 120). Highland converted its 0.6% interest into a 50.58% interest and thereby control of HCLOF.

[7] Even if this court dismisses the contract claim (Count 2), that would not operate to deprive CLO Holdco or the DAF of the right to have Highland put their interests first as a matter of Advisers Act fiduciary duty. Defendants cannot waive those fiduciary obligations. *See* 15 U.S.C. § 80b-15(a).

---

249 U.S. App. D.C. 33, 772 F.2d 951, 959 (C.A.D.C. 1985) (holding that plaintiffs did not plead fraud where the complaint only alleged a breach of fiduciary duty of loyalty or care)). Plaintiffs also allege that Highland breached fiduciary duties by self-dealing when Highland purchased the entire HarbourVest Interests without providing Plaintiffs with the opportunity to participate. (Compl. at ¶ 76–88). These allegations do not require a false statement, nor require Plaintiffs' reliance, nor damage to Plaintiffs (a benefit to Highland suffices), all of which are elements of fraud. Because fraudulent conduct does not underlie Plaintiffs allegations, Rule 9(b) does not apply. *Tigue Inv. Co. v. Chase Bank of Tex. N.A.*, No. 3:03-CV-2490-N, 2004 U.S. Dist. LEXIS 27582, at *7–8 (N.D. Tex. Nov. 15, 2004). "Although fraud and breach of a duty to inform may both involve an omission, the Court does not find that every breach of a fiduciary duty to inform is a scheme to defraud." *EDS,* 305 F. Supp. 2d at 672.

Thus, Rule 9(b) does not apply here because violations of §§ 206(2) and (4) of the Advisers Act do not require proving or even alleging all the elements of fraud. 15 U.S.C. § 80b-6(4). Negligence is sufficient to establish liability under § 206(2) and (4). *See Capital Gains,* 375 U.S. at 195 ("… Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent to injure and actual injury to the client."); *ZPR Inv. Mgmt. v. SEC,* 861 F.3d 1239, 1247 (11th Cir. 2017) ("Sections 206(2) and (4) require no showing of scienter, and a showing of negligence is sufficient.") (internal citations omitted). Nor is a showing of reliance required. *Id.*

Even if Rule 9(b) did apply, it was met here. Plaintiff alleges the specific disclosures and statements in the Complaint made by Jim Seery under oath—when they were made, who made them, where they were made, and in what context. (Compl. ¶¶ 25-45; 47-51, 53, 55-91). Plaintiffs

---

further allege why those statements were false and how the falsity caused Plaintiffs injury. *Id.*[8]

*Accord Fund of Funds, Ltd. v. Vesco*, 74-Civ-1980, 1976 U.S. Dist. LEXIS 14183, at *31

(S.D.N.Y. 1976) ("The complaint identifies the alleged fraudulent transactions and how the fraud

was accomplished. Defendant's roles in those events are described and specific actions by

defendant, as a participant in allegedly unlawful activity, is delineated.").

Therefore, Rule 9(b) is not a basis for dismissing the claims herein.

## C.  PLAINTIFFS PLED CLAIMS FOR BREACH OF CONTRACT AND TORTIOUS INTERFERENCE

Plaintiff CLO Holdco's breach of contract claim is straightforward. Under the HCLOF

Company Agreement, a "Transfer" of the shares of HCLOF is defined to include the "sale" of the

shares. Company Agreement, § 6.1 (App_0026). Sections 6.1 and 6.2 of the Agreement purport to

allow sales by members of their interests in HCLOF to "affiliates" of members, but not to members

themselves, without certain conditions precedent. App_0026-27). One of those conditions is that

the other members have to be afforded the right to purchase their pro-rata portion (App_0027).

Highland contends that the "transfer" to its "nominee," HCMLP Investments, LLC, is a

transfer to an "affiliate." But this is factual gerrymandering and outside the scope of a 12(b)(6).

The transfer that is the basis of Plaintiffs' contract claim is the sale by HarbourVest to Highland.

That sale was accomplished through the Settlement Agreement with Highland (App_0046-54). In

the Settlement Agreement, Highland paid for the HarbourVest Interests. In return, HarbourVest

agreed to release its claims against Highland and transfer the HarbourVest Interests *to Highland*.

(App_0047). Highland's supposed "nominee," HCMLP Investments, LLC was not a party to this

agreement and Highland's nominee did not pay for those interests. *Id*. Therefore, the Settlement

---

[8] Indeed, Seery's testimony that is averted to specifically stated that Class 8 interests were only going to be paid some seventy cents on the dollar. Yet, according to publicly filed documents, almost 100% of Class 8 interests have been paid. What changed? Nothing.

---

Agreement constitutes a sale to *Highland*, and the sale violated Section 6.2 of the Company Agreement. The addendum transfer where Highland delegated its right to receive the shares to a nominee is "form over substance" and is bad faith, in violation of the Company Agreement § 20.5's "good faith" clause.

Defendant argues that Plaintiffs failed to plead actual damages. But Defendant ignores that fact that Plaintiffs plead that the breach of contract denied them the opportunity to obtain a share of the HabourVest Interests at a $20+ million discount, which it alleges are damages. (Compl. at ¶¶ 98–100, 102). Lost profits are an available remedy for breach of contract. *Basic Capital Mgmt. v. Dynex Commer., Inc.*, 402 S.W.3d 257, 268 (Tex. App.—Dallas, 2013). "Recovery for loss profits does not require that the loss be susceptible of exact calculation." *Id.* (quoting *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). Highland claims that Plaintiffs' damages are too speculative. The case it cites, *Snowden v. Wells Fargo Bank, N.A.*, No. 3:18-cv-1797, 2019 U.S. Dist. LEXIS 23557, at *13–14 (N.D. Tex. Jan. 18, 2019), which is completely inapposite on the facts because there no one had actually lost their use and enjoyment of the home. However, Plaintiffs do plead that it would have paid for the interest with cash. (Compl. ¶ 49-50). Highland's choice to disbelieve this allegation is not relevant here.

Turning to tortious interference. The elements are "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

Because Highland's entire premise for dismissing Plaintiffs' tortious interference claim is predicated on the non-existence of an enforceable contract and/or judicial estoppel, Plaintiff's tortious interference claim likewise survives. Plaintiffs' tortious interference claim survives for

another reason: the self-dealing and misleading statements by Highland as to the value of HarbourVest, which enabled it to circumvent the contractual duties, and the right of first refusal was a willful interference with Holdco's rights under the Company Agreement. There is no motion suggesting that Holdco did not allege that it suffered an injury due to the failure to be offered the HarbourVest interest and lose control of HCLOF to Highland. Nothing in the record states that Plaintiffs conceded that the HarbourVest sale did not violate the Company Agreement.

## D. PLAINTIFFS HAVE PLED A CLAIM FOR NEGLIGENCE

Highland's entire argument for dismissal of the negligence cause of action is incorporating its other arguments. But this is a waiver because it has not articulated any basis for dismissal and has not shown which elements have not been met. First, under long-established Texas law, the elements of a negligence claim are: (a) a legal duty owed by one person to another; (b) breach of that duty; and (c) damages proximately caused by the breach. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Here, the Motion should be denied because the elements have all been pled. *See* Compl. ¶ 103-112. As argued before, the Advisers Act imposes a duty of care and loyalty under § 206(4). Even if Highland's misleading statements were unintentional, and/or its disclosure failures were unintentional, they were doubtlessly in violation of the standard of care, and Highland makes no argument to the contrary.

Highland's attempt to argue that the Plan exculpation precludes this claim is a non-starter. It was raised previously, meaning it is waived under Rule (g) and (h) and therefore should be stricken. Moreover, the duty of care here is a *federally imposed duty* which is *unwaivable* under 15 U.S.C. § 80b-15(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void."). No case undersigned could find—and no case cited by Highland—makes an

exception for a Chapter 11 debtor to be able to violate the securities laws with impunity.

### E.  MOTION TO DISMISS RICO CLAIM UNDER RULE 41

Plaintiffs respectfully dismiss the RICO claim under Rule 41(a) to the extent such a claim is revealed to have existed under non-securities bases. Because Highland has conceded that Plaintiffs' claims are actionable under the federal securities laws and the Advisers Act, and has cited same as a basis for dismissing the RICO claim, Highland is precluded and estopped from denying the violations of the Securities Laws and the Advisers Act. As such, to the extent that other, non-securities law violations may give rise to RICO violations, Plaintiffs respectfully reserve the right to bring such a claim but respectfully dismiss their RICO claim at this time.

### F.  HIGHLAND'S REQUEST FOR FEES FAILS

Defendants' oblique request for fees is baseless. Absent a contract or law shifting the responsibility for fees, a party is expected to bear their own fees in litigation. *See Fisk Elec. Co. v. DQSI, L.L.C.*, 740 F. App'x 399, 401-02 (5th Cir. 2018). This is as true for a successful defendant as it is for a successful plaintiff. *Id*. Here, no contract or law provides for attorneys' fees to even a prevailing defendant. Therefore, no fees may be awarded.

### V.

### MOTION IN THE ALTERNATIVE FOR LEAVE TO AMEND

Plaintiffs respectfully ask for leave to amend in the alternative to cure any pleading deficiencies that the Court determines exist. A court's discretion to deny leave is severely limited by the bias of Rule 15(a) favoring amendment. *See Dussouy v. Gulf Coast Invest. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). Leave to amend "should not be denied 'unless there is a *substantial reason* to do so.'" *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (emphasis added) (quoting *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)).

---

Amendment would not be futile because—to the extent necessary under Rules 8 or 9(b)—

Plaintiffs could add more detail, if necessary, on the representations and falsity, and on the

allegations claimed to be deficient. The balance between Rule 8 and Rule 9(b) is not always perfect

on the first try, and Plaintiffs should not be dismissed for want of an opportunity to cure any

deficiencies. Plaintiffs could further add, if necessary, other acts by Highland wherein it has sold

assets and used the funds to pay off its own creditors, which would buttress the allegations that

this is not an isolated set of facts. Plaintiffs would further suggest that upon amendment, Plaintiffs

would plead that there is a pattern of violations of the Advisers Act by Highland over the course

of the past year which  threatens to continue unabated into the future because Highland has clearly

decided to shirk fiduciary duties to the investors in its funds.

## VI.

## <u>CONCLUSION</u>

For the foregoing reasons, the successive 12(b)(6) motion should be denied.


Dated:  November 18, 2022                Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         <u>*/s/  Mazin A. Sbaiti*</u>
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         JPMorgan Chase Tower
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                             jeb@sbaitilaw.com

                                         ***Counsel for Plaintiffs***

004473

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| **Defendants.** | § | |

## APPENDIX IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION TO DISMISS COMPLAINT

| Exhibit No. | Description | Bates Range |
|---|---|---|
| | Declaration of Mazin A. Sbaiti | APP_0001 - 0002 |
| 1 | Excerpts from Transcript of Hearing of Application to Employ James P. Seery, Jr. on July 14, 2020 | APP_0003 - 0014 |
| 2 | Highland CLO Funding - Members Agreement Relating to the Company | APP_0015 - 0042 |
| 3 | HarbourVest Settlement Agreement | APP_0043 - 0061 |
| 4 | Order Approving Debtor's Settlement with HarbourVest | APP_0062 - 0084 |
| 5 | HCLOF Offering | APP_0085 - 0206 |
| 6 | Amended and Restated Investment Advisory Agreement | APP_0207 - 0221 |



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| ***Defendants.*** | § | |

<u>**DECLARATION OF MAZIN A. SBAITI**</u>

1.      My name is Mazin A. Sbaiti. I am over twenty-one years old and fully competent in all respects to make this Declaration.

2.      I am a partner at Sbaiti & Company PLLC, and am admitted in good standing in this Court. I represent Plaintiffs Charitable DAF Fund, L.P. and CLO Holdco, Ltd. in this matter. The facts stated in this Declaration are based on my personal knowledge and made under penalty of purjury.

3.      Exhibit 1 is a true and correct copy of excerpts from a Transcript of the July 14, 2020 Hearing before the Northern District of Texas Bankruptcy Court, in the *In Re Highland Capital Management, LP,* Cause No. 19-34054-sgj11.

4.      Exhibit 2 is a true and correct copy of the Highland CLO Funding Members Agreement Relating to the Company, executed on November 15, 2017.

5.      Exhibit 3 is a true and correct copy of the HarbourVest Settlement Agreement, entered into between Highland Capital Management and the various Harbourvest entities in the bankruptcy.

6.      Exibit 4 is a true and correct copy of the Order Approving Settlement with Harbourvest under Rule 9019 (the "<u>9019 Order</u>").

7.      Exhibit 5 is a true and correct copy of the HCLOF Offering Memorandum.

1

Executed on November 18, 2022.

*/s/ Mazin A. Sbaiti* _____
Mazin A. Sbaiti

004476

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 09/11/23    Page 96 of 204    PageID 4892
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 1 of 134

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj11** |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | July 14, 2020 |
|  | ) | 1:30 p.m. Docket |
| Debtor. | ) |  |
|  | ) | APPLICATIONS TO EMPLOY JAMES |
|  | ) | P. SEERY AND DEVELOPMENT |
|  | ) | SPECIALISTS, INC. (774, 775) |
|  | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtors:          Jeffrey N. Pomerantz
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                           13th Floor
                          Los Angeles, CA  90067
                          (310) 277-6910

For the Debtors:          John A. Morris
                          Greg Demo
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          780 Third Avenue, 34th Floor
                          New York, NY  10017-2024
                          (212) 561-7700

For the Debtors:          Ira D. Kharasch
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                           13th Floor
                          Los Angeles, CA  90067-4003
                          (310) 277-6910

For the Debtors:          Zachery Z. Annable
                          Melissa S. Hayward
                          HAYWARD & ASSOCIATES, PLLC
                          10501 N. Central Expressway,
                           Suite 106
                          Dallas, TX  75231
                          (972) 755-7104

**EXHIBIT**

1

04477

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 13-21    Filed 05/11/23    Page 97 of 204    PageID 4893
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 16 of 134

Seery – Direct                                16

1   matter as well as financing in distressed matters during that

2   time.

3       In 1999, I went to the business side and I began to manage

4   distressed assets at Lehman Brothers as well as a leverage

5   finance business.  That grew into my running the risky finance

6   business as well as the loan business at Lehman globally,

7   which included high-grade loans, high-yield loans, trading and

8   sales of those products, a big part of distressed, all of

9   restructuring, all of asset management, and all of the hedging

10  of the portfolio that we had.

11      From there, I left Lehman with a small group and sold it

12  to Barclay's.  I moved on and ran a hedge fund with two former

13  partners of mine who are the founding partners called River

14  Birch Capital.  It was a long-short credit fund; mostly

15  credit, though we did structured finance as well, and we also

16  handled some equities.

17  Q    Okay.  Let's spend a few minutes, as a preview, talking

18  about the Debtor and its business.  And let's start with the

19  basics.  Is there a way you can summarize the business of the

20  Debtor?

21  A    I think, from a high level, the best way to think about

22  the Debtor is that it's a registered investment advisor.  As a

23  registered investment advisor, which is really any advisor of

24  third-party money over $25 million, it has to register with

25  the SEC, and it manages funds in many different ways.

004478

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 15-21    Filed 09/11/23    Page 98 of 204    PageID 4894
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 17 of 134

1        The Debtor manages approximately $200 million current

2    values -- it was more than that at the start of the case -- of

3    its own assets.  It doesn't have to be a registered investment

4    advisor for those assets, but it does manage its own assets,

5    which include directly-owned securities; loans from mostly

6    related entities, but not all; and investments in certain

7    funds which it also manages.

8        In addition, the Debtor manages about roughly $2 billion

9    in -- $2 billion in total managed assets, around $2 billion in

10   CLO assets, and then other entities, which are hedge funds or

11   PE style.

12       In addition, the Debtor provides shared services for

13   approximately $6 billion of assets.  Those are assets that are

14   owned by related entities but not owned by Debtor-owned or

15   managed entities.  And those are a combination of back office

16   services, which include timely reporting, asset management,

17   legal and compliance support, trading and research support,

18   but not the actual management of the assets.

19       The Debtors run -- and I think the way to think about it

20   is on a functional basis; at least, that's the way I think

21   about it -- and there's really six areas.  There's corporate

22   management; finance, accounting and tax; trading and research;

23   private equity and fund investing; compliance and legal; and

24   then structured equity, which really includes all of the CLO

25   businesses.

Case 21-03067-sgj   Doc 130-1   Filed 11/18/22   Entered 11/18/22 15:55:14   Desc
Case 3:23-cv-01503-B   Document 18-21   Filed 07/11/23   Page 99 of 204   PageID 4895
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 18 of 134

Seery - Direct                                    18

1      The goals of the Debtor generally are what you'd expect

2   out of an asset manager.  A little bit different than most

3   because the Debtor does own assets, which is a little

4   different than when money asset managers typically hold assets

5   away from the asset manager.  But number one, discharge

6   Highland's, which I'll call Highland (inaudible), LP, duties

7   to investors in the funds.  Those are fiduciary duties under

8   the Investment Advisors Act.  Each day, you've got to make

9   sure that you do that first and foremost.

10     Number two, create positive MPD in each of the funds that

11  we manage, either through sales, purchases, or hedging.

12     Next, make sure that we report timely finances of our own

13  assets, including in the funds, but also, to the third-party

14  investors.  Maximize the value of HCMLP's owned assets.  And

15  then operate as efficiently as possible for the lowest cost.

16     That's essentially how the Debtor -- how we think about

17  the Debtor from a functional perspective.  It's got about 70

18  employees laid out in those areas that I mentioned, and each

19  of those employees every day usually think about those goals

20  and try to discharge their duties by focusing on those goals.

21  Q    Thank you, Mr. Seery.  And can you describe for the Court

22  how those 70 or so employees are organized?  Is there an

23  internal corporate structure that you're working with?

24  A    Yeah.  The way -- the way -- I apologize.  The way we

25  think about it is, as I said, corporate management, which is

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 08/01/22    Page 100 of 204    PageID 4896
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 19 of 134

Seery - Direct                              19

1    really HR and overseeing the function that it's filling every

2    day, that's been really -- because Mr. Dondero was removed

3    from management.  It used to all roll up to him.  That's been

4    effectively rolling up to me since February.

5        Finance, accounting, and tax.  Each of these businesses

6    every day require certain amounts of liquidity.  Each of them

7    have requirements that they have to pay out to investors.

8    Each of them have expenses.  And all of them have different

9    kinds of tax either obligations or reporting.  Those are

10   managed by Frank Waterhouse as the CFO.  (inaudible), sorry.

11       Trading and research.  With respect to the assets, they're

12   not -- they're not static assets.  Many of them do get traded

13   on a regular basis.  A gentleman, Joe Sowin, heads up the

14   trading of the liquid assets.  John Povish (phonetic) heads up

15   the research and the trading of the more illiquid assets, but

16   not PE.  In addition, we have PE assets that require some

17   management every day, including Board seats.  That's a

18   gentleman by the name of Cameron Baynard, and also he will

19   fund investments in that area.  J.P. Sevilla is responsible

20   for working with Cameron on those investments and leading that

21   team.

22       Importantly, because of the nature of what the Debtor

23   does, the fiduciary obligations, as well as the

24   responsibilities to each investor and the legal overlay, we

25   have a robust compliance and legal department.  That's headed

004481

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 09/01/22    Page 101 of 204    PageID 4897
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 20 of 134

Seery - Direct                                20

1    by Thomas Surgent and Scott Ellington.  Scott:  more focused

2    on transactional issues with respect to legal.  He is actually

3    general counsel.  Everything that has do with compliance, the

4    interrelatedness of the funds, trading between funds or

5    positions that are shared across funds, which are many, runs

6    through Thomas Surgent and his team.

7         And finally, structured equity.  Sitting on top of the

8    structured finance business that we have, understanding those

9    assets, particularly of two billion-ish assets in CLOs, that's

10   headed by Hunter Covitz.

11   Q    Can you describe for the Court your interaction with each

12   of the department heads that you just identified?

13   A    Well, depending on the nature of the issue each day, I

14   have at least -- I'd say generally at least weekly contact

15   with most, often daily contact with most.  So, for example,

16   when there are trading issues, particularly as the market was

17   extremely volatile with respect to unliquid securities, Joe

18   Sowin and I were on the phone several times a day.

19        Relating to the COVID issues, Brian Collins, who heads the

20   HR group, and I were on the phone several times a day.

21        Relating to structured equity, depending on what's

22   happening with a particular fund or what's happening in loan

23   prices, I speak to Hunter Covitz.  And it goes down the line.

24        So it really depends on each of the areas and what's going

25   on in the business, but I try to touch base with each of those

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 09/01/23    Page 102 of 204    PageID 4898
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 21 of 134

Seery - Direct                          21

1    department heads on a regular basis.

2         Frank Waterhouse, of course, is at least weekly.  We have

3    a standing call every week to make sure that we're focused on

4    liquidity, which is always a concern in a Chapter 11, and

5    Frank and his team are on that call and prepare weekly

6    materials for us.

7    Q    Okay.

8              MR. MORRIS:  Your Honor, before I move to the next

9    area of questions, the work of the Board, I just wanted to see

10   if the Court had any questions on the corporate organizational

11   structure, the internal structure of the business, or any of

12   the matters that Mr. Seery touched on?

13             THE COURT:  I do not.  And I do have in front of me a

14   demonstrative aid that Mr. Annable sent over ahead of time, so

15   I appreciate that as well.

16             MR. MORRIS:  Okay.  Your Honor, I think Mr. Seery

17   covered much of what's on that document, but if you'd like him

18   to go through that, we're happy to do it.

19             THE COURT:  No, that's fine.

20             MR. MORRIS:  Okay.

21   BY MR. MORRIS:

22   Q    Then let's shift gears a little bit and start talking

23   about the work of the Independent Board itself.  The

24   Independent Board was appointed in mid-January; is that right?

25   A    Yeah.  It was the first -- January 9th, the first week of

004483

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-1    Filed 09/11/22    Page 103 of 204    PageID 4899
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 22 of 134

Seery - Direct                                    22

1    January, and we started working that afternoon.

2    Q    Okay.  Can you describe for the Court what the -- the

3    Board's initial focus?  What were you focused on?

4    A    Well, if you think about the areas that I just mentioned

5    previously, the Board initially, for lack of a better term,

6    gang-tackled everything.  So we tried to make sure that we had

7    a broad base of understanding among the three of us with

8    respect to the business.

9         I, because of my background, had a lot more familiarity

10   with asset management, these type of asset security

11   businesses.  But we wanted to make sure that each of us was at

12   least facile with the main areas that we had to understand.

13   First was operations.  How does the company run each day?

14   Particularly, how was it going to run without Mr. Dondero?

15   And I went through some of those functional areas and how we

16   thought about those and who head each of those.

17        Next in the -- I don't mean to say it's second, because

18   it's always first, but liquidity.  What did the Debtors'

19   liquidity look like?  How are we going to manage that

20   liquidity, not just for the near-term, but also for the

21   medium-term, and then even into the slightly longer-term?  We

22   had to think about what assets are there, what money those

23   assets might need that we would have to invest in them, and

24   whether there was liquidity in those assets that we can create

25   liquidity in order to fund the Debtors' business.

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 09/21/22    Page 104 of 204    PageID 4900
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 23 of 134

Seery - Direct                        23

1          Personnel, we needed a good opportunity to understand who

2     did what, not just in the senior managers that I mentioned,

3     but deeper into the staff, because we're going to rely on

4     those folks.  Particularly worked through with DSI.

5          As I mentioned, the Debtor, unlike a lot of other asset

6     managers, owns a lot of assets.  It's a disparate group of

7     assets, but getting a feel and understanding for what those

8     assets were, what the critical issues surrounding those assets

9     are, who managed them day-to-day:  We wanted to make sure that

10    each of the directors had a good (inaudible) and understanding

11    of those issues that might arise with respect to those assets,

12    and a good sense of how quickly those issues could, you know,

13    further arise.

14         We also had to get a very good understanding of each of

15    the funds that we manage.  As I said, the Investment Advisors

16    Act puts a fiduciary duty on Highland Capital to discharge its

17    duty to the investors.  So while we have duties to the estate,

18    we also have duties, as I mentioned in my last testimony, to

19    each of the investors in the funds.

20         Now, some of them are related parties, and those are a

21    little bit easier.  Some of them are owned by Highland.  But

22    there are third-party investors in these funds who have no

23    relation whatsoever to Highland, and we owe them a fiduciary

24    duty both to manage their assets prudently but also to seek to

25    maximize value.  And we wanted to make sure we had a good

Case 21-03067-sgj   Doc 130-1   Filed 11/18/22   Entered 11/18/22 15:55:14   Desc
Case 3:23-cv-01503-B   Document 18-21   Filed 09/31/2222 Page 105 of 204   PageID 4901
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 24 of 134

Seery - Direct                                24

1    understanding of that.

2         Finally, with respect to the shared service arrangements,

3    we needed to get an understanding of that $6 billion in assets

4    and how our business, HCMLP, worked with those -- those shared

5    service counterparties and exactly who did what for whom.

6    It's very complicated because it had been run much more on a

7    functional basis than on a line basis from each contract.  So

8    it's not as if your employees are allocated to NexBank.  It's

9    the whole panoply of businesses that we enter into, and

10   providing those services to NexBank, not through a central

11   point but through whatever requests come in from the counter-

12   parties.  So we needed a good understanding of what those

13   contracts looked and what those obligations were.

14         A VOICE:  John, you're on mute.

15         MR. MORRIS:  Thank you.

16   BY MR. MORRIS:

17   Q    All of that work was going on in the first weeks of the

18   appointment of the Board?

19   A    Yeah, it would not be fair to say we could do that in a

20   couple weeks.  So it took far longer than that.  But that

21   didn't mean that issues didn't start to arise immediately in

22   February.  And so, while we were learning, we were also

23   starting to get a feel for different things that could happen

24   in the company.

25         As in many companies, immediately, one of the first things

Case 21-03067-sgj   Doc 130-1   Filed 11/18/22   Entered 11/18/22 15:55:14   Desc
Case 3:23-cv-01503-B   Document 18-21   Filed 09/14/22   Page 106 of 204   PageID 4902
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 25 of 134

Seery - Direct                                    25

1   you have to deal with is, particularly at the beginning of the

2   year, what does compensation look like; who are the -- what do

3   promotions look like; are you going to be able to hold this

4   team together to service these assets?  And yeah, we had that,

5   with an additional wrinkle that Highland's payment structure

6   defers a significant amount of compensation to its employees,

7   and it vests over time, and it has the very typical provision

8   that if you are not there when it vests -- when it is going to

9   be paid, actually, not when it vests.  Even if you're vested,

10  if you're not there when it gets paid, you're not entitled to

11  it.  And so understanding who was owed what; how the vesting

12  worked; what the compensation structure looked like compared

13  to third parties, was one of the first things we had to do.

14  And Highland has an extremely robust review process.  Brian

15  Collins manages it.  It's first-rate.  It goes through both

16  360 in terms of what other employees think of each other as

17  well as bottoms up, in terms of performance.  And then it has

18  a top-down component, which ultimately ran through Mr.

19  Dondero.  Since he was effectively removed from that role, the

20  Board had to jump in and get a full understanding with Brian

21  about what the process looked like; how it was going to work;

22  how it compared to other firms; and whether we could go

23  forward with it.  And that was one of the motions that was

24  brought early to the Court.

25  A    Let's talk a minute about the transactional work that the

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 09/11/23    Page 107 of 204    PageID 4903
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 133 of 134

133

1    yesterday counsel for Mr. Dondero filed a joinder in the

2    Debtors' objection to Acis's claim.  So, again, just thinking

3    about this in the context of mediation, I think, with that

4    joinder, they will be a necessary party.  So, going back to

5    Mr. Seery's point, this is not just --

6            THE COURT:  Oh, absolutely.  Mr. Dondero is --

7            MS. PATEL:  -- a two-party --

8            THE COURT:  -- going to be a required party in

9    mediation.  Absolutely.  So, --

10            MS. PATEL:  Thank you, Your Honor.

11            THE COURT:  All right.  Well, if there's nothing

12    further, we'll see you on the 21st.  And, again, my courtroom

13    deputy may be reaching out before then if we've got things

14    nailed down on mediation.

15        (Proceedings concluded at 4:54 p.m.)

16                            --oOo--

17

18

19

20

                            CERTIFICATE
21

22        I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
23    the proceedings in the above-entitled matter.

         /s/ Kathy Rehling                    07/16/2020
24

25    _____        _____
    Kathy Rehling, CETD-444                    Date
    Certified Electronic Court Transcriber

**EXECUTION VERSION**

Between

**CLO HOLDCO, LTD.**

And

**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

And

**HARBOURVEST 2017 GLOBAL AIF L.P.**

And

**HARBOURVEST 2017 GLOBAL FUND L.P.**

And

**HV INTERNATIONAL VIII SECONDARY L.P.**

And

**HARBOURVEST SKEW BASE AIF L.P.**

And

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

And

**LEE BLACKWELL PARKER, III**

And

**QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311**

And

**QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811**

And

**QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612**

And

**QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211**

And

**HIGHLAND CLO FUNDING, LTD.**

And

**HIGHLAND HCF ADVISOR, LTD.**

---

**MEMBERS AGREEMENT RELATING TO THE COMPANY**

---

**EXHIBIT**

**2**

exhibitsticker.com

004489

TABLE OF CONTENTS

1.    INTERPRETATION ............................................................................................ 2

2.    THE BUSINESS OF THE COMPANY ............................................................ 4

3.    VOTING RIGHTS ............................................................................................. 4

4.    ADVISORY BOARD ......................................................................................... 4

5.    DEFAULTING MEMBERS ............................................................................... 4

6.    TRANSFERS OR DISPOSALS OF SHARES ................................................. 4

7.    CONFIDENTIALITY .......................................................................................... 4

8.    DIVIDENDS ....................................................................................................... 9

9.    TERM OF THE COMPANY .............................................................................. 9

10.   ERISA MATTERS ............................................................................................. 9

11.   TAX MATTERS ................................................................................................. 9

12.   AMENDMENTS TO CERTAIN AGREEMENTS .............................................. 9

13.   FINANCIAL REPORTS .................................................................................... 9

14.   TERMINATION AND LIQUIDATION .............................................................. 9

15.   WHOLE AGREEMENT ................................................................................... 12

16.   STATUS OF AGREEMENT ............................................................................ 12

17.   ASSIGNMENTS .............................................................................................. 12

18.   VARIATION AND WAIVER ............................................................................ 12

19.   SERVICE OF NOTICE ................................................................................... 12

20.   GENERAL ....................................................................................................... 13

21.   GOVERNING LAW AND JURISDICTION ..................................................... 14

SCHEDULE ................................................................................................................. 18
Adherence Agreement .............................................................................................. 18

**THIS AGREEMENT** is made the 15th day of November 2017

**BETWEEN**

(1)    **CLO HOLDCO, LTD.** whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)    **HARBOURVEST DOVER IX INVESTMENT L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)    **HARBOURVEST 2017 GLOBAL AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)    **HARBOURVEST 2017 GLOBAL FUND L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)    **HV INTERNATIONAL VIII SECONDARY L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)    **HARBOURVEST SKEW BASE AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)    **HIGHLAND CAPITAL MANAGEMENT, L.P.** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)    **LEE BLACKWELL PARKER, III** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)    **QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311** of 17171 Park Row #100, Houston, Texas 77084, USA

(10)    **QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811** of 17171 Park Row #100, Houston, Texas 77084, USA

(11)    **QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612** of 17171 Park Row #100, Houston, Texas 77084, USA

(12)    **QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211** of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "**Members**") and

(13)    **HIGHLAND CLO FUNDING, LTD.,** with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**") and

(14)    **HIGHLAND HCF ADVISOR, LTD.,** whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**WHEREAS**:

(A)    The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)    The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, (the (the "**Offering Memorandum**"), subject to the restrictions set forth therein.

23981765.11. BUSINESS                    1

004491

(C)     The Members are the owners of the entire issued capital of the Company.

(D)     The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

**OPERATIVE PROVISIONS**

1.     **INTERPRETATION**

In this Agreement, including the Schedule:

1.1   the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"**Adherence Agreement**" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"**Advisers Act**" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"**Affiliate**" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"**Agreement**" means this agreement together with the Schedule;

"**Articles**" means the articles of incorporation of the Company as amended from time to time;

"**Business**" means the business of the Company as described in Recital (B);

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"**Directors**" means the directors of the Company from time to time;

"**CLO Holdco**" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Directors**" means the directors of the Company from time to time;

"**Dover IX**" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"**DOL**" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"**DOL Regulations**" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"**Dover IX**" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"**ERISA**" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"**ERISA Member**" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"**HarbourVest Entities**" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"**Highland Principals**" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"**Law**" means the Companies (Guernsey) Law, 2008, as amended;

"**Member**" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"**Parties**" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"**Shares**" means ordinary shares in the Company;

"**Subsidiary**" shall have the meaning ascribed to it in the Law;

"**Subscription and Transfer Agreement**" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2    any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3    any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4    any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5    any reference to time shall be to Guernsey time;

1.6    except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

004493

1.7    unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8    Clause headings are for ease of reference only and do not affect the construction of any provision.

2.    **THE BUSINESS OF THE COMPANY**

2.1    The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2    The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3    The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.    **VOTING RIGHTS**

3.1    The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2    The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

3.2.1    any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

3.2.2    any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

3.2.3    any conversion or redemption of Shares, except pursuant to Clause 5.5,

3.2.4    any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

3.2.5    the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

3.2.6    the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.    **ADVISORY BOARD.**

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "**Advisory Board**") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum.  Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4     <u>Term of Members of Advisory Board</u>.  A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5     <u>No Duties to Other Members</u>.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.      **DEFAULTING MEMBERS**

5.1     In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "**Outstanding Settlement Amount**"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "**Default Interest Rate**") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "**Defaulting Member**"), the following provisions shall apply:

5.2     Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3     The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

004496

5.4 The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5 The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6 The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7 At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8 The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9 Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6. **TRANSFERS OR DISPOSALS OF SHARES**

6.1 No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

004497

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1    such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2    such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3    such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4    such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2    Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again.  Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3    No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4    Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5    The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6    All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

7.    **CONFIDENTIALITY**

7.1   Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2   Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.    **DIVIDENDS**

8.1   The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.    **TERM OF THE COMPANY**

9.1   Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "**Term**"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2   Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.   **ERISA MATTERS**

10.1  The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.   **TAX MATTERS**

11.1  <u>PFIC</u>. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

004499

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2 <u>CFC</u>. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3 <u>Other Tax Information</u>. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4 <u>Withholding and Other Taxes</u>. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12. **AMENDMENTS TO CERTAIN AGREEMENTS**

12.1 The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "**Management Agreement**") without the consent of the Parties.

12.2 The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3 The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13. **FINANCIAL REPORTS**

13.1 The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

004500

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2    After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.    **TERMINATION AND LIQUIDATION**

14.1    Save as provided for in Clause 13.2, this Agreement shall terminate:

    14.1.1    when one Party holds all the Shares;

    14.1.2    when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

    14.1.3    with the written consent of all the Parties.

14.2    The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3    Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4    Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

    14.4.1    all existing contracts of the Company are performed to the extent that there are sufficient resources;

    14.4.2    the Company shall not enter into any new contractual obligations;

    14.4.3    the Company is dissolved and its assets are distributed as soon as practical; and

    14.4.4    any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

15. **WHOLE AGREEMENT**

15.1 This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2 Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3 Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16. **STATUS OF AGREEMENT**

16.1 Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2 If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17. **ASSIGNMENTS**

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18. **VARIATION AND WAIVER**

18.1 A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2 A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3 A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19. **SERVICE OF NOTICE**

19.1 Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

19.1.1 to the Company:
Address:
First Floor, Dorey Court, Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

19.1.2 to CLO Holdco:

004502

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3    to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4    to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2    Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee **PROVIDED THAT** if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3    In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20.    **GENERAL**

20.1    Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2    Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3    The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4    All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5    Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

20.6  Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7  This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.    **STATUS OF AGREEMENT**

21.1  The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2  If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22.    **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

*[Signature Page Follows.]*

004504

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:...............................................................
**Name:** Grant Scott
**Title:** Director

004505

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:      HarbourVest Partners (Europe) Limited,
         its Alternative Investment Fund Manager

**By:**......................................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:      HarbourVest Partners (Europe) Limited,
         its Alternative Investment Fund Manager

**By:**......................................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:      HarbourVest 2017 Global Associates L.P.,
         its General Partner

By:      HarbourVest GP LLC,
         its General Partner

By:      HarbourVest Partners, LLC,
         its Managing Member

**By:**......................................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:    HIPEP VIII Associates L.P.
        Its General Partner
By:    HarbourVest GP LLC
        Its General Partner
By:    HarbourVest Partners, LLC
        Its Managing Member

**By:** .................................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .................................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person

004507

SIGNED

Lee Blackwell Parker, III

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:
Name: *Emmanuel Manuel*
Title: *transactions operation*

Read and approved

X

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**


By: .................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By: .................................................................
Name: *Emmanuel Maciei*
Title: *Transaction supervisor*

*Read & Approved*


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**


By: .................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**


By: .................................................................
Name:
Title:


SIGNATURE PAGE TO MEMBERS' AGREEMENT

004510

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**


By:.......................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**


By:.......................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:.......................................................................
Name:  _Emmanuel Mackey_
Title:  _Transactions Supervisor_

_Read and Approved:_

_[signature]  11/7/17_


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**


By:.......................................................................
Name:
Title:


SIGNATURE PAGE TO MEMBERS' AGREEMENT

004511

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**


By:...................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**


By:...................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**


By:...................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:...................................................................
Name: Emmanuel Mader
Title: Transaction Supervisor

Read and approved

SIGNATURE PAGE TO MEMBERS' AGREEMENT

004512

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc.,
       its General Partner

**By**:...................................................................
**Name:** James Dondero
**Title:**  President

004513

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:.......................................................................

**Name:** James Dondero
**Title:**  President

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

**By**:.................................................................
**Name:** William Scott
**Title:** Director

004515

**SCHEDULE**

**Adherence Agreement**

**THIS ADHERENCE AGREEMENT** is made on [●] 200[●]

**BETWEEN**:

(1)     [●] of [●] (the "**Covenantor**");

(2)     CLO HOLDCO, LTD. of [                          ] (a "**Member**");

(3)     [●] of [                     ] (a "**Member**");

(4)     [●] of [                     ] (a "**Member**");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**RECITAL**

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "**Members Agreement**").

**IT IS HEREBY AGREED** as follows:

1.     The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.     Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.     This Agreement shall be governed by and construed in accordance with Guernsey law.

**IN WITNESS** of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.

004516

**EXECUTION VERSION**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS,** on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS,** the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

**EXHIBIT**

**3**

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

    (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

    (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

US-DOCS\115534291.12

004519

**EXECUTION VERSION**

4.     **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.     **Plan Support.**

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

US-DOCS\115534291.12

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

004522

**EXECUTION VERSION**

        14.     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

EXECUTION VERSION

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:     /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:      CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

8

004524

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

9

004525

# Exhibit A

004526

**TRANSFER AGREEMENT**

**FOR ORDINARY SHARES OF**

**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of December [＿], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

2

004528

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 183646253v.3

004529

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

ActiveUS 183646253v.3

004531

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

004532

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By: HIPEP VIII Associates L.P.
 Its General Partner

By: HarbourVest GP LLC
 Its General Partner

By: HarbourVest Partners, LLC
 Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By: HarbourVest Partners (Ireland) Limited
 Its Alternative Investment Fund Manager

By: HarbourVest Partners L.P.
 Its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC
 Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By: HarbourVest Partners (Ireland) Limited
 Its Alternative Investment Fund Manager

By: HarbourVest Partners L.P.
 Its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC
 Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

7

004533

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

004534

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [        ] | [        ] |
| HarbourVest 2017 Global AIF L.P. | [        ] | [        ] |
| HarbourVest 2017 Global Fund L.P. | [        ] | [        ] |
| HV International VIII Secondary L.P. | [        ] | [        ] |
| HarbourVest Skew Base AIF L.P. | [        ] | [        ] |

9



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §  Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

EXHIBIT

4

04536

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to ==28 U.S.C. §§ 157== and ==1334==; and this Court having found that this is a core proceeding pursuant to ==28 U.S.C. § 157(b)(2)==; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to ==28 U.S.C. §§ 1408== and ==1409==; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

### ###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

004539

# EXHIBIT 1

004540

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

### R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS,** on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS,** the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

   (a)  In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

   (i)  an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

   (ii)  an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

   (b)  On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

   (a)  Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

Case 19-34054-sgj11 Doc 1780 Filed 01/21/18 Entered 01/21/18 22:05:55 Page 3 of 23
Case 3:23-cv-01503-B   Document 18-21   Filed 07/17/23   Page 162 of 204   PageID 4958
EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

004543

EXECUTION VERSION

4.   **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)   each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)   the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.   **Plan Support.**

(a)   Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)   In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)   The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

      6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

      7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

      8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

004545

Case 3:24-cv-03357-L-JStg DoD 417-83e Filed File2/11/18/22ter Ende1e2/11/11/09/20155655 Page 16s of 23
Case 3:23-cv-01503-B   Document 18-21   Filed 09/31/222   Page 165 of 204   PageID 4961
EXECUTION VERSION

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

004546

**EXECUTION VERSION**

14.    **<u>Governing Law; Venue; Attorneys' Fees and Costs</u>**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

004547

Case 3:40-bk-34067-sgj11 Doc 1788 Filed 11/11/21 Entered 11/11/21 16:55:14 Desc
Case 3:23-cv-01503-B    Document 18-21    Filed 09/11/22    Page 167 of 204    PageID 4963
Main Document    Page 9751 of 223

EXECUTION VERSION

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:     /s/ James P. Seery, Jr.
Name:  James P. Seery, Jr.
Its:     CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

004548

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch _____

Name: Michael Pugatch _____

Its: Managing Director _____

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch _____

Name: Michael Pugatch _____

Its: Managing Director _____

9

004549

# Exhibit A

004550

# TRANSFER AGREEMENT
# FOR ORDINARY SHARES OF
# HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action be required from any party for the transfer of the Interest to be effective except as described herein.

2.  <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

3

004553

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member

By:  _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By:  _____

Name:  James P. Seery, Jr.

Title:  President

**FUND:**
**Highland CLO Funding, Ltd.**

By:  _____

Name:

Title:

*[Additional Signatures on Following Page]*

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
       Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
       Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
       Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

004556

**HarbourVest 2017 Global Fund L.P.**

By:   HarbourVest 2017 Global Associates L.P.
      Its General Partner

By:   HarbourVest GP LLC
      Its General Partner

By:   HarbourVest Partners, LLC
      Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

004557

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.  If you are in any doubt as to the action you should take or the contents of this document, you are recommended to seek your own independent financial advice immediately from your stockbroker, bank, solicitor, accountant, or other appropriate independent financial adviser, who is authorised under the Financial Services and Markets Act 2000, as amended ("FSMA") if you are in the United Kingdom, or from another appropriately authorised independent financial adviser if you are in a territory outside the United Kingdom.**

**A copy of this document, which comprises an offering memorandum (the "Offering Memorandum") relating to Highland CLO Funding, Ltd. (the "Company") in connection with the issue of Placing Shares in the Company, is available at the Company's registered office upon request.**

**The Placing Shares are only suitable for investors:  (i) who understand the potential risk of capital loss and that there may be limited liquidity in the underlying investments of the Company; (ii) for whom an investment in the Placing Shares is part of a diversified investment programme; and (iii) who fully understand and are willing to assume the risks involved in such an investment programme.  It should be remembered that the price of the Placing Shares and the income from them can go down as well as up and that investors may not receive, on the sale or cancellation of the Placing Shares, the amount that they invested.**

The Company and its directors (whose names appear in the section of this Offering Memorandum entitled "*Company Directors and Administration*") (the "**Directors**") accept responsibility for the information contained in this Offering Memorandum.  To the best of the knowledge of the Company and the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in the Offering Memorandum is in accordance with the facts and contains no omission likely to affect its import.  The Directors have taken all reasonable care to ensure that the facts stated in the Offering Memorandum are true and accurate in all material respects, and that there are no other facts the omission of which would make misleading any statement in this Offering Memorandum, whether of facts or of opinion.  All the Directors accept responsibility accordingly.

**Potential investors should read the whole of this Offering Memorandum when considering an investment in the Placing Shares and, in particular, attention is drawn to the section of this Offering Memorandum entitled "*Risk Factors*" on pages 18 to 47 of this Offering Memorandum.**

---

### HIGHLAND CLO FUNDING, LTD.
*(a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120)*

### Placing for a target issue of U.S. $153,000,000 of Placing Shares

---

This Offering Memorandum does not constitute or form part of any offer or invitation to sell, or the solicitation of an offer to acquire or subscribe for, any securities other than the securities to which it relates or any offer or invitation to sell or issue, or any solicitation of any offer to purchase or subscribe for such securities by any person in any circumstances in which such offer or solicitation is unlawful.

The Placing Shares have not been and will not be registered under the U.S. Securities Act of 1933 (the "**U.S. Securities Act**") or under the securities laws of any state or other jurisdiction of the United States.  The Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.

The Company has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "**U.S. Investment Company Act**") and investors will not be entitled to the benefits of the U.S. Investment Company Act.  There will be no public offer of the Placing Shares in the United States.

**Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of the Placing Shares or passed upon or endorsed the merits of the offering of the Placing Shares or the adequacy or accuracy of this Offering Memorandum.  Any representation to the contrary is a criminal offence in the United States.**

Except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by:  (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3)

**EXHIBIT**

**5**

559

of the United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the United States Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**"), including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

The distribution of this Offering Memorandum and the offer of the Placing Shares in certain jurisdictions may be restricted by law.  No action has been or will be taken to permit the possession, issue or distribution of this Offering Memorandum (or any other offering or publicity material relating to the Placing Shares) in any jurisdiction where action for that purpose may be required or doing so is restricted by law.  Accordingly, neither this Offering Memorandum, nor any advertisement, nor any other offering material may be distributed or published in any jurisdiction except under circumstances that will result in compliance with any applicable laws and regulations. Persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions.  None of the Company or any of its affiliates or advisors accepts any legal responsibility for any breach by any person, whether or not a prospective investor, of any such restrictions.

**In addition, the Placing Shares are subject to restrictions on transferability and resale in certain jurisdictions and may not be transferred or resold except as permitted under applicable securities laws and regulations. Investors may be required to bear the financial risks of their investment in the Placing Shares for an indefinite period of time.  Any failure to comply with these restrictions may constitute a violation of the securities laws of any such jurisdictions.  For further information on restrictions on offers, sales and transfers of the Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".**

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved.  The investors also acknowledge that they have relied only on the information contained in this document.  No person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been so authorised.  Neither the delivery of this Offering Memorandum nor any subscription or sale made under it shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date of this document or that the information in it is correct as of any subsequent time.

None of the Company or any of its representatives is making any representation to any prospective investor in respect of the Placing Shares regarding the legality of an investment in the Placing Shares by such prospective investor under the laws applicable to such prospective investor.

The contents of this Offering Memorandum should not be construed as legal, financial or tax advice.  Each prospective investor should consult his, her or its own legal, financial or tax adviser for legal, financial or tax advice.

The Company is a registered closed-ended collective investment scheme pursuant to The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended and the Registered Collective Investment Schemes Rules 2015 issued by the Guernsey Financial Services Commission. Neither the Guernsey Financial Services Commission nor the States of Guernsey take any responsibility for the soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

If you are in any doubt about the contents of this Offering Memorandum you should consult your accountant, legal or professional adviser or financial adviser.

This Offering Memorandum has not been reviewed by the Guernsey Financial Services Commission and, in granting registration, the Guernsey Financial Services Commission has relied upon specific warranties provided by State Street (Guernsey) Limited, the Company's designated administrator.

It should be remembered that the price of securities and the income from them can go down as well as up.

**You are wholly responsible for ensuring that all aspects of the Company are acceptable to you.  Investment in the Company may involve special risks that could lead to a loss of all or a substantial portion of such investment.**

**Unless you fully understand and accept the nature of the Company and the potential risks inherent in this Company you should not invest in the Company.**

This Offering Memorandum is dated November 15, 2017.

## IMPORTANT NOTICES

**Investors should rely only on the information contained in this Offering Memorandum.  No person has been authorised to give any information or to make any representations in connection with the Placing other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied upon as having been authorised by or on behalf of the Company.  Neither the delivery of this Offering Memorandum nor any subscription or sale made under this Offering Memorandum shall, under any circumstances, create any implication that there has been no change in the business or affairs of the Company since the date of this Offering Memorandum or that the information contained in this Offering Memorandum is correct as of any time subsequent to its date.**

The contents of this Offering Memorandum are not to be construed as legal, financial, business, investment or tax advice.  Each prospective investor should consult his or her own legal adviser, financial adviser or tax adviser for legal, financial or tax advice in relation to any purchase or proposed purchase of Placing Shares.

An investment in the Placing Shares is suitable only for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who are capable of evaluating the merits and risks of such an investment and/or who have received advice from their fund manager or broker regarding such an investment and who have sufficient resources to be able to bear losses (which may equal the whole amount invested) that may result from such an investment.  An investment in the Placing Shares should constitute part of a diversified investment portfolio.  Accordingly, typical investors in the Company are expected to be institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved.  Investors who purchase Placing Shares will be deemed to have acknowledged that no person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been authorised by the Company.

**General**

Prospective investors should not treat the contents of this Offering Memorandum as advice relating to legal, taxation, investment or any other matters.  Prospective investors should inform themselves as to:  (a) the legal requirements within their own countries for the purchase, holding, transfer, redemption or other disposal of Placing Shares; (b) any foreign exchange restrictions applicable to the purchase, holding, transfer, redemption or other disposal of Placing Shares which they might encounter; and (c) the income and other tax consequences which may apply in their own countries as a result of the purchase, holding, transfer, redemption or other disposal of Placing Shares.  Prospective investors must rely on their own representatives, including their own legal advisers, financial advisers and accountants, as to legal, tax, investment or any other related matters concerning the Company and an investment therein.

Statements made in this Offering Memorandum are based on the law and practice currently in force and are subject to changes therein.  This Offering Memorandum should be read in its entirety before making any application for Placing Shares.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

All times and dates referred to in this Offering Memorandum are, unless otherwise stated, references to Guernsey times and dates and are subject to change without further notice.

004562

**Capitalised terms contained in this Offering Memorandum shall have the meanings set out in the Offering memorandum and/or in the section of this Offering Memorandum entitled "*Definitions*", save where the context indicates otherwise.**

**Restrictions on distribution and sale**

The distribution of this Offering Memorandum and the offering and sale of securities offered hereby in certain jurisdictions may be restricted by law.  Persons in possession of this Offering Memorandum are required to inform themselves about and observe any such restrictions.  This Offering Memorandum may not be used for, or in connection with, and does not constitute, any offer to sell, or solicitation to purchase, any such securities in any jurisdiction in which solicitation would be unlawful.

**For a description of restrictions on offers, sales and transfers of Shares, please refer to the sections of this Offering Memorandum entitled "*Selling restrictions*" below and "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".  Save as set out in these sections, there are no restrictions on the transfer of Shares under the Articles.**

**Forward-looking statements**

This Offering Memorandum includes statements that are, or may be deemed to be, "forward-looking statements".  These forward-looking statements can be identified by the use of forward-looking terminology, including the terms "believes", "estimates", "anticipates", "expects", "intends", "plans", "projects", "targets", "aims", "may", "will" or "should" or, in each case, their negative or other variations or comparable terminology.  These forward-looking statements include all matters that are not historical facts.  They appear in a number of places throughout this Offering Memorandum and include statements regarding the intentions, beliefs or current expectations of the Company concerning, amongst other things, the investment objective and investment policy, investment strategy, financing strategies, investment performance, results of operations, financial condition, prospects, and dividend/distribution policy of the Company, and the markets in which the Company, and their respective portfolios of investments, invest and/or operate.  By their nature, forward-looking statements involve risks (including those set out in the section of this Offering Memorandum entitled "*Risk Factors*") and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future.  Forward-looking statements are not guarantees of future performance.  The Company's actual investment performance, results of operations, financial condition, dividend policy and the development of its investment strategy financing strategies may differ materially from the impression created by the forward-looking statements contained in this Offering Memorandum.  In addition, even if the investment performance, results of operations, financial condition of the Company, and the development of its financing strategies, are consistent with the forward-looking statements contained in this Offering Memorandum, those results or developments may not be indicative of results or developments in subsequent periods.  Important factors that could cause these differences include, but are not limited to:

- changes in economic conditions generally and the Company's ability to achieve its investment objective and target returns and target dividends for investors;

- the ability of the Company to invest the cash on its balance sheet and the proceeds of the Placing on a timely basis within the investment objective and investment policy;

- foreign exchange mismatches with respect to exposed assets;

- changes in the interest rates and/or credit spreads, as well as the success of the Company's investment strategy in relation to such changes and the management of the un-invested proceeds of the Placing;

- impairments in the value of the investments;

- the availability and cost of capital for future investments;

- the departure of key personnel employed by the Portfolio Manager;

004563

- changes in laws or regulations, including tax laws, or new interpretations or applications of laws and regulations, that are applicable to the Company; and

- general economic trends and other external factors, including those resulting from war, incidents of terrorism or responses to such events.

Given these uncertainties, prospective investors are cautioned not to place any undue reliance on such forward-looking statements. Prospective investors should carefully review the "*Risk Factors*" section of this Offering Memorandum before making an investment decision. Forward-looking statements speak only as at the date of this Offering Memorandum. Although the Company undertakes no obligation to revise or update any forward-looking statements contained herein (save where required by the Offering Memorandum Rules), whether as a result of new information, future events, conditions or circumstances, any change in the Company's expectations with regard thereto or otherwise, prospective investors are advised to consult any communications made directly to them by the Company and/or any additional disclosures through announcements that the Company may make through a website to be created or through the Administrator.

**Selling Restrictions**

**This Offering Memorandum does not constitute, and may not be used for the purposes of, an offer or an invitation to apply for any Placing Shares by any person: (i) in any jurisdiction in which such offer or invitation is not authorised; or (ii) in any jurisdiction in which the person making such offer or invitation is not qualified to do so; or (iii) to any person to whom it is unlawful to make such offer or invitation. The distribution of this Offering Memorandum and the offering of Placing Shares in certain jurisdictions may be restricted. Accordingly, persons into whose possession this Offering Memorandum comes are required to inform themselves about and observe any restrictions as to the offer or sale of Placing Shares and the distribution of this Offering Memorandum under the laws and regulations of any jurisdiction in connection with any applications for Placing Shares, including obtaining any requisite governmental or other consent and observing any other formality prescribed in such jurisdiction.**

*Bailiwick of Guernsey*

The Company has been established in Guernsey as a registered collective investment scheme under the RCIS Rules.

Further information in relation to the regulatory treatment of registered closed-ended investment funds domiciled in Guernsey may be found on the website of the Guernsey Financial Services Commission at www.gfsc.gg.

This Offering Memorandum is prepared, and a copy of it has been sent to the Guernsey Financial Services Commission, in accordance with the RCIS Rules.

The Commission takes no responsibility for the financial soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

The applicant is strongly recommended to read and consider this Offering Memorandum before completing an application.

This Offering Memorandum has not been approved by the GFSC and neither the GFSC nor the States of Guernsey Policy Council takes any responsibility for the financial soundness of the Company or for the correctness of any of the statements made or opinions expressed with regard to it.

*European Economic Area*

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), no Placing Shares have been offered or will be offered pursuant to the Placing to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Placing Shares which has been approved by the competent authority in that Relevant Member State, or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that offers of Placing Shares to the public may be made at any time

004564

under the following exemptions under the Prospectus Directive, if they are implemented in that Relevant Member State:

(a)      to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)      to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) in such Relevant Member State; or

(c)      in any other circumstances falling within Article 3(2) of the Prospectus Directive,

**provided that** no such offer of Placing Shares shall result in a requirement for the publication of a prospectus pursuant to Article 3 of the Prospectus Directive or a supplemental prospectus pursuant to Article 16 of the Prospectus Directive or any measure implementing the Prospectus Directive in a Relevant Member State and each person who initially acquires any Placing Shares or to whom any offer is made under the Placing will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purposes of this provision, the expression an "**offer to the public**" in relation to any offer of Placing Shares in any Relevant Member State means a communication in any form and by any means presenting sufficient information on the terms of the offer and any Placing Shares to be offered so as to enable an investor to decide to purchase or subscribe for the Placing Shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "**Prospectus Directive**" means Directive 2003/71/EC (and the amendments thereto, including 2010 PD Amending Directive, to the extent implemented in the Relevant Member State) and includes any relevant implementing measure in each Relevant Member State and the expression "**2010 PD Amending Directive**" means Directive 2010/73/EU.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions.

The Company is an alternative investment fund for the purpose of the AIFMD. The Placing Shares may only be marketed to prospective investors which are domiciled or have a registered office in a member state of the European Economic Area ("**EEA Persons**") in which marketing has been registered or authorised (as applicable) under the relevant national implementation of Article 42 of AIFMD and in such cases only to EEA Persons which are Professional Investors or any other category of person to which such marketing is permitted under the national laws of such member state.

This Offering Memorandum is not intended for, should not be relied on by and should not be construed as an offer (or any other form of marketing) to any other EEA Person.

A "Professional Investor" is an investor who is considered to be a professional client or who may, on request, be treated as a professional client within the relevant national implementation of Annex II of Directive 2004/39/EC (Markets in Financial Instruments Directive) and the AIFMD.

Each EEA Person who initially acquires Placing Shares or to whom any offer is made will be deemed to have represented, warranted to and agreed with the entity placing such shares and the Company that (a) it is a "qualified investor" within the meaning of the law in that relevant member state implementing Article 2.1(e) of the Prospectus Directive and (b) , that it is a Professional Investor or other person to whom Placing Shares in the Company may lawfully be marketed under the AIFMD or under the national laws of that relevant member state.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions

*Switzerland*

This Offering Memorandum may only be freely circulated and Shares in the Company may only be freely offered, distributed or sold to regulated financial intermediaries such as banks, securities dealers, fund management companies,

asset managers of collective investment schemes and central banks as well as to regulated insurance companies. Circulating this Offering Memorandum and offering, distributing or selling Shares in the Company to other persons or entities including qualified investors as defined in the Federal Act on Collective Investment Schemes ("**CISA**") and its implementing Ordinance ("**CISO**") may trigger, in particular, (i) licensing/prudential supervision requirements for the distributor, (ii) a requirement to appoint a representative and paying agent in Switzerland and (iii) the necessity of a written distribution agreement between the representative in Switzerland and the distributor. Accordingly, legal advice should be sought before providing this Offering Memorandum to and offering, distributing, selling or on-selling Shares of the Company to any other persons or entities. This Offering Memorandum does not constitute an issuance prospectus pursuant to Articles 652a or 1156 of the Swiss Code of Obligations and may not comply with the information standards required thereunder. The Shares will not be listed on the SIX Swiss Exchange, and consequently, the information presented in this document does not necessarily comply with the information standards set out in the relevant listing rules. The documentation of the Company has not been and will not be approved, and may not be able to be approved, by the Swiss Financial Market Supervisory Authority ("**FINMA**") under the CISA. Therefore, investors do not benefit from protection under the CISA or supervision by the FINMA. This Offering Memorandum does not constitute investment advice. It may only be used by those persons to whom it has been handed out in connection with the Shares and may neither be copied or directly/indirectly distributed or made available to other persons.

### *United States*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States. There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, prospective investors should note that, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by: (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

If 25 per cent or more of any class of equity in the Company is owned, directly or indirectly, by U.S. Plan Investors that are subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, the assets of the Company will be deemed to be "plan assets", subject to the constraints of ERISA and Section 4975 of the U.S. Tax Code. This would result, among other things, in: (i) the application of the prudence and fiduciary responsibilities standards of ERISA to investments made by the Company, and (ii) the possibility that certain transactions that the Company and its subsidiaries might enter into, or may have entered into in the ordinary course of business, might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA and/or Section 4975 of the U.S. Tax Code and might have to be rescinded. A non-exempt prohibited transaction may also result in the imposition of an excise tax under the U.S. Tax Code upon a "party in interest" (as defined in ERISA) or "disqualified person" (as defined in the U.S. Tax Code), with whom a plan engages in the transaction. The Company will use commercially reasonable efforts to restrict ownership by U.S. Plan Investors of equity in the Company. However, no assurance can be given that investment by U.S. Plan Investors will not exceed 25 per cent or more of any class of equity in the Company.

For a description of restrictions on offers, sales and transfers of Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

004566

**TABLE OF CONTENTS**

                                                                                                    **Page**

IMPORTANT NOTICES. ................................................................................................................... i
SUMMARY. .................................................................................................................................... 1
RISK FACTORS. ............................................................................................................................ 19
COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY ............................ 48
THE CURRENT CLO PORTFOLIO. ............................................................................................. 55
MARKET OPPORTUNITY. ........................................................................................................... 56
INVESTMENT PROCESS ............................................................................................................. 57
COMPANY DIRECTORS AND ADMINISTRATION. ................................................................. 61
PLACING ARRANGEMENTS. ..................................................................................................... 65
TAXATION. .................................................................................................................................... 70
SHAREHOLDERS OF THE COMPANY. ..................................................................................... 75
ADDITIONAL INFORMATION ON THE COMPANY. ............................................................... 76
TERMS AND CONDITIONS OF THE PLACING. ..................................................................... 100
PLACING STATISTICS................................................................................................................ 105
DEFINITIONS. ............................................................................................................................. 106
DIRECTORS, ADVISERS AND SERVICE PROVIDERS. ......................................................... 113

004567

## SUMMARY

The following is an overview of the transaction structure and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and related documents referred to herein. Capitalised terms not specifically defined in this Offering Memorandum have the meanings set out in the section of this Offering Memorandum entitled "*Definitions*" below. For a discussion of certain risk factors to be considered in connection with an investment in the Shares, see "*Risk Factors*".

|   |   |
|---|---|
| **The Company:** | Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") is a closed-ended investment company limited by shares incorporated on 30 March 2015 under the laws of Guernsey with registered number 60120.  The Company changed its name from Acis Loan Funding, Ltd. to Highland CLO Funding, Ltd. on October 27, 2017. |

The Company holds a partial, indirect ownership in Highland CLO Management, LLC ("**Highland CLO Management**"), a Delaware series limited liability company established to manage Highland CLOs, act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and as an "originator" for purposes of EU Retention Requirements and to hold with respect to Highland CLOs the required risk retention interests required under, and in accordance with, the U.S. Retention Rules and/or the EU Retention Requirements, as applicable (such interests with respect to any CLO, the applicable "**Retention Interest**"). Highland CLO Management is also partly held (on an indirect basis through Highland HCF Advisor) by Highland Capital Management, L.P. ("**Highland**"), a Delaware limited partnership, which controls the major economic decisions of Highland CLO Management.

The Company holds a partial, indirect ownership in ACIS CLO Management, LLC ("**Acis CLO Management**" and together with Highland CLO Management, the "**Management Companies**" and each, a "**Management Company**"), a Delaware series limited liability company established to manage Acis CLO 2017-7, Ltd. ("**Acis CLO 7**"), act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and to hold the Retention Interests with respect to Acis CLO 7 required under, and in accordance with, the U.S. Retention Rules. Acis CLO Management is also partly held (on an indirect basis) by Acis Capital Management, L.P. ("**Acis**"), a Delaware limited partnership, which controls the major economic decisions of Acis CLO Management.

Each of Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules.

**Investment Objective:** The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage,

004568

including, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

**Investment policy:**

The Company's investment policy is to focus on synergistic investments in the following areas.

*Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's Investor Services, Inc. ("**Moody's**"), Standard & Poor's Financial Services LLC ("**S&P**") or Fitch Group, Inc. ("**Fitch**"). Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S or European originator subsidiary of the Company.  The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and (without limiting the foregoing):

- Such loan is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

- Such loan provides for a fixed amount of principal payable in cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price less than par;

- Such loan is not an obligation issued by Highland, any of its controlled affiliates that are investment funds or any other investment fund whose investments are primarily managed by Highland or any affiliate or company that is controlled by Highland, an affiliate thereof, or an account, fund, client or portfolio established and controlled by Highland or an affiliate thereof (a "**Related Obligation**");

- Such loan is neither an equity security nor by its terms is convertible into or exchangeable for an equity security and does not include an attached warrant to purchase equity securities;

- Such loan is not a bridge loan; and

004569

- Such loan is not a zero coupon loan.

*Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager. In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements. As a result, Highland CLO Management will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially. In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO such that the required percentage of the total securitised exposures held by the CLO issuer will have come from Highland CLO Management (collectively, the "**Origination Requirements**").

*CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Acis CLO 7, Highland CLOs, CLOs where Acis is the CLO Manager, ("**Acis Legacy CLOs**"), CLOs where Highland is the CLO Manager, ("**Highland Legacy CLOs**" and together with the Highland CLOs, Acis CLO 7 and the Acis Legacy CLOs, the "**Managed CLOs**") or CLOs managed by other asset managers.

With respect to each such investment, Highland CLO Management, and Acis CLO Management with respect to Acis CLO 7, will acquire the percentages and tranches of CLO Notes necessary to enable the related CLO to meet the U.S. Risk Retention Rules and, if applicable, the EU Retention Requirements.

With respect to any such investments in Highland CLOs where Highland CLO Management acts as CLO Manager, it is expected that Highland CLO Management will be a "relying adviser" of Highland. With respect to Acis CLO 7, Acis CLO Management is a "relying adviser" of Acis. It is further expected that Highland or Acis, as applicable, will act as a "sponsor" of such Managed CLOs for purposes of the U.S. Risk Retention Rules and will treat the applicable Management Company as its "majority-owned affiliate" under the U.S. Risk Retention Rules. All management and incentive fees received from such Managed CLO will be paid to the applicable Management Company pursuant to the relevant portfolio management agreement, which will then pay the majority of such fees to Highland or Acis, as applicable, in its roles as Staff and Services Provider and as Sub-Advisor. The applicable Management Company may also seek to act as "originator" for purposes of the EU Retention Requirements with respect to such Managed CLOs as described above.

Each CLO in which the Company directly or indirectly holds CLO Notes will have its own eligibility criteria and portfolio limits. These limits are designed to ensure the portfolio of loans within the CLO meets a prescribed level of diversity and quality as set by the relevant rating agencies rating securities issued by such CLO. The applicable CLO Manager, including Highland CLO Management with respect to new Highland CLOs or Acis CLO Management with respect to Acis CLO 7, intends to identify and actively manage loans

004570

which meet those criteria and limits within each CLO. The eligibility criteria and portfolio limits within a CLO will typically include the following required criteria and may include some or all of the following expected criteria:

- a limit on the weighted average life of the portfolio;

- a limit on the weighted average rating of the portfolio;

- a limit on the maximum amount of portfolio assets with a rating lower than B-/B3/B-; and

- a limit on the minimum diversity of the portfolio.

- a limit on the minimum weighted average of the prescribed rating agency recovery rate;

- a limit on the minimum amount of senior secured assets;

- a limit on the maximum aggregate exposure to second lien loans, high yield bonds, mezzanine loans and unsecured loans;

- a limit on the maximum portfolio exposure to covenant-lite loans;

- an exclusion of project finance loans;

- an exclusion of structured finance securities;

- an exclusion on investing in the debt of companies domiciled in countries with a local currency sub investment grade rating; and

- an exclusion of leases.

The above are not intended to be an exhaustive list of the eligibility criteria and portfolio limits within a typical CLO and the inclusion or exclusion of such limits and their absolute levels are subject to change depending on market conditions.

### Act as Risk Retention Provider

The Company may also invest in, provide loans to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy the U.S. Risk Retention Rules or EU Retention Requirements.

### Allocation of Investment Opportunities

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and other clients, including other investment funds and client accounts, including those which follow an investment program substantially similar to that of the Business (such other clients, funds and accounts, collectively, the "**Other Accounts**"). For the avoidance of doubt, the Portfolio

- 4 -

004571

Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time. *See* "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*".

**Investment Restrictions:** During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs. A "**Qualifying CLO**" is a Highland CLO (a) pursuant to which Highland, the Portfolio Manager, Highland CLO Management or any of its affiliates does not charge subordinate management fees in excess of 0.00%, senior management fees in excess of 0.15% or incentive management fees in excess of 0.00% and (b) which does not have a reinvestment period longer than 5 years; *provided* that, if the Portfolio Manager has provided reasonable evidence to the Advisory Board that a substantial portion of new issue CLOs have reinvestment periods longer than 5 years (the "**RP Condition**"), the consent of the Advisory Board to invest in any Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in a refinancing or "reset" with respect to the following CLOs (which may extend the re-investment period and/or term of such CLOs, subject to the proviso below) managed by Highland affiliates (the "**Designated CLO Resets**"):

Acis CLO 2013-1, Ltd.
Acis CLO 2014-3, Ltd.
Acis CLO 2014-4, Ltd.
Acis CLO 2014-5, Ltd.
Acis CLO 2015-6, Ltd.

provided that, with respect to Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd. and Acis CLO 2014-5, Ltd., any such Designated CLO Reset may not extend the re-investment period beyond 2.25 years of the date of such Designated CLO Reset.

During the Investment Period, the Company shall be permitted to invest in a refinancing with respect to Acis CLO 7 (which may not extend the re-investment period or term of such CLO) (the "**Designated CLO Refinancing**").

For the avoidance of doubt, following the expiration of the Investment Period, the Company shall not consummate an investment in any "reset" with respect to CLO Income Notes held by the Company. In addition, the Company shall not permit a reset with respect to any CLO Income Notes of Managed CLOs

004572

that it holds, unless such CLO Income Notes of Managed CLOs are fully redeemed.

The Company shall not invest in the CLO Income Notes of a new issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

### *Indirect Actions*

Neither the Portfolio Manager nor the Company may take any action indirectly through controlled subsidiaries that either the Portfolio Manager or the Company is not permitted to undertake directly as set forth herein.

**Borrowing:**

It is expected that the Company will have access to one or more committed credit facilities and will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or other assets. Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities.  In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

### *Borrowing Limits*

Notwithstanding the foregoing or anything to the contrary set forth herein, as of the time any such debt is incurred, the Company's maximum gross leverage exposure (excluding the Warehouse Loan Facilities) pursuant to (a) committed secured loan facilities and any other borrowing (other than described in clause (b)) shall not exceed (i) during the Investment Period, the greater of (x) 15% of the Company's gross asset value and (y) $50,000,000 and (ii) after the Investment Period, 15% of the Company's gross asset value, and (b) repurchase agreements shall not exceed 75% of the Company's gross asset value.

For purposes of the limits regarding repurchase agreements set forth in clause (b) above, the "gross asset value" of the Company shall exclude financing for CLO Notes held by a Management Company as part of a "vertical" Retention Interest (including for the Designated CLO Resets), the NexBank Credit Facility, any Warehouse Loan Facilities and cash equivalents.

### *Warehouse Loan Facilities*

One or more multi-currency warehouse lending facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider (the "**Warehouse Loan Facilities**"), pursuant to which the Company is able to draw multi-currency loans from time to time in order to purchase assets for its portfolio.  The Warehouse Loan Facilities will be entered into on market standard terms, as negotiated between the Company and the relevant warehouse provider in each case and will include a senior security package in favour of the warehouse provider.

### *Hedging and Derivatives*

004573

Without the consent of the Advisory Board, the Company may only use hedging or derivatives to hedge investments consistent with the Company's investment objectives, and not for speculative purposes.

*Repurchase Agreements*

The Company may not use repurchase agreements to finance the purchase of CLO Income Notes, however, the Company may pledge any already owned CLO Income Notes as additional collateral under repurchase agreements.

*Revolving Credit Facility*

The Company may enter into a secured revolving credit facility with a committed amount of $50,000,000 for working capital purposes (a "**Revolving Credit Facility**")

*NexBank Credit Facility*

The Company currently has a secured term credit facility provided by NexBank SSB, a Texas savings bank, with a principal amount of $22,158,337, as of September 30, 2017 (the "**NexBank Credit Facility**"). The Company may, from time to time, increase its borrowing under the NexBank Credit Facility up to a maximum principal amount of $30,000,000 at any time without the consent of the Advisory Board, but subject to the limitations set forth above in "—*Borrowing Limits*". The terms of the NexBank Credit Facility, and of any increase in the principal amount thereto, shall be at or better than market standard terms and shall be promptly disclosed to the Advisory Board (any such amended terms, the "**Permitted NexBank Credit Facility Amendments**").

**Advisory Board:**   The Company shall form and assemble an advisory board (the "**Advisory Board**") composed of individuals who shall be representatives of certain Shareholders selected by the Portfolio Manager in its sole discretion in order to (a) provide advice to the Portfolio Manager with respect to certain issues involving conflicts of interest in any transaction or relationship between the Company and the Portfolio Manager or any of its employees or affiliates that are presented to the Advisory Board by the Portfolio Manager, and (b) be required to approve the following actions:

- Any extension of the Investment Period;

- Any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board);

- Any allotment of additional equity securities by the Company; and

- Any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its affiliates, on the other hand.

Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into

004574

new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments.

No voting member of the Advisory Board shall be a controlled affiliate of Highland, it being understood that none of CLO Holdco, Ltd., its wholly-owned subsidiaries or any of their respective directors or trustees shall be deemed to be a controlled affiliate of Highland due to their pre-existing non-discretionary advisory relationship with Highland.

Each member of the Advisory Board shall owe no fiduciary or other duties to the Company or the shareholders and may act solely in the interest of the shareholder that it represents.

Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an affiliate of the Company, the Portfolio Manager or Highland solely by reason of such appointment.

**Investment Period:**   The Company's assets may be invested and, subject to the terms and conditions set forth in the "*Dividend Policy*" section below, reinvested for a period commencing on the Closing Date of the Placing and ending on April 30, 2020 (the "**Investment Period**"), subject to two additional one-year extensions with the consent of the Advisory Board (as hereinafter defined) and the Portfolio Manager; provided that the Term will automatically be extended by an identical length of time in the event of an extension of the Investment Period.

*Termination of Investment Period following Key Person Event*

The Portfolio Manager will promptly provide each Shareholder with written notice in the event that any two of James Dondero, Mark Okada, Trey Parker or Hunter Covitz (collectively, the "**Key Persons**") cease to devote such time to the affairs of the Company as is sufficient to effectively manage the operations of the Company (a "**Key Person Event**"), as determined by the Portfolio Manager in its reasonable discretion, taking into account such factors as it shall deem relevant in its reasonable discretion. The Portfolio Manager will promptly provide each Shareholder with written notice in the event of the termination of employment of any Key Person.

The Investment Period will be terminated immediately upon a Key Person Event. The Investment Period shall resume in the event that (i) the Portfolio Manager obtains or receives notice of the written election or vote of the Advisory Board to reinstate the Investment Period, or (ii) one or more Qualified Replacements (as defined below) are appointed in place of (or in addition to) the then existing Key Persons to cure the Key Person Event, in which event the Investment Period will continue until its termination as otherwise described herein without further regard to such Key Person Event.

For purposes of this Offering Memorandum, a "**Qualified Replacement**" means a person nominated by the Portfolio Manager and approved by the Advisory Board, such approval not to be unreasonably withheld, conditioned or delayed, as a replacement for any existing Key Person or as an additional Key Person; provided that the Advisory Board will provide notice of its

004575

approval or disapproval of any person nominated to be a Qualified Replacement within 10 business days of such nomination.

For the avoidance of doubt, during any cessation of the Investment Period following a Key Person Event, (i) the Portfolio Manager may continue to require Placees to purchase Shares pursuant to the subscription and transfer agreement to fund (a) any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities) or (b) the completion, no later than 180 days after the expiration of the Investment Period, new issue Highland CLOs that were in process at the time of such Key Person Event and (ii) the Company shall not receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs until the Investment Period resumes.

**Term:**

The term of the Company will end (and the Company thereafter will be wound up and dissolved) on the ten-year anniversary of the date of the Placing (the "**Term**"), subject to (a) automatic extension in the event of an extension of the Investment Period and (b) two additional one-year extension with the consent of the Portfolio Manager and the Advisory Board, or such earlier date after the end of the Investment Period on which the Portfolio Manager determines to terminate and wind up the Company following the receipt by the Company of all amounts reasonably expected by the Portfolio Manager to be received with respect to the Company's assets or the sale thereof during the term and in a manner that will not cause the Company, the Portfolio Manager, Highland, Acis, the Management Companies or any subsidiary thereof to violate any applicable law or contract.

The Company has been established as a closed-ended vehicle. Accordingly, there is no right or entitlement attaching to Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

**Placing Arrangements – Investment Period Subscription Commitment:**

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of up to approximately U.S. $153 million.

Placees will commit under a subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period. The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

004576

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares. Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the NAV of the Company as of September 30, 2017, adjusted with respect to a dividend of $9,000,000 on October 10, 2017, and a buyback of the Shares of Acis Capital Management, L.P. on October 24, 2017 (the "**Adjusted NAV**") such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on *pro rata* basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

| | |
|---|---|
| **Regulatory status:** | The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120. The Company is regulated by the GFSC, and is not regulated by any regulator other than the GFSC. |
| **Typical investors:** | Investment in the Company is only suitable for Professional Investors as defined in the AIFMD and any other person to whom the Placing Shares may be lawfully offered. |
| **Applicant's service providers:** | *Portfolio Manager* |

Highland HCF Advisor, Ltd. ("**Highland HCF Advisor**") has been appointed as the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement. In that capacity, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the origination and ongoing management of the portfolio by the Company. Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by

004577

the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Manager has entered into a Master Sub-Advisory Agreement (the "**HCF Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCF Staff and Services Agreement**", together with the Sub-Advisory Agreement, the "**HCF Services Agreements**") with Highland Capital Management, L.P. under which Highland Capital Management, L.P. provides investment research and recommendations and operational support to the Portfolio Manager, including services that may be used in connection with the Portfolio Manager's recommendations regarding the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services.

Highland CLO Management has a Master Sub-Advisory Agreement (the "**HCLOM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCLOM Staff and Services Agreement**", together with the HCLOM Sub-Advisory Agreement, the "**HCLOM Services Agreements**") in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Highland CLOs for which Highland CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by the Highland CLO Management, and certain loan services and administrative services.

Acis (an affiliate of Highland) has entered into a Master Sub-Advisory Agreement (the "**ACM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**ACM Staff and Services Agreement**", together with the ACM Sub-Advisory Agreement, the "**ACM Services Agreements**") with Highland under which Highland provides investment research and recommendations and operational support to Acis, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLOs for which Acis acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by Acis, and certain loan services and administrative services.

Acis CLO Management has entered into a Master Sub-Advisory Agreement (the "**ACLOM Sub-Advisory Agreement**", and together with the HCF Sub-Advisory Agreement, the HCLOM Sub-Advisory Agreement and the ACM Sub-Advisory Agreement, the "**Sub-Advisory Agreements**") and a Staff and Services Agreement (the "**ACLOM Staff and Services Agreement**", and the ACLOM Staff and Services Agreement together with the HCF Staff and Services Agreement, the HCLOM Staff and Services Agreement and the ACM Staff and Services Agreement, the "**Staff and Services Agreements**", and the ACLOM Staff and Services Agreement together with the ACLOM Sub-Advisory Agreement, the "**ACLOM Services Agreements**" and the ACLOM Services Agreements with the HCF Services Agreements, the HCLOM Services Agreements and the ACM Services Agreements, the "**Services Agreements**") in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLO 7 for which Acis CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the

004578

execution of investment transactions approved by Acis CLO Management, and certain loan services and administrative services.

No management fees will be payable by the Company pursuant to any Services Agreement; it being understood that each of the Management Companies will pay (i) eleven-fifteenths (11/15ths) of the total 0.15% senior management fee received from Acis CLO 7 and the Highland CLOs to affiliates of Highland pursuant to the applicable Services Agreements, and (ii) following any Designated CLO Reset, a portion of the management fees received from any CLO subject to such Designated CLO Reset to affiliates of Highland pursuant to the applicable Services Agreements, other than an amount equivalent to a senior management fee of 0.04%.

*Administrator*

State Street (Guernsey) Limited has been appointed as administrator to the Company pursuant to the Administration Agreement. In such capacity, the Administrator is responsible for the day-to-day administration of the Company. Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company calculated and payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

**Operating Expenses:**    Except as provided below, the Portfolio Manager will pay all of its own Overhead without reimbursement by the Company.

Subject to the following paragraph, the Company shall pay or reimburse the Portfolio Manager and its affiliates for all Operating Expenses. See "Company Directors and Administration—The Portfolio Manager—Highland Fees".

**Exculpation:**    The Portfolio Manager will assume no responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager.

The Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (e.g., executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") will incur no liability to the Company or any Shareholder in the absence of a finding by any court or governmental body of competent jurisdiction in a final, non-appealable judgment that the commission by such person of an action, or the omission by such person to take an action, constitutes bad faith, gross

004579

negligence or wilful misconduct (a "**Triggering Event**"), except as otherwise required by applicable law (including the Companies Law).  Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

**Indemnification:**

To the fullest extent permitted by applicable law, the Company will be required to indemnify each Indemnified Person against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") incurred by such Indemnified Person or to which such Indemnified Person may be subject by reason of its activities in connection with the conduct of the business or affairs of the Company, unless such losses result from an Indemnified Person's Triggering Event.

The Indemnified Persons shall be entitled to advancement of expenses as they are incurred in connection with the investigation, defence or resolution of any claim that may be subject to indemnification, subject to providing an undertaking to repay any amounts ultimately determined not to be subject to indemnification due to a Triggering Event.

Each member of the Advisory Board and each member of any subcommittee thereof and, solely in connection with matters relating to the Advisory Board or such subcommittee, the Shareholder and/or other person or entity on whose behalf such Advisory Board member or subcommittee member serves, will have the benefit of similar exculpation and indemnification rights unless it has not acted in good faith.

Notwithstanding the foregoing or anything to the contrary set forth herein, the Company will not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent that such liability may not be waived, modified or limited under applicable law.

Under the Companies Law, any indemnity provided (directly or indirectly) by the Company to a Director, or an associated company, or a body corporate which is an overseas company and a subsidiary of the company, against any liability attaching to him in connection with any negligence, default, breach of duty or breach of trust in relation to the Company is void, except in certain circumstances.

**Regulatory status of Portfolio Manager:**

Highland HCF Advisor is a relying adviser of Highland Capital Management, L.P., an investment adviser registered under the Investment Advisers Act of 1940, as amended (the "**Investment Advisers Act**") and, as such, is subject to the provisions of the Investment Advisers Act.

**Regulatory status of Custodian:**

The Custodian of the Company is State Street Custodial Services (Ireland) Limited, which is authorised as an Investment Business Firm under Section

004580

<table>
<tbody>
<tr><td></td><td>10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.</td></tr>
</tbody>
</table>

| | |
|---|---|
| **Calculation of Net Asset Value:** | The Company intends to publish the Net Asset Value per Share on a quarterly basis, within 15 Business Days following the relevant quarter-end. Notice will be provided by the Administrator by e-mail. |
| **Portfolio:** | The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts: |

| **Acis CLOs:** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |

| **Highland Legacy CLOs:** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

| **ACIS CLO Management Aggregate Outstanding Amount (U.S.$)** | |
|---|---|
| Acis CLO 7 | $17,850,000.00 |

| | |
|---|---|
| **Net Asset Value:** | As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13. |
| **Type and class of securities:** | The Shares being offered under the Placing are ordinary shares of no par value in the capital of the Company. |
| **Currency of the securities issue:** | U.S. Dollar |
| **Number of securities in issue:** | The issued share capital of the Company (all of which shares have been fully paid) as of the date of this Offering Memorandum consists of 143,454,001 million Shares. |
| | There are no non-paid up Shares in issue. |
| **Description of the rights attaching to the securities:** | The holders of the Shares shall be entitled to receive, and to participate in, any dividends declared in relation to the Shares that they hold. |
| | On a winding-up or a return of capital by the Company, the net assets of the Company attributable to the Shares shall be divided pro rata among the holders of the Shares. |

004581

The Shares shall carry the right to receive notice of, attend and vote at general meetings of the Company.

Unless otherwise authorised by a special resolution, the Company shall not allot equity securities on any terms unless the Company has first made an offer to each person who holds Shares to allot to him, on the same or more favourable terms, such proportion of those equity securities that is as nearly as practicable (fractions being disregarded) equal to the proportion held by the relevant person of the Shares.

**Restrictions on the free transferability of the securities:**

The Company has elected to impose certain restrictions (pursuant to its Articles) on the Placing and on the future trading of the Shares so that the Company will not be required to register the offer and sale of the Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations. These transfer restrictions, which will remain in effect until the Company determines in its sole discretion to remove them, may adversely affect the ability of Shareholders to trade the Shares. Due to the restrictions described below, potential investors in the United States and U.S. Persons (including persons acting for the account or benefit of any U.S. Person) are advised to consult legal counsel prior to making any offer, resale, exercise, pledge or other transfer of the Shares.

Subject to certain exceptions, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

**Dividend policy:**

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter. During the Investment Period, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio in excess of the dividends paid to Shareholders as provided below will be reinvested by the Company with the objective of growing the NAV.

During the Investment Period, on the 15th of February, May, August and November of each calendar year, beginning May 15, 2018 (each a "**Quarterly Dividend Date**"), after satisfaction of all expenses, debts, liabilities and obligations of the Company, the Company will pay a dividend to each Shareholder at a rate of at least 8% per annum, based on such Shareholder's aggregate capital contributions as of the prior Quarterly Dividend Date (the "**Target Dividend**").

Following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio will be distributed by the Company to the Shareholders as a dividend on each Quarterly Dividend Date in accordance with the distribution priority as follows (the "**Distribution Priority**"):

*First*, 100% to the Shareholders *pro rata* based on the number of Shares held until each Shareholder has received (i) pursuant to this clause (i), aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus (ii) an amount necessary for such Shareholder to

004582

receive a cumulative rate of return of 8.0% per annum, compounded annually, on such Shareholder's aggregate capital contributions;

*Second*, 100% to the Portfolio Manager until the Portfolio Manager has received aggregate distributions from the Company equal to 20% of the sum of all distributions made in excess of aggregate capital contributions made by Shareholders;

*Third*, 80% to the Shareholders *pro rata* based on the number of Shares held and 20% to the Portfolio Manager until each Shareholder has received aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus an amount necessary for such Shareholder to receive a cumulative rate of return of 16% per annum, compounded annually, on such Shareholder's aggregate capital contributions; and

*Thereafter*, 70% to the Shareholders *pro rata* based on the number of Shares held and 30% to the Portfolio Manager.

For purposes of this section, references herein to a "Shareholder" shall include Highland HCF Advisor in its capacity as a shareholder of the Company, if applicable, and references to "aggregate distributions" received by the "Portfolio Manager" shall not include any distributions received by Highland HCF Advisor in its capacity as a Shareholder.

| | |
|---|---|
| **The total net proceeds and an estimate of the total expenses of the issue/offer, including estimated expenses charged to the investor by the issuer or the offeror:** | The Net Placing Proceeds are expected to be approximately U.S. $153 million.<br><br>The initial expenses of the Company are those which are necessary for the Placing, and shall not exceed U.S. $750,000.  These expenses will be paid on or around the Placing and will include, without limitation: the cost of settlement and escrow arrangements; printing, advertising and distribution costs; legal fees; and any other applicable expenses. |
| **Reasons for the offer and use of proceeds:** | The Company is making the offer in order to raise the Net Placing Proceeds which will be invested in accordance with the Company's investment objective and policy, including its indirect investment in the Management Companies. |
| **Expenses related to the Placing:** | All costs associated with the Placing will be borne by the Company after the Placing and therefore the Net Placing Proceeds will be lower than the Gross Placing Proceeds immediately following the Placing. |
| **Ongoing annual expenses:** | The Company currently estimates that its total annual expenses for 2017 will be approximately $525,000 per annum, and will provide the Advisory Board with updated estimates and reasonable detail from time to time upon request. For the avoidance of doubt, except as expressly set forth in the section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*", the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent without reimbursement by the Company<br><br>These expenses will include the following:<br><br>*The Portfolio Manager, Highland, Acis and the Management Companies* |

004583

Please see below in section titled "*Company Directors and Administration— Portfolio Manager—Highland Fees*".

### Administrator

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the agreement.

### Custodian

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub custodian. All such charges shall be charged at normal commercial rates.

### Directors

The Directors are remunerated for their services at a fee of £35,000 per annum (£40,000 for the Chairman). For more information in relation to the remuneration of the Directors, please refer to the section of this Offering Memorandum entitled "Memorandum and Articles" in "Additional Information on the Company".

### Operating Expenses

All Operating Expenses shall be borne by the Company. All reasonably and properly incurred out-of-pocket expenses of the Administrator, the Custodian, and the Directors relating to the Company are borne by the Company.

The amount of charges and expenses which are borne by an investor may vary from year to year.

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

|  |  |
|---|---|
| **Terms and conditions of the offer:** | An amount of Shares equal to U.S. $153 million are being marketed and are available for subscription of commitments under the Placing until the Closing Date. |

Shares will be issued under the Placing at a price per Share based on the most recent quarterly determined NAV of the Company. The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.

Placees may acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

Placees may also enter into commitments to acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

The Placing is not being underwritten.

**Press Releases:**    Neither the Portfolio Manager, the Company nor any Shareholder shall issue or approve any press release or other announcement referring to the identity

004584

of a Shareholder without the prior written consent of the applicable Shareholder.

004585