**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P**  § Case No. **19-34054-SGJ11**
**Charitable DAF Fund, L.P et al**

|  |  |  |
|---|---|---|
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

   [167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

## Volume 22

## APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | |

*INDEX*

### APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
### AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.   Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2.   The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.   Docket Sheet kept by the Bankruptcy Clerk.

4.   Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*Handwritten annotations in left margin:*
Vol. 2
000139
000232
000239
000270
Thru Vol. 6
Vol. 7
001196

| | | | | |
|---|---|---|---|---|
| *Vol. 7*<br>*001203*<br>*Thru Vol 8* | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br>*001711* | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001712* | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001738* | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001760* | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001805* | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *001893* | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9*<br><br>*001905*<br>*thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.*<br><br>*002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*  003637 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| 003666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| 003843 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 003844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 003851 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*  003882  *Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*  004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
|---|---|---|---|---|
*Vol. 21 004400* | | | | |
| | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
*004410* | | | | |
| | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
*004442 Thru vol. 22* | | | | |
| | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
*Vol. 22 004696* | | | | |
| | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
*004717* | | | | |
| | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
*004732* | | | | |
| | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
*004737* | | | | |
| | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
*004742* | | | | |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 *Thru Vol. 25.* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
|---|---|---|---|---|
| *006133* *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32* *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| *006961* | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                    Respectfully submitted,

                                          **SBAITI & COMPANY PLLC**

                                          */s/  Mazin A. Sbaiti*
                                          **Mazin A. Sbaiti**
                                          Texas Bar No. 24058096
                                          **Jonathan Bridges**
                                          Texas Bar No. 24028835
                                          2200 Ross Avenue – Suite 4900W
                                          Dallas, TX  75201
                                          T:  (214) 432-2899
                                          F:  (214) 853-4367
                                          E:  mas@sbaitilaw.com
                                               jeb@sbaitilaw.com

                                          **Counsel for Appellants**


                            **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was filed
electronically through the Court's ECF system, which provides notice to all parties of interest, on
this 14th day of July, 2023.


                                          */s/ Mazin A. Sbaiti*
                                          Mazin A. Sbaiti

---

## RISK FACTORS

**Investment in the Company should be regarded as long term in nature and involving a high degree of risk. Accordingly, prospective investors should consider carefully all of the information set out in this Offering Memorandum and the risks relating to the Company and the Shares including, in particular, the risks described below which are not presented in any order of priority and may not be an exhaustive list or explanation of all the risks which investors may face when making an investment in the Shares and should be used as guidance only.**

**Only those risks which are believed to be material and currently known to the Company in relation to itself and its industry as at the date of this Offering Memorandum have been disclosed. Additional risks and uncertainties not currently known, or deemed immaterial at the date of this Offering Memorandum, may also have an adverse effect on the business, results of operations, financial conditions and prospects of the Company and its net asset value. Potential investors should review this Offering Memorandum carefully and in its entirety and consult with their professional advisers before making an application to invest in the Shares.**

**Prospective investors should note that the risks relating to the Company and the Shares summarised in the section of this document headed "Summary" are the risks that the Directors believe to be the most essential to an assessment by a prospective investor of whether to consider an investment in the Shares. However, as the risks which the Company faces relate to events and depend on circumstances that may or may not occur in the future, prospective investors should consider not only the information on the key risks summarised in the section of this document headed "*Summary*" but also, among other things, the risks and uncertainties described below.**

## RISKS RELATING TO THE COMPANY

### *The Company is a recently incorporated company incorporated under the laws of Guernsey with limited history*

The Company was incorporated under the laws of Guernsey on 30 March 2015. It commenced operations after the initial Placing in August 2015. As the Company has a limited operating history, investors have limited information on which to evaluate the Company's ability to achieve its investment objective or implement its investment strategy and provide a satisfactory investment return. An investment in the Company is therefore subject to all the risks and uncertainties associated with a recently formed business, including the risk that the Company will not achieve its investment objective and that the value of an investment in the Company could decline substantially as a consequence. Any failure by the Company to do so may adversely affect its business, financial condition, results of operations and/or its NAV.

The Company's returns and operating cash flows depend on many factors, including the price and performance of the investments, the availability and liquidity of investment opportunities falling within the Company's investment objective and policy, the level and volatility of interest rates, readily accessible short-term borrowings, the conditions in the financial markets and economy, the financial performance of obligors under the investments and the Company's ability successfully to operate its business and execute its investment strategy. There can be no assurance that the Company's investment strategy will be successful.

### *The Company's target return and target dividend yield are based on estimates and assumptions that are inherently subject to significant business and economic uncertainties and contingencies, and the actual return and dividend yield may be materially lower than the target return and target dividend yield and could be negative*

The Company's target return and target dividend yield set forth in this Offering Memorandum are targets only and are based on estimates and assumptions concerning the performance of its investment portfolio which will be subject to a variety of factors including, without limitation, the availability of investment opportunities, asset mix, value, volatility, holding periods, performance of underlying portfolio debt issuers, investment liquidity, borrower default, changes in current market conditions, interest rates, government regulations or other policies, the worldwide economic environment, changes in law and taxation, natural disasters, terrorism, social unrest and civil disturbances or the occurrence of risks described elsewhere in this Offering Memorandum, which are inherently subject to significant business, economic and market uncertainties and contingencies, all of which are beyond the control of the Company and which may adversely affect the Company's ability to achieve its target return and target dividend yield. Such

- 19 -

004586

targets are based on market conditions and the economic environment at the time of assessing the proposed targets and the assumption that the Company will be able to implement its investment policy and strategy successfully, and are therefore subject to change.  There is no guarantee or assurance that the target return and/or target dividend yield can be achieved at or near the levels set forth in this Offering Memorandum.  Accordingly, the Company's actual rate of return and actual dividend yield achieved may be materially lower than the targets, or may result in a loss.  A failure to achieve the target return and/or target dividend yield set forth in this Offering Memorandum may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

An investment in the Company will be a speculative investment of a long-term nature and involving a high degree of risk.  Shareholders could lose all or a substantial portion of their investment in the Company.  Shareholders must have the financial ability, sophistication, experience and willingness to bear the risks of an investment in the Company.

***Material changes affecting global debt and equity capital markets may have a negative effect on the Company's business, financial condition, results of operations, and/or its NAV***

The global financial markets have experienced extreme volatility and disruption in recent years, as evidenced by a lack of liquidity in the equity and debt capital markets, significant write-offs in the financial services sector, the repricing of credit risk in the credit market and the failure of major financial institutions.  Despite actions of governmental authorities, these events contributed to general economic conditions that have materially and adversely affected the broader financial and credit markets and reduced, and in certain circumstances, significantly reduced, the availability of debt and equity capital.

Further, within the banking sector, the default of any institution could lead to defaults by other institutions.  Concerns about, or default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, because the commercial soundness of many financial institutions may be closely related as a result of their credit, trading, clearing or other relationships.  This risk is sometimes referred to as "systemic risk" and may adversely affect other third parties with whom the Company deals.  The Company may therefore be exposed to systemic risk when the Company deals with various third parties whose creditworthiness may be exposed to such risk.

Recurring market deterioration may materially adversely affect the ability of an issuer whose debt obligations form part of the Company's portfolio, or an issuer whose debt obligations form part of a CLO in which the Company holds CLO Notes, to service its debts or refinance its outstanding debt.  Further, such financial market disruptions may have a negative effect on the valuations of the investments (and, by extension, on the Company's NAV), and on the potential for liquidity events involving such investments.  In the future, non-performing assets in the Company's portfolio may cause the value of that portfolio to decrease (and, by extension and/or its the NAV to decrease).  Adverse economic conditions may also decrease the value of any security obtained in relation to any of the investments.

Conversely, in the event of sustained market improvement, the Company may have access to a reduced number of attractive potential investment opportunities, which also may result in limited returns to Shareholders.

***The Company's NAV is subject to valuation risk and the Company can provide no assurance that the NAVs it records from time to time will ultimately be realised***

The Company's NAV will be calculated by third parties and will be subject to valuation risk (see the risk factor entitled "*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*"). If a valuation estimate provided to the Company by a third party subsequently proves to be incorrect, no adjustment to any previously calculated NAV will be made.  Any acquisitions or disposals of Shares based on previous erroneous NAVs may result in losses for shareholders.

The investments held by the Company will be valued quarterly and the Company's Net Asset Value will be calculated based on these values.  Therefore, the actual value of the investments at any given time may be different from the value based on which the Company's latest Net Asset Value has been calculated.

Investors should note that where a loan becomes subject to a Forward Purchase Agreement (described further in the section of this Offering Memorandum entitled "*Additional Information on the Company*") the Company will (subject to certain conditions as set out in the section of this Offering Memorandum entitled  "*Additional Information on the*

004587

*Company*") neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

***Each of the Company, the Portfolio Manager, Acis and the Management Companies is reliant on Highland (acting in its different capacities), asset management subsidiaries and other third party service providers to carry on their businesses and a failure by one or more service providers may materially disrupt the business of the Company and or the Management Companies***

The Company has no employees and its directors have all been appointed on a non-executive basis. Highland HCF Advisor will, as part of the services to be provided under the terms of the Portfolio Management Agreement, be responsible for selecting the portfolio of investments and the acquisition, disposition or sale of investments and providing the Company with the necessary personnel, credit research and other resources to perform the functions necessary to the business of the Company. In addition, Highland or its affiliates, including the Portfolio Manager, Acis or the Management Companies, may also act as CLO Manager in respect of the Managed CLOs from time to time. The Company may also invest in, provide debt financing to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis, including the Management Companies, and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements. Therefore, the Company is reliant upon the performance of Highland and/or its affiliates, asset management subsidiaries of the Company and other third party service providers for the performance of certain functions.

Highland CLO Management relies on Highland for access to its employees (which are shared with Highland). Acis CLO Management relies on Acis for access to its employees (which are shared with Acis). Highland and Acis, as applicable, will, as part of the services to be provided under the terms of the Staff and Services Agreements, be responsible for providing the Company with the necessary credit research, back office and other resources to perform the functions necessary to the business of each of the Management Companies, including its management of CLOs. Therefore, each of the Management Companies is reliant upon the performance of Highland and Acis, as applicable, for the performance of essential functions, and may be unable to properly manage CLOs without the support of Highland or Acis, as applicable.

Failure by any service provider to carry out its obligations to the Company or the applicable Management Company in accordance with the applicable duty of care and skill, or at all, or termination of any such appointment may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

In the event that it is necessary for the Company or the applicable Management Company to replace any third party service provider, it may be that the transition process takes time, increases costs and may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

***The Shares will be subordinated to the rights of any secured Warehouse Loan Facility Provider or holder of any other future indebtedness or preference shares of the Company.***

The Company is permitted to issue preference shares and incur indebtedness, including secured debt in the form of one or more Warehouse Loan Facilities or other lending facilities. Such preference shares and indebtedness will rank ahead of the Shares in respect of any distributions or payments by the Company to Shareholders. In an enforcement scenario under any Warehouse Loan Facility, the provider(s) of such facilities will have the ability to enforce their security over the assets of the Company and to dispose of or liquidate (on their own behalf or through a security trustee or receiver) the assets of the Company in a manner which is beyond the control of the Company. In such an enforcement scenario, there is no guarantee that there will be sufficient proceeds from the disposal or liquidation of the Company assets to repay any amounts due and payable on the Shares and this may adversely affect the performance of the Company's business, financial condition, results of operations and/or its NAV.

*Exculpation and Indemnification*

The Articles contain provisions that, subject to applicable law, reduce or modify the duties that the Indemnified Persons would otherwise owe to the Company and the Shareholders. The Portfolio Manager will assume no

004588

responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager. Further, Indemnified Persons will incur no liability to the Company or any Shareholder in the absence of a Triggering Event, except as otherwise required by applicable law (including the Companies Law). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

Under the Articles, the Company, to the fullest extent permitted by applicable law (including the Companies Law), will indemnify each Indemnified Person against all Indemnified Losses to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

The fees, costs and expenses (whether or not advanced) and other liabilities resulting from the Company's indemnification obligations are generally operating expenses and will be paid by or otherwise satisfied out of the assets of the Company. The application of the foregoing standards may result in Shareholders having a more limited right of action in certain cases than they would in the absence of such standards. In particular, a "gross negligence" standard of care has been held in some jurisdictions to involve conduct that is closer to wilful misconduct. Even though such provisions in the Articles will not act as a waiver on the part of any Shareholder of any of its rights under applicable U.S. securities laws or other laws, the applicability of which is not permitted to be waived, the Company may bear significant financial losses even where such losses were caused by the negligence (even if heightened) of such Indemnified Persons.

## RISKS RELATING TO THE INVESTMENT STRATEGY

### *General Background relating to the United States and European Risk Retention Requirements*

Effective for CLOs on December 24, 2016, the so-called "risk retention" rules promulgated by U.S. federal regulators under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") require a "securitizer" or "sponsor" (which in the case of a CLO is considered the collateral manager) to retain directly or through a "majority-owned affiliate" at least 5% of the credit risk of the securitized assets. Highland CLO Management is being formed with intention of acting as a "majority-owned affiliate" of Highland as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Managed CLOs and to provide a vehicle whereby the Company can invest in Managed CLOs. Acis CLO Management is intended to act as a "majority-owned affiliate" of Acis as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Acis CLO 7 and to provide a vehicle whereby the Company can invest in Acis CLO 7.

The CLOs in which the Company invests may be structured with the intent to be compliant with the European risk retention requirements for securitisation transactions, meaning, collectively, (i) Articles 404-410 of Regulation (EU) No 575/2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No. 648/2012 (the "**CRR**") as supplemented by Commission Delegated Regulation (EU) No. 625/2014 (the "**CRR Retention Requirements**") (ii) Articles 51-54 of the Commission Delegated Regulation (EU) No 231/2013 (the "**AIFMD Level 2 Regulation**") implementing Article 17 of Directive 2011/61/EU on Alternative Investment Fund Managers (the "**AIFMD**"), and (iii) Article 254-257 of the Commission Delegated Regulation (EU) 2015/35 implementing Article 135(2) of Directive 2009/138/EC on the taking-up and pursuit of the business of Insurance and Reinsurance, as amended by Directive 201/51/EU (and as supplemented by Articles 254-257 of Commission

004589

Delegated Regulation (EU) 2015/35) (the "**Solvency II Level 2 Regulation**"), each together with any applicable guidance, technical standards and related documents published by any European regulator in relation thereto and any implementing laws or regulations in force in any Member State of the European Union (together with the CRR Retention Requirements and the AIFMD Level 2 Regulation, the "**EU Retention Requirements**" and, together with the risk retention requirements under the U.S. Risk Retention Rules, the "**Retention Requirements**").  Any such Company investments in CLOs intended to be compliant with the EU Retention Requirements will continue to be subject to the EU Retention Requirements. However, it is expected that, going forward, the Company's investments in CLOs will be done primarily on an indirect basis through its indirect interest in the Management Companies. As used herein, any reference to the Company's investments in CLOs or CLO Retention Notes shall be deemed to refer primarily to (i) prior to the formation of the Management Companies, the CLO securities the Company acquired directly and (ii) following the formation of the Management Companies, the indirect interests in CLOs it intends to hold through the applicable Management Company. Furthermore, any reference to Managed CLOs or CLOs managed by Highland, Acis, the Portfolio Manager and the Management Companies shall be deemed to refer primarily to (i) for CLOs formed prior to the formation of Acis, CLOs managed by Highland (ii) for CLOs formed after the formation of Acis and prior to the formation of Acis CLO Management, CLOs managed by Acis, (iii) for CLOs formed following the formation of Acis CLO Management and prior to the formation of Highland CLO Management, CLOs managed by Acis CLO Management and (iv) for CLOs formed following the formation of Highland CLO Management, CLOs managed by Highland CLO Management.

Although the Company, the Portfolio Manager, Highland, Acis and the Management Companies intend to comply with the Retention Requirements, there has been no explicit guidance regarding how entities may be structured for this purpose and therefore the regulatory environment in which the CLOs intend to operate is highly uncertain.  There can be no assurance that applicable governmental authorities will agree that any of the transactions, structures or arrangements entered into by the Company, Highland, Acis or the applicable Management Company, and the manner in which it expects to hold retention interests, will satisfy the Retention Requirements, including any transactions pursuant to which Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. If such transactions, structures or arrangements are determined not to comply with the Retention Requirements, Highland, Acis, the applicable Management Company or the Company (as applicable) could become subject to regulatory action which could in turn materially and adversely affect the Company and/or the potential return to shareholders. The impact of the Retention Requirements on the securitization market is also unclear and such rules may negatively impact the value of the CLOs and their underlying assets.

*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*

The Company's portfolio may at any given time include, directly and indirectly, securities or other financial instruments or obligations which are very thinly traded, for which no market exists or which are restricted as to their transferability under applicable securities laws.  These investments may be extremely difficult to value accurately.  Further, because of overall size or concentration in particular markets of positions held by the Company, the value of its investments which can be liquidated may differ, sometimes significantly, from their valuations. Third party pricing information may not be available for certain positions held by the Company.  Investments to be held by the Company may trade with significant bid-ask spreads.  The Company is entitled to rely, without independent investigation, upon pricing information and valuations furnished by third parties, including pricing services and valuation sources.  In the absence of fraud, gross negligence (under New York law), bad faith or manifest error, valuation determinations in accordance with the Company's valuation policy will be conclusive and binding.

*Market factors may result in the failure of the investment strategy*

Strategy risk is associated with the failure or deterioration of an investment strategy such that most or all investment managers employing that strategy suffer losses. Strategy-specific losses may result from excessive concentration by multiple market participants in the same investment or general economic or other events that adversely affect particular strategies (for example the disruption of historical pricing relationships).  Furthermore, an imbalance of supply and demand favouring borrowers could result in yield compression, higher leverage and less favourable terms to the detriment of all investors in the relevant asset class.  The investment strategy employed by the Company is speculative

004590

and involves substantial risk of loss in the event of a failure or deterioration in the financial markets, although the Company has certain investment limits which define to a degree how it invests. As a result, the Company's investment strategy may fail, and it may be difficult for the Company to amend its investment strategy quickly or at all should certain market factors appear, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***The investment strategy of the Company includes investing predominantly in CLO Notes, and, under certain circumstances, asset management subsidiaries, all of which are subject to a risk of loss of principal***

The investment strategy of the Company consists of investing predominantly in CLO Notes, directly and indirectly through its investment in the Management Companies, and, under certain circumstances, asset management subsidiaries. The company may also invest in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements). Such investments may be considered to be subject to a level of risk in the case of deterioration of general economic conditions, which might increase the risk of loss of principal or investment. This could result in losses to the Company which could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***In the event of a default in relation to an investment, the Company or the CLO in which the Company holds CLO Notes will bear a risk of loss of principal, and accrued interest***

Performance and investor yield on the Company's investments (including both direct investments by the Company in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and investments in senior secured loans held by CLOs in which the Company holds CLO Notes) may be affected by the default or perceived credit impairment of such investments and by general or sector specific credit spread widening. Credit risks associated with the investments include (among others): (i) the possibility that earnings of an obligor may be insufficient to meet its debt service obligations; (ii) an obligor's assets declining in value; and (iii) the declining creditworthiness, default and potential for insolvency of an obligor during periods of rising interest rates and economic downturn. An economic downturn and/or rising interest rates could severely disrupt the market for the investments and adversely affect the value of the investments and the ability of the obligors thereof or the CLO to repay principal and interest. In turn, this may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

In the event of a default in relation to an investment held by the Company or a CLO in which the Company holds CLO Notes, the Company will bear a risk of loss of principal and accrued interest on that investment. Any such investment may become defaulted for a variety of reasons, including non-payment of principal or interest, as well as breaches of contractual covenants. A defaulted investment may become subject to workout negotiations or may be restructured by, for example, reducing the interest rate, a write-down of the principal, and/or changes to its terms and conditions. Any such process may be extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on the defaulted investment. In addition, significant costs might be imposed on the lender, further affecting the value of the investment. The liquidity in such defaulted investments may also be limited and, where a defaulted investment is sold, it is unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest owed on that investment. This would adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

In the case of secured loans, restructuring can be an expensive and lengthy process which could have a material negative effect on the Company's anticipated return on the restructured loan. By way of example, it would not be unusual for any costs of enforcement to be paid out in full before the repayment of interest and principal. This would substantially reduce the Company's anticipated return on the restructured loan.

***The illiquidity of investments may have an adverse impact on their price and the Company's ability to trade in them or require significant time for capital gains to materialise***

Credit markets may from time to time become less liquid, leading to valuation losses on the investments making it difficult to acquire or dispose of them at prices the Company considers their fair value. Accordingly, this may impair the Company's ability to respond to market movements and the Company may experience adverse price movements upon liquidation of such investments. Liquidation of portions of the portfolio under these circumstances could produce realised losses. The size of the Company's positions may magnify the effect of a decrease in market liquidity for such

004591

instruments. Settlement of transactions may be subject to delay and uncertainty. Such illiquidity may result from various factors, such as the nature of the instrument being traded, or the nature and/or maturity of the market in which it is being traded, the size of the position being traded, or lack of an established market for the relevant securities. Even where there is an established market, the price and/or liquidity of instruments in that market may be materially affected by certain factors.

The investment objective of the Company is to provide investors with stable income returns and capital appreciation from exposure on an indirect basis to a portfolio of predominantly floating rate senior secured loans, CLO Notes and, under certain circumstances, asset management subsidiaries. Investments which are in the form of loans are not as easily purchased or sold as publicly traded securities due to the unique and more customised nature of the debt agreement and the private syndication process. As a result, there may be a significant period between the date that the Company makes an investment and the date that any capital gain or loss on such investment is realised. Moreover, the sale of restricted and illiquid securities may result in higher brokerage charges or dealer discounts and other selling expenses than the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Further, the Company may not be able readily to dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time, which could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV. See further the risk factor titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*" below.

### The Company may hold a relatively concentrated portfolio

The Company may hold a relatively concentrated portfolio. There is a risk that the Company could be subject to significant losses if any obligor, especially one with whom the Company had a concentration of investments, were to default or suffer some other material adverse change. The level of defaults in the portfolio and the losses suffered on such defaults may increase in the event of adverse financial or credit market conditions. Any of these factors could adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

A significant portion of the Company's investment portfolio is expected to comprise directly or indirectly of Managed CLOs advised by Highland, Acis, the Portfolio Manager or a Management Company, as the CLO Manager. The performance of the Company's portfolio depends heavily on the skills of Highland, Acis, the Portfolio Manager and the Management Companies, as applicable, in analyzing, selecting and managing the relevant CLOs. See further the sections titled "*Risks Relating to Highland and Acis*" and "*Conflicts of Interest*" below.

### The Company may be exposed to foreign exchange risk, which may have an adverse impact on the value of its assets and on its results of operations

The base currency of the Company is the U.S. Dollar. Certain of the Company's assets may be invested in securities and other investments which are denominated in other currencies. Accordingly, the Company will necessarily be subject to foreign exchange risks and the value of its assets may be affected unfavourably by fluctuations in currency rates. Although the Company may utilise financial instruments to hedge against declines in the value of such assets as a result of changes in currency exchange rates, it is not obliged to do so and may terminate any hedge contract at any time. Moreover, it may not be possible for the Company to hedge against a particular change or event at an acceptable price or at all. In addition, there can be no assurance that any attempt to hedge against a particular change or event would be successful, and any such hedging failure could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### The hedging arrangements of the Company may not be successful

The Company's economic risks cannot be effectively hedged. However, in connection with the financing of certain investments, the Company may employ hedging techniques designed to reduce the risks of adverse movements in interest rates, securities' prices and/or currency exchange rates. However, some residual risk may remain as a result of imperfections and inconsistencies in the market and/or in the hedging contract. While such hedging transactions may reduce certain risks, they create others. The Company directly or indirectly (through affiliates and subsidiaries) will not be permitted to enter into hedging with respect to the CLO Retention Notes.

004592

The Company may utilise certain derivative instruments (including, without limitation, single-name credit default swaps, credit default swap and loan credit default swap indexes, equity futures and equity indexes) for hedging purposes.  However, even if used primarily for hedging purposes, the prices of derivative instruments are highly volatile, and acquiring or selling such instruments involves certain leveraged risks.  There may be an imperfect correlation between the instrument acquired for hedging purposes and the investments or market sectors being hedged, in which case, a speculative element is added to the highly leveraged position acquired through a derivative instrument primarily for hedging purposes.  In particular, the investments which are in the form of loans may, in certain circumstances, be repaid at any time on short notice at no cost, and accordingly the hedging of interest rate or currency risk in such circumstances may be less precise than is the case with investments in the public securities market.

Furthermore, default by any hedging counterparty in the performance of its obligations could subject the investments to unwanted credit and market risks.  Accordingly, although the Company may benefit from the use of hedging strategies, failure to properly hedge the market risk in the investments and/or default of a counterparty in the performance of its obligations under a hedging contract may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV, and such material adverse effects may exceed those which may have resulted had no hedging strategy been employed.

***Under certain hedging contracts that the Company may enter into, the Company may be required to grant security interests over some of its assets to the relevant counterparty as collateral***

In connection with certain hedging contracts, the Company may be required to grant security interests over some of its assets to the relevant counterparty to such hedging contract as collateral.  Such hedging contracts typically will give the counterparty the right to terminate the agreement upon the occurrence of certain events.  Such termination events may include, among others, a failure by the Company to pay amounts owed when due, a failure to provide required reports or financial statements, a decline in the value of the investments secured as collateral, a failure to maintain sufficient collateral coverage, a failure by the Company to comply with its investment policy and any investment restrictions, key changes in the Company's management, a significant reduction in the Company's Net Asset Value, and material violations of the terms, representations, warranties or covenants contained in the hedging contract, as well as other events determined by the counterparty.  If a termination event were to occur, there may be a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The use of leverage by the Company may increase the volatility of returns and providers of leverage would rank ahead of investors in the Company in the event of insolvency***

The Company may employ leverage in order to increase investment exposure with a view to achieving its target return, in the form of one or more committed credit facilities.  Leverage may come in the form of CLO securitizations.

While leverage presents opportunities for increasing total returns, it can also have the effect of increasing the volatility of the Shares, including the risk of total loss of the amount invested.  If income and capital appreciation on investments made with borrowed funds are less than the costs of the leverage, the Net Asset Value will decrease.  The effect of the use of leverage is to increase the investment exposure, the result of which is that, in a market that moves adversely, the possible resulting loss to investors' capital would be greater than if leverage were not used.  As a result of leverage, small changes in the value of the underlying assets may cause a relatively large change in the value of the Company.  Many financial instruments used to employ leverage are subject to variation or other interim margin requirements, which may force premature liquidation of investments.  Investors should be aware that the use of leverage by the Company can be considered to multiply the leverage effect on their investment returns in the Company.  As described above, while this effect may be beneficial when markets' movements are favourable, it may result in a substantial loss of capital when markets' movements are unfavourable.

In addition, such leverage may involve granting of security or the outright transfer of specific investments in the portfolio.  Since there is no security created in respect of the Shares, any insolvency of the Shareholders could rank behind the Company's financing and hedging counterparties, whose claims will be considered as indebtedness of the Company and may be secured.  Leverage does create opportunities for greater total returns on the investments but simultaneously may create special risk considerations by magnifying changes in the total value of the Net Asset Value and in the yield on the investments held by the Company.

004593

In addition, to the extent leverage is employed, the Company may be required to refinance transactions from time to time.  On each refinancing, the applicable counterparty may choose to re-negotiate the terms of each transaction or indeed not to refinance the transaction at all.  To the extent refinancing facilities are not available in the market at economic rates or at all, the Company may be required to sell assets at disadvantageous prices.  Any such deleveraging may result in losses on investments which could be severe and accordingly could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***Interest rate fluctuations could expose the Company to additional costs and losses***

The prices of the investments that may be held by the Company tend to be sensitive to interest rate fluctuations and unexpected fluctuations in interest rates could cause the corresponding prices of a position to move in directions which were not initially anticipated.  In addition, interest rate increases generally will increase the interest carrying costs of borrowed securities and leveraged investments.  Further, the Company may invest in both floating and fixed rate securities and interest rate movements will affect those respective securities differently.  In particular, when interest rates rise significantly the value of fixed interest rate securities often fall.  Furthermore, to the extent that interest rate assumptions underlie the hedging of a particular position, fluctuations in interest rates could invalidate those underlying assumptions and expose the Company to additional costs and losses.  Any of the above factors could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Additional Information about LIBOR***

In a speech on 27 July 2017, Andrew Bailey, the Chief Executive of the Financial Conduct Authority ("**FCA**"), announced the FCA's intention to cease sustaining LIBOR from the end of 2021.

The FCA has statutory powers to compel panel banks to contribute to LIBOR where necessary. The FCA has decided not to ask, or to require, that panel banks continue to submit contributions to LIBOR beyond the end of 2021. The FCA has indicated that the current panel banks will voluntarily sustain LIBOR until the end of 2021. The FCA does not intend to sustain LIBOR through using its influence or legal powers beyond that date.  The FCA's intention is that after 2021, it will no longer be necessary for the FCA to persuade, or to compel, banks to submit to LIBOR due to the development of alternative benchmark rates, which the FCA suggested should be based on transactions and not on reference rates that do not have active underlying markets to support them.  As of the date of this Offering Memorandum, no specific alternative rates have been generally agreed in the CLO market.

It is possible that the LIBOR administrator, ICE Benchmark Administration, and the panel banks could continue to produce LIBOR on the current basis after 2021, if they are willing and able to do so. However, the survival of LIBOR in its current form, or at all, is not guaranteed after 2021 and, if LIBOR in its current form does not survive, it could cause a disruption in the credit markets generally, which could negatively impact the market value and/or transferability of the Notes.

It is currently unclear how LIBOR would be determined pursuant to existing underlying CLO indentures if LIBOR ceased to exist. If an alternative or a successor benchmark rate were determined, it may increase the risk of a mismatch between the interest rate applicable to the underlying loan assets and the interest rate applicable to the underlying collateral obligations of the CLOs held by the Company. Such mismatch could have a material adverse effect on the value and liquidity of the CLO Notes held by the Company.

Investors should be aware that: (a) any of these changes or any other changes to LIBOR could affect the level of the published rate, including to cause it to be lower and/or more volatile than it would otherwise be; (b) if the applicable rate of interest on any collateral obligation held by the Company is calculated with reference to a currency or tenor which is discontinued, such rate of interest will then be determined by the provisions of the affected collateral obligation, which may include determination by the relevant calculation agent in its discretion; (c) the administrator of LIBOR will not have any involvement in the collateral obligations or notes linked to those obligations and may take any actions in respect of LIBOR without regard to the effect of such actions on the collateral obligations or the notes; and (d) any uncertainty in the value of LIBOR or the admissions made by financial institutions that LIBOR has been manipulated or any uncertainty in the prominence of LIBOR as a benchmark interest rate due to the recent regulatory reforms may adversely affect liquidity of the collateral obligations or the notes in the secondary market and their market value.  Any of the above or any other significant change to the setting of LIBOR could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

*In the event of the insolvency of an obligor in respect of an investment, or of an underlying obligor in respect of an investment, the return on such investment to the Company may be adversely impacted by the insolvency regime or insolvency regimes which may apply to that obligor or underlying obligor and any of their respective assets*

In the event of the insolvency of an obligor in respect of an investment (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio), the Company's (or the CLO issuer's, in the case of CLO Notes) recovery of amounts outstanding in insolvency proceedings may be impacted by the insolvency regimes in force in the jurisdiction of incorporation of such obligor or in the jurisdiction in which such obligor mainly conducts its business (if different from the jurisdiction of incorporation), and/or in the jurisdiction in which the assets of such obligor are located.  Such insolvency regimes impose rules for the protection of creditors and may adversely affect the ability to recover such amounts as are outstanding from the insolvent obligor under the investment, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

Similarly, the ability of obligors to recover amounts owing to them from insolvent underlying obligors may be adversely impacted by any such insolvency regimes applicable to those underlying obligors, which in turn may adversely affect the abilities of those obligors to make payments due under the investment to the Company on a full or timely basis.

In particular, it should be noted that the United States and a number of European jurisdictions operate unpredictable insolvency regimes which may cause delays to the recovery of amounts owed by insolvent obligors or underlying obligors subject to those regimes.  The different insolvency regimes applicable in the different jurisdictions result in a corresponding variability of recovery rates for senior secured loans, entered into or issued in such jurisdictions, any of which may have a material adverse effect on the performance of a CLO and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

*A CLO issuer may be subject to losses on investments as a result of insolvency or clawback legislation and/or fraudulent conveyance findings by courts*

Various laws enacted for the protection of creditors and stakeholders may apply to certain investments that are debt obligations, although the existence and applicability of such laws will vary between jurisdictions.  For example, if a court were to find that an obligor did not receive fair consideration or reasonably equivalent value for incurring indebtedness evidenced by an investment and the grant of any security interest securing such investment, and, after giving effect to such indebtedness, the obligor: (i) was insolvent; (ii) was engaged in a business for which the assets remaining in such obligor constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court may: (a) invalidate such indebtedness and such security interest as a fraudulent conveyance; (b) subordinate such indebtedness to existing or future creditors of the obligor; or (c) recover amounts previously paid by the obligor (including to a CLO issuer) in satisfaction of such indebtedness or proceeds of such security interest previously applied in satisfaction of such indebtedness.  In addition, if an obligor in whose debt a CLO issuer has an investment becomes insolvent, any payment made on such investment may be subject to avoidance, cancellation and/or clawback as a "preference" if made within a certain period of time (which for example under some current laws may be as long as two years) before insolvency.

In general, if payments on an investment are voidable, whether as fraudulent conveyances, extortionate transactions or preferences, such payments may be recaptured either from the initial recipient or from subsequent transferees of such payments.  To the extent that any such payments are recaptured from a CLO issuer, there will be an adverse effect on the performance of the CLO issuer and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

*The due diligence process that the Company plans to undertake in evaluating specific investment opportunities may not reveal all facts that may be relevant in connection with such investment opportunities and any corporate mismanagement, fraud or accounting irregularities may materially affect the integrity of the Company's due diligence on investment opportunities*

When conducting due diligence and making an assessment regarding an investment, the Company will be required to rely on resources available to it, including internal sources of information as well as information provided by existing and potential obligors, any equity sponsor(s), lenders and other independent sources.  The due diligence process may at times be required to rely on limited or incomplete information.

004595

The Portfolio Manager will select investments on the Company's behalf in part on the basis of information and data relating to potential investments filed with various government regulators and publicly available or made directly available to the Portfolio Manager by the entities filing such information or third parties. Although the Portfolio Manager will evaluate all such information and data and seek independent corroboration when it considers it appropriate and reasonably available, the Portfolio Manager will not be in a position to confirm the completeness, genuineness or accuracy of such information and data. The Portfolio Manager is dependent upon the integrity of the management of the entities filing such information and such third parties as well as the financial reporting process in general.

The value of an investment made by the Portfolio Manager on the Company's behalf may be affected by fraud, misrepresentation or omission on the part of an obligor, underlying obligor, any related parties to such obligor or underlying obligor, or by other parties to the investment (or any related collateral and security arrangements). Such fraud, misrepresentation or omission may adversely affect the value of the investment and/or the value of the collateral underlying the investment in question and may adversely affect the ability of the Portfolio Manager's on the Company's behalf to enforce its contractual rights relating to that investment or the relevant obligor's ability to repay the principal or interest on the investment.

Investment analysis and decisions by the Portfolio Manager may be undertaken on an expedited basis in order to make it possible for the Portfolio Manager to take advantage of short-lived investment opportunities. In such cases, the available information at the time of an investment decision may be limited, inaccurate and/or incomplete. Furthermore, the Portfolio Manager may not have sufficient time to evaluate fully such information even if it is available.

Accordingly, the Portfolio Manager cannot guarantee that the due diligence investigation it carries out with respect to any investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such investment opportunity. Any failure by the Portfolio Manager to identify relevant facts through the due diligence process may cause it to make inappropriate investment decisions, which may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The collateral and security arrangements attached to an investment may not have been properly created or perfected, or may be subject to other legal or regulatory restrictions***

The collateral and security arrangements in relation to secured obligations in which the Company may invest (and the security arrangements relating to the underlying assets of CLOs) will be subject to such security or collateral having been correctly created and perfected and any applicable legal or regulatory requirements which may restrict the giving of collateral or security by an obligor, such as, for example, thin capitalisation, over-indebtedness, financial assistance and corporate benefit requirements. If the investments do not benefit from the expected collateral or security arrangements, this may adversely affect the value of, or in the event of a default, the recovery of principal or interest from, such investments. Accordingly, any such failure properly to create or perfect collateral and security interests attaching to the investments may adversely affect the performance of the CLO issuer and/or the Company and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

***The investments will be based in part on valuations of collateral which are subject to assumptions and factors that may be incomplete, inherently uncertain or subject to change***

A component of the Company's analysis of the desirability of making a given investment relates to the estimated residual or recovery value of such investments in the event of the insolvency of the obligor (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio). This residual or recovery value will be driven primarily by the value of the anticipated future cash flows of the obligor's business and by the value of any underlying assets constituting the collateral for such investment. The anticipated future cash flows of the obligor's business and the value of collateral can, however, be extremely difficult to predict as in certain circumstances market quotations and third party pricing information may not be available. If the recovery value of the collateral associated with the investments in which the Company or a CLO issuer invests decreases or is materially worse than expected by the Company or a CLO issuer (as applicable), such a decrease or deficiency may affect the value of the investments made by the Company or a CLO issuer. Accordingly, there will be an adverse effect on the performance of the CLO issuer and/or the Company and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

004596

***CLO Income Notes are volatile and interest and principal payments payable on the CLO Income Notes are not fixed***

CLO Income Notes are the most subordinated tranche of a CLO and all payments of principal and interest on such CLO Income Notes are fully subordinated.  Interest and principal payments are not fixed but are based on residual amounts available to make such payments.  As a result, payments on such CLO Income Notes will be made by the CLO issuer to the extent of available funds, and no payments thereon will be made until amongst other things (a) the payment of certain costs, fees and expenses have been made and (b) interest and principal (respectively) has been paid on the more senior notes of the CLO.  Non-payment of interest or principal on such CLO Income Notes will be unlikely to cause an event of default in relation to the CLO issuer.

CLO Income Notes represent a highly leveraged investment in the underlying assets of the CLO issuer.  Accordingly, it is expected that changes in the market value of such CLO Income Notes will be greater than changes in the market value of the underlying assets of the CLO issuer, which themselves are subject to credit, liquidity, interest rate and other risks.  Utilisation of leverage is a speculative investment technique and involves certain risks to investors and will generally magnify the CLO Income Notes investors' opportunities for gain and risk of loss.  In certain scenarios, the CLO Income Notes may be subject to a partial or a 100 per cent loss of invested capital.  CLO Income Notes represent the most junior securities in a leveraged capital structure.  As a result, any deterioration in performance of the asset portfolio of a CLO issuer, including defaults and losses, a reduction of realised yield or other factors, will be borne first by holders of such CLO Income Notes prior to the rest of the capital structure.

***CLO Income Notes are a limited recourse obligation of the CLO issuer***

CLO Income Notes are a limited recourse obligation of a CLO issuer and amounts payable on CLO Income Notes are payable solely from amounts received in respect of the collateral of the CLO issuer.  Payments on CLO Income Notes prior to and following enforcement of the security over the collateral of a CLO issuer are subordinated to the prior payment of certain costs, fees and expenses of, or payable by, the CLO issuer and to payment of principal and interest on more senior notes of the CLO issuer.  The holders of CLO Income Notes must rely solely on distributions on the collateral of the CLO for payment of principal and interest, if any, on the CLO Income Notes.  There can be no assurance that the distributions on the collateral of a CLO will be sufficient to make payments on the CLO Income Notes.  If distributions are insufficient to make payments on the CLO Income Notes, no other assets of the CLO issuer will be available for payment of the deficiency and following realisation of the collateral and the application of the proceeds thereof, the obligations of the CLO issuer to pay such deficiency shall be extinguished.  Such shortfall will be borne in the first instance by the CLO Income Notes.

In addition, at any time whilst the CLO Income Notes are outstanding in a CLO, no CLO Income Notes holder shall be entitled to institute against the related CLO issuer, or join in any institution against such CLO issuer of, any bankruptcy, reorganization, arrangement, insolvency, examinership, winding up or liquidation proceedings under any applicable bankruptcy or similar law in connection with any obligations of the CLO issuer relating to the CLO Income Notes or otherwise owed to the CLO Income Notes holder, save for lodging a claim in the liquidation of the CLO issuer which is initiated by another party or taking proceedings to obtain a declaration as to the obligations of the CLO issuer, nor shall it have a claim arising in respect of the share capital of the CLO issuer.

Furthermore, following the establishment of the Management Companies, CLO Income Notes may not be held directly by the Company. As such the Company's interest in the CLO Income Notes may be indirect, and the Management Company, not the Company, will be entitled to exercise voting rights associated with the CLO Income Notes.

***CLO Notes have limited liquidity***

In addition to the restrictions mentioned in the section titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*", there will usually be a limited market for notes representing collateralised loan obligations (including the CLO Notes).  There is no guarantee that any party to a CLO transaction will make a secondary market in relation to the CLO Notes.  There can be no assurance that a secondary market for any CLO Notes will develop or, if a secondary market does develop, that it will provide the holders of CLO Notes with liquidity of investment or that it will continue for the life of such notes. As a result, the Company may have to hold the CLO Notes for an indefinite period of time or until their early

004597

redemption date or maturity date.  Where a market does exist, to the extent that an investor wants to sell the CLO Notes, the price may, or may not, be at a discount from the outstanding principal amount.  There may be additional restrictions on divestment in the terms and conditions of CLO Notes.

*Investments in asset management subsidiaries may subject the Company to increased regulatory scrutiny or disputes related to CLOs or other investments managed by such asset management subsidiaries*

As part of its business, the Portfolio Manager may advise the Company to invest in asset management subsidiaries, affiliated with the Company, Highland, Acis, the Portfolio Manager or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements.  Asset managers of U.S. or European CLOs operate in a highly regulated environment, and are subject to a comprehensive statutory and regulatory regime as well as oversight by governmental agencies.  In light of the current conditions in the global financial markets and economy, regulators have increased their focus on the regulation of asset managers in the U.S. and Europe.  New or modified regulations and related regulatory guidance, including under Basel III and the Dodd-Frank Act, may have unforeseen or unintended adverse effects on asset managers of CLOs.  These international regulations could limit an asset management subsidiary from pursuing certain business opportunities and/or impose additional costs, and otherwise indirectly materially adversely affect the Company's business operations and have other negative consequences.

*Investors will not have control over the CLO management activities of the Portfolio Manager, Highland, Acis or the Management Companies in CLOs*

The Portfolio Manager, Highland, Acis and/or the Management Companies, in the capacity of CLO Manager of a CLO, will have the discretion to make collateral management decisions for such CLO, including with respect to asset selection, disposition and amendments of the underlying loans.  In exercising such discretion, the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be responsible to act solely in the best interests of the applicable CLO issuer, not the Company or any Investor.  Any amendment, waiver or modification of an investment could postpone the receipt of payments in respect of such investment and/or reduce distributions to Investors.  The shareholders will have no right to compel the Portfolio Manager, Highland, Acis or the Management Companies, in their roles as CLO Manager to take or refrain from taking any actions or decisions, and the actions or decisions taken by the Portfolio Manager, Highland, Acis or the Management Companies as CLO Manager may expose the Investors to losses on their investment.

*United States retention requirements may affect future actions of the Company and negatively impact the leveraged loan market*

As part of its business, the Company may invest in asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain CLOs in order to satisfy the U.S. Risk Retention Rules.

On October 21, 2014, the U.S. Risk Retention Rules were issued and became effective on December 24, 2016 with respect to asset-backed securities collateralized by assets other than residential mortgages.  The statements contained herein regarding how compliance with the U.S. Risk Retention Rules may be achieved by a CLO are solely based on publicly available information as of the date hereof.  Except with respect to asset-backed securities transactions that satisfy certain exemptions, the U.S. Risk Retention Rules generally require one of the sponsors of asset-backed securities or a "majority-owned affiliate" thereof to retain not less than 5% of the credit risk of the assets collateralizing asset-backed securities.  The preamble to the rule text in the U.S. Risk Retention Rules indicates that a party that organizes and initiates a securitization would be the "sponsor."  In the case of many collateralized loan obligation transactions, the entity acting as collateral manager typically organizes and initiates a transaction and, therefore, would be considered the "sponsor" for U.S. Risk Retention Rules purposes, as further discussed in the preamble.  The U.S. Risk Retention Rules provide that if there is more than one "sponsor" of a securitization transaction, each "sponsor" is to ensure that at least one "sponsor" (or its "majority-owned affiliate") retains the requisite U.S. Retention Interest.

It is expected that Highland or Acis, as applicable, will agree to act as "sponsor" for purposes of Managed CLOs in which the Company invests, but there can be no assurance, and no representation, made that any Governmental Authority will agree that such is the case.  Each of Highland and Acis intends to treat the applicable Management Company as its "majority-owned affiliate" due to holding by it (or by affiliates that are intended to be, directly or

004598

indirectly, majority controlled, are majority controlled by or are under common majority control with Highland or Acis, as applicable) of a controlling financial interest in such Management Company as determined under GAAP, although there can be no assurance that such Management Companies will maintain treatment as a "majority-owned affiliates" of Highland or Acis as "sponsors" given the lack of guidance in the U.S. Risk Retention Rules with respect to such affiliated situations.  Moreover, there can be no guarantee that Highland or Acis will be able to maintain the treatment of such Management Company as a "majority-owned affiliate," particularly if GAAP regulations or interpretations change over time.

Each of Highland or Acis, as applicable, may also hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules.  There can be no assurance that following any such transfer any Governmental entity will agree that the applicable Management Company will remain a "majority-owned affiliate" of Highland or Acis, as applicable.

At this time, each potential investor should understand that there is uncertainty with respect to what is required to comply with the U.S. Risk Retention Rules in certain circumstances, and therefore there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures with respect to such CLO will enable the applicable CLO Manager or U.S. retention holder to comply with the U.S. Risk Retention Rules.

In addition, there are a number of future uncertainties surrounding U.S. Risk Retention Rules for CLO Managers, including:  (i) the ultimate results of litigation currently in process brought by the Loan Syndications and Trading Association (LSTA), a major industry trade association, challenging, among other things, the regulators' application of U.S. Risk Retention Rules to collateral managers of typical so-called open market CLOs, (ii) proposed legislation designed to exclude from U.S. Risk Retention Rules, collateral managers of certain defined "QCLOs" (qualified CLOs) and (iii) future directives and interpretations by Governmental Authorities with respect to the U.S. Risk Retention Rules.  If such publicly available information is altered as a result of the foregoing (or anything else), there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures would be viewed by any Governmental Authority as sufficient to meet the requirements under the U.S. Risk Retention Rules.  The failure to satisfy the requirements of the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the applicable CLO Notes and on Highland, Acis and the Management Companies and the Company's investments therein.

***The failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the Company and/or the Portfolio Manager***

The failure by the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules with respect to any Managed CLO may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the applicable Management Company, which could result in such person being required, among other things, to pay damages, transfer interests and/or acquire additional CLO Notes (which may or may not be available at such time for acquisition) or be subject to cease and desist orders or other regulatory action.  In addition, a failure to remedy non-compliance with the U.S. Risk Retention Rules may also trigger a "cause" event under the applicable CLO Management Agreement and/or subject the Portfolio Manager, Highland, Acis and/or the applicable Management Company to adverse publicity and reputational risk resulting from such non-compliance.  In addition, given the lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests upon a resignation or removal of a CLO Manager or an if the Portfolio Manager, Highland, Acis and/or the applicable Management Company resigns or the applicable holders of CLO Notes desire to remove the Portfolio Manager in connection with any such "cause" event, there may be no successor CLO Manager willing to accept appointment as such, in which case the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be required to continue to act as CLO Manager under the applicable CLO Management Agreement.  Further, given such lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests, there can be no assurance that Highland or Acis, as applicable, will be able to maintain compliance with the U.S. Risk Retention Rules following any transfer of ownership interests in an entity holding Retention Interests by Highland or Acis to their respective affiliates that are, directly or indirectly, majority controlled,

004599

are majority controlled by or are under common majority control with, Highland or Acis, as applicable, particularly in situations involving CLOs which have already been issued when the related transfer occurs.  As a result of any of the foregoing, the failure of the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the Company's investment in the applicable CLO Notes as well as on the business, condition (financial or otherwise), assets, operations or prospects of the Portfolio Manager, Highland, Acis and/or the applicable Management Company and the Company.

***The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)***

In connection with the intention to comply with the Retention Requirements, each Management Company will need to, amongst other things, (a) on the closing date of a Managed CLO, commit to purchase and retain CLO Notes held in the form and at least the minimum required under the applicable Retention Requirements, as applicable, for the relevant CLO (the "**CLO Retention Notes**") and (b) undertake that, for so long as any securities of the CLO remain outstanding (including the CLO Retention Notes), it will retain its interest in the CLO Retention Notes and will not (except to the extent permitted by the EU Retention Requirements, the accompanying regulatory technical standards or any other related guidance published by the European Securities and Markets Authority) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO Retention Notes.  The Company or the applicable Management Company, as applicable, may make certain representations and/or give certain undertakings in favour of Managed CLOs (and/or certain other transaction parties) in respect of its ongoing retention of the CLO Retention Notes and regarding its agreement to sell certain assets to such Managed CLOs from time to time.  There are currently transactions in the market which are similar to the Managed CLOs, however if an applicable regulatory authority supervising investors in a Managed CLO were to conclude that the applicable Management Company was not holding the CLO Retention Notes in accordance with the CRR, it is possible, but far from certain, that this may negatively impact the investors in such Managed CLO.  If such investors decided to take action against the Company or the applicable Management Company as a result of any negative impact, this may have an adverse effect on the Company's financial performance and prospects.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements if applicable to the relevant CLO, the applicable Management Company would be required to meet the Origination Requirements.

As a result of the above commitments, the applicable Management Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption).  Consequently, if any shares were to become due and repayable in connection with any resolution for their redemption, the Company, the applicable Management Company will not be obliged to immediately sell, transfer or liquidate the CLO Retention Notes and the proceeds of such CLO Retention Notes (if any) will not be available until the final maturity or early redemption in full of the securities of the relevant CLO.  In addition, cash held by the Company will not be able to be used to repay any shares to the extent that such repayment could leave the Company unable to continue to originate and sell assets to the CLO issuers in order to ensure that during the relevant CLO's reinvestment period the Company, the applicable Management Company has met the Origination Requirements.

The Company or the applicable Management Company directly or indirectly, may hold a controlling equity stake in the Managed CLOs; accordingly, upon exercise by the Company or the applicable Management Company an early redemption option will result in a full redemption of the applicable CLO securities.  Neither the Company nor the applicable Management Company will generally be able to exercise any early redemption options during a "non-call period" (generally lasting two years) after the closing date of the CLO.  As a result of this feature and the EU Retention Requirements, the relevant CLO Retention Notes will not be permitted to be sold, transferred or liquidated during this time.  In addition, even after an early redemption option is permitted to be exercised, such an option usually contains a number of conditions to its exercise including, but not limited to, a threshold that the liquidation value of the CLO collateral exceed an amount which would pay (a) all expenses of the CLO and (b) principal and accrued interest on the CLO Notes senior to the CLO Income Notes.  If the liquidation value of the portfolio will not achieve this threshold at the time the Company intends to exercise its early redemption option, the CLO will not be able to be optionally redeemed by the Company at such time.  In such circumstances, the Company or the applicable Management Company

004600

may not redeem the CLO Retention Notes until their final stated maturity (which may be in excess of 12 years), therefore producing no proceeds to pay to Shareholders until this point.

***Potential non-compliance with or changes to the United States and European risk retention requirements***

The purchase and retention of the CLO Retention Notes in a CLO will be undertaken by the Company or the applicable Management Company with the intention of achieving compliance with the U.S. Risk Retention Rules and/or the EU Retention Requirements by the relevant CLO.

The U.S. Risk Retention Rules and/or EU Retention Requirements may be amended, supplemented or revoked from time to time. There is no guarantee that existing CLOs or future CLOs will be grandfathered into the regime which results from such amendments, supplements or revocations and, as such, the CLOs in which the applicable Management Company is retaining the CLO Retention Notes, may become non-compliant with the U.S. Risk Retention Rules and/or EU Retention Requirements.

***Liability for breach of a risk retention letter***

The arranger of a CLO and certain other parties of a CLO in which a Management Company agrees to hold the CLO Retention Notes (in such capacity, the "**Retention Holder**") will require the applicable Management Company to execute a risk retention letter. Under a risk retention letter the applicable Retention Holder will typically be required to, amongst other things, make certain representations, warranties and undertakings: (a) in relation to its acquisition and retention of the CLO Retention Notes for the life of the CLO; and (b) regarding its agreement to sell assets to the relevant CLO from time to time. If the applicable Retention Holder sells or is forced to sell the CLO Retention Notes prior to the maturity of the relevant CLO, or the applicable Retention Holder holds insufficient cash or investments to continually sell the assets to the CLO as described above or for any other reason the applicable Retention Holder is not considered to be an "originator" (as such term is defined in the CRR), the Company may be in breach of the terms of the related risk retention letter. In such circumstances the arranger of the relevant CLO and the other parties to the related risk retention letter would have recourse to the applicable Retention Holder for losses incurred as a result of such breach. Such claims may reduce, or entirely diminish any cash or assets of the Company which may have been available to make payments on the Shares.

## RISKS RELATING TO HIGHLAND AND ACIS

***Past Performance Not Indicative of Future Results***

The past performance of Highland and Acis and their principals and affiliates in other portfolios or investment vehicles, including, without limitation their outstanding CLO transactions, may not be indicative of the results that the Company may be able to achieve. Similarly, the past performance of Highland, Acis and their principals and affiliates over a particular period may not necessarily be indicative of the results that may be expected in future periods. Furthermore, the nature of, and risks associated with, the Company's investments may differ substantially from those investments and strategies undertaken historically by Highland, Acis and their principals and affiliates. There can be no assurance that Highland's or Acis' investment recommendations will perform as well as past investments of Highland or Acis or their principals and affiliates, that the Company will be able to avoid losses or that the Company will be able to make investments similar to the past investments of Highland, Acis and their principals and affiliates. In addition, such past investments may have been made utilizing a leveraged capital structure, an asset mix and fee arrangements that are different from the anticipated capital structure, asset mix and fee arrangements of the Company. Moreover, because the investment criteria that govern investments in the Company's portfolio do not govern the investments and investment strategies of Highland, Acis and their principals and affiliates generally, such investments conducted in accordance with such criteria, and the results they yield, are not directly comparable with, and may differ substantially from other investments undertaken by Highland, Acis and their principals and affiliates.

***Acis, as CLO Manager, Relies on Highland to Perform Certain Services***

Acis currently relies on Highland, a U.S. SEC-registered investment adviser under common control with Acis, pursuant to the ACM Services Agreements, to provide investment research and recommendations and operational support to Acis, including services in connection with credit research, due diligence of actual or potential investments,

004601

the execution of investment transactions, and certain loan services and administrative services. If Highland does not continue to provide such services to Acis, or there is a departure or inability of certain Highland personnel to provide such services to Acis, there can be no assurances that Acis would be able to find a substitute service provider with the same experience as, or on the same terms as its ACM Services Agreements with, Highland. The inability of Acis to perform its duties under the applicable CLO Management Agreements or the ACLOM Services Agreements in accordance with the standard of care specified therein due to the termination of the Services Agreements could result in removal of Acis or Acis CLO Management, as applicable, under the applicable CLO Management Agreements for the Acis CLOs and Acis CLO 7.

### Litigation Involving Highland and Acis

Highland and Acis currently are and have been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. Shareholders have had an opportunity to discuss with Highland to their satisfaction all litigation matters against Highland and its affiliates unrelated to its distressed business. We currently do not anticipate these proceedings will have a material negative impact to the Company.

### Failure to Comply with Investment Advisers Act May Have an Adverse Effect on the Portfolio Manager's Performance

Highland HCF Advisor and Highland CLO Management are relying advisers of Highland, and Highland is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act. Acis CLO Management is a relying adviser of Acis, and Acis is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act. Failure to comply with the requirements imposed on the Portfolio Manager, Highland, Acis and/or the Management Companies under the Investment Advisers Act may have a significant adverse effect on the Portfolio Manager, Highland, Acis and/or the applicable Management Company. The Portfolio Manager, Highland's, Acis' and/or the applicable Management Company's ability to act as CLO Manager for Managed CLOs in which the Company holds CLO Notes may also be adversely affected by negative publicity arising from any regulatory compliance failures or other inappropriate behavior attributed to or any other negative publicity related to the Portfolio Manager, Highland, Acis and/or the applicable Management Company, any affiliate thereof or any of their respective investment professionals.

### SEC enforcement actions

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid regulatory examination and possibly enforcement actions. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including the undisclosed allocation of the fees, costs and expenses related to unconsummated co-investment transactions (i.e., the allocation of broken deal expenses), undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser. Although each of the Portfolio Manager, Highland, Acis and the Management Companies believe the foregoing practices to have been common historically amongst private fund advisers within the U.S. private funds industry, if the SEC or any other governmental authority, regulatory agency or similar body may take issue with, or in the case of insufficient disclosure regarding acceleration of certain special fees as described below, may continue to take issue with, past or future practices of the Portfolio Manager, Highland, Acis or the Management Companies or any of their affiliates as they pertain to any of the foregoing. In such instances, the Portfolio Manager, Highland, Acis or the Management Companies and/or such affiliates may be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis or the Management Companies was small in monetary amount, the Portfolio Manager, Highland, Acis and/or the applicable Management Company or their respective affiliates may be subject to adverse publicity relating to the investigation, proceeding or imposition of any such sanction.

### Potential litigation and regulatory actions may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies

004602

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid potential third party or other litigation or regulatory actions under existing laws (including the U.S. Risk Retention Requirements) or laws enacted in the future. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser and the undisclosed acceleration of certain special fees. In addition, the failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the Management Companies. If the SEC or any other Governmental Authority takes issue with the practices of the Portfolio Manager, Highland, Acis and/or the Management Companies or any of their affiliates as they pertain to any of the foregoing, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or any such affiliates will be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis and/or the Management Companies and/or such affiliates was small in monetary amount, the adverse publicity relating to the investigation, proceeding or imposition of these sanctions could harm the Company, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or their respective affiliates' reputations which may adversely affect the market value and/or liquidity of the Debt. There is also a material risk that Governmental Authorities in the United States and beyond will continue to adopt new laws or regulations (including tax laws or regulations), or change existing laws or regulations, or enhance the interpretation or enforcement of existing laws and regulations including the U.S. Risk Retention Rules. Any such events or changes could occur during the term of the Debt and may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies and its ability to operate and/or pursue its management strategies on behalf of the Issuer. Such risks are often difficult or impossible to predict, avoid or mitigate in advance.

*Dependence on Highland, Acis and other collateral managers of CLOs*

A significant portion of the Company's investment portfolio will comprise of its investment in the Management Companies and in Managed CLOs. The Company's investment portfolio may also include CLOs managed by other asset managers. The performance of the Company's portfolio depends heavily on the skills of the Portfolio Manager, Highland, Acis, the Management Companies or such other asset managers in analyzing, selecting and managing the relevant CLOs. As a result, the Company and the CLOs will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, Highland, Acis, the Management Companies and the other asset managers, none of whom is under any contractual obligation to the Company or such CLOs to continue to be associated with the Portfolio Manager, Highland, Acis, the applicable Management Company or such other collateral manager for the term of the Company or any particular CLO. The loss of one or more of these individuals could have a material adverse effect on the performance of the Company and the relevant CLO.

Furthermore, the Portfolio Manager has informed the Company that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Company's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Company and the Managed CLOs may also depend on the financial and managerial experience of such individuals. Moreover, the Portfolio Management Agreement may be terminated under certain circumstances.

*The Company generally may not terminate the Portfolio Management Agreement, even in the event of the Portfolio Manager's poor performance*

The Portfolio Management Agreement was negotiated between related parties and its terms may not be as favorable as if it had been negotiated with unaffiliated third parties. The Company may choose not to enforce, or to enforce less vigorously, certain of its rights under the Portfolio Management Agreement in an effort to maintain its ongoing relationship with the Portfolio Manager or Highland Capital Management, L.P., as the case may be.

Termination of the Portfolio Management Agreement is difficult and costly. In order to terminate the Portfolio Management Agreement without cause, the Company must (i) be required to register as an investment company under the provisions of the Investment Company Act of 1940 and it must notify the Portfolio Manager of such

004603

requirement, (ii) the portfolio must be liquidated in full and its financing arrangements must have been terminated or redeemed in full, or (iii) it must reach a mutual agreement with the Portfolio Manager to terminate the agreement. The initial term of the Portfolio Management Agreement is three years, with automatic renewals of three years thereafter. The Company may not choose to not renew the Portfolio Management Agreement.

The Company's ability to terminate the Portfolio Management Agreement for "cause" is limited, including grounds of wilful violation of the Portfolio Management Agreement by the Portfolio Manager and fraud or criminal activity. However, poor performance by the Portfolio Manager is not grounds for termination for cause under the Portfolio Management Agreement.  See "*Material Contracts*"

## RISKS RELATING TO CONFLICTS OF INTEREST

### *Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

### *The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*

The following briefly summarizes certain potential and actual conflicts of interest which may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates, but is not intended to be an exhaustive list of all such conflicts.  The scope of the activities of the Portfolio Manager, Highland, its affiliates, and the funds and clients managed or advised by Highland or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Company in the future that cannot be foreseen or mitigated at this time.

As part of their regular business, the Portfolio Manager, Highland, its affiliates and their respective officers, directors, trustees, shareholders, members, partners, personnel and employees and their respective funds and investment accounts (collectively, the "**Related Parties**") hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.  The Related Parties will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make.  The Related Parties may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Company and the Managed CLOs may invest.  In particular, the Related Parties may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Company and/or the Managed CLOs, or in which partners, security holders, members, officers, directors, agents, personnel or employees of such Related Parties serve on boards of directors or otherwise have ongoing relationships.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Company and/or the Managed CLOs and otherwise create conflicts of interest for the Company and/or the Managed CLOs.  In such instances, the Related Parties may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Company's and/or the Managed CLOs' investments. In connection with any such activities described above, the Related Parties may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to be included as investments by the Company and/or Managed CLOs.  Other than with respect to new issue Highland CLOs as described below, the Related Parties will not be required to offer such securities or investments to the Company or Managed CLOs or provide notice of such activities to the Company or Managed CLOs.  In addition, in providing services under the Portfolio Management Agreement and the CLO Management Agreements, the Portfolio Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.  Furthermore, in connection with actions taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its other clients, the Portfolio Manager may take, or be required to take, actions which adversely affect the interests of the Company and/or Managed CLOs.  Except as otherwise set forth herein, including with respect to Qualifying CLOs, Designated CLO Resets, Designated CLO

004604

Refinancings and the NexBank Facility and any Permitted NexBank Credit Facility Amendments, the consent of the Advisory Board will be required with respect to transactions with any Related Party.

The Related Parties invested and may continue to make investments that would also be appropriate for the Company, the Portfolio Manager, the Management Companies and/or the Managed CLOs. Such investments may be different from those recommended to the Company or made on behalf of the Managed CLOs or the Management Companies. Neither the Portfolio Manager nor any Related Entity has any duty, in making or maintaining such investments, to act in a way that is favorable to the Company, the Management Companies and/or the Managed CLOs or to offer any such opportunity to the Company, other than with respect to new issue Highland CLOs as described below, or the Managed CLOs. The investment policies, fee arrangements and other circumstances applicable to such other parties may vary from those applicable to the Company, the Portfolio Manager, Highland, Acis, the Management Companies and the Managed CLOs. The Portfolio Manager and/or any Related Entity may also provide advisory or other services for a customary fee to issuers or obligors whose debt obligations or other securities are held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and neither the Shareholders nor the Company shall have any right to such fees. The Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may also have ongoing relationships with, render services to or engage in transactions with other clients, including other issuers of collateralized loan obligations and collateralized debt obligations, who invest in assets of a similar nature to those of the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and with companies whose securities or loans are acquired by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and may own equity or debt securities issued by obligors of debt held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs. In connection with the foregoing activities, the Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to advise the Company or the Management Companies or effect a transaction for Managed CLOs, and the Company's, the Management Companies' and/or the Managed CLOs' investments may be constrained as a consequence of Highland's or Acis' inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Company, the Management Companies and/or the Managed CLOs. In addition, officers or affiliates of the Portfolio Manager, Highland, Acis and/or Related Parties may possess information relating to obligors of debt held by the Company, the Management Companies and/or the Managed CLOs that is not known to the individuals at the Portfolio Manager responsible for monitoring such investments and performing the other obligations under the Portfolio Management Agreement or CLO Management Agreements.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts. For the avoidance of doubt, the Portfolio Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time as described below. The Portfolio Manager, Highland, Acis and their affiliates may, from time to time, be presented with investment opportunities, other than with respect to new issue Highland CLOs during the Investment Period, that fall within the investment objectives of the Company, the Management Companies and/or the Managed CLOs and other clients, funds or other investment accounts managed by Highland, Acis or their affiliates, and in such circumstances, the Portfolio Manager, Highland, Acis and their affiliates expect to allocate such opportunities among the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts on a basis that the Portfolio Manager, Highland, Acis and their affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other investments of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by the Portfolio Manager, Highland, Acis

004605

and their affiliates in good faith. Subject to the Company's priority allocation with respect to new issue Highland CLOs, the Portfolio Manager, will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act. The Portfolio Manager, will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Company, the Management Companies and/or the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company, the Management Companies and/or any of the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

Although the professional staff of the Portfolio Manager will devote as much time to the Company as the Portfolio Manager deems appropriate to perform its duties in accordance with the Portfolio Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Company and the Portfolio Manager's other accounts.

The directors, officers, personnel, employees and agents of the Portfolio Manager and its Related Parties may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Company or entities that operate in the same or a related line of business as the Company or the Management Companies, or of other clients managed by the Portfolio Manager or its affiliates, or for any obligor or issuer in respect of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs, or any affiliate thereof, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Company, such other entities, or any obligor or issuer (or any affiliate thereof) in respect of any of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs pursuant to their respective governing instruments, and neither the Company, The applicable Management Company nor the Managed CLOs shall have the right to any such fees.

As further described below, the Portfolio Manager and its Related Parties may effect client cross-transactions where the Portfolio Manager advises the Company or a Management Company, or causes a Managed CLO, to effect a transaction between the Company, the applicable Management Company or such Managed CLO, as applicable, and another client advised by the Portfolio Manager or any of its affiliates. The Portfolio Manager, may engage in a client cross-transaction involving the Company, the Management Companies and/or Managed CLOs any time that the Portfolio Manager believes such transaction to be fair to the Company, the applicable Management Company and/or the Managed CLOs, as applicable, and such other client. By purchasing Shares of the Company, a Shareholder is deemed to have consented to such client cross-transactions between the Company, the applicable Management Company and another client of the Portfolio Manager or one of its Related Parties.

As further described below, the Portfolio Manager may effect principal transactions where Highland advises the Company, or causes a Managed CLO, to make and/or hold an investment, including an investment in securities, in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, in each case in accordance with applicable law, which may include the Portfolio Manager obtaining the consent and approval of the Advisory Board of the Company prior to engaging in any such principal transaction between the Company and the Portfolio Manager or its affiliates. By purchasing Shares of the Company, a Shareholder is deemed to have consented to such procedures relating to principal transactions between the Company and the Portfolio Manager or its Related Entities, subject to consent of the Advisory Board. In addition, in the event a Managed CLO engages in a principal trade, consent of the client may consist of consent of the board of directors of such Managed CLO (or certain professionals contracted by the board of directors, to the extent relevant), and none of the Company or its Shareholders will have any additional consent rights with respect to such transaction.

The Portfolio Manager may advise the Company, or direct the Managed CLOs, to acquire or dispose of investments in cross trades between the Company or the Managed CLOs, as applicable, and other clients of the Portfolio Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Company and/or the Managed CLOs may invest in securities of obligors or issuers in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Company and/or Managed CLOs may enhance the profitability of the Portfolio Manager's own investments in such companies. Moreover, the Company and Managed CLOs may invest in assets originated by the Portfolio Manager or its affiliates. In each such case, the Portfolio Manager and such affiliates may have a potentially conflicting division

004606

of loyalties and responsibilities regarding the Company or the Managed CLOs, as applicable, and the other parties to such trade.  Under certain circumstances, the Portfolio Manager and its affiliates may determine that it is appropriate to mitigate such conflicts by selling an investment at a fair value that has been calculated pursuant to the Portfolio Manager's valuation procedures to another client managed or advised by the Portfolio Manager or such affiliates.  In addition, the Portfolio Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Company or a Managed CLO, as applicable, and for the other party to the transaction, to the extent permitted under applicable law.   The Portfolio Manager may obtain the Company's written consent as provided herein if any such transaction requires the consent of the Company under Section 206(3) of the Investment Advisers Act.

The Portfolio Manager and/or its Related Parties may participate in creditor committees or other committees with respect to the bankruptcy, restructuring or workout of obligors or issuers of debt obligations or securities held by the Company and/or the Managed CLOs.  In such circumstances, the Portfolio Manager may take positions on behalf of itself or Related Parties that are adverse to the interests of the Company or the Managed CLOs in the relevant investment.

The Portfolio Manager and/or its Related Parties may act as an underwriter, arranger or placement or administrative agent, or otherwise participate in the origination, structuring, negotiation, syndication, administration or offering of CLOs or any senior secured loans purchased by the Company.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving CLOs or senior secured loans that are underwritten, originated, arranged or placed by the Portfolio Manager and/or its affiliates and the Company shall not have any right to any such fees.

There is no limitation or restriction on the Portfolio Manager or any of its Related Parties with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons.  This and other future activities of the Portfolio Manager and/or its Related Parties may give rise to additional conflicts of interest.  Such conflicts may relate to obligations that the Portfolio Manager's investment committee, the Portfolio Manager or its affiliates have to other clients.

The members of the Portfolio Manager's investment committee serve or may serve as personnel, officers, directors or principals of entities that operate in the same or a related line of business as the Company, or of other clients managed by the Portfolio Manager or its affiliates.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Company.  The Company may compete with other entities managed by the Portfolio Manager and its affiliates for capital and investment opportunities.

There are generally no ethical screens or information barriers among the Portfolio Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.  If the Portfolio Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Company or a Managed CLO to acquire a particular CLO security, the Portfolio Manager may be prevented from causing the Company or Managed CLO to purchase or sell such asset due to internal restrictions imposed on the Portfolio Manager.   Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Portfolio Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.  Inadvertent trading on material non-public information could have adverse effects on the Portfolio Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Portfolio Manager's ability to perform its portfolio management services to the Company and the Managed CLOs.  In addition, while the Portfolio Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.  In such event, the Portfolio Manager's ability to operate as an integrated platform could also be impaired, which would limit the Portfolio Manager's access to personnel of its affiliates and potentially impair its ability to advise the Company and manage the Managed CLOs' investments.

004607

## RISKS RELATING TO AN INVESTMENT IN THE SHARES

***Shareholders have no right to have their Shares redeemed or repurchased by the Company***

The Company has been established as a closed-ended vehicle.  Accordingly, there is no right or entitlement attaching to the Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

***There is no public market for the Shares, and a market for the Shares may never develop, which could result in Shareholders being unable to monetize their investment.***

The Shares have not been registered under any securities exchange, and, unless so registered, may not be offered or sold except pursuant to an exemption from the applicable securities exchange regulator.  It is not expected that the Shares will be listed on any securities exchange in the future.  The Shares are newly issued securities for which there is no established trading market. In the absence of an active trading market, Shareholders may be unable to resell the Shares at the time and for the price desired or at all. The Company can provide no assurances that the Shares will not subsequently trade below the price at which they are purchased pursuant to this Offering Memorandum.

In connection with the Company filing any registration for any securities exchange, the Company will agree to use commercially reasonable efforts to satisfy the criteria for listing and list and thereafter maintain the listing on such exchange or market so long as it is in the best interests of the Company.  Each market or exchange has initial listing criteria, including criteria related to minimum bid price, public float, market makers, minimum number of round lot holders and board independence requirements that the Company can give no assurance that it will meet.  The Company's inability to list or include the Shares on a securities exchange could affect the ability of Shareholders to sell their Shares subsequent to the declaration of the effectiveness of any registration statement, and consequently adversely affect the value of such Shares.  In such case, Shareholders would find it more difficult to dispose of, or to obtain accurate quotations as to the market value of, the Shares.  In addition, the Company would have more difficulty attracting the attention of market analysts to cover it in their research.  If the Shares are approved for listing or inclusion on a securities exchange, the Company will have no prior reporting history, and thus there is no way to determine the prices or volumes at which the Shares will trade.  The Company can give no assurances as to the development or liquidity of any trading market for the Shares.  Shareholders may not be able to resell their Shares at or near their original acquisition price, or at any price.

***In the event a market for the Shares does develop, the Shares may trade at a discount to the Net Asset Value per Share and Shareholders may be unable to realise their Shares at the Net Asset Value per Share or at any other price***

The Shares may trade at a discount to the Net Asset Value per Share for a variety of reasons, including due to market or economic conditions or to the extent investors undervalue the Company.

Subject to the Companies Law, under its Articles, the Company may issue additional securities, including Shares, for any purpose.  Any additional issuances by the Company, or the possibility of such issue, may cause the price of the Shares to decline.

***The existence of a liquid market in the Shares cannot be guaranteed***

The Shares may be admitted to a securities exchange at some point in the future, however there can be no guarantee that a liquid market in the Shares will develop or be sustained or that the Shares will trade at prices close to the Net Asset Value per Share.  The number of Shares to be issued pursuant to the Placing is not yet known, and there may be a limited number of holders of Shares.  Limited numbers and/or holders of Shares may mean that there is limited liquidity in such Shares which may affect:  (i) a Shareholder's ability to realise some or all of their investment; (ii) the price at which such Shareholder can effect such realisation; and/or (iii) the price at which Shares trade in the secondary market.  Accordingly, Shareholders may be unable to realise their investment at Net Asset Value per Share or at all.

004608

*The Shares will be subject to purchase and transfer restrictions in the Placing and in secondary transactions in the future*

The Company intends to restrict the ownership and holding of its Shares so that none of its assets will constitute "plan assets" under the U.S. Plan Assets Regulations.  The Company intends to impose such restrictions based on deemed representations in the case of a subscription of Shares.  If the Company's assets were deemed to be "plan assets" of any plan subject to Title I of ERISA or Section 4975 of the U.S. Tax Code ("**U.S. Plan**"), pursuant to Section 3(42) of ERISA and U.S. Department of Labor regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 as amended by Section 3(42) of ERISA (collectively, the "**U.S. Plan Asset Regulations**") then:   (i) the prudence and other fiduciary responsibility standards of ERISA would apply to investments made by the Company; and (ii) certain transactions that the Company or a subsidiary of the Company may enter into, or may have entered into, in the ordinary course of business might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA or Section 4975 of the U.S. Tax Code and might have to be rescinded.  Governmental plans and certain church plans, while not subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, may nevertheless be subject to other State, local or other laws or regulations that would have the same effect as the U.S. Plan Asset Regulations so as to cause the underlying assets of the Company to be treated as assets of an investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company (or other persons responsible for the investment and operation of the Company assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code.

Each purchaser and subsequent transferee of the Shares will be deemed to represent and warrant that no portion of the assets used to acquire or hold its interest in the Shares constitutes or will constitute the assets of any U.S. Plan.  The Articles of the Company provide that the Board of Directors may refuse to register a transfer of Shares to any person they believe to be a Non-Qualified Holder or a U.S. Plan investor.  If any Shares are owned directly or beneficially by a person believed by the Board of Directors to be a Non-Qualified Holder or a U.S. Plan investor, the Board of Directors may give notice to such person requiring him either (i) to provide the Board of Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Board of Directors that such person is not a Non-Qualified Holder or a U.S. Plan investor, or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Board of Directors with satisfactory evidence of such sale or transfer.  Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

In addition, the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.  For more information, refer to "Risks relating to regulation and taxation - The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules" in this section of this Offering Memorandum.

For more information on purchase and transfer restrictions, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

## RISKS RELATING TO REGULATION AND TAXATION

*Changes in law or regulations, or a failure to comply with any laws or regulations, may adversely affect the respective businesses, investments and performance of the Company*

The Company is subject to laws and regulations enacted by national and local governments.

On June 23, 2016, in a public referendum, the United Kingdom voted to leave the European Union. On March 29, 2017, the United Kingdom triggered Article 50 of the Treaty on European Union ("**Article 50**") by formally notifying the European Council of the United Kingdom's intention to withdraw from the European Union.  In accordance with Article 50, the European Union shall negotiate and conclude a withdrawal agreement with the United Kingdom within 2 years of the United Kingdom triggering Article 50, although the European Council in agreement with the United Kingdom may decide to extend this period.  The United Kingdom's decision to leave the European Union has caused,

004609

and is anticipated to continue to cause, significant new uncertainties and instability in both domestic and global financial markets. These uncertainties could have a material adverse effect on the various obligors' ability to make payments due under the assets within the CLO portfolios, which in turn could have a material adverse effect on the Company's financial condition, results of operations and/or its NAV.

The Company is subject to, and is required to comply with, certain regulatory requirements that are applicable to registered investment schemes which are domiciled in Guernsey.

The laws and regulations affecting the Company are evolving and any changes in such laws and regulations may have an adverse effect on the ability of the Company to carry on its business.  Any such changes may also have an adverse effect on the ability of the Company to pursue the investment policies, and may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Certain income of the Company may be subject to U.S. withholding tax, and changes in tax law may adversely affect the Company***

The Company intends to make loan investments in the United States that will qualify for the "portfolio interest exemption" from U.S. withholding on interest. However, if the Company is not eligible for the portfolio interest exemption with respect to a loan paying U.S.-source interest, interest payments to the Company could be subject to a 30% withholding tax. In addition, there can be no assurance that, as a result of any change in any applicable law, rule or regulation or interpretation thereof, U.S.-source interest or other payments on the loans that were not subject to withholding tax when purchased will not in the future become subject to U.S. or other withholding tax or that the amount or rate of withholding tax to which a payment on a loan is subject might not increase.

In addition, if the Company acquires equity interests in U.S. entities, either as a result of a direct purchase or as a result of loans previously purchased by the Company being converted into equity interests, the Company could be subject to 30% U.S. withholding tax on any U.S.-source dividends. If the Company is deemed to be engaged in a trade or business in the United States as a result of its ownership of an equity interest in an entity treated as fiscally transparent in the United States or certain other investments, the Company could be subject to a tax on net income with respect to income from such equity interest or other investments, as well as a "branch profits" tax, with a combined U.S. tax rate with respect to such equity interest or other investments of approximately 54%.

If the Company is subject to U.S. withholding tax on payments from investments or is subject to U.S. net income tax, such tax would reduce the amounts available to make payments on the Placing Shares.  The extent to which other source country withholding taxes may apply to the Issuer's income will depend on the actual composition of its assets.

***The European Directive on Alternative Investment Fund Managers may impair marketing of the Shares to EU investors***

The AIFMD was transposed into the national legislation of a number of EEA member states on 22 July 2013. The Company will be considered an Alternative Investment Fund ("**AIF**") for the purposes of AIFMD.  AIFMD will allow the continued marketing of AIFs, such as the Company, under national private placement regimes where EEA member states choose to implement AIFMD national private placement regimes.  In relation to the Company, such marketing will be subject to registration under the AIFMD in those EU member states where there will be marketing of the Shares to investors.   To permit marketing, appropriate cooperation agreements must be in place between the supervisory authorities of the relevant EEA member states in which the Shares are being marketed and the jurisdiction of both the Company and the Portfolio Manager, as the AIFM of the Company.

Accordingly, the ability of the Portfolio Manager to market the Shares in the EEA will depend on the relevant EEA state permitting the marketing of non-EEA managed funds, the continuing status of Guernsey and the USA in relation to AIFMD and the Portfolio Manager's willingness to comply with the relevant provisions of AIFMD and the other requirements of the national private placement regimes of individual EEA states, the requirements of which may restrict the Company's ability to raise additional capital from the issue of new Shares in one or more EEA state.

Additionally, it should be noted that what is and what is not "marketing" under AIFMD can vary between EEA member states, in some cases covering most promotional activity in respect of a fund and in some cases covering only material that is sufficiently specific or precise in respect of information relating to the terms of the fund that it could

004610

alone form the basis of a decision to invest in the fund. This in turn means that the type of promotional activity that will require registration under AIFMD can also vary between EEA member states.

However, what is and what is not "marketing" under AIFMD remains a developing area and regulatory guidance in many EEA member states is limited. It is possible that European Securities and Markets Authority ("**ESMA**") or an EEA national regulator may change its policy approach in the future or that ESMA, the European Commission or another European entity, regulatory or legislative body may have a different interpretation at a later date of what constitutes marketing under AIFMD.

If it was held that certain promotional material in respect of the fund constitutes marketing under AIFMD and was provided to investors in an EEA member state without the Company having been registered in that EEA member state for marketing under AIFMD by the Portfolio Manager, the Portfolio Manager may face regulatory sanctions as a result of non-compliance with AIFMD, and the enforceability of agreements with Shareholders may be affected.

ESMA has also consulted on the possible extension of the passport for marketing and managing under AIFMD to non-EEA based managers (the marketing and managing passports are currently only available to EEA based AIFMs) and delivered advice to the European Commission on 18 July 2016 on whether, amongst other things, the passporting regime should be extended to the management and/or marketing of AIFs by non-EEA based managers.

This advice regarding extending the passport to US domiciled AIFMs was qualified, meaning it is currently not clear if the passporting regime will be extended to the Portfolio Manager as an AIFM, nor is it clear that the European Commission consider that this advice contains a positive assessment of a sufficient number of non-EEA countries to extend the passport to these countries. If the European Commission were to consider there were sufficient grounds to extend the passport and adopted the requisite delegated act extending the passport, the national private placement regimes which are currently applicable to non-EEA AIFMs and non-EEA AIFs in EEA member states will temporarily continue to co-exist with this new non-EEA passport (the "**Third Country Passport**").

However, three years after the adoption of this delegated act, ESMA is required to issue an opinion on the functioning of the Third Country Passport and advise on the potential termination of the current national private placement regimes. If the national private placement regimes were then abolished, an AIF could not be marketed into Europe by a non-EEA AIFM except by way of the Third Country Passport, meaning in this scenario the Portfolio Manager would not be able to market the Shares in the Company in the EEA.

Any regulatory changes arising from implementation of the AIFMD (or otherwise) that limit the Company's ability to carry on its business or to market future issues of its Shares may materially adversely affect the Company's ability to carry out its investment policy successfully and to achieve its investment objective, which in turn may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Final regulations implementing the "Volcker Rule" in the United States of America were issued in December 2013 and became effective by operation of law on 1 April 2014, subject to a conformance period. The final Volcker Rule regulations revised the November 2011 proposed regulations and include certain changes to the treatment of foreign funds and non-U.S. bank investors. If the Volcker Rule applies to an investor's ownership of Shares, the investor may be forced to sell its shares, or the continued ownership of such shares may be subject to certain restrictions.***

On 21 July 2010, U.S. President Barack Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act and certain provisions therein known as the "Volcker Rule." On 10 December 2013, the final Volcker Rule regulations (the "**Final Regulations**") were issued by U.S. regulators. The Final Regulations are effective from 1 April 2014, subject to a conformance period ending on 21 July 2015 (which may be extended). The Volcker Rule generally restricts certain non-U.S. banks and affiliated financial firms, collectively identified as "banking entities," from investing in and sponsoring "covered funds." In the event that a non-U.S. bank is deemed to be a "banking entity" and the Company is deemed to be a "covered fund" for purposes of the Volcker Rule, the non-U.S. bank's ownership of the Shares may be subject to investment restrictions. If so, the non-U.S. bank may be required to divest the Shares by the end of the conformance period. Depending on market conditions and other factors, if an investor is required to liquidate its investment in the Shares during the conformance period, it may suffer a loss from the price at which it purchased the Shares.

004611

*If the Company becomes subject to tax on a net income basis in any tax jurisdiction, including Guernsey or the United Kingdom, the Company's financial condition and prospects could be materially and adversely affected*

The Company intends to conduct its affairs so that it will not be treated as UK resident for taxation purposes, or as having a permanent establishment or otherwise being engaged in a trade or business, in the UK.  The Company intends that it will not be subject to tax on a net income basis in any country.  There can be no assurance, however, that the net income of the Company will not become subject to income tax in one or more countries, including Guernsey and the United Kingdom, as a result of unanticipated activities performed by the Company, adverse developments or changes in law, contrary conclusions by the relevant tax authorities, changes in the Directors' personal circumstances or management errors, or other causes.  The imposition of any such unanticipated net income taxes could materially reduce the post-tax returns available for distributions on the Shares, and consequently may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### Changes in taxation legislation, or the rate of taxation, may adversely affect the Company

Any change in the tax status of the Company, or in taxation legislation or practice in Guernsey, the United Kingdom or elsewhere could affect the value of the investments held by the Company or the Company's ability to achieve its investment objectives or alter the post-tax returns to Shareholders.  Statements in this Offering Memorandum concerning the taxation of Shareholders and/or the Company are based upon current Guernsey and United Kingdom law and published practice as at the date of this Offering Memorandum, which law and practice is, in principle, subject to change (potentially with retrospective effect) that could adversely affect the ability of the Company to meet its investment objective and which could adversely affect the taxation of Shareholders and/or the Company.

Potential investors are urged to consult their tax advisers with respect to their particular tax situations and the tax effect of an investment in the Company.

### Possible Financial Transaction Tax

On 14 February 2013, the European Commission issued proposals, including a draft Directive (the "Commission's Proposal") for a financial transaction tax ("**FTT**") to be adopted in certain participating EU member states (including Belgium, Germany, Estonia, Greece, Spain, France, Italy, Austria, Portugal, Slovenia and Slovakia (the "Participating Member States"), although Estonia has since stated that it will not participate). If the Commission's Proposal was adopted in its current form, the FTT would be a tax primarily on "financial institutions" in relation to "financial transactions" (which would include the conclusion or modification of derivative contracts and the purchase and sale of financial instruments).

Under the Commission's Proposal, the FTT could apply in certain circumstances to persons both within and outside of the Participating Member States.  Generally, it would apply where at least one party is a financial institution, and at least one party is established in a Participating Member State. A financial institution may be, or be deemed to be, "established" in a Participating Member State in a broad range of circumstances, including (a) by transacting with a person established in a Participating Member State or (b) where the financial instrument which is subject to the financial transaction is issued in a Participating Member State.

The FTT proposal remains subject to negotiation between the Participating Member States.  It may therefore be altered prior to implementation, the timing of which remains unclear.  Additional EU member states may decide to participate.

In addition to the FTT, certain countries (such as France and Italy) have unilaterally introduced or announced their own financial transaction tax, and other countries may follow suit. There is therefore a risk that a financial transaction tax may be incurred on certain transactions entered into by the Company. Any such financial transaction tax may adversely affect the cost of investment or hedging strategies pursued by the Company as well as the value and liquidity of certain assets within the Company, such as securities, derivatives and structured finance securities.

### Different regulatory, tax or other treatment of the Company or the Shares in different jurisdictions, or changes to such treatment in different jurisdictions, may adversely impact shareholders in certain jurisdictions

For regulatory, tax and other purposes, the Company and the Shares may be treated in different ways in different jurisdictions.  For instance, in certain jurisdictions and for certain purposes, the Shares may be treated as more akin to

004612

holding units in a collective investment scheme. Furthermore, in certain jurisdictions, the treatment of the Company and/or the Shares may be uncertain or subject to change, or it may differ depending on the availability of certain information or disclosure by the Company of that information. The Company may be subject, therefore, to financially and logistically onerous requirements to disclose any or all of such information or to prepare or disclose such information in a form or manner which satisfies the regulatory, tax or other authorities in certain jurisdictions. The Company may elect not to disclose such information or prepare such information in a form which satisfies such authorities. Therefore Shareholders in such jurisdictions may be unable to satisfy the regulatory requirements to which they are subject.

***The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules***

The Company has not, does not intend to, and may be unable to, become registered in the United States as an investment company under the U.S. Investment Company Act. The U.S. Investment Company Act provides certain protections to U.S. investors and imposes certain restrictions on companies that are registered as investment companies. As the Company is not so registered, and does not intend to so register, none of these protections or restrictions is or will be applicable to the Company. In addition, to avoid being required to register as an investment company under the U.S. Investment Company Act and to avoid violating the U.S. Investment Company Act, the Company has implemented restrictions on the purchase of the Shares by persons who are located in the United States or are U.S. Persons (or are acting for the account or benefit of any U.S. Person). For more information, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in in "*Placing Arrangements*".

***Certain payments to the Company will in the future be subject to 30 per cent withholding tax unless the Company agrees to certain reporting and withholding requirements and certain Shareholders will be required to provide the Company with required information so that the Company may comply with its obligations under FATCA***

Under Sections 1471 through 1474 of the U.S. Internal Revenue Code (commonly referred to as "**FATCA**"), Financial Institutions are required to use enhanced due diligence procedures to identify U.S. persons who have invested in either non-U.S. financial accounts or non-U.S. entities. Pursuant to FATCA, certain payments of (or attributable to) U.S.-source income, and the proceeds of sales of property that give rise to U.S.-source payments, will be subject to 30 per cent withholding tax with effect from 1 July 2014 unless the Company agrees to certain reporting and withholding requirements.

The United States and Guernsey have entered into an Intergovernmental Agreement ("**US IGA**") to implement FATCA. Under the terms of the US IGA, the Company may be obliged to comply with the provisions of FATCA as enacted by the Guernsey legislation implementing the US IGA (the "**Guernsey IGA Legislation**"), rather than directly complying with the U.S. Treasury Regulations implementing FATCA. Under the terms of the US IGA, Guernsey resident entities that comply with the requirements of the Guernsey IGA Legislation will be treated as compliant with FATCA and, as a result, will not be subject to withholding tax under FATCA ("**FATCA Withholding**") on payments they receive and will not be required to withhold under FATCA on payments they make.

The Company expects that it will be considered to be a Guernsey resident financial institution and therefore will be required to comply with the requirements of the Guernsey IGA Legislation.

Under the Guernsey IGA Legislation, the Company will be required to register with the United States Internal Revenue Service ("**IRS**") and report to the Guernsey President of the Policy & Resources Committee certain holdings by and payments made to certain U.S. investors in the Company, as well as to non-U.S. financial institutions that do not comply with the terms of the Guernsey IGA Legislation. Under the terms of the US IGA, such information will be onward reported by the Guernsey President of the Policy & Resources Committee to the United States under the general information exchange provisions of the United States-Guernsey Agreement for the Exchange of Information Relating to Taxes.

Further, even if the Company is not characterised under FATCA as a Financial Institution, it nevertheless may become subject to such 30 per cent withholding tax on certain U.S.-source payments to it unless it either provides information to withholding agents with respect to its U.S. Controlling Persons or certifies that it has no such U.S. Controlling Persons.

004613

As a result, Shareholders may be required to provide any information that the Company determines necessary in order to allow the Company to satisfy its obligations under FATCA.

Additional intergovernmental agreements similar to the US IGA have been entered into or are under discussion by other jurisdictions with the United States. Different rules than those described above may apply depending on whether a payee is resident in a jurisdiction that has entered into an intergovernmental agreement to implement FATCA.

In addition to the US IGA, Guernsey and the United Kingdom have entered into an inter-governmental agreement ("**UK IGA**") for the implementation of information exchange arrangements, based on FATCA, whereby relevant financial information held in Guernsey in respect of a person or entity who is resident in the UK for tax purposes will be reported to the Guernsey President of the Policy & Resources Committee for onward reporting to the UK's HM Revenue and Customs. Under the UK IGA, the Company may be required to provide information to the Guernsey authorities about investors and their interests in the Company in order to fully discharge its reporting obligations and, in the event of any failure or inability to comply with the proposed arrangements, may suffer a financial penalty or other sanction under Guernsey law.

The scope and application of FATCA Withholding and information reporting pursuant to the terms of FATCA and the IGAs are subject to review by the United States, the United Kingdom, Guernsey and other IGA governments, and the rules may change. Although the UK IGA and US IGA have been ratified by Guernsey's parliament, guidance published to date has been in draft format only and therefore, while the Company intends to comply with applicable law, it cannot be predicted at this time what the full impact on the Company and the Company's reporting responsibilities pursuant to the UK IGA and US IGA will be. Shareholders should consult with their own tax advisors regarding the application of FATCA to their particular circumstances.

### OECD's Base Erosion Profit Shifting ("*BEPS*") Action Points

In 2013, the OECD published its report on Addressing Base Erosion and Profit Shifting ("**BEPS**") and its Action Plan on BEPS. The aim of the report and Action Plan was to address and reduce aggressive international tax planning. BEPS remains an ongoing project. On 5 October 2015, the OECD published its final reports, analyses and sets of recommendations (deliverables) with a view to implementing internationally agreed and binding rules which could result in material changes to relevant tax legislation of participating OECD countries. The final package of deliverables was subsequently approved by the G20 Finance Ministers on 8 October 2015. On 24 November 2016, the OECD announced that more than 100 jurisdictions concluded negotiations on a multilateral instrument that will amend their respective tax treaties (more than 2,000 tax treaties worldwide) in order to implement the tax treaty-related BEPS recommendations, although the effective date of such multilateral instrument remains uncertain. A first high level signing ceremony took place on 7 June 2017 where 68 countries signed the multilateral instrument. It is currently anticipated that the multilateral instrument will enter into force after five countries have ratified it. The multilateral instrument will then enter into effect for a specific tax treaty after all parties to that treaty have ratified the multilateral instrument. The final actions to be implemented in the tax legislation of the countries in which the Company will have investments, in the countries where the Company is domiciled or resident, or changes in tax treaties negotiated by these countries, could adversely affect the returns from the Company to its investors.

004614

## COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY

### COMPANY

Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") was incorporated on 30 March 2015 and registered under the laws of Guernsey (registration number 60120) pursuant to the Companies Law. The Company changed its name on October 27, 2017. The Company is an investment company established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy, including through the Management Companies.

The Company is seeking to raise U.S. $153 million through the Placing to invest in accordance with its investment objective and policy. Applications to an appropriate securities exchange may be made when deemed appropriate by the Company.

Investment in the Company is only suitable for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

### INVESTMENT OBJECTIVE

The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

Highland HCF Advisor, in its capacity as the Portfolio Manager under the Portfolio Management Agreement, will manage the Company's investments. In addition, the Portfolio Manager, Highland, Highland CLO Management, or another affiliate of Highland, in the capacity of the CLO Manager, may also manage Highland CLOs and the Portfolio Manager Highland, Acis, Acis CLO Management, or another affiliate of Acis, in the capacity of the CLO Manager, may also manage Managed CLOs, in each case, pursuant to CLO Management Agreements to be entered into from time to time.

### INVESTMENT POLICY

#### *Overview*

The Company's investment policy is to focus on synergistic investments in the following areas.

#### *Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's, S&P or Fitch. Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S. or European originator subsidiary of the Company. The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other

004615

underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and set forth in "*Summary—Investment Policy—Loan Investments*".

*Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager.  In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements.  As a result, Highland CLO Management, will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially.  In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO to satisfy the Origination Requirements.

*CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Managed CLOs or CLOs managed by other asset managers as set forth in "*Summary—Investment Policy—CLO Notes*".

The Company is currently invested in CLO Income Notes issued by Managed CLOs managed by Highland, Acis and Acis CLO Management. Following the Placing, the Company will invest indirectly through the Management Companies in CLO Notes.

*Act as Risk Retention Provider*

The Company may also invest in, provide loans to, or purchase performance-linked notes from asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. Risk Retention Rules or EU Retention Requirements.

**Allocation of Investment Opportunities**

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts as set forth in "*Summary—Investment Policy—Allocation of Investment Opportunities*".

## INVESTMENT RESTRICTIONS

The Company will, at all times, invest and manage its assets in a way which is consistent with its object of spreading investment risk and in accordance with the investment policy set out in "*—Investment Policy*".

In the event of any breach of the Company's investment policy or of the investment restrictions applicable to the Company, Shareholders will be informed of the actions to be taken by the Company (at the time of such a breach) by an announcement issued by the Administrator.

During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs as set forth in "*Summary—Investment Restrictions*"; provided that, if the Portfolio Manager has satisfied the RP Condition, the consent of the Advisory Board to invest in any

Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in "resets" with respect to the Designated CLO Resets and refinancings with respect to the Designated CLO Refinancings, each as set forth in "*Summary— Investment Restrictions*".

The Company shall not invest in the CLO Income Notes of a new-issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

## BORROWING

Subject to the limitations set forth in "*Summary-Borrowing*", it is expected that the Company will have access to one or more committed credit facilities.  Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities.  It is expected that the Company will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and other assets.  In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

## CHANGES TO INVESTMENT OBJECTIVE AND POLICY

Any material change to the investment objective and policy of the Company would be made only with the approval of Shareholders.

## INVESTMENT STRATEGY

Whether the senior secured loans or other assets are held directly by the Company (with respect to senior secured loans for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or indirectly via CLO Notes or its investment in the applicable Management Company it is the Company's intention that, in any case, the portfolios will be actively managed (by the Portfolio Manager, Highland, Acis, the applicable Management Company, an asset manager subsidiary or the applicable CLO Manager, as the case may be) to minimise default risk and potential loss through comprehensive credit analysis performed by the Portfolio Manager, Highland, Acis, the applicable Management Company or the applicable CLO Manager (as applicable).

Whilst the intention is to pursue an active, non-benchmark total return strategy, Highland HCF Advisor as the Company's Portfolio Manager will be cognisant of the positioning of the loan portfolios against relevant indices. Accordingly, Highland HCF Advisor will track the returns and volatility of such indices, while seeking to outperform them on a consistent basis.  In-depth, fundamental credit research dictates name selection and sector over-weights/under-weights relative to the benchmark, backstopped by constant portfolio monitoring and risk oversight. The Portfolio Manager will typically look to diversify the Company's portfolios to avoid the risk that any one obligor or industry will adversely impact overall returns.  The investment strategy also places an emphasis on loan portfolio liquidity to ensure that if the Company's credit outlook changes, it is free to respond quickly and effectively to reduce or mitigate risk in its portfolio.  The Portfolio Manager believes this investment strategy will be successful in the future as a result of its emphasis on risk management, capital preservation and fundamental credit research.  The Portfolio Manager believes the best way to control and mitigate risk is by remaining disciplined in market cycles, by making careful credit decisions and maintaining adequate diversification.

### Leverage and Expected Returns

It is anticipated that any borrowing for the purpose of investing directly in senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) will be in the form of a term Warehouse Loan Facility, however the Company has entered into the NexBank Credit Facility and may enter into any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps, repurchase agreements or other facilities to facilitate the acquisition or financing of loans.  Loans purchased using such borrowings will typically be held for no more than 12 months before being sold to a Highland

004617

CLO.  Except in relation to the CLO Retention Notes it holds, the Company may enter into hedging and derivatives transactions pursuant to its investment activities, for the purposes of efficient portfolio management.

The Company does not currently grant any guarantee under any leveraging arrangement.  The grant of any such guarantee would be disclosed to investors in accordance with the AIFMD Rules.

Any proposed changes to the Company's investment objective and policy will be subject to the process described in the section titled "*Changes to Investment Objective and Policy*" above in this section of the Offering Memorandum.

*Collateral and Asset Re-use Arrangements*

Any collateral and asset re-use arrangements of the Company will vary according to the brokers and/or trading counterparties which it may use (each a "**Trading Counterparty**").

The Company may be required to deliver collateral from time to time to its Trading Counterparties, under the terms of the relevant trading agreements, by posting initial margin and/or variation margin and on a mark-to-market basis. The Company may also deposit collateral as security with a Trading Counterparty.  The treatment of such collateral varies according to the type of transaction and where it is traded. Under such arrangements, the cash, securities and other assets deposited as collateral will generally become the absolute property of the Trading Counterparty, the Trading Counterparty will have the right to use such collateral.

Where collateral is reused by a Trading Counterparty, the Company will have an unsecured right to the return of equivalent assets and such collateral will be at risk in the event of the insolvency of a Trading Counterparty.

Any changes to the right of re-use of collateral will be disclosed to investors in accordance with the AIFMD Rules.

*Current Investments of the Company*

In order to facilitate a timely investment of the proceeds of the Placing and to take advantage of existing opportunities, the Company is currently invested in CLO Income Notes issued by Managed CLOs managed by the Portfolio Manager, Highland, Acis and Acis CLO Management.  The details of such CLOs are set out in "*The Current CLO Portfolio*".

Following the Placing, the Company will acquire further assets and fund origination by Highland CLO Management of new Highland CLOs and it is expected that the Net Placing Proceeds will be substantially invested in CLO Notes upon closing.  The Company may also, from time to time:  (i) hold assets within its portfolio to maturity; (ii) sell assets within its portfolio to the market; or (iii) sell assets within its portfolio to another CLO which is not Managed CLO.

## TARGET RETURN AND DIVIDEND POLICY

*Target Total Return*

Whilst not forming part of the investment objective or policy of the Company, on the basis of current market conditions as at the date of this Offering Memorandum, the Company is targeting an annualised mid-teen total return over the medium-term, once the Net Placing Proceeds are substantially invested (through the Company) in CLO Notes (the "**Target Total Return**").  The Company intends to seek to deliver this return through a combination of dividend payments and capital appreciation.

*Target Dividend Yield and Policy*

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter.

During the Investment Period, on each Quarterly Dividend Date, beginning May 15, 2018, the Company will target the Target Dividend.  During the Investment Period, excess cash or interest from the portfolio will be reinvested by the Company with the objective of growing the NAV.

004618

Following the Investment Period, excess cash, interest and proceeds from the realization of portfolio investments after satisfaction of all expenses, debts, liabilities and obligations of the Company will be distributed by the Company to the Shareholders as a dividend on the Quarterly Dividend Date in accordance with the Distribution Priority as set forth in "*Summary-Dividend Policy*".

To the extent the Company does not have available funds on hand to meet the Target Dividend with respect to any Quarterly Payment Date, the Board of Directors may suspend dividends if, in consultation with the Portfolio Manager, it determines that a sale of assets to produce proceeds to meet the Target Dividend would not be in the best interests of the Company and/or would not produce a sale price reflective of the value of the assets.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

The actual dividend generated by the Company in pursuing its investment objective will, however, depend on a wide range of factors including, but not limited to, general economic and market conditions, fluctuations in currency exchange rates, prevailing interest rates and credit spreads, the terms of the investments made by the Company and the risks highlighted in the "*Risk Factors*" section of this Offering Memorandum. Dividend payments may be suspended by Board of Directors in its absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The Target Total Return and the Target Dividend should not be taken as an indication of the Company's expected future performance or results. The Target Total Return and the Target Dividend are targets only and there is no guarantee that they can or will be achieved and should not be seen as an indication of the Company's expected or actual return. Target returns are hypothetical and are neither guarantees nor predictions or projections of future performance. Actual events and conditions may differ materially from the assumptions used to establish the Target Total Return and Target Dividend. Accordingly, investors should not place any reliance on the Target Total Return or the Target Dividend in deciding whether to invest in Shares.

Furthermore, the future performance of the Company may be materially adversely affected by the risks discussed in the section of this Offering Memorandum entitled "*Risk Factors*".

## FURTHER ISSUES OF SHARES

The Directors will have authority to allot further Shares in the share capital of the Company following the Placing subject to the subscription and transfer agreement. Further issues of Shares beyond the issuances contemplated in the subscription and transfer agreement would only be made subject to consent of the Advisory Board, as described in "*Summary—Advisory Board*" if the Directors determine such issues to be necessary to protect the Company, consistent with the Board's duties to the Company, and in the best interests of Shareholders and the Company as a whole. Relevant factors in making such determination include net asset performance, share price rating and perceived investor demand. In the case of further issues of Shares (or sales of Shares from treasury), except as permitted by the Shareholders, such Shares will only be issued at prices which are not less than the then prevailing Net Asset Value per Share (as estimated by the Directors).

There are no provisions of Guernsey law which confer rights of pre-emption in respect of the allotment of Shares. The Articles, however, contain pre-emption rights in relation to allotments of Shares for cash.

004619

## VALUATION

### *Net Asset Value*

As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13.

### *Publication of Net Asset Value*

The Company intends to publish the Net Asset Value per Share as calculated in accordance with the process described below, on a quarterly basis (within 15 Business Days following the relevant month-end). Notice will be provided either by a website to be created or investors may elect to be contacted by the Administrator by e-mail. The Net Asset Value will be calculated by the Administrator on the basis of the valuation policy established by the Directors from time to time. The Company's initial valuation policy is described below.

### *Valuation of the portfolio*

It is intended that, in accordance with its investment objective and policy set out above, the Company will invest in: (a) senior secured loans and other debt securities on both a direct basis (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and indirect basis, including through the use of leverage via warehouse facilities and Warehouse Loan Facilities, and for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements; (b) CLO Notes, and any other assets held by management subsidiaries; and (c) interests in the Management Companies, and will value such instruments in accordance with the valuation policy established by the Portfolio Manager from time to time.

The Company (meaning for the purposes of the valuation of assets described herein, the Company itself, the Portfolio Manager or the Administrator under the ultimate supervision of the Board) will generally compute the value of the instruments and other assets of the Company as of the close of business on the last day of each fiscal period and on any other date selected by the Board in its sole discretion. In addition, the Company must compute the value of the instruments that are being distributed in-kind as of their date of distribution in accordance with the Company's Memorandum and Articles of Association. In determining the value of the assets of the Company, no value is placed on the goodwill or name of the Company, or the office records, files, statistical data or any similar intangible assets of the Company not normally reflected in the Company's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell instruments pursuant to agreements entered into on or prior to such valuation date.

A copy of the Company's valuation policy is available upon request.

The value of each instrument and other asset of the Company and the net worth of the Company as a whole determined pursuant the Company's Memorandum and Articles of Association are conclusive and binding on all of the members of the Company and all persons claiming through or under them.

### *Suspension of the calculation of Net Asset Value*

The Directors may at any time, but are not limited to, temporarily suspend the calculation of the NAV and NAV per Share during any period if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control, as a result of which, in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the shareholders; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be

004620

accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

Shareholders will be informed by e-mail from the Administrator in the event that the calculation of the NAV per Share is suspended as described above.

## REPORTS AND ACCOUNTS

The accounting period of the Company ends on 31 December, in each year, and the audited annual accounts will be provided to Shareholders within four months of the year end to which they relate.  The Company shall report its results of operations and financial position in U.S. Dollars.  The Company's first accounts were prepared for the period ending 31 December 2015.

The audited annual accounts will also be available at the registered office of the Administrator and the Company.

The financial statements of the Company will be prepared in accordance with GAAP, and the annual accounts will be audited.  The Company's financial statements, which will be the responsibility of its Board, will consist of a statement of comprehensive income, statement of financial position, statement of cash flows, statement of changes in equity, related notes and any additional information that the Board deems appropriate or that is required by applicable law.

It is expected that the CLOs and any Warehouse Loan Facilities established will not be consolidated in the Company's GAAP financial statements, although such assessment will depend on the facts and circumstances.

Any disclosures required to be made to Shareholders pursuant to the AIFMD will be contained either in the Company's periodic reports or communicated to Shareholders in written form.

004621

## THE CURRENT CLO PORTFOLIO

The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts (the "**Current CLO Portfolio**"):

| CLOs: | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |
| Acis CLO 2017-7, Ltd. | $17,850,000.00 |
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

**Valuation of the Current Portfolio**

Information regarding the Current Portfolio and its valuation as of 30 September 2017 has been made available to all Placees free of charge.

Information on the historic performance of the Company is available upon request from the Portfolio Manager. Such information will be updated periodically in accordance with the AIFMD Rules.

004622

# MARKET OPPORTUNITY

## INVESTMENT OPPORTUNITY

The Company intends to invest in CLO Notes of CLOs which are compliant with the U.S. Risk Retention Rules and which may be compliant with the EU Retention Requirements (as defined above) and in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements).  In pursuance of this intention, the Company will invest in each of the Management Companies which will, pursuant to the EU Retention Requirements, need to, amongst other things:  (a) on the closing date of a CLO it establishes, commit to purchase "material net economic interest" equal to at least five per cent of the maximum portfolio principal amount of the assets in the CLO and (b) undertake that, for so long as any securities of the CLO remain outstanding (including any CLO Retention Notes), it will retain its interest in the CLO and will not (except to the extent permitted by the EU Retention Requirements) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO.  This five per cent material net economic interest in the CLO can, amongst other methods, be retained through the holding of a vertical strip of all issued tranches (AAA-rated notes to equity) or a retention holding in the first loss tranche or a combination thereof.  The EU Retention Requirements prohibit many significant European investors from investing in any securitisation which does not comply with them.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements with respect to Highland CLOs, Highland CLO Management will be required to meet the Origination Requirements.

Highland CLO Management may seek to adopt the "originator" model to address the EU Retention Requirements for its CLOs and intends to be treated as a "majority-owned affiliated" of Highland in order to comply with the U.S. Risk Retention Rules.

In addition to its current holdings, the Company may buy floating rate senior secured loans from the primary and secondary market before selling the assets to one or more CLOs which it establishes and for which Highland CLO Management will act as a retention provider, thereby offering investors wholesale access to senior secured loans acquired by the Company and retained CLO Income Notes.

The Portfolio Manager will be responsible for selecting and monitoring the performance of the investments.  The Company's purchase and sale decisions (with certain exceptions) will be taken by Highland HCF Advisors as Portfolio Manager pursuant to the Portfolio Management Agreement.  Further details on the investment process are set out in the section of this Offering Memorandum entitled "*Investment Process*".

004623

## INVESTMENT PROCESS

### *Highland HCF Advisor as Portfolio Manager and CLO Manager*

The Company has entered into a Portfolio Management Agreement with Highland HCF Advisor as the Portfolio Manager.  Pursuant to the Portfolio Management Agreement, Highland HCF Advisor will, at its discretion, select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support services to the Company.  The performance of the Company's portfolio will depend heavily on the skills of Highland HCF Advisor in analyzing, selecting and managing the investments.  The Portfolio Manager has entered into Services Agreements with Highland Capital Management, L.P. under which the Portfolio Manager has agreed to make its investment research and recommendations and back-office support services available to Highland HCF Advisor.  Further details are set out in the section of this offering memorandum entitled "Investment Process" and "Additional Information on the Company".

Based in Dallas, Texas, Highland is an SEC Registered Investment Adviser founded in 1993 that specializes in senior secured bank loans, high yield bonds, structured products and equities.  Highland issued its first CLO in 1996, and Highland and its affiliates have since issued and managed over U.S. $28 billion of CLOs and CDOs consisting of 40 separate vehicles.  As of August 31, 2017, Highland and its affiliates, managed or serviced approximately U.S. $13.4 billion in senior secured bank loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations and high net worth individuals.

The Portfolio Manager, Highland, Acis and/or the Management Companies, may act as CLO Manager(s) in relation to the Managed CLOs pursuant to CLO Management Agreements.  The Portfolio Manager, Highland, Acis and/or the applicable Management Company as CLO Manager is responsible for purchasing and selling of collateral obligations and performing certain other advisory and administrative tasks for and on behalf of the Managed CLOs in each case subject to the provisions of the applicable CLO Management Agreement and any applicable provisions of the indenture.

Highland HCF Advisor is a relying adviser of Highland. Highland is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds. Highland CLO Management is a relying adviser of Highland and will manage Highland CLOs.  Highland CLO Management has the HCLOM Services Agreements in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to the Highland CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by Highland CLO Management, and certain loan services and administrative services.

Acis is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds.  Acis CLO Management is a relying adviser of Acis and currently manages ACIS CLO 2017-7. Acis is an affiliate of Highland and is 100% owned by Highland senior management, and was established by James Dondero and Mark Okada to focus on managing traditional CLOs that invest in liquid, broadly syndicated bank loans and secondary CLO investments. Acis has the ACM Services Agreements in place with Highland, pursuant to which Highland provides investment research and recommendations and operational support to Acis, including services in connection with the Portfolio Manager's recommendations with respect to the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services. Acis CLO Management has the ACLOM Services Agreements in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to the ACIS CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by ACIS CLO Management, and certain loan services and administrative services.  All final credit decisions are made by the Highland individuals referenced below.

### Investment Philosophy

Highland's investment philosophy centers on being investors first. The firm has 25 years of experience investing in alternative strategies through multiple cycles. Highland is a recognized pioneer in bank loan asset management and

004624

CLO issuance. The firm invests a meaningful amount of capital in the portfolios they manage, with market value in excess of $250 million invested alongside our clients, as of September 30, 2017.

Highland's investment philosophy is rooted in a value-driven approach that combines rigorous bottom-up credit underwriting with top-down risk analysis to optimize risk-adjusted performance of portfolios. The firm integrates risk management throughout its investment process and maintains a culture of a high level of compliance. Highland focuses on attractive risk/return arbitrage opportunities where the firm can add value. Highland seeks to generate alpha by implementing checks and balances that allow the firm to identify risks, mitigate volatility, and quickly ascertain and sell losers.

While participating in the larger, liquid bank loan asset class, Highland continues to capture market inefficiencies in this over the counter (OTC) market through mispricings that it identifies via robust fundamental analysis, proactive diligence and monitoring, and nimble trading capabilities. Given the scale of the firm's investment resources, Highland is able to follow and manage investment portfolio names more closely. Highland credit research analysts manage 20-30 credits per analyst versus most peers, who manage 40-50 credits per analyst. In addition, the firm's dedicated trading desk and active dialogue with the Street enable Highland to identify technical dislocations and opportunities. The firm's high conviction investment philosophy and active portfolio management style versus peers have been key drivers of creating alpha for clients over time.

## Investment Monitoring and Risk Management

Risk management is integrated into all levels of the investment process, from research, to portfolio construction and management, to ongoing monitoring. Highland conducts extensive position and portfolio monitoring activities on a daily basis. Portfolio risk is reviewed using internally generated daily, weekly, and monthly reports which measure transaction compliance including investor-mandated metrics such as portfolio concentrations or required test scores, as well as compliance with evolving internal positioning targets. Individual position risk is monitored in a number of ways, including Highland's extensive proprietary intranet system (Highland Online Management Engine or "**HOME**"), which pulls together data from their various data providers (Wall Street Office, LPC, Moody's, S&P, MarkIt, S&P LCD, CSFB Index) to provide a comprehensive portfolio/risk management system. The system allows the CLO team to monitor metrics at any level of aggregation (instrument, issuer, portfolio, fund and across the platform). Additionally, the system is designed to be scalable and with flexibility to enable future data inputs and reporting requirements.

For both Managed CLOs and for the underlying loans, the HOME intranet system allows Highland to monitor portfolios on a real-time, ongoing basis by receiving alerts showing positions with the largest daily/weekly/monthly mark change, as well as alerts on downgrades/upgrades, and when their credit analyst has changed his opinion on a broadly syndicated loan.

## Allocation Policy

Highland and its affiliates may, from time to time, be presented with investment opportunities that fall within the investment objectives of the Company and the Managed CLOs and such other clients, funds or other investment accounts managed by Highland or its affiliates, and in such circumstances, subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs Highland and its affiliates expect to allocate such opportunities among the Company, the Managed CLOs and such other clients, funds or other investment accounts on a basis that Highland and its affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other collateral obligations of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by Highland and its affiliates in good faith. Subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs, Highland will allocate investment opportunities across the entities for which such opportunities are

004625

appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act.  Highland will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Company and the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company and the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

**Biographies of the Highland Key Personnel**

The Portfolio Manager will use the services of the key personnel set forth below, although it may not necessarily continue to use their services during the entire term of the Portfolio Management Agreement.  Of these, Trey Parker and Hunter Covitz (and such other personnel as may be determined from time to time) will be made available by the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement.

Although the persons described above are currently employed by Highland and are engaged in the activities of the Portfolio Manager, such persons may not necessarily continue to be employed by the Portfolio Manager during the entire term of the Portfolio Management Agreement and, if so employed, may not remain engaged in the activities of the Portfolio Manager.

**James Dondero, CFA, CMA**

**Co-Founder, President**

Mr. Dondero is President of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments) and Acis Capital Management, L.P.  Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Under Mr. Dondero's leadership, Highland and Acis have been a pioneer in both developing the collateralized loan obligation (CLO) market and advancing credit-oriented solutions for institutional and retail investors worldwide, including product offerings such as institutional separate accounts, CLOs, hedge funds, private equity funds, mutual funds, REITs, and ETFs. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NXRT), is Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

**Mark Okada, CFA**

**Co-Founder, Co-Chief Investment Officer**

Mr. Okada is Co-Founder of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and Co-Chief Investment Officer of Highland Capital Management, L.P. and Acis Capital Management, L.P.  Responsible for overseeing investment activities for various strategies within Highland and Acis, Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund advisory board.

004626

**Trey Parker**

**Partner, Portfolio Manager and Co-Chief Investment Officer**

Mr. Parker is Partner, Portfolio Manager and Co-Chief Investment Officer at Highland Capital Management, L.P., and serves on the Investment Manager's Investment Committee.  Prior to his current role, Mr. Parker was Head of Credit and covered a number of the industrial verticals, as well as parts of tech, media and telecom for the Investment Manager and worked on the Distressed & Special Situations investment team at Highland.  Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing.  Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries.  Prior to joining Hunt, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal.  While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions.  Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley.  Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute.  Mr. Parker serves on the Board of Directors of Omnimax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Hunter Covitz, CPA**

**Managing Director, Structured Products**

Mr. Covitz is a Managing Director and Portfolio Manager at Highland Capital Management, L.P. He is responsible for all CLOs, separate accounts, and hedge funds managed by Acis Capital Management, L.P., as well as all CLOs managed by Highland. Mr. Covitz serves on Highland's investment committee and leads the structured products investment team. Since joining Highland in 2003, Mr. Covitz has been instrumental in the structuring, warehousing, ramping, and ongoing portfolio management of over 30 Highland and Acis-originated CLOs. Prior to joining Highland, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma. Mr. Covitz is a licensed Certified Public Accountant.

**Neil Desai**

**Portfolio Manager, Structured Products**

Mr. Desai is a Portfolio Manager of Structured Products at Highland Capital Management, L.P. He is focused on sourcing and trading structured products for Highland's CLOs, hedge funds, mutual funds and separate accounts in the primary and secondary markets. Prior to joining Highland in August 2015, Mr. Desai was a Director in Pfizer Inc.'s Treasury organization where he built and ran Pfizer's structured products business. Prior to Pfizer, Mr. Desai spent several years structuring and trading various structured products at Barclays Capital and its spin-off hedge fund, C12 capital. Mr. Desai received both a Bachelor's and Master's degree in Computer Science & Electrical Engineering from MIT.

004627

## COMPANY DIRECTORS AND ADMINISTRATION

### DIRECTORS

The Directors are responsible for managing the business affairs of the Company in accordance with the Articles and have overall responsibility for the Company's activities including the appointment of the service providers. The Directors may delegate certain functions to other parties such as the Administrator. The Directors have appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

The Board comprises two Directors, both of whom are independent of Highland and Acis.

The address of the Directors, all of whom are non-executive, is the registered office of the Company. The Directors of the Company are as follows:

### William Scott (Chairman)

William Scott, a Guernsey resident, acts as an independent non-executive Director of the Company. Mr. Scott also currently serves as independent non-executive director of a number of investment companies and funds. From 2003 to 2004, Mr. Scott worked as Senior Vice President with FRM Investment Management Limited. Previously, Mr. Scott was a director at Rea Brothers (which became part of the Close Brothers group in 1999 and where he was a director of Close Bank Guernsey Limited) (1989-2002) and Assistant Investment Manager with the London Residuary Body Superannuation Scheme (1987-1989). Mr. Scott graduated from the University of Edinburgh in 1982 and is a Chartered Accountant having qualified with Arthur Young (now E&Y) in 1987. Mr. Scott also holds the Securities Institute Diploma and is a Chartered Fellow of the Chartered Institute for Securities & Investment. He is also a Chartered Wealth Manager.

### Heather Bestwick

Heather Bestwick, a Jersey resident, acts as an independent non-executive Director of the Company. She qualified as an English solicitor with Norton Rose, and worked in their London and Athens offices for eight years. In 1999 she joined Walkers in the Cayman Islands, qualifying as a Cayman Islands attorney and Notary Public, and became a partner in 2003. Her practice encompassed hedge funds, private equity, structured finance, secured lending and yacht registration and finance. Ms. Bestwick moved to Jersey in 2007 to become Managing Partner of the Walkers Jersey office. She joined Jersey Finance in 2010 as Technical Director and Deputy Chief Executive, leading the development of finance industry legislation on behalf of industry and liaising with the regulator and government. Ms. Bestwick is a member of the Channel Islands committee of the Association of Investment Companies.

### Management functions of the Board of Directors

As there are no employees of the Company, the Board performs certain management functions, which include the overseeing of the Company's investment policy and investment strategy and the supervision of any delegated responsibilities to third-party service providers, and has the ultimate responsibility for the management and operations of the Company.

The Company has appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

### CORPORATE GOVERNANCE

The Directors are committed to maintaining high standards of corporate governance. Insofar as the Directors believe it to be appropriate and relevant to the Company, it is their intention that the Company should comply with best practice standards for the business carried on by the Company.

On 1 January 2012, the GFSC's Finance Sector Code of Corporate Governance (the "**GFSC Code**") came into effect. The GFSC has stated in the GFSC Code that companies which report against the UK Corporate Governance Code are

004628

deemed to meet the requirements of the GFSC Code, and need take no further action.  Other than as set out below, the Company currently complies with, and will comply with, the GFSC Code.

The Company does not have a senior independent director because all of its Directors are non-executive and the Company has a Chairman.  There are no other instances of non-compliance with the UK Corporate Governance Code by the Company as at the date of this Offering Memorandum.

**Audit Committee**

The Company has established an Audit Committee, which comprises all the Directors.  The Company's Audit Committee meets formally at least twice a year for the purpose, amongst other things, of considering the appointment, independence and remuneration of the Auditor and to review the Company's annual financial reports.  Where audit-related and/or non-audit services are to be provided by the Auditors, full consideration of the financial and other implications on the independence of the Auditors arising from any such engagement will be considered before proceeding.  Heather Bestwick acts as chairman of the Audit Committee.  The responsibilities of the Audit Committee includes monitoring the integrity of the Company's results and financial statements, reviewing reports received from the Administrator on the adequacy and the effectiveness of the Company's internal controls and risk management systems, considering annually whether there is a need for an effectiveness of the Company's internal audit function and assessing the ongoing suitability of the Auditors and ensuring their co-ordination with any internal audit function.

The chairmanship of the Audit Committee and each Director's performance is reviewed annually by the Chairman and the performance of the Chairman is assessed by the other Directors.

**Advisory Board**

The Company has established an Advisory Board, which composed of individuals who shall be representatives of certain Shareholders.  See "*Summary—Advisory Board*".

**PORTFOLIO MANAGER**

Highland HCF Advisor will act as Portfolio Manager to the Company (pursuant to the Portfolio Management Agreement) and may act (either itself or through an affiliate) as the CLO Manager to Managed CLOs.

Pursuant to the Portfolio Management Agreement, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and be responsible for the business decisions and carry on the day-to-day management of the Company's business and implementation of its investment objective and policy.

*Highland Fees*

Highland HCF Advisor will receive, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder as described below, together with any irrecoverable VAT arising on such costs and expenses.  Except as provided below, the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent ("**Overhead**") without reimbursement by the Company.

The Company shall pay or reimburse the Portfolio Manager and its affiliates for only for reasonable third party costs and expenses related to the services hereunder, including, but not limited to investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, actual out-of-pocket professional fees relating to, trustee, administration, tax, accounting, legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in connection with the Company's compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes imposed upon the Company (including, but not limited to, any

004629

irrecoverable VAT arising on such costs and expenses), fees relating to valuing the financial instruments, extraordinary expenses and the Company's indemnification obligations (including those incurred in connection with indemnifying indemnified persons, including advancing such amounts) (collectively, the "**Operating Expenses**"). In the event any fees or expenses are for services used by, or attributable to, other persons advised by Highland HCF Advisor or its affiliates, including, but not limited to, any fees or expenses for software or subscription-based services, the Company shall only reimburse the Portfolio Manager for its pro rata share of such expenses, as determined by the Portfolio Manager in good faith.

For the avoidance of doubt, (i) the cost of all third party expenses incurred by the Portfolio Manager in connection with the Portfolio Management Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any services provider, the Company shall reimburse the Portfolio Manager (or the relevant services provider, as applicable) for such expenses so long as such expenses are determined on an arm's length basis.

The Portfolio Manager will also receive distributions pursuant to the Distribution Priority following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company and the Shareholders have receive a cumulative rate of return of 8.0% per annum, compounded annually.  See "*Summary—Dividend Policy*".

Further details regarding the Portfolio Manager and Highland are set out in the section of this Offering Memorandum entitled "*Investment Process*".  Further details regarding the Portfolio Management Agreement are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*".

## CLO MANAGER

In addition, the Portfolio Manager, Highland, Acis and/or the Management Companies (or one of their affiliates), as CLO Manager, may also manage Managed CLOs pursuant to management agreements ("**CLO Management Agreements**") to be entered into from time to time.  The applicable CLO Manager will receive customary fees, in consideration for its services as the CLO Manager, from each of the Managed CLOs it manages.

## ADMINISTRATOR

State Street (Guernsey) Limited has been appointed as Administrator of the Company pursuant to the Administration Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*").  In such capacity, the Administrator is responsible for the day-to-day administration of the Company (including but not limited to the calculation and publication of the estimated quarterly NAV) and general secretarial functions required by the Companies Law (including but not limited to the maintenance of the Company's accounting and statutory records).  Prospective investors should note that it is not possible for the Administrator to provide any investment advice to investors.

The Administrator is a private limited company, created under the laws of Guernsey on 17 March 2000 whose registered office is situated at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands.  The Administrator is licensed under the POI Law, with the GFSC to carry out controlled investment business. The Administrator's principal business activity is providing securities services.

## CUSTODIAN

State Street Custodial Services (Ireland) Limited has been appointed as Custodian of the Company pursuant to the Custody Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*").  In acting as custodian of the Company's investments, the Custodian shall provide for the safekeeping of certificates of deposit, shares, notes and in general any instrument evidencing the ownership of securities and may take custody of cash and other assets.  Assets will be held in a custody account and registered in the name of the Company or the Custodian, its delegate or a nominee.

004630

The Custodian, which is authorised as an Investment Business Firm under Section 10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.

**FEES AND EXPENSES**

The expenses of the Company related to the Placing are described in "*Summary—Expenses related to the Placing*".

The Company's ongoing expenses are described in "*Summary—Ongoing annual expenses*".

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

**MEETINGS AND REPORTS TO SHAREHOLDERS**

All general meetings of the Company shall be held in Guernsey.

The Company's audited annual report and accounts will be prepared to 31 December, each year, and it is expected that copies will be sent to Shareholders at the end of April each year.  Shareholders will also receive an unaudited interim report each year covering the six months from 1 January to 30 June, expected to be despatched at the end of August each year.

The Company's accounts are drawn up in U.S. Dollars and in compliance with GAAP.

The following information will be disclosed to investors at the same time as the annual financial statements and may be provided at other times by way of a report and/or letter sent to investors by the Portfolio Manager or the Administrator:

(a)    the percentage of the assets of the Company that are subject to special arrangements arising from their illiquid nature;

(b)    any new arrangements for managing the liquidity of the Company;

(c)    the current risk profile of the Company and the risk management systems employed by the Portfolio Manager to manage those risks; and

(d)    the total amount of leverage employed by the Company.

Any changes to the following information will be provided by the Portfolio Manager or the Administrator to investors without undue delay and may be provided by email:

(a)    the maximum level of leverage which the Portfolio Manager may employ on behalf of the Company;

(b)    the right of re-use of collateral or any changes to any guarantee granted under any leveraging arrangement; and

(c)    activation of liquidity management tools.

004631

## PLACING ARRANGEMENTS

**THE PLACING**

The target number of Placing Shares to be issued pursuant to the Placing is an amount of Shares equal to U.S. $153 million.  As at the date of this Offering Memorandum, the actual number of Placing Shares to be issued under the Placing is not known.

The results of the Placing will be released by the Company, including details of the number of Placing Shares allotted (or such other date as may be notified by the Company).  The Directors are under no obligation to issue share certificates unless requested to do so by a Shareholder.  No temporary documents of title will be issued.

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of US $153 million.

Placees will commit under the subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period.  The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.  Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the Adjusted NAV such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on pro rata basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

## TIME AND DATE OF THE OPENING AND CLOSING OF THE OFFER

004632

This subscription is open for a fixed offer period only. This period runs from November 15, 2017, the offer opening date, until 17:00 in Guernsey on the Closing Date.  Only fully completed applications received by this date with cleared funds in the Company's nominated account will be acceptable for investment.

**USE OF PROCEEDS**

The Net Placing Proceeds will depend on the number of Placing Shares issued pursuant to the Placing.  The Portfolio Manager intends to invest the Net Placing Proceeds in accordance with the Company's investment policy (further details of the Company's investment process and strategy are set out in the section of this Offering Memorandum entitled "*Company, its Investment Objective, Policy and Strategy*").

**DEALINGS**

The Company does not guarantee that at any particular time any market maker(s) will be willing to make a market in the Placing Shares, nor does it guarantee the price at which a market will be made in the Placing Shares.  Accordingly, the dealing price of the Placing Shares may not necessarily reflect changes in the Net Asset Value per Share. Furthermore, the level of the liquidity in the Placing Shares can vary significantly.

**SCALING BACK AND ALLOCATION**

If aggregate applications for Placing Shares exceed 325 million Shares, being the maximum number of Shares to be issued pursuant to the Placing, it will be necessary to scale back applications under the Placing.  The Company reserves the right to decline in whole or in part any application for Placing Shares pursuant to the Placing.

**GENERAL**

Pursuant to anti-money laundering laws and regulations with which the Company must comply in the UK and Guernsey, the Company (and its agents) may require evidence in connection with any application for Placing Shares, including further identification of the applicant(s), before any Placing Shares are issued.

In the event that there are any significant changes affecting any of the matters described in this Offering Memorandum or where any significant new matters have arisen after the publication of this Offering Memorandum, the Company will publish a notice to investors.  Such notice will give details of the significant change(s) or the significant new matter(s). In the event that the Company is required to publish any notice, applicants who have applied for Placing Shares shall have at least two clear business days following the publication of the relevant notice within which to withdraw their offer to subscribe for Placing Shares in its entirety.  The right to withdraw an application to subscribe for Placing Shares in these circumstances will be available to all investors in the Placing.  If the application is not withdrawn within the time limits set out in the relevant notice, any application for Placing Shares will remain valid and binding.

The Directors may, in their absolute discretion, waive the minimum application amounts in respect of any particular application for Placing Shares under the Placing.

Should the Placing be aborted or fail to complete for any reason, monies received will be returned without interest at the risk of the applicant to the bank account from which the money was received forthwith following such abort or failure, as the case may be.

**CLEARING AND SETTLEMENT**

Payment for the Placing Shares should be made in accordance with settlement instructions to be provided to Placees by or on behalf of the Company.  To the extent that any application for Placing Shares is rejected in whole or in part (whether by scaling back or otherwise), monies received will be returned without interest at the risk of the applicant.

**PURCHASE AND TRANSFER RESTRICTIONS**

This Offering Memorandum does not constitute an offer to sell, or the solicitation of an offer to acquire or subscribe for, Placing Shares in any jurisdiction where such an offer or solicitation is unlawful or would impose any unfulfilled registration, qualification, publication or approval requirements on the Company.

004633

The Company has elected to impose the restrictions described below on the Placing and on the future trading of the Placing Shares so that the Company will not be required to register the offer and sale of the Placing Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations.  The Company and its agents will not be obligated to recognise any resale or other transfer of the Placing Shares made other than in compliance with the restrictions described below.

### *Restrictions due to lack of registration under the U.S. Securities Act and U.S. Investment Company Act*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.  There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by (i) investors using assets of (A) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Code; or (C) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

### *Subscriber and Shareholder warranties*

By participating in the Placing, each subscriber acknowledges and agrees that it will (for itself and any person(s) procured by it to subscribe for Shares and any nominee(s) for any such person(s)) be further deemed to represent and warrant to the Company that:

(a)     if it is located outside the United States, it is not a U.S. Person, it is acquiring the Shares in an offshore transaction meeting the requirements of Regulation S and it is not acquiring the Shares for the account or benefit of a U.S. Person;

(b)     if it is located inside the United States or is a U.S. Person, it is an Eligible U.S. Investor and has received, read, understood and, prior to its receipt of any Shares pursuant to the Placing, returned an executed a U.S. Investor Letter to the Company;

(c)     it acknowledges that the Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. Persons absent registration or an exemption from registration under the U.S. Securities Act;

(d)     it acknowledges that the Company has not registered under the U.S. Investment Company Act and that the Company has put in place restrictions for transactions not involving any public offering in the United States, and to ensure that the Company is not and will not be required to register under the U.S. Investment Company Act;

(e)     unless the Company expressly consents in writing otherwise, no portion of the assets used to purchase, and no portion of the assets used to hold, the Shares or any beneficial interest therein constitutes or will constitute the assets of (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account

004634

or other arrangement that is subject to Section 4975 of the U.S. Code; or (iii) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code.  In addition, if an investor is a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, its purchase, holding, and disposition of the Shares must not constitute or result in a non-exempt violation of any such substantially similar law;

(f)     that if any Shares offered and sold are issued in certificated form, then such certificates evidencing ownership will contain a legend substantially to the following effect unless otherwise determined by the Company in accordance with applicable law:

"THE COMPANY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") AND THE SECURITY EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) OUTSIDE THE UNITED STATES TO A NON-US PERSON (AS DEFINED IN RULE 902 OF REGULATION S, "US PERSON") THAT IS NOT A US RESIDENT FOR THE PURPOSES OF THE INVESTMENT COMPANY ACT (A "US RESIDENT") IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT (AND NOT IN A PRE- ARRANGED TRANSACTION RESULTING IN THE RESALE OF SUCH SECURITY INTO THE UNITED STATES) OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND UNDER CIRCUMSTANCES WHICH WILL NOT REQUIRE THE COMPANY TO REGISTER UNDER THE INVESTMENT COMPANY ACT (PROVIDED THAT, IF SUCH TRANSFER PURSUANT TO THIS CLAUSE (B) IS TO A US PERSON OR A US RESIDENT, THE PURCHASER IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) AND, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS.  THE HOLDER OF THIS SECURITY AGREES THAT IT WILL COMPLY WITH THE FOREGOING RESTRICTIONS.  NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THE SECURITY.

THE HOLDER ACKNOWLEDGES THAT THE COMPANY RESERVES THE RIGHT PRIOR TO ANY SALE OR OTHER TRANSFER TO REQUIRE THE DELIVERY OF SUCH CERTIFICATIONS, LEGAL OPINIONS AND OTHER INFORMATION AS THE COMPANY MAY REASONABLY REQUIRE TO CONFIRM THAT THE PROPOSED SALE OR OTHER TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

IF A BENEFICIAL OWNER OF THIS SECURITY WHO IS REQUIRED TO BE A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT IS AT ANY TIME NOT SUCH A QUALIFIED PURCHASER, THE COMPANY MAY (A) REQUIRE SUCH BENEFICIAL OWNER TO SELL THIS SECURITY TO A PERSON WHO IS NOT A US PERSON OR A US RESIDENT OR WHO IS A US PERSON WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR (B) SELL THIS SECURITY ON BEHALF OF THE BENEFICIAL OWNER AT THE BEST PRICE REASONABLY OBTAINABLE TO A PERSON WHO IS NOT A US PERSON OR WHO IS A US PERSON OR A US RESIDENT WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT.

THE HOLDER OF THIS SECURITY IS DEEMED TO HAVE ACKNOWLEDGED THAT THIS LEGEND WILL NOT BE REMOVED FROM THIS SECURITY FOR AS LONG AS THE COMPANY RELIES ON SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT";

004635

(g)     if in the future the investor decides to offer, sell, transfer, assign or otherwise dispose of the Shares, it will do so only in compliance with an exemption from the registration requirements of the U.S. Securities Act and under circumstances which will not require the Company to register under the U.S. Investment Company Act. It acknowledges that any sale, transfer, assignment, pledge or other disposal made other than in compliance with such laws and the above stated restrictions will be subject to the compulsory transfer provisions as provided in the Articles;

(h)     if in the future it decides to offer, resell, pledge or otherwise transfer any of the Shares, such Shares may be offered, resold, pledged or otherwise transferred only (A) outside the United States to persons not known to be U.S. Persons in an offshore transaction in accordance with Rule 904 of Regulation S under the U.S. Securities Act, (B) in a transaction that does not require registration under the U.S. Securities Act or any applicable United States securities laws and regulations or require the Company to register under the U.S. Investment Company Act, subject to, if requested by the Company, delivery of an opinion of counsel of recognised standing in form and substance reasonably satisfactory to the Company, or (C) to the Company;

(i)     it is purchasing the Shares for its own account or for one or more investment accounts for which it is acting as a fiduciary or agent, in each case for investment only, and not with a view to or for sale or other transfer in connection with any distribution of the Shares in any manner that would violate the U.S. Securities Act, the U.S. Investment Company Act or any other applicable securities laws;

(j)     it acknowledges that the Company reserves the right to make inquiries of any holder of the Shares or interests therein at any time as to such person's status under the U.S. federal securities laws and to require any such person that has not satisfied the Company that holding by such person will not violate or require registration under the U.S. securities laws to transfer such Shares or interests in accordance with the Articles;

(k)     it acknowledges and understands that the Company is required to comply with FATCA and that the Company will follow FATCA's extensive reporting and withholding requirements. The subscriber agrees to furnish any information and documents the Company may from time to time request, including but not limited to information required under FATCA;

(l)     it is entitled to acquire the Shares under the laws of all relevant jurisdictions which apply to it, it has fully observed all such laws and obtained all governmental and other consents which may be required thereunder and complied with all necessary formalities and it has paid all issue, transfer or other taxes due in connection with its acceptance in any jurisdiction of the Shares and that it has not taken any action, or omitted to take any action, which may result in the Company or its directors, officers, agents, employees and advisers being in breach of the laws of any jurisdiction in connection with the Placing or its acceptance of participation in the Placing;

(m)     it has received, carefully read and understands this Offering Memorandum, and has not, directly or indirectly, distributed, forwarded, transferred or otherwise transmitted this Offering Memorandum or any other presentation or offering materials concerning the Shares to within the United States or to any U.S. Persons, nor will it do any of the foregoing; and

(n)     if it is acquiring any Shares as a fiduciary or agent for one or more accounts, the investor has sole investment discretion with respect to each such account and full power and authority to make such foregoing representations, warranties, acknowledgements and agreements on behalf of each such account.

The Company and its directors, officers, agents, employees, advisers and others will rely upon the truth and accuracy of the foregoing representations, warranties, acknowledgments and agreements.

If any of the representations, warranties, acknowledgments or agreements made by the investor are no longer accurate or have not been complied with, the investor will immediately notify the Company.

004636

## TAXATION

**GENERAL**

The information below, which relates only to Guernsey and UK taxation, summarises the advice received by the Board and is applicable to the Company (except insofar as express reference is made to the treatment of other persons) to persons who are resident or ordinarily resident in Guernsey or the United Kingdom for taxation purposes and who hold Placing Shares as an investment.  It is based on current Guernsey and UK tax law and published practice, respectively, which law or practice is, in principle, subject to any subsequent changes therein (potentially with retrospective effect).  Certain Shareholders, such as dealers in securities, collective investment schemes, insurance companies and persons acquiring their Placing Shares in connection with their employment may be taxed differently and are not considered.  The tax consequences for each Shareholder of investing in the Company may depend upon the Shareholder's own tax position and upon the relevant laws of any jurisdiction to which the Shareholder is subject.

**If you are in any doubt about your tax position, you should consult your professional adviser.**

**GUERNSEY**

The Directors intend to conduct the Company's affairs such that, based on current law and practice of the relevant tax authorities, the Company will not become resident for tax purposes in any other territory other than Guernsey.

*The Company*

The Company has been granted tax exempt status by the Director of Income Tax in Guernsey pursuant to the Income Tax (Exempt Bodies) (Guernsey) Ordinance, 1989.  The Company will need to reapply annually for exempt status, an application that currently incurs a fee of £1,200 per annum.  It is expected that the Company will continue to apply for exempt status annually.

Once exempt status has been granted, the Company is not considered resident in Guernsey for Guernsey income tax purposes and will be exempt from tax in Guernsey on both bank deposit interest and any income that does not have its source in Guernsey.  It is not anticipated that any income other than bank deposit interest will arise in Guernsey and therefore the Company is not expected to incur any additional liability to Guernsey tax.

*Shareholders*

Non-Guernsey resident Shareholders will not be subject to any income tax in Guernsey in respect of or in connection with the acquisition, holding or disposal of any shares owned by them.  Such Shareholders will receive dividends without deduction of Guernsey income tax.

Any Shareholders who are resident in Guernsey will be subject to Guernsey income tax on any dividends paid to such persons but will not suffer any deduction of tax by the Company from any such dividends payable where the Company is granted tax exempt status.  The Company is however required to provide the Director of Income Tax the names, addresses and gross amount of any income paid to Guernsey resident shareholders during the previous year when renewing the Company's exempt tax status each year.

At present Guernsey does not levy taxes upon capital gains, capital transfer, wealth, sales or turnover (unless the varying of investments and turning of such investments to account is a business or part of a business), nor are there any estate duties save for registration fees and an ad valorem duty for a Guernsey grant of representation where the deceased dies leaving assets in Guernsey which require presentation of such a grant.  No stamp duty is chargeable in Guernsey on the issue, transfer, switching or redemption of Shares in the Company.

*FATCA*

The US Hiring Incentives to Restore Employment Act resulted in the introduction of legislation in the US known as the Foreign Account Tax Compliance Act (**FATCA**) which has the effect that a 30 per cent withholding tax may be imposed on payments of US source income and certain payments of proceeds from the sale of property that could give rise to US source income unless there is compliance with requirements for the Company to report on an annual basis the identity of, and certain other information about, direct and indirect US investors in the Company to the relevant

Guernsey authority for onward transmission to the US Internal Revenue Service (**IRS**). An investor that fails to provide the required information to the Company may be subject to the 30 per cent withholding tax with respect to its share of any such payments directly or indirectly attributable to US investments of the Company, and the Company might be required to terminate such investor's investment in the Company.

On 13 December 2013 an intergovernmental agreement was entered into between Guernsey and the US in respect of FATCA (the **IGA**), which agreement was enacted into Guernsey law as of 30 June 2014 by the Income Tax (Approved International Agreements) (Implementation) (United Kingdom and United States of America) Regulations, 2014. Guidance notes currently in draft form have been issued by the relevant Guernsey authority to provide practical assistance on the reporting obligations of affected businesses under the IGA.

Although the Company will attempt to satisfy any obligations imposed on it to avoid the imposition of such withholding tax, no assurance can be given that the Company will be able to satisfy these obligations. If the Company becomes subject to a withholding tax as a result of FATCA, the return of all Shareholders may be materially affected.

**This summary of Guernsey taxation issues can only provide a general overview of this area and it is not a description of all the tax considerations that may be relevant to a decision to invest in the Company. The summary of certain Guernsey tax issues is based on the laws and regulations in force as of the date of this document and may be subject to any changes in Guernsey law occurring after such date. Legal advice should be taken with regard to individual circumstances. Any person who is in any doubt as to his tax position or where he is resident, or otherwise subject to taxation, in a jurisdiction other than Guernsey, should consult his professional adviser.**

## UNITED KINGDOM

The following statements are intended as a general guide to certain UK tax considerations relating to an investment in Shares and do not purport to be a complete analysis of all potential UK tax consequences of holding Shares. They are based on current UK legislation and current published practice of HMRC, which may change, possibly with retroactive effect. Except insofar as express reference is made to the treatment of non-UK tax residents and non-UK domiciled individuals, they apply only to Shareholders who are resident and domiciled (in the case of individuals) or resident (in the case of companies) for tax purposes in (and only in) the UK, who hold their Shares as an investment (other than under an individual savings account) and who are the absolute beneficial owners of both the Shares and any dividends paid on them. The statements are not addressed to Shareholders who hold Shares in connection with a trade, profession or vocation carried on in the UK through a branch or agency (or, in the case of a corporate Shareholder, in connection with a trade in the UK carried on through a permanent establishment or otherwise). The tax position of certain categories of Shareholders who are subject to special rules (such as persons acquiring their Shares in connection with employment, dealers in securities, insurance companies and collective investment schemes) is not considered.

### Taxation of the Company

As the Company is an alternative investment fund for the purpose of the Alternative Investment Fund Managers Regulations 2013, it should not be considered to be UK resident for UK tax purposes. Accordingly, and provided that the Company does not carry on a trade in the UK through a permanent establishment situated therein for UK corporation tax purposes or through a branch or agency situated in the UK which would bring it within the charge to income tax, the Company will not be subject to UK corporation tax or income tax on income and capital gains arising to it save as noted below in relation to possible withholding tax on certain UK source income. The Directors intend that the affairs of the Company are conducted so that no such permanent establishment, branch or agency will arise insofar as this is within their control, but it cannot be guaranteed that the conditions necessary to prevent any such permanent establishment, branch or agency coming into being will at all times be satisfied.

Interest and other income received by the Company which has a UK source may be subject to withholding taxes in the UK.

### Disposals of Shares

Each class of Shares will constitute a relevant interest in an "offshore fund" for the purposes of UK taxation. Under the UK's offshore fund legislation, any gain arising on the sale, redemption or other disposal of shares in an offshore

004638

fund (which may include an in specie redemption by the Company) held by persons who are resident in the UK for tax purposes will be taxed at the time of such sale, disposal or redemption as income and not as a capital gain. This does not apply, however, where the relevant offshore fund is accepted by HMRC as a "reporting fund" throughout the period during which the relevant interests were held.

It is not currently intended that the Company will apply for reporting fund status under the offshore funds regime in respect of any Shares. Accordingly, Shareholders who are resident in the UK for taxation purposes may be liable to UK income taxation in respect of gains arising from the sale, redemption or other disposal of their Shares. Such gains may remain taxable notwithstanding any general or specific UK capital gains tax exemption or allowance available to a Shareholder and may result in certain Shareholders incurring a proportionately greater UK taxation charge. Any losses arising on the disposal of Shares by Shareholders who are resident in the UK will be eligible for capital gains loss relief. The Directors may launch one or more classes of Shares in future certified by HMRC as reporting funds for the purposes of UK taxation.

### Dividends

Any dividends received by UK resident individual Shareholders (or deemed to be received in the case of any future class of Shares with reporting fund status) will generally be subject to UK income tax whether or not such distributions are reinvested.

Dividends received by a UK resident Shareholder (or deemed to be received in the case of any future class of Shares with reporting fund status) within the charge to corporation tax should be exempt from tax in respect of dividends paid by the Company, although it should be noted that this exemption is subject to certain exclusions and specific anti-avoidance rules (particularly in the case of "small companies", as defined in section 931S of the Corporation Tax Act 2009 ("CTA 2009")).

### Other UK taxation considerations

The attention of non-corporate Shareholders who are resident in the UK is drawn to the provisions of Chapter 2 of Part 13 of the UK Income Tax Act 2007. These provisions are aimed at preventing the avoidance of income tax by individuals through transactions resulting in the transfer of assets or income to persons (including companies) resident or domiciled abroad and may render them liable for income tax in respect of undistributed income and profits of the Company. This legislation will, however, not apply if such a Shareholder can satisfy HMRC that either:

(i)     it would not be reasonable to draw the conclusion from all the circumstances of the case, that the purpose of avoiding liability to taxation was the purpose, or one of the purposes, for which the relevant transactions or any of them were effected;

(ii)    all the relevant transactions are genuine commercial transactions and it would not be reasonable to draw the conclusion, from all the circumstances of the case, that any one or more of the transactions was more than incidentally designed for the purpose of avoiding liability to taxation; or

(iii)   all the relevant transactions were genuine, arm's length transactions and if the Shareholder were liable to tax under Chapter 2 of Part 13 in respect of such transactions such liability would constitute an unjustified and disproportionate restriction on a freedom protected by Title II or IV of Part Three of the Treaty on the Functioning of the European Union or Part II or III of the EEA Agreement.

Chapter 3 of Part 6 of the CTA 2009 provides that, if at any time in an accounting period a corporate Shareholder within the charge to UK corporation tax holds an interest in an offshore fund and there is a time in that period when that fund fails to satisfy the "non-qualifying investments test", the interest held by such a corporate Shareholder will be treated for the accounting period as if it were rights under a creditor relationship for the purposes of the rules relating to the taxation of most corporate debt contained in the CTA 2009 (the "Corporate Debt Regime"). Shares will (as explained above) constitute interests in an offshore fund and, on the basis of the current investment policies of the Company, it is likely that the "non-qualifying investments test" will not be met. In circumstances where the test is not so satisfied (for example where the Company invests in cash, securities or debt instruments or open-ended companies that themselves do not satisfy the "non-qualifying investments test" and the market value of such investments exceeds

004639

60 per cent. of the market value of all its investments at any time), the Shares in the relevant class will be treated for corporation tax purposes as within the Corporate Debt Regime. As a consequence, all returns on the Shares in respect of each corporate Shareholder's accounting period during which the test is not met (including gains, profits and deficits and exchange gains and losses) will be taxed or relieved as an income receipt or expense on a fair value accounting basis. Accordingly, a corporate Shareholder in the Company may, depending on its own circumstances, incur a charge to corporation tax on an unrealised increase in the value of its holding of Shares (and, likewise, obtain relief against corporation tax for an unrealised reduction in the value of its holding of Shares). The provisions relating to non-reporting funds (outlined above) would not then apply to such corporate shareholders and the effect of the provisions relating to holdings in controlled foreign companies (outlined below) would then be substantially mitigated.

Part 9A of TIOPA 2010 subjects UK resident companies to tax on the profits of companies not so resident (such as the Company) in which they have an interest. The provisions, broadly, affect UK resident companies which hold, alone or together with certain other associated persons, shares which confer a right to at least 25 per cent. of the profits of a non-resident company (a "25% Interest") where that non-resident company is controlled by persons who are resident in the UK and is subject to a lower level of taxation in its territory of residence. The legislation is not directed towards the taxation of capital gains. In addition, these provisions will not apply if the shareholder reasonably believes that it does not hold a 25% Interest in the Company throughout the relevant accounting period.

The attention of persons resident in the UK for taxation purposes is drawn to the provisions of section 13 of the Taxation of Chargeable Gains Act 1992 ("section 13"). Section 13 applies to a "participator" for UK taxation purposes (which term includes a shareholder) if at any time when any gain accrues to the Company which constitutes a chargeable gain for those purposes, at the same time, the Company is itself controlled by a sufficiently small number of persons so as to render the Company a body corporate that would, were it to have been resident in the UK for taxation purposes, be a "close" company for those purposes. The provisions of section 13 could, if applied, result in any such person who is a "participator" in the Company being treated for the purposes of UK taxation of chargeable gains as if a part of any chargeable gain accruing to the Company had accrued to that person directly, that part being equal to the proportion of the gain that corresponds on a just and reasonable basis to that person's proportionate interest in the Company as a "participator". No liability under section 13 could be incurred by such a person however, where such proportion does not exceed one quarter of the gain. In addition, exemptions may also apply where none of the acquisition, holding or disposal of the assets had a tax avoidance main purpose or where the relevant gains arise on the disposal of assets used only for the purposes of genuine, economically significant business activities carried on outside the UK.

In the case of UK resident individuals domiciled outside the UK, section 13 applies only to gains relating to UK situate assets of the Company and gains relating to non-UK situate assets if such gains are remitted to the UK.

### *Stamp duty and stamp duty reserve tax*

No UK stamp duty or stamp duty reserve tax will be payable on an issue of Shares. UK stamp duty at the rate of 0.5% of the value of the consideration for the transfer of any Shares (rounded up where necessary to the nearest £5) may become payable on any instrument of transfer of the Shares which is executed within the UK, or which relates to any property situated, or to any matter or thing done or to be done, in the UK. Provided, as is the intention, that the Shares are not registered in any register kept in the UK by or on behalf of the Company and are not paired with shares issued by a body corporate incorporated in the UK, any agreement to transfer the Shares will not be subject to stamp duty reserve tax.

### *Inheritance tax*

A liability to UK inheritance tax on Shares may arise in the event of the death of or on the making of certain categories of lifetime transfers by an individual Shareholder domiciled or deemed to be domiciled in the UK for inheritance tax purposes.

### *The Common Reporting Standard*

Drawing extensively on the intergovernmental approach to implementing US FATCA, the OECD developed the Common Reporting Standard ("CRS") to address the issue of offshore tax evasion on a global basis. Aimed at maximizing efficiency and reducing cost for financial institutions, the CRS provides a common standard for due

004640

diligence, reporting and exchange of financial account information. Pursuant to the CRS, tax authorities in participating CRS jurisdictions will obtain from reporting financial institutions, and automatically exchange with other participating tax authorities in which the Shareholders of the reporting financial institution are resident on an annual basis, financial account and personal information with respect to all reportable accounts identified by financial institutions on the basis of common due diligence and reporting procedures. The first information exchanges are expected to begin in September 2017. Guernsey has legislated to implement the CRS. As a result, the Company will be required to comply with the CRS due diligence and reporting requirements, as adopted by Guernsey. Shareholders may be required to provide additional information to the Company to enable the Company to satisfy its obligations under the CRS. Failure to provide requested information may subject a Shareholder to liability for any resulting penalties or other charges and/or mandatory termination of its interest in the Company.

If you are in any doubt as to your tax position, you should consult your professional adviser.

004641

## SHAREHOLDERS OF THE COMPANY

So far as the Company is aware, as at November 15 2017 (being the latest practicable date prior to publication of this document) CLO Holdco, Ltd. is the sole Shareholder and holds directly or indirectly 5% or more of the Company's voting rights.

Immediately following the Placing the following persons will hold directly or indirectly the following percentages of the Company's voting rights:

| Name | Immediately prior to the Placing | | Immediately following the Placing | |
|---|---|---|---|---|
| | Number of Shares | % of voting rights in respect of the issued share capital | Number of Shares | % of voting rights in respect of the issued share capital |
| CLO Holdco, Ltd. | 143,454,001.00 | 100.00% | 70,314,387.44 | 49.02% |
| HarbourVest Dover Street IX Investment L.P. | 0.00 | 0.00% | 50,917,791.20 | 35.49% |
| HarbourVest 2017 Global Fund L.P. | 0.00 | 0.00% | 3,478,649.09 | 2.42% |
| HarbourVest 2017 Global AIF L.P. | 0.00 | 0.00% | 6,957,226.48 | 4.85% |
| HV International VIII Secondary L.P. | 0.00 | 0.00% | 9,317,699.94 | 6.50% |
| HarbourVest Skew Base AIF L.P. | 0.00 | 0.00% | 1,034,136.77 | 0.72% |
| Highland Capital Management, L.P. | 0.00 | 0.00% | 898,708.98 | 0.63% |
| Lee Blackwell Parker, III | 0.00 | 0.00% | 94,173.23 | 0.07% |
| Quest IRA, Inc., fbo Lee B. Parker III, Acct. # 3058311 | 0.00 | 0.00% | 58,798.51 | 0.04% |
| Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811 | 0.00 | 0.00% | 239,018.34 | 0.17% |
| Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612 | 0.00 | 0.00% | 95,607.34 | 0.07% |
| Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 | 0.00 | 0.00% | 47,803.67 | 0.03% |

Save as set out above in this section of this Offering Memorandum, the Company is not aware of any person who holds, or who will immediately following the Placing hold, as shareholder directly or indirectly, 5% or more of the voting rights of the Company.

None of the Shareholders referred to in the table set forth in above has voting rights which differ from those of any other Shareholder in respect of any Shares held by them.

Save as set out in this above in this section of this Offering Memorandum, the Company is not aware of any person who immediately following the Placing directly or indirectly, jointly or severally, will own sufficient shares to exercise control over the Company.

004642

## ADDITIONAL INFORMATION ON THE COMPANY

### INCORPORATION AND ADMINISTRATION

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120. The Company continues to be registered and domiciled in Guernsey. The registered office and principal place of business of the Company is First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (telephone number 01481 715601). The statutory records of the Company are kept at this address. The Company operates and issues shares in accordance with the Companies Law and ordinances and regulations made thereunder and has no employees. The Company shall have an unlimited life.

The Company is regulated by the GFSC and is not regulated by any regulator other than the GFSC.

The Company's accounting period will end on 31 December, of each year, with the first year end on 31 December 2015.

PricewaterhouseCoopers CI LLP of Royal Bank Place, 1 Glategny Esplanade, St Peter Port, Guernsey GY1 4ND has been the only Auditors of the Company since incorporation. PricewaterhouseCoopers CI LLP is a member of the Institute of Chartered Accountants of England & Wales. The Shareholders have the power, under the Companies Law, to appoint the auditor at each AGM or remove the auditor by ordinary resolution.

The annual report and accounts will be prepared according to GAAP.

Save for its entry into the material contracts summarised in "—*Material Contracts*" of this section of this Offering Memorandum and certain non-material contracts, since its incorporation the Company has not incurred borrowings, issued any debt securities, incurred any contingent liabilities or made any guarantees, nor granted any charges or mortgages.

Save as set out in "*Share Capital*" below, there have been no changes to the issued share capital of the Company since incorporation.

### SHARE CAPITAL

On incorporation, the share capital of the Company consisted of one ordinary share of no par value. The Placing Shares will be issued in the form of participating ordinary shares having the rights set out in the Articles. Shareholders have no right to have their Shares redeemed.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital is 143,454,001 shares of no par value.

None of the Shareholders has voting rights attaching to Shares that they hold which are different to the voting rights attached to any other Shares of the same class in the Company.

As at the date of this Offering Memorandum, the memorandum of incorporation provides that there is no limit on the number of shares of any class which the Company is authorised to issue.

The Directors have absolute authority under the Articles to allot the Shares to be issued pursuant to the Placing and are expected to do so shortly prior to the Placing.

No share or loan capital of the Company is under option or has been agreed, conditionally or unconditionally, to be put under option.

### DIRECTORS' AND OTHER INTERESTS

As at the date of this Offering Memorandum, none of the Directors or any person connected with any of the Directors has a Shareholding or any other interest in the share capital of the Company. The Directors and their connected persons may, however, subscribe for Shares pursuant to the Placing.

004643

The Directors are not aware of any person or persons who, following the Placing, will or could, directly or indirectly, jointly or severally, exercise control over the Company and there are no arrangements known to the Directors the operation of which may subsequently result in change of control of the Company, other than as disclosed above in "Shareholders of the Company" on page 75 of this Offering Memorandum.

There are no outstanding loans from the Company to any of the Directors or any outstanding guarantees provided by the Company in respect of any obligation of any of the Directors.

The aggregate remuneration and benefits in kind of the Directors in respect of the Company's accounting period ending on 31 December 2017, which will be payable out of the assets of the Company, is not expected to exceed £150,000.  No amount has been set aside or accrued by the Company to provide pension, retirement or other similar benefits.

No Director has a service contract with the Company, nor are any such contracts proposed.  The Directors have been appointed through letters of appointment which can be terminated in accordance with the Articles and without compensation.  The notice period specified in the Articles for the removal of Directors is one month.  The Articles provide that the office of Director shall be terminated by, among other things: (i) written resignation; (ii) unauthorised absences from board meetings for 12 months or more; (iii) written request of the other Directors; and (iv) an ordinary resolution.

None of the Directors has, or has had, an interest in any transaction which is or was unusual in its nature or conditions or significant to the business of the Company and which has been effected by the Company since its incorporation.

In addition to their directorships of the Company, the Directors hold or have held the directorships and are or were members of the partnerships, as listed in the table below, over or within the past five years.

| Name | Current directorships/partnerships | Past directorships/partnerships |
|---|---|---|
| **William Scott** | Aberdeen Global Infrastructure GP Limited (name changed from Lloyds Bank Global Infrastructure GP Limited 15 May 2014) | BMS Specialist Debt Fund Limited (applied for voluntary strike-off 29 September 2014) |
| | Aberdeen Global Infrastructure GP II Limited | Cinven Capital Management (G3) Limited |
| | Aberdeen Infrastructure Finance GP Limited (name changed from Uberior Infrastructure Finance GP Limited 7 August 2014) | FCA Catalyst Fund SPC (formerly FCM Catalyst Fund SPC) |
| | Aberdeen Infrastructure Spain Co-Invest II GP Limited | FCA Catalyst Master Fund SPC (formerly FCM Catalyst Master Fund SPC) |
| | Absolute Alpha Fund PCC Limited | FCA Trading SPC (formerly FCM Trading SPC) |
| | AcenciA Debt Strategies Limited | Financial Risk Management Diversified Fund Limited |
| | AHL Strategies PCC Limited | Financial Risk Management Matrio Fund Limited |
| | Axiom European Financial Debt Fund Limited | Financial Ventures Limited |
| | Cinven Capital Management (V) General Partner Limited | FRM Access II Fund SPC |
| | Cinven Capital Management (VI) General Partner Limited | FRM Customised Diversified Fund Limited |
| | Cinven Capital Management (G4) Limited | FRM Diversified II Fund SPC |
| | Cinven Limited | FRM Diversified II Master Fund Limited |
| | Class N AHL 2.5XL Trading Limited | FRM Diversified III Fund PCC Limited |
| | Class P Global Futures EUR Trading Limited | FRM Diversified III Master Fund Limited |
| | Hanseatic Asset Management LBG | FRM Equity Alpha Limited |

004644

| | |
|---|---|
| Highland CLO Funding, Ltd. | FRM Credit Strategies Fund PCC Limited |
| KCSB Properties Limited | FRM Credit Strategies Master Fund PCC Limited |
| MAN AHL Diversified PCC Limited | FRM Global Diversified Fund |
| Pershing Square Holdings Limited | FRM Phoenix Fund Limited (name changed from FRM Financials Limited 10 June 2008) |
| Sandbourne Asset Management   Limited (name changed from Sandbourne Asset Management  Guernsey Limited 26 June 2015) | FRM Sigma Fund Limited |
| Sandbourne PCC Limited | FRM Strategic Fund PCC Limited |
| Savile AD4 Limited | FRM Strategic Master Fund Limited |
| Savile AD7 Limited | FRM Tail Hedge Limited |
| Savile AD8 Limited | FRM Thames Fund General Partner 1 Limited |
| Savile AD9 Limited | Invista European Real Estate Trust SICAF |
| SPL Guernsey ICC Limited (formerly Arch Guernsey ICC Limited) | Land Race Limited |
| The Flight and Partners Recovery Fund Limited | OldCo Limited ( name changed from Axiom European Financial Debt Limited 25 September 2015) |
| 30 St. Mary Axe Management Limited Partnership Incorporated | Principia TR-S 40 Ltd |
| | Property Income & Growth Fund Limited |
| | PSource Structured Debt Fund Limited |
| | PSource Structured Debt SPV II Inc |
| | Sandbourne Fund |
| | Savile AD2 Limited |
| | Savile ANG1 Limited |
| | Savile APG1 Limited |
| | Savile APG3 Limited |
| | Savile Durham 1 Limited |
| | Savile Exeter 1 Limited |
| | Savile ML1 Limited |
| | Secured Real Estate Finance Limited (dormant after unsatisfactory fundraising) |
| | TBH Guernsey Limited |
| | Threadneedle Asset Backed Income Limited (dormant after unsatisfactory fundraising) |
| | UCAP Investment Management Fund PCC Limited (name changed from Uttrup Investment Management Fund PCC Limited 7 February 14) |
| | UCAP Investment Management Limited (name changed from Uttrup Investment Management Limited 7 February 14) |
| | WyeTree RMBS Opportunities Fund Limited (name changed from WyeTree Opportunities |

004645

Fund Limited 29 May 2014)

| *Name* | *Current directorships/partnerships* | *Past directorships/partnerships* |
|---|---|---|
| **Heather Bestwick** | Andium Homes Limited | Jersey Finance Limited |
| | Deutsche International Corporate Services Limited | Walkers Limited |
| | Equiom (Jersey) Limited | Walkers Capital Markets Limited |
| | Highland CLO Funding, Ltd. | Walkers Pension Services (Jersey) Limited |
| | Equiom (Guernsey) Limited | Walkers Property Services (Jersey) Limited |
| | Sole Shipping SO II GP Limited | Homelink (Jersey) Limited |
| | Sole Shipping SO Adviser Limited | Altamas Resources Limited |
| | EPE Special Opportunities plc | BSREP Marina Village (Jersey) Limited |
| | | Altair Partners Limited |
| | | Cyan Blue Topco Limited |
| | | Century Limited |
| | | Fundamental Global  Corporate Secured Loan Fund Limited |
| | | AEP 2003 Limited |
| | | AEP 2008 Limited |
| | | AEP 2012 Limited |
| | | Invision Capital Partners IV Limited |
| | | Invision IV Co-invest General Partner Limited |
| | | Invision Capital Partners V Limited |
| | | Triton Advisers Limited |
| | | GCP Infrastructure OEIC Limited |
| | | Equiom Trust Company (CI) Limited |
| | | Rokos Capital Management (GP) Limited |
| | | Rokos Intermediate (Jersey) Limited |

As at the date of this Offering Memorandum, there are no potential conflicts of interest between any duties to the Company of any of the Directors and their private interests and/or other duties.  There are no lock up provisions regarding the disposal by any of the Directors of any Shares.

Save as set out in immediately following paragraph below, as at the date of this Offering Memorandum:

(a)     none of the Directors has had any convictions in relation to fraudulent offences for at least the previous five years;

(b)     save as detailed above, none of the Directors was a director of a company, a member of an administrative, management or supervisory body or a senior manager of a company within the previous five years which has entered into any bankruptcy, receivership or liquidation proceedings;

(c)     none of the Directors has been subject to any official public incrimination and/or sanctions by statutory  or  regulatory  authorities  (including  designated  professional  bodies)  or  has  been

004646

disqualified by a court from acting as a member of the administrative, management or supervisory bodies of an issuer or from acting in the management or conduct of the affairs of any issuer for at least the previous five years; and

(d)     none of the Directors are aware of any contract or arrangement subsisting in which they are materially interested and which is significant to the business of the Company which is not otherwise disclosed in this Offering Memorandum.

In respect of the declaration in the immediately preceding paragraph above, certain of the Directors have been directors of entities which have been dissolved.  To the best of each Director's knowledge, no such entity, upon its dissolution, was insolvent or owed any amounts to creditors.

The Company maintains directors' and officers' liability insurance on behalf of the Directors at the expense of the Company.

No employees of the Administrator have any service contracts with the Company.

## MATERIAL CONTRACTS

The following are all of the contracts, not being contracts entered into in the ordinary course of business, that have been entered into by the Company since its incorporation and are, or may be, material or that contain any provision under which the Company has any obligation or entitlement which is or may be material to it as at the date of this Offering Memorandum.

### *Administration Agreement*

An administration agreement dated 10 August 2015 between (i) the Company and (ii) the Administrator, whereby the Administrator was appointed to act as administrator of the Company and provide related administrative, compliance and treasury services (the "**Administration Agreement**").

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

The Administration Agreement may be terminated by either party on not less than three months written notice (or such shorter notice as the parties may agree).  The Administration Agreement may be terminated immediately by either party:  (i) in the event that either party shall go into liquidation or receivership or an examiner shall be appointed to the Company (except for a voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the notifying party, such approval not to be unreasonably withheld or delayed) or be unable to pay its debts as they fall due or commits any act of bankruptcy under the laws of an applicable jurisdiction; or (ii) if the other party commits any material breach of the provisions of the Administration Agreement and, if such breach is capable of remedy shall not have remedied that within 30 days after the service of written notice requiring it to be remedied; (iii) if it shall become illegal or impossible without breach of any applicable laws and for reasons reasonably outside the control of the relevant party for any party to fulfil its obligations hereunder; or (iv) if any changes to the Administration Agreement are required as a consequence of any financial services regulation which may in the future bind any of the parties thereto and which cannot be agreed between the parties.  The appointment of the Administrator shall also automatically terminate forthwith if the Administrator shall become or be deemed to become resident for tax purposes in the United Kingdom or in any other place or places outside Guernsey in circumstances which cause the Company to become liable to pay any taxes which it would not otherwise be liable to pay.

The Company has given certain market standard indemnities in favour of the Administrator in respect of the Administrator's potential losses in carrying out its responsibilities under the Administration Agreement.

The Administration Agreement is governed by the laws of Guernsey.

004647

*Portfolio Management Agreement*

A Portfolio Management Agreement dated November 15, 2017 between (i) the Company and (ii) the Portfolio Manager (the "**Portfolio Management Agreement**"), pursuant to which the Company appointed the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

The Portfolio Management Agreement may be terminated in the event of (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full and (C) such other date as agreed between the Company and the Portfolio Manager.

In addition, the Portfolio Management Agreement may be terminated, and the Portfolio Manager removed for "Cause" by the Advisory Board or by the Board of Directors upon 30 business days' prior written notice to the Portfolio Manager.

As defined in the Portfolio Management Agreement, "Cause" means any one of the following events: (a) the Portfolio Manager wilfully violates, or takes any action that it knows breaches any material provision of the Portfolio Management Agreement or the Offering Memorandum applicable to it in bad faith (not including a wilful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions); (b) the Portfolio Manager breaches in any respect any provision of the Portfolio Management Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Portfolio Manager receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Portfolio Manager receives notice thereof; (c) the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for sixty (60) days; (d) the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under the Portfolio Management Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or (e) any Key Person of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

The Portfolio Management Agreement provides that if any of the events specified in the definition of "Cause" occurs, the Portfolio Manager will give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event. The Advisory Board and/or the Board of Directors may waive any event

004648

described in (a), (b), (d), or (e) above as a basis for termination of the Portfolio Management Agreement and removal of the Portfolio Manager under the terms of the Portfolio Management Agreement.

Any resignation or removal of the Portfolio Manager will only be effective on the satisfaction of certain conditions set out in the Portfolio Management Agreement.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to perform its obligations thereunder, with reasonable care (a) using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets that it manages for itself and others having similar investment objectives and restrictions, and (b) to the extent not inconsistent with the foregoing, in a manner consistent with the Portfolio Manager's customary standards, policies and procedures in performing its duties under the Portfolio Management Agreement (the "**Standard of Care**"); provided that the Portfolio Manager will not be liable for any loss or damages resulting from any failure to satisfy the Standard of Care except to the extent any act or omission of the Portfolio Manager constitutes a Portfolio Manager Breach (as defined below).  The Standard of Care may change from time to time to reflect changes by the Portfolio Manager to its customary standards, policies and procedures provided that such customary standards, policies and procedures are at least as rigorous as the foregoing.

The Portfolio Manager will not be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Company under the Portfolio Management Agreement for liabilities incurred by the Company as a result of or arising out of or in connection with the performance by the Portfolio Manager under the Portfolio Management Agreement, or for any losses or damages resulting from any failure to satisfy the Standard of Care except to the extent such liabilities were incurred by reason of acts or omissions constituting bad faith, fraud, wilful misconduct or due to the gross negligence (with such term given its meaning under New York law) or reckless disregard of the duties and obligations of the Portfolio Manager (a "**Portfolio Manager Breach**").

Under the Portfolio Management Agreement, the Company will be required to indemnify the Portfolio Manager and its affiliates, managers, directors, officers, secretaries, partners, agents and employees, from and against all liabilities incurred in connection with the Portfolio Management Agreement (except to the extent such liabilities are incurred as a result of any acts or omissions of the Portfolio Manager which constitute a Portfolio Manager Breach).

The Portfolio Manager is able to resign its role under the Portfolio Management Agreement upon 90 days' written notice to the Company.  Whilst the resignation will not be effective until the date as of which a successor adviser has been appointed, it may be difficult to locate an alternative adviser as a successor.  In addition, the Portfolio Manager may immediately resign by providing written notice to the Company upon the occurrence of certain events relating to the Company such as, amongst others, the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a wilful breach or knowing violation by the Company of a material provision of the Portfolio Management Agreement or the occurrence of insolvency proceedings in respect of the Company.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to the provision of certain human resources as may be necessary to enable the Company to conduct any matters related to its portfolio of assets.

Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Management Agreement is governed by the laws of the State of Texas.

***Predecessor and Interim Portfolio Management Agreements and Terminations***

Prior to the current Portfolio Management Agreement, the Company held a Portfolio Management Agreement dated 22 December 2016 (the "**Predecessor Portfolio Management Agreement**") between (i) the Company and (ii) Acis as the predecessor portfolio manager (the "**Predecessor Portfolio Manager**"), pursuant to which the Company appointed Acis as the Predecessor Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

The terms of the Predecessor Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Predecessor Portfolio Management Agreement was governed by the laws of the State of Texas.

The Predecessor Portfolio Management Agreement was terminated pursuant to a Portfolio Management Agreement dated October 27, 2017 (the "**Interim Portfolio Management Agreement**") between (i) the Company and (ii) the Portfolio Manager and agreed and acknowledged by the Predecessor Portfolio Manager, pursuant to which the Company appointed Highland HCF as the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.  Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety, (y) each party thereto released the other party from all claims, suits or causes of action arising out of or relating to the Predecessor Portfolio Management Agreement and (z) each party ratified prior transactions effected in accordance with the Predecessor Portfolio Management Agreement.

The terms of the Interim Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Interim Portfolio Management Agreement was terminated pursuant to the Portfolio Management Agreement. Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety and (y) each party ratified prior transactions effected in accordance with the Interim Portfolio Management Agreement.

The Interim Portfolio Management Agreement was governed by the laws of the State of Texas.

*Subscription and Transfer Agreement*

A Subscription and Transfer Agreement dated November 15, 2017 (the "**Subscription and Transfer Agreement**") entered into by and among the Company, the Portfolio Manager, CLO Holdco, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct. and Quest IRA, Inc., fbo Neil Desai, Acct., pursuant to which CLO Holdco, Ltd., as the existing Shareholder, agrees to transfer a portion of its shares to the new Shareholders listed above.

Under the Subscription and Transfer Agreement, CLO Holdco, Ltd. agreed to provide an indemnity to the new Shareholders relating to certain liabilities arising prior to the date of the transfer of Shares.

Further, each of the Shareholders subscribed to purchase Shares on a pro rata basis pursuant to commitments under the Subscription and Transfer Agreement, to be called for settlement by the Portfolio Manager from time to time during the Investment Period and at such time issued (including in the form of fractional shares).

The Subscription and Transfer Agreement may be terminated by mutual agreement of the parties.

The Subscription and Transfer Agreement is governed by the laws of Guernsey.

*Members' Agreement*

A Shareholders' Agreement relating to the Company dated November 15, 2017 (the "**Shareholder's Agreement**"), among CLO HoldCo, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct., Quest IRA, Inc., fbo Neil Desai, Acct., the Company and the Portfolio Manager, which contemplates certain agreements of commercial terms among the Shareholders with respect to the formation of an Advisory Board, voting matters and the Shareholders' commitments to settle subscriptions for the Placing Shares.

004650

Pursuant to the Shareholders' Agreement, the Shareholders set forth their rights in respect of the Company with respect to their voting rights, the composition and function of the Advisory Board, provisions with respect to Shareholders defaulting on commitments to settle Shares, indemnification and restrictions on the transfers or disposals of Shares.

The Shareholders' Agreement will be terminated when one party holds all the Shares, when a resolution is passed by the Shareholders or creditors of the Company or with the written consent of the parties.

The Shareholders' Agreement is governed by the laws of Guernsey.

### NexBank Credit Facility

The Company currently has the NexBank Credit Facility with a principal amount of $22,158,337, as of September 30, 2017.  The NexBank Credit Facility is governed by an Amended and Restated Loan Agreement dated as of 17 January 2017 that provides for quarterly payments of principal and interest at 5.00% *per annum* and a maturity on November 23, 2021.

### Warehouse Loan Facilities

One or more multi-currency Warehouse Loan Facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider as described in "*Summary-Borrowing-Warehouse Loan Facilities*".

### Forward Purchase Agreements

Forward Purchase Agreements may be entered into from time to time, between (i) the Company and (ii) a CLO (each, a "**Forward Purchase Agreement**"), pursuant to which the Company may from time to time enter into sale and purchase contracts with a CLO with respect to the assets of the Company ("**Forward Sales**").  Such Forward Sales are with a view to effectively managing its access to wholesale funding and exposure to undesireable market price volatilities of its portfolio.  Such Forward Purchase Agreements may be entered into at the same time or shortly after the origination or acquisition of the relevant asset by the Company, at a later date, or not at all.  Where a loan becomes subject to a Forward Purchase Agreement, the Company will (subject to the conditions set out below) neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

Each Forward Sale will be conditional upon:

- the occurrence of the closing date of the relevant CLO; and

- the assets that are the subject of such Forward Sale satisfying a set of eligibility criteria on the closing date of the relevant CLO as agreed between the Company and the relevant CLO.

The Forward Purchase Agreements will contain standard limited recourse and non-petition provisions with respect to the Company and with respect to the relevant CLO.

The governing law of the Forward Purchase Agreements will be English or New York law.

### Custody Agreement

A custody agreement dated 10 August 2015 between (i) the Company and (ii) the Custodian (the "**Custody Agreement**"), whereby the Custodian was appointed to act as custodian of the Company's investments, cash and other assets.

The Custodian provides custody services in respect of such of the property of the Company which is delivered to and accepted by the Custodian as and when such custody services may be required.  Securities are held by the Custodian in one or more accounts registered in the name of the Company or of the Custodian, its delegate or a nominee. The securities are separately designated in the books of the Custodian as belonging to the Company.

004651

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub-custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub-custodian. All such charges shall be charged at normal commercial rates.

The Custody Agreement shall continue for an initial period of six months and thereafter may be terminated by either of the parties hereto on giving ninety (90) days' prior written notice to the other party hereto, provided that the appointment of the Custodian shall not terminate before the appointment of a replacement Custodian provided always if a replacement custodian is not appointed within six months from the date of the relevant termination notice, the Custody Agreement shall terminate in any event. It may be terminated without notice in certain specified circumstances including the insolvency of either party.

The Custodian has a market standard indemnity from the Company in relation to liabilities incurred other than as a result of its negligence, fraud, bad faith, wilful default or recklessness in carrying out its responsibilities under the Custody Agreement.

The Custody Agreement is governed by the laws of Ireland.

## MEMORANDUM AND ARTICLES

### Memorandum of Incorporation

The Memorandum of Incorporation provides that the Company's objects are unrestricted and it shall therefore have the full power and authority to carry out any object not prohibited by the Companies Law, or any other law of Guernsey.

### Articles of Incorporation

The Articles of Incorporation of the Company contain provisions, *inter alia*, to the following effect.

### *Share Capital*

The Company may issue an unlimited number of Shares of no par value each, including Unclassified Shares which may be designated and issued as Ordinary Shares or otherwise as the Directors may from time to time determine.

*Ordinary Shares*

The rights attaching to the Ordinary Shares shall be as follows:

(a)     As to income – subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and, within each such class, income shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

(b)     As to capital – on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles and the Companies Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of the Ordinary Shares and, within each such class, such assets shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of that class held by them.

(c)     As to voting – the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak  and vote at general meetings of the Company.

004652

*General*

Without prejudice to any special rights previously conferred on the holders of any existing Shares or class of Shares, any Share (or option, warrant or other right in respect of a Share) in the Company may be issued with such preferred, deferred or other special rights or restrictions, whether as to dividend, voting, return of capital or otherwise, as the Board may determine.

### *Offers to Shareholders to be on a pre-emptive basis*

(a)   The Company shall not allot equity securities to a person on any terms unless:

(i)   it has made an offer to each person who holds equity securities of the same class in the Company to allot to him on the same or more favourable terms a proportion of those securities that is as nearly as practicable equal to the proportion in number held by him of the share capital of the Company; and

(ii)   the period during which any such offer may be accepted has expired or the Company has received notice of the acceptance or refusal of every offer so made.

(b)   Securities that the Company has offered to allot to a holder of equity securities in accordance with the preceding may be allotted to him, or anyone in whose favour he has renounced his right to their allotment, without contravening the restriction referred to in above.

(c)   Shares held by the Company as treasury shares shall be disregarded for the purposes of the restriction referred to in the second preceding paragraph, so that the Company is not treated as a person who holds equity shares; and the treasury shares are not treated as forming part of the equity share capital of the Company.

(d)   Any offer required to be made by the Company pursuant to the restriction referred to above should be made by a notice (given in accordance with "—*Notices*" below) and such offer must state a period during which such offer may be accepted and such offer shall not be withdrawn before the end of that period.  Such period must be a period of at least 21 days beginning on the date on which such offer is deemed to be delivered or received (as the case may be), pursuant to "—*Notices*" below.

(e)   The restriction referred to above shall not apply in relation to the allotment of bonus shares, nor to a particular allotment of equity securities if these are, or are to be, wholly or partly paid otherwise than in cash.

(f)   The Company may by special resolution resolve that the restriction referred to above shall be excluded or that the restriction referred to in above shall apply with such modifications as may be specified in the resolution:

(i)   generally in relation to the allotment by the Company of equity securities;

(ii)   in relation to allotments of a particular description; or

(iii)   in relation to a specified allotment of equity securities;

and any such resolution must:  (A) state the maximum number of equity securities in respect of which the restriction referred to above is excluded or modified; and (B) specify the date on which such exclusion or modifications will expire, which must be not more than five years from the date on which the resolution is passed.

(g)   Any resolution passed pursuant to the provisions referred to in the preceding paragraph may:

(i)   be renewed or further renewed by special resolution of the Company for a further period not exceeding five years; and

004653

(ii)     be revoked or varied at any time by special resolution of the Company.

(h)     Notwithstanding that any such resolution referred to in the two preceding paragraphs has expired, the Directors may allot equity securities in pursuance of an offer or agreement previously made by the Company if the resolution enabled the Company to make an offer or agreement that would or might require equity securities to be allotted after it expired.

(i)     In relation to an offer to allot securities, a reference (however expressed) to the holder of shares of any description is to whoever was the holder of shares of that description at the close of business on a date to be specified in the offer and the specified date must fall within the period of 28 days immediately before the date of the offer.

### Issue of Shares

Subject to "—*Offers to Shareholders to be on a pre-emptive basis*", the unissued Shares shall be at the disposal of the Board, which is authorised to allot or grant options, warrants or other rights over or otherwise dispose of them to such persons on such terms and conditions and at such times as the Board determines but so that no Share shall be issued at a discount except in accordance with the Companies Law and so that the amount payable on application on each Share shall be fixed by the Board.

### Variation of class rights

If at any time the share capital is divided into different classes of Shares, the rights attached to any class (unless otherwise provided by the terms of issue) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of three-fourths of the issued Shares of that class or with the sanction of a special resolution of the holders of the Shares of that class.

### Winding up

The term of the Placing will commence on the date of the Placing and will end (and the Company thereafter will be wound up and dissolved) at the end of the Term, subject to extension as described in "*Summary-Term*".

If the Company is wound up whether voluntarily or otherwise the liquidator may with the sanction of a special resolution divide among the Shareholders in specie any part of the assets of the Company and may with the like sanction vest any part of the assets of the Company in trustees upon such trusts for the benefit of the Shareholders as the liquidator with the like sanction shall think fit.

If any of the securities or other assets to be divided as aforesaid involve a liability to calls or otherwise any person entitled under such division to any of the said assets may within fourteen (14) clear days after the passing of the special resolution, by notice in writing, direct the liquidator to sell his proportion and pay him the net proceeds and the liquidator shall, if practicable, act accordingly.

### Disclosure of Third Party Interests in Shares

The Directors shall have power, if required for any regulatory purposes, by notice in writing to require any Shareholder to disclose to the Company the identity of any person (other than the Shareholder) who has an interest in the Shares held by the Shareholder and the nature of such interest.  Any such notice shall require any information in response to such notice to be given in writing within the prescribed period which is 28 days after service of the notice or 14 days if the Shares concerned represent 0.25 per cent or more in value of the issued Shares of the relevant class or such other reasonable period as the Directors may determine.  If any Shareholder has been duly served with such a notice and is in default for the prescribed period in supplying to the Company the information required by such notice, the Directors may serve a direction notice upon such Shareholder. The direction notice may direct that in respect of the Shares in respect of which the default has occurred (the "default Shares") and any other Shares held by the Shareholder, the Shareholder shall not be entitled to vote (either personally or by representative or by proxy) in general meetings or class meetings.  Where the default Shares represent at least 0.25 per cent of the class of Shares concerned, the direction notice may additionally direct that dividends on such shares will be retained by the Company (without interest) and

004654

that no transfer of the Shares (other than a transfer approved under the Articles) shall be registered until the default is rectified.

*Dividends*

Subject to compliance with Section 304 of the Companies Law and the Distribution Priority, the Board may at any time declare and pay such dividends as appear to be justified by the position of the Company.  The Board may also declare and pay any fixed dividend which is payable on any Shares half-yearly or otherwise on fixed dates whenever the position, in the opinion of the Board, so justifies.  Dividend payments may be suspended by the Directors in their absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The method of payment of dividends shall be at the discretion of the Board and the Portfolio Manager.

No dividend shall be paid in excess of the amounts permitted by the Companies Law or approved by the Board.

Unless and to the extent that the rights attached to any Shares or the terms of issue thereof otherwise provide, all dividends shall be declared and paid pro rata according to the number of Shares held by each Shareholder.  For the avoidance of doubt, where there is more than one class of Shares in issue, dividends declared in respect of any class of Share shall be declared and paid pro rata according to the number of Shares of the relevant class held by each Shareholder.

With the sanction of the Company in general meeting by way of a special resolution, any dividend may be paid wholly or in part by the distribution of specific assets and, in particular, of paid-up Shares of the Company.  Where any difficulty arises in regard to such distribution, the Board may settle the same as it thinks expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets and may determine that cash payments shall be made to any Shareholders upon the basis of the value so fixed in order to adjust the rights of Shareholders and may vest any such specific assets in trustees for the Shareholders entitled as may seem expedient to the Board.

Any dividend interest or other monies payable in cash in respect of Shares may be paid by cheque or warrant sent through the post to the registered address of the holder or, in the case of joint holders, to the registered address of that one of the joint holders who is first named on the register.  Any one of two or more joint holders may give effectual receipts for any dividends, interest or other monies payable in respect of their joint holdings.  In addition, any such dividend or other sum may be paid by any bank or other funds transfer system or such other means and to or through such person as the holder or joint holders (as the case may be) may in writing direct, and the Company shall have no responsibility for any sums lost or delayed in the course of any such transfer or where it has acted on any such directions.  Any one of two or more joint holders may give effectual receipts for any dividends, interest, bonuses or other monies payable in respect of their joint holdings.

No dividend or other monies payable on or in respect of a Share shall bear interest against the Company.

All unclaimed dividends may be invested or otherwise made use of by the Board for the benefit of the Company until claimed and the Company shall not be constituted a trustee in respect thereof.  All dividends unclaimed for a period of six years after having been declared shall be forfeited and shall revert to the Company.

*Transfer of Shares*

No Shareholder shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**", other than to an Affiliate of an initial Shareholder party hereto, without the prior written consent of the Portfolio Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

004655

(a)   such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in this Offering Memorandum;

(b)   such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the U.S. Investment Company Act;

(c)   such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

(d)   such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the U.S. Tax Code.

Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Shareholder or, in the case of CLO Holdco or a Highland Principal (as defined in the Members' Agreement), to Highland, its Affiliates or another Highland Principal) a Shareholder must first offer to the other Shareholders a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Shareholders will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Shareholders do not accept the offer, the Shareholder may (subject to complying with the other Transfer restrictions in the Articles) Transfer the applicable Shares that such Shareholders have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Shareholder has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Shareholders have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Shareholder (subject to complying with the other Transfer restrictions in the Articles), any initial Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in the Articles), and CLO Holdco or the Highland Principals (unless such Shareholder is the Shareholder proposing the Transfer its shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in the Articles).

Subject to the Articles and such of the restrictions of the Articles as may be applicable, any Shareholder may transfer all or any of his certificated Shares by an instrument of transfer in any usual or common form or in any other form which the Board may approve.  The instrument of transfer of a certificated Share shall be signed by or on behalf of the transferor and, unless the Share is fully paid, by or on behalf of the transferee.  An instrument of transfer of a certificated Share need not be under seal.

The Board may, in its absolute discretion and without giving a reason, decline to transfer, convert or register any transfer of any Share in certificated form which is not fully paid or on which the Company has a lien.  The Directors may also refuse to register a transfer of Shares unless it is in respect of only one class of Shares, it is in favour of a single transferee or not more than four joint transferees; and in the case of a Share in certificated form, having been delivered for registration to the Office or such other place as the Board may decide, it is accompanied by the certificate(s) for the Shares to which it relates and such other evidence as the Board may reasonably require to prove the right of the transferor to make the transfer.

The Board may, in its absolute discretion, decline to register a transfer of any Shares to any person whose ownership may result in a person holding Shares in violation of the transfer restrictions published by the Company, from time to time.

The Directors may, in their absolute discretion, refuse to register a transfer of any Shares to a person that they have reason to believe is (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that is subject to Part 4 of Title 1 of ERISA, (ii) a plan, individual retirement account or other arrangement that is subject to Section

004656

4975 of the U.S. Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**") or any other state, local laws or regulations that would have the same effect as regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 to cause the underlying assets of the Company to be treated as assets of that investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company and the Portfolio Manager (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code, (iii) an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each of (i), (ii) and (iii) in this paragraph a "**Plan**") or (iv) any person in circumstances where the holding of Shares by such person would (a) give rise to an obligation on the Company to register as an "investment company" under the Investment Company Act (as defined in the Articles) (including because the holder of the Shares is not a "qualified purchaser" as defined in the Investment Company Act), (b) preclude the Company from relying on the exception to the definition of "investment company" contained in Section 3(c)(7) of the Investment Company Act, (c) give rise to an obligation on the Company to register its Shares under the Exchange Act, the Securities Act or any similar legislation (each as defined in the Articles), (d) result in the Company not being considered a "Foreign Private Issuer" as that term is defined by Rule 3b-4(c) promulgated under the Exchange Act, (e) give rise to an obligation on the Portfolio Manager to register as a commodity pool operator or commodity trading advisor under the U.S. Commodity Exchange Act of 1974, as amended, (f) cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code, or cause the Company to suffer any pecuniary disadvantage (including any excise tax, penalties or liabilities under ERISA or the U.S. Tax Code), or (g) give rise to the Company or the Portfolio Manager becoming subject to any U.S. law or regulation determined to be detrimental to it (each such person in this paragraph a "**Prohibited U.S. Person**"). Each person acquiring Shares shall by virtue of such acquisition be deemed to have represented to the Company that they are not a Prohibited U.S. Person.

If the Board refuses to register the transfer of a Share it shall, within two months after the date on which the transfer was lodged with the Company, send notice of the refusal to the transferee.

The registration of transfers may be suspended at such times and for such periods (not exceeding 30 days in the aggregate in any one calendar year) as the Board may decide on giving notice in *La Gazette Officielle* and either generally or in respect of a particular class of Share.

### Compulsory redemptions of Shares by the Company

The Company may redeem all or any of the Shares at any time subject to and in accordance with the provisions of the Members' Agreement and the Articles.

A Director is authorised to do all such acts and things as shall be necessary or expedient and to execute any documents deemed necessary or desirable in each case to complete any redemption of Shares subject to and in accordance with the Members' Agreement and the Articles.

The redemption of Shares under the Articles shall be deemed to be effective from the close of business on the relevant redemption date at which time any Shares which are so redeemed shall forthwith be cancelled and the name of the relevant Shareholder(s) be removed from the Register. Upon the redemption of a Share being effected pursuant to the Members' Agreement and the Articles, a Shareholder shall cease to be entitled to any rights in respect thereof save for payment of the redemption proceeds.

### Purchase of Shares

The Company may, at the discretion of the Board, purchase any of its own Shares, whether or not they are redeemable, and may pay the purchase price in respect of such purchase to the fullest extent permitted by the Companies Law.

### Notices

A notice or other communication may be given by the Company to any Shareholder by any means as set out in Section 523 of the Companies Law.

004657

Any notice or other document, if served by post (including registered post, recorded delivery service or ordinary letter post), shall be deemed to have been served 48 hours after the time when the letter containing the same is posted and in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly posted.

Any notice or other document that may be sent by the Company by courier will be deemed to be received 24 hours after the time at which it was despatched.

A notice may be given by the Company to the joint holders of a Share by giving the notice to the joint holder first named in the register in respect of the Share.

Any notice or other communication sent to the address of any Shareholder shall, notwithstanding the death, disability or insolvency of such Shareholder and whether the Company has notice thereof, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder and such service shall, for all purposes, be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in any such Share.

All Shareholders shall be deemed to have agreed to accept communication from the Company by electronic means in accordance with sections 524 and 526 and schedule 3 of the Companies Law unless a Shareholder notifies the Company otherwise. Such notification must be in writing and signed by the Shareholder and delivered to the Company's registered office or such other place as the Board directs. A Shareholder shall be entitled to require the Company to send him a version of a document or information in hard copy form.

Every person who becomes entitled to a Share shall be bound by any notice in respect of that Share which, before his name is entered in the register of members, has been duly given to a person from which he derives his title.

### *General meetings*

General meetings shall be held once at least in each calendar year in accordance with Section 199 of the Companies Law but so that not more than fifteen (15) months may elapse between one annual general meeting and the next. At each such annual general meeting shall be laid copies of the Company's most recent accounts, Directors' report and, if applicable, the auditor's report in accordance with Section 252 of the Companies Law. The requirement for an annual general meeting may be waived by the shareholders in accordance with Section 201 of the Companies Law. Other meetings of the Company shall be called extraordinary general meetings.

All general meetings shall be held in Guernsey.

A shareholder participating by video link or telephone conference call or other electronic or telephonic means of communication in a meeting at which a quorum is present shall be treated as having attended that meeting, provided that the shareholders present at the meeting can hear and speak to the participating shareholder.

A video link or telephone conference call or other electronic or telephonic means of communication in which a quorum of shareholders participates and all participants can hear and speak to each other shall be a valid meeting which shall be deemed to take place where the Chairman is present unless the shareholders resolve otherwise.

Any general meeting convened by the Board, unless its time shall have been fixed by the Company in a general meeting or unless convened in pursuance of a requisition, may be postponed by the Board by notice in writing and the meeting shall, subject to any further postponement or adjournment, be held at the postponed date for the purpose of transacting the business covered by the original notice.

The Board may, whenever it thinks fit, and shall on the requisition of shareholders who hold more than ten per cent (10%) of such of the capital of the Company as carries the right to vote at general meetings (excluding any capital held as treasury shares) in accordance with Sections 203 and 204 of the Companies Law, proceed to convene a general meeting.

004658

*Notice of general meetings*

A general meeting of the Company (other than an adjourned meeting) must be called by notice of at least 14 clear days.

A general meeting may be called by shorter notice than otherwise required if all the Shareholders entitled to attend and vote so agree.

Notices and other documents may be sent in electronic form or published on a website in accordance with Section 208 of the Companies Law.

Notice of a general meeting of the Company must be sent to every Shareholder (being only persons registered as a Shareholder), every Director and every alternate Director registered as such.

Notice of a general meeting of the Company must state the time and date of the meeting, state the place of the meeting, specify any special business to be put to the meeting (as defined in the Articles), contain the information required under Section 178(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a special resolution at the meeting, contain the information required under Section 179(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a waiver resolution at the meeting, and contain the information required under Section 180(3)(a) of the Companies Law in respect of a resolution which is to be proposed as a unanimous resolution at the meeting.

Notice of a general meeting must state the general nature of the business to be dealt with at the meeting.

The accidental omission to give notice of any meeting to or the non-receipt of such notice by any Shareholder shall not invalidate any resolution or any proposed resolution otherwise duly approved.

*Conflicts of interest*

A Director must, immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the Company, disclose to the Board in accordance with section 162 of the Companies Law the nature and extent of that interest.

The obligation referred to above does not apply if:

(a)     the transaction or proposed transaction is between the Director and the Company; and

(b)     the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

A general disclosure to the Board to the effect that a Director has an interest (as director, officer, employee, member or otherwise) in a party and is to be regarded as interested in any transaction which may after the date of the disclosure be entered into with that party is sufficient disclosure of interest in relation to that transaction.

Nothing referred to above in this section applies in relation to:

(a)     remuneration or other benefit given to a Director;

(b)     insurance purchased or maintained for a Director in accordance with Section 158 of the Companies Law; or

(c)     a qualifying third party indemnification provision provided for a Director in accordance with Section 159 of the Companies Law.

Subject to the paragraph below, a Director is interested in a transaction to which the Company is a party if such Director:

(a)     is a party to, or may derive a material benefit from, the transaction;

004659

(b)       has a material financial interest in another party to the transaction;

(c)       is a director, officer, employee or member of another party (other than a party which is an associated company) who may derive a material financial benefit from the transaction;

(d)       is the parent, child or spouse of another party who may derive a material financial benefit from the transaction; or

(e)       is otherwise directly or indirectly materially interested in the transaction.

A Director is not interested in a transaction to which the Company is a party if the transaction comprises only the giving by the Company of security to a third party which has no connection with the Director, at the request of the third party, in respect of a debt or obligation of the Company for which the Director or another person has personally assumed responsibility in whole or in part under a guarantee, indemnity or security.

Save as provided in the Articles, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest otherwise than by virtue of his interest in Shares or debentures or other securities of or otherwise through the Company.  A Director may be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

A Director shall (in the absence of some other material interest than is indicated below) be entitled to vote (and be counted in the quorum) in respect of any resolution concerning any of the following matters, namely:

(a)       the giving of any guarantee, security or indemnity to him in respect of money lent or obligations incurred by him at the request of or for the benefit of the Company or any of its subsidiaries;

(b)       the giving of any guarantee, security or indemnity to a third party in respect of a debt or obligation of the Company or any of its subsidiaries for which he himself has assumed responsibility in whole or in part under a guarantee or indemnity or by the giving of security;

(c)       any proposal concerning an offer of Shares or debentures or other securities of or by the Company or any of its subsidiaries for subscription or purchase in which offer he is or is to be interested as a participant in the underwriting or sub-underwriting thereof; or

(d)       any proposal concerning any other company in which he is interested, directly or indirectly and whether as an officer or shareholder or otherwise howsoever, provided that he is not the holder of or beneficially interested in one per cent  or more of the issued shares of such company (or of any third company through which his interest is derived) or of the voting rights available to shareholders of the relevant company (any such interest being deemed for these purposes to be a material interest in all circumstances).

Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employment with the Company or any company in which the Company is interested, the Directors may be counted in the quorum for the consideration of such proposals and such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned (if not debarred from voting under the provisions referred to above) shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to any other Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

The Company may by ordinary resolution suspend or relax the provisions referred to above to any extent or ratify any transaction not duly authorised by reason of a contravention of any of the paragraphs above.

Subject to the provisions referred to above the Directors may exercise the voting power conferred by the shares in any other company held or owned by the Company or exercisable by them as directors of such other company in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them director, managing director, managers or other officer of such company or voting or providing for the payment or remuneration to the directors, managing director, manager or other officer of such company).

A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director on such terms as to tenure of office or otherwise as the Directors may determine.

Subject to due disclosure in accordance with the provisions referred to in this section, no Director or intending Director shall be disqualified by his office from contracting with the Company as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested render the Director liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relationship thereby established.

Any Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director, provided that nothing herein contained shall authorise a Director or his firm to act as Auditor to the Company.

Any Director may continue to be or become a director, managing director, manager or other officer or member of any company in which the Company may be interested and (unless otherwise agreed) no such Director shall be accountable for any remuneration or other benefits received by him as a director, managing director, manager or other officer or member of any such other company.

### Remuneration and appointment of Directors

The ordinary remuneration of the Directors who do not hold executive office for their services (excluding amounts payable under any other sub-paragraph of the Articles) shall not exceed in aggregate £150,000 per annum or such higher amount as the Company may from time to time by ordinary resolution determine. Such remuneration shall be deemed to accrue from day to day. The Directors shall also be paid all reasonable out-of-pocket travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the Directors or any committee of the Directors or general meetings of the Company or in connection with the business of the Company. In addition, the Board may award additional remuneration to any Director engaged in exceptional work at the request of the Board on a time spent basis.

The Board shall have power at any time to appoint any person eligible in accordance with Section 137 of the Companies Law to be a Director either to fill a casual vacancy or as an addition to the existing Directors but so that the total number of Directors shall not at any time exceed the number, if any, fixed pursuant to the Articles. Any Director so appointed shall hold office only until the next following annual general meeting and shall then be eligible for re-election. Without prejudice to the powers of the Board, the Company in general meeting may appoint any person to be a Director either to fill a casual vacancy or as an additional Director.

The Directors may at any time appoint one or more of their body (other than a Director resident in the United Kingdom) to the office of managing director for such term and at such remuneration and upon such terms as they determine.

### Disqualification of Directors

No person other than a Director retiring at a general meeting shall, unless recommended by the Directors, be eligible for election by the Company to the office of Director unless, not less than 14 clear days before the date appointed for the meeting there shall have been left at the Company's registered office notice in writing signed by a Shareholder duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election together with notice in writing signed by that person of his willingness to be elected.

A Director shall cease to hold office:  (i) if the Director (not being a person holding for a fixed term an executive office subject to termination if he ceases for any reason to be a Director) resigns his office by written notice signed by him sent to or deposited at the registered office of the Company, (ii) if he shall have absented himself from meetings of the Board for a consecutive period of 12 months and the Board resolves that his office shall be vacated, (iii) if he

004661

dies or becomes of unsound mind or incapable, (iv) if he becomes insolvent, suspends payment or compounds with his creditors, (v) if he is requested to resign by written notice signed by all his co-Directors, (vi) if the Company in general meeting shall declare that he shall cease to be a Director, (vii) if he becomes resident in the United Kingdom and, as a result thereof, a majority of the Directors are resident in the United Kingdom, (viii) if he becomes ineligible to be a Director in accordance with section 137 of the Companies Law or (ix) if he becomes prohibited from being a Director by reason of any order made under any provisions or any law or enactment.

*Indemnities*

The Directors, company secretary and officers of the Company and their respective heirs and executors shall, to the extent permitted by Section 157 of the Companies Law, be fully indemnified out of the assets and profits of the Company from and against all actions expenses and liabilities which they or their respective heirs or executors may incur by reason of any contract entered into or any act in or about the execution of their respective offices or trusts except such (if any) as they shall incur by or through their own negligence, default, breach of duty or breach of trust respectively and none of them shall be answerable for the acts, receipts, neglects or defaults of the others of them or for joining in any receipt for the sake of conformity or for any bankers or other person with whom any monies or assets of the Company may be lodged or deposited for safe custody or for any bankers or other persons into whose hands any money or assets of the Company may come or for any defects of title of the Company to any property purchased or for insufficiency or deficiency of or defect in title of the Company to any security upon which any monies of the Company shall be placed out or invested or for any loss misfortune or damage resulting from any such cause as aforesaid or which may happen in or about the execution of their respective offices or trusts, except if the same shall happen by or through their own negligence, default, breach of duty or breach of trust.

To the fullest extent permitted by applicable law (including the Companies Law) and subject to compliance with this Offering Memorandum, the Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (including executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") shall be fully indemnified against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

*Borrowing powers*

Subject to the restrictions set forth in this Offering Memorandum, the Board may exercise all the powers of the Company to borrow money (in whatever currency the Board determines from time to time) and to mortgage, hypothecate, pledge or charge all or part of its undertaking property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Company or of any third party, subject to any limits on borrowings adopted by the Board from time to time. The Board may exercise all the

004662

powers of the Company to engage in currency or interest rate hedging in the interests of efficient portfolio management.

### *Forfeiture and surrender of Shares*

Any Share in respect of which a notice requiring payment of an unpaid call or instalment, together with any interest which may have accrued and any expenses which may have been incurred, has been served may, at any time before payment has been made, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited Share and not actually paid before the forfeiture.

The Board may accept from any Shareholder on such terms as agreed a surrender of any Shares in respect of which there is a liability for calls. Any surrendered Share may be disposed of in the same manner as a forfeited share.

If any Shares are owned directly or beneficially by a person believed by the Directors to be a Prohibited U.S. Person, the Directors may give notice to such person requiring them either (i) to provide the Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Directors that such person is not a Prohibited U.S. Person or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Directors with satisfactory evidence of such sale or transfer. Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

### LITIGATION

There are no, and have not been in the last 12 months, any governmental, legal or arbitration proceedings, nor, so far as the Company is aware, are any such proceedings pending or threatened, which may have, or have in the recent past had, a significant effect on the Company's financial position or profitability.

### RELATED PARTY TRANSACTIONS

Other than as set out in the section of this Offering Memorandum entitled "*—Material Contracts*" (including the NexBank Credit Facility), "*Investment Policy—Company Borrowing*" and cross-transactions as described in "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" the Company has not entered into any related party transactions. The consent of the Advisory Board will be required with respect to transactions with any Related Party.

### GENERAL

Highland may be regarded as the promoter of the Company. Save as disclosed in this section of this Offering Memorandum, no amount or benefit has been paid, or given, to the promoter or any of its subsidiaries since the incorporation of the Company and none is intended to be paid, or given. Highland is a limited partnership, established under the laws of the State of Delaware in the U.S. with its registered office at 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801.

The Net Placing Proceeds available for investment by the Company following the Placing will be approximately U.S. $153 million (less any amounts retained for working capital purposes) and these proceeds will be invested in accordance with the Company's investment policy described in the section of this Offering Memorandum entitled "*The Company*". Since incorporation, the Company has not commenced operations, and therefore has not generated earnings. As the Shares do not have a par value, the Placing Price consists solely of share premium.

None of the Shares available under the Placing are being underwritten.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

The Company does not own any premises and does not lease any premises.

004663

**THIRD PARTY SOURCES**

Where third party information has been referenced in this Offering Memorandum, the source of that third party information has been disclosed. Where information contained in this Offering Memorandum has been so sourced, the Company confirms that such information has been accurately reproduced and, as far as the Company is aware and able to ascertain from information published by such third parties, no facts have been omitted which would render the reproduced information inaccurate or misleading.

Highland has given and not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear. Highland accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Each of the Management Companies has given and, as at the date of this Offering Memorandum, has not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear. Each of the Management Companies accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

**WORKING CAPITAL**

The Company is of the opinion that the working capital available to the Group is sufficient for the present requirements of the Company, that is, for at least the next 12 months from the date of this Offering Memorandum.

**CAPITALISATION AND INDEBTEDNESS**

As at the date of this Offering Memorandum, the Company:

(a)     does not have any secured, unsecured or unguaranteed indebtedness, including indirect and contingent, other than the NexBank Credit Facility;

(b)     has not granted any mortgage or charge over any of its assets, other than that granted under the NexBank Credit Facility; and

(c)     does not have any contingent liabilities or guarantees.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital consisted of 143,454,001 Shares of no par value.

**DOCUMENTS AVAILABLE FOR INSPECTION**

Copies of the Articles, the constitutional documents of the Company, the material contracts referred to in "—*Material Contracts*" above and this Offering Memorandum will be available for inspection at the registered office of the Company during normal business hours on any weekday (Saturdays and public holidays excepted) up to and including the date of the Placing.

Copies of this Offering Memorandum may be obtained, free of charge during normal business hours on any weekday (bank and public holidays excepted) at the Company's registered office up to and including the date of the Placing.

**RELATIONSHIP BETWEEN SHAREHOLDERS, THE COMPANY AND SERVICE PROVIDERS**

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015. While prospective investors will acquire an interest in the Company on subscribing for Placing Shares, the Company is the sole legal and/or beneficial owner of its investments. Consequently, Shareholders have no direct legal or beneficial interest in those investments. The liability of Shareholders for the debts and other obligations of the Company is limited to the amount unpaid, if any, on the Placing Shares held by them.

004664

Shareholders' rights in respect of their investment in the Company are governed by the Articles, the Companies Law and the investment terms set out in this Offering Memorandum.

**RIGHTS AGAINST THIRD PARTIES, INCLUDING THIRD PARTY SERVICE PROVIDERS**

As the Company has no employees and the Directors have all been appointed on a non-executive basis, the Company is reliant on the performance of service providers listed in this Offering Memorandum (the "**Service Providers**").

Without prejudice to any potential right of action in tort that a Shareholder may have to bring a claim against a Service Provider, each Shareholder's contractual relationship in respect of its investment in Shares is with the Company only. Therefore, no Shareholder will have any contractual claim against any Service Provider with respect to such Service Provider's default.

**JURISDICTION AND APPLICABLE LAW**

As noted above, Shareholders' rights are governed by the Articles, the Companies Law and the terms set out in this Offering Memorandum. By subscribing for Placing Shares, investors agree to be bound by the Articles, the Companies Law and the terms set out in this Offering Memorandum.

Information on the existence or not of any legal instruments providing for the recognition and enforcement of judgments in the territory where the Company is established is as follows. A final and conclusive judgement under which a sum of money is payable (not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or penalty) obtained in the superior courts in the reciprocating countries set out in the Judgments (Reciprocal Enforcement) (Guernsey) Law 1957 (the ''**1957 Law**'') (which includes the Supreme Court and the Senior Courts of England and Wales, excluding the Crown Court), after a hearing on the merits would be recognised as a valid judgement by the Guernsey courts and would be enforceable in accordance with and subject to the provisions of the 1957 Law.

The Guernsey courts would also recognise, without reconsideration of the merits and assuming proper service of process and assumption of jurisdiction in accordance with the laws of the relevant jurisdiction, any final and conclusive judgement under which affixed or ascertainable sum of money is payable (not being a sum payable in respect of taxes or other charges or a like nature or in respect of a fine or other penalty) obtained in a court not recognised by the 1957 Law provided that the judgment was not obtained by fraud or in a manner opposed to the principles of natural justice and recognition of the judgment is not contrary to public policy as applied by the Guernsey courts.

**FAIR TREATMENT AND PREFERENTIAL TREATMENT OF INVESTORS**

The Directors owe certain fiduciary duties to the Company which require them, among other things, to act in good faith and in what they consider to be the best interests of the Company. In doing so, the Directors will act in a manner that ensures the fair treatment of investors.

Under the AIFMD Rules, the Portfolio Manager as AIFM must treat all investors fairly. The Portfolio Manager ensures the fair treatment of investors through its decision-making procedures and organisational structure which (1) identify any preferential treatment, or the right thereto, accorded to investors and (2) ensure that any such preferential treatment does not result in an overall disadvantage to other investors.

In addition, the Portfolio Manager monitors the terms of side arrangements entered into with investors in relation to their investment in the Company to seek to ensure the fair treatment of investors. In so doing, the Portfolio Manager takes into consideration whether such side arrangements are in accordance with side arrangements previously entered into.

The Portfolio Manager may enter into side letters in relation to the Company and its investments with certain individual investors covering, inter alia, *capacity, provision of additional information, fees, most favoured investor commitments, individual investor approval requirements, transfer rights and confirmations of how expenses will be borne*. Such information may provide the recipient greater insights into the Company activities than is included in standard reports to investors. In entering into any side letters, the Company will act in the best interests of the investors as a whole.

004665

Information on such side letters will be disclosed to investors in accordance with the AIFMD.

004666

## TERMS AND CONDITIONS OF THE PLACING

### INTRODUCTION

Each Placee which confirms its agreement (whether orally or in writing) to subscribe for Placing Shares under the Placing will be bound by these terms and conditions and will be deemed to have accepted them.

The Company may require any Placee to agree to such further terms and/or conditions and/or give such additional warranties and/or representations as it (in its absolute discretion) sees fit and/or may require any such Placee to execute a separate placing letter (a "**Placing Letter**").

### AGREEMENT TO SUBSCRIBE FOR PLACING SHARES

Any Placee agrees to become a member of the Company and agrees to subscribe for those Placing Shares allocated to it at the Placing Price in respect of the Placing Shares allocated to the Placee.  To the fullest extent permitted by law, each Placee acknowledges and agrees that it will not be entitled to exercise any remedy of rescission at any time.  This does not affect any other rights the Placee may have.

### PAYMENT FOR PLACING SHARES

Each Placee must pay the Placing Price for the Placing Shares issued to the Placee in the manner and by the time directed by the Company.  If any Placee fails to pay as so directed and/or by the time required, the relevant Placee's application for Placing Shares shall be rejected.

### REPRESENTATIONS AND WARRANTIES

By agreeing to subscribe for Placing Shares, each Placee which will enter into a commitment to subscribe for Placing Shares will (for itself and any person(s) procured by it to subscribe for Placing Shares and any nominee(s) for any such person(s)) agree, represent and warrant to the Company that:

(a)     in agreeing to subscribe for Placing Shares under the Placing, it is relying solely on this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and not on any other information given, or representation or statement made at any time, by any person concerning the Company or the Placing.  It agrees that none of the Company nor any of its respective officers, agents or employees, will have any liability for any other information or representation.  It irrevocably and unconditionally waives any rights it may have in respect of any other information or representation;

(b)     if the laws of any territory or jurisdiction outside the United Kingdom are applicable to its agreement to subscribe for Placing Shares under the Placing, it warrants that it has complied with all such laws, obtained all governmental and other consents which may be required, complied with all requisite formalities and paid any issue, transfer or other taxes due in connection with its placing commitment in any territory and that it has not taken any action or omitted to take any action which will result in the Company or any of its respective officers, agents, affiliates or employees acting in breach of the regulatory or legal requirements, directly or indirectly, of any territory or jurisdiction outside the United Kingdom in connection with the Placing;

(c)     it does not have a registered address in, and is not a citizen, resident or national of, any jurisdiction in which it is unlawful to make or accept an offer of the Placing Shares and it is not acting on a non-discretionary basis for any such person;

(d)     it agrees that, having had the opportunity to read this Offering Memorandum, it shall be deemed to have had notice of all information and representations contained in this Offering Memorandum, that it is acquiring Placing Shares solely on the basis of this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and no other information and that in accepting a participation in the Placing it has had access to all information it believes necessary or appropriate in connection with its decision to subscribe for Placing Shares;

004667

(e)    it acknowledges that no person is authorised in connection with the Placing to give any information or make any representation other than as contained in this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and, if given or made, any information or representation must not be relied upon as having been authorised by the Company;

(f)    it is not applying as, nor is it applying as nominee or agent for, a person who is or may be liable to notify and account for tax under the Stamp Duty Reserve Tax Regulations 1986 at any of the increased rates referred to in section 67, 70, 93 or 96 (depository receipts and clearance services) of the Finance Act 1986;

(g)    it accepts that none of the Placing Shares have been or will be registered under the laws of any Restricted Territory.  Accordingly, the Placing Shares may not be offered, sold, issued or delivered, directly or indirectly, within any Restricted Territory unless an exemption from any registration requirement is available;

(h)    if it is receiving the offer in circumstances under which the laws or regulations of a jurisdiction other than the United Kingdom would apply, that it is a person to whom the Placing Shares may be lawfully offered under that other jurisdiction's laws and regulations;

(i)    if it is a resident in the EEA (other than the United Kingdom), it is a "Qualified Investor" within the meaning of the law in the Relevant Member State implementing Article 2(1)(e)(i), (ii) or (iii) of the Prospectus Directive;

(j)    if it is outside the United Kingdom, neither this Offering Memorandum nor any other offering, marketing or other material in connection with the Placing constitutes an invitation, offer or promotion to, or arrangement with, it or any person whom it is procuring to subscribe for Placing Shares pursuant to the Placing unless, in the relevant territory, such offer, invitation or other course of conduct could lawfully be made to it or such person and such documents or materials could lawfully be provided to it or such person and Placing Shares could lawfully be distributed to and subscribed and held by it or such person without compliance with any unfulfilled approval, registration or other regulatory or legal requirements;

(k)    it acknowledges the representations, warranties and agreements set out in this Offering Memorandum, including those set out in the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*", and further acknowledges that it is not a U.S. Person, it is not located within the United States, it is subscribing for Placing Shares in an "offshore transaction" as defined in Regulation S and it is not acquiring the Placing Shares for the account or benefit of a U.S. Person, and where it is subscribing for Placing Shares for one or more managed, discretionary or advisory accounts, it is authorised in writing for each such account:  (i) to subscribe for the Placing Shares for each such account; (ii) to make on each such account's behalf the representations, warranties and agreements set out in this Offering Memorandum or in any Placing Letter, where relevant; and (iii) to receive on behalf of each such account any documentation relating to the Placing in the form provided by the Company.  It agrees that the provision of this paragraph shall survive any resale of the Placing Shares by or on behalf of any such account;

(l)    it is acting as principal only in respect of the Placing, or, if it is acting for any other person (i) it is and will remain liable to the Company for the performance of all its obligations as a placee in respect of the Placing (regardless of the fact that it is acting for another person), (ii) it is both an "authorised person" for the purposes of FSMA and a "qualified investor" as defined at Article 2.1(e)(i) of Directive 2003/71/EC (known as Prospectus Directive) acting as agent for such person, and (iii) such person is either (1) a FSMA Qualified Investor or (2) its "client" (as defined in section 86(2) of FSMA) that has engaged it to act as his agent on terms which enable it to make decisions concerning the Placing or any other offers of transferable securities on his behalf without reference to him;

(m)    it has not and will not offer or sell any Placing Shares to persons in the United Kingdom, except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business or otherwise in circumstances which

004668

have not resulted and which will not result in an offer to the public in the United Kingdom within the meaning of section 102B of the FSMA;

(n)     it is an "eligible counterparty" within the meaning of Chapter 3 of the FCA's Conduct of Business Sourcebook and it is subscribing for or purchasing the Shares for investment only and not for resale or distribution;

(o)     it irrevocably appoints any Director of the Company to be its agent and on its behalf (without any obligation or duty to do so), to sign, execute and deliver any documents and to do all acts, matters and things as may be necessary for, or incidental to, its subscription for all or any of the Placing Shares for which it has given a commitment under the Placing, in the event of its own failure to do so;

(p)     it accepts that if the Placing does not proceed or such Placing Shares are not admitted to a securities exchange for any reason whatsoever, then none of the Company or any of its affiliates, nor persons controlling, controlled by or under common control with any of them nor any of their respective employees, agents, officers, members, stockholders, partners or representatives, shall have any liability whatsoever to it or any other person;

(q)     it has not taken any action or omitted to take any action which will or may result in the Company or any of its directors, officers, agents, affiliates, employees or advisers being in breach of the legal or regulatory requirements of any territory in connection with the Placing or its subscription of Placing Shares pursuant to the Placing;

(r)     in connection with its participation in the Placing it has observed all relevant legislation and regulations, in particular (but without limitation) those relating to money laundering and countering terrorist financing and that its placing commitment is only made on the basis that it accepts full responsibility for any requirement to identify and verify the identity of its clients and other persons in respect of whom it has applied.  In addition, it warrants that it is a person:  (i) subject to the Money Laundering Regulations 2007 in force in the United Kingdom; or (ii) subject to the Money Laundering Directive (2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing); or (iii) subject to the Guernsey AML Requirements; or (iv) acting in the course of a business in relation to which an overseas regulatory authority exercises regulatory functions and is based or incorporated in, or formed under the law of, a country in which there are in force provisions at least equivalent to those required by the Money Laundering Directive;

(s)     due to anti-money laundering and the countering of terrorist financing requirements, the Company may require proof of identity of the Placee and related parties and verification of the source of the payment before the placing commitment can be processed and that, in the event of delay or failure by the Placee to produce any information required for verification purposes, the Company may refuse to accept the placing commitment and the subscription moneys relating thereto.  It holds harmless and will indemnify the Company against any liability, loss or cost ensuing due to the failure to process the placing commitment, if such information as has been required has not been provided by it or has not been provided timeously;

(t)     any person in Guernsey involved in the business of the Company who knows or suspects or has reasonable grounds for knowing or suspecting that any other person (including the Company or any person subscribing for Placing Shares) is involved in money laundering activities, is under an obligation to report such suspicion to the relevant authorities pursuant to the Guernsey AML Requirements.  Similar disclosures may be required under other legislation;

(u)     it and each person or body (including, without limitation, any local authority or the managers of any pension fund) on whose behalf it accepts Placing Shares pursuant to the Placing or to whom it allocates such Placing Shares have the capacity and authority to enter into and to perform their obligations as a Placee of the Placing Shares and will honour those obligations;

004669

(v)     it confirms that it is not acquiring the Placing Shares using the assets of:  (i)(A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law;

(w)     the representations, undertakings and warranties contained in this Offering Memorandum or in any Placing Letter, where relevant, are irrevocable.  It acknowledges that the Company and its affiliates will rely upon the truth and accuracy of such representations and warranties and it agrees that if any of the representations or warranties made or deemed to have been made by its subscription of the Shares are no longer accurate, it shall promptly notify the Company;

(x)     nothing has been done or will be done by it in relation to the Placing that has resulted or could result in any person being required to publish a prospectus in relation to the Company or to any ordinary shares in accordance with FSMA or the Prospectus Rules or in accordance with any other laws applicable in any part of the European Union or the European Economic Area;

(y)     it accepts that the allocation of Placing Shares shall be determined by the Company in its absolute discretion and that such persons may scale down any placing commitments for this purpose on such basis as they may determine; and

(z)     time shall be of the essence as regards its obligations to settle payment for the Placing Shares and to comply with its other obligations under the Placing; and

(aa)    it has been provided an opportunity to ask questions of, and have received satisfactory answers thereto from, the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable, regarding the Company's assets and the terms and conditions of the offering of the Placing Shares, and it and its representatives have obtained all additional information requested of the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable and to the extent such information is in their possession or reasonably obtainable thereby without undue expense or burden, in order to respond to any inquiries it has made regarding the offering of the Placing Shares.  In connection with the offering of the Shares, it is not relying upon any statements other than those statements contained in the Offering Memorandum. It are not relying on the Company, the Portfolio Manager, Highland, Acis and/or their respective any of its respective affiliates or any of its partners, members, managers, shareholders, officers, employees, shared personnel, representatives, consultants, advisors, attorneys or agents for legal, investment or tax advice.  It has sought independent legal, investment and tax advice to the extent that it has deemed necessary or appropriate in connection with its decision to subscribe for the Placing Shares.

## SUPPLY AND DISCLOSURE OF INFORMATION

If the Administrator or the Company or any of their agents request any information in connection with a Placee's agreement to subscribe for Placing Shares under the Placing or to comply with any relevant legislation, such Placee must promptly disclose it to them.

## DATA PROTECTION

Pursuant to the Data Protection (Bailiwick of Guernsey) Law, 2001, as amended (the "**DP Law**") and any successor legislation, the Company and/or the Administrator may hold personal data (as defined in the DP Law) relating to past and present Shareholders.

004670

Such personal data held is used by those parties in relation to the Placing and to maintain a register of the Shareholders and mailing lists and this may include sharing such data with third parties in one or more of the countries mentioned below when (a) effecting the payment of dividends and redemption proceeds to Shareholders (in each case, where applicable) and, if applicable, the payment of commissions to third parties; and (b) filing returns of Shareholders and their respective transactions in shares with statutory bodies and regulatory authorities.  Personal data may be retained on record for a period exceeding six years after it is no longer used.

The countries referred to above include, but need not be limited to, those in the European Economic Area or the European Union and any of their respective dependent territories overseas, Andorra, Argentina, Canada, State of Israel, New Zealand, Switzerland and the Eastern Republic of Uruguay.

By becoming registered as a holder of Placing Shares in the Company a person becomes a data subject (as defined in the DP Law) and is deemed to have consented to the processing by the Company and the Administrator of any personal data relating to them in the manner described above.

The Company will be the "data controller" in respect of the personal data, but has appointed the Administrator as a "data processor" of such data (each as defined in the DP Law).  Details of the registration of the Company as data controller can be found on the website of the Guernsey Data Protection Commissioner:  www.dpr.gov.gg.

**MISCELLANEOUS**

The rights and remedies of the Company and the Administrator under these terms and conditions are in addition to any rights and remedies which would otherwise be available to each of them and the exercise or partial exercise of one will not prevent the exercise of others.

On the acceptance of their placing commitment, if a Placee is a discretionary fund manager, that Placee may be asked to disclose in writing or orally the jurisdiction in which its funds are managed or owned.  All documents provided in connection with the Placing will be sent at the Placee's risk.  They may be returned by post to such Placee at the address notified by such Placee.

Each Placee agrees to be bound by the Articles (as amended from time to time) once the Placing Shares, which the Placee has agreed to subscribe for pursuant to the Placing, have been acquired by the Placee.  The contract to subscribe for Placing Shares under the Placing and the appointments and authorities mentioned in this Offering Memorandum will be governed by, and construed in accordance with, the laws of England.  For the exclusive benefit of the Company and the Administrator, each Placee irrevocably submits to the jurisdiction of the courts of England and Wales and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.  This does not prevent an action being taken against a Placee in any other jurisdiction.

In the case of a joint agreement to subscribe for Placing Shares under the Placing, references to a "Placee" in these terms and conditions are to each of the Placees who are a party to that joint agreement and their liability is joint and several.

The Company expressly reserves the right to modify the Placing (including, without limitation, its timetable and settlement) at any time prior to the date of the Placing.

004671

## PLACING STATISTICS

| | |
|---|---|
| Target Gross Placing Proceeds[*] | U.S. $153 million |
| Minimum expected initial Net Asset Value per Share[**] | U.S. $1.02535 |

_____

[*]    The target size of the Placing is U.S. $153 million. The number of Placing Shares to be issued, and therefore the Gross Placing Proceeds, is not known as at the date of this Offering Memorandum.

[**]    NAV per Share immediately following Placing based on the NAV of the Company as at September 30, 2017, as adjusted with respect to a dividend of US $ 9 million on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. for an aggregate purchase price of $991,180.13 on October 24, 2017.

004672

# DEFINITIONS

The following definitions apply in this Offering Memorandum unless the context otherwise requires:

| | |
|---|---|
| "**2010 PD Amending Directive**" | Directive 2010/73/EU of the European Parliament and of the Council of 24 November 2010 amending Directives 2003/71/EC on the prospectus to be published when securities are offered to the public or admitted to trading and 2004/109/EC on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market |
| "**Accredited Investor**" | an as "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act |
| "**Acis**" | Acis Capital Management, L.P. |
| "**Acis CLO Management**" | Acis CLO Management, LLC |
| "**Acis Legacy CLO**" | a CLO in which Acis is the CLO manager |
| "**Administration Agreement**" | the agreement dated 10 August 2015 between the Company and the Administrator, a summary of which is set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Administrator**" | State Street (Guernsey) Limited, or such other person or persons from time to time appointed by the Company |
| "**affiliate**" or "**affiliated**" | with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "affiliate" of the Company solely because the Administrator or its affiliates serve as administrator or share trustee for such entity |
| "**AIF**" | an alternative investment fund, as defined in the AIFMD |
| "**AIFM**" | an alternative investment fund manager, as defined in the AIFMD |
| "**AIFMD**" | Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directive 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010 |

004673

| "AIFMD Rules" | any implementing legislation and regulations under AIFMD including, without limitation, Commission Delegated Regulation (EU) No 231/2013 supplementing the AIFMD with regard to exemptions, general operating conditions, depositaries, leverage, transparency, supervision and other applicable regulations implementing the AIFMD, in each case as may be altered, amended, added to or cancelled from time to time |
|---|---|
| "Application Form" | the application form for Shares, which is available upon request; |
| "Approved Pricing Source" | in relation to loans, Markit Partners or any other entity appointed from time to time and in relation to CLO Notes, Thomson Reuters or any other entity appointed from time to time |
| "Articles" | the articles of incorporation of the Company |
| "Audit Committee" | the audit committee of the Company, as more fully described in the section of this Offering Memorandum entitled "*Audit Committee*" in "*Company Directors and Administration*" |
| "Auditor" | PricewaterhouseCoopers CI LLP, or such other person or persons from time to time appointed by the Company |
| "bps" | basis point |
| "Business Day" | a day on which the banks in Guernsey and the United Kingdom are normally open for business |
| "certificated" or "certificated form" | not in uncertified form |
| "Chairman" | the chairman of the Board |
| "CLO" | a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans |
| "CLO Income Notes" | the most subordinated tranche of debt issued by a CLO (which may be represented by a debt or equity security) |
| "CLO Manager" | the entity acting as manager in a CLO pursuant to the relevant CLO Management Agreement |
| "CLO Notes" | notes representing tranches of debt issued by a CLO, including CLO Income Notes (which may be represented by a debt or equity security) |
| "Closing Date" | November 15, 2017 |
| "Companies Law" | the Companies (Guernsey) Law 2008, as amended, extended or replaced and any ordinance, statutory instrument or regulation made thereunder |
| "Company" | Highland CLO Funding, Ltd., a closed-ended investment company incorporated in Guernsey under the Companies Law on 30 March 2015 with registration number 60120 |
| "CRR" | Regulation 575/2013 of the European Parliament and of the Council on prudential requirements for credit institutions and investment firms |

004674

| | |
|---|---|
| "**CRR Retention Requirements**" | the retention requirements contained in the CRR as amended from time to time and including any guidance or any technical standards published in relation thereto |
| "**Custodian**" | State Street Custodial Services (Ireland) Limited |
| "**Custody Agreement**" | the agreement dated 10 August 2015 between the Company and the Custodian, further details of which are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Directors**" or "**Board**" or "**Board of Directors**" | the directors of the Company |
| "**DP Law**" | The Data Protection (Bailiwick of Guernsey) Law, 2001, as amended |
| "**EEA**" | the European Economic Area being the countries included as such in the Agreement on European Economic Area, dated 1 January 1994, among Iceland, Liechtenstein, Norway, the European Community and the EU Member States, as may be modified, supplemented or replaced |
| "**Eligible U.S. Investor**" | a U.S. Person who is reasonably believed to be (x) a Qualified Institutional Buyer and a Qualified Purchaser (y) an Accredited Investor and a Qualified Purchaser or (z) an Accredited Investor and a Knowledgeable Employee with respect to the Company and to whom the Company is privately placing a certain number of the Placing Shares in reliance on exemptions from registration under the U.S. Securities Act and the U.S. Investment Company Act |
| "**ERISA**" | the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable regulations thereunder |
| "**EU**" | the European Union |
| "**EU Member State**" | a member country of the EU |
| "**EU Retention Requirements**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**EU Savings Tax Directive**" | Council Directive 2003/48/EC of 3 June 2003 on taxation of savings income in the form of interest payments |
| "**EURIBOR**" | Euro interbank offered rate, a benchmark interest rate |
| "**Euro**" or "**€**" | the lawful currency of the EU |
| "**FATCA**" | the U.S. Foreign Account Tax Compliance Act 2010 |
| "**FATCA Withholding**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**Financial Conduct Authority**" or "**FCA**" | the UK Financial Conduct Authority and any successor regulatory authority |

004675

| "**Forward Purchase Agreement**" | agreements which may be entered into from time to time between the Company and a CLO pursuant to which the Company may, from time to time, enter into sale and purchase contracts with a CLO with respect to certain assets of the Company |
| --- | --- |
| "**FSMA**" | the Financial Services and Markets Act 2000 of the United Kingdom, as amended |
| "**FTT**" | the European Commission's proposal for a Directive for a common financial transaction tax in certain EU Member States |
| "**GFSC**" or "**Commission**" | the Guernsey Financial Services Commission |
| "**GFSC Code**" | the Finance Sector Code of Corporate Governance published by the Commission |
| "**Gross Placing Proceeds**" | the aggregate value of the Placing Shares |
| "**Guernsey AML Requirements**" | The Criminal Justice (Proceeds of Crime) (Bailiwick of Guernsey) Law, 1999, the Criminal Justice (Proceeds of Crime) (Financial Services Businesses) (Bailiwick of Guernsey) Regulations 2007 and the Handbook of Financial Services Business (in each case as amended) and any other regulations relating to prevention of use of the financial system for the purpose of money laundering and made pursuant thereto |
| "**Guernsey IGA Legislation**" | Guernsey legislation implementing the IGA |
| "**Highland**" | Highland Capital Management, L.P. |
| "**Highland CLO**" | a CLO in which Highland or Highland CLO Management (or their affiliate) or a wholly owned subsidiary of the Company advised by Highland is the collateral manager |
| "**Highland CLO Management**" | Highland CLO Management, LLC |
| "**Highland HCF Advisor**" | Highland HCF Advisor, Ltd. |
| "**Highland Legacy CLO**" | a CLO in which Highland is the CLO manager |
| "**HMRC**" | Her Majesty's Revenue and Customs |
| "**IRR**" | internal rate of return |
| "**IRS**" | U.S. Internal Revenue Service |
| "Knowledgeable Employee" | a "knowledgeable employee" as defined in Rule 3c-5 promulgated under the Investment Company Act |
| "**LIBOR**" | London interbank offered rate, a benchmark interest rate |
| "**Managed CLO**" | any Acis Legacy CLO, Acis CLO 7, any Highland CLO or any Highland Legacy CLO |
| "**Market Abuse Directive**" | Directive 2003/6/EC of the European Parliament and of the Council on insider dealing and market manipulation (market abuse) |
| "**Memorandum**" | the memorandum of incorporation of the Company |

004676

| | |
|---|---|
| "**Money Laundering Directive**" | 2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing |
| "**Net Asset Value**" or "**NAV**" | gross assets less liabilities (including accrued but unpaid fees) determined in accordance with the section of this Offering Memorandum entitled "*Net Asset Value*" in "*The Company*" |
| "**Net Asset Value per Share**" or "**NAV per Share**" | the Net Asset Value divided by the number of Shares in issue at the relevant time |
| "**Net Placing Proceeds**" | the Gross Placing Proceeds less any offering expenses and any amounts retained for working capital purposes |
| "**Non-Qualified Holder**" | any person whose ownership of Shares (i) may result in the U.S. Plan Threshold being exceeded causing the Company's assets to be deemed "plan assets" for the purpose of ERISA or the U.S. Tax Code; (ii) may cause the Company to be required to register as an "investment company" under the U.S. Investment Company Act (including because the holder of the shares is not a "qualified purchaser" as defined in the U.S. Investment Company Act) or to lose an exemption or a status thereunder to which it might be entitled; (iii) may cause the Company to have to register under the U.S. Exchange Act or any similar legislation; (iv) may cause the Company not to be considered a "Foreign Private Issuer" as such term is defined in rule 3b-4(c) under the U.S. Exchange Act; (v) may result in a person holding shares in violation of the transfer restrictions published by the Company, from time to time; and (vi) may cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code |
| "**Offering Memorandum**" | this offering memorandum |
| "**Ordinary Shares**" | ordinary shares of no par value each in the capital of the Company |
| "**Placee**" | a person subscribing for Shares under the Placing |
| "**Placing**" | the placing of Placing Shares at the Placing Price to one or more investors |
| "**Placing Price**" | As of a given date, the price per Ordinary Share determined in reference to the most recent quarterly determined NAV |
| "**Placing Shares**" | Shares to be issued by the Company pursuant to the Placing |
| "**POI Law**" | The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended |
| "**Portfolio Management Agreement**" | the agreement dated 22 December 2016 between the Company and the Portfolio Manager pursuant to which the Portfolio Manager will provide certain support and personnel to the Company |
| "**Portfolio Manager**" | Highland HCF Advisor acting as Portfolio Manager to the Company pursuant to the Portfolio Management Agreement |
| "**Prospectus Directive**" | Directive 2003/71/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading |
| "**Provider**" | the provider of any Warehouse Loan to the Company |

004677

| | |
|---|---|
| "**Qualified Institutional Buyers**" | has the meaning given in Regulation 144A of the U.S. Securities Act |
| "**Qualified Purchasers**" | has the meaning given in the U.S. Investment Company Act |
| "**RCIS Rules**" | the Registered Collective Investment Schemes Rules 2015 |
| "**Register**" | the register of Shareholders |
| "**Regulation S**" | Regulation S promulgated under the U.S. Securities Act |
| "**Relevant Member State**" | each member state of the European Economic Area which has implemented the Prospectus Directive |
| "**Restricted Shareholders**" | Shareholders who are resident in, or citizens of, a Restricted Territory |
| "**Restricted Territory**" | the United States and any other jurisdiction where the extension or availability of the Placing would breach any applicable law |
| "**RTS**" | the Regulatory Technical Standards, published by the European Commission |
| "**SDRT**" | UK Stamp Duty Reserve Tax |
| "**SEC**" | the U.S. Securities and Exchange Commission |
| "**Services Agreements**" | the Staff and Services Agreement and the Sub-Advisory Agreement |
| "**Share**" | a share in the capital of the Company (of whatever class) and having such rights and being subject to such restrictions as are contained in the Articles |
| "**Shareholder**" | a holder of Shares |
| "**Shareholding**" | a holding of Shares |
| "**UK**" or "**United Kingdom**" | the United Kingdom of Great Britain and Northern Ireland |
| "**UK Corporate Governance Code**" | the UK Corporate Governance Code as published by the Financial Reporting Council |
| "**United States**" or "**U.S.**" | the United States of America, its territories and possessions, any state of the United States of America and the District of Columbia |
| "**U.S. Dollar**" or "**U.S.$**" | the lawful currency of the United States |
| "**U.S. Exchange Act**" | the U.S. Securities Exchange Act of 1934, as amended |
| "**U.S. Investment Company Act**" | the U.S. Investment Company Act of 1940, as amended |
| "**U.S. Person**" | has the meaning given in Regulation S under the U.S. Securities Act |
| "**U.S. Plan**" | any plan subject to Title 1 of ERISA or section 4975 of the U.S. Tax Code |
| "**U.S. Plan Assets Regulations**" | the regulations promulgated by the U.S. Department of Labor at 29 CFR 2510.3-101, as modified by section 3(42) of ERISA |
| "**U.S. Plan Investor**" | (i) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or |

004678

|  |  |
|---|---|
|  | (iii) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in the preceding clause (i) or (ii) in such entity pursuant to the U.S. Plan Assets Regulations |
| **"U.S. Plan Threshold"** | ownership by benefit plan investors, as defined under section 3(42) of ERISA, in the aggregate of 25 per cent or more of the value of any class of equity in the Company (calculated by excluding the value of any equity interest held by any person (other than a benefit plan investor, as defined under section 3(42) of ERISA) that has discretionary authority or control with respect to the assets of the Company or that provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person); the term shall be amended to reflect such new ownership threshold that may be established by a change in the U.S. Plan Asset Regulations or other applicable law |
| **"U.S. Risk Retention Rules"** | the United States federal interagency credit risk retention rules, codified at 17 C.F.R. Part 246. |
| **"U.S. Securities Act"** | the U.S. Securities Act of 1933, as amended |
| **"U.S. Tax Code"** | the U.S. Internal Revenue Code of 1986, as amended |
| **"VAT"** | value added tax or a similar consumption tax |

004679

## DIRECTORS, ADVISERS AND SERVICE PROVIDERS

**Directors**
Heather Bestwick
William Scott

*All c/o the Company's registered office*

**Registered Office**
First Floor, Dorey Court
Admiral Park
St Peter Port
Guernsey
GY1 6HJ
Channel Islands

**Portfolio Manager and Adviser**
Highland HCF Advisor, Ltd.
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman, KY1-1104
Cayman Islands

**Legal Advisers to the Company (as to Guernsey law)**
Mourant Ozannes
PO Box 186
1 Le Marchant Street
St Peter Port
Guernsey GY1 4HP
Channel Islands

**Legal Advisers to the Company**
(as to English law)
Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ
United Kingdom

**Administrator/Company Secretary**
State Street (Guernsey) Limited
First Floor, Dorey Court
Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Custodian & Principal Bankers**
State Street Custodial Services (Ireland) Limited
No. 78
Sir John Rogerson's Quay
Dublin
Ireland

**Corporate Services Provider**
State Street Guernsey (Limited)
First Floor, Dorey Court
Admiral Park,
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Auditors**
PricewaterhouseCoopers CI LLP
Royal Bank Place
1 Glategny Esplanade
St Peter Port
Guernsey
GY1 4ND
Channel Islands

004680

## AMENDED AND RESTATED
## INVESTMENT ADVISORY AGREEMENT

THIS AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "**Agreement**"), dated to be effective from July 1, 2014 is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "**Fund**"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "**General Partner**"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "**Investment Advisor**").

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor are parties to that certain Investment Advisory Agreement dated January 1, 2012 (the "**Original Agreement**");

WHEREAS, the parties desire to amend and restate the Original Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Investment Advisory Services</u>.  Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2.    <u>Custody</u>.  The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian").  The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the

EXHIBIT

6

exhibitsticker.com

004681

Financial Instruments.  The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

       3.    <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

       (a)    investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in

2

real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "*Financial Instruments*"), and the sale of Financial Instruments short and covering such sales.

(b)     engaging in such other lawful Financial Instruments transactions;

(c)     research and analysis;

(d)     purchasing Financial Instruments and holding them for investment;

(e)     entering into contracts for or in connection with investments in Financial Instruments;

(f)     investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)     possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)     lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)     opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)     opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

004683

(k)      combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("**_Other Accounts_**") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)      entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)      organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)      causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)      engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)      voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.      Policies of the Fund.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the

4

General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)     to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)     to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)     to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)     to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)     to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

004685

5.     <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.     <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

7.     <u>Investments</u>.  ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.     <u>Reimbursement by the General Partner</u>.  The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "**Sub-Advisor**"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries

004686

hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

       9.    <u>Expenses</u>.

       (a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

       (b)    To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

       10.    <u>Fees</u>.  Without limiting the expense reimbursements set forth above, the Investment Advisor shall provide the Fund with the services described herein for 100 bps per annum (25 bps per quarter) of the market value of the Equity Investments (defined below) and 50 bps per annum (12.5 bps per quarter) of the market value of the Debt Investments (defined

below), calculated as of the last business day of each calendar quarter (the "***Calculation Date***"), payable quarterly in arrears by the 45th business day following the end of each quarter, provided that the Investment Advisor shall deliver to the General Partner on or before the 30th business day following the end of each calendar quarter a statement showing the calculation of the fee for such quarter. For purposes hereof, the "***Equity Investments***" shall mean those Financial Instruments which are equity investments held by the Fund (either directly or indirectly through a subsidiary vehicle) on the Calculation Date, and "***Debt Investments***" shall mean those Financial Instruments which are debt investments held by the Fund (either directly or indirectly through a subsidiary vehicle) on the Calculation Date. For the avoidance of doubt, the Financial Instruments shall be valued as of each Calculation Date in accordance with the then current valuation policy of the Investment Advisor. Notwithstanding the foregoing, neither the term "Equity Investments" nor the term "Debt Investments" shall include any Financial Instruments with respect to which the Investment Advisor or any affiliate thereof already receives management fees.

      11.    <u>Exculpation; Indemnification</u>.

      (a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "***Covered Person***" and collectively, "***Covered Persons***") shall be subject to the provisions of this Section.

      (b)    To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on

004688

behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)     Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "**_Indemnified Party_**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

004689

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence.  As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct,

10

fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements.  Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.     <u>Activities of the Investment Advisor and Others</u>.  The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund.  Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate.  In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund.  The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar.  The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager.  Each of the General Partner and the Fund acknowledges that it has received a copy of Part 2 of the Investment Advisor's Form ADV, which further describes conflicts of interest, including the Investment Advisor, its affiliates and their respective advised accounts.

13.     <u>Term</u>.  This Agreement shall remain in effect through an initial term concluding December 31, 2014 and shall be automatically extended for additional one-year

terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

     14.   <u>Miscellaneous</u>.

     (a)   <u>Notices</u>.  Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

     If to the Investment Advisor, to:

     Highland Capital Management, L.P.
     300 Crescent Court, Suite 700
     Dallas, Texas 75201
     Telephone Number:  (972) 628-4100
     Facsimile Number:  (972) 628-4147

     If to the General Partner or the Fund, to:

     Charitable DAF GP, LLC
     4140 Park Lake Avenue, Suite 600
     Raleigh, North Carolina 27612
     Attention:  Grant Scott
     Telephone Number:  (919) 854-1407
     Facsimile Number:  (919) 854-1401

     (b)   <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

     (c)   <u>Amendments and Waivers</u>.  No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on

004692

any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)  Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided; however, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)  Governing Law.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f)  Arbitration.  (i) Any controversy or claim or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (a "***Disputed Matter***") shall be handled exclusively pursuant to the following procedures. In the event of any Disputed Matter, the parties agree that upon written notice of such Disputed Matter sent by one party to the party, the parties shall arbitrate the Disputed Matter pursuant to this Section 14(f) unless the parties expressly agree in writing to resolve the Disputed Matter in another manner through mediation or otherwise.  The arbitration shall be conducted pursuant to the commercial arbitration rules of the American Arbitration Association in Dallas, Texas.  Any arbitration pursuant to this Agreement unless otherwise agreed to by the parties shall be conducted by a panel of three (3) arbitrators mutually selected by the parties from a list of

arbitrators determined in accordance with the American Arbitration Association's arbitrator selection procedure.

(ii)  The judgment upon the award rendered in any such arbitration shall be final and binding upon the parties and may be entered in any court having jurisdiction thereof.  All fees and expenses of the arbitrator and all other expenses of the arbitration shall be paid by the non-prevailing party in such arbitration.  The arbitrator shall have no authority to impose any punitive or consequential damages.

(iii)  Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)  Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)  Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)  Survival.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)  Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)  Arm's-Length Agreement.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

14

004694

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:  President
Date:  August 26, 2014

CHARITABLE DAF GP, LLC

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  August 26, 2014

CHARITABLE DAF FUND, L.P.

By:   Charitable DAF GP, LLC, its general partner

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  August 26, 2014

004695

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
|    Debtor, | § | |
| ------------------------------------------------ | § | |
| THE CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| | § | |
|    Plaintiffs/Appellants, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-3129-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
|    Defendant/Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Appellants The Charitable DAF Fund, L.P. (Charitable DAF) and CLO

Holdco, Ltd. (CLO Holdco)'s appeals from the bankruptcy court's Motion to Dismiss Order and

Motion to Stay Order. For the reasons that follow, the Motion to Dismiss Order is **REVERSED** and

**REMANDED**. The Motion to Stay Order is **AFFIRMED**.

004696

# I.

## BACKGROUND[1]

These are consolidated appeals from an adversary proceeding in a bankruptcy case. The Debtor, Highland Capital Management, L.P. (HCM), filed for Chapter 11 bankruptcy on October 16, 2019, in the United States Bankruptcy Court for the District of Delaware and that court transferred venue to the United States Bankruptcy Court for the North District of Texas. *In re Highland Cap. Mgmt. L.P.*, 2022 WL 780991, at *1 (Bankr. N.D. Tex. Mar. 11, 2022).

In 2017, Charitable DAF—through the holding entity CLO Holdco—purchased 49.02% of the available shares of Highland CLO Funding, Ltd. (HCLOF) based upon investment advice from HCM.[2] Doc. 9, Appellant's Br., 5. Another entity, HarbourVest, acquired 49.98% of the HCLOF shares and HCM and its employees acquired the remaining 1%. *Id.*; Doc. 21, Appellee's Br., 7. A company agreement (the HCLOF Member Agreement) governing the rights and obligations of HCLOF shareholders purportedly prohibited a member from "sell[ing] shares to another member without first providing all other members the right to purchase a pro rata portion thereof at the same price" (the Right of First Refusal). Doc. 9, Appellant's Br., 6. The value of the HCLOF shares fluctuated throughout the bankruptcy proceedings; the actual value is one of the issues giving rise to some of Charitable DAF's causes of action. *Id.* at 6–7; R. at 551–65.

---

[1] Because these are two consolidated appeals with separate appellate records, the Court indicates when it switches between the separate appellate records by footnotes. The Appellant's Brief and record cites in this Background section are in Doc. 6 in case No. 3:22-CV-0695-B. Appellee's Brief, which was filed after consolidation, is in case No. 21-CV-3129-B.

[2] Except where otherwise stated, the Court refers to Charitable DAF and CLO Holdco collectively as Charitable DAF because Charitable DAF controls and owns CLO Holdco and both entities have the same director. Doc. 21, Appellee's Br., 7 & n.6. Appellant Charitable DAF does not dispute this relationship and imputes the actions of CLO Holdco to itself throughout Appellant's brief. *See* Doc. 9, Appellant's Br., 13–14 (imputing the Objection to both Appellants).

004697

During the bankruptcy, "HarbourVest filed proof of claims against [HCM] totaling over $300 million, notionally." Doc. 9, Appellant's Br., 6. As part of the settlement for these claims, "HarbourVest agreed to sell its interest in HCLOF to [HCM]." *Id.* at 8. HCM would then have majority ownership of HCLOF. *See id.* at 5; Doc. 21, Appellee's Br., 7. "CLO Holdco filed an objection to the settlement, contending that the HCLOF Member Agreement entitled [CLO] Holdco to a Right of first Refusal" (the Objection). Doc. 9, Appellant's Br., 8. At the beginning of the settlement hearing (the Rule 9019 Settlement Hearing), CLO Holdco withdrew its Objection. Doc. 21, Appellee's Br., 10–11; R. at 6269–70. After overruling the remaining objections from the other parties, the bankruptcy court approved the HarbourVest Settlement. Doc. 9, Appellant's Br., 9.

This Adversary Proceeding stems from the complaint filed by Appellants on April 12, 2021, in this Court in *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P., et al.*, Case No. 3:21-CV-0842-B. *Id.*; Complaint, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D Tex. Apr. 12, 2021), Doc. 1. On September 20, 2021, this Court referred that case to the bankruptcy court for "docket[ing] as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P." Order of Reference, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D. Tex. Sept. 20, 2021), Doc. 64. During the Adversary Proceeding, Appellants moved for a stay of the case (the Motion to Stay) and Appellees moved to dismiss the case (the Motion to Dismiss). R. at 1634–67, 3248–52. On November 23, 2021, the bankruptcy court held a hearing on the Motion to Stay and Motion to Dismiss. *Id.* at 5951. The bankruptcy court denied the Motion to Stay at the hearing and later entered an order granting the Motion to Dismiss, dismissing all causes of action with prejudice. *Id.* at 5977; *In re Highland*, 2022 WL 780991, at *12. Appellants promptly appealed both orders; this

004698

Court consolidated the appeals. *In re Highland Cap. Mgmt.*, 2022 WL 2193000, at *1, *4 (N.D. Tex.

June 17, 2022). While the appeals were pending, the Fifth Circuit affirmed the HCM reorganization

plan (the Plan), but vacated the exculpatory provision "as to all parties *except* [HCM], the

Committee and its members, and the Independent Directors for conduct within the scope of their

duties." *Highland Cap. Mgmt., L.P. v. NexPoint Advisors, L.P.*, 2022 WL 3571094, at *14 (5th Cir.

Aug. 19, 2022).

The appeals are fully briefed and ripe for review. The Court considers them below.

## II.

## LEGAL STANDARDS

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal

district court. 28 U.S.C. § 158(a). Because the district court functions as an appellate court in this

scenario, it applies the same standards of review that federal appellate courts use when reviewing

district court decisions. *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992) (citations omitted).

A.    *Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule

12(b)(6) authorizes a court to dismiss a plaintiffs complaint for "failure to state a claim upon which

relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss,

"[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the

plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). But the court will

"not look beyond the face of the pleadings to determine whether relief should be granted based on

the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

- 4 -

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotation marks and alterations omitted).

B.      *Motion to Stay*

Incidental to a court's inherent power to control its docket is the power to stay proceedings before it. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A court considers four factors when determining whether to stay a case pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quoting *Nken*, 556 U.S. at 434).

004700

III.

ANALYSIS

The Court begins with the appeal of the Motion to Dismiss Order because it can only review the appeal of the Motion to Stay Order if it reverses the bankruptcy court's decision to dismiss the causes of action in the adversary proceeding. *In re Highland*, 2022 WL 2193000, at *2. Finding reversal of the Motion to Dismiss Order warranted, the Court then reviews the appeal of the Motion to Stay Order.

A.    *Appeal of the Motion to Dismiss Order*[3]

Charitable DAF raises three issues in its appeal of the Motion to Dismiss Order: (1) whether the bankruptcy court "commit[ted] reversible error by sua sponte dismissing this action on the basis of collateral estoppel without giving notice and an opportunity to respond"; (2) whether collateral estoppel barred Charitable DAF's claims when the claims were adjudicated in a Rule 9019 Settlement Hearing; and (3) whether the bankruptcy court's application of judicial estoppel erroneously relied on a transcription error, an ostensibly inconsistent position of Charitable DAF, or a failure to conclude that "subsequently discovered evidence . . . render[ed] the ostensible inconsistency 'inadvertent.'" Doc. 9, Appellant's Br., 2.

An appellate court reviews a dismissal under Rule 12(b)(6) de novo. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 868 (5th Cir. 2000). "[T]he application of collateral estoppel is" also reviewed de novo. *Id.* (quoting *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997)). However, "a [bankruptcy] court's decision to invoke the equitable doctrine of judicial estoppel [is reviewed] for abuse of discretion." *Cox v. Richards*, 761 F. App'x 244, 246 (5th Cir. 2019) (citing

---

[3] For this appeal, the record and document citations are in case No. 3:22-CV-0695-B. However, Appellee's Brief is in case No. 21-CV-3129-B.

*United States ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 271 (5th Cir. 2015)). Therefore, this Court reviews the bankruptcy court's sua sponte invocation of collateral estoppel de novo, the application of collateral estoppel de novo, and the invocation of judicial estoppel for abuse of discretion. The Court addresses each in turn below.

1.    Sua Sponte Dismissal

The bankruptcy court dismissed Charitable DAF's claims with prejudice based on collateral estoppel—even though neither party raised the issue "per se"—finding their res judicata arguments relevant to the issue. *In re Highland*, 2022 WL 780991, at *7. The Court first considers whether the sua sponte application was proper.

Charitable DAF challenges the bankruptcy court's sua sponte invocation of collateral estoppel to dismiss its claims. Doc. 9, Appellant's Br., 11–12. Specifically, Charitable DAF argues that the bankruptcy court could "only do so if the 'procedure employed is fair'—that is, if prior notice is given with adequate time for the plaintiff to prepare a response." *Id.* at 12 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177–78 (5th Cir. 2006)). The failure to provide "notice and an opportunity to dispute the claimed bases for dismissal is reversible error," according to Charitable DAF. *Id.*

The Court disagrees. The Fifth Circuit has recognized two instances when a court may dismiss a case sua sponte on the basis of collateral estoppel: when (1) "both actions were brought in courts of the same district" or (2) "all of the relevant facts are contained in the record and . . . uncontroverted." *OneBeacon Am. Ins. Co. v. Barnett*, 761 F. App'x 396, 399 (5th Cir. 2019) (first quoting *Trammell Crow Residential Co. v. Am. Prot. Ins. Co.*, 574 F. App'x 513, 522 (5th Cir. 2014); and then quoting *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 281 (5th Cir. 2001)). This case easily

004702

fits into the first category because all of the proceedings at issue took place in the bankruptcy court before the same judge. *See In re Highland*, 2022 WL 780991, at *7 (relying on the former category to dismiss the case). Thus, the bankruptcy court did not err by raising the collateral estoppel issue sua sponte.

This case is unlike the *Carroll* case cited by Charitable DAF, which did not involve collateral estoppel. 470 F.3d 1171. In *Carroll*, the Fifth Circuit held that a court may dismiss a case sua sponte under Federal Rule of Civil Procedure 12(b)(6) if the "procedure employed is fair[,]" which requires "both notice of the court's intention and an opportunity to respond." *Id.* at 1177 (quoting *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)). The district court erred by not providing "notice or opportunity to be heard" and "did not even . . . mention [some of the dismissed] claims in its order of dismissal." *Id.*

This case is more akin to *McIntyre v. Ben E. Keith Co.* where the Fifth Circuit upheld the district court's sua sponte raising of the issue of res judicata to dismiss the case under Rule 12(b)(6). 754 F. App'x 262, 265 (5th Cir. 2018). In *McIntyre*, the plaintiff's "Civil Rights Act and FLSA actions were brought before the same federal district court." *Id.* Because the latter action closely resembled the former action, the Fifth Circuit found no reversible error with the district court's raising the issue of res judicata sua sponte. *Id.*

First, dismissal for failure to state a claim like in *Carroll* and dismissal for collateral estoppel as in the instant case are conceptually and procedurally different. In the former, the plaintiff is in the process of attempting to "allege[] [their] best case," *Bazrowx*, 136 F.3d at 1054, while collateral estoppel occurs after a plaintiff "alleged [their] best case" and fully litigated the issue. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980). Put more succinctly, collateral estoppel eliminates "unnecessary

- 8 -

judicial waste" from repeated attempts at alleging the best case. *Arizona v. California*, 530 U.S. 392,
412 (2000) (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J.,
dissenting)). Second, the parties addressed res judicata during oral argument and in their pleadings
before the bankruptcy court. While res judicata is not collateral estoppel, it is closely related. *Hous.
Prof'l Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016) ("[R]es judicata
encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion
and (2) collateral estoppel or issue preclusion."). Thus, the bankruptcy court employed a fair
procedure by allowing the parties to litigate the issues, including res judicata, before dismissing the
case sua sponte. *See generally Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) ("District courts
may, for appropriate reasons, dismiss cases *sua sponte*.").

The Court next considers whether the bankruptcy court's substantive application of collateral
estoppel was proper.

## 2.    Collateral Estoppel

"Collateral estoppel prevents litigation of an issue when: '(1) the identical issue was previously
adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary
to the decision.'"[4] *Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548 (5th Cir. 2013) (quoting *Pace v.
Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005)). "Relitigation of an issue is not precluded
unless the facts and the legal standard used to assess them are the same in both proceedings." *In re
Southmark Corp.*, 163 F.3d at 932.

Charitable DAF attacks each element of collateral estoppel, so the Court addresses each

---

[4] Appellant lists a fourth element occasionally referenced by the Fifth Circuit—"there is no special
circumstance that would make it unfair to apply the doctrine"—but the Court finds no reason to address this
possible fourth element in this case. *See In re Southmark Corp.*, 163 F.3d 925, 932 n.9 (5th Cir. 1999)
(declining to apply the fourth element because appellant "failed to support it factually").

004704

element individually.

        i.     *Identical issue*

The bankruptcy court found "(a) consideration of the value that the estate was both receiving and paying, as well as (b) the potential existence of a 'Right of First Refusal' . . . [were] the gravamen of [Charitable DAF's] Complaint." *In re Highland*, 2022 WL 780991, at *9 (emphasis omitted). During the settlement hearing, the bankruptcy court had to determine whether the HarbourVest Settlement "was 'fair and equitable' and in the 'best interests of creditors,' and whether it was the 'product of arms-length bargaining, and not of fraud or collusion[.]'" *Id.* at *8. This determination entailed "arguments and evidence regarding the methodology for the valuation of the HCLOF interest and the existence or non-existence of a 'Right of First Refusal.'" *Id.*

Charitable DAF argues that the issues are not identical because the Objection "only addressed whether HarbourVest . . . had performed all conditions precedent to being able to transfer the interest to Highland *as another co-investor*" and did not present an identical claim "for breach of the HCLOF [Member] Agreement" and associated damages. Doc. 9, Appellant's Br., 13–14. Further, "even if this one contract issue was fully . . . litigated," only the second cause of action in Charitable DAF's complaint arguably parallels that issue, according to Charitable DAF—the others are distinct. *Id.* at 14–15. Charitable DAF contends that these non-contract causes of action rely on evidence that was not known at the Rule 9019 Settlement Hearing, "stem from events that either occurred post-hearing, or were not discovered until after the hearing." *Id.* at 15.

The Court finds the issues are identical. CLO Holdco's Objection specifically argued:

> Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally

inaccurate interpretation of the Member Agreement's contractual provisions that would render specific passages redundant and meaningless.

R. at 4730. The bankruptcy court also heard argument and testimony from Seery, HCM's chief executive and chief restructuring officer, and Pugatch, a managing director of HarbourVest, about the valuation of HCLOF's assets at the settlement hearing. *Id.* at 6273, 6292, 6303–05 ("The twenty-two and a half [million] is the current—actually, the November value of HCLOF—the HarbourVest interests in HCLOF."), 6358, 6374 ("The current value is right around $22-1/2 million.").

In the Original Complaint, Charitable DAF brought five causes of action: breach of fiduciary duties, breach of the HCLOF Member Agreement, negligence, RICO, and tortious interference. *Id.* at 551–65. The breach of fiduciary duties and negligence causes of action center around the alleged concealment of the rising value of HCLOF's assets and failing to offer the purchase of the assets to CLO Holdco or Charitable DAF before offering to HCM. *Id.* at 553–55, 559–60. The breach of the HCLOF Member Agreement cause of action encompasses the Right of First Refusal in the agreement. *Id.* at 558–59. The RICO cause of action alleges that HCM used mail and wire fraud "to obtain or arrive at valuations of the HCLOF interests," and "conceal[ ] the true value of the HCLOF interests." *Id.* at 560–64. Lastly, the tortious interference cause of action stems from HCM's alleged interference with CLO Holdco's Right of First Refusal in the Member Agreement and "misrepresenting the fair market value" of HCLOF's assets. *Id.* at 564–65. In sum, all of these causes of action involve either the valuation of HCLOF or the Right of First Refusal, so the issues are the same as those before the bankruptcy court at the Rule 2019 Settlement Hearing.

      *ii.*    *Actually Litigated*

The bankruptcy court found the same arguments were also actually litigated, reasoning:

The Bankruptcy Court would never have approved the HarbourVest Settlement if it thought the value being exchanged was not fair, or if it thought the HCLOF Interests could not be transferred and that someone might later sue the Debtor, claiming the Transfer was improper. All parties had the chance to argue and present evidence about this. The Bankruptcy Court made a ruling based on the evidence and argument.

*In re Highland*, 2022 WL 780991, at *9.

Charitable DAF argues that because the Objection was withdrawn and no one objected to the withdrawal, the issue asserted therein was not litigated. Doc. 9, Appellant's Br., 16. Additionally, it claims the Rule 9019 Settlement Hearing is not a mini-trial and, therefore, cannot serve as an opportunity for a party to litigate their claims. *Id.* at 17–18 (citing *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015)).

An issue is not actually litigated and, thus, precluded unless the legal standard in the prior action mirrors the legal standard of the latter action. *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995) (citations omitted). The bankruptcy court approved the HarbourVest Settlement after applying the *Jackson Brewing* test, which considers:

> (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

R. at 5568; *see also In re Highland*, 2022 WL 780991, at *8 (quoting *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015)). Stated more succinctly, when faced with a settlement, the bankruptcy court ensures the "compromise is truly 'fair and equitable' and 'in the best interest of the estate.'" *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th

- 12 -

Cir. 1980) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*

*(TMT Trailer)*, 390 U.S. 414, 424 (1968)).

However, in the context of litigating actual claims—such as those asserted by Charitable

DAF—a court applies a preponderance of the evidence standard, not the probability of success

standard from *Jackson Brewing*. *Copeland*, 47 F.3d at 1423; *In re Zale Corp.*, 62 F.3d 746, 766 n.60

(5th Cir. 1995) ("We also note for future reference that the legal standard in a settlement hearing

differs from that applicable in an adversary proceeding or state court trial . . . . Consequently, we

doubt that the findings of the bankruptcy court in a settlement hearing would have preclusive effect

in adversary proceedings or state court trials."). *See generally Weaver v. Aquila Energy Mktg.*, 196 B.R.

945, 957 (S.D. Tex. 1996) ("[S]ettlement hearings and preference actions involve the application

of different legal standards."). "Examining whether a particular settlement is fair or equitable and in

the best interest of the estate and creditors is a different inquiry, driven by different policies, than

litigation of the actual claim." *Copeland*, 47 F.3d at 1423. While the issues of the Right of First

Refusal and the valuation of HCLOF were raised in the Rule 9019 Settlement Hearing, the parties

did not fully litigate the issues as one would at trial, and the bankruptcy court did not resolve the

issues according to a preponderance of the evidence standard. Because the bankruptcy court applied

a legal standard in the Rule 9019 Settlement Hearing that is inapplicable to the adjudication of

Charitable DAF's causes of action, the issues were not actually litigated in the Rule 9019 Settlement

Hearing and collateral estoppel does not apply.[5] The Court **REVERSES** the bankruptcy court on this

issue.

---

[5] Having found the second element of collateral estoppel unmet, the Court need not address the third
element—necessity of the previous determination to the prior decision.

3.    Judicial Estoppel

The bankruptcy court found the elements of judicial estoppel met and barred the second and fifth causes of action, which rely on the Right of First Refusal. *In re Highland*, 2022 WL 780991, at *12. The Court now addresses whether judicial estoppel applies to Charitable DAF's second and fifth causes of action.

Judicial estoppel is an equitable common law doctrine aimed at preventing a party from asserting an inconsistent legal position from a previous proceeding. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999). "The purpose of the doctrine is 'to protect the integrity of the judicial process', by 'prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest.'" *Id.* (alteration in original) (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). A court examines three criteria when determining the applicability of judicial estoppel: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc).

Charitable DAF raises arguments for each of the judicial estoppel elements, so the Court addresses each element below.

i.    *Inconsistent legal position*

Charitable DAF argues that the bankruptcy court's determination relies on a transcription error that amounted to an admission of HCM's compliance with the Right of First Refusal. Doc. 9, Appellant's Br., 22–23. The corrected transcript makes clear that no admission was made on behalf of CLO Holdco, according to Charitable DAF. *Id.* at 23–24.

The relevant portion of the original transcript reads:

- 14 -

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my
> client, **but** the Debtor is compliant with all aspects of the contract. We withdrew our
> objection, and we believe that's sufficient.

R. at 6280. The corrected transcript reads:

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my
> client **that** the Debtor is compliant with all aspects of the contract. We withdrew our
> objection, and we believe that's sufficient.

Doc. 9-1, Appellant's Br. Ex. A, 4.

Accepting this verison of the record, CLO Holdco refused to "enter into a short stipulation on the record reflecting that the Debtor's acquisition of HarbourVest's interests in HCLOF is compliant with all of the applicable agreements between the parties." *Id.*; R. at 6280. However, moments before this, CLO Holdco withdrew its Objection premised on the Right of First Refusal stating:

> CLO Holdco has had an opportunity to review the reply briefing, and after doing so
> has gone back and scrubbed the HCLOF corporate documents. Based on our analysis
> of Guernsey law and some of the arguments of counsel in those pleadings and our
> review of the appropriate documents, I obtained authority from my client, Grant
> Scott, as Trustee for CLO Holdco, to withdraw the CLO Holdco objection based on
> the interpretation of the member agreement.

R. at 6269–70. The bankruptcy court's decision rests primarily on this earlier withdrawal of the Objection and only later buttresses its argument with the then-unknown transcription error. *In re Highland*, 2022 WL 780991, at *11 (following discussion of the withdrawal of the Objection with "[i]f that weren't enough" before mentioning the then-unknown transcription error). Thus, if the earlier withdrawal—without the transcription error—satisfies the first element of judicial estoppel then the bankruptcy court did not commit any error even if it referenced an incorrect transcription of the latter exchange.

- 15 -

004710

The Court finds the bankruptcy court did not err in finding the first element of judicial estoppel. CLO Holdco made clear in the withdrawal of its objection that it no longer disputed the other parties' interpretation of the Right of First Refusal, which now forms the basis of Charitable DAF's second and fifth causes of action. *See* R. at 6269–70. Thus, the withdrawal of the objection put CLO Holdco on the opposite side of the legal argument that Charitable DAF now makes in its second and fifth causes of action. The first element of judicial estoppel is established because Charitable DAF has taken inconsistent positions in separate proceedings.

ii.     *The bankruptcy court accepted the prior position*

The bankruptcy court solely relied on the withdrawal of the Objection to find the second element of judicial estoppel established. *In re Highland*, 2022 WL 780991, at *12. In the words of the bankruptcy court, it "perceived [this objection] as one of the major arguments that was relevant to the HarbourVest Settlement." *Id.* "The [b]ankruptcy [c]ourt relied upon that withdrawal of CLO Holdco's objection in making the determination to approve of the HarbourVest Settlement and, specifically, that Highland would not be running afoul of any obligation in entering into the HarbourVest Settlement." *Id.*

Charitable DAF argues that there is no acceptance by the bankruptcy court of a prior position because without the transcription error, there is no admission and no inconsistent position. Doc. 9, Appellant's Br., 25–26. Further, it contends that the withdrawal of the Objection is not the equivalent of stating the Right of First Refusal causes of action are meritless. *Id.* at 26–27.

The bankruptcy court did not err in finding the second element of judicial estoppel met because it necessarily relied on the change in CLO Holdco's assessment of its Objection. The Right of First Refusal created a major obstacle to approval of the HarbourVest Settlement. When CLO

- 16 -

Holdco withdrew its Objection based on the Right of First Refusal, the Court had to accept CLO
Holdco's position that the Right of First Refusal no longer posed an obstacle to the HarbourVest
Settlement. Thus, the Court finds no error by the bankruptcy court for the second element of judicial
estoppel.

        *iii.*      *Inadvertence of Charitable DAF*

The bankruptcy court did not examine the inadvertence of Charitable DAF in asserting
inconsistent legal positions. *See In re Highland*, 2022 WL 780991, at *12.

Charitable DAF argues that it did not know the facts for several of its claims until after the
settlement hearings, so it could not have asserted these claims at the hearing. Doc. 9, Appellant's
Br., 27. Charitable DAF relies on the allegations surrounding the valuations of the HCLOF assets
and the alleged acts violating the RICO statutes. *Id.* at 27–29. Additionally, the bankruptcy court
did not address the inadvertence element for judicial estoppel and a failure to apply the correct legal
standard is reversible error, Charitable DAF contends. Doc. 9, Appellant's Br., 27; Doc. 27,
Appellant's Reply, 3–4.

The Court agrees with Appellant's last argument. A court abuses its discretion by applying
the wrong legal standard. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Def. Distrib.
v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022). And the misapplication of a legal standard is reviewed
de novo. *In re Woerner*, 783 F.3d 266, 270–71 (5th Cir. 2015). By not addressing the third element
of judicial estoppel, the bankruptcy court applied the wrong legal standard. The Fifth Circuit
implicitly recognized this third element—inadvertence—in *In re Coastal Plains, Inc.*, 179 F.3d at 206,
210, which the bankruptcy court cited for its legal standard. *In re Highland*, 2022 WL 780991, at *11.
The Fifth Circuit has since clarified that "[t]his circuit . . . recognizes *three* particular requirements"

- 17 -

for judicial estoppel. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008) (emphasis

added). Because the bankruptcy court did not address the inadvertence element in its order

dismissing Charitable DAF's second and fifth causes of action, the bankruptcy court abused its

discretion. While the district court finds no issue in the bankruptcy court's analysis of the first two

elements of judicial estoppel, the bankruptcy court did not address this third element, warranting

remand for determination by the bankruptcy court whether Charitable DAF acted inadvertently to

change its legal position.

    3.    <u>Leave to Amend</u>

      Charitable DAF requested leave to amend its complaint in its response to the motion to

dismiss, R. at 2272–73, which the bankruptcy court denied by dismissing all claims with prejudice.

*In re Highland*, 2022 WL 780991, at *12. The Court need not address this argument because, upon

remand, the bankruptcy court will have the opportunity to reassess Charitable DAF's claims and

determine whether amendment should be allowed under Federal Rule of Civil Procedure 15(a). *See*

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (listing

factors a court considers when determining whether to allow amendment of the complaint).

C.    *Appeal of the Motion to Stay Order*[6]

      Appellant Charitable DAF raises one issue on appeal of the Motion to Stay Order: "Did the

bankruptcy court err by proceeding with the case rather than staying it" when Charitable DAF was

enjoined "from litigating any action against Appellee [HCM]"? Doc. 11, Appellant's Br., 2. The

bankruptcy court denied Charitable DAF's Motion to Stay All Proceedings and the subsequent

Amended Motion to Stay All Proceedings, reasoning:

---

    [6] For this appeal, the record and document citations are in case No. 3:21-CV-3129-B.

> I just don't think that you have shown that, you know, either the exculpation clause
> or the injunction provisions of the plan somehow tie your hands in arguing the
> 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that
> your arguments reflect, frankly, a misunderstanding of how the injunction language
> and exculpation language applies here.

R. at 2087; *see also id.* at 4–5.

On appeal, Charitable DAF argues that the bankruptcy court erred in its denial of the motion for a stay because the Plan Confirmation Order's injunction prohibited Charitable DAF from participating in the case, "terminat[ing] any case or controversy and stripp[ing] the bankruptcy court of jurisdiction." Doc. 11, Appellant's Br., 7. Accordingly, "[t]he bankruptcy court could only stay the case pending the [appeal of the Plan Confirmation Order's injunction], or dismiss the case as barred by the injunction[,]" Charitable DAF contends." *Id.* at 9.

As noted above, the Fifth Circuit affirmed the Plan in all respects except one and specifically affirmed the injunction. *Highland*, 2022 WL 3571094, at *13–14. The injunction in the Plan provides that "all Enjoined Parties are and shall be permanently enjoined . . . from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind . . . against or affecting the Debtor or the property of the Debtor." R. at 2401. And the term Enjoined Parties includes "(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor [and] . . . (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case." *Id.* at 2358.

Relatedly, the Plan exculpates HCM[7] "from, any claim, obligation, suit, judgment, damage,

demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after

the Petition Date in connection with or arising out of [execution of the Plan]." *Id.* at 2398. However,

this exculpation provision[8] does "not apply to (a) any acts or omissions of an Exculpated Party arising

out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal

misconduct, or willful misconduct or (b) [other specific entities actions]." *Id.* at 2398–99.

The bankruptcy court did not abuse its discretion[9] in denying the motion for a stay of the

case. The bankruptcy court found that the Plan's injunction and exculpation provisions—*which it*

*approved*—did not prevent Charitable DAF from pursuing its causes of action. *Id.* at 2087. In effect,

the bankruptcy court held that Charitable DAF could continue to litigate its causes of action and

the Court agrees. *See id.* Just like the bankruptcy court, this Court does not see how the injunction

and exculpation provisions prohibit Charitable DAF from participating in the below action. The

exculpation provision permits Charitable DAF to bring claims against HCM for "bad faith, fraud,

---

[7] The Plan makes clear that the term Exculpated Party does not include Charitable DAF. R. at 2359 ("Exculpated Parties" means, collectively, (i) the Debtor . . . provided, however, that, for the avoidance of doubt, none of . . . the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities) . . . is included in the term 'Exculpated Party.'").

[8] Subsequently to this appeal, the Fifth Circuit vacated a portion of the exculpation provision. *Highland*, 2022 WL 3571094, at *12. The Fifth Circuit held that "the exculpation of certain non-debtors . . . was unlawful" so the court "str[uck] all exculpated parties from the Plan except for [HCM], the Committee and its members, and the Independent Debtors." *Id.* Charitable DAF brings its causes of action against HCM, so what remains of the exculpation provision still applies to this case. *See id.*

[9] The parties disagree on whether this Court reviews the denial of the stay for abuse of discretion or de novo. Doc. 11, Appellant's Br., 6 ("Questions of law are reviewed de novo."); Doc. 16, Appellee's Br., 2 ("The Court reviews the bankruptcy court's order for abuse of discretion."). Charitable DAF does not pursue this argument in its Reply, so this argument is considered waived, *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006), as well as incorrect. *See Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 392 (5th Cir. 2013) (citing *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992)) ("We review a district court's denial of a stay pending appeal for abuse of discretion.").

- 20 -

gross negligence, criminal misconduct, or willful misconduct" and Charitable DAF's causes of action—breach of fiduciary duty, breach of contract, negligence, and RICO—appear to fit within these categories of claims. *Id.* at 490–504, 2398–99. Further, Charitable DAF continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss. *See* Section III(A) *supra*. Lastly and importantly, Charitable DAF did not even attempt to address the traditional stay elements. R. at 2087 ("I guess one might say the traditional four-factor test for a stay of a proceeding has really not been the subject of the argument here for a stay."). Without argument on the factors for a stay, this Court lacks any basis to overturn the bankruptcy court.

The bankruptcy court's Motion to Stay Order is **AFFIRMED**.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **REVERSES** and **REMANDS** the bankruptcy court's Motion to Dismiss Order and **AFFIRMS** the bankruptcy court's Motion to Stay Order.

**SO ORDERED**.

**SIGNED: September 2, 2022.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

004716

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>       Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD.,<br><br>       Plaintiffs,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD.<br><br>       Defendants | Adv. Pro. No. 21-03067-sgj |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## <u>RENEWED MOTION TO DISMISS COMPLAINT</u>

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

004717

## TABLE OF CONTENTS

Page

I.      PLAINTIFFS' SO-CALLED "MOTIONS" MUST BE DENIED .................................... 1

II.     THE COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE
        GRANTED ................................................................................................ 4

   A.   Judicial Estoppel Bars Counts 2 and 5 ................................................................ 4

   B.   Plaintiffs Concede Dismissal of Their RICO Claim .......................................... 6

   C.   Plaintiffs' Breach of Fiduciary Duty Claim Fails ............................................. 6

   D.   Plaintiffs' Breach of Contract and Tortious Interference Claims Fail ............... 9

   E.   Plaintiffs' Negligence Claim Fails .................................................................... 10

III.    CONCLUSION ............................................................................................... 11

DOCS_NY:46794.4 36027/003

004718

## TABLE OF AUTHORITIES

**CASES**

*1st & Trinity Super Majority, LLC v. Milligan,*
  2022 Tex. App. LEXIS 4842 (Tex. App. July 14, 2022)..........................................10

*360 Sec. Partners, LLC v. Hammond,*
  No. 3:21-CV-3004-B, 2022 U.S. Dist. LEXIS 140283 (N.D. Tex. Aug. 8, 2022).....................8

*Butler v. Denka Performance Elastomer, LLC,*
  2022 U.S. Dist. LEXIS 4981 (E.D. La. Jan. 11, 2022) ...................................................2

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt. L.P.),*
  2022 Bankr. LEXIS 2780 (Bankr. N.D. Tex. Sep. 30, 2022)................................................3, 4

*Commerce Bank v. Malloy,*
  2013 U.S. Dist. LEXIS 106329 (N.D. Okl a. July 30, 2013) ...........................................5

*Dandridge v. Williams,*
  397 U.S. 471 (1970)..................................................................................................2

*Doe v. Columbia-Brazoria Indep. Sch. Dist.,*
  855 F.3d 681 (5th Cir. 2017) ...............................................................................2

*Du Bois v. Martin Luther King Jr Family Clinic, Inc.,*
  2018 U.S. Dist. LEXIS 246910 (N.D. Tex. May 29, 2018) ......................................2

*E-Dealer Direct v. Bank of Am., N.A.,*
  No. EP-21-CV-62-DB, 2021 U.S. Dist. LEXIS 99011 (W.D. Tex. May 25, 2021) .................6

*Jackson v. Dear and Others,*
  Judgment 10/2013 (Royal Ct. Guernsey 26 March 2013) .........................................9

*Jacquez v. Geo Int'l Mgmt.,*
  2021 U.S. Dist. LEXIS 130474 (W.D. Tex. Mar. 24, 2021) ........................................2

*Legate v. Livingston,*
  822 F.3d 207 (5th Cir. 2016) ...................................................................................2

*Leyse v. Bank of Am. Nat'l Ass'n,*
  804 F.3d 316 (3d Cir. 2015) ...................................................................................2

*Mary E. Bivins Found. v. Highland Cap. Mgmt., L.P.,*
  451 S.W.3d 104 (Tex. App. 2014)..........................................................................7

*Mora v. Angiodynamics, Inc. Defs.,*
  2022 U.S. Dist. LEXIS 200544 (S.D. Tex. Sep. 20, 2022) .......................................4

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
  No. 22-10387, 2022 U.S. App. LEXIS 31958 (5th Cir. Nov. 18, 2022) ...................................1

DOCS_NY:46794.4 36027/003

004719

*NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*,
 2022 U.S. Dist. LEXIS 142029 (S.D.N.Y. Aug. 9, 2022) ....................................... 7

*Occidental Petro. Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*,
 631 B.R. 847 (Bankr. S.D. Tex. 2021) .................................................................. 10

*Omega Overseas, Ltd. v. Griffith*,
 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) ....................................... 7

*Perkins v. Starbucks Corp.*,
 2022 U.S. Dist. LEXIS 208484 (S.D. Tex. Nov. 17, 2022) ...................................... 3

*Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*,
 374 F.3d 330 (5th Cir. 2004) ................................................................................. 5

*Wells Fargo Trust Co., N.A. v. Sioux City*,
 2022 U.S. Dist. LEXIS 81860 (D. Neb. May 5, 2022) ............................................ 2

*WickFire, L.L.C. v. Woodruff*,
 989 F.3d 343 (5th Cir. 2021) ............................................................................... 10

DOCS_NY:46794.4 36027/003

004720

Highland[2] submits this reply in further support of Highland's Motion [Docket No. 122].

## I.   PLAINTIFFS' SO-CALLED "MOTIONS" MUST BE DENIED[3]

1.      In an effort to put their RICO claim (Count 3) into suspended animation so that they can re-assert it at some later date (and presumably in a different court), Plaintiffs "move to dismiss" that Count pursuant to FRCP 41(a) while attempting to "reserve the right to bring such a claim." Pl. Mem at 23.[4]  But by its plain terms, Rule 41(a) only permits "an action" to be dismissed, not a single claim in a complaint.  *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 22-10387, 2022 U.S. App. LEXIS 31958, at *19 & n.15 (5th Cir. Nov. 18, 2022).  If Plaintiffs want to dismiss their entire complaint with prejudice, they are welcome to do so.  But Plaintiffs cannot dismiss a single claim without prejudice just by saying so.  Absent a voluntary dismissal of their entire case, Plaintiffs must face the music on this Motion.[5]

2.      Separately, Plaintiffs' argument that the Motion violates FRCP 12(g) and should therefore be stricken as a "successive motion to dismiss" is based on the erroneous notion that this Court "presumptively denied Highland's bases for dismissal on the merits by not ruling on them." Pl. Mem. at 5-6.  In fact, ***the Court did the exact opposite***.  After ruling that Plaintiffs were estopped from bringing their claims, the Court expressly stated that it would "forego" and "refrain"

---

[2] Capitalized terms used but not defined herein have the meanings given to them in *Highland's Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. 123] (the "Memorandum" or "Mem.").

[3] Each of Plaintiffs' so-called "motions" is procedurally improper because each fails to comply with Rule 7007-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* in every respect and should be denied on that basis alone.

[4] Citations to "Pl. Mem. at __" refer to *Plaintiffs' Response to Renewed Motion to Dismiss Complaint* [Docket No. 130] (which also includes Plaintiffs' Appendix ("Pl. Appx. __")).

[5] In order to dismiss only Count 3, Plaintiffs were required to move for leave to amend pursuant to FRCP 15. Had they followed the rule, Highland would have pointed out that the dismissal of Count 3 would have to be with prejudice because Plaintiffs' attempt to preserve their right to bring the RICO claim in a separate action would present a textbook case of *res judicata*.  *See* Original MTD Decision [Docket No. 100 at 11] (citing cases).

from addressing Highland's substantive arguments "for the sake of efficiency and judicial economy," while also noting that it was "inclined to agree with these arguments." MTD Order at 26. Now, following remand, Highland renews its motion to dismiss each claim on the same basis—failure to state a claim—that it initially asserted because it never obtained a substantive ruling on those aspects of the Original MTD. That is entirely appropriate because the assertion after remand of defenses not initially addressed is not duplicative. *See Butler v. Denka Performance Elastomer, LLC*, 2022 U.S. Dist. LEXIS 4981, at *11 (E.D. La. Jan. 11, 2022).[6]

3.      Even if it were (and it is not), the Court still maintains the discretion to entertain even a duplicative motion if judicial economy would be served by doing so, rather than forcing Highland to answer and then assert the same grounds on a Rule 12(c) motion. *See Jacquez v. Geo Int'l Mgmt.*, 2021 U.S. Dist. LEXIS 130474, at *4 (W.D. Tex. Mar. 24, 2021) (court has discretion to entertain second Rule 12(b)(6) motion) (citing *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 686 (5th Cir. 2017)); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 321-22 (3d Cir. 2015); *Wells Fargo Trust Co., N.A. v. Sioux City*, 2022 U.S. Dist. LEXIS 81860, at *10 (D. Neb. May 5, 2022). Here, where the Complaint is plainly vulnerable, there is no reason to require Highland to expend additional time and expense answering the Complaint and engaging in legally unnecessary discovery at the behest of a serial litigant's sock puppet.

---

[6] Plaintiffs' suggestion that this Court "presumptively denied" the Original MTD "on the merits" is plainly wrong and is not supported by the cases they cite. *Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970), does not hold that matters not ruled on by the lower court are "presumptively denied." Instead, the Supreme Court observed that "when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court." Here, Highland asks this Court to now address the merits of the other arguments it raised in the Original MTD. *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016), simply recognized that appellant there failed to address on appeal the core holding of the decision against him and is irrelevant. *Du Bois v. Martin Luther King Jr Family Clinic, Inc.*, 2018 U.S. Dist. LEXIS 246910 (N.D. Tex. May 29, 2018), was in a completely different posture than this case. In *Du Bois*, the defendant filed a cursory motion to dismiss and then, two months later, an "amended" motion to dismiss asserting additional bases. The court denied the motion as a second motion under Rule 12(g). That is radically different than the matter here, where the District Court remanded, and Highland is asserting the same basis for dismissal and substantially the same arguments.

4.      Next, Plaintiffs "move to strike" Highland's Appendix, claiming that "a court cannot take judicial notice of unpled facts unless the facts are undisputed."  Pl. Mem. at 6. Plaintiffs' contention is without merit.  The Fifth Circuit's standard is clear:

> When considering a motion to dismiss under Rule 12(b)(6), the Court's review is limited to the complaint; any documents attached to the complaint; any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint; and matters subject to judicial notice under Federal Rule of Evidence 201.

*Perkins v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 208484, at *8 (S.D. Tex. Nov. 17, 2022).[7]

5.      With the exception of exhibits 7, 13, and 14, all documents in the Appendix are on the docket of this Court or the District Court and are therefore properly included.  *See id.* at *3 n.1. Exhibit 7 (the deposition of HarbourVest's Michael Pugatch) is cited solely to establish the undisputed fact that Plaintiffs had the opportunity to conduct discovery on the 9019 Motion. Exhibits 13 and 14—the Member Agreement and the DAF/Highland advisory agreement—are the weak linchpins of Plaintiffs' claims and are referenced in the Complaint.[8]  Thus, all of the documents in the Appendix are properly before the Court.[9]

6.      Plaintiffs' fourth improperly asserted "motion" is for leave to amend.  Plaintiffs complain of the difficulty of pleading the minimum requirements of Rule 9 but suggest additional,

---

[7]  As this Court very recently ruled in a companion case **involving Plaintiff DAF and its same counsel**, "a court may also take judicial notice of matters that are part of the public record when considering a motion to dismiss." *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt. L.P.)*, 2022 Bankr. LEXIS 2780, at *5 n.4 (Bankr. N.D. Tex. Sep. 30, 2022).

[8]  Plaintiffs' objection to Exhibits 13 and 14 is particularly odd given that (a) Highland's Exhibit 13 is a duplicate of Plaintiffs' Exhibit 2 (Pl. Appx. 15-42), and (b) Highland's Exhibit 14—the *Second Amended and Restated Investment Advisory Agreement*—superseded the version of that Agreement that Plaintiffs mistakenly included in their Appendix. *See* Pl. Ex. 6, Appx 207-21.  If Plaintiffs want the Court to consider the DAF Advisory Agreement, they should presumably want the Court to consider the operative document and not a stale version.

[9]  Notably, with the exception of Exhibit 14, Highland's Appendix offered in support of its current Motion is exactly the same as the Appendix it offered in support of its Original MTD—and Plaintiffs failed to object the first time around, thereby further highlighting the lack of credibility underlying this so-called "motion."  *Compare Appendix in Support of Highland Capital Management, L.P.'s Motion to Dismiss the Complaint* [Docket No. 28] *with Appendix in Support of Highland Capital Management, L.P.'s Renewed Motion to Dismiss the Complaint* [Docket No. 124].

unpled facts exist.  Plaintiffs filed this case on April 12, 2021.  Since that time, Plaintiffs have

never actually identified any new "facts" or sought leave to amend,[10] despite having vigorously

litigated the Original MTD.  Even now, while Plaintiffs vaguely assert that they possess further

facts to plead viable claims, they fail to disclose or allege any of them.  This renders the claims

futile.  *See Mora v. Angiodynamics, Inc. Defs.*, 2022 U.S. Dist. LEXIS 200544, at *11 (S.D. Tex.

Sep. 20, 2022) (denying request in brief for leave to amend where plaintiff did not show that

amendment would not be futile), *report & recommendation adopted*, 2022 U.S. Dist. LEXIS

199844 (S.D. Tex. Nov. 1, 2022).  Plaintiffs' request for leave to amend should be denied.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

### A.    Judicial Estoppel Bars Counts 2 and 5[11]

7.    With respect to Counts 2 and 5, Plaintiffs first allege they only conceded that

HarbourVest, not Highland, complied with the Members Agreement, *i.e.*, that Highland still had a

supposed obligation to bring the transaction to Plaintiffs.  Pl. Mem. at 8.  That position contradicts

the Decision in which the District Court held that CLOH "made clear in the withdrawal of its

objection that it no longer disputed *the other parties' interpretation* of the Right of First Refusal,

which now forms the basis of Charitable DAF's second and fifth causes of action."  Decision at

16 (emphasis added).  The District Court's holding that Plaintiffs' position applied to *all* parties

was correct, is law of the case, and is not at issue on remand.[12]  Plaintiffs next argue that, because

---

[10] Of course, this excludes *Plaintiffs' Motion for Leave to File First Amended Complaint* filed in the District Court [Case No. 3:21-cv-00842-B, Docket No. 6], in which Plaintiffs improperly sought to name James P. Seery, Jr. as a defendant, an act that resulted in the imposition of a contempt order [Bankr. Docket No. 2660].

[11] On the issue of judicial estoppel, the District Court remanded *solely* "for [a] determination by the bankruptcy court whether the Charitable DAF acted inadvertently to change its legal position."  Decision at 18.

[12] Plaintiffs' position in the *first* paragraph of page 8 also contradicts their position in the *second* paragraph of page 8, where they admit that their "contract claims were disclosed [in the Objection] albeit they were withdrawn without prejudice."  "Contract claims" necessarily refers to claims with respect to HarbourVest and Highland; all were

4

they did not conceal claims, withdrawal was not inadvertent.  Pl. Mem. at 8-9.  But, to the extent Plaintiffs now claim their claim is somehow different than the claim they withdrew in the 9019 Objection, they have concealed the claim.

8.      More importantly, as Highland noted (and Plaintiffs concur), a failure to disclose is "'inadvertent' only when, in general, the debtor lacks knowledge of the undisclosed claims *or* has no motive for their concealment."  *Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330 (5th Cir. 2004).  Here, Plaintiffs' assertion that a purported misrepresentation of the *value* of HarbourVest's interest bears on whether Highland had a *contractual obligation* to offer those interest to Plaintiffs is a *non sequitur*.  Plaintiffs knowingly withdrew their contract claim after an investigation of their rights, with full knowledge of the facts, of the contract, and of applicable law.[13] Mem. ¶ 21-24. And Plaintiffs had a motive to conceal; they seek to "reap a windfall" from that concealment.  *Id.* ¶ 24.

9.      Finally, Plaintiffs vaguely argue that CLOH would not have withdrawn its objection or would have "made a more robust objection" (whatever that means) had they known of the alleged misrepresentation of value upon which Plaintiffs' tortious interference claim is

---

withdrawn.  If their "contract claims" did not include claims in respect of Highland, there would have been nothing to withdraw applicable here.

[13] Plaintiffs cite *Commerce Bank v. Malloy*, 2013 U.S. Dist. LEXIS 106329, at *16 (N.D. Okla. July 30, 2013), for the proposition that "unsuccessful legal position taken during a 9019 hearing are not a basis for finding that judicial estoppel applies" to issues more properly addressed in an adversary proceeding.  In fact, in *Commerce Bank*, plaintiff consistently took the position that the issue of assignability of the contract at issue was better dealt with in an adversary proceeding than a 9019 motion and never withdrew that argument.  The finding of no judicial estoppel was predicated on plaintiff's consistent assertion of the position, not its validity.  Moreover, the Tenth Circuit's view of judicial estoppel—that it relates primarily to assertions of fact—differs from the Fifth Circuit's—that it prevents a party from asserting inconsistent legal positions.  Decision at 14.  Plaintiffs have taken inconsistent factual and legal positions, and the Decision found as law of the case that judicial estoppel applies subject to a determination of inadvertence.

DOCS_NY:46794.4 36027/003

based.[14] Pl. Mem. at 9.  This is also a *non sequitur*.  HCLOF's value is irrelevant to the contractual interpretation analysis that underlies Counts 2 and 5.

10.     Plaintiffs conducted a full investigation of their rights under the Members Agreement; their withdrawal was advertent, voluntary, informed, and intentional.  Mem. ¶¶ 21-24.

### B.     Plaintiffs Concede Dismissal of Their RICO Claim

11.     Because Plaintiffs offer no substantive response to Highland's arguments that Count 4 (RICO) must be dismissed (*see* Mem. ¶¶ 26-39),[15] those arguments are deemed conceded. *See E-Dealer Direct v. Bank of Am., N.A.*, No. EP-21-CV-62-DB, 2021 U.S. Dist. LEXIS 99011, at *21 (W.D. Tex. May 25, 2021).  Count 4 must therefore be dismissed.

### C.     Plaintiffs' Breach of Fiduciary Duty Claim Fails

12.     In response to Highland's arguments in support of its Motion (Mem. ¶¶ 40-46), Plaintiffs argue that: (1) Highland owes Plaintiffs duties under the IAA; (2) they are making a claim under Section 215 of the IAA; (3) state law fiduciary duty claims can be brought for violations of the IAA; (4) fiduciary duties can run to investors in funds and Section 206 of the IAA imposes duties to such investors; (5) CLOH pled its claims derivatively in the alternative; (6) Plaintiffs have alleged breaches of fiduciary duty; and (7) Rule 9(b) does not apply or Plaintiffs have satisfied it.  Pl. Mem. at 9-20.  Each of these arguments fails as a matter of law and/or were not actually pled in the Complaint.

---

[14] This argument is rank speculation since neither the Plaintiffs' current trustee (Mark Patrick) nor its counsel (Sbaiti & Company PLLC) played any role in the decision to withdraw CLOH's objection; there is simply no foundation for Plaintiffs' argument concerning what Grant Scott (who made the decision to withdraw CLOH's objection) or John Kane (CLOH's counsel) might or might not have done in a hypothetical situation. Rather than speculate, the Court should decide the Motion based on the undisputed facts that Plaintiffs ignore—the intentional withdrawal of CLOH's objection based on a fully informed legal analysis.  In the end, Plaintiffs' argument—like their Complaint—is simply an audacious attempt to re-litigate a result they do not like because it was made by someone other than Mr. Dondero.

[15] Plaintiffs do concede that their RICO claim is predicated on securities law violations (Pl. Mem. at 23); consequently, it is not sustainable.  Plaintiffs' attempt to voluntarily withdraw their RICO claim and save it for another day fails for the reasons set forth above.  *See supra* ¶ 1.

004726

13.    *First*, Plaintiffs cannot credibly dispute that no private right of action exists under Section 206 of the IAA (*see* Mem. ¶ 44).  Instead, they simply engage in a bait-and-switch and now assert that "Section 215 recognizes a limited private right of action for equitable relief" (even though Section 215 is not even mentioned in the Complaint).  Pl. Mem. at 12.  But Section 215 provides no cover for Plaintiffs because it imposes no fiduciary duty of any kind.  Rather, Section 215 gives a client of an investment advisor a limited right to void an advisory agreement "*made in violation* of any provision" of the IAA, not for subsequent breaches.  Mem. ¶ 44 n.29; *NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 142029, at *10 (S.D.N.Y. Aug. 9, 2022) (Section 215 "'voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance'") (quoting *Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)).  Section 215 is therefore irrelevant because (a) Plaintiffs do not allege that any advisory agreement was "made in violation" of the IAA; (b) Plaintiffs do not seek the equitable remedy of rescission; and (c) even on the most generous reading, Section 215 does not create or impose a fiduciary duty nor does it provide a remedy for post-formation conduct.

14.    *Second*, Plaintiffs do not address their failure to plead the breach of any duty and that is not surprising:  An advisor to a fund does not owe fiduciary duties to fund investors (like CLOH), as this would itself create a conflict of interest.  *See* Mem. ¶ 45; *Mary E. Bivins Found. v. Highland Cap. Mgmt., L.P.*, 451 S.W.3d 104, 113 (Tex. App. 2014) (adopting reasoning in *Goldstein*).  In any event, there was no "taking" of a corporate opportunity here.  As this Court knows, the HarbourVest Transfer was but one component of a broader settlement of HarbourVest's claim against Highland, not the purchase of a security for cash free of extraneous considerations.  Mem. ¶ 46.  Thus, this transaction could not have been offered to Plaintiffs.  Further, the applicable

DOCS_NY:46794.4 36027/003

004727

agreements prepared under Mr. Dondero's watch expressly disclosed that Highland could compete

with DAF for investments and had no obligation to offer those investments to DAF.  Mem. ¶ 45.[16]

15.     **Third**, the Complaint is clear that the only breach of fiduciary duty claims pled

were federal, not state claims.  *See, e.g*, Compl. ¶ 57 (alleging "federal fiduciary duty"); ¶ 69

(alleging violation of federal regulation); ¶ 74 ("breached the Advisers Act's fiduciary duties");

and ¶ 83 ("federal law makes the duties … unwaivable").  Plaintiffs cannot amend the Complaint

by brief to assert new state law claims.  *See 360 Sec. Partners, LLC v. Hammond*, No. 3:21-CV-

3004-B, 2022 U.S. Dist. LEXIS 140283, at *14 (N.D. Tex. Aug. 8, 2022).  But even if they could,

state law claims would fail for the same reasons:  Highland has complied with all obligations to

Plaintiffs and has not violated its duties.

16.     **Fourth**, Plaintiffs have failed to properly plead demand futility for a derivative

claim.  None of Highland, HCFA, or Mr. Seery controls HCLOF's ability to bring suit.  The

Complaint makes no allegation as to the corporate management (rather than portfolio

management) of HCLOF, aside from a bare, inconsistent allegation that: "[t]o the extent the Court

determines that this claim had to have been brought derivatively on behalf of *HCLOF*, then

Plaintiffs represent that any pre-suit demand would have been futile since asking *HCM* to bring

suit against its principal, Seery, would have been futile."  Compl. ¶ 91 (emphasis added).  But the

issue is not asking *Highland* to bring suit, it is asking *HCLOF*.[17]  Even more to the point, at the

hearing on the Original MTD, Plaintiffs' counsel stated: "I think that based upon Highland's

---

[16] The twists and gyrations that Mr. Dondero and his "charitable trusts" engage in to try to disavow or nullify the very provisions written to protect him would be amusing if not for the substantial costs and burdens they unfairly place on the court system and Highland's creditors.

[17] The Complaint does not allege, nor could it, that Highland, HCFA, or Mr. Seery controls HCLOF.  HCLOF is a Guernsey entity (Compl. ¶ 5) managed by independent directors, and the Complaint makes no allegation that they are under any conflict or disability preventing them from deciding whether HCLOF ought to bring suit against Highland or Mr. Seery.  *See Highland CLO Funding, Ltd.'s Brief in Support of its Motion to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P.*, [Docket No. 58] (Sept. 29, 2021), at 2, 4-6.

004728

arguments and the arguments that we had, I don't think the derivative action is necessary for us to maintain on a go-forward basis.  And so we don't oppose them [HCLOF] being dismissed."  Nov. 23 Hearing Tr., Docket No. 78, at 97:3-98:2 (filed Nov. 24, 2021).  Plaintiffs (1) already told the Court they did not believe a derivative action was necessary and (2) voluntarily dismissed HCLOF with prejudice [Docket No. 80, Dec. 7, 2021]; Plaintiffs cannot now argue the contrary.[18]

17.     Finally, Rule 9(b) applies to the fiduciary duty claim, as Plaintiffs have asserted securities law violations, including Section 10 of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, to the pleading of which Rule 9(b) applies.  Mem. ¶ 40.

### D.     **Plaintiffs' Breach of Contract and Tortious Interference Claims Fail**

18.     Even absent judicial estoppel, Plaintiffs' breach of contract (Count 2) and tortious interference (Count 5) claims fail.  HarbourVest's transfer of its interests in HCLOF to a subsidiary of Highland was permitted under the plain and unambiguous terms of the Member Agreement (Ex. 13, Appx. 459-487) and the Right of First Refusal did not apply.  Mem. ¶ 48.  Plaintiffs' efforts to recharacterize the Transfer as a "sale to Highland" contradicts the facts and the terms of the transaction authorized by this Court in the Settlement Order.  As authorized, HarbourVest transferred its interests to HCMLP Investments, LLC ("HCMLPI"), a wholly-owned subsidiary (or "Affiliate") of Highland (Appx. Ex. 10, Appx. 386-409), as part of the settlement of HarbourVest's claim in the Highland case.  HCMLPI's status as an "Affiliate" of Highland is established by documents of which the Court may take judicial notice or on which the Complaint relies.  *See, e.g.*, Ex. 12 at Appx. at 91 (Highland is HCMLPI's member), Ex. 8 at Appx. 204-05

---

[18] Plaintiffs' interpretation of Guernsey law is also wrong.  Under Guernsey law, for a plaintiff to bring a derivative suit it must establish that wrongdoers control the company.  *Highland CLO Funding, Ltd.'s Brief in Support of its Motion to Dismiss and Joiner in Motion to Dismiss of Highland Capital Mgmt. L.P.* at 5 [Doc. No. 58] (citing *Jackson v. Dear and Others*, Judgment 10/2013, ¶ 8 (Royal Ct. Guernsey 26 March 2013) (unreported judgment) (*available at* https://www.guernseylegalresources.gg/CHttpHandler.ashx?documentid=63021).

(HCMLPI is an affiliate), and Ex. 10 at Appx. 402 (same).  HarbourVest's interest could be transferred to an "Affiliate" of Highland under the Members Agreement, and that is the end of the matter.

19.    Plaintiff's tortious interference claim also necessarily fails; it is duplicative of Plaintiffs' breach of contract claim (Mem. ¶ 48) and there is no breach of the Members Agreement (*id.* ¶ 51).[19]  Further, Plaintiffs fail to explain how Highland, a party to the Members Agreement, could have interfered with it; only third parties can interfere with a contract.  *1st & Trinity Super Majority, LLC v. Milligan*, 2022 Tex. App. LEXIS 4842, at *39 (Tex. App. July 14, 2022).

### E.    Plaintiffs' Negligence Claim Fails

20.    Plaintiffs contend that the basis of their negligence claim is the alleged breach of duty under Section 206(4) of the IAA.  Pl. Mem. at 22.  But there is no private right of action under Section 206.  Mem. ¶ 44.  Moreover, the exculpation provision in Highland's Plan, which is *res judicata*, binds Plaintiffs, and cannot be collaterally attacked,[20] bars claims for negligence (Mem. ¶ 50), and Plaintiffs cite no authority barring the application of that provision to (noncognizable) claims of negligence under the IAA.  And Plaintiffs essentially concede that any other negligence claim is barred by the exculpation provision.  Plaintiffs' negligence claim must be dismissed.

---

[19] Of course, it is axiomatic that tortious interference with contract claims cannot exist in the absence of a contract right with which a defendant can interfere.  *See e.g.*, *WickFire, L.L.C. v. Woodruff*, 989 F.3d 343, 354 (5th Cir. 2021) ("to prevail on an interference claim, the plaintiff must "present evidence that some obligatory provision of a contract [was] breached") (internal quotations omitted).  CLOH conceded that Plaintiffs had no contractual right of first refusal; therefore, a claim for tortious interference cannot be viable.

[20] *See Occidental Petro. Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, 631 B.R. 847, 858 (Bankr. S.D. Tex. 2021).

004730

## III.    <u>CONCLUSION</u>

      WHEREFORE, Highland respectfully requests that the Court grant the Motion and enter

an order in the form annexed to the Motion as **<u>Exhibit A</u>** and grant such further relief as the it

deems just and proper.

Dated:  December 2, 2022         **PACHULSKI STANG ZIEHL & JONES LLP**

                    Jeffrey N. Pomerantz (CA Bar No. 143717)
                    John A. Morris (NY Bar No. 2405397)
                    Gregory V. Demo (NY Bar No. 5371992)
                    Hayley R. Winograd (NY Bar No. 5612569)
                    10100 Santa Monica Blvd., 13th Floor
                    Los Angeles, CA 90067
                    Telephone: (310) 277-6910
                    Facsimile: (310) 201-0760
                    Email: jpomerantz@pszjlaw.com
                           jmorris@pszjlaw.com
                           gdemo@pszjlaw.com
                           hwinograd@pszjlaw.com

                    -and-

                    **HAYWARD PLLC**

                    */s/ Zachery Z. Annable*
                    Melissa S. Hayward (Texas Bar No. 24044908)
                    Zachery Z. Annable (Texas Bar No. 24053075)
                    10501 N. Central Expy, Ste. 106
                    Dallas, Texas 75231
                    Telephone: (972) 755-7100
                    Facsimile: (972) 755-7110
                    Email: MHayward@HaywardFirm.com
                           ZAnnable@HaywardFirm.com

                    *Counsel for Highland Capital Management, L.P.*

DOCS_NY:46794.4 36027/003

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § |
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATELY, | § § § § |
| Plaintiffs, | § § Adversary Proceeding No. |
| vs. | § § 21-03067-sgj § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY, | § § § § § |
| Defendants. | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

004732

## AMENDED NOTICE OF HEARING AND
## <u>NOTICE OF STATUS CONFERENCE</u>

**PLEASE TAKE NOTICE** that the following matter has been rescheduled for hearing on

**<u>Wednesday, January 25, 2023, at 1:30 p.m. (Central Time)</u>** (the "<u>Hearing</u>"):

1. *Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss
   Complaint* [Docket No. 122].

**PLEASE TAKE FURTHER NOTICE** that the following matter has been scheduled for a

status conference on **<u>Wednesday, January 25, 2023, at 1:30 p.m. (Central Time)</u>** (the "<u>Status</u>

<u>Conference</u>"):

1. *Renewed Motion to Withdraw the Reference* [Docket No. 128].

The Hearing and Status Conference will be held via WebEx videoconference before The

Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge.  The WebEx video

participation/attendance link for the Hearing is:  https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing and Status Conference is attached

hereto as **<u>Exhibit A</u>**; alternatively, the WebEx Hearing Instructions for the Hearing and Status

Conference may be obtained from Judge Jernigan's hearing/calendar site at:

https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

*[Remainder of Page Intentionally Left Blank]*

DOCS_NY:46811.1 36027/003

004733

Dated:  December 7, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

004734

# EXHIBIT A

004735

# WebEx Hearing Filing Instructions
## Judge Stacey G. Jernigan

Pursuant to General Order 2020-14 issued by the Court on May 20, 2020, all hearings before Judge Stacey G. Jernigan are currently being conducted by WebEx videoconference unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:   https://us-courts.webex.com/meet/jerniga

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In: 1.650.479.3207
Meeting ID: 479 393 582

**Participation/Attendance Requirements:**

- Counsel and other parties in interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above.  Counsel and other parties in interest who will <u>not</u> be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic only mode may attend the hearing in the WebEx telephonic only mode using the WebEx dial-in and meeting ID above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time.  Please be advised that a hearing may already be in progress.  <u>During hearings, participants are required to keep their lines on mute at all times that they are not addressing the Court or otherwise actively participating in the hearing</u>.  **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings**.  For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode and live testimony will only be accepted from witnesses who have the WebEx video function activated**. Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.

- All WebEx hearing attendees are required to comply with Judge Jernigan's Telephonic and Videoconference Hearing Policy (included within Judge Jernigan's Judge-Specific Guidelines):  https://www.txnb.uscourts.gov/content/judge-stacey-g-c-jernigan

**Exhibit Requirements**:

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual attachment thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- If the number of pages of such exhibits exceeds 100, then such party <u>must</u> also deliver two (2) sets of such exhibits in exhibit binders to the Court by no later than twenty-four (24) hours in advance of the hearing.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-courts.webex.com/meet/jerniga" as the location of the hearing</u> (note: this option appears immediately after the first set of Wichita Falls locations).  Do <u>not</u> select Judge Jernigan's Dallas courtroom as the location for the hearing.

004736

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. § | |
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATELY, § | |
| Plaintiffs, § | Adversary Proceeding No. |
| vs. § | 21-03067-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY, § | |
| Defendants. § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

004737

## AMENDED NOTICE OF HEARING AND
## <u>NOTICE OF STATUS CONFERENCE</u>

**PLEASE TAKE NOTICE** that the following matter has been rescheduled for hearing on

<u>**Wednesday, January 25, 2023, at 1:30 p.m. (Central Time)**</u> (the "<u>Hearing</u>"):

1. *Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. 122].

**PLEASE TAKE FURTHER NOTICE** that the following matter has been scheduled for a

status conference on <u>**Wednesday, January 25, 2023, at 1:30 p.m. (Central Time)**</u> (the "<u>Status</u>

<u>Conference</u>"):

1. *Renewed Motion to Withdraw the Reference* [Docket No. 128].

The Hearing and Status Conference will be held via WebEx videoconference before The

Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge.  The WebEx video

participation/attendance link for the Hearing is:  https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing and Status Conference is attached

hereto as **<u>Exhibit A</u>**; alternatively, the WebEx Hearing Instructions for the Hearing and Status

Conference may be obtained from Judge Jernigan's hearing/calendar site at:

https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.


*[Remainder of Page Intentionally Left Blank]*

DOCS_NY:46811.1 36027/003

004738

Dated:  December 7, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

004740

# WebEx Hearing Instructions
## Judge Stacey G. Jernigan

Pursuant to General Order 2020-14 issued by the Court on May 20, 2020, all hearings before Judge Stacey G. Jernigan are currently being conducted by WebEx videoconference unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:    https://us-courts.webex.com/meet/jerniga

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In: 1.650.479.3207
Meeting ID: 479 393 582

**Participation/Attendance Requirements**:

- Counsel and other parties in interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above. Counsel and other parties in interest who will <u>not</u> be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic only mode may attend the hearing in the WebEx telephonic only mode using the WebEx dial-in and meeting ID above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time. Please be advised that a hearing may already be in progress. <u>During hearings, participants are required to keep their lines on mute at all times that they are not addressing the Court or otherwise actively participating in the hearing.</u> **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings.** For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode and live testimony will only be accepted from witnesses who have the WebEx video function activated.** Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.

- All WebEx hearing attendees are required to comply with Judge Jernigan's Telephonic and Videoconference Hearing Policy (included within Judge Jernigan's Judge-Specific Guidelines): https://www.txnb.uscourts.gov/content/judge-stacey-g-c-jernigan

**Exhibit Requirements**:

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual attachment thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- If the number of pages of such exhibits exceeds 100, then such party <u>must</u> also deliver two (2) sets of such exhibits in exhibit binders to the Court by no later than twenty-four (24) hours in advance of the hearing.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-courts.webex.com/meet/jerniga" as the location of the hearing</u> (note: this option appears immediately after the first set of Wichita Falls locations). Do <u>not</u> select Judge Jernigan's Dallas courtroom as the location for the hearing.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) ) ) | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | ) ) ) | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | ) ) ) ) | |
| Defendants | ) ) | |

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**<u>RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE</u>**

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Highland Capital Management, L.P., a defendant in the above-captioned adversary proceeding ("Highland"), hereby submits this response (the "Response") in opposition to the *Renewed Motion to Withdraw the Reference* [D.I. 128] (the "Motion") filed by plaintiffs The Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLOH," and together with DAF, "Plaintiffs"). In support of its Response, Highland states as follows:

## RELIEF REQUESTED

1.      Through this Response, Highland respectfully requests that the Court deny the Motion in full, because the Motion is nothing more than another attempt by Plaintiffs to forum shop, delay adjudication, and waste judicial and estate resources.

2.      Pursuant to Rules 7.1(d) and (h) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), a separate brief (the "Brief") is being filed contemporaneously with this Response and is incorporated by reference as if fully set forth herein.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Highland respectfully requests that the Court enter an order (i) denying in whole the relief requested in the Motion, and (ii) granting Highland such further and additional relief as the Court deems just and proper.

Dated:  December 9, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

2

004744

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants | |

## BRIEF IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

004745

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ........................................................................................................................ 2

ARGUMENT .............................................................................................................................. 6

    I.        There is No Basis for Mandatory Withdrawal of the Reference ........................... 6

          a.     The Motion Is Untimely and Should Be Denied .................................... 7

          b.     The Renewed MTD Does Not Require "Substantial and Material Consideration" of Significant Federal Laws ........................................... 9

          c.     Plaintiffs Cite No Applicable Case Law. ............................................. 14

          d.     Plaintiffs' Additional Arguments Are Meritless. ................................. 15

    II.      The Court Has "Core" Jurisdiction to Adjudicate the Complaint. ...................... 16

CONCLUSION ........................................................................................................................ 18

004746

## TABLE OF AUTHORITIES

**CASES**

*Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*,
  625 F.3d 185 (5th Cir. 2010) ........................................................................... 13

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2012) ............................................................................ 14

*Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*,
  485 B.R. 604 (Bankr. W.D. Wash. 2013) ........................................................ 12

*Carter v. Schott (In re Carter Paper Co.)*,
  220 B.R. 276 (Bankr. M.D. La. 1998) ............................................................. 15

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.
  (In re Highland Cap. Mgmt., L.P.)*,
  2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022) ........................... passim

*City of N.Y. v., Exxon Corp.*,
  932 F.2d 1020 (2d Cir. 1991) ............................................................................ 7

*Connolly v. Bidermann Indust. U.S.A., Inc.*,
  1996 U.S. Dist. LEXIS 8059 (S.D.N.Y. June 13, 1996) .................................... 7

*Corwin v. Marney, Orton Inv.*,
  788 F.2d 1063 (5th Cir. 1986) ......................................................................... 11

*Drew v. WorldCom, Inc.*,
  2006 U.S. Dist. LEXIS 52318 (S.D.N.Y. July 26, 2006) ................................... 8

*Dugaboy Inv. Tr. v. Highland Cap Mgmt., L.P.*,
  2022 U.S. Dist. LEXIS 172351 (N.D. Tex. Sept. 22, 2022)............................. 10

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006).................................................................... 9, 10

*Gupta v. Quincy Med. Ctr.*,
  585 F.3d 657 (1st Cir. 2017)........................................................................... 17

*Harpole Constr., Inc. v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*,
  565 B.R. 193 (Bankr. D. N.M. 2017) .............................................................. 15

*Holzhueter v. Groth (In re Holzhueter)*,
  571 B.R. 812 (Bankr. W.D. Wis. 2017)........................................................... 12

*Hupp v. Educ. Credit Mgmt. Corp.*,
  2007 U.S. Dist. LEXIS 68199 (S.D. Cal. Sept. 13, 2007)................................. 8

*In re AI Copeland Enters., Inc.*,
  991 F.2d 233 (5th Cir. 1993) ........................................................................... 16

*In re Colo. Place L.P.*,
  2002 Bankr. LEXIS 2000 (Bankr. N.D. Tex. Feb. 5, 2002) ............................ 17

*In re Fresh Approach, Inc.*,
  51 B.R. 412 (Bankr. N.D. Tex. 1985)................................................................ 7

004747

*In re Harrah's Entertainment,*
  1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996) ........................................ 13

*In re Highland Cap. Mgmt., L.P.,*
  2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021),
  *aff'd* 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022) ............................. 3

*In re Nat'l Gypsum,*
  14 B.R. 188 (N.D. Tex. 1991) ................................................................................. 6

*In re New York Trap Rock Corp.,*
  158 BR 574 (S.D.N.Y. 1993) ................................................................................. 8

*In re Pilgrim's Pride Corp.,*
  453 B.R. 691 (Bankr. N.D. Tex. 2011) ................................................................. 17

*In re Rickel & Assoc., Inc.,*
  2003 U.S. Dist. LEXIS 23136 (S.D.N.Y. Dec. 24, 2003) ...................................... 8

*In re SGS Studio, Inc.,*
  256 B.R. 580 (Bankr. N.D. Tex. 2000) ................................................................. 17

*In re Taco Bueno Rests., Inc.,*
  606 B.R. 289 (Bankr. N.D. Tex. 2019) ................................................................. 17

*In re UAL Corp.,*
  386 B.R. 701 (Bankr. N.D. Ill. 2008) ................................................................... 15

*In re Vicars Ins. Agency, Inc.,*
  96 F.3d 949 (7th Cir. 1996) ................................................................................... 7

*In re Weblink Wireless, Inc.,*
  2003 Bankr. LEXIS 2312 (Bankr. N.D. Tex. Mar. 12, 2003) ............................... 17

*Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.),*
  2015 U.S. Dist. LEXIS 74006 (D. Me. June 8, 2015) .......................................... 15

*King v. Skolness (In re King),*
  624 B.R. 259 (Bankr. N.D. Ga. 2020) .................................................................. 12

*Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.),*
  2022 Bankr. LEXIS 1028 (Bankr. N.D. Tex. Apr. 6, 2022) ................................... 6

*Laird v. Integrated Res., Inc.,*
  897 F.2d 826 (5th Cir. 1990) ................................................................................ 10

*Langenkamp v. Culp,*
  498 U.S. 42 (1990) ................................................................................................ 15

*Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.),*
  587 B.R. 311 (N.D. Tex. 2018, *aff'd* 916 F.3d 528 (5th Cir. 2019) ....................... 12

*Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.),*
  2009 U.S. Dist. LEXIS 102134 (N.D. Tex. Oct. 1, 2009),
  *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009) .............................. 7

*MLSMK Inv. Co. v. JP Morgan Chase & Co.,*
  651 F.3d 268 (2d Cir. 2011) ................................................................................. 13

*Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.),*
931 F.3d 432 (5th Cir. 2019) ........................................................................................ 16

*NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.,*
48 F.4th 419 (5th Cir. 2022) .......................................................................................... 3

*NexPoint Diversified Real Es. Tr. v. Acis Cap. Mgmt., L.P.,*
2022 U.S. Dist. LEXIS 142029 (S.D.N.Y. Aug. 9, 2022) ............................................. 11

*Omega Overseas, Ltd. v. Griffith,*
2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) ............................................. 11

*Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.),*
256 B.R. 712 (Bankr. N.D. Tex. 2000) ......................................................................... 17

*Reading Co. v. Brown,*
391 U.S. 471 (1968) ................................................................................................. 16, 17

*Robare Grp., Ltd. v. SEC,*
992 F.3d 468, 472 (D.C. Cir. 2019) ............................................................................. 10

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
375 U.S. 180 (1963); .................................................................................................... 10

*SEC v. Northshore Asset Mgmt.,*
2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008) ................................................. 9

*SEC v. Trabulse,*
526 F.Supp.2d 1008 (N.D. Cal. 2007) ........................................................................... 9

*Sec. Farms v. Int'l Bhd. of Teamsters,*
124 F.3d 999, 1007 (9th Cir. 1997) ............................................................................... 7

*Tillman Enters., LLC v. Horlbeck (In re Horlbeck),*
589 B.R. 818 (Bankr. N.D. Ill. 2018) ........................................................................... 12

*Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.),*
258 F.3d 385 (5th Cir. 2001) ........................................................................................ 16

*Tradex Glob. Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui),*
538 B.R. 793 (Bankr. N.D. Cal. 2015) ......................................................................... 12

*Transamerica Mortg. Advisors v. Lewis,*
444 U.S. 11 (1979) ....................................................................................................... 11

**STATUTES**

11 U.S.C. § 503(b)(1)(A) ............................................................................................... 16

11 U.S.C. § 523(a)(19) ................................................................................................... 12

18 U.S.C.A. § 1964(c) .................................................................................................... 13

28 U.S.C § 157(d) .................................................................................................... passim

28 U.S.C. § 1334 ........................................................................................................... 17

28 U.S.C. § 157 ........................................................................................................... 4, 7

28 U.S.C. § 157(b) ........................................................................................................ 17

**OTHER AUTHORITIES**

9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ................................................................... 7

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18 (July 12, 2019) .......................................................... 10

*Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628; File No. S7-25-06 (Aug. 3, 2007) .............................................................................. 9

DOCS_NY:46770.8 36027/003

004750

Highland Capital Management, L.P., a defendant in the above-captioned adversary proceeding ("Highland"), hereby submits this brief in support of its response (the "Response") to the *Renewed Motion to Withdraw the Reference* [D.I. 128] (the "Motion") filed by plaintiffs The Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLOH," and together with DAF, "Plaintiffs").[2]  In opposition to the Motion, Highland states as follows:

## PRELIMINARY STATEMENT[3]

1.      This Court should deny Plaintiffs' Motion because it is yet another attempt to forum shop, delay adjudication, and waste judicial and estate resources.

2.      On April 12, 2021, Plaintiffs commenced this action in the District Court by filing its (baseless) Complaint.  After Highland moved to enforce the reference, Plaintiffs cross-moved for a ruling that mandatory withdrawal of the reference was required under 28 U.S.C § 157(d) and that enforcing the reference would therefore be pointless.   On September 29, 2021, notwithstanding Plaintiffs' cross-motion, the District Court enforced the reference and sent this matter to this Court for adjudication.

3.      After referral, Plaintiffs pressed their Stay Motion, and on November 18, 2021, stated that, if their request for a stay were denied, they would file a motion for mandatory withdrawal of the reference.  Plaintiffs' Stay Motion was denied, but Plaintiffs, for unknown reasons, did not move to withdraw the reference at that time.

4.      Now, a year after the hearing on the Original MTD and after resolution of Plaintiffs' appeal of the MTD Order, Plaintiffs filed the Motion to withdraw the reference under 28 U.S.C. § 157(d).  The Motion is untimely.  The Complaint was referred to this Court in September 2021.

---

[2] Concurrently herewith, Highland is filing its *Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference* (the "Appendix").  Citations to the Appendix are as follows:  Ex. #, Appx. #.

[3] All capitalized used but not defined in this Preliminary Statement have the meanings given to them below.

Plaintiffs could have filed a motion to withdraw at that time; they did not and instead adjudicated the Original MTD on the merits in this Court.  The MTD Order was remanded in early September 2022.  Plaintiffs could have filed a motion to withdraw at that time; they did not.  Instead, Plaintiffs waited to file the Motion until a month after Highland filed the Renewed Motion and after all parties had expended significant resources adjudicating the matter in this Court.  The Motion also fails on the merits.

5.       *First*, the Complaint does not require substantial and material consideration of non-bankruptcy federal law.  Notwithstanding that, Plaintiffs argue mandatory withdrawal is necessary so that the District Court, not this Court, can resolve four fundamental issues: (a) whether Highland owe Plaintiffs a fiduciary duty under the IAA; (b) the scope of such duty and whether breached; (c) remedies and damages for any breach; and (d) whether a violation of the IAA can be a predicate act under RICO.  But the foregoing allegations only require application of well-settled federal law, including law from the Supreme Court.  None warrant withdrawal.

6.       *Second*, the Bankruptcy Court has jurisdiction to adjudicate the Complaint. The facts underlying the Complaint arose *after* the Petition Date but *prior* to confirmation from Highland's ordinary course operation of its estate.  Assuming a viable claim exists, it would be an "administrative expense claim," and this Court has core jurisdiction to adjudicate administrative expense claims.

7.       Ultimately, the Motion is another waste of judicial and estate resources and should be denied as untimely, prejudicial to Highland, and meritless.

## **BACKGROUND**

8.       On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.  On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").  The Plan became effective on August 11, 2021 [Bankr. Docket No. 2700] (the "Effective Date").[4]

10.  Pursuant to the Plan, this Court expressly retained jurisdiction to "allow, disallow, determine, liquidate … any Claim … including, without limitation, the resolution of any request for payment of any Administrative Expense Claim …."  Plan, Art. XI.[5]

11.  On April 12, 2021, Plaintiffs filed their *Original Complaint* [D.I. 1] (the "Complaint") in the U.S. District Court for the Northern District of Texas (the "District Court"), in which they alleged that the Bankruptcy Court approved settlement with HarbourVest somehow violated the contractual and extra-contractual duties Highland purportedly owed (i) to CLOH as an investor in Highland CLO Funding, Ltd. ("HCLOF") and (ii) to DAF as an advisee under an investment management agreement.  Complaint ¶¶ 56-112.[6]  Highland's alleged misconduct in settling the HarbourVest claim occurred during the last quarter of 2020 and the first quarter of

---

[4] On September 8, 2022, the U.S. Court of Appeals for the Fifth Circuit affirmed, in material part, the Confirmation Order's factual findings and legal conclusions.  *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022).

[5] The Plan defines "Administrative Expense Claim," in relevant part, as a:

Claim for costs and expenses of administration of the Chapter 11 Case … pursuant to sections 503(b), 507(a)(2), 507(b) … including … (a) the actual and necessary costs and expense incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor ….

Plan, Art I.B.2.

[6] Plaintiffs subsequently sought to add Mr. Seery as a defendant in violation of two orders entered by this Court.  Plaintiffs' actions resulted in this Court holding Plaintiffs, among others, in contempt.  *In re Highland Cap. Mgmt., L.P.*, 2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021), *aff'd* 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022).  The contempt order was affirmed by the District Court, but Plaintiffs have, of course, appealed to the Fifth Circuit.

2021, *i.e.* after the Petition Date but before the Effective Date while Highland was a debtor-in-possession. *Id.* ¶¶ 29-54.

12.     On May 19, 2021, Highland moved for an order to enforce the standing order of reference (Misc. Order No. 33) [D.I. 22] (the "Motion to Enforce") in the District Court arguing that the Complaint asserted claims arising in, arising under, or related to Title 11 and Highland's bankruptcy case.

13.     On May 27, 2021, Highland moved to dismiss the Complaint [D.I. 26] (the "Original MTD"). The Original MTD was fully briefed to the District Court.

14.     On June 29, 2021, Plaintiffs filed their response to the Motion to Enforce [D.I. 36] in which they cross-moved, arguing the Motion to Enforce should be denied because the claims in the Complaint were subject to mandatory withdrawal of the reference, could not be adjudicated in this Court, and that granting the Motion to Enforce would therefore be pointless. The arguments in Plaintiffs' cross-motion are identical to those in the Motion.

15.     On August 26, 2021, Plaintiffs filed a motion in the District Court to stay all proceedings pending appeal of the Confirmation Order [D.I. 55] (the "Stay Motion"), arguing that the Plan injunction somehow prohibited the prosecution of the Complaint. The Stay Motion was fully briefed to the District Court.

16.     On September 20, 2021, the District Court—notwithstanding Plaintiffs' cross-motion—granted the Motion to Enforce [D.I. 1] and referred this case to this Court, including the Original MTD, "[p]ursuant to 28 U.S.C. § 157 … to be adjudicated as a matter related to the … Bankruptcy of Highland Capital Management, L.P." This Court docketed the proceeding and set a hearing for November 23, 2021, on both the Original MTD and Stay Motion.

17.    On November 18, 2021, five days before the scheduled hearing, Plaintiffs filed—

without leave of this Court[7]—an amended motion to stay the proceedings [D.I. 69] and attached a

draft motion to withdraw the reference [D.I. 69-1] (the "Proposed Motion").  Plaintiffs said they

would file the Proposed Motion if this Court denied the Stay Motion.

18.    At the November 23 hearing, this Court denied the Stay Motion from the bench,[8]

finding Plaintiffs' arguments "reflect[ed] frankly, a misunderstanding of how the injunction

language … applies here"[9] and that the injunction did not prevent litigation of the Complaint in

this Court.  Subsequently, Plaintiffs argued the merits of the Original MTD, including their alleged

claims under the Investment Advisers Act (the "IAA") and RICO, to this Court.[10]  Plaintiffs, for

reasons known only to them, never filed the Proposed Motion.

19.    On March 11, 2022, this Court granted the Original MTD [D.I. 100] (the "MTD

Order") and dismissed the Complaint with prejudice.  *Charitable DAF Fund, L.P. v. Highland

Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 659 (Bankr. N.D. Tex.

Mar. 11, 2022).  Plaintiffs appealed the MTD Order to the District Court and that appeal was

consolidated with Plaintiffs' appeal of this Court's denial of the Stay Motion.  *See* 3:21-cv-03129-

B, Docket No. 20 (N.D. Tex. Jun. 17, 2022).  Both appeals were fully briefed to the District Court.

Plaintiffs did not raise 28 U.S.C. § 157(d) in the appeals or otherwise argue that this Court lacked

jurisdiction to have entered the MTD Order.

---

[7] Ex. 1, Appx. 12 ("I will say that these last-minute amended motions are not going to be tolerated …. Your firm has already been sanctioned once in this adversary proceeding …. So, you know, I'm just kind of baffled why you would take a chance filing an amended motion without leave or somehow getting it to the attention of the Court or running it by the other parties for their consent to you doing it.")

[8] A formal order denying the Stay Motion was entered on December 7, 2021 [D.I. 81].

[9] Ex. 1, Appx. 30.

[10] Ex. 1, Appx. 65-97.

004755

20.     On September 2, 2022, the District Court remanded the MTD Order to this Court for further proceedings.  *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 166 (N.D. Tex. 2022).  The District Court, in the same opinion, affirmed this Court's denial of the Stay Motion.  *Id.* at 24-28.

21.     On October 14, 2022, Highland filed its renewed motion to dismiss [D.I. 122] (the "<u>Renewed MTD</u>").  Plaintiffs responded to the Renewed MTD on November 18, 2022 (the "<u>Response</u>") but did not include a statement regarding their consent to entry of final orders or judgments as required by Federal Rule of Bankruptcy Procedure 7012(b).

22.     On November 18, 2022, only after the parties expended significant resources adjudicating the Complaint in this Court did Plaintiffs file the Motion seeking mandatory withdrawal of the reference.  Although the Motion is styled as a "renewed" motion, it renews nothing.

## ARGUMENT

**I.      <u>There is No Basis for Mandatory Withdrawal of the Reference</u>**

23.     Under 28 U.S.C. § 157(d), a district court "shall, *on timely motion* of a party, so withdraw a proceeding if … resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d) (emphasis added).  Assuming a timely motion, mandatory withdrawal is warranted only if a matter requires "substantial and material consideration" and "significant interpretation of federal laws[,]" rather than a "straightforward application of a federal statute to a particular set of facts." *In re Nat'l Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991); *Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 1028, at *27-28 (Bankr. N.D. Tex. Apr. 6, 2022) (same).

24.     Simply asserting federal law is insufficient and mandatory withdrawal only applies when a matter requires something "more than mere application of existing law to new facts." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996); *City of N.Y. v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal requires "significant interpretation, as opposed to simple application, of federal laws"). "[M]andatory withdrawal is to be applied narrowly" to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

### a.     *The Motion Is Untimely and Should Be Denied*

25.     A motion to withdraw the reference may only be granted if it is "timely." 28 U.S.C. § 157(d). Section 157(d) does not define "timely," but it has been interpreted as requiring a motion be made at the first reasonable opportunity. *See In re Fresh Approach, Inc.*, 51 B.R. 412, 415-16 (Bankr. N.D. Tex. 1985) (finding a motion to withdraw the reference untimely when filed sixteen days after the court entered its decision on the matter); *see also Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1007, n.3 (9th Cir. 1997). ("A motion to withdraw is timely 'if it was made as promptly as possible in light of the developments in the bankruptcy proceeding.'"); *Connolly v. Bidermann Indust. U.S.A., Inc.,* 1996 U.S. Dist. LEXIS 8059, at *8 (S.D.N.Y. June 13, 1996) ("Plaintiff's delay of over eight months renders her motion untimely, and as such it does not meet the threshold requirement set forth in 28 U.S.C. § 157(d)."); 9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ("[M]otions for mandatory withdrawal must be made as soon as it is apparent that it is necessary for the district court to hear the proceeding").

26.     Failure to timely move for mandatory withdrawal is dispositive, especially when that delay would prejudice the non-movant or is an attempt to delay or forum shop. *See Fresh Approach,* 51 B.R. at 415 ("[A] motion to withdraw reference should not be used as a vehicle to

protract litigation and delay controversies. 'If a motion for withdrawal of reference is not timely made, it will almost certainly be held that the provisions of the second sentence of section 157(d) have been waived.'") (citations omitted); *see also Hupp v. Educ. Credit Mgmt. Corp.*, 2007 U.S. Dist. LEXIS 68199, at *8-10 (S.D. Cal. Sept. 13, 2007) ("Courts have found a motion to withdraw the reference untimely when a significant amount of time has passed since the moving party had notice of grounds for withdrawing the reference or where the withdrawal would have an adverse effect on judicial economy"); *Drew v. WorldCom, Inc.*, 2006 U.S. Dist. LEXIS 52318, at *8-9 (S.D.N.Y. July 26, 2006) (denying motion to withdraw reference filed eighteen months after objection to claim, noting "there is no legitimate justification for the length of the delay in this case," and "the timing of [movants'] motion gives rise to a strong inference that he is attempting to forum shop").[11]

27.     Here, the Motion is untimely and can only be interpreted as an attempt to forum shop, delay adjudication, and waste judicial and estate resources. The Complaint was referred to this Court on September 20, 2021. Plaintiffs did not file a motion to withdraw at that time (although they threatened to file the Proposed Motion), and consequently the parties spent considerable time and resources adjudicating the MTD Order in this Court on the merits in November 2021. Subsequently, the parties spent more time and resources adjudicating the appeal of the MTD Order. The MTD Order was remanded to this Court on September 2, 2021. But Plaintiffs did not file the Motion until November 18, 2022, after Highland spent more time and

---

[11] *In re Rickel & Assoc., Inc.*, 2003 U.S. Dist. LEXIS 23136, *6 (S.D.N.Y. Dec. 24, 2003) (finding motion to withdraw reference untimely where "the bankruptcy court had devoted substantial resources to the claim," and "defendants [] seek to retrace in the district court substantially the same journey previously taken in the bankruptcy court," noting "the potential prejudice … of having a case dislodged from its steady progression in the bankruptcy court's calendar to be placed on that of the district court."); *In re New York Trap Rock Corp.*, 158 BR 574, 577 (S.D.N.Y. 1993) (finding untimely a motion to withdraw reference filed after a "short" period of three months where "time span was rich with events," and the circumstances strongly indicated forum shopping—"[f]orum shopping efforts pursued by awaiting a decision relevant to the merits and then bypassing or filing a motion to transfer should not be rewarded with success.").

004758

resources briefing and filing the Renewed MTD.  Instead of timely filing a motion to withdraw the reference, Plaintiffs allowed Highland (and this Court) to expend substantial time, effort, and money briefing and arguing this case *in this Court*.  Plaintiffs' belated attempt to now have the case adjudicated in the District Court is impermissible.  The Motion is untimely and prejudicial to Highland.  It should be denied on that basis alone.

b. ***The Renewed MTD Does Not Require "Substantial and Material Consideration" of Significant Federal Laws***

28.    Even if the Motion were timely (it is not), the Complaint does not require "substantial and material consideration" and "significant interpretation of federal laws."  Plaintiffs attempt to bootstrap themselves into this stringent standard by exaggerating the complexity of their baseless claims.  But, their claims are simple:  (a)(i) did Highland owe Plaintiffs a fiduciary duty under the IAA; (ii) what was the nature of that duty and was it violated; and (iii), if violated, what are the remedies and potential damages and (b) is the alleged securities fraud a predicate act under RICO?  These are not difficult questions or outside this Court's expertise.

29.    **Fiduciary Duty under the IAA.**  It is well-settled that Section 206 of the IAA creates a fiduciary duty to an investment adviser's "client" (*i.e.* the person or entity that is the counterparty to the investment management agreement) but not to an underlying investor in the "client." *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund [*i.e.*, the client], not to the fund's investors … If the investors are owed a duty and

the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.")[12]

30.    HCLOF is a fund managed by Highland HCF Advisors, Ltd. ("HCFA"), a Highland subsidiary.  CLOH is an investor in HCLOF; DAF is not.  Highland's and HCFA's duties do not run to investors in HCLOF, just to HCLOF itself.  Highland has never had a management agreement or client relationship with CLOH and owes it no fiduciary or other duty.  Highland, at all relevant times, was party to a management agreement with DAF and owed DAF certain duties under that agreement.[13]  This analysis is not complicated and only requires a straightforward application of settled law.

31.    **The Scope of the Fiduciary Duty and Breach.**  An adviser's fiduciary duty is satisfied by disclosure.  "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship."  *See Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18 (July 12, 2019), Ex. 4, Appx. 170-71.  The law is well-established; includes Supreme Court jurisprudence; is not based solely on interpretation of SEC releases; and was recently opined on by the District Court in one of Mr. Dondero's numerous appeals of this Court's orders.  *See, e.g., SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-92 (1963); *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 831-36 (5th Cir. 1990); *Robare Grp., Ltd. v. SEC*, 992 F.3d 468, 472 (D.C. Cir. 2019); *Goldstein*, 451 F.3d at 881; *Dugaboy Inv. Tr. v. Highland Cap Mgmt., L.P.*, 2022 U.S. Dist.

---

[12] *See also SEC v. Northshore Asset Mgmt.*, 2008 U.S. Dist. LEXIS 36160, at *18-20 (S.D.N.Y. May 5, 2008) (dismissing a claim that an investment adviser owed a duty to a fund's investors rather than just the fund); *SEC v. Trabulse*, 526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007) (same); *Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628; File No. S7-25-06 (Aug. 3, 2007), Ex. 2, Appx. 119 (Rule 206(4)-8 "does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law").

[13] Highland and DAF entered into that certain *Second Amended and Restated Investment Advisory Agreement,* effective from January 1, 2017 (the "DAF Agreement").  Ex. 3, Appx. 126-48.  The DAF Agreement terminated on February 28, 2021.

DOCS_NY:46770.8 36027/003

LEXIS 172351, at *10-11 (N.D. Tex. Sept. 22, 2022). Adjudicating this issue only requires determining if appropriate disclosures were made (which they were).[14]

32. **Remedies for Breach of Duty.** Assuming, *arguendo*, that Highland breached its fiduciary duty to DAF under the IAA, under clear Supreme Court precedent, there is no private right of action for such breach under Rule 206 of the IAA. *Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 13-14 (1979) ("[W]e hold there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable [on a client]").[15] There is no unsettled federal law.[16]

33. **Bankruptcy Courts Apply the IAA.** Finally, bankruptcy courts routinely analyze federal securities laws. In fact, this Court reviewed Plaintiffs' claims earlier this year although it did not rule on them. *Charitable DAF Fund*, 2022 Bankr. LEXIS 659, at *39-40 ("[This Court]

---

[14] Exhibit A to the DAF Agreement includes pages of disclosures, including the following: (1) "[Highland] … is [not] precluded from engaging in or owning an interest in. . . investment activities of any kind, whether or not such ventures are competitive with [DAF]" and (2) "[Highland] … may actively engage in transactions in the same securities sought by [DAF] and, therefore, may compete with [DAF] for investment opportunities or may hold positions opposite to positions maintained by [DAF]." Ex. 3, Appx. 142-43.

[15] *See also Corwin v. Marney, Orton Inv.*, 788 F.2d 1063, 1066 (5th Cir. 1986) (affirming dismissal of claims under the Advisers Act "because the investors had no private causes of action"); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 2780, at *13 n.23 ("the court notes that the … Supreme Court has held [in *Transamerica*] that there is not a private right of action for damages under the IAA."); *NexPoint Diversified Real Es. Tr. v. Acis Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 142029, at *9-10 (S.D.N.Y. Aug. 9, 2022) ("[U]nder the IAA … there is no private right of action to bring a claim pursuant to [Section 206 of the IAA].").

[16] Plaintiffs alleged, for the first time, in their Response to the Renewed MTD that "Section 215 [of the IAA] recognizes a limited private right of action for equitable relief" (even though Section 215 is not mentioned in the Complaint). Response at 12. Plaintiffs do not mention Rule 215 in the Motion but will presumably argue it is a basis for mandatory withdrawal of the reference. It is not. First, Rule 215 was not pled in the Complaint and cannot be the basis for withdrawal—there is no claim to withdraw. Second, Rule 215 imposes no fiduciary duty of any kind but simply provides, under clear Supreme Court precedent, "a limited private remedy … to void an investment advisers contract, but … confers no other private causes of action, legal or equitable." *Transamerica*, 441 U.S. at 24; *see also Corwin*, 788 F.2d at 1066 ("The Investors seek damages, not the voiding of an investment advisers contract, and there is no such private cause of action based on [Section 215]"). That remedy applies only when an advisory agreement was made in violation of any provision of the IAA, not for subsequent breaches. *NexPoint* , 2022 U.S. Dist. LEXIS 142029, at *10 (Section 215 "'voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance.'") (quoting *Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)). Here, the contours of Rule 215 (and its lack of applicability to the Complaint) are well-settled and will only require the application of that settled case law to the facts of this case.

will forego addressing the other arguments of Highland …. While this court is inclined to agree with those arguments, the court will refrain from addressing them until such time as any higher court may instruct this court to address them.")  Further, Highland was heavily involved in the bitterly contested bankruptcy of Acis Capital Management, L.P. ("Acis").  *In re Acis Cap. Mgmt., L.P.*, *et al*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2019).  In *Acis*, Highland (then controlled by Mr. Dondero) brought claims ***in this Court*** alleging Acis was liable to Highland for breach of fiduciary duties under the IAA—nearly identical claims to those in the Complaint.  Ex. 5, Appx. 205-06.

34.    Moreover, 11 U.S.C. § 523(a)(19) requires bankruptcy courts to determine if there were violations of "federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934) …"[17] in connection with discharge.  As part of this analysis, bankruptcy courts look to, among other things, the applicability of the IAA.  *See, e.g., Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 832 (Bankr. N.D. Ill. 2018) ("bankruptcy courts have jurisdiction to determine liability on an underlying securities claim for purposes of § 523(a)(19)" and "liability under § 523(a)(19) cannot be supported by an alleged violation" of the Advisers Act as there is no private remedy or "actionable claim"); *Tradex Glob. Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*, 538 B.R. 793, 806-08 (Bankr. N.D. Cal. 2015) (same).[18] Bankruptcy court analysis of the IAA, however, is not limited to Section 523(a)(19).  *See Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604 (Bankr. W.D. Wash. 2013)

---

[17] Section 3(a)(47) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "securities laws" as "the Securities Act of 1933 (15 U.S.C. 78a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the Sarbanes-Oxley Act of 2002, the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.), ***the Investment Advisers Act of 1940*** (15 U.S.C. 80b et seq.), and the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa, et seq.)" (emphasis added).

[18] *See also King v. Skolness (In re King)*, 624 B.R. 259, 301 (Bankr. N.D. Ga. 2020) (bankruptcy court could determine liability under state and federal securities laws for purposes of § 523(a)(19)); *Holzhueter v. Groth (In re Holzhueter)*, 571 B.R. 812, 822-24 (Bankr. W.D. Wis. 2017) (same).

(dismissing complaint alleging that defendant owed a fiduciary duty to an investor under the IAA for failure to state a claim); *Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.),* 587 B.R. 311, 317-20 (N.D. Tex. 2018) (affirming bankruptcy court's rulings under the IAA), *aff'd* 916 F.3d 528 (5th Cir. 2019); *In re Acis Cap. Mgmt. L.P., et al.*, Case No. 18-30264-sgj11, D.I. 549 (Bankr. N.D. Tex. Sept. 4, 2018) (Ex. 6, Appx. 228-30) (finding the IAA did not prohibit assumption of a management agreement under Section 365).

35.    **The IAA Cannot Be a RICO Predicate:**   Plaintiffs allege that determining whether securities fraud can be a predicate act under RICO requires mandatory withdrawal. Motion ¶ 12.  This argument also fails.  ***First***, Plaintiffs concede they have no RICO claim. Response at 23.  Consequently, it should not be a basis for withdrawal of the reference.  ***Second***, RICO, by its terms, expressly excludes securities fraud as a predicate act. 18 U.S.C.A. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].")[19]  Because Plaintiffs' RICO claim is premised on an alleged securities fraud, it is barred by the express language of the RICO statute. *See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273-80 (2d Cir. 2011) (barring RICO claims arising out of the operation of a Ponzi scheme because they involved a purchase or sale of a security despite no private right of action existing); *Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*, 625 F.3d 185, 189-91 (5th Cir. 2010) (same).  There is no unsettled question of federal law warranting mandatory withdrawal.

---

[19] *See also* H.R. Rep. No. 104-369, at 47 (1995) ("The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the . . . Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.")

DOCS_NY:46770.8 36027/003

c.    *Plaintiffs Cite No Applicable Case Law.*

36.    Plaintiffs' only citations to support their arguments are to two factually inapposite cases. ***First***, they cite *In re Harrah's Entertainment*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996), which has nothing to do with the IAA. *Harrah's* involved a class action arising from the issuance of $435 million in publicly traded debt; claims that the prospectus violated the Exchange Act; and attempts to hold the issuer's partners liable for the issuer's actions under the Exchange Act. The district court ruled that mandatory withdrawal applied because of the foregoing factors, none of which apply here. There is no public issuance; no retail investors; no class action; no derivative liability; no applicability of the Exchange Act; and no complicated factual analysis. Plaintiffs' IAA claims require only the straightforward application of settled law to the facts in a dispute between two private parties.

37.    ***Second***, Plaintiffs cite *Belmont v. MB Investment Partners, Inc.*, 708 F.3d 470 (3d Cir. 2012), for the proposition that there is "considerable 'confusion'" because "federal law (the IAA) provides, 'the duty and the standard to which investment advisers are to be held,' but 'the cause of action is presented as springing from state law.'" Motion ¶ 13. *Belmont* confirms no private right of action exists under the IAA. *Belmont*, 708 F.3d at 502. The only "confusion" noted in *Belmont* is if ***state, not federal, law*** creates a private right. *Id.* (finding the lack of private rights in the IAA "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging the label 'state law' on an otherwise forbidden federal law claim" but recognizing split on state law claims). But Plaintiffs have not pled a state law claim, and an unpled claim is irrelevant—there is nothing to withdraw under 28 U.S.C. § 157(d). Further, section 157(d) requires mandatory withdrawal only ***if material federal law is implicated***; state law claims—even properly pled ones—are not a basis for mandatory withdrawal.

### d.    *Plaintiffs' Additional Arguments Are Meritless.*

38.    Plaintiffs' allege two additional arguments to support mandatory withdrawal. ***First***, Plaintiffs argue the District Court needs to assess whether a breach of fiduciary duty claim "can be terminated by a blanket injunction in a bankruptcy plan." Motion ¶ 8. But Plaintiffs have been told ***three times*** that the Plan's injunction does not prevent Plaintiffs' prosecution of their alleged IAA claims so long as they are prosecuted in this Court—twice by this Court and once by the District Court.[20]  ***Second***, Plaintiffs' jury trial waiver argument is premature and irrelevant. DAF affirmatively waived its jury trial right in the DAF Agreement (Ex. 3, Appx. 138),[21] but neither Plaintiff has a jury trial right having availed themselves of the equitable jurisdiction of this Court.[22] And, importantly for the Motion, Highland has not yet moved to strike Plaintiffs' jury trial demand.[23] Accordingly, Plaintiffs' request to withdraw the reference on the jury trial question is

---

[20] Ex. 1, Appx. 30 ("I just don't think that you have shown that … the injunction provisions of the plan somehow tie your hands in arguing the 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that your arguments reflect, frankly, a misunderstanding of how the injunction language … applies here."); Ex. 7, Appx. 261 (responding to DAF's assertion that it could not prosecute a claim for an IAA breach of fiduciary duty because of the Plan injunction "THE COURT: Why not? Why not? Why not? There is nothing that would have precluded you from filing a request for allowance of administrative claim."); *Charitable DAF*, 643 B.R. at 176-77 ("The bankruptcy court found the Plan's injunction … did not prevent [DAF] from pursuing its causes of action. … [T]he bankruptcy court held that Charitable DAF could continue to litigate its cause of action and the Court agrees. … Just like the bankruptcy court, this Court does not see how the injunction … prohibit[s] [DAF] from participating [in litigating the Complaint] … [and] [DAF] continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss.")

[21] Plaintiffs argue that the District Court must determine whether DAF's contractual waiver "can be enforced as to non parties [*i.e.*, CLOH] to the waiver" (Motion ¶ 8), but Highland has not argued that CLOH waived its jury trial rights through the DAF Agreement.

[22] The causes of action in the Complaint are administrative expense claims (*see infra* ¶¶ 39-41), and, by pursuing the Complaint, Plaintiffs have triggered the claims allowance process and subjected themselves to this Court's equitable jurisdiction. *See, e.g., In re UAL Corp.*, 386 B.R. 701, 707 (Bankr. N.D. Ill. 2008) ("[B]y filing a claim … the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power … As such, there is no Seventh Amendment right to a jury trial … Claims for payment of an administrative expense are no different from other claims in this regard.") (citing *Langenkamp v. Culp*, 498 U.S. 42 (1990)); *see also Harpole Constr., Inc. v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*, 565 B.R. 193, 202 (Bankr. D. N.M. 2017) (same); *Carter v. Schott (In re Carter Paper Co.)*, 220 B.R. 276, 290-311 (Bankr. M.D. La. 1998) (finding breach of fiduciary duty claim against bankruptcy trustee originally filed in state court was an administrative expense claim and no jury trial right existed).

[23] Highland will move to strike the jury trial demand if the Renewed MTD is denied, but if the time comes to adjudicate Plaintiffs' jury trial right, it will be decided by this Court as a matter of core bankruptcy law. Highland reserves all rights.

premature; there is currently nothing to withdraw.  Plaintiffs' thinly veiled attempt to create controversy and a federal issue where none exists should be rejected.  *See, e.g., Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.),* 2015 U.S. Dist. LEXIS 74006, at *21-23 (D. Me. June 8, 2015) (finding no mandatory withdrawal when movant simply "tries to kick up some dust to make the relevant analysis seem complicated").

## II.    The Court Has "Core" Jurisdiction to Adjudicate the Complaint

39.    The Court has already found that this action "arises in" Highland's bankruptcy case and is a "core" proceeding.

> [This action] "arises in" a bankruptcy case (making it "core"), in that a claim is being asserted against a debtor (which was not yet a "reorganized debtor" …) and involves actions of a debtor-in-possession in administering its case.  It involves orders of this Bankruptcy Court and activities and litigation over which the Bankruptcy Court presided.

*Charitable DAF*, 2022 Bankr. LEXIS 659, at *14-15.  Plaintiffs did not appeal that portion of the MTD Order, and it is binding.

40.    But even in the absence of a prior ruling, this action involves the adjudication of an administrative expense claim and is quintessentially "core," having "arisen in" Highland's bankruptcy.  An administrative expense claim is a priority claim under Section 503(b) for, among other things, "the actual, necessary costs and expenses of preserving the estate …." 11 U.S.C. § 503(b)(1)(A).  Administrative expense claims include claims arising from a debtor-in-possession's postpetition negligence, tortfeasance, and malfeasance. *See Reading Co. v. Brown,* 391 U.S. 471, 478-79 (1968) (holding that if a debtor-in-possession commits a tort or harms a non-debtor following the petition date, the resulting claim is an administrative expense claim even though there was no benefit to the debtor's estate); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* 2022 Bankr. LEXIS 2780, at *19-21 (Bankr. N.D. Tex.

DOCS_NY:46770.8 36027/003

004766

Sept 30, 2022) (finding Highland's alleged breach of its contractual and extra-contractual duties under the IAA to DAF constituted an administrative expense claim).[24]

41.     Plaintiffs were allegedly harmed by Highland's breach of its duties and obligations (a) *after* the Petition Date, but *before* the Effective Date, *i.e.*, while Highland was a debtor-in-possession, and (b) arising from the ordinary course operation of its estate.  Accordingly, under *Reading* (and this Court's recent precedent), the claims alleged in the Complaint, if valid, would be administrative claims.  This Court retained jurisdiction to adjudicate administrative claims (Plan, Art. XI), and adjudication of an administrative claim is a "core" proceeding.  *See In re Weblink Wireless, Inc.*, 2003 Bankr. LEXIS 2312, at *3 (Bankr. N.D. Tex. Mar. 12, 2003) ("The allowance of an administrative expense to be paid pursuant to a confirmed plan of reorganization constitutes a core matter over which the court has jurisdiction to enter a final order."); *see also In re Taco Bueno Rests., Inc.*, 606 B.R. 289, 292 (Bankr. N.D. Tex. 2019) (finding core jurisdiction to adjudicate administrative claim); *In re Pilgrim's Pride Corp.*, 453 B.R. 691, 692 (Bankr. N.D. Tex. 2011) ("Objections [to administrative expense claims] are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B)").[25]  This Court has "core" jurisdiction to adjudicate the Complaint and can enter final orders under 28 U.S.C. §§ 157(b) and 1334(b).[26]

---

[24] *See, e.g., Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 388 (5th Cir. 2001); *In re AI Copeland Enters., Inc.*, 991 F.2d 233, 239 (5th Cir. 1993).

[25] *See also In re Colo. Place L.P.*, 2002 Bankr. LEXIS 2000, at *1 (Bankr. N.D. Tex. Feb. 5, 2002) (same); *In re SGS Studio, Inc.*, 256 B.R. 580, 581 (Bankr. N.D. Tex. 2000) (same); *Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.)*, 256 B.R. 712, 714 (Bankr. N.D. Tex. 2000) (same).

[26] Plaintiffs cite *Gupta v. Quincy Medical Center*, 585 F.3d 657 (1st Cir. 2017) to support their argument that this Court lacks jurisdiction over the Complaint.  In *Gupta*, the bankruptcy court approved an asset purchase agreement pursuant to 11 U.S.C. § 363, which provided that certain employees would receive severance if terminated.  When they were subsequently terminated, they sought damages for breach of the purchase agreement *in the bankruptcy court*.  The First Circuit held that the severance claims arose "solely" from the alleged breach of the agreement and not from (a) a breach of the order approving the agreement, (b) a question of interpretation of that order, (c) the administration of the bankruptcy estate, or (d) the Bankruptcy Code (*Id.* at 664) and accordingly held there was no bankruptcy jurisdiction.  *Gupta* is irrelevant.  The Complaint asserts administrative expense claims against the estate and thus invokes the claims allowance process and this Court's equitable jurisdiction—a quintessentially core action.

## CONCLUSION

42.    Highland respectfully requests that the Court deny the Motion and grant such

further relief as the Court deems just and proper.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

DOCS_NY:46770.8 36027/003

004768

Dated:  December 9, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
   jmorris@pszjlaw.com
   gdemo@pszjlaw.com
   hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
   ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

004769