**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P** | § | Case No. **19-34054-SGJ11** |
| **Charitable DAF Fund, L.P et al** | | |
| Appellant | § | |
| vs. | § | 21-03067 |
| **Highland Capital Management, L.P** | § | |
| | § | |
| Appellee | § | **3:23-CV-01503-B** |

[167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

# Volume 28

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | *INDEX* |
| | § | |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

     Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed

Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States

Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.   STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital
  Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.   DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.   Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11
     [Doc. 168].

*000042*

2.   The judgment, order, or decree appealed from: Memorandum Opinion and Order
     Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to
     Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.   Docket Sheet kept by the Bankruptcy Clerk.

4.   Documents listed below and as described in the Docket Sheet for Bankruptcy Case
     Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|-----|-----------|-----------|--------------------------|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

| | | | |
|---|---|---|---|
| **Vol. 2**<br><br>**000139** | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **000232** | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **000239** | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **000270**<br><br>**Thru Vol. 6** | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **Vol. 7**<br><br>**001196** | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | | | | |
|---|---|---|---|---|
| **Vol. 7**<br><br>**001203**<br>**thru Vol 8** | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **Vol. 9**<br><br>**001711** | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **001712** | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **001738** | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **001760** | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **001805** | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| **001893** | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
|---|---|---|---|---|
| *Vol. 9*<br><br>*001905*<br>*thru Vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.*<br><br>*002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| Vol. 14 | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| 002878 | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| 002883 Thru Vol. 16 | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| Vol. 17 003392 | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| 003394 | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| 003583 | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| 003585 | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| 003611 | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| Vol. 18 003637 | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| 003666 | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| 003843 | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| 003844 | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| 003851 | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| Vol. 19 003882 Thru Vol. 20 | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| Vol. 21 004395 | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21*<br>*004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442*<br>*Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22*<br>*004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 *Thru Vol. 25.* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

*Vol. 28*
*006130*

| | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
| --- | --- | --- | --- | --- |
| *006133*  *Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32*  *006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |
| --- | --- | --- | --- | --- |

*006961*

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                            Respectfully submitted,

                                                 **SBAITI & COMPANY PLLC**

                                                 */s/  Mazin A. Sbaiti*
                                                 **Mazin A. Sbaiti**
                                                 Texas Bar No. 24058096
                                                 **Jonathan Bridges**
                                                 Texas Bar No. 24028835
                                                 2200 Ross Avenue – Suite 4900W
                                                 Dallas, TX  75201
                                                 T:  (214) 432-2899
                                                 F:  (214) 853-4367
                                                 E:  mas@sbaitilaw.com
                                                      jeb@sbaitilaw.com

                                                 **Counsel for Appellants**


### CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.


                                                 */s/ Mazin A. Sbaiti*
                                                 Mazin A. Sbaiti

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendants. | § | |
| | § | |

### PLAINTIFFS' CORRECTED AMENDED WITNESS AND
### EXHIBIT LIST REGARDING HEARING ON HIGHLAND CAPITAL
### MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS COMPLAINT
### <u>TO BE HELD ON JANUARY 25, 2023</u>

Plaintiffs submit the following corrected amended witness and exhibit list regarding

Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint.

_____

006074

**WITNESSES**:

1.    Any witness identified or called by any other party;

2.    Any witness for impeachment or rebuttal.

**EXHIBITS**:

| No. | Exhibit | Offered | Admitted |
|-----|---------|---------|----------|
| 1 | Excerpts from Transcript of Hearing on Application to Employ James P. Seery, Jr. on July 14, 2020 (APP_0003 – 0014) | | |
| 2 | Highland CLO Funding – Members Agreement Relating to the Company (APP_0015 – 0042) | | |
| 3 | HarbourVest Settlement Agreement (APP_0043 – 0061) | | |
| 4 | Order Approving Debtor's Settlement with HarbourVest (APP_0062 – 0084) | | |
| 5 | HCLOF Offering (APP_0085-0206) | | |
| 6 | Amended and Restated Investment Advisory Agreement (APP_0207 – 0221) | | |
| 7 | Testimony of Mark Patrick at June 8, 2021 hearing | | |
| | All exhibits necessary for impeachment and/or rebuttal purposes. | | |
| | All exhibits identified by or offered by any other party for the hearing on Highland Capital Management, L.P.'s Renewed Motion to Dismiss. | | |

Dated: January 24, 2023                    Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
      jeb@sbaitilaw.com

*Counsel for Plaintiffs*

006075

```
                      IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION

                                    )  Case No. 19-34054-sgj-11
     In Re:                         )  Chapter 11
                                    )
     HIGHLAND CAPITAL               )  Dallas, Texas
     MANAGEMENT, L.P.,              )  Tuesday, June 8, 2021
                                    )  9:30 a.m. Docket
              Debtor.               )
                                    )  - SHOW CAUSE HEARING (2255)
                                    )  - MOTION TO MODIFY ORDER
                                    )    AUTHORIZING RETENTION OF
                                    )    JAMES SEERY (2248)
                                    )  - MOTION FOR ORDER FURTHER
                                    )    EXTENDING THE PERIOD WITHIN
                                    )    WHICH DEBTOR MAY REMOVE
                                    )    ACTIONS (2304)
     _____)

                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

     APPEARANCES:

     For the Debtor:                Jeffrey Nathan Pomerantz
                                    PACHULSKI STANG ZIEHL & JONES, LLP
                                    10100 Santa Monica Blvd.,
                                      13th Floor
                                    Los Angeles, CA  90067-4003
                                    (310) 277-6910

     For the Debtor:                John A. Morris
                                    Gregory V. Demo
                                    PACHULSKI STANG ZIEHL & JONES, LLP
                                    780 Third Avenue, 34th Floor
                                    New York, NY  10017-2024
                                    (212) 561-7700

     For the Debtor:                Zachery Z. Annable
                                    HAYWARD & ASSOCIATES, PLLC
                                    10501 N. Central Expressway,
                                      Suite 106
                                    Dallas, TX  75231
                                    (972) 755-7104
```

EXHIBIT

7

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01560-B Document 18-28 Filed 09/11/2023 Page 17 of 213 PageID 6583

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:           Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:           Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:          Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
14                                420 Throckmorton Street,
                                     Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee  Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee  Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01580-B Document 28-28 aFiled 08/11/2031 hParing18 of 213  PageID 6584

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01566-B Document 18-28 aFiled 09/11/2021 Page 19 of 213 PageID 6585

Patrick - Direct                                95

 1  our witness stand and I'll swear you in.  Please raise your

 2  right hand.

 3        (The witness is sworn.)

 4           THE COURT:  All right.  Please take a seat.

 5           MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7  BY MR. MORRIS:

 8  Q    Good afternoon, Mr. Patrick.

 9  A    Good afternoon.

10  Q    Can you hear me okay?

11  A    Yes, I can.

12  Q    Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18        Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A    I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q    Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A    That is my understanding, correct.

25  Q    And your understanding is that Mr. Dondero doesn't have an

1   ownership interest in that entity, correct?

2   A    That he does not.  That is correct.

3   Q    And your understanding is that he's not an employee of

4   that -- of Skyview, correct?

5   A    That is correct.

6   Q    Prior to joining Skyview on March 1st, you had worked at

7   Highland Capital Management, LP for about 13 years, correct?

8   A    Correct.

9   Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01550-B Document 28-28 aFiled 09/11/2031 hPag31 of 21 36 PageID 6587

Patrick - Direct                                97

1    that right?

2    A    That is correct.  I worked for the tax department.

3    Q    Okay.  Let's talk about how you became the authorized

4    representative of the Plaintiffs.  You are, in fact,

5    authorized representative today of CLO Holdco, Ltd. and

6    Charitable DAF, LP, correct?

7    A    Charitable DAF Fund, LP.  Correct.

8    Q    And those are the two entities that filed the complaint in

9    the United States District Court against the Debtor and two

10   other entities, correct?

11   A    Correct.

12   Q    And may I refer to those two entities going forward as the

13   Plaintiffs?

14   A    Yes.

15   Q    You became the authorized representative of the Plaintiffs

16   on March 24th, 2021, the day you and Mr. Scott executed

17   certain transfer documents, correct?

18   A    Correct.

19   Q    And you had no authority to act on behalf of either of the

20   Plaintiffs before March 24th, correct?

21   A    Correct.

22   Q    The DAF controls about $200 million in assets, correct?

23   A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24   Fund, LP.

25   Q    Yes.

 1   A    Around there.

 2   Q    Okay.  Let me try and just ask that again, and thank you

 3   for correcting me.  To the best of your knowledge, the

 4   Plaintiffs control about $200 million in assets, correct?

 5   A    Net assets, correct.

 6   Q    Okay.  And that asset base is derived largely from HCMLP,

 7   Mr. Dondero, or Mr. Dondero's trusts, correct?

 8   A    Can you restate that question again, Mr. Morris?

 9   Q    Sure.  The asset base that you just referred to is derived

10   largely from HCMLP, Mr. Dondero, or donor trusts?

11   A    The way I would characterize it -- you're using the word

12   derived.  I would characterize it with respect to certain

13   charitable donations --

14   Q    Uh-huh.

15   A    -- that were -- that were made at certain time periods,

16   where the donors gave up complete dominion and control over

17   the respective assets and at that time claimed a federal

18   income tax deduction for that.

19        I do -- I do believe that, as far as the donor group, as

20   you specified, Highland Capital Management, I recall, provided

21   a donation to a Charitable Remainder Trust that eventually had

22   expired and that eventually such assets went into the

23   supporting organizations.  And then I do believe Mr. Dondero

24   also contributed to the Charitable Remainder Trust No. 2,

25   which seeded substantial amounts of the original assets that

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-N Document 18-28 a Filed 08/11/2021 Page 23 of 213 PageID 6589

Patrick - Direct                                    99

1    were eventually composed of the $200 million.  And then from

2    time to time I do believe that Mr. Dondero's trusts made

3    charitable donations to their respective supporting

4    organizations.

5    Q    Okay.  Thank you.

6    A    Is that responsive?

7    Q    It is.  It's very responsive.  Thank you very much.  So,

8    to the best of your knowledge, the charitable donations that

9    were made that form the bases of the assets came from those

10   three -- primarily from those three sources, correct?

11   A    Well, you know, there's two different trusts.  There's the

12   Dugaboy Trust and the Get Good Trust.

13   Q    Okay.

14   A    Then you have Mr. Dondero and Highland Capital Management.

15   So I would say four sources.

16   Q    Okay.  All right.  Thank you.  Prior to assuming your role

17   as the authorized representative of the Plaintiff, you had

18   never had meaningful responsibility for making investment

19   decisions, correct?

20   A    I'm sorry.  You kind of talk a little bit fast.  Please

21   slow it down --

22   Q    That's okay.

23   A    -- and restate it.  Thank you.

24   Q    And I appreciate that.  And any time you don't understand

25   what I'm saying or I speak too fast, please do exactly what

 1  you're doing.  You're doing fine.

 2      Prior to assuming your role as the authorized

 3  representative of the Plaintiffs, you never had any meaningful

 4  responsibility making investment decisions.  Is that correct?

 5  A    To whom?

 6  Q    For anybody.

 7  A    Well, during my deposition, I believe I testified that I

 8  make investment decisions with respect to my family.  Family

 9  and friends come to me and they ask me for investment

10  decisions.  I was -- in my deposition, I indicated to you that

11  I was a board member of a nonprofit called the 500, Inc.  They

12  had received a donation of stock in Yahoo!, and the members

13  there looked to me for financial guidance.  As an undergrad at

14  the University of Miami, I was a -- I was a finance major, and

15  so I do have a variety of background with respect to

16  investments.

17  Q    Okay.  So you told me that from time to time friends and

18  family members come to you for investing advice.  Is that

19  right?

20  A    That is correct.

21  Q    And when you were a young lawyer you were on the board of

22  a nonprofit that received a donation of Yahoo! stock and the

23  board looked to you for guidance.  Is that correct?

24          THE COURT:  Just a moment.  I think there's an

25  objection.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-N   Document 18-28 at Filed 09/12/23   Page 25 Page 10 Page ID 6591

Patrick - Direct                                101

```
 1              MR. MORRIS:  Uh-huh.

 2              THE COURT:  Go ahead.

 3              MR. ANDERSON:  So far -- relevance, Your Honor.  This

 4    is way out of the bounds of the contempt proceeding.  You

 5    know, what he did as a young person with Yahoo! stock.  We're

 6    here to -- he authorized the lawsuit.  They filed the lawsuit.

 7    That's it.  Getting into all this peripheral stuff is

 8    completely irrelevant.

 9              THE COURT:  Your response?

10              MR. MORRIS:  My response, Your Honor, is very simple.

11    Mr. Patrick assumed responsibility, and you're going to be

12    told that he exercised full and complete authority over a $200

13    million fund that was created by Mr. Dondero, --

14              THE COURT:  Okay.

15              MR. MORRIS:  -- that funds -- that is funded

16    virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17    lovely man, and I don't mean to disparage him at all -- but he

18    has no meaningful experience in investing at all.

19              THE COURT:  All right.  Counsel, I overrule.  I think

20    there's potential relevance.

21         And may I remind people that when you're back at counsel

22    table, please make sure you speak your objections into the

23    microphone.  Thank you.

24    BY MR. MORRIS:

25    Q    When you were a young lawyer, sir, you were on the board
```

006085

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-N   Document 18-28   Filed 09/12/23   Page 26 of 31   PageID 6592

Patrick - Direct                                    102

1  of a nonprofit that received a donation of Yahoo! stock and

2  the board looked to you for guidance, correct?

3  A    Yes, correct.

4  Q    And -- but during your 13 years at Highland, you never had

5  formal responsibility for making investment decisions,

6  correct?

7  A    That is correct.

8  Q    Yeah.  In fact, other than investment opportunities that

9  you personally presented where you served as a co-decider, you

10 never had any responsibility or authority to make investment

11 decisions on behalf of HCMLP or any of its affiliated

12 entities, correct?

13 A    That is correct.

14 Q    And at least during your deposition, you couldn't identify

15 a single opportunity where you actually had the authority and

16 did authorize the execution of a transaction on behalf of

17 HCMLP or any of its affiliates, correct?

18 A    Correct.

19 Q    And yet today you are now solely responsible for making

20 all investment decisions with respect to a $200 million

21 charitable fund, correct?

22 A    Yes, but I get some help.  I've engaged an outside third

23 party called ValueScope, and they have been as -- effectively

24 working as a "gatekeeper" for me, and I look to them for

25 investment guidance and advice, and I informally look to Mr.

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01506-B Document 18-28 at Filed 09/12/2021 hearing 27 Page 12 PageID 6593

Patrick - Direct                                103

 1  Dondero since the time period of when I took control on March

 2  24th for any questions I may have with respect to the

 3  portfolio.  So I don't feel like I'm all by myself in making

 4  decisions.

 5  Q    Okay.  I didn't mean to suggest that you were, sir, and I

 6  apologize if you took it that way.  I was just asking the

 7  question, you are the person now solely responsible for making

 8  the investment decisions, correct?

 9  A    Yes.

10  Q    Okay.  Let's talk about the circumstances that led to the

11  filing of the complaint for a bit.  On April 12, 2021, you

12  caused the Plaintiffs to commence an action against HCMLP and

13  two other entities, correct?

14  A    Correct.

15  Q    Okay.  One of the binders -- you've got a couple of

16  binders in front of you.  If you look at the bottom, one of

17  them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18  could grab that one and turn to Exhibit 12.  Do you have that,

19  sir?

20  A    It says -- it says the original complaint.  Is that the

21  right one?

22  Q    That is the right one.  And just as I said when we were

23  doing this virtually last Friday, if I ask you a question

24  about a particular document, you should always feel free to

25  review as much of the document as you think you need to

 1  competently and fully answer the question.  Okay?

 2  A    Okay.  Thank you.

 3  Q    All right.  You instructed the Sbaiti firm to file that

 4  complaint on behalf of the Plaintiffs, correct?

 5  A    Correct.

 6  Q    And to the best of your recollection, the Plaintiffs

 7  returned -- retained the Sbaiti firm in April, correct?

 8  A    Correct.

 9  Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/11/2023   Page 29   Page 314   PageID 6595

Patrick - Direct                                    105

1   A    Yes.  After he brought certain information to myself and

2   then that I engaged the Sbaiti firm to launch an

3   investigation, I also wanted Mr. Dondero to work with the

4   Sbaiti firm with respect to their investigation of the

5   underlying facts.

6   Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7   but he did communicate with the Sbaiti firm about the

8   complaint, correct?

9   A    I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q    Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A    Correct.

17  Q    And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A    That is correct.

21  Q    At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A    I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general

1  awareness that there was a HarbourVest something or other, but

2  the specific aspects of it, I was unaware.

3  Q    Okay.  And you had no reason to believe that Mr. Seery had

4  done anything wrong with respect to the HarbourVest

5  transaction at the time you became the Plaintiffs' authorized

6  representative, correct?

7  A    That is correct.

8  Q    But you recall very specifically that some time after

9  March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

 1  counsel at NexPoint Advisors, correct?

 2  A    Correct.

 3  Q    You didn't ask Mr. Sauter for a recommendation for a

 4  lawyer; he just volunteered that you should use the Sbaiti

 5  firm.  Correct?

 6  A    That is correct.

 7  Q    And you never used -- considered using another firm, did

 8  you?

 9  A    When they were presented to me, they appeared to have all

10  the sufficient skills necessary to undertake this action, and

11  so I don't recall interviewing any other firms.

12  Q    Okay.  Now, after bringing the matter to your action, Mr.

13  Dondero communicated directly with the Sbaiti firm in relation

14  to the investigation that was being undertaken.  Correct?

15  A    That is correct.

16  Q    But you weren't privy to the communications between Mr.

17  Dondero and the Sbaiti firm, correct?

18  A    I did not participate in those conversations as the --

19  what I, again, considered Mr. Dondero as the investment

20  advisor to the portfolio, and he was very versant in the

21  assets.  I wanted him to participate in the investigation that

22  the Sbaiti firm was undertaking prior to the filing of this

23  complaint.

24  Q    Let's talk for a minute about the notion of Mr. Dondero

25  being the investment advisor.  Until recently, the entity

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 18-28 at Filed 09/12/23   Page 32 Page 31 Page 17 PageID 6598

Patrick - Direct                                        108

 1  known as the DAF had an investment advisory committee with HC

 2  -- an investment advisory agreement with HCMLP.  Correct?

 3  A    It's my understanding that the investment advisory

 4  agreement existed with the Plaintiffs, CLO Holdco, as well as

 5  Charitable DAF Fund, LP, up and to the end of February,

 6  throughout the HarbourVest transaction.

 7  Q    Okay.  And since February, the Plaintiffs do not have an

 8  investment advisory agreement with anybody, correct?

 9  A    That is correct.

10  Q    Okay.  So Mr. Dondero, if he serves as an investment

11  advisor, it's on an informal basis.  Is that fair?

12  A    After I took control, he serves as an informal investment

13  advisor.

14  Q    Okay.  So there's no contract that you're aware of between

15  either of the Plaintiffs and Mr. Dondero pursuant to which he

16  is authorized to act as the investment advisor for the

17  Plaintiffs, correct?

18  A    That is correct.

19  Q    Okay.  When you communicated with Grant Scott --

20  withdrawn.  You know who Grant Scott is, right?

21  A    Yes, I do.

22  Q    He's the gentleman who preceded you as the authorized

23  representative of the Plaintiffs, correct?

24  A    Yes.

25  Q    Okay.  You communicated with Mr. Scott from time to time

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01500-N   Document 18-28   Filed 09/12/23   Page 33 of 213   PageID 6599

Patrick - Direct                              109

1   during February and March 2021, correct?

2   A    February and March are the dates?  Yes.

3   Q    Yeah.  And from February 1st until March 21st -- well,

4   withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5   Plaintiffs' authorized representative, correct?

6   A    Correct.

7   Q    And you have no recollection of discussing with Mr. Scott

8   at any time prior to March 24th any aspect of the HarbourVest

9   settlement with Mr. Scott.  Correct?

10  A    Correct.

11  Q    And you have no recollection of discussing whether the

12  Plaintiffs had potential claims that might be brought against

13  the Debtor.  Correct?  Withdrawn.  Let me ask a better

14  question.

15       You have no recollection of discussing with Mr. Scott at

16  any time prior to March 24th whether the Plaintiffs had

17  potential claims against the Debtor.  Correct?

18  A    That is correct.

19  Q    You and Mr. Scott never discussed whether either of --

20  either of the Plaintiffs had potential claims against Mr.

21  Seery.  Correct?

22  A    Correct.

23  Q    Okay.  At the time that you became their authorized

24  representative, you had no knowledge that the Plaintiffs would

25  be filing a complaint against the Debtors relating to the

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B Document 18-28 at Filed 09/12/23   Page 34 Page 319 Page ID 6600

Patrick - Direct                                    110

1   HarbourVest settlement less than three weeks later, correct?

2   A    That is correct.

3   Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4   see at the top it refers to Mr. Seery as a potential party.

5   Do you see that?

6   A    Yes, I do.

7   Q    Okay.  You don't know why Mr. Seery was named --

8   withdrawn.  You don't know why Mr. Seery was not named as a

9   defendant in the complaint, correct?

10  A    No, I -- that's correct.  I do not know why he was not

11  named.  That's in the purview of the Sbaiti firm.

12  Q    Okay.  And the Sbaiti firm also made the decision to name

13  Mr. Seery on Page 2 there as a potential party when drafting

14  the complaint, correct?

15  A    That's what the document says.

16  Q    And you weren't involved in the decision to identify Mr.

17  Seery as a potential party, correct?

18  A    That is correct.  Again, I rely on the law firm to decide

19  what parties to bring a suit to -- against.

20  Q    Okay.  Okay.  Do you recall the other day we talked about

21  a document called the July order?

22  A    Yes.

23  Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24  you can turn to that.  And take a moment to look at it, if

25  you'd like.  And my first question is simply whether this is

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/12/23   Page 35 of 213   PageID 6601

Patrick - Direct                                    111

 1   the July order, as you understand it.

 2        (Pause.)

 3   A   Yes, it is.  I was just looking for the gatekeeper

 4   provision.  It looks like it's Paragraph 5.  So, --

 5   Q   Okay.  Thank you for that.  About a week after the

 6   complaint was filed, you authorized the Plaintiffs to file a

 7   motion in the District Court for leave to amend the

 8   Plaintiffs' complaint to add Mr. Seery as a defendant.

 9   Correct?

10   A   I authorized the filing of a motion in Federal District

11   Court that would ask the Federal District Court whether or not

12   Jim Seery could be named in the original complaint with

13   respect to the gatekeeper provision cited in that motion and

14   with respect to the arguments that were made in that motion.

15   Q   Okay.  Just to be clear, if you turn to Exhibit 17, the

16   next tab, --

17   A   I'm here.

18   Q   -- do you see that document is called Plaintiffs' Motion

19   for Leave to File First Amended Complaint?

20   A   Yes.

21   Q   And that's the document that you authorized the Plaintiffs

22   to file on or about April 19th, correct?

23   A   Correct.

24   Q   Okay.  And can we refer to that document as the motion to

25   amend?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01506-N Document 18-28 at Filed 09/11/2023 hearing Page 36 Page 21 PageID 6602

Patrick - Direct                                        112

1   A    Yes.

2   Q    Okay.  You were aware of the July order at Tab 16 before

3   you authorized the filing of the motion to amend.  Correct?

4   A    Yes, because it's cited in the motion itself.

5   Q    Okay.  And at the time that you authorized the filing of

6   the motion to amend, you understood that the July order was

7   still in effect.  Correct?

8   A    Yes, because it was referenced in the motion, so my

9   assumption would be it would still be in effect.

10  Q    Okay.  Before the motion to amend was filed, you're -- you

11  are aware that my firm and the Sbaiti firm communicated by

12  email about the propriety of filing the motion to amend?

13  A    Before it was filed?  Communications between your firm and

14  the Sbaiti firm?  I would have to have my recollection

15  refreshed.

16  Q    I'll just ask the question a different way.  Did you know

17  before you authorized the filing of the motion to amend that

18  my firm and the Sbaiti firm had engaged in an email exchange

19  about the propriety of filing the motion to amend in the

20  District Court?

21  A    It's my recollection -- and again, I could be wrong here

22  -- but I thought the email exchange occurred after the fact,

23  not before.  But again, I -- I just --

24  Q    Okay.  In any event, on April 19th, the motion to amend

25  was filed.  Correct?

Patrick - Direct                                    113

1    A    Correct.

2    Q    That's the document that is Exhibit 17.  And you

3    personally authorized the Sbaiti firm to file the motion to

4    amend on behalf of the Plaintiffs, correct?

5    A    Correct.

6    Q    And you authorized the filing of the motion to amend with

7    knowledge -- withdrawn.

8         Can you read the first sentence of the motion to amend out

9    loud, please?

10   A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11   15 of the Federal Rules of Civil Procedure for one purpose:

12   to name as defendant one James P. Seery, Jr., the CEO of

13   defendant Highland Capital Management, LP (HCM) and the chief

14   perpetrator of the wrongdoing that forms the basis of the

15   Plaintiffs' causes of action.

16   Q    And does that fairly state the purpose of the motion?

17        MR. SBAITI:  Objection, Your Honor.  Asks him to make

18   a legal conclusion about the purpose of the legal motion filed

19   in court that he didn't draft.

20        THE COURT:  Okay.  I overrule.  You can answer if you

21   have an answer.

22        THE WITNESS:  It's always been my general

23   understanding that the purpose of filing this motion was to go

24   to the Federal District Court and ask that Court of reference

25   to this Court whether or not Mr. Seery could be named with

1    respect to the original complaint, citing again the gatekeeper

2    provisions and citing the various arguments that we've heard

3    much earlier.

4    BY MR. MORRIS:

5    Q    Okay.  You personally didn't learn anything between April

6    9th, when the complaint was filed, and April 19th, when the

7    motion to amend was filed, that caused you to authorize the

8    filing of the motion to amend, correct?

9    A    That is correct.

10   Q    In fact, you relied on the Sbaiti firm with respect to

11   decisions concerning the timing of the motion to amend.

12   Correct?

13   A    Correct.

14   Q    And you had no knowledge of whether anyone acting on

15   behalf of the Plaintiffs ever served the Debtor with a copy of

16   the motion to amend.  Correct?

17   A    Yes.  I have no knowledge.

18   Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19   provided my firm with a copy of the motion to amend.  Correct?

20   A    I cannot recall one way or another.

21   Q    Okay.  You never instructed anyone on behalf -- acting on

22   behalf of the Plaintiffs to inform the Debtor that the motion

23   to amend had been filed, correct?

24   A    That is correct.

25   Q    And that's because you relied on the Sbaiti firm on

Patrick - Direct                                          115

1    procedural issues, correct?

2    A    That is correct.

3    Q    You didn't consider waiting until the Debtor --

4         (Interruption.)

5    Q    -- had appeared in the action before authorizing the

6    filing of the motion --

7    A    Yeah, --

8              THE COURT:  Yes.  Y'all are being a little bit loud.

9    Okay.

10             A VOICE:  Sorry.

11             MR. MORRIS:  No problem.

12             MR. PHILLIPS:  I've heard that before, Your Honor,

13   and I apologize.

14             THE COURT:  I bet you have.  Thank you.

15             MR. MORRIS:  Admonish Mr. Phillips, please.

16             THE COURT:  Okay.

17             MR. MORRIS:  He's always the wild card.

18             MR. PHILLIPS:  I admonish --

19             MR. MORRIS:  He's always the wild card.

20             MR. PHILLIPS:  I admonish myself.

21             THE COURT:  All right.  I think he got the message.

22   Continue.

23   BY MR. MORRIS:

24   Q    You didn't consider waiting until the Debtor had appeared

25   in the action before filing the motion to amend, correct?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/11/2023   Page 40   Page 325   PageID 6606

Patrick - Direct                                116

1    A    Again, I am the client and I rely upon the law firm that's

2    engaged with respect to making legal decisions as to the

3    timing and notice and appearance and what have you.  I'm a tax

4    lawyer.

5    Q    Okay.  You wanted the District Court to grant the relief

6    that the Plaintiffs were seeking.  Correct?

7    A    I wanted the District Court to consider, under the

8    gatekeeper provisions of this Court, whether or not Mr. Seery

9    could be named in the original complaint.  That's -- that,

10   from my perspective, is what was desired.

11   Q    All right.  You wanted the District Court to grant the

12   relief that the Plaintiffs were seeking, correct?

13            MR. SBAITI:  Objection, Your Honor.  Asked and

14   answered.

15            THE COURT:  Overruled.

16            THE WITNESS:  Again, I would characterize this motion

17   as not necessarily asking for specific relief, but asking the

18   Federal District Court whether or not, under the gatekeeper

19   provision, that Mr. Seery could be named on there.  What

20   happens after that would be a second step.  So I kind of -- I

21   dispute that characterization.

22   BY MR. MORRIS:

23   Q    All right.  I'm going to cross my fingers and hope that

24   Ms. Canty is on the line, and I would ask her to put up Page

25   57 from Mr. Patrick's deposition transcript.

1          THE COURT:  There it is.

2          MR. MORRIS:  There it is.  It's like magic.  Can we

3    go down to Lines 18 through 20?

4    BY MR. MORRIS:

5    Q   Mr. Patrick, during the deposition on Friday, did I ask

6    you this question and did you give me this answer?  Question,

7    "Did you want the Court to grant the relief you were seeking?"

8    Answer, "Yes."

9    A   I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q   Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A   If the Sbaiti firm recommended that I do so.  That is

25   correct.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/12/23   Page 42   Page 327   PageID 6608

Patrick - Direct                                      118

 1   Q   Okay.  Let's talk for a little bit about the line of

 2   succession for the DAF and CLO Holdco.  Can we please go to

 3   Exhibit 25, which is in the other binder?  It's in the other

 4   binder, sir.

 5       (Pause.)

 6   Q   I guess you could look on the screen or you can look in

 7   the binder, whatever's easier for you.

 8   A   Yeah.  I prefer the screen.  I prefer the screen.

 9   Q   Okay.

10   A   It's much easier.

11   Q   All right.  We've got it in both spots.  But do you have

12   Exhibit 25 in front of you, sir?

13   A   Yes, I do.

14   Q   All right.  Do you know what it is?

15   A   This is the organizational chart depicting a variety of

16   charitable entities as well as entities that are commonly

17   referred to the DAF.  However, when I look at this chart, I do

18   not look at and see just boxes, what I see is the humanitarian

19   effort that these boxes represent.

20           MR. MORRIS:  Your Honor, may I interrupt?

21           THE COURT:  You may.

22           MR. MORRIS:  Okay.

23   BY MR. MORRIS:

24   Q   I appreciate that, and when your lawyers get up to ask you

25   questions, I bet they'll want to know just what you were about

 1  to tell me.  But I just want to understand what this chart is.

 2  This chart is the DAF, CLO Holdco, structure chart.  Correct?

 3  A    Correct.

 4  Q    Okay.  And you were personally involved in creating this

 5  organizational structure, correct?

 6  A    I -- yes.

 7  Q    Okay.  And from time to time, the Charitable DAF Holdco

 8  Limited distributes cash to the foundations that are above it.

 9  Correct?

10  A    Correct.

11  Q    All right.  I want to talk a little bit more specifically

12  about how this happens.  The source of the cash distributed by

13  Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14  entity, the Cayman Islands entity near the bottom.  Correct?

15          MR. ANDERSON:  Your Honor, I have an objection.

16  Completely irrelevant.  I'm objecting on relevance grounds.

17  This has nothing to do with the contempt proceeding.  We've

18  already gone over that he authorized the filing of the

19  complaint, that he authorized the filing of the motion to

20  amend.  It's all in the record.  This is completely irrelevant

21  at this point.

22          THE COURT:  Okay.  Relevance objection.  Your

23  response?

24          MR. MORRIS:  I believe that it's relevant to the

25  Debtor's motion to hold Mr. Dondero in contempt for pursuing

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B Document 18-28 at Lee 09/12/2021 hearing 44 Page 329 Page ID 6610

Patrick - Direct                                    120

1  claims against Mr. Seery, in violation of the July 7 order.  I

2  think an understanding of what the Plaintiffs are, how they're

3  funded, and Mr. Dondero's interest in pursuing claims on

4  behalf of those entities is relevant to the -- to the -- just

5  -- it's just against him.  It's not against their clients,

6  frankly.  It's just against Mr. Dondero.

7              THE COURT:  I overrule.

8              MR. MORRIS:  I'll try and -- I'll try and make this

9  quick, though.

10 BY MR. MORRIS:

11 Q    CLO Holdco had two primary sources of capital.  Is that

12 right?

13 A    Two primary sources of capital?

14 Q    Let me ask it differently.  There was a Charitable

15 Remainder Trust that was going to expire in 2011, correct?

16 A    That is correct.

17 Q    And that Charitable Remainder Trust had certain CLO equity

18 assets, correct?

19 A    Correct.

20 Q    And the donor to that Charitable Remainder Trust was

21 Highland Capital Management, LP.  Correct?

22 A    Not correct.  After my deposition, I refreshed my memory.

23 There were two Charitable Remainder Trusts that existed, which

24 I think in my mind caused a little bit of confusion.  The

25 Charitable Remainder Trust No. 2, which is the one that

1   expired in 2011, was originally funded by Mr. Dondero.

2   Q   Okay.  So, so the Charitable Remainder Trust that we were

3   talking about on Friday wasn't seeded with capital from

4   Highland Capital Management, it came from Mr. Dondero

5   personally?

6   A   That is correct.

7   Q   Okay.  Thank you.  And the other primary source of capital

8   was the Dallas Foundation, the entity that's in the upper

9   left-hand corner of the chart.  Is that correct?

10  A   No.

11  Q   The -- you didn't tell me that the other day?

12  A   You said -- you're pointing to the Dallas Foundation.

13  That's a 501(c)(3) organization.

14  Q   I apologize.  Did you tell me the other day that the

15  Dallas Foundation was the second source of capital for HCLO

16  Hold Company?

17  A   No, I did not.  You --

18      (Pause.)

19  Q   Maybe I know the source of the confusion.  Is the Highland

20  Dallas Foundation something different?

21  A   Yes.  On this organizational chart, you'll see that it has

22  an indication, it's a supporting organization.

23  Q   Ah, okay.  So, so let me restate the question, then.  The

24  second primary source of capital for CLO Holdco, Ltd. is the

25  Highland Dallas Foundation.  Do I have that right?

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 18-28 at Filed 09/12/021 hearing 46 Page 31 PageID 6612

Patrick - Direct                                        122

1    A    Yes.

2    Q    Okay.  And the sources of that entity's capital were

3    grantor trusts and possibly Mr. Dondero personally.  Correct?

4    A    In addition -- per my refreshing my recollection from our

5    deposition, the other Charitable Remainder Trust, I believe

6    Charitable Remainder Trust No. 1, which expired later, also

7    sent a donation, if you will, or assets to -- and I cannot

8    recall specifically whether it was just the Highland Dallas

9    Foundation or the other supporting organizations that you see

10   on this chart.

11   Q    But the source of that -- the source of the assets that

12   became the second Charitable Remainder Trust was Highland

13   Capital Management, LP.  Is that right?

14   A    I think that is accurate from my recollection.  And again,

15   I'm talking about Charitable Remainder Trust No. 1.

16   Q    Okay.  So is it fair to say -- I'm just going to try and

17   summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18   is the investment arm of the organizational structure on this

19   page?

20   A    Yes.

21   Q    And is it fair to say that nearly all of the assets that

22   are in there derived from either Mr. Dondero, one of his

23   trusts, or Highland Capital Management, LP?

24   A    Yes.  It's like the Bill Gates Foundation or the

25   Rockefeller Foundation.  These come from the folks that make

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/12/23   Page 47 of 213   PageID 6613

Patrick - Direct                          123

 1  their donations and put their name on it.

 2  Q   Okay.

 3          MR. MORRIS:  Now, now, Your Honor, I'm going to go

 4  back just for a few minutes to how Mr. Scott got appointed,

 5  because I think that lays kind of the groundwork for his

 6  replacement.  It won't take long.

 7          THE COURT:  Okay.  I have a question either --

 8          MR. MORRIS:  Sure.

 9          THE COURT:  -- for you or the witness.  I'm sorry,

10  but --

11          MR. MORRIS:  Sure.  Yeah.

12          THE COURT:  -- the organizational chart, it's not

13  meant to show everything that might be connected to this

14  substructure, right?  Because doesn't CLO Holdco, Ltd. own

15  49.02 percent of HCLOF, --

16          MR. MORRIS:  That --

17          THE COURT:  -- which gets us into the whole

18  HarbourVest transaction issue?

19          MR. MORRIS:  You're exactly right, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  But that's just an investment that HCLO

22  Holdco made.

23          THE COURT:  Right.

24          MR. MORRIS:  Right?  And so I -- let me ask the

25  witness, actually.

006107

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-N Document 18-28 at Filed 09/12/21   hearing   Page 48 Page 33 Page ID 6614

Patrick - Direct                                    124

 1              THE COURT:  Okay.  Thank you.  Thank you.

 2              MR. MORRIS:  Let me ask the witness.  Yeah.

 3              THE COURT:  I just want my brain --

 4              MR. MORRIS:  Right.

 5              THE COURT:  -- to be complete on this chart.

 6   BY MR. MORRIS:

 7   Q   Mr. Patrick, there are three entities under CLO Holdco,

 8   Ltd.  Do you see that?

 9   A   Yes.

10   Q   And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A   Yes.

13   Q   Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A   Correct.

17   Q   Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A   It has other investments.  That is correct.

20   Q   And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A   That is fair.

24              MR. MORRIS:  Does that--?

25              THE COURT:  Yes.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/12/23   Page 49   Page 34   PageID 6615

Patrick - Direct                                    125

1        MR. MORRIS:  Okay.

2        THE COURT:  Uh-huh.

3   BY MR. MORRIS:

4   Q   So, so let's go back to Mr. Grant for a moment.  Mr.

5   Scott, rather.  Mr. Dondero was actually the original general

6   partner.  If you look at this chart, while it's still up here,

7   you see on the left there's Charitable DAF GP, LLC?

8   A   Yes.

9   Q   And the Charitable DAF GP, LLC is the general partner of

10  the Charitable DAF Fund, LP.  Correct?

11  A   Correct.

12  Q   And on this chart, Grant Scott was the managing member of

13  Charitable DAF GP, LLC.  Right?

14  A   Correct.

15  Q   Okay.  But Mr. Dondero was the original general partner of

16  that entity, correct?

17  A   That is correct.  But I do want to point out, I just note

18  that the GP interest is indicating a one percent interest and

19  the 99 interest to Charitable DAF Holdco.  I believe that's

20  incorrect.  It's a hundred percent by Charitable DAF Holdco,

21  Ltd., and the Charitable DAF GP interest is a noneconomic

22  interest.  So that should actually reflect a zero percent to

23  the extent it may indicate some sort of profits or otherwise.

24  Q   Okay.  Thank you for the clarification.  Can you turn to

25  Exhibit 26, please, in your binder?  And is it your

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01500-B Document 18-28 Filed 09/12/23 Page 50 of 213 PageID 6616

Patrick - Direct                                126

1    understanding that that is the amended and restated LLC

2    agreement for the DAF GP, LLC?

3    A    Yes.

4    Q    Okay.  And this was amended and restated effective as of

5    January 1st, 2012, correct?

6    A    Yes.

7    Q    And if you go to the last page, you'll see there are

8    signatures for Mr. Scott and Mr. Dondero, correct?

9    A    Yes.

10    Q    And Mr. Dondero is identified as the forming -- former

11    managing member and Mr. Scott is identified as the new

12    managing member.   Correct?

13    A    Correct.  That's what the document says.

14    Q    And it's your understanding that Mr. Dondero had the

15    authority to select his successor.  Correct?

16    A    Correct.

17    Q    In fact, it's based on your understanding of documents and

18    your recollection that Mr. Dondero personally selected Mr.

19    Scott as the person he was going to transfer control to,

20    correct?

21    A    Upon advice of Highland Capital Management's tax

22    compliance officer, Mr. Tom Surgent.

23    Q    What advice did Mr. Surgent give?

24    A    He gave advice that, because Mr. Dondero -- and this is

25    what I came to an understanding after the fact of this

1    transaction, because I was not a part of it -- that by Mr.

2    Dondero holding that GP interest, that it would be -- the

3    Plaintiffs, if you will, would be an affiliate entity for

4    regulatory purposes, and so he advised that if he -- if Mr.

5    Dondero transferred his GP interest to Mr. Scott, it would no

6    longer be an affiliate, is my recollection.

7    Q    Okay.  You didn't appoint Mr. Scott, did you?

8    A    No.

9    Q    That was Mr. Dondero.  Is that right?

10   A    Yes.

11   Q    Okay.  Let's go to 2021.  Let's come back to the current

12   time.  Sometime in February, Mr. Scott called you to ask about

13   the mechanics of how he could resign.  Correct?

14   A    That is correct.

15   Q    But the decision to have you replace Mr. Scott was not

16   made until March 24th, the day you sent an email to Mr. Scott

17   with the transfer documents.  Correct?

18   A    That is correct.

19   Q    And it's your understanding that he could have transferred

20   the management shares and control of the DAF to anyone in the

21   world.  Correct?

22   A    Correct.

23   Q    That's what the docu... that he had the authority under

24   the documentation, as you understood it, to freely trade or

25   transfer the management shares.  Correct?

 1   A    Wait.  Now, let's be precise here.

 2   Q    Okay.

 3   A    Are you talking about the GP interests or the management

 4   shares held by Charitable DAF Holdco, Ltd.?

 5   Q    Let's start with the management shares.  Can you explain

 6   to the Court what the management shares are?

 7            MR. ANDERSON:  Your Honor?  Hang on one second.  Your

 8   Honor, I want to object again on relevance.  We're going way

 9   beyond the scope of the contempt issue, whether or not --

10            MR. MORRIS:  This is about control.

11            MR. ANDERSON:  -- the motion to amend somehow

12   violated the prior order of this Court.  Getting into the

13   management structure, transfer of shares, that's way outside

14   the bounds.  I object on relevance.

15            THE COURT:  Okay.  Relevance objection?

16            MR. MORRIS:  Your Honor, they have probably 30

17   documents, maybe 20 documents, on their exhibit list that

18   relate to management and control.  I'm asking questions about

19   management and control.  Okay?  This is important, again, to

20   (a) establish his authority, but (b) the circumstances under

21   which he came to be the purported control person.

22            THE COURT:  Okay.  Overruled.  Go ahead.

23            THE WITNESS:  It might be helpful to look at the

24   organizational chart, but if not -- but I'll describe it to

25   you again.  With respect to the entity called --

1      MR. MORRIS:  Hold on one second.  Can we put up the

2   organizational chart again, Ms. Canty, if you can?  There you

3   go.

4      THE WITNESS:  Okay.  So with respect to the

5   Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6   Scott, he organized that entity when he was the independent

7   director of the Charitable Remainder Trust, and he caused the

8   issuance of the management shares to be issued to himself.

9   And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11      And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q   Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A   It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

 1  member-managed Delaware limited liability company.  And from

 2  that, he -- that authority kind of trickles down to where he

 3  can appoint directorships.

 4  Q   All right.  I think I want to just follow up on that a

 5  bit.  Which entity is the issuer of the manager shares, the

 6  management shares?

 7  A   Yeah, the -- per the organizational chart, it is accurate,

 8  it's the Charitable DAF Holdco, Ltd. which issued the

 9  management shares to Mr. Scott.

10  Q   Okay.  And that's why you have the arrow from Mr. Scott

11  into that entity?

12  A   Correct.

13  Q   And do those -- does the holder of the management shares

14  have the authority to control the Charitable DAF Holdco, Ltd.?

15  A   Yes.

16  Q   Okay.  And as the control person for the Charitable DAF

17  Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18  Holdco Limited owns a hundred percent of the limited

19  partnership interests of the Charitable DAF Fund, LP.

20  Correct?

21  A   Correct.

22  Q   And so does the holder of that hundred percent limited

23  partnership interest have the authority to decide who acts on

24  behalf of the Charitable DAF Fund, LP?

25  A   I would say no.  I mean, you know, just -- I would love to

 1   read the partnership agreement again.  But I, conceptually,

 2   what I know with partnerships, I would say the limited partner

 3   would not.  It would be through the Charitable DAF GP, LLC

 4   interest.

 5   Q    The one on the left, the general partner?

 6   A    The general partner.

 7   Q    I see.  So when Mr. Scott transferred to you the one

 8   hundred percent of the management shares as well as the title

 9   of the managing member of the Charitable DAF GP, LLC, did

10   those two events give you the authority to control the

11   entities below it?

12   A    Yes.

13   Q    Thank you.  And so prior to the time that he transferred

14   those interests to you, is it your understanding that Mr.

15   Scott had the unilateral right to transfer those interests to

16   anybody in the world?

17   A    Yes.

18   Q    Okay.  And you have that right today, don't you?

19   A    Yes, I do.

20   Q    If you wanted, you could transfer it to me, right?

21   A    Yes, I could.

22   Q    Okay.  But of all the people in the world, Mr. Scott

23   decided to transfer the management shares and the managing

24   member title of the DAF GP to you, correct?

25   A    Restate that question again?

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01506-N Document 18-28 at Exhibit 09/11/2021 hearing 56 Page 341 Page ID 6622

Patrick - Direct                                        132

1  Q    Of all the people in the world, Mr. Scott decided to

2  transfer it to you, correct?

3  A    Yeah.  Mr. Scott transferred those interests to me.

4  Q    Okay.  And you accepted them, right?

5  A    Yes.

6  Q    You're not getting paid anything for taking on this

7  responsibility, correct?

8  A    I am not paid by any of the entities depicted on this

9  chart.

10  Q    And Mr. Scott used to get $5,000 a month, didn't he?

11  A    I believe that's what he testified to.

12  Q    Yeah.  But you don't get anything, right?

13  A    Correct.

14  Q    In fact, you get the exact same salary and compensation

15  from Skyview that you had before you became the authorized

16  representative of the DAF entities and CLO Holdco.  Correct?

17  A    Correct.

18         MR. MORRIS:  Okay.  Your Honor, if I may just take a

19  moment, I may be done.

20         THE COURT:  Okay.

21      (Pause.)

22         MR. MORRIS:  Your Honor, I have no further questions.

23         THE COURT:  All right.  Pass the witness.  Any

24  examination of the witness?

25                        CROSS-EXAMINATION

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 18-28 at Filed 09/12/2021 hearing 57 Page 342 PageID 6623

Patrick - Cross                          133

 1  BY MR. ANDERSON:

 2  Q   Mr. Patrick, I just had a few follow-up questions.  When

 3  you authorized the filing of the lawsuit against Highland

 4  Capital Management, LP, Highland HCF Advisor Limited, and

 5  Highland CLO Funding, Limited, when that lawsuit was filed in

 6  April of this year, was Mr. Seery included as a defendant?

 7  A   No.

 8  Q   Have the two Plaintiffs in that lawsuit, have they

 9  commenced any lawsuit against Mr. Seery?

10  A   No.

11  Q   Have they pursued any lawsuit against Mr. Seery?

12  A   No.

13  Q   Have they pursued a claim or cause of action against Mr.

14  Seery?

15  A   No.

16  Q   At most, did the Plaintiffs file a motion for leave to add

17  Mr. Seery as a defendant?

18          MR. MORRIS:  Objection, Your Honor.  To the extent

19  that any of these questions are legal conclusions, I object.

20  He's using the word pursue.  If he's trying -- if he's then

21  going to argue that, But the witness testified that he didn't

22  pursue and that's somehow a finding of fact, I object.

23          THE COURT:  Okay.  I understand.

24          MR. MORRIS:  Yeah.

25          THE COURT:  But I overrule.  He can answer.

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-N Document 18-28 at Filed 09/12/23 hearing 58 Page 343 PageID 6624

Patrick - Cross                                134

```
 1          MR. MORRIS:  That's fine.

 2          THE WITNESS:  Can you restate the question again?

 3   BY MR. ANDERSON:

 4   Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

 5   Did the Plaintiffs pursue a claim or cause of action against

 6   Mr. Seery?

 7   A    No.

 8   Q    At most, did the Plaintiffs file a motion for leave to

 9   file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.
```

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 18-28   Filed 09/12/2021 hearing   Page 59   Page 344 PageID 6625

Patrick - Cross                         135

 1   Q    Was there any effort whatsoever to hide the prior order of

 2   the Bankruptcy Court?

 3   A    No.

 4            MR. ANDERSON:  Pass the witness.

 5            THE COURT:  Okay.  Other examination?

 6            MR. SBAITI:  Yes, Your Honor.  Just a couple of

 7   questions.

 8                         CROSS-EXAMINATION

 9   BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 18-28 at Filed 09/12/23 hearing 60 Page 345 Page ID 6626

Patrick - Cross                                    136

1    Q    So did Mr. Dondero both have the control shares of the GP,

2    LLC and DAF Holdco Limited?

3    A    No, I believe not.  I believe he only held the Charitable

4    DAF GP interest and that Mr. Scott at all times held the

5    Charitable DAF Holdco, LTD interest, until he decided to

6    transfer it to me.

7    Q    Can you just tell us how Mr. Scott came to hold the

8    control shares of the Charitable DAF Holdco, LTD?

9    A    When he was the independent trustee of the Charitable

10   Remainder Trust, he caused that -- the creation of that

11   entity, and that's how he became in receipt of those

12   management shares.

13   Q    And does the Charitable DAF GP, LLC have any control over

14   Charitable DAF Fund, LP's actions or activities?

15   A    Yes, it does.

16   Q    What kind of control is that?

17   A    I would describe complete control.  It's the managing

18   member of that entity and can -- and effectively owns, you

19   know, the hundred percent interest in the respective

20   subsidiaries, and so the control follows down.

21   Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22   managing member of the GP?

23   A    Well, I think as the -- and Mr. Morris had shown me with

24   respect to that transfer occurring on March 2012.

25   Q    So nine years ago?

006120

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B Document 18-28   Filed 09/12/23   Page 61 of 213 PageID 6627

Patrick - Cross                    137

1   A    Yes.

2   Q    Does Mr. Dondero today exercise any control over the

3   activities of the DAF Charitable -- the Charitable DAF, GP or

4   the Charitable DAF Holdco, LTD?

5   A    No.

6   Q    Is he a board member of sorts for either of those

7   entities?

8   A    No.

9   Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19           MR. SBAITI:  No more questions, Your Honor.

20           THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21      All right.  Any redirect?

22                        REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-N Document 18-28    Filed 09/12/23    Page 62 of 347 PageID 6628

Patrick - Cross                                    138

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10 A    I didn't -- I don't -- I did not discuss with him prior to

11 making the decisions that I made that were adverse to his

12 economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15 redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22 My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25 Island entities, charitable organizations formed in the Cayman

Patrick - Examination by the Court                139

```
 1   Islands?

 2           THE WITNESS:  Yeah.  I'll keep it as simple as I can,

 3   even though I'm a tax lawyer, so I won't get into the tax

 4   rules, but the Cayman structure is modeled after what you

 5   typically see in the investment management industry, and so I

 6   -- and I won't reference specific entities here with respect

 7   to the Highland case, but I think you'll note some

 8   similarities, if you think about it.  They're -- it's

 9   described as an offshore master fund structure where you have

10   a -- and that would be the Charitable DAF Fund that's

11   organized offshore, usually in the Cayman or Bermuda Islands,

12   where the general partner, typically, in the industry, holds

13   the management --

14           THE COURT:  Yeah.  Let --

15           THE WITNESS:  Okay.

16           THE COURT:  -- me just stop you.  I've seen this

17   enough --

18           THE WITNESS:  Yeah, it's

19           THE COURT:  -- to know that it happens in the

20   investment world.  But in --

21           THE WITNESS:  Yeah.

22           THE COURT:  You know, usually, I see 501(c)(3), you

23   know, domestically-created entities for charitable purposes,

24   so I'm just curious.

25           THE WITNESS:  Yes.
```

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01506-B Document 18-28    Filed 09/12/23    Page 64 of 349 PageID 6630

Patrick - Examination by the Court                140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7       Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18      And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01506-N    Document 18-28    Filed 09/12/23    Page 65 of 213    PageID 6631

Patrick - Examination by the Court                141

1    The creation of capital gains or losses under the -- they call

2    it the trading, 864(b) trading safe harbor, is not taxable.

3    So that's why you'll find these structures operating offshore

4    to rely on those safe harbor provisions as well as -- as well

5    as what I indicated with respect to the two type blocker

6    entities.  It's very typical and industry practice to organize

7    these way.  And so when this was set --

8              THE COURT:  It's very typical in the charitable world

9    to --

10             THE WITNESS:  In the investment management --

11             THE COURT:  -- form this way?

12             THE WITNESS:  In the investment management world,

13   when you have charitable entities that are taking some

14   exposure to assets that are levered, to set this structure up

15   in this way.  It was modeled after -- they just call them

16   offshore master fund structures.  They're known as Mickey

17   Mouse structures, where you'll have U.S. investors --

18             THE COURT: Yes.  I -- yes, I --

19             THE WITNESS:  -- enter through a U.S. partnership,

20   and the foreign investors enter through a blocker.

21             THE COURT:  It was really just the charitable aspect

22   of this that I was --

23             THE WITNESS:  Yeah.  Yeah.

24             THE COURT:  -- getting at.

25             THE WITNESS:  Yeah.  No, but I'm just trying to

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01506-N   Document 18-28   Filed 09/12/23   Page 66 of 213   PageID 6632

Patrick - Recross                           142

 1    emphasize if --

 2              THE COURT:  All right.  It's --

 3              THE WITNESS:  Yeah.

 4              THE COURT:  -- neither here nor there.  All right.

 5         MR. SBAITI:  Your Honor, may I ask a slightly

 6    clarifying leading question on that, because I think I

 7    understand what he was trying to say, just for the record?

 8              THE COURT:  Well, --

 9         MR. MORRIS:  I object.

10              THE COURT:  -- I tell you what.  Anyone who wants to

11    ask one follow-up question on the judge's question can do so.

12    Okay?  You can go first.

13         MR. SBAITI:  I'll approach, Your Honor.

14              THE COURT:  Okay.

15                        RECROSS-EXAMINATION

16    BY MR. SBAITI:

17    Q    Would it be a fair summary of what you were saying a

18    minute ago that the reason the bottom end of that structure is

19    offshore is so that it doesn't get taxed before the money

20    reaches the charities on the U.S. side?

21    A    Tax -- it converts the nature of the income that is being

22    thrown off by the investments so that it becomes a tax

23    friendly income to the tax-exempt entity.  Passive income.

24    That's --

25    Q    So, essentially, --

Patrick - Recross                                    143

```
 1              THE COURT:  Okay.  Okay.

 2              MR. SBAITI:  -- so it doesn't get taxed before it

 3   hits the --

 4              THE COURT:  I said one question.

 5              MR. SBAITI:  Sorry, Your Honor.

 6              THE COURT:  Okay.  He answered it.

 7              MR. PHILLIPS:  And I have one question, Your Honor

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  I don't know if I need to ask this

10   question, but I'd rather not ask you if I need to ask it.

11              THE COURT:  Go ahead.

12              MR. PHILLIPS:  But if I do, you know, I could --

13              THE COURT:  Go ahead.

14              MR. PHILLIPS:  Well, okay.

15                       RECROSS-EXAMINATION

16   BY MR. PHILLIPS:

17   Q   We've talked about the offshore structure.  Are the

18   foundations in the top two tiers of the organizational chart

19   offshore entities?

20   A   No.

21   Q   They're --

22   A   They're onshore entities.  They're tax-exempt entities.

23   Q   Thank you.

24   A   The investments are offshore.

25   Q   Thank you.
```

 1          THE COURT:  Mr. Morris?  One question.

 2                 FURTHER REDIRECT EXAMINATION

 3   BY MR. MORRIS:

 4   Q    Do you hold yourself out as an expert on the

 5   organizational structures in the Caribbean for charitable

 6   organizations?

 7   A    I hold myself out as a tax professional versant on setting

 8   up offshore master fund structures.  It's sort of a bread-and-

 9   butter thing.  But there are plenty of people that can testify

10   that this is very typical.

11   Q    Uh-huh.  Okay.

12          THE COURT:  Okay.  Thank you.

13       All right.  You are excused, Mr. Patrick.  I suppose

14   you'll want to stay around.  I don't know if you'll

15   potentially be recalled today.

16       (The witness steps down.)

17          THE COURT:  All right.  We should take a lunch break.

18   I'm going to put this out for a democratic vote.  Forty-five

19   minutes?  Is that good with everyone?

20          MR. SBAITI:  Do we have to leave the building to eat,

21   Your Honor, or is there food in the building?

22          THE COURT:  I think --

23          MR. SBAITI:  I'm sorry to ask that question, but --

24          THE COURT:  Yes.  You know what, there used to be a

25   very bad cafeteria, but I think it closed.  Right, Mike?  So,

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01506-B   Document 18-28   Filed 09/12/23   Page 69 of 213   PageID 6635

296

1              THE COURT:  I guess I'll see you Thursday on the

2     WebEx.  Thank you.

3              THE CLERK:  All rise.

4        (Proceedings concluded at 6:00 p.m.)

5                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
      the electronic sound recording of the proceedings in the
22    above-entitled matter.

23      **/s/ Kathy Rehling**                          **06/09/2021**

24    _____        _____
      Kathy Rehling, CETD-444                         Date
25    Certified Electronic Court Transcriber

**SBAITI & COMPANY PLLC**
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

| | |
|---|---|
| **KELLY HART PITRE** | **KELLY HART & HALLMAN** |
| Louis M. Phillips (#10505) | Hugh G. Connor II |
| One American Place | State Bar No. 00787272 |
| 301 Main Street, Suite 1600 | hugh.connor@kellyhart.com |
| Baton Rouge, LA 70801-1916 | Michael D. Anderson |
| Telephone: (225) 381-9643 | State Bar No. 24031699 |
| Facsimile: (225) 336-9763 | michael.anderson@kellyhart.com |
| Email: louis.phillips@kellyhart.com | Katherine T. Hopkins |
| Amelia L. Hurt (LA #36817, TX #24092553) | Texas Bar No. 24070737 |
| 400 Poydras Street, Suite 1812 | katherine.hopkins@kellyhart.com |
| New Orleans, LA 70130 | 201 Main Street, Suite 2500 |
| Telephone: (504) 522-1812 | Fort Worth, Texas 76102 |
| Facsimile: (504) 522-1813 | Telephone: (817) 332-2500 |
| Email: amelia.hurt@kellyhart.com | Telecopier: (817) 878-9280 |

*Special Purpose for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd. with respect to Withdrawal of Reference Motion*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| | § | |
| **Debtor** | § | |
| | § | |
| | § | |
| | § | |
| **CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY** | § | |
| | § | |
| | § | |
| **Plaintiff** | § | |

1

006130

|  |  |  |
|---|---|---|
| v. | § | **Case No. 21-03067-sgj** |
|  | § |  |
| **HIGHLAND CAPITAL MANAGEMENT,** | § |  |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § |  |
| **AND HIGHLAND CLO FUNDING LTD.,** | § |  |
| **NOMINALLY ,** | § |  |
| **Defendant** |  |  |

## NOTICE OF APPEARANCE OF SPECIAL PURPOSE COUNSEL WITH RESPECT TO THE RENEWED MOTION TO WITHDRAW THE REFERENCE TO BE HELD ON JANUARY 25, 2023 AT 1:30 PM

**PLEASE TAKE NOTICE THAT** undersigned counsel ("Kelly Hart") files this *Notice of Appearance as Special Purpose Counsel* with respect to the *Renewed Motion to Withdraw the Reference* [Docket No. 128] (the "Withdrawal of Reference Motion"), which the Court has set for hearing at 1:30 p.m. (Central Time) on January 25, 2023 (the "Hearing") in the above-styled adversary proceeding (the "Adversary Proceeding"). Kelly Hart's representation of Plaintiffs in this Adversary Proceeding is for the limited purpose of the Hearing with respect to the Withdrawal of Reference Motion.

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

2

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

*Special Purpose for Plaintiffs for Withdrawal of Reference Motion*

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this January 25, 2023.

*/s/ Louis M. Phillips*
Louis M. Phillips

006132

| | | |
|---|---|---|
| IN RE: Charitable DAF Fund, LP et al v. Highland Capital Management, LP et al | Status Conference: Motion For Withdrawal of Reference filed by Plaintiff CLO Holdco, Ltd., & Charitable DAF Fund, LP., doc. #128 | Case # 21−03067−sgj |
| **DEBTOR** | | |

### TYPE OF HEARING

| | | |
|---|---|---|
| Charitable DAF Fund, LP et al | ***VS*** | Highland Capital Management, LP et al |
| **PLAINTIFF / MOVANT** | | **DEFENDANT / RESPONDENT** |
| | | |
| Louise M. Phillips & Mazin Ahmad Sbaiti | | Gregory V. Demo & John A. Morris |
| **ATTORNEY** | | **ATTORNEY** |

### EXHIBITS

SEE EXHIBIT LIST

Exhibit #1 − Excerpts from Transcript of hearing on Application to Employ James P. Seery. Jr.

Exhibit #2 − Highland CLO Funding − Members Agreement relating to the Company

Exhibit #3 − HarbourVest Settlement Agreement

Exhibit #4 − Order Approving Debtor's Settlement with HarbourVest

Exhibit #5 − HCLOF Offering

Exhibit #6 − Amended and Restated Investment Advisory Agreement

| | | |
|---|---|---|
| Michael Edmond | January 25, 2023 | Stacey G Jernigan |
| REPORTED BY | HEARING DATE | JUDGE PRESIDING |

006133

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendants. | § | |
| | § | |

### PLAINTIFFS' WITNESS AND EXHIBIT LIST REGARDING HEARING ON
### HIGHLAND CAPITAL MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS
### <u>COMPLAINT TO BE HELD ON JANUARY 25, 2023</u>

Plaintiffs submit the following witness and exhibit list regarding Defendant Highland

Capital Management, L.P.'s Renewed Motion to Dismiss Complaint.

**WITNESSES**:

1.      Any witness identified or called by any other party;

2.      Any witness for impeachment or rebuttal.

**EXHIBITS**:

| No. | Exhibit | Offered | Admitted |
|---|---|---|---|
| 1 | Excerpts from Transcript of Hearing on Application to Employ James P. Seery, Jr. on July 14, 2020 (APP_0003 – 0014) | | |
| 2 | Highland CLO Funding – Members Agreement Relating to the Company (APP_0015 – 0042) | | |
| 3 | HarbourVest Settlement Agreement (APP_0043 – 0061) | | |
| 4 | Order Approving Debtor's Settlement with HarbourVest (APP_0062 – 0084) | | |
| 5 | HCLOF Offering (APP_0085-0206) | | |
| 6 | Amended and Restated Investment Advisory Agreement (APP_0207 – 0221) | | |
| 7 | Transcript of January 14, 2021 hearing | | |
| | All exhibits necessary for impeachment and/or rebuttal purposes. | | |
| | All exhibits identified by or offered by any other party for the hearing on Highland Capital Management, L.P.'s Renewed Motion to Dismiss. | | |

Dated: January 23, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*            
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

*Counsel for Plaintiffs*

---

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                           DALLAS DIVISION

 3                                    )   Case No. 19-34054-sgj11
       In Re:                         )
 4                                    )
       HIGHLAND CAPITAL               )   Dallas, Texas
       MANAGEMENT, L.P.,              )   July 14, 2020
 5                                    )   1:30 p.m. Docket
                                      )
 6           Debtor.                  )
                                      )   APPLICATIONS TO EMPLOY JAMES
 7                                    )   P. SEERY AND DEVELOPMENT
                                      )   SPECIALISTS, INC. (774, 775)
 8     _____)

 9                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                 UNITED STATES BANKRUPTCY JUDGE.

11     WEBEX/TELEPHONIC APPEARANCES:

12     For the Debtors:         Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
13                              10100 Santa Monica Blvd.,
                                 13th Floor
14                              Los Angeles, CA  90067
                                (310) 277-6910
15
       For the Debtors:         John A. Morris
16                              Greg Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
18                              (212) 561-7700

19     For the Debtors:         Ira D. Kharasch
                                PACHULSKI STANG ZIEHL & JONES, LLP
20                              10100 Santa Monica Blvd.,
                                 13th Floor
21                              Los Angeles, CA  90067-4003
                                (310) 277-6910
22
       For the Debtors:         Zachery Z. Annable
23                              Melissa S. Hayward
                                HAYWARD & ASSOCIATES, PLLC
24                              10501 N. Central Expressway,
                                 Suite 106
25                              Dallas, TX  75231
                                (972) 755-7104
```

EXHIBIT

1

006136

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:15-bhib01150Exibeit Document 3-48, 2020 09 Anth03Transcp077 of 2082 PateID 6643
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 16 of 134

Seery - Direct                          16

1   matter as well as financing in distressed matters during that

2   time.

3       In 1999, I went to the business side and I began to manage

4   distressed assets at Lehman Brothers as well as a leverage

5   finance business.  That grew into my running the risky finance

6   business as well as the loan business at Lehman globally,

7   which included high-grade loans, high-yield loans, trading and

8   sales of those products, a big part of distressed, all of

9   restructuring, all of asset management, and all of the hedging

10  of the portfolio that we had.

11      From there, I left Lehman with a small group and sold it

12  to Barclay's.  I moved on and ran a hedge fund with two former

13  partners of mine who are the founding partners called River

14  Birch Capital.  It was a long-short credit fund; mostly

15  credit, though we did structured finance as well, and we also

16  handled some equities.

17  Q    Okay.  Let's spend a few minutes, as a preview, talking

18  about the Debtor and its business.  And let's start with the

19  basics.  Is there a way you can summarize the business of the

20  Debtor?

21  A    I think, from a high level, the best way to think about

22  the Debtor is that it's a registered investment advisor.  As a

23  registered investment advisor, which is really any advisor of

24  third-party money over $25 million, it has to register with

25  the SEC, and it manages funds in many different ways.

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-B-BH Document 18-48  Filed 08/11/23  Page 78 of 213  PageID 6644
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 17 of 134

Seery - Direct                          17

1        The Debtor manages approximately $200 million current

2   values -- it was more than that at the start of the case -- of

3   its own assets.  It doesn't have to be a registered investment

4   advisor for those assets, but it does manage its own assets,

5   which include directly-owned securities; loans from mostly

6   related entities, but not all; and investments in certain

7   funds which it also manages.

8        In addition, the Debtor manages about roughly $2 billion

9   in -- $2 billion in total managed assets, around $2 billion in

10  CLO assets, and then other entities, which are hedge funds or

11  PE style.

12       In addition, the Debtor provides shared services for

13  approximately $6 billion of assets.  Those are assets that are

14  owned by related entities but not owned by Debtor-owned or

15  managed entities.  And those are a combination of back office

16  services, which include timely reporting, asset management,

17  legal and compliance support, trading and research support,

18  but not the actual management of the assets.

19       The Debtors run -- and I think the way to think about it

20  is on a functional basis; at least, that's the way I think

21  about it -- and there's really six areas.  There's corporate

22  management; finance, accounting and tax; trading and research;

23  private equity and fund investing; compliance and legal; and

24  then structured equity, which really includes all of the CLO

25  businesses.

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-X-BE Document 13-8    Exhibit Document 18-1    Transcript Page 79 of 213 PageID 6645
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 18 of 134

Seery - Direct                    18

1        The goals of the Debtor generally are what you'd expect

2    out of an asset manager.  A little bit different than most

3    because the Debtor does own assets, which is a little

4    different than when money asset managers typically hold assets

5    away from the asset manager.  But number one, discharge

6    Highland's, which I'll call Highland (inaudible), LP, duties

7    to investors in the funds.  Those are fiduciary duties under

8    the Investment Advisors Act.  Each day, you've got to make

9    sure that you do that first and foremost.

10        Number two, create positive MPD in each of the funds that

11   we manage, either through sales, purchases, or hedging.

12        Next, make sure that we report timely finances of our own

13   assets, including in the funds, but also, to the third-party

14   investors.  Maximize the value of HCMLP's owned assets.  And

15   then operate as efficiently as possible for the lowest cost.

16        That's essentially how the Debtor -- how we think about

17   the Debtor from a functional perspective.  It's got about 70

18   employees laid out in those areas that I mentioned, and each

19   of those employees every day usually think about those goals

20   and try to discharge their duties by focusing on those goals.

21   Q    Thank you, Mr. Seery.  And can you describe for the Court

22   how those 70 or so employees are organized?  Is there an

23   internal corporate structure that you're working with?

24   A    Yeah.  The way -- the way -- I apologize.  The way we

25   think about it is, as I said, corporate management, which is

006139

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-K    Document 8-28    Filed 09/11/23    Page 80 of 135    PageID 6646
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 19 of 134

Seery - Direct                    19

1    really HR and overseeing the function that it's filling every

2    day, that's been really -- because Mr. Dondero was removed

3    from management.  It used to all roll up to him.  That's been

4    effectively rolling up to me since February.

5        Finance, accounting, and tax.  Each of these businesses

6    every day require certain amounts of liquidity.  Each of them

7    have requirements that they have to pay out to investors.

8    Each of them have expenses.  And all of them have different

9    kinds of tax either obligations or reporting.  Those are

10   managed by Frank Waterhouse as the CFO.  (inaudible), sorry.

11       Trading and research.  With respect to the assets, they're

12   not -- they're not static assets.  Many of them do get traded

13   on a regular basis.  A gentleman, Joe Sowin, heads up the

14   trading of the liquid assets.  John Povish (phonetic) heads up

15   the research and the trading of the more illiquid assets, but

16   not PE.  In addition, we have PE assets that require some

17   management every day, including Board seats.  That's a

18   gentleman by the name of Cameron Baynard, and also he will

19   fund investments in that area.  J.P. Sevilla is responsible

20   for working with Cameron on those investments and leading that

21   team.

22       Importantly, because of the nature of what the Debtor

23   does, the fiduciary obligations, as well as the

24   responsibilities to each investor and the legal overlay, we

25   have a robust compliance and legal department.  That's headed

Case 21-03067-sgj   Doc 147-1   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Case 3:23-cv-01503-X Exhibit Document 1-48   Filed 08/10/23   Transcript Page 81 of 213 PageID 6647
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 20 of 134

Seery - Direct                    20

1   by Thomas Surgent and Scott Ellington.  Scott:  more focused

2   on transactional issues with respect to legal.  He is actually

3   general counsel.  Everything that has do with compliance, the

4   interrelatedness of the funds, trading between funds or

5   positions that are shared across funds, which are many, runs

6   through Thomas Surgent and his team.

7       And finally, structured equity.  Sitting on top of the

8   structured finance business that we have, understanding those

9   assets, particularly of two billion-ish assets in CLOs, that's

10  headed by Hunter Covitz.

11  Q    Can you describe for the Court your interaction with each

12  of the department heads that you just identified?

13  A    Well, depending on the nature of the issue each day, I

14  have at least -- I'd say generally at least weekly contact

15  with most, often daily contact with most.  So, for example,

16  when there are trading issues, particularly as the market was

17  extremely volatile with respect to unliquid securities, Joe

18  Sowin and I were on the phone several times a day.

19      Relating to the COVID issues, Brian Collins, who heads the

20  HR group, and I were on the phone several times a day.

21      Relating to structured equity, depending on what's

22  happening with a particular fund or what's happening in loan

23  prices, I speak to Hunter Covitz.  And it goes down the line.

24      So it really depends on each of the areas and what's going

25  on in the business, but I try to touch base with each of those

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-x  Document  1-3  Filed 01/13/23  Transcript Page 82 of 213  PageID 6648
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 21 of 134

Seery - Direct                              21

1   department heads on a regular basis.

2       Frank Waterhouse, of course, is at least weekly.  We have

3   a standing call every week to make sure that we're focused on

4   liquidity, which is always a concern in a Chapter 11, and

5   Frank and his team are on that call and prepare weekly

6   materials for us.

7   Q   Okay.

8           MR. MORRIS:  Your Honor, before I move to the next

9   area of questions, the work of the Board, I just wanted to see

10  if the Court had any questions on the corporate organizational

11  structure, the internal structure of the business, or any of

12  the matters that Mr. Seery touched on?

13          THE COURT:  I do not.  And I do have in front of me a

14  demonstrative aid that Mr. Annable sent over ahead of time, so

15  I appreciate that as well.

16          MR. MORRIS:  Okay.  Your Honor, I think Mr. Seery

17  covered much of what's on that document, but if you'd like him

18  to go through that, we're happy to do it.

19          THE COURT:  No, that's fine.

20          MR. MORRIS:  Okay.

21  BY MR. MORRIS:

22  Q   Then let's shift gears a little bit and start talking

23  about the work of the Independent Board itself.  The

24  Independent Board was appointed in mid-January; is that right?

25  A   Yeah.  It was the first -- January 9th, the first week of

006142

Case 21-03067-sgj   Doc 147-1   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Case 3:21-cv-01503-S Exhibit Documents July 28, 2020 Hearing Transcript 83 of 213 PageID 6649
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 22 of 134

Seery - Direct                                  22

1    January, and we started working that afternoon.

2    Q    Okay.  Can you describe for the Court what the -- the

3    Board's initial focus?  What were you focused on?

4    A    Well, if you think about the areas that I just mentioned

5    previously, the Board initially, for lack of a better term,

6    gang-tackled everything.  So we tried to make sure that we had

7    a broad base of understanding among the three of us with

8    respect to the business.

9        I, because of my background, had a lot more familiarity

10   with asset management, these type of asset security

11   businesses.  But we wanted to make sure that each of us was at

12   least facile with the main areas that we had to understand.

13   First was operations.  How does the company run each day?

14   Particularly, how was it going to run without Mr. Dondero?

15   And I went through some of those functional areas and how we

16   thought about those and who head each of those.

17       Next in the -- I don't mean to say it's second, because

18   it's always first, but liquidity.  What did the Debtors'

19   liquidity look like?  How are we going to manage that

20   liquidity, not just for the near-term, but also for the

21   medium-term, and then even into the slightly longer-term?  We

22   had to think about what assets are there, what money those

23   assets might need that we would have to invest in them, and

24   whether there was liquidity in those assets that we can create

25   liquidity in order to fund the Debtors' business.

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-B Document 1-8    Filed 09/11/23    Page 84 of 213 PageID 6650
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 23 of 134

Seery - Direct                                    23

1      Personnel, we needed a good opportunity to understand who

2   did what, not just in the senior managers that I mentioned,

3   but deeper into the staff, because we're going to rely on

4   those folks.  Particularly worked through with DSI.

5      As I mentioned, the Debtor, unlike a lot of other asset

6   managers, owns a lot of assets.  It's a disparate group of

7   assets, but getting a feel and understanding for what those

8   assets were, what the critical issues surrounding those assets

9   are, who managed them day-to-day:  We wanted to make sure that

10   each of the directors had a good (inaudible) and understanding

11   of those issues that might arise with respect to those assets,

12   and a good sense of how quickly those issues could, you know,

13   further arise.

14      We also had to get a very good understanding of each of

15   the funds that we manage.  As I said, the Investment Advisors

16   Act puts a fiduciary duty on Highland Capital to discharge its

17   duty to the investors.  So while we have duties to the estate,

18   we also have duties, as I mentioned in my last testimony, to

19   each of the investors in the funds.

20      Now, some of them are related parties, and those are a

21   little bit easier.  Some of them are owned by Highland.  But

22   there are third-party investors in these funds who have no

23   relation whatsoever to Highland, and we owe them a fiduciary

24   duty both to manage their assets prudently but also to seek to

25   maximize value.  And we wanted to make sure we had a good

Case 21-03067-sgj   Doc 147-1   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Case 3:23-cv-01598-E Exhibit Document 18-28 Filed 09/11/23 Transcript Page 85 of 213 PageID 6651
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 24 of 134

1   understanding of that.

2         Finally, with respect to the shared service arrangements,

3   we needed to get an understanding of that $6 billion in assets

4   and how our business, HCMLP, worked with those -- those shared

5   service counterparties and exactly who did what for whom.

6   It's very complicated because it had been run much more on a

7   functional basis than on a line basis from each contract.   So

8   it's not as if your employees are allocated to NexBank.   It's

9   the whole panoply of businesses that we enter into, and

10  providing those services to NexBank, not through a central

11  point but through whatever requests come in from the counter-

12  parties.   So we needed a good understanding of what those

13  contracts looked and what those obligations were.

14        A VOICE:   John, you're on mute.

15        MR. MORRIS:   Thank you.

16  BY MR. MORRIS:

17  Q   All of that work was going on in the first weeks of the

18  appointment of the Board?

19  A   Yeah, it would not be fair to say we could do that in a

20  couple weeks.   So it took far longer than that.   But that

21  didn't mean that issues didn't start to arise immediately in

22  February.   And so, while we were learning, we were also

23  starting to get a feel for different things that could happen

24  in the company.

25        As in many companies, immediately, one of the first things

Seery - Direct                                          25

1   you have to deal with is, particularly at the beginning of the

2   year, what does compensation look like; who are the -- what do

3   promotions look like; are you going to be able to hold this

4   team together to service these assets?  And yeah, we had that,

5   with an additional wrinkle that Highland's payment structure

6   defers a significant amount of compensation to its employees,

7   and it vests over time, and it has the very typical provision

8   that if you are not there when it vests -- when it is going to

9   be paid, actually, not when it vests.  Even if you're vested,

10  if you're not there when it gets paid, you're not entitled to

11  it.  And so understanding who was owed what; how the vesting

12  worked; what the compensation structure looked like compared

13  to third parties, was one of the first things we had to do.

14  And Highland has an extremely robust review process.  Brian

15  Collins manages it.  It's first-rate.  It goes through both

16  360 in terms of what other employees think of each other as

17  well as bottoms up, in terms of performance.  And then it has

18  a top-down component, which ultimately ran through Mr.

19  Dondero.  Since he was effectively removed from that role, the

20  Board had to jump in and get a full understanding with Brian

21  about what the process looked like; how it was going to work;

22  how it compared to other firms; and whether we could go

23  forward with it.  And that was one of the motions that was

24  brought early to the Court.

25  A    Let's talk a minute about the transactional work that the

006146

Case 21-03067-sgj    Doc 147-1    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-X  Document 11-28  Filed 09/01/23  Page 87 of 213  PageID 6653
Case 19-34054-sgj11  Doc 864  Filed 07/17/20    Entered 07/17/20 10:53:51    Page 133 of 134

133

1    yesterday counsel for Mr. Dondero filed a joinder in the

2    Debtors' objection to Acis's claim.  So, again, just thinking

3    about this in the context of mediation, I think, with that

4    joinder, they will be a necessary party.  So, going back to

5    Mr. Seery's point, this is not just --

6            THE COURT:  Oh, absolutely.  Mr. Dondero is --

7            MS. PATEL:  -- a two-party --

8            THE COURT:  -- going to be a required party in

9    mediation.  Absolutely.  So, --

10            MS. PATEL:  Thank you, Your Honor.

11            THE COURT:  All right.  Well, if there's nothing

12    further, we'll see you on the 21st.  And, again, my courtroom

13    deputy may be reaching out before then if we've got things

14    nailed down on mediation.

15        (Proceedings concluded at 4:54 p.m.)

16                        --oOo--

17

18

19

20

21                    CERTIFICATE

22    I certify that the foregoing is a correct transcript to
      the best of my ability from the electronic sound recording of
      the proceedings in the above-entitled matter.

23

      **/s/ Kathy Rehling**                    **07/16/2020**

24
      _____        _____
25    Kathy Rehling, CETD-444                        Date
      Certified Electronic Court Transcriber

Case 21-03067-sgj    Doc 147-2    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:21-cv-01503-F   Document 28   Filed 09/11/23   Page 88 of 213   PageID 6654
Exhibit 2 - HCLOF Members Agreement Relating to the Company   Page 88 of 213

**EXECUTION VERSION**

Between

**CLO HOLDCO, LTD.**

And

**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

And

**HARBOURVEST 2017 GLOBAL AIF L.P.**

And

**HARBOURVEST 2017 GLOBAL FUND L.P.**

And

**HV INTERNATIONAL VIII SECONDARY L.P.**

And

**HARBOURVEST SKEW BASE AIF L.P.**

And

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

And

**LEE BLACKWELL PARKER, III**

And

**QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311**

And

**QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811**

And

**QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612**

And

**QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211**

And

**HIGHLAND CLO FUNDING, LTD.**

And

**HIGHLAND HCF ADVISOR, LTD.**

---

**MEMBERS AGREEMENT RELATING TO THE COMPANY**

---

**EXHIBIT**

**2**

006148

TABLE OF CONTENTS

1.   INTERPRETATION ................................................................. 2

2.   THE BUSINESS OF THE COMPANY ........................................ 4

3.   VOTING RIGHTS ................................................................. 4

4.   ADVISORY BOARD .............................................................. 4

5.   DEFAULTING MEMBERS ....................................................... 4

6.   TRANSFERS OR DISPOSALS OF SHARES ................................ 4

7.   CONFIDENTIALITY .............................................................. 4

8.   DIVIDENDS ....................................................................... 9

9.   TERM OF THE COMPANY ..................................................... 9

10.  ERISA MATTERS ................................................................ 9

11.  TAX MATTERS ................................................................... 9

12.  AMENDMENTS TO CERTAIN AGREEMENTS .............................. 9

13.  FINANCIAL REPORTS .......................................................... 9

14.  TERMINATION AND LIQUIDATION .......................................... 9

15.  WHOLE AGREEMENT ......................................................... 12

16.  STATUS OF AGREEMENT .................................................... 12

17.  ASSIGNMENTS ................................................................. 12

18.  VARIATION AND WAIVER .................................................... 12

19.  SERVICE OF NOTICE ......................................................... 12

20.  GENERAL ....................................................................... 13

21.  GOVERNING LAW AND JURISDICTION .................................. 14

SCHEDULE ............................................................................. 18
Adherence Agreement................................................................ 18

**THIS AGREEMENT** is made the 15th day of November 2017

**BETWEEN**

(1)   **CLO HOLDCO, LTD.** whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)   **HARBOURVEST DOVER IX INVESTMENT L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)   **HARBOURVEST 2017 GLOBAL AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)   **HARBOURVEST 2017 GLOBAL FUND L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)   **HV INTERNATIONAL VIII SECONDARY L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)   **HARBOURVEST SKEW BASE AIF L.P.** of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)   **HIGHLAND CAPITAL MANAGEMENT, L.P.** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)   **LEE BLACKWELL PARKER, III** of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)   **QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311** of 17171 Park Row #100, Houston, Texas 77084, USA

(10)   **QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811** of 17171 Park Row #100, Houston, Texas 77084, USA

(11)   **QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612** of 17171 Park Row #100, Houston, Texas 77084, USA

(12)   **QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211** of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "**Members**") and

(13)   **HIGHLAND CLO FUNDING, LTD.,** with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**") and

(14)   **HIGHLAND HCF ADVISOR, LTD.,** whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

**WHEREAS**:

(A)   The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)   The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, (the (the "**Offering Memorandum**"), subject to the restrictions set forth therein.

23981765.11. BUSINESS                                        1

006150

(C)     The Members are the owners of the entire issued capital of the Company.

(D)     The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

**OPERATIVE PROVISIONS**

1.     **INTERPRETATION**

In this Agreement, including the Schedule:

1.1    the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"**Adherence Agreement**" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"**Advisers Act**" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"**Affiliate**" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above. For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"**Agreement**" means this agreement together with the Schedule;

"**Articles**" means the articles of incorporation of the Company as amended from time to time;

"**Business**" means the business of the Company as described in Recital (B);

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"**Directors**" means the directors of the Company from time to time;

"**CLO Holdco**" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Directors**" means the directors of the Company from time to time;

"**Dover IX**" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"**DOL**" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"**DOL Regulations**" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"**Dover IX**" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"**ERISA**" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"**ERISA Member**" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"**HarbourVest Entities**" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"**Highland Principals**" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"**Law**" means the Companies (Guernsey) Law, 2008, as amended;

"**Member**" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"**Parties**" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"**Shares**" means ordinary shares in the Company;

"**Subsidiary**" shall have the meaning ascribed to it in the Law;

"**Subscription and Transfer Agreement**" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager;

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2    any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3    any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4    any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5    any reference to time shall be to Guernsey time;

1.6    except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

006152

Case 21-03067-sgj    Doc 147-2    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Exhibit 2 - HSCF Members Agreement Relating to the Company    Page 93 of 213
Case 21-03067-sgj    Doc 28-28    Filed 09/11/23    Page 93 of 213    PageID 6659

1.7    unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8    Clause headings are for ease of reference only and do not affect the construction of any provision.

2.    **THE BUSINESS OF THE COMPANY**

2.1    The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2    The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3    The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.    **VOTING RIGHTS**

3.1    The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2    The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

3.2.1    any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

3.2.2    any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

3.2.3    any conversion or redemption of Shares, except pursuant to Clause 5.5,

3.2.4    any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

3.2.5    the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

3.2.6    the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4. **ADVISORY BOARD.**

4.1 <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "**Advisory Board**") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2 <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3 <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum.  Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4    <u>Term of Members of Advisory Board</u>.  A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5    <u>No Duties to Other Members</u>.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.    **DEFAULTING MEMBERS**

5.1    In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "**Outstanding Settlement Amount**"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "**Default Interest Rate**") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "**Defaulting Member**"), the following provisions shall apply:

5.2    Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3    The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

5.4  The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5  The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6  The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7  At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8  The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9  Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.  **TRANSFERS OR DISPOSALS OF SHARES**

6.1  No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

Case 21-03067-sgj    Doc 147-2    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:21-cv-01603-B   Document 8-26   Filed 09/01/23   Page 97 of 213   PageID 3663
Exhibit 2 - Inbound Agreement Part 1 of the Page 97 of 213

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1    such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2    such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3    such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4    such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2    Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again.  Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3    No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4    Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5    The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6    All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

7.      **CONFIDENTIALITY**

7.1     Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2     Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.      **DIVIDENDS**

8.1     The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.      **TERM OF THE COMPANY**

9.1     Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "**Term**"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2     Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.     **ERISA MATTERS**

10.1    The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with such other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.     **TAX MATTERS**

11.1    PFIC. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

006158

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2   CFC. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3   Other Tax Information. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4   Withholding and Other Taxes. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12.   **AMENDMENTS TO CERTAIN AGREEMENTS**

12.1   The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "**Management Agreement**") without the consent of the Parties.

12.2   The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3   The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13.   **FINANCIAL REPORTS**

13.1   The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2    After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.    **TERMINATION AND LIQUIDATION**

14.1    Save as provided for in Clause 13.2, this Agreement shall terminate:

14.1.1    when one Party holds all the Shares;

14.1.2    when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

14.1.3    with the written consent of all the Parties.

14.2    The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3    Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4    Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

14.4.1    all existing contracts of the Company are performed to the extent that there are sufficient resources;

14.4.2    the Company shall not enter into any new contractual obligations;

14.4.3    the Company is dissolved and its assets are distributed as soon as practical; and

14.4.4    any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

15.   **WHOLE AGREEMENT**

15.1   This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2   Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3   Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16.   **STATUS OF AGREEMENT**

16.1   Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2   If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17.   **ASSIGNMENTS**

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18.   **VARIATION AND WAIVER**

18.1   A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2   A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3   A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19.   **SERVICE OF NOTICE**

19.1   Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

19.1.1   to the Company:
Address:
First Floor, Dorey Court, Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

19.1.2   to CLO Holdco:

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3   to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4   to any other Party: by post or hand delivery only to the address specified in the
register of members of the Company.

19.2   Communications sent by post shall be deemed to have been received 24 hours after posting.
Communications sent by facsimile transmission shall be deemed to have been received at the
time the transmission has been received by the addressee **PROVIDED THAT** if the facsimile
transmission, where permitted, is received after 5.00pm or on a day which is not a Business
Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3   In proving service by post it shall only be necessary to prove that the notice was contained in an
envelope which was duly addressed and posted in accordance with this Clause and in the case of
facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to
the correct number.

20.   **GENERAL**

20.1   Each of the Parties hereby agree not to enter into or abide by any agreement whether written or
oral with any one or more of the other Parties in respect of the voting of Shares or the
submission of Member resolutions to any Members for voting by them, or otherwise to direct or
influence, or attempt to direct or influence, the day-to-day management of the Company, either
directly or indirectly, other than in order to comply with the other terms of this Agreement or
the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt
to direct or influence any of the Directors through any employment relationship that the
Directors may have outside of the Company other than in order to comply with the other terms
of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall
continue to apply to them whether or not they are or remain a Member.

20.2   Unless otherwise provided, all costs in connection with the negotiation, preparation, execution
and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3   The Parties are not in partnership with each other and there is no relationship of principal and
agent between them.

20.4   All transactions entered into between any Party and the Company shall be conducted in good
faith and on the basis set out or referred to in this Agreement or, if not provided for in this
Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an
arm's length basis.

20.5   Each Party shall at all times act in good faith towards the other Parties and shall use all
reasonable endeavours to ensure that this Agreement is observed.

006162

20.6 Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7 This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21. **STATUS OF AGREEMENT**

21.1 The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2 If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.


22. **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[*Signature Page Follows*.]

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:................................................................
**Name:** Grant Scott
**Title:** Director

006164

Case 21-03067-sgj   Doc 147-2   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Case 3:18-cv-01535-F   Document 26   Filed 03/11/03   Page 105 of 213   Page #286671
Exhibit 2 - HSOF Members Agreement Relating to other parts of Page 2 of 1

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:      HarbourVest Partners (Europe) Limited,
          its Alternative Investment Fund Manager

**By:** ................................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:      HarbourVest Partners (Europe) Limited,
          its Alternative Investment Fund Manager

**By:** ................................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:      HarbourVest 2017 Global Associates L.P.,
          its General Partner

By:      HarbourVest GP LLC,
          its General Partner

By:      HarbourVest Partners, LLC,
          its Managing Member

**By:** ................................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


SIGNATURE PAGE TO MEMBERS' AGREEMENT

006165

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner
By:     HarbourVest GP LLC
        Its General Partner
By:     HarbourVest Partners, LLC
        Its Managing Member

**By:** ....................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:     HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ....................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


SIGNATURE PAGE TO MEMBERS' AGREEMENT

006166

**SIGNED**

.......................................................................................
Lee Blackwell Parker, III

Signature Page to Members' Agreement

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

X

By: .......................................................
Name: Emmanuel Magalel
Title: Transactions operation

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By: .......................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By: .......................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By: .......................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
Name: Emmanuel Mairei
Title: Transaction Supervisor

*Recd & Approved*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

006169

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:................................................................
Name: *Emmanuel Macey*
Title: *Transaction Supervisor*

*Read and Approved:*

*[signature] 11/7/17*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

006170

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**


By:..................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**


By:..................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**


By:..................................................................
Name:
Title:


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**


By:..................................................................
Name: Emmanuel Mador
Title: Transaction Supervisor

Read and approved

SIGNATURE PAGE TO MEMBERS' AGREEMENT

006171

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     Strand Advisors, Inc.,
        its General Partner

**By**:................................................................

**Name:** James Dondero
**Title:**  President

006172

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

By: .........................................................

**Name:** James Dondero
**Title:** President

Case 21-03067-sgj    Doc 147-2    Filed 01/23/23    Entered 01/23/23 15:02:21    Desc
Case 3:23-cv-01503-LOF Document Aug-28 Filed 09/01/23   Page 114 of 213   PageID 6680
Exhibit B1 HCLOF Members' Agreement Relating to the Company    Page 27 of 28

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

By:........................................................

**Name:** William Scott
**Title:** Director

## SCHEDULE

### Adherence Agreement

**THIS ADHERENCE AGREEMENT** is made on [●] 200[●]

**BETWEEN**:

(1)      [●] of [●] (the "**Covenantor**");

(2)      CLO HOLDCO, LTD. of [                          ] (a "**Member**");

(3)      [●] of [                          ] (a "**Member**");

(4)      [●] of [                          ] (a "**Member**");

(5)      HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "**Company**")

(6)      HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "**Portfolio Manager**").

### RECITAL

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "**Members Agreement**").

**IT IS HEREBY AGREED** as follows:

1.      The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.      Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.      This Agreement shall be governed by and construed in accordance with Guernsey law.

**IN WITNESS** of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.

**EXECUTION VERSION**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

**EXHIBIT**

006176

EXECUTION VERSION

WHEREAS, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

WHEREAS, the Debtor disputes the HarbourVest Claims;

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

WHEREAS, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

WHEREAS, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

NOW THEREFORE, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

(a)     In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

(i)     an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

(ii)     an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

(b)     On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

(a)     Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

US-DOCS\115534291.12

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

EXECUTION VERSION

4.     **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.     **Plan Support.**

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action another action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7. **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

006180

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9. **Advice of Counsel**. Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10. **Entire Agreement**. This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11. **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12. **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

**EXECUTION VERSION**

       14.     **<u>Governing Law; Venue; Attorneys' Fees and Costs</u>**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

EXECUTION VERSION

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:      /s/ James P. Seery, Jr.
Name:   James P. Seery, Jr.
Its:      CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:      /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

006183

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:  /s/ Michael Pugatch
Name: Michael Pugatch
Its:  Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:  /s/ Michael Pugatch
Name: Michael Pugatch
Its:  Managing Director

006184

# Exhibit A

# TRANSFER AGREEMENT

# FOR ORDINARY SHARES OF

# HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of December [__], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

006187

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

   a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

   b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

   c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

   a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

   b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

    Prior to the Effective Date the Transferee shall procure that:

   c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

   a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

006188

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

006189

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name: _____

Title: _____

ActiveUS 183646253v.3

006190

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

006191

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director


**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest Skew Base AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

006192

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
          Its General Partner

By:    HarbourVest GP LLC
          Its General Partner

By:    HarbourVest Partners, LLC
          Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

006193

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [ ] | [ ] |
| HarbourVest 2017 Global AIF L.P. | [ ] | [ ] |
| HarbourVest 2017 Global Fund L.P. | [ ] | [ ] |
| HV International VIII Secondary L.P. | [ ] | [ ] |
| HarbourVest Skew Base AIF L.P. | [ ] | [ ] |

9



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re:                                          §          Chapter 11
                                                §
HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]           §          Case No. 19-34054-sgj11
                                                §
                    Debtor.                     §
                                                §

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

**EXHIBIT**

**4**

006195

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "<u>Morris Declaration</u>"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "<u>Settlement Agreement</u>"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "<u>Dondero Objection</u>"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "<u>Trusts' Objection</u>"), filed by the Dugaboy Investment Trust ("<u>Dugaboy</u>") and Get Good Trust ("<u>Get Good</u>," and together with Dugaboy, the "<u>Trusts</u>"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "<u>CLOH Objection</u>" and collectively, with the Dondero Objection and the Trusts' Objection, the "<u>Objections</u>"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "<u>Debtor's Reply</u>"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "<u>HarbourVest Reply</u>"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "<u>Hearing</u>"), including assessing the credibility of the witnesses; and (j) the

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** as set forth herein.

2. All objections to the Motion are overruled.

3. The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3

4. All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5. The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6. Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7. The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

006198

# EXHIBIT 1

006199

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

### R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

Case 19-34054-sgj11 Doc 3487-4 Filed 01/02/23 Entered 01/02/23 15:02 Page 7 of 23
Case 21-03067-sgj Doc 17-2 Filed 01/23/23 Entered 01/23/23 15:02:21 Page Test 23
Case 3:21-cv-01503-B Document 18-2 Filed 09/11/23 Harbour Vest of Page Page23 6707
**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.  **Settlement of Claims.**

    (a)     In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)     an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)     an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)     On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.  **Releases.**

    (a)     Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)　　Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)　　Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.　　**Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

4.  **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.  **Plan Support.**

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action or other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7. **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

006204

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.    **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.    **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.    **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.    **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**EXECUTION VERSION**

     14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

EXECUTION VERSION

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:     CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

US-DOCS\115534291.12

006207

**EXECUTION VERSION**


**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**


By: /s/ Michael Pugatch

Name: Michael Pugatch

Its: Managing Director


**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**


By: /s/ Michael Pugatch

Name: Michael Pugatch

Its: Managing Director

# Exhibit A

# TRANSFER AGREEMENT
## FOR ORDINARY SHARES OF
## HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of January ____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on <u>Exhibit A</u> hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Transfer of Shares and Advisory Board</u>

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

  Prior to the Effective Date the Transferee shall procure that:

    c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

006212

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement. In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto. No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

006213

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member


By: _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer



**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**


By: _____

Name:  James P. Seery, Jr.

Title:  President



**FUND:**
**Highland CLO Funding, Ltd.**


By: _____

Name:

Title:


*[Additional Signatures on Following Page]*

006214

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
        Its General Partner

By:    HarbourVest GP LLC
        Its General Partner

By:    HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

006215

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
          Its General Partner

By:     HarbourVest GP LLC
          Its General Partner

By:     HarbourVest Partners, LLC
          Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

006216

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

006217

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.  If you are in any doubt as to the action you should take or the contents of this document, you are recommended to seek your own independent financial advice immediately from your stockbroker, bank, solicitor, accountant, or other appropriate independent financial adviser, who is authorised under the Financial Services and Markets Act 2000, as amended ("FSMA") if you are in the United Kingdom, or from another appropriately authorised independent financial adviser if you are in a territory outside the United Kingdom.**

**A copy of this document, which comprises an offering memorandum (the "Offering Memorandum") relating to Highland CLO Funding, Ltd. (the "Company") in connection with the issue of Placing Shares in the Company, is available at the Company's registered office upon request.**

**The Placing Shares are only suitable for investors:  (i) who understand the potential risk of capital loss and that there may be limited liquidity in the underlying investments of the Company; (ii) for whom an investment in the Placing Shares is part of a diversified investment programme; and (iii) who fully understand and are willing to assume the risks involved in such an investment programme.  It should be remembered that the price of the Placing Shares and the income from them can go down as well as up and that investors may not receive, on the sale or cancellation of the Placing Shares, the amount that they invested.**

The Company and its directors (whose names appear in the section of this Offering Memorandum entitled "*Company Directors and Administration*") (the "**Directors**") accept responsibility for the information contained in this Offering Memorandum.  To the best of the knowledge of the Company and the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in the Offering Memorandum is in accordance with the facts and contains no omission likely to affect its import.  The Directors have taken all reasonable care to ensure that the facts stated in the Offering Memorandum are true and accurate in all material respects, and that there are no other facts the omission of which would make misleading any statement in this Offering Memorandum, whether of facts or of opinion.  All the Directors accept responsibility accordingly.

**Potential investors should read the whole of this Offering Memorandum when considering an investment in the Placing Shares and, in particular, attention is drawn to the section of this Offering Memorandum entitled "*Risk Factors*" on pages 18 to 47 of this Offering Memorandum.**

---

**HIGHLAND CLO FUNDING, LTD.**

*(a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120)*

**Placing for a target issue of U.S. $153,000,000 of Placing Shares**

---

This Offering Memorandum does not constitute or form part of any offer or invitation to sell, or the solicitation of an offer to acquire or subscribe for, any securities other than the securities to which it relates or any offer or invitation to sell or issue, or any solicitation of any offer to purchase or subscribe for such securities by any person in any circumstances in which such offer or solicitation is unlawful.

The Placing Shares have not been and will not be registered under the U.S. Securities Act of 1933 (the "**U.S. Securities Act**") or under the securities laws of any state or other jurisdiction of the United States.  The Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.

The Company has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "**U.S. Investment Company Act**") and investors will not be entitled to the benefits of the U.S. Investment Company Act.  There will be no public offer of the Placing Shares in the United States.

**Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of the Placing Shares or passed upon or endorsed the merits of the offering of the Placing Shares or the adequacy or accuracy of this Offering Memorandum.  Any representation to the contrary is a criminal offence in the United States.**

Except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by:  (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3)

EXHIBIT

5  006218

of the United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the United States Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**"), including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

The distribution of this Offering Memorandum and the offer of the Placing Shares in certain jurisdictions may be restricted by law. No action has been or will be taken to permit the possession, issue or distribution of this Offering Memorandum (or any other offering or publicity material relating to the Placing Shares) in any jurisdiction where action for that purpose may be required or doing so is restricted by law. Accordingly, neither this Offering Memorandum, nor any advertisement, nor any other offering material may be distributed or published in any jurisdiction except under circumstances that will result in compliance with any applicable laws and regulations. Persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions. None of the Company or any of its affiliates or advisors accepts any legal responsibility for any breach by any person, whether or not a prospective investor, of any such restrictions.

**In addition, the Placing Shares are subject to restrictions on transferability and resale in certain jurisdictions and may not be transferred or resold except as permitted under applicable securities laws and regulations. Investors may be required to bear the financial risks of their investment in the Placing Shares for an indefinite period of time. Any failure to comply with these restrictions may constitute a violation of the securities laws of any such jurisdictions. For further information on restrictions on offers, sales and transfers of the Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".**

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved. The investors also acknowledge that they have relied only on the information contained in this document. No person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been so authorised. Neither the delivery of this Offering Memorandum nor any subscription or sale made under it shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date of this document or that the information in it is correct as of any subsequent time.

None of the Company or any of its representatives is making any representation to any prospective investor in respect of the Placing Shares regarding the legality of an investment in the Placing Shares by such prospective investor under the laws applicable to such prospective investor.

The contents of this Offering Memorandum should not be construed as legal, financial or tax advice. Each prospective investor should consult his, her or its own legal, financial or tax adviser for legal, financial or tax advice.

The Company is a registered closed-ended collective investment scheme pursuant to The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended and the Registered Collective Investment Schemes Rules 2015 issued by the Guernsey Financial Services Commission. Neither the Guernsey Financial Services Commission nor the States of Guernsey take any responsibility for the soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

If you are in any doubt about the contents of this Offering Memorandum you should consult your accountant, legal or professional adviser or financial adviser.

This Offering Memorandum has not been reviewed by the Guernsey Financial Services Commission and, in granting registration, the Guernsey Financial Services Commission has relied upon specific warranties provided by State Street (Guernsey) Limited, the Company's designated administrator.

It should be remembered that the price of securities and the income from them can go down as well as up.

**You are wholly responsible for ensuring that all aspects of the Company are acceptable to you. Investment in the Company may involve special risks that could lead to a loss of all or a substantial portion of such investment.**

**Unless you fully understand and accept the nature of the Company and the potential risks inherent in this Company you should not invest in the Company.**

This Offering Memorandum is dated November 15, 2017.

## IMPORTANT NOTICES

**Investors should rely only on the information contained in this Offering Memorandum. No person has been authorised to give any information or to make any representations in connection with the Placing other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied upon as having been authorised by or on behalf of the Company. Neither the delivery of this Offering Memorandum nor any subscription or sale made under this Offering Memorandum shall, under any circumstances, create any implication that there has been no change in the business or affairs of the Company since the date of this Offering Memorandum or that the information contained in this Offering Memorandum is correct as of any time subsequent to its date.**

The contents of this Offering Memorandum are not to be construed as legal, financial, business, investment or tax advice. Each prospective investor should consult his or her own legal adviser, financial adviser or tax adviser for legal, financial or tax advice in relation to any purchase or proposed purchase of Placing Shares.

An investment in the Placing Shares is suitable only for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who are capable of evaluating the merits and risks of such an investment and/or who have received advice from their fund manager or broker regarding such an investment and who have sufficient resources to be able to bear losses (which may equal the whole amount invested) that may result from such an investment. An investment in the Placing Shares should constitute part of a diversified investment portfolio. Accordingly, typical investors in the Company are expected to be institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved. Investors who purchase Placing Shares will be deemed to have acknowledged that no person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been authorised by the Company.

**General**

Prospective investors should not treat the contents of this Offering Memorandum as advice relating to legal, taxation, investment or any other matters. Prospective investors should inform themselves as to: (a) the legal requirements within their own countries for the purchase, holding, transfer, redemption or other disposal of Placing Shares; (b) any foreign exchange restrictions applicable to the purchase, holding, transfer, redemption or other disposal of Placing Shares which they might encounter; and (c) the income and other tax consequences which may apply in their own countries as a result of the purchase, holding, transfer, redemption or other disposal of Placing Shares. Prospective investors must rely on their own representatives, including their own legal advisers, financial advisers and accountants, as to legal, tax, investment or any other related matters concerning the Company and an investment therein.

Statements made in this Offering Memorandum are based on the law and practice currently in force and are subject to changes therein. This Offering Memorandum should be read in its entirety before making any application for Placing Shares.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

All times and dates referred to in this Offering Memorandum are, unless otherwise stated, references to Guernsey times and dates and are subject to change without further notice.

006221

**Capitalised terms contained in this Offering Memorandum shall have the meanings set out in the Offering memorandum and/or in the section of this Offering Memorandum entitled "*Definitions*", save where the context indicates otherwise.**

**Restrictions on distribution and sale**

The distribution of this Offering Memorandum and the offering and sale of securities offered hereby in certain jurisdictions may be restricted by law. Persons in possession of this Offering Memorandum are required to inform themselves about and observe any such restrictions. This Offering Memorandum may not be used for, or in connection with, and does not constitute, any offer to sell, or solicitation to purchase, any such securities in any jurisdiction in which solicitation would be unlawful.

**For a description of restrictions on offers, sales and transfers of Shares, please refer to the sections of this Offering Memorandum entitled "*Selling restrictions*" below and "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*". Save as set out in these sections, there are no restrictions on the transfer of Shares under the Articles.**

**Forward-looking statements**

This Offering Memorandum includes statements that are, or may be deemed to be, "forward-looking statements". These forward-looking statements can be identified by the use of forward-looking terminology, including the terms "believes", "estimates", "anticipates", "expects", "intends", "plans", "projects", "targets", "aims", "may", "will" or "should" or, in each case, their negative or other variations or comparable terminology. These forward-looking statements include all matters that are not historical facts. They appear in a number of places throughout this Offering Memorandum and include statements regarding the intentions, beliefs or current expectations of the Company concerning, amongst other things, the investment objective and investment policy, investment strategy, financing strategies, investment performance, results of operations, financial condition, prospects, and dividend/distribution policy of the Company, and the markets in which the Company, and their respective portfolios of investments, invest and/or operate. By their nature, forward-looking statements involve risks (including those set out in the section of this Offering Memorandum entitled "*Risk Factors*") and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. Forward-looking statements are not guarantees of future performance. The Company's actual investment performance, results of operations, financial condition, dividend policy and the development of its investment strategy financing strategies may differ materially from the impression created by the forward-looking statements contained in this Offering Memorandum. In addition, even if the investment performance, results of operations, financial condition of the Company, and the development of its financing strategies, are consistent with the forward-looking statements contained in this Offering Memorandum, those results or developments may not be indicative of results or developments in subsequent periods. Important factors that could cause these differences include, but are not limited to:

- changes in economic conditions generally and the Company's ability to achieve its investment objective and target returns and target dividends for investors;

- the ability of the Company to invest the cash on its balance sheet and the proceeds of the Placing on a timely basis within the investment objective and investment policy;

- foreign exchange mismatches with respect to exposed assets;

- changes in the interest rates and/or credit spreads, as well as the success of the Company's investment strategy in relation to such changes and the management of the un-invested proceeds of the Placing;

- impairments in the value of the investments;

- the availability and cost of capital for future investments;

- the departure of key personnel employed by the Portfolio Manager;

006222

- changes in laws or regulations, including tax laws, or new interpretations or applications of laws and regulations, that are applicable to the Company; and

- general economic trends and other external factors, including those resulting from war, incidents of terrorism or responses to such events.

Given these uncertainties, prospective investors are cautioned not to place any undue reliance on such forward-looking statements. Prospective investors should carefully review the "*Risk Factors*" section of this Offering Memorandum before making an investment decision. Forward-looking statements speak only as at the date of this Offering Memorandum. Although the Company undertakes no obligation to revise or update any forward-looking statements contained herein (save where required by the Offering Memorandum Rules), whether as a result of new information, future events, conditions or circumstances, any change in the Company's expectations with regard thereto or otherwise, prospective investors are advised to consult any communications made directly to them by the Company and/or any additional disclosures through announcements that the Company may make through a website to be created or through the Administrator.

**Selling Restrictions**

**This Offering Memorandum does not constitute, and may not be used for the purposes of, an offer or an invitation to apply for any Placing Shares by any person: (i) in any jurisdiction in which such offer or invitation is not authorised; or (ii) in any jurisdiction in which the person making such offer or invitation is not qualified to do so; or (iii) to any person to whom it is unlawful to make such offer or invitation. The distribution of this Offering Memorandum and the offering of Placing Shares in certain jurisdictions may be restricted. Accordingly, persons into whose possession this Offering Memorandum comes are required to inform themselves about and observe any restrictions as to the offer or sale of Placing Shares and the distribution of this Offering Memorandum under the laws and regulations of any jurisdiction in connection with any applications for Placing Shares, including obtaining any requisite governmental or other consent and observing any other formality prescribed in such jurisdiction.**

*Bailiwick of Guernsey*

The Company has been established in Guernsey as a registered collective investment scheme under the RCIS Rules.

Further information in relation to the regulatory treatment of registered closed-ended investment funds domiciled in Guernsey may be found on the website of the Guernsey Financial Services Commission at www.gfsc.gg.

This Offering Memorandum is prepared, and a copy of it has been sent to the Guernsey Financial Services Commission, in accordance with the RCIS Rules.

The Commission takes no responsibility for the financial soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

The applicant is strongly recommended to read and consider this Offering Memorandum before completing an application.

This Offering Memorandum has not been approved by the GFSC and neither the GFSC nor the States of Guernsey Policy Council takes any responsibility for the financial soundness of the Company or for the correctness of any of the statements made or opinions expressed with regard to it.

*European Economic Area*

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), no Placing Shares have been offered or will be offered pursuant to the Placing to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Placing Shares which has been approved by the competent authority in that Relevant Member State, or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that offers of Placing Shares to the public may be made at any time

006223

under the following exemptions under the Prospectus Directive, if they are implemented in that Relevant Member State:

(a)    to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)    to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) in such Relevant Member State; or

(c)    in any other circumstances falling within Article 3(2) of the Prospectus Directive,

**provided that** no such offer of Placing Shares shall result in a requirement for the publication of a prospectus pursuant to Article 3 of the Prospectus Directive or a supplemental prospectus pursuant to Article 16 of the Prospectus Directive or any measure implementing the Prospectus Directive in a Relevant Member State and each person who initially acquires any Placing Shares or to whom any offer is made under the Placing will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purposes of this provision, the expression an "**offer to the public**" in relation to any offer of Placing Shares in any Relevant Member State means a communication in any form and by any means presenting sufficient information on the terms of the offer and any Placing Shares to be offered so as to enable an investor to decide to purchase or subscribe for the Placing Shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "**Prospectus Directive**" means Directive 2003/71/EC (and the amendments thereto, including 2010 PD Amending Directive, to the extent implemented in the Relevant Member State) and includes any relevant implementing measure in each Relevant Member State and the expression "**2010 PD Amending Directive**" means Directive 2010/73/EU.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions.

The Company is an alternative investment fund for the purpose of the AIFMD. The Placing Shares may only be marketed to prospective investors which are domiciled or have a registered office in a member state of the European Economic Area ("**EEA Persons**") in which marketing has been registered or authorised (as applicable) under the relevant national implementation of Article 42 of AIFMD and in such cases only to EEA Persons which are Professional Investors or any other category of person to which such marketing is permitted under the national laws of such member state.

This Offering Memorandum is not intended for, should not be relied on by and should not be construed as an offer (or any other form of marketing) to any other EEA Person.

A "Professional Investor" is an investor who is considered to be a professional client or who may, on request, be treated as a professional client within the relevant national implementation of Annex II of Directive 2004/39/EC (Markets in Financial Instruments Directive) and the AIFMD.

Each EEA Person who initially acquires Placing Shares or to whom any offer is made will be deemed to have represented, warranted to and agreed with the entity placing such shares and the Company that (a) it is a "qualified investor" within the meaning of the law in that relevant member state implementing Article 2.1(e) of the Prospectus Directive and (b) , that it is a Professional Investor or other person to whom Placing Shares in the Company may lawfully be marketed under the AIFMD or under the national laws of that relevant member state.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions

*Switzerland*

This Offering Memorandum may only be freely circulated and Shares in the Company may only be freely offered, distributed or sold to regulated financial intermediaries such as banks, securities dealers, fund management companies,

006224

asset managers of collective investment schemes and central banks as well as to regulated insurance companies. Circulating this Offering Memorandum and offering, distributing or selling Shares in the Company to other persons or entities including qualified investors as defined in the Federal Act on Collective Investment Schemes ("**CISA**") and its implementing Ordinance ("**CISO**") may trigger, in particular, (i) licensing/prudential supervision requirements for the distributor, (ii) a requirement to appoint a representative and paying agent in Switzerland and (iii) the necessity of a written distribution agreement between the representative in Switzerland and the distributor. Accordingly, legal advice should be sought before providing this Offering Memorandum to and offering, distributing, selling or on-selling Shares of the Company to any other persons or entities. This Offering Memorandum does not constitute an issuance prospectus pursuant to Articles 652a or 1156 of the Swiss Code of Obligations and may not comply with the information standards required thereunder. The Shares will not be listed on the SIX Swiss Exchange, and consequently, the information presented in this document does not necessarily comply with the information standards set out in the relevant listing rules. The documentation of the Company has not been and will not be approved, and may not be able to be approved, by the Swiss Financial Market Supervisory Authority ("**FINMA**") under the CISA. Therefore, investors do not benefit from protection under the CISA or supervision by the FINMA. This Offering Memorandum does not constitute investment advice. It may only be used by those persons to whom it has been handed out in connection with the Shares and may neither be copied or directly/indirectly distributed or made available to other persons.

### *United States*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States. There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, prospective investors should note that, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by: (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

If 25 per cent or more of any class of equity in the Company is owned, directly or indirectly, by U.S. Plan Investors that are subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, the assets of the Company will be deemed to be "plan assets", subject to the constraints of ERISA and Section 4975 of the U.S. Tax Code. This would result, among other things, in: (i) the application of the prudence and fiduciary responsibilities standards of ERISA to investments made by the Company, and (ii) the possibility that certain transactions that the Company and its subsidiaries might enter into, or may have entered into in the ordinary course of business, might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA and/or Section 4975 of the U.S. Tax Code and might have to be rescinded. A non-exempt prohibited transaction may also result in the imposition of an excise tax under the U.S. Tax Code upon a "party in interest" (as defined in ERISA) or "disqualified person" (as defined in the U.S. Tax Code), with whom a plan engages in the transaction. The Company will use commercially reasonable efforts to restrict ownership by U.S. Plan Investors of equity in the Company. However, no assurance can be given that investment by U.S. Plan Investors will not exceed 25 per cent or more of any class of equity in the Company.

For a description of restrictions on offers, sales and transfers of Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

006225

**TABLE OF CONTENTS**

Page

IMPORTANT NOTICES. ........................................................................................................................... i
SUMMARY. ............................................................................................................................................. 1
RISK FACTORS. ...................................................................................................................................... 19
COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY ......................................... 48
THE CURRENT CLO PORTFOLIO. ...................................................................................................... 55
MARKET OPPORTUNITY. ..................................................................................................................... 56
INVESTMENT PROCESS ........................................................................................................................ 57
COMPANY DIRECTORS AND ADMINISTRATION. ........................................................................... 61
PLACING ARRANGEMENTS. ................................................................................................................ 65
TAXATION. ............................................................................................................................................. 70
SHAREHOLDERS OF THE COMPANY. ................................................................................................ 75
ADDITIONAL INFORMATION ON THE COMPANY. .......................................................................... 76
TERMS AND CONDITIONS OF THE PLACING. .................................................................................. 100
PLACING STATISTICS ........................................................................................................................... 105
DEFINITIONS. ......................................................................................................................................... 106
DIRECTORS, ADVISERS AND SERVICE PROVIDERS. ..................................................................... 113

006226

## SUMMARY

The following is an overview of the transaction structure and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and related documents referred to herein. Capitalised terms not specifically defined in this Offering Memorandum have the meanings set out in the section of this Offering Memorandum entitled "*Definitions*" below. For a discussion of certain risk factors to be considered in connection with an investment in the Shares, see "*Risk Factors*".

|  |  |
|---|---|
| **The Company:** | Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") is a closed-ended investment company limited by shares incorporated on 30 March 2015 under the laws of Guernsey with registered number 60120.  The Company changed its name from Acis Loan Funding, Ltd. to Highland CLO Funding, Ltd. on October 27, 2017. |

The Company holds a partial, indirect ownership in Highland CLO Management, LLC ("**Highland CLO Management**"), a Delaware series limited liability company established to manage Highland CLOs, act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and as an "originator" for purposes of EU Retention Requirements and to hold with respect to Highland CLOs the required risk retention interests required under, and in accordance with, the U.S. Retention Rules and/or the EU Retention Requirements, as applicable (such interests with respect to any CLO, the applicable "**Retention Interest**"). Highland CLO Management is also partly held (on an indirect basis through Highland HCF Advisor) by Highland Capital Management, L.P. ("**Highland**"), a Delaware limited partnership, which controls the major economic decisions of Highland CLO Management.

The Company holds a partial, indirect ownership in ACIS CLO Management, LLC ("**Acis CLO Management**" and together with Highland CLO Management, the "**Management Companies**" and each, a "**Management Company**"), a Delaware series limited liability company established to manage Acis CLO 2017-7, Ltd. ("**Acis CLO 7**"), act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and to hold the Retention Interests with respect to Acis CLO 7 required under, and in accordance with, the U.S. Retention Rules. Acis CLO Management is also partly held (on an indirect basis) by Acis Capital Management, L.P. ("**Acis**"), a Delaware limited partnership, which controls the major economic decisions of Acis CLO Management.

Each of Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules.

| **Investment Objective:** | The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage, |

006227

including, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

**Investment policy:**    The Company's investment policy is to focus on synergistic investments in the following areas.

*Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's Investor Services, Inc. ("**Moody's**"), Standard & Poor's Financial Services LLC ("**S&P**") or Fitch Group, Inc. ("**Fitch**"). Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S or European originator subsidiary of the Company.  The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and (without limiting the foregoing):

-   Such loan is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

-   Such loan provides for a fixed amount of principal payable in cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price less than par;

-   Such loan is not an obligation issued by Highland, any of its controlled affiliates that are investment funds or any other investment fund whose investments are primarily managed by Highland or any affiliate or company that is controlled by Highland, an affiliate thereof, or an account, fund, client or portfolio established and controlled by Highland or an affiliate thereof (a "**Related Obligation**");

-   Such loan is neither an equity security nor by its terms is convertible into or exchangeable for an equity security and does not include an attached warrant to purchase equity securities;

-   Such loan is not a bridge loan; and

006228

- Such loan is not a zero coupon loan.

### *Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager.  In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements.  As a result, Highland CLO Management will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially.  In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO such that the required percentage of the total securitised exposures held by the CLO issuer will have come from Highland CLO Management (collectively, the "**Origination Requirements**").

### *CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Acis CLO 7, Highland CLOs, CLOs where Acis is the CLO Manager, ("**Acis Legacy CLOs**"), CLOs where Highland is the CLO Manager, ("**Highland Legacy CLOs**" and together with the Highland CLOs, Acis CLO 7 and the Acis Legacy CLOs, the "**Managed CLOs**") or CLOs managed by other asset managers.

With respect to each such investment, Highland CLO Management, and Acis CLO Management with respect to Acis CLO 7, will acquire the percentages and tranches of CLO Notes necessary to enable the related CLO to meet the U.S. Risk Retention Rules and, if applicable, the EU Retention Requirements.

With respect to any such investments in Highland CLOs where Highland CLO Management acts as CLO Manager, it is expected that Highland CLO Management will be a "relying adviser" of Highland.  With respect to Acis CLO 7, Acis CLO Management is a "relying adviser" of Acis. It is further expected that Highland or Acis, as applicable, will act as a "sponsor" of such Managed CLOs for purposes of the U.S. Risk Retention Rules and will treat the applicable Management Company as its "majority-owned affiliate" under the U.S. Risk Retention Rules.  All management and incentive fees received from such Managed CLO will be paid to the applicable Management Company pursuant to the relevant portfolio management agreement, which will then pay the majority of such fees to Highland or Acis, as applicable, in its roles as Staff and Services Provider and as Sub-Advisor.  The applicable Management Company may also seek to act as "originator" for purposes of the EU Retention Requirements with respect to such Managed CLOs as described above.

Each CLO in which the Company directly or indirectly holds CLO Notes will have its own eligibility criteria and portfolio limits.  These limits are designed to ensure the portfolio of loans within the CLO meets a prescribed level of diversity and quality as set by the relevant rating agencies rating securities issued by such CLO.  The applicable CLO Manager, including Highland CLO Management with respect to new Highland CLOs or Acis CLO Management with respect to Acis CLO 7, intends to identify and actively manage loans

006229

which meet those criteria and limits within each CLO.  The eligibility criteria and portfolio limits within a CLO will typically include the following required criteria and may include some or all of the following expected criteria:

- a limit on the weighted average life of the portfolio;

- a limit on the weighted average rating of the portfolio;

- a limit on the maximum amount of portfolio assets with a rating lower than B-/B3/B-; and

- a limit on the minimum diversity of the portfolio.

- a limit on the minimum weighted average of the prescribed rating agency recovery rate;

- a limit on the minimum amount of senior secured assets;

- a limit on the maximum aggregate exposure to second lien loans, high yield bonds, mezzanine loans and unsecured loans;

- a limit on the maximum portfolio exposure to covenant-lite loans;

- an exclusion of project finance loans;

- an exclusion of structured finance securities;

- an exclusion on investing in the debt of companies domiciled in countries with a local currency sub investment grade rating; and

- an exclusion of leases.

The above are not intended to be an exhaustive list of the eligibility criteria and portfolio limits within a typical CLO and the inclusion or exclusion of such limits and their absolute levels are subject to change depending on market conditions.

### Act as Risk Retention Provider

The Company may also invest in, provide loans to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy the U.S. Risk Retention Rules or EU Retention Requirements.

### Allocation of Investment Opportunities

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and other clients, including other investment funds and client accounts, including those which follow an investment program substantially similar to that of the Business (such other clients, funds and accounts, collectively, the "**Other Accounts**"). For the avoidance of doubt, the Portfolio

Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time.  *See* "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*".

**Investment Restrictions:** During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs. A "**Qualifying CLO**" is a Highland CLO (a) pursuant to which Highland, the Portfolio Manager, Highland CLO Management or any of its affiliates does not charge subordinate management fees in excess of 0.00%, senior management fees in excess of 0.15% or incentive management fees in excess of 0.00% and (b) which does not have a reinvestment period longer than 5 years; *provided* that, if the Portfolio Manager has provided reasonable evidence to the Advisory Board that a substantial portion of new issue CLOs have reinvestment periods longer than 5 years (the "**RP Condition**"), the consent of the Advisory Board to invest in any Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in a refinancing or "reset" with respect to the following CLOs (which may extend the re-investment period and/or term of such CLOs, subject to the proviso below) managed by Highland affiliates (the "**Designated CLO Resets**"):

Acis CLO 2013-1, Ltd.
Acis CLO 2014-3, Ltd.
Acis CLO 2014-4, Ltd.
Acis CLO 2014-5, Ltd.
Acis CLO 2015-6, Ltd.

provided that, with respect to Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd. and Acis CLO 2014-5, Ltd., any such Designated CLO Reset may not extend the re-investment period beyond 2.25 years of the date of such Designated CLO Reset.

During the Investment Period, the Company shall be permitted to invest in a refinancing with respect to Acis CLO 7 (which may not extend the re-investment period or term of such CLO) (the "**Designated CLO Refinancing**").

For the avoidance of doubt, following the expiration of the Investment Period, the Company shall not consummate an investment in any "reset" with respect to CLO Income Notes held by the Company. In addition, the Company shall not permit a reset with respect to any CLO Income Notes of Managed CLOs

006231

that it holds, unless such CLO Income Notes of Managed CLOs are fully redeemed.

The Company shall not invest in the CLO Income Notes of a new issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

### *Indirect Actions*

Neither the Portfolio Manager nor the Company may take any action indirectly through controlled subsidiaries that either the Portfolio Manager or the Company is not permitted to undertake directly as set forth herein.

**Borrowing:**  It is expected that the Company will have access to one or more committed credit facilities and will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or other assets. Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

### *Borrowing Limits*

Notwithstanding the foregoing or anything to the contrary set forth herein, as of the time any such debt is incurred, the Company's maximum gross leverage exposure (excluding the Warehouse Loan Facilities) pursuant to (a) committed secured loan facilities and any other borrowing (other than described in clause (b)) shall not exceed (i) during the Investment Period, the greater of (x) 15% of the Company's gross asset value and (y) $50,000,000 and (ii) after the Investment Period, 15% of the Company's gross asset value, and (b) repurchase agreements shall not exceed 75% of the Company's gross asset value.

For purposes of the limits regarding repurchase agreements set forth in clause (b) above, the "gross asset value" of the Company shall exclude financing for CLO Notes held by a Management Company as part of a "vertical" Retention Interest (including for the Designated CLO Resets), the NexBank Credit Facility, any Warehouse Loan Facilities and cash equivalents.

### *Warehouse Loan Facilities*

One or more multi-currency warehouse lending facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider (the "**Warehouse Loan Facilities**"), pursuant to which the Company is able to draw multi-currency loans from time to time in order to purchase assets for its portfolio. The Warehouse Loan Facilities will be entered into on market standard terms, as negotiated between the Company and the relevant warehouse provider in each case and will include a senior security package in favour of the warehouse provider.

### *Hedging and Derivatives*

006232

Without the consent of the Advisory Board, the Company may only use hedging or derivatives to hedge investments consistent with the Company's investment objectives, and not for speculative purposes.

*Repurchase Agreements*

The Company may not use repurchase agreements to finance the purchase of CLO Income Notes, however, the Company may pledge any already owned CLO Income Notes as additional collateral under repurchase agreements.

*Revolving Credit Facility*

The Company may enter into a secured revolving credit facility with a committed amount of $50,000,000 for working capital purposes (a "**Revolving Credit Facility**")

*NexBank Credit Facility*

The Company currently has a secured term credit facility provided by NexBank SSB, a Texas savings bank, with a principal amount of $22,158,337, as of September 30, 2017 (the "**NexBank Credit Facility**"). The Company may, from time to time, increase its borrowing under the NexBank Credit Facility up to a maximum principal amount of $30,000,000 at any time without the consent of the Advisory Board, but subject to the limitations set forth above in "—*Borrowing Limits*". The terms of the NexBank Credit Facility, and of any increase in the principal amount thereto, shall be at or better than market standard terms and shall be promptly disclosed to the Advisory Board (any such amended terms, the "**Permitted NexBank Credit Facility Amendments**").

**Advisory Board:**    The Company shall form and assemble an advisory board (the "**Advisory Board**") composed of individuals who shall be representatives of certain Shareholders selected by the Portfolio Manager in its sole discretion in order to (a) provide advice to the Portfolio Manager with respect to certain issues involving conflicts of interest in any transaction or relationship between the Company and the Portfolio Manager or any of its employees or affiliates that are presented to the Advisory Board by the Portfolio Manager, and (b) be required to approve the following actions:

-   Any extension of the Investment Period;

-   Any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board);

-   Any allotment of additional equity securities by the Company; and

-   Any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its affiliates, on the other hand.

Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into

006233

new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments.

No voting member of the Advisory Board shall be a controlled affiliate of Highland, it being understood that none of CLO Holdco, Ltd., its wholly-owned subsidiaries or any of their respective directors or trustees shall be deemed to be a controlled affiliate of Highland due to their pre-existing non-discretionary advisory relationship with Highland.

Each member of the Advisory Board shall owe no fiduciary or other duties to the Company or the shareholders and may act solely in the interest of the shareholder that it represents.

Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an affiliate of the Company, the Portfolio Manager or Highland solely by reason of such appointment.

| | |
|---|---|
| **Investment Period:** | The Company's assets may be invested and, subject to the terms and conditions set forth in the "*Dividend Policy*" section below, reinvested for a period commencing on the Closing Date of the Placing and ending on April 30, 2020 (the "**Investment Period**"), subject to two additional one-year extensions with the consent of the Advisory Board (as hereinafter defined) and the Portfolio Manager; provided that the Term will automatically be extended by an identical length of time in the event of an extension of the Investment Period. |

*Termination of Investment Period following Key Person Event*

The Portfolio Manager will promptly provide each Shareholder with written notice in the event that any two of James Dondero, Mark Okada, Trey Parker or Hunter Covitz (collectively, the "**Key Persons**") cease to devote such time to the affairs of the Company as is sufficient to effectively manage the operations of the Company (a "**Key Person Event**"), as determined by the Portfolio Manager in its reasonable discretion, taking into account such factors as it shall deem relevant in its reasonable discretion. The Portfolio Manager will promptly provide each Shareholder with written notice in the event of the termination of employment of any Key Person.

The Investment Period will be terminated immediately upon a Key Person Event. The Investment Period shall resume in the event that (i) the Portfolio Manager obtains or receives notice of the written election or vote of the Advisory Board to reinstate the Investment Period, or (ii) one or more Qualified Replacements (as defined below) are appointed in place of (or in addition to) the then existing Key Persons to cure the Key Person Event, in which event the Investment Period will continue until its termination as otherwise described herein without further regard to such Key Person Event.

For purposes of this Offering Memorandum, a "**Qualified Replacement**" means a person nominated by the Portfolio Manager and approved by the Advisory Board, such approval not to be unreasonably withheld, conditioned or delayed, as a replacement for any existing Key Person or as an additional Key Person; provided that the Advisory Board will provide notice of its

006234

approval or disapproval of any person nominated to be a Qualified Replacement within 10 business days of such nomination.

For the avoidance of doubt, during any cessation of the Investment Period following a Key Person Event, (i) the Portfolio Manager may continue to require Placees to purchase Shares pursuant to the subscription and transfer agreement to fund (a) any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities) or (b) the completion, no later than 180 days after the expiration of the Investment Period, new issue Highland CLOs that were in process at the time of such Key Person Event and (ii) the Company shall not receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs until the Investment Period resumes.

**Term:**

The term of the Company will end (and the Company thereafter will be wound up and dissolved) on the ten-year anniversary of the date of the Placing (the "**Term**"), subject to (a) automatic extension in the event of an extension of the Investment Period and (b) two additional one-year extension with the consent of the Portfolio Manager and the Advisory Board, or such earlier date after the end of the Investment Period on which the Portfolio Manager determines to terminate and wind up the Company following the receipt by the Company of all amounts reasonably expected by the Portfolio Manager to be received with respect to the Company's assets or the sale thereof during the term and in a manner that will not cause the Company, the Portfolio Manager, Highland, Acis, the Management Companies or any subsidiary thereof to violate any applicable law or contract.

The Company has been established as a closed-ended vehicle. Accordingly, there is no right or entitlement attaching to Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

**Placing Arrangements – Investment Period Subscription Commitment:**

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of up to approximately U.S. $153 million.

Placees will commit under a subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period. The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

006235

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.  Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the NAV of the Company as of September 30, 2017, adjusted with respect to a dividend of $9,000,000 on October 10, 2017, and a buyback of the Shares of Acis Capital Management, L.P. on October 24, 2017 (the "**Adjusted NAV**") such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on *pro rata* basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

|                              |                                                                                                                                                                                                                                                                                                             |
| ---------------------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Regulatory status:**       | The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120.  The Company is regulated by the GFSC, and is not regulated by any regulator other than the GFSC.       |
| **Typical investors:**       | Investment in the Company is only suitable for Professional Investors as defined in the AIFMD and any other person to whom the Placing Shares may be lawfully offered.                                                                                                                                        |
| **Applicant's service providers:** | *Portfolio Manager*                                                                                                                                                                                                                                                                                  |

Highland HCF Advisor, Ltd. ("**Highland HCF Advisor**") has been appointed as the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement.  In that capacity, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the origination and ongoing management of the portfolio by the Company.  Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by

006236

the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Manager has entered into a Master Sub-Advisory Agreement (the "**HCF Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCF Staff and Services Agreement**", together with the Sub-Advisory Agreement, the "**HCF Services Agreements**") with Highland Capital Management, L.P. under which Highland Capital Management, L.P. provides investment research and recommendations and operational support to the Portfolio Manager, including services that may be used in connection with the Portfolio Manager's recommendations regarding the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services.

Highland CLO Management has a Master Sub-Advisory Agreement (the "**HCLOM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCLOM Staff and Services Agreement**", together with the HCLOM Sub-Advisory Agreement, the "**HCLOM Services Agreements**") in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Highland CLOs for which Highland CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by the Highland CLO Management, and certain loan services and administrative services.

Acis (an affiliate of Highland) has entered into a Master Sub-Advisory Agreement (the "**ACM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**ACM Staff and Services Agreement**", together with the ACM Sub-Advisory Agreement, the "**ACM Services Agreements**") with Highland under which Highland provides investment research and recommendations and operational support to Acis, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLOs for which Acis acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by Acis, and certain loan services and administrative services.

Acis CLO Management has entered into a Master Sub-Advisory Agreement (the "**ACLOM Sub-Advisory Agreement**", and together with the HCF Sub-Advisory Agreement, the HCLOM Sub-Advisory Agreement and the ACM Sub-Advisory Agreement, the "**Sub-Advisory Agreements**") and a Staff and Services Agreement (the "**ACLOM Staff and Services Agreement**", and the ACLOM Staff and Services Agreement together with the HCF Staff and Services Agreement, the HCLOM Staff and Services Agreement and the ACM Staff and Services Agreement, the "**Staff and Services Agreements**", and the ACLOM Staff and Services Agreement together with the ACLOM Sub-Advisory Agreement, the "**ACLOM Services Agreements**" and the ACLOM Services Agreements with the HCF Services Agreements, the HCLOM Services Agreements and the ACM Services Agreements, the "**Services Agreements**") in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLO 7 for which Acis CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the

006237

execution of investment transactions approved by Acis CLO Management, and certain loan services and administrative services.

No management fees will be payable by the Company pursuant to any Services Agreement; it being understood that each of the Management Companies will pay (i) eleven-fifteenths (11/15ths) of the total 0.15% senior management fee received from Acis CLO 7 and the Highland CLOs to affiliates of Highland pursuant to the applicable Services Agreements, and (ii) following any Designated CLO Reset, a portion of the management fees received from any CLO subject to such Designated CLO Reset to affiliates of Highland pursuant to the applicable Services Agreements, other than an amount equivalent to a senior management fee of 0.04%.

*Administrator*

State Street (Guernsey) Limited has been appointed as administrator to the Company pursuant to the Administration Agreement. In such capacity, the Administrator is responsible for the day-to-day administration of the Company. Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company calculated and payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

**Operating Expenses:** Except as provided below, the Portfolio Manager will pay all of its own Overhead without reimbursement by the Company.

Subject to the following paragraph, the Company shall pay or reimburse the Portfolio Manager and its affiliates for all Operating Expenses. See "Company Directors and Administration—The Portfolio Manager—Highland Fees".

**Exculpation:** The Portfolio Manager will assume no responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager.

The Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (e.g., executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") will incur no liability to the Company or any Shareholder in the absence of a finding by any court or governmental body of competent jurisdiction in a final, non-appealable judgment that the commission by such person of an action, or the omission by such person to take an action, constitutes bad faith, gross

006238

negligence or wilful misconduct (a "**Triggering Event**"), except as otherwise required by applicable law (including the Companies Law).  Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

|  |  |
|---|---|
| **Indemnification:** | To the fullest extent permitted by applicable law, the Company will be required to indemnify each Indemnified Person against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") incurred by such Indemnified Person or to which such Indemnified Person may be subject by reason of its activities in connection with the conduct of the business or affairs of the Company, unless such losses result from an Indemnified Person's Triggering Event. |

The Indemnified Persons shall be entitled to advancement of expenses as they are incurred in connection with the investigation, defence or resolution of any claim that may be subject to indemnification, subject to providing an undertaking to repay any amounts ultimately determined not to be subject to indemnification due to a Triggering Event.

Each member of the Advisory Board and each member of any subcommittee thereof and, solely in connection with matters relating to the Advisory Board or such subcommittee, the Shareholder and/or other person or entity on whose behalf such Advisory Board member or subcommittee member serves, will have the benefit of similar exculpation and indemnification rights unless it has not acted in good faith.

Notwithstanding the foregoing or anything to the contrary set forth herein, the Company will not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent that such liability may not be waived, modified or limited under applicable law.

Under the Companies Law, any indemnity provided (directly or indirectly) by the Company to a Director, or an associated company, or a body corporate which is an overseas company and a subsidiary of the company, against any liability attaching to him in connection with any negligence, default, breach of duty or breach of trust in relation to the Company is void, except in certain circumstances.

|  |  |
|---|---|
| **Regulatory status of Portfolio Manager:** | Highland HCF Advisor is a relying adviser of Highland Capital Management, L.P., an investment adviser registered under the Investment Advisers Act of 1940, as amended (the "**Investment Advisers Act**") and, as such, is subject to the provisions of the Investment Advisers Act. |
| **Regulatory status of Custodian:** | The Custodian of the Company is State Street Custodial Services (Ireland) Limited, which is authorised as an Investment Business Firm under Section |

006239

10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.

| | |
|---|---|
| **Calculation of Net Asset Value:** | The Company intends to publish the Net Asset Value per Share on a quarterly basis, within 15 Business Days following the relevant quarter-end. Notice will be provided by the Administrator by e-mail. |
| **Portfolio:** | The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts: |

| **Acis CLOs:** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |

| **Highland Legacy CLOs:** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

| **ACIS CLO Management** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| Acis CLO 7 | $17,850,000.00 |

| | |
|---|---|
| **Net Asset Value:** | As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13. |
| **Type and class of securities:** | The Shares being offered under the Placing are ordinary shares of no par value in the capital of the Company. |
| **Currency of the securities issue:** | U.S. Dollar |
| **Number of securities in issue:** | The issued share capital of the Company (all of which shares have been fully paid) as of the date of this Offering Memorandum consists of 143,454,001 million Shares.

There are no non-paid up Shares in issue. |
| **Description of the rights attaching to the securities:** | The holders of the Shares shall be entitled to receive, and to participate in, any dividends declared in relation to the Shares that they hold.

On a winding-up or a return of capital by the Company, the net assets of the Company attributable to the Shares shall be divided pro rata among the holders of the Shares. |

006240

The Shares shall carry the right to receive notice of, attend and vote at general meetings of the Company.

Unless otherwise authorised by a special resolution, the Company shall not allot equity securities on any terms unless the Company has first made an offer to each person who holds Shares to allot to him, on the same or more favourable terms, such proportion of those equity securities that is as nearly as practicable (fractions being disregarded) equal to the proportion held by the relevant person of the Shares.

| | |
|---|---|
| **Restrictions on the free transferability of the securities:** | The Company has elected to impose certain restrictions (pursuant to its Articles) on the Placing and on the future trading of the Shares so that the Company will not be required to register the offer and sale of the Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations.  These transfer restrictions, which will remain in effect until the Company determines in its sole discretion to remove them, may adversely affect the ability of Shareholders to trade the Shares.  Due to the restrictions described below, potential investors in the United States and U.S. Persons (including persons acting for the account or benefit of any U.S. Person) are advised to consult legal counsel prior to making any offer, resale, exercise, pledge or other transfer of the Shares. |

Subject to certain exceptions, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

| | |
|---|---|
| **Dividend policy:** | Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter.  During the Investment Period, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio in excess of the dividends paid to Shareholders as provided below will be reinvested by the Company with the objective of growing the NAV. |

During the Investment Period, on the 15th of February, May, August and November of each calendar year, beginning May 15, 2018 (each a "**Quarterly Dividend Date**"), after satisfaction of all expenses, debts, liabilities and obligations of the Company, the Company will pay a dividend to each Shareholder at a rate of at least 8% per annum, based on such Shareholder's aggregate capital contributions as of the prior Quarterly Dividend Date (the "**Target Dividend**").

Following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio will be distributed by the Company to the Shareholders as a dividend on each Quarterly Dividend Date in accordance with the distribution priority as follows (the "**Distribution Priority**"):

*First*, 100% to the Shareholders *pro rata* based on the number of Shares held until each Shareholder has received (i) pursuant to this clause (i), aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus (ii) an amount necessary for such Shareholder to

006241

receive a cumulative rate of return of 8.0% per annum, compounded annually, on such Shareholder's aggregate capital contributions;

*Second*, 100% to the Portfolio Manager until the Portfolio Manager has received aggregate distributions from the Company equal to 20% of the sum of all distributions made in excess of aggregate capital contributions made by Shareholders;

*Third*, 80% to the Shareholders *pro rata* based on the number of Shares held and 20% to the Portfolio Manager until each Shareholder has received aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus an amount necessary for such Shareholder to receive a cumulative rate of return of 16% per annum, compounded annually, on such Shareholder's aggregate capital contributions; and

*Thereafter*, 70% to the Shareholders *pro rata* based on the number of Shares held and 30% to the Portfolio Manager.

For purposes of this section, references herein to a "Shareholder" shall include Highland HCF Advisor in its capacity as a shareholder of the Company, if applicable, and references to "aggregate distributions" received by the "Portfolio Manager" shall not include any distributions received by Highland HCF Advisor in its capacity as a Shareholder.

| | |
|---|---|
| **The total net proceeds and an estimate of the total expenses of the issue/offer, including estimated expenses charged to the investor by the issuer or the offeror:** | The Net Placing Proceeds are expected to be approximately U.S. $153 million.<br><br>The initial expenses of the Company are those which are necessary for the Placing, and shall not exceed U.S. $750,000. These expenses will be paid on or around the Placing and will include, without limitation: the cost of settlement and escrow arrangements; printing, advertising and distribution costs; legal fees; and any other applicable expenses. |
| **Reasons for the offer and use of proceeds:** | The Company is making the offer in order to raise the Net Placing Proceeds which will be invested in accordance with the Company's investment objective and policy, including its indirect investment in the Management Companies. |
| **Expenses related to the Placing:** | All costs associated with the Placing will be borne by the Company after the Placing and therefore the Net Placing Proceeds will be lower than the Gross Placing Proceeds immediately following the Placing. |
| **Ongoing annual expenses:** | The Company currently estimates that its total annual expenses for 2017 will be approximately $525,000 per annum, and will provide the Advisory Board with updated estimates and reasonable detail from time to time upon request. For the avoidance of doubt, except as expressly set forth in the section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*", the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent without reimbursement by the Company<br><br>These expenses will include the following:<br><br>*The Portfolio Manager, Highland, Acis and the Management Companies* |

006242

Please see below in section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*".

*Administrator*

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the agreement.

*Custodian*

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub custodian.  All such charges shall be charged at normal commercial rates.

*Directors*

The Directors are remunerated for their services at a fee of £35,000 per annum (£40,000 for the Chairman).  For more information in relation to the remuneration of the Directors, please refer to the section of this Offering Memorandum entitled "Memorandum and Articles" in "Additional Information on the Company".

*Operating Expenses*

All Operating Expenses shall be borne by the Company.  All reasonably and properly incurred out-of-pocket expenses of the Administrator, the Custodian, and the Directors relating to the Company are borne by the Company.

The amount of charges and expenses which are borne by an investor may vary from year to year.

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

|                                      |                                                                                                                                                                                        |
| ------------------------------------ | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Terms and conditions of the offer:** | An amount of Shares equal to U.S. $153 million are being marketed and are available for subscription of commitments under the Placing until the Closing Date. |

Shares will be issued under the Placing at a price per Share based on the most recent quarterly determined NAV of the Company.  The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.

Placees may acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

Placees may also enter into commitments to acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

The Placing is not being underwritten.

|                       |                                                                                                                                  |
| --------------------- | -------------------------------------------------------------------------------------------------------------------------------- |
| **Press Releases:**   | Neither the Portfolio Manager, the Company nor any Shareholder shall issue or approve any press release or other announcement referring to the identity |

006243

of a Shareholder without the prior written consent of the applicable Shareholder.

006244

# RISK FACTORS

**Investment in the Company should be regarded as long term in nature and involving a high degree of risk. Accordingly, prospective investors should consider carefully all of the information set out in this Offering Memorandum and the risks relating to the Company and the Shares including, in particular, the risks described below which are not presented in any order of priority and may not be an exhaustive list or explanation of all the risks which investors may face when making an investment in the Shares and should be used as guidance only.**

**Only those risks which are believed to be material and currently known to the Company in relation to itself and its industry as at the date of this Offering Memorandum have been disclosed. Additional risks and uncertainties not currently known, or deemed immaterial at the date of this Offering Memorandum, may also have an adverse effect on the business, results of operations, financial conditions and prospects of the Company and its net asset value. Potential investors should review this Offering Memorandum carefully and in its entirety and consult with their professional advisers before making an application to invest in the Shares.**

**Prospective investors should note that the risks relating to the Company and the Shares summarised in the section of this document headed "Summary" are the risks that the Directors believe to be the most essential to an assessment by a prospective investor of whether to consider an investment in the Shares. However, as the risks which the Company faces relate to events and depend on circumstances that may or may not occur in the future, prospective investors should consider not only the information on the key risks summarised in the section of this document headed "*Summary*" but also, among other things, the risks and uncertainties described below.**

## RISKS RELATING TO THE COMPANY

### *The Company is a recently incorporated company incorporated under the laws of Guernsey with limited history*

The Company was incorporated under the laws of Guernsey on 30 March 2015. It commenced operations after the initial Placing in August 2015. As the Company has a limited operating history, investors have limited information on which to evaluate the Company's ability to achieve its investment objective or implement its investment strategy and provide a satisfactory investment return. An investment in the Company is therefore subject to all the risks and uncertainties associated with a recently formed business, including the risk that the Company will not achieve its investment objective and that the value of an investment in the Company could decline substantially as a consequence. Any failure by the Company to do so may adversely affect its business, financial condition, results of operations and/or its NAV.

The Company's returns and operating cash flows depend on many factors, including the price and performance of the investments, the availability and liquidity of investment opportunities falling within the Company's investment objective and policy, the level and volatility of interest rates, readily accessible short-term borrowings, the conditions in the financial markets and economy, the financial performance of obligors under the investments and the Company's ability successfully to operate its business and execute its investment strategy. There can be no assurance that the Company's investment strategy will be successful.

### *The Company's target return and target dividend yield are based on estimates and assumptions that are inherently subject to significant business and economic uncertainties and contingencies, and the actual return and dividend yield may be materially lower than the target return and target dividend yield and could be negative*

The Company's target return and target dividend yield set forth in this Offering Memorandum are targets only and are based on estimates and assumptions concerning the performance of its investment portfolio which will be subject to a variety of factors including, without limitation, the availability of investment opportunities, asset mix, value, volatility, holding periods, performance of underlying portfolio debt issuers, investment liquidity, borrower default, changes in current market conditions, interest rates, government regulations or other policies, the worldwide economic environment, changes in law and taxation, natural disasters, terrorism, social unrest and civil disturbances or the occurrence of risks described elsewhere in this Offering Memorandum, which are inherently subject to significant business, economic and market uncertainties and contingencies, all of which are beyond the control of the Company and which may adversely affect the Company's ability to achieve its target return and target dividend yield. Such

006245

targets are based on market conditions and the economic environment at the time of assessing the proposed targets and the assumption that the Company will be able to implement its investment policy and strategy successfully, and are therefore subject to change.  There is no guarantee or assurance that the target return and/or target dividend yield can be achieved at or near the levels set forth in this Offering Memorandum.  Accordingly, the Company's actual rate of return and actual dividend yield achieved may be materially lower than the targets, or may result in a loss.  A failure to achieve the target return and/or target dividend yield set forth in this Offering Memorandum may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

An investment in the Company will be a speculative investment of a long-term nature and involving a high degree of risk.  Shareholders could lose all or a substantial portion of their investment in the Company.  Shareholders must have the financial ability, sophistication, experience and willingness to bear the risks of an investment in the Company.

***Material changes affecting global debt and equity capital markets may have a negative effect on the Company's business, financial condition, results of operations, and/or its NAV***

The global financial markets have experienced extreme volatility and disruption in recent years, as evidenced by a lack of liquidity in the equity and debt capital markets, significant write-offs in the financial services sector, the repricing of credit risk in the credit market and the failure of major financial institutions.  Despite actions of governmental authorities, these events contributed to general economic conditions that have materially and adversely affected the broader financial and credit markets and reduced, and in certain circumstances, significantly reduced, the availability of debt and equity capital.

Further, within the banking sector, the default of any institution could lead to defaults by other institutions.  Concerns about, or default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, because the commercial soundness of many financial institutions may be closely related as a result of their credit, trading, clearing or other relationships.  This risk is sometimes referred to as "systemic risk" and may adversely affect other third parties with whom the Company deals.  The Company may therefore be exposed to systemic risk when the Company deals with various third parties whose creditworthiness may be exposed to such systemic risk.

Recurring market deterioration may materially adversely affect the ability of an issuer whose debt obligations form part of the Company's portfolio, or an issuer whose debt obligations form part of a CLO in which the Company holds CLO Notes, to service its debts or refinance its outstanding debt.  Further, such financial market disruptions may have a negative effect on the valuations of the investments (and, by extension, on the Company's NAV), and on the potential for liquidity events involving such investments.  In the future, non-performing assets in the Company's portfolio may cause the value of that portfolio to decrease (and, by extension and/or its the NAV to decrease).  Adverse economic conditions may also decrease the value of any security obtained in relation to any of the investments.

Conversely, in the event of sustained market improvement, the Company may have access to a reduced number of attractive potential investment opportunities, which also may result in limited returns to Shareholders.

***The Company's NAV is subject to valuation risk and the Company can provide no assurance that the NAVs it records from time to time will ultimately be realised***

The Company's NAV will be calculated by third parties and will be subject to valuation risk (see the risk factor entitled "*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*"). If a valuation estimate provided to the Company by a third party subsequently proves to be incorrect, no adjustment to any previously calculated NAV will be made.  Any acquisitions or disposals of Shares based on previous erroneous NAVs may result in losses for shareholders.

The investments held by the Company will be valued quarterly and the Company's Net Asset Value will be calculated based on these values.  Therefore, the actual value of the investments at any given time may be different from the value based on which the Company's latest Net Asset Value has been calculated.

Investors should note that where a loan becomes subject to a Forward Purchase Agreement (described further in the section of this Offering Memorandum entitled "*Additional Information on the Company*") the Company will (subject to certain conditions as set out in the section of this Offering Memorandum entitled "*Additional Information on the*

006246

*Company*") neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

***Each of the Company, the Portfolio Manager, Acis and the Management Companies is reliant on Highland (acting in its different capacities), asset management subsidiaries and other third party service providers to carry on their businesses and a failure by one or more service providers may materially disrupt the business of the Company and or the Management Companies***

The Company has no employees and its directors have all been appointed on a non-executive basis.  Highland HCF Advisor will, as part of the services to be provided under the terms of the Portfolio Management Agreement, be responsible for selecting the portfolio of investments and the acquisition, disposition or sale of investments and providing the Company with the necessary personnel, credit research and other resources to perform the functions necessary to the business of the Company.  In addition, Highland or its affiliates, including the Portfolio Manager, Acis or the Management Companies, may also act as CLO Manager in respect of the Managed CLOs from time to time.  The Company may also invest in, provide debt financing to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis, including the Management Companies, and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements.  Therefore, the Company is reliant upon the performance of Highland and/or its affiliates, asset management subsidiaries of the Company and other third party service providers for the performance of certain functions.

Highland CLO Management relies on Highland for access to its employees (which are shared with Highland). Acis CLO Management relies on Acis for access to its employees (which are shared with Acis).  Highland and Acis, as applicable, will, as part of the services to be provided under the terms of the Staff and Services Agreements, be responsible for providing the Company with the necessary credit research, back office and other resources to perform the functions necessary to the business of each of the Management Companies, including its management of CLOs. Therefore, each of the Management Companies is reliant upon the performance of Highland and Acis, as applicable, for the performance of essential functions, and may be unable to properly manage CLOs without the support of Highland or Acis, as applicable.

Failure by any service provider to carry out its obligations to the Company or the applicable Management Company in accordance with the applicable duty of care and skill, or at all, or termination of any such appointment may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

In the event that it is necessary for the Company or the applicable Management Company to replace any third party service provider, it may be that the transition process takes time, increases costs and may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

***The Shares will be subordinated to the rights of any secured Warehouse Loan Facility Provider or holder of any other future indebtedness or preference shares of the Company.***

The Company is permitted to issue preference shares and incur indebtedness, including secured debt in the form of one or more Warehouse Loan Facilities or other lending facilities.  Such preference shares and indebtedness will rank ahead of the Shares in respect of any distributions or payments by the Company to Shareholders.  In an enforcement scenario under any Warehouse Loan Facility, the provider(s) of such facilities will have the ability to enforce their security over the assets of the Company and to dispose of or liquidate (on their own behalf or through a security trustee or receiver) the assets of the Company in a manner which is beyond the control of the Company.  In such an enforcement scenario, there is no guarantee that there will be sufficient proceeds from the disposal or liquidation of the Company assets to repay any amounts due and payable on the Shares and this may adversely affect the performance of the Company's business, financial condition, results of operations and/or its NAV.

*Exculpation and Indemnification*

The Articles contain provisions that, subject to applicable law, reduce or modify the duties that the Indemnified Persons would otherwise owe to the Company and the Shareholders.  The Portfolio Manager will assume no

006247

responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager. Further, Indemnified Persons will incur no liability to the Company or any Shareholder in the absence of a Triggering Event, except as otherwise required by applicable law (including the Companies Law). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

Under the Articles, the Company, to the fullest extent permitted by applicable law (including the Companies Law), will indemnify each Indemnified Person against all Indemnified Losses to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

The fees, costs and expenses (whether or not advanced) and other liabilities resulting from the Company's indemnification obligations are generally operating expenses and will be paid by or otherwise satisfied out of the assets of the Company. The application of the foregoing standards may result in Shareholders having a more limited right of action in certain cases than they would in the absence of such standards. In particular, a "gross negligence" standard of care has been held in some jurisdictions to involve conduct that is closer to wilful misconduct. Even though such provisions in the Articles will not act as a waiver on the part of any Shareholder of any of its rights under applicable U.S. securities laws or other laws, the applicability of which is not permitted to be waived, the Company may bear significant financial losses even where such losses were caused by the negligence (even if heightened) of such Indemnified Persons.

## RISKS RELATING TO THE INVESTMENT STRATEGY

### *General Background relating to the United States and European Risk Retention Requirements*

Effective for CLOs on December 24, 2016, the so-called "risk retention" rules promulgated by U.S. federal regulators under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") require a "securitizer" or "sponsor" (which in the case of a CLO is considered the collateral manager) to retain directly or through a "majority-owned affiliate" at least 5% of the credit risk of the securitized assets. Highland CLO Management is being formed with intention of acting as a "majority-owned affiliate" of Highland as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Managed CLOs and to provide a vehicle whereby the Company can invest in Managed CLOs. Acis CLO Management is intended to act as a "majority-owned affiliate" of Acis as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Acis CLO 7 and to provide a vehicle whereby the Company can invest in Acis CLO 7.

The CLOs in which the Company invests may be structured with the intent to be compliant with the European risk retention requirements for securitisation transactions, meaning, collectively, (i) Articles 404-410 of Regulation (EU) No 575/2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No. 648/2012 (the "**CRR**") as supplemented by Commission Delegated Regulation (EU) No. 625/2014 (the "**CRR Retention Requirements**") (ii) Articles 51-54 of the Commission Delegated Regulation (EU) No 231/2013 (the "**AIFMD Level 2 Regulation**") implementing Article 17 of Directive 2011/61/EU on Alternative Investment Fund Managers (the "**AIFMD**"), and (iii) Article 254-257 of the Commission Delegated Regulation (EU) 2015/35 implementing Article 135(2) of Directive 2009/138/EC on the taking-up and pursuit of the business of Insurance and Reinsurance, as amended by Directive 201/51/EU (and as supplemented by Articles 254-257 of Commission

006248

Delegated Regulation (EU) 2015/35) (the "**Solvency II Level 2 Regulation**"), each together with any applicable guidance, technical standards and related documents published by any European regulator in relation thereto and any implementing laws or regulations in force in any Member State of the European Union (together with the CRR Retention Requirements and the AIFMD Level 2 Regulation, the "**EU Retention Requirements**" and, together with the risk retention requirements under the U.S. Risk Retention Rules, the "**Retention Requirements**").  Any such Company investments in CLOs intended to be compliant with the EU Retention Requirements will continue to be subject to the EU Retention Requirements. However, it is expected that, going forward, the Company's investments in CLOs will be done primarily on an indirect basis through its indirect interest in the Management Companies. As used herein, any reference to the Company's investments in CLOs or CLO Retention Notes shall be deemed to refer primarily to (i) prior to the formation of the Management Companies, the CLO securities the Company acquired directly and (ii) following the formation of the Management Companies, the indirect interests in CLOs it intends to hold through the applicable Management Company. Furthermore, any reference to Managed CLOs or CLOs managed by Highland, Acis, the Portfolio Manager and the Management Companies shall be deemed to refer primarily to (i) for CLOs formed prior to the formation of Acis, CLOs managed by Highland (ii) for CLOs formed after the formation of Acis and prior to the formation of Acis CLO Management, CLOs managed by Acis, (iii) for CLOs formed following the formation of Acis CLO Management and prior to the formation of Highland CLO Management, CLOs managed by Acis CLO Management and (iv) for CLOs formed following the formation of Highland CLO Management, CLOs managed by Highland CLO Management.

Although the Company, the Portfolio Manager, Highland, Acis and the Management Companies intend to comply with the Retention Requirements, there has been no explicit guidance regarding how entities may be structured for this purpose and therefore the regulatory environment in which the CLOs intend to operate is highly uncertain.  There can be no assurance that applicable governmental authorities will agree that any of the transactions, structures or arrangements entered into by the Company, Highland, Acis or the applicable Management Company, and the manner in which it expects to hold retention interests, will satisfy the Retention Requirements, including any transactions pursuant to which Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. If such transactions, structures or arrangements are determined not to comply with the Retention Requirements, Highland, Acis, the applicable Management Company or the Company (as applicable) could become subject to regulatory action which could in turn materially and adversely affect the Company and/or the potential return to shareholders. The impact of the Retention Requirements on the securitization market is also unclear and such rules may negatively impact the value of the CLOs and their underlying assets.

*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*

The Company's portfolio may at any given time include, directly and indirectly, securities or other financial instruments or obligations which are very thinly traded, for which no market exists or which are restricted as to their transferability under applicable securities laws.  These investments may be extremely difficult to value accurately. Further, because of overall size or concentration in particular markets of positions held by the Company, the value of its investments which can be liquidated may differ, sometimes significantly, from their valuations. Third party pricing information may not be available for certain positions held by the Company.  Investments to be held by the Company may trade with significant bid-ask spreads. The Company is entitled to rely, without independent investigation, upon pricing information and valuations furnished by third parties, including pricing services and valuation sources.  In the absence of fraud, gross negligence (under New York law), bad faith or manifest error, valuation determinations in accordance with the Company's valuation policy will be conclusive and binding.

*Market factors may result in the failure of the investment strategy*

Strategy risk is associated with the failure or deterioration of an investment strategy such that most or all investment managers employing that strategy suffer losses. Strategy-specific losses may result from excessive concentration by multiple market participants in the same investment or general economic or other events that adversely affect particular strategies (for example the disruption of historical pricing relationships).  Furthermore, an imbalance of supply and demand favouring borrowers could result in yield compression, higher leverage and less favourable terms to the detriment of all investors in the relevant asset class. The investment strategy employed by the Company is speculative

006249

and involves substantial risk of loss in the event of a failure or deterioration in the financial markets, although the Company has certain investment limits which define to a degree how it invests. As a result, the Company's investment strategy may fail, and it may be difficult for the Company to amend its investment strategy quickly or at all should certain market factors appear, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***The investment strategy of the Company includes investing predominantly in CLO Notes, and, under certain circumstances, asset management subsidiaries, all of which are subject to a risk of loss of principal***

The investment strategy of the Company consists of investing predominantly in CLO Notes, directly and indirectly through its investment in the Management Companies, and, under certain circumstances, asset management subsidiaries. The company may also invest in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements). Such investments may be considered to be subject to a level of risk in the case of deterioration of general economic conditions, which might increase the risk of loss of principal or investment. This could result in losses to the Company which could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***In the event of a default in relation to an investment, the Company or the CLO in which the Company holds CLO Notes will bear a risk of loss of principal, and accrued interest***

Performance and investor yield on the Company's investments (including both direct investments by the Company in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and investments in senior secured loans held by CLOs in which the Company holds CLO Notes) may be affected by the default or perceived credit impairment of such investments and by general or sector specific credit spread widening. Credit risks associated with the investments include (among others): (i) the possibility that earnings of an obligor may be insufficient to meet its debt service obligations; (ii) an obligor's assets declining in value; and (iii) the declining creditworthiness, default and potential for insolvency of an obligor during periods of rising interest rates and economic downturn. An economic downturn and/or rising interest rates could severely disrupt the market for the investments and adversely affect the value of the investments and the ability of the obligors thereof or the CLO to repay principal and interest. In turn, this may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

In the event of a default in relation to an investment held by the Company or a CLO in which the Company holds CLO Notes, the Company will bear a risk of loss of principal and accrued interest on that investment. Any such investment may become defaulted for a variety of reasons, including non-payment of principal or interest, as well as breaches of contractual covenants. A defaulted investment may become subject to workout negotiations or may be restructured by, for example, reducing the interest rate, a write-down of the principal, and/or changes to its terms and conditions. Any such process may be extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on the defaulted investment. In addition, significant costs might be imposed on the lender, further affecting the value of the investment. The liquidity in such defaulted investments may also be limited and, where a defaulted investment is sold, it is unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest owed on that investment. This would adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

In the case of secured loans, restructuring can be an expensive and lengthy process which could have a material negative effect on the Company's anticipated return on the restructured loan. By way of example, it would not be unusual for any costs of enforcement to be paid out in full before the repayment of interest and principal. This would substantially reduce the Company's anticipated return on the restructured loan.

***The illiquidity of investments may have an adverse impact on their price and the Company's ability to trade in them or require significant time for capital gains to materialise***

Credit markets may from time to time become less liquid, leading to valuation losses on the investments making it difficult to acquire or dispose of them at prices the Company considers their fair value. Accordingly, this may impair the Company's ability to respond to market movements and the Company may experience adverse price movements upon liquidation of such investments. Liquidation of portions of the portfolio under these circumstances could produce realised losses. The size of the Company's positions may magnify the effect of a decrease in market liquidity for such

instruments.  Settlement of transactions may be subject to delay and uncertainty.  Such illiquidity may result from various factors, such as the nature of the instrument being traded, or the nature and/or maturity of the market in which it is being traded, the size of the position being traded, or lack of an established market for the relevant securities.  Even where there is an established market, the price and/or liquidity of instruments in that market may be materially affected by certain factors.

The investment objective of the Company is to provide investors with stable income returns and capital appreciation from exposure on an indirect basis to a portfolio of predominantly floating rate senior secured loans, CLO Notes and, under certain circumstances, asset management subsidiaries.  Investments which are in the form of loans are not as easily purchased or sold as publicly traded securities due to the unique and more customised nature of the debt agreement and the private syndication process.  As a result, there may be a significant period between the date that the Company makes an investment and the date that any capital gain or loss on such investment is realised.  Moreover, the sale of restricted and illiquid securities may result in higher brokerage charges or dealer discounts and other selling expenses than the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Further, the Company may not be able readily to dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time, which could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.  See further the risk factor titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*" below.

### The Company may hold a relatively concentrated portfolio

The Company may hold a relatively concentrated portfolio.  There is a risk that the Company could be subject to significant losses if any obligor, especially one with whom the Company had a concentration of investments, were to default or suffer some other material adverse change.  The level of defaults in the portfolio and the losses suffered on such defaults may increase in the event of adverse financial or credit market conditions.  Any of these factors could adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

A significant portion of the Company's investment portfolio is expected to comprise directly or indirectly of Managed CLOs advised by Highland, Acis, the Portfolio Manager or a Management Company, as the CLO Manager.  The performance of the Company's portfolio depends heavily on the skills of Highland, Acis, the Portfolio Manager and the Management Companies, as applicable, in analyzing, selecting and managing the relevant CLOs.  See further the sections titled "*Risks Relating to Highland and Acis*" and "*Conflicts of Interest*" below.

### The Company may be exposed to foreign exchange risk, which may have an adverse impact on the value of its assets and on its results of operations

The base currency of the Company is the U.S. Dollar.  Certain of the Company's assets may be invested in securities and other investments which are denominated in other currencies.  Accordingly, the Company will necessarily be subject to foreign exchange risks and the value of its assets may be affected unfavourably by fluctuations in currency rates.  Although the Company may utilise financial instruments to hedge against declines in the value of such assets as a result of changes in currency exchange rates, it is not obliged to do so and may terminate any hedge contract at any time.  Moreover, it may not be possible for the Company to hedge against a particular change or event at an acceptable price or at all.  In addition, there can be no assurance that any attempt to hedge against a particular change or event would be successful, and any such hedging failure could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### The hedging arrangements of the Company may not be successful

The Company's economic risks cannot be effectively hedged.  However, in connection with the financing of certain investments, the Company may employ hedging techniques designed to reduce the risks of adverse movements in interest rates, securities' prices and/or currency exchange rates.  However, some residual risk may remain as a result of imperfections and inconsistencies in the market and/or in the hedging contract.  While such hedging transactions may reduce certain risks, they create others.  The Company directly or indirectly (through affiliates and subsidiaries) will not be permitted to enter into hedging with respect to the CLO Retention Notes.

The Company may utilise certain derivative instruments (including, without limitation, single-name credit default swaps, credit default swap and loan credit default swap indexes, equity futures and equity indexes) for hedging purposes.  However, even if used primarily for hedging purposes, the prices of derivative instruments are highly volatile, and acquiring or selling such instruments involves certain leveraged risks.  There may be an imperfect correlation between the instrument acquired for hedging purposes and the investments or market sectors being hedged, in which case, a speculative element is added to the highly leveraged position acquired through a derivative instrument primarily for hedging purposes.  In particular, the investments which are in the form of loans may, in certain circumstances, be repaid at any time on short notice at no cost, and accordingly the hedging of interest rate or currency risk in such circumstances may be less precise than is the case with investments in the public securities market.

Furthermore, default by any hedging counterparty in the performance of its obligations could subject the investments to unwanted credit and market risks.  Accordingly, although the Company may benefit from the use of hedging strategies, failure to properly hedge the market risk in the investments and/or default of a counterparty in the performance of its obligations under a hedging contract may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV, and such material adverse effects may exceed those which may have resulted had no hedging strategy been employed.

***Under certain hedging contracts that the Company may enter into, the Company may be required to grant security interests over some of its assets to the relevant counterparty as collateral***

In connection with certain hedging contracts, the Company may be required to grant security interests over some of its assets to the relevant counterparty to such hedging contract as collateral.  Such hedging contracts typically will give the counterparty the right to terminate the agreement upon the occurrence of certain events.  Such termination events may include, among others, a failure by the Company to pay amounts owed when due, a failure to provide required reports or financial statements, a decline in the value of the investments secured as collateral, a failure to maintain sufficient collateral coverage, a failure by the Company to comply with its investment policy and any investment restrictions, key changes in the Company's management, a significant reduction in the Company's Net Asset Value, and material violations of the terms, representations, warranties or covenants contained in the hedging contract, as well as other events determined by the counterparty.  If a termination event were to occur, there may be a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The use of leverage by the Company may increase the volatility of returns and providers of leverage would rank ahead of investors in the Company in the event of insolvency***

The Company may employ leverage in order to increase investment exposure with a view to achieving its target return, in the form of one or more committed credit facilities.  Leverage may come in the form of CLO securitizations.

While leverage presents opportunities for increasing total returns, it can also have the effect of increasing the volatility of the Shares, including the risk of total loss of the amount invested.  If income and capital appreciation on investments made with borrowed funds are less than the costs of the leverage, the Net Asset Value will decrease.  The effect of the use of leverage is to increase the investment exposure, the result of which is that, in a market that moves adversely, the possible resulting loss to investors' capital would be greater than if leverage were not used.  As a result of leverage, small changes in the value of the underlying assets may cause a relatively large change in the value of the Company.  Many financial instruments used to employ leverage are subject to variation or other interim margin requirements, which may force premature liquidation of investments.  Investors should be aware that the use of leverage by the Company can be considered to multiply the leverage effect on their investment returns in the Company.  As described above, while this effect may be beneficial when markets' movements are favourable, it may result in a substantial loss of capital when markets' movements are unfavourable.

In addition, such leverage may involve granting of security or the outright transfer of specific investments in the portfolio.  Since there is no security created in respect of the Shares, any insolvency of the Shareholders could rank behind the Company's financing and hedging counterparties, whose claims will be considered as indebtedness of the Company and may be secured.  Leverage does create opportunities for greater total returns on the investments but simultaneously may create special risk considerations by magnifying changes in the total value of the Net Asset Value and in the yield on the investments held by the Company.

006252

In addition, to the extent leverage is employed, the Company may be required to refinance transactions from time to time.  On each refinancing, the applicable counterparty may choose to re-negotiate the terms of each transaction or indeed not to refinance the transaction at all.  To the extent refinancing facilities are not available in the market at economic rates or at all, the Company may be required to sell assets at disadvantageous prices.  Any such deleveraging may result in losses on investments which could be severe and accordingly could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***Interest rate fluctuations could expose the Company to additional costs and losses***

The prices of the investments that may be held by the Company tend to be sensitive to interest rate fluctuations and unexpected fluctuations in interest rates could cause the corresponding prices of a position to move in directions which were not initially anticipated.  In addition, interest rate increases generally will increase the interest carrying costs of borrowed securities and leveraged investments.  Further, the Company may invest in both floating and fixed rate securities and interest rate movements will affect those respective securities differently.  In particular, when interest rates rise significantly the value of fixed interest rate securities often fall.  Furthermore, to the extent that interest rate assumptions underlie the hedging of a particular position, fluctuations in interest rates could invalidate those underlying assumptions and expose the Company to additional costs and losses.  Any of the above factors could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Additional Information about LIBOR***

In a speech on 27 July 2017, Andrew Bailey, the Chief Executive of the Financial Conduct Authority ("**FCA**"), announced the FCA's intention to cease sustaining LIBOR from the end of 2021.

The FCA has statutory powers to compel panel banks to contribute to LIBOR where necessary. The FCA has decided not to ask, or to require, that panel banks continue to submit contributions to LIBOR beyond the end of 2021. The FCA has indicated that the current panel banks will voluntarily sustain LIBOR until the end of 2021. The FCA does not intend to sustain LIBOR through using its influence or legal powers beyond that date.  The FCA's intention is that after 2021, it will no longer be necessary for the FCA to persuade, or to compel, banks to submit to LIBOR due to the development of alternative benchmark rates, which the FCA suggested should be based on transactions and not on reference rates that do not have active underlying markets to support them.  As of the date of this Offering Memorandum, no specific alternative rates have been generally agreed in the CLO market.

It is possible that the LIBOR administrator, ICE Benchmark Administration, and the panel banks could continue to produce LIBOR on the current basis after 2021, if they are willing and able to do so. However, the survival of LIBOR in its current form, or at all, is not guaranteed after 2021 and, if LIBOR in its current form does not survive, it could cause a disruption in the credit markets generally, which could negatively impact the market value and/or transferability of the Notes.

It is currently unclear how LIBOR would be determined pursuant to existing underlying CLO indentures if LIBOR ceased to exist. If an alternative or a successor benchmark rate were determined, it may increase the risk of a mismatch between the interest rate applicable to the underlying loan assets and the interest rate applicable to the underlying collateral obligations of the CLOs held by the Company. Such mismatch could have a material adverse effect on the value and liquidity of the CLO Notes held by the Company.

Investors should be aware that: (a) any of these changes or any other changes to LIBOR could affect the level of the published rate, including to cause it to be lower and/or more volatile than it would otherwise be; (b) if the applicable rate of interest on any collateral obligation held by the Company is calculated with reference to a currency or tenor which is discontinued, such rate of interest will then be determined by the provisions of the affected collateral obligation, which may include determination by the relevant calculation agent in its discretion; (c) the administrator of LIBOR will not have any involvement in the collateral obligations or notes linked to those obligations and may take any actions in respect of LIBOR without regard to the effect of such actions on the collateral obligations or the notes; and (d) any uncertainty in the value of LIBOR or the admissions made by financial institutions that LIBOR has been manipulated or any uncertainty in the prominence of LIBOR as a benchmark interest rate due to the recent regulatory reforms may adversely affect liquidity of the collateral obligations or the notes in the secondary market and their market value.  Any of the above or any other significant change to the setting of LIBOR could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

*In the event of the insolvency of an obligor in respect of an investment, or of an underlying obligor in respect of an investment, the return on such investment to the Company may be adversely impacted by the insolvency regime or insolvency regimes which may apply to that obligor or underlying obligor and any of their respective assets*

In the event of the insolvency of an obligor in respect of an investment (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio), the Company's (or the CLO issuer's, in the case of CLO Notes) recovery of amounts outstanding in insolvency proceedings may be impacted by the insolvency regimes in force in the jurisdiction of incorporation of such obligor or in the jurisdiction in which such obligor mainly conducts its business (if different from the jurisdiction of incorporation), and/or in the jurisdiction in which the assets of such obligor are located.  Such insolvency regimes impose rules for the protection of creditors and may adversely affect the ability to recover such amounts as are outstanding from the insolvent obligor under the investment, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

Similarly, the ability of obligors to recover amounts owing to them from insolvent underlying obligors may be adversely impacted by any such insolvency regimes applicable to those underlying obligors, which in turn may adversely affect the abilities of those obligors to make payments due under the investment to the Company on a full or timely basis.

In particular, it should be noted that the United States and a number of European jurisdictions operate unpredictable insolvency regimes which may cause delays to the recovery of amounts owed by insolvent obligors or underlying obligors subject to those regimes.  The different insolvency regimes applicable in the different jurisdictions result in a corresponding variability of recovery rates for senior secured loans, entered into or issued in such jurisdictions, any of which may have a material adverse effect on the performance of a CLO and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

*A CLO issuer may be subject to losses on investments as a result of insolvency or clawback legislation and/or fraudulent conveyance findings by courts*

Various laws enacted for the protection of creditors and stakeholders may apply to certain investments that are debt obligations, although the existence and applicability of such laws will vary between jurisdictions.  For example, if a court were to find that an obligor did not receive fair consideration or reasonably equivalent value for incurring indebtedness evidenced by an investment and the grant of any security interest securing such investment, and, after giving effect to such indebtedness, the obligor: (i) was insolvent; (ii) was engaged in a business for which the assets remaining in such obligor constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court may: (a) invalidate such indebtedness and such security interest as a fraudulent conveyance; (b) subordinate such indebtedness to existing or future creditors of the obligor; or (c) recover amounts previously paid by the obligor (including to a CLO issuer) in satisfaction of such indebtedness or proceeds of such security interest previously applied in satisfaction of such indebtedness.  In addition, if an obligor in whose debt a CLO issuer has an investment becomes insolvent, any payment made on such investment may be subject to avoidance, cancellation and/or clawback as a "preference" if made within a certain period of time (which for example under some current laws may be as long as two years) before insolvency.

In general, if payments on an investment are voidable, whether as fraudulent conveyances, extortionate transactions or preferences, such payments may be recaptured either from the initial recipient or from subsequent transferees of such payments.  To the extent that any such payments are recaptured from a CLO issuer, there will be an adverse effect on the performance of the CLO issuer and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

*The due diligence process that the Company plans to undertake in evaluating specific investment opportunities may not reveal all facts that may be relevant in connection with such investment opportunities and any corporate mismanagement, fraud or accounting irregularities may materially affect the integrity of the Company's due diligence on investment opportunities*

When conducting due diligence and making an assessment regarding an investment, the Company will be required to rely on resources available to it, including internal sources of information as well as information provided by existing and potential obligors, any equity sponsor(s), lenders and other independent sources.  The due diligence process may at times be required to rely on limited or incomplete information.

006254

The Portfolio Manager will select investments on the Company's behalf in part on the basis of information and data relating to potential investments filed with various government regulators and publicly available or made directly available to the Portfolio Manager by the entities filing such information or third parties. Although the Portfolio Manager will evaluate all such information and data and seek independent corroboration when it considers it appropriate and reasonably available, the Portfolio Manager will not be in a position to confirm the completeness, genuineness or accuracy of such information and data. The Portfolio Manager is dependent upon the integrity of the management of the entities filing such information and of such third parties as well as the financial reporting process in general.

The value of an investment made by the Portfolio Manager on the Company's behalf may be affected by fraud, misrepresentation or omission on the part of an obligor, underlying obligor, any related parties to such obligor or underlying obligor, or by other parties to the investment (or any related collateral and security arrangements). Such fraud, misrepresentation or omission may adversely affect the value of the investment and/or the value of the collateral underlying the investment in question and may adversely affect the ability of the Portfolio Manager's on the Company's behalf to enforce its contractual rights relating to that investment or the relevant obligor's ability to repay the principal or interest on the investment.

Investment analysis and decisions by the Portfolio Manager may be undertaken on an expedited basis in order to make it possible for the Portfolio Manager to take advantage of short-lived investment opportunities. In such cases, the available information at the time of an investment decision may be limited, inaccurate and/or incomplete. Furthermore, the Portfolio Manager may not have sufficient time to evaluate fully such information even if it is available.

Accordingly, the Portfolio Manager cannot guarantee that the due diligence investigation it carries out with respect to any investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such investment opportunity. Any failure by the Portfolio Manager to identify relevant facts through the due diligence process may cause it to make inappropriate investment decisions, which may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The collateral and security arrangements attached to an investment may not have been properly created or perfected, or may be subject to other legal or regulatory restrictions***

The collateral and security arrangements in relation to secured obligations in which the Company may invest (and the security arrangements relating to the underlying assets of CLOs) will be subject to such security or collateral having been correctly created and perfected and any applicable legal or regulatory requirements which may restrict the giving of collateral or security by an obligor, such as, for example, thin capitalisation, over-indebtedness, financial assistance and corporate benefit requirements. If the investments do not benefit from the expected collateral or security arrangements, this may adversely affect the value of, or in the event of a default, the recovery of principal or interest from, such investments. Accordingly, any such failure properly to create or perfect collateral and security interests attaching to the investments may adversely affect the performance of the CLO issuer and/or the Company and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

***The investments will be based in part on valuations of collateral which are subject to assumptions and factors that may be incomplete, inherently uncertain or subject to change***

A component of the Company's analysis of the desirability of making a given investment relates to the estimated residual or recovery value of such investments in the event of the insolvency of the obligor (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio). This residual or recovery value will be driven primarily by the value of the anticipated future cash flows of the obligor's business and by the value of any underlying assets constituting the collateral for such investment. The anticipated future cash flows of the obligor's business and the value of collateral can, however, be extremely difficult to predict as in certain circumstances market quotations and third party pricing information may not be available. If the recovery value of the collateral associated with the investments in which the Company or a CLO issuer invests decreases or is materially worse than expected by the Company or a CLO issuer (as applicable), such a decrease or deficiency may affect the value of the investments made by the Company or a CLO issuer. Accordingly, there will be an adverse effect on the performance of the CLO issuer and/or the Company and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

006255

***CLO Income Notes are volatile and interest and principal payments payable on the CLO Income Notes are not fixed***

CLO Income Notes are the most subordinated tranche of a CLO and all payments of principal and interest on such CLO Income Notes are fully subordinated.  Interest and principal payments are not fixed but are based on residual amounts available to make such payments.  As a result, payments on such CLO Income Notes will be made by the CLO issuer to the extent of available funds, and no payments thereon will be made until amongst other things (a) the payment of certain costs, fees and expenses have been made and (b) interest and principal (respectively) has been paid on the more senior notes of the CLO.  Non-payment of interest or principal on such CLO Income Notes will be unlikely to cause an event of default in relation to the CLO issuer.

CLO Income Notes represent a highly leveraged investment in the underlying assets of the CLO issuer.  Accordingly, it is expected that changes in the market value of such CLO Income Notes will be greater than changes in the market value of the underlying assets of the CLO issuer, which themselves are subject to credit, liquidity, interest rate and other risks.  Utilisation of leverage is a speculative investment technique and involves certain risks to investors and will generally magnify the CLO Income Notes investors' opportunities for gain and risk of loss.  In certain scenarios, the CLO Income Notes may be subject to a partial or a 100 per cent loss of invested capital.  CLO Income Notes represent the most junior securities in a leveraged capital structure.  As a result, any deterioration in performance of the asset portfolio of a CLO issuer, including defaults and losses, a reduction of realised yield or other factors, will be borne first by holders of such CLO Income Notes prior to the rest of the capital structure.

***CLO Income Notes are a limited recourse obligation of the CLO issuer***

CLO Income Notes are a limited recourse obligation of a CLO issuer and amounts payable on CLO Income Notes are payable solely from amounts received in respect of the collateral of the CLO issuer.  Payments on CLO Income Notes prior to and following enforcement of the security over the collateral of a CLO issuer are subordinated to the prior payment of certain costs, fees and expenses of, or payable by, the CLO issuer and to payment of principal and interest on more senior notes of the CLO issuer.  The holders of CLO Income Notes must rely solely on distributions on the collateral of the CLO for payment of principal and interest, if any, on the CLO Income Notes.  There can be no assurance that the distributions on the collateral of a CLO will be sufficient to make payments on the CLO Income Notes.  If distributions are insufficient to make payments on the CLO Income Notes, no other assets of the CLO issuer will be available for payment of the deficiency and following realisation of the collateral and the application of the proceeds thereof, the obligations of the CLO issuer to pay such deficiency shall be extinguished.  Such shortfall will be borne in the first instance by the CLO Income Notes.

In addition, at any time whilst the CLO Income Notes are outstanding in a CLO, no CLO Income Notes holder shall be entitled to institute against the related CLO issuer, or join in any institution against such CLO issuer of, any bankruptcy, reorganization, arrangement, insolvency, examinership, winding up or liquidation proceedings under any applicable bankruptcy or similar law in connection with any obligations of the CLO issuer relating to the CLO Income Notes or otherwise owed to the CLO Income Notes holder, save for lodging a claim in the liquidation of the CLO issuer which is initiated by another party or taking proceedings to obtain a declaration as to the obligations of the CLO issuer, nor shall it have a claim arising in respect of the share capital of the CLO issuer.

Furthermore, following the establishment of the Management Companies, CLO Income Notes may not be held directly by the Company. As such the Company's interest in the CLO Income Notes may be indirect, and the Management Company, not the Company, will be entitled to exercise voting rights associated with the CLO Income Notes.

***CLO Notes have limited liquidity***

In addition to the restrictions mentioned in the section titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*", there will usually be a limited market for notes representing collateralised loan obligations (including the CLO Notes).  There is no guarantee that any party to a CLO transaction will make a secondary market in relation to the CLO Notes.  There can be no assurance that a secondary market for any CLO Notes will develop or, if a secondary market does develop, that it will provide the holders of CLO Notes with liquidity of investment or that it will continue for the life of such notes.  As a result, the Company may have to hold the CLO Notes for an indefinite period of time or until their early

006256

redemption date or maturity date.  Where a market does exist, to the extent that an investor wants to sell the CLO Notes, the price may, or may not, be at a discount from the outstanding principal amount.  There may be additional restrictions on divestment in the terms and conditions of CLO Notes.

***Investments in asset management subsidiaries may subject the Company to increased regulatory scrutiny or disputes related to CLOs or other investments managed by such asset management subsidiaries***

As part of its business, the Portfolio Manager may advise the Company to invest in asset management subsidiaries, affiliated with the Company, Highland, Acis, the Portfolio Manager or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements.  Asset managers of U.S. or European CLOs operate in a highly regulated environment, and are subject to a comprehensive statutory and regulatory regime as well as oversight by governmental agencies.  In light of the current conditions in the global financial markets and economy, regulators have increased their focus on the regulation of asset managers in the U.S. and Europe.  New or modified regulations and related regulatory guidance, including under Basel III and the Dodd-Frank Act, may have unforeseen or unintended adverse effects on asset managers of CLOs.  These international regulations could limit an asset management subsidiary from pursuing certain business opportunities and/or impose additional costs, and otherwise indirectly materially adversely affect the Company's business operations and have other negative consequences.

***Investors will not have control over the CLO management activities of the Portfolio Manager, Highland, Acis or the Management Companies in CLOs***

The Portfolio Manager, Highland, Acis and/or the Management Companies, in the capacity of CLO Manager of a CLO, will have the discretion to make collateral management decisions for such CLO, including with respect to asset selection, disposition and amendments of the underlying loans.  In exercising such discretion, the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be responsible to act solely in the best interests of the applicable CLO issuer, not the Company or any Investor.  Any amendment, waiver or modification of an investment could postpone the receipt of payments in respect of such investment and/or reduce distributions to Investors.  The shareholders will have no right to compel the Portfolio Manager, Highland, Acis or the Management Companies, in their roles as CLO Manager to take or refrain from taking any actions or decisions, and the actions or decisions taken by the Portfolio Manager, Highland, Acis or the Management Companies as CLO Manager may expose the Investors to losses on their investment.

***United States retention requirements may affect future actions of the Company and negatively impact the leveraged loan market***

As part of its business, the Company may invest in asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain CLOs in order to satisfy the U.S. Risk Retention Rules.

On October 21, 2014, the U.S. Risk Retention Rules were issued and became effective on December 24, 2016 with respect to asset-backed securities collateralized by assets other than residential mortgages.  The statements contained herein regarding how compliance with the U.S. Risk Retention Rules may be achieved by a CLO are solely based on publicly available information as of the date hereof.  Except with respect to asset-backed securities transactions that satisfy certain exemptions, the U.S. Risk Retention Rules generally require one of the sponsors of asset-backed securities or a "majority-owned affiliate" thereof to retain not less than 5% of the credit risk of the assets collateralizing asset-backed securities.  The preamble to the rule text in the U.S. Risk Retention Rules indicates that a party that organizes and initiates a securitization would be the "sponsor."  In the case of many collateralized loan obligation transactions, the entity acting as collateral manager typically organizes and initiates a transaction and, therefore, would be considered the "sponsor" for U.S. Risk Retention Rules purposes, as further discussed in the preamble.  The U.S. Risk Retention Rules provide that if there is more than one "sponsor" of a securitization transaction, each "sponsor" is to ensure that at least one "sponsor" (or its "majority-owned affiliate") retains the requisite U.S. Retention Interest.

It is expected that Highland or Acis, as applicable, will agree to act as "sponsor" for purposes of Managed CLOs in which the Company invests, but there can be no assurance, and no representation, made that any Governmental Authority will agree that such is the case.  Each of Highland and Acis intends to treat the applicable Management Company as its "majority-owned affiliate" due to holding by it (or by affiliates that are intended to be, directly or

006257

indirectly, majority controlled, are majority controlled by or are under common majority control with Highland or Acis, as applicable) of a controlling financial interest in such Management Company as determined under GAAP, although there can be no assurance that such Management Companies will maintain treatment as a "majority-owned affiliates" of Highland or Acis as "sponsors" given the lack of guidance in the U.S. Risk Retention Rules with respect to such affiliated situations. Moreover, there can be no guarantee that Highland or Acis will be able to maintain the treatment of such Management Company as a "majority-owned affiliate," particularly if GAAP regulations or interpretations change over time.

Each of Highland or Acis, as applicable, may also hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. There can be no assurance that following any such transfer any Governmental entity will agree that the applicable Management Company will remain a "majority-owned affiliate" of Highland or Acis, as applicable.

At this time, each potential investor should understand that there is uncertainty with respect to what is required to comply with the U.S. Risk Retention Rules in certain circumstances, and therefore there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures with respect to such CLO will enable the applicable CLO Manager or U.S. retention holder to comply with the U.S. Risk Retention Rules.

In addition, there are a number of future uncertainties surrounding U.S. Risk Retention Rules for CLO Managers, including: (i) the ultimate results of litigation currently in process brought by the Loan Syndications and Trading Association (LSTA), a major industry trade association, challenging, among other things, the regulators' application of U.S. Risk Retention Rules to collateral managers of typical so-called open market CLOs, (ii) proposed legislation designed to exclude from U.S. Risk Retention Rules, collateral managers of certain defined "QCLOs" (qualified CLOs) and (iii) future directives and interpretations by Governmental Authorities with respect to the U.S. Risk Retention Rules. If such publicly available information is altered as a result of the foregoing (or anything else), there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures would be viewed by any Governmental Authority as sufficient to meet the requirements under the U.S. Risk Retention Rules. The failure to satisfy the requirements of the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the applicable CLO Notes and on Highland, Acis and the Management Companies and the Company's investments therein.

***The failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the Company and/or the Portfolio Manager***

The failure by the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules with respect to any Managed CLO may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the applicable Management Company, which could result in such person being required, among other things, to pay damages, transfer interests and/or acquire additional CLO Notes (which may or may not be available at such time for acquisition) or be subject to cease and desist orders or other regulatory action. In addition, a failure to remedy non-compliance with the U.S. Risk Retention Rules may also trigger a "cause" event under the applicable CLO Management Agreement and/or subject the Portfolio Manager, Highland, Acis and/or the applicable Management Company to adverse publicity and reputational risk resulting from such non-compliance. In addition, given the lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests upon a resignation or removal of a CLO Manager or an if the Portfolio Manager, Highland, Acis and/or the applicable Management Company resigns or the applicable holders of CLO Notes desire to remove the Portfolio Manager in connection with any such "cause" event, there may be no successor CLO Manager willing to accept appointment as such, in which case the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be required to continue to act as CLO Manager under the applicable CLO Management Agreement. Further, given such lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests, there can be no assurance that Highland or Acis, as applicable, will be able to maintain compliance with the U.S. Risk Retention Rules following any transfer of ownership interests in an entity holding Retention Interests by Highland or Acis to their respective affiliates that are, directly or indirectly, majority controlled,

006258

are majority controlled by or are under common majority control with, Highland or Acis, as applicable, particularly in situations involving CLOs which have already been issued when the related transfer occurs. As a result of any of the foregoing, the failure of the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the Company's investment in the applicable CLO Notes as well as on the business, condition (financial or otherwise), assets, operations or prospects of the Portfolio Manager, Highland, Acis and/or the applicable Management Company and the Company.

***The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)***

In connection with the intention to comply with the Retention Requirements, each Management Company will need to, amongst other things, (a) on the closing date of a Managed CLO, commit to purchase and retain CLO Notes held in the form and at least the minimum required under the applicable Retention Requirements, as applicable, for the relevant CLO (the "**CLO Retention Notes**") and (b) undertake that, for so long as any securities of the CLO remain outstanding (including the CLO Retention Notes), it will retain its interest in the CLO Retention Notes and will not (except to the extent permitted by the EU Retention Requirements, the accompanying regulatory technical standards or any other related guidance published by the European Securities and Markets Authority) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO Retention Notes. The Company or the applicable Management Company, as applicable, may make certain representations and/or give certain undertakings in favour of Managed CLOs (and/or certain other transaction parties) in respect of its ongoing retention of the CLO Retention Notes and regarding its agreement to sell certain assets to such Managed CLOs from time to time. There are currently transactions in the market which are similar to the Managed CLOs, however if an applicable regulatory authority supervising investors in a Managed CLO were to conclude that the applicable Management Company was not holding the CLO Retention Notes in accordance with the CRR, it is possible, but far from certain, that this may negatively impact the investors in such Managed CLO. If such investors decided to take action against the Company or the applicable Management Company as a result of any negative impact, this may have an adverse effect on the Company's financial performance and prospects.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements if applicable to the relevant CLO, the applicable Management Company would be required to meet the Origination Requirements.

As a result of the above commitments, the applicable Management Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption). Consequently, if any shares were to become due and repayable in connection with any resolution for their redemption, the Company, the applicable Management Company will not be obliged to immediately sell, transfer or liquidate the CLO Retention Notes and the proceeds of such CLO Retention Notes (if any) will not be available until the final maturity or early redemption in full of the securities of the relevant CLO. In addition, cash held by the Company will not be able to be used to repay any shares to the extent that such repayment could leave the Company unable to continue to originate and sell assets to the CLO issuers in order to ensure that during the relevant CLO's reinvestment period the Company, the applicable Management Company has met the Origination Requirements.

The Company or the applicable Management Company directly or indirectly, may hold a controlling equity stake in the Managed CLOs; accordingly, upon exercise by the Company or the applicable Management Company an early redemption option will result in a full redemption of the applicable CLO securities. Neither the Company nor the applicable Management Company will generally be able to exercise any early redemption options during a "non-call period" (generally lasting two years) after the closing date of the CLO. As a result of this feature and the EU Retention Requirements, the relevant CLO Retention Notes will not be permitted to be sold, transferred or liquidated during this time. In addition, even after an early redemption option is permitted to be exercised, such an option usually contains a number of conditions to its exercise including, but not limited to, a threshold that the liquidation value of the CLO collateral exceed an amount which would pay (a) all expenses of the CLO and (b) principal and accrued interest on the CLO Notes senior to the CLO Income Notes. If the liquidation value of the portfolio will not achieve this threshold at the time the Company intends to exercise its early redemption option, the CLO will not be able to be optionally redeemed by the Company at such time. In such circumstances, the Company or the applicable Management Company

006259

may not redeem the CLO Retention Notes until their final stated maturity (which may be in excess of 12 years), therefore producing no proceeds to pay to Shareholders until this point.

#### *Potential non-compliance with or changes to the United States and European risk retention requirements*

The purchase and retention of the CLO Retention Notes in a CLO will be undertaken by the Company or the applicable Management Company with the intention of achieving compliance with the U.S. Risk Retention Rules and/or the EU Retention Requirements by the relevant CLO.

The U.S. Risk Retention Rules and/or EU Retention Requirements may be amended, supplemented or revoked from time to time. There is no guarantee that existing CLOs or future CLOs will be grandfathered into the regime which results from such amendments, supplements or revocations and, as such, the CLOs in which the applicable Management Company is retaining the CLO Retention Notes, may become non-compliant with the U.S. Risk Retention Rules and/or EU Retention Requirements.

#### *Liability for breach of a risk retention letter*

The arranger of a CLO and certain other parties of a CLO in which a Management Company agrees to hold the CLO Retention Notes (in such capacity, the "**Retention Holder**") will require the applicable Management Company to execute a risk retention letter. Under a risk retention letter the applicable Retention Holder will typically be required to, amongst other things, make certain representations, warranties and undertakings: (a) in relation to its acquisition and retention of the CLO Retention Notes for the life of the CLO; and (b) regarding its agreement to sell assets to the relevant CLO from time to time. If the applicable Retention Holder sells or is forced to sell the CLO Retention Notes prior to the maturity of the relevant CLO, or the applicable Retention Holder holds insufficient cash or investments to continually sell the assets to the CLO as described above or for any other reason the applicable Retention Holder is not considered to be an "originator" (as such term is defined in the CRR), the Company may be in breach of the terms of the related risk retention letter. In such circumstances the arranger of the relevant CLO and the other parties to the related risk retention letter would have recourse to the applicable Retention Holder for losses incurred as a result of such breach. Such claims may reduce, or entirely diminish any cash or assets of the Company which may have been available to make payments on the Shares.

## RISKS RELATING TO HIGHLAND AND ACIS

#### *Past Performance Not Indicative of Future Results*

The past performance of Highland and Acis and their principals and affiliates in other portfolios or investment vehicles, including, without limitation their outstanding CLO transactions, may not be indicative of the results that the Company may be able to achieve. Similarly, the past performance of Highland, Acis and their principals and affiliates over a particular period may not necessarily be indicative of the results that may be expected in future periods. Furthermore, the nature of, and risks associated with, the Company's investments may differ substantially from those investments and strategies undertaken historically by Highland, Acis and their principals and affiliates. There can be no assurance that Highland's or Acis' investment recommendations will perform as well as past investments of Highland or Acis or their principals and affiliates, that the Company will be able to avoid losses or that the Company will be able to make investments similar to the past investments of Highland, Acis and their principals and affiliates. In addition, such past investments may have been made utilizing a leveraged capital structure, an asset mix and fee arrangements that are different from the anticipated capital structure, asset mix and fee arrangements of the Company. Moreover, because the investment criteria that govern investments in the Company's portfolio do not govern the investments and investment strategies of Highland, Acis and their principals and affiliates generally, such investments conducted in accordance with such criteria, and the results they yield, are not directly comparable with, and may differ substantially from other investments undertaken by Highland, Acis and their principals and affiliates.

#### *Acis, as CLO Manager, Relies on Highland to Perform Certain Services*

Acis currently relies on Highland, a U.S. SEC-registered investment adviser under common control with Acis, pursuant to the ACM Services Agreements, to provide investment research and recommendations and operational support to Acis, including services in connection with credit research, due diligence of actual or potential investments,

006260

the execution of investment transactions, and certain loan services and administrative services. If Highland does not continue to provide such services to Acis, or there is a departure or inability of certain Highland personnel to provide such services to Acis, there can be no assurances that Acis would be able to find a substitute service provider with the same experience as, or on the same terms as its ACM Services Agreements with, Highland. The inability of Acis to perform its duties under the applicable CLO Management Agreements or the ACLOM Services Agreements in accordance with the standard of care specified therein due to the termination of the Services Agreements could result in removal of Acis or Acis CLO Management, as applicable, under the applicable CLO Management Agreements for the Acis CLOs and Acis CLO 7.

### Litigation Involving Highland and Acis

Highland and Acis currently are and have been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. Shareholders have had an opportunity to discuss with Highland to their satisfaction all litigation matters against Highland and its affiliates unrelated to its distressed business. We currently do not anticipate these proceedings will have a material negative impact to the Company.

### Failure to Comply with Investment Advisers Act May Have an Adverse Effect on the Portfolio Manager's Performance

Highland HCF Advisor and Highland CLO Management are relying advisers of Highland, and Highland is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act. Acis CLO Management is a relying adviser of Acis, and Acis is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act. Failure to comply with the requirements imposed on the Portfolio Manager, Highland, Acis and/or the Management Companies under the Investment Advisers Act may have a significant adverse effect on the Portfolio Manager, Highland, Acis and/or the applicable Management Company. The Portfolio Manager, Highland's, Acis' and/or the applicable Management Company's ability to act as CLO Manager for Managed CLOs in which the Company holds CLO Notes may also be adversely affected by negative publicity arising from any regulatory compliance failures or other inappropriate behavior attributed to or any other negative publicity related to the Portfolio Manager, Highland, Acis and/or the applicable Management Company, any affiliate thereof or any of their respective investment professionals.

### SEC enforcement actions

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid regulatory examination and possibly enforcement actions. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including the undisclosed allocation of the fees, costs and expenses related to unconsummated co-investment transactions (i.e., the allocation of broken deal expenses), undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser. Although each of the Portfolio Manager, Highland, Acis and the Management Companies believe the foregoing practices to have been common historically amongst private fund advisers within the U.S. private funds industry, if the SEC or any other governmental authority, regulatory agency or similar body may take issue with, or in the case of insufficient disclosure regarding acceleration of certain special fees as described below, may continue to take issue with, past or future practices of the Portfolio Manager, Highland, Acis or the Management Companies or any of their affiliates as they pertain to any of the foregoing. In such instances, the Portfolio Manager, Highland, Acis or the Management Companies and/or such affiliates may be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis or the Management Companies was small in monetary amount, the Portfolio Manager, Highland, Acis and/or the applicable Management Company or their respective affiliates may be subject to adverse publicity relating to the investigation, proceeding or imposition of any such sanction.

### Potential litigation and regulatory actions may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies

006261

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid potential third party or other litigation or regulatory actions under existing laws (including the U.S. Risk Retention Requirements) or laws enacted in the future. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser and the undisclosed acceleration of certain special fees. In addition, the failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the Management Companies. If the SEC or any other Governmental Authority takes issue with the practices of the Portfolio Manager, Highland, Acis and/or the Management Companies or any of their affiliates as they pertain to any of the foregoing, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or any such affiliates will be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis and/or the Management Companies and/or such affiliates was small in monetary amount, the adverse publicity relating to the investigation, proceeding or imposition of these sanctions could harm the Company, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or their respective affiliates' reputations which may adversely affect the market value and/or liquidity of the Debt. There is also a material risk that Governmental Authorities in the United States and beyond will continue to adopt new laws or regulations (including tax laws or regulations), or change existing laws or regulations, or enhance the interpretation or enforcement of existing laws and regulations including the U.S. Risk Retention Rules. Any such events or changes could occur during the term of the Debt and may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies and its ability to operate and/or pursue its management strategies on behalf of the Issuer. Such risks are often difficult or impossible to predict, avoid or mitigate in advance.

### *Dependence on Highland, Acis and other collateral managers of CLOs*

A significant portion of the Company's investment portfolio will comprise of its investment in the Management Companies and in Managed CLOs. The Company's investment portfolio may also include CLOs managed by other asset managers. The performance of the Company's portfolio depends heavily on the skills of the Portfolio Manager, Highland, Acis, the Management Companies or such other asset managers in analyzing, selecting and managing the relevant CLOs. As a result, the Company and the CLOs will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, Highland, Acis, the Management Companies and the other asset managers, none of whom is under any contractual obligation to the Company or such CLOs to continue to be associated with the Portfolio Manager, Highland, Acis, the applicable Management Company or such other collateral manager for the term of the Company or any particular CLO. The loss of one or more of these individuals could have a material adverse effect on the performance of the Company and the relevant CLO.

Furthermore, the Portfolio Manager has informed the Company that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Company's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Company and the Managed CLOs may also depend on the financial and managerial experience of such individuals. Moreover, the Portfolio Management Agreement may be terminated under certain circumstances.

### *The Company generally may not terminate the Portfolio Management Agreement, even in the event of the Portfolio Manager's poor performance*

The Portfolio Management Agreement was negotiated between related parties and its terms may not be as favorable as if it had been negotiated with unaffiliated third parties. The Company may choose not to enforce, or to enforce less vigorously, certain of its rights under the Portfolio Management Agreement in an effort to maintain its ongoing relationship with the Portfolio Manager or Highland Capital Management, L.P., as the case may be.

Termination of the Portfolio Management Agreement is difficult and costly. In order to terminate the Portfolio Management Agreement without cause, the Company must (i) be required to register as an investment company under the provisions of the Investment Company Act of 1940 and it must notify the Portfolio Manager of such

006262

requirement, (ii) the portfolio must be liquidated in full and its financing arrangements must have been terminated or redeemed in full, or (iii) it must reach a mutual agreement with the Portfolio Manager to terminate the agreement. The initial term of the Portfolio Management Agreement is three years, with automatic renewals of three years thereafter. The Company may not choose to not renew the Portfolio Management Agreement.

The Company's ability to terminate the Portfolio Management Agreement for "cause" is limited, including grounds of wilful violation of the Portfolio Management Agreement by the Portfolio Manager and fraud or criminal activity. However, poor performance by the Portfolio Manager is not grounds for termination for cause under the Portfolio Management Agreement.  See "*Material Contracts*"

## RISKS RELATING TO CONFLICTS OF INTEREST

### *Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

### *The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*

The following briefly summarizes certain potential and actual conflicts of interest which may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates, but is not intended to be an exhaustive list of all such conflicts.  The scope of the activities of the Portfolio Manager, Highland, its affiliates, and the funds and clients managed or advised by Highland or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Company in the future that cannot be foreseen or mitigated at this time.

As part of their regular business, the Portfolio Manager, Highland, its affiliates and their respective officers, directors, trustees, shareholders, members, partners, personnel and employees and their respective funds and investment accounts (collectively, the "**Related Parties**") hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.  The Related Parties will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make.  The Related Parties may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Company and/or the Managed CLOs may invest.  In particular, the Related Parties may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Company and/or the Managed CLOs, or in which partners, security holders, members, officers, directors, agents, personnel or employees of such Related Parties serve on boards of directors or otherwise have ongoing relationships.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Company and/or the Managed CLOs and otherwise create conflicts of interest for the Company and/or the Managed CLOs.  In such instances, the Related Parties may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Company's and/or the Managed CLOs' investments.  In connection with any such activities described above, the Related Parties may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to be included as investments by the Company and/or Managed CLOs.  Other than with respect to new issue Highland CLOs as described below, the Related Parties will not be required to offer such securities or investments to the Company or Managed CLOs or provide notice of such activities to the Company or Managed CLOs.  In addition, in providing services under the Portfolio Management Agreement and the CLO Management Agreements, the Portfolio Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.  Furthermore, in connection with actions taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its other clients, the Portfolio Manager may take, or be required to take, actions which adversely affect the interests of the Company and/or Managed CLOs.  Except as otherwise set forth herein, including with respect to Qualifying CLOs, Designated CLO Resets, Designated CLO

Refinancings and the NexBank Facility and any Permitted NexBank Credit Facility Amendments, the consent of the Advisory Board will be required with respect to transactions with any Related Party.

The Related Parties invested and may continue to make investments that would also be appropriate for the Company, the Portfolio Manager, the Management Companies and/or the Managed CLOs. Such investments may be different from those recommended to the Company or made on behalf of the Managed CLOs or the Management Companies. Neither the Portfolio Manager nor any Related Entity has any duty, in making or maintaining such investments, to act in a way that is favorable to the Company, the Management Companies and/or the Managed CLOs or to offer any such opportunity to the Company, other than with respect to new issue Highland CLOs as described below, or the Managed CLOs. The investment policies, fee arrangements and other circumstances applicable to such other parties may vary from those applicable to the Company, the Portfolio Manager, Highland, Acis, the Management Companies and the Managed CLOs. The Portfolio Manager and/or any Related Entity may also provide advisory or other services for a customary fee to issuers or obligors whose debt obligations or other securities are held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and neither the Shareholders nor the Company shall have any right to such fees. The Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may also have ongoing relationships with, render services to or engage in transactions with other clients, including other issuers of collateralized loan obligations and collateralized debt obligations, who invest in assets of a similar nature to those of the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and with companies whose securities or loans are acquired by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and may own equity or debt securities issued by obligors of debt held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs. In connection with the foregoing activities, the Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to advise the Company or the Management Companies or effect a transaction for Managed CLOs, and the Company's, the Management Companies' and/or the Managed CLOs' investments may be constrained as a consequence of Highland's or Acis' inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Company, the Management Companies and/or the Managed CLOs. In addition, officers or affiliates of the Portfolio Manager, Highland, Acis and/or Related Parties may possess information relating to obligors of debt held by the Company, the Management Companies and/or the Managed CLOs that is not known to the individuals at the Portfolio Manager responsible for monitoring such investments and performing the other obligations under the Portfolio Management Agreement or CLO Management Agreements.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts. For the avoidance of doubt, the Portfolio Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time as described below. The Portfolio Manager, Highland, Acis and their affiliates may, from time to time, be presented with investment opportunities, other than with respect to new issue Highland CLOs during the Investment Period, that fall within the investment objectives of the Company, the Management Companies and/or the Managed CLOs and other clients, funds or other investment accounts managed by Highland, Acis or their affiliates, and in such circumstances, the Portfolio Manager, Highland, Acis and their affiliates expect to allocate such opportunities among the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts on a basis that the Portfolio Manager, Highland, Acis and their affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other investments of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by the Portfolio Manager, Highland, Acis

006264

and their affiliates in good faith. Subject to the Company's priority allocation with respect to new issue Highland CLOs, the Portfolio Manager, will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act. The Portfolio Manager, will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Company, the Management Companies and/or the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company, the Management Companies and/or any of the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

Although the professional staff of the Portfolio Manager will devote as much time to the Company as the Portfolio Manager deems appropriate to perform its duties in accordance with the Portfolio Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Company and the Portfolio Manager's other accounts.

The directors, officers, personnel, employees and agents of the Portfolio Manager and its Related Parties may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Company or entities that operate in the same or a related line of business as the Company or the Management Companies, or of other clients managed by the Portfolio Manager or its affiliates, or for any obligor or issuer in respect of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs, or any affiliate thereof, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Company, such other entities, or any obligor or issuer (or any affiliate thereof) in respect of any of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs pursuant to their respective governing instruments, and neither the Company, The applicable Management Company nor the Managed CLOs shall have the right to any such fees.

As further described below, the Portfolio Manager and its Related Parties may effect client cross-transactions where the Portfolio Manager advises the Company or a Management Company, or causes a Managed CLO, to effect a transaction between the Company, the applicable Management Company or such Managed CLO, as applicable, and another client advised by the Portfolio Manager or any of its affiliates. The Portfolio Manager, may engage in a client cross-transaction involving the Company, the Management Companies and/or Managed CLOs any time that the Portfolio Manager believes such transaction to be fair to the Company, the applicable Management Company and/or the Managed CLOs, as applicable, and such other client. By purchasing Shares of the Company, a Shareholder is deemed to have consented to such client cross-transactions between the Company, the applicable Management Company and another client of the Portfolio Manager or one of its Related Parties.

As further described below, the Portfolio Manager may effect principal transactions where Highland advises the Company, or causes a Managed CLO, to make and/or hold an investment, including an investment in securities, in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, in each case in accordance with applicable law, which may include the Portfolio Manager obtaining the consent and approval of the Advisory Board of the Company prior to engaging in any such principal transaction between the Company and the Portfolio Manager or its affiliates. By purchasing Shares of the Company, a Shareholder is deemed to have consented to such procedures relating to principal transactions between the Company and the Portfolio Manager or its Related Entities, subject to consent of the Advisory Board. In addition, in the event a Managed CLO engages in a principal trade, consent of the client may consist of consent of the board of directors of such Managed CLO (or certain professionals contracted by the board of directors, to the extent relevant), and none of the Company or its Shareholders will have any additional consent rights with respect to such transaction.

The Portfolio Manager may advise the Company, or direct the Managed CLOs, to acquire or dispose of investments in cross trades between the Company or the Managed CLOs, as applicable, and other clients of the Portfolio Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Company and/or the Managed CLOs may invest in securities of obligors or issuers in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Company and/or Managed CLOs may enhance the profitability of the Portfolio Manager's own investments in such companies. Moreover, the Company and Managed CLOs may invest in assets originated by the Portfolio Manager or its affiliates. In each such case, the Portfolio Manager and such affiliates may have a potentially conflicting division

006265

of loyalties and responsibilities regarding the Company or the Managed CLOs, as applicable, and the other parties to such trade.  Under certain circumstances, the Portfolio Manager and its affiliates may determine that it is appropriate to mitigate such conflicts by selling an investment at a fair value that has been calculated pursuant to the Portfolio Manager's valuation procedures to another client managed or advised by the Portfolio Manager or such affiliates.  In addition, the Portfolio Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Company or a Managed CLO, as applicable, and for the other party to the transaction, to the extent permitted under applicable law.  The Portfolio Manager may obtain the Company's written consent as provided herein if any such transaction requires the consent of the Company under Section 206(3) of the Investment Advisers Act.

The Portfolio Manager and/or its Related Parties may participate in creditor committees or other committees with respect to the bankruptcy, restructuring or workout of obligors or issuers of debt obligations or securities held by the Company and/or the Managed CLOs.  In such circumstances, the Portfolio Manager may take positions on behalf of itself or Related Parties that are adverse to the interests of the Company or the Managed CLOs in the relevant investment.

The Portfolio Manager and/or its Related Parties may act as an underwriter, arranger or placement or administrative agent, or otherwise participate in the origination, structuring, negotiation, syndication, administration or offering of CLOs or any senior secured loans purchased by the Company.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving CLOs or senior secured loans that are underwritten, originated, arranged or placed by the Portfolio Manager and/or its affiliates and the Company shall not have any right to any such fees.

There is no limitation or restriction on the Portfolio Manager or any of its Related Parties with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons.  This and other future activities of the Portfolio Manager and/or its Related Parties may give rise to additional conflicts of interest.  Such conflicts may relate to obligations that the Portfolio Manager's investment committee, the Portfolio Manager or its affiliates have to other clients.

The members of the Portfolio Manager's investment committee serve or may serve as personnel, officers, directors or principals of entities that operate in the same or a related line of business as the Company, or of other clients managed by the Portfolio Manager or its affiliates.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Company.  The Company may compete with other entities managed by the Portfolio Manager and its affiliates for capital and investment opportunities.

There are generally no ethical screens or information barriers among the Portfolio Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.  If the Portfolio Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Company or a Managed CLO to acquire a particular CLO security, the Portfolio Manager may be prevented from causing the Company or Managed CLO to purchase or sell such asset due to internal restrictions imposed on the Portfolio Manager.  Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Portfolio Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.  Inadvertent trading on material non-public information could have adverse effects on the Portfolio Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Portfolio Manager's ability to perform its portfolio management services to the Company and the Managed CLOs.  In addition, while the Portfolio Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.  In such event, the Portfolio Manager's ability to operate as an integrated platform could also be impaired, which would limit the Portfolio Manager's access to personnel of its affiliates and potentially impair its ability to advise the Company and manage the Managed CLOs' investments.

006266

**RISKS RELATING TO AN INVESTMENT IN THE SHARES**

*Shareholders have no right to have their Shares redeemed or repurchased by the Company*

The Company has been established as a closed-ended vehicle.  Accordingly, there is no right or entitlement attaching to the Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

*There is no public market for the Shares, and a market for the Shares may never develop, which could result in Shareholders being unable to monetize their investment.*

The Shares have not been registered under any securities exchange, and, unless so registered, may not be offered or sold except pursuant to an exemption from the applicable securities exchange regulator.  It is not expected that the Shares will be listed on any securities exchange in the future.  The Shares are newly issued securities for which there is no established trading market.  In the absence of an active trading market, Shareholders may be unable to resell the Shares at the time and for the price desired or at all. The Company can provide no assurances that the Shares will not subsequently trade below the price at which they are purchased pursuant to this Offering Memorandum.

In connection with the Company filing any registration for any securities exchange, the Company will agree to use commercially reasonable efforts to satisfy the criteria for listing and list and thereafter maintain the listing on such exchange or market so long as it is in the best interests of the Company.  Each market or exchange has initial listing criteria, including criteria related to minimum bid price, public float, market makers, minimum number of round lot holders and board independence requirements that the Company can give no assurance that it will meet.  The Company's inability to list or include the Shares on a securities exchange could affect the ability of Shareholders to sell their Shares subsequent to the declaration of the effectiveness of any registration statement, and consequently adversely affect the value of such Shares.  In such case, Shareholders would find it more difficult to dispose of, or to obtain accurate quotations as to the market value of, the Shares.  In addition, the Company would have more difficulty attracting the attention of market analysts to cover it in their research.  If the Shares are approved for listing or inclusion on a securities exchange, the Company will have no prior reporting history, and thus there is no way to determine the prices or volumes at which the Shares will trade.  The Company can give no assurances as to the development or liquidity of any trading market for the Shares.  Shareholders may not be able to resell their Shares at or near their original acquisition price, or at any price.

*In the event a market for the Shares does develop, the Shares may trade at a discount to the Net Asset Value per Share and Shareholders may be unable to realise their Shares at the Net Asset Value per Share or at any other price*

The Shares may trade at a discount to the Net Asset Value per Share for a variety of reasons, including due to market or economic conditions or to the extent investors undervalue the Company.

Subject to the Companies Law, under its Articles, the Company may issue additional securities, including Shares, for any purpose.  Any additional issuances by the Company, or the possibility of such issue, may cause the price of the Shares to decline.

*The existence of a liquid market in the Shares cannot be guaranteed*

The Shares may be admitted to a securities exchange at some point in the future, however there can be no guarantee that a liquid market in the Shares will develop or be sustained or that the Shares will trade at prices close to the Net Asset Value per Share.  The number of Shares to be issued pursuant to the Placing is not yet known, and there may be a limited number of holders of Shares.  Limited numbers and/or holders of Shares may mean that there is limited liquidity in such Shares which may affect:  (i) a Shareholder's ability to realise some or all of their investment; (ii) the price at which such Shareholder can effect such realisation; and/or (iii) the price at which Shares trade in the secondary market.  Accordingly, Shareholders may be unable to realise their investment at Net Asset Value per Share or at all.

006267

*The Shares will be subject to purchase and transfer restrictions in the Placing and in secondary transactions in the future*

The Company intends to restrict the ownership and holding of its Shares so that none of its assets will constitute "plan assets" under the U.S. Plan Assets Regulations.  The Company intends to impose such restrictions based on deemed representations in the case of a subscription of Shares.  If the Company's assets were deemed to be "plan assets" of any plan subject to Title I of ERISA or Section 4975 of the U.S. Tax Code ("**U.S. Plan**"), pursuant to Section 3(42) of ERISA and U.S. Department of Labor regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 as amended by Section 3(42) of ERISA (collectively, the "**U.S. Plan Asset Regulations**") then:   (i) the prudence and other fiduciary responsibility standards of ERISA would apply to investments made by the Company; and (ii) certain transactions that the Company or a subsidiary of the Company may enter into, or may have entered into, in the ordinary course of business might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA or Section 4975 of the U.S. Tax Code and might have to be rescinded.  Governmental plans and certain church plans, while not subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, may nevertheless be subject to other State, local or other laws or regulations that would have the same effect as the U.S. Plan Asset Regulations so as to cause the underlying assets of the Company to be treated as assets of an investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company (or other persons responsible for the investment and operation of the Company assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code.

Each purchaser and subsequent transferee of the Shares will be deemed to represent and warrant that no portion of the assets used to acquire or hold its interest in the Shares constitutes or will constitute the assets of any U.S. Plan.  The Articles of the Company provide that the Board of Directors may refuse to register a transfer of Shares to any person they believe to be a Non-Qualified Holder or a U.S. Plan investor.  If any Shares are owned directly or beneficially by a person believed by the Board of Directors to be a Non-Qualified Holder or a U.S. Plan investor, the Board of Directors may give notice to such person requiring him either (i) to provide the Board of Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Board of Directors that such person is not a Non-Qualified Holder or a U.S. Plan investor, or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Board of Directors with satisfactory evidence of such sale or transfer.  Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

In addition, the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.  For more information, refer to "Risks relating to regulation and taxation - The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules" in this section of this Offering Memorandum.

For more information on purchase and transfer restrictions, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

## RISKS RELATING TO REGULATION AND TAXATION

*Changes in law or regulations, or a failure to comply with any laws or regulations, may adversely affect the respective businesses, investments and performance of the Company*

The Company is subject to laws and regulations enacted by national and local governments.

On June 23, 2016, in a public referendum, the United Kingdom voted to leave the European Union. On March 29, 2017, the United Kingdom triggered Article 50 of the Treaty on European Union ("**Article 50**") by formally notifying the European Council of the United Kingdom's intention to withdraw from the European Union.  In accordance with Article 50, the European Union shall negotiate and conclude a withdrawal agreement with the United Kingdom within 2 years of the United Kingdom triggering Article 50, although the European Council in agreement with the United Kingdom may decide to extend this period.  The United Kingdom's decision to leave the European Union has caused,

006268

and is anticipated to continue to cause, significant new uncertainties and instability in both domestic and global financial markets. These uncertainties could have a material adverse effect on the various obligors' ability to make payments due under the assets within the CLO portfolios, which in turn could have a material adverse effect on the Company's financial condition, results of operations and/or its NAV.

The Company is subject to, and is required to comply with, certain regulatory requirements that are applicable to registered investment schemes which are domiciled in Guernsey.

The laws and regulations affecting the Company are evolving and any changes in such laws and regulations may have an adverse effect on the ability of the Company to carry on its business. Any such changes may also have an adverse effect on the ability of the Company to pursue the investment policies, and may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Certain income of the Company may be subject to U.S. withholding tax, and changes in tax law may adversely affect the Company***

The Company intends to make loan investments in the United States that will qualify for the "portfolio interest exemption" from U.S. withholding on interest. However, if the Company is not eligible for the portfolio interest exemption with respect to a loan paying U.S.-source interest, interest payments to the Company could be subject to a 30% withholding tax. In addition, there can be no assurance that, as a result of any change in any applicable law, rule or regulation or interpretation thereof, U.S.-source interest or other payments on the loans that were not subject to withholding tax when purchased will not in the future become subject to U.S. or other withholding tax or that the amount or rate of withholding tax to which a payment on a loan is subject might not increase.

In addition, if the Company acquires equity interests in U.S. entities, either as a result of a direct purchase or as a result of loans previously purchased by the Company being converted into equity interests, the Company could be subject to 30% U.S. withholding tax on any U.S.-source dividends. If the Company is deemed to be engaged in a trade or business in the United States as a result of its ownership of an equity interest in an entity treated as fiscally transparent in the United States or certain other investments, the Company could be subject to a tax on net income with respect to income from such equity interest or other investments, as well as a "branch profits" tax, with a combined U.S. tax rate with respect to such equity interest or other investments of approximately 54%.

If the Company is subject to U.S. withholding tax on payments from investments or is subject to U.S. net income tax, such tax would reduce the amounts available to make payments on the Placing Shares. The extent to which other source country withholding taxes may apply to the Issuer's income will depend on the actual composition of its assets.

***The European Directive on Alternative Investment Fund Managers may impair marketing of the Shares to EU investors***

The AIFMD was transposed into the national legislation of a number of EEA member states on 22 July 2013. The Company will be considered an Alternative Investment Fund ("**AIF**") for the purposes of AIFMD. AIFMD will allow the continued marketing of AIFs, such as the Company, under national private placement regimes where EEA member states choose to implement AIFMD national private placement regimes. In relation to the Company, such marketing will be subject to registration under the AIFMD in those EU member states where there will be marketing of the Shares to investors. To permit marketing, appropriate cooperation agreements must be in place between the supervisory authorities of the relevant EEA member states in which the Shares are being marketed and the jurisdiction of both the Company and the Portfolio Manager, as the AIFM of the Company.

Accordingly, the ability of the Portfolio Manager to market the Shares in the EEA will depend on the relevant EEA state permitting the marketing of non-EEA managed funds, the continuing status of Guernsey and the USA in relation to AIFMD and the Portfolio Manager's willingness to comply with the relevant provisions of AIFMD and the other requirements of the national private placement regimes of individual EEA states, the requirements of which may restrict the Company's ability to raise additional capital from the issue of new Shares in one or more EEA state.

Additionally, it should be noted that what is and what is not "marketing" under AIFMD can vary between EEA member states, in some cases covering most promotional activity in respect of a fund and in some cases covering only material that is sufficiently specific or precise in respect of information relating to the terms of the fund that it could

006269

alone form the basis of a decision to invest in the fund. This in turn means that the type of promotional activity that will require registration under AIFMD can also vary between EEA member states.

However, what is and what is not "marketing" under AIFMD remains a developing area and regulatory guidance in many EEA member states is limited. It is possible that European Securities and Markets Authority ("**ESMA**") or an EEA national regulator may change its policy approach in the future or that ESMA, the European Commission or another European entity, regulatory or legislative body may have a different interpretation at a later date of what constitutes marketing under AIFMD.

If it was held that certain promotional material in respect of the fund constitutes marketing under AIFMD and was provided to investors in an EEA member state without the Company having been registered in that EEA member state for marketing under AIFMD by the Portfolio Manager, the Portfolio Manager may face regulatory sanctions as a result of non-compliance with AIFMD, and the enforceability of agreements with Shareholders may be affected.

ESMA has also consulted on the possible extension of the passport for marketing and managing under AIFMD to non-EEA based managers (the marketing and managing passports are currently only available to EEA based AIFMs) and delivered advice to the European Commission on 18 July 2016 on whether, amongst other things, the passporting regime should be extended to the management and/or marketing of AIFs by non-EEA based managers.

This advice regarding extending the passport to US domiciled AIFMs was qualified, meaning it is currently not clear if the passporting regime will be extended to the Portfolio Manager as an AIFM, nor is it clear that the European Commission consider that this advice contains a positive assessment of a sufficient number of non-EEA countries to extend the passport to these countries. If the European Commission were to consider there were sufficient grounds to extend the passport and adopted the requisite delegated act extending the passport, the national private placement regimes which are currently applicable to non-EEA AIFMs and non-EEA AIFs in EEA member states will temporarily continue to co-exist with this new non-EEA passport (the "**Third Country Passport**").

However, three years after the adoption of this delegated act, ESMA is required to issue an opinion on the functioning of the Third Country Passport and advise on the potential termination of the current national private placement regimes. If the national private placement regimes were then abolished, an AIF could not be marketed into Europe by a non-EEA AIFM except by way of the Third Country Passport, meaning in this scenario the Portfolio Manager would not be able to market the Shares in the Company in the EEA.

Any regulatory changes arising from implementation of the AIFMD (or otherwise) that limit the Company's ability to carry on its business or to market future issues of its Shares may materially adversely affect the Company's ability to carry out its investment policy successfully and to achieve its investment objective, which in turn may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Final regulations implementing the "Volcker Rule" in the United States of America were issued in December 2013 and became effective by operation of law on 1 April 2014, subject to a conformance period. The final Volcker Rule regulations revised the November 2011 proposed regulations and include certain changes to the treatment of foreign funds and non-U.S. bank investors. If the Volcker Rule applies to an investor's ownership of Shares, the investor may be forced to sell its shares, or the continued ownership of such shares may be subject to certain restrictions.***

On 21 July 2010, U.S. President Barack Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act and certain provisions therein known as the "Volcker Rule." On 10 December 2013, the final Volcker Rule regulations (the "**Final Regulations**") were issued by U.S. regulators. The Final Regulations are effective from 1 April 2014, subject to a conformance period ending on 21 July 2015 (which may be extended). The Volcker Rule generally restricts certain non-U.S. banks and affiliated financial firms, collectively identified as "banking entities," from investing in and sponsoring "covered funds." In the event that a non-U.S. bank is deemed to be a "banking entity" and the Company is deemed to be a "covered fund" for purposes of the Volcker Rule, the non-U.S. bank's ownership of the Shares may be subject to investment restrictions. If so, the non-U.S. bank may be required to divest the Shares by the end of the conformance period. Depending on market conditions and other factors, if an investor is required to liquidate its investment in the Shares during the conformance period, it may suffer a loss from the price at which it purchased the Shares.

006270

*If the Company becomes subject to tax on a net income basis in any tax jurisdiction, including Guernsey or the United Kingdom, the Company's financial condition and prospects could be materially and adversely affected*

The Company intends to conduct its affairs so that it will not be treated as UK resident for taxation purposes, or as having a permanent establishment or otherwise being engaged in a trade or business, in the UK.  The Company intends that it will not be subject to tax on a net income basis in any country.  There can be no assurance, however, that the net income of the Company will not become subject to income tax in one or more countries, including Guernsey and the United Kingdom, as a result of unanticipated activities performed by the Company, adverse developments or changes in law, contrary conclusions by the relevant tax authorities, changes in the Directors' personal circumstances or management errors, or other causes.  The imposition of any such unanticipated net income taxes could materially reduce the post-tax returns available for distributions on the Shares, and consequently may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

*Changes in taxation legislation, or the rate of taxation, may adversely affect the Company*

Any change in the tax status of the Company, or in taxation legislation or practice in Guernsey, the United Kingdom or elsewhere could affect the value of the investments held by the Company or the Company's ability to achieve its investment objectives or alter the post-tax returns to Shareholders.  Statements in this Offering Memorandum concerning the taxation of Shareholders and/or the Company are based upon current Guernsey and United Kingdom law and published practice as at the date of this Offering Memorandum, which law and practice is, in principle, subject to change (potentially with retrospective effect) that could adversely affect the ability of the Company to meet its investment objective and which could adversely affect the taxation of Shareholders and/or the Company.

Potential investors are urged to consult their tax advisers with respect to their particular tax situations and the tax effect of an investment in the Company.

*Possible Financial Transaction Tax*

On 14 February 2013, the European Commission issued proposals, including a draft Directive (the "Commission's Proposal") for a financial transaction tax ("**FTT**") to be adopted in certain participating EU member states (including Belgium, Germany, Estonia, Greece, Spain, France, Italy, Austria, Portugal, Slovenia and Slovakia (the "Participating Member States"), although Estonia has since stated that it will not participate). If the Commission's Proposal was adopted in its current form, the FTT would be a tax primarily on "financial institutions" in relation to "financial transactions" (which would include the conclusion or modification of derivative contracts and the purchase and sale of financial instruments).

Under the Commission's Proposal, the FTT could apply in certain circumstances to persons both within and outside of the Participating Member States.  Generally, it would apply where at least one party is a financial institution, and at least one party is established in a Participating Member State. A financial institution may be, or be deemed to be, "established" in a Participating Member State in a broad range of circumstances, including (a) by transacting with a person established in a Participating Member State or (b) where the financial instrument which is subject to the financial transaction is issued in a Participating Member State.

The FTT proposal remains subject to negotiation between the Participating Member States.  It may therefore be altered prior to implementation, the timing of which remains unclear.  Additional EU member states may decide to participate.

In addition to the FTT, certain countries (such as France and Italy) have unilaterally introduced or announced their own financial transaction tax, and other countries may follow suit. There is therefore a risk that a financial transaction tax may be incurred on certain transactions entered into by the Company. Any such financial transaction tax may adversely affect the cost of investment or hedging strategies pursued by the Company as well as the value and liquidity of certain assets within the Company, such as securities, derivatives and structured finance securities.

*Different regulatory, tax or other treatment of the Company or the Shares in different jurisdictions, or changes to such treatment in different jurisdictions, may adversely impact shareholders in certain jurisdictions*

For regulatory, tax and other purposes, the Company and the Shares may be treated in different ways in different jurisdictions.  For instance, in certain jurisdictions and for certain purposes, the Shares may be treated as more akin to

006271

holding units in a collective investment scheme. Furthermore, in certain jurisdictions, the treatment of the Company and/or the Shares may be uncertain or subject to change, or it may differ depending on the availability of certain information or disclosure by the Company of that information. The Company may be subject, therefore, to financially and logistically onerous requirements to disclose any or all of such information or to prepare or disclose such information in a form or manner which satisfies the regulatory, tax or other authorities in certain jurisdictions. The Company may elect not to disclose such information or prepare such information in a form which satisfies such authorities. Therefore Shareholders in such jurisdictions may be unable to satisfy the regulatory requirements to which they are subject.

***The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules***

The Company has not, does not intend to, and may be unable to, become registered in the United States as an investment company under the U.S. Investment Company Act. The U.S. Investment Company Act provides certain protections to U.S. investors and imposes certain restrictions on companies that are registered as investment companies. As the Company is not so registered, and does not intend to so register, none of these protections or restrictions is or will be applicable to the Company. In addition, to avoid being required to register as an investment company under the U.S. Investment Company Act and to avoid violating the U.S. Investment Company Act, the Company has implemented restrictions on the purchase of the Shares by persons who are located in the United States or are U.S. Persons (or are acting for the account or benefit of any U.S. Person). For more information, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in in "*Placing Arrangements*".

***Certain payments to the Company will in the future be subject to 30 per cent withholding tax unless the Company agrees to certain reporting and withholding requirements and certain Shareholders will be required to provide the Company with required information so that the Company may comply with its obligations under FATCA***

Under Sections 1471 through 1474 of the U.S. Internal Revenue Code (commonly referred to as "**FATCA**"), Financial Institutions are required to use enhanced due diligence procedures to identify U.S. persons who have invested in either non-U.S. financial accounts or non-U.S. entities. Pursuant to FATCA, certain payments of (or attributable to) U.S.-source income, and the proceeds of sales of property that give rise to U.S.-source payments, will be subject to 30 per cent withholding tax with effect from 1 July 2014 unless the Company agrees to certain reporting and withholding requirements.

The United States and Guernsey have entered into an Intergovernmental Agreement ("**US IGA**") to implement FATCA. Under the terms of the US IGA, the Company may be obliged to comply with the provisions of FATCA as enacted by the Guernsey legislation implementing the US IGA (the "**Guernsey IGA Legislation**"), rather than directly complying with the U.S. Treasury Regulations implementing FATCA. Under the terms of the US IGA, Guernsey resident entities that comply with the requirements of the Guernsey IGA Legislation will be treated as compliant with FATCA and, as a result, will not be subject to withholding tax under FATCA ("**FATCA Withholding**") on payments they receive and will not be required to withhold under FATCA on payments they make.

The Company expects that it will be considered to be a Guernsey resident financial institution and therefore will be required to comply with the requirements of the Guernsey IGA Legislation.

Under the Guernsey IGA Legislation, the Company will be required to register with the United States Internal Revenue Service ("**IRS**") and report to the Guernsey President of the Policy & Resources Committee certain holdings by and payments made to certain U.S. investors in the Company, as well as to non-U.S. financial institutions that do not comply with the terms of the Guernsey IGA Legislation. Under the terms of the US IGA, such information will be onward reported by the Guernsey President of the Policy & Resources Committee to the United States under the general information exchange provisions of the United States-Guernsey Agreement for the Exchange of Information Relating to Taxes.

Further, even if the Company is not characterised under FATCA as a Financial Institution, it nevertheless may become subject to such 30 per cent withholding tax on certain U.S.-source payments to it unless it either provides information to withholding agents with respect to its U.S. Controlling Persons or certifies that it has no such U.S. Controlling Persons.

006272

As a result, Shareholders may be required to provide any information that the Company determines necessary in order to allow the Company to satisfy its obligations under FATCA.

Additional intergovernmental agreements similar to the US IGA have been entered into or are under discussion by other jurisdictions with the United States.  Different rules than those described above may apply depending on whether a payee is resident in a jurisdiction that has entered into an intergovernmental agreement to implement FATCA.

In addition to the US IGA, Guernsey and the United Kingdom have entered into an inter-governmental agreement ("**UK IGA**") for the implementation of information exchange arrangements, based on FATCA, whereby relevant financial information held in Guernsey in respect of a person or entity who is resident in the UK for tax purposes will be reported to the Guernsey President of the Policy & Resources Committee for onward reporting to the UK's HM Revenue and Customs.  Under the UK IGA, the Company may be required to provide information to the Guernsey authorities about investors and their interests in the Company in order to fully discharge its reporting obligations and, in the event of any failure or inability to comply with the proposed arrangements, may suffer a financial penalty or other sanction under Guernsey law.

The scope and application of FATCA Withholding and information reporting pursuant to the terms of FATCA and the IGAs are subject to review by the United States, the United Kingdom, Guernsey and other IGA governments, and the rules may change.  Although the UK IGA and US IGA have been ratified by Guernsey's parliament, guidance published to date has been in draft format only and therefore, while the Company intends to comply with applicable law, it cannot be predicted at this time what the full impact on the Company and the Company's reporting responsibilities pursuant to the UK IGA and US IGA will be.  Shareholders should consult with their own tax advisors regarding the application of FATCA to their particular circumstances.

### *OECD's Base Erosion Profit Shifting ("BEPS") Action Points*

In 2013, the OECD published its report on Addressing Base Erosion and Profit Shifting ("**BEPS**") and its Action Plan on BEPS.  The aim of the report and Action Plan was to address and reduce aggressive international tax planning.  BEPS remains an ongoing project. On 5 October 2015, the OECD published its final reports, analyses and sets of recommendations (deliverables) with a view to implementing internationally agreed and binding rules which could result in material changes to relevant tax legislation of participating OECD countries.   The final package of deliverables was subsequently approved by the G20 Finance Ministers on 8 October 2015. On 24 November 2016, the OECD announced that more than 100 jurisdictions concluded negotiations on a multilateral instrument that will amend their respective tax treaties (more than 2,000 tax treaties worldwide) in order to implement the tax treaty-related BEPS recommendations, although the effective date of such multilateral instrument remains uncertain. A first high level signing ceremony took place on 7 June 2017 where 68 countries signed the multilateral instrument. It is currently anticipated that the multilateral instrument will enter into force after five countries have ratified it. The multilateral instrument will then enter into effect for a specific tax treaty after all parties to that treaty have ratified the multilateral instrument. The final actions to be implemented in the tax legislation of the countries in which the Company will have investments, in the countries where the Company is domiciled or resident, or changes in tax treaties negotiated by these countries, could adversely affect the returns from the Company to its investors.

006273