**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P**   §   Case No. **19-34054-SGJ11**
**Charitable DAF Fund, L.P et al**

|  | Appellant | § |  |
|---|---|---|---|
| vs. |  | § | 21-03067 |
| **Highland Capital Management, L.P** |  | § |  |
|  |  | § |  |
|  | Appellee | § | **3:23-CV-01503-B** |

   [167] Order granting Defendant Highland Capital Management, L.P.'s Renewed motion to dismiss adversary proceeding (related document # 122) Entered on 6/25/2023.

# Volume 29

# APPELLANT RECORD

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendant. | § | |
| | § | *INDEX* |

## APPELLANTS' SECOND AMENDED STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Appellants") hereby designate

the following items to be included in the record and identify the following issues with respect to

---

their appeal of the Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] which was entered by the United States Bankruptcy Court for the Northern District of Texas on June 25, 2023.

## I.    STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

- Whether the Bankruptcy Court had jurisdiction to rule on Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint

- Whether the Renewed Motion to Dismiss Complaint was improperly granted

## II.    DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD

*Vol. 1*
*000001*

1.    Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-03067-sgj11 [Doc. 168].

*000042*

2.    The judgment, order, or decree appealed from: Memorandum Opinion and Order Granting Defendant Highland Capital Management, L.P.'s "Renewed Motion to Dismiss Complaint" [Adv. Proc. Doc. No. 122] [Doc. 167].

*000080*

3.    Docket Sheet kept by the Bankruptcy Clerk.

4.    Documents listed below and as described in the Docket Sheet for Bankruptcy Case Proceeding No. 21-03067-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 9/29/21 | 1 | (36 pgs; 3 docs) Adversary case 21-03067. ORDER REFERRING CASE NUMBER 21-CV-0842-Bfrom U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division. Complaint by Charitable DAF Fund, LP, CLO Holdco, Ltd. against Highland Capital Management, LP, Highland HCF Advisor Ltd., Highland CLO Funding, Ltd. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Docket Sheet from 3:20-cv-0842-B) Nature(s) of suit: 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, M.) |
| 2 | 9/29/21 | 2 | (1 pg) Supplemental Document (cover sheet) by CLO Holdco Ltd., Charitable DAF Fund (RE: related document(s)1 Adversary case 21-03067) [ORIGINALLY FILED IN 21-CV-0842 AS #2 ON 04/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

*000102*

*000138*

*Vol. 2*

*000139*

*000232*

*000239*

*000270*

*Thru Vol. 6*

*Vol. 7*

*001196*

| | | | | |
|---|---|---|---|---|
| | 3 | 9/29/21 | 6 | (93 pgs; 6 docs) MOTION for Leave to File First Amended Complaint filed by CLO Holdco Ltd., Charitable DAF Fund LP (Attachments: # 1 Exh 1_First Amended Complaint # 2 Exh 2_Motion for Authorization to Retain James Seery # 3 Exh 3_Order Approving Retention of James Seery # 4 Exh 4_Order Approving Settlement # 5 Proposed Order) (Bridges, Jonathan) (Entered: 04/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #6 ON 04/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 4 | 9/29/21 | 22 | (7 pgs; 2 docs) MOTION for an Order to Enforce the Order of Reference filed by Highland Capital Management LP. (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/20/2021 (mjr). (Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #22 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 5 | 9/29/21 | 23 | (31 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference. (Annable, Zachery) Modified text on 5/20/2021 (mjr).(Entered: 05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #23 ON 05/19/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 6 | 9/29/21 | 24 | (926 pgs; 29 docs) Appendix in Support filed by Highland Capital Management LP re: 23 Brief/Memorandum in Support. (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13 # 14 Appendix 14 # 15 Appendix 15 # 16 Appendix 16 # 17 Appendix 17 # 18 Appendix 18 # 19 Appendix 19 # 20 Appendix 20 # 21 Appendix 21# 22 Appendix 22 # 23 Appendix 23 # 24 Appendix 24 # 25 Appendix 25 # 26 Appendix 26 # 27 Appendix 27 # 28 Appendix 28) (Annable, Zachery) Modified linkage and text on 5/20/2021 (mjr). (Entered:05/19/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #24 ON 05/19/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 7 | 9/29/21 | 26 | (7 pgs; 2 docs) MOTION to Dismiss Complaint filed by Highland Capital Management LP (Attachments: # 1 Exhibit(s) A--Proposed Order) (Annable, Zachery) Modified text on 5/28/2021 (jmg).(Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #26 ON 05/27/2021 IN U.S.DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |

| | 8 | 9/29/21 | 28 | (508 pgs; 14 docs) Appendix in Support filed by Highland Capital Management LP (Attachments: # 1 Appendix 1 # 2 Appendix 2 # 3 Appendix 3 # 4 Appendix 4 # 5 Appendix 5 # 6 Appendix 6 # 7 Appendix 7 # 8 Appendix 8 # 9 Appendix 9 # 10 Appendix 10 # 11 Appendix 11 # 12 Appendix 12 # 13 Appendix 13) (Annable, Zachery) (Entered: 05/27/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #28 ON 05/27/2021 IN U.S. DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 9 | 9/29/21 | 33 | (1 pg) Amended Civil Cover Sheet by CLO Holdco Ltd, Charitable DAF Fund LP. Amendment to 2 Supplemental Document. (Sbaiti, Mazin) Modified text on 6/23/2021 (mjr). (Entered: 06/22/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #33 ON 06/22/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 10 | 9/29/21 | 36 | (26 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 22 MOTION for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #36 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 11 | 9/29/21 | 37 | (22 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 36 Response/Objection Response to Motion for an Order to Enforce the Order of Reference (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #37 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 12 | 9/29/21 | 38 | (45 pgs) RESPONSE filed by CLO Holdco Ltd, Charitable DAF Fund LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #38 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 13 | 9/29/21 | 39 | (88 pgs) Appendix in Support filed by CLO Holdco Ltd, Charitable DAF Fund LP re 38 Response/Objection to Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint (Sbaiti, Mazin) (Entered: 06/29/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #39 ON 06/29/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| | 14 | 9/29/21 | 42 | (12 pgs) REPLY filed by Highland Capital Management LP re: 22 MOTION for an Order to Enforce the Order of Reference (Annable, Zachery) (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842AS #42 ON 07/13/2021 IN U.S. |

Handwritten annotations in left margin:
Vol. 7
0012O3
Thru  Vol 8

Vol. 9
001711

001712

001738

001760

001805

001893

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 9*<br><br>*001905*<br>*thru vol. 13* | 15 | 9/29/21 | 43 | (852 pgs) Appendix in Support filed by Highland Capital Management LP re: 42 Reply. (Annable, Zachery) Modified text on 7/14/2021 (mjr). (Entered: 07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #43 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *Vol. 14.*<br><br>*002757* | 16 | 9/29/21 | 45 | (21 pgs) REPLY filed by Highland Capital Management LP re: 26 MOTION to Dismiss (Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint) (Annable, Zachery) (Entered:07/13/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #44 ON 07/13/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002778* | 17 | 9/29/21 | 57 | (7 pgs; 2 docs) MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. filed by Highland CLO Funding Ltd. (Attachments: # 1 Proposed Order) Attorney Paul R Bessette added to party Highland CLO Funding Ltd (pty:dft) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #57 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002785* | 18 | 9/29/23 | 58 | (12 pgs) Brief/Memorandum in Support filed by Highland CLO Funding Ltd. re 57 MOTION to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P. (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #58 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002797* | 19 | 9/29/23 | 59 | (80 pgs; 5 docs) Appendix in Support filed by Highland CLO Funding Ltd re 58 Brief/Memorandum in Support of Motion (Attachments: # 1 Exhibit(s) A - Jackson v Dear # 2 Exhibit(s) B – Prudential Assurance v. Newman # 3 Exhibit(s) C - Harbourvest Settlement Agreement # 4 Exhibit(s) D – Boleat Declaration) (Bessette, Paul) (Entered: 08/30/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #59 ON 08/30/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002877* | 20 | 9/29/21 | 64 | (1 pg) ORDER OF REFERENCE: Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby REFERRED to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No.19-34054. (Ordered by Judge Jane J. Boyle |

| | | | | |
|---|---|---|---|---|
| *Vol. 14* | | | | on 9/20/2021) (svc) (Entered: 09/20/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #64 ON 09/20/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.) |
| *002878* | 21 | 10/19/21 | 66 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP, 47 Motion to strike document filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 55 Motion to abate filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) Hearing to be held on 11/23/2021 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 26 and for 47 and for 55, (Annable, Zachery) |
| *002883 Thru Vol. 16* | 22 | 11/22/21 | 71 | (509 pgs; 2 docs) Witness and Exhibit List *for Hearing on November 23, 2021* filed by Defendant Highland Capital Management, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding). (Attachments: # 1 Exhibits 1-13) (Hayward, Melissa) |
| *Vol. 17* *003392* | 23 | 11/22/21 | 72 | (2 pgs) Witness List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 26 Motion to dismiss adversary proceeding, 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint), 69 Motion to abate *Plaintiffs' Amended Motion to Stay All Proceedings* (related document(s) 55 Motion to abate (related document(s) 1Complaint))). (Sbaiti, Mazin) |
| *003394* | 24 | 11/22/21 | 73 | (189 pgs; 4 docs) Exhibit List *for November 23, 2021 hearing* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 47 Motion to strike (related document(s): 43 Document), 55 Motion to abate (related document(s) 1 Complaint)). (Attachments: # 1 Exhibit 1_Defendant's Memorandum of Law in Support of Motion for Reconsideration # 2 Exhibit 2_Highland Memorandum in Support of Motion to Dismiss # 3 Exhibit 3_Order (I) Confirming Fifth Amended Plan of Reorganization of Highland) (Sbaiti, Mazin) |
| *003583* | 25 | 12/7/21 | 80 | (2 pgs) Order granting Highland CLO Funding, Ltd.'s motion to dismiss adversary as a party with prejudice (related document 57) Entered on 12/7/2021. (Okafor, Marcey) Modified text on 3/11/2022 (Okafor, Marcey). |
| *003585* | 26 | 3/11/22 | 99 | (26 pgs) Memorandum of Opinion and order granting motion to dismiss the adversary proceeding (RE: related document(s) 26 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Entered on 3/11/2022 (Okafor, Marcey) |
| *003611* | 27 | 3/11/22 | 100 | (26 pgs) Order granting motion to dismiss adversary proceeding with prejudice (related document #26) Entered on 3/11/2022. (Okafor, Marcey) |

| | | | | |
|---|---|---|---|---|
| *Vol. 18*<br>*003637* | 28 | 3/21/22 | 104 | (29 pgs) Notice of appeal. Fee Amount $298 filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 100 Order on motion to dismiss adversary proceeding). Appellant Designation due by 04/4/2022. (Sbaiti, Mazin) |
| *003666* | 29 | 5/26/22 | 120 | (177 pgs; 2 docs) Support/supplemental document *Motion to Supplement Appellate Record* filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 111 Appellant designation). (Attachments: # 1 Amended Transcript of January 14, 2021 Hearing) (Sbaiti, Mazin) |
| *003843* | 30 | 6/9/22 | 121 | (1 pg) DISTRICT COURT Order: Case 3:22-00695-B is hereby transferred to the docket of the Honorable Judge Jane J. Boyle for consolidation with The Charitable DAF Fund LP, et al. v. Highland Capital Management LP, Case No. 3:21-cv-3129-N. Judge Karen Gren Scholer no longer assigned to case.(RE: related document(s) 86 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 104 Notice of appeal filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 6/9/2022 (Whitaker, Sheniqua) (Entered: 06/10/2022) |
| *003844* | 31 | 10/24/22 | 122 | (7 pgs) Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (Annable, Zachery) |
| *003851* | 32 | 10/14/22 | 123 | (31 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Annable, Zachery |
| *Vol. 19*<br>*003882*<br>*Thru Vol 20* | 33 | 10/14/22 | 124 | (513 pgs; 15 docs) Support/supplemental document *(Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 21*<br>*004395* | 34 | 10/27/22 | 126 | (5 pgs) Notice of hearing *(Notice of Hearing and Briefing Schedule on Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 12/8/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 122. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 21* *004400* | 35 | 11/18/22 | 128 | (10 pgs) Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (Sbaiti, Mazin) |
| *004410* | 36 | 11/18/22 | 129 | (32 pgs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| *004442* *Thru vol. 22* | 37 | 11/18/22 | 130 | (254 pgs; 2 docs) Response opposed to (related document(s): 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint)* filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Attachments: # 1 Appendix) (Sbaiti, Mazin) |
| *Vol. 22* *004696* | 38 | 9/2/22 | 131 | (21 pgs) DISTRICT COURT MEMORANDUM OPINION AND ORDER: The Court REVERSES and REMANDS the bankruptcy court's Motion to Dismiss Order and AFFIRMS the bankruptcy courts Motion to Stay Order. re: appeal on Civil Action number: Case 3:22-00695-B consolidated with 3:21-CV-3129-B, (RE: related document(s) 81 Order on motion to abate, 100 Order on motion to dismiss adversary proceeding). Entered on 9/2/2022 (Whitaker, Sheniqua) (Entered: 11/29/2022) |
| *004717* | 39 | 12/2/22 | 133 | (15 pgs) Reply to (related document(s): 129 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 130 Response filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |
| *004732* | 40 | 12/7/22 | 135 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, LP). Hearing to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga for 122, (Annable, Zachery) |
| *004737* | 41 | 12/7/22 | 136 | (5 pgs) Notice of hearing filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Status Conference to be held on 1/25/2023 at 01:30 PM at https://us-courts.webex.com/meet/jerniga. (Annable, Zachery). |
| *004742* | 42 | 12/9/22 | 138 | (3 pgs) Response opposed to (related document(s): 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) filed by Defendant Highland Capital Management, LP. (Annable, Zachery) |

| | | | | |
|---|---|---|---|---|
| *Vol. 22* 004745 | 43 | 12/9/22 | 139 | (25 pgs) Brief in support filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Annable, Zachery) |
| *Vol. 23* 004770 | 44 | 12/9/22 | 140 | (280 pgs; 8 docs) Support/supplemental document *(Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference)* filed by Defendant Highland Capital Management, LP (RE: related document(s) 138 Response). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 24* 005050 | 45 | 12/16/22 | 144 | (6 pgs) Reply to (related document(s): 138 Response filed by Defendant Highland Capital Management, LP) filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Sbaiti, Mazin) |
| 005056 *Thru Vol. 25.* | 46 | 1/23/23 | 145 | (514 pgs; 15 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 #3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Annable, Zachery) |
| *Vol. 26* 005570 | 47 | 1/23/23 | 146 | (280 pgs; 8 docs) Witness and Exhibit List filed by Defendant Highland Capital Management, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Annable, Zachery) |
| *Vol. 27* 005850 | 48 | 1/23/23 | 147 | (221 pgs; 7 docs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 122 Motion to dismiss adversary proceeding *(Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint))*. (Attachments: # 1 Exhibit 1_Excerpts from July 14, 2020 Hearing Transcript # 2 Exhibit 2_HCLOF Members Agreement Relating to the Company # 3 Exhibit 3_HarbourVest Settlement Agreement # 4 Exhibit 4_Order Approving Debtor's Settlement with HarbourVest # 5 Exhibit 5_HCLOF Offering # 6 Exhibit 6 Amended and Restated Investment Advisory Agreement) (Sbaiti, Mazin) |
| 006071 | 49 | 1/23/23 | 148 | (3 pgs) Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188,). (Phillips, Louis) |
| *Vol. 28* 006074 | 50 | 1/25/23 | 150 | (56 pgs; 2 docs) Amended Witness and Exhibit List filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP (RE: related document(s) 147 List (witness/exhibit/generic), 149 List (witness/exhibit/generic)). (Attachments: # 1 Exh 7_Testimony of Mark Patrick at June 8, 2021 hearing) (Sbaiti, Mazin |

| | | | | |
|---|---|---|---|---|
| *Vol. 28*<br>*006130* | 51 | 1/25/23 | 152 | (3 pgs) Notice of Appearance and Request for Notice by Louis M. Phillips filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP. (Phillips, Louis) |
| *006133*<br>*Thru Vol. 31* | 52 | 1/25/23 | 154 | (1 pg) Court admitted exhibits date of hearing January 25, 2023 (RE: related document(s) 128 Motion for withdrawal of reference, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (COURT ADMITTED DEFENDANT'S EXHIBITS #1, #2, #3, #4, #5 & #6 OFFERED BY ATTY GREG DEMO). (Edmond, Michael) (Entered: 01/27/2023) |
| *Vol. 32*<br>*006925* | 53 | 2/6/23 | 158 | Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023 (Okafor, Marcey) |
| *006942* | 54 | 2/6/23 | 161 | (18 pgs) DISTRICT COURT Notice of transmission of report and recommendation in re: renewed motion to withdraw reference. Civil Case # 3:22-cv-02802-S. (RE: related document(s) 158 Report and recommendation to the U.S. District Court by U.S. Bankruptcy Judge. (RE: related document(s) 128 Motion for withdrawal of reference filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.). Entered on 2/6/2023) (Whitaker, Sheniqua) |
| *006960* | 55 | 4/3/23 | 165 | (1 pg) DISTRICT COURT ORDER: The Court GRANTS the 11 Joint Motion to Transfer Proceeding and Consolidate Before Original Court and the above-numbered case (3:22-cv-02802-S) is transferred to the docket of the Honorable Judge Jane Boyle: Civil case 3:21-cv-00842-B (order referring case). (RE: related document(s) 1 Complaint filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd., 143 Notice of transmission of motion to withdraw reference). Entered on 4/3/2023 (Whitaker, Sheniqua) Modified on 4/10/2023 (Whitaker, Sheniqua). (Entered: 04/10/2023) |

TRANSCRIPTS

| | | | | |
|---|---|---|---|---|
| *006961* | 56 | 11/24/21 | 78 | (104 pgs) Transcript regarding Hearing Held 11-23-2021 RE: Motion Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/22/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 75 Hearing held on 11/23/2021. (RE: related document(s)55 MOTION to Stay filed by CLO Holdco Ltd, Charitable DAF Fund LP (Sbaiti, Mazin) (Entered: 08/26/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #55 ON 08/26/2021 IN U.S. |

| | | | | |
|---|---|---|---|---|
| | | | | DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied. Mr. Pomerantz to upload order.), 76 Hearing held on 11/23/2021. (RE: related document(s) 47 Motion to strike 43 Appendix in support filed by CLO Holdco, Ltd., Charitable DAF Fund, LP (Bridges, Jonathan) Modified text on 7/16/2021 (mjr). (Entered: 07/15/2021) [ORIGINALLY FILED IN 21-CV-0842 AS #47 ON 07/15/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, M.)) (Appearances: J. Pomerantz and J. Morris for Highland Defendants; J. Jordan and P. Bessett for HCLOF; M. Sbaiti for Plaintiffs. Nonevidentiary hearing. Motion denied (Plaintiffs acknowledged complained-of Appendices it did not relate to Motion to Dismiss). Mr. Pomerantz to upload order.)). Transcript to be made available to the public on 02/22/2022. (Patel, Dipti) |
| *Vol. 33* | 57 | 2/21/23 | 164 | 164 (112 pgs) Transcript regarding Hearing Held 1/25/23 RE: HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND, LP (128). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/22/2023. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel, Telephone number 847-848-4907. (RE: related document(s) 155 Hearing held on 1/25/2023. (RE: related document(s) 122 Motion to dismiss adversary proceeding, (Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint) filed by Defendant Highland Capital Management, LP filed by Defendant Highland Capital Management, LP) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court took matter under advisement.), 156 Hearing held on 1/25/2023. (RE: related document(s) 128 Motion for withdrawal of reference. Fee amount $188, filed by Plaintiffs CLO Holdco, Ltd., Charitable DAF Fund, LP filed by Plaintiff Charitable DAF Fund, LP, Plaintiff CLO Holdco, Ltd.) (Appearances: J. Morris and G. Demo for Movants; L. Phillips and M. Sbaiti for Plaintiffs. Evidentiary hearing (appendices). Court announced it will recommend denial to District Court. Court is working on Report & Recommendation.)). Transcript to be made available to the public on 05/22/2023. (Patel, Dipti) |

*007065*

Dated:  July 14, 2023                    Respectfully submitted,

                                         **SBAITI & COMPANY PLLC**

                                         */s/  Mazin A. Sbaiti*
                                         **Mazin A. Sbaiti**
                                         Texas Bar No. 24058096
                                         **Jonathan Bridges**
                                         Texas Bar No. 24028835
                                         2200 Ross Avenue – Suite 4900W
                                         Dallas, TX  75201
                                         T:  (214) 432-2899
                                         F:  (214) 853-4367
                                         E:  mas@sbaitilaw.com
                                              jeb@sbaitilaw.com

                                         **Counsel for Appellants**


## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 14th day of July, 2023.


                                         */s/ Mazin A. Sbaiti*
                                         Mazin A. Sbaiti

## COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY

**COMPANY**

Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") was incorporated on 30 March 2015 and registered under the laws of Guernsey (registration number 60120) pursuant to the Companies Law. The Company changed its name on October 27, 2017. The Company is an investment company established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy, including through the Management Companies.

The Company is seeking to raise U.S. $153 million through the Placing to invest in accordance with its investment objective and policy. Applications to an appropriate securities exchange may be made when deemed appropriate by the Company.

Investment in the Company is only suitable for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

**INVESTMENT OBJECTIVE**

The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

Highland HCF Advisor, in its capacity as the Portfolio Manager under the Portfolio Management Agreement, will manage the Company's investments. In addition, the Portfolio Manager, Highland, Highland CLO Management, or another affiliate of Highland, in the capacity of the CLO Manager, may also manage Highland CLOs and the Portfolio Manager Highland, Acis, Acis CLO Management, or another affiliate of Acis, in the capacity of the CLO Manager, may also manage Managed CLOs, in each case, pursuant to CLO Management Agreements to be entered into from time to time.

**INVESTMENT POLICY**

*Overview*

The Company's investment policy is to focus on synergistic investments in the following areas.

*Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's, S&P or Fitch. Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S. or European originator subsidiary of the Company. The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other

006274

underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and set forth in "*Summary—Investment Policy—Loan Investments*".

### *Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager.  In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements.  As a result, Highland CLO Management, will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially.  In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO to satisfy the Origination Requirements.

### *CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Managed CLOs or CLOs managed by other asset managers as set forth in "*Summary—Investment Policy—CLO Notes*".

The Company is currently invested in CLO Income Notes issued by Managed CLOs managed by Highland, Acis and Acis CLO Management. Following the Placing, the Company will invest indirectly through the Management Companies in CLO Notes.

### *Act as Risk Retention Provider*

The Company may also invest in, provide loans to, or purchase performance-linked notes from asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. Risk Retention Rules or EU Retention Requirements.

### Allocation of Investment Opportunities

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts as set forth in "*Summary—Investment Policy—Allocation of Investment Opportunities*".

## INVESTMENT RESTRICTIONS

The Company will, at all times, invest and manage its assets in a way which is consistent with its object of spreading investment risk and in accordance with the investment policy set out in "*—Investment Policy*".

In the event of any breach of the Company's investment policy or of the investment restrictions applicable to the Company, Shareholders will be informed of the actions to be taken by the Company (at the time of such a breach) by an announcement issued by the Administrator.

During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs as set forth in "*Summary—Investment Restrictions*"; provided that, if the Portfolio Manager has satisfied the RP Condition, the consent of the Advisory Board to invest in any

Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in "resets" with respect to the Designated CLO Resets and refinancings with respect to the Designated CLO Refinancings, each as set forth in "*Summary—Investment Restrictions*".

The Company shall not invest in the CLO Income Notes of a new-issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

**BORROWING**

Subject to the limitations set forth in "*Summary-Borrowing*", it is expected that the Company will have access to one or more committed credit facilities.   Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities.  It is expected that the Company will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and other assets.  In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

**CHANGES TO INVESTMENT OBJECTIVE AND POLICY**

Any material change to the investment objective and policy of the Company would be made only with the approval of Shareholders.

**INVESTMENT STRATEGY**

Whether the senior secured loans or other assets are held directly by the Company (with respect to senior secured loans for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or indirectly via CLO Notes or its investment in the applicable Management Company it is the Company's intention that, in any case, the portfolios will be actively managed (by the Portfolio Manager, Highland, Acis, the applicable Management Company, an asset manager subsidiary or the applicable CLO Manager, as the case may be) to minimise default risk and potential loss through comprehensive credit analysis performed by the Portfolio Manager, Highland, Acis, the applicable Management Company or the applicable CLO Manager (as applicable).

Whilst the intention is to pursue an active, non-benchmark total return strategy, Highland HCF Advisor as the Company's Portfolio Manager will be cognisant of the positioning of the loan portfolios against relevant indices. Accordingly, Highland HCF Advisor will track the returns and volatility of such indices, while seeking to outperform them on a consistent basis.   In-depth, fundamental credit research dictates name selection and sector over-weights/under-weights relative to the benchmark, backstopped by constant portfolio monitoring and risk oversight. The Portfolio Manager will typically look to diversify the Company's portfolios to avoid the risk that any one obligor or industry will adversely impact overall returns.  The investment strategy also places an emphasis on loan portfolio liquidity to ensure that if the Company's credit outlook changes, it is free to respond quickly and effectively to reduce or mitigate risk in its portfolio.  The Portfolio Manager believes this investment strategy will be successful in the future as a result of its emphasis on risk management, capital preservation and fundamental credit research.  The Portfolio Manager believes the best way to control and mitigate risk is by remaining disciplined in market cycles, by making careful credit decisions and maintaining adequate diversification.

*Leverage and Expected Returns*

It is anticipated that any borrowing for the purpose of investing directly in senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) will be in the form of a term Warehouse Loan Facility, however the Company has entered into the NexBank Credit Facility and may enter into any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps, repurchase agreements or other facilities to facilitate the acquisition or financing of loans.  Loans purchased using such borrowings will typically be held for no more than 12 months before being sold to a Highland

006276

CLO.  Except in relation to the CLO Retention Notes it holds, the Company may enter into hedging and derivatives transactions pursuant to its investment activities, for the purposes of efficient portfolio management.

The Company does not currently grant any guarantee under any leveraging arrangement.  The grant of any such guarantee would be disclosed to investors in accordance with the AIFMD Rules.

Any proposed changes to the Company's investment objective and policy will be subject to the process described in the section titled "*Changes to Investment Objective and Policy*" above in this section of the Offering Memorandum.

*Collateral and Asset Re-use Arrangements*

Any collateral and asset re-use arrangements of the Company will vary according to the brokers and/or trading counterparties which it may use (each a "**Trading Counterparty**").

The Company may be required to deliver collateral from time to time to its Trading Counterparties, under the terms of the relevant trading agreements, by posting initial margin and/or variation margin and on a mark-to-market basis. The Company may also deposit collateral as security with a Trading Counterparty.  The treatment of such collateral varies according to the type of transaction and where it is traded. Under such arrangements, the cash, securities and other assets deposited as collateral will generally become the absolute property of the Trading Counterparty, the Trading Counterparty will have the right to use such collateral.

Where collateral is reused by a Trading Counterparty, the Company will have an unsecured right to the return of equivalent assets and such collateral will be at risk in the event of the insolvency of a Trading Counterparty.

Any changes to the right of re-use of collateral will be disclosed to investors in accordance with the AIFMD Rules.

*Current Investments of the Company*

In order to facilitate a timely investment of the proceeds of the Placing and to take advantage of existing opportunities, the Company is currently invested in CLO Income Notes issued by Managed CLOs managed by the Portfolio Manager, Highland, Acis and Acis CLO Management.  The details of such CLOs are set out in "*The Current CLO Portfolio*".

Following the Placing, the Company will acquire further assets and fund origination by Highland CLO Management of new Highland CLOs and it is expected that the Net Placing Proceeds will be substantially invested in CLO Notes upon closing.  The Company may also, from time to time:  (i) hold assets within its portfolio to maturity; (ii) sell assets within its portfolio to the market; or (iii) sell assets within its portfolio to another CLO which is not Managed CLO.

**TARGET RETURN AND DIVIDEND POLICY**

*Target Total Return*

Whilst not forming part of the investment objective or policy of the Company, on the basis of current market conditions as at the date of this Offering Memorandum, the Company is targeting an annualised mid-teen total return over the medium-term, once the Net Placing Proceeds are substantially invested (through the Company) in CLO Notes (the "**Target Total Return**").  The Company intends to seek to deliver this return through a combination of dividend payments and capital appreciation.

*Target Dividend Yield and Policy*

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter.

During the Investment Period, on each Quarterly Dividend Date, beginning May 15, 2018, the Company will target the Target Dividend.  During the Investment Period, excess cash or interest from the portfolio will be reinvested by the Company with the objective of growing the NAV.

006277

Following the Investment Period, excess cash, interest and proceeds from the realization of portfolio investments after satisfaction of all expenses, debts, liabilities and obligations of the Company will be distributed by the Company to the Shareholders as a dividend on the Quarterly Dividend Date in accordance with the Distribution Priority as set forth in "*Summary-Dividend Policy*".

To the extent the Company does not have available funds on hand to meet the Target Dividend with respect to any Quarterly Payment Date, the Board of Directors may suspend dividends if, in consultation with the Portfolio Manager, it determines that a sale of assets to produce proceeds to meet the Target Dividend would not be in the best interests of the Company and/or would not produce a sale price reflective of the value of the assets.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

The actual dividend generated by the Company in pursuing its investment objective will, however, depend on a wide range of factors including, but not limited to, general economic and market conditions, fluctuations in currency exchange rates, prevailing interest rates and credit spreads, the terms of the investments made by the Company and the risks highlighted in the "*Risk Factors*" section of this Offering Memorandum. Dividend payments may be suspended by Board of Directors in its absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The Target Total Return and the Target Dividend should not be taken as an indication of the Company's expected future performance or results. The Target Total Return and the Target Dividend are targets only and there is no guarantee that they can or will be achieved and should not be seen as an indication of the Company's expected or actual return. Target returns are hypothetical and are neither guarantees nor predictions or projections of future performance. Actual events and conditions may differ materially from the assumptions used to establish the Target Total Return and Target Dividend. Accordingly, investors should not place any reliance on the Target Total Return or the Target Dividend in deciding whether to invest in Shares.

Furthermore, the future performance of the Company may be materially adversely affected by the risks discussed in the section of this Offering Memorandum entitled "*Risk Factors*".

## FURTHER ISSUES OF SHARES

The Directors will have authority to allot further Shares in the share capital of the Company following the Placing subject to the subscription and transfer agreement. Further issues of Shares beyond the issuances contemplated in the subscription and transfer agreement would only be made subject to consent of the Advisory Board, as described in "*Summary—Advisory Board*" if the Directors determine such issues to be necessary to protect the Company, consistent with the Board's duties to the Company, and in the best interests of Shareholders and the Company as a whole. Relevant factors in making such determination include net asset performance, share price rating and perceived investor demand. In the case of further issues of Shares (or sales of Shares from treasury), except as permitted by the Shareholders, such Shares will only be issued at prices which are not less than the then prevailing Net Asset Value per Share (as estimated by the Directors).

There are no provisions of Guernsey law which confer rights of pre-emption in respect of the allotment of Shares. The Articles, however, contain pre-emption rights in relation to allotments of Shares for cash.

006278

**VALUATION**

*Net Asset Value*

As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13.

*Publication of Net Asset Value*

The Company intends to publish the Net Asset Value per Share as calculated in accordance with the process described below, on a quarterly basis (within 15 Business Days following the relevant month-end). Notice will be provided either by a website to be created or investors may elect to be contacted by the Administrator by e-mail. The Net Asset Value will be calculated by the Administrator on the basis of the valuation policy established by the Directors from time to time. The Company's initial valuation policy is described below.

*Valuation of the portfolio*

It is intended that, in accordance with its investment objective and policy set out above, the Company will invest in: (a) senior secured loans and other debt securities on both a direct basis (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and indirect basis, including through the use of leverage via repurchase facilities and Warehouse Loan Facilities, and for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements; (b) CLO Notes, and any other assets held by management subsidiaries; and (c) interests in the Management Companies, and will value such instruments in accordance with the valuation policy established by the Portfolio Manager from time to time.

The Company (meaning for the purposes of the valuation of assets described herein, the Company itself, the Portfolio Manager or the Administrator under the ultimate supervision of the Board) will generally compute the value of the instruments and other assets of the Company as of the close of business on the last day of each fiscal period and on any other date selected by the Board in its sole discretion. In addition, the Company must compute the value of the instruments that are being distributed in-kind as of their date of distribution in accordance with the Company's Memorandum and Articles of Association. In determining the value of the assets of the Company, no value is placed on the goodwill or name of the Company, or the office records, files, statistical data or any similar intangible assets of the Company not normally reflected in the Company's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell instruments pursuant to agreements entered into on or prior to such valuation date.

A copy of the Company's valuation policy is available upon request.

The value of each instrument and other asset of the Company and the net worth of the Company as a whole determined pursuant the Company's Memorandum and Articles of Association are conclusive and binding on all of the members of the Company and all persons claiming through or under them.

*Suspension of the calculation of Net Asset Value*

The Directors may at any time, but are not obliged to, temporarily suspend the calculation of the NAV and NAV per Share during any period if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control, as a result of which, in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the shareholders; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be

006279

accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

Shareholders will be informed by e-mail from the Administrator in the event that the calculation of the NAV per Share is suspended as described above.

## REPORTS AND ACCOUNTS

The accounting period of the Company ends on 31 December, in each year, and the audited annual accounts will be provided to Shareholders within four months of the year end to which they relate. The Company shall report its results of operations and financial position in U.S. Dollars. The Company's first accounts were prepared for the period ending 31 December 2015.

The audited annual accounts will also be available at the registered office of the Administrator and the Company.

The financial statements of the Company will be prepared in accordance with GAAP, and the annual accounts will be audited. The Company's financial statements, which will be the responsibility of its Board, will consist of a statement of comprehensive income, statement of financial position, statement of cash flows, statement of changes in equity, related notes and any additional information that the Board deems appropriate or that is required by applicable law.

It is expected that the CLOs and any Warehouse Loan Facilities established will not be consolidated in the Company's GAAP financial statements, although such assessment will depend on the facts and circumstances.

Any disclosures required to be made to Shareholders pursuant to the AIFMD will be contained either in the Company's periodic reports or communicated to Shareholders in written form.

006280

## THE CURRENT CLO PORTFOLIO

The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts (the "**Current CLO Portfolio**"):

| CLOs: | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |
| Acis CLO 2017-7, Ltd. | $17,850,000.00 |
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

**Valuation of the Current Portfolio**

Information regarding the Current Portfolio and its valuation as of 30 September 2017 has been made available to all Placees free of charge.

Information on the historic performance of the Company is available upon request from the Portfolio Manager. Such information will be updated periodically in accordance with the AIFMD Rules.

006281

# MARKET OPPORTUNITY

## INVESTMENT OPPORTUNITY

The Company intends to invest in CLO Notes of CLOs which are compliant with the U.S. Risk Retention Rules and which may be compliant with the EU Retention Requirements (as defined above) and in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements).  In pursuance of this intention, the Company will invest in each of the Management Companies which will, pursuant to the EU Retention Requirements, need to, amongst other things:  (a) on the closing date of a CLO it establishes, commit to purchase "material net economic interest" equal to at least five per cent of the maximum portfolio principal amount of the assets in the CLO and (b) undertake that, for so long as any securities of the CLO remain outstanding (including any CLO Retention Notes), it will retain its interest in the CLO and will not (except to the extent permitted by the EU Retention Requirements) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO.  This five per cent material net economic interest in the CLO can, amongst other methods, be retained through the holding of a vertical strip of all issued tranches (AAA-rated notes to equity) or a retention holding in the first loss tranche or a combination thereof.  The EU Retention Requirements prohibit many significant European investors from investing in any securitisation which does not comply with them.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements with respect to Highland CLOs, Highland CLO Management will be required to meet the Origination Requirements.

Highland CLO Management may seek to adopt the "originator" model to address the EU Retention Requirements for its CLOs and intends to be treated as a "majority-owned affiliated" of Highland in order to comply with the U.S. Risk Retention Rules.

In addition to its current holdings, the Company may buy floating rate senior secured loans from the primary and secondary market before selling the assets to one or more CLOs which it establishes and for which Highland CLO Management will act as a retention provider, thereby offering investors wholesale access to senior secured loans acquired by the Company and retained CLO Income Notes.

The Portfolio Manager will be responsible for selecting and monitoring the performance of the investments.  The Company's purchase and sale decisions (with certain exceptions) will be taken by Highland HCF Advisors as Portfolio Manager pursuant to the Portfolio Management Agreement.  Further details on the investment process are set out in the section of this Offering Memorandum entitled "*Investment Process*".

006282

## INVESTMENT PROCESS

### *Highland HCF Advisor as Portfolio Manager and CLO Manager*

The Company has entered into a Portfolio Management Agreement with Highland HCF Advisor as the Portfolio Manager.  Pursuant to the Portfolio Management Agreement, Highland HCF Advisor will, at its discretion, select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support services to the Company.  The performance of the Company's portfolio will depend heavily on the skills of Highland HCF Advisor in analyzing, selecting and managing the investments.  The Portfolio Manager has entered into Services Agreements with Highland Capital Management, L.P. under which the Portfolio Manager has agreed to make its investment research and recommendations and back-office support services available to Highland HCF Advisor.  Further details are set out in the section of this offering memorandum entitled "Investment Process" and "Additional Information on the Company".

Based in Dallas, Texas, Highland is an SEC Registered Investment Adviser founded in 1993 that specializes in senior secured bank loans, high yield bonds, structured products and equities.  Highland issued its first CLO in 1996, and Highland and its affiliates have since issued and managed over U.S. $28 billion of CLOs and CDOs consisting of 40 separate vehicles.  As of August 31, 2017, Highland and its affiliates, managed or serviced approximately U.S. $13.4 billion in senior secured bank loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations and high net worth individuals.

The Portfolio Manager, Highland, Acis and/or the Management Companies, may act as CLO Manager(s) in relation to the Managed CLOs pursuant to CLO Management Agreements.  The Portfolio Manager, Highland, Acis and/or the applicable Management Company as CLO Manager is responsible for purchasing and selling of collateral obligations and performing certain other advisory and administrative tasks for and on behalf of the Managed CLOs in each case subject to the provisions of the applicable CLO Management Agreement and any applicable provisions of the indenture.

Highland HCF Advisor is a relying adviser of Highland. Highland is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds. Highland CLO Management is a relying adviser of Highland and will manage Highland CLOs.  Highland CLO Management has the HCLOM Services Agreements in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to the Highland CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by Highland CLO Management, and certain loan services and administrative services.

Acis is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds.  Acis CLO Management is a relying adviser of Acis and currently manages ACIS CLO 2017-7. Acis is an affiliate of Highland and is 100% owned by Highland senior management, and was established by James Dondero and Mark Okada to focus on managing traditional CLOs that invest in liquid, broadly syndicated bank loans and secondary CLO investments. Acis has the ACM Services Agreements in place with Highland, pursuant to which Highland provides investment research and recommendations and operational support to Acis, including services in connection with the Portfolio Manager's recommendations with respect to the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services. Acis CLO Management has the ACLOM Services Agreements in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to the ACIS CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by ACIS CLO Management, and certain loan services and administrative services.  All final credit decisions are made by the Highland individuals referenced below.

### Investment Philosophy

Highland's investment philosophy centers on being investors first. The firm has 25 years of experience investing in alternative strategies through multiple cycles. Highland is a recognized pioneer in bank loan asset management and

006283

CLO issuance. The firm invests a meaningful amount of capital in the portfolios they manage, with market value in excess of $250 million invested alongside our clients, as of September 30, 2017.

Highland's investment philosophy is rooted in a value-driven approach that combines rigorous bottom-up credit underwriting with top-down risk analysis to optimize risk-adjusted performance of portfolios. The firm integrates risk management throughout its investment process and maintains a culture of a high level of compliance. Highland focuses on attractive risk/return arbitrage opportunities where the firm can add value. Highland seeks to generate alpha by implementing checks and balances that allow the firm to identify risks, mitigate volatility, and quickly ascertain and sell losers.

While participating in the larger, liquid bank loan asset class, Highland continues to capture market inefficiencies in this over the counter (OTC) market through mispricings that it identifies via robust fundamental analysis, proactive diligence and monitoring, and nimble trading capabilities. Given the scale of the firm's investment resources, Highland is able to follow and manage investment portfolio names more closely. Highland credit research analysts manage 20-30 credits per analyst versus most peers, who manage 40-50 credits per analyst. In addition, the firm's dedicated trading desk and active dialogue with the Street enable Highland to identify technical dislocations and opportunities. The firm's high conviction investment philosophy and active portfolio management style versus peers have been key drivers of creating alpha for clients over time.

**Investment Monitoring and Risk Management**

Risk management is integrated into all levels of the investment process, from research, to portfolio construction and management, to ongoing monitoring. Highland conducts extensive position and portfolio monitoring activities on a daily basis. Portfolio risk is reviewed using internally generated daily, weekly, and monthly reports which measure transaction compliance including investor-mandated metrics such as portfolio concentrations or required test scores, as well as compliance with evolving internal positioning targets. Individual position risk is monitored in a number of ways, including Highland's extensive proprietary intranet system (Highland Online Management Engine or "**HOME**"), which pulls together data from their various data providers (Wall Street Office, LPC, Moody's, S&P, MarkIt, S&P LCD, CSFB Index) to provide a comprehensive portfolio/risk management system. The system allows the CLO team to monitor metrics at any level of aggregation (instrument, issuer, portfolio, fund and across the platform). Additionally, the system is designed to be scalable and with flexibility to enable future data inputs and reporting requirements.

For both Managed CLOs and for the underlying loans, the HOME intranet system allows Highland to monitor portfolios on a real-time, ongoing basis by receiving alerts showing positions with the largest daily/weekly/monthly mark change, as well as alerts on downgrades/upgrades, and when their credit analyst has changed his opinion on a broadly syndicated loan.

**Allocation Policy**

Highland and its affiliates may, from time to time, be presented with investment opportunities that fall within the investment objectives of the Company and the Managed CLOs and such other clients, funds or other investment accounts managed by Highland or its affiliates, and in such circumstances, subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs Highland and its affiliates expect to allocate such opportunities among the Company, the Managed CLOs and such other clients, funds or other investment accounts on a basis that Highland and its affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other collateral obligations of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by Highland and its affiliates in good faith. Subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs, Highland will allocate investment opportunities across the entities for which such opportunities are

006284

appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act.  Highland will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Company and the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company and the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

## Biographies of the Highland Key Personnel

The Portfolio Manager will use the services of the key personnel set forth below, although it may not necessarily continue to use their services during the entire term of the Portfolio Management Agreement.  Of these, Trey Parker and Hunter Covitz (and such other personnel as may be determined from time to time) will be made available by the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement.

Although the persons described above are currently employed by Highland and are engaged in the activities of the Portfolio Manager, such persons may not necessarily continue to be employed by the Portfolio Manager during the entire term of the Portfolio Management Agreement and, if so employed, may not remain engaged in the activities of the Portfolio Manager.

### James Dondero, CFA, CMA

#### Co-Founder, President

Mr. Dondero is President of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments) and Acis Capital Management, L.P.  Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Under Mr. Dondero's leadership, Highland and Acis have been a pioneer in both developing the collateralized loan obligation (CLO) market and advancing credit-oriented solutions for institutional and retail investors worldwide, including product offerings such as institutional separate accounts, CLOs, hedge funds, private equity funds, mutual funds, REITs, and ETFs. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NXRT), is Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

### Mark Okada, CFA

#### Co-Founder, Co-Chief Investment Officer

Mr. Okada is Co-Founder of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and Co-Chief Investment Officer of Highland Capital Management, L.P. and Acis Capital Management, L.P.  Responsible for overseeing investment activities for various strategies within Highland and Acis, Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund advisory board.

006285

**Trey Parker**

**Partner, Portfolio Manager and Co-Chief Investment Officer**

Mr. Parker is Partner, Portfolio Manager and Co-Chief Investment Officer at Highland Capital Management, L.P., and serves on the Investment Manager's Investment Committee. Prior to his current role, Mr. Parker was Head of Credit and covered a number of the industrial verticals, as well as parts of tech, media and telecom for the Investment Manager and worked on the Distressed & Special Situations investment team at Highland. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Omnimax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Hunter Covitz, CPA**

**Managing Director, Structured Products**

Mr. Covitz is a Managing Director and Portfolio Manager at Highland Capital Management, L.P. He is responsible for all CLOs, separate accounts, and hedge funds managed by Acis Capital Management, L.P., as well as all CLOs managed by Highland. Mr. Covitz serves on Highland's investment committee and leads the structured products investment team. Since joining Highland in 2003, Mr. Covitz has been instrumental in the structuring, warehousing, ramping, and ongoing portfolio management of over 30 Highland and Acis-originated CLOs. Prior to joining Highland, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma. Mr. Covitz is a licensed Certified Public Accountant.

**Neil Desai**

**Portfolio Manager, Structured Products**

Mr. Desai is a Portfolio Manager of Structured Products at Highland Capital Management, L.P. He is focused on sourcing and trading structured products for Highland's CLOs, hedge funds, mutual funds and separate accounts in the primary and secondary markets. Prior to joining Highland in August 2015, Mr. Desai was a Director in Pfizer Inc.'s Treasury organization where he built and ran Pfizer's structured products business. Prior to Pfizer, Mr. Desai spent several years structuring and trading various structured products at Barclays Capital and its spin-off hedge fund, C12 capital. Mr. Desai received both a Bachelor's and Master's degree in Computer Science & Electrical Engineering from MIT.

006286

**COMPANY DIRECTORS AND ADMINISTRATION**

**DIRECTORS**

The Directors are responsible for managing the business affairs of the Company in accordance with the Articles and have overall responsibility for the Company's activities including the appointment of the service providers. The Directors may delegate certain functions to other parties such as the Administrator. The Directors have appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

The Board comprises two Directors, both of whom are independent of Highland and Acis.

The address of the Directors, all of whom are non-executive, is the registered office of the Company. The Directors of the Company are as follows:

**William Scott (Chairman)**

William Scott, a Guernsey resident, acts as an independent non-executive Director of the Company. Mr. Scott also currently serves as independent non-executive director of a number of investment companies and funds. From 2003 to 2004, Mr. Scott worked as Senior Vice President with FRM Investment Management Limited. Previously, Mr. Scott was a director at Rea Brothers (which became part of the Close Brothers group in 1999 and where he was a director of Close Bank Guernsey Limited) (1989-2002) and Assistant Investment Manager with the London Residuary Body Superannuation Scheme (1987-1989). Mr. Scott graduated from the University of Edinburgh in 1982 and is a Chartered Accountant having qualified with Arthur Young (now E&Y) in 1987. Mr. Scott also holds the Securities Institute Diploma and is a Chartered Fellow of the Chartered Institute for Securities & Investment. He is also a Chartered Wealth Manager.

**Heather Bestwick**

Heather Bestwick, a Jersey resident, acts as an independent non-executive Director of the Company. She qualified as an English solicitor with Norton Rose, and worked in their London and Athens offices for eight years. In 1999 she joined Walkers in the Cayman Islands, qualifying as a Cayman Islands attorney and Notary Public, and became a partner in 2003. Her practice encompassed hedge funds, private equity, structured finance, secured lending and yacht registration and finance. Ms. Bestwick moved to Jersey in 2007 to become Managing Partner of the Walkers Jersey office. She joined Jersey Finance in 2010 as Technical Director and Deputy Chief Executive, leading the development of finance industry legislation on behalf of industry and liaising with the regulator and government. Ms. Bestwick is a member of the Channel Islands committee of the Association of Investment Companies.

**Management functions of the Board of Directors**

As there are no employees of the Company, the Board performs certain management functions, which include the overseeing of the Company's investment policy and investment strategy and the supervision of any delegated responsibilities to third-party service providers, and has the ultimate responsibility for the management and operations of the Company.

The Company has appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

**CORPORATE GOVERNANCE**

The Directors are committed to maintaining high standards of corporate governance. Insofar as the Directors believe it to be appropriate and relevant to the Company, it is their intention that the Company should comply with best practice standards for the business carried on by the Company.

On 1 January 2012, the GFSC's Finance Sector Code of Corporate Governance (the "**GFSC Code**") came into effect. The GFSC has stated in the GFSC Code that companies which report against the UK Corporate Governance Code are

006287

deemed to meet the requirements of the GFSC Code, and need take no further action.  Other than as set out below, the Company currently complies with, and will comply with, the GFSC Code.

The Company does not have a senior independent director because all of its Directors are non-executive and the Company has a Chairman.  There are no other instances of non-compliance with the UK Corporate Governance Code by the Company as at the date of this Offering Memorandum.

**Audit Committee**

The Company has established an Audit Committee, which comprises all the Directors.  The Company's Audit Committee meets formally at least twice a year for the purpose, amongst other things, of considering the appointment, independence and remuneration of the Auditor and to review the Company's annual financial reports.  Where audit-related and/or non-audit services are to be provided by the Auditors, full consideration of the financial and other implications on the independence of the Auditors arising from any such engagement will be considered before proceeding.  Heather Bestwick acts as chairman of the Audit Committee.  The responsibilities of the Audit Committee includes monitoring the integrity of the Company's results and financial statements, reviewing reports received from the Administrator on the adequacy and the effectiveness of the Company's internal controls and risk management systems, considering annually whether there is a need for an effectiveness of the Company's internal audit function and assessing the ongoing suitability of the Auditors and ensuring their co-ordination with any internal audit function.

The chairmanship of the Audit Committee and each Director's performance is reviewed annually by the Chairman and the performance of the Chairman is assessed by the other Directors.

**Advisory Board**

The Company has established an Advisory Board, which composed of individuals who shall be representatives of certain Shareholders.  See "*Summary—Advisory Board*".

**PORTFOLIO MANAGER**

Highland HCF Advisor will act as Portfolio Manager to the Company (pursuant to the Portfolio Management Agreement) and may act (either itself or through an affiliate) as the CLO Manager to Managed CLOs.

Pursuant to the Portfolio Management Agreement, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and be responsible for the business decisions and carry on the day-to-day management of the Company's business and implementation of its investment objective and policy.

*Highland Fees*

Highland HCF Advisor will receive, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder as described below, together with any irrecoverable VAT arising on such costs and expenses.  Except as provided below, the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent ("**Overhead**") without reimbursement by the Company.

The Company shall pay or reimburse the Portfolio Manager and its affiliates for only for reasonable third party costs and expenses related to the services hereunder, including, but not limited to investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, actual out-of-pocket professional fees relating to, trustee, administration, tax, accounting, legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in connection with the Company's compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes imposed upon the Company (including, but not limited to, any

006288

irrecoverable VAT arising on such costs and expenses), fees relating to valuing the financial instruments, extraordinary expenses and the Company's indemnification obligations (including those incurred in connection with indemnifying indemnified persons, including advancing such amounts) (collectively, the "**Operating Expenses**"). In the event any fees or expenses are for services used by, or attributable to, other persons advised by Highland HCF Advisor or its affiliates, including, but not limited to, any fees or expenses for software or subscription-based services, the Company shall only reimburse the Portfolio Manager for its pro rata share of such expenses, as determined by the Portfolio Manager in good faith.

For the avoidance of doubt, (i) the cost of all third party expenses incurred by the Portfolio Manager in connection with the Portfolio Management Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any services provider, the Company shall reimburse the Portfolio Manager (or the relevant services provider, as applicable) for such expenses so long as such expenses are determined on an arm's length basis.

The Portfolio Manager will also receive distributions pursuant to the Distribution Priority following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company and the Shareholders have receive a cumulative rate of return of 8.0% per annum, compounded annually. See "*Summary—Dividend Policy*".

Further details regarding the Portfolio Manager and Highland are set out in the section of this Offering Memorandum entitled "*Investment Process*". Further details regarding the Portfolio Management Agreement are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*".

## CLO MANAGER

In addition, the Portfolio Manager, Highland, Acis and/or the Management Companies (or one of their affiliates), as CLO Manager, may also manage Managed CLOs pursuant to management agreements ("**CLO Management Agreements**") to be entered into from time to time. The applicable CLO Manager will receive customary fees, in consideration for its services as the CLO Manager, from each of the Managed CLOs it manages.

## ADMINISTRATOR

State Street (Guernsey) Limited has been appointed as Administrator of the Company pursuant to the Administration Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*"). In such capacity, the Administrator is responsible for the day-to-day administration of the Company (including but not limited to the calculation and publication of the estimated quarterly NAV) and general secretarial functions required by the Companies Law (including but not limited to the maintenance of the Company's accounting and statutory records). Prospective investors should note that it is not possible for the Administrator to provide any investment advice to investors.

The Administrator is a private limited company, created under the laws of Guernsey on 17 March 2000 whose registered office is situated at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands. The Administrator is licensed under the POI Law, with the GFSC to carry out controlled investment business. The Administrator's principal business activity is providing securities services.

## CUSTODIAN

State Street Custodial Services (Ireland) Limited has been appointed as Custodian of the Company pursuant to the Custody Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*"). In acting as custodian of the Company's investments, the Custodian shall provide for the safekeeping of certificates of deposit, shares, notes and in general any instrument evidencing the ownership of securities and may take custody of cash and other assets. Assets will be held in a custody account and registered in the name of the Company or the Custodian, its delegate or a nominee.

006289

The Custodian, which is authorised as an Investment Business Firm under Section 10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.

**FEES AND EXPENSES**

The expenses of the Company related to the Placing are described in "*Summary—Expenses related to the Placing*".

The Company's ongoing expenses are described in "*Summary—Ongoing annual expenses*".

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

**MEETINGS AND REPORTS TO SHAREHOLDERS**

All general meetings of the Company shall be held in Guernsey.

The Company's audited annual report and accounts will be prepared to 31 December, each year, and it is expected that copies will be sent to Shareholders at the end of April each year.  Shareholders will also receive an unaudited interim report each year covering the six months from 1 January to 30 June, expected to be despatched at the end of August each year.

The Company's accounts are drawn up in U.S. Dollars and in compliance with GAAP.

The following information will be disclosed to investors at the same time as the annual financial statements and may be provided at other times by way of a report and/or letter sent to investors by the Portfolio Manager or the Administrator:

(a)     the percentage of the assets of the Company that are subject to special arrangements arising from their illiquid nature;

(b)     any new arrangements for managing the liquidity of the Company;

(c)     the current risk profile of the Company and the risk management systems employed by the Portfolio Manager to manage those risks; and

(d)     the total amount of leverage employed by the Company.

Any changes to the following information will be provided by the Portfolio Manager or the Administrator to investors without undue delay and may be provided by email:

(a)     the maximum level of leverage which the Portfolio Manager may employ on behalf of the Company;

(b)     the right of re-use of collateral or any changes to any guarantee granted under any leveraging arrangement; and

(c)     activation of liquidity management tools.

006290

## PLACING ARRANGEMENTS

**THE PLACING**

The target number of Placing Shares to be issued pursuant to the Placing is an amount of Shares equal to U.S. $153 million.  As at the date of this Offering Memorandum, the actual number of Placing Shares to be issued under the Placing is not known.

The results of the Placing will be released by the Company, including details of the number of Placing Shares allotted (or such other date as may be notified by the Company).  The Directors are under no obligation to issue share certificates unless requested to do so by a Shareholder.  No temporary documents of title will be issued.

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of US $153 million.

Placees will commit under the subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period.  The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.  Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the Adjusted NAV such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on pro rata basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

## TIME AND DATE OF THE OPENING AND CLOSING OF THE OFFER

006291

This subscription is open for a fixed offer period only. This period runs from November 15, 2017, the offer opening date, until 17:00 in Guernsey on the Closing Date.  Only fully completed applications received by this date with cleared funds in the Company's nominated account will be acceptable for investment.

## USE OF PROCEEDS

The Net Placing Proceeds will depend on the number of Placing Shares issued pursuant to the Placing.  The Portfolio Manager intends to invest the Net Placing Proceeds in accordance with the Company's investment policy (further details of the Company's investment process and strategy are set out in the section of this Offering Memorandum entitled "*Company, its Investment Objective, Policy and Strategy*").

## DEALINGS

The Company does not guarantee that at any particular time any market maker(s) will be willing to make a market in the Placing Shares, nor does it guarantee the price at which a market will be made in the Placing Shares.  Accordingly, the dealing price of the Placing Shares may not necessarily reflect changes in the Net Asset Value per Share. Furthermore, the level of the liquidity in the Placing Shares can vary significantly.

## SCALING BACK AND ALLOCATION

If aggregate applications for Placing Shares exceed 325 million Shares, being the maximum number of Shares to be issued pursuant to the Placing, it will be necessary to scale back applications under the Placing.  The Company reserves the right to decline in whole or in part any application for Placing Shares pursuant to the Placing.

## GENERAL

Pursuant to anti-money laundering laws and regulations with which the Company must comply in the UK and Guernsey, the Company (and its agents) may require evidence in connection with any application for Placing Shares, including further identification of the applicant(s), before any Placing Shares are issued.

In the event that there are any significant changes affecting any of the matters described in this Offering Memorandum or where any significant new matters have arisen after the publication of this Offering Memorandum, the Company will publish a notice to investors.  Such notice will give details of the significant change(s) or the significant new matter(s). In the event that the Company is required to publish any notice, applicants who have applied for Placing Shares shall have at least two clear business days following the publication of the relevant notice within which to withdraw their offer to subscribe for Placing Shares in its entirety.  The right to withdraw an application to subscribe for Placing Shares in these circumstances will be available to all investors in the Placing.  If the application is not withdrawn within the time limits set out in the relevant notice, any application for Placing Shares will remain valid and binding.

The Directors may, in their absolute discretion, waive the minimum application amounts in respect of any particular application for Placing Shares under the Placing.

Should the Placing be aborted or fail to complete for any reason, monies received will be returned without interest at the risk of the applicant to the bank account from which the money was received forthwith following such abort or failure, as the case may be.

## CLEARING AND SETTLEMENT

Payment for the Placing Shares should be made in accordance with settlement instructions to be provided to Placees by or on behalf of the Company.  To the extent that any application for Placing Shares is rejected in whole or in part (whether by scaling back or otherwise), monies received will be returned without interest at the risk of the applicant.

## PURCHASE AND TRANSFER RESTRICTIONS

This Offering Memorandum does not constitute an offer to sell, or the solicitation of an offer to acquire or subscribe for, Placing Shares in any jurisdiction where such an offer or solicitation is unlawful or would impose any unfulfilled registration, qualification, publication or approval requirements on the Company.

006292

The Company has elected to impose the restrictions described below on the Placing and on the future trading of the Placing Shares so that the Company will not be required to register the offer and sale of the Placing Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations.  The Company and its agents will not be obligated to recognise any resale or other transfer of the Placing Shares made other than in compliance with the restrictions described below.

***Restrictions due to lack of registration under the U.S. Securities Act and U.S. Investment Company Act***

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.  There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by (i) investors using assets of (A) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Code; or (C) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

***Subscriber and Shareholder warranties***

By participating in the Placing, each subscriber acknowledges and agrees that it will (for itself and any person(s) procured by it to subscribe for Shares and any nominee(s) for any such person(s)) be further deemed to represent and warrant to the Company that:

(a)     if it is located outside the United States, it is not a U.S. Person, it is acquiring the Shares in an offshore transaction meeting the requirements of Regulation S and it is not acquiring the Shares for the account or benefit of a U.S. Person;

(b)     if it is located inside the United States or is a U.S. Person, it is an Eligible U.S. Investor and has received, read, understood and, prior to its receipt of any Shares pursuant to the Placing, returned an executed a U.S. Investor Letter to the Company;

(c)     it acknowledges that the Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. Persons absent registration or an exemption from registration under the U.S. Securities Act;

(d)     it acknowledges that the Company has not registered under the U.S. Investment Company Act and that the Company has put in place restrictions for transactions not involving any public offering in the United States, and to ensure that the Company is not and will not be required to register under the U.S. Investment Company Act;

(e)     unless the Company expressly consents in writing otherwise, no portion of the assets used to purchase, and no portion of the assets used to hold, the Shares or any beneficial interest therein constitutes or will constitute the assets of (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account

006293

or other arrangement that is subject to Section 4975 of the U.S. Code; or (iii) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code.  In addition, if an investor is a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, its purchase, holding, and disposition of the Shares must not constitute or result in a non-exempt violation of any such substantially similar law;

(f)     that if any Shares offered and sold are issued in certificated form, then such certificates evidencing ownership will contain a legend substantially to the following effect unless otherwise determined by the Company in accordance with applicable law:

"THE COMPANY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") AND THE SECURITY EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) OUTSIDE THE UNITED STATES TO A NON-US PERSON (AS DEFINED IN RULE 902 OF REGULATION S, "US PERSON") THAT IS NOT A US RESIDENT FOR THE PURPOSES OF THE INVESTMENT COMPANY ACT (A "US RESIDENT") IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT (AND NOT IN A PRE- ARRANGED TRANSACTION RESULTING IN THE RESALE OF SUCH SECURITY INTO THE UNITED STATES) OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND UNDER CIRCUMSTANCES WHICH WILL NOT REQUIRE THE COMPANY TO REGISTER UNDER THE INVESTMENT COMPANY ACT (PROVIDED THAT, IF SUCH TRANSFER PURSUANT TO THIS CLAUSE (B) IS TO A US PERSON OR A US RESIDENT, THE PURCHASER IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) AND, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS.  THE HOLDER OF THIS SECURITY AGREES THAT IT WILL COMPLY WITH THE FOREGOING RESTRICTIONS.  NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THE SECURITY.

THE HOLDER ACKNOWLEDGES THAT THE COMPANY RESERVES THE RIGHT PRIOR TO ANY SALE OR OTHER TRANSFER TO REQUIRE THE DELIVERY OF SUCH CERTIFICATIONS, LEGAL OPINIONS AND OTHER INFORMATION AS THE COMPANY MAY REASONABLY REQUIRE TO CONFIRM THAT THE PROPOSED SALE OR OTHER TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

IF A BENEFICIAL OWNER OF THIS SECURITY WHO IS REQUIRED TO BE A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT IS AT ANY TIME NOT SUCH A QUALIFIED PURCHASER, THE COMPANY MAY (A) REQUIRE SUCH BENEFICIAL OWNER TO SELL THIS SECURITY TO A PERSON WHO IS NOT A US PERSON OR A US RESIDENT OR WHO IS A US PERSON WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR (B) SELL THIS SECURITY ON BEHALF OF THE BENEFICIAL OWNER AT THE BEST PRICE REASONABLY OBTAINABLE TO A PERSON WHO IS NOT A US PERSON OR WHO IS A US PERSON OR A US RESIDENT WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT.

THE HOLDER OF THIS SECURITY IS DEEMED TO HAVE ACKNOWLEDGED THAT THIS LEGEND WILL NOT BE REMOVED FROM THIS SECURITY FOR AS LONG AS THE COMPANY RELIES ON SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT";

006294

(g)     if in the future the investor decides to offer, sell, transfer, assign or otherwise dispose of the Shares, it will do so only in compliance with an exemption from the registration requirements of the U.S. Securities Act and under circumstances which will not require the Company to register under the U.S. Investment Company Act.  It acknowledges that any sale, transfer, assignment, pledge or other disposal made other than in compliance with such laws and the above stated restrictions will be subject to the compulsory transfer provisions as provided in the Articles;

(h)     if in the future it decides to offer, resell, pledge or otherwise transfer any of the Shares, such Shares may be offered, resold, pledged or otherwise transferred only (A) outside the United States to persons not known to be U.S. Persons in an offshore transaction in accordance with Rule 904 of Regulation S under the U.S. Securities Act, (B) in a transaction that does not require registration under the U.S. Securities Act or any applicable United States securities laws and regulations or require the Company to register under the U.S. Investment Company Act, subject to, if requested by the Company, delivery of an opinion of counsel of recognised standing in form and substance reasonably satisfactory to the Company, or (C) to the Company;

(i)     it is purchasing the Shares for its own account or for one or more investment accounts for which it is acting as a fiduciary or agent, in each case for investment only, and not with a view to or for sale or other transfer in connection with any distribution of the Shares in any manner that would violate the U.S. Securities Act, the U.S. Investment Company Act or any other applicable securities laws;

(j)     it acknowledges that the Company reserves the right to make inquiries of any holder of the Shares or interests therein at any time as to such person's status under the U.S. federal securities laws and to require any such person that has not satisfied the Company that holding by such person will not violate or require registration under the U.S. securities laws to transfer such Shares or interests in accordance with the Articles;

(k)     it acknowledges and understands that the Company is required to comply with FATCA and that the Company will follow FATCA's extensive reporting and withholding requirements.  The subscriber agrees to furnish any information and documents the Company may from time to time request, including but not limited to information required under FATCA;

(l)     it is entitled to acquire the Shares under the laws of all relevant jurisdictions which apply to it, it has fully observed all such laws and obtained all governmental and other consents which may be required thereunder and complied with all necessary formalities and it has paid all issue, transfer or other taxes due in connection with its acceptance in any jurisdiction of the Shares and that it has not taken any action, or omitted to take any action, which may result in the Company or its directors, officers, agents, employees and advisers being in breach of the laws of any jurisdiction in connection with the Placing or its acceptance of participation in the Placing;

(m)     it has received, carefully read and understands this Offering Memorandum, and has not, directly or indirectly, distributed, forwarded, transferred or otherwise transmitted this Offering Memorandum or any other presentation or offering materials concerning the Shares to within the United States or to any U.S. Persons, nor will it do any of the foregoing; and

(n)     if it is acquiring any Shares as a fiduciary or agent for one or more accounts, the investor has sole investment discretion with respect to each such account and full power and authority to make such foregoing representations, warranties, acknowledgements and agreements on behalf of each such account.

The Company and its directors, officers, agents, employees, advisers and others will rely upon the truth and accuracy of the foregoing representations, warranties, acknowledgments and agreements.

If any of the representations, warranties, acknowledgments or agreements made by the investor are no longer accurate or have not been complied with, the investor will immediately notify the Company.

006295

## TAXATION

### GENERAL

The information below, which relates only to Guernsey and UK taxation, summarises the advice received by the Board and is applicable to the Company (except insofar as express reference is made to the treatment of other persons) to persons who are resident or ordinarily resident in Guernsey or the United Kingdom for taxation purposes and who hold Placing Shares as an investment. It is based on current Guernsey and UK tax law and published practice, respectively, which law or practice is, in principle, subject to any subsequent changes therein (potentially with retrospective effect). Certain Shareholders, such as dealers in securities, collective investment schemes, insurance companies and persons acquiring their Placing Shares in connection with their employment may be taxed differently and are not considered. The tax consequences for each Shareholder of investing in the Company may depend upon the Shareholder's own tax position and upon the relevant laws of any jurisdiction to which the Shareholder is subject.

**If you are in any doubt about your tax position, you should consult your professional adviser.**

### GUERNSEY

The Directors intend to conduct the Company's affairs such that, based on current law and practice of the relevant tax authorities, the Company will not become resident for tax purposes in any other territory other than Guernsey.

#### *The Company*

The Company has been granted tax exempt status by the Director of Income Tax in Guernsey pursuant to the Income Tax (Exempt Bodies) (Guernsey) Ordinance, 1989. The Company will need to reapply annually for exempt status, an application that currently incurs a fee of £1,200 per annum. It is expected that the Company will continue to apply for exempt status annually.

Once exempt status has been granted, the Company is not considered resident in Guernsey for Guernsey income tax purposes and will be exempt from tax in Guernsey on both bank deposit interest and any income that does not have its source in Guernsey. It is not anticipated that any income other than bank deposit interest will arise in Guernsey and therefore the Company is not expected to incur any additional liability to Guernsey tax.

#### *Shareholders*

Non-Guernsey resident Shareholders will not be subject to any income tax in Guernsey in respect of or in connection with the acquisition, holding or disposal of any shares owned by them. Such Shareholders will receive dividends without deduction of Guernsey income tax.

Any Shareholders who are resident in Guernsey will be subject to Guernsey income tax on any dividends paid to such persons but will not suffer any deduction of tax by the Company from any such dividends payable where the Company is granted tax exempt status. The Company is however required to provide the Director of Income Tax the names, addresses and gross amount of any income paid to Guernsey resident shareholders during the previous year when renewing the Company's exempt tax status each year.

At present Guernsey does not levy taxes upon capital gains, capital transfer, wealth, sales or turnover (unless the varying of investments and turning of such investments to account is a business or part of a business), nor are there any estate duties save for registration fees and an ad valorem duty for a Guernsey grant of representation where the deceased dies leaving assets in Guernsey which require presentation of such a grant. No stamp duty is chargeable in Guernsey on the issue, transfer, switching or redemption of Shares in the Company.

#### *FATCA*

The US Hiring Incentives to Restore Employment Act resulted in the introduction of legislation in the US known as the Foreign Account Tax Compliance Act (**FATCA**) which has the effect that a 30 per cent withholding tax may be imposed on payments of US source income and certain payments of proceeds from the sale of property that could give rise to US source income unless there is compliance with requirements for the Company to report on an annual basis the identity of, and certain other information about, direct and indirect US investors in the Company to the relevant

006296

Guernsey authority for onward transmission to the US Internal Revenue Service (**IRS**). An investor that fails to provide the required information to the Company may be subject to the 30 per cent withholding tax with respect to its share of any such payments directly or indirectly attributable to US investments of the Company, and the Company might be required to terminate such investor's investment in the Company.

On 13 December 2013 an intergovernmental agreement was entered into between Guernsey and the US in respect of FATCA (the **IGA**), which agreement was enacted into Guernsey law as of 30 June 2014 by the Income Tax (Approved International Agreements) (Implementation) (United Kingdom and United States of America) Regulations, 2014. Guidance notes currently in draft form have been issued by the relevant Guernsey authority to provide practical assistance on the reporting obligations of affected businesses under the IGA.

Although the Company will attempt to satisfy any obligations imposed on it to avoid the imposition of such withholding tax, no assurance can be given that the Company will be able to satisfy these obligations. If the Company becomes subject to a withholding tax as a result of FATCA, the return of all Shareholders may be materially affected.

**This summary of Guernsey taxation issues can only provide a general overview of this area and it is not a description of all the tax considerations that may be relevant to a decision to invest in the Company. The summary of certain Guernsey tax issues is based on the laws and regulations in force as of the date of this document and may be subject to any changes in Guernsey law occurring after such date. Legal advice should be taken with regard to individual circumstances. Any person who is in any doubt as to his tax position or where he is resident, or otherwise subject to taxation, in a jurisdiction other than Guernsey, should consult his professional adviser.**

## UNITED KINGDOM

The following statements are intended as a general guide to certain UK tax considerations relating to an investment in Shares and do not purport to be a complete analysis of all potential UK tax consequences of holding Shares. They are based on current UK legislation and current published practice of HMRC, which may change, possibly with retroactive effect. Except insofar as express reference is made to the treatment of non-UK tax residents and non-UK domiciled individuals, they apply only to Shareholders who are resident and domiciled (in the case of individuals) or resident (in the case of companies) for tax purposes in (and only in) the UK, who hold their Shares as an investment (other than under an individual savings account) and who are the absolute beneficial owners of both the Shares and any dividends paid on them. The statements are not addressed to Shareholders who hold Shares in connection with a trade, profession or vocation carried on in the UK through a branch or agency (or, in the case of a corporate Shareholder, in connection with a trade in the UK carried on through a permanent establishment or otherwise). The tax position of certain categories of Shareholders who are subject to special rules (such as persons acquiring their Shares in connection with employment, dealers in securities, insurance companies and collective investment schemes) is not considered.

### Taxation of the Company

As the Company is an alternative investment fund for the purpose of the Alternative Investment Fund Managers Regulations 2013, it should not be considered to be UK resident for UK tax purposes. Accordingly, and provided that the Company does not carry on a trade in the UK through a permanent establishment situated therein for UK corporation tax purposes or through a branch or agency situated in the UK which would bring it within the charge to income tax, the Company will not be subject to UK corporation tax or income tax on income and capital gains arising to it save as noted below in relation to possible withholding tax on certain UK source income. The Directors intend that the affairs of the Company are conducted so that no such permanent establishment, branch or agency will arise insofar as this is within their control, but it cannot be guaranteed that the conditions necessary to prevent any such permanent establishment, branch or agency coming into being will at all times be satisfied.

Interest and other income received by the Company which has a UK source may be subject to withholding taxes in the UK.

### Disposals of Shares

Each class of Shares will constitute a relevant interest in an "offshore fund" for the purposes of UK taxation. Under the UK's offshore fund legislation, any gain arising on the sale, redemption or other disposal of shares in an offshore

006297

fund (which may include an in specie redemption by the Company) held by persons who are resident in the UK for tax purposes will be taxed at the time of such sale, disposal or redemption as income and not as a capital gain. This does not apply, however, where the relevant offshore fund is accepted by HMRC as a "reporting fund" throughout the period during which the relevant interests were held.

It is not currently intended that the Company will apply for reporting fund status under the offshore funds regime in respect of any Shares. Accordingly, Shareholders who are resident in the UK for taxation purposes may be liable to UK income taxation in respect of gains arising from the sale, redemption or other disposal of their Shares. Such gains may remain taxable notwithstanding any general or specific UK capital gains tax exemption or allowance available to a Shareholder and may result in certain Shareholders incurring a proportionately greater UK taxation charge. Any losses arising on the disposal of Shares by Shareholders who are resident in the UK will be eligible for capital gains loss relief. The Directors may launch one or more classes of Shares in future certified by HMRC as reporting funds for the purposes of UK taxation.

### Dividends

Any dividends received by UK resident individual Shareholders (or deemed to be received in the case of any future class of Shares with reporting fund status) will generally be subject to UK income tax whether or not such distributions are reinvested.

Dividends received by a UK resident Shareholder (or deemed to be received in the case of any future class of Shares with reporting fund status) within the charge to corporation tax should be exempt from tax in respect of dividends paid by the Company, although it should be noted that this exemption is subject to certain exclusions and specific anti-avoidance rules (particularly in the case of "small companies", as defined in section 931S of the Corporation Tax Act 2009 ("CTA 2009")).

### Other UK taxation considerations

The attention of non-corporate Shareholders who are resident in the UK is drawn to the provisions of Chapter 2 of Part 13 of the UK Income Tax Act 2007. These provisions are aimed at preventing the avoidance of income tax by individuals through transactions resulting in the transfer of assets or income to persons (including companies) resident or domiciled abroad and may render them liable for income tax in respect of undistributed income and profits of the Company. This legislation will, however, not apply if such a Shareholder can satisfy HMRC that either:

(i)     it would not be reasonable to draw the conclusion from all the circumstances of the case, that the purpose of avoiding liability to taxation was the purpose, or one of the purposes, for which the relevant transactions or any of them were effected;

(ii)     all the relevant transactions are genuine commercial transactions and it would not be reasonable to draw the conclusion, from all the circumstances of the case, that any one or more of the transactions was more than incidentally designed for the purpose of avoiding liability to taxation; or

(iii)     all the relevant transactions were genuine, arm's length transactions and if the Shareholder were liable to tax under Chapter 2 of Part 13 in respect of such transactions such liability would constitute an unjustified and disproportionate restriction on a freedom protected by Title II or IV of Part Three of the Treaty on the Functioning of the European Union or Part II or III of the EEA Agreement.

Chapter 3 of Part 6 of the CTA 2009 provides that, if at any time in an accounting period a corporate Shareholder within the charge to UK corporation tax holds an interest in an offshore fund and there is a time in that period when that fund fails to satisfy the "non-qualifying investments test", the interest held by such a corporate Shareholder will be treated for the accounting period as if it were rights under a creditor relationship for the purposes of the rules relating to the taxation of most corporate debt contained in the CTA 2009 (the "Corporate Debt Regime"). Shares will (as explained above) constitute interests in an offshore fund and, on the basis of the current investment policies of the Company, it is likely that the "non-qualifying investments test" will not be met. In circumstances where the test is not so satisfied (for example where the Company invests in cash, securities or debt instruments or open-ended companies that themselves do not satisfy the "non-qualifying investments test" and the market value of such investments exceeds

006298

60 per cent. of the market value of all its investments at any time), the Shares in the relevant class will be treated for corporation tax purposes as within the Corporate Debt Regime. As a consequence, all returns on the Shares in respect of each corporate Shareholder's accounting period during which the test is not met (including gains, profits and deficits and exchange gains and losses) will be taxed or relieved as an income receipt or expense on a fair value accounting basis. Accordingly, a corporate Shareholder in the Company may, depending on its own circumstances, incur a charge to corporation tax on an unrealised increase in the value of its holding of Shares (and, likewise, obtain relief against corporation tax for an unrealised reduction in the value of its holding of Shares). The provisions relating to non-reporting funds (outlined above) would not then apply to such corporate shareholders and the effect of the provisions relating to holdings in controlled foreign companies (outlined below) would then be substantially mitigated.

Part 9A of TIOPA 2010 subjects UK resident companies to tax on the profits of companies not so resident (such as the Company) in which they have an interest. The provisions, broadly, affect UK resident companies which hold, alone or together with certain other associated persons, shares which confer a right to at least 25 per cent. of the profits of a non-resident company (a "25% Interest") where that non-resident company is controlled by persons who are resident in the UK and is subject to a lower level of taxation in its territory of residence. The legislation is not directed towards the taxation of capital gains. In addition, these provisions will not apply if the shareholder reasonably believes that it does not hold a 25% Interest in the Company throughout the relevant accounting period.

The attention of persons resident in the UK for taxation purposes is drawn to the provisions of section 13 of the Taxation of Chargeable Gains Act 1992 ("section 13"). Section 13 applies to a "participator" for UK taxation purposes (which term includes a shareholder) if at any time when any gain accrues to the Company which constitutes a chargeable gain for those purposes, at the same time, the Company is itself controlled by a sufficiently small number of persons so as to render the Company a body corporate that would, were it to have been resident in the UK for taxation purposes, be a "close" company for those purposes. The provisions of section 13 could, if applied, result in any such person who is a "participator" in the Company being treated for the purposes of UK taxation of chargeable gains as if a part of any chargeable gain accruing to the Company had accrued to that person directly, that part being equal to the proportion of the gain that corresponds on a just and reasonable basis to that person's proportionate interest in the Company as a "participator". No liability under section 13 could be incurred by such a person however, where such proportion does not exceed one quarter of the gain. In addition, exemptions may also apply where none of the acquisition, holding or disposal of the assets had a tax avoidance main purpose or where the relevant gains arise on the disposal of assets used only for the purposes of genuine, economically significant business activities carried on outside the UK.

In the case of UK resident individuals domiciled outside the UK, section 13 applies only to gains relating to UK situate assets of the Company and gains relating to non-UK situate assets if such gains are remitted to the UK.

### Stamp duty and stamp duty reserve tax

No UK stamp duty or stamp duty reserve tax will be payable on an issue of Shares. UK stamp duty at the rate of 0.5% of the value of the consideration for the transfer of any Shares (rounded up where necessary to the nearest £5) may become payable on any instrument of transfer of the Shares which is executed within the UK, or which relates to any property situated, or to any matter or thing done or to be done, in the UK. Provided, as is the intention, that the Shares are not registered in any register kept in the UK by or on behalf of the Company and are not paired with shares issued by a body corporate incorporated in the UK, any agreement to transfer the Shares will not be subject to stamp duty reserve tax.

### Inheritance tax

A liability to UK inheritance tax on Shares may arise in the event of the death of or on the making of certain categories of lifetime transfers by an individual Shareholder domiciled or deemed to be domiciled in the UK for inheritance tax purposes.

### The Common Reporting Standard

Drawing extensively on the intergovernmental approach to implementing US FATCA, the OECD developed the Common Reporting Standard ("CRS") to address the issue of offshore tax evasion on a global basis. Aimed at maximizing efficiency and reducing cost for financial institutions, the CRS provides a common standard for due

006299

diligence, reporting and exchange of financial account information. Pursuant to the CRS, tax authorities in participating CRS jurisdictions will obtain from reporting financial institutions, and automatically exchange with other participating tax authorities in which the Shareholders of the reporting financial institution are resident on an annual basis, financial account and personal information with respect to all reportable accounts identified by financial institutions on the basis of common due diligence and reporting procedures. The first information exchanges are expected to begin in September 2017. Guernsey has legislated to implement the CRS. As a result, the Company will be required to comply with the CRS due diligence and reporting requirements, as adopted by Guernsey. Shareholders may be required to provide additional information to the Company to enable the Company to satisfy its obligations under the CRS. Failure to provide requested information may subject a Shareholder to liability for any resulting penalties or other charges and/or mandatory termination of its interest in the Company.

If you are in any doubt as to your tax position, you should consult your professional adviser.

006300

**SHAREHOLDERS OF THE COMPANY**

So far as the Company is aware, as at November 15 2017 (being the latest practicable date prior to publication of this document) CLO Holdco, Ltd. is the sole Shareholder and holds directly or indirectly 5% or more of the Company's voting rights.

Immediately following the Placing the following persons will hold directly or indirectly the following percentages of the Company's voting rights:

| Name | Immediately prior to the Placing | | Immediately following the Placing | |
|---|---|---|---|---|
| | Number of Shares | % of voting rights in respect of the issued share capital | Number of Shares | % of voting rights in respect of the issued share capital |
| CLO Holdco, Ltd. | 143,454,001.00 | 100.00% | 70,314,387.44 | 49.02% |
| HarbourVest Dover Street IX Investment L.P. | 0.00 | 0.00% | 50,917,791.20 | 35.49% |
| HarbourVest 2017 Global Fund L.P. | 0.00 | 0.00% | 3,478,649.09 | 2.42% |
| HarbourVest 2017 Global AIF L.P. | 0.00 | 0.00% | 6,957,226.48 | 4.85% |
| HV International VIII Secondary L.P. | 0.00 | 0.00% | 9,317,699.94 | 6.50% |
| HarbourVest Skew Base AIF L.P. | 0.00 | 0.00% | 1,034,136.77 | 0.72% |
| Highland Capital Management, L.P. | 0.00 | 0.00% | 898,708.98 | 0.63% |
| Lee Blackwell Parker, III | 0.00 | 0.00% | 94,173.23 | 0.07% |
| Quest IRA, Inc., fbo Lee B. Parker III, Acct. # 3058311 | 0.00 | 0.00% | 58,798.51 | 0.04% |
| Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811 | 0.00 | 0.00% | 239,018.34 | 0.17% |
| Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612 | 0.00 | 0.00% | 95,607.34 | 0.07% |
| Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 | 0.00 | 0.00% | 47,803.67 | 0.03% |

Save as set out above in this section of this Offering Memorandum, the Company is not aware of any person who holds, or who will immediately following the Placing hold, as shareholder directly or indirectly, 5% or more of the voting rights of the Company.

None of the Shareholders referred to in the table set forth in above has voting rights which differ from those of any other Shareholder in respect of any Shares held by them.

Save as set out in this above in this section of this Offering Memorandum, the Company is not aware of any person who immediately following the Placing directly or indirectly, jointly or severally, will own sufficient shares to exercise control over the Company.

006301

## ADDITIONAL INFORMATION ON THE COMPANY

### INCORPORATION AND ADMINISTRATION

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120.  The Company continues to be registered and domiciled in Guernsey.  The registered office and principal place of business of the Company is First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (telephone number 01481 715601).  The statutory records of the Company are kept at this address.  The Company operates and issues shares in accordance with the Companies Law and ordinances and regulations made thereunder and has no employees.  The Company shall have an unlimited life.

The Company is regulated by the GFSC and is not regulated by any regulator other than the GFSC.

The Company's accounting period will end on 31 December, of each year, with the first year end on 31 December 2015.

PricewaterhouseCoopers CI LLP of Royal Bank Place, 1 Glategny Esplanade, St Peter Port, Guernsey GY1 4ND has been the only Auditors of the Company since incorporation.  PricewaterhouseCoopers CI LLP is a member of the Institute of Chartered Accountants of England & Wales.  The Shareholders have the power, under the Companies Law, to appoint the auditor at each AGM or remove the auditor by ordinary resolution.

The annual report and accounts will be prepared according to GAAP.

Save for its entry into the material contracts summarised in "—*Material Contracts*" of this section of this Offering Memorandum and certain non-material contracts, since its incorporation the Company has not incurred borrowings, issued any debt securities, incurred any contingent liabilities or made any guarantees, nor granted any charges or mortgages.

Save as set out in "*Share Capital*" below, there have been no changes to the issued share capital of the Company since incorporation.

### SHARE CAPITAL

On incorporation, the share capital of the Company consisted of one ordinary share of no par value.  The Placing Shares will be issued in the form of participating ordinary shares having the rights set out in the Articles.  Shareholders have no right to have their Shares redeemed.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital is 143,454,001 shares of no par value.

None of the Shareholders has voting rights attaching to Shares that they hold which are different to the voting rights attached to any other Shares of the same class in the Company.

As at the date of this Offering Memorandum, the memorandum of incorporation provides that there is no limit on the number of shares of any class which the Company is authorised to issue.

The Directors have absolute authority under the Articles to allot the Shares to be issued pursuant to the Placing and are expected to do so shortly prior to the Placing.

No share or loan capital of the Company is under option or has been agreed, conditionally or unconditionally, to be put under option.

### DIRECTORS' AND OTHER INTERESTS

As at the date of this Offering Memorandum, none of the Directors or any person connected with any of the Directors has a Shareholding or any other interest in the share capital of the Company.  The Directors and their connected persons may, however, subscribe for Shares pursuant to the Placing.

006302

The Directors are not aware of any person or persons who, following the Placing, will or could, directly or indirectly, jointly or severally, exercise control over the Company and there are no arrangements known to the Directors the operation of which may subsequently result in change of control of the Company, other than as disclosed above in "Shareholders of the Company" on page 75 of this Offering Memorandum.

There are no outstanding loans from the Company to any of the Directors or any outstanding guarantees provided by the Company in respect of any obligation of any of the Directors.

The aggregate remuneration and benefits in kind of the Directors in respect of the Company's accounting period ending on 31 December 2017, which will be payable out of the assets of the Company, is not expected to exceed £150,000. No amount has been set aside or accrued by the Company to provide pension, retirement or other similar benefits.

No Director has a service contract with the Company, nor are any such contracts proposed. The Directors have been appointed through letters of appointment which can be terminated in accordance with the Articles and without compensation. The notice period specified in the Articles for the removal of Directors is one month. The Articles provide that the office of Director shall be terminated by, among other things: (i) written resignation; (ii) unauthorised absences from board meetings for 12 months or more; (iii) written request of the other Directors; and (iv) an ordinary resolution.

None of the Directors has, or has had, an interest in any transaction which is or was unusual in its nature or conditions or significant to the business of the Company and which has been effected by the Company since its incorporation.

In addition to their directorships of the Company, the Directors hold or have held the directorships and are or were members of the partnerships, as listed in the table below, over or within the past five years.

| Name | Current directorships/partnerships | Past directorships/partnerships |
|---|---|---|
| **William Scott** | Aberdeen Global Infrastructure GP Limited (name changed from Lloyds Bank Global Infrastructure GP Limited 15 May 2014) | BMS Specialist Debt Fund Limited (applied for voluntary strike-off 29 September 2014) |
| | Aberdeen Global Infrastructure GP II Limited | Cinven Capital Management (G3) Limited |
| | Aberdeen Infrastructure Finance GP Limited (name changed from Uberior Infrastructure Finance GP Limited 7 August 2014) | FCA Catalyst Fund SPC (formerly FCM Catalyst Fund SPC) |
| | Aberdeen Infrastructure Spain Co-Invest II GP Limited | FCA Catalyst Master Fund SPC (formerly FCM Catalyst Master Fund SPC) |
| | Absolute Alpha Fund PCC Limited | FCA Trading SPC (formerly FCM Trading SPC) |
| | AcenciA Debt Strategies Limited | Financial Risk Management Diversified Fund Limited |
| | AHL Strategies PCC Limited | Financial Risk Management Matrio Fund Limited |
| | Axiom European Financial Debt Fund Limited | Financial Ventures Limited |
| | Cinven Capital Management (V) General Partner Limited | FRM Access II Fund SPC |
| | Cinven Capital Management (VI) General Partner Limited | FRM Customised Diversified Fund Limited |
| | Cinven Capital Management (G4) Limited | FRM Diversified II Fund SPC |
| | Cinven Limited | FRM Diversified II Master Fund Limited |
| | Class N AHL 2.5XL Trading Limited | FRM Diversified III Fund PCC Limited |
| | Class P Global Futures EUR Trading Limited | FRM Diversified III Master Fund Limited |
| | Hanseatic Asset Management LBG | FRM Equity Alpha Limited |

| | |
|---|---|
| Highland CLO Funding, Ltd. | FRM Credit Strategies Fund PCC Limited |
| KCSB Properties Limited | FRM Credit Strategies Master Fund PCC Limited |
| MAN AHL Diversified PCC Limited | FRM Global Diversified Fund |
| Pershing Square Holdings Limited | FRM Phoenix Fund Limited (name changed from FRM Financials Limited 10 June 2008) |
| Sandbourne Asset Management  Limited (name changed from Sandbourne Asset Management  Guernsey Limited 26 June 2015) | FRM Sigma Fund Limited |
| Sandbourne PCC Limited | FRM Strategic Fund PCC Limited |
| Savile AD4 Limited | FRM Strategic Master Fund Limited |
| Savile AD7 Limited | FRM Tail Hedge Limited |
| Savile AD8 Limited | FRM Thames Fund General Partner 1 Limited |
| Savile AD9 Limited | Invista European Real Estate Trust SICAF |
| SPL Guernsey ICC Limited (formerly Arch Guernsey ICC Limited) | Land Race Limited |
| The Flight and Partners Recovery Fund Limited | OldCo Limited ( name changed from Axiom European Financial Debt Limited 25 September 2015) |
| 30 St. Mary Axe Management  Limited  Partnership Incorporated | Principia TR-S 40 Ltd |
| | Property Income & Growth Fund Limited |
| | PSource Structured Debt Fund Limited |
| | PSource Structured Debt SPV II Inc |
| | Sandbourne Fund |
| | Savile AD2 Limited |
| | Savile ANG1 Limited |
| | Savile APG1 Limited |
| | Savile APG3 Limited |
| | Savile Durham 1 Limited |
| | Savile Exeter 1 Limited |
| | Savile ML1 Limited |
| | Secured Real Estate Finance Limited (dormant after unsatisfactory fundraising) |
| | TBH Guernsey Limited |
| | Threadneedle Asset Backed Income Limited (dormant after unsatisfactory fundraising) |
| | UCAP Investment Management Fund PCC Limited (name changed from Uttrup Investment Management Fund PCC Limited 7 February 14) |
| | UCAP Investment Management Limited (name changed from Uttrup Investment Management Limited 7 February 14) |
| | WyeTree RMBS Opportunities Fund Limited (name changed from WyeTree Opportunities |

006304

Fund Limited 29 May 2014)

| Name | Current directorships/partnerships | Past directorships/partnerships |
|---|---|---|
| **Heather Bestwick** | Andium Homes Limited | Jersey Finance Limited |
| | Deutsche International Corporate Services Limited | Walkers Limited |
| | Equiom (Jersey) Limited | Walkers Capital Markets Limited |
| | Highland CLO Funding, Ltd. | Walkers Pension Services (Jersey) Limited |
| | Equiom (Guernsey) Limited | Walkers Property Services (Jersey) Limited |
| | Sole Shipping SO II GP Limited | Homelink (Jersey) Limited |
| | Sole Shipping SO Adviser Limited | Altamas Resources Limited |
| | EPE Special Opportunities plc | BSREP Marina Village (Jersey) Limited |
| | | Altair Partners Limited |
| | | Cyan Blue Topco Limited |
| | | Century Limited |
| | | Fundamental Global  Corporate Secured Loan Fund Limited |
| | | AEP 2003 Limited |
| | | AEP 2008 Limited |
| | | AEP 2012 Limited |
| | | Invision Capital Partners IV Limited |
| | | Invision IV Co-invest General Partner Limited |
| | | Invision Capital Partners V Limited |
| | | Triton Advisers Limited |
| | | GCP Infrastructure OEIC Limited |
| | | Equiom Trust Company (CI) Limited |
| | | Rokos Capital Management (GP) Limited |
| | | Rokos Intermediate (Jersey) Limited |

As at the date of this Offering Memorandum, there are no potential conflicts of interest between any duties to the Company of any of the Directors and their private interests and/or other duties.  There are no lock up provisions regarding the disposal by any of the Directors of any Shares.

Save as set out in immediately following paragraph below, as at the date of this Offering Memorandum:

(a)      none of the Directors has had any convictions in relation to fraudulent offences for at least the previous five years;

(b)      save as detailed above, none of the Directors was a director of a company, a member of an administrative, management or supervisory body or a senior manager of a company within the previous five years which has entered into any bankruptcy, receivership or liquidation proceedings;

(c)      none of the Directors has been subject to any official public incrimination and/or sanctions by statutory or regulatory authorities (including designated professional bodies) or has been

006305

disqualified by a court from acting as a member of the administrative, management or supervisory bodies of an issuer or from acting in the management or conduct of the affairs of any issuer for at least the previous five years; and

(d)     none of the Directors are aware of any contract or arrangement subsisting in which they are materially interested and which is significant to the business of the Company which is not otherwise disclosed in this Offering Memorandum.

In respect of the declaration in the immediately preceding paragraph above, certain of the Directors have been directors of entities which have been dissolved.  To the best of each Director's knowledge, no such entity, upon its dissolution, was insolvent or owed any amounts to creditors.

The Company maintains directors' and officers' liability insurance on behalf of the Directors at the expense of the Company.

No employees of the Administrator have any service contracts with the Company.

## MATERIAL CONTRACTS

The following are all of the contracts, not being contracts entered into in the ordinary course of business, that have been entered into by the Company since its incorporation and are, or may be, material or that contain any provision under which the Company has any obligation or entitlement which is or may be material to it as at the date of this Offering Memorandum.

### *Administration Agreement*

An administration agreement dated 10 August 2015 between (i) the Company and (ii) the Administrator, whereby the Administrator was appointed to act as administrator of the Company and provide related administrative, compliance and treasury services (the "**Administration Agreement**").

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

The Administration Agreement may be terminated by either party on not less than three months written notice (or such shorter notice as the parties may agree).  The Administration Agreement may be terminated immediately by either party:  (i) in the event that either party shall go into liquidation or receivership or an examiner shall be appointed to the Company (except for a voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the notifying party, such approval not to be unreasonably withheld or delayed) or be unable to pay its debts as they fall due or commits any act of bankruptcy under the laws of an applicable jurisdiction; or (ii) if the other party commits any material breach of the provisions of the Administration Agreement and, if such breach is capable of remedy shall not have remedied that within 30 days after the service of written notice requiring it to be remedied; (iii) if it shall become illegal or impossible without breach of any applicable laws and for reasons reasonably outside the control of the relevant party for any party to fulfil its obligations hereunder; or (iv) if any changes to the Administration Agreement are required as a consequence of any financial services regulation which may in the future bind any of the parties thereto and which cannot be agreed between the parties.  The appointment of the Administrator shall also automatically terminate forthwith if the Administrator shall become or be deemed to become resident for tax purposes in the United Kingdom or in any other place or places outside Guernsey in circumstances which cause the Company to become liable to pay any taxes which it would not otherwise be liable to pay.

The Company has given certain market standard indemnities in favour of the Administrator in respect of the Administrator's potential losses in carrying out its responsibilities under the Administration Agreement.

The Administration Agreement is governed by the laws of Guernsey.

006306

*Portfolio Management Agreement*

A Portfolio Management Agreement dated November 15, 2017 between (i) the Company and (ii) the Portfolio Manager (the "**Portfolio Management Agreement**"), pursuant to which the Company appointed the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

The Portfolio Management Agreement may be terminated in the event of (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full and (C) such other date as agreed between the Company and the Portfolio Manager.

In addition, the Portfolio Management Agreement may be terminated, and the Portfolio Manager removed for "Cause" by the Advisory Board or by the Board of Directors upon 30 business days' prior written notice to the Portfolio Manager.

As defined in the Portfolio Management Agreement, "Cause" means any one of the following events: (a) the Portfolio Manager wilfully violates, or takes any action that it knows breaches any material provision of the Portfolio Management Agreement or the Offering Memorandum applicable to it in bad faith (not including a wilful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions); (b) the Portfolio Manager breaches in any respect any provision of the Portfolio Management Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Portfolio Manager receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Portfolio Manager receives notice thereof; (c) the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for sixty (60) days; (d) the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under the Portfolio Management Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or (e) any Key Person of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

The Portfolio Management Agreement provides that if any of the events specified in the definition of "Cause" occurs, the Portfolio Manager will give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event. The Advisory Board and/or the Board of Directors may waive any event

006307

described in (a), (b), (d), or (e) above as a basis for termination of the Portfolio Management Agreement and removal of the Portfolio Manager under the terms of the Portfolio Management Agreement.

Any resignation or removal of the Portfolio Manager will only be effective on the satisfaction of certain conditions set out in the Portfolio Management Agreement.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to perform its obligations thereunder, with reasonable care (a) using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets that it manages for itself and others having similar investment objectives and restrictions, and (b) to the extent not inconsistent with the foregoing, in a manner consistent with the Portfolio Manager's customary standards, policies and procedures in performing its duties under the Portfolio Management Agreement (the "**Standard of Care**"); provided that the Portfolio Manager will not be liable for any loss or damages resulting from any failure to satisfy the Standard of Care except to the extent any act or omission of the Portfolio Manager constitutes a Portfolio Manager Breach (as defined below).  The Standard of Care may change from time to time to reflect changes by the Portfolio Manager to its customary standards, policies and procedures provided that such customary standards, policies and procedures are at least as rigorous as the foregoing.

The Portfolio Manager will not be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Company under the Portfolio Management Agreement for liabilities incurred by the Company as a result of or arising out of or in connection with the performance by the Portfolio Manager under the Portfolio Management Agreement, or for any losses or damages resulting from any failure to satisfy the Standard of Care except to the extent such liabilities were incurred by reason of acts or omissions constituting bad faith, fraud, wilful misconduct or due to the gross negligence (with such term given its meaning under New York law) or reckless disregard of the duties and obligations of the Portfolio Manager (a "**Portfolio Manager Breach**").

Under the Portfolio Management Agreement, the Company will be required to indemnify the Portfolio Manager and its affiliates, managers, directors, officers, secretaries, partners, agents and employees, from and against all liabilities incurred in connection with the Portfolio Management Agreement (except to the extent such liabilities are incurred as a result of any acts or omissions of the Portfolio Manager which constitute a Portfolio Manager Breach).

The Portfolio Manager is able to resign its role under the Portfolio Management Agreement upon 90 days' written notice to the Company.  Whilst the resignation will not be effective until the date as of which a successor adviser has been appointed, it may be difficult to locate an alternative adviser as a successor.  In addition, the Portfolio Manager may immediately resign by providing written notice to the Company upon the occurrence of certain events relating to the Company such as, amongst others, the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a wilful breach or knowing violation by the Company of a material provision of the Portfolio Management Agreement or the occurrence of insolvency proceedings in respect of the Company.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to the provision of certain human resources as may be necessary to enable the Company to conduct any matters related to its portfolio of assets.

Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Management Agreement is governed by the laws of the State of Texas.

*Predecessor and Interim Portfolio Management Agreements and Terminations*

Prior to the current Portfolio Management Agreement, the Company held a Portfolio Management Agreement dated 22 December 2016 (the "**Predecessor Portfolio Management Agreement**") between (i) the Company and (ii) Acis as the predecessor portfolio manager (the "**Predecessor Portfolio Manager**"), pursuant to which the Company appointed Acis as the Predecessor Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

- 82 -

006308

The terms of the Predecessor Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Predecessor Portfolio Management Agreement was governed by the laws of the State of Texas.

The Predecessor Portfolio Management Agreement was terminated pursuant to a Portfolio Management Agreement dated October 27, 2017 (the "**Interim Portfolio Management Agreement**") between (i) the Company and (ii) the Portfolio Manager and agreed and acknowledged by the Predecessor Portfolio Manager, pursuant to which the Company appointed Highland HCF as the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.  Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety, (y) each party thereto released the other party from all claims, suits or causes of action arising out of or relating to the Predecessor Portfolio Management Agreement and (z) each party ratified prior transactions effected in accordance with the Predecessor Portfolio Management Agreement.

The terms of the Interim Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Interim Portfolio Management Agreement was terminated pursuant to the Portfolio Management Agreement. Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety and (y) each party ratified prior transactions effected in accordance with the Interim Portfolio Management Agreement.

The Interim Portfolio Management Agreement was governed by the laws of the State of Texas.

### *Subscription and Transfer Agreement*

A Subscription and Transfer Agreement dated November 15, 2017 (the "**Subscription and Transfer Agreement**") entered into by and among the Company, the Portfolio Manager, CLO Holdco, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct. and Quest IRA, Inc., fbo Neil Desai, Acct., pursuant to which CLO Holdco, Ltd., as the existing Shareholder, agrees to transfer a portion of its shares to the new Shareholders listed above.

Under the Subscription and Transfer Agreement, CLO Holdco, Ltd. agreed to provide an indemnity to the new Shareholders relating to certain liabilities arising prior to the date of the transfer of Shares.

Further, each of the Shareholders subscribed to purchase Shares on a pro rata basis pursuant to commitments under the Subscription and Transfer Agreement, to be called for settlement by the Portfolio Manager from time to time during the Investment Period and at such time issued (including in the form of fractional shares).

The Subscription and Transfer Agreement may be terminated by mutual agreement of the parties.

The Subscription and Transfer Agreement is governed by the laws of Guernsey.

### *Members' Agreement*

A Shareholders' Agreement relating to the Company dated November 15, 2017 (the "**Shareholder's Agreement**"), among CLO HoldCo, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct., Quest IRA, Inc., fbo Neil Desai, Acct., the Company and the Portfolio Manager, which contemplates certain agreements of commercial terms among the Shareholders with respect to the formation of an Advisory Board, voting matters and the Shareholders' commitments to settle subscriptions for the Placing Shares.

006309

Pursuant to the Shareholders' Agreement, the Shareholders set forth their rights in respect of the Company with respect to their voting rights, the composition and function of the Advisory Board, provisions with respect to Shareholders defaulting on commitments to settle Shares, indemnification and restrictions on the transfers or disposals of Shares.

The Shareholders' Agreement will be terminated when one party holds all the Shares, when a resolution is passed by the Shareholders or creditors of the Company or with the written consent of the parties.

The Shareholders' Agreement is governed by the laws of Guernsey.

### NexBank Credit Facility

The Company currently has the NexBank Credit Facility with a principal amount of $22,158,337, as of September 30, 2017.  The NexBank Credit Facility is governed by an Amended and Restated Loan Agreement dated as of 17 January 2017 that provides for quarterly payments of principal and interest at 5.00% *per annum* and a maturity on November 23, 2021.

### Warehouse Loan Facilities

One or more multi-currency Warehouse Loan Facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider as described in "*Summary-Borrowing-Warehouse Loan Facilities*".

### Forward Purchase Agreements

Forward Purchase Agreements may be entered into from time to time, between (i) the Company and (ii) a CLO (each, a "**Forward Purchase Agreement**"), pursuant to which the Company may from time to time enter into sale and purchase contracts with a CLO with respect to the assets of the Company ("**Forward Sales**").  Such Forward Sales are with a view to effectively managing its access to wholesale funding and exposure to undesireable market price volatilities of its portfolio.  Such Forward Purchase Agreements may be entered into at the same time or shortly after the origination or acquisition of the relevant asset by the Company, at a later date, or not at all.  Where a loan becomes subject to a Forward Purchase Agreement, the Company will (subject to the conditions set out below) neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

Each Forward Sale will be conditional upon:

- the occurrence of the closing date of the relevant CLO; and

- the assets that are the subject of such Forward Sale satisfying a set of eligibility criteria on the closing date of the relevant CLO as agreed between the Company and the relevant CLO.

The Forward Purchase Agreements will contain standard limited recourse and non-petition provisions with respect to the Company and with respect to the relevant CLO.

The governing law of the Forward Purchase Agreements will be English or New York law.

### Custody Agreement

A custody agreement dated 10 August 2015 between (i) the Company and (ii) the Custodian (the "**Custody Agreement**"), whereby the Custodian was appointed to act as custodian of the Company's investments, cash and other assets.

The Custodian provides custody services in respect of such of the property of the Company which is delivered to and accepted by the Custodian as and when such custody services may be required.  Securities are held by the Custodian in one or more accounts registered in the name of the Company or of the Custodian, its delegate or a nominee. The securities are separately designated in the books of the Custodian as belonging to the Company.

006310

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub-custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub-custodian. All such charges shall be charged at normal commercial rates.

The Custody Agreement shall continue for an initial period of six months and thereafter may be terminated by either of the parties hereto on giving ninety (90) days' prior written notice to the other party hereto, provided that the appointment of the Custodian shall not terminate before the appointment of a replacement Custodian provided always if a replacement custodian is not appointed within six months from the date of the relevant termination notice, the Custody Agreement shall terminate in any event. It may be terminated without notice in certain specified circumstances including the insolvency of either party.

The Custodian has a market standard indemnity from the Company in relation to liabilities incurred other than as a result of its negligence, fraud, bad faith, wilful default or recklessness in carrying out its responsibilities under the Custody Agreement.

The Custody Agreement is governed by the laws of Ireland.

## MEMORANDUM AND ARTICLES

### Memorandum of Incorporation

The Memorandum of Incorporation provides that the Company's objects are unrestricted and it shall therefore have the full power and authority to carry out any object not prohibited by the Companies Law, or any other law of Guernsey.

### Articles of Incorporation

The Articles of Incorporation of the Company contain provisions, *inter alia*, to the following effect.

### *Share Capital*

The Company may issue an unlimited number of Shares of no par value each, including Unclassified Shares which may be designated and issued as Ordinary Shares or otherwise as the Directors may from time to time determine.

*Ordinary Shares*

The rights attaching to the Ordinary Shares shall be as follows:

(a)     As to income – subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and, within each such class, income shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

(b)     As to capital – on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles and the Companies Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and, within each such class, such assets shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of that class held by them.

(c)     As to voting – the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak  and vote at general meetings of the Company.

006311

*General*

Without prejudice to any special rights previously conferred on the holders of any existing Shares or class of Shares, any Share (or option, warrant or other right in respect of a Share) in the Company may be issued with such preferred, deferred or other special rights or restrictions, whether as to dividend, voting, return of capital or otherwise, as the Board may determine.

***Offers to Shareholders to be on a pre-emptive basis***

(a)     The Company shall not allot equity securities to a person on any terms unless:

    (i)     it has made an offer to each person who holds equity securities of the same class in the Company to allot to him on the same or more favourable terms a proportion of those securities that is as nearly as practicable equal to the proportion in number held by him of the share capital of the Company; and

    (ii)     the period during which any such offer may be accepted has expired or the Company has received notice of the acceptance or refusal of every offer so made.

(b)     Securities that the Company has offered to allot to a holder of equity securities in accordance with the preceding may be allotted to him, or anyone in whose favour he has renounced his right to their allotment, without contravening the restriction referred to in above.

(c)     Shares held by the Company as treasury shares shall be disregarded for the purposes of the restriction referred to in the second preceding paragraph, so that the Company is not treated as a person who holds equity shares; and the treasury shares are not treated as forming part of the equity share capital of the Company.

(d)     Any offer required to be made by the Company pursuant to the restriction referred to above should be made by a notice (given in accordance with "—*Notices*" below) and such offer must state a period during which such offer may be accepted and such offer shall not be withdrawn before the end of that period.  Such period must be a period of at least 21 days beginning on the date on which such offer is deemed to be delivered or received (as the case may be), pursuant to "—*Notices*" below.

(e)     The restriction referred to above shall not apply in relation to the allotment of bonus shares, nor to a particular allotment of equity securities if these are, or are to be, wholly or partly paid otherwise than in cash.

(f)     The Company may by special resolution resolve that the restriction referred to above shall be excluded or that the restriction referred to in above shall apply with such modifications as may be specified in the resolution:

    (i)     generally in relation to the allotment by the Company of equity securities;

    (ii)     in relation to allotments of a particular description; or

    (iii)     in relation to a specified allotment of equity securities;

and any such resolution must:  (A) state the maximum number of equity securities in respect of which the restriction referred to above is excluded or modified; and (B) specify the date on which such exclusion or modifications will expire, which must be not more than five years from the date on which the resolution is passed.

(g)     Any resolution passed pursuant to the provisions referred to in the preceding paragraph may:

    (i)     be renewed or further renewed by special resolution of the Company for a further period not exceeding five years; and

006312

      (ii)     be revoked or varied at any time by special resolution of the Company.

(h)     Notwithstanding that any such resolution referred to in the two preceding paragraphs has expired, the Directors may allot equity securities in pursuance of an offer or agreement previously made by the Company if the resolution enabled the Company to make an offer or agreement that would or might require equity securities to be allotted after it expired.

(i)     In relation to an offer to allot securities, a reference (however expressed) to the holder of shares of any description is to whoever was the holder of shares of that description at the close of business on a date to be specified in the offer and the specified date must fall within the period of 28 days immediately before the date of the offer.

### Issue of Shares

Subject to "—*Offers to Shareholders to be on a pre-emptive basis*", the unissued Shares shall be at the disposal of the Board, which is authorised to allot or grant options, warrants or other rights over or otherwise dispose of them to such persons on such terms and conditions and at such times as the Board determines but so that no Share shall be issued at a discount except in accordance with the Companies Law and so that the amount payable on application on each Share shall be fixed by the Board.

### Variation of class rights

If at any time the share capital is divided into different classes of Shares, the rights attached to any class (unless otherwise provided by the terms of issue) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of three-fourths of the issued Shares of that class or with the sanction of a special resolution of the holders of the Shares of that class.

### Winding up

The term of the Placing will commence on the date of the Placing and will end (and the Company thereafter will be wound up and dissolved) at the end of the Term, subject to extension as described in "*Summary-Term*".

If the Company is wound up whether voluntarily or otherwise the liquidator may with the sanction of a special resolution divide among the Shareholders in specie any part of the assets of the Company and may with the like sanction vest any part of the assets of the Company in trustees upon such trusts for the benefit of the Shareholders as the liquidator with the like sanction shall think fit.

If any of the securities or other assets to be divided as aforesaid involve a liability to calls or otherwise any person entitled under such division to any of the said assets may within fourteen (14) clear days after the passing of the special resolution, by notice in writing, direct the liquidator to sell his proportion and pay him the net proceeds and the liquidator shall, if practicable, act accordingly.

### Disclosure of Third Party Interests in Shares

The Directors shall have power, if required for any regulatory purposes, by notice in writing to require any Shareholder to disclose to the Company the identity of any person (other than the Shareholder) who has an interest in the Shares held by the Shareholder and the nature of such interest.  Any such notice shall require any information in response to such notice to be given in writing within the prescribed period which is 28 days after service of the notice or 14 days if the Shares concerned represent 0.25 per cent or more in value of the issued Shares of the relevant class or such other reasonable period as the Directors may determine.  If any Shareholder has been duly served with such a notice and is in default for the prescribed period in supplying to the Company the information required by such notice, the Directors may serve a direction notice upon such Shareholder. The direction notice may direct that in respect of the Shares in respect of which the default has occurred (the "default Shares") and any other Shares held by the Shareholder, the Shareholder shall not be entitled to vote (either personally or by representative or by proxy) in general meetings or class meetings.  Where the default Shares represent at least 0.25 per cent of the class of Shares concerned, the direction notice may additionally direct that dividends on such shares will be retained by the Company (without interest) and

006313

that no transfer of the Shares (other than a transfer approved under the Articles) shall be registered until the default is rectified.

*Dividends*

Subject to compliance with Section 304 of the Companies Law and the Distribution Priority, the Board may at any time declare and pay such dividends as appear to be justified by the position of the Company.  The Board may also declare and pay any fixed dividend which is payable on any Shares half-yearly or otherwise on fixed dates whenever the position, in the opinion of the Board, so justifies.  Dividend payments may be suspended by the Directors in their absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The method of payment of dividends shall be at the discretion of the Board and the Portfolio Manager.

No dividend shall be paid in excess of the amounts permitted by the Companies Law or approved by the Board.

Unless and to the extent that the rights attached to any Shares or the terms of issue thereof otherwise provide, all dividends shall be declared and paid pro rata according to the number of Shares held by each Shareholder.  For the avoidance of doubt, where there is more than one class of Shares in issue, dividends declared in respect of any class of Share shall be declared and paid pro rata according to the number of Shares of the relevant class held by each Shareholder.

With the sanction of the Company in general meeting by way of a special resolution, any dividend may be paid wholly or in part by the distribution of specific assets and, in particular, of paid-up Shares of the Company.  Where any difficulty arises in regard to such distribution, the Board may settle the same as it thinks expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets and may determine that cash payments shall be made to any Shareholders upon the basis of the value so fixed in order to adjust the rights of Shareholders and may vest any such specific assets in trustees for the Shareholders entitled as may seem expedient to the Board.

Any dividend interest or other monies payable in cash in respect of Shares may be paid by cheque or warrant sent through the post to the registered address of the holder or, in the case of joint holders, to the registered address of that one of the joint holders who is first named on the register.  Any one of two or more joint holders may give effectual receipts for any dividends, interest or other monies payable in respect of their joint holdings.  In addition, any such dividend or other sum may be paid by any bank or other funds transfer system or such other means and to or through such person as the holder or joint holders (as the case may be) may in writing direct, and the Company shall have no responsibility for any sums lost or delayed in the course of any such transfer or where it has acted on any such directions.  Any one of two or more joint holders may give effectual receipts for any dividends, interest, bonuses or other monies payable in respect of their joint holdings.

No dividend or other monies payable on or in respect of a Share shall bear interest against the Company.

All unclaimed dividends may be invested or otherwise made use of by the Board for the benefit of the Company until claimed and the Company shall not be constituted a trustee in respect thereof.  All dividends unclaimed for a period of six years after having been declared shall be forfeited and shall revert to the Company.

*Transfer of Shares*

No Shareholder shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**", other than to an Affiliate of an initial Shareholder party hereto, without the prior written consent of the Portfolio Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

(a)  such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in this Offering Memorandum;

(b)  such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the U.S. Investment Company Act;

(c)  such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

(d)  such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the U.S. Tax Code.

Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Shareholder or, in the case of CLO Holdco or a Highland Principal (as defined in the Members' Agreement), to Highland, its Affiliates or another Highland Principal) a Shareholder must first offer to the other Shareholders a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Shareholders will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Shareholders do not accept the offer, the Shareholder may (subject to complying with the other Transfer restrictions in the Articles) Transfer the applicable Shares that such Shareholders have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Shareholder has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Shareholders have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again.  Any Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Shareholder (subject to complying with the other Transfer restrictions in the Articles), any initial Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in the Articles), and CLO Holdco or the Highland Principals (unless such Shareholder is the Shareholder proposing the Transfer its shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in the Articles).

Subject to the Articles and such of the restrictions of the Articles as may be applicable, any Shareholder may transfer all or any of his certificated Shares by an instrument of transfer in any usual or common form or in any other form which the Board may approve.  The instrument of transfer of a certificated Share shall be signed by or on behalf of the transferor and, unless the Share is fully paid, by or on behalf of the transferee.  An instrument of transfer of a certificated Share need not be under seal.

The Board may, in its absolute discretion and without giving a reason, decline to transfer, convert or register any transfer of any Share in certificated form which is not fully paid or on which the Company has a lien.  The Directors may also refuse to register a transfer of Shares unless it is in respect of only one class of Shares, it is in favour of a single transferee or not more than four joint transferees; and in the case of a Share in certificated form, having been delivered for registration to the Office or such other place as the Board may decide, it is accompanied by the certificate(s) for the Shares to which it relates and such other evidence as the Board may reasonably require to prove the right of the transferor to make the transfer.

The Board may, in its absolute discretion, decline to register a transfer of any Shares to any person whose ownership may result in a person holding Shares in violation of the transfer restrictions published by the Company, from time to time.

The Directors may, in their absolute discretion, refuse to register a transfer of any Shares to a person that they have reason to believe is (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that is subject to Part 4 of Title 1 of ERISA, (ii) a plan, individual retirement account or other arrangement that is subject to Section

006315

4975 of the U.S. Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**") or any other state, local laws or regulations that would have the same effect as regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 to cause the underlying assets of the Company to be treated as assets of that investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company and the Portfolio Manager (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code, (iii) an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each of (i), (ii) and (iii) in this paragraph a "**Plan**") or (iv) any person in circumstances where the holding of Shares by such person would (a) give rise to an obligation on the Company to register as an "investment company" under the Investment Company Act (as defined in the Articles) (including because the holder of the Shares is not a "qualified purchaser" as defined in the Investment Company Act), (b) preclude the Company from relying on the exception to the definition of "investment company" contained in Section 3(c)(7) of the Investment Company Act, (c) give rise to an obligation on the Company to register its Shares under the Exchange Act, the Securities Act or any similar legislation (each as defined in the Articles), (d) result in the Company not being considered a "Foreign Private Issuer" as that term is defined by Rule 3b-4(c) promulgated under the Exchange Act, (e) give rise to an obligation on the Portfolio Manager to register as a commodity pool operator or commodity trading advisor under the U.S. Commodity Exchange Act of 1974, as amended, (f) cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code, or cause the Company to suffer any pecuniary disadvantage (including any excise tax, penalties or liabilities under ERISA or the U.S. Tax Code), or (g) give rise to the Company or the Portfolio Manager becoming subject to any U.S. law or regulation determined to be detrimental to it (each such person in this paragraph a "**Prohibited U.S. Person**"). Each person acquiring Shares shall by virtue of such acquisition be deemed to have represented to the Company that they are not a Prohibited U.S. Person.

If the Board refuses to register the transfer of a Share it shall, within two months after the date on which the transfer was lodged with the Company, send notice of the refusal to the transferee.

The registration of transfers may be suspended at such times and for such periods (not exceeding 30 days in the aggregate in any one calendar year) as the Board may decide on giving notice in *La Gazette Officielle* and either generally or in respect of a particular class of Share.

### Compulsory redemptions of Shares by the Company

The Company may redeem all or any of the Shares at any time subject to and in accordance with the provisions of the Members' Agreement and the Articles.

A Director is authorised to do all such acts and things as shall be necessary or expedient and to execute any documents deemed necessary or desirable in each case to complete any redemption of Shares subject to and in accordance with the Members' Agreement and the Articles.

The redemption of Shares under the Articles shall be deemed to be effective from the close of business on the relevant redemption date at which time any Shares which are so redeemed shall forthwith be cancelled and the name of the relevant Shareholder(s) be removed from the Register. Upon the redemption of a Share being effected pursuant to the Members' Agreement and the Articles, a Shareholder shall cease to be entitled to any rights in respect thereof save for payment of the redemption proceeds.

### Purchase of Shares

The Company may, at the discretion of the Board, purchase any of its own Shares, whether or not they are redeemable, and may pay the purchase price in respect of such purchase to the fullest extent permitted by the Companies Law.

### Notices

A notice or other communication may be given by the Company to any Shareholder by any means as set out in Section 523 of the Companies Law.

006316

Any notice or other document, if served by post (including registered post, recorded delivery service or ordinary letter post), shall be deemed to have been served 48 hours after the time when the letter containing the same is posted and in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly posted.

Any notice or other document that may be sent by the Company by courier will be deemed to be received 24 hours after the time at which it was despatched.

A notice may be given by the Company to the joint holders of a Share by giving the notice to the joint holder first named in the register in respect of the Share.

Any notice or other communication sent to the address of any Shareholder shall, notwithstanding the death, disability or insolvency of such Shareholder and whether the Company has notice thereof, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder and such service shall, for all purposes, be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in any such Share.

All Shareholders shall be deemed to have agreed to accept communication from the Company by electronic means in accordance with sections 524 and 526 and schedule 3 of the Companies Law unless a Shareholder notifies the Company otherwise.  Such notification must be in writing and signed by the Shareholder and delivered to the Company's registered office or such other place as the Board directs.  A Shareholder shall be entitled to require the Company to send him a version of a document or information in hard copy form.

Every person who becomes entitled to a Share shall be bound by any notice in respect of that Share which, before his name is entered in the register of members, has been duly given to a person from which he derives his title.

### *General meetings*

General meetings shall be held once at least in each calendar year in accordance with Section 199 of the Companies Law but so that not more than fifteen (15) months may elapse between one annual general meeting and the next.  At each such annual general meeting shall be laid copies of the Company's most recent accounts, Directors' report and, if applicable, the auditor's report in accordance with Section 252 of the Companies Law.  The requirement for an annual general meeting may be waived by the shareholders in accordance with Section 201 of the Companies Law.  Other meetings of the Company shall be called extraordinary general meetings.

All general meetings shall be held in Guernsey.

A shareholder participating by video link or telephone conference call or other electronic or telephonic means of communication in a meeting at which a quorum is present shall be treated as having attended that meeting, provided that the shareholders present at the meeting can hear and speak to the participating shareholder.

A video link or telephone conference call or other electronic or telephonic means of communication in which a quorum of shareholders participates and all participants can hear and speak to each other shall be a valid meeting which shall be deemed to take place where the Chairman is present unless the shareholders resolve otherwise.

Any general meeting convened by the Board, unless its time shall have been fixed by the Company in a general meeting or unless convened in pursuance of a requisition, may be postponed by the Board by notice in writing and the meeting shall, subject to any further postponement or adjournment, be held at the postponed date for the purpose of transacting the business covered by the original notice.

The Board may, whenever it thinks fit, and shall on the requisition of shareholders who hold more than ten per cent (10%) of such of the capital of the Company as carries the right to vote at general meetings (excluding any capital held as treasury shares) in accordance with Sections 203 and 204 of the Companies Law, proceed to convene a general meeting.

006317

*Notice of general meetings*

A general meeting of the Company (other than an adjourned meeting) must be called by notice of at least 14 clear days.

A general meeting may be called by shorter notice than otherwise required if all the Shareholders entitled to attend and vote so agree.

Notices and other documents may be sent in electronic form or published on a website in accordance with Section 208 of the Companies Law.

Notice of a general meeting of the Company must be sent to every Shareholder (being only persons registered as a Shareholder), every Director and every alternate Director registered as such.

Notice of a general meeting of the Company must state the time and date of the meeting, state the place of the meeting, specify any special business to be put to the meeting (as defined in the Articles), contain the information required under Section 178(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a special resolution at the meeting, contain the information required under Section 179(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a waiver resolution at the meeting, and contain the information required under Section 180(3)(a) of the Companies Law in respect of a resolution which is to be proposed as a unanimous resolution at the meeting.

Notice of a general meeting must state the general nature of the business to be dealt with at the meeting.

The accidental omission to give notice of any meeting to or the non-receipt of such notice by any Shareholder shall not invalidate any resolution or any proposed resolution otherwise duly approved.

*Conflicts of interest*

A Director must, immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the Company, disclose to the Board in accordance with section 162 of the Companies Law the nature and extent of that interest.

The obligation referred to above does not apply if:

    (a)    the transaction or proposed transaction is between the Director and the Company; and

    (b)    the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

A general disclosure to the Board to the effect that a Director has an interest (as director, officer, employee, member or otherwise) in a party and is to be regarded as interested in any transaction which may after the date of the disclosure be entered into with that party is sufficient disclosure of interest in relation to that transaction.

Nothing referred to above in this section applies in relation to:

    (a)    remuneration or other benefit given to a Director;

    (b)    insurance purchased or maintained for a Director in accordance with Section 158 of the Companies Law; or

    (c)    a qualifying third party indemnification provision provided for a Director in accordance with Section 159 of the Companies Law.

Subject to the paragraph below, a Director is interested in a transaction to which the Company is a party if such Director:

    (a)    is a party to, or may derive a material benefit from, the transaction;

006318

(b)     has a material financial interest in another party to the transaction;

(c)     is a director, officer, employee or member of another party (other than a party which is an associated company) who may derive a material financial benefit from the transaction;

(d)     is the parent, child or spouse of another party who may derive a material financial benefit from the transaction; or

(e)     is otherwise directly or indirectly materially interested in the transaction.

A Director is not interested in a transaction to which the Company is a party if the transaction comprises only the giving by the Company of security to a third party which has no connection with the Director, at the request of the third party, in respect of a debt or obligation of the Company for which the Director or another person has personally assumed responsibility in whole or in part under a guarantee, indemnity or security.

Save as provided in the Articles, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest otherwise than by virtue of his interest in Shares or debentures or other securities of or otherwise through the Company.  A Director may be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

A Director shall (in the absence of some other material interest than is indicated below) be entitled to vote (and be counted in the quorum) in respect of any resolution concerning any of the following matters, namely:

(a)     the giving of any guarantee, security or indemnity to him in respect of money lent or obligations incurred by him at the request of or for the benefit of the Company or any of its subsidiaries;

(b)     the giving of any guarantee, security or indemnity to a third party in respect of a debt or obligation of the Company or any of its subsidiaries for which he himself has assumed responsibility in whole or in part under a guarantee or indemnity or by the giving of security;

(c)     any proposal concerning an offer of Shares or debentures or other securities of or by the Company or any of its subsidiaries for subscription or purchase in which offer he is or is to be interested as a participant in the underwriting or sub-underwriting thereof; or

(d)     any proposal concerning any other company in which he is interested, directly or indirectly and whether as an officer or shareholder or otherwise howsoever, provided that he is not the holder of or beneficially interested in one per cent  or more of the issued shares of such company (or of any third company through which his interest is derived) or of the voting rights available to shareholders of the relevant company (any such interest being deemed for these purposes to be a material interest in all circumstances).

Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employment with the Company or any company in which the Company is interested, the Directors may be counted in the quorum for the consideration of such proposals and such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned (if not debarred from voting under the provisions referred to above) shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to any other Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

The Company may by ordinary resolution suspend or relax the provisions referred to above to any extent or ratify any transaction not duly authorised by reason of a contravention of any of the paragraphs above.

006319

Subject to the provisions referred to above the Directors may exercise the voting power conferred by the shares in any other company held or owned by the Company or exercisable by them as directors of such other company in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them director, managing director, managers or other officer of such company or voting or providing for the payment or remuneration to the directors, managing director, manager or other officer of such company).

A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director on such terms as to tenure of office or otherwise as the Directors may determine.

Subject to due disclosure in accordance with the provisions referred to in this section, no Director or intending Director shall be disqualified by his office from contracting with the Company as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested render the Director liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relationship thereby established.

Any Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director, provided that nothing herein contained shall authorise a Director or his firm to act as Auditor to the Company.

Any Director may continue to be or become a director, managing director, manager or other officer or member of any company in which the Company may be interested and (unless otherwise agreed) no such Director shall be accountable for any remuneration or other benefits received by him as a director, managing director, manager or other officer or member of any such other company.

### Remuneration and appointment of Directors

The ordinary remuneration of the Directors who do not hold executive office for their services (excluding amounts payable under any other sub-paragraph of the Articles) shall not exceed in aggregate £150,000 per annum or such higher amount as the Company may from time to time by ordinary resolution determine.  Such remuneration shall be deemed to accrue from day to day.  The Directors shall also be paid all reasonable out-of-pocket travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the Directors or any committee of the Directors or general meetings of the Company or in connection with the business of the Company.  In addition, the Board may award additional remuneration to any Director engaged in exceptional work at the request of the Board on a time spent basis.

The Board shall have power at any time to appoint any person eligible in accordance with Section 137 of the Companies Law to be a Director either to fill a casual vacancy or as an addition to the existing Directors but so that the total number of Directors shall not at any time exceed the number, if any, fixed pursuant to the Articles.  Any Director so appointed shall hold office only until the next following annual general meeting and shall then be eligible for re-election.  Without prejudice to the powers of the Board, the Company in general meeting may appoint any person to be a Director either to fill a casual vacancy or as an additional Director.

The Directors may at any time appoint one or more of their body (other than a Director resident in the United Kingdom) to the office of managing director for such term and at such remuneration and upon such terms as they determine.

### Disqualification of Directors

No person other than a Director retiring at a general meeting shall, unless recommended by the Directors, be eligible for election by the Company to the office of Director unless, not less than 14 clear days before the date appointed for the meeting there shall have been left at the Company's registered office notice in writing signed by a Shareholder duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election together with notice in writing signed by that person of his willingness to be elected.

A Director shall cease to hold office:  (i) if the Director (not being a person holding for a fixed term an executive office subject to termination if he ceases for any reason to be a Director) resigns his office by written notice signed by him sent to or deposited at the registered office of the Company, (ii) if he shall have absented himself from meetings of the Board for a consecutive period of 12 months and the Board resolves that his office shall be vacated, (iii) if he

006320

dies or becomes of unsound mind or incapable, (iv) if he becomes insolvent, suspends payment or compounds with his creditors, (v) if he is requested to resign by written notice signed by all his co-Directors, (vi) if the Company in general meeting shall declare that he shall cease to be a Director, (vii) if he becomes resident in the United Kingdom and, as a result thereof, a majority of the Directors are resident in the United Kingdom, (viii) if he becomes ineligible to be a Director in accordance with section 137 of the Companies Law or (ix) if he becomes prohibited from being a Director by reason of any order made under any provisions or any law or enactment.

*Indemnities*

The Directors, company secretary and officers of the Company and their respective heirs and executors shall, to the extent permitted by Section 157 of the Companies Law, be fully indemnified out of the assets and profits of the Company from and against all actions expenses and liabilities which they or their respective heirs or executors may incur by reason of any contract entered into or any act in or about the execution of their respective offices or trusts except such (if any) as they shall incur by or through their own negligence, default, breach of duty or breach of trust respectively and none of them shall be answerable for the acts, receipts, neglects or defaults of the others of them or for joining in any receipt for the sake of conformity or for any bankers or other person with whom any monies or assets of the Company may be lodged or deposited for safe custody or for any bankers or other persons into whose hands any money or assets of the Company may come or for any defects of title of the Company to any property purchased or for insufficiency or deficiency of or defect in title of the Company to any security upon which any monies of the Company shall be placed out or invested or for any loss misfortune or damage resulting from any such cause as aforesaid or which may happen in or about the execution of their respective offices or trusts, except if the same shall happen by or through their own negligence, default, breach of duty or breach of trust.

To the fullest extent permitted by applicable law (including the Companies Law) and subject to compliance with this Offering Memorandum, the Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (including executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") shall be fully indemnified against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

*Borrowing powers*

Subject to the restrictions set forth in this Offering Memorandum, the Board may exercise all the powers of the Company to borrow money (in whatever currency the Board determines from time to time) and to mortgage, hypothecate, pledge or charge all or part of its undertaking property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Company or of any third party, subject to any limits on borrowings adopted by the Board from time to time. The Board may exercise all the

powers of the Company to engage in currency or interest rate hedging in the interests of efficient portfolio management.

### *Forfeiture and surrender of Shares*

Any Share in respect of which a notice requiring payment of an unpaid call or instalment, together with any interest which may have accrued and any expenses which may have been incurred, has been served may, at any time before payment has been made, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited Share and not actually paid before the forfeiture.

The Board may accept from any Shareholder on such terms as agreed a surrender of any Shares in respect of which there is a liability for calls. Any surrendered Share may be disposed of in the same manner as a forfeited share.

If any Shares are owned directly or beneficially by a person believed by the Directors to be a Prohibited U.S. Person, the Directors may give notice to such person requiring them either (i) to provide the Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Directors that such person is not a Prohibited U.S. Person or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Directors with satisfactory evidence of such sale or transfer. Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

## LITIGATION

There are no, and have not been in the last 12 months, any governmental, legal or arbitration proceedings, nor, so far as the Company is aware, are any such proceedings pending or threatened, which may have, or have in the recent past had, a significant effect on the Company's financial position or profitability.

## RELATED PARTY TRANSACTIONS

Other than as set out in the section of this Offering Memorandum entitled "*—Material Contracts*" (including the NexBank Credit Facility), "*Investment Policy—Company Borrowing*" and cross-transactions as described in "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" the Company has not entered into any related party transactions. The consent of the Advisory Board will be required with respect to transactions with any Related Party.

## GENERAL

Highland may be regarded as the promoter of the Company. Save as disclosed in this section of this Offering Memorandum, no amount or benefit has been paid, or given, to the promoter or any of its subsidiaries since the incorporation of the Company and none is intended to be paid, or given. Highland is a limited partnership, established under the laws of the State of Delaware in the U.S. with its registered office at 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801.

The Net Placing Proceeds available for investment by the Company following the Placing will be approximately U.S. $153 million (less any amounts retained for working capital purposes) and these proceeds will be invested in accordance with the Company's investment policy described in the section of this Offering Memorandum entitled "*The Company*". Since incorporation, the Company has not commenced operations, and therefore has not generated earnings. As the Shares do not have a par value, the Placing Price consists solely of share premium.

None of the Shares available under the Placing are being underwritten.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

The Company does not own any premises and does not lease any premises.

006322

**THIRD PARTY SOURCES**

Where third party information has been referenced in this Offering Memorandum, the source of that third party information has been disclosed. Where information contained in this Offering Memorandum has been so sourced, the Company confirms that such information has been accurately reproduced and, as far as the Company is aware and able to ascertain from information published by such third parties, no facts have been omitted which would render the reproduced information inaccurate or misleading.

Highland has given and not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear. Highland accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Each of the Management Companies has given and, as at the date of this Offering Memorandum, has not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear. Each of the Management Companies accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

**WORKING CAPITAL**

The Company is of the opinion that the working capital available to the Group is sufficient for the present requirements of the Company, that is, for at least the next 12 months from the date of this Offering Memorandum.

**CAPITALISATION AND INDEBTEDNESS**

As at the date of this Offering Memorandum, the Company:

(a)  does not have any secured, unsecured or unguaranteed indebtedness, including indirect and contingent, other than the NexBank Credit Facility;

(b)  has not granted any mortgage or charge over any of its assets, other than that granted under the NexBank Credit Facility; and

(c)  does not have any contingent liabilities or guarantees.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital consisted of 143,454,001 Shares of no par value.

**DOCUMENTS AVAILABLE FOR INSPECTION**

Copies of the Articles, the constitutional documents of the Company, the material contracts referred to in "—*Material Contracts*" above and this Offering Memorandum will be available for inspection at the registered office of the Company during normal business hours on any weekday (Saturdays and public holidays excepted) up to and including the date of the Placing.

Copies of this Offering Memorandum may be obtained, free of charge during normal business hours on any weekday (bank and public holidays excepted) at the Company's registered office up to and including the date of the Placing.

**RELATIONSHIP BETWEEN SHAREHOLDERS, THE COMPANY AND SERVICE PROVIDERS**

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015. While prospective investors will acquire an interest in the Company on subscribing for Placing Shares, the Company is the sole legal and/or beneficial owner of its investments. Consequently, Shareholders have no direct legal or beneficial interest in those investments. The liability of Shareholders for the debts and other obligations of the Company is limited to the amount unpaid, if any, on the Placing Shares held by them.

006323

Shareholders' rights in respect of their investment in the Company are governed by the Articles, the Companies Law and the investment terms set out in this Offering Memorandum.

**RIGHTS AGAINST THIRD PARTIES, INCLUDING THIRD PARTY SERVICE PROVIDERS**

As the Company has no employees and the Directors have all been appointed on a non-executive basis, the Company is reliant on the performance of service providers listed in this Offering Memorandum (the "**Service Providers**").

Without prejudice to any potential right of action in tort that a Shareholder may have to bring a claim against a Service Provider, each Shareholder's contractual relationship in respect of its investment in Shares is with the Company only. Therefore, no Shareholder will have any contractual claim against any Service Provider with respect to such Service Provider's default.

**JURISDICTION AND APPLICABLE LAW**

As noted above, Shareholders' rights are governed by the Articles, the Companies Law and the terms set out in this Offering Memorandum.  By subscribing for Placing Shares, investors agree to be bound by the Articles, the Companies Law and the terms set out in this Offering Memorandum.

Information on the existence or not of any legal instruments providing for the recognition and enforcement of judgments in the territory where the Company is established is as follows. A final and conclusive judgement under which a sum of money is payable (not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or penalty) obtained in the superior courts in the reciprocating countries set out in the Judgments (Reciprocal Enforcement) (Guernsey) Law 1957 (the "**1957 Law**") (which includes the Supreme Court and the Senior Courts of England and Wales, excluding the Crown Court), after a hearing on the merits would be recognised as a valid judgement by the Guernsey courts and would be enforceable in accordance with and subject to the provisions of the 1957 Law.

The Guernsey courts would also recognise, without reconsideration of the merits and assuming proper service of process and assumption of jurisdiction in accordance with the laws of the relevant jurisdiction, any final and conclusive judgement under which affixed or ascertainable sum of money is payable (not being a sum payable in respect of taxes or other charges or a like nature or in respect of a fine or other penalty) obtained in a court not recognised by the 1957 Law provided that the judgment was not obtained by fraud or in a manner opposed to the principles of natural justice and recognition of the judgment is not contrary to public policy as applied by the Guernsey courts.

**FAIR TREATMENT AND PREFERENTIAL TREATMENT OF INVESTORS**

The Directors owe certain fiduciary duties to the Company which require them, among other things, to act in good faith and in what they consider to be the best interests of the Company.  In doing so, the Directors will act in a manner that ensures the fair treatment of investors.

Under the AIFMD Rules, the Portfolio Manager as AIFM must treat all investors fairly.  The Portfolio Manager ensures the fair treatment of investors through its decision-making procedures and organisational structure which (1) identify any preferential treatment, or the right thereto, accorded to investors and (2) ensure that any such preferential treatment does not result in an overall disadvantage to other investors.

In addition, the Portfolio Manager monitors the terms of side arrangements entered into with investors in relation to their investment in the Company to seek to ensure the fair treatment of investors.  In so doing, the Portfolio Manager takes into consideration whether such side arrangements are in accordance with side arrangements previously entered into.

The Portfolio Manager may enter into side letters in relation to the Company and its investments with certain individual investors covering, inter alia, *capacity, provision of additional information, fees, most favoured investor commitments, individual investor approval requirements, transfer rights and confirmations of how expenses will be borne*. Such information may provide the recipient greater insights into the Company activities than is included in standard reports to investors.  In entering into any side letters, the Company will act in the best interests of the investors as a whole.

006324

Information on such side letters will be disclosed to investors in accordance with the AIFMD.

006325

**TERMS AND CONDITIONS OF THE PLACING**

**INTRODUCTION**

Each Placee which confirms its agreement (whether orally or in writing) to subscribe for Placing Shares under the Placing will be bound by these terms and conditions and will be deemed to have accepted them.

The Company may require any Placee to agree to such further terms and/or conditions and/or give such additional warranties and/or representations as it (in its absolute discretion) sees fit and/or may require any such Placee to execute a separate placing letter (a "**Placing Letter**").

**AGREEMENT TO SUBSCRIBE FOR PLACING SHARES**

Any Placee agrees to become a member of the Company and agrees to subscribe for those Placing Shares allocated to it at the Placing Price in respect of the Placing Shares allocated to the Placee.  To the fullest extent permitted by law, each Placee acknowledges and agrees that it will not be entitled to exercise any remedy of rescission at any time.  This does not affect any other rights the Placee may have.

**PAYMENT FOR PLACING SHARES**

Each Placee must pay the Placing Price for the Placing Shares issued to the Placee in the manner and by the time directed by the Company.  If any Placee fails to pay as so directed and/or by the time required, the relevant Placee's application for Placing Shares shall be rejected.

**REPRESENTATIONS AND WARRANTIES**

By agreeing to subscribe for Placing Shares, each Placee which will enter into a commitment to subscribe for Placing Shares will (for itself and any person(s) procured by it to subscribe for Placing Shares and any nominee(s) for any such person(s)) agree, represent and warrant to the Company that:

(a)   in agreeing to subscribe for Placing Shares under the Placing, it is relying solely on this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and not on any other information given, or representation or statement made at any time, by any person concerning the Company or the Placing.  It agrees that none of the Company nor any of its respective officers, agents or employees, will have any liability for any other information or representation.  It irrevocably and unconditionally waives any rights it may have in respect of any other information or representation;

(b)   if the laws of any territory or jurisdiction outside the United Kingdom are applicable to its agreement to subscribe for Placing Shares under the Placing, it warrants that it has complied with all such laws, obtained all governmental and other consents which may be required, complied with all requisite formalities and paid any issue, transfer or other taxes due in connection with its placing commitment in any territory and that it has not taken any action or omitted to take any action which will result in the Company or any of its respective officers, agents, affiliates or employees acting in breach of the regulatory or legal requirements, directly or indirectly, of any territory or jurisdiction outside the United Kingdom in connection with the Placing;

(c)   it does not have a registered address in, and is not a citizen, resident or national of, any jurisdiction in which it is unlawful to make or accept an offer of the Placing Shares and it is not acting on a non-discretionary basis for any such person;

(d)   it agrees that, having had the opportunity to read this Offering Memorandum, it shall be deemed to have had notice of all information and representations contained in this Offering Memorandum, that it is acquiring Placing Shares solely on the basis of this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and no other information and that in accepting a participation in the Placing it has had access to all information it believes necessary or appropriate in connection with its decision to subscribe for Placing Shares;

006326

(e)      it acknowledges that no person is authorised in connection with the Placing to give any information or make any representation other than as contained in this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and, if given or made, any information or representation must not be relied upon as having been authorised by the Company;

(f)      it is not applying as, nor is it applying as nominee or agent for, a person who is or may be liable to notify and account for tax under the Stamp Duty Reserve Tax Regulations 1986 at any of the increased rates referred to in section 67, 70, 93 or 96 (depository receipts and clearance services) of the Finance Act 1986;

(g)      it accepts that none of the Placing Shares have been or will be registered under the laws of any Restricted Territory.  Accordingly, the Placing Shares may not be offered, sold, issued or delivered, directly or indirectly, within any Restricted Territory unless an exemption from any registration requirement is available;

(h)      if it is receiving the offer in circumstances under which the laws or regulations of a jurisdiction other than the United Kingdom would apply, that it is a person to whom the Placing Shares may be lawfully offered under that other jurisdiction's laws and regulations;

(i)      if it is a resident in the EEA (other than the United Kingdom), it is a "Qualified Investor" within the meaning of the law in the Relevant Member State implementing Article 2(1)(e)(i), (ii) or (iii) of the Prospectus Directive;

(j)      if it is outside the United Kingdom, neither this Offering Memorandum nor any other offering, marketing or other material in connection with the Placing constitutes an invitation, offer or promotion to, or arrangement with, it or any person whom it is procuring to subscribe for Placing Shares pursuant to the Placing unless, in the relevant territory, such offer, invitation or other course of conduct could lawfully be made to it or such person and such documents or materials could lawfully be provided to it or such person and Placing Shares could lawfully be distributed to and subscribed and held by it or such person without compliance with any unfulfilled approval, registration or other regulatory or legal requirements;

(k)      it acknowledges the representations, warranties and agreements set out in this Offering Memorandum, including those set out in the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*", and further acknowledges that it is not a U.S. Person, it is not located within the United States, it is subscribing for Placing Shares in an "offshore transaction" as defined in Regulation S and it is not acquiring the Placing Shares for the account or benefit of a U.S. Person, and where it is subscribing for Placing Shares for one or more managed, discretionary or advisory accounts, it is authorised in writing for each such account:  (i) to subscribe for the Placing Shares for each such account; (ii) to make on each such account's behalf the representations, warranties and agreements set out in this Offering Memorandum or in any Placing Letter, where relevant; and (iii) to receive on behalf of each such account any documentation relating to the Placing in the form provided by the Company.  It agrees that the provision of this paragraph shall survive any resale of the Placing Shares by or on behalf of any such account;

(l)      it is acting as principal only in respect of the Placing, or, if it is acting for any other person (i) it is and will remain liable to the Company for the performance of all its obligations as a placee in respect of the Placing (regardless of the fact that it is acting for another person), (ii) it is both an "authorised person" for the purposes of FSMA and a "qualified investor" as defined at Article 2.1(e)(i) of Directive 2003/71/EC (known as Prospectus Directive) acting as agent for such person, and (iii) such person is either (1) a FSMA Qualified Investor or (2) its "client" (as defined in section 86(2) of FSMA) that has engaged it to act as his agent on terms which enable it to make decisions concerning the Placing or any other offers of transferable securities on his behalf without reference to him;

(m)      it has not and will not offer or sell any Placing Shares to persons in the United Kingdom, except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business or otherwise in circumstances which

006327

have not resulted and which will not result in an offer to the public in the United Kingdom within the meaning of section 102B of the FSMA;

(n)    it is an "eligible counterparty" within the meaning of Chapter 3 of the FCA's Conduct of Business Sourcebook and it is subscribing for or purchasing the Shares for investment only and not for resale or distribution;

(o)    it irrevocably appoints any Director of the Company to be its agent and on its behalf (without any obligation or duty to do so), to sign, execute and deliver any documents and do all acts, matters and things as may be necessary for, or incidental to, its subscription for all or any of the Placing Shares for which it has given a commitment under the Placing, in the event of its own failure to do so;

(p)    it accepts that if the Placing does not proceed or such Placing Shares are not admitted to a securities exchange for any reason whatsoever, then none of the Company or any of its affiliates, nor persons controlling, controlled by or under common control with any of them nor any of their respective employees, agents, officers, members, stockholders, partners or representatives, shall have any liability whatsoever to it or any other person;

(q)    it has not taken any action or omitted to take any action which will or may result in the Company or any of its directors, officers, agents, affiliates, employees or advisers being in breach of the legal or regulatory requirements of any territory in connection with the Placing or its subscription of Placing Shares pursuant to the Placing;

(r)    in connection with its participation in the Placing it has observed all relevant legislation and regulations, in particular (but without limitation) those relating to money laundering and countering terrorist financing and that its placing commitment is only made on the basis that it accepts full responsibility for any requirement to identify and verify the identity of its clients and other persons in respect of whom it has applied. In addition, it warrants that it is a person: (i) subject to the Money Laundering Regulations 2007 in force in the United Kingdom; or (ii) subject to the Money Laundering Directive (2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing); or (iii) subject to the Guernsey AML Requirements; or (iv) acting in the course of a business in relation to which an overseas regulatory authority exercises regulatory functions and is based or incorporated in, or formed under the law of, a country in which there are in force provisions at least equivalent to those required by the Money Laundering Directive;

(s)    due to anti-money laundering and the countering of terrorist financing requirements, the Company may require proof of identity of the Placee and related parties and verification of the source of the payment before the placing commitment can be processed and that, in the event of delay or failure by the Placee to produce any information required for verification purposes, the Company may refuse to accept the placing commitment and the subscription moneys relating thereto. It holds harmless and will indemnify the Company against any liability, loss or cost ensuing due to the failure to process the placing commitment, if such information as has been required has not been provided by it or has not been provided timeously;

(t)    any person in Guernsey involved in the business of the Company who knows or suspects or has reasonable grounds for knowing or suspecting that any other person (including the Company or any person subscribing for Placing Shares) is involved in money laundering activities, is under an obligation to report such suspicion to the relevant authorities pursuant to the Guernsey AML Requirements. Similar disclosures may be required under other legislation;

(u)    it and each person or body (including, without limitation, any local authority or the managers of any pension fund) on whose behalf it accepts Placing Shares pursuant to the Placing or to whom it allocates such Placing Shares have the capacity and authority to enter into and to perform their obligations as a Placee of the Placing Shares and will honour those obligations;

- 102 -

(v)    it confirms that it is not acquiring the Placing Shares using the assets of: (i)(A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law;

(w)    the representations, undertakings and warranties contained in this Offering Memorandum or in any Placing Letter, where relevant, are irrevocable. It acknowledges that the Company and its affiliates will rely upon the truth and accuracy of such representations and warranties and it agrees that if any of the representations or warranties made or deemed to have been made by its subscription of the Shares are no longer accurate, it shall promptly notify the Company;

(x)    nothing has been done or will be done by it in relation to the Placing that has resulted or could result in any person being required to publish a prospectus in relation to the Company or to any ordinary shares in accordance with FSMA or the Prospectus Rules or in accordance with any other laws applicable in any part of the European Union or the European Economic Area;

(y)    it accepts that the allocation of Placing Shares shall be determined by the Company in its absolute discretion and that such persons may scale down any placing commitments for this purpose on such basis as they may determine; and

(z)    time shall be of the essence as regards its obligations to settle payment for the Placing Shares and to comply with its other obligations under the Placing; and

(aa)   it has been provided an opportunity to ask questions of, and have received satisfactory answers thereto from, the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable, regarding the Company's assets and the terms and conditions of the offering of the Placing Shares, and it and its representatives have obtained all additional information requested of the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable and to the extent such information is in their possession or reasonably obtainable thereby without undue expense or burden, in order to respond to any inquiries it has made regarding the offering of the Placing Shares. In connection with the offering of the Shares, it is not relying upon any statements other than those statements contained in the Offering Memorandum. It are not relying on the Company, the Portfolio Manager, Highland, Acis and/or their respective any of its respective affiliates or any of its partners, members, managers, shareholders, officers, employees, shared personnel, representatives, consultants, advisors, attorneys or agents for legal, investment or tax advice. It has sought independent legal, investment and tax advice to the extent that it has deemed necessary or appropriate in connection with its decision to subscribe for the Placing Shares.

## SUPPLY AND DISCLOSURE OF INFORMATION

If the Administrator or the Company or any of their agents request any information in connection with a Placee's agreement to subscribe for Placing Shares under the Placing or to comply with any relevant legislation, such Placee must promptly disclose it to them.

## DATA PROTECTION

Pursuant to the Data Protection (Bailiwick of Guernsey) Law, 2001, as amended (the "**DP Law**") and any successor legislation, the Company and/or the Administrator may hold personal data (as defined in the DP Law) relating to past and present Shareholders.

006329

Such personal data held is used by those parties in relation to the Placing and to maintain a register of the Shareholders and mailing lists and this may include sharing such data with third parties in one or more of the countries mentioned below when (a) effecting the payment of dividends and redemption proceeds to Shareholders (in each case, where applicable) and, if applicable, the payment of commissions to third parties; and (b) filing returns of Shareholders and their respective transactions in shares with statutory bodies and regulatory authorities.  Personal data may be retained on record for a period exceeding six years after it is no longer used.

The countries referred to above include, but need not be limited to, those in the European Economic Area or the European Union and any of their respective dependent territories overseas, Andorra, Argentina, Canada, State of Israel, New Zealand, Switzerland and the Eastern Republic of Uruguay.

By becoming registered as a holder of Placing Shares in the Company a person becomes a data subject (as defined in the DP Law) and is deemed to have consented to the processing by the Company and the Administrator of any personal data relating to them in the manner described above.

The Company will be the "data controller" in respect of the personal data, but has appointed the Administrator as a "data processor" of such data (each as defined in the DP Law).  Details of the registration of the Company as data controller can be found on the website of the Guernsey Data Protection Commissioner:  www.dpr.gov.gg.

**MISCELLANEOUS**

The rights and remedies of the Company and the Administrator under these terms and conditions are in addition to any rights and remedies which would otherwise be available to each of them and the exercise or partial exercise of one will not prevent the exercise of others.

On the acceptance of their placing commitment, if a Placee is a discretionary fund manager, that Placee may be asked to disclose in writing or orally the jurisdiction in which its funds are managed or owned.  All documents provided in connection with the Placing will be sent at the Placee's risk.  They may be returned by post to such Placee at the address notified by such Placee.

Each Placee agrees to be bound by the Articles (as amended from time to time) once the Placing Shares, which the Placee has agreed to subscribe for pursuant to the Placing, have been acquired by the Placee.  The contract to subscribe for Placing Shares under the Placing and the appointments and authorities mentioned in this Offering Memorandum will be governed by, and construed in accordance with, the laws of England.  For the exclusive benefit of the Company and the Administrator, each Placee irrevocably submits to the jurisdiction of the courts of England and Wales and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.  This does not prevent an action being taken against a Placee in any other jurisdiction.

In the case of a joint agreement to subscribe for Placing Shares under the Placing, references to a "Placee" in these terms and conditions are to each of the Placees who are a party to that joint agreement and their liability is joint and several.

The Company expressly reserves the right to modify the Placing (including, without limitation, its timetable and settlement) at any time prior to the date of the Placing.

006330

**PLACING STATISTICS**

Target Gross Placing Proceeds[*]                                    U.S. $153 million

Minimum expected initial Net Asset Value per Share[**]             U.S. $1.02535

---

[*]   The target size of the Placing is U.S. $153 million.  The number of Placing Shares to be issued, and therefore the Gross Placing Proceeds, is not known as at the date of this Offering Memorandum.

[**]  NAV per Share immediately following Placing based on the NAV of the Company as at September 30, 2017, as adjusted with respect to a dividend of US $ 9 million on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. for an aggregate purchase price of $991,180.13 on October 24, 2017.

006331

## DEFINITIONS

The following definitions apply in this Offering Memorandum unless the context otherwise requires:

| | |
|---|---|
| "**2010 PD Amending Directive**" | Directive 2010/73/EU of the European Parliament and of the Council of 24 November 2010 amending Directives 2003/71/EC on the prospectus to be published when securities are offered to the public or admitted to trading and 2004/109/EC on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market |
| "**Accredited Investor**" | an as "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act |
| "**Acis**" | Acis Capital Management, L.P. |
| "**Acis CLO Management**" | Acis CLO Management, LLC |
| "**Acis Legacy CLO**" | a CLO in which Acis is the CLO manager |
| "**Administration Agreement**" | the agreement dated 10 August 2015 between the Company and the Administrator, a summary of which is set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Administrator**" | State Street (Guernsey) Limited, or such other person or persons from time to time appointed by the Company |
| "**affiliate**" or "**affiliated**" | with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "affiliate" of the Company solely because the Administrator or its affiliates serve as administrator or share trustee for such entity |
| "**AIF**" | an alternative investment fund, as defined in the AIFMD |
| "**AIFM**" | an alternative investment fund manager, as defined in the AIFMD |
| "**AIFMD**" | Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directive 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010 |

006332

| | |
|---|---|
| **"AIFMD Rules"** | any implementing legislation and regulations under AIFMD including, without limitation, Commission Delegated Regulation (EU) No 231/2013 supplementing the AIFMD with regard to exemptions, general operating conditions, depositaries, leverage, transparency, supervision and other applicable regulations implementing the AIFMD, in each case as may be altered, amended, added to or cancelled from time to time |
| **"Application Form"** | the application form for Shares, which is available upon request; |
| **"Approved Pricing Source"** | in relation to loans, Markit Partners or any other entity appointed from time to time and in relation to CLO Notes, Thomson Reuters or any other entity appointed from time to time |
| **"Articles"** | the articles of incorporation of the Company |
| **"Audit Committee"** | the audit committee of the Company, as more fully described in the section of this Offering Memorandum entitled "*Audit Committee*" in "*Company Directors and Administration*" |
| **"Auditor"** | PricewaterhouseCoopers CI LLP, or such other person or persons from time to time appointed by the Company |
| **"bps"** | basis point |
| **"Business Day"** | a day on which the banks in Guernsey and the United Kingdom are normally open for business |
| **"certificated"** or **"certificated form"** | not in uncertificated form |
| **"Chairman"** | the chairman of the Board |
| **"CLO"** | a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans |
| **"CLO Income Notes"** | the most subordinated tranche of debt issued by a CLO (which may be represented by a debt or equity security) |
| **"CLO Manager"** | the entity acting as manager in a CLO pursuant to the relevant CLO Management Agreement |
| **"CLO Notes"** | notes representing tranches of debt issued by a CLO, including CLO Income Notes (which may be represented by a debt or equity security) |
| **"Closing Date"** | November 15, 2017 |
| **"Companies Law"** | the Companies (Guernsey) Law 2008, as amended, extended or replaced and any ordinance, statutory instrument or regulation made thereunder |
| **"Company"** | Highland CLO Funding, Ltd., a closed-ended investment company incorporated in Guernsey under the Companies Law on 30 March 2015 with registration number 60120 |
| **"CRR"** | Regulation 575/2013 of the European Parliament and of the Council on prudential requirements for credit institutions and investment firms |

006333

| | |
|---|---|
| "**CRR Retention Requirements**" | the retention requirements contained in the CRR as amended from time to time and including any guidance or any technical standards published in relation thereto |
| "**Custodian**" | State Street Custodial Services (Ireland) Limited |
| "**Custody Agreement**" | the agreement dated 10 August 2015 between the Company and the Custodian, further details of which are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Directors**" or "**Board**" or "**Board of Directors**" | the directors of the Company |
| "**DP Law**" | The Data Protection (Bailiwick of Guernsey) Law, 2001, as amended |
| "**EEA**" | the European Economic Area being the countries included as such in the Agreement on European Economic Area, dated 1 January 1994, among Iceland, Liechtenstein, Norway, the European Community and the EU Member States, as may be modified, supplemented or replaced |
| "**Eligible U.S. Investor**" | a U.S. Person who is reasonably believed to be (x) a Qualified Institutional Buyer and a Qualified Purchaser (y) an Accredited Investor and a Qualified Purchaser or (z) an Accredited Investor and a Knowledgeable Employee with respect to the Company and to whom the Company is privately placing a certain number of the Placing Shares in reliance on exemptions from registration under the U.S. Securities Act and the U.S. Investment Company Act |
| "**ERISA**" | the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable regulations thereunder |
| "**EU**" | the European Union |
| "**EU Member State**" | a member country of the EU |
| "**EU Retention Requirements**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**EU Savings Tax Directive**" | Council Directive 2003/48/EC of 3 June 2003 on taxation of savings income in the form of interest payments |
| "**EURIBOR**" | Euro interbank offered rate, a benchmark interest rate |
| "**Euro**" or "**€**" | the lawful currency of the EU |
| "**FATCA**" | the U.S. Foreign Account Tax Compliance Act 2010 |
| "**FATCA Withholding**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**Financial Conduct Authority**" or "**FCA**" | the UK Financial Conduct Authority and any successor regulatory authority |

006334

| | |
|---|---|
| **"Forward Purchase Agreement"** | agreements which may be entered into from time to time between the Company and a CLO pursuant to which the Company may, from time to time, enter into sale and purchase contracts with a CLO with respect to certain assets of the Company |
| **"FSMA"** | the Financial Services and Markets Act 2000 of the United Kingdom, as amended |
| **"FTT"** | the European Commission's proposal for a Directive for a common financial transaction tax in certain EU Member States |
| **"GFSC"** or **"Commission"** | the Guernsey Financial Services Commission |
| **"GFSC Code"** | the Finance Sector Code of Corporate Governance published by the Commission |
| **"Gross Placing Proceeds"** | the aggregate value of the Placing Shares |
| **"Guernsey AML Requirements"** | The Criminal Justice (Proceeds of Crime) (Bailiwick of Guernsey) Law, 1999, the Criminal Justice (Proceeds of Crime) (Financial Services Businesses) (Bailiwick of Guernsey) Regulations 2007 and the Handbook of Financial Services Business (in each case as amended) and any other regulations relating to prevention of use of the financial system for the purpose of money laundering and made pursuant thereto |
| **"Guernsey IGA Legislation"** | Guernsey legislation implementing the IGA |
| **"Highland"** | Highland Capital Management, L.P. |
| **"Highland CLO"** | a CLO in which Highland or Highland CLO Management (or their affiliate) or a wholly owned subsidiary of the Company advised by Highland is the collateral manager |
| **"Highland CLO Management"** | Highland CLO Management, LLC |
| **"Highland HCF Advisor"** | Highland HCF Advisor, Ltd. |
| **"Highland Legacy CLO"** | a CLO in which Highland is the CLO manager |
| **"HMRC"** | Her Majesty's Revenue and Customs |
| **"IRR"** | internal rate of return |
| **"IRS"** | U.S. Internal Revenue Service |
| "Knowledgeable Employee" | a "knowledgeable employee" as defined in Rule 3c-5 promulgated under the Investment Company Act |
| **"LIBOR"** | London interbank offered rate, a benchmark interest rate |
| **"Managed CLO"** | any Acis Legacy CLO, Acis CLO 7, any Highland CLO or any Highland Legacy CLO |
| **"Market Abuse Directive"** | Directive 2003/6/EC of the European Parliament and of the Council on insider dealing and market manipulation (market abuse) |
| **"Memorandum"** | the memorandum of incorporation of the Company |

006335

| | |
|---|---|
| **"Money Laundering Directive"** | 2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing |
| **"Net Asset Value"** or **"NAV"** | gross assets less liabilities (including accrued but unpaid fees) determined in accordance with the section of this Offering Memorandum entitled "*Net Asset Value*" in "*The Company*" |
| **"Net Asset Value per Share"** or **"NAV per Share"** | the Net Asset Value divided by the number of Shares in issue at the relevant time |
| **"Net Placing Proceeds"** | the Gross Placing Proceeds less any offering expenses and any amounts retained for working capital purposes |
| **"Non-Qualified Holder"** | any person whose ownership of Shares (i) may result in the U.S. Plan Threshold being exceeded causing the Company's assets to be deemed "plan assets" for the purpose of ERISA or the U.S. Tax Code; (ii) may cause the Company to be required to register as an "investment company" under the U.S. Investment Company Act (including because the holder of the shares is not a "qualified purchaser" as defined in the U.S. Investment Company Act) or to lose an exemption or a status thereunder to which it might be entitled; (iii) may cause the Company to have to register under the U.S. Exchange Act or any similar legislation; (iv) may cause the Company not to be considered a "Foreign Private Issuer" as such term is defined in rule 3b-4(c) under the U.S. Exchange Act; (v) may result in a person holding shares in violation of the transfer restrictions published by the Company, from time to time; and (vi) may cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code |
| **"Offering Memorandum"** | this offering memorandum |
| **"Ordinary Shares"** | ordinary shares of no par value each in the capital of the Company |
| **"Placee"** | a person subscribing for Shares under the Placing |
| **"Placing"** | the placing of Placing Shares at the Placing Price to one or more investors |
| **"Placing Price"** | As of a given date, the price per Ordinary Share determined in reference to the most recent quarterly determined NAV |
| **"Placing Shares"** | Shares to be issued by the Company pursuant to the Placing |
| **"POI Law"** | The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended |
| **"Portfolio Management Agreement"** | the agreement dated 22 December 2016 between the Company and the Portfolio Manager pursuant to which the Portfolio Manager will provide certain support and personnel to the Company |
| **"Portfolio Manager"** | Highland HCF Advisor acting as Portfolio Manager to the Company pursuant to the Portfolio Management Agreement |
| **"Prospectus Directive"** | Directive 2003/71/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading |
| **"Provider"** | the provider of any Warehouse Loan to the Company |

006336

| | |
|---|---|
| "**Qualified Institutional Buyers**" | has the meaning given in Regulation 144A of the U.S. Securities Act |
| "**Qualified Purchasers**" | has the meaning given in the U.S. Investment Company Act |
| "**RCIS Rules**" | the Registered Collective Investment Schemes Rules 2015 |
| "**Register**" | the register of Shareholders |
| "**Regulation S**" | Regulation S promulgated under the U.S. Securities Act |
| "**Relevant Member State**" | each member state of the European Economic Area which has implemented the Prospectus Directive |
| "**Restricted Shareholders**" | Shareholders who are resident in, or citizens of, a Restricted Territory |
| "**Restricted Territory**" | the United States and any other jurisdiction where the extension or availability of the Placing would breach any applicable law |
| "**RTS**" | the Regulatory Technical Standards, published by the European Commission |
| "**SDRT**" | UK Stamp Duty Reserve Tax |
| "**SEC**" | the U.S. Securities and Exchange Commission |
| "**Services Agreements**" | the Staff and Services Agreement and the Sub-Advisory Agreement |
| "**Share**" | a share in the capital of the Company (of whatever class) and having such rights and being subject to such restrictions as are contained in the Articles |
| "**Shareholder**" | a holder of Shares |
| "**Shareholding**" | a holding of Shares |
| "**UK**" or "**United Kingdom**" | the United Kingdom of Great Britain and Northern Ireland |
| "**UK Corporate Governance Code**" | the UK Corporate Governance Code as published by the Financial Reporting Council |
| "**United States**" or "**U.S.**" | the United States of America, its territories and possessions, any state of the United States of America and the District of Columbia |
| "**U.S. Dollar**" or "**U.S.$**" | the lawful currency of the United States |
| "**U.S. Exchange Act**" | the U.S. Securities Exchange Act of 1934, as amended |
| "**U.S. Investment Company Act**" | the U.S. Investment Company Act of 1940, as amended |
| "**U.S. Person**" | has the meaning given in Regulation S under the U.S. Securities Act |
| "**U.S. Plan**" | any plan subject to Title 1 of ERISA or section 4975 of the U.S. Tax Code |
| "**U.S. Plan Assets Regulations**" | the regulations promulgated by the U.S. Department of Labor at 29 CFR 2510.3-101, as modified by section 3(42) of ERISA |
| "**U.S. Plan Investor**" | (i) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or |

006337

|  | (iii) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in the preceding clause (i) or (ii) in such entity pursuant to the U.S. Plan Assets Regulations |
| **"U.S. Plan Threshold"** | ownership by benefit plan investors, as defined under section 3(42) of ERISA, in the aggregate of 25 per cent or more of the value of any class of equity in the Company (calculated by excluding the value of any equity interest held by any person (other than a benefit plan investor, as defined under section 3(42) of ERISA) that has discretionary authority or control with respect to the assets of the Company or that provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person); the term shall be amended to reflect such new ownership threshold that may be established by a change in the U.S. Plan Asset Regulations or other applicable law |
| **"U.S. Risk Retention Rules"** | the United States federal interagency credit risk retention rules, codified at 17 C.F.R. Part 246. |
| **"U.S. Securities Act"** | the U.S. Securities Act of 1933, as amended |
| **"U.S. Tax Code"** | the U.S. Internal Revenue Code of 1986, as amended |
| **"VAT"** | value added tax or a similar consumption tax |

006338

## DIRECTORS, ADVISERS AND SERVICE PROVIDERS

**Directors**
Heather Bestwick
William Scott

*All c/o the Company's registered office*

**Registered Office**
First Floor, Dorey Court
Admiral Park
St Peter Port
Guernsey
GY1 6HJ
Channel Islands

**Portfolio Manager and Adviser**
Highland HCF Advisor, Ltd.
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman, KY1-1104
Cayman Islands

**Legal Advisers to the Company (as to Guernsey law)**
Mourant Ozannes
PO Box 186
1 Le Marchant Street
St Peter Port
Guernsey GY1 4HP
Channel Islands

**Legal Advisers to the Company**
(as to English law)
Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ
United Kingdom

**Administrator/Company Secretary**
State Street (Guernsey) Limited
First Floor, Dorey Court
Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Custodian & Principal Bankers**
State Street Custodial Services (Ireland) Limited
No. 78
Sir John Rogerson's Quay
Dublin
Ireland

**Corporate Services Provider**
State Street Guernsey (Limited)
First Floor, Dorey Court
Admiral Park,
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Auditors**
PricewaterhouseCoopers CI LLP
Royal Bank Place
1 Glategny Esplanade
St Peter Port
Guernsey
GY1 4ND
Channel Islands

006339

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 1 of 15
Case 3:23-cv-01503-B   Document 19-25   Filed 09/01/23   Page 80 of 213   PageID 6859

## AMENDED AND RESTATED
## INVESTMENT ADVISORY AGREEMENT

THIS AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "*Agreement*"), dated to be effective from July 1, 2014 is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "*Fund*"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "*General Partner*"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "*Investment Advisor*").

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor are parties to that certain Investment Advisory Agreement dated January 1, 2012 (the "*Original Agreement*");

WHEREAS, the parties desire to amend and restate the Original Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     Investment Advisory Services.   Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2.     Custody.   The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian").   The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the

EXHIBIT

6

006340

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 2 of 15
Case 3:23-cv-01503   Document 19-19   Filed 09/11/23   Page 81 of 213   PageID 6860

Financial Instruments.  The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

      3.    <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

      (a)    investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in

006341

real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

        (b)      engaging in such other lawful Financial Instruments transactions;

        (c)      research and analysis;

        (d)      purchasing Financial Instruments and holding them for investment;

        (e)      entering into contracts for or in connection with investments in Financial Instruments;

        (f)      investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

        (g)      possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

        (h)      lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

        (i)      opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

        (j)      opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

006342

(k)      combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("***Other Accounts***") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)      entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)      organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)      causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)      engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)      voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.      <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the

006343

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 5 of 15
Case 3:23-cv-01503   Document 19-29   Filed 09/11/23   Page 84 of 213   PageID 6863

General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)        to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)        to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)        to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)        to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)        to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5

       5.       <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

       6.       <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

       7.       <u>Investments</u>.  ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

       8.       <u>Reimbursement by the General Partner</u>.  The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "***Sub-Advisor***"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries

006345

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 7 of 15
Case 3:23-cv-01503   Document 29   Filed 09/11/23   Page 86 of 213   PageID 6865

hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.  Expenses.

(a)  The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)  To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.  Fees.  Without limiting the expense reimbursements set forth above, the Investment Advisor shall provide the Fund with the services described herein for 100 bps per annum (25 bps per quarter) of the market value of the Equity Investments (defined below) and 50 bps per annum (12.5 bps per quarter) of the market value of the Debt Investments (defined

006346

below), calculated as of the last business day of each calendar quarter (the "*Calculation Date*"), payable quarterly in arrears by the 45th business day following the end of each quarter, provided that the Investment Advisor shall deliver to the General Partner on or before the 30th business day following the end of each calendar quarter a statement showing the calculation of the fee for such quarter. For purposes hereof, the "*Equity Investments*" shall mean those Financial Instruments which are equity investments held by the Fund (either directly or indirectly through a subsidiary vehicle) on the Calculation Date, and "*Debt Investments*" shall mean those Financial Instruments which are debt investments held by the Fund (either directly or indirectly through a subsidiary vehicle) on the Calculation Date. For the avoidance of doubt, the Financial Instruments shall be valued as of each Calculation Date in accordance with the then current valuation policy of the Investment Advisor. Notwithstanding the foregoing, neither the term "Equity Investments" nor the term "Debt Investments" shall include any Financial Instruments with respect to which the Investment Advisor or any affiliate thereof already receives management fees.

11.   Exculpation; Indemnification.

(a)   Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "*Covered Person*" and collectively, "*Covered Persons*") shall be subject to the provisions of this Section.

(b)   To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on

006347

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 9 of 15
Case 3:23-cv-01503   Document 29   Filed 09/01/23   Page 88 of 213   PageID 6867

behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)       Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)       To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "***Indemnified Party***"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

006348

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 10 of 45
Case 3:23-cv-01503-E   Document 18-29   Filed 09/15/23   Page 89 of 213   PageID 6868

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence.  As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct,

10

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Case 3:23-cv-01503-S   Document 18-29   Filed 01/17/23   Page 90 of 213   PageID 6869
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 10 of 15

fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.    Activities of the Investment Advisor and Others. The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund. Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate. In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund. The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar. The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager. Each of the General Partner and the Fund acknowledges that it has received a copy of Part 2 of the Investment Advisor's Form ADV, which further describes conflicts of interest, including the Investment Advisor, its affiliates and their respective advised accounts.

13.    Term. This Agreement shall remain in effect through an initial term concluding December 31, 2014 and shall be automatically extended for additional one-year

11

Case 21-03067-sgj   Doc 147-6   Filed 01/23/23   Entered 01/23/23 15:02:21   Desc
Exhibit 6 Amended and Restated Investment Advisory Agreement   Page 12 of 15
Case 3:21-cv-01503-S   Document 13-29   Filed 09/15/23   Page 91 of 213   PageID 6870

terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

          14.   <u>Miscellaneous</u>.

          (a)   <u>Notices</u>.  Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

> If to the Investment Advisor, to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Telephone Number:  (972) 628-4100
> Facsimile Number:  (972) 628-4147
>
> If to the General Partner or the Fund, to:
>
> Charitable DAF GP, LLC
> 4140 Park Lake Avenue, Suite 600
> Raleigh, North Carolina 27612
> Attention:  Grant Scott
> Telephone Number:  (919) 854-1407
> Facsimile Number:  (919) 854-1401

          (b)   <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

          (c)   <u>Amendments and Waivers</u>.  No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on

006351

any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)     Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided; however, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)     Governing Law.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f)     Arbitration.  (i) Any controversy or claim or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (a "***Disputed Matter***") shall be handled exclusively pursuant to the following procedures. In the event of any Disputed Matter, the parties agree that upon written notice of such Disputed Matter sent by one party to the party, the parties shall arbitrate the Disputed Matter pursuant to this Section 14(f) unless the parties expressly agree in writing to resolve the Disputed Matter in another manner through mediation or otherwise.  The arbitration shall be conducted pursuant to the commercial arbitration rules of the American Arbitration Association in Dallas, Texas.  Any arbitration pursuant to this Agreement unless otherwise agreed to by the parties shall be conducted by a panel of three (3) arbitrators mutually selected by the parties from a list of

13

arbitrators determined in accordance with the American Arbitration Association's arbitrator selection procedure.

(ii)     The judgment upon the award rendered in any such arbitration shall be final and binding upon the parties and may be entered in any court having jurisdiction thereof.  All fees and expenses of the arbitrator and all other expenses of the arbitration shall be paid by the non-prevailing party in such arbitration.  The arbitrator shall have no authority to impose any punitive or consequential damages.

(iii)     Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)     Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)     Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)     Survival.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)     Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)     Arm's-Length Agreement.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

14

006353

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed
to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:  President
Date:  August 26, 2014

CHARITABLE DAF GP, LLC

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  August 26, 2014

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  August 26, 2014

006354

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO | § | |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § |  21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| HIGHLAND HCF ADVISOR, LTD., AND | § | |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| Defendants. | § | |
| | § | |

### PLAINTIFFS' CORRECTED AMENDED WITNESS AND
### EXHIBIT LIST REGARDING HEARING ON HIGHLAND CAPITAL
### MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS COMPLAINT
### <u>TO BE HELD ON JANUARY 25, 2023</u>

Plaintiffs submit the following corrected amended witness and exhibit list regarding

Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint.

---

006355

**WITNESSES**:

1.    Any witness identified or called by any other party;

2.    Any witness for impeachment or rebuttal.

**EXHIBITS**:

| No. | Exhibit | Offered | Admitted |
|-----|---------|---------|----------|
| 1 | Excerpts from Transcript of Hearing on Application to Employ James P. Seery, Jr. on July 14, 2020 (APP_0003 – 0014) | | |
| 2 | Highland CLO Funding – Members Agreement Relating to the Company (APP_0015 – 0042) | | |
| 3 | HarbourVest Settlement Agreement (APP_0043 – 0061) | | |
| 4 | Order Approving Debtor's Settlement with HarbourVest (APP_0062 – 0084) | | |
| 5 | HCLOF Offering (APP_0085-0206) | | |
| 6 | Amended and Restated Investment Advisory Agreement (APP_0207 – 0221) | | |
| 7 | Testimony of Mark Patrick at June 8, 2021 hearing | | |
| | All exhibits necessary for impeachment and/or rebuttal purposes. | | |
| | All exhibits identified by or offered by any other party for the hearing on Highland Capital Management, L.P.'s Renewed Motion to Dismiss. | | |

Dated: January 24, 2023                    Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

***Counsel for Plaintiffs***

```
                        IN THE UNITED STATES BANKRUPTCY COURT
 1                       FOR THE NORTHERN DISTRICT OF TEXAS
                                  DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3    In Re:                         )    Chapter 11
                                     )
 4    HIGHLAND CAPITAL               )    Dallas, Texas
      MANAGEMENT, L.P.,              )    Tuesday, June 8, 2021
 5                                   )    9:30 a.m. Docket
             Debtor.                 )
 6                                   )    - SHOW CAUSE HEARING (2255)
                                     )    - MOTION TO MODIFY ORDER
 7                                   )      AUTHORIZING RETENTION OF
                                     )      JAMES SEERY (2248)
 8                                   )    - MOTION FOR ORDER FURTHER
                                     )      EXTENDING THE PERIOD WITHIN
 9                                   )      WHICH DEBTOR MAY REMOVE
                                     )      ACTIONS (2304)
10    _____)

11                          TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                       UNITED STATES BANKRUPTCY JUDGE.

13    APPEARANCES:

14    For the Debtor:               Jeffrey Nathan Pomerantz
                                    PACHULSKI STANG ZIEHL & JONES, LLP
15                                  10100 Santa Monica Blvd.,
                                      13th Floor
16                                  Los Angeles, CA  90067-4003
                                    (310) 277-6910
17
      For the Debtor:               John A. Morris
18                                  Gregory V. Demo
                                    PACHULSKI STANG ZIEHL & JONES, LLP
19                                  780 Third Avenue, 34th Floor
                                    New York, NY  10017-2024
20                                  (212) 561-7700

21    For the Debtor:               Zachery Z. Annable
                                    HAYWARD & ASSOCIATES, PLLC
22                                  10501 N. Central Expressway,
                                      Suite 106
23                                  Dallas, TX  75231
                                    (972) 755-7104

24

25
```

EXHIBIT

7

006357

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01599-B   Document 18-29 a Filed 08/11/2021   Page 98 of 213   PageID 6877

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

006358

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01505-B   Document 28-2   Filed 08/11/2023   Page 99 of 213   PageID 6878

3

```
 1   Transcribed by:            Kathy Rehling
                                311 Paradise Cove
 2                              Shady Shores, TX  76208
                                (972) 786-3063
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.
25
```

1   our witness stand and I'll swear you in.  Please raise your

2   right hand.

3       (The witness is sworn.)

4          THE COURT:  All right.  Please take a seat.

5          MARK PATRICK, DEBTOR'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7   BY MR. MORRIS:

8   Q   Good afternoon, Mr. Patrick.

9   A   Good afternoon.

10  Q   Can you hear me okay?

11  A   Yes, I can.

12  Q   Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18      Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A   I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q   Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A   That is my understanding, correct.

25  Q   And your understanding is that Mr. Dondero doesn't have an

Case 3:23-cv-01503-B Document 18-2k filed 05/11/2021 Page 101 Page 3 of 54 PageID 6880

Patrick - Direct                                    96

1   ownership interest in that entity, correct?

2   A    That he does not.  That is correct.

3   Q    And your understanding is that he's not an employee of

4   that -- of Skyview, correct?

5   A    That is correct.

6   Q    Prior to joining Skyview on March 1st, you had worked at

7   Highland Capital Management, LP for about 13 years, correct?

8   A    Correct.

9   Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 13-29   Filed 09/11/2021   Page 102 of 213   PageID 6881

Patrick - Direct                          97

1   that right?

2   A    That is correct.  I worked for the tax department.

3   Q    Okay.  Let's talk about how you became the authorized

4   representative of the Plaintiffs.  You are, in fact,

5   authorized representative today of CLO Holdco, Ltd. and

6   Charitable DAF, LP, correct?

7   A    Charitable DAF Fund, LP.  Correct.

8   Q    And those are the two entities that filed the complaint in

9   the United States District Court against the Debtor and two

10  other entities, correct?

11  A    Correct.

12  Q    And may I refer to those two entities going forward as the

13  Plaintiffs?

14  A    Yes.

15  Q    You became the authorized representative of the Plaintiffs

16  on March 24th, 2021, the day you and Mr. Scott executed

17  certain transfer documents, correct?

18  A    Correct.

19  Q    And you had no authority to act on behalf of either of the

20  Plaintiffs before March 24th, correct?

21  A    Correct.

22  Q    The DAF controls about $200 million in assets, correct?

23  A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24  Fund, LP.

25  Q    Yes.

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 3-28  Filed 09/11/2021 Page 103 of 213  PageID 6882
Box 1 - Exhibit B Part 2a    Page 37 of 54

Patrick - Direct                                98

1    A    Around there.

2    Q    Okay.  Let me try and just ask that again, and thank you

3    for correcting me.  To the best of your knowledge, the

4    Plaintiffs control about $200 million in assets, correct?

5    A    Net assets, correct.

6    Q    Okay.  And that asset base is derived largely from HCMLP,

7    Mr. Dondero, or Mr. Dondero's trusts, correct?

8    A    Can you restate that question again, Mr. Morris?

9    Q    Sure.  The asset base that you just referred to is derived

10   largely from HCMLP, Mr. Dondero, or donor trusts?

11   A    The way I would characterize it -- you're using the word

12   derived.  I would characterize it with respect to certain

13   charitable donations --

14   Q    Uh-huh.

15   A    -- that were -- that were made at certain time periods,

16   where the donors gave up complete dominion and control over

17   the respective assets and at that time claimed a federal

18   income tax deduction for that.

19       I do -- I do believe that, as far as the donor group, as

20   you specified, Highland Capital Management, I recall, provided

21   a donation to a Charitable Remainder Trust that eventually had

22   expired and that eventually such assets went into the

23   supporting organizations.  And then I do believe Mr. Dondero

24   also contributed to the Charitable Remainder Trust No. 2,

25   which seeded substantial amounts of the original assets that

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-Body Document Part 2k-filed 03/11/2021 Page 104 Page 3 of 54 PageID 6883

Patrick - Direct                                    99

1   were eventually composed of the $200 million.  And then from

2   time to time I do believe that Mr. Dondero's trusts made

3   charitable donations to their respective supporting

4   organizations.

5   Q    Okay.  Thank you.

6   A    Is that responsive?

7   Q    It is.  It's very responsive.  Thank you very much.  So,

8   to the best of your knowledge, the charitable donations that

9   were made that form the bases of the assets came from those

10  three -- primarily from those three sources, correct?

11  A    Well, you know, there's two different trusts.  There's the

12  Dugaboy Trust and the Get Good Trust.

13  Q    Okay.

14  A    Then you have Mr. Dondero and Highland Capital Management.

15  So I would say four sources.

16  Q    Okay.  All right.  Thank you.  Prior to assuming your role

17  as the authorized representative of the Plaintiff, you had

18  never had meaningful responsibility for making investment

19  decisions, correct?

20  A    I'm sorry.  You kind of talk a little bit fast.  Please

21  slow it down --

22  Q    That's okay.

23  A    -- and restate it.  Thank you.

24  Q    And I appreciate that.  And any time you don't understand

25  what I'm saying or I speak too fast, please do exactly what

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B   Document 13-25   Filed 09/11/2021   Page 105 of 213   PageID 6884

Patrick - Direct                          100

1    you're doing.  You're doing fine.

2         Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24              THE COURT:  Just a moment.  I think there's an

25   objection.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01560-B   Document 18-29   Filed 09/11/23   Page 106 of 213   PageID 6885

Patrick - Direct                          101

 1            MR. MORRIS:  Uh-huh.

 2            THE COURT:  Go ahead.

 3            MR. ANDERSON:  So far -- relevance, Your Honor.  This

 4   is way out of the bounds of the contempt proceeding.  You

 5   know, what he did as a young person with Yahoo! stock.  We're

 6   here to -- he authorized the lawsuit.  They filed the lawsuit.

 7   That's it.  Getting into all this peripheral stuff is

 8   completely irrelevant.

 9            THE COURT:  Your response?

10            MR. MORRIS:  My response, Your Honor, is very simple.

11   Mr. Patrick assumed responsibility, and you're going to be

12   told that he exercised full and complete authority over a $200

13   million fund that was created by Mr. Dondero, --

14            THE COURT:  Okay.

15            MR. MORRIS:  -- that funds -- that is funded

16   virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17   lovely man, and I don't mean to disparage him at all -- but he

18   has no meaningful experience in investing at all.

19            THE COURT:  All right.  Counsel, I overrule.  I think

20   there's potential relevance.

21        And may I remind people that when you're back at counsel

22   table, please make sure you speak your objections into the

23   microphone.  Thank you.

24   BY MR. MORRIS:

25   Q    When you were a young lawyer, sir, you were on the board

1   of a nonprofit that received a donation of Yahoo! stock and

2   the board looked to you for guidance, correct?

3   A    Yes, correct.

4   Q    And -- but during your 13 years at Highland, you never had

5   formal responsibility for making investment decisions,

6   correct?

7   A    That is correct.

8   Q    Yeah.  In fact, other than investment opportunities that

9   you personally presented where you served as a co-decider, you

10  never had any responsibility or authority to make investment

11  decisions on behalf of HCMLP or any of its affiliated

12  entities, correct?

13  A    That is correct.

14  Q    And at least during your deposition, you couldn't identify

15  a single opportunity where you actually had the authority and

16  did authorize the execution of a transaction on behalf of

17  HCMLP or any of its affiliates, correct?

18  A    Correct.

19  Q    And yet today you are now solely responsible for making

20  all investment decisions with respect to a $200 million

21  charitable fund, correct?

22  A    Yes, but I get some help.  I've engaged an outside third

23  party called ValueScope, and they have been as -- effectively

24  working as a "gatekeeper" for me, and I look to them for

25  investment guidance and advice, and I informally look to Mr.

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B    Document 18-2    Filed 09/11/2021 Page 108 of 213    PageID 6887

Patrick - Direct                                103

 1  Dondero since the time period of when I took control on March

 2  24th for any questions I may have with respect to the

 3  portfolio.  So I don't feel like I'm all by myself in making

 4  decisions.

 5  Q   Okay.  I didn't mean to suggest that you were, sir, and I

 6  apologize if you took it that way.  I was just asking the

 7  question, you are the person now solely responsible for making

 8  the investment decisions, correct?

 9  A   Yes.

10  Q   Okay.  Let's talk about the circumstances that led to the

11  filing of the complaint for a bit.  On April 12, 2021, you

12  caused the Plaintiffs to commence an action against HCMLP and

13  two other entities, correct?

14  A   Correct.

15  Q   Okay.  One of the binders -- you've got a couple of

16  binders in front of you.  If you look at the bottom, one of

17  them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18  could grab that one and turn to Exhibit 12.  Do you have that,

19  sir?

20  A   It says -- it says the original complaint.  Is that the

21  right one?

22  Q   That is the right one.  And just as I said when we were

23  doing this virtually last Friday, if I ask you a question

24  about a particular document, you should always feel free to

25  review as much of the document as you think you need to

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01580-B Document 18-29 aFiled 09/11/2021 hPeagie 109 Pagis 33 Pafe5ID 6888

Patrick - Direct                              104

 1   competently and fully answer the question.  Okay?

 2   A    Okay.  Thank you.

 3   Q    All right.  You instructed the Sbaiti firm to file that

 4   complaint on behalf of the Plaintiffs, correct?

 5   A    Correct.

 6   Q    And to the best of your recollection, the Plaintiffs

 7   returned -- retained the Sbaiti firm in April, correct?

 8   A    Correct.

 9   Q    So the Sbaiti firm was retained no more than twelve days

10   before the complaint was filed, correct?

11   A    Correct.

12   Q    You personally retained the Sbaiti firm, correct?

13   A    Correct.

14   Q    And the idea of filing this complaint originated with the

15   Sbaiti firm, correct?

16   A    Correct.

17   Q    Before filing -- withdrawn.  Before becoming the

18   Plaintiffs' authorized representative, you hadn't had any

19   communications with anyone about potential claims that might

20   be brought against the Debtor arising out of the HarbourVest

21   settlement, correct?

22   A    That is correct.

23   Q    Now, after you became the Plaintiffs' authorized

24   representative, Mr. Dondero communicated with the Sbaiti firm

25   about the complaint that's marked as Exhibit 12, correct?

```
 1  A    Yes.  After he brought certain information to myself and

 2  then that I engaged the Sbaiti firm to launch an

 3  investigation, I also wanted Mr. Dondero to work with the

 4  Sbaiti firm with respect to their investigation of the

 5  underlying facts.

 6  Q    Okay.  Mr. Dondero did not discuss the complaint with you,

 7  but he did communicate with the Sbaiti firm about the

 8  complaint, correct?

 9  A    I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q    Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A    Correct.

17  Q    And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A    That is correct.

21  Q    At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A    I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general
```

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 18-29 aFiled 09/11/2021 Page 111Page 135 Page4ID 6890

Patrick - Direct                                    106

 1  awareness that there was a HarbourVest something or other, but

 2  the specific aspects of it, I was unaware.

 3  Q    Okay.  And you had no reason to believe that Mr. Seery had

 4  done anything wrong with respect to the HarbourVest

 5  transaction at the time you became the Plaintiffs' authorized

 6  representative, correct?

 7  A    That is correct.

 8  Q    But you recall very specifically that some time after

 9  March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01598-S-BN Document 18-29    Filed 09/11/2021 Page 112    Page 136 of 54 PageID 6891

Patrick - Direct                                      107

1    counsel at NexPoint Advisors, correct?

2    A    Correct.

3    Q    You didn't ask Mr. Sauter for a recommendation for a

4    lawyer; he just volunteered that you should use the Sbaiti

5    firm.  Correct?

6    A    That is correct.

7    Q    And you never used -- considered using another firm, did

8    you?

9    A    When they were presented to me, they appeared to have all

10   the sufficient skills necessary to undertake this action, and

11   so I don't recall interviewing any other firms.

12   Q    Okay.  Now, after bringing the matter to your action, Mr.

13   Dondero communicated directly with the Sbaiti firm in relation

14   to the investigation that was being undertaken.  Correct?

15   A    That is correct.

16   Q    But you weren't privy to the communications between Mr.

17   Dondero and the Sbaiti firm, correct?

18   A    I did not participate in those conversations as the --

19   what I, again, considered Mr. Dondero as the investment

20   advisor to the portfolio, and he was very versant in the

21   assets.  I wanted him to participate in the investigation that

22   the Sbaiti firm was undertaking prior to the filing of this

23   complaint.

24   Q    Let's talk for a minute about the notion of Mr. Dondero

25   being the investment advisor.  Until recently, the entity

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01650-B Document 18-29 aFiled 09/12/2021 Page 113 Page 37 Page D 6892

Patrick - Direct                                            108

1  known as the DAF had an investment advisory committee with HC

2  -- an investment advisory agreement with HCMLP.  Correct?

3  A    It's my understanding that the investment advisory

4  agreement existed with the Plaintiffs, CLO Holdco, as well as

5  Charitable DAF Fund, LP, up and to the end of February,

6  throughout the HarbourVest transaction.

7  Q    Okay.  And since February, the Plaintiffs do not have an

8  investment advisory agreement with anybody, correct?

9  A    That is correct.

10  Q    Okay.  So Mr. Dondero, if he serves as an investment

11  advisor, it's on an informal basis.  Is that fair?

12  A    After I took control, he serves as an informal investment

13  advisor.

14  Q    Okay.  So there's no contract that you're aware of between

15  either of the Plaintiffs and Mr. Dondero pursuant to which he

16  is authorized to act as the investment advisor for the

17  Plaintiffs, correct?

18  A    That is correct.

19  Q    Okay.  When you communicated with Grant Scott --

20  withdrawn.  You know who Grant Scott is, right?

21  A    Yes, I do.

22  Q    He's the gentleman who preceded you as the authorized

23  representative of the Plaintiffs, correct?

24  A    Yes.

25  Q    Okay.  You communicated with Mr. Scott from time to time

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01566-B Document 18-29 aFiled 09/11/2021 Reaing 14Pafe138 Page ID 6893

Patrick - Direct                                    109

1  during February and March 2021, correct?

2  A    February and March are the dates?  Yes.

3  Q    Yeah.  And from February 1st until March 21st -- well,

4  withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5  Plaintiffs' authorized representative, correct?

6  A    Correct.

7  Q    And you have no recollection of discussing with Mr. Scott

8  at any time prior to March 24th any aspect of the HarbourVest

9  settlement with Mr. Scott.  Correct?

10  A    Correct.

11  Q    And you have no recollection of discussing whether the

12  Plaintiffs had potential claims that might be brought against

13  the Debtor.  Correct?  Withdrawn.  Let me ask a better

14  question.

15       You have no recollection of discussing with Mr. Scott at

16  any time prior to March 24th whether the Plaintiffs had

17  potential claims against the Debtor.  Correct?

18  A    That is correct.

19  Q    You and Mr. Scott never discussed whether either of --

20  either of the Plaintiffs had potential claims against Mr.

21  Seery.  Correct?

22  A    Correct.

23  Q    Okay.  At the time that you became their authorized

24  representative, you had no knowledge that the Plaintiffs would

25  be filing a complaint against the Debtors relating to the

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01549-E Document 18-29 Filed 09/11/2023    Page 115 of 213    PageID 6894

Patrick - Direct                                110

1    HarbourVest settlement less than three weeks later, correct?

2    A    That is correct.

3    Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4    see at the top it refers to Mr. Seery as a potential party.

5    Do you see that?

6    A    Yes, I do.

7    Q    Okay.  You don't know why Mr. Seery was named --

8    withdrawn.  You don't know why Mr. Seery was not named as a

9    defendant in the complaint, correct?

10   A    No, I -- that's correct.  I do not know why he was not

11   named.  That's in the purview of the Sbaiti firm.

12   Q    Okay.  And the Sbaiti firm also made the decision to name

13   Mr. Seery on Page 2 there as a potential party when drafting

14   the complaint, correct?

15   A    That's what the document says.

16   Q    And you weren't involved in the decision to identify Mr.

17   Seery as a potential party, correct?

18   A    That is correct.  Again, I rely on the law firm to decide

19   what parties to bring a suit to -- against.

20   Q    Okay.  Okay.  Do you recall the other day we talked about

21   a document called the July order?

22   A    Yes.

23   Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24   you can turn to that.  And take a moment to look at it, if

25   you'd like.  And my first question is simply whether this is

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01550-B   Document 18-29   Filed 09/11/2023   Page 116 of 213   PageID 6895

Patrick - Direct                                 111

 1   the July order, as you understand it.

 2        (Pause.)

 3   A    Yes, it is.  I was just looking for the gatekeeper

 4   provision.  It looks like it's Paragraph 5.  So, --

 5   Q    Okay.  Thank you for that.  About a week after the

 6   complaint was filed, you authorized the Plaintiffs to file a

 7   motion in the District Court for leave to amend the

 8   Plaintiffs' complaint to add Mr. Seery as a defendant.

 9   Correct?

10   A    I authorized the filing of a motion in Federal District

11   Court that would ask the Federal District Court whether or not

12   Jim Seery could be named in the original complaint with

13   respect to the gatekeeper provision cited in that motion and

14   with respect to the arguments that were made in that motion.

15   Q    Okay.  Just to be clear, if you turn to Exhibit 17, the

16   next tab, --

17   A    I'm here.

18   Q    -- do you see that document is called Plaintiffs' Motion

19   for Leave to File First Amended Complaint?

20   A    Yes.

21   Q    And that's the document that you authorized the Plaintiffs

22   to file on or about April 19th, correct?

23   A    Correct.

24   Q    Okay.  And can we refer to that document as the motion to

25   amend?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-B Document 18-29 Filed 09/11/2021 Page 117 Page 131 PageID 6896

Patrick - Direct                                    112

1  A    Yes.

2  Q    Okay.  You were aware of the July order at Tab 16 before

3  you authorized the filing of the motion to amend.  Correct?

4  A    Yes, because it's cited in the motion itself.

5  Q    Okay.  And at the time that you authorized the filing of

6  the motion to amend, you understood that the July order was

7  still in effect.  Correct?

8  A    Yes, because it was referenced in the motion, so my

9  assumption would be it would still be in effect.

10 Q    Okay.  Before the motion to amend was filed, you're -- you

11 are aware that my firm and the Sbaiti firm communicated by

12 email about the propriety of filing the motion to amend?

13 A    Before it was filed?  Communications between your firm and

14 the Sbaiti firm?  I would have to have my recollection

15 refreshed.

16 Q    I'll just ask the question a different way.  Did you know

17 before you authorized the filing of the motion to amend that

18 my firm and the Sbaiti firm had engaged in an email exchange

19 about the propriety of filing the motion to amend in the

20 District Court?

21 A    It's my recollection -- and again, I could be wrong here

22 -- but I thought the email exchange occurred after the fact,

23 not before.  But again, I -- I just --

24 Q    Okay.  In any event, on April 19th, the motion to amend

25 was filed.  Correct?

Patrick - Direct                                113

1   A    Correct.

2   Q    That's the document that is Exhibit 17.  And you

3   personally authorized the Sbaiti firm to file the motion to

4   amend on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And you authorized the filing of the motion to amend with

7   knowledge -- withdrawn.

8        Can you read the first sentence of the motion to amend out

9   loud, please?

10  A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11  15 of the Federal Rules of Civil Procedure for one purpose:

12  to name as defendant one James P. Seery, Jr., the CEO of

13  defendant Highland Capital Management, LP (HCM) and the chief

14  perpetrator of the wrongdoing that forms the basis of the

15  Plaintiffs' causes of action.

16  Q    And does that fairly state the purpose of the motion?

17           MR. SBAITI:  Objection, Your Honor.  Asks him to make

18  a legal conclusion about the purpose of the legal motion filed

19  in court that he didn't draft.

20           THE COURT:  Okay.  I overrule.  You can answer if you

21  have an answer.

22           THE WITNESS:  It's always been my general

23  understanding that the purpose of filing this motion was to go

24  to the Federal District Court and ask that Court of reference

25  to this Court whether or not Mr. Seery could be named with

006378

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01690-B   Document 18-29   Filed 09/11/2021   Page 119 of 213   Page ID 6898

Patrick - Direct                                    114

1    respect to the original complaint, citing again the gatekeeper

2    provisions and citing the various arguments that we've heard

3    much earlier.

4    BY MR. MORRIS:

5    Q    Okay.  You personally didn't learn anything between April

6    9th, when the complaint was filed, and April 19th, when the

7    motion to amend was filed, that caused you to authorize the

8    filing of the motion to amend, correct?

9    A    That is correct.

10   Q    In fact, you relied on the Sbaiti firm with respect to

11   decisions concerning the timing of the motion to amend.

12   Correct?

13   A    Correct.

14   Q    And you had no knowledge of whether anyone acting on

15   behalf of the Plaintiffs ever served the Debtor with a copy of

16   the motion to amend.  Correct?

17   A    Yes.  I have no knowledge.

18   Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19   provided my firm with a copy of the motion to amend.  Correct?

20   A    I cannot recall one way or another.

21   Q    Okay.  You never instructed anyone on behalf -- acting on

22   behalf of the Plaintiffs to inform the Debtor that the motion

23   to amend had been filed, correct?

24   A    That is correct.

25   Q    And that's because you relied on the Sbaiti firm on

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01560-B    Document 18-29    Filed 09/11/2021    Page 120 of 213    PageID 6899

Patrick - Direct                                    115

 1  procedural issues, correct?

 2  A    That is correct.

 3  Q    You didn't consider waiting until the Debtor --

 4       (Interruption.)

 5  Q    -- had appeared in the action before authorizing the

 6  filing of the motion --

 7  A    Yeah, --

 8            THE COURT:  Yes.  Y'all are being a little bit loud.

 9  Okay.

10            A VOICE:  Sorry.

11            MR. MORRIS:  No problem.

12            MR. PHILLIPS:  I've heard that before, Your Honor,

13  and I apologize.

14            THE COURT:  I bet you have.  Thank you.

15            MR. MORRIS:  Admonish Mr. Phillips, please.

16            THE COURT:  Okay.

17            MR. MORRIS:  He's always the wild card.

18            MR. PHILLIPS:  I admonish --

19            MR. MORRIS:  He's always the wild card.

20            MR. PHILLIPS:  I admonish myself.

21            THE COURT:  All right.  I think he got the message.

22  Continue.

23  BY MR. MORRIS:

24  Q    You didn't consider waiting until the Debtor had appeared

25  in the action before filing the motion to amend, correct?

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01500-S-BN Document 18-29 aiJedne09/112031 Page 121 ofe135 Page ID 6900

Patrick - Direct                              116

 1  A    Again, I am the client and I rely upon the law firm that's

 2  engaged with respect to making legal decisions as to the

 3  timing and notice and appearance and what have you.  I'm a tax

 4  lawyer.

 5  Q    Okay.  You wanted the District Court to grant the relief

 6  that the Plaintiffs were seeking.  Correct?

 7  A    I wanted the District Court to consider, under the

 8  gatekeeper provisions of this Court, whether or not Mr. Seery

 9  could be named in the original complaint.  That's -- that,

10  from my perspective, is what was desired.

11  Q    All right.  You wanted the District Court to grant the

12  relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14  answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17  as not necessarily asking for specific relief, but asking the

18  Federal District Court whether or not, under the gatekeeper

19  provision, that Mr. Seery could be named on there.  What

20  happens after that would be a second step.  So I kind of -- I

21  dispute that characterization.

22  BY MR. MORRIS:

23  Q    All right.  I'm going to cross my fingers and hope that

24  Ms. Canty is on the line, and I would ask her to put up Page

25  57 from Mr. Patrick's deposition transcript.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01550-B   Document 18-2   Filed 09/11/2031   Page 122 of 213   PageID 6901

Patrick - Direct                              117

 1          THE COURT:  There it is.

 2          MR. MORRIS:  There it is.  It's like magic.  Can we

 3   go down to Lines 18 through 20?

 4   BY MR. MORRIS:

 5   Q   Mr. Patrick, during the deposition on Friday, did I ask

 6   you this question and did you give me this answer?  Question,

 7   "Did you want the Court to grant the relief you were seeking?"

 8   Answer, "Yes."

 9   A   I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q   Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A   If the Sbaiti firm recommended that I do so.  That is

25   correct.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01550-B   Document 18-29   Filed 09/11/2021   Page 123 Page 137 PageID 6902

Patrick - Direct                                118

```
 1   Q    Okay.  Let's talk for a little bit about the line of
 2   succession for the DAF and CLO Holdco.  Can we please go to
 3   Exhibit 25, which is in the other binder?  It's in the other
 4   binder, sir.
 5        (Pause.)
 6   Q    I guess you could look on the screen or you can look in
 7   the binder, whatever's easier for you.
 8   A    Yeah.  I prefer the screen.  I prefer the screen.
 9   Q    Okay.
10   A    It's much easier.
11   Q    All right.  We've got it in both spots.  But do you have
12   Exhibit 25 in front of you, sir?
13   A    Yes, I do.
14   Q    All right.  Do you know what it is?
15   A    This is the organizational chart depicting a variety of
16   charitable entities as well as entities that are commonly
17   referred to the DAF.  However, when I look at this chart, I do
18   not look at and see just boxes, what I see is the humanitarian
19   effort that these boxes represent.
20           MR. MORRIS:  Your Honor, may I interrupt?
21           THE COURT:  You may.
22           MR. MORRIS:  Okay.
23   BY MR. MORRIS:
24   Q    I appreciate that, and when your lawyers get up to ask you
25   questions, I bet they'll want to know just what you were about
```

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01566-Bon Document 18-29 a Filed 09/11/2021 Hearing 124 Page 28 PageID 6903

Patrick - Direct                                        119

1   to tell me.  But I just want to understand what this chart is.

2   This chart is the DAF, CLO Holdco, structure chart.  Correct?

3   A    Correct.

4   Q    Okay.  And you were personally involved in creating this

5   organizational structure, correct?

6   A    I -- yes.

7   Q    Okay.  And from time to time, the Charitable DAF Holdco

8   Limited distributes cash to the foundations that are above it.

9   Correct?

10  A    Correct.

11  Q    All right.  I want to talk a little bit more specifically

12  about how this happens.  The source of the cash distributed by

13  Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14  entity, the Cayman Islands entity near the bottom.  Correct?

15          MR. ANDERSON:  Your Honor, I have an objection.

16  Completely irrelevant.  I'm objecting on relevance grounds.

17  This has nothing to do with the contempt proceeding.  We've

18  already gone over that he authorized the filing of the

19  complaint, that he authorized the filing of the motion to

20  amend.  It's all in the record.  This is completely irrelevant

21  at this point.

22          THE COURT:  Okay.  Relevance objection.  Your

23  response?

24          MR. MORRIS:  I believe that it's relevant to the

25  Debtor's motion to hold Mr. Dondero in contempt for pursuing

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01503-bon Document 18-29 a Filed 09/11/2021 Page 125 of 213 Page ID 6904

Patrick - Direct                                    120

 1   claims against Mr. Seery, in violation of the July 7 order.  I

 2   think an understanding of what the Plaintiffs are, how they're

 3   funded, and Mr. Dondero's interest in pursuing claims on

 4   behalf of those entities is relevant to the -- to the -- just

 5   -- it's just against him.  It's not against their clients,

 6   frankly.  It's just against Mr. Dondero.

 7            THE COURT:  I overrule.

 8            MR. MORRIS:  I'll try and -- I'll try and make this

 9   quick, though.

10   BY MR. MORRIS:

11   Q    CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A    Two primary sources of capital?

14   Q    Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A    That is correct.

17   Q    And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A    Correct.

20   Q    And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A    Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01560-Bond Document 18-29 a Filed 09/11/2021 Page 126 Page 130 of 554 ID 6905

Patrick - Direct                                    121

 1  expired in 2011, was originally funded by Mr. Dondero.

 2  Q    Okay.  So, so the Charitable Remainder Trust that we were

 3  talking about on Friday wasn't seeded with capital from

 4  Highland Capital Management, it came from Mr. Dondero

 5  personally?

 6  A    That is correct.

 7  Q    Okay.  Thank you.  And the other primary source of capital

 8  was the Dallas Foundation, the entity that's in the upper

 9  left-hand corner of the chart.  Is that correct?

10  A    No.

11  Q    The -- you didn't tell me that the other day?

12  A    You said -- you're pointing to the Dallas Foundation.

13  That's a 501(c)(3) organization.

14  Q    I apologize.  Did you tell me the other day that the

15  Dallas Foundation was the second source of capital for HCLO

16  Hold Company?

17  A    No, I did not.  You --

18       (Pause.)

19  Q    Maybe I know the source of the confusion.  Is the Highland

20  Dallas Foundation something different?

21  A    Yes.  On this organizational chart, you'll see that it has

22  an indication, it's a supporting organization.

23  Q    Ah, okay.  So, so let me restate the question, then.  The

24  second primary source of capital for CLO Holdco, Ltd. is the

25  Highland Dallas Foundation.  Do I have that right?

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01560-B Document 18-29 aile09/11/2031 Page 127 of 213 Page31 PageID 6906

Patrick - Direct                                    122

```
 1   A    Yes.

 2   Q    Okay.  And the sources of that entity's capital were

 3   grantor trusts and possibly Mr. Dondero personally.  Correct?

 4   A    In addition -- per my refreshing my recollection from our

 5   deposition, the other Charitable Remainder Trust, I believe

 6   Charitable Remainder Trust No. 1, which expired later, also

 7   sent a donation, if you will, or assets to -- and I cannot

 8   recall specifically whether it was just the Highland Dallas

 9   Foundation or the other supporting organizations that you see

10   on this chart.

11   Q    But the source of that -- the source of the assets that

12   became the second Charitable Remainder Trust was Highland

13   Capital Management, LP.  Is that right?

14   A    I think that is accurate from my recollection.  And again,

15   I'm talking about Charitable Remainder Trust No. 1.

16   Q    Okay.  So is it fair to say -- I'm just going to try and

17   summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18   is the investment arm of the organizational structure on this

19   page?

20   A    Yes.

21   Q    And is it fair to say that nearly all of the assets that

22   are in there derived from either Mr. Dondero, one of his

23   trusts, or Highland Capital Management, LP?

24   A    Yes.  It's like the Bill Gates Foundation or the

25   Rockefeller Foundation.  These come from the folks that make
```

006387

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01566-B Document 18-29 a Filed 09/11/2023 Heang 128 Page 32 PageID 6907

Patrick - Direct                         123

 1  their donations and put their name on it.

 2  Q   Okay.

 3          MR. MORRIS:  Now, now, Your Honor, I'm going to go

 4  back just for a few minutes to how Mr. Scott got appointed,

 5  because I think that lays kind of the groundwork for his

 6  replacement.  It won't take long.

 7          THE COURT:  Okay.  I have a question either --

 8          MR. MORRIS:  Sure.

 9          THE COURT:  -- for you or the witness.  I'm sorry,

10  but --

11          MR. MORRIS:  Sure.  Yeah.

12          THE COURT:  -- the organizational chart, it's not

13  meant to show everything that might be connected to this

14  substructure, right?  Because doesn't CLO Holdco, Ltd. own

15  49.02 percent of HCLOF, --

16          MR. MORRIS:  That --

17          THE COURT:  -- which gets us into the whole

18  HarbourVest transaction issue?

19          MR. MORRIS:  You're exactly right, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  But that's just an investment that HCLO

22  Holdco made.

23          THE COURT:  Right.

24          MR. MORRIS:  Right?  And so I -- let me ask the

25  witness, actually.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01550-B   Document 18-29   a Filed 09/11/2021   Page 129   Page 133   Page 54 ID 6908

Patrick - Direct                                        124

1          THE COURT:  Okay.  Thank you.  Thank you.

2          MR. MORRIS:  Let me ask the witness.  Yeah.

3          THE COURT:  I just want my brain --

4          MR. MORRIS:  Right.

5          THE COURT:  -- to be complete on this chart.

6    BY MR. MORRIS:

7    Q   Mr. Patrick, there are three entities under CLO Holdco,

8    Ltd.  Do you see that?

9    A    Yes.

10   Q   And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A    Yes.

13   Q   Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A    Correct.

17   Q   Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A    It has other investments.  That is correct.

20   Q   And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A    That is fair.

24          MR. MORRIS:  Does that--?

25          THE COURT:  Yes.

006389

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01566-B Document 18-29 filed 09/11/2021 Page 130 of 213 PageID 6909

Patrick - Direct                              125

1         MR. MORRIS:  Okay.

2         THE COURT:  Uh-huh.

3    BY MR. MORRIS:

4    Q    So, so let's go back to Mr. Grant for a moment.  Mr.

5    Scott, rather.  Mr. Dondero was actually the original general

6    partner.  If you look at this chart, while it's still up here,

7    you see on the left there's Charitable DAF GP, LLC?

8    A    Yes.

9    Q    And the Charitable DAF GP, LLC is the general partner of

10   the Charitable DAF Fund, LP.  Correct?

11   A    Correct.

12   Q    And on this chart, Grant Scott was the managing member of

13   Charitable DAF GP, LLC.  Right?

14   A    Correct.

15   Q    Okay.  But Mr. Dondero was the original general partner of

16   that entity, correct?

17   A    That is correct.  But I do want to point out, I just note

18   that the GP interest is indicating a one percent interest and

19   the 99 interest to Charitable DAF Holdco.  I believe that's

20   incorrect.  It's a hundred percent by Charitable DAF Holdco,

21   Ltd., and the Charitable DAF GP interest is a noneconomic

22   interest.  So that should actually reflect a zero percent to

23   the extent it may indicate some sort of profits or otherwise.

24   Q    Okay.  Thank you for the clarification.  Can you turn to

25   Exhibit 26, please, in your binder?  And is it your

1  understanding that that is the amended and restated LLC

2  agreement for the DAF GP, LLC?

3  A    Yes.

4  Q    Okay.  And this was amended and restated effective as of

5  January 1st, 2012, correct?

6  A    Yes.

7  Q    And if you go to the last page, you'll see there are

8  signatures for Mr. Scott and Mr. Dondero, correct?

9  A    Yes.

10 Q    And Mr. Dondero is identified as the forming -- former

11 managing member and Mr. Scott is identified as the new

12 managing member.   Correct?

13 A    Correct.  That's what the document says.

14 Q    And it's your understanding that Mr. Dondero had the

15 authority to select his successor.  Correct?

16 A    Correct.

17 Q    In fact, it's based on your understanding of documents and

18 your recollection that Mr. Dondero personally selected Mr.

19 Scott as the person he was going to transfer control to,

20 correct?

21 A    Upon advice of Highland Capital Management's tax

22 compliance officer, Mr. Tom Surgent.

23 Q    What advice did Mr. Surgent give?

24 A    He gave advice that, because Mr. Dondero -- and this is

25 what I came to an understanding after the fact of this

Case 21-03067-sgj    Doc 150-1    Filed 01/24/23    Entered 01/24/23 13:25:47    Desc
Case 3:23-cv-01503-B Document 18-29 aFiled 09/11/2021 Page 132 Page 136 PageID 6911

Patrick - Direct                          127

1    transaction, because I was not a part of it -- that by Mr.

2    Dondero holding that GP interest, that it would be -- the

3    Plaintiffs, if you will, would be an affiliate entity for

4    regulatory purposes, and so he advised that if he -- if Mr.

5    Dondero transferred his GP interest to Mr. Scott, it would no

6    longer be an affiliate, is my recollection.

7    Q    Okay.  You didn't appoint Mr. Scott, did you?

8    A    No.

9    Q    That was Mr. Dondero.  Is that right?

10   A    Yes.

11   Q    Okay.  Let's go to 2021.  Let's come back to the current

12   time.  Sometime in February, Mr. Scott called you to ask about

13   the mechanics of how he could resign.  Correct?

14   A    That is correct.

15   Q    But the decision to have you replace Mr. Scott was not

16   made until March 24th, the day you sent an email to Mr. Scott

17   with the transfer documents.  Correct?

18   A    That is correct.

19   Q    And it's your understanding that he could have transferred

20   the management shares and control of the DAF to anyone in the

21   world.  Correct?

22   A    Correct.

23   Q    That's what the docu... that he had the authority under

24   the documentation, as you understood it, to freely trade or

25   transfer the management shares.  Correct?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01506-Hon Document Part 2 a Filed 08/11/2021 Page 133 Page 137 PageID 6912

Patrick - Direct                              128

1    A    Wait.  Now, let's be precise here.

2    Q    Okay.

3    A    Are you talking about the GP interests or the management

4    shares held by Charitable DAF Holdco, Ltd.?

5    Q    Let's start with the management shares.  Can you explain

6    to the Court what the management shares are?

7              MR. ANDERSON:  Your Honor?  Hang on one second.  Your

8    Honor, I want to object again on relevance.  We're going way

9    beyond the scope of the contempt issue, whether or not --

10             MR. MORRIS:  This is about control.

11             MR. ANDERSON:  -- the motion to amend somehow

12   violated the prior order of this Court.  Getting into the

13   management structure, transfer of shares, that's way outside

14   the bounds.  I object on relevance.

15             THE COURT:  Okay.  Relevance objection?

16             MR. MORRIS:  Your Honor, they have probably 30

17   documents, maybe 20 documents, on their exhibit list that

18   relate to management and control.  I'm asking questions about

19   management and control.  Okay?  This is important, again, to

20   (a) establish his authority, but (b) the circumstances under

21   which he came to be the purported control person.

22             THE COURT:  Okay.  Overruled.  Go ahead.

23             THE WITNESS:  It might be helpful to look at the

24   organizational chart, but if not -- but I'll describe it to

25   you again.  With respect to the entity called --

1          MR. MORRIS:  Hold on one second.  Can we put up the

2     organizational chart again, Ms. Canty, if you can?  There you

3     go.

4          THE WITNESS:  Okay.  So with respect to the

5     Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6     Scott, he organized that entity when he was the independent

7     director of the Charitable Remainder Trust, and he caused the

8     issuance of the management shares to be issued to himself.

9     And then those are, again, noneconomic shares, but they are

10    control shares over that entity.

11         And I think, to answer your question, is -- it -- he alone

12    decides who he can transfer those shares to.

13    BY MR. MORRIS:

14    Q   Do I have this right, that whoever holds the noneconomic

15    management shares has the sole authority to appoint the

16    representatives for each of the Charitable DAF entities and

17    CLO Holdco?  It's kind of a magic ticket, if you will?

18    A   It -- I think there's a -- the answer really is no from a

19    legal standpoint, because Charitable DAF Holdco is a limited

20    partner in Charitable DAF Fund, LP, so it does not have

21    authority -- authority under all -- the respective entities

22    underneath that.  It could cause a redemption, if you will, of

23    Charitable DAF Fund.  And so, really, the authority -- the

24    trickle-down authority that you're referencing is with respect

25    to his holding of the Charitable DAF GP, LLC interest.  It's a

1   member-managed Delaware limited liability company.  And from

2   that, he -- that authority kind of trickles down to where he

3   can appoint directorships.

4   Q   All right.  I think I want to just follow up on that a

5   bit.  Which entity is the issuer of the manager shares, the

6   management shares?

7   A   Yeah, the -- per the organizational chart, it is accurate,

8   it's the Charitable DAF Holdco, Ltd. which issued the

9   management shares to Mr. Scott.

10  Q   Okay.  And that's why you have the arrow from Mr. Scott

11  into that entity?

12  A   Correct.

13  Q   And do those -- does the holder of the management shares

14  have the authority to control the Charitable DAF Holdco, Ltd.?

15  A   Yes.

16  Q   Okay.  And as the control person for the Charitable DAF

17  Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18  Holdco Limited owns a hundred percent of the limited

19  partnership interests of the Charitable DAF Fund, LP.

20  Correct?

21  A   Correct.

22  Q   And so does the holder of that hundred percent limited

23  partnership interest have the authority to decide who acts on

24  behalf of the Charitable DAF Fund, LP?

25  A   I would say no.  I mean, you know, just -- I would love to

1  read the partnership agreement again.  But I, conceptually,

2  what I know with partnerships, I would say the limited partner

3  would not.  It would be through the Charitable DAF GP, LLC

4  interest.

5  Q    The one on the left, the general partner?

6  A    The general partner.

7  Q    I see.  So when Mr. Scott transferred to you the one

8  hundred percent of the management shares as well as the title

9  of the managing member of the Charitable DAF GP, LLC, did

10 those two events give you the authority to control the

11 entities below it?

12 A    Yes.

13 Q    Thank you.  And so prior to the time that he transferred

14 those interests to you, is it your understanding that Mr.

15 Scott had the unilateral right to transfer those interests to

16 anybody in the world?

17 A    Yes.

18 Q    Okay.  And you have that right today, don't you?

19 A    Yes, I do.

20 Q    If you wanted, you could transfer it to me, right?

21 A    Yes, I could.

22 Q    Okay.  But of all the people in the world, Mr. Scott

23 decided to transfer the management shares and the managing

24 member title of the DAF GP to you, correct?

25 A    Restate that question again?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01566-B   Document 18-29   aFiled 09/11/2021   hearing 137   Page 41 of 54   PageID 6916

Patrick - Direct                                    132

1    Q    Of all the people in the world, Mr. Scott decided to

2    transfer it to you, correct?

3    A    Yeah.  Mr. Scott transferred those interests to me.

4    Q    Okay.  And you accepted them, right?

5    A    Yes.

6    Q    You're not getting paid anything for taking on this

7    responsibility, correct?

8    A    I am not paid by any of the entities depicted on this

9    chart.

10   Q    And Mr. Scott used to get $5,000 a month, didn't he?

11   A    I believe that's what he testified to.

12   Q    Yeah.  But you don't get anything, right?

13   A    Correct.

14   Q    In fact, you get the exact same salary and compensation

15   from Skyview that you had before you became the authorized

16   representative of the DAF entities and CLO Holdco.  Correct?

17   A    Correct.

18           MR. MORRIS:  Okay.  Your Honor, if I may just take a

19   moment, I may be done.

20           THE COURT:  Okay.

21      (Pause.)

22           MR. MORRIS:  Your Honor, I have no further questions.

23           THE COURT:  All right.  Pass the witness.  Any

24   examination of the witness?

25                      CROSS-EXAMINATION

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01553-Exhibit Document 28-29   Filed 09/11/2021 Hearing 138 Page 42 PageID 6917

Patrick - Cross                                133

```
 1   BY MR. ANDERSON:

 2   Q    Mr. Patrick, I just had a few follow-up questions.  When

 3   you authorized the filing of the lawsuit against Highland

 4   Capital Management, LP, Highland HCF Advisor Limited, and

 5   Highland CLO Funding, Limited, when that lawsuit was filed in

 6   April of this year, was Mr. Seery included as a defendant?

 7   A    No.

 8   Q    Have the two Plaintiffs in that lawsuit, have they

 9   commenced any lawsuit against Mr. Seery?

10   A    No.

11   Q    Have they pursued any lawsuit against Mr. Seery?

12   A    No.

13   Q    Have they pursued a claim or cause of action against Mr.

14   Seery?

15   A    No.

16   Q    At most, did the Plaintiffs file a motion for leave to add

17   Mr. Seery as a defendant?

18         MR. MORRIS:  Objection, Your Honor.  To the extent

19   that any of these questions are legal conclusions, I object.

20   He's using the word pursue.  If he's trying -- if he's then

21   going to argue that, But the witness testified that he didn't

22   pursue and that's somehow a finding of fact, I object.

23         THE COURT:  Okay.  I understand.

24         MR. MORRIS:  Yeah.

25         THE COURT:  But I overrule.  He can answer.
```

1          MR. MORRIS:  That's fine.

2          THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

Patrick - Cross                        135

1    Q    Was there any effort whatsoever to hide the prior order of

2    the Bankruptcy Court?

3    A    No.

4              MR. ANDERSON:  Pass the witness.

5              THE COURT:  Okay.  Other examination?

6              MR. SBAITI:  Yes, Your Honor.  Just a couple of

7    questions.

8                         CROSS-EXAMINATION

9    BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.

1  Q   So did Mr. Dondero both have the control shares of the GP,

2  LLC and DAF Holdco Limited?

3  A   No, I believe not.  I believe he only held the Charitable

4  DAF GP interest and that Mr. Scott at all times held the

5  Charitable DAF Holdco, LTD interest, until he decided to

6  transfer it to me.

7  Q   Can you just tell us how Mr. Scott came to hold the

8  control shares of the Charitable DAF Holdco, LTD?

9  A   When he was the independent trustee of the Charitable

10 Remainder Trust, he caused that -- the creation of that

11 entity, and that's how he became in receipt of those

12 management shares.

13 Q   And does the Charitable DAF GP, LLC have any control over

14 Charitable DAF Fund, LP's actions or activities?

15 A   Yes, it does.

16 Q   What kind of control is that?

17 A   I would describe complete control.  It's the managing

18 member of that entity and can -- and effectively owns, you

19 know, the hundred percent interest in the respective

20 subsidiaries, and so the control follows down.

21 Q   And when did Mr. Scott replace Mr. Dondero as the GP --

22 managing member of the GP?

23 A   Well, I think as the -- and Mr. Morris had shown me with

24 respect to that transfer occurring on March 2012.

25 Q   So nine years ago?

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01556-B Document 18-29 aFiled 09/11/203 1 Page 142 Page 136 PageID 6921

Patrick - Cross                                    137

 1   A    Yes.

 2   Q    Does Mr. Dondero today exercise any control over the

 3   activities of the DAF Charitable -- the Charitable DAF, GP or

 4   the Charitable DAF Holdco, LTD?

 5   A    No.

 6   Q    Is he a board member of sorts for either of those

 7   entities?

 8   A    No.

 9   Q    Is he a board members of CLO Holdco?

10   A    No.

11   Q    Does he have any decision-making authority at CLO Holdco?

12   A    None.

13   Q    The decision to authorize the lawsuit and the decision to

14   authorize the motion that you've been asked about, who made

15   that authorization?

16   A    I did.

17   Q    Did you have to ask for anyone's permission?

18   A    No.

19        MR. SBAITI:  No more questions, Your Honor.

20        THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21   All right.  Any redirect?

22                      REDIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q    Since becoming the authorized representative of the

25   Plaintiffs, have you ever made a decision on behalf of those

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10 A    I didn't -- I don't -- I did not discuss with him prior to

11 making the decisions that I made that were adverse to his

12 economic interests.

13         MR. MORRIS:  Okay.  No further questions, Your Honor.

14         THE COURT:  Any further examination?  Recross on that

15 redirect?

16         MR. ANDERSON:  No further questions.

17         MR. SBAITI:  No further questions, Your Honor.

18         MR. ANDERSON:  Sorry.

19         THE COURT:  Nothing?

20         MR. ANDERSON:  I think we're good.

21         THE COURT:  Okay.  I have one question, Mr. Patrick.

22 My brain sometimes goes in weird directions.

23                   EXAMINATION BY THE COURT

24         THE COURT:  I'm just curious.  What are these Cayman

25 Island entities, charitable organizations formed in the Cayman

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01560-Bon Document 18-29 aFiled 09/11/2021 Hearing 144 Pag138 PageID 6923

Patrick - Examination by the Court                139

 1   Islands?

 2           THE WITNESS:  Yeah.  I'll keep it as simple as I can,

 3   even though I'm a tax lawyer, so I won't get into the tax

 4   rules, but the Cayman structure is modeled after what you

 5   typically see in the investment management industry, and so I

 6   -- and I won't reference specific entities here with respect

 7   to the Highland case, but I think you'll note some

 8   similarities, if you think about it.  They're -- it's

 9   described as an offshore master fund structure where you have

10   a -- and that would be the Charitable DAF Fund that's

11   organized offshore, usually in the Cayman or Bermuda Islands,

12   where the general partner, typically, in the industry, holds

13   the management --

14           THE COURT:  Yeah.  Let --

15           THE WITNESS:  Okay.

16           THE COURT:  -- me just stop you.  I've seen this

17   enough --

18           THE WITNESS:  Yeah, it's

19           THE COURT:  -- to know that it happens in the

20   investment world.  But in --

21           THE WITNESS:  Yeah.

22           THE COURT:  You know, usually, I see 501(c)(3), you

23   know, domestically-created entities for charitable purposes,

24   so I'm just curious.

25           THE WITNESS:  Yes.

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01590-B   Document 18-29   Filed 09/11/2023   Page 145 of 213   PageID 6924
Patrick - Examination by the Court                    140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7       Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18       And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

Patrick - Examination by the Court          141

1    The creation of capital gains or losses under the -- they call

2    it the trading, 864(b) trading safe harbor, is not taxable.

3    So that's why you'll find these structures operating offshore

4    to rely on those safe harbor provisions as well as -- as well

5    as what I indicated with respect to the two type blocker

6    entities.  It's very typical and industry practice to organize

7    these way.  And so when this was set --

8              THE COURT:  It's very typical in the charitable world

9    to --

10             THE WITNESS:  In the investment management --

11             THE COURT:  -- form this way?

12             THE WITNESS:  In the investment management world,

13   when you have charitable entities that are taking some

14   exposure to assets that are levered, to set this structure up

15   in this way.  It was modeled after -- they just call them

16   offshore master fund structures.  They're known as Mickey

17   Mouse structures, where you'll have U.S. investors --

18             THE COURT:  Yes.  I -- yes, I --

19             THE WITNESS:  -- enter through a U.S. partnership,

20   and the foreign investors enter through a blocker.

21             THE COURT:  It was really just the charitable aspect

22   of this that I was --

23             THE WITNESS:  Yeah.  Yeah.

24             THE COURT:  -- getting at.

25             THE WITNESS:  Yeah.  No, but I'm just trying to

                          Patrick - Recross                    142

1  | emphasize if --

2  |         THE COURT:  All right.  It's --

3  |         THE WITNESS:  Yeah.

4  |         THE COURT:  -- neither here nor there.  All right.

5  |         MR. SBAITI:  Your Honor, may I ask a slightly

6  | clarifying leading question on that, because I think I

7  | understand what he was trying to say, just for the record?

8  |         THE COURT:  Well, --

9  |         MR. MORRIS:  I object.

10 |         THE COURT:  -- I tell you what.  Anyone who wants to

11 | ask one follow-up question on the judge's question can do so.

12 | Okay?  You can go first.

13 |         MR. SBAITI:  I'll approach, Your Honor.

14 |         THE COURT:  Okay.

15 |                      RECROSS-EXAMINATION

16 | BY MR. SBAITI:

17 | Q   Would it be a fair summary of what you were saying a

18 | minute ago that the reason the bottom end of that structure is

19 | offshore is so that it doesn't get taxed before the money

20 | reaches the charities on the U.S. side?

21 | A   Tax -- it converts the nature of the income that is being

22 | thrown off by the investments so that it becomes a tax

23 | friendly income to the tax-exempt entity.  Passive income.

24 | That's --

25 | Q   So, essentially, --

1          THE COURT:  Okay.  Okay.

2          MR. SBAITI:  -- so it doesn't get taxed before it

3    hits the --

4          THE COURT:  I said one question.

5          MR. SBAITI:  Sorry, Your Honor.

6          THE COURT:  Okay.  He answered it.

7          MR. PHILLIPS:  And I have one question, Your Honor

8          THE COURT:  Okay.

9          MR. PHILLIPS:  I don't know if I need to ask this

10   question, but I'd rather not ask you if I need to ask it.

11         THE COURT:  Go ahead.

12         MR. PHILLIPS:  But if I do, you know, I could --

13         THE COURT:  Go ahead.

14         MR. PHILLIPS:  Well, okay.

15                      RECROSS-EXAMINATION

16   BY MR. PHILLIPS:

17   Q    We've talked about the offshore structure.  Are the

18   foundations in the top two tiers of the organizational chart

19   offshore entities?

20   A    No.

21   Q    They're --

22   A    They're onshore entities.  They're tax-exempt entities.

23   Q    Thank you.

24   A    The investments are offshore.

25   Q    Thank you.

1          THE COURT:  Mr. Morris?  One question.

2                  FURTHER REDIRECT EXAMINATION

3    BY MR. MORRIS:

4    Q    Do you hold yourself out as an expert on the

5    organizational structures in the Caribbean for charitable

6    organizations?

7    A    I hold myself out as a tax professional versant on setting

8    up offshore master fund structures.  It's sort of a bread-and-

9    butter thing.  But there are plenty of people that can testify

10   that this is very typical.

11   Q    Uh-huh.  Okay.

12          THE COURT:  Okay.  Thank you.

13      All right.  You are excused, Mr. Patrick.  I suppose

14   you'll want to stay around.  I don't know if you'll

15   potentially be recalled today.

16      (The witness steps down.)

17          THE COURT:  All right.  We should take a lunch break.

18   I'm going to put this out for a democratic vote.  Forty-five

19   minutes?  Is that good with everyone?

20          MR. SBAITI:  Do we have to leave the building to eat,

21   Your Honor, or is there food in the building?

22          THE COURT:  I think --

23          MR. SBAITI:  I'm sorry to ask that question, but --

24          THE COURT:  Yes.  You know what, there used to be a

25   very bad cafeteria, but I think it closed.  Right, Mike?  So,

Case 21-03067-sgj   Doc 150-1   Filed 01/24/23   Entered 01/24/23 13:25:47   Desc
Case 3:23-cv-01590-B on Document 18-29 a Filed 09/11/2021 hPage 150 of 213 4 PageID 6929

296

```
1              THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3              THE CLERK:  All rise.

4         (Proceedings concluded at 6:00 p.m.)

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23     /s/ Kathy Rehling                      06/09/2021

24   _____    _____
     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber
```

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD., | |
| Defendants | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**WITNESS AND EXHIBIT LIST FOR HEARING ON JANUARY 25, 2023**
DOCS_NY:46994.1 36027/003

006411

### REORGANIZED DEBTOR'S WITNESS AND EXHIBIT LIST WITH
### RESPECT TO EVIDENTIARY HEARING TO BE HELD ON JANUARY 25, 2023

Highland Capital Management, L.P. (the "Debtor") submits the following witness and exhibit list with respect to *Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. 122], which the Court has set for hearing at 1:30 p.m. (Central Time) on January 25, 2023 (the "Hearing") in the above-styled adversary proceeding (the "Adversary Proceeding").

A.    **Witnesses:**

    1.    Any witness identified by or called by any other party; and

    2.    Any witness necessary for rebuttal.

**Exhibits:**

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 1. | HarbourVest 2017 Global Fund L.P. Proof of Claim No. 143, HarbourVest 2017 Global AIF L.P., Proof of Claim No. 147, HarbourVest Dover Street IX Investment L.P., Proof of Claim No. 150, HV International VIII Secondary L.P., Proof of Claim No. 153, HarbourVest Skew Base AIF L.P., Proof of Claim No. 154, and HarbourVest Partners L.P., Proof of Claim No. 149. | | |
| 2. | *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Bankr. Docket No. 1625] | | |
| 3. | *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* [Bankr. Docket No. 1631-1] | | |
| 4. | *James Dondero's Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Bankr. Docket No. 1697] | | |
| 5. | The Dugaboy Investment Trust and Get Good Trust's *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Bankr. Docket No. 1706] | | |
| 6. | *CLO Holdco, Ltd.'s Objection to HarbourVest Settlement* [Bankr. Docket No. 1707] | | |

006412

| Number | Exhibit | Offered | Admitted |
|:---:|:---|:---:|:---:|
| 7. | Deposition Transcript of Michael Pugatch, January 21, 2021 | | |
| 8. | *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Bankr. Docket No. 1731] | | |
| 9. | Hearing Transcript, January 14, 2021 | | |
| 10. | *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Bankr. Docket No. 1788] | | |
| 11. | *Original Complaint*, Case No. 21-cv-00842-B, Docket No. 1 (N.D. Tex. Apr. 12, 2021) | | |
| 12. | *Memorandum Opinion and Order*, Case No. 21-cv-03129-B, Docket No. 28 (N.D. Tex. September 2, 2021) | | |
| 13. | Members Agreement, November 15, 2017 | | |
| 14. | Second Amended and Restated Investment Advisory Agreement | | |

006413

Dated:  January 23, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

# CLAIM 143

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___  District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | Who is the current creditor? | HarbourVest 2017 Global Fund L.P. |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.  From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- | --- |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | HarbourVest 2017 Global Fund L.P. Attn: Erica Weisgerber Debevoise and Plimpton LLP 919 Third Avenue New York, NY 10022, U.S.A. | See summary page |
| | | Contact phone   2129096000 | Contact phone   6173483773 |
| | | Contact email   eweisgerber@debevoise.com | Contact email   agoren@harbourvest.com |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | |

| 4. | Does this claim amend one already filed? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____  MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes. Who made the earlier filing? _____ |

Official Form 410    **Proof of Claim**    page 1

1934054200040800000000000055

**Part 2:**  Give Information About the Claim as of the Date the Case Was Filed

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**    $  See  Annex _____.    **Does this amount include interest or other charges?**

☐  No

☐  Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

  See  Annex _____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐  Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐  Motor vehicle

☐  Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                  $_____

**Amount of the claim that is secured:**        $_____

**Amount of the claim that is unsecured:**     $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐  Fixed

☐  Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes**.** Identify the property: _____

---

006418

1934054200040800000000000055

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$ _____

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it.
FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

_/s/Michael Pugatch_
Signature

Print the name of the person who is completing and signing this claim:

Name        Michael Pugatch
            First name        Middle name        Last name

Title       Managing Director - Company: HarbourVest 2017 Global Fund L.P., by Harbo

Company     by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____        Email _____

---

1934054200408000000000055

Case 21-03067-sgj    Doc 145-1    Filed 01/23/23    Entered 01/23/23 13:42:05    Desc
Case 3:23-cv-01503-B   KCC QQC Electronic Claim Filing Summary 3   PageID 6939

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global Fund L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global Fund L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | | |
| No | **Annual Interest Rate:** | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | | |
| No | **Amount Unsecured:** | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:40:16 p.m. Eastern Time | |
| **Title:** | |
| Managing Director - Company: HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its Gen Partner | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

VN: 0DB62642624B41D1B004FEABCD97B964

006420

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global Fund L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g., id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

006422

documents.  However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

006423

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.    Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.    This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

006424

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.


***

006425

# CLAIM 147

**Fill in this information to identify the case:**

Debtor _____ Highland Capital Management, L.P. _____

United States Bankruptcy Court for the: _____ Northern _____ District of _____ Texas _____
(State)

Case number _____ 19-34054 _____

Official Form 410

# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest 2017 Global AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HarbourVest 2017 Global AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____  Filed on ___/___/_____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

00604217

1934054200040800000000000059

**Part 2:**   Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $ _See Annex_____. **Does this amount include interest or other charges?**<br><br>☐ No<br><br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>_See Annex_____ |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☑ No<br><br>☐ Yes.  The claim is secured by a lien on property.<br><br>**Nature or property:**<br><br>☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br><br>☐ Motor vehicle<br><br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                    $_____<br>**Amount of the claim that is secured:**   $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes. Identify the property: _____ |

006428

1934054200040800000000000059

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
|---|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |
|---|---|

---

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   <u>04/08/2020</u><br>            MM / DD / YYYY<br><br><br><u>/s/Michael Pugatch</u><br>    Signature<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name     <u>Michael Pugatch</u><br>         First name             Middle name          Last name<br><br>Title        <u>Managing Director-Company: HarbourVest 2017 Global AIF L.P., by Harbour\</u><br><br>Company    <u>Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme</u><br>            Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address<br><br><br>Contact phone   _____           Email   _____ |

---

C006429

1934054200040800000000000059

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:49:59 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative | |
| **Company:** | |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

### ANNEX TO PROOF OF CLAIM

1.    This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.    The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

006431

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents.   However, any requested relevant documents will be provided to the Official

Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the

event of a dispute regarding this Proof of Claim and will be made available for review by other

parties in interest as appropriate upon reasonable request and after consultation with the Debtor

and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to

amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any

time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or

release of any of the Claimant's rights against any person, entity or property accruing to it

against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C.

§ 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the

Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of

any of the claims described herein, or any objection or other proceeding commenced with respect

to any of the claims described herein, or any other proceeding commenced in the Debtor's

chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right

of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or

proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have

orders entered only after *de novo* review by a United States District Judge; (f) an election of

remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request

withdrawal of the reference with respect to any matter, including, without limitation, any matter

relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without

limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

006433

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.    Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.    This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

006434

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

006435

# CLAIM 150

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern    District of Texas   (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HarbourVest Dover Street IX Investment L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

See summary page

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone   2129096000          Contact phone   6173483773
Contact email   eweisgerber@debevoise.com    Contact email   agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____    Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

1934054200408000000000060

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?**   $  See Annex_____.  **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

  See Annex_____

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature or property:**

☐  Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐  Motor vehicle

☐  Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                          $_____

**Amount of the claim that is secured:**      $_____

**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐  Fixed

☐  Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200040800000000000060

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
|---|---|---|---|---|
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ | |

---

| **Part 3:** | **Sign Below** |
|---|---|

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   __04/08/2020__<br>                              MM / DD / YYYY<br><br><br>  __/s/Michael Pugatch__<br>       Signature<br><br>**Print the name of the person who is completing and signing this claim:** |

| Name | __Michael Pugatch__ | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | __Managing Director-Company: HarbourVest Dover Street IX Investment L.P.,__ | | |
| Company | __Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme__ | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |
| | | | |
| Contact phone | _____ | Email | _____ |

1934054200408000000000060

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Dover Street IX Investment L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest Dover Street IX Investment L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| U.S.A. |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** | |
| No | **Amount Unsecured:** | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:59:00 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners Ireland Limited, its Alter |
| **Company:** |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.    This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Dover Street IX Investment L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.    The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g., Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

006441

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.    Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.    Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.    The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

006442

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

006443

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.    Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.    This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

4

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

006445

# CLAIM 153

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___ District of ___Texas___
(State)

Case number ___19-34054___

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HV International VIII Secondary L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HV International VIII Secondary L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on ___/___/___
                                                                                      MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

1934054200040800000000000065

**Part 2:**    Give Information About the Claim as of the Date the Case Was Filed

---

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

7. **How much is the claim?**    $ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

---

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

    **Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

    **Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**     $_____

    **Amount of the claim that is secured:**     $_____

    **Amount of the claim that is unsecured:**     $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:**     $_____

    **Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

---

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

    **Proof of Claim**

006448

1934054200040800000000000065

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2020
                   MM / DD / YYYY

/s/ Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael Pugatch |
| | First name    Middle name    Last name |
| Title | Managing Director-Company: HV International VIII Secondary L.P., by HII |
| Company | by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____    Email _____ |

1934054200040800000000000065

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HV International VIII Secondary L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HV International VIII Secondary L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
|---|---|---|
| See Annex | No | |

| | |
|---|---|
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:16:54 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. |  |

### ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HV International VIII Secondary L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g., Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

006451

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

006452

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

006453

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

006454

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*** 

006455

# CLAIM 154

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___ District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | **Who is the current creditor?** | HarbourVest Skew Base AIF L.P. |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor ___ |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.    From whom? ___ |

| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- |
| | HarbourVest Skew Base AIF L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A. | See summary page |
| | Contact phone ___2129096000___<br>Contact email ___eweisgerber@debevoise.com___ | Contact phone ___6173483773___<br>Contact email ___agoren@harbourvest.com___ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br> ___ ___ ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | |

| 4. | **Does this claim amend one already filed?** | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.    Claim number on court claims registry (if known) _____    Filed on ___/___/___<br>MM / DD / YYYY |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| --- | --- | --- |
| | | ☐ Yes. Who made the earlier filing? ___ |

Official Form 410                    **Proof of Claim**

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

   ☑ No

   ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**   $ _See Annex_____ .   **Does this amount include interest or other charges?**

   ☐ No

   ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   _See Annex_____

9. **Is all or part of the claim secured?**

   ☑ No

   ☐ Yes.   The claim is secured by a lien on property.

   **Nature or property:**

   ☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

   ☐ Motor vehicle

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**   $_____

   **Amount of the claim that is secured:**   $_____

   **Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**   $_____

   **Annual Interest Rate** (when case was filed)_____%

   ☐ Fixed

   ☐ Variable

10. **Is this claim based on a lease?**

    ☑ No

    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

11. **Is this claim subject to a right of setoff?**

    ☑ No

    ☐ Yes. Identify the property: _____

Official Form 410   **Proof of Claim**

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. **Check all that apply:** |

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| | |
|---|---|
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  <u>04/08/2020</u><br>               MM / DD / YYYY<br><br><br><u>/s/Michael Pugatch</u><br>   Signature<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name  <u>Michael Pugatch</u><br>         First name         Middle name       Last name<br><br>Title  <u>Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVes</u><br><br>Company  <u>Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investme</u><br>        Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address<br><br><br>Contact phone  _____       Email  _____ |

---

**Proof of Claim**

Case 21-03067-sgj   Doc 145-1   Filed 01/23/23   Entered 01/23/23 13:42:05   Desc
Case 3:23-cv-01503-B   Document 8   Filed 00/00/23   Page 200 of 213   PageID 6979
KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HarbourVest Skew Base AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| **Disbursement/Notice Parties:** | |
|---|---|
| HarbourVest Skew Base AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| **Other Names Used with Debtor:** | **Amends Claim:** | |
|---|---|---|
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| **Submitted By:** | |
|---|---|
| Michael Pugatch on 08-Apr-2020 5:11:50 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative Inv | |
| **Company:** | |
| Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | |

VN: 37ADBC619BCE5E389F8F25C4DAB7545F

006460

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

### ANNEX TO PROOF OF CLAIM

1. This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Skew Base AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2. The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings

006461

in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

006462

documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.   The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

006463

as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

006464

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

006465

# CLAIM 149

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: ___Northern_____  District of __Texas____
                                                                                                        (State)

Case number    __19-34054_____

# Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---------|---------------------|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | HarbourVest Partners L.P. on behalf of funds and accounts under management<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.   From whom? _____ |

| | | | |
|---|---|---|---|
| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>See summary page<br><br><br><br><br>Contact phone   2129096000<br>Contact email   eweisgerber@debevoise.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ | **Where should payments to the creditor be sent?** (if different)<br><br>See summary page<br><br><br><br><br>Contact phone   6173483773<br>Contact email   agoren@harbourvest.com |

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____<br>                                                                                                                                    MM  / DD  / YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

Official Form 410                              **Proof of Claim**

1934054200408000000000061

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ _See Annex_____ . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes**.** Identify the property: _____

C06468

1934054200040800000000061

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. **Check all that apply:**

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

**Check the appropriate box:**

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   _04/08/2020_
                     MM / DD / YYYY

_/s/Michael Pugatch_
Signature

Print the name of the person who is completing and signing this claim:

Name   __Michael Pugatch__
         First name          Middle name          Last name

Title   __Managing Director__

Company   __HarbourVest Partners L.P., on behalf of funds and accounts under manage__
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone   _____        Email   _____

---

006400

1934054200040800000000061

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HarbourVest Partners L.P. on behalf of funds and accounts under management | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| | No |
| New York, NY, 10022 | **Related Claim Filed By:** |
| U.S.A. | |
| **Phone:** | **Filing Party:** |
| 2129096000 | Authorized agent |
| **Phone 2:** | |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| **Disbursement/Notice Parties:** |
|---|
| HarbourVest Partners L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| U.S.A. |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| **Other Names Used with Debtor:** | **Amends Claim:** | |
|---|---|---|
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | | |
| No | **Annual Interest Rate:** | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** | |
| No | **Amount Unsecured:** | |

| **Submitted By:** |
|---|
| Michael Pugatch on 08-Apr-2020 5:06:59 p.m. Eastern Time |
| **Title:** |
| Managing Director |
| **Company:** |
| HarbourVest Partners L.P., on behalf of funds and accounts under management,  by HarbourVest Partners, LLC, its Gen Partner |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. |  |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Partners L.P. on behalf of funds and accounts under management (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant manages investment funds that are limited partners in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third*

006471

*Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.   *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

006472

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

006473