CIVIL ACTION NO. 3:23-CV-1503-B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re: HIGHLAND CAPITAL MANAGEMENT, L.P.,
Reorganized Debtor.

_____

CHARITABLE DAF FUND, L.P.
and CLO HOLDCO, LTD.,

*Appellants,*

v.

HIGHLAND CAPITAL MANAGEMENT, L.P., et al.

*Appellee.*

_____

On Appeal from the United States Bankruptcy Court for the Northern District
of Texas, Adversary No. 21-03067-sg, Hon. Stacey G.C. Jernigan, Presiding

BRIEF OF APPELLANTS THE CHARITABLE DAF
FUND, L.P. AND CLO HOLDCO, LTD.

Mazin A. Sbaiti
Jonathan Bridges
Sbaiti & Company PLLC
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367

Counsel for Appellants

## <u>RULE 8012 CORPORATE DISCLOSURE STATEMENT</u>

Appellant Charitable DAF Fund, L.P. is the parent of CLO Holdco, Ltd.

## <u>LOCAL RULE 8012.1 CERTIFICATE OF INTERESTED PERSONS</u>

Appellants certify that the following list is, to the best of its knowledge, a complete list of all persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent corporations, and/or other legal entities who or which are financially interested in the outcome of this appeal.

1.      Appellants:

Charitable DAF Fund, L.P.
CLO Holdco, Ltd.

<u>Counsel for Appellants</u>:
Mazin A. Sbaiti
Jonathan Bridges
Sbaiti & Company PLLC

2.      Appellee (Debtor):

Highland Capital Management, L.P.

<u>Counsel for Appellee</u>:
John A. Morris
Jeffrey N. Pomerantz
Gregory v. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones LLP

3.      The Dallas Foundation, Greater Kansas City Community Foundation,
        Santa Barbara Foundation, The Community Foundation of North
        Texas (CFNT), Highland Dallas Foundation, Inc., Highland Kansas
        City Foundation, Inc., Highland Santa Barbara Foundation, Inc.,
        HCMLP Charitable Fund, Charitable DAF Holdco, Ltd., Charitable
        DAF Fund, L.P ., CLO Holdco, Ltd.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

LOCAL RULE 8012.1 CERTIFICATE OF INTERESTED PERSONS ...............i

TABLE OF CONTENTS.........................................................................iii

TABLE OF AUTHORITIES ....................................................................v

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ........................................... 1

ISSUES PRESENTED.............................................................. 1

INTRODUCTION .................................................................. 4

STATEMENT OF THE CASE.................................................................... 4

STANDARD OF REVIEW ................................................................. 10

SUMMARY OF THE ARGUMENT ................................................... 11

ARGUMENTS AND AUTHORITIES ............................................ 16

    A.    The Lower Court Incorrectly dismissed the Fiduciary Duty Claims.................................................................... 16

        1.    Fiduciary Duties Owed Under the Investment Advisers Act of 1940 ........................................... 16

        2.    Defendants Owe Plaintiffs Fiduciary Duties Under Texas Common Law ........................................... 22

        3.    Plaintiffs Have Alleged Breaches ......................... 25

        4.    Rule 9(b) Does Not Apply But is Met Anyway ................. 28

        5.    The DAF and Holdco Have Standing ................................... 29

6.  The Lower Court Erred in Holding that Guernsey Law Governs Whether There is a Fiduciary Duty ......................... 29

7.  The Lower Court Erred in Concluding Without Any Explanation that the IAA Claim Requires Satisfying the PSLRA and Rule 10b-5 .................................................... 32

B.  The Lower Court Incorrectly Waved Off the Negligence Claim .............................................................................. 33

C.  The Lower Court Incorrectly Dismissed the Contract and Tortious Interference Claims  on Judicial Estoppel Grounds .......... 35

D.  The Lower Court Incorrectly Dismissed the Contract and Tortious Interference Claims on the Merits .................................... 40

E.  The Lower Court Incorrectly Dismissed the RICO Claim with Prejudice Instead of Without Prejudice ................................... 41

F.  The Lower Court Erred by Failing to Address Why Amendments Could Not Solve the Pleading Errors......................... 43

G.  This Court Should Reconsider Withdrawing the Reference ......................................................................... 44

CONCLUSION .................................................................................. 44

CERTIFICATE OF SERVICE ............................................................. 45

CERTIFICATE OF COMPLIANCE .................................................... 45

iv

# TABLE OF AUTHORITIES

## **Cases**

*Abrahamson v. Fleschner*,
    568 F.2d 862 (2d Cir. 1977) ........................................................................ 19

*Abraham v. Singh*,
    480 F.3d 351 (5th Cir. 2007) ...................................................................... 31

*Alphonse v. Arch Bay Holdings, L.L.C.*,
    548 F. App'x 979 (5th Cir. 2013) ............................................................... 30

*Anderson* v. *Abbott*,
    321 U.S. 349 (1944).................................................................................... 31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................... 10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................... 10

*Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*,
    179 F.3d 197 (5th Cir. 1999) ...................................................................... 39

*Broyles v. Cantor Fitzgerald & Co.*,
    No. 10-854, 2014 U.S. Dist. LEXIS 169364
    (M.D. La., Dec. 8, 2014) ............................................................................ 31

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000)...................................................................... 10

*Com. Bank v. Malloy*,
    No. 13-cv-252, 2013 U.S. Dist. LEXIS 106329
    (N.D. Okla. July 30, 2013)......................................................................... 38

*Cudd Pressure Control, Inc. v. Roles*,
    328 F. App'x 961 (5th Cir. 2009)..........................................................22-23

*Douglass v. Beakley*,
900 F. Supp. 2d 736 (N.D. Tex. 2012) ......................................................... 1, 23

*Du Bois v. Martin Luther King Jr. Family Clinic, Inc.*,
No. 3:17-CV-2668, 2018 U.S. Dist. LEXIS 246910
(N.D. Tex. May 29, 2018).................................................................................... 30

*Dussouy v. Gulf Coast Invest. Corp.*,
660 F.2d 594 (5th Cir. 1981)............................................................................. 43

*Edgar v. Mite Corp.*,
457 U.S. 624 (1982)......................................................................................30-31

*Firefighters' Ret. Sys. v. Eisneramper, L.L.P.*,
898 F.3d 553 (5th Cir. 2018) ............................................................................ 38

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*,
462 U.S. 611 (1983) ........................................................................................... 30

*Fund of Funds, Ltd. v. Vesco*,
74-Civ-1980, 1976 U.S. Dist. LEXIS 14183 (S.D.N.Y. 1976)....................... 29

*Goldenson v. Steffens*,
No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258
(D. Me. Mar. 7, 2014) ................................................................................. 20, 23

*Hand v. Dean Witter Reynolds, Inc.*,
889 S.W. 2d 483 (Tex. App.—Houston [14th Dist.] 1994) ............................ 24

*In re Mirant Corp.*,
348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) ................................................... 38

*Jacobsen v. Osborne*,
133 F.3d 315, 318 (5th Cir. 1998) .................................................................... 43

*Jethroe v. Omnova Solutions, Inc.*,
412 F.3d 598 (5th Cir. 2005).................................................................36, 38-39

*Johnson Serv. Co. v. Transamerica Ins.*,
  485 F.2d 164 (5th Cir. 1973) ............................................................................ 36

*Laird v. Integrated Res.*,
  897 F.2d 826 (5th Cir. 1990) ....................................................... 23, 25, 32-33

*Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA"*
  *Litig.)*, 238 F. Supp. 3d 799 (S.D. Tex. 2017).................................................. 24

*Leffall v. Dall. Indep. Sch. Dist.*,
  28 F.3d 521 (5th Cir. 1994) ............................................................................. 43

*Leyse v. Bank of Am. Nat'l Ass'n*,
  804 F.3d 316 (3d Cir. 2015) ............................................................................ 30

*Lowrey v. Tex. A & M Univ. Sys.*,
  117 F.3d 242 (5th Cir.1997) ............................................................................ 10

*McCarthy v. Azure*,
  22 F.3d 351 (1st Cir. 1994) ............................................................................. 39

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)........................................................................................ 22

*Nabors Drilling, U.S.A., Inc. v. Escoto*,
  288 S.W.3d 401 (Tex. 2009) ........................................................................... 34

*Navigant Consulting, Inc. v. Wilkinson*,
  508 F.3d 277 (5th Cir. 2007) ........................................................................... 23

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)........................................................................................ 39

*Norman v. Salomon Smith Barney, Inc.*,
  350 F. Supp. 2d 382 (S.D.N.Y. 2004) ............................................................. 32

*Pool v. Johnson*,
  No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613
  (N.D. Tex. Apr. 15, 2002) ............................................................................... 25

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*,
   29 S.W.3d 74 (Tex. 2000) ............................................................... 41

*Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*,
   678 F.2d 552 (5th Cir. 1982) ......................................................... 22

*Romano v. Merrill Lynch, Pierce, Fenner & Smith*,
   834 F.2d 523 (5th Cir. 1987) ......................................................... 24

*Sassen v. Tanglegrove Townhouse Condo. Ass'n*,
   877 S.W.2d 489 (Tex. App.—Texarkana 1994) ............................... 25

*SEC v. ABS Manager, LLC*,
   No. 13cv319, 2014 U.S. Dist. LEXIS 80542
   (S.D. Cal. June 11, 2014) ............................................................... 20

*SEC v. Ambassador Advisors, LLC*,
   576 F. Supp. 3d 286 (E.D. Pa. 2021) ............................................. 17

*SEC v. Blavin*,
   760 F.2d 706 (6th Cir. 1985) ......................................................... 25

*SEC v. Capital Gains Research Bureau, Inc.*,
   375 U.S. 180 (1963) .................................................................. 16-17

*SEC v. Markusen*, 143 F. Supp. 3d 877 (D. Minn. 2015) .................... 20

*SEC v. Tambone*,
   550 F.3d 106 (1st Cir. 2008) .................................................... 17, 19

*SEC v. World Tree Fin., L.L.C.*,
   43 F.4th 448 (5th Cir. 2022) ........................................... 17, 27, 33

*SEC v. Zandford*,
   535 U.S. 813 (2002) ....................................................................... 18

*Skinner v. Switzer*,
   562 U.S. 521 (2011) ......................................................................... 2

*State ex rel. Udall v. Colonial Penn Ins. Co.*,
812 P.2d 777 (N.M. 1991) ................................................................. 23

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
964 F. Supp. 783 (S.D.N.Y. 1997) ..................................................... 23

*Strougo v. Bassini,*
282 F.3d 162 (2d Cir. 2002) .............................................................. 23

*The Dratel Grp., Inc.*, SEC Exchange Act Release No. 77396,
2016 SEC LEXIS 1035 (Mar. 17, 2016) ............................................ 10

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979) ........................................................... 1, 16, 19, 21

*United States v. Tomlin (In re Tomlin*),
266 B.R. 350 (N.D. Tex. 2001) .......................................................... 10

*W. Res. Life Assurance Co.  v. Graben*,
233 S.W.3d 360 (Tex. App.—Fort Worth 2007) ................................. 24

*Wells Fargo Bank, N.A. v. Titus Chinedu Operaji*,
698 F.3d 231 (5th Cir. 2012) ....................................................... 2, 36

*Zimmerman v. Matson Money*,
2021 U.S. Dist. LEXIS 247095 (N.D. Ga., June 9, 2021) ................... 24

## Rules, Statutes and Regulations

17 C.F.R. 240.10b-5 .................................................................. 32, 33

17 C.F.R. § 275.204A-1 .................................................................... 17

17 C.F.R. § 275.206(4)-8 ...............................................................19-20

15 U.S.C. § 80b-6 .............................................................................. 31

15 U.S.C. § 80b-6(4) ......................................................................... 19

15 U.S.C. § 80b-8(d) ............................................................................ 25

15 U.S.C. § 80b-15 .............................................................................. 21

15 U.S.C. § 80b-15(a) ............................................................. 28, 31, 34

15 U.S.C. § 80b-15(b) .......................................................................... 22

15 U.S.C. § 1961 .................................................................................. 41

18 U.S.C. § 1964(c) ............................................................................. 42

Fed. R. Bankr. P. 7012(b) ................................................................... 10

Fed. R. Civ. P. 9(b) ........................................................................ 28, 29

Fed. R. Civ. P. 12 ................................................................................ 30

Fed. R. Civ. P. 12(b)(6) ...................................................................... 41

Fed. R. Civ. P. 12(g) ........................................................................... 30

Fed. R. Civ. P. 12(h) ........................................................................... 30

Fed. R. Evid. 201(b) ............................................................................ 19

## Other Authorities

*Commission Interpretation Regarding Standard of Conduct for
Investment Advisers*, Release No. IA–5248, 84 Fed. Reg./Vol. 84,
No. 134 (July 12, 2019) ...................................................................... 18

*Commission Interpretation Regarding Standard of Conduct for
Investment Advisers*, 84 Fed. Reg. 33681, SEC Release No. IA-5248;
File No. S7-07-18, 17 CFR Part 276 (June 5, 2019) ........................... 25

Investment Advisers Act of 1940 .................................................. *passim*

Investment Advisers Act Release No. 3060, 75 Fed. Reg. 49,234
(Aug. 12, 2010) ......................................................................................... 18

Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003) .......................... 18

Restatement (2d) of Agency § 425 .................................................................... 24
Restatement (Third) of Agency, § 8.01 (AM. L. INST. 2006) ............................... 18

Tex. Sec. Act § 4001.002(a) ............................................................................. 24

Tex. Sec. Act § 4004.302 ................................................................................. 24

https://www.ssb.texas.gov/securities-professionals/dealer-adviser-
registration/getting-started-registered-investment-adviser-3 ............................... 25

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the appeal from the Bankruptcy Court of the Northern District of Texas under 28 U.S.C § 158.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. Oral argument will allow Appellants to assist the Court in navigating some of the more idiosyncratic issues raised due to the convoluted history of this case.

## ISSUES PRESENTED

ISSUE ONE          The lower court dismissed Plaintiffs' Count I for breach of fiduciary duties arising under the Investment Advisers Act ("IAA") and under common law. The IAA action is limited to voiding the "rights" of one who violates the IAA in a contract and seeking relief "incident to voidness." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979). And this Court has held that the IAA can lay a predicate to common law fiduciary duty claims for damages and other relief. *Douglass v. Beakley*, 900 F. Supp. 2d 736, 751-52, n.16 (N.D. Tex. 2012). ***Did the lower court err in dismissing those claims given that (1) Plaintiffs pled violations of the IAA and requested to void Highland's right to keep the HarbourVest Interest, and sought equitable relief such as disgorgement; (2) Plaintiffs plainly are owed fiduciary duties and have direct and derivative standing, respectively, to bring the common law claims, and (3) Plaintiffs' allegations of Defendant's "cherry picking" is a classic case of self-dealing which meet Rule 9(b) if it applies?***

1

ISSUE TWO        The lower court dismissed Plaintiffs' Count III for negligence because the Plan excludes it. The Supreme Court has held that not every cause of action must be spelled out so long as the support facts are pled. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). ***Did the lower court err because the plan did not apply to gross negligence and Plaintiffs pled gross negligence?***

ISSUE THREE     The lower court dismissed Counts II and V for breach of contract based on judicial estoppel. This Court previously held that the lower court failed to adequately address the inadvertence element of judicial estoppel. The Fifth Circuit is clear that where a creditor has no duty to make a claim, its failure to bring one forth (even when it has taken the opportunity to assert other claims) is not deemed inconsistent with a later attempt to litigate the claim. *Wells Fargo Bank, N.A. v. Titus Chinedu Operaji*, 698 F.3d 231, 236-37 (5th Cir. 2012).

                              ***Did the lower court err in finding judicial estoppel where (1) it failed to address any of Plaintiffs' arguments for why its actions were inadvertent and why its claims are based on new information it lacked before; (2) Plaintiff's objection to the Settlement going forward (which it withdrew) is not inconsistent with its position today that it is entitled to damages for breach because it had no duty to bring its claims for damages as part of its objection; and (3) the lower court admitted in its Order that the HarbourVest settlement was so substantial that it was likely to overrule any objection, meritorious or not?***

ISSUE FOUR      The lower court dismissed Counts II and V on the merits on the basis that the HCLOF Company Agreement allows other members, like Highland or Holdco, the right to buy another member's shares when offered to someone other than the affiliate of another member. ***Did the lower court err given that Holdco's right of first refusal is triggered by the "offer" to buy HarbourVest's shares, and here the offer and the "sale" of the***

2

|              | ***shares were made to Highland, not to HarbourVest's or Highland's affiliate?*** |
|--------------|-----------------------------------------------------------------------------------|
| ISSUE FIVE   | The lower court dismissed Plaintiffs' RICO claim with prejudice. Below, Highland contended that the RICO claim could not proceed in light of the Securities claims under the IAA. ***Did the lower court err in dismissing the RICO claims with prejudice on this basis, as opposed to without prejudice with leave to replead?*** |
| ISSUE SIX    | This Court previously dismissed as moot Plaintiffs' request to withdraw the Reference. ***Will this Court agree to reconsider and grant that motion?*** |

## INTRODUCTION

Plaintiffs, the Charitable DAF Fund, L.P. ("DAF") and its wholly-owned subsidiary, CLO Holdco, Ltd. ("Holdco."), respectfully submit this appeal of the grant of Defendants' Highland Capital Management L.P. ("Highland") and its subsidiary, Highland HCF Advisor, Ltd. ("HCFA")'s Motion to Dismiss under Bankruptcy Rule 7012 (the "Order"). For the reasons set forth herein, Plaintiffs respectfully request that the Court reverse the dismissal of all of its claims with prejudice, allow Plaintiffs to amend their Complaint in the alternative, and reconsider Plaintiffs' prior *Motion to Withdraw the Reference*.

## STATEMENT OF THE CASE

Plaintiff Charitable DAF Fund, L.P. ("DAF") is a charitable fund that helps several causes throughout the country, including providing millions of dollars every year to local charities in Dallas and around the country, such as family shelters, education initiatives, veteran's welfare associations, public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Original Complaint ("Compl.") at ¶ 10. [R.000106]

Since 2012, the DAF was advised by its registered investment advisor, Defendant Highland Capital Management, L.P. ("Highland"), and its various subsidiaries about where to invest. (Compl. at ¶ 11) [R000106]. This relationship was governed by an investment advisory agreement. (Compl. at ¶ 12) [R.000107]. As the DAF's investment advisor, Highland owed the DAF fiduciary obligations,

4

including the duty against self-dealing, the duty to put the DAF's best interest ahead of its own, and the duty to obtain informed consent from the DAF before acting in any way that might benefit Highland at the DAF' expense. (Compl. at ¶¶ 56–57, 62, 64) [R.000113, 000114].

In 2017, Highland advised the DAF to keep 143,454,001 shares of Highland CLO Funding, Ltd ("HCLOF"), which the DAF did via a holding entity, Plaintiff CLO Holdco, Ltd. ("CLO Holdco"). (Compl. at ¶ 12)[R.000107].

Shortly thereafter, CLO Holdco entered into a Subscription and Transfer Agreement whereby a series of related entities collectively referred to as "HarbourVest" acquired a 49.98% membership interest in HCLOF (the "HarbourVest Interests"). (Compl. at ¶¶ 13–14) [R.000107]. As part of this transaction Holdco retained a 49.02% membership interest. (Compl. at ¶ 13) [R.000107], and Highland took a 0.6% membership interest HCLOF. (Compl. at ¶ 25) [R.000109].

HCLOF's portfolio manager is Highland HCF Advisor, Ltd. ("HCFA"), which is a subsidiary of Highland and is controlled and operated by Highland. (Compl. at ¶ 24) [R.000108]. Both are registered investment advisers ("RIA"). As such, both Highland and HCFA owed fiduciary duties to CLO Holdco as a wholly-owned subsidiary of the DAF, and as an investor in the HCLOF fund. James P. Seery, Jr., CEO of Highland, testified that Highland owed such fiduciary duties

5

under the Investment Advisers Act of 1940 (the "Advisers Act") to investors in the funds that Highland manages. [R.004480]

The HCLOF parties' rights and obligations as members of HCLOF were governed by the *Members Agreement Relating to the Company* dated November 15, 2017 ("Company Agreement"). (Compl. at ¶¶ 93–94) [R.000120]. Under the Company Agreement, Highland as a member, owed the other members duties of good faith and fair dealing; moreover, no member was allowed to sell shares to another member without first providing all other members the opportunity and right to purchase a *pro rata* portion thereof at the same price being offered. (Compl. at ¶ 95) [R.000120].

In October 2019, Highland filed for Chapter 11 (Compl. at ¶ 15) [R.000107]. As part of this bankruptcy, HarbourVest filed its proof of claim against Highland totaling over $300 million (Compl. at ¶¶ 16, 21-26) [R.000107-000109]. Highland, controlled by James Seery at the time, vehemently denied the validity of these claims. (Compl. at ¶ 17) [R.000108].

In the meantime, Highland continued to control HCLOF through its subsidiary HCFA. (Compl. at ¶¶ 115–124) [R.000122-000124]. On or about September 30, 2020, Highland utilized interstate wires to transmit information to the HCLOF investors regarding the value of their respective interests. (Compl. at ¶ 121)

[R.000124]. Due to COVID, the value of the investment in HCLOF had ostensibly declined to around $52 million in value. (Compl. at ¶ 27) [R.000109].

In the following months, however, the value HCLOF began to rebound along with the rest of the market, but Highland did not update investors. (Compl. ¶¶ 123-124) [R.000124]. By the end of November 2020, the value of HCLOF's total assets had increased to almost $73 million (with over $36 million allocable to HarbourVest) and by the end of December, HCLOF's value reached over $86 million (with over $43 million allocable to the HarbourVest Interests). *Id.* However, Highland did not transmit these valuations to Plaintiffs. (Compl. at ¶ 120) [R000123-000124].

Around November 2020, Highland and HarbourVest—utilizing the interstate wires—entered into discussions about settling HarbourVest's claims in the bankruptcy. (Compl. at ¶ 119) [R.000123]. Highland and HarbourVest reached a settlement, which Highland requested the bankruptcy court approve on December 23, 2020 (the "9019 Hearing"). (Compl. at ¶ 29) [R.000109]; R.04517-04535.

As part of the settlement, Highland agreed to allow HarbourVest around $80 million in unsecured claims -- $45 million in Class 8 and the rest in Class 9. The $45 million in Class 8 claims were expected to yield about seventy cents on the dollar to HarbourVest (roughly $31,500,000). (Compl. at ¶ 32) [R.00110]; R.04517-04535. As part of the consideration for the $80 million in allowed claims, HarbourVest

7

transferred its interest in HCLOF to Highland, which Highland said was worth $22,500,000 at the time (Compl. at ¶ 33) [R.000110] ("HarbourVest Settlement"). Highland used this as a justification for the HarbourVest Settlement, to say that it had settled $300,000,000 in meritless claims for just $9,000,000. (Compl. at ¶¶ 35) [R000110].

Despite Highland's fiduciary obligations to Plaintiffs, Highland concealed the true value the HarbourVest Interest in HCLOF, as well as the value that it was buying the Interest for. It diverted the entire opportunity to participate in this windfall transaction to itself in violation of its fiduciary and other duties of good faith. (Compl. at ¶ 67) [R.000115].

At the January 14, 2021, Bankruptcy Rule 9019 hearing to approve the settlement, HCFA's CEO testified that the value allocated to the HarbourVest Interest was $22.5 million. (Compl. at ¶¶ 34, 37) [R.000110]. Highland represented that that number was "overstated." [R.000578]. Highland's CEO, Jim Seery, testified that given the value of the Interest, all claims were being settled for a nominal $9,000,000 because the Class 8 claims ($45,000,000) would only yield 70 cents on the dollar ($31,500,000) and the Class 9 claims would likely not pay.[1]

---

[1] This, it turns out, was also a blatant prevarication. Within less than three months of this testimony, the Class 8 and 9 claims were sold by HarbourVest to buyers known to be affiliated with James Seery. The buyers allegedly paid some 70 cents on the dollar for all claims—meaning, they expected to make a premium *even on the Class 9 claims which were supposed to be worth zero*. Who buys bankruptcy claims from an estate where the guy in charge of it just three months earlier said that at most, one class will yield 70 cents and the other will yield zero? Someone who

[R.000578, 605-606]

The bankruptcy court issued an order approving the HarbourVest Settlement (the "9019 Order"). The sale of the HarbourVest Interest transformed Highland from a minority member with a 0.6% interest into the controlling member with a 50.49% interest. So not only did Highland maneuver to keep for itself an interest that had a built-in $20 million profit, it maneuvered for itself a controlling interest in HCLOF.

As Plaintiffs learned only after the fact from former Highland employees who were familiar with the valuation, the HarbourVest interest was actually worth $42 million on a net asset value basis. (Compl. at ¶¶ 34, 37) [R.000110]. Thus, Highland's testimony that the "current" market value [in January 2021] of the HarbourVest Interest was only $22.5 million was false when made. It was recklessly or intentionally made because Highland as a debtor and a Registered Investment Adviser had heightened duties not to get those numbers wrong.

Highland's failure to inform the DAF, Holdco, or HCLOF—whom it controlled through HCFA—means Highland reaped a $20 million-plus immediate windfall by self-dealing and without proper disclosure, resting on an affirmative misrepresentation by its CEO, and without obtaining informed consent from its

---

has been told something in private; that's who. While the DAF's awareness of these facts only arose a year after the Complaint was filed, there has been no opportunity to amend the Complaint in this case; and these facts would be pleaded as further evidence of the disingenuousness of Mr. Seery's belief as to what the values were worth. While many have tried to look behind the curtain, the Bankruptcy Court has dispatched all such inquiries in their cribs. *See, e.g., Mem. Op. and Order* [Doc. 33904].

investors. It is indisputable that what the Debtor did amounts to cherry picking as the SEC has defined it. *The Dratel Grp., Inc.*, SEC Exchange Act Release No. 77396, 2016 SEC LEXIS 1035, at *1 (Mar. 17, 2016) (defining "cherry picking" as "a practice in which securities professionals allocate profitable trades to a preferred account (like their own)").

## STANDARD OF REVIEW

This Court reviews *de novo* the bankruptcy court's ruling on a FED. R. BANKR. P. 7012(b) motion to dismiss. *United States v. Tomlin (In re Tomlin)*, 266 B.R. 350, 352 (N.D. Tex. 2001) (Fitzwater, J.) (citing *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 246 (5th Cir.1997)). Motions to dismiss for failure to state a claim are viewed with disfavor and are seldom granted. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-678 (2009). This Court must draw all reasonable inferences in favor of the plaintiff. *See Collins*, 224 F.3d at 498. Rule 8 does not demand "'detailed factual allegations[.]'" *Ashcroft* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In ruling upon a motion to dismiss, the Court cannot decide disputed fact issues; the court may grant a motion to dismiss for failure to state a claim *only if* it can determine with certainty that the plaintiff cannot prove a set of plausible facts that would allow the

relief sought in the complaint. *Id.*

## SUMMARY OF THE ARGUMENT

This is a rather simple case with an unfortunate number of similar acronyms. Highland is a debtor, and at all relevant times was a registered investment advisor who served as both an advisor to the DAF directly and indirectly to Holdco., as well as to an investment vehicle, Highland CLO Funding, Ltd. ("HCLOF"), in which Holdco. held an ownership stake of 49.02% compared to Highland's 0.6%. Another investor in HCLOF, HarbourVest,[2] who owned some 49.98% of HCLOF (the HarbourVest "Interest"), sued Highland in bankruptcy for $300 million—which Highland deemed meritless at the time it was filed.

Highland sought to settle this enormous claim and was able to reach a deal in December of 2020 ("Settlement"). One part of the Settlement was that HarbourVest would transfer its ownership in HCLOF to Highland, which Highland said it valued at $22.5 million. The truth of the matter, however, was that the Interest was worth almost double what it was represented to have been. The lower court credibly states that there was a lot more to the HarbourVest Settlement. No one disagrees that the court may not have found who stood to receive the HarbourVest Interest and how much it was worth was comparatively significant enough to prevent Settlement approval given that it would relieve the estate of a $300 million claim. And nothing

---

[2] The Order properly lays out the multiplicity of entities grouped under the "HarbourVest" moniker at footnote 9 (R000008).

in this lawsuit attempts to reverse the Settlement with HarbourVest.

The Court improperly dismissed Plaintiffs' breach of fiduciary duty claims. The Court incorrectly assumed that Plaintiffs were not seeking relief under § 215 of the Investment Advisers Act ("IAA") even though it featured prominently in Plaintiffs' Response briefing, and the violations of the IAA and requests for equitable relief were requested in the Complaint. The law in this Circuit is plain that someone who violates the IAA in the "making" or the "performance" of a contract loses their rights under that contract—i.e., disgorgement of the benefit gained via violation of the IAA. Plaintiffs pled the violations and pled for disgorgement.

The Order further dismissed without direct analysis Plaintiffs' common law fiduciary duty claims. First, the Order is flat wrong that the fiduciary duties spoken of here arise from the internal affairs of HCLOF and are therefore subject to Guernsey law. The duties here do not arise from either Defendant's role as an officer or director of HCLOF and, therefore, do not implicate the internal affairs of HCLOF.

Second, the Order glosses over the fact that (1) this Court—and every other to consider the question—has found that the IAA creates the formal fiduciary relationship whence the fiduciary duties arise—this is especially so since Texas law adopts the IAA's framework as its own for registered investment advisors; and (2) Texas law has independently found that the relationship between adviser and investor is a fiduciary one.

12

Third, the Order simply states that the Complaint is "conclusory" and therefore has not set forth sufficient detail to make out the elements. But this is difficult to fathom given that the Complaint literally quotes the false statement given under oath, and explains why the statement is false (i.e., that the value of the Interest was actually worth almost twice as much, per information given by former Highland employees). And the Complaint explains how this opportunity is the type that an adviser would have had to offer an advisee. The Order cites no case to explain why that is insufficient detail. Highland has ample notice of the claim against it.

Finally, the Order suggests that "there was no opportunity to divert." But it is undisputed that had Highland offered the opportunity to the DAF, as it was supposed to, the DAF would have had the option to pay $22.5 million in cash for the Interest. Instead, Highland kept a $42 million interest for itself.

The Order dismissed the negligence claim on the basis that it is barred by the final plan injunction. But that injunction by its terms does not apply to gross negligence. Thus, at a minimum, because Plaintiffs' negligence claim would include gross negligence, it should survive to that extent. Moreover, Plaintiffs have properly pled a claim for gross negligence because they pled that Highland was well aware— and had exclusive access to the information—relevant to valuing the Interest, and therefore was aware of the risk that by not offering it to Plaintiffs first, it was substantially likely to cause damage.

13

The Order further dismissed the contract and tortious interference claims on judicial estoppel grounds. That the true value of the Interest was concealed, and because the transfer of the Interest was only a small part of the overall $300 million HarbourVest Settlement is precisely why judicial estoppel does not apply. Nothing in the Order squarely addresses Holdco's arguments for inadvertence or the fact that it had nothing to hide.  As such, this element is again not met in the Order.

Moreover, in the Order, the lower court concedes what Holdco has said all along: that the court likely would have overruled an objection because of the enormity of the Settlement's impact on the estate. So, while Holdco's objection to the *Settlement* based upon its contractual right of first refusal was withdrawn could be construed as "taking a position" on the *Settlement* going forward, it was not a position on whether Holdco's contractual claim *had merit* or that Holdco was entitled to a remedy in light of the Settlement. Indeed, what is completely missed in the Order is the fact that (1) nothing in this current lawsuit seeks to alter the *Settlement* with HarbourVest, those claims will remain gone, and (2) at the 9019 Hearing for approving the Settlement, the Order excised the part of the transcript where counsel for Holdco was indeed asked to, but then *refused*, stipulate or agree on the record that the contract interpretation lacked merit. The lower court's interpretation of the subjective reasons why is not dispositive here given that it would be perfectly reasonable for Holdco to have withdrawn its objection to preserve

14

its right to litigate the merits of its contract claim based upon a complete factual record (especially given that the contract is far from intuitive and is not the model of clarity, and therefore, should not be interpreted as a matter of law at this early stage).

Moreover, a plausible reading of the HCLOF Company Agreement § 6.2 is that it was meant to require a right of first refusal ("ROFR") for all transfers except from a member *to its own affiliate.* That the duty to offer a ROFR exists only when one member offers its interest to another member and not when one member offers it to the "affiliate" of another member makes no sense. There is no advantage. One purpose of the ROFR is to prevent one member from bringing in an outsider without existing members having the chance to maintain the current member composition by simply buying the exiting member out. Another would be to prevent one member from offering its interest to another member, who would improve their position relative to the existing membership percentages, without giving all members the same chance. Neither is not accomplished where, as has happened here, a member can vastly increase its power by simply putting the interest into an affiliate instead of its own name. To wit, Highland now controls over 50% of HCLOF via its affiliate.

Furthermore, the lower court ignores the fact that the actual settlement agreement and transfer had the Interest going to *Highland*, who in turn could give it to a nominee (e.g., an affiliate).

Finally, the Order dismisses the RICO claim with prejudice for several

15

reasons—one among them is that a RICO claim cannot be made out where the facts would be actionable as "fraud in the purchase or sale of securities." Plaintiffs conceded that this is likely the case and dismissed their RICO claim without prejudice. If this Court believes that Plaintiffs have no claim under the IAA or Rule 10b-5, Plaintiffs would ask this Court for leave to amend to allege non-securities fraud-related conduct, including to cure any other deficiencies outlined by this Court.

## ARGUMENTS AND AUTHORITIES

### A. THE LOWER COURT INCORRECTLY DISMISSED THE FIDUCIARY DUTY CLAIMS

The lower court's opinion dismissing the fiduciary duties rests on the general premise that Plaintiffs haven't pled how a fiduciary duty is owed or, if owed, how it was violated. The analysis supporting this thesis is wrong as a matter of law.

#### 1.  Fiduciary Duties Owed Under the Investment Advisers Act of 1940

"The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). The Supreme Court noted that the report giving rise to the adoption of the IAA, specifically found, among others, injury to investors "when the business of investment advisors is so conducted as to defraud or mislead investors, or to enable

16

such advisors to relieve themselves of their fiduciary obligations to their clients," *id.* at 189, and concluded that "[t]he Investment Advisers Act of 1940 thus reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,'" *id.* at 191. The IAA therefore did not invent fiduciary duties owed by investment advisors, it merely adopted what was already part of the common law, as a part of federal law. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979).

The Advisers Act imposes both a duty of care and a duty of loyalty on investment advisors. *See SEC v. Tambone,* 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6] imposes a fiduciary duty on investment advisors to act at all times in the best interest of the fund and its investors."); *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 300 (E.D. Pa. 2021). The Advisers Act was also enacted in part to prevent conflicts of interest, self-dealing and fraud by investment advisors. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 186–87; 17 C.F.R. § 275.204A-1 (describing the required investment adviser code of ethics and its focus on conflicts of interest).

A key prohibition is that the advisor cannot engage in cherry picking— selecting the best securities and opportunities in a way that enriches itself. *Accord SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 461(5th Cir. 2022) ("Because cherry-picking involves allocating more profitable trades to certain accounts, an adviser is

17

'stealing from one customer to enrich himself'"). *See also* Investment Advisers Act Release No. 3060, 75 Fed. Reg. 49,234 (Aug. 12, 2010) ("Under the Advisers Act, an advisor is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).[3]

The fiduciary duties under the Advisers Act are not limited to direct advisees. Highland's CEO, James Seery, testified under oath—under *direct examination by Highland's lawyers*—that he and Highland, as registered investment advisors, owed fiduciary duties to the funds they managed and the *investors* in those funds. [R.004480, R.004485] ("The goals of the debtor…number one, discharge Highland's, … duties to investors in the funds. Those are fiduciary duties under the Investment Advisers Act.") [R004480]; ("the Investment Advisors Act puts a

---

[3] The SEC's interpretive guidance of the Advisers Act is accorded *Chevron* deference. *See SEC v. Zandford*, 535 U.S. 813 (2002). In interpreting § 206 of the Advisers Act, the SEC has recognized that conflicts of interest arise where an advisor seeks to take advantage of an opportunity that it otherwise might offer to its client. *See* Commission Interpretation Regarding Standard of Conduct for Investment, Release No. IA–5248, Fed. Reg./Vol. 84, No. 134 at 33675-77 (citing Restatement (Third) of Agency, § 8.01 (AM. L. INST. 2006) (explaining that "the general fiduciary principle, …also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.")). A necessary but not sufficient measure by the advisor is full and fair disclosure and obtaining the client's informed consent before the advisor takes such an action. *Id*. at 33676-77. "In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material facts or conflicts of interest and make an informed decision whether to provide consent." *Id.* at 33676. This includes all information about an advisor's potential gain or advantage—especially hidden ones and ulterior motives. *Id.* at 33677. The failure to make such disclosures and obtain informed consent in a manner that is not disinterested is a breach of the fiduciary duty. *Id.* at 33677.

fiduciary duty on Highland Capital to discharge its duty to the **investors**. So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, **to each of the investors in the funds**.") (bolding added) [R.004485]. Seery's sworn, uncontradicted testimony is a judicial admission and an undisputed fact that this Court may take judicial notice of at this stage. *See* Fed. R. Evid. 201(b).

The Advisers Act § 206 expressly imposes duties owed directly to investors in a fund. *See* 15 U.S.C. § 80b-6(4). Highland attempts to circumscribe the issue to just "clients". But Section 206(4) says nothing about clients while §§ 206(1) and (2) expressly limit duties only to "clients." *Accord SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6(4)] imposes a fiduciary duty on investment advisors to act at all times in the best interest of the fund *and its investors*." (emphasis added)). The Supreme Court and circuit courts long ago recognized the right of investors in pools of funds to bring direct actions against the fund managers for breaches of the Advisers Act. *See, e.g., TAMA*, 444 U.S. at 13; *Abrahamson v. Fleschner*, 568 F.2d 862, 871-74 (2d Cir. 1977) *rev'd in part on other grounds*.

Furthermore, § 206(4) empowered the SEC to enact regulations on the scope of the duties under § 206(4). Pursuant to its grant of authority, the SEC promulgated 17 C.F.R. § 275.206(4)-8 ("Rule 206(4)-8") to enforce the fiduciary standards in Section 206(d), making it unlawful for an advisor to a "pooled investment vehicle" to:

(1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, **to any investor** or prospective investor in the pooled investment vehicle; or

(2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative **with respect to any investor** or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206(4)-8 (bolding added). By its plain terms, Rule 206(4)-8(a) expressly anticipates a lack of direct privity and imposes direct duties on investment advisors to investment funds with respect to the investors in those funds—which includes Holdco.[4] *SEC v. ABS Manager, LLC*, No. 13cv319, 2014 U.S. Dist. LEXIS 80542, at *45 (S.D. Cal. June 11, 2014) (adopting SEC's position and granting summary judgment as to violations of Rule 206(4)-8 because "section 206(4) and Rule 275.206(4)-8. . .prohibit the same conduct as sections 206(1) and 206(2) but in connection with 'pooled investment vehicles'"); *SEC v. Markusen*, 143 F. Supp. 3d 877,891 (D. Minn. 2015) (denying motion to dismiss action by investors against manager of fund); *Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258, at *139 (D. Me. Mar. 7, 2014) (holding that an advisor to a pooled vehicle had general fiduciary duty to investors even as to outside investments made by the advisor).

---

[4] Neither the Order nor Highland appears to contest that HCLOF is a "pooled investment vehicle" for the purposes of this regulation.

Here, in the face of these arguments, the lower court did not hold that Plaintiffs had not alleged violations of the IAA; it merely held that violations of § 206 of the IAA did not result in a federal private right of action for damages (which is not disputed here). The Court incorrectly states that Plaintiffs had not asked for relief under the IAA. The lower court completely ignored the fact that Plaintiffs argued for equitable relief, including disgorgement as part of their allegations for breach of the IAA and fiduciary duties. *See* Compl. ¶¶ 57, 82-84, 91, 143 [R.000113, R.000118-000119, R.000127]; Resp. Br. at p.12 ("Section 215 recognizes a limited private right of action for equitable relief including disgorgement, wherein one may seek to void the rights of a violator who performs a contract in violation of the Advisers Act.") [R.004429].

Indeed, the IAA § 215 does provide a private right of action for equitable relief "incident" to a contract made or performed in violation of the Advisers Act being declared void. *See* 15 U.S.C. § 80b-15; *Transamerica Mortg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979) ("we conclude that when Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow").

The Fifth Circuit has noted that Section 29 of the Exchange Act and Section 215 of the Advisers Act are identical, and therefore, their construction should largely be parallel. *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678

F.2d 552, 557 (5th Cir. 1982). Notably, based upon the plain language of the statute and the case law, the entire contract is not void under § 215(b), it is only void "as to the rights" of the violating party. *See* 15 U.S.C. § 80b-15(b); *cf. Regional Properties*, 678 F.2d at 559-60 (holding that § 29's identical voidness language did not void entire agreement as to innocent parties, only as to the violating parties) (citing *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 386-388 (1970) (noting that same language under IAA rendered "contract merely voidable at the option the innocent party").

So, while it is true that the IAA does not itself provide a cause of action for *damages*, Plaintiffs did and still do request that the trial court find that the IAA § 206(4) and Rule 206(4)-8 were violated in the "making" of the settlement agreement and the "performance" of the advisory agreements with the DAF and HCLOF. What Plaintiffs ask does NOT require undoing the settlement with HarbourVest in any way—but it does require justice and equity for the innocent party, and Highland should have to disgorge the unjust benefit of its violations of § 206(4) and Rule 206(4)-8.

### 2. Defendant Owes Plaintiffs Fiduciary Duties Under Texas Common Law

In Texas, the elements of a breach of fiduciary duty are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.'" *Cudd Pressure Control, Inc. v.*

*Roles*, 328 F. App'x 961, 964 (5th Cir. 2009) (quoting *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007)).

There are two separate bases for finding a breach of fiduciary duty under Texas law here. For one thing, in *Douglass v. Beakley,* this very Court decided that, although the Advisers Act does not itself create a cause of action for damages, state law fiduciary duty claims can be brought for violations of the Advisers Act. 900 F. Supp. 2d 736, 751-52, n.16 (N.D. Tex. 2012) (Boyle, J.) (denying motion to dismiss state fiduciary duty claims because "the Amended Complaint clearly pleads a formal fiduciary relationship of some type" including "the *Transamerica* court's recognition that Section 206 of the IAA 'establishes federal fiduciary standards to govern the conduct of investment advisers[.]'").

The Fifth Circuit has recognized that the Advisers Act provides the scope of, and rules governing, the advisor/advisee relationship. *See Laird v. Integrated Res.*, 897 F.2d 826, 834 (5th Cir. 1990). Other courts agree that breaches of the IAA are actionable via common law fiduciary duty claims. *See Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. Mar. 7, 2014); *State ex rel. Udall v. Colonial Penn Ins. Co*., 812 P.2d 777, 785 (N.M. 1991); *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 799 (S.D.N.Y. 1997), *rev'd in part on other grounds in Strougo v. Bassini,* 282 F.3d 162 (2d Cir. 2002); *Zimmerman v. Matson Money*, 2021 U.S. Dist. LEXIS 247095, *12 (N.D.

Ga., June 9, 2021) (finding that breaches of Advisors Act actionable in common law fiduciary duty claim).

As further evidence that the fiduciary duties owed by investment advisors to investors are a core matter of common law, Texas courts have repeatedly found that advisors owe investors fiduciary duties. *See W. Res. Life Assurance Co. v. Graben*, 233 S.W.3d 360, 374 (Tex. App.—Fort Worth 2007, no pet.); *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987); *Lampkin v. UBS Painewebber, Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 238 F. Supp. 3d 799, 851 (S.D. Tex. 2017) (under Texas law, an investment advisor and investors are in a formal fiduciary relationship). Texas law provides that a fiduciary relationship is governed by the terms of agency. *See Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.—Houston [14th Dist.] 1994, *writ denied*); Restatement (2d) of Agency § 425 (agents employed to make, manage, or advise on investments have fiduciary obligation).[5] Therefore, the lower court erred in

---

[5] Moreover, if there were any question about the above, Texas law adopts the Advisers Act's standards as its own for registered investment advisors who have registered under the federal registration. *See, e.g.,* Tex. Sec. Act § 4001.002(a) ("The general purposes of this title are to:…(1) protect investors and, consistent with that purpose, encourage capital formation, job formation, and free and competitive securities markets; (2) maximize coordination with **federal** and other states' laws and administration, particular with respect to procedure, reports, forms, exemptions, and …(b) This title may be construed and implemented to effectuate the title's general purposes"); *see also* §4004.302 (exempting advisors from registering with state if they have already a Registered Investment Adviser certificate with SEC).

*See also* explanation of relationship with federal Advisers Act by the Texas Securities Board. https://www.ssb.texas.gov/securities-professionals/dealer-adviser-registration/getting-started-registered-investment-adviser-3, at 1.A.1 and Preface and  id at § 1.A.11 (noting that advisors under Texas law still owe fiduciary duties to persons even if not counted in total "client" count).

determining that there was no fiduciary duty here upon which liability could be based.

### 3. Plaintiffs Have Alleged Breaches

Highland breached multiple fiduciary obligations in the process of negotiating and consummating the HarbourVest Settlement. The materiality of misrepresenting the value and the benefit to Highland of the investment is not debatable. *Accord SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). And Highland cannot escape liability for this duty by conducting its advisory activities through HCFA. *See* 15 U.S.C. § 80b-8(d).

Highland and HCFA breached the duty of care and the duty of loyalty. The Advisers Act's primary purpose is to eliminate advisors' conflicts of interest and ensure that advisors always act in the best interest of the investor. *See Laird,* 897 F.2d at 839. The Advisers Act also makes clear that the duty of loyalty means putting CLO Holdco's interest first. *See* Securities and Exchange Commission Interpretative Release*, Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248, Fed. Reg./Vol. 84, No. 134, at pp. 8, 23 (internal citations omitted). Under this duty, the Advisers Act explains that an advisor must have a rational, non-self-interested basis for how it allocates investment opportunities. *Id*. at 27.

Additionally, Highland was appointed the DAF's attorney-in-fact. (Compl. at

¶ 59) [R.000114]. Moreover, "[a]s the appointment of an attorney-in-fact creates a fiduciary relationship as a matter of law, Texas law imposes special duties on persons acting in that capacity." *Pool v. Johnson*, No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613, at *17 (N.D. Tex. Apr. 15, 2002) (citing *Sassen v. Tanglegrove Townhouse Condo. Ass'n*, 877 S.W.2d 489, 492 (Tex. App.—Texarkana 1994, *writ denied*)). Under Texas law, "[a] fiduciary owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability." *Id*. (citing *Sassen*, 877 S.W.2d at 492).

The HCLOF Company Agreement makes it clear that the purposes of HCLOF's investors is to acquire profitable CLO and CLO-related securities—which the shares in HCLOF would fall under [R.004491].[6] Thus, for Highland to take for itself a $44 million CLO opportunity (buying back the HarbourVest Interest), it is in direct contravention of Highland's fiduciary and contractual obligation to the DAF and Holdco. This is made even more stark given that the Offering Memorandum specifically incorporated the Advisers Act as a governing limit on Highland's ability to usurp investment opportunities. Offering Memo at p. 59 [R.004625-004626].

Highland reserving for itself without proper disclosure the entire HarbourVest

---

[6] The Company Agreement states that HCLOF "has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy [in the Offering Memo]."

Interest in HCLOF is plainly a violation of fiduciary duty—and a knowing one at that.[7] The fact that it was alleged to have been done knowingly, if not purposefully, satisfies the scienter requirement for federal and state fiduciary claims. "[A]s other courts have pointed out, cherry picking can satisfy the scienter element because it involves the knowing conduct of picking certain accounts over others." *World Tree Fin.,* 43 F.4th 448, 463 (citing cases).

This is also why the Order's statement that there could not have been a breach of fiduciary duty because "there was no corporate opportunity to divert" turns a blind eye to the obvious. The opportunity was taking the Interest from HarbourVest at a

---

[7] The undisputed facts are that the Advisory Agreement between Highland and the DAF commits Highland to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [Highland], a copy of which will [sic] provided to the General Partner upon request." (Compl. ¶ 60 [R.000114]). And while Highland contracted for the recognition that it would be acting on behalf of others simultaneously and could be in conflict with advice given to the DAF, (Advisory Agreement ¶ 12 [R.004691]), nowhere did it purport to allow Highland to self-deal, nor did it *waive* the fiduciary duties owed to the DAF and HoldCo. not to trade as a principal in a manner that was self-dealing or harmed the DAF. (Compl. ¶ 61) [R.000114]. Here, Highland entered into settlement negotiations in November 2020 with HarbourVest where it first learned of HarbourVest's intent to sell its interests in HCLOF. (Compl. ¶ 119) [R.000123]. On December 23, 2020, Highland moved for approval of the HarborVest Settlement. On January 14, 2021, at the Bankruptcy Court for the Northern District of Texas, Highland's CEO declared the that the value of HarbourVest's Interest in HCLOF was $22.5 million (Compl. at ¶ 34) [R000110]. The Bankruptcy Court approved a settlement that permitted Highland to obtain HCLOF's interest for this amount (Compl. at ¶¶ 32-34) [000110]. In truth, the HarbourVest Interests were worth in excess of $41,750,000 at that time. (Compl. at ¶ 37) [R.0001110]. Highland, however, did not disclose the true value of HarbourVest's interests to Plaintiffs. (Compl. at ¶ 75) [R.000116]. Furthermore, the value of the trade, the potential upside in the trade, and the nature of the trade were never disclosed to HoldCo or the DAF prior to the hearing—indeed, the value and nature were misrepresented to them at the hearing. (Compl. ¶¶ 76, 120) [R.000117, R.000123-000124]. Highland converted its 0.6% interest into a 50.58% interest and thereby control of HCLOF.

steep discount. While, yes, there was also a settlement, Highland could have, for example, offered the Interest to the DAF as its advisee, and the DAF of course would have had to pay the $22.5 million (or whatever discounted value was appropriate) in cash for it. The only difference in the Settlement would have been Highland would have received $22.5 million in cash, instead of 49.98% of HCLOF. [8]

And to the extent Highland contends that the Company Agreement or any other provision waives its obligations under the Advisers Act, or those of HCFA, those waivers are null and void under 15 U.S.C. § 80b-15(a).

### 4. Rule 9(b) Does Not Apply But is Met Anyway

While Plaintiffs do not believe it applies, Rule 9(b) was met. Plaintiffs allege the specific disclosures and statements in the Complaint made by Jim Seery under oath—when they were made, who made them, where they were made, and in what context. (Compl. ¶¶ 25-45,] 47-51, 53, 55-91) [R.000108-000111, R.000112-000120]. Plaintiffs further allege why those statements were false and how the falsity caused Plaintiffs injury. *Id.*[9] *Accord Fund of Funds, Ltd. v. Vesco*, 74-Civ-1980, 1976

---

[8] Even if this court dismisses the contract claim (Count 2), that would not operate to deprive CLO Holdco or the DAF of the right to have Highland put their interests first as a matter of fiduciary duty.

[9] Indeed, Seery's testimony that is averted to in the Complaint specifically stated that Class 8 interests were only going to be paid some 70 cents on the dollar and the Class 9 interests would be wiped out. The Complaint further alleges that subsequent information from employees shed light on the true value at the time. Yet, according to later publicly filed documents, almost 100% of Class 8 interests have been paid off as well as the Class 9 interests.

U.S. Dist. LEXIS 14183, at *31 (S.D.N.Y. 1976) ("The complaint identifies the alleged fraudulent transactions and how the fraud was accomplished. Defendant's roles in those events are described and specific actions by defendant, as a participant in allegedly unlawful activity, is delineated.").

Therefore, Rule 9(b) is not a basis for dismissing the claims herein, and certainly not without affording an opportunity to amend first.

### 5. The DAF and Holdco Have Standing

The DAF, as a direct advisee of Highland, argued below that it had a direct claim against Highland. *See* Resp. Br. at pp. 12 n.3, 16-17 [R.004430-0004431, R.004433-0004434]. Holdco argued below that it has both direct standing under the IAA and under Texas law, and derivative standing under Guernsey law. *See* Resp. Br. at pp. 15-16 [R.004432-004433]. Highland never challenged the basis for derivative standing below, and the lower court failed to address this in any way. Therefore, these issues are settled in Plaintiffs' favor.

### 6. The Lower Court Erred in Holding that Guernsey Law Governs Whether There is a Fiduciary Duty

The lower court held that under the internal affairs doctrine, Guernsey fiduciary duty law applies. The lower court completely ignored Plaintiffs' analysis as to why this argument was waived, and why it was not true. Highland newly contended in the Renewed Motion to Dismiss that because HCLOF is a Guernsey company, Guernsey fiduciary duty law applies under the internal affairs doctrine.

However, it was not raised originally in Highland's Motion to Dismiss—meaning it was waived under Rule 12(g) and (h), and being brought in the "renewed" motion made it a successive Rule 12 motion, which is not allowed. *Du Bois v. Martin Luther King Jr. Family Clinic, Inc.*, No. 3:17-CV-2668, 2018 U.S. Dist. LEXIS 246910, at *5-6 (N.D. Tex. May 29, 2018); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 322 n.5 (3d Cir. 2015) ("district courts should enforce [the rule against successive motions] even if their failure to do so is not a ground for reversal").

For another, the argument incorrectly supposes—without any support—that the internal affairs doctrine would apply and would select Guernsey law for duties related to HCLOF. The internal affairs doctrine only applies to HCLOF's *internal* affairs—i.e., the duties of officers and directors towards the company and shareholders. *Accord Alphonse v. Arch Bay Holdings, L.L.C.*, 548 F. App'x 979, 986 (5th Cir. 2013) (noting that internal affairs doctrine does not apply where rights with respect to "third parties external to the corporation are at issue") (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621-22 (1983)).

The internal affairs doctrine is NOT at issue here as neither Highland nor HCFA is alleged to be an officer or director of HCLOF, nor is their fiduciary duty alleged to arise out of service in such a role. Nor can the internal affairs doctrine circumvent federal securities laws. The Supreme court in *Edgar v. Mite Corp.*, 457

30

U.S. 624, 645 (1982) held that the internal affairs doctrine was irrelevant where the issue was the violation of the securities laws between a shareholder and a third party who was not an officer or director of the company, and that the internal affairs doctrine could not be used to circumvent federal securities laws. *See id; cf. Anderson* v. *Abbott*, 321 U.S. 349, 365 (1944) (declining to apply the law of the state of incorporation to determine whether a banking corporation complied with the requirements of federal banking laws because "no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning national banks which Congress has announced"); *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854, 2014 U.S. Dist. LEXIS 169364 (M.D. La., Dec. 8, 2014) (internal affairs doctrine does not apply to claims of breach of a fiduciary duty against stockbroker).

Here, Highland's and HCFA's fiduciary duties arise out of their roles as registered investment advisors to the DAF directly and to HCLOF, that is collateral to the internal affairs of HCLOF, and the duties are non-waivable in any event. *See* 15 U.S.C. § 80b-6 and § 80b-15(a). Those duties are subject to their Advisory Agreements, neither of which select Guernsey law—actually, they expressly select Texas law. *See* Offering Memo p. 82 ("[HCFA]'s Portfolio Management Agreement is governed by the laws of the State of Texas.") [R.004649]; DAF/HCMLP Advisory Agreement at ¶ 14(e) [R.004693]. Moreover, the Offering Memorandum (which is

incorporated via the Company Agreement § 2.2) states that HCFA is "subject to the provisions of the Investment Advisers Act." Offering Memo at p. 13 and 59 [R.004580, R.004626].

Therefore, the lower court's reliance on the internal affairs doctrine to dismiss the common law fiduciary duty claims was baseless.

### 7.  The Lower Court Erred in Concluding Without Any Explanation that the IAA Claim Requires Satisfying the PSLRA and Rule 10b-5

The lower court Order expends a vast amount of time discussing why Plaintiffs' claims under the IAA do not meet the elements of Rule 10b-5 (17 C.F.R. 240.10b-5) or the rigorous pleading standards of the PSLRA. Notably, Plaintiffs did not bring a 10b-5 class action. So neither the elements of Rule 10b-5 need be satisfied nor the PSLRA, which only applies to class actions. No one briefed the issue.[10] No case has held that to bring a claim for violation of the Investment Advisers Act, one has to meet the elements of Rule 10b-5. The opposite is actually true—violations of the antifraud provisions of the Exchange Act are different from those under the IAA. *See, e.g., Laird v. Integrated Res*., 897 F.2d 826, 836 (5th Cir. 1990); *Norman v. Salomon Smith Barney, Inc*., 350 F. Supp. 2d 382, 391-92 (S.D.N.Y. 2004).

---

[10] This is the second time in this case that the lower court has dismissed claims based on arguments that were never raised by the Defendants, nor briefed by any party. The lower court previously *sua sponte* dismissed this case on collateral estoppel grounds, which no party raised or briefed, and which this Court properly reversed on the merits.

Notably, the Fifth Circuit has held that "for the purpose of rule 10(b)-5, an investment adviser is a fiduciary and therefore has an affirmative duty of utmost good faith to avoid misleading clients. This duty includes disclosure of all material facts and all possible conflicts of interest." *See Laird*, 897 F.2d at 834, and *see id*. at 836 ("[o]ur holding … requires considering the fiduciary status of investment advisors in assessing liability under rule 10(b)-5"). The Fifth Circuit concluded that such an obligation provided the basis for the "material omission" and reliance elements of a 10b-5 claim. *See id. at* 833-36. To wit, the Fifth Circuit and other courts have held that cherry-picking schemes—e.g., which come in all shapes and sizes, but generally involve an investment advisor who takes an opportunity for itself at the expense of its investors without fully informing them of the nature of the transaction—violate both the IAA and Rule 10b-5. *See, e.g., SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 460-64 (5th Cir. 2022) (affirming district court finding that defendants "engaged in a fraudulent cherry-picking scheme in violation of Section 10(b), Rule 10b-5, Section 17(a)(1), and Sections 206(1) and (2) [of the IAA]").

There is no dispute that what is alleged here is a species of cherry picking. Therefore, the lower court's decision that Rule 10b-5 cannot be met is both irrelevant at this juncture and fundamentally incorrect.

## B. THE LOWER COURT INCORRECTLY WAVED OFF THE NEGLIGENCE CLAIM

The lower court dismissed the claim for negligence because it contended that

no duty existed. But this is yet another case of the lower court making arguments that Highland never raised. Highland's entire argument for dismissal of the negligence cause of action incorporated its other arguments. It never made the arguments the lower court raised.

Nonetheless, Plaintiffs address it. Under Texas law, the elements of a negligence claim are: (a) a legal duty owed by one person to another; (b) breach of that duty; and (c) damages proximately caused by the breach. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).

Here, the elements had all been pled. *See* Compl. ¶ 103-112 [R000121-000122].  For one thing, the Advisers Act imposes a duty of care and loyalty under § 206(2) and (4). Even if Highland's misleading statements were unintentional, and/or its disclosure failures were unintentional, they were doubtlessly in violation of this standard of care, and Highland made no argument to the contrary, nor did the lower court.

Highland attempted to argue that the Plan exculpation precludes this claim. However, to the extent that the duty of care arises from federal law, the duty of care here is a *federally imposed duty* which is *unwaivable* under 15 U.S.C. § 80b-15(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void."). No case undersigned could find—and no case cited by Highland—

34

makes an exception for a Chapter 11 debtor to be able to violate the securities laws with impunity.

What is more, the case was brought and was before the bankruptcy court prior to the plan effectiveness or exculpation became effective. As an administrative claim, it would be preserved. Therefore, there is no basis for holding that it applied to the claims in this case.

## C. THE LOWER COURT INCORRECTLY DISMISSED THE CONTRACT AND TORTIOUS INTERFERENCE CLAIMS ON JUDICIAL ESTOPPEL GROUNDS

In the Order, the lower court purports to analyze the "inadvertence factor" of judicial estoppel and concludes that "Plaintiffs' conduct—with regard to Plaintiff CLO Holdco's withdrawal of its objection to the HarbourVest Settlement—was 'advertent.'" Order at 26 [R000029]. But the bankruptcy court erred in its analysis, both by misconstruing the inadvertence element itself and by neglecting Plaintiffs' arguments wholesale that (a) there is no evidence in the record that Holdco intentionally concealed its claims from the Court for breach of contract or tortious interference—nor that it had any reason to do so, and (b) that the facts giving rise to the lawsuit arose after the 9019 hearing—to wit, Highland's concealment and misrepresentation of the net asset value of HCLOF prior to and during the 9019 hearing—the true value of which only became known to Holdco well after the 9019 hearing and 9019 Order. (Compl. ¶¶ 36-45, 47-52) [R.000110-112].

The lower court ignored these premises wholesale as did Highland below.

35

The lower court's mis-construction of inadvertence relies on three core assumptions—all flawed. First, what is clear is that the lower court views the current lawsuit as a new challenge to the *Settlement*, as opposed to simply seeking damages for a claim. The lower court's misapprehension of this critical distinction is reversible error. Given that Plaintiffs could not have litigated their ROFR claim for damages or property, it cannot be plausibly said that Plaintiffs' assertion of such a claim, if any, is the type of "cold manipulation" necessary to trigger judicial estoppel. *Johnson Serv. Co. v. Transamerica Ins.,* 485 F.2d 164, 175 (5th Cir. 1973).

Second, the Order analyzed Plaintiffs' claims in the adversary as though Plaintiffs had a duty to raise them in the 9019. Doing so was error—each time judicial estoppel might apply, the party against which judicial estoppel may run bears an affirmative duty to act or make a representation of some sort. *See, e.g.*, *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 601 (5th Cir. 2005) (affirmative duty to disclose claim in bankruptcy given knowledge of facts underlying the claim). The Fifth Circuit has held that judicial estoppel did not apply to bar a bank from bringing forth arrearage in a subsequent case where it had filed proof of claim in a prior bankruptcy, but left these arrearages out of its prior representations. *Wells Fargo NA v. Titus Chinedu Operaji*, 698 F.3d 231, 236-37 (5th Cir. 2012). The analysis is highly instructive—in sum, the Circuit Court held that the proofs of claim lacking the arrearage were not inconsistent positions with the position taken later

36

that arrearage was owed. *Id.* The Court held that the inconsistency must be "clear and express" and not implied, and that given other plausible explanations for why those arrearages were not included, there was no express inconsistency sufficient to trigger judicial estoppel. *Id.*

Here, Holdco's withdrawal of its objection with the idea of having the merits of the contract dispute decided upon a full evidentiary record is not inconsistent with allowing the Settlement to go forward—a settlement that is not being challenged.

Likewise here, Holdco had no duty to bring forth an objection in the first instance. And while its withdrawal of the objection may have appeared to be a position that it did not oppose the *Settlement*, it is not the same thing as saying that Holdco took the position that its claims lacked any merit. To the contrary, Highland specifically demanded an on-the-record stipulation that everything Highland was doing was "compliant in all applicable agreements between the parties" which Holdco *refused* to agree to, and the lower court said "All right. I'm content with that." *See* 9019 Corrected Hrg Tr. at 18 [R003687]. This is a far cry from the lower court's current position that it "accepted" Holdco's representation that its claims lacked merit.

Finally, the Order wrongly assumed Plaintiffs' knowledge of "the underlying facts and legal issues underlying Counts 2 and 5." [R000065]. But this ignored the evidence, for one, that not all facts were known to Plaintiffs at the time—it was not

until after the hearing that Plaintiffs were provided some information about the asset valuations that the facts became known. (Compl. ¶¶ 27-51, 67-75) [R000109-000112, R.000115-000116]. Moreover, the inadvertence element goes to the inconsistent position[11] purportedly at issue—the *merits* of Counts 2 and 5 were not at issue at the 9019 hearing anyway. *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) (identifying the substantive standards of a 9019 hearing as "(1) whether the settlement is 'fair and equitable,' and (2) whether the settlement is 'in the best interests of the estate'"). As Plaintiffs maintained below, "unsuccessful legal positions taken during a 9019 hearing are not a basis for finding that judicial estoppel applies where those legal positions relate to matters more properly addressed in an adversary proceeding." Response brief at p. 8 [R004425]; *see Com. Bank v. Malloy*, No. 13-cv-252, 2013 U.S. Dist. LEXIS 106329, at *15–17 (N.D. Okla. July 30, 2013). And this Court has already held in reversing the lower court's prior collateral estoppel ruling that a 9019 hearing is not where merits get decided in the first place, and that a 9019 settlement can be approved even in the face of a meritorious objection. Because the merits were factually not at issue, could not have been decided, and Plaintiffs had "no motive to conceal [their position] from the

---

[11] Even though the bankruptcy court determined that Plaintiffs took an inconsistent position here, the bankruptcy court's formulation of an inconsistent position does not square with governing law. Plaintiffs did not adopt "an inconsistent position, much less a plainly inconsistent one." *Firefighters' Ret. Sys. v. Eisneramper, L.L.P.*, 898 F.3d 553, 559 (5th Cir. 2018).

court." *Jethroe*, 412 F.3d at 601.

Furthermore, throughout its inadvertence analysis, the Order reverses course on the second element of judicial estoppel—"whether the party has succeeded in persuading a court to accept that party's earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). The Order spends considerable time detailing why even if Plaintiffs had pursued its argument related to the Right of First Refusal at the 9019 hearing, it would have been irrelevant because the Settlement was much more involved, and could and still would have been approved. *See* Order at 24–26 [R000065-000067]. Plaintiffs understand the bankruptcy court's point, but it runs contrary to the notion of judicial acceptance, and reinforces Plaintiffs' point.

Because the merits of Plaintiffs' objection to the outcome of the 9019 motion would not have ultimately mattered as the bankruptcy court posits, judicial estoppel cannot apply here because Plaintiffs' withdrawal of its objection at the 9019 hearing did not actually lead to the bankruptcy court "adopt[ing] [any] position urged" by Plaintiffs.[12] *See Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 206 (5th Cir. 1999).

---

[12] And to the extent the bankruptcy court does claim it acted in reliance on Plaintiffs' withdrawal, the only position that Plaintiffs' withdrawal could pertain to is the 9019 motion, not the underlying merits of Counts 2 and 5. *Cf. McCarthy v. Azure*, 22 F.3d 351, 355 n.4 (1st Cir. 1994).

## D. THE LOWER COURT INCORRECTLY DISMISSED THE CONTRACT AND TORTIOUS INTERFERENCE CLAIMS ON THE MERITS

Plaintiff CLO Holdco's breach of contract claim is straightforward. Sections 6.1 and 6.2 of the HCLOF Company Agreement purport to allow sales by members of their interests in HCLOF to "affiliates" of members, but not to members themselves, without certain conditions precedent. [R004497-004498]. One of those conditions is that the other members have to be afforded the right to purchase their pro-rata portion [R.004498]. Under the HCLOF Company Agreement, the ROFR is triggered by an "offer" by a purchaser.

Here, the December 2021 Settlement Agreement between HarbourVest and Highland provides that Highland was offered the Interest and paid for the HarbourVest Interest [R004517-004534]. In return, HarbourVest agreed to release its claims against Highland and transfer the HarbourVest Interest *to Highland*. [R004518]. Highland's supposed "nominee," HCMLP Investments, LLC was not a party to this agreement and Highland's nominee did not pay for those interests. *Id*. Thus, at the time that the Settlement Agreement was negotiated and made, Holdco's ROFR right had already been triggered.

That the lower court's order later authorized a transfer to Highland or to HCMLP Investments, LLC changes nothing. The Settlement Agreement constitutes an offer and sale to *Highland*, and the sale to Highland facially violated Section 6.2 of the Company Agreement. The addendum transfer where Highland delegated its

40

right to receive the shares to a nominee is "form over substance," in violation of the Company Agreement § 20.5's "good faith" clause.

Turning to tortious interference. The elements are "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Because the lower court's entire premise for dismissing Plaintiffs' tortious interference claim is predicated on the non-existence of an enforceable contract and/or judicial estoppel, Plaintiffs' tortious interference claim likewise survives. Plaintiffs' tortious interference claim survives for another reason: the self-dealing and misleading statements by Highland as to the value of HarbourVest, which enabled it to circumvent the contractual duties, and the right of first refusal was a willful interference with Holdco's rights under the Company Agreement. There is no motion suggesting that Holdco did not allege that it suffered an injury due to the failure to be offered the HarbourVest interest and lose control of HCLOF to Highland.

## E. THE LOWER COURT INCORRECTLY DISMISSED PLAINTIFFS' RICO CLAIM WITH PREJUDICE INSTEAD OF WITHOUT PREJUDICE

While Plaintiffs believe they have stated a claim for Racketeer Influenced and Corrupt Organizations (15 U.S.C. § 1961 et seq.) ("RICO") under Rule 12(b)(6), Highland argued that, and the Order holds that as long as Plaintiffs maintain an

action under an securities antifraud statute,  the RICO claim was barred. (Renewed

Motion at p. 13 [R003868]. Plaintiffs acquiesced to the argument in good faith in

their Response, and agreed to dismiss their RICO claim without prejudice because,

to establish a RICO violation, "no person may rely upon any conduct that would

have been actionable as fraud in the purchase or sale of securities to establish a

violation of section 1962" unless it is preceded by a conviction. *See* 18 U.S.C. §

1964(c). The plain language suggests, as Highland contends, that RICO is foreclosed

until this Court determines that the claims Plaintiffs raise *could not be brought as*

*securities fraud claims*. Accordingly, Plaintiffs asked to dismiss their RICO action

without prejudice.  Furthermore, Plaintiffs requested leave to amend to cure pleading

deficiencies alleged by Highland and, apparently, found by the lower court.

The lower ignored this analysis and dismissed the entire claim with prejudice

and without leave to amend. This was error and should be corrected. If this Court

finds that Plaintiffs' IAA claims are without bases and does not believe that Plaintiffs

could plead a 10b-5 claim, then Plaintiffs respectfully request that the Court grant

them leave to amend to properly plead the other bases it has for a RICO violation

(these were described in the initial Motion to Dismiss briefing, but ignored, and are

set forth below).

## F. THE LOWER COURT ERRED BY FAILING TO ADDRESS WHY AMENDMENTS COULD NOT SOLVE THE PLEADING ERRORS

The lower court did not grant amendment to cure any of the pleading defects and did not even address Plaintiffs' request for amendment. Plaintiffs respectfully ask for leave to amend in the alternative to cure any pleading deficiencies that the Court determines exist. This is especially so if the Court determines that (i) there is no violation of the Securities Act that would preclude the RICO claim, and (ii) that Plaintiffs did not sufficiently allege a RICO violation. A court's discretion to deny leave is severely limited by the bias of Rule 15(a) favoring amendment. *See Dussouy v. Gulf Coast Invest. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). Leave to amend "should not be denied 'unless there is a *substantial reason* to do so.'" *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (emphasis added) (quoting *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)).

Amendment would not be futile because—to the extent necessary under Rules 8 or 9(b)—Plaintiffs could add more detail, if necessary, on the representations and falsity, and on the allegations claimed to be deficient. The balance between Rule 8 and Rule 9(b) is not always perfect on the first try, and Plaintiffs should not be dismissed for want of an opportunity to cure any deficiencies. Plaintiffs could further add, if necessary, other acts by Highland wherein it has sold assets and used the funds to pay off its own creditors, which would buttress the allegations that this is not an isolated set of facts.

43

## G. THIS COURT SHOULD RECONSIDER WITHDRAWING THE REFERENCE

Plaintiffs asked this Court to withdraw the Reference, which this Court denied as moot. Case No. 2:22-cv-02802, Dkt. No. 17. Plaintiffs respectfully contend that, if this Court reverses on any claims, it should withdraw the reference for the reasons set forth in Plaintiffs' moving papers. *Id.*

## CONCLUSION

For the reasons set forth above, this Court should reverse dismissal of Plaintiffs' claims and withdraw the reference.

Dated: November 1, 2023

Respectfully submitted,

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
Sbaiti & Company PLLC
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

Counsel for Appellants

44

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, a true and correct copy of the foregoing was served via the Court's CM/ECF system on all counsel of record.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure ("Rule") 8015(h) as it contains 10,196 words, excluding the portions of the document exempted by Rule 8015(g).

I further certify that this document complies with the typeface requirements of Rule 8015(a)(5) and the type-style requirements of Rule 8015(a)(7)(B) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti