Case No. 3:23-cv-1503-B

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

In re: HIGHLAND CAPITAL MANAGEMENT, L.P.,

Reorganized Debtor.

---

CHARITABLE DAF FUND, L.P. and CLO HOLDCO, LTD., directly and derivatively,

                    Appellants,

        v.

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., and HIGHLAND CLO FUNDING, LTD., nominally,

Appellees.

---

On Appeal from the United States Bankruptcy Court for the Northern
District of Texas, Dallas Division, Adv. Pro. No. 21-03067-sgj
Hon. Stacey G. C. Jernigan

---

### APPENDIX IN SUPPORT OF APPELLEE'S BRIEF

---

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

| **Ex.** | **Description** | **Appx. #** |
|---|---|---|
| 1. | *CLO Holdco Ltd. v. Highland CLO Funding Ltd.*, [2023] GRC061 (Roy. Court of Guernsey 1 Dec. 2023) | 001-043 |

[*Remainder of Page Intentionally Blank*]

Dated: December 22, 2023     **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**
*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 22, 2023, the foregoing document was served electronically via the Court's CM/ECF system on those parties registered to receive such service.

<u>*/s/ Zachery Z. Annable*</u>
Zachery Z. Annable

# **EXHIBIT 1**

Complaint of "unfairly prejudicial" conduct of company's affairs under ss349 and 350 of Companies (Guernsey) Law 2008.   Review of principles.  Relevant prejudice must be to Plaintiff's interests as a member of the company and not otherwise.   Prejudice must also be "unfair".   No such conduct in this case; application dismissed.  Court could not, in any event, grant relief which overrode contractual rights of other members of the company not convened, or of third parties.

**[2023]GRC061**

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**BETWEEN:**

**CLO HOLDCO LIMITED**

Applicant

-and-

**HIGHLAND CLO FUNDING LIMITED**

Respondent

**Before: Her Honour Hazel Marshall KC Lieutenant Bailiff,
Ms Claire Le Pelley and Dr Simon Bodkin, Jurats**

**Hearing Dates: 24-26 and 30, 31 October 2023**

**Judgment handed down 1st December 2023**

Counsel for the Applicant:  Advocate A Horsbrugh-Porter
Counsel for the Respondent: Advocate M Dunster

**Cases and legislation referred to**:

**Legislation:**
**Guernsey**

Royal Court (Reform) (Guernsey) Law 2008.
Companies (Guernsey) Law 2008, ss 314, 349,350

**England and Wales:**

Companies Act 1949, s210
Companies Act 1980, s 75

**Cases:**

**Guernsey**

*Prodefin Trading Ltd v Midland Resources Holding Ltd and others* (Royal Court Judgment, 7/2017).
*Carlyle Capital Corporation Ltd v Conway* (2017) (Royal Court Judgment 38/2017)

**United Kingdom**

*Warmington v Miller* [1973] QB 877
*Re Noble & Sons (Clothing) Ltd* [1983] BCLC 273
*Re J E Cade & Son Ltd* [1992] BCLC 213
*Re Saul D Harrison & Sons PLC* [1994] BCC 475
*Re BSB Holdings Ltd* 1996 1 BCLC 155 ChD
*O'Neill v Phillips* [1999] 1 WLR 1092
*Gamlestaden Fastigheter AB v Baltic Partners Ltd* [ 2007] Bus L R 1521
*Att. Gen for Belize v Belize Telecom Ltd* [2009] UKPC 10
*Re Neath Rugby ltd (No 2)* [2007] EWHC 2999 (Ch)
*Apex Global Management Limited v Fi Call Limited* [2015] EWHC 3239 (Ch)
*Shanda Games Ltd v Maso Capital Investments Ltd* (Cayman Islands) [2020] UKPC 2 *Re Hut Group Ltd* [2021] EWCA Civ 904
*Re Compound Photonics Group Ltd* [2022] EWCA Civ 1371


## INDEX

|  | Para. |
|---|---|
| **Introduction - this Action and the parties** | **1** |
| **About this Judgment** | **6** |
| **The Facts** | **11** |
| 2015 | 17 |
| 2016 | 20 |
| 2017 | 21 |
| 2018 | 24 |
| 2019 | 27 |
| 2020 | 30 |
| 2021 | 39 |
| 2022 | 62 |
| 2023 | 75 |
| **The Action and the Trial** | **80** |
| **The Legal Framework** | **85** |
| **Essence of conduct which can be "unfairly prejudicial"** | **87** |
| Applicant's submissions | 95 |
| Respondent's submissions | 101 |
| Discussion | 107 |
| Conclusion | 115 |

**Unfairly prejudicial conduct – the complaints examined**      **118**

   **(1)**   **Failure to inform CLOH that it was negotiating the Settlement Agreements, and**
   **(2)**   **Retention of HCM as (effective) Portfolio Manager**      **124**

**The eventual matters of actual complaint**      **132**
   **Preliminary Point**      **133**

   **(3)**   **Entry into the 2021 Settlement Agreement**      **135**

       **Backdrop**      **135**
       **Applicant's submissions**      **138**
       **Respondent's submissions**      **143**
       **Discussion and conclusion**      **147**

   **(4)**   **Intervening in the NexPoint Litigation; coupled with**
   **(5)**   **Failure to sue US Bank to obtain the retained Redemption Proceeds**      **160**

       **Backdrop**      **161**
       **The complaints**      **168**
       **Applicant's submissions**      **169**
       **Respondent's submissions**      **173**
       **Discussion and conclusion**      **178**

   **(6)** **Entry into the 2023 Settlement Agreement**      **182**

       **Backdrop**      **182**
       **The complaints**      **185**
       **Applicant's submissions**      **186**
       **Respondent's submissions**      **193**
       **Discussion and conclusion**      **198**

**Relief**      **206**

**Summary of conclusions and disposal**      **219**

––––––––––––––

J U D G M E N T

––––––––––––––

**Introduction - this Action and the parties**

1.   The Applicant, CLO Holdco Ltd ("**CLOH**") is a limited company incorporated in the Cayman Islands and is the 49.015% minority shareholder in the Respondent, Highland CLO Funding Limited ("**HCLOF**").     CLOH brings this Application against the company, HCLOF, under ss 349 (1) (a) and 350 of the Companies (Guernsey) Law 2008 on the grounds that

> *"the affairs of [HCLOF] are being or have been conducted in a manner that is unfairly prejudicial to the interests of the members generally or of some part of the members (including at least [itself])".*

2.    The Application, dated 6th March 2023, states that it arises out of the management of HCLOF in a manner which has caused ongoing unfair prejudice to CLOH in its capacity as minority shareholder as set out in the supporting affidavit of CLOH's director, Mr Paul Murphy.   It is alleged that this is "*mainly*" predicated upon HCLOF - acting, of course, through its own Directors, Mr Richard Boleat and Mr Richard Burwood, but primarily the former - having aligned HCLOF's interests with the wider commercial interests of the majority "HCM shareholders" (a term explained below) who own 50.612% of HCLOF's issued shares.

3.    The Application itself does not elaborate further.  The supporting affidavit of Mr Murphy gave the Applicant's perspective at the time as to the way in which the affairs of HCLOF had been managed, raising several points of complaint aimed, principally (in summary) at matters which it was said were inhibiting CLOH's right or opportunity, in the circumstances, to receive funds properly due to shareholder/investors, or alternatively to "exit" its relationship with HCLOF.   It is not necessary to recite these complaints here, as the grounds of CLOH's Application, and the relief which it seeks, have changed and moved on as the case has developed.

4.    The purpose of the Application is said to be to mitigate further harm being done to CLOH's interests, preferably by an order enabling CLOH to terminate its relationship with HCLOF on what CLOH submits are equitable terms.   CLOH's preferred option is (or was) that it should surrender its shareholding to HCLOF in return for a distribution to it *in specie* of its proportionate share of HCLOF's underlying assets, these being certain financial instruments known as Collateralised Loan Obligations, or "**CLOs**".      Initially in the Application, alternatives were also proposed as to actions which the court might order HCLOF to perform. However, these latter forms of relief have rather fallen away as the case has progressed, and in fact, the form of relief ultimately sought by CLOH, formulated during the hearing itself, was that the court should order HCLOF to buy back CLOH's shareholdings, in two stages, at a price equal to their pro-rata share of HCLOF's current NAV (or Net Asset Value).

5.    HCLOF resists the Application.  It denies that its business has been conducted in any way prejudicially to the interests of CLOH as a member of HCLOF, let alone <u>unfairly</u> prejudicially.  It submits that the relations of the parties are purely commercial, and it relies on the documents governing those relations, in particular HCLOF's Articles of Association, and a Members' Agreement made between all the then shareholders and HCLOF itself in 2017.  It asserts:

   i.    that the manner in which HCLOF's business has been conducted, including in respect of the particular matters of complaint raised by CLOH at various times, has been entirely in accordance with the terms of those documents – and that is really an end of the matter; but in any event

   ii.    that, upon examination, the substance of CLOH's complaints are that business decisions taken by HCLOF's Directors were "wrong" as a matter of business judgment, and in the absence of bad faith in and about those decisions – and CLOH does not allege bad faith – such decisions do not found a claim of "unfair prejudice",

   iii.    that the alleged "prejudice" cited by CLOH is, in any event, not prejudice to its "interests as a *member*" of HCLOF (emphasis added), and

   iv.    that the relief sought by CLOH is not relief which the court has jurisdiction to grant (again, in any event) because it would involve either

      (a) contravening provisions of Guernsey company law, specifically, s 314 of the Companies (Guernsey) Law 2008 ("**the Companies Law**"), or

(b) overriding contractual provisions of the Members' Agreement or HCLOF's Articles of Association, and neither of these courses is possible in the absence of the other members of HCLOF – and in particular the majority shareholder – who are not convened as parties to this action, and, indeed who cannot be so convened, for reasons which will emerge, or

(c) breaching the contractual rights of independent third parties.

## About this judgment

6. This is a decision of the Court and this written judgment has been prepared in accordance with Section 16 (5) of the Royal Court (Reform) (Guernsey) Law 2008. Pursuant to Section 14 (2) of that Law, the Lt-Bailiff did not sum up to the Jurats in open court but instead retired with the Jurats.

7. The Lt-Bailiff reminded the Jurats of their respective roles, namely that the Lt-Bailiff is the sole judge of matters of law and procedure and the Jurats must follow her directions on such matters, but that Jurats are the sole judges of questions of fact.

8. The Lt-Bailiff directed the Jurats that in making their factual findings, they must take into account all the evidence presented to the court, written, oral and documentary, on behalf of both parties, but it was for them to decide what evidence they accepted and what they rejected, or what weight they gave to any evidence.  They should take into account the arguments which they heard from both Advocates, but they were not bound to accept them. Insofar as the Lt-Bailiff might herself appear to express views on the facts when guiding their deliberations, they should ignore these and reach their own independent conclusions.  As to this, the standard of proof which they should adopt as regards any finding of fact was the ordinary civil standard of proof, namely proof "on balance of probability", and that this meant simply that they must be satisfied that the particular fact in issue was more likely to be so, than not to be so.

9. In this case, and with due notice to the parties, the court sat with a complement of only two Jurats instead of three, owing to the illness of the third intended Jurat on the first day of the hearing.  The consequence of this was that in the case of a disagreement on any finding of fact between the two Jurats who heard the case, the Lt-Bailiff would have a casting vote on that issue.  However, the Jurats were the sole arbiters of fact in the first instance, the Lt-Bailiff's finding only being required if they disagreed.   In the event, no disagreement arose between them.

10. Therefore, where this judgment sets out holdings of law and reasons therefor, they are the holdings and reasons of the Lt-Bailiff; where it sets out findings of fact and reasons therefor, they are the common findings and reasons of the Jurats.   Where mixed findings of fact and law are concerned, they have been reached on the above principles, but are referred to as the findings of "the Court" for brevity.

## The Facts

11. In order to understand the matters complained of it is first necessary to know something of the surrounding facts and of the history, which is very complex.  CLOH argues that HCLOF has tried to overburden the case with unnecessary and confusing detail in order to bolster its case.    However, even to assess that proposition requires an examination of the facts.    In

fact, a reasonably full account of the history is necessary for its materiality to two questions. The first is an appreciation of the circumstances in which HCLOF's Board was making the decisions of which CLOH complains.  The second is to enable a proper analysis of what are, or are not, CLOH's interests "as a member" of HCLOF, as opposed to in any other respect.

12. The following account is broadly matters which have been common ground, and it is derived from the parties' respective chronologies except where indicated.  Otherwise, it can be taken to record the Jurats' findings.

13. In 1993, a very wealthy United States citizen, Mr James Dondero, founded Highland Capital Management LP ("**HCM**") as a limited partnership incorporated under the laws of Texas. Mr Dondero was its CEO, in fact until January 2020.   Its General Partner appears to have been Strand Management Inc or Strand Advisors Inc, of which Mr Dondero was also Chief Executive.  One of its limited partners was a Mr Joshua Terry, or trust interests of his.  The business of HCM was or included the sponsoring of CLOs.

14. A CLO is a form of security and the term refers to a special purpose vehicle (or "**SPV**") used by a portfolio manager to purchase and hold a basket of corporate loans. The CLO sponsor purchases such loans from the banks which made them, typically to large companies, and bundles them into a basket of (say) 150 or 200, and then sells interests in that basket to shareholder/investors.  The loans themselves are typically held, pursuant to an indenture, by a trustee who has custody of the portfolio investments and also manages the payment obligations of the CLO to its investors.   Various tranches of debts and quasi-equity securities in the form of "Notes" are issued by the SPVs to subscribing investors and the subscription proceeds are used to purchase the loans initially.  These may be traded, subsequently.   The tranches have different credit ratings and differing rates of return, according to their priority for payment.   They will typically be secured, except for the lowest rated tranche, which is "subordinated".  The most senior interest (that which will be paid in first priority out of the payments being made into the basket by the debtors of the underlying loans) may be rated AAA in terms of credit rating, because payment is very secure, but it will receive a lower rate of return.   Conversely, the inferior interests, the lowest being the "junior" interest, will be rated progressively lower (poorer) on the credit rating scale as their priority for payment reduces, but, will conversely receive a higher rate of return, because they are at greater risk of non-payment if there are defaults.   In investments markets, risk and return are inversely correlated.

15. Mr Dondero was – and still is - also the ultimate founder and benefactor (or settlor) of the Charitable Donor Advisor Fund LLP ("**CDAF**"), a Cayman Islands limited partnership which manages and administers his charitable and philanthropic affairs, although he himself apparently has no direct formal involvement in its operation or ownership.  CDAF is run by a corporate General Partner, with the limited partners comprising Mr Dondero's family trusts, and/or other charitable foundations.     CLOH was incorporated at some time in the Cayman Islands and is 100% owned by CDAF.

16. In 2011, Mr Dondero founded Acis Capital Management LP ("**ACIS**") in the United States, as a limited partnership.  It was founded as a subsidiary of HCM, to manage HCM's portfolio of CLOs.     Mr Terry was a key employee or participator in ACIS, and is now its President and sole limited partner, as a result of events yet to be related.   As previously mentioned, Mr Terry was then also effectively a limited partner in HCM.

**2015**

17. In March 2015, HCLOF was incorporated in Guernsey, - but then under the name Acis Loan Funding Limited - as a registered closed-ended collective investment scheme.   CLOH was initially the 100% shareholder of the company.   The directors of HCLOF were a Mr William

Scott and a Ms Heather Bestwick, but their functions have been described as "non-executive"; HCLOF used ACIS as its portfolio manager and, of course, ACIS earned fees for this.

18. HCLOF's investment objective was (obviously) to provide income returns and capital growth to its shareholders. It commenced business in August 2015 under a Portfolio Services Agreement with ACIS. Its investments were largely in CLOs, some being ACIS CLOs and others being Highland CLOs, issued by HCM. This amalgamation or duplication of functions between linked entities is not, the evidence suggests, unusual in the high finance world.

19. HCLOF's "investment period" was five years, expiring in April 2020. Whilst HCLOF would invest actively during this period, and pay returns (dividends) quarterly to its investors, in accordance with their rights as described in its Offering Memorandum, from the expiry of the investment period the business would be in "wind-down" mode. The value of CLOs, and thus of CLO Notes diminishes over time, as the underlying loans mature and are paid off, or terminate in default, or the senior and cheapest rate "Notes" are paid off and fall out of account, leaving only those with the highest rates of interest being paid out. Because of these factors, the costs and expenses of administration begin to take up a greater proportion of the underlying income, making them increasingly more uneconomic until they can even become a liability. Typically, therefore, the terms of a CLO will enable the holder of such an unprofitable structure to request to redeem it before the maturity of all the underlying loans. During the wind-down period, the investments of the investment scheme might therefore be realised or retained, according to investment advice and judgements then made, with returns continuing to be paid out in accordance with the terms of the investment. However, there would be a final cut-off date some years later (in fact, in this case it is November 2027) at which time any remaining assets held would simply be realised and the CLO fund would be wound up and its proceeds finally distributed to investors, again in accordance with their scheme rights.

**2016**

20. In 2016, Mr Dondero fell out with Mr Terry in a very major way. They parted ways, but clearly not amicably. ACIS continued to provide portfolio management services to HCLOF, with a replacement Portfolio Management Agreement being concluded in December 2016.

**2017**

21. On 20th October 2017, Mr Terry obtained an arbitration award of $8Mn against ACIS. On 27th October 2017 HCLOF changed its name from Acis Loan Funding Ltd to its present name of Highland Capital Loan Funding Limited.

22. On 15th November 2017, a particularly important suite of events occurred.

   (i)     First, by a Subscription and Transfer Agreement, CLOH sold a 50.8% shareholding in HCLOF to new shareholders, including 0.63% to HCM, 49.98% to various linked companies known as the "HarbourVest" entities and also a very small percentage (0.073% in aggregate) to four individual investors (who have played no part in these proceedings.)

   •     Advocate Horsbrugh-Porter, appearing for CLOH in this matter confirmed that this was a voluntary transaction by CLOH. It appears to have been associated with a round of further capital raising. However, it left CLOH as a minor, albeit significant, shareholder in HCLOF, holding a 49.015% interest in the company.

- An Offering Memorandum was issued in connection with this transfer and the further subscription for new shares in HCLOF which is next referred to below. HCLOF's investment objective continued as above, being (as stated in the Offering Memorandum) to provide shareholders with

  "*stable and growing income returns, and to grow the capital value of the ... investment portfolio through opportunistic exposure to CLO Notes* [and other assets]."

(ii)   HCLOF adopted new Articles of Association, and all shareholders subscribed for further shares.

(iii)   HCLOF appointed Highland Capital Advisor Ltd ("**HCA**") a wholly-owned subsidiary of HCM, as its portfolio manager in place of ACIS, to manage the investment and reinvestment of the company's assets in accordance with the Offering Memorandum.   As such, HCA receives (or is entitled to receive if certain conditions are met) reimbursement of its expenses, and also a fee payment, effectively equivalent in the first place, to 20% of profits made on investments after the shareholder/investors themselves have received an initial return of 8% (compound) on their investments, and with further provisions for the ration of distribution in relation to any monies earned in excess of this return.   However, it is HCM which in fact provides portfolio management services to HCLOF as the "sub-advisor" of HCA.

(iv)   All the members of HCLOF also entered into a Members' Agreement, ("**the Members' Agreement**") to which HCLOF itself, and HCA as its portfolio manager, were also parties.   The terms of the Members' Agreement have assumed some significance as will appear, and, indeed, were intended to take priority over the Articles of Association, in case of conflict (see Clause 21).

- For present purposes it is to be noted that Clause 20 contains several "General" provisions, including a denial of any partnership relationship between the parties (Clause 20.3), and in particular Clause 20.5 provides that

  "*Each party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.*"

23.   By this time HCLOF itself had subscribed for and held certain CLO Notes issued under the ACIS name.   ACIS was the portfolio manager of these CLOs, themselves.   The relevant CLO SPVs for the purpose of these proceedings are ACIS 2014-4 Ltd, ACIS 2014-5 Ltd and ACIS 2014-6 Ltd, which can be conveniently referred to as "**ACIS-4**", "**ACIS-5**" and "**ACIS-6**" (together, "**the ACIS CLOs**").   HCLOF was the 100% owner of ACIS-4 and ACIS-5, but only 87% owner of ACIS-6.   The remaining 13% of ACIS-6 was owned by another corporate entity, NexPoint Strategic Opportunities Fund ("**NexPoint**").   The Jurats are satisfied on the balance of the evidence, that Mr Dondero also had/has an interest, or an influential association, with NexPoint.

**2018**

24.   On 30 January 2018 Mr Terry commenced "involuntary bankruptcy proceedings" (no doubt the equivalent of compulsory winding up) against ACIS in Texas, in support of enforcing his entitlement under his arbitration award.   His action cited concerns that HCM, then under the control of Mr Dondero, had been depleting ACIS's assets.

25. On 14 May 2018, and doubtless after strenuously contested proceedings, the Texas Bankruptcy Court appointed an independent Trustee over the Bankruptcy of ACIS.   That Trustee apparently issued various proceedings against HCLOF between May and July 2018.   On 31 May, the Texas Bankruptcy Court took the further measure of issuing, of its own motion, a Temporary Restraining Order ("**TRO**") prohibiting HCLOF from taking any actions in furtherance of optional redemptions or other liquidations of its ACIS CLO Notes. Condensing a long story, this TRO was subsequently continued by injunction on 21 June 2018, confirmed on 30 August 2018.   An appeal by HCLOF failed.

26. From August 2018, HCM ceased to use ACIS personnel for the management of its business and instead formed an association with Brigade Capital Management LLP ("**Brigade**").

**2019**

27. On 31st January 2019, the Texas Bankruptcy Court confirmed the fourth iteration of a "Plan of Reorganisation" (no doubt the equivalent of a Creditors' Voluntary Arrangement) for ACIS, put forward by Mr Terry and the ACIS Bankruptcy Trustee in the ACIS Bankruptcy. This was known as "Plan D".  The Court dismissed objections from HCM and from HCLOF, acting by Mr Scott and Ms Bestwick.      Within Plan D it was provided that ownership of ACIS should be transferred to Mr Terry.  The Plan also included an injunction preventing HCLOF from seeking the redemption of the ACIS CLOs until the earliest of

    i.    the resolution of ACIS's claims against (among others) HCM and Mr Dondero,

    ii.    payment in full of claims established against ACIS,

    iii.    a material default under Plan D, or

    iv.    further order of the Court.

Appeals brought by HCM and HCLOF failed.

28. On 16th October 2019 HCM filed for bankruptcy in Delaware, but this filing was transferred to Texas on 4th December 2019.   Mr Dondero was still President and CEO of HCM at this time.   Proofs of substantial debts, including a claim from Union Bank of Switzerland for just over $1Bn and a claim from previous litigation regarding another HCM fund ("Crusader"), of around $190Mn were filed against HCM.

29. On 24th October 2019 CDAF and CLOH filed proceedings in New York against parties including (in particular) US Bank as the indentured trustee of the ACIS CLOs, alleging mismanagement of the ACIS CLOs ("**the 2019 Lawsuit**").

**2020**

30. On 9th January 2020 the Texas Bankruptcy Court approved a settlement between HCM and its committee of unsecured creditors in the HCM Bankruptcy.   Within this were terms that

    i.    Mr Dondero relinquish control of HCM and resign as President and CEO and officer and adviser of HCM's General Partner, Strand Advisors Inc, and

    ii.    A board of directors be appointed for HCM, comprising Mr James Seery of Strand (an experienced financier in the field of distressed investing, and independent of either Mr Dondero or Mr Terry) and two others, one of whom is a retired US Judge.

Mr Dondero remained an unpaid employee of HCM, and its portfolio manager, but the new independent board subsequently brought this relationship to an end as "*untenable*" and appointed Mr Seery as HCM's CEO and Chief Restructuring Officer.

31. Records of proceedings in the US Courts disclose extensive further litigation, after this time, between entities in which Mr Dondero was interested, or which he controlled, on the one hand, and HCM and also Mr Seery on the other.    The process of the HCM Bankruptcy also involved ownership of HCM and the majority of its assets being transferred to a trust for its creditors, with all HCM's causes of action being transferred to a litigation sub-trust, again to be pursued, realised or otherwise dealt with for the benefit of its creditors.    Whilst this is of no direct relevance to the present application, it is material as context showing the extensive background of hostile litigation.

32. On 31st January 2020 CDAF and CLOH added Mr Terry and ACIS as defendants to the 2019 Lawsuit, but then on 5th February they sought, and were granted, the voluntary dismissal of that suit but without prejudice to refiling to renew it.

33. On 6th February 2020, CDAF and CLOH filed a second lawsuit against US Bank and ACIS alleging mismanagement of the ACIS CLOs, ("**the 2020 Lawsuit**") but on 25th February 2020, they once again sought (and were granted) voluntary dismissal of that suit without prejudice to refiling.

34. On 21st April 2020, through counsel, CDAF and CLOH wrote to ACIS's counsel, seeking changes to the management of the ACIS CLOs, repeating the complaints previously made in the dismissed 2019 and 2020 Lawsuits, but expressly reserving all rights should the matter proceed to litigation.  They repeated these sentiments in a further letter of 8th May 2020.

35.  In the meantime, HCLOF's investment period expired, on 30th April 2020.

36. On 7th July 2020, Mr Scott and Ms Bestwick resigned as Directors of HCLOF, owing to personal conflicts of interests arising (apparently) in regard to the 2019 and 2020 Lawsuits. They appointed Mr Boleat, who is based in Jersey and Mr Burwood, who is based in Guernsey, as independent Directors in their place.  Mr Boleat had been professionally known to Ms Bestwick and he in turn had recommended Mr Burwood.  Neither of them had had any previous dealings with Mr Dondero, Mr Terry, Mr Seery, or any employee or representative of HCM, CLOH, HarbourVest, ACIS or US Bank.

37. On 31st July 2020, at HCLOF's Annual General Meeting, Mr Boleat and Mr Burwood were re-appointed by the shareholders of HCLOF, including CLOH.    In his oral evidence, Mr Murphy accepted that these two Directors were entirely independent and, indeed, well-qualified for this role by their financial experience.

38.  Mr Boleat has been the Director principally concerned directly with the matters in issue in these proceedings.  He is a Chartered Accountant, specialising in hedge funds, private equity and debt funds and SPV's and investment groups.  He is currently also a director of a number of other substantial investment funds, three of which are listed on the London Stock Exchange.  He has been personally regulated by the Jersey Financial Service Commission since 2007, and he has experience of winding up listed funds and the management of a contested take-over of a listed fund.  He therefore has considerable experience of corporate governance in the financial sector, in particular as regards investment funds, and including in a contentious context.    He is not however, as he emphasises, a qualified lawyer or advocate.

**2021**

39. On 14th January 2021, the Texas Bankruptcy Court, acting in the HCM Bankruptcy, approved a settlement agreement between HarbourVest and HCM ("**the HarbourVest Settlement**)". Within this it was provided that HarbourVest should transfer its 49.98% shareholding in HCLOF to HCMLP Investments LLC ("**HCMLPI**"), a wholly-owned subsidiary of HCM and HCM's nominee, (together, therefore, "**the HCM Shareholders**"), thus bringing HCM's effective interest in HCLOF up to 50.612% and making it the majority shareholder.  CLOH, Mr Dondero and his two family trusts opposed this settlement.  CLOH apparently withdrew its opposition before the hearing, but the other objections were pressed.  However, they were dismissed by the Court.  HCLOF itself played no part in the settlement.

40. On 22nd February 2021, the Texas Bankruptcy Court approved a Fifth Amended Plan of Reorganisation for HCM.  No doubt prompted by the remarkable intensity and extent of the hostile litigation landscape previously noted, this included "gatekeeper" provisions preventing certain persons, including CLOH, from commencing or pursuing litigation against HCM, its subsidiaries, and various other parties connected with it including its directors, without first obtaining the leave of that Court.

41. On 12th April 2021, CDAF and CLOH issued proceedings in Texas against the HCM shareholders in relation to the HarbourVest Settlement, alleging breach of a fiduciary duty said to be owed to them, negligence and breaches of statutory anti-fraud provisions. HCLOF was named as a Defendant.  (After certain procedural skirmishes this claim remained on-going in the Texas Bankruptcy Court at the time of this hearing with a decision expected in a few weeks.)

42. On 22nd April 2021, Mr Paul Murphy was appointed as a director of CLOH in addition to Mr Mark Patrick.  Mr Murphy is a lawyer based in the Cayman Islands who specialises in the conduct of contentious cross-border insolvencies.  He has effectively had charge of these proceedings on behalf of CLOH, in parallel with Mr Patrick, previously the sole director, dealing with other more administrative matters.  He obtains his information as to the facts from CLOH's attorneys in other jurisdictions.  He has never met Mr Dondero and has no communications with him. The Court infers that this distancing has been intentional, because of the contentious history of the whole matter.

43. On 28th April 2021 HCLOF, ACIS and Mr Terry reached a Settlement Agreement ("**the 2021 Settlement Agreement")** which disposed of the litigation between them and released all cross-claims between them and their affiliates: see Clauses 7, 9 and 10 of that Agreement. CLOH was not a party to that Agreement, and the "*Acis Releasees*" who were the beneficiaries of the releases given by ACIS and Mr Terry expressly excluded Mr Dondero, CLOH, CDAF and other entities owned or controlled by Mr Dondero (Clause 9).

44. Exactly when CLOH became aware of this agreement is not perfectly clear and is a matter of some contention.  Mr Murphy says that CLOH was not aware of this Agreement at all until it received discovery in a later action, referred to below.  HCLOF points out that Mr Murphy requested a copy of this Agreement from Mr Boleat by an email of 11th January 2022, to which Mr Boleat responded, on 20th January 2022, referring him to an affidavit which had exhibited the Agreement and saying that it was assumed, therefore, that he or CLOH's counsel had a copy.  Mr Boleat says that he received no reply.  He points out that this complaint was then not raised further until Mr Murphy made his fourth affidavit, on 23rd September 2023.

45. CLOH apparently does not complain that HCLOF's entering into the 2021 Settlement Agreement was itself unfairly prejudicial to its interests.  Rather, its complaint is that in doing so, HCLOF agreed to a particular term, contained in Clause 2(iii) of the Agreement, to the effect that HCLOF would thereafter ensure that any third party transferee, assignee or successor, direct or indirect, to the "HCLOF Subordinated Notes" (which were the ACIS

CLO Notes held by HCLOF) would not be affiliated in any way with Mr Dondero, CLOH, CDAF or any other entities owned or controlled by Mr Dondero or managed by any affiliate of his.   In effect, this precluded HCLOF from transferring the ACIS CLOs to CLOH (or to any "Dondero entity"), and required HCLOF to take steps to prevent such CLOs coming into CLOH's (or any other Dondero entity's) hands.

46. CLOH complains that this conduct of HCLOF was unfairly prejudicial to its interests as a member of HCLOF, because it created an impediment to CLOH's achieving its desired exit strategy of taking an *in specie* distribution of assets from HCLOF.   Mr Boleat has pointed out that CLOH had no right to such a possibility under the terms of  its investment, and the possibility of taking any such course was not raised by CLOH until several months later.

47. Under the 2021 Settlement Agreement, though, the injunction which had been preventing HCLOF from seeking to redeem its ACIS subordinated loan Notes was lifted.  Consequently, on 12th May 2021 HCLOF was able to exercise its option, contained within its subscription rights as the 100% holder of ACIS-4 and ACIS-5 CLO Notes, and the sufficient majority (86.63%) holder of those in ACIS-6, to request that US Bank redeem or realise all those outstanding Notes, paving the way to a distribution of the proceeds to HCLOF shareholders.

48. Rather promptly thereafter, however, on 14th May 2021 NexPoint filed complaints in the New York Courts against ACIS (as the ACIS CLO portfolio manager), US Bank (as trustee), Mr Terry (as ACIS's principal) and Brigade as its investment manager, alleging breach of fiduciary duty regarding the ACIS-6 CLO ("**the NexPoint Litigation**").

49. On 17th June 2021, following a finding of contempt of court against Mr Dondero for attempts to interfere with the management of HCM, the Texas Bankruptcy Court required all "Non-Debtor Related Entities", expressly including CDAF and CLOH, to provide evidence of their ownership, and whether Mr Dondero or his family trusts had any direct or indirect ownership interest in them.

50. On 23rd June 2021 US Bank sold the underlying assets held by the ACIS CLOs and redeemed the secure Notes, leaving only the junior subordinated Notes, owned by HCLOF, outstanding.    However, US Bank retained the remaining proceeds ("**the Redemption Proceeds**") and declined to release them.    It informed HCLOF orally of this decision on 15th July 2021, explaining its reasons.

51. On being informed of the retention, CLOH wrote to HCLOF on 22nd July 2021 expressing concern and asking what action HCLOF was therefore taking.   By a letter of 23rd July 2021 HCLOF's administrators, Elysium Fund Management Limited ("**Elysium**"), relayed to CLOH US Bank's explanation of its reasons, namely that it was retaining the Redemption Proceeds to cover its own and ACIS's potential costs and liabilities related to pending and threatened litigation concerning the ACIS CLOs.   By a letter of 27th July 2021 CLOH wrote to HCLOF setting out why it considered that US Bank had no right to retain the Redemption Proceeds.  By a letter of 28th July 2021, HCLOF wrote to US Bank strongly objecting to the retention, and reserving its right to take legal action, whilst also expressing willingness to enter into discussion to try to find a resolution without the need for this.

52. On 3rd August 2021, on yet another front, the Texas Bankruptcy Court found parties including CDAF, CLOH, Mr Dondero and Mr Patrick, (who was a director of CDAF as well as CLOH) in contempt of court for their respective involvements in bringing proceedings against Mr Seery without the leave of the Bankruptcy Court, in breach of the gatekeeper provisions contained in the Plan of Reorganisation made in HCM's bankruptcy on 22nd February 2021.

53. On 13th August 2021 US Bank's attorneys replied to HCLOF's attorneys setting out US Bank's reasons for considering itself entitled to retain the Redemption Proceeds.

54. On 31st August, 2021, HCLOF's Interim report and unaudited financial statements to 30th June 2021 were published to shareholders. They included a note to the effect that the Directors of HCLOF (ie Mr Boleat and Mr Burwood) were of the opinion, having taken advice, that US Bank's retention of the Redemption Proceeds was unlawful. This is a point upon which heavy reliance has been placed by CLOH in this Application.

55. On 20th October 2021, CLOH, through Ogier as its Attorneys, emailed the Directors of HCLOF requesting information regarding the retention of the Redemption Proceeds. On 26th October 2021, Carey Olsen on behalf of HCLOF, replied that US Bank's stated justification for such retention was threatened litigation from CLOH, and also the NexPoint Litigation, in which HCLOF was a named defendant.

56. On 2nd November 2021, CLOH raised with HCLOF for the first time, an issue regarding HCLOF's Advisory Board, its composition and the permissible functions of its members, in all the circumstances. Although this issue was pursued initially as a complaint, in the end, it has not been relied on. It is not therefore, described any further in this factual account. However it is an example of, and a reminder that there were yet, other matters of dispute being raised, and forming part of the general background picture.

57. On 10th November 2021, Mr Murphy wrote further to the Directors of HCLOF on the subject of US Bank's retention of the Redemption Proceeds, but he added, as a final comment, a question whether the Company would consider making an "*in-kind distribution from the underlying assets*". He repeated this request in an email of 28th November 2021. On 3rd December 2021 Mr Boleat, on behalf of HCLOF rejected this request, giving various commercial reasons (dilution of HCLOF's power and influence as itself a holder of such assets; practical problems as to whether it was feasible, and concern as to provoking more expensive and hostile litigation by upsetting the status quo). He also pointed out that the retention issue could be resolved quickly if NexPoint would release its claims in the NexPoint Litigation, and CDAF and CLOH would confirm that they did not have any claims against US Bank or ACIS, as this would remove any excuse that US Bank might have for making any retention.

58. In the meantime, on 24th November 2021 HCLOF applied to intervene in the NexPoint Litigation, on the basis that NexPoint had insufficient standing, under the terms of the ACIS-6 CLO, to bring any such claim, since its holding was a mere 13% and a 25% interest was required under the terms of the CLO itself. On 7th December 2021 the New York Federal Court granted this motion. The actions of HCLOF in making this intervention are asserted by CLOH to be detrimental to its interests as a shareholder in HCLOF, and consequently the reasons for this intervention have become material. This intervention has continued to be another main plank of CLOH's case that the business of HCLOF has been carried on in a manner which is unfairly prejudicial to its interests as a member of HCLOF.

59. In the meantime, again, on 1st December 2021, Mr Seery, on behalf of HCM as HCLOF's Portfolio Manager, wrote, at the request of HCLOF, to US Bank challenging their retention of the Redemption Proceeds and demanding their distribution by 15th December 2021. Unsurprisingly, this did not happen. The general wind-down business of HCLOF was continuing however, and on 16th December 2021, HCLOF's Board approved payment of a dividend to shareholders of £15.86Mn, leaving HCLOF with cash in hand of about $15Mn.

60. On 24th December 2021, US Bank's attorneys reiterated to HCLOF its reasons for retaining the Redemption Proceeds and its belief that it faced a very real threat of proceedings from CDAF and CLOH. ACIS's attorneys wrote similarly to HCLOF maintaining that the retention of the Redemption Proceeds was justified both under the terms of the ACIS CLOs trust indentures, and as a matter of case law. At the same time, US Bank, ACIS and Mr Terry issued proceedings in New York, seeking declarations against CDAF, CLOH and

NexPoint to the effect that none of those Defendants had any viable claims against any of the Plaintiffs in respect of the ACIS CLOs ("**the Declaratory Action**").   They then wrote on 28th December 2021, asking CLOH and CDAF to release their threatened mismanagement claims so as to avoid further "unnecessary" litigation.

61. From HCLOF's subsequent Annual Report and Financial Statements, HCLOF's assets at 31st December 2021 amounted to $76Mn, including significant interests in the ACIS CLOs.  Of this some $38Mn was cash in hand.

**2022**

62. On 10th January 2022 CLOH and CDAF refused to release their threatened mismanagement claims against US Bank, ACIS and Mr Terry.

63. On 11th January 2022, Mr Murphy wrote to HCLOF's Directors, requesting information about some of the matters later complained of in this Application, but also putting forward, once again, "exit proposals" that HCLOF should make an *in specie* distribution to CLOH, in satisfaction of its share entitlement.    On 20th January 2022, Mr Boleat once again rejected this proposal.

64. On 21st March 2022, the value of the Redemption Proceeds retained by US Bank was about $39Mn.

65. On 12th April 2022, Ogier, on behalf of CLOH wrote what was effectively a letter before action to Carey Olsen, on behalf of HCLOF, setting out complaints later included in this Application and again making the "exit proposal" of an *in specie* distribution to CLOH, but also now including an alternative proposal that HCLOF should buy back CLOH's shares in HCLOF.      On 13th April, Mr Seery wrote on behalf of HCM stating that the HCM shareholders did not regard these proposals as being in their best interests and they would not be supporting them.   On 14th April, Carey Olsen replied to Ogier, refuting the various complaints made.

66. HCLOF's AGM took place on 19th May 2022.   At the meeting, Ogier, on behalf of CLOH, requested the Directors to consider potential ways for CLOH to "exit" HCLOF.

67. Possibly arising from this, on 28th June 2022 HCLOF wrote to shareholders, including CLOH, making an offer to buy back shares in HCLOF *pro rata* at 85% of the current NAV of the company.    HCLOF had just recently acquired cash as a result of selling its interests in MGM Studios equity and, whilst this was insufficient to buy back all HCLOF's outstanding shares, the HCM Shareholders had already informed HCLOF that they did not wish to take up this Share Buy Back offer.   This meant that there would be sufficient cash in HCLOF to enable it to purchase the remaining shares, held principally by CLOH, and the HCM Shareholders had no objection to this.

68. However, on 7th July 2022, CLOH rejected this offer, in effect because it rejected the discount value of 85% of NAV being proposed.    Indeed, at one point CLOH appeared to allege that the very making of such an offer constituted unfairly prejudicial conduct by HCLOF, although it is difficult to see how this could be.   The assertion was eventually moderated to a submission that the proposal of such discount was evidence of a mindset, and a pattern of conduct, of HCLOF's preferring and advantaging the HCM Shareholders' interests and subordinating those of CLOH, which was said to support CLOH's other claims of demonstrable unfairly prejudicial conduct.

69. On 15th July 2022 HCLOF therefore informed shareholders that the Share Buy Back Offer had lapsed owing to insufficient support, and that a dividend would be paid instead.   On 18th

July it therefore declared a cash dividend to investors (paid on 22nd July), totaling some $22.Mn.  This left HCLOF with about $15.5 Mn in cash.

70. On 9th August 2022, the New York Federal Court ruled in the NexPoint Litigation that NexPoint's claims were a matter of state law and were not within the jurisdiction of the Federal Court.

71. On 31st August 2022 CLOH provided the HCM Shareholders in HCLOF with a draft of this Application and the Affidavit of Mr Murphy in support.  This was as an exhibit to an application CLOH proposed to make in the Texas Bankruptcy Proceedings (later filed on 9th September 2022) applying for an order recognising that HCLOF was not a protected party under the gatekeeper provisions, so that, therefore, these proceedings could be brought.

72. On 28th September 2022 the Texas District Court made a second finding of contempt of court against Mr Dondero and others, expressing itself to be satisfied from evidence that there was ample evidence before the State Court of Mr Dondero's control over CDAF and CLOH, notwithstanding the absence of his holding any formal position.

73. On 4th October 2022 NexPoint refiled a portion of its complaint against US Bank, ACIS and Mr Terry in the New York State Court. On 30th November 2022 HCLOF intervened in this litigation on the same basis as its previous intervention in the Federal case.

74. On 8th December 2022, US Bank, ACIS and HCLOF agreed a draft Settlement Agreement, to be held in escrow pending fulfilment of certain requirements.  These requirements were fulfilled when the Texas Bankruptcy Court issued its decision on 27th February 2023 (referred to below), and this agreement therefore subsequently became the "**2023 Settlement Agreement**", which has also become a major plank in CLOH's assertion of unfair prejudice.

**2023**

75. On 24th February 2023 HCM filed a motion in the Texas Court seeking permission to bring proceedings to have parties designated the "Dondero Entities" (expressly including CDAF and CLOH) declared vexatious litigants, and to restrain their ability to bring litigation against HCM and its management.

76. On 27th February 2023 the Texas Bankruptcy Court in the HCM Bankruptcy issued an order in favour of CLOH, confirming that HCLOF was <u>not</u> a protected party under the gatekeeper provisions, thereby permitting CLOH to commence the current proceedings against HCLOF.

77. The day after this, on 28th February 2023, HCLOF, US Bank and ACIS signed, or perhaps confirmed, the 2023 Settlement Agreement, and HCLOF so informed its shareholders by letter.   The terms of the 2023 Settlement Agreement secured the release by US Bank of $16.5Mn worth of the retained Redemption Proceeds, which would then be free to be distributed to investors.   However, that Agreement also included three provisions which CLOH now says were unfairly prejudicial to its interests as a member of HCLOF.   These are

    i. Clause 4 of the 2023 Settlement Agreement whereby HCLOF agreed, upon receipt of the partial release of the funds being retained by US Bank, to release US Bank from any claims (including therefore its claim that the retention was intrinsically unlawful) until after final disposal of the Declaratory Action, subject only to an agreement that it and US Bank would meet and confer in good faith about the potential release of the remaining sums (Clause 4 (b) and (c));

    ii.   the term at Clause 6 of that Agreement whereby the parties agreed to co-operate to pursue fees and costs from entities, including expressly NexPoint and itself, incurred in various pieces of litigation; and

    iii.   Clause 12 (a) (ii) whereby HCLOF again agreed to procure that any transferee, assignee or successor to the ACIS CLOs (there called the "HCLOF Notes") should not be affiliated in any way to CDAF, CLOH, NexPoint, Mr Dondero or any entity owned, controlled or affiliated with him, and also take steps to prevent either the transfer of its management agreement or the transfer of the HCLOF Notes, to any Dondero entity.

78.   CLOH did not discover the actual terms of the 2023 Settlement Agreement until 16th May 2023, through its US Counsel.   When it did, those terms, and the coincidence that this agreement appeared to have been made immediately after the order obtained by CLOH which enabled it to proceed against HCLOF by these proceedings, of which it had forewarned HCLOF in August 2022, caused Mr Murphy to conclude that this had been part of a deliberate plan to obstruct CLOH and its desire to "exit" HCLOF.   HCLOF's entering into the 2023 Settlement Agreement, has therefore been cited as another major plank of CLOH's claim to have suffered unfair prejudice.

79.   To bring matters finally up to date, this Application was issued on 6th March 2023.   Since then

    i.   On 30th March 2023, CLOH, together with CDAF filed a defence and counterclaim in the Declaratory Action in New York, seeking its own declaratory relief, but also seeking damages based on, broadly, the same allegations of misconduct regarding the management of the ACIS CLOs as had been the basis of the 2019/2020 Lawsuits, withdrawn at the time, but again raised in correspondence in April 2020, and never released.  Their motion to join HCLOF in those New York proceedings was granted on 1st May 2023.

    ii.   On 7th September 2023, NexPoint's appeal against the dismissal of its <u>Federal</u> litigation (heard in April 2023) was dismissed.

**The Action and the Trial**

80.   CLOH's Application was launched on 6th March 2023, supported by a lengthy affidavit of Mr Murphy sworn on 7th March 2023. Mr Murphy swore two further affidavits on 14th March 2023 and 2nd June 2023, setting out the various matters which CLOH claimed were conduct of HCLOF which was unfairly prejudicial to it, entitling it to relief.   Mr Boleat swore a lengthy affidavit in reply on 26th June 2023, in which he refuted CLOH's claims, explaining all the actions taken by him and Mr Burwood on behalf of HCLOF since his appointment, and making the particular point that they had taken advice from both financial experts and legal advice where they deemed it necessary and had had regard to such advice in forming their views as to what steps it was appropriate to take in HCLOF's best interests.  He suggested that CLOH's claim seemed rather to be with regard to the appropriateness of the actions which the Board had taken (and with which Mr Murphy, on behalf of CLOH patently did not agree) rather than of any conduct which could fairly be viewed as prejudicial to the interests of CLOH.   Mr Murphy swore his fourth affidavit in answer to some of the points made by Mr Boleat on 14th September 2023.

81.   The hearing took place on 24th-26th and 30th October 2023.  Advocate Alex Horsbrugh-Porter appeared for CLOH and Advocate Mark Dunster represented HCLOF.   Both Mr Murphy and Mr Boleat gave oral evidence, and were cross-examined on their affidavits.  The Court reserved judgment.

82. Certain parts of the evidence of Mr Boleat revealed legal advice which had been given to HCLOF in the context of litigation against third parties, and also certain financial information. HCLOF wished to waive privilege in such advice for the purpose of these legal proceedings only, and clearly the advice and information was reasonably regarded as commercially sensitive. Consequently, the Court permitted such sensitive information to be redacted out of those parts of the evidence which might be in the public domain and made privacy orders in respect of unredacted evidence. It also directed the hearing to go into camera when such parts of the evidence were being dealt with, and it has ordered that those parts of both the evidence and the hearing transcript should be separated in the court records and should be sealed.

83. It has already been observed that the matters relied on by CLOH have changed and developed over the course of the proceedings. Even with a semi-agreed list of issues of 19th September 2023, made five weeks before the hearing as directed by the court, several such issues were then not pursued at the hearing. At the same time, Advocate Horsbrugh-Porter raised points which Advocate Dunster complained were newly raised issues, although since they were either points of law, or arose out of the evidence given, this was not necessarily impermissible, fundamentally. Advocate Dunster has complained, though, that this chopping and changing of issues relied on has made it difficult to understand the case which his client was expected to meet. He also suggests that it demonstrates the weakness of CLOH's case. Advocate Horsbrugh-Porter says that this evolution has simply been the product of events moving on, and his client's having discovered, or been subjected to, yet more matters which they perceive as unfair prejudice.

84. By the time of the hearing the matters identified by CLOH as being those upon which it relied as conduct of the affairs of HCLOF which was unfairly prejudicial to its interests as a member of HCLOF were the following

    i. Entry into the 2021 Settlement Agreement having regard to Clauses 2 (iii), 7, and 9 and 10 thereof;

    ii. Entry into the 2023 Settlement Agreement having regard to Clauses 4, 6 and 12 thereof;

    iii. (Possibly) failing to inform CLOH that it was negotiating the above Agreements;

    iv. Intervening in the NexPoint Litigation; coupled with

    v. Failure to sue US Bank to obtain the retained Redemption Proceeds, when their retention was recognised to be unlawful;

    vi. Continuing to use HCM as effective Portfolio Manager when HCLOF's business was in "wind-down" mode, thereby incurring the unnecessarily high fees payable out of HCLOF's funds.

In closing speeches, however, Advocate Horsbrugh-Porter only pressed items (i), (ii), (iv), and (v). These will be considered later. It is convenient now, though, to consider the law.

**The legal framework**

85. By way of background, the power of the court to grant relief in a case of the "unfairly prejudicial conduct" of a company's affairs under ss 349 and 350 of the Companies Law is entirely statutory. It was adopted into Guernsey law from the company law of England and Wales, where it was introduced in its present form by s 75 of the English Companies Act 1980, after the language of an earlier attempt to provide such a remedy (in s 210 of the

Companies Act 1948, which used the word "oppressive") had been found to be construed too restrictively by the courts.

86. The jurisdiction was introduced to alleviate injustices faced by minority shareholders who felt that the company's affairs were being conducted in a manner detrimental to them, but for whom other means of redress were highly unsatisfactory. If they could allege that the conduct of which they complained constituted a wrong to the company itself, but that the company could not, or would not, take action because the alleged wrongdoers were in control of the company, they could seek permission to bring a "derivative action", whereby they were authorised to use the company's name to pursue the claim. However, that route was cumbersome and could only bring the relief which the company itself might be entitled to. The only alternative was to seek a "just and equitable" winding up of the company, but that was a "nuclear" option, and was likely to cause considerable damage and depletion to the company's value, and hence the value of their own interests, on any basis. The statutory power was therefore introduced to provide a very wide and flexible discretionary remedy, which could be adapted to fit the merits of any particular case.

**Essence of conduct which can be "unfairly prejudicial"**

87. However, that jurisdiction had to be reconciled with the general principles of company law, which dictate that the company is a construct whose affairs are governed by the agreements constituted, basically, by the company's articles of association, those being the terms upon which its shareholders have agreed to create it. The jurisdiction is not simply a jurisdiction to remedy any perceived grievance which may be advanced by a member or members of a company. The limits arising from such reconciliation are apparent, therefore, in three particular aspects of the statutory power:

   i. It is the conduct of *the affairs of the company* which founds the jurisdiction, not the conduct of any particular member (unless that conduct does, in fact, constitute conduct of the affairs of the company itself);

   ii. The jurisdiction is to grant relief on the grounds that the affairs of the company are being or have been conducted in a manner which is not merely "*prejudicial*" to the interests of the "*members generally*" (ie, the company as a whole) or to "*a part of the members including* [the complainant]"; the relevant conduct has to be "*unfairly prejudicial*" (emphasis added). This recognises the fact that there is an intrinsic prejudice in the very position of a minority shareholder, in that such a shareholder's wishes or interests may be overruled by the majority, whether directly by force of numbers, or indirectly through the majority's ability to appoint directors more attuned to their own views. That situation is not <u>unfairly</u> prejudicial, because it is inherent in the structure of the company to which the minority shareholder has subscribed. It only becomes unfairly prejudicial if that power is exercised in some way which goes outside the boundaries of what can be seen as properly inherent in the agreement which the complaining member has subscribed to.

   iii. The "*unfair prejudice*" must have been suffered to the interests of the complainant *as a member of the company*. This limitation is implicit in the words of the statutory provision. If the prejudice is suffered only to some other interest of the complainant, which cannot be seen to be part of his interests as a member of the company, then relief under the statutory power is not available. The interests of a member of a company are linked, of course, to the value of his share-holding, but are essentially his right to have the company (in whose enterprise he has a financial interest) administered and managed properly in the best financial interests of the enterprise as a whole.

It is also to be observed that the formulation of s 349 provides the court with jurisdiction in three distinguishable situations.  The first is that the prejudice has been suffered by the whole undertaking of the company, and the complainant complains as a representative of the whole company.   The second is that the prejudice has been suffered by some part of the membership, and the complainant complains as a representative of that part.  The third is that the prejudice has been suffered by a "part" of the membership comprising solely the complainant. That ultimate reduction renders the complaint effectively an individual one.   But whatever the situation, the relevant prejudice must be seen to be being (or have been) suffered to the complainant's interests as a member of the company, and not in some other interest.

88. The parties are broadly in agreement as to the above principles.  Their differences are as to their true extent, and/or their application.  It is therefore important to keep in mind the legal framework of the "unfair prejudice" jurisdiction which CLOH seeks to invoke when considering the facts of the case.

89. As the Guernsey provision has been imported from English law, with the wording of s 349 (1) the Companies Law being identical with that of (now) s 994 of the English Companies Act 2006, and with there being little Guernsey law on the application of the relevant principles, it is accepted that Guernsey law will regard English authorities on the topic as highly persuasive: see *Prodefin Trading Ltd v Midland Resources Holding Ltd and others* (Royal Court Judgment 7/2017).   Collas B there (at [55]-[56]) discussed the applicable principles of English law, and approved a succinct expression of the three points noted in Para [87] above, as stated in *Apex Global Management Limited v Fi Call Limited* [2015] EWHC 3239 (Ch) per Hildyard J at [37], as being a correct expression of Guernsey law.

90. In their submissions on the correct interpretation of these principles, both Advocates start from the Privy Council case of *O'Neill v Phillips* [1999] 1 WLR 1092, which is now regarded as the leading authority in England and Wales.

91. At 1098D and onwards, Lord Hoffmann said

> *"In section 459* [as it then was] *Parliament has chosen fairness as the criterion by which the court must decide whether it has jurisdiction to grant relief….. But this does not mean that the court can do whatever the individual judge happens to think fair. The concept of fairness must be applied judicially and the content which it is given by the courts must be based on rational principles. ….*

> *"Although fairness is a notion which can be applied to all kinds of activities, its content will depend upon the context in which it is being used.  Conduct which is perfectly fair between competing businessmen may not be fair between members of a family.   In some sports it may require, at best, observance of the rules, in others ('it's not cricket') it may maybe unfair to take advantage of them.   All is said to be fair in love and war. So the context and backgrounds are very important."*

> *"In the case of section 459 the background has the following two features. First, a company is an association of persons for an economic purpose, usually entered into with legal advice and some degree of formality. The terms of the association are contained in articles of association and sometimes in collateral agreements between the shareholders.   Thus the manner in which the affairs of the company may be conducted is closely regulated by rules to which the shareholders have agreed. Secondly company law has developed seamlessly from the law of partnership, which was treated by equity … as a contract of good faith.  One of the traditional roles of equity, as a separate jurisdiction, was to restrain the exercise of strict legal rights in*

> *certain relationships in which it considered this would be contrary to good faith. These principles have, with appropriate modification, been carried over into company law.*
>
> *"The first of these two features leads to the conclusion that a member of a company will not ordinarily be entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted. But the second leads to the conclusion that there will be cases in which equitable considerations make it unfair for those conducting the affairs of the company to rely upon their strict legal powers. Thus unfairness may consist in a breach of the rules or in using the rules in a manner which equity would regard as contrary to good faith".*

92. Lord Hoffmann also referred back to his previous observations in In *Re Saul D Harrison & Sons PLC* [1994] BCC 475, to similar effect, at [488]:

> *"In deciding what is fair or unfair for the purposes of s 459, it is important to have in mind that fairness is being used in the context of a commercial relationship. The articles of association are just what their name implies: the contractual terms which govern the relationships of the shareholders with the company and each other. They determine the powers of the board and the company in general meeting and everyone who becomes a member of a company is taken to have agreed to them. Since keeping promises and honouring agreements is probably the most important element of commercial fairness, the starting point in any case under s 450 will be to ask whether the conduct of which the shareholder complains was in accordance with the articles of association. The answer to this question often turns on the fact that the powers which the shareholders have entrusted to the board are fiduciary powers, which must be exercised for the benefit of the company as a whole. If the board act for some ulterior purpose, they step outside the terms of the bargain between the shareholders and the company. Although one begins with the articles and the powers of the board, a finding that conduct was not in accordance with the articles does not necessarily mean that it was unfair, still less that the court will exercise its discretion to grant relief. There is often sound sense in the rule in Foss v Harbottle. Not only may conduct be technically unlawful without being unfair, it can also be unfair without being unlawful. In a commercial context this may at first seem surprising. How can it be unfair to act in accordance with what the parties have agreed? As a general rule, it is not. But there are cases in which the letter of the articles does not fully reflect the understandings upon which the shareholders are associated."*

93. Thus – and the Advocates both agree on this – the starting point in judging whether conduct is "*unfairly prejudicial*" to the interests of any member is the agreement documents which govern his or its relationship with the company and with the other members. Here, that is the Articles of Association of HCLOF and the Members' Agreement, both set up in November 2017.

94. The difference between the Advocates is that on behalf of HCLOF, Advocate Dunster submits that those documents are not merely the starting point but also the finishing point of the enquiry whereas Advocate Horsbrugh-Porter for CLOH submits that it is not that cut and dried.

**Applicant's submissions**

95. Advocate Horsbrugh-Porter on behalf of CLO makes a two-fold submission. He submits, first, that there has in fact been a breach of the governing agreements. He relies on Clause 20.5 of the Members' Agreement, (see above) which obliges HCLOF to act "*in good faith*" towards the other parties such as CLOH.

96. Unsurprisingly, Advocate Dunster was emphatic that Advocate Horsbrugh-Porter should state clearly whether he was alleging <u>bad</u> faith on the part of HCLOF and, specifically, Mr Boleat as the relevant human agent.   This would of course, be a serious allegation to make against a professional person.  Advocate Horsbrugh-Porter was emphatic that he was <u>not</u> alleging bad faith against Mr Boleat, but also that he did not need to.  He submitted that a "good faith" clause, such as this, could be breached in two ways; the first was by a party acting dishonestly, but the second was by a party acting in a way which would

> "*be regarded as commercially unacceptable by reasonable and honest people*"

even if not dishonest, citing *Re Compound Photonics Group Ltd* [2022] EWCA Civ 1371 at [241].   Such a test was objective: see per Slade J in *Re Noble & Sons (Clothing) Ltd* [1983] BCLC 273 at 290f-291a, proposing that the test was

> "*whether a reasonable bystander observing the consequences of* [the directors'] *conduct would regard it as having unfairly prejudiced the petitioner's interests.*"

97. It was not, therefore (he submitted) necessary that the conduct under examination should have been accompanied by dishonesty, or even a conscious malevolent intent or ulterior motive, which were the ingredients of bad faith.   It was merely necessary for the court to look at the actions complained of and conclude that reasonable and honest people would regard them as commercially unacceptable, even if the actual parties had taken such actions in a subjectively innocent way.  Such a finding was perfectly possible, therefore, even if – as he did accept – Mr Boleat had acted honestly.

98. His second, alternative, submission was that this was a case in which equitable considerations, and hence constraints on the actions of HCLOF in the interests of fairness, <u>did</u> come into play.   He emphasised that the cases did not lay down that this could never arise in the context of a purely commercial agreement, but only that this was the "general rule".  The general proposition therefore admitted exceptions, dependent on the case itself, as was recognised by Arden J in *Re BSB Holdings Ltd* 1996 1 BCLC 155 ChD at 245.  He submitted that the highly unusual circumstances of this case, which he urged could be described as "unique", were such as to impose equitable constraints on HCLOF which amounted to a duty not to take actions which would hinder the ability of CLOH to "*receive the Redemption Proceeds* [this apparently meaning its substantial share of the sums being retained by US Bank] *via any available avenue"*.   It could be seen that this had been breached, by the individual matters of complaint raised, or by an overarching view of them in combination.

99. The unusual circumstances giving rise to this equitable constraint were, he submitted, the facts that

    i.   HCLOF's business was now, and had been since April 2020, in "wind-down" mode rather than conducting active business;

    ii.  the sums being withheld by US Bank were part of the assets which ought to be distributed to HCLOF's shareholders, including CLOH;

    iii.  HCLOF had at all times been of the view that such withholding was unlawful;

    iv.  the existence of the multi-faceted litigation between "Dondero Entities" and "Terry Entities" in the United States, in which ACIS was one of the latter and CLOH was one of the former;

> v. Mr Terry had told Mr Boleat that ACIS and US Bank were considering withholding reserves before HCLOF entered into the 2021 Settlement Agreement; and

> vi. the Members' Agreement did not contemplate protracted litigation being on foot after HCLOF's ivestment period came to an end in April 2020.

100. He submitted, therefore, that there was no specific contractual machinery dealing with the present situation. In particular such matters as the entering into of the 2021 Settlement Agreement, intervening in third party litigation, and the unanticipated position in general, created a situation in which equitable considerations could (and did) arise, so as to affect and constrain the company's exercise of any legal powers apparently conferred by the contractual documents. With the test for whether such constraints ought fairly to be observed being focused on the consequences of the company's actions (see the citation from *Re Noble* (above)), and the motivations or state of mind of the directors therefore being irrelevant, he submitted that it could be seen that the conduct of which complaint was made here could and did fall within the scope of "unfairly prejudicial" conduct.

**Respondent's submissions**

101. Advocate Dunster, on the other hand, submits that, really, the only question is the plain and simple one: has there been a breach of the contractual terms governing the relationship between HCLOF and CLOH? There is no room for equitable considerations in the present situation, and since (he submits) there plainly, on examination, has been no such breach, there has been no unfairly prejudicial conduct, that is really the end of the case.

102. He accepts that there are, of course, instances in which equitable considerations can arise, and form a constraint on the directors' exercise of powers which they might strictly have under the company's constitution, but he submits that the cases make it clear that that is not the norm, and it is particularly unlikely to occur where agreements have been drawn up, formally and obviously with legal advice, with an entirely commercial objective, and between sophisticated parties. He cites, the recent case of *Re Hut Group Ltd* [2021] EWCA Civ 904, in which David Richards LJ (as he then was) expressed the position as follows at [9]:

> "… *the terms on which a member agreed that the affairs of the company should be conducted will usually be found in the articles of association, any shareholders' agreements, the fiduciary (now statutory* [in the UK]) *duties of directors and the principles of law which limit the power of a majority of members to bind the minority by resolution in general meeting. There may be cases, such as those discussed by Lord Wilberforce in* Re Westbourne Galleries Ltd *[1973] AC 360 at 379, where the particular circumstances of the case, normally involving the personal relations between members of a small company, may subject the exercise of legal powers to equitable restrictions going beyond the articles, agreements and rules of law. However, such cases are not the norm. As Lord Wilberforce said, the company structure "is defined by the Companies Act and by the articles of association by which shareholders agree to be bound. In most companies and in most contexts, this definition is sufficient and exhaustive, equally, so whether the company is large or small."*

The court rejected the proposition that the application of equitable considerations such as discussed by Lord Wilberforce was called for in that case, (at [10]) because

> "… *The relationship between all the parties has at all times been entirely commercial, as evidenced by the detailed and complex provisions, including those for the protection*

> *of members' interests, contained in the company's articles and in the shareholders' agreement to which [the applicant] acceded when it became a shareholder."*

103. Advocate Dunster submits that that is precisely the position in this case.   The relations between HCLOF and its shareholders have always been entirely commercial, and are to be treated, therefore, as governed by the commercial agreements which they have entered into. There is no room for equitable considerations to modify these where, as here, there are comprehensive professionally-drafted company documents, executed between sophisticated parties whose intentions are entirely commercial.  Unless, therefore the court finds some breach of the terms of those documents the Application must fail for that reason, and he submits that the evidence shows quite clearly that it cannot – as he submits is rather underlined by the lengths which CLOH has had to go to, chopping and changing its complaints, in order to try, unsuccessfully, to construct one.

104. The circumstances cited by Advocate Horsbrugh-Porter did not (he submitted) make the situation unusual or unique so as to somehow affect, change, overturn or abrogate the parties' contractual agreements, just because they might not have been expected.

105. He criticises Advocate Horsbrugh-Porter's attempt to construct a breach of the "good faith" clause as something of a contortion. He submits that there can be no breach of a duty to "act in good faith", other than by acting in bad faith – a charge which Advocate Horsbrugh-Porter expressly disavows – and one cannot get away from that.   In the quotation from *Compound Photonics* (above) the court was saying that "bad faith" could take two forms: dishonesty or behaving in a way which was commercially unacceptable to honest and reasonable people, but the latter was still bad faith; it was not something different. There is no middle ground between bad faith and good faith, as being some sort of lack of good faith which could give rise to a breach of a good faith clause without being itself bad faith.

106. He further relies on dicta in *Re Corion Ltd* [2013] EWCA Civ 781, at [51], that a general term of an obligation to act in good faith cannot in itself impose an obligation to "*act in a manner outside the terms of the ... agreement*", and that a duty of good faith should not cut across other express contractual rights: see *TSG Building Services plc v South Anglia Housing Ltd* [2013] EWHC 1151 (TCC) at [51].

**Discussion**

107. The issue here is whether, in the present situation, any question of unfair prejudicial conduct necessarily requires there to have been some breach of the agreements which contractually govern the relations between HCLOF and CLOH (and if so whether there has been such a breach) or whether equitable principles have any supervening application. This is a matter of law. On these points the Lt-Bailiff unhesitatingly prefers Advocate Dunster's submissions to those of Advocate Horsbrugh-Porter.

108. As regards the first question, the only term of the contractual documents which Advocate Horsbrugh-Porter relies on as having been breached is the "duty to act in good faith" clause at Clause 20.5 of the Members' Agreement.    As to this, the Lt-Bailiff accepts Advocate Dunster's submission, first, that there is no conceptual space where actions can be a breach of a duty to act in good faith but simultaneously not amount to bad faith.  Actions are either the one or the other, albeit the mental element – and there must be one – may not amount to actual dishonesty.   It is in fact difficult to see how performing a contract strictly according to its terms could ever amount to bad faith (except possibly where the party asserting that it was doing so knew or seriously suspected that the counterparty had contracted under a mistake about the effect of the relevant term, which is not this case and is very far from it).

109. As to Advocate Horsbrugh-Porter's second, alternative, contention, the Lt-Bailiff again accepts Advocate Dunster's submission that there is really no room for equitable considerations to modify or constrain a party's reliance on its powers and rights embodied in the express terms of the relevant contracts where the context is a commercial relationship, and the contractual documents are carefully drawn, no doubt after negotiation, clearly with legal advice, and made between commercially sophisticated parties.  These contractual documents are, the court finds, plainly within that class.

110. The Lt-Bailiff holds that the fact that the ensuing circumstances may not have been anticipated as the context in which these contractual documents would be operated is just not relevant.  Parties make contracts in order to lay down the principle of the terms which are to govern their relations in the future, and the future is inevitably uncertain.  Each accepts, therefore, that those principles will apply to the future position even if, and very possibly even because, that is not certain and not certainly predictable, in itself.  In the event, those principles may turn out to be more to the liking or advantage of one side than the other, but in the interests of securing their initial bargain, the parties accept that degree of uncertainty as to the particular result.  Unless the singular degree of unusualness about any future situation is sufficient to frustrate the contract – a very high threshold – the parties are taken to accept that the principles they have laid down will apply to their relevant rights and obligations in any future situation, for better or worse, and there is no half way house where "equity" can be called on to intervene to modify that result.

111. In any event, the Lt-Bailiff holds that none of the features of the matter cited by Advocate Horsbrugh-Porter in support of his argument that the situation here is so unexpected or "unique" as to justify the imposition of equitable considerations *ex post facto,* comes anywhere near justification for such an argument.  It is by no means unpredictable, or even out of the norm, for a company to get embroiled in legal proceedings, whether directly itself, or through being sucked into proceedings involving its affiliates or associates.  Even if the intensity of such hostile proceedings is remarkable, that makes no difference in principle.  There is no reason why decisions as to the actions best undertaken in the company's best interests in the context of litigation should not be regarded as another matter for the business judgment of the company's directors, just like any other decision as to the conduct of the company's affairs.  On analysis, that is all that has happened here, and CLOH's complaint then simply becomes an allegation of bad business judgment, or, more accurately perhaps, of a business judgment with which it does not agree.

112. In addition, it is apparent from the authorities that the features which have caused the courts to hold that equitable considerations do have a place in governing the controlling parties' conduct of the affairs of a company have been matters which applied or arose *at the time of the creation of the corporate relations between the parties.* They thus underlay such agreements and implicitly formed part of the agreement between the parties, but were simply not expressed in the documents (see the quotation from Hoffmann LJ, as he then was, in *Re Saul D Harrison* (above)).    Examples are understandings that all participators should share in management decisions, making it unfairly prejudicial for one faction to oust the participation of another, or understandings that profits should be shared by the mechanism of dividends such that it was unfair for a majority faction subsequently to vote itself disproportionate remuneration by way of salary.  None of the factors cited in this case is in any way rooted in any such underlying understanding between the parties (in particular, CLOH and HCLOF) because they had no such pre-existing relationship to give rise to it.  The framework for their relationship was created, apparently entirely for commercial reasons and on an arm's length basis, by the transactions in November 2017.

113. The Lt-Bailiff accepts that there will not be an absolutely rigid rule that there could "never" be a situation in which equitable principles could be invoked in the interpretation of behaviour under a purely commercial corporate relationship.   However, that possibility

could only be in a very extreme and very rare case, which is not this case.   The Lt-Bailiff is fortified in this view because it appears to her that admitting the influence of equitable principles in determining any particular case is tantamount to implying a term into the contractual documents that such an interpretation should apply.       The conditions for implying terms into formally drafted contractual documents are stringent; they effectively require a finding that, on an objective basis, such a term "must have been" intended by <u>both</u> parties to the agreement, see, eg *Att Gen for Belize v Belize Telecom Ltd* [2009] UKPC 10 at [16] – [27].  That, again, is just not this case.

114. There are no compelling considerations for the finding of any such implication here. Indeed, the terms of the documents even point away from any such intention, in particular the general provisions of Clause 20 of the Members' Agreement, and specifically Clause 20.3, where the parties thought it appropriate to record, expressly, that their arrangements were not a partnership, and thus exclude the equitable considerations which may underlie partnership relations.

**Conclusion**

115. Thus, the Lt-Bailiff has held that it is not open to CLOH to allege breach of the "act in good faith" clause whilst simultaneously disavowing any intention to allege bad faith, but it is also the case that that breach is the only actual breach which is alleged of the express contractual terms which govern the parties' relations *inter se*.   That first ground is therefore dismissed as any possible basis for CLOH's claim to relief.   She has also rejected Advocate Horsbrugh-Porter's alternative proposition that, in the circumstances of this case, there is scope for invoking equitable considerations as a constraint on HCLOF's exercise of its legal powers in support of an assertion of unfairly prejudicial conduct.   Having done so, the Lt-Bailiff agrees with Advocate Dunster that that is really the end of the case.

116. However, in case the latter finding is wrong, and since the matter was fully examined and argued at the hearing the Court has gone on to examine the various matters of allegedly unfairly prejudicial conduct ultimately relied on by CLOH (see Para [84] above), as facts capable of constituting "unfairly prejudicial conduct" against HCLOF within the meaning of s 349 of the Companies Law.

117. This exercise entails looking at the consequences of such conduct rather than (as above) considering the nature of the conduct itself as a matter of law, in the contractual context.

**Unfairly prejudicial conduct – the complaints examined**

118. A finding of unfairly prejudicial conduct within s 349, as the gateway for any judicial intervention in the company's affairs, requires findings that the conduct which is impugned has caused prejudice to the interests of the complainant as a member of the company, and that such prejudice is unfair.     The first is a matter of law, the second is a matter of fact, but they are sufficiently intertwined that it is convenient to consider them together in relation to any particular complaint.

119. Before turning to this, though, it is appropriate to note legal authority as to the requirement that the relevant prejudice is prejudice to the "*interests of the members*" of the company (or some part of them).  This has been held to mean the interests of the members of the company *as such members*.   Thus, if the prejudice being suffered from the conduct complained of is suffered to a different interest of the relevant plaintiff, not being his interest as a member of the company, no relief can be given.

120. By way of example, see *Re J E Cade & Son Ltd* [1992] BCLC 213, in which relief was refused because the petitioner was complaining at the family company refusing to give up

possession of the farm of which he was the freehold owner, and in those circumstances he was held to be seeking to protect his interests as landlord, and not any interest of his as a member of the company.  That case also recognises that there are limits on the court's wide discretion when granting relief on the basis of "equitable considerations", reiterating that this does not mean just whatever the judge might think fair.

121. As the interests of a shareholder in a company are broadly financial, certainly where the shareholding is an investment, it would seem that prejudice to his interests as such shareholder must itself *prima facie* be financial detriment, and this will, clearly, normally be the case.  It is not clear whether any other kind of prejudice could justify the court's intervention in a purely commercial case, ie in contrast to the cases of family, or informal, type arrangements noted above, where there is a broader underlying substratum of rights and expectations.  This question was not really investigated in this case, because all the matters of prejudice being contended for, in the end, do appear to come down to adverse financial consequences, even if indirect ones.

122. However, it was noted that the cases do establish that the "*interests of [the plaintiff] as a member of the company*" may be construed with some flexibility so long as such interests are sufficiently linked to the member's status as a shareholder in the particular case.   In *Gamlestaden Fastigheter AB v Baltic Partners Ltd* [ 2007] Bus L R 1521, the UK Privy Council held that the interests of a member of the company could extend to encompass its interests as a lender to the company (ie not merely as a holder of equity, ie shares, in the company) where the lending had been made as part of the whole package of the arrangements under which the company relationship had been set up.   The actual decision, however, was simply that it was <u>not unarguable</u> that a member's interests could be held to extend that far in such circumstances, so that the fact that there was no loss caused to the value of the petitioner's actual shareholding was not sufficient to enable the respondent to strike the claim out summarily.   It was not, therefore, a final decision.

123. With that introductory comment this judgment turns to the complaints of allegedly unfairly prejudicial conduct of the affairs of HCLOF which are put forward by CLOH: see [84] above.   These are taken in a convenient order for this judgment.

   **(1)   Failure to inform CLOH that it was negotiating the Settlement Agreements, and**
   **(2)   Retention of HCM as (effective) Portfolio Manager.**

124. These two complaints are items (iii) and (vi) in Advocate Horsbrugh-Porter's list.  They are touched on first, because whilst they figured in CLOH's case up to and including the opening of the trial hearing, they were not pursued by Advocate Horsbrugh-Porter in his closing address, and were effectively treated as withdrawn.

125. For the sake of completeness, however, the court records that such abandonment must be right.   A shareholder's entitlement to information is only to be found in the terms, either express or possibly implied, within the contractual documents governing the company's obligations in this respect, or in statute.  There is no obligation, express or implied, (and none has been suggested) in the relevant documents in this case which would oblige the Directors of HCLOF to inform the shareholders, or a shareholder, about anything they were doing or proposing to do in their day to day management of the company's affairs, still less to consult any such shareholder or seek its approval.   Negotiating and concluding agreements to further what they judge to be the promotion of the company's best interests falls within the scope of management decisions.  Concluding a settlement of disputes or differences perceived to hinder the company's best interests are within this concept.  The particular personal interests, or self-interest, of a particular shareholder, such as CLOH, cannot, and did not, alter that position.  Of course, directors may *choose* to inform shareholders of what they are doing in any particular case, and shareholders may be grateful

or gratified to receive information, but that is not the same thing as a duty on the directors to do so, such that a failure could be regarded as any unfair prejudice to shareholders.

126. Likewise, the retention of HCM (effectively) As the Portfolio Manager of HCLOF is a decision as to the running of the company's affairs which is within the scope of the Directors' authority.  It might have been expected, intuitively, that CLOH's complaint here would be of an unacceptable possibility of bias, arising from the current differing allegiances of the two major shareholders in HCLOF - HCM and CLOH - which have been brought about by the events which have happened.    HCM, the effective portfolio manager of HCLOF through HCA, is now a "Terry" entity, whereas CLOH remains a "Dondero" entity.

127. However, as that was not the position at the time when the relevant contracts were entered into (November 2017) it is not a feature which could therefore have any implied effect on the intended meaning and effect of those documents, and in any event, the transactions by which the ownership of a majority shareholding passed away from CLOH (in fact, to HarbourVest entities), was the result of CLOH's own voluntary actions.    There is no evidence as to whether or how far the HarbourVest entities were connected with the "Dondero" camp, and if this status had been a matter of significance, then one would have expected it to have been regulated in the documents; there has been no suggestion of any such provision.

128.  However, that is not the complaint which was in fact advanced on behalf of CLOH.  CLOH accepts that it is quite common in the finance industry for a portfolio manager, or adviser, to be also an affiliate or associate of a major shareholder in the company, and that this is not perceived as being unacceptable or seriously objectionable, although where this relationship is envisaged, the Offering Memorandum will (as it does here) record that conflicts of interest may arise with regard to the manager's functions because of its relationship or involvement with other companies or entities, and that a subscriber for the shares shall have no complaint on this score.  In this case, there are enormously extensive warnings about conflicts of interest on the part of the Portfolio Manager contained in the Offering Memorandum, at pages 37 – 40.  They are clearly designed to alert investors to such possibility and to forestall and prevent any complaints on that score.

129. The complaint which was actually pressed on behalf of CLOH was that the retention of a Portfolio Manager in relation to HCLOF's business, at all, was prejudicial to its members (including CLOH) having regard to the fact that HCLOF  was now no longer actively investing (and had not done so since April 2020) and was in "wind-down" mode; the Portfolio Manager agreement was therefore causing excessive and unnecessary high fees to be charged on HCLOF's assets.    In answer to this Mr Boleat on behalf of HCLOF gave evidence that there were still many functions relating to the management of HCLOF's investments, requiring the expenditure of time and effort, to be performed by the Portfolio Manager even if these no longer included actively seeking out or dealing with investments.

130. The Jurats accept this evidence, and it was not really challenged.  Advocate Dunster also pointed out that it was not clear what remedy was being sought by CLOH on account of this complaint, but it would seem to amount to requiring HCLOF to terminate the Portfolio Management Agreement, even though the question whether this was legally possible had not been grappled with.

131. Once again, this dispute seemed to become reduced to a complaint about a management decision of the Directors    Whether because of the above facts, or for some other reason, this complaint was ultimately abandoned by CLOH, and in the judgment of the Lt-Bailiff, this was correct.

**The eventual matters of actual complaint**

132. Four matters were therefore left as matter of substantive complaint pursued by CLOH as constituting "unfair prejudice" under s 349 at the end of the hearing.

**Preliminary point**

133. In each case, the basis of the characterisation of such conduct as "*unfair*" was formulated by Advocate Horsbrugh-Porter, in his final submissions, by reference to his argument that such conduct was a breach of the good faith clause (Clause 20.5 of the Members' Agreement), for being "*commercially unacceptable to reasonable and honest people*", or alternatively that this conduct brought into play "equitable considerations" of constraint on HCLOF which had not been observed, the reason being that the conduct in question hindered the ability of CLOH to get in a position to obtain the "*Redemption Proceeds*" by some "*available avenue*".

134. The Lt-Bailiff has already dismissed these two submissions as a matter of underlying legal principal.   It is emphasised that the consideration of the particular complaints below, as to whether they could amount to "unfairly prejudicial" conduct, is required only if that initial dismissal is held to be wrong.

### (3)   Entry into the 2021 Settlement Agreement

**Backdrop**

135. The Jurats find the situation at the time of the conclusion of the 2021 Settlement Agreement to be as follows, taken from the evidence in Mr Boleat's affidavit which was not really challenged.

136. At the time of the appointment of Mr Boleat and Mr Burwood as Directors of HCLOF in 2020 (with, it is to be noted, the positive support of CLOH at that time), HCLOF was being prevented from realising its interest in the ACIS CLOs, and distributing the proceeds to its investors in accordance with its objectives, by the US Court's injunction prohibiting such redemptions made in the ACIS Bankruptcy Plan of Reorganisation (ie Plan D) on 31st January 2019.    This had been made at the time when ACIS had been in the "Terry" camp, and HCM in the "Dondero" camp, although the landscape had later changed.

137. Reviewing the position, the Directors concluded that the most beneficial course for HCLOF - indeed Mr Boleat described it as the only commercially justifiable action - was to seek to achieve the lifting of the injunction.  This meant reaching a settlement with ACIS to resolve the claims, other proceedings and other possible claims or proceedings between ACIS and HCLOF, and also those facing HCLOF's former Directors, whom HCLOF would be *prima facie* obliged to indemnify under their service contracts.   At the same time, HCLOF was receiving suggestions that early 2021 was becoming an optimal moment in the market to redeem the ACIS CLOs.   Having reassured themselves of the soundness of this approach by taking independent financial advice, the Directors intensified negotiations with ACIS and Mr Terry, through lawyers, ultimately achieving the 2021 Settlement Agreement on 28th April 2021.

**Applicant's submissions**

138. It is not contended that entering into the 2021 Settlement Agreement was outside the powers of Mr Boleat and Mr Burwood as the duly appointed Directors of HCLOF, nor that doing so was not reasonably thought by them to be a step to be taken in HCLOF's best interests. In the light of Mr Boleat's evidence referred to above, this is really inevitable.

139. In the end, CLOH's objections were focused on certain terms of the 2021 Settlement Agreement, namely Clauses 2 (iii), 7 and 9, and in particular the first such term.  Clause 2 (iii) reads, so far as material here:

> *"....HCLOF further agrees that:*
>
> *"(iii) any third party transferees, assignees or successors* [to the HCLOF Subordinated Loan Notes", ie the ACIS CLOs] *shall not be affiliated in any way with James Dondero, CLO Holdco Ltd, the Charitable DAF Fund LP or any other entities owned or controlled by James Dondero, including but not limited to any funds or entities managed by an affiliate of James Dondero".*

- Clause 7 provided for the dismissal "with prejudice", (ie expressly without the right to refile) of certain identified ACIS lawsuits against HCLOF, against HCLOF's former Directors, Mr William Scott and Ms Bestwick, and against HCM also within the various terms, against HCM.

- Clause 9 provided for ACIS and Mr Terry to release, in comprehensive terms, all their claims against HCLOF itself, its successors, assigns, agents, advisers, and representatives, officers and its former Directors by name, but excluding, expressly and by name (although presumably for the avoidance of doubt) any such release as regarded CDAF, or any of its subsidiaries including CLOH, and also against Mr Dondero and other named persons related to or associated with Mr Dondero.

- HCLOF gave similarly wide reciprocal releases in Clause 10, in favour of ACIS, Mr Terry, Brigade, US Bank National Association, Moody's Investor Services, the ACIS CLOs and others, and their respective successors, assigns agents, officers advisers and directors, etc.

140. In his closing submissions on behalf of CLOH Advocate Horsbrugh-Porter concentrated on Clause 2 (iii).  He submitted that HCLOF's agreeing to this clause was prejudicial to CLOH because it prevented HCLOF from making an *in specie* distribution of the ACIS CLOs to CLOH "*as a shareholder*", thus preventing a valuable "exit" route from the company for CLOH (ie by the implementation of such an *in specie* distribution, as CLOH has been pressing for) and consequently prejudicing CLOH by preventing it from subsequently taking direct action against US Bank, after such an *in specie* distribution had been effected - presumably through *locus standi* gained through then being the direct holder of some ACIS CLO Notes.

141. CLOH's primary contention was that this clause was an unnecessary clause to put in the 2021 Settlement Agreement, having regard to its purpose and its machinery.   It was even, apparently, submitted that this lack of necessity suggested that its inclusion must have been prompted simply from a wish to damage CLOH.

142. As regards the other clauses referred to (Clauses 7 and 9 in particular) the objection appeared to be, that these clauses, and the specific exclusion of CLOH from the benefit of the ACIS releases being granted, was indicative of bias against CLOH, or favouritism of the interests of others rather than CLOH, and was "unfairly prejudicial" on this score.  This last point was not really pressed, however, in Advocate Horsbrugh-Porter's final position.

**Respondent's submissions**

143. Advocate Dunster submitted, first, that there was no challenge to Mr Boleat's evidence as to the merits and desirability of achieving the position achieved by the 2021 Settlement Agreement, as regards paving the way to redeem the ACIS CLOs, reducing legal costs and

reducing indemnity liabilities to the former Directors, and that this was perceived by the Directors, and reasonably perceived, to be in the best interests of HCLOF.   He also pointed out that, at the time of the 2021 Settlement Agreement, there had been no suggestion that CLOH was seeking any *in specie* distribution of HCLOF's assets as a means of exiting the fund; that suggestion was only first broached in Mr Murphy's letter of 10th November 2021.

144. Furthermore, this was not something to which CLOH had any right as a shareholder.  It was (he submitted) even contrary to the terms of the Offering Memorandum, which stated very clearly that "*Shareholders have no right to have their Shares redeemed or repurchased by the Company*".    There was therefore no reason why the Directors should have considered the impact of the terms of the 2021 Agreement on that possibility, still less any evidence that there was an intention to frustrate such possibility.

145. Mr Boleat also gave evidence that the restriction on transfers of HCLOF's assets was a requirement of ACIS (as to which the reasons are fairly obvious, from the circumstances) and were regarded by the Board as being of no practical disadvantage to HCLOF at all, not least because the intention at that time, was to liquidate the ACIS CLOs as quickly as possible, converting them into cash which would be paid back to shareholders, so that the possibility of an *in specie* distribution was theoretical only.

146. In summary, he submitted that the evidence shows that none of the Clauses complained about infringed any contractual right of CLOH; it could be seen that Clauses 7 and 9, did not infringe any right of CLOH, but benefitted HCLOF generally and also because they released claims against other parties, as to which HCLOF could have become liable on contractual indemnities.  The whole 2021 Settlement Agreement plainly benefited HCLOF and, more importantly was reasonably and honestly seen by the Directors to do so.  The effects of the 2021 Settlement Agreement therefore could not be the basis for any viable submission that the conduct by which it was obtained amounted to conduct which was unfairly prejudicial to the interests of the members of HCLOF in general, or CLOH in particular, as such a member.

**Discussion and conclusion**

147. The first consideration is whether Clause 2 (iii) could be said to prejudice CLOH's rights as a member of the company.    Advocate Dunster argues that it cannot, because it only prejudices the possibility of CLOH ever gaining direct title to the ACIS CLOs, and this is not a right that CLOH ever had, as a shareholder of HCLOF at all.

148. The Lt-Bailiff agrees.    She accepts Advocate Dunster's argument noted above at [144], although it does appear to depend somewhat on the phrase "*redeemed or repurchased*" being capable of encompassing a surrender of shares in return for an *in specie* distribution of ACIS CLOs, rather than for cash; the Offering Memorandum seems, rather, to be ruling out CLOH's alternative proposal of a buyback.  However, the Lt-Bailiff does accept that it is fair to say that an *in specie* distribution of HCLOF's investments appears to be outside the contemplation of the Offering Memorandum.  The point that CLOH has never enjoyed any right as a shareholder to be able to acquire the underlying assets of HCLOF is a strong one.

149. The final submissions of Advocate Horsbrugh-Porter, describing the detrimental effects on it of which CLOH complains (see [140] above) show that the prejudice which CLOH perceives it has suffered is, really, to the prospect of getting itself into a position to pursue mismanagement claims against ACIS (and possibly Mr Terry) through being the actual direct owner of ACIS CLOs.        However, the preservation of the opportunity for a shareholder to acquire an interest which will provide a means of leveraging a dispute with a third party is not, in the Lt-Bailiff's judgment, a prejudice suffered in connection with its interests *as a member of the company*.

150. The Lt-Bailiff felt, at times, that Advocate Horsbrugh-Porter's argument appeared to be tantamount to a submission that the Directors of HCLOF owed a duty to act evenhandedly between shareholders - obviously, in particular, CLOH and HCM, bearing in mind that their respective personal positions had by then come into conflict with each other within the wider landscape of interests and disputes between "Dondero" and "Terry" entities.  It appeared to be being suggested that there was an unacceptable element of bias in their actions, exemplified by Clause 2(iii) of the 2021 Settlement Agreement, which expressly singled out CLOH (though amongst others) for disadvantageous treatment not meted out to HCM, and Clause 9 which, again expressly singled out CLOH and its affiliates for emphatically not being accorded the benefit of the "*ACIS Releases*".

151. The Lt-Bailiff rejects any such implicit submission.  It contends for a parallel with the duties of trustees to act even-handedly between beneficiaries, but the situation here is entirely different.  The fiduciary duty of company directors is to act in the best interests of the company as a whole - in effect, its enterprise, although this is conveniently described as a duty owed to the impersonal "general body of shareholders".  It is no part of a company director's general duties to consider or take account of the personal interests or circumstances of particular shareholders when considering the general question, what is in the best interests of the company, in general?  In fact, any such proposition would be entirely unworkable in practice.  Considering the best interests of one individual shareholder or set of such shareholders and any attempt to further, or not damage, these, would almost inevitably lead to a failure to do the same as regards the interests of another shareholder or set of shareholders. It would also, in any event, be all too likely to put directors in an impossible position of conflict of interest.

152. As regards the submission that the clause was "unnecessary" the Lt-Bailiff considers this to be entirely beside the point.   Once it is accepted (as is Mr Boleat's unchallenged evidence) that Clause 2(iii) was a provision which was sought and required by ACIS, the question for the Directors was then simply whether, taking the balance of advantage and disadvantage, agreeing to its inclusion was in the best interests of HCLOF with a view to achieving the most beneficial position for it overall.   That is a matter of business judgement, and is a decision quite well within the ambit of what would be a reasonable decision in the circumstances.

153. The Lt-Bailiff therefore rejects this argument of unfair prejudice, on the grounds that, as formulated by Advocate Horsbrugh-Porter, it does not disclose any prejudice to the interests of members of HCLOF, or to a part of such membership including CLOH, as members of the company.

154. For completeness though, but also to illustrate the distinction between the interests of CLOH personally and the interests of CLOH as a member of HCLOF, the Lt-Bailiff notes that it might be possible to discern some prejudice in the latter capacity, on the basis of the following analysis.

155. In agreeing to the restriction on transferees laid down in Clause 2(iii), the Directors did, in effect, fetter their discretion as to the persons to whom they would consider selling the ACIS CLO Notes owned by HCLOF.   They thereby limited the market for the disposal of such CLO Notes.  If they were ever to sell those CLO Notes, they would, in the normal case, expect to sell to the highest bidder, but would now do so in that restricted market.  They would thereby prevent HCLOF, and by extension its shareholders, from gaining the possible increased financial benefit (a higher payment for the relevant CLOs) which might be obtainable from any of the excluded parties as a potential special purchaser of such Notes, because of a perceived collateral advantage in making such purchase (as demonstrated by Advocate Horsbrugh-Porter's argument).  Thus, this limiting of the market could be argued

to have created a prejudice to the members of HCLOF generally, by potentially reducing the realisable value of their interests.

156. Mr Boleat's evidence was that the restriction did not appear to the Directors to affect HCLOF materially because once the instruction had been given to liquidate the CLOs, as the Directors intended, those CLOs would have no assets in them and would be valueless. Thus, this particular point does not appear to have been considered.

157. However, the Lt-Bailiff does not consider that this arguable shortcoming would make any difference to the ultimate position here (and she therefore did not think it necessary to ask for any further argument from the parties upon it) for the following reasons.

158. First, the analysis that such prejudice actually occurred is highly speculative; it owes more to theory than to any reality in evidential fact.   Second, this is backed up by the fact that CLOH apparently did not perceive this prejudice (ie the potential forgoing of an element of value in HCLOF's underlying assets) as actually occasioning any damage to its (CLOH's) interests at all, because it never raised this point, whilst making very many others of greater or lesser substance.   Third, Clause 2(iii) was not entered into in isolation but as part of a package deal contained in the whole of the 2021 Settlement Agreement and the question whether any potential prejudice caused by Clause 2 (iii) was adequately compensated by the benefits of other aspects of the whole package was a matter for the business judgment of HCLOF's Directors.   To decide to accept this clause was, in the Lt-Bailiff's judgment, *prima facie* well within the ambit of an objectively reasonable business judgement by directors of HCLOF in all the complicated set of circumstances pertaining, even if the Directors themselves had not directly evaluated this particular point.   The company itself could not have raised any complaint (see *Carlyle Capital Corporation Ltd v Conway* (2017) Royal Court Judgment 38/2017 at [393] and [395]).

159. As CLOH did not take this point at all in its argument, that really is enough to dispose of it in practice.   However, insofar as the situation could be thus perceived to give rise to some element of prejudice (to refer back to the words of s 349 (1) of the Companies Law) "*to the interests of members of [HCLOF] generally*" (as contrasted with, merely, to the personal interests of CLOH, which was what was argued), and insofar as such element of prejudice had any substance in fact rather than merely commercial theory, the Court is of the view that it would not, in all the circumstances, amount to <u>unfair</u> prejudice, bearing in mind that it is, *ex hypothesi* here, the interests of the whole membership of HCLOF which is the factual situation being considered, and the effect upon which CLOH would be complaining about. Moreover, on any basis, the Court would not think it appropriate to exercise its discretion to grant any relief to CLOH in respect of such postulated prejudice, in all the above circumstances.

**(4)   Intervening in the NexPoint Litigation; coupled with**
**(5)   Failure to sue US Bank to obtain the retained Redemption Proceeds.**

160. These complaints can conveniently be taken together, here, as they are next in point of time, and they are argued on an interlinked basis by CLOH.

## Backdrop

161. After the 2021 Settlement Agreement procured the lifting of the injunction which prevented HCLOF from seeking redemption of its ACIS CLOs, HCLOF was able to and did instruct US Bank to effect redemption.   US Bank had not been a party to the 2021 Settlement Agreement.   Mr Boleat's evidence was that the Directors expected that there would be an immediate and smooth release of the Redemption Proceeds by US Bank to HCLOF's investors, as a dividend distribution in accordance with their rights.   However, US Bank,

instead, asserted a right to retain such proceeds as security for its contractual indemnity against costs, expenses or liabilities incurred by it as indentured Trustee of the relevant CLOs, claiming to be at clear risk of incurring such costs, expenses or liabilities in various lawsuits, current, potential and future, which it faced from entities controlled by or connected with Mr Dondero.    Acting on these asserted rights, US Bank refused to release $41.5Mn of the proceeds.

162. There was obvious objective justification for US Bank's claimed fears.   First, there were the two claims brought by CLOH itself amongst others in late 2019/early 2020 each withdrawn, but reserving the right to bring them again, combined with the fact that the claiming parties had refused to confirm later that these proceedings were unconditionally withdrawn, and indeed a threatening letter on behalf of CDAF and CLOH had been written in May 2020.

163. Second, at the same time as the CLOs were being redeemed, and further justifying US Bank's expressed fears, NexPoint – a Dondero entity - commenced an action against ACIS, Mr Terry, Brigade and US Bank as a minority 13% noteholder in ACIS-6 (possibly amongst other investments) alleging breach of fiduciary duty in the management of certain CLOs by ACIS.

164. Whilst the Directors of HCLOF were advised in June 2021, that US Bank's retention of the Redemption Proceeds was unlawful, US Bank disagreed - and of course it still held the funds.   The Directors of HCLOF therefore needed to consider how best to deal with this situation, in what they judged to be HCLOF's best interests.   In principle, of course, this meant deciding on the best, most cost-effective and potentially successful, route to recovery of the retained money.

165. The Directors took advice.   This has been adduced in these proceedings, but in redacted form, with its full contents sealed, in view of their privileged nature, and the sensitivity of particular comments being brought into the public domain against this hostile and complicated litigation background.   During the second half of 2021 the Directors sought, through their lawyers, to persuade US Bank that their retention of the funds was not lawful, but US Bank was adamant.

166. HCLOF plainly had two broad potential courses of action.   The first was to seek to negotiate a way to get US Bank to agree to release the proceeds, which effectively meant having all the current and potential litigation terminated ("Option 1").   The second was to sue US Bank for the release of the proceeds ("Option 2").   Having considered detailed advice as to the merits of each option, taken from three eminent US law firms, the Directors decided that the better course was Option 1.    The disadvantages of Option 2 - apart from the sheer litigation risk that, however, strong they thought their case was, it might not succeed - were the time that this would be likely to take, and also the fact that involving US Bank directly in proceedings would invite it to use and deplete the funds it was retaining in defraying its own legal costs.

167. The Directors also decided, again on advice, that intervening in the NexPoint litigation in the way which was chosen, (which they did in December 2021 in the Federal case, and again in November 2022 in the State case) would be a cost-effective part of this course of action, because they could assist in getting the NexPoint action struck out, in which case the justification for US Bank to retain moneys against the likely costs of, at least, that action would disappear.   Since NexPoint was only a minority shareholder in ACIS-6, holding only 13% of the shares, the presence of HCLOF in the action, as both the majority shareholder and in support of the point that NexPoint's interest was below the 25% interest which the terms of ACIS-6 laid down as the minimum interest required in order to launch mismanagement claims, was thought to add considerable weight to resisting such claims.

(At the time of writing this judgment, the US court's judgment in the US application to strike out NexPoint's claim is awaited shortly).

### The complaints

168. CLOH's complaint is that HCLOF did not take Option 2 and simply sue US Bank when they should have done, because they had received clear advice, which they believed in (and indeed, relayed to shareholders in a Directors' report at the time) that the retention was unlawful.   This is the fundamental complaint, with the intervention in the NexPoint litigation being criticised as a part of that alternative, unjustified, strategy.

### Applicant's submissions

169. Essentially Advocate Horsbrugh-Porter's submission is that it was unfairly prejudicial conduct of HCLOF to choose the Option 1 approach – seeking, without resort to the courts, to bring about a situation where US Bank would accept that there was no need for them to retain the Redemption Proceeds or any part of them – in preference to the Option 2 approach – that of simply suing for their release – with the intervention in the NexPoint proceedings being a particular aspect of this.

170. He submits that intervening in the NexPoint Litigation was unfairly prejudicial to CLOH because

    (i)        it directly affects CLOH's right to receive the Redemption Proceeds, it was obviously doomed to failure, given the litigious nature of the Dondero and Terry entities, and it did not deal with US Bank's known stance that there was potentially "future" litigation justifying retention, not just the NexPoint action;

    (ii)      it would be a far longer process than simply suing directly to recover the retention monies;

    (iii)     it would be using HCLOF money wastefully, simply to duplicate defences already raised by ACIS, US Bank itself, Mr Terry and Brigade;

    (iv)     it would be a more costly process than simply taking direct action; and

    (v)      it was actually seeking to use HCLOF monies to strike out an action which, if it succeeded could bring in about $50Mn of recoveries for HCLOF itself.

171. He submits that failing to sue US Bank to recover the proceeds in the summer of 2021 was unfairly prejudicial to CLOH because

    (i)        it similarly directly affects CLOH's right to receive the Redemption Proceeds;

    (ii)      doing so accorded with the Directors' expressed view in the summer of 2021 that US Bank's withholding such proceeds was unlawful;

    (iii)     doing so was quicker and cheaper than the "negotiation and pressure" route; and

    (iv)     doing so was in fact the only route by which CLOH could receive its share of the Redemption Proceeds given the terms of the 2021 (and later the 2023) Settlement Agreement.

172. Advocate Horsbrugh-Porter relies on the fact that the Directors advised shareholders, in the summer of 2021, that the retention of the Redemption Proceeds by US Bank was unlawful, without caveat or qualification. Therefore, the obvious and only right course was to take proceedings in accordance with that view.

## Respondent's submissions

173. Advocate Dunster submits that these complaints boil down to complaints about the commercial decisions as to the best route forward in HCLOF's interests. They are therefore, effectively, complaints about management decisions, taken in good faith by the Board for what they reasonably perceived to be those ends, and as such they do not provide a legal foundation for a finding of "unfairly prejudicial conduct" on any basis.

174. Elaborating, he submits that Mr Boleat gives a clear explanation as to why direct legal proceedings were not taken, on the basis of legal advice about the totality of legal and procedural considerations, and the consequent relevant commercial implications (those advices being confidentially exhibited to his affidavit, and therefore not recited here). He points out that CLOH has not identified any errors in the advices given to the Board, which CLOH would have to show was so obviously wrong that the Board should not have followed it. As this advice depends on US Law and procedure, any such contention would require to be backed by expert evidence, but CLOH has not sought to adduce any. Instead this whole assertion relies on the opinion of Mr Murphy, who admitted he was not an expert in New York Law, but opined that the case had a 70%-80% chance of success which was well within the bounds of what he would regard as mere "litigation risk", so that he himself would have advised that HCLOF should go ahead and sue. Advocate Dunster submitted that was an astonishingly arrogant approach to take on any basis, but it was certainly insufficient to support any finding that the contrary approach was unfairly prejudicial to any shareholder.

175. Advocate Dunster further pointed out that CLOH had produced no evidence to support the proposition that HCLOF (and therefore its shareholders) would have been better off, now, if HCLOF had taken direct proceedings against US Bank in the summer of 2021; that proposition was merely assertion. CLOH has therefore failed to <u>prove</u> any prejudice to its interests as a member of HCLOF, at all.

176. Specifically as regards the decision to intervene in the NexPoint Litigation, Advocate Dunster submitted that Mr Boleat had once again explained why the Board saw this as being in the interests of HCLOF – namely that the dismissal of the NexPoint litigation would remove the basis for US Bank's retention of at least part of the Redemption Proceeds and make it more likely that it would release at least some of them to HCLOF, and he was not challenged on this evidence, which was supported by some of the confidential legal advice; all that was put to Mr Boleat was that HCLOF's intervention was not necessary, because ACIS and US Bank were themselves defending the proceedings.

177. In summary, this was, he submitted, once again, a commercial decision by the Board, taken, obviously, perfectly reasonably and (as was not challenged) in good faith. It was not suggested to have breached any rights which CLOH had under the contractual documents. Finally, no prejudice to CLOH as a shareholder had been suffered, the only prejudice alleged being the unsupported assertion, for which there was no evidence, that HCLOF would have been "better off" if the Board had not made the intervention.

## Discussion and conclusion

178. The Court unhesitatingly prefers Advocate Dunster's submissions on these two linked topics. There is ample evidence that the Board made carefully considered, and apparently reasonable decisions, based on taking appropriate advice, as to which approach to obtaining

release of funds to HCLOF from US Bank was most likely to be cost-effective.    The decision to pursue the approach of trying to remove US Bank's own reasons for wishing to withhold the monies, as opposed to the confrontational approach of simply suing them and relying on the legal advice obtained being ultimately – and how long and how expensive "ultimately" might prove to be could not be regarded as clear – held to be correct, is a decision perfectly, it seems to the Court, within the range of decisions which a reasonable board of directors might take in the circumstances of this case.    The Court agrees with Advocate Dunster that Advocate Horsbrugh-Porter's submission that suing US Bank rather than seeking to achieve the release of funds by other means would be cheaper and quicker than taking this latter course is simply assertion, with no evidence either adduced or appearing, to support it.

179. The Court finds that CLOH's submission that this amounted to unfairly prejudicial conduct towards it really does simply come down to the fact that it is conduct with which it (more accurately its current director, Mr Murphy) does not agree.    That is not sufficient grounds for a finding of unfairly prejudicial conduct.    Moreover, CLOH has not proved to the satisfaction of the Court that there has been any actual prejudice suffered by it as a result of these actions.    Still less has it proved that such conduct has prejudicially affected CLOH's interests *as a member of HCLOF* unfairly.

180. It should be expressly recorded that the fifth point submitted (see [170] above) by Advocate Horsbrugh-Porter to amount to prejudice suffered as a result of the intervention in the NexPoint Litigation, (namely that intervention to try to get the NexPoint litigation struck out in respect of the ACIS-6 CLOs was using HCLOF's funds to defeat a claim (of breach of duty) which if successful, would have brought significant moneys in to HCLOF) was not, so far as the Court can see, raised in argument or evidence prior to Advocate Horsbrugh-Porter's closing speech.  In particular it was not put to Mr Boleat in evidence.

181. In the Lt-Bailiff's judgment, it is not open to CLOH to rely upon this point in those circumstances. However, even if that were permissible, such a point appears to be entirely speculative, and the weight which could be attached to it as a factor supporting a criticism of the Board's decision is impossible to assess.    The *Court* is therefore not satisfied that even those asserted facts could be sufficient to found a finding of unfairly prejudicial conduct towards CLOH, whose interests on this point are no different from those of any other shareholder in HCLOF.

**(6)   Entry into the 2023 Settlement Agreement**

**Backdrop**

182. By this time, US Bank and ACIS had launched their own action, the December 2021 Declaratory Action, seeking declarations that none of the designated Dondero entities had viable claims against them, prompted by those entities' (including CLOH) refusal to confirm that they were not going to bring proceedings.    However, those entities, including CLOH, had filed counterclaims, seeking their own declaratory relief, and these proceedings had continued, in amongst the other litigation noted above, during the following year.

183. Meanwhile, in line with its chosen strategy to obtain release of the Redemption Proceeds retained by US Bank, the Directors had sought to negotiate with US Bank, and also, necessarily, with ACIS, who were embroiled in claims for which indemnities could be claimed against HCLOF, to try to secure the release of at least some of the $41.5 Mn being retained by US Bank.  Those negotiations culminated in an agreement in escrow in December 2022, which became unconditional and effective on 28th February 2023 – apparently, indeed, triggered by the decision of the Texas Court that CLOH did not require the permission of the Texas Court to launch these proceedings against HCLOF.

184. The 2023 Settlement Agreement contained extensive recitals of the state of the various Reserve Funds held in respect of each of the ACIS CLO Notes, and the potential claims for indemnity by US Bank as Trustee, and ACIS entities as Portfolio Manager and Collateral Administrator of such Notes (as there defined). It provided also for the release from such reserves to HCLOF of a total of $16.5 Mn, (about 40% of the entire reserve) which was then distributed to HCLOF's shareholders in March 2023. The Agreement contained provisions for reporting to HCLOF by US Bank and ACIS of the state of the reserves continuing to be held thereafter, and provisions preserving the rights of HCLOF to pursue its claim to the remainder of the sums, but also that the parties would negotiate in good faith about their continuing dispute.

## The complaints

185. CLOH's eventual complaints focus on three particular paragraphs of the 2023 Settlement Agreement, namely paragraphs 4(b), 6 and 12(a). It argues that HCLOF should not have agreed to these terms, and that its conduct in doing so was unfairly prejudicial to CLOH. It complains that these terms, coupled with the previous conduct already referred to, have left CLOH in an inescapable situation in which it is *"trapped in perpetuity"* with no prospect of receiving the share of the $41.5 Mn Redemption Proceeds to which it is entitled.

## Applicant's submissions

186. As to Clause 4(b), by this clause HCLOF agreed to forbear from taking steps (declarations of default, or proceedings) to obtain release of the proceeds of the ACIS 4 and ACIS 5 Notes until after the very final disposal of the Declaratory Action (of 24th December 2021), with the parties (ACIS, US Bank and HCLOF) agreeing thereafter to meet and confer in good faith about potential distribution of the relevant reserves and further release of claims. By Clause 4(c) similar provisions were made in respect of the reserves retained in relation to ACIS-6, although no complaint is actually made by CLOH with regard to this.

187. CLOH submits that Clause 4(b) by preventing distributions until the termination of the litigation, thus ties the relevant funds up for a long and uncertain amount of time. In addition, the ultimate proviso is not even for payment, but merely for discussion and negotiation about possible payment. It therefore lacks any contractual bite and there is no guarantee of the release of the funds at all. It also puts (it is complained) undue pressure on CLOH to withdraw its counterclaim in the Declaratory Action. It is submitted that all this is unfairly prejudicial to CLOH.

188. As to Clause 6, by this clause HCLOF agreed to cooperate with US Bank and ACIS to pursue actions to recover fees, expenses and other liabilities from NexPoint in relation to the NexPoint Litigation, from NexPoint, CDAF and CLOH itself in relation to the Declaratory Action, and against any Dondero entity (including NexPoint CDAF and CLOH) which pursued litigation related to the ACIS CLOs. CLOH submits that by authorising HCLOF's funds to be spent in actively assisting third parties to sue it (CLOH) as HCLOF's own shareholder, and committing time and resources to pursuing it as such, this is conduct which is unfairly prejudicial to it.

189. As to Clause 12(a), by this Clause HCLOF agreed, once again, that any sale or transfer of the "HCLOF Notes" (that is, the ACIS CLOs) should provide (i) that the relevant transferee and its successors should be bound by the terms of the 2023 Settlement Agreement, and also (ii) that any such transferees should not be affiliated in any way with CDAF, CLOH, NexPoint, Mr Dondero or any entities owned or controlled directly or indirectly by Mr Dondero or any funds or entities managed by an affiliate of his, and further (iii) that HCLOF would not consent to, and would do all in its power to prevent, the transfer of its management

of, or discretionary control over, its assets, or the transfer of the HCLOF Notes, to any Dondero entity.

190. CLOH submits that this has prevented it from availing of a valuable "exit route" from HCLOF via an *in specie* distribution, and prevents it from taking direct action against US Bank after such a distribution, and "*guarantees*" that US Bank will not release the reserves in the light of their letter of 13th August 2021  (this is the letter which set out US Bank's reasons for retaining part of the Redemption Proceeds in the first place).

191. CLOH also complains that holding the 2023 Settlement Agreement in escrow until the Texas Bankruptcy Court made its order of 27th February 2023 was reprehensible conduct, because it pressurised CLOH, unduly, to withdraw this Application.

192. Advocate Horsbrugh-Porter also submitted, generally, and he persisted in this in his closing submissions, that entering into the 2023 Agreement could be seen, in all the circumstances, to be an attempt to "*stifle and sabotage*" CLOH's exit proposals to enable it to part ways with HCLOF and, with its timing, was a "*cynical attempt to stave off*" this Application. These features were, he submitted, commercially unacceptable conduct, which was unfairly prejudicial to CLOH, and entitled it to relief.

## Respondent's submissions

193. Advocate Dunster submits that the starting point, based on Mr Boleat's effectively unchallenged evidence, is that these were the best terms available if HCLOF wanted to secure the release of at least some part of the Redemption Proceeds, and it in fact achieved the release of a significant part.   Furthermore, it is not alleged that entering into any of the terms complained of was any breach of HCLOF's Articles of Association or the Members' Agreement (except in the general respects of lack of good faith which have already been dismissed above).

194. As to the "standstill" agreements in Clause 4, he points out that they are, simply that – standstill agreements.  They do not forgo or release any rights or claims by HCLOF, and are thus of negligible, if any, disadvantage.  He submits that it is simply wrong to argue that entering into such a standstill agreement placed "unfair" pressure on CLOH to withdraw its counterclaim in the Declaratory Action.    HCLOF was obliged and entitled to take what steps appeared to be *in the interests of HCLOF* in the situation where CLOH might, or might not, proceed with such counterclaim.   In addition, it must be likely that the US courts would have put such litigation on hold until the disposal of the NexPoint litigation and the Declaratory Action and Counterclaims, in any event.

195. As for Clause 6, he submits that this clause was self-evidently for HCLOF's benefit because, as pointed out by Mr Boleat in his evidence, any recoveries which were made would swell HCLOF's assets.   He submitted that the suggested prejudice was not suffered by CLOH as a member of HCLOF but, and clearly only, as a litigating party.

196. As for Clause 12(a)(ii), this Clause self-evidently largely replicated the existing prohibitions contained in Clause 2(iii) of the 2021 Settlement Agreement, and therefore, Advocate Dunster submits, in itself it effected no prejudice against CLOH at all.   Once again, in any event, it disclosed no arguable prejudice to CLOH in the capacity of a member of the company.

197. Finally Advocate Dunster resists, strongly, any submission of reprehensible or unconscionable conduct by the Directors, which he submits should not have been made or persisted in.    The clear evidence is that the Directors acted solely in what they honestly perceived to be the best interests of HCLOF, as was their duty.   If their actions are perceived

to cause damage to CLOH, then it is because of CLOH's separate status as a litigating party, or as a member, also, of the Dondero entities group, but not as a member of HCLOF and certainly not in a manner or to an extent which could justifiably be said to be unfair.

**Discussion and conclusion**

198. The Court once again prefers the submissions of Advocate Dunster to those of Advocate Horsburgh-Porter, and for much the same reasons generally, as it has found to apply in relation to each of CLOH's individual matters of complaint.

199. The Jurats accept Mr Boleat's evidence that the 2023 Settlement Agreement was pursued and negotiated on the basis of genuinely seeking the agreement that was most beneficial to HCLOF in the circumstances.   The Court can see no prejudice to CLOH as a member of HCLOF in any of the matters challenged by Advocate Horsbrugh-Porter in relation to the 2023 Settlement Agreement, nor that any of the matters complained of were unfair, in all the circumstances.

200. CLOH's arguments in themselves show, once again, that any prejudice of which it is complaining is in reality prejudice to its interests as a litigating party, or as an affiliate of the Dondero group of entities, rather than as a member of HCLOF.      Furthermore, its complaints about particular decisions themselves are really complaints about management decisions taken by the Directors, decisions which it is not entitled to control but with which it disagrees, in its own particular interests.

201. The fact that CLOH's complaints are made from its viewpoint as a litigating party rather than as a shareholder is illustrated by the fact that one such complaint, pursued in this Application has even been an allegation that it was reprehensible conduct by the Directors of HCLOF, against CLOH's interests, to enter into the 2023 settlement in escrow, dependent, apparently, on it being settled that CLOH was entitled to pursue this foreshadowed application.   Viewed from a neutral standpoint, taking this step can be seen to be a perfectly reasonable step in the best interests of HCLOF, which the Directors were obliged to protect, when threatened with such an application.

202. This also illustrates why CLOH's approach, that the Directors were somehow "unfairly" disadvantaging CLOH in contrast with other shareholders simply cannot found a viable claim of *unfairly* prejudicial conduct by HCLOF.   If the Directors refrained from taking a step which would be in the interests of HCLOF as they perceived it, because it worked independent disadvantage to a major shareholder (CLOH), they would not only be in breach of their fiduciary duty to HCLOF, but would also by the standards of CLOH's own argument, be acting unfairly prejudicially to the interests of the other part of the shareholder body.

203. CLOH's rights as a member of HCLOF were, and are, to have HCLOF's affairs conducted properly and competently by its Directors, in accordance with, and in the apparent best interests of, HCLOF's function as a closed-ended investment scheme as described in its Offering Memorandum, its Articles of Association and the Members' Agreement.   CLOH had no further rights grafted on to this regime, and has no grounds for complaint under ss 349 and 350 of the Companies Law if measures lawfully taken by HCLOF in its own best interests should work to its perceived actual or relative (to other shareholders') disadvantage, because of CLOH's individual position.

204. CLOH is entitled to the benefit of the arrangements in HCLOF's constitutional documents. Insofar as CLOH might have been able and wished to avail itself of an opportunity to negotiate an arrangement which was outside the ambit of those constitutional documents, such an opportunity was merely a general commercial opportunity.   It has no special

protected significance.   It was not a right enjoyed by CLOH as a member of HCLOF, and the fact that its inclination or enthusiasm to pursue such opportunities might be influenced by the fact that it is a shareholder in HCLOF can make no difference to this.

205. CLOH argues that the matters of unfair prejudice of which it complains can if necessary be regarded in combination, and would then amount to unfairly prejudicial conduct on this basis.   Having considered and rejected CLOH's complaints individually for the reasons given above, the Court confirms that it rejects this argument.   Taking all CLOH's complaints in combination does not increase their weight, nor, in particular, does the totality of them become prejudice to CLOH's interests as a member of HCLOF when the individual component parts are not.

**Relief**

206. This can be dealt with quite shortly, in view of the fact that the Court has rejected CLOH's case that it is entitled to any relief.   It should, however, be dealt with for completeness.

207. Assuming that CLOH had established its case of unfairly prejudicial conduct, it sought by way of relief in its Application, an order that it should transfer its shares in HCLOF back to HCLOF, in return for HCLOF transferring to it full legal and beneficial title to the assets of HCLOF in the proportion (49.015%) of CLOH's shareholding in such assets, either by way of a redemption of shares, or a share buyback.   These transactions were known as the "Exit Proposals".

208. However, as had been pointed out to CLOH, and as Advocate Dunster submitted in his argument, there were three reasons why the court could not, or should not, order such relief.

209. The first is that HCLOF is not lawfully competent to undertake the share buyback proposed in the Exit Proposals because of the provisions of s 314 of the Companies Law, which requires a buyback of a company's shares to be authorised by an ordinary resolution of the company's membership.   This would therefore require the support of HCM, as the majority shareholder, and that support had been enquired about, but is not forthcoming.

210. Second, the position is actually more acute, because under s 3.2 of the Members' Agreement, it was provided (for the protection of shareholders' rights *inter se*) that HCLOF cannot take any action at any meeting requiring the sanction of an ordinary resolution of the company without that, in fact, being authorised by an extraordinary majority, namely an affirmative vote of 75% of the members.   This provision expressly refers to actions such as the "*conversion or redemption of shares"* (except in particular circumstances of default, not applicable here): see Clause 3.2.3. Once again, the required majority could not be obtained without the support of HCM as majority shareholder which is not forthcoming.

211. The third reason is that making any order for an *in specie* distribution would override the contractual rights of third parties under Clause 2(iii) of the 2021 Settlement Agreement or Clause 12(a) of the 2023 Settlement Agreement, and the Court will not make orders pursuant to its statutory jurisdiction under s 350 of the Companies Law which have that effect.

212. Advocate Dunster submits that the third reason is insurmountable, because it is established that the Court will not grant discretionary relief - which is what the power pursuant to ss 349 and 350 is - which infringes the contractual rights of third parties (or requires something which the respondent cannot lawfully do): see *Warmington v Miller* [1973] QB 877 at 886. In addition, the courts are warned, in any event, about making orders for distributions *in specie*: see *Re Neath Rugby ltd (No 2)* [2007] EWHC 2999 (Ch) at [250].

213. The two former reasons are also insurmountable at present, because HCM is not a party to the Application, so that it cannot be bound by any order which might be made by the Court under which, possibly, its refusal of consent might be overridden, (without conceding that the Court could, should or would do so).    This difficulty, moreover, would not be surmountable either, at present, because HCM cannot be convened as a party to this Application without the permission of the Texas Court, because doing so would fall foul of the gatekeeper provisions in the HCM Bankruptcy proceedings.

214. Because of those difficulties and other practical difficulties which it perceived about the grant of relief in any other form which might normally be contemplated in an application of this type, immediately before closing speeches in the hearing, CLOH notified HCLOF that it would be seeking a different form of relief.   This was an order that HCLOF should effect a buy out of CLOH's shares, apparently for cash, at a full price proportionate to their relative share of HCLOF's NAV, in two parts, namely an immediate purchase within 14 days of 85% of such holding, with the remaining 15% being purchased once the US proceedings (presumably the Declaratory Action) had been concluded.

215. The background to this was no doubt the offer of 28th June 2022 by which HCLOF had revealed that they had sufficient cash in hand to re-purchase all the shares of all the minority shareholders at 85% of their relative NAV value.    At that time CLOH had refused to accept that there should be a minority discount applied to the NAV figure, and so the offer had lapsed, but the making of it suggested that HCLOF would have enough funds to implement the first part of CLOH's proposed buy out.

216. Advocate Dunster's response was that this form of relief was not only not justified on the facts, nor supported by legal principle, but was in fact impossible for the court to grant. Apart from his general submissions that CLOH's claim failed on its merits, and laying aside any argument about whether or not any valuation of the shares would properly require a minority shareholding discount to be applied, (which he submitted, it did: citing *Shanda Games Ltd v Maso Capital Investements Ltd* (Cayman Islands) [2020] UKPC 2 at [38] and [42]) he submitted that it was impossible to calculate NAV properly without taking into account the wholly unquantifiable contingent liabilities of HCLOF which were contingent on the outcome of several sets of contentious US proceedings.     Equally, there were contingent in-flows of cash, in the shape of possible litigation costs recoveries, which might replenish the sums taken from the retention reserves by US Bank to fund its own defence costs.  No relief dependent on a valuation of HCLOF's undertaking was therefore capable of accurate or fair quantification.

217. Perhaps most significantly, the relief suggested by CLOH would still infringe the first two objections noted above, namely that, without HCM's consent, it would infringe both s 314 of the Companies Law and would "ride roughshod" over the terms of Clause 3 of the Members' Agreement.

218. Since the Court has already concluded that CLOH's application fails on the merits, it is not necessary for the Court to decide the above points.  It records, however, and admittedly without having heard extensive argument in all the circumstances of this case, that it would be inclined to accept the objections raised by Advocate Dunster on behalf of HCLOF. Where that would have left the matter, if it had been necessary to consider the question of appropriate relief, is therefore unclear and any decisions of principle upon such questions will have to await their arising in another case.

**Summary of conclusions and disposal**

219. The Court therefore summarises its conclusions as follows:

220. The Applicant's Application fails for the following reasons, alone or in combination:

> (i)     The Applicant has established no breach towards it of any term of the contractual documents defining the legal rights of the parties.

> (ii)     This case is one of a detailed and sophisticated commercial contractual relationship.  There is nothing in the circumstances of this case which can be cited as an "equitable consideration" importing any restraint on HCLOF's right to exercise its own rights under that relationship.

> (iii)     There is no evidence that the Directors of HCLOF have taken steps other than in what they honestly and reasonably believed to be the best interests of the company, HCLOF, itself.      CLOH's complaints are largely simply that it disagrees with what have been, on the face of it, valid and appropriate management decisions made by HCLOF's admittedly independent Directors.

> (iv)     Even if there were grounds for invoking "equitable constraints", the matters of complaint ultimately relied upon by CLOH do not disclose (except possibly in one minor respect) any prejudice arguably being suffered to the interests of CLOH *as a member of HCLOF*.   The substance of CLOH's complaints relate to perceived disadvantage to it as a party engaged in litigation, whether with HCLOF or other third parties.

> (iv)     The minor respect (a possibly discernible consequence of Clause 2(iii) of the 2021 Settlement Agreement discussed at [155] – [159] above) was not argued by CLOH, appears to be theoretical only rather than real, and is so minor and incidental that in the judgment of the Court it would not, in any event, justify the court's intervention.

> (v)     Even if CLOH could be said to have suffered prejudice in its position as a member of HCLOF as a result of any of the matters complained of, the Court is not satisfied that this could be characterised as "unfair" prejudice in all the circumstances of the case.

> (vi)     In any event, viewing the case as a whole, the Court would not consider it appropriate to exercise its discretion to intervene.

> (vii)     Furthermore, the Court considers that it would not be open to it to grant any form of relief which CLOH has sought or now seeks.

221.     The Application will therefore be dismissed.   As regards costs, the Court will make an order dismissing the Application with the Respondent's costs to be paid by the Applicant on the recoverable basis unless either party wishes to contend that some other costs order is appropriate.   If so, that party should notify the court and the other party within 7 days of the handing down of this judgment and further directions will be given by the Lt-Bailiff.

Her Hon Hazel Marshall KC, Lt-Bailiff
1 December 2023